1              UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK
2

3    ----------------------------------------X
                                            :
4    DANIEL KLEEBERG, et al.,               : 16-CV-09517 (LAK)
                                            :
5                        Plaintiffs,        :
               v.                           :
6                                           : 500 Pearl Street
     EBER, et al.,                          : New York, New York
7                                           :
                        Defendants.  : May 30, 2018
8    ----------------------------------------X

9
          TRANSCRIPT OF CIVIL CAUSE FOR CASE MANAGEMENT
10               AND DISCOVERY CONFERENCE
          BEFORE THE HONORABLE KATHARINE H. PARKER
11             UNITED STATES MAGISTRATE JUDGE

12

13   APPEARANCES:

14   For the Plaintiff:      BRIAN C. BROOK, ESQ
                             Clinton Brook & Peed
15                           100 Church Street, 8th Floor
                             New York, New York  10007
16
     For the Defendant:      PAUL F. KENEALLY, ESQ.
17                           Underberg & Kessler, LLP
                             300 Bausch & Lomb Place
18                           Rochester, New York  14604

19   For Elliot Gumaer:      ROBERT B. CALIHAN, ESQ.
                             Calihan Law PLLC
20                           The Power Building, Suite 761
                             16 East Main Street
21                           Rochester, New York 14614

22

23   Court Transcriber:      MARY GRECO
                             TypeWrite Word Processing Service
24                           211 N. Milton Road
                             Saratoga Springs, New York 12866
25

     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service

1        THE COURT:  Here for a case management conference and

2   also a discovery conference.  I have a letter from Mr. Brook

3   concerning a dispute over certain documents listed on a

4   privilege log.

5        Before we talk about that motion or the proposed

6   motion though, I'd like to hear a little bit more about the

7   case and a little bit more about the defenses and then we can

8   talk about discovery issues.

9        PLAINTIFF'S ATTORNEY:  I assume starting with --

10       THE COURT:  Yes, starting with plaintiff.

11       PLAINTIFF'S ATTORNEY:  So in a nutshell, this case is

12  about a family owned business that was held by a trust,

13  testamentary trust created by the founder of the business for

14  the benefit of his children and their heirs.  And the

15  plaintiffs represent the people who were at one time when this

16  lawsuit started two-thirds of the beneficial owners of that

17  trust.  That trust held, in addition to some stocks, all of the

18  corporate stock of the Eber Brothers Wine & Liquor business.

19  This was at one time a much bigger regional chain throughout

20  New York.  It had distributorships in Ohio and Delaware, and it

21  also in 2005 I believe acquired a distributorship in

22  Connecticut.  And due to a variety of factors in 2007, this

23  company sold off its New York, Ohio, and Delaware business and

24  was left with just Connecticut.  And the business was being run

25  by the defendant Lester Eber who was one of the original

1  children of the founder of the business and who was also

2  therefore a one-third beneficiary of the trust and the person

3  who was also designated a co-trustee of the trust and was the

4  president of the corporations themselves.  And without getting

5  into all the weeds of it, suffice it to say that in 2012 Lester

6  Eber initiated court proceedings and some board meetings as

7  well that had the effect of transferring the entirety of the

8  Connecticut business to just himself and away from his sisters

9  and his niece who are now survived by my clients, the

10 plaintiffs.  So that transfer in 2012 which was approved in a

11 judicial action that was commenced by defendant Alexbay against

12 some of the other defendants including Eber Brothers Wine &

13 Liquor Corp. Eber Brothers Metro, which was a subsidiary, and

14 then Eber Connecticut, the Connecticut business itself, and a

15 competitor who had bought up some business as well.  That

16 lawsuit -- and this is pertinent to the privilege thing which

17 is why I'm pointing to this now, was we contend a sham.  And in

18 this proceeding in fact all of those entities on both sides of

19 the case except for the competitor are being represented by

20 single counsel here.  So we believe that this lawsuit was a

21 sham to try to --

22          THE COURT:  The plaintiffs and the defendants in that

23 lawsuit?

24          PLAINTIFF'S ATTORNEY:  Yes.  Alexbay is owned

25 entirely by Lester Eber who was also at the time the lawsuit

4

 1   was filed president of the company that he was suing through

 2   his entity Alexbay.  In fact, Alexbay was originally named

 3   Lester Eber, LLC but shortly before filing the lawsuit to try

 4   to essentially foreclose on the debt he was supposedly owed by

 5   taking the Connecticut business.  Shortly before that he

 6   changed it to Alexbay.  No idea where that name came from but

 7   that's certainly part of why we have now asserted fraud claims.

 8   My clients are not the first ones to do so.  My clients didn't

 9   learn about this transfer even occurring for years until they

10   read about a lawsuit by the Eber defendants' former counsel

11   Harris Beach in which Harris Beach had alleged a fraudulent

12   conveyance.  And then the Pension Benefit Guarantee Corporation

13   which had been providing the pension guarantees for former

14   employees of Eber Brothers New York distributorship filed suit.

