# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DANIEL KLEEBERG, LISA STEIN, and AUDREY HAYS,

          Plaintiffs,

    v.

LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC; CANANDAIGUA NATIONAL BANK & TRUST COMPANY; ESTATE OF ELLIOTT W. GUMAER, JR.; EBER BROS. & CO., INC.; EBER BROS. WINE AND LIQUOR CORP.; EBER BROS. WINE & LIQUOR METRO, INC.; EBER-CONNECTICUT, LLC; and WENDY EBER,

          Defendants.

Civil Action No.  16-CV-9517(LAK)

---

## MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO COMPEL THE EBER DEFENDANTS TO PROVIDE DISCOVERY IMPROPERLY WITHHELD ON PRIVILEGE GROUNDS

---

Brian C. Brook (BB 1980)
CLINTON BROOK & PEED
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Facsimile: (646) 257-2887
Brian@clintonbrook.com

*Attorneys for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

FACTS ........................................................................................................................ 2

    A.   Background ........................................................................................... 2

    B.   The 2010 Sale of Six Percent of Eber-Conn to a Lawyer in Disguise .............. 3

    C.   Lester Tried to Take Eber-Conn for Himself for "No Consideration" .............. 4

    D.   Next, Lester "Resigned" as President and Sued EBWLC Supposedly to Foreclose on $3 million of Debt (the "Foreclosure Action") .............................. 5

    E.   The Various Lawyers .......................................................................... 6

    F.   The Harris Beach Litigation ................................................................ 7

    G.   Plaintiffs' Claims ............................................................................... 7

ARGUMENT ............................................................................................................. 7

I.    Communications that Are Not Privileged, Due to Lack of Foundation or Waiver ................................................................................................... 8

    A.  The Eber Defendants' privilege claims cannot be assessed without at least asserting who the purported client was ............................................... 9

    B.   Engagement agreements and payments to lawyers are not privileged .......... 11

    C.   Communications among non-lawyers, or not involving legal advice (Log Code: NL) ............................................................................... 13

    D.   Communications with adversaries or non-employees are not privileged, or constitute waiver (Log Code: W) ...................................................... 14

    E.   Communications with Gumaer were not privileged, for a host of reasons (Log Codes: NL, W) ......................................................................... 15

    F.   Communications with Sturm in a business capacity (Log Code: NL) ............................................................................... 17

    G.   The November 7, 2012 Underberg Letter ............................................. 18

II.   The Fiduciary Exception Encompasses Attorney-Client Communications
      Where Plaintiffs Had an Interest in the Corporate Client (Log Code: F) ......... 18

III.  The Crime-Fraud Exception Applies Because There Is Probable Cause to
      Conclude that Fraudulent and Other Wrongful Conduct Occurred
      (Log Code: C) ....................................................................................................... 20

CONCLUSION ........................................................................................................... 23

# TABLE OF AUTHORITIES

## Cases

*A.I.A. Holdings, S.A. v. Lehman Bros., Inc,*
  2002 WL 31385824 (S.D.N.Y. Oct. 21, 2002) .......................................................... 8

*Ambrose v. City of White Plains,*
  No. 10 CIV. 4946 (CS), 2011 WL 13290651 (S.D.N.Y. Sept. 30, 2011) ................... 8

*Amusement Indus., Inc. v. Stern,*
  293 F.R.D. 420 (S.D.N.Y. 2013) ............................................................................ 22

*Anwar v. Fairfield Greenwich Ltd.,*
  306 F.R.D. 117 (S.D.N.Y. 2013) ............................................................................ 15

*Beard v. Ames,*
  468 N.Y.S.2d 253 (App. Div. 4th Dept. 1983)........................................................ 18

*Garner v. Wolfinbarger,*
  430 F.2d 1093 (5th Cir. 1980) ............................................................................... 19

*Gary Friedrich Enters., LLC v. Marvel Enters., Inc.,*
  No. 08-1533, 2011 WL 2020586 (S.D.N.Y. May 20, 2011) ...................................... 8

*Hoopes v. Carota,*
  531 N.Y.S. 2d 407 (3d Dep't  1988)........................................................................ 19

*In re Bank of New York Mellon,*
  977 N.Y.S.2d 560 (Sup. Ct. N.Y. Co. 2013) ........................................................... 19

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983,*
  731 F.2d 1032 (2d Cir. 1984).................................................................................. 21

*In re John Doe, Inc.,*
  13 F.3d 633 (2d Cir. 1994)...................................................................................... 21

*Matter of Priest v. Hennessy,*
  51 N.Y.2d 62 (1980)........................................................................................ 12, 22

*Nama Holdings, LLC v. Greenberg Traurig LLP,*
  18 N.Y.S.3d 1 (1st Dep't 2015)............................................................................... 19

*Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.,*
  2016 WL 2977175 (S.D.N.Y. May 20, 2016).......................................................... 12

*Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker,*
  767 N.Y.S.2d 223 (1st Dep't 2003) .......................................................................... 22

*United States v. Bergstein,*
  302 F. Supp. 3d 580 (S.D.N.Y. 2018) ...................................................................... 8

Plaintiffs Audrey Hays, Daniel Kleeberg, and Lisa Stein respectfully submit the following memorandum of law in support of their motion to compel discovery from Defendants Lester Eber ("Lester"); Alexbay, LLC; Eber Bros. & Co., Inc. ("EB&C"); Eber Bros. Wine and Liquor Corporation ("EBWLC"); Eber Bros. Wine & Liquor Metro, Inc. ("EB Metro"), Inc.; Eber-Connecticut, LLC ("Eber-Conn"); and Wendy Eber (together, the "Eber Defendants").

