# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DANIEL KLEEBERG, LISA STEIN, and
AUDREY HAYS,

               Plaintiffs,

      v.

LESTER EBER; ALEXBAY, LLC f/k/a
LESTER EBER, LLC; CANANDAIGUA
NATIONAL BANK & TRUST
COMPANY; ESTATE OF ELLIOTT W.
GUMAER, JR.; EBER BROS. & CO.,
INC.; EBER BROS. WINE AND LIQUOR
CORP.; EBER BROS. WINE & LIQUOR
METRO, INC.; EBER-CONNECTICUT,
LLC; and WENDY EBER,

               Defendants.

Civil Action No.  16-CV-9517(LAK)

---

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' SECOND MOTION TO COMPEL
THE EBER DEFENDANTS TO PROVIDE DISCOVERY IMPROPERLY WITHHELD
ON PRIVILEGE GROUNDS**

---

Brian C. Brook (BB 1980)
CLINTON BROOK & PEED
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Facsimile: (646) 257-2887
Brian@clintonbrook.com

*Attorneys for Plaintiffs Daniel Kleeberg, Lisa Stein,
and Audrey Hays*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................................................................. iii

PRELIMINARY STATEMENT ........................................................................................... 1

FACTS .................................................................................................................................. 3

    A.   Background ................................................................................................................ 3

    B.   The 2010 Sham Sale of Six Percent of Eber-Conn to a Lawyer in Disguise ..................... 4

    C.   Lester Tried to Take Eber-Conn for Himself for "No Consideration" in December 2011. 5

    D.   Next, Lester "Resigned" as President and Sued EBWLC Supposedly to Foreclose on $3 million of Debt (the "Foreclosure Action") ........................................................................ 6

    E.   Lester, Wendy, and Gumaer intentionally concealed the Alexbay transaction from Plaintiffs ................................................................................................................................ 7

    F.   The Various Lawyers ................................................................................................... 7

    G.   The Harris Beach Litigation ........................................................................................ 9

    H.   Plaintiffs Assert Derivative Claims ........................................................................... 10

ARGUMENT ...................................................................................................................... 10

I.     The Fiduciary Exception Encompasses Attorney-Client Communications Where Plaintiffs Had an Interest in the Corporate Client (Log Code: F) ...................................................... 10

II.    Communications that Are Not Privileged, Due to Lack of Foundation or Waiver ............. 13

    A.   Plaintiffs are entitled to know the information on the Eber Defendants to-be-revised privilege log .......................................................................................................................... 14

    B.   Communications among non-lawyers, or not involving legal advice (Log Code: NL).... 15

    C.   Communications with adversaries or non-employees are not privileged, or constitute waiver (Log Code: W) ....................................................................................................... 16

    D.   Communications with Gumaer were not privileged, for a host of reasons (Log Codes: NL, W) ................................................................................................................................ 16

    E.   Communications with Sturm in a business capacity (Log Code: NL) ............................. 19

    F.   The documents produced so far suggest that Underberg & Kessler was representing EBWLC, even when it was suing EBWLC ...................................................................... 19

i

G.    Selective waiver is improper.................................................................................... 20

H.    The November 7, 2012 Underberg Letter.......................................................... 21

III.   The Crime-Fraud Exception Applies Because There Is Probable Cause to Conclude that Fraudulent and Other Wrongful Conduct Occurred (Log Code: C)................................... 22

CONCLUSION............................................................................................................... 24

# TABLE OF AUTHORITIES

**Cases**

*A.I.A. Holdings, S.A. v. Lehman Bros., Inc*,
  2002 WL 31385824 (S.D.N.Y. Oct. 21, 2002) ........................................................................ 14

*Ambrose v. City of White Plains*,
  No. 10 CIV. 4946 (CS), 2011 WL 13290651 (S.D.N.Y. Sept. 30, 2011) ............................... 13

*Amusement Indus., Inc. v. Stern*,
  293 F.R.D. 420 (S.D.N.Y. 2013) ........................................................................................... 23

*Anwar v. Fairfield Greenwich Ltd.*,
  306 F.R.D. 117 (S.D.N.Y. 2013) ........................................................................................... 17

*Beard v. Ames*,
  468 N.Y.S.2d 253 (App. Div. 4th Dept. 1983) ...................................................................... 11

*Garner v. Wolfinbarger*,
  430 F.2d 1093 (5th Cir. 1980) .............................................................................................. 11

*Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*,
  No. 08-1533, 2011 WL 2020586 (S.D.N.Y. May 20, 2011) .................................................. 14

*Hoopes v. Carota*,
  531 N.Y.S. 2d 407 (3d Dep't 1988) ....................................................................................... 11

*In re Bank of New York Mellon*,
  977 N.Y.S.2d 560 (Sup. Ct. N.Y. Co. 2013) ......................................................................... 12

*In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*,
  731 F.2d 1032 (2d Cir. 1984) ............................................................................................... 23

*In re John Doe, Inc.*,
  13 F.3d 633 (2d Cir. 1994) ................................................................................................... 23

*In re Long Island Lighting Co.*,
  129 F.3d 268 (2d Cir. 1997) ................................................................................................. 12

*Nama Holdings, LLC v. Greenberg Traurig LLP*,
  18 N.Y.S.3d 1 (1st Dep't 2015) ............................................................................................ 11

*Standard Chartered Bank PLC v. Ayala Int'l Holdings (U.S.) Inc.*,
  111 F.R.D. 76 (S.D.N.Y. 1986) ............................................................................................ 21

*Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*,
  767 N.Y.S.2d 223 (1st Dep't 2003) ...................................................................................... 23

*United States v. Bergstein*,
  302 F. Supp. 3d 580 (S.D.N.Y. 2018)..........................................................................14

Plaintiffs Audrey Hays, Daniel Kleeberg, and Lisa Stein respectfully submit the following memorandum of law in support of their second motion to compel discovery from Defendants Lester Eber ("Lester"); Alexbay, LLC; Eber Bros. & Co., Inc. ("EB&C"); Eber Bros. Wine and Liquor Corporation ("EBWLC"); Eber Bros. Wine & Liquor Metro, Inc. ("EB Metro"), Inc.; Eber-Connecticut, LLC ("Eber-Conn"); and Wendy Eber (together, the "Eber Defendants").

