# Exhibit B

STATE OF NEW YORK
SUPREME COURT          COUNTY OF MONROE

HARRIS BEACH PLLC,

                    Plaintiff,

                                                    **AFFIDAVIT OF**
          v.                                        **LESTER EBER**

EBER BROS. WINE & LIQUOR CORP., ALEXBAY, LLC        Index No. 2014-13623
F/K/A LESTER EBER, LLC, EBER BROS. WINE &
LIQUOR METRO, INC., AND EBER-CONNECTICUT,
LLC,

                    Defendants.

STATE OF NEW YORK          )
                           ) ss.:
COUNTY OF MONROE           )

          **LESTER EBER**, being duly sworn, deposes and says:

          1.      I am currently the President and Managing Member of Alexbay, LLC

("Alexbay") and the President and a Director of Eber Bros. Wine & Liquor Metro, Inc.

("Eber Metro").

          2.      I have personal knowledge of the matters set forth herein, except for those

matters stated to be on information and belief, which I believe to be true.

          3.      From 1959 until February 1, 2012, I was also affiliated with Eber Bros.

Wine and Liquor Corp. ("Eber Bros."), most recently serving as President and a Director

of Eber Bros. I resigned from serving as President and a Director of Eber Bros.

effective February 1, 2012. Accordingly, I have not held any position with Eber Bros. as

of February 1, 2012. (*See* Exhibit 1, copies of my resignation and Board Approval of my

resignation).

EB-00017525

4.      I never held the position of Chief Executive Office of Eber Bros.  According to Eber Bros.' By-Laws, there is no CEO position within Eber Bros.  Instead, the position of President includes the responsibilities of a CEO.  (*See* Exhibit 2, Eber Bros.' By-Laws).

5.      Eber Bros. is a New York corporation that was incorporated in 1935 and previously operated as a wholesale wine and liquor distributor in upstate New York.  For the reasons described herein, Eber Bros. is not currently an operating entity.

6.      Eber Metro is a New York corporation that was incorporated in the mid-1990s and was wholly owned by Eber Bros until May 2012.  Eber Metro previously operated as a wholesale wine and liquor distributor in downstate New York.  But for the reasons described herein, Eber Metro is not currently an operating entity.

7.      Eber-Connecticut, LLC ("Eber-CT") is a Delaware limited liability company, formed on February 16, 2005.  Eber-CT operates as a wholesale wine and spirits distributor in Connecticut.

### Harris Beach's Representation of Eber Entities

8.      For several decades, the law firm of Harris Beach PLLC ("Harris Beach") served as outside general counsel to Eber Bros.; to Eber Metro from 1995 to 2010; and to Eber-CT from 2005 to 2010 in a variety of litigation and transactional matters.  During that time, various attorneys who are still associated with and/or members of Harris Beach provided legal advice to Eber Bros., Eber Metro, and Eber-CT (collectively, the "Eber Entities").  Patrick J. Dalton, a Harris Beach partner, served as corporate counsel to these Eber entities for more than a decade.  Other attorneys who are still affiliated with Harris Beach and who have worked on Eber Entity matters in the past include

2

Kevin W. Tompsett, David M. Mehalick, Justine R. Runke, Charles W. Russell, Paul J. Yesawich, Daniel J. Moore and Dale A. Worrall.

9.    As is relevant here, the Eber Entities engaged Harris Beach to represent them in the following  transactions:  (a) the acquisition of Slocum & Sons, Inc., which became Eber-CT in April 2005; (b) the exchange, proposed by Southern Wine & Spirits ("Southern"), but never consummated, of a $3 million interest free note for a 15% ownership interest in Eber-CT in the Fall of 2007; (c) the sale of the 15% ownership interest in Eber-CT, originally sought by Southern, to Eder-Goodman LLC in January 2008; and (d) the sale of a 6% ownership interest in Eber-CT to Polebridge Bowman in May 2010.

