```
                    UNITED STATES DISTRICT COURT
                    SOUTHERN DISTRICT OF NEW YORK

In re:                              :
                                             Docket #16cv9517
KLEEBERG, et al.,                   :

                Plaintiffs,         :

        - against -                 :

EBER, et al.,                       :
                                            New York, New York
                Defendants.         : November 7, 2018

------------------------------------:

                        PROCEEDINGS BEFORE
                THE HONORABLE KATHERINE H. PARKER
            UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:

For Plaintiffs:           CLINTON BROOK & PEED
                          BY:  BRIAN BROOK, ESQ.
                               DARYOUSH BEHBOOD, ESQ.
                          100 Church Street, Eighth Floor
                          New York, New York 10007

For Eber Defendants:      UNDERBERG & KESSLER LLP
                          BY:  PAUL KENEALLY, ESQ.
                          300 Bausch & Lomb Place
                          Rochester, New York 14604


For Estate of            CALIHAN LAW PLLC
Elliot Gumaer:           BY:  ROBERT CALIHAN, ESQ.
                         16 East Main Street, Suite 761
                         Rochester, New York 14614




Transcription Service: Carole Ludwig, *Transcription Services*
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---|---|---|---|---|---|
| None | | | | | |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|---|---|---|---|---|
| None | | | | |

1

```
 1                                                    3
 2            THE CLERK:  Calling case 16cv9517, Kleeberg v.
 3   Eber.  Counsel, please make your appearances for the record.
 4            MR. BRIAN BROOK:   Good morning, Your Honor.  For
 5   the plaintiffs Brian Brook and Daryoush Behbood.
 6            THE COURT:   Good morning.
 7            MR. PAUL KENEALLY:   Good morning, Your Honor,
 8   Paul Keneally for the Eber defendants, and John Herbert,
 9   corporate counsel for Wendy and Lester Eber.  His
10   admission's pending.  He's here for the settlement
11   conference as well.
12            THE COURT:   Okay, good morning.
13            MR. ROBERT CALIHAN:   Good morning, Your Honor,
14   Robert Calihan on behalf of the Estate of Elliot Gumaer.
15            THE COURT:   Good morning.
16            MR. CALIHAN:   Good morning.
17            THE COURT:   All right, so I take it you haven't
18   been able to agree on any kind of resolution since we last
19   met.  That's too bad.  We are here to talk about discovery,
20   and I did receive your joint discovery letter, so thank you
21   very much.  Just to summarize issues as I understand them,
22   and then I'll ask you to correct me if I'm wrong.  So, one,
23   I understand that both sides want extension of the discovery
24   schedule to extend fact discovery until January 31 and
25   expert discovery to March 8.  I have no problem with that,
```

4

1

2  so I'll grant that request to allow you time to complete

3  discovery.

4         Now, other issues that I understand, both sides

5  object to certain depositions that the other side wants to

6  take.  I understand that plaintiffs object to the deposition

7  of Erica Stein, plaintiff Lisa Stein's daughter, and that

8  defendants object to the depositions of Glen Sturm and Paul

9  Keneally.  Then I understand there's an issue with respect

10  to certain interrogatories that plaintiffs believe that have

11  not been fully answered.

12         Finally, I understand there's some issues with

13  respect to financial records, that the plaintiffs are

14  requesting certain financial records pertaining to Lester

15  and Wendy Eber's personal finances and the assets and

16  liabilities of Alexbay and also that plaintiffs are

17  requesting certain general ledgers from the entities and

18  also legal payments to Underberg and Kessler.

19         Have I adequately stated or are there additional

20  issues besides the motion to disqualify which I will talk

21  about after the discovery issues and then the corporate

22  governance issues.

23         MR. KENEALLY:  Well, the only thing, Your Honor,

24  is the sentence about consenting to the magistrate judge

25  jurisdiction was a little misleading.  Defendants have

```
1                                                        5
2   agreed to that, and plaintiffs have not.
3           THE COURT:   Okay, well --
4           MR. BROOK:   Your Honor --
5           THE COURT:   -- this is --
6           MR. BROOK:   -- that's completely improper for
7   counsel to say.
8           THE COURT:   It's no problem for, you know, that's
9   your entitlement and that's no issue.  So I take no offense,
10  no problem.
11          All right, so let's - are there any other
12  discovery issues that I haven't mentioned that are on either
13  sides' agenda.
14          MR. BROOK:   I believe that summarized it
15  correctly.
16          THE COURT:   Okay, very good.  So let's first talk
17  about the, I think the interrogatories.  Because as I
18  understand it, defendants believe that the interrogatory
19  questions were already answered.  So I'm wondering if, Mr.
20  Brook, if you can perhaps explain in a little bit more
21  detail what it is that you think is missing from the
22  response, from the interrogatory responses?
23          MR. BROOK:   Sure.  So we attached the
24  interrogatories, and so, for example - okay, so, for
25  example, there is interrogatory number 8 --
```

```
 1                                                      6
 2            THE COURT:   Hold on, let me take a look.
 3            MR. BROOK:   Page 3.
 4            THE COURT:   Yeah.
 5            MR. BROOK:   Asks to identify all persons who
 6   currently hold any kind of equity or ownership interest in
 7   any of the Eber & Companies or Alexbay.  And the response to
 8   this was to say they've already answered this question in
 9   responses to interrogatories previously served by
10   plaintiffs.  Wendy Eber has no other information in response
11   to this interrogatory other than what has been set forth in
12   produced interrogatories.
13            We didn't ask this question before.  There were
14   other questions that related to some similar issues such as
15   asking Lester and Wendy in what companies are you a member
16   or an officer or a director.  But as far as trying to
17   ascertain who the current equity holders in these companies
18   are, that was an important question.  I think the importance
19   of the question has only become more obvious as a result of
20   the events the last week relating to who the equity holders
21   are in Eber Bros. & Co. Inc.  And I think that's now, I
22   understand why they refuse to answer this question because
23   they didn't want to come right out and tell us that they
24   were not recognizing my clients' interests in Eber Bros. &
25   Co. Inc., the top level company here.
```

So I don't know if Your Honor has had an
opportunity to review that issue, but that was the subject
of another letter, and my understanding is we're going to
be talking about it more today.  But I think that's one
of the many reasons why we should be able to know who
the equity holders are and the owners are of these closely
held companies because that – I think that that's just
obviously relevant given that these are closely held
companies and we're alleging breaches of duties to the
shareholders.

THE COURT:  Okay, Mr. Keneally, as I understand
it, you believe you've already provided the identification,
you already identified the persons who hold an equity or
ownership interest in these companies.

MR. KENEALLY:   Yeah, so, Your Honor, we had three
different interrogatory responses, Lester Eber's
interrogatory response number 6 to Kleeberg's
interrogatories.  Eber Bros. Wine & Liquor Corp.
interrogatory response number 7 to Mr. Kleeberg's
interrogatories to that entity.  Lester Eber interrogatory
response number 8 to Ms. Stein's interrogatories.  That's
just you know, Your Honor, because there's multiple
plaintiffs that the plaintiffs have served, I think it's
somewhere between 50 and 75 interrogatories going to the

```
 1                                                      8
 2    limit of each plaintiff.  We've answered all those
 3    interrogatories I believe, and I'm happy to double-check
 4    whether those three interrogatory responses answer every
 5    single question in 5, 7, 8, and 9 --
 6              THE COURT:  Okay --
 7              MR. KENEALLY:   -- in addition to all the other
 8    things.
 9              THE COURT:  So there are, there's the trust
10    entity, right, and then there's the parent Eber and then
11    there's the subsidiary Eber from New York and then the
12    Connecticut Eber, is that right?
13              MR. KENEALLY:  That's correct, and the --
14              THE COURT:  I'm hearing a shaking --
15              MR. KENEALLY:  The trust has been dissolved --
16              THE COURT:  I'm hearing --
17              MR. KENEALLY:  Yeah, that (indiscernible) letter
18    requested from the corporate counsel --
19              MR. CALIHAN:  Maybe make this --
20              THE COURT:  So, Mr. Calihan, let's just identify
21    the entities, and, Mr. Brook, I want to make sure you're in
22    agreement with these are the entities whose shareholders or
23    owners you need to know.  So --
24              MR. KENEALLY:  Just to make this easy, there are
25    two different independent chains of companies.  One is
```

