EXHIBIT I

## AMENDED AND RESTATED SECURITY AGREEMENT

**THIS AMENDED AND RESTATED SECURITY AGREEMENT** (this "Agreement") is made and entered into as of February 11, 2011 by **EBER BROS. WINE AND LIQUOR CORPORATION** ("**Parent**") and **EBER BROS. WINE & LIQUOR METRO, INC.** ("**Metro**"; Parent and Metro, individually and collectively, "**Debtor**") in favor of **LESTER EBER** ("**Secured Party**").

      1.    THE SECURITY.  Debtor hereby assigns and grants to Secured Party a security interest in the following described property now owned or hereafter acquired by Debtor ("**Collateral**"):

      (a)    All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles, including all amounts due to Debtor from a factor; and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.

      (b)    All inventory, including all materials, work in process and finished goods.

      (c)    All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by Debtor.

      (d)    All of Debtor's deposit accounts. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

      (e)    All instruments, notes, chattel paper, documents, certificates of deposit, securities and investment property of every type.  The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing.

      (f)    All general intangibles, including, but not limited to, (i) all patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems.  The Collateral shall include all good will connected with or symbolized by any of such general intangibles; all contract rights, documents, applications, licenses, materials and other matters related to such general intangibles; all tangible property embodying or incorporating any such general intangibles; and all chattel paper and instruments relating to such general intangibles.

      (g)    The shares of common stock and preferred stock, or partnership, membership and other ownership interests, now or hereafter owned by Debtor, including,

EB-00018379

without limitation, any membership interest in Eber-Connecticut, LLC now or hereafter owned, directly or indirectly, by Metro and Parent and any ownership interests in Metro now or hereafter owned by Parent (collectively, the "**Pledged Equity**"), and all certificates evidencing the same, together with, in each case, all shares, securities, monies or property representing a dividend on any of the Pledged Equity, or representing a distribution or return of capital upon or in respect of the Pledged Equity, or resulting from a split up, revision, reclassification or other like change of the Pledged Equity or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Equity (the Pledged Equity, together with all other certificates, shares, securities, properties, ownership interests, or moneys, dividends, distributions, returns of capital subscription, warrants, rights or options as may from time to time be pledged hereunder pursuant to this clause being herein collectively called the "**Equity Collateral**").

(h)     All negotiable and nonnegotiable documents of title covering any Collateral.

(i)     All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

(j)     All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral, and all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the Collateral and sums due from a third party which has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(k)     All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("**Books and Records**").

2.     INDEBTEDNESS. The Collateral secures all Indebtedness.

"**EWLC Note**" means that certain Amended and Restated Promissory Note dated as of March 13, 2006, in the original principal amount of $1,503,750.00, made by Parent in favor of Secured Party, as the same may be amended, modified, replaced or restated from time to time, the obligations and liabilities of which have been assumed by Metro pursuant to that certain Debt Assumption Agreement among Parent, Metro and Secured Party dated February 11, 2011.

"**Guaranty**" means that certain Guaranty dated as of February 26, 2010, executed by Parent in favor of Secured Party, as amended, restated, supplemented or otherwise modified from time to time.

-#4832-6870-7368 v.3-

2

"**Indebtedness**" means any and all debts, liabilities, and obligations of Debtor to Secured Party (i) arising under the Transaction Documents, or (ii) arising under the EWLC Note, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Secured Party by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Secured Party for its own account or as agent for another or others, whether Debtor may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, any and all obligations of Debtor to Secured Party for reasonable attorneys' fees and all other costs and expenses incurred by Secured Party in the collection or enforcement of any debts, liabilities, and obligations of Debtor to Secured Party.

"**Note**" means that certain Line of Credit Note dated as of February 26, 2010, executed by Metro in favor of Secured Party in the maximum principal amount of $1,500,000 as amended, restated, supplemented or otherwise modified from time to time.

"**Transaction Documents**" means the Note, the Guaranty, this Agreement and each other document, instrument and agreement executed in connection therewith.

Capitalized terms used but not defined herein have the meanings given such terms in the Note.

3.    DEBTOR'S COVENANTS. Debtor represents, covenants and warrants that unless compliance is waived by Secured Party in writing:

(a)    Debtor will properly preserve the Collateral; defend the Collateral against any adverse claims and demands; and keep accurate Books and Records.

