UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

DANIEL KLEEBERG, LISA STEIN
and AUDREY HAYS,

                        Plaintiffs,
      v.

                                  Civil Action No. 16-CV-9517(LAK)

LESTER EBER,
ALEXBAY, LLC f/k/a LESTER EBER, LLC,
CANANDAIGUA NATIONAL CORPORATION d/b/a
CANANDAIGUA NATIONAL BANK AND TRUST,
ELLIOT W. GUMAER, JR.,
EBER BROS. & CO, INC.,
EBER BROS. WINE AND LIQUOR CORP.,
EBER BROS. WINE & LIQUOR METRO, INC.,
EBER CONNECTICUT, LLC, and
WENDY EBER,

                        Defendants.
_____

**EBER DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO PLAINTIFFS' MOTION TO DISQUALIFY UNDERBERG & KESSLER LLP FROM REPRESENTING EBER BROS. & CO., INC. AND EBER BROS. WINE AND LIQUOR CORP.**

UNDERBERG & KESSLER LLP
*Attorneys for Eber Defendants*
300 Bausch & Lomb Place
Rochester, New York 14604
(585) 258-2882

Paul F. Keneally, Esq.
Colin D. Ramsey, Esq.
Of Counsel

## **PRELIMINARY STATEMENT**

Defendants, Eber Bros. & Co., Inc. ("Eber Bros.") and Eber Bros. Wine and Liquor Corp. ("EBWLC") submit this Memorandum of Law in opposition to the motion of plaintiffs to disqualify Underberg & Kessler LLP ("U&K") from continuing to represent Eber Bros. and EBWLC in this matter. As set forth below, plaintiffs' motion is a discovery dispute masquerading as a motion to disqualify, and should not be countenanced at this late stage in the litigation.

As set forth below, there was no conflict because the out-of-business Eber Bros. and EBWLC entities were not adversely affected by the judicially-ordered assignment in 2012 of Eber-CT to Alexbay/Lester Eber, as Eber-CT was worth far less than the first-position secured debt owed to Alexbay/Lester Eber.

**STATEMENT OF FACTS**

Plaintiffs have varying interests in a Trust ("the Trust") created on October 27, 1969 by Allen Eber, their grandfather and father. Prior to the 2017 termination of the Trust by the Monroe County Surrogate's Court, the Trustees were defendant Lester Eber, Elliott W. Gumaer, Jr., and The Canandaigua National Bank ("CNB"). Lester Eber and Audrey Hayes each had a 1/3 interest in the Trust, while Daniel Kleeberg and Lisa Stein each had a 1/6 interest.

Allen Eber, and subsequently Lester Eber, ran the wine and liquor distribution business for over 80 years – primarily in Rochester, New York. There are a number of Eber entities that must be distinguished. See **Exhibit A**[1]. Eber Bros. & Co., Inc. ("Eber Bros.") is a New York corporation founded in 1917. Eber Bros. has been majority owned by the Trust since the 1970s, but has not been an operating entity since the late 1980s.

Eber Bros. Wine and Liquor Corp. ("Eber W&L") is a New York corporation that was founded in 1935 and previously operated as a wholesale wine and liquor distributor in upstate New York. It has not been an operating entity since 2007. It is majority owned by Eber Bros., and Lester Eber and the Trust (prior to its dissolution) had minor interests.

Eber Bros. Wine & Liquor Metro, Inc. ("Eber Metro") is a New York corporation founded in 1996, and previously operated as wholesale wine and liquor distributor downstate New York. Eber Metro has not been an operating entity since 2004. Prior to June 2012, Eber Metro was a wholly-owned subsidiary of Eber W&L. Following the June 2012 stock assignment in lieu of foreclosure proceeding and the Order from Justice

---

[1] All Exhibits referenced herein are attached to the Declaration dated November 30, 2018 of Paul F. Keneally, Esq.

3

Rosenbaum of the Monroe County Supreme Court in that case, which granted that stock assignment, Eber Metro became a wholly-owned subsidiary of Alexbay, LLC ("Alexbay"). *See* **Exhibit B**. Upon that stock assignment, Eber W&L had no remaining equity interest in Eber Metro. Alexbay is a Connecticut limited liability company founded in 2011. Alexbay is wholly owned by Lester Eber.

Eber Connecticut, LLC ("Eber-CT") is a Delaware limited liability company founded in 2005. Eber-CT currently operates a wholesale wine and liquor business in Connecticut. Since 2005, Eber Metro has held a controlling equity interest in Eber-CT. *See* Ex. A.

