# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DANIEL KLEEBERG, LISA STEIN, and
AUDREY HAYS,

Plaintiffs,

v.

LESTER EBER; ALEXBAY, LLC f/k/a
LESTER EBER, LLC; CANANDAIGUA
NATIONAL BANK & TRUST
COMPANY; ESTATE OF ELLIOTT W.
GUMAER, JR.; EBER BROS. & CO.,
INC.; EBER BROS. WINE AND LIQUOR
CORP.; EBER BROS. WINE & LIQUOR
METRO, INC.; EBER-CONNECTICUT,
LLC; and WENDY EBER,

Defendants.

Civil Action No.  16-CV-9517(LAK)

---

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION TO DISQUALIFY UNDERBERG & KESSLER FROM REPRESENTING EBER BROS. & CO., INC AND EBER BROS. WINE AND LIQUOR CORP.

---

Brian C. Brook (BB 1980)
CLINTON BROOK & PEED
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Facsimile: (646) 257-2887
Brian@clintonbrook.com

*Attorneys for Plaintiffs Daniel Kleeberg, Lisa Stein,
and Audrey Hays*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...............................................................................................ii

ARGUMENT ....................................................................................................................... 1

I.   The Impact of U&K's Conflicts on EBWLC's Compliance with Discovery Presents a
     Significant Risk to the Integrity of the Trial Process............................................................ 1

   A.   U&K Has Failed to Follow-Through on Two Different Issues that Were Resolved
        During the Last Conference ........................................................................................ 3

   B.   There Will Be No Prejudice to the Ebers' Defense ........................................................... 4

   C.   Plaintiffs Filed Promptly Once the Basis for Disqualification Was Clear.......................... 5

II.  U&K's Assertion that "No Conflict" Existed Is Illogical and Undeveloped Nonsense,
     Contradicted by Other Parts of Its Own Brief, Demonstrating a Regrettable Lack of
     Competence and Integrity .......................................................................................... 7

CONCLUSION................................................................................................................. 10

i

# TABLE OF AUTHORITIES

**Cases**

*Armstrong v. McAlpin*,
   625 F.2d 433 (2d Cir.1980) ................................................................................ 2

*Hull v. Celanese Corp.*,
   513 F.2d 568 (2d Cir. 1975) ............................................................................... 7

*NCK Organization Ltd. v. Bregman*,
   542 F.2d 128 (2d Cir. 1976) ............................................................................... 2

*Obeid v. La Mack*,
   No. 14-cv-6498, 2015 WL 7180735 (S.D.N.Y. Nov. 9, 2015) ................................ 6

*Papyrus Tech. Corp. v. New York Stock Exchange, Inc.*,
   325 F.Supp.2d 270 (S.D.N.Y.2004) ..................................................................... 2

*Toussie v. Allstate Ins. Co.*,
   No. 15-CV-5235, 2018 WL 2766140 (E.D.N.Y. June 8, 2018) ........................... 1, 2

*Williams v. Trans World Airlines, Inc.*,
   588 F.Supp. 1037 (D.Mo. 1984) .......................................................................... 2

**Rules**

N.Y.R.P.C. 1.7 ....................................................................................................... 10

Plaintiffs respectfully submit the following reply in support of their motion to disqualify Underberg & Kessler, LLP ("U&K") from representing Eber Bros. & Co., Inc. ("EB&C") and Eber Bros. Wine and Liquor Corporation ("EBWLC").

## ARGUMENT

U&K is conflicted, representing the companies that were injured along with the officers and directors who injured them, both at the time of the injury and now. As explained in the opening brief, that conflict becomes important and actionable when the injured companies begin to take an active role in the litigation. Pls. Br. 9. Here, that is precisely what has happened through stonewalling of discovery to hide or minimize U&K's culpability. For not only is U&K conflicted about who it represents, but also its own role in the main transaction at issue in this litigation: the 2012 Metro Transfer. U&K's desire to defend its own actions may not conflict with representing Lester and Wendy Eber, but it does conflict with representing EB&C and EBWLC.

