## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL KLEEBERG, LISA STEIN, and AUDREY HAYS, | |
| Plaintiffs, | |
| v. | Civil Action No.  16-CV-9517 (LAK) |
| LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC; ESTATE OF ELLIOTT W. GUMAER, JR.; and WENDY EBER, | |
| Defendants, | **[UPDATED PROPOSED] THIRD AMENDED COMPLAINT** |
| and | |
| EBER BROS. & CO., INC.; EBER BROS. WINE AND LIQUOR CORP.; EBER BROS. WINE & LIQUOR METRO, INC.; EBER-CONNECTICUT, LLC; EBER-RHODE ISLAND, LLC; EBER BROS. ACQUISITION CORP.; EBER-METRO, LLC; SLOCUM & SONS OF MAINE, INC. | **Jury Trial Demanded** |
| Nominal Defendants. | |

Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays, as their Complaint against

Defendants Lester Eber ("Lester"); Alexbay, LLC f/k/a Lester Eber, LLC ("Alexbay"); Estate of

Elliot W. Gumaer, Jr. ("Gumaer"); and Wendy Eber ("Wendy"), including derivative claims on

behalf of Eber Bros. & Co., Inc. ("EB&C") and Eber Bros. Wine and Liquor Corp. ("EBWLC"),

allege as follows:

## NATURE OF THE ACTION

1.     This action concerns unfair self-dealing and fraudulent concealment by individuals who were required by law to act as fiduciaries to the injured parties.

2.     At all relevant times, Plaintiffs were beneficiaries or contingent remaindermen of a combined two-thirds interest in a testamentary trust created upon the death of their grandfather, Allen Eber (the "Trust").

3.     The other third of the interest in the Trust was held by Allen Eber's only son, Lester Eber ("Lester"). Lester was also a co-trustee of the Trust.

4.     The Trust held all of the voting stock in the parent company for the Eber Bros. Wine and Liquor distribution business (generally referred to herein as "Eber Bros."), which Allen Eber founded in the early 20th century.

5.     Lester was entrusted with stewardship of the family business, serving as the President of Eber Bros. Under his stewardship, Eber Bros. encompassed multiple different corporate entities operating in several different states, including New York.

6.     In 2007, due to increased competition and, ultimately, a buy-out agreement with their stiffest competitor, Eber Bros. started winding down operations in New York and a few other locations.

7.     During the buy-out negotiations with Eber Bros.' competitor, Lester negotiated a $3 million "consulting" fee from the competitor for himself, paid at $600,000 per year for five years.

8.     That "consulting" fee significantly exceeded the entire compensation package Lester received from Eber Bros. Indeed, the fee was vastly inflated beyond the reasonable value of Lester's consulting services because it also compensated *Lester* for agreeing to restrictions on

*Eber Bros.'* ability to compete. This money belonged to the Eber Bros. business, but Lester diverted it to himself. And he did so while still employed as President of Eber Bros. and still acting as a trustee over the Trust that owned Eber Bros.

9.     This was just one of a series of Lester's disloyal actions taken for the benefit of both himself and his daughter, and to the detriment of both Eber Bros. and the Trust that owned it.

10.     The worst malfeasance occurred when Lester and his coconspirators took Eber Bros.' sole remaining operating business for himself. This did not occur overnight, but rather was effectuated through a series of steps over several years starting in 2010, completed in 2012 (the "Metro Transfer"). The Transfer itself was followed by years of concealing Lester's malfeasance from the Trust beneficiaries who had had their shares of the family business stolen from them by the very man legally obligated to safeguard their interests.

11.     Because of the various holding companies that Lester created underneath the Eber Bros. umbrella, Plaintiffs' injury was indirect; the direct injury from the Metro Transfer, and much of Lester's other self-dealing, was felt by Eber Bros. Wine & Liquor Corp. ("EBWLC").

12.     After Plaintiffs finally learned about the Metro Transfer through their own research (Defendants never disclosed it), Plaintiffs filed this lawsuit in December 2016, asserting derivative claims on behalf of EBWLC.

13.     Lester responded to this lawsuit by taking extra-judicial steps to dilute or divest Plaintiffs' interests in EBWLC and its parent corporation. This was more improper self-dealing, particularly when he abused his position as trustee. In this Amended Complaint, Plaintiffs seek to unwind these acts as well as any similar actions that may be contemplated by Lester and his cohorts to entrench himself and his daughter in the family business.

14.     Lester's perpetual self-dealing might not give rise to a derivative lawsuit if he were the sole owner of his own business. But he inherited only part of this business; Plaintiffs inherited two-thirds of it. Lester may feel entitled to more because he was in charge of the business for decades, and he loaned substantial sums of money to it in recent years. But Lester was paid for that work, and paid well, it seems, since he had so much money to be able to loan.

15.     As a corporate officer, Lester was bound as a fiduciary to faithfully serve the interests of all of the shareholders. As a trustee, Lester was obligated to advance the interests of all beneficiaries. He was not permitted to abuse his position of trust and power to benefit himself at the expense of the corporate shareholders and trust beneficiaries. Because that is precisely what he did—with the help of the other Defendants—this lawsuit seeks a number of equitable remedies to undo his various self-dealing transactions.

16.     And because the Defendants' malfeasance involved such a serious abuse of trust combined with fraudulent concealment, ~~the equitable remedy~~imposition of ~~a surcharge—essentially~~ punitive damages— or a surcharge is also appropriate, both to punish their wrongdoing and to deter others who are in similar positions of trust from engaging in similar wrongdoing.

## PARTIES

*Plaintiffs*

17.     Plaintiff Audrey Hays is a citizen of Colorado, with her primary residence in the city of Oak Creek. She is the only child of Mildred Boslov, who was one Allen Eber's two daughters. Mildred Boslov died in 1973, at which point Hays became a beneficiary of the Trust, holding a 1/3 interest in it.

4

18.     Plaintiffs Daniel Kleeberg and Lisa Stein are the children of Sally Kleeberg, who was Allen Eber's other daughter, and who had a 1/3 interest in the Trust. Prior to their mother's death in 2014, Daniel Kleeberg and Lisa Stein were contingent remaindermen of the Trust. After their mother's death, they became the beneficiaries by operation of law, pursuant to the terms of the Allen Eber will, which provided that Sally's 1/3 interest go to her issue *per stirpes*. Accordingly, they split their mother's 1/3 interest evenly, with each receiving a 1/6 interest. *See* Exhibit A (family tree illustrating the relationships at the time of first filing).

19.     Plaintiff Daniel Kleeberg is a citizen of Florida, and at the time of filing has his primary residence in Lake Worth, Florida.

20.     Plaintiff Lisa Stein is a citizen of New Jersey, with her primary residence in Linwood, New Jersey.

*Defendants*

21.     Defendant Lester Eber ("Lester") is a citizen of New York who was a co-trustee of the Trust until its dissolution in 2017.

22.     Defendant Alexbay, LLC ("Alexbay") is a Connecticut limited liability company. When it was first registered in December 2011, it originally named Lester Eber, LLC and it changed its name in 2012. Its sole member is Lester Eber. On information and belief, its principal place of business is located at 30 Corporate Drive, North Haven, Connecticut, although it is and was at all relevant times controlled by Lester Eber, who frequently transacts Alexbay-related business relating in New York state, including in Manhattan.

23.     Defendant Wendy Eber ("Wendy") is a citizen of New York who resides at 188 East 78th Street, Apartment 21A in Manhattan. Wendy is Lester Eber's daughter and Plaintiffs'

first cousin. At various points in time since approximately 2007, Wendy has served as an officer and director of some of the Eber Bros. entities.

24.     Elliott W. "Mike" Gumaer, Jr. ("Gumaer"), at the time this case was filed, was a citizen of Georgia with a primary residence at 228 W. 28th Street, Cottage 494, Sea Island, Georgia 31561. He was an attorney licensed to practice in New York since 1958, although that license was not maintained and he was, as a result, not authorized to practice law at the time this case was first filed. Gumaer was designated as a co-trustee of the Trust in Allen Eber's will and served in that capacity until the Trust was dissolved in 2017. Gumaer was also a director of EB&C from 2000 to 2017, and a director of EBWLC until at least 2014.

25.     Defendant Estate of Elliott W. Gumaer ("Gumaer's Estate") is liable for Gumaer's actions, having been substituted for Gumaer individually after he died on February 20, 2018.

*Nominal Parties*

26.     Eber Bros. & Co., Inc. ("EB&C") is a New York corporation that first registered with the Department of State on June 25, 1917. At the time of this lawsuit's first filing in December 2016, EB&C was controlled by the Trust, which held all 1850 of its Class A voting shares.

27.     Eber Bros. Wine and Liquor Corporation ("EBWLC") is a New York corporation. It was first registered with the Department of State on September 3, 1935. At the time of this lawsuit's first filing, EB&C held all of the voting shares of EBWLC.

28.     Eber Bros. Wine & Liquor Metro, Inc. ("Eber Metro") is a New York corporation. It was first registered with the Department of State on June 20, 1996. Prior to June 2012, Eber Metro was a wholly-owned subsidiary of EBWLC.

29.     Since approximately 2008, if not earlier, EB&C, EBWLC, and Eber Metro have functioned primarily as holding companies without their own business operations.

30.     Eber-Connecticut, LLC ("Eber-CT") is a Delaware limited liability company. It has been registered to do business in New York since March 8, 2006. Its principal place of business is located at 30 Corporate Drive, North Haven, Connecticut. Since approximately 2005, Eber-CT has operated a wine and liquor distributorship in Connecticut under the trade name Slocum & Sons. As of the time of this lawsuit's first filing, Eber-CT had three members: Alexbay, LLC; Polebridge Bowman Partners, LLC; and Eder-Goodman, LLC.

31.     Eber-Rhode Island, LLC ("Eber-RI") is a Delaware limited liability company. It has been registered to do business in New York since March 8, 2006.

32.     Eber Bros. Acquisition Corp. ("Eber Acquisition") is a New York corporation and a wholly-owned subsidiary of EBWLC. Its last-used principal place of business was in Rochester, New York.

33.     Eber-Metro, LLC ("Eber-NDC") was formerly known as Eber-NDC, LLC. It is a Delaware limited liability company. On information and belief, its sole member Eber Metro.

34.     The "Eber Entities" include all entities that were, prior to approximately June 5, 2012, owned or controlled by EB&C, including EBWLC; Eber Metro; Eber-CT; Eber-RI; Eber-NDC; and Eber Acquisition.

35.     "Eber Bros." as used herein generally refers to the wine and liquor business engaged in by certain of the Eber Entities.

36.     Slocum & Sons of Maine, Inc. is a Maine corporation, previously named TGH America, Inc., that is involved in the wine and liquor distribution business. Since approximately 2012, Lester and Wendy have each owned half of the company.

7

37.    Non-party Canandaigua National Bank & Trust Company ("CNB") was a co-trustee of the Trust since approximately mid-2007. It was originally named as a Defendant in this lawsuit but subsequently dismissed by stipulation.

38.    Non-party Polebridge Bowman Partners, LLC ("Polebridge Bowman") is a Georgia limited liability company. On information and belief, its sole member is, and was at all relevant times, Glenn Sturm, who is, and at all relevant times was, an attorney with Nelson Mullins in Atlanta and a citizen of Georgia. Polebridge no longer is a member in Eber-CT.

39.    Non-party Eder-Goodman, LLC is a Connecticut limited liability company. Its registered members are Richard M. Weiss and David G. Heller, both of whom are, and were at the time of filing, residents and citizens of Connecticut.

## JURISDICTION AND VENUE

40.    This case implicates the Court's diversity jurisdiction.

41.    Plaintiffs are citizens of New Jersey, Colorado, and Florida, and it is their citizenship that matters only because Plaintiffs have standing to sue independent of any other person's interest.

42.    No claims are being asserted by any Plaintiff as a personal representative of any deceased person. Nor would any claims potentially be able to be asserted by the personal representative of a former beneficiary such as Sally Kleeberg, because her interest in the Trust was not part of her estate, but rather part of the Allen Eber estate, and the beneficial interest transferred to her children by operation of his will.

