Page 1

1

2     UNITED STATES DISTRICT COURT

3     SOUTHERN DISTRICT OF NEW YORK

4     Civil Action No. 16-cv-951 (LAK)

5     -------------------------------------x

6     DANIEL KLEEBERG, LISA STEIN and

7     AUDREY HAYS,

8                         Plaintiffs,

9              -against-

10    LESTER EBER; ALEXBAY, LLC f/k/a LESTER

11    EBER, LLC; CANANDAIGUA NATIONAL

12    CORPORATION d/b/a CANANDAIGUA NATIONAL

13    BANK & TRUST; ELLIOT W. GUMAER, JR.;

14    EBER BROS. & CO., INC.; EBER BROS.

15    WINE AND LIQUOR CORPORATION; EBER

16    BROS. WINE AND LIQUOR METRO, INC.,

17    EBER-CONNECTICUT, LLC; and WENDY EBER,

18                        Defendants.

19    -------------------------------------x

20

21                        January 24, 2019

22

23      Videotaped deposition of LESTER EBER

24

25

Page 2

```
1
2           January 24, 2019
3           9:33 a.m.
4
5
6           Videotaped deposition of LESTER EBER,
7   held at the offices of Veritext New York City,
8   1250 Broadway, New York, New York, pursuant to
9   Notice, before Lynne D. Metz, a Shorthand Reporter
10  and Notary Public of the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2   A P P E A R A N C E S:
3
4       BROOK & ASSOCIATES PLLC
5       Attorneys for Plaintiffs
6           100 Church Street
7           8th Floor
8           New York, New York 10007
9       BY:   BRIAN C. BROOK, ESQ.
10
11
12      UNDERBERG & KESSLER LLP
13      Attorneys for Defendants LESTER EBER;
14      ALEXBAY, LLC f/k/a LESTER EBER, LLC; EBER
15      BROS. & CO., INC.; EBER BROS. WINE AND
16      LIQUOR CORPORATION; EBER BROS. WINE AND
17      LIQUOR METRO, INC., EBER-CONNECTICUT, LLC;
18      and WENDY EBER
19          50 Fountain Plaza
20          Buffalo, New York 14202
21      BY:   COLIN D. RAMSEY, ESQ.
22
23      (Appearances continued on next page)
24
25
```

Page 4

```
1
2   A P P E A R A N C E S: (Cont'd):
3
4           JOHN HERBERT, ESQ. (Telephonically)
5       Attorneys for Defendants LESTER EBER and
6       WENDY EBER
7           P.O. Box 1031
8           Tiburone, California 94920
9
10
11      CALIHAN LAW PLLC
12      Attorneys for Defendant Estate of ELLIOT W.
13      GUMAER
14          16 East Main Street
15          Rochester, New York 14614
16      BY:   ROBERT B. CALIHAN, ESQ.
17
18
19      ALSO PRESENT:
20          Wayne Saline - Videographer
21          Dan Kleeberg
22
23
24
25
```

