Page 1

1

2  UNITED STATES DISTRICT COURT

3  SOUTHERN DISTRICT OF NEW YORK

4  Civil Action No. 16-cv-951 (LAK)

5  ------------------------------------x

6  DANIEL KLEEBERG, LISA STEIN and

7  AUDREY HAYS,

8                          Plaintiffs,

9              -against-

10  LESTER EBER; ALEXBAY, LLC f/k/a LESTER

11  EBER, LLC; CANANDAIGUA NATIONAL

12  CORPORATION d/b/a CANANDAIGUA NATIONAL

13  BANK & TRUST; ELLIOT W. GUMAER, JR.;

14  EBER BROS. & CO., INC.; EBER BROS.

15  WINE AND LIQUOR CORPORATION; EBER

16  BROS. WINE AND LIQUOR METRO, INC.,

17  EBER-CONNECTICUT, LLC; and WENDY EBER,

18                          Defendants.

19  ------------------------------------x

20

21

22                      January 23, 2019

23

24

25

Page 2

```
 1
 2                    January 23, 2019
 3                    9:41 a.m.
 4
 5
 6          Videotaped deposition of WENDY EBER,
 7  held at the offices of Veritext New York City,
 8  1250 Broadway, New York, New York, pursuant to
 9  Notice, before Lynne D. Metz, a Shorthand Reporter
10  and Notary Public of the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1
 2  A P P E A R A N C E S:
 3
 4     BROOK & ASSOCIATES PLLC
 5     Attorneys for Plaintiffs
 6        100 Church Street
 7        8th Floor
 8        New York, New York 10007
 9     BY:   BRIAN C. BROOK, ESQ.
10
11
12     UNDERBERG & KESSLER LLP
13     Attorneys for Defendants LESTER EBER;
14     ALEXBAY, LLC f/k/a LESTER EBER, LLC; EBER
15     BROS. & CO., INC.; EBER BROS. WINE AND
16     LIQUOR CORPORATION; EBER BROS. WINE AND
17     LIQUOR METRO, INC., EBER-CONNECTICUT, LLC;
18     and WENDY EBER
19        50 Fountain Plaza
20        Buffalo, New York 14202
21     BY:   COLIN D. RAMSEY, ESQ.
22
23
24
25
```

Page 4

```
 1
 2  A P P E A R A N C E S: (Cont'd):
 3
 4        JOHN HERBERT, ESQ. (Telephonically)
 5        Attorneys for Defendants LESTER EBER and
 6        WENDY EBER
 7           P.O. Box 1031
 8           Tiburone, California 94920
 9
10
11     CALIHAN LAW PLLC
12     Attorneys for Defendant THE ESTATE of
13     ELLIOT W. GUMAER
14        16 East Main Street
15        Rochester, New York 14614
16     BY:   ROBERT B. CALIHAN, ESQ.
17
18
19     ALSO PRESENT:
20        Wayne Saline - Videographer
21        Dan Kleeberg
22        Lester Eber
23
24
25
```

