## LINE OF CREDIT NOTE

$1,500,000                                                October ___, 2009

FOR VALUE RECEIVED, EBER BROS. WINE & LIQUOR METRO, INC., a New York corporation with an address at 155 Paragon Drive, Rochester, New York 14625 ("Maker"), hereby promises to pay to the order of LESTER EBER, an individual with an address at 155 Paragon Drive, Rochester, New York 14625 ("Holder"), the principal sum of ONE MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($1,500,000.00) (the "Maximum Principal Amount") or such lesser or greater amount as may be outstanding hereunder.

1.     Line of Credit.  This Note evidences a revolving line of credit.  Accordingly amounts hereunder may be borrowed, repaid and re-borrowed provided that at no time shall Maker permit the aggregate principal amount of all advances made under this Note to exceed the Maximum Principal Amount.

2.     Interest Rate.  All amounts outstanding under this Note shall bear interest at a rate equal to twelve and one half percent (12.5%) per annum.  Upon the occurrence of an Event of Default (whether or not the Holder has accelerated payment of the outstanding balance due hereunder), or after maturity or after judgment has been rendered with respect to the obligations hereunder, the unpaid principal balance, at the option of Holder, shall bear interest at a rate equal to fifteen percent (15%).  The right of the Holder to receive such increased rate of interest shall not constitute a waiver of any other right or remedy of the Holder.  All interest shall be calculated based on 360 day year and the actual number of days elapsed.

3.     Payments.  Accrued interest will be due and payable in arrears on December 1, 2009 and on the first day of each March, June, September and December thereafter (each an "Interest Payment Date") and on the Maturity Date, as hereinafter defined.  Notwithstanding the foregoing, on each Interest Payment Date, at the request of Maker all or such portion of the interest then due and owing specified by Maker shall be added to the principal amount hereof instead of paying such interest in cash, whereupon such amount will bear interest at rate per annum specified herein.  Maker hereby agrees, upon the request of Holder, to amend this Note or execute one or more new notes in the form hereof to reflect any increase in the principal sum hereof resulting from the addition of the accrued interest to the principal; provided, however that the failure to so amend this Note or to enter into one or more new notes shall not relieve Maker of its obligation to pay such accrued interest in accordance with the terms hereof.  All amounts remaining outstanding hereunder, including all principal and interest, shall become due and payable in full on December 31, 2011 (the "Maturity Date").

4.     Late Charge.  If the entire amount of any required payment is not paid in full within five (5) days after the same is due, the Maker shall pay to Holder a late fee equal to two percent (2%) of the amount of the payment that remains unpaid.

5.     Prepayment.  Maker shall have the option of paying the amounts outstanding under this Note to Holder, in full or part, at any time and from time to time without any premium or penalty.

134762 1237716.1



PLAINTIFF'S
EXHIBIT
_13_
1/23/19
PENGAD 800-631-6989

KSH00001

EB-00017871

6.     Request for Advances; Discretionary Facility. At any time and from time to time Maker may make a request for a loan that specifies (a) the amount requested as the principal amount of such loan and (b) the business day of Holder on which such loan is requested to be made which shall not be less than three (3) days from the date of such notice. The decision whether to honor such loan request and make such loan shall be in the sole discretion of Holder. Holder may treat as made by Maker and rely upon, and Maker shall be bound by, any loan request that Holder in good faith believes to be valid and to have been made in the name or on behalf of Maker by any officer of Maker, and Holder shall not incur any liability to Maker or any other person as a direct or indirect result of honoring such loan request and making such loan.

7.     Events of Default/Remedies. At the option of Holder, all amounts outstanding under this Note shall become immediately due and payable in full, without further presentment, protest, notice, or demand, upon the happening of any Event of Default. Upon the occurrence of an Event of Default, Holder shall be entitled to exercise any legal or equitable right which he or it may have, and may proceed to protect and enforce its rights by any other appropriate proceedings. The following events shall constitute "Events of Default" under this Note:

> a.  *Nonpayment.* Failure of Maker to make any payment of any type within fifteen (15) days after the same becomes due and payable.
>
> b.  *Financial Difficulties.* Financial difficulties of Maker as evidenced by:
>
>> i.   the filing of a voluntary or involuntary petition in bankruptcy, or under any chapters of the Bankruptcy Code, or under any federal or state statute providing for the relief of debtors;
>>
>> ii.  making an assignment for the benefit of creditors;
>>
>> iii. consenting to the appointment of a trustee or receiver for all or a major part of any of Maker's property;
>>
>> iv.  the entry of a court order appointing a receiver or a trustee for all or a major part of Maker's property; or
>>
>> v.   the admission by Maker in writing of the Maker's inability to pay its debts as they become due.
>
> c.  *Change of Control.* Maker enters into any agreement pursuant to which Maker will sell all or substantially all of the assets of Maker, or upon the closing of any transaction or series of related transactions in which more than fifty percent (50%) of the issued and outstanding shares of capital stock of the Maker are issued to, or acquired by, any one or more persons or entities who are not shareholders of the Maker as of the date of this Note.
>
> d.  *Cease Operations.* Maker ceases all ongoing business operations.
>
> e.  *Sale of Eber-Connecticut, LLC.* Eber-Connecticut, LLC ("Eber-CT")

134782 1237719.1                                    2

KSH00002

EB-00017872

enters into any agreement pursuant to which Eber-CT will sell all or substantially all of the assets of Eber-CT, or upon the closing of any transaction or series of related transactions in which more than fifty percent (50%) of the issued and outstanding units of membership interest of the Maker are issued to, or acquired by, any one or more persons or entities who are not controlled by or under common control with the Maker.

8.  **Expenses.** Maker shall pay to Holder all amounts incurred by Holder, including without limitation attorneys' fees and disbursements, in order to collect any amount due under this Note, to negotiate or document a workout or restructuring, or to preserve its rights hereunder, whether or not any legal proceeding ins commenced.

9.  **Holder's Records Conclusive.** Holder shall maintain a record of the date and original principal amount of each advance made by him hereunder and the date and amount of each payment to be applied to the outstanding principal amount of this Note. Such records shall be conclusive evidence of the outstanding principal amount under this Note and of all advances hereunder, absent manifest error. No failure by Holder to make any such annotation in its records shall affect Maker's obligation to pay the principal and interest of each advance or any other obligation of Maker hereunder.

10. **Subordination.** All amounts outstanding under this Note are subordinate to any and all amounts owed by the Maker to The Canandaigua National Bank and Trust Company.

11. **Miscellaneous.** The terms of this Note cannot be changed, nor may this Note be discharged in whole or in part, except by a writing executed by Holder. No delay or omission by Holder in exercising any rights hereunder shall operate as a waiver of such rights. This Note shall be governed by and construed under the laws of the State of New York.

IN WITNESS WHEREOF, Maker has duly executed this Note as of the day and year first above written.

EBER BROS. WINE & LIQUOR METRO, INC.

By: _____

Lester Eber, Chief Executive Officer

By: _____

Wendy Eber, Chief Financial Officer

Accepted:

_____

Lester Eber

{3782 1237719.1

3

KSH00003

EB-00017873

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "**Agreement**") is made and entered into as of _February 26_ ___, 2010 by **EBER BROS. WINE AND LIQUOR CORPORATION** ("**Parent**") and **EBER BROS. WINE & LIQUOR METRO, INC.** ("**Metro**"; Parent and Metro, individually and collectively, "**Debtor**") in favor of **LESTER EBER** ("**Secured Party**").

1.      THE SECURITY. Debtor hereby assigns and grants to Secured Party a security interest in the following described property now owned or hereafter acquired by Debtor ("**Collateral**"):

(a)      All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles, including all amounts due to Debtor from a factor; and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.

(b)      All inventory, including all materials, work in process and finished goods.

(c)      All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by Debtor.

(d)      All of Debtor's deposit accounts. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

(e)      All instruments, notes, chattel paper, documents, certificates of deposit, securities and investment property of every type. The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing.

