```
                    UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK

In re:                             :
                                         Docket #16cv9517
 KLEEBERG, et al.,                 : 1:16-cv-09517-LAK-KHP

                   Plaintiffs,     :

          - against -              :

 EBER, et al.,                     :
                                         New York, New York
                   Defendants.     : March 12, 2019

------------------------------------ :

                      PROCEEDINGS BEFORE
              THE HONORABLE KATHARINE H. PARKER
          UNITED STATES DISTRICT COURT MAGISTRATE JUDGE


APPEARANCES:

For Plaintiffs:      BROOK & ASSOCIATIONS, PLLC
                     BY:  BRIAN BROOK, ESQ.
                     100 Church Street, 8th Floor
                     New York, New York 10007

For Defendants:      UNDERBERG & KESSLER, LLP
                     BY:  COLIN D. RAMSEY, ESQ.
                     50 Fountain Plaza, Suite 320
                     Buffalo, New York 14202


For Defendants -     JOHN HERBERT, ESQ.
Wendy & Lester
Eber:



Transcription Service: Carole Ludwig, Transcription Services
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

<u>APPEARANCES (CONTINUED)</u>:

For Defendants -      CALIHAN LAW PLLC
Estate of Elliot      BY:  ROBERT CALIHAN, ESQ.
W. Gumaer, Jr.:       The Power Building, Suite 761
                      16 East Main Street
                      Rochester, New York 14614

### INDEX

#### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---------|--------|-------|-----------|----------|-------|

None

#### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|

None

1

```
 1                                          4
 2            THE CLERK:  Calling case 16cv9517, Kleeberg versus
 3   Eber.  Counsel, please make your appearance for the record.
 4            MR. BRIAN BROOK:  Good afternoon, Your Honor,
 5   Brian Brook for the plaintiffs.
 6            THE COURT:  Good afternoon.
 7            MR. COLIN RAMSEY:  Good afternoon, Your Honor,
 8   Colin Ramsey for the Eber defendants.
 9            THE COURT:  Good afternoon.
10            MR. JOHN HERBERT:  John Herbert for Wendy &
11   Lester Eber.
12            THE COURT:  Nice to see you.
13            MR. ROBERT CALIHAN:  Bob Calihan on behalf of
14   the Estate of Elliot Gumaer.
15            THE COURT:  Okay, nice to see you all.  All
16   right, I want to address a couple of the pending
17   motions. The first is the motion to intervene. I am
18   going to grant the motion to intervene and I'll issue
19   a short decision on that.  With respect to the pending
20   motion to amend, I'd like to hear some additional
21   argument on that motion and I do have some questions
22   that I'd like the parties to address. So just as a
23   preview, defendants argue that some of the new claims
24   are time barred, and I'd like to understand when
25   you're saying the claims, the statute of limitations
```

```
 1
 2   began to accrue, and I'd like to better understand
 3   when plaintiffs say that the claims accrued.  So maybe
 4   we can start with this motion to amend, and Mr. Brook,
 5   could you explain when, the date when you think each
 6   of the new claims accrued from a statute of
 7   limitations standpoint?
 8           MR. BROOK:  Sure, Your Honor.  Well, as far as
 9   the breach of fiduciary duty claims, and I think
10   there's a few counts that encompass that, the
11   fiduciary tolling rule applies. And I don't believe
12   that the statute of limitations for those claims would
13   have begun to run until the fiduciary relationship was
14   terminated or openly repudiated. And I don't think
15   there is any argument that there was some kind of open
16   repudiation where Lester Eber said I'm no longer a
17   fiduciary. So it's when it terminated, and our
18   understanding is that it terminated when the trust was
19   terminated.  And although there is some dispute that
20   became apparent during recent depositions as to
21   whether the trust terminated, whether Lester is still
22   a trustee, the latest that that could have occurred,
23   or earliest I guess is the way to put it, is, say,
24   February, 2017, when CNB filed its petition to
25   dissolve the trust, and that was after this lawsuit
```

1
2    was filed, and I think these claims certainly relate

3    back. But even if they didn't, February, 2017, until

4    when we filed the proposed third amended complaint is

5    less than two years.

6         THE COURT:  Okay, so the fraudulent, I mean

7    the breach of fiduciary duty, I have that the new

8    claims that you're suggesting to add would be the

9    count three for unjust enrichment, count four to set

10   aside an unlawful transaction, count five seeking an

11   order for a new election of the board, count six, a

12   declaratory judgment, and count eight, aiding and

13   abetting breach of fiduciary duty and fraudulent

14   concealment. Those are the ones that I have as new, so

15   --

16        MR. BROOK:  I think it's a little more

17   complicated than that, if I may explain?

18        THE COURT:  Okay.

19        MR. BROOK:  So the first two counts, or at

20   least the first one is breach of fiduciary duty.

