## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| DANIEL KLEEBERG, LISA STEIN, and AUDREY HAYS,<br><br>     Plaintiffs,<br><br>  v.<br><br>LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC; CANANDAIGUA NATIONAL BANK & TRUST COMPANY; ESTATE OF ELLIOTT W. GUMAER, JR.; EBER BROS. & CO., INC.; EBER BROS. WINE AND LIQUOR CORP.; EBER BROS. WINE & LIQUOR METRO, INC.; EBER-CONNECTICUT, LLC; and WENDY EBER,<br><br>     Defendants. | Civil Action No.  16-CV-9517(LAK)(KHP) |

## SUPPLEMENTAL BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO AMEND THEIR COMPLAINT

Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Facsimile: (646) 257-2887
Brian@brook-law.com

*Attorneys for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................... 1

ARGUMENT ............................................................................................................................ 2

I.    The Totality of the Circumstances Should Be Considered In Assessing Diligence ............. 2

    A.    The Circumstances Included Settlement Discussions, Substitution of Parties, and
    Relevant Motions Regarding Privilege Claims and Disqualification ................................. 3

    B.    The Original Scheduling Order Permitted Amendments Until Three Months Before the
    Close of All Discovery, and That Deadline Has Been Extended Repeatedly ................... 5

II.   Identifying What Is Subject to the Order for Supplemental Briefing .................................... 6

III.  Addressing Specific Transactions or Claims ........................................................................ 8

    A.    The Decision to Seek Reformation of Lester's Loans Was Based Largely on this
    Court's Comments During the Settlement Conference ...................................................... 8

    B.    Preparatory Transactions, Going Back to 2010 and Polebridge ...................................... 10

    C.    Lester's "Consulting" for Southern .................................................................................. 11

    D.    Slocum & Sons of Maine (and addressing other nominal party additions) ..................... 14

    E.    Defendants' Dilution Efforts in February 2017 ................................................................ 15

    F.    Wendy's Acquisition of Shares in Metro .......................................................................... 16

    G.    Wendy's Aiding and Abetting Malfeasance by the Trustees ............................................ 16

    H.    Assignment of Harris Beach's Claims to Lester ............................................................... 16

IV.   The Second Circuit Has Expressly Held that Diligence Is Not the Only Factor to
    Consider After a Rule 16 Deadline Passes ......................................................................... 17

CONCLUSION ....................................................................................................................... 19

i

# TABLE OF AUTHORITIES

**Cases**

*Castro v. City of New York*, 2010 WL 889865 (E.D.N.Y. Mar. 6, 2010)...................................... 17

*Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170 (S.D.N.Y. 2014) ..... 17

*Grochowski v. Phoenix Const.*, 318 F.3d 80 (2d Cir. 2003) ........................................................ 17

*Joinnides v. Floral Park-Bellerose Union Sch. Dist.*, No. CV 12-5682 JS AKT, 2015 WL
1476422 (E.D.N.Y. Mar. 31, 2015) ............................................................................................ 4

*Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229 (2d Cir.2007) ....................................... 17

*Olaf Soot Design, LLC v. Daktronics, Inc.*, 299 F.Supp.3d 395 (S.D.N.Y. 2017) ........................ 2

*Parker v. Columbia Pictures Indus.*, 204 F.3d 326 (2d Cir. 2000)................................................ 17

*Ruotolo v. City of New York*, 514 F.3d 184 (2d Cir. 2008)........................................................... 18

Pursuant to this Court's March 30 Order, Plaintiffs Audrey Hays, Daniel Kleeberg, and Lisa Stein respectfully submit the following supplemental brief in support of their motion for leave to amend the Second Amended Complaint ("SAC").

## PRELIMINARY STATEMENT

This Court has questioned Plaintiffs' diligence in seeking to amend. Plaintiffs have been diligent, not only in pursuing amendments, but more broadly in pursuing the truth. Defendants cannot deny that the documents produced by them are voluminous and difficult to get a handle on, even for them (and their lawyers have been involved in the business since 2011). The Ebers' counsel did not even know there was an engagement agreement between Lester Eber and Gumaer until we found it and attached it to the re-filed privilege motion. *See* 2d Mot. to Compel. Ex. P (filed October 23, 2018). In other cases, interrogatory responses had the effect of misleading Plaintiffs, particularly with respect to the Consulting Agreement between Lester and Southern Wine & Spirits ("Southern").

