## BROOK & ASSOCIATES, PLLC
### —— NEW YORK | NEW JERSEY | WASHINGTON DC ——

**BRIAN C. BROOK**
BRIAN@BROOK-LAW.COM

100 CHURCH STREET
FLOOR 8
NEW YORK, NY 10007
TEL: (212) 256-1957

May 1, 2019

**By ECF**

The Honorable Katherine H. Parker
United States Magistrate Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

**Re:** *Daniel Kleeberg et al. v. Lester Eber et al.,* 1:16-cv-09517-LAK-KHP
    **Motion Conference Request to Seek Protective Order**

Dear Judge Parker,

I write on behalf of Plaintiffs in the above-named matter to request a conference to discuss a motion for a protective order against the Eber Defendants' efforts to take time-consuming and expensive discovery for the sole (improper) purpose of attempting to collaterally attack the 2017 Surrogate's Court proceedings in which the Allen Eber Trust was deemed terminated and its assets were ordered to be distributed to the Trust beneficiaries.

**Meet-and-Confer Requirement:** After receiving a Rule 30(b)(6) deposition notice from the Ebers to Canandaigua National Bank ("CNB") on April 4, 2019, I sent written objections on April 8, 2019. Afterwards, counsel for CNB indicated that he also had objections but was unavailable for some time before he could participate in a meet-and-confer. The parties spoke by telephone on April 25, 2019. Although some modifications to the Rule 30(b)(6) notice occurred as a result, the Ebers insist on questioning CNB's actions in Surrogate's Court. *See* Ex. A.

**Background:** In 2017, CNB petitioned the Surrogate's Court for Monroe County for an order terminating the Allen Eber Trust (the "Trust") and distributing its assets to the beneficiaries proportionate to their respective interests in the Trust. Notice of the petition was served on all co-trustees and beneficiaries, including Plaintiffs and Defendant Lester Eber, who was both a co-trustee and a beneficiary. Lester entered an appearance in the Surrogate proceeding.[1] Despite doing so, Lester did not object either to the termination of the Trust or to CNB's accounting and

---

[1] Plaintiffs declined to incur the expense of entering an appearance through counsel, because they did not disagree with the requested relief or the accounting provided.

proposed distribution of assets. And it was so noted in the Surrogate's Order for Judicial Settlement of Final Account of Successor Co-Trustee, Resignation and Discharge of Co-Trustee and Termination of Trust, dated June 1, 2017. *See* Ex. B at 1 ("THERE having been no Objections with the Court by any of the appearing parties; and … UPON … the appearance of Lester Eber…"). Lester did not appeal the Surrogate's Order, either.

In the summer of 2017, after entry of the Surrogate's Order, CNB made some minor adjustments to the final accounting based on discussions with Lester's counsel about some early distributions made to one of the beneficiaries' children that had to be accounted for. As a result, the final distribution of Trust assets did not match the percentages specified in the Surrogate's June 1, 2017 Order. Nonetheless, as to the assets that were successfully distributed, there is no dispute that the adjustments made were proper. That distribution occurred in October 2017.

In October 2018, a dispute arose about whether the Trust's stock in Eber Bros. & Co., Inc. ("EB&C") was distributed to the Trust beneficiaries. Lester then sought to acquire all of the shares himself, without giving Plaintiffs any consideration.[2] The legality of Lester's conduct *after* the entry of the Surrogate's Court June 1, 2017 Final Order is at issue in this case.[3]

**Prior Related Proceedings:** During the March 12, 2019 conference, the Ebers' personal lawyer John Herbert expressed the Ebers' desire to depose CNB about the "acts and omissions of Canandaigua as trustee of the trust *after June, 2017*." Tr. 28:17-18 (emphasis added) (attached as Ex. C). *See also id.* at 29:6 (examining the "summer of 2017"); *id.* at 36:12-37:6 (discussing concerns about how the June 1, 2017 Order was implemented "in July and August of 2017"). Although there were some questions raised by Mr. Herbert about CNB's basis for terminating the Trust, *id.* at 30, he later conceded that "[i]t is true that when it came on for adjudication, that Lester Eber did make an appearance there and did acquiesce in the final order." *Id.* at 36:4-6.

Based on that representation of the scope of the deposition, this Court said it would permit the Ebers to notice an additional deposition of CNB. It informed the parties that it is "granting the motion to intervene and then you [the Ebers] can notice that deposition." Tr. 37:19-20. The Ebers waited until April 4, 2019, to issue a deposition notice; specifically, a Rule 30(b)(6) notice with 19 enumerated topics. After the meet-and-confer, the Ebers reduced the number of topics slightly but said they "are not willing to eliminate questions regarding the Trust and its termination." *See* Ex. A (April 30, 2019 email transmitting revised Rule 30(b)(6) notice, with attachment).

---

[2] Had Lester sought to obtain Plaintiffs' rightful portion of the stock through the Surrogate's Court proceeding, Plaintiffs would have then entered an appearance and objected accordingly.

[3] Although this Court has not yet ruled on Plaintiffs' motion for leave to amend to add such claims, the Court did permit CNB to intervene for purposes of those claims.

**Argument:** A collateral attack on the Surrogate's Court proceeding is indisputably impermissible. During the meet-and-confer, counsel of record for the Ebers, Colin Ramsey, conceded that it was not possible to collaterally attack the Surrogate's order terminating the Allen Eber Trust, and he could not articulate any other basis for seeking such discovery. During the same call, however, his unofficial co-counsel John Herbert responded to the question about whether they were trying to collaterally attack the Trust termination saying, "I don't know if we are or we aren't." Mr. Herbert proceeded to launch into arguments about why he believes the Trust should not have been terminated.

A collateral attack on the termination of the Trust is prohibited for two main reasons. First, because Lester Eber participated in the Surrogate's Court proceedings, he is barred from challenging the result of them under the doctrine of *res judicata*. *See Thomas & Agnes Carvel Found. v. Carvel*, 736 F. Supp. 2d 730, 757 (S.D.N.Y. 2010) ("New York has adopted a transactional approach to claim preclusion, also referred to as res judicata. Thus, 'a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'") (quoting *Monahan v. New York City Dep't of Corr.,* 214 F.3d 275, 285 (2d Cir. 2000)). Lester cannot relitigate matters that were already decided in that proceeding, and his efforts to gather discovery so he can try to do so should be headed off at the pass.

Second, the distribution of Trust assets is the quintessential stuff of the probate exception. It is exactly the opposite of the situation in *Marcus v. Quattrocchi*, where this Court found that the probate exception did not apply. *See* 715 F.Supp.2d 524, 534 ("Even assuming, *arguendo,* that the Trust was improperly terminated, Plaintiffs, at best, are asking the Court to return property currently in the Defendants' possession to the Trust. Requests to return property to an estate or trust, rather than to dispose of property currently part of an estate or trust, do not fall within the probate exception because the *res* at issue is not within the probate court's jurisdiction if it is was not part of the estate at the time of the decedent's death.). Here, assuming that the EB&C shares still belong to the Trust (as the Ebers contend), then the Ebers would be asking this court "to dispose of property currently part of a[] … trust," and that would be improper.[4] If there is a bona fide dispute about whether the Surrogate's Court ordered the EB&C shares distributed, *see* Tr. 36:6-11 (Mr. Herbert suggesting that the Surrogate's Court's order was not specific enough), it must be raised with the Surrogate's Court.

Because there is no proper purpose of the discovery they seek and it would be burdensome to entertain even the possibility of challenging the Surrogate's Court proceedings here, the Court

---

[4] Here, Plaintiffs have claims seeking to have EB&C recognize Plaintiffs' rights as shareholders. These claims assume, correctly, that the Trust has been terminated and that the distribution should be deemed made in accordance with the Surrogate's Order, notwithstanding Defendants' efforts to obstruct it. It only remains for the corporation and its Secretary—non-parties to the Surrogate proceeding—to take the appropriate corporate actions.

May 1, 2019
Page 4

should grant Plaintiffs and CNB a protective order against such discovery. The scope of the deposition should be limited to the conduct that occurred after the June 1, 2017 Final Order.

We thank the Court for its attention to this matter. It is my understanding that CNB will write separately.

Respectfully submitted,

Brian C. Brook

cc:     All counsel of record

# Exhibit A



Brian Brook <brian@brook-law.com>

---

## CNB 30(b)(6)

**Ramsey, Colin D.** <cramsey@underbergkessler.com>                    Tue, Apr 30, 2019 at 2:40 PM
To: "O'Brien, Dan" <dobrien@woodsoviatt.com>
Cc: Robert Calihan <rcalihan@calihanlaw.com>, "Keneally, Paul F." <PKeneally@underbergkessler.com>, Brian Brook <brian@brook-law.com>, John Herbert <johnherbert24@mac.com>

Dan/Brian-


I am attaching a revised 30(b)(6) notice for your consideration.  As you will see, it reduces the number of topics and scope of the examination.  However, we are not willing to eliminate questions regarding the Trust and its termination.


