USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 05/23/2019

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------------X

DANIEL KLEEBERG, et al.,

                                    Plaintiffs,                    **16-CV-9517 (LAK) (KHP)**

                  -against-                                         <u>**OPINION AND ORDER**</u>

LESTER EBER, et al.,

                                    Defendants.

----------------------------------------------------------------X

**KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

        Plaintiffs commenced the instant diversity action in December 9, 2016 and have

amended their Complaint twice.  They now bring the instant Motion to file their Third

Amended Complaint  ("TAC").  Plaintiffs claim that newly discovered evidence, coupled

with recent actions undertaken by Defendants Lester and Wendy Eber, entitle them to

assert additional claims for equitable relief against Defendants.  Plaintiffs also contend

that granting them leave to file the TAC will help clarify the pleadings by allowing them

to identify their specific bases for relief and the remedies they will seek in this action,

beyond the general claim for equitable relief alleged in their Second Amended

Complaint ("SAC").   For the reasons set forth below, the Motion is granted.

<u>**FACTUAL ALLEGATIONS IN THE TAC**</u>

        As this Court has stated in prior opinions, this case is family dispute.  Allen Eber,

the Eber family patriarch, started a successful family liquor distribution business.  It

operated in New York, Connecticut and elsewhere.  He placed the business in a family

trust for the benefit of his son, Lester Eber, his two daughters, and their respective children and heirs. Lester Eber took over for his father in running the business, and Lester's daughter, Wendy Eber, has assisted him in running the business.  Lester Eber also was appointed and remained a trustee of the family trust until 2017, when the trust was dissolved.   At this point, the only operating company that remains of the companies started by Allen Eber is the business located in Connecticut—Eber-CT.

Lester's two sisters have passed away and their children (Plaintiffs) are now suing their uncle (Lester), cousin (Wendy), and others contending that Lester and other trustees of the family trust and fiduciaries to the Eber family businesses engaged in self-dealing, depriving Plaintiffs of their inheritance.  The principal complaint concerns actions that occurred in 2011 and 2012 when Lester allegedly orchestrated a transfer of Eber-CT out of the Trust to his privately held company, Alexbay, as payment for a purported debt owed by the Eber Entities to Lester personally.  Plaintiffs bring this action both as beneficiaries of the Trust and derivatively as beneficial shareholders of the Eber Entities.

The TAC substantially expands upon the facts of this family drama based on information learned, in large part, through discovery and developments since this action was started.  The TAC now contains additional details about corporate transactions that occurred under Lester's watch that Plaintiffs characterize as predicates for the later transfer of Eber-CT out of the Trust.  Some of these transactions indicate that the value of Eber-CT far exceeded the debt the Eber Entities purportedly owed to Lester, Lester acted in his self-interest to the detriment of the Eber Entities by selling interests in Eber-

CT in sham transactions that flowed to his or his daughter's benefit, and Lester violated his duties to the Eber Entities and Trust beneficiaries by selling a substantial portion of the business to a competitor for an insufficient amount and then agreed to become a consultant for that same competitor and maintains that role to this day. The TAC also includes allegations concerning and causes of action arising out of actions taken by Lester and Wendy Eber since the 2017 dissolution of the Trust to block distribution of its assets to Plaintiffs. For purposes of this motion, the Court assumes the facts plead in the TAC and recited below are true.

### I.      The Trust and the Eber Entities' Corporate Leadership

Plaintiffs, along with Defendant Lester Eber, are the beneficiaries of the testamentary trust created upon the death of Allen Eber (the "Trust").[1]  (TAC ¶¶ 2-3, 17, 18, 42, 43, 44, 49-50 .)  Defendant Wendy Eber is Lester's daughter and is a contingent beneficiary of the Trust.  (*Id*. ¶ 22.)  The Trust owned certain assets, including all of the voting stock, and almost 80 percent of the total stock, of Eber Bros. & Co., Inc. ("EB&C"), the parent company of the Eber Family's liquor distribution business.  (*Id*. ¶¶ 4, 26, 29.)  The Trust also owned almost 20 percent of the stock of Eber Bros. Wine and Liquor Corporation ("EBWLC"), the direct subsidiary of EB&C.  (*Id*. ¶¶ 27, 29.)  Eber Bros. Wine & Liquor Metro, Inc. ("Eber Metro") is a direct subsidiary of EBWLC and owned a 79 percent stake in Eber-Connecticut, LLC ("Eber-CT" and, collectively with EB&C, EBWLC,

---

[1] Each of Allen Eber's three children were granted one-third of the Trust's assets.  Plaintiffs collectively have an interest in two-thirds of the Trust assets and Lester Eber has a one-third interest.  (TAC ¶ 54-55.)

and Eber Metro, the "Eber Entities").  (*Id*. ¶¶ 28, 30, 63.)  As of 2010, Eber-CT was the

Eber Family's sole remaining operational business.[2]  (*Id*. ¶¶ 5, 11, 29.)

Lester Eber, Elliot Gumaer ("Gumaer"),[3] and Canandaigua National Corporation

d/b/a Canandaigua National Bank & Trust ("CNB") were co-Trustees of the Trust until its

dissolution in 2017.  (*Id*. ¶¶ 21, 24, 37, 51-54.)  CNB is currently holding the remaining

Trust assets, which consist of shares of EB&C and EBWLC, while it waits for a resolution

of this case to provide it direction as to how to distribute the shares among the Trust

beneficiaries.[4]  Concurrently with their roles as co-trustees of the Trust, Lester Eber and

Gumaer also were officers for the Eber Entities.  (*Id*. ¶¶ 24, 58.)  Lester Eber was, and

continues to be, president and director of EB&C, Eber Metro, and Eber-CT.  (*Id*. ¶¶ 58-

59.)  Lester Eber was president and director of EBWLC until or about February 1, 2012,

when he resigned from that position.  (*Id*. ¶¶  60-61, 111, 113.)  Plaintiffs contend that,

in actuality, Lester backdated his resignation letter and did not, in fact, resign on

February 1, 2012.  (*Id*. ¶¶ 114-17.)  Gumaer was a director for the Eber Entities and,

according to Defendants, also was in-house counsel for the Eber Entities and Lester and

Wendy Eber's personal attorney.[5]  Wendy Eber was a director for the Eber Entities and

---

[2] The TAC identifies Eber Bros. Acquisition Corp. ("Eber Acquisition") as a wholly-owned subsidiary of EBWLC based in Rochester, New York and Eber-Metro LLC ("Eber-NDC") as the sole member of Eber Metro and being a Delaware corporation.  (*Id*. ¶¶ 32-33.)

[3] Elliot Gumaer passed away in 2018 and is now proceeding in this case as the Estate of Elliot Gumaer. (*Id*. ¶ 25.)

[4] Some shares of both entities are held outside of the Trust.

[5] In a recent opinion deciding Plaintiffs' Second Motion to Compel Privileged Documents, the Court determined that Defendants failed to meet their burden of showing that Gumaer was, in fact, in-house counsel for the Eber Entities and an attorney to Lester and Wendy personally.  *Kleeberg v. Eber*, No. 16-CV-9517 (LAK) (KHP), 2019 WL 2085412, at *14–15 (S.D.N.Y. May 13, 2019) (Doc. No. 216).

replaced Lester as president of EBWLC when he resigned from that role in 2012.  (*Id*. ¶¶ 23, 60-61.)  Although she is no longer president of EBWLC, Plaintiffs allege that, as "assistant secretary," Wendy Eber continues to be the highest-ranking officer at EBWLC. (*Id*. ¶ 61.)

      **II.**    **Lester's Loans to EBWLC and Eber Metro**

Starting in or about the early to mid-2000s, the Eber Entities allegedly began to struggle financially due to a confluence of factors, including increasing competition from rival liquor distributors, such as Southern Wine & Spirits of America ("Southern"), and the 2008 economic recession.  (*Id*. ¶ 6.)  Between 2002 and 2009, and while he was an officer of the Eber Entities and a co-trustee of the Trust, Lester Eber made cash loans and extended credit to EBWLC and Eber Metro totaling over $3.5 million.  (*Id*. ¶ 102.) Lester Eber claims he made these loans because no third parties were willing to lend money to the Eber Entities, which badly needed the capital to continue their operations. In February of 2010, Lester executed Guaranty and Security Agreements (the "2010 Guaranty and Security Agreements") with EBWLC and Eber Metro to ensure that he would have priority in collecting the debt in the event of default.  (*Id.*)  In or about January 18, 2012, while he was still a co-trustee of the Trust and president and director of the Eber Entities, Lester Eber assigned his personal right to collect on the loans to a company solely owned and operated by him, Lester Eber LLC (now operating as Defendant Alexbay LLC, "Alexbay").  (*Id*. ¶ 21, 103.)

