EXHIBIT A

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DANIEL KLEEBERG, LISA STEIN, and
AUDREY HAYS,

               Plaintiffs,

      v.

LESTER EBER; ALEXBAY, LLC f/k/a
LESTER EBER, LLC; ESTATE OF
ELLIOTT W. GUMAER, JR.; and WENDY
EBER,

               Defendants,

     and

EBER BROS. & CO., INC.; EBER BROS.
WINE AND LIQUOR CORP.; EBER
BROS. WINE & LIQUOR METRO, INC.;
EBER-CONNECTICUT, LLC; EBER-
RHODE ISLAND, LLC; EBER BROS.
ACQUISITION CORP.; EBER-METRO,
LLC; SLOCUM & SONS OF MAINE, INC.;
and CANANDAIGUA NATIONAL BANK
& TRUST COMPANY,

            Nominal Defendants.

Civil Action No.  16-CV-9517(LAK)(KHP)

## PLAINTIFFS' RESPONSES AND OBJECTIONS TO
## THE GUMAER ESTATE'S CONTENTION INTERRROGATORIES

Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays, by and through undersigned counsel, hereby respond to Defendant Estate of Elliott W. Gumaer, Jr.'s contention interrogatories. Plaintiffs reserve the right to supplement these responses to the extent that additional information becomes available to them and are particularly limited at this time due to the inadequate disclosure of payments to Gumaer for a period of several years.

1

1.      *Identify each act on the part of Guamer which you contend made him a faithless servant or otherwise entitles plaintiffs to relief from the Estate and state when the act occurred.*

**Response:**

    a.  On or about January 2, 2001, Gumaer offered to be and was retained as Lester Eber's personal attorney.

    b.  Guamer never disclosed to the other Trust beneficiaries his attorney-client relationship with Lester Eber.

    c.  If Gumaer served as a personal attorney to Wendy Eber as well, it was also without the knowledge and consent of the other Trust beneficiaries.

    d.  While impaired by his undisclosed conflict of interest, Gumaer either approved of, or failed to exercise reasonable care and prudence to discover, the fact that Lester had entered into a personal services contract with Southern Wine & Spirits to generate side payments for himself, separate from Eber Bros., even though he did so during the overall negotiations with Southern on behalf of Eber Bros.

    e.  To the extent that he did so, Gumaer approved the Security Agreement with Lester dated as of February 26, 2010, and related board meeting minutes that falsely asserted that Lester had not already executed the October 2009 Line of Credit Note.

    f.  Gumaer authorized Eber Metro's sale of 6% of Eber-CT to Polebridge Bowman in or about July 2010 (backdated to May 2010), in exchange for a non-recourse note with a below-market interest rate of 2% simple interest.

g.  Gumaer attempted to conspire with Lester to fabricate a rationale to support Wendy receiving a right of first refusal on Polebridge Bowman's interest because he knew that it improperly favored her over other Trust beneficiaries and remaindermen.

h.  On or about August 18, 2011, Gumaer purported to ratify loans that were supposedly made by Lester, while acting with an undisclosed conflict of interest and without exercising due care, including taking reasonable steps to determine whether the purported loans had actually been made such that any sums were due or owing.

i.  Guamer failed to disclose Alexbay's UCC Article 9 proposal—which was self-dealing by his co-trustee—to the other Trust beneficiaries prior to the proposal being accepted.

j.  Gumaer authorized EBWLC and Eber Metro to accept Alexbay's UCC Article 9 proposal.

k.  After the transfer of Eber Metro to Alexbay, Gumaer failed to disclose to any Plaintiffs or Sally Kleeberg that the Trust no longer had any interest in CT business.

l.  Gumaer failed to disclose to the Trust beneficiaries that there was no positive value in Eber Bros. or EBWLC stock, despite knowing that it was being incorrectly reported as having a significant positive value in Trust statements.

m.  Gumaer conspired with Lester and Wendy Eber to conceal information from the other Trust beneficiaries.

3

n. Gumaer approved of corporate transactions concerning Lester and Wendy Eber that Gumaer purported to authorize as an independent director or manager, notwithstanding his undisclosed conflict of interest, including but limited to authorizing Lester's and Wendy's compensation.

o. Gumaer served as director of Eber Metro after it was transferred to Alexbay, creating an additional fiduciary duty to Lester that exacerbated the conflict.

