## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL KLEEBERG, LISA STEIN and AUDREY HAYS,<br><br>                                Plaintiffs,<br><br>v.<br><br>LESTER EBER, ALEXBAY, LLC f/k/a LESTER EBER, LLC, ESTATE OF ELLIOTT W. GUMAER, JR. and WENDY EBER,<br><br>                                Defendants,<br><br>and<br><br>EBER BROS. & CO, INC., EBER BROS. WINE AND LIQUOR CORP., EBER BROS. WINE & LIQUOR METRO, INC., EBER-CONNECTICUT, LLC, EBER-RHODE ISLAND, LLC, EBER BROS. ACQUISITION CORP., EBER-METRO, LLC, SLOCUM & SONS OF MAINE, INC., and CANANDAIGUA NATIONAL BANK & TRUST COMPANY,<br><br>                                Nominal Defendants. | Civil Action No.<br>16-CV-9517(LAK/KHP)<br><br><br><br><br><br><br><br><br><br><br>**AFFIDAVIT OF<br>LESTER EBER** |

STATE OF NEW YORK   )
                                  ) ss:
COUNTY OF MONROE    )

        Lester Eber, being duly sworn, deposes and states as follows:

        1.     I am a defendant in the above-captioned action. I make this Affidavit in support of the motion for summary judgment filed by me and Defendants Alexbay, LLC f/k/a Lester Eber ("Alexbay"), LLC and Wendy Eber (collectively, the "Eber Defendants").

        2.     I began working for Nominal Defendant Eber Bros. & Co. Inc. ("Eber Bros."), a wine and liquor distributorship, in or about 1959. I eventually held the titles of President and Director of Eber Bros.

3. My father, Allen Eber, the founder of Eber Bros., created a Testamentary Trust in his 1969 Will (the "Will") known as the Allen Eber Trust ("the Trust"). A copy of the will is attached as Exhibit A.

4. I served as Co-Trustee of the Trust, along with Elliott W. Gumaer, Jr., and an institutional trustee – ultimately Canandaigua National Bank ("CNB").

5. Prior to its termination in June 2017, the Trust held a number of assets, most relevantly for the present dispute, all of the voting stock in Eber Bros.

6. Nominal Defendant Eber Bros. Wine and Liquor Corp ("EBWLC"), is a subsidiary of Eber Bros. At some point I became President of EBWLC, a position I held until I voluntarily resigned on February 1, 2012.

7. Prior to the 2012 Foreclosure, Nominal Defendant Eber Bros. Wine & Liquor Metro, Inc. ("Metro") was a subsidiary of EBWLC.

8. Nominal Defendant Eber-Connecticut, LLC ("Eber CT), is a subsidiary of Metro, which owns 79% of Eber CT. Organization charts detailing the organizational structures of the Eber Entities are attached as Exhibit A to the November 8, 2019 Affidavit of Wendy Eber ("Wendy Eber Affidavit").

9. I continue to hold the positions of CEO and Director of Metro and Eber CT.

10. Over the years, I have voluntarily provided various family members – especially plaintiffs and their immediate families – with gifts and benefits that I was not obligated to provide.

11. For example, I approved loans from the Eber Entities to plaintiff, Daniel Kleeberg, that were never repaid. See deposition testimony of Daniel Kleeberg taken December 19, 2018, pp. 90, 107-113 attached as Exhibit B.

12. I paid the health care expenses and health insurance costs for my sister, Sally Kleeberg, a Trust beneficiary. See copies of payment detail attached as Exhibit C.

13. In addition, I made payments to Trust beneficiaries when the Trust had no money to distribute. I also arranged for the Trust to distribute money on a monthly basis to plaintiff, Lisa Stein and her daughter, to help with her daughter's medical expenses. See Exhibit D.

### Southern Wine & Spirits

14. In approximately October 2004, Southern Wine and Spirits of America, Inc., a Florida Business Corporation authorized to conduct business in New York ("Southern"), one of the largest wine and liquor distributors in the nation, entered the New York market. Southern proceeded to hire more than 20 of Eber's senior salesforce, and subsequently took numerous longtime customers and suppliers.

15. Metro attempted to fend off Southern's attacks, even going as far as to sue Southern for tortious interference, inducement of breach of fiduciary duty, unfair competition, and interference with prospective business advantage, among other things. However, Monroe County Supreme Court Justice Kenneth Fisher denied the application for a Preliminary Injunction (See Ex. E), and we had no choice but to settle with Southern to survive at all. A copy of the settlement agreement with Southern is attached as Exhibit F.

16. As of approximately March 2007, Eber CT was the only entity still operating, as both EBWC and Metro had laid off all employees and ceased operations in New York.

