# EXHIBIT B (PART 1)

1                          DANIEL KLEEBERG

2

3

4

5     UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
6     - - - - - - - - - - - - - - - - - - - - - - - - - - - -
      DANIEL KLEEBERG, LISA STEIN, and AUDREY HAYS,
7
                               Plaintiffs,
8
              - vs -          Case No.:
9                             16-CV-9517(LAK)

10    LESTER EBER, ALEXBAY, LLC f/k/a LESTER EBER,
      LLC, THE CANANDAIGUA NATIONAL BANK & TRUST
11    COMPANY, ELLIOTT W. GUMAER, JR., EBER BROS &
      CO., INC., EBER BROS. WINE AND LIQUOR CORP.,
12    EBER BROS. WINE & LIQUOR METRO, INC.,
      EBER-CONNECTICUT, LLC AND WENDY EBER,
13
                               Defendants.
14    - - - - - - - - - - - - - - - - - - - - - - - - - - - -

15

16          Deposition of DANIEL KLEEBERG, Plaintiff,

17    taken pursuant to a Notice and to the Federal Rules

18    of Civil Procedure, in the offices of DIAMOND

19    REPORTING, INC., 150 Broadway, New York, New York,

20    on December 19, 2018, commencing at 9:15 a.m.,

21    before MAY JEAN WU, Notary Public.

22

23

      JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE

2

```
 1   APPEARANCES:      CLINTON BROOK & PEED,
                       By BRIAN C. BROOK, ESQ.,
 2                     By DARYOUSH BEHBOOD, ESQ.,
                       100 Church Street, 8th Floor,
 3                     New York, New York 10007,
                       Appearing for the Plaintiffs.
 4
                       UNDERBERG & KESSLER LLP,
 5                     By COLIN D. RAMSEY, ESQ.,
                       50 Fountain Plaza, Suite 320,
 6                     Buffalo, New York 14202,
                       Appearing for the Defendants.
 7
                       CALIHAN LAW,
 8                     By ROBERT CALIHAN, ESQ.,
                       16 East Main Street,
 9                      Rochester, New York 10017,
                       Appearing for the Estate of
10                     Elliott W. Gumaer, Jr.

11                     ALSO PRESENT:
                       LISA STEIN
12                     LESTER EBER
                       WENDY EBER
13

14

15

16

17

18

19

20   D A N I E L      K L E E B E R G, called as a

21   witness, having been first duly sworn by a Notary

22   Public of the State of New York, was examined and

23   testified as follows:
```

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Ramsey - 12/19/18

1

2     EXAMINATION BY MR. RAMSEY:

3

4          MR. RAMSEY:  Please pre-mark these as

5     exhibits.

6          The following were marked for Identification:

7          KLEEBERG EXH. 1 E-mail dated 10/6/07

8          KLEEBERG EXH. 2 A letter dated 12/10/01

9          KLEEBERG EXH. 3 Certification of medical

10                    expenses

11         KLEEBERG EXH. 4 A letter dated 8/6/07

12         KLEEBERG EXH. 5 A letter dated 11/30/07

13         KLEEBERG EXH. 6 Benefit determination for

14                    Daniel Kleeberg

15         KLEEBERG EXH. 7 E-mails dated 8/29/14 and

16                    8/28/14

17         KLEEBERG EXH. 8 E-mail dated 12/17/07

18         KLEEBERG EXH. 9 Promissory note.

19         KLEEBERG EXH. 10 A letter dated 8/11/03

20         KLEEBERG EXH. 11 A letter dated 8/11/04

21         KLEEBERG EXH. 12 E-mail dated 9/1/09

22         KLEEBERG EXH. 13 E-mail dated 10/9/09

23         KLEEBERG EXH. 14 E-mail dated 12/10/13

4

D. Kleeberg - Ramsey - 12/19/18

| | |
|---|---|
| 1 | KLEEBERG EXH. 15 E-mails dated 2/5/15 and |
| 2 | 2/4/15 |
| 3 | KLEEBERG EXH. 16 E-mail dated 2/5/16 |
| 4 | KLEEBERG EXH. 17 A letter dated 12/15/09 |
| 5 | KLEEBERG EXH. 18 Note |
| 6 | KLEEBERG EXH. 19 A letter dated 3/22/16 |
| 7 | KLEEBERG EXH. 20 A letter dated 4/2/10 |
| 8 | KLEEBERG EXH. 21 Non-disclosure agreement |
| 9 | KLEEBERG EXH. 22 A letter dated 4/27/10 |
| 10 | KLEEBERG EXH. 23 A letter dated 10/27/10 |
| 11 | KLEEBERG EXH. 24 A letter dated 11/19/10 |
| 12 | KLEEBERG EXH. 25 A letter dated 12/13/10 |
| 13 | KLEEBERG EXH. 26 E-mail dated 1/12/11 |
| 14 | KLEEBERG EXH. 27 Sally Kleeberg's expenses |
| 15 | paid by Mr. Eber |
| 16 | KLEEBERG EXH. 28 Letter |
| 17 | KLEEBERG EXH. 29 E-mail dated 6/3/16 |
| 18 | KLEEBERG EXH. 30 Letter of agreement among |
| 19 | Cousins concerning Eber |
| 20 | Brothers lawsuit |
| 21 | KLEEBERG EXH. 31 E-mail dated 6/3/16 |
| 22 | KLEEBERG EXH. 32 E-mail dated 10/30/16 |
| 23 | KLEEBERG EXH. 33 E-mail dated 12/13/16 |

D. Kleeberg - Ramsey - 12/19/18

1      BY MR. RAMSEY:

2          Q.   Please state your name for the record.

3          A.   Daniel Kleeberg.

4          Q.   Where do you live?

5          A.   8606 River Preserve Drive, Bradenton,

6      Florida 34212.

7          Q.   Good morning, Mr. Kleeberg.  We met off

8      the record.  My name is Colin Ramsey and I

9      represent a number of the defendants in the lawsuit

10     that we're here to talk about this morning.

11         I'm sure your attorney has essentially

12     explained what's going to take place, but let me go

13     over a few ground rules so that we're on the same

14     page, okay?

15         A.   Sure.

16         Q.   Everything that is said this morning or

17     most probably this afternoon is being taken down by

18     the court reporter, my questions and your answers.

19     Therefore, we need a verbal response to any

20     questions, whether it calls for a "yes" or "no".

21     Whatever the response calls for, she can't take

22     down head nods, "uh-huhs", "uh-uhs" or things like

23     that, okay?

D. Kleeberg - Ramsey - 12/19/18

1      A.   Sure, yes.

2      Q.   All right, another rule, you're going

3  to know where I'm going with my question a lot of

4  the time.  Let me get it out before you start to

5  answer for two reasons, the first being it's very

6  difficult for our court reporter to take down

7  competing voices.  Second, there might be something

8  at the end of the question that somehow changes it,

9  so make sure that you know exactly what it is I'm

10  asking.  Fair enough?

11      A.   Yes.

12      Q.   If you don't understand a question,

13  don't hear it or you're not sure at what I'm

14  getting at, just let me know.  I'm happy to try and

15  rephrase it or re-ask it, okay?

16      A.   Yes.

17      Q.   If you don't know the answer to a

18  question, that's fine too.  We don't want guesses.

19  If you've got a reasonable assumption or a

20  reasonable estimate, depending on what the question

21  is, that's fine, but no one's interested in guesses

22  or assumptions, okay?

23      A.   Yes.

D. Kleeberg - Ramsey - 12/19/18

1      Q.  All right, if you need a break at any

2  time, just let us know.  If you want to get up and

3  stretch your legs or to use the bathroom, that's

4  fine.  Just give us the heads up, okay?

5      A.  Yes.

6      Q.  Fair enough.

7      What, if anything, did you review in

8  preparation for your deposition today?

9      A.  Just a general discussion with our

10  attorney.

11      Q.  All right, I don't want to hear about

12  what the discussions with your attorneys were.  Did

13  you review any documents though knowing that you

14  were coming here to give your deposition?

15      A.  No, I did not.

16      Q.  Other than your attorneys, did you have

17  discussions with anyone about coming here to give a

18  deposition?

19      A.  Yes.

20      Q.  Who did you speak with?

21      A.  My oldest son.

22      Q.  What's his name?

23      A.  Adam.

D. Kleeberg - Ramsey - 12/19/18

1         Q.    Adam Kleeberg?

2         A.    Yes.

3         Q.    What did you talk about with your son?

4         A.    Just that I was coming to New York to

5    be deposed.

6         Q.    Did you talk about the substance of the

7    lawsuit or any of the questions you thought you

8    might be asked?

9         A.    No.

10        Q.    Did you talk with Lisa Stein at all

11   about your deposition this morning?

12        A.    This morning?

13        Q.    No, about your deposition in general,

14   whether you talked to her this morning for some

15   time.

16        A.    Yes, I did.

17        Q.    When did you talk with Lisa about the

18   deposition?

19        MR. BROOK:  Excluding instances where you

20   both were talking with your attorneys.

21        THE WITNESS:  Right.

22        MR. RAMSEY:  Fair enough.

23        BY MR. RAMSEY:

D. Kleeberg - Ramsey - 12/19/18

1          A.   I would say about three weeks ago.

2          Q.   What did you discuss with Lisa about

3    three weeks ago?

4          A.   We discussed how the procedure might

5    go.

6          Q.   Okay, and specifically what did you

7    talk about the procedure?

8          A.   The types of questions that could be

9    asked.

10         Q.   You had a back and forth with Lisa

11   about what questions you thought you were going to

12   be asked and what possible questions she thought

13   she was going to be asked?

14         A.   Yes.

15         Q.   Anyone else present for that

16   discussion?

17         A.   No.

18         Q.   Any discussions with Audrey Hays about

19   your deposition?

20         A.   Yes.

21         Q.   When did you talk with Audrey?

22         A.   Three weeks ago.

23         Q.   That was a separate discussion than the

D. Kleeberg - Ramsey - 12/19/18

1    one you had with Lisa?

2         A.   Yes.

3         Q.   What was the content of your discussion

4    with Audrey?

5         A.   Very general, just very unspecific

6    because she just wanted to know what I thought they

7    might ask.

8         Q.   So it was a similar discussion in that

9    you were talking about questions that you or Audrey

10   might be asked or you thought you might be asked?

11        A.   Yes.

12        Q.   Just so the record's clear, what is

13   your relationship to both Lisa Stein and Audrey

14   Hays?

15        A.   Lisa Stein is my sister.  Audrey Hays

16   is my cousin, my first cousin.

17        Q.   The three of you are the three named

18   plaintiffs in this lawsuit, correct?

19        A.   Yes.

20        Q.   Let me jump back for a record.  What's

21   your date of birth?

22        A.   3/20/52.

23        Q.   The River Preserve address you gave to

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Ramsey - 12/19/18

1    the court reporter at the beginning, how long have

2    you resided at that address?

3            A.   About a year and a half.

4            Q.   Who do you live there with?

5            A.   My wife.

6            Q.   What's her name?

7            A.   Lisa.

8            Q.   Kleeberg?

9            A.   Yes.

10           Q.   Anyone else?

11           A.   No.

12           Q.   You referenced your son Adam.  Any

13   other children?

14           A.   Yes.

15           Q.   Who are the other children?

16           A.   Justin Kleeberg.

17           Q.   Where do Adam and Justin live?

18           A.   Adam lives in Marietta, Georgia.

19   Justin lives in Manhattan.

20           Q.   Do you know where Lisa and Audrey live?

21           A.   Lisa lives in Atlantic City in New

22   Jersey.  Audrey lives in Colorado.  I forgot the

23   name of the town, the city.

D. Kleeberg - Ramsey - 12/19/18

1      Q.   How often not specifically related to

2  this lawsuit or anything to do with it, how often

3  do you speak with Lisa?

4      A.   I would say once a week.

5      Q.   What about Audrey?

6      A.   Once every four weeks.

7      Q.   Once a month roughly?

8      A.   Yes.

9      Q.   Have your conversations with either of

10 them increased since this lawsuit has been going

11 on?

12     A.   Only with Audrey.

13     Q.   Do you speak more than once a month

14 with Audrey now or was it less frequently prior to

15 the lawsuit?

16     A.   More.

17     Q.   Is that specifically to do with

18 discussing something to do with the lawsuit?

19     A.   Yes.

20     Q.   How often do you speak with Audrey or

21 how often have you spoken with her since the

22 lawsuit was started?

23     A.   Could you rephrase that?

D. Kleeberg - Ramsey - 12/19/18

1        Q.   Sure, you indicated that you've spoken

2   more since the lawsuit was commenced with Audrey

3   than you had in the past.  I'm wondering if you can

4   give me a sense of how often you're speaking to her

5   these days.

6        MR. BROOK:  Again excluding conversations

7   among all plaintiffs?

8        MR. RAMSEY:  I'm not looking for the content

9   at this point.

10       MR. BROOK:  Okay, so I guess can you just

11  clarify your question as to whether you're talking

12  just the two of them or more people?

13       BY MR. RAMSEY:

14       Q.   You and Audrey speak on somewhat of a

15  regular basis, correct?

16       A.   Yes.

17       Q.   Okay, and it sounded from your previous

18  answer that that has increased since this lawsuit

19  has been going on, is that accurate?

20       A.   No.

21       Q.   So it's the same that you speak with

22  her now, the same amount, about once a month that

23  you had prior to the lawsuit?

D. Kleeberg - Ramsey - 12/19/18

1          A.   No, prior to the lawsuit, you didn't

2    ask that question.  Prior to the lawsuit, we did

3    not speak for many, many months.

4          Q.   So prior to the lawsuit, on a yearly

5    basis you talked to her a couple of times a year?

6          A.   Yes.

7          Q.   Okay, and just so we're both on the

8    same page, since the lawsuit it's about once a

9    month?

10         A.   Yes.

11         Q.   The purpose of those conversations that

12   you have with Audrey about on a monthly basis is to

13   discuss the status of the lawsuit?

14         A.   Yes.

15         Q.   Those conversations are on the phone, I

16   assume?

17         A.   Yes.

18         Q.   Do you ever e-mail Audrey discussing

19   what's going on with the lawsuit?

20         A.   Not that I can recall.

21         Q.   Do you ever e-mail Lisa discussing

22   anything to do with the lawsuit?

23         A.   Yes.

D. Kleeberg - Ramsey - 12/19/18

1      Q.    How often ballpark do you exchange

2  e-mails with Lisa having something to do with the

3  lawsuit?

4      A.    Only after we have had any conversation

5  with our attorneys.

6      Q.    The communications, the e-mail

7  communications, that you're talking about, are

8  those limited to you and Lisa or is there someone

9  else on the e-mail strand?

