EXHIBIT B (PART 2)

D. Kleeberg - Ramsey - 12/19/18

1        A.    Not that I was aware of.

2        Q.    Do you know whether your mother would

3   ever have communications, written or verbal, with

4   Lester Eber about the state of the Eber companies

5   or the trust?

6        MR. BROOK:  Objection to the form.

7        BY MR. RAMSEY:

8        A.    I knew they spoke.

9        Q.    How do you know they spoke?

10       A.    My mother would tell me they had a

11   conversation.

12       Q.    Okay, so in the instances when your

13   mother had any communications with Lester, you

14   would generally learn about that from your mother?

15       MR. BROOK:  Objection to the form.

16       BY MR. RAMSEY:

17       A.    Actually, no.

18       Q.    Okay.

19       A.    There was nothing revealed in those

20   conversations to me.

21       Q.    She just said, "I spoke with Lester,"

22   without giving you any clue as to the substance?

23       A.    That is correct.

D. Kleeberg - Ramsey - 12/19/18

1    Q.   Did you ask about what the substance

2   was?

3    A.   No.

4    Q.   Why not?

5    A.   Because at that time I did not want to

6   get into subjects that could be detrimental to her

7   well-being.

8    Q.   Why do you think those subjects could

9   be detrimental to her well-being?

10    A.   Because of what was happening to Eber

11   Brothers and the problems that the company was

12   incurring.

13    Q.   If I'm understanding you correctly,

14   that could have been upsetting to your mother?

15    A.   Yes.

16    Q.   So you wanted to spare her as much as

17   possible?

18    A.   That is correct.

19    Q.   Let me show you what has been marked as

20   Exhibit 17.  Let me know when you've had a chance

21   to review that (indicating).

22    MR. RAMSEY:  Off the record.

23    (Whereupon, an off-the-record discussion was

D. Kleeberg - Ramsey - 12/19/18

1    held.)

2          BY MR. RAMSEY:

3          Q.   Have you had a chance to review Exhibit

4    17, Mr. Kleeberg?

5          A.   Yes.

6          Q.   Have you ever seen that document

7    before?

8          A.   No.

9          Q.   Exhibit 17 looks to be a letter dated

10   December 15, 2009 from Lester to your mother?

11         A.   Yes.

12         Q.   Understanding that you hadn't seen it

13   prior to today, but it looks like that he's talking

14   generally about the recession and the impact on the

15   Eber business?

16         MR. BROOK:   Objection to the form.

17         BY MR. RAMSEY:

18         A.   Yes.

19         Q.   It's also discussing the inability to

20   make a dividend payment that year?

21         MR. BROOK:   Objection to the form.

22         BY MR. RAMSEY:

23         A.   Yes.

D. Kleeberg - Ramsey - 12/19/18

1          Q.   In the second paragraph Lester writes,

2     "To ease this burden," resulting from the lack of

3     the dividend payment, "I propose to make a personal

4     tax free gift to you in the amount of $5,000.00

5     which is enclosed."  Do you see that sentence?

6          A.   Yes.

7          Q.   Do you have an understanding, whether

8     that payment was made to your mother?

9          A.   No.

10         Q.   Did you ever have any discussions with

11    your mother about Lester conveying to her some of

12    the problems that the business was having?

13         A.   Any discussions with her regarding the

14    business having problems?

15         Q.   With Lester, that she had discussions

16    with Lester about the business.

17         A.   I'm sorry.  Please say that again.

18         Q.   I'll start over.

19              Any discussions with your mother about

20    Lester conveying to her either verbally or in

21    writing any problems that the business was having

22    in or around December of 2009?

23         MR. BROOK:  Objection to the form.

D. Kleeberg - Ramsey - 12/19/18

1        BY MR. RAMSEY:

2            A.   She would have a discussion with me

3     asking me what was really going on with the

4     company.

5            Q.   Okay, and was that your testimony a few

6     minutes ago that you tried to soften the blow for

7     lack of a better word so that she wasn't upset?

8            A.   Well, I will -- I will take it one step

9     further.  My conversations with her would always

10    refer back to, "You need to speak to your brother

11    to get clarification if you have any questions."

12           Q.   Okay, and I believe you told me in

13    those instances when she did communicate with

14    Lester, she might tell you that she had

15    communications, but you were typically not privied

16    to the substance of those communications?

17           A.   That is correct.

18           Q.   Okay, and just to be clear, you haven't

19    seen Exhibit 17 and you don't recall a discussion

20    with your mother about her receiving a letter from

21    Lester in December of 2009?

22           A.   That is correct.

23           Q.   I show you what has been marked as

D. Kleeberg - Ramsey - 12/19/18

1    Exhibit 18 (indicating).

2          A.   Okay.

3          Q.   Have you seen Exhibit 18 before?

4          A.   No.

5          Q.   The name "Sally Kleeberg" is written on

6    Exhibit 18, correct?

7          A.   Yes.

8          Q.   Then there's some handwriting below it?

9          A.   Yes.

10         Q.   Does the handwriting appear to be that

11   of your mother?

12         A.   Yes.

13         Q.   It says, "Thank you for the check.  I

14   appreciate it," and then it's signed "Sally",

15   correct?

16         A.   Yes.

17         Q.   It looks like a photocopy of some type

18   of correspondence note or thank you note?

19         A.   That I couldn't answer.

20         Q.   Are you aware whether your mom had

21   correspondence or thank you notes that she would

22   send to people as needed?

23         A.   Was I aware of?

D. Kleeberg - Ramsey - 12/19/18

1      Q.   Did she have correspondence notes that
2   she used?
3      A.   Yes.
4      Q.   Would this be consistent with one of
5   those notes, its appearance anyway?
6      A.   Yes.
7      Q.   Do you recall any discussion or
8   learning from any source that your mother received
9   a personal check from Lester Eber to replace the
10  loss of a dividend payment?
11     A.   No.
12     Q.   She never shared that with you?
13     A.   No.
14     Q.   As you sit here today, do you have any
15  reason to dispute that such a check was sent to
16  your mother by Lester?
17     A.   No.
18     Q.   That would be consistent with Exhibit
19  18, your mother thanking Lester for the check?
20     MR. BROOK:  Objection to the form.
21     BY MR. RAMSEY:
22     A.   Yes.
23     Q.   I'm going to show you next what we've

D. Kleeberg - Ramsey - 12/19/18

1   marked as Exhibit 19.  Let me know when you've had

2   a chance to review it (indicating).

3          A.   Okay.

4          Q.   Have you had a chance to review Exhibit

5   19?

6          A.   Yes.

7          Q.   Have you seen it before?

8   MR. BROOK:  Objection to the form.

9   BY MR. RAMSEY:

10         A.   Only with what has been provided to me

11  for this case.

12         Q.   Okay, so you've seen it in the context

13  of this lawsuit?  Well, let me identify it.

14  Exhibit 19 is a handwritten letter from Lester to

15  Sally, correct?

16         A.   Yes.

17         Q.   It's dated March 22, 2010, correct?

18         A.   Yes.

19         Q.   If I'm understanding what you just

20  said, you've seen this document in the context of

21  this lawsuit and you didn't see it

22  contemporaneously with it being sent back in 2010?

23         A.   That is correct.

D. Kleeberg - Ramsey - 12/19/18

1          Q.   What's the subject matter of Exhibit

2     19?  What's Lester conveying to your mother?

3          MR. BROOK:  Objection to the form.

4          BY MR. RAMSEY:

5          A.   The current financial situation of

6     Slocum and Lester's feeling of putting X amount of

7     money into the company.

8          Q.   Exhibit 19 references a loan that

9     Lester advanced to the company that he's sharing

10    with your mother?

11         A.   Yes.

12         Q.   It also references a $4,000.00 check

13    that he previously sent her to make up for the

14    elimination of a distribution?

15         A.   Yes.

16         Q.   He then a little bit farther down

17    Exhibit 9 indicates that he is enclosing an

18    additional personal check in the amount of

19    $6,000.00?

20         A.   Yes.

21         Q.   Did you have a discussion of any of

22    those items with your mother at about the time that

23    this letter was written?

D. Kleeberg - Ramsey - 12/19/18

1      A.   No, I did not.

2      Q.   As you sit here today, do you have any

3  reason to dispute the accuracy of what Lester

4  provided to your mother, the $4,000.00 check and

5  the $6,000.00 check?

6      MR. BROOK:  Objection to the form.

7      BY MR. RAMSEY:

8      A.   No, I do not.

9      Q.   Based upon what you knew about the

10  state of the business back in 2010, was the message

11  that Lester was conveying to your mom that there

12  were some financial troubles and some business

13  hardships accurate?

14      MR. BROOK:  Objection to the form.

15      BY MR. RAMSEY:

16      A.   That I wouldn't know because I was

17  never made aware of what was going on in Slocum.

18      Q.   Okay, but as far as Eber Brothers, it

19  had already shut down, correct?

20      A.   That is true.

21      Q.   Okay, so do you have any reason to

22  dispute the accuracy of what Lester was conveying

23  to your mother at that time?

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Ramsey - 12/19/18

1        MR. BROOK:  Objection to the form.

2        BY MR. RAMSEY:

3        A.   My only objection would be that it is

4   very difficult in a franchise state to be in a very

5   difficult situation where you are not making money

6   and that there has to be a tremendous amount of

7   influx of money.

8        Q.   What specifically are you referring to

9   in the letter that you're disagreeing with?

10       A.   Well, this money is being put into, if

11  I'm not mistaken, into Slocum, right?

12       Q.   I'm just asking you based on the letter

13  what you are disagreeing with in the content of the

14  letter.

15       MR. BROOK:  You're asking him to identify

16  the sentence?

17       MR. RAMSEY:  The sentence or the paragraph

18  or if he's disagreeing with the accuracy of what

19  Lester was conveying to his mother.

20       BY MR. RAMSEY:

21       A.   I only disagree with the amount because

22  I never saw that amount and nor was I ever told

23  that that was the amount that was going to be put

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Ramsey - 12/19/18

1    in there, so I have no proof that that actually

2    took place.

3        Q.   You don't know one way or the other?

4        A.   No, I do not.

5        Q.   You recall no discussions at all with

6    your mother about this letter, the subject

7    discussed in this letter, around the time it was

8    sent?

9        A.   No, I do not.

10       MR. BROOK:  Objection to the form.

11       THE WITNESS:  Sorry.

12       BY MR. RAMSEY:

13       A.   No, I do not.

14       Q.   I'm going to show you what's been

15    marked as Exhibit 20 for identification

16    (Indicating).

17       A.   Okay.

18       Q.   Have you seen Exhibit 20 before?

19       A.   No, I have not.

20       Q.   Have you seen Exhibit 20 in the context

21    of this lawsuit?

22       A.   Yes.

23       Q.   Okay, so much like the previous

D. Kleeberg - Ramsey - 12/19/18

1   document, you at least had seen it prior to this

2   morning, but if I'm understanding you correctly,

3   you didn't see it contemporaneously when it was

4   sent?

5        A.   That is correct.

6        Q.   This is a letter dated April 2, 2010

7   from Lester to your mother, correct?

8        A.   Yes.

9        Q.   Okay, and he's making an invitation to

10  have her contribute some money to the business?

11       A.   Yes.

12       Q.   Specifically he's indicating that $1.5

13  million in capital is needed and is proposing that

14  he, your mother and Audrey split that three ways,

15  right?

16       MR. BROOK:  Objection to the form.

17       BY MR. RAMSEY:

18       A.   I don't see Audrey's name there.

19       Q.   Okay, but your mother was offered a

20  one-third interest, correct?

21       A.   Yes.

22       Q.   In the second to last --

23       A.   No, backtrack for a second.  No, that's

D. Kleeberg - Ramsey - 12/19/18

1    not true.  Could you restate that question?

2           Q.   Of the $1.5 million that Lester

3    references in that letter, he's asking your mother

4    whether she would be interested in contributing

5    one-third of that, correct?

6           A.   Right.

7           Q.   In the second to last paragraph of

8    Exhibit 20, Lester indicates that he's already

9    advanced the company $500,000.00.  Do you see that?

10          A.   In the second paragraph?

11          Q.   In the second to last.

12          A.   Second to last, yes.

13          Q.   He also again discusses throughout the

14   letter some of the business difficulties that the

15   company's facing?

16          A.   Only the liquidity, yes.

17          Q.   Okay, and he indicates that the

18   proposed $1.5 million loan in the middle paragraph

19   would be secured by Eber Brothers Wine and Liquor

20   and Eber Metro's equity interest in the Connecticut

21   business?

22          A.   Yes.

23          Q.   Did your mother have any discussion

D. Kleeberg - Ramsey - 12/19/18

1    with you about this letter when she received it?

2          A.   No.

3          Q.   As of 2010, did your mother have any

4    issue, health issue or otherwise, that would impede

5    her ability to understand and comprehend documents

6    that were sent to her?

7          A.   In 2010, no.

8          Q.   In other words, there was no competency

9    issue in 2010?

10         A.   No.

11         Q.   The letter, Exhibit 20, also indicates

12   that it's enclosing copies of loan documents.  Do

13   you see that in the last paragraph?

14         A.   Yes.

15         Q.   In the last sentence, Lester writes,

16   "Finally, please let me know if you would like any

17   additional information about Eber-Connecticut LLC."

18   Do you see that?

19         A.   Yes.

20         Q.   Were you aware at the time in 2010 that

21   any loan documents or proposed loan documents had

22   been provided to your mother?

23         A.   No.

D. Kleeberg - Ramsey - 12/19/18

1          Q.    I'm going to show you what we've marked

2     as Exhibit 21.  It's a relatively thick stack of

3     documents, so I'm not going to ask you to go

4     through all of them.  Take as much time as you want

5     to review them.  I just have a couple of questions

6     on them.  It won't be long (indicating).

7          A.    So why don't you ask the questions and

8     then point me to where you want me to read?

9          Q.    Okay, the first two pages of Exhibit 21

10    appear to be a document entitled Non-Disclosure

11    Agreement.  Do you see that?

12         A.    Yes.

13         Q.    It looks like it's filled out for Sally

14    Kleeberg to sign and is dated April 2, correct?

15         A.    Yes.

16         Q.    2010, correct?

17         A.    Yes.

18         Q.    The second page, it's not signed by

19    your mother, correct?