15   And finally got around to my clients where they ended up filing

16   suit as well.  So those other two cases my understanding have

17   been settled.  I believe we've been provided most, if not all,

18   of the discovery that was in those actions but those never went

19   as far as even depositions.  So I apologize.  I'm trying to

20   think for a second if I left out any key facts here.  I mean I

21   think that -- so the basic challenge is to the transfer of the

22   business itself to Lester Eber.  We have two bases for the

23   challenge.  One is that the evaluation that was used for the

24   business was significantly suspicious because it was based

25   entirely on an essentially related party transaction that had

1  valued part of the Eber Connecticut shares, a 6 percent

2  interest.  But the counterparty to the transaction was the

3  lawyer, or a lawyer and financial advisor to Lester Eber.  And

4  there was no, from what I can tell, there was no money actually

5  paid for it.  This was compensation for services.  But that was

6  the only fact that was disclosed to the New York Supreme Court

7  Justice who was looking at whether this was a commercially

8  reasonable foreclosure on the debt.  They did not disclose that

9  there had been an earlier arms length transaction with a

10 competitor that valued the business at nearly five times higher

11 nor did they disclose that on their own financial statements at

12 the time that they filed suit they had a valuation of over $1

13 million higher.  So now we're talking -- when I said five

14 times, that's a difference of roughly 3 and a half million to

15 15 million.  So even their financial statements said the book

16 value which is oftentimes understating true value of the assets

17 was $1 million higher.  So we feel very confident about that.

18 I think that it's fair to say that certainly liability is never

19 a foregone conclusion and understanding especially among the

20 defendants who bears liability is going to be a key question

21 with our cross claims being asserted and questions being raised

22 about whether one defendant, which was as far as we can tell

23 not involved in any intentional wrongdoing, and did not learn

24 about the transfer until after the fact, whether that defendant

25 can be let out of the case.  But the damages portion of

1  discovery is something where I think that there are going to be

2  some issues that may need to be resolved based upon some

3  information I just got from my expert earlier today in terms of

4  trying to figure out what the real books and records were for

5  this company because I think it's fair to say that in a case

6  where a family member has concealed the fact that he took the

7  family business for himself for years, we don't exactly trust

8  the financial statements at face value.  And one of the bases

9  that we believe we now have to also challenge the 2012 action

10 which supposedly transferred -- it supposedly extinguished $3.5

11 million in debt owed by Eber Brothers to Lester Eber for the

12 Eber Connecticut business is that we don't see documentation to

13 support this $3.5 million loan.  And in fact, about $2 million

14 of those loans were in 2006 which is before the significant

15 buyout transaction with a competitor that brought in I think

16 over $10 million in value to the company.  And we've got some

17 documents indicating that Lester Eber had represented to his

18 sisters that he only loaned half $1 million four years after

19 that fact.  So we think there's a very serious question about

20 whether there was a deliberate misrepresentation of even the

21 amount of debt that was eliminated which of course would be

22 another basis not only for liability but also for additional

23 damages.  Or in the alternative, equitable relief because I

24 think it's fair to say that when you're valuing a privately

25 held business especially in markets that are regulated like

7

1    liquor distributorships, a valuation can be a very

2    significantly challenging prospect.

3           And so at the end of the day with the complaint seeks

4    is damages and/or equitable relief.  Just essentially unwinding

5    the transfer giving my clients back their ownership interest.

6    And because of some things that were initiated by one of the

7    defendants who has now reached a settlement agreement with us,

8    my clients now -- stepping back, the trust has been dissolved

9    in 2017.  So my clients now own directly two-thirds of the

10   ownership in the Eber company.  So if we were to get equitable

11   relief, then my clients would have the ability to take control

12   of that company and remedy things.  So that is certainly

13   something that my clients are open to and considering.

14          And just one more point by way of background is this

15   is actually the first time that all counsel have been in the

16   same room together, so --

17          THE COURT:  Okay.  But there is a close of discovery

18   technically the end of June.

19          PLAINTIFF'S ATTORNEY:  Yes.  Sorry, I should have

20   mentioned this.  One of the defendants passed away a few weeks

21   ago.  And combining that with the fact that I in an unrelated

22   matter that had been pending for five years was scheduled to go

23   to trial against four law firms with just us, and that ended up

24   settling on the first day of trial two weeks ago, all that

25   combined with the fact that we still are not getting the

8

1   documents that my experts need to be able to do their

2   evaluation and combined with this privilege dispute where

3   documents relating to both liability and damages we believe are

4   being wrongly withheld, I think all the parties -- well, they

5   wouldn't agree with what I just said in characterizing what has

6   or has not been produced.  I think we are in agreement that an

7   extension of discovery is necessary at this point in order to

8   be able to get the discovery completed and get this case ready.

9           THE COURT:  All right.  And what kind of extension

10  are you talking about?

11          PLAINTIFF'S ATTORNEY:  I don't believe that we had

12  finalized it.  The numbers that were thrown around were 90 days

13  or 120 days largely because in the summertime it can be very

14  hard to schedule depositions.  Prior efforts to schedule

15  depositions in April after notices were served were

16  unsuccessful.  So I think that the expectation is that we would

17  most likely be able to conduct, at least on my part, conduct

18  depositions in September.  So having the ability to get out to

19  then for fact discovery and then having at least a month or so

20  for additional expert discovery would be I think a reasonable

21  schedule especially in a case with the complex valuation issues

22  that this one presents.

23          THE COURT:  Mr. Keneally?

24          MR. KENEALLY:  Thank you, Judge.  I can start with

25  the back.  If somehow this case completely goes quite opposite

1    of the way I believe it goes and that transfer gets unwound,

2    the plaintiffs are going to be presented with an absolute

3    disaster of mountains and mountains of millions and millions of

4    dollars of debt.  These companies were absolutely defunct at

5    2012 and long before that.  But 2006, 10 million was a drop in

6    the bucket of what they owed.  This company, these companies

7    were wiped out by a gigantic distributorship called Southern in

8    early 2000.  And Lester Eber in quite the opposite of taking

9    improperly, threw tons of money into this company for no use.