## PRELIMINARY STATEMENT

Before any party may withhold responsive discovery materials on privilege grounds, the withholding party must demonstrate that the materials are indeed protected by the attorney-client privilege or work product doctrine, and that the privilege has not been waived. And even when that initial burden is met, privileged communications may nonetheless be disclosed in discovery if the party seeking discovery falls within the scope of the privilege (the fiduciary exception), or if the communications were in furtherance of wrongdoing (the crime-fraud exception).

Here, the Eber Defendants have failed to lay the necessary foundation for withholding many if not all of the communications. They have persistently refused to identify which persons or entities constituted "the client," even though that is reasonably required by New York law and Local Civil Rule. They also often fail to support claims that there was someone actually acting as an attorney. The Eber Defendants have also failed to show that privilege was not waived. And as to legal advice received by the corporate Eber entities in which Plaintiffs held an interest, the "fiduciary exception" applies to relevant privileged communications.

1

The remarkable facts also suggest application of the "crime-fraud exception," if the communications were privileged and the fiduciary exception did not apply. But our main challenge is to the applicability of privilege at all, at least for the time period when Lester was openly adverse to EBWLC. By deciding to file a public lawsuit between themselves, the Eber Defendants have committed to the position that there could be no confidential communications between the adverse parties. Even if they were now to try to walk it back, and admit that the lawsuit was a sham, that would not save them, for the crime-fraud exception would require disclosure anyway.

## FACTS

### A. Background

As alleged in more detail in the Second Amended Complaint, from 1970 until its dissolution in 2017, a testamentary trust (the "Trust") controlled the Eber Bros. wine and liquor distributorship business. At its inception, the Trust's three beneficiaries were the company's founder's three children, each of whom had a one-third interest in the Trust: Nan Boslov (mother of Audrey Hays), Sally Kleeberg (mother of Daniel Kleeberg and Lisa Stein), and Lester Eber.

The Trust was managed by three co-trustees: Defendants Lester Eber ("Lester") and Elliott Gumaer ("Gumaer," who is deceased), plus a bank (since 2007, Canandaigua National Bank, or "CNB"). CNB managed passive investments, while Lester and Gumaer were responsible for managing the operating business. Lester was President and a Director of Eber Bros. & Co., Inc. ("EB&C") and its subsidiaries, Eber Bros. Wine and Liquor Corporation ("EBWLC"); Eber Bros. Wine & Liquor

Metro, Inc. ("EB Metro"), Inc.; and Eber-Connecticut, LLC ("Eber-Conn"). Gumaer was a Director of EB&C and its subsidiaries. As of approximately 2010, the only operational business entity among EB&C's subsidiaries was Eber-Conn. The following organizational chart illustrates the corporate structure as of 2010:



### B. The 2010 Sale of Six Percent of Eber-Conn to a Lawyer in Disguise

In 2010, Eber Metro sold a portion of its equity interest in Eber-Conn to Poleridge Bowman Partners, LLC ("Poleridge"). This amounted to a six percent stake in Eber-Conn, for the purported purchase price of $350,000. However, no cash was

actually received. Instead, Eber Metro simultaneously received a promissory note from Poleridge for the amount of $350,000. Brook Decl. Ex. A.

Despite its name, Poleridge involved no "Partners" because the company was owned by one man alone: a lawyer/strategic consultant named Glenn Sturm. Sturm was then a partner in the Atlanta law firm Nelson Mullins. According to Lester, Glenn was Sturm was first approached in the Spring of 2010 by Eber-Conn. Ex. B ¶ 35. The scope and timing of Sturm's engagement is extremely unclear, as Defendants have not produced his engagement agreement, even though it would obviously have significant weight in completing the financial picture surrounding the six percent interest sale—which, as discussed in Section B, became very important.

### C. Lester Tried to Take Eber-Conn for Himself for "No Consideration"

On December 8, 2011, Lester created Lester Eber, LLC in the State of Connecticut, and filed an affidavit with the state liquor licensing board, attesting— under penalty of perjury—to the following:

1. I make this affidavit from my own knowledge and belief.  I understand that I am making this affidavit under penalty of false statement.
2. This affidavit is being made as part of an application to the Department of Consumer Protection Liquor Control Division to transfer stock in the entity known as Eber-CT.  Eber-CT is the backer of LIW0000596.
3. Presently, 79 percent of Eber-CT is owned by me through an entity known as Eber Metro.
4. I wish to transfer all of that 79 percent that I own from Eber-Metro to Lester Eber LLC, an entity which will also be wholly owned by me.
5. This transfer is being done for no consideration, in that it is being done strictly for organizational purposes.  No money or other consideration will change hands.