## PRELIMINARY STATEMENT

Lester Eber, Wendy Eber, and Elliott Gumaer were fiduciaries to Plaintiffs. This means that they owed strict duties to Plaintiffs, including a fundamental duty of candor and disclosure.

Despite this duty, they are withholding dozens of relevant communications between and among themselves, with no outside lawyers involved. There is no valid claim to withhold on grounds of privilege when each participant—including the supposed lawyer—owed *direct* duties to the party seeking disclosure.

Allowing Defendants to withhold communications among fiduciaries would eviscerate New York's strong public policy in favor of holding fiduciaries, particularly trustees, accountable for misconduct. *See, e.g.*, E.P.T.L. 11-1.7 (prohibiting as "contrary to public policy [t]he exoneration of any [trustee] from liability for failure to exercise reasonable care, diligence and prudence"). If fiduciaries could conspire with each other and then keep those communication secret, even in litigation, they would effectuate in practice that which is prohibited by law and policy.

Defendants persist in withholding dozens of relevant documents that "concern the transactions at issue in this case." Order dated Sept. 13, 2018 at 3. They do so even though they recently disclosed a handful of documents that show how Lester, Wendy, and Gumaer subsequently discussed whether Plaintiffs would be upset to learn about those transactions (spoiler

alert: they decided not to find out). This selective disclosure of purportedly privileged communications is improper, however, because the transactions implicated their fiduciary duties for two reasons: first, because EBWLC was a Trust-controlled asset; and second, because as corporate officers and directors, Lester, Wendy, and Gumaer owed fiduciary duties to their shareholders, which ultimately were Plaintiffs. Thus, the earlier communications concerning the corporate transactions at issue are subject to disclosure.

Similarly, communications involving lawyers retained by EBWLC or another Trust-controlled entity are subject to disclosure pursuant to the "fiduciary exception." If legal advice concerned the exercise of fiduciary duties, then it falls within the exception. Here, the decisions about whether to divest EBWLC of its sole remaining asset by giving it to Lester's newly formed company plainly concerned fiduciary duties, since the corporate officers and directors had a fiduciary duty to preserve corporate assets and, if to be sold, to ensure that fair value is received. This Court need not find that any violation occurred at this juncture to hold that the evidence showing one way or another should be produced to Plaintiffs.

Only if Lester Eber could show that he obtained independent legal advice from someone who was not a fiduciary to Plaintiffs, either directly or indirectly via EBWLC, could such communications be withheld. But as we explain below, the evidence provided by Defendants so far shows that there was no such independent counsel. Quite the opposite, the lawyers who represented Lester were simultaneously representing EBWLC and being paid by it or its direct subsidiary, Eber Metro.

# FACTS

## A. Background

As alleged in more detail in the Second Amended Complaint, from 1970 until its dissolution in 2017, a testamentary trust (the "Trust") controlled the Eber Bros. wine and liquor distributorship business. At its inception, the Trust's three beneficiaries were the company's founder's three children, each of whom had a one-third interest in the Trust: Nan Boslov (mother of Audrey Hays), Sally Kleeberg (mother of Daniel Kleeberg and Lisa Stein), and Lester Eber.

The Trust was managed by three co-trustees: Defendants Lester Eber ("Lester") and Elliott Gumaer ("Gumaer," who is deceased), plus a bank (since 2007, Canandaigua National Bank, or "CNB"). CNB managed passive investments, while Lester and Gumaer were responsible for managing the operating business. Lester was President and a Director of Eber Bros. & Co., Inc. ("EB&C") and its subsidiaries, Eber Bros. Wine and Liquor Corporation ("EBWLC"); Eber Bros. Wine & Liquor Metro, Inc. ("EB Metro"), Inc.; and Eber-Connecticut, LLC ("Eber-Conn"). Gumaer was a Director of EB&C and its subsidiaries. As of approximately 2010, the only operational business entity among EB&C's subsidiaries was Eber-Conn.

Prior to the events in question here, EBWLC was the parent to Eber Metro. Eber Metro, in turn, held the controlling interest in Eber-Conn. The following organizational chart illustrates the corporate structure as of 2010, including the relationship to the Trust and its beneficiaries:



**B. The 2010 Sham Sale of Six Percent of Eber-Conn to a Lawyer in Disguise**

In May 2010, Eber Metro sold a portion of its equity interest in Eber-Conn to Poleridge Bowman Partners, LLC ("Poleridge"). This amounted to a six percent stake in Eber-Conn, for the purported purchase price of $350,000. However, no cash was actually received. Instead, Eber Metro simultaneously received a promissory note from Poleridge for the amount of $350,000. Brook Decl. Ex. A. This was a roundtrip transaction with no real economic substance; in other words, a sham.

Despite its name, Poleridge involved no "Partners" because the company was owned by one man alone: a lawyer/strategic consultant named Glenn Sturm. Sturm was then a partner in the

Atlanta law firm Nelson Mullins. According to Lester, Glenn was Sturm was first approached in the Spring of 2010 by Eber-Conn. Ex. B ¶ 35. The scope and timing of Sturm's engagement is extremely unclear, as Defendants have not produced his engagement agreement, even though it would obviously have significant weight in completing the financial picture surrounding the six percent interest sale—which, as discussed in Section D, became very important.

### C. Lester Tried to Take Eber-Conn for Himself for "No Consideration" in December 2011

On December 8, 2011, Lester created Lester Eber, LLC in the State of Connecticut, and filed an affidavit with the state liquor licensing board, attesting—under penalty of perjury—to the following:

1. I make this affidavit from my own knowledge and belief. I understand that I am making this affidavit under penalty of false statement.
2. This affidavit is being made as part of an application to the Department of Consumer Protection Liquor Control Division to transfer stock in the entity known as Eber-CT. Eber-CT is the backer of LIW0000596.
3. Presently, 79 percent of Eber-CT is owned by me through an entity known as Eber Metro.
4. I wish to transfer all of that 79 percent that I own from Eber-Metro to Lester Eber LLC, an entity which will also be wholly owned by me.
5. This transfer is being done for no consideration, in that it is being done strictly for organizational purposes. No money or other consideration will change hands.