10.    Harris Beach had no involvement at all with the Alexbay foreclosure on the loans owed to Alexbay by Eber Metro and guaranteed by Eber Bros.' assets in June 2012, since the Eber Entities had terminated them as counsel in 2010.  In fact, it was Michael J. Beyma at Underberg & Kessler LLP who represented Alexbay in the foreclosure.  (See Exhibit 3, Mr. Beyma's Affidavit).  In fact, Mr. Beyma still believes that Eber Bros. received fair consideration in the foreclosure.  As a result, Mr. Dalton's thoughts on the value of Eber-CT in 2012 are purely speculative, clearly wrong and should be ignored.

11.    Harris Beach holds itself out only as a law firm.  We hired Harris Beach solely in its capacity as a law firm.  They are not an investment banking, financial advisory, appraisal or accounting firm.  They do not hold themselves out as experts in the valuation of businesses of any kind. .  Mr. Dalton's thoughts on appropriate

3

EB-00017527

methods of valuing our companies are purely speculative, clearly wrong and should be ignored.

### 2005 Acquisition of Slocum & Sons Inc./Before the Recession

12.     In April 2005, Eber Metro acquired a wine and liquor distributorship operating in Connecticut and Rhode Island called Slocum & Sons, Inc. ("Slocum"). The transaction was accomplished by merging Slocum into Eber-CT, a newly formed limited liability company. Eber-CT is currently operating solely as a distributor of wine and spirits in Connecticut.

13.     I have spent my entire life running private businesses. Over the course of 50 years, I have bought and sold many private businesses. In my experience, privately held businesses are difficult to value. A wide variety of considerations go into every decision about what to pay or what to accept in the purchase or sale of a private business. The principal considerations that are relevant in one purchase and sale may be quite different than those applicable in another. Industries change over time and through business cycles. Therefore, mechanical formulas rarely apply. In my experience, competitors in the liquor industry hold this same view when purchasing and selling private businesses.

14.     In the case of the Eber Entities' expansion through the acquisition of Slocum, Eber Metro's primary consideration was strategic; it was part of a much larger company in 2005. In 2005, Eber Entities' gross revenues were approximately $600 million compared to $36 million in 2012. Eber Bros. had significant operations in New York, and was striving to become a leading multi-state distributor. The acquisition of Slocum was strategically important because it would solidify and augment Eber Bros.'

4

EB-00017528

competitive presence and scale in the Northeast, and affirm its commitment to growth for the benefit of key suppliers and attracting new suppliers.  Slocum also owned an attractive import company with a portfolio of German, Austrian and Italian wines and sold these items exclusively in Connecticut.  The Eber Entities were eager to add Slocum's then highly profitable and vertically integrated business model to their own and saw an opportunity to leverage the Slocum import business throughout the rest of its distribution network.  Understandably, it is not possible to accurately pinpoint or create a mechanically derived valuation of the benefits of such an acquisition.

15.    Eber Bros.' analysis of the appropriate purchase price for Slocum was also significantly affected by the belief that there were other strong competitors who were interested in buying Slocum at the same time.  They saw the strategic value of Slocum's business as well.  It wasn't a matter of seeing how little it would cost to buy Slocum.  Rather, it was a matter of anticipating how high the purchase price would have to be to purchase the business and prevent key competitors from seizing this opportunity.

16.    Another significant factor in determining the offer to buy Slocum was that there were significant tax advantages to the Eber Entities in making the acquisition with the transaction structure that was employed.  It was a transaction structure tailored to the specific facts of the situation and not a structure that would apply to another sale of Slocum.  Essentially, because of the timing of tax considerations, Eber Bros. could afford to pay substantially more to buy the business in 2005.

17.    In retrospect, I believe Eber Metro significantly overpaid to acquire Slocum.  Although prior to Eber Metro's acquisition Slocum was profitable, during each

5

EB-00017529

fiscal year from 2005 through 2012 Slocum experienced significant losses, with aggregate net losses of $7,275,269 during that same period. (*See* Exhibit 4). Due to the forced wind-down of Eber Bros. as described below, the acquisition of Slocum never had the opportunity to generate the material synergies and other benefits that had been expected and had been factored into the proposed valuation at the time of the acquisition of Slocum.