```
                                                                9
 1
 2   starts with Eber Bros. & Co. Inc., a New York corporation,
 3   which is a dormant company with no assets.
 4           THE COURT:   Right.
 5           MR. KENEALLY:   It has a subsidiary, Eber Bros.
 6   Wine & Liquor, a New York company, which also has no assets
 7   and is a dormant company.  The other chain of companies,
 8   independent, stars with Alexbay LLC, a Delaware LLC.  Its
 9   subsidiary is Eber Bros. Metro Inc., which is a New York
10   company which is just a holding company, and then Eber Bros.
11   Metro owns 79 percent of the operating, the only operating
12   company here, Eber Connecticut LLC.
13           THE COURT:   And who owns the remainder of Eber
14   Connecticut LLC?  That's Lester Eber?
15           MR. KENEALLY:   No, Your Honor, 15 percent of Eber
16   Connecticut LLC is owned by an independent third party
17   called Eder, E-D-E-R --
18           THE COURT:   Oh, right, right.  Okay, okay.
19           MR. KENEALLY:   -- and 6 percent of Eber
20   Connecticut is owned by Wendy Eber.
21           THE COURT:   So --
22           MR. BROOK:   I just want to ask – sorry to
23   interrupt, but are you sure about that last part?
24           MR. KENEALLY:   We're not answering questions from
25   counsel.
```

```
 1                                                    10
 2            MR. BROOK:   I actually think --
 3            THE COURT:   Right, I just want to make sure that
 4  these are the entities whose owners that you want to know.
 5  You want to know who has an ownership interest in the Eber
 6  Bros. & Company New York, Eber Bros. Wine & Liquor New York,
 7  Eber Bros. Metro Inc. New York, and Eber Connecticut, is
 8  that right?
 9            MR. BROOK:   Yes, that's right, Your Honor, and I
10  think – and interrogatory number 9 then follows onto that
11  and asks for the type of equity interest held, the amount of
12  it, the percentage, and I think the fact that what I just
13  heard is different than what my understanding was, I can
14  tell you I thought that 6 percent of Eber Connecticut was
15  owned by someone named, or by a company named Polebridge
16  Bowman (phonetic), and that that's – this is why we need
17  this question answered because I think that there is --
18            MR. KENEALLY:   Well, he (inaudible).
19            THE COURT:   Okay, go ahead.
20            MR. KENEALLY:   It used to be owned by Polebridge
21  Bowman Partners LLC I think it was called, but they
22  transferred their interest to Wendy Eber, so she owns it.
23            MR. CALIHAN:   Yeah, and we're happy, and we will
24  review those interrogatory responses, Your Honor, and see
25  how many have already been answered, if not all of them, and
```

1
2  supplement if necessary.

3            THE COURT:   I mean this doesn't seem to be a

4  controversial issue, but at the same time plaintiffs should

5  not be re-asking for information that's already been

6  answered.  So I'll ask you to meet to discuss that and just

7  clarify for plaintiffs who the owners are in those four

8  entities and what type of ownership interest is held.

9            Mr. Brook, are there other key interrogatories

10 that you believe have not been answered?

11            MR. BROOK:   I think that's it.  The other

12 interrogatories, our understanding is that defense counsel

13 will be providing us with supplemental responses.

14            THE COURT:   All right.  Now, with respect to the

15 – I want to go to financial records next.  You are seeking

16 information about the net worth of Wendy and Lester Eber.

17 Why is that relevant?

18            MR. BROOK:   Well, that's relevant, Your Honor,

19 because we're seeking punitive damages here for one thing,

20 and there's case law to that effect that the amount of

21 punitive damages will be based in part on the assets of the

22 individual so that the amount of damages can actually be

23 punitive as opposed to something that can be merely brushed

24 aside or something that would be unduly punitive.

25            THE COURT:   And why do you need that now?  Is

1
2   this something that could be bifurcated and you could get
3   later?
4           MR. BROOK:  I don't think that bifurcation would
5   make sense here, and I don't think that it would be as
6   helpful to have that later for a number of reasons.  One is
7   the records are also relevant to the fact that we had sought
8   an accounting as part of the remedy.  We are trying to
9   follow, to essentially trace the money to see it's gone.
10  One of the issues that has come up in one of the
11  interrogatories where we'd been promised an additional
12  response is for the Eber defendants to identify some related
13  to party to Eber Connecticut that has apparently been paid
14  millions of dollars a year by Eber Connecticut going back to
15  about 2010.  They haven't --
16          THE COURT:  What entity are you speaking of?
17          MR. BROOK:  That's the question.  I've asked to
18  identify the related parties in the financial – because the
19  financial statements say we've had about $3 million in
20  purchases --
21          THE COURT:  Why are you focused on Eber
22  Connecticut now?  Isn't the concern, isn't this somewhat
23  removed from the principal claim in the case?
24          MR. BROOK:  No, Your Honor, because part of the
25  Eber Connecticut issue is what is the value of Eber

13

Connecticut, what're we fighting for here.  Because that

value, as the only operating asset, is something that is

significant to whether there was an inappropriate transfer,

significant to whether in the Article 9 UCC proceeding there

was misinformation provided.  It's significant to whether,

you know, there's – one of the reliefs we've sought is that,

in addition to returning the company to the Eber Bros.

chain, is that there would be a constructive trust placed

around proceeds received from the company.

        So to the extent that there have been proceeds

from Eber Connecticut that have not been paid directly to

the defendants, Wendy and Lester Eber, but instead had done

through some related party that they control and then

they're getting profits out of that end, that would be very

significant for us to know because it would show what the

real profitability of this company is --

        THE COURT:  What makes you think that that's

occurred?

        MR. BROOK:  The financial statements saying that

they have purchased about $3 million a year from a related

party.  That's --

        THE COURT:  Who's – and you don't know the

identity of the party?

        MR. BROOK:  We have a suspicion, but they refused

1

2 to answer the interrogatory up until now.  That's why we

3 pressed on it, and we were told that that was going to be

4 answered.  So we're still waiting for that answer, and I

5 believe that that is going to be something that ties into

6 the personal finances.  Because we're trying to connect the

7 dots here in terms of where is the money going that's coming

8 into this company because they're claiming that it's losing

9 money, but there's all these other entities, and they really

10 want to hold onto this company which makes us think that it

11 actually is profitable in total, even if at a specific

12 entity level it has been structured in a way so that maybe

13 money is going through this other related party entity and

14 then to Lester and Wendy.

15          And I think that given the fact that there were

16 fiduciary duties going all the way down the chain to even

17 Connecticut until mid-2012 and the fact they're still

18 continuing fiduciary duties for the other entities and r's

19 still a continuing officer and director relationship there,

20 that the additional basis beyond discovery rules, the fact

21 that we could get an accounting from them is another reason

22 why we should get that.  And I don't think that because of

23 the breadth of discovery that we would need to actually say

24 let's go ahead and get that accounting now, but I think that

25 if we needed to, that would be another way to try to get

1
2   this, to try to see where that money has been going.
3   Because I don't think that it would be right if we get back
4   Eber Connecticut, but there's six years' worth of millions
5   of dollars going out the door to another company that has
6   not been accounted for, that has essentially been lost money
7   that should've been coming to the Eber Bros. chain of
8   companies.
9           THE COURT:  I'd like to hear, Mr. Keneally, from
10  you regarding these financial documents.
11          MR. KENEALLY:  This is the summary of this whole
12  day is they're just making things up out of thin air when
13  they haven't done discovery yet.  So what they're talking
14  about is something that's not relevant, but I'm happy to
15  produce it anyway.  It's a pass-through company that's done
16  for like shipping reasons.  The money goes in and out.
17  We've given every single slip of paper of every nickel that
18  went from any of these companies to the Ebers ever.  That's
19  the only thing that counts.
20          This whole thing about general net worth is not
21  relevant whatsoever, and, in fact, in Davis v. Ross, 107
22  F.R.D. 326, 327, just what Your Honor said, they said we
23  don't have to - there's no need to produce all this stuff
24  for some speculative, you know, prejudice or punitive
25  damages when the (indiscernible) company is Lester put $6