(b)    Debtor shall give Secured Party at least thirty (30) days notice before changing its chief executive office or state of incorporation or organization. Debtor will notify Secured Party in writing prior to any change in the location of any Collateral, including the Books and Records.

(c)    Debtor will notify Secured Party in writing prior to any change in Debtor's name, identity or business structure.

(d)    Except for liens existing on February 26, 2010, Debtor has not granted and will not grant any security interest in any of the Collateral except to Secured Party, and will keep the Collateral free of all liens, claims, security interests and encumbrances of any kind or nature except the security interest of Secured Party.

(e)    Debtor will promptly notify Secured Party in writing of any event which materially and adversely affects the value of the Collateral, the ability of Debtor or Secured Party to dispose of the Collateral, or the rights and remedies of Secured Party in relation thereto, including, but not limited to, the levy of any legal process against any

-#4832-8820-7368 v.2-

3

Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise.

(f)     Debtor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect Secured Party's security interest (collectively, the "**Collateral Costs**"). Without waiving Debtor's default for failure to make any such payment, Secured Party at its option may pay any such Collateral Costs, and discharge encumbrances on the Collateral, and such Collateral Costs payments shall be a part of the Indebtedness and bear interest at the rate set out in the Indebtedness. Debtor agrees to reimburse Secured Party on demand for any Collateral Costs so incurred.

(g)     Until Secured Party exercises its rights to make collection, Debtor will diligently collect all Collateral.

(h)     If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading Debtor shall immediately deliver such document to Secured Party, together with any necessary endorsements.

(i)     Debtor will not sell, lease, agree to sell or lease, or otherwise dispose of any Collateral, except with the prior written consent of Secured Party; provided, however, that Debtor may sell inventory in the ordinary course of business.

(j)     Debtor will maintain and keep in force all risk insurance covering the Collateral against fire, theft, liability and extended coverages (including without limitation windstorm coverage and hurricane coverage as applicable), to the extent that any Collateral is of a type which can be so insured. Such insurance shall be in form, amounts, coverages and basis reasonably acceptable to Secured Party, shall require losses to be paid on a replacement cost basis, shall be issued by insurance companies acceptable to Secured Party and, upon request of Secured Party, include a loss payable endorsement in favor of Secured Party in a form acceptable to Secured Party. Upon the request of Secured Party, Debtor will deliver to Secured Party a copy of each insurance policy, or, if permitted by Secured Party, a certificate of insurance listing all insurance in force.

(k)     Debtor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless Debtor first obtains the written consent of any owner, holder of any lien on the real property or fixture, or other person having an interest in such property to the removal by Secured Party of the Collateral from such real property or fixture. Such written consent shall be in form and substance acceptable to Secured Party and shall provide that Secured Party has no liability to such owner, holder of any lien, or any other person.

(l)     Exhibit A to this Agreement is a complete list as of February 26, 2010, of all patents, trademark and service mark registrations, copyright registrations,

-#4833-6820-7368 v.2-

4

mask work registrations, and all applications therefor, in which Debtor has any right, title, or interest, throughout the world. Debtor will promptly notify Secured Party of any acquisition (by adoption and use, purchase, license or otherwise) of any patent, trademark or service mark registration, copyright registration, mask work registration, and applications therefor, and unregistered trademarks and service marks and copyrights, throughout the world, which are granted or filed or acquired after February 26, 2010, or which are not listed on the Exhibit. Debtor authorizes Secured Party, without notice to Debtor, to modify this Agreement by amending the Exhibit to include any such Collateral.

(m)     Debtor will, at its expense, diligently prosecute all patent, trademark or service mark or copyright applications pending on or after February 26, 2010, will maintain in effect all issued patents and will renew all trademark and service mark registrations, including payment of any and all maintenance and renewal fees relating thereto, except for such patents, service marks and trademarks that are being sold, donated or abandoned by Debtor pursuant to the terms of its intellectual property management program. Debtor will at its expense protect and defend all rights in the Collateral against any material claims and demands of all persons  and will, at its expense, enforce all rights in the Collateral against any and all infringers of the Collateral where such infringement would materially impair the value or use of the Collateral to Debtor or Secured Party. Debtor will not license or transfer any of the Collateral, except for such non-exclusive licenses as are customary in the ordinary course of Debtor's business, or except with Secured Party's prior written consent.