In the 2000s, the business of Eber W&L began a downward spiral that it was unable to reverse. Its largest competitor, Southern Wine and Spirits, a company with more than $11 Billion in annual sales, entered the New York market and wiped Eber W&L out. Key employees and suppliers defected, and these losses had a material adverse effect on the company's financial performance and liquidity. As these business challenges mounted, between 2002 and 2012, Lester Eber voluntarily made cash loans to Eber W&L and Eber Metro for the purpose of enabling those entities to remain in business and pay various operating expenses and other third-party liabilities. *See* **Exhibit C**. The loans were made pursuant to loan and security documentation entered into by the borrower entities and Lester Eber at the time of the loans.

The loans were secured by validly-perfected first priority UCC Article 9 Security Interests in all the assets of Eber W&L (i.e., Eber W&L's controlling equity interest in Eber Metro) and of Eber Metro (i.e., Eber Metro's controlling equity interest in Eber-CT). *See* **Exhibit D**. Lester Eber had priority as a secured creditor over any claims by other

4

secured and unsecured creditors of Eber Bros. and Eber Metro, and the UCC filings to perfect his security interests were a matter of public record. The loans from Lester Eber were necessary as no third party lender was willing to make such loans.

More specifically, on or about October 1, 2002, Lester Eber loaned Eber W&L the sum of $575,895.00. *See* **Exhibit E**. The loan was evidenced by a Promissory Note and was secured by collateral security interest in all of the assets of Eber W&L. Thereafter, on or about August 15, 2005, Lester Eber loaned Eber W&L the additional sum of $1,503,750.00. This loan was also evidenced by a Promissory Note. On March 13, 2006, Eber W&L executed an "Amended and Restated Promissory Note" payable to Lester Eber which reiterated its obligation to repay the $575,895.00 loan and the $1,503,750.00 with interest at an annual rate of 9%. *See* **Exhibit F**.

Finally, in October 2009, Lester Eber agreed to loan Eber Metro "an amount not exceed $1,500,000.00" under a revolving line of credit. This loan was evidenced by a line of credit note. *See* **Exhibit G**.

On or about February 26, 2010, Eber W&L executed a Guarantee, agreeing to guarantee the repayment by Eber Metro of all of its obligations to Lester Eber. The obligations under the Guarantee were confirmed in a Security Agreement executed by the parties on February 26, 2010, granting Lester Eber security interests in all of Eber Bros.' property. *See* **Exhibit H**. This agreement was reiterated in an Amended and Restated Security Agreement executed by the parties on February 11, 2011. Also on February 11, 2011, Eber Metro, Eber W&L and Lester Eber entered into a "Debt Assumption Agreement" whereby Eber Metro assumed all of Eber W&L's obligations to

Lester Eber under the March 13, 2006 Amended and Restated Promissory Note. *See* **Exhibits I and J**, respectively.

Plaintiffs were well aware of the financial struggles of the various Eber entities. In the spring of 2010, Lester Eber wrote and spoke to Sally Kleeberg (Daniel Kleeberg and Lisa Stein's mother) and Audrey Hayes, advising them of the severe financial difficulties faced by the Eber businesses, and that efforts to obtain outside financing had been unsuccessful. *See* **Exhibit K**. Lester Eber further advised that he had voluntarily agreed to make additional cash loans to Eber Metro to allow the business to operate, and specifically advised that the additional loans were secured by Eber W&L's controlling equity interest in Eber Metro and Eber Metro's controlling equity interest in Eber-CT. Moreover, copies of the loan documentation were provided to both Sally Kleeberg and Audrey Hayes. Critically, Lester Eber also offered both Sally Kleeberg and Audrey Hayes the opportunity to be a 1/3 participant in the $1.5 million loan. However, both Sally Kleeberg and Audrey Hayes declined to participate.

At an August 18, 2011 meeting of the Trustees of the Trust, the loans previously made by Lester Eber as described above were ratified by a unanimous vote. *See* **Exhibit L**. The meeting minutes described the security arrangement for each loan, and noted that Sally Kleeberg and Audrey Hayes had been offered the opportunity to participate in the loans but declined to do so. It should be noted that the ratification of the loans by the Trustees was entirely voluntary and not required by any provision of the New York Business Corporation Law ("BCL").