U&K's failure to appreciate the significance of avoiding conflicts of interest is apparent from its claim that "plaintiffs' motion is a discovery dispute masquerading as a motion to disqualify." Def. Br. 2. That is incorrect, as we already outlined. Pls. Br. 14. Just because the conflict's impact is felt on discovery does not convert this motion into a stalking horse for a discovery dispute. Rather, as we explain further below, disqualification of conflicted and unfit counsel is required to ensure the integrity of these proceedings. Unlike a motion to compel, this motion is not about the things that we know were withheld; it is about all the things that we do not know exist but for the integrity of opposing counsel—something that we have no basis to trust.

## I. THE IMPACT OF U&K'S CONFLICTS ON EBWLC'S COMPLIANCE WITH DISCOVERY PRESENTS A SIGNIFICANT RISK TO THE INTEGRITY OF THE TRIAL PROCESS

"More than in any earlier era, discovery is essential to our system of civil justice." *Toussie v. Allstate Ins. Co.*, No. 15-CV-5235, 2018 WL 2766140, at *3 (E.D.N.Y. June 8, 2018).

"The Second Circuit has directed that courts faced with disqualification motions take a 'restrained approach that focuses primarily on preserving the integrity of the trial process.'" *Papyrus Tech. Corp. v. New York Stock Exchange, Inc.*, 325 F.Supp.2d 270, 276 (S.D.N.Y.2004) (quoting *Armstrong v. McAlpin*, 625 F.2d 433, 444 (2d Cir.1980), *vac. on other gds.*, 449 U.S. 1106 (1981)). The integrity of the discovery process necessarily implicates the integrity of the trial process, because it is through discovery that the evidence is collected, preserved, and disclosed so that it can be used at trial. *See Toussie*, 2018 WL 2766140, at *7 ("[T]he parties' pre-existing, independent obligations to preserve relevant evidence for use in discovery and at trial [] ensur[e] the integrity and fairness of the adjudicative process."). To have confidence in the integrity of discovery requires confidence in the ethics of counsel, because so much of the discovery process— e.g., collecting and reviewing documents—occurs behind closed doors.

Here, discovery about how the injuries to EBWLC occurred—including who was responsible for it and why they did it—is essential to a just resolution on the merits. While the Ebers have complete and unfettered access to EBWLC's records, Plaintiffs do not, even though their interests are aligned with EBWLC while the Ebers' interests are not. Plaintiffs must instead rely on normal discovery procedures.[1] Plaintiffs' are entitled to have counsel representing EBWLC that will not give their adversaries an unfair advantage at every turn.

No discovery motion would be an adequate substitute for disqualification. For example, if this Court enters an order compelling EBWLC to turn over documents or information, the nature

---

[1] Unfair discovery advantages have been recognized as threatening the integrity of the trial process. *See Williams v. Trans World Airlines, Inc.*, 588 F.Supp. 1037, 1045 (D.Mo. 1984) ("[T]he potential for unfair discovery of information through private consultation rather than through normal discovery procedures threatens the integrity of the trial process.") (citing *NCK Organization Ltd. v. Bregman*, 542 F.2d 128, 132 (2d Cir. 1976) ("The potential of unfair discovery and use of it through private consultation rather than through the normal modes of interrogatories, deposition and trial examination is critical in this case."). Though the basis for disqualification was different—there, access to the adversary's client confidences—the danger to the fairness of the adversary process was substantially similar.

2

of our system still relies upon the integrity of EBWLC's counsel to act appropriately and comply with the order fully and in good faith. The conflicts present ample cause to doubt U&K's ability to act appropriately in connection with discovery, and U&K's conduct to date unfortunately demonstrates that it cannot be trusted.