43.    Audrey Hays has had standing to sue as a beneficiary of the Trust since 1973.

44.    Before 2014, Daniel Kleeberg and Lisa Stein had standing to sue as contingent remaindermen to the beneficial interest held by their mother. *See Benjamin v. Morgan Guar.*

*Trust Co. of New York*, 557 N.Y.S.2d 360, 363 (1st Dept. 1990) (interpreting Surrogate's Court Procedure Act § 2205 as granting contingent remaindermen of a testamentary trust standing to sue). Since 2014, they have had standing to sue as beneficiaries of the Trust.

45.     As detailed above, Defendants are citizens of New York, Connecticut, and Georgia. In the case of LLC Defendants, they are citizens of the states where their members are citizens. For Alexbay, its sole member is Lester Eber (New York). For Eber-CT, its members are three LLCs, and those LLCs' individual members are citizens of New York, Connecticut, and Georgia.

46.     The amount in controversy exceeds the $75,000 jurisdictional minimum because this case seeks equitable relief for Defendants' wrongful transfer of an entity worth at least approximately $10 million, as well as other equitable remedies that would result in a judgment significantly larger than $75,000.

47.     Because there is complete diversity between Plaintiffs (Colorado, Florida, and New Jersey) and Defendants (New York, Connecticut, and Georgia), this Court therefore has jurisdiction under 28 U.S.C. § 1332.

48.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) because at least one defendant resides in this district and, upon information and belief, a substantial part of the events or omissions giving rise to the claim occurred in this district.

## FACTS COMMON TO ALL COUNTS

*The Allen Eber Trust*

49.     Allen Eber founded the Eber Bros. wine and liquor business nearly 100 years ago. He had three children: Sally Kleeberg, Mildred Boslov, and Lester Eber. *See* Exhibit A.

50.     As part of his will, Allen Eber created a testamentary trust to hold, maintain, and manage his residuary estate, including the family business for the benefit of his children and their heirs (the "Trust").

51.     Pursuant to the terms of his father's will, when his father died, Lester Eber became a co-trustee of the family's business assets, including the Eber Bros. wine and liquor business.

52.     The will named Gumaer and a bank as co-trustees with Lester.

53.     In 2007, CNB replaced the original bank as a trustee. CNB remained trustee at all times since until the Trust was ordered terminated in 2017.

54.     Lester himself had only a one-third beneficial interest in the Trust's assets. Pursuant to the terms of the Allen Eber will, which governed the testamentary Trust, the other two-thirds interest belonged to Lester's two sisters, Sally and Mildred, and upon their deaths transferred to their issue then living *per stirpes*.

55.     Thus, at the time of this lawsuit's filing, the beneficiaries of the Trust and their respective interests were: Lester Eber (1/3); Audrey Hays (1/3); Daniel Kleeberg (1/6); and Lisa Stein (1/6).

56.     In or about February 2017, CNB petitioned the Monroe County Surrogate's Court to terminate the Trust and approve a Final Accounting to distribute the Trust's remaining assets to the beneficiaries in accordance with their respective interests.

57.     Lester Eber entered an appearance in the Surrogate's Court proceeding and did not state any objection to CNB's request to terminate the Trust or to its proposed Final Accounting.

58.     On or about June 1, 2017, the Surrogate's Court entered ~~a~~an Order of Judicial Settlement and Final Accounting of the Trust. It provided for distribution of all Trust assets as follows: 1/3 to Lester Eber; 1/3 to Audrey Hays; 1/ 6 to Daniel Kleeberg; and 1/6 to Lisa Stein.

*The Eber Bros. Family Business*

59.     In addition to being a co-trustee of the Trust that controlled the equity of the family business entities, Lester has held officer and director positions with the Eber Entities, including serving as President or Chief Executive Officer of EB&C and EBWLC.

60.     Lester brought his daughter, Wendy, into the family business and made her his heir apparent.

61.     Since 2007, Wendy has held director and officer positions with both EB&C, EBWLC, and Eber Metro. For example, Wendy was the CFO and Secretary of EBWLC from 2007 until 2014. From 2012 to 2014, she was also President of EBWLC. Since 2014, she has held the title of EBWLC's Assistant Secretary, but is in fact the company's most senior executive officer.

62.     Before 2013, Lester served as President of Eber-CT. Since 2013, Wendy has been the President of Eber-CT.

63.     As of February 2012, Eber Metro held a 79% interest in Eber-CT.

64.     Thus, because Eber Metro was a wholly owned subsidiary of EBWLC, which was controlled by EB&C, the Trust indirectly held a controlling interest in Eber-CT thanks to its holding of all of the voting shares in EB&C.

65.     Starting in 2007, Lester agreed to close most of the Eber Bros. business, including its entire New York State operation. As part of the deal, EBWLC accepted money, essentially a buy-out, from its competitor, Southern Wine & Spirits of America, Inc. ("Southern").

11

66.     As a result of the Southern transaction in 2007, the Eber Bros wine and liquor business—which once operated in New York, Delaware and Ohio—was primarily focused on the state of Connecticut, through the Eber-CT entity, which did business as Slocum & Sons.

67.     In addition, on information and belief, some business was transacted in Rhode Island through Eber-RI, which also did business as Slocum & Sons.

68.     Slocum & Sons was a family-owned wine and liquor distributorship operating in New England for decades, primarily in the State of Connecticut.

69.     Slocum & Sons was acquired by Eber Metro in 2005 for a total purchase price of over $20 million.

**The Southern Consulting Agreement**

70.     At the same time as the Southern transaction with EBWLC, Southern entered into a Consulting Agreement with Lester Eber.

71.     The Consulting Agreement is hereby incorporated by reference. Until it was produced to them in discovery, Plaintiffs had not seen a copy of the Consulting Agreement nor were they aware of any of its specific terms. Neither Lester nor the other fiduciaries ever disclosed any of the Consulting Agreement's terms to Plaintiffs prior to this lawsuit being filed.

72.     As part of the Consulting Agreement, Lester agreed to provide up to 40 hours of services per week to Southern, however only "on an as-needed basis," and Southern expressly obtained the right to "entirely eliminate [Lester's] duties" as long as Lester was paid in full.

73.     The Consulting Agreement also included a Restrictive Covenant that prohibited Lester (and thus the Eber Entities he controlled) from conducting active business in any State where Southern operated.

12

74.     The fee for the Consulting Agreement was $600,000 per year for five years, paid at $50,000 per month, for a total of $3 million.

75.     After the initial five-year term, Lester continued consulting with Southern, but for a much, much lower amount of compensation.

76.     For 2017-18, Lester's consulting fee was only $833 per month (i.e. $10,000 per year)—far less than the $50,000 per month or $600,000 per year that he received previously.

77.     Moreover, Lester's entire annual compensation package as President of EBWLC prior to 2007 was far less than the annual consulting fee Lester negotiated for himself from Southern.

78.     Thus, in effect, the "Consulting Agreement" was really just a personal deal bonus for Lester that he negotiated with Southern, rather than going through the proper channels for obtaining executive compensation from his actual employer.

**Slocum of Maine**

79.     As part of the 2005 Slocum acquisition, Eber Metro acquired a Call Option to buy Slocum of Maine for the purchase price of just $10 at any time through December 31, 2008.

80.     Even before exercise of the Call Option, Slocum of Maine agreed to operate as directed by Eber-CT and to retain all profits for the benefit of Eber-CT.

81.     In the event that Eber Metro did not exercise the Call Option by December 31, 2008, Slocum of Maine would have to be dissolved.

82.     As of 2011, Lester and Wendy together personally owned just over 50% of Slocum of Maine's stock.

83.     As of approximately 2012, Lester and Wendy together personally owned 100% of Slocum of Maine's stock.

84.     In 2012, Lester began receiving income from Slocum of Maine each year from

then through at least 2017. Plaintiffs were first informed of this fact—and thereby discovered the

existence of Slocum of Maine—in responses to interrogatories that were served by Lester's

counsel on Plaintiffs' counsel in October 2017.

85.     Lester and Wendy have both received compensation for services from Slocum of

Maine.

86.     According to Eber-CT's books, Eber-CT has paid millions of dollars a year to

Slocum of Maine. Until Plaintiffs received Eber-CT's general ledger files in August 2018,

Plaintiffs had no idea that Slocum of Maine engaged in any transactions with Eber-CT, let alone

regular transactions of this magnitude.

87.     It is unclear how Wendy and Lester came to personally own Slocum of Maine

when Eber Metro had the Call Option to buy it. The reasonable inference is that Lester and

Wendy took it for their own personal benefit, without having to share or account for the proceeds

they derived from it.

### The Polebridge Transaction

88.     In May 2010, Eber Metro sold a portion of its equity interest in Eber-CT to

Polebridge Bowman Partners, LLC ("Polebridge").

89.     This amounted to a six percent stake in Eber-CT, for the purported purchase price

of $350,000.

90.     Eber Metro simultaneously received a promissory note from Polebridge for the

amount of $350,000, made payable after five years, with an interest rate of 2% per year.

91.     Polebridge's promissory note was expressly non-recourse, meaning that if it failed

to pay the note, no one else was potentially on the hook to pay it, not even Polebridge's owners.

14

92.     Polebridge's promissory note was secured only by the six percent of Eber-CT that it acquired.

93.     Thus, Polebridge did not actually pay anything for its six percent interest in Eber-CT. This was a roundtrip transaction with no real economic substance; in other words, a sham. This fact was unknown to Plaintiffs until they received a copy of the transaction documentation during discovery in this litigation.

94.     Despite its name, Polebridge involved no "Partners" because the company was owned by one man alone: a lawyer/strategic consultant named Glenn Sturm. Sturm was then a partner in the Atlanta law firm Nelson Mullins.

95.     As a result of the Polebridge Transaction, Eber Metro's stake in Eber-CT decreased from 85% to 79%.

**The Metro Transfer**

96.     On December 8, 2011, Lester created Lester Eber, LLC in the State of Connecticut, and filed an affidavit with the state liquor licensing board, attesting—under penalty of perjury—to the following:

1. I make this affidavit from my own knowledge and belief. I understand that I am making this affidavit under penalty of false statement.

2. This affidavit is being made as part of an application to the Department of Consumer Protection Liquor Control Division to transfer stock in the entity known as Eber-CT. Eber-CT is the backer of LIW0000596.

3. Presently, 79 percent of Eber-CT is owned by me through an entity known as Eber Metro.

4. I wish to transfer all of that 79 percent that I own from Eber-Metro to Lester Eber LLC, an entity which will also be wholly owned by me.

5. This transfer is being done for no consideration, in that it is being done strictly for organizational purposes. No money or other consideration will change hands.

_Lester Eber_

**Lester Eber**

97.     Lester did this while he was still President of EBWLC and co-trustee of the Trust.

98.     It is unclear who else knew about it, or why this "no consideration" transfer attempt was ultimately abandoned.

99.     Lester proceeded to change the name of his new company to Alexbay.

100.    On or about January 18, 2012, Lester assigned to Alexbay several debts that were purportedly owed to him by Eber Metro.

*The Foreclosure Action*

101.    On February 21, 2012, Alexbay filed a complaint (the "Foreclosure Action") against EBWLC, Eber Metro, and Southern, in New York Supreme Court, seeking a judicial declaration that it was "commercially reasonable" to transfer ownership of Eber Metro to Alexbay in full satisfaction of debts that were supposedly owed to Alexbay by Eber Metro. A copy of the Foreclosure Action summons and complaint (without exhibits) is attached as Exhibit B.