Page 5

```
1
2
3
4       IT IS HEREBY STIPULATED AND AGREED, by and
5   between the attorneys for the respective parties
6   herein, that filing and sealing be and the same
7   are hereby waived.
8       IT IS FURTHER STIPULATED AND AGREED
9   that all objections, except as to the form of the
10  question, shall be reserved to the time
11  of the trial.
12      IT IS FURTHER STIPULATED AND AGREED that the
13  within deposition may be signed and sworn to
14  before any officer authorized to administer an
15  oath, with the same force and effect as if signed
16  and sworn to before the officer before whom the
17  within deposition was taken.
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1
2          THE VIDEOGRAPHER:  We are going on the
3    record at 9:33 on January 24, 2019.  Please
4    note that the microphones are sensitive and
5    may pick up whispering and private
6    conversations.  Please turn off all cell
7    phones and place them away from the
8    microphones as they may interfere with the
9    deposition audio.  Recording will continue
10   until all parties agree to go off the
11   record.
12         This is media unit one of the video
13   recorded deposition of Lester Eber taken by
14   counsel for plaintiff in the matter of Dan
15   Kleeberg et al versus Lester Eber et al
16   filed in the United States District Court
17   Southern District of New York, case number
18   16-CV-9517 (LAK).  This deposition is being
19   held at Veritext located at 1250 Broadway
20   New York, New York.
21         My name is Wayne Saline from the firm
22   Veritext.  I am the videographer.  The court
23   reporter is Lynne Metz from the firm
24   Veritext.
25         At this time the attorneys will

Page 7

1                   L. Eber
2    introduce themselves and their affiliations
3    for the record.  The court reporter will
4    swear in the witness and we can proceed.
5          MR. BROOK:  On behalf of the
6    plaintiffs Brian Brook of Brook and
7    Associates PLLC.
8          MR. RAMSEY:  Colin Ramsey from
9    Underberg and Kessler on behalf of the Eber
10   defendants.
11         MR. CALIHAN:  Robert Calihan on behalf
12   of the Estate of Elliot Gumaer.
13         MR. KLEEBERG:  Dan Kleeberg.
14   L E S T E R   E B E R,
15   called as a witness, having been first duly
16   sworn by the Notary Public (Lynne D. Metz),
17   was examined and testified as follows:
18   EXAMINATION BY
19   MR. BROOK:
20   Q.    Good morning Mr. Eber.
21         Have you been deposed before?
22   A.    Yes.
23   Q.    When is the last time you were
24   deposed?
25   A.    A couple of years ago.

Page 8

1                   L. Eber
2    Q.    Just because no matter how many times
3    you do this it is worth going over it again.  I
4    will go over some of the differences between
5    today's deposition and a typical conversation to
6    make sure that we are as efficient and have as
7    clean a record as possible.
8          One major difference is there is a
9    court reporter writing down everything that we
10   say.  So even though there is a videographer
11   recording it too, it is important that we do our
12   best not to talk over each other.  Even if you
13   know where I am going with the question, please
14   let me finish the question before you answer it.
15         Okay?
16         MR. RAMSEY:  Yes?
17   A.    Yes.
18   Q.    And that brings me to the next point.
19   All responses need to be verbal meaning yes or no
20   rather than shaking your head or grunts like aha.
21         Okay?
22   A.    Yes.
23   Q.    Another thing is that if I ask a
24   question and you answer it, I am going to assume
25   that you understood the question.  So if there is

Page 9

1                   L. Eber
2    something in my question that you don't understand
3    be sure to ask me to clarify my question before
4    you answer it.
5          Okay?
6    A.    Yes.
7    Q.    How do you feel today?
8    A.    Okay.
9    Q.    Is there any reason such as being
10   tired, overly stressed or on prescription
11   medications or something like that that would
12   impair your ability to testify fully and
13   truthfully today?
14   A.    Not that I know of.
15   Q.    What is your date of birth?
16   A.    1/26/38.
17   Q.    And what is your home address?
18   A.    15 Coral Way, Rochester, New York.
19   Q.    When you were last deposed, what was
20   the legal matter that was in connection with?
21   A.    It was part of being a lobbyist for
22   Southern Glazer Wine and Liquor.
23   Q.    And how was that part of the being a
24   lobbyist, sir?
25   A.    It was guarding legislation that had

3 (Pages 6 - 9)

L. Eber

1
2  been passed or not passed.  Legislation in the
3  State of New York.
4      Q.   And they took your deposition for
5  that?
6      A.   It was an investigation into
7  legislation that was going on.
8      Q.   And have you ever been deposed before
9  that?
10     A.   Yes.
11     Q.   When was the previous time that you
12 had been deposed before?
13     A.   Many times.  I can't remember all of
14 them.  I have had a lot of depositions.
15     Q.   Were you ever deposed in connection
16 with a lawsuit by Harris Beach?
17     A.   No.
18     Q.   Were you ever deposed in connection
19 with a lawsuit by PBGC?
20     A.   No.
21     Q.   What is your highest level of
22 education that you obtained?
23     A.   College degree.  BS in economics.
24     Q.   Where did you get that?
25     A.   University of Pennsylvania.

L. Eber

1
2      Q.   And was that the Wharton School?
3      A.   Yes.
4      Q.   And when did you graduate?
5      A.   '59.
6      Q.   What did you do immediately after
7  college?
8      A.   Went to work for Eber Brothers Wine
9  and Liquor.
10     Q.   What was your position?
11     A.   Salesman.
12     Q.   And I am not going to go through the
13 whole history.
14         At some point did you become president
15 of Eber Brothers Wine and Liquor?
16     A.   Eventually.
17     Q.   When was that?
18     A.   I don't remember the exact date.
19     Q.   Was it before or after your father
20 Allen Eber passed away?
21     A.   After he passed away.
22     Q.   And approximately, how long after?
23     A.   You know I can't remember.  I just
24 don't remember how long.
25     Q.   Who was president immediately after he

L. Eber

1
2  passed away?
3      A.   Richard Murnighan.
4      Q.   And was there anyone else who was
5  president between Richard Murnighan and you?
6      A.   No.
7      Q.   When did you stop being president of
8  Eber Brothers Wine and Liquor?
9      A.   I can't remember the exact date, but
10 it could have been 2012 or in through there.  I
11 don't have the exact dates.  I would want to be
12 specific with you.
13     Q.   But approximately 2012?
14     A.   I think.
15         MR. RAMSEY:  As long as that's your
16 approximation, that's fine.
17     Q.   As president of Eber Brothers Wine and
18 Liquor, what were your responsibilities?
19     A.   To basically oversee the management of
20 the company and interact with our suppliers.
21     Q.   Were you the senior most executive
22 officer or was there a CEO above you?
23     A.   No.  I was the -- when I was president
24 you mean?
25     Q.   Yes.

L. Eber

1
2      A.   I was the senior most officer.
3      Q.   And you mentioned that you have done
4  some lobbying work since that, since you were
5  president of Eber Brothers.
6         Did you do lobbying work while you
7  were president of Eber Brothers?
8      A.   I did governmental work.
9      Q.   What do you mean by that?
10     A.   I was very active in New York State in
11 the legislation and with the regulatory agencies
12 that regulate the business.
13     Q.   And how long had you been active in
14 that kind of governmental work for?
15     A.   Forever really.  I was brought up in
16 it.  Since I have been with the company.
17     Q.   And so did you attempt to get reforms
18 made to the state liquor laws and things like
19 that?
20     A.   Yes.
21     Q.   And were you successful in that?
22     A.   Not a lot.  It's very difficult to
23 make any kind of changes.
24     Q.   How was your compensation determined
25 as president of Eber Brothers?

4 (Pages 10 - 13)

Page 14

L. Eber

2   A.   You know I can't remember exactly.  It
3   grew over the years, but I don't think there was a
4   specific formula or anything in it.
5   Q.   And who determined what your
6   compensation would be?
7   A.   The people I worked for, Richard
8   Murnighan and the financial people there.
9   Q.   And I am speaking specifically as
10  president of Eber Brothers.
11       So once you were president, who was it
12  that determined what your compensation was?
13  A.   Well, I think it was, you know, myself
14  and our CFO who was there.
15  Q.   Was there more than one CFO as your
16  time as president?
17  A.   Yes.
18  Q.   Who were the people that were CFO
19  during your time as president?
20  A.   Well, Elmer LeFeavre goes back with
21  Murnighan and then Stanley Otto.  Then Robert
22  Belanti and then Ryan.  You know I can't think of
23  his first name.
24  Q.   John Ryan?
25  A.   John Ryan, yes.

Page 15

L. Eber

2   Q.   And was Lisa Seminock at some point
3   CFO?
4   A.   She could have been, yes.
5   Q.   Besides yourself and the CFO, was
6   anyone else at Eber Brothers involved in
7   determining your compensation as president?
8   A.   Mike Gumaer would have been aware of
9   everything that went on.
10  Q.   Aware of it, but was he involved in
11  determining it?
12  A.   You know I couldn't say determining
13  it, but his input was highly valued in my salary.
14  Q.   And so as president you received a
15  salary; correct?
16  A.   Yes.
17  Q.   Did you also receive incentive
18  compensation like bonuses?
19  A.   I don't remember, to be honest with
20  you.
21       MR. BROOK:  Our first exhibit of the
22  day.  Mark this Plaintiffs' 25.
23       (Plaintiffs' Exhibit 25, a document
24  entitled Unanimous Written Consent of the
25  Board of Directors of Eber Brothers Wine and

Page 16

L. Eber

2   Liquor Corporation Bates numbered EB
3   00001338 through 1340, marked for
4   identification, as of this date.)
5   Q.   I am showing you what was marked as
6   Exhibit 25.  It is a document entitled Unanimous
7   Written Consent of the Board of Directors of Eber
8   Brothers Wine and Liquor Corporation and it is
9   Bates numbered EB 00001338 through 1340.
10       Do you recognize this document?
11  A.   Yes.  I recognize what went on here.
12  I am just reading it now.
13  Q.   So what went on here?
14       MR. RAMSEY:  Take your time to read it
15  if you need to.
16       MR. BROOK:  You don't have to read the
17  whole document.  Just to get a sense of it.
18  A.   Yeah.
19  Q.   Does this document refresh your
20  recollection as to whether or not there was any
21  incentive or bonus compensation paid to you?
22  A.   That's the only one.  It was never
23  paid to me.
24  Q.   What do you mean by it, the 1.5
25  million dollars?

Page 17

L. Eber

2   A.   I never got that.
3   Q.   Why not?
4   A.   Money wasn't there.  There wasn't any
5   money in the company.
6   Q.   So take a look at page 3.  The
7   document, this is how it was produced in this
8   case.
9       Do you see that there is only two
10  signatures present there and there is no signature
11  for Mike Gumaer?
12  A.   Yes.
13  Q.   Do you know whether Mike Gumaer
14  ultimately did sign off on this?
15  A.   I don't know.
16  Q.   And if you turn to page, it is still
17  page 3.  The very top of page 3 it also provides
18  there the resolution that "The corporation is
19  authorized, empowered and directed to enter into a
20  bonus plan with Lester Eber pursuant to which the
21  corporation shall pay Lester Eber a bonus in an
22  amount equal to one million dollars for the fiscal
23  years ending on each of May 31, 2006, 2007, 2008,
24  2009 and 2010 respectively provided.  However,
25  that the payment of each such bonus payment shall

5 (Pages 14 - 17)

Page 18

L. Eber

1
2 be subject to and conditioned upon Lester Eber's
3 employment by the corporation as of the end of
4 each such fiscal year."
5    A.  Mm-hmm.
6    Q.  And then there is further resolutions.
7     Did I read that correctly?
8    A.  Yes.
9    Q.  So that's separate from the 1.5
10 million dollar commission for NDC that was
11 referenced in this document; correct?
12    A.  Yes.
13    Q.  But it is your testimony that you were
14 not paid either the commission or any of the one
15 million dollar bonuses?
16    A.  That's correct.  There was no money.
17     MR. RAMSEY:  You answered the
18 question.
19    Q.  Whose idea was it to pay you a
20 commission and bonuses?
21     MR. RAMSEY:  Form.
22     Go ahead.
23    A.  I was the one who found these people
24 to be a partner and got them to go along with us.
25 So they felt that it would be worthwhile and it

Page 19

L. Eber

1
2 was the kind of money that these people were
3 paying their top management.
4    Q.  So what do you mean, who is they?
5    A.  NDC.
6    Q.  And so my question was and I will
7 rephrase it.
8     Who at Eber Brothers proposed that you
9 receive a commission and a bonus plan?
10    A.  I don't remember.
11    Q.  Did you propose that?
12    A.  I honestly don't remember.  It wasn't
13 just me, but it really didn't matter because I
14 never was paid any of this.
15    Q.  Did you think that the compensation
16 that was potentially going to be provided to you
17 pursuant to these board resolutions was something
18 that you had justifiably earned?
19    A.  Yes.
20     MR. RAMSEY:  Form.
21    Q.  Why is that?
22    A.  Because I got the deal.  I got them to
23 make the deal with us.
24    Q.  So by them you are referring to NDC?
25    A.  Correct.

Page 20

L. Eber

1
2    Q.  That's the National Distributing
3 Company?
4    A.  Yes.
5    Q.  What was that company's business?
6    A.  Wine and liquor distribution in
7 Georgia and other states.
8    Q.  What was the deal between Eber
9 Brothers and NDC?
10    A.  They bought 50 percent of Metro.
11    Q.  So what was the business -- withdrawn.
12     When you say Metro, are you referring
13 to Eber Brothers Wine and Liquor Metro, Inc.?
14    A.  Yes.
15    Q.  So what was the business of Eber Metro
16 at that time prior to the NDC deal?
17    A.  It was Paramount Brands.  We bought
18 Paramount Brands from Paramount Distillers in
19 Cleveland, Ohio.  I filed that one also so that we
20 could enter the New York market.
21    Q.  So Paramount was a brand of alcohol?
22    A.  There were two Paramounts.  There was
23 a Paramount Distillers in Cleveland, Ohio that
24 produced the Paramount Brand name and there was
25 Paramount Brands who was a wholesaler in New York

Page 21

L. Eber

1
2 and I was the one who found them and we bought
3 them so we can enter the New York Metro market.
4    Q.  When did you buy the Paramount
5 distributor?
6    A.  I don't remember.  It was in the
7 nineties I believe, but I can't remember.
8    Q.  And was the Eber Metro corporate
9 entity created for purposes of that acquisition?
10    A.  Yes.
11    Q.  How much was paid to acquire
12 Paramount?
13    A.  I don't remember.
14    Q.  What's your best ball park
15 recollection?
16    A.  I can't remember, but it was a good --
17 it was reasonable I would say but I can't remember
18 the figures, you know.  It goes back how many
19 years.
20    Q.  How successful was the Eber Brothers
21 venture into the New York City Metropolitan
22 distribution market?
23     MR. RAMSEY:  Form.
24    A.  Depends on how you evaluate success.
25    Q.  Was it profitable?

Page 22

L. Eber

1
2    A.   I think it originally was profitable.
3  Originally.
4    Q.   And then at some point it stopped
5  being profitable?
6    A.   Yes.
7    Q.   Why was that?
8    A.   Lost lines.  The major lines.
9    Q.   What caused the company to lose lines?
10   A.   That suppliers can go on a 30-day
11  notice wherever they want.
12   Q.   And when did that occur?
13   A.   It occurred -- I don't have the exact
14  dates on that.
15   Q.   Was it prior to the Eber Brothers
16  acquisition of Slocum and Sons?
17   A.   Yes.
18   Q.   And was that experience with suppliers
19  leaving on 30 days notice a reason why you wanted
20  to enter The State of Connecticut?
21   A.   Yes.  Among others, yes.
22   Q.   And how was The State of Connecticut
23  different?
24   A.   It appears to be different but it
25  isn't because there is franchise law but really

Page 23

L. Eber

1
2  isn't a franchise law because the supplier can
3  appoint another wholesaler and then work with the
4  other wholesaler and eventually your business just
5  goes away.
6    Q.   Let's step back and before getting
7  into how it didn't work out, what do you mean by
8  franchise law?
9    A.   Franchise law means that the supplier
10  has a legal obligation to stay with you.
11   Q.   And under what circumstances can the
12  supplier end its relationship with the distributor
13  in Connecticut?
14   A.   Whatever they feel like.  There aren't
15  any circumstances.  There are circumstances that
16  you know if you don't pay your bill they can move
17  right away, you know.  That's with anyone, but
18  there aren't any circumstances for them to leave.
19  If they want to leave they can leave.  They can go
20  dual to start with.
21   Q.   So putting aside dualling for the
22  moment, in order to actually terminate a
23  relationship is this correct that in Connecticut a
24  supplier has to have good cause to end the
25  relationship?

Page 24

L. Eber

1
2    A.   Yes.  You have good cause to end it
3  but the relationship could go on and you could not
4  do any business because they have got another
5  wholesaler on the line or more than one.  They
6  have the right to appoint as many as they want.
7    Q.   By appoint you mean?
8    A.   Other wholesalers.
9    Q.   And specifically that's when
10  wholesalers name a preferred distributor?
11   A.   Yes.
12   Q.   At the time that Eber Brothers
13  acquired Slocum and Sons, how many of the Slocum
14  and Sons brands were exclusive to Slocum and Sons
15  in Connecticut?
16   A.   Most of them.
17   Q.   Were there any that were at that time
18  dual?
19   A.   I just can't remember.
20   Q.   After the acquisition of Slocum and
21  Sons, were some of the brands that had been
22  exclusive dualled by the supplier?
23   A.   Yes.
24   Q.   What was the biggest one that was
25  dualled?

Page 25

L. Eber

1
2    A.   Yellow Tail.
3    Q.   What was the reason why they dualled
4  Eber Brothers, I am sorry, Slocum and Sons?
5    A.   They didn't give any reason.
6    Q.   Did you ask?
7    A.   They just said we are going dual.
8    Q.   So you did not ask?
9    A.   Yeah, we did.  The Deutsches are the
10  importers of it.  You try asking them.
11   Q.   Had Eber Brothers had a relationship
12  with the Deutsches prior to acquiring Slocum and
13  Sons?
14   A.   Yes.
15   Q.   Was Eber Brothers the distributor for
16  the Deutsches in New York?
17   A.   Upstate New York.
18   Q.   And was that the case through the end
19  of Eber Brothers operations?
20   A.   Yes.
21   Q.   When did Eber Brothers --
22   A.   You said through the end of their
23  operations.  They left before.  They left us
24  upstate before, while Eber Brothers was still in
25  business if I remember correctly.

7 (Pages 22 - 25)

Page 26

L. Eber

1 
2    Q.   So that was at some point before the
3  deal was reached with Southern to wind down
4  operations?
5    A.   Yes.
6    Q.   And did they go with Southern?
7    A.   Yes.
8    Q.   Just returning to the matter of
9  compensation.
10        Did you have in addition to your
11  salary and bonuses that were not paid, was there
12  any other form of compensation that you received
13  from Eber Brothers as president?
14    A.   Not that I remember.
15    Q.   Did you have an expense account?
16    A.   Yes.
17    Q.   And what kinds of expenses were
18  allowed to be put on to the expense account?
19    A.   Tasting and bars you know.  Expenses
20  in bars where you are tasting your product.
21        Travel for business.
22    Q.   Did the Eber Brothers company have an
23  apartment in New York City at some point?
24    A.   Eber Brothers did not have an
25  apartment.  There was an apartment with the Metro

Page 27

L. Eber

1 
2  division.
3    Q.   So the Metro subsidiary had an
4  apartment in New York?
5    A.   Yes.
6    Q.   Where was that apartment located?
7    A.   Next to the Hospital for Special
8  Surgery.
9    Q.   So in Manhattan?
10    A.   Yeah.
11    Q.   When did it acquire that apartment?
12    A.   After they had moved down here.  Come
13  down here.  I don't remember the exact date.
14    Q.   This was an apartment that was
15  acquired by Eber Metro after Eber Metro acquired
16  Paramount; correct?
17    A.   Yes.
18    Q.   What was the reason for the apartment
19  being acquired?
20    A.   For people to come down here.
21  Actually, a manager we brought down from upstate
22  New York.  So for a place for him to stay.
23    Q.   Who was that?
24    A.   Dan Park.
25    Q.   Did anyone else use the apartment in

Page 28

L. Eber

1 
2  New York City?
3    A.   They could have, but I don't remember
4  that.
5    Q.   Did you ever use that apartment?
6    A.   No.
7    Q.   Did you travel to New York City for
8  business purposes when you were president of Eber
9  Brothers?
10    A.   Yes.
11    Q.   Where did you typically stay when you
12  did so?
13    A.   In New York City The Palace Hotel.
14    Q.   Did Eber Brothers provide you with a
15  car?
16    A.   Yes.
17    Q.   What kind of car?
18    A.   Oldsmobile I think.
19    Q.   And did you have only one car?
20    A.   Yes.
21    Q.   And how long did you have that car
22  for?
23    A.   I don't remember.
24    Q.   Prior to approximately the year 2008,
25  was the only corporate entity that was paying your

Page 29

L. Eber

1 
2  salary Eber Brothers Wine and Liquor Corp.?
3    A.   I think so.  I think so.  I can't give
4  you an exact.
5    Q.   And after 2008 which corporate entity
6  paid your salary, if any?
7    A.   Slocum paid me, paid for my salary.
8    Q.   And by Slocum you are referring to
9  what's also called Eber Connecticut LLC?
10    A.   Yes.
11    Q.   In your position with Eber Connecticut
12  LLC, how is that different, if at all, from when
13  you were president of Eber Brothers in New York?
14    A.   It is a very different size company.
15  It is a much smaller company.
16    Q.   Any other differences?
17    A.   Well, I think it was a more fine wine
18  company than Eber Brothers was.
19    Q.   So was Eber Brothers more heavy on the
20  spirit side?
21    A.   Yes.
22    Q.   After -- let's step back.
23        I asked you before whether the
24  franchise laws in Connecticut were one of the
25  reasons you acquired Slocum in 2005.

8 (Pages 26 - 29)

Page 30

L. Eber

1
2      Were there any other reasons why you
3  acquired Slocum in 2005?  And by you I mean you on
4  behalf of Eber Brothers.
5      A.  Yes.  It was a strategic.  The company
6  was doing over five hundred, six hundred million
7  and the supplier was looking for multi-state
8  distribution and it was next to New York.  There
9  were some lines we had in common and they had a
10  very good import business of their own and we
11  thought we could get involved in that direct
12  importing.
13      Q.  How did the topic of an acquisition
14  get broached with Slocum and Sons?
15      A.  I don't understand the question.
16      Q.  Well, how did you find Slocum and Sons
17  as an acquisition target?
18      A.  We knew of them.  Had some lines in
19  common with them and they are very respected in
20  the fine wine business.
21      Q.   So how did the topic of a potential
22  acquisition get broached with Slocum and Sons?
23      A.  I don't remember.
24      Q.   Did you know the president or CEO of
25  Slocum personally at the time?

Page 31

L. Eber

1
2      A.  Yes.
3      Q.   Did you pick up the phone and call
4  him?
5      A.  I could have.  I don't remember.
6      Q.   Did you hire any third parties or
7  brokers to assist with the acquisition?
8      A.  No.
9      Q.   Did you hire any bankers to assist
10  with the acquisition?
11      A.  No.
12      Q.   How was the pricing for the
13  acquisition of Slocum and Sons determined?
14      A.  I don't remember.
15      Q.   Do you remember the approximate total
16  purchase price?
17      A.  I think I do.  I think it was around
18  20 million or something like that.  It was what I
19  read.
20      Q.   So does 21.4 million sound about
21  right?
22      A.  It could be, yes.
23      Q.   Was that paid in cash?
24      A.  I don't know.
25      Q.   Where did Eber Brothers get the money

Page 32

L. Eber

1
2  to pay 21.4 or so million dollars for Slocum and
3  Sons?
4      A.  I did not handle that.
5      Q.  Who handled that?
6      A.  Would have been probably John Ryan and
7  our law firm.
8      Q.  Which law firm was that?
9      A.  Harris Beach N.
10      Q.  Was there a particular lawyer who was
11  your point of contact for that?
12      A.  Pat Dalton.
13      Q.  Had Eber Brothers retained Pat Dalton
14  prior to that?
15      A.  Yes.
16      Q.  How long had Pat Dalton been a lawyer
17  for Eber Brothers?
18      A.  I don't remember.
19      Q.  Was it several years before that
20  point?
21      A.  Yes.
22      Q.  And Pat Dalton continued to provide
23  legal services for several years after that
24  acquisition too; correct?
25      A.  Yes.

Page 33

L. Eber

1
2      Q.   Why did the relationship between
3  Harris Beach and Pat Dalton come to an end?
4      MR. RAMSEY:  Before you answer that,
5      don't testify to any conversations you had
6      with Mr. Dalton or anybody at Harris Beach.
7      If you can answer the question without doing
8      that, go ahead.
9      MR. BROOK:  You are not suggesting
10      that the reasons for terminating a legal
11      relationship --
12      MR. RAMSEY:  I am not saying that.  I
13      want to make sure he is not negating
14      attorney/client privilege.
15      A.   Can you repeat the question?
16      MR. BROOK:  Could you please read that
17      back?
18      (Record read.)
19      A.   I believe it was a disagreement over
20  legal billing.
21      Q.   And so you thought that the Harris
22  Beach folks were billing you too much?
23      A.   Yes.
24      Q.   Was it in connection with anything
25  specific, any particular matter?

9 (Pages 30 - 33)

Page 34

L. Eber

1
2     A.   Yes.
3     Q.   What matter was that?
4     A.   The Wolf Concepts lawsuit.
5     Q.   Was Pat Dalton handling that?
6     A.   Yes.
7     Q.   And did you find other lawyers to
8  replace Pat Dalton?
9     A.   Yes.
10    Q.   Which lawyers?
11    A.   I can't remember right now.
12    Q.   Was it Underberg and Kessler?
13    A.   Could have been.
14    Q.   How did you get introduced to the
15  Underberg and Kessler firm?
16    A.   Alan Underberg and Irv Kessler, the
17  original partners.
18    Q.   When was the first time that you or a
19  company you controlled hired Underberg and Kessler
20  as counsel?
21    A.   Could have been when we left Harris
22  Beach, but I can't give you an exact date.
23    Q.   But as you sit here today you can't
24  remember any matters that they handled for you or
25  Eber Brothers prior to Wolf Concepts; correct?

Page 35

L. Eber

1
2     A.   Yes.
3     Q.   Who was your primary point of contact
4  with Underberg and Kessler?
5     MR. RAMSEY:  Form.
6     Go ahead.
7     A.   Well, it became Paul Keneally.
8     Q.   Who was it prior to that?
9     A.   Rachel.  I can't remember her last
10  name.
11    Q.   Why did you switch from Rachel to Mr.
12  Keneally?
13    A.   I believe she handled wealth
14  management or trusts and estates and Paul was a
15  litigator.
16    Q.   So the services you were looking for
17  were litigation services?
18    A.   What we had with Harris Beach.
19    Q.   Harris Beach did litigation and
20  corporate transaction work for Eber Brothers;
21  correct?
22    A.   Yes.
23    Q.   So was it the same lawyer Pat Dalton
24  that handled both of those things?
25    A.   Yes.

Page 36

L. Eber

1
2     Q.   I want to change topic briefly.
3     Did Eber Brothers own any real estate?
4     A.   Yes.
5     Q.   What did it own?
6     A.   Well, it owned real estate in Monroe
7  Avenue in Rochester.  There are warehouses there.
8  And it owned real in Buffalo warehouses there.
9  And it owned real estate in Syracuse.
10    Q.   Did it also own, and maybe this is
11  Monroe Avenue, headquarters and warehouse in
12  Rochester?
13    A.   Yes.  So that is the same.  The
14  warehouse was the headquarters and offices.
15    Q.   What was the address for that
16  building?
17    A.   3200 Monroe Avenue.
18    Q.   Was there another address that was
19  used for official purposes for Eber Brothers?
20    A.   I don't know.
21    Q.   What happened to the real estate
22  holdings of Eber Brothers?
23    A.   They were all sold off.
24    Q.   When was that?
25    A.   I don't have the date.  I don't

Page 37

L. Eber

1
2  remember the date.
3     Q.   Were those owned by Eber Brothers Wine
4  and Liquor Corp. or another entity?
5     A.   I don't know what entity but it was
6  some -- one of the Eber corporations.
7     Q.   How much was the headquarters building
8  sold for?
9     A.   I don't remember.
10    Q.   Does the number 4.15 million dollars
11  refresh your recollection?
12    A.   It's possible.
13    Q.   What happened with the income or the
14  proceeds -- withdrawn.
15    What happened to the proceeds of the
16  sale of the headquarters in Rochester?
17    A.   It went to building a consolidated
18  warehouse for Rochester and Buffalo in one
19  location.
20    Q.   So when was that?
21    A.   I don't remember the date.
22    MR. BROOK:  Let's mark this as
23  Plaintiffs' Exhibit 26.
24    (Plaintiffs' Exhibit 26, an article
25  found online on casshilldevelopment.com,

10 (Pages 34 - 37)

L. Eber

1
2    marked for identification, as of this date.)
3        Q.   I am showing you what has been marked
4    as Plaintiffs' 26.  It is an article found online
5    on casshilldevelopment.com and a part of the first
6    page of the exhibit handed to the witness has been
7    highlighted.
8            Do you see that highlighted portion?
9        A.   Yes.
10       Q.   And do you see that this article
11   refers to Cass Hill's 4.15 million dollar purchase
12   of the former Eber Brothers Wine and Liquor
13   Distribution Corp. Headquarters and it says some
14   other things about that, but do you see that part
15   of it?
16       A.   Yes.
17       Q.   Is that consistent with your
18   recollection of the purchase price paid for the
19   headquarters building?
20       A.   If that's what it says that's what it
21   is.  It could be, yes.
22       Q.   And do you see the date on this
23   article up at the top it says Sunday November 25,
24   2007?
25       A.   Yes.

L. Eber

1
2        Q.   So is that date consistent with what
3    you said a moment ago about using the proceeds to
4    build out a new facility?
5        A.   No.  I got confused with Monroe Avenue
6    and this.  The Monroe Avenue was sold and our
7    property in Buffalo was sold to consolidate into
8    this consolidated for Rochester and Buffalo and
9    then after 2007 when we went out of business that
10   was sold to this.
11       Q.   So what happened with the proceeds
12   received for the 2007 sale of the former
13   headquarters to Cass Hill?
14       A.   I don't remember.  I don't know.  I
15   would imagine --
16           MR. RAMSEY:  Don't guess.
17       Q.   Based on your many years of experience
18   with the Eber Brothers business, what is your best
19   educated guess as to what happened with the money
20   after it was sold?
21           MR. RAMSEY:  If you have an
22       understanding or a reasonable approximation
23       that's one thing.  Don't guess.
24       A.   It probably went to pay down debt.
25       Q.   Approximately, how much debt did Eber

L. Eber

1
2    Brothers have as of approximately November 2007?
3        A.   I don't remember.
4        Q.   When was the first time that you
5    recall learning that Southern Wine and Spirits was
6    interested in moving into the New York market?
7        A.   I don't remember.
8        Q.   Was it before or after you struck a
9    deal with NDC?
10       A.   You know, I can't remember the exact
11   date of it.
12       Q.   I am just asking not for the exact
13   date but timing wise.
14           Was learning about Southern's
15   intensions to come into New York one of the
16   reasons why you sought a partnership with NDC?
17       A.   You know, I don't remember the dates
18   of it of what you are asking.  I just don't.
19       Q.   You don't remember the sequence or
20   order?
21       A.   Not -- yes, not the...
22       Q.   Did Southern at any point in time
23   attempt to talk with you before it went into the
24   New York market about its intensions and proposing
25   a potential partnership or acquisition between

L. Eber

1
2    Southern and Eber Brothers?
3        A.   We had some casual conversations but
4    nothing actually formal.
5        Q.   Who participated in those
6    conversations?
7        A.   It would be the owners of Southern,
8    the Chaplins.
9        Q.   Did you meet with them in person?
10       A.   No.
11       Q.   Was it telephone calls?
12       A.   Telephone.  Some telephone calls, yes.
13       Q.   What were the different possibilities
14   that were discussed during those conversations?
15       A.   You know, I don't remember.  It goes
16   back to two thousand -- before 2007.
17       Q.   Did the Chaplins propose they might
18   purchase Eber Brothers?
19       A.   They had talked about joint venture or
20   something in New York, but nothing solid or
21   specific.
22       Q.   So separate from a joint venture, did
23   they also discuss the possibility of an
24   acquisition of Eber Brothers?
25       A.   Not an acquisition.  More of a joint

Page 42

L. Eber

1  L. Eber
2  venture.
3      Q.   What about a merger, did they discuss
4  that?
5      A.   I don't remember, yeah.
6      Q.   So did discussions you had with them
7  all involved some situation in which you would
8  remain in charge of Eber Brothers; correct?
9      A.   Yes.
10     Q.   Did they float any pricing in terms of
11 what they thought might pay Eber Brothers for
12 engaging in this joint venture?
13     A.   No.
14     Q.   So there was never any proposal from
15 Southern that they would acquire Eber Brothers for
16 an eight figure sum?
17         MR. RAMSEY:  Form.
18     A.   No.  There wasn't any figure that I
19 remember.
20     Q.   Did you ask them for any offers in
21 terms of how much money they would pay?
22     A.   It just wasn't in the discussion.
23     Q.   Why not?
24     A.   I don't know.
25     Q.   So when they proposed a joint venture,

Page 43

1  L. Eber
2  how did you respond to that?
3      A.   We listened to it.
4      Q.   And when you say we, who besides
5  yourself are you including in that?
6      A.   It would be John Ryan and Harris
7  Beach.
8      Q.   So you had lawyers involved in those
9  discussions?
10     A.   Yes.
11     Q.   Were they on the telephone or some
12 other way?
13     A.   Telephone.
14     Q.   Do you normally have casual
15 conversations with lawyers on the line?
16         MR. RAMSEY:  Form.
17     Q.   Is that a no?
18     A.   I don't remember.
19     Q.   Why did you involve the lawyers in
20 these conversations?
21     A.   I think you should answer that one.
22 You know, it is part of running a business.
23     Q.   After -- let's step back.
24         Eber Brothers ultimately told Southern
25 it was not interested in a joint venture; correct?

Page 44

1  L. Eber
2      A.   I don't think they ever told them
3  that.
4      Q.   So how did those conversations end?
5      A.   I think the joint venture was with
6  NDC.
7      Q.   Did you prefer NDC to Southern?
8      A.   At the time we thought it was a better
9  deal for Eber Brothers.
10     Q.   Why was that?
11     A.   We could continue managing the
12 business and they were very interested in
13 investing in Metropolitan New York.
14     Q.   So under the proposal by Southern you
15 would not continue managing the business; is that
16 correct?
17         MR. RAMSEY:  Form.
18     A.   We wouldn't manage Metropolitan New
19 York.  We might have managed upstate New York.
20     Q.   But with NDC you continued to manage
21 both; correct?
22     A.   Yes.
23     Q.   After the discussions with Southern
24 about a potential joint venture ended, how long
25 was it after then before Southern started moving

Page 45

1  L. Eber
2  into New York State?
3      A.   I think they were there during that
4  time.  They bought another wholesaler in
5  Metropolitan New York.
6      Q.   What company was that?
7      A.   Premiere Beverage.  Premiere out on
8  Long Island.
9      Q.   How long after the discussions ended
10 with Southern was it that Southern ended up hiring
11 a number of Eber Brothers employees away?
12     A.   I don't remember the amount of time
13 that it was.
14     Q.   Was it years later, months, weeks?
15     A.   I can't remember the exact time.
16     Q.   But you do remember that Southern
17 ultimately at some point hired a number of Eber
18 Brothers employees away from Eber Brothers?
19     A.   Yes.
20     Q.   Approximately, how many employees left
21 for Southern?
22     A.   Could have been 40 or 50.
23     Q.   And out of how many?
24     A.   I couldn't give you that figure.
25     Q.   What type of employees were those that

12 (Pages 42 - 45)

L. Eber

1
2  were hired?
3      A.   All types.
4      Q.   Did that include salespeople?
5      A.   Yes.
6      Q.   Did it include people that worked in
7  the warehouse?
8      A.   Yeah, probably.  I -- it could have.
9      Q.   Who was the highest level employee
10  that you recall leaving Eber Brothers for Southern
11  at that time?
12     A.   The manager of the upstate business.
13     Q.   Who was that?
14     A.   Dan Cisco.
15     Q.   Did he tell you why he was leaving?
16     A.   They offered him a lot of money.
17     Q.   Did he give you the opportunity to try
18  to match that?
19     A.   No.  Not that kind of money.
20     Q.   So is it fair to say Southern paid
21  these employees more than Eber Brothers could
22  afford to pay?
23     A.   Yes.
24     Q.   Aside from hiring a number of Eber
25  Brothers employees, did Southern do anything else

L. Eber

1
2  that affected Eber Brothers' ability to function
3  as a business?
4      A.   Yes.
5      Q.   What did it do?
6      A.   Took lines away from us.
7      Q.   How many lines?
8      A.   Multiple ones.  I can't remember how
9  many wine a spirit lines.
10     Q.   Anything else that it did?
11     A.   I can't remember.
12     Q.   At some point Eber Brothers filed a
13  lawsuit against Southern; is that right?
14     A.   Yes.
15     Q.   What was the basis for that lawsuit?
16     A.   Putting us out of business.
17     Q.   Why did you believe that was something
18  that was legally wrong?
19         MR. RAMSEY:  Form.
20         Go ahead.
21     A.   They took our employees and they took
22  our lines.  What else do we have.
23     Q.   Had there been any sort of
24  non-disclosure or confidentiality agreements
25  between Eber Brothers and Southern?

L. Eber

1
2      A.   I don't know.  I don't remember.
3  Excuse me, I should say I don't remember.
4      Q.   How was -- other than -- let me
5  withdraw that.
6         How many lawsuits were there filed
7  against Southern by Eber Brothers?
8      A.   I only remember one.
9      Q.   And other than filing a lawsuit, did
10  you do anything to else to fight back against
11  Southern?
12         MR. RAMSEY:  Form.
13     A.   Yeah.  We hired people to replace the
14  ones that had left us and we solicited suppliers
15  to replace the suppliers that left us.
16     Q.   And did you get any new suppliers
17  through the --
18     A.   Yes, some.
19     Q.   Approximately, how long did your
20  efforts to try to survive despite Southern moving
21  into New York go on for?
22     A.   Till we closed in '07 was it.
23     Q.   How was the final -- I will withdraw.
24         So at the end of the day Eber Brothers
25  reached an agreement with Southern where Eber

L. Eber

1
2  Brothers would end its operations in New York;
3  correct?
4      A.   Yes.
5      Q.   What did Eber Brothers receive in
6  exchange for agreeing to do that?
7      A.   Southern would take the inventories of
8  the lines that we had, would pay for them and the
9  suppliers would move over to them.  We would get
10  the money for the inventory.
11     Q.   And other than the inventory, was
12  there any other sorts of payments that were made
13  by Southern to Eber Brothers?
14     A.   Well, they had an agreement with me.
15  They hired me.
16     Q.   Any other payments that were made?
17     A.   It's possible.  I don't remember.
18     Q.   Did Southern also acquire Eber
19  Brothers' interests in certain operations that
20  were outside of New York State?
21     A.   Yes.
22     Q.   What were those?
23     A.   Ohio and Delaware.
24     Q.   What were the interests that Eber
25  Brothers had in Ohio?

13 (Pages 46 - 49)

Page 50

L. Eber

1
2      A.    They owned a brokerage company there.
3      Q.    What kind of brokerage?
4      A.    Spirit brokerage.
5      Q.    Was that a profitable company?
6      A.    Yes.
7      Q.    How much did Southern pay for that?
8      A.    I don't remember.
9      Q.    Was everything that Southern acquired
10  part of one big deal?
11     A.    It could have been.
12     Q.    What guarantee did Southern have that
13  after agreeing to close Eber Brothers that you and
14  one of the remaining Eber entities wouldn't just
15  start all over again in New York?
16         MR. RAMSEY:  Form.
17     A.    You would have to go back to the
18  agreement we signed with them.  It's possible
19  there that we agreed to.
20     Q.    So you don't remember whether there
21  were any agreements not to compete with Southern?
22         MR. RAMSEY:  Form.
23     A.    I think there could have been, but I
24  don't remember exactly.
25     Q.    Do you recall in approximately 2008 or

Page 51

L. Eber

1
2  2009 having a conversation with your nephew Dan
3  Kleeberg about his desire to start a wine import
4  business in the state of Florida?
5      A.    I have seen that he said that, but I
6  don't remember it.
7      Q.    Are you aware that he owns a company
8  called Prestige?
9      A.    Yes.
10     Q.    And so you don't recall a conversation
11  with Dan about another possible name he wanted to
12  use for that business?
13     A.    No.
14     Q.    After Eber Brothers Wine and Liquor
15  wound down, how frequently did you speak with Dan
16  Kleeberg in the years after that?
17     A.    Consistently, a lot.
18     Q.    What do you mean by that; once a week?
19     A.    Whenever something came up that we
20  wanted to discuss.  He wanted to discuss or I did.
21     Q.    So approximately, how frequently was
22  that?
23     A.    There was no specific frequency.  It
24  could have been every day.  It could have been
25  once a week.  I don't remember.

Page 52

L. Eber

1
2      Q.    Do you recall ever talking with Dan
3  Kleeberg about the possible job opportunities with
4  Southern?
5      A.    Yes.
6      Q.    When was that?
7      A.    After we shut down.
8      Q.    And at that point in time had you
9  begun working for Southern?
10     A.    I don't remember the exact time that
11  that would have been.
12     Q.    What was the job opportunity that you
13  discussed with Dan?
14     A.    We are having them employ him in
15  upstate New York or wherever.
16     Q.    Did Dan end up interviewing?
17     A.    Yes.
18     Q.    What came out of that interview?
19     A.    I wasn't there at the interview, but
20  nothing seemed to happen there between them.
21     Q.    Did you ask anyone from Southern what
22  happened in that meeting?
23     A.    I didn't get into it with them.  You
24  know, he just -- I asked Dan and he said either he
25  wasn't interested or whatever with them.

Page 53

L. Eber

1
2         MR. BROOK:  Let's take a five minute
3  break.
4         MR. RAMSEY:  I was going to say this
5  is a good point.
6         THE VIDEOGRAPHER:  This marks the end
7  of media unit one in the videotaped
8  deposition of Lester Eber.  We are going off
9  the record.  The time is 10:27.
10        (Recess taken.)
11        THE VIDEOGRAPHER:  This marks the
12  beginning of media unit number two in the
13  videotaped deposition of Lester Eber.  We
14  are going on the record.  The time is 10:42.
15  BY MR. BROOK:
16     Q.    I want to return to the topic of the
17  Southern deal that was struck to end Eber Brothers
18  operations in New York.
19        You mentioned that there was an
20  agreement between you and Southern for you to work
21  for Southern as a result of that; correct?
22     A.    Yes.
23     Q.    How did the idea of you working for
24  Southern get brought up in your negotiations with
25  Southern?

14 (Pages 50 - 53)

Page 54

L. Eber

1
2    A.   They said to me that, you know, you
3    are out of business and that we could use someone
4    to help us with government relations in the State
5    of New York and we know your background in
6    governmental affairs and we would like you to
7    represent us for the State of New York in
8    governmental relations with it.
9    Q.   Did you agree to do that?
10    A.   Yes.
11    Q.   Were there any other aspects to your
12    agreement to work with Southern beside doing
13    governmental relations?
14    A.   At that time it was just governmental
15    relations.
16    Q.   At some point later -- first withdraw
17    that question.
18         Did you continue to provide
19    governmental relations services for Southern
20    continuously since the Southern deal took place in
21    2007?
22    A.   Yes.
23    Q.   Are you still providing governmental
24    relations services for Southern?
25    A.   Yes.

Page 55

L. Eber

1
2    Q.   Has the governmental relations work
3    that you have done for Southern changed at all in
4    the years since it began?
5    A.   Yes.
6    Q.   How so?
7    A.   I handled compliance and governmental
8    relations for the State of New York.
9    Q.   So you have taken on additional duties
10    of handling compliance?
11    A.   Yes.
12    Q.   When did that occur?
13    A.   It was a couple of years after I had
14    done, two or three years after I had done
15    governmental relations, just governmental
16    relations.
17    Q.   Did the nature of the work that you
18    were doing on the governmental relations side
19    change in any other way since the relationship
20    began in 2007?
21    A.   It's become more intense.  New York is
22    a very heavily regulated state.  When Elliot
23    Spitzer was Attorney General he did an
24    investigation of the industry and ended up with a
25    consent order in Eerie County that the industry

Page 56

L. Eber

1
2    lives under in the State of New York and it is
3    very tight.
4    Q.   When did that consent order go in?
5    A.   '06.
6    Q.   So that was before you started working
7    with Southern?
8    A.   Yes.
9    Q.   Did you have any involvement in --
10    what was your involvement, if any, with the
11    consent order that went into place?
12         MR. RAMSEY:  Form.
13    A.   Eber Brothers was involved in it
14    because we were still in business when it went in
15    originally.
16    Q.   So was Eber Brothers a target of the