Page 5

```
 1
 2
 3
 4     IT IS HEREBY STIPULATED AND AGREED, by and
 5  between the attorneys for the respective parties
 6  herein, that filing and sealing be and the same
 7  are hereby waived.
 8     IT IS FURTHER STIPULATED AND AGREED
 9  that all objections, except as to the form of the
10  question, shall be reserved to the time
11  of the trial.
12     IT IS FURTHER STIPULATED AND AGREED that the
13  within deposition may be signed and sworn to
14  before any officer authorized to administer an
15  oath, with the same force and effect as if signed
16  and sworn to before the officer before whom the
17  within deposition was taken.
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1
2       THE VIDEOGRAPHER:  We are going on the
3   record at 9:42 on January 23, 2019.  Please
4   note the microphones are sensitive and may
5   pick up whispering and private
6   conversations.  Please turn off all cell
7   phones or place them away from the
8   microphone as they may interfere with the
9   deposition audio.  Recording will continue
10   until all parties agree to go off the
11   record.
12       This is media unit one of the video
13   recorded deposition of Wendy Eber on behalf
14   of Eber Brothers Wine and Liquor Metro Inc.
15   taken by counsel for plaintiff in the matter
16   of Daniel Kleeberg et al versus Lester Eber
17   et al filed in the United States District
18   Court, Southern District of New York, case
19   number 16-CV-9517 (LAK).
20       This deposition is being held at
21   Veritext located at 1250 Broadway New York,
22   New York.  My name is Wayne Saline from the
23   firm Veritext.  I am the videographer.  The
24   court reporter is Lynne Metz from the firm
25   Veritext.

Page 7

1                W. Eber
2       At this time the attorneys will
3   introduce themselves and their affiliation
4   for the record.  The court reporter will
5   swear in the witness and we can proceed.
6       MR. BROOK:  On behalf of the
7   plaintiffs Brian Brook of Brook and
8   Associates PLLC.
9       MR. RAMSEY:  Colin Ramsey, Underberg
10   and Kessler on behalf of the Eber
11   defendants.
12       MR. CALIHAN:  Robert Calihan from
13   Calihan Law PLLC on behalf of the Estate of
14   Elliot Gumaer.
15
16 W E N D Y   E B E R,
17   called as a witness, having been first duly
18   sworn by the Notary Public (Lynne D. Metz),
19   was examined and testified as follows:
20 EXAMINATION BY
21 MR. BROOK:
22   Q.   Good morning.
23   A.   Good morning.
24   Q.   Have you ever been deposed before?
25   A.   Yes.

Page 8

1                W. Eber
2   Q.   When was the last time you were
3 deposed?
4   A.   I don't remember the exact date.
5   Q.   Approximately when, ballpark figure?
6   A.   Between 2014 and 2016.
7   Q.   So within the last few years, is that
8 fair to say?
9   A.   Yeah, maybe it was a little earlier
10 than that.
11   Q.   So I am going to nonetheless, even
12 though you have done this before, go over some of
13 the basics before we get to the substance of the
14 questioning.  The most important thing to remember
15 is everything we say is being transcribed.  So
16 even though there is a videographer, if it doesn't
17 end up in the transcript made by the court
18 reporter isn't said.  So it is important that
19 we try our best to not talk over each other even
20 though we know where the other is going.
21       Can you do that?
22   A.   Yes.
23   Q.   Or at least try.
24       Another important thing is to make
25 answers verbal and so gestures, nods or even

Page 9

1                W. Eber
2 saying aha or uh-uh is not something that makes
3 its way into the transcript in a way that's clear
4 enough for the court record.
5       So occasionally we may get reminded to
6 do that; okay, to make verbal answers?
7   A.   Okay.
8   Q.   And you are doing a very good job
9 waiting for me to finish my question before
10 speaking, so that's good at the beginning part.
11       One thing just because I know there is
12 a lot of stuff to cover here, it is important in
13 this deposition that consistent with your oath
14 that you provide full answers and so that's what I
15 am entitled to in this deposition.  So for
16 example, if I ask you what you had for breakfast
17 and you said orange juice when in fact you had
18 orange juice and toast, orange juice would not be
19 a full answer.
20       Do you understand that?
21   A.   Yes.
22   Q.   You are welcome to try to take a break
23 at any time whenever you feel like it.  It is
24 important that you be in a place where you feel
25 you can answer the questions effectively.  So if

3 (Pages 6 - 9)

W. Eber

1
2  you need a break for any reason you don't have to
3  say why, just ask for a break.  The only thing I
4  ask is if I have a question pending that you
5  answer the question before we take a break; okay?
6      A.   Okay.
7      Q.   Is there any reason such as not
8  getting enough sleep or being on any prescription
9  medications that would affect your ability to
10 testify truthfully and fully today?
11     A.   No.
12     Q.   And you are testifying this morning on
13 behalf of the company corporation Eber Brothers
14 Wine and Liquor Metro Inc.; is that right?
15     A.   That is right.
16         MR. BROOK:  Let's go ahead and mark
17     our first exhibit.  This is Plaintiffs' 10.
18     I am going to show you what is going to be
19     marked as Plaintiffs' Exhibit 10.  It is a
20     copy of the deposition notice for today's
21     deposition.
22         (Plaintiffs' Exhibit 10, a copy of
23     the deposition notice for today's
24     deposition, marked for identification, as of
25     this date.)

W. Eber

1
2      Q.   Do you have Exhibit 10 in front of
3  you?
4      A.   I do.
5      Q.   Have you seen this before?
6      A.   Yes, I believe it was e-mailed to me
7  but I didn't read the whole thing.
8      Q.   Take a look at the second page of the
9  exhibit.  It says attachment A at the top.
10         Do you see that?
11     A.   Yes.
12     Q.   And there is a list of five topics
13 with some sub topics.
14         Do you see that?
15         MR. RAMSEY:  You don't have to read
16     them all.  Do you see there are five
17     different categories at this point?
18     A.   Yes.
19     Q.   And have you seen or read these topics
20 before today's deposition?  Have you read this
21 list of topics before today's deposition?
22     A.   No.
23     Q.   What did you do to prepare for today's
24 deposition?
25     A.   I spoke to my lawyers.

W. Eber

1
2      Q.   Did you do anything else?
3      A.   I reviewed some documents.
4      Q.   Did you do anything else?
5      A.   No.  I don't remember doing anything
6  else.
7      Q.   Did you speak to any other persons who
8  had worked with Eber Metro or let me first
9  withdraw that question and do something I should
10 have done a minute ago, which was because the name
11 of the company is very long here I am going to
12 refer to Eber Brothers Wine and Liquor Metro Inc.
13 as Eber Metro today.
14         Is that okay?  Do you understand that?
15     A.   Yes.
16     Q.   I would like you to do the same.
17         Can you do that please?
18     A.   Can you repeat?
19     Q.   So use Eber Metro, when referring to
20 the company we are talking about for the
21 deposition today.
22     A.   Yes.
23     Q.   And am I correct in understanding
24 there is a also an entity that was called Eber
25 Metro LLC?

W. Eber

1
2      A.   Yes.
3      Q.   So if you are at any time referring to
4  that entity I would ask you to please specify the
5  LLC designation for it so we can distinguish that
6  entity from the corporation that's being deposed
7  today; okay?
8      A.   Right.
9          Can you repeat what you want?
10     Q.   Sure.
11     A.   Yeah.
12     Q.   For today's deposition when referring
13 to Eber Brothers Wine and Liquor Metro Inc. we are
14 both going to refer to it as Eber Metro; okay?
15     A.   Okay.
16     Q.   Then if at any time either one of us
17 is going to refer to Eber Metro LLC, we will be
18 sure to say LLC to distinguish it; okay?
19     A.   Okay.
20     Q.   So did you speak with any other
21 persons who had worked with Eber Metro to prepare
22 for your deposition today?
23     A.   I did speak with Glenn Sturm not in
24 preparation for this but I did speak with him
25 before today.

Page 14

W. Eber
1
2      Q.   When was that?
3      A.   Like before Christmas.
4      Q.   And did it relate to today's
5   deposition?
6      A.   No, not my deposition, no.
7      Q.   Did it relate to the deposition of
8   Eber Metro?
9           MR. RAMSEY:  I am just going to stop
10   you there.
11          Were you consulting with legal advice
12   or you were just having conversation more
13   general?
14          THE WITNESS:  Just conversation.
15          MR. RAMSEY:  Go ahead.  Any legal
16   advice is privileged, but go ahead.
17   BY MR. BROOK:
18      Q.   So what was the topic of discussion
19   with Glenn Sturm?
20      A.   Just his general health and what he
21   was doing Christmas.  It was kind of general
22   things with his family.
23      Q.   And had he been associated with or
24   working with Eber Metro at some time in the past?
25      A.   He had worked with us, yes.

Page 15

W. Eber
1
2      Q.   In what capacity?
3      A.   As an attorney.
4      Q.   And in any other capacity?
5      A.   Strategic consultant.
6      Q.   Was he compensated for his work as an
7   attorney in strategic consulting?
8           MR. RAMSEY:  Form.
9           Go ahead and answer.
10      A.   Yes.
11      Q.   How so?
12      A.   He had been paid.
13      Q.   He was paid cash?
14      A.   He had been paid some cash, yes.
15      Q.   Was he paid in any other way?
16          MR. RAMSEY:  Specifically with respect
17   to Metro at this point?
18          MR. BROOK:  Yes.
19      A.   No.
20      Q.   Was the payment made to Glenn Sturm
21   directly or to a law firm?
22      A.   Law firm.
23      Q.   Was that the Nelson Mullins Riley
24   firm?
25      A.   I believe so.

Page 16

W. Eber
1
2      Q.   Looking at still Exhibit 10 in front
3   of you, the attachment A, I am going to go through
4   the topics and make sure we understand what you
5   are supposed to be testifying about today.  So
6   topic one is "Any transactions referenced,
7   directly or indirectly, in the updated proposed
8   third amended complaint served on December 21,
9   2018."
10          Do you see that?
11      A.   Yes.
12      Q.   Have you seen a copy of the updated
13   proposed third amended complaint that's referenced
14   there?
15      A.   I saw a red line version of it.
16          Is that what you are referring to?
17      Q.   If you saw a red line version of it
18   yes, that would have it in there.  I don't know
19   for sure if it was the exact document but it was
20   recent that it showed additional allegations.
21          Did you see that?
22      A.   Yes.  I saw that one.
23      Q.   And did you review the entire updated
24   proposed third amended complaint or just the
25   portions that had been red lined?

Page 17

W. Eber
1
2      A.   There were two versions.
3          Which one are you referring to?
4      Q.   So I will withdraw the question.
5          Are you aware that plaintiffs have
6   added additional allegations to their complaint in
7   the last few weeks and have asked the court to
8   include those in this lawsuit?
9      A.   Yes.
10      Q.   And you are aware of, at least in
11   general terms, of what transactions those are that
12   had been put into the new proposed complaint?
13      A.   I don't remember all of them.
14      Q.   So in preparing for your testimony
15   today, is it fair to say you did not go through
16   the proposed third amended complaint to review
17   each transaction?
18          MR. RAMSEY:  Form.
19      A.   What do you mean?
20      Q.   So in preparing for today's testimony,
21   did you go through the updated proposed third
22   amended complaint or any version of plaintiffs'
23   complaint to check and make sure you were familiar
24   with any transactions that involved Eber Metro?
25      A.   I read it.

5 (Pages 14 - 17)

W. Eber

1
2   Q.   When was the last time you read it?
3   A.   Which version?
4   Q.   Any version of the complaint.
5       When was the last time you read that?
6   A.   I think it was a couple of weeks ago.
7  I don't really remember the exact date.
8   Q.   Let's go to the second topic on
9  attachment A.  It says "The formation and
10 corporate governance of Eber Metro."
11      Do you see that?
12  A.   Yes.
13  Q.   What did you do to prepare for
14 testimony on that topic?
15  A.   I don't remember.
16  Q.   When were you first employed by or
17 working with Eber Metro?
18  A.   Somewhere in the early two thousands.
19  Q.   Was Eber Metro already a going concern
20 at the time you started working with it or were
21 you involved in forming the company?
22  A.   It was a going -- it was already up
23 and running.
24  Q.   Do you know when Eber Metro was
25 formed?

W. Eber

1
2   A.   I would say, I believe it was mid
3  nineties, '95, '96.
4   Q.   What was the reason for Eber Metro's
5  formation?
6   A.   I don't know.  It was started before I
7  started.
8   Q.   Who would know the reason for Eber
9  Metro's formation?
10      MR. RAMSEY:  If you know.
11  A.   John Ryan would know.
12      MR. CALIHAN:  I am sorry.
13      Who?
14  A.   John Ryan would know and my father
15 would probably know.
16  Q.   Did you speak to either of those
17 individuals to prepare for this deposition?
18  A.   I have spoken to Lester regarding --
19 sorry.
20  Q.   Go ahead.  I didn't mean to cut you
21 off.
22      What did you speak to Lester
23 regarding?
24  A.   Not necessarily about the formation.
25  Q.   And did you speak to him about today's

W. Eber

1
2  deposition?
3   A.   Yes.
4   Q.   What did you discuss?
5       MR. RAMSEY:  Anything not in the
6  presence of counsel.  Go ahead.
7   A.   The time.  We thought it was at 10
8  o'clock and changed to 9 o'clock.
9   Q.   Anything else?
10  A.   And the location.  The location.
11  Q.   Did you and Lester discuss anything
12 about Eber Metro's business or history in your
13 preparation for today's deposition?
14  A.   No.
15  Q.   Topic 3 back on Exhibit 10.  It says
16 "The acquisition of Slocum and Sons in 2005
17 including without limitation the terms of the
18 transactions, the negotiations for the
19 transactions, the basis for the purchase price
20 i.e., the valuation of the business both as a
21 whole and as to its particular entities."
22      Do you see that?
23  A.   Yes.
24  Q.   Were you personally involved in the
25 acquisition of Slocum and Sons in 2005?

W. Eber

1
2   A.   No.
3   Q.   Did you do anything to prepare to
4  testify on this topic number 3?
5       MR. RAMSEY:  Form.
6   A.   I searched for documents for it.
7   Q.   When did you do that?
8   A.   When you initially asked for the
9  documents and then I found some subsequently.
10  Q.   Are you referring to the documents for
11 the merger and acquisition?
12  A.   What merger and acquisition?
13  Q.   Let's step back.
14      Slocum and Sons were acquired or
15 certain of its entities were acquired and then
16 merged into Eber entities in 2005; is that right?
17  A.   I wasn't involved in that transaction.
18  Q.   So other than having found documents
19 for it, are you able to testify today about the
20 terms or the negotiations for that transaction?
21  A.   No.  I was not involved in that.
22      MR. BROOK:  I am going to briefly
23 pause on the question of the witness and ask
24 counsel are you anticipating another witness
25 on behalf of Eber Metro to answer questions

W. Eber

1
2    that have been noticed?
3        MR. RAMSEY:  We have got a limited
4    universe of people we can produce and they
5    are both here and you are deposing one
6    tomorrow.  So if you can't get a question
7    out this witness you are welcome to ask
8    Lester Eber tomorrow, but that's the
9    universe of witnesses.
10       MR. BROOK:  That's not how 30(b)6
11   depositions are supposed to work, but we
12   will reserve our rights and we don't have to
13   argue about it right now.
14       MR. RAMSEY:  Fair enough.
15   Q.   Topic 4 on Exhibit 10 says "The
16   nature, governance and financial performance of
17   each business that was at any time controlled by
18   Eber Metro."
19       Do you see that?
20   A.   Eber Metro Inc. you mean?
21   Q.   Yes, all this is Eber Metro Inc.
22   A.   What is your question?
23   Q.   I just asked if you saw that.
24   A.   I see that, yes.
25   Q.   Did you do anything to prepare for

W. Eber

1
2    testimony today on that topic?
3        MR. RAMSEY:  Form.
4        MR. BROOK:  Basis.
5        MR. RAMSEY:  I don't know what you
6    mean by prepare.
7        MR. BROOK:  I am fine with the record
8    saying that.
9    Q.   Go ahead.  You can answer the question
10   if you understand it.
11   A.   No.
12   Q.   So did you review any of the financial
13   records of Eber Metro in preparation for your
14   testimony today?
15   A.   Not specifically for preparation for
16   today, but I did pull documents that were provided
17   to you.
18   Q.   And when was that?
19   A.   You know, when this lawsuit started.
20   Throughout the time that it started we also pulled
21   some documents for our valuation expert.
22   Q.   When was the last time that you recall
23   looking at any of Eber Metro's financial records
24   or -- I will withdraw the question.
25       When is the last time you remember

W. Eber

1
2    looking at the financial records for any business
3    that was ever controlled by Eber Metro?
4    A.   We did look at some documents for the
5    valuation expert.
6    Q.   When was that?
7    A.   I would say last couple of months.
8    Last month.
9    Q.   Can you name for me the different
10   businesses that have been controlled by Eber Metro
11   at any time in the last ten years?
12   A.   Yes.
13   Q.   Please do so.
14   A.   Eber -- let's see.  There was ENDC
15   which became Eber Metro LLC.  Eber Connecticut.
16   Eber Rhode Island.  I don't remember anything
17   else.
18   Q.   Was a company called Slocum and Sons
19   of Maine Inc. ever controlled by Eber Metro?
20   A.   No, no.
21   Q.   Did Eber Metro ever have any sort of a
22   interest in, Slocum and Sons of Maine, Inc. such
23   as an option to purchase it?
24   A.   I don't remember.  It may have.  I
25   don't specifically remember.  It may have.  I was

W. Eber

1
2    not involved in that transaction from 2005.
3    Q.   So let's step back.
4        What was your first position with Eber
5    Metro?
6    A.   I was a divisional accounting manager
7    type person.
8    Q.   And were you compensated for that
9    position by Eber Metro or another Eber entity?
10   A.   By Eber Metro I believe.
11   Q.   And what was your compensation?
12   A.   I don't remember the exact amount.
13   Q.   So it was some amount of a salary; is
14   that right?
15   A.   Yes.
16   Q.   Did you also have any incentive
17   compensation such as a bonus?
18   A.   No, no.
19   Q.   And what was the next position that
20   you had after that with Eber Metro?
21   A.   It was financial analyst type
22   position.
23   Q.   Approximately, when was that that you
24   held that position?
25   A.   Sorry.  I am just trying to think

7 (Pages 22 - 25)

Page 26

W. Eber

1  here.
2  here.
3       2003-ish, 2004.  2004-issue.
4     Q.   At some point did you move into some
5  sort of management role with Eber Metro?
6     A.   No.
7     Q.   What is your current position?
8     A.   Well, at some point later yes.
9     Q.   When was that?
10    A.   In approximately like 2007, 2008
11  maybe.  2007, 2007-issue, 2008.
12    Q.   What was that position?
13    A.   I became the secretary and treas --
14  uh, CFO.
15    Q.   And at the time, who was it that you
16  were reporting to for Eber Metro?
17    A.   When?
18    Q.   At that time once you became secretary
19  and CFO, who did you report to?
20    A.   Lester Eber.
21    Q.   Anyone else?
22    A.   Everyone else had left.
23    Q.   And were you at that time also on the
24  board of directors?
25    A.   Yes.

Page 27

W. Eber

1
2     Q.   Did you replace someone else who had
3  left as director?
4     A.   Yes.
5     Q.   Who was that?
6     A.   Lisa Seminock.
7          MR. CALIHAN:  I couldn't hear.
8     A.   Lisa Seminock.
9     Q.   Who else was on the board of directors
10  at that time once you joined it?
11    A.   Lester Eber and Mike Gumaer.  Elliot
12  is his formal name.
13    Q.   What is your position today with Eber
14  Metro?
15    A.   Eber Metro I am the CFO and secretary.
16    Q.   So you have -- sorry.  Go ahead.
17    A.   Board member.
18    Q.   Did you -- withdrawn.
19         So you stayed in the same position
20  with Eber Metro since approximately 2007 or 2008;
21  is that right?
22    A.   Yeah.
23    Q.   And is the president of the company
24  still Lester Eber?
25    A.   Yes.

Page 28

W. Eber

1
2     Q.   Now you mentioned a couple of
3  companies or three companies that were controlled
4  by Eber Metro.
5          The first you mentioned was called
6  ENDC and is now referred to as Eber Metro LLC; is
7  that right?
8     A.   Correct.
9     Q.   What was the nature of that company's
10  business?
11    A.   Liquor distribution in like the New
12  York, downstate New York business.
13    Q.   So like the New York City Metropolitan
14  area; is that right?
15    A.   Yes.
16    Q.   Were you involved with ENDC in any
17  direct way?
18    A.   No.
19    Q.   Is ENDC still an operating entity?
20    A.   There are no operations, no.
21    Q.   When did it cease operating?
22    A.   2007 I believe.  I don't remember.
23    Q.   Why did it cease operating at that
24  time?
25    A.   It went out of business.

Page 29

W. Eber

1
2     Q.   What caused it to go out of business?
3     A.   Southern coming in to the market and
4  putting it basically out of business.
5     Q.   And you are referring to by Southern
6  as Southern Wine and Spirits; is that correct?
7     A.   Correct.
8     Q.   And was ENDC a partnership or a joint
9  venture with another company in addition to Eber
10  Brothers?
11    A.   I don't really know.  I don't know the
12  details of that company.
13    Q.   What does ENDC stand for?
14    A.   I don't know for sure.
15    Q.   What's your best guess?
16         MR. CALIHAN:  Form.
17         MR. RAMSEY:  Don't guess.  If you have
18  an understanding, but don't guess.
19         MR. BROOK:  Fair enough.
20    Q.   What is your best understanding of
21  what ENDC stands for?
22    A.   National Distributing Company.
23    Q.   And that is another wine and liquor
24  distributor; is that right?
25    A.   Yes.

8 (Pages 26 - 29)

Page 30

W. Eber

1
2      Q.   And does Eber Metro have any
3  continuing relationship with National Distributing
4  Company at this time?
5      A.   No.
6      Q.   When did it stop working with National
7  Distributing Company?
8      A.   I don't remember.  It went out of
9  business.
10     Q.   Have you yourself ever interacted with
11 anyone from National Distributing Company?
12     A.   I met one of the owners.
13     Q.   When was that?
14     A.   I don't remember.
15     Q.   What was his or her name?
16     A.   Chris Carlos.
17          MR. RAMSEY:  Keep your voice up.
18     Q.   What was the purpose of your meeting?
19     A.   I don't remember.
20     Q.   Was anyone else there on behalf of
21 Eber Metro or any of its affiliates?
22     A.   I don't remember.
23     Q.   Was ENDC a profitable enterprise?
24     A.   I don't know.
25     Q.   You mentioned Eber Rhode Island;

Page 31

W. Eber

1
2  right?
3      A.   Yes.
4      Q.   What is the nature of that entity's
5  business?
6      A.   Distribution of wine in Rhode Island.
7  It was.
8      Q.   So it is no longer operating; is that
9  right?
10     A.   No.
11     Q.   When did it stop operating?
12     A.   I don't remember the exact date.
13 Sorry.
14     Q.   So in this deposition when I ask
15 questions about when something occurred, I am not
16 asking for the exact date necessarily.  If you
17 know the exact date you should say it, but if you
18 don't know I am asking for the best approximation
19 you can have.  So if you remember the month and
20 year you can say the month and year.  If you
21 remember the year please say the year.  If it is a
22 season within a two-year period, winter 2008, 2009
23 you can say that.
24          So with that clarification of what I
25 am asking for, when did Eber Rhode Island stop

Page 32

W. Eber

1
2  operating?
3      A.   Can I ask a question to you?
4      Q.   Yes.  If you don't understand any of
5  my questions you can always ask me a question to
6  clarify.
7      A.   Like a year period like --
8          MR. RAMSEY:  If you can give a range.
9          Give your best approximation of when they no
10         longer operated.
11     A.   2007 or 2008.  Something like that.
12     Q.   Did you personally have any direct
13 involvement in Eber Rhode Island's business?
14     A.   No.
15     Q.   Who was in charge of Eber Rhode Island
16 when it was last operating?
17     A.   I mean I don't remember.  I don't
18 know.  I don't know.
19     Q.   Do you know whether Eber Rhode Island
20 was a profitable enterprise?
21     A.   I don't believe so, but I don't know
22 specifics.
23     Q.   Does Eber Metro still have any
24 documents that its retained concerning the
25 operations or financial performance of Eber Rhode

Page 33

W. Eber

1
2  Island?
3      A.   I don't remember.  I don't know.  I
4  don't remember.
5      Q.   Now the third entity was Eber
6  Connecticut.
7          On that company is it fair to say you
8  do have a lot more personal knowledge?
9      A.   Yes.
10     Q.   And because we are deposing Eber
11 Connecticut later we will address that one later.
12          So continuing to look at Exhibit 10,
13 the fifth topic listed is "The relationships with
14 and any transactions between Eber Metro and any of
15 the following persons or entities including their
16 subsidiaries, employees, officers, directors,
17 managers, owners or other affiliates."  And it has
18 a list of ten or 11 names.
19          Do you see that?
20     A.   What are you asking?
21          MR. RAMSEY:  Do you see that right
22 now?
23     Q.   Do you see that on the page?
24          MR. RAMSEY:  Number 5.
25     A.   Yes, I see it.

9 (Pages 30 - 33)

Page 34

W. Eber

1
2    Q.   So were you given at least this list
3  of names or some of these names prior to today's
4  deposition so you can look and see if there had
5  been any transactions between Eber Metro and those
6  entities or persons?
7         MR. RAMSEY:  Form.
8    A.   I haven't seen this list before today.
9  It may have been e-mailed to me, but I don't
10 recall seeing it.
11   Q.   So let's look at letter A there is the
12 Allen Eber Trust.
13        Do you know what that is?
14   A.   Yes.
15   Q.   What is the Allen Eber Trust?
16   A.   It is a trust for Allen Eber.
17   Q.   And how was it created?
18   A.   When -- how was it created, is that
19 your question?
20   Q.   Yes.  If you know.
21   A.   I don't know.  I mean it was created.
22 I might have been two years old when it was
23 created.  When he died.  When Allen Eber died.
24   Q.   Is there any relationship at this time
25 between the Allen Eber Trust and Eber Metro?

Page 35

W. Eber

1
2        MR. RAMSEY:  Form.
3    A.   Can you ask the question again?
4    Q.   Sure.  Let's step back.
5        At the time when you first became
6  secretary and CFO of Eber Metro, what was the
7  relationship between Eber Metro and the Allen Eber
8  Trust?
9    A.   There was an ownership structure with
10 the trust.
11   Q.   So the Allen Eber Trust was either
12 directly or indirectly an owner of Eber Metro; is
13 that what you are saying?
14   A.   Yes.
15        MR. BROOK:  Let's mark our next
16   exhibit as Plaintiffs' 11.
17        (Plaintiffs' Exhibit 11, a document
18   that's described at the top as current
19   corporate structure of Eber Brothers Wine
20   and Liquor Corporation and its operating
21   affiliates, marked for identification, as of
22   this date.)
23   Q.   So I am showing you what has been
24 marked as Exhibit 11.  It is a document that's
25 described at the top as current corporate

Page 36

W. Eber

1
2  structure of Eber Brothers Wine and Liquor
3  Corporation and its operating affiliates.
4        Do you see that?
5        MR. RAMSEY:  He wants to know if you
6    see the top.
7    A.   Yes.
8    Q.   And do you recognize this document?
9    A.   This specific document?
10   Q.   Yes.
11        Do you recognize what it is?
12   A.   Current corporate structure of Eber
13 Brothers Wine and Liquor Corporation and its
14 operating affiliates is the title.
15   Q.   And this is an organizational chart;
16 is that a fair description of it?
17   A.   Yes.
18   Q.   And have you seen this particular
19 organizational chart before?  If you are not sure
20 you can say you are not sure.
21   A.   I am not sure.
22   Q.   Have you had a chance to look at the
23 organizational chart, the substance of it and the
24 different branches?
25   A.   Can I look at it now?

Page 37

W. Eber

1
2    Q.   Yes.  It is right in front of you to
3  do so.
4        While you are looking at this, I would
5  like you to consider whether this is a accurate
6  depiction of the corporate structure of Eber
7  Brothers Wine and Liquor Corporation, its
8  operating affiliates at any particular point in
9  time and let me know when you have had a chance to
10 examine it and determine whether it is accurate.
11        Do you need more time with the
12 document?
13   A.   Yes.
14        Okay.
15   Q.   Is this an accurate depiction of the
16 corporate structure that existed at approximately
17 the time when you first became CFO and secretary
18 of Eber Metro?
19   A.   No.
20   Q.   What is different about it?
21   A.   I believe I became CFO before the
22 Eder-Goodman 15 percent ownership.
23   Q.   So at the time that you became CFO and
24 secretary Eber Metro owned one hundred percent of
25 Eber Connecticut; is that right?

Page 38

W. Eber

2    A.   I believe so yes, my recollection.
3    Q.   At some point afterwards 15 percent of
4  its interest in Eber Connecticut was sold to
5  Eder-Goodman LLC; is that right?
6    A.   Yes.
7    Q.   So is this an
8  accurate depiction of the corporate structure that
9  actually existed for Eber Metro and its affiliates
10 for the time period immediately after the
11 Eder-Goodman acquisition of 15 percent of Eber
12 Connecticut?
13   A.   I am sorry.
14        Can you repeat that question?
15   Q.   Sure.
16        So is this document, to the best of
17 your knowledge and belief, an accurate depiction
18 of the corporate structure of Eber Brothers Wine
19 and Liquor Corporation and its operating
20 affiliates at the time immediately after the
21 Eder-Goodman LLC transaction.
22   A.   Was that a different question than you
23 asked?
24   Q.   It was.
25   A.   Sorry.

Page 39

W. Eber

2    Q.   So, you heard enough of my last
3  question before that to know it was a little
4  different.  I had assumed that you hadn't
5  understood some part of my question so.
6    A.   I just got confused.
7    Q.   Is this -- let's step back.
8        When was the Eder-Goodman LLC
9  transaction?
10        MR. RAMSEY:  If you don't know a year
11   just give a range like we talked about
12   before.
13   A.   Approximately, 2008-ish.
14   Q.   So is this an accurate depiction of
15 the corporate structure for Eber Brothers and its
16 affiliates as of 2009?
17   A.   Yes.
18   Q.   At some point did this corporate
19 structure, at some point after 2009, did this
20 corporate structure change?
21   A.   Yes.
22   Q.   When was that?  I will withdraw the
23 last question.
24        What was the event that caused a
25 change in this corporate structure?

Page 40

W. Eber

2    A.   I believe in 2010 there was a sale of
3  six percent.
4    Q.   Six percent of what?
5    A.   Of Connecticut.
6    Q.   And who was the six percent sold to?
7    A.   Polebridge Bowman.
8    Q.   Who or what is Polebridge Bowman?
9    A.   Polebridge Bowman is Glenn Sturm.
10   Q.   Who is Glenn Sturm again?
11   A.   He is an attorney.
12   Q.   And so he also invested in Eber
13 Connecticut; is that right?
14        MR. RAMSEY:  Form.
15   A.   He yeah, and also provided legal
16 advice too.
17   Q.   How much did he pay for six percent of
18 Eber Connecticut?
19   A.   He paid 350,000 dollars.  He had a
20 note.
21   Q.   What do you mean he had a note?
22   A.   A note payable.
23   Q.   Referring to a promissory note?
24   A.   Yes.
25   Q.   And who issued or who is the

Page 41

W. Eber

2  promissory note issued to?
3        MR. RAMSEY:  If you know.
4    A.   Yeah, I don't remember.  I am not
5  certain.
6    Q.   Did he put in any actual cash for the
7  six percent?
8        MR. RAMSEY:  Form.
9    A.   No.
10   Q.   Who negotiated the Polebridge Bowman
11 six percent deal on behalf of Eber Metro?
12   A.   I was involved in that.
13   Q.   Were you the primary person involved
14 in it or was someone else more involved?
15   A.   I consulted with -- who?  Sorry.
16        Can you just repeat that?
17   Q.   Sure.
18        Was there anyone else besides yourself
19 who was involved on behalf of Eber Metro in the
20 Polebridge Bowman deal?
21   A.   Yes.
22   Q.   Who?
23   A.   Our attorneys.
24   Q.   Who were your attorneys?
25   A.   Harris Beach was involved in that and

11 (Pages 38 - 41)

W. Eber

2 also I consulted with our tax advisor Sumner
3 Persol.
4       Can I take a bathroom break?
5       MR. BROOK:  Sure.  You can do that but
6 let me ask one last very quick question to
7 finish this topic up.
8       Q.   Was Lester Eber involved in the
9 Polebridge Bowman deal?
10      A.   He knew about it.
11      Q.   But he was not the person negotiating
12 it, you were; is that right?
13      A.   It was the attorneys Harris Beach was
14 involved in it.
15      MR. RAMSEY:  He is asking about
16 Lester.
17      Was Lester involved in it?
18      THE WITNESS:  He knew about it.  I
19 don't remember how much involved he was
20 involved in it.
21      Q.   So let's take a break.
22      THE VIDEOGRAPHER:  This marks the end
23 of media unit number one in the videotaped
24 deposition of Wendy Eber.  We are going off
25 the record.  The time is 10:42.

W. Eber

2       (Recess taken.)
3       THE VIDEOGRAPHER:  This marks the
4 beginning of media unit number two in the
5 videotaped deposition of Wendy Eber.  We are
6 going on the record.  The time is 10:56.
7 BY MR. BROOK:
8       Q.   Are you good to continue at this
9 point?
10      A.   Yes.
11      Q.   When we broke we were talking a little
12 bit about who was involved in the negotiations
13 relating to the Polebridge Bowman acquisition of
14 six percent interest in Eber Connecticut.
15      How did those -- how did that deal
16 first get brought to your attention?
17      A.   The companies were losing lots of
18 money.  It was a very disastrous situation and we
19 wanted Glenn to help us.
20      Q.   So how did Glenn helping the companies
21 relate to his acquisition of six percent interest?
22      A.   That was the type of lawyer that he
23 is.  That was kind of common place for what he did
24 as a living.  I mean he was a corporate lawyer and
25 helped small businesses grow and had a lot of

W. Eber

2 issues.
3       Q.   So you are saying Glenn Sturm
4 requested an interest in the company?
5       MR. RAMSEY:  Form.
6       A.   No.  I am saying that he -- we wanted
7 him to help us.
8       Q.   So how did him helping you relate to
9 him acquiring an interest in Eber Connecticut?
10      A.   It is a part -- we paid him part and
11 this is the way he got paid in a lot of companies
12 that he worked with.  So this was kind of the way
13 he did business.
14      Q.   So this was a part of his compensation
15 for services, is that what you are saying?
16      A.   Partly to help.  We -- yes.
17      Q.   Was there another purpose to the
18 transaction?
19      MR. RAMSEY:  Form.
20      A.   Not that I remember.  There could have
21 been other purposes, but we wanted him to help us.
22      Q.   Who first brought up the idea of Glenn
23 Sturm acquiring an interest in Eber Connecticut?
24      A.   I don't remember.
25      Q.   What was the first proposal that you

W. Eber

2 recall seeing for Glenn Sturm to acquire an
3 interest in Eber Connecticut?
4       A.   I don't remember.  I don't remember.
5       Q.   At the time that the Polebridge Bowman
6 six percent deal was first proposed, was Glenn
7 Sturm already representing Eber Metro or its
8 affiliates as a lawyer?
9       A.   He may have been.  He may have been.
10 He was involved in some legal work for us.
11      Q.   What was that legal work?
12      MR. RAMSEY:  Not discussions you had
13 with him.  Just the nature of the work he
14 was doing for you.
15      A.   We had a legal case against us with a
16 company called Wolf Concepts.
17      Q.   So you are saying Glenn Sturm was
18 involved in that?
19      A.   He was advising us on some of that,
20 yes.  You know the dates are -- I don't know all
21 the specific dates he was involved in that.
22      MR. RAMSEY:  He was involved in some
23 of it?
24      THE WITNESS:  Yes.  Some of it.  We
25 had other lawyers too working on that Wolf

Page 46

1              W. Eber
2       Concepts.  He was involved in the
3       negotiation of the settlement.  You know,
4       these legal cases can go on a long time.  So
5       he was involved in parts of it.
6       Q.   What was the Wolf Concepts matter
7  about?
8       A.   Sorry?
9       Q.   What was the Wolf Concepts legal case
10 about in a nutshell?
11      A.   That was -- my understanding was that
12 was a breach of contract dispute with a vodka
13 supplier and the Eber companies.
14      Q.   So Wolf Concepts was a vodka supplier;
15 is that right?
16      A.   Petrossian Vodka.
17      Q.   And who was suing who?  Was Wolf