(f)      All general intangibles, including, but not limited to, (i) all patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems. The Collateral shall include all good will connected with or symbolized by any of such general intangibles; all contract rights, documents, applications, licenses, materials and other matters related to such general intangibles; all tangible property embodying or incorporating any such general intangibles; and all chattel paper and instruments relating to such general intangibles.

(g)      The shares of common stock and preferred stock, or partnership, membership and other ownership interests, now or hereafter owned by Debtor, including, without limitation, any membership interest in Eber-Connecticut, LLC now or hereafter

~Doc# 1142595~

PLAINTIFF'S
EXHIBIT
15
1/23/19
PENGAD 800-631-6989

CNB000055

owned, directly or indirectly, by Metro and Parent and any ownership interests in Metro now or hereafter owned by Parent (collectively, the **"Pledged Equity"**), and all certificates evidencing the same, together with, in each case, all shares, securities, monies or property representing a dividend on any of the Pledged Equity, or representing a distribution or return of capital upon or in respect of the Pledged Equity, or resulting from a split up, revision, reclassification or other like change of the Pledged Equity or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Equity (the Pledged Equity, together with all other certificates, shares, securities, properties, ownership interests, or moneys, dividends, distributions, returns of capital subscription, warrants, rights or options as may from time to time be pledged hereunder pursuant to this clause being herein collectively called the **"Equity Collateral"**).

        (h)     All negotiable and nonnegotiable documents of title covering any Collateral.

        (i)     All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

        (j)     All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral, and all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the Collateral and sums due from a third party which has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

        (k)     All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory (**"Books and Records"**).

        2.     INDEBTEDNESS. The Collateral secures all Indebtedness.

**"Guaranty"** means that certain Guaranty dated as of the date hereof executed by the Metro in favor of Secured Party, as amended, restated, supplemented or otherwise modified from time to time.

**"Indebtedness"** means any and all debts, liabilities, and obligations of Debtor to Secured Party arising under the Transaction Documents, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Secured Party by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Secured Party for its own account or as agent for another or others, whether Debtor may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter

~Doc# 1142595~

**CNB000056**

become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, any and all obligations of Debtor to Secured Party for reasonable attorneys' fees and all other costs and expenses incurred by Secured Party in the collection or enforcement of any debts, liabilities, and obligations of Debtor to Secured Party.

"**Note**" means that certain Line of Credit Note dated as of ⟨Feb 26, 2010⟩ executed by Metro in favor of Secured Party in the maximum principal amount of $1,500,000 as amended, restated, supplemented or otherwise modified from time to time.

"**Transaction Documents**" means the Note, the Guaranty, this Agreement and each other document, instrument and agreement executed in connection therewith.

Capitalized terms used but not defined herein have the meanings given such terms in the Note.

3.      DEBTOR'S COVENANTS. Debtor represents, covenants and warrants that unless compliance is waived by Secured Party in writing:

(a)      Debtor will properly preserve the Collateral; defend the Collateral against any adverse claims and demands; and keep accurate Books and Records.

(b)      Debtor shall give Secured Party at least thirty (30) days notice before changing its chief executive office or state of incorporation or organization. Debtor will notify Secured Party in writing prior to any change in the location of any Collateral, including the Books and Records.

(c)      Debtor will notify Secured Party in writing prior to any change in Debtor's name, identity or business structure.

(d)      Except for liens existing on the date hereof, Debtor has not granted and will not grant any security interest in any of the Collateral except to Secured Party, and will keep the Collateral free of all liens, claims, security interests and encumbrances of any kind or nature except the security interest of Secured Party.

(e)      Debtor will promptly notify Secured Party in writing of any event which materially and adversely affects the value of the Collateral, the ability of Debtor or Secured Party to dispose of the Collateral, or the rights and remedies of Secured Party in relation thereto, including, but not limited to, the levy of any legal process against any Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise.

(f)      Debtor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect Secured Party's security interest (collectively, the "**Collateral Costs**"). Without waiving Debtor's default for failure to make any such payment, Secured Party at its option may

- 3 -

**CNB000057**

pay any such Collateral Costs, and discharge encumbrances on the Collateral, and such Collateral Costs payments shall be a part of the Indebtedness and bear interest at the rate set out in the Indebtedness. Debtor agrees to reimburse Secured Party on demand for any Collateral Costs so incurred.

(g)     Until Secured Party exercises its rights to make collection, Debtor will diligently collect all Collateral.

(h)     If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading Debtor shall immediately deliver such document to Secured Party, together with any necessary endorsements.

(i) Debtor will not sell, lease, agree to sell or lease, or otherwise dispose of any Collateral except with the prior written consent of Secured Party; provided, however, that Debtor may sell inventory in the ordinary course of business.

(j)     Debtor will maintain and keep in force all risk insurance covering the Collateral against fire, theft, liability and extended coverages (including without limitation windstorm coverage and hurricane coverage as applicable), to the extent that any Collateral is of a type which can be so insured. Such insurance shall be in form, amounts, coverages and basis reasonably acceptable to Secured Party, shall require losses to be paid on a replacement cost basis, shall be issued by insurance companies acceptable to Secured Party and, upon request of Secured Party, include a loss payable endorsement in favor of Secured Party in a form acceptable to Secured Party. Upon the request of Secured Party, Debtor will deliver to Secured Party a copy of each insurance policy, or, if permitted by Secured Party, a certificate of insurance listing all insurance in force.

(k)     Debtor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless Debtor first obtains the written consent of any owner, holder of any lien on the real property or fixture, or other person having an interest in such property to the removal by Secured Party of the Collateral from such real property or fixture. Such written consent shall be in form and substance acceptable to Secured Party and shall provide that Secured Party has no liability to such owner, holder of any lien, or any other person.

(l)     Exhibit A to this Agreement is a complete list of all patents, trademark and service mark registrations, copyright registrations, mask work registrations, and all applications therefor, in which Debtor has any right, title, or interest, throughout the world. Debtor will promptly notify Secured Party of any acquisition (by adoption and use, purchase, license or otherwise) of any patent, trademark or service mark registration, copyright registration, mask work registration, and applications therefor, and unregistered trademarks and service marks and copyrights, throughout the world, which are granted or filed or acquired after the date hereof or which are not listed on the Exhibit. Debtor authorizes Secured Party, without notice to Debtor, to modify this Agreement by amending the Exhibit to include any such Collateral.

- 4 -

~Doc# 1142595~

CNB000058

(m)     Debtor will, at its expense, diligently prosecute all patent, trademark or service mark or copyright applications pending on or after the date hereof, will maintain in effect all issued patents and will renew all trademark and service mark registrations, including payment of any and all maintenance and renewal fees relating thereto, except for such patents, service marks and trademarks that are being sold, donated or abandoned by Debtor pursuant to the terms of its intellectual property management program. Debtor will at its expense protect and defend all rights in the Collateral against any material claims and demands of all persons  and will, at its expense, enforce all rights in the Collateral against any and all infringers of the Collateral where such infringement would materially impair the value or use of the Collateral to Debtor or Secured Party. Debtor will not license or transfer any of the Collateral, except for such non-exclusive licenses as are customary in the ordinary course of Debtor's business, or except with Secured Party's prior written consent.

4.     ADDITIONAL REQUIREMENTS. Debtor agrees that Secured Party may at its option at any time, whether or not Debtor is in default:

(a)     Require Debtor to deliver to Secured Party (i) copies of or extracts from the Books and Records, and (ii) information on any contracts or other matters affecting the Collateral.

(b)     Examine the Collateral, including the Books and Records, and make copies of or extracts from the Books and Records, and for such purposes enter at any reasonable time upon the property where any Collateral or any Books and Records are located.

(c)     Require Debtor to deliver to Secured Party any instruments, chattel paper or letters of credit which are part of the Collateral, and to assign to Secured Party the proceeds of any such letters of credit.