21        THE COURT:  Right.

22        MR. BROOK:  Well, what used to be count one

23   has been split into two counts in order to separate

24   two different theories of breach of fiduciary duty for

25   clarity sake.

THE COURT:  Right.

MR. BROOK:  So they both were in the original complaint.

THE COURT:  Right.

MR. BROOK:  What happened for count one is that additional transactions were added, including the receipt of money for Lester Eber under a supposed consulting agreement with Southern Wine and Spirits. I think that's the one that probably, if I had to guess, was most contentious by the other side because that consulting agreement was originally entered into in 2007.  And so because it's a breach of fiduciary duty claim and we are seeking equitable remedies such as an accounting, which we're still getting in pieces, and it also includes disgorgement of the profits that are received from that because it was essentially a corporate opportunity that was usurped because this was not even an acquisition or a merger, this was a transaction where it was essentially a settlement agreement between Eber Bros. and its competitor, Southern, that had driven them out of business. And Lester Eber, while remaining president and CEO of the Eber Bros. companies, also negotiated this side deal for himself. So it's something where we're seeking

8

1

2  equitable remedies in addition to, not only under a

3  breach of fiduciary duty theory, but also under the

4  standards set, I think it's in the new count four,

5  we're citing the business corporation statute to set

6  aside transactions that were not properly taken by the

7  corporation.

8          So those are interrelated and I don't believe

9  that there is a statute of limitations that applies

10  for that kind of equitable remedy in this situation

11  where you're setting aside a transaction. If it did,

12  it would be six years from the date when the fiduciary

13  relationship ended.

14          THE COURT:  Which you're saying would be

15  February of 2017.

16          MR. BROOK:  At the absolute earliest. And

17  that, and the trust wasn't ordered dissolved by the

18  Court until June, 2017, but since it doesn't matter,

19  let's just say February.  And I think most of the

20  other transactions in there I think are all part of

21  what was in the original complaint, just spelled out

22  in more detail.

23          So going through the counts, and the faithful

24  servant doctrine, that was in the original complaint,

25  as well, it has been spelled out in more detail

9

1

2  because I'm one of those lawyers that likes to have a

3  complaint that tells a little bit of a story and lets

4  people know where we're going so that there is no

5  surprise, and hopefully settle the case. I don't think

6  there is anything in that that was not fairly included

7  within the original ones.  But count, what used to be

8  count two, I believe, so the numbering being off is

9  why the Court is under the impression that everything

10 after count two is new, but, in fact, the fraudulent

11 concealment claim was in the original complaint, I

12 think that was count two. And the breach of --

13         THE COURT:  No, I know that fraudulent

14 concealment was in the prior complaint.

15         MR. BROOK:  Okay, sorry. And then I believe

16 that the aiding and abetting breach of fiduciary duty

17 was also in the original complaint, I think that was

18 count three.  And then count four, if member serves,

19 was the results for an accountant.

20         Unjust enrichment, you know, I don't think

21 that the equitable, that we're not equitable.

22 Fiduciary tolling would probably not apply to that

23 count. I probably don't need it, so at the end of the

24 day I don't know if I really care about that count,

25 just to be perfectly frank, having thought about it

1
2   more. But we also have the argument that separate from
3   fiduciary tolling there were material facts about what
4   made the Southern transaction wrong and usurpation of a
5   corporate opportunity that we didn't discovery until
6   discovery in this case. Most critically is the fact that
7   somehow this agreement between Eber Bros. and Southern
8   where Eber Bros. of New York agreed to go out of business
9   and not compete with Southern anymore, did not include any
10  provision against competition.  That wasn't in the
11  agreement, that doesn't make any sense, what kind of deal
12  do you have to get your competitor to go out of business
13  without a noncompetition clause?  Well the answer is that
14  they built it into Lester Eber's consulting agreement, and
15  because Lester was remaining at the Helm of Eber Bros., it
16  was effectively precluding Eber Bros. and its remaining
17  operating entity, Eber Connecticut, from ever competing
18  with Southern, but paying Lester a loan for that, not
19  paying the company for giving up those future business
20  opportunities it might have had.
21          THE COURT:  What do you mean the loan, I thought
22  that the agreement was a consulting agreement?
23          MR. BROOK:  I misspoke, I meant consulting
24  agreement.  Apologize.  So the consulting agreement
25  with Lester, that was what was given to him, you know,

11

1

2  it was $600,000 a year for several years and then in

3  the years since it's been $310,000 a year for sort of

4  untold consulting plus tens of thousands, if not

5  hundreds of thousands of dollars a year in various

6  reimbursements. So that money, we argue, is something

7  that because it all derives from this contract that

8  had this noncompetition clause that actually bound

9  Eber Bros., because of Lester Eber remaining at the

10 helm of Eber Bros., that that is a corporate asset.