Ultimately, most of the amendments subject to this Court's order for supplemental briefing are sought by Plaintiffs for the purpose of resolving all anticipated disputes expeditiously in a single proceeding, which would benefit judicial economy and Plaintiffs' resources. Defendants are obviously opposed because they want to delay. If this Court is not interested in hearing these other issues beyond the Metro Transfer itself in a timely fashion, Plaintiffs will initiate a separate action to pursue them. That seems awfully wasteful, however, especially when all of the same facts will have to be considered as part of understanding the complete (and still emerging) story of how Lester and Wendy decided to make sure that the entire Eber family business belonged to their branch of the family alone.

## ARGUMENT

### I.  THE TOTALITY OF THE CIRCUMSTANCES SHOULD BE CONSIDERED IN ASSESSING DILIGENCE

Good cause exists to amend the scheduling order to permit the requested amendments because Plaintiffs have been diligent in pursuing these amendments. To assess diligence, the Court must consider the totality of the circumstances, including the nature of the amendment and whether it would amount to a "radical departure" from the existing claims. *Olaf Soot Design, LLC v. Daktronics, Inc.*, 299 F.Supp.3d 395, 399 n.4 (S.D.N.Y. 2017). The more extreme the amendment in terms of altering the landscape of the case, the greater diligence must be exercised. Here, the latest amendments are largely based on facts learned in discovery about transactions that are intertwined with the Metro Transfer at the core of this case since the outset. If Plaintiffs' challenges to those transactions are not expressly addressed in this case, it will result in wasteful duplication of effort to relitigate the same issues solely to obtain further judicial relief, even though one Court has already been educated sufficiently to render a ruling.

The initial Rule 16 scheduling order was originally entered with the assumption that the window for discovery would be *much* shorter. Judge Kaplan had required the parties to propose a schedule that would have a joint pretrial order due within just six months. Based on that, the parties picked a date for amendments to be due of March 31, 2018. Two parties chose to amend their pleadings before that date: Plaintiffs and former Defendant Canandaigua National Bank & Trust ("CNB"). Plaintiffs' amendment

The filing of the First Amended Complaint ("FAC") was critical to helping to settle with CNB. The elaboration on the facts there based on discovery so far helped CNB come to the table. It was with that in mind that Plaintiffs sought to amend the complaint again in the manner that they did. So many of the amendments in the proposed Third Amended Complaint ("TAC") are

not technically necessary given the breadth of the current operative complaint, but were made because, after the settlement talks failed to yield any progress, it seemed a good idea to lay out our case in more exacting detail. It is vital to keep this in mind to avoid a ruling that inadvertently *narrows* the current complaint rather than denying leave to expand it.

Alternatively, if it did not facilitate getting the Ebers towards a reasonable settlement position, the TAC was written with another, similar objective in mind: a final resolution in one proceeding. Lester's attempt to side-step this Court and take Plaintiffs' shares in Eber Bros. through extra-judicial action in October 2018 illustrated that Defendants would never stop trying to find ways to fight. Accordingly, it suddenly became clear that even though certain prior transactions would not directly affect the value of Eber Bros. in any material way (e.g., the security agreements executed in 2010 and 2011), those could provide a potential basis for continual fighting even after rescinding the Metro Transfer itself. Rather than waiting for those disputes to arise, it made more sense to ask this Court to rescind such transactions now.

Thus, if this Court denies the motion for leave to amend to add these other pre-2018 transactions, it will not permanently prejudice Plaintiffs since, in some sense, the real dispute over those transactions is not even ripe until we get the Metro Transfer resolved. But that said, since this Court already has jurisdiction over this case and will have to plod through these transactions anyway, there is no good reason not to try to resolve everything in on shot. Otherwise, the only result is that Lester may be left with more options to try to engage in more creative attempts to divest Plaintiffs of their rightful inheritance—and this dispute will never end.

### A.  The Circumstances Included Settlement Discussions, Substitution of Parties, and Relevant Motions Regarding Privilege Claims and Disqualification

Courts recognize that this decision must be based on "the unique circumstances" of the case. *See Joinnides v. Floral Park-Bellerose Union Sch. Dist.*, No. CV 12-5682 JS AKT, 2015

WL 1476422, at *15 (E.D.N.Y. Mar. 31, 2015). Plaintiffs have been aggressively pursuing discovery of the facts in this case, which involved trying to understand a thoroughly confusing set of transactions without the benefit of depositions before moving to amend. Even during depositions, Lester and Wendy often struggled to explain their actions, often simply throwing up their hands and saying, "Ask the lawyer." *See generally* Supp. Br., ECF No. 193. Under the circumstances, Plaintiffs were justified in generally awaiting some clarity about the facts during ongoing discovery before rushing towards filing a new amendment every time a light bulb goes off. Plaintiffs had to balance the need to act with diligence against the need to avoid making insufficiently supported allegations of serious wrongdoing based on an unavoidably incomplete understanding.