It remains our view that we are entitled to elicit facts relating to the termination of the Trust that will be useful to the defense of the claims and allegation in this litigation.  We also believe that given the cost concerns that have been raised, scheduling the 30(b)(6) for a mutually convenient date and time will be far more cost effective for all parties, as compared to drafting a motion, traveling to NYC to argue it, etc.


The 30(b)(6) is currently noticed for May 13, 2019, but we are certainly amenable to finding an alternate date.


Colin




**Colin D. Ramsey**

PARTNER
cramsey@underbergkessler.com

www.underbergkessler.com

Underberg & Kessler LLP
50 Fountain Plaza, Suite 320
Buffalo, NY 14202
716-847-9103 PHONE
716-847-6004 FAX

**From:** O'Brien, Dan <dobrien@woodsoviatt.com>
**Sent:** Thursday, April 25, 2019 9:35 AM
**To:** Ramsey, Colin D. <cramsey@underbergkessler.com>
**Cc:** Robert Calihan <rcalihan@calihanlaw.com>; Keneally, Paul F. <PKeneally@underbergkessler.com>; Brian
Brook <brian@brook-law.com>
**Subject:** CNB 30(b)(6)


Colin:


Your focus seems to be the Bank's justification for seeking to end the Trust (Topics 2(a) through (h)).  The
papers speak for themselves and, if your clients disagreed with the relief being sought, they had ample opportunity to
make their objections known while the proceeding was pending.  Mr. Eber, who was a trustee of the trust and was
represented by counsel during the proceeding, could have opposed the Bank's petition but did not.  Nor was any
appeal of Judge Owens' order ever filed.   As far as I can see, the proposed topics appear to be aimed at an improper
collateral attack on the Surrogate Court's determination and, as a result, are irrelevant.


As far as the Bank's role with respect to the stock of Eber Bros. & Co., Inc. is concerned (Topics 1(i) through
(v)), the parties have taken the deposition of Richard Hawks, the trust officer responsible for the management of the
Trust and the person most knowledgeable about the Bank's limited role with respect to that stock.  You need to
explain to me why we need to provide another representative of the Bank to speak to this subject.


To the extent your 30(b)(6) notice addresses topics other than the management of the trust (Topics 3 and 4),
you need to explain to me what relevance these topics have to the issues in this lawsuit and/or the Bank and why you
believe that the Bank should, or does, have knowledge of these topics.


With respect to the "terms of the CNB settlement agreement with the Plaintiffs," it is my understanding that
you and all other counsel were sent a copy of the settlement agreement on February 1st so you do not need a
witness from the Bank to illuminate you in that regard.


Even if some of the areas of inquiry are marginally relevant, the incremental benefit of the 30(b)(6)
deposition is far outweighed by the burden of preparing a witness or witnesses to testify as to these nineteen topics.
The Trust was terminated almost two years ago and the Bank was dismissed from the case with prejudice on August
18, 2018, so compliance with your subpoena would impose a significant and costly burden on the Bank.  As you know,
but for your client's demand that the Bank deliver stock shares to him, the Bank would not have been forced to
intervene and expose itself to the technical susceptibility to a notice such as the one your served.  As I mentioned in
my e-mail from yesterday, there was no counsel representing the Bank when the Magistrate Judge appeared to
approve the service of such a notice, so we have never waived our right to object to the 30(b)(6) notice.


Finally, the focus of most of your proposed topics implicate the attorney-client and work product privileges.  It
is clear that the expected objections as to many, if not most, of the questions will require the Court's intervention and
will place a significant burden on the Court's time and attention.

We hope this assists you in understanding our opposition to this notice.  This e-mail does not purport to be an exhaustive list of our objections.  We reserve all our rights and waive none in that regard.

Unless I hear otherwise, we will confer at 3:30 pm.  Do you want to set up a conference call number?

Dan O'Brien, Esq.
Partner
Direct Dial: 585-987-2810
Direct Fax: 585-987-2910

dobrien@woodsoviatt.com

Firm Phone: 585-987-2800
Firm Fax: 585-454-3968
woodsoviatt.com



*PLEASE NOTE: We will be moving our offices soon.  As of May 20, 2019 our new address will be:*
*1900 Bausch & Lomb Place, Rochester, New York 14604*

*The addresses of our other offices in Buffalo and Phoenix will remain the same.*

*700 Crossroads Building 2 State Street  Rochester, New York 14614*

A Member of **MERITAS** Firms Worldwide.

THE INFORMATION CONTAINED IN THIS COMMUNICATION IS CONFIDENTIAL, MAY BE SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE, AND IS INTENDED ONLY FOR REVIEW AND USE BY THE ADDRESSEE. UNAUTHORIZED USE, DISCLOSURE OR COPYING OF THIS COMMUNICATION OR ANY PART THEREOF IS STRICTLY PROHIBITED AND MAY BE UNLAWFUL. IF YOU HAVE RECEIVED THIS COMMUNICATION IN ERROR, PLEASE DESTROY THIS COMMUNICATION, INCLUDING ALL ATTACHMENTS. PLEASE NOTIFY US IMMEDIATELY BY RETURN E-MAIL OR CALL 585-987-2800.

**From:** Ramsey, Colin D. [mailto:cramsey@underbergkessler.com]
**Sent:** Wednesday, April 24, 2019 6:09 PM
**To:** Brian Brook; O'Brien, Dan
**Cc:** Robert Calihan; Keneally, Paul F.
**Subject:** Re: CNB 30(b)(6)

Dan-

I am checking schedules for tomorrow and will advise asap. In the interim, can you give us a better sense of the nature of your objections so we can discuss internally in advance of call (and hopefully make call more productive)?

Thanks

Get Outlook for Android

---

**From:** O'Brien, Dan <dobrien@woodsoviatt.com>
**Sent:** Wednesday, April 24, 2019 4:50:40 PM
**To:** Ramsey, Colin D.; Brian Brook
**Cc:** Robert Calihan; Keneally, Paul F.
**Subject:** CNB 30(b)(6)


Colin:


I have spent some time reviewing your Rule 30(b)(6) deposition notice and have a number of objections to it. I propose we have a meet and confer tomorrow afternoon; in the event we cannot get your agreement to trim the scope of the notice substantially, I intend to seek relief from the Court. Insofar as you intend to argue that the Judge already approved this proposed 30(b)(6) deposition of CNB, I certainly wasn't present at any conversation or conference at which that was discussed so I do not see how my client or I could be bound by such a determination.


Let me know what time works for you.


Dan O'Brien


Dan O'Brien, Esq.
Partner
Direct Dial: 585-987-2810
Direct Fax: 585-987-2910

dobrien@woodsoviatt.com

Firm Phone: 585-987-2800
Firm Fax: 585-454-3968
woodsoviatt.com



*PLEASE NOTE: We will be moving our offices soon. As of May 20, 2019 our new address will be:*
*1900 Bausch & Lomb Place, Rochester, New York 14604*

*The addresses of our other offices in Buffalo and Phoenix will remain the same.*

*700 Crossroads Building 2 State Street Rochester, New York 14614*


A Member of **MERITAS** Firms Worldwide.


THE INFORMATION CONTAINED IN THIS COMMUNICATION IS CONFIDENTIAL, MAY BE SUBJECT TO THE ATTORNEY-CLIENT PRIVILEGE, AND IS INTENDED ONLY FOR REVIEW AND USE BY THE ADDRESSEE. UNAUTHORIZED USE, DISCLOSURE OR COPYING OF THIS COMMUNICATION OR ANY PART THEREOF IS STRICTLY PROHIBITED AND MAY BE UNLAWFUL. IF YOU HAVE RECEIVED THIS

COMMUNICATION IN ERROR, PLEASE DESTROY THIS COMMUNICATION, INCLUDING ALL ATTACHMENTS. PLEASE NOTIFY US IMMEDIATELY BY RETURN E-MAIL OR CALL 585-987-2800.

**From:** Ramsey, Colin D. [mailto:cramsey@underbergkessler.com]
**Sent:** Tuesday, April 23, 2019 7:01 PM
**To:** O'Brien, Dan; Brian Brook
**Cc:** Robert Calihan; Keneally, Paul F.
**Subject:** Re: CNB 30(b)(6)


Dan-

As you know, 30(b)(6) is noticed for May 13th. Are you able to particularize any objections you have at this point? We are willing to listen and discuss, but Magistrate Parker has already blessed the deposition. Given Brian's threats to involve the Court, and the discovery deadline, it would benefit everyone to know where we stand asap.