### III.   Acquisition of Slocum & Sons and Slocum & Sons of Maine, Inc.

Notwithstanding its purported financial difficulties, Eber Metro acquired the wine and liquor distributor Slocum & Sons ("Slocum") in 2005 for the sum of $20 million to operate under the direction of Eber-CT for Eber-CT's benefit.  (*Id*. ¶¶ 68, 127.)  As part of the 2005 Slocum acquisition, Eber Metro acquired a call option to buy Slocum of Maine, Inc. ("Slocum Maine") for $10 at any time through December 31, 2008.  If Eber Metro did not exercise the call option, Slocum Maine would be dissolved.  (*Id*. ¶¶ 36, 79, 81.)

Eber Metro never exercised its call option to buy Slocum Maine.  However, at some point Lester and Wendy Eber became its shareholders.  Plaintiffs recently discovered that, as of 2011, Lester and Wendy Eber collectively owned over 50 percent of Slocum Maine's stock and, as of approximately 2012, acquired all the remaining shares of Slocum Maine.[6]  (*Id*. ¶¶ 82-83.)

### IV.   The Southern Consulting Agreement

In 2007, Lester Eber closed most of the Eber Bros. businesses, including in New York.  (*Id*. ¶ 65.)  Plaintiffs characterize what occurred as a buy-out from the Eber Entities' competitor, Southern.  (*Id*. ¶¶ 5, 142-43.)  This left Eber-CT as the sole operating company from the empire started by Allen Eber.  (*Id*. ¶ 66.)  Lester Eber then entered into a lucrative consulting agreement with Southern that included a restrictive covenant prohibiting Lester and the Eber Entities from conducting active business in any

---

[6] Additionally, Eber-CT's books show that it has paid Slocum Maine millions of dollars each year and that Lester and Wendy Eber each received compensation from Slocum Maine.  (*Id*. ¶¶ 84-87.)

State where Southern operated.  (*Id*. ¶¶ 7-8, 66, 70-74.)  Lester has continued to consult

for Southern to the present.  (*Id*. ¶¶ 75-76.)

Plaintiffs aver that they did not learn until recently that Lester Eber's consulting

agreement contained a restrictive covenant that constrained the Eber Entities from

conducting business in certain states.  They argue that the consulting agreement

purportedly benefitted Lester individually, to the detriment of the Eber Entities and the

other beneficiaries of the Trust.  (*Id*. ¶ 78.)

**V.      The Polebridge and Other "Preparatory Transactions"**

In May of 2010, Eber Metro sold a six percent stake in Eber-CT to a company

named Polebridge Bowman Partners, LLC ("Polebridge") for the purchase price of

$350,000 (the "Polebridge Transaction").  (*Id*. ¶¶ 38, 88.)  Eber Metro received a

promissory note from Polebridge for the amount of $350,000 at the time of the sale.

The note was non-recourse and was secured only by the six percent of Eber-CT that

Polebridge acquired. (*Id*. ¶¶ 90-92.)  The Polebridge Transaction reduced Eber Metro's

stake in Eber-CT from 85 to 79 percent.  (*Id*. ¶ 89, 95.)

Plaintiffs allege that Polebridge was a shell company owned by an attorney and

strategic consultant named Glenn Sturm ("Sturm") who was hired by Wendy and Lester,

and that Wendy declined to collect on the debt on Eber Metro's behalf when Polebridge

defaulted.  (*Id*. ¶¶ 94, 144.)  Plaintiffs characterize the Polebridge Transaction as a sham

that undervalued Eber-CT's worth, allowing Lester Eber to accomplish the transfer of

Eber-CT to his personal company through the Foreclosure Action discussed below.  (*Id*.

¶¶ 125-131, 168.)

Additionally, and unknown to Plaintiffs until recently, the Polebridge purchase agreement gave Wendy Eber, in her personal capacity, the right of first refusal in the event that Polebridge, *i.e.* Sturm, wanted to sell its six percent stake in Eber-CT to a third party.  (*Id*. ¶¶ 240-45.)  Plaintiffs contend that they were unaware of this provision in the Polebridge purchase agreement and aver that they only just recently learned about it in discovery.  In February 2017, Polebridge expressed an interest in selling its stake in Eber-CT, and Wendy exerted her right of first refusal, thereby acquiring Polebridge's interest in Eber-CT for herself.  (*Id*. ¶ 246-47.)

Plaintiffs also assert that Sturm assisted Lester and Wendy Eber to prioritize debts the Eber Entities owed to Lester over debts that were owed to the Eber Entities, paving the way for the Foreclosure Action described below.  (*Id*. ¶¶ 144-54.)

## VI.    The Foreclosure Action and Metro Transfer

In December of 2011, Lester Eber attempted to transfer Eber Metro's 79 percent stake in Eber-CT to Lester Eber LLC (now Alexbay) for no consideration.  (*Id*. ¶¶ 96-98, 168.)  That transfer was never effectuated.  (*Id*.)  However, in February of 2012, shortly after Lester Eber assigned his interest in the 2010 Guaranty and Security Agreements to Alexbay and resigned from the board of EBWLC, Alexbay sued EBWLC and Eber Metro, among others, in the New York Supreme Court in Monroe County (the "Foreclosure Action").  (*Id*. ¶¶ 100-104.)  The purpose of the Foreclosure Action was to collect the debt owed by EBWLC and Eber Metro to Lester Eber under the 2010 Guaranty and Security Agreements (and that Lester had assigned to Alexbay).  (*Id*.)  Alexbay contended that EBWLC's and Eber-Metro's debt could be paid by transferring their

interest in Eber-CT to Alexbay.  For purposes of the Foreclosure Action, Alexbay

represented that Eber-CT's value was approximately equal to the debt owed, leading

the Court to find the transaction "commercially reasonable."  As a result of the court's

ruling, as of June 5, 2012, Alexbay acquired EBWLC's interest in Eber Metro and Eber

Metro's 79 percent stake in Eber-CT.  (*Id*. ¶¶ 104-107, 125-27, 134.)

Plaintiffs contend that Lester and Wendy Eber colluded with their attorneys to

accomplish the transfer of the Trust's and Eber Entities' interest in the sole remaining

asset of value, Eber-CT,  to Alexbay by providing a phony valuation for Eber-CT.  (*Id*. ¶¶

118-31.)  They point to various evidence that Eber-CT was considerably more valuable

than the approximately $4.6 million value provided to the court in the Foreclosure

Action.  This evidence includes the fact that Eber-Metro acquired Slocum for over $20

million in 2005, that Southern offered $3 million for a 15 percent stake in Eber-CT in

2007 (meaning that Eber-CT was valued at $20 million at that time), that a company

called Eder-Goodman LLC paid $4.5 million for a 15 percent stake in Eber-CT in 2008

(reflecting a valuation of $30 million), and that Eber-CT's audited financial statements

from 2010-12 reflect an equity value of between $5.3 and $6.6 million and total value of

about $20 million.  (*Id*. ¶¶ 126-27, 168.)  Plaintiffs also contend that the amount of the

loans Lester made to the Eber Entities were exaggerated.  (*Id*. ¶¶ 139-41.)

In their capacities as officers of the Eber Entities, Wendy Eber and Gumaer

elected not to oppose Alexbay's complaint in the Foreclosure Action and approved the

transfer of the Eber Entities' ownership interest in Eber-CT to Alexbay (the "Metro

Transfer").  (*Id*. ¶¶ 107, 132-33.)  In March of 2012, the court held that the proposed

transfer of the interest in Eber-CT as payment for the debt was "commercially reasonable." (*Id*. ¶¶ 107.)

Plaintiffs note that CNB was not informed about the Foreclosure Action until after the court ruled in favor of Alexbay. (*Id*. ¶ 108.)  Likewise, neither Lester Eber nor anyone else informed the other Trust beneficiaries of the Foreclosure Action or the transfer of assets out of the Trust. (*Id*. ¶¶ 109, 155-59.)  Although it was the majority shareholder of EBWLC, EB&C was not a party to the Foreclosure Action. (*Id*. ¶ 110.)

Plaintiffs contend that Alexbay had no right to take the Eber Metro shares to satisfy the outstanding debt without EBWLC's consent and that no rational business justification existed for EBWLC to agree to the transaction.  They also contend that EBWLC's board had not even approved the transaction when the shares were transferred to Alexbay. (*Id*.¶¶ 134-37.)  Plaintiffs say they first learned that Lester/Alexbay had acquired Eber-CT in February 2016 through a news article.[7] (*Id*. ¶ 160.)