2. *For each act identified in response to Interrogatory No. 1, identify the persons(s) or entity to which you contend Gumaer owed a duty of loyalty that was violated by the act.*

**Response:** Plaintiffs object to this interrogatory to the extent that it incorrectly implies that Plaintiffs' claims are founded solely on the duty of loyalty, when in fact certain claims that could give rise to liability for the estate are founded on the duty of care. Accordingly, the answers provided identify the persons to whom Gumaer owed fiduciary duties generally, including loyalty.

a. The Allen Eber Trust, including its beneficiaries and remaindermen (together referred to herein as the "Trust," since in all instances when duties run to the trust itself, they also run to the beneficiaries and remaindermen).

b. The Trust.

c. The Trust.

d. The Trust; Eber Bros. & Co., Inc. ("EB&C"); Eber Bros Wine and Liquor Corp. ("EBWLC"); Eber Bros. Wine & Liquor Metro, Inc. ("Eber Metro"); Eber-Connecticut, LLC ("Eber-CT").

e. The Trust; EB&C; EBWLC; Eber Metro.

f. The Trust; EB&C; EBWLC; Eber Metro.

g. The Trust; EB&C; EBWLC; Eber Metro.

    h.   The Trust; EB&C; EBWLC; Eber Metro.

    i.   The Trust; EB&C; EBWLC; Eber Metro.

    j.   The Trust; EB&C; EBWLC; Eber Metro.

    k.   The Trust.

    l.   The Trust.

    m.   The Trust.

    n.   The Trust; EB&C; EBWLC; Eber Metro; Eber-CT.

    o.   The Trust.

    *3.    For each person or entity identified in response to Interrogatory No. 2, identify the legal relationship (e.g., employee, counsel, trustee, agent, director) you contend Gumaer had with that person(s) or entity at the time of the acts identified in response to Interrogatory No. 1 and identify the time period you contend that relationship existed.*

**Response:**

    **The Trust:** Gumaer was the trustee since its inception and was never discharged. The persons included as those to whom there was a breach of duty include Sally Kleeberg, Audrey Hays, Daniel Kleeberg, and Lisa Stein. Although Lester and Wendy Eber were technically in this category as well, there was no apparent failure to disclose or concealment from those two.

    **EB&C:** Gumaer was a director from at least 2000 through February 2017. *See* EB-00030935.

    **EBWLC:** Gumaer was a director from at least 2000 through 2013. The exact circumstances surrounding his purported resignation are unclear and appear to have shifted at various points in time in 2014 and 2015. *See* EB-00016954-59.

**Eber Metro:** Gumaer was a director from at least 2000 through February 2017. *See* EB-00030935.

**Eber-CT:** Gumaer was a member of the board of managers from its inception through February 2017. *See id.*

4.      *For each legal relationship identified in response to Interrogatory No. 3, state the factual and legal basis for your contention that Gumaer has such legal relationship with that person or entity.*

**Response:** Plaintiffs object to most of this request because it is undisputed (i) that Gumaer was an appointed trustee of the Allen Eber Trust since its inception, and (ii) that Gumaer served as a director of EB&C, EBWLC, and Eber Metro, and as a member of the board of managers of Eber-CT. These legal relationships intrinsically create direct fiduciary duties.

In addition, Plaintiffs note that the fiduciary duties of a director run both to the company itself and also to its shareholders, especially when the company is a wholly owned subsidiary. *See, e.g.*, *Andarko Petroleum Corp. v. Panhandle Eastern Corp.*, 545 A.2d 1171, 1174 (Del. Sup. Ct. 1988). Accordingly, all of Gumaer's actions as corporate director of a corporation ultimately controlled by the Trust implicated his highest duty of undivided loyalty to the Trust.

5.      *For each act identified in response to Interrogatory No. 1, identify the damages you contend were caused by the act, including the identification of each person or entity that you contend suffered such damages and the amount of such damages you contend was suffered by that person or entity.*

**Response:** Plaintiffs object to this request on the grounds that it is vague about "damages… caused" or "suffered," and whether it would (i) include non-monetary injuries, including those that result in financial recoveries without demonstrating financial loss, or (ii) include indirect monetary

damages. It would be unduly burdensome to require Plaintiffs to respond with specifications of either the non-monetary injuries caused by a faithless fiduciary on an act-by-act basis or the amounts of indirect damages as to each act. Accordingly, Plaintiffs answer this Interrogatory solely with respect to the identification of direct monetary damages, and without attempting to specify or quantify indirect damages suffered by shareholders, parent companies, or Trust beneficiaries. Acts of disloyalty resulting in the forfeiture of compensation or disgorgement of profits does not constitute "damages." Furthermore, Plaintiffs note that they do not include interest or expenses, including attorney's fees, in this response.