17. As none of the Eber entities had a presence in New York at that point, in or about August 2007, I accepted a role with Southern as a consultant and lobbyist based

on my long experience and knowledge of the New York wine and liquor market. A copy of the independent consulting agreement with Southern is attached as Exhibit G.

18. Notably, none of the Eber Entities ever did any consulting or lobbying work – in New York or anywhere else – for unaffiliated third parties. Also, Eber CT operated in Connecticut, not New York.

19. Plaintiffs have mistakenly alleged that my decision to accept a consulting role with Southern usurped a corporate opportunity of EBWLC and/or Metro.

20. This is patently false.

21. Again, at the time of my agreement with Southern, both companies had laid off all employees and ceased doing business in New York.

22. Further, as clearly stated by Lee Hager, Executive Vice-President of Southern, during his May 9, 2019 deposition, Southern was interested in my personal knowledge and connections – not the corporate name Eber Brothers.

23. Mr. Hager testified:

> Q: Was there a particular reason why the consulting agreement was entered into with Lester Eber personally rather than with Eber Brothers, the company?
>
> A: I can only answer that as that it's a hundred percent typical that we enter these things, you know, on what I will describe as an individual and personal contract basis. If God forbid something happened to one of our consultants, why would I want to be bound to a corporation for consulting? These are personal services. God forbid something happens, again, to any one of these consultants, their value is diminished. No, I would never enter – again, these are personal services.

See pp. 43-44 of Lee Hager's deposition transcript attached as Exhibit H.

24. Put simply, there was no corporate opportunity to be usurped, as Southern was not interested in contracting with any of the Eber Entities. See Ex. H, pp. 22-26.

4

**Business Downturn**

25. Despite agreeing to become a consultant for Southern in or about August 2007, it is indisputable that its entry into New York in 2005 began a downward spiral for our business.

26. Prior to 2007, Eber Bros. had a $130 million first lien credit facility with Wells Fargo. However, as a result of the catastrophic impact of Southern's entry into the New York market, in March 2007, Wells Fargo put Eber Bros. loans into default and classified the loans as a "workout", freezing all of Eber Bros. working capital in order to pay down the outstanding loans. Even after the Wells Fargo loans were paid off, Wells Fargo declined to extend any further credit to any Eber entity.

27. Between 2008 and 2012, the Eber Defendants (specifically, Eber CT) made numerous attempts to arrange new first lien debt financing with third party lenders. Discussions were held with at least six different banks and finance companies in the northeast about obtaining additional financing, but none of those lenders were willing to provide any credit.

28. Accordingly, I was faced with the decision of either loaning my own funds to the Eber Entities to prevent them from being liquidated, or allowing the business that I had worked for my entire life to go under.

29. I ultimately agreed to make a number of personal loans to the companies to try and save them ("the Loans"). These loans were evidenced by the following:

> A. October 1, 2002 August 15, 2005: My loans to EBWLC - $2,079,645.00 Notes which were amended and restated on March 13, 2006;
> B. October 2009: My $1.5 Million LOC Note to Eber Metro;
> C. February 26, 2010: EBWLC Guaranty in favor of me;
> D. February 26, 2010: Security Agreement by EBWLC and Metro in favor of me; Board Resolutions and Minutes;

5

    E. February 11, 2011: Amended and Restated Security Agreement EBWLC and Metro in favor of me;
    F. February 11, 2011: Debt Assumption Agreement Between EBWLC, Metro and me (Metro assumed all of EBWLC's obligation under the $1.5 Million Note); Board Resolutions;
    G. August 18, 2011: Metro Board Meeting Minutes;
    H. January 18, 2012: Assignments (EBWLC & Metro) of Line of Credit Note and Security Agreement by and among me and Alexbay; and
    I. March 13, 2012: Joint Meeting Minutes for EBWLC and Metro.

Copies of the above-referenced loan documents are attached as Exhibit I.

30. My father's Will expressly permitted me, as a Co-Trustee, to make a secured loan to the Trust or the companies owned by it – and concomitantly, to enforce my security interest in the collateral.

31. Notably, I affirmatively gave the Plaintiffs the opportunity to participate in such loans.

32. More specifically, by letters dated March 22, 2010 and April 2, 2010, I wrote to Sally Kleeberg and Audrey Hays explaining the dire financial situation faced by the company. Copies of those letters are attached as Exhibit J.

33. I explained in my letters that I had already loaned significant sums of money, and additional sums would be needed to keep the companies from going under.

34. Accordingly, I offered my sisters the opportunity to participate in a $1.5 million loan to the Eber Entities on a 1/3 basis. I specifically noted that the loan would be secured by the interest of EBWLC in Metro, and the interest of Metro in Eber CT.