10      A.    It would include Brian.

11      Q.    Brian Brook, your attorney?

12      A.    Correct.

13      Q.    Any e-mails that excluded Brian that's

14  just you and Lisa?

15      A.    Not that I can recall.

16      Q.    It's my understanding your mother was

17  Sally Kleeberg.

18      A.    Yes.

19      Q.    She's now deceased?

20      A.    Yes.

21      Q.    When did she pass away?

22      A.    2000 and -- what's today, 2018 -- 2014.

23      Q.    Your mother was the sister of Lester

D. Kleeberg - Ramsey - 12/19/18

1    Eber?

2         A.   Yes.

3         Q.   We're going to talk more about the Eber

4    businesses in a bit, but was your mother involved

5    at all in the operations of any of the Eber

6    businesses?

7         A.   No.

8         Q.   What was your father's name?

9         A.   Stanley Kleeberg.

10        Q.   Was he involved in any of the

11   operations of the Eber businesses?

12        A.   Yes.

13        Q.   What do you recall him doing with

14   respect to the Eber businesses?

15        A.   He was the general manager of our

16   Buffalo office.

17        Q.   Can you give me an approximate date

18   range when he held that position?

19        A.   I couldn't tell you when he started.   I

20   could tell you that he never officially retired.

21        Q.   By that you mean he passed away before

22   he had a chance to retire?

23        A.   Yes.

D. Kleeberg - Ramsey - 12/19/18

1      Q.   When did he pass away?

2      A.   2007.

3      Q.   So he was working up until the time of

4  his death in some capacity anyway?

5      A.   Yes.

6      Q.   Other than being a general manager of

7  the Buffalo office, did he hold any other positions

8  with any Eber businesses?

9      A.   I believe he was on the board of

10  directors.

11      Q.   Do you know what time frame he would

12  have been on the board?

13      A.   No.

14      Q.   Was he on the board at the time of his

15  death, to your understanding?

16      A.   I don't know.

17      Q.   Did you grow up in Buffalo?

18      A.   Yes.

19      Q.   Your dad was the general manager of the

20  Buffalo office while you were growing up?

21      A.   General manager/vice president.

22      Q.   Where was that office in Buffalo

23  located?

D. Kleeberg - Ramsey - 12/19/18

1          A.    Two locations, one on William Street
2    and one on North Bailey Ave.
3          Q.    When you were a teenager, did you have
4    any employment with any of the Eber businesses --
5          A.    Yes.
6          Q.    (Continuing) that your father was the
7    general manager?
8          A.    Yes.
9          Q.    What did you do?
10         A.    I worked in the warehouse.
11         Q.    When do you recall doing that?  In high
12   school?
13         A.    Yes.
14         Q.    A summer job or did you do it during
15   the year as well?
16         A.    Summer.
17         Q.    Other than the summers in the warehouse
18   growing up, any other position you held with any of
19   the Eber businesses?
20         A.    When I was growing up?
21         Q.    Yes.
22         A.    No.
23         Q.    Did you continue working in the

D. Kleeberg - Ramsey - 12/19/18

1   warehouse when you were in college?

2        A.   Yes.

3        Q.   Where did you go to college?

4        A.   I went to Oglethorpe University and

5   then I went to the University of Jacksonville in

6   Florida and graduated from the University of

7   Buffalo, O-G-L-E-T-H-O-R-P-E.

8        Q.   So you had some classes in Oglethorpe

9   and some in Jacksonville but ultimately graduated

10  from UB?

11       A.   Correct.

12       Q.   What was your degree in from UB?

13       A.   I got an associate's degree in

14  business.

15       Q.   What year was that?

16       A.   I believe it was 1975.

17       Q.   Any further formal education after

18  obtaining your associate's from UB?

19       A.   Regarding college?

20       Q.   Well, college or any other formal

21  education, whether it was trade school or some type

22  of certification.

23       A.   I received a real estate license two

D. Kleeberg - Ramsey - 12/19/18

1  years ago.

2       Q.   Between 1975 when you obtained the

3  associate's and getting the real estate license two

4  years ago, any other formal education?

5       A.   Well, two years ago from now, I

6  received a real estate license back in -- what is

7  it, 2018 -- in 2016.

8       Q.   Okay, so between 2016 and back in 1975

9  when you obtained your associate's, any other

10  formal education?

11      A.   No.

12      Q.   Back to your mother for a moment, she

13  was the beneficiary or one of the beneficiaries of

14  the trust established by Allen Eber, correct?

15      A.   Yes.

16      Q.   Who is Allen Eber?

17      A.   My grandfather.

18      Q.   Was he the founder of the Eber

19  business?

20      A.   Yes.

21      Q.   Just for the record, what was or is the

22  business of Eber brothers?

23      A.   Liquor and wine distributor.

D. Kleeberg - Ramsey - 12/19/18

1      Q.   Do you have a recollection or do you
2   know when it was first established?
3      A.   Right after prohibition.
4      Q.   Upon your mother's death, did her
5   interest in the Allen Eber trust pass a portion to
6   you?
7      A.   Yes.
8      Q.   Another portion to your sister Lisa?
9      A.   Yes.
10      Q.   Prior to her death, did you ever have
11   any discussions with your mother regarding the
12   trust or the Eber business in general?
13      A.   Yes.
14      Q.   What do you recall discussing with your
15   mother?
16      A.   Basic updates on how the company was
17   proceeding.
18      Q.   You were giving her updates, she was
19   giving you updates or how did that work?
20      A.   I would give her some updates when she
21   would ask the question.
22      Q.   How often in general were you updating
23   your mother about the state of the business?

D. Kleeberg - Ramsey - 12/19/18

1      A.   Oh, maybe once a month, once every two

2   months.

3      Q.   Was this while you were still working

4   for Eber Brothers or that continued even after you

5   left?

6      A.   It continued even after I left.

7      Q.   Where were you getting your information

8   after you left to update your mother?

9      A.   Some from Lester and some from various

10   suppliers that we dealt business with, that we did

11   business with.

12      Q.   Do you recall any of their names, the

13   suppliers that you had got information from?

14      A.   No, just in general.

15      Q.   Prior to her death, was your mother

16   receiving regular distributions from the Allen Eber

17   trust?

18      A.   Prior to her death?

19      Q.   Yes.

20      A.   Yes.

21      Q.   How often would she receive a

22   distribution?

23      A.   No.

D. Kleeberg - Ramsey - 12/19/18

1       Q.   Do you know the amount of that

2   distribution?

3       A.   No, I do not.

4       Q.   Do you know any other individuals who

5   were receiving distributions from the trust again

6   prior to your mother's death?

7       A.   Do I know or do I assume?

8       Q.   Well, I want if you know it.  I don't

9   want you to guess but if you have a reasonable

10  belief as to someone.

11      A.   No, please rephrase the question.

12      Q.   Do you have a reasonable belief or

13  understanding of other individuals who were also

14  receiving distributions from the Allen Eber trust

15  prior to your mother's death?

16      A.   Yes.

17      Q.   Who else do you believe was receiving

18  distributions?

19      A.   My sister Lisa.

20      Q.   Anyone else?

21      A.   No.

22      Q.   What about Audrey?

23      A.   I don't know.

D. Kleeberg - Ramsey - 12/19/18

1          Q.   Any discussions with either Lisa or

2     Audrey prior to your mother's death about

3     distributions they may have been receiving from the

4     trust?

5          A.   No.

6          Q.   Any idea how much your sister was

7     receiving in distributions?

8          MR. BROOK:  Objection to the form.

9          BY MR. RAMSEY:

10         Q.   Go ahead.

11         A.   I only have a rough idea.

12         Q.   What's your rough idea?

13         A.   Around 1,000.

14         Q.   How often would she receive around

15    $1,000.00?

16         A.   Monthly.

17         Q.   What's the source of that information?

18         A.   Through my sister.

19         Q.   Were you receiving any distributions

20    from the trust prior to your mother's death?

21         A.   No, oh, no, that's not true.  Sorry,

22    yes, I was getting a small amount.

23         Q.   How often would you receive any

D. Kleeberg - Ramsey - 12/19/18

1    distributions?

2           A.    About once a year.

3           Q.    When you say "a small amount", how much

4    would you receive on a yearly basis?

5           A.    It would vary.

6           Q.    Between what and what?

7           A.    I don't even remember.

8           Q.    Can you give me an estimate or a

9    ballpark?

10          A.    No, I cannot.

11          Q.    Less than $5,000.00?

12          A.    Yes.

13          Q.    Less than $1,000.00?

14          A.    Yes.

15          Q.    So somewhere in the couple hundred

16   dollar range?

17          A.    Yes.

18          Q.    Did that amount increase after your

19   mother passed away?

20          A.    Yes.

21          Q.    What did it increase to?

22          A.    Over 1,000.

23          Q.    Do you know whether Lisa's distribution

D. Kleeberg - Ramsey - 12/19/18

1    also increased upon your mother's death?

2          A.    No.

3          Q.    You don't know or it didn't?

4          A.    I don't know.

5          Q.    After your mother passed away, did you

6    learn anything more about who was receiving

7    distributions from the trust --

8          A.    No.

9          Q.    (Continuing) other than what you

10   already told me?

11         A.    No.

12         Q.    Are you currently employed?

13         A.    Yes.

14         Q.    Where are you employed?

15         A.    Self.

16         Q.    How are you self-employed?

17         A.    I have a company.

18         Q.    What's the name of the company?

19         A.    Prestige Wine and Spirits.

20         Q.    What's the business of Prestige Wine

21   and Spirits?

22         A.    Consulting with European liquor

23   suppliers on a national level in the United States.

D. Kleeberg - Ramsey - 12/19/18

1          Q.   What type of consulting are you

2    providing consulting work?

3          A.   To provide them with access to

4    distributors and also to help them hire brokers

5    throughout the country.

6          Q.   Is the business based in the Bradenton,

7    Florida area?

8          A.   Yes.

9          Q.   Any employees?

10         A.   No.

11         Q.   Is the business profitable?

12         A.   No.

13         Q.   Do you pay yourself a salary or do --

14         A.   Yes, sorry.

15         Q.   What's your monthly or yearly salary or

16   whatever is easier for you to give me?

17         A.   $7,500.00 a month.

18         Q.   Are you the sole owner of the company?

19         A.   No.

20         Q.   Who else has an ownership interest?

21         A.   My wife Lisa Kleeberg.

22         Q.   You are co-owners of the company?

23         A.   Yes.

D. Kleeberg - Ramsey - 12/19/18

1      Q.   Is it an S corp.?

2      A.   Yes, well, it's an LLC.

3      Q.   An LLC?

4      A.   Yes.

5      Q.   How long has it been in business?

6      A.   I believe since 2010.

7      Q.   Does Lisa draw a salary?

8      A.   Yes.

9      Q.   How much?

10     A.   $300.00 a month.

11     Q.   Well, does she have a formal position

12  or title?

13     A.   Just co-owner.

14     Q.   When you said it's not profitable, it

15  loses money on a yearly basis?

16     A.   No, it breaks even.

17     Q.   So the salary that you draw and the

18  salary that Lisa draws and all of the expenses of

19  the company, you get to about a break even point?

20     A.   Yes.

21     Q.   Are you employed anywhere else other

22  than Prestige Wine and Spirits?

23     A.   What?

29

D. Kleeberg - Ramsey - 12/19/18

1        Q.   Are you employed anywhere else other

2    than Prestige Wine and Spirits?

3        A.   No.

4        Q.   Other than the $7,500.00 a month that

5    you get from Prestige Wine and Spirits, do you have

6    any other source of income currently?

7        A.   Yes.

8        Q.   What are your other sources of income?

9        A.   Pension plan, Eber pension plan.

10       Q.   How much do you receive from that?

11       A.   $2,100.00.

12       Q.   Monthly?

13       A.   Yes.

14       Q.   Any other monthly source of income?

15       A.   Social Security.

16       Q.   How much do you receive from Social

17   Security?

18       A.   Around $2,500.00 a month.

19       Q.   Anything else?

20       A.   Yes.

21       Q.   Okay.

22       A.   I draw $4,100.00 a month off of

23   investments.

D. Kleeberg - Ramsey - 12/19/18

1          Q.   Personal investments, in other words,

2     unrelated to your work at Eber?

3          A.   Yes.

4          Q.   Is that a fixed amount or is that

5     something with an annuity?

6          A.   No, it's not an annuity.  It is a fixed

7     amount.

8          Q.   What type of investment is it?

9          A.   Mutual funds, stocks, bonds.

10         Q.   So it doesn't vary on a monthly basis?

11         A.   No.

12         Q.   Any other source of income on a monthly

13    basis?

14         A.   No.

15         Q.   All right, I want to jump back to your

16    employment with Eber Brothers.  We talked about you

17    working in the warehouse in high school and in

18    college.  Following UB where you obtained an

19    associate's in 1975, did you go back to work for

20    Eber at some point?

21         A.   Yes.

22         Q.   When was that?

23         A.   I believe in 1975.

D. Kleeberg - Ramsey - 12/19/18

1    Q.   What was the first position you had at
2  Eber following graduating from UB?
3    A.   Sales promotion.
4    Q.   What type of responsibilities did you
5  have in that position?
6    A.   Helping to put up liquor displays and
7  going into merchandise in retail stores.
8    Q.   Where were you based?
9    A.   In Buffalo.
10    Q.   Was that your territory?  Just the
11  Buffalo area?
12    A.   Yes.
13    Q.   Was that a salaried position?
14    A.   Yes.
15    Q.   How much do you recall making when you
16  first started?
17    A.   12 or 15,000 a year.
18    Q.   How long did you hold the sales
19  promotion position?
20    A.   Two years.
21    Q.   Your duties and responsibilities
22  remained the same over those two years?
23    A.   Yes.

D. Kleeberg - Ramsey - 12/19/18

1        Q.    What happened after two years?

2        A.    I was promoted to sales supervisor.

3        Q.    What type of responsibilities did you

4    have in that position?

5        A.    To help manage our sales

6    representatives.

7        Q.    What was your territory?

8        A.    It was Buffalo.

9        Q.    Do you recall what your salary was

10   following the promotion?

11       A.    25,000, somewhere in that neighborhood.

12       Q.    How long did you hold the sales

13   supervisor position?

14       A.    Quite a few years, I would say, at

15   least fifteen years.

16       Q.    Did your territory ever expand beyond

17   the Buffalo area?

18       A.    Well, if you want to include Jamestown,

19   Olean and our southern tier market.

20       Q.    Yes, but the general western New York

21   market?

22       A.    Correct.

23       Q.    Okay, and that would have been the case

D. Kleeberg - Ramsey - 12/19/18

1    for the entire fifteen years that you held that

2    position?