20         A.    Correct.

21         Q.    All right, following the Non-Disclosure

22    Agreement, it looks like a Guaranty Agreement or a

23    loan document, correct?

D. Kleeberg - Ramsey - 12/19/18

1          MR. BROOK:  Objection to the form.

2          BY MR. RAMSEY:

3          A.    Guaranty?

4          Q.    Let me try it this way rather than go

5     page by page.  Exhibit 20 references loan documents

6     that Lester was supplying to your mother, correct?

7          A.    Yes.

8          Q.    Do you have any reason to dispute that

9     the loan documents that Lester was referencing were

10    actually supplied to your mother for her review?

11         A.    Do I have any reason to dispute it?

12         Q.    Yes.

13         A.    I cannot really respond to that because

14    my mother never brought it up to me, so I have no

15    idea whether she received it or not.

16         Q.    Right, she didn't discuss it with you?

17         A.    No.

18         Q.    Yes, but you hadn't learned from any

19    other source that no loan documents were, in fact,

20    ever provided to her, the proposed loan documents?

21         A.    Right.

22         MR. RAMSEY:  Off the record.

23              (Whereupon, an off-the-record discussion was

D. Kleeberg - Ramsey - 12/19/18

1  held.)

2       MR. RAMSEY:  We'll break for lunch at this

3  point.

4       Whereupon, at 12:10 PM, the parties broke

5  for a lunch break until 12:55 PM.)

6       BY MR. RAMSEY:

7       Q.   All right, back on the record, ready to

8  continue, Mr. Kleeberg?

9       A.   Yes.

10      Q.   I show you what we've marked at Exhibit

11  22 for identification (indicating).

12      A.   Okay.

13      Q.   Have you ever seen Exhibit 22 before?

14      A.   Before?  Can you give me a time frame?

15      Q.   Sure, as you sit here today, have you

16  ever seen Exhibit 22 before?

17      MR. BROOK:  Before today.

18      BY MR. RAMSEY:

19      Q.   Before today.

20      A.   Before today?

21      Q.   Yes.

22      A.   Yes.

23      Q.   Okay, and then let me jump ahead and

150

D. Kleeberg - Ramsey - 12/19/18

1    see if I can short circuit this.  Is this another

2    example of a document that you've seen in

3    connection with this lawsuit that you didn't see at

4    the time it purports to have been created?

5         A.    That is correct.

6         Q.    Exhibit 22 is another letter from

7    Lester to your mother, correct?

8         A.    Yes.

9         Q.    This one is dated April 27, 2010?

10        A.    Yes.

11        Q.    In sum and substance, Exhibit 22 is a

12   letter in which Lester's conveying to your mother

13   his thanks for considering the investment

14   opportunity he discussed earlier and that he

15   understands she's not looking to take that up?  Is

16   that a fair summary of it?

17        MR. BROOK:  Objection.  Objection to the

18   form.

19        BY MR. RAMSEY:

20        A.    Yes.

21        Q.    Did your mother ever convey to you that

22   she had turned down the opportunity to invest money

23   in the Eber companies?

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Ramsey - 12/19/18

1       MR. BROOK:  Objection to the form.

2       BY MR. RAMSEY:

3       A.   No, I never had that discussion with

4  her.

5       Q.   When is the first time that you learned

6  that your mother had been presented with such an

7  opportunity?

8       MR. BROOK:  Objection to the form.

9       BY MR. RAMSEY:

10      A.   During our -- during this lawsuit.

11      Q.   Okay, so until you received some

12  documents or other information in this lawsuit,

13  that was unknown to you?

14      A.   That is correct.

15      Q.   I show you what we've had marked as

16  Exhibit 23.  Let me know when you've had a chance

17  to review that (indicating).

18      A.   Okay.

19      Q.   All right, I'll tell you what.  In the

20  interest of time, I'm going to show you Exhibit 24

21  at the same time and ask you questions about both

22  of them (indicating).

23      A.   Okay.

D. Kleeberg - Ramsey - 12/19/18

1      Q.    Just to set the table, Exhibit 23 is an

2   October 27, 2010 letter from Lester to your mother

3   and Exhibit 24 is a November 19, 2010 letter from

4   Lester to your mother, correct?

5      A.    Yes.

6      Q.    Prior to this lawsuit, had you ever

7   seen either Exhibit 23 or Exhibit 24?

8      A.    No.

9      Q.    Have you seen either or both of these

10  exhibits in the context of this lawsuit?

11     A.    No.

12     Q.    You've had a chance to read them?

13     A.    Yes.

14     Q.    For example, Exhibit 23 first, it

15  appears to be a letter indicating to your mother

16  that health care costs could be covered in whole or

17  in part from principal from the trust?

18     A.    Yes.

19     Q.    Did you ever have any discussions with

20  your mother whether or not there was a

21  consideration for using trust assets to pay for her

22  health care costs?

23     A.    No.

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

153

D. Kleeberg - Ramsey - 12/19/18

1      Q.   In 2010, October of 2010, how were your

2  mother's health care costs paid for generally?

3      A.   How were they paid for?

4      Q.   Yes.

5      A.   I do not know.

6      Q.   Was she on Medicare?

7      A.   In 2010 she could be.  I don't know.

8      Q.   Do you know whether she had any private

9  insurance or supplemental insurance?

10     A.   I don't know.

11     Q.   Had you ever discussed any of your

12  mother's health issues or health expenses with her?

13     A.   No, she never brought it up to me.

14     Q.   Who would your mom have spoken with

15  about issues like that, either health concerns or

16  the payment of health care costs?

17     A.   Health concerns would be with my

18  sister.  Health costs I have no idea.

19     Q.   Other than the health care expenses

20  that Exhibit 23 is discussing, were you ever aware

21  of any principal from the trust being used for any

22  other purpose in or about this time period?

23     A.   Could you be more specific?

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Ramsey - 12/19/18

1        Q.   Sure, the subjects of both Exhibit 23

2    and Exhibit 24 is using principal from the trust to

3    pay or proposing to use principal from the trust to

4    pay for your mom's health care costs.   I'm

5    wondering if you were aware from any source whether

6    the principal from the trust was used to pay either

7    other individual's health care costs or other costs

8    not related to costs that certain individuals might

9    have?

10            MR. BROOK:   Objection to the form.

11            BY MR. RAMSEY:

12       A.   You mean outside of my mother?

13       Q.   Yes.

14       A.   Yes.

15       Q.   All right, well, who were you aware of

16    that were receiving payments from the trust,

17    principal payments?

18       A.   My niece.

19       Q.   Erica Stein?

20       A.   Yes.

21       Q.   We'll talk about that a bit more in a

22    moment, but were those for costs associated with an

23    illness --

D. Kleeberg - Ramsey - 12/19/18

1      A.   Yes.

2      Q.   (Continuing) that she had?

3      A.   Yes.

4      Q.   Exhibit 24 indicates Lester indicating

5   to your mother that he had been paying her medical

6   bills from his own personal resources.  Do you see

7   that?

8      A.   Yes.

9      Q.   Did your mother make you aware in any

10  way that Lester was paying this money out of his

11  pocket for some of her medical costs?

12      MR. BROOK:  Objection to the form.

13      BY MR. RAMSEY:

14      A.   No.

15      Q.   Do you have any reason to dispute the

16  accuracy of this letter?

17      MR. BROOK:  Objection to the form.

18      BY MR. RAMSEY:

19      A.   I would not know because I was not

20  aware of this.

21      Q.   Your mother didn't share that with you?

22      A.   No.

23      Q.   Was there ever a time when your mother

D. Kleeberg - Ramsey - 12/19/18

1    needed some type of procedure, health care related

2    expense, where she was unable to afford it?

3         A.   No.

4         Q.   I should ask you this with respect to a

5    couple of the previous exhibits and you can flip

6    back to them if you need to.  The invitation by

7    Lester to make a one-third contribution of that

8    $1.5 million, at that time did your mother have the

9    assets to do that if she had so chosen?

10        A.   I don't know.  I don't know.  She never

11   discussed that with me.

12        Q.   Who would she discuss her personal

13   assets with?

14        A.   Nobody.

15        MR. BROOK:  Objection to the form.

16        BY MR. RAMSEY:

17        Q.   Would she discuss that with Lisa?

18        A.   No.

19        Q.   Did she have an adviser, a financial

20   adviser, that she used?  Do you know?

21        A.   Yes.

22        Q.   Who was that?

23        A.   Daniel Abelson, A-B-E-L-S-O-N.

D. Kleeberg - Ramsey - 12/19/18

1    Q.   Where is Mr. Abelson located?

2    A.   Buffalo, New York.

3    Q.   Is he with a firm or is he on his own?

4    A.   He is a financial adviser.

5    Q.   With a practice group or is he on his

6    own?

7    A.   On his own.

8    Q.   Is it your understanding that financial

9    decisions that you knew that your mother had to

10   make would be made in consultation with Mr.

11   Abelson?

12        MR. BROOK:  Objection to the form.

13        BY MR. RAMSEY:

14   A.   She never told me that, but that was

15   who -- that was her financial adviser.

16   Q.   I believe you told me that Lisa is the

17   executor or was the executor of your mom's estate?

18   A.   Yes.

19   Q.   Did Lisa discuss with you the assets

20   that were included in the estate at the time of

21   your mom's death?

22   A.   Yes.

23   Q.   Based on those discussions with Lisa,

D. Kleeberg - Ramsey - 12/19/18

1   would your mom have had the assets in 2010 to make

2   the $500,000.00 investment that Lester was

3   offering?

4         MR. BROOK:  Objection to the form.

5         BY MR. RAMSEY:

6         A.   Yes.

7         Q.   The 4,000, approximately $4,000.00, a

8   month that you received from investments, is that,

9   the source of those monies, an inheritance from

10  your mother?

11        A.   Yes.

12        Q.   Is it your understanding that Lisa

13  receives approximately the same amount as far as an

14  inheritance?

15        A.   No.

16        Q.   You don't understand one way or the

17  other or that's not your understanding?

18        A.   It's not my understanding.

19        Q.   What does Lisa receive on a monthly

20  basis?

21        A.   I have no idea.

22        Q.   So you don't know one way or the other?

23        A.   I, correct.

D. Kleeberg - Ramsey - 12/19/18

1      Q.   Okay, so you just don't know one way or

2  the other?

3      A.   I don't know one way or the other.

4      Q.   I show you what is marked as Exhibit

5  25.  Let me know when you've had a chance to review

6  that (indicating).

7      A.   Okay.

8      Q.   Exhibit 25 is another letter from

9  Lester to your mother, correct?

10     A.   Yes.

11     MR. BROOK:  Objection to the form.

12     THE WITNESS:  Oh, I'm sorry.

13     BY MR. RAMSEY:

14     A.   Yes.

15     MR. RAMSEY:  What's the objection?

16     MR. BROOK:  That's not Lester's signature on

17  it.

18     MR. RAMSEY:  Oh, you're right.  I apologize.

19     BY MR. RAMSEY:

20     Q.   It's on Lester Eber's letterhead, is

21  that correct?

22     A.   Yes.

23     Q.   It's dated December 13, 2010?

160

D. Kleeberg - Ramsey - 12/19/18

1        A.   Yes.

2        Q.   Is this another one of the document

3   where you've seen in the context of this lawsuit

4   but did not see it contemporaneously with when it

5   purports to have been sent?

6        A.   No.

7        Q.   This is something you saw prior to the

8   lawsuit?

9        A.   No.

10        Q.   When was the first time you'd seen this

11   document?

12        A.   Today.

13        Q.   Okay, so in the context of this

14   lawsuit, you haven't had a chance to review Exhibit

15   25?

16        A.   That is correct.

17        Q.   You've had a chance to review it after

18   I've handed it to you though?

19        A.   Yes.

20        Q.   It looks to be a letter to your mother

21   again on Lester Eber's letterhead from an

22   individual, Janet Lissow.  Do you know who Janet

23   Lissow is?

D. Kleeberg - Ramsey - 12/19/18

1      A.   Yes.

2      Q.   Who is she?

3      A.   Lester's personal secretary.

4      Q.   Do you know whether from time to time

5  Lester would have his personal secretary send

6  correspondence on his behalf?

7      A.   Yes.

8      Q.   Okay, so it wouldn't be unusual that

9  Janet Lissow would be sending correspondence to

10  your mother on Lester Eber's letterhead?

11      MR. BROOK:   Objection to the form.

12      BY MR. RAMSEY:

13      A.   I don't -- I don't think that would be

14  the norm.   I think Lester would be the one who

15  would be sending them.

16      Q.   Okay, but this is his personal

17  secretary anyway?

18      A.   Yes.

19      Q.   Okay, and the substance of Exhibit 25

20  appears to be a confirmation to your mother that

21  she's decided to manage the payment of her medical

22  bills on her own?   That's what the letter says

23  anyway?

D. Kleeberg - Ramsey - 12/19/18

1        A.    That's what the letter says.

2        Q.    Based upon what you told me a few

3   minutes ago about the assets in your mother's

4   estate at the time of her death, is it fair to say

5   that she had enough assets to pay for her own

6   medical bills?

7        A.    Yes.

8        Q.    I understand you weren't privied to

9   these discussions at the time they were happening

10  back in 2010, but have you learned the reason why

11  there was a consideration that she was going to be

12  receiving principal to go towards medical expenses

13  when she was able to independently cover her

14  medical costs?

15       MR. BROOK:  Objection to the form.

16       BY MR. RAMSEY:

17       A.    There was never a discussion.

18       Q.    You don't know one way or the other?

19       A.    No, I do not.

20       Q.    I show you what's been marked as

21  Exhibit 26 (indicating).

22       A.    Okay.

23       Q.    Exhibit 26 is an e-mail from an Elliott

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Ramsey - 12/19/18

1    Gumaer to an R. Hawks at cnb.com, is that accurate?

2         A.   Yes.

3         Q.   Is that what it purports to be?

4         A.   Yes.

5         Q.   Prior to today, had you ever seen

6    Exhibit 26?

7         A.   No.

8         Q.   Have you had a chance to read it after

9    I've handed it to you?

10        A.   Yes.

11        Q.   The substance of the e-mail from Mr.

12   Gumaer to -- and I'll represent to you it is Rick

13   Hawks at CNB -- again is dealing with the

14   possibility of the trust paying your mother's

15   supplemental medical expenses, correct?