10   He should have walked away.  He would have been way better off.

11   Instead, he dumped tons and tons of money, $3.5 million in

12   loans which resulted in the 2012 foreclosure action before

13   Supreme Court Justice Rosenbaum would be very interested to

14   hear how this was all a sham.  He got every single bit of facts

15   he wanted and reviewed the whole thing, as did the trustees,

16   and approved everything.  So not only did he loan that $3.5

17   million, he also paid money out of his own pocket all through

18   these years to the plaintiffs who kept talking about their

19   financial hardships.  He paid out of his own pocket because the

20   companies had no money and the trust had no money.  He paid for

21   the Pension Benefit Guarantee Corp. case and settlement which

22   had nothing to do with the allegations in this case.  Those

23   allegations were that the 401(k) was handled improperly.  He

24   had no personal liability.  He paid all of that himself to

25   protect the pensions of people including at least one of the

1  plaintiffs.  He paid [indiscernible] litigation the settlement

2  and the attorneys fees.  He didn't have to.  He could have let

3  it go under.  Same thing Wolf Concept, a gigantic case.  He

4  paid all the settlement and the attorneys fees out of his own

5  pocket.  He could've let the company go under.  D4, another

6  litigation related to that same thing.  So instead of letting

7  it go under, he tried to get it to survive and only got a

8  company worth what his debt was out of the 2012 action that

9  quite the opposite of hiding he filed a lawsuit in public and

10 notified everyone he was supposed to notify, as did the

11 companies.  So the evaluation was exactly appropriate.

12       The prior transfer was not an accurate evaluation.

13 It was way too high.  It had all sorts of other provisions that

14 involved -- or a very complicated business transaction.  So the

15 evaluation was accurate.  Our expert will 100 percent

16 demonstrate that.  We've produced tens of thousands of

17 documents, everything asked of us.  We've revised, looked

18 again.  We revised privilege logs at their request and we

19 responded with a letter yesterday of other privilege issues.

20 We're happy to discuss that.

21       And in terms of the other law office, Harris Beach,

22 the law firm up in Rochester, wanted to get paid hundreds of

23 thousands of dollars of legal fees and made up this fiction

24 about a fraud so they could get leverage to get their attorneys

25 fees.  And frankly, they shouldn't have done it but they did.

1   And plaintiffs read that and think they're seeing ghosts.

2   There's no fraud here.  There was a principal of all these

3   companies who threw way too much money and he should have let

4   it gone under.  You know, the evidence will bear that out.

5   Thank you.

6           THE COURT:  Do you have anything else?

7           MR. CALIHAN:  Your Honor, I have very little to add.

8   I'm in the unusual position my client died.  Before he died, he

9   had had several strokes.  I was never able to talk to him.  So

10  I am dependent on the documents and discovery at this point.  I

11  do agree with the valuation contentions Mr. Keneally made.

12  I've looked at it fairly closely.  But beyond that, I think

13  I'll sit down.  Thank you.

14          THE COURT:  One question that I have is whether or

15  not the parties have discussed -- the remaining parties have

16  discussed settlement.  Is it something that can be resolved?  I

17  mean if the company doesn't have a lot of money, has debts, is

18  that something --

19          MR. CALIHAN:  We suggested mediation and had some

20  discussion with Judge Kaplan before he had an unfortunate

21  accident.  So we're happy to participate in mediation.

22          MR. BROOK:  I'll say that there has been discussion

23  between me and Mr. Calihan.  I think it's fair to say that

24  after his client passed away, maybe even before then, we were

25  still discussing it because before we got discovery in this

1   case we actually had -- my clients had no idea that his client

2   had actually been a director of the company.  We thought he was

3   just a trustee who we knew was elderly and perhaps had not been

4   paying attention to things.  So we ended up getting to the

5   point -- certainly my clients are open to settlement.  It

6   sounds like Mr. Eber has in the past settled a number of cases

7   by paying out of his own pocket.  My clients I'm sure would be

8   amenable to hearing that offer.  But I think that the biggest

9   challenge we have is that my clients are unwilling to put forth

10  a monetary demand until we can get some sense of what the real

11  value of this company is.  And that involves getting financial

12  records, the underlying books and records.  My accountants say

13  that that's what they need to see.  They can just go on the

14  financial statement without looking behind the numbers that

15  were printed up.

16          THE COURT:  Well, what are the documents that

17  defendants have already produced?  You said, Mr. Keneally, that

18  you've already produced documents so --

19          MR. KENEALLY:  We produced everything requested that

20  was available.  Some of these documents are quite old.  I mean

21  every document request in this case has been from the year 2000

22  to the present basically and that's been a significant issue.

23  Basically it's a father and a daughter.  That's it.  It's the

24  whole company.  And a lot of that information is a very

25  important point.  So in 2012 they traded the debt and the judge

13

1   approved the debt for the stock of Eber Metro which became Eber

2   Connecticut.  The value of Eber Connecticut today has nothing

3   to do with the value that day.  So every day that goes by that

4   evidence is less and less relevant.  So if any value was

5   created since 2012, that has nothing to do with this case.  So

6   we are producing everything we possibly can.  We are happy to

7   hear from -- if Mr. Brook wants to send a letter of what his

8   expert thinks is missing, he'll send it.  I mean records back

9   in 2005 are not perfect.  You know, the companies are going out

10  of business.  We produced everything we can.