Lester Eber

Lester Eber

4

Ex.C.[1] Incredibly, Lester did this while he was still President of EBWLC and co-trustee of the Trust. It is unclear who else knew about it, or why this "no consideration" transfer attempt was ultimately abandoned.

### D. Next, Lester "Resigned" as President and Sued EBWLC Supposedly to Foreclose on $3 million of Debt (the "Foreclosure Action")[2]

After attempting to transfer Eber-Conn to himself for literally nothing back to the companies controlled by the Trust, Lester and his cohorts engaged in a series of transactions that suggest he used his lawyers to accomplish the same goal—taking EBWLC for himself—with at least the appearance of legitimacy.

First, Lester resigned as Director and President of EBWLC effective February 1, 2012. Ex. D. Lester's daughter, Defendant Wendy Eber ("Wendy"), took Lester's place as President of EBWLC. *Id*.

In January 2012, Lester signed a document purporting to assign debts owed to him by Eber Metro to his newly-formed LLC, which he renamed "Alexbay." Ex. E.

On February 21, 2012, Alexbay filed a Summons and Complaint against EBWLC in Monroe County Supreme Court, Ex. G, with Eber-Metro named as a nominal defendant because the lawsuit sought to transfer all of Eber-Metro's shares from EBWLC to Lester's Alexbay, supposedly to satisfy over $3 million in debt.

On March 13, 2012, a joint board meeting was held for EBWLC and Eber Metro to discuss "the Alex Bay, LLC suit vs EWLC and Eber Brothers Metro Inc. suit regarding the default of Eber Brothers Metro Inc. to repay Alex Bay, LLC's (which is

---

[1] Curiously, no documents on Defendants' Privilege Log appear to relate to these December 2011 events, suggesting either inaccurate subject matter descriptions, or significant omissions.
[2] The Second Amended Complaint ¶¶ 55–75 contains additional detail. ECF No. 88.

owned by Lester Eber) loans to the company." Ex. F. Apparently, after the meeting there was "extensive conversation" and "the board decided not to extend [sic] funds on defending the suit and authorized the company to waive its defenses." *Id*.

Absent any defense, the Supreme Court approved the transaction. EBWLC's shares in Eber Metro were transferred to Lester's Alexbay on June 5, 2012.

### E. The Various Lawyers

Although the Eber Defendants have produced no engagement agreements or answered questions about the scope of the legal representation they received, or even which parties were being represented by which lawyers, the record suggests a tangled web of conflicts. The following supposed representations are the most significant:

*Gumaer.* The Eber Defendants assert that Gumaer was not just a trustee and Director, but also an attorney who they turned to for legal advice (long after he retired from the practice of law). It is unclear who Gumaer supposedly represented.

*Underberg & Kessler.* Underberg & Kessler attorneys William Brueckner and Michael Beyma represented Alexbay in the Foreclosure Action. *See* Ex. G (Summons dated Feb. 21, 2012). Although it was not apparent from the public filings, it seems that the legal team included counsel of record, Paul Keneally. *See, e.g.*, Ex. L at EB-00026272-73; EB-00026637; EB-00026651; EB-00026657. At the same time that Underberg was suing EBWLC and other companies it now represents, Underberg was also drafting documents for EBWLC, *see* Ex. L at EB-00026637, and engaging in "privileged" communications with Wendy about it, even though she was the President of EBWLC who was tasked with evaluating the transfer.

*Marino Fernandez.* Mr. Fernandez, a solo lawyer, purportedly represented

EBWLC and Eber Metro in the Foreclosure Action. He also advised the EBWLC board about whether it should consent to transfer its 100% stake in Eber Metro to Alexbay (i.e., Lester). Ex. F. Lester himself apparently participated in these discussions. *Id*.

Glenn Sturm. The Eber Defendants also claim to have been receiving legal advice from Sturm, the lawyer who acquired six percent of Eber-Conn

## F. The Harris Beach Litigation

In 2014, Harris Beach sued most of the Eber Defendants on a fraudulent conveyance theory, focusing on the transfer of Eber Metro to Alexbay. This was the second lawsuit filed by Harris Beach, after a 2011 collection action against EBWLC proved fruitless due to the 2012 transfer of Eber-Conn.

## G. Plaintiffs' Claims

In this action, Plaintiffs challenge the Foreclosure Action as a sham concocted to create the appearance of an arms-length and fair transaction that was anything but. Without limitation, we dispute the valuation of Eber-Conn that was given to the court by Alexbay (and left undisputed by EBWLC), as well as the amounts of the debt that the Eber Companies supposedly owed Alexbay at the time the Foreclosure Action was initiated.

## ARGUMENT

New York courts have repeatedly refused to allow defendants to conceal evidence of wrongdoing, especially when it involves wrongdoing by fiduciaries. Several distinct but overlapping doctrines have formed through the case law, and they are simultaneously applicable here.