_Lester Eber_

**Lester Eber**

Ex.C.[1] Incredibly, Lester did this while he was still President of EBWLC and co-trustee of the Trust. It is unclear who else knew about it, or why this "no consideration" transfer attempt was ultimately abandoned.

---

[1] Curiously, no documents on Defendants' Privilege Log appear to relate to these December 2011 events, suggesting either inaccurate subject matter descriptions, or significant omissions.

**D. Next, Lester "Resigned" as President and Sued EBWLC Supposedly to Foreclose on $3 million of Debt (the "Foreclosure Action")[2]**

After attempting to transfer Eber-Conn to himself for literally nothing back to the companies controlled by the Trust, Lester and his cohorts engaged in a series of transactions that suggest he used his lawyers to accomplish the same goal—taking EBWLC for himself—with at least the appearance of legitimacy.

First, Lester resigned as Director and President of EBWLC effective February 1, 2012. Ex. D. Lester's daughter, Defendant Wendy Eber ("Wendy"), took Lester's place as President of EBWLC. *Id.*

In January 2012, Lester signed a document purporting to assign debts owed to him by Eber Metro to his newly-formed LLC, which he renamed "Alexbay." Ex. E.

On February 21, 2012, Alexbay filed a Summons and Complaint against EBWLC in Monroe County Supreme Court, Ex. G, with Eber-Metro named as a nominal defendant because the lawsuit sought to transfer all of Eber-Metro's shares from EBWLC (the Trust) to Alexbay (just Lester), supposedly to satisfy over $3 million in debt. Alexbay and Lester represented to the court that the amount of the debt was equivalent to or greater than the value of Eber Metro and its stake in Eber-Conn. It supported that representation by reference to the six-percent interest sale to Poleridge Bowman. Ex. G ¶¶ 32–36. The complaint asserted that Poleridge Bowman acquired its interest "in an arm's length transaction" that occurred through "the free market." *Id.* ¶¶ 33, 36.

On March 13, 2012, a joint board meeting was held for EBWLC and Eber Metro to discuss "the Alex Bay, LLC suit vs EWLC and Eber Brothers Metro Inc. suit regarding the default of Eber Brothers Metro Inc. to repay Alex Bay, LLC's (which is owned by Lester Eber) loans to the company." Ex. F. Apparently, after the meeting there was "extensive conversation" and "the board

---

[2] The Second Amended Complaint ¶¶ 55–75 contains additional detail. ECF No. 88.

decided not to extend [sic] funds on defending the suit and authorized the company to waive its defenses." *Id*.

Absent any defense, the Supreme Court approved the transaction. EBWLC's shares in Eber Metro were transferred to Lester's Alexbay on June 5, 2012.

### E. Lester, Wendy, and Gumaer intentionally concealed the Alexbay transaction from Plaintiffs

If nothing else, filing the first motion did get us all the documents we need to prove that Lester, Wendy, and Gumaer knowingly concealed the Alexbay transaction from Plaintiffs. Two short emails are attached as Exhibit Q to the Brook Declaration. In combination, these show the co-trustees (and Wendy) discussing whether "the family" (Plaintiffs, the other Trust beneficiaries) should be told about the Eber Bros.' stock having a "true value" of "zero" thanks to the Alexbay transaction. *See* Ex. Q. Although the emails do not document their decision after Gumaer raised the issue, the record is clear that they chose to keep quiet. As a result, the bank's trust statements continued to misstate the "market value" of the stock at $655,000, right up to the point when we filed the lawsuit in December 2016. Ex. R (2016 Q2 Trust statement excerpt).

Among the documents being withheld Lester's response to Wendy's email on the first page of Exhibit Q, which Defendants describe as constituting "Legal Advice regarding Eber Bros." *See* Ex. L at EB-00031202. Of course, they used the exact same description for Wendy's email that they then produced—and which contained no legal advice.[3]

### F. The Various Lawyers

Since the first motion, there is a little more information available reflecting the scope of

---

[3] Defendants' disclosures of these emails, including that sent by Gumaer who they claim was acting as a lawyer, seems to be a self-serving attempt to cast blame on the settling Defendant CNB, since both emails refer to supposed conversations with CNB's representative. *See* Ex. Q. Such selective disclosure is prohibited—it amounts to a waiver of the entire subject matter.

representations and to help identify the clients—they do nothing to resolve the convoluted conflict issues.

*Gumaer.* The Eber Defendants assert that Gumaer was not just a trustee and Director, but also an attorney who they turned to for legal advice (long after he retired from the practice of law). A document recently found in the discovery appears to reflect Gumaer's post-retirement engagement. *See* Ex. P. The letter provides that Gumaer would be merely a "consultant" to the corporate entities, while being "counsel" to Lester personally. *Id.* at 2. His compensation for that work, plus his work as Trustee, was paid all together by the corporate entities—not by Lester individually. *Id.* Notably, this letter emphasized the role of the Eber Bros. business in the Trust's affairs, and thus "the magnitude of the responsibility which [Lester] and [Gumaer] share as a duty to [Lester's] extended family." *Id.* at 1.

*Underberg & Kessler.* Underberg & Kessler was retained by EBWLC in May 2011 to represent it in a litigation matter, with Paul Keneally apparently as lead counsel. *See* Ex. M. Shortly thereafter, attorneys from the same firm, William Brueckner and Michael Beyma, represented Alexbay in suing EBWLC in the Foreclosure Action. *See* Ex. G (Summons dated Feb. 21, 2012). Although it was not apparent from the public filings, it seems that the Alexbay legal team included Mr. Keneally. *See, e.g.*, Ex. L at EB-00026272-73; EB-00026637; EB-00026651; EB-00026657. At the same time that Underberg was suing EBWLC, Underberg was also drafting documents for EBWLC, *see* Ex. L at EB-00026637, and engaging in "privileged" communications with Wendy about it, even though she was the President of EBWLC who was tasked with evaluating the transfer. There apparently was no separate engagement for the Alexbay matter, nor any written conflict waiver, as required by New York Rules of Professional Responsibility. *See* N.Y. R.P.C. 1.7(b)(4).