18.    Harris Beach represented Eber Metro in the acquisition of Slocum. Mr. Dalton alleges that the acquisition of Slocum was prompted by certain legal protections afforded wine and liquor franchisees in Connecticut, as is stated in paragraph 15 of the affidavit of Patrick J. Dalton sworn to on December 11, 2014 ("First Dalton Affidavit"). Mr. Dalton also alleges that our acquisition of Slocum was prompted by the "legal bulwark" afforded liquor franchisees in Connecticut against termination of distributorships in that state. Neither of these allegations is correct. Mr. Dalton is a lawyer, not a businessman with the many years of experience in the wine and liquor distribution business that I have. Mr. Dalton does not have a comprehensive understanding of the competitive dynamics of this industry.

19.    The Connecticut wine and liquor franchise laws are not as valuable as Mr. Dalton alleges. They do not insulate a distributor from the risk of losing the exclusive right to sell a wine product line in Connecticut, rather - at most - they prevent a distributor from being completely excluded from the sale of a wine product. Although Connecticut law prevents a supplier from completely terminating its relationship with a distributor without good cause, a supplier may still "dual" a distributor at any time, meaning that the supplier can sell to a new "preferred" distributor in addition to the

6

EB-00017530

original distributor. Thus, the original distributor can be deprived of the benefit of being the exclusive distributor of a product within Connecticut without any protection under the franchise law. In my experience, the new "preferred" distributor typically ends up selling the majority of a supplier's particular product in Connecticut since the new "preferred" distributor receives marketing support and programming that is not offered to the original distributor. Additionally, the preferred distributor is the exclusive distributor of all new items or line extensions which typically drive revenues over the life cycle of the brand. Once a distributor becomes "dual" on an item, revenues and profitability are negatively impacted. As a result, revenues and profitability of any distributor in Connecticut are subject to many of the same uncertainties as in any state without a franchise law, and the Connecticut franchise laws offer little protection against these kinds of risks for Eber-CT. This could materially and adversely impact the value of the equity of Eber-CT.

20.    In fact, Eber-CT was "dualed" in 2009 by Deutsch, its largest supplier and the producer of Yellow Tail Wines. Until that point, Eber-CT distributed all Yellow Tail Wine products sold in Connecticut. As a result of being "dualed," the volume and revenue of Yellow Tail Wine products that Eber-CT sold in Connecticut was reduced by a catastrophic 50% in the first year of the "dual." Eber-CT now sells less than 28% of its "pre-dual" volume of Yellow Tail Wine products sold in Connecticut.

21.    During the period from 2008 through 2012, Eber-CT was "dualed" not only by Yellow Tail Wines but by many other brands, as well. This "dualing" took place after the Slocum acquisition in 2005, and after the sale of the 15% ownership interest to Eder Goodman in 2008, but before the foreclosure sale in 2012. Eber-CT's overall financial

7

performance was materially and adversely impacted by this "dualing," as its revenues for Deutsch (Yellow Tail Wines) fell from over $11 million, for the year ending May 31, 2009, to $2.6 million, for the year ending December 2014. Given that Eber-CT is among the smallest state-wide distributors, the threat of a "dual" on all its brands remains a constant concern and a source of future risk to revenue, profitability and valuation.

22.    Mr. Dalton's lawyerly theories have been disproven by what actually happened to Eber-CT since 2005.

### Fending off Southern (2005 through January 2008)/Before the Recession

23.    A number of events took place after Eber Metro's acquisition of Slocum that resulted in Eber-CT becoming the only remaining Eber Entity with any operating assets. Southern Wine & Spirits of America, Inc. ("Southern")—the largest wine and spirits distributor in the United States—entered the New York market in 2005, and swiftly set out to destroy Eber Bros.' and Eber Metro's businesses in New York through highly predatory and aggressive business tactics. At the time, New York was by far Eber Bros.' largest market. In 2006, Southern lured away many of Eber Bros.' and Eber Metro's significant suppliers in New York. As a result, Eber Bros. and Eber Metro could no longer sell their longstanding portfolio of highly recognizable wine and spirits brands in New York. In addition, Southern paid $10 million to Daniel Sisto, Eber Bros.' VP of Sales, and lured him away to work for them. Southern then hired more than 20 additional employees of Eber Bros. in one day and eventually hired hundreds of other former Eber Bros and Eber Metro employees, all in an effort to drive the Eber Entities out of business.