```
 1                                                    16
 2  1/2 million and got nothing back from it, you know, if
 3  that's why he wants to keep the company because he kept this
 4  thing alive when it went over.
 5            And, by the way, there's a very, very important
 6  line of cases, when a company in New York becomes insolvent
 7  or nearly insolvent, the trust fund doctrine provides that
 8  the fiduciary duty goes to the creditors, not to the
 9  shareholders.  So this whole fiduciary duty idea is not
10  true.  Credit Agricole, 94 N.Y.2d 541, that's the Court of
11  Appeals of New York.  SDN Enterprises, 779 F.2d --
12            THE COURT:  Wait, wait, wait, hold on a second.
13            MR. KENEALLY:   Sorry.
14            THE COURT:  I'm writing – did you put these cases
15  in --
16            MR. KENEALLY:  Yeah, they're in the brief on the
17  attorney-client privilege portion.
18            THE COURT:  Oh, on the attorney-client, so I have
19  – that's what was submitted --
20            MR. KENEALLY:  You have those.
21            THE COURT:  -- yesterday.
22            MR. KENEALLY:  That's correct.
23            THE COURT:  So I have not yet read what was
24  submitted yesterday.  Okay.
25            MR. KENEALLY:  So the records of somebody's net
```

                                                                17

1
2   worth, you know, what Wendy Eber's husband's money is and
3   what Lester Eber's wife's money is and what Lester Eber,
4   he's 80 something years old, and he had money from 50 years
5   ago that's in his account, it's completely irrelevant and
6   more just attempting to run up the fees here and just
7   torture these defendants with irrelevant – he said it
8   himself in one of his letters, one of the primary issues –
9   what was the value of this company in 2012 when it happened?
10  And it was, our experts are going to say zero from what I'm
11  told.  And if Judge Rosenbaum looked at it, Judge Rosenbaum
12  signed the order.  Let's look at the business judgment of
13  that – that's what this case is about instead of all these
14  completely irrelevant issues about some shipping subsidiary
15  because of the rules of liquor distribution you have to give
16  it to one company to have permission to ship it to another.
17  Every nickel that ever came out of any company that went to
18  my clients we've produced every document about that, and
19  we're happy it because it ain't very much.
20          THE COURT:  So it seems to me that maybe
21  discovery through, maybe discovery should be phased first.
22  Which of the depositions go to – whether of the proposed
23  depositions are going to the 2012 transfer?  Because, as I
24  understand it, all of the documents have been produced with
25  respect to that, is that right?

1

2          MR. KENEALLY:  Yeah, the only other ones is on

3   this general ledger issue which lead right into it.  We've

4   given every single document that exists at any Eber company

5   about it.  We are in contact with the accounting firm to see

6   if maybe they have something else.  We're going to get

7   whatever they – to make sure – we were told it was the same.

8   If it's not exactly the same, we'll produce that, we're glad

9   to.  But, yes, exactly, the depositions should go forward on

10  the issue that matters.

11         THE COURT:  Okay, so which depositions are going

12  to the 2012 transfer?

13         MR. KENEALLY:  Well, you know, Danny Eber,

14  plaintiff Daniel Eber used to work there, so that certainly

15  would be one of them.  Erica Stein was certainly in contact

16  with her relative Mr. Eber and may well have knowledge of

17  the value of Eber as well as --

18         THE COURT:  Ms. Hayes.

19         MR. KENEALLY:  As well as she has significant

20  knowledge of the extra trust distributions that she got for

21  years and years and other gifts from Lester.  So she would

22  be important to that.

23         THE COURT:  And then from the plaintiffs, which

24  of plaintiffs' depositions are going to the 2012 transfer?

25  Obviously, Lester Eber, although his testimony would be

1
2  broader than that.

3          MR. BROOK:  Right, well, I think that when we

4  talk about the 2012 transfer, I think it's important to keep

5  in mind what the purported basis for it was was done for a

6  different debt transactions that go back several years.  I

7  mean I think we just heard from Keneally, Lester Eber's put

8  $6.5 million into this company.  Just to tie it back, those

9  kind of statements are another reason why we think that if

10  he's going to make these sorts of claims about all his

11  personal finances going into the company, that his personal

12  finances are, therefore, at issue.

13          In any event, as far as the depositions go, I

14  think that Eber Connecticut, Eber Metro 30(b)(6)'s those

15  definitely go to trying to value the company, trying to

16  understand their assets and liabilities including Eber

17  Metro's purported liabilities to Lester Eber.  Glen Sturm,

18  definitely relevant.  He was someone who had supposedly

19  bought part of the company.  His transaction, his Polebridge

20  Bowman transaction for 6 percent was expressly relied upon

21  in the court action to try to get a stamp of approval as

22  commercially reasonable on the 2012 transfer.

23          Paul Keneally, his, again, we haven't seen the

24  correspondence itself, but the volume of correspondence

25  going back to December 2011, right when Lester Eber first

```
 1                                                    20
 2   started trying, at least started telling the world that he
 3   was trying to take Eber Connecticut for himself when he
 4   created Lester Eber LLC which became Alexbay LLC.  I think
 5   that's - there's quite a bit of correspondence there that we
 6   would want to understand and understand what's not in
 7   writing too.  Wendy Eber certainly, she was apparently on
 8   both sides of that deal talking to the lawyers for everyone,
 9   and, again, a lot of those conversations and communications
10   had been --
11              MR. KENEALLY:   I apologize for interrupting, Your
12   Honor, but that goes to his use twice on these issues of a
13   document that you said was attorney-client privilege that
14   Mr. Calihan produced by accident, you struck it from the
15   record --
16              THE COURT:   I did.
17              MR. KENEALLY:   You should it's not to be used for
18   any purpose --
19              THE COURT:   Correct.
20              MR. KENEALLY:   He used it twice, and he just
21   mentioned it again.
22              MR. BROOK:   I did not.  I was referring to on the
23   privilege log there is a volume of correspondence that is
24   being withheld.
25              MR. KENEALLY:   I just want that document stricken
```