4.     ADDITIONAL REQUIREMENTS. Debtor agrees that Secured Party may at its option at any time, whether or not Debtor is in default:

(a)     Require Debtor to deliver to Secured Party (i) copies of or extracts from the Books and Records, and (ii) information on any contracts or other matters affecting the Collateral.

(b)     Examine the Collateral, including the Books and Records, and make copies of or extracts from the Books and Records, and for such purposes enter at any reasonable time upon the property where any Collateral or any Books and Records are located.

(c)     Require Debtor to deliver to Secured Party any instruments, chattel paper or letters of credit which are part of the Collateral, and to assign to Secured Party the proceeds of any such letters of credit.

(d)     Notify any account debtors, any buyers of the Collateral, or any other persons of Secured Party's interest in the Collateral.

-#4832-6820-7368 v.2-

5

5.   DEFAULTS.  Any one or more of the following shall be a default hereunder:

(a)   Debtor breaches any term, provision, warranty or representation under this Agreement, or under any other obligation of Debtor to Secured Party, and such breach remains uncured after any applicable cure period.

(b)   Secured Party fails to have a perfected and enforceable lien on or security interest in the Collateral..

(c)   Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

(d)   Debtor has given Secured Party any false or misleading information or representations.

(e)   A default or Event of Default occurs under the EWLC Note, the Note, the Guaranty or any other Transaction Document.

6.   SECURED PARTY'S REMEDIES AFTER DEFAULT.  In the event of any default, Secured Party may do any one or more of the following, to the extent permitted by law:

(a)   Declare any Indebtedness immediately due and payable, without notice or demand.

(b)   Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

(c)   Enforce the security interest of Secured Party in any account of Debtor maintained with Secured Party by applying such account to the Indebtedness.

(d)   Require Debtor to obtain Secured Party's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral consisting of inventory.

(e)   Require Debtor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Secured Party in kind.

(f)   Require Debtor to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under Secured Party's exclusive control.

EB-00018384

(g)     Require Debtor to assemble the Collateral, including the Books and Records, and make them available to Secured Party at a place designated by Secured Party.

(h)     Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of Debtor's equipment, if Secured Party deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(i)     Demand and collect any payments on and proceeds of the Collateral.  In connection therewith Debtor irrevocably authorizes Secured Party to endorse or sign Debtor's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to Debtor and remove therefrom any payments and proceeds of the Collateral.

(j)     Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to Debtor.

(k)     Use or transfer any of Debtor's rights and interests in any Intellectual Property now owned or hereafter acquired by Debtor, if Secured Party deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.  Debtor agrees that any such use or transfer shall be without any additional consideration to Debtor.  As used in this paragraph, "**Intellectual Property**" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which Debtor has any right or interest, whether by ownership, license, contract or otherwise.

(l)     Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral.  Debtor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(m)     Take such measures as Secured Party may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and Debtor hereby irrevocably constitutes and appoints Secured Party as Debtor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(n)     Without notice or demand to Debtor, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by Secured

EB-00018385

Party or any of Secured Party's agents or affiliates to or for the credit of the account of Debtor or any guarantor or endorser of Debtor's Indebtedness.

(o)     Assign, sell or otherwise dispose of and deliver all or any part of the Equity Collateral, at public or private sale or otherwise, either with or without special conditions or stipulations, for cash or on credit or for future delivery, in such other consideration and at such time or times and at such place or places, and upon such terms and conditions as shall be commercially reasonable and in accordance with all applicable laws.

(p)     Exercise any other remedies available to Secured Party at law or in equity.

The proceeds of any sale, lease or other disposition of the Collateral hereunder shall be applied first, to the expenses of retaking, holding, storing, processing and preparing for sale, selling, and the like (including, without limitation, any taxes, fees and other costs incurred in connection therewith) of the Collateral, second, to the attorneys' fees and expenses, and then to satisfaction of the Indebtedness to the Secured Party (in such manner as Secured Party shall elect in its discretion), and to the payment of any other amounts required by applicable law.