6

As of December 31, 2011, the outstanding aggregate principal and interest on the loans was $3,650,682.48. By that time, Eber W&L and Eber Metro had no business operations and were generating no cash flow. Eber W&L's only material asset was its controlling equity interest in Eber Metro, and Eber Metro's only material asset was its controlling equity interest in Eber-CT. Eber W&L and Eber Metro failed to pay any of the principal or interest on the loans payable to Lester Eber on the dates such payments were due, so the loans were in default. On January 18, 2012, Lester Eber transferred all of his right, title and interest in the loans and the definitive loan and security documentation to Alexbay. *See* **Exhibit M**. On that same date, Alexbay sent Eber W&L and Eber Metro a notice pursuant to New York UCC 9-620 proposing to accept Eber W&L's entire controlling equity interest in Eber Metro, and Eber Metro's entire controlling equity interest in Eber-CT (79%) in full satisfaction of the loans. *See* **Exhibit N**.

Thereafter, on February 21, 2012, Alexbay commenced an action pursuant to New York UCC 9-627 seeking a judicial review of Alexbay's acceptance of Eber W&L's interest in Eber Metro in full satisfaction of the secured loan obligations owed to Alexbay, and the determination that such acceptance was "commercially reasonable." A judicial determination of commercial reasonableness is not required by the UCC, but it was pursued by Alexbay out of an abundance of caution.

By judgment dated May 11, 2012, the Hon. Matthew A. Rosenbaum, New York State Supreme Court Monroe County, issued a declaratory judgment confirming that Alexbay's acceptance of Eber W&L's interest in Eber Metro was commercially reasonable given the amount of Lester Eber's loans. *See*, Ex. B.

7

Further, it is clear that plaintiffs either do not realize or choose to ignore the fact that many of the debts of Eber Bros. were also contingent liabilities of Eber-CT.  Lester Eber had no personal obligation or liability to pay such contingent liabilities, but nonetheless extended personal loans and made many other payments outright.  Further, in 2017 Lester Eber forfeited all of his vested rights under the Eber W&L Pension Plan (worth $1.4 million) in order to save the business.  *See* **Exhibit O**.

Eber Bros., the only Eber entity directly held by the Trust, was not a party to any of the loans or security arrangements.  No action was required to be taken by the Board of Directors of Eber Bros in connection with any of the loans.  Similarly, under the BCL, no shareholder approval – including approval by the Trust as controlling shareholder of Eber Bros. – was required for any of the loans or security arrangements.  None of the actions taken by Lester Eber in connection with the loans and the related security arrangements were taken in his capacity as Trustee of the Trust.

**ARGUMENT**

**POINT I**

**PLAINTIFFS' MOTION IS PURELY TACTICAL
AND BASED UPON ERRONEOUS CONJECTURE**

Plaintiffs admit that "the upside of granting this motion is limited," (*See* Plaintiffs' MOL at p. 1) and that "ultimately, it is not anticipated that new counsel would do all that much, except be in a position to ensure that documents have been preserved and searched appropriately" (*See* Plaintiffs' MOL at p. 13). Thus, by their own admission, plaintiffs are not concerned about any purported conflict, but rather whether they have received complete responses to their discovery demands.

The motion to disqualify is essentially a recitation of plaintiffs' complaints about discovery despite receiving several thousand documents, as well as answers to interrogatories. Plaintiffs have raised numerous discovery issues for the Court's determination, and the Court is certainly able to address those discovery concerns – however misplaced the Eber Defendants believe them to be – without the necessity of a disqualification motion.

It is clear that plaintiffs (or at least their counsel) have made the strategic decision to try and force the Eber Defendants to expend extensive funds in obtaining new counsel at this late stage of the litigation. This type of practice is universally frowned upon by courts. *See Goodwine v. Lee*, 2014 U.S. Dist. LEXIS 124414 (S.D.N.Y. 2014) ["Because motions to disqualify counsel are often interposed for tactical reasons, they are subject to a high standard of proof…Mere speculation will not suffice"].

If U&K is disqualified from representing Eber Bros. and EBWLC, all of the Eber Defendants will be highly prejudiced. There will be substantial legal costs to allow new counsel to get up to speed on the case mere weeks before depositions are scheduled to commence in mid-December 2018. It is "appropriate for the court to consider the prejudice [the Eber Defendants] may suffer by having [their] counsel disqualified." *Prisco v. Westgate Entertainment, Inc.*, 799 F. Supp. 266, 272 (D. Conn. 1992) citing *Keoseian v. Von Kaulbach*, 707 F. Supp. 150, 153 (S.D.N.Y. 1989). A district court of the Second Circuit assumes "that motions to disqualify counsel filed [] after much discovery has been conducted work great prejudice on the counsel's client." *Prisco*, 799 F. Supp. At 272.