### A. U&K Has Failed to Follow-Through on Two Different Issues that Were Resolved During the Last Conference

During the November 7 conference, the Court directed the Defendants to disclose "(1) the identities of all persons who currently hold any kind of equity or ownership interest in any of the Eber Companies or Alexbay, LLC; and (2) the type and amount of each such equity interest as well as the percentage of total voting power within each company held by each person." Order 1, ECF No. 146. None of the Eber Companies nor Alexbay have complied with that order, not even after we mentioned this failure to comply to the Court on Monday, Brook Ltr. 1-2, ECF No. 169, nor after the Court sided with Plaintiffs the next day, ECF No. 169. There can be no doubt about the fact that non-compliance by EB&C and EBWLC was willful and a direct result of U&K's conflicted position, trying to protect Lester's and Wendy's interests.

The issue of corporate ownership is important because it affects Plaintiffs standing and ability to obtain the requested relief, and indeed it appears to be a constantly moving target. In August 2018, U&K purported to respond to an inquiry about the ownership interests in EBWLC, but it seems that someone changed the language before sending, indicating that the interests stated were no longer current. *See* Brook Decl. Ex. F ("The ownership interests in Eber W&L *was* [sic] as follows….") (emphasis added). Considering that this same letter also disclosed that Lester issued himself 750 shares of EBWLC in February 2017, after this lawsuit was filed, U&K's choice of language is particularly suspect. Combined with its non-compliance with this Court's simple November 7 order, it illustrates U&K's failure to conduct of discovery on behalf of EBWLC in

3

accordance with the basic standard of good faith.

In addition, in connection with the November 7 discussions of the corporate governance dispute regarding distribution of former Trust shares in EB&C, the Court may recall that Mr. Keneally (despite initially shaking his head) consented to allowing Canandaigua National Bank ("CNB") transfer the stock certificates and stock powers to Plaintiffs' counsel. After the conference, Paul Keneally and his co-counsel, John Herbert, refused to sign a short stipulation, requested by CNB, confirming that agreement for CNB's counsel's edification. Instead, Mr. Keneally completely rewrote the stipulation, demanding new concessions from Plaintiffs that were completely untenable. For example, Mr. Keneally insisted that Plaintiffs stipulate to there being no legal consequences as a result of transmitting the stock powers to EB&C—a stipulation that would obviate the whole endeavor.[2] Mr. Keneally thus demonstrated that his word means nothing.

These are just the latest problems with U&K, demonstrating a meaningful threat to the integrity of this matter. *See, e.g.*, Pls. Br. 4, 11 n.10, 13 (noting irregularities in the Privilege Log). We are not now seeking U&K's complete removal—just another lawyer or two to ensure that vital corporate records of the nominal defendants are preserved, searched, and disclosed appropriately.

### B.  There Will Be No Prejudice to the Ebers' Defense

U&K's purported concerns about prejudice from disqualification are impossible to reconcile with its position that EB&C and EBWLC are mere passive participants in the litigation. Although we disagree with that given how much information from those companies is being

---

[2] Specifically, Mr. Keneally insisted the stipulation include the following language:

> IT IS FURTHER STIPULATED that transmission to, and receipt of such Documents by, such corporate secretary will not constitute due presentment or other delivery of the Shares for any purpose; and none of the parties to the above-captioned litigation or CNB will exercise the right to vote any of the Shares, or to request the call of a stockholders' meeting of Eber Bros., prior to the final resolution of all such issues;

withheld—including even the identities of their equity holders—the corporate entities are unlikely to take a position at any trial or hearing, or to require to conduct their own discovery.

Given that granting this motion will not deprive the active participants—Lester and Wendy—of their choice of counsel, U&K's prejudice argument is without merit. While it may be damaging to their defense to have independent counsel ensure discovery compliance by EB&C and EBWLC, that is not the kind of "prejudice" that would be a basis to deny this motion. Quite the opposite, that is why the motion must be granted.

U&K claims that this motion is a tactical maneuver to drive up the Ebers' costs. Defs. Br. 9. That is untrue, for many reasons. First and foremost, the motion is meritorious. Second, we have been clear that the new counsel's role would be limited to ensuring that discovery was undertaken in accordance with the Rules of Civil Procedure and Professional Responsibility. Pls. Br. 13. Third, Plaintiffs are willing to split the cost *pro rata*, provided that their 2/3 ownership interest in these entities is recognized and Plaintiffs are allowed to have an equal say in choosing the new counsel.