16

102.    In the Foreclosure Action, Alexbay alleged that the following agreements had

been executed, creating a total debt in excess of $3.650 million:

    a.    On October 1, 2002, Lester loaned EBWLC $575,895 pursuant to a

           promissory note;

    b.    On August 15, 2005, Lester loaned EBWLC the sum of $1,503,750 pursuant

           to a promissory note;

    c.    On March 13, 2006, the two promissory notes were combined into an

           amended and restated promissory note with a principal balance of

           $1,434,710.68;

    d.    In October 2009, Lester extended a line of credit to Eber Metro of up to

           $1,500,000 pursuant to a Line of Credit Note;

    e.    On February 26, 2010, EBWLC guaranteed Eber Metro's payments on the

           line of credit note to Lester;

    f.    On February 26, 2010, a security agreement gave Lester a secured interest in

           substantially all of EBWLC's assets;

    g.    On February 10, 2011, the security agreement was amended to specifically

           include EBWLC's shares in Eber Metro, and thus its 79% interest in Eber-CT;

    h.    On February 11, 2011, pursuant to a debt assumption agreement, Eber Metro

           assumed EBWLC's obligations under the amended promissory note.

103.    Alexbay's complaint in the Foreclosure Action alleged that Eber Metro had

defaulted on the debts owed to the "Original Secured Creditor" (i.e., Lester), and that Eber

Metro's capital stock was the "Collateral" that secured the debts.

104.   Alexbay's complaint alleged that since EBWLC had guaranteed Eber Metro's debts, it was appropriate for it Alexbay to take all of EBWLC's stock in Eber Metro in order to eliminate Eber Metro's debt.

105.   On March 15, 2012, Alexbay filed a motion seeking a determination that Alexbay's acceptance of all of EBWLC's shares in Eber Metro in full satisfaction of the alleged debt was commercially reasonable under the Uniform Commercial Code ("UCC").

106.   No opposition to Alexbay's motion was filed by EBWLC.

107.   On May 11, 2012, the court granted Alexbay's unopposed motion and stated that the transaction was commercially reasonable.

108.   CNB was not informed about the Foreclosure Action until after the court rendered its May 11, 2012 finding.

109.   Neither Lester nor anyone else associated with him or any other trustee informed Plaintiffs or the Trust beneficiaries about the Foreclosure Action.

110.   Even though it was the majority shareholder of EBWLC, EB&C was not a party to the Foreclosure Action, and had no representation in court.

*Lester Retroactively "Resigned" as President of EBWLC*

111.   In February or March 2012, Lester resigned from his position as President of EBWLC.

112.   Lester resigned from EBWLC based on advice from counsel.

113.   Lester's resignation was dated to be effective as of February 1, 2012.

114.   In fact, Lester did not resign on February 1, 2012, but only did so later, and then backdated his resignation.

115.   Lester did not communicate any intention to resign until after February 21, 2012.

18

116.    On or about March 23, 2012, Wendy and Gumaer signed a corporate document purporting to approve Lester's resignation on February 1, 2012.

117.    Notably, the approval document itself was backdated to "as of February 28, 2012."

*Collusion Between Alexbay (Lester) and EBWLC (Wendy)*

118.    The Foreclosure Action was filed on behalf of Alexbay by lawyers from Underberg & Kessler LLP ("U&K").

119.    At the same time, U&K was representing EBWLC in other matters.

120.    U&K did not obtain a written conflict waiver from EBWLC prior to filing Alexbay's suit against EBWLC.

121.    No written retainer or engagement agreement was executed between Alexbay and U&K at any time in 2012 or earlier.

122.    U&K proceeded to engage in purportedly confidential communications with individuals affiliated with both sides of the Foreclosure Action—EBWLC and Alexbay—and on the subject of the Foreclosure Action and the planned transfer of Eber Metro to Alexbay.

123.    The two sides of the litigation were colluding with each other to achieve the same objective as Lester had tried to accomplish for "no consideration" just weeks earlier.

124.    To ensure that the court gave its seal of approval on the long-planned transfer of Eber-CT to Lester, Lester and Wendy colluded to ensure that critical information was withheld from the court.

125.    In the Complaint for the Foreclosure Action, Alexbay asserted that the value of all of the equity in Eber-CT was $4,633,300 as of December 31, 2011. It made this assertion based

on an implied valuation that occurred through the sale of 6% of Eber-CT's equity to Polebridge in 2010.

126.    Neither Lester nor anyone from EBWLC inform the court of any of the facts indicating that the Polebridge Transaction was a sham. Far from it, Lester and his lawyers affirmatively misrepresented the Polebridge Transaction as having been with an arm's-length third party and conducted on the free market.

127.    There were other sources of identifying the value of Eber-CT that showed its value to be significantly higher:

a. In 2005, Eber Metro had acquired Slocum & Sons, which included Eber-CT and Eber-RI, for over $20 million.

b. In 2007, Southern offered $3 million for a 15% stake in Eber-CT, reflecting a total valuation of $20 million.

c. In 2008, Eder-Goodman paid $4.5 million for a 15% stake in Eber-CT, reflecting a total valuation of $30 million.

d. Based on the 2005 purchase of Slocum & Sons and still shown on Eber Metro's books as of May 31, 2010, the value of Eber-CT's goodwill alone was approximately $14 million.

e. According to Eber-CT's audited financial statements, the equity value of Eber-CT as of May 31, 2010 had been $6,607,831.

f. So, as of May 31, 2010, the books reflected a total value of over $20 million for Eber-CT, by combining its own book value of its assets with the recorded goodwill on Eber Metro's books.

g. According to Eber-CT's audited financial statements, the equity value of Eber-CT as of May 31, 2011 had been $5,699,031.

h. According to Eber-CT's audited financial statements, the equity value of Eber-CT as of May 31, 2012 was $5,335,899.

128. Neither Lester nor anyone from EBWLC informed the Court of any of the foregoing evidence for finding a significantly higher valuation.

129. Alexbay's complaint misleadingly implied that EBWLC had significantly more assets than just the capital stock of Eber Metro. *See, e.g.*, Ex. B at 2–3.

130. Alexbay's complaint did not indicate that the act of transferring Eber Metro to Alexbay would render it insolvent.

131. The Foreclosure Action was thus a sham because there was no actual adversity between what Alexbay sought and what EBWLC's management (Wendy and Lester) was willing to give.

*Wendy and Gumaer Approved the Transfer of Eber Metro to Alexbay*

132. On June 6, 2012, Wendy Eber, acting as a Director of EBWLC, approved the transfer of EBWLC's shares in Eber Metro to Alexbay.

133. On June 9, 2012, Gumaer, acting as a Director of EBWLC, approved the transfer of EBWLC's shares in Eber Metro to Alexbay.

134. Even though EBWLC's board had not yet approved the transaction, on June 5, 2012, all shares in Eber Metro were transferred to Alexbay, and with them the controlling interest in Eber-CT.

135. Importantly, under the UCC Article 9, which governs secured transactions, Alexbay had no right to take the Eber Metro shares in satisfaction of the outstanding debts.

21

Rather, Alexbay could only do so if EBWLC consented to its doing so as part of a strict foreclosure under UCC § 9-620.

136.    No rational business justification existed for EBWLC to agree to let anyone take EBWLC's shares in Eber Metro to satisfy the debt to any one creditor.

137.    Eber Metro constituted EBWLC's sole significant asset. And because it was a going concern, Eber Metro had a value that was uncertain and subject to a multitude of variables. Without question though, Eber Metro's value had the potential to appreciate over time so long as it operated. Thus, by either liquidating or holding onto Eber Metro, EBWLC could have potentially paid all of its creditors and generated profit for its shareholders. By contrast, by giving away Eber Metro to Alexbay, EBWLC merely satisfied one creditor, and simultaneously ensured that all other creditors and the shareholders alike got paid nothing.

138.    The impropriety of giving Eber Metro to Alexbay to eliminate the debt to Alexbay is all the more palpable given that it was, at the time of the Transfer, *Eber Metro's debt*. The basic premise of a strict foreclosure is that the debtor gives up collateral to satisfy the debt. Here, the debtor *was* the collateral; the creditor thus simply took over the debtor *itself*.

*The Supposed Debts Owed to Lester Were Exaggerated*

139.    The purported loans by Lester to Eber Bros. appear to have been fictitious or exaggerated, and the representations made by Defendants to the New York state court were false.

140.    Attached as Exhibit C is a letter, dated April 2, 2010, sent by Lester to Sally Kleeberg on EBWLC letterhead.

141.    According to the letter, Lester represented that he had loaned only "approximately $500,000" to the business, including EBWLC and Eber Metro.

22

142.    In 2007, Eber Bros. W&L entered into a broad settlement agreement with Southern that resulted in a substantial payment of many millions of dollars to EBWLC. With this money, EBWLC repaid its outstanding debts and ceased to actively operate a wine and liquor distributorship business in New York, Delaware and Ohio.

143.    On information and belief, at least some of the proceeds that EBWLC received from Southern were used to repay the previously incurred debts to Lester.

*Preparatory Transactions Set Lester Up to Take Eber Metro Upon Default*

144.    On information and belief, in or about January 2010, Lester retained Glenn Sturm for the purpose of advising him on how to transfer the Eber Bros. operating assets to himself to avoid both other creditors and the other Trust beneficiaries.

145.    After Sturm's engagement, a series of transactions occurred—at least some of which appear to have been backdated—that were critical to setting up the Foreclosure Action. In combination, these transactions had the effect of prioritizing debt owed to Lester over debts that were owed to the Trust-controlled companies.

146.    As of September 30, 2010, EBWLC's books reflected an asset of $12.7 million, which was the amount of debt that Eber Metro owed to EBWLC.

147.    In or about 2011, Lester and Wendy caused EBWLC to convert that debt to additional paid in capital.

148.    Thus, by reclassifying the debt as equity, EBWLC was no longer a creditor of Eber Metro at all.

149.    Had the debts to Lester been similarly converted into equity at that time, Lester would have received no more than 25% of the company's equity.

23

150.    By simply eliminating EBWLC as a creditor, Lester gave himself priority over EBWLC in any liquidation of Eber Metro.

151.    Around the same time, through documents dated as of February 26, 2010, Lester and Wendy caused EBWLC to guarantee Lester's Line of Credit Note to Eber Metro, and caused EBWLC and Eber Metro to grant Lester a security interest in all of their assets, including their interest in Eber-CT.

152.    Considering that EBWLC had no other substantial assets besides Eber Metro, it is odd that Lester would have actually wanted this guarantee.

153.    The guaranty and security agreements were not signed or effective until months after Lester already executed the Line of Credit Note.

154.    Based on the foregoing, it is reasonable to infer that Lester and Wendy had been planning the Metro Transfer for years, and thus executed the security agreements with the full knowledge and intent that EBWLC and Eber Metro would default on them.

**Defendants' Concealment of the Transfer**

155.    None of the Plaintiffs, nor any their immediate family members, have been employed by, or otherwise knowledgeable of the business affairs of, any Defendants since 2007.

156.    The trustees failed to disclose this transfer in any of their annual statements and in fact affirmatively suggested that Eber-CT was still part of the Trust's assets.

157.    For example, on December 18, 2012, CNB sent an annual statement to Plaintiff Hays that included the following paragraph in the cover letter:

> The trust does hold various Eber Bros. securities. The focus with business limited to Connecticut has required the company to downsize and execute a modified business plan. The company will not be declaring and paying an annual dividend on its Class A, Class B, or Preferred stock this year. Earnings are being used to invest and improve the business.

Exhibit D (December 18, 2012, cover letter).

158.     CNB's December 18, 2012, letter was misleading because it stated that the business was "limited to Connecticut" and had been required to "downsize and execute a modified business plan." These statements implied that the Trust had a continuing interest in Eber-CT, even though months earlier it was determined that Eber-CT would be transferred to Lester alone.

159.     CNB's December 23, 2013, cover letter for its next annual statement for the Trust simply omitted any mention of an operating business. Nor did it mention anything about the disposition of Eber-CT. By doing so, CNB continued to conceal the Foreclosure Action and Lester's self-dealing from Plaintiffs. A copy of the cover letter is attached as Exhibit E.

**Plaintiffs Discovered that Lester Acquired Eber-CT After Uncovering the Fraudulent Conveyance Action filed by EBWLC's Former Lawyers**

160.     Plaintiffs first learned that Lester himself acquired Eber-CT in June 2015on or about February 13, 2016, when Lisa Stein searched the internet for news about Eber Bros. and found an article published on May 29, 2015, in the Rochester Business Journal. A copy of the article is attached as Exhibit F.