17    Attorney General's investigation?
18         MR. RAMSEY:  Form.
19    A.   Any license in the state was.
20    Q.   And why was that?
21    A.   Who they would go to to find out what
22    was going on or to investigate.
23    Q.   What was it in terms of wrongdoing
24    that was being investigated?
25    A.   Illegal behavior imposed on the laws,

Page 57

L. Eber

1
2    payoffs, giving incentives to buy.
3    Q.   So by payoffs, do you mean things like
4    kickbacks?
5    A.   Yes.
6    Q.   And what do you mean by incentives to
7    buy?
8    A.   Free television sets or all kinds of
9    things.
10    Q.   So not necessarily cash kickbacks but
11    also other sorts of gifts?
12    A.   Yes.
13    Q.   Did Eber Brothers ever provide
14    kickbacks to any of its suppliers?
15         MR. RAMSEY:  Form.
16    A.   Suppliers?
17    Q.   Yes.
18    A.   Not suppliers, no.
19    Q.   To other parties that it worked with?
20    A.   I wouldn't say kickbacks.  They had
21    situations that were not under the law that went
22    on.
23    Q.   What was that?
24    A.   You know, television sets or gimmicks
25    or things, incentives to buy.

15 (Pages 54 - 57)

Page 58

L. Eber

1
2     Q.    Those were given to retailers?
3     A.    Yes.
4     Q.    Who at Eber Brothers was involved in
5  providing television sets to --
6     A.    Sales management I would imagine.
7     Q.    Was this something that you were aware
8  was going on?
9     A.    Yes, I was.  Some of it, yes.
10    Q.    What --
11    A.    Yes.
12    Q.    What did you do about it when you
13  learned that it was going on?
14    A.    I tried to control it the best I
15  could, but it was a general condition in the
16  market.
17    Q.    So was there a concern on your part
18  that if Eber Brothers didn't do this kind of thing
19  then the retailers would just go with another
20  retailer that did?
21          MR. RAMSEY:  Form.
22    A.    Yes.
23    Q.    So as a result of the consent order,
24  did all of the wholesalers agree to end that
25  practice?

Page 59

L. Eber

1
2     A.    Yes.
3     Q.    Was Eber Brothers required to pay any
4  sort of fines or penalties?
5     A.    Yes.
6     Q.    What was the fine or penalty?
7     A.    I don't remember.  It was a
8  substantial sum.
9     Q.    What do you mean by substantial?
10    A.    Hundreds of thousands.
11    Q.    But do you believe it was under a
12  million dollars?
13    A.    Yes.
14    Q.    When was that paid?
15    A.    I don't remember.
16    Q.    Was it at approximately the time that
17  the consent order went into place?
18    A.    Yeah.  Well, yes.  That's when it was
19  done.
20    Q.    Did the Attorney General's
21  investigation affect Eber Brothers' relationships
22  with suppliers in any way?
23    A.    I don't remember that.
24    Q.    Did Eber Brothers lose any retailers
25  as a result of the Attorney General's

Page 60

L. Eber

1
2  investigation or the consent order?
3     A.    I don't understand your question.
4     Q.    Did any retailers stop doing business
5  with Eber Brothers as a result of the Attorney
6  General's investigation?
7     A.    They could have.  Or done less
8  business.
9     Q.    So returning to the work with
10  Southern, so the 2006 consent order, how does that
11  affect any of the work that you have done for
12  Southern?
13    A.    Well, it's the blueprint of how you
14  have to work in the State of New York.
15    Q.    Is that something you advised Southern
16  about?
17    A.    Yes.
18    Q.    Is that something you continue to
19  advise Southern about?
20    A.    Yes.
21    Q.    When you started doing compliance work
22  for Southern in addition to governmental affairs,
23  did the terms of your consulting arrangement with
24  them change at all?
25    A.    No.

Page 61

L. Eber

1
2     Q.    So you didn't ask for more money for
3  taking on more responsibility?
4     A.    No.
5     Q.    Why not?
6     A.    This is what they said they were
7  paying me and that's the job and they have given
8  me a lot of support in what I do.
9          MR. BROOK:  Let's go ahead to the next
10  exhibit Plaintiffs' 27.
11          (Plaintiffs' Exhibit 27, a document
12  entitled Consulting Agreement Bates numbers
13  EB 00000702 through 711, marked for
14  identification, as of this date.)
15    Q.    So I am showing you what has been
16  marked as Plaintiffs' Exhibit 27.  It is a
17  document entitled Consulting Agreement Bearing
18  Bates numbers EB 00000702 through 711.
19          Do you recognize this document?
20    A.    Yes.
21    Q.    What is it?
22    A.    It is a consulting agreement with
23  Southern.
24    Q.    And it is between you and Southern
25  Wine and Spirits of Upstate Inc.?

16 (Pages 58 - 61)

Page 62

L. Eber

1
2    A.   If that's what it says, yes.
3    Q.   What was Southern Wine and Spirits
4  Upstate Inc.?
5    A.   That would be their upstate business
6  as opposed to Metropolitan New York.
7    Q.   Earlier you referred to a company
8  called Southern Glazer.
9         What is that?
10   A.   They merged with Glazer out of Dallas,
11  Texas.
12   Q.   When did that merger occur?
13   A.   A couple of years ago I believe.
14   Q.   But for all intents and purposes in
15  terms of your relationship with that, with the
16  Southern company, the merger did not, with Glazer
17  did not affect that relationship; correct?
18   A.   No.
19   Q.   How was the consulting agreement
20  Exhibit 27 negotiated?
21   A.   You have to ask a lawyer.  Probably
22  Pat Dalton.
23   Q.   So Pat Dalton negotiated this for you?
24   A.   I would -- I believe so.  I can't
25  think of anyone else.

Page 63

L. Eber

1
2    Q.   Did you pay Pat Dalton for negotiating
3  this agreement yourself?
4    A.   I believe he billed the company.
5    Q.   And why did he bill the company for
6  doing work to negotiate an agreement between you
7  personally?
8    A.   I don't remember who paid him.
9    Q.   But is it fair to say you don't
10  remember paying Pat Dalton yourself; correct?
11        MR. RAMSEY:  Form.
12   A.   I just don't remember.  It's possible
13  but I don't remember who paid him.
14   Q.   And just to be totally clear, if you
15  look at the last page 9, what's listed page 9 of 9
16  that's your signature; correct?  There are
17  two-page 9s.
18        MR. RAMSEY:  (Indicating.)
19   A.   Yes, the first one.
20   Q.   That is your signature?
21   A.   Yes.
22   Q.   How was -- let's step back.
23        So this was an agreement originally
24  drafted with a five year term; correct?
25   A.   Yes.

Page 64

L. Eber

1
2    Q.   Why was it limited to five years?
3    A.   That's what they would give me because
4  I needed a job and they had worked with us to help
5  us stay out of bankruptcy and I felt an obligation
6  to work with them and they thought that was a fair
7  amount of time and gave me the time to set up a
8  structure for them of lobbyists with the state.  I
9  am a lobbyist myself and to represent them in the
10  legislature with the State Liquor Authority and
11  the Governor's Office.
12   Q.   Why do you say that you needed a job?
13   A.   Everyone needs a job.  We lost the
14  business.  We lost everything in New York.
15   Q.   You still had a job with Eber
16  Connecticut; correct?
17   A.   Eber Connecticut was not in very good
18  condition at that time.
19        MR. BROOK:  Let's go ahead and get
20        another exhibit going here.  Mark this as
21        Plaintiffs' 28.
22        (Plaintiffs' Exhibit 28, a series of
23        W-2s that were produced by the parties in
24        discovery Bates numbers EB 00021420 through
25        428, marked for identification, as of this

Page 65

L. Eber

1
2  date.)
3    Q.   Plaintiffs' 28 is a series of W-2s
4  that were produced by the Eber parties in
5  discovery bearing Bates numbers EB 00021420
6  through 428.
7        Do you recognize the documents that
8  are copied off of this exhibit?
9    A.   Yes.
10   Q.   What are they?
11   A.   W-2s.
12   Q.   And do you see on the first page it
13  has W-2s for the years 2007, 2008 and 2009?
14   A.   Mm-hmm.
15        MR. RAMSEY:  Yes?
16   Q.   Is that a yes?
17   A.   Yes.
18   Q.   And so is it correct that according to
19  this exhibit Eber Brothers Wine and Liquor Corp.
20  paid you 303,021 dollars for the year 2007?
21   A.   Yes.
22   Q.   So that was the year when the
23  consulting agreement we were just looking at was
24  executed; correct?
25   A.   Yes.

17 (Pages 62 - 65)

Case 1:16-cv-09517-LAK-KHP   Document 193-1   Filed 02/25/19   Page 18 of 77

L. Eber

1
2    Q.   And then the next year you received a
3  W-2 from Eber Connecticut LLC; correct?
4    A.   Yes.
5    Q.   And in that year Eber Connecticut LLC
6  paid you wages, tips and other compensation
7  totalling 189,788 dollars; correct?
8    A.   Yes.
9    Q.   So not quite as much paid by Eber
10 Connecticut as you had made the year before from
11 Eber Brothers Wine and Liquor; correct?
12   A.   That's correct.
13   Q.   Just under two thirds of the amount;
14 correct?
15   A.   Yes.
16   Q.   Now the consulting agreement provided
17 for an annual sum for five years of six hundred
18 thousand dollars per year; correct?
19   A.   Yes.
20   Q.   So that was more than twice what you
21 were paid in terms of salary by Eber Brothers Wine
22 and Liquor Corp.?
23   A.   Yes.
24   Q.   How did that amount get determined in
25 the course of negotiations?

L. Eber

1
2    A.   They are a very large company.  They
3  are 17 billion today.  They do 2 billion in New
4  York.  Two thousand employees.  They pay big
5  salaries.
6    Q.   So did you ask for this consulting
7  agreement?
8    A.   They offered it to me.
9    Q.   And did they ask for anything else in
10 return besides your governmental affairs services?
11      MR. RAMSEY:  Form.
12   A.   They gave me the freedom to set up a
13 lobbying governmental affairs structure in the
14 State of New York for them.
15   Q.   Did they ask for anything else in
16 return for agreeing to this six hundred thousand
17 dollars a year for five years payment?
18      MR. RAMSEY:  Form.
19   A.   No.
20      MR. RAMSEY:  Form objection to that
21 question.
22   Q.   So Southern did not -- let's step
23 back.
24      So six hundred thousand a year for
25 five years, that's three million dollars total;

L. Eber

1
2  correct?  Is that a yes?
3    A.   Yes.
4    Q.   In connection with the overall
5  transaction, Southern ended up giving what was, I
6  suppose some kind of a loan in the amount of three
7  million dollars to one of the Eber companies; is
8  that right?
9    A.   Yes.  I don't know if it was a loan.
10 It was money that the Eber companies owned, owed
11 Southern for the money they came up with to keep
12 us out of bankruptcy.
13   Q.   So it wasn't a loan per se but one or
14 more of the Eber companies agreed that they owed
15 Southern three million dollars as a result of the
16 deal; correct?
17   A.   Yes.  As a result of moneys that were
18 paid to them to pay them back for the money they
19 advanced us to keep us out of bankruptcy.
20   Q.   So how much money did Southern advance
21 to the Eber companies not counting your consulting
22 agreement?
23   A.   I don't remember the figure.  It was
24 substantial.
25   Q.   Was it more than three million

L. Eber

1
2  dollars?
3    A.   Yes.
4    Q.   So of the amount of money that was
5  advanced, Eber Brothers agreed to pay back three
6  million of it; correct?
7       MR. RAMSEY:  Form.
8    A.   They paid back all the money that was
9  advanced to them.
10   Q.   So separate from advancements, did
11 Southern also make payments that were not subject
12 to repayment to Eber Brothers not counting
13 payments for inventory?
14   A.   No.
15   Q.   So is it just a coincidence then that
16 the amount of money that Eber Brothers was
17 required to pay Southern three million dollars is
18 the same amount that the consulting agreement
19 provided to be paid to you?
20      MR. RAMSEY:  Form.
21   A.   I never thought of it that way at all.
22 I never thought of that.
23   Q.   Besides Patrick Dalton, was anyone
24 else involved in negotiating or reviewing your
25 consulting agreement with Southern?

18 (Pages 66 - 69)

Page 70

L. Eber

1
2    A.   I don't remember.
3    Q.   Was Mike Gumaer involved in the
4  consulting agreement with Southern?
5    A.   He would be aware of anything I was
6  involved in.  Everything I did he knew about.
7    Q.   Do you have any specific recollections
8  of discussing the consulting agreement with Mike
9  Gumaer?
10    A.   I don't remember, but there is nothing
11  that I would have done that he would not be aware
12  of.
13    Q.   And do you recall discussing the
14  consulting agreement with any other employees of
15  Eber Brothers?
16    A.   Possibly the financial officer John
17  Ryan.
18    Q.   You say possibly.
19         You don't specifically recall doing
20  so?
21    A.   I can't remember.
22    Q.   And the consulting agreement was not
23  specifically approved by the board of directors;
24  correct?
25    A.   I don't know.

Page 71

L. Eber

1
2    Q.   In addition to providing governmental
3  affairs services, Southern also required you to
4  enter into a restrictive covenant; correct?
5    A.   Yes.
6    Q.   Why was that?
7    A.   It was what they wanted so that I
8  wouldn't compete or someone else would hire me for
9  doing governmental work.  It is a specialty.
10    Q.   And after the initial five-year term,
11  did you continue to have -- withdrawn.
12         After the initial five-year term, were
13  there subsequent agreements between you and
14  Southern for consulting services?
15    A.   There is no agreement.  I am a
16  consultant for them.
17    MR. BROOK:   Let's go to the next
18  Exhibit 29.
19         (Plaintiffs' Exhibit 29, a series of
20  letters that appears to be written on Lester
21  Eber's letterhead bearing Bates stamps EB
22  695 through 701, marked for identification,
23  as of this date.)
24    Q.   I am showing you what has been marked
25  as Plaintiffs' Exhibit 29.  It is a series of

Page 72

L. Eber

1
2  letters that appears to be written on Lester
3  Eber's letterhead bearing Bates stamps EB 695
4  through 701.
5         Do you see these letters?
6    A.   Yes.
7    Q.   Do these refresh your recollection
8  that there was a subsequent agreement, subsequent
9  agreements between you and Southern concerning
10  consulting?
11    A.   I think you are a little confused on
12  this.
13    Q.   Okay.  Help me understand.
14    A.   This is an agreement.  I am a
15  registered lobbyist in the State of New York.
16  JACO is the regulatory agency that supervises
17  lobbyists and they pay me to be a lobbyist.  I
18  think it is ten thousand dollars a year and I
19  happen to have an agreement in order to lobby with
20  the governmental agencies and the Governor's
21  Office in the State of New York and that's what
22  this is.
23    Q.   So are you saying are there any other
24  -- let's step back.
25         So just looking at the first page of

Page 73

L. Eber

1
2  this exhibit that's a letter dated January 1, 2012
3  addressed to Steven Becker.
4         Do you see that?
5    A.   Yes.
6    Q.   Who is Steven Becker?
7    A.   He is principal in charge of
8  governmental affairs for the United States for
9  Southern Glazers.
10    Q.   And this letter, is this something you
11  wrote up or the language was given to you by
12  someone else?
13    A.   I don't remember, but it is what has
14  to be done to give the JACO in New York.  I have
15  to be a registered lobbyist.  It is required.
16    Q.   And is the contract between you and
17  the company that you are lobbying for something
18  that has to be disclosed to the government?
19    A.   Yes, the State of New York.  It is
20  disclosed to the State of New York, yes.
21    Q.   So when we were looking at the
22  consulting agreement, Exhibit 27, is that a
23  document that was disclosed to the State of New
24  York?
25    A.   No.

19 (Pages 70 - 73)

Page 74

L. Eber
1
2    Q.   Why not?
3    A.   It's not a lobbying agreement.  This
4 is a governmental lobbying agreement that I have
5 to have as being a lobbyist, a registered
6 lobbyist.
7    Q.   So --
8    A.   The other is a private agreement
9 between myself and Southern.
10    Q.   So for the years 2007 through 2011,
11 was there a separate lobbying agreement between
12 you and Southern?
13    A.   There should have been.
14    Q.   Do you recall whether there was an
15 actual one?
16    A.   I don't remember, but I don't know if
17 they required the agreements changed and I can't
18 remember everything, but I think with the JACO
19 regulations Southern told me that, you know, I
20 have to have a -- because of the time I am
21 spending in Albany with the legislature and the
22 State Liquor Authority or with the Governor's
23 Office that I have to register as a lobbyist and I
24 had not registered as a lobbyist before.
25    Q.   So for the year 2012, the year covered

Page 75

L. Eber
1
2 by page one of Exhibit 29, what was your total
3 compensation received from Southern Wine and
4 Spirits for all your activities on their behalf
5 lobbying, consulting or otherwise?
6    A.   I don't remember.
7    Q.   According to this document it says the
8 fee for your services covered by it was ten
9 thousand dollars?
10    A.   Oh, for lobbying.  Yes, for being a
11 registered lobbyist was 10,833 a month is what I
12 get from them.
13    Q.   And were you paid other sums as well?
14    A.   I was paid yes, as a consultant.  Yes.
15 RQ       MR. BROOK:  We request that all
16    payment records between Mr. Eber and
17    Southern be produced including tax forms and
18    any other agreements that may exist that
19    show fees for consulting or other services
20    beyond the amount reflected on this Exhibit
21    29.
22       MR. RAMSEY:  I understand your
23    request.
24 BY MR. BROOK:
25    Q.   You said you don't remember the exact

Page 76

L. Eber
1
2 compensation.
3       What is your best estimate of what
4 your annual compensation from Southern has been in
5 total for any of the years from 2012 through the
6 present?
7       MR. RAMSEY:  Form.
8       Go ahead.  If you can give an
9    estimate, go ahead.
10    A.   Yeah, I think it's twenty-five
11 thousand a month.
12    Q.   Do you recall attending a settlement
13 conference in this case in early September last
14 year?
15    A.   Yes, I believe so.
16    Q.   Do you remember that at one point
17 everyone except for Mr. Gumaer's attorney was
18 sitting in the courtroom with the judge in a
19 circle and we were talking about certain fact
20 questions that the plaintiffs had?
21    A.   I believe it went on.  I don't
22 remember the questions.
23    Q.   Do you recall that I brought up the
24 topic of your consulting agreement with Southern
25 at that point?

Page 77

L. Eber
1
2    A.   I don't remember it.
3    Q.   So you don't remember saying that that
4 consulting agreement and the payments relating to
5 it ended back in 2012?
6       MR. RAMSEY:  Form.
7    A.   Yes.  I do remember the agreement
8 ended after five years, the consulting agreement.
9    Q.   But is it your testimony that at least
10 half or approximately half of the payments
11 continued in the years afterwards?
12       MR. RAMSEY:  Form.
13    A.   Yes.
14    Q.   It is your testimony that's not
15 pursuant to any kind of agreement between you and
16 Southern?
17    A.   Yes.
18    Q.   So how does the amount of money that
19 Southern pays you get determined?
20    A.   It is what they feel my services are
21 worth.
22    Q.   So what happens if Southern decides to
23 pay you nothing for your services?
24    A.   I am through.
25    Q.   Meaning you are not going to provide


Page 78

L. Eber
services for Southern anymore?
A. I won't be involved with them, that's correct, yes.
Q. Other than monthly payments of approximately twenty-five thousand dollars per month, are there any other benefits or perks that you receive from Southern?
MR. RAMSEY: Form.
A. I don't get any fringe benefits from them of any kind. I do get expenses, legitimate business expenses.
Q. Do you have an expense credit card for Southern?
A. No.
Q. So how do you submit your expenses to Southern?
A. I submit them monthly.
Q. And are you still bound by any kind of restrictive covenant with Southern?
MR. RAMSEY: Form.
A. I don't believe so.
Q. So you believe at this point if you went and tried to start up the Eber Brothers Wine and Liquor business in New York that would not be

Page 79

L. Eber
something that would violate any agreement you have with Southern?
MR. RAMSEY: Form.
A. I don't know about that. It's not something I am going to do.
Q. I am going to change topics now.
How did you, if you know, how did it come to pass that you were named a trustee of the Allen Eber trust?
A. I do not know.
Q. Is this something that you had discussed with your father before his passing?
A. No.
Q. What is your understanding of what your responsibilities were as a named trustee of the Allen Eber trust?
A. My responsibilities?
Q. Yes.
As a trustee, what did that mean that you had to do?
MR. RAMSEY: Form.
A. With the -- work with the other co-trustees in managing the Eber assets.
Q. And for whom's benefit did you have to

Page 80

L. Eber
manage the Eber assets?
MR. RAMSEY: Form.
A. For the beneficiaries of the trust.
Q. Who were the beneficiaries of the trust?
A. Myself and my sisters.
Q. And after your sisters passed, who were the other beneficiaries of the trust at that point?
A. It was their children.
Q. And that is for your sister Nan.
What was her child's name?
A. Mildred was my sister.
Q. Sorry. I think I was using her middle name.
What was Mildred's daughter's name?
A. Audrey.
Q. And your sister Sally, what were her kid's names?
A. Danny and Lisa.
Q. After your sisters passed, did you continue to understand you had an obligation to manage the trust for the benefit of your nieces and nephew?

Page 81

L. Eber
A. I didn't manage the trust. I worked with the other two trustees.
Q. Who were the other two trustees?
A. Mike Gumaer and the bank.
Q. What was Mike Gumaer's involvement in managing the trust?
A. He was a lawyer and he was put there by my father to work and guide me in the management of the business and to work with me in the trust.
Q. Was Mike Gumaer a lawyer for the trust?
MR. RAMSEY: Form.
A. No. He was a lawyer for Eber Brothers but he was a trustee of the trust.
Q. What was the bank's responsibility with respect to the trust?
A. They were there. They did a lot of the paperwork and legal work of the operation of the trust.
Q. You understood that the Eber Brothers business was a trust asset; correct?
A. Yes.
Q. What did that mean in terms of how it

Veritext Legal Solutions
212-267-6868 www.veritext.com 516-608-2400

Page 82

1        L. Eber
2    affected your management of the Eber Brothers
3    business?
4        MR. RAMSEY:  Form.
5        MR. CALIHAN:  Form.
6    A.    I don't understand the question.
7    Q.    Did the fact that the Eber Brothers
8    business was owned by the trust affect the way in
9    which you managed the Eber Brothers business at
10   all?
11       MR. RAMSEY:  Form.
12   A.    I reported to the trust.
13   Q.    So since you were a co-trustee --
14   withdrawn.
15       Putting aside who you reported to, did
16   you understand that you had an obligation to run
17   the Eber Brothers business for the benefit of the
18   trust beneficiaries?
19       MR. RAMSEY:  Form.
20   A.    Could you repeat that question?
21   Q.    The Eber Brothers business, at the top
22   level there was Eber Brothers and Co., Inc.;
23   correct?
24   A.    Yes.
25   Q.    And is it correct that all of the

Page 83

1        L. Eber
2    shares of that business, at least all the voting
3    shares, were controlled by the Allen Eber trust?
4    A.    Yes.
5    Q.    And is it your understanding that it
6    is the voting common shareholders to whom a
7    corporate officer owes a primary duty of care?
8        MR. RAMSEY:  Form.
9    A.    I don't have an answer for you on
10   that.  I don't know.
11   Q.    Who are the other shareholders in Eber
12   Brothers and Co., Inc. besides the Allen Eber
13   Trust?
14   A.    There was common non-voting stock was
15   owned by myself and my sisters.
16   Q.    Did anyone else own Eber Brothers and
17   Co., Inc. stock?
18   A.    No.
19   Q.    Did you have any understanding as to
20   whether -- withdrawn.
21       So you did understand that as a
22   corporate officer and a director you had a
23   fiduciary duty towards the shareholders of the
24   company; correct?
25       MR. CALIHAN:  Objection to form.

Page 84

1        L. Eber
2        MR. RAMSEY:  Form.
3    A.    Yes, I believe so.
4    Q.    So with respect to the company Eber
5    Brothers and Co., Inc., you understood you had a
6    fiduciary duty with respect to the trust, your
7    sisters and yourself?
8        MR. RAMSEY:  Form.
9    Q.    Correct?
10   A.    Yes.
11   Q.    And did you understand that when you
12   owe fiduciary duties to multiple individuals at
13   the same level like that that you are not allowed
14   to prefer one individual shareholder over another
15   individual shareholder?
16       MR. CALIHAN:  Objection to form.
17       MR. RAMSEY:  Form.
18   A.    I never got into any of this.  This is
19   something I just did my job with the company and
20   reported to the trustees of the trust.
21   Q.    Was it your understanding that you
22   could issue dividends or distributions to some
23   shareholders but not others?
24   A.    I don't understand the question.  It's
25   is something I never -- I don't have an

Page 85

1        L. Eber
2    understanding of what you are asking.
3    Q.    In terms of Eber Brothers and Co.,
4    Inc., that held the stock of other Eber Brothers
5    entities; correct?
6    A.    Yes.
7    Q.    Which entities did it control?
8    A.    Whatever ones that were there at the
9    time.
10   Q.    So that included Eber Brothers Wine
11   and Liquor Corp.; correct?
12   A.    Yes.
13   Q.    Were there other businesses such as a
14   framing business?
15   A.    No.
16   Q.    Or --
17   A.    The produce business.
18   Q.    Produce business.
19       What was that called?
20   A.    Eber and Co.
21   Q.    When did Eber and Co. stop operations?
22   A.    Eber and Co. was a produce business.
23   Stopped quite a few years ago.  I don't have the
24   date.
25   Q.    Did you ever work for that produce

22 (Pages 82 - 85)

Page 86

L. Eber

1
2  business?
3      A.  Yes.
4      Q.  When was that?
5      A.  In high school and college.
6      Q.  Was it still operating at the time
7  that you graduated from college?
8      A.  Yes.
9      Q.  Who managed that?
10     A.  Audrey Hays' father.
11     Q.  What was his name?
12     A.  Darwin Boslov, B-O-S-L-O-V.
13     Q.  So not likely a creationist?
14     A.  What?
15     Q.  Bad joke.
16         Returning to Eber Brothers Wine and
17  Liquor Corp., you were the president of that
18  entity; correct?
19     A.  Eventually.
20     Q.  And what was your position with
21  respect to Eber Brothers and Co., Inc. at the same
22  time you were president of Eber Brothers Wine and
23  Liquor Corp.?
24     A.  I was president of that too.
25     Q.  Besides Eber Brothers and Co., Inc.,

Page 87

L. Eber

1
2  were there any other shareholders in Eber Brothers
3  Wine and Liquor Corp. when you were president of
4  it?
5      A.  Not that I remember.
6      Q.  So as president of Eber Brothers Wine
7  and Liquor Corp. you understood that your
8  fiduciary duties to the shareholders ran to
9  ultimately the Allen Eber Trust; correct?
10         MR. RAMSEY:  Form.
11     A.  I reported to the Allen Eber Trust.
12     Q.  And Eber Brothers Wine and Liquor
13  Corp. in turn opened all of the shares in Eber
14  Brothers Wine and Liquor Metro Inc. once that was
15  created in the nineties; correct?
16     A.  I don't remember.  It's possible, but
17  I don't remember.
18     Q.  Are there any Eber Brothers entities
19  that were owned or at one point controlled by Eber
20  Brothers and Co., Inc., where you did not believe
21  that you had fiduciary duties to the beneficiaries
22  of the trust?
23         MR. RAMSEY:  Form.
24     A.  No.
25     Q.  At some point you ended up resigning

Page 88

L. Eber

1
2  as president of Eber Brothers Wine and Liquor
3  Corp.; correct?
4      A.  Yes.
5      Q.  But you remained president of Eber
6  Brothers and Co., Inc.?
7      A.  Yeah, it's possible.  I don't
8  remember.  There are a lot of companies.  It can
9  get confusing.
10     Q.  What is your current position with
11  Eber Brothers and Co., Inc.?
12     A.  My current position with Eber Brothers
13  and Co.?  I could be a director.  I don't remember
14  what else.  The company actually there are so many
15  of them it confuses me.  I would have to look at
16  what it actually is.
17     Q.  Other than yourself, do you recall
18  anyone else whoever served as president of Eber
19  Brothers and Co., Inc.?
20     A.  It's possible there could be somebody
21  else.
22     Q.  What is Wendy's position with Eber
23  Brothers and Co., Inc.?
24     A.  She may be president of it.
25     Q.  When is the last time there was any

Page 89

L. Eber

1
2  kind of election of either officers or directors
3  for Eber Brothers and Co., Inc.?
4      A.  I don't remember.
5      Q.  Why did you resign as president of
6  Eber Brothers Wine and Liquor Corp.?
7      A.  Because it didn't see -- it didn't --
8  there was nothing for me to do in Eber Wine and
9  Liquor Corp. anymore.  I was working for Southern
10  in New York and then I was involved in Eber
11  Connecticut.
12     Q.  Did someone replace you as president
13  of Eber Brothers Wine and Liquor Corp.?
14     A.  I believe so.
15     Q.  Who was that?
16     A.  It could be Wendy Eber.  I don't
17  remember.
18     Q.  Well, if there was nothing for you to
19  do, was there something for Wendy Eber to do?
20     A.  Yes.
21         MR. RAMSEY:  Form.
22     Q.  What was that?
23     A.  She has a very strong financial
24  background and there were a lot of problems there
25  and she was very capable in relating to solving

23 (Pages 86 - 89)

L. Eber

1
2  those problems and dealing with regulatory
3  agencies and moneys that were owed and different
4  things that were thrown against the company.
5      Q.   Which regulatory agencies are you
6  referring to?
7      A.   Anyone that would -- any financial
8  ones that would be involved in any business.  No
9  one in particular but there are different agencies
10 that any business confronts with.
11     Q.   So there was no particular regulatory
12 agency or governmental or quasi governmental body
13 that you were specifically referring to when you
14 said that Wendy would need to interact with them
15 as president of the Eber Brothers Wine and Liquor
16 Corp.?
17     A.   Well, you know the problems the
18 company had with the past Pension Benefit
19 Guarantee Corporation.
20     Q.   So that's one.
21     A.   And whatever other ones in different
22 situations that the company was faced with.
23     Q.   What was the situation with Pension
24 Benefit Guarantee Corp.?
25     A.   That Eber Brothers had a defined

L. Eber

1
2  benefit pension plan going back to 1950s and after
3  they couldn't afford to make the payments and so
4  the Pension Benefit Guarantee Corporation put the
5  company in default under the ERISA laws and we had
6  a deal with it.
7      Q.   When was the default that you just
8  referred to.
9      A.   I don't have the exact -- I don't
10 remember the exact date.
11     Q.   By default do you mean place the lien
12 against the corporate assets?
13     A.   Yes.
14     Q.   Yes?
15     A.   Yes.
16     Q.   When did that occur?
17     A.   I don't remember the exact date.
18     Q.   Was it in approximately 2014?
19     A.   It could have been.  If you have it
20 there.  I can't remember these dates.  I am glad to
21 remember what I did yesterday.
22     Q.   So your resignation was in 2012 to the
23 best of your recollection; correct?
24     A.   Yes.
25     Q.   So as of 2012 were you anticipating

L. Eber

1
2  that PBGC would be placing a lien on corporate
3  assets?
4      A.   No.
5      Q.   So as of 2012, did you expect that
6  Eber Brothers would be able to continue making the
7  payments due to PBGC?
8      A.   The money wasn't there.  You know we
9  tried to resolve it.  It was a legacy that doesn't
10 go away.  If you know the ERISA laws there is no
11 way out of it.
12     Q.   Did you try to find a way out of it?
13     A.   Yes.
14     Q.   What was that?
15     A.   Hired legal counsels that specialize
16 in it who I paid personally.
17     Q.   Which counsel is that?
18     A.   Groom in Washington, D.C.
19     Q.   Anyone else?
20     A.   With the PBGC you are talking about?
21     Q.   Yes, to help get out of the ERISA laws
22 as you said.
23     A.   We hired a law firm.  They have a
24 branch in Rochester.  Hourihan, he was the lawyer
25 on it.

L. Eber

1
2      Q.   Is this the Bond --
3      A.   Bond Schoeneck, thank you.
4      Q.   Any other lawyers that you hired?
5      A.   I don't remember.  It's possible, but
6  I don't remember.
7      Q.   Do you recognize the name Glenn Sturm?
8      A.   Yes.
9      Q.   Who is he?
10     A.   A lawyer.
11     Q.   Is he a lawyer who you hired?
12     A.   No.
13     Q.   Who hired Glenn Sturm?
14     A.   Well, I met him and he was hired, he
15 was hired.  I would say I was involved in hiring
16 him.  I correct that, and my daughter Wendy.
17     Q.   And for what purpose was he hired?
18     A.   To help Eber Connecticut out of dire
19 financial straights.
20     Q.   How specifically was Glenn Sturm
21 qualified to do that?
22     A.   He was a partner, senior partner of
23 Mullins something in Atlanta.  Very well
24 respected.  Had done a lot in turnaround companies
25 and was going to -- did help us in navigating

Page 94

L. Eber

1 through a very difficult financial period.
2
3    Q.   How were you introduced to Glenn
4 Sturm?
5    A.   I met him in a restaurant.
6    Q.   Where was that?
7    A.   In New Haven.
8    Q.   When was that?
9    A.   I don't have the date.
10   Q.   Was it years before you had hired him
11 or shortly beforehand?
12   A.   Shortly before we hired him.
13   Q.   And what kinds of things did Glenn
14 Sturm advise you about in terms of the subject
15 matter?
16   A.   Tried to get us bank loans.  Brought
17 in consultants to help streamline the company.
18 Talk to our management.  Education.  Had an
19 excellent legal background and everything.
20   Q.   Did he advise you or the companies
21 concerning their debts and trying to get out of
22 some of the debts that were owed to other third
23 parties like PBGC?
24       MR. RAMSEY:  Form.
25   A.   He did advise us on debt and how to

Page 95

L. Eber

1
2 restructure the company to make it look more
3 attractive to banks so we could borrow money.
4    Q.   And what were some of the ways in
5 which the company was restructured?
6    A.   I don't actually remember the actual
7 restructuring.
8    Q.   Was part of the restructuring included
9 in the sale of six percent of Eber Connecticut to
10 Polebridge Bowman?
11   A.   I think the six percent to him was
12 that he wanted to get paid.  And it was a way to
13 pay him and the company didn't have any money to
14 pay him.
15   Q.   He was associated as a partner with a
16 law firm Nelson Mullins; correct?
17   A.   Yes.
18   Q.   Wasn't he paid through payments to his
19 law firm?
20   A.   There were payments to his law firm
21 originally and then he -- I don't know what
22 happened between he and his law firm.  He went
23 more on and off on his own.
24   Q.   So it was your understanding that
25 while he was doing work for you he left Nelson

Page 96

L. Eber

1
2 Mullins; is that right?
3    A.   I believe so.  I can't remember the
4 exact but he was working on his own at some point.
5    Q.   And once he was working on his own,
6 how was the topic of selling him a piece of the
7 company broached?
8    A.   I don't know.  I don't remember.  I
9 was not involved in that.
10   Q.   Who was?
11   A.   I would say my daughter Wendy.
12       MR. RAMSEY:  When you get to a good
13 place Brian to take five minutes.
14       MR. BROOK:  We can do that, sure.
15       THE VIDEOGRAPHER:  This marks the end
16 of media unit two in the videotaped
17 deposition of Lester Eber.  We are going off
18 the record.  Time is 11:32.
19       (Recess taken.)
20       THE VIDEOGRAPHER:  This marks the
21 beginning of media unit number three in the
22 videotaped deposition of Lester Eber.  We
23 are going on the record.  The time is 11:45.
24 BY MR. BROOK:
25   Q.   Mr. Eber, when did you decide to cut

Page 97

L. Eber

1
2 your sister, nieces and nephew out of the family
3 business?
4        MR. RAMSEY:  Form.
5    A.   I didn't.
6    Q.   What do you mean by that?
7    A.   I didn't decide to cut anyone out of
8 the family business.
9    Q.   Didn't you take actions that cut your
10 sister, nieces and nephew out of the family
11 business?
12       MR. RAMSEY:  Form.
13   A.   I didn't look at it that way.  I did
14 what would save a company from going into
15 liquidation.
16   Q.   How did and -- withdrawn.
17       What did you do to save the company
18 from going into liquidation that you were just
19 referring to?
20   A.   I have personally paid legal and other
21 expenses that I was not personally liable for to
22 keep the company viable that were legacy costs
23 that were shoved -- that were Eber Connecticut was
24 obligated to.  You have a list of all of them.
25   Q.   How did those cash infusions give you

25 (Pages 94 - 97)

Page 98

L. Eber

1    L. Eber
2    the right to take control of the business for
3    yourself?
4         MR. RAMSEY:  Form.
5         A.   That wasn't -- the cash infusions kept
6    the company alive.  If I didn't do that there
7    wouldn't be a company to talk about today.
8         Q.   But you never at the time when you
9    agreed to make the cash infusions, you never said
10   if I do this I get to own the company, do I?
11        A.   I never -- I just did what had to be
12   done to keep the company alive and if I hadn't had
13   done it there wouldn't be a company today.
14        Q.   Is it your understanding that when
15   someone loans money to a company that person has
16   the right to take over the company in the event of
17   nonpayment?
18        MR. RAMSEY:  Form.
19        A.   All I know is if you loan money you
20   got to secure the loan so you can get your money
21   back.
22        Q.   And is that what you did when you
23   loaned money to Eber Brothers?
24        A.   I eventually did that.
25        Q.   So when you say you know when you owe

Page 99

L. Eber

1    L. Eber
2    money you have to secure the loan, at what point
3    did you come to know that?
4         A.   It was always something that as a
5    businessman that if you are lending money you got
6    to handle the companies in desperate situations
7    facing liquidation, you have to protect your, the
8    money you have lent.
9         Q.   When did you secure any of your loans
10   with Eber Brothers?
11        A.   I don't remember the exact dates.
12        MR. BROOK:  Let's mark this as
13   Plaintiffs' Exhibit 30.
14        (Plaintiffs' Exhibit 30, a document
15   entitled Amended and Restated Promissory
16   Note bearing Bates numbers EB 00031310
17   through 311, marked for identification, as
18   of this date.)
19        Q.   I am showing you what has been marked
20   as Plaintiffs' Exhibit 30.  It is a document
21   entitled Amended and Restated Promissory Note
22   bearing Bates numbers EB 00031310 through 311.
23        Do you recognize this document?
24        A.   Yes.
25        Q.   What is it?

Page 100

L. Eber

1    L. Eber
2         A.   It's a amended and restated promissory
3    note from the company.
4         Q.   So this is Eber Brothers Wine and
5    Liquor Corp. promising to pay you; correct?
6         A.   Yes.
7         Q.   And who authorized this promissory
8    note on behalf of Eber Brothers Wine and Liquor
9    Corp.?
10        A.   I would imagine it is John Ryan, chief
11   financial officer.
12        Q.   And you also signed on behalf of Eber
13   Brothers Wine and Liquor Corp.?
14        A.   Yes.
15        Q.   And you also signed this document on
16   behalf of yourself?
17        A.   Yes.
18        Q.   Now on the first page, do you see
19   there is some handwritten amendments?
20        A.   Yes.
21        Q.   And the handwritten amendments
22   increased the interest rate from six percent to
23   nine percent?
24        A.   Yes.
25        Q.   And it looks like are those your

Page 101

L. Eber

1    L. Eber
2    initials by that?
3         A.   Yes.
4         Q.   But John Ryan's initials don't appear
5    next to those changes, do they?
6         A.   I didn't see them.
7         Q.   Did John Ryan approve those changes?
8         A.   I would imagine he had to approve them
9    and it is very possible there was a lawyer
10   involved in this.  Would probably be Pat Dalton
11   that suggested this.
12        Q.   Do you actually remember John Ryan
13   approving increasing the interest rate by 50
14   percent?
15        A.   No.
16        Q.   When did the change to the interest
17   rate occur?
18        A.   I don't remember.
19        Q.   This note, which is dated March 13,
20   2006, that is not a secured promissory note;
21   correct?
22        A.   If that's what you say it is.  I
23   haven't had a chance to read it.
24        Q.   Do you have any recollection of
25   securing your 2006 promissory note?

26 (Pages 98 - 101)

Page 102

L. Eber
2    A.   No.
3    Q.   Let's go to Exhibit 13 which we used
4  yesterday.  That is a line of credit note with a
5  date in the upper right-hand corner of October
6  blank 2009.
7        Do you see that?
8    A.   Yes.
9    Q.   And this is a note that was issued by
10 Eber Brothers Wine and Liquor Metro Inc.; correct?
11   A.   Yes.
12   Q.   If you look on page 3 you see it was
13 authorized again by you and also Wendy Eber on
14 behalf of Eber Metro?
15   A.   Yes.
16   Q.   Was this note something that was
17 secured at the time that you executed it?
18   A.   I haven't had a chance to read this.
19 I don't know.  It probably wasn't.
20   Q.   And as you sit here today, do you have
21 any recollection of insisting that you would not
22 loan more money to the company unless you got a
23 security agreement?
24   A.   No, I don't remember saying that.  I
25 did whatever I had to to keep the company alive.

Page 103

L. Eber
2    Q.   So now let's take a look at Exhibit
3  15.  This is the security agreement entered into
4  as of February 26, 2010.
5        Do you see that?
6    A.   Yes.
7    Q.   Do you remember this agreement?
8    A.   Yes.  I don't remember the details of
9  it but I do remember the agreement.
10   Q.   Why did you enter into the security
11 agreement with Eber Brothers Metro and Eber
12 Brothers Wine and Liquor Corp.?
13   A.   To protect my loans.
14   Q.   What did the Eber companies get out of
15 this?
16        MR. RAMSEY:  Form.
17   A.   What did the Eber companies get out of
18 it?  They were kept alive by my loans.
19   Q.   But you already agreed to make loans,
20 hadn't you?
21   A.   Yes, I had.  Yes.
22   Q.   And you made those loans without
23 requiring security; correct?
24   A.   That's correct.
25        MR. RAMSEY:  Form.

Page 104

L. Eber
2    Q.   So why did the Eber companies sign the
3  security agreement?
4        MR. RAMSEY:  Form.
5    A.   The companies were in desperate
6  condition and could have been liquidated and it is
7  normal to ask for security in those circumstances.
8    Q.   Are you saying it is normal to ask for
9  security for a loan after the loan has already
10 been executed?
11        MR. RAMSEY:  Form.
12   A.   As I told you before, I did whatever I
13 had to to keep the companies alive and not be
14 liquidated.  There isn't a time to say is it
15 secured or not.  You got to do it to keep the
16 company working, being able to run a business or
17 there wouldn't be a company.
18   Q.   Who drafted the security agreement?
19   A.   I don't remember.
20   Q.   Was legal counsel retained for either
21 side of this transaction?
22   A.   Very -- yeah.  I would say yes.
23   Q.   Who was legal counsel?
24   A.   It would probably have been Pat
25 Dalton.

Page 105

L. Eber
2    Q.   Do you specifically remember Pat
3  Dalton working on this?
4    A.   I can't remember, but that's who it
5  probably would have been.
6    Q.   Do you remember when the billing
7  dispute between Eber Brothers and Pat Dalton
8  began?
9    A.   Not the exact date of it.
10   Q.   Was it in approximately 2009 or '10?
11   A.   I don't think it was then.  I can't
12 remember.  I don't remember the dates.
13   Q.   Did Glenn Sturm draft this agreement?
14   A.   He could have.
15   Q.   Let's look at one more document that
16 we covered yesterday.  Here we go.  Exhibit 16
17 this is another copy of the line of credit note
18 but you may remember this from yesterday's
19 testimony.  On the upper right-hand corner it says
20 the date is February 26, 2010.
21        Do you see that?
22   A.   Yes.
23   Q.   Do you remember this version of the
24 line of credit note?
25   A.   This one my signature is on it but I

27 (Pages 102 - 105)

L. Eber

1
2  don't remember it.
3      Q.   So you don't remember why you signed
4  the same line of credit note with two different
5  dates?
6      A.   No.
7      Q.   When did -- let's look at either one
8  of the line of credit notes either Exhibit 13 or
9  16.  Take your pick.  I think the terms are all
10  the same except for the date.
11      MR. RAMSEY:  Do you have 16 in front
12      of you?  Look at this (indicating).
13      Q.   Do you see at the bottom of paragraph
14  3 it says in the final sentence that "The maturity
15  date is defined as December 31, 2011."?
16      A.   Yes.
17      Q.   What is your understanding of what the
18  maturity date means with respect to a line of
19  credit note?
20      A.   That it has to be paid then.
21      Q.   And how was the maturity date for this
22  line of credit note determined?
23      A.   I do not know.
24      Q.   Did you think that it was realistic as
25  of February 2010 to expect Eber Metro or Eber

L. Eber

1
2  Brothers and Co., Inc. to be able to pay 1.5
3  million dollars plus interest within less than two
4  years?
5      MR. RAMSEY:  Form.
6      A.   I did not draft this.  I was involved
7  in keeping the company in business.  That was my
8  priority.  I was not involved in drafting this.
9      Q.   How does taking Eber Brothers Metro
10  shares away from Eber Brothers Wine and Liquor
11  Corp. and putting it into your own company an
12  action that helps keep the company in business?
13      MR. RAMSEY:  Form.
14      A.   It restructures the company, cleans up
15  the statement and turns a debt into an asset for a
16  bank.  So you can go -- because the company
17  couldn't get a loan.  It couldn't get any loans
18  from anyone.  So this cleans up the balance sheet
19  and makes it as an asset instead of a debt.
20      Q.   So you wanted to transfer the company
21  out from underneath the debts owed by Eber
22  Brothers Wine and Liquor Corp.; correct?
23      A.   I wanted to get a bank loan for the
24  company.  You know in our business you have to pay
25  the suppliers.  They transfer the money out of

L. Eber

1
2  your bank account.
3      Q.   At the time of approximately 2010
4  through 2012, was Eber Brothers Wine and Liquor
5  Corp. a solvent company?
6      A.   Wine and Liquor, I don't know what --
7  I don't think they were solvent.  I think they