18 Concepts suing Eber brothers or the other --
19      A.   Yes.  They were suing Eber Brothers
20 and maybe other companies within the -- I am not
21 sure.  This is before my time.  So as I believe
22 the lawsuit started before I was CFO and secretary
23 of Metro.
24      Q.   At the time you were CFO and secretary
25 of Eber Metro, what was your position with Eber

Page 47

1              W. Eber
2  Brothers Wine and Liquor Corporation?
3       A.   When?
4       Q.   At the time.
5       MR. RAMSEY:  Form.
6       Q.   I guess when you were first made
7  secretary and CFO.
8       A.   Of?
9       Q.   Of Eber Metro.
10      What was your position with Eber
11 Brothers Wine and Liquor Corp.?
12      A.   I was CFO and secretary of Eber
13 Brothers Wine and Liquor Corp. too.
14      Q.   And at that same time, what was your
15 position or your positions with Eber Connecticut?
16      A.   Eber Connecticut I was treasurer and
17 secretary, I believe.
18      Q.   What is your current position with
19 Eber Brothers Wine and Liquor Corp.?
20      A.   My current position with Eber Brothers
21 Wine and Liquor Corp. assistant secretary of
22 dispute management and secretary.
23      MR. CALIHAN:  I'm sorry.
24      Can you say that again?
25      THE WITNESS:  Assistant secretary of

Page 48

1              W. Eber
2       dispute management and secretary.  I am also
3       on the board.  The board, I believe.
4       Q.   Are there any other officers or
5  directors of Eber Brothers Wine and Liquor Corp.
6  at this time?
7       A.   Lester.
8       Q.   What is his position?
9       A.   He is a director.
10      Q.   And was there a time when Lester was
11 not a director of Eber Brothers Wine and Liquor
12 Corp.?
13      A.   Yes.
14      Q.   When was that?
15      A.   Somewhere like February of 2012 he
16 resigned.
17      Q.   As both an officer and director?
18      A.   I don't remember specifics.  He did
19 resign as -- he resigned as president.  I don't
20 remember all the specifics.
21      Q.   Did anyone replace him as president of
22 Eber Brothers Wine and Liquor Corp.?
23      A.   I did.
24      Q.   How long were you the president of
25 Eber Brothers Wine and Liquor Corp. for?

Page 49

1              W. Eber
2       A.   I don't remember all the specific
3       dates.  There were some insurance issues where we
4       resigned some positions, but I don't remember all
5       the dates going back and forth.
6       Q.   Are you saying you resigned as
7  president of Eber Brothers Wine and Liquor Corp.
8  at some point out of insurance concerns?
9       MR. RAMSEY:  Form.
10      A.   Yes, I believe so.  And I was the
11 assistant secretary of dispute management.
12      Q.   What does that title mean?
13      A.   As you know there is a lot -- there
14 were a lot of legal matters that needed to be
15 worked on.  So I was in that capacity.  Had the
16 ability to work on some legal matters.
17      Q.   Approximately, when did Lester Eber
18 most recently get elected as a director of Eber
19 Brothers Wine and Liquor Corp.?
20      A.   Recently, recently.  We had a board
21 meeting.
22      Q.   When was that approximately?
23      A.   Within recently I would say the last
24 couple of months or so.  Three months.  I don't
25 remember exactly.

13 (Pages 46 - 49)

W. Eber

1
2    Q.   Had he been a director immediately
3 before that election?
4    A.   You know, I don't remember.
5    Q.   Going back to the Polebridge Bowman
6 transaction, was any part of that transaction
7 actually negotiated with Glenn Sturm?
8        MR. RAMSEY:  Form.
9    Q.   Meaning there was back and forth?
10    A.   Yes.
11    Q.   What was it?
12    A.   What do you mean by back and forth?
13    Q.   Did he make any proposals that you did
14 not agree to?
15    A.   I think originally he wanted more
16 stock and we agreed on less.  You know, I remember
17 talking to our accountant.  I believe I spoke with
18 Mike Gumaer.  I don't remember.  I don't remember
19 all the specifics.  I spoke with Sumner our tax
20 accountant.
21    Q.   And how was the pricing established
22 for the six percent that he acquired?
23    A.   The company was losing -- Connecticut
24 was losing vasts amounts of money.  It was a
25 disaster.  We were losing millions of dollars and

W. Eber

1
2 -- sorry.
3        Repeat your question.
4        MR. BROOK:  Would you read my question
5    back please?
6        (Record read.)
7    A.   So you know we were in rough shape.
8 It was a disaster and I had kind of remember
9 looking at the financials, speaking with Sumner.
10 That's about what I remember.
11    Q.   So how was the pricing established?
12        MR. RAMSEY:  Form.
13        Do you mean the price or the
14    structure?
15        MR. BROOK:  The price.
16    A.   I don't remember the specifics.  I
17 mean I know we were losing -- we looked at the
18 financial statements.  I talked to Sumner our tax
19 accountant.  It was severe financial distress for
20 us.  Connecticut had lost --
21        MR. RAMSEY:  I think he is asking how
22    did you arrive at the 350.
23    A.   Yeah, I don't remember all the
24 specifics.  I just remember it was severe
25 financial distress.

W. Eber

1
2    Q.   So do you recall whether the 350,000
3 dollar purchase price was something that was
4 negotiated?
5    A.   We did negotiate it.  I mean we did
6 talk about it, yes.
7    Q.   So now that your memory has been
8 refreshed, what do you recall about those
9 negotiations?
10    A.   I don't remember.  I just -- I told
11 you what I remember.
12    Q.   Who put out the first offer in terms
13 of a price?
14    A.   I don't remember.  I don't remember.
15    Q.   Was any valuation worked on on the
16 company by any accountants?
17    A.   I spoke with our accountant Sumner
18 Persol.
19    Q.   You said he was your tax accountant;
20 is that right?
21    A.   Yes.
22    Q.   And you are saying he also -- did he
23 perform a valuation analysis on the company?
24    A.   What do you mean by valuation?
25    Q.   Have you ever heard of accountants or

W. Eber

1
2 investment bankers doing a valuation of a company
3 before?
4    A.   Yes.  I mean I --
5    Q.   Has that ever been done on Eber
6 Connecticut by anyone?
7        MR. CALIHAN:  Objection to form.
8    A.   We recently had one done, you know.
9 We recently.
10    Q.   Was that done at all in connection
11 with the Polebridge Bowman transaction?
12    A.   No.
13    Q.   Why not?
14        MR. CALIHAN:  Objection to form.
15        MR. RAMSEY:  Form.
16    A.   I don't know.  We didn't do it.  This
17 is a small family business, you know.  It was
18 losing a lot of money at the time.  You know, you
19 had the recession compounded you know, the company
20 losing money.
21    Q.   So is it fair to say that when you
22 were negotiating the 350,000 dollar purchase price
23 with Glenn Sturm you didn't feel that Eber Metro
24 had a lot of leverage to try to bargain for a
25 higher price?

14 (Pages 50 - 53)

Page 54

W. Eber

1
2     MR. RAMSEY:  Form.
3     A.   We wanted him to really come help us.
4  This is how he did business.  We were in, like I
5  said it was the recession.  We were losing a lot
6  of money and we really wanted him to help us
7  through what was a very challenging financial
8  situation and legal.  A lot of legal things going
9  on as well.
10    Q.   Did you or Eber Metro look into
11 possibly selling six percent of the company to
12 anyone else instead of Glenn Sturm?
13    A.   I don't really remember.
14    Q.   Were any outside parties given the
15 opportunity to bid on the six percent that was
16 sold to Glenn Sturm?
17    MR. RAMSEY:  Form.
18    A.   I don't remember.  I don't
19 specifically remember.
20    Q.   By taking six percent of Eber
21 Connecticut, was it your understanding that Glenn
22 Sturm would have a role in the management or
23 operation of Eber Connecticut?
24    A.   What do you mean?
25    Q.   By taking an interest in the company,

Page 55

W. Eber

1
2  was it your understanding that that would help
3  Glenn Sturm to provide services in connection with
4  the management or operation of Eber Connecticut?
5     A.   Well, what do you mean by management
6  or operation?
7     Q.   So what exactly was it that you wanted
8  Glenn Sturm to do for Eber Metro or its
9  affiliates?
10    A.   As I said, we were in extreme
11 financial distress in that company from you know,
12 the recession.  Like strategically we needed some
13 direction and legal advice on many different
14 fronts.  So he wasn't necessarily going to be
15 involved in the day-to-day management, but he did
16 offer a lot of strategic, like setting directions
17 on different strategic initiatives.
18    Q.   What were the strategic initiatives
19 that he provided directions on?
20    A.   Well, he did come in and you know,
21 address -- a lot of issues I think were leadership
22 driven, you know.  These are extremely difficult
23 times Brian; right?  There is a lot of stress.
24 They are very, very stressful.  So he provided I
25 think some leadership for Lester, for me, for the

Page 56

W. Eber

1
2  company.  He came and addressed the company.  He
3  was helping us with developing like the direction
4  to go into craft spirits and defining what it is
5  that we do well.  You know smaller craft spirits
6  he was involved in that and focusing on the Slocum
7  imports which were the Slocum and Sons.  Eber
8  Connecticut owned part of it was the import wine
9  company and trying to focus on some of those wines
10 within that import company to grow the company.
11    Q.   What was the import wine company's
12 name?
13    A.   It was part of Eber Connecticut.  I
14 mean it just it didn't have a separate.  It was
15 Slocum Imports.  It's more for the label with the
16 TTB, but we had a big initiative to kind of grow
17 those brands and German and Austrian portfolio.
18    Q.   Can you name a couple of the brands
19 that you are referring to?
20    A.   Sure.  Jos Reinisch Rotgipfler.
21    Q.   Probably starts with a J; right?
22    A.   Yeah, it does.  It was not a large
23 seller.
24      We had an Auxerrois from Luxembourg.
25      We had --

Page 57

W. Eber

1
2     Q.   Why don't you focus on the ones that
3  actually were good sellers.
4     A.   Okay.  You know we had some Gruner
5  Veltliner portfolios.  Let me just think here.
6  Groiss.  One of the producer is Eder, E-D-E-R,
7  Diel, D-I-E-L.
8       Some very esoteric -- it's a lot of
9  esoteric stuff too.
10    Q.   And this was a successful part of your
11 business?
12    A.   It has not been that successful.
13    Q.   This is something that Glenn Sturm
14 encouraged you to go into; is that right?
15    A.   We were in it.  We were trying to grow
16 it.  The craft spirits has been much more
17 successful for us.
18    Q.   And what are some of the most
19 successful craft spirit brands that you are
20 referring to?
21    A.   The most successful ones that we have
22 I would say High West, Four Roses.
23    Q.   Does Eber Connecticut still own the
24 Slocum Imports Wine Company, Import Wine Company?
25    A.   It is not an import wine company

15 (Pages 54 - 57)

W. Eber

1
2 separate from Connecticut.  It is part of the
3 Connecticut business.  So it's -- you know, so we
4 do still import some wines.  It just hasn't been
5 that successful.  The German Austrian wines
6 haven't been that successful in terms of creating
7 a brand and then selling it.  We don't have the
8 infrastructure to do it as much, but some items
9 like the Groiss Gruner Veltliner has been
10 successful.
11     Q.  In order to import wines from abroad,
12 is a license required?
13     A.  For us to import it I believe so, yes.
14     Q.  So Eber Connecticut has an import
15 license?
16     A.  I believe so, yes.  We do have.  I
17 don't know all the specifics.
18     Q.  Does the company Slocum and Sons of
19 Maine Inc. have any involvement in importing wines
20 that are sold by Eber Connecticut?
21     A.  I don't know.  It may.  I don't know
22 specifically.
23     Q.  Do you currently have a position with
24 Slocum and Sons of Maine?
25     A.  I just pulled that documentation for

W. Eber

1
2 you.  So I am secretary and either CFO or
3 treasurer.
4     Q.  And how long have you had those
5 positions for?
6     A.  Since when I acquired it which 2012
7 maybe, 2013.  2012, 2013.
8     Q.  Who did you acquire it from?
9     A.  I acquired 50 percent from I believe
10 it was Tom Slocum and Jeb Slocum.
11     Q.  What did you give them for exchange of
12 the 50 percent?
13     A.  I believe it was $10.
14     Q.  What do you mean by $10?  Is that
15 something that had been specified earlier?
16     A.  I don't have the document in front of
17 me.  The document was provided.
18     MR. RAMSEY:  What's your recollection
19 of what you gave for the 50 percent?
20     THE WITNESS:  I believe it was $10 but
21 I don't know.  I don't remember
22 specifically.
23     Q.  And prior to 2012, did you have an
24 interest in Slocum of Maine?
25     MR. CALIHAN:  I am sorry.

W. Eber

1
2     Interest in?
3     MR. BROOK:  Slocum of Maine.
4     A.  No.
5     Q.  Is it correct that Lester Eber
6 acquired the other 50 percent at about the same
7 time that you did?
8     A.  Correct.
9     Q.  Did he also pay $10 or was the $10 for
10 both of you?
11     A.  I don't know.  I don't.
12     Q.  Probably doesn't make a difference
13 whether it was ten or $20?
14     A.  You do have the document though.
15     MR. RAMSEY:  Just your recollection.
16     Q.  And I get a little ahead of myself.  I
17 am going to ask more questions on that when I get
18 to Eber Connecticut, but for now I want to stay
19 focused on getting through what we can on Eber
20 Metro.
21     Now going back to again the Polebridge
22 Bowman deal, you said it was extremely difficult
23 times.  I know dates are hard, but to the best of
24 your ability, what approximate time range are you
25 talking about was the extremely difficult times

W. Eber

1
2 when you were negotiating with Glenn Sturm?
3     A.  When Southern came into the market and
4 put us out of business it was a crisis and that
5 was kind of the beginning of the crisis.  Then
6 there was the recession, you know.  One thing --
7 then we were duelled on Yellow Tail wines.  There
8 were many things going on.  There were lawsuits.
9 Many lawsuits going on and legal issues, bank
10 problems, Wells Fargo calling a loan.  It was...
11     Q.  At what point approximately did the
12 extremely difficult times end?
13     MR. CALIHAN:  Objection to form.
14     MR. RAMSEY:  Form.  If they did.
15     A.  I don't know.  It's you know, been a
16 lot of struggles over many, many years.  Many
17 years of struggles.
18     Q.  Going back to Exhibit 11 in front of
19 you, that's the organizational chart.
20     A.  Yes.
21     Q.  We already discussed how the next
22 change on this occurred was the six percent sale
23 to Polebridge Bowman.
24     After that, what was the next change
25 that occurred with respect to this chart?

16 (Pages 58 - 61)

Page 62

W. Eber

1
2     A.    Alexbay.
3     Q.    So you are referring to the Alexbay
4  acquisition of Eber Brothers Wine and Liquor
5  Metro?
6     A.    The article nine sale.
7     Q.    What do you mean by article nine sale?
8     A.    Well, the foreclosure of Alexbay
9  taking, you know loaning in the money and then
10  taking the stock of Eber Metro.  The foreclosure
11  action.  I don't know the legal term but Lester
12  loaned in money.
13     Q.    So at some point Lester sought to
14  foreclose on that loan or those loans?
15     MR. RAMSEY:  Form.
16     Q.    Is that right?
17     A.    I don't know what the legal term is.
18  I don't want to misuse a term.  Lester took
19  control over Metro.
20     Q.    And did Lester taking control of Eber
21  Metro have any impact on how difficult the
22  economic times were for Eber Connecticut?
23     A.    Can you rephrase that question?
24     Q.    Did Alexbay and Lester taking control
25  of Eber Metro have any impact on the difficult

Page 63

W. Eber

1
2  times that you were facing as a company?
3     A.    What company?
4     Q.    Either Eber Metro or its affiliates,
5  Eber Connecticut.
6     A.    I don't specifically remember.  I mean
7  it's -- there were a lot of issues going on and I
8  am not a lawyer, so.
9     Q.    I am not asking legally.  I am asking
10  in terms of the company.
11     A.    Him loaning in money helped.  I mean
12  yeah, it definitely.  If we hadn't had the money
13  that Lester loaned in the companies would have
14  collapsed, yes.
15     Q.    That wasn't my question.
16     My question was about him taking
17  control of the company was something that had any
18  impact on the difficult times that the company and
19  its affiliates were facing.
20     MR. RAMSEY:  Do you understand the
21  question?
22     THE WITNESS:  Not really.
23     MR. RAMSEY:  Then tell him that and he
24  will repeat.
25     A.    I don't really.

Page 64

W. Eber

1
2     Q.    Is there a particular word that I am
3  using that's hard to understand?
4     MR. RAMSEY:  Form.  She said she
5  doesn't understand the question.
6     MR. BROOK:  I am trying to help her.
7     A.    I don't really know.
8     What did you say?  Say it again.
9     Q.    Was there any benefit to Eber Metro or
10  Eber Connecticut financially as a result of Lester
11  Eber taking control of Eber Metro?
12     A.    He did loan in a lot of money to
13  basically save the money, save the companies.
14     MR. RAMSEY:  He is asking about
15  Alexbay, not the loans before.  He is asking
16  when Lester gained control of Eber Metro.
17  That's what he is talking about now.
18     Q.    Talking about actually --
19     A.    Then he lent in more money too.  So
20  that was a benefit.  He was lending in more money
21  in too after that as well.  So that was definitely
22  a benefit, you know, that, had that money not been
23  lent in the company would not be around.  It would
24  have just closed.
25     Q.    Was it your understanding that Lester

Page 65

W. Eber

1
2  was not willing to loan any more money to the
3  company unless he had complete control over it?
4     MR. RAMSEY:  Form.
5     A.    No.  I mean I think in the original
6  loans -- I don't know.  I don't know.  I mean why
7  don't you ask Lester.  I don't -- I mean I don't
8  know.  I mean he loaned money in after, after this
9  chart changed and before and had he not done that
10  these companies would not have existed given the
11  financial legal disaster faced by these companies.
12     Q.    What was your understanding as to why
13  Lester was loaning so much money to a business
14  that was not performing well?
15     A.    Why he was doing it?
16     Q.    Yes.
17     A.    I think it was emotional.  Some
18  emotional trying to keep the company alive.
19  Trying to keep, save jobs.  The employees.  You
20  got to ask him.
21     Q.    Did you ever ask him Lester, why are
22  you loaning so much money to this business?
23     A.    Did I ever ask him why?  No.  I didn't
24  ask him.  I knew it was a struggle for him
25  emotionally, financially.  I will say when I put

17 (Pages 62 - 65)

1          W. Eber
2   the document together for discovery and you see
3   how much it is, it is after putting it on a
4   document you are like oh my God, this is a lot of
5   money, you know.
6          MR. RAMSEY:  All right.  You answered
7      the question.
8   A.   So --
9          MR. RAMSEY:  You answered the
10      question.
11   Q.   The other side of the coin, you never
12   told him Lester, you should stop putting money
13   into the company, it is a sinking ship or
14   something along those lines, did you?
15          MR. RAMSEY:  Form.
16   A.   You know, I don't specific -- I don't
17   specifically remember.  It is easy to play Monday
18   morning quarterback.
19          MR. RAMSEY:  All he is asking is did
20      you have that conversation about investing,
21      loaning money.
22   A.   I don't remember saying that.  I
23   remember just, you know, that it was financially a
24   lot of money coming from him and very hard on him
25   financially.  Very, very hard.  And these are

1          W. Eber
2   emotional decisions that, you know, that I don't
3   specifically remember having that conversation
4   with him.
5          MR. BROOK:  Let's mark this next one
6      which is a document called Summary of Lester
7      Eber's Payments For Liabilities of Eber
8      Brothers W and L Corp. Bates number EB
9      00020333 as Plaintiffs' Exhibit 12.
10          (Plaintiffs' Exhibit 12, a document
11      called Summary of Lester Eber's Payments For
12      Liabilities of Eber Brothers W and L Corp.
13      Bates number EB 00020333 as Plaintiffs'
14      Exhibit 12, marked for identification, as of
15      this date.)
16   Q.   Do you have Exhibit 12 in front of
17   you?
18   A.   Yes.
19   Q.   Do you recognize this document?
20   A.   Yes.
21   Q.   What is it?
22   A.   These are moneys that Lester loaned
23   and paid for various liabilities and also he
24   personally guaranteed a bank loan and secured it
25   with cash and pledges of assets.

1          W. Eber
2   Q.   Is that guarantee because that's
3   reflected at the footnote on the bottom; is that
4   right?
5   A.   Yes.
6   Q.   But that's not included in the total
7   that's appeared on this document?
8   A.   No.
9   Q.   And you prepared this document?
10   A.   Yes.
11   Q.   When did you prepare it?
12   A.   I believe for this litigation.
13   Q.   Where did you get the information that
14   you put into this document?
15   A.   I don't remember the places.  Some of
16   the source documents.  Maybe the actual checks.  I
17   don't remember everywhere I got numbers from.
18   Q.   Did anyone else either at the Eber
19   companies or at a law firm, to your knowledge,
20   ever check the accuracy of the information that
21   you put into this document?
22          MR. RAMSEY:  Form.
23   A.   Sorry.  Say that again.
24   Q.   Did anyone else, no matter who they
25   are associated with, check the accuracy of the

1          W. Eber
2   information that you put into this document?
3   A.   I don't remember.  I don't know if my
4   lawyers did or not.
5   Q.   But to your knowledge, no one else
6   checked that; is that correct?
7          MR. RAMSEY:  Form.  That's what she
8      said.
9          Go ahead.
10          THE WITNESS:  Am I supposed to --
11          MR. RAMSEY:  Go ahead and answer.
12   Q.   You are not aware of anyone else who
13   checked this; is that right?
14   A.   No.
15   Q.   So no, you are not aware?
16   A.   No, I am not aware.  Sorry.
17   Q.   And I notice that the first line says
18   EWLC loan and then the next few lines say EBWLC
19   loan.
20          Do you see that under description of
21   funds?
22   A.   Yes.
23   Q.   Is there a difference between EWLC
24   loan and EBWLC loan?  Is there a difference
25   intended I should say?

Page 70

W. Eber

1
2     A.   I think the first part where loans
3  that were made into Eber Brothers Wine and Liquor
4  Corp.  I don't know all the legalese but there
5  were --
6          MR. RAMSEY:  The first line she is
7     referring to, correct me if I am wrong.
8     There is no B in the first line.
9     A.   Oh, you are saying this one EWLC loan
10 versus EB.
11    Q.   Yes.
12    A.   Oh, no.  I think that's a typo.
13    Q.   So --
14    A.   Oh, I thought you were talking about
15 that.
16    Q.   I am getting to that next.
17    A.   Sorry.  No, I think that's a typo.
18    Q.   So then below the lines that say, we
19 will just say EBWLC loan for all of them.
20         It says EBWL Metro Inc. loan on a
21 number of lines; right?
22    A.   Right.
23    Q.   So how did you determine for creating
24 this document whether to describe it as EBWLC or
25 EBWL Metro?

Page 71

W. Eber

1
2     A.   I don't remember.
3     Q.   Did you base it on the dates when Eber
4  Metro assumed the loan obligations of Eber
5  Brothers Wine and Liquor Corp.?
6     A.   I don't remember Brian.  I just don't
7  remember.
8     Q.   Do you recall that there was a 1.5
9  million dollar line of credit note between Eber
10 Metro and Lester Eber?
11    A.   I don't remember all the details of
12 the notes.
13    Q.   Who -- was there anyone on behalf of
14 Eber Metro that was involved in negotiating the
15 line of credit note between Lester Eber and Eber
16 Metro?
17    A.   What year was that?
18    Q.   Let's get it in writing.
19         MR. BROOK:  Please mark this as
20    Plaintiffs' Exhibit 13.
21         (Plaintiffs' Exhibit 13, a document
22    entitled Line of Credit Note bearing Bates
23    numbers EB 00017871 through 73, as well as
24    Bates numbers KSH 00001 through 3, marked
25    for identification, as of this date.)

Page 72

W. Eber

1
2     Q.   Plaintiffs' Exhibit 13 is a document
3  entitled Line of Credit Note bearing Bates numbers
4  EB 00017871 through 73, as well as Bates numbers
5  KSH 00001 through 3.
6          Do you recognize this document?
7     A.   Vaguely.
8     Q.   Is that your -- please turn to page 3.
9          Is that your signature?
10    A.   Yeah.
11    Q.   Does this refresh your recollection
12 that there was a line of credit note in the amount
13 of 1,500,000 dollars between Eber Metro and Lester
14 Eber?
15    A.   Yes.
16    Q.   And who negotiated the terms of this
17 note on behalf of Eber Metro?
18    A.   I think Harris Beach was the lawyer.
19 So I don't specifically remember.  You know, this
20 was the recession.  We were -- we needed money.
21 No banks would give us money and this was -- we
22 were trying to get money and I don't remember the
23 details who negotiated this.
24    Q.   Who determined the amount?
25    A.   I don't remember.

Page 73

W. Eber

1
2     Q.   Take a look at page 1 paragraph 2 sets
3  out an interest rate of a non-default interest
4  rate of 12.5 percent per year.
5          Do you see that?
6     A.   Yes.
7     Q.   How was that interest rate determined?
8     A.   Can I just take a minute to read this?
9          MR. RAMSEY:  Sure.  Take as much time
10    as you need.
11         Off the record.
12         (Discussion off the record.)
13 BY MR. BROOK:
14    A.   Do you want me to read the whole
15 document or just the interest rate?
16    Q.   No.  I was just asking about the
17 interest rate.
18         How was that determined?
19    A.   I don't remember.
20    Q.   Do you recall there being any
21 negotiation of that amount?
22    A.   I don't remember.  I just don't
23 remember.  You know, it's ten years ago.
24    Q.   If you look at just the bottom of
25 paragraph 3 on that first page it sets the

19 (Pages 70 - 73)

Page 74

1           W. Eber
2  maturity date at December 31, 2011.
3       Do you see that?
4     A.   Can I read that paragraph?
5     Q.   If you really need to, yes.
6     A.   Do you know what this word is here
7  (indicating)?
8       MR. RAMSEY:  Which one?
9       THE WITNESS:  (Indicating.)
10      MR. RAMSEY:  Annum.
11    A.   Okay.
12    Q.   So do you see the December 31, 2011 is
13 set as the maturity date?
14    A.   Yes.
15    Q.   How is the maturity date determined?
16    A.   I don't remember.
17    Q.   From the date on the top of the
18 document, it doesn't have a day but it says
19 October 2009.
20      Do you see that?
21    A.   Yeah.
22    Q.   Do you believe that date to be
23 generally accurate as to when this note was
24 executed?
25    A.   Yes.

Page 75

1           W. Eber
2     Q.   Was that in the time period of the
3  extremely difficult times?
4     A.   October 2009?
5     Q.   Yes.
6     A.   Yes.
7     Q.   So the maturity date is set at just
8  over two years after that; correct?
9     A.   Yes.
10    Q.   From the perspective of Eber Metro and
11 given the extremely difficult times it was facing,
12 was it better to have as long a maturity date as
13 possible?
14      MR. CALIHAN:  Objection to form.
15      MR. RAMSEY:  Form.
16      You can answer.
17    A.   Can you repeat the question?
18    Q.   Given the difficult times that were
19 facing Eber Metro in October 2009, do you believe
20 that it was in Eber Metro's interest to have a
21 note that was not required to be paid back for as
22 long as possible?
23      MR. RAMSEY:  Form.
24      MR. CALIHAN:  Objection to form.
25      MR. BROOK:  That was a bad one.

Page 76

1           W. Eber
2       Go back and read my question two
3  questions ago.  I think I said it better
4  then.
5       (Record read.)
6       MR. RAMSEY:  Same objection.
7       MR. BROOK:  I guess as long of a
8  maturity date as possible.
9       MR. CALIHAN:  Same objection.
10    A.   I just don't remember the specifics
11 around how the maturity date was determined.  I
12 just don't.  I just don't remember.  I know we
13 were in desperate need of cash.  You know, we had
14 a lot of liabilities and needed money.  I believe
15 Mike Gumaer also looked at this document.  He was
16 involved in it and our lawyers Harris Beach was
17 involved in it as well.  Both attorneys and at the
18 time we didn't have any other options.
19    Q.   But you don't recall the maturity date
20 being something that was a topic of discussion at
21 the time?
22    A.   I don't remember.  This is ten years
23 ago.  I just don't remember it.
24    Q.   This is the note, this Exhibit 13 is
25 the note on which Eber Metro defaulted by failing

Page 77

1           W. Eber
2  to make payment in full by December 31, 2011; is
3  that right?
4     A.   I don't remember.  There were several
5  notes.  You know, I don't have all of the notes in
6  front of me.  There were -- it was over three
7  million dollars in what was owed in loans, but I
8  don't remember the specifics of it.
9     Q.   So was it your understanding that Eber
10 Metro defaulted on more than one note?
11    A.   I remember it being three point
12 something million dollars of loans that Lester
13 made and plus interest, plus the interest.
14    Q.   But putting aside the other notes and
15 I shouldn't have used the word the in my previous
16 question, it is your understanding that Eber Metro
17 did default on this note; correct?
18    A.   I just don't remember all the
19 specifics Brian.  I don't remember all the
20 specifics of all the loans.  I know that he, that
21 Lester loaned in over three million dollars plus
22 interest and I know we had the lawyers look at all
23 of this, but I don't remember all the specifics.
24 I haven't reviewed all the documents.
25    Q.   What is your understanding of what it

Page 78

W. Eber

1
2 means to default on a note?
3     A.   That's, you know, there is no payments
4 made or interest made.
5     Q.   So for example --
6     A.   I don't know what the legal definition
7 is.
8         MR. RAMSEY:  All he is asking for is
9     your understanding.
10     A.   There were no payments or interest
11 made.
12     Q.   For example, in your understanding it
13 would be a default if the full amount of this note
14 were not paid by the maturity date of December 31,
15 2011; is that right?
16         MR. RAMSEY:  Form.
17         Go ahead.
18     A.   Can you rephrase the question?
19     Q.   In your understanding of what it means
20 to default, would it have constituted default if
21 Eber Metro did not pay the amount of this note
22 including all principal and interest in full on or
23 before December 31, 2011, the maturity date?
24         MR. RAMSEY:  Form.
25         You can answer.

Page 79

W. Eber

1
2     A.   Sorry?
3         MR. RAMSEY:  Go ahead and answer.
4     A.   Yes, that would be default if they
5 didn't pay on it.
6     Q.   Do you have any reason to believe that
7 Eber Metro paid all principal and interest on this
8 note in full on or before December 31, 2011?
9     A.   Rephrase that.  Did?
10     Q.   Did Eber Metro pay this note in full?
11     A.   No, no.
12     Q.   So I am having a hard time trying to
13 understand how you can be so confused.
14         So you understand that this note was
15 not paid by the maturity date; right?
16     A.   No.  It was not paid.
17     Q.   So in your understanding of what a
18 default is you understand that there was a default
19 on this note; correct?
20     A.   Yes.
21         MR. RAMSEY:  You have answered the
22     question.  You are good, okay.
23     A.   I just haven't looked at these
24 documents in a long time.
25         MR. RAMSEY:  Okay.  Wait for a

Page 80

W. Eber

1
2     question.
3     Q.   At the time of the default December
4 31, 2011 you were the CFO and secretary of Eber
5 Metro; correct?
6     A.   Yes.
7     Q.   So as CFO were you aware that this
8 note was coming due at the end of the month in
9 December 2011?
10     A.   I don't remember.  I mean there were
11 -- I don't remember all the specifics.  There was
12 a lot of financial distress Brian.  There was a
13 lot going on.  So for me to step back whatever
14 eight years.
15         MR. RAMSEY:  The answer is you don't
16     remember.
17     A.   I just don't remember.  I don't
18 remember everything that went on.
19     Q.   Was there any attempt to try to
20 renegotiate this note and try to extend the
21 maturity date prior to the maturity date of
22 December 31st?
23     A.   I don't remember.
24     Q.   In your role with various Eber
25 entities you have been involved with bank loans;

Page 81

W. Eber

1
2 correct?
3     A.   Yes.
4     Q.   And are you generally aware of when
5 those loans are becoming due, maturing and have to
6 be paid in full?
7         MR. RAMSEY:  You are talking just in
8     general or --
9     A.   In general?
10     Q.   The Eber entities.
11         I don't know if there was a bank loan
12 specific to Eber Metro, but in your role with
13 various Eber entities have you been involved in
14 tracking whether any bank loans are about to
15 mature and become due?  And by be involved you
16 doing it or someone else is doing it and telling
17 you about it.
18     A.   Someone else is doing it and telling
19 me about it.
20         MR. CALIHAN:  I am sorry.
21         Could you read back the question?  I
22     missed it completely.
23         (Record read.)
24     A.   And I also have been aware of when
25 some loans have come due too.

21 (Pages 78 - 81)

Page 82

W. Eber

1
2    Q.   Are you also in those situations aware
3  of whether the company is going to be able to pay
4  those loans or not?
5         MR. RAMSEY:  Form.  Go ahead.
6    A.   Yeah.  I had some idea, yes.
7    Q.   And when the company has not been in a
8  position where it can pay those loans, what have
9  you done?
10        MR. RAMSEY:  Form.
11        MR. BROOK:  Basis?
12        MR. RAMSEY:  You are assuming she did
13     something or had to do something.
14        You can answer the question.
15    A.   What's the question?
16    Q.   In those situations where the company
17  has a loan to a bank that's becoming due but the
18  company is not able to pay it in full back on the
19  maturity date what, if anything, have you done
20  about it?
21        MR. RAMSEY:  Same objection.
22        Go ahead.  Don't let me throw you off.
23    A.   Well, let's talk about the Wells Fargo
24  loan, okay.  With Eber Brothers 130 million
25  dollars.  I had no idea.  I was not involved in

Page 83

W. Eber

1
2  that.
3    Q.   I am talking about when you were
4  involved.  Situations when you were involved you
5  were being made aware of it becoming due and you
6  realized that the company could not just pay the
7  loan off in full.
8         What, if anything, did you do in that
9  situation?
10    A.   In some circumstances we had to ask
11  Lester to loan them money.
12    Q.   And in other circumstances did you
13  talk to the banks?
14    A.   We had to hire -- yeah.  We talked to
15  banks.  We talked to them.  We had lawyers.
16    Q.   What did you talk about, the banks?
17    A.   I mean, like with Canandaigua Bank?
18    Q.   If that's one that meets the
19  situation.
20    A.   You know, I don't remember all the
21  specific conversations we had with them.  You
22  know, we tried to extend or Lester had to
23  personally put money in to secure the loan.  He
24  had to put more money in to secure it.  He had to
25  leave more security than he had to put more cash

Page 84

W. Eber

1
2  in to secure it.
3    Q.   So you asked the bank to extend the
4  loan, that was one of the things you did; right?
5         MR. RAMSEY:  Form.
6    A.   Or we had lawyers try to help us
7  extend it.
8    Q.   Without getting into the details of
9  what you specifically discussed with the lawyers
10  since there was a pending objection on that, what
11  was it that the lawyers -- what was your
12  understanding of what the lawyers were going to do
13  to extend the note without the bank's consent?
14        MR. RAMSEY:  Form.
15    A.   Say that -- ask that question again.
16    Q.   Were the lawyers doing something that
17  would involve -- was it your understanding that
18  the lawyers could do something to extend the loans
19  without the bank agreeing to it?
20        MR. CALIHAN:  Objection to form.
21    A.   Say it again the lawyers.
22    Q.   Was it your understanding that by
23  hiring lawyers that could be a way to extend the
24  loan without having the bank agree to extend the
25  loan?

Page 85

W. Eber

1
2         MR. RAMSEY:  Form.
3    A.   I don't remember.  I don't remember.
4  I don't know.
5    Q.   When you asked or when one of the Eber
6  companies has asked banks to extend the loans such
7  as Canandaigua Bank, it has sometimes been
8  successful in getting that to happen; hasn't it?
9    A.   They extended some loans, yes.  But
10  they always said they wanted to get out of the
11  loan.
12    Q.   But they extended it anyway; didn't
13  they?
14        MR. CALIHAN:  Objection to form.
15        MR. RAMSEY:  Form.
16        Go ahead.
17    A.   Yes, they did extend it, but they
18  would only do it under the circumstances of Lester
19  personally guaranteeing it and securing it with
20  five hundred thousand and then pledging more
21  assets and more assets and --
22    Q.   Sorry.  Go ahead.
23        MR. RAMSEY:  Are you done with your
24     answer?
25        THE WITNESS:  Yes.

22 (Pages 82 - 85)

Page 86