(d)     Notify any account debtors, any buyers of the Collateral, or any other persons of Secured Party's interest in the Collateral.

5.     DEFAULTS.  Any one or more of the following shall be a default hereunder:

(a)     Debtor breaches any term, provision, warranty or representation under this Agreement, or under any other obligation of Debtor to Secured Party, and such breach remains uncured after any applicable cure period.

(b)     Secured Party fails to have a perfected and enforceable lien on or security interest in the Collateral.

(c)     Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

- 5 -

CNB000059

(d)     Debtor has given Secured Party any false or misleading information or representations.

(e)     A default or Event of Default occurs under the Note, the Guaranty or any other Transaction Document.

6.     SECURED PARTY'S REMEDIES AFTER DEFAULT. In the event of any default, Secured Party may do any one or more of the following, to the extent permitted by law:

(a)     Declare any Indebtedness immediately due and payable, without notice or demand.

(b)     Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

(c)     Enforce the security interest of Secured Party in any account of Debtor maintained with Secured Party by applying such account to the Indebtedness.

(d)     Require Debtor to obtain Secured Party's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral consisting of inventory.

(e)     Require Debtor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Secured Party in kind.

(f)     Require Debtor to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under Secured Party's exclusive control.

(g)     Require Debtor to assemble the Collateral, including the Books and Records, and make them available to Secured Party at a place designated by Secured Party.

(h)     Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of Debtor's equipment, if Secured Party deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(i)     Demand and collect any payments on and proceeds of the Collateral.  In connection therewith Debtor irrevocably authorizes Secured Party to endorse or sign Debtor's name on all checks, drafts, collections, receipts and other

~Doc# 1142595~

CNB000060

documents, and to take possession of and open the mail addressed to Debtor and remove therefrom any payments and proceeds of the Collateral.

(j)     Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to Debtor.

(k)     Use or transfer any of Debtor's rights and interests in any Intellectual Property now owned or hereafter acquired by Debtor, if Secured Party deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. Debtor agrees that any such use or transfer shall be without any additional consideration to Debtor. As used in this paragraph, "**Intellectual Property**" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which Debtor has any right or interest, whether by ownership, license, contract or otherwise.

(l)     Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. Debtor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(m)     Take such measures as Secured Party may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and Debtor hereby irrevocably constitutes and appoints Secured Party as Debtor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(n)     Without notice or demand to Debtor, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by Secured Party or any of Secured Party's agents or affiliates to or for the credit of the account of Debtor or any guarantor or endorser of Debtor's Indebtedness.

(o)     Assign, sell or otherwise dispose of and deliver all or any part of the Equity Collateral, at public or private sale or otherwise, either with or without special conditions or stipulations, for cash or on credit or for future delivery, in such other consideration and at such time or times and at such place or places, and upon such terms and conditions as shall be commercially reasonable and in accordance with all applicable laws.

(p)     Exercise any other remedies available to Secured Party at law or in equity.

The proceeds of any sale, lease or other disposition of the Collateral hereunder shall be applied first, to the expenses of retaking, holding, storing, processing and

- 7 -

CNB000061

preparing for sale, selling, and the like (including, without limitation, any taxes, fees and other costs incurred in connection therewith) of the Collateral, second, to the attorneys' fees and expenses, and then to satisfaction of the Indebtedness to the Secured Party (in such manner as Secured Party shall elect in its discretion), and to the payment of any other amounts required by applicable law.

Debtor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "**1933 Act**") and applicable state securities laws, Secured Party may be compelled, with respect to any sale of all or any part of the Equity Collateral conducted without prior registration or qualification of such Equity Collateral under the 1933 Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Equity Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Debtor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the 1933 Act) and, notwithstanding such circumstances, Debtor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Equity Collateral for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the 1933 Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.

For the purpose of enabling Secured Party, during the continuance of an Event of Default, to exercise rights and remedies under this Section at such time as Secured Party shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, Debtor hereby grants to Secured Party, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to Debtor) to use, license or sublicense any of the Intellectual Property now owned or hereafter acquired by Debtor, wherever the same may be located.

7.    ENVIRONMENTAL MATTERS.

(a)    Debtor represents and warrants: (i) it is not in violation of any health, safety, or environmental law or regulation regarding hazardous substances and (ii) it is not the subject of any claim, proceeding, notice, or other communication regarding hazardous substances. "**Hazardous substances**" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

(b)    Debtor shall deliver to Secured Party, promptly upon receipt, copies of all notices, orders, or other communications regarding (i) any enforcement

- 8 -

CNB000062

action by any governmental authority relating to health, safety, the environment, or any hazardous substances with regard to Debtor's property, activities, or operations, or (ii) any claim against Debtor regarding hazardous substances.

(c)     Secured Party and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to Debtor, to enter and visit any locations where the Collateral is located for the purposes of observing the Collateral, taking and removing environmental samples, and conducting tests.  Debtor shall reimburse Secured Party on demand for the costs of any such environmental investigation and testing. Secured Party will make reasonable efforts during any site visit, observation or testing conducted pursuant to this paragraph to avoid interfering with Debtor's use of the Collateral.  Secured Party is under no duty to observe the Collateral or to conduct tests, and any such acts by Secured Party will be solely for the purposes of protecting Secured Party's security and preserving Secured Party's rights under this Agreement. No site visit, observation or testing or any report or findings made as a result thereof (**"Environmental Report"**) will (i) result in a waiver of any default of Debtor; (ii) impose any liability on Secured Party; or (iii) be a representation or warranty of any kind regarding the Collateral (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness).  In the event Secured Party has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to Debtor or any other party, Debtor authorizes Secured Party to make such a disclosure.  Secured Party may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in Secured Party's judgment. Debtor further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to Debtor by Secured Party or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of Debtor) by Debtor without advice or assistance from Secured Party.

(d)     Debtor will indemnify and hold harmless Secured Party from any loss or liability Secured Party incurs in connection with or as a result of this Agreement, which directly or indirectly arises out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance.  This indemnity will apply whether the hazardous substance is on, under or about Debtor's property or operations or property leased to Debtor.  The indemnity includes but is not limited to attorneys' fees (including the reasonable estimate of the allocated cost of in-house counsel and staff). The indemnity extends to Secured Party, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys and assigns.

8.     CONSENT TO JURISDICTION.  DEBTOR AND SECURED PARTY HEREBY AGREE THAT THE FEDERAL COURT OF THE WESTERN DISTRICT OF NEW YORK OR, AT THE OPTION OF SECURED PARTY, ANY COURT LOCATED IN THE STATE OF NEW YORK SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN DEBTOR AND SECURED PARTY PERTAINING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER

- 9 -

CNB000063

CAUSE OR DISPUTE WHATSOEVER BETWEEN DEBTOR AND SECURED PARTY OF ANY KIND OR NATURE.   DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURTS, HEREBY WAIVING PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREEING THAT SERVICE OF SUCH SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED ADDRESSED TO DEBTOR AT THE ADDRESS OF DEBTOR FOR NOTICES SET FORTH HEREIN. SHOULD DEBTOR FAIL TO APPEAR OR ANSWER ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THIRTY DAYS AFTER THE MAILING THEREOF, IT SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED AGAINST IT AS PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS.   THE CHOICE OF FORUM SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE BRINGING OF ANY ACTION BY SECURED PARTY OR THE ENFORCEMENT BY SECURED PARTY OF ANY JUDGMENT OBTAINED IN SUCH FORUM IN ANY OTHER APPROPRIATE JURISDICTION. FURTHER, DEBTOR HEREBY WAIVES THE RIGHT TO ASSERT THE DEFENSE OF FORUM NON CONVENIENS AND THE RIGHT TO CHALLENGE THE VENUE OF ANY COURT PROCEEDING.

9.     WAIVER OF JURY TRIAL. DEBTOR AND SECURED PARTY EACH WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS AGREEMENT, THE NOTE, THE GUARANTY OR ANY TRANSACTION DOCUMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. DEBTOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST SECURED PARTY OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

10.     MISCELLANEOUS.

(a)     Any waiver, express or implied, of any provision hereunder and any delay or failure by Secured Party to enforce any provision shall not preclude Secured Party from enforcing any such provision thereafter.