11 And because that fact was concealed until discovery in

12 this case, the statute of limitations should not run

13 on that until discovery. And then we have the two-year

14 period after discovery to assert the claim.

15       THE COURT:  Are you contending that pay for

16 actual work performed under the consulting agreement

17 by Lester Eber individually, is a corporate asset?

18       MR. BROOK:  Not exactly, Your Honor. I think

19 that there is certainly a right to be paid for actual

20 work, the problem is the amount of money being paid,

21 over $3 million dollars in five years for supposed

22 part time consulting.  And the fact that this contract

23 not only required some untold consulting, but also

24 included that noncompetition clause. And my reading on

25 these documents is that that is what this was really

about, was about putting Eber Bros. down, but allowing

Lester to get that money because they still had so

many creditors at Eber Bros. that he wanted to avoid

the money going to the creditors, and instead going to

himself.  And that's ultimately what a lot of the

transactions in this case are about, is all the ways

in which Lester Eber and his daughter tried to get

money to go them instead of to the creditors, and

ultimately to the shareholders, as well, had those

creditors been paid off. And the exact numbers and all

that I don't have off the tip of my fingers, but

that's what that was about is that, you know, it's

over $4.5 million that was paid to Lester Eber for

consulting with the competitor at the same time that

he was getting a salary from Eber Bros. for continuing

to work for them and preventing Eber Bros. from

potential business opportunities.

So that, regardless of the merits of that

claim but going to the statute of limitations, the

point is that the key fact, what makes it at least

inflated, we're not necessarily asking for the whole

amount back but it's certainly inflated, and the

inflated amount is because of that noncompetition

clause in the consulting agreement that was only

13

discovered in the course of discovery in this case and
that was at the earliest sometime in late 2017. I
personally didn't see it until mid-2018.

THE COURT:  And are you saying your clients
weren't aware of the consulting agreement?

MR. BROOK:  They were aware of the consulting
agreement generally, but they did not know that the
consulting agreement is what included the prohibition
against competition.  And, in fact, Lester Eber misled
Dan Kleeberg at one point into making Dan Kleeberg
believe that he, as a former Eber employee, could not
start a business with Eber in the name of it because
there was a noncompetition clause with Southern.
Lester never told Dan Kleeberg that well only I,
Lester, am bound by that noncompetition clause. So
what it shows is Lester, himself, treated the
noncompetition clause in his own personal consulting
agreement as something that was binding on the company
and the entire family that had worked with him. And it
was a corporate asset, it was something that he sold
off, because it just makes no sense for a corporation
to agree to go out of business, sell off its
inventory, give a lot of it to its competitor and not
include a noncompetition clause in those documents.

14

1

2   What happened here was they modified it so that Lester

3   could get paid more, but that money was money that

4   should have gone to the company because it was a

5   corporate asset, its ability to operate.

6          THE COURT:  If the business is being sold and

7   going out of business essentially, what would be the

8   purpose of a noncompetition clause apart from the

9   individual owner of the seller?

10          MR. BROOK:  Well the whole business, only some

11  parts like Delaware and I think Ohio were being sold

12  to Southern. New York was going out of business and

13  then Eber Bros. was continuing in Connecticut. But

14  what happened was, and that was the Eber Connecticut

15  entity, and so this noncompetition clause in Lester's

16  consulting agreement made it so that Eber Connecticut

17  and its affiliates, which included the parent

18  companies, could not ever try to go back out again and

19  do anything in New York or other states. And, in fact,

20  something we learned at a recent deposition, it's not

21  in the third amended complaint, obviously, since this

22  was two weeks ago, is that apparently Lester Eber's

23  son, David, went to work for Southern and they, rather

24  than Eber Bros. trying to sell liquors and other

25  imported goods into New York that it was bringing in

1                                                                    15

2    from abroad because they have an import business

3    aspect, as well, they were forced to go through

4    Southern to do that.  If it wasn't for this

5    noncompetition clause, the company could sell wherever

6    it wanted, it wouldn't have to go through Southern in

7    order to do something in New York. And so it is a

8    restriction on the business.  And the amount is

9    certainly inflated, because $600,000 a year for some

10   undocumented amount of, you know, a few hours here and

11   there, is ridiculously inflated as a price. And some

12   of the evidence of that is that after five years, the

13   amount that Lester was being paid for consulting was

14   cut in half.

15           THE COURT:  Well what are you contending was

16   the motivation for the sale of the Eber Bros. New York

17   business and the other, outside of Connecticut, what

18   was the motivation for the sale?