That concern is why Plaintiffs tried to schedule depositions of Lester and Wendy Eber over a year ago, but Defendants refused to agree to a date that did not conflict with the undersigned's trial scheduled in another matter.  Moreover, the need to substitute the Gumaer Estate for the recently deceased Gumaer made scheduling depositions more difficult while that was unresolved.

Despite the hesitation given so much remaining discovery, Plaintiffs were forthright with this Court about their intention to amend prior to the September 5 settlement conference. Ex. B. Plaintiffs again raised their anticipation of amending the pleadings on October 16, 2018, during the telephone conference about why Plaintiffs were aggressively pursuing the documents withheld on privilege grounds. Brook Decl. ¶ 16. We stated that based on the privilege log alone and the recent discovery that Underberg & Kessler LLP ("U&K") had been representing EBWLC in certain matters at the same time that it filed a lawsuit on behalf of Alexbay against EBWLC, we were considering seeking to amend and to add U&K as a party. *Id*. This Court then

stated that it believed it was too late to be adding new parties, and accordingly Plaintiffs then

stated, at the minimum, there was likely a basis to disqualify counsel. *Id.* Nonetheless, Plaintiffs'

diligence in ferreting out the facts necessary to support further amendments was never seriously

questioned by Defendants, especially not in light of the aggressive and still-pending pursuit of

documents withheld on privilege grounds for well over a year now.

### B. The Original Scheduling Order Permitted Amendments Until Three Months Before the Close of All Discovery, and That Deadline Has Been Extended Repeatedly

The February 21, 2018 Rule 16 scheduling order included a discovery end date of June

29, 2018. *See* ECF No. 80 ("All discovery, including any depositions of experts, shall be

completed on or before June 29, 2018."). The deadline for amendments was set by consent of the

parties for three months before the discovery end date.

Since then, the discovery deadline has been extended several times, well beyond what

Judge Kaplan contemplated. Although the other deadlines required by Rule 16(b)(3)(A) have

never been formally adjusted, it is apparent that the parties understood that they were impliedly

adjusted along with the discovery deadline that served as the guidepost for working towards the

ultimate resolution of this case. That is why neither side briefed this motion under the Rule 16

standard.

Plaintiffs have never hidden their intention to seek further amendments as discovery

progressed. *See, e.g.,* SAC ¶ 104 ("In reviewing the discovery produced by Defendants in this

action (even though that review is still ongoing and depositions have not yet occurred), Plaintiffs

have learned of additional facts, including…").[1] The SAC also alleged that critical documents

were being withheld on privilege grounds. *Id.* ¶ 107. The Court cannot doubt that Plaintiffs have

---

[1] Prior to the September 5, 2018 settlement conference, Plaintiffs also advised the Court that they intended to make further amendments based on the discovery that was ongoing. *See* Ex. B at 2.

been diligent in their efforts to obtain those concealed communications, which could very well have illuminated in minutes what has instead taken Plaintiffs' counsel hours and hours to discern from the dense transaction documents themselves. Plaintiffs expressly intended further amendments in view of the privileged documents and depositions.

Despite the ongoing struggle to obtain complete discovery, the motion for leave to amend was nonetheless filed ***before*** either receiving a ruling on the privilege dispute or deposing any of the Eber Defendants. This is why, given that many of the amendments are to correct or elaborate on the facts, Plaintiffs arguably filed too soon. Indeed, several assertions in the proposed TAC have already been determined to be wrong or incomplete based on the Ebers' depositions in January and February 2019.

## II. IDENTIFYING WHAT IS SUBJECT TO THE ORDER FOR SUPPLEMENTAL BRIEFING

Because the proposed TAC was written with an eye towards laying out more of the facts in support of a more persuasive presentation of the existing claims, there are many changes that are already legally joined by the existing pleadings and therefore need not be specifically addressed by this Court.[2] These include, most notably, the longstanding request for "Rescission of all of the agreements related to the transfer of Eber Metro to Alexbay," SAC ¶ 174(d). That existing demand fairly encompasses the majority of the additional details alleged in the general facts section of the TAC and much of Count I.[3] Several of the related agreements for which specific equitable relief is now expressly sought were already challenged or questionable transactions in the original Complaint:

---

[2] It is unfortunate that the Ebers simply objected to everything without any specificity whatsoever. There was no good reason for them to do that. It was either laziness on their part or a desire to bog this Court down given Plaintiffs' substantial rewrite, or both.