Thanks, Colin

Get Outlook for Android

---

**From:** Ramsey, Colin D.
**Sent:** Friday, April 12, 2019 10:49:04 AM
**To:** O'Brien, Dan; Brian Brook
**Cc:** Robert Calihan; Keneally, Paul F.
**Subject:** RE: CNB 30(b)(6)


Dan-

Will your objections relate to the topics/scope of the Notice, or the whole concept of a 30(b)(6)?  If the latter, Magistrate Parker has already determined that we are entitled to the deposition.  If the former, we will wait to see the nature of your objections.  However, can you confirm that the noticed date of May 13th works (provided you or Brian do not move for a protective order)?  If that date does not work, I would like to at least get an alternate date scheduled given the number of calendars we have to consult.

Brian-

In response to you email from yesterday, it does not make sense to speak until Dan is in a position to participate.  While we will consider substantive objections, as previously advised, your demand that the Ebers pay your costs to attend the deposition is wholly rejected.

I am available most of the day on Monday, April 22nd, and in the later afternoon on April 23rd.

Colin


our most important partner is you®

Colin D. Ramsey
PARTNER
cramsey@underbergkessler.com
www.underbergkessler.com

Underberg & Kessler LLP
50 Fountain Plaza, Suite 320
Buffalo, NY 14202
716-847-9103 PHONE
716-847-6004 FAX


-----Original Message-----
From: O'Brien, Dan <dobrien@woodsoviatt.com>
Sent: Friday, April 12, 2019 10:39 AM
To: Brian Brook <brian@brook-law.com>
Cc: Ramsey, Colin D. <cramsey@underbergkessler.com>; Robert Calihan <rcalihan@calihanlaw.com>
Subject: Re: CNB 30(b)(6)

I am in the process of reviewing Colin's 30(b)(6) notice with CNB and intend to make formal objections. I am going to be out of the office all next week so it will be early the following week before I can provide those objections to you.

Dan O'Brien

Sent from my iPhone

> On Apr 11, 2019, at 5:22 PM, Brian Brook <brian@brook-law.com> wrote:
>
> Colin and Dan,
>
> Based on Dan saying today that he has issues with the Rule 30(b)(6) notice issued by the Ebers to CNB, and since Colin was unable to stay after the deposition today to discuss my issues that I raised earlier this week, I propose that we schedule a time when at least the three of us are available to meet and confer. I think we should do so as soon as possible since if we cannot come to an agreement we would need time to seek a protective order in advance of the May 13 date specified in the notice.
>
> I am currently free tomorrow after 11am and all Monday. Please let me know about your availability.
>
> And since Rob is so interested in CNB and talking about noticing more depositions, I am copying him on this as well so he can chime in if he wants to weigh in more generally on what additional depositions, if any, are appropriate for CNB here.
>
> Thanks,
>
> Brian
>

*CONFIDENTIALITY NOTICE: This email message and any attachments are confidential and intended solely for the named addressee(s). They may be subject to legal, professional or other privilege or may be protected by other legal rules. They must not be disclosed to anyone without the sender's authorization. If you are not the intended recipient or authorized to receive this email for the intended recipient, you may not disclose, copy, distribute or retain this message or any part of it. Please notify us if you received this message but were not the intended recipient. Thank you, Underberg & Kessler LLP*


*CONFIDENTIALITY NOTICE: This email message and any attachments are confidential and intended solely for the named addressee(s). They may be subject to legal, professional or other privilege or may be protected by other legal rules. They must not be disclosed to anyone without the sender's authorization. If you are not the intended recipient or authorized to receive this email for the intended recipient, you may not disclose, copy, distribute or retain this message or any part of it. Please notify us if you received this message but were not the intended recipient. Thank you, Underberg & Kessler LLP*

Brody & Associates, LLC Mail - CNB 30(b)(1)

*CONFIDENTIALITY NOTICE: This email message and any attachments are confidential and intended solely for the named addressee(s). They may be subject to legal, professional or other privilege or may be protected by other legal rules. They must not be disclosed to anyone without the sender's authorization. If you are not the intended recipient or authorized to receive this email for the intended recipient, you may not disclose, copy, distribute or retain this message or any part of it. Please notify us if you received this message but were not the intended recipient. Thank you, Underberg & Kessler LLP*

 **CNB 30(b)(6).docx**
21K

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DANIEL KLEEBERG, LISA STEIN AND AUDREY HAYS,

PLAINTIFFS,

V.

LESTER EBER, ALEXBAY, LLC F/K/A
LESTER EBER, LLC, ESTATE OF ELLIOT W. GUMAER, JR.,
EBER BROS. & CO, INC., EBER BROS. WINE AND LIQUOR
CORP., EBER BROS. WINE & LIQUOR METRO, INC.,
EBER CONNECTICUT, LLC, AND WENDY EBER,

DEFENDANTS.

---

CANANDAIGUA NATIONAL BANK & TRUST COMPANY,

INTERVENOR- PLAINTIFF,

V.

LESTER EBER, ALEXBAY, LLC F/K/A
LESTER EBER, LLC, ESTATE OF ELLIOT W. GUMAER,
JR.,EBER BROS. & CO, INC., EBER BROS. WINE AND
LIQUOR CORP., EBER BROS. WINE & LIQUOR METRO,
INC., EBER CONNECTICUT, LLC, WENDY EBER,
DANIEL KLEEBERG, LISA STEIN AND AUDREY HAYS,

INTERVENOR- DEFENDANTS.

Civil Action No.
16-CV-9517(LJK/KHP)

**NOTICE OF DEPOSITION
PURSUANT TO
FED. R. CIV. P. 30(b)(6)**

**TO:   THE CANANDAIGUA NATIONAL BANK & TRUST COMPANY ("CNB")**

**C/C:   DONALD O'BRIEN, ESQ.
WOODS OVIATT GILMAN
700 CROSSROADS BUILDING
2 STATE STREET
ROCHESTER, NEW YORK 14614**

PLEASE TAKE NOTICE that, pursuant to Federal Rules of Civil Procedure 30(b)(6), Defendants LESTER EBER, ALEXBAY, LLC f/k/a LESTER EBER, LLC, EBER BROS. & CO., INC., EBER BROS. WINE AND LIQUOR CORP., EBER BROS. WINE & LIQUOR METRO, INC., EBER-CONNECTICUT, LLC and WENDY EBER (the "Eber Defendants") will take the deposition of CNB upon oral examination before a notary public at the law offices of Underberg & Kessler LLP, attorneys for the Eber Defendants, 300 Bausch and Lomb Place, Rochester, New York 14604, on the 13th day of May, 2019 at 10:00 a.m. in the forenoon of that day and at any adjourned date, in the above-entitled action now pending in the United States District Court in the Southern District of New York. CNB is requested to designate the person or persons most knowledgeable and prepared to testify on behalf of CNB concerning the subject matter described on Attachment A hereto.

Dated:    April 30, 2019

                                           _____

Colin D. Ramsey, Esq.
UNDERBERG & KESSLER LLP
*Attorneys for the Eber Defendants*
300 Bausch & Lomb Place
Rochester, New York 14604
Telephone: (585) 258-2800

## ATTACHMENT A

1.      CNB's role in holding, voting, transferring or otherwise handling any capital stock of Eber Brothers & Co., Inc. ("EB&Co."), as Co-Trustee of the Allen Eber Trust (the "Trust), including, without limitation

   i.   CNB's actions relating to any EB&Co. capital stock after the Trust was ordered terminated by Order of the Monroe County Surrogate's Court on June 1, 2017;

   ii.  the purported transfers of shares of EB&Co. capital stock to Trust beneficiaries after June 1, 2017;

   iii. stock powers executed by CNB with respect to the shares of EB&Co. capital stock registered in the name of the Co-Trustees;

   iv.  communications by CNB with respective beneficiaries; and

   v.   Receipts and Releases requested by CNB from the Trust beneficiaries.

2.      All matters relating to Monroe County Surrogate's Court case (Case No. 1970DT01952), including, without limitation

   a.   the decision to terminate the Trust and the justification for doing so under the Allen Eber Will;

   b.   the preparation of the Petition and Final Accounting for termination of the Trust;

   c.   the proposed allocation of the Trust assets on July 12, 2017;

   d.   the proposed reallocation of the Trust assets on August 1, 2017, including the EB&Co. stock;

   e.   CNB's knowledge on or before June 1, 2017 of the allegations in the Plaintiff's complaint filed in December 2016;

   f.   CNB's knowledge of the terms of the settlement between the Eber entities and the PBGC in February 2017; and

   g.   the rights of Wendy and David Eber under Allen Eber's Will.