### VII.    Wendy's Acquisition of 9.1 Percent of Eber Metro

Since at least January 23, 2014, Wendy Eber has owned a portion of Eber Metro's common stock.  Out of 22,000 outstanding shares, Wendy currently holds 2,000

---

[7] The news article concerned an action that had been filed against the Eber Entities.  Specifically, on December 11, 2014, the law firm of Harris Beach PLLC ("HB") sued the Eber Entities and Alexbay for unpaid attorneys' fees in connection with its representation of EBWLC in a lawsuit brought by Wolf Concept, S.A.R.L. in New York Supreme Court, Monroe County.  HB claimed that the transfer of Eber-CT to Lester/Alexbay was a fraudulent conveyance to avoid paying HB. (*Id*. ¶¶ 161-63.)  HB subsequently settled the lawsuit and, as part of the settlement, assigned its claims against EBWLC to Lester Eber. (*Id*. ¶¶ 164-66.)  HB did not release any of the named defendants from liability. (*Id*. ¶¶ 161, 165.)  Plaintiffs claim that Lester should be disgorged of any claims assigned to him personally through that settlement. (*Id*. ¶¶ 262-64.)

shares, and Alexbay holds the other 20,000 shares.  Plaintiffs contend that Wendy Eber

acquired her shares of Eber Metro from Alexbay following the Foreclosure Action and

the Eber Metro Transfer to Alexbay.  They allege that the Foreclosure Action and Eber

Metro Transfer were fraudulent transactions and that neither Alexbay nor Wendy Eber

are entitled to keep their shares of Eber Metro stock.  (*Id*. ¶¶ 230-32.)

### VIII.    Dilution of EBWLC Stock

In February 2017, Lester Eber, as president and director of EB&C, appointed

Wendy Eber as the sole director of EBWLC.  In turn, Wendy Eber amended EBWLC's

Certificate of Incorporation to create a new class of voting preferred shares of stock and

issued 750 of those new shares to Lester Eber for no cash consideration.  Plaintiffs allege

that Lester's appointment of Wendy as sole director of EBWLC violated EBWLC's bylaws,

which presently require that there be at least three directors.  (*Id*. ¶¶ 265-73, 302-305.)

### IX.    Dissolution of the Trust and Lester Eber's Attempt to Transfer Eber Stock From CNB

In February 2017, CNB moved to dissolve the Trust and distribute its remaining

assets.  The dissolution of the Trust was approved in June 2017 by the Surrogate's Court

in Monroe County, New York.  (*Id*. ¶¶ 21, 53, 56, 58, 170.)  CNB then attempted to

distribute the Trust's assets pursuant to the Surrogate's Court Order.  (*Id*. ¶¶ 171-75.)

However, a dispute arose about the proper distribution of the Trust's remaining assets.

(*Id*. ¶¶ 309-31.)

On or about October 30, 2018, Lester Eber, through counsel, sent CNB a notice

of intent to purchase the remaining EB&C shares being held by CNB.  Lester Eber alleges

that the request was made pursuant to EB&C's bylaws.  Plaintiffs objected to the

proposed transfer of shares, causing CNB to refuse to transfer the EB&C shares to

Lester.  On or about December 17, 2018, Lester Eber sent another notice to CNB,

through his counsel, requesting that all of the remaining shares of EB&C stock be

transferred to him for no consideration.  Once again, Plaintiffs objected to the transfer,

and CNB refused to distribute the EB&C stock to Lester out of fear that it would be sued

by Plaintiffs for effectuating the transfer.  Consequently, although it had reached a

settlement with Plaintiffs and was dismissed as a Defendant in this action, CNB moved

to rejoin this action as an Intervenor Plaintiff, which this Court granted, in order to

receive a ruling on the proper distribution of the EB&C stock.  (*Id*. ¶¶ 171-75, 306-308,

309-31; *see also* Doc. Nos. 117 and 200.)

## RELEVANT PROCEDURAL HISTORY AND PROPOSED AMENDMENTS

The Scheduling Order in this case set a deadline of February 28, 2018 for joinder

of additional parties and of March 31, 2018 for amendments to the pleadings.  (Doc. No.

80.)  On March 31, 2018, Plaintiffs attempted to file their First Amended Complaint

("FAC"), but were instructed by the Clerk of Court to re-file it because it listed parties

not entered on ECF.  (Doc. No. 85.)  Plaintiffs then filed the SAC on April 16, 2018.  That

pleading includes claims for: (1) breach of fiduciary duty; (2) fraudulent concealment; (3)

aiding and abetting breach of fiduciary duty; and (4) seeking an accounting.  (Doc. No.

88.)

On October 16, 2018, Plaintiffs sought permission to file a Third Amended

Complaint.  The proposed TAC contains the same four causes of action as the SAC.  It

also adds claims: (1) for unjust enrichment related to Lester's receipt of consulting fees

from Southern; (2) to set aside and enjoin unlawful transactions under New York

Business Corporation Law ("BCL") § 720; (3) for new elections of the board of EB&C and

EBWLC pursuant to BCL § 619; (4) for a declaratory judgment; and (5) for common law

(equitable) indemnification.  It also seeks to join three corporate entities, Eber-Rhode

Island LLC ("Eber-RI"), Eber Bros. Acquisition Corp. ("Eber Acquisition"), and Slocum

Maine, as nominal defendants in order to obtain complete relief.  Finally, it removes

CNB as a Defendant—a change that is appropriate and not opposed and, thus, is not

further addressed herein.

The TAC also specifies the type of equitable relief Plaintiffs seek, including, *inter

alia*, the disgorgement of profits Defendants' purportedly made from deals that violated

their fiduciary duties to Plaintiffs; the disgorgement of the Individual Defendants'

salaries; the unwinding of certain transactions, including the transfer of Eber Metro, and

its interest in Eber-CT, to Alexbay; and the reformation of the allegedly predatory loans

Lester Eber made to EBWLC and Eber Metro.  The indemnification claim arises from

Plaintiffs' settlement agreement with CNB pursuant to which it released CNB as a

defendant and agreed to indemnify CNB for any additional costs it incurred in

connection with this action.  Plaintiffs allege that Lester Eber's request that CNB transfer

the remaining shares of EB&C stock to him and not to Plaintiffs, necessitating CNB to

reinsert itself into this action as an Intervenor Plaintiff, triggered Plaintiffs'

indemnification obligations to CNB.

Defendants oppose the amendments for a number of reasons.  They assert that

Plaintiffs failed to demonstrate diligence insofar as certain facts and causes of action

should have been known to them at the outset of this action.  They argue that some of the claims are futile because they are time-barred and that some of the relief sought is unavailable as a matter of law.  They also argue the amendments will cause delay insofar as permitting the claims would require significant additional discovery (although at oral argument it became clear that very little additional discovery would be needed if the amendments were permitted).  Finally, Defendants argue that they will be prejudiced by having to mount defenses to new theories and claims.  These arguments are without merit, as discussed below.

## DISCUSSION

**I.    LEGAL STANDARD**

### A.    Amending the Complaint

Under Rule 15(a) of the Federal Rules of Civil Procedure, "a party may amend its pleading once as a matter of course within . . . 21 days after serving it, or . . . if the pleading is one to which a responsive pleading is required, 21 days after service of a responsive pleading or 21 days after service of a motion under Rule 12(b), (e), or (f), whichever is earlier." Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's written consent or the court's leave.  The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2).  The Second Circuit has stated that "[t]his permissive standard is consistent with our strong preference for resolving disputes on the merits." *Williams v. Citigroup Inc.*, 659 F.3d 208, 212–13 (2d Cir. 2011) (citation omitted). Under Rule 15, leave to amend should be given "absent evidence of undue delay, bad faith or dilatory motive on the part of the movant,

undue prejudice to the opposing party, or futility." *Monahan v. New York City Dep't of Corrs.*, 214 F.3d 275, 283 (2d Cir. 2000).

Where, as here, there is a scheduling order in place that establishes a deadline for seeking leave to amend, "the lenient standard under Rule 15(a), which provides leave to amend shall be freely given, must be balanced against the requirement under Rule 16(b) that the Court's scheduling order shall not be modified except upon a showing of good cause." *Holmes v. Grubman*, 568 F.3d 329, 334 (2d Cir. 2009) (internal quotation marks and citation omitted); *see also* Fed. R. Civ. P. 16(b)(4) (a scheduling order "may be modified only for good cause and with the judge's consent."). The determination of whether "good cause" exists under Rule 16(b) largely turns on the diligence of the moving party. *Holmes*, 568 F.3d at 335; *see also Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*, 889 F. Supp. 2d 453, 457 (S.D.N.Y. 2012) (to show good cause, a moving party must demonstrate that "despite its having exercised diligence, the applicable deadline could not have been reasonably met") (citation omitted).