     a. No direct damages were caused by this act alone. Plaintiffs note that its occurrence serves as a basis for forfeiture of compensation and disgorgement of profits for breach of fiduciary duty and pursuant to the faithless servant doctrine.

     b. No direct damages were caused by this act alone. Plaintiffs note that its occurrence serves as a basis for forfeiture of compensation and disgorgement of profits for breach of fiduciary duty and pursuant to the faithless servant doctrine.

     c. No direct damages were caused by this act alone, if it in fact occurred. Plaintiffs note that its occurrence serves as a basis for forfeiture of compensation and disgorgement of profits for breach of fiduciary duty and pursuant to the faithless servant doctrine.

     d. EBWLC or Eber Metro were both New York companies capable of entering into a personal services contract for Lester to provide consulting services to Southern, and accordingly either or both of them directly suffered the loss of

$600,000 per year in income. The loss of this income directly led to the borrowing of money from Lester, which led to the other damages noted below. To the extent that Eber-CT could have been capable of providing services in New York, it also suffered because it was lost the opportunity as well and, as an operating entity, was injured by virtue of Lester's agreement not to compete with Southern, which limited Eber-CT's ability to conduct business without compensation, since the compensation for that limitation was instead diverted to Lester personally.

e.   EBWLC and Eber Metro were damaged by giving Lester the right of foreclosure on collateral without receiving anything in return. The amount of damages for this act standing alone has not been quantified. As the events ultimately played out, however, because this act was integral to the subsequent acts, the amount of damages is calculable the Expert Report of Glenn Liebman.

f.   Eber Metro was damaged primarily by selling the interest in Eber-CT for sham consideration since the amount was financed with a non-recourse note that did not have a reasonable interest rate, particularly since Eber Metro's cost of borrowing was then 12.5% compounding interest to Lester and it was loaning money to Polebridge at just 2% simple interest. To the extent that the transaction was motivated by the desire to retain Glenn Sturm's services, there is no evidence to support the conclusion that Glenn Sturm provided services to Eber Metro that would warrant Eber Metro bearing the brunt of the costs. Even if the consideration received by Eber Metro had been cash, the amount

8

was below fair value, particularly since Eber Metro did not retain its own right of first refusal, but instead gave that away to Wendy Eber. Plaintiffs have not quantified the damages by valuing Eber-CT at the time of the transfer, which was authorized in July 2010 but backdated to May 2010. Instead, Plaintiffs seek to rescind the transaction.

    i.   This response does not take into account the fact that Polebridge received distributions from Eber-CT, because an adequate accounting of what was paid has not yet been provided; any such distributions must be returned to Eber Metro as part of the rescission. If the distributions cannot be recovered from Polebridge Bowman or Wendy Eber, Gumaer as an authorizing director is liable for reimbursing the company.

g.  Eber Metro was damaged in that it lost the opportunity to recover the six percent that it "sold" to Polebridge in a sham transaction. The Expert Report of Glenn Liebman establishes the value of Eber-CT as of May 31, 2018, which is close enough in time to the February 2017 effective date when Wendy Eber exercised her right of first refusal to provide a reasonable estimate of the damages at $875,140, which is the difference between the fair market value of the six percent interest and the consideration This does not take into account the unreasonably low interest rate on the Polebridge note, since if Eber Metro had the right of first refusal and exercised it on the same economic terms as did Wendy, it would have assumed a debt to itself that would have been canceled.

h.   The amount of damages for this act standing alone is at least the amount of the purported 2006 amended loans that Lester claimed to have satisfied through the Article 9 strict foreclosure. *See* 2/21/2012 Alexbay Complaint ¶ 27 (specifying indebtedness of $1,951,874.26 as of Dec. 31, 2011). The amount of damages may be larger if Lester were to collect interest calculated after approximately December 31, 2011, or if Lester were to attempt to collect on the second 2006 note. Moreover, as the events ultimately played out, because this act was integral to the subsequent acts, the full amount of damages is calculable the Expert Report of Glenn Liebman.

i.   EBWLC suffered the direct damages based on the loss of Eber Metro, which constituted substantially all of its assets. The amount of damages may be determined by reference to the Expert Report of Glenn Liebman and the current value of Eber-CT. Assuming that damages are awarded rather than rescission of the transfer, the precise amount will vary depending on the specific equitable relief entered as to other transactions, including but not limited to the request to rescind the Polebridge Bowman transaction and right of first refusal to Wendy Eber and the issuance of Eber Metro stock to Wendy under a compensation agreement executed after Alexbay acquired control; it will also depend on whether Lester is capable of substantiating his currently unsubstantiated claims of pre-2009 loans. If there were distributions that would have reached EBWLC during the period after June 5, 2012 (as will be determined after receiving a proper and complete accounting), the loss of

those distributions constitutes additional damages suffered directly by
EBWLC.