35. However, both rejected my offer to participate in the Loans to try and save the business, so I was forced to proceed alone.

6

36. Despite the efforts described above, by late 2011, the companies were performing even more poorly, and were insolvent. At that point, I was no longer willing to continue lending money with no expectation of repayment.

37. Rather, I decided to pursue a New York State UCC Article 9 foreclosure for my debt[1].

38. At or around the same time, I also resigned as President of EBWLC. See Exhibit K.

39. As of that time, the outstanding principal and accrued but unpaid interest on the Loans was an aggregate of $3,650,682.48.

40. The Loans were the primary obligation of Metro, but were guaranteed by EBWLC, and were secured by a validly perfected first priority security interest.

41. Subsequently, I assigned the Loans to Alexbay LLC, a newly formed Delaware limited liability company owned by me.

42. Alexbay availed itself of the UCC in order to efficiently transfer EBWLC's (i.e. the debtor) interest in collateral to Alexbay (the secured creditor) in satisfaction of the Alexbay's debt.

43. Alexbay was a secured creditor of EBWLC and Metro as evidenced by the Loans referenced above.

44. EBWLC and Metro were in default under the terms of the 2005 Note and the Line of Credit Note. The Line of Credit Note matured on December 31, 2011 and was

---

[1] My December 8, 2011 Affidavit to the CT Department of Consumer Protection regarding the foreclosure erroneously stated that it was for no consideration – the consideration was my $3.5 Million in loans and interest.

unpaid. The 2005 Note was in default because a cross-default provision automatically created a default under the 2005 Note when the Line of Credit Note went into default.

45. Accordingly, on or about February 21, 2012, Alexbay filed an action in New York State Supreme Court, Monroe County, seeking a judicial determination pursuant to New York UCC §9-627/§9-620, that Alexbay's acceptance of EBWLC's. ownership interest in Metro (and, indirectly, all of Eber Metro's 79% ownership interest in Eber CT), in full satisfaction of the loans then held by Alexbay was "commercially reasonable." A copy of the Alexbay action is attached as Exhibit L.

46. Notably, there was no requirement that Plaintiffs – or any of the Trust beneficiaries – be notified of the UCC proceeding.

47. Further, there was no request to the Co-Trustees from the Trust beneficiaries seeking information about the 2012 proceeding.

48. This is understandable, since the UCC proceeding did not require the consent of the Trust beneficiaries.

49. The prior course of dealing between the Co-Trustees and Trust beneficiaries was limited to the dissemination of a year-end annual report prepared by CNB.

50. On May 24, 2012, State Supreme Court Judge Rosenbaum issued a Notice of Entry of and Order Granting the Article 9 relief ("Rosenbaum Order"). A copy of Judge Rosenbaum's Order is attached as Exhibit M.

51. Thereafter, EBWLC and Metro executed a Unanimous Written Consent consenting to the Article 9 foreclosure, and Alexbay executed an Agreement for Turnover

and Acceptance on June 5, 2012. Copies of the Written Consent and Turnover Agreement are attached as Exhibits N and O, respectively.

52. Subsequent to 2012, I continued to make loans and other financial accommodations to Eber CT and the other Eber Entities.

53. For example, I paid $400,000 to settle a lawsuit brought by Harris Beach, the Eber Entities former counsel. A copy of settlement paperwork is attached as Exhibit P.

54. My wife and I also waived my personal pension entitlement from EBWLC with a value of approximately $1.4 million in order to settle the Eber Entities dispute(s) with the PBGC. A copy of this Settlement Agreement is attached as Exhibit Q.

55. Ironically, plaintiff, Daniel Kleeberg, was able to keep his full EBWLC pension benefit after I waived mine. See Ex. B, pp. 93-96.

56. Moreover, I personally guaranteed a loan from CNB to Eber CT that was outstanding from 2008 to 2017.

57. I also paid fees on behalf of the Eber Entities for a wide variety of legal matters.

58. What's more, I asked Mr. Kleeberg to help us wind down our New York operations – specifically with liquidation of the inventory for the Albany location. He initially helped, but shortly thereafter he elected to relocate to Florida rather than assist the business that was so good to him and his family for 72 years. See Ex. B, p. 53, 76.

59. I have devoted my entire working life to this business, and have acted in good faith at all times. Plaintiffs' allegations are incorrect and misplaced.

_____
LESTER EBER

Sworn to before me this
8th day of November, 2019.

_____
NOTARY PUBLIC

PAUL F. KENEALLY
Notary Public, State of New York
Monroe County
My Commission Expires 3/18/22