3           A.    Yes.

4           Q.    How many salespeople were you

5    supervising approximately?

6           A.    Ten to twelve.

7           Q.    Who did you report to?  Who was your

8    boss?

9           A.    A gentleman named Donald Altman,

10   A-L-T-M-A-N.

11          Q.    Who was Mr. Altman's position?

12          A.    General manager of Buffalo.

13          Q.    Was Lester Eber involved in the

14   business during that period, the fifteen years when

15   you were the sales supervisor?

16          A.    Yes.

17          Q.    Did you have any interaction with

18   Lester in connection with your position as the

19   sales supervisor?

20          A.    Yes.

21          Q.    How often would you interact with

22   Lester?

23          A.    Quite often.

D. Kleeberg - Ramsey - 12/19/18

1      Q.   Give me a sense of what you mean by,

2  "Quite often."

3      A.   I would say probably a couple of times

4  a week.

5      Q.   Is that in person or you would speak to

6  him on the phone?

7      A.   Yes.

8      Q.   On the phone?

9      A.   I'm sorry, in person and on the phone.

10     Q.   Where was Lester based at that time?

11     A.   Rochester, New York.

12     Q.   Did any of your responsibilities extend

13  to Rochester or was it just western New York and

14  the southern tier we talked about?

15     A.   Only in Rochester, excuse me, only in

16  Buffalo and the southern tier.

17     Q.   What would be the reason for you having

18  interaction with Lester?

19     MR. BROOK:  Objection to the form.

20     BY MR. RAMSEY:

21     A.   To discuss our general business and any

22  advice he might have in my capacity.

23     Q.   What was Lester's position at that

D. Kleeberg - Ramsey - 12/19/18

1    time?

2         A.    He was president of Eber Brothers.

3         Q.    During the course of the fifteen years

4    that you were a sales supervisor, did you see your

5    salary increase?

6         A.    Yes.

7         Q.    Roughly speaking, if you worked two

8    years as a sales supervisor, that would take us to

9    1977 and another fifteen years takes us to about

10   1992.  Does that sound about right for the time

11   period when you were a sales supervisor?

12        A.    Yes.

13        Q.    As of 1992, do you have a recollection

14   of approximately how much you were making salary

15   wise?

16        A.    I'll say 60, 70,000.

17        Q.    Your discussions that you would

18   regularly have with Lester, did that allow you to

19   get a sense of the overall business of Eber

20   Brothers and not just your territory?

21        A.    At times.

22        Q.    What do you mean by, "At times"?

23        A.    Primarily it was about what was going

D. Kleeberg - Ramsey - 12/19/18

1   on in Buffalo and then in general some of the

2   things that were happening within the industry.

3           Q.   With respect to the Buffalo market over

4   the fifteen years, did the Eber Brothers business

5   there improve, get worse or stay about the same?

6           A.   Improve.

7           Q.   Can you quantify in whatever way you

8   can how it improved either in sales or in numbers?

9   Is there a way you can quantify that for me?

10          MR. BROOK:   Objection to the form.

11          BY MR. RAMSEY:

12          A.   I believe it improved not only in sales

13   but in profitability.

14          Q.   What's your basis for that belief?

15          A.   We would have meetings at the end of

16   the year to discuss our, you know, our financials

17   and Eber Brothers-Buffalo was doing well at that

18   time.

19          Q.   When you say, "We would have meetings,"

20   who was part of those meetings?

21          A.   Lester, my father Stanley, John Altman,

22   our general manager, and I'm not sure who else was

23   at the meetings.

D. Kleeberg - Ramsey - 12/19/18

1      Q.   Were those meetings specific to Buffalo

2  or were they to discuss the Eber business more

3  generally?

4      A.   Ninety percent was Buffalo.  The rest

5  would be the overall picture of Eber Brothers.

6      Q.   Based upon your attendance at that

7  meeting, did you have a sense of the overall

8  picture of Eber Brothers from a financial

9  perspective on a year-to-year basis?

10     A.   Yes.

11     Q.   During the fifteen years that you were

12 the sales supervisor, not just the Buffalo area,

13 just Eber Brothers in general, did you have an

14 understanding whether the business improved, got

15 worse or stayed about the same?

16     A.   Please rephrase that.

17     Q.   Sure, you indicated to me that the

18 Buffalo territory business improved, to your

19 understanding, over the fifteen years that you were

20 the sales manager.

21     A.   Not sales manager, sales supervisor.

22     Q.   Sales supervisor, I'm sorry.

23          During your meetings with Lester and your

D. Kleeberg - Ramsey - 12/19/18

1   father when you at least touched on the larger Eber

2   business over that time period, do you have an

3   understanding or recollection whether the larger

4   Eber Brothers business improved, got worse or

5   stayed about the same?

6       A.   My understanding is that it improved.

7       Q.   That's based on those meetings?

8       A.   Correct.

9       Q.   Yes, but your role was limited to

10  Buffalo?

11      A.   Yes.

12      Q.   What did you do in 1992?

13      A.   What did I do in 1992?  I honestly

14  don't know where my position was in 1992.  I don't

15  recall what my role was in 1992.

16      Q.   Did you continue to work for Eber

17  Brothers?

18      A.   Yes.

19      Q.   Yes, but it was no longer as a sales

20  supervisor?

21      A.   I believe not.  I believe I was

22  elevated to general manager.

23      Q.   General manager of what?

D. Kleeberg - Ramsey - 12/19/18

1      A.   Eber-Buffalo.

2      Q.   You took over the job from your dad?

3      A.   No, just hang on one second, please.

4  Let me just think it through, yes.

5      Q.   Yes, you took over the job from your

6  dad?

7      A.   Yes.

8      Q.   Your dad stayed on with the company --

9      A.   Yes.

10      Q.   (Continuing) in some capacity?

11      A.   Yes.

12      Q.   Let me finish the question.

13      Your dad stayed on with the company in some

14  capacity?

15      A.   Yes.

16      Q.   What was his position after you

17  ascended to general manager?

18      A.   He was still vice president.

19      Q.   What were your responsibilities when

20  you became general manager of the Buffalo market?

21      A.   To oversee the operations in Buffalo.

22      Q.   Did the sales team remain about the

23  same in size as it had been when you were sales

D. Kleeberg - Ramsey - 12/19/18

1    supervisor?

2         A.   It would have increased slightly.

3         Q.   What salary do you recall making when

4    you were promoted to GM?

5         A.   Six figures.

6         Q.   Do you recall where in the six figures?

7         A.   The low six figures.

8         Q.   How long were you general manager of

9    the Buffalo market?

10        A.   Approximately ten years.

11        Q.   Did your salary increase over those ten

12   years?

13        A.   Yes.

14        Q.   So that takes us to the early 2000s,

15   somewhere in that range?

16        A.   Yes.

17        Q.   What do you recall your salary was the

18   last year that you were general manager of the

19   Buffalo market?

20        A.   I don't know.  I honestly don't know.

21        Q.   Did you for about ten years take

22   another position with Eber, Eber Brothers?

23        A.   Yes.

D. Kleeberg - Ramsey - 12/19/18

1       Q.    What was that position?

2       A.    There wasn't.  I became vice president

3   of Eber Brothers, senior vice president of Eber

4   Brothers.

5       Q.    You were no longer limited to just the

6   Buffalo market?

7       A.    Yes.

8       Q.    What were your responsibilities as

9   senior VP?

10      A.    To help oversee the upstate market,

11  which would have been --

12      Q.    Upstate?

13      A.    (Continuing) Upstate New York.

14      Q.    Yes, upstate New York, different people

15  have different definitions.

16      A.    Yeah.

17      Q.    What's upstate to you?

18      A.    Right, upstate to me is from Buffalo to

19  Albany.

20      Q.    Were you still based in Buffalo at this

21  time?

22      A.    Yes.

23      Q.    Yes, but you traveled to other places

D. Kleeberg - Ramsey - 12/19/18

1   as necessary?

2        A.   Yes.

3        Q.   Was Lester still the president of Eber

4   Brothers?

5        A.   Yes.

6        Q.   Did you regularly interact with Lester

7   in overseeing the upstate market?

8        A.   Yes.

9        Q.   How often would you see Lester in

10  person?

11       A.   Mostly when we had supplier meetings.

12       Q.   How often were the supplier meetings?

13       A.   It could vary.  It could be three or

14  four times a month.  It could be once a month.  It

15  really was there was no frequency that I could

16  honestly give you.

17       Q.   Other than the in-person meetings,

18  would you talk regularly with Lester on the phone

19  about the state of the business?

20       A.   Yes.

21       Q.   How often did you speak to him on the

22  phone?

23       A.   At least once a week.

D. Kleeberg - Ramsey - 12/19/18

1  Q. Were there other VPs in addition to

2 you?

3  A. I don't know.  I'm not sure of someone

4 else's title.

5  Q. Other than Lester, were there other

6 individuals you considered part of the management

7 team that you worked with?

8  A. Could you be more specific?

9  Q. Sure, well, Lester was president,

10 right?

11  A. Yes.

12  Q. You were the vice president at least

13 during that time period anyway, correct?

14  A. Yes.

15  Q. Anyone else that was either formally

16 designated as an officer or otherwise had an

17 executive or a management position?

18  A. I would work with the CFO quite often.

19  Q. Who was that?

20  A. John Ryan, R-Y-A-N.

21  Q. In what capacity would you work with

22 John Ryan?

23  A. To establish budgets for each

D. Kleeberg - Ramsey - 12/19/18

1    individual market.

2           Q.   By "individual markets", you mean the

3    cities of upstate, Rochester, Buffalo, Syracuse and

4    Albany?

5           A.   Yes.

6           Q.   Where else was the Eber business

7    located at that time in addition to upstate?

8           A.   At that time, we were in Delaware,

9    Ohio.  What's the time?  What's the date that you

10   gave me?

11          Q.   When you became VP of Eber Brothers.

12          A.   We were in -- what did I say -- Ohio,

13   Delaware, New York State and I am not sure on

14   Slocum and Sons, but I believe that was in the

15   early 2000s that we had acquired Slocum and we had

16   also acquired Syracuse.

17          Q.   When you says "New York State", did you

18   have a presence in the New York City area in

19   addition to upstate?

20          A.   Yes.

21          Q.   Your responsibilities though were

22   limited to the upstate region and not the other

23   states that you just mentioned or New York City?

D. Kleeberg - Ramsey - 12/19/18

1          A.    That is correct.

2          Q.    Were there individuals with either

3    similar titles or similar responsibilities to you

4    that were overseeing these other markets?

5          A.    To oversee the outside markets of New

6    York?

7          Q.    Well, the role that you were playing as

8    VP of Eber Brothers for Upstate New York, were

9    there other individuals playing a similar role for

10   these other markets that you were not involved in?

11         A.    That I was not involved in?

12         Q.    Correct.

13         A.    Only Lester.

14         Q.    It was your understanding that Lester

15   was responsible for those other markets?

16         A.    Yes.

17         Q.    How long did you hold the position of

18   vice president of Eber Brothers?

19         A.    Till 2007.

20         Q.    2007 was when you left the company?

21         A.    Yes.

22         Q.    During the time period that you were

23   the VP, did you become aware of a downturn in the

D. Kleeberg - Ramsey - 12/19/18

1   financial circumstances of Eber Brothers?

2        A.   Yes.

3        Q.   How did you first become aware of this

4   downturn?

5        A.   Through my conversations with Lester.

6        Q.   What do you recall Lester conveying to

7   you about some of the financial struggles that the

8   company was facing?

9        A.   That we were being squeezed quite

10  heavily by our suppliers, which was affecting our

11  margins.

12       Q.   Did Lester have an explanation as to

13  why the suppliers were squeezing you?

14       A.   Yes.

15       Q.   What was his explanation?  What did he

16  convey to you?

17       A.   They were looking to increase their

18  profitability and push us to generate more sales

19  and also we were being threatened at the time that

20  we needed to get to their certain numbers.

21       Q.   So the actions taken by the suppliers

22  were decreasing the profitability of Eber Brothers?

23       A.   That is correct.

D. Kleeberg - Ramsey - 12/19/18

1       Q.   Are you familiar with the company

2  Southern Wine and Spirits?

3       A.   Yes.

4       Q.   What, to your understanding, is the

5  business of Southern Wine and Spirits?

6       A.   In general?

7       Q.   Generally speaking.

8       A.   They are the largest distributor in the

9  US market.

10      Q.   They were a competitor of Eber

11  Brothers?

12      A.   No.

13      Q.   No?

14      A.   No.

15      Q.   Did Southern come into markets

16  previously controlled by Eber Brothers and try to

17  drive Eber out?

18      A.   Yes, but that -- but during the time

19  that we were there they were not there.

20      Q.   At some point though, they entered the

21  market?

22      A.   Yes.

23      Q.   When do you recall Southern first

D. Kleeberg - Ramsey - 12/19/18

1   entering the market?

2        A.   2005.

3        Q.   What impact did Southern's actions have

4   on the Eber businesses?

5        A.   When they came in the market?

6        Q.   Yes?

7        A.   Devastating.

8        Q.   They were the big bully essentially,

9   correct?

10       MR. BROOK:  Objection to the form.

11       BY MR. RAMSEY:

12       A.   Yes.

13       Q.   Specifically what was the impact on the

14   businesses of Eber once Southern decided to enter

15   the market?

16       MR. BROOK:  Objection to the form.

17       BY MR. RAMSEY:

18       A.   It was it caused a tremendous upheaval

19   with our suppliers.

20       Q.   Suppliers started doing business with

21   Southern rather than with Eber?

22       A.   Not originally, no.

23       Q.   Eventually?

D. Kleeberg - Ramsey - 12/19/18

1          A.    Yes.

2          Q.    Did Southern approach certain Eber

3   salespeople?

4          A.    Yes.

5          Q.    How many?

6          A.    Thirty maybe, maybe more.

7          Q.    That had a pretty significant impact on

8   the Eber businesses?

9          A.    Yes.

10         Q.    At some point did Southern's actions

11  drive Eber completely out of the New York market?

12         MR. BROOK:  Objection to the form.

13         BY MR. RAMSEY:

14         A.    Yes.

15         Q.    Did Southern's actions drive Eber out

16  of any of the other markets of the other states you

17  told me about?

18         A.    Yes.

19         MR. BROOK:  Objection to the form.

20         THE WITNESS:  Sorry.

21         BY MR. RAMSEY:

22         Q.    Was that at about the same time that

23  you left Eber in 2007?

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Ramsey - 12/19/18

1          MR. BROOK:  Objection to the form.

2          BY MR. RAMSEY:

3          A.   No.

4          Q.   It happened before or after?

5          A.   It happened before.

6          Q.   Why did you leave Eber Brothers in

7     2007?