16        A.   Yes.

17        Q.   It looks like on the third or so line

18   that it would have been intended to continue her

19   Medicare supplemental insurance?

20        A.   Yes.

21        Q.   Okay, and then the next sentence goes

22   on to say that in sum and substance Lester had

23   maintained the cost of that from his personal

D. Kleeberg - Ramsey - 12/19/18

1   resources for some period of time?

2        A.   Yes.

3        Q.   Again you have no recollection of any

4   discussion with your mother about any supplemental

5   medical expenses or the fact that Lester was paying

6   them?

7        A.   No.

8        Q.   Do you know whether your mother had any

9   of those discussions with anyone else?

10        A.   No, I do not.

11        Q.   Have you ever discussed that issue with

12   either Lisa Stein or Audrey Hays?

13        A.   No.

14        Q.   I show you what has been marked as

15   Exhibit 27 (indicating).

16        A.   Okay.

17        Q.   Had you ever seen prior to today, had

18   you seen Exhibit 27?

19        A.   No.

20        Q.   Exhibit 27 purports to be a listing of

21   medical expenses of your mother paid by Mr. Eber,

22   Lester Eber, in 2010.  Is that what this appears to

23   be anyway?

D. Kleeberg - Ramsey - 12/19/18

1      A.   I don't see where it says that Lester

2  paid these.

3      Q.   Right at the top, the top left-hand

4  corner of the page.

5      A.   "Sally Kleeberg's expenses paid", oh,

6  "Paid by Mr. Eber", sorry, yes.

7      Q.   It looks like the total amount in 2010

8  anyway at least set forth on Exhibit 27 was a

9  little over $6,000.00?

10     A.   That is correct.

11     Q.   Any discussion once again that you had

12  with your mother in 2010 about medical expenses

13  that Lester was paying?

14     A.   No, she did not have any discussion

15  with me on medical expenses except that she always

16  said that whatever my father got when he passed

17  away she would receive the same.

18     Q.   Did you take that to mean she was going

19  to receive it in periodic distributions or in a

20  lump sum?

21     A.   I have no idea.

22     Q.   You took that to include covering her

23  medical expenses, if necessary?

D. Kleeberg - Ramsey - 12/19/18

1        A.   I took it as whatever my father was

2   receiving, which I did not know what he was

3   actually receiving, that she would receive the

4   exact same amount and that was a promise made to

5   her when my dad passed away.

6        Q.   When you say "receive the exact same

7   amount", did you have an understanding whether that

8   was a regular distribution, in an as needed payment

9   or what?

10       A.   No, I assumed that it was something

11   that was given to my father on a monthly or annual

12   basis.

13       Q.   Okay, and do you have any knowledge one

14   way or the other whether your mother did, in fact,

15   receive whatever your dad had been receiving?

16       A.   I'm sorry.  Please rephrase that.

17       Q.   Do you have any knowledge to confirm

18   whether or not your mom received what your dad had

19   been receiving as you envisioned was what was

20   intended?

21       MR. BROOK:  Objection to the form.

22       BY MR. RAMSEY:

23       A.   I have no knowledge as far as actually

D. Kleeberg - Ramsey - 12/19/18

1   seeing anything.

2          Q.   Okay, and specifically with respect to

3   Exhibit 27, the medical expenses, do you have any

4   reason or basis to dispute that this amount was

5   paid for your mother's medical expenses by Lester

6   in 2010?

7          A.   No.

8          Q.   I'll show you what has been marked as

9   Exhibit 28 (indicating).

10         A.   Okay.

11         Q.   Prior to today, had you ever seen

12   Exhibit 28?

13         A.   No.

14         Q.   Have you had a chance to review Exhibit

15   28?

16         A.   Yes.

17         Q.   Generally speaking, is it a letter to

18   your mother seeking consent to the trust to making

19   distributions for the benefit of Erica Stein?

20         A.   Yes.

21         Q.   Were you aware at some point a request

22   was made to the trust beneficiaries to consent to

23   such distributions?

D. Kleeberg - Ramsey - 12/19/18

1      A.    Yes.

2      Q.    How did you become aware of that?

3      A.    My sister made me aware of it.

4      Q.    When do you recall your sister making

5   you aware of it?

6      A.    Gosh, probably a few years, maybe four

7   or five years, I'm not sure on the date, but it was

8   sometime after my niece had her liver transplant.

9      Q.    Do you know whether your sister had

10  conversations with your mother encouraging or

11  confirming that your mother would consent to such

12  distributions?

13     A.    Yes.

14     Q.    Ultimately, as you understand it, your

15  mother did consent?

16     A.    Yes.

17     Q.    Do you know the amount of money from

18  the trust either in sum or in whatever

19  distributions it was sent out that Erica Stein

20  received?

21     A.    Not at the time.

22     Q.    As you sit here today, do you have any

23  sense of how much money Erica Stein received in

169

D. Kleeberg - Ramsey - 12/19/18

1   distributions?

2           A.   I have a sense.

3           Q.   What's your sense?

4           A.   I think it was $1,100.00, something

5   like that, or 1,200-something, somewhere in that

6   neighborhood.

7           Q.   On a monthly basis?

8           A.   I'm not sure.

9           Q.   The $1,100.00 or $1,200.00, is that the

10  total amount of your understanding or is that the

11  amount of the distribution however often it

12  happened?

13          A.   I was under the impression -- and again

14  my numbers might be incorrect -- that this was paid

15  on a monthly basis.

16          Q.   In addition to your mother, was it your

17  understanding that the other trustees had to sign

18  off on those distributions?

19          A.   That is correct.

20          Q.   One of the trustees was Lester Eber?

21          A.   Yes.

22          Q.   It's your understanding that he

23  consented as well?

D. Kleeberg - Ramsey - 12/19/18

1    A.    Yes.

2    Q.    Do you know who the other trustee was?

3    A.    It would be Gumaer.

4    Q.    Elliott Gumaer?

5    A.    Elliott Gumaer.

6    Q.    As far as you know, was there ever any

7    objection from anyone to the distributions for

8    Erica Stein's benefit?

9    A.    Yes.

10   Q.    Who objected?

11   A.    David Eber.

12   Q.    Who's David Eber?

13   A.    David Eber is Lester Eber's son.

14   Q.    What's your understanding of what David

15   Eber's objection was?

16   A.    David Eber did not think it was fair to

17   start taking money out of the trust.

18   Q.    Where did you learn that information?

19   A.    From David himself.

20   Q.    When did he convey that to you?

21   A.    Soon after the request was made and the

22   letter went out, the letter went out requiring

23   everyone to sign off on it.

171

D. Kleeberg - Ramsey - 12/19/18

1       Q.    When he conveyed his disagreement with

2  the proposal, was that an in-person conversation

3  you had with him or on the phone?

4       A.    On the phone.

5       Q.    Do you know where David Eber lives

6  currently?

7       A.    I believe in New York.

8       Q.    What about at the time you had the

9  phone conversation with him?

10      A.    Like I said, it was soon after the

11  request was made.

12      Q.    Was he living in the same location as

13  far as you know at that point?

14      A.    In New York, I don't know if it was the

15  same address but in New York.

16      Q.    To your understanding, did David need

17  to sign off on the distributions in order for that

18  to happen?

19      A.    Yes.

20      Q.    Do you know if he ultimately did so?

21      A.    Yes.

22      Q.    So whatever concerns he had, he

23  ultimately agreed to the distributions?

D. Kleeberg - Ramsey - 12/19/18

1      A.   Yes.

2      Q.   I want to talk to you next about the

3   lawsuit itself.

4      A.   Mmhmmm, yes, I'm sorry.

5      MR. RAMSEY:   I can mark this, if we need to,

6   Brian, but I'm just referring to the Second Amended

7   Complaint at this point.

8      MR. BROOK:   Well, if you're going to be

9   referring to it, I think it should be marked.

10      MR. RAMSEY:   All right, fair enough.   Fair

11   enough.

12      The follow was marked for Identification:

13      KLEEBERG EXH. 34 Second amended complaint.

14      BY MR. RAMSEY:

15      Q.   Now this lawsuit was filed in 2016,

16   correct?

17      A.   Yes.

18      Q.   Okay, and I've had this marked as

19   Exhibit 34 and feel free to refer to it if you need

20   although I'm not going to ask at this point anyway

21   any specific questions about the document, but

22   Exhibit 24 is designated as the Second Amended

23   Complaint.   Are you aware that there have been a

D. Kleeberg - Ramsey - 12/19/18

1    couple of versions of the Complaint for lack of a

2    better word (indicating)?

3         A.   Yes.

4         Q.   Each version alleges in sum and

5    substance that you, Lisa and Audrey became aware of

6    what I'll call in your view the objectionable

7    transactions or actions that are the subject of the

8    Complaint, you became aware of that in about 2015

9    as a result of an Internet search performed by

10   Lisa, is that accurate?

11        A.   Yes.

12        MR. BROOK:   Objection to the form.

13        THE WITNESS:   I'm sorry.

14        BY MR. RAMSEY:

15        A.   Yes.

16        Q.   How did you first learn of this

17   Internet search that Lisa performed?

18        A.   Lisa called me on the phone and told me

19   to, I believe, look at these articles.  I think she

20   e-mailed them to me and then asked me to get back

21   to her with my opinion.

22        Q.   What were the articles that she

23   e-mailed to you?  What was the content?

D. Kleeberg - Ramsey - 12/19/18

1          A.    There were a couple of articles that

2    were written in the Rochester Journal -- I think

3    it's the Rochester Journal -- by a reporter that

4    had originally started reporting about Eber

5    Brothers way back when we ended up liquidating the

6    company and then follow-up information that showed

7    how Slocum and Sons was acquired.

8          Q.    What, to your understanding, was the

9    purpose of Lisa providing those articles to you?

10         A.    That she was unaware that Slocum and

11   Sons was no longer a part or she was questioning

12   whether or not Slocum and Sons was still a part of

13   the Eber companies.

14         Q.    What, if anything, did you do after

15   reviewing those articles?

16         A.    I took some time to think it through

17   because I did not believe that that actually took

18   place, and then after reading those articles and

19   then discussing it with an attorney that I met on

20   an airplane, believe it or not, I started to

21   realize that there was something wrong in the way

22   that was acquired.

23         Q.    What's the name of the attorney you

D. Kleeberg - Ramsey - 12/19/18

1    spoke with?

2           A.   His first name's Steve.  I can't

3    remember his last name.

4           Q.   Do you have Steve's contact information

5    anywhere in your records?

6           A.   I might.

7           Q.   I'll ask you to look through your

8    records.  If you have any contact information, give

9    it to your attorney, your current attorney.

10          A.   Okay.

11          MR. BROOK:  I can provide that to you if you

12   want.  I can tell you more about that because

13   that's how I got the case.

14          Off the record.

15          (Whereupon, an off-the-record discussion was

16   held.)

17          BY MR. RAMSEY:

18          Q.   Each version of the Complaint discusses

19   a 2012 transaction proceeding involving a company

20   known as Alexbay.  Are you familiar with that?

21          A.   Yes.

22          Q.   Do you recall a conversation you had

23   with Lester indicating that you had first learned

D. Kleeberg - Ramsey - 12/19/18

1    about that 2012 Alexbay proceeding from Mark Stein?

2          A.   That I?

3          Q.   Yes.

4          A.   No, no.

5          Q.   Well, first of all, who is Mark Stein?

6          A.   Mark Stein is my brother-in- law, Lisa

7    Stein's husband.

8          Q.   Do you recall a conversation you had

9    with Mark separate and apart from the e-mail from

10   Lisa with these articles talking about this 2012

11   Alexbay transaction proceeding?

12         A.   Prior to this?

13         Q.   Yes.

14         A.   No.

15         Q.   What about subsequent to Lisa sending

16   you those articles?  Did you have any discussions

17   with Mark Stein?

18         A.   I brought it up to him just to see if

19   he had any inclination.

20         Q.   What do you recall Mark's response to

21   be?

22         MR. BROOK:   I'm going to object and instruct

23   the witness not to answer on the grounds of I

D. Kleeberg - Ramsey - 12/19/18

1   believe Mark Stein is an attorney and that he was

2   seeking legal advice in that situation.

3        BY MR. RAMSEY:

4        Q.   Well, let me ask you this.  Did you

5   retain Mark Stein as an attorney?

6        A.   No.

7        Q.   So you were asking him brother- in-law

8   to brother-in-law?

9        MR. BROOK:  Objection to the form.

10       BY MR. RAMSEY:

11       A.   Yes.

12       Q.   Okay, so what did Mr. Stein convey to

13   you in response to your questions?

14       MR. BROOK:  The same instruction, don't

15   answer.

16       MR. RAMSEY:  He just indicated he hadn't

17   retained him and he was asking him as a

18   brother-in-law.

19       MR. BROOK:  You put words in his mouth.  You

20   didn't ask him at all any sort of question that

21   would go to what was the nature of the advice that

22   he was seeking from him and why he was asking him

23   as opposed to someone else on the street or another

D. Kleeberg - Ramsey - 12/19/18

1    family member.

2         MR. RAMSEY:  He just said he wasn't seeking

3    legal advice.

4         MR. BROOK:  He did not say that.  He said

5    that he did not retain him.

6         BY MR. RAMSEY:

7         A.   I did not say that I wasn't seeking

8    legal advice.

9         Q.   Okay, but you did say you didn't retain

10   Mr. Stein?  You did not retain Mr. Stein?

11        A.   No.

12        Q.   Is there any document indicating that

13   he was going to serve as your lawyer for the

14   purpose of exploring what your sister had learned

15   vis-a-vis these articles?

16        A.   Any documents?

17        Q.   Yes.

18        A.   No.

19        Q.   Once again I'll ask what did Mr. Stein

20   convey to you in response to your questions to him

21   about these articles?

22        MR. BROOK:  Same instruction, don't answer

23   that.