11        THE COURT:  So what specifically is missing?

12        MR. BROOK:  Well, according to my expert, here's

13  what's missing.  I'll try to make it a little less

14  [indiscernible] if I can for the record.

15        The first one is business tax returns for fiscal

16  years ending May 31, 2007, is when their fiscal year ended,

17  through 2017 including forms K-1, fixed asset and depreciation

18  schedules and supplemental schedules to them.  Financial

19  statements for the last three years, the years ending May 31,

20  2014 through 2017.  Contrary to what Mr. Keneally said, those

21  numbers certainly are relevant where my clients are in a

22  position of trying to decide whether to pursue equitable relief

23  to get their ownership stake in the business back now or to

24  accept money.  They need to know what the company's worth now

25  to know what the value of that equitable relief would be.  Sub-

1   schedules for the May 2009 financial statements relating to

2   selling, delivering, and administrative expenses.  Apparently

3   that year was omitted.  Certain forms that were issued such as

4   K-1s and 1099s from the company for the years ending May 31,

5   2007 through 2017.  We only have W-2s for a five-year period in

6   the middle there, 2008 through 2012.  But K-1s and 1099s are

7   important also because of how these companies were set up and

8   the different ownership interests and contract relationships

9   they may have had.  Credit card statements are necessary to try

10   to audit a number of expenses that appear or are referenced

11   elsewhere.

12          THE COURT:  What kind of credit card statements?

13          MR. BROOK:  Business credit card statements, not

14   personal credit cards.

15          THE COURT:  Right.  But is there is concern about

16   expenses?

17          MR. BROOK:  My understanding without going into

18   details because I just can't right now is that this is

19   something that my accountants would routinely ask for in this

20   kind of a situation to try to verify what the expenses were and

21   to see that -- because the advantage of that versus other sort

22   of secondary books and records is that they're prepared by a

23   third party who is not going to have any interest in

24   characterizing expenses one way or another.  That is not as

25   important an issue in my opinion but it's something that they

1  said was missing. I think one of the biggest things that

2  they've asked for, and it makes sense to me, that has not been

3  produced is computerized accounting records, what the books and

4  records actually were to see what the ledger of the company

5  says for the years in question. What is actually reported on

6  there? And ideally in the format where it includes the

7  necessary metadata to ascertain when these different entries

8  were put into place. They've also asked for copies of business

9  plans and financial forecasts that were prepared during the

10  time period of -- again, it's not 2000, it's 2007 through 2017.

11  And the reason for 2007 is that is when the company had a

12  settlement with this vendor Southern Wine & Spirits. And I

13  think on that point one of the reasons why we're extremely and

14  justifiably suspicious of the books and records is one thing

15  that Mr. Keneally said was that this company was wiped out by

16  its competitor Southern. What he didn't mention is that Lester

17  Eber signed a contract with Southern while remaining supposedly

18  the head of the Eber Brothers companies. He started taking

19  direct personal payments of $600,000 a year going forward. So

20  that's one of the facts in this case that we think is important

21  to try to understand what happened in 2007. Because as I

22  mentioned before, we are challenging the existence of a debt

23  that was supposedly entered into in 2006 based on this 2007

24  transaction we believe wiping it out and the fact that Lester a

25  few years later said his debt was much less, and then

16

1   ultimately filed this case in New York Supreme Court saying it
2   was much higher.  So getting the records in 2007 that show
3   where the money that was received from Southern went and also
4   records indicating whether the company ever approved Lester
5   getting the $600,000 a year payout.  That eliminated the debt
6   in and of itself in a very short period of time for supposed
7   consulting services that he was providing to this competitor.
8   And I think that it's reasonable to infer from just the facts
9   that we have now that Lester Eber's getting $600,000 a year
10  eliminated the debt even if he wasn't paid directly because why
11  else would the company authorize that kind of breach of the
12  duty of loyalty to itself by its president and managing
13  officer?  And that's a difference we can make from the facts
14  here.  But I would like to get the documents.  And that's what
15  this is about is trying to get that stuff.  And I understand
16  it's a long time ago now but from the litany of litigation that
17  Mr. Keneally referenced, some of which I've actually not even
18  heard of before I don't think, one item anyway, I find it hard
19  to imagine that these things were not preserved earlier
20  especially when we believe the privilege documents are very
21  likely -- or documents being withheld as privileged are likely
22  to reflect in anticipation of litigation at the time.  And
23  that's ultimately what triggers the duty to preserve this stuff
24  in addition to other sorts of accounting records preservation
25  rules that may exist.

17

1    THE COURT:  And what relationship were your clients
2  to the sister and niece of Lester Eber?
3    MR. BROOK:  My client, Audrey Hayes, is the niece.
4  Her mother, who was Lester's sister, passed away about a year
5  after the testamentary trust was created.  So she has been the
6  beneficiary directly for the entire time.  Daniel Kleeberg and
7  Lisa Stein are the children of Sally Kleeberg who is Lester's
8  other sister who passed away in 2014.
9    THE COURT:  So it's nieces and nephews of Lester
10  Eber.
11    MR. BROOK:  At this point it's two nieces and a
12  nephew, correct.
13    THE COURT:  Who are beneficiaries in the trust.
14    MR. BROOK:  Correct.
15    THE COURT:  Let me hear a little bit more about this
16  motion because as I understand it you believe that certain of
17  these documents are subject to waiver pursuant to the fiduciary
18  exception to the attorney-client privilege.  And I took a quick
19  look, Mr. Keneally, at your response letter stating that the
20  fiduciary functions weren't at issue.  So I want to better
21  understand that I guess, Mr. Brook, why the fiduciary exception
22  would apply here.
23    MR. BROOK:  Well, let me first off start by saying --
24    THE COURT:  The duty is owed to the beneficiaries of
25  the trust.  So the question is who was the person in the

1   position of trust acting -- on whose behalf was he acting?