## I.   COMMUNICATIONS THAT ARE NOT PRIVILEGED, DUE TO LACK OF FOUNDATION OR WAIVER

For many documents being withheld, the Eber Defendants' Privilege Log reveals an insufficient basis for asserting attorney-client privilege. It is their burden to establish both that the privilege attached to the communications, "'*and* that the privilege has not been waived.'" *Ambrose v. City of White Plains*, No. 10 CIV. 4946 (CS), 2011 WL 13290651, at *4 (S.D.N.Y. Sept. 30, 2011) (quoting *Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, No. 08-1533, 2011 WL 2020586, at *2 (S.D.N.Y. May 20, 2011)).

The elements that a withholding party must show to establish a valid attorney-client privilege claim are: "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *United States v. Bergstein*, 302 F. Supp. 3d 580, 584 (S.D.N.Y. 2018).

Here, Plaintiffs challenge all three elements as to a significant number of the Eber Defendants' Privilege Log entries.[3] We address them categorically. First and foremost, the Eber Defendants' privilege log completely and consistently fails to show who the attorneys' purported client was—a critical issue when simultaneously representing multiple parties who had different duties and conflicting interests. We respectfully request that the Eber Defendants be required to clarify which attorneys were representing which clients, and to be more consistent about using more specific

---

[3] Once challenged, the withholding party then has to submit evidence, by way of affidavit, deposition testimony or otherwise, establishing only the challenged elements of the applicable privilege or protection…." *A.I.A. Holdings, S.A. v. Lehman Bros., Inc*, 2002 WL 31385824, at *5-6 (S.D.N.Y. Oct. 21, 2002) (Pitman, M.J.).

names than just "Eber," which appears far too often in their Privilege Log, even though it could refer to any one of seven parties.

Despite the difficulties in parsing the combined Privilege Log, we have still been given enough information to find significant problems with many specific log entries. So, without waiving our request for more information, we have annotated the combined Privilege Log with codes to indicate specific types of challenges asserted. Ex. L. The codes are kept simple, and to some extent involve painting with a broad brush. The goal is to identify the documents that we request be examined *in camera* at this time, and to provide some guidance to the Court on our reasons for doing so.

### A. The Eber Defendants' privilege claims cannot be assessed without at least asserting who the purported client was

The very first element required to invoke the attorney-client privilege is to show "a communication between client and counsel." But as we told the Eber Defendants months ago, they failed to satisfy that requirement because we could not then, and still cannot now, identify who the client was from their privilege log. See also L.C.R. 26.2(a)(2)(A) (requiring a party asserting privilege to disclose, "where not apparent, the relationship of the author, addressees, and recipients to each other" on its privilege log). There is no exception to this rule for lawyers who are representing multiple individuals who were associated with a multitude of corporate entities.

The Eber Defendants comprise two individuals and five entities. Although all but one have similar-sounding names, the entities have significant differences. For more than six years, they have had conflicting legal interests and distinct ownership. Indeed, at the most critical juncture, they were openly adverse to each other: From

late 2011 through June 2012, Alexbay and Lester were trying to take Eber Metro and Eber-Conn away from EB&C and EBWLC (and the Trust). And from February through May 2012, Alexbay was suing the rest.

Suffice it to say, this is not a situation in which we can look at the privilege log, see that Lester was talking to a lawyer, and conclude that it was probably an attorney-client communication; he could have been talking to his adversary's lawyer.

Failing to identify the client also impairs the ability to determine whether privilege has been waived, especially for the corporate clients with different employees. In particular, Lester Eber resigned from EBWLC effective February 1, 2012. From that point forward, he could no longer participate in privileged discussions about that company. But Lester remained President of EB&C, so he could communicate with its attorneys about that entity's legal matters. The Eber Defendants' refusal to provide this threshold information in its privilege log is fatal to many of its privilege assertions.

The Eber Defendants' failure to identify the clients on the log not only impairs our ability to determine whether communications are privileged in the first instance, but also whether they are subject to an exception, such as the fiduciary exception. If lawyers were retained by the corporate entities in which Plaintiffs had an interest at the time, rather than Lester or Wendy individually, the fiduciary exception applies.[4]

*   *   *

Ultimately, this much is probably true: corporate distinctions only mattered to

---

[4] Plaintiffs had a beneficial interest only in some of the Eber entities, and those interests have changed over time as a result of the June 5, 2012 transfer of Eber Metro's shares from EBWLC to Alexbay.

the Eber Defendants when convenient. They may have viewed their fiduciary duties as fluid and fleeting based on whatever "hat" they thought they were wearing at a given moment. That is the only way to possibly explain what appears on their Privilege Log. *See, e.g.*, EB-00026333–37 (communications with Underberg, which represented "secured creditor" Alexbay); EB-00026274–79, EB-00031214, EB-00031284 (communications with Fernandez, who represented supposed "debtor" EBWLC). Lester and Wendy were actively engaging in supposedly *privileged* discussions about the Foreclosure Action with lawyers *on both sides*.