*Marino Fernandez.* Mr. Fernandez, a solo lawyer, purportedly represented EBWLC and Eber Metro in the Foreclosure Action. He also advised the EBWLC board about whether it should consent to transfer its 100% stake in Eber Metro to Alexbay (i.e., Lester). Ex. F. Lester himself apparently participated in these discussions. *Id.*

*Glenn Sturm.* The Eber Defendants also claim to have been receiving legal advice from Sturm, the lawyer who acquired six percent of Eber-Conn. There is no engagement agreement with him, and there is good reason to doubt whether he ever provided legal services. In 2012, Lester represented to the New York State Supreme Court that the sale of part of Eber-Conn to Sturm's wholly-owned company was an "arm's length" transaction. Ex. O at 2. If Sturm was truly a fiduciary to Lester or any of the Eber companies, then Lester must be admitting to perjury.

*Other lawyers.* There are other purported lawyers listed on the privilege log. We should not have to guess at who they were hired by and hope that the Court will allow us to see the revised privilege log when it is prepared.

### G. The Harris Beach Litigation

In 2014, Harris Beach sued most of the Eber Defendants on a fraudulent conveyance theory, focusing on the transfer of Eber Metro to Alexbay. This was the second lawsuit filed by Harris Beach, after a 2011 collection action against EBWLC proved fruitless due to the 2012 transfer of Eber-Conn.

For the instant motion, it is important to distinguish the two lawsuits. Only the second lawsuit included a challenge to the fraudulent conveyance—the issue here. Under the fiduciary exception, legal advice relating to that second litigation would probably not be subject to disclosure. By contrast, the first lawsuit by Harris Beach was likely a driving factor behind the fraudulent conveyance. Therefore, communications relating to it inform the exercise of fiduciary duties at the time of the alleged breaches, and disclosure of those is sought by this motion.

### H.  Plaintiffs Assert Derivative Claims

In this action, Plaintiffs challenge the transfer of Eber Metro (and its 79% stake in Eber-Conn) from the Trust-controlled EBWLC to Lester's own Alexbay as improper self-dealing in breach of his and the others individual defendants' fiduciary duties. To that end, Plaintiffs also challenge the integrity of the Foreclosure Action. As Defendants admitted in response to the last motion, that proceeding was a sham, because the outcome was predetermined. No one with any semblance of independence or competence in matters of valuation was engaged to seriously question it.

Plaintiffs' challenge to the Eber Metro transfer as a breach of fiduciary duty is a derivative one, asserted on behalf of EBWLC. SAC ¶ 120.

Plaintiffs also allege that Lester, Wendy and Gumaer fraudulently concealed the transfer of Eber-Conn to Alexbay from them. That claim is brought both individually and derivatively. *Id.* ¶ 147.

## ARGUMENT

New York courts have repeatedly refused to allow defendants to conceal evidence of wrongdoing, especially when it involves wrongdoing by fiduciaries. Several distinct but overlapping doctrines have formed through the case law, and they are simultaneously applicable here. The first and foremost is the fiduciary exception, which is rooted in the simple policy that fiduciaries cannot withhold information from their beneficiaries.

### I.  THE FIDUCIARY EXCEPTION ENCOMPASSES ATTORNEY-CLIENT COMMUNICATIONS WHERE PLAINTIFFS HAD AN INTEREST IN THE CORPORATE CLIENT (LOG CODE: F)

In response to the first motion, Defendants completely failed to address the fiduciary

exception.[4] Although they have been given a second chance to put up an argument, the facts and the law are unchanged. The fiduciary exception permits Plaintiffs to inspect all communications concerning Lester's, Wendy's and Gumaer's roles and responsibilities as corporate officers and directors of Eber Bros., EBWLC and its subsidiaries.

New York recognizes that corporations exist for the benefit of their shareholders, who are not directly involved obtaining legal advice, even though such advice ultimately affects their interests. *See Beard v. Ames*, 468 N.Y.S.2d 253, 255–56 (4th Dep't 1983) ("We are persuaded that corporate management, since it has duties which run ultimately to the benefit of the stockholders, cannot hide behind 'an ironclad veil of secrecy' and that under certain circumstances its judgment may be questioned") (quoting *Garner v. Wolfinbarger*. 430 F.2d 1093, 1101 (5th Cir. 1980)); *see also Hoopes v. Carota*, 531 N.Y.S.2d 407 (3d Dep't 1988) (applying fiduciary exception where defendant was a trustee of a trust that controlled the corporation for which he was an officer and director).

Upon a showing of good cause, courts allow disclosure of the corporation's privileged communications to its shareholders. *See Nama Holdings, LLC v. Greenberg Traurig LLP*, 18 N.Y.S.3d 1, 8 (1st Dep't 2015) (adopting "good cause" requirement). Whether "good cause" is shown must be determined based on the specific facts of each case. *Hoopes*, 531 N.Y.S.2d at 910.

Plaintiffs alleging colorable claims of self-dealing and conflicts of interest, as alleged here, have been consistently recognized as triggering application of the fiduciary exception. *See, e.g.*, *Hoopes*, 531 N.Y.S.2d at 910; *In re Bank of New York Mellon*, 977 N.Y.S.2d 560, 568 (Sup. Ct.

---

[4] The sole reference to the doctrine was misplaced in connection with Gumaer. However, because Gumaer was a *direct* fiduciary to Plaintiffs as co-trustee, we did not and do not rely on the fiduciary exception as the primary basis for disclosure of communications with him. Rather, Lester and Wendy knew about Gumaer's duties to the other Trust beneficiaries, and therefore they could not have reasonably expected him to be able to keep material facts secret from the Trust beneficiaries.

N.Y. Co. 2013). The following factors were considered by these courts:

> (1)[T]here was an apparent identity of interests regarding disclosure among the beneficiaries of the trusts; (2) plaintiffs may have been directly affected by any decision defendant made on his attorneys' advice; (3) the information sought was highly relevant to and may be the only evidence available on whether defendant's actions respecting the relevant transactions and proposals were in furtherance of the interests of the beneficiaries of the trust or primarily for his own interests in preserving and promoting the rewards and security of his own position as a corporate officer; (4) the communication apparently related to prospective actions by defendant, not advice on past actions; (5) plaintiffs' claims of defendant's self-dealing and conflict of interest are at least colorable, and the information they seek is not only relevant, but specific.