8

24.     As a result, in March 2007, Eber Bros. and Eber Metro were on the verge of bankruptcy and were unable to satisfy outstanding debts to their bank lender, vendors and suppliers.  Eber Bros. and Eber Metro engaged in a lengthy negotiation with Southern in the Summer of 2007 over a complex, multi-part transaction where Eber Bros. agreed to sell its interests in its Delaware and Ohio distributorships to Southern and, in exchange, Southern provided a significant amount of cash to Eber Bros. and Eber Metro to allow them to pay their debts to suppliers and thereby avoid bankruptcy. Southern did not want Eber Bros. and Eber Metro to file for bankruptcy because it would have hurt many of Southern's vendors, who were also vendors to Eber Bros. and Eber Metro.

25.     After Eber Bros. conveyed its interests in the Delaware and Ohio distributorships to Southern in 2007, Eber Bros. and Eber Metro still owed Southern $3 million.  A promissory note for this $3 million debt was offered to Southern in 2007. In 2007, Southern proposed that it exchange its $3 million note for a 15% ownership interest in Eber-CT.  I believe the principal motivation for Southern's proposal was that Southern was not then in the Connecticut market, and it could only enter the market by acquiring an interest in an existing distributorship.  The 15% interest in Eber-CT would have given Southern a way to enter the Connecticut market, and thus, Southern's interest in Eber-CT's equity was strategic and opportunistic.  The equity value discussed was not the result of the application of any mechanical valuation formula.  It was a value that was derived from the unique situation of a huge, national distributor pursuing a strategic goal and was a measure of what they were willing to pay to enter the

9

EB-00017533

Connecticut market at that time.  The proposed equity sale to Southern was never consummated.

26.    While we were in discussions with Southern, Mr. Dalton approached Eder Goodman, another Connecticut distributor, and offered to sell the 15% to Eder Goodman rather than to Southern.  Eder Goodman ultimately agreed to pay $4.5 million for the 15% ownership interest in Eber-CT in January 2008.  Eder Goodman's motivation was also strategic and opportunistic.  They were clearly motivated by a strong desire to keep Southern out of the Connecticut market.  Eder Goodman was willing to pay a 50% premium over Southern's offer in order to protect itself from Southern, which had a record of raiding suppliers, employees and customers of competing distributors and consequently destroying those distributors upon entering new markets.  Eder-Goodman was under significant pressure to pay a premium because Southern's presence in Connecticut would have been devastating to its businesses.  As Mr. Dalton knows, he was able to extract more money from Eder-Goodman by discussing the devastation Southern had inflicted on Eber Bros in New York.

27.    The competing motivations of Southern and Eder Goodman in late 2007 and early 2008 were unique to their particular circumstances.  One was trying to buy its way into the Connecticut market; the other was paying to keep a competitor out of the same market.  Their motivations and circumstances were completely different from those I faced in 2012, when I foreclosed on my loans to Eber Metro.

10

EB-00017534

### Failed Attempts to Obtain Financing or Sell Eber-CT (2008-2012)

28.     Until 2007, Eber Bros. had a $130 million first lien credit facility with Wells
Fargo. In March 2007, Wells Fargo put Eber Bros. loans into default and classified the
loans as a "work out," freezing all of Eber Bros.' working capital in order to pay down the
outstanding loans. When Wells Fargo was finally paid off, they declined to extend
further credit to any Eber entity. Finally, in June of 2008, Canandaigua National Bank
and Trust Co. ("CNB") was willing to provide only a $1.5 million loan on a six-month
basis thereafter. Between 2008 and 2012, Eber-CT made numerous attempts to
arrange new first lien debt financing with independent third-party lenders. None of
these lenders had any prior affiliation with Eber-CT. Discussions were held with at least
six different banks and finance companies in the Northeast about obtaining additional
financing. None of these lenders was willing to provide any credit to Eber-CT, on a first
lien basis or otherwise. It was not until after the Alexbay foreclosure sale that Eber-CT
was able to arrange a long-term seven-year loan facility with CNB. This lending facility
is an asset-based loan, not a cash flow-based loan. CNB relied only on the value of the
company's inventory and accounts receivable, and not on any projected cash flow or
inherent equity value of the company. CNB has informed us that they strongly prefer
that we refinance them out of their current facility as soon as possible.