```
 1                                                      21
 2   again.
 3            THE COURT:   So that request is granted, and I
 4   will strike that document from the record.   The Court
 5   already found that that document was privileged, so it
 6   shouldn't be resubmitted via ECF.
 7            MR. BROOK:   I didn't resubmit the document, Your
 8   Honor.  Part of the – the only thing I did for the brief
 9   was, there was part of the brief that had not been stricken
10   which discusses it.  I thought to the extent the Court is
11   going to be reviewing that document among others, that stuff
12   is already on the public record.
13            MR. KENEALLY:   It should be off the public
14   record, that's the whole point.
15            THE COURT:   So to the – Mr. Keneally, to the
16   extent that there are documents that, on ECF that you wish
17   to be redacted in part or sealed, send a letter so that I
18   can order that those portions be sealed with respect to that
19   particular document that I found was, indeed, privileged.
20            MR. BROOK:   I wasn't talking about that, Your
21   Honor.  I'm talking about, when I'm talking about the 2012
22   transfer, I'm talking about everything up to June of 2012
23   which is when the transfer occurred, and that memo, as I
24   recall, was much later according to the privilege log.
25            Reno Fernandez was the lawyer who was apparently
```

22

1   representing --

2          THE COURT:  Well, but what you're doing, Mr.

3   Brook, is you're listing every single person on your 13 a

4   relevant for the – I'm trying to figure out if there's – how

5   would you prioritize the depositions that you want to take?

6          MR. BROOK:  Well, I think that – I mean we are

7   litigating that, and I think each of these witnesses may

8   have information, some of these witnesses may have

9   information that's relevant to other things, but all of them

10  have information that's relevant to the 2012 transfer,

11  including – with the exception of the Gumaer estate where

12  the questions were going to be focused again on

13  understanding the assets of the estate for purposes of

14  assessing punitive damages.  Otherwise, I think everything

15  goes to the 2012 transfer in at least substantial part.

16         THE COURT:  All right, so let me summarize.  The

17  interrogatory issue is resolved.  Mr. Keneally, you're going

18  to – you and Mr. Brook are going to talk and make sure that

19  plaintiffs have the owners --

20         MR. KENEALLY:  Yes, Your Honor.

21         THE COURT:  -- of the entities.  With respect to

22  the general ledgers, you've produced everything you have.

23  To the extent the accountants have anything different,

24  you'll produce them.

23

          MR. KENEALLY:   Correct, Your Honor.

          THE COURT:   The issue of the financial records,
as I understand, is tied into plaintiffs' theory of punitive
damages for the most part and that this bleeds into issues
regarding the pending motions.  Is that right?

          MR. BROOK:   Yes.

          THE COURT:   So let's talk about the pending
motions because perhaps I need to resolve those motions
before there's additional directions on, or decisions on
this discovery.

          So the motion to disqualify, I understand
defendants just filed a brief yesterday.  I haven't reviewed
that yet.

          MR. KENEALLY:   Well, actually, Your Honor, that
was the, on Monday was our letter response to their letter
response on that issue.  Yesterday was the attorney-client
privilege.

          THE COURT:   The attorney-client privilege, yes, I
apologize.  Attorney-client privilege brief I haven't read
yet.

          MR. KENEALLY:   And you'd have all those documents
in camera as well.

          THE COURT:   And I will look at those.  I will
look at those promptly and make a ruling on those.  But I

                                                                24

1

2    think that then also potentially goes into the motion to

3    disqualify issue as well because Mr., because as I

4    understand it, Mr. Brook, you're saying that Mr. Keneally

5    was involved in some of these transactions.  Mr. Keneally

6    has said he wasn't involved --

7              MR. KENEALLY:   Yeah, can I speak to that, Your

8    Honor?

9              THE COURT:   Yeah.

10             MR. KENEALLY:   So the fact that I was the client

11   contact and got cc'd on a bunch of letters is just, that's

12   just being a lawyer.  It has nothing to do with making a

13   lawyer a witness.  The Eber, Mr. Eber of Alexbay LLC and

14   Lester Eber LLC came to the firm to do an Article 9

15   litigation.  I gave it to the bankruptcy guys, Bruckner and

16   Beyma, who also shouldn't be deposed by the way, and they

17   litigated it, and I was cc'd on some letters.  That doesn't

18   make me a witness.  You could do that in every single case

19   that ever appears before you and have the other side start

20   deposing all the other lawyers, and including – as to Mr.

21   Sturm, him being deposed at all is okay.  Any business that

22   he did related to Polebridge Bowman is fine.  But he has

23   attorney-client issues as well that you'll see in that

24   motion.  Thank you.

25             THE COURT:   Okay.  All right, so I think that I

1

2   need to look at those privileged documents, and with respect

3   to the proposed motion to disqualify, perhaps briefing on

4   that should be deferred until I've looked at some of these,

5   at the privileged documents because that may inform the

6   motion to disqualify.  Mr. Brook, what's your view on that?

7           MR. BROOK:   I think that's certainly true for the

8   motion to disqualify insofar as it's seeking to disqualify

9   Mr. Keneally from the proceedings generally because I think

10  it sounds like he was operating in a role almost like an

11  outside general counsel being copied on all the

12  correspondence, including things where he was not working

13  on.  And I do believe, according to privilege level, he

14  actually is the author of a number of different

15  communications.  So that he might be underselling himself to

16  some extent.  I don't know for sure though.  I've not been

17  able to see those documents.

18          But the separate issue which ties into a lot of

19  the other issues we have right now which is disqualifying

20  Underberg & Kessler from representing Eber Bros. & Co. Inc.

21  and Eber Bros. Wine & Liquor Corp., which is the primary

22  basis asserted in the letter that I submitted.  Due to the

23  conflict of interest between those companies and the

24  remaining Eber defendants and in light of our recent

25  discoveries about some of the additional facts in terms of

1                                                                          26

2    Underberg & Kessler's involvement in the transactions at

3    issue that I think give rise to an even greater conflict of

4    interest because Underberg & Kessler was actively involved

5    in representing Eber Bros. Wine & Liquor Corp. in apparently

6    a different matter but at the same time that it was suing

7    Eber Bros. Wine & Liquor Corp. in 2012.

8            That gives rise I think to the reason why we had

9    decided to pursue that disqualification now because I think

10   it calls not question very seriously their ability to be

11   objective and appropriate counsel to those entities.

12   Because those entities are the ones that are, according to

13   them, defunct and have no assets.  But the point of this

14   lawsuit is to change that, to give them assets, to give them

15   control of Eber Connecticut.  And so there is a conflict

16   there.  There's certainly serious misconduct that is alleged

17   which is what's referred to in the notes to the Rules of

18   Professional Conduct on this.  And there are cases out there

19   that discuss this issue as well.

20           And I think that given all the circumstances which

21   we've laid out in our letter, and we could expound on that

22   further in briefing if necessary, that that disqualification

23   should proceed.  And I think that there's a couple of other

24   factors in this case that make it even more appropriate to

25   do that.  One is my clients are actually the majority

27

shareholders in the entity, Eber Bros. & Co. Inc., and so under the Rules in order to get informed consent to waive the conflict for them to represent both the corporation and the officers and directors accused of wrongdoing, there needs to be shareholder approval under the Rules because there's no written informed consent that has been received otherwise.  And so my clients being shareholders do not consent to that, so that's one issue.

        Relating to this is in reviewing the case law, which I can expound on further in more briefing – I didn't have that much space – it looks to me like a lot of times – and this is where we were with this – there's a conflict, but because the corporate entity is really just a nominal defendant not a significant players, it doesn't really matter.  It's not worth the resources, it's not worth any impairment of choice of counsel or things like that to get into disqualification.  But because of these privilege issues, in fact, which relate to Eber Bros. Wine & Liquor Corp. and the question is about the scope of the fiduciary duty and such, and the fact that there is this sort of incredible assertion that there was no fiduciary duty owed to my clients as shareholders even, I think it shows that there is a serious enough conflict to warrant disqualification.

2        Because I don't think that an objective lawyer who
3  is representing those corporations' interests would ever
4  make the assertion that the corporation or its officers and
5  directors don't owe fiduciary duties to shareholders just
6  because he found one case where there's a Court of Appeals
7  of New York said that officers and directors also have a
8  fiduciary duty to creditors when a company's insolvent.
9  There are three cases I could rattle off right now that say
10 that the duties to shareholders continue even for an
11 insolvent corporation.
12        THE COURT:  All right, so I think then I need to
13 have more, fuller briefing on this motion to disqualify.
14 Let's talk about a schedule to submit those briefs.  When
15 will plaintiffs be in a position to submit their moving
16 brief?
17        MR. BROOK:  I think we could do it – I'm
18 traveling a lot over the next few days – but I think we
19 could do it by the end of next week.
20        THE COURT:  That's November 16.
21        MR. BROOK:  Yes, we can do that.
22        THE COURT:  So the moving brief on the proposed
23 motion, on the motion to disqualify will be due November 16.
24 And how long will – and this is going to relate to the firm
25 Underberg & Kessler?