Debtor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "**1933 Act**") and applicable state securities laws, Secured Party may be compelled, with respect to any sale of all or any part of the Equity Collateral conducted without prior registration or qualification of such Equity Collateral under the 1933 Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Equity Collateral for their own account, for investment and not with a view to the distribution or resale thereof.    Debtor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the 1933 Act) and, notwithstanding such circumstances, Debtor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Equity Collateral for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the 1933 Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.

For the purpose of enabling Secured Party, during the continuance of an Event of Default, to exercise rights and remedies under this Section at such time as Secured Party shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, Debtor hereby grants to Secured Party, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to Debtor) to use, license or sublicense any of the Intellectual Property now owned or hereafter acquired by Debtor, wherever the same may be located.

EB-00018386

7.   ENVIRONMENTAL MATTERS.

(a)     Debtor represents and warrants: (i) it is not in violation of any health, safety, or environmental law or regulation regarding hazardous substances and (ii) it is not the subject of any claim, proceeding, notice, or other communication regarding hazardous substances. "**Hazardous substances**" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

(b)     Debtor shall deliver to Secured Party, promptly upon receipt, copies of all notices, orders, or other communications regarding (i) any enforcement action by any governmental authority relating to health, safety, the environment, or any hazardous substances with regard to Debtor's property, activities, or operations, or (ii) any claim against Debtor regarding hazardous substances.

(c)     Secured Party and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to Debtor, to enter and visit any locations where the Collateral is located for the purposes of observing the Collateral, taking and removing environmental samples, and conducting tests.   Debtor shall reimburse Secured Party on demand for the costs of any such environmental investigation and testing. Secured Party will make reasonable efforts during any site visit, observation or testing conducted pursuant to this paragraph to avoid interfering with Debtor's use of the Collateral. Secured Party is under no duty to observe the Collateral or to conduct tests, and any such acts by Secured Party will be solely for the purposes of protecting Secured Party's security and preserving Secured Party's rights under this Agreement.  No site visit, observation or testing or any report or findings made as a result thereof ("**Environmental Report**") will (i) result in a waiver of any default of Debtor; (ii) impose any liability on Secured Party; or (iii) be a representation or warranty of any kind regarding the Collateral (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness).  In the event Secured Party has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to Debtor or any other party, Debtor authorizes Secured Party to make such a disclosure.   Secured Party may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in Secured Party's judgment. Debtor further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to Debtor by Secured Party or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of Debtor) by Debtor without advice or assistance from Secured Party.

(d)     Debtor will indemnify and hold harmless Secured Party from any loss or liability Secured Party incurs in connection with or as a result of this Agreement,

EB-00018387

which directly or indirectly arises out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance. This indemnity will apply whether the hazardous substance is on, under or about Debtor's property or operations or property leased to Debtor. The indemnity includes but is not limited to attorneys' fees (including the reasonable estimate of the allocated cost of in-house counsel and staff). The indemnity extends to Secured Party, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys and assigns.

8.      CONSENT TO JURISDICTION.  DEBTOR AND SECURED PARTY HEREBY AGREE THAT THE FEDERAL COURT OF THE WESTERN DISTRICT OF NEW YORK OR, AT THE OPTION OF SECURED PARTY, ANY COURT LOCATED IN THE STATE OF NEW YORK SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN DEBTOR AND SECURED PARTY PERTAINING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER CAUSE OR DISPUTE WHATSOEVER BETWEEN DEBTOR AND SECURED PARTY OF ANY KIND OR NATURE.  DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURTS, HEREBY WAIVING PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREEING THAT SERVICE OF SUCH SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED ADDRESSED TO DEBTOR AT THE ADDRESS OF DEBTOR FOR NOTICES SET FORTH HEREIN. SHOULD DEBTOR FAIL TO APPEAR OR ANSWER ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THIRTY DAYS AFTER THE MAILING THEREOF, IT SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED AGAINST IT AS PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS.  THE CHOICE OF FORUM SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE BRINGING OF ANY ACTION BY SECURED PARTY OR THE ENFORCEMENT BY SECURED PARTY OF ANY JUDGMENT OBTAINED IN SUCH FORUM IN ANY OTHER APPROPRIATE JURISDICTION.  FURTHER, DEBTOR HEREBY WAIVES THE RIGHT TO ASSERT THE DEFENSE OF FORUM NON CONVENIENS AND THE RIGHT TO CHALLENGE THE VENUE OF ANY COURT PROCEEDING.