A court considering such a motion for disqualification of counsel after much discovery scrutinizes a movant's tactics as those aimed to burden an adversary with the need "to find and educate new counsel" at a late and crucial stage of the litigation. *Universal City Studios, Inc. v. Reimerdes*, 98 F. Supp. 2d 449, 455, 456 (S.D.N.Y 2000). A court will not reward such a tactical gambit. A district court is "unwilling to compromise [parties'] right to freely choose counsel, and efficiently conduct [] litigation" after considerable time in "the discovery process in [] heavily contested, complex litigation [when those parties'] counsel has built up significant knowledge," "[n]ew counsel would face a daunting task in having to become familiar with the facts of [the] case," and the disqualification motion evidences "no taint to the[] proceedings" associated with challenged counsel's continued representation. *Med. Diagnostic Imaging, PLLC v. CareCore Nat'l, LLC*, 542 F. Supp. 2d 296, 306, 316 (S.D.N.Y. 2008). In truth, it will be

10

essentially impossible for new counsel to gain a full understanding of the case in that short time period.

It is for this reason that where shareholders delay in seeking disqualification of Defendants' counsel due to a purported conflict, New York courts deny the requested relief. *Dukas v. Davis Aircraft Products Co. Inc.,* 123 A.D.2d 304, (2d Dep't 1986) (reversing trial court and denying Plaintiffs' motion due to the shareholders' "inordinate delay" of approximately eighteen months after the action was commenced). The present case was filed in 2016.

**POINT II**

**DERIVATIVE CLAIMS DO NOT MANDATE DISQUALIFICATION**

Plaintiffs claim to have asserted a derivative claim on behalf of Eber Bros. and EBWLC and that this presents a conflict of interest for U&K. However, plaintiffs themselves admit that disqualification in such circumstances is typically only considered when the corporation plays an active role in the litigation. *Russo v. Zaharko*, 53 A.D.2d 663 (2d Dep't 1976).

A movant for disqualification who "asserts that [a] firm's representation of [] individual defendants and [associated corporations] is impermissible because of a conflict of interest between two sets of clients…[and] the law firm['s] previous[] represent[ation of] plaintiff and [the corporations]" suffers denial of his motion in the Second Circuit. *Obeid v. La Mack*, 2015 U.S. Dist. LEXIS 154546 at *2. Such "challenged joint representation" presents "no demonstrated meaningful threat to the integrity of the trial." *Id.* at *8. This

11

allowance of joint representation extends even in the cases of shareholder derivative suits involving closely held corporations. *Id.* at *6-7.

The "routine disqualification" Plaintiffs seek "appears to be inconsistent with the caution emphasized by the Second Circuit when addressing motions to disqualify the opposing" counsel in derivative suits. *Obeid*, 2015 U.S. Dist. LEXIS 154546 at *5. Nothing obligates the courts of the Second Circuit to follow the precedent of New York's courts in matters of ethics. Nevertheless, even "the New York courts have observed that representation of a company sued derivatively as a nominal defendant does not ordinarily trigger a need for separate representation." *Id.* at *6 citing *Stilwell Value Partners IV, L.P. v. Cavanaugh*, 123 A.D.3d 641, 641-42 (1st Dep't 2014).

Here, the Article 9 proceeding was necessary because Eber Bros. and EBWLC were no longer operating entities, and had liabilities that far exceeded any assets. Accordingly, those entities are necessarily "passive" participants in this litigation. A district court will treat challenged joint representation in a shareholder derivative suit identically regardless of whether there the corporate defendants are active or passive. New York's courts have crafted a distinction that federal courts do not follow. New York's precedent permits joint representation when a "corporation's posture in th[e] litigation is passive*." Fleet v. Pulsar Constr. Corp.*, 143 A.D.2d 187, 189 (2d Dep't 1988).