### C.  Plaintiffs Filed Promptly Once the Basis for Disqualification Was Clear

There is some tension between two different limits on motions to disqualify: On the one hand, disqualification motions must be filed without undue delay; on the other hand, such motions are not granted without an adequate basis in the record. Under the case law governing derivative lawsuit disqualification motions, the counsel representing the nominal party corporation is generally not subject to disqualification unless and until the corporation takes an active role in the litigation. Pls. Br. 9.

As explained in the letter for leave to file this motion, the impetus for disqualification did not become apparent to Plaintiffs for quite some time. *See* ECF No. 138, at 2 (currently removed from ECF pending a ruling on redactions to this very portion of the argument). *See also* Pls. Br. 10 n.7. Plaintiffs were long kept in the dark about U&K's conflicted role at the time of the

transactions in question. Plaintiffs did not know that U&K had ever represented EBWLC on any matter until recently. U&K only disclosed its long-requested engagement agreements on August 19, 2018, showing that U&K was only formally engaged by EBWLC—not Alexbay—at the time it sued EBWLC on behalf of Alexbay. ECF No. 119-4. There is no evidence that anyone other than EBWLC ever paid U&K prior the completion of the 2012 Metro Transfer. U&K's conflicted role thus goes far beyond jointly representing nominal and actual defendants here.

U&K relies to its detriment on the unpublished decision in *Obeid v. La Mack*, No. 14-cv-6498, 2015 WL 7180735 (S.D.N.Y. Nov. 9, 2015). Defs. Br. 11-12, 14. But *Obeid* does not remotely support denial of this motion. First, Plaintiffs here did not seek to disqualify U&K as a routine matter due to the nature of derivative claims, as was the case in *Obeid*. Rather, Plaintiffs here moved only after developing a record that went far beyond the conflict itself, demonstrating a serious threat to the integrity of these proceedings. In *Obeid*, it appears that the sole basis for disqualification was the inherent conflict in the joint representation. 2015 WL 7180735, at *2 ("there is no demonstrated meaningful threat to the integrity of the trial from the challenged joint representation"). *Obeid* did not concern the impact on discovery from having conflicted counsel represent the nominal defendants. Indeed, in *Obeid*, the nominal defendants voluntarily retained independent counsel. *Id.* ("[D]uring the pendency of this motion, new counsel has been substituted to represent the nominal defendants, and that step leaves no basis to disqualify McGuire Woods from representing the other, active defendants on a conflict-of-interest theory."). Thus, the conflict was removed; no concern about fair access to corporate records existed.

U&K also relies on the inapposite second part of *Obeid* to misstate the applicable standard for disqualification. U&K argues that "any movant for disqualification must establish two elements," the first being that "the movant must establish that counsel's prior representation relates

to a matter 'identical' to the representation for which the movant seeks disqualification." Defs. Br. 14 (citing *Obeid*). The cited test concerns disqualification motions based on the lawyer's prior representation of the movant, not a concurrent conflict of interest in a derivative lawsuit. Regardless of whether it was intentional, this misrepresentation of the case law does not help to alleviate concerns about U&K's fitness to represent EB&C and EBWLC.[3]

To our knowledge, no case has ever considered anything close to the confluence of conflicts present here: (1) direct involvement by the law firm in a prior judicial proceeding where the result was allegedly obtained through fraud; (2) the prior judicial proceeding was filed by the law firm against a current client, without even raising the issue of the conflict that resulted; (3) the client sued by the law firm is now being jointly represented by the law firm in subsequent derivative litigation as a nominal defendant (i.e., victim) alongside the actual defendants. *Cf. Hull v. Celanese Corp.*, 513 F.2d 568, 571 (2d Cir. 1975) ("[I]n the disqualification situation, any doubt is to be resolved in favor of disqualification.").