161.     The article mentioned a lawsuit (the "Fraudulent Conveyance Action") that had been filed against EBWLC, Eber Metro, Eber-CT, and Alexbay by EBWLC's former attorneys, Harris Beach, PLLC, seeking to collect on a judgment that they had received against EBWLC for unpaid fees.

162.     After investigating further, Plaintiffs obtained a copy of the complaint in the Fraudulent Conveyance Action, which detailed the fraudulent conveyance of Eber-CT to Lester. The complaint included four causes of action under New York Debtor and Credit Law. A copy

of that complaint, which was filed on December 11, 2014, in New York Supreme Court, Monroe County, is attached hereto as Exhibit G.

163.    The Fraudulent Conveyance Action's detailed allegations support the conclusion that the transfer of Eber-CT to Lester was a fraudulent conveyance and that the Foreclosure Action attempted to rubber stamp the fraudulent conveyance. But the Foreclosure Action withheld from the court material facts indicating that Eber-CT was worth far more than the amount of the debt that was supposedly owed to Lester.

164.    Harris Beach subsequently settled the Fraudulent Conveyance Action and a stipulation of discontinuance was filed with the court on November 12, 2015.

165.    As part of the Fraudulent Conveyance Action settlement, Harris Beach assigned its claims to Lester. Harris Beach did not release any of the defendants.

166.    Plaintiffs are aware of no facts suggesting that any of the material allegations in the Fraudulent Conveyance Action were untrue.

167.    On the contrary, additional facts indicate that the Eber-CT transfer was fraudulent, including, as alleged above, knowledge of Lester's inconsistent statements about debts owed to him; the false assertion that Alexbay did not know who had an ownership interest in EBWLC; the fact that the GAAP book value of Eber-CT's equity at the time of transfer was significantly higher than the value stated in the Foreclosure Action court papers; the fact that Lester secretly resigned from EBWLC at the same time; and the years of concealment since.

168.    Accordingly, Plaintiffs hereby incorporate the detailed allegations in paragraph 16 through 60 of the complaint in the Fraudulent Conveyance Action, as if fully set forth herein, including without limitation:

a.   that on or about December 8, 2011, Lester Eber first tried to transfer Eber-CT to Lester Eber, LLC (Alexbay) "for no consideration";

b.   that Alexbay misrepresented the nature of a 2010 sale of six percent of Eber-CT's equity as "arms' length" when in fact the purchaser was one of Lester's attorneys;

c.   that Alexbay's reliance on the 2010 sale price to value Eber-CT was unfounded not only because it was not arm's length, but also because there were two earlier transactions that Alexbay had omitted from its filings that reflected a value about *four times* larger than the amount of the allegedly outstanding debt; and

d.   that, therefore, the transfer of Eber Metro to Alexbay was far from commercially reasonable and, in fact, a fraudulent conveyance.

*See* Exhibit G ¶¶ 16–60.

## Futility of Demand

169.   Before filing this lawsuit, Plaintiffs did not demand that EB&C' Board initiate suit against Lester because, to the best of Plaintiffs' knowledge at the time, the Board's only member was Lester. To the extent that any other Board members existed, they were appointed and controlled by Lester. Accordingly, there was no reasonable basis to believe that a demand to sue Lester would be acted upon.

## Lester Has Improperly Interfered with Distribution of Trust Assets

170.   As noted above, in 2017, after this lawsuit was filed, CNB filed a Petition in the Surrogate's Court for Monroe County, New York, to terminate the Trust and distribute its assets, which included shares in EB&C.

171.    CNB's filings in the Surrogate's Court did not raise or address any of the issues of breach of fiduciary duty or fraudulent concealment that were presented by the Initial Complaint in this action.

172.    Plaintiffs did not enter an appearance in the Surrogate's Court proceeding and did not oppose the request to terminate the Trust early, as it was in their interest to remove Defendants' ability to continue to control their assets that were held by the Trust.

173.    Attached as Exhibit H is a copy of the Order for Judicial Settlement of Final Account and Termination of Trust entered by the Honorable John M. Owens, Surrogate, on or about June 1, 2017.

174.    After the Surrogate's Court approved CNB's Final Account and terminated the Trust, CNB was required to distribute the assets that had been held in the Trust.

175.    Defendants Lester and Wendy proceeded to prevent CNB from distributing the Trust's shares in EB&C to the Trust beneficiaries.

## COUNT I

### Breach of Fiduciary Duty – Improper Transactions

176.    Plaintiffs incorporate the allegations contained in the paragraphs set forth above as if fully set forth herein.

177.    Plaintiffs bring this claim against Defendants for their execution of transactions in breach of their fiduciary duties both in their own right, as former beneficiaries to the Trust, and derivatively on behalf of EB&C and EBWLC.

178.    As a co-trustee of the Trust, Lester owed fiduciary duties to the beneficiaries of the Trust, starting from its inception and lasting until all of the Trust's assets are finally and properly distributed to the beneficiaries.

28

179.    As a co-trustee of the Trust, Gumaer owed fiduciary duties to the beneficiaries of the Trust, starting from its inception and through his death, because he was not discharged from his role as co-trustee at any earlier time.

180.    As a senior executive and director of EB&C and EBWLC, Lester owed fiduciary duties to the corporations and to the corporations' shareholders.

181.    As a senior executive and director of EB&C and EBWLC, Wendy owed fiduciary duties to the corporations and to the corporations' shareholders.

182.    As a director of EB&C and EBWLC, Gumaer owed fiduciary duties to the corporations and to the corporations' shareholders.

183.    A core duty of being a fiduciary is the duty of loyalty, which precludes self-dealing, conflicts of interest, and usurping corporate opportunities.

184.    As the Honorable Learned Hand has explained: "Nobody is obliged to become a director, an officer, or a 'beneficial owner'; just as nobody is obliged to become the trustee of a private trust; but, as soon as he does so, he accepts whatever are the limitations, obligations and conditions attached to the position, and any default in fulfilling them is as much a 'violation' of law as though it were attended by the sanction of imprisonment." *Gratz v. Claughton*, 187 F.2d 46, 49 (2d Cir. 1951).

185.    "'A trustee with power to sell trust property is under a duty not to sell to himself either at private sale or at auction, whether the property has a market price or not, and whether the trustee makes a profit thereby.' All such transactions are breaches of trust." *Id.* (quoting Restatement of Trusts § 170(1) Cmt. b) (*quoted with approval by Donoghue v. Bulldog Investors General Partnership*, 696 F.3d 170, 177 (2d Cir. 2012)).

186.     When faced with self-dealing by a trustee, New York courts have adopted the "no-further-inquiry rule" whereby such transactions are per se voidable by the beneficiaries, requiring no proof that the transactions were unreasonable or harmful. This rule may be at times inequitable, but courts hold that public policy requires it to be enforced nonetheless to ensure that trustees always act solely for the benefit of the beneficiaries.

187.     As detailed herein, Lester's conduct was at least comparable to selling trust property to himself. In some instances, it was significantly worse.

*A. The "Consulting" Fees to Lester*

188.     The Consulting Agreement between Lester and Southern included a Restrictive Covenant and provided for fees that vastly exceeded the fair and reasonable value of Lester's consulting services.

189.     The Restrictive Covenant in the Consulting Agreement constituted a detriment incurred by the Eber Entities because of Lester's continuing role as chief executive of Eber Bros. If Lester could not compete, neither could Eber Bros.

190.     Thus, the compensation paid for the Restrictive Covenant should have been paid to one or more of the Eber Entities, not to Lester individually; Lester's income from it should be disgorged accordingly.

191.     Moreover, because Lester remained in his position with EBWLC and the other Eber Entities, he was not permitted to work for a competitor for his own personal benefit on the side. Doing so was a breach of his duty of loyalty to EBWLC and the other Eber Entities. Thus, the Consulting Agreement was a corporate opportunity that Lester usurped for himself; Lester's income from it should be disgorged accordingly.

*B. The Metro Transfer*

192.    As set forth in detail above, Lester engaged in improper self-dealing and diverted corporate assets by transferring Eber Metro and its controlling interest in Eber-CT to Alexbay, an entity that Lester controlled and solely owned.

193.    Lester acted knowingly, willfully, intentionally, and fraudulently to enrich himself at the expense of the corporations and the Trust that he managed and directed.

194.    Instead of acting for the benefit of the Trust beneficiaries who were the beneficial owners of the Eber Entities, Lester sought to take over the complete ownership interest in the Trust's remaining operating assets for himself. This was classic self-dealing and it was per se voidable.

195.    Even if Lester's acquisition of Eber Metro was done at a fair price and without bad motives, the transaction should be set aside as a matter of public policy under New York law and the no-further-inquiry rule.

196.    The New York Surrogate's Court never approved the Metro Transfer as fair to the beneficiaries of the Trust.

197.    As explained above and in the Fraudulent Conveyance Action complaint, Ex. G, the Foreclosure Action was a sham, uncontested lawsuit against EBWLC to create the phony appearance of a legitimate, arms-length transfer of the Eber-CT business to himself.

198.    The Foreclosure Action's final order finding the transaction "commercially reasonable" was fraudulently induced by omitting certain facts and misrepresenting other facts. For example, the court was deprived of material information showing that the method of valuation pleaded in the complaint did not reflect a market value of Eber-CT. The court was also led to believe that EBWLC had other assets besides Eber Metro, when it did not.

199.    The Foreclosure Action's finding of commercial reasonableness does not amount to a finding that the transaction was fair to EBWLC and thus, even if the finding had not been fraudulently induced, it could not protect Defendants from a derivative challenge to the transaction as having been unfair to EBWLC.

200.    Even if the Foreclosure Action had involved full disclosure of the facts to the court and had addressed the fairness of the transaction to EBWLC, it would not prevent application of the no-further-inquiry rule because none of the other Trust beneficiaries even knew about it, let alone had opportunity to be heard in connection with it. Indeed, even co-trustee CNB was not consulted about it.

201.    Through his self-dealing, Lester failed to act for the benefit of the corporations for which he was the senior executive officer and a director (EB&C and EBWLC).

202.    A freeze-out merger occurs when the persons in control of a company freeze out the other equity holders. Such transactions involve an inherent conflict of interest and require careful scrutiny, such that the burden is on the defendants to prove good faith and the entire fairness of the merger. *In re Kenneth Cole Productions, Inc.*, 27 N.Y.3d 268, 275 (N.Y. 2016). Showing entire fairness involves two components: fair process and fair price. *Id*. The fair process aspect concerns timing, structure, disclosure of information to independent directors and shareholders, how approvals were obtained, and similar matters. *Id*. The fair price aspect can be measured by whether independent advisors rendered an opinion or other bids were considered, which may demonstrate the price that would have been established by arm's length negotiations. *Id*.

203.    The Metro Transfer amounted to a freeze-out by Lester of the other Trust beneficiaries' interests in the Eber Bros. operating business.

204.    As detailed above, the process by which the Metro Transfer was approved by EBWLC was unfair to the corporation and its shareholders.

205.    The value received by EBWLC—eliminating just a portion of its outstanding debt—was unfair to EBWLC and its shareholders because they were left with no assets or operations.

206.    The Metro Transfer was more culpable than the typical freeze-out merger because it involved a trustee freezing out the trust (and thus its beneficiaries) and transferring substantially all of the corporate assets to himself.

207.    Even under the business judgment rule, which would apply if Alexbay were a completely unrelated third party, the Metro Transfer would be voidable because no person of ordinary sound business judgment would say that the corporation received fair benefit.

208.    By attempting to backdate a resignation to before he filed the Foreclosure Action (a resignation he concealed for years afterwards), Lester essentially admitted that he breached his fiduciary duties as an officer and director of EBWLC. Nonetheless, he remained both a co-trustee of the Trust and President of EB&C, which was the controlling shareholder of the closely-held EBWLC, and as such continued to have fiduciary duties regardless of the true date of his secret resignation.