8  were struggling.
9      Q.   Did you have any understanding of what
10  additional fiduciary duties a corporate executive
11  has at a time period when a company is in the zone
12  of insolvency?
13      MR. RAMSEY:  Form.
14      A.   I reported to the trust.  They were
15  aware of everything that went on.  I did the best
16  I could to keep above water.
17      Q.   Why did you create the company
18  Alexbay?
19      A.   It was at the suggestion of my
20  lawyers.
21      Q.   Which lawyers?
22      A.   Would have been David Beltz and there
23  is another one.  I cannot think of the other.
24      Q.   Who is David Beltz?
25      A.   He was a lawyer that advised me in

L. Eber

1
2  Connecticut.
3      Q.   And why did he say that you should
4  create the Alexbay company?
5      MR. RAMSEY:  Hold on.  Just be careful
6      you are not infringing on any conversation
7      you had.  The action he ultimately took you
8      can testify about that.  I don't want you
9      testifying to any conversations you had with
10      Mr. Beltz.
11      Q.   What was the purpose -- I understand
12  that you created the company because a lawyer told
13  you to do it, but what was the purpose you
14  intended to have the company Alexbay serve?
15      A.   A personal holding company.
16      Q.   What did you want to hold when you
17  created it?
18      A.   Whatever that had to be, that was, an
19  investment that I would make.
20      Q.   Were you thinking of any specific
21  investments at the time you created it?
22      A.   You know, I at the time I don't
23  remember what but it was a personal LLC that I
24  created that was created for me.
25      Q.   Do you remember when you created it?

28 (Pages 106 - 109)

Page 110

L. Eber

1
2     A.   I don't remember the date.
3     Q.   Let's mark this next exhibit
4  Plaintiffs' Exhibit 31.
5          (Plaintiffs' Exhibit 31, a copy of
6     two printouts made on October 1, 2016 from
7     the Connecticut Department of State
8     concerning the business Alexbay LLC, marked
9     for identification, as of this date.)
10    Q.   Plaintiffs' Exhibit 31 in front of you
11 is a copy of two printouts made on October 1, 2016
12 from the Connecticut Department of State
13 concerning the business Alexbay LLC.
14         Do you see it on the first page it
15 states the date of incorporation/registration as
16 December 8, 2011?  It is the fifth line down.
17    A.   Yes.
18    Q.   And is that consistent with your
19 recollection of when you created the company?
20    A.   I would believe so.
21    Q.   What was the original name that you
22 had for your company?
23    A.   Lester Eber LLC.
24    Q.   Why did you change the name?
25    A.   There were enough Eber -- a lot of

Page 111

L. Eber

1
2  Ebers.  Just too much confusion.  I think it
3  needed a separate name.
4     Q.   How did you arrive at the Alexbay LLC
5  name?
6     A.   There were other names that I tried
7  but they were taken in the state of Connecticut
8  and I go up there in the summertime and I didn't
9  think anyone would probably use that name.
10 Alexandria Bay is in upstate New York on the
11 Canadian border.
12    Q.   It is named after Alexandria Bay?
13    A.   Yes.
14    Q.   Is that a place that you visited?
15    A.   In the summer, yes.
16    Q.   So is it -- having seen the date when
17 Alexbay which was then called Lester Eber LLC was
18 created, does that refresh your recollection as to
19 what particular investments or other holdings you
20 wanted to have held by the company?
21         MR. RAMSEY:  Form.
22    A.   Yeah.  I think it would be for the
23 investment.  Would be the investment in
24 Connecticut.
25    Q.   You mean Eber Connecticut?

Page 112

L. Eber

1
2     A.   Eber Connecticut, yes.
3     Q.   And here is a document previously
4  marked Exhibit Plaintiffs' 8.
5     A.   Yes.
6     Q.   This is an affidavit that was signed
7  by you under oath on December 8, 2011; correct?
8     A.   Yes.
9     Q.   What was the purpose of this
10 affidavit?
11    A.   It's a law that any transfer of stock
12 or change in ownership of stock has to be reported
13 to the Consumer Protection Agency in Connecticut.
14    Q.   So as of December 8, 2011 you had
15 already decided to take Eber Connecticut and put
16 it in Alexbay in some way; correct?
17         MR. RAMSEY:  Form.
18    A.   I don't remember the date.
19    Q.   This affidavit is dated December 8th;
20 correct?
21    A.   Yeah.
22    Q.   And this states item number 4 or let's
23 start with item number 3.  3 says "Presently 79
24 percent of Eber Connecticut is owned by me through
25 an entity known as Eber Metro.

Page 113

L. Eber

1
2          4, I wish to transfer all of that 79
3  percent that I own from Eber Metro to Lester Eber
4  LLC, an entity which will also be wholly owned by
5  me.
6          5, this transfer is being done for no
7  consideration and that it is being done strictly
8  for organizational purposes.  No money or other
9  consideration will change hands."
10         Did I read that correctly?
11    A.   Yes.
12    Q.   As of December 8, 2011 you had decided
13 to take Eber Connecticut and have it be held by
14 Lester Eber LLC; correct?
15         MR. RAMSEY:  Form.
16    A.   Yes.
17    Q.   Had any of the debt to you been
18 defaulted on at that point?
19    A.   Hadn't been defaulted.  Hadn't been
20 paid either.  There was no way of it being paid.
21    Q.   So you were still president of Eber
22 Wine and Liquor and Eber Metro at that point;
23 correct?
24    A.   Eber Metro but I don't know about Eber
25 Wine and Liquor.

29 (Pages 110 - 113)

Page 114

L. Eber

1
2    Q.   Eber Metro had assumed all the debt to
3    you; correct?
4    A.   Yes.
5    Q.   And so as president of Eber Metro
6    weren't you obligated to try or -- withdrawn.
7         Was it your understanding that as
8    president of Eber Metro you had an obligation to
9    attempt to either pay outstanding debts that were
10   coming due or to renegotiate the terms of those
11   debts to avoid default?
12        MR. RAMSEY:  Form.
13   A.   I don't understand the question.  You
14   got me confused.
15   Q.   As the president of a company, do you
16   want to see that company be liquidated?
17        MR. RAMSEY:  Form.
18   A.   I did everything possible to stop a
19   liquidation.
20   Q.   And isn't the liquidation something
21   that is often times a result of a default on a
22   large amount of debt?
23   A.   Yes.
24   Q.   And as a secured lender at that point
25   of Eber Metro, you had the right to require a

Page 115

L. Eber

1
2    liquidation of the company if it went into
3    default; correct?
4    A.   That's what it says.  I don't know
5    what -- I don't know the law of what you are
6    talking about.  So the only thing I knew was that
7    I had to keep -- I had invested a lot of money.  I
8    continue to invest money and if I hadn't invested
9    money there would have been no Eber Connecticut
10   and what I did here was to clean up the statement
11   to make it look taking debt and making it into
12   assets so a bank would want to give us a loan.
13   When Wells Fargo left us we were nowhere's.  We
14   had nothing.  They put a workout team in our
15   company and we were desperate and I personally
16   lent enough money to keep this company, the last
17   vestige afloat and paid legal fees and everything
18   personally to do it.  You got all those copies.
19        MR. RAMSEY:  You answered the
20        question.
21   Q.   Why didn't you create an entity that
22   rather than being held entirely by you was held by
23   the Allen Eber Trust and transfer the company into
24   that new entity?
25        MR. RAMSEY:  Form.

Page 116

L. Eber

1
2    A.   I had asked my sister and my niece to
3    contribute money and they both declined.
4    Q.   When did you ask them to contribute
5    money?
6    A.   I don't have the exact date, but I
7    did.  There are letters that we submitted that
8    prove it.
9    Q.   Does the timing of April 2010 sound
10   correct for when he sent those letters?
11   A.   You probably have them here.  So
12   that's what it is.  I don't remember that date.
13        2010, can you remember?
14   Q.   Unfortunately yes, but --
15   A.   Good.
16   Q.   -- it is -- do you have any
17   recollection of after those letters were sent to
18   your sister and your niece ever raising the topic
19   again with them about putting money into the
20   Connecticut business?
21   A.   Yes.
22   Q.   When was that?
23   A.   I don't remember the date but I will
24   let you know what my sister said.  She said I want
25   to get money out.  I don't want to put money in.

Page 117

L. Eber

1
2    Q.   And when did she say that?
3    A.   I don't remember the date.
4    Q.   Was it around the time when you sent
5    her the letter?
6    A.   It could have been and then later on.
7    I don't have the dates.
8    Q.   Did you ever tell your sister that if
9    she didn't put money in that you were going to
10   take it away from the trust?
11        MR. RAMSEY:  Form.
12   A.   No, I didn't say that to her.
13   Q.   Why not?
14   A.   Because it wasn't that desperate a
15   situation.  I did it when the company, it became
16   desperate that if I didn't put the money in no one
17   else was going to put it in and there wouldn't be
18   a company.
19   Q.   How do you know if no one else was
20   going to put money in if they knew what was at
21   stake was the continuation of the family business
22   under the family trust?
23        MR. RAMSEY:  Form.
24   A.   They both refused and had no interest
25   in putting any money into the company.

30 (Pages 114 - 117)

Page 118

L. Eber

1
2    Q.    But you never told them of the
3    possibility that if they did not put money in they
4    would lose their interest in the family business;
5    correct?
6          MR. RAMSEY:  Form.  Asked and
7    answered.
8          Go ahead.  You can answer it again.
9          MR. BROOK:  It was asked but not
10    answered.
11    A.    I don't remember saying that to them.
12    Q.    Do you know anyone else who talked
13    with your sister or your niece about the need to
14    put money into the family business in 2010 or
15    2011?
16    A.    I don't know.
17    Q.    Looking at Exhibit 8 in front of you,
18    you signed that based upon your own knowledge and
19    belief it says at the top; right?
20    A.    Yes.
21    Q.    So and this was also something where
22    you made the statement or made the affidavit under
23    penalty of false statement; correct?
24    A.    Yes.
25    Q.    So you understood that it was a

Page 119

L. Eber

1
2    statement being made under oath like your
3    testimony today?
4    A.    Yes.
5    Q.    So you knew how important it was to
6    tell the truth?
7    A.    Yes.
8    Q.    The whole truth; correct?
9          MR. RAMSEY:  Form.
10    A.    Yes.
11    Q.    And nothing but the truth; correct?
12          MR. RAMSEY:  Form.
13    A.    Yes.
14    Q.    So item 3 you wrote in this affidavit
15    "Presently 79 percent of Eber Connecticut is owned
16    by me through an entity known as Eber Metro."
17          Was that a true statement?
18          MR. RAMSEY:  Form.
19    A.    If that's what I said at the time and
20    signed it, yes.
21    Q.    So it is your understanding that at
22    the time that you signed this Eber Connecticut or
23    Eber Metro was not owned by the trust?
24    A.    Yes.
25    Q.    And you said that item number 4 though

Page 120

L. Eber

1
2    is that you wish to transfer that 79 percent from
3    Eber Metro to Lester Eber LLC.
4          Do you see that?
5    A.    Yes.
6    Q.    So isn't it true that actually this
7    affidavit was written at a time when Eber
8    Connecticut was still ultimately or 79 percent of
9    Eber Connecticut was owned by the trust?
10          MR. RAMSEY:  Form.
11    A.    I don't understand what you -- I just
12    don't understand what you are saying here.
13    Q.    You agree with me that if Eber Metro
14    was still an entity that was owned and controlled
15    by the trust, then the statement in item number
16    three would not be correct?
17          MR. RAMSEY:  Form.
18    A.    Could you repeat that?
19          (Record read.)
20    A.    That's correct.
21    Q.    Now item number 4 emphasizes that by
22    saying that Lester Eber LLC is an entity which
23    will also be wholly owned by me.
24          Do you see that?
25    A.    Yes.

Page 121

L. Eber

1
2    Q.    So you were making it clear that you
3    were telling the recipient of this affidavit that
4    Eber Metro was wholly owned by you; correct?
5          MR. RAMSEY:  Form.
6    A.    Yes.
7    Q.    And you said in item number 5 "This
8    transfer is being done for no consideration."
9          Do you see that?
10    A.    Yes.
11    Q.    What did you mean by that?
12    A.    It is whatever it says.  No
13    consideration.
14    Q.    So no consideration means nothing is
15    being received by Eber Metro in return for giving
16    up the 79 percent of Eber Connecticut; is that
17    right?
18          MR. RAMSEY:  Form.
19    A.    I didn't write this and I would have
20    to talk to whoever did write this to explain it to
21    me.
22    Q.    Who wrote this?
23    A.    I think it's probably something that
24    the Consumer Protection Agency of The State of
25    Connecticut required.

31 (Pages 118 - 121)

Page 122

L. Eber

1
2    Q.   That doesn't answer who wrote this.
3    A.   I don't know.
4    Q.   So was it true that you wanted to
5    transfer the 79 percent of Eber Connecticut to
6    Lester Eber LLC for no consideration?
7         MR. RAMSEY:  Form.
8    A.   I can't explain that to you.
9    Q.   Let's jump ahead in time for a little
10   bit here to late 2016 through 2017.
11   Around the time when this lawsuit was
12   first filed and months afterwards, do you recall
13   that at that point you sought to acquire all of
14   the shares of Eber Brothers and Co., Inc. from the
15   Allen Eber Trust?
16   A.   Yeah.  I believe so.
17   Q.   What did you offer to provide to the
18   Allen Eber Trust in exchange for that?
19   A.   I don't remember the transaction.  I
20   was not -- I was aware of it but I was not
21   actually into the details of it.
22   Q.   Did you have any lawyer who was
23   helping you try to acquire Eber Brothers and Co.,
24   Inc.?
25   A.   Yes.

Page 123

L. Eber

1
2    Q.   Who was that?
3    A.   John Herbert.
4    Q.   Anyone else?
5    A.   I believe he was the lawyer.
6    Q.   Who is Jim Vazzana?
7    A.   Yes.  He is trust and estate lawyer.
8    Q.   Is he a lawyer that you hired?
9    A.   Yes.
10   Q.   To represent you individually?
11   A.   Yes.
12   Q.   And did you also ask him to help you
13   acquire the stock of Eber Brothers and Co., Inc.?
14   A.   I believe so at one time.
15   Q.   Why did you want the Eber Brothers and
16   Co., Inc. stock at that time?
17   A.   You know, I just don't remember the
18   details of it.
19   Q.   But you asked for the stock on
20   multiple occasions; correct?
21   A.   I believe so, yes.
22   Q.   And let's -- withdrawn.
23   Who was it that you were asking to
24   authorize the transfer of the stock?
25   A.   I don't understand the question.

Page 124

L. Eber

1
2    Q.   You yourself were a co-trustee of the
3    trust; correct?
4    A.   Yes.
5    Q.   So why didn't you just transfer the
6    stock to yourself?
7    A.   I didn't do it.
8    Q.   Why not?
9    A.   I just didn't.  I don't have an answer
10   for you.
11   Q.   Did you think that you had the power
12   or authority to do that?
13   A.   I don't know.  It's possible I did.  I
14   just didn't do it.
15        MR. BROOK:  I think this next segment
16   is going to be best done on one continuous
17   whole.  So why don't we go ahead and break
18   for lunch right now.
19        THE VIDEOGRAPHER:  We are going off
20   the record.  The time is 12:20.
21        (Luncheon recess:  12:20 p.m.)
22
23
24
25

Page 125

L. Eber

1
2    A F T E R N O O N   S E S S I O N.
3         (12:57 p.m.)
4    L E S T E R   E B E R,
5    having been previously sworn, resumed the
6    stand and testified further as follows:
7    EXAMINATION (Cont'd)
8    BY MR. BROOK:
9         THE VIDEOGRAPHER:  We are going back
10   on the record.  The time is 12:59.
11   Q.   After breaking for lunch Mr. Eber,
12   were you able to get some food?
13   A.   Yes.
14   Q.   And are you feeling okay to continue
15   this deposition?
16   A.   Yes.
17   Q.   Any reason at all you can think of why
18   you wouldn't be able to provide full and truthful
19   testimony?
20   A.   No.
21   Q.   After this lawsuit was filed, did you
22   become aware of the plans by your co-trustee
23   Canandaigua National Bank and Trust to seek a
24   judicial order terminating the trust?
25   A.   Yes.

32 (Pages 122 - 125)

Page 126

L. Eber

2    Q.    How did you find out about that?
3    A.    I believe my lawyer Vazzana told me
4    about it.
5    Q.    Did you know about that before it was
6    filed in the court?
7    A.    No.
8    Q.    And so you appointed Mr. Vazzana to be
9    your lawyer for that court proceeding; correct?
10    A.    Yes.
11    Q.    Had he represented you on anything
12    before then?
13    A.    Yes.
14    Q.    What?
15    A.    Personal issues.
16    Q.    How long had he been representing you
17    for personal issues?
18    A.    I don't remember.  Could have been a
19    couple of years.  I don't remember.
20    Q.    Did any of those personal issues
21    concern the Allen Eber Trust?
22    A.    No.
23    Q.    What was your understanding of what
24    would happen with the assets or what was going to
25    happen with the assets of the Allen Eber Trust if

Page 127

L. Eber

2    Canandaigua National Bank had been successful in
3    terminating the trust?
4    A.    Never would happen with the
5    disbursement of the trust.  You know, whatever the
6    procedure was.  I didn't know.
7    Q.    You didn't know what would happen with
8    the assets?
9    A.    The assets would be distributed among
10    the trustees.  Not the trustees.  The
11    beneficiaries, excuse me.
12    Q.    How would the percentages or amounts
13    of distribution be determined?
14    A.    By the percentage of the trustees.
15    You know, there were -- not the trustees.  Excuse
16    me, by the beneficiaries divided three ways which
17    would also Danny and his sister would split one of
18    the thirds.
19    Q.    So it was going to be divided into
20    thirds between one third going to you, one third
21    going to Audrey Hays and one third being split
22    between Lisa Stein and Dan Kleeberg; is that
23    right?
24    A.    Yes.
25    Q.    And did you oppose that distribution

Page 128

L. Eber

2    of the assets?
3    A.    No.
4    Q.    And you understood that the assets
5    included the trust stock in Eber Brothers and Co.,
6    Inc.; correct?
7    MR. RAMSEY:  Form.
8    A.    You know, I think that was
9    questionable.  I can't give you an answer on that.
10    I don't know.
11    Q.    What was questionable about that?
12    A.    I don't know of the status of what the
13    stock was or wasn't and I think that would be a
14    question you would have to ask my lawyer.
15    MR. BROOK:  Let's mark this as the
16    next exhibit Plaintiffs' 32.
17    (Plaintiffs' Exhibit 32, a letter
18    and some attachments that are dated July 12,
19    2017 from Rita Nischal of Canandaigua
20    National Bank and Trust to Lester Eber,
21    marked for identification, as of this date.)
22    MR. BROOK:  Go ahead and do 33 as
23    well.
24    (Plaintiffs' Exhibit 33, a order in
25    the Surrogates Court of The State of New

Page 129

L. Eber

2    York in Monroe County dated June 1, 2017
3    signed by Surrogate Judge John M. Owens,
4    marked for identification, as of this date.)
5    Q.    You have Exhibits 32 and 33 in front
6    of you.  Exhibit 32 is a letter and some
7    attachments that are dated July 12, 2017 from Rita
8    Nischal, N-I-S-C-H-A-L, of Canandaigua National
9    Bank and Trust to Lester Eber.
10    And Exhibit 33 is a order in the
11    Surrogates Court of The State of New York in
12    Monroe County dated June 1, 2017 signed by
13    Surrogate Judge John M. Owens.
14    Have you seen either or both of these
15    documents before Mr. Eber?
16    A.    Yes.
17    Q.    When did you see the judicial order
18    Exhibit 33?
19    A.    I don't remember.
20    Q.    Was it around the time that the order
21    was entered?
22    A.    It was whenever my lawyer sent it to
23    me.
24    Q.    And do you have any reason to doubt
25    that your lawyer sent it to you promptly after

33 (Pages 126 - 129)

Page 130

L. Eber

1 receiving it himself?
2
3     A.   No.
4     Q.   And Exhibit 32, when did you see that?
5     A.   I saw it when it was sent to me.  It
6 is July 12th.  So whenever that time period.
7     Q.   Did you review the documents that were
8 enclosed with it?
9     A.   Yes.
10    Q.   Look at page 2 of this exhibit.
11        It says receipt and release in the
12 upper right-hand corner?
13    A.   Yes.
14    Q.   Did you ever sign a receipt and
15 release for Canandaigua National Bank?
16    A.   You know, I don't think I did, but I
17 could have.  I don't remember.
18    Q.   Take a look at page 3.
19        You see it is a table saying residuary
20 TUW Allen Eber proposed distribution?
21    A.   Yes.
22    Q.   And you saw that too; correct?
23    A.   Yes.
24    Q.   And so you saw presumably that listed
25 on the assets here was three line items for Eber

Page 131

L. Eber

1
2 Brothers and Co. stock?
3     A.   Yes.
4     Q.   And this shows that stock being
5 distributed in roughly the proportions you said
6 the trust assets should be distributed; correct?
7     A.   That I had said.
8     Q.   Well, you previously testified that
9 you understood that the distribution would be one
10 third to you, one third to Audrey Hays and one
11 third split between Dan Kleeberg and Lisa Stein?
12    A.   Yes.
13    Q.   And this reflects close to that
14 distribution; correct?
15    A.   Yes.
16    Q.   Did you have any objection to that
17 distribution of shares of Eber Brothers and Co.
18 stock as specified in this proposed distribution
19 chart?
20    A.   I don't remember it.  I could have.
21 There has been some discussion about it, but I
22 don't remember what I said or didn't say or what
23 our position was.
24    Q.   It is your understanding ultimately
25 the publicly traded stocks and the cash held by

Page 132

L. Eber

1
2 the Allen Eber Trust was distributed to the
3 beneficiaries of the trust?
4     A.   Yes.
5     Q.   Did you insist that there be certain
6 adjustments made to the distribution after you saw
7 this chart page 3 of Exhibit 32?
8         MR. RAMSEY:  Form.
9     A.   (Indicating.)
10    Q.   Yes.
11    A.   I don't remember.
12        MR. BROOK:  Let's mark this next
13 exhibit Plaintiffs' Exhibit 34.
14        (Plaintiffs' Exhibit 34, a letter
15 and attachments that was produced yesterday
16 by Canandaigua National Bank Bates stamped
17 CNB-PL 0010 through 12, marked for
18 identification, as of this date.)
19    Q.   Exhibit 34 in front of you is a letter
20 and attachments that was produced yesterday by
21 Canandaigua National Bank and is Bates stamp by me
22 as CNB-PL 0010 through 12.
23        Do you recognize this document?
24    A.   Yes.
25    Q.   What is it?

Page 133

L. Eber

1
2     A.   It's a letter to Canandaigua Bank
3 reducing the money to Lisa Stein from the money
4 that was given by the trust to her daughter Erica
5 Stein.
6     Q.   And is this a letter that you asked to
7 have sent on your behalf?
8     A.   I am copied on it.  So I was aware of
9 it.
10    Q.   Did you authorize Mr. Vazzana to send
11 it?
12    A.   I was aware of it and I was involved
13 in that knew what was going on.  I was aware of
14 it.  That's what I can say to you.
15    Q.   Were you aware of the letter going out
16 before it was sent?
17    A.   Yes.
18    Q.   This was not the first letter that was
19 sent on your behalf asking Canandaigua National
20 Bank to reduce the amount of distribution from the
21 trust to Lisa Stein, was it?
22        MR. RAMSEY:  Form.
23    A.   No.  You are asking questions that
24 show in the other letters.  So you know the
25 answer.

34 (Pages 130 - 133)

Page 134

L. Eber

1
2    Q.   Why did you want the amount of
3    distribution from the trust to Lisa Stein reduced
4    versus what Canandaigua had proposed?
5        A.   I believe the reason and you say me, I
6    think there were other people involved in this as
7    you see who were copied, lawyers, that there was
8    money had been given to, from the trust to her
9    daughter.
10       Q.   So you wanted to make sure that only
11   the cost of the money being given to Lisa Stein's
12   daughter was borne solely by Lisa Stein; is that
13   right?
14       A.   It was for her daughter out of Lisa
15   Stein's money, the money that was to go to Lisa
16   Stein.  The trust, the way I understood it, took
17   the money out of Lisa Stein's account.
18       Q.   And is it your understanding that
19   based on your request Canandaigua National Bank
20   the amount of the distribution to Lisa Stein was
21   reduced in full by the amount that had been paid
22   previously to Erica Stein?
23       A.   Yes.
24       Q.   And is there any amount of money
25   that's still owed back to the other trust

Page 135

L. Eber

1
2    beneficiaries by Lisa Stein?
3        A.   Not that I know.
4        Q.   Did you ask the Canandaigua National
5    Bank also reduce the number of shares of Eber
6    Brothers and Co. Inc. that were distributed to
7    Lisa Stein?
8        A.   Did I, no.  I don't remember that.  I
9    don't remember that, no.
10       Q.   Can you think of any reason why the
11   number of shares that Eber Brothers and Co., Inc.
12   should have been reduced, the numbers of shares --
13   let me restart this.
14       Can you think of any reason why the
15   trusts distribution of shares of Eber Brothers and
16   Co., Inc. should have been reduced for Lisa Stein
17   based upon either the prior distributions to Erica
18   Stein or for any other reason?
19       MR. RAMSEY:  Form.
20       A.   I think --
21       MR. BROOK:  I will withdraw that.
22       That was still bad.
23       Q.   So can you think of any reason why the
24   trusts distribution of Eber Brothers and Co., Inc.
25   shares to Lisa Stein should have been reduced?

Page 136

L. Eber

1
2        MR. RAMSEY:  Form.
3        Go ahead.
4        A.   I believe that it is a legal question
5    and I am not a lawyer.
6        Q.   What was your belief as of July 2017
7    about the value of the Eber Brothers and Co., Inc.
8    stock?
9        MR. RAMSEY:  Form.
10       A.   As I thought it was worthless.
11       Q.   Why did you believe that?
12       A.   Because it had no assets.  What were
13   the assets.
14       Q.   Why did you want to obtain the shares
15   of Eber Brothers and Co., Inc. stock for yourself?
16       A.   I think, as I told you before, I think
17   it is a legal question that you should ask the
18   lawyers.  I am not capable of answering it.
19       Q.   Was your goal to try to prevent
20   plaintiffs from pursuing their lawsuit against
21   you?
22       MR. RAMSEY:  Form.
23       A.   I said ask the lawyers.  I don't have
24   an answer for you.
25       MR. BROOK:  Let's go to this next

Page 137

L. Eber

1
2        Exhibit 35.
3        (Plaintiffs' Exhibit 35, a e-mail
4    and attachment dated October 31, 2018 sent
5    by Paul Keneally with multiple recipients
6    CNB-PL 0001 to 2, marked for identification,
7    as of this date.)
8        Q.   Exhibit 35 in front of you is a e-mail
9    and attachment dated October 31, 2018 sent by Paul
10   Keneally with multiple recipients CNB-PL 0001 to
11   2.
12       Have you seen this before?
13       A.   I signed it, so I must have.
14       Q.   You're referring to the second page of
15   the exhibit?
16       A.   Behind it, yeah.
17       Q.   So that is your signature?
18       A.   Yes.
19       Q.   And do you remember signing this
20   document?
21       A.   I don't remember, but I did sign it.
22       Q.   How do you know that you signed it if
23   you don't remember it?
24       A.   That's my signature.  So nobody is
25   putting my -- that's my signature on it.

35 (Pages 134 - 137)

Page 138

L. Eber

2    Q.    The second page is addressed to the
3    Allen Eber Trust care of the Canandaigua National
4    Bank and Trust Company; correct?
5    A.    Yes.
6    Q.    And it says in all caps below that
7    notice of intent to purchase shares; correct?
8    A.    Yes.
9    Q.    Then the body of it states "The
10   undersigned hereby gives notice of my intent to
11   purchase all shares of capital stock of Eber
12   Brothers and Co., Inc. defined as the company of
13   which the Allen Eber Trust is the registered
14   holder that are proposed to be transferred to
15   Daniel Kleeberg, Lisa Stein or Audrey Hays
16   pursuant to Article 12 of the bylaws of the
17   company." Then your signature.
18         Did I read that correctly?
19   A.    Yes.
20   Q.    What was your purpose in sending this
21   notice of intent?
22   A.    If you look at the bylaws of the
23   company I had the right to do it.
24   Q.    Why do you say that?
25   A.    Read the bylaws.

Page 139

L. Eber

2    Q.    Did you read the bylaws?
3    A.    I have.
4    Q.    And it is your belief that the bylaws
5    of the company permitted you to purchase the
6    shares of capital stock of Eber Brothers and Co.
7    stock?
8    A.    On the advice of counsel, yes.
9    Q.    Why did you wait until October 31,
10   2018 to send this notice?
11   A.    Ask my lawyer.
12   Q.    Now you knew that Canandaigua National
13   Bank and Trust Company had proposed to and
14   attempted to transfer the Eber Brothers and Co.,
15   Inc. shares to Dan Kleeberg, Lisa Stein and Audrey
16   Hays a year before this date; correct?
17   MR. RAMSEY: Form.
18   A.    If you are saying that you probably
19   have something that shows that. I don't remember.
20   Q.    And you said here, what you signed
21   your name to, you intended to purchase the shares;
22   correct?
23   A.    That's what it says here.
24   Q.    How much money did you intend to
25   purchase the shares for?

Page 140

L. Eber

2    A.    You have to ask my lawyer.
3    Q.    So you signed this without knowing how
4    much money you were committing to pay?
5    MR. RAMSEY: Form.
6    A.    I signed it. I don't have an answer
7    for you on that. I think it's a legal question.
8    Q.    So for all you know you might need to
9    pay the plaintiffs over two million dollars each
10   in order to get the shares that you agreed to
11   purchase?
12   MR. RAMSEY: Form.
13   A.    No.
14   Q.    Why do you say no?
15   A.    Because it isn't worth it.
16   Q.    Well, why do you say that?
17   A.    What's the -- where does it show that
18   it is worth that kind of money? Can you show
19   that?
20   Q.    Again, if it is not -- if you don't
21   know how much the shares are worth, then how can
22   you agree to purchase them?
23   MR. RAMSEY: Form.
24   A.    I told you I am not qualified to
25   answer your question. Please consult my lawyer.

Page 141

L. Eber

2    Q.    So you are authorizing us to ask these
3    questions of your lawyer?
4    DI    MR. RAMSEY: Don't answer that.
5    MR. BROOK: I think he already did,
6    but I am just trying to make it clear.
7    MR. CALIHAN: I don't agree, but.
8    MR. BROOK: I know.
9    Let's do two more exhibits after that.
10   We are up to 36 and 37.
11        (Plaintiffs' Exhibit 36, a printout
12   of a table with some notes entitled
13   Residuary TUW Allen Eber Proposed
14   Distribution of Securities, marked for
15   identification, as of this date.)
16        (Plaintiffs' Exhibit 37, a e-mail
17   dated September 15, 2017 sent by Jim Vazzana
18   to R. Nischal at CNB, Canandaigua National
19   Bank, with yourself as one of the people
20   copied on it Bates stamped CNB-PL 0005,
21   marked for identification, as of this date.)
22   Q.    Looking first at Exhibit 36. This is
23   a printout of a table with some notes entitled
24   Residuary TUW Allen Eber Proposed Distribution of
25   Securities.

36 (Pages 138 - 141)

Page 142

L. Eber

1
2      Do you see that?
3      A.  Yes.
4      Q.  And have you seen this version of the
5  chart before?
6      A.  Yes.
7      Q.  When do you recall first seeing this?
8      A.  I don't remember.
9      Q.  Do you see that this table also
10  includes distribution numbers for the shares of
11  Eber Brothers and Co. stock held by the trust?
12      A.  Yes.
13      Q.  Do you recall making any objection to
14  the distribution proposed in this chart after you
15  saw it?
16      A.  I don't remember.
17      Q.  After you saw this chart, do you
18  recall contacting anyone and saying you wanted to
19  buy the shares of Eber Brothers and Co., Inc.
20  stock that were proposed to be distributed to
21  Daniel Kleeberg, Lisa Stein and Audrey Hays?
22      MR. RAMSEY:  Form.
23      A.  I don't remember.
24      Q.  Please take a look at Exhibit 37 now
25  which is a e-mail dated September 15, 2017 sent by

Page 143

L. Eber

1
2  Jim Vazzana to R. Nischal at CNB, Canandaigua
3  National Bank, with yourself as one of the people
4  copied on it Bates stamped CNB-PL 0005.
5      Do you see that?
6      A.  Yes.
7      Q.  Do you recognize this e-mail?
8      A.  I assume I saw it.  It was sent.  I
9  was copied on.
10      Q.  In this e-mail, which was sent by your
11  lawyer, it begins by saying "Dear Rita, as you
12  know we represent Lester Eber and he and the other
13  beneficiaries are reticent to sign a release and
14  receipt as submitted.  However, he will sign it
15  without the release provision."
16      Do you see that?
17      A.  Yes.
18      Q.  So you had talked to your lawyer about
19  signing a receipt prior to him sending this
20  e-mail; correct?
21      MR. RAMSEY:  Well, hold on.
22      Don't tell him what you talked to your
23      lawyer about.
24      Q.  Did you authorize your lawyer to send
25  this e-mail?

Page 144

L. Eber

1
2      MR. RAMSEY:  You can answer that.
3      A.  Yes.
4      Q.  And so is it fair to say that as of
5  September 15, 2017 you agreed with the proposed
6  distribution that Canandaigua National Bank had
7  sent to you?
8      MR. RAMSEY:  Form.
9      A.  No, I don't.  This is only to sign a
10  release.
11      Q.  Okay, so what did you understand to be
12  the significance of signing or not signing a
13  release?
14      A.  Whatever liability that would waive or
15  what have you.
16      MR. BROOK:  Let's go to the next
17      Exhibit 38.
18      (Plaintiffs' Exhibit 38, a letter
19      dated October 11, 2017 on letterhead for
20      Woods Oviatt Gilman LLP addressed to Jim
21      Vazzana and me, marked for identification,
22      as of this date.)
23      Q.  Exhibit 38 is a letter dated October
24  11, 2017 on letterhead for Woods Oviatt Gilman LLP
25  addressed to Jim Vazzana and me.

Page 145

L. Eber

1
2      Do you see that?
3      A.  Yes.
4      Q.  Have you seen this letter before?
5      A.  You know I don't remember.  It doesn't
6  show me copied on it, but I could have.  I don't
7  remember.
8      Q.  And do you recall seeing that there
9  were stock powers that were signed by someone from
10  Canandaigua National Bank purporting to transfer
11  to you shares in Eber Brothers and Co., Inc.?
12      A.  Could you repeat the question?
13      Q.  Sure.
14      Do you recall seeing that around the
15  time of this letter there were stock powers that
16  had been signed by someone from Canandaigua
17  National Bank and Trust purporting to transfer
18  Eber Brothers and Co., Inc. stock to you?
19      A.  I don't remember.
20      Q.  Do you know what stock powers are?
21      A.  Yes.
22      Q.  What are stock powers?
23      A.  The ability to vote the stock.
24      Q.  And how do the stock powers once
25  executed get turned into actual voting rights for

37 (Pages 142 - 145)

Page 146

L. Eber

1
2  the stock?
3      A.  I don't know.
4      Q.  Was it your understanding as a result
5  of the termination of the Allen Eber Trust and
6  distribution of assets by Canandaigua National
7  Bank you yourself became a voting common
8  shareholder of Eber Brothers and Co., Inc.?
9      MR. RAMSEY:  Form.
10      A.  I never -- I don't know.  I don't
11  remember conversations on that.  I just don't
12  remember.
13      Q.  On this document here in this letter
14  it refers to copies of stock powers being sent and
15  then I will just read the whole paragraph into the
16  record so we are all clear.  It says "Enclosed
17  please find your client's respective copies of the
18  stock powers transferring their shares of Eber
19  Brothers and Co., Inc. pursuant to Canandaigua
20  National Bank and Trust Company's distribution
21  schedule.  As the bank never had possession of the
22  company's stock book or other corporate documents
23  and despite requests, the bank has not been
24  provided with the same.  We were required to
25  complete these transfers via these stock powers as

Page 147

L. Eber

1
2  opposed to issuing new stock certificates.  We are
3  currently retaining the original stock powers
4  which I have affixed to each original stock
5  certificate that the bank received when it became
6  successor co-trustee.  We will continue to do so
7  unless and until such time as we are advised as to
8  whom these originals should be provided given the
9  apparent inability to locate the company's stock
10  book and affiliated records.  It is my
11  understanding that the securities were transferred
12  to your client's respective financial institutions
13  on September 29th and that the remaining assets
14  were electronically transferred last week as
15  well."
16      Did I read that correctly?
17      A.  Yes.
18      Q.  And so do you know what this letter
19  was referring to about the apparent inability to
20  locate the company's stock book?
21      A.  What it says there.  They couldn't
22  find it.
23      Q.  What is a stock book?
24      A.  I don't know.
25      Q.  How does new stock get issued by a

Page 148

L. Eber

1
2  company?
3      A.  I am not involved.  I don't know.
4      Q.  Whose responsibility was it for Eber
5  Brothers and Co., Inc. to take care of the stock
6  book registration of stockholders and issuance of
7  stock certificates?
8      A.  I can't remember.
9      Q.  Do you know where the stock book for
10  Eber Brothers and Co., Inc. currently is?
11      A.  No.
12      Q.  Is it your understanding that the
13  stock book for Eber Brothers and Co., Inc. was
14  misplaced for a period of time?
15      A.  I do not know.
16      MR. BROOK:  Let's go to the next
17      Exhibit 39.
18      (Plaintiffs' Exhibit 39, a four-page
19      letter dated November 5, 2018 by Paul
20      Keneally addressed to Magistrate Judge
21      Katherine Parker, marked for identification,
22      as of this date.)
23      Q.  Exhibit 39 is a four-page letter dated
24  November 5, 2018 by Paul Keneally addressed to
25  Magistrate Judge Katherine Parker.

Page 149

L. Eber

1
2      Do you recognize this document?
3      A.  I don't remember seeing it.  Yeah, I
4  probably did.  I probably was copied and got a
5  copy of it.  I just don't remember.
6      Q.  Paul Keneally is the lawyer for you,
7  your daughter and the Eber companies in this
8  litigation; correct?
9      A.  Yes.
10      Q.  And I would like to draw your
11  attention to paragraph 3 on this first page.  I
12  will read it into the record.  Mr. Keneally wrote
13  to the court in response to a letter by me "It is
14  not true that the corporate stock register was
15  quote lost.  The register is maintained by the
16  corporate secretary Wendy Eber who is solely
17  responsible for registering valid transfers of
18  stock in it.  Neither the Allen Eber Trust,
19  defined as the trust, nor CNB as one of its
20  trustees has any responsibility or role in
21  registering stock transfers.  The corporate
22  secretary never told CNB that the register was
23  lost."
24      Did you see that?
25      A.  Yes.

38 (Pages 146 - 149)

Page 150

L. Eber

1
2    Q.   And did you authorize Mr. Keneally to
3    make this statement?
4         MR. RAMSEY:  Form.
5    A.   He is my lawyer.
6    Q.   And does that refresh your
7    recollection as to whose responsibility it was to
8    deal with the stock book and issue stock
9    certificates on behalf of Eber Brothers and Co.,
10   Inc.?
11        MR. RAMSEY:  Form.
12   A.   If that's what he says that's what it
13   is.  He represents me.
14   Q.   So do you know how looking back at
15   Exhibit 38, do you know why the lawyers for
16   Canandaigua National Bank appeared to believe that
17   the stock book was not able to be located as of
18   October 2017?
19   A.   No.
20   Q.   And to the best of your knowledge, has
21   Wendy Eber always been in possession of the
22   company's stock book?
23        MR. RAMSEY:  Form.
24   A.   I don't know.
25        MR. BROOK:  Let's do two more

Page 151

L. Eber

1
2    exhibits.  This is 40 and 41.
3         (Plaintiffs' Exhibit 40, a e-mail
4    dated June 2, 2017 from Jim Vazzana to
5    Lorisa LaRocca Bates number CNB-PL 0022,
6    marked for identification, as of this date.)
7         (Plaintiffs' Exhibit 41, an e-mail
8    dated August 18, 2017 from Jim Vazzana to
9    Lorisa LaRocca, marked for identification,
10   as of this date.)
11   Q.   Exhibit 40 is a e-mail dated June 2,
12   2017 from Jim Vazzana to Lorisa LaRocca Bates
13   number CNB-PL 0022.
14        Do you recognize that e-mail?
15        MR. RAMSEY:  You are not suggesting he
16   was copied on it; right?
17        MR. BROOK:  I'm not.  I wasn't copied.
18   A.   I'm not.  I wasn't copied.
19   Q.   Nonetheless, are you aware that your
20   lawyer sent an e-mail along these lines to Lorisa
21   LaRocca who was representing Canandaigua National
22   Bank?
23   A.   You know, I think it's possible.  I
24   don't remember but it is very possible.
25   Q.   Was Jim Vazzana representing your

Page 152

L. Eber

1
2    daughter Wendy as well as you?
3    A.   He was my lawyer.
4    Q.   Now do you see the second paragraph
5    here.  It refers to first two words say my
6    clients.
7         Do you see that plural?
8    A.   Yes.
9    Q.   Who else --
10   A.   It would be my daughter.
11   Q.   I would like to point your attention
12   now to the substance of the first paragraph which
13   I will also read for the record.  "Dear Lorisa, I
14   trust you received my e-mail of yesterday
15   afternoon regarding your inquiry as to the
16   corporate stock book of Eber Brothers and Co.,
17   Inc.  I am fairly confident that they do not have
18   it.  However, to be sure, Wendy will be in
19   Rochester for the fourth of July weekend and will
20   double check."
21        Do you see that?
22   A.   Yes.
23   Q.   So your lawyer told counsel for
24   Canandaigua National Bank that you and Wendy could
25   not locate the corporate stock book; correct?

Page 153

L. Eber

1
2         MR. RAMSEY:  Form.
3    A.   I don't remember that.  It's very
4    confusing and I just don't remember.
5    Q.   Did you have an understanding as to
6    why Canandaigua National Bank wanted the corporate
7    stock book?
8    A.   No.
9    Q.   Please turn to Exhibit 41 which is an
10   e-mail dated August 18, 2017 again from Jim
11   Vazzana to Lorisa LaRocca this time with you and
12   your daughter Wendy copied on it.
13        Do you see that?
14   A.   Yes.
15   Q.   This has Bates numbers CNB-PL 0006.
16   And this e-mail reads "Lorisa, have you or your
17   client ever found the stock register on Eber
18   Brothers Co.  My client indicated in June that she
19   would make a special trip to Rochester in July to
20   see if she could find them.  Please advise."
21        Do you see that?
22   A.   Yes.
23   Q.   Do you remember this e-mail?
24   A.   I got it.
25   Q.   Do you remember seeing it?

39 (Pages 150 - 153)

Page 154

L. Eber

1
2    A.   No, I don't remember it, but I was
3  copied on it.
4    Q.   So is it fair to say that as of mid
5  August 2017 neither you nor Wendy knew where the
6  stock register was for Eber Brothers and Co.,
7  Inc.?
8        MR. RAMSEY:  Form.
9    A.   I can't give you an answer on that
10  because I just do not remember this whole e-mail.
11    Q.   Have you or Wendy misled Mr. Vazzana
12  about where the stock register was for Eber
13  Brothers and Co., Inc.?
14        MR. RAMSEY:  Form.
15    A.   I never misled Mr. Vazzana on
16  anything.
17    Q.   Did you guys ask Mr. Vazzana to make
18  it seem like you did not know where the stock
19  register was?
20        MR. RAMSEY:  Form.
21    A.   I never had a conversation with him on
22  it.
23    Q.   So are you saying that any
24  conversations with Mr. Vazzana about the stock
25  register were between Wendy and Mr. Vazzana?

Page 155

L. Eber

1
2    A.   I think Vazzana was the lawyer with
3  counsel.
4        MR. RAMSEY:  Form.
5    Q.   Do you know where the stock book or
6  stock register for Eber Brothers and Co., Inc. is
7  as of right now?
8    A.   No.
9        MR. BROOK:  Let's go to Exhibit 42.
10        (Plaintiffs' Exhibit 42, a copy of a
11    letter dated October 10, 2018 from Audrey
12    Hays to Wendy Eber and Lester Eber, marked
13    for identification, as of this date.)
14    Q.   Exhibit 42 is a copy of a letter dated
15  October 10, 2018 from Audrey Hays to Wendy Eber
16  and Lester Eber.
17        Do you recognize this document?
18    A.   It was sent to me, so I did see it.
19    Q.   And what do you recall about this
20  document?
21    A.   What you got here, that's it.
22    Q.   What was the purpose for Miss Hays
23  writing to you?
24        MR. RAMSEY:  Form.
25    A.   I don't know.

Page 156

L. Eber

1
2    Q.   Would you please read aloud the first
3  sentence of this letter?
4    A.   "On behalf of myself, Lisa Stein and
5  Daniel Kleeberg representing more than one third
6  of the shares I write to request a special meeting
7  of the shareholders of Eber Brothers and Co., the
8  company pursuant to Article 1 Section 1 of the
9  bylaws."
10    Q.   So you understood from that that the
11  purpose of this letter was to request a special
12  meeting of the shareholders of Eber Brothers and
13  Co., Inc.?
14        MR. RAMSEY:  Form.
15    A.   I understand what it says in the
16  letter.
17    Q.   So reading it now you understand that
18  purpose; correct?
19    A.   Mm-hmm, yes.
20    Q.   And then it says it got three items
21  after or -- withdrawn.
22        After that first sentence it has a
23  list of three items that it says are the purposes
24  for the special meeting.
25        Do you see that?

Page 157

L. Eber

1
2    A.   Yes.
3    Q.   And the first one says appointing
4  and/or removing directors of the company.
5        Do you see that?
6    A.   Yes.
7    Q.   Do you have any trouble understanding
8  what that means?
9    A.   No.
10    Q.   The second item is to consider
11  amendments to the bylaws so that they conform to
12  the current status of the company.
13        Do you see that?
14    A.   Yes.
15    Q.   Do you understand what that means?
16    A.   Yes.
17    Q.   Item number three.  "Such other items
18  as the shareholders may deem necessary in
19  connection with the above or for the operation of
20  the company's business which are subject to the
21  control of the shareholders."
22        Do you see that?
23    A.   Yes.
24    Q.   Do you understand what that means?
25    A.   I don't know what other items means.

40 (Pages 154 - 157)

Page 158