```
 1                W. Eber
 2      Q.   When was the first time that a bank
 3   asked Lester to pledge personal assets to support
 4   his loan?
 5      A.   I don't know.
 6      Q.   Was it before the Alexbay deal or
 7   after the Alexbay deal?
 8      A.   I don't remember.  I know that I think
 9   the 120 thousand was -- it may have been after.  I
10   am not sure of the additional securities he had to
11   put there.  I don't remember specifically.
12      Q.   Why didn't you ask Lester to extend
13   the maturity date on the line of credit note
14   Exhibit 13?
15           MR. RAMSEY:  Form.
16           MR. BROOK:  Basis?
17           MR. RAMSEY:  I don't know she had an
18   obligation to.
19           MR. BROOK:  Whatever.
20      A.   Sorry?
21      Q.   You can answer the question.
22      A.   What was the question?
23           MR. BROOK:  Can you read it back
24   please?
25           (Record read.)
```

Page 87

```
 1                W. Eber
 2      A.   I didn't have to.
 3      Q.   Why do you say that?
 4      A.   I don't remember all the details
 5   around it.  There was a lot going on and I just
 6   don't remember.  I don't know that, you know, he
 7   -- I don't remember.  I may have talked to Mike
 8   Gumaer the attorney.  I don't remember.
 9      Q.   Are you referring to Mike Gumaer as
10   the attorney or are you referring to another
11   attorney and Mike Gumaer?
12      A.   I don't remember all the attorneys
13   involved, that were involved specifically.  I mean
14   I did talk to Mike about these notes.  He
15   definitely.
16           MR. CALIHAN:  Don't disclose any legal
17   --
18           MR. BROOK:  She is absolutely allowed
19   to do that.
20           MR. RAMSEY:  Well, there is either two
21   hats.  There is a lawyer hat and there is a
22   non-lawyer hat.  So if you are asking about
23   the non-lawyer questions with Gumaer that's
24   one thing, but he also served --
25      A.   I saw him as the lawyer.
```

Page 88

```
 1                W. Eber
 2           MR. BROOK:  I mean it is her corporate
 3   rep.
 4      Q.   You said a minute ago you didn't think
 5   that you had to ask to extend the maturity.
 6           What was your basis for that belief?
 7      A.   I don't remember.
 8      Q.   Did you think it was a good thing for
 9   Eber Metro to default on the note?
10           MR. RAMSEY:  Form.
11      A.   Did I think it was a good thing for
12   Metro?  I don't remember.  I just remember there
13   was no -- there weren't a lot of alternatives
14   here.  And I spoke with Mike.
15           MR. CALIHAN:  Don't disclose legal
16   advice.
17      A.   Okay.  I spoke with Mike.  He was an
18   attorney representing us.  I definitely spoke with
19   him.
20           MR. BROOK:  Just so the record is
21   clear, we do not waive the right to insist
22   on getting complete answers to what the
23   basis was for her action if she is going to
24   say anything like that.
25           MR. CALIHAN:  Brian, would you say
```

Page 89

```
 1                W. Eber
 2   that again?
 3           MR. BROOK:  Just saying reserving
 4   rights with respect to these instructions to
 5   the witness not to answer questions when she
 6   has already said what she thought and
 7   appears to be relying on advice that she got
 8   at the time.  We don't have to litigate that
 9   now.
10           MR. CALIHAN:  Just to make sure there
11   is no misunderstanding, so your position is
12   is that testimony, that reliance constitutes
13   a waiver or that she can not raise it
14   without disclosing the underlying advice?
15           MR. BROOK:  I think that if there is
16   going to be -- I don't know that that
17   testimony does, but if there is going to be
18   reliance on the assertion that she believed
19   at the time that she didn't have an
20   obligation to do so as far as purporting her
21   good faith and such, then that is
22   essentially the advice of counsel and it
23   does not constitute a waiver.
24           MR. CALIHAN:  I will consider it and
25   get back to you after lunch.
```

23 (Pages 86 - 89)

W. Eber

1
2     MR. BROOK:  Okay.  We only have a
3  couple of more minutes here, so I want to
4  try to wrap this up.
5 BY MR. BROOK:
6     Q.   Did you have any third parties or
7  outside bankers or accountants opine on the
8  fairness of the line of credit note Exhibit 13?
9        MR. RAMSEY:  Form.
10     Q.   Were any third parties such as
11  accountants or investment bankers or the like ever
12  asked to opine on the fairness of the credit note
13  to Eber Metro?
14        MR. RAMSEY:  Same objection.
15     A.   Like a lawyer?
16     Q.   Anyone.
17     A.   The lawyers looked at it, yes.
18     Q.   Were they asked to opine on whether it
19  was fair from an economic point of view to Metro?
20        MR. RAMSEY:  Don't talk about any
21     conversations you had with lawyers.
22     A.   I am not going to talk about any
23  conversations I had with lawyers.
24     Q.   I am not asking about legal advice.  I
25  am asking about economic advice.  Whether anyone,

W. Eber

1
2  lawyers or non-lawyers was asked to opine on
3  whether from an economic point of view the line of
4  credit note was fair to Eber Brothers or Eber
5  Metro?
6        MR. RAMSEY:  Form.
7     A.   It was all reviewed by our lawyers.
8     Q.   And was it your understanding that
9  your lawyers reviewed the economics of the
10  transaction as well?
11        MR. RAMSEY:  Form.
12     I am not sure you can parse it out
13  Brian, but if you can parse it out, go
14  ahead.
15     A.   This was all reviewed by the lawyers
16  you know and I relied on my lawyers.
17     Q.   Again, lawyers here were Harris Beach;
18  right?
19     A.   Well, we had, you know, Mike looked at
20  this too.  I would consider him my lawyer as well.
21  You know we had Harris Beach involved with the
22  document.
23     Q.   Was Glenn Sturm involved in this one?
24     A.   I don't remember.  I don't remember.
25        MR. BROOK:  We have to go off the

W. Eber

1
2  record.
3        THE VIDEOGRAPHER:  This marks the end
4  of media unit number 2 in the videotaped
5  deposition of Wendy Eber.  We are going off
6  the record.  The time is 12:24.
7     (Luncheon recess:  12:24 p.m.)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

W. Eber

1
2     A F T E R N O O N   S E S S I O N.
3        (1:10 p.m.)
4 W E N D Y   E B E R,
5     having been previously sworn, resumed the
6     stand and testified further as follows:
7 EXAMINATION (Cont'd)
8 BY MR. BROOK:
9        THE VIDEOGRAPHER:  This marks the
10     beginning of media unit number three in the
11     videotaped deposition of Wendy Eber.  We are
12     going on the record.  The time is 1:11.
13     Q.   We are back after lunch.
14     Miss Eber, were you able to get some
15  food during the break?
16     A.   Yes, thank you.
17     Q.   Is there any reason why you are not
18  able to continue with this deposition and be able
19  to answer questions fully and truthfully?
20     A.   No.
21     Q.   I am showing you now what has been
22  marked as Exhibit 14.  It is a document entitled A
23  Stock Purchase Agreement bearing --
24        MR. RAMSEY:  I'm sorry Brian, I should
25     have done this first.  The discussion we had

24 (Pages 90 - 93)

W. Eber

1
2  immediately before we went off the record
3  regarding the question extending the
4  maturity date of the loan and the privilege
5  issue that we raised, as long as we are in
6  agreement that this is a narrow exception
7  not a complete waiver of privilege, we will
8  permit Miss Eber to answer the questions
9  about the basis for her understanding as to
10  why she elected not to pursue an extension
11  of the maturity date.
12       MR. BROOK:  I am not going to agree
13  that it is not a waiver of the subject
14  matter.  If it is a waiver.  I have done
15  those agreements before and it never works
16  out.  So if this is condition on it only
17  being limited to advice she got in that
18  particular month or something --
19       MR. RAMSEY:  That's exactly what it
20  is.
21       MR. BROOK:  Then I don't agree with
22  that and --
23       MR. CALIHAN:  Brian, what is your
24  position on that?
25       MR. BROOK:  The position is that it is

W. Eber

1
2  not necessarily by her saying it here the
3  response to a question that it is a waiver
4  but if there is going to be any sort of
5  reliance on an assertion that she had this
6  belief, then the basis of that belief and
7  things like that, that's a defense and I am
8  entitled to all the discovery that's related
9  to that defense to see whether it is true or
10  not.
11       MR. RAMSEY:  I don't necessarily
12  disagree with that.  I think it is
13  encapsulated in the answer that she gave
14  you, but I just want to make sure you are
15  not taking this as a larger waiver.  We can
16  leave that for another time.
17       MR. BROOK:  We can test the boundaries
18  when we get to it, but I appreciate you
19  clarifying that and I may go back to that at
20  another time.
21       MR. RAMSEY:  Okay.
22  BY MR. BROOK:
23       Q.   So stay focused for now on Exhibit 14
24  which is a document entitled Stock Purchase
25  Agreement.  The Bates number appears to be cut off

W. Eber

1
2  at the very bottom but it is EB-00020488 to 492.
3       Do you recognize this document?
4       (Plaintiffs' Exhibit 14, a document
5  entitled Stock Purchase Agreement Bates
6  stamped EB-00020488 to 492, marked for
7  identification, as of this date.)
8       A.   Should I read the whole thing?
9       Q.   If you need to to recognize it, but my
10  question simply is:  Do you recognize this
11  document?
12       MR. RAMSEY:  Look at the first page.
13       Do you recognize what it is?
14       A.   Yeah.
15       Q.   What is it?
16       A.   It says stock purchase agreement.
17       Q.   And do you recognize the party that is
18  purchasing stock under this agreement?
19       A.   Yes.
20       Q.   It is Polebridge Bowman.
21       That's the entity we were talking
22  about earlier that was created by Glenn Sturm;
23  correct?
24       A.   Yes.
25       Q.   And turn to the last page.  It has

W. Eber

1
2  Lester's signature on it on behalf of Eber Metro.
3       Do you see that?
4       A.   Yes.
5       Q.   Now what was Lester's role in
6  connection with negotiating or approving this
7  transaction?
8       A.   I don't remember the exact specifics.
9       Q.   Is it still your recollection that
10  this was primarily negotiated by you?
11       A.   Well, I think you know we had the
12  lawyers involved with it and he was, you know,
13  obviously involved with them and I spoke to him
14  but I don't remember any specific.
15       Q.   Which lawyers were involved with this
16  one on behalf of Eber Metro?
17       A.   Well, it would have been Harris Beach
18  would have had some involvement and would have had
19  Mike involved, Mike Gumaer.
20       Q.   Anyone else?
21       A.   I don't remember.
22       Q.   If you would please turn to page 3 and
23  directing your attention specifically to Article
24  5.04.
25       Do you see that?

25 (Pages 94 - 97)

Page 98

W. Eber

1
2    A.   Yes.
3  RQ       MR. BROOK:  Before my next question I
4    will put in a request on the record for a
5    somewhat clearer copy of this.
6    A.   It is hard to read.
7    Q.   I will just take my best shot at
8  reading this and I would like you to read along
9  with me and let me know if I read anything
10  incorrectly.  Section 5.04 says "To the extent
11  that buyer proposes to sell all or a portion of
12  the units to a third party, then buyer shall
13  comply with the rights of refusal set forth in
14  this section.  Upon receipt by buyer of a bona
15  fide written offer from a third-party to purchase
16  all or a portion of the units, then buyer shall
17  submit a written notice to each of Wendy Eber,
18  seller and in brackets EG, in parenthesis the
19  quote proposed sale notice, end quote end
20  parenthesis, setting forth the material terms
21  under which the proposed sale is to take place and
22  offering to sell such amount of units on the terms
23  described therein.  Miss Eber shall have the first
24  right to purchase all the units set forth on the
25  proposed sale notice (and on the terms described

Page 99

W. Eber

1
2  therein)."  And there is more but I am going to
3  stop there.
4        Did you follow with that Miss Eber?
5    A.   Mm-hmm, yes.
6    Q.   So this agreement gave you the right
7  of first refusal for any sale of the units that
8  were sold to Polebridge Bowman; is that right?
9    A.   Well, I am not a lawyer, so.
10    Q.   Do you know what a right of first
11  refusal is?
12    A.   In legal terms?
13    Q.   What is your understanding of what a
14  right of first refusal is?
15    A.   I am not exactly sure.
16       MR. RAMSEY:  Form.
17       Go ahead.
18    Q.   I am just asking for your
19  understanding.
20    A.   It does say I have the right of first
21  refusal.  Yeah.
22    Q.   So that means before anyone else can
23  buy these units, you will have a chance to buy the
24  units on at least the same terms that are offered
25  by a third party in a written bona fide offer;

Page 100

W. Eber

1
2  correct?
3       MR. RAMSEY:  Form.
4        The question is what her understanding
5    is?
6       MR. BROOK:  I am asking if that's --
7       MR. RAMSEY:  It says what -- the
8    document says what it says and if you want
9    to ask her understanding, that's fine.
10       MR. BROOK:  Yes.  I am asking still
11    for her understanding of what that means;
12    correct.
13    A.   Yeah.
14    Q.   Did you request this right of first
15  refusal?
16    A.   I don't remember.  I don't.
17    Q.   How did this right of first refusal
18  get into this document?
19    A.   I don't remember.  I don't remember.
20    Q.   Did you give anything to Eber Metro in
21  exchange for receiving this right of first
22  refusal?
23       MR. RAMSEY:  Form.
24       MR. BROOK:  Basis?
25       MR. RAMSEY:  Give.

Page 101

W. Eber

1
2       MR. BROOK:  Okay.
3    Q.   Did you pay anything to Eber Metro in
4  exchange for receiving this right of first
5  refusal?
6    A.   No.
7    Q.   Did you give up any other rights or
8  property besides money to Eber Metro in exchange
9  for this right of first refusal?
10       MR. RAMSEY:  Form.
11       Go ahead you can answer.
12    A.   I work there.  I worked at Metro.  I
13  mean I worked, yeah.
14    Q.   So was this a form of compensation for
15  your work then, is that what you are saying?
16    A.   It could be.  I mean you know, I am
17  just saying I worked there, so it is not like I
18  didn't work there.  I worked there.
19    Q.   And are you aware of any documents
20  that you have or you have seen in connection with
21  this case that support your understanding that
22  this is a form of compensation to you, that this
23  right of first refusal is a form of compensation
24  to you for your work?
25       MR. RAMSEY:  Form.

26 (Pages 98 - 101)

Page 102

```
                      W. Eber
 1
 2       A.   I don't remember.  I mean, I just --
 3   there is a lot of documents.  I just don't
 4   remember.
 5       Q.   So you can't think of anything off the
 6   top of your head; is that right?
 7       A.   Right off the top of my head, there is
 8   a lot of documents in this case.
 9       Q.   Did the board ever approve your
10   receiving a right of first refusal to the
11   Polebridge Bowman shares as a form of
12   compensation?
13       A.   I don't remember.  I believe the board
14   approved this document, but I don't specifically
15   remember on that.
16       Q.   At the time of this stock purchase
17   agreement May 2010 is when it is dated as of, Eber
18   Metro was still indirectly controlled by the Allen
19   Eber Trust; correct?
20       A.   Yes.
21       Q.   Did the trustees of the Allen Eber
22   Trust approve of this right of first refusal being
23   given to you or granted to you?
24       A.   Not that I am aware of, no.  Wait.
25            Did the trustees?
```

Page 103

```
                      W. Eber
 1
 2       Q.   Yes.  I asked if the trustees of the
 3   trust approved.
 4       A.   I believe this was Mike Gumaer saw
 5   this who was an attorney and he was a trustee and
 6   Lester signed this.  He is also a trustee but I am
 7   not aware of a document.
 8       Q.   Do you know whether Mike Gumaer
 9   actually read this specific paragraph 5.04?
10            MR. RAMSEY:  Form.
11       A.   He may have.  I mean, I believe he
12   read this document.  So yes, I mean he may have.
13   He may have read it.
14       Q.   Did you ever discuss this right of
15   first refusal with Mike Gumaer?
16            MR. RAMSEY:  In the context of counsel
17   or trustee?
18            MR. BROOK:  In any context to suggest
19   that he knew about it.
20            MR. RAMSEY:  Don't discuss any
21   conversations that were in connection with
22   legal advice.  If there was another
23   conversation you had with Gumaer, that's
24   fine.
25            MR. BROOK:  I would actually ask that
```

Page 104

```
                      W. Eber
 1
 2   any conversation.  She doesn't have to say
 3   what advice he gave.
 4       Q.   But if there was any conversation
 5   where he said something indicating that he was
 6   aware that there was a right of first refusal
 7   being granted, please tell me about it.
 8       A.   I don't remember a conversation.
 9   There may have been an e-mail, but I don't
10   remember a conversation with him.
11   RQ        MR. BROOK:  If there is any e-mail
12       with Mike Gumaer reflecting the right of
13       first refusal, we request that it be
14       produced to us in redacted form if
15       necessary.
16            MR. RAMSEY:  I will check.
17   BY MR. BROOK:
18       Q.   Was this right of first refusal ever
19   discussed with anyone from Canandaigua National
20   Bank, to your knowledge?
21       A.   I don't remember.
22       Q.   Do you have an employment contract
23   with Eber Metro, something in writing?
24       A.   Yes.
25       Q.   Did that provide for the terms of your
```

Page 105