(b)     Debtor shall, at the request of Secured Party, execute such other agreements, documents, instruments, or financing statements in connection with this Agreement as Secured Party may reasonably deem necessary.

- 10 -

CNB000064

(c)     All notes, security agreements, subordination agreements and other documents executed by Debtor or furnished to Secured Party in connection with this Agreement must be in form and substance satisfactory to Secured Party.

(d)     This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of laws principles which would require the application of the laws of a different state.

(e)     All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(f)     All terms not defined herein are used as set forth in the Uniform Commercial Code as in effect in any applicable jurisdiction.

(g)     In the event of any action by Secured Party to enforce this Agreement or to protect the security interest of Secured Party in the Collateral, or to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, Debtor agrees to pay immediately the costs and expenses thereof, together with reasonable attorneys' fees and allocated costs for in-house legal services to the extent permitted by law.

(h)     In the event Secured Party seeks to take possession of any or all of the Collateral by judicial process, Debtor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action.

(i)     This Agreement shall constitute a continuing agreement, applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this Agreement, and if all transactions between Secured Party and Debtor shall be closed at any time, shall be equally applicable to any new transactions thereafter.

(j)     Secured Party's rights hereunder shall inure to the benefit of its successors and assigns. In the event of any assignment or transfer by Secured Party of any of the Indebtedness or the Collateral, Secured Party thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Indebtedness or the Collateral not so assigned or transferred. All representations, warranties and agreements of Debtor if more than one are joint and several and all shall be binding upon the personal representatives, heirs, successors and assigns of Debtor.

(k)     Any notice to be given hereunder shall be given in the manner prescribed in the Guaranty or the Note, as applicable.

- 11 -

~Doc# 1142595~

CNB000065

11.    FINAL AGREEMENT.   BY SIGNING THIS AGREEMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS AGREEMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

- 12 -

~Doc# 1142595~

**IN WITNESS WHEREOF,** the parties executed this Agreement as of the date first written above, intending to create an instrument executed under seal.

**EBER   BROS.   WINE   AND   LIQUOR CORPORATION**

By: _Wendy Eber_

Title: _CEO_

(Seal)

**EBER BROS. WINE & LIQUOR METRO, INC.**

By: _Wendy Eber_

Title: _CEO_

(Seal)

Accepted:

_Lester Eber_

**LESTER EBER**

- 13 -

CNB000067

Exhibit A

Intellectual Property

~Doc# 1142595~

CNB000068

## LINE OF CREDIT NOTE

$1,500,000                                                     February 26 , 2010

FOR VALUE RECEIVED, EBER BROS. WINE & LIQUOR METRO., INC., a New York corporation with an address at 155 Paragon Drive, Rochester, New York 14625 ("Maker"), hereby promises to pay to the order of LESTER EBER, an individual with an address at 155 Paragon Drive, Rochester, New York 14625 ("Holder"), the principal sum of ONE MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($1,500,000.00) (the "Maximum Principal Amount") or such lesser or greater amount as may be outstanding hereunder.

1.       Line of Credit. This Note evidences a revolving line of credit. Accordingly amounts hereunder may be borrowed, repaid and re-borrowed provided that at no time shall Maker permit the aggregate principal amount of all advances made under this Note to exceed the Maximum Principal Amount.

2.       Interest Rate. All amounts outstanding under this Note shall bear interest at a rate equal to twelve and one half percent (12.5%) per annum. Upon the occurrence of an Event of Default (whether or not the Holder has accelerated payment of the outstanding balance due hereunder), or after maturity or after judgment has been rendered with respect to the obligations hereunder, the unpaid principal balance, at the option of Holder, shall bear interest at a rate equal to fifteen percent (15%). The right of the Holder to receive such increased rate of interest shall not constitute a waiver of any other right or remedy of the Holder. All interest shall be calculated based on 360 day year and the actual number of days elapsed.

3.       Payments. Accrued interest will be due and payable in arrears on December 1, 2009 and on the first day of each March, June, September and December thereafter (each an "Interest Payment Date") and on the Maturity Date, as hereinafter defined. Notwithstanding the foregoing, on each Interest Payment Date, at the request of Maker all or such portion of the interest then due and owing specified by Maker shall be added to the principal amount hereof instead of paying such interest in cash, whereupon such amount will bear interest at rate per annum specified herein. Maker hereby agrees, upon the request of Holder, to amend this Note or execute one or more new notes in the form hereof to reflect any increase in the principal sum hereof resulting from the addition of the accrued interest to the principal; provided, however that the failure to so amend this Note or to enter into one or more new notes shall not relieve Maker of its obligation to pay such accrued interest in accordance with the terms hereof. All amounts remaining outstanding hereunder, including all principal and interest, shall become due and payable in full on December 31, 2011 (the "Maturity Date").

4.       Late Charge. If the entire amount of any required payment is not paid in full within five (5) days after the same is due, the Maker shall pay to Holder a late fee equal to two percent (2%) of the amount of the payment that remains unpaid.

5.       Prepayment. Maker shall have the option of paying the amounts outstanding under this Note to Holder, in full or part, at any time and from time to time without any premium or penalty.

134782 1237719.1

PLAINTIFF'S
EXHIBIT
16
1/23/19

CNB000040

6.   Request for Advances; Discretionary Facility.   At any time and from time to time Maker may make a request for a loan that specifies (a) the amount requested as the principal amount of such loan and (b) the business day of Holder on which such loan is requested to be made which shall not be less than three (3) days from the date of such notice. The decision whether to honor such loan request and make such loan shall be in the sole and absolute discretion of Holder and Holder shall have no obligation or commitment to make any loans hereunder. Holder may treat as made by Maker and rely upon, and Maker shall be bound by, any loan request that Holder in good faith believes to be valid and to have been made in the name or on behalf of Maker by any officer of Maker, and Holder shall not incur any liability to Maker or any other person as a direct or indirect result of honoring such loan request and making such loan.

7.   Events of Default/Remedies.   At the option of Holder, all amounts outstanding under this Note shall become immediately due and payable in full, without further presentment, protest, notice, or demand, upon the happening of any Event of Default. Upon the occurrence of an Event of Default, Holder shall be entitled to exercise any legal or equitable right which he or it may have, and may proceed to protect and enforce its rights by any other appropriate proceedings. The following events shall constitute "Events of Default" under this Note:

   a.   *Nonpayment.*   Failure of Maker to make any payment of any type within fifteen (15) days after the same becomes due and payable.

   b.   *Financial Difficulties.*   Financial difficulties of Maker or any guarantor hereof as evidenced by:

      i.   the filing of a voluntary or involuntary petition in bankruptcy, or under any chapters of the Bankruptcy Code, or under any federal or state statute providing for the relief of debtors;

      ii.   making an assignment for the benefit of creditors;

      iii.   consenting to the appointment of a trustee or receiver for all or a major part of any of Maker's or such guarantor's property;

      iv.   the entry of a court order appointing a receiver or a trustee for all or a major part of Maker's or such guarantor's property; or

      v.   the admission by Maker or any guarantor in writing of the Maker's or such guarantor's inability to pay its debts as they become due.

   c.   *Change of Control.*   Maker or any guarantor hereof enters into any agreement pursuant to which Maker or such guarantor will sell all or substantially all of the assets of Maker or such guarantor, or upon the closing of any transaction or series of related transactions in which more than fifty percent (50%) of the issued and outstanding shares of capital stock of the Maker or such guarantor are issued to, or acquired by, any one or more persons or entities who are not shareholders of the Maker or such guarantor as of the date of this Note.