19           MR. BROOK:  I'm sorry, there wasn't a sale of

20   those assets and so -- there was no sale.  What

21   happened was the company agreed to shut down its

22   business and Lester Eber agreed to not compete with

23   Southern in his own personal contract.

24           THE COURT:  Right.

25           MR. BROOK:  So the money that should have gone

16

to Eber for shutting down, to go to its creditors and maybe go to shareholders if there was some left over, Lester took for himself, and that's what was wrong. Because you can't, whether it's a merger, it's an acquisition, or you're selling off parts of a business, a corporate executive cannot say, okay, I'll give you this, but you give me this on the side so that I don't have to give it to the company, even though it's the corporate asset.  Because the corporate's right to do business is what continued. Maybe it would be a different situation if Lester had resigned as Eber Bros. president so that restrictions on him for noncompetition did not carry over onto all the Eber companies. But he remained, and he continued to get a salary, a six-figure salary.

THE COURT:  It was my understanding that Eber Bros. New York was not making any money and that there were significant debts, is that correct?

MR. BROOK:  Yes, there were significant debts.

THE COURT:  Do you know what the size of the debts were at the time that it shut down?

MR. BROOK:  It's one of the many things that I have sought in discovery and it's a little hard to piece that together. I think -- the amount of the

17

debts were substantial. The amount of, the money that

Lester had taken from Eber Bros. through this side

deal with Southern may very well have gone to pay the

company's creditors, rather than to the shareholders.

It doesn't matter who it would have ultimately gone to

because at the end of the day we're asserting

derivative claims on behalf of the corporation. So

whether my client --

THE COURT:  Right, but how would the company,

what deal would have been entered into by Eber Bros.

that the money would have gone to it from Southern?

Are you saying Southern would have purchased the

business, that's --

MR. BROOK:  No, I'm not saying that.

THE COURT:  So what are you saying, I'm trying

to understand what you're saying should have happened,

how is it that Lester would have been able to get

Southern to give the company money sufficient to pay

off all of its debts?

MR. BROOK:  Well there was, for more context,

there was a lawsuit filed by Eber Bros. against

Southern, so part of this was a settlement of that.

And so there was money being paid to Eber Bros. to get

rid of the litigation and to just get them to go away

18

quietly.  So the fact is, Southern was paying Eber
Bros., it was paying them to shut down business in New
York, to give off I believe some of their assets. Eber
Bros. was selling off interests that it had in
Delaware and Ohio businesses as well. There was a
large deal worth many, many millions of dollars and I
believe it was an eight figure sum was paid to Eber
Bros. by Southern. So there is no question that Eber
Bros. and Southern were entering into a deal whether
Southern was paying Eber Bros. to shut down. The
problem is, when Lester took some of that and siphoned
it off for himself, and it happened to be a critical
part of it which is the noncompetition provision.
Because what good would it do Southern to pay Eber
Bros. off to shut it down only to have Lester Eber and
Eber Bros. coming in from Connecticut or wherever, and
continuing to creating problems, possibly taking, you
know, retail sales from them.

        And so the two-step part of that was they made
him a consultant, even though he was still CEO and a
fiduciary to Eber Bros. and they inflated the price
significantly to include the noncompetition clause
there.  And that was how they had the excuse on their
books of paying such an inflated amount to Lester

Eber. And he got that by going around the company. So
that, there was no signature from anyone at Eber Bros.
on that consulting agreement approving of it for the
company, as like additional compensation to Lester for
negotiating the deal or something.  There were any
number of ways they could have given Lester a deal
bonus that was aboveboard. This wasn't one of them,
you can't take a corporate asset which is its ability
to do business, and have that part of it be sold off
just by giving it to Lester and letting him remain at
the company.

THE COURT:  You keep saying a deal, so I'm
confused about what the deal is.

MR. BROOK:  Sure.  The deal was multifaceted
again. Southern Wine & Spirits was paying Eber Bros.
to shut down in New York, and it was paying Eber Bros.
to give up its operating assets, and I think it had 50
percent interest in a Delaware company and an Ohio
company. It was settling litigation as well. This was
a deal between Southern Wine and Spirits and Eber
Bros. Wine and Liquor Corp. and in the middle of that
deal --

THE COURT:  As it a deal or was it a
settlement agreement?

20

MR. BROOK:  It was a deal. It was far more
than just a settlement. In fact, I don't think that
there was a document officially called a settlement,
it just said that they would drop the lawsuit.

THE COURT:  Okay.

MR. BROOK:  I'm not 100 percent on that, it's
many, many pages long.

THE COURT:  Okay.

MR. BROOK:  But we're getting really far into
the merits of this now --

THE COURT:  Right, I understand.