[3] Because of the voluminous detail in the SAC on transactions subject to rescission, Plaintiffs separated SAC Count I into two separate counts in the TAC: Count I for rescission and Count II for faithless servant.

- Lester's loans and the subsequent Security Agreements (Compl. ¶ 49; TAC Count I ¶¶ 252-61)

- The Polebridge Transaction (Compl. Ex. G at 7-8; TAC Count I ¶¶ 233-51)

Only one such "related" transaction was new to the TAC: The elimination of Eber Metro's debt to EBWLC (TAC ¶¶ 146-50, 220-223).

Other transactions were less closely related to the Metro Transfer, but were already added to the FAC and are thus in the current SAC[4]:

- Lester's Consulting Agreement with Southern (SAC ¶ 82; TAC Count I ¶¶ 188-91 and Count III ¶¶ 295-97)

- Slocum & Sons of Maine (SAC ¶¶ 114-18, 126, 136, 155; TAC Count I ¶¶ 224-29)

The truly new additions based on events occurring before the SAC was filed on April 16, 2018, and which are at the core of the request for supplemental briefing, are as follows:

- Lester and Wendy amending EBWLC's Certificate of Incorporation and issuing new shares to Lester to dilute Plaintiffs' interests in February 2017 – Count I (TAC ¶¶ 265-273) and Count IV (in part, ¶¶ 302-305)

- Wendy Aiding and Abetting Breach of Fiduciary Duty and Fraudulent Concealment, based on conduct occurring prior to December 2016 - Count VII

- Wendy's acquisition of a 9.1% interest in Eber Metro pursuant to an Employment Agreement dated August 14, 2012 - Count I (TAC ¶¶ 230-32)

- The assignment of Harris Beach's Claims to Lester – Count I (TAC ¶¶ 262-64)

The new counts based on conduct occurring since the filing of the SAC generally concern Lester's attempt to divest Plaintiffs of standing and thereby avoid a judicial decision on the merits. To ensure clarity of what that covers, it is pled in:

---

[4] These were added to the SAC based on interrogatory responses, since Plaintiffs had not been able to spend any significant amount of time reviewing the voluminous and dense documents produced before the March 31, 2018 deadline. *See* Brook Decl. (explaining that counsel was preparing for a high-profile trial starting in May 2018). Later, with the benefit of sufficient time to process the documents and get a more complete understanding of the transactions, Plaintiffs had the necessary ammunition to go after the transactions more explicitly, with the goal setting those transactions aside in one proceeding.

- Background (¶¶ 170-75)

- Count IV (in part, ¶¶ 306-331)

- Count V (all)

- Count VI (all)

Accordingly, these are <u>not</u> subject to the Court's order for supplemental briefing.

### III. ADDRESSING SPECIFIC TRANSACTIONS OR CLAIMS

#### A. The Decision to Seek Reformation of Lester's Loans Was Based Largely on this Court's Comments During the Settlement Conference

Plaintiffs have disputed Lester's loans from the outset of the case. *See* Compl. ¶¶ 49-52 (alleging that "the purported loans by Lester to Eber Bros. were fictitious or exaggerated," based in part on a letter sent by Lester stating that he had only loaned $500,000 (rather than the $2.5 million he later claimed) as of April 2010). But, importantly, Plaintiffs did not request any judicial relief or declaration with respect to the loans specifically. Instead, the lack of support for the loans was one factor that would support the requested relief of unwinding the Metro Transfer.

Plaintiffs did not believe that a challenge to the terms of Lester's loans was necessary because Plaintiffs were seeking control over Eber Metro (the entity that had assumed the debts). Once such control was obtained, as a matter of corporate governance, Plaintiffs (through their chosen officers) could make the decision about whether to refuse to pay the loans in whole or in part. And if the loans were insufficiently supported, the burden would be on Lester to sue—and prove in court the legitimacy of the loans.

During the September 5, 2018 settlement conference, however, this Court indicated that Plaintiffs could not obtain their requested relief without repaying Lester's loans. When Plaintiffs stated their position that, although the loans (if real) would no longer be deemed satisfied if the foreclosure transaction was unwound, it would then be for the corporation to decide what to do

with the loans (as an example, Plaintiffs stated that it would be necessary for the corporation to determine whether the support for the loans was adequate to establish that the loans were real and not already repaid). This Court questioned Plaintiffs' understanding of corporate governance in this situation and indicated that the Court might order the repayment of Lester's loans as part of the ultimate judgment in this case.