3.      All matters relating to the transfer restrictions set forth in the Article XII of the EB&Co. Bylaws, including without limitation, any giving of the notice by the transferor required by Article XII, Section 1 of the Bylaws, and the exercise of the call right by Lester Eber on October 30, 2018.

Exhibit B

CrY

. At a Surrogate's Court of the State of New York
held in and for the County of Monroe at
Rochester, New York, on May 18, 2017.

PRESENT: HON. JOHN M. OWENS, Surrogate

|  |  |
|---|---|
| FINAL ACCOUNTING OF THE CANANDAIGUA NATIONAL BANK AND TRUST COMPANY, AS SUCCESSOR CO-TRUSTEE OF RESIDUARY TRUST UNDER WILL OF ALLEN EBER DATED OCTOBER 27, 1969 | **ORDER FOR JUDICIAL SETTLEMENT OF FINAL ACCOUNT OF SUCCESSOR CO-TRUSTEE, RESIGNATION AND DISCHARGE OF CO-TRUSTEE AND TERMINATION OF TRUST** |

File No. 1970,1952 /D

UPON reading and filing the duly verified Petition for Judicial Settlement of Final
Account of Successor Co-Trustee, Resignation and Discharge of Co-Trustee and Termination of
Trust, verified by Petitioner, Canandaigua National Bank and Trust Company, on February 15,
2017; and

UPON all proofs of service having been duly filed with the Court; and

THERE having been no Objections filed with the Court by any of the appearing parties;
and

UPON, the appearance of Canandaigua National Bank through its counsel, Woods Oviatt
Gilman LLP, Lorisa D. LaRocca, Esq. and William G. Bauer, Esq., and the appearance of Lester
Eber, through his counsel, Wiedman, Vazzana, Corcoran and Volta, P.C., James G. Vazzana,
Esq. at an adjourned return date of this Court on May 18, 2017; and

UPON, the appearance of Calihan Law PLLC, Robert B. Calihan, Esq., on behalf of
Elliott W. Gumaer, Jr., having been waived by the Court at counsel's request;

NOW, THEREFORE, it is hereby

**ORDERED, ADJUDGED AND DECREED** that the Final Account of Canandaigua
National Bank and Trust Company, as Successor Co-Trustee of the Residuary Trust Under Will
of Allen Eber dated October 27, 1969 (the "Trust"), is hereby judicially settled and Canandaigua
National Bank and Trust Company is discharged from any liability in the administration of the

Trust from its receipt of assets until distribution of the Trust assets, in its capacity as Successor Co-Trustee of the Trust; and it is further

**ORDERED, ADJUDGED AND DECREED** that the Trust be terminated and that the Trust assets be distributed to the beneficiaries in accordance with the terms set forth in the Final Account and allowed as filed (and adjusted), and that the following is a summary thereof as settled:

### SUMMARY

### PRINCIPAL ACCOUNT

**CHARGES:**

| | | | |
|---|---|---|---|
| Schedule A | Principal received | $1,409,047.07 | |
| Schedule AA | Subsequent receipts of principal | 12,000.44 | |
| Schedule A-1 | Realized increases in principal | 5,842.73 | |
| Schedule G | Unrealized increases in principal | 163,793.19 | |
| | Total Principal Charges | | $1,590,683.43 |

**CREDITS:**

| | | | |
|---|---|---|---|
| Schedule B | Realized decreases in principal | $ 768,370.36 | |
| Schedule C | Administration expenses | 48,535.21 | |
| Schedule E | Distributions of principal | 88,851.48 | |
| Schedule G | Unrealized decreases in principal | 10,827.35 | |
| | Total Principal Credits | | $ 916,584.40 |
| **Principal balance on hand shown by Schedule G** | | | $ 674,099.03 |

### INCOME ACCOUNT

**CHARGES:**

| | | | |
|---|---|---|---|
| Schedule AA-1 | Income received | $ 2,868.90 | |
| Schedule A-2 | Income collected | 203,676.91 | |
| Schedule A-3 | Realized increases in income | 229.15 | |
| | Total Income Charges | | $ 206,774.96 |

CREDITS:

| | | | |
|---|---|---|---|
| Schedule C-2 | Administrative expenses | $ 18,778.18 | |
| Schedule E-1 | Distributions of income | 170,529.29 | |
| | Total Income Credits | | $ 189,307.42 |
| **Income remaining on hand as shown in Schedule G-1** | | | $ 17,467.49 |

### COMBINED ACCOUNTS

| | | | |
|---|---|---|---|
| Principal on hand: | Cash | $ 35,523.28 | |
| | Other assets | 638,575.75 | |
| | Total principal on hand | | $674,099.03 |
| Income on hand: | Cash | | 17,467.49 |
| | **Total Assets on hand** | | **$691,566.52** |

**ORDERED, ADJUDGED AND DECREED** that petitioner pay the remaining cash and transfer, assign and deliver the other remaining assets as shown in the account as follows:

To:  Canandaigua National Bank

As and for the commissions in the sum of         $   8,114.86

To:  Woods Oviatt Gilman LLP

For legal services rendered in the sum of         $    TBD

For costs and disbursements         $    TBD

Balance         $ 683,451.66*

To be distributed as follows:

To:  Daniel Kleeberg (1/6 share)         $ 113,908.61*

To:  Lisa Stein (1/6 share)         $ 113,908.61*

To:  Audrey Hays (1/3 share)         $ 227,817.22*

To:  Lester Eber (1/3 share)         $ 227,817.22*

*Less Woods Oviatt Gilman LLP fees and disbursements – amount to be determined.

{6127751: }

ORDERED, ADJUDGED AND DECREED that, upon its completion of the distribution of the Trust assets, as set forth in the Final Account and this Order, Canandaigua National Bank and Trust Company shall be discharged as Successor Co-Trustee of the Trust; and it is further

ORDERED, ADJUDGED AND DECREED that, the sum of $ _5757.50 in fees and 1460 in disbursements_ shall be paid from the Trust to Woods Oviatt Gilman LLP, as attorneys for Petitioner in connection with its services _and disbursements_ in regard to this proceeding.

Dated: _June 1, 2017_          HON. _____
                                    JOHN M. OWENS, SURROGATE

SURROGATE'S COURT
MONROE COUNTY
JUN - 2017
FILED

{5127751: }

Exhibit C

```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                                 :
                                            Docket #16cv9517
 KLEEBERG, et al.,                     : 1:16-cv-09517-LAK-KHP

                    Plaintiffs,        :

          - against -                  :

 EBER, et al.,                         :
                                            New York, New York
                    Defendants.        : March 12, 2019

------------------------------------ :

                        PROCEEDINGS BEFORE
                 THE HONORABLE KATHARINE H. PARKER
            UNITED STATES DISTRICT COURT MAGISTRATE JUDGE

APPEARANCES:

For Plaintiffs:        BROOK & ASSOCIATIONS, PLLC
                       BY:  BRIAN BROOK, ESQ.
                       100 Church Street, 8th Floor
                       New York, New York 10007

For Defendants:        UNDERBERG & KESSLER, LLP
                       BY:  COLIN D. RAMSEY, ESQ.
                       50 Fountain Plaza, Suite 320
                       Buffalo, New York 14202


For Defendants -   JOHN HERBERT, ESQ.
Wendy & Lester
Eber:



Transcription Service: Carole Ludwig, Transcription Services
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service.
```

APPEARANCES (CONTINUED):

```
For Defendants -    CALIHAN LAW PLLC
Estate of Elliot    BY:  ROBERT CALIHAN, ESQ.
W. Gumaer, Jr.:     The Power Building, Suite 761
                    16 East Main Street
                    Rochester, New York 14614
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross | Court |
|---------|--------|-------|-----------|----------|-------|

None

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|

None

1

```
 1                                                    4

 2            THE CLERK:  Calling case 16cv9517, Kleeberg versus

 3   Eber.  Counsel, please make your appearance for the record.

 4            MR. BRIAN BROOK:  Good afternoon, Your Honor,

 5   Brian Brook for the plaintiffs.

 6            THE COURT:  Good afternoon.

 7            MR. COLIN RAMSEY:  Good afternoon, Your Honor,

 8   Colin Ramsey for the Eber defendants.

 9            THE COURT:  Good afternoon.

10            MR. JOHN HERBERT:  John Herbert for Wendy &

11   Lester Eber.

12            THE COURT:  Nice to see you.

13            MR. ROBERT CALIHAN:  Bob Calihan on behalf of

14   the Estate of Elliot Gumaer.