If the moving party demonstrates diligence under Rule 16, the court then applies Rule 15(a) to determine whether the amendment is otherwise proper. *E.g., Samad Bros. v. Bokara Rug Co. Inc*, No. 09 Civ. 5843(JFK)(KNF), 2010 WL 4457196, at *2 (S.D.N.Y. Oct. 18, 2010), *objections overruled sub nom. Samad Bros. v. Bokara Rug Co.*, No. 09 Civ. 5843(JFK), 2010 WL 5094634 (S.D.N.Y. Dec. 13, 2010).   Courts will find "good reason" to deny a request for leave to amend pursuant to Rule 15 where the proposed amendment is futile because, for example, it fails to state a viable legal claim or is time-barred.  When conducting this analysis, the Court applies the standard for determining a

motion to dismiss under Federal Rule of Civil Procedure 12(b) and must assume the facts pleaded are true. *See, e.g.*, *IBEW Local Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scotland Grp.*, PLC, 783 F.3d 383, 387, 389 (2d Cir. 2015)*; Ryder Energy Distrib. Corp. v. Merrill Lynch Commodities Inc.*, 748 F.2d 774, 783 (2d Cir. 1984) (a claim is not futile if it presents a colorable claim for relief).

A court also may deny a request for leave to amend where the request was made in bad faith or for tactical reasons, will cause undue delay or will prejudice the nonmoving party. *E.g.*, *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d Cir. 2007) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). When evaluating delay, the court considers whether a trial date has been set, whether discovery has ended, and whether dispositive motions were already filed. *E.g.*, *Guadagno v. M.A. Mortenson Co.*, No. 1:15-CV-00482, 2018 WL 4870693, at *8 (W.D.N.Y. Oct. 2, 2018). "Mere delay, however, absent a showing of bad faith or undue prejudice, does not provide a basis for the district court to deny the right to amend." *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (internal quotation marks and citation omitted); *see also Friedl v. City of New York*, 210 F.3d 79, 88 (2d Cir. 2000) (permitting amendment following discovery of relevant facts). When determining prejudice, courts consider whether the assertion of the new claim would: "(i) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (ii) significantly delay the resolution of the dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." *Block v. First Blood Assocs.*, 988 F.2d 344, 350 (2d Cir. 1993) (citations omitted). Finally, in evaluating whether the amendment is appropriate, the

court may consider whether the amendment will promote judicial economy, particularly where denying leave to amend will cause there to be two separate proceedings in two different courts arising from the same operative facts.  When a plaintiff's proposed new claims arise out of the same facts set forth in the original complaint, "forcing plaintiffs to institute a new action against the defendant would run counter to the interests of judicial economy." *Scott v. Chipotle Mexican Grill, Inc.*, 300 F.R.D. 193, 199 (S.D.N.Y. 2014) (internal quotation marks and alterations omitted).

### B.   Supplementing the Complaint

Rule 15(d) allows a party to supplement its complaint in order to present facts and claims that arose after the operative complaint was filed.  *LaBarbera v. Audax Const. Corp.*, 971 F. Supp. 2d 273, 284 (E.D.N.Y. 2013) (citing *Argus, Inc. v. Eastman Kodak Co.*, 552 F. Supp. 589, 602 (S.D.N.Y. 1982)).  Rule 15(d) provides:

> On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented. The court may permit supplementation even though the original pleading is defective in stating a claim or defense. The court may order that the opposing party plead to the supplemental pleading within a specified time.

Under the Rule, "[l]eave to file a supplemental pleading should be freely permitted when the supplemental facts connect it to the original pleading."  *Quaratino v. Tiffany & Co.*, 71 F.3d 58, 66 (2d Cir. 1995) (citing *Bornholdt v. Brady*, 869 F.2d 57, 68 (2d Cir. 1989)).

Where the plaintiff seeks to add related claims against the same defendants, the analysis used to determine whether supplementation is appropriate under Rule 15(d) is identical to the analysis used to determine whether amendment is appropriate pursuant to Rule 15(a).  *Cummings-Fowler v. Suffolk Cty. Cmty. Coll.*, 282 F.R.D. 292, 296 (E.D.N.Y. 2012).  Thus, courts will grant leave to supplement a pleading so long as the supplemental facts are connected to the original pleading and there is no good reason to deny the request.  "As with Rule 15(a), the decision to grant or deny a Rule 15(d) motion is within the sound discretion of the district court."  *LaBarbera*, 971 F. Supp. 2d at 284.

### C.   <u>Joinder of Parties</u>

Federal Rule of Civil Procedure 21 ("Rule 21") provides the standard for adding new defendants in an amended pleading.  Rule 21 provides that "[o]n motion or on its own, the court may at any time, on just terms, add or drop a party."  The same liberal standard for amending pleadings under Rule 15(a) applies to the joinder of parties under Rule 21.  *E.g.*, *Williams v. Town of Hempstead*, No. 16-cv-1992 (ADS)(AYS), 2017 WL 4712219, at *2 (E.D.N.Y. Oct. 18, 2017).  However, a motion to join additional parties is subject to the "good cause" requirement of Rule 16(d) if the time to join additional parties has expired.  *International Media Films, Inc. v. Lucas Entm't, Inc.*, No. 07 Civ. 1178(JGK)(FM), 2008 WL 781823, at *3 (S.D.N.Y. Mar. 20, 2008) ("[I]f a Rule 21 motion to add a party after the scheduling deadline did not have to meet the good cause requirement of Rule 16(b), the scheduling order would be rendered meaningless.").

Where, as here, a plaintiff seeks to add a nominal defendant to an action, the court will apply Federal Rule of Civil Procedure 19 ("Rule 19") in conjunction with Rule 21. Rule 19 provides that a "party whose joinder will not deprive the court of subject-matter jurisdiction must be joined as a party if . . . in that person's absence, the court cannot accord complete relief among existing parties." *See also, e.g.*, *City of Syracuse v. Onondaga Cty.*, 464 F.3d 297, 310 (2d Cir. 2006) (affirming joinder of parties pursuant to Rules 19 and 21). Likewise, under Federal Rule of Civil Procedure 20 ("Rule 20"), a defendant may be joined "if any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences" and "any question of law or fact common to all defendants will arise in the action."

Courts "will deny a request [to join a party] that comes so late in the litigation that it will delay the case or prejudice any of the parties to the action." *City of Syracuse*, 464 F.3d at 308 (internal quotation marks and citation omitted).

## II. ANALYSIS

The Court finds that Plaintiffs have been sufficiently diligent in pursuing the amendments for the reasons discussed below. And, as to all of the proposed amendments, the Court finds no prejudice to Defendants. Nor will allowing the amendments cause undue delay. Indeed, at the March 12, 2019 conference held before this Court, Defendants failed to explain how they would be prejudiced by permitting the amendments. It is well established that merely defending against a new theory is not prejudicial. *Journal Pub. Co. v. American Home Assur. Co.*, 771 F. Supp. 632, 637

(S.D.N.Y. 1991) (quoting *S.S. Silberblatt, Inc. v. East Harlem Pilot Block*, 608 F.2d 28, 43

(2d Cir. 1979)).  Defendants also acknowledged that any additional discovery required to

address Plaintiffs' newly alleged facts and claims would take no longer than an

additional one or two months.  As explained above, it is Defendants' burden to show

that they will suffer prejudice if the proposed amendments are allowed.  *Block*, 988 F.2d

at 350.  Absent such a showing, and in light of the fact that discovery is ongoing and a

trial date has not yet been set, the Court finds that permitting the amendments

described above will not cause undue delay or prejudice and will serve the interest of

judicial economy.   The Court's additional analysis is discussed below.

### A.   Amendment/Supplementation of Existing Claims

#### i.   Breach of Fiduciary Duty – Improper Transactions (Count I)

Although Plaintiffs asserted breach of fiduciary duty claims against Defendants in

their initial Complaint (Doc. No. 1), the TAC adds facts pertinent to these claims.  (Doc.

No. 88.)  The new factual allegations are: (1) Lester Eber's personal consulting

agreement with Southern, pursuant to which he was paid substantial consideration over

three years, improperly constrained the Eber Entities from conducting business in any

state where Southern conducted business; (2) the 2010 Guaranty and Security

Agreements paved the way for the Metro Transfer, to the detriment of Trust

beneficiaries; (3) Wendy Eber acquired 6.1 percent of Eber Metro's stock from Alexbay,

which should be disgorged because the transfer of Eber stock to Alexbay was

fraudulent; (4) the Polebridge Transaction transferred six percent of Eber Metro's stock

to Polebridge for no consideration and formed the basis for the undervaluation of Eber

Metro and Eber-CT in the Foreclosure Action; (5) Eber Metro acquired Slocum and did

not exercise its call option to purchase Slocum Maine for $10, instead leading to Lester

and Wendy Eber personally acquiring Slocum Maine, to the detriment of the Eber

Entities; (6) the line of credit Lester Eber extended to Eber Metro charged exorbitant

interest rates of 9 to 12.5 percent and provided substantial penalties and late fees upon

default, indicating that Lester was acting contrary to the interests of the Eber Entities;

(7) Lester Eber improperly assigned HB's claims for unpaid fees against EBWLC and other

Eber entities to himself, harming the Eber Entities; (8) Lester Eber appointed Wendy

Eber as sole director of EBWLC as part of his scheme to take assets from the Trust for his

personal benefit; and (9) Wendy Eber amended EBWLC's certificate of incorporation to

create a new class of voting preferred shares and issued 750 of those shares to Lester

for no cash consideration, diluting the value of the company and Trust assets.