j.   See response to Act (i).

k.   See response to Act (i).

l.   See response to Act (i).

m.  See response to Act (i).

n.   No direct damages were caused by this act alone. Plaintiffs note that its
occurrence serves as a basis for forfeiture of compensation and disgorgement
of profits for breach of fiduciary duty and pursuant to the faithless servant
doctrine.

o.   No direct damages were caused by this act alone. Plaintiffs note that its
occurrence serves as a basis for forfeiture of compensation and disgorgement
of profits for breach of fiduciary duty and pursuant to the faithless servant
doctrine.

6.      *With respect to the damages identified in response to Interrogatory No. 5, identify
the person or entity you contend is entitled to recover in this action those damages or any portion
of them, including the amount of such damages you contend each such person or entity is entitled
to recover.*

**Response:** In their response to Interrogatory No. 5, Plaintiffs have identified the persons or entities
that suffered direct damages (EBWLC and Eber Metro, as specified above), and thus those are the
entities that are entitled to recover damages in this derivative lawsuit. Plaintiffs note that because
Eber Metro was a wholly owned subsidiary of EBWLC at the time of the Polebridge Bowman
transaction, the damages suffered by Eber Metro may and should be awarded to EBWLC,

particularly to the extent that Eber Metro is not a wholly owned subsidiary of EBWLC at the time when judgment is entered.

With respect to the forfeiture of compensation or disgorgement of profits as remedies for Gumaer's breach of fiduciary duty of loyalty (although those do not technically constitute damages), Plaintiffs advise that they argue two alternatives:

(i)    **Disgorgement:** Because Gumaer's duty of trust to the Trust was violated to the detriment of the disfavored Trust beneficiaries, he must account for and be disgorged of his profits earned as a result of the breach of trust. *See, e.g.*, *Fed. Ins. Co. v. Mertz*, No. 12-CV-1597-NSR-JCM, 2016 WL 164618, at *7 (S.D.N.Y. Jan. 12, 2016) ("In [] cases where a fiduciary violates his position of trust, courts have held that he must account for all the profits derived therefrom."). Such disgorged profits should be paid to Plaintiffs, as the parties whose trust was violated, without giving a share to Lester, who was complicit in Gumaer's breach of trust.

(ii)   **Forfeiture:** Alternatively, the compensation must be forfeited to the entities that paid the compensation to Gumaer. Based on the information disclosed by the Ebers, this appears to have been $40,000 from EBWLC each calendar year beginning in 2001 and presumptively continuing through the first half of 2010[1]; $82,000 from Eber-CT from August 2010 through July 2017.

Under either theory, the amount of disgorgement or forfeiture is equal to the amount of compensation paid to him by any of the Eber entities or by the Ebers themselves, and for which

---

[1] As the Supreme Court explained, "while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise." *Story Parchment Co. v. Paterson Parchment Co.*, 282 U.S. 555, 563 (1931). Here, any deficiency in the records is a direct and proximate result of the passage of time since the events in question, which is a direct and proximate result of the improper concealment by Gumaer.

Plaintiffs still require a formal and complete accounting. Plaintiffs reserve the right to supplement or correct this response if necessary to conform to what the law permits based on the factual allegations in the Third Amended Complaint that are undisputed or sufficiently supported by admissible evidence.

7. *With respect to each person or entity identified in response to Interrogatory No. 6, state the legal and factual basis for your contention that that person or entity is entitled to recover damages in this action.*

**Response:** See response to Interrogatory No. 5 for the primary factual basis.

The legal basis for receiving lost profit damages, as with Lester's Southern contract (Act (d)), is based on the fact that it involved self-dealing and abuse of trust. *See Matter of Rothko*, 43 N.Y.2d 305, 321–22 (1977). To the extent that the Ebers stop contending that Gumaer knew about the transaction, Gumaer's responsibility for negligently violating the duty of care (rather than loyalty) as to this specific transaction for the damages may theoretically be limited to actual losses without appreciation. *See id.* at 316–17. However, because Gumaer's ability to exercise his duty of care was impeded by his undisclosed conflict of interest, it is Plaintiffs' position that even if he did not know of the Southern transaction, the injury was ultimately due to his breach of his duty of loyalty. The existence of the conflict of interest merits appreciation damages. *Id.* at 319.