8          A.   We were in the final stages of our

9     liquidation and I wanted to move on with a new

10    career.

11         Q.   You didn't see a whole lot of future

12    going with Eber Brothers at that point?

13         A.   No.

14         Q.   You were offered a position with

15    Southern, is that correct?

16         A.   No.

17         Q.   You were never offered?

18         A.   No.

19         Q.   Did you have any discussions with

20    Southern --

21         A.   Yes.

22         Q.   Let me get the question out.

23         A.   Sorry.

D. Kleeberg - Ramsey - 12/19/18

1          Q.   Did you have any discussions with

2    Southern about a position there?

3          A.   Yes.

4          Q.   Who did you have those discussion with?

5          A.   The principals in their New York

6    office.

7          Q.   Do you recall their names?

8          A.   God, oh, it was their assistant general

9    manager.  I don't have the name off the top of my

10   head, which I should, but I don't.

11         Q.   What position was at least discussed if

12   not offered?

13         A.   There was no position offered.  They

14   told me that because of Lester that they would

15   create a position for me if I wanted one.

16         Q.   You didn't take them up on that?

17         A.   No, I did not.

18         Q.   How come?

19         A.   Because I did not want a position that

20   was just going to be created as a favor.

21         Q.   Lester accepted a consulting role with

22   Southern around that time, correct?

23         MR. BROOK:  Objection to the form.

D. Kleeberg - Ramsey - 12/19/18

1        BY MR. RAMSEY:

2        A.    I don't know.

3        Q.    As you sit here today, do you have an

4   understanding one way or the other whether Lester

5   ever accepted any type of role with Southern?

6        A.    I had no knowledge at that time.

7        Q.    I'm asking as you sit here today.

8        A.    Oh, today?

9        Q.    Yes.

10       A.    Yes.

11       Q.    What's your understanding of what

12   position, if any, Lester had with Southern?

13       A.    He was to be the liaison between

14   Southern and the State Liquor Authority.

15       Q.    How did you learn that information?

16       A.    Originally through various suppliers.

17       Q.    One of the allegations in this lawsuit

18   is that it was improper for Lester to accept any

19   role with Southern.  Are you aware of that

20   allegation?

21       A.    Yes.

22       Q.    Is that your belief?

23       A.    Yes.

D. Kleeberg - Ramsey - 12/19/18

1       Q.   Why?

2       A.   I thought it was a conflict of interest

3    for the family.

4       Q.   In what respect?

5       A.   That any compensation that was going to

6    be given should have been considered to include the

7    family.

8       Q.   Eber Brothers was out of business at

9    that point, correct?

10      MR. BROOK:  Objection to the form.

11      BY MR. RAMSEY:

12      Q.   Yes, or on its way to be out of

13   business at that point?

14      A.   Yes.

15      Q.   So what was improper about Lester

16   looking for another source of income?

17      A.   Nothing improper to look for another

18   source of income.

19      Q.   When you left in 2007 to start a new

20   career or a new venture, what did you do?

21      A.   I bought into a landscape company in

22   Florida.

23      Q.   Was that Amerilawn and Landscape?

D. Kleeberg - Ramsey - 12/19/18

1       A.    Yes, it was.

2       Q.    When you say you bought into it, it was

3   a going entity in 2007 already?

4       A.    Yes.

5       Q.    Who was the owner that you bought into?

6       A.    David Berwitzky, B-E-R-W-I-T-Z-K-Y.

7       Q.    What percentage of Amerilawn did you

8   buy from David?

9       A.    Fifty percent.

10      Q.    How much did you pay for that fifty

11  percent interest?

12      A.    $600,000.00.

13      Q.    Were you able to pay that in cash or

14  did you have to leverage anything to get the

15  600,000?

16      A.    I took an SBA loan.

17      Q.    For the full 6?

18      A.    Yes.

19      Q.    Other than the SBA loan, did you invest

20  any of your own money initially?

21      A.    Yes.

22      Q.    How much of your own money?

23      A.    About 150,000.

D. Kleeberg - Ramsey - 12/19/18

1    Q.    Did you invest any of your 401(k)?

2    A.    Yes.

3    Q.    Was that the 150?

4    A.    I would say seventy-five percent of it.

5    Q.    So about seventy-five percent of the

6    150 came from the 401(k) and twenty-five percent

7    came from other sources?

8    A.    That is correct.

9    Q.    What was the business of Amerilawn?  I

10   know it was a landscape business, but more

11   specifically what did it do?

12   A.    We had contracts with residential and

13   commercial clients to maintain their properties and

14   also reconstruct their landscaping.

15   Q.    How did you learn about Amerilawn to

16   buy into the opportunity?

17   A.    A business broker.

18   Q.    So the owner that you bought the fifty

19   percent from, you didn't know prior to the

20   introduction by the broker?

21   A.    That is correct.

22   Q.    What ultimately became of Amerilawn?

23   A.    It eventually went under after a couple

D. Kleeberg - Ramsey - 12/19/18

1    of years.

2         Q.    Did you have to file for bankruptcy at

3    some point?

4         A.    No, not, no.

5         Q.    Have you ever filed for bankruptcy?

6         A.    Yes.

7         Q.    When did you file for bankruptcy?

8         A.    Shortly after that.

9         Q.    Shortly after Amerilawn went under?

10        A.    Yes.

11        Q.    Was the bankruptcy related to the

12   Amerilawn investment?

13        A.    Yes.

14        Q.    In about 2010 you filed for bankruptcy?

15   Does that sound about right?

16        A.    I believe so.

17        Q.    Did you ultimately receive a discharge?

18        A.    Yes.

19        Q.    When did you receive a discharge?

20        A.    I would say within a year of 2011,

21   somewhere in there.

22        Q.    Any subsequent bankruptcies?

23        A.    No.

57

D. Kleeberg - Ramsey - 12/19/18

1          Q.   What did you do employment wise after

2     Amerilawn failed?

3          A.   I was able to create a company called

4     Prestige Wine and Spirits and was able to negotiate

5     a deal with a company called Camus Cognac out of

6     France.

7          Q.   What was the deal that you negotiated

8     with the cognac company?

9          A.   That I would help represent them in the

10    US market.

11         Q.   Do you still have that position today?

12         A.   No.

13         Q.   How long did you hold that position

14    for?

15         A.   A year.

16         MR. CALIHAN:   What was the name of the

17    company?

18         THE WITNESS:   It's called Camus, C-A-M-U-S.

19         BY MR. RAMSEY:

20         Q.   Your position or role with the cognac

21    company, was it similar to what you do now for

22    Prestige, consulting for European liquor suppliers?

23         A.   Yes.

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Ramsey - 12/19/18

1        Q.    Providing them with access to

2    distributors and brokers?

3        A.    Yes.

4        Q.    Did you draw a salary from the cognac

5    company?

6        A.    It was I was an independent contractor

7    that would be compensated for my consulting.

8        Q.    You only held that position for about a

9    year?

10       A.    A little over a year.

11       Q.    Between the time of your bankruptcy and

12   the present day, other than Prestige Wine and the

13   cognac company, any other employment?

14       MR. BROOK:  Objection to the form.

15       BY MR. RAMSEY:

16       A.    Yes.

17       Q.    Where else did you work?

18       A.    A company called Kannon Organic Vodka.

19       Q.    When did you work for Kannon Organic

20   Vodka?

21       A.    If I recall, 2001.

22       Q.    What did you do for Kannon?

23       A.    Again I was independent and I also set

D. Kleeberg - Ramsey - 12/19/18

1    them up with national distribution.

2         Q.   Were they a European company?

3         A.   Yes, out of Sweden.

4         Q.   Similar to the role that you played for

5    the cognac company and that you currently perform

6    with Prestige?

7         A.   Yes.

8         Q.   Any other employment in that time

9    period between the bankruptcy and the present day

10   that we haven't talked about?

11        A.   Yes.

12        Q.   What else?

13        A.   I worked with a company called PaQui --

14   that's spelled P-a-Q-U-I -- Tequila.

15        Q.   What did you do for the tequila

16   company?

17        A.   But that was a New York-based company.

18        Q.   You played the same role as far as

19   introducing them to distributors and brokers, but

20   this was a New York company as opposed to a

21   European company?

22        A.   Yes.

23        Q.   Did you facilitate any business between

D. Kleeberg - Ramsey - 12/19/18

1    any of those three manufacturers that you told me

2    about and any of the Eber entities?

3         MR. BROOK:  Objection to the form.

4         BY MR. RAMSEY:

5         A.   I believe Camus Cognac was already at

6    Slocum and then I followed up with that.

7         Q.   So did you have a role with the cognac

8    company interfacing or interacting with Slocum?

9         A.   Yes.

10       Q.   Who would you deal with at Slocum?

11       A.   John, John Slocum.

12       Q.   You had a role with the cognac company

13    for about a year?

14       A.   A little over a year.

15       Q.   What about the vodka company or the

16    tequila company?  Any role in introducing them to

17    any of the Eber entities?

18       A.   I approached Lester on the vodka

19    company and that was it.

20       Q.   Did anything come of the approach?

21       A.   No, no.

22       Q.   Why?

23       A.   I don't think the fit according to

D. Kleeberg - Ramsey - 12/19/18

1    Lester was appropriate at the time.

2         Q.   What time period are we talking about?

3         A.   Oh, God, 2011, 2012.

4         Q.   What about the tequila company?  Any

5    role in introducing them to any of the Eber

6    entities?

7         A.   God, I don't remember.  No, I don't

8    think so.

9         MR. RAMSEY:  Off the record.

10        (Whereupon, an off-the-record discussion was

11   held.)

12        MR. RAMSEY:  It's my understanding based on

13   a discussion with counsel off the record that the

14   witness would like to correct something from

15   previously.

16        BY MR. RAMSEY:

17        A.   Yes, I believe we did introduce PaQui

18   Tequila to Slocum.  We probably did.

19        Q.   I was actually going to follow up with

20   that further.  Do you have an understanding of how

21   that relationship worked out for Slocum or actually

22   was it Slocum or Eber-Connecticut?

23        MR. BROOK:  Objection to the form.

D. Kleeberg - Ramsey - 12/19/18

1         BY MR. RAMSEY:

2         A.   At that time Eber-Connecticut.

3         Q.   Okay, and do you know whether

4    Eber-Connecticut lost money as a result of the deal

5    with PaQui?

6         A.   I don't know.

7         Q.   As you sit here today, do you have any

8    dispute that Eber-Connecticut lost money?

9         MR. BROOK:  Objection to the form.

10        BY MR. RAMSEY:

11        Q.   Go ahead.  You can answer.

12        A.   It is possible.

13        Q.   Earlier on in my questions you had

14   talked about some e-mail exchanges that you had

15   with Lisa Stein about this case.  I think you

16   indicated that your attorney Brian was copied on

17   most of them or all of them.  Do you recall that

18   line of questioning?

19        A.   Yes.

20        Q.   Did I understand correctly that there

21   were communications back and forth between you and

22   Lisa about the status of the case and that you were

23   copying Brian just to keep him in the loop, so to

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Ramsey - 12/19/18

1    speak?

2         A.   Yes.

3         Q.   You weren't seeking legal advice from

4    Brian?

5         MR. BROOK:  Objection to the form.

6         BY MR. RAMSEY:

7         A.   No.

8         MR. RAMSEY:  Okay, I'll make a document

9    request for those e-mails and I'll follow up in

10   writing.

11        MR. BROOK:  Well, I understand the request.

12   I'll state on the record I have no idea which

13   e-mails are being referring to.  I don't remember

14   being copied on anything but if you want to explore

15   further of what he may be referring to so that I

16   can reasonably identify what is being referenced

17   because this has been going on for a while.

18        MR. RAMSEY:  Fair enough.  Well, we can go

19   back.  Well, when I attach the transcript I'll send

20   you a letter, but Mr. Kleeberg testified that there

21   was a exchange of e-mails between him and his

22   sister that discussed the substance of this

23   lawsuit, so that's what I'm referring to.

D. Kleeberg - Ramsey - 12/19/18

1       MR. BROOK:  Specifically you're looking for

2    the ones where I'm merely being copied, correct?

3       MR. RAMSEY:  Yes, he said that you were

4    copied on all of them.  That was his testimony, so

5    we don't need to waste time here.  The request has

6    been made and I'll follow up in writing, but he

7    clearly testified there was an e-mail exchange.

8       MR. BROOK:  All right.

9       BY MR. RAMSEY:

10       Q.   I show you, Mr. Kleeberg, what I had

11    previously marked as Exhibit 1 for identification.

12    Let me know when you've had a chance to review that

13    (indicating).

14       A.   Okay.

15       Q.   Exhibit 1 looks to be an e-mail to

16    Lester Eber from an individual named Lisa Semenick?

17       A.   Mmhmmm, yes.

18       Q.   Do you know who Lisa Semenick is?

19       A.   She was involved with our accounts, our

20    financial accounting.

21       Q.   When you say "our", you mean Eber

22    Brothers?

23       A.   Yes.

D. Kleeberg - Ramsey - 12/19/18

1      Q.   You're not copied on this e-mail,

2   correct?

3      A.   No.

4      Q.   Had you ever seen Exhibit 1 prior to

5   today?

6      A.   What's the date on this?  2007, I don't

7   know.

8      Q.   It looks as if the subject line is, "D.

9   Kleeberg annual cost," correct?

10      A.   Yes.

11      Q.   Then the body of the e-mail lists a

12   number of items starting with the salary, correct?

13      A.   Yes.

14      Q.   It looks like the salary is listed as

15   $250,000.00?

16      A.   Yes.

17      Q.   Was that your salary in 2007 at Eber

18   Brothers?

19      A.   Yes.

20      Q.   The next line is a monthly payment of

21   $60,000.00.  Do you have any idea what that refers

22   to?

23      A.   Previous loans.

D. Kleeberg - Ramsey - 12/19/18

1        Q.    Previous loans that Eber Brothers made

2   to you?

3        A.    Yes.

4        Q.    When it says "monthly payment", was

5   that a payment you were receiving or a payment you

6   were making?

7        A.    A payment I was receiving.

8        Q.    So in 2007 you were receiving

9   $60,000.00 a month?

10       MR. BROOK:  Objection to the form.

11       BY MR. RAMSEY:

12       A.    I don't recall receiving that amount of

13   money on a monthly basis on top of my salary.

14       Q.    You were receiving some amount of

15   money?  You're just not sure if that's the figure?

16       MR. BROOK:  Objection to the form.  It

17   mischaracterizes his testimony.

18       BY MR. RAMSEY:

19       Q.    You can answer.

20       A.    Yes, can you answer the question again?

21       Q.    Sure, so in addition to your salary,

22   you recall receiving some additional amount of

23   money that was a loan and you're just not sure of

D. Kleeberg - Ramsey - 12/19/18

1      the amount?