D. Kleeberg - Ramsey - 12/19/18

1        BY MR. RAMSEY:

2            Q.   All right, well, I don't want to have

3     to bring you back here, but let's note this in the

4     transcript and we'll let the judge decide on that.

5            Was the conversation that you had with Mr.

6     Stein before or after your airplane conversation

7     with the lawyer Steve?

8            MR. RAMSEY:   I'm not asking him for the

9     substance of anything, so --

10           MR. BROOK:   Answer.

11           Let the record reflect that the witness

12    looked at me.   He can answer the question as to the

13    timing of when things occurred.

14           That's fine, if you recall.

15           BY MR. RAMSEY:

16           A.   It was prior to my trip when I met this

17    attorney.

18           Q.   So your conversation with Steve

19    predated your conversation with Mr. Stein or vice

20    versa?

21           A.   Vice versa.

22           Q.   Okay, so it was the conversation with

23    Mr. Stein first and then happenstance you were on a

D. Kleeberg - Ramsey - 12/19/18

1    plane with an attorney and you discussed it with

2    him?

3         A.    That is correct.

4         MR. CALIHAN:  Off the record.

5         (Whereupon, an off-the-record discussion was

6    held.)

7         BY MR. RAMSEY:

8         Q.    When you had the conversation with Mr.

9    Stein, was anyone else present?

10        A.    No.

11        Q.    Did you ever have any conversations

12   with Mr. Stein about the same subject matter when

13   Lisa Stein was present, the three of you?

14        A.    No.

15        Q.    Did you ever have any conversations

16   with Mr. Stein about the same subject matter when

17   any other person was present?

18        A.    No.

19        Q.    Did you ever retain Steve, the lawyer

20   from the plane, to represent you in connection with

21   anything you learned from the articles that Lisa

22   sent to you?

23        A.    Yes.

181

D. Kleeberg - Ramsey - 12/19/18

1    Q.   You did retain him at some point?

2    A.   Briefly.

3    MR. BROOK:   I'm going to object to the form

4    on the grounds of vagueness as to the word

5    "Retained".

6    BY MR. RAMSEY:

7    Q.   Is there a written engagement letter or

8    retainer letter between you and this Steve that you

9    met on the plane?

10   A.   There was a verbal agreement and then a

11   rejection letter that came out soon after.

12   Q.   The rejection letter was from Steve to

13   you or from you to Steve?

14   A.   From Steve to me.

15   Q.   Declining representation or terminating

16   it?

17   A.   Yes.

18   Q.   Which was it?  Was it declining it or

19   was it terminating it?

20   A.   Declining it.

21   Q.   Do you still have a copy of that

22   letter?

23   A.   I do not know.  I'd have to look at my

D. Kleeberg - Ramsey - 12/19/18

1   records.

2          Q.   Okay, and I'd ask you to do so, and if

3   you find it, give it to Mr. Brook, please.

4          A.   Okay.

5          Q.   Other than that letter, did you

6   exchange any e-mails with the lawyer Steve about

7   the representation or potential representation?

8          A.   Yes.

9          Q.   Do you still have copies of those

10  e-mails?

11         A.   I would have to look.

12         Q.   Okay, once again I would ask you to

13  check, and if you have them, send them to Mr.

14  Brook.

15             At some point subsequent to receiving the

16  rejection letter from Steve, did you engage another

17  attorney in this matter?

18         A.   No.

19         Q.   Well, at some point you engaged Mr.

20  Brook, right?

21         A.   Yes.

22         Q.   Prior to Mr. Brook, did you engage

23  anybody else?

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Ramsey - 12/19/18

1        A.   No.

2        Q.   How soon after receiving the letter

3   from Steve did you engage Mr. Brook?

4        A.   Very shortly after.

5        Q.   Can you recall approximately when that

6   was, the month and year?

7        A.   I can only tell you that it was

8   probably within thirty to sixty days we retained

9   Mr. Brook after Steve not rejected but declined to

10  take on our case.

11       Q.   Okay, and how long after being provided

12  with the articles from Lisa was it that you

13  retained Mr. Brook?

14       A.   I'll have to say six months.

15       Q.   Was there a reason or do you have an

16  understanding why the lawsuit wasn't ultimately

17  filed until the following year then?

18       MR. BROOK:  Objection to the form.

19       BY MR. RAMSEY:

20       A.   Why it wasn't?  Because of -- do I

21  have?  No.

22       Q.   Were there discussions amongst you,

23  Lisa and Audrey about whether to proceed with the

D. Kleeberg - Ramsey - 12/19/18

1    lawsuit?

2         MR. BROOK:  Objection.

3         BY MR. RAMSEY:

4         A.   Yes.

5         Q.   How did those discussions take place?

6    Were they in person?

7         A.   No.

8         Q.   On the phone?

9         A.   Yes.

10        Q.   Multiple discussions between the three

11   of you?

12        A.   Yes.

13        Q.   What was the sum and substance of those

14   discussions?

15        A.   That we needed to speak with an

16   attorney to give us advice on how or if we should

17   proceed.

18        Q.   Did you personally have any reluctance

19   in proceeding with the lawsuit given how good Eber

20   Brothers and Lester Eber had been to you over the

21   years?

22        MR. BROOK:  Objection to the form.

23        BY MR. RAMSEY:

D. Kleeberg - Ramsey - 12/19/18

1       A.   An interesting question, initially I

2   had to really think about it, but after reading the

3   articles and seeing how it was orchestrated, I had

4   no objection on moving forward.

5       Q.   When you say "seeing how it was

6   orchestrated", what do you mean?

7       A.   I mean by the way it was acquired out

8   of the family business.

9       Q.   How what was acquired?

10      A.   Slocum and Sons.

11      Q.   Your basis of the understanding of that

12  were the two articles that Lisa sent you?

13      A.   Yes.

14      Q.   Any other basis of the information as

15  to what was orchestrated in your words?

16      A.   Just give me a second.

17      MR. BROOK:  I just want to advise the

18  witness to the extent that his answer is based on

19  legal advice received not to disclose the legal

20  advice that was received.  That's all.

21      You can otherwise answer the question.

22      BY MR. RAMSEY:

23      A.   Please restate the question.

D. Kleeberg - Ramsey - 12/19/18

1      MR. RAMSEY:  Can you read that question

2  back?

3      (The above-requested question was then read

4  by the reporter.)

5      BY MR. RAMSEY:

6      Q.  Other than the two articles that you

7  already referenced.

8      A.  Not that I can recall.

9      Q.  The Second Amended Complaint, which

10  I've marked as Exhibit 34 and there's actually, as

11  I imagine you're aware, there's a pending

12  application for permission to file the Third

13  Amended Complaint, have you read each version of

14  the Complaint?

15      A.  I had seen it but not read it

16  thoroughly.

17      Q.  Is it fair to say you weren't the one

18  who prepared the Complaint?

19      A.  I was not.

20      Q.  There are numerous factual allegations

21  in both the original Complaint, the First Amended

22  Complaint, the Second Amended Complaint and the

23  Third Amended Complaint.  I don't want to get into

D. Kleeberg - Ramsey - 12/19/18

1    any discussions that you had with your lawyers.

2    What I want to know is if you were the source of

3    any of the factual allegations that were made in

4    the various versions of the Complaint.

5          MR. BROOK:  Objection to the form.

6          BY MR. RAMSEY:

7          A.   Since you're not going to get into it,

8    I can't really answer that question because I don't

9    know specifically what you're asking.

10          Q.   Are you aware of -- and we'll focus on

11   the Second Amended Complaint and feel free to

12   reference it -- are you aware of the specific

13   allegations that are being made?

14          A.   I would have to look at that Second

15   Amended Complaint and ascertain that.

16          Q.   Without referring to it and you're

17   welcome to do it, but before you refer to it, as

18   you sit here today, do you have an understanding of

19   what is being alleged in that Second Amended

20   Complaint?

21          MR. BROOK:  Objection to the form.

22          BY MR. RAMSEY:

23          Q.   Before you look at it, I'm just asking

D. Kleeberg - Ramsey - 12/19/18

1  you if you didn't look at it, would you be able to

2  tell me what's being alleged?

3      A.   No.

4      Q.   As you sit here today, do you recall

5  providing specific factual allegations to be

6  included in any version of the Complaint?

7      A.   I provided --

8  MR. BROOK:  Objection to the form.

9  BY MR. RAMSEY:

10     A.   I provided whatever my attorney asked

11  me that I knew at the time and I only answered I

12  only gave him information that he had asked me.

13     Q.   If I understood your testimony from a

14  few minutes ago, you've never read cover to cover

15  the Second Amended Complaint?

16     A.   Not cover to cover, no.

17     Q.   Okay, and would that also be true for

18  the proposed Third Amended Complaint?

19     A.   That would be true.

20     Q.   Would that be true of the original

21  Complaint?

22     A.   The original Complaint, I believe I did

23  read it cover to cover.

D. Kleeberg - Ramsey - 12/19/18

1      Q.   Do you recall doing that before it was

2  filed?

3      A.   Yes.

4      Q.   Do you know whether Lisa Stein and

5  Audrey Hays also did that?

6      A.   I would have no idea.

7      Q.   Do you recall a discussion with Lisa

8  Stein or Audrey Hays prior to the filing of the

9  original Complaint, whether you agreed with all of

10  its contents or were okay with filing it?

11      A.   A discussion with?

12      Q.   A discussion with Lisa Stein or Audrey

13  Hays.

14      A.   No.

15      Q.   No, you don't recall or, no, it didn't

16  occur?

17      A.   No, it didn't occur.

18      Q.   You can put that off to the side

19  anyway.

20      Let me show you what I've previously had

21  marked as Exhibit 29 (indicating).

22      MR. CALIHAN:  I'm sorry.  What number is

23  this?

D. Kleeberg - Ramsey - 12/19/18

1      MR. RAMSEY:  29.

2      MR. CALIHAN:  Okay.

3      BY MR. RAMSEY:

4      A.   Okay.

5      Q.   Have you ever seen Exhibit 29 before?

6      A.   Yes.

7      Q.   Exhibit 29 looks like an e-mail from

8  Audrey Hays to you dated June 3, 2016 with a

9  subject line, "We can make the change that Mark

10 suggested," correct?

11     MR. BROOK:  The subject line (indicating).

12     THE WITNESS:  The subject line?

13     MR. BROOK:  That's what he's reading from.

14     BY MR. RAMSEY:

15     A.   Yes.

16     Q.   Do you recall receiving this e-mail?

17     A.   I know it was sent to me.  I don't

18 really recall it, but I can't deny that it did not

19 come to me.

20     Q.   The first sentence of the body of the

21 e-mail indicates, "With this agreement signed, I

22 can sign the lawyer's proposal."  Do you know what

23 agreement Audrey was referring to?

D. Kleeberg - Ramsey - 12/19/18

1          A.    I really can't recall the agreement
2    that she is referring to on this.
3          Q.    She next writes, "Paul will need a
4    couple of weeks to critically think this through
5    for me."  Do you know who Paul is?
6          A.    I believe it's -- honestly I really
7    don't know who Paul is.  It's somebody that might
8    advise her.  I don't know.
9          Q.    Do you recall any discussions with
10   Audrey about who this Paul is?
11         A.    Somebody that she referred to that she
12   will get some advice from.
13         Q.    Do you know that he was a lawyer?
14         A.    Pardon me?
15         Q.    Do you know whether or not he was a
16   lawyer?
17         A.    No, I do not.
18         Q.    Do you know what she was relying on
19   Paul to critically think through?
20         A.    No.
21         Q.    She next writes, "I now understand why
22   you wanted to pursue this suit."  Were you the one
23   pushing Audrey and Lisa to proceed with the

D. Kleeberg - Ramsey - 12/19/18

1   lawsuit?

2        MR. BROOK:  Objection to the form.

3        BY MR. RAMSEY:

4        A.   No.

5        Q.   Do you know why she was writing that

6   you were the one that wanted to pursue the lawsuit?

7        MR. BROOK:  Objection to the form.

8        BY MR. RAMSEY:

9        A.   Just the context of the lawsuit, she

10   agreed that there were things that needed to be

11   addressed on how Slocum and Sons was acquired.  I

12   think that that was the gist of what she was trying

13   to say in here.

14        Q.   Yes, but she indicated that you were

15   the one that wanted to pursue it, correct?

16        A.   Yes.

17        Q.   Did you respond to this e-mail?

18        A.   I don't remember.

19        Q.   If you did, would you have a record of

20   it?

21        A.   I would, yes.

22        Q.   I'd ask you to check your records, and

23   if you have a response, please provide it to Mr.

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Ramsey - 12/19/18

1  Brook.

2      Is there a reason or do you have an

3  understanding why Lisa is not copied on this e-mail

4  exchange?

5      A.  No.

6      Q.  As of June of 2016, did Audrey and Lisa

7  get along, to our understanding?

8      A.  Yes.

9      Q.  Did you and Audrey get along as of June

10  of 2016?

11      A.  Yes.

12      Q.  When the three of you were discussing

13  the possibility of a lawsuit, I think you told me

14  that those conversations were generally on the

15  telephone?

16      A.  Yes.

17      Q.  Do you recall any e-mail exchanges

18  between the three of you discussing the substance

19  of the lawsuit?

20      A.  No, I do not.

21      Q.  I show you what we marked as Exhibit

22  30.  Let me know when you've had a chance to review

23  it (indicating).

D. Kleeberg - Ramsey - 12/19/18

1        A.    No, no, I've seen it.

2        Q.    Had you seen Exhibit 30 prior to today?

3        A.    Yes.

4        Q.    Exhibit 30 is entitled Letter of

5   Agreement Among Cousins Concerning Eber Brothers

6   Lawsuit and it has a date of June 1, 2016, correct?

7        A.    That is correct.

8        Q.    Is it a fair assumption that the

9   agreement that Audrey was referring to in Exhibit

10  29 was this agreement?

11       A.    I'm not sure.  I don't know.

12       Q.    Was there any other agreement, to your

13  knowledge, that Audrey was considering executing

14  that she would have been reaching out to you two

15  days after the date of the June 1, 2016 date of the

16  letter, the cousins' letter agreement?