2   MR. BROOK:  And that's essentially my frustration

3   that I've had in dealing with this, in trying to resolve this

4   matter beforehand is that Mr. Keneally is now representing a

5   number of parties who at one time some of them were in

6   litigation with each other.  In fact, at the time in question

7   they were in litigation with each other even though there would

8   be control by both sides.  Obviously, a huge part of our case

9   is proving that that litigation was in fact a sham.  So I think

10  that essentially what this dispute is about is whether they can

11  continue to deny that that litigation was a sham while

12  insisting that attorney-client privilege existed between the

13  communications at the same time they are on opposite sides of a

14  supposedly real litigation.  So that's one issue.

15  THE COURT:  But was that litigation being undertaken

16  on behalf of the trust?

17  MR. BROOK:  Sorry, let me step back.  The fiduciary

18  exception applies not only because my clients were beneficiary

19  with the trust, but also because they were the beneficial

20  owners of shares of corporate stock.  But as to the defendants

21  other than Canandaigua National Bank, those defendants had

22  fiduciary obligations to those corporations which were held by

23  my clients.  So this is in fact a shareholder derivative

24  lawsuit in a lot of respects.  And that's how ultimately the

25  remedy of equitable relief is sought is the company would not

1   come to my clients directly.  Instead, the Eber Connecticut

2   business would come back to the company that is owned by the

3   company in which they have a controlling number of shares.  And

4   that's Eber Brothers Wine & Liquor Corporation.  So that

5   fiduciary exception was created in the context, and it's been

6   most applied in the context of both beneficiaries of the trust

7   and shareholder derivative lawsuits.  This is both at the same

8   time.  And one of the things that I can't find any precedent

9   for that I think makes our claim that the exception applies

10  here is that they supposedly are for the fiduciaries, Lester

11  Eber and Wendy Eber, was himself a fiduciary to clients.  That

12  supposed lawyer was Mr. Gumaer who has since passed away.  So

13  they're saying the communications between the defendants at the

14  time in question, 2012 even, and at a time when Lester Eber was

15  supposedly resigned as president of Eber Brothers and

16  controlling a company that was suing Eber Brothers, but Wendy

17  Eber, Lester's daughter, was still an officer of Eber Brothers

18  and Gumaer was a director of Eber Brothers and a trustee to

19  plaintiff.  This is I think without any hyperbole the most

20  clear-cut situation where the fiduciary exception would apply.

21  That wouldn't mean waiver of the privilege.  It would just mean

22  disclosure to plaintiffs as fiduciaries.  The privilege would

23  still exist --

24            THE COURT:  Right.  I --

25            MR. BROOK:  -- as to all other parties.

1          THE COURT:  I understand.  I think it would be

2   helpful to provide a chart of the relationships because I guess

3   what I'm not -- I still am not following exactly what -- the

4   communications concerned the lawsuit and the lawsuit was

5   brought on behalf of whom?

6          MR. BROOK:  The lawsuit was brought -- well, I can't

7   say having not seen the documents that they concerned a lawsuit

8   but they may concern other aspects of the Eber Brothers

9   business.  That's what's been represented by Mr. Keneally.  The

10  timing happens to be during the pending lawsuit.  The lawsuit

11  in 2012 which was for the purpose of getting a judicial stamp

12  of approval on the transfer of the Eber Connecticut business to

13  Lester Eber's Alexbay company in extinguishing the debt.  That

14  lawsuit was brought by Lester Eber through his company Alexbay

15  against Eber Brothers Wine & Liquor Corporation and its

16  subsidiaries that controlled the Connecticut business.

17          THE COURT:  In which your clients had an interest.

18          MR. BROOK:  My clients had an interest in those

19  businesses.  They did not have an interest in Alexbay to my

20  knowledge.

21          THE COURT:  I understand.  Alexbay was the plaintiff.

22          MR. BROOK:  Right.  And so --

23          THE COURT:  And Lester Eber was on both sides of that

24  lawsuit you're saying.

25          MR. BROOK:  He was although I'm still not totally

1   clear on exactly when it happened.  But right before or right

2   after that lawsuit's filing there's a document claiming that

3   Lester Eber resigned as president of the subsidiary Eber

4   Brothers company two steps down from my client.  So at the top

5   there's something called Eber Brothers.  Then there's Eber

6   Brothers Wine & Liquor, then there's Eber Brothers Wine  &

7   Liquor Metro, and then Eber Connecticut.  And my clients have

8   shares in Eber Brothers.  Lester resigned as president of Eber

9   Brothers Wine & Liquor.  He remained president of Eber Brothers

10  which controlled Eber Brothers Wine & Liquor.  The reasons for

11  this resignation are unclear but I think it's pretty clear that

12  it was a document that he signed because someone pointed out to

13  him you can't sue your own company in this kind of manner and

14  not have that look extremely suspect.  So there was I believe a

15  retroactively dated resignation to the beginning of February

16  that says that Lester was no longer president of this Eber

17  Brothers Wine & Liquor which was the named defendant because

18  the company above that in which my clients have the direct

19  ownership interest was not a defendant in that case.  My

20  clients were never informed about that 2012 lawsuit at the time

21  that it happened.  And one of the things I think is most

22  damning for Lester Eber's case here is his lawyer when filing

23  that lawsuit on his behalf listed John Doe parties claiming

24  that they didn't know who else might have an interest in Eber

25  Brothers company that this gentleman has been running for the

1   previous 30 something years.  So those representations were

2   made to this Supreme Court justice who then said this is a

3   commercially reasonable transaction.  But those were clear

4   misrepresentations.  Lester Eber knew every person who had an

5   interest in the company he had been running for three decades.