The obfuscation of client identities on the Privilege Log is almost certainly intentional. Underberg & Kessler—counsel of record here—may not want to say who retained them and paid their bills when they were communicating with both Lester and Wendy about the Alexbay Foreclosure Action and other things in 2012, while that lawsuit was pending. If Underberg was representing both sides of that litigation—Alexbay *and* EBWLC—then Underberg itself is liable to EBWLC and should be added as an additional defendant in this case based on that new information.

Underberg has made an appearance in this case and therefore, although not a party, they should not be allowed to remain silent about what they were doing communicating with both sides of an active litigation (and claiming privilege over those communications). If the reason why Underberg will not say who their client was is because *they do not know*, they should at least be forced to admit it.

## B. Engagement agreements and payments to lawyers are not privileged

Because the Eber Defendants bear the burden of establishing privilege, and

because they have been so evasive about identifying who the attorneys were supposedly representing when engaging in the withheld communications, the Court should require them to produce the contemporaneous documents to support whatever assertions they may make at this late date.

Hays' Interrogatory No. 10 asked the Eber Defendants to "[i]dentify all documents concerning any of the Eber Defendants' retention of Gumaer as their attorney … as well as the compensation paid to him for legal work."

In response, the Eber Defendants claimed to have no written engagement agreements or conflict waivers with respect to Gumaer's representation. And as to the payments, the Eber Defendants stated that "[q]uarterly retainer payments were made to Gumaer, but the Eber Defendants decline to produce the records of such payments based on the attorney-client privilege."

If indeed the Eber Defendants have withheld payment records on privilege grounds, that is strong evidence that, at best, they do not understand attorney-client privilege. *See, e.g.*, *Matter of Priest v. Hennessy*, 51 N.Y.2d 62, 69 (1980) ("The fee arrangements between attorney and client do not ordinarily constitute a confidential communication and, thus, are not privileged in the usual case."); *Royal Park Investments SA/NV v. Deutsche Bank Nat'l Tr. Co.*, 2016 WL 2977175, at *6 (S.D.N.Y. May 20, 2016) (fee arrangements between attorney and client are not privileged); *Saxholm AS v Dynal, Inc.*, 164 FRD 331, 339 (E.D.N.Y. 1996) ("The general rule is that information concerning a client's identity and fees are not protected by the attorney-client privilege."). More likely, Defendants are concerned

that evidence who was paying the legal bills will strengthen Plaintiffs' claims, both on the merits and procedurally, for application of the fiduciary exception. At least with respect to Gumaer, however, we believe that no such payments existed—because the Eber Defendants knew he was not a practicing lawyer anymore.

Even if Gumaer was separately retained by Lester as his personal lawyer, that would mean he was also a fiduciary to Plaintiffs and thus independently required to account for any payments he received in connection with his fiduciary duties, especially where they may have colored his judgment.

Relatedly, it appears that communications regarding fees are being withheld as supposedly privileged. *See* Log at EB-00031274, EB-00031280. Without knowing whose fees these were, or which client supposedly owed them, it is impossible to evaluate this privilege assertion.

### C. Communications among non-lawyers, or not involving legal advice (Log Code: NL)

Many communications are between non-lawyers, such as emails between Wendy and her father, Lester, or his administrative assistant. *See, e.g.*, EB-00000729 (emails re "Money Lester Eber loaned to EBWLC").  To the extent that there is a privileged communication within an email chain (and which is not otherwise subject to disclosure), the solution is to redact that portion, not to withhold the entire chain.

To the extent that a lawyer conveyed factual information from a third party, that is not legal advice and should be disclosed, with any surrounding legal advice redacted (if not otherwise subject to disclosure). For example, EB-00000729-31 apparently concerns "Money Lester Eber loaned to EBWLC." If the initial email from

13

David Belt, Esq. conveyed communications that he had with an accountant or a banker about Lester's loans, that may be important contemporaneous evidence of what was known at the time, and it would not be privileged. If, on the other hand, Belt offered his opinion about how he read certain documents, that would probably be a privileged communication, depending on who he was representing.

Lawyers often wear "hats" other than that of a lawyer. Accordingly, communications with lawyers who were not acting as lawyers are not privileged.

And just because a lawyer is copied on an email sent by a non-lawyer does not necessarily render the email privileged. Generally, the sender must be seeking legal advice or responding to a question from counsel. Important emails about business decisions being made should not be withheld from discovery just because lawyers may have also been recipients.

### D. Communications with adversaries or non-employees are not privileged, or constitute waiver (Log Code: W)

After Lester Eber purportedly "resigned" from EBWLC effective February 1, 2012, [5] he was a third party to EBWLC. Only under limited circumstances, relating to his prior employment, could communications with him still be privileged. Communications with him about things like (a) debt that was owed to him, or (b) his attempt to take the Eber-Conn business for himself, would not constitute even arguably "privileged" communications. To the extent that attorney-client communications were shared with Lester in that situation, any privilege was waived.