*In re Bank of New York Mellon*, 977 N.Y.S.2d at 566. Each of these factors weighs in favor of disclosure of the communications sought here.

Plaintiffs represent two-thirds of the beneficial interest in EB&C, which owned a controlling interest in EBWLC, which owned (until June 5, 2012) a controlling interest in Eber Metro, which owned a controlling interest in Eber-Conn. Legal advice sought or obtained by those entities at the times when Plaintiffs had an interest in them is what we seek pursuant to the fiduciary exception. As to each document on the annotated privilege log with code "F", we believe in good faith that the document was prepared for the benefit of EBWLC or a subsidiary it controlled at the time of the communication.[5]

All the trust beneficiaries/shareholders of EBWLC were directly affected in the same manner as EBWLC itself: they lost ownership of the most valuable asset.

The information sought is focused primarily on what the individuals tasked with managing EBWLC (Lester, Wendy, and Gumaer) were intending when they took the challenged actions, and

---

[5] The fact that Defendants may have also had some conversations with their lawyers that did not involve Defendants' fiduciary duties as corporate officers or trustees is no basis to withhold the communications that did. *See In re Long Island Lighting Co.*, 129 F.3d 268, 272 (2d Cir. 1997) (in the analogous ERISA fiduciary context: "when the same lawyer gives advice to the employer (i) as employer on matters that are non-fiduciary under ERISA, and (ii) as plan fiduciary, the privileged consultation on non-fiduciary matters does not defeat the fiduciary exception that allows beneficiaries to discover the otherwise privileged communications on fiduciary matters.").

ascertaining the extent to which any real consideration (supposed debt relief) was actually received. Such evidence—regardless of which side it helps—is "highly relevant" indeed. *In re Bank of New York Mellon*, 977 N.Y.S.2d at 566. Because this case concerns allegations of fiduciary misconduct and fraud, and seeks punitive damages, evidence of the Defendants' intent at the time is particularly important. And there is no better or more reliable evidence of what someone was thinking at the time than contemporaneous communications.

We have been careful to avoid seeking communications that concern solely past actions; instead, this motion is focused primarily on getting discovery as to communications about the prospective actions by the defendant at the time of the events in question. Thus, we are not seeking to apply the fiduciary exception to privileged communications that occurred in the course of subsequent litigation.

Because all of the factors for invoking the fiduciary exception strongly support doing so, Plaintiffs have good cause to examine the relevant communications.[6] Importantly, the communication shall remain privileged as against third parties.

## II. COMMUNICATIONS THAT ARE NOT PRIVILEGED, DUE TO LACK OF FOUNDATION OR WAIVER

Of course, the fiduciary exception need only be invoked if the documents are privileged in the first place. For many documents being withheld, however, the Eber Defendants' Privilege Log reveals an insufficient basis for asserting attorney-client privilege, even though it is their burden to establish both that the privilege attached to the communications, "'*and* that the privilege has not been waived.'" *Ambrose v. City of White Plains*, No. 10 CIV. 4946 (CS), 2011 WL 13290651, at *4 (S.D.N.Y. Sept. 30, 2011) (quoting *Gary Friedrich Enters., LLC v. Marvel Enters., Inc.*, No.

---

[6] Because the Privilege Log's descriptions of the withheld documents are perfunctory and often inscrutable, we may have identified documents that concern past actions as falling within this exception, despite our best effort to focus on documents that fall within the established parameters of the fiduciary exception.

08-1533, 2011 WL 2020586, at *2 (S.D.N.Y. May 20, 2011)).

The elements that a withholding party must show to establish a valid attorney-client privilege claim are: "(1) a communication between client and counsel that (2) was intended to be and was in fact kept confidential, and (3) was made for the purpose of obtaining or providing legal advice." *United States v. Bergstein*, 302 F. Supp. 3d 580, 584 (S.D.N.Y. 2018).

Here, Plaintiffs challenge all three elements as to a significant number of the Eber Defendants' Privilege Log entries.[7] We address them categorically.

We are also cognizant of the Court's order that Plaintiffs "must specifically identify the documents they are challenging on the privilege log," Order dated Sept. 13, 2018, and so, without waiving our request for more information to help us do that effectively, we have annotated the combined Privilege Log with codes to indicate specific types of challenges asserted as to each line item. *See* Ex. L at 1 (describing the codes); *see also* Brook Decl. ¶ 15 (describing changes to the annotated log since the first motion).

## A. Plaintiffs are entitled to know the information on the Eber Defendants to-be-revised privilege log

The very first element required to invoke the attorney-client privilege is to show "a communication between client and counsel." Although Defendants have still refused to identify the purported client on the privilege log, this Court has fortunately ruled that Defendants will be required to identify the client in response to this motion. Order dated Sept. 13, 2018 at 4 (citing L.Civ.R. 26.2(a)(2)(A)).

Plaintiffs respectfully request that the Court amend the part of its order permitting the amended privilege log to be delivered to the Court for "*in camera* review." *Id*. The purpose of a

---

[7] Once challenged, the withholding party then has to submit evidence, by way of affidavit, deposition testimony or otherwise, establishing only the challenged elements of the applicable privilege or protection…." *A.I.A. Holdings, S.A. v. Lehman Bros., Inc*, 2002 WL 31385824, at *5-6 (S.D.N.Y. Oct. 21, 2002) (Pitman, M.J.).

privilege log is to apprise the adversary of what is being withheld. Accordingly, the information required to be disclosed pursuant to Local Civil Rule 26.2(a)(2)(A) should be disclosed to Plaintiffs as well.

## B. Communications among non-lawyers, or not involving legal advice (Log Code: NL)

Many communications are between non-lawyers, such as emails between Wendy and her father, Lester, or his administrative assistant, J. Lissow. *See, e.g.*, EB-00000729 (emails re "Money Lester Eber loaned to EBWLC").

To the extent that a lawyer conveyed factual information from a third party, that is not legal advice and should be disclosed, with any surrounding legal advice redacted (if not otherwise subject to disclosure). For example, EB-00000729-31 apparently concerns "Money Lester Eber loaned to EBWLC." If the initial email from David Belt, Esq. conveyed communications that he had with an accountant or a banker about Lester's loans, that may be important contemporaneous evidence of what was known at the time, and it would not be privileged. If, on the other hand, Belt offered his opinion about how he read certain documents, that would probably be a privileged communication, depending on who he was representing.