29.     During the period from 2002 through 2012, I made an aggregate of
$3.228 million in cash loans to Eber Bros. and Eber Metro to support their operations.
In the Spring of 2010, I offered several other members of my extended family an
opportunity to participate in these loans on the same terms applicable to me. All of
them declined my offer.

11

EB-00017535

30.     Between 2008 and 2012, Eber-CT also contacted at least four different strategic wine and liquor distributors in the Northeast to see if there was any interest in acquiring Eber-CT.  None of these distributors had any prior affiliation with Eber-CT. After discussion and due diligence with each of the parties, none of them would make a proposal to acquire Eber-CT on any basis.

31.     The foregoing clearly demonstrates that a significant group of independent third party lenders and wine and liquor distributors, all of whom were well positioned to have an educated opinion of the value of Eber-CT's business, saw little or no value in Eber-CT during the period after the onset of the economic recession in the Fall of 2008. Extended family members who had participated for many years in the companies and had a strong familial relationship with me declined to infuse new funds, as well.  This was the harsh reality confronting Eber-CT in 2010, when it negotiated the sale of 6% of its common equity to Polebridge Bowman, and in 2012, when it asked the Court to confirm its view that the foreclosure of Alexbay's $3.5 million notes was commercially reasonable.

**2010 Sale of 6% to Polebridge Bowman/During the Economic Recession**

32.     In the Spring of 2010, Eber-Ct was struggling.  The economic recession, which started in the Fall of 2008, long after the Southern and Eder Goodman transactions, was still weighing heavily on the U.S. economy and was taking its toll on Eber-CT.  Its annual losses were mounting (losing $2.4 million for the fiscal year ending May 30, 2009 and $1.1 million for the fiscal year ending May 30, 2010).  The acquisition of the Slocum business had not lived up to Eber Metro's expectations at all.  Eber Metro's asset base had significantly shrunk from what it was in 2005 and by then only

12

comprised of the Connecticut business. Eber-Ct was suffering as a result of the aggressive competitive actions of its competitors and suppliers. All attempts to raise a new first lien credit facility or sell the company had all failed to attract any interest. Eder Goodman's investment in Eber-CT brought with it a number of negative covenant constraints on our flexibility in raising debt capital and in selling the company. It also brought with it a partner who, for their own strategic reasons, really did not have any interest in seeing the company be sold or perform well.

33.     In light of these unfortunate circumstances, the value of Eber-CT in 2010 was extremely uncertain; it could not be derived with any precision at all. Eber-CT may well have been worthless. The refusal of other distributors to purchase an interest in Eber-CT and the reluctance of the lending market to advance funds confirmed that Eber-CT had little value.

34.     Mr. Dalton's statement in paragraph 18 of the First Dalton Affidavit that he believed Eber-CT "was worth in the vicinity of $20 million" is uninformed and just flatly wrong. Mr. Dalton was retained as a lawyer, not a financial advisor or valuation expert. Whatever he may think he overheard me say in 2010, he clearly misunderstood. He took my hopes and dreams about creating a valuable company and tried to change those into current facts.

35.     In the Spring of 2010, Eber-CT approached Glenn Sturm seeking his assistance in formulating a plan to turn around the company. Eber-CT had no prior contact with Mr. Strum before 2010. The goal was to retain Mr. Sturm as both a lawyer and a senior strategic consultant.

13

EB-00017537

36.     Mr. Sturm was then a Senior Partner at Nelson Mullins Riley & Scarborough LLP, a prominent Atlanta law firm, where he practiced corporate and securities law, focusing on investment banks, private equity funds and emerging companies, with extensive experience in the financing and mergers and acquisitions markets. Mr. Sturm also chaired his firm's corporate department and served on its executive committee. At the same time, he was a well-known business advisor at The White Oak Group, a prominent private equity firm in Atlanta that is in the business of investing in, and growing the value of, lower middle market emerging companies. He had served as chief executive officer of a number of emerging companies and had served on the boards of numerous private and public companies.