```
 1                                                    29
 2              MR. BROOK:   Correct, Your Honor.
 3              THE COURT:   Right.  Mr. Keneally, how long will
 4    you need to respond?  Because Thanksgiving is that following
 5    week.
 6              MR. KENEALLY:   Well, I just want to
 7    (indiscernible) first, Your Honor, all this discussion about
 8    conflict and retainer agreements is absolutely irrelevant.
 9    I never represented – the firm never represented the
10    plaintiffs.  The plaintiffs still don't, as you can see in
11    the (indiscernible), still do not own anything of any of
12    these corporations.  But even the best possible argument
13    that they did came after the trust was dissolved in 2017.
14    So there is no conflict.  The clients who they keep talking
15    about, none of those clients have any conflict, none of
16    those clients had any problem with anything that happened.
17    The only client that had, needed separate counsel got it,
18    Eber Bros. Wine & Liquor Corp., who they want to depose the
19    lawyer who did that.
20              So the standing to make all these arguments,
21    they're making arguments on behalf of clients who don't
22    exist.  The retainer rules and the conflict rules are for
23    clients.  They're for people who are clients of lawyers.
24    They're not for opposing counsel to go off on a tangent and
25    to deprive clients of their lawyers.
```

1
2          In terms of timing --
3          THE COURT:   You'll make all of those arguments --
4          MR. KENEALLY:   We sure will.
5          THE COURT:   -- in your opposition brief --
6          MR. KENEALLY:   So let's see --
7          THE COURT:   -- and I'll certainly consider that.
8          MR. KENEALLY:   The security takes my calendar.
9          THE COURT:   So the Thanksgiving, the 16th is the
10   Friday before Thanksgiving.  I think Thanksgiving is on the
11   22nd.  The 30th is fine if that will work for you.  So the
12   opposition will be due November 30, and reply seven days, a
13   week, by December 7, is that sufficient?
14          MR. BROOK:   Yes, Your Honor.
15          THE COURT:   So 12/7.  Now to the extent that
16   these documents include information that may be privileged
17   and confidential, you should follow my - or that need to be
18   submitted under seal, then you should follow my rules which
19   would include filing a redacted portion on the ECF and then
20   the unredacted document to be emailed to my chambers --
21          MR. KENEALLY:   Yeah, I think we have a protective
22   order in place as to financial information.
23          THE COURT:   Right, so to the extent - I don't
24   know the extent that any of - I suspect that this briefing
25   may involve some things that may need to be under seal, but

31

1

2    just follow my procedures with respect to that so I can

3    consider that.

4            So I will review the privilege motion and the

5    motion to disqualify promptly.  Now, this then goes to the

6    issue of these corporate governance matters as well, and I'm

7    – based on the letters that have been submitted, I think I

8    need further briefing on whether this is even something that

9    can be done by this Court.  It seems to me that these may

10   involve additional claims and potentially a proposed

11   amendment to the complaint.  I don't know that the, they're

12   not live claims though I'm not sure that the Court has

13   jurisdiction to act on these requests.  So – and in your

14   letter, Mr. Brook, you said that you could bring it in state

15   court, so that's also what's making me think that maybe it

16   really is an amendment to the complaint to add claims.

17           MR. BROOK:   Well, I do have some precedent on

18   that, Your Honor.  This court in 1974 ended up – I'm sorry,

19   it's not this court, it's the Eastern District of New York –

20   ended up addressing a similar issue involving a contested

21   election in a case where there were breach of fiduciary

22   claims against officers and directors.  And in that case the

23   court ended up finding that because the issues related to

24   the corporate governance issues that were being sought there

25   to find breach of fiduciary duty and the court ended up

1                                                                32

2   having jurisdiction over it.  And it invokes – there is a

3   state court procedure, I guess it's Section 619 or 617 – I'm

4   not seeing it right here right now – 617 that allows any

5   shareholder who's aggrieved by an election to bring suit.

6   In this case it's <u>Wolpert v. National Bank</u>.  I would hand it

7   up but I see that, unfortunately, it was printed out with my

8   associate's comments in there.

9           THE COURT:   Okay, that's not a problem.

10          MR. BROOK:   But I can give the citation, it's 381

11  F. Supp. 625, and it's <u>Wolpert</u>, W-O-L-P-E-R-T --

12          THE COURT:   But what that's saying is that

13  there's a cause of action.

14          MR. BROOK:   No, it was not explicitly a cause of

15  action to challenge the election or anything in this case.

16  It was about other breaches of fiduciary duty, but because

17  the election ended up having the same effect as trying to

18  remove officers and directors from the company that was

19  being sought in that case, that, therefore, the court could

20  go ahead and hear it because it related to the alternate

21  causes of action.

22          THE COURT:   But what was the nature of the

23  motion?

24          MR. BROOK:   The motion was to set aside the

25  election of board of directors and schedule a new one.  And

33

that was not something that was sought as a specific claim

in the complaint there.  The complaint was about other

issues.  But because the court found that because it related

to the other issues that were involved there and the relief

sought was similar, although not identical in terms of

ultimately holding the officers and directors accountable

for breaching fiduciary duties, it ended up saying that it

had jurisdiction over this to decide it.

And I think in this case the issue is even

stronger because this issue has now been raised as a

challenge not just to the election of directors but as to

whether my clients have standing.  And I think this Court

certainly has jurisdiction to decide whether or not my

clients have standing.  Otherwise, I can't imagine --

THE COURT:  The Court can – I believe if there's

an issue of standing, that's a motion that defendants can

raise and say that, you know, move to dismiss whatever claim

for lack of standing.  I have to look at that case, and I'd

also like to hear defendants' view on procedurally how you

think this issue could be brought to the Court.

MR. BROOK:  May I make one more note, Your Honor,

just on the standing point.  Mr. Keneally repeatedly

referred to my clients' standing to challenge

disqualification and to challenge privilege.  And so I think

                                                              34

1

2    standing is currently before this Court on those pending

3    motions.

4         MR. KENEALLY:    That standing has nothing to do

5    with this standing, that's completely different.  They have

6    no standing to make these arguments about clients they don't

7    represent about retainer issues and conflict issues when the

8    clients themselves have no objection.

9              In terms of this, yeah, you're absolutely right,

10   Judge, there's no cause of action pending that has anything

11   to do with stock books or shareholder meetings or call

12   rights.  By the way, if you recall, this all started because

13   counsel sent me an email saying, you know, in help of our

14   coming settlement conference, please send me the bylaws, and

15   the next thing you know we have a shareholder meeting.

16   They're just not an issue in this case, and I see from the

17   letter, all's that has been done is specifically by the

18   bylaws.

19             So we're by the book making arguments on behalf of

20   my clients about whether a retainer agreement was signed in

21   2010, but then we don't go by the literal byways.  So bylaws

22   say personal delivery.  Personal delivery still hasn't

23   happened.  So this corporate governance issue is just not,

24   it's not at bar, I don't think you have jurisdiction, and

25   alls that's happened is the defendants filed the bylaws.  So

```
 1                                                        35
 2   I don't think it's a topic that --
 3              THE COURT:   I think --
 4              (interposing)
 5              MR. KENEALLY:   -- should be litigated here.
 6              THE COURT:   I mean in my view is that this
 7   governance issue has to be raised through potentially a new
 8   claim if it's a pendant claim and potentially through a
 9   proposed amendment and maybe you're seeking some kind of
10   declaratory or injunctive relief with respect to that claim.
11   That's how I would view it, and then defendants would be
12   able to respond to whether or not they would agree or
13   whether they oppose the amendment.  But to me that is a more
14   logical way of proceeding with this proposed motion I guess.
15              MR. BROOK:   Yes, Your Honor, and we can – as I
16   mentioned on the last conference call, we are planning to
17   seek leave to amend to essentially update the allegations
18   from what we've learned in discovery as well, including some
19   additional transactions in this shipping company that Mr.
20   Keneally referred to but still hasn't named is one of those
21   things.  So I would like to be able to file that amendment
22   by the end of next week as well.
23              THE COURT:   So let's, well, let's talk about that
24   because I want to set a schedule for that.  I'd like you to
25   provide the proposed revised pleading to defendants with any
```

36

1
2  additional claims that you believe are colorable to the
3  extent that they relate to this corporate governance matter
4  that you've raised.  And I'd like to give defendants the
5  chance to look at the proposed amendments.  You should
6  provide a redline.  And if there's not an agreement, then
7  what I'd like to do is set a briefing schedule related to
8  the proposed amendment so that on November 30, if that works
9  for you, that you can make a motion to amend, and then I can
10 give defendants two weeks to respond to that.

11          I think that works schedule-wise because the
12 defendants will be working on their opposition up to the
13 30th, so you won't have anything actively to oppose, so you
14 could file your moving brief on the 30th of November, and
15 then defendants can file their opposition on the 14th, and
16 then your reply can be due the 21st.

17          MR. KENEALLY:  Your Honor, is that an actual
18 motion or is it the proposal like the letters --

19          THE COURT:  The motion.  We're not going to - you
20 don't need to do any pre-motion letters for this because
21 we've just talked about it.  So I think that's the best way
22 to proceed and to tee up this corporate governance issues.

23          MR. BROOK:  Two things, Your Honor.  One is I'd
24 like to clarify.  Your Honor said about providing proposed
25 revised pleading to the extent that it relates to this

                                                                    37

1

2  corporate governance issue.

3        THE COURT:   Any revisions, you should provide

4  defendants with all revisions --

5        MR. BROOK:   Just making sure, I thought so.

6        THE COURT:   -- and a redline as to all revisions.

7        MR. BROOK:   Second thing is my concern on

8  standing, I know that Mr. Keneally said standing for

9  bringing claims has nothing to do with it.  In fact, it's

10 entirely related because all of it relates to the ability to

11 assert derivative claims.  So my clients were not clients of

12 Mr. Keneally.  Eber Bros. Wine & Liquor Corp. and Eber Bros.

13 & Co. were.  And so my clients as shareholders or previously

14 beneficiaries in the trust are asserting derivative or

15 doubly derivative claims there.  So I do think it

16 unfortunately relates to that.  I hope that the record may

17 be clear enough to be able to try to clear that up.

18        And actually there's one document that, to the

19 extent the Court was interested in seeing it, I think would

20 be very relevant to this corporate governance issue in that

21 Mr. Keneally in his letter referred to - he referred to the

22 fact that Lester Eber didn't get notice of this transfer.

23 Well, that, you know, there was a letter that was sent in

24 October 2017, but it didn't include the stock power showing

25 how many shares were being sent to my clients.  The truth is