9.      WAIVER OF JURY TRIAL.  DEBTOR AND SECURED PARTY EACH WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS AGREEMENT, THE EWLC NOTE, THE NOTE, THE GUARANTY OR ANY TRANSACTION DOCUMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, THE EWLC NOTE OR ANY TRANSACTION DOCUMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY.  DEBTOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST SECURED PARTY OR ANY OTHER

EB-00018388

PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

10.  MISCELLANEOUS.

(a)  Any waiver, express or implied, of any provision hereunder and any delay or failure by Secured Party to enforce any provision shall not preclude Secured Party from enforcing any such provision thereafter.

(b)  Debtor shall, at the request of Secured Party, execute such other agreements, documents, instruments, or financing statements in connection with this Agreement as Secured Party may reasonably deem necessary.

(c)  All notes, security agreements, subordination agreements and other documents executed by Debtor or furnished to Secured Party in connection with this Agreement must be in form and substance satisfactory to Secured Party.

(d)  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of laws principles which would require the application of the laws of a different state.

(e)  All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(f)  All terms not defined herein are used as set forth in the Uniform Commercial Code as in effect in any applicable jurisdiction.

(g)  In the event of any action by Secured Party to enforce this Agreement or to protect the security interest of Secured Party in the Collateral, or to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, Debtor agrees to pay immediately the costs and expenses thereof, together with reasonable attorneys' fees and allocated costs for in-house legal services to the extent permitted by law.

(h)  In the event Secured Party seeks to take possession of any or all of the Collateral by judicial process, Debtor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action.

(i)  This Agreement shall constitute a continuing agreement, applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this Agreement, and if all transactions between Secured Party and Debtor shall be closed at any time, shall be equally applicable to any new transactions thereafter.

-#4832-0820-7308 v.2-

11

(j)      Secured Party's rights hereunder shall inure to the benefit of its successors and assigns. In the event of any assignment or transfer by Secured Party of any of the Indebtedness or the Collateral, Secured Party thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Indebtedness or the Collateral not so assigned or transferred. All representations, warranties and agreements of Debtor if more than one are joint and several and all shall be binding upon the personal representatives, heirs, successors and assigns of Debtor.

(k)      Any notice to be given hereunder shall be given in the manner prescribed in the Guaranty or the Note, as applicable.

11.      FINAL AGREEMENT. BY SIGNING THIS AGREEMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS AGREEMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

12.      Effect of Amendment and Restatement. On and after the date hereof, this Agreement shall restate and replace the Prior Security Agreement in full, and the provisions of the Prior Security Agreement shall be superseded by the provisions hereof; provided, that the effectiveness hereof shall not be deemed to be a waiver of or consent to any breach or default under the Prior Security Agreement occurring or existing prior to the date hereof. Such restatement and replacement shall not be and is not intended by the parties to constitute a novation of the obligations or the liens arising under or created by the Prior Security Agreement, all of which shall continue in full force and effect under and as set forth in this Agreement. The EWLC Note, the Note, the Guaranty and the other Transaction Documents shall and are hereby intended by the parties to continue in full force and effect pursuant to their terms. The "**Prior Security Agreement**" means the Security Agreement dated February 26, 2010, made by Debtor in favor of Secured Party.

EB-00018390

IN WITNESS WHEREOF, the parties executed this Agreement as of the date first written above, intending to create an instrument executed under seal.

EBER   BROS.   WINE   AND   LIQUOR CORPORATION

By: _Windy Eber_____

Title: _CFO_____

(Seal)

EBER BROS. WINE & LIQUOR METRO, INC.