A New York court will not grant such a motion for disqualification in such a manner when corporate defendants are nominal defendants rather than active parties to the litigation. New York courts generally are reluctant to grant such motions for disqualification of counsel even if corporations are more than nominal defendants unless

the challenged counsel once represented the corporations but now has switched sides to represent the individual shareholders who instigate the derivative suit against the corporate interests. *See Deerin v Ocean Rich Foods, LLC*, 158 A.D.3d 603, 608 (2d Dep't 2018); *See Morris v. Morris*, 306 A.D.2d 449, 452 (2d Dep't 2003); *See Greenberg v. Greenberg*, 206 A.D.2d 963, 965 (4th Dep't 1994); *See Pulsar*, 143 A.D.2d at 189. Plaintiffs recognize this fact, referring to Eber Bros. and EBWLC as "nominal defendants" including in their proposed Third Amended Complaint.

Further, aside from counsel's blatantly tactical broadside to try and disqualify U&K, no individual or entity involved in the 2012 proceeding ever raised any issue of a conflict. Moreover, they fully consented to U&K's actions. Under the law, Plaintiffs will never have control over any of the Eber entities to have standing to assert their false conflict claims. "Absent any facts, evidence, or argument substantiating prejudice, [a district c]ourt questions whether this motion is anything more than litigation strategy." *Pu v. Greenthal Mgmt. Corp.*, 2009 U.S. Dist. LEXIS 19554 at *27 (S.D.N.Y. 2009). Plaintiffs bear the burden of surpassing a threshold showing of taint to the trial from U&K's continued representation of the Eber Defendants. Otherwise, the Court may infer that plaintiffs' strategic naming of defendants was "a prelude to a motion to disqualify" because serving as counsel for multiple "named defendants, the mere presence of this circumstance without more should not sway in favor of disqualification" in a shareholder derivative suit. *Pu*, 2009 U.S. Dist. LEXIS 19554 at *27-28. Plaintiffs contend that Rules 1.7 and 1.13 require informed consent in writing, but such an argument clearly exalts form over substance.

## POINT III

## U&K DID NOT REPRESENT EBWLC IN THE ARTICLE 9 PROCEEDING

At the time of the Article 9 proceeding at issue, U&K explicitly declined to represent EBWLC because of the conflict between EBWLC and Lester Eber and Alexbay. Rather, EBWLC was represented by Marino Fernandez, Esq. The continuing allegations by plaintiffs' counsel that U&K was surreptitiously representing EBWLC in connection with the Article 9 proceeding is baseless and wholly unsupported by the facts.

Corporate defendants are allowed and encouraged to retain long-time counsel, especially in matters of complex litigation. This increases judicial economy. The longer the relationship of representation and the more "tortured [the] history of the litigation," the greater factors weigh against disqualification. *Keoseian*, 707 F. Supp. at 155. Any movant for disqualification must establish two elements. First, the movant must establish that counsel's prior representation relates to a matter "identical" to the representation for which the movant seeks disqualification. *Obeid*, 2015 U.S. Dist. LEXIS 154546 at *12-13. Secondly, the movant must establish that the challenged counsel acted as counsel on behalf of the individual movant after establishing "a professional relationship" with the individual movant. *Pulsar*, 143 A.D.2d at 189; *Obeid*, 2015 U.S. Dist. LEXIS 154546 at

*12-13. Otherwise, a movant fails to invite even the specter of the appearance of a conflict of representation in a derivative shareholder suit.

It is true that Paul Keneally and other attorneys at U&K represented the various Eber Defendants in a wide variety of matters over the years – including EBWLC – but it did not represent EBWLC in connection with the Article 9 proceeding.

Moreover, contrary to plaintiffs' allegations, U&K is not "self-interested" as contemplated by Rule 1.7 (i.e., it has no financial, property or business interests at stake in this litigation). Tellingly, plaintiffs cite no authority for this proposition.

Plaintiffs can attempt to prove their current causes of action, but the disqualification motion distracts from the real issues in this case, and is a waste of judicial time and resources.

15

## **CONCLUSION**

Plaintiffs' motion to disqualify is merely a re-packaging of their multiple discovery complaints, as well as a strategic attempt to disqualify U&K at this late stage of discovery. There is no basis for disqualification.  Further, even assuming for the sake of argument that any of plaintiffs' assertions are colorable, the prejudice to all of the Eber Defendants in granting the motion far outweighs any benefit.

DATED:  November 30, 2018
        Rochester, New York

                                        UNDERBERG & KESSLER LLP

                                By: */s/ Paul F. Keneally*
                                        Paul F. Keneally, Esq., Of Counsel
                                        *Attorneys for Eber Defendants*
                                        300 Bausch & Lomb Place
                                        Rochester, New York 14604
                                        (585) 258-2882