## II.  U&K'S ASSERTION THAT "NO CONFLICT" EXISTED IS ILLOGICAL AND UNDEVELOPED NONSENSE, CONTRADICTED BY OTHER PARTS OF ITS OWN BRIEF, DEMONSTRATING A REGRETTABLE LACK OF COMPETENCE AND INTEGRITY

U&K cannot even maintain a consistent position on whether there was a conflict in 2012 or not. It contradicts itself within the same brief.

At the outset, U&K asserts that there was "no conflict." Defs. Br. 2 ("[T]here was no conflict because the out-of-business Eber Bros. and EBWLC entities were not adversely affected by the judicially-ordered assignment in 2012 of Eber-CT to Alexbay/Lester Eber…."). U&K even

---

[3] We cannot rebut every misrepresentation of the law by U&K. Some like *Obeid* are potentially significant. *See also, e.g.*, Defs. Br. 12-13 (claiming that courts are reluctant to disqualify counsel for nominal defendants unless counsel "switched sides," but citing cases that stand for the proposition that attorney, who has served as counsel for a corporation, may not represent an individual shareholder in a case in which his interests are adverse to other shareholders). We have tried our best to triage, focusing on the misrepresentations most likely to be relevant to the instant motion and not obviously false. Bogus claims suggesting that New York law supposedly permits trustee self-dealing and interested-director transactions without oversight, Defs. Br. 6, 8, can be addressed another day.

admits that neither it nor its clients ever discussed the issue of its conflict at the time. *Id.* at 13

("[N]o individual or entity involved in the 2012 proceeding ever raised any issue of a conflict.").[4]

      In a separate section, however, U&K acknowledges that a conflict existed when it sued

EBWLC on behalf of Alexbay. Def. Br. 14 ("At the time of the Article 9 proceeding at issue, U&K

explicitly declined to represent EBWLC *because of the conflict* between EBWLC and Lester Eber

and Alexbay.") (emphasis added). As the author of that section of their brief recognized, U&K

was obviously conflicted out of suing its then-current client, EBWLC.

      U&K's assertion about the supposed non-existence of a conflict seems predicated on

asking this Court to render a premature ruling on the valuation of Eber-CT. *See* Defs. Br. 2

("[T]here was no conflict because the out-of-business Eber Bros. and EBWLC entities were not

adversely affected by the judicially-ordered assignment in 2012 of Eber-CT to Alexbay/Lester

Eber, as Eber-CT was worth far less than the first-position secured debt owed to Alexbay/Lester

Eber."); *see also id.* at 12. The value of Eber-CT is a disputed merits issue in this litigation,

however, and it has *nothing* to do with the existence of a legal conflict.

      In fact, by advancing the ludicrous argument that there was "no conflict" and then basing

it on an unsupported and strongly disputed contention about the valuation of Eber-CT, U&K

convincingly demonstrates that it is incapable of effectively representing EB&C and EBWLC.

      After raising the issue of Eber-CT's value as supposedly critical to this motion, U&K's

brief proceeds to go out of its way to evade the issue. Despite extensive exposition going to many

merits-related facts (e.g., each of Lester's loans), and lots of exhibits, there is no discussion of

---

[4] This admission that no one raised the conflict issue is at odds with U&K's unsupported assertion that EBWLC "fully consented to U&K's actions." *Id*. Lawyers are required to advise their clients of the potential consequences of the conflict in order to obtain an effective waiver. The rule that a waiver must be in writing does not "clearly exalt[] form over substance." *Id*. Rather, it ensures that lawyers do not engage in unethical representations and later try to cover their tracks with lies about what was supposedly discussed. In any event, U&K's blasé attitude towards the express requirements of the Rules of Professional Conduct, *id*., lends considerable support to the conclusion that their continued representation of EBWLC presents a significant risk of trial taint.