209.    Wendy and Gumaer knowingly facilitated Lester's malfeasance.

210.    After Lester's resignation from EBWLC, Wendy was the chief executive of EBWLC, and she was responsible for ensuring that EBWLC received fair value for Eber Metro. Wendy breached her fiduciary duties to EBWLC and its shareholder, EB&C, by agreeing to the Metro Transfer and by failing to oppose the Foreclosure Action.

211.     Wendy acted knowingly, willfully, intentionally, and fraudulently to enrich Lester at the expense of the corporations that she managed and directed. Wendy had a clear conflict of interest in that her actions also sought to benefit herself, as daughter and heir-apparent to Lester.

212.     As a reward for helping Lester take Eber Metro from EBWLC, Wendy was made President of Eber-CT in 2013 and has since personally received interests in Eber Metro and Eber-CT.

213.     Further demonstrating their culpable mental states, Lester, Wendy, and Gumaer concealed the Metro Transfer from Plaintiffs, even though they realized that the Trust statements issued by CNB (with their approval) contained materially false information about the value of the EB&C stock post-Transfer.

214.     Alexbay, an entity completely controlled and dominated by Lester as the sole member, knowingly took all or substantially all of the assets held by EBWLC without giving fair value in exchange and rendering EBWLC insolvent. Because Alexbay knew or should have known that doing so was unlawful under the circumstances as alleged above, it is subject to this Court's equitable jurisdiction, including rescission of the Metro Transfer and imposition of a constructive trust on its assets, including Eber Metro, retroactive to June 5, 2012.

215.     The Metro Transfer should be rescinded and set aside in full. EBWLC is entitled to the return of all of the Eber Metro shares.

216.     At the same time, because this is an equitable remedy sought, Lester should not be bound by his 2012 agreement to give up the debts purportedly owed to him by Eber Metro.

217.     Defendants' actions warrant imposition of a surcharge and/or punitive damages against them, as well.

*C. The Preparatory Transactions*

218.    The February 26, 2010 Guaranty and Security Agreements were given to Lester without either EBWLC or Eber Metro receiving any consideration in return, because Lester had already executed the Line of Credit Note months earlier.

219.    To the extent that these transactions had consideration or were not required to have consideration in order to not be void, they are nonetheless voidable because they were unfair to EBWLC and Eber Metro. The companies received nothing meaningful for executing these. Lester, meanwhile, was setup to take the company upon its default on the Line of Credit Note—something that Lester could ensure would happen.

220.    Lester and Wendy abused their power over Eber Metro to grant security for Lester's debts without similarly securing the debt then-owed to EBWLC. Because they were also officers and directors of EBWLC, this constituted a breach of their fiduciary duties to EBWLC.

221.    By causing EBWLC to convert Eber Metro's debt into additional paid in capital, Wendy and Lester ensured that Lester had a stronger claim to Eber Metro's assets than EBWLC, and thus the Trust.

222.    Converting Eber Metro's debt to EBWLC into an additional capital infusion in Eber Metro, especially without similarly converting the debt to Lester into equity, constituted a breach of the duty of loyalty that Lester and Wendy owed to EBWLC as officers and directors of it.

223.    The reclassification of debt to equity should be unwound or modified so that Lester does not get priority over EBWLC in the assets of Eber Metro.

35

*D. Slocum of Maine*

224.     By acquiring personal interests in Slocum of Maine even though Eber Metro had the Call Option to acquire it for $10, Lester and Wendy usurped a corporate opportunity.

225.     In or about 2012, Wendy and Lester increased their ownership interest in Slocum of Maine from just over 50% to 100% of the equity.

226.     Wendy and Lester have not disclosed to Plaintiffs the identity of the other owner(s) of Slocum of Maine prior to 2012.

227.     Starting in 2012, if not earlier, Wendy and Lester began to cause Eber-CT to purchase millions of dollars' worth of wine and liquor from Slocum of Maine each year.

228.     A constructive trust should be imposed over all the money earned by Wendy and Lester from Slocum of Maine, including their share of the profits as owners as well as salaries and bonuses that they paid themselves from Slocum of Maine.

229.     In addition, Lester and Wendy must fully account for how they came to acquire all of their interests in Slocum of Maine, and to support their contentions with sufficient evidence to enable the Court to determine whether it is practicable and proper to impose additional equitable relief, such as mandating the transfer of their interests to one of the Eber Entities.

*E. Wendy's Acquisition of ~~6.6~~9.1% of Eber Metro*

230.     ~~In an email produced by Defendants dated~~As of January 23, 2014, Wendy told the Pension Benefit Guaranty Corp. that she owned 6.6% of the common stock of Eber Metro. As of December 1, 2018, Wendy's counsel informed Plaintiffs that she held 9.1% of Eber Metro's common stock. Specifically, out of 22,000 outstanding shares, Wendy purportedly held 2,000 shares, with the other 20,000 shares held by Alexbay.

231.    On information and belief, Wendy acquired her interests in Eber Metro through a transaction transactions with or authorized by Alexbay, since as of June 2012, Alexbay acquired all of the common stock of Eber Metro.

232.    Because Alexbay wrongly obtained the common stock of Eber Metro and Wendy knew this, Wendy should be disgorged of her interest in Eber Metro and her shares should be transferred back to EBWLC along with those held by Alexbay.

*F. The Polebridge Transaction*

233.    The sham sale of six percent of Eber-CT to Polebridge Bowman constituted an improper usurpation of corporate assets—by Wendy.

234.    Polebridge was nothing but a shell company. It paid nothing for the six percent interest in Eber-CT, and instead incurred a $350,000 non-recourse debt at a meager two-percent interest rate. Thus, it is apparent that there was never any intention—by either side—that Polebridge would actually pay the debt.

235.    In fact, Wendy repeatedly avoided collecting the debt. First, in 2015, she unilaterally excused its non-payment and extended its maturity by one year due to apparent health issues Sturm had. Then, in 2016, Wendy extended the maturity date on the note by a full decade, to 2026. She and Sturm both executed an amendment to the Note in May 2016.

236.    Eber Metro received no consideration from Polebridge for either extension of the note's maturity date.

237.    Through her gratuitous actions, Wendy prevented Polebridge from defaulting on its promissory note to Eber Metro.

238.    Had Polebridge been allowed to default on its promissory note, Eber Metro had the right to take back the six percent interest in Eber-CT.

239.   In accordance with her fiduciary duties as an officer and director of Eber Metro, Wendy was not permitted to prevent Eber Metro from exercising its rights in the event of Polebridge's default.

240.   Wendy's actions in protecting Polebridge from default constituted a breach of her duty of loyalty to Eber Metro, favoring not only Polebridge over Eber Metro, but also herself.

241.   Buried within the May 2010 Polebridge purchase agreement was a right of first refusal for Wendy's benefit. That right of first refusal was never disclosed or otherwise known to Plaintiffs prior to the filing of this lawsuit. Moreover, that purchase agreement was not available to Plaintiffs until they received a copy of it in discovery in this litigation.

242.   Under its terms, before Polebridge could possibly sell its interest in Eber-CT to a third party, it had to offer to sell it to Wendy first. Wendy even had priority over Eber Metro: Only if and when Wendy turned down the opportunity could Eber Metro buy back the interest it sold.

243.   A right of first refusal in property is a valuable right.

244.   Wendy did not provide any consideration to Eber Metro in exchange for receiving the right of first refusal for Polebridge's interest in Eber-CT.

245.   Even if Wendy had provided consideration to Eber Metro for the right of first refusal, her provision of that benefit to herself renders the transaction voidable as improper self-dealing.

246.   In a document dated as of February 15, 2017, Wendy acquired Polebridge's interest in Eber-CT for herself.

247.   On information and belief, this document was backdated. This is evidenced by it being dated "as of" February 15, 2017.

248.    Wendy assumed Polebridge's debt to Eber Metro as part of the transaction.

249.    By acquiring the six percent interest in Eber-CT for herself, rather than offering the opportunity to Eber Metro, EBWLC, EB&C, or another Eber Entity, Wendy completed the usurpation of the corporate opportunity.[1]

250.    Because of the difficulty in valuing the Eber-CT interest acquired by Wendy, an appropriate equitable remedy should be fashioned, including one of the following options:

    a.    Disgorging Wendy of her interest in Eber-CT such that it is transferred to Eber Metro and the Polebridge note assumed by Wendy is canceled; or

    b.    Reformation of the Polebridge note assumed by Wendy so as to eliminate the amendments that extended the maturity date for an unusually and unreasonably long time.

251.    In addition to being improper self-dealing in violation of the duty of loyalty, the Polebridge transaction constituted corporate waste in violation of the duty of care. There was no benefit to Eber Metro from the transaction, as it did not even receive any money, let alone sufficient money that fairly valued the transaction. Accordingly, even under the business judgment rule, the transaction constituted a breach of fiduciary duty and cannot be sustained.

### G. Lester's Loans

252.    As part of the equitable relief sought herein, Lester will be eligible to try to collect on debts that are purportedly owed by Eber Metro to him or Alexbay.

253.    The loans that Lester purported made to EBWLC and Eber Metro carried unfairly high interest rates, from 9% to 12.5% per year, provided for substantial penalties and late fees,

---

[1] To the extent that the corporate opportunity belonged to Eber Metro as of February 2017, Plaintiffs may nevertheless assert Eber Metro's rights based on the anticipated rescission of the Metro Transfer and imposition of a constructive trust over Eber Metro's assets during the interim period.

which were payable upon default, and including other onerous terms that were highly unfavorable to the corporations.

254.    These loan transactions constituted interested transactions and self-dealing by Lester. For example, the Line of Credit Note was signed by Lester himself on behalf of Eber Metro, and although Wendy co-signed it, she was obviously conflicted. Lester obtained richer terms for himself than he or Wendy would have authorized if they were negotiating with a third party. In addition, the loans were not approved by any fair processes.

255.    The earlier loans carried interest rates of 9% per year. The $1.5 million Line of Credit Note provided for an even higher interest rate of 12.5% per year.

256.    As an insider, and particularly one in a position of trust, Lester was precluded from receiving more favorable terms than he could have received through an arm's length transaction. Among other things, he was precluded from receiving a higher interest rate than was available from a third party.

257.    On information and belief, no efforts were made to find alternative sources of financing for the Line of Credit Note.

258.    The rate of interest that should have been charged was much lower, and is demonstrated by the Polebridge non-recourse promissory note, which carried a 2% interest rate—less than 1/6th the amount of interest charged by Lester just months earlier.

259.    Given Wendy's demonstrated willingness to prevent a supposed third-party (Polebridge) from defaulting on a loan to Eber Metro, Defendants cannot justly claim that Lester should be given greater priority as a creditor.

260.    For these reasons, the loans between Lester/Alexbay and Eber Metro should be reformed by the Court to ensure that the terms given to Lester are no richer or more favorable

40

than the terms that Lester and Wendy authorized with respect to the Polebridge non-recourse note. This includes, without limitation, reformation of the:

    a.   Interest rates;

    b.   Maturity dates;

    c.   Events of default;

    d.   Rights to attorney's fees on enforcement; and

    e.   The Line of Credit § 9.

261.    In the alternative to reforming the debt terms, most or all of the debt owed by EBWLC as of August 2007 should be deemed constructively discharged by Lester's receipt of the Southern Consulting fee.

### H. Assignment of Harris Beach's Claims to Lester

262.    The Harris Beach litigation's ultimate settlement provided that Lester was assigned Harris Beach's claims against EBWLC and all the other Eber Entities. Lester was even assigned Harris Beach's claims against himself.

263.    By taking assignment of claims against the entities that he served as a fiduciary, Lester created an impermissible conflict of interest and breached his fiduciary duties to those entities.

264.    Accordingly, Lester should be disgorged of any and all claims assigned to him personally by Harris Beach.

### I. Diluting EB&C's Interest in EBWLC in 2017

265.    In February 2017, Lester and Wendy engaged in a brief series of transactions for the transparent purpose of entrenching themselves in the management of EBWLC.