```
1              L. Eber
2      Q.   And what did you do after you received
3  this letter?
4      A.   I don't remember.
5      Q.   Was a special meeting of the
6  shareholders called?
7      A.   I don't remember.
8      Q.   When is the last time there were
9  elections for directors of Eber Brothers and Co.,
10 Inc.?
11     A.   I don't remember.
12     Q.   Do you know who the current directors
13 of Eber Brothers and Co., Inc. are?
14     A.   I believe they are Wendy and myself.
15     Q.   And what is your understanding as to
16 how frequently elections for directors have to be
17 called?
18         MR. RAMSEY:  Form.
19     A.   I don't remember.
20     Q.   Do you recall ever giving a copy of
21 the bylaws of Eber Brothers and Co., Inc. to
22 anyone from Canandaigua National Bank and Trust?
23     A.   I don't remember.
24     Q.   Do you recall ever giving a copy of
25 the bylaws of Eber Brothers and Co., Inc. to Dan
```

Page 159

```
1              L. Eber
2  Kleeberg, Audrey Hays or Lisa Stein?
3      A.   No.
4      Q.   Now it is pursuant to the bylaws of
5  Eber Brothers and Co., Inc. that you have said
6  that you have the right to acquire the shares that
7  would otherwise be distributed to my clients;
8  correct?
9      A.   Yes.
10     Q.   Had you ever indicated prior to the
11 correspondence dated October 31, 2018 that we
12 looked at in Exhibit 35 that you believed that
13 there were any restrictions against transferring
14 Eber Brothers and Co., Inc. shares to Dan
15 Kleeberg, Lisa Stein or Audrey Hays?
16         MR. RAMSEY:  Form.
17     A.   Could you repeat that?
18         MR. BROOK:  Sure.
19         (Record read.)
20     A.   I don't remember.
21     Q.   And to the best of your recollection,
22 the stock certificates of Eber Brothers and Co.,
23 Inc. issued to the Allen Eber Trust did not
24 indicate there were any restrictions on the
25 transfer of the shares; correct?
```

Page 160