```
                      W. Eber
 1
 2   compensation?
 3       A.   There were terms in there of
 4   compensation I believe.  I don't remember all the
 5   details.
 6   RQ        MR. BROOK:  I am not sure that we have
 7       seen that.  So in an abundance of caution, I
 8       am going to make a request that if there are
 9       any employment contracts with any of the
10       Eber entities for either Wendy or Lester
11       Eber that those be produced to us.
12            MR. RAMSEY:  Note any document
13       requests on the record please.  Thanks.
14       Q.   To the best of your recollection, did
15   any employment contract that you had ever make
16   reference to a right of first refusal?
17       A.   I don't remember.  I mean, it is many
18   years ago.  I don't remember.
19       Q.   I am going to return now to Exhibit 13
20   which is the line of credit note we were
21   discussing before lunch.  It should be in front of
22   you.
23            Do you see it?
24            MR. RAMSEY:  Do you got it?
25            THE WITNESS:  Yes.
```

27 (Pages 102 - 105)

Page 106

```
1            W. Eber
2     This one (indicating)?
3        MR. RAMSEY:  Yes.
4     A.  Yes.
5     Q.  Before we broke I asked you some
6  questions about what you did or didn't do as the
7  maturity date was coming due and on the topic of
8  whether you requested an extension of that
9  maturity date you testified that it was your
10 understanding that you didn't have to do so; is
11 that correct?
12    A.  I don't remember.  I mean I don't
13 remember.  I don't remember.
14    Q.  So why didn't you request that Lester
15 extend the maturity date of this line of credit
16 note?
17    A.  I don't remember.
18    Q.  Was it your understanding that you did
19 not have to request an extension of a maturity
20 date on this line of credit note as part of your
21 obligations to Eber Metro?
22    A.  Would you rephrase that?
23    Q.  Do you recall your testimony earlier
24 today that you believed you did not have to
25 request an extension of the maturity date of this
```

Page 107

```
1            W. Eber
2  note?
3     A.  I don't remember.  You know, I may
4  have spoke to counsel on it about that.  It is
5  2011 is the maturity date.  I really don't
6  remember.
7     Q.  As you sit here today, is your
8  understanding you did not have to request that
9  Lester extend the maturity date of this note?
10    A.  Well, it matured on December -- you
11 are saying after December 31, 2011?
12    Q.  I am asking whether it is your
13 understanding today since you said it is hard to
14 remember ten years ago, is it your understanding
15 today that back in December 2011 or November 2011
16 that you had no obligation under law, policy or
17 otherwise, to request that Lester extend the
18 maturity date of this note?
19    A.  This was done by the lawyers.
20       MR. RAMSEY:  He is asking for your
21 understanding.
22    A.  Oh, yeah.  That it didn't need to be.
23 I am sorry.
24       Asking what?
25    Q.  So as the -- I mean you signed the
```

Page 108

```
1            W. Eber
2  original note; correct, on behalf of Eber Metro?
3     A.  Yes.
4     Q.  And so did Lester even though he was
5  the counterparty; correct?
6     A.  Yes.
7     Q.  And was it your understanding that
8  Lester was negotiating -- withdrawn.
9       Who at Eber Metro was responsible for
10 ensuring that this line of credit note was paid
11 when it became due?
12    A.  Metro.  Metro would be responsible for
13 it to pay it.
14    Q.  I am asking who was responsible as a
15 person because companies are made up of people.
16 Was it -- let's step back even further.
17       Besides you and Lester, was there
18 anyone else who worked for Eber Metro as of late
19 2011?
20    A.  No.
21    Q.  Between you and Lester, who was
22 responsible for ensuring this line of credit
23 note was paid when it became due?
24    A.  Me.
25    Q.  And does that mean that you also had
```

Page 109