CNB000041

d. *Cease Operations.* Maker ceases all ongoing business operations.

e. *Sale of Eber-Connecticut, LLC.* Eber-Connecticut, LLC ("Eber-CT") enters into any agreement pursuant to which Eber-CT will sell all or substantially all of the assets of Eber-CT, or upon the closing of any transaction or series of related transactions in which more than fifty percent (50%) of the issued and outstanding units of membership interest of the Maker are issued to, or acquired by, any one or more persons or entities who are not controlled by or under common control with the Maker

f. The occurrence of a breach or default under any guaranty, security agreement or any other document, instrument or agreement executed in connection herewith or providing security or other credit support for the obligations of the Maker hereunder.

8.   Expenses. Maker shall pay to Holder all amounts incurred by Holder, including without limitation attorneys' fees and disbursements, in order to collect any amount due under this Note, to negotiate or document a workout or restructuring, or to preserve its rights hereunder, whether or not any legal proceeding ins commenced.

9.   Holder's Records Conclusive. Holder shall maintain a record of the date and original principal amount of each advance made by him hereunder and the date and amount of each payment to be applied to the outstanding principal amount of this Note. Such records shall be conclusive evidence of the outstanding principal amount under this Note and of all advances hereunder, absent manifest error. No failure by Holder to make any such annotation in its records shall affect Maker's obligation to pay the principal and interest of each advance or any other obligation of Maker hereunder.

10.   Subordination. All amounts outstanding under this Note are subordinate to any and all amounts owed by the Maker to The Canandaigua National Bank and Trust Company.

11.   Miscellaneous. The terms of this Note cannot be changed, nor may this Note be discharged in whole or in part, except by a writing executed by Holder. No delay or omission by Holder in exercising any rights hereunder shall operate as a waiver of such rights. This Note shall be governed by and construed under the laws of the State of New York.

[Signatures are on the next page.]

CNB000042

IN WITNESS WHEREOF, Maker has duly executed this Note as of the day and year first above written.

EBER BROS. WINE & LIQUOR METRO, INC.

By: _____*Lester Eber*_____
Lester Eber, Chief Executive Officer

By: _____*Wendy Eber*_____
Wendy Eber, Chief Financial Officer

Accepted:

_____*Lester Eber*_____
Lester Eber

CNB000043

**STATE OF NEW YORK**
**SUPREME COURT**          **COUNTY OF MONROE**

---

ALEXBAY, LLC,

                              Plaintiff,                    **SUMMONS**

       -vs.-                                               **Index No.:**

EBER BROS. WINE & LIQUOR CORP.;                            $2012 - 1919$

SOUTHERN WINE & SPIRITS
OF AMERICA, INC.;

EBER BROS. WINE & LIQUOR METRO, INC.;
       and

JOHN DOES 1 – 10, being fictitious names
intended to designate other entities or persons
claiming any interest in Eber Bros. Wine &
Liquor, Inc.'s "OWNERSHIP INTEREST IN
EBER BROS. WINE & LIQUOR METRO,
INC.";

                              Defendants.

*2012 FEB 21 PM 2:37   MONROE COUNTY CLERK   FILED*

---

To the above-named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a
copy of your Answer on the Plaintiff's attorneys within twenty (20) days after service of this
Summons, exclusive of the day of service (or within 30 days after the service is complete if
this Summons is not personally delivered to you within the State of New York); and in case of
your failure to appear or answer, judgment will be taken against you by default for the relief
demanded in the Complaint.

Trial is to be held in the County of Monroe; the venue of this matter is based upon
Defendants' principal place of business.

DATED:   21 February 2012              **UNDERBERG & KESSLER LLP**
         Rochester, New York.          *Attorneys for Plaintiff Alexbay, LLC*

                                       William E. Brueckner and Michael J. Beyma
                                       300 Bausch & Lomb Place
                                       Rochester, New York  14604
                                       585.258.2800

G:\Microsoft\UKE\Eber Brothers\ucc foreclosure\Summons.docx

**PLAINTIFF'S
EXHIBIT
44**
PENGAD 800-631-6989
1/2/19

KSH00070

STATE OF NEW YORK
SUPREME COURT          COUNTY OF MONROE

ALEXBAY, LLC,

                              Plaintiff,                    Index No.:

                                                           2012-1919
          -vs.-

EBER BROS. WINE & LIQUOR CORP.;

SOUTHERN WINE & SPIRITS
OF AMERICA, INC.;

EBER BROS. WINE & LIQUOR METRO, INC.;
and

JOHN DOES 1 – 10, being fictitious names
intended to designate other entities or persons
claiming any interest in Eber Bros. Wine &
Liquor, Inc.'s "OWNERSHIP INTEREST IN
EBER BROS. WINE & LIQUOR METRO,
INC.";

                              Defendants.

---

## COMPLAINT FOR
## DETERMINATION OF 'COMMERCIAL REASONABLENESS'
## OF ACCEPTANCE OF COLLATERAL
## UNDER §9-627 of UNIFORM COMMERCIAL CODE

**AS AND FOR ITS COMPLAINT** against the Defendants herein, Plaintiff ALEXBAY,

LLC, by its attorneys Underberg & Kessler LLP, alleges and states as follows:

### OVERVIEW:

1.      By this action, Plaintiff, the secured creditor of a borrower in default, seeks a

determination, as provided under Uniform Commercial Code §9-627, that the enforcement of

the creditor's security interest, by the creditor's acceptance of certain collateral in full

satisfaction of the underlying obligation, are "commercially reasonable" and in good faith.

## THE PARTIES and the COLLATERAL:

2.     Plaintiff Alexbay, LLC ("*Alexbay*"), is a limited liability company organized and existing under the laws of the State of Connecticut, with an address for the transaction of business at 30 Corporate Drive, North Haven, Connecticut 06473.  As of the date of this Complaint, Alexbay is the holder of a certain promissory note executed by Eber Bros. Wine & Liquor Corp. and all the associated rights to the collateral that secures repayment of the debt memorialized by that promissory note.

3.     Defendant Eber Bros. Wine & Liquor Corp. ("*Eber Bros.*") is a corporation organized and existing under the laws of the State of New York, with an address for the transaction of business at 95 Allens Creek Drive, Suite 10, Building 2, Rochester, New York 14618.

4.     Defendant Eber Bros. Wine & Liquor Metro, Inc. ("*Metro*") is a corporation organized and existing under the laws of the State of New York, with an address for the transaction of business at 95 Allens Creek Drive, Suite 10, Building 2, Rochester, New York 14618.  Metro is a wholly owned subsidiary of Eber Bros.: that is to say, Eber Bros. owns all of Metro's capital stock.  As its name suggests, Metro was formed to carry on business as a distributor of wine and liquor.

5.     Through a series of transactions defined in greater detail subsequently in this Complaint, Eber Bros. became indebted to Lester Eber in sums exceeding $3.2Million.  Under the terms of a contemporaneously executed security agreement, Eber Bros.' indebtedness to Lester Eber (the "*Original Secured Creditor*") was secured by a pledge of virtually all of Eber Bros.' assets, including (without limitation) Eber Bros.' ownership interest in Metro.  The Original Secured Creditor's rights under the notes and security agreement were thereafter

*Alexbay, LLC. v. Eber Bros. Wine & Liquor Corp. et al.*
Index No.:

Complaint to Determine Commercial Reasonableness
KSH000072 of 13

assigned by the Original Secured Creditor to Alexbay. The capital stock of Metro, owned entirely by Eber Bros. and pledged to secure Eber Bros.' indebtedness and other obligations under the notes and security agreements, is the collateral that is the subject of this action (*"the Collateral"*).

6.     Upon information and belief, Southern Wine & Spirits of America, Inc. (*"Southern"*), is a corporation organized and existing under the laws of the State of Florida, with an address for the transaction of business at 166 N.W. 163rd Street, Miami, Florida, 33169. Upon further information and belief, Southern may claim an interest as a secured creditor with respect to the Collateral, by virtue of a financing statement describing the Collateral: that financing statement was filed with the New York State Secretary of State on or about on or about August 31, 2007.