MR. BROOK:  And I certainly understand it is a
claim that requires development. It's one of the
reasons why I've noticed the deposition of Southern
Wine and Spirits to occur on March 25th. And so
hopefully getting more information there about how
this was negotiated. Because surprise, surprise, no
one could remember anything about how this was
negotiated during their depositions.  At least nothing
in terms of the details or how the amounts were
determined, things like that.

So what we do have though is a record of the
amount being significantly greater when there was a
noncompetition clause than in later years where there

1
2  wasn't one. And based on that we see at least a $1.5
3  million enhancement to Lester as a result of that
4  noncompetition. And we will provide expert testimony
5  about how these transactions work and that in that
6  kind of situation, the company's ability to compete is
7  going to be something that should be considered a
8  corporate asset that was usurped here. Because I think
9  it is something that is technical enough that it
10 probably does require expert testimony to establish
11 that.
12         THE COURT:  Okay.
13         MR. BROOK:  And I don't think there is any
14 dispute that when that aspect of the transaction was
15 discovered was in discovery in this case and that
16 whenever the date when that document was produced, we
17 can use that as the date, it doesn't matter that I
18 read it several months later because it's all still
19 well within the statute. And that is separate and
20 apart from the fiduciary tolling on the first two
21 claims.
22         THE COURT:  Okay.  All right.
23         MR. BROOK:  So you wanted to talk about counts
24 five and six -- four, five and six are the ones
25 regarding business laws and unwinding transactions.

1

2          THE COURT:  Right.

3          MR. BROOK:  I am honestly not aware of any

4  statute of limitation that applies to those and then

5  the declaration of rights. A lot of those regard

6  transactions that occurred just very recently, you

7  know, documents that were being, transactions that

8  were attempted in February, 2017, after this lawsuit

9  was filed, there is no real statute of limitations

10  argument there. I know it was confusing because the

11  brief in opposition to the motion just said this is

12  all outside the statute of limitations, but it's a lot

13  more nuanced than that obviously. One of the most

14  recent transactions that occurred was in October,

15  2018, when Lester sent his notice that he was going to

16  just take my client's shares in Eber Bros. parent

17  company for nothing.  There is no way that is outside

18  the statute of limitations.

19          THE COURT:  Okay.  All right --

20          MR. RAMSEY: Colin Ramsey.

21          THE COURT:  Mr. Ramsey, yes.

22          MR. RAMSEY: Briefly, back to Southern, if I

23  could, and not to get too deep in the woods, and I

24  think Your Honor has anticipated our position is this

25  was not a corporate opportunity, this was Lester Eber,

individually, that entered into a consulting agreement
with Southern.  Eber Bros. was essentially bullied out
of the market by Southern, that ship had sailed. There
was no corporate opportunity to usurp at that point.
They were out, there was an agreement amongst Southern
and Eber Bros. that they were going to be out of New
York. At that point, Lester Eber, given his numerous
contacts, his experience in the industry, was offered
this consulting position with Southern, he had every
right to accept it.

The value of that consulting agreement, and
Lester testified to this during his deposition, and I
would anticipate that when we take the deposition from
Southern, said, look, this is a large company, it pays
generous salaries, this was commensurate with what
other folks were getting doing similar things in
similar areas of the country. So I know Mr. Brook
wants to turn this essentially into a conspiracy that
Lester was somehow funneling money to himself, that
wasn't the case. He was receiving this money pursuant
to an aboveboard consulting agreement.  And if there's
an issue with that, his consulting agreement was back
in 2008, and by Mr. Brook's own admission, his clients
were aware of it at that time. So any claims relating

24

to that, I don't think there are any that are

meritorious anyway, but certainly a decade later have

sailed, to put it simply.

          With respect to some of the other arguments

that Mr. Brook made, essentially we're saying a lot of

the factual predicates in this third amended

complaint, a lot of the actions that are complained

of, were not necessarily taken in a fiduciary

capacity. He probably has a point on the fiduciary

exception relationship if whatever he is relying on is

taken in the capacity of a fiduciary. Many of them, at

least some of them in the complaint, were not. And

those are the ones, and I apologize, I don't have a

brief in front of us, those are the ones that we're

saying, look, if you are not doing this as a

fiduciary, you don't get obviously the benefit of the

fiduciary exception.

          THE COURT:  How much additional discovery,

beyond what's already been contemplated, would be

required by addition of these new claims from your

perspective?

          MR. RAMSEY: I don't know that it would be

terrible significant. I think there would certainly be

some additional depositions, one on the stock issue,

25

for example, I think we're probably going to want
further depositions of Canandaigua National Bank
anyway, but certainly the stock issue that's raised in
the third amended complaint would require additional
depositions. Beyond that, some of the depositions that
are outstanding might cover that, so I don't want to
say, hey, look, we've got to do this whole new round
of depositions, but there would at least be some
additional discovery from our perspective now.