Considering the Court's comments, Plaintiffs determined that it was necessary to litigate the details of the loans in this proceeding, to avoid potential res judicata effect on the issue despite the fact that Plaintiffs had not directly challenged Lester's loans in this proceeding.

Moreover, at the time, Plaintiffs had no knowledge of *how* those loans were approved by the Eber Bros. company. According to documents produced by the Ebers, the loans were "ratified" by the co-trustees, including Canandaigua National Bank's trust officer for the Allen Eber Trust (the "Trust"), Rick Hawks. Ex. F at 4. But during the first deposition in this case, on August 20, 2018, Hawks testified that he "would not characterize it as a ratification," because there was inadequate information provided and no vote occurred. *See* Ex. E at 89:2-91:20. This was an important discovery because it meant that no disinterested or independent person had ever examined the terms of the loans to determine whether they were fair to the company or its shareholder (the Trust). This testimony also contradicted the meeting minutes prepared by Wendy Eber.

In light of the newfound basis to challenge the loans provided by Hawks' testimony, combined with the Court's indication that the details of the loans might need to be litigated before judgment is entered here, Plaintiffs have requested to challenge the loans now. To be clear, Plaintiffs would be happy to leave this issue for another day as originally planned, as long

as this Court's order makes clear that the legitimacy or fairness of Lester's loans will not be the subject of a judicial determination in this proceeding.

## B.  Preparatory Transactions, Going Back to 2010 and Polebridge

In the original Complaint, Plaintiffs sought "[r]escission of all of the agreements related to the transfer of Eber Metro to Lester Eber, Alexbay, and any other affiliated persons or entities." Compl. 23. The specific agreements were not specified because, although some were known from the record in the prior Harris Beach litigation, Plaintiffs were uncertain as to how they "related" to each other, and whether there were additional transactions yet to be discovered. Accordingly, all transactions that Plaintiffs could prove are related are already subject to rescission, whether or not they are specified in the detail provided by the TAC. Nonetheless, out of concern that Plaintiffs might have the SAC constructively narrowed by denial of motion for leave, we will explain the additional request to rescind "preparatory transactions."

In particular, Plaintiffs did not know when Lester began preparing to take over the family business. According to the Harris Beach complaint (which is incorporated by reference into the original Complaint and SAC), the chain of "Events Leading Up to the Fraudulent Conveyance" began on "December 8, 2011, two and a half months after" Harris Beach first sued Eber Bros. for nonpayment of legal bills. Compl. Ex. G at 4, ECF No. 1-7.

As of the time the motion to amend was filed, Plaintiffs still did not know for certain when the plans began or how far back they were really planning this. But the subsequent depositions have in general been consistent with our inference that the real preparation for Lester's personal taking of Eber-CT began when Glenn Sturm was retained in or about February 2012. Sturm proceeded to direct Lester to secure his loans to the Company (without giving the Company any new consideration), thus setting the stage for him to foreclose on the loans and take the assets.

10

By the time of the SAC's filing, Plaintiffs knew only some, but not all of the transactions that were preliminary steps to the 2012 Metro Transfer. Other transactions that got more specific names than "the Preparatory Transactions" in the TAC were nevertheless preparatory and thus included in the scope of the SAC's request to rescind all "related" agreements.

With respect to the Polebridge Transaction, rescission is now sought because Plaintiffs learned that that transaction was a sham concocted by Glenn Sturm to serve as the basis for undervaluing Eber-CT when the time came for Lester to foreclose on the debt. This "discovery" was not based on any one piece of information being newly produced, but rather the result of processing the totality of the documents that had been produced, combined with careful review of Defendants' privilege log entries (showing the dates when Sturm was communicating with them) during the privilege dispute that was first briefed over the summer in 2018. In particular, upon learning that Wendy Eber had somehow come to own the Polebridge 6% interest herself, the right of first refusal buried in the middle of the original deal became apparent and that self-dealing aspect of the transaction strongly supports the finding that it was simply a sham.

With respect to the elimination of Eber Metro's debt to EBWLC, neither Metro's debt nor the elimination of it was known to Plaintiffs until after a deep dive into the accounting records in the weeks immediately before this motion was filed. *See* Brook Decl. ¶¶ 28-29.