15            THE COURT:  Okay, nice to see you all.  All

16   right, I want to address a couple of the pending

17   motions. The first is the motion to intervene. I am

18   going to grant the motion to intervene and I'll issue

19   a short decision on that.  With respect to the pending

20   motion to amend, I'd like to hear some additional

21   argument on that motion and I do have some questions

22   that I'd like the parties to address. So just as a

23   preview, defendants argue that some of the new claims

24   are time barred, and I'd like to understand when

25   you're saying the claims, the statute of limitations
```

                                                  5

1
2    began to accrue, and I'd like to better understand
3    when plaintiffs say that the claims accrued.  So maybe
4    we can start with this motion to amend, and Mr. Brook,
5    could you explain when, the date when you think each
6    of the new claims accrued from a statute of
7    limitations standpoint?
8           MR. BROOK:  Sure, Your Honor.  Well, as far as
9    the breach of fiduciary duty claims, and I think
10   there's a few counts that encompass that, the
11   fiduciary tolling rule applies. And I don't believe
12   that the statute of limitations for those claims would
13   have begun to run until the fiduciary relationship was
14   terminated or openly repudiated. And I don't think
15   there is any argument that there was some kind of open
16   repudiation where Lester Eber said I'm no longer a
17   fiduciary. So it's when it terminated, and our
18   understanding is that it terminated when the trust was
19   terminated.  And although there is some dispute that
20   became apparent during recent depositions as to
21   whether the trust terminated, whether Lester is still
22   a trustee, the latest that that could have occurred,
23   or earliest I guess is the way to put it, is, say,
24   February, 2017, when CNB filed its petition to
25   dissolve the trust, and that was after this lawsuit