     While the SAC generally sought "appropriate equitable relief," the TAC clarifies

the scope of the relief Plaintiffs seek as follows: (1) disgorgement of Lester Eber's

income from the Southern consulting agreement; (2) rescission of the Metro Transfer

and the unwinding/modification of the preparatory transactions that allowed Eber

Metro to be transferred to Alexbay; (3) disgorgement of Wendy Eber's interest in Eber

Metro and the transfer of her shares back to EBWLC (along with the Eber Metro shares

currently owned by Alexbay); (4) disgorgement of Wendy Eber's interest in Eber-CT and

the reformation of the Polebridge Note (last amended in May of 2016) to eliminate

amendments that extended the maturity date and prevented Polebridge from

defaulting; (5) that a constructive trust be imposed over all monies earned by Lester and

Wendy Eber in connection with their ownership of Slocum Maine and an accounting of how Lester and Wendy acquired their interest in Slocum of Maine; (6) reformation of the loans between Alexbay/Lester Eber and Eber Metro or, in the alternative, reformation of the debt terms and discharge of debt owed by EBWLC to Lester Eber as of August 2007; and (7) the disgorgement of any claims assigned to Lester Eber by HB.

As a threshold matter, the Court is satisfied that Plaintiffs exercised the requisite diligence in asserting the new facts and claims for relief contained in Count I of the TAC. In their supplemental briefing, Plaintiffs averred that they first learned about the restrictive covenant in the Southern consulting agreement, and the fact that the Agreement was allegedly never approved by the board of any Eber Company, on or about October 22, 2018.  (Doc. No. 202, 11-14.)  Plaintiffs also allege that they did not initially seek to reform the loans Lester Eber made to EBWLC and Eber Metro because they still lacked information regarding how the loans were approved.  (*Id*. at 8-9.) Plaintiffs claim that they first learned that the loans were approved without a vote during the August 20, 2018 deposition of Rick Hawkes, a CNB representative.  (*Id*. at 9-10.)  Because the SAC sought the "[r]escission of all of the agreements related to the transfer of Eber Metro to Lester Eber, Alexbay, and any other affiliated persons or entities," Plaintiffs also contend that they preserved their right to assert additional underlying facts related to their rescission claims arising from the Metro Transfer.  (*Id*. at 10.)  Plaintiffs maintain that they waited until now to add the specific preparatory transactions that paved the way for the Metro Transfer because they have been actively piecing together the relevant transactions that occurred throughout the discovery

process and from the Eber Defendants' privilege log.[8]  (*Id*. at 10-11.)  Indeed, they allege

that they learned about the elimination of Eber Metro's debt to Lester in the weeks

before they filed the instant Motion to Amend.  (*Id*. at 11.)

      With respect to Slocum Maine, Plaintiffs are still unsure of how Lester and

Wendy Eber acquired their interest in the company.  (*Id*. at 14-15.)  However, they

contend that the deal documents regarding Eber Metro's acquisition of Slocum were

produced by Defendants in November of 2018.  (*Id*. at 15.)  Plaintiffs also maintain that

they first learned that Wendy acquired shares of Eber Metro stock on or about August

28, 2018.  (*Id*. at 16.)  In short, Plaintiffs moved to amend the SAC within three months

of learning the new facts and related forms of relief listed above.  This time frame leads

this Court to conclude that Plaintiffs were sufficiently diligent in seeking an amendment.

      Whether Plaintiffs exercised the requisite diligence with respect to the claims

arising from the allegation that Lester Eber received 750 shares of newly-issued EBWLC

voting stock is a closer call, because the documents giving rise to that claim were

produced in September of 2017 (as part of a 19,746 page production).  (*Id*. at 15.)

Plaintiffs also concede that they knew early in the discovery process that Lester Eber

took assignment of HB's claims, but argue that they did not seek to add that claim to

their Complaint until now because they initially believed he would not attempt to collect

on those claims.  To ensure that Lester cannot collect on HB's claims, Plaintiffs now seek

a disgorgement of any amounts collected.  (*Id*. at 16-17.)  The Court will permit Plaintiffs

---

[8] The Court recently ruled on Plaintiffs' Second Motion to Compel and ordered the Eber Defendants to produce approximately 100 documents listed in their privilege log that are either not protected by the attorney-client privilege or fall within an exception to privilege.  *Kleeberg*, 2019 WL 2085412, at *3.

to add claims regarding the issuance of 750 shares of EBWLC stock and assignment of

the HB claims to Lester Eber for reasons of judicial economy because these transactions

are relevant to Plaintiffs' overall theory of fiduciary breach and to require Plaintiffs to

file separate actions relating to these transactions would be inefficient given the time

invested by this Court already. *Guadagno*, 2018 WL 4870693, at *7 ("'The judicial

system benefits by efficient resolution in one proceeding of common issues of law and

fact arising from the same alleged activity.'" (quoting *Hoffman-La Roche Inc. v. Sperling*,

493 U.S. 165, 170 (1989) (alteration omitted)).

To the extent Defendants argue that the amendments are futile on statute of

limitations grounds, their arguments fail.  In New York, the statute of limitations for a

breach of fiduciary duty claim is *the greater of* six years from the date the cause of

action accrued or, where fraud is alleged, within two years from the time plaintiff

discovered the fraud or, with reasonable diligence, could have discovered it.  N.Y.

C.P.L.R. § 213.  Additionally, New York recognizes the open repudiation doctrine

pursuant to which "the limitations period for claims arising out of a fiduciary

relationship does not commence until the fiduciary has openly repudiated his or her

obligation or the relationship has been otherwise terminated."  *Golden Pac. Bancorp v.

F.D.I.C.*, 273 F.3d 509, 518 (2d Cir. 2001) (internal quotation marks and citations

omitted).  Thus, pursuant to the open repudiation doctrine, the statutory period is tolled

between the date the alleged fiduciary misconduct occurred and the date when the

fiduciary relationship was openly terminated.  *Id.* at 519 (citation omitted).  Although

the open repudiation doctrine applies to equitable claims, courts have also applied it in

cases where both equitable relief and compensatory damages were sought.

*Transportation Workers Union of Am. Local 100 AFL-CIO v. Schwartz*, 17 A.D.3d 218, 218,

794 N.Y.S.2d 308, 309 (1st Dep't 2005) (where plaintiffs had a fiduciary relationship with

defendants until 2000, claims seeking damages, an accounting, and disgorgement were

timely).[9]

There is no dispute that Lester Eber and Gumaer owed fiduciary duties to

Plaintiffs in their capacity as co-trustees of the Trust until its dissolution in 2017.  To the

extent the Individual Defendants acted as officers and directors of various Eber Entities,

the also had fiduciary duties to the shareholders of those entities (including the Trust,

which held the shares for the benefit of the Trust beneficiaries).  These duties existed

during all times relevant to this action.  Lester was, and remains, president and director

of EB&C and was president and director of EBWLC until on or about February 1, 2012.

Gumaer was a director of EB&C from 2000 through 2017 and a director of EBWLC until

at least 2014.  Wendy Eber was and remains an officer of various Eber Entities and is

currently the sole director of EBWLC.  Further, Plaintiffs asserted damages arising from

the Individual Defendants' purported self-dealing, which allegedly deprived EB&C and

EBWLC of lucrative opportunities and led to dissipation of Trust assets.

---

[9] Plaintiffs also ask that a surcharge and punitive damages be imposed against Defendants.  But, because Plaintiffs sought this relief in the SAC, the Court does not address whether the relief sought is futile on this Motion.  Defendants may make merit-based arguments regarding these forms of relief at a later stage of this action.

Although Defendants argue that Plaintiffs' breach of fiduciary duties claims are time-barred, their argument fails to account for New York's open repudiation doctrine.[10] Under Plaintiffs' theory, Lester Eber and Gumaer cannot be deemed to have "repudiated" their fiduciary obligations as trustees of the Trust until the dissolution of the Trust in 2017.  (Doc. No. 174, 5-6.)  Thus, they argue, the statute of limitations period on Plaintiffs' fiduciary breach claims did not begin to accrue until the dissolution of the Trust, rendering their claims timely.  There also are questions of fact as to when Plaintiffs learned of some of the alleged breaches of duty and/or fraud making it inappropriate at this stage in the proceeding to determine the merits of Defendants' statute of limitations arguments.