The same legal basis applies to the appreciation damages in connection with EBWLC's and Eber Metro's lost interests in Eber-CT. However, by mid-2010 (if not earlier), Gumaer was further conflicted by the fact that his compensation was coming from Eber-CT, giving him an incentive to help Eber-CT avoid obligations to EBWLC's creditors that might impair his "consulting" fee. It is unlikely to be a coincidence that the first recorded payment from Eber-CT to Gumaer was in August 2010, shortly after he approved the backdated Polebridge Bowman

transaction. Accordingly, to the extent that EBWLC is not given equitable relief to recover its 85% interest in Eber-CT (including rescission of the six percent sold by Eber Metro to Polebridge), Gumaer's estate is liable for damages.

Even if equitable relief is entered, Gumaer's estate may be liable for payments to EBWLC in connection with the same transactions because Plaintiffs will be entitled to a constructive trust over proceeds from Eber-CT and Eber Metro since the transfer. If the Ebers are unable to return the funds subject to the constructive trust, Gumaer's estate is liable for the same reason that it is liable for appreciate damages: Because of Gumaer's conflict of interest in favor of Lester.

As to Act (h), if the 2006 loan is not set aside, Gumaer's estate will be liable to EBWLC for any amounts that it is liable to pay to Lester or Alexbay. Even if no cash is paid by EBWLC due to offsetting liabilities from Lester or Alexbay to EBWLC or its subsidiaries, any amount of offset will still be subject to Gumaer's liability as direct loss attributable to his negligence in failing to adequately investigate the loan, its interest rate, and related facts and circumstances that may have shown that EBWLC had valid defenses to the payment of the purported loan.

    *8.*    *With respect to each alleged act of disloyalty identified in response to Interrogatory No. 1, do you contend his breach of duty of loyalty was 'substantial' as that term was used in* <u>*Turner v. Kouwenhoven*</u>*, 100 N.Y. 115 (1885), and if so, state the factual and legal basis for that contention.*

**Response:** Plaintiffs object to this request to the extent that is asks them to repeat the responses already provided above, all of which are incorporated by reference.

The *Turner* case's definition of "substantial" is somewhat inapposite because it concerns an employment contract rather than the specific situation of a conflicted fiduciary, let alone a conflicted trustee. *See, e.g.*, *Meinhard v. Salmon*, 164 N.E. 545 (N.Y. 1928) ("Many forms of

conduct permissible in a workaday world for those acting at arm's length are forbidden to those bound by fiduciary ties. A trustee is held to something strict than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior."). *Turner* has also been characterized as establishing one of "two alternative standards for determining whether an employee's conduct warrants forfeiture under the faithless servant doctrine." *Stanley v. Skowron*, 989 F.Supp.2d 356, 359 (S.D.N.Y. 2013). Under the second standard, "it is sufficient that the employee … omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment." *Id.* at 359-60. Here, Gumaer's conduct violated both standards given the fundamental purpose of a trustee.

A trustee is bound by a duty of *undivided* loyalty. By entering into a separate fiduciary relationship with just one beneficiary, who was also the co-trustee with the greatest potential power for acting out of self-interest to the detriment of the rest of the Trust beneficiaries, Gumaer substantially defeated the very purpose of his appointment as a co-trustee. Gumaer's failure to disclose his attorney-client relationship to the beneficiaries, much less receive the beneficiaries' consent, was a substantial breach of his duty of loyalty. Gumaer's undisclosed conflict of interest permeated every single decision that he made, and thus every action that benefitted Lester or Wendy in any way was a substantial violation of his primary duty as trustee.

Moreover, in his capacity as a corporate director, the acts specifically identified above benefitting Lester or Wendy (including conspiring to conceal information and fabricate explanations) were so egregious as to violate the essence of his duty to the corporations. And to the extent that he purported to act as independent director, such as when he approved compensation to Lester, it was a violation of his duty of candor to conceal his conflict of interest that effectively required him to favor Lester.

To the extent that he was acting as a lawyer in any capacity for the Eber entities (Plaintiffs do not contend that he did so, although the Ebers may), Gumaer also violated the Rules of Professional Conduct by failing to obtain informed consent given his potentially conflicting personal representation of Lester. Failure to adhere to the ethical standards of the profession is a substantial failure of performance.

Respectfully submitted,

Dated: October 25, 2019

/s Brian C. Brook
Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Facsimile: (646) 257-2887
Brian@brook-law.com

*Counsel for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*