2          A.   That is correct.

3          Q.   If you go down a few lines, it looks

4      like there's an employer contribution to a 401(k)

5      of $6,600.00.  Was Eber Brothers making a

6      contribution yearly to your 401(k) in that amount?

7          A.   Yes.

8          Q.   A couple of lines down, it looks like

9      you had an auto allowance of just shy of

10     $16,000.00?

11         A.   Yes.

12         Q.   A Westwood County Club membership of

13     $9,000.00?

14         A.   Yes.

15         Q.   Then above those, the country club,

16     expenses of just over $55,000.00, what were those

17     expenses?

18         A.   They in my opinion would be restaurant

19     expenses, travel expenses, bar expenses.

20         Q.   Reimbursements for client entertainment

21     and things like that?

22         A.   Yes.

23         Q.   You would have to document that when

D. Kleeberg - Ramsey - 12/19/18

1   you made a purchase or extended money?  In order to

2   get repaid, you would have to document that in some

3   way?

4           A.   Yes.

5           Q.   When you would make those types of

6   outlays, would you do it on a personal credit card

7   or pay from your own money or was there a company

8   card that you used?

9           A.   A company credit card.

10          Q.   The bill for the company credit card,

11  did that go to you or did that go to someone else?

12          A.   That would go to someone else.

13          Q.   Was there any limit either on a monthly

14  or yearly basis as to how much you could charge to

15  the company card?

16          A.   No.

17          Q.   Do you ever recall anyone ever raising

18  any issue with the amount that you were charging to

19  the company card?

20          A.   Yes.

21          Q.   Who would raise that issue?

22          A.   John Ryan.

23          Q.   Was that a one-time occurrence or would

D. Kleeberg - Ramsey - 12/19/18

1   John regularly have conversations with you about

2   how much they were being charged?

3        MR. BROOK:  Objection to the form.

4        BY MR. RAMSEY:

5        Q.   Go ahead.

6        A.   Occasionally.

7        Q.   Occasionally a couple of times a year

8   or a couple of times a month?

9        MR. BROOK:  Objection to the form.

10       BY MR. RAMSEY:

11       A.   A few times a year.

12       Q.   In response to those conversations,

13   would you reduce the amount that you were charging

14   the company card?

15       A.   Yes.

16       Q.   Were the few times a year conversations

17   that John Ryan would have with you, was that

18   multiple years or are you talking about a single

19   year?

20       MR. BROOK:  Objection to the form.

21       BY MR. RAMSEY:

22       A.   Multiple years.

23       Q.   Do you know how many individuals at

D. Kleeberg - Ramsey - 12/19/18

1   Eber Brothers had access to the company credit

2   card?

3        A.   No.

4        Q.   I'm going show you what I marked as

5   Exhibit 2.  Take a look at that and tell me when

6   you've had a chance.  Are you ready (indicating)?

7        A.   I'm sorry?

8        Q.   Have you a chance to review Exhibit 2?

9        A.   Yes.

10        Q.   Have you seen that document before?

11        A.   Yes.

12        Q.   It looks to be a letter from a James

13   Shaw to John Ryan at Eber Brothers?

14        A.   Yes.

15        Q.   You're CC'd on it, correct?

16        A.   Yes.

17        Q.   It's dated December 10, 2001?

18        A.   Yes.

19        Q.   It's talking about your salary

20   structure at Eber Brothers?

21        A.   Yes.

22        Q.   Specifically what was this letter

23   addressing?  What does this letter address?

D. Kleeberg - Ramsey - 12/19/18

1      A.    My situation with my divorce.

2      Q.    How is it addressing your situation

3  with your divorce?

4      A.    How to deal with the implications of my

5  potential tax consequences.

6      Q.    Discussing how much should be withheld

7  to deal with any tax implications?

8      A.    That is correct.

9      Q.    It looks like your base salary in 2001

10 was $225,000.00?

11     A.    Yes.

12     Q.    Well, the last paragraph talks about

13 smoothing out your paychecks.  Do you have any idea

14 what was meant by smoothing out your paychecks?

15     A.    No.

16     Q.    When is the last time prior to today

17 you recall seeing this document?

18     A.    Back in 2001.

19     Q.    It doesn't specifically reference your

20 divorce anywhere in the body of Exhibit 2, does it?

21     A.    No.

22     Q.    It's just your understanding and

23 recollection that that was the driver of this

D. Kleeberg - Ramsey - 12/19/18

1    letter?

2         A.   Yes.

3         Q.   Okay, so you were making $250,000.00 in

4    2007 based on Exhibit 1 that had increased from

5    $225,000.00 in 2001 based on Exhibit 2, correct?

6         A.   Yes.

7         Q.   I show you what's been marked as

8    Exhibit 3.  Take a moment to review that

9    (Indicating).

10        MR. CALIHAN:  Were these marked as

11   defendant's exhibits?

12        MR. RAMSEY:  Yes, they're marked as

13   Kleeberg's.

14        MR. CALIHAN:  Okay.

15        MR. RAMSEY:  Kleeberg's 1, 2, 3.

16        BY MR. RAMSEY:

17        Q.   Have you had a chance to review Exhibit

18   3?

19        A.   Yes, I reviewed it.

20        Q.   That document is entitled Eber Brothers

21   Wine and Liquor Corp. Certification of Medical

22   Expenses, correct?

23        A.   Yes.

D. Kleeberg - Ramsey - 12/19/18

1    Q.   Have you seen this document before?

2    A.   Yes.

3    Q.   What was the purpose of this document?

4    A.   Any outside expenses that I had from

5    our medical plan I was able to submit for

6    reimbursement.

7    Q.   You're listed on Exhibit 3 as is Gail

8    Kleeberg, Justin Kleeberg and Adam Kleeberg,

9    correct?

10   A.   Yes.

11   Q.   Then there's a dollar amount associated

12   with each of you?

13   A.   Yes.

14   Q.   Okay, and that dollar amount is medical

15   expenses that you were required to incur in this

16   year, which was 2000?

17   A.   Yes.

18   Q.   Those expenses were above and beyond

19   what the insurance would cover?

20   A.   Yes.

21   Q.   Did Eber Brothers also provide you with

22   an insurance plan?

23   A.   Yes.

D. Kleeberg - Ramsey - 12/19/18

1        Q.    What type of expenses fell outside the

2   insurance plan that Eber Brothers provided?

3        A.    Any co-pays, whether it was previous

4   medication or doctor's visits, that's what I can

5   recall.

6        Q.    The total amount listed on Exhibit 3 is

7   just over $6,600.00, correct?

8        A.    Yes.

9        Q.    Is it your recollection that there was

10  approximately $6,600.00 in co-pays and medications

11  in 2000?

12        A.    I would also include surgeries.

13        Q.    Do you recall someone having to undergo

14  surgery in 2000?

15        A.    I believe -- and again I might be wrong

16  on my date -- that I incurred a shoulder surgery

17  back in 2000.

18        Q.    It looks like it's just shy of

19  $3,000.00 associated with you and a little over

20  $3,000.00 associated with Gail Kleeberg, correct?

21        A.    Yes.

22        Q.    Is Gail your ex-wife?

23        A.    Yes.

D. Kleeberg - Ramsey - 12/19/18

1          Q.    Do you recall anything that would have

2     occurred from a medical standpoint to Gail in 2000

3     that would have required $3,000.00 above and beyond

4     the insurance that was in place?

5          A.    No, I do not recall.

6          Q.    That total amount, that $6,600.00, was

7     reimbursed to you by Eber Brothers?

8          A.    Yes.

9          Q.    This happened on a yearly basis?

10    Whatever uncovered expenses you had from a medical

11    perspective were reimbursed by Eber Brothers?

12         A.    Yes.

13         Q.    I show you Exhibit 4 that I previously

14    marked.  Let me know when you've had a chance to

15    look at that (indicating).

16         A.    Yes.

17         Q.    Are you ready?

18         A.    Yes.

19         Q.    Exhibit 4 is an August 6, 2007 letter

20    on Eber Brothers' letterhead from a Mark Shevlin,

21    correct?

22         A.    Yes.

23         Q.    His title is benefits manager?

D. Kleeberg - Ramsey - 12/19/18

1   A.   Yes.

2   Q.   Do you know who Mark was or is?

3   A.   Yes.

4   Q.   Who is Mark Shevlin?

5   A.   Our benefits manager.

6   Q.   At Eber Brothers?

7   A.   Yes.

8   Q.   Okay, and the body of the letter

9   indicates that effective September 1, 2007 you were

10  to become a consultant to Eber Brothers at the rate

11  of $10,000.00 per month?

12  A.   Yes.

13  Q.   Was this after the time that you had

14  left Eber Brothers?

15  A.   It was right at the time.

16  Q.   Okay, and you were at least in the

17  process of heading down to Florida for Amerilawn?

18  A.   Yes.

19  Q.   What were the services that you were

20  going to provide in return for the $10,000.00 a

21  month payment?

22  A.   Helping to renegotiate our contract on

23  our lease in Buffalo on our office.

D. Kleeberg - Ramsey - 12/19/18

1    Q.    Anything else?

2    A.    Working on discussing with certain

3    suppliers our situation and helping to possibly get

4    a reduction of what we owed them.

5    MR. BROOK:    I want to briefly note for the

6    record that this document does not have Bates

7    numbers and it does not appear to have been

8    produced to us in this litigation, and accordingly,

9    we object to its use and we'll certainly be

10   discussing it further later.

11   MR. RAMSEY:    My understanding is that it was

12   produced.    I clearly grabbed the document without

13   the Bates number, but we can deal with that later.

14   BY MR. RAMSEY:

15   Q.    The lease in Buffalo, Eber Brothers was

16   essentially out of business or going out of

17   business at that point, correct?

18   A.    Yes.

19   Q.    What type of renegotiation was

20   contemplated given the lack of business?

21   A.    Exactly what you just said, the lack of

22   business, no business, we were renegotiating or

23   trying to get a better scenario with the company

D. Kleeberg - Ramsey - 12/19/18

1   called Benderson Development.

2          Q.   Part of the consultant fee was you were

3   to be the point person to deal with Benderson?

4          A.   Originally, yes.

5          Q.   Who did you deal with at Benderson?

6          A.   Randy Benderson, the owner.

7          Q.   What was the ultimate result of your

8   negotiations on the lease?

9          A.   They would not reduce what we owed at

10  that time.

11         Q.   So your efforts were unsuccessful?

12         A.   That is correct.

13         Q.   That ultimately resulted in a lawsuit,

14  correct, between Benderson and Eber Brothers?

15         A.   I believe so.

16         Q.   We can talk about that in a minute.

17         The discussions you had with suppliers to

18  reduce the amount that was owed, what was the

19  result of those discussions?

20         A.   I believe in the most part they were

21  favorable, but I can't be sure because I was not

22  part of the final arrangements.

23         Q.   When you say you weren't part of the

D. Kleeberg - Ramsey - 12/19/18

1    final arrangements, you had initial discussions

2    with suppliers, but ultimately someone else made

3    the final deal for lack of a better word?

4         A.    Yes.

5         Q.    Who, to your understanding, made the

6    final deal?

7         A.    My assumption was Lester Eber.

8         Q.    During the course of your involvement

9    with these suppliers, did you discuss specific

10   dollar amounts and specific reductions?

11        A.    No, just the consideration of what

12   happened to Eber Brothers and how important it

13   would be for us to get a reduction on what was owed

14   to them.

15        Q.    Were you ever provided with any type of

16   document memorializing whatever reductions the

17   suppliers were willing to give to Eber Brothers?

18        A.    No.

19        Q.    Did you ever have a discussion with

20   Lester or anyone else conveying to you what these

21   reductions may have been?

22        A.    I may have.

23        Q.    As you sit here today, do you recall

D. Kleeberg - Ramsey - 12/19/18

1    what were the discussions along those lines?

2          A.    No.

3          Q.    As you sit here today, you just don't

4    know one way or other what, reductions, if any, the

5    suppliers agreed to give?

6          A.    I don't know specifically what

7    reductions.

8          Q.    Do you know whether there was any

9    reduction?

10         A.    Yes.

11         Q.    What's that based on?

12         A.    Based on suppliers getting back to me

13   saying that they had settled with Lester.

14         Q.    With what suppliers do you specifically

15   remember advising you that they had settled and

16   there was a reduction?

17         A.    I'm trying to think.  I spoke with a

18   couple of our wineries and I'm trying to remember

19   their names.  I can't recall their names right now,

20   but they had said that they would talk to Lester

21   and then try to work out an arrangement with him.

22         Q.    Yes, but you can't remember the names

23   as you sit here?

D. Kleeberg - Ramsey - 12/19/18

1          A.    I cannot at this point.  It's been
2     eleven years.
3          Q.    Other than the lease renegotiation and
4     some initial discussions you had with some
5     suppliers, anything else that you did to benefit
6     Eber Brothers in return for receiving $10,000.00 a
7     month?
8          MR. BROOK:  Objection to the form.
9          BY MR. RAMSEY:
10         A.    No.
11         Q.    How long were you a consultant
12    receiving $10,000.00 a month?
13         A.    For roughly a year.
14         Q.    So until approximately August of 2008?
15         A.    Approximately I think it went into
16    December of 2008.
17         Q.    The discussions that you had either
18    with Randy Benderson or any of these suppliers that
19    you can't recall, did that take place over the
20    entirety of that year period or were they front
21    loaded?
22         A.    They were more front loaded.
23         Q.    After the initial discussions with the

D. Kleeberg - Ramsey - 12/19/18

1   suppliers and after the time period when Benderson

2   wasn't willing to bulge, what, if anything, did you

3   do on behalf of Eber Brothers to continue drawing

4   the $10,000.00 a month payment?

5        A.   We just stayed in contact with Lester.

6        Q.   At that point, it was Lester trying to

7   finalize the deals with the suppliers though?

8        A.   Ultimately, yes.

9        Q.   I'm going to show you what I marked as

10  Exhibit 5 (indicating).

11       MR. RAMSEY:  I think we're going to have the

12  same issue, Brian.  It is my understanding that

13  they were produced, but there's not a Bates number

14  on them.

15       MR. BROOK:  It's not in our data base.

16       Let's note for the record that Wendy Eber

17  presently stated that the documents were all

18  produced.

19       THE WITNESS:  Do you want to see this?

20       MR. BROOK:  I have it.

21       THE WITNESS:  Okay.

22       BY MR. RAMSEY:

23       Q.   Did you have a chance to review Exhibit

D. Kleeberg - Ramsey - 12/19/18

1    5?