17       A.    Not that I'm aware of.

18       Q.    Regardless, what was the purpose of the

19  cousins' letter agreement?

20       A.    That if there was a settlement or an

21  agreement with Lester and with Eber Brothers or

22  Slocum that this is how we would set up our

23  percentages of what we would receive.

D. Kleeberg - Ramsey - 12/19/18

1    Q.   Okay, but it wasn't just if there was a

2  settlement, correct?  It talks about essentially

3  funding the lawsuit?

4    A.   Yes, that's also included in here.

5    Q.   Specifically paragraph one indicates

6  that the three of you were each obligated to pay a

7  third of the out-of- pocket expenses, otherwise

8  known as costs, billed by your attorney?

9    A.   Yes.

10   Q.   At this point, had you retained Mr.

11 Brook?  As of June 1, 2016, had you retained Mr.

12 Brook?

13   A.   Yes.

14   Q.   Paragraph one goes on to say that the

15 one-third split for costs is only up to $50,000.00

16 and thereafter only you and Lisa will pay the costs

17 going forward, is that accurate?

18   A.   That is correct.

19   Q.   How did that provision come to be in

20 this agreement?

21   A.   Audrey would only go up to a certain

22 amount of out-of-pocket expenses.

23   Q.   How come?

D. Kleeberg - Ramsey - 12/19/18

1        A.    It's you have to ask her.

2        Q.    Did she indicate that it was going to

3    be a financial burden for her to do more than that?

4        A.    No, she just said that that's as far as

5    she would go.

6        Q.    Two goes on to say that her name is not

7    even going to appear as being responsible for any

8    costs, is that accurate?

9        A.    Yes.

10        Q.    Do you know whether the retainer

11    agreement provides that only you and Lisa are

12    responsible for costs?

13        A.    Well, it will go back to one.

14        Q.    Well, I understand that.  This is the

15    cousins' agreement.  I'm talking about the retainer

16    agreement with Mr. Brook's firm.  Do you know that

17    that agreement provides that only you and Lisa are

18    responsible for costs?

19        A.    I would have to look into that.

20        Q.    As you sit here today, you don't know?

21        A.    I'm not sure.  I don't want to give you

22    an answer that I'm not sure of.

23        Q.    It would be consistent if it said that

D. Kleeberg - Ramsey - 12/19/18

1   based on this agreement though, correct?

2        A.   That would be correct.

3        Q.   Number three then says in sum and

4   substance even though Audrey would otherwise be

5   entitled to fifty percent of any proceeds from a

6   settlement or recovery, in return for not paying

7   costs above $50,000.00, she reduces her recovery to

8   one-third, correct?

9        A.   That is correct.

10        Q.   Number four provides that any one of

11   you can settle independently if you so choose?

12        A.   Yes.

13        Q.   Who drafted Exhibit 30?

14        A.   We did collectively, Lisa, myself and

15   Audrey collectively.

16        Q.   Were there multiple versions of it that

17   you exchanged?

18        A.   I think there was more discussion than

19   multiple versions.

20        Q.   How was the document circulated amongst

21   the three of you?  Was it a hard copy or via

22   e-mail?

23        A.   I believe it was e-mail.

198

D. Kleeberg - Ramsey - 12/19/18

1      Q.   Do you recall more than one version or

2  Exhibit 30 was the only version that ever existed?

3      A.   I think once Audrey explained her

4  position in this, this was basically the one

5  version maybe with -- I don't know -- some

6  exceptions, but this was the one version that we

7  agreed upon.

8      Q.   Who ultimately drafted this?  Who put

9  the finger to keypad?

10      A.   Who wrote this up?

11      Q.   Yes, who created it?

12      A.   I don't remember who actually wrote

13  this.

14      Q.   Do you have a recollection one way or

15  the other whether it was you?

16      A.   No, it was not me.

17      Q.   The second page of Exhibit 30 has some

18  signature lines.  This version is not signed.  Does

19  a signed version of Exhibit 30 exist?

20      A.   Yes.

21      Q.   Do you have a copy of that?

22      A.   Yes.

23      Q.   Is it fully executed by all three of

D. Kleeberg - Ramsey - 12/19/18

1   you?

2        A.   Yes.

3        Q.   There's no mention in the cousins'

4   agreement about how the attorney is going to be

5   paid, is there?  It indicates that you were

6   responsible for costs.  It doesn't refer to

7   attorney's fees anywhere in Exhibit 30 I don't

8   believe.

9        A.   That is correct.

10       MR. BROOK:  Objection to the form.

11       BY MR. RAMSEY:

12       Q.   Actually let me make a document request

13   for the fully executed cousins' agreement in your

14   possession and any e-mails exchanging versions or

15   discussing the cousins' letter agreement.

16        Are any of you responsible for out-of-pocket

17   attorney's fees to fund this lawsuit?

18        A.   I think you need to be more specific.

19        Q.   That was a poorly asked question.

20        Are you currently paying out of pocket any

21   attorney's fees, fronting attorney's fees?

22        A.   Yes.

23        Q.   What is the division of how those

200

D. Kleeberg - Ramsey - 12/19/18

1   attorney's fees are being paid as between you,

2   Audrey and Lisa?

3         A.   Equally.

4         Q.   Okay, and are you paying the full

5   amount of your attorney's fees or less than full

6   amount?

7         A.   Less than full amount.

8         Q.   So a portion of this lawsuit is being

9   conducted on what is considered a contingency

10  basis?

11        A.   That is correct.

12        Q.   Let me show you what I've had marked as

13  Exhibit 31 (indicating).

14        A.   Okay.

15        Q.   Have you had a chance to review Exhibit

16  31?

17        A.   Yes.

18        Q.   Have you seen that document before?

19        A.   No.

20        Q.   Today is the first time you've ever

21  seen it?

22        A.   Yes.

23        Q.   Exhibit 31 looks to be an e-mail from

D. Kleeberg - Ramsey - 12/19/18

1   Audrey Hays to an e-mail address pes@qcapital.com

2   dated June 3, 2016.  Did I read that correctly?

3        A.   Yes.

4        Q.   Do you know who is the owner or

5   recipient of the e-mail address at

6   pes@qcapital.com?

7        A.   No I do not.

8        Q.   Do you know whether that's the Paul

9   that Audrey was referring to in one of the previous

10  exhibits?

11       A.   I do not know that.

12       Q.   Are you familiar with an individual

13  named Paul Shapiro?

14       A.   No.

15       Q.    In any event, Audrey is writing to this

16  pes@qcapital.com and the second lines says, "That

17  is why the first larger firm did not take the case

18  -- did not want to wait for their money and no

19  liquid cash available."  Do you know what she is

20  referring to there?

21       A.   You would have to ask Audrey.

22       Q.   Was Steve, the lawyer you met on the

23  airplane, was he part of a larger law firm?

D. Kleeberg - Ramsey - 12/19/18

1      A.   Yes.

2      Q.   Was the reason that he declined the

3  representation because they did not want to proceed

4  on a contingency basis?

5      A.   No, no.

6      Q.   What was the reason for his declining

7  the representation?

8      MR. BROOK:  You can answer to the extent

9  that it does not involve any comments that were

10  made by prospective attorneys about legal matters

11  or the merits of the case.

12      BY MR. RAMSEY:

13      A.   Then I cannot answer the question.

14      Q.   The letter that you received, did that

15  set forth the reasons for declining the

16  representation?

17      A.   Some, yes.

18      Q.   Okay, and was at least one of the

19  reasons the fee arrangement?  Was at least one of

20  the reasons for declining the representation the

21  fee arrangement, that you were unable to reach an

22  agreement as to how the fees would be paid?

23      A.   One of the reasons?

D. Kleeberg - Ramsey - 12/19/18

1        Q.   Yes.

2        A.   I thought I cannot answer that because

3   at that time we were trying to retain him as our

4   attorney.

5        Q.   Well, you can answer if one of the

6   disputes was about the fee arrangement.   You can

7   answer that.

8        MR. BROOK:  Objection to the form.

9        BY MR. RAMSEY:

10       A.   No, it really was not about the fee

11   arrangement.

12       Q.   So I'll ask again, do you have any idea

13   what Audrey was referring to when she said they did

14   not want to wait for their money and no liquid cash

15   was available?

16       A.   Again I will have to say you would have

17   to ask Audrey what she meant by that.

18       Q.   The next sentence that Audrey writes

19   is, "This lawyer agreed to it for forty percent."

20   Do you know who she is referring to when she writes

21   "This lawyer"?

22       A.   I do not.

23       Q.   Do you know or do you have an

D. Kleeberg - Ramsey - 12/19/18

1    understanding whether Mr. Brook's contingency is

2    forty percent?

3          A.   Do I understand?

4          Q.   Yes.

5          A.   Yeah, I understand what is his, yes.

6          Q.   Is it forty percent?

7          A.   I'm not answering that question.  It's

8    between me and my lawyer.

9          MR. BROOK:  You can answer the question as

10   to compensation.

11         BY MR. RAMSEY:

12         A.   Okay, yes.

13         Q.   Okay, so that would make sense that the

14   lawyer she is referring to is Mr. Brook?

15         A.   Yes.

16         Q.   I don't think I asked you and I

17   apologize if I did, but do you recall having any

18   discussions with Audrey about the contingency

19   arrangement with Mr. Brook for forty percent?

20         A.   Could you be more specific?

21         Q.   Sure, was there a discussion and I

22   won't limit it to Audrey, whether it was Lisa or

23   Audrey, did you have a discussion with either of

D. Kleeberg - Ramsey - 12/19/18

1   them as to what an appropriate amount of the

2   contingency fee would be, what percentage?

3           A.   Only when Mr. Brook proposed it and we

4   agreed to it.

5           Q.   Okay, and again I don't want that.  Any

6   conversation that you had with Mr. Brook is none of

7   my business.

8           A.   Yes, that's why I am trying to answer

9   this without --

10          Q.   Understood.

11          A.   (Continuing) invading our privacy.

12          Q.   I'm just looking for conversations

13  either between you and one or the other or both

14  Lisa and Audrey about that percentage.

15          A.   Right.

16          Q.   Do you recall any discussions about it,

17  either it was too high or it was too low or you

18  wanted to talk more about it?

19          A.   We discussed it and we all agreed that

20  it was fair.

21          Q.   Were any of those discussions via

22  e-mail?

23          A.   Outside of this, I don't believe so.

D. Kleeberg - Ramsey - 12/19/18

1        Q.   I'd ask you again to check your

2   records, your e-mail records, for that.

3        A.   Sure.

4        Q.   I show you what we've marked as Exhibit

5   32 (indicating).

6        A.   Okay.

7        Q.   Have you had a chance to review Exhibit

8   32?

9        A.   Yes.

10       Q.   Prior to me handing it to you, had you

11   ever seen Exhibit 32?

12       A.   No.

13       Q.   Exhibit 32 is an e-mail from Audrey

14   Hays once again to that pes@qcapital.com e-mail

15   address from October 30, 2016 with the subject

16   being, "Eber lawsuit -- I NEED you!"  Did I read

17   that right?

18       A.   Yes.

19       Q.   Okay, and I know I asked you before,

20   but you're not sure who the recipient

21   pes@qcapital.com is.  Audrey writes, "I am

22   desperate for your help or we will lose this

23   opportunity.  Please speak with Mark on his cell

D. Kleeberg - Ramsey - 12/19/18

1   any time."  Do you know whether Audrey is referring

2   to Mark Stein at that point?  Do you know if that

3   is Mark Stein's cell number?

4          A.   Without speaking to Audrey about this,

5   I can only say that if that is his cell number,

6   then it was Mark Stein, but I don't know if that is

7   his cell number.  I don't recognize his cell

8   number.

9          Q.   Do you know whether he has a cell

10  number with a 609 area code?

11         A.   I believe so.

12         Q.   The next line says, "Please tell Steve

13  Cozen what type of lawyer we need and what our time

14  frame is."  Do you know who Steve Cozen is?

15         A.   No.

16         Q.   In the next line Audrey writes, "I am

17  annoying my cousins, but they are ready to make a

18  change if we can do it quickly."  Do you have any

19  idea what she was referring to there as far as

20  annoying her cousins?

21         A.   I have no idea what she is referring

22  to.

23         Q.   Was Audrey pushing either you or Lisa

208

D. Kleeberg - Ramsey - 12/19/18

1   to change attorneys at that point?

2        A.   She did not know who Brian was and was

3   looking into other possibilities.

4        Q.   Brian had been retained at this point

5   though, correct?

6        A.   What's the date on this?

7        Q.   October of 2016.

8        A.   Yes.

9        Q.   Do you recall specific conversations

10  with Audrey either verbally or over e-mail about

11  making a change in lawyers?

12       A.   No, not really, you know, you know, I

13  should answer that the right way, no.

14       Q.   Do you recall having any discussions

15  with your sister Lisa about whatever concerns

16  Audrey had in the possibility of changing

17  attorneys?

18       A.   No.

19       Q.   Audrey next writes in this e-mail,

20  Exhibit 32, "There is a good suit and with Brian's

21  personal problems, we might get away from him

22  easily."  Do you have any idea what she is

23  referring to there?

D. Kleeberg - Ramsey - 12/19/18

1      A.   No.

2      Q.   Did she raise any issues or problems

3  that she thought necessitated the change of

4  attorneys?

5      A.   She only mentioned one time Brian's

6  work schedule and that was it.

7      Q.   So other than that, you have no idea

8  what she was referring to here?

9      A.   No.

10      Q.   Would it have been normal assuming --

11  and I know you can't confirm this -- assuming that

12  cell phone number is Mark's, would it have been

13  normal for Audrey to communicate or direct others

14  to communicate with Mark?

15      MR. BROOK:  I object to the form.

16      BY MR. RAMSEY:

17      A.   I would not know that.  I would not

18  know what normal was for Audrey and Mark.

19      Q.   Where does Mark practice?  Do you know?

20      A.   In New Jersey.

21      Q.   Do you know what type of attorney he

22  is?