6            THE COURT:  But in the lawsuit wouldn't the trust

7   documents and information by the company have been presented to

8   the court?

9            MR. BROOK:  My understanding is that it was not, is

10  that the lawyer who was retained by the defendants in that

11  case, Mr. Keneally's other clients, Eber Brothers Wine & Liquor

12  and the subsidiaries, was a gentleman who did not typically

13  practice any kind of corporate law, appears to be generally a

14  criminal defense attorney in the Rochester area.  Not clear

15  that he ever represented this company before or after.  And he

16  appears to have simply laid down and said we do not oppose.

17           THE COURT:  What was the name of that lawyer?

18           MR. BROOK:  I cannot recall his name.  Mr. Keneally

19  can probably remember it better than I can

20           MR. KENEALLY:  Was it Marino Fernandez?

21           MR. BROOK:  That sounds correct.  So --

22           THE COURT:  That's not the law firm that also sued

23  the --

24           MR. KENEALLY:  No.

25           MR. BROOK:  No.

23

1          MR. KENEALLY:  It was another attorney.

2          THE COURT:  Okay.

3          MR. BROOK:  So I hope that at least helps with that

4    litigation.  And I think that -- so the fiduciary exception, we

5    believe that it applies to all of the business that is

6    conducted by fiduciary as long as that business was one that

7    was controlled by the corporation which my clients were

8    fiduciaries, Eber Brothers.  So it would not apply to legal

9    advice that was given exclusively to Alexbay which is separate.

10   But when it comes to Alexbay there's another issue that arises

11   which is waiver in that Alexbay was adverse to the companies

12   that were held by the trust and just taken its assets.  And

13   there's no indication that, for example, Mr. Gumaer, who was a

14   co-trustee of the trust and a director of Eber Brothers Wine &

15   Liquor, that he ever had any relationship with Alexbay.  But as

16   we point out in our letter, Mr. Gumaer produced to us in

17   discovery a memo that appears to have been issued by Mr.

18   Keneally and one of his partners to Alexbay which implicates

19   waiver because what is Mr. Gumaer, who has no relationship with

20   Alexbay, doing receiving that document?  It's not like Mr.

21   Gumaer can just ignore the fact that he's got his own pre-

22   existing fiduciary responsibilities to my clients as

23   beneficiaries of the trust and my clients as shareholders of

24   the companies which he is a director if there was some sort of

25   a conflict waiver or something like that and they're contending

1  that Mr. Gumaer was providing legal advice about Mr. Keneally's

2  firm's legal advice, then the onus is on them to prove that.

3  But I think under the circumstances that disclosure implicates

4  simultaneously waiver of attorney-client privilege and the

5  fiduciary exception to it.

6          THE COURT:  All right.  Well, the best way to resolve

7  the dispute about the privilege is to have an in camera review

8  of the documents and then I can take any additional briefing

9  that you feel is necessary in connection with a review of those

10 documents and take a look at them.

11         MR. KENEALLY:  I don't have an objection to that,

12 Your Honor.  I do not think plaintiffs have made the initial

13 showing sufficient to get that.  The way they've interpreted

14 the fiduciary exception is to completely eliminate the

15 privilege of every single document in this case.  That's not

16 what it says.  I cited you the case.  What you do is you look

17 at the communication.  If it's legal advice, it's privileged.

18 If it's talking about the fiduciary duties of a trustee, it's

19 not privileged.  Or fiduciary duties of corporate shareholders.

20 And that's what we've done, that's what we disclosed in our

21 log.  So I don't think they've met that burden.  But I do not

22 have an objection to the in camera review particularly of that

23 last document we were talking about.  That document is

24 privileged.  Mr. Gumaer gave legal, and the Ebers will submit

25 affidavits, Mr. Gumaer gave legal advice to the Ebers all the

25

1   time and sometimes they were trustees.  It's two different

2   things.  And that letter is from my partner to his client and

3   to co-counsel.  That letter should be immediately stricken from

4   the ECF system till we resolve this and counsel should agree

5   not to use it and not to -- and to give copies to the Court

6   until we resolve it.  And our privilege, the Eber's privilege

7   cannot be waived by a lawyer.  They can only waive it

8   themselves.  So that document is absolutely privileged.  You

9   can in camera review that right now.  And I think today we

10  should have all the copies returned to you and an agreement not

11  to use it and have it stricken from the system.  It looks like

12  it's --

13          THE COURT:  So you're seeking a clawback of that

14  document?  Is that --

15          MR. KENEALLY:  Yes.  A clawback where someone else

16  disclosed it.  Not even a clawback of something we disclosed by

17  accident.  It's a clawback of something another party disclosed

18  by accident, meaning Mr. Gumaer.

19          THE COURT:  All right.  So I think that that has to

20  be part of the motion that you're seeking to --

21          MR. KENEALLY:  And would we be allowed to make that

22  motion, Your Honor, without another letter motion --

23          THE COURT:  Yes.

24          MR. KENEALLY:  -- to make the motion?

25          THE COURT:  Yes.

26

1        MR. KENEALLY:  Another conference?

2        THE COURT:  Yes.  You can do that in your opposition

3  and then there can be a --

4        MR. KENEALLY:  Cross motion.

5        THE COURT:  So in terms of these documents, how many

6  total documents are you challenging?  All the ones that are

7  listed on Exhibit A?