---

[5] Since Lester was still a fiduciary as both co-trustee and President of the parent EB&C, the arguments for applying the fiduciary exception still apply as an additional basis for disclosure. *See* Part II, *infra*.

14

By the same token, after February 1, 2012, Wendy Eber was President of EBWLC. And then on February 12, 2012, Alexbay sued EBWLC to take its shares in Eber Metro. Alexbay's counsel of record was Underberg & Kessler. To be sure, communications between Wendy and the lawyers who were suing her company could not be privileged. But such communications are on the Eber Defendants' Privilege Log nonetheless. *See, e.g.,* Ex. L at EB-00026637.

### E. Communications with Gumaer were not privileged, for a host of reasons (Log Codes: NL, W)

Plaintiffs challenge all the privilege assertions concerning communications with Gumaer. First, the Eber Defendants had no expectation that their communications with Gumaer would be privileged and confidential (at least not confidential against Plaintiffs). Gumaer was himself a co-trustee with direct duties to Plaintiffs. Thus, Gumaer was at all relevant times legally precluded from concealing material information from Plaintiffs.

Second, Gumaer was not a licensed attorney during the relevant time period. But to claim privilege, the communications must concern legal advice (either requested or offered) by a licensed attorney. *Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 117, 119 (S.D.N.Y. 2013) ("[T]he attorney-client privilege generally applies only to communications with attorneys who are licensed to practice law."). Gumaer was in his late 70s during the relevant time period, and he had long since retired from the practice of law. Unless the Eber Defendants can show that they "reasonably believed" that Gumaer was still a licensed attorney at the time, *id.* at 120, no communications concerning Gumaer's advice can be deemed privileged. No such

15

showing has been made; indeed, the only available evidence suggests that Gumaer was not holding himself out as a lawyer at all. *See, e.g.*, Exs. J, K.

Third, Gumaer was also a corporate director of several entities. Even if he was licensed to practice law, his communications are not entitled to any presumption that they involve legal advice. He was required to exercise his independent judgment as a director of the companies, and to the extent that he was gathering information to inform his decisions, rather than to render legal advice, that must be disclosed.

In sum, given Gumaer's demonstrable non-legal roles and independent fiduciary responsibilities, the Eber Defendants have fallen far short of meeting their burden to establish that any of the *many* communications between Lester, Wendy and Gumaer may be withheld from Plaintiffs on privilege grounds.

For example, there were communications between Gumaer and Wendy on March 13, 2012 and other dates that related directly to their decision to approve the transfer of Eber-Conn to Alexbay. *See* Ex. H (Unanimous Written Consent stating that they "met and/or had numerous conversations regarding the Proposed Transfer and fully discussed the Proposed Transfer (including but not limited to discussions on March 13, 2012, throughout the week of March 13, 2012, May 30, 2012 and June 1, 2012)"). Despite the fact that these communications are affirmatively asserted as the basis for making the decision that is the primary focus of Plaintiffs' challenge in this case, Defendants are withholding the written part of those discussion.

Some of these discussions have been partially disclosed. The Eber Defendants produced an email from Gumaer to Wendy on May 31, 2012, asking her to "Answer

this question? Eber Conn. is owned by Eber Metro and Eber Metro is ownedd [sic] by Eber & Co. The Trust owns Eber & Co. Does it still own oindirectly [sic] an interest in Conn?" Ex. I[6] Defendants apparently have withheld Wendy's response(s), which appear on the Privilege Log:

| Bates Number | Date of Document | Type of Document | General Subject Matter | Author(s) | Addressee(s) | Reason Document Withheld From Disclosure |
|---|---|---|---|---|---|---|
| EB-00026612 – EB-00026626 | 5/31/2012 | Electronic mail with attachment | L. Eber loan balance and EBWLC outstanding liabilities | W. Eber | E. Gumaer, Esq. L. Eber | Attorney Client Privilege |
| EB-00026661 | 6/1/2012 | Electronic mail | Alexbay case | W. Eber | E. Gumaer, Esq. | Attorney Client Privilege |

Having disclosed the question, the Eber Defendants should also provide the answer, especially since it goes to the core of this case. *See infra* Part II.[7]

### F. Communications with Sturm in a business capacity (Log Code: NL)

Unlike Gumaer, Glenn Sturm does not appear to have had any independent fiduciary responsibilities to Plaintiffs. He also appears to still be practicing law. Nevertheless, Sturm was retained to serve not just as a lawyer, but also as a strategic consultant. His communications concerning non-legal advice are not privileged.

Relatedly, there is a stray assertion of "attorney work product" in a memorandum about "Eber CT" drafted by Sturm. Log at 14 (EB-00026654). Plaintiffs challenge this because there was no apparent litigation anticipated at that time.

---

[6] The fact that the Gumaer was asking this question less than two months after supposedly authorizing the transfer of Eber Metro's shares to Alexbay is evidence that he was not capable of exercising his duty of care. It also means that if Wendy was supposedly relying on Gumaer for legal advice, as the Privilege Log claims, she may have been failing to exercise her duty of care as well.