Lawyers often wear "hats" other than that of a lawyer. Accordingly, communications with lawyers who were not acting as lawyers are not privileged.

And just because a lawyer is copied on an email sent by a non-lawyer does not necessarily render the email privileged. Generally, the sender must be seeking legal advice or responding to a question from counsel. Important emails about business decisions being made should not be withheld from discovery just because lawyers may have also been recipients.

**C. Communications with adversaries or non-employees are not privileged, or constitute waiver (Log Code: W)**

After Lester Eber purportedly "resigned" from EBWLC effective February 1, 2012, [8] he was a third party to EBWLC. Only under limited circumstances, relating to his prior employment, could communications with him still be privileged. Communications with him about things like (a) debt that was owed to him, or (b) his attempt to take the Eber-Conn business for himself, would not constitute even arguably "privileged" communications. To the extent that attorney-client communications were shared with Lester in that situation, any privilege was waived.

By the same token, after February 1, 2012, Wendy Eber was President of EBWLC. And then on February 21, 2012, Alexbay sued EBWLC to take its shares in Eber Metro. Alexbay's counsel of record was Underberg & Kessler. To be sure, communications between Wendy and the lawyers who were suing her company could not be privileged. But such communications are on the Eber Defendants' Privilege Log nonetheless. *See, e.g.,* Ex. L at EB-00026637.

**D. Communications with Gumaer were not privileged, for a host of reasons (Log Codes: NL, W)**

Plaintiffs challenge all the privilege assertions concerning communications with Gumaer. First, the Eber Defendants had no expectation that their communications with Gumaer would be privileged and confidential (at least not confidential against Plaintiffs). Gumaer was himself a co-trustee with direct fiduciary duties to Plaintiffs. Thus, Gumaer was at all relevant times legally precluded from concealing material information from Plaintiffs.

Lester cannot deny that he knew about Gumaer's duty to Plaintiffs, and that this duty extended to the EBWLC business itself, even though the only Trust asset was its parent holding corporation. The 2001 letter from Gumaer, which Lester himself signed, emphasized the role of

---

[8] Since Lester was still a fiduciary as both co-trustee and President of the parent EB&C, the arguments for applying the fiduciary exception still apply as an additional basis for disclosure. *See* Part II, *infra*.

EBWLC in the Trust's affairs, and thus "the magnitude of the responsibility which [Lester] and [Gumaer] share as a duty to [Lester's] extended family." Ex. P at 1. The "extended family" that Gumaer was referring to was Plaintiffs and their predecessor beneficiaries.

Second, Gumaer told Lester that he was not going to act as an attorney for the Eber companies, but rather only as a "consultant." *Id.* at 2. Back in 2001, he did say that he would act as Lester's personal "counsel," but that means that any privilege was limited to Lester and Lester alone. Communications with Wendy and others relating to EBWLC or other entities are not within the scope of Gumaer's engagement, and thus not covered by privilege.

Moreover, 2001 was long before the key time period. By then, it seems that Gumaer had let his license to practice lapse. But to claim privilege, the communications must concern legal advice (either requested or offered) by a licensed attorney. *Anwar v. Fairfield Greenwich Ltd.*, 306 F.R.D. 117, 119 (S.D.N.Y. 2013) ("[T]he attorney-client privilege generally applies only to communications with attorneys who are licensed to practice law."). Gumaer was in his late 70s during the relevant time period, and he had retired in 2001. Unless the Eber Defendants can show that they "reasonably believed" that Gumaer was still a licensed attorney at the time, *id.* at 120, no communications concerning Gumaer's advice can be deemed privileged. No such showing has been made, at least not as to anyone other than Lester himself; and the only available evidence suggests that, by that point, Gumaer was no longer holding himself out as a lawyer at all. *See, e.g.*, Exs. J, K.

Third, Gumaer was also a corporate director of several entities. Even if he was licensed to practice law, his communications are not entitled to any presumption that they involve legal advice. He was required to exercise his independent judgment as a director of the companies, and to the extent that he was gathering information to inform his decisions, rather than to render legal

advice, that must be disclosed.

In sum, given Gumaer's demonstrable non-legal roles and independent fiduciary responsibilities to Plaintiffs, the Eber Defendants have fallen far short of meeting their burden to establish that any of the *many* communications between Lester, Wendy and Gumaer may be withheld from Plaintiffs on privilege grounds.

For example, there were communications between Gumaer and Wendy on March 13, 2012 and other dates that related directly to their decision to approve the transfer of Eber-Conn to Alexbay. *See* Ex. H (Unanimous Written Consent stating that they "met and/or had numerous conversations regarding the Proposed Transfer and fully discussed the Proposed Transfer (including but not limited to discussions on March 13, 2012, throughout the week of March 13, 2012, May 30, 2012 and June 1, 2012)"). Despite the fact that these communications are affirmatively asserted as the basis for making the decision that is the primary focus of Plaintiffs' challenge in this case, Defendants are withholding the written part of those discussion.

Some of these discussions have been partially disclosed. The Eber Defendants produced an email from Gumaer to Wendy on May 31, 2012, asking her to "Answer this question? Eber Conn. is owned by Eber Metro and Eber Metro is ownedd [sic] by Eber & Co. The Trust owns Eber & Co. Does it still own oindirectly [sic] an interest in Conn?" Ex. I[9] Defendants apparently have withheld Wendy's response(s), which appear on the Privilege Log:

| Bates Number | Date of Document | Type of Document | General Subject Matter | Author(s) | Addressee(s) | Reason Document Withheld From Disclosure |
|---|---|---|---|---|---|---|
| EB-00026612 – EB-00026626 | 5/31/2012 | Electronic mail with attachment | L. Eber loan balance and EBWLC outstanding liabilities | W. Eber | E. Gumaer, Esq. L. Eber | Attorney Client Privilege |

[9] The fact that the Gumaer was asking this question less than two months after supposedly authorizing the transfer of Eber Metro's shares to Alexbay is evidence that he was not capable of exercising his duty of care. It also means that if Wendy was supposedly relying on Gumaer for legal advice, as the Privilege Log claims, she may have been failing to exercise her duty of care as well.

| EB-00026661 | 6/1/2012 | Electronic mail | Alexbay case | W. Eber | E. Gumaer, Esq. | Attorney Client Privilege |

Having disclosed the question, the Eber Defendants should also provide the answer, especially since it goes to the core of this case. *See infra* § I(G) (discussing the impropriety of selective disclosure).[10]

### E.  Communications with Sturm in a business capacity (Log Code: NL)

Unlike Gumaer, Glenn Sturm does not appear to have had any independent fiduciary responsibilities to Plaintiffs. He also appears to still be practicing law, though there is no credible evidence that he was ever engaged as a lawyer for any of the Defendants. If he was, the scope of his representation needs to be understood and explained. Even if he was retained as a lawyer to some extent, he was also a strategic consultant. His communications concerning non-legal advice are not privileged.