37.     Mr. Sturm was an expert in assisting and advising small privately owned businesses. Eber-CT was fortunate to obtain his expertise and assistance in helping to forge a plan to turn around the company. He advised and consulted with Eber-CT on strategic initiatives to rehabilitate the business. Among other things, he was responsible for creating a marketing plan that focused on growing the craft spirit business and the Eber-CT imports business.

38.     Like any outside adviser, Mr. Sturm required that he be paid for his services. In this regard, he was no different from Harris Beach. This fact does not make him any less of an independent purchaser of Eber-CT. Mr. Sturm typically proposed to new clients that he be paid fees in cash and that he be given an opportunity to make a minority investment in the client's common equity at a fair market value purchase price. This was the way Mr. Sturm did business with his clients. This is the

14

EB-00017538

same way many similar advisors do business with financially distressed or emerging private companies having liquidity constraints.

39.  Mr. Sturm originally proposed a 10% ownership interest in Eber-CT, but was eventually negotiated down to 6% by May of 2010. The $350,000 purchase price for this interest was a negotiated value and was based on the then-current facts and circumstances regarding the company for a non-strategic purchaser. These then-current (ie as of May 2010) facts and circumstances regarding the company included the following (note that the company's fiscal year ends on May 31st):

- Total annual sales had *declined* by nearly $7 million, or more than 15%, over the then-most recent two fiscal years
- Total net income *losses* were more than $3.5 million over the then-most recent two fiscal years
- The company's operations were generating negative cash flow and as a result its total indebtedness *increased* by 160% from $1.5 million to $3.9 million over the then-most recent two fiscal years

As such, the company's deteriorating financial performance (declining sales, negative cash flows, and increasing levels of indebtedness) driven by the fallout from the Great Recession and the decision by a key supplier to "dual" the company on its largest single product, made many of the valuations that arrived prior to these events and consequences irrelevant.

Furthermore, even if the company had not experienced the materially deteriorating financial performance that it did between 2008 and May of 2010, the

15

EB-00017539

valuations arrived at in the Eder Goodman transaction and the proposed, but never

consummated, Southern transaction, were irrelevant for the 2010 transaction.

It is also important to note that as a highly leveraged company (the company had

nearly $4 million of debt and was not generating positive cash flow from operations),

even small changes in the value of the company translate into material changes in the

equity value of the company.

### Foreclosure on My Loans to Eber Bros. and Eber Metro/Foreclosure

40.     Between 2002 and 2012, I personally made cash loans to Eber Bros. and

Eber Metro for the purpose of enabling them to pay various operating and other

liabilities of the business, including helping to fund a portion of the liabilities of the Eber

Bros.' Pension Plan. (*See* Exhibit 5, copies of notes).  At all times prior to June 5, 2012,

all the common equity in Eber Bros. (and, indirectly, Eber Metro) was owned by a trust

of which various members of the extended Eber family, including myself, were

beneficiaries.  As mentioned above, in the Spring of 2010, I offered several other

members of my extended family an opportunity to participate in these loans on the

same terms applicable to me.  All of them declined my offer.

41.     I retained Harris Beach and Mr. Dalton to structure the loan transactions

and prepare the necessary documentation.  I instructed Mr. Dalton to put in place a first

lien loan facility that was consistent with arm's length loans from unaffiliated third parties

with rights, protections and enforcement mechanisms that were standard, typical and

commercially reasonable for an arm's length loan.  I believed that is what he did.

42.     As of December 31, 2011, the outstanding principal and accrued but

unpaid interest on my loans was an aggregate of $3,650,682.48.  The loans were then

16

the primary obligation of Eber Metro, but all the loans were guaranteed by Eber Bros.' assets. The loans and the guarantee were then secured by a validly perfected first priority security interest in the assets of Eber Bros. (principally all the capital stock of Eber Metro) and in the assets of Eber Metro (principally all of Eber Metro's 79% ownership interest in Eber-CT). (*See* Exhibit 6, Guarantees and Assignments.)