```
 1                                                    38
 2   Lester Eber chose the amounts of shares that were
 3   distributed to my clients as co-trustee.
 4             This letter, which I can hand up to the Court, was
 5   just given to me yesterday by counsel for Canandaigua
 6   National Bank after I forwarded Mr. Keneally's letter to
 7   them.
 8             THE COURT:   Okay.
 9             MR. BROOK:   And it says that this letter is in
10   follow-up – and this is being sent to the lawyer who's
11   representing Lester Eber in connection with the trust
12   dissolution proceeding.
13             THE COURT:   James Vazzana is the lawyer who
14   represented Lester Eber in connection with the dissolution.
15             MR. BROOK:   Correct, Your Honor.
16             THE COURT:   Not Underberg & Kessler.
17             MR. BROOK:   I believe that is correct.  Underberg
18   I think had some ancillary communications perhaps in that
19   proceeding, but the counsel of record was Mr. Vazzana.  And
20   so this letter, I'll just sort of summarize it, that what it
21   basically says is that we're following up to your previous
22   letter and that they've reviewed further and they confirmed
23   what apparently – I don't have the original letter that was
24   sent – but the reference back to it suggests that Lester
25   Eber saw that there was a proposed distribution of shares
```

                                                                39

1
2     where one-third would go to him, one-third would go to
3     Audrey Hayes, and then one-third would be split between
4     Daniel Kleeberg and Lisa Stein, the two children of his
5     recently deceased sister.  And that in response – and that
6     was both true for the shares as well as the overall assets
7     of the trust.

8              And Lester Eber responded by saying no, wait,
9     there was this money that was given to Lisa Stein's
10    daughter, you know, this was the gift, the extra
11    distributions Mr. Keneally referred to as a gift from Lester
12    Eber.  Well, it wasn't a gift because this is, responding to
13    (indiscernible) then asked the trustee, asked the trust to
14    ultimately deduct all of that that was given to Lisa Stein's
15    daughter from what she received from the trust.  So in
16    response to that request for Lester Eber, this letter
17    attached (indiscernible), and on page 2 it specifically
18    shows how in light of those earlier transfers that Lester
19    wanted to make sure did not come out of his pocket at all,
20    that the new amount of shares that would be issued for Eber
21    Bros. & Co. class A.  Those are the voting shares at issue
22    here.  It says that Daniel Kleeberg will get 301; Lisa
23    Stein, 137; Audrey Hayes, 706; Lester Eber, 706.  And this
24    was dated August 1, 2017.

25             So this idea that he didn't have any notice about

1
2   what the proposed transfer was, to the extent that that
3   provision has anything to do with anything considering that
4   they concealed the bylaws from us until about a month ago
5   and never gave the bylaws to Canandaigua National Bank, so
6   trying to say that this notice was ineffective under the
7   bylaws that we didn't give to you is kind of a crazy thing
8   in and of itself.  But it's also just untrue.  And this is
9   truly a remarkable attempt to mislead the Court in the
10  letter that was submitted two days ago, given that Lester
11  Eber clearly knew what the number of shares were, and, in
12  fact, because he was co-trustee and because it was in
13  response to his letter, he for all legal purposes
14  authorized, if not directed, this very transfer to my
15  clients of the shares.
16          And so the idea that he's now going to try to
17  exercise some repurchase right is just lawyers coming up
18  with excuses at the last minute to try to figure out ways to
19  prevent my clients from getting the shares that have already
20  been authorized by their client was he acting as co-trustee.
21          MR. KENEALLY:  Your Honor, nobody ever said
22  Lester didn't know anything in my letter.  Alls it said it
23  was never personally delivered.  The bylaws say personal
24  delivery, in quotes; it still hasn't been personally
25  delivered.  This is not personal delivery.  It's a letter to

41

1
2 a lawyer.  Nobody said Lester didn't know about that things
3 were happening.  The trust was being dissolved, sure, but
4 it's personal delivery, and Lester is being sued in 2016, he
5 has no duty to go around and teach everyone what the bylaws
6 says.  Never deprived the bylaws to anyone.  There's no
7 letter saying give us the bylaws.  The plaintiffs had every
8 opportunity to get any bylaws they wanted or CNB had every
9 opportunity.  And if they sent a letter and didn't get it,
10 they could've sued gotten them, which did not happen.  So it
11 says, the bylaws say personal delivery, and that's what the
12 issue is.
13         I think it's also important to note here that the
14 stock certificates that the trust owned before the trust was
15 dissolved, to the extent that they had anything to do with
16 the plaintiffs, they've never been presented to the
17 corporate secretary of Eber Bros. & Co.
18         THE COURT:  That's Wendy Eber.
19         MR. KENEALLY:  Yes, they never – the originals
20 had never been presented --
21         THE COURT:  I thought they were missing.
22         MR. KENEALLY:  No, no, the stock certificates
23 themselves are not missing.  The stock certificates were
24 issued in the name of the trust, and they were in the
25 possession of Canandaigua.  Those stock certificates and the

                                                                    42

1

2    stock powers that effectively endorsed or purportedly

3    endorsed the shares to the plaintiffs, those have never been

4    presented to the corporate secretary Wendy Eber.  Under the

5    UCC they have to be duly presented to the corporate

6    secretary.  They've just never been presented.

7              THE COURT:   Well, so, Mr. Brook, do you have

8    those stock certificates?

9              MR. BROOK:   So this is the issue, Your Honor, in

10   the letter that was attached as exhibit A to our corporate

11   governance letter --

12             THE COURT:   Yeah.

13             MR. BROOK:   -- where – and my conversations with

14   Canandaigua National Bank's counsel, my understanding is

15   consistent with that letter which states at the beginning

16   basically that it's our – apparently you can't find the

17   stock but we made repeated requests.  So what my

18   understanding is is that Canandaigua National Bank holds the

19   stock certificates.  It holds the stock powers that it

20   issued as well when it didn't get a response from Eber Bros.

21   corporate secretary --

22             THE COURT:   So your clients don't have the stock

23   certificates.

24             MR. BROOK:   Our clients don't.  My understanding

25   is Canandaigua --

43

1

2          THE COURT:   And they want the stock certificates

3    and the bank has the stock certificates.

4          MR. BROOK:   No, Your Honor, I'll try and break it

5    down, I'm sorry.  So the stock certificates issued to the

6    trust many, many, many years ago, Canandaigua has those.

7    Our clients don't want those because they're not issued to

8    them.  When the trust was dissolved, Canandaigua tried to

9    either issue new certificates or at least get stock powers

10   delivered to Eber Bros. & Co.  It made a request for where

11   do we send this because the company, as has been pointed out

12   multiple times, is not operating, and no response was given.

13   They couldn't just send this into the ether, they couldn't

14   send it into a vacuum --

15         THE COURT:   Well, they couldn't they send it to

16   Wendy Eber?  Isn't she still secretary?

17         MR. KENEALLY:   They know Wendy Eber's address.  I

18   don't know what you're saying.

19         MR. BROOK:   My understanding is that they tried

20   to get the corporate address to send it to Eber Bros. & Co.

21   Inc.  They weren't going to send it to --

22         (interposing)

23         MR. KENEALLY:   They know where Lester Eber and

24   Wendy Eber live.  What're you saying?

25         MR. BROOK:   Then why was - I don't want to engage