By: _Windy Eber_____

Title: _CFO_____

(Seal)

Accepted:

_Lester Eber_____

**LESTER EBER**

13

EB-00018391

Exhibit A

Intellectual Property

**Trademarks Owned by EBER BROS. WINE AND LIQUOR CORPORATION**

Registration Number     Registration Date          Trademark

1131932                 March 11, 1980             DOMSKI

–#4832-6820-7368 v.2–

## DEBT ASSUMPTION AGREEMENT

**THIS DEBT ASSUMPTION AGREEMENT** (this "Agreement") is made as of the 11th day of February, 2011, by and among **EBER BROS. WINE AND LIQUOR CORPORATION** ("EWLC"), **EBER BROS. WINE AND LIQUOR METRO, INC.** ("Metro"), and **LESTER EBER** ("Holder").

### R E C I T A L S :

WHEREAS, Holder made a loan to EWLC (the "EWLC Loan") evidenced by that certain Amended and Restated Promissory Note dated March 13, 2006, in the original principal amount of $1,503,750.00 (the "EWLC Note"); and

WHEREAS, as of the date hereof, the remaining principal balance of the EWLC Loan is $1,434,710.68, plus accrued and unpaid interest; and

WHEREAS, upon the terms and conditions set forth herein, Metro has agreed to assume the outstanding principal and interest of the EWLC Loan and all other liabilities and obligations in respect thereof (the "Assumption"), and Holder has agreed to fully release EWLC from its obligations under the EWLC Note; and

**NOW, THEREFORE,** in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby agree as follows:

1. Acknowledgment. Each of EWLC, Metro and Holder agree that the unpaid principal balance of the EWLC Loan is, as of the date hereof, One Million Four Hundred Thirty-Four Thousand Seven Hundred Ten and 68/100 Dollars ($1,434,710.68), plus accrued and unpaid interest.

2. Assumption. EWLC hereby irrevocably assigns to Metro all of EWLC's obligations to pay principal, interest and other obligations and liabilities in respect of the EWLC Loan. Metro hereby irrevocably assumes all of EWLC's obligations to pay principal, interest and other obligations and liabilities in respect of the EWLC Loan, and Metro agrees to be bound by the terms of the EWLC Note as if it were the "Maker" thereunder and promises to pay the obligations evidenced thereby in accordance with the terms thereof. Holder hereby consents to such assignment by EWLC and assumption by Metro. At any time on or after the date hereof, Holder may require Metro to issue a replacement note to Holder, in replacement of the EWLC Note, which replacement note shall be acceptable to Holder.

3. Conditions; Advance. Holder's obligation to consent to the Assumption is conditioned upon Holder's receipt of an amended and restated security agreement (the "Security Agreement"), in form and substance acceptable to Holder, which amends and restates the Security Agreement dated February 26, 2010, made by EWLC and Metro in favor of Holder (which for the avoidance of doubt shall continue to include a grant of a security interest in and pledge of all limited liability company interests or other equity interests in Eber-Connecticut, LLC). In connection with and in reliance upon Holder's receipt of executed copies of this

-44843-8258-1000 v.1 -

Agreement and the Security Agreement, Holder shall make an advance of funds to Metro in the amount of $100,000, which advance shall be pursuant to the terms of and evidenced by that certain Line of Credit Note dated February 26, 2010, made by Metro in favor of Holder in the stated principal amount of $1,500,000.

    4.    <u>Release; Continuation</u>.

    a.  Upon the effectiveness of this Agreement, Holder hereby releases EWLC from any and all obligations and liabilities (the "<u>Assumed Liabilities</u>") under the EWLC Note.

    b.  Upon the effectiveness of this Agreement, all obligations of EWLC to pay the Assumed Liabilities shall continue as obligations of Metro under the EWLC Note.

    5.    <u>No Novation</u>.  Each of the parties hereto hereby agrees and intends that this Agreement shall not create, result in or evidence a novation of any of the Assumed Liabilities, the EWLC Loan or the EWLC Note.

    6.    <u>Successors and Assigns</u>.  This Agreement shall bind and inure to the benefit of the parties hereto and their heirs, personal representatives, successors, and assigns.

    7.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to conflict of law principals.

    8.    <u>Counterparts</u>.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

EB-00018394

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed and sealed as of the date first above written.

EBER BROS. WINE AND LIQUOR CORPORATION

By: _____
Name: Wendy Eber
Title: CFO

EBER BROS. WINE & LIQUOR METRO, INC.

By: _____
Name: Wendy Eber
Title: CFO

_____
Name: Lester Eber

4843-3258-1000 v.1

EB-00018395