Eber-CT's value.[5] The omission is downright misleading when it comes to U&K's description of the Foreclosure (Article 9) Action. Defs. Br. 7. It asserts that New York State Justice Rosenbaum found the transfer of Eber Metro "commercially reasonable given the amount of Lester's loans." *Id*. But the amount of the loans is only *half* of the equation—the other half is the value of Eber Metro's 79% interest in Eber-CT. To convince Justice Rosenbaum that Lester's loans were roughly equal to 79% of Eber-CT, U&K affirmatively misrepresented the facts about the prior Polebridge transaction so that its low price could serve as the basis for valuing Eber-CT. *See* Pls. Br. 3, 5 (U&K's complaint characterized the Polebridge deal as "arm's length" when U&K knew that it was not); *see also* Defs. Priv. Log at EB-00026664, EB-0002627 (showing that U&K lawyers, including one who signed the Alexbay complaint, were communicating with Polebridge's Glenn Sturm, Lester, and Wendy *together*, both before and during the Foreclosure Action).

Our opening brief argued that "a major part of Plaintiffs' case is going to be demolishing the lies that U&K put before the New York Supreme Court in the 2012 Foreclosure Action." *Id*. at 12. Given our argument about U&K's prior misrepresentations about Eber-CT's value, and U&K's own argument about that value being integral to finding "no conflict," its failure to address the issue is baffling. Apparently, U&K cannot dispute that its lawyers *lied* to a court about Eber-CT's value in order to get a judicial finding of commercial reasonableness.

This Court should be seriously concerned by U&K's persistent effort to misleadingly minimize its conflicted role in the 2012 Metro Transfer, which goes beyond downplaying the significance of its in-court misrepresentations on behalf of Alexbay. *See* Defs. Br. 14-15.[6]

---

[5] The closest the brief comes is referencing Lester's unsupported (and ultimately self-serving) general assertion that "the various Eber entities" faced "financial struggles."

[6] U&K's conclusory assertion that it is not self-interested in this litigation as a result of its representation of Alexbay in the Foreclosure Action avoids any discussion of the facts. Defs. Br. 15. U&K instead relies on a false claim that Plaintiffs cited "no authority," *id.*, disregarding the cited commentary to the Rules of Professional Conduct. *See* Pls.

When it comes to its concurrent representation of EBWLC—the party from which Alexbay took Eber Metro and its controlling interest in Eber-CT—U&K chooses its words *very* carefully. U&K denies only that it represented EBWLC in the "Article 9 proceeding" (i.e. Foreclosure Action) that rubber stamped the Metro Transfer. Defs. Br. 14-15.

Crucially, U&K *does not deny* that it helped Lester come up with the strategy that led to the 2012 Metro Transfer itself. *Id*. Given that we flagged this in our opening brief, *see* Pls. Br. 4-5 ("[Keneally] stops short of disclaiming involvement in planning it, or in helping Lester come up with the overall strategy…. It is U&K's involvement behind closed doors in developing that strategy that is of primary concern—not what happened out in the open in a sham lawsuit."), U&K's conspicuous omission is effectively an admission.

Unless it is disqualified, U&K will remain the sole gatekeeper for all discovery from EBWLC.[7] Its manifest interest in concealing or minimizing its true role, combined with its representation of Lester and Wendy and its generally blasé attitude to the Rules of Professional Conduct, demonstrates why permitting U&K to remain the gatekeeper threatens the integrity of these proceedings.

## CONCLUSION

The Court should disqualify U&K from representing EB&C and EBWLC.

---

Br. 12 (citing N.Y.R.P.C. 1.7 Comment [10] ("[I]f the probity of a lawyer's own conduct in a transaction is in serious question, it may be difficult or impossible for the lawyer to give a client detached advice.").

[7] U&K's role includes deciding which documents find their way onto the Privilege Log. As suggested in the opening brief, there is good cause to believe that the documents that are logged as concerning certain litigation matters in fact reflect U&K rendering advice that relates to what ultimately became the 2012 Metro Transfer. Pls. Br. 4, 13.

Respectfully submitted,

/s Brian C. Brook
Brian C. Brook (BB 1980)
CLINTON BROOK & PEED
100 Church Street, 8th Floor
New York, NY 10007
Tel./Fax: (212) 257-2334
Brian@clintonbrook.com

*Counsel for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

Dated: December 7, 2018