41

266.    Their acts included (a) appointing Wendy as the sole director of EBWLC; (b) amending the Certificate of Incorporation to create a new class of voting preferred shares; and (c) issuing Lester 750 of those newly-minted voting preferred shares.

267.    The 750 voting preferred shares were issued to Lester for no cash consideration— merely a prospective promise to provide some funds if it is needed.

268.    This self-dealing transaction was highly dilutive of EB&C's interests in EBWLC.

269.    The transaction was a breach of the duty of care owed to EBWLC's common shareholder, EB&C. The issuance of shares at a par value of $50 per share for the mere promise to pay money upon EBWLC's "request" in order to cover unspecified expenses for a non-operating entity was absurd. The consideration received was too unnecessary and contingent to be fair to the corporation.

270.    It was also a breach of the duty of loyalty by Wendy, for facilitating Lester's self-dealing in order to protect her and Lester's own interests by trying to entrench themselves in control of EBWLC and try to prevent this lawsuit from resulting in their removal.

271.    Because this occurred while the Trust was still active, Lester's personal acquisition of shares in EBWLC also constituted self-dealing by a trustee that is per se voidable.

272.    For these reasons, Plaintiffs seek to void the transaction and disgorge Lester of the 750 preferred shares he obtained.

273.    Defendants' conduct with respect to this issuance illustrates the kind of culpable self-dealing that is antithetical to New York's strong protections against abuses by fiduciaries, and particularly actions designed specifically to impair beneficiaries' ability to seek judicial recourse. To Gumaer's credit, he did not participate in this outrageous act; in fact, he resigned instead one week earlier. Lester and Wendy proceeded with it anyway. Accordingly, a

substantial award of punitive damages or an equitable surcharge should be imposed on both Lester and Wendy for their intentional misconduct.

## COUNT II

### Breach of Fiduciary Duty – Acting as Faithless Servants

274.    Plaintiffs incorporate the allegations contained in the paragraphs set forth above as if fully set forth herein.

275.    Under New York's faithless servant doctrine, a disloyal fiduciary or employee must be disgorged of all monies and other compensation received since the first disloyal act.

*Lester*

276.    Lester's disloyalty began by, at the latest, August 2007, when he negotiated an inflated consulting fee for himself from Southern.

277.    On information and belief, Lester's disloyalty began even earlier, in or about 2005, when Lester acquired a personal interest in Slocum of Maine.

278.    Alternatively, Lester's disloyalty began by December 8, 2011, when he formed Lester Eber, LLC (i.e., Alexbay) and at about the same time submitted an application to the Connecticut Liquor Control Division for approval to transfer Eber Metro's controlling 79% interest in Eber-CT to Lester Eber, LLC.

279.    Accordingly, among other damages, Lester must repay all compensation, profits, or other benefits he received from at least December 8, 2011, through the present.

280.    Lester's compensation from Eber-CT, even after the Metro Transfer, is indeed subject to the faithless servant doctrine. Because equitable rescission or setting the Metro Transfer aside will mean retroactively treating Eber-CT as if it had been a subsidiary of EBWLC, Lester's disloyalty to EBWLC is appropriately remedied by disgorgement of his entire salary and

all of his bonuses since the first instance of disloyalty, which was at the latest December 2011, and likely years earlier, as alleged above.

*Wendy*

281.    Because Wendy's actions were disloyal to EBWLC, she was a faithless servant and must return all compensation, profits, and benefits that she received from the date of her first disloyal act.

282.    Wendy's compensation from Eber-CT, even after the Metro Transfer, is indeed subject to the faithless servant doctrine. Because equitable rescission or setting the Metro Transfer aside will mean retroactively treating Eber-CT as if it had been a subsidiary of EBWLC, Wendy's disloyalty to EBWLC is appropriately remedied by disgorgement of her entire salary and all of her bonuses since the first instance of disloyalty.

*Gumaer's Representation of Lester Created an Impermissible Conflict of Interest*

283.    As a duly appointed trustee of the Trust, Gumaer was obligated to avoid conflicts of interest.

284.    As a partner in Nixon Peabody for decades until his retirement at or about the end of 2000, Gumaer represented one or more of the Eber Entities at various points in time.

285.    In or about January 2001, Gumaer became engaged as a personal lawyer to Lester Eber.

286.    According to the letter agreement between Lester and Gumaer, the scope of the representation specifically included advising Lester in connection with his role as an executive officer of the Eber Entities.

287.    Gumaer was paid for his services as Lester's lawyer by one or more of the Eber Entities. This payment was made as a lump sum, compensating not only Gumaer's legal services,

but also Gumaer's service as director of and consultant to the Eber Entities and as trustee of the Trust.

288.    Gumaer's representation of Lester individually created a severe conflict of interest that materially impaired Gumaer's ability to effectively carry out his responsibilities as trustee and director.

289.    Gumaer and Lester concealed the fact that Gumaer was representing Lester individually from the Trust beneficiaries and their co-trustee banks.

290.    As alleged in detail above, Gumaer used his position as director and trustee to advance Lester's interest at the expense of corporations and beneficiaries he was obligated to serve.

291.    New York's faithless servant doctrine is implicated by an agent's failure to disclose any interest which would naturally influence his conduct in dealing with the subject of the agency. *Murray v. Beard*, 102 N.Y. 505, 508 (1886). Such conduct results in disgorgement of all compensation paid since the beginning of the disloyal conduct. *See Diamond v. Oreamuno,* 24 N.Y.2d 494, 498 (1969) ("[T]he function of [a breach of fiduciary duty] action, unlike an ordinary tort or contract case, is not merely to compensate the plaintiff for wrongs committed by the defendant but ... to prevent them, by removing from agents and trustees all inducement to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency or trust relates.").

292.    Because the compensation paid to Gumaer for his disloyal service as a trustee and director was lumped together with the compensation for his loyal service to Lester, Gumaer's Estate must be disgorged of the full amount paid to Gumaer since 2001.

293.     Even if New York's faithless servant doctrine permitted Gumaer's Estate to retain compensation for his legal services to Lester despite being lumped together, Gumaer and Lester are jointly and severally liable to the Eber Entities for that portion of his compensation because it was a misappropriation of corporate assets and self-dealing for them to have caused the Eber Entities pay Gumaer for representing Lester individually.

294.     Alternatively, Gumaer's Estate should be disgorged of all compensation paid to Gumaer since his first disloyal act to benefit Lester over either the other beneficiaries or the corporations generally. Such disloyalty began, at the latest, when Gumaer approved the Metro Transfer. In particular, Gumaer explicitly approved the transaction without appearing to question the valuation used in the Foreclosure Action, even though Eber-CT's own internal financial records reported a book value (which oftentimes understates the fair market value) at a significantly higher valuation than that presented to justify the transfer of Eber Metro to Alexbay. It is clear that Gumaer was unduly conflicted at best, and probably consciously favoring Lester, in breach of his duty of loyalty to EBWLC, EB&C, and the Trust.

### COUNT III

### Unjust Enrichment

295.     Plaintiffs incorporate the allegations contained in the paragraphs set forth above as if fully set forth herein.

296.     To establish a derivative claim for Unjust Enrichment, Plaintiffs must allege and establish (1) the Defendant was enriched, (2) at Plaintiffs' expense, and (3) the Defendant's retention of the benefit would be unjust.

297.   As detailed above, by entering into a Consulting Agreement with Southern, Lester Eber was unjustly enriched at the expense of the Eber entities, and Lester's retention of the monies paid to him under the Consulting Agreement would be unjust.

## COUNT IV

### B.S.C. § 720 – To Set Aside and Enjoin Unlawful Transactions

298.   Plaintiffs incorporate the allegations contained in the paragraphs set forth above as if fully set forth herein.

299.   As alleged in detail above, the following corporate transactions were unlawful due to constituting breaches of fiduciary duties:

    a.   The Metro Transfer

    b.   The Polebridge Transaction

    c.   Lester and Wendy's acquisition of Slocum of Maine

    d.   Wendy's acquisition of a 6.6% interest in Eber Metro

    e.   Wendy's acquisition of Polebridge's interest

    f.   Lester's receipt of 750 preferred shares in EBWLC

    g.   The 2010 Guaranty and Security Agreements to benefit Lester

300.   In each of the foregoing transactions, the transferee was aware that the transaction was unlawful.

301.   To the extent necessary to ascertain the potential need for additional relief, Defendants must account for their official conduct in connection with each of the foregoing transactions. B.S.C. § 720(a)(1).

*Invalid corporate actions*

302.     The February 14, 2017 appointment of Wendy as the sole director of EBWLC by

Lester on behalf of EB&C was invalid because EBWLC's bylaws required the board to consist

of at least three directors, or fewer, so long as there were as many directors as there were

shareholders. As of February 2017, EBWLC had two shareholders: EB&C and the Trust.

Accordingly, EBWLC was required to have at least two directors.

303.     The February 2017 Amendment to EBWLC's Certificate of Incorporation was

invalid because it was authorized by an invalidly constituted board of directors.

304.     The February 2017 Amendment was further invalid because it violated N.Y.

B.S.C. § 804. Under that section, an amendment that would create a new class of shares that have

preferences superior to the common shares must be approved by the shareholders. The

Amendment here did that, but no shareholder approval of the Amendment was obtained.

305.     Even if the Amendment authorizing the new class of voting preferred shares were

effective (and it was not), Lester's receipt of 750 preferred shares was still unlawful because it

was not authorized by a validly constituted board of directors for EBWLC.

*Enjoin Lester's Threatened Taking of Shares*

306.     On or about October 30, 2018, Lester sent a notice of intent to purchase Plaintiffs'

EB&C shares to CNB in an attempt to exercise a purported purchase right to acquire the shares

that were designated to go to Plaintiffs upon distribution of the Trust's assets. Specifically,

Lester purported to invoke Section XII of EB&C's bylaws.

307.     On or about December 17, 2018, Lester again sent a notice of intent to purchase

Plaintiffs' EB&C shares to CNB, this time stating that he valued the shares at $0 and therefore

intended to provide no compensation to Plaintiffs for taking the shares distributed to them.

48

307.308.        Specifically, Lester purported to invoke Section XII of EB&C's

bylaws.Lester's attempt to invoke Section XII of EB&C's bylaws was in violation of those

bylaws, primarily because the notice of intent to purchase was sent by a person who himself

authorized the transfer and, in any event, was sent far too late to be effective.

308.309.        On or about February 15, 2017, CNB petitioned the Monroe County

Surrogate's Court to terminate the Trust. In that Petition, CNB disclosed its intention to transfer

all of the Trust's assets to the Trust beneficiaries in accordance with their respective interests in

the Trust. The Petition stated that the EB&C stock was an asset held by the Trust, and provided

that the Trust's assets should be distributed as follows: 1/3 to Lester; 1/3 to Audrey Hays; 1/6 to

Daniel Kleeberg; and 1/6 to Lisa Stein.

309.310.        On information and belief, Lester was personally served with CNB's

Petition for termination of the Trust in or about February 2017.

310.311.        On March 6, 2017, the Honorable John M. Owens of the Surrogate's

Court issued a citation to Lester directing him to show cause why the account of CNB should not

be judicially settled. The citation was also issued to Plaintiffs and Gumaer.

311.312.        Lester entered an appearance in the Surrogate's Court proceeding initiated

by CNB's Petition through counsel.

312.313.        By making an appearance in the Surrogate's Court through counsel, Lester

authorized his attorney to accept service of all related documents on his behalf. Accordingly, to

the extent there is a requirement of personal delivery of any notice, the delivery upon Lester's

attorney satisfied that requirement.

313.314.        No notice was required to be delivered to Lester because Lester, as co-

trustee, was responsible for initiating and authorizing the transfer. Accordingly, he did not have

to give notice to himself. Or, stated differently, if notice was required to be provided, Lester was the one obligated to provide it—especially since he, unlike CNB, had access to EB&C's bylaws.