```
1              L. Eber
2         MR. RAMSEY:  Form.
3      A.   I didn't say that.
4      Q.   Well, do you recall --
5      A.   You have said that.  I didn't say it.
6      Q.   I am asking a question.
7      A.   You didn't ask a question.  You said
8  that.
9         MR. RAMSEY:  All right.  Let him ask a
10     different question.
11     Q.   So do you recall whether there are any
12 restrictions on the transfer of Eber Brothers and
13 Co., Inc. shares that are mentioned on the face of
14 the stock certificates for Eber Brothers and Co.,
15 Inc. that were issued to the Allen Eber Trust?
16     A.   Yes.  There are.
17     Q.   What restrictions are noted on the
18 certificates?
19     A.   I don't remember but there are.
20     Q.   And how do you know that?
21     A.   Because being a trustee of the estate
22 when my sisters died and stock could have been
23 picked up by the trust and they were allowed to
24 keep it but the company had the right to pick up
25 the stock.
```

Page 161

```
1              L. Eber
2      Q.   I am sorry.
3         So you are referring to the times when
4  both of your sisters died?
5      A.   Yes.
6      Q.   And at that point it was your
7  understanding that the company Eber Brothers and
8  Co., Inc. could have acquired the stock instead of
9  the stock being inherited by your sister's
10 children?
11     A.   That was my understanding.
12     Q.   How did you come to have that
13 understanding?
14     A.   From my lawyer Mr. Gumaer.
15     Q.   And he told you that at the time of
16 your sister Mildred's death?
17 DI     MR. RAMSEY:  Don't answer that.
18     That's privileged.  He is not talking about
19     any conversation.  Whatever the
20     understanding was, that's what he said.  He
21     is not talking about what his conversations
22     were.
23         MR. BROOK:  I am just trying to get
24     the time on this.
25         MR. CALIHAN:  I'm sorry.
```

41 (Pages 158 - 161)

Page 162

L. Eber

1          L. Eber
2      You are trying to get?
3          MR. BROOK:  The timing on this.
4  BY MR. BROOK:
5      Q.   So your understanding that you just
6  described is an understanding that you had at or
7  shortly after the time of your sister Mildred's
8  death; is that right?
9      A.   Yes.
10      Q.   And do you remember having that
11  understanding in 1973?
12      A.   I remember it was that I was told that
13  by Mr. --
14          MR. CALIHAN:  You don't want to
15      disclose the substance of what was said
16      between you and Mr. Gumaer for legal advice.
17          THE WITNESS:  Thank you.
18      To be clear, you do have the right to
19  disclose it if you choose.
20      A.   I will listen to my counsel.
21      Q.   Or Mr. Gumaer's counsel.
22      A.   Mr. Gumaer's counsel.  My lawyer's
23  counsel.
24      Q.   Did you know Rob Calihan before this
25  lawsuit was filed?

Page 163

L. Eber

1          L. Eber
2      A.   Maybe.  Not well.
3      Q.   Had you ever retained Rob Calihan to
4  represent you?
5      A.   No.
6      Q.   Have you asked Rob Calihan for any
7  legal advice in connection with this lawsuit?
8      A.   He is not my lawyer.  Underberg and
9  Kessler is my lawyer.
10      Q.   You have at a previous deposition
11  passed notes to Mr. Calihan; correct?
12      A.   If you are saying it, I don't
13  remember.  You are very observant.
14          MR. BROOK:  Let's go ahead and stop
15      here for media reasons.
16          THE VIDEOGRAPHER:  This marks the end
17      of media unit number 3 in the videotaped
18      deposition of Lester Eber.  We are going off
19      the record.  The time is 1:47.
20      (Recess taken.)
21          THE VIDEOGRAPHER:  This marks the
22      beginning of media unit number four in the
23      videotaped deposition of Lester Eber.  We
24      are going on the record.  The time is 1:57.
25  BY MR. BROOK:

Page 164

L. Eber

1          L. Eber
2      Q.   Before we broke you had testified that
3  it was your understanding that you had had the
4  right to acquire your sister's shares instead of
5  those shares being distributed to your nieces and
6  nephew; correct?
7      A.   Yes.
8      Me personally acquire or the company
9  acquire?
10      Q.   So clarify that.
11      What was your understanding of who
12  could acquire the shares?
13      A.   I am not quite sure.  It could have
14  been either.  I don't have an answer for you on
15  that.
16      Q.   Whether it was you or the company, why
17  didn't you attempt to acquire the shares of your
18  sister's instead of having those shares be passed
19  to your nieces and nephew?
20      A.   I don't have an answer.  I think
21  that's what my father wanted.  I think you would
22  have to ask -- he is not here my lawyer Mr.
23  Gumaer.  I don't have an answer for that because I
24  had nothing to do with his will or what have you.
25      Q.   Are you saying that Mr. Gumaer was the

Page 165

L. Eber

1          L. Eber
2  person who made the decision about whether or not
3  to acquire the shares?
4          MR. RAMSEY:  Form.
5          MR. CALIHAN:  Objection to form.
6      A.   I think there was nothing I did there
7  that I didn't discuss with Mr. Gumaer.
8      Q.   But who actually made the decision not
9  to try to acquire the shares that had belonged to
10  your sisters?
11      A.   I don't remember.
12      Q.   After this lawsuit was filed in
13  December 2016, did you retain counsel right away?
14      A.   Yes.
15      Q.   Who did you retain?
16      A.   Paul Keneally, Underberg and Kessler.
17      Q.   And why did you choose Paul Keneally
18  with Underberg and Kessler?
19      A.   Because he had been working with us
20  and he handled our legal affairs.
21      Q.   Did Paul Keneally already have
22  familiarity with some of the transactions at issue
23  in this case?
24          MR. RAMSEY:  Form.
25      A.   I don't remember.

42 (Pages 162 - 165)

Page 166

L. Eber

1
2    Q.   Who is the lawyer that you hired to
3  represent Alexbay when Alexbay foreclosed on the
4  debt that you had assigned to it?
5    A.   Michael Beyma.
6    Q.   Which firm is he associated with?
7    A.   Underberg and Kessler.
8    Q.   Was Paul Keneally involved in that at
9  all?
10    A.   Not that I know.
11    Q.   Did Paul Keneally introduce you to Mr.
12  Beyma?
13    A.   I don't remember.
14    Q.   After this lawsuit was filed, did you
15  take any steps to attempt to prevent plaintiffs
16  from potentially obtaining control over the Eber
17  Brothers Wine and Liquor Company?
18    MR. RAMSEY:  Form.
19    A.   I don't remember.
20    Q.   You did understand that one of the
21  things that plaintiffs requested in this lawsuit
22  from the beginning was to take a controlling stake
23  in the Eber Brothers and Co., Inc. company;
24  correct?
25    A.   I don't remember.

Page 167

L. Eber

1
2    MR. BROOK:  Let's mark this next one
3  Exhibit 43.
4    (Plaintiffs' Exhibit 43, a series of
5  documents that were produced together Bates
6  range EB 00001166 through 1173, marked for
7  identification, as of this date.)
8    Q.   Exhibit 43 is a series of documents
9  that were produced together.  The Bates range EB
10  00001166 through 1173.
11    Do you recognize these documents?
12    A.   I believe I have seen them.
13    Q.   And these are documents concerning the
14  Eber Brothers Wine and Liquor Corp.; is that
15  right?
16    A.   Yes.
17    Q.   The various documents are signed by
18  either you or Wendy or both of you, correct?
19    A.   Yes.
20    Q.   Why were these -- and let me step back
21  one more.
22    So you see the first document is
23  referred to as the written consent of the sole
24  member of the board of directors of Eber Brothers
25  Wine and Liquor Corporation.

Page 168

L. Eber

1
2    Do you see that?
3    A.   Which page are you on?
4    MR. RAMSEY:  First page.
5    Q.   The first page.
6    A.   Yes.
7    Q.   And on the second page you can see it
8  is dated as of February 15, 2017.
9    Do you see that?
10    A.   Yes.
11    Q.   What is your understanding of what it
12  means to have a document dated or executed as of a
13  particular date?
14    A.   I don't know.
15    Q.   Is it your understanding that the
16  document was actually executed on that date?
17    A.   I do not know.
18    Q.   Are you familiar with the term of an
19  effective date?
20    A.   No.
21    Q.   Take a look at the next page Bates 3
22  of the document that is the page that's signed by
23  both you and Wendy dated February 15, 2017;
24  correct?
25    A.   Yes.

Page 169

L. Eber

1
2    Q.   So Wendy signed on behalf of Eber
3  Brothers Wine and Liquor and you signed on behalf
4  of yourself; right?
5    A.   Yes.
6    Q.   And then flip forward one, two, three,
7  four pages to the second to last page.
8    You see there is a signature by Wendy
9  Eber as assistant secretary there?
10    A.   Yes.
11    Q.   And this one is dated February 14,
12  2017?
13    A.   Yes.
14    Q.   That's one day earlier than the first
15  two documents we saw; correct?
16    A.   The first one says February 14th also.
17    Q.   I am sorry.
18    So it is the same day as the first
19  document but one day before the second; correct?
20    A.   Yes.
21    Q.   And then the very last page of this
22  exhibit page 8, that one is signed by you as the
23  written consent of the stockholders of Eber
24  Brothers Wine and Liquor Corporation signed by you
25  as president of Eber Brothers and Co., Inc.

43 (Pages 166 - 169)

Page 170

L. Eber
1
2       Do you see that?
3       A.   Yes.
4       Q.   Does that refresh your recollection
5   that you still are the president of Eber Brothers
6   and Co., Inc.?
7       A.   Yes.
8       Q.   And you see that one is dated as of
9   February 14, 2017; correct?
10      A.   Yes.
11      Q.   So were you and Wendy you actually got
12  together on Valentine's Day and executed these
13  documents?
14      A.   I don't remember.
15      Q.   Is it possible these documents were
16  dated as of a different date than the date when
17  you were actually signing them?
18      MR. RAMSEY:  Form.
19      A.   I don't remember.
20      Q.   Who prepared these documents for you?
21      A.   I don't know.
22      Q.   Were they prepared by you?
23      A.   No.
24      Q.   Did Wendy prepare these?
25      A.   I don't know.  Could have been a

Page 171

L. Eber
1
2   lawyer.  I don't know.
3       Q.   Did Eber Brothers and Co., Inc. or
4   Eber Brothers Wine and Liquor Corp. hire any
5   lawyers in connection with these documents?
6       A.   I don't know.
7       Q.   What was the purpose of these
8   documents being executed on February 14th and 15,
9   2017?
10      A.   I don't remember.
11      Q.   Looking at the last page first, that
12  document reflects your consent on behalf of Eber
13  Brothers and Co., Inc. to the appointment of Wendy
14  Eber as the sole director of Eber Brothers Wine
15  and Liquor Corp.; correct?
16      A.   Yes.
17      Q.   And was it your understanding that
18  Eber Brothers Wine and Liquor Corp. was permitted
19  to have just a single director?
20      MR. RAMSEY:  Form.
21      A.   I don't know.  I don't know.
22      Q.   Do you recall that at approximately
23  the same time mid February 2017 Mike Gumaer
24  resigned as director of Eber Brothers and Co.,
25  Inc. and Eber Brothers Wine and Liquor Corp.?

Page 172

L. Eber
1
2       A.   I think he did.  I just don't remember
3   the exact date of it.
4       Q.   And then going forward from the back
5   the longest document is from pages 4 to 7.  That
6   one is called Certificate of Amendment of the
7   Certificate of Incorporation of Eber Brothers Wine
8   and Liquor Corporation.
9       Do you see that?
10      A.   It is page 2?
11      MR. RAMSEY:  Starts at page 4.
12      A.   Page 4.
13      MR. RAMSEY:  This one (indicating).
14  One more (indicating).
15      A.   Yes.
16      Q.   So once -- let me withdraw that.
17      Why was Wendy signing this document to
18  amend the certificate of incorporation?
19      MR. RAMSEY:  Form.
20      A.   I don't know.  I don't remember.  I
21  just don't.
22      Q.   So you do not recall that the
23  certificate of amendment of the certificate of
24  incorporation was done in order to create a new
25  class of junior preferred stock which had voting

Page 173

L. Eber
1
2   rights?
3       A.   I don't -- I can't -- I just don't
4   know.
5       Q.   Do you have an understanding as to the
6   distinction between common stock and preferred
7   stock?
8       A.   Yes.
9       Q.   What's the distinction?
10      A.   Common is usually non-voting and
11  preferred is voting or dividend paying.
12      Q.   You mean it the other way around,
13  common shares are voting?
14      A.   I have seen common that's non-voting.
15      Q.   In a liquidation of a company, which
16  shares get paid first; preferred or common?
17      A.   I believe preferred.
18      Q.   And it is your understanding that the
19  preferred stock typically has voting rights?
20      A.   It could.  It could or could not.  I
21  don't know.
22      Q.   Do you know if Eber Brothers Wine and
23  Liquor Corporation had any preferred stock with
24  voting rights prior to the execution of this
25  amendment?

44 (Pages 170 - 173)

Page 174

L. Eber

1
2    A.   I do not know.
3    Q.   Prior to February 2017, did you have
4  or did you own any preferred stock in Eber
5  Brothers Wine and Liquor Corporation?
6    A.   Not that I can remember.
7    Q.   After February 2017 did you own any
8  preferred stock in Eber Brothers Wine and Liquor
9  Corporation?
10    A.   I would have to look at this closer.
11  I don't remember.
12    Q.   Flip forward one page to page 3.
13  Although it has no title it appears to be some
14  kind of a corporate decision.  It says, I will
15  just read the whole thing because it is short
16  "Eber Brothers Wine and Liquor Corporation,
17  defined as the corporation, hereby issues to
18  Lester Eber 750 shares of class B junior preferred
19  stock par value fifty dollars per share, defined
20  as the shares, of the corporation in consideration
21  of Lester Eber's agreement hereby to reimburse the
22  corporation at its request for up to 37,500
23  dollars of expenses incurred or to be incurred by
24  the corporation in connection with its general
25  operations.  Upon the execution and delivery of

Page 175

L. Eber

1
2  this agreement by the parties hereto, the shares
3  will be duly authorized, validly issued, fully
4  paid and non-assessable without further action by
5  either party."
6        Do you see that?
7    A.   Yes, I see that.
8    Q.   Having gone through that, does it
9  refresh your recollection that through some
10  corporate mechanisms you have acquired 750 shares
11  of class B junior preferred stock in Eber Brothers
12  Wine and Liquor Corporation?
13    A.   Yes.
14    Q.   And why did that transaction occur?
15    A.   I don't remember.
16    Q.   What were the expenses incurred in
17  connection with Eber Brothers Wine and Liquor's
18  general operations that required your financing?
19    A.   I don't remember.
20    Q.   Did you ask?
21    A.   I don't remember.  I just don't.  My
22  time is spent keeping Connecticut afloat and the
23  job I have working in New York.
24    Q.   You also have had to spend time and
25  money defending against this lawsuit; correct?

Page 176

L. Eber

1
2    A.   Yes.
3    Q.   And this lawsuit you understand is one
4  that is brought by plaintiffs in their capacity,
5  through their derivative capacity on behalf of the
6  Eber Brothers Wine and Liquor Corporation;
7  correct?
8        MR. RAMSEY:  Form.
9    A.   You are speaking legal language that I
10  don't understand, so I don't understand.  I don't.
11  I don't understand you.
12    Q.   Have you ever heard of a derivative
13  shareholder lawsuit?
14    A.   I have heard of it.  I don't know much
15  about it.
16    Q.   Are you someone who has ever invested
17  in publicly traded stock?  Is that a yes?
18    A.   I don't know much about it.  I don't
19  know much about it.
20    Q.   So you have never received mailers
21  from law firms or courts saying --
22    A.   No.
23    Q.   -- there is a class and a derivative
24  lawsuit is involved?
25    A.   I have received that, but I don't know

Page 177

L. Eber

1
2  if it was under derivative name or class actions
3  suits I believe.
4    Q.   It is your understanding; right, that
5  as a shareholder of a corporation a shareholder
6  may attempt to assert the rights of the
7  corporation in the event that the officers or
8  directors of the corporation are harming the
9  company; right?
10        MR. RAMSEY:  Form.
11    A.   You know, I don't have an answer for
12  you on that.
13    Q.   It was your understanding after this
14  lawsuit was filed that plaintiffs sought to have
15  the shares of Eber Metro returned to Eber Brothers
16  Wine and Liquor Corp. from Alexbay; right?
17        MR. RAMSEY:  Form.
18    A.   I don't remember that.
19    Q.   But as of this time you are aware that
20  is one of the items of relief that the plaintiffs
21  are seeking; right?
22    A.   That's what you are mentioning now.
23  If that's what you are saying they are doing,
24  that's what's going on.
25    Q.   You never heard that before I

45 (Pages 174 - 177)

Page 178

1          L. Eber
2   mentioned it to you?
3       A.   I could have.  I said I don't
4   remember.
5       Q.   Why did you want to have 750 shares of
6   voting preferred stock in Eber Brothers Wine and
7   Liquor Corporation?
8       A.   I think you would have to ask my
9   lawyer.
10      Q.   So is this something that you did
11  because your lawyer told you to do it?
12      A.   Yes.
13      Q.   And which lawyer are you referring to?
14      A.   I would say John Herbert.
15      Q.   Going back now to the first document,
16  this is one signed by Wendy Eber February 15th,
17  you see this is just her authorizing the other
18  documents that we had just looked at; correct?
19          MR. RAMSEY:  Form.
20          MR. BROOK:  Well, I will rephrase
21  that.
22      Q.   Among other things it authorized this
23  certificate of amendment and the purchase
24  agreement that we had just looked at; correct?
25      A.   Yes.

Page 179

1          L. Eber
2       Q.   Do you know why Wendy executed this
3   consent document?
4       A.   I said I don't know.  You would have
5   to ask my lawyer.
6       Q.   Do you recall that in approximately on
7   February 11, 2011 you executed the document
8   transferring debt that was owed -- let me
9   withdraw.
10          Do you recall that in February 2011
11  Eber Brothers Wine and Liquor Corporation assigned
12  debt that it owed to you to Eber Metro?
13      A.   I don't remember.
14      Q.   Plaintiffs' Exhibit 17, that is the
15  document entitled Debt Assumption Agreement.
16          Do you have that in front of you?
17      A.   Yes.
18      Q.   Do you recognize that document?
19      A.   Yes.
20      Q.   Why was that document executed?
21      A.   I don't remember.
22      Q.   Why did Eber Metro assume the debt
23  owed to you by Eber Brothers Wine and Liquor
24  Corp.?
25      A.   I don't remember.

Page 180

1          L. Eber
2       Q.   I am going to move to something very
3   different for a moment so you can put that
4   document down.  Thank you.
5          A lawsuit was filed by PBGC in 2015 to
6   terminate or to get a judicial order approving a
7   determination of the ERISA pension plan that had
8   been created and managed by Eber Brothers Wine and
9   Liquor Corp.; correct.
10      A.   If that's the date.  I don't remember
11  the date, but that there was one.
12      Q.   But you remember a lawsuit along the
13  lines that I just described; yes?
14      A.   Yes.
15      Q.   That lawsuit was ultimately settled
16  with PBGC; correct?
17      A.   Yes.
18      Q.   And it was settled shortly after this
19  lawsuit that we are here today was filed; correct?
20      A.   I don't remember the date and what
21  have you.
22      Q.   Do you remember what the monetary
23  terms of the settlement were?
24      A.   Some of it.
25      Q.   Which terms do you remember?

Page 181

1          L. Eber
2       A.   My pension plan that I gave up.
3       Q.   Anything else?
4       A.   I gave up 1.4 million to the plan.
5   Other members of the company no one else.  They
6   are getting money from the plan because we were
7   able to settle this.
8       Q.   And in addition to giving up your
9   pension there was also a two million dollar
10  payment to PBGC?
11      A.   That's correct, yes.
12      Q.   Who made that payment?
13      A.   It was -- I don't know the exact
14  thing.  It came from the Connecticut.
15      Q.   So Eber Connecticut --
16      A.   Or it came from -- it could have come
17  from Eber Brothers Metro.  I don't remember who.
18  I don't want to give you an answer because I don't
19  want to give you the wrong answer.  I don't
20  remember.
21  RQ        MR. BROOK:  Since I think neither
22  witness today or yesterday can testify, I am
23  putting in a request for documentation
24  sufficient to show which entity or entities
25  paid the settlement funds to PBGC.  Yeah,

46 (Pages 178 - 181)

Page 182

L. Eber

1    L. Eber
2    that sounds right.
3         MR. RAMSEY:  I understand your
4    request.
5    Q.    And in exchange for giving up your
6    pension and a two million dollar payment, PBGC
7    agreed that it would not attempt to impose any
8    liens to satisfy unpaid pension plan obligations
9    against Eber Connecticut or Eber Metro; correct?
10    A.    I believe so.
11    Q.    Do you know why PBGC was trying to
12    impose liens on Eber Connecticut or Eber Metro?
13         MR. RAMSEY:  Form.
14    A.    To collect moneys for the termination
15    of the plan.
16    Q.    And PBGC did that even though years
17    before it filed suit Eber Metro had been
18    transferred away from Eber Brothers Wine and
19    Liquor Corp.; correct?
20    A.    That's correct.
21    Q.    So is it your understanding that PBGC
22    was seeking to have the court endorse a plan
23    termination date that was early enough that it
24    could enforce pension plan obligations on
25    subsidiaries that were controlled by Eber Brothers

Page 183

L. Eber

1    L. Eber
2    Wine and Liquor Corp. as of the date termination
3    they were trying to choose?
4         MR. RAMSEY:  Form.
5    A.    Yes.
6    Q.    And they chose the date or they were
7    attempting to choose the date of April 30, 2010;
8    correct?
9    A.    I don't remember the date.
10    Q.    It was a date before the sale of six
11    percent of Eber Connecticut to Polebridge Bowman;
12    correct?
13    A.    I don't remember that.
14    Q.    Do you remember that under the ERISA
15    rules in place there was a certain threshold of
16    ownership of a subsidiary for when a subsidiary
17    would be considered part of the controlled group?
18    A.    I am not --
19         MR. RAMSEY:  Form.
20    A.    I am not an ERISA lawyer.
21    Q.    Do you remember -- I am not asking if
22    you are an ERISA lawyer.  Just if you had an
23    understanding that the percentage of ownership of
24    a subsidiary by a company that was sponsoring a
25    plan was relevant as to whether that subsidiary

Page 184

L. Eber

1    L. Eber
2    would be potentially on the hook or liable for
3    pension plan funding obligations?
4         MR. RAMSEY:  Form.
5    A.    It's possible.  I just don't remember
6    it, but it is very possible.
7    Q.    Isn't it correct it was based upon
8    trying to get the percentage of ownership of Eber
9    Connecticut below that percentage threshold; that
10    was the real reason why six percent of Eber
11    Connecticut was sold to Polebridge Bowman?
12         MR. RAMSEY:  Form.
13    A.    Not that I know of.  I was not
14    involved in that.
15    Q.    So it was just a coincidence then that
16    after the Polebridge Bowman transaction the
17    percentage ownership of Eber Connecticut by Eber
18    Metro was 79 percent; is that right?
19         MR. RAMSEY:  Form.  That's not what he
20    testified to.
21    A.    That's not what my affidavit I believe
22    that he wanted ten percent originally.  We got him
23    down to six percent.
24    Q.    Well, ten percent would have looked a
25    little less obviously fishy; right?

Page 185

L. Eber

1    L. Eber
2         MR. RAMSEY:  Form.
3    A.    I didn't say that.
4         MR. CALIHAN:  Objection to form.
5    Q.    When you made loans to Eber Brothers
6    Wine and Liquor Corp. and Eber Metro, did you get
7    board approval for those loans and their terms?
8    A.    You would have to ask my lawyer on
9    that.  I believe so.
10    Q.    And do you know whether that board
11    approval was obtained prior to the loans being
12    made?
13    A.    You know, I don't -- it goes back so
14    long I just don't remember.  I would suggest you
15    talk to the lawyers involved.
16         MR. RAMSEY:  (Indecipherable.  Talking
17    at the same time as witness.)
18    A.    I don't know.  I don't remember it.
19    Q.    Now when you sold or you agreed to
20    sell six percent of Eber Connecticut to Polebridge
21    Bowman, you knew that Polebridge Bowman was a
22    company created and controlled entirely by Glenn
23    Sturm; right?
24    A.    Yes.
25    Q.    And what was the relationship between

47 (Pages 182 - 185)

Page 186

L. Eber
1
2  Glenn Sturm and the Eber companies at that time?
3      A.   He was a legal consultant.
4      Q.   Did he do anything else for them?
5      A.   Well, he helped advise them in trying
6  to turn around a company that was headed for
7  liquidation.
8      Q.   And is it correct that he agreed to
9  provide those services at a certain point only if
10  you agreed that his company Polebridge Bowman
11  could acquire six percent of Eber Connecticut?
12      A.   That's what was finally resolved.  The
13  way it was resolved.
14      Q.   And how was the price determined for
15  that six percent interest?
16      A.   I don't know.
17      Q.   You weren't involved in that?
18      A.   No.
19      Q.   Who was?
20      A.   It would be the lawyers.
21      Q.   What did the lawyers know about how to
22  price Eber Connecticut stock?
23      A.   I don't know.  I think it's -- I don't
24  know.  I don't want to comment on something I
25  don't know and it might have been more than the

Page 187

L. Eber
1
2  lawyers.  I was not involved in that.
3      Q.   Did Andy Eder or anyone else from
4  Eder-Goodman have any involvement in the pricing
5  of the Polebridge Bowman six percent?
6      A.   Not that I know of.
7      Q.   Was the pricing of the Polebridge
8  Bowman six percent transaction ultimately
9  disclosed to Andy Eder and Eder-Goodman?
10      A.   I don't know.
11      Q.   Did you have any discussions with
12  anyone from Eder-Goodman about the Polebridge
13  Bowman six percent?
14      A.   I did not.
15      Q.   Did someone else?
16      A.   I don't know.
17      Q.   Was it your understanding that
18  Eder-Goodman had any rights of first refusal with
19  respect to the sale of six percent?
20      A.   I don't know.
21      Q.   Did you ever attempt to put the six
22  percent that was going to be sold to Polebridge
23  Bowman out to auction in a market style auction?
24      A.   I was not involved in any of that.  I
25  was aware of the stock and that's it.  I didn't

Page 188

L. Eber
1
2  know the mechanics or anything else about it.
3      Q.   And it is your testimony that you also
4  don't know how the six percent sale was negotiated
5  with Polebridge Bowman; correct?
6      A.   If I -- I don't remember and I do not
7  remember being involved in it.
8      Q.   Would you characterize the sale of the
9  stock -- I am sorry.
10      Would you characterize the sale of six
11  percent of Eber Connecticut membership units to
12  Polebridge Bowman as a free market transaction?
13      MR. RAMSEY:  Form.
14      A.   What is a free market transaction?
15      Q.   What is your understanding of what
16  that means?
17      A.   I am asking you.  I don't know.  I am
18  asking you.  You asked me the question and I want
19  you to explain to me what a free market
20  transaction is so I can answer you.
21      Q.   Sure.
22      So I have now moved on past that
23  question and my question to you is:  What is your
24  understanding of what it means to have a
25  transaction be done through the free market?

Page 189

L. Eber
1
2      MR. RAMSEY:  Form.
3      If you have an understanding.
4      A.   I don't have an understanding of it.
5      Q.   Why did you transfer debts that were
6  owed to you by Eber Metro to Alexbay?
7      A.   To Alexbay because it was my personal
8  hold company and on advice of counsel.
9      Q.   And after you did that Alexbay on your
10  authority made a proposal to Eber Metro to accept
11  Eber Metro's shares in lieu of other methods of
12  foreclosing on the unpaid debt; correct?
13      A.   You know, I don't remember the
14  mechanics, but I know everything that was done was
15  to clean up the balance sheet and to transfer debt
16  into assets so that we could get a bank loan to
17  run the business.  We were in dire straits and we
18  needed a bank to be able to run a business and pay
19  our suppliers.
20      Q.   And so you were trying to reduce the
21  amount of debt that was weighing down the company;
22  correct?
23      A.   And clean up the balance sheet so that
24  a bank would be interested in lending us money.
25      Q.   So in other words, this didn't affect

48 (Pages 186 - 189)

Page 190

L. Eber

1    L. Eber
2  any debts that were owed directly by Eber
3  Connecticut; correct?
4        MR. RAMSEY:  Form.
5     A.   I don't -- I can't give you an answer.
6  I don't -- I would like to give you an answer but
7  I don't have an answer for you.
8     Q.   So was it your understanding that Eber
9  Connecticut was weighed down by the debt of Eber
10  Brothers Wine and Liquor Corp.?
11        MR. RAMSEY:  Form.
12     A.   Eber Wine and Liquor Corp. yeah, it
13  could have -- it didn't help it.  If it cleaned up
14  the debt and made a cleaner statement so we could
15  go to a bank and they could lend us money based on
16  the inventory or receivables of Connecticut.
17     Q.   And what were the debts that Eber
18  Brothers Wine and Liquor Corp. had at the time
19  that you were trying to clean up the balance
20  sheet?
21     A.   I don't remember.
22     Q.   There was PBGC; right?
23     A.   Yes.
24     Q.   There was the Teamsters?
25     A.   Yes.

Page 191

1    L. Eber
2     Q.   There was Harris Beach?
3     A.   Yes.
4     Q.   Anyone else?
5     A.   Benderson.
6     Q.   What is Benderson?
7     A.   A real estate company.
8     Q.   How much was owed to them
9  approximately?
10     A.   It was over two hundred thousand I
11  believe at the time.
12     Q.   Anyone else?
13     A.   There could have been.  I just can't
14  remember now.
15     Q.   At some point in February 2012 you
16  through Alexbay filed a lawsuit against Eber
17  Brothers Wine and Liquor Corp.; correct?
18     A.   I don't remember.
19        MR. BROOK:  Let's go to our next
20     exhibit.  Up to 44 I think.
21        (Plaintiffs' Exhibit 44, a copy of a
22     summons and complaint dated February 21,
23     2012 bearing Bates number KSH 00070 through
24     83, marked for identification, as of this
25     date.)

Page 192

1    L. Eber
2     Q.   Exhibit 44 is a copy of a summons and
3  complaint dated February 21, 2012 bearing Bates
4  number KSH 00070 through 83.
5        Do you recognize this document?
6     A.   Yes.
7     Q.   What is it?
8     A.   It is summons before a State Supreme
9  Court.  It is on an action for the foreclosure.
10     Q.   Who is the listed plaintiff here?
11     A.   Alexbay.
12     Q.   That's your company; right?
13     A.   Yes.
14     Q.   Who is the lawsuit against?
15     A.   Eber Wine and Liquor, Southern Eber
16  Wine and Liquor Metro, John Doe et cetera.
17     Q.   So does this refresh your recollection
18  that in February 2012 you did authorize the filing
19  of a lawsuit on behalf of Alexbay against Eber
20  Brothers Wine and Liquor Corp.?
21     A.   Yes.
22     Q.   At the time this lawsuit was filed,
23  had you resigned as president of Eber Brothers
24  Wine and Liquor Corp.?
25     A.   I believe so.

Page 193

1    L. Eber
2     Q.   How did you resign?  How did you go
3  about doing this?
4     A.   I believe there was a board meeting
5  and I submitted my resignation to it.  I don't
6  actually remember going.  You know, how many years
7  ago that was.  It was when, in 2012 or before
8  that.
9     Q.   It is your recollection that it
10  happened at a board meeting; correct?
11     A.   I believe so, yes.  To the best of my
12  recollection.
13     Q.   Do you recall any board meetings of
14  Eber Brothers Wine and Liquor Corp. within the two
15  or three month period before this document Exhibit
16  44 was filed?
17     A.   I don't remember.  You know, it could
18  have been at a board meeting.  I could have just
19  submitted it.  Going back I don't remember.
20     Q.   What do you mean by submitted it, what
21  is it?
22     A.   Submitted a letter of resignation.
23     Q.   Do you recall ever signing a letter of
24  resignation?
25     A.   I can't remember.  I could have, but I

49 (Pages 190 - 193)

Page 194

L. Eber

1                L. Eber
2  don't remember the whole scenario of what
3  happened.
4      Q.   It had to have been a pretty big deal
5  when you resigned as president of your father's
6  company; correct?
7          MR. CALIHAN:  Objection to form.
8          MR. RAMSEY:  Form.
9      Q.   Was that an emotional moment for you?
10     A.   With what we have been through nothing
11 is emotional anymore.
12     Q.   So this was just strictly business; is
13 that right?
14         MR. RAMSEY:  Form.
15     Q.   You are nodding.
16         Is that a yes?
17     A.   It was part of the nightmare that was
18 going on with all these companies and trying to
19 keep them from being liquidated to survive.
20     Q.   What was your understanding as to what
21 might cause the business to be liquidated since
22 you were afraid of that?
23     A.   Lack of funds to pay the bills, pay
24 the suppliers and you are out.
25     Q.   So it was your understanding that

Page 195

L. Eber

1                L. Eber
2  there were certain creditors of the company that
3  could have forced a liquidation?
4      A.   Possibly that or we had to get a bank,
5  we had to get bank loans.  We had to get a bank
6  that would give us money to survive because you
7  saw early on Wells Fargo foreclosed on it and that
8  put us right out of business in New York.
9      Q.   When was that?
10     A.   It was in two thousand and what, five,
11 six.  I don't have the exact date.
12     Q.   So you are referring to Wells Fargo
13 foreclosing on Eber Metro?
14     A.   On Eber period.  All the Eber
15 companies.
16     Q.   Was there actually like a judicial
17 proceeding relating to that?
18     A.   Not that I know of.  They just
19 notified us that our loan was in default and we
20 were in a workout.
21     Q.   So it was something short of actually
22 initiating foreclosure proceedings in court; is
23 that right?
24     A.   I don't remember being in court on it.
25     Q.   And then you found Canandaigua

Page 196

L. Eber

1                L. Eber
2  National Bank to replace Wells Fargo?
3      A.   We found them for a small amount.  I
4  think it was a million five.  That wasn't enough.
5  We needed more and we needed something that wasn't
6  renewed every month or so.  We needed somebody to
7  give us a commitment and that's why we had to
8  clean up the balance sheet to make it look like
9  for a bank to want to loan us money.
10     Q.   Returning to Exhibit 44 in front of
11 you.
12         Did you review this before it was
13 filed?
14     A.   I don't remember, but I must have.
15 You know, I can't remember all these things 2012.
16         MR. RAMSEY:  Just wait for a question.
17     Q.   So why did you file this lawsuit?
18     A.   Why did I file what lawsuit?
19     Q.   The one that we are looking at here
20 Exhibit 44.
21     A.   Oh, the foreclosure?
22     Q.   Yes.
23         MR. CALIHAN:  Objection to form.
24         MR. RAMSEY:  Form.
25     A.   I filed it to solidify showing that I

Page 197

L. Eber

1                L. Eber
2  wasn't doing anything underhanded.  There would be
3  a public record of what I had done on advice of
4  counsel.
5      Q.   Which counsel was that?
6      A.   Michael Beyma.
7      Q.   And was it your understanding from the
8  outset that Eber Wine and Liquor and Eber Metro
9  were going to consent to what you requested?
10     A.   We filed it and it took its course.
11     Q.   Had you discussed the lawsuit before
12 you filed it with Wendy, your daughter?
13     A.   I probably had a discussion with her
14 of it.  I don't remember.  I was on advice.  My
15 discussion was with Michael Beyma.
16     Q.   Was Michael Beyma also representing
17 Eber Brothers Wine and Liquor at the time?
18     A.   I don't think so.  I think he just --
19 I don't remember.  I don't remember that, but I
20 remember that's who I worked with the lawyer on
21 this.  He had another fellow Brueckner, if you
22 look at the bottom, who wasn't with them anymore.
23     Q.   Who paid the legal fees of Michael
24 Beyma and Brueckner?
25     A.   I did.

50 (Pages 194 - 197)

Page 198

L. Eber

1
2    Q.   You paid them personally?
3    A.   Yes.
4    Q.   When did you pay them?
5    A.   I don't remember.
6    Q.   Was it at approximately the time when
7  the services were being performed?
8    A.   I believe so.
9    Q.   Now you were aware that at
10  approximately the same time early 2012 or perhaps
11  late 2011 Underberg and Kessler was also
12  performing legal work for Eber Brothers Wine and
13  Liquor Corp.; correct?
14   A.   Yes.
15   Q.   What legal work was that?
16   A.   Just general legal work in operation
17  of a business or in legal situations that
18  confronted the company, you know, whatever lawyers
19  would do.  They took over as our general counsel.
20   Q.   So what kinds of things are you
21  talking about they were doing?
22   A.   I don't have specifics.  I don't
23  remember specifics.
24   Q.   Now do you recall how you came up with
25  the valuation of Eber Connecticut that you

Page 199

L. Eber

1
2  conveyed to the Supreme Court in this lawsuit that
3  was filed?
4    A.   I don't remember.
5    Q.   Please turn to page 9 of this exhibit.
6  It is hard to see page numbers.
7    A.   Where are you?
8    Q.   The page beginning at the top numbered
9  paragraph is 31.  It is on the left side if you
10  are opening it wide.
11   A.   Yes.
12   Q.   And if you go back one page you can
13  see that page 9 is underneath the heading that
14  says The Amount of the Indebtedness and the Value
15  of the Collateral.
16       Do you see that?
17   A.   Yes.
18   Q.   And starting from the bottom of this
19  page and going onto the next page, page 9 in
20  paragraph 30 it says "Metro does not presently
21  operate and it conducts no business activity.  It
22  has not generated profit of any kind in several
23  years.  Metro has no cash reserves other than
24  those required in the ordinary course of its
25  business.  Metro has no tangible assets.  Its only

Page 200

L. Eber

1
2  intangible asset of any significant value and its
3  only valuable asset of any kind is Metro's
4  ownership of a partial interest in yet another
5  company Eber Connecticut LLC."
6       Do you see that?
7    A.   Yes.
8    Q.   Was that an accurate statement?
9    A.   Yes.
10   Q.   So as of February 2011 or 2012 it was
11  consistent with your understanding that Metro's
12  interests in subsidiary entities Eber NDC and Eber
13  Rhode island had no value?
14   A.   Eber NDC, Eber Rhode Island, those are
15  the two you said, yeah.  It had no value.
16   Q.   When had Eber Rhode Island ceased to
17  have any operations?
18   A.   I don't remember the date.  It goes
19  back shortly after we bought the company,
20  Connecticut was purchased.  It came with
21  Connecticut.
22   Q.   And then continuing on page 9 it has
23  some paragraphs describing Eber Connecticut and
24  one paragraph that says it is a limited liability
25  company.

Page 201

L. Eber

1
2    A.   Where are you?
3    Q.   Sorry.  Paragraph 31.
4    A.   Yes.  I have it.
5    Q.   Eber Connecticut is a limited
6  liability company formed under the laws of The
7  State of Delaware.
8       Do you see that?
9    A.   Yes.
10   Q.   And then there is a description of who
11  the various owners are of Eber Connecticut in
12  paragraph 32.
13       Do you see that?
14   A.   Yes.
15   Q.   And it states that Polebridge Bowman
16  owns six percent of Eber Connecticut; right?
17   A.   Yes.
18   Q.   And that Eder-Goodman LLC owns 15
19  percent; right?
20   A.   Yes.
21   Q.   And in the following paragraph it
22  states "Polebridge Bowman is a party unrelated to
23  the original secured creditor to Eber Brothers, to
24  Metro and/or to Eber Connecticut.
25       Do you see that?

51 (Pages 198 - 201)

Page 202

L. Eber

1
2      A.   Yes.
3      Q.   I will stop for a second.
4           Who was the original secured creditor?
5           MR. RAMSEY:  Form.
6      A.   I don't -- I would have to go back to
7   the lawyers to get that.  I don't have an answer
8   for you.
9      Q.   The original secured creditor was you,
10  was it not?
11     A.   It could have been.
12     Q.   Let's go ahead and answer this.  Let's
13  go back to paragraph 5 in this document that's on
14  the third page.
15     A.   Five?
16     Q.   Yes.  In the second sentence it says
17  "Lester Eber" and then defines that as "the
18  original secured creditor."
19          Do you see that?
20     A.   Mm-hmm.
21     Q.   Is that a yes?
22     A.   Yes.  At the bottom of 5, yes.
23     Q.   So let's go back now to page 9
24  paragraph 33.  The second sentence of that
25  paragraph says -- let me know when you are there.

Page 203

L. Eber

1
2           MR. RAMSEY:  Do you have 33?
3      Q.   Are you there?
4      A.   Yes, 33.
5      Q.   Now after stating that Polebridge
6   Bowman is unrelated to you or to those companies
7   this document continues by saying "Polebridge
8   Bowman acquired its ownership interest in Eber
9   Conn in May 2010 in an arms length transaction and
10  became a new member of Eber Conn by virtue of that
11  transaction.  The membership units Polebridge
12  Bowman acquired were sold to it by Metro."
13          Do you see that?
14     A.   Yes.
15     Q.   Was that an accurate statement?
16          MR. RAMSEY:  Form.
17     A.   I believe so.
18     Q.   What is your understanding of what an
19  arms length transaction is?
20          MR. RAMSEY:  Form.
21     A.   As I told you before, I was aware of
22  this.  I was -- you are going to have to ask the
23  lawyers how this was done.
24     Q.   So the term arms length transaction a
25  way that you would describe the Polebridge Bowman

Page 204

L. Eber

1
2   transaction?
3           MR. RAMSEY:  Form.
4      A.   I was not involved in it.  So I was
5   aware of it, but I did not -- I was not involved,
6   so I can't give you an intelligent answer.
7      Q.   Nothing in this paragraph 33 on
8   Exhibit 44 states that Polebridge Bowman was owned
9   by your lawyer, does it?
10     A.   It mentions Polebridge Bowman.  It
11  doesn't mention anyone else.
12     Q.   It doesn't mention Glenn Sturm; right?
13     A.   No.
14     Q.   So why wasn't the fact that Polebridge
15  Bowman was owned by your lawyer disclosed to the
16  court?
17          MR. RAMSEY:  Form.
18     A.   I do not know.
19     Q.   You said that you wanted the court to
20  make a finding that everything about your
21  acceptance of Eber Metro shares was on the up and
22  up; right?
23     A.   Yes.
24     Q.   So wasn't it important to you that all
25  material facts be disclosed to the court?

Page 205

L. Eber

1
2           MR. RAMSEY:  Form.
3      A.   I think that's a legal question or
4   something for the court to decide.
5      Q.   So who made the decision not to
6   disclose to the court that Polebridge Bowman was
7   owned by your lawyer?
8      A.   I do not know.
9           MR. CALIHAN:  Objection to form.
10     Q.   Going to paragraph 35 the same page.
11  I will read that and paragraph 36.  This document
12  continues by saying "Polebridge Bowman acquired
13  its ownership of six percent in Eber Conn in May
14  2010 for 350,000 dollars.  Eder-Goodman consented
15  to the sale of Metro's membership units at that
16  price.
17          Paragraph 36, "No other sale or
18  purchase of any interest in Eber Conn has occurred
19  since.  Accordingly, Polebridge Bowman's
20  acquisition of its ownership interest in Eber Conn
21  represents the best evidence of the current value
22  of ownership rights in Eber Conn.  It is the last
23  time the free market has spoken with respect to
24  the value of Eber Conn's membership units."
25          Do you see that?

52 (Pages 202 - 205)

Page 206

L. Eber

1
2      A.   Yes.
3      Q.   Are those statements accurate?
4          MR. RAMSEY:  Form.
5      A.   If that's what they say I would
6  believe so.  I can't give you anything to the
7  contrary.
8      Q.   What do you mean by they?
9      A.   Whoever the lawyers who handled this.
10  I suggest you talk to the lawyers.
11     Q.   So the lawyers you are saying are the
12  ones that are responsible for the choice of
13  language here?
14         MR. RAMSEY:  Form.
15     A.   It wasn't me.
16     Q.   And so you didn't write it but you did
17  review it; right?
18     A.   I looked at it but I did not write it.
19  I needed it to be explained and I should have had
20  it, need it to be refreshed since this goes back
21  to 2012.  So it is a while back for me.
22     Q.   Was Polebridge Bowman's acquisition of
23  six percent of Eber Connecticut a transaction that
24  occurred on any kind of market?
25         MR. RAMSEY:  Form.

Page 207

L. Eber

1
2      A.   It says a free market here and
3  whatever that is.
4      Q.   What's is your understanding of what a
5  market is?
6      A.   I think a market is what someone will
7  pay for something.  A willing buyer.  Yeah, a
8  willing buyer will pay a willing seller.
9      Q.   Is a market a place where something
10  can be bought behind closed doors?
11         MR. RAMSEY:  Form.
12     A.   I think it could be bought anywhere.
13  I don't have a definition of it.
14     Q.   So in your view the Polebridge Bowman
15  acquisition of six percent of Eber Connecticut
16  fairly represents a free market transaction; is
17  that right?
18     A.   I believe so.  The Glenn Sturm did a
19  lot to help us through a very, very difficult
20  period and he was entitled to if we couldn't pay
21  him to get something for it.  That's the way he
22  worked.  If you look at my affidavit that I
23  submitted which I am sure you have, it describes
24  it.
25     Q.   So you specifically wanted Glenn Sturm

Page 208

L. Eber

1
2  to get those membership units and not anyone else;
3  correct?
4          MR. RAMSEY:  Form.
5      A.   I was aware of it and you know, I
6  thought it was a good idea, but I did not conduct
7  the transaction.
8      Q.   In a free market transaction, does the
9  seller pick the specific buyer in advance of the
10  transaction?
11         MR. RAMSEY:  Form.
12     A.   I don't -- I think they could.  I
13  don't know.  I can't give you an answer to
14  something that I don't know.  I have no experience
15  with the free market.
16     Q.   Did you discuss with any other lawyers
17  besides Glenn Sturm the possibility of them
18  stepping into the role that you anticipated for
19  Glenn Sturm?
20     A.   Glenn Sturm had, although he was a
21  lawyer, he had a lot of knowledge as to getting
22  bankers, restructuring companies, helping
23  companies get back on their feet or getting
24  startups going.  So he was very, very helpful in
25  many of those areas.

Page 209

L. Eber

1
2      Q.   Was Glenn Sturm also someone with
3  knowledge of trusts?
4      A.   He could have.  He was a very
5  knowledgeable person.  One of the smartest lawyers
6  I had ever met.
7      Q.   Did you involve Glenn Sturm in matters
8  affecting the Allen Eber Trust?
9      A.   I don't remember that.
10         MR. CALIHAN:  When you get to a good
11  breaking point shortly.
12         MR. BROOK:  Yes.  Let's go ahead and
13  take five.
14         THE VIDEOGRAPHER:  This marks the end
15  of media unit number four in the videotaped
16  deposition of Lester Eber.  We are going off
17  the record.  The time is 2:55.
18         (Recess taken.)
19         THE VIDEOGRAPHER:  This marks the
20  beginning of media unit number five in the
21  videotaped deposition of Lester Eber.  We
22  are going on the record.  The time is 3:08.
23         MR. BROOK:  Let's go for a new Exhibit
24  45.
25         (Plaintiffs' Exhibit 45, a document

53 (Pages 206 - 209)

Page 210

L. Eber

1
2    bearing the caption of Alexbay versus Eber
3    Brothers and it states it is the affidavit
4    of Lester Eber bearing Bates numbers EB
5    00001059 through 1063, marked for
6    identification, as of this date.)
7        Q.   Exhibit 45 is a document bearing the
8    caption of Alexbay versus Eber Brothers and it
9    states it is the affidavit of Lester Eber bearing
10   Bates numbers EB 00001059 through 1063.
11       Do you recognize this document?
12       A.   Yes.
13       Q.   What is it?
14       A.   It's an affidavit in support of
15   judicial determination for commercial
16   reasonableness under UCC 9-627.
17       Q.   And that's your signature on the last
18   page of this document; correct?
19       A.   Yes.
20       Q.   It states below your signature that it
21   was sworn before a notary public on the 14th day
22   of March 2012.
23       Do you see that?
24       A.   Yes.
25       Q.   You understood this was a statement

Page 211

L. Eber

1
2    under oath like today's deposition; correct?
3        A.   Yes.
4        Q.   Did you review this document carefully
5    before you signed it?
6        A.   Yes.
7        Q.   And you knew that this was a document
8    that the court might rely upon in deciding whether
9    to find the transaction that you had proposed to
10   be commercially reasonable or not; correct?
11       A.   Yes.
12       MR. RAMSEY:  Form.
13       Q.   Please turn to the second page
14   paragraph 6.
15       Are you there?
16       A.   Yes.
17       Q.   That states "Based upon very recent
18   arms length sales on the open market, Eber Conn's
19   value as a going concern is best established at
20   4,633,300 dollars as of December 2011."
21       Do you see that?
22       A.   Yes.
23       Q.   What sales were you referring to in
24   that sentence?
25       A.   I don't know.  I don't remember.

Page 212

L. Eber

1
2        Q.   Based upon your knowledge of the Eber
3    Metro, Eber Connecticut business, which sales do
4    you think you were referring to?
5        A.   I don't remember.
6        Q.   And you can't determine what sales you
7    were referring to based upon your knowledge of the
8    company?
9        A.   I just don't remember.  It is December
10   of 2011.
11       Q.   Why are you reluctant to state that
12   the sales you were referring to were the sales of
13   six percent to Polebridge Bowman?
14       MR. CALIHAN:  Objection to form.
15       MR. RAMSEY:  Form.  That's not what he
16   said.
17       A.   I didn't say that.
18       Q.   Besides Polebridge Bowman, what other
19   sales could you have possibly been referring to?
20       A.   I don't remember.
21       Q.   I am not asking you what you remember.
22   I am asking you as you sit here today.
23       A.   I don't know.
24       Q.   So you can't think of anything else
25   you might have been referring to?

Page 213

L. Eber

1
2        MR. RAMSEY:  Form.
3        A.   As I told you, going back to 2011 I
4    don't remember.
5        Q.   How many times has Eber Connecticut,
6    how many times has Eber Connecticut membership
7    units ever been sold?
8        A.   The only ones I remember are
9    Eder-Goodman and Polebridge Bowman.
10       Q.   And then besides those two
11   transactions, there was also a third transaction
12   in which the Polebridge Bowman shares were
13   transferred to your daughter; correct?
14       A.   Yes.
15       Q.   But that was not a sale; correct?
16       A.   I am not a lawyer.  The lawyers
17   handled that and I can't give you an answer to it.
18   I think you have to ask a lawyer.
19       Q.   To your knowledge, did Wendy pay
20   anything to Polebridge Bowman to acquire its
21   shares?
22       MR. RAMSEY:  Form.
23       A.   I do not know.  You know, I know the
24   transaction took place, but I do not know the
25   details of the transaction.

54 (Pages 210 - 213)

Page 214

L. Eber
1
2      Q.   Do you know why that transaction took
3  place?
4      A.   I believe Wendy had a right of first
5  refusal if he wanted to sell it.
6      Q.   After the Alexbay complaint seeking a
7  judicial determination of commercial
8  reasonableness was filed, did you discuss that
9  lawsuit or any of the related transactions with
10 anyone from Southern?
11     A.   No.
12     Q.   Did anyone else discuss the Alexbay
13 transaction or lawsuit with Southern on your
14 behalf?
15     A.   Not that I know of.
16     Q.   Please turn to page 3 of Exhibit 45
17 paragraph 12 at the bottom that reads "Southern
18 has consented to Alexbay's proposal to accept the
19 collateral in full satisfaction of Eber Brothers'
20 obligation."
21          Do you see that?
22     A.   Yes.
23     Q.   How is Southern's consent obtained?
24     A.   You know, I don't remember.  I imagine
25 it was through lawyers.  I think it was something

Page 215

L. Eber
1
2  that was handled through lawyers that I was not
3  involved.  You know, I could have been aware of,
4  but I don't remember but it was handled by
5  lawyers.  It is not something that I would be
6  involved in.
7      Q.   Do you know why Southern wanted
8  Spirits of America Inc. was named as a defendant
9  in this Alexbay lawsuit?
10     A.   I believe you should -- I can't
11 remember the answer, but I believe in my
12 deposition, my affidavit it might have explained
13 that.
14     Q.   So we are looking at your affidavit
15 now and that's the first mention of Southern that
16 we just covered there and it does not appear to
17 state that.
18          Is there another affidavit or document
19 you are referring to?
20     A.   No.  Uh --
21     MR. RAMSEY:  Wait for a question.
22     Q.   Did you want to correct something you
23 just said?
24     A.   No.  I vaguely recall something but I
25 don't know where it is.

Page 216

L. Eber
1
2      Q.   Something --
3      A.   You know, I got confused.  This was
4  all handled by lawyers.  This is all legalese and
5  I was not directly involved in it.
6      Q.   Other than signing it under penalty of
7  perjury; correct?
8      A.   Yes.  On advice of counsel.
9      Q.   So you signed this document on the
10 advice of counsel is what you are saying?
11     MR. RAMSEY:  Form.
12     A.   I didn't do any document, any legal
13 document without talking to a lawyer.
14     Q.   But you were swearing to the
15 truthfulness of the facts in this document; right?
16     A.   That's correct.
17     Q.   And if a lawyer told you to lie under
18 oath, you wouldn't do that would you?
19     MR. RAMSEY:  Form.
20     A.   No, I wouldn't.  I never had a lawyer
21 say that to me.
22     Q.   So you are not suggesting that a
23 lawyer advised you to sign something that you
24 believe to be untrue in any way; correct?
25     A.   That's correct.

Page 217

L. Eber
1
2      Q.   So at the time that you signed this,
3  you are reaffirming today you believe that all the
4  contents of your affidavit, Exhibit 45, were true
5  and correct?
6      A.   Yes.  This is the first time I have
7  seen this in a while, but if I signed it it is.
8      Q.   You are saying you have not seen this
9  affidavit in the course of this litigation before?
10     A.   I have seen this before, but I haven't
11 seen it in the course of this litigation.
12     Q.   Is it correct then that in the course
13 of preparing for your testimony today you have not
14 reviewed this document?
15     A.   That's correct.
16     Q.   Did you review the Alexbay complaint
17 that we looked at a few minutes ago?
18     A.   Yes, I believe so.
19     Q.   And I should have asked this question
20 before, but what did you do to prepare for today's
21 deposition?
22     A.   Today, I have talked to my lawyers.
23     Q.   Anything else?
24     A.   That's it.
25     Q.   And you reviewed documents before

Page 218

L. Eber
1
2  today?
3     A.  Some, yes.
4     Q.  Which documents do you recall
5  reviewing to prepare for today's testimony?
6     A.  My affidavit and your complaint.
7     Q.  Which affidavit are you referring to?
8     A.  I believe it was a Harris Beach
9  affidavit.
10       MR. BROOK:  Let's mark it Exhibit 46.
11       (Plaintiffs' Exhibit 46, Affidavit
12  of Lester Eber bearing Bates numbers EB
13  00017525 through 544, marked for
14  identification, as of this date.)
15     Q.  Exhibit 46 is titled Affidavit of
16  Lester Eber bearing Bates numbers EB 00017525
17  through 544.
18       Is this the affidavit you were just
19  referring to a moment ago?
20     A.  Yes.
21     Q.  So you reviewed this to prepare for
22  today's testimony?
23     A.  Yes.
24     Q.  And this was an affidavit that was
25  prepared in connection with the Harris Beach

Page 219

L. Eber
1
2  litigation?
3     A.  Yes.
4     Q.  Why did you review this document to
5  prepare for today's testimony?
6     A.  My lawyers thought it was a good idea
7  and I thought it was a good idea.
8       MR. RAMSEY:  Make sure you are not
9     disclosing conversations with counsel.
10     Q.  Please turn to page 4 of this Exhibit
11  46.  Paragraph 13 states "I have spent my entire
12  life running private businesses.  Over the course
13  of 50 years I have bought and sold many private
14  businesses.  In my experience privately held
15  businesses are difficult to value.  A wide variety
16  of considerations going to every decision about
17  what to pay, what to accept in the purchase or
18  sale of a private business."
19       Do you see that?
20     A.  Yes.
21     Q.  Is all of that true?
22     A.  Yes.
23     Q.  Now you were present for your
24  daughter's, most of your daughter's deposition
25  yesterday; correct?

Page 220

L. Eber
1
2     A.  Yes.
3     Q.  Do you remember some testimony about
4  an import company that is owned by Eber
5  Connecticut?
6     A.  Yes.
7     Q.  What is the name of that company?
8     A.  The import company.  There isn't any
9  name to it.
10     Q.  So would it be incorrect to refer to
11  it as a separate company owned by Slocum and Sons?
12     A.  No.  It wouldn't be a separate.  It's
13  just brands that are imported directly by Slocum.
14     Q.  And do you recall was there a
15  particular label or something that was applied to
16  that?
17     A.  No.  It is brands, specific brands
18  from different countries.
19     Q.  Please turn to page 5 of this
20  affidavit.  Paragraph 16 begins "Another
21  significant factor in determining the offer to buy
22  Slocum was that there were significant tax
23  advantages to the Eber entities in making the
24  acquisition with the transaction structure that
25  was employed."

Page 221

L. Eber
1
2       What were the tax advantages that you
3  were referring to?
4     A.  I am not a tax lawyer but I believe it
5  was a like kind transaction on moneys that we had
6  received from, that the company, that Eber Metro
7  had received that could be, that would give us a
8  tax advantage.  This was handled by the lawyers.
9  It was totally legalese.
10     Q.  So Eber Metro had in 2005 sold some
11  kind of a business asset?
12     A.  Well, Eber Metro had sold 50 percent
13  of their business to NDC as you remember from
14  before.
15     Q.  And what did NDC pay for that?
16     A.  What did they pay?  I don't remember
17  the exact amount.
18     Q.  But it was a significant cash
19  infusion?
20     A.  Yes.
21     Q.  In paragraph 17 you begin by saying
22  "In retrospect, I believe Eber Metro significantly
23  overpaid to acquire Slocum."
24       Do you see that?
25     A.  Yes.

56 (Pages 218 - 221)

Page 222

L. Eber

1
2      Q.   Do you still believe that?
3      A.   Yes.
4      Q.   So if someone offered 21 million
5   dollars to buy Slocum today, you would jump on
6   that offer?
7           MR. RAMSEY:  Form.
8      Q.   Correct?
9      A.   I haven't seen that kind of an offer.
10  We haven't had any offers.  I don't have an answer
11  for you.
12     Q.   Have you thought about in recent years
13  how much you would expect to receive or want to
14  receive in the event of a sale of Eber Metro's
15  interest in Eber Connecticut?
16          MR. RAMSEY:  Form.
17     A.   No, I haven't.
18     Q.   What do you think the current value of
19  Eber Connecticut is as a whole?
20     A.   I don't know.
21     Q.   In connection with attempts to resolve
22  this case, you offered to sell a little over 50
23  percent of the equity interest value in Eber
24  Connecticut to plaintiffs for over ten million
25  dollars; correct?

Page 223

L. Eber

1
2      A.   I offered that?  I don't remember
3   that.
4      Q.   You don't remember offering phantom
5   stock interests to plaintiffs?
6      A.   Oh, the phantom, phantom stock.  We
7   offered phantom stock.  You gave me -- you didn't
8   say phantom stock.  Yes.
9      Q.   And the phantom stock was not actual
10  equity.  It was instead a derivative that was
11  based on the value of the equity; correct?
12          MR. RAMSEY:  Form.
13     A.   I am not a lawyer and I do not
14  particularly understand the legalese.  So that you
15  would have to talk to a lawyer on that.
16     Q.   Is it fair to say that you believed
17  that if plaintiffs wanted to get approximately 51
18  percent of Eber Connecticut that they had to pay
19  approximately ten million dollars for that?
20     A.   I don't believe anything.  I cannot
21  intelligently discuss that with you.  I was not --
22  I think that's a legalese.  It is legal terms and
23  that's who you have to talk to not me.  You are
24  talking to the wrong person on that.
25     Q.   So if plaintiffs offered you five

Page 224

L. Eber

1
2   million dollars to purchase all of Eber Metro's
3   interests in Eber Connecticut, would you accept
4   that?
5           MR. RAMSEY:  Form.
6      A.   I am not here to buy or sell or
7   anything.  I have no answer for you.  I just am
8   not here for that.
9      Q.   So you are refusing to answer the
10  question?
11          MR. RAMSEY:  No.  That's not what he
12  said.
13     A.   That's not what I said.  I said I am
14  not here to buy or sell the company.  This is not
15  an auction here.  I am here to answer your
16  questions to the best of my ability.
17     Q.   So if Andy Eder offered five million
18  dollars to buy all of Eber Metro's interests in
19  Eber Connecticut, would you accept that?
20          MR. RAMSEY:  Form.
21     Q.   Would you sell the company?
22     A.   No.
23     Q.   Why not?
24     A.   Would I not sell it because I have put
25  a lot more into that company to keep it alive.

Page 225

L. Eber

1
2      Q.   What does that have to do with what
3   its worth to a third-party?
4      A.   Listen, I am not here to buy or sell a
5   company.  You are giving me hypothetical questions
6   which I don't have answers for that I would have
7   to consult my lawyer or financial people to talk
8   to and I am not capable of giving you an answer
9   here today on this.
10     Q.   You understand that the value of Eber
11  Connecticut is an issue in this case; correct?
12     A.   Yes.
13          MR. RAMSEY:  Form.
14     Q.   So we are talking about the value of a
15  privately held business.
16          Isn't ultimately the most important
17  thing for someone who wants to buy a privately
18  held business the amount that the seller would
19  accept for it?
20          MR. RAMSEY:  Form.
21     Q.   Is that a yes?
22     A.   No, it is not.  I don't have an answer
23  for you.  I am not -- I do not -- I have a whole
24  -- I don't have an answer for you.
25     Q.   Let's look at your affidavit paragraph

57 (Pages 222 - 225)

Page 226

L. Eber

1
2    15. It states "Eber Brothers analysis of the
3    appropriate purchase price for Slocum was also
4    significantly affected by the belief that there
5    were other strong competitors who were interested
6    in buying Slocum at the same time.  They saw the
7    strategic value of Slocum's business as well.  It
8    wasn't a matter of seeing how little it would cost
9    to buy Slocum, rather it was a matter of
10   anticipating how high the purchase price would
11   have to be to purchase the business and prevent
12   key competitors from seizing this opportunity."
13          Do you see that?
14       A.   Yes.
15       Q.   So weren't you saying that at least
16   two components to determining the purchase price
17   for a private business like Slocum were both what
18   the seller is willing to sell it for and also what
19   other third parties are willing to pay for it?
20          MR. RAMSEY:  Form.
21       A.   Yes.
22       Q.   So if the price that the seller or the
23   current owner is willing to pay is relevant, then
24   I am going to return to -- then wouldn't you agree
25   that your opinion as the person who controls Eber

Page 227

L. Eber

1
2    Connecticut of what the value of that company is
3    and what you would accept for it is relevant in
4    determining the value of the company?
5          MR. RAMSEY:  Form.
6        A.   I think the environment, the date, the
7    time, the whole business.  There is so many
8    variables there is no direct answer that I could
9    give you.
10       Q.   Was Slocum and Sons profitable before
11   it was acquired by Eber Brothers?
12       A.   I believe they had -- they were making
13   money.  I don't remember that well, but I believe
14   they were making some money.
15       Q.   And what was the basis for that
16   belief?
17       A.   What my financial people had told me.
18       Q.   So they conducted some due diligence
19   on Slocum?
20       A.   Yes.
21       Q.   And after Eber Brothers or Eber Metro
22   acquired Slocum, it ceased to be profitable; is
23   that right?
24       A.   I think there were a lot of
25   situations.  There were suppliers that left.  That

Page 228

L. Eber

1
2    there was the great recession or whatever business
3    was way off.  Financial companies were going out
4    of business and everything.  So the environment
5    changed dramatically in a very short period of
6    time.
7        Q.   So the first full calendar year when
8    Eber controlled Slocum was 2006; correct?
9        A.   If you say so.  I don't remember the
10   date.
11       Q.   It was a few years.  There were a few
12   years of time when Eber controlled Slocum before
13   the recession occurred; correct?
14       A.   Well, we got into it pretty fast after
15   we bought it.  That 2007, 2008 and '9 were
16   tough years for us.
17       Q.   2006 you are saying that was also not
18   a profitable year?
19       A.   I don't remember.