```
1            W. Eber
2  the responsibility, if anyone did, to request an
3  extension of this line of credit note maturity in
4  the event that payment in full was not possible?
5     A.  Well, this was a document done by
6  lawyers, so.
7     Q.  I am not asking about the document.  I
8  am asking about your assignment of
9  responsibilities.  You were responsible for
10 ensuring payment.
11       Was it not also your responsibility if
12 payment was not possible to try to get an
13 extension of this note to avoid default?
14       MR. RAMSEY:  Form.
15    A.  Well, you got to have Lester wanting
16 to extend it too.  I mean it is not just me hoping
17 to, you know, extend it.
18    Q.  Did Lester tell you he did not want to
19 extend this note?
20    A.  I don't remember the conversations
21 that we had about this particular notice from
22 2011.
23    Q.  So --
24    A.  We were trying to, you know, raise
25 money.  We were going out and talking to banks.  I
```

28 (Pages 106 - 109)

W. Eber

1   mean, we had several presentations to many banks
2   trying to get money, to raise money. So there was
3   a lot of conversations going on. I don't remember
4   the specifics around this particular note. You
5   know, we also asked Sally and Audrey to
6   participate. It was a disaster.
7       Q.   When was it that you had asked Sally
8   and Audrey to participate?
9       MR. RAMSEY: Do you recall?
10      A.   2010.
11      Q.   So it was --
12      A.   I don't know.
13      Q.   So it was more than a year before the
14  maturity date of the line of credit note; correct?
15      A.   I don't remember all the specific
16  dates. This is many years ago. I know we were
17  trying to go to other banks. I talked to many. I
18  had presentations with many banks. I also --
19      Q.   Did you also have a presentation in
20  2011?
21      MR. RAMSEY: Let her answer the
22      question.
23      MR. BROOK: I don't think it is
24      responsive to my question that's pending.

W. Eber

1       MR. RAMSEY: Well let her finish it
2   before you decide.
3       Are you done with your answer?
4       A.   Possibly that I did have some
5   presentations to banks. I also -- can I just
6   think for a second? I am just thinking.
7       I believe I did have some
8   presentations in 2011 to banks trying to raise
9   money.
10      Q.   And did you tell any of those banks
11  about this line of credit note to Lester Eber that
12  was becoming due?
13      A.   I don't remember.
14      Q.   Is it fair to say you don't remember
15  doing that?
16      MR. RAMSEY: Speaking of Lester, I am
17      sorry, advising the banks?
18      MR. BROOK: Advising the banks of the
19      line of credit.
20      Q.   You don't have any memory of doing
21  that?
22      A.   I don't remember. I know we did try
23  to talk to several different banks and.
24      Q.   Which banks?

W. Eber

1       A.   It may take me a couple of minutes.
2       Can I think for a couple of minutes
3   here? Okay.
4       Q.   Do you remember anyone at any time go
5   ahead and say that so you don't forget it.
6       A.   There was a company called Profit
7   Stars that tries to find banks. Mike's daughter
8   works for a bank. It is in New York. I forgot
9   the name. I think it is Republic something. I
10  don't know if that was the name of it.
11      There was I think a bank in
12  Westchester. I don't remember the name of that
13  bank.
14      We did, I remember we did speak with
15  Webster Bank but it was a later date. It wasn't
16  this particular time period. I just don't
17  remember. I mean this is a lot of years ago. I
18  don't remember. We did try talking to several
19  different banks.
20      Q.   Other than talking to banks what, if
21  anything else, do you think you may have done as
22  part of your responsibility to try and ensure
23  there was not a default on the line of credit
24  note?

W. Eber

1       MR. RAMSEY: Form.
2       A.   Specifically in 2011?
3       Q.   At any point in time.
4       A.   We were trying to, you know, work on
5   Connecticut and turning around that business as
6   well, but you know, it's...
7       Q.   Did you expect that the Eber
8   Connecticut business would generate over 1.5
9   million dollars in free cash available to pay down
10  this note by the end of December 2011?
11      A.   We were hoping to turn the company
12  around. We put a lot of effort into trying to
13  turn it around.
14      Q.   But did you think that 1.5 million
15  dollar plus interest was remotely feasible at any
16  point in time between October 2009 and December
17  2011?
18      A.   Brian, I wasn't an expert in being a
19  CFO. So I started off at Eber Brothers --
20      MR. RAMSEY: Hold on. That's not the
21      question. That's not the question. Just
22      answer the question.
23      Do you think 1.5 million dollars can
24      be paid off?

29 (Pages 110 - 113)

Page 114

W. Eber

2   A.   I don't know if I had the expectation
3   because you know we were hoping to turn around
4   Connecticut and make some money here.  There were
5   -- we had the economy go, you know, into a
6   recession.  I mean did I expect the economy going
7   into a recession, you know.  How did I expect that
8   would affect the company.  Did I expect to get
9   duals on Yellow Tail.  Did I expect to get duals
10  on dug horn.  There are a lot of moving parts
11  here.  So we were trying to turn around the
12  company.
13      Q.   When was the dualling by Yellow Tail?
14  When did that occur?
15      A.   I don't specifically remember.  2010,
16  I don't know.  Somewhere in -- I apologize.  I am
17  trying to think here.
18      Q.   Before 2011, is that fair to say?
19      A.   I think so.
20      Q.   When was the dualling by Duck Horn,
21  also before 2011?
22      A.   I don't specifically remember.
23      Q.   Sometime in the time period of about
24  2009 and 2010 there was a need to pay the Slocums
25  additional compensation as part of the original

Page 115

W. Eber

2   purchase agreement; is that correct?
3      A.   I have a vague recollection of that,
4   yes.
5      Q.   What's your recollection as to the
6   approximate timing of that?  Was it before
7   December 2011?
8      A.   I don't really remember.  I wasn't
9   involved in that original deal and then our CFO
10  was working on that at the time.  I just don't
11  remember the timing of that.
12      Q.   So thereby RCO do you mean the CFO,
13  I'm sorry, the CFO of Connecticut?
14      A.   Yes.
15      Q.   Who was that?
16      A.   What year are you talking about?
17      Q.   The year when the payouts to the
18  Slocums occurred.
19      A.   I don't remember the exact date of the
20  payouts.
21          Do you have the document?
22      Q.   You just referred to a CFO who handled
23  it.
24          Which CFO were you referring to?
25      A.   Well, it would have either been Dave

Page 116

W. Eber

2   Dean or Wally Crumb.
3      Q.   And again, because you aren't prepared
4   to testify about the Slocum deal in 2005, am I
5   correct in understanding that you cannot provide
6   testimony about what the basis was for the payouts
7   that were made to the Slocums in later years?
8      A.   No, I have no idea.
9      Q.   Did you want Eber Metro to default on
10  the credit note?
11          MR. RAMSEY:  Form.
12      A.   No.  I mean, we were -- this is -- no.
13      Q.   Why not?
14      A.   Why would I?  No.  I mean, we were in
15  financial distress.  So there was a lot of things
16  going on.  The economy was not doing well.  There
17  was a lot of financial distress going on within
18  the companies.  Southern had put us out of
19  business and created a nightmare situation.  So we
20  were trying to get money.  Trying to raise money.
21  Trying to ask family members for money.  Trying to
22  find bankers to help us.  Trying to get
23  Connecticut to make money.  It's very, very
24  stressful.  A lot of things going on.
25      Q.   So it is your testimony that you

Page 117

W. Eber

2   cannot think of any reason why you would have
3   wanted Eber Metro to default on the line of credit
4   note; is that correct?
5      A.   Yeah.  No, yes.
6      Q.   What happened after Eber Metro
7   defaulted on the line of credit note?
8      A.   I don't specifically remember.  I
9   mean, a lot of years ago.
10      Q.   Isn't it true that by mid December
11  2011 it was your and Lester's intention to have
12  Eber Metro default on the line of credit note?
13          MR. RAMSEY:  Form.
14      A.   What?
15      Q.   Isn't it true that by mid December
16  2011 it was your and Lester's intention to have
17  Eber Metro default on the line of credit note?
18          MR. RAMSEY:  Same objection.
19      A.   What I think was happening is that you
20  know it was severe financial distress; right.  You
21  know, I wouldn't characterize it in those terms.
22  The company, Connecticut was losing a lot of
23  money.  There were a lot of liabilities from
24  Southern putting us out of business.  It was very,
25  very stressful, you know and to --

30 (Pages 114 - 117)

Page 118

W. Eber

1
2       MR. RAMSEY:  The question was:  Was it
3   yours and Lester's intention to have the
4   line of credit, default on the line of
5   credit.
6       THE WITNESS:  No.
7       MR. RAMSEY:  That was the question.
8  BY MR. BROOK:
9   Q.   What was your understanding at that
10  time of what the consequences were in the event of
11  a default by Eber Metro on the line of credit?
12      MR. RAMSEY:  Form.
13  A.   Can you repeat the question?
14  Q.   Sure.
15      In December 2011, what was your
16  understanding of what the consequences were going
17  to be in the event of a default by Eber Metro on
18  the line of credit note?
19      MR. RAMSEY:  Form.
20  A.   I don't specifically remember what,
21  you know.
22  Q.   Did you know that the line of credit
23  note was subject to a security agreement?
24  A.   Yes.  Yes.
25  Q.   What did that mean in terms of the

Page 119

W. Eber

1
2  consequences of the default, potential
3  consequences?
4       MR. RAMSEY:  Form.
5   A.   These are legal questions.  Lester
6  loaned --
7   Q.   I am only asking for your
8  understanding at the time.
9   A.   He loaned in money and had a secured
10  interest in Metro and the stock of Metro.
11  Q.   He also had a security interest in
12  Metro's membership units in Eber Connecticut;
13  correct?
14  A.   I believe so.  I don't know all the
15  legal terms here.
16  Q.   And who on behalf of Eber Metro
17  authorized the execution of the security agreement
18  with Lester Eber?
19  A.   I am not looking at it right now.
20      Do you have a copy?  I just don't
21  remember.  I just don't remember.  This is from --
22  when --
23      MR. RAMSEY:  Let him show it to you.
24      MR. BROOK:  We will mark this as
25  Plaintiffs' Exhibit 15.

Page 120

W. Eber

1
2       (Plaintiffs' Exhibit 15, a security
3   agreement dated as of February 26, 2010
4   between Eber Brothers Wine and Liquor Corp.
5   and Eber Metro in favor of Lester Eber
6   bearing Bates numbers CNB 000055 through 68,
7   marked for identification, as of this date.)
8   Q.   I am showing you now what has been
9  marked as Plaintiffs' Exhibit 15.  It is a
10  security agreement dated as of February 26, 2010
11  between Eber Brothers Wine and Liquor Corp. and
12  Eber Metro in favor of Lester Eber bearing Bates
13  numbers CNB 000055 through 67.  Through, I am
14  sorry, 68.
15      Do you recognize this as the security
16  agreement we were talking about a moment ago?
17  A.   It says security agreement at the top
18  of it.
19  Q.   So is that a yes?
20  A.   Is what a yes?
21  Q.   This is the security agreement that
22  gave Lester secured or secured Lester's loans to
23  the company with the assets of Eber Metro and Eber
24  Brothers Wine and Liquor?
25  A.   Yes.

Page 121

W. Eber

1
2   Q.   And if you turn to page 13, that's
3  your signature on behalf of both entities;
4  correct?
5   A.   Yeah.
6   Q.   So why was the security agreement
7  entered into?
8       MR. RAMSEY:  Form.
9       MR. BROOK:  Basis?
10      MR. RAMSEY:  You are asking for a
11  legal.
12  A.   Yeah, it is a legal.
13      MR. RAMSEY:  I am asking.
14      MR. RAMSEY:  If you want to ask her
15  understanding that's fine.  My form
16  objection is that it is soliciting a legal
17  opinion.
18      MR. BROOK:  I understand.
19  BY MR. BROOK:
20  Q.   Why did Eber Metro and Eber Wine and
21  Liquor sign the security agreement?
22  A.   Advised by, you know I mean these were
23  all disclosed to our, you know, to Mike and I am
24  sure I discussed this with Mike, our attorney, and
25  I believe Harris Beach put this document together.

31 (Pages 118 - 121)

W. Eber

1
2       MR. RAMSEY:  Do you have an
3   understanding of the purpose of the
4   agreement, you personally?  That's what the
5   question is.
6       MR. BROOK:  Actually, my question is
7   why they signed it.
8       MR. RAMSEY:  Well.
9    A.    Secured -- I don't remember all the
10  details around it, but it gave us a secured
11  interest.
12   Q.    What did Eber Metro get out of signing
13  the security agreement?
14       MR. RAMSEY:  Form.
15   Q.    What was the benefit to Eber Metro as
16  a result of signing the security agreement?
17   A.    I don't remember.  It's been a while.
18  I have to read through all the documents.
19       I thought we discussed this at like
20  with Mike.  I discussed it with Mike.
21   Q.    Gumaer?
22   A.    Gumaer, yeah.
23   Q.    You discussed it with Glenn Sturm as
24  well; correct?
25   A.    I may have.

W. Eber

1
2   Q.    Glenn Sturm was retained at some point
3   prior to February 26, 2010; is that right?
4   A.    I don't remember the exact date.  But
5   we discussed all of these documents.
6       MR. RAMSEY:  Just wait for a question.
7   Q.    You are talking about all the exhibits
8   that you looked at today you are saying you
9   discussed with somebody?
10  A.    No.  I am saying I believe the line of
11  credit note and the security agreement.
12   Q.    So as you sit here today you can't
13  think of any reason why Eber Metro agreed to sign
14  the security agreement; is that correct?
15       MR. RAMSEY:  Form.
16   A.    We needed the money.  I mean, it was
17  you know.
18   Q.    What money did the company get as a
19  result of signing the security agreement in
20  February 2010?
21       MR. RAMSEY:  Form.
22   A.    I think Lester was advancing money
23  into the company at that time.
24   Q.    Wasn't he already obligated to do so
25  based on the October 2009 line of credit note

W. Eber

1
2   Exhibit 13?
3       MR. RAMSEY:  Form.  You are asking for
4   a legal opinion here.
5       MR. BROOK:  She offered one.
6       MR. RAMSEY:  Form.
7       If you understand you can answer.  My
8   objection is to.
9       Go ahead.
10   A.    This is on advice of counsel.
11   Q.    This was signed on advice of counsel,
12  you are saying the security agreement was signed
13  on the advice of counsel; is that right?
14   A.    Yes, I believe so.  I don't remember
15  all the details on the security agreement.
16   Q.    To the best of your recollection,
17  which counsel are you referring to?
18   A.    Well, we spoke with Mike Gumaer.
19   Q.    And that's the only name that you can
20  state right now?
21   A.    Well.
22   Q.    The person who is no longer around --
23   A.    I believe Harris Beach put together
24  the document.  I don't remember all the details.
25   Q.    And putting aside the document and

W. Eber

1
2   specifically what's in it, you said that the
3   reason that you signed it was also because you
4   needed the money from Lester; is that right?
5   A.    He was providing money, to loan in
6   money into the companies.  Yes, he was.
7   Q.    Did anyone tell you that if this
8   security agreement was not signed, then Lester
9   would not have to continue to provide money to the
10  company under the line of credit note?
11       MR. RAMSEY:  Form.
12       As long as that's not from counsel
13  imparting legal advice, with that caveat go
14  ahead and answer the question.
15  A.    Say that again.
16       MR. RAMSEY:  Brian asked you if anyone
17  told you anything.  If someone told you
18  something that wasn't from your attorneys.
19  If it was from your attorneys that's
20  protected.
21       MR. BROOK:  I will withdraw the
22  question.
23 BY MR. BROOK:
24   Q.    Was it your understanding at or about
25  the time you signed the security agreement that

32 (Pages 122 - 125)

Page 126

W. Eber

1
2  unless you signed it Lester would not loan anymore
3  money to Eber Brothers Wine and Liquor or Eber
4  Metro?
5          MR. RAMSEY: Objection to form.
6          You can answer.
7      A.  I don't remember.  I remember discus
8  -- this did come up I believe -- I don't remember
9  all the details around it.  I really don't
10  remember all the details around it.
11         MR. BROOK: We will go to another
12  exhibit.  Make this one Exhibit 16.
13         (Plaintiffs' Exhibit 16, a copy of a
14  line of credit note, marked for
15  identification, as of this date.)
16     Q.  I am showing you what has been marked
17  as Exhibit 16 and see that it is a copy of a line
18  of credit note.  It appears to be substantially
19  similar to the one that we saw in Exhibit 13
20  except there seems to be possibly some more
21  written or maybe it is just a different font size.
22  It is more pages and if you note, what's the date
23  on this one, on the first page?  Can you see that?
24     A.  February 26, 2010.
25     Q.  So now this line of credit note which

Page 127

W. Eber

1
2  has Bates numbers from CNB 000040 through 43,
3  meaning it was produced by Canandaigua National
4  Bank, has the same date as the security agreement
5  that we were just looking at Exhibit 15; correct?
6      A.  Okay.
7      Q.  Do you know why this document Exhibit
8  16 with a new date of February 26, 2010 was
9  prepared?
10     A.  No.
11     Q.  Is it your signature on the last page?
12     A.  I think so.
13     Q.  Let's compare the signatures on
14  Exhibits 13 and 16.  They are a little different.
15  I want you to make sure you take a look and if one
16  of them is not you to please say so.
17     A.  No.  I think they are mine.  I just
18  signed this one, the one dated February 26, 2010,
19  Wendy and the other one I signed W.
20     Q.  So as you sit here today, can you
21  think of any reason whether you remember or not,
22  can you think of any reason why you might have
23  signed essentially the same line of credit note
24  twice with two different dates?
25         MR. RAMSEY: Form.

Page 128

W. Eber

1
2      A.  Well, they are different date.  I mean
3  this -- I don't remember.  I mean I don't.  I
4  don't remember.
5      Q.  So you don't remember but can you
6  think of any reason why you might have?  I am
7  asking you to make a reasoned, your best reasoned
8  speculation about why you did this.
9          MR. RAMSEY: Form.
10         If you've got a reasonable assumption
11  that's one thing, but don't guess.
12     A.  I have no idea.  I don't know.
13     Q.  Actually, I am going to ask you to
14  guess.  Can you even --
15     A.  No.
16         MR. RAMSEY: Do not guess.  She is not
17  guessing.
18     A.  I don't know.
19         MR. BROOK: You are allowed to state
20  your objection to form.  It may not be
21  admissible but I am allowed to ask the
22  question for her to guess.
23         MR. RAMSEY: She is not going to
24  guess.  We are not guessing.
25     A.  There were --

Page 129

W. Eber

1
2          MR. RAMSEY: Wait for a question.
3      A.  Okay.
4      Q.  Did you just think of something that
5  might explain it?
6      A.  No, no.  There is a lot of documents
7  involved here.  You know nine years ago, 11 years
8  ago I just don't remember.  I mean it is a lot of
9  years ago.
10     Q.  Did you sign Exhibit 16 on the advice
11  of counsel?
12         MR. RAMSEY: Form.
13     A.  I believe so, yes.  I spoke to Mike on
14  all these documents.
15     Q.  And do you remember speaking to anyone
16  else other than the person who is unfortunately
17  not with us to confirm or deny what you are
18  saying?
19         MR. RAMSEY: Form.
20     A.  I may have.  I don't remember right
21  now.  I believe Harris Beach did these documents.
22  So I may have spoken to Harris Beach, but I just
23  -- nine years ago I don't.  My memory is not that
24  good.
25     Q.  Do you know what a UCC financing

33 (Pages 126 - 129)

Page 130

W. Eber

1
2 statement is?
3     A.   It is something that's filed?
4     Q.   It is your understanding it is
5 something filed with the state?
6     A.   With the state, yeah.
7     Q.   Didn't Glenn Sturm file the UCC
8 financing statement after execution of the
9 security agreement Exhibit 15?
10     A.   I don't know.  I mean I don't
11 remember, I don't.
12     Q.   Would it be fair to infer that
13 whichever lawyer or law firm was involved in
14 filing the UCC financing statement in connection
15 with the security agreement, was likely also the
16 lawyer that advised you to sign the security
17 agreement?
18         MR. RAMSEY:  Form.
19         If you know.
20         THE WITNESS:  If I know what?
21         MR. RAMSEY:  If you know you can
22 answer the question.
23     A.   I don't know.
24     Q.   You don't know if that would be a
25 reasonable inference under the circumstances?

Page 131

W. Eber

1
2         MR. RAMSEY:  Same objection.
3         MR. BROOK:  Let's go to Exhibit 17.
4         (Plaintiffs' Exhibit 17, Debt
5 Assumption Agreement dated as of February
6 11, 2011 between Eber Brothers Wine and
7 Liquor and Eber Metro and Lester Eber Bates
8 number CNB 000072 through 74, marked for
9 identification, as of this date.)
10     Q.   I am showing you what has been marked
11 as Exhibit 17 called Debt Assumption Agreement
12 dated as of February 11, 2011 between Eber
13 Brothers Wine and Liquor and Eber Metro and Lester
14 Eber.  It is Bates number CNB 000072 through 74.
15         Do you recognize this document?
16     A.   Dated March 13, 2006.
17         What's the date on this?
18     Q.   I am sorry.
19         Did I hand you the wrong document?
20         MR. RAMSEY:  No.
21         MR. CALIHAN:  That's what it says.
22     A.   That assumption agreement is made as
23 of the 11th day of February 2011.
24     Q.   If you turn to the third page, do you
25 recognize your signature there twice?

Page 132

W. Eber

1
2     A.   Yes.
3     Q.   It is also signed by Lester Eber?
4     A.   Yes.
5     Q.   Do you recall that in approximately
6 February 2011 Eber Metro assumed all of the debt
7 that Eber Brothers Wine and Liquor Corp. at that
8 time had owed to Lester Eber?
9     A.   Vaguely.
10     Q.   Why is it such a vague recollection?
11     A.   It is like eight years ago.  I just
12 don't remember.  I don't have these documents
13 memorized.  I haven't really looked at them in
14 many, many years.  So it's just kind of this.
15     Q.   How many lawsuits have been filed
16 arising out of this document and related documents
17 that ultimately led to Alexbay acquiring Eber
18 Metro?
19     A.   Well, there is this one.
20     Q.   And there have been two others too;
21 correct, at least?
22     A.   I don't know.
23     Q.   Harris Beach sued over this
24 transaction; right?  It claimed it was a
25 fraudulent conveyance?

Page 133

W. Eber

1
2     A.   No.
3     Q.   Harris Beach didn't sue anyone over
4 this or --
5     A.   My understanding is they sued over
6 fees.
7     Q.   So --
8     A.   Fees, unpaid fees.
9     Q.   So you don't have an understanding
10 that Harris Beach sued various Eber entities
11 including Eber Metro, Eber Connecticut, Alexbay,
12 Lester Eber alleging that the transfer of Eber
13 Metro to Alexbay was a fraudulent conveyance?
14         MR. RAMSEY:  Form.
15     A.   Well, first they sued I believe over
16 fees and then they may have sued based on what you
17 just stated.
18     Q.   So as you sit here --
19     A.   So I just haven't looked at these
20 documents in a very long time.
21     Q.   When is the last time that you recall
22 looking at these documents?
23     A.   When do I recall looking at these
24 documents?  I don't remember.  I mean it's been a
25 long time.  I just don't -- I just haven't looked

34 (Pages 130 - 133)

Page 134

W. Eber

1    W. Eber
2 at them. I am running a company. You know, I
3 have got -- you know.
4         MR. RAMSEY: You answered the
5    question.
6    A.   It's been a very long time. I don't
7 remember the last time I looked at these
8 documents. It's been a very long time since I
9 looked at these documents.
10   Q.   So, and it is your testimony today
11 under oath that you are not sure whether or not
12 Harris Beach alleged that a fraudulent conveyance
13 occurred with the transfer to Alexbay; is that
14 right?
15        MR. RAMSEY: Form.
16   A.   What?
17   Q.   It is your testimony today under oath
18 that you are not sure whether Harris Beach alleged
19 that the transfer of Eber Metro to Alexbay was a
20 fraudulent conveyance?
21        MR. RAMSEY: Form.
22   A.   I didn't say that. What I said was
23 they originally sued for fees, legal fees and then
24 they brought a suit later for the fraudulent
25 conveyance was I believe at a later date they

Page 135

1    W. Eber
2 brought that, but originally was for legal fees
3 that were not paid.
4    Q.   And didn't PBGC, Pension Benefit
5 Guaranty Corporation, also allege there had been a
6 fraudulent conveyance of Eber Metro to Alexbay?
7    A.   No.
8         MR. RAMSEY: Form.
9    Q.   What were their allegations when they
10 filed suit in Federal Court?
11        MR. RAMSEY: Form.
12   A.   These are legal questions that they
13 did not sue for fraudulent conveyance, no. I
14 mean --
15        MR. RAMSEY: Whatever your
16    understanding is.
17   A.   That's my understanding as a
18 non-lawyer that they did not sue for fraudulent
19 conveyance.
20   Q.   So what I am saying is well, putting
21 aside fraudulent conveyance, did they question the
22 transfer of Eber Metro to Alexbay?
23        MR. RAMSEY: Form.
24   Q.   Did they challenge it, say that it was
25 improper in any way?

Page 136

1    W. Eber
2         MR. RAMSEY: Form.
3    If you can answer.
4    A.   I am not an ERISA lawyer but that's
5 not my understanding, no. But ERISA laws --
6         MR. RAMSEY: You answered the
7    question.
8    Q.   So what was your understanding of the
9 basis for PBGC's claims?
10   A.   Claims, what do you mean? The
11 termination liability? What do you mean?
12   Q.   Didn't PBGC end up suing Eber
13 Connecticut and Eber Metro and Alexbay?
14   A.   I am not sure if they sued all of
15 those entities. I don't remember if it was all
16 those entities that they sued. It was around
17 other issues I believe, but I am not an ERISA
18 lawyer. These are legal questions, but it wasn't
19 around fraudulent conveyance.
20   Q.   The lawsuit --
21   A.   To my understanding.
22   Q.   The lawsuit brought by PBGC was
23 ultimately settled out of court; correct?
24   A.   What do you mean by out of court?
25   Q.   It was settled between the parties;

Page 137

1    W. Eber
2 correct?
3    A.   There was a settlement, yes.
4    Q.   And you were one of the people who
5 authorized that settlement when it occurred;
6 correct?
7    A.   Yes.
8    Q.   So you had some understanding of what
9 the lawsuit was about if you authorized the
10 settlement, didn't you?
11        MR. RAMSEY: Form.
12   A.   Say that again.
13   Q.   It is not your testimony that you
14 didn't understand what the case was about when you
15 authorized the settlement for seven figures, did
16 you?
17        MR. RAMSEY: Form.
18   A.   No. I don't understand what you are
19 saying.
20   Q.   You authorized the settlement with
21 PBGC; correct?
22   A.   Yes.
23   Q.   And that settlement involved paying
24 PBGC two million dollars; correct?
25   A.   Yes, and --

35 (Pages 134 - 137)

Page 138

W. Eber

1
2    Q.   And it involved Lester Eber giving up
3  his pension benefits worth approximately 1.4
4  million; correct?
5    A.   Yes.
6    Q.   3.4 million dollars in benefit
7  transferred from either your father or companies
8  in which you are an executive to PBGC; correct?
9    A.   Yes.
10    Q.   What was your understanding of what
11  you were authorizing that 3.4 million transfer for
12  in terms of what was PBGC saying was the basis for
13  it to get that money?
14    MR. RAMSEY:  Form.
15    A.   It's a termination liability that, for
16  the pension plan.  There was a -- when -- let's
17  step back here.
18    When Eber Brothers was put out of
19  business by Southern there was, you know, a lot of
20  liabilities and part of the liabilities was a
21  pension plan liability.  Now it is very
22  complicated.  I am not an ERISA lawyer, so I don't
23  know all of the legal ERISA laws because it is a
24  very specific area of the law, but they did not
25  sue us for fraudulent conveyance.

Page 139

W. Eber

1
2    Q.   It was about when the termination date
3  for the plan would be set up; is that correct?
4    MR. RAMSEY:  Form.
5    A.   You know I believe so but you know, I
6  am not a lawyer.
7    Q.   Which corporate entity was it that had
8  the pension plan that was in question that was the
9  basis for liability to PBGC?
10    A.   Which?
11    Q.   Which corporate entity among the Eber
12  entities?
13    A.   Well, it's -- I am not an ERISA
14  lawyer.  You got to ask the -- these are ERISA
15  questions.
16    Q.   My question is which -- let's step
17  back.
18    Did Eber Metro have a pension plan?
19    A.   Eber Metro had employees who did have
20  a pension, who were members of the pension plan.
21    Q.   And the pension plan was maintained at
22  the higher level for Eber Brothers Wine and Liquor
23  Corp.; correct?
24    A.   I believe so, yes.  Yes.
25    Q.   Now who paid the 2 million dollars to

Page 140

W. Eber

1
2  PBGC?
3    A.   Who paid the 2 million dollars to
4  PBGC?
5    Q.   Correct.
6    Which entity?
7    A.   I think Metro paid a part of it.  I
8  think Metro paid it.  You know, I don't quite
9  remember.  I don't want to go -- there are
10  documents on it.  So I would like to refer back to
11  the documents to know who exactly paid it.
12  RQ    MR. BROOK:  I am not sure we have seen
13    those documents for Metro.  We have like a
14    stop at 2012 or something.  I am going to
15    put in the request that whatever documents
16    can be reasonably found that relate to
17    payment of settlement proceeds to PBGC be
18    produced.
19    MR. RAMSEY:  On that note can we take
20    five minutes?
21    MR. BROOK:  Sure.
22    THE VIDEOGRAPHER:  This marks the end
23    of media unit number three of the videotaped
24    deposition of Wendy Eber.  We are going off
25    the record.  The time is 2:20.

Page 141

W. Eber

1
2    (Recess taken.)
3    THE VIDEOGRAPHER:  This marks the
4    beginning of media unit number four in the
5    videotaped deposition of Wendy Eber.  We are
6    going on the record.  The time is 2:31.
7  BY MR. BROOK:
8    Q.   So still looking at Exhibit 17, the
9  debt assumption agreement.
10    Do you have any recollection at all
11  about why you executed this agreement?
12    A.   I don't.  I don't remember the details
13  around it.  You know, I do know we needed, you
14  know money.  We were in need of money.
15    Q.   Just because that's now on the
16  transcript in your answer I have to ask you, how
17  did this debt assumption agreement relate to or
18  how did this signing the debt assumption agreement
19  help with the situation where the company needed
20  money?
21    A.   I don't remember all the details
22  Brian.  I don't remember.  I haven't looked at
23  these documents in years.
24    Q.   You said, you indicated this agreement
25  was signed because the company needed money, but

36 (Pages 138 - 141)

Page 142

W. Eber

1
2 there was nothing in here that the company is
3 getting any money as a result of signing this;
4 correct?
5      A.  I don't remember.
6           MR. RAMSEY:  Form.
7      Q.  Pursuant to this agreement debt that
8 belonged to Eber Brothers Wine and Liquor Corp. is
9 being assigned to and assumed by Eber Metro;
10 correct?
11           MR. RAMSEY:  Form.
12      A.  Can you repeat that?
13           MR. BROOK:  Can you please read back
14 the question?
15           (Record read.)
16      A.  Read it again.  Sorry.
17           (Record read.)
18      A.  Correct.  I believe that we talked to
19 Mike about all these documents and he was advising
20 us.
21      Q.  So Mike Gumaer?
22      A.  Yeah.
23      Q.  So did Mike Gumaer draft this
24 agreement?
25      A.  I don't remember.  I don't believe he

Page 143

W. Eber

1
2 drafted it.  I don't remember.
3      Q.  Who do you believe drafted this
4 agreement?
5      A.  I don't remember.
6      Q.  Do you recall discussing this
7 agreement with anyone besides Mike Gumaer?
8      A.  I may have.  I don't remember.  I may
9 have spoken to Glenn.  I don't remember any
10 details.  It's 2011.
11      Q.  And do you recall executing an amended
12 and restated security agreement at or about the
13 same time you signed this debt assumption
14 agreement?
15      A.  Vaguely.
16           MR. BROOK:  I don't have questions
17 about it, but let's just mark it anyway to
18 cover the bases.  Plaintiffs' 18.
19           (Plaintiffs' Exhibit 18, the amended
20 and restated security agreement with Bates
21 numbers EB 00018379 through 392, marked for
22 identification, as of this date.)
23      Q.  So is this the amended and restated
24 security agreement with Bates numbers EB 00018379
25 through 392 the same one that you were referring

Page 144

W. Eber

1
2 to a moment ago?
3      A.  It may have been.  I don't know.
4      Q.  Please turn to the second to last
5 page.
6           Is that your signature there twice on
7 that page?
8      A.  Yes.
9      Q.  Do you recall discussing this Exhibit
10 18 with anyone at or around the time that you
11 signed it?
12      A.  I don't remember.  I am sure I
13 discussed it.  I just don't remember.
14           MR. BROOK:  Let's mark this next one
15 as 19.
16           (Plaintiffs' Exhibit 19, board
17 meeting minutes bearing Bates number EB
18 00016953, marked for identification, as of
19 this date.)
20      Q.  I am showing you what has been marked
21 as Plaintiffs' Exhibit 19.  It is board meeting
22 minutes bearing Bates number EB 00016953.
23           Do you recognize this document?
24      A.  Can I have a minute to read it?
25      Q.  Yes.  Let me know when you are done.

Page 145

W. Eber

1
2           Do you still need more time?
3      A.  Yes.
4           Okay.
5      Q.  Do you recognize this document?
6      A.  Yes.
7      Q.  What is it?
8      A.  The minutes from the meeting of the
9 board of Eber Brothers Wine and Liquor Metro Inc.
10      Q.  And did you prepare these?
11      A.  Yes.
12      Q.  When did you prepare these minutes?
13      A.  You know, after the meeting at some
14 point.  I don't remember when.
15      Q.  Did you take notes during the meeting?
16      A.  I may have, yeah.
17      Q.  Was it your typical practice as
18 secretary of the board of Eber Metro to take notes
19 at board meetings?
20      A.  Yeah, I did take note.
21           MR. RAMSEY:  Hold on one second.  He
22 said he lost the connection.
23           MR. BROOK:  Just since some of this
24 ended up on the record, I will note that the
25 he be referred to is John Herbert.  He is

37 (Pages 142 - 145)

Page 146

1             W. Eber
2     now back on the line.
3 BY MR. BROOK:
4     Q.   So Miss Eber, do you now recall
5 specifically taking notes during the August 18,
6 2011 board meeting?  I wasn't sure about your
7 answer.
8     A.   I don't -- you know I may have taken
9 notes, yes.  I don't remember.
10     Q.   Approximately, how long after the
11 board meeting in August 2011 did you prepare these
12 minutes?  Was it the next day?
13     A.   This was eight years ago.
14         MR. RAMSEY:  To the best of your
15 recollection.
16     A.   I just don't remember.  At some point
17 after the meeting.
18     Q.   Did you have a particular habit,
19 routine or practice when you were secretary of
20 either the board of Eber Metro or Eber Brothers
21 Wine and Liquor Corp. with respect to the time you
22 prepared minutes after a board meeting?
23     A.   Sorry.  Repeat that.
24     Q.   Did you have a particular habit,
25 routine or practice for preparing board meeting

Page 147

1             W. Eber
2 minutes?
3     A.   No.  I mean I did it.
4     Q.   And did you typically wait a couple of
5 months before preparing the minutes?
6         MR. RAMSEY:  Form.
7     A.   I don't remember.  It may have taken
8 longer at some points.  You know, I don't really
9 remember.
10     Q.   Was there a procedure in place for
11 approving board meeting minutes after you drafted
12 them?
13     A.   I believe I sent them.  I would send
14 them to the people involved, the lawyers.  I
15 probably sent it to Mike and I may have had a --
16 maybe Glenn looked at them.  I don't remember.
17     Q.   Did you send them to Lester as well?
18     A.   Yeah.  I may have sent them to Lester
19 as well or may have given them to Lester.
20     Q.   Now although the title of this
21 document Says Minutes From the Meeting of the
22 Board Eber Brothers Wine and Liquor Metro Inc., do
23 you see the second paragraph seems to talk about
24 actions by the trustees of the Allen Eber Trust?
25     A.   Yes.

Page 148

1             W. Eber
2     Q.   Why is that?
3     A.   We may have done these meetings
4 altogether, like a trustees meeting and a board
5 meeting.  I don't know.  Maybe I just didn't
6 change the title.  I don't remember.
7     Q.   What was your relationship at the time
8 to the Allen Eber Trust?
9     A.   I believe I was a beneficiary.
10     Q.   And is that based on --
11     A.   Like not --
12     Q.   Go ahead.
13     A.   Not a named beneficiary but descendant
14 or something.
15     Q.   A contingent one?
16     A.   It is a legal term.
17     Q.   I believe she is trying to say per
18 stirpes.  Sounds like a bad disease but it is just
19 a Latin term.
20     A.   I believe I was, but I could be wrong.
21     Q.   And did you have, did the trustees
22 retain you to provide any services to the trust?
23         MR. CALIHAN:  What was the question?
24         (Record read.)
25         MR. RAMSEY:  Form to that question.

Page 149

1             W. Eber
2     A.   What do you mean by retain?
3     Q.   Were you employed by the trust to do
4 anything in connection with its administration?
5     A.   No.
6     Q.   Did any of the trustees ask you to
7 help them in an unofficial capacity with the
8 administration of the trust?
9     A.   Sorry.  Repeat that.
10         MR. BROOK:  Could you read it back
11 please?
12         (Record read.)
13     A.   No.
14     Q.   Did you participate in meetings among
15 the trustees?
16     A.   I may have been involved in some, but
17 not all of them, no.
18     Q.   Returning to specifically Exhibit 19.
19         So are these board meeting minutes
20 accurate insofar as they indicate that the loans
21 that had been made to Lester Eber, from Lester
22 Eber to Eber Brothers Wine and Liquor Corp. and
23 Eber Metro had not been reviewed by or approved by
24 either company's board of directors prior to this
25 board meeting?

38 (Pages 146 - 149)

Page 150

W. Eber

1
2     A.   I don't remember.  I haven't looked at
3  many of these documents in a very long time.  So I
4  don't remember.  I believe we spoke to Mike.  We
5  had meetings with Mike.  I think he was aware that
6  Lester was loaning money in to the company.  I
7  don't know if those, some of those meetings were
8  documented or not.
9     Q.   Now a few moments ago you had an
10  opportunity to thoroughly read this Exhibit 19;
11  correct?
12     A.   Yeah.
13     Q.   When you did so, did you see anything
14  that was stated in this document that you believed
15  was incorrect?
16     A.   I didn't read it that closely, so I am
17  not sure.
18     Q.   But you don't recall seeing anything
19  that you noticed --
20          MR. RAMSEY:  Hold on.
21          Do you need to read it again after the
22  question?
23          THE WITNESS:  I would like a little
24  time to reread it.  I haven't read these
25  things in a long time.

Page 151

W. Eber

1
2          MR. RAMSEY:  Go ahead.
3          MR. BROOK:  I will withdraw that
4  question.
5     Q.   And you are not going to be bound to
6  it, but is it correct that when you read it
7  nothing jumped out at you as incorrect that you
8  read when you saw it before?
9          MR. RAMSEY:  Form.
10          If you want to read it again take your
11  time and read it.
12     A.   It is a little confusing.  There are a
13  lot of documents.
14          MR. RAMSEY:  Hold on.
15          Do you need to reread it to answer
16  that question?
17          THE WITNESS:  Yeah.  I would like to
18  take a couple of minutes to --
19          MR. BROOK:  I am going to withdraw the
20  question because we don't have -- if that
21  wasn't a close reading before I don't know
22  how long the next one will take.
23     A.   I am a slow reader.  I am sorry.
24     Q.   To your knowledge, were any third
25  parties contacted about the possibility of buying

Page 152

W. Eber

1
2  Eber Connecticut from Eber Metro in or around the
3  time period of 2011 or 2012?
4     A.   We did talk to some parties.  I don't
5  remember the specific date.
6     Q.   Which parties were spoken to?
7     A.   What were the time frame?  From like
8  what time periods because I really -- we did speak
9  to some parties.  I just don't specifically -- it
10  is a lot of years ago.  I don't remember the
11  specific dates.  I know we did speak to
12  Maglioccos.  I don't remember exactly when that
13  was.  I think there was a distributor in New
14  Jersey.  I don't remember exactly when that was.
15     Q.   So is it fair to say that you don't
16  recall contacting any third parties for them to
17  potentially buy Eber Connecticut during the time
18  period when you were trying to find a way to have
19  Eber Metro pay the Lester Eber line of credit?
20          MR. RAMSEY:  Form.
21     A.   I don't -- I mean I don't really know
22  people in the industry to contact.  So I wasn't
23  contacting people.
24     Q.   And you didn't hire any third-party
25  brokers or anything?

Page 153

W. Eber

1
2     A.   I am just saying I don't really have a
3  lot of contacts in the industry where I would know
4  people to contact.
5     Q.   You were saying Lester is the one with
6  the contacts?
7     A.   Lester had more contacts than I would
8  have.  I had more internal accounting jobs where I
9  just didn't know a lot of the people who would be
10  interested in purchasing.  We did have a
11  conversation I remember with the Maglioccos.
12     Q.   How did that conversation go?
13     A.   They were not interested.
14     Q.   Who are the Maglioccos?
15     A.   They own a distributor.  They own a
16  distributor in New York and they own one in
17  Connecticut too.
18     Q.   What is their distributor that they
19  own in Connecticut?
20     A.   It is called Broscum.
21     Q.   Did you speak with anyone from
22  Eder-Goodman about potentially selling them the 79
23  percent stake in Eber Connecticut that Eber Metro
24  had as of 2011?
25     A.   No.

39 (Pages 150 - 153)

Page 154

W. Eber

1
2    Q.   Why not?
3    A.   We were not performing well.  I mean
4 you know, I don't know.  They weren't that happy
5 with us.  I don't know.
6        MR. RAMSEY:  Brian, just for
7    clarification for the demarcation talk
8    earlier, are you -- I know there is some
9    blurring, but are you into Eber Connecticut?
10       MR. BROOK:  No, no.  Talking about
11   Eber Metro selling its shares and --
12       MR. RAMSEY:  We are still on the Metro
13   30(b)(6)?
14       MR. BROOK:  Correct.  I am not talking
15   about Connecticut selling itself, so.
16 BY MR. BROOK:
17   Q.   So why did you think that the
18 Eder-Goodman folks were not happy with your
19 management of Eber Connecticut?
20   A.   We lost a significant amount of money.
21 A lot of money.  Multi millions of dollars.  I
22 think it was in the, you know, like three, four,
23 five, six million bucks.
24   Q.   And --
25   A.   I don't know.

Page 155

W. Eber

1
2    Q.   Was Eder-Goodman ever asked to make
3 additional capital contributions to Eber
4 Connecticut as a result of that?
5    A.   I believe we did ask them.  Lester
6 loaned in some money into Connecticut because we
7 couldn't pay our bills and I believe we asked them
8 to participate with him and they declined is my
9 recollection.
10   Q.   So now referring to preferred stock.
11 I am sorry, PIK.
12       Did you say pick PIK, P-I-K?
13   A.   No.  Just like loan in working capital
14 into the company.
15   Q.   And what was the response?
16   A.   No.
17   Q.   Was it more colorful than that?  I am