7.     Metro is a co-obligor with respect to some or all of the Eber Bros.' obligations that are secured by the Collateral.

8.     "John Does 1 – 10" are unknown parties identified for the purpose of this action by fictitious names: those fictitious names being intended to designate any other entities or persons who may claim any interest in the Collateral.

## THE LOAN TRANSACTIONS:

### A. The $576K Loan to Eber Bros.

9.     On or about October 1, 2002, the Original Secured Creditor loaned Eber Bros. $575,895.00. The loan was evidenced by a promissory note, and was secured by a collateral security interest in "all of the assets of (Eber Bros.) in favor of (the Original Secured Creditor)." Under the terms of the promissory note evidencing the indebtedness, all principal and interest due was to be paid in full no later than October 1, 2012.

10.    On or about March 13, 2006, Eber Bros. executed an "Amended and Restated Promissory Note" in the amount of $575,895.00, together with interest at an annual rate of nine percent. The note called for payment in full of the obligations to the Original Secured Creditor on or before March 13, 2016.

### B. The $1.5 Million Loan to Eber Bros.

11.    On or about August 15, 2005, the Original Secured Creditor loaned Eber Bros. $1,503,750.00, and Eber Bros. executed a promissory note to memorialize the obligation to repay the loan. Shortly thereafter, on or about March 13, 2006, Eber Bros. executed an "Amended and Restated Promissory Note" payable to the Original Secured Creditor, and in that Amended and Restated Promissory Note agreed to repay the principal amount of the original loan, plus interest at an annual rate of nine percent.

12.    On or about February 11, 2011, Metro, Eber Bros. and the Original Secured Creditor entered into a "Debt Assumption Agreement" (*"the Debt Assumption Agreement"*) whereby Metro assumed all of Eber Bros.' obligations to the Original Secured Creditor under the March 13, 2006, Amended and Restated Promissory Note. At the time of Metro's assumption of those obligations, the remaining unpaid principal balance of the March 13, 2006, Amended and Restated Promissory Note was $1,434,710.68 plus accrued and unpaid interest. [A true and accurate copy of the Debt Assumption Agreement is attached to this Complaint as Exhibit A.]

13.    The Debt Assumption Agreement expressly provides:

> Each of (Eber Bros.), Metro and (Original Secured Creditor) agree that the unpaid principal balance of the (Eber Bros.) Loan is, as of the date hereof, One Million Four Hundred Thirty-Four Thousand Seven Hundred Ten and 68/100 Dollars ($1,434,710.68) plus accrued and unpaid interest. … **(Eber Bros.) hereby irrevocably assigns to Metro all of (Eber Bros.') obligations to pay principal, interest and**

---

> other obligations and liabilities in respect of the (Eber Bros.) **Loan,**
> **and Metro agrees to be bound by the terms of the (Eber Bros.)**
> **Note as if it were the "Maker" thereunder and promises to pay the**
> **obligations evidenced thereby in accordance with the terms**
> **thereof. (Original Secured Creditor) hereby consents to such**
> **assignment by (Eber Bros.) and assumption by Metro.**

(Emphasis added.)

### C. The $1,500,000 Line of Credit to Metro.

14.     In October, 2009, the Original Secured Creditor agreed to lend to Metro, and

Metro promised to repay the Secured Creditor, an amount not to exceed $1.5 Million under a

revolving line of credit (*"the Line of Credit Note"*). Repayment of any amounts borrowed

and applicable interest was to be paid in full on or before December 31, 2011. [A true and

accurate copy of the Line of Credit Note is attached to this Complaint as Exhibit B.]

15.     The Line of Credit Note expressly provides:

> FOR VALUE RECEIVED, EBER BROS. WINE & LIQUOR METRO,
> INC., ("Maker") a New York corporation … hereby promises to pay to
> the Order of (the Secured Creditor) … the principal sum of ONE
> MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS
> ($1,500,000.00) (the "Maximum Principal Amount") or such lesser or
> greater amount as may be outstanding hereunder. … This Note
> evidences a revolving line of credit. Accordingly, amounts hereunder
> may be borrowed, repaid and re-borrowed provided that at no time shall
> Maker permit the aggregate principal amount of all advances made
> under this Note to exceed the Maximum Principal Amount.

### D. Eber Bros.' Secured Guaranty of Metro's Obligations.

16.     On or about February 26, 2010, Eber Bros. agreed to guaranty the repayment

by Metro of all its obligations to the Original Secured Creditor, then existing or thereafter

incurred (*"the EB Guaranty"*). [A true and accurate copy of the EB Guaranty is annexed to

this Complaint as Exhibit C.]

17.     The EB Guaranty defines the term Guarantor to mean Eber Bros., and the term

Lender to mean the Original Secured Creditor, and it expressly provides:

---

> For valuable consideration, **Guarantor hereby unconditionally guarantees and promises to repay promptly to Lender,** or order, in lawful money of the United States, **any and all Indebtedness to Lender** when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. This Guaranty is cumulative and does not supersede and other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor. ... **"Borrower" shall mean Eber Bros Wine & Liquor Metro, Inc. ... "Indebtedness" shall mean any and all debts liabilities, and obligations of the Borrower and Guarantor to Lender ... now or hereafter existing.**

(Emphasis added.)

18.     The EB Guaranty expressly ran to the benefit of the Original Secured Creditor's endorsees, successors, and assigns.

19.     By the terms of a certain Security Agreement executed by the parties on or about February 26, 2010, Eber Bros.' obligations under the EB Guaranty were secured by a grant to the Original Secured Creditor of a security interest in substantially all of Eber Bros.' property. The agreement was subsequently reiterated in an Amended and Restated Security Agreement executed by the parties on or about February 10, 2011 ("*the Security Agreement*"). Specifically included within the grant of the security interest were Eber Bros.' membership interests in Metro. [A true and accurate copy of the Security Agreement is annexed to this Complaint as Exhibit D.]

20.     The Security Agreement defines the term "Parent" to mean Eber Bros.; defines the term "Metro" in the same manner as this Complaint; defines "Debtor" to include Eber Bros. and Metro; and defines "Secured Party" as the Original Secured Creditor. The Security Agreement expressly provides:

> **Debtor hereby assigns and grants to Secured Party a security interest in** the following described property now owned or hereafter acquired by Debtor ... All instruments, notes, chattel papers, documents, certificates of deposit, **securities and investment property of every**

> **type.** The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing. …
> **The shares of common stock and preferred stock, or partnership, membership and other ownership interests, now or hereafter owned by Debtor, including, without limitation …any ownership interests in Metro now or hereafter owned by Parent … .**

(Emphasis added).

### E. The Default and the Assignment to Alexbay.

21.     Metro did not repay the sums due to the Original Secured Creditor as required under the Line of Credit Note, and is in default of its obligations under the Line of Credit Note. Metro did not repay the sums due to the Original Secured Creditor as required by the Debt Assumption Agreement, and is in default of its obligations under the Debt Assumption Agreement.

22.     Accordingly, as permitted under the terms of the EB Guaranty, the Original Secured Creditor has made demand for payment by Eber Bros. of the sums due from Metro. Despite demand duly made, Eber Bros. has failed to pay the Original Secured Creditor those sums.

23.     As a consequence of Eber Bros.' failure to pay the Original Secured Creditor the sums Metro owes the Original Secured Creditor, Eber Bros. is in default of its obligations under the EB Guaranty.

24.     On or about January 18, 2012, the Original Secured Creditor irrevocably granted, assigned and transferred all his right, title and interest in the Debt Assumption Agreement, the Line of Credit Note, and the Metro Security Agreement to Alexbay. [True and accurate copies of the assignments are collectively annexed to this Complaint as Exhibit E.]

## PROPOSED ACCEPTANCE OF COLLATERAL:

25. Alexbay has proposed to accept Eber Bros.' stock in Metro in full satisfaction of all Eber Bros. obligations to Alexbay, as assignee, under the EB Guaranty and the Security Agreement.