THE COURT:  Okay, and how would that impact
the timeline for discovery?

MR. RAMSEY: Well, as Mr. Brook said, we've got
a Southern deposition noticed for the end of this
month, we've got the deposition of Mark Stein, the
brother of plaintiff, Lisa Stein, this Friday
actually. There's been some talk of some other third
parties that I think Mr. Brook wanted so I'll let him
speak to that. But I would think a brief extension
would probably be necessary, I don't think it would be
too terribly wrong, a month or two would be my
thought, subject to Mr. Brook's opinion.

THE COURT:  Okay.  Mr. Brook, from your
perspective, how much additional discovery would be
needed by these added claims and how would that impact

the schedule?

MR. BROOK:  I don't think there is any additional discovery that would be needed.  I think the Southern deposition is more defensible with the third amended complaint in there in an active claim, but either way, Southern is important because this money that is going to Lester Eber was ultimately what was being used for him to make loans to the company. So the company, he's getting $600,000 a year from the company and surprise, surprise, the company doesn't have enough money to pay its debts after that point, even though he's continuing to receive a six figure salary from him.

So understanding where that money was coming from and where it was going is part and parcel to understanding also how this debt crisis occurred that was ultimately the excuse that Lester used to take the company for himself as a creditor. You know, if the company had been getting $600,000 a year from Southern instead, and Lester was just given credit for making that deal happen, and he was doing the same work for Southern that he did for Eber Bros. you know, he'd just continue to get paid by Eber Bros. for doing the work for the company. If he brought the deal into the

                                                                    27

1

2  company as a CEO of the company, rather than doing it

3  on the side, the company would not have been in the

4  credit crisis that it had.  And that's an important

5  part of the story that we need to tell, and

6  understanding that with Southern, so that's the only

7  one where, you know, if we had the third amended

8  complaint in we'd get more.

9           I have no idea what Mr. Ramsey is talking

10  about when he says he needs more depositions of

11  Canandaigua National Bank based on the sock issue in

12  terms of who owns the stock or not.  That is an issue

13  that is going to be decided entirely based upon two

14  things, interpreting what the dissolution of the trust

15  order says and the bylaws of the company and how those

16  apply. And I think that from the depositions that

17  we've had, the last one got unfortunately very heated,

18  very emotional for Ms. Eber, you know, it's clear that

19  they are under the impression that that issue is a

20  silver bullet for them.  That somehow they'll be able

21  to just take the shares for nothing based upon that

22  bylaw provision, and then Lester gets to run the

23  family business without the family in it.  And I

24  believe they also brought up the intent under the Alan

25  Eber Trust document, the will, itself. So maybe we'll

28

1
2   also look at the will. But that's something that I
3   believe is right for adjudication, and because it's
4   seen as this silver bullet, I think it really should
5   be resolved sooner rather than later, and I think it's
6   going to take that being resolved before we even have
7   a chance at seeing a real settlement offer that is
8   close to valuing what my client's claims are worth in
9   this case.
10          THE COURT:  I think when we last spoke all the
11  parties were in agreement that that was a legal issue
12  that could be briefed, is that correct?
13          MR. HERBERT: I think that that's not so,
14  because it's become a much more complicated issue.
15          THE COURT:  Okay.
16          MR. HERBERT: I think that the actions, the
17  acts and omissions of Canandaigua as trustee of the
18  trust after June, 2017, raise a whole host of issues
19  about the propriety of actions that they took. Some of
20  the reasons why they did what they did in 2017, we
21  frankly don't know what they, we don't know what they
22  were because Lester Eber wasn't involved in any of
23  that decision making at all, he had nothing to do with
24  it.
25          THE COURT:  I see. So that's why you're saying

1

2  you would need some deposition.

3          MR. HERBERT: Absolutely, yes.  Yes.  I

4  couldn't tell you today why, I think there's a

5  question as to whether or not the stock was allocated

6  amongst the beneficiaries in the summer of 2017, I

7  think there's a serious question as to whether or not

8  that was done appropriately. And I don't know why

9  Canandaigua did it the way they did it and we need to

10  have some deposition testimony from them to understand

11  why they did what they did and the way they did it.

12  And that has ramifications throughout all the issues

13  relating to who's entitled to which shares of stock

14  and whether or not this call right fits into the whole

15  case. So I think that we did discus this at a prior

16  conference but I think it's become a much more

17  complicated issue since then.

18          THE COURT:  So from your client's perspective,

19  there would be the additional deposition of a bank

20  representative.