### C.  Lester's "Consulting" for Southern

Prior to this lawsuit, Plaintiffs had only vague, second-hand inklings that Lester had done some kind of consulting work for Southern, but they did not know how much money that was, where that money was going (i.e., to Eber Bros. or to Lester directly), or what strings were attached to that consulting agreement. Only in discovery did Plaintiffs learn that Lester received $600,000 per year himself, directly, while at the same time receiving a full salary from Eber Bros.

The FAC challenged that consulting arrangement based on the facts as then understood. The FAC indicates that Plaintiffs still believed that the Consulting Agreement had been authorized by the company's board of directors in consideration for reduction or elimination of the debt to Lester:

> Eber W&L nonetheless allowed Lester to accept a lucrative consulting position with Southern that has allowed him personally to be paid several million dollars by Southern in the years since. Such a direct personal benefit to Lester must have eliminated his outstanding debt because, in the absence of any otherwise apparent consideration, it would have constituted a significant ***breach of fiduciary duty***, including the duty of loyalty, for Lester to accept the position at such lucrative payment terms that could have otherwise inured to the benefit of Eber W&L and its shareholders.

FAC ¶ 63 (emphasis added). This shows that the FAC already alleges that, absent consideration to Eber Bros. (i.e., elimination of outstanding debts), Lester breached his fiduciary duty.[5] And the FAC included a count for breach of fiduciary duty. Thus, the issue of whether Lester breached his fiduciary duty through the Consulting Agreement is already joined in this case.

The FAC's allegation necessarily assumed that the company had approved the Consulting Agreement. *Id*. ("Eber W&L nonetheless allowed…."). This assumption was based on Lester's October 2017 interrogatory response, which indicated that the Consulting Agreement was part of the overall settlement transaction with Southern, and expressly stated that that transaction had been approved by Lester, Wendy, and Gumaer:

> [Interrogatory No.] 3. Identify all persons involved in any transaction between any Defendant and Southern, and specify which transaction each person was involved in and his role in the transaction.
>
> Response to No. 3:

---

[5] The Court may recall that, during the September 5, 2018 settlement conference, Lester and Wendy defended the Consulting Agreement and tried to dissuade Plaintiffs from pursuing claims based on it. So did this Court, through its vocal skepticism of Plaintiffs' position. Accordingly, that alone made it reasonable for Plaintiffs to conduct further diligence before seeking to amend further to state a direct claim based on the transaction.

> Settlement of lawsuit and Sale of Delaware and Ohio – Lester Eber, Wendy Eber
> and Elliott Gumaer (Directors authorizing transaction)[2007].

Ex. A at 5.[6] Plaintiffs relied on this response and amended the Complaint accordingly in Spring 2018. Nonetheless, Plaintiffs recognized the need for more specific information given the new allegations in the SAC and issued additional interrogatories to Lester for more information. In his August 27, 2018 response, Lester provided inconsistent information.[7]

Given the inconsistencies, Plaintiffs the Court may recall that Plaintiffs specifically discussed the Consulting Agreement during the settlement conference the following week. There, Wendy and Lester provided more information to downplay the significance of the Consulting Agreement, claiming that it had ended in 2012. This statement was surprising because we recalled that Lester's interrogatory responses said that he received income from Southern after 2012. This raised enough concern that we began fact-checking and looking at the overall transaction more closely. It turned out that Lester and Wendy had misspoken at the settlement conference: After the Consulting Agreement's initial five-year term ended, Lester continued consulting for Southern for a new contracted price of just $10,000 per year.  We realized this fact on or about October 22, 2018. Brook Decl. ¶ 22.

Confused about why the amount changed so drastically, we began searching for answers. Only after careful review of these documents did we realize that the Consulting Agreement's

---

[6] If the Ebers argue that they did not understand the Consulting Agreement to be a transaction, that should be rejected. Black's Law Dictionary defines a transaction as "[t]he act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract." Black's Law Dictionary 1535 (8th ed. 2004). Moreover, they included as a second "transaction" the Alexbay foreclosure action where Southern was a party—that shows they were interpreting this interrogatory broadly.

[7] In response to the interrogatory asking him to identify everyone who was responsible for or involved in reviewing or approving the terms of" the Consulting Agreement, Lester said: Harris Beach PLLC, as attorneys; Elliott Gumaer, as attorney; and Lisa Semenick, Director to Eber W&L. This conflicted with the prior response identifying Wendy Eber, and stating that Gumaer had approved the deal as a director. But more troubling was the response to the question about what documents were disclosed to any directors or officers of the Eber Companies, where Lester said, merely, "Do not recall." It begged the question: How could the Consulting Agreement be approved by the directors if it was not shown to them?

non-competition clause was the *only* non-competition clause in the entire set of Southern

settlement documents.[8] Moreover, looking at the various corporate board resolutions approving

the numerous Southern settlement agreements, we finally saw that, in fact, the Consulting

Agreement was not referenced in *any* of those resolutions (even though it seemed that each

agreement was the subject of a resolution). Although still not conclusive, this record indicated

that it was never approved by the board of any Eber company. Accordingly, when the Court

requested that Plaintiffs file an amended complaint, we proceeded to substantially amend the

Consulting Agreement allegations in light of having put the pieces together and despite

Defendants' apparently false representations.