```
 1                                                        6
 2   was filed, and I think these claims certainly relate
 3   back. But even if they didn't, February, 2017, until
 4   when we filed the proposed third amended complaint is
 5   less than two years.
 6              THE COURT:  Okay, so the fraudulent, I mean
 7   the breach of fiduciary duty, I have that the new
 8   claims that you're suggesting to add would be the
 9   count three for unjust enrichment, count four to set
10   aside an unlawful transaction, count five seeking an
11   order for a new election of the board, count six, a
12   declaratory judgment, and count eight, aiding and
13   abetting breach of fiduciary duty and fraudulent
14   concealment. Those are the ones that I have as new, so
15   --
16              MR. BROOK:  I think it's a little more
17   complicated than that, if I may explain?
18              THE COURT:  Okay.
19              MR. BROOK:  So the first two counts, or at
20   least the first one is breach of fiduciary duty.
21              THE COURT:  Right.
22              MR. BROOK:  Well, what used to be count one
23   has been split into two counts in order to separate
24   two different theories of breach of fiduciary duty for
25   clarity sake.
```

1

2          THE COURT:  Right.

3          MR. BROOK:  So they both were in the original

4  complaint.

5          THE COURT:  Right.

6          MR. BROOK:  What happened for count one is

7  that additional transactions were added, including the

8  receipt of money for Lester Eber under a supposed

9  consulting agreement with Southern Wine and Spirits.

10  I think that's the one that probably, if I had to

11  guess, was most contentious by the other side because

12  that consulting agreement was originally entered into

13  in 2007.  And so because it's a breach of fiduciary

14  duty claim and we are seeking equitable remedies such

15  as an accounting, which we're still getting in pieces,

16  and it also includes disgorgement of the profits that

17  are received from that because it was essentially a

18  corporate opportunity that was usurped because this

19  was not even an acquisition or a merger, this was a

20  transaction where it was essentially a settlement

21  agreement between Eber Bros. and its competitor,

22  Southern, that had driven them out of business. And

23  Lester Eber, while remaining president and CEO of the

24  Eber Bros. companies, also negotiated this side deal

25  for himself. So it's something where we're seeking

equitable remedies in addition to, not only under a
breach of fiduciary duty theory, but also under the
standards set, I think it's in the new count four,
we're citing the business corporation statute to set
aside transactions that were not properly taken by the
corporation.

So those are interrelated and I don't believe
that there is a statute of limitations that applies
for that kind of equitable remedy in this situation
where you're setting aside a transaction. If it did,
it would be six years from the date when the fiduciary
relationship ended.

THE COURT:  Which you're saying would be
February of 2017.

MR. BROOK:  At the absolute earliest. And
that, and the trust wasn't ordered dissolved by the
Court until June, 2017, but since it doesn't matter,
let's just say February.  And I think most of the
other transactions in there I think are all part of
what was in the original complaint, just spelled out
in more detail.

So going through the counts, and the faithful
servant doctrine, that was in the original complaint,
as well, it has been spelled out in more detail

9

because I'm one of those lawyers that likes to have a complaint that tells a little bit of a story and lets people know where we're going so that there is no surprise, and hopefully settle the case. I don't think there is anything in that that was not fairly included within the original ones.  But count, what used to be count two, I believe, so the numbering being off is why the Court is under the impression that everything after count two is new, but, in fact, the fraudulent concealment claim was in the original complaint, I think that was count two. And the breach of --

THE COURT:  No, I know that fraudulent concealment was in the prior complaint.

MR. BROOK:  Okay, sorry. And then I believe that the aiding and abetting breach of fiduciary duty was also in the original complaint, I think that was count three.  And then count four, if member serves, was the results for an accountant.

Unjust enrichment, you know, I don't think that the equitable, that we're not equitable. Fiduciary tolling would probably not apply to that count. I probably don't need it, so at the end of the day I don't know if I really care about that count, just to be perfectly frank, having thought about it

10

more. But we also have the argument that separate from
fiduciary tolling there were material facts about what
made the Southern transaction wrong and usurpation of a
corporate opportunity that we didn't discovery until
discovery in this case. Most critically is the fact that
somehow this agreement between Eber Bros. and Southern
where Eber Bros. of New York agreed to go out of business
and not compete with Southern anymore, did not include any
provision against competition.  That wasn't in the
agreement, that doesn't make any sense, what kind of deal
do you have to get your competitor to go out of business
without a noncompetition clause?  Well the answer is that
they built it into Lester Eber's consulting agreement, and
because Lester was remaining at the Helm of Eber Bros., it
was effectively precluding Eber Bros. and its remaining
operating entity, Eber Connecticut, from ever competing
with Southern, but paying Lester a loan for that, not
paying the company for giving up those future business
opportunities it might have had.

THE COURT:  What do you mean the loan, I thought
that the agreement was a consulting agreement?

MR. BROOK:  I misspoke, I meant consulting
agreement.  Apologize.  So the consulting agreement
with Lester, that was what was given to him, you know,

1

2  it was $600,000 a year for several years and then in

3  the years since it's been $310,000 a year for sort of

4  untold consulting plus tens of thousands, if not

5  hundreds of thousands of dollars a year in various

6  reimbursements. So that money, we argue, is something

7  that because it all derives from this contract that

8  had this noncompetition clause that actually bound

9  Eber Bros., because of Lester Eber remaining at the

10  helm of Eber Bros., that that is a corporate asset.

11  And because that fact was concealed until discovery in

12  this case, the statute of limitations should not run

13  on that until discovery. And then we have the two-year

14  period after discovery to assert the claim.

15          THE COURT:  Are you contending that pay for

16  actual work performed under the consulting agreement

17  by Lester Eber individually, is a corporate asset?

18          MR. BROOK:  Not exactly, Your Honor. I think

19  that there is certainly a right to be paid for actual

20  work, the problem is the amount of money being paid,

21  over $3 million dollars in five years for supposed

22  part time consulting.  And the fact that this contract

23  not only required some untold consulting, but also

24  included that noncompetition clause. And my reading on

25  these documents is that that is what this was really

about, was about putting Eber Bros. down, but allowing
Lester to get that money because they still had so
many creditors at Eber Bros. that he wanted to avoid
the money going to the creditors, and instead going to
himself.  And that's ultimately what a lot of the
transactions in this case are about, is all the ways
in which Lester Eber and his daughter tried to get
money to go them instead of to the creditors, and
ultimately to the shareholders, as well, had those
creditors been paid off. And the exact numbers and all
that I don't have off the tip of my fingers, but
that's what that was about is that, you know, it's
over $4.5 million that was paid to Lester Eber for
consulting with the competitor at the same time that
he was getting a salary from Eber Bros. for continuing
to work for them and preventing Eber Bros. from
potential business opportunities.

So that, regardless of the merits of that
claim but going to the statute of limitations, the
point is that the key fact, what makes it at least
inflated, we're not necessarily asking for the whole
amount back but it's certainly inflated, and the
inflated amount is because of that noncompetition
clause in the consulting agreement that was only

13

1

2  discovered in the course of discovery in this case and

3  that was at the earliest sometime in late 2017. I

4  personally didn't see it until mid-2018.

5      THE COURT:  And are you saying your clients

6  weren't aware of the consulting agreement?

7      MR. BROOK:  They were aware of the consulting

8  agreement generally, but they did not know that the

9  consulting agreement is what included the prohibition

10  against competition.  And, in fact, Lester Eber misled

11  Dan Kleeberg at one point into making Dan Kleeberg

12  believe that he, as a former Eber employee, could not

13  start a business with Eber in the name of it because

14  there was a noncompetition clause with Southern.

15  Lester never told Dan Kleeberg that well only I,

16  Lester, am bound by that noncompetition clause. So

17  what it shows is Lester, himself, treated the

18  noncompetition clause in his own personal consulting

19  agreement as something that was binding on the company

20  and the entire family that had worked with him. And it

21  was a corporate asset, it was something that he sold

22  off, because it just makes no sense for a corporation

23  to agree to go out of business, sell off its

24  inventory, give a lot of it to its competitor and not

25  include a noncompetition clause in those documents.

14

What happened here was they modified it so that Lester could get paid more, but that money was money that should have gone to the company because it was a corporate asset, its ability to operate.

THE COURT:  If the business is being sold and going out of business essentially, what would be the purpose of a noncompetition clause apart from the individual owner of the seller?

MR. BROOK:  Well the whole business, only some parts like Delaware and I think Ohio were being sold to Southern. New York was going out of business and then Eber Bros. was continuing in Connecticut. But what happened was, and that was the Eber Connecticut entity, and so this noncompetition clause in Lester's consulting agreement made it so that Eber Connecticut and its affiliates, which included the parent companies, could not ever try to go back out again and do anything in New York or other states. And, in fact, something we learned at a recent deposition, it's not in the third amended complaint, obviously, since this was two weeks ago, is that apparently Lester Eber's son, David, went to work for Southern and they, rather than Eber Bros. trying to sell liquors and other imported goods into New York that it was bringing in

15

from abroad because they have an import business

aspect, as well, they were forced to go through

Southern to do that.  If it wasn't for this

noncompetition clause, the company could sell wherever

it wanted, it wouldn't have to go through Southern in

order to do something in New York. And so it is a

restriction on the business.  And the amount is

certainly inflated, because $600,000 a year for some

undocumented amount of, you know, a few hours here and

there, is ridiculously inflated as a price. And some

of the evidence of that is that after five years, the

amount that Lester was being paid for consulting was

cut in half.

          THE COURT:  Well what are you contending was

the motivation for the sale of the Eber Bros. New York

business and the other, outside of Connecticut, what

was the motivation for the sale?

          MR. BROOK:  I'm sorry, there wasn't a sale of

those assets and so -- there was no sale.  What

happened was the company agreed to shut down its

business and Lester Eber agreed to not compete with

Southern in his own personal contract.

          THE COURT:  Right.

          MR. BROOK:  So the money that should have gone

16

to Eber for shutting down, to go to its creditors and

maybe go to shareholders if there was some left over,

Lester took for himself, and that's what was wrong.

Because you can't, whether it's a merger, it's an

acquisition, or you're selling off parts of a

business, a corporate executive cannot say, okay, I'll

give you this, but you give me this on the side so

that I don't have to give it to the company, even

though it's the corporate asset.  Because the

corporate's right to do business is what continued.

Maybe it would be a different situation if Lester had

resigned as Eber Bros. president so that restrictions

on him for noncompetition did not carry over onto all

the Eber companies. But he remained, and he continued

to get a salary, a six-figure salary.

          THE COURT:  It was my understanding that Eber

Bros. New York was not making any money and that there

were significant debts, is that correct?

          MR. BROOK:  Yes, there were significant debts.

          THE COURT:  Do you know what the size of the

debts were at the time that it shut down?