### ii. *Breach of Fiduciary Duty – Acting as Faithless Servants (Count II)*

In the SAC, Plaintiffs asserted that the Individual Defendants were faithless servants.  (SAC ¶¶ 119-45.)  In New York, the faithless servant doctrine can be applied pursuant to two standards: (1) "the misconduct and unfaithfulness substantially violates the contract of service such that it permeates the employee's service in its most material and substantial part" (more stringent); or (2) the conduct rises "to the level of breach of duty of loyalty and good faith."  *Khaldei v. Kaspiev*, 135 F. Supp. 3d 70, 84 (S.D.N.Y. 2015) (quotation marks, alterations, and citations omitted).  Under the second, less stringent standard, "it is sufficient that the employee acts adversely to his employer

---

[10] Plaintiffs also assert that an additional tolling rule, the "continuous wrong doctrine," may also apply to their claims.  (Doc. No. 174, 8-9.)  However, because the open repudiation doctrine may apply to Plaintiffs' claims, the Court need not reach the issue of whether the continuous wrong doctrine applies.

in any part of the transaction, or omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment." *Id*. at 84 (internal quotation marks and citation omitted omitted).  An employer who successfully raises a claim under the faithless servant doctrine is entitled to seek the disgorgement of any compensation paid to that employee during his or her period of disloyalty that directly relates to their disloyal acts.  *Stanley v. Skowron*, 989 F. Supp. 2d 356, 360 (S.D.N.Y. 2013).

Plaintiffs' faithless servant allegations fall under the second standard, pursuant to which they seek disgorgement of the Individual Defendants' salary and bonuses paid by the Eber Entities from the date of their "first disloyal act."  (TAC ¶¶ 274-94.)  The primary difference between the SAC and the TAC is that the TAC adds details regarding the Southern consulting agreement and the acquisition of Slocum Maine by Lester and Wendy Eber, which caused Plaintiffs to contend that the "first disloyal act" occurred earlier than originally thought.  (*Id*. ¶¶ 276-77.)  Specifically, the SAC alleges that Lester Eber's disloyalty started "at the latest" on or about December 11, 2011, when he attempted to transfer Eber Metro's 79 percent stake in Eber-CT to himself for no consideration, whereas the TAC alleges that Lester's disloyalty may have started earlier and, "at the latest, in 2007 when he entered into the consulting agreement with Southern . . . ."  As discussed *supra*, Plaintiffs exercised the requisite diligence to allege claims arising from Lester Eber's consulting agreement with Southern.

The TAC also adds the allegation that Gumaer acted as Lester Eber's personal attorney and that this created a conflict of interest because, on the one hand, as a

director of the Eber Entities, Gumaer was obliged to act in the best interests of the Trust but, on the other, as Lester Eber's personal attorney, he was motivated to help Lester profit from the Eber Entities.[11]  This theory was briefly referenced in the SAC in paragraph 107 and is expanded upon in the TAC.  According to Plaintiffs, this intractable conflict of interest caused Gumaer to be a faithless servant.  Because Plaintiffs had already referred to this allegation in the SAC, the Court finds no prejudice in allowing Plaintiffs to add facts supporting the allegations regarding Gumaer.

### iii.   Fraudulent Concealment (Count VII)

Plaintiffs' fraudulent concealment claim is similar to the version set forth in the SAC as Count II, which asserts fraudulent concealment claims against Lester Eber and, under the theory of *respondeat superior,* against Alexbay.[12]  (SAC ¶¶ 146-61.)  The main thrust of Plaintiffs' fraudulent concealment claim is that Defendants intentionally failed to inform Plaintiffs about the Eber Metro Transfer.  The TAC adds claims against Gumaer on the theory that he had an obligation to provide Plaintiffs with information regarding the Eber Metro Transfer.  (TAC ¶¶ 107, 109.)  Plaintiffs also allege that Gumaer had a conflict of interest because he served as Lester Eber's personal attorney while he was a co-trustee of the Trust and officer of the Eber Entities.  (*Id*. ¶¶ 356-61.)

---

[11] In its Opinion disposing of Plaintiffs' Second Motion to Compel, the Court held that the Eber Defendants failed to meet their burden of showing that Gumaer was Lester Eber's personal attorney and declined to apply the attorney-client privilege to certain documents on that basis.  Nevertheless, because the Court did not explicitly find that Gumaer was not Lester Eber's personal attorney, it is possible that, once discovery is completed, Plaintiffs will be able to show that Gumaer was Lester Eber's personal attorney at the same time that he was director for the Eber Entities.

[12] Because this allegation was included the SAC, the Court need not analyze this claim for futility because it is already joined in this action.

As explained above, this purported conflict of interest arising from Gumaer's concurrent roles as Lester Eber's personal attorney, director of the Eber Entities, and co-trustee of the Trust, was referenced in the SAC.  (SAC ¶¶ 107, 109.)  The TAC, however, includes newly learned facts regarding the Southern agreement and Lester and Wendy's acquisition of Slocum Maine.  (TAC ¶¶ 362-63, 365-68.)  As explained in detail above, these allegations were either already in the Complaint or were just learned by Plaintiffs. Accordingly, there can be no claim of lack of diligence.  The statute of limitations for a fraudulent concealment claim is the greater of six years from the date the cause of action accrued or two years from the time the plaintiff discovered the fraud or, with reasonable diligence, could have discovered it.  N.Y. C.P.L.R. § 213(8).  Here, there is a factual issue of when Plaintiffs learned or could have learned of fraud.  Therefore, the Court cannot find that this claim is untimely as against Gumaer.

To the extent Defendants argue futility for failure to state a claim, their argument fails, as the TAC sufficiently pleads a plausible and timely claim of fraudulent concealment as against Gumaer.  The elements of fraudulent concealment under New York law are: "(1) a duty to disclose material facts; (2) knowledge of material facts by a party bound to make such disclosures; (3) failure to discharge a duty to disclose; (4) scienter; (5) reliance; and (6) damages." *De Sole v. Knoedler Gallery, LLC*, 137 F. Supp. 3d 387, 410 (S.D.N.Y. 2015) (internal quotation marks and citation omitted); *see also Bannister v. Agard*, 125 A.D.3d 797, 798, 5 N.Y.S.3d 114, 115–16 (2d Dep't 2015).

As to the first element, Gumaer had a duty to disclose material facts to the Trust beneficiaries.  *Brass v. American Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993)

*abrogated in part on other grounds by Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002); *see also De Sole*, 137 F. Supp. 3d at 410 (citation omitted) (recognizing cause of action to recover damages for fraudulent concealment against defendants who had superior knowledge about a transaction, or means to acquire such knowledge, such that their failure to disclose that information rendered the transaction unfair).

As to the second and third elements, the TAC identifies the transactions that Plaintiffs say were concealed and led to dissipation of Trust assets.  As to the fourth element, Plaintiffs have sufficiently pleaded scienter insofar as they assert that concealment of, *inter alia*, the Foreclosure Action and the Metro Transfer, the restrictive covenant with Southern, and Gumaer's role as Lester Eber's personal attorney was intentional and motivated by Defendants' desire to profit from the Eber Entities to Plaintiffs' detriment.  *See Allied Irish Banks, P.L.C. v. Bank of Am., N.A.*, No. 03 Civ. 3748(DAB), 2006 WL 278138, at *7 (S.D.N.Y. Feb. 2, 2006) (a plaintiff may plead facts giving rise to "a strong inference of fraudulent intent" where he or she raises "allegations of a motive to deceive" and claims that the defendant withheld "accurate information" (internal quotation marks and citations omitted)).

As to the last two elements, Plaintiffs have sufficiently pleaded that their reliance was reasonable insofar as they were beneficiaries of a trust and believed it was reasonable to rely on the trustees to act in accordance with their fiduciary duties. Plaintiffs further allege that they lacked the means to learn about the transactions impacting the Trust assets because they were not employees, officers or directors of the Eber Entities.  The TAC alleges that the "Trustees failed to disclose th[e] [Metro]

[T]ransfer in any of their annual statements and . . . affirmatively suggested that Eber-CT was still part of the Trust's assets."  (TAC ¶ 156.)   Defendants argue that Plaintiffs failed to show that their reliance on Defendants' representations regarding the status of the Trust, EB&C, and EBWLC was reasonable because they were "passive investors." However, this is a merits argument that is not appropriate to decide on a motion to amend a pleading.

Finally, because punitive damages may be available under the fraudulent concealment theory, Plaintiffs' request for punitive damages as to this claim is permissible.  *Swersky v. Dreyer & Traub*, 219 A.D.2d 321, 328, 643 N.Y.S.2d 33, 38 (1st Dep't 1996).