2            A.   Yes.

3            Q.   Exhibit 5 is a November 30, 2007 letter

4    to you from Mark Shevlin, correct?

5            A.   Yes.

6            Q.   It's discussing the status of your

7    health care coverage?

8            A.   Yes.

9            Q.   As of that time, you were still covered

10   under the Eber Brothers health insurance?

11           A.   Yes.

12           Q.   The content of the letter is

13   essentially discussing what options you had going

14   forward?

15           A.   Yes.

16           Q.   Do you recall what option you

17   ultimately selected?

18           A.   I believe I went with a Florida plan.

19           Q.   Instead of one of the COBRA plans

20   through Eber Brothers?

21           A.   Yes.

22           Q.   Do you know when your coverage through

23   the Florida plan started?

D. Kleeberg - Ramsey - 12/19/18

1      A.   No, I do not.

2      Q.   The letter indicates that at least your

3  current coverage as of the date of that letter was

4  going to terminate effective January 1 of 2008?

5      A.   Yes.

6      Q.   Okay, and it's your recollection as you

7  sit here that you elected to proceed with an

8  alternate option down in Florida at that point?

9      A.   Yes, beginning in January of 2008.

10      Q.   The second to last sentence of Exhibit

11  5 indicated that you would no longer be able to use

12  your American Express card for miscellaneous health

13  care expenses.  Did you still have the company

14  credit card as of November 30, 2007?

15      A.   I do not believe I did.

16      Q.   After you left and you became a

17  consultant, at any time during the consultant

18  period, did you still have the company credit card?

19      A.   No.

20      Q.   Was there a reason or do you have a

21  recollection why Mr. Shevlin is referencing no

22  longer being able to use this in November of 2007

23  if you no longer had it?

D. Kleeberg - Ramsey - 12/19/18

1      MR. BROOK:  Objection to the form.

2      BY MR. RAMSEY:

3      A.   My assumption is it was protocol.

4      Q.   Is it possible that you still had it at

5  this point given that Mr. Shevlin is referencing it

6  in this letter?

7      MR. BROOK:  Objection to the form.

8      BY MR. RAMSEY:

9      A.   It is possible.

10     Q.   One of the things that you had used the

11  card for, whatever time period you had it for, one

12  of the things that you had used the company card

13  for was for miscellaneous health care expenses?

14     A.   That is correct.

15     Q.   The expenses that we talked about on

16  one of the prior exhibits that you were looking to

17  get reimbursed, why wouldn't those expenses go onto

18  the company credit card?

19     MR. BROOK:  Objection to the form.

20     BY MR. RAMSEY:

21     A.   Please restate the question.

22     Q.   Sure, one of the previous exhibits --

23  and you can pull it out if you need to -- was a

D. Kleeberg - Ramsey - 12/19/18

1  handwritten listing of some un-reimbursed medical

2  expenses that Eber Brothers paid you back for.  I'm

3  wondering why those expenses didn't get put on the

4  company credit card that you just testified you had

5  used for miscellaneous health care expenses.

6      MR. BROOK:  Objection to the form.

7      BY MR. RAMSEY:

8      A.  I'm not sure.  I am not sure.

9      Q.  Based on those two exhibits, it looks

10  like at least some would go on the company card and

11  some for whatever reason wouldn't?

12      MR. BROOK:  Objection to the form.

13      BY MR. RAMSEY:

14      A.  That is true.

15      Q.  You didn't pay the company card,

16  correct?

17      A.  No, I did not.

18      Q.  I'm going to show you what we had

19  marked as Exhibit 6 (indicating).

20      MR. RAMSEY:  I don't know why I grabbed the

21  non-Bates one.  I know I got this one, Brian,

22  sorry.

23      BY MR. RAMSEY:

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Ramsey - 12/19/18

1      Q.   Let me know when you've had a chance to

2   review Exhibit 6.

3      A.   I'm all set.

4      Q.   Have you seen Exhibit 6 before?

5      A.   Yes.

6      Q.   What is Exhibit 6?

7      A.   It's about the pension plan.

8      Q.   That's the pension benefit that you

9   testified to in response to my question a little

10   while ago?

11      A.   Please repeat the question.

12      Q.   When we were talking about your sources

13   of monthly income, one of the sources was the

14   pension benefit?

15      A.   Yes.

16      Q.   Is this the pension benefit that you

17   were talking about?

18      A.   Yes, it is.

19      Q.   It looks like according to Exhibit 6

20   you were receiving over $2,000.00 a month?

21      A.   Yes.

22      Q.   I want you to jump to the last page of

23   Exhibit 6.  It's a three-page document, correct?

D. Kleeberg - Ramsey - 12/19/18

1       A.   Yes.

2            Q.   The third page, there's a couple of

3    lines for the participant's signatures.  Do you see

4    those?

5       A.   Yes.

6            Q.   Is that your signature on both of those

7    lines?

8       A.   Yes, it is.

9            Q.   It looks like the date is 8/22/07,

10   right?

11      A.   Yes.

12           Q.   The top signature line -- and correct

13   me if you have a different understanding -- looks

14   like it's requiring you to confirm that you weren't

15   aware of any Qualified Domestic Relations Order,

16   also known as a QDRO, that would attach to any

17   portion of your benefit.  Do you see that?

18      A.   Yes.

19           Q.   You signed that participant's signature

20   box indicating that there was no such QDRO,

21   correct?

22      A.   Yes.

23           Q.   Was that accurate as of the time when

D. Kleeberg - Ramsey - 12/19/18

1    you signed it?

2         A.    No.

3         Q.    Why did you sign it if it wasn't

4    accurate?

5         A.    I was told not to worry about it.

6         Q.    Who told you not to worry about it?

7         A.    Mark Shevlin.

8         Q.    Mr. Shevlin of Eber Brothers told you

9    not to worry about it?

10        A.    Yes, that is correct.

11        Q.    Did you consult with any counsel or

12   with anyone else with expertise in that area to

13   determine whether or not that was an appropriate

14   course of action?

15        A.    No.

16        Q.    That ultimately caused some problems

17   down the road, correct?

18        A.    That is true.

19        Q.    When were you and your wife divorced?

20        A.    The date here is what?

21        MR. BROOK:  You're asking for the date of

22   finalization?

23        MR. RAMSEY:  Yes.

D. Kleeberg - Ramsey - 12/19/18

1     BY MR. RAMSEY:

2     A.   It was early 2000.

3     Q.   So as of 2007, you were aware that your

4  wife did, in fact, have a right to an interest in

5  your pension?

6     A.   Yes.

7     Q.   Yes, but you still signed Exhibit 6?

8     A.   Yes.

9     Q.   Who paid for your divorce attorney back

10  in the early 2000s?

11     A.   Eber Brothers.

12     Q.   How is it or why was it that Eber

13  Brothers paid for it rather than you paying for

14  your attorney yourself?

15     MR. BROOK:  Objection to the form.

16     BY MR. RAMSEY:

17     A.   Well, Lester and I negotiated an

18  arrangement where in lieu of getting an increase in

19  my income, which would show obviously to my soon to

20  be ex-spouse, I was better off receiving a loan.

21     Q.   So that the monies paid to your divorce

22  attorney were characterized as a loan?

23     A.   Yes.

D. Kleeberg - Ramsey - 12/19/18

1      Q.   Was there any document memorializing

2   that arrangement?

3      A.   Not specifically on that.

4      Q.   How, if at all, was it documented or

5   memorialized?

6      A.   I don't know.

7      Q.   Do you yourself have anything in

8   writing discussing that arrangement?

9      A.   I do not.

10      Q.   Have you ever paid back whatever was

11   expended on your divorce lawyer?

12      A.   No.

13      Q.   As you sit here today, do you have an

14   understanding of how much was paid on your behalf?

15      A.   Do I specifically?

16      Q.   Yes.

17      A.   No.

18      Q.   Do you have a ballpark?

19      A.   Yes.

20      Q.   What's your ballpark of how much the

21   divorce attorney cost?

22      A.   A couple hundred thousand.

23      MR. BROOK:  Objection to the form.

D. Kleeberg - Ramsey - 12/19/18

1        THE WITNESS:  I'm sorry.

2        BY MR. RAMSEY:

3        Q.    Go ahead.  You can answer.

4        A.    A couple hundred thousand.

5        Q.    That was Eber Brothers paying that?

6        A.    That is correct.

7        Q.    Okay, and that was essentially, to your

8    understanding, meant to be part of your

9    compensation package?

10       A.    Yes.

11       Q.    Your ex-wife ultimately sued Eber

12   Brothers regarding the discrepancy with the QDRO,

13   correct?

14       A.    Yes.

15       Q.    When do you recall that taking place?

16       A.    I don't remember the exact date.

17       Q.    Eber Brothers then had to pay your

18   ex-wife her attorney's fees, correct?

19       A.    That I do not know.

20       Q.    Would you be surprised to learn that

21   that was the ultimate result?

22       A.    No.

23       Q.    No reason to dispute that as you sit

D. Kleeberg - Ramsey - 12/19/18

1    here today?

2         A.   No.

3         Q.   Yes, but you're still receiving a

4    pension benefit?

5         A.   Yes.

6         Q.   It's just less now that your wife or

7    ex-wife has a portion of it, correct?

8         A.   Yes.

9         Q.   Okay, and that's the $2,100.00 that you

10   receive a month?  Do you receive all of that or

11   does a portion of that go to your ex-wife?

12        A.   No, I receive all of it.

13        Q.   Are you aware of the lawsuit that Eber

14   Brothers was involved in regarding the Pension

15   Benefit Guaranty Corporation?

16        A.   Yes.

17        Q.   Under underfunded liabilities?

18        A.   Yes.

19        Q.   How did you become aware of that

20   lawsuit?

21        A.   Through Wendy in our discussions as to

22   how this could potentially affect my monthly

23   benefits.

D. Kleeberg - Ramsey - 12/19/18

1      Q.    Were you still at Eber Brothers when
2   you first became aware of this potential liability
3   of the company?
4      A.    Yes.
5      Q.    Okay, and when you reference Wendy, I
6   assume you're referring to Wendy Eber?
7      A.    Yes.
8      Q.    So you had discussions with Wendy about
9   this issue?
10     A.    Yes.
11     Q.    What do you recall discussing with
12  Wendy?
13     A.    "To be patient and we are trying to
14  work it out and it could affect you, but we're not
15  really sure how everything is going to play out."
16     Q.    You were concerned about the impact on
17  your pension benefit?
18     A.    Yes.
19     Q.    The discussions you had with Wendy,
20  were they around 2007 when you were still at Eber
21  Brothers or just left or were they later in time?
22     A.    Both.
23     Q.    How often do you recall having

D. Kleeberg - Ramsey - 12/19/18

1    discussions with Wendy in sum and substance about

2    what you just indicated, you know, discussing your

3    concerns that your pension benefit might be

4    affected?

5           MR. BROOK:  Objection to the form.

6           BY MR. RAMSEY:

7           A.   A few times.

8           Q.   A few times in total or a few times a

9    year?

10          A.   A few times in total.

11          Q.   When was the last time you recall any

12   communication with Wendy regarding any concerns

13   regarding your pension benefit?

14          A.   I would say probably a year after I

15   left Eber Brothers.

16          Q.   Around 2008?

17          A.   Correct.

18          Q.   Ultimately you received your full

19   pension and continue to receive your full pension,

20   correct?

21          A.   Yes.

22          Q.   Do you have any understanding of the

23   nature of the resolution that Eber Brothers

D. Kleeberg - Ramsey - 12/19/18

1  negotiated with PBGC or GC?

2      A.   I know it was negotiated, but I do not

3  have an understanding of how that worked.

4      Q.   Are you aware that Lester gave up all

5  of his rights to a pension benefit as part of a

6  settlement so that others could continue to receive

7  theirs?

8      A.   No, I do not.

9      Q.   This is the first time you're hearing

10  that today?

11      A.   Yes.

12      Q.   The bottom line is that your pension

13  benefit was never impacted?

14      A.   Yes, it was.

15      Q.   How was it impacted?

16      A.   Because I wanted to take a lump sum,

17  which would have put me in a much better position,

18  especially leaving Eber Brothers, and I was not

19  allowed to do that because we were underfunded.

20      Q.   Yes, but you are still receiving a

21  pension benefit?

22      A.   Yes.

23      Q.   I'm going to show you what we've marked

D. Kleeberg - Ramsey - 12/19/18

1   as Exhibit 7.  Tell me when you've had a chance to

2   review that (indicating).

3          A.   Yes.

4          Q.   All set?

5          A.   Yes.

6          Q.   Have you seen Exhibit 7 previously?

7          A.   Yes.

8          Q.   It looks like it's an e-mail exchange

9   or chain with the subject line being, "Dan

10  Kleeberg's benefit"?

11         A.   Yes.

12         Q.   Okay, and the date is August.  Well,

13  there's one on August 28, 2014 and one on August

14  29, 2014, correct?

15         A.   Yes.

16         Q.   Do you recall reaching out to Wendy

17  Eber in 2014, August of 2014, or thereabouts about

18  your pension benefit?

19         A.   I don't recall.

20         Q.   Do you recall having concerns about any

21  impact on your benefit when the PBGC took over the

22  plan?

23         A.   Yes.

D. Kleeberg - Ramsey - 12/19/18

1      Q.    Would Wendy Eber have been the logical

2   person for you to reach out to to discuss those

3   concerns?

4      A.    Yes.

5      Q.    It looks like Wendy forwarded to you a

6   response from a Michael Gallagher on August 29,

7   2014?

8      A.    Yes.

9      Q.    Do you recall receiving that e-mail?

10     A.    Yes.

11     Q.    Did anything change as far as your

12  monthly pension benefit following this exchange

13  with Wendy?

14     A.    No, it did not.

15     Q.    So the fact that the PBGC took over the

16  plan didn't impact you one way or the other?

17     A.    No, it did not.

18     Q.    I show you what I've marked as Exhibit

19  8.  Tell me when you've had a chance to review that

20  (indicating).

21     A.    Yes.

22     Q.    Ready?

23     A.    Yes.

D. Kleeberg - Ramsey - 12/19/18

1      Q.   Have you seen Exhibit 8 previously?

2      A.   Yes.

3      Q.   It looks like that is an e-mail from

4  you to Lester Eber on December 17, 2007?

5      A.   Yes.

6      Q.   You got under your signature block the

7  title with Amerilawn.  At that point, you were down

8  in Florida with the new business?

9      A.   Yes.

10     Q.   The subject line, is "Benderson lease,"

11 correct?

12     A.   Yes.

13     Q.   Was this one of the outreaches you were

14 doing in return for the $10,000.00 a month

15 consulting fee?