23      A.   I think general, just a --

D. Kleeberg - Ramsey - 12/19/18

1      Q.   Just a general practitioner?

2      A.   Yeah.

3      Q.   Ultimately no change was made with

4  counsel though as a result of whatever concerns

5  Audrey had?

6      A.   That is correct.

7      Q.   Let me show you what we marked as

8  Exhibit 33 (indicating).

9      A.   That looks like a government document.

10     Q.   A Michael Flynn assessment?

11     A.   Yeah, no, I've read it.  I'm sorry.

12     Q.   Prior to me handing this document to

13  you, had you seen Exhibit 33?

14     A.   I honestly do not remember seeing this.

15     Q.   Once again Exhibit 33 is an e-mail this

16  time to you, correct, dated December 13, 2016?

17     A.   That is correct.

18     Q.   It's short, so I'll just read it.

19  Audrey writes, "Wow, how fascinating.  People don't

20  even get a chance to keep their name out of the

21  press.  You and I are left to hold the fort while

22  Lisa escapes.  Hope it is quiet."  What was Audrey

23  referring to here?

D. Kleeberg - Ramsey - 12/19/18

1        A.   I'm sorry.  I honestly do not know.

2        Q.   Do you know whose name was in the press

3   that she was referring to?

4        A.   The only thing I can think of is that

5   looking at the date it's when there is a

6   publication that comes out every single day through

7   our industry, there was an article in our industry

8   that listed the lawsuit at the time.  It came out

9   right before the holidays, if I'm not mistaken.

10  That's all I can think of what she might be

11  referring to.  I don't know.

12       Q.   This e-mail would have been sent to you

13  after the lawsuit had been filed, correct?

14       A.   Yes.

15       Q.   Okay, and it seems like she's

16  suggesting that you were mentioned, your name was

17  mentioned and her name was mentioned, but Lisa

18  wasn't.  Is that your understanding of what she is

19  conveying here?

20       A.   That's my understanding of what she's

21  conveying, but I'm not sure if that's exactly how

22  the article read.

23       Q.   Do you recall having a discussion with

D. Kleeberg - Ramsey - 12/19/18

1    her about whatever issue she is raising here?

2         A.   No, no.

3         Q.   Do you know whether she addressed this

4    issue that she had in any way with Lisa?

5         A.   That I don't know.

6         Q.   Lisa is not copied on Exhibit 33,

7    correct?

8         A.   Not that I can see, no, but there are a

9    lot of lines drawn on here but no.

10        Q.   There are a lot of lines.

11        A.   Yeah, no.

12        Q.   I want to jump back.  I want to ask you

13   a question and then we can take a quick break.

14   Before lunch about legal disputes or potential

15   legal disputes that your company had, one question

16   I asked you about was about the teamsters and I

17   think you gave some testimony about what you

18   thought the dispute might have been about.  I want

19   to refine the question a little bit more on the

20   issue with the teamsters' withdraw liability.  Do

21   you have any recollection of anything to do with

22   that?

23        A.   Explain withdraw liability.

D. Kleeberg - Ramsey - 12/19/18

1      Q.   Well, if you know what I'm talking

2    about, that's great.  If you don't, let me know

3    that.  Do you have any recollection from your time

4    at Eber that there was an issue with the teamsters

5    relating to withdraw liability?

6      A.   No.

7      Q.   Any recollection from whatever source

8    that Lester ultimately had to pay $600,000.00 or so

9    out of his own pocket to settle that with the

10   teamsters?

11     A.   Out of his own pocket?

12     Q.   Yes.

13     A.   No.

14   MR. RAMSEY:  Off the record.

15        (Whereupon, an off-the-record discussion was

16   held.)

17     BY MR. RAMSEY:

18     Q.   All right, Mr. Kleeberg, I'm going to

19   ask a couple of questions.  Then I'm going to go

20   through my notes and turn it over to Mr. Calihan.

21        You testified a few moments ago that based

22   upon the articles that Lisa provided to you that

23   you thought Slocum was acquired in an improper

D. Kleeberg - Ramsey - 12/19/18

1    manner.  Did you gain an understanding either from

2    those articles or from any source that had Lester

3    not paid various liabilities of Slocum and Sons

4    that the company would have been liquidated?

5         MR. CALIHAN:  I couldn't hear the question.

6    I'm sorry.

7         MR. RAMSEY:  Sure, can you read it back?

8         (The above-requested question was then read

9    by the reporter.)

10        MR. CALIHAN:  That Lester had not paid what?

11        MR. RAMSEY:  Liabilities.

12        BY MR. RAMSEY:

13        A.   Did I have any understanding of that?

14        Q.   Yes.

15        A.   Not really because I really believed

16   that after especially seeing the letter that stated

17   what a great investment opportunity this is and how

18   well we could do in a franchise state and how

19   franchise states traditionally and for the most

20   part make money, I honestly could not comprehend

21   how bad Lester was saying that Slocum was, so for

22   me, no, I did not -- I did not understand that at

23   all or accept that.

215

D. Kleeberg - Ramsey - 12/19/18

1          Q.   As you sit here today, do you have any

2     knowledge or understanding of what liabilities of

3     Slocum Lester actually did pay personally?

4          A.   All I know is from what I saw that he

5     put in $500,000.00 from what I've read from these,

6     read from these, but I've never seen -- I never saw

7     a check or anything.

8          Q.   It's fair to say that you don't have a

9     complete picture of what liabilities Lester paid on

10    behalf of Slocum and Sons?

11         A.   That is true.

12         Q.   Real briefly back to the contingency

13    arrangement that you did have in this lawsuit, you

14    indicated that you're paying at least some

15    attorney's fees, all three of you, out of pocket?

16         MR. BROOK:  Objection to the form.

17         BY MR. RAMSEY:

18         A.   We're not paying attorney's fees.

19    We're paying expenses.

20         Q.   You're paying the costs?

21         A.   Yes.

22         Q.   That's what the cousin's agreement

23    addressed, correct?

D. Kleeberg - Calihan - 12/19/18

1      A.    That is correct.

2      Q.    So, in other words, if there was a cost

3    that had to be fronted, that would be part of that

4    $50,000.00, up to $50,000.00, that the three of you

5    were splitting in thirds?

6      A.    That is correct.

7      Q.    Yes, but you're not actually paying a

8    fee any recovery for attorney's fees to be part of

9    that contingency?

10      A.    That is correct.

11      MR. RAMSEY:  I'm going to go through my

12   notes here, but in the interest of time I'm going

13   to pass it over to Mr. Calihan.

14      EXAMINATION BY MR. CALIHAN:

15      Q.    I'm Rob Calihan.  We met.  I represent

16   the estate of Elliott Gumaer --

17      A.    Sure.

18      Q.    (Continuing) whom I've sometimes heard

19   sometimes referred to as Mike, I think.

20      A.    Okay.

21      Q.    You knew Mr. Gumaer?

22      A.    Yes, I did.

23      Q.    Did you know him as Mike or Elliott?

D. Kleeberg - Calihan - 12/19/18

1        A.    Both.

2        Q.    Okay, so if I say "Mike", there would

3   be no misunderstanding?

4        A.    That is correct.

5        Q.    Good.  Let me go back and just follow

6   up for a minute the last set of questions.  You

7   said and you said earlier in your testimony that

8   because Connecticut was a franchise state that it

9   was fair to assume that Eber-Connecticut was doing

10  very well or would do very well?  I wasn't sure

11  what your testimony was.

12       A.    Well, being in a franchise state, it's

13  very difficult to lose its supplier.  With that

14  being said, it was hard for me to comprehend that

15  after we or Lester decided to acquire Slocum why we

16  would acquire a company that supposedly was doing

17  well at the time and had suppliers that were intact

18  that within a short period of time was all of a

19  sudden losing money and that to me was very

20  confusing and it was never really explained to me

21  what was happening.

22       Q.    When you say it was never really

23  explained to you, who did you ask what was

D. Kleeberg - Calihan - 12/19/18

1   happening?

2       A.   I discussed it at times very briefly

3   with Lester but more so with John Ryan, our CFO,

4   and to be honest with you, I was never privied to

5   how we acquired it, what it entailed and all I was

6   told at the time was that this would be a

7   tremendous pickup because it would help solidify us

8   in the market as massive consolidations were going

9   on and this was a smart move and I know Lester and

10  I had always talked about that it would be great to

11  be in a franchise state because most distributors

12  make money.

13      Q.   Most distributors, but is it fair to

14  say, however, that in a franchise state not all

15  distributors necessarily make money?

16      A.   I couldn't make that assessment.

17      Q.   Are you familiar with any other

18  distributors that were in Connecticut at the time?

19      A.   I know of other distributors, yes.

20      Q.   Who do you know of?

21      A.   Andy Eder I know, E-D-E-R.

22      Q.   Did you know the Maglioccos?

23      A.   I knew the Maglioccos.  I knew them.  I

D. Kleeberg - Calihan - 12/19/18

1    had had interactions with them through conventions.

2         Q.   With whom?

3         A.   With --

4         Q.   John?

5         A.   With John Magliocco.

6         Q.   Is it fair to say that they're fairly

7    fierce competitors?

8         A.   Yee.

9         MR. CALIHAN:   Off the record.

10        (Whereupon, an off-the-record discussion was

11   held.)

12        BY MR. CALIHAN:

13        Q.   So it's fair to say that

14   Eber-Connecticut's success wasn't guaranteed?

15        A.   Well, there's no guarantee.

16        Q.   There's no guarantee?  You can have

17   others competing distributors come along and take

18   away suppliers?

19        A.   No.

20        Q.   You cannot shift a single supplier in a

21   franchise state?

22        A.   There are rules in Connecticut that

23   will allow a supplier to leave, but the distributor

D. Kleeberg - Calihan - 12/19/18

1    will be compensated and I believe there has to be a

2    set of circumstances before they can leave.

3         Q.   Why is it that a distributor could

4    fail, however, in a state like Connecticut?

5         A.   By over-purchasing, whether it's in

6    wine, spirits, and then overpaying your employees.

7         Q.   Yes, but it cannot be harmed by

8    competition is your testimony?

9         A.   No, I didn't say that.  I did not say

10   that.

11        Q.   Let me ask you.

12        A.   If you don't have the right lines, if

13   you don't have the right spirits and everything,

14   sure, there could be it could be an issue.

15        Q.   Let's go back for a moment to Exhibit

16   13.  Can you take a look?  This is the e-mail that

17   you sent to Lester on October 9, 2009.  Do you see

18   it?

19        MR. BROOK:  That (indicating).

20        BY MR. CALIHAN:

21        Q.   Do you see it?

22        A.   Yes.

23        Q.   You saw it before.  Can you read the

D. Kleeberg - Calihan - 12/19/18

1   first sentence or the first three sentences into

2   the record?

3         A.   "Lester, thank you again for your help,

4   support and guidance.  I can't tell you enough how

5   much it means to me.  You have always been there

6   for me and my family.  I will never forget that."

7         Q.   At that point, for how long had you

8   worked for Lester?  Starting in high school it's

9   fair to say?

10        A.   Well, really as a full-time employee

11  since 1975.

12        Q.   So that would be by then it's

13  thirty-four years?

14        A.   That is correct.

15        Q.   Were the sentiments that you conveyed

16  in the first three sentences of Exhibit 13, were

17  they sincere?

18        A.   Yes, they were.  They were.  I

19  appreciated what Eber Brothers and Lester being the

20  president had provided my family.

21        Q.   Were you fond of Lester at the time?

22        A.   I was fond of Lester as far as working

23  with him.

D. Kleeberg - Calihan - 12/19/18

1   Q.   Did you trust him?

2   A.   Not always.

3   Q.   What do you mean by that?

4   A.   Because I was never brought into the

5   inner circle of what was really going on.

6   Q.   Did you feel that you had ever been

7   misled by Lester?

8   MR. RAMSEY:  Form.

9   BY MR. CALIHAN:

10   A.   That's a very open question.  Did I

11   feel?  Sure, but I can't unless you're being

12   specific.

13   Q.   Can you give any examples?

14   A.   Well, when Eber Brothers shut down, he

15   had offered me the company in Ohio, a brokerage

16   company.  He told me to go out to Columbus and look

17   for a place to stay.  Within a week after that

18   offer was made, he had ended up making a deal with

19   Southern and it was no longer available for me.

20   Little things to major things like that, those were

21   things that were very disconcerting to me,

22   especially at a time when I had nothing to look

23   forward to at that point.

D. Kleeberg - Calihan - 12/19/18

1      Q.   You had nothing to look forward to at

2   that point because Southern had come in and

3   disseminated the company?

4      A.   Well, do you want to get into this at

5   this point on how Southern disseminated this

6   company?

7      Q.   Well, actually I was going to ask you

8   that.  It was in a different section of my outline,

9   but let's go.

10      A.   Okay, Southern offered us -- and again

11   I don't know the numbers -- to purchase us.

12      Q.   Right.

13      A.   They had two different offers from what

14   I understand according to what I was told.  My

15   mother said to me that there were offers made, but

16   she never told me any amounts or whatever.  Because

17   we collectively and more so Lester decided that he

18   could fight Southern, contrary to how I felt at the

19   time that I didn't think we had any chance against

20   a multi-billion dollar company, that company went

21   down.  Now it happens.

22      Q.   Which company went down?

23      A.   Eber Brothers.

D. Kleeberg - Calihan - 12/19/18

1     Q.    Right.

2     A.    Now I'm not saying that that hasn't

3    happened at other family businesses.  You take your

4    shots, you do the best you can and it can happen,

5    but Southern didn't disseminate us in the sense

6    that they gave us the opportunity to do something.

7    We, Lester and the Eber Brothers, decided that they

8    did not want that, which is an irony because then

9    soon after Lester went to work for Southern.

10    Q.    What was the first hostile act that

11   Southern took against Eber Brothers after their

12   offer had been rejected?

13         MR. BROOK:  Objection to the form.

14            Go ahead.

15         MR. CALIHAN:  The reason?  The basis?

16         MR. BROOK:  "Hostile act" could mean

17   anything.

18         BY MR. CALIHAN:

19    Q.    Do you understand "hostile act"?

20    A.    Yes.

21    Q.    What do you understand it to mean?

22    A.    What did they do to detrimentally hurt

23   us.

225

D. Kleeberg - Calihan - 12/19/18

1        Q.   Okay, and using that definition, can

2    you answer the question?