8        MR. BROOK:  No, Your Honor.  I believe it's --

9        THE COURT:  Just a few.

10        MR. BROOK:  It's just the ones through 741.  I

11  believe the letter specifies specifically which ones.

12        THE COURT:  Right.

13        MR. BROOK:  But I think the bigger issue here, and

14  this is something that I had already written most of the letter

15  before I saw this Exhibit E memo in the discovery from Mr.

16  Gumaer.  Mr. Gumaer had only produced a few hundred pages but

17  it was one big PDF and anyway, my paralegal ended up finding

18  that and passing it along to me.  But that was never logged by

19  Mr. Keneally and his firm.  So that's kind of significant.  I

20  mean it's a document from 2012.  It relates specifically to

21  whether the 2012 action is something that was legally valid or

22  not.  And it was not put on a privilege log even though Mr.

23  Keneally is copied on it.  So this raises serious questions for

24  us about whether --

25        MR. KENEALLY:  Well, if it was responsive.

27

1      MR. BROOK:  How could it not be?

2      MR. KENEALLY:  And we're not finished yet either.  I

3 don't know what it's responsive to.  It's --

4      THE COURT:  I'm not going to -- I don't think -- I

5 haven't looked at the document.  It is true that a lawyer can't

6 waive the client's privilege and it's also true with respect to

7 the fiduciary exception that that only applies to the extent

8 the activity concerns a fiduciary function.  So I can take a

9 look at those documents.  And I think it wasn't completely

10 clear to me why you believe that these communications concern a

11 fiduciary function.  I mean in the ERISA context, for example,

12 where the fiduciary exception to the attorney-client privilege

13 is used, lawyers to the trust, if they're giving advice on non-

14 fiduciary functions such as changes to the plan, things like

15 that that have nothing to do with administration of investments

16 in the fund, for example, that wouldn't be subject to the

17 fiduciary exception.  So I haven't taken a really careful look.

18 I just quickly read through the letters and Mr. Keneally's

19 response in advance of this conference.  So I'll have to take a

20 look at that more closely.  But let's talk about a schedule for

21 the briefing of this.  When would you be in a position to file

22 something, or do you think you need something in addition to

23 this letter?

24      MR. BROOK:  Well, I think I could certainly try to

25 flesh it out more to help explain why we believe, you know,

1    certainly with having more than three pages.  I think I can lay

2    out in better detail why the types of activities that we're

3    interested in are all implicated by the fiduciary exception.

4    So I think that that would be helpful.  To be clear, my concern

5    about the log is that this is not the only document that was

6    supposedly -- or that was on its face involving the Eber

7    defendants that was produced by Mr. Gumaer even though he

8    produced far fewer documents.  And this includes email

9    communications that undermine their claim Mr. Gumaer was ever

10   acting as their lawyer.  He referred to himself as just a

11   confident and director.  So calling yourself a confident,

12   especially when he's not been I think licensed to practice law

13   for many years at that point, those are facts that are

14   important.  And I'm concerned that the factual record that has

15   been produced to us, although voluminous in terms there's a lot

16   of -- I'm not even sure what to call them.  They're sort of

17   quasi financial documents that are not really the stuff we're

18   asking for.  But we've gotten a lot of that stuff from prior

19   litigations.  The fact that we've seen Mr. Calihan dutifully

20   produced to us responsive documents with the limited resources

21   available to him given his client's situation and especially in

22   light of all the prior litigation that existed, that is

23   seriously concerning and it makes me concerned that to the

24   extent that this privilege log includes documents that may not

25   be implicated by the fiduciary exception, might not relate to

1  the facts in this case but has excluded something like our

2  Exhibit E, that we're not really working with a full record

3  here and that the Court will not be seeing what it needs to see

4  in order to assess not only those exceptions but because this

5  is a fraud case I think certainly reviewing it, the Court would

6  be entitled to say that perhaps the crime fraud exception is

7  being implicated there as well.  If there was discussion, for

8  example, of not telling the trust beneficiaries about the

9  Lester Eber lawsuit and the transfer that was occurring, that

10  would certainly implicate the fiduciary exception.  But so

11  would -- if we're just talking about whether this was something

12  where Lester Eber needed to retroactively resign, that may not

13  obviously to non-lawyers implicate the fiduciary duties to my

14  clients who are just shareholders.  But it does implicate

15  whether the only operating asset of the company was being given

16  away for peanuts.

17            THE COURT:  Okay.

18            MR. KENEALLY:  Well, we got back to the merits again.

19  Article 9 in New York is very, very clear about who gets served

20  in a foreclosure sale and everybody was properly served.

21  Beneficiaries of the trust don't get served.  The Jane Does did

22  not refer to the beneficiaries of the trust.  Under Article 9

23  large significant creditors of whatever name they may be which

24  is particularly Southern, Southern was still a huge -- $10

25  million was a drop in the bucket.  Southern was still a huge

1  creditor of Eber.  Related companies to Southern is what's

2  referred to by the Jane Does.  So there's --

3         THE COURT:  Okay.

4         MR. KENEALLY:  And plaintiffs knew all about all this

5  because Lester had been begging them to help to contribute to

6  save the company for decades, or at least a decade.  So if we

7  get back to the merits, I got to --

8         MR. BROOK:  I apologize.

9         THE COURT:  Let's talk about a schedule for this.

10  How long, Mr. Burke, do you need to file a moving brief?

11         MR. BROOK:  I think that I need -- I could do it in a

12  week.  The concern I have, and I apologize I got distracted

13  with the merits, is Mr. Keneally said something that I was not

14  aware of which is we're not finished with producing --

15         MR. KENEALLY:  We are absolutely not.  Yeah.

16         MR. BROOK:  So I mean --

17         THE COURT:  Well, let's address the discovery

18  schedule in a moment.  So June 8th?