[7] Moreover, by copying Lester on the email about "EBWLC outstanding liabilities," Wendy waived any theoretical privilege since Lester was no longer employed by EBWLC, and it is likely that Lester was actually EBWLC's counterparty as to the referenced "liabilities." *See supra* Section I(D).

### G. The November 7, 2012 Underberg Letter

The November 7, 2012 Underberg Letter exemplifies the problems. It was ostensibly prepared for Alexbay (not a fiduciary to Plaintiffs), since it was addressed to Wendy in her capacity as CFO of Alexbay. EB-00026647. You would not know that from the Privilege Log, however. As written up in the Privilege Log, the Underberg Letter concerns the "Alexbay case," suggesting that the legal advice may have been rendered to EBWLC, which was adverse to Alexbay in that case. The difference is critical to whether the fiduciary exception applies: EBWLC = yes; Alexbay = no.

More important, Defendants' privilege log fails even to acknowledge that this letter was disclosed to Gumaer (who produced it to Plaintiffs back when the Eber Defendants' privilege log was not even one-page long), let alone offer any explanation for why that disclosure did not amount to a waiver.[8] Thus, the Eber Defendants cannot even arguably claim to have met their initial burden.

### II. THE FIDUCIARY EXCEPTION ENCOMPASSES ATTORNEY-CLIENT COMMUNICATIONS WHERE PLAINTIFFS HAD AN INTEREST IN THE CORPORATE CLIENT (LOG CODE: F)

New York recognizes that corporations exist for the benefit of their shareholders, who are not directly involved obtaining legal advice, even though such advice ultimately affects their interests. *See Beard v. Ames*, 468 N.Y.S.2d 253, 255–56 (4th Dep't 1983) ("We are persuaded that corporate management, since it has duties which run ultimately to the benefit of the stockholders, cannot hide behind 'an ironclad veil of secrecy' and that under certain circumstances its judgment may be

---

[8] The Eber Defendants also waived privilege over this letter by asserting in a public filing that it "demonstrates the absence of fraud in this matter…" Keneally Ltr. dated May 29, 2018, at 2 (ECF No. 99). That is a textbook example of trying to use privilege as a sword and a shield through selective disclosure.

questioned") (quoting *Garner v. Wolfinbarger*. 430 F.2d 1093, 1101 (5th Cir. 1980));

*see also Hoopes v. Carota*, 531 N.Y.S.2d 407 (3d Dep't 1988) (applying fiduciary

exception where defendant was a trustee of a trust that controlled the corporation for

which he was an officer and director). Upon a showing of good cause, courts allow

disclosure of the corporation's privileged communications to its shareholders. *See

Nama Holdings, LLC v. Greenberg Traurig LLP*, 18 N.Y.S.3d 1, 8 (1st Dep't 2015)

(adopting "good cause" requirement). Whether "good cause" is shown must be

determined based on the specific facts of each case. *Hoopes*, 531 N.Y.S.2d at 910.

Plaintiffs alleging colorable claims of self-dealing and conflicts of interest, as

alleged here, have been consistently recognized as triggering application of the

fiduciary exception. *See, e.g.*, *Hoopes*, 531 N.Y.S.2d at 910; *In re Bank of New York

Mellon*, 977 N.Y.S.2d 560, 568 (Sup. Ct. N.Y. Co. 2013). The following factors were

considered by these courts:

> (1)[T]here was an apparent identity of interests regarding disclosure
> among the beneficiaries of the trusts; (2) plaintiffs may have been
> directly affected by any decision defendant made on his attorneys'
> advice; (3) the information sought was highly relevant to and may be the
> only evidence available on whether defendant's actions respecting the
> relevant transactions and proposals were in furtherance of the interests
> of the beneficiaries of the trust or primarily for his own interests in
> preserving and promoting the rewards and security of his own position
> as a corporate officer; (4) the communication apparently related to
> prospective actions by defendant, not advice on past actions;
> (5) plaintiffs' claims of defendant's self-dealing and conflict of interest
> are at least colorable, and the information they seek is not only relevant,
> but specific.

*In re Bank of New York Mellon*, 977 N.Y.S.2d at 566. Each of these factors weighs in

favor of disclosure of the communications sought here.

Plaintiffs represent two-thirds of the beneficial interest in EB&C, which owned

19

a controlling interest in EBWLC, which owned (until June 5, 2012) a controlling interest in Eber Metro, which owned a controlling interest in Eber-Conn. Legal advice sought or obtained by those entities at the times when Plaintiffs had an interest in them is what we seek pursuant to the fiduciary exception.