### F.  The documents produced so far suggest that Underberg & Kessler was representing EBWLC, even when it was suing EBWLC

Although the Eber Defendants appear to have conceded that they must disclose engagement agreements and payment information, their disclosure has been substantially incomplete.

Underberg & Kessler's engagement—not in this case, but in 2011 to 2012—is particularly important, because it was simultaneously representing EBWLC at the same time that it was representing Lester in suing EBWLC. But only one engagement agreement was produced for that time period. *See* Ex. M. That engagement agreement shows only EBWLC as a client. Contemporaneous financial records show that EBWLC's direct subsidiary at the time, Eber Metro, was paying Underberg & Kessler. *See* Ex. N. There is no evidence that Lester paid Underberg

---

[10] Moreover, by copying Lester on the email about "EBWLC outstanding liabilities," Wendy waived any theoretical privilege since Lester was no longer employed by EBWLC, and it is likely that Lester was actually EBWLC's counterparty as to the referenced "liabilities." *See supra* Section I(D).

himself (either directly or through an entity that he alone controlled) until late December 2012, many months after the transactions at issue were complete. *Id*.

To the extent that EBWLC or Eber Metro (while an EBWLC subsidiary) were the only ones paying Underberg, that would lend support to the conclusion that all Underberg work during that time was for the benefit of EBWLC—and thus subject to the fiduciary exception. *See supra* Part I.

It may sound far-fetched to think that a law firm would be paid by its own client (EBWLC) to represent another (Alexbay) and sue the paying client (EBWLC), but the existing record indicates that that is indeed what transpired. Considering that these same lawyers have affirmatively argued that the whole Alexbay lawsuit was a sham involving no real adversity, it is not really that outlandish at all. *See* Eber Br. at 13 (arguing that communications between opposing sides to the 2012 Foreclosure Action can be withheld as privileged because "there was no conflict as the parties were not adverse - all agreed that the assignment to Alexbay was commercially reasonable compensation for debts justly due and secured"). But just because they may have thought that this was okay does not mean that this Court should let it stand: If EBWLC officers were involved in the discussions and EBWLC was paying the legal bills, then EBWLC has the right to the information—and by extension through the fiduciary exception, so do Plaintiffs here.

### G. Selective waiver is improper

As noted in Facts Section E, above, Defendants have produced a handful of documents in response to the first motion. Some of these appear designed to cast blame on CNB for the fraudulent concealment of the 2012 transfer to Alexbay. *See* Ex. Q. But by disclosing some documents—including more emails with Gumaer, as to whom they claim a lot of privilege— Defendants must disclose all documents concerning the same subject matter.

"[T]he voluntary production of a privileged document effects a waiver of the privilege as

to all other privileged communications concerning the same subject matter. This is so because fairness and full disclosure cannot permit a party to selectively choose to produce only those communications which may be favorable to him and withhold on grounds of privilege others which may be favorable to his adversary." *Standard Chartered Bank PLC v. Ayala Int'l Holdings (U.S.) Inc.*, 111 F.R.D. 76, 85 (S.D.N.Y. 1986).

By voluntarily disclosing a couple communications with Gumaer about the value of the Trust's Eber Bros. stock after the Alexbay transaction, Ex. Q, Defendants have necessarily waived all communications with Gumaer—and any other lawyer—concerning the effect of the Alexbay transaction on the value of EBWLC, its parent, or the Trust.[11]

Another example on the log is EB-00031199, which is one communication in the middle of many others, presumably on the same topic. Ultimately though, Plaintiffs can only guess at what the topics of the documents on the log actually are, since the current log is quite inaccurate.

### H. The November 7, 2012 Underberg Letter

Although the November 7, 2012 Underberg Letter was required to be clawed back, the following description of it and how it "exemplifies the problems" remains on the record and should be considered:

It was ostensibly prepared for Alexbay (not a fiduciary to Plaintiffs), since it was addressed to Wendy in her capacity as CFO of Alexbay. EB-00026647. You would not know that from the Privilege Log, however. As written up in the Privilege Log, the Underberg Letter concerns the "Alexbay case," suggesting that the legal advice may have been rendered to EBWLC, which was adverse to Alexbay in that case. The difference is critical to whether the fiduciary exception

---

[11] Although we disagree with the contention that Gumaer was in a position to be providing legal advice, the Eber Defendants insist on that—accordingly, the scope of their voluntary waiver should be judged based on their intent, and it is plain that they voluntarily produced a document that they themselves contend they could have continued to withhold on privilege grounds.

applies: EBWLC = yes; Alexbay = no.

More important, Defendants' privilege log fails even to acknowledge that this letter was disclosed to Gumaer (who produced it to Plaintiffs back when the Eber Defendants' privilege log was not even one-page long), let alone offer any explanation for why that disclosure did not amount to a waiver.[12] Thus, the Eber Defendants cannot even arguably claim to have met their initial burden.