43.     I assigned the loans to Alexbay, LLC ("Alexbay"), a newly formed Connecticut limited liability company owned by me to hold these loans. As of December 31, 2011, I had priority as a secured creditor over any claim by the Pension Benefit Guaranty Corporation ("PBGC") against Eber Bros. or Eber Metro, as well as over any claim of Harris Beach as an alleged general unsecured creditor of Eber Bros. UCC filings made by me to perfect my security interest were a matter of public record. (*See* Exhibit 7, UCC filings)

44.     Eber Metro did not repay the sums due as required under the Line of Credit Note and the Debt Assumption Agreement. Accordingly, demand for payment was made for the sums due, but no payment was made. On February 21, 2012, Alexbay filed an action in the New York Supreme Court for Monroe County, seeking a judicial determination, pursuant to New York Uniform Commercial Code Section 9-627, that Alexbay's acceptance of all of Eber Bros.' ownership interest in Eber Metro (and, indirectly, all of Eber Metro's 79% ownership interest in Eber-CT) in full satisfaction of the loans then held by Alexbay was "commercially reasonable."

45.     A judicial action is not required under New York law, but was commenced out of an abundance of caution to alert any potential creditors of the foreclosure. Alexbay named Southern as a party to the action because it had a UCC on file asserting

17

it was a secured creditor of Eber Bros. and Eber Metro. While Southern originally opposed the action, it ultimately did not take any action to frustrate it. On May 11, 2012, this Court granted Alexbay's motion and determined that the foreclosure was commercially reasonable. On June 5, 2012, all the capital stock of Eber Metro was transferred to Alexbay in satisfaction of the $3.65 million loans. This occurred almost 19 months before Judge Odorisi granted Harris Beach's now reversed summary judgment motion in its Underlying Collection Action on January 14, 2014.

46.     In the Winter of 2012, Eber-Ct continued to struggle. The economic recession still weighed heavily on the U.S. economy and on Eber-CT. Eber-CT continued to incur annual net losses (losing $908,800 for the fiscal year ended May 30, 2011 and $363,132 for the fiscal year ended May 30, 2012). The acquisition of Slocum still had not lived up to its expectations at all. Eber-CT suffered as a result of the aggressive competitive actions of Southern and other competitors and suppliers. All attempts to raise a new first lien credit facility or sell the company had failed to attract any interest. Eder Goodman's investment in Eber-CT had brought with it a number of negative covenant constraints on our flexibility in raising debt capital and in selling Eber-CT. It had also brought with it a partner who, for their own strategic reasons, really did not have any interest in seeing the company be sold or expand.

47.     In light of these continuing unfortunate circumstances, the value of the equity in Eber-CT in 2012 continued to be quite uncertain. It couldn't be derived at that time with any precision at all. It certainly could have been materially less than $3.65 million. I believed at the time that the value of Eber-CT's equity had not changed materially since the sale to Polebridge Bowman in 2010. Alexbay cited the 2010

18

investment by Polebridge Bowman in support of its request for a determination of commercial reasonableness, not just because it was the most recent sale, but also because the circumstances surrounding the company's business prospects or lack thereof in 2010 were substantially the same as they were in 2012. In both years, the company was weighed down by the economic recession and the other circumstances previously described. Those were the circumstances on which the value of Polebridge Bowman's investment was based in 2010. It was, I believed, not only the most recent but also the most relevant valuation.

48.     As I explained above, Eber-CT's motivation in buying Slocum in 2005 was driven by strategic and opportunistic considerations, as well as tax considerations and the expectation of material synergies stemming from being part of the family of Eber companies. It took place when Eber was an entirely different company trying to compete in a booming economy, and the expected material synergies were never realized as the demise of the Eber businesses described above precluded such realization.

49.     The competing motivations of Southern and Eder Goodman in 2007 were unique to their particular circumstances at that time. One was trying to buy its way into the Connecticut market; the other was paying to keep a competitor out of the same market. Their motivations and circumstances were completely different than mine in 2012, when Alexbay foreclosed on the $3.65 million loans to Eber Metro.

50.     For all these reasons, I did not believe that any of the transactions that occurred in the pre-recession period between 2005 and early 2008 were relevant in

19

2012, when we asked this Court for a determination of commercial reasonableness in
connection with Alexbay's foreclosure on the $3.65 million loans.

*Lester Eber*

LESTER EBER

Sworn to before me this
24th day of June, 2015.

*Notary Public*

INGRID C. PALERMO
Notary Public, State of New York
Qualified in Monroe County
No. 02PA6170118
Commission Expires July 2, 20__

20