```
                                                    44
 1
 2   with counsel.
 3           THE COURT:   Let me just ask this simple question
 4   that is not legal.  Can your client ask the bank to deliver
 5   those certificates to Wendy Eber?
 6           MR. BROOK:   Yes, it's always been understood that
 7   they should be delivered to Wendy Eber.  The bank knows this
 8   --
 9           THE COURT:   So --
10           MR. BROOK:   The bank has been waiting for someone
11   to confirm here's where you deliver it because --
12           THE COURT:   Well, why can't your clients do that?
13           MR. BROOK:   Because our clients aren't the only
14   ones involved.  The stock powers also include Lester Eber.
15   So I can't act unilaterally to say you send Lester Eber's
16   stock power here or there.
17           THE COURT:   I thought you said your clients had -
18   -
19           MR. BROOK:   They need to --
20           THE COURT:   -- a majority of the stock though,
21   they have two-thirds.  So why can't they do that?
22           MR. BROOK:   Well, I think the issue is that they
23   - I'm not sure that this is a corporate --
24           THE COURT:   Isn't that what you --
25           MR. BROOK:   -- decision.  I think that this
```

                                                                    45

1
2    something that affects the individuals who are being –
3    because Canandaigua National Bank is doing this in its role
4    as winding up the affairs of the trust, I think that its
5    duties extend to all of the trust beneficiaries.  Now, I'm
6    happy to --
7                THE COURT:   Why can't your clients ask for the
8    stock certificates relevant to them be delivered to Wendy
9    Eber?
10               MR. BROOK:   Well, because the stock certificates
11   cover all four of them.  The stock certificates be just to
12   the trust, Lester Eber has an interest in those that is
13   equal to Audrey Hayes.  And so, look, I'm happy to do that,
14   but I – Canandaigua has told me that they want to know
15   officially, because they could be liable if this goes to the
16   wrong place.  They want to know where do we deliver these
17   things because they've got the executed originals.  They
18   can't send those somewhere without knowing where to go, and
19   that information was not provided to them.
20               I think that that's something where – I guess I'm
21   at a loss here.  I don't see what – it's the corporation's
22   responsibility to respond to a request from its shareholder,
23   which was the trust, Canandaigua's acting in the capacity of
24   the trust, the trust as shareholder asked for information
25   where do I send the stock certificates and the stock powers.

1

2         THE COURT:   Who do you believe is the person to

3 answer the question?

4         MR. BROOK:   It is, well, in this case it was

5 directed to counsel for Lester and Wendy Eber.  It's my

6 understanding of what happened.  Now, again, I'm doing this

7 on hearsay from what Canandaigua's counsel was doing.  But

8 they're the ones in control of this thing.  They're the one

9 who've been saying we're trying to get this to the company.

10 And even though my clients own the majority of the shares,

11 as they're pointing out, they don't actually have control of

12 the company.  They're not directors yet.  They aren't even

13 being recognized as shareholders.  And my understanding is

14 that as soon as these stock powers go in, they're going to

15 be torn up and replaced by Lester Eber exercising some

16 repurchase right based upon supposedly not getting notice of

17 something that he himself authorized.

18         THE COURT:   Okay, Mr. Herbert, I want to hear

19 from you.

20         MR. HERBERT:   I think the point is that there's

21 millions of stock transfers that go on in this neighborhood

22 every single day, and so there are some very specific rules

23 in the UCC about what's required in order to obligate the

24 issuer of the stock to register the transfer of the shares.

25 There's two different things going on here.  There's the

47

1

2  actual transfer of the shares, that's between the transferor

3  and the transferee, and then there's the registration of the

4  transfer of the shares on the company.  What's going on with

5  the transfer of the shares, that's between the transferor

6  and the transferee.  Wendy Eber as the secretary doesn't

7  really have anything to do with that.  That's really up to

8  the transferor or transferee.

9         She's just obligated as the secretary to register

10 the transfer on the books of the company when and if the

11 transferor and/or the transferee complied with the UCC and

12 the bylaws about what's required to obligate her to register

13 the transfer.

14        THE COURT:   All right, but the transferor's the

15 bank and the transferee would be the entity, right?

16        MR. HERBERT:   Right, but either or both of them

17 could've presented the original stock certificate to Wendy

18 Eber --

19        THE COURT:   The plaintiffs.

20        MR. HERBERT:   Correct.

21        THE COURT:   Either of them.

22        MR. HERBERT:   Either Canandaigua or the

23 plaintiffs could've presented the stock certificate to the

24 corporate secretary with a request to register the transfer.

25        THE COURT:   So why doesn't that happen?  Why

```
 1                                                    48
 2   didn't your client do that?
 3           MR. HERBERT:   Well, why didn't they do that?
 4   They just never did it.
 5           THE COURT:   I don't understand.
 6           MR. BROOK:   Well, I'll tell you why they didn't,
 7   and it's because Lester Eber having an interest of about 38
 8   percent in those stock certificates, I'm not the kind of guy
 9   who just goes and takes that and doesn't - if you guys are
10   saying I have permission to take possession of the stock
11   certificates which include Lester Eber's interest in them,
12   then we can go ahead, but I see Mr. Keneally shaking his
13   head, as I thought.  They would object to me doing exactly
14   what they're now saying I should have done.
15           MR. KENEALLY:   Well, I think we're
16   overcomplicating this, really.  I mean this gets done every
17   single day.  What you're supposed to do is take the stock,
18   the original stock certificate and the signed stock powers,
19   submit them (indiscernible) company, and then the company's
20   supposed to issue new shares.  I don't see why that's so
21   difficult.  People at Canandaigua know very well who Lester
22   and Wendy Eber are.
23           THE COURT:   Are you objecting to that?  Are you
24   objecting to plaintiffs delivering the stock certificates --
25           MR. KENEALLY:   No.
```

                                                                49

 1
 2          THE COURT:   -- to Wendy Eber?
 3          MR. KENEALLY:   I'm not, but all we're saying is
 4  that since they never did that, you know, we can't be, they
 5  can't argue that somehow we've gotten notice of the
 6  transfer, and, therefore, this (indiscernible) isn't
 7  operative.  Because we never got the --
 8          THE COURT:   Okay, I understand you're --
 9          MR. KENEALLY:   -- we never got what was
10  necessary.
11          THE COURT:   -- relying on the specifics, the
12  specific provisions of the UCC and the bylaws, but what I'm
13  hearing is your clients can go ahead and deliver it.
14          MR. BROOK:   All right, in that case I will follow
15  up today with an email to Canandaigua National Bank's
16  counsel advising that the Eber defendants consent to the
17  delivery of the stock certificates and original stock powers
18  for all parties to plaintiffs, and then we will ensure that
19  they get to Wendy Eber --
20          THE COURT:   To plaintiffs for purposes of
21  delivery to Wendy Eber.
22          MR. BROOK:   Yes, and I would like to get on the
23  record as well where I should be delivering those to.
24  Because I know the New York Department of State website has
25  a registered address for Eber Bros. & Co. Inc. that I think

50

1

2    is incorrect, and that may have been one of the issues, the

3    registered agent for delivery on corporation is an address

4    that is no longer being used.  So please tell me where I

5    should put this.

6             THE COURT:  Mr. Herbert.

7             MR. HERBERT:   We will do that but since the other

8    trustee of the trust was Lester Eber, I think they know

9    pretty well at Canandaigua where he lives.

10            THE COURT:  So where should plaintiff's attorney

11   deliver it?

12            MR. HERBERT:   Well, we'll give that.

13            THE COURT:   Okay.

14            MR. HERBERT:   Wendy's address.

15            THE COURT:   Okay.  All right, so let's talk about

16   the deposition schedule.  There are no depositions scheduled

17   this month, and the deposition – so there was time for me to

18   take a look at these privileged, the privilege document

19   submission which I'll do.  I'm wondering if you can

20   prioritize – I realize that you have some dates here, but

21   I'm wondering if you can prioritize those depositions that

22   are not in dispute and not necessarily implicated by the

23   other motions that are being briefed.

24            MR. BROOK:   We have attempted to do that, Your

25   Honor.

```
 1                                              51
 2           THE COURT:  All right, very good.  And then let's
 3  talk about the Lisa Stein deposition for a moment.  I want
 4  to understand why that's important to the claims or
 5  defenses.
 6           MR. KENEALLY:  So the plaintiffs have said that
 7  this is some great fraud, that the company wasn't really out
 8  of money and Lester didn't really put in all that money to
 9  keep it going.  So he's committed all these terrible frauds.
10  Well, in fact, he authorized extra payments to Erica Stein
11  over the course of time in this trust, and to her and to
12  others, and other gifts to her perhaps, as well as she may
13  well have information about how the company was doing during
14  those years.  Her relative Daniel Kleeberg and co-plaintiff,
15  she's not a plaintiff but the co-plaintiff with her mother
16  worked there, and he knows very well how dire the situation
17  --
18           THE COURT:  So Lisa worked at the company?
19           MR. KENEALLY:  No, Daniel Kleeberg did.
20           THE COURT:  I know Daniel Kleeberg did, but --
21           MR. KENEALLY:  So she may have information that
22  she received from Daniel about the status of the company and
23  what happened when --
24           THE COURT:  Why do you think she would have
25  information about the company?
```