314.315.    To the extent that notice to Lester was required, Lester received such notice on multiple occasions throughout 2017, including without limitation CNB's February 2017 Petition, the Surrogate's March 2017 Citation to Show Cause, and the June 1, 2017 Order of Judicial Settlement and Final Accounting.

315.316.    Lester's October 30, 2018 notice of intent to purchase to CNB was thus ineffective because it was sent more than five days after Lester received effective notice. His December 17, 2018 notice was even later.

316.317.    An additional reason why the October 30, 2018 notice of intent to purchase was ineffective is because it failed to indicate that Lester would pay a price equal to the book value of the shares. Such information was required to be included in the notice.

317.318.    EB&C has not actively maintained its books for several years.

318.319.    It is impossible to determine the book value of any EB&C shares based on the immediately preceding fiscal year because no books existed as of the end of the last fiscal year. This, it is impossible for the purchase right to be exercised since no book value meeting the criteria specified by Section XII can reasonably be determined.

319.320.    Alternatively, to the extent that any suchLester's valuation of the book value may have existedat $0, Plaintiffs dispute theat book value as significantly understating the value because, on information and belief, the books of EB&C and EBWLC fail to account for the potential value of this lawsuit, which constitutes a corporate asset. Indeed, if Lester truly believed the shares were worthless, he would not waste his time and money on trying to acquire them for himself.

320.321.      Separate from being improper under the bylaws, Lester is estopped from intercepting the transfer of the shares to Plaintiffs due to his failure to inform the Surrogate's Court, CNB, or Plaintiffs about the existence of any restriction.

321.322.      Lester's failure to object to the distribution of shares as provided in the Final Accounting constituted a waiver or forfeiture of any purchase rights he may have otherwise been able to attempt to assert.

322.323.      Lester's failure to disclose the restriction or otherwise object to the distribution of shares also rendered the restriction itself ineffective under the UCC.

323.324.      Before September 2018, CNB and Plaintiffs were not given access to EB&C's bylaws and were not notified by Lester or anyone else associated with EB&C about the existence of any restrictions on the transfer of EB&C stock.

324.325.      Nor was the Monroe County Surrogate's Court ever notified by Lester that there were any restrictions on the transfer of EB&C stock.

325.326.      The face of the stock certificates in question did not indicate that there were any restrictions on their transfer.

326.327.      Under UCC § 8-204, the restriction against transfer in the bylaws is ineffective because the stock certificates did not conspicuously note the restriction and no notice of the restriction was given to CNB, Plaintiffs, or the Surrogate's Court.

327.328.      Moreover, as co-trustee, Lester had a duty not to misdeliver trust property. As per the Restatement (Third) of Trusts § 89: "[T]he trustee's duty of distribution is performed by surrendering possession of the subject matter of the trust within a reasonable time and taking steps that may be necessary to enable the beneficiary readily to establish ownership."

328.329.        Lester is legally obligated to ensure that the Trust's assets are distributed in accordance with both the Allen Eber Will and the Final Accounting as ordered by the Surrogate's Court. Thus, it would be unlawful for Lester to prevent Plaintiffs from receiving their shares and all of the attendant rights thereto.

329.330.        As a co-trustee, Lester is strictly prohibited from self-dealing. Not only does Lester intend to prevent the lawful distribution of Trust assets, he wants to take those Trust assets for himself. That makes his threatened action doubly violative of his obligations as co-trustee.

330.331.        Under N.Y.B.S.C. § 720(a)(3), any one of the foregoing reasons is enough to enjoin the unlawful conveyance of EB&C's voting stock to Lester Eber.

## COUNT V
### B.S.C. § 619 –New Elections

331.332.        Plaintiffs incorporate the allegations contained in the paragraphs set forth above as if fully set forth herein.

332.333.        Pursuant to B.S.C. § 619, any shareholder aggrieved by an election may petition the court to order a new election or take such other action as justice requires.

333.334.        The power to compel new elections also gives this Court the power to specify the criteria for how the election should occur.

### *EB&C*

334.335.        According to Defendants' counselIt is unclear when the last time EB&C last held any shareholder meeting. The Ebers' counsel has made statements indicating that, EB&C held an annual shareholder meeting on or about October 31, 2018, and elected Wendy and Lester as directors. On December 19, 2018, however—after reviewing the proposed Third

Amended Complaint—the same counsel asserted that EB&C held no elections on October 31, 2018.

335.336.     As to EB&C's elected directors, an order compelling the holding of a new election for EB&C's board of directors is warranted for several reasons:

a.  First, there was no annual shareholder election as required by EB&C's bylaws.

b.  Second, EB&C's corporate secretary improperly disregarded the written request for a shareholder meeting, including for the purpose of holding an election, sent by Audrey Hays.

c.  Third, Lester, as co-trustee of the Trust and as chief executive of EB&C, was required to ensure that the voting shares of EB&C previously held by the Trust were transferred effectively and officially to the Trust beneficiaries, including Plaintiffs. Lester failed to so act, and thus unlawfully prevented Plaintiffs from participating in any elections that may have occurred since mid-2017.

d.  Fourth, even if the voting shares of EB&C were properly registered in the name of the Trust, Lester did not have the authority to vote the shares. To the extent the Trust still exists, and the shares represented by the certificates held by CNB are not deemed to have been distributed to the beneficiaries, CNB remains a trustee. As such, to the extent that he did so, Lester was incapable of voting the Trust's shares in EB&C without CNB's joint approval of his actions.

e.  Fifth, Lester's conflict of interest in protecting himself and Wendy from
claims brought on behalf of EB&C itself prevented him from being able to act
unilaterally to vote Trust's shares in EB&C., to the extent that he did so. At
best, Lester could have sought judicial appointment of a co-trustee to vote
EB&C's shares. Because Lester failed to do so, his attempt to unilaterally vote
the Trust's EB&C shares should be deemed ineffective and invalid.

336.337.      In connection with a new election, Plaintiffs' voting rights in their shares distributed by the Trust must be recognized.

337.338.      EB&C and Defendants should be compelled to recognized Plaintiffs' rights and to count their votes and recognize the appointment of directors in accordance with the votes.

338.339.      As additional relief permitted by § 619, Plaintiffs demand compensation for any and all costs, expenses or liabilities incurred as a result of Defendants' misconduct in connection with obstructing Plaintiffs' rights as EB&C shareholders. This includes payment of the reasonable attorneys' fees of Plaintiffs' lawyers with respect to all related legal work, including preparing the applicable portions of this Third Amended Complaint.

*EBWLC*

339.340.      As to EBWLC, a new election should be ordered to occur within a reasonable period of time after the EB&C election, so that the newly elected EB&C board can elect officers who can appropriately vote EB&C's shares in EBWLC and thereby direct the conduct of its subsidiary.

340.341.     Recent elections as to EBWLC have not complied with EBWLC's bylaws, in that annual shareholder meetings have not been called at the correct times and with the correct notice.

341.342.     In addition, EBWLC has failed to elect the minimum necessary number of directors, because the bylaws require a minimum of three directors due to the fact that EBWLC has three or more shareholders.

342.343.     Accordingly, a new election for EBWLC's board of directors should be so ordered.

**COUNT VI**

**Declaration of Rights and Lawfulness of Certain Actions**

343.344.     Plaintiffs incorporate the allegations contained in the paragraphs set forth above as if fully set forth herein.

344.345.     In accordance with Federal Rule of Civil Procedure 57, Plaintiffs seek a speedy hearing with respect to the following matters as to which a declaratory judgment is sought.

345.346.     The controversy between Plaintiffs and Defendants Lester and Wendy with respect to Plaintiffs' rights as shareholders in EB&C is sufficiently concrete and immediate as to be justiciable.

346.347.     Because the Surrogate's Court has already ordered that Plaintiffs must be distributed the EB&C shares in accordance with the Final Accounting, and because Lester Eber participated in that proceeding, no declaration of Plaintiffs' rights to those shares is believed to be necessary from this Court.

347.348.     Nonetheless, Plaintiffs are entitled to a declaration that (a) Lester, as co-trustee, has unreasonably delayed and interfered with Plaintiffs' ability to establish ownership over the EB&C shares that were held by the Trust; and, (b) accordingly, Lester is now obligated as a matter of New York law to take all necessary steps to enable Plaintiffs to establish ownership over the EB&C shares in accordance with the Final Account entered by the Surrogate's Court. *See* Restatement (Third) of Trusts § 89 (2007).

348.349.     Plaintiffs are also entitled to a declaration that EB&C, including its corporate Secretary, Wendy, must recognize Plaintiffs as shareholders of record in EB&C, together holding two-thirds of the shares previously held by the Trust.

349.350.     To avoid any further shenanigans when it comes to counting votes, Plaintiffs are entitled to a declaration that EB&C's board shall consist of three directors, two of whom shall be elected by Plaintiffs, and one of whom shall be elected by Lester.

350.351.     Because neither EB&C nor EBWLC has had a validly constituted board of directors since at least February 2017, Plaintiffs are entitled to a declaration that all significant corporate actions since then, whether taken by the board or the officers appointed by the board, are deemed null and void, or at least voidable by a majority of a properly elected and constituted board.

351.352.     Regardless of whether an injunction is issued against Lester's attempt to take Plaintiffs' shares in EB&C, a declaratory judgment should be issued specifying that it would be unlawful for Lester to take any actions to prevent Plaintiffs from receiving the shares in accordance with the Final Accounting.

352.353.     In the alternative to having their two-thirds interest in EB&C recognized in accordance with the Final Accounting, Plaintiffs seek a declaration that certain Stock Powers

executed by CNB on or about October 2, 2017, must be accepted for delivery by Wendy and EB&C and recorded by Wendy on EB&C's stock book.

## COUNT VII

### Fraudulent Concealment

353.354.    Plaintiffs incorporate the allegations contained in the paragraphs set forth above as if fully set forth herein.

354.355.    This claim for fraudulent concealment is brought by Plaintiffs both in their individual capacity for injuries suffered as former Trust beneficiaries, and to the extent necessary, derivatively on behalf of the corporations such as EBWLC in which Plaintiffs have been and still are beneficial owners.

355.356.    Plaintiffs, as Trust beneficiaries and as passive beneficial shareholders in EB&C (and beneficial owners of EBWLC), relied on Lester and Gumaer to manage the Trust and the business affairs of EB&C and its affiliates.

356.357.    As trustees, and under New York law, Lester, Gumaer, and CNB were required to furnish annual statements to Plaintiffs. They purported to do so in or about December of each year for each of the years relevant to this matter.

357.358.    The Metro Transfer of Eber Metro to Alexbay was material information that Lester and Gumaer were obligated to disclose to Plaintiffs, given Plaintiffs' known ownership interest and that the transaction was not arms-length, and involved self-dealing since Alexbay was entirely owned and controlled by Lester.

358.359.    Lester and Gumaer failed to disclose the Metro Transfer to Plaintiffs at any time prior to the filing of this lawsuit.

359.360.    Had Lester or Gumaer disclosed the planned Metro Transfer or the Foreclosure Action to Plaintiffs along with sufficient information about prior investments in Eber-CT and its financial condition, Plaintiffs would have protested the transfer of Eber Metro to Lester and taken all available actions as the beneficial majority shareholders of EB&C and EBWLC to prevent the transfer from occurring.

360.361.    In addition, Gumaer and Lester concealed their attorney-client relationship from Plaintiffs, thereby preventing Plaintiffs from petitioning for the appointment of a different co-trustee to replace Gumaer due to his material conflict of interest.

361.362.    Lester also failed to disclose that he and Wendy began to pursue wine and liquor distributorship business opportunities inacquired Slocum of Maine, keeping the income generated therefrom entirely for themselves and off of Eber-CT's books.

363.    Lester and Wendy have received compensation from Slocum of Maine.

362.364.    Lester also failed to disclose to Plaintiffs that he purported to resign from EBWLC in 2012.

365.    Lester failed to disclose that he personally took $3 million from Southern for entering into a non-competition agreement that effectively bound Eber Bros.