20       Q.   Please let's look at paragraph 17
21   which goes from pages 5 to 6 on Exhibit 46.  After
22   the sentence we read before about overpaying it
23   states "Although prior to Eber Metro's acquisition
24   Slocum was profitable.  During each fiscal year
25   from 2005 through 2012 Slocum experienced

Page 229

L. Eber

1
2    significant losses with aggregate net losses of
3    7,275,269 dollars during that same period."
4          Do you see that?
5        A.   Yes.
6        Q.   So even in the years before the
7    recession occurred Slocum under your control was
8    experiencing significant losses; is that right?
9        A.   That's correct.
10       Q.   And what were the reasons for those
11   losses?
12       A.   Part of it was the economy.  Losses of
13   major suppliers.  A change in the market.  All
14   kinds of -- you know, the economy was terrible and
15   we had lost the major suppliers.
16       Q.   So it is your testimony the economy
17   was terrible in the years 2005, 2006?
18       A.   No.  It was going into that.  2007,
19   '8, '9 is when they went into the difficult
20   economy but major suppliers left.  Had to change
21   things overnight.
22       Q.   Which suppliers left?
23       A.   Deutsche.  They went dual.  That's
24   Yellow Tail.  Duck Horn is another winery.
25       Q.   Did any suppliers go dual with Slocum

58 (Pages 226 - 229)

Page 230

L. Eber

1   L. Eber
2   and Sons in the first year or two after Eber
3   Brothers acquired it?
4       A.   Not -- I think it happened shortly you
5   know within two years.  I can't remember.  I don't
6   remember the dates of the duals.
7       Q.   So can you offer any explanation for
8   why the company Eber Connecticut was experiencing
9   significant losses in the years 2005, 2006 before
10  any recession and before any major suppliers went
11  dual?
12      MR. RAMSEY:  Form.
13      A.   I think the -- there were suppliers
14  that went dual during that period and it didn't
15  take much when you are selling two hundred
16  thousand cases of Yellow Tail to, we are down to
17  twenty thousand today.  That would have been
18  enough to do it.  Your major supplier and then
19  there were some other ones.  I can't remember but
20  it was -- that was, it was a problem for the
21  company.
22      Q.   After Eber Brothers acquired Eber
23  Connecticut or acquired Slocum through Eber
24  Connecticut, did it appoint someone to be the
25  day-to-day operations manager for Eber

Page 231

L. Eber

1   L. Eber
2   Connecticut?
3       A.   By operations you mean sales or
4   overall management or --
5       Q.   Sales and overall management.
6       A.   And the question was when?
7       Q.   Let's step back.
8       So you were at the time of the
9   acquisition of Slocum and Sons the president of
10  all of the Eber Brothers operations; correct?
11      A.   Yes.
12      Q.   So you oversaw New York, Ohio,
13  Delaware and Connecticut; correct?
14      A.   Yes.
15      Q.   So who was the point person for
16  Connecticut?
17      A.   I had hired a fellow who had been with
18  Deutsche and he didn't work out.  So we -- he was
19  there.
20      Q.   Was he a contributing factor to the
21  losses that Slocum and Sons experienced?
22      A.   You know, I am not blaming at all.  It
23  was a change in management from to owner operators
24  there who, you know, did things directly
25  themselves as opposed to he was the new

Page 232

L. Eber

1   L. Eber
2   management.  I wouldn't necessarily blame
3   everything.  There were a series of events that
4   happened to the company.  I wouldn't blame anyone
5   in particular.
6       Q.   Please turn to page 12 of this
7   affidavit.  In paragraph 30 you wrote "Between
8   2008 and 2012 Eber Connecticut also contacted at
9   least four different strategic wine and liquor
10  distributors in the northeast to see if there was
11  any interest in acquiring Eber Connecticut."
12      Do you see that?
13      A.   Yes.
14      Q.   Which distributors were you referring
15  to?
16      A.   Different wine and liquor wholesalers
17  in the northeast.  Principally Connecticut, New
18  York and New Jersey.
19      Q.   What were the names of the
20  distributors?
21      A.   Well, one was Peerless.  They are in
22  New York and they own a company in Connecticut.
23      Then we talked to a couple in New
24  Jersey, Allied and Fedway.
25      I forgot who the forth one was.

Page 233

L. Eber

1   L. Eber
2       Q.   Was it Magliocco?
3       A.   Magliocco was Peerless.
4       MR. CALIHAN:  My guy.  What a
5   character.
6       Q.   When were the discussions with
7   Peerless?
8       A.   I don't remember the dates.
9       Q.   When were the discussions with Allied?
10      A.   There weren't any discussions.  Just a
11  phone conversation with them and they weren't
12  interested.
13      Q.   When were the discussions with Fedway?
14      A.   Same thing.
15      Q.   Same thing as Allied?
16      A.   Yes.  They were both in New Jersey.
17      Q.   And the fourth company, although you
18  can't recall its name, how far did those
19  discussions go?
20      A.   They never went anywheres.  The only
21  one we had a meeting with was Peerless.
22      Q.   So the fourth one was also just a
23  phone call and nothing happened?
24      A.   I don't remember.
25      Q.   And so with Peerless, how many

59 (Pages 230 - 233)

Page 234

L. Eber
1
2   meetings was it?
3       A.   I would say maybe two.
4       Q.   And did you get to the point of
5   exchanging financial information?
6       A.   Yes.
7       Q.   And did you involve lawyers?
8       A.   I must have, but I don't remember who.
9   It had to be Harris Beach.
10      Q.   So you believe it was Harris Beach
11  that was involved?
12      A.   If there was a lawyer in it.  I just
13  don't remember.
14      Q.   Did you get to the point of discussing
15  sales prices with Peerless?
16      A.   No.
17      Q.   Were any financial terms discussed
18  with them?
19      A.   We exchanged -- they got our financial
20  statements.
21      Q.   How did they respond to that?
22      A.   By taking our largest supplier away
23  from us after it.
24      Q.   Which one was that?
25      A.   Yellow Tail.

Page 235

L. Eber
1
2       Q.   Had you had a non-disclosure agreement
3   in place before those discussions?
4       A.   I don't know.  We could have.
5       Q.   Did you end up suing Peerless?
6       A.   No.
7       Q.   Is Peerless still a preferred
8   distributor for Yellow Tail today?
9       A.   In Connecticut, yes.
10      Q.   When you were meeting with Peerless,
11  how much money were you looking to get them to
12  offer?
13      A.   Never any -- there were never any
14  figures that I remember.  It was quite a while ago
15  and I don't remember any figures.
16      Q.   Did you have a sense in your mind as
17  to what you thought the company should fetch?
18      A.   No.
19      Q.   As part of the acquisition of Slocum
20  and Sons, you agreed to retain one or more of the
21  Slocums as employees; is that right?
22      A.   Yes.
23      Q.   And which individuals specifically did
24  you agree to retain?
25      A.   John Slocum.

Page 236

L. Eber
1
2       Q.   Anyone else?
3       A.   Toby Slocum.
4       Q.   Anyone else?
5       A.   And possibly Drew Barter.  He is part
6   of the family.  To the best of my knowledge, I can
7   remember was John Slocum and Toby Slocum.
8       Q.   Who was the head of that family at the
9   time?
10      A.   Tom Slocum.
11      Q.   So you did not agree to employ Tom; is
12  that right?
13      A.   No.
14      Q.   Was he retired at that point?
15      A.   No.  He was there for a while.
16      Q.   And so did he continue to work once
17  Eber Connecticut took over?
18      A.   For a while.
19      Q.   About how long?
20      A.   I don't remember.
21      Q.   What was his position?
22      A.   He ran it when he was there.
23      Q.   What was John Slocum's position?
24      A.   He wasn't there.  He was in Rhode
25  Island at the time.  So he was working in the

Page 237

L. Eber
1
2   company in Rhode Island.
3       Q.   Was he running the Rhode Island part?
4       A.   Yes.
5       Q.   At some point did he come back to
6   Connecticut?
7       A.   Yes.
8       Q.   When was that?
9       A.   It wasn't that long.  We closed Rhode
10  Island down.
11      Q.   What was Toby Slocum's position?
12      A.   He is a cripple and it is very hard
13  for him every day.  It was a challenge and he had
14  some accounts to call on.
15      Q.   I am sorry.
16           What was his position?  I didn't
17  understand that.
18      A.   He was a salesman.
19      Q.   And is it Drew Barter?
20      A.   Yes.
21      Q.   What was his position?
22      A.   He was a salesman.
23      Q.   Are John, Toby and Drew still employed
24  by Eber Connecticut?
25      A.   John and Drew are.  Toby has been very

60 (Pages 234 - 237)

Page 238

L. Eber
1
2  sick. He was in a bad accident. He is retired.
3      Q.   As part of the deal with to purchase
4  Slocum and Sons, did you agree to have ability for
5  certain of the Slocum individuals to get bonuses
6  after a five-year period?
7      A.   You know, I don't remember that. It
8  is something that could have been in there, but I
9  don't remember it. I just don't remember.
10     Q.   Do you remember in the calendar year
11 2010 that there were a number of larger than
12 average bonuses paid to the Slocums?
13     A.   They could have been part of -- it
14 could have happened. I don't remember that. I
15 don't remember what was the cause of it or why.
16 If it was in the agreement or what. I just don't
17 remember.
18     Q.   Please turn to page 13 of Exhibit 46.
19 Paragraph 33 apparently summarizing what is
20 written here before states "In light of these
21 unfortunate circumstances the value of Eber
22 Connecticut in 2010 was extremely uncertain. It
23 could not be derived with any precision at all."
24         Do you see that?
25     A.   Yes.

Page 239

L. Eber
1
2      Q.   Was that accurate?
3      A.   Yes.
4      Q.   In paragraph 34 you make reference to
5  a statement by Pat Dalton stating "Mr. Dalton's
6  statement in paragraph 18 of the first Dalton
7  affidavit that he believed Eber Connecticut quote,
8  was worth it in the vicinity of twenty million
9  dollars, end quote is uninformed and just flatly
10 wrong. Mr. Dalton was retained as a lawyer not a
11 financial advisor or valuation expert. Whatever
12 he may think he overheard me say in 2010 he
13 clearly misunderstood."
14         What were you referring to there?
15     A.   That Dalton if you take this -- that
16 was a statement he made in the lawsuit with Harris
17 Beach which in a further affidavit he recanted and
18 admitted that he was not a financial person and
19 did not -- was a lawyer and did not specialize in
20 valuing companies and did not -- that was not his
21 job.
22     Q.   You are talking about the subsequent
23 affidavit in which he recanted?
24     A.   Yes.
25     Q.   And he executed that affidavit

Page 240

L. Eber
1
2  pursuant to a settlement agreement reached; is
3  that correct?
4      A.   That's correct, yes. He was never
5  hired as a valuation person. He was hired as a
6  lawyer.
7      Q.   And what do you refer to when you talk
8  about something he may think he overheard me say?
9      A.   I don't know where he came up with
10 that from. I don't know.
11     Q.   Do you recall believing that Eber
12 Connecticut should be worth twenty million
13 dollars?
14     A.   No.
15     Q.   In 2010 did you believe that Eber
16 Connecticut was worth twenty million dollars?
17     A.   No.
18     Q.   How much did you think it was worth?
19     A.   I don't know. What I say here before
20 it was extremely uncertain. I don't think there
21 was any value. It could have been worthless.
22 With debts we had and the lawsuits and everything
23 else being thrown at us I don't know how it
24 survived. If it hadn't we wouldn't be here today.
25 If survived because of the money I personally put

Page 241

L. Eber
1
2  in.
3      Q.   Why did you not extent the maturity
4  date on your line of credit note rather than begin
5  foreclosure proceedings?
6      A.   I am not a lawyer. I didn't write it.
7  I followed the advice of lawyers.
8      Q.   Which lawyers?
9      A.   I had so many lawyers I don't want to
10 give you the wrong name. Whoever -- what document
11 is it?
12     Q.   Your line of credit note Eber Metro
13 the one with the maturity date of December 31,
14 2011.
15     A.   Yeah.
16     Q.   So which lawyers were involved in
17 advising you to allow that default to occur rather
18 than extending the terms of the note?
19         MR. CALIHAN: Objection to form.
20     A.   I would have to go back. I don't
21 remember which lawyer did it. There were
22 different lawyers doing different documents. So I
23 can't give you the name of the specific one that
24 wrote that. But it was written by my lawyer.
25 That's not terminology or things that I would

61 (Pages 238 - 241)

Page 242

1                       L. Eber
2       know.
3           Q.   Let's look at pages 17 to 18 paragraph
4    45 of this Exhibit 46.  In that you are discussing
5    the Alexbay foreclosure action.  You say "A
6    judicial action is not required under New York
7    law, --
8           A.   45 you are on?
9           Q.   Yes, 45.
10               -- but was commenced out of an
11   abundance of caution to alert any potential
12   creditors of the foreclosure.  Alexbay named
13   Southern as a party to the action because it had a
14   UCC on file asserting it was a secured creditor of
15   Eber Brothers and Eber Metro.  While Southern
16   originally opposed the action it ultimately did
17   not take any action to frustrate it."
18               In what way did Southern originally
19   oppose the action?
20          A.   I think it is something that was left
21   over that they hadn't done anything with from the
22   loan that they had given us to keep us out of
23   bankruptcy.  It was still there, so.
24          Q.   So had the loan already been repaid by
25   that point?

Page 243

1                       L. Eber
2           A.   The loan to Southern, yes.
3           Q.   So what did you mean by saying while
4    Southern originally opposed the action?
5           A.   You know, they wanted the UCC's there
6    and then they did not do anything to fight this
7    but the UCC's were still there as I believe a
8    carryover from the original loan.
9           Q.   So you didn't mean that Southern
10   originally opposed you taking Eber Metro from Eber
11   Brothers Wine and Liquor and putting it in
12   Alexbay?
13          A.   I don't remember what they did or
14   would not do.  That was lawyers.  It was all done
15   with lawyers.  It wasn't me.  I was not a party to
16   it.  You'd have to talk to the lawyers.
17          Q.   I want to ask you about a sentence
18   that's in paragraph 46.  You are referring to the
19   time period of winter 2012 and the second to last
20   sentence states "Eder-Goodman's investment in Eber
21   Connecticut had brought with it a number of
22   negative covenant constraints on our flexibility
23   in raising debt capital and in selling Eber
24   Connecticut."
25               Do you see that?

Page 244

1                       L. Eber
2           A.   Yes.
3           Q.   What were you referring to there?
4           A.   Limiting the amount of money we could
5    borrow from a bank.
6           Q.   How did Eder-Goodman's investment
7    limit that?
8           A.   It was the agreement that was signed
9    when they bought the 15 percent that we could not
10   borrow more than five million from a bank.
11          Q.   Why did you agree to that?
12          A.   I didn't.  It was written by Mr.
13   Dalton.
14          Q.   And your understanding is that Mr.
15   Dalton agreed to that even though you did not?
16          A.   I signed it.  It was done and it was
17   the lawyers worked it out.  They worked out a very
18   good deal for themselves.  They have a lot of
19   security on top of that in their agreement.
20          Q.   Did you ever ask Eder-Goodman to amend
21   that term of the agreement?
22          A.   We would like them to yeah.  They
23   didn't want to do it.
24          Q.   When did you ask them that?
25          A.   I think it goes back a few years I

Page 245

1                       L. Eber
2    believe.
3           Q.   And who had that conversation with
4    Eder-Goodman?
5           A.   I don't remember.
6           Q.   Did it, did the conversation get far
7    enough to where you actually showed them in
8    writing what amendment you wanted to make?
9           A.   I think it was -- I was not involved
10   in the conversation.  So it -- I would have to go
11   back and find out who did.
12          Q.   In what way did Eder-Goodman's
13   investment constrain your ability to sell Eber
14   Connecticut?
15          A.   They have right of first refusal.
16          Q.   So how does that affect the ability to
17   sell the company?
18          A.   They would have the right to buy it
19   before anyone else.
20          Q.   But only if they paid the same price;
21   right?
22          A.   Right of first refusal would inhibit
23   the ability to be flexible to sell it to who you
24   want to.
25          Q.   And did they still have a right of

62 (Pages 242 - 245)

Page 246

L. Eber

1 
2 first refusal?
3     A.  Yes.
4     Q.  Have you ever discussed selling the
5 remainder of Eber Metro's interest in Eber
6 Connecticut to Eder-Goodman?
7     A.  No.
8     Q.  Why not?
9     A.  They are not interested.
10     Q.  How do you know that?
11     A.  They bought this to keep Southern out
12 of the state.  That's the only reason they bought
13 it.
14     Q.  But you never had a conversation with
15 anyone from Eder-Goodman about whether they are
16 interested in buying the rest of it?
17     A.  I haven't had it and they haven't
18 proposed it either.  I think they bought it just
19 to keep Eder-Goodman out of the state.  It was
20 worth it to them.
21     Q.  Well, have you ever done anything to
22 indicate to anyone from Eder-Goodman that you
23 might be open to selling Eber Connecticut and
24 walking away from the business?
25     MR. RAMSEY:  Form.

Page 247

L. Eber

1 
2     A.  No.  We haven't.  We have not had a
3 close working relationship with them.  It's been
4 very competitive.
5     MR. CALIHAN:  Brian, I think he
6     misspoke two answers ago.  I think he said
7     Eder-Goodman and I think he meant to say
8     Southern.  I don't know if you want to
9     correct it.
10     MR. RAMSEY:  I think it is pretty
11     clear what he meant but.
12     MR. BROOK:  So he said Eder-Goodman
13     twice?
14     MR. CALIHAN:  Yes.  I think he meant
15     Southern the first time.
16     MR. BROOK:  Talking about keeping
17     Southern out of --
18     MR. CALIHAN:  Yes.
19     MR. BROOK:  It is understood that
20     Eder-Goodman is not trying to keep itself
21     out of Connecticut.
22     MR. CALIHAN:  Maybe it is late in the
23     day.
24     THE WITNESS:  Oh, yes.
25 BY MR. BROOK:

Page 248

L. Eber

1 
2     Q.  Bottom of page 18 is paragraph 47.
3 This reads "In light of these continuing
4 unfortunate circumstances the value of equity in
5 Eber Connecticut in 2012 continued to be quite
6 uncertain.  It couldn't be derived at that time
7 with any precision at all."
8     Do you see that?
9     A.  Yes.
10     Q.  And was that accurate?
11     A.  Yeah.
12     Q.  What attempts, if any, did you make to
13 try to value Eber Connecticut in 2012?
14     A.  I didn't do anything.  I was fighting
15 for survival.  I kept paying bills personally and
16 putting out fires and keeping the company alive to
17 keep it out of bankruptcy or keep it liquid.
18     Q.  So dealing with the bankers you had to
19 provide them with some estimate of what the
20 company's equity value was; correct?
21     A.  Canandaigua was overcollateralized
22 because I left.  I had five hundred thousand with
23 them personally.  120 thousand in stock personally
24 and I personally guaranteed their loan.  So they
25 were over collateralized.

Page 249

L. Eber

1 
2     Q.  Well, the banks when making these
3 loans they want to have an understanding of what
4 the debt to asset ratio to the company; right?
5     A.  They just looked at what they had.
6 They were overcollateralized and they had the
7 inventory and the receivables.
8     Q.  So were they basing the value of the
9 assets on Generally Accepted Accounting
10 Principles?
11     MR. RAMSEY:  Form.
12     A.  I am not an accountant.  You would
13 have to ask our accountant.
14     Q.  The company had annual financial
15 statements prepared and audited; right?
16     A.  Yes.
17     Q.  And those were based upon Generally
18 Accepted Accounting Principles?
19     A.  Yes.
20     Q.  And those statements included
21 estimates of the value of the equity of the
22 company; right?
23     A.  That I don't remember and I think you
24 would have to ask our accountant on that.
25     Q.  Do you know what the financial

63 (Pages 246 - 249)

Page 250

L. Eber

1    L. Eber
2    statements value the equity of Eber Connecticut at
3    in late 2011 and early 2012?
4        A.    No.
5        Q.    Do you think that information is
6    material to understanding what the value of Eber
7    Connecticut might have been at that time?
8        MR. RAMSEY:  Form.
9        A.    I think you would have to ask an
10   accountant for that, of that.  I can't answer for
11   you.
12       Q.    I want to ask you now about your
13   relationship with Mike Gumaer.
14           When did you first meet him?
15       A.    After my father died.
16       Q.    So you had not interacted with him
17   before then?
18       A.    Never.
19       Q.    What was the nature of your
20   relationship with Mike Gumaer during the first few
21   years after your father died?
22       A.    He worked, I worked very close with
23   him.  He educated me to the trust and to
24   transactions you know in settling an estate, my
25   father's estate.

Page 251

1    L. Eber
2        Q.    At any point in time or -- withdrawn.
3           At that time Mike Gumaer was a partner
4    in the law firm of Nelson Hargrave?
5        A.    Nixon.
6        Q.    Nixon Hargrave?
7        A.    Yes.
8        Q.    Did you or Eber Brothers retain him as
9    a lawyer for the company?
10       A.    Yes.
11       Q.    Did you ever retain him as your
12   personal attorney?
13       A.    I used him as a personal attorney.
14       Q.    When did you start doing that?
15       A.    After my father died.
16       Q.    What kinds of things did you retain
17   him for?
18       A.    He advised me legally.  Send me
19   different law specialists in his firm or what have
20   you.  Everything.  Anything I had I needed a legal
21   opinion on I would go through him.
22       Q.    And for personal matters?
23       A.    Both personal and business, yes.
24       Q.    So for personal matters give an
25   example of something where you relied on Mr.

Page 252

1    L. Eber
2    Gumaer's legal advice.
3        A.    A will.
4        Q.    Did you pay him anything for that?
5        A.    I don't remember if he could have sent
6    me to someone else in his firm that charged me for
7    it.
8        Q.    Was Mr. Gumaer compensated for his
9    role as a co-trustee of the trust?
10       A.    He didn't take any money from the
11   trust.  He was paid by the company and the reason
12   he didn't take any money from the trust because it
13   would have reduced the income to the beneficiaries
14   of the trust.  So he was paid by the company.
15       Q.    Was there ever any sort of
16   documentation where Mr. Gumaer agreed to waive his
17   right to compensation as a director, I meant a
18   trustee?  I am correcting myself.
19       A.    I don't believe so.  In my father's
20   will I waived my compensation as an executor of
21   his estate.
22       Q.    What do you mean you waived?
23       A.    I served for free where the other
24   executors, the bank and Mr. Gumaer, were paid, you
25   know, whatever the law was.

Page 253

1    L. Eber
2        Q.    Was that your decision to serve for
3    free?
4        A.    It was my father's wish and I observed
5    it.
6        Q.    When did Mr. Gumaer retire from Nixon
7    Hargrave or Nixon Peabody as it became?
8        MR. CALIHAN:  Objection to form.
9        A.    It is in there.  I don't remember the
10   date.
11       MR. BROOK:  What's the basis for the
12   objection?
13       MR. CALIHAN:  I am not sure which
14   relationship with the firm you are referring
15   to.  I think there were several but I am
16   not --
17       MR. BROOK:  Understood.
18       A.    Thank you.
19       MR. BROOK:  Let's go to another
20   exhibit.  This is 47.
21       (Plaintiffs' Exhibit 47, a two-page
22   letter on the letterhead for Elliot W.
23   Gumaer, Jr. dated January 2, 2001 Bates
24   stamped January 8, 2001 and Bates number EB
25   00001556 to 57, marked for identification,

64 (Pages 250 - 253)

Page 254

L. Eber

1        L. Eber
2    as of this date.)
3        Q.    Exhibit 47 is a two-page letter on the
4    letterhead for Elliot W. Gumaer, Jr. dated January
5    2, 2001 Bates stamped January 8, 2001 and Bates
6    number EB 00001556 to 57.
7            Do you recognize this document?
8        A.    Yes.
9        Q.    What is it?
10       A.    It is a letter from Mike Gumaer to
11   myself regarding his retirement from Nixon Peabody.
12       Q.    And do you see on the back page there
13   is a line below the signature of Mike Gumaer
14   stating the terms and conditions of this letter
15   are agreed by the Eber companies?
16       A.    Yes.
17       Q.    And is that your signature below?
18       A.    Yes.
19       Q.    Do you remember signing this document?
20       A.    I don't remember signing it but I did.
21   It is January of '01.
22       Q.    And when is the last time that you
23   remember seeing this document?
24       A.    I don't remember.
25       Q.    Do you have any reason to believe that

Page 255

L. Eber

1        L. Eber
2    there are any amendments to this letter agreement?
3        A.    I don't know.  I don't remember.  I
4    don't know.
5        Q.    Turning to the second page at the top,
6    do you see he, Mike writes "As a director and
7    consultant to the companies I have endorsed your
8    strategic plan to grow our companies thus enabling
9    us to compete in an industry that's changed
10   radically over the years since your father's
11   death."
12           Do you see that?
13       A.    Yes.
14       Q.    Do you know what he meant by referring
15   to himself as a consultant to the companies?
16       A.    Yeah.  He was into the business.  My
17   father put him right into the business to work
18   with me and help me.
19       Q.    So is it fair to say that Mike Gumaer
20   did nonlegal work for the companies?
21           MR. RAMSEY:  Form.
22       A.    He did legal work.  He did consulting.
23   He did everything.
24       Q.    Second paragraph on page 2 reads "With
25   the foregoing as historical records I would

Page 256

L. Eber

1        L. Eber
2    propose to you the following A, I shall continue
3    to waive any direct annual compensation as a
4    trustee of the Allen Eber Trust.  B, I shall
5    continue as a director of the Eber companies
6    without any compensation commensurate with my
7    responsibilities as a director.  And C, I shall
8    continue to serve as a consultant to the companies
9    and as counsel to you personally and as chief
10   executive officer."
11           Do you see that?
12       A.    Yes.
13       Q.    The letter then continues in the next
14   paragraph, "As compensation for all of these
15   duties the Eber companies will pay me an annual
16   consulting fee of forty thousand dollars payable
17   quarterly on the first of February, May, August
18   and November beginning February 1, 2001.  This
19   relationship shall remain in place until modified
20   by you and me in the manner established by this
21   letter."
22           Do you see that?
23       A.    Yes.
24       Q.    And you agreed to those terms that he
25   proposed?

Page 257

L. Eber

1        L. Eber
2        A.    Yes.
3        Q.    How long did the annual consulting fee
4    of forty thousand dollars continue for?
5        A.    As long as we could pay it and I don't
6    have the date that it changed, but it had to be
7    after Wells foreclosed on us and we didn't have
8    the money to pay him.
9        Q.    After that point was his consulting
10   fee reduced?
11       A.    Yes.
12       Q.    What was it reduced to?
13       A.    I don't remember.
14           MR. BROOK:  Let's go to the next
15   exhibit.  This will be Plaintiffs' Exhibit
16   48.
17           (Plaintiffs' Exhibit 48, an e-mail
18   from Mike Gumaer to Wendy Eber and Lester
19   Eber dated October 29, 2013 bearing Bates
20   number GUM 000023, marked for
21   identification, as of this date.)
22       Q.    Exhibit 48 is an e-mail from Mike
23   Gumaer to Wendy Eber and Lester Eber dated October
24   29, 2013 bearing Bates number GUM 000023.
25           Do you recognize this document?

65 (Pages 254 - 257)

Page 258

L. Eber

1
2    A.   I got it so I do, yes.
3    Q.   I would like to draw your attention to
4  the second paragraph of Mike's e-mail. He writes
5  "You will recall I hope our conversation last
6  December when I was asked to continue as
7  director/trustee/confidant."
8         Do you see that?
9    A.   Yes.
10   Q.   "While I was prepared to conclude my
11 relationship after 40 or so years, I was happy to
12 continue. My annual compensation for some time
13 has been twenty two thousand dollars payable in
14 quarterly installments."
15        Do you see that?
16   A.   Yes.
17   Q.   Does that refresh your recollection as
18 to what the compensation amount was reduced to
19 from forty thousand dollars?
20   A.   I knew it was reduced but I didn't
21 remember the amount.
22   Q.   And is it your best recollection that
23 twenty two thousand dollars was the amount?
24   A.   It is very possible.
25   Q.   Which of the Eber companies was

Page 259

L. Eber

1
2  responsible for paying Mike Gumaer's consulting
3  fee?
4    A.   Eber Wine and Liquor originally paid
5  him.
6    Q.   And at a certain point was the
7  responsibility changed to Eber Connecticut?
8    A.   Yes.
9    Q.   What about after the Alexbay
10 acquisition of Eber Connecticut, who paid the
11 consulting fee then?
12   A.   I believe -- I don't know. I would
13 have to find out. I don't know.
14   Q.   Is it correct that at some point the
15 consulting fee was reduced even more below twenty
16 two thousand dollars?
17   A.   It is very possible.
18   Q.   Did you ever pay Mike Gumaer directly
19 for work that he did as an attorney for you
20 personally?
21   A.   I don't remember. I believe most of
22 it was paid through the company.
23   Q.   And that procedure that you just
24 described would be consistent with the proposal
25 that Mike made in Exhibit 47; correct?

Page 260

L. Eber

1
2    A.   Would you repeat that again for me?
3    Q.   Sure.
4         The proposal that Mike had made in
5  2001 is that he would --
6    A.   Yes.
7    Q.   -- be counsel to you personally --
8    A.   Yes.
9    Q.   -- as chief executive officer without
10 seeking compensation beyond an annual consulting
11 fee of forty thousand dollars?
12   A.   Yes. That would be consistent.
13   Q.   To whom did you disclose the terms of
14 your engagement of Mike Gumaer pursuant to this
15 letter?
16   A.   To this letter it would be Wendy Eber.
17   Q.   And were these terms disclosed to
18 anyone else?
19   A.   I don't -- I don't believe so.
20 Basically when Eber could have been I don't know.
21 I would like you to read the last paragraph.
22   Q.   You are talking about the last
23 paragraph on Exhibit 48?
24   A.   Yes. You like to read paragraphs. So
25 I'd like you to.

Page 261

L. Eber

1
2    Q.   If you would like to read it aloud I
3  will allow you to do so now.
4    A.   No, you're the --
5         MR. RAMSEY: You want to read it go
6  ahead.
7    A.   Yeah. I am taking over your job.
8         "I wish to accommodate you two as
9  members of a team. Lord knows that Lester has
10 committed an incredible amount to bring about the
11 company's success. I am prepared to do my share
12 if the kitty calls for it. Please give me your
13 thoughts. All the best, Mike."
14   Q.   Do you have an understanding as to
15 what Mike meant when he said I am prepared to do
16 my share if the kitty calls for it?
17   A.   I think -- I just think he wants --
18 supportive as he can be to help us through a
19 difficult period.
20   Q.   Now the two sentences immediately or
21 the three sentences I guess it is actually -- I am
22 not going to count the number of sentences. Let's
23 read the part in between the part that I read
24 earlier and the part that you just read. It says
25 "I have been paid eleven thousand dollars so far

66 (Pages 258 - 261)

Page 262

L. Eber

1           L. Eber
2   this year.  In August, at Wendy's request, I
3   agreed to defer receipt until October to ease the
4   cash flow during the summer.  It is now a day or
5   so shy of November.  Two months remain to complete
6   the annual commitment.  It could be that you are
7   unaware that no compensation has been paid since
8   July."
9           Do you see that?
10      A.   Yes.
11      Q.   So he was asking you for money; right?
12      A.   Yes.
13      Q.   And have you ever flattered someone to
14  get them to give you money?
15           MR. RAMSEY:  Form.
16      A.   No.  Flatter them, I don't know what
17  you mean.
18           MR. BROOK:  I am getting pretty close
19  to the end.  So we don't we take another
20  break and I will try to streamline it.
21           THE VIDEOGRAPHER:  This marks the end
22  of media unit number five in the videotaped
23  deposition of Lester Eber.  We are going off
24  the record.  The time is 4:16.
25           (Recess taken.)

Page 263

1           L. Eber
2           THE VIDEOGRAPHER:  This marks the
3   beginning of media unit number six in the
4   videotaped deposition of Lester Eber.  We
5   are going on the record.  The time is 4:27.
6   BY MR. BROOK:
7       Q.   Just as a point of reference, can you
8   please find Exhibit 43?  That was the February
9   2017 corporate documents.
10           MR. CALIHAN:  Written consent?
11           MR. BROOK:  Yes.
12           MR. RAMSEY:  There you go Exhibit 43.
13      Q.   Now on page 2 of this document it has
14  the resolution.  I am sorry.  Page 3 there is the
15  agreement to reimburse the corporation at its
16  request for up to 37,500 dollars worth of
17  expenses.
18           Do you see that?
19      A.   Yes.
20      Q.   Have you as of now provided any of the
21  37,500 dollars to Eber Brothers Wine and Liquor
22  Corporation?
23      A.   No.
24      Q.   Have you been asked to put in any
25  money?

Page 264

1           L. Eber
2       A.   No.
3       Q.   And so you as of today received the
4   750 shares of class B junior preferred stock at no
5   cost?
6           MR. RAMSEY:  Form.
7       Q.   Correct?
8           MR. CALIHAN:  Form.
9       A.   I don't remember putting any in.  I
10  would have to go back and check but I don't
11  remember.  It's possible but I don't remember.
12      Q.   We talked about earlier the letters
13  that you sent to your sister Sally and to your
14  niece Audrey Hays offering them an opportunity to
15  participate in the line of credit note.
16           Do you remember that?
17      A.   Yes.
18           MR. BROOK:  I would like to make one
19  of those an exhibit.  We are up to 48.
20           MR. RAMSEY:  49.
21           MR. BROOK:  49.
22           (Plaintiffs' Exhibit 49, a letter on
23  Eber Brothers Wine and Liquor Corp.
24  letterhead signed by Lester Eber Bates
25  number KSH 00004 dated April 2, 2010, marked

Page 265

1           L. Eber
2   for identification, as of this date.)
3       Q.   Exhibit 49 is a letter on Eber
4   Brothers Wine and Liquor Corp. letterhead signed
5   by Lester Eber Bates number KSH 00004 dated April
6   2, 2010.
7           Do you recognize this document?
8       A.   Yes.
9       Q.   What is it?
10      A.   It's a request to ask for my sister to
11  invest in the company in Connecticut.
12      Q.   And in this letter is it fair to say
13  that you describe the business as one that is
14  struggling?
15      A.   Yes.
16      Q.   And in paragraph 4 you said "As a
17  result of the business' financial needs,
18  Connecticut's growth opportunities and our failure
19  to find a financial institution to provide us with
20  an adequate financial option, I offer to
21  personally loan the company the capital it needed
22  to meet its projected obligations this year.  The
23  amount of the loan is 1.5 million dollars.  The
24  loan is secured by the Eber Brothers Wine and
25  Liquor and Metro's equity interest in our

67 (Pages 262 - 265)

Page 266

L. Eber

1
2 Connecticut business. The board of directors
3 recently approved the loan documents as well as
4 our security arrangement."
5       Do you see that?
6   A.  Yes.
7   Q.  Were those statements accurate?
8   A.  I believe so.
9   Q.  Now how had the board approved the
10 loan documents?
11  A.  I don't remember.
12  Q.  Do you recall there was a board
13 meeting at some point where the board went over
14 the preexisting loan documents and then ratified
15 them after the fact?
16  A.  I don't remember.
17  Q.  Were there ever any board meetings
18 that you can recall when no minutes of those
19 meetings were created?
20  A.  I don't remember.
21  Q.  Looking at the next paragraph you
22 wrote "For the next 30 days I will offer you the
23 opportunity to participate in the loan. If you
24 desire to participate you would be responsible for
25 funding one third of any advances to the company.

Page 267

L. Eber

1
2 To date I have advanced the company of
3 approximately five hundred thousand dollars.
4 Therefore, if you decide to participate in the
5 loan you would be required to remit to me
6 approximately sixteen thousand dollars to
7 reimburse me for my advances. Future advances
8 would be in minimum increments of approximately
9 fifty thousand dollars for each of us and could be
10 done on a monthly basis."
11      Do you see that?
12  A.  Yes.
13  Q.  How did you come up with these terms
14 to offer to your sister?
15  A.  I was told about the financial
16 situation of the company and this is what would be
17 necessary to -- for them to invest in it.
18  Q.  Who told you that?
19  A.  It was probably on advice of counsel.
20  Q.  So counsel advised you about the
21 financial terms to provide here?
22  A.  Yeah, I believe so.
23  Q.  Which counsel are you referring to?
24  A.  I don't remember. It was counsel but
25 I would have to -- I would have to go back and try

Page 268

L. Eber

1
2 to find out, remember. I don't remember which
3 one.
4   Q.  Now let's look at the first line of
5 that paragraph.
6       You limited the opportunity to 30 days
7 from the date of this letter; correct?
8   A.  Yes.
9   Q.  Why did you choose to do that?
10  A.  It was probably on the advice of
11 counsel.
12  Q.  So can you think of any business
13 reasons why you couldn't have allowed the
14 opportunity to participate to continue past 30
15 days?
16      MR. RAMSEY: Form.
17  A.  Business reason. The company needed
18 money and I had to know where we were going. If I
19 had to come up or take money out of my retirement
20 more to fund it or get some help.
21  Q.  Had you saved money for your
22 retirement prior to this point?
23  A.  Yes.
24  Q.  How much money had you saved?
25  A.  I don't have an amount. I had

Page 269

L. Eber

1
2 annuities and as I told you, I eventually gave up
3 my pension plan which was paying me and --
4   Q.  I am sorry. Go ahead.
5   A.  And so I had saved over the years. I
6 have been with the company since 1959, 1960.
7   Q.  And was it from your retirement
8 savings that you put in all the money that you
9 loaned to Eber Brothers and Eber Metro?
10  A.  Some of it.
11  Q.  Where else did you get money from?
12  A.  Investments I made I sold. Stock
13 investments, et cetera.
14  Q.  Any other sources?
15  A.  No. It was all money from savings.
16  Q.  And as of today, do you still have
17 retirement savings?
18  A.  I have some. Not what I had before.
19  Q.  Do you have other investments besides
20 retirement savings?
21  A.  I have a few stocks, nothing big.
22  Q.  What's the current approximate account
23 value of your retirement savings account?
24  A.  I don't have it with me.
25  Q.  Is it more than ten thousand dollars?

68 (Pages 266 - 269)

Page 270

L. Eber

1
2      A.    Yeah.  I would say so.
3      Q.    Is it more than one million dollars?
4      A.    I don't have an exact amount for you
5  on it.  I just would have to go back and look at
6  it.
7      Q.    What would you look at to determine
8  that?
9      A.    Different annuities I have and then my
10  tax situation because whenever I had to take money
11  out I had to pay taxes on it.  You know, it was
12  accumulating tax free, but when it comes out of
13  the annuity you have to pay the income tax on it.
14      Q.    So you've got annuities in tax
15  deferred accounts of some type?
16      A.    Yeah.
17      Q.    And what are the amounts the annuity
18  is paying?
19      A.    Some pay three percent.  I can't get
20  that anymore.  I haven't been able to get that for
21  quite a while.
22      Q.    So do any of your current annuities
23  have a three percent?
24      A.    No.
25      Q.    What are the percentages on your

Page 271

L. Eber

1
2  current annuities?
3      A.    I don't know if it is one and a half,
4  two.  I don't remember.
5      Q.    In terms of your other investments
6  that are not retirement savings, what is the
7  approximate value of those investments today?
8      A.    Geez, I'd have to go back and look.  I
9  don't think it is anything -- I don't know.  I
10  have to go back and look to give you an answer on
11  it.
12      Q.    Do you own any real property?
13      A.    My home.
14      Q.    And any other real property?
15      A.    No.
16      Q.    What is the approximate value of your
17  home?
18      A.    I think maybe 230, 240,000.
19      Q.    Where is that located?
20      A.    In Rochester.
21      Q.    Are you continuing to receive twenty
22  five thousand dollars a month from Southern?
23      A.    Yes.
24      Q.    Is that in addition to or -- let me
25  rephrase it.

Page 272

L. Eber

1
2          Is the twenty five thousand dollars a
3  month in addition to the 833 dollars a month you
4  receive for lobbying?
5      A.    Yes.
6      Q.    So it's the total amount from Southern
7  that's 25,833 dollars per month?
8      A.    Yes.
9      Q.    How long do you expect that to
10  continue for?
11      A.    I do not know.
12      Q.    Again, there is nothing in writing
13  where Southern is committed to paying you twenty
14  five thousand dollars a month; correct?
15      A.    No.  That's correct, yes.
16      Q.    After sending this letter Exhibit 49
17  to Sally, did you speak with her about the
18  opportunity?
19      A.    Yes.
20      Q.    When was that?
21      A.    During that period.  I don't remember
22  the time but I did ask her.  She said I want to
23  get money out.  I don't want to put money in.
24      Q.    Did she say anything else?
25      A.    No.  That was about it.

Page 273

L. Eber

1
2      Q.    Did you help explain to her any of the
3  particular terms of your offer?
4      A.    I tried to.
5      Q.    So what did you tell her about the
6  security agreement?
7      A.    I don't remember about, talking to her
8  about the security agreement.
9      Q.    Did she ask you what it means when it
10  says the loan is secured by the equity interest in
11  the Connecticut business?
12      A.    No.  It wasn't much of a discussion.
13      Q.    What was your understanding of what it
14  meant to say that the loan is secured by the
15  Connecticut business?
16      A.    That means that like I would have
17  rights against Connecticut to collect my money.
18      Q.    Did you have any conversations with
19  Audrey Hays after she received a similar letter to
20  this?
21      A.    I don't remember any.  It could have
22  been something but I don't remember any.
23      Q.    What kind of information did the
24  trustees provide to the trust beneficiaries about
25  the financial performance of the assets held by

69 (Pages 270 - 273)

L. Eber
1   L. Eber
2   the trust?  Did it provide anything on a regular
3   basis?
4       A.   Yeah, I believe so.
5       Q.   What was that?
6       A.   They would send I believe quarterly
7   statements to the trust, to the beneficiaries.
8       Q.   Were there also annual letters?
9       A.   Yes.
10      Q.   Did you have any involvement in
11  drafting those letters?
12      A.   The only involvement I had when the
13  company couldn't pay what they had been getting
14  before because the company didn't have any cash, I
15  personally supplemented it to make it what it was
16  before.
17      Q.   How much money are we talking about
18  putting in there?
19      A.   I think it was four thousand a piece.
20      Q.   So four thousand times how many people
21  then?
22      A.   Two.
23      Q.   So that was at a time before your
24  sister passed?
25      A.   My sister, yeah.  She was my sister

1   L. Eber
2   and then Audrey Hays.
3       Q.   Was that a one time occasion?
4       A.   You know I think it could have been
5   more but I think it might have been one.  I don't
6   remember.
7       Q.   Do you remember approximately what
8   year that was?
9       A.   No.
10      Q.   As far as the annual letters went,
11  those were typically sent on bank letterhead;
12  correct?
13      A.   Yes.
14      Q.   And did you have the opportunity to
15  review those letters before they were sent to the
16  beneficiaries?
17      A.   Sometimes.
18      Q.   I am going to show you one that was
19  previously marked as Plaintiffs' Exhibit 4.
20          MR. BROOK:  I have a couple of spares
21  if you guys want.
22          MR. CALIHAN:  This is 50?
23          MR. BROOK:  This is previously marked
24  4.
25          MR. CALIHAN:  Oh, okay.

1   L. Eber
2       Q.   This is a letter on Canandaigua
3   letterhead dated December 18, 2012 signed by Rick
4   Hawks.
5           Do you see that?
6       A.   Yes.
7       Q.   Do you recognize this letter?
8       A.   Yeah.  It looks familiar.  I probably
9   got one too.
10      Q.   Did you review this before it was sent
11  out?
12      A.   I could have.  I don't remember.  He
13  would send letters out without -- I didn't know
14  about it.  I mean he would send the letters out
15  before I could have reviewed it.  Sometimes when I
16  didn't review them.
17      Q.   I would like to direct your attention
18  to the third paragraph of this letter.  There it
19  states "The trust does hold various Eber Brothers
20  securities.  The focus with business limited to
21  Connecticut has required the company to downsize
22  and execute a modified business plan.  The company
23  will not be declaring and paying an annual
24  dividend on its class A, class B or preferred
25  stock this year.  Earnings are being used to

1   L. Eber
2   invest and improve the business."
3           Do you see that?
4       A.   Yes.
5       Q.   Was that an accurate statement at the
6   time this letter was sent?
7       A.   I believe so.
8       Q.   So as of December 18, 2012 the trust
9   held securities that had a focus on business in
10  Connecticut; is that what you are saying?
11      A.   You know like Hawks didn't run this by
12  me and you know, you have deposed him and I think
13  he should be the one that you should talk to on
14  this or his lawyer.
15      Q.   So now is it fair to say that you
16  realize that your earlier testimony that this was
17  an accurate statement at the time was incorrect?
18      A.   What?  What was inaccurate?
19      Q.   Just a couple of moments ago I asked
20  you if that was an accurate description of what
21  the trusts holdings were as of December 18, 2012
22  and you said you thought so?
23          MR. RAMSEY:  Form.
24      A.   I was confused and I think if
25  Connecticut had been -- if you go back to you --

Page 278

L. Eber

1 know this was December 18, 2012 and the
2 foreclosure was in February; wasn't it? So they
3 didn't hold Connecticut if that's the...
4     Q.   When you saw this at the time in
5 December of 2012, did you do anything to try to
6 correct the misstatement?
7         MR. RAMSEY:  Form.
8     A.   I think they -- there were -- Wendy
9 Eber did do something on that to get it because it
10 wasn't right.
11     Q.   What did Wendy Eber do?
12     A.   I don't remember.  But I know it was a
13 mistake and it is very possible he sent this out
14 without showing it to us.
15     Q.   Why was it Wendy Eber's responsibility
16 to do anything to correct this letter sent by a
17 co-trustee?
18         MR. RAMSEY:  Form.
19     A.   She was the financial person who
20 watched the finances at that time.
21     Q.   What finances?
22     A.   CFO of the companies, the Eber
23 companies.
24     Q.   Did she have any role or

Page 279

L. Eber

1 responsibility in connection with the Allen Eber
2 Trust?
3     A.   No.  She was not involved in the Allen
4 Eber Trust.
5     Q.   You were a co-trustee of the trust
6 though; is that right?
7     A.   That's correct.
8     Q.   So --
9     A.   As I told you, this letter shouldn't
10 have been sent out and it was a mistake and I
11 refer you to your deposition with Hawks which you
12 had in Rochester and I don't know if you are going
13 to see or talk to him again.  This was something
14 that was handled by Richard Hawks.  Now Richard,
15 what's his name?  Yeah, Richard Hawks.
16     Q.   Did you contact either Sally Kleeberg
17 or Audrey Hays after seeing this letter to advise
18 them of the sale or the transfer rather of the
19 Eber Connecticut business to Alexbay?
20         MR. RAMSEY:  Form.
21     A.   I don't remember doing that.
22     Q.   Why not?
23     A.   I don't know.
24         MR. CALIHAN:  Objection to form.

Page 280

L. Eber

1     Q.   In hindsight, do you believe you
2 should have contacted either Audrey Hays or Sally
3 Kleeberg or both of them after you saw this
4 letter?
5         MR. RAMSEY:  Form.  Go ahead.
6     A.   Yes.  If I had seen it before it came
7 out I would have known that it should have been
8 corrected.
9     Q.   I am going to show you a new exhibit.
10 This I believe now 50.
11         (Plaintiffs' Exhibit 50, a chain of
12     two e-mails possible another e-mail that
13     appears to have been redacted Bates number
14     EB 00031202, marked for identification, as
15     of this date.)
16     Q.   Plaintiffs' Exhibit 50 is a chain of
17 two e-mails possibly another e-mail that appears
18 to have been redacted.  The document bears Bates
19 number EB 00031202.  The top e-mail is from Wendy
20 Eber to Lester Eber and Mike Gumaer dated January
21 10, 2013.  The subject is Allen Eber Trust.
22         Do you see that?
23     A.   Mm-hmm.
24     Q.   Is that a yes?

Page 281

L. Eber

1     A.   Yes.
2     Q.   The e-mail states "Lester and Mike,
3 attached is the December 2012 statement for the
4 trust of Allen Eber from Canandaigua Bank.  It
5 values Eber stock at approximately 655,000
6 dollars.  It should be zero per our conversation
7 in June with Rick Hawks.  Regards Wendy."
8         Do you see that?
9     A.   Yes.
10     Q.   Do you know what valuation she is
11 referring to?
12     A.   No.
13     Q.   Do you know what the 655,000 dollars
14 number is?
15     A.   No.
16     Q.   Do you know where Canandaigua got that
17 number from?
18     A.   No.
19     Q.   Do you know what Wendy was referring
20 to when she referred to a conversation in June
21 with Rick Hawks?
22     A.   I would believe that she told him that
23 it should be zero.  That the Eber Brothers stock
24 should be valued at zero per our conversation in

71 (Pages 278 - 281)

Page 282

L. Eber

1    June. That's what she is saying.
2        Q.    So at this point in time Wendy was
3    pointing out to you and to Mike Gumaer that the
4    statement from Canandaigua Bank for the trust that
5    accompanied the letter we just looked at contained
6    a valuation of Eber Brothers stock that was
7    incorrect?
8        MR. CALIHAN:  Form.
9        Q.    Is that right?
10       MR. CALIHAN:  Objection to form.
11       A.    Yes.
12       Q.    What, if anything, did you do or tell
13   someone else to do after learning about this?
14       A.    I believe we talked to Rick Hawks to
15   get the correct valuation on there.
16       Q.    And what did Rick say?
17       A.    I don't remember.
18       Q.    Was the valuation of the Eber Brothers
19   stock and the trust statements from Canandaigua
20   Bank ever changed from 655,000 dollars?
21       A.    I don't remember.
22       Q.    Did you personally contact Sally
23   Kleeberg or Audrey Hays after realizing there had
24   been an incorrect value for the Eber Brothers

Page 283

L. Eber

1    stock?
2        A.    No. That would have been the job of
3    the bank who managed the trust.
4        Q.    Why do you say that?
5        A.    Because everything in the trust came
6    from the bank. They did all the paperwork. They
7    did everything.
8        Q.    And so you understood that --
9        A.    It was the obligation of the bank to
10   correct it.
11       Q.    So it was your understanding that if
12   the bank made a mistake with respect to the trust
13   it was the bank's obligation to correct it?
14       A.    Well, yes. The bank handled all the
15   valuations. Did all the paperwork. Sent out the
16   letters. That's what they were there for to do
17   all of that. That wasn't my job.
18       Q.    What was your understanding of your
19   responsibilities as a co-trustee to monitor or
20   supervise the activities of your co-trustees?
21       MR. RAMSEY:  Form.
22       A.    I did -- I worked at the companies and
23   did the business. Did the best I could to keep
24   the business afloat through very difficult periods

Page 284

L. Eber

1    and grew the business before then. The company
2    went from thirty million to six hundred million
3    from 1970 to the time it was disbanded.
4        Q.    So I am not sure I understood that.
5        What was your responsibility, if any,
6    given your role as co-trustee in terms of being
7    aware of your co-trustee's activities with respect
8    to the trust?
9        MR. RAMSEY:  Form.
10       A.    My -- I repeat my job was to manage in
11   the business and I reported on the business to the
12   other trustees.
13       Q.    So you are saying you did not believe
14   that you had any responsibility to monitor or
15   check in on the activities of the other
16   co-trustees with respect to the trust?
17       MR. RAMSEY:  Form.
18       A.    I am not an accountant. I am not a
19   lawyer. I am a businessman and that was my job to
20   report on the business. And to manage the
21   business of what was there.
22       Q.    So if one of your co-trustees was
23   stealing money from the trust, did you have any
24   responsibility there?

Page 285

L. Eber

1        A.    I would be very upset and if I found
2    out about it, but I don't do audits. I am not an
3    auditor. I am not an accountant. I imagine there
4    are people that do that.
5        Q.    Even though you are not an auditor, if
6    you discovered that --
7        A.    If I discovered that yes, I would
8    definitely want it corrected.
9        Q.    So you understood that as a co-trustee
10   of the trust under New York law you had an
11   obligation to provide truthful information to the
12   beneficiaries; correct?
13       MR. RAMSEY:  Form.
14       A.    I provided truthful information to the
15   other trustees and it was up to the trust to
16   provide the information to the beneficiaries. I
17   did not control the trust. There were three
18   members of the trust. I was one of them.
19       Q.    What was the basis for your belief
20   that you did not have an obligation to correct
21   false statements about the trust that were given
22   by a co-trustee to beneficiaries?
23       MR. RAMSEY:  Form. I think we asked
24   this three or four times.

72 (Pages 282 - 285)

Page 286

L. Eber

1
2    MR. BROOK: I am asking for the basis.
3    MR. RAMSEY: We will try it one more
4  time.
5    A.   Could you repeat your question again?
6    Q.   Sure.
7    I am asking now for the basis for this
8  understanding.  Where did you get the
9  understanding that you did not have an obligation
10  to correct misstatements of fact that were made by
11  your co-trustee to the beneficiaries of the trust?
12    MR. RAMSEY:  Form.
13    A.   I corrected it by -- my obligation was
14  to the trust and I told the trust, to Hawks or
15  with Gumaer to that this was wrong or and if I
16  could do anything I would but that's where I
17  worked through.  My line of communication was
18  through the trust.  The trust would -- it was
19  their obligation to notify the beneficiaries like
20  they did with everything else and the money they
21  disbursed to them.
22    MR. BROOK:  Let's go to another
23  exhibit.  This will be 51.
24    (Plaintiffs' Exhibit 51, an e-mail
25  from Mike Gumaer to Lester Eber copying

Page 287

L. Eber

1
2  Wendy Eber dated December 1, 2013 bearing
3  Bates numbers EB 00031106, marked for
4  identification, as of this date.)
5    Q.   Plaintiffs' Exhibit 51 is an e-mail
6  from Mike Gumaer to Lester Eber copying Wendy Eber
7  dated December 1, 2013 bearing Bates numbers EB
8  00031106.
9    Do you recognize this e-mail chain?
10    A.   This was sent to me from Wendy.
11    Q.   Well, let's go back.  It is from
12  bottom to top.  It is in chronological order.
13    First, there is an e-mail from Janet
14  Lissow to you?
15    A.   Mm-hmm.
16    Q.   Right?
17    A.   Yes.
18    Q.   Who is Janet Lissow?
19    A.   My secretary, administrative
20  assistant.
21    Q.   Is she still in that role?
22    A.   Yes.
23    Q.   And then she was attaching something
24  with the subject line Allen Eber Trust December
25  2012.

Page 288

L. Eber

1
2    Do you see that?
3    A.   Yes.
4    Q.   Then it appears that you wrote an
5  e-mail on November 25, 2013 addressed to Mike and
6  Rick.
7    Do you see that?
8    A.   Yes.
9    Q.   Do you believe that was Mike Gumaer
10  and Rick Hawks?
11    A.   Yes.
12    Q.   And you said "I suggest we change the
13  paragraph on the first page which says the trust
14  does hold various Eber securities and at the
15  bottom of the holdings page of various
16  non-marketable Eber Brothers and Co. stock
17  holdings.  What are your suggestions?"
18    Do you see that?
19    A.   Yes.
20    Q.   So if we look back at Exhibit 4, the
21  paragraph that you suggested be changed was the
22  one that I just read a few moments ago; correct?
23    A.   Mm-hmm.
24    Q.   Yes?
25    A.   Yes.

Page 289

L. Eber

1
2    Q.   The one that says the trust does hold
3  various Eber securities?
4    A.   Mm-hmm.
5    Q.   So how did you want to change that
6  paragraph?
7    A.   I don't remember.
8    Q.   Why did you want to change that
9  paragraph?
10    A.   I don't remember.
11    Q.   Do you see above that on December 1st
12  a few days after your e-mail it appears Mike
13  responded to you?
14    A.   Yeah.
15    Q.   Do you recall whether you ended up
16  having further discussions with either Mike or
17  Rick concerning the annual trust letter?
18    A.   You know I hope I did.  I don't
19  remember.
20    Q.   Why do you hope that you did?
21    A.   Well, if it corrects a misstatement I
22  would hope that they corrected that.
23    Q.   Let's look at the next year's letter
24  that was sent a little under a month after your
25  e-mail.  It is Plaintiffs' Exhibit 5 previously

73 (Pages 286 - 289)

Page 290

L. Eber

1
2  marked.
3       Do you have that in front of you?
4    A.   Yes.
5    Q.   And comparing Exhibit 5 against
6  Exhibit 4, it appears that the paragraph that you
7  had asked to change was simply deleted in the
8  December 2013 letter?
9    A.   Yes.
10   Q.   So no correction of the fact was made?
11       MR. RAMSEY:  Form.
12   Q.   Is that right?
13   A.   Looks like that.
14   Q.   To your knowledge, did any of the
15  co-trustees or anyone on their behalf ever inform
16  either Audrey Hays or Sally Kleeberg or Sally
17  Kleeberg's children about the misstatement that
18  had been made in the December 18, 2012 letter?
19       MR. RAMSEY:  Form.
20   A.   I don't know.
21   Q.   Did you ever discuss the transfer of
22  Eber Metro to Alexbay with any of Sally Kleeberg,
23  Audrey Hays, Dan Kleeberg or Lisa Stein?
24   A.   I talked to my sister Sally.
25   Q.   When was that?

Page 291

L. Eber

1
2    A.   Could have been a year before she died
3  or so.
4    Q.   Approximately, when was that?
5    A.   It was in the summer when she died in
6  what, '14 or '15.  Probably a year before I told
7  her about that.
8    Q.   What did you tell her specifically?
9    A.   That the company had lost a lot of
10  money and I had lent in a lot of money and that I
11  took it over to protect my interest.
12   Q.   How did she respond?
13   A.   She didn't -- I don't think she liked
14  it very much.
15   Q.   Why do you say that?
16   A.   She didn't respond very much.
17   Q.   Do you recall anything that she said?
18   A.   No.
19   Q.   Do you recall --
20   A.   She --
21   Q.   Go ahead.
22   A.   She didn't say much.
23   Q.   Was she sick at that time?
24   A.   No.
25   Q.   Was she typically someone that didn't

Page 292

L. Eber

1
2  say much when you talked to her?
3    A.   It depends.  She was very personable
4  and had a lot of friends and she just didn't say
5  much.
6    Q.   Where did this conversation occur?
7    A.   In a restaurant where we had dinner.
8    Q.   Where was that?
9    A.   In Buffalo.
10   Q.   Do you recall the restaurant?
11   A.   800.
12   Q.   Is this a restaurant that you
13  frequently went to?
14   A.   She would go to.
15   Q.   Did she live in the Buffalo area?
16   A.   Yes.
17   Q.   Was anyone else present for this
18  conversation?
19   A.   My wife was with me but she had
20  excused herself to go to the bathroom and it was
21  just the two of us.
22   Q.   By the time your wife came back the
23  conversation was over?
24   A.   Yeah.  It wasn't a long conversation.
25   Q.   And after that conversation, did you

Page 293

L. Eber

1
2  make any effort to memorialize the fact what you
3  had told her?
4    A.   I don't remember that.
5    Q.   Why didn't you?
6       MR. RAMSEY:  Form.
7       MR. CALIHAN:  Form.
8    A.   I have been absorbed by keeping the
9  company going and seeing that it's viable and not
10  going into liquidation.
11   Q.   Was there any benefit to either of the
12  other trust beneficiaries at the time Audrey Hays
13  or Sally Kleeberg from your transferring Eber
14  Metro to Alexbay?
15       MR. RAMSEY:  Form.
16   A.   Benefit?
17   Q.   Did it benefit them in any way?
18   A.   I don't know.  I don't have an answer
19  for you.
20   Q.   Did you think about whether it
21  benefitted them at the time that you did it?
22       MR. RAMSEY:  Form.
23   A.   I thought about -- no.  I thought
24  about keeping Connecticut viable and not facing
25  liquidation.  That's what my thinking was about.

74 (Pages 290 - 293)

Page 294

L. Eber

1
2      Q.   So you weren't thinking about whether
3   that transaction would have any positive or
4   negative impact on the shareholders of the
5   company; is that right?
6      A.   I was thinking about keeping the
7   company alive and if I didn't do it there wouldn't
8   be a business today.
9      Q.   So that was a yes that you were not
10  thinking about the shareholders?
11          MR. CALIHAN:  Objection to form.
12          MR. RAMSEY:  Form.
13     A.   I didn't say that.
14     Q.   So walk me through your reasoning.
15          In what way did you consider the
16  shareholders' interests benefitted or harmed by
17  the Alexbay acquisition of Eber Metro?
18     A.   I had asked the shareholders to
19  invest.  They chose not to.  I proceeded on my
20  own.  I spent millions of dollars, lent.  Paid
21  legal fees and I did not -- I was absorbed with
22  keeping the company alive.
23     Q.   Did you -- sorry, go ahead.
24     A.   That's it.
25     Q.   Did you describe your request for

Page 295

L. Eber

1
2   money to either Audrey Hays or Sally Kleeberg as
3   an investment opportunity?
4      A.   Originally I did and in original
5   letters I asked for them to invest.
6      Q.   And did you make it sound like a very
7   good investment?
8          MR. RAMSEY:  Form.
9      A.   You see what it said.  The letters
10  speak for themselves.
11     Q.   Was the family business important to
12  your sister Sally?
13     A.   Yes.  I believe so.
14     Q.   So wasn't it important for you to make
15  clear to her that you intended to take the company
16  for yourself and away from the rest of the family
17  if she didn't invest?
18          MR. RAMSEY:  Form.
19     A.   I didn't feel -- I asked her to
20  invest.  I am not going to say to her what I was
21  going to do or not do.  I did what I had to do to
22  keep the company alive to make -- so we can clean
23  up our statement and get a bank loan.  Otherwise,
24  there wouldn't be a company.
25     Q.   Do you think your father would be

Page 296

L. Eber

1
2   proud of what you did?
3      A.   Yes.
4          MR. RAMSEY:  Form.
5      Q.   Why?
6      A.   I did what I had to do to keep -- you
7   know, it is all speculation.  So I did what I had
8   to do to survive to keep the company alive.
9      Q.   Your father wanted the company to
10  remain with the full family; right?
11     A.   Well, he took the family -- he took
12  the family really out of it and set up trusts
13  outside of the family that had control of
14  everything.
15     Q.   So he wanted the business to remain
16  with the trust?
17          MR. RAMSEY:  Form.
18     Q.   Correct?
19     A.   He just took family members out of it.
20  So I don't know what he did.  I have no idea what
21  his thinking was.  I never saw his will or
22  anything.  I was handed a copy of his estate when
23  I first met Mr. Gumaer.  I knew from nothing.
24     Q.   Just to wrap this up, did you ever
25  discuss the transfer of Eber Metro to Alexbay with

Page 297

L. Eber

1
2   anyone else in your family besides Sally Kleeberg
3   and Wendy Eber?
4      A.   No.  There wouldn't be anyone else to
5   discuss it with.
6          MR. BROOK:  I have no further
7      questions.
8          MR. CALIHAN:  I have no questions at
9      this time.
10          MR. RAMSEY:  We are done.
11          THE VIDEOGRAPHER:  This marks the end
12      of media unit number six in the videotaped
13      deposition of Lester Eber.  We are going off
14      the record.  The time is 5:08.
15          (Time Noted:  5:08 p.m.)
16
17
18          LESTER EBER
19
20  Subscribed and sworn to before me
21  this _____ day of _____, 2019.
22
23
24  (Notary Public)      My Commission Expires:
25

75 (Pages 294 - 297)

Page 298