18 gauging off your facial reaction.  If you can
19 remember the exact words, please do so.
20   A.   These conversations are so long ago it
21 is really hard for me to remember.  We had lost
22 millions of dollars and they were very concerned
23 about that, those losses.
24   Q.   Eder-Goodman runs a distributor in The
25 State of Connecticut itself; doesn't it?

Page 156

W. Eber

1
2    A.   Correct.
3    Q.   And have you ever proposed to
4 Eder-Goodman that there could be a merger between
5 Eber Connecticut and Eder-Goodman?
6    A.   Have I ever proposed that to them?
7    Q.   Has Eber Metro ever proposed that to
8 them?
9    A.   What do you mean by merger?
10   Q.   A combination of the two companies in
11 some way, shape or form either through merger,
12 through acquisition, through sale of substantially
13 all of the assets or through partnership or a
14 joint venture.
15   A.   Not through those terms, no.  We
16 talked about I think some joint warehousing.
17   Q.   When was that?
18   A.   I don't remember.
19   Q.   What was the response by them to the
20 proposal for joint warehousing?
21   A.   It's complicated because they are two
22 separate companies and their warehousing is not
23 together either and there are some state, I think,
24 liquor laws that prevent that.  So it is kind of a
25 legal.

Page 157

W. Eber

1
2    Q.   Is it fair to say they did not agree
3 to have joint warehousing?
4    A.   I don't think it was possible.  I
5 don't think it was possible.
6    Q.   So other than the joint warehousing
7 proposal, just so the record is clear, you don't
8 recall any discussions between Eber Metro and
9 anyone from Eder-Goodman about a possible
10 combination between the two companies?
11   A.   No.  There was something, a discussion
12 about sales for doing something with the sales
13 force together, but that didn't go anywhere
14 either.
15   Q.   Approximately, when was that
16 discussion?
17   A.   I don't remember.
18   Q.   Was it within the last five years?
19   A.   Last five years like you are saying
20 when?
21   Q.   On the more recent side of things
22 versus the events that we are talking about in --
23   A.   No.  I think it was before the last
24 five years.
25   Q.   And how extensive were those

40 (Pages 154 - 157)

Page 158

W. Eber

1
2 discussions?
3    A.   I don't really remember.  I don't
4 really remember.
5    Q.   Is it fair to say that there was never
6 any discussions between Eber Metro and anyone from
7 Eder-Goodman about a combination where the end
8 result would be a company joint venture
9 partnership that did not involve you and Lester
10 continuing in some management capacity?
11    A.   Say that again?
12    Q.   Is it fair to say that there was never
13 a discussion between anyone from Eber Metro and
14 anyone from Eder-Goodman about the possibility of
15 a combination where you and Lester would no longer
16 be involved in the management of whatever company
17 resulted?
18    A.   Yeah, yes.
19    Q.   That's fair to say?
20    A.   Yes, I believe so, yes.
21    Q.   I am going to show you what was
22 previously marked as Plaintiffs' Exhibit 8 at a
23 previous deposition.
24       I have a couple of extra copies if you
25 guys need one.

Page 159

W. Eber

1
2       This is an affidavit and is dated --
3       MR. CALIHAN:  I can't read it.
4       What exhibit is it?
5       MR. BROOK:  Plaintiffs' Exhibit 8.
6    Sorry.  I don't have the stickers on there.
7    Q.   An affidavit dated December 8, 2011 by
8 Lester Eber Bates number EB 00020413.
9       Do you recognize this document?
10    A.   I am say slow reader.
11       Can I read it?
12       MR. RAMSEY:  Go ahead.  Take your
13    time.
14    Q.   Sure.
15    A.   Okay.
16    Q.   Do you recognize this document?
17    A.   I did see it before, yes.
18    Q.   When did you see it?
19    A.   I think my lawyer showed it to me.
20    Q.   Have you seen it before then?
21    A.   It may have appeared in Harris Beach's
22 papers.
23    Q.   Did you see this affidavit at or
24 around the time that it was signed by Lester?
25    A.   No.

Page 160

W. Eber

1
2    Q.   Were you aware of its existence at
3 that time?
4    A.   No.
5    Q.   Have you discussed this affidavit with
6 Lester since you first became aware of it?
7       MR. RAMSEY:  Outside the presence of
8    counsel.
9    A.   No.  I talked about it with counsel.
10    Q.   What did you think of this affidavit
11 when you first saw it?
12       MR. RAMSEY:  Form.
13    A.   I think it is an administrative error.
14 I don't think this is accurate.  It is a mistake.
15    Q.   Why do you say that?
16    A.   Because it was -- because it says this
17 transfer is being done for no consideration.  It
18 was done for consideration.  The transfer was for
19 consideration.  I just think this was an
20 administrative error that was done for the State
21 Liquor Authority and Canandaigua -- the Consumer
22 Department of Protection.
23    Q.   So do you have any reason to believe
24 that the date on this notarized affidavit is
25 incorrect?

Page 161

W. Eber

1
2    A.   I don't know.  I don't know.  I just,
3 I don't know about when it was done.  I was not
4 involved in it.
5    Q.   And other than thinking that it is
6 incorrect in stating that the transfer is being
7 done for no consideration, is there anything else
8 about this that you think is incorrect?
9    A.   Well, the entity that it was
10 transferred to was Alexbay not Lester Eber LLC.
11 So I like I said, I was not involved in any of
12 this, but it should have been Alexbay LLC.  It was
13 a mistake.
14    Q.   Do you know what Alexbay LLC was named
15 when it was first created?
16    A.   Alexbay LLC.
17    Q.   So you don't know that Alexbay LLC is
18 the same thing as Lester Eber LLC?
19    A.   I wasn't involved in them being -- in
20 Alexbay LLC being formed.  So I think that it
21 should have been Alexbay LLC all along is my
22 understanding.  Like I said, I think this is a
23 typographical error, mistake or something that was
24 just a mistake.
25    Q.   And other than those two mistakes you

41 (Pages 158 - 161)

Page 162

W. Eber

1
2  now identified, are there any other mistakes on
3  this that you believe exist?
4      A.   Let me just read it one more time.
5  Maybe it should be Eber Brothers Wine and Liquor
6  Metro.
7      Q.   You mean it should say the full name
8  of the company?
9      A.   I don't know.  I mean you are asking
10  me.  Maybe it should say Eber Brothers Wine and
11  Liquor Metro Inc.
12      Q.   Is there anything else in terms of the
13  description of the facts that you believe is
14  incorrect on this exhibit?
15      A.   No, I think that's it.
16      Q.   Let's go on to another topic then.
17          Mike Gumaer was a director for Eber
18  Metro and other Eber entities; correct?
19      A.   Yes.
20      Q.   Was he compensated for that role?
21      A.   As a director?
22      Q.   Yes.
23      A.   Well, he was compensated -- he had a
24  retainer as a lawyer.  On a retainer as a lawyer.
25      Q.   So what is your basis for saying he

Page 163

W. Eber

1
2  was on a retainer as a lawyer?
3      A.   That's just my -- actually, that's
4  where I learned what the word retainer meant for a
5  lawyer.  I was just always under the impression
6  even as like someone in high school that he was on
7  retainer, you know, through my childhood.  He was
8  a lawyer for the company.
9      Q.   And I am focusing specifically on the
10  time period from say January 2001 forward.
11          Is it your understanding he was on
12  retainer as a lawyer for Eber Metro during that
13  time?
14      A.   And Eber -- yes, all the Eber
15  companies.  Yes, he was the lawyer.
16      Q.   And was there any sort of retainer or
17  engagement agreement between any of the Eber
18  companies and Mike Gumaer?
19          MR. RAMSEY:  Form.
20      A.   He started working with the Eber
21  companies you know, like maybe in the sixties or
22  seventies.  Before I was born probably.
23      Q.   I am focusing on the time period from
24  2001 forward only.
25      A.   Oh, 2001.  I didn't find one.  I know

Page 164

W. Eber

1
2  we looked for one for you.  I don't believe I -- I
3  didn't find one unless you have it somewhere.
4      Q.   Do you recall seeing when you were
5  gathering documents there were records of payments
6  between Eber entities and -- or from Eber entities
7  to Mike Gumaer?
8          MR. CALIHAN:  From Eber?
9          MR. BROOK:  From various Eber entities
10  to Mike Gumaer.
11      A.   Yes, there were some payments to him.
12      Q.   Did you ever see any payments that
13  said in their description that or memo or in just
14  an associated file that they were for legal
15  services?
16      A.   You have all the accounting records on
17  the hard drives and stuff.  You know all that.  So
18  there maybe something in that, you know.
19          Can we go off the record for a second?
20          MR. RAMSEY:  No.
21      A.   So we sent you all the accounting
22  detail which I did not look through all of that.
23  You know, on the hard drives.  So it may say legal
24  work on that.  I don't specifically -- I didn't
25  specifically look at every single transaction.

Page 165

W. Eber

1
2      Q.   So do you recall what those
3  transactions were typically described as in the
4  various memos and notes?
5      A.   What various notes?
6      Q.   Memos based on a check, for example?
7      A.   I wasn't doing the checks.  You know,
8  I mean I am not -- I wasn't the AP clerk doing
9  that.  I don't know how it was categorized.  It
10  may have been -- you have all the detail.  So I
11  don't know specifically.
12      Q.   Do you have any reason to believe that
13  that detail in those financial documents and
14  accounting documents that were produced to us
15  inaccurately described the basis for payments
16  being made by Eber entities to Mike Gumaer?
17          MR. RAMSEY:  Form.
18          Go ahead.
19      Q.   Sorry.  I don't understand the
20  question.
21          What was the question?
22          MR. BROOK:  Could you please read back
23  the question?
24          (Record read.)
25          MR. CALIHAN:  Objection to form.

42 (Pages 162 - 165)

Page 166

W. Eber

1
2     A.   Just read it one more time.  Sorry.  I
3  am having a hard time with it.
4     Q.   I will rephrase it at this point.
5     A.   I thought it was --
6        MR. RAMSEY:  Let him ask the question.
7     Q.   Do you have any reason to believe that
8  any of the Eber companies financial records
9  describe the relationship between those companies
10 and Mike Gumaer in an inaccurate way?
11       MR. CALIHAN:  Objection to form.
12    A.   What do you mean in an inaccurate way?
13    Q.   Other than -- you said the
14 relationship was an attorney-client relationship;
15 is that right?
16    A.   And yeah, he was an attorney client
17 relationship.  He also was a trustee.  He was a
18 director.
19    Q.   And it was your testimony that he was
20 not paid for his work as director; is that right?
21    A.   It was my understanding that his
22 payments were for on retainer, that there was this
23 retainer that he would get every year as a lawyer.
24    Q.   Who described the payments to Mike
25 Gumaer as a retainer?

Page 167

W. Eber

1
2        MR. RAMSEY:  Form.
3        Go ahead.
4     A.   This is like a recollection from how I
5  learned what the word meant when I was literally
6  in high school.  That he was the lawyer on
7  retainer.  So this is how I...
8     Q.   At some point you learned that Mike
9  Gumaer retired from the active practice of law
10 with Nixon Hargrave; correct?
11    A.   No.
12       MR. RAMSEY:  Form.
13    A.   Well, I mean that he retired from
14 them.
15       Could you repeat that?
16    Q.   I will make it simpler.
17       At some point you were made aware that
18 he was no longer working for Nixon Hargrave;
19 correct?
20       MR. RAMSEY:  Form.
21       MR. RAMSEY:  Form.
22    Q.   He being Mike Gumaer.
23    A.   Yes.  At some point.
24       MR. RAMSEY:  You answered.
25    A.   Yeah.

Page 168

W. Eber

1
2     Q.   So did you have an understanding that
3  he was continuing to be the Eber companies lawyer
4  after he was no longer working with Nixon
5  Hargrave?
6     A.   I thought he was our lawyer, yes.
7     Q.   What was the basis for that
8  understanding?
9     A.   Historically he was a long time lawyer
10 of the companies and you know my grandfather and
11 my father and me and I spoke to him and relied on
12 him as an attorney.
13    Q.   Was he your personal attorney?
14       MR. RAMSEY:  Form.
15    Q.   At any point in time?
16    A.   He, was he my personal attorney?  He
17 may have helped me on my will.
18    Q.   When was that?
19    A.   Or directed me to someone who -- he
20 worked with someone else on my will.
21    Q.   Was it within the last ten years?
22    A.   Maybe before the last ten years.
23    Q.   That's fine.
24    A.   Maybe before the last ten years.
25       MR. RAMSEY:  You have to keep your

Page 169

W. Eber

1
2  voice up.
3     A.   It's been a long day.
4        MR. CALIHAN:  Should we do a break?
5     A.   Thank you.
6        MR. CALIHAN:  The deponent seems
7  tired.
8        THE VIDEOGRAPHER:  This marks the end
9  of media unit number four in the videotaped
10 deposition of Wendy Eber.  We are going off
11 the record.  The time is 3:21.
12       (Recess taken.)
13       THE VIDEOGRAPHER:  This marks the
14 beginning of media unit number five in the
15 videotaped deposition of Wendy Eber.  We are
16 going on the record.  The time is 3:37.
17 BY MR. BROOK:
18    Q.   Let us mark a new exhibit, Plaintiffs'
19 Exhibit 20.
20       (Plaintiffs' Exhibit 20, an e-mail
21 bearing Bates number EB 00031104, marked for
22 identification, as of this date.)
23    Q.   This is an e-mail bearing Bates number
24 EB 00031104.  It appears to have been printed by
25 you Miss Eber.

43 (Pages 166 - 169)

Page 170

W. Eber

1
2      Do you see that?
3      A.   Yes.
4      Q.   It is from Elliot Gumaer, Mike Gumaer
5  to you dated January 9, 2014; correct?
6      A.   Sorry?
7      Q.   It is an e-mail from Mike Gumaer to
8  you dated January 9, 2014; correct?
9      A.   Yes.
10     Q.   And in it it says "Wendy, Happy New
11 Year. I look forward to learning the final year
12 numbers as we work with you to reach the strategic
13 goals. I received a check from Slocum dated
14 December 30 in the amount of thirty five hundred
15 dollars. The check was addressed to me at
16 Nantucket but was mailed to me in Georgia. What
17 is the payment covering in the way of an account
18 payable?  Best to you Mike."
19     Do you see that?
20     A.   Yes.
21     Q.   What was the payment from Slocum that
22 was addressed to Mike Gumaer here?
23     A.   I thought probably something with the
24 retainer where we paid him for legal fees. Every
25 so often the company was paying him for legal

Page 171

W. Eber

1
2  fees.
3      Q.   So check from Slocum, does that mean
4  Eber Connecticut?
5      A.   Yeah, mm-hmm.
6      Q.   So is it your testimony that as of the
7  final part of 2013 because this is referring to a
8  check dated December 30, 2013, that Mike Gumaer
9  was an attorney representing Eber Connecticut?
10     MR. CALIHAN:  Objection to form.
11     A.   He was an attorney representing I
12 think all of the Eber companies. The check was
13 cut from Connecticut though.
14     Q.   So the Connecticut -- Eber Connecticut
15 was paying for Mike Gumaer to represent Eber
16 Brothers Wine and Liquor Corp. even though they
17 were no longer two companies related to each
18 other?
19     MR. RAMSEY:  Form.
20     A.   He was representing all the companies.
21 So partially I mean it would have been all the
22 companies.
23     Q.   Did Eber Connecticut seek any
24 reimbursement from any of the other Eber entities
25 for their share of these legal fees?

Page 172

W. Eber

1
2      A.   Not to my knowledge, no.
3      Q.   Do you know why Mike Gumaer didn't
4  understand what the reason was for this check as
5  referenced in Exhibit 20?
6      A.   No.  You mean what is the payment
7  covering in the way of an account payable?  No.
8      Q.   Did you respond to this e-mail?
9      A.   I don't remember.  I mean I don't
10 remember.
11     Q.   How was this e-mail located for
12 purposes of this litigation?
13     A.   I searched through all the terms that
14 you gave me and also looked at all of his e-mails.
15     Q.   What do you mean by his e-mails?
16     A.   All of Mike's e-mails.
17     Q.   Did you also go through your sent
18 items folder for items you sent to Mike Gumaer?
19     A.   They come up, yeah.
20     Q.   What do you mean they come up?
21     A.   When you search, yes.  It comes up.
22     Q.   So if there was no reply to this
23 e-mail that was produced to us, does that mean
24 there was no reply that you found during your
25 search?

Page 173

W. Eber

1
2      A.   Yeah.
3      Q.   Did anyone else help you with your
4  search of e-mails?
5      A.   No.
6      Q.   Did you keep a record of what search
7  terms you used?
8      A.   I used the search terms that were
9  given in what you requested.
10     Q.   How were those search terms conveyed
11 to you?
12     A.   In a document.  In the documents that
13 were requested.
14     Q.   So you remember a document in which I
15 as plaintiffs' counsel provided search terms for
16 you to use; is that right?
17     MR. RAMSEY:  She is referring to the
18 discovery demands.
19     A.   The discovery demands.
20     Q.   What you are saying is you looked at
21 our discovery demands and based on those you chose
22 search terms to run on your e-mail; is that right?
23     A.   Based on that document I searched the
24 terms, yes.
25     Q.   But you did not keep a record of which

44 (Pages 170 - 173)

W. Eber

1
2 particular terms you searched for based on the
3 discovery demands; is that correct?
4     A.   I did all my searches based on the
5 discovery demands and then there were in your
6 interrogatories I listed more.
7     Q.   But if I asked you to write out a list
8 of which search terms you ran based on our
9 discovery demands, you wouldn't be able to prepare
10 that completely, would you?
11     A.   I would look at your discovery demands
12 and based on that.
13     Q.   So for example, the discovery demands
14 included the word the multiple times.
15         That doesn't mean that you did a
16 search in your e-mail for the word the; correct?
17     A.   No, I did not do a discovery on the,
18 no.
19     Q.   And --
20     A.   But you also asked for Alexbay and I
21 did a discovery.  I am just giving you an example
22 of Alexbay.  Then you asked for it spelled two
23 different ways.  Alexbay is one word and then Alex
24 bay in two different words and I did that.
25     Q.   Mike Gumaer resigned from his position

W. Eber

1
2 as a director of Eber Metro in February 2017.
3     Do you recall that?
4     A.   Somewhere in that neighborhood, yeah.
5     MR. BROOK:  Let's mark this as 21.
6     (Plaintiffs' Exhibit 21, an e-mail
7 dated February 7, 2017 from Wendy to Lester
8 Eber copying Janet Lissow, marked for
9 identification, as of this date.)
10     Q.   So Exhibit 21 unfortunately has its
11 Bates number cut off due to my printer settings I
12 guess.  This is one of those printed up by folks
13 here.  Anyhow, it is an e-mail dated February 7,
14 2017 from you Wendy to Lester Eber copying Janet
15 Lissow and you are forwarding what seems to be a
16 scan; is that correct?
17     A.   Yes.
18     Q.   And the second page is the document
19 that was scanned; is that right?
20     A.   Yes.
21     Q.   And it says I, Elliot W. Gumaer, Jr.,
22 hereby resign from the, and it has three lines,
23 board of directors of Eber Brothers and Co., Inc.,
24 board of managers of Eber Connecticut LLC, board
25 of directors of Eber Brothers Wine and Liquor

W. Eber

1
2 Metro Inc., signed Elliot W Gumaer, Jr."
3     Did I read that correctly?
4     A.   Yes.
5     Q.   How did you get this document from
6 whoever you got it from?  First off, who gave this
7 to you?
8     MR. RAMSEY:  Who gave her the e-mail?
9     MR. BROOK:  Who gave her the scanned
10     document?  Where did it come from?
11     A.   The scanned -- this document he may
12 have mailed it to me.  I don't know.
13     Q.   And had you discussed his resignation
14 with -- had you discussed with Mike his
15 resignation separate from receiving this document?
16     A.   I believe so.  I don't remember.
17     Q.   What did he tell you as far as his
18 reason for resigning?
19     MR. CALIHAN:  I am going to raise an
20     objection not to have her not answer.  I am
21     not objecting to her answering.  I want to
22     put on the record at that point it is very
23     difficult to understand.  I couldn't
24     understand him generally with some
25     exceptions but he had had some medical

W. Eber

1
2 events.
3     MR. RAMSEY:  So with that pending, the
4     question pending is:  Do you have an
5     understanding of why he resigned?
6     MR. BROOK:  That is the question.
7     MR. RAMSEY:  Go ahead.
8     A.   He may have had some health reasons
9 which I recall some conversations with him to
10 where he just had -- it was hard to kind of
11 understand him.
12     MR. BROOK:  I would kindly ask counsel
13     not to coach the witnesses going forward.
14     MR. CALIHAN:  That was not intended as
15     coaching as I think you know.
16     MR. BROOK:  Intentions and products
17     are sometimes different.
18         I would like to just state for the
19     record while tomorrow's witness is outside
20     the room, you have a standing objection on
21     the grounds that he just stated to anything
22     that is said in any deposition going forward
23     regarding what Mike Gumaer said during the
24     last couple of years during his life.  That
25     way it doesn't have to be repeated with

45 (Pages 174 - 177)

Page 178

W. Eber

1
2    other witnesses.
3        MR. CALIHAN:  I am fine with that,
4    yeah.
5  BY MR. BROOK:
6        Q.    After Mike Gumaer resigned, did Eber
7  Metro attempt to find a replacement director?
8        A.    We may have discussed it.
9        Q.    Who is we?
10       A.    Lester and me.
11       Q.    And you made the decision not to find
12  a replacement director; is that right?
13       A.    I don't know if we ever decided
14  anything.
15       Q.    Did you remember something else?
16       A.    Which company were you specifically?
17       Q.    We are still on Eber Metro.
18       A.    Okay.  We may have discussed that.  I
19  don't remember.
20       Q.    But no replacement director was
21  appointed; correct?
22       A.    No.
23       Q.    I would like to now ask you about
24  Slocum and Sons of Maine.
25            Did that have any business dealings

Page 179

W. Eber

1
2  with Eber Metro?
3        A.    No.  I mean well.
4        Q.    In terms of selling products.
5        A.    Can you explain that a little?
6  Between Slocum Maine and Connecticut selling
7  products, yes.  That's the relationship.  Yes.
8        Q.    So Slocum and Sons of Maine sold
9  products to Eber Connecticut; correct?
10       A.    Yes.
11       Q.    And when did that relationship begin
12  with Slocum and Sons of Maine selling products to
13  Eber Connecticut?
14       A.    I don't know.
15       Q.    Has it always been a relationship
16  that's existed during your time as an officer of
17  Eber Metro and Eber Connecticut?
18       A.    I believe so.  I didn't learn about it
19  until 2012 at a later time.
20       Q.    What are the types of products that
21  are sold from Slocum and Sons of Maine to Eber
22  Connecticut?
23       A.    Wine.
24       Q.    Just wine?
25       A.    I believe it is mostly wine.  It may

Page 180

W. Eber

1
2  have some spirits too.
3        Q.    Why is it that Slocum and Sons of
4  Maine is selling products to Eber Connecticut
5  rather than Eber Connecticut buying directly?
6        A.    Okay.  So Slocum and Sons of Maine
7  Inc. is an out of -- it is a registered out of
8  state shipper registered with The State of
9  Connecticut.  So Slocum and Sons Maine Inc.
10  registers itself with the state for a fee.  Some
11  of our smaller suppliers don't want to pay this
12  fee with the state.  So the way they do this is
13  they use an out of state shipper instead of the
14  supplier being an out of state shipper.  Slocum
15  and Sons of Maine Inc. is the out of state shipper
16  and then our smaller suppliers don't have to pay
17  these fees with The State of Connecticut.  It is a
18  passthrough entity.
19       Q.    And is Slocum and Sons of Maine a self
20  sufficient company?  Does it have its own books
21  and records?
22       A.    It has its own books and records, yes.
23       Q.    Does it have any employees?
24       A.    No.
25       Q.    Who operates Slocum and Sons of Maine?

Page 181

W. Eber

1
2        A.    It's a passthrough entity which is
3  maintained by our CFO.
4        Q.    Does the CFO receive any compensation
5  for doing that?
6        A.    No.
7        Q.    So who places orders for Slocum and
8  Sons of Maine to buy products?
9        A.    I don't know all the details.  My
10  understanding is that the purchase order is placed
11  by Connecticut, Eber Connecticut.  The inventory
12  is received into Connecticut.  There is a payment
13  made from Connecticut to Maine and then Maine pays
14  the supplier, but I don't know all of the exact
15  entries made.  It's a passthrough entity where
16  there is no markup.  So it eliminates the supplier
17  from registering with the state as an out of state
18  shipper and they don't have to pay the fee.  Many
19  of our competitors set up similar companies to
20  eliminate this expense for the supplier.
21  RQ        MR. BROOK:  Now to go ahead and just
22            put on the record a request for the general
23            ledger for Eber, I am sorry, for Slocum and
24            Sons.
25       A.    You have it.

46 (Pages 178 - 181)

Page 182

W. Eber

1
2     Q.   Is that one of the recently produced
3  documents?
4     A.   No.  That was produced in August when
5  you required all of our general ledgers for the
6  last ten years for your accountant to review it
7  and it was in a specific format that you gave us
8  which we spent a very long time getting for you.
9          MR. BROOK:  So the witness' answer is
10    noted and my request remains on the record.
11         MR. RAMSEY:  Okay.
12    Q.   So have you ever made any money off of
13 owning a 50 percent of Slocum of Maine?
14    A.   I received one check for ten thousand
15 dollars.
16    Q.   When was that?
17    A.   I believe it was 2013.  That was one
18 check.  But it is essentially a company that
19 doesn't really make or lose money.  It is very
20 immaterial amounts.  You have copies of all the
21 K-1s.
22    Q.   Sure.
23         Now the ten thousand dollar payment to
24 you, that was not reported on a K-1; correct?
25    A.   I am not sure.  No.  That was -- it

Page 183

W. Eber

1
2  may have been.  I don't know the tax.
3     Q.   What was the reason for the ten
4  thousand dollar check to you?
5     A.   I think one -- I don't know.  I don't
6  know.  I don't know.
7     Q.   Was there a ten thousand dollar check
8  for anyone else besides you?
9     A.   I believe Lester got a ten thousand
10 dollar check as well.
11    Q.   Who authorized those checks to be
12 issued?
13    A.   Our CFO Wally Crumb.
14    Q.   Did he keep any records why those
15 checks were issued?
16    A.   He has -- you have all the financial
17 data.  So yes, I believe he has.
18    Q.   Why is it that Slocum and Sons of
19 Maine came to be owned by you and Lester directly
20 rather than being owned by one of the corporate
21 entities such as Eber Metro?
22         MR. CALIHAN:  Objection to form.
23    A.   I don't know.
24    Q.   Since you don't make any money from
25 Slocum of Maine, is there any reason why you

Page 184

W. Eber

1
2  wouldn't be willing to just transfer ownership of
3  Slocum of Maine to Eber Metro with no
4  consideration?
5          MR. RAMSEY:  Form.
6     A.   I don't know if it makes a difference.
7     Q.   Is Slocum of Maine an important part
8  of the Eber Connecticut business?
9          MR. RAMSEY:  Form.
10    A.   I don't believe so, no.
11    Q.   If Slocum of Maine wasn't there to act
12 as the out of state shipper into Connecticut, do
13 you believe that the volume of sales of wine would
14 decrease for Eber Connecticut?
15    A.   No.  What I believe that this is a
16 passthrough entity which is only done to
17 accommodate certain suppliers so they don't have
18 to pay a fee of registering with the state.
19         MR. RAMSEY:  The question was though
20    do you think the volume of wine would
21    decrease?
22         THE WITNESS:  In Connecticut.
23         MR. RAMSEY:  Yes.  If there wasn't a
24    relationship with Slocum of Maine.
25    A.   Do I think no, I mean you could just

Page 185

W. Eber

1
2  another passthrough or something.  I am not
3  entirely certain it is needed.
4          MR. RAMSEY:  Okay.
5     A.   I don't know all the details of the
6  law.  I didn't -- I don't know all the details of
7  the Connecticut state law with regard to wine and
8  spirits.
9     Q.   Is it difficult to become registered
10 as an out of state shipper in Connecticut?
11    A.   I don't know.  As an out of state
12 shipper I don't know.
13    Q.   And that's because Slocum of Maine was
14 already registered when you acquired it; is that
15 right?
16    A.   They were registered, yes.
17    Q.   Are there annual fees or registration
18 forms that need to be filed in connection with
19 maintaining that out of state shipper license?
20    A.   There maybe.  I am not really that
21 involved in it.  Our CFO handles most of it.
22 Handles it.  So I am just not that involved.  It
23 is more administration.
24         MR. BROOK:  Let's go to another
25    exhibit.  I just want to go through a few of

47 (Pages 182 - 185)

Page 186

W. Eber

1
2      these and make sure we know what they are.
3      We are up to 22.  Yes.
4          (Plaintiffs' Exhibit 22, a document
5      that was received in discovery entitled Eber
6      Brothers Wine and Liquor Metro Inc. General
7      Ledger All Transactions, marked for
8      identification, as of this date.)
9      Q.   Exhibit 22 is a document that was
10   received in discovery entitled Eber Brothers Wine
11   and Liquor Metro Inc. General Ledger All
12   Transactions.
13         Do you see that?
14     A.   Yes.
15     Q.   Do you recognize this document?
16     A.   I got it for discovery, for your
17   discovery, yes.
18     Q.   Where did you get it?
19     A.   From Davie Kaplan our accountant.
20     Q.   And you mentioned before Sumner Persol
21   as an accountant too.
22         What's the difference between Davie
23   Kaplan and Sumner Persol in terms of what they
24   have done for Eber Metro?
25     A.   So Davie Kaplan was the accountant and

Page 187

W. Eber

1
2      auditor of all of the Eber entities going back
3      before my time.
4          Sumner Persol actually used to work at
5      Davie Kaplan, but he handled all the taxes for the
6      Eber entities except not the taxes for Slocum of
7      Maine.
8      Q.   Who handled the taxes for Slocum of
9      Maine?
10     A.   I believe it is Bloom Shapiro which is
11   Connecticut auditor, tax accounting firm.
12     Q.   Does Slocum of Maine have any actual
13   locations or operations in The State of Maine?
14     A.   It has a mailbox in Maine.
15     Q.   And nothing else?
16     A.   It has a bank account.  I am not sure
17   if that's a Maine bank account or not.
18     Q.   So --
19     A.   If it is located in Maine or not.
20     Q.   And does it file taxes in The State of
21   Maine?
22     A.   I don't know.  It files taxes.  I
23   don't know if it files in The State of Maine.
24     Q.   I would like you to turn to the very
25   last page on this.  The second line item is

Page 188

W. Eber

1
2      account number 8110 right off of intangible
3      assets.
4          Do you see that?
5      A.   Yes.
6      Q.   And it refers to a general journal
7      entry dated -- that was entered for the date of
8      May 31, 2011.
9          Do you see that?
10     A.   Yes.
11     Q.   It says "To write off intangible
12   assets per Brian Connetta."
13         Do you see that?
14     A.   Yes.
15     Q.   And it refers to a debit of 14 million
16   dollars that appears to have been taken from the
17   goodwill account; is that correct?
18     A.   Yes.
19     Q.   What is that line item about?
20     A.   You know, I am not exactly -- I don't
21   exactly remember.  I have a vague recollection of
22   the intangible asset as being written down
23   possibly from Metro or Connecticut.  I am not
24   sure.  I don't remember all the details around it.
25     Q.   I am not asking for all the details.

Page 189

W. Eber

1
2          What do you remember about the reason
3      why a 14 million dollar adjustment was made in
4      this instance?
5      A.   I don't remember that much about the
6      details.  I do know the companies were in severe
7      financial distress.
8      Q.   And --
9      A.   And I think Brian either worked with
10   Sumner Persol or Davie Kaplan.  So I would have
11   worked with them on that.
12     Q.   So is it typically the case that when
13   an accountant makes an adjustment to your books
14   that the memo will state which particular
15   accountant said to do that?
16     A.   I don't know.  None of these -- I
17   don't know if this was -- I don't know.  I am not
18   really -- I would talk to Davie Kaplan or Sumner
19   about it with more specifics because they would be
20   very well aware, but we were in severe financial
21   distress.
22     Q.   And what does the financial distress
23   have to do with the amount of goodwill that's
24   booked on the balance sheet?
25     A.   You know intangible asset being

48 (Pages 186 - 189)

Page 190

1           W. Eber
2 written down.  It is not what you once thought it
3 was.
4     Q.    So this was recording your change
5 belief in the goodwill value of the Eber
6 Connecticut business; is that correct?
7        MR. RAMSEY:  Form.
8     A.    I don't remember all the details
9 around it.  I would like to look at some of the --
10 I would like to talk to Sumner and Davie Kaplan
11 because I am sure they were involved in it.  I
12 just don't remember.  It's a lot of years.
13        MR. BROOK:  I would just note for the
14     record that we are not asking you to talk to
15     the accountants.  We are anticipating
16     deposing them ourselves and I think it would
17     be our preference if there was not
18     discussions with individuals who are not
19     actively involved in accounting matters that
20     could affect their testimony.
21        MR. RAMSEY:  Noted.
22 BY MR. BROOK:
23     Q.    Do you recall that Davie Kaplan never
24 actually finished preparing a balance sheet or a
25 P&L for Eber Metro for the fiscal year ending May

Page 191

1           W. Eber
2 31, 2012?
3     A.    I don't remember.
4     Q.    Let's mark this and see if it
5 refreshes your recollection.
6        (Plaintiffs' Exhibit 23, an e-mail
7     chain between Wendy Eber and Jeanne
8     Stockmaster on July 29th and 30, 2013,
9     marked for identification, as of this date.)
10     Q.    I am showing you what has been marked
11 as Exhibit 23.  It appears to be an e-mail chain
12 between you and someone named Jeanne Stockmaster
13 on July 29th and 30, 2013.
14        Do you see that?
15     A.    Yes.
16     Q.    Who is Jeanne Stockmaster?
17     A.    Jeanne was a staff accountant who was
18 keeping the books from Davie Kaplan for Eber
19 Brothers companies.
20     Q.    So is she the person that maintained
21 the general ledger that we were just looking at
22 Exhibit 22?
23     A.    I believe so, yes.
24     Q.    And that was maintained on a
25 QuickBooks file?

Page 192

1           W. Eber
2     A.    I believe so.
3     Q.    And do you see that in the second
4 e-mail from the bottom you stated "I need the
5 financial statements i.e., income statement and
6 balance sheet for 2012 for Metro Inc.  Sorry.  Do
7 you have it?  If not that is okay since I have tax
8 return."  And then in response Jeanne said "Oh, no
9 we don't.  We never finished 5/31/12."
10        Do you see that?
11     A.    Yes.
12     Q.    Does that refresh your recollection
13 that Davie Kaplan never completed the books for
14 Eber Metro for the time period June 1, 2011
15 through May 31, 2012?
16     A.    Okay.
17     Q.    Do you now remember that that is what
18 happened?
19     A.    Not -- I mean this is basically saying
20 it.  I don't remember the e-mail, but okay.
21     Q.    Do you know why it was that the
22 accounting records were never completed for that
23 entire fiscal year?
24     A.    Well, there weren't a lot of
25 transactions happening and the companies didn't

Page 193

1           W. Eber
2 have any money.  So you know, basically it was
3 Sumner who was basically doing all of the
4 accounting because it just, you know, it is not a
5 -- these are companies that aren't doing a lot of
6 transactions.  So it might just be taking one
7 balance and nothing happened that year.  So you
8 are just taking that balance and moving it to the
9 next year for the tax return.
10        So I just think that it wasn't, there
11 weren't just a tremendous amount of transactions
12 happening and you know, as you know it was a
13 disaster where there is really no money.  So why
14 would you spend money for someone to do something
15 when nothing is really happening.  You know there
16 was not a lot of transaction.
17     Q.    So for fiscal year ending May 31, 2012
18 and all the years since, is it your testimony that
19 all the accounting for tax purposes was being done
20 by Sumner Persol?
21     A.    He was doing the accounting for -- he
22 was doing this, excuse me.  He was doing the taxes
23 always.  He was always doing the taxes.
24     Q.    But he actually started doing the
25 accounting side of it too; is that correct?

49 (Pages 190 - 193)

Page 194

W. Eber

2    A.   Yes, because there just weren't a lot
3 of transactions.  It was just maintaining balances
4 I think, you know.  So he would have a detail on
5 everything.
6    Q.   And in responding to our discovery
7 requests in this case, did you request the
8 accounting records maintained by Sumner Persol for
9 Eber Metro?
10    A.   I requested all the tax returns from
11 him.  So you would have all the tax returns.
12    Q.   My question was focused on the
13 accounting since that was being done by Sumner
14 Persol.
15    A.   You requested, your requests were
16 specifically for Connecticut where you wanted ten
17 years of data for Connecticut that we put on the
18 hard drive and then you needed a particular format
19 that we then gave that to you for Connecticut.
20 Then you requested, my understanding was the
21 general ledgers like this.  I don't know if he is
22 maintaining general ledgers like this and I don't
23 remember the exact dates but we can get it from
24 him if you want.
25 RQ      MR. BROOK:  I will clarify my request

Page 195

W. Eber

2 that it was general ledger or substantive
3 equivalent for every year preferably done on
4 a annual basis so they can be checked
5 against the tax return numbers.
6       MR. RAMSEY:  Okay.
7    Q.   Even Metro having so few transactions,
8 have you considered simply shutting Eber Metro
9 down and finding another way to structure the
10 organization to avoid having the entity involved
11 at all?
12       MR. RAMSEY:  Form.
13    A.   Have I considered that?
14    Q.   Has Eber Metro considered doing that?
15    A.   Yes.
16    Q.   And why has that not been done?
17    A.   I was on advice of counsel.
18    Q.   And I am not asking for what the
19 advice specifically was, but which counsel are you
20 referring to?
21    A.   What do you mean?
22    Q.   You said advice of counsel.
23       Who are you talking about?
24    A.   John Herbert.
25    Q.   What is the relationship between John

Page 196

W. Eber

2 Herbert and Eber Metro?
3    A.   He is counsel.
4    Q.   So he is you mean by that an attorney?
5    A.   Yeah.
6    Q.   And is he compensated for that work by
7 Eber Metro or another entity?
8    A.   I don't remember.  I may have asked
9 Underberg Kessler as well.
10       MR. BROOK:  I have a bunch of
11    documents here, but we will start with one
12    for now and see how that goes.
13       Mark this as 24.
14       (Plaintiffs' Exhibit 24, a document
15    bearing Bates stamp EB 00020191 entitled
16    Eber Brothers Wine and Liquor Metro Inc.
17    Profit and Loss Collapse June 2007 through
18    May 2008, marked for identification, as of
19    this date.)
20    Q.   Plaintiffs' Exhibit 24 is in front of
21 you.  It is a document bearing Bates stamp EB
22 00020191.  It is entitled Eber Brothers Wine and
23 Liquor Metro Inc. Profit and Loss Collapse June
24 2007 through May 2008.
25       Do you see that?

Page 197

W. Eber

2    A.   Yes.
3    Q.   And is it correct this appears to have
4 been printed on July 31, 2013 in the upper left?
5    A.   I see that date, yeah.
6    Q.   Where did this document come from?
7    A.   I am not sure.  Maybe Davie Kaplan.  I
8 don't know.
9       MR. RAMSEY:  Keep your voice up.
10    A.   I don't know.  I am not sure.  Davie
11 Kaplan.  I am not sure.
12    Q.   And so this is a document.  It
13 indicates there is 1.975,000 dollars in income in
14 that time period June '07 through May '08.
15       Do you see that?
16    A.   Yes.
17    Q.   Do you know what that source of that
18 income was?
19    A.   Not specifically unless you can see
20 the detail accounts.
21    Q.   Are there detail accounts available
22 for that particular year?
23    A.   I don't know.  I mean these aren't
24 audited numbers or anything.  We could -- what
25 year was this?  This was -- this goes back.  So it

50 (Pages 194 - 197)

Page 198

W. Eber

1
2 might be something that you could go back to this
3 document and reconcile it back.
4    Q.   So how do you go about doing that?
5    A.   It's been a long time since I was an
6 auditor Brian.  You want me to look into it and
7 get you, how to reconcile back.  I mean I have an
8 idea of what this maybe, but I am not certain.
9    Q.   So turn to page 10 of Exhibit 22.
10    A.   Yeah.
11    Q.   That's the general ledger?
12    A.   Okay.
13    Q.   You see there is the same account
14 number for income three thousand is towards the
15 bottom of that page?
16    A.   What page?
17    Q.   Page 10.
18    A.   Yes.
19    Q.   And there is a memo there that says
20 "To reverse portion of journal entry-PBC, unsure
21 of nature of adjustment."
22       Do you see that?
23    A.   Yes.
24    Q.   And actually I added in some words,
25 ADJ, the letters ADJ.

Page 199

W. Eber

1
2       Is that likely meaning adjustment in
3 QuickBooks or accounting terms?
4    A.   I don't know.  I have never used
5 QuickBooks.  I don't know.
6    Q.   You were the CFO of the company.
7       How do you understand ADJ?
8    A.   Adjustment.
9    Q.   And so after seeing that memo, does
10 that help you understand where that recorded
11 income is coming from?
12    A.   Maybe from the reversement of this
13 adjustment.  I don't know.  I would refer back to
14 Davie Kaplan and ask them.  I don't know.
15    Q.   Is it correct that for the fiscal year
16 ending May 2008 you were the CFO for Eber Metro?
17    A.   Yes, but I -- wait.  The fiscal year
18 2008.  When did I become the CFO?  I may have not
19 become -- I am not sure when I became the CFO.
20 Was it October of 2008?  I don't remember.
21       MR. RAMSEY:  Do you remember whether
22 you were CFO at the end of 2008?
23       THE WITNESS:  This is May 2008.  I am
24 not -- I think I might have been October.  I
25 am not sure of the exact dates of when I

Page 200

W. Eber

1
2 became the CFO but none of these are audited
3 statements to go on the record.
4       MR. BROOK:  I think since we, as we
5 discussed it was off the record.  We are
6 coming back.  Rob wanted to use a little bit
7 of time to ask some questions today.
8       MR. CALIHAN:  Excuse me?
9       MR. BROOK:  Did you want to use some
10 time today?
11       MR. CALIHAN:  No.  I have two minutes
12 of questions.  I will wait until the end.
13 Thank you.
14       MR. BROOK:  Why don't we go ahead and
15 I think this is a good breaking point to
16 pause for today.
17       (Continued on the next page.)
18
19
20
21
22
23
24
25

Page 201

W. Eber

1
2
3       THE VIDEOGRAPHER:  This marks the end
4 of media unit number five in the videotaped
5 deposition of Wendy Eber.  We are going off
6 the record.  The time is 4:28.
7       (Time Noted:  4:28 p.m.)
8
9
10       WENDY EBER
11
12 Subscribed and sworn to before me
13 this        day of        , 2019.
14
15
16 (Notary Public)        My Commission Expires:
17
18
19
20
21
22
23
24
25

51 (Pages 198 - 201)

Page 202