26. By notice dated January 18, 2012, and as authorized by UCC 9-620, Alexbay notified Eber Bros. of its proposal to accept the Collateral in full satisfaction of Eber Bros. obligation to Alexbay. [A true and accurate copy of Alexbay's notice to Eber Bros. is annexed to this Complaint as Exhibit F.]

### THE AMOUNT OF THE INDEBTEDNESS and the VALUE OF THE COLLATERAL:

27. As of December 31, 2011, Metro's indebtedness to the Original Secured Creditor under the Debt Assumption Agreement was $1,951,874.26 (plus interest accruing at 9% per annum).

28. As of December 31, 2011, Metro's indebtedness to the Original Secured Creditor under the Line of Credit Note was $1,698,808.22 (plus interest accruing at 12 ½% per annum).

29. As a consequence of all the foregoing, Metro's indebtedness to Alexbay currently exceeds $3.650 Million. By virtue of the EB Guaranty, Eber Bros. obligation to Alexbay also exceeds $3.650 Million.

30. Metro does not presently operate and it conducts no business activity. It has not generated profit of any kind in several years. Metro has no cash reserves other than those required in the ordinary course of its business. Metro has no tangible assets: its only intangible asset of any significant value, indeed its only valuable asset of any kind, is Metro's

ownership of a partial interest in yet another company, Eber-Connecticut, LLC ("*EberConn*").

31. EberConn is a limited liability company formed under the laws of the State of Delaware.

32. Metro owns seventy-nine percent (79%) of the membership units in EberConn. Other owners of EberConn are Eder Goodman, LLC, which owns fifteen percent (15%) of the membership units in EberConn, and Polebridge Bowman, LLC ("*Polebridge Bowman*"), which owns six percent (6%) of the membership units of EberConn.

33. Polebridge Bowman is a party unrelated to the Original Secured Creditor, to Eber Bros., to Metro, and/or to EberConn. Polebridge Bowman acquired its ownership interest in EberConn in May, 2010, in an arms' length transaction, and became a new member of EberConn by virtue of that acquisition. The membership units Polebridge Bowman acquired were sold to it by Metro.

34. Under the terms of the operating agreement that governs EberConn's corporate affairs, existing members are provided a right of first refusal that permits existing members to acquire any membership units proposed for sale to a potential new member, on the same terms that are proposed for sale to the potential new member. By operation of that right of first refusal, before Polebridge Bowman could acquire its membership units from Metro, Eder-Goodman had to decline to purchase those membership units on the terms Polebridge Bowman proposed for the purchase.

35. Polebridge Bowman acquired its ownership of six percent (6%) in EberConn in May 2010 for $350,000. Eder-Goodman consented to the sale of Metro's membership units at that price.

36.    No other sale or purchase of any interest in EberConn has occurred since. Accordingly, Polebridge Bowman's acquisition of its ownership interest in EberConn represents the best evidence of the current value of ownership rights in EberConn: it is the last time the free market has spoken with respect to the value of EberConn's membership units.

37.    As established by Polebridge Bowman's acquisition, each one percent of the membership units in EberConn was worth approximately $58,333 in May, 2010.[1] Accordingly, at that time, the value of all of EberConn's membership units was $5,833,300.

38.    Since the Polebridge Bowman acquisition, EberConn has lost more than $1.2 Million. As a consequence, the value of all of EberConn's membership units was reduced to $4,633,300 by December 2011.

39.    Thus, as of December, 2011, Metro's ownership of 79% of the ownership units in EberConn has a value of approximately $3.660 Million.[2] That ownership interest is Metro's only valuable asset, and effectively establishes the value of the Collateral. The Collateral has a value of approximately $3.660 Million.

40.    Valuation of the Collateral at $3.660 Million does not apply any discount for lack of marketability, partial ownership, costs of sale or other applicable factors that might reduce the Collateral's value. Moreover, because Metro's business as a wine and liquor distributor is highly regulated, requiring business owners to have proper licensing, there are significant barriers to entry to the ownership of Metro, and there are reasonable justifications for valuation of the Collateral at less than $3.660 Million.

---

[1]    Polebridge Bowman paid $350,000 for a six percent ownership interest. $350,000 ÷ 6 = 58,333.

[2]    4,633,300 x 0.79 = 3,660,307.00.

---

41.     Therefore, by and through acceptance of the Collateral in full satisfaction of Eber Bros. obligations to Alexbay, Alexbay will accept a value of approximately $3.660 Million in full satisfaction of an obligation of $3.650 Million, plus continually accruing interest.

## THE PROCEDURES FOR ACCEPTING THE COLLATERAL:

42.     As required under UCC §9-620, Alexbay has provided Eber Bros. notice of its intent to accept the Collateral in full satisfaction of Eber Bros.' obligations under the EB Guaranty and Security Agreement.

43.     Upon information and belief, Southern filed a financing statement with the New York State Department of State on or about August 31, 2007, under File Number 200708310704958, by which it may claim an interest in the Collateral. As required under UCC §9-621(a), and by virtue of this action, Southern has been provided notice of Alexbay's intention to accept the Collateral in full satisfaction of Eber Bros.' obligations under the EB Guaranty and Security Agreement.

44.     The Original Secured Creditor's financing statement with respect to the Collateral was filed on February 22, 2010.

45.     Upon information and belief, no other person holds any interest in the Collateral subordinate to Alexbay's interest.

46.     By virtue of this action, Metro has been provided notice of Alexbay's intention to accept the Collateral in full satisfaction of Eber Bros.' obligations under the EB Guaranty and the Security Agreement.

_Alexbay, LLC. v. Eber Bros. Wine & Liquor Corp. et al._
Index No.:

Complaint to Determine Commercial Reasonableness
KSH Page 14 of 13

47. As a consequence of all the foregoing, Alexbay's acceptance of the Collateral in full satisfaction of Eber Bros.' obligations under the EB Guaranty and Security Agreement: (i) it is authorized by relevant provisions of the Uniform Commercial Code; (ii) it complies with all procedures required of the Uniform Commercial Code; and (iii) by its satisfaction in full of the obligations of Eber Bros under the EB Guaranty and Security Agreement, it gives fair and reasonable consideration for the Collateral.

48. Accordingly, Alexbay's acceptance of the Collateral in full satisfaction of Eber Bros. obligations under the EB Guaranty and Security Agreement is "commercially reasonable" as the term is used in Section 9-627 of the Uniform Commercial Code.

## PROCEDURAL PREREQUSITES:

49. Section 9-627(c) of the Uniform Commercial Code provides, in pertinent part:

A collection, enforcement, disposition, or acceptance is commercially reasonable if it has been approved: in a judicial proceeding ... .

50. CPLR Section 3001 provides, in pertinent part:

Declaratory judgment. The supreme court may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed.

51. Alexbay requests that the acceptance of its collateral be "approved in a judicial proceeding." Its proposal to accept the Collateral presents a justiciable controversy among the parties to this action. The Court's determination of the "commercial reasonableness" of the proposed acceptance will determine the rights and other legal relations of the parties to that controversy.

52. No previous request has been made for the relief requested in this action.

//

//

---

*Alexbay, LLC. v. Eber Bros. Wine & Liquor Corp. et al.*
Index No.:

Complaint to Determine Commercial Reasonableness
KSH Page 32 of 13

//

//

**WHEREFORE, Plaintiff Alexbay LLC** requests that this Court determine, adjudge, and order, that Alexbay LLC's acceptance, as a secured creditor, of Eber Bros. Wine & Liquor Corporation's ownership interests in Eber Bros. Wine & Liquor Metro, LLC, (which ownership interests serve as collateral securing the obligations of Eber Bros. Wine & Liquor Corporation's obligations to Alexbay LLC) in full satisfaction of the secured obligations owed to Alexbay LLC, is "commercially reasonable," together with such other and further relief as the Court may deem just and reasonable.