21          MR. HERBERT: Absolutely.

22          THE COURT:  Okay.

23          MR. HERBERT: I think one thing that's important

24  to note, in 2017, Canandaigua decided to try to terminate

25  the trust, Alan Eber Trust, and they filed their petition

1                                                                30

2   in February and it was finally adjudicated in June. Lester

3   and Wendy Eber, they didn't have anything to do with that

4   process at all, nothing to do with that. So what the

5   motivation was behind the bank's filing that petition,

6   whether or not they thought they were entitled to try to

7   terminate the trust, because at least on a reading of the

8   petition, the petition seems illogical to us because it

9   doesn't seem to be responsive to what the requirements

10  are in the will to be in a position to terminate the

11  trust. And then things that happened after that raise

12  a lot of questions in our mind that we need deposition

13  testimony.

14          THE COURT:  Okay.

15          MR. BROOK:  May I say a couple of things to

16  correct Mr. Herbert on a few things that I think are

17  really important to what he said?

18          THE COURT:  Sure.

19          MR. BROOK:  Lester Eber entered an appearance

20  in the action to terminate the trust, and his lawyer

21  waived any objection to terminating the trust. That's

22  why the Court entered an order saying here's how the

23  assets are going to be distributed. So for Mr. Herbert

24  to stand up and say they didn't have anything to do

25  with that is just incorrect. And that lawyer Wendy

31

1

2  Eber said was representing her interests personally as

3  well. So any objections that they have to Canandaigua

4  terminating the trust and the Court entering that

5  order, they had an obligation to enter at the time

6  when they made an appearance in that case. If they

7  hadn't made an appearance, like my clients did not,

8  maybe they'd have some kind of an argument to do it --

9         THE COURT:  Why didn't your clients make an

10 appearance?

11        MR. BROOK:  Well, because, frankly,

12 termination was premature.

13        THE COURT:  So why didn't your clients enter

14 an objection?

15        MR. BROOK:  Because at the end of the day the

16 last thing they wanted was to have the company

17 business still in the hands of Lester and Wendy Eber.

18 And as long as the trust was around, there was a

19 serious risk that, you know, this would go on years

20 longer as a new trustee has to be appointed, and then

21 we'd have to be overseeing that trustee.

22        So when Canandaigua said they were going to

23 just try to terminate the trust and distribute the

24 shares, my clients made, we made the decision not to

25 oppose that, but not to support it either.

32

THE COURT:  But now you're using the basis of that to add new claims to the complaint.

MR. BROOK:  Well because, at the end of the day, that order is still a Court Order that is binding on the parties that did enter an appearance there, and it's binding on my clients, too.

THE COURT:  Right, but how is it, if your clients had an opportunity to object to that, you didn't appear, you chose not to appear, you chose not to object and now you want to use that transaction as the basis to add a claim against the defendants, is that right?

MR. BROOK:  I think Your Honor has it backwards. They're the ones who want to undo that Court Order. We support that Court Order, we have no problem with what that Court did, with what was ordered in it, it was done completely correctly in terms of distributing the assets according to how they needed to be.

THE COURT:  Okay.

MR. BROOK:  And Lester Eber agreed with that and then years later Canandaigua is saying, well, we need to distribute these shares. And first there were these excuses about a missing stock book.  We've

33

recently had some emails produced to us by

Canandaigua's lawyer that show that, and Your Honor

may remember this, too, so representations had been

made that no one misplaced the stock book for the

company, that was never represented. Multiple emails

from Lester and Wendy's lawyer in that trust action,

in that Surrogates Court action, to Canandaigua's

lawyer saying we can't find the stock book, we're

going to maybe do a special trip up to Rochester to

try to find it.

So there was active obstruction going on

trying to prevent the Court's order from going

through. Because what happened was they entered an

appearances, they order went through, and now they

don't want to abide by the order that they were a part

of. And so we're not challenging that, we're simply

saying that we've been relying on that for a long

time, from the first time that we amended the

complaint after that transaction we made it clear that

the trust doesn't exist, that's our understanding.

And what Mr. Herbert's actually saying is he

wants to revive the trust, have this Court somehow do

that, even though it's a Surrogates Court order that

has already terminated the trust, I don't know how

34

that's possible. But the other thing that's really
remarkable about their position is they think that the
trust still exists and should be revived by judicial
fiat, but that Lester Eber doesn't have any duties as
trustee.  That somehow only he was relieved of his
duties as trustee. I mean obviously Mr. Gumaer also
passed away, so that Canandaigua is now solely the bad
guy. And what they are really trying to do is they're
trying to take advantage of the fact that we did reach
a settlement with Canandaigua which was very much on
the sidelines on this thing. They only thing they did
wrong was not acting more as trustee and filing suit
when it discovered these transactions earlier. So
they're trying to make Canandaigua into the bad guy as
much as they can and they're trying to delay this
thing. There is no reason why we need to depose
someone from Canandaigua about what they did. Nothing
that they did or didn't do is remotely in dispute. The
only question that this Court can address is a legal
one which is does this Court see the Court's order
from Surrogates Court as having impact or binding
authority here. I mean there's legal issues that might
come into play, but none of that is going to require a
deposition and further delay of this issue.