 In sum, Plaintiffs were diligent about seeking to amend to go after the Consulting

Agreement once we determined that the Defendants' initial discovery responses to Plaintiffs

about the Consulting Agreement were misleading. Although the documentation was produced

that might have indicated that it was false earlier, this was not the primary claim and therefore

Plaintiffs were reasonably entitled to rely on those representations because the documents

produced were extremely voluminous and Defendants' superior familiarity with the documents

placed them in the best position to answer the key questions.

### D.  Slocum & Sons of Maine (and addressing other nominal party additions)

 Like the Consulting Agreement, Plaintiffs already added at least part of the Slocum &

Sons of Maine facts in the FAC. Unfortunately, even by the time when the TAC was filed,

Plaintiffs still could not discern that entity's role or how Lester and Wendy came to own it. *See*

TAC 229 (demanding Lester and Wendy "fully account for how they came to acquire all of their

---

[8] As clarified at Lester's deposition, he actually was receiving $310,000 a year from mid-2012 forward, but apparently with no contract for $300,000 of that. At the minimum, this shows that the value of the contract was inflated by $300,000 per year for the non-competition clause during the first five years.

interests in Slocum of Maine"). The deal documents for Eber Metro's acquisition of other Slocum entities in 2005 was only produced to Plaintiffs in late November, and they were missing key documents. The agreement by which Wendy and Lester acquired their interests was only produced on January 18, 2019, after the proposed TAC was last updated. *See* Brook Decl. ¶ 23 & Ex. D.

Although Plaintiffs have requested to add several other Eber entities as nominal parties, we did so merely in an abundance of caution because we did not know what further forensic review of the books and records might reveal about their significance. The only entity that should be added to ensure comprehensive relief is Slocum of Maine. But even then, if the Court denies that part of this motion and declines to add any new parties, that probably will be okay based on the details subsequently disclosed about the nature of the Ebers' interests in Slocum of Maine.

### E.  Defendants' Dilution Efforts in February 2017

Lester's acquisition of 750 new-issue preferred shares in EBWLC was a failed attempt to prevent Plaintiffs from getting control of EBWLC upon termination of the Trust (which was being sought by CNB) and receipt of their shares in EBWLC's parent, EB&C.

The documents showing the distribution of shares were produced in September 2017 as part of a 19,746 page production. The specific transactions were not noticed by Plaintiffs' counsel until the summer of 2018 in preparation for the settlement conference, because documents created in 2017—*after* the lawsuit had been filed—did not seem likely to have any direct relevance to the facts at issue in the case. Indeed, these are essentially new causes of action. And as explained above, we seek to have them adjudicated here for the sake of economy, since they would require a trivial amount of further attention to resolve here rather than to require a new case be initiated.

The Court should also consider that Defendants' representations during discovery and settlement conferences reasonably led Plaintiffs to conduct additional investigation before seeking to amend. For example, during the settlement conference, Defendants vigorously defended the February 2017 distribution of new voting preferred shares to Lester as something necessitated by his paying fees on behalf of the EBWLC entity. Brook Decl. ¶ 24. Upon closer review, however (and despite the fact that depositions were being postponed), the explanation fell apart, because of all the Eber Entities, EBWLC was the only one that issued such shares to Lester. Id. ¶ 25. And yet, EBWLC was also the one entity that stood only to gain from Plaintiffs' claims, and thus was the least likely to fairly bear any of Lester's defense expenses.

### F.  Wendy's Acquisition of Shares in Metro

Defendants did not disclose Wendy's interest in Eber Metro until August 28, 2018. *See* Brook Decl. ¶ 30. As shown by the two different versions of the TAC filed already showing different percentages, this was a real surprise when it was noticed, which was not for several weeks after production, due to the volume of other materials produced at that same point and right before the settlement conference. *Id.*

### G.  Wendy's Aiding and Abetting Malfeasance by the Trustees

The additional charges against Wendy for aiding and abetting the trustees' wrongdoing arise from receiving evidence in August 2018 indicating that Wendy played an integral role in deciding to conceal the Metro Transfer from the Trust beneficiaries. *See* Brook Decl. ¶ H.