          MR. BROOK:  It's one of the many things that I

have sought in discovery and it's a little hard to

piece that together. I think -- the amount of the

17

debts were substantial. The amount of, the money that

Lester had taken from Eber Bros. through this side

deal with Southern may very well have gone to pay the

company's creditors, rather than to the shareholders.

It doesn't matter who it would have ultimately gone to

because at the end of the day we're asserting

derivative claims on behalf of the corporation. So

whether my client --

          THE COURT:  Right, but how would the company,

what deal would have been entered into by Eber Bros.

that the money would have gone to it from Southern?

Are you saying Southern would have purchased the

business, that's --

          MR. BROOK:  No, I'm not saying that.

          THE COURT:  So what are you saying, I'm trying

to understand what you're saying should have happened,

how is it that Lester would have been able to get

Southern to give the company money sufficient to pay

off all of its debts?

          MR. BROOK:  Well there was, for more context,

there was a lawsuit filed by Eber Bros. against

Southern, so part of this was a settlement of that.

And so there was money being paid to Eber Bros. to get

rid of the litigation and to just get them to go away

                                                        18

quietly.  So the fact is, Southern was paying Eber

Bros., it was paying them to shut down business in New

York, to give off I believe some of their assets. Eber

Bros. was selling off interests that it had in

Delaware and Ohio businesses as well. There was a

large deal worth many, many millions of dollars and I

believe it was an eight figure sum was paid to Eber

Bros. by Southern. So there is no question that Eber

Bros. and Southern were entering into a deal whether

Southern was paying Eber Bros. to shut down. The

problem is, when Lester took some of that and siphoned

it off for himself, and it happened to be a critical

part of it which is the noncompetition provision.

Because what good would it do Southern to pay Eber

Bros. off to shut it down only to have Lester Eber and

Eber Bros. coming in from Connecticut or wherever, and

continuing to creating problems, possibly taking, you

know, retail sales from them.

          And so the two-step part of that was they made

him a consultant, even though he was still CEO and a

fiduciary to Eber Bros. and they inflated the price

significantly to include the noncompetition clause

there.  And that was how they had the excuse on their

books of paying such an inflated amount to Lester

19

1  Eber. And he got that by going around the company. So

2  that, there was no signature from anyone at Eber Bros.

3  on that consulting agreement approving of it for the

4  company, as like additional compensation to Lester for

5  negotiating the deal or something.  There were any

6  number of ways they could have given Lester a deal

7  bonus that was aboveboard. This wasn't one of them,

8  you can't take a corporate asset which is its ability

9  to do business, and have that part of it be sold off

10  just by giving it to Lester and letting him remain at

11  the company.

12  THE COURT:  You keep saying a deal, so I'm

13  confused about what the deal is.

14  MR. BROOK:  Sure.  The deal was multifaceted

15  again. Southern Wine & Spirits was paying Eber Bros.

16  to shut down in New York, and it was paying Eber Bros.

17  to give up its operating assets, and I think it had 50

18  percent interest in a Delaware company and an Ohio

19  company. It was settling litigation as well. This was

20  a deal between Southern Wine and Spirits and Eber

21  Bros. Wine and Liquor Corp. and in the middle of that

22  deal --

23  THE COURT:  As it a deal or was it a

24  settlement agreement?

20

MR. BROOK:  It was a deal. It was far more than just a settlement. In fact, I don't think that there was a document officially called a settlement, it just said that they would drop the lawsuit.

THE COURT:  Okay.

MR. BROOK:  I'm not 100 percent on that, it's many, many pages long.

THE COURT:  Okay.

MR. BROOK:  But we're getting really far into the merits of this now --

THE COURT:  Right, I understand.

MR. BROOK:  And I certainly understand it is a claim that requires development. It's one of the reasons why I've noticed the deposition of Southern Wine and Spirits to occur on March 25th. And so hopefully getting more information there about how this was negotiated. Because surprise, surprise, no one could remember anything about how this was negotiated during their depositions.  At least nothing in terms of the details or how the amounts were determined, things like that.

So what we do have though is a record of the amount being significantly greater when there was a noncompetition clause than in later years where there

wasn't one. And based on that we see at least a $1.5 million enhancement to Lester as a result of that noncompetition. And we will provide expert testimony about how these transactions work and that in that kind of situation, the company's ability to compete is going to be something that should be considered a corporate asset that was usurped here. Because I think it is something that is technical enough that it probably does require expert testimony to establish that.

THE COURT:  Okay.

MR. BROOK:  And I don't think there is any dispute that when that aspect of the transaction was discovered was in discovery in this case and that whenever the date when that document was produced, we can use that as the date, it doesn't matter that I read it several months later because it's all still well within the statute. And that is separate and apart from the fiduciary tolling on the first two claims.

THE COURT:  Okay.  All right.

MR. BROOK:  So you wanted to talk about counts five and six -- four, five and six are the ones regarding business laws and unwinding transactions.

1

2          THE COURT:  Right.

3          MR. BROOK:  I am honestly not aware of any

4  statute of limitation that applies to those and then

5  the declaration of rights. A lot of those regard

6  transactions that occurred just very recently, you

7  know, documents that were being, transactions that

8  were attempted in February, 2017, after this lawsuit

9  was filed, there is no real statute of limitations

10  argument there. I know it was confusing because the

11  brief in opposition to the motion just said this is

12  all outside the statute of limitations, but it's a lot

13  more nuanced than that obviously. One of the most

14  recent transactions that occurred was in October,

15  2018, when Lester sent his notice that he was going to

16  just take my client's shares in Eber Bros. parent

17  company for nothing.  There is no way that is outside

18  the statute of limitations.

19          THE COURT:  Okay.  All right --

20          MR. RAMSEY: Colin Ramsey.

21          THE COURT:  Mr. Ramsey, yes.

22          MR. RAMSEY: Briefly, back to Southern, if I

23  could, and not to get too deep in the woods, and I

24  think Your Honor has anticipated our position is this

25  was not a corporate opportunity, this was Lester Eber,

individually, that entered into a consulting agreement with Southern. Eber Bros. was essentially bullied out of the market by Southern, that ship had sailed. There was no corporate opportunity to usurp at that point. They were out, there was an agreement amongst Southern and Eber Bros. that they were going to be out of New York. At that point, Lester Eber, given his numerous contacts, his experience in the industry, was offered this consulting position with Southern, he had every right to accept it.

The value of that consulting agreement, and Lester testified to this during his deposition, and I would anticipate that when we take the deposition from Southern, said, look, this is a large company, it pays generous salaries, this was commensurate with what other folks were getting doing similar things in similar areas of the country. So I know Mr. Brook wants to turn this essentially into a conspiracy that Lester was somehow funneling money to himself, that wasn't the case. He was receiving this money pursuant to an aboveboard consulting agreement. And if there's an issue with that, his consulting agreement was back in 2008, and by Mr. Brook's own admission, his clients were aware of it at that time. So any claims relating

1
2   to that, I don't think there are any that are

3   meritorious anyway, but certainly a decade later have

4   sailed, to put it simply.

5           With respect to some of the other arguments

6   that Mr. Brook made, essentially we're saying a lot of

7   the factual predicates in this third amended

8   complaint, a lot of the actions that are complained

9   of, were not necessarily taken in a fiduciary

10  capacity. He probably has a point on the fiduciary

11  exception relationship if whatever he is relying on is

12  taken in the capacity of a fiduciary. Many of them, at

13  least some of them in the complaint, were not. And

14  those are the ones, and I apologize, I don't have a

15  brief in front of us, those are the ones that we're

16  saying, look, if you are not doing this as a

17  fiduciary, you don't get obviously the benefit of the

18  fiduciary exception.

19          THE COURT:  How much additional discovery,

20  beyond what's already been contemplated, would be

21  required by addition of these new claims from your

22  perspective?

23          MR. RAMSEY: I don't know that it would be

24  terrible significant. I think there would certainly be

25  some additional depositions, one on the stock issue,

for example, I think we're probably going to want

further depositions of Canandaigua National Bank

anyway, but certainly the stock issue that's raised in

the third amended complaint would require additional

depositions. Beyond that, some of the depositions that

are outstanding might cover that, so I don't want to

say, hey, look, we've got to do this whole new round

of depositions, but there would at least be some

additional discovery from our perspective now.

THE COURT:  Okay, and how would that impact

the timeline for discovery?

MR. RAMSEY: Well, as Mr. Brook said, we've got

a Southern deposition noticed for the end of this

month, we've got the deposition of Mark Stein, the

brother of plaintiff, Lisa Stein, this Friday

actually. There's been some talk of some other third

parties that I think Mr. Brook wanted so I'll let him

speak to that. But I would think a brief extension

would probably be necessary, I don't think it would be

too terribly wrong, a month or two would be my

thought, subject to Mr. Brook's opinion.

THE COURT:  Okay.  Mr. Brook, from your

perspective, how much additional discovery would be

needed by these added claims and how would that impact

1   the schedule?

2        MR. BROOK:  I don't think there is any

3   additional discovery that would be needed.  I think

4   the Southern deposition is more defensible with the

5   third amended complaint in there in an active claim,

6   but either way, Southern is important because this

7   money that is going to Lester Eber was ultimately what

8   was being used for him to make loans to the company.

9   So the company, he's getting $600,000 a year from the

10  company and surprise, surprise, the company doesn't

11  have enough money to pay its debts after that point,

12  even though he's continuing to receive a six figure

13  salary from him.

14       So understanding where that money was coming

15  from and where it was going is part and parcel to

16  understanding also how this debt crisis occurred that

17  was ultimately the excuse that Lester used to take the

18  company for himself as a creditor. You know, if the

19  company had been getting $600,000 a year from Southern

20  instead, and Lester was just given credit for making

21  that deal happen, and he was doing the same work for

22  Southern that he did for Eber Bros. you know, he'd

23  just continue to get paid by Eber Bros. for doing the

24  work for the company. If he brought the deal into the

27

company as a CEO of the company, rather than doing it
on the side, the company would not have been in the
credit crisis that it had.  And that's an important
part of the story that we need to tell, and
understanding that with Southern, so that's the only
one where, you know, if we had the third amended
complaint in we'd get more.

I have no idea what Mr. Ramsey is talking
about when he says he needs more depositions of
Canandaigua National Bank based on the sock issue in
terms of who owns the stock or not.  That is an issue
that is going to be decided entirely based upon two
things, interpreting what the dissolution of the trust
order says and the bylaws of the company and how those
apply. And I think that from the depositions that
we've had, the last one got unfortunately very heated,
very emotional for Ms. Eber, you know, it's clear that
they are under the impression that that issue is a
silver bullet for them.  That somehow they'll be able
to just take the shares for nothing based upon that
bylaw provision, and then Lester gets to run the
family business without the family in it.  And I
believe they also brought up the intent under the Alan
Eber Trust document, the will, itself. So maybe we'll

28

also look at the will. But that's something that I