### iv. Aiding and Abetting Breach of Fiduciary Duty and Fraudulent Concealment (Count VIII)

The SAC asserted a claim of aiding and abetting a breach of fiduciary duty and fraudulent concealment against Alexbay.  (SAC ¶¶ 162-65.)  Plaintiffs now aim this allegation against Wendy Eber on the basis that she concealed information from Plaintiffs commencing in 2010 regarding the Eber Metro Transfer and also aided and abetted Lester Eber's interference in the distribution of the Trust assets to Plaintiffs following the dissolution of the Trust.  (TAC ¶¶ 373-78.)  To establish liability for aiding and abetting fraud, Plaintiffs must show: "(1) the existence of a fraud; (2) the defendant's knowledge of the fraud; and (3) that the defendant provided substantial assistance to advance the fraud's commission."  *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 292 (2d Cir. 2006) (internal quotation marks, alterations, and citation omitted).  To

satisfy the knowledge requirement under New York law, the plaintiffs must assert actual knowledge of the fraud.  *Id.*

 For the same reasons discussed above, the Court finds that resolution of any statute of limitations argument is premature.  Further, to the extent Defendants have suggested that Plaintiffs failed to sufficiently plead the existence of fraud, they are incorrect.  Plaintiffs expressly allege in the TAC (and SAC) that Wendy Eber knew about the Eber Metro Transfer and helped conceal it from Plaintiffs to their detriment, providing facts as to how Plaintiffs belatedly learned of the transfer.  Plaintiffs also contend that Wendy Eber prepared an offer letter from Lester Eber addressed to former Trust beneficiary Sally Kleeberg and current Trust beneficiary Plaintiff Audrey Hays asking them for help to finance the struggling Eber Entities and "omitted material information necessary to prevent [the letter] from being misleading."  (TAC ¶ 370.) Additionally, Plaintiffs allege that Wendy Eber recently assisted Lester Eber in his efforts to prevent the distribution of the Trust assets to Plaintiffs by, among other things, feigning ignorance about the location of the corporate stock book and the current address that should be used for the receipt of official corporate correspondence and documents.  (*Id*. ¶ 372.)  These allegations are sufficient to plausibly state a claim for aiding and abetting fraud and fiduciary breaches.

 Also, to the extent Plaintiffs received certain information in August of 2018 supporting their allegation that Wendy played an integral role in deciding to conceal the Eber Metro Transfer from the Trust beneficiaries, Plaintiffs have been reasonably diligent in seeking to amend and add this claim against Wendy Eber.

### iv.  Accounting (Count IV)

The SAC sought an accounting of profits made by Lester, Wendy, and Gumaer

from entities wholly-owned or controlled by Lester and Wendy Eber, including but not

limited to Alexbay and Slocum Maine.  (SAC ¶ 173.)  The TAC, expands the scope of

Plaintiffs' accounting claim and seeks an accounting of: (1) "all money received from or

paid into any wine and liquor related business, whether or not they are Eber Bros.

entities, because of their duty of loyalty to the Eber Bros. wine and liquor business,"

including "all contracts between and among these entities and/or Lester and Wendy or

their wholly-owned entities" and (2) an accounting of "all entities affiliated with Eber

Bros now or at any time in the past ten years," including without limitation, Eber-RI,

Eber-NDC, Eber-Metro, LLC, and a company called Segway.  (TAC ¶¶ 385, 387.)

A party seeking an accounting must establish four conditions: "(1) relations of a

mutual and confidential nature; (2) money or property entrusted to the defendant

imposing upon him a burden of accounting; (3) that there is no adequate legal remedy;

and (4) in some cases, a demand for an accounting and a refusal."  *Winklevoss Capital*

*Fund, LLC v. Shrem*, 351 F. Supp. 3d 710, 721 (S.D.N.Y. 2019) (internal quotation marks

and citation omitted).  An equitable accounting is used to require a fiduciary to

demonstrate what they did with their principle's property.  *Id.* (citing *Soley v.*

*Wasserman*, 823 F. Supp. 2d 221, 237 (S.D.N.Y. 2011)).  Where a plaintiff successfully

asserts an accounting claim, the fiduciary will be required to return the property as well

as any profits generated by the use of the property. *Id.* The statute of limitations period

for a demand for an accounting is the greater of six years from the date the cause of

action accrued or two years from discovery of the fraud, or the time when fraud could

have been discovered with reasonable diligence.  The open repudiation doctrine also

applies to the assertion of an accounting claim.  N.Y. CPLR § 213(7).

Here, Plaintiffs pleaded sufficient facts to allege the elements necessary to justify

expanding their accounting claim by alleging that: (1) they were in a fiduciary

relationship with Defendants; (2) they trusted Defendants to manage the Trust, EB&C,

and EBWLC; and (3) they now have reason to believe that Defendants abused their

fiduciary relationship with Plaintiffs to enrich themselves, and Plaintiffs will be unable to

uncover the extent of Defendants' purported fraud without an accounting.  The Court is

satisfied that Plaintiffs acted diligently in seeking to add these additional requests for an

accounting because, like many of the other amendments in the TAC, these allegations

are premised on facts Plaintiffs learned during the three months prior to their filing of

their Motion to Amend and merely build on theories and claims that already were

pleaded in the SAC.  Likewise, Plaintiffs satisfied their requirements under Rule 15(a)

because their proposed amendments are not futile and Defendants have not argued

that they will suffer prejudice if this amendment is allowed.

### B.   New Claims

#### i.  Unjust Enrichment (Count III)

Plaintiffs recently learned that Lester Eber entered into a consulting agreement

with Southern which allegedly was to the detriment of the Eber Entities.  This newly

discovered fact forms the basis of the Plaintiffs' new Unjust Enrichment Claim, which seeks disgorgement of amounts Lester received under the agreement.  (TAC ¶¶ 295-97.) For the same reasons discussed above, Plaintiffs exercised the requisite diligence under Rule 16(d) to add this claim now.  To the extent Defendants argue that the claim is futile because it is barred by the statute of limitations, this issue cannot be determined at this stage.  Like breach of fiduciary duty claims, the statute of limitations for unjust enrichment claims is governed by C.P.L.R. § 213.  Thus, the applicable limitations period is the greater of six years from the date the cause of action accrued or, where fraud is alleged, within two years from the time plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it.  The open repudiation doctrine also applies.  *Golden Pac. Bancorp*, 273 F.3d at 518.  For now, there are sufficient factual issues as to when Plaintiffs discovered or could have discovered this claim to permit it to go forward.

### ii.  *BCL § 720 – To Set Aside and Enjoin Unlawful Transactions (Count IV)*

Plaintiffs seek to set aside certain of the preparatory transactions pursuant to New York BCL §§ 720(a)(2) and (3), through which they claim that Defendants breached their fiduciary duties to Plaintiffs.  (TAC ¶¶ 298-331.)  They also seek an accounting pursuant to BCL § 720(a)(1).  Specifically, Plaintiffs seek an accounting for the following transactions they contend resulted in a breach of fiduciary duty: (1) the Eber Metro Transfer; (2) the Polebridge Transaction; (3) Lester and Wendy's acquisition of Slocum Maine; (4) Wendy Eber's acquisition of a 6.6 percent interest in Eber Metro; (5) Wendy Eber's acquisition of Polebridge's interest in Eber Metro; (6) Lester Eber's receipt of 750

newly-issued EBWLC voting shares; and the (7) 2010 Guaranty and Security Agreements. (*Id*. ¶¶ 299-301.)  As explained above, Plaintiffs have exercised the requisite diligence to amend the SAC to add information about these various transactions and have sufficiently pleaded the timeliness of the claims for fiduciary breach upon which the set-aside claim is based.  Thus, at this point, the claim cannot be deemed futile for being time-barred.

To the extent Plaintiffs now seek to add a claim to enjoin Lester Eber from obtaining more than one-third of the EB&C stock currently being held by CNB pursuant to New York BCL § 720(a)(3), their claim is timely because Lester only sought to transfer these assets to himself in October of 2018.  This is well within the applicable six-year statute of limitations.  C.P.L.R. § 213(7) and (8); *see also generally Busher v. Barry*, No. 14-cv-4322 (NSR), 2016 WL 1249612, at *5 (S.D.N.Y. Mar. 28, 2016).  Moreover, Plaintiffs were diligent in seeking amendment upon learning of Lester Eber's conduct.

### *iii.   BCL § 619 – New Elections (Count V)*

Plaintiffs assert new claims pursuant to New York BCL § 619 seeking new elections of the boards of EB&C and EBWLC.  (TAC ¶¶ 332-43.)  BCL § 619 permits shareholders to petition the court to order a new election of the board of directors and to schedule a new election, or take such other action "as justice may require."  *Wolpert v. First Nat. Bank of E. Islip*, 381 F. Supp. 625, 632 (E.D.N.Y. 1974) (citing § 619) (internal quotation marks).  Federal courts have jurisdiction to adjudicate claims brought pursuant to BCL § 619 in a diversity action.  *Id*. at 628.