16     A.   Yes.

17     Q.   You're referencing a Jeff, which we've

18 been calling Randy.  I assume Randy is Randy

19 Benderson?

20     A.   Yes.

21     Q.   Who is Jeff that you're referencing?

22     A.   Jeff was our sales rep that negotiated

23 the original lease.

D. Kleeberg - Ramsey - 12/19/18

1      Q.   Do you recall reaching out to Randy

2   Benderson either that day or the following morning?

3      A.   Yes.

4      Q.   What do you recall from that

5   conversation?

6      A.   That Randy referred me back to Jeff.

7      Q.   To do what?

8      A.   To see if there was anything he was

9   willing to do.

10      Q.   Ultimately Benderson wouldn't bulge,

11   correct?

12      A.   That is correct.

13      Q.   Do you know the ultimate resolution of

14   the dispute between Eber Brothers and Benderson?

15      A.   No, I do not.

16      Q.   Do you have an understanding that Eber

17   Brothers was forced to pay some sum of money?

18      A.   Yes.

19      Q.   Do you have an idea of how much?

20      A.   No, I do not.

21      Q.   Do you have a ballpark idea of how

22   much?

23      A.   No, I do not.

D. Kleeberg - Ramsey - 12/19/18

1          Q.   Do you know how many years were

2    remaining on the lease at the time?

3          A.   Not specifically.

4          Q.   Do you remember what the monthly lease

5    payment was?

6          A.   No.

7          Q.   Hundreds of thousands of dollars

8    remained on the lease?  Is that fair?

9          A.   I couldn't answer that.

10         Q.   Yes, but you weren't able to negotiate

11   a resolution with Mr. Benderson?

12         A.   No, I was not.

13         Q.   Prior to departing Eber Brothers or

14   during the time that you were a consultant at Eber

15   Brothers, do you recall any litigation or

16   threatened litigation between Eber Brothers and a

17   company known as D4?

18         A.   D4?

19         Q.   D4.

20         A.   No.

21         Q.   The same question with respect to a

22   company known as Wolf or Wolf Concepts.

23         A.   Litigation with Wolf?

D. Kleeberg - Ramsey - 12/19/18

1        Q.    Litigation or threatened litigation.

2        A.    Could you describe Wolf Concepts?

3        Q.    Well, I'm asking you.

4        A.    No.

5        Q.    So if you have a recollection of them

6    or litigation, that's my question.

7        A.    No, no, no.

8        Q.    All right, do you recall any litigation

9    or threatened litigation between Eber Brothers and

10   the Harris Beach law firm?

11       A.    Do I recall?  No.

12       Q.    Any knowledge or recollection of any

13   litigation between Eber Brothers and Harris Beach?

14       MR. BROOK:  Objection to the form.

15       BY MR. RAMSEY:

16       A.    At that time?

17       Q.    Yes.

18       A.    No.

19       Q.    Subsequently have you learned about any

20   litigation between Eber Brothers and Harris Beach?

21       A.    Yes.

22       Q.    How did you learn about that?

23       A.    Through discovery.

D. Kleeberg - Ramsey - 12/19/18

1      Q.    Through this case?

2      A.    Yes.

3      Q.    Prior to this case being commenced, any

4   knowledge of the Harris Beach lawsuit?

5      A.    No.

6      Q.    While at Eber Brothers, any knowledge

7   of litigation or threatened litigation between Eber

8   Brothers and the teamsters?

9      A.    Please rephrase that again.

10     Q.    Sure, the same question that I've asked

11  about the other entities, my last couple of

12  questions were the subject of any knowledge of

13  litigation or threatened litigation between Eber

14  Brothers and the teamsters.

15     A.    Litigation?  Not negotiations?

16  Litigation, right?

17     Q.    Litigation or threatened litigation

18  that there was negotiation to avoid litigation,

19  that would be encompassed by threatened litigation.

20     MR. BROOK:  Objection to the form.

21     BY MR. RAMSEY:

22     A.    No.

23     Q.    No knowledge of any dispute with the

D. Kleeberg - Ramsey - 12/19/18

1    teamsters while you were at Eber Brothers?

2         A.   Yes.

3         Q.   What do you recall as far as a dispute

4    with the teamsters?

5         A.   Potential strike.

6         Q.   What role, if any, did you have in

7    addressing that?

8         A.   Discussions with the manager in our

9    warehouse.

10        Q.   What type of discussions did you have?

11        A.   The benefits of not going with the

12   teamsters.

13        Q.   What time period are we talking here?

14        A.   Back in probably in the middle to late

15   1990s, somewhere in that neighborhood.

16        Q.   As part of your discussions with the

17   manager, did you have discussions with Lester about

18   the status of what was going on?

19        A.   Yes.

20        Q.   What do you recall discussing with

21   Lester?

22        A.   Updates.

23        Q.   What do you recall Lester saying to you

D. Kleeberg - Ramsey - 12/19/18

1   or you saying to Lester as far as the strategy for

2   trying to address this?

3        A.   To continue to explain what we do for

4   them.

5        Q.   Give me an example.  What types of

6   things would you convey that you would do for them?

7        A.   The benefits we offer them and the way

8   they have been treated.

9        Q.   What was the ultimate resolution of

10  that?

11       A.   They did not go on strike.

12       Q.   Did this happen once or multiple times?

13       A.   You're going to need to rephrase that.

14       Q.   Sure, the discussions that you had to

15  avoid a strike, was that a one time occurrence or

16  were there multiple times where a strike was

17  threatened?

18       A.   With me one time.

19       Q.   Are you aware of other times that

20  someone else had to deal with --

21       A.   Yes.

22       Q.   (Continuing) at Eber Brothers?

23       MR. BROOK:   Remember to let him finish the

D. Kleeberg - Ramsey - 12/19/18

1    question.

2              THE WITNESS:  Oh, I'm sorry.

3              BY MR. RAMSEY:

4         Q.   Was that before or after the instance

5    in which you dealt with it?

6         A.   Please restate the question.

7         Q.   Sure, you just indicated that there

8    were multiple times that a strike was threatened.

9    You were only tasked with dealing with that one

10   occasion.  On those other occasions, did those

11   occur before the time that you were involved or

12   after the time that you were involved?

13        A.   Before.

14        Q.   Do you know who dealt with it those

15   times on behalf of the company?

16        A.   A Mr. Michael Jeziorski,

17   J-E-Z-I-O-R-S-K-I.

18        Q.   Do you know whether there was ever a

19   strike in those previous occasions?

20        A.   I don't recall.  I don't believe so.

21        Q.   Do you recall playing any role in those

22   previous instances in which a strike was

23   threatened?

D. Kleeberg - Ramsey - 12/19/18

1          A.    No.

2          Q.    I'm going to show you three exhibits,

3    9, 10 and 11, and I'll ask you questions about all

4    of them (indicating).

5          A.    Sure.

6          Q.    Let me know when you've had a chance to

7    review all three.

8          A.    I have.

9          Q.    We touched on a moment ago about

10   certain loans that Eber Brothers made to you?

11         A.    Yes.

12         Q.    Do you recall that questioning?

13         A.    Yes, yes.

14         Q.    Exhibit 9, have you seen that before?

15         A.    This is all Exhibit 9 (indicating)?

16         Q.    No.

17         MR. BROOK:   This page (indicating).

18         BY MR. RAMSEY:

19         A.    Yes.

20         Q.    What is Exhibit 9?

21         A.    The loan with the interest rate to be

22   paid annually in full by December 31 and it looks

23   like 2000.

D. Kleeberg - Ramsey - 12/19/18

1    Q.   When you say "the loan", Exhibit 9 is

2  entitled Promissory Note, correct?

3    A.   Yes.

4    Q.   You were promising to pay to Eber

5  Brothers the sum of $15,000.00?

6    A.   Yes.

7    Q.   What was the $15,000.00 loaned to you

8  for?

9    A.   I believe it was for my son's college

10 education.

11   Q.   Okay, and is --

12   A.   His education.

13   Q.   I'm sorry.

14        Is that your signature that appears on the

15 bottom of Exhibit 9?

16   A.   Yes.

17   Q.   The date of the Promissory Note is

18 September 27, 1999, correct?

19   A.   Yes.

20   Q.   Was this one of multiple loans that you

21 had taken from Eber Brothers or was this the first?

22        MR. BROOK:  Objection to the form.

23        MR. RAMSEY:  That was poorly asked.  Let me

D. Kleeberg - Ramsey - 12/19/18

1    strike that.

2           BY MR. RAMSEY:

3           Q.   Exhibit 9, is this the first loan that

4    you took from Eber Brothers?

5           A.   I don't recall.

6           Q.   Do you recall executing a document

7    similar to Exhibit 9 entitled a Promissory Note on

8    more than one occasion for either a different

9    amount, a different date or different payment

10   terms?

11          A.   Not necessarily the way this looks.

12          Q.   Do you recall executing other documents

13   memorializing in some way loans that Eber Brothers

14   had made to you?

15          A.   Yes.

16          Q.   Let's look at Exhibits 10 and 11.

17   Exhibit 10 first, is Exhibit 10 in front of you?

18          A.   Yes.

19          Q.   That is an August 11, 2003 letter to

20   you from John Ryan of Eber Brothers, correct?

21          A.   Yes.

22          Q.   It indicates on the second paragraph

23   that, "According to our records, the balance at May

D. Kleeberg - Ramsey - 12/19/18

1    31, 2003 was $279,257.35," correct?

2         A.   Yes.

3         Q.   Is it your understanding that that was

4    the amount of money that you owed to Eber Brothers

5    for loans they advanced as of that date?

6         MR. BROOK:  Objection to the form.

7         BY MR. RAMSEY:

8         A.   In lieu of my salary, yes.

9         Q.   What do you mean by that?

10        A.   This I think I stated that before

11   earlier.

12        Q.   When you were talking about you

13   received some amount per month as part of a loan?

14        MR. BROOK:  Objection to the form.

15        BY MR. RAMSEY:

16        A.   I received loans over a period of time

17   in lieu of increasing my salary.

18        Q.   Understood, but the $279,000.00 figure

19   here on Exhibit 10, is it your understanding that

20   was the amount that you owed from these loans as of

21   that date, August 11, 2003?

22        MR. BROOK:  Objection to the form.

23        BY MR. RAMSEY:

D. Kleeberg - Ramsey - 12/19/18

1        A.   Yes.

2        Q.   Your signature appears on the bottom of

3   Exhibit 10, correct?

4        A.   Yes.

5        Q.   Okay, and the last paragraph of the

6   letter indicates that if you had any exceptions,

7   essentially any disagreements, that you should

8   bring it to their attention, correct?

9        A.   Yes.

10       Q.   Do you recall ever bringing any

11   exceptions or any disagreements to the attention of

12   Mr. Ryan?

13       A.   No.

14       Q.   I will have you turn to Exhibit 11 now.

15       A.   Yes.

16       Q.   A very similar letter to Exhibit 10,

17   correct?

18       A.   Yes.

19       Q.   It's just approximately a year later or

20   exactly a year later, August 11, 2004, right?

21       A.   Yes.

22       Q.   At this point, the balance of your

23   loans is indicated to be $339,065.73?

D. Kleeberg - Ramsey - 12/19/18

1      A.   Yes.

2      Q.   Okay, and you signed off at the bottom

3  attesting to the accuracy of that statement?

4      A.   Yes.

5      Q.   Do you recall the total amount owed at

6  the time of your departure in 2007?

7      A.   No.

8      MR. BROOK:  Objection to the form.

9      THE WITNESS:  Sorry.

10     BY MR. RAMSEY:

11     Q.   Did you ever pay any of these monies

12  back to Eber Brothers?

13     A.   No.

14     Q.   After you left Eber Brothers, you began

15  collecting the $10,000.00 a month consulting fee,

16  correct?

17     A.   Yes.

18     Q.   Is my understanding correct that any

19  obligations you might have had to repay these loans

20  was discharged as part of your bankruptcy in 2010?

21     MR. BROOK:  Objection to the form.

22     BY MR. RAMSEY:

23     A.   I don't know.

D. Kleeberg - Ramsey - 12/19/18

1      Q.   As you sit here today, is it your

2   position or your understanding that you still owe

3   this money to Eber Brothers?

4      A.   No.

5      Q.   Was that discharged as part of your

6   bankruptcy?

7      A.   I would have to look at my records.

8      Q.   Okay, but as you sit here today, you're

9   certain that you never paid any of that back?

10     A.   Yes.

11     MR. RAMSEY:  Off the record.

12        (Whereupon, an off-the-record discussion was

13   held.)

14     BY MR. RAMSEY:

15     Q.   You're ready to continue, Mr. Eber?

16     A.   Sure.

17     Q.   I asked you a number of questions about

18   litigation that you may or may not have been aware

19   of.  One of the questions I asked was Wolf or Wolf

20   Concepts.

21     A.   Excuse me?

22     Q.   One of the questions I asked was Wolf

23   or Wolf Concepts and you weren't sure about that

D. Kleeberg - Ramsey - 12/19/18

1    one.  Were you aware of a dispute with the Petrogen

2    Vodka?

3              A.    With Petrogen?

4              Q.    Yes.

5              A.    Patron?

6              Q.    Petrogen.

7              A.    Petrogen Vodka, no.

8              Q.    So in your time at Eber Brothers,

9    you're not aware of a dispute, litigation or

10   threatened litigation with a entity known as

11   Petrogen Vodka?

12             A.    No.

13             Q.    The Benderson litigation we talked a

14   little bit about, do you have an understanding

15   whether the ultimate resolution was paid by the

16   company or by Lester individually?

17             A.    I do not know.

18             Q.    If I told you that Lester paid that

19   settlement himself, any reason to dispute that?

20             A.    No.

21             Q.    With respect to the lawsuit regarding

22   the Pension Benefit Guaranty Corporation, if I told

23   you that Lester forewent $1.5 million in benefits,

D. Kleeberg - Ramsey - 12/19/18

1    any reason to dispute that?

2         A.    Please repeat that.

3         Q.    Sure, the resolution with the PBGC, if

4    I told you that Lester forewent $1.5 million in

5    benefits, would that surprise you?  Do you have any

6    reason to dispute that?

7         MR. BROOK:  Objection to the form.

8         BY MR. RAMSEY:

9         A.    That he paid directly to?

10        Q.    He either paid or waived his right to

11   future pension benefits.

12        MR. BROOK:  It's the same objection.

13        BY MR. RAMSEY:

14        A.    Would that surprise me?

15        Q.    Yes, or do you have any reason to

16   dispute it?

17        MR. BROOK:  Objection to the form.

18        BY MR. RAMSEY:

19        Q.    That's the better question.  Let's go

20   with that.  Do you have any reason to dispute it?