3        A.   The major one was when I got a call

4    from one of our suppliers who worked in New Jersey

5    at the time or actually worked I believe it's

6    either New Jersey or for our distributor warning

7    me.  He called me on a Sunday night telling me,

8    "You better get hold of your uncle because the next

9    day you're going to lose anywhere from sixty to

10   seventy percent of your top management and sales

11   reps between Syracuse and Albany, some in Buffalo

12   and some in Rochester the following morning through

13   faxes."  I called Lester up.  He wasn't really --

14   he didn't really believe that that could take

15   place.  I drove to Rochester.  We sat there and saw

16   all these resumes come through that -- not resumes,

17   I'm sorry --

18       Q.   Letters of resignation?

19       A.   (Continuing) letters of resignation

20   that they had left us to go to Southern.

21       Q.   Do you know why they left?

22       A.   Because Southern had told them that we

23   would no longer be in business and they gave them

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Calihan - 12/19/18

1    guaranteed contracts, which we had at that time

2    never did.

3         Q.   Isn't it the case that Southern

4    significantly increased the guaranteed

5    compensation?

6         A.   Yes, very true.

7         Q.   The guaranteed compensation for the

8    lead salesmen at least?

9         A.   Not just the lead salesmen, for anybody

10   they took.

11        Q.   Also a much better car with the deal?

12        A.   I don't know.  The car part I don't

13   know.

14        Q.   Fair enough.  Fair enough.

15        A.   All I know is the salary.

16        Q.   As of that day, as of the close of

17   business that Monday, what condition was Eber

18   Brothers in?

19        A.   Scrambling.

20        Q.   What, if anything, do you think they

21   could have done at that point to salvage what was

22   going on?

23        A.   I think at that point the handwriting

D. Kleeberg - Calihan - 12/19/18

1   was on the wall.

2          Q.   It was basically over?

3          A.   I think at that point because it forced

4   us to have to go out and hire people at a much

5   higher price and it became unaffordable for us to

6   compete in the marketplace, which eventually caused

7   us to lose our suppliers.

8          Q.   Did the suppliers start leaving also

9   when they realized that you lost your key

10  salespeople?

11         A.   Yes.

12         Q.   You testified earlier that you -- I

13  don't mean to put words in your mouth --

14  essentially were troubled by and did not like the

15  manner in which you thought that Lester had taken

16  Eber-Connecticut out of the family business, is

17  that correct?

18         A.   That is correct.

19         Q.   Can you tell me again what about or

20  what was it about the way that he did that that

21  concerned you?

22         A.   It was part of our family business.  It

23  was always part of our family business after we

D. Kleeberg - Calihan - 12/19/18

1   acquired it.  There was never any indication

2   whatsoever in any correspondence that I saw or that

3   I ever heard·from my mother, sister or anybody that

4   that company would eventually go over to Alexbay.

5        Q.   Your mother did not discuss these sorts

6   of affairs with you though, isn't that correct?

7        A.   She did not get into any details, but

8   she did ask the question was Slocum still part of

9   the company, and at that time when she asked me, I

10  said, of course, there was no reason why it

11  wouldn't be.

12       Q.   When you learned of the court

13  proceeding that resulted in Slocum being

14  transferred, did you have any idea how much money

15  Lester had loaned the Eber companies?

16       A.   That the Eber companies or Slocum?

17       Q.   Let's start with the Eber companies and

18  then include Slocum.

19       A.   How much he personally loaned?

20       Q.   How much he personally loaned.

21       A.   The Eber companies?

22       Q.   Yes.

23       A.   No, I do not know the amount that he

D. Kleeberg - Calihan - 12/19/18

1  put into the Eber companies.

2      Q.   Do you know how much he had loaned

3  Slocum?

4      A.   At that time?

5      Q.   Yes.

6      A.   No, I only knew that he was

7  contemplating it because we had a conversation that

8  he was going to look at his whole life insurance

9  policies to use that as, you know, whatever loan

10  monies he was going to put in.

11     Q.   When did that conversation occur?

12     A.   Shortly after, I believe it was shortly

13  after Eber Brothers liquidated or back in 2007,

14  something like that or 2008, I'm not really sure on

15  the date.

16     Q.   Did you press him for details?

17     A.   No.

18     Q.   After you learned about the foreclosure

19  action, the 2012 action, that you discovered

20  because you had seen those articles on the

21  Internet, correct?

22         MR. BROOK:  Objection to the form.

23         BY MR. CALIHAN:

230

D. Kleeberg - Calihan - 12/19/18

1     A.    When you say "foreclosure" --

2     Q.    You said that articles had been brought

3   to your attention that your sister had found on the

4   Internet, correct?

5     A.    That is correct.

6     Q.    What did those articles tell you?

7     A.    Without having them right in front of

8   me, that basically not only was Eber Brothers

9   liquidated and a lot of people lost their jobs, but

10  it went on to say how Slocum, which was part of

11  Eber Brothers, was acquired by Alexbay and a couple

12  of investors.

13    Q.    Did you come to have an understanding

14  as to how that occurred?

15    A.    I read how Lester used an attorney in

16  Rochester, New York or used him in Rochester, New

17  York to go in front of a judge to acquire Slocum

18  through his Alexbay company.

19    Q.    Did you understand that part of that

20  action involved how much money Lester had loaned at

21  the time?

22    A.    Please rephrase that.

23    Q.    Did you understand when you were

D. Kleeberg - Calihan - 12/19/18

1   looking at the foreclosure action that one of the

2   issues was how much money Lester was owed by and

3   now I'll talk about the Eber companies and Slocum

4   together.

5          MR. BROOK:  Objection to the form.

6          BY MR. CALIHAN:

7          A.   Not in those articles.

8          Q.   Did you come to understand that?

9          A.   Sometime later.

10          Q.   When?

11          A.   When counsel showed us documents,

12   documents from you or from your group.

13          Q.   Do you know how much money had been

14   loaned by Lester?

15          A.   All I know is that originally the

16   number was 500,000 and then there was something.  I

17   think it was 3 million or something like that.

18          Q.   Did you ever ask Lester how much he had

19   loaned?

20          A.   No.

21          Q.   Did you ever think before suing him

22   perhaps asking him how much he loaned?

23          A.   No, after reading those articles.

D. Kleeberg - Calihan - 12/19/18

1      Q.    Why not?

2      A.    Because at that point there was no

3  point for me to approach it anymore.

4      Q.    So you had no interest in asking him

5  how much he had loaned?

6      A.    No.

7      MR. BROOK:  Objection to the form.

8      BY MR. CALIHAN:

9      Q.    What did you actually know about the

10  value of Eber-Connecticut after you had read those

11  articles?

12      A.    My only knowledge of Eber

13  Brothers-Connecticut was that based on what I knew

14  in the industry, I could only make an assumption

15  that the value of that company in my opinion -- and

16  again I can't substantiate this -- is it was worth

17  probably close to $20 million.

18      Q.    What did you base that on?

19      A.    I based it on other companies that in

20  The Beverage Journal and in the beverage media it

21  shows what the gross sales are for all these

22  companies and you can kind of decipher off of that

23  what companies are supposed to be worth, but it

233

D. Kleeberg - Calihan - 12/19/18

1   doesn't give you all the information that you would

2   need to make an accurate assessment of what a

3   company is really worth.

4          Q.   What information does it not give you

5   that you would need?

6          A.   It doesn't give you all the liabilities

7   and everything else, so it does, you know, it gives

8   you a barometer of what you would think it would be

9   worth.

10          Q.   What information did you discovery

11   about Slocum when you looked at that source or

12   sources?

13          A.   At that time going back that they were

14   doing a nice volume and that they were -- I forgot

15   the exact number -- they looked like they were

16   profitable at the time.

17          Q.   So you had the volume figures?

18          A.   At the time I looked at it, but I never

19   -- I never consciously wrote them down because

20   there was nothing for me to be involved in when it

21   came to Slocum.

22          Q.   So is it fair to say when you decided

23   to proceed with this lawsuit, you really had no

D. Kleeberg - Calihan - 12/19/18

1   idea of what the value of Slocum was?

2          A.   I did not have a legitimate idea.

3          Q.   Yes, and you didn't know how much

4   Lester owed to Slocum and/or the Eber companies?

5          MR. BROOK:  Objection to the form.

6          BY MR. CALIHAN:

7          Q.   At the time.

8          A.   All I could tell you is what I read,

9   but I never saw anything from Lester that showed

10  that he had put that kind of money into the

11  company.

12         Q.   Yes, and you never made any direct

13  inquiries about what the value of Slocum was?

14         A.   No.

15         Q.   You never contacted Lester to try to

16  find out?

17         A.   I have never contacted Lester after we

18  filed the lawsuit.

19         Q.   I asked you before if Lester had ever

20  misled you and you described it and I wasn't quite

21  sure what you said, but let me ask the question

22  again in the sense of did Lester ever lie to you

23  about an actual fact?

D. Kleeberg - Calihan - 12/19/18

1        MR. BROOK:  Objection to the form.

2        BY MR. CALIHAN:

3        A.   About an actual fact?

4        Q.   Yes.

5        A.   You know something?  I don't recall

6    anything that specific except for when Eber

7    Brothers was liquidated the fact that we could

8    never work for the principals of Southern and that

9    he and I could never last and then he decides to go

10   to work for Southern Wine and Spirits.  I don't

11   know if you want to call that a lie, but I'd say

12   that's very misleading in my opinion.  A specific

13   lie, I can't give you a specific lie off the top of

14   my head.

15       Q.   Tell me what is it he said about not

16   being able to work for Southern.

17       A.   He said that, "You and I both know that

18   it would be impossible for us to go to work for the

19   Chaplins in the way that they would run the

20   business."  I wanted us to keep upstate under their

21   umbrella.  Lester did not believe that that would

22   be a smart move because we would be still working

23   for the Chaplins.  He said, "There is no way we

D. Kleeberg - Calihan - 12/19/18

1   should even consider that idea and we should fight

2   them," and ultimately he ends up working for

3   Southern and the rest is history.

4        Q.   How much time passed between that

5   conversation and when he ended up working for

6   Southern?

7        MR. BROOK:  Objection to the form.

8        BY MR. CALIHAN:

9        A.   I don't know.

10       Q.   Do you have any idea or any

11   recollection?

12       A.   I would assume right after the

13   liquidation was over, officially over, then he

14   would probably have negotiated something with

15   Southern.

16       Q.   Do you believe that when he told you

17   that you could never work for Southern that he knew

18   that that was not, in fact, the case?

19       A.   At the time?

20       Q.   At the time.

21       A.   No.

22       Q.   Let's go to Mike Gumaer.  We'll call

23   him Mike, okay?

237

D. Kleeberg - Calihan - 12/19/18

1       A.   Sure.

2       Q.   When did you meet Mike Gumaer?

3       A.   I met him a few times over the years,

4    but I didn't have a lot of direct interaction with

5    him.

6       Q.   You met him two times?

7       A.   Two or three times.

8       Q.   What do you recall about those times?

9       A.   Amicable.

10      Q.   Social settings?

11      A.   They were at the office just basically

12   asking me how I was doing, how things were doing.

13      Q.   So the two of you didn't discuss the

14   business, Eber companies' business, or the Eber

15   trust?

16      A.   No.

17      Q.   Did you ever receive any information

18   from Mike Gumaer in writing about the Eber trust?

19      A.   Not that I can recall, directly from

20   Mike, no.

21      Q.   Did you ever receive any information

22   from Mike Gumaer indirectly about the Eber trusts?

23      A.   No.

D. Kleeberg - Calihan - 12/19/18

1      Q.   Are you aware of any communications Mr.

2   Gumaer had with any other of the trust

3   beneficiaries?

4      A.   Only my cousin Audrey.

5      Q.   What do you know about those contacts?

6      A.   Only that Audrey was not happy with the

7   interactions she had with Mr. Gumaer.

8      Q.   Did she tell you why?

9      A.   She did not believe what he was telling

10   her was the truth.

11      Q.   What interactions was she referring to

12   when she said that?

13      A.   That I don't know.  It had to do with

14   whatever that settlement was, whatever she was

15   asking for.  She did not feel that Mike Gumaer was

16   being up front with her.

17      Q.   Did you have any idea what she was

18   asking for?

19      A.   Something that had to do with her

20   shares of the Eber companies.

21      Q.   Do you have any idea when that

22   communication occurred?

23      A.   Oh, God, years, twenty years,

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Calihan - 12/19/18

1    twenty-five years ago maybe.

2         Q.   Is that essentially the sum and

3    substance of what you recall about her complaint

4    about Mr. Gumaer?

5         A.   I don't know.  I can't answer for her

6    how many times she interacted with Mike, so it's

7    not fair for me to make that comment.

8         Q.   What do you think Mike Gumaer did wrong

9    in connection with this matter?

10        A.   Well, I'm going to be very honest with

11   you.  I was not there and I had nothing to do with

12   it.  The only other person that had -- that did not

13   like Mike Gumaer was my mother.

14        Q.   Let's first get your answer and maybe I

15   just did to what you believed Mr. Gumaer did wrong

16   in connection with the transactions that gave rise

17   to this lawsuit.

18        A.   That he allowed Lester to orchestrate

19   this deal without notifying the family, listen, if

20   you're going down this route and you brought up

21   letters, you brought up all these other things,

22   there was never ever anything said to my mother

23   that I'm aware of -- now again when you depose my

D. Kleeberg - Calihan - 12/19/18

1    sister you can ask her that question or to Audrey

2    you'll have to ask -- that ever stated that if they

3    did not contribute money into this company to help

4    with the financial sources that that company would

5    no longer be part of the Eber family business, so

6    there were things in there that just Gumaer whose

7    responsibility was to the family, not to Lester,

8    not to Wendy, not to me, not to them, for the whole

9    family, that we felt that he did not represent the

10   family in a proper way.

11          Q.   We've looked at the exhibits where

12   Lester asked family members whether or not they

13   wanted to contribute funds to the company?

14          A.   Correct.

15          Q.   That's what you're referring to?

16          A.   That is correct.

17          Q.   Those communications?

18          A.   Yes.

19          Q.   Do you remember what year those

20   communications occurred in?  Was it 2009?

21          A.   I think so.  I never saw the letters,

22   so I'm only going by what I'm seeing her.

23          Q.   Didn't we see the letters today?  Isn't

D. Kleeberg - Calihan - 12/19/18

1    that what you're referring to?

2        A.    Yes, yeah, I mean I saw the letters

3    earlier, you know, when we started going through

4    the lawsuit, but when this was brought to my

5    attention after my sister found these articles, I

6    specifically tried to see if there was anything in

7    there that indicated that if they do not invest

8    money would they lose their interest in Slocum.

9        Q.    If you look at Exhibit 19, --

10       A.    Yeah.

11       Q.    (Continuing) this is one of the

12   communications you're referring to, is it not?

13       MR. BROOK:  Objection to the form.

14       BY MR. CALIHAN:

15       A.    That is.

16       THE WITNESS:  Sorry.

17       MR. BROOK:  That's okay.

18       MR. CALIHAN:  Objection for?

19       MR. BROOK:  The form.

20       MR. CALIHAN:  On the basis?

21       MR. BROOK:  On the basis that I don't

22   believe that that is necessarily correct and I

23   think it's confusing, I'm trying to avoid

D. Kleeberg - Calihan - 12/19/18

1   suggesting an answer, but I'm trying to explain it.

2        MR. CALIHAN:  All right, we'll move forward.

3        BY MR. CALIHAN:

4        Q.   You testified in response to, I think,

5   two or three questions ago that there were

6   communications and your complaint, if you will, was

7   that the family was never told that if they didn't

8   invest this money that the trust would lose the

9   company, is that correct?  That's in sum and

10  substance?

11       A.   That is correct.

12       Q.   I said isn't it the case those

13  communications occurred in 2009?  I think if you

14  look at Exhibit 19, in fact, it was in the 2010

15  period, is that right?

16       A.   That is correct.

17       Q.   Okay, and when did the trust eventually

18  lose the company or lose Eber- Connecticut?

19       A.   I don't know the exact date.

20       Q.   It was in connection with the 2012

21  foreclosure, was it not?

22       A.   Yes.

23       Q.   So two years later?

D. Kleeberg - Calihan - 12/19/18

1        A.   Yes.

2        Q.   Do you have any reason to believe that

3   when Lester was communicating with family members

4   about the possibility of contributing funds in 2010

5   that he knew the company what was going to happen

6   in 2012?

7        A.   I wouldn't know because I hadn't seen

8   these letters.

9        Q.   If you look at the second to last

10  sentence on Kleeberg's 19, can you read that into

11  the record?

12       A.   On this 19?

13       Q.   Yes, it's the one that starts, "I am

14  working."

15       A.   "I am working diligently to rebuild the

16  company and maximize any returns that we may

17  achieve."

18       Q.   Do you have any reason to believe that

19  that was not an accurate statement when he made it

20  in March of 2010?

21       MR. BROOK:   Objection to the form.

22       BY MR. CALIHAN:

23       A.   No.

D. Kleeberg - Calihan - 12/19/18

1    Q.   Did you have any direct communications
2  with Canandaigua National Bank in connection with
3  its role as a trustee?
4    A.   Only when it came to when they were
5  dissolving it and it had to do with the monies that
6  were being sent back to my sister and myself, like
7  I said.
8    Q.   The occurrence in Surrogate's Court of
9  a year or two ago?
10    A.   Correct, that was the only
11  communication.
12    Q.   That was the only communication that
13  you ever had with them?
14    A.   Yes.
15    Q.   You were asked a series of questions
16  about the extent to which you reviewed the
17  Complaint in this action and I recognize there have
18  now been, I think, three, including the pending
19  Third Amended Complaint.
20    A.   Mmhmmm, yes.
21    Q.   I forget the exact term you used, but
22  maybe let me ask the question directly.  Did you
23  ever read any of the Complaints from start to

D. Kleeberg - Calihan - 12/19/18

1   finish?

2          A.   I believe I read the first one from

3   start to finish.  The others I would skim through

4   it to go through it and then rely on my attorney to

5   fill in any questions I might have.

6          Q.   When you use the term "skim", what do

7   you mean by that?

8          A.   I would take a look at it.  I would

9   look at it, proofread it, you know, you know, and

10  just look to see if there was anything in there

11  that I, number one, would not agree with it or,

12  number two, just didn't understand it.

13         Q.   Is it fair to say though when you say

14  you skimmed the document, it means you really

15  didn't read all of it?

16         A.   Well, that's what I just said.  I said

17  I read the first one, but I did not thoroughly read

18  the other two.

19         Q.   Do you recall that the first one

20  referenced another Complaint, a Complaint in what's

21  sometimes called the Harris Beach litigation?

22         A.   Yes.

23         Q.   Did you review that Complaint?

JACK W. HUNT & ASSOCIATES, INC. - GLOBAL SCHEDULING SERVICE
1120 Liberty Building
Buffalo, New York  14202  -  (716) 853-5600

D. Kleeberg - Brook - 12/19/18

1      A.   Yes.

2      Q.   Did you read that from the start to the

3  end?

4      A.   Yes.

5      Q.   You did?

6      A.   I did read it at the time, yes.

7      Q.   In connection with your reading the

8  first Complaint?

9      A.   Yes.

10     MR. CALIHAN:  I think that's all I have now.

11     MR. RAMSEY:  I have a few more.

12     MR. BROOK:  Sure, if you want, I actually

13  have a few questions and then you guys can go on.

14     MR. RAMSEY:  Sure, go for it, yes.

15     EXAMINATION BY MR. BROOK:

16     Q.   I want to ask you about your company

17  Prestige.  What's the full name of that company?

18     A.   It was Prestige Imports, Wine Imports.

19     Q.   Was that your original choice for the

20  name?

21     A.   Yes.

22     Q.   Had you ever considered any other names

23  for that company?

D. Kleeberg - Brook - 12/19/18

1        A.    At that time, no.

2        Q.    How about was there ever a time when

3    you considered starting a company that had the Eber

4    name in it?

5        A.    Yes.

6        Q.    When was that?

7        A.    That was prior to Prestige.   I wanted

8    to call it Eber Imports.   I told Lester what my

9    plans were and he instructed me not to use the word

10   "Eber" because of his agreement with Southern that

11   we should not use the name Eber in any way that

12   referenced a liquor or wine company.

13       Q.    What was your understanding at the time

14   of what agreement with Southern he was referencing?

15       A.    I did not get into it.   My only thing

16   was not to compete.

17       Q.    What was your understanding as to who

18   the parties were to that non-compete agreement?

19       A.    Lester, Eber Brothers and then

20   obviously myself, he did not want me to put that

21   name out there because he felt that that would

22   upset Southern Wine and Spirits and that would

23   violate what he put together.

248

D. Kleeberg - Ramsey - 12/19/18

1      Q.   Approximately when was this

2   conversation?

3      A.   Oh, God, it would have to be back in

4   2009 maybe, 2008, somewhere in there, right before

5   I started Prestige Wine and Spirits.

6      MR. BROOK:  That's all I have.

7      FURTHER EXAMINATION BY MR. RAMSEY:

8      Q.   A few more.

9      A.   Sure.

10     Q.   In response to one of Mr. Calihan's

11  questions, you indicated you felt misled when

12  Lester ended up taking a consulting position with

13  Southern?

14     A.   Yes.

15     Q.   Do you recall that testimony?

16     A.   Yes, yes.

17     Q.   Just to be clear, you were offered

18  earlier, a potential position with Southern as

19  well, correct?

20     A.   No.

21     Q.   Well, you had a discussion and you

22  elected not to pursue it?

23     A.   No.

D. Kleeberg - Ramsey - 12/19/18

1     Q.   Well, that's what you told me earlier
2  this morning I thought.
3     A.   No, that's not what I said.  What I
4  said was I went there and they offered me no
5  position, but they said they could create a
6  position for me if I wanted to and I said no,
7  thanks.
8     Q.   So there was a position had you chose
9  to pursue it?
10    A.   There was no position.
11    Q.   They told you they would create one?
12    A.   They would try to create one because of
13 Lester.
14    Q.   Yes, but it was your decision not to
15 pursue that?
16    A.   That is correct.
17    Q.   You have been asked a number of
18 questions both by me and some by Mr. Calihan as
19 well about various loans that Lester made and
20 various liabilities of the Eber companies.  Would
21 you agree with me that to the extent that loans and
22 liabilities exist, that would affect the value of
23 Eber-Connecticut?

D. Kleeberg - Ramsey - 12/19/18

1      A.    That would affect the value, no.

2      Q.    Why wouldn't loans or liabilities

3  affect the value?

4      A.    Of my loans?

5      Q.    No, no, no, no, no.

6      A.    Oh, of loans?

7      Q.    Of loans that Lester made to the Eber

8  entities or the liabilities of the Eber entities

9  would affect the liabilities of Eber-CT, would you

10  agree with that?

11      A.    If I was privied to see all the

12  numbers, sure.

13      Q.    Okay, and a similar question, I've

14  asked you a number of questions about your

15  awareness of loans that Lester's made and your

16  awareness of various debts that Lester's paid.  Is

17  it fair to say that you just don't know one way or

18  the other the extent of either the loans that

19  Lester made or the debts that he paid?

20      A.    That is correct.

21      MR. RAMSEY:  Okay, that's all I have.

22      (Deposition concluded at 3:00 p.m.)

23                  *    *    *

251

1          I hereby CERTIFY that I have read the

2     foregoing 250 pages, and that they are a true and

3     accurate transcript of the testimony given by me in

4     the above entitled action on December 19, 2018.

5

6

7

8                              _____
                                  DANIEL KLEEBERG

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

252

1                   C E R T I F I C A T E

2    STATE OF NEW YORK        )
                              :  SS.:
3    COUNTY OF NEW YORK       )

4

5           I, MAY JEAN WU, a Notary Public for and

6    within the State of New York, do hereby certify:

7           That the witness whose examination is

8    hereinbefore set forth was duly sworn and that such

9    examination is a true record of the testimony given

10   by that witness.

11          I further certify that I am not related

12   to any of the parties to this action by blood or by

13   marriage and that I am in no way interested in the

14   outcome of this matter.

15          IN WITNESS WHEREOF, I have hereunto set

16   my hand this 28th day of December 2018.

17

18                    _[signature]_

19          ------------------------------------
                          MAY JEAN WU
20

21

22

23

253

```
 1                          INDEX TO EXHIBITS

 2    Exhibit                    Description              Page

 3    KLEEBERG EXH. 1     E-mail dated 10/6/07             3

 4    KLEEBERG EXH. 2     Letter dated 12/10/01            3

 5    KLEEBERG EXH. 3     Certification of
                          Medical Expenses                 3
 6
      KLEEBERG EXH. 4     Letter dated 8/6/07              3
 7
      KLEEBERG EXH. 5     Letter dated 11/30/07            3
 8
      KLEEBERG EXH. 6     Benefit Determination
 9                        for Daniel Kleeberg              3

10    KLEEBERG EXH. 7     E-mails dated 8/29/14
                          and 8/28/14                      3
11
      KLEEBERG EXH. 8     E-mail dated 12/17/07            3
12
      KLEEBERG EXH. 9     Promissory Note                  3
13
      KLEEBERG EXH. 10    Letter dated 8/11/13             3
14
      KLEEBERG EXH. 11    Letter dated 8/11/14             3
15
      KLEEBERG EXH. 12    E-mail dated 9/1/19              3
16
      KLEEBERG EXH. 13    E-mail dated 10/9/09             3
17
      KLEEBERG EXH. 14    E-mail dated 12/10/13            3
18
      KLEEBERG EXH. 15    E-mails dated 2/5/15
19                        and 2/4/15                       4

20    KLEEBERG EXH. 16    E-mail dated 2/5/16              4

21    KLEEBERG EXH. 17    Letter dated 12/15/09            4

22    KLEEBERG EXH. 18    Note                             4

23
```

254

INDEX TO EXHIBITS

| | Exhibit | Description | Page |
|---|---|---|---|
| 1 | | INDEX TO EXHIBITS | |
| 2 | Exhibit | Description | Page |
| 3 | KLEEBERG EXH. 19 | Letter dated 3/22/16 | 4 |
| 4 | KLEEBERG EXH. 20 | Letter dated 4/2/10 | 4 |
| 5 | KLEEBERG EXH. 21 | Non-Disclosure Agreement | 4 |
| 6 | KLEEBERG EXH. 22 | Letter dated 4/27/10 | 4 |
| 7 | KLEEBERG EXH. 23 | Letter dated 10/27/10 | 4 |
| 8 | KLEEBERG EXH. 24 | Letter dated 11/19/10 | 4 |
| 9 | KLEEBERG EXH. 25 | Letter dated 12/13/10 | 4 |
| 10 | KLEEBERG EXH. 26 | E-mail dated 1/12/11 | 4 |
| 11, 12 | KLEEBERG EXH. 27 | Sally Kleeberg's Expenses paid By Mr. Eber | 4 |
| 13 | KLEEBERG EXH. 28 | Letter | 4 |
| 14 | KLEEBERG EXH. 29 | E-mail dated 6/3/16 | 4 |
| 15, 16 | KLEEBERG EXH. 30 | Letter of Agreement Among Cousins Concerning Eber Brothers Lawsuit | 4 |
| 17 | KLEEBERG EXH. 31 | E-mail dated 6/3/16 | 4 |
| 18 | KLEEBERG EXH. 32 | E-mail dated 10/30/16 | 4 |
| 19 | KLEEBERG EXH. 33 | E-mail dated 12/13/16 | 4 |
| 20 | KLEEBERG EXH. 34 | Second Amended Complaint | 172 |
| 21 | | | |
| 22 | | | |
| 23 | | | |

255

```
1                    INDEX TO WITNESSES

2    Witness                 Examination          Page

3    DANIEL KLEEBERG         BY MR. RAMSEY:        3

4                            BY MR. CALIHAN:       216

5                            BY MR. BROOK:         246

6                            BY MR. RAMSEY:        248

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
```

256

1          QUESTIONS MARKED FOR RULINGS

2     PAGE LINE QUESTION

3     178    19 Once again I'll ask what did Mr. Stein

4             convey to you in response to your

5             questions to him about these articles?

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23