19         MR. BROOK:  June 8th.  And the reason I say that is

20  because to the extent that Mr. Keneally has additional

21  documents that he intends to log, for example, that should be

22  done and I should be able to see that privilege log immediately

23  so that I can address it in the briefing because I know from

24  past experience how hard it is once the Court has already done

25  an in camera review and reviewed briefing to try to get the

1  Court to do that again.  It's an imposition on the Court, the

2  plaintiffs, and it slows the whole thing down.  So I would in

3  an ideal world, and look I can't force anything, but I would

4  respectfully request that Mr. Keneally be directed to expedite

5  whatever is remaining and to provide a complete privilege log,

6  what he claims is privileged, including identifying other

7  documents that Mr. Gumaer produced that he's now claiming

8  privilege over so that we can address it.

9           THE COURT:  So you asked for an extension of

10  discovery.  Defendants in agreement?

11          MR. KENEALLY:  Yes, Your Honor, we do.

12          THE COURT:  So I will extend discovery by 30 days.  I

13  mean by 90 days.  Sorry.  And within the next 30 days I would

14  like defendant to complete its production and log.

15          MR. KENEALLY:  Your Honor, I do have a trial in mid-

16  June.  I was wondering if we could respectfully request 45 days

17  on that?

18          THE COURT:  Well, how many documents do you think

19  there's going to be?

20          MR. KENEALLY:  There's still quite -- there's at

21  least two large groups and I'm going to caucus with my client

22  to make sure.  Like I said, it's really a one person operation.

23  Lester Eber is 80 years old.  His daughter is the only person

24  left, so she is doing this on her own.

25          THE COURT:  All right.  So July 13.  So by July 13

1  defendants should produce the remaining documents including the

2  documents that have been requested today except to the extent

3  that you have a legitimate objection that you can't work out

4  through a meet and confer.  I'm not prejudging the

5  appropriateness of the request at the moment.

6        So the plaintiff's motion should be filed on July 27

7  as to any challenges to the documents on the privilege log.

8  And defendant's response will be due August 17.  And their

9  reply will be due the 24th of August.  I'd like defendants to

10 provide the documents for in camera review on August 17

11 together with their opposition and together with -- that brief

12 can also be a cross motion to claw back the Exhibit E to Mr.

13 Brook's letter.  And if in the meantime you want to make a

14 motion to seal, you should do that in connection with my

15 practices.  I'm going to schedule a case management conference

16 for September 5 at 10 a.m.  And I'd also like to schedule a

17 settlement conference.  Do you think that you'll be in a

18 position to have a settlement conference in August or not until

19 September?

20        MR. KENEALLY:  We'd be happy to participate in either

21 month.  We'll be ready in August.

22        MR. BROOK:  I think that getting the documents from

23 the completed production July 13th, August may be feasible.  I

24 don't know my clients' schedules.  Two of them reside

25 significantly out of the area.  But I think that if it was in

1  the second half of August, then that might be more feasible.

2  The first half of August less so.  I think that that will also

3  give my accountants time enough to get through the documents

4  although hopefully -- and hopefully it will be a submission.

5  Certainly we want to get a settlement conference done before we

6  get I think to the bulk of deposition because that's when costs

7  go up significantly.  So late August or early September would

8  make sense.

9          THE COURT:  Why don't we have a settlement conference

10  on September 5 and to the extent there is any discovery issues

11  that need to be addressed if you don't resolve the case, we'll

12  address them that day as well?  As part of my rules for

13  settlement conferences I require an ex parte letter a week in

14  advance of the conference.  That ex parte letter is emailed to

15  my chambers email address, not filed on the docket.  And I do

16  require people with authority to settle to attend.  I meet with

17  the parties here in my courtroom.  And then no opening

18  statements are required and I then caucus separately with the

19  parties in the jury room, my robing room as appropriate.  Now,

20  I don't know whether all of the defendants -- obviously your

21  client is deceased.  I don't know whether your attendance is --

22          MR. CALIHAN:  I think one of the executors should be

23  able to attend.  I will check with them.

24          THE COURT:  Okay.  Very good.  So I'm going to put

25  that date of September 5th down for 10 a.m. for a settlement

34

conference.  And if there's anything in the meantime, you

should follow my rules concerning any discovery disputes.  And

if for some reason September 5 does not work, you should let me

know as soon as possible so that I can change that date.  Is

there anything else that anybody would like to raise at this

time?

          MR. BROOK:  Not from plaintiffs, Your Honor.

          MR. KENEALLY:  No.  Thank you, Your Honor.

          MR. CALIHAN:  Nothing, Your Honor.  Thank you.

          THE COURT:  All right.  Thank you to all.

               * * * * * *

35

1    I certify that the foregoing is a court transcript from an

2   electronic sound recording of the proceedings in the above-

3   entitled matter.

4

5                                         *Mary Greco*
     _____

6                                         Mary Greco

7   Dated:   June 27, 2018