All the trust beneficiaries/shareholders of EBWLC were directly affected in the same manner as EBWLC itself: they lost ownership of the most valuable asset. The information sought is focused on what the individuals tasked with managing EBWLC (Lester, Wendy, and Gumaer) were intending when they took the challenged actions, and ascertaining the extent to which any real consideration (supposed debt relief) was actually received. Thus, this motion is focused primarily on getting discovery as to communications about the prospective actions by the defendant at the time of the events in question—we are not seeking to apply the fiduciary exception to privileged communications that occurred in the course of subsequent litigation. Accordingly, Plaintiffs have good cause to examine the relevant communications.[9]

### III. THE CRIME-FRAUD EXCEPTION APPLIES BECAUSE THERE IS PROBABLE CAUSE TO CONCLUDE THAT FRAUDULENT AND OTHER WRONGFUL CONDUCT OCCURRED (LOG CODE: C)[10]

In addition to involving fiduciary duties, this is a fraudulent concealment case. Defendants did not even attempt to dismiss the Complaint on the merits, even though

---

[9] Because the Privilege Log's descriptions of the withheld documents are perfunctory and often inscrutable, we may have identified documents that concern past actions as falling within this exception, despite our best effort to focus on documents that fall within the established parameters of the fiduciary exception.

[10] Plaintiffs respectfully request that the Court consider the crime-fraud exception as to all documents reviewed in camera, even if the "C" code does not appear next to a given document. As a general matter, the "C" was used to identify documents that were not otherwise being challenged based on the information currently available.

Rule 9 imposed heightened pleading requirements. Thus, it is undisputed that if Defendants did the things alleged in the Complaint, a fraud claim exists.[11] Moreover, there is ample evidence that the Foreclosure Action was a sham—essentially a fraud on the court—and Defendants' decision to assert privilege over communications between the opposing parties to that litigation only strengthens our case.

The circumstances thus suggest the applicability of the crime-fraud exception. To invoke it, the Court must conclude "that there is 'probable cause to believe that a crime or fraud ha[s] been committed [or attempted] and that the communications were in furtherance thereof.'" *See In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir. 1994) (quoting *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1039 (2d Cir. 1984)) ("This standard has been rephrased as requiring 'that a prudent person have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof.'"). Importantly, the probable cause standard does not require a conclusive determination, as Magistrate Judge Gorenstein has explained:

> A party seeking to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed—or has been attempted—and that the communications in question were in furtherance of the fraud or crime. The factual basis must strike a prudent person as constituting a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof. Obviously, there need not be a definitive showing of the fraudulent nature of the client's objective; rather, there need only be presented a reasonable basis for believing that objective was fraudulent. It is sufficient to come within the exception that the client intended to use the attorney's services in furtherance of a crime or fraud even if the

---

[11] And Lester Eber has personally paid substantial sums to settle two different previous lawsuits filed by credits who had alleged that the transfer of Eber-Conn to Alexbay was a fraudulent conveyance.

attorney was unaware of this purpose.

*Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 426 (S.D.N.Y. 2013) (internal quotations and citations omitted). "In the end, 'the probable cause necessary to sustain the exception is not an overly demanding standard.'" *Id.* (quoting *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999)).

Moreover, even in the absence of a literal crime or fraud, New York courts have extended the exception to encompass "an alleged breach of fiduciary duty or an accusation of some other wrongful conduct." *Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*, 767 N.Y.S.2d 223, 224 (1st Dep't 2003). Simply put, New York recognizes that the attorney-client privilege "may give way to strong public policy considerations." *Spectrum Sys. Intl. Corp. v. Chemical Bank,* 78 N.Y.2d 371, 380 (1991) (citing *Priest,* 51 N.Y.2d at 67–68).

Especially around the time period when Lester tried to take Eber-Conn for "no consideration," his communications with lawyers to EBWLC, Eber Metro, or the Trust were likely in an attempt to concoct a less-obviously-flawed legal mechanism to take Eber-Conn for himself and his daughter. It would not be surprising if the idea was discussed in the context of the then-pending lawsuits against EBWLC—after all, Harris Beach believed that the transfer of Eber-Conn was all about avoiding liability for the million dollars in unpaid legal fees. Accordingly, we have broadly requested in camera review of such communications from November 2011 through the transfer. Sure enough, it seems like the same lawyers who were representing EBWLC in at least one of the pending lawsuits became the lawyers that soon thereafter sued EBWLC at Lester's behest. *See, e.g.*, Log at EB-00026667 (showing Underberg &

Kessler lawyers involved in emails with Lester and Wendy regarding "Harris Beach v. Eber" and "D4 v. Eber").

The November 7, 2012 Underberg Letter (EB-00026647) also implicates the crime-fraud exception because it shows that Wendy was actively working to protect Lester's financial interests at the expense of EBWLC, even though she was then President of EBWLC (a Trust asset). This letter was thus in furtherance of Wendy's ongoing breach of her fiduciary duties.

## CONCLUSION

The Court should order the Eber Defendants to disclose the allegedly privileged communications concerning the transactions at issue in this case. To the extent that any disclosure is based on the fiduciary exception, the Court's order should invoke Federal Rule of Evidence 502(d) to provide that disclosure to Plaintiffs in this litigation does not constitute a waiver as to anyone not a party to this litigation.

Respectfully submitted,

/s Brian C. Brook
Brian C. Brook (BB 1980)
CLINTON BROOK & PEED
100 Church Street, 8th Floor
New York, NY 10007
Tel./Fax: (212) 257-2334
Brian@clintonbrook.com

*Counsel for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

Dated: July 29, 2017