### III. THE CRIME-FRAUD EXCEPTION APPLIES BECAUSE THERE IS PROBABLE CAUSE TO CONCLUDE THAT FRAUDULENT AND OTHER WRONGFUL CONDUCT OCCURRED (LOG CODE: C)[13]

In addition to involving fiduciary duties, this is a fraudulent concealment case. Defendants did not even attempt to dismiss the Complaint on the merits, even though Rule 9 imposed heightened pleading requirements. Thus, it is undisputed that if Defendants did the things alleged in the Complaint, a fraud claim exists.[14] Moreover, there is ample evidence that the Foreclosure Action was a sham—essentially a fraud on the court—and Defendants' decision to assert privilege over communications between the opposing parties to that litigation only strengthens our case. And on top of all that, we now have compelling contemporaneous evidence that Lester, Wendy, and Gumaer knew that Plaintiffs were being misled about the "true value" of the Trust assets, and

---

[12] The Eber Defendants also waived privilege over this letter by asserting in a public filing that it "demonstrates the absence of fraud in this matter…" Keneally Ltr. dated May 29, 2018, at 2 (ECF No. 99). That is a textbook example of trying to use privilege as a sword and a shield through selective disclosure. The fact that the Keneally Letter simultaneously purported not to waive privilege is preposterous: One cannot disclose part of a privileged document's contents while shielding the rest from disclosure. "[A] party cannot partially disclose a privileged document nor selectively waive the privilege and then expect it to remain a shield." NXIVM Corp. v. O'Hara, 241 F.R.D. 109, 138 (N.D.N.Y. 2007). See also *United States v. John Doe (In re Grand Jury Proceedings)*, 219 F.3d 175, 188 (2d Cir. 2000) ("Waiver of attorney-client privilege may take place even if the disclosing party does not intentionally relinquish a known right."). There are no magic words that a lawyer can use that change this rule, which is grounded in fairness. Thus, by characterizing the contents of the communication, Defendants necessarily waived any claim of privilege over it.

[13] Plaintiffs respectfully request that the Court consider the crime-fraud exception as to all documents reviewed in camera, even if the "C" code does not appear next to a given document. As a general matter, the "C" was used to identify documents that were not otherwise being challenged based on the information currently available.

[14] And Lester Eber has personally paid substantial sums to settle two different previous lawsuits filed by credits who had alleged that the transfer of Eber-Conn to Alexbay was a fraudulent conveyance.

yet they chose to keep Plaintiffs in the dark. *See* Ex. Q.

The circumstances thus suggest the applicability of the crime-fraud exception. To invoke it, the Court must conclude "that there is 'probable cause to believe that a crime or fraud ha[s] been committed [or attempted] and that the communications were in furtherance thereof.'" *See In re John Doe, Inc.*, 13 F.3d 633, 637 (2d Cir. 1994) (quoting *In re Grand Jury Subpoena Duces Tecum Dated Sept. 15, 1983*, 731 F.2d 1032, 1039 (2d Cir. 1984)) ("This standard has been rephrased as requiring 'that a prudent person have a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof.'"). Importantly, the probable cause standard does not require a conclusive determination, as Magistrate Judge Gorenstein has explained:

> A party seeking to invoke the crime-fraud exception must demonstrate that there is a factual basis for a showing of probable cause to believe that a fraud or crime has been committed—or has been attempted—and that the communications in question were in furtherance of the fraud or crime. The factual basis must strike a prudent person as constituting a reasonable basis to suspect the perpetration or attempted perpetration of a crime or fraud, and that the communications were in furtherance thereof. Obviously, there need not be a definitive showing of the fraudulent nature of the client's objective; rather, there need only be presented a reasonable basis for believing that objective was fraudulent. It is sufficient to come within the exception that the client intended to use the attorney's services in furtherance of a crime or fraud even if the attorney was unaware of this purpose.

*Amusement Indus., Inc. v. Stern*, 293 F.R.D. 420, 426 (S.D.N.Y. 2013) (internal quotations and citations omitted). "In the end, 'the probable cause necessary to sustain the exception is not an overly demanding standard.'" *Id.* (quoting *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, 1999 WL 61442, at *5 (S.D.N.Y. Feb. 3, 1999)).

Moreover, even in the absence of a literal crime or fraud, New York courts have extended the exception to encompass "an alleged breach of fiduciary duty or an accusation of some other wrongful conduct." *Ulico Cas. Co. v. Wilson, Elser, Moskowitz, Edelman & Dicker*, 767 N.Y.S.2d 223, 224 (1st Dep't 2003). Simply put, New York recognizes that the attorney-client privilege

"may give way to strong public policy considerations." *Spectrum Sys. Intl. Corp. v. Chemical Bank,* 78 N.Y.2d 371, 380 (1991) (citing *Priest,* 51 N.Y.2d at 67–68).

Especially around the time period when Lester tried to take Eber-Conn for "no consideration"—December 2011—his communications with lawyers to EBWLC, Eber Metro, or the Trust were likely in an attempt to concoct a less-obviously-flawed legal mechanism to take Eber-Conn for himself and his daughter. It would not be surprising if the idea was discussed in the context of the then-pending lawsuits against EBWLC—after all, Harris Beach believed that the transfer of Eber-Conn was all about avoiding liability for the million dollars in unpaid legal fees. Accordingly, we have broadly requested *in camera* review of such communications from November 2011 through the transfer. Sure enough, it seems like the same lawyers who were representing EBWLC in at least one of the pending lawsuits became the lawyers that soon thereafter sued EBWLC at Lester's behest. *See, e.g.*, Log at EB-00026667 (showing Underberg & Kessler lawyers involved in emails with Lester and Wendy regarding "Harris Beach v. Eber" and "D4 v. Eber").

And, as noted in our previous brief: The November 7, 2012 Underberg Letter (EB-00026647) also implicates the crime-fraud exception because it shows that Wendy was actively working to protect Lester's financial interests at the expense of EBWLC, even though she was then President of EBWLC (a Trust asset). This letter was thus in furtherance of Wendy's ongoing breach of her fiduciary duties.

## CONCLUSION

The Court should order the Eber Defendants to disclose the allegedly privileged communications concerning the transactions at issue in this case. To the extent that any disclosure is based on the fiduciary exception, the Court's order should invoke Federal Rule of Evidence

502(d) to provide that disclosure to Plaintiffs in this litigation does not constitute a waiver as to anyone not a party to this litigation.

Respectfully submitted,

/s Brian C. Brook
Brian C. Brook (BB 1980)
CLINTON BROOK & PEED
100 Church Street, 8th Floor
New York, NY 10007
Tel./Fax: (212) 257-2334
Brian@clintonbrook.com

*Counsel for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

Dated: July 29, 2017