```
 1                                                  52
 2            MR. KENEALLY:   Well, they're niece and uncle.  I
 3  don't know everything she knows, that's what I want to find
 4  out, but she clearly got extra money from the trust at
 5  Lester's authorization that is directly in conflict with
 6  this allegation that this is some gigantic fraud.  And there
 7  are also other payments over time to her and other family
 8  members that Lester made.  He made some trust payments out
 9  of his own pocket.  When the trust was supposed to X to
10  somebody, the trust didn't have any money, and he paid it
11  out of his own pocket.  So those are things that she knows
12  and --
13            THE COURT:  But how do those --
14            MR. KENEALLY:   -- we're entitled to hear it from
15  her.
16            THE COURT:  Explain to me how those go to the
17  claims and defenses.
18            MR. KENEALLY:  It's a defense to – or they're
19  saying it's just a gigantic fraud and Lester's stealing
20  money from the company.  In fact, he's given money he didn't
21  have to to people like Erica Stein.  And I don't know
22  everything that she knows.
23            THE COURT:  Okay, Mr. Brook,
24            MR. BROOK:  So that was consistent with what I
25  thought they were trying to do which is they want to say
```

53

1

2  that because Lester Eber, among other co-trustees,

3  authorized payments to Erica Stein to help her financially

4  after she needed a liver transplant, which is the issue

5  here.  And this is about a very serious health issue that

6  she had, and so she got extra money.  That was explicitly

7  allowed by the Will that created the trust.  Lester

8  authorized it.  There's no dispute that he authorized that.

9  I think there's a real question as to whether it's even

10  admissible for him to try to put that into evidence at a

11  trial and say he's a really good guy or something.

12          But if there's no dispute over those facts, I

13  don't see why we need to go to Philadelphia or wherever she

14  is for a deposition.  I mean I think if you can dispose the

15  niece of someone who is a witness who's available in this

16  case just because she may have had a conversation with him,

17  total speculation on their part, why not depose everyone in

18  this entire family?  I mean if you're getting into nieces, I

19  mean we should be doing everyone's husband and wife, we

20  should be getting Lester's wife, we should be getting

21  Wendy's husband.  That's not what we do.

22          And adding in Erica Stein for the purpose of just

23  proving the undisputed fact that Lester Eber authorized

24  these payments to her is just them trying to say Lester's a

25  good guy.  And they're free to make that argument, we'll

54

1
2  object on 403 grounds or 401, but I don't see any need for a
3  deposition.  This is purely an attempt to harass my client I
4  think because of the sensitivity over how close to death
5  their daughter was with this stuff.  And the fact is at the
6  end of the day I'm not even sure that Lester's going to come
7  out looking like that good a guy given this letter showing
8  that – and hopefully I'll get the original letter too –
9  showing that at the end of the day this authorization that
10 Lester did was far from a gift; it came of Lisa Stein's
11 pocket at the end of the day.  So all Lester did was
12 authorize Lisa's own money to be used to pay her daughter
13 for some living expenses while she was undergoing health
14 concerns.

15        So, look, if they want to try to go there, I mean,
16 fine; I still don't see why Erica Stein, you know, has to be
17 deposed on this and has to be subjected to questioning about
18 her illness and her expenses and such --

19        THE COURT:   Well, I didn't hear that there were
20 going to be questions about the illness.  What I heard is
21 that plaintiffs want to understand what Erica knows about
22 the state of the business at that time and proceeds paid
23 from the business that were paid with the knowledge and
24 consent of everyone and not as a fraud.  That's what I
25 thought that I heard defendants say.

1                                                                55

2              MR. BROOK:    It has nothing to do with the

3    business, Your Honor.   These are separate trust assets, so

4    trust managed at the end of the day was a little over

5    $600,000 in assets.

6              THE COURT:    Right.

7              MR. BROOK:    So my – there is no evidence

8    whatsoever, and I'm aware of none, that there was ever any

9    discussion with Erica Stein having to do with the business

10   at all.  And if Erica Stein can be deposed just because of

11   the fact that she was the recipient of transfers, I mean she

12   wasn't even the one communicating directly for this stuff.

13   It was Lisa Stein who is my client and will be deposed.  I

14   just think there's no basis to have us do this deposition of

15   this random witness, and if there were on the basis of there

16   may be communications about the business, then I should be

17   deposing the spouses and children and the other nieces and

18   nephews of the defendants.  And I don't think that's right,

19   and I don't think that it's right for them to be trying to

20   get that from my clients.

21             THE COURT:    All right, so with respect to the

22   daughter Erica Stein, I'm going to deny, I guess as styled

23   is I'm going to grand plaintiffs' objection but without

24   prejudice to defendants' requesting the deposition if upon

25   discovery, further discovery it appears that she may have

                                                              56

1
2  relevant information.

3          MR. KENEALLY:   And I'd just get our exception on

4  the record today, Your Honor.

5          THE COURT:   Yes, that's noted for the record.

6  Okay, so I'm not going to address the Glen Sturm and Paul

7  Keneally depositions because I need to take a look at that,

8  at the briefs that everybody's submitting.  What I'd like to

9  do is set another conference for December.  11:30 on

10 December 17, does that work for everybody?

11         MR. KENEALLY:   Without my calendar, subject to

12 review of that --

13         THE COURT:   It's a Monday.

14         MR. KENEALLY:   It's a Monday.

15         MR. BROOK:   I think, again, I don't have my

16 calendar, but I think I'm going to be flying that day.  Is

17 there anything available the 18th?

18         THE COURT:   No.  There's not.

19         MR. BROOK:   I could move my flight if need be.

20         THE COURT:   Well, let me see here.  I can do the

21 19th at 4 p.m.

22         MR. BROOK:   We do have plaintiffs' depositions

23 schedule for that day, but I think that we'll – because – I

24 believe we will be able to accommodate that.  I think

25 everyone will be in the City is what that means?

```
 1                                                    57
 2              THE COURT:   Is everybody going to be here in the
 3    City?
 4              MR. KENEALLY:   Yeah, I think the deposition is
 5    set --
 6              (interposing)
 7              MR. BROOK:   We haven't picked one (inaudible) but
 8    --
 9              MR. KENEALLY:   Yeah, I think so.
10              THE COURT:   Is 4 p.m. late enough in the day to
11    get done the deposition?
12              MR. KENEALLY:   Yeah, I think so.  If we need to
13    finish another day, we can do that.
14              MR. BROOK:   They're scheduled for the 19th and
15    20th, and I would be surprised if it took two full days.  So
16    I think that the 4 p.m. on the 19th should work.
17              THE COURT:   Okay, so 4 p.m. December 19.  I think
18    that's all that we can really resolve today until I read the
19    further briefing.  Is there anything else that either side
20    would like to raise?
21              MR. BROOK:   I just – I apologize if I'm just
22    blanking on something, but with respect to the financial
23    records for Wendy and Lester, I understand that financial
24    records for the company they're going to be going back and
25    trying to get the accounting documents from those other
```

```
 1                                                58
 2   entities.
 3            THE COURT:   Yes.
 4            MR. BROOK:   I do believe at least, certainly for
 5   Lester, given all the discussion about what he personally
 6   put into the business, I think that his personal finances
 7   are at issue in addition to being relevant for other
 8   purposes.
 9            THE COURT:   Mr. Keneally, what's your position on
10   that?
11            MR. KENEALLY:   I don't agree at all.  Lester
12   Eber's personal finances have nothing to do with what came
13   from the company, and anything that he paid of company debts
14   will be produced.  Anything he received from an Eber entity
15   will be produced.  But the money that he has independent of
16   that that goes back decades is absolutely irrelevant,
17   (indiscernible) as irrelevant, and I've cited for you the
18   case, Your Honor.
19            THE COURT:   All right, so I'm going to reserve on
20   that issue, and I will take a look at the case.  Okay?
21   Anything else?
22            MR. BROOK:   No, Your Honor.
23            MR. KENEALLY:   Thank you
24            THE COURT:   All right, then we're adjourned.
25   Nice to see everybody.  See you in December.  Have a good
```

59

1

2   Thanksgiving.

3           MR. KENEALLY:   You too.

4           (Whereupon the matter is adjourned to December 19,

5   2018 at 4 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

60

C E R T I F I C A T E

     I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, Kleeberg, et al. v. Eber, et al., Docket #16cv9517, was prepared using PC-based transcription software and is a true and accurate record of the proceedings.

Signature_____*Carole Ludwig*_____

Date:  November 15, 2018