366.    In or about 2008 or 2009, Lester had a conversation with Plaintiff Kleeberg about Kleeberg's desire to start a business in Florida with the name "Eber Importing." During the conversation, Lester told Kleeberg that Kleeberg could not use the Eber name due to the non-competition agreement with Southern. Lester led Kleeberg to believe that the family business entities were parties to and bound by the non-competition agreement.

367.    Lester's statements to Kleeberg were false and misleading because, in fact, no Eber Entity was a party to any non-competition agreement as a result of Lester's negotiation of

the Consulting Agreement to include that clause, so that only he would be paid for the agreement.

368.    Lester felt entitled to the money paid by Southern for not competing because he viewed Eber Bros. as his business and he did not want to share the fruits of it with his family members (other than his wife and children).

363.369.    Plaintiffs, through EB&C and EBWLC, have suffered damages in the form of their lost ownership interest in the last remaining operations of the Eber Bros. wine and liquor businesswine and liquor business. Damages were also suffered as a result of Lester's concealment of the fact that the Eber Entities could sell wine and liquor in New York and other states where Southern operated without violating any provisions of the Southern agreements to which the Eber Entities were actual parties.

364.370.    For these reasons, Defendants Lester and Gumaer's Estate are liable for fraudulent concealment.

365.371.    Because Lester's conduct served to transfer valuable assets to Alexbay at the expense of the other entities he was obligated to serve, Alexbay is also liable under principles of *respondeat superior*.

366.372.    Given their abuse of their positions of trust, an award of punitive damages is justified and appropriate, and should be entered notwithstanding Plaintiffs' right to receive equitable relief in lieu of compensatory damages.

## COUNT VIII

### Aiding and Abetting Breach of Fiduciary Duty and Fraudulent Concealment

367.373.    Plaintiffs incorporate the allegations contained in the paragraphs set forth above as if fully set forth herein.

368.374.        Although Wendy was not a trustee herself, she substantially involved herself in administering the Trust's affairs, including trustees' communications with the beneficiaries.

369.375.        Wendy knowingly and willfully aided and abetted the years-long deception of the Trust beneficiaries. The deception began by 2010, when Wendy participated in preparing an offer letter from Lester to Sally Kleeberg and Audrey Hays regarding providing financing to the Eber Entities. That letter omitted material information necessary to prevent it from being misleading.

370.376.        Wendy perpetuated the deception by coordinating with Lester and Gumaer to withhold information about the Metro Transfer from the Trust beneficiaries. She did so despite knowing that the Trust statements issued to the beneficiaries were materially misrepresenting the post-Transfer value of Eber Bros. assets.

371.377.        Wendy knowingly and willfully aided and abetted Lester's interference with the distribution of Trust assets, including EB&C shares, to Plaintiffs. She did so by, *inter alia*, feigning ignorance about the location of the corporate stock book and the current address for receipt of official corporate correspondence and documents.

372.378.        For these reasons, Wendy is liable for aiding and abetting the breaches of fiduciary duties and fraudulent concealment by Lester and Gumaer.

### COUNT IX

### Accounting

373.379.        Plaintiffs incorporate the allegations contained in the paragraphs set forth above as if fully set forth herein.

374.380.    The right to an accounting is premised on the existence of a fiduciary relationship and a breach of that duty respecting property in which the party seeking the accounting has an interest.

375.381.    Plaintiffs have an interest in EB&C and EBWLC, and previously had an interest in Eber Metro, Eber-CT, and the Trust.

376.382.    Lester and Gumaer were, at all relevant times, fiduciaries to Plaintiffs because they were trustees for the Trust.

377.383.    Lester, Wendy, and Gumaer were, at all relevant times, fiduciaries to Plaintiffs and to EB&C and EBWLC.

378.384.    Lester, Gumaer, and Wendy are required to provide an accounting of their profits relating to the Eber Bros. business to Plaintiffs and to EB&C and EBWLC.

379.385.    This includes all money received from or paid into any wine and liquor related business, whether or not they are Eber Bros. entities, because of their duty of loyalty to the Eber Bros. wine and liquor business.

380.386.    This includes all contracts between and among these entities and/or Lester and Wendy or their wholly-owned entities.

381.387.    There are numerous Eber entities that have been used in connection with the Eber Bros business at times, including without limitation, Eber-RI, Eber-NDC, Eber-Metro, LLC, and Segway. All entities affiliated with Eber Bros now or at any time in the past ten years are included in this demand. Plaintiffs demand an accounting from those entities in order to ascertain the full scope of financial entanglements and assets.

382.388.     The accounting demand necessarily includes legal entities that are wholly-owned or at least controlled by Lester and Wendy, including but not limited to Alexbay and Slocum & Sons of Maine, Inc.

## COUNT X

## Common Law (Equitable) Indemnification

389.    Plaintiffs incorporate the allegations contained in the paragraphs set forth above as if fully set forth herein.

390.    This Count X is against Lester and Wendy.

391.    In connection with the settlement of previously asserted claims against CNB, Plaintiffs agreed to indemnify CNB for certain legal costs incurred by CNB in connection with further proceedings relating to the Allen Eber Trust.

392.    By engaging in conduct to prevent the transfer of shares of EB&C to Plaintiffs, including purporting to exercise an option to acquire Plaintiffs' shares for nothing, Lester and Wendy have caused and are continuing to cause Plaintiffs to incur indemnification liability to CNB.

393.    Defendants' conduct has been and continues to be wrongful.

394.    Defendants' conduct has caused CNB to incur legal expenses that are likely to be subject to the indemnification agreement executed by Plaintiffs.

395.    As a matter of equity and good conscience, Plaintiffs should not bear the burden of paying CNB's expenses, because those expenses were incurred as a direct and proximate result of Defendants' wrongful actions.

396.    Accordingly, Lester and Wendy are liable to Plaintiffs for common law or equitable indemnification and must pay any and all expenses incurred by CNB that are subject to contractual indemnification by Plaintiffs.

397.    Plaintiffs demand judgment against Lester and Wendy in the full amount of the indemnification obligations to CNB that Lester and Wendy have caused Plaintiffs to incur.

398.    Because of the possibility that further such costs may be incurred, Plaintiffs also seek a declaration that any expenses incurred by CNB relating to Defendants' wrongful conduct with respect to the distribution of shares to Plaintiffs shall be paid by Lester directly to CNB, or alternatively reimbursed by Lester to Plaintiffs, in the full amount paid by Plaintiffs to CNB.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment as follows:

a.  A declaration of rights and obligations, and concerning the lawfulness of certain transactions, as specified in detail in Counts VI and X;

b.  An order compelling EB&C and EBWLC (and Defendants, if necessary) to issue new stock certificates to Plaintiffs and Lester in accordance with the distribution of the Judicial Order of Settlement and Final Accounting of the Trust, and canceling the certificates issued to the Trust (or effectuating the proper distribution of all EB&C and EBWLC shares currently recorded by EB&C and EBWLC as belonging to the Trust through alternative means);

c.  An order vacating any corporate elections with respect to EB&C or EBWLC since February 1, 2017, compelling the holding of new elections, beginning with EB&C, and requiring EB&C and its Secretary to recognize Plaintiffs' ownership of approximately 2/3 of the voting shares of EB&C, to count all votes cast by

Plaintiffs or their proxy, and to appoint directors in accordance with the votes cast immediately and without reservation;

d. An order vacating and rescinding all corporate actions taken since February 2017 with respect to EB&C and EBWLC, including without limitation the February 2017 amendment to EBWLC's Certificate of Incorporation and issuance of voting preferred shares to Lester;

e. A temporary injunction enjoining Lester and Wendy from taking any actions to affect the corporate ownership or records of any of the Eber Entities;

f. A permanent injunction barring Lester and Wendy from serving as officers, directors, or managers of any of the Eber Entities;

g. Rescission of the Metro Transfer of Eber Metro to Alexbay, and all of the agreements related to it, including an order returning the Eber Metro shares to EBWLC;

h. Rescission of Eber Metro's sham sale of 6% of Eber-CT to Polebridge Bowman including the Right of First Refusal to Wendy, and an order returning the 6% interest to Eber Metro;

i. An order voiding the transaction(s) that effectuated the conversion of EBWLC debt assets into additional paid in capital;

j. Rescission of the February 26, 2010 Guaranty and Security Agreements, and any subsequent amendments thereto;

k. An order transferring Wendy's ~~6.~~69.1% interest in Eber Metro to EBWLC.

l. Restitution to EBWLC and any of its affiliates for any and all costs and expenses, including without limitation legal fees and expenses, incurred in connection with

Defendants breaches of their duties, including any incurred in carrying out the Metro Transfer or defending it after-the-fact, whether in this litigation or previously;

m.  Imposition of a constructive trust on Eber Metro and Eber-CT, made retroactive to June 5, 2012;

n.  Imposition of a constructive trust on Slocum of Maine;

n.o. Disgorgement by Alexbay of any moneys received from Eber Metro or any of its affiliates since June 5, 2012;

o.p. Pursuant to the faithless servant doctrine, disgorgement of all compensation paid by EBWLC or any of its affiliates to Lester and Wendy since the earliest date of their disloyalty, which is alleged to have been in or about 2005, when Lester and Wendy manipulated the Slocum deal so as to acquire Slocum of Maine themselves, or at the latest August 2007, when Lester and Wendy negotiated the Consulting Agreement with Southern for Lester's own personal benefit;

p.q. Disgorgement of all amounts paid to Gumaer by the Trust or any of its controlled entities since the beginning of his disloyalty, which is alleged to have begun in January 2001;

q.r. Restitution Disgorgement of all amounts paid to EBWLC for Lester by Southern based on Lester's usurping of corporate assets and opportunities, including without limitation the $2.595 million in compensation excessive payments from Southern that Lester wrongfully received from 2007 through 2012 based on an agreement that effectively prevented EBWLC and its affiliates from competing with Southern;

r.s. Disgorgement of all compensation received by Lester or Wendy through Slocum of Maine or any other Slocum entity since 2005;

s.t. Imposition of punitive damages a surcharge for the benefit of EBWLC and EB&C against Lester, Wendy, and Gumaer's Estate, for their breaches of duties as corporate officers and directors and fraudulent concealment;

t.u. Imposition of punitive damages or a surcharge for the benefit of Daniel Kleeberg, Lisa Stein, and Audrey Hays against Lester and Gumaer's Estate, for their breaches of duties as trustees and fraudulent concealment;

u.v. Imposition of a constructive trust on the assets of Alexbay, on the proceeds received by Lester and Wendy from Slocum of Maine, and on any other assets held by persons or entities controlled by or affiliated with any of Defendants, known or unknown, that can be traced to Eber-CT;

w. Rescission of Lester and Wendy's acquisition of Slocum of Maine and/or imposition of a constructive trust on Slocum of Maine for the benefit of Eber Metro and such other entities as may be appropriate;

v.x. To the extent that any cause of action permits a reasonably certain remedy at law rather than equity (including the Aiding and Abetting count against Wendy), compensatory and punitive damages;

w.y. Accountings from Lester, Wendy, and all of the wine-and-liquor-related entities owned or controlled by either or both of them, including such detail as is necessary to ascertain all transactions between them and the bases therefor;

x.z. AccountingAn accounting from Gumaer's Estate for all transactions with and moneys paid by Lester, Wendy, the Trust, any Eber Entity, Slocum of Maine, or

66

any other wine-and-liquor-related entities owned or controlled by Lester and/or Wendy;

~~y.~~aa.      Pre-judgment interest at the New York statutory rate of nine percent (9%), to the extent not already included in any award of restitution or disgorgement;

~~z.~~bb.      Post-judgment interest;

~~aa.~~cc.      An award of attorney's fees and costs; and

~~bb.~~dd.      Such other and further relief as the Court deems just and proper.

### JURY DEMAND

~~383.~~399.      Plaintiffs demand a jury trial on all issues so triable.

Dated: December 21, 2018

/s Brian C. Brook

_____

Brian C. Brook (BB 1980)
CLINTON BROOK & PEED
100 Church Street, 8th Floor
New York, NY 10007
(212) 257-2334
Brian@clintonbrook.com

*Attorney for Plaintiffs*