```
 1
 2            C E R T I F I C A T E
 3   STATE OF NEW YORK   )
                         : ss.
 4   COUNTY OF NEW YORK  )
 5        I, LYNNE D. METZ, a Shorthand Reporter
 6   and a Notary Public within and for the State of
 7   New York, do hereby certify that the foregoing
 8   deposition of LESTER EBER was taken before me on
 9   the 24th day of January, 2019;
10        That the said witness was duly sworn
11   before the commencement of his testimony; that the
12   said testimony was taken stenographically by me
13   and then transcribed.
14        I further certify that I am not
15   related by blood or marriage to any of the parties
16   to this action or interested directly or
17   indirectly in the matter in controversy; nor am I
18   in the employ of any of the counsel in this
19   action.
20        IN WITNESS WHEREOF, I have hereunto
21   set my hand this 8th day of February, 2019.
22
23
24             LYNNE D. METZ
25
```

Page 299

```
 1
 2   January 24, 2019
 3
 4              I N D E X
 5   WITNESS           EXAMINATION BY      PAGE
 6   LESTER EBER          MR. BROOK        7
 7
 8   ---------- INFORMATION REQUESTS ----------
 9   DIRECTIONS (DI):   141, 161
10   INSERT:        None
11   RULINGS (RL):      None
12   REQUESTS (RQ):     75, 181
13   CERTIFIED (CE):    None
14   MOTIONS (MO):      None
15
16          E X H I B I T S
17   Plaintiffs' Exhibits        For ID
18   Exhibit 25, a document entitled        15
19   Unanimous Written Consent of the Board
20   of Directors of Eber Brothers Wine and
21   Liquor Corporation Bates numbered EB
22   00001338 through 1340
23   Exhibit 26, an article found online on   37
24   casshilldevelopment.com
25   Exhibit 27, a document entitled        61
```

Page 300

```
 1
 2   Consulting Agreement Bates numbers EB
 3   00000702 through 711
 4   Exhibit 28, a series of W-2s that were   64
 5   produced by the parties in discovery
 6   Bates numbers EB 00021420 through 428
 7   Exhibit 29, a series of letters that   71
 8   appears to be written on Lester Eber's
 9   letterhead bearing Bates stamps EB 695
10   through 701
11   Exhibit 30, a document entitled Amended   99
12   and Restated Promissory Note bearing
13   Bates numbers EB 00031310 through 311
14   Exhibit 31, a copy of two printouts     110
15   made on October 1, 2016 from the
16   Connecticut Department of State
17   concerning the business Alexbay LLC
18   Exhibit 32, a letter and some          128
19   attachments that are dated July 12,
20   2017 from Rita Nischal of Canandaigua
21   National Bank and Trust to Lester Eber
22   Exhibit 33, an order in the Surrogates   128
23   Court of The State of New York in
24   Monroe County dated June 1, 2017 signed
25   by Surrogate Judge John M. Owens
```

Page 301

```
 1
 2   Exhibit 34, a letter and attachments    132
 3   that was produced yesterday by
 4   Canandaigua National Bank Bates stamped
 5   CNB-PL 0010 through 12
 6   Exhibit 35, a e-mail and attachment    137
 7   dated October 31, 2018 sent by Paul
 8   Keneally with multiple recipients
 9   CNB-PL 0001 to 2
10   Exhibit 36, a printout of a table with   141
11   some notes entitled Residuary TUW Allen
12   Eber Proposed Distribution of
13   Securities
14   Exhibit 37, a e-mail dated September    141
15   15, 2017 sent by Jim Vazzana to R.
16   Nischal at CNB, Canandaigua National
17   Bank, with yourself as one of the
18   people copied on it Bates stamped
19   CNB-PL 0005
20   Exhibit 38, a letter dated October 11,   144
21   2017 on letterhead for Woods Oviatt
22   Gilman LLP addressed to Jim Vazzana and
23   me
24   Exhibit 39, a four-page letter dated    148
25   November 5, 2018 by Paul Keneally
```

76 (Pages 298 - 301)

Page 302

1
2  addressed to Magistrate Judge Katherine
3  Parker
4  Exhibit 40, a e-mail dated June 2, 2017  151
5  from Jim Vazzana to Lorisa LaRocca
6  Bates number CNB-PL 0022
7  Exhibit 41, an e-mail dated August 18,  151
8  2017 from Jim Vazzana to Lorisa LaRocca
9  Exhibit 42, a copy of a letter dated     155
10  October 10, 2018 from Audrey Hays to
11  Wendy Eber and Lester Eber
12  Exhibit 43, a series of documents that  167
13  were produced together Bates range EB
14  00001166 through 1173
15  Exhibit 44, a copy of a summons and     191
16  complaint dated February 21, 2012
17  bearing Bates number KSH 00070 through
18  83
19  Exhibit 45, a document bearing the     209
20  caption of Alexbay versus Eber Brothers
21  and it states it is the affidavit of
22  Lester Eber bearing Bates numbers EB
23  00001059 through 1063
24  Exhibit 46, Affidavit of Lester Eber     218
25  bearing Bates numbers EB 00017525

Page 303

1
2  through 544
3  Exhibit 47, a two-page letter on the     253
4  letterhead for Elliot W. Gumaer, Jr.
5  Dated January 2, 2001 Bates stamped
6  January 8, 2001 and Bates number EB
7  00001556 to 57
8  Exhibit 48, an e-mail from Mike Gumaer  257
9  to Wendy Eber and Lester Eber dated
10  October 29, 2013 bearing Bates number
11  GUM 000023
12  Exhibit 49, a letter on Eber Brothers     264
13  Wine and Liquor Corp. Letterhead signed
14  by Lester Eber Bates number KSH 00004
15  dated April 2, 2010
16  Exhibit 50, a chain of two e-mails     280
17  possible another e-mail that appears to
18  have been redacted Bates number EB
19  00031202
20  Exhibit 51, an e-mail from Mike Gumaer  286
21  to Lester Eber copying Wendy Eber dated
22  December 1, 2013 bearing Bates numbers
23  EB 00031106
24
25     ***Exhibits retained by counsel.***

Page 304

1
2               ERRATA SHEET
               VERITEXT LEGAL SOLUTIONS
2              330 OLD COUNTRY ROAD
               MINEOLA, NEW YORK 11501
3                 516-608-2400
4  NAME OF CASE: Kleeberg, et al v. Eber, et al
   NAME OF DEPONENT: Lester Eber
5  DATE OF DEPOSITION: January 24, 2019
6  PAGE   LINE(S)      CHANGE         REASON
7  |_____|_____|_____|_____|
8  |_____|_____|_____|_____|
9  |_____|_____|_____|_____|
10 |_____|_____|_____|_____|
11 |_____|_____|_____|_____|
12 |_____|_____|_____|_____|
13 |_____|_____|_____|_____|
14 |_____|_____|_____|_____|
15 |_____|_____|_____|_____|
16 |_____|_____|_____|_____|
17 |_____|_____|_____|_____|
18 |_____|_____|_____|_____|
19 |_____|_____|_____|_____|
20 |_____|_____|_____|_____|
21  _____
            Lester Eber
22
   SUBSCRIBED AND SWORN TO BEFORE ME
23 THIS___DAY OF _____, 20__.
24
   _____   _____
25 (NOTARY PUBLIC)       MY COMMISSION EXPIRES:

77 (Pages 302 - 304)