```
 1
 2           C E R T I F I C A T E
 3 STATE OF NEW YORK   )
                        : ss.
 4 COUNTY OF NEW YORK  )
 5      I, LYNNE D. METZ, a Shorthand Reporter
 6 and a Notary Public within and for the State of
 7 New York, do hereby certify that the foregoing
 8 deposition of WENDY EBER was taken before me on
 9 the 23rd day of January, 2019;
10        That the said witness was duly sworn
11 before the commencement of her testimony; that the
12 said testimony was taken stenographically by me
13 and then transcribed.
14        I further certify that I am not
15 related by blood or marriage to any of the parties
16 to this action or interested directly or
17 indirectly in the matter in controversy; nor am I
18 in the employ of any of the counsel in this
19 action.
20        IN WITNESS WHEREOF, I have hereunto
21 set my hand this 11th day of February, 2019.
22
23
24      LYNNE D. METZ
25
```

Page 203

```
 1
 2 January 23, 2019
 3
 4          I N D E X
 5 WITNESS          EXAMINATION BY     PAGE
 6 WENDY EBER          MR. BROOK        7
 7
 8 ---------- INFORMATION REQUESTS ----------
 9 DIRECTIONS (DI):    None
10 INSERT:             None
11 RULINGS (RL):       None
12 REQUESTS (RQ):      98, 104, 105, 140, 181, 194
13 CERTIFIED (CE):     None
14 MOTIONS (MO):       None
15
16       E X H I B I T S
17 Plaintiffs' Exhibits        For ID
18 Exhibit 10, a copy of the deposition    10
19 notice for today's deposition
20 Exhibit 11, a document that's described  35
21 at the top as current corporate
22 structure of Eber Brothers Wine and
23 Liquor Corporation and its operating
24 affiliates
25 Exhibit 12, a document called Summary    67
```

Page 204

```
 1
 2 of Lester Eber's Payments For
 3 Liabilities of Eber Brothers W and L
 4 Corp. Bates number EB 00020333 as
 5 Plaintiffs' Exhibit 12
 6 Exhibit 13, a document entitled Line of   71
 7 Credit Note bearing Bates numbers EB
 8 00017871 through 73, as well as Bates
 9 numbers KSH 00001 through 3
10 Exhibit 14, a document entitled Stock     96
11 Purchase Agreement Bates stamped
12 EB-00020488 to 492
13 Exhibit 15, a security agreement dated   120
14 as of February 26, 2010 between Eber
15 Brothers Wine and Liquor Corp. And Eber
16 Metro in favor of Lester Eber bearing
17 Bates numbers CNB 000055 through 68
18 Exhibit 16, a copy of a line of credit   126
19 note
20 Exhibit 17, Debt Assumption Agreement    131
21 dated as of February 11, 2011 between
22 Eber Brothers Wine and Liquor and Eber
23 Metro and Lester Eber Bates number CNB
24 000072 through 74
25 Exhibit 18, the amended and restated     143
```

Page 205

```
 1
 2 security agreement with Bates numbers
 3 EB 00018379 through 392
 4 Exhibit 19, board meeting minutes        144
 5 bearing Bates number EB 00016953
 6 Exhibit 20, an e-mail bearing Bates      169
 7 number EB 00031104
 8 Exhibit 21, an e-mail dated February 7,  175
 9 2017 from Wendy to Lester Eber copying
10 Janet Lissow
11 Exhibit 22, a document that was          186
12 received in discovery entitled Eber
13 Brothers Wine and Liquor Metro Inc.
14 General Ledger All Transactions
15 Exhibit 23, an e-mail chain between      191
16 Wendy Eber and Jeanne Stockmaster on
17 July 29th and 30, 2013
18 Exhibit 24, a document bearing Bates     196
19 stamp EB 00020191 entitled Eber
20 Brothers Wine and Liquor Metro Inc.
21 Profit and Loss Collapse June 2007
22 through May 2008
23 (Exhibits retained by counsel.)
24
25
```

52 (Pages 202 - 205)