DATED:   21 February 2012          **UNDERBERG & KESSLER LLP**
            Rochester, New York.          *Attorneys for Plaintiff Alexbay, LLC*

William E. Brueckner and Michael J. Beyma
300 Bausch & Lomb Place
Rochester, New York  14604
585.258.2800

*Alexbay, LLC, v. Eber Bros. Wine & Liquor Corp. et al.*
Index No.:

Complaint to Determine Commercial Reasonableness
KSHBA0083 of 13

**STATE OF NEW YORK**
**SUPREME COURT**      **COUNTY OF MONROE**

———————————————————————

ALEXBAY, LLC,

                                   Plaintiff,          Index No.:

        -vs.-                                          2012-1919

EBER BROS. WINE & LIQUOR CORP.;

SOUTHERN WINE & SPIRITS
OF AMERICA, INC.;

EBER BROS. WINE & LIQUOR METRO, INC.;
and            /

JOHN DOES 1 – 10, being fictitious names intended
to designate other entities or persons claiming any
interest in Eber Bros. Wine & Liquor, Inc.'s
"OWNERSHIP INTEREST IN EBER BROS. WINE
& LIQUOR METRO, INC.";

                                   Defendants.

———————————————————————

### AFFIDAVIT OF LESTER EBER
### in Support of
### MOTION FOR JUDICIAL DETERMINATION
### OF 'COMMERCIAL REASONABLENESS' UNDER UCC 9-627

STATE OF _New York_ )
COUNTY OF _Monroe_ ) S.s.:

**LESTER EBER**, being first duly sworn, deposes and says:

1.      I am a principal of Plaintiff Alexbay, LLC ("*Alexbay*") in this action. I have

personal knowledge of all the factual matters recounted in this Affidavit, which I submit in

support of Alexbay's request for a judicial determination of "commercial reasonableness" as the

term is defined in the provisions of Section 9-627 of the Uniform Commercial Code.



PLAINTIFF'S
EXHIBIT
45
1|24|19

EB-00001059

2.     This action was commenced upon the filing of Plaintiff's Summons and

Complaint on February 21, 2012. The Complaint explains the circumstances through which

Alexbay became a secured creditor of Eber Bros. Wine & Liquor Corp. (*"Eber Bros."*), and its

proposal to accept the collateral that secures that obligation, certain shares of stock owned by

Eber Bros., in full satisfaction of the debt. [A time stamped copy of the Complaint, together with

all its Exhibits, is attached to this Affidavit as Exhibit A.] The action was brought under the

provisions of Uniform Commercial Code §9-627 to obtain this Court's judicial determination

that the proposal to accept the stock is "commercially reasonable."

3.     In pertinent part, Section 9-627(c) reads:

> A collection, enforcement, disposition, or acceptance (of collateral) is
> commercially reasonable if it has been approved: in a judicial
> proceeding ... .

4.     As the Complaint explains, the collateral at issue in this action (*"the Collateral"*)

is all the shares of capital stock of a New York corporation known as Eber Bros. Wine & Liquor

Metro, Inc. (*"Metro"*). Those shares are owned by Eber Bros., and they were pledged by Eber

Bros. to secure the repayment of an Eber Bros. obligation totaling more than $3.650 Million,

with continually accruing interest.

5.     Metro is not an operating company, and its only asset of any significance is a 79%

ownership interest in yet another Company: Eber Connecticut LLC (*"EberConn"*).

6.     Based upon very recent arms' length sales on the open market, EberConn's value

as a going concern is best established at $4,633,300 as of December 2011. That valuation of

EberConn establishes the value of Metro's only significant asset: the 79% ownership of

EberConn. Because it is Metro's only significant asset, that 79 percent interest (valued at $3.660

Million), itself establishes the value of Metro.

---

*Alexbay, LLC, v. Eber Bros. Wine & Liquor Corp. et al.*
Index No.: 2012-1919

Affidavit of Lester Eber in Support of Motion
Page 2 of 5

EB-00001060

7.      Thus, Alexbay's proposal is to accept as the Collateral all of the shares of Metro, a corporation valued at $3.660 Million, in full satisfaction of a debt of $3.650 Millon.

8.      The Uniform Commercial Code proscribes the procedure for acceptance of collateral in satisfaction of the obligation it secures in Sections 9-620 and 9-621.  In the situation presented by this case, where consumer goods are not implicated, Section 9-620(a) permits a secured creditor to accept the collateral in satisfaction of an obligation if:  (i) the debtor consents to the acceptance; and (ii) no objection to the acceptance is made by others who are entitled to notice of the proposed acceptance under Section 9-621.

9.      The Debtor, Eber Bros., has consented to the acceptance.  [A copy of the Debtor's consent to the acceptance of the Collateral and all the other relief requested in this action is annexed to this Affidavit as Exhibit B.]

10.     Section 9-621 requires that notice of the proposed acceptance be sent to:  (i) any person who has notified the secured party that the person claims an interest in the collateral; (ii) any person who has properly filed a financing statement with respect to the collateral; and (iii) a person who has properly perfected a security interest in the collateral under other applicable law.

11.     As provided under UCC 9-310(a), security interests in the Collateral are perfected by filing a financing statement in New York, where Eber Bros. is incorporated.  Attached to this Affidavit as Exhibit C are the results of a search of the financing statements filed against the Collateral with the New York Secretary of State: those results show that the only other person that has a financing statement filed with respect to the Collateral is Defendant Southern Wine & Spirits of America, Inc. ("**Southern**").

12.     Southern has consented to Alexbay's proposal to accept the Collateral in full satisfaction of Eber Bros.' obligation.  [A copy of Southern's consent to the acceptance of the

EB-00001061

Collateral and all the other relief requested in this action is annexed to this Affidavit as Exhibit

B.]

13.     The only other person that might claim an interest in the Collateral is Metro:

Alexbay has no knowledge that any other person claims any interest in the Collateral. Metro has

also consented to Alexbay's proposal to accept the Collateral in full satisfaction of Eber Bros.'

obligation.

14.     As the Official Comments to the Uniform Commercial Code recognize:

> It is important to make clear the conduct and procedures that are
> commercially reasonable and to provide a secured party with the
> means of obtaining, by court order of negotiation with a creditors'
> committee or a representative of creditors, advance approval of a
> proposed method of enforcement as commercially reasonable.

15.     Alexbay has complied in good faith with the conduct and procedures required to

enforce its security interest in the Collateral by accepting the Collateral, and proposes to fully

satisfy a debt of $3.650 Millon (plus accruing interest) in exchange for collateral with a value of

$3.660 Million.

16.     All parties entitled to notice of the proposal, and all parties that are known to

claim any interest in the Collateral, have consented to the proposal. It is therefore manifest that

the proposal is a commercially reasonable means of enforcing Alexbay's security interest.

17.     Alexbay's stipulation with Southern agrees that Alexbay will request an Order

dismissing Southern from this action.

**WHEREFORE, Plaintiff Alexbay, LLC**, requests that this Court grant an Order: (A)

determining that Alexbay's acceptance of the Collateral in full satisfaction of Eber Bros.'

obligation is "commercially reasonable" under the Uniform Commerical Code; (B) dismissing

_Alexbay, LLC, v. Eber Bros. Wine & Liquor Corp. et al._
Index No.: 2012-1919

Affidavit of Lester Eber in Support of Motion
Page 4 of 5

EB-00001062

Defendant Southern Wine & Spirits of America, Inc., from this action; and (C) granting such other and further relief as the Court may deem just, equitable and appropriate.

_LESTER EBER_

Sworn to before me this
14th day of March 2012.

Notary Public

SUSAN J. LESTRANGE
NOTARY PUBLIC STATE OF NEW YORK.
QUALIFIED IN WAYNE COUNTY,
MY COMMISSION EXPIRES 3/27 / 2015

_Alexbay, LLC. v. Eber Bros. Wine & Liquor Corp. et al._
Index No.: 2012-1919

Affidavit of Lester Eber in Support of Motion
Page 5 of 5

EB-00001063