35

THE COURT:  Okay.

MR. BROOK:  Thank you.

THE COURT:  Hold on, let me hear from Mr.
Calihan.

MR. CALIHAN:  I just want it noted that the
Gumaer estate has already asked for both Canandaigua
depositions and they've been agreed to.

THE COURT:  Um-hmm.

MR. CALIHAN:  We may be arguing about the
scope of those depositions but we're going to be
completing Awk's (phonetic) deposition and then taking
the deposition of Mr. Lowenthal. I think there is no
dispute but that they are going to go forward.

MR. BROOK:  I think the issue is the third
Canandaigua deposition.

THE COURT:  Okay.

MR. HERBERT: Let's make sure we understand
what we're talking about here. Mr. Brook, it's very
interesting but that's actually not what happened,
okay?  Canandaigua, in the winter of 2017, they
decided to terminate the trust. They cobbled up a
petition to be filed in the Surrogates Court. They
cobbled up a final accounting with respect to the
termination of the trust. It is noted in the

accounting expressly that Lester Eber had nothing to

do with the preparation of the final accounting, okay?

It is true that when it came on for adjudication, that

Lester Eber did make an appearance there and did

acquiesce in the final order, okay, but all the

termination order did was it ordered that the assets

of the trust as a whole be distributed one-third, one-

third, one-third. It didn't purport to address how any

particular issue was to be allocated amongst the

beneficiaries.

        So there was a process in July and August of

2017 where the Trust Department people at Canandaigua

came up with a specific allocation of the specific

assets in the trust.  Their first attempt at

allocating the assets, we pointed out to them, was

wrong, okay, it had nothing to do with the order from

the Surrogates Court, this was like mop up duties that

Canandaigua had as a trustee.  If you look at the

order issued by the Surrogates Court, it's all about

what Canandaigua has to do to finalize the

distribution of the trust assets. There is nothing in

there about what Lester Eber has to do, he didn't have

anything to do. Lester Eber pointed out to the people

at Canandaigua that they did the allocation

37

1  
2  incorrectly.  Then in the month of August Canandaigua

3  went back and did a reallocation and it would be our

4  contention that we're not so sure they did that

5  correctly, and it does have ramifications on all the

6  rest of the issues.

7          THE COURT:  Okay. Well I'm going to permit you

8  to ask questions about this in the depositions of the

9  Canandaigua folks whose depositions have been noticed.

10  I'm going to --

11          MR. HERBERT: Can I ask you, those are not the

12  right witnesses though.

13          THE COURT:  Oh, so you need to have a

14  different person from Canandaigua?

15          MR. HERBERT:  Right.

16          MR. RAMSEY:  The thought was, if Your Honor

17  read the motion to intervene, we'd do an appropriate

18  notice and have them produce --

19          THE COURT:  Yes, I'm granting the motion to

20  intervene and then you can notice that deposition. I'm

21  going to reserve judgment on the amendment to the

22  complaint, but I will turn to that shortly.  So let's

23  talk about the discovery schedule though, it seems

24  that you're not going to meet the March 29th deadline

25  to complete fact discovery, you have an expert

38

1
2  discovery deadline of May 31st right now, so I'm going

3  to extend both deadlines by sixty days.  And I'm going

4  to schedule another conference, status conference, how

5  would Monday, May 20th work?

6          MR. BROOK:  That time, Your Honor?

7          THE COURT:  Let's do 10 a.m.  All right, is

8  there anything else that any of the parties wanted to

9  raise at this time?

10          MR. BROOK:  I understand how burdened the

11  Court is, I've clerked, does the Court have any sense

12  of when we might get a ruling on the privilege issues?

13  Because to the extent that we need to do much more

14  discovery at all, that's really the biggest factor.

15          THE COURT:  I understand.  I'm working on it.

16          MR. BROOK:  Okay.

17          THE COURT:  All right, then we're adjourned.

18  Thank you.

19          (Whereupon the matter is adjourned to May 20,

20  2019, at 10:00 a.m.)

21

22

23

24

25

39

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing transcript of proceedings in the United States District Court, Southern District of New York, Kleeberg, et al. versus Eber, et al., Docket #16cv9517, was prepared using PC-based transcription software and is a true and accurate record of the proceedings.

Signature_____

Date:  March 25, 2019