### H.  Assignment of Harris Beach's Claims to Lester

Honestly, this is just beyond bizarre. Rather than seek a release from Harris Beach after being sued for fraud, Lester instead took assignment of Harris Beach's claims—including the claims against *himself*. This fact was known to Plaintiffs early on in the document review, because the prior Harris Beach litigation about the Metro Transfer was a lead focal point.

Plaintiffs did not seek to amend to include relief as to this transaction because we could not imagine that Lester would actually try to collect. Subsequent events convinced us that logic, reason, and equity hold no influence over what Lester and his lawyers are willing to try to allow him to keep the company he has stolen. To avoid a dispute in the future, this could be resolved now. Of course, this would be moot if Lester were to say in response that he will not try to collect on Harris Beach's claims (at least those against the Eber companies – he can go to town to collect on his claims against himself).

## IV. THE SECOND CIRCUIT HAS EXPRESSLY HELD THAT DILIGENCE IS NOT THE ONLY FACTOR TO CONSIDER AFTER A RULE 16 DEADLINE PASSES

As the *Kassner* decision cited by this Court's order stated, the Court "also may consider other relevant factors including, in particular, whether allowing the amendment of the pleading at this stage of the litigation will prejudice defendants." *Kassner v. 2nd Avenue Delicatessen Inc.*, 496 F.3d 229, 244 (2d Cir.2007) (citing *Parker v. Columbia Pictures Indus.*, 204 F.3d 326, 339–340 (2d Cir. 2000), for the proposition that the "primary consideration" is diligence). That statement was consistent with Second Circuit went further, holding that the Court must "balance[]" Rule 15 and Rule 16 considerations:

> Where a scheduling order has been entered, the lenient standard under Rule 15(a),
> which provides leave to amend "shall be freely given," must be balanced against
> the requirement under Rule 16(b) that the Court's scheduling order "shall not be
> modified except upon a showing of good cause."

*Grochowski v. Phoenix Const.*, 318 F.3d 80, 86 (2d Cir. 2003). "Thus, '[b]y requiring the district court to consider and balance factors other than a plaintiff's diligence, the [Second Circuit] left open the possibility that amendments could be permitted even where a plaintiff has not been diligent in seeking an amendment.'" *Fresh Del Monte Produce, Inc. v. Del Monte Foods, Inc.*, 304 F.R.D. 170, 175 (S.D.N.Y. 2014) (quoting *Castro v. City of New York*, 2010 WL 889865, at *2 (E.D.N.Y. Mar. 6, 2010)).

Applied here, even if this Court has lingering doubts about whether Plaintiffs were diligent when it came specifically to amendments, it should nonetheless grant leave to amend given the nature of the amendments. As to existing claims that have been expanded upon (e.g., SAC Count I becoming TAC Counts I and II), the additional detailed allegations should, if anything, help defendants prepare their defense by giving them a detailed roadmap to our case. The amendments also seek to avoid potential duplicative litigation, by ensuring that all improper transactions considered in the course of this litigation be ruled upon in one proceeding rather than in piecemeal and potentially inconsistent fashion.[9]

An amendment is prejudicial to the non-moving party if it would "require the opponent to expend significant additional resources to conduct discovery and prepare for trial' or 'significantly delay the resolution of the dispute." *Ruotolo v. City of New York*, 514 F.3d 184, 192 (2d Cir. 2008) (quotation omitted). Here, permitting amendment will actually expedite the resolution of the full dispute between the parties, by resolving other issues now that would otherwise require further litigation later on. *See also* Pls. Reply at 3.

Defendants got to see the proposed amendments weeks before any of them were deposed. Fact discovery alone has been extended to six months after the date when the motion for leave to amend was filed—twice as much time as provided by the first Rule 16 scheduling order. There would be no prejudice to Defendants, and that factor weighs in favor of granting leave to amend.

---

[9] Because of the fiduciary tolling rule, Plaintiffs could go and file a new lawsuit based on any claims excluded from this case and it would still be well within the applicable statute of limitations. That is unduly wasteful, however.

## CONCLUSION

The Court should find that Plaintiffs acted diligently or, alternatively, find that leave to amend is nonetheless warranted when balancing the Rule 15 and Rule 16 considerations.

Respectfully submitted,

/s Brian C. Brook
Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Facsimile: (646) 257-2887
Brian@brook-law.com

*Counsel for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

Dated: April 13, 2019

19