believe is right for adjudication, and because it's

seen as this silver bullet, I think it really should

be resolved sooner rather than later, and I think it's

going to take that being resolved before we even have

a chance at seeing a real settlement offer that is

close to valuing what my client's claims are worth in

this case.

THE COURT:  I think when we last spoke all the

parties were in agreement that that was a legal issue

that could be briefed, is that correct?

MR. HERBERT: I think that that's not so,

because it's become a much more complicated issue.

THE COURT:  Okay.

MR. HERBERT: I think that the actions, the

acts and omissions of Canandaigua as trustee of the

trust after June, 2017, raise a whole host of issues

about the propriety of actions that they took. Some of

the reasons why they did what they did in 2017, we

frankly don't know what they, we don't know what they

were because Lester Eber wasn't involved in any of

that decision making at all, he had nothing to do with

it.

THE COURT:  I see. So that's why you're saying

1
2  you would need some deposition.

3          MR. HERBERT: Absolutely, yes.  Yes.  I

4  couldn't tell you today why, I think there's a

5  question as to whether or not the stock was allocated

6  amongst the beneficiaries in the summer of 2017, I

7  think there's a serious question as to whether or not

8  that was done appropriately. And I don't know why

9  Canandaigua did it the way they did it and we need to

10 have some deposition testimony from them to understand

11 why they did what they did and the way they did it.

12 And that has ramifications throughout all the issues

13 relating to who's entitled to which shares of stock

14 and whether or not this call right fits into the whole

15 case. So I think that we did discus this at a prior

16 conference but I think it's become a much more

17 complicated issue since then.

18         THE COURT:  So from your client's perspective,

19 there would be the additional deposition of a bank

20 representative.

21         MR. HERBERT: Absolutely.

22         THE COURT:  Okay.

23         MR. HERBERT: I think one thing that's important

24 to note, in 2017, Canandaigua decided to try to terminate

25 the trust, Alan Eber Trust, and they filed their petition

1                                                                    30

2   in February and it was finally adjudicated in June. Lester

3   and Wendy Eber, they didn't have anything to do with that

4   process at all, nothing to do with that. So what the

5   motivation was behind the bank's filing that petition,

6   whether or not they thought they were entitled to try to

7   terminate the trust, because at least on a reading of the

8   petition, the petition seems illogical to us because it

9   doesn't seem to be responsive to what the requirements

10  are in the will to be in a position to terminate the

11  trust. And then things that happened after that raise

12  a lot of questions in our mind that we need deposition

13  testimony.

14          THE COURT:  Okay.

15          MR. BROOK:  May I say a couple of things to

16  correct Mr. Herbert on a few things that I think are

17  really important to what he said?

18          THE COURT:  Sure.

19          MR. BROOK:  Lester Eber entered an appearance

20  in the action to terminate the trust, and his lawyer

21  waived any objection to terminating the trust. That's

22  why the Court entered an order saying here's how the

23  assets are going to be distributed. So for Mr. Herbert

24  to stand up and say they didn't have anything to do

25  with that is just incorrect. And that lawyer Wendy

31

Eber said was representing her interests personally as well. So any objections that they have to Canandaigua terminating the trust and the Court entering that order, they had an obligation to enter at the time when they made an appearance in that case. If they hadn't made an appearance, like my clients did not, maybe they'd have some kind of an argument to do it --

THE COURT:  Why didn't your clients make an appearance?

MR. BROOK:  Well, because, frankly, termination was premature.

THE COURT:  So why didn't your clients enter an objection?

MR. BROOK:  Because at the end of the day the last thing they wanted was to have the company business still in the hands of Lester and Wendy Eber. And as long as the trust was around, there was a serious risk that, you know, this would go on years longer as a new trustee has to be appointed, and then we'd have to be overseeing that trustee.

So when Canandaigua said they were going to just try to terminate the trust and distribute the shares, my clients made, we made the decision not to oppose that, but not to support it either.

1

2          THE COURT:  But now you're using the basis of

3  that to add new claims to the complaint.

4          MR. BROOK:  Well because, at the end of the

5  day, that order is still a Court Order that is binding

6  on the parties that did enter an appearance there, and

7  it's binding on my clients, too.

8          THE COURT:  Right, but how is it, if your

9  clients had an opportunity to object to that, you

10  didn't appear, you chose not to appear, you chose not

11  to object and now you want to use that transaction as

12  the basis to add a claim against the defendants, is

13  that right?

14          MR. BROOK:  I think Your Honor has it

15  backwards. They're the ones who want to undo that

16  Court Order. We support that Court Order, we have no

17  problem with what that Court did, with what was

18  ordered in it, it was done completely correctly in

19  terms of distributing the assets according to how they

20  needed to be.

21          THE COURT:  Okay.

22          MR. BROOK:  And Lester Eber agreed with that

23  and then years later Canandaigua is saying, well, we

24  need to distribute these shares. And first there were

25  these excuses about a missing stock book.  We've

1

2 recently had some emails produced to us by

3 Canandaigua's lawyer that show that, and Your Honor

4 may remember this, too, so representations had been

5 made that no one misplaced the stock book for the

6 company, that was never represented. Multiple emails

7 from Lester and Wendy's lawyer in that trust action,

8 in that Surrogates Court action, to Canandaigua's

9 lawyer saying we can't find the stock book, we're

10 going to maybe do a special trip up to Rochester to

11 try to find it.

12          So there was active obstruction going on

13 trying to prevent the Court's order from going

14 through. Because what happened was they entered an

15 appearances, they order went through, and now they

16 don't want to abide by the order that they were a part

17 of. And so we're not challenging that, we're simply

18 saying that we've been relying on that for a long

19 time, from the first time that we amended the

20 complaint after that transaction we made it clear that

21 the trust doesn't exist, that's our understanding.

22          And what Mr. Herbert's actually saying is he

23 wants to revive the trust, have this Court somehow do

24 that, even though it's a Surrogates Court order that

25 has already terminated the trust, I don't know how

that's possible. But the other thing that's really
remarkable about their position is they think that the
trust still exists and should be revived by judicial
fiat, but that Lester Eber doesn't have any duties as
trustee.  That somehow only he was relieved of his
duties as trustee. I mean obviously Mr. Gumaer also
passed away, so that Canandaigua is now solely the bad
guy. And what they are really trying to do is they're
trying to take advantage of the fact that we did reach
a settlement with Canandaigua which was very much on
the sidelines on this thing. They only thing they did
wrong was not acting more as trustee and filing suit
when it discovered these transactions earlier. So
they're trying to make Canandaigua into the bad guy as
much as they can and they're trying to delay this
thing. There is no reason why we need to depose
someone from Canandaigua about what they did. Nothing
that they did or didn't do is remotely in dispute. The
only question that this Court can address is a legal
one which is does this Court see the Court's order
from Surrogates Court as having impact or binding
authority here. I mean there's legal issues that might
come into play, but none of that is going to require a
deposition and further delay of this issue.

1

2          THE COURT:  Okay.

3          MR. BROOK:  Thank you.

4          THE COURT:  Hold on, let me hear from Mr.

5     Calihan.

6          MR. CALIHAN:  I just want it noted that the

7     Gumaer estate has already asked for both Canandaigua

8     depositions and they've been agreed to.

9          THE COURT:  Um-hmm.

10         MR. CALIHAN:  We may be arguing about the

11    scope of those depositions but we're going to be

12    completing Awk's (phonetic) deposition and then taking

13    the deposition of Mr. Lowenthal. I think there is no

14    dispute but that they are going to go forward.

15         MR. BROOK:  I think the issue is the third

16    Canandaigua deposition.

17         THE COURT:  Okay.

18         MR. HERBERT: Let's make sure we understand

19    what we're talking about here. Mr. Brook, it's very

20    interesting but that's actually not what happened,

21    okay?  Canandaigua, in the winter of 2017, they

22    decided to terminate the trust. They cobbled up a

23    petition to be filed in the Surrogates Court. They

24    cobbled up a final accounting with respect to the

25    termination of the trust. It is noted in the

36

accounting expressly that Lester Eber had nothing to

do with the preparation of the final accounting, okay?

It is true that when it came on for adjudication, that

Lester Eber did make an appearance there and did

acquiesce in the final order, okay, but all the

termination order did was it ordered that the assets

of the trust as a whole be distributed one-third, one-

third, one-third. It didn't purport to address how any

particular issue was to be allocated amongst the

beneficiaries.

        So there was a process in July and August of

2017 where the Trust Department people at Canandaigua

came up with a specific allocation of the specific

assets in the trust.  Their first attempt at

allocating the assets, we pointed out to them, was

wrong, okay, it had nothing to do with the order from

the Surrogates Court, this was like mop up duties that

Canandaigua had as a trustee.  If you look at the

order issued by the Surrogates Court, it's all about

what Canandaigua has to do to finalize the

distribution of the trust assets. There is nothing in

there about what Lester Eber has to do, he didn't have

anything to do. Lester Eber pointed out to the people

at Canandaigua that they did the allocation

37

1

2  incorrectly.  Then in the month of August Canandaigua

3  went back and did a reallocation and it would be our

4  contention that we're not so sure they did that

5  correctly, and it does have ramifications on all the

6  rest of the issues.

7          THE COURT:  Okay. Well I'm going to permit you

8  to ask questions about this in the depositions of the

9  Canandaigua folks whose depositions have been noticed.

10 I'm going to --

11         MR. HERBERT: Can I ask you, those are not the

12 right witnesses though.

13         THE COURT:  Oh, so you need to have a

14 different person from Canandaigua?

15         MR. HERBERT:  Right.

16         MR. RAMSEY:  The thought was, if Your Honor

17 read the motion to intervene, we'd do an appropriate

18 notice and have them produce --

19         THE COURT:  Yes, I'm granting the motion to

20 intervene and then you can notice that deposition. I'm

21 going to reserve judgment on the amendment to the

22 complaint, but I will turn to that shortly.  So let's

23 talk about the discovery schedule though, it seems

24 that you're not going to meet the March 29th deadline

25 to complete fact discovery, you have an expert

                                                                   38

1

2   discovery deadline of May 31st right now, so I'm going

3   to extend both deadlines by sixty days.  And I'm going

4   to schedule another conference, status conference, how

5   would Monday, May 20th work?

6          MR. BROOK:  That time, Your Honor?

7          THE COURT:  Let's do 10 a.m.  All right, is

8   there anything else that any of the parties wanted to

9   raise at this time?

10          MR. BROOK:  I understand how burdened the

11  Court is, I've clerked, does the Court have any sense

12  of when we might get a ruling on the privilege issues?

13  Because to the extent that we need to do much more

14  discovery at all, that's really the biggest factor.

15          THE COURT:  I understand.  I'm working on it.

16          MR. BROOK:  Okay.

17          THE COURT:  All right, then we're adjourned.

18  Thank you.

19          (Whereupon the matter is adjourned to May 20,

20  2019, at 10:00 a.m.)

21

22

23

24

25

39

C E R T I F I C A T E

I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the United States District

Court, Southern District of New York, Kleeberg, et al.

versus Eber, et al., Docket #16cv9517, was prepared using

PC-based transcription software and is a true and accurate

record of the proceedings.


Signature_____

Date:  March 25, 2019