Plaintiffs' claim relates to information learned and events occurring in October of 2018 and later pertaining EB&C's elections, which allegedly occurred without a shareholders' meeting being called, and EBWLC's shareholder elections, which may not have been called at the correct times and with the correct notice as required by EBWLC's bylaws.  Plaintiffs also disagree with Lester and Wendy Eber on how the remaining Trust assets should be distributed by CNB.   (TAC ¶¶ 332-43.)  Thus, Plaintiffs have been diligent is seeking to add this claim, as it developed only recently, and there is no basis for finding that the claim is time-barred.  The Court also finds that the interests of justice are best served by permitting this amendment because it will allow for a complete resolution of Plaintiffs' claims in a single action.

### iv.  Declaration of Rights and Lawfulness of Certain Actions (Count VI)

Plaintiffs seek to add a claim for a declaratory judgment that: (1) by seeking to acquire all remaining EB&C shares of stock remaining in the Trust, Lester Eber interfered with Plaintiffs' right to establish rightful ownership over the EB&C stock and must now enable Plaintiffs to establish ownership over the EB&C shares, as permitted by the Monroe County Surrogate's Court Order; (2) Plaintiffs are shareholders of record in EB&C and, together, hold two-thirds of the shares held in the Trust; (3) EB&C's board shall consist of three directors, two of whom shall be elected by Plaintiffs, and one of whom will be elected by Lester Eber; (4) because neither EB&C nor EBWLC has had a validly constituted board of directors since at least February 2017, all significant corporate actions since then are deemed null and void, or voidable; (5) it will be unlawful for Lester to take any actions to prevent Plaintiffs from receiving their shares in

accordance with the Final Accounting of the Trust assets or, in the alternative, Wendy Eber and EB&C must accept certain Stock Powers executed by CNB on or about October 2, 2017 for delivery and record the stock powers in EB&C's stock book.

Rule 57 governs the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201, the Declaratory Judgment Act.  The Act provides that, "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  Any such declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such."  28 U.S.C. § 2201.

When determining whether to entertain a declaratory judgment claim, courts in the Second Circuit ascertain: "(1) whether the judgment will serve a useful purpose in clarifying or settling the legal issues involved; and (2) whether a judgment would finalize the controversy and offer relief from uncertainty."  *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005) (citation omitted).  Here, Plaintiffs seek declaratory judgments that will conclusively determine: (1) how many shares of EB&C and EBWLC stock are owned by Plaintiffs; (2) Plaintiffs' interest in the Trust; (3) how may directors must be elected to EB&C's board of directors and who will select them; (4) whether the actions of EB&C's and EBWLC's board, *i.e.*, Lester and Wendy Eber, should be deemed null and void or voidable; and (5) whether Lester Eber can lawfully seek to acquire the remaining shares of EB&C shares of stock held by CNB over Plaintiffs'

objection or, in the alternative, whether Wendy Eber is obliged to accept the delivery of stock powers executed by CNB and record them in EB&C's stock book.

This claim is timely insofar as it pertains to distribution of the Trust assets and allowing it is in the interest of justice as it will allow the Court to determine issues that need to be resolved before this action can be completely adjudicated. Indeed, one of the most crucial issues that still needs to be determined in this case is how the assets of the Trust should be distributed among the Trust beneficiaries.[13]

### v. *Common Law (Equitable) Indemnification (Count X)*

The TAC raises a new claim for common law indemnification arising from Plaintiffs' agreement with former defendant CNB. (TAC ¶¶ 389-98.) In connection with the settlement of their claims against CNB, Plaintiffs agreed to indemnify CNB for certain legal costs incurred by CNB in connection with this action. (*Id*. ¶ 391.) Plaintiffs allege that, by seeking to acquire all of the EB&C shares of stock in CNB's possession and preventing the transfer of the same to Plaintiffs, Lester and Wendy Eber have caused, and are continuing to cause, Plaintiffs to incur indemnification liability to CNB in the form of court costs and attorneys' fees. (*Id*. ¶¶ 392, 396-97.) Additionally, Plaintiffs seek a declaration that any expenses incurred by CNB relating to Defendants' wrongful

---

[13] The Court notes that, to the extent this Court considers how the Trust assets are to be distributed, the Court may act only in accordance with its jurisdictional mandate. *Marshall v. Marshall*, 547 U.S. 293, 296 (2006) ("[T]the probate exception reserves to state probate courts the probate or annulment of a will and the administration of a decedent's estate; it also precludes federal courts from disposing of property that is in the custody of a state probate court. But it does not bar federal courts from adjudicating matters outside those confines and otherwise within federal jurisdiction.").

conduct shall be paid by Lester Eber directly to CNB, or alternatively reimbursed by Lester to Plaintiffs, in the full amount paid by Plaintiffs to CNB.  (*Id*. at 398.)

Under New York law, the right to indemnification may arise out of an express agreement for indemnification, or it may be implied by law in favor of one who is held liable solely by imputation of law because of his relation to the actual wrongdoer. Indemnification is an equitable concept that shifts liability when the failure to do so would result in "'the unjust enrichment of one party at the expense of another.'" *LNC Inv., Inc. v. First Fid. Bank, Nat. Ass'n*, 935 F. Supp. 1333, 1352 (S.D.N.Y. 1996) (quoting *Mas v. Two Bridges Assocs.,* 555 N.Y.S.2d 669, 674–75, 554 N.E.2d 1257, 1262–63 (1990)).  In other words, implied indemnification "avoids the unfairness of holding one party liable solely on account of the negligence of another."  *LNC Inv., Inc.*, 935 F. Supp. at 1352 (citation omitted).

Here, Plaintiffs voluntarily dismissed CNB from this action in August of 2018 and agreed to indemnify CNB for any additional costs it incurred in connection with this action.  At the time Plaintiffs entered into the indemnification agreement with CNB, Plaintiffs did not expect that Lester Eber would ask CNB to transfer all of the remaining shares of EB&C to him for no consideration or that CNB would feel compelled to intervene in this action less than a year after it was dismissed from the case.  The Court finds that Plaintiffs alleged sufficient facts that, at this stage, support its claim for equitable indemnification.  Supplementation of the complaint to add this claim is appropriate because the proposed additional indemnification claim is not futile and will not unduly prejudice defendants or cause undue delay.

C.   **Joinder of Parties**

The TAC seeks to clarify that EB&C, EBWLC, Eber Metro, and Eber-CT are named as nominal defendants in this action and to add Eber-RI, Eber Acquisition, and Slocum Maine as Nominal Defendants.  (TAC ¶¶ 26-39.)  Plaintiffs allege that the addition of nominal parties is necessary "to ensure complete relief is possible."  (Doc. No. 165, 5.)

Because Plaintiffs are seeking to add additional parties after the deadline imposed by the Scheduling Order, Rule 16's diligence standard applies.  The Court is satisfied that Plaintiffs exercised the requisite diligence because they only recently learned, through discovery, of the extent of some of Lester and Wendy Eber's purported self-dealing and the entities involved.  If the Court were to deny Plaintiffs' request to join these nominal parties, it would inhibit Plaintiffs' ability to obtain the broad accounting necessary to ensure that they have the opportunity to learn about  the actions Lester and Wendy Eber took to enrich themselves while they owed fiduciary duties to Plaintiffs.

Because the Court is satisfied that Plaintiffs exercised the requisite diligence to join these additional parties, it will apply the relaxed standards of Rule 21, which permits the joinder of parties so long as the joinder will not destroy diversity.  Here, the only new parties being added are Eber-RI, a Delaware limited liability company, Eber Acquisition, a New York corporation and a wholly owned subsidiary of EBWLC, and Slocum Maine, a Maine corporation.  Because Plaintiff Daniel Kleeberg is a resident of Florida, Lisa Stein is a resident of New Jersey, and Audrey Hays is a resident of Colorado, adding these additional parties will not destroy diversity under 28 U.S.C. § 1332.

Moreover, under Rule 15(a), the Court finds that the joinder of these parties will not prejudice Defendants or cause undue delay.

## **CONCLUSION**

Accordingly, for all the reasons set forth above, Plaintiffs' Motion to Amend the SAC is granted in its entirety.  As discussed at the May 20, 2019 conference, Plaintiffs shall have until **June 5, 2019** to make minor corrections to the TAC and file the same on ECF.  Defendants shall have until **June 19, 2019** to file their Answer.

**SO ORDERED.**

DATED:       New York, New York
             May 23, 2019

_____
KATHARINE H. PARKER
United States Magistrate Judge