21        A.    No.

22        Q.    Let me show you what I've had marked as

23   Exhibit 12 for identification.  Let me know when

D. Kleeberg - Ramsey - 12/19/18

1    you've had a chance to review that (indicating).

2        A.    Okay.

3        Q.    Have you seen Exhibit 12 before?

4        A.    Yes.

5        Q.    That is an e-mail from September 1,

6    2009 to Lester from you, right?

7        A.    Yes.

8        Q.    What was the purpose of you sending

9    that e-mail to Lester?

10        A.    Lester had reduced my consulting fee

11   substantially and I was in a position where I

12   needed to ascertain a job and my belief was to

13   revisit the Southern possible opportunity and I

14   needed -- or I didn't need -- I was hoping that

15   Lester would call them on my behalf.

16        Q.    So the discussion that you had with the

17   principals of Southern back in 2007 about coming

18   aboard, you wanted to restart those discussions?

19        A.    That is correct.

20        Q.    Okay, and the date of this e-mail of

21   2009, you were still receiving a consulting fee?

22        A.    Not at the level that I had before.

23        Q.    What level was it at this point?

D. Kleeberg - Ramsey - 12/19/18

1      A.   I believe it was reduced down to about

2    6,500.

3      Q.   This is essentially two years after you

4    had left Eber Brothers though, correct?

5      A.   That is correct.

6      Q.   Okay, so your testimony earlier that it

7    was about a year that you received this consulting

8    fee, that was a little light?

9      MR. BROOK:  Objection to the form.

10     BY MR. RAMSEY:

11     A.   Say that.  Please say that again.

12     MR. BROOK:  When did you receive it, the

13   date?

14     BY MR. RAMSEY:

15     Q.   You received it for at least two years

16   and not a little over a year like you previously

17   testified, correct?

18     MR. BROOK:  Objection to the form.

19     BY MR. RAMSEY:

20     A.   Yes.

21     Q.   You were asking in Exhibit 12 that

22   Lester continue that consulting fee payment,

23   correct?

D. Kleeberg - Ramsey - 12/19/18

1          A.   Yes.

2          Q.   You indicated that you don't want it to

3    come directly out of his pocket.  Why did you write

4    that?

5          A.   At this time, he was negotiating with

6    employees that he had signed personal contracts

7    with and I wanted Lester to comply with our

8    discussion, our original discussion, when I left

9    Eber Brothers that the monies that we negotiated on

10   for when I left would be continuous to help me get

11   a fresh start and I wanted it to come out of our

12   corporation.

13         Q.   When you say "the monies that we

14   negotiated", is that the $10,000.00 consulting fee?

15         A.   That is correct.

16         Q.   Were you aware that Lester was paying

17   other members of your family out of his pocket for

18   various items --

19         A.   Yes.

20         Q.   (Continuing) and you didn't want his

21   generosity to be taken advantage of?  Is that fair?

22         MR. BROOK:  Objection to the form.

23         BY MR. RAMSEY:

D. Kleeberg - Ramsey - 12/19/18

1        A.   No.

2        Q.   No?  When you say you didn't want it to

3   come out of his pocket, you didn't want him to

4   incur the expense personally?

5        A.   Yes.

6        Q.   In the last sentence of your e-mail you

7   write, "I might be the only one outside of yourself

8   who truly appreciates what we had."  What were you

9   referring to there?

10       A.   When Eber Brothers was successful and

11  we were doing well, it provided my family with a

12  very nice living.

13       Q.   The downturn in the market changed

14  that?

15       MR. BROOK:  Objection to the form.

16       BY MR. RAMSEY:

17       A.   No.

18       Q.   Southern Spirits coming in didn't

19  change the performance of Eber Brothers?

20       A.   It did, but that was not the downturn.

21       Q.   Okay, but the downturn happened as a

22  result of Southern coming into the market, correct?

23       MR. BROOK:  Objection to the form.

D. Kleeberg - Ramsey - 12/19/18

1        BY MR. RAMSEY:

2        A.   No.

3        Q.   You testified, I think, earlier this

4    morning that when Southern came in that they

5    essentially wiped out Eber Brothers?

6        A.   That is correct.

7        Q.   How long did you continue to receive

8    the consulting fee after the date of Exhibit 10 or

9    Exhibit 12, excuse me, as September of 2009?  How

10   long did you continue to receive the consulting

11   fee?

12       MR. BROOK:  Objection to the form.

13       BY MR. RAMSEY:

14       A.   Well, you stated here almost -- what --

15   a year and a half, two years, a year and a half.

16       Q.   Did you continue to receive it after

17   September, 2009?

18       MR. BROOK:  The date of his e-mail.

19       BY MR. RAMSEY:

20       A.   No.

21       Q.   So your request to Lester that you

22   continue to receive the consulting fee that you

23   made in the body of this e-mail, that was

D. Kleeberg - Ramsey - 12/19/18

1    essentially rejected?

2         MR. BROOK:  Objection to the form.

3         BY MR. RAMSEY:

4         A.   Yes.

5         Q.   So it's your recollection and

6    understanding that subsequent to this e-mail that

7    you received no additional payments as a consulting

8    fee?

9         A.   No, I don't believe I did.

10        Q.   You're not sure one way or the other?

11        A.   I don't believe that I did, no, no.

12        Q.   No, you're not sure?

13        A.   No, I don't -- I don't -- I did not get

14   any more consulting fees.

15        Q.   I show you what we've had marked as

16   Exhibit 13 for identification.  Let me know when

17   you've had a chance to review that (indicating).

18        A.   Okay.

19        Q.   Have you had a chance to review Exhibit

20   13?

21        A.   Yes.

22        MR. BROOK:  Note again for the record just a

23   standing objection to the exhibits lacking Bates

D. Kleeberg - Ramsey - 12/19/18

1   numbers, but you can proceed.

2          BY MR. RAMSEY:

3          Q.   Have you seen Exhibit 13 before?

4          A.   Yes.

5          Q.   Exhibit 13 is an e-mail from you to

6   Lester dated October 9, 2009, correct?

7          A.   Yes.

8          Q.   What was the purpose of this e-mail?

9          A.   I was looking for to start on my own

10  back in the liquor industry and I needed to acquire

11  a supplier.  Lester recommended that I get a hold

12  of a Manny Bergeron who was in charge of Camus

13  Cognac and to follow up with him to see if I could

14  work out some kind of deal.

15         Q.   So you were reaching out to Lester for

16  some help in initiating this contact?

17         A.   That is correct.  That is correct.

18         Q.   In fact, the first sentence writes,

19  "Thank you again for your help, support and

20  guidance," correct?

21         A.   Yes.

22         Q.   Was that not just for this particular

23  ask but the time that you spent with Eber Brothers?

D. Kleeberg - Ramsey - 12/19/18

1        A.   No, for this specific help that Lester

2   gave me.

3        Q.   The help, support and guidance that you

4   referenced is limited to this particular issue with

5   Manny?

6        A.   Yes.

7        Q.   You write, "I can't tell you enough how

8   much it means to me," and the next sentence is,

9   "You have always been there for me and my family.

10  I will never forget that."  That relates more

11  broadly to your time at Eber Brothers?

12       A.   Yes.

13       Q.   Were you able to get in touch with

14  Manny?

15       A.   Yes.

16       Q.   Okay, and ultimately was that the

17  cognac company that you went to work for for some

18  period of time?

19       A.   Yes.

20       Q.   That was facilitated in some way by

21  Lester?

22       A.   Yes.

23       Q.   You were appreciative of Lester for

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Ramsey - 12/19/18

1    doing that?

2         A.   Yes.

3         Q.   Let me show you what we have marked as

4    Exhibit 14.  Let me know when you've had a chance

5    to review that (indicating).

6         A.   Okay, yes.

7         Q.   You've seen Exhibit 14 before?

8         A.   Yes.

9         Q.   You were again reaching out to Lester

10   for some assistance for facilitating an

11   introduction?

12        A.   Through, yes, through my supplier John

13   Chappell.

14        Q.   Specifically John Chappell is sending

15   an e-mail?  Exhibit 14 is an e-mail from John

16   Chappell to Lester CCing you dated December 9, 2013

17   with the subject line of, "Referral to

18   Constellation," correct?

19        A.   Yes.

20        Q.   Who is John Chappell?

21        A.   John Chappell is the owner of PaQui

22   Tequila Holdings.

23        Q.   He was reaching out to Lester?

D. Kleeberg - Ramsey - 12/19/18

1      A.   Yes.

2      Q.   What was the purpose of the outreach?

3      A.   John wanted to associate himself with a

4  major supplier that had a void in the tequila

5  industry and was hoping that they would take him on

6  and help him with distribution.

7      Q.   Based on the signature block AT the

8  bottom of Exhibit 14, it looks like you were VP of

9  sales of PaQui Tequila at that point?

10     A.   Yes.

11     Q.   Okay, and was Mr. Chappell reaching out

12 to Lester at your suggestion?

13     A.   No.

14     Q.   He was independently reaching out to

15 Lester?

16     A.   No, he had asked me if it would be all

17 right for him to reach out to Lester.

18     Q.   Okay, so he knew your relationship with

19 Lester --

20     A.   Yes.

21     Q.   (Continuing) and he checked with you to

22 make sure that it was okay?

23     A.   Yes.

126

D. Kleeberg - Ramsey - 12/19/18

1       Q.    Did you have any objection to him doing

2   so?

3       A.    No.

4       Q.    Were you hopeful that Lester might be

5   able to facilitate what John was seeking here?

6       A.    Yes.

7       Q.    Ultimately that didn't work out or did

8   it?

9       A.    No, it did not.

10      Q.    Why didn't it work out?

11      A.    Constellation did not need a start-up

12  company to develop another tequila.

13      Q.    So Lester tried to facilitate

14  something, but Constellation wasn't interested?

15      A.    That is correct.

16      Q.    I show you what we've marked as Exhibit

17  15.  It's a two-page document (indicating).

18      A.    All right.

19      Q.    Ready?

20      A.    Yes.

21      Q.    Have you seen Exhibit 15 before?

22      A.    Yes.

23      Q.    It looks like an e-mail chain between

127

D. Kleeberg - Ramsey - 12/19/18

1   primarily you, Lester and a Mr. Jeff Greenstein?

2        A.   Yes.

3        Q.   Who is Mr. Greenstein?

4        A.   Greenstein, Jeff was my sales rep for

5   New York for a brand called Kannon Organic Vodka.

6        Q.   The middle e-mail is dated February 5,

7   2015 from you to Lester.  Were you hoping Lester

8   could facilitate the introduction for Jeff at

9   Southern Wines?

10       A.   That is correct.

11       Q.   Okay, and what was Lester's response?

12       A.   He gave a contact name for Jeff to

13  reach out to.

14       Q.   Okay, and that's the e-mail above that

15  in which Lester's writing for him to contact

16  Elizabeth Toohig, T-O-O-H-I-G?

17       A.   Yes.

18       Q.   Did you know Ms. Toohig?

19       A.   Yes.

20       Q.   Was there a reason that you couldn't

21  suggest to Mr. Greenstein to contact Elizabeth?

22       A.   Well, since Lester was working in

23  conjunction with Southern, I thought his

D. Kleeberg - Ramsey - 12/19/18

1    relationship would be stronger than mine.

2         Q.   Okay, so you were hoping again that

3    Lester would facilitate something to help Jeff out?

4         A.   Yes.

5         Q.   Do you know whether Jeff reached out to

6    Ms. Toohig?

7         A.   Yes.

8         Q.   Do you recall the result was that he

9    was able to obtain a position?

10        A.   No.

11        Q.   You don't know or he was not?

12        A.   No, I'm sorry.  No, he did not.

13        Q.   Do you know whether he was able to

14   touch base or connect with Ms. Toohig?

15        A.   Yes.

16        Q.   For whatever reason, the position never

17   materialized?

18        A.   That is correct.

19        Q.   Next I want to show you Exhibit 16

20   (indicating).

21        A.   I'm ready.

22        Q.   Okay, and have you seen Exhibit 16

23   before?

129

D. Kleeberg - Ramsey - 12/19/18

1      A.    Yes.

2      Q.    This is an e-mail from you to Lester

3  dated February 5, 2016, correct?

4      A.    Yes.

5      Q.    Okay, and what was the purpose of this

6  e-mail?

7      A.    Kannon Organic Vodka had shut down in

8  the United States.  I was looking for a job within

9  the industry.  I had come across this PBG Spirits

10  investment and knew that Lester or John Slocum knew

11  them because they did business with them and I

12  wanted to see if they could make a call on my

13  behalf.

14      Q.    Okay, so you were hoping Lester could

15  facilitate an introduction to one of the principals

16  of this PBG Spirits?

17      A.    Yes.

18      Q.    You were comfortable approaching Lester

19  or making this ask of Lester at this point?

20      A.    Yes.

21      Q.    Based on the history that you had

22  together?

23      A.    Yes.

D. Kleeberg - Ramsey - 12/19/18

1      Q.    Did Lester respond to this e-mail

2   either in writing or verbally?

3      A.    I don't remember.  I don't recall.  I

4   think John Slocum responded back to me.

5      Q.    Were you ever able to get in touch with

6   anyone from PBG Spirits?

7      A.    No.

8      Q.    I want to spend a little time talking

9   about your mother.  Did she have a will when she

10  passed away?  Do you know?

11     A.    Yes.

12     Q.    Who's the executor of her estate?

13     A.    My sister Lisa Stein.

14     Q.    To your knowledge, does Lisa have a

15  copy of your mother's will?

16     A.    To my knowledge, yes.

17     MR. RAMSEY:  I'll note that I would like to

18  make a document request for that will.  I can note

19  that for the record and I'll follow up in writing.

20     BY MR. RAMSEY:

21     Q.    Your mother passed away in 2014 you

22  said?

23     A.    Yes.

D. Kleeberg - Ramsey - 12/19/18

1        Q.    Prior to her passing away, how often

2    would you speak with her?

3        A.    Up till when she got very ill, probably

4    once a month, maybe twice a month.

5        Q.    Where was she residing at the time that

6    she passed away?

7        A.    In Buffalo, New York.

8        Q.    Okay, and you told me this morning that

9    at least some of those conversations would be you

10   updating her on the status of the Eber companies?

11       A.    When she would ask a question.

12       Q.    Okay, and I think you told me that

13   obviously when you were working there you had some

14   firsthand knowledge, but even after you left you

15   were able to get knowledge from various sources to

16   get some updates?

17       A.    Yes.

18       Q.    Do you know other than you whether your

19   mother had any source, any other source of

20   knowledge, about any of the Eber companies, of

21   their performance or anything that was going on?

22       MR. BROOK:  Objection to the form.

23       BY MR. RAMSEY: