# EXHIBIT H

Page 1

1                   UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK
2
3                   CIVIL ACTION NO. 16-cv-951 (LAK)
4
     DANIEL KLEEBERG, et al.,
5
                        Plaintiffs,
6
          v.
7
     LESTER EBER, et al.,
8
                        Defendants.
9
     - - - - - - - - - - - - - - - - - -x
10
11
12                        98 Southeast 7th Street
                          Suite 1100
13                        Miami, Florida
                          Thursday, May 9, 2019
14                        9:35 a.m.- 11:55 a.m.
15
16
17
18       DEPOSITION OF SOUTHERN GLAZER'S WINE & SPIRITS, LLC
19                    THROUGH LEE HAGER
20
21
22            Taken before Edward Varkonyi, Registered
23   Merit Reporter and Notary Public for the State of
24   Florida at Large, pursuant to Notice of Taking
25   Deposition filed in the above cause.

Page 2

```
 1                    APPEARANCES
 2
            BRIAN BROOK, ESQ.,
 3          Brook & Associates PLLC
            100 Church Street, 8th Floor
 4          New York, New York 10007
            on behalf of the Plaintiffs.
 5
 6          COLIN D. RAMSEY, ESQ.,
            Underberg & Kessler LLP
 7          50 Fountain Plaza, Suite 320
            Buffalo, New York 14202
 8          on behalf of Defendants Lester Eber,
            Alexbay, LLC f/k/a Lester Eber, LLC
 9          Eber Brothers & Co., Inc., Eber Bros. Wine
            and Liquor Corporation, Eber Bros. Wine and
10          Liquor Metro, Inc., Eber Connecticut, LLC,
            and Wendy Eber
11
12          JOHN HERBERT, ESQ. (Telephonically)
            P.O. Box 1031
13          Tiburone, California 94920
            on behalf of Defendants Lester Eber and
14          Wendy Eber
15
            DAVID P. ACKERMAN, ESQ.,
16          Akerman LLP
            777 S. Flagler Drive West
17          Palm Beach, Florida 33401
            on behalf of the Witness.
18
19          ROBERT B. CALIHAN, ESQ.,
            Calihan Law PLLC
20          16 Main Street
            Rochester, New York 14614
21          on behalf of Defendant Estate of Elliot W.
            Gumaer
22
23      ALSO PRESENT: Alan Greenspan, Esq.,
                       Executive VP and General Counsel
24                     Southern Glazer's Wine and Spirits
25
```

Page 3

1                     I N D E X

2        Witness          Direct     Cross      Red.        Rec.

3    LEE HAGER                4         78        83          --

4

5

6

7                     E X H I B I T S

8    Plaintiff's                              For Ident.

9    Exhibit 92    Subpoena                         8

10   Exhibit 93    SGWS-000124 to 138               19

11   Exhibit 94    EB-00035524 to 43                58

12   Exhibit 95    Restrictive Covenant EB-644 to 652    63

13   Exhibit 96    EB-688 to 691                    75

14

15

16

17

18

19    NOTE:  THE ORIGINAL EXHIBITS WERE RETAINED BY MR.

20         BROOK AND ARE NOT ATTACHED TO THE TRANSCRIPT.

21

22

23

24

25

Page 4

1    Thereupon--

2                          LEE HAGER

3    was called as a witness by the Plaintiff and having

4    been first duly sworn responded as follows:

5                     THE WITNESS:  Yes, I do.

6                     DIRECT EXAMINATION

7    BY MR. BROOK:

8         Q.    Good morning.

9         A.    Good morning.

10        Q.    Could you please state your full name.

11        A.    Lee F. Hager.

12        Q.    And you are aware you're being deposed in

13   the case of Kleeberg versus Lester Eber?

14        A.    Yes.

15        Q.    And you are here as a corporate

16   representative for Southern Glazer's Wine and Spirits

17   of America, LLC; is that correct?

18        A.    Yes.

19        Q.    Did I get that name, right?

20        A.    Yes.

21        Q.    Okay.  Is it fair to say that that is

22   a -- that that entity can be referred to herein as

23   just generally Southern, and that would include that

24   entity and also its predecessors and affiliates?

25        A.    Yes.

Page 5

1      Q.    Have you ever been deposed before?

2      A.    Yes.

3      Q.    How many times?

4      A.    I would have to say three, four times.

5      Q.    When was the last time you were deposed?

6      A.    Approximately two years ago.

7      Q.    Even though you probably discussed these

8   sorts of things with your lawyers and I don't want to

9   know specific advice or anything that was given

10  there, I'm just going to go over some of the ground

11  rules generally.

12            In this deposition I'm going to be asking

13  you questions and you're going to be answering them

14  under oath.  You understand that?

15     A.    Yes.

16     Q.    And there is a few differences between a

17  deposition and a typical conversation that I want to

18  make sure we remain conscious of.

19            First, the court reporter is trying to

20  transcribe everything that we say and if he doesn't

21  put it in the transcript, it might as well not have

22  been said.  So that means it's important for us to

23  try our best not to speak over each other.  Do you

24  understand that?

25     A.    Yes.

Page 6

 1          Q.   So even though you're going to know where
 2     my question is going and I may pause or even fumble a
 3     little, I would like you to please try to let me
 4     finish getting the question out before you start to
 5     answer, okay?
 6          A.   Yes.
 7          Q.   Another important thing, you're doing a
 8     great job so far saying yes, a lot of witnesses will
 9     sometimes lapse into uh-huh.  That doesn't read well
10     in a transcript so if you say that either the court
11     reporter or I will end up asking you to clarify
12     that.
13          A.   Just remind me.  It will happen.
14          Q.   It always does.  Same thing goes for
15     gestures, that's even less transcribable, although
16     some court reporters try, so we will try to clarify
17     that as well.
18               Another thing that's unlike a typical
19     conversation is that when I ask a question I'm
20     entitled to full answers.  So if I, for example, ask
21     you what you had for breakfast and you said toast,
22     but you had toast and orange juice and salmon, it
23     would not have been a full answer to just say toast.
24               Do you understand that?
25          A.   Yes.

1      Q.    There is nothing wrong with asking me to

2   repeat a question or even explain a term if you don't

3   understand it, but if you answer my question, I am

4   going to assume that you understood it, okay?

5      A.    Understood.

6      Q.    If you need clarification of my question,

7   please look to me for clarification and not to anyone

8   else, okay?

9      A.    Yes.

10     Q.    You may hear objections from your lawyer

11  or other lawyers from time to time.  You should

12  proceed to answer the question if you can do so,

13  okay?

14     A.    Understood.

15     Q.    Only if your lawyer instructs you not to

16  answer on the grounds of attorney-client privilege,

17  that's a different situation, okay?

18     A.    Understood.

19     Q.    You are allowed to ask for a break if you

20  need one.  The only thing I ask is that if I've asked

21  a question, you go ahead and answer the question

22  before we take our break, okay?

23     A.    Yes.

24     Q.    Is there any reason such as being under

25  unusual stress, a physical or mental condition or

Page 8

1    being under the influence of any substances that

2    would prevent or limit you today from giving full and

3    truthful answers to my questions?

4         A.    No.

5         Q.    Have you ever testified as a corporate

6    representative?

7         A.    Yes.

8         Q.    When was that?

9         A.    Approximately two years ago.

10        Q.    Okay.  I'm going to start with what is

11   going to be marked as Plaintiff's Exhibit 92.

12             (The document referred to was thereupon

13   marked Plaintiff's Exhibit 92 for Identification, a

14   copy of which is not attached hereto.)

15   BY MR. BROOK:

16        Q.    This is a copy of a subpoena and list of

17   deposition topics.  Have you seen this before?

18        A.    Yes.

19        Q.    If you look at the second page, the

20   deposition topics, have you prepared yourself to

21   testify as to all of the listed topics there?

22        A.    I believe so, yes.

23        Q.    What have you done in terms of

24   preparation for topic 1?

25        A.    A lot is based upon my personal knowledge

Page 9

1    and my involvement in the transaction itself.

2              I have obviously spoken to my counsel to

3    help refresh me on some of these issues.  I have

4    also, in preparing for this, spoke to some of the

5    people that remain in our organization who worked

6    most closely with Mr. Eber on a day-to-day basis, as

7    well as with the transaction and generally reviewed a

8    package of documents that were I believe submitted to

9    you as part of this.

10        Q.   Who were the individuals that you spoke

11   to that you referred to as working most closely with

12   Lester Eber on a day-to-day basis?

13        A.   A gentleman by the name of Larry

14   Goodrich.

15        Q.   Anyone else?

16        A.   Steven Becker.

17        Q.   Anyone else?

18        A.   And Wayne Chaplin.

19        Q.   Is that it?

20        A.   Yes.

21        Q.   Were there any other individuals that you

22   spoke with about working with Lester Eber on the

23   transaction?

24        A.   No.

25        Q.   Did you speak with Harvey Chaplin?

1      A.   No.

2      Q.   Why not?

3      A.   Because I didn't work with Mr. Chaplin on

4  the transaction.  Harvey Chaplin on the transaction.

5      Q.   I know it's probably disrespectful to

6  refer to them by their first names but just for the

7  sake of clarity let's try to use the first name when

8  referring to one of the Chaplins.

9      A.   Mr. Chaplin is Harvey Chaplin.  Wayne is

10 Wayne Chaplin.

11     Q.   Okay.  We can also do it that way.

12     A.   Yeah.

13     Q.   In terms of looking at any sorts of

14 documents or records, did you also look at any

15 e-mails to prepare?

16     A.   No.

17     Q.   Why not?

18     A.   I did not have any e-mails when I went to

19 search for e-mails.  This case is pretty old and way

20 past our document retention policy.

21     Q.   By this case, you mean the transaction

22 with Eber in 2007?

23     A.   Yes, sir.

24     Q.   With respect to topic 2, the work

25 performed by Lester Eber, have you spoken with any

1    individuals other than the three you mentioned to

2    prepare for that testimony?

3          A.    No.

4          Q.    Was the answer that you gave in terms of

5    preparing for topic 1 the same answer you would give

6    for topics 2, 3 and 4 as well or did you do anything

7    else to prepare for any of the other topics?

8          A.    On the payments one, in addition to what

9    I discussed, I did verify with our accounting

10   department about the payments that were made to

11   Mr. Eber.

12         Q.    How did you verify with the accounting

13   department?

14         A.    It's just a request for payments to a

15   particular vendor.

16         Q.    So Lester Eber is a vendor in Southern's

17   system?

18         A.    Exactly.

19         Q.    So he's not listed as an employee, for

20   example?

21         A.    No, a vendor.

22         Q.    And how far back to those accounting

23   records go?

24         A.    The formal accounting records that I had

25   access to only went back about five or six years in

Page 12

1    our formal system and the rest could have been on

2    notes within the accounting department, but nothing

3    formalized.  Again, this goes back pretty old from

4    retention.

5        Q.   Let's go ahead and jump into it.  In

6    terms of the discussions between Southern and -- let

7    me step back and give you another definition.

8            When I refer generally to Eber, I'm going

9    to be referring to Lester Eber or any of the Eber

10   companies that were affiliated with him.  If there is

11   going to be a more specific entity, I will identify

12   that specific entity, okay?

13       A.   Uh-huh.

14       Q.   Is that okay?

15       A.   Yes.

16       Q.   So when was the first communication

17   between Southern and Eber regarding any potential

18   transaction between the two?

19       A.   If I remember correctly it dates back to

20   shortly after we entered the state of New York.

21       Q.   And what was the nature of that

22   conversation?

23       A.   Well, when we entered the state of New

24   York, and I believe that was in '04, I believe it was

25   late in '04, we -- our intention was to become a

1    statewide wholesaler and we had consummated another

2    transaction with another wholesaler by the name of

3    Premier and at that time or shortly after that, you

4    know, our intention was to expand our statewide

5    reach, which was minimal in upstate New York, and

6    that I believe was the first time that we reached out

7    to Mr. Eber or the company to possibly join with us.

8          Q.    So you were contacting Eber about

9    possibly acquiring the business?

10         A.    Yes.

11         Q.    Just so that I'm clear, the transaction

12   that occurred with Premier, was that an acquisition

13   of Premier?

14         A.    That was an acquisition, an asset

15   purchase of Premier.

16         Q.    In what general area did Premier operate?

17         A.    Premier primarily, what was held out to

18   us is they were a statewide operation.  Shortly after

19   the acquisition we realized quite clearly that they

20   were metro based.  Do you need a definition of that

21   or not?

22         Q.    You mean New York metropolitan area?

23         A.    Right, they were Metro based and they had

24   a rather weak -- rather weak footprint in upstate New

25   York.

Page 14

1          Q.    Why did you select Eber as the potential

2     contact for upstate New York?

3          A.    You know, to us at that time there was

4     what I will say was our -- an archrival competition

5     that was in metro and then we saw the Eber company as

6     the strongest player up there that we can leverage

7     and build our business.

8          Q.    And how did Eber or Lester Eber respond

9     when Southern reached out about a potential

10    acquisition?

11         A.    Again, what I remember, it wasn't

12    positive, that he was really not interested in it.

13         Q.    How far did the discussions go about a

14    potential acquisition?

15         A.    I think they were general at that point.

16    I don't believe there was anything formal when you

17    are talking about that period of time.

18              You know, you have to understand the

19    nature of our business.  You know, we were up there.

20    We were up there, we were down in metro.  We had felt

21    that we understood that market pretty well and at

22    this point the suppliers that we had in metro, there

23    was a lot of alignment with some of the suppliers

24    that Lester had, so there was that natural inertia to

25    align with Eber, Eber Brothers or whatever the

1   organization was, and to expand our business so there

2   was continuity on the supplier base.  That's how

3   business works.

4         Q.   Did the discussions get to the point of

5   discussing even in general terms any sorts of numbers

6   for what an acquisition might be?

7         A.   I do not believe so at that time, no.

8         Q.   At a later time did numbers get used for

9   a potential acquisition of Eber Brothers?

10         A.   Not until long after.

11         Q.   When was the first time when any numbers

12   were used for a potential acquisition?

13         A.   The substantive discussion probably took

14   place way over a year after that, after that period

15   of time, sometime in '05, in the beginnings of '05,

16   you know.

17              We had -- we had continued to try to

18   expand and grow the way we know how to grow in the

19   marketplace and, you know, if Mr. Eber or his

20   companies were not going to sell, that wasn't going

21   to deter us from continuing to expand in the State.

22         Q.   So what event or events precipitated

23   having more substantive discussions with Eber in

24   2005, other than -- I can give you examples if you're

25   not sure what I'm talking about.

Page 16

1          A.    You're going to have to give me some

2    examples.

3          Q.    By that point in time had Southern, for

4    lack of a better way to put it, poached any employees

5    of Eber Brothers?

6          A.    I think I take a certain offense to the

7    word poached.

8          Q.    Let me rephrase.

9          A.    Yeah.

10          Q.    Had Southern hired any individuals who

11    had been working for Eber Brothers prior to that

12    point?

13          A.    We hired a number of individuals who

14    basically saw the future of what our intentions were

15    to do in the state, invest in the state and how we

16    were going to grow and bring suppliers to the

17    operation.

18                Salespeople by their very nature are

19    like -- in a non-condescending way, rats find the

20    cheese.  Salespeople will go where the product is to

21    sell the product to make money, to bring home to

22    their families to feed it and I believe often they

23    are the bellwether of the future and I believe a

24    number of them saw what was going on in metro because

25    our growth was tremendous when we got there with our

1    ways of working.

2            I'm not saying they are the best way of

3    working but we got there with new ideas, new ways of

4    doing business and I think there was a certain

5    excitement that this was a future and we had an

6    overwhelming response to us putting up our flag at

7    that time and people coming to us.

8        Q.   And was that an event that precipitated

9    the more substantive discussions with Eber?

10       A.   I tell you the truth, I think the

11   substantive discussions --

12           MR. CALIHAN:  Objection.  Objection as to

13       form.

14           MR. ACKERMAN:  You can still answer to

15       the best of your ability.

16           THE WITNESS:  Okay.  I think in terms of

17       what I'll say is the time line, no, I think the

18       people part, which you had said was an early

19       part of the building -- from my standpoint the

20       building of our business, but those substantive

21       discussions I believe came way after that period

22       of time.

23   BY MR. BROOK:

24       Q.   So you mentioned substantive discussions

25   in 2005.  What were the general terms discussed then,

Page 18

1    in terms of what an acquisition deal might look like?

2        A.   Well, you know, you skipped a big part,

3    as I remember this.

4             The substantive discussions in '05

5    related to the Delaware and the Ohio acquisitions or

6    mergers into the business -- let's call it

7    acquisitions into our business.

8             Prior to that -- just so we're all on the

9    same page, prior to that the New York operations had

10   already, from my standpoint, ceased to exist.

11       Q.   Let's just step back for one second.  We

12   might be off on the timing here and that could be the

13   source of confusion.

14       A.   Yeah, I'm a little confused.

15       Q.   So how long was it between the time when

16   you started talking about acquiring Ohio and Delaware

17   interests and that transaction actually being

18   consummated, a matter of months, weeks?

19       A.   It was rapid.  I would have to say you

20   could measure it in weeks.  Now, if it was six weeks

21   or eight weeks, it happened -- it happened rather

22   quickly.  It was the summer of '05, I remember,

23   because it was a lost summer for me.  It was the

24   summer of '05 when this transaction all came

25   together.  Yeah.  '07?

Page 19

1         Q.    Let's look at an exhibit.

2              MR. ACKERMAN:   Look at a document.

3              MR. BROOK:   Let's mark this as 93.

4              THE WITNESS:   Excuse me, it was the

5         summer of '07.  Excuse me, summer of '07.

6              MR. BROOK:   Let's mark this Exhibit 93.

7              MR. ACKERMAN:   You may want to clarify

8         the prior answers.

9              THE WITNESS:   Yeah.

10             (The document referred to was thereupon

11     marked Plaintiff's Exhibit 93 for Identification, a

12     copy of which is not attached hereto.)

13     BY MR. BROOK:

14         Q.    Do you recognize what has been marked as

15     Exhibit 93?

16         A.    Yes.

17         Q.    What is it?

18         A.    This was our -- what I will say is our

19     initial letter of intent regarding the -- yeah, this

20     is our initial letter of intent regarding the

21     purchase of the New York operation.

22         Q.    Okay.  So that was -- it's dated March

23     2007, and February 2007, looks like there is a few

24     amendments?

25         A.    Yes.

1        Q.    Let's jump back in time a little bit to

2    before this.

3              Prior to the discussions that immediately

4    preceded the letter of intent, had there been any

5    substantive discussions about an acquisition of Eber

6    Brothers in either '05 or '06?

7        A.    No.

8        Q.    So was there only one previous discussion

9    with Lester Eber about a potential acquisition?

10       A.    To the best of my knowledge, yes.

11       Q.    Who participated in that discussion?

12       A.    It would have been myself and Mr. Chaplin

13   at that time.  Wayne Chaplin had it.  Possibly Harvey

14   Chaplin at the initial one about joining forces with

15   us.  I am referring to that early one now in that --

16   right after we entered the state.

17       Q.    In that early discussion had it been

18   conveyed to Lester Eber that he would have a

19   continuing role in the business if Eber Brothers was

20   acquired?

21             MR. RAMSEY:  Form.

22             THE WITNESS:  Excuse me?

23   BY MR. BROOK:

24       Q.    Sometimes when a company is acquired the

25   existing management goes, sometimes it stays.  During

Page 21

1    those initial discussions with Lester Eber, was it
2    contemplated by Southern that Lester Eber would
3    continue on in a senior role with the New York
4    operations if Southern acquired Eber Brothers?
5         A.    It was never really our intentions for
6    Lester to have a long-term role, and especially that
7    of an employee.
8              We really kind of looked at it as being,
9    you know, we have done this before as a consultant as
10   a transition for our business, you know, ways of
11   working.
12             We did realize very, very early on when
13   we started in New York, we had a fairly good
14   understanding about metro, we thought, and then we
15   had an awful lot to learn about metro and we had very
16   little understanding about the ways of working in
17   upstate New York, which to me should be a different
18   state.
19             It's just a totally different way of
20   working, customer, supplier preference.  Everything
21   is just totally different and we realized our initial
22   fore up there and going up there when we did was
23   without knowledgeable source, so we really believed
24   that we needed to have a transition with it.  I think
25   it was always anticipated that there would be some

1   sort of consultive role.

2        Q.   And in terms of a consulting role, was

3   that meant to be more limited than the role of say

4   someone who was actually managing the operation

5   itself?

6        A.   A hundred percent.  We already had -- we

7   already moved at kind of great thought and expense

8   what we thought at that time was our future

9   leadership up there, both on the commercial point and

10  operational point but, again, through years of

11  expansion, acquisition, we realized that sending the

12  best minds to a foreign country where they couldn't

13  speak the language was never going to be successful.

14        So the answer to that question is, you

15  know, we had, we thought, the core of the nucleus of

16  the commercial people now in place, but needed to

17  really have some knowledge given to them.

18        Q.   So when Southern moved into other states,

19  not counting New York, was it typical business

20  practice to acquire a local distributor?

21        A.    I would have to say it's not only

22  Southern's, but it's probably the industry's way of

23  doing it because of the regulations, the laws and

24  whatever.

25        No wholesaler will ever go up and just

1    plant their flag because, you know, a wholesaler owns

2    nothing.  They have to have the brands.  They have to

3    have the distribution rights.  They have to have

4    employees.  You very, very rarely go to what people

5    typically say is green field.  No, that's a -- that's

6    a very costly and long route to go.

7         Q.   And in those typical situations where a

8    local distributor was acquired in a new state, what

9    typically happened to the existing management of

10   those companies that were acquired?

11        A.   If we were successful in charming the old

12   owners, which are traditionally family owned, very

13   prideful people, we were successful in getting some

14   sort of transition plan and it varies.  You know,

15   some sort of -- like I might say, consulting,

16   advisory, whatever it might want to be.  Yes, that

17   would be part of our game plan.

18        Q.   Then for more junior employees like

19   salespeople, was it typically your goal to retain

20   them as employees?

21        A.   Yeah, quite contrary you want to keep the

22   continuity of the people that are selling and making

23   money for you and it's usually those middle executive

24   managers are the ones that have chances of being

25   either replaced or reorganized.  So it's the very,

Page 24

1    very top and the very, very bottom.

2         Q.    You made a gesture there.  Were you

3    suggesting that if you kept the middle or higher

4    executive people around, that they might butt heads

5    with Southern management?

6         A.    No, my gesture was my figure of speech.

7    I have some European blood in me.

8         Q.    I was trying to understand.

9         A.    Nothing was not spoken.

10        Q.    Okay.  Who initially proposed -- when it

11   came to Southern acquiring Eber and its assets, who

12   first proposed that Lester Eber have a consulting

13   role?

14        A.    I would very much like to say it was a

15   joint -- for us it was almost like it was a part of

16   our all our deals, as I have said.

17             It wasn't like one person proposed it.

18   It was almost accepted.  So as we sit down, as say

19   this executive group, and I would represent mostly

20   organizationally from my point as being secretary of

21   the company in charge of all the back office and all

22   the administration, and then there would be our

23   salespeople or administrative people.  It's almost a

24   natural thing, you know, to benefit us.

25             It wasn't one.  It was almost like it was

1    our challenge to get -- again, to me it's all

2    business continuity.  It's all long term for me,

3    short term/long term.

4         Q.   Were the terms of the consulting

5    arrangement negotiated?

6              MR. RAMSEY:  Form.

7              THE WITNESS:  Am I supposed to answer

8         that?

9              MR. ACKERMAN:  Yes.

10             THE WITNESS:  As in all of them, they

11        were made as broad as possible for my advantage,

12        you know, giving me the ability to expand or

13        contract as my business was going to progress.

14             You know, no insult to Mr. Eber in this

15        room, to us it was very, very typical to

16        negotiate as broad as you can and then utilize

17        the services and the knowledge as they became

18        needed.

19   BY MR. BROOK:

20        Q.   How was the amount of the consulting fee

21   determined?

22        A.   Again, from experience for what we had

23   expected, to -- again, being way now in advance and

24   being up there now a couple of years before, two,

25   three years from '04 to this period of '07 when the

Page 26

1    consulting agreement was actually done, we had

2    learned a lot, but probably from my standpoint, being

3    critical like I am, we learned so much that we did

4    not know that, you know, from my standpoint, you

5    know, I just saw this agreement replacing other sort

6    of consultants that I would have had to hire, be them

7    operational consultants, be them industry

8    consultants, be them lobbyists in their things.

9              This is one of the things that maybe

10   doing these transactions I saw Lester, Mr. Eber, as

11   almost like a one stop shop of knowledge of a lot of

12   different things that I was going to have to

13   purchase, you know, in the marketplace.

14             It was -- again, we thought it was fair

15   and we thought it was arm's length and we thought it

16   was equitable from our standpoint.  We would have

17   spent a lot more trying to buy these services some

18   other place.

19        Q.   And who was negotiating the consulting

20   agreement on behalf of Lester Eber?  Was it just him

21   or did he have someone else negotiating for him?

22             MR. RAMSEY:  Form.

23             THE WITNESS:  I don't remember.  I don't

24        really remember.  I know that they had a very

25        large law firm.

```
 1              Any discussions about any of the work
 2       product that came out of that -- I'm sure Lester
 3       had the right attorneys working with him.  Any
 4       discussions about things -- you know, like any
 5       sort of consulting agreement, we pushed what we
 6       wanted and they pushed back.
 7              I don't really think it was Lester
 8       pushing back but his attorneys.  I'm sure he had
 9       counsel.
10   BY MR. BROOK:
11       Q.    Does the name Harris Beach ring a bell?
12       A.    Yeah, they were pretty good.  Yeah.
13   Harris Beach, yeah.
14       Q.    I want to ask you a couple of questions
15   about this Exhibit 93.  Do you have that in front of
16   you still?
17       A.    Yes.
18       Q.    If you could, please, turn to the page
19   that has the Bates number in the bottom right ending
20   in 130.  It's about halfway in.
21       A.    Okay.
22       Q.    Are you there?
23       A.    130, yes, sir.
24       Q.    There section 2 specifies a purchase
25   price for the assets.  Do you see that?
```

Page 28

1       A.   Uh-huh.

2       Q.   That's a yes?

3       A.   Yes.  Excuse me.

4       Q.   And it refers to in the first item

5  purchasing the value of the inventory.  Do you see

6  that?

7       A.   Yes, sir.

8       Q.   Not necessarily specific to this letter

9  of intent, but do you know was the inventory of Eber

10  Brothers ultimately acquired by Southern?

11      A.   Yes.

12      Q.   Was all the inventory acquired by

13  Southern or was some of it not able to be agreed upon

14  as to the amount of the price?

15      A.   I would have to say substantially all of

16  the inventory.  We would not have bought things we

17  didn't feel we can represent.  We would not have

18  bought unsaleable or unmarketable merchandise and we

19  wouldn't have bought oddball things that we would

20  have to just write down or write off.  So we would

21  have bought saleable, marketable merchandise.

22      Q.   Do you recall there being any oddball

23  things that couldn't be bought?

24      A.   There always is.  There always is but I

25  don't recollect.  It would be a de minimis amount in

Veritext Legal Solutions
www.veritext.com
212-267-6868      516-608-2400

1    any wholesaler's operation.

2         Q.   And the third item under 2, it says $10

3    million for the intangible assets that have been

4    listed and I think it's on the preceding page.

5              Was that amount ultimately paid or was

6    that amount changed?

7         A.   I believe that amount was ultimately

8    changed.  I believe that was like a placeholder as

9    this -- as this transaction evolved from amendment to

10   amendment to amendment.  So I would have to say at

11   this point it was a placeholder.

12        Q.   How was that amount changed?  Did it go

13   up or down?

14        A.   I can't tell you now exactly.

15        Q.   Please turn to the next page.

16        A.   Uh-huh.

17        Q.   It says in the first full paragraph

18   there:  "At closing Southern shall pay Eber in cash

19   the purchase price less, (i), an amount to be

20   allocated to the restrictive covenants."

21             Do you see that?

22        A.   Uh-huh.

23        Q.   What was the amount being referred to

24   there?

25        A.   I don't specifically recollect what

Page 30

1    amount that was.

2         Q.   Is it typical to enter into restrictive

3    covenants with companies when you are acquiring their

4    assets?

5         A.   Absolutely.

6         Q.   If you look at, I believe it's the next

7    page, section 5.

8              It says "Eber, you", and I will note for

9    the record that this letter is addressed to Lester

10   Eber.

11             It says:   "Eber, you, and each of the

12   current shareholders, owners and affiliates of both

13   EBWLC and Eber NDC will enter into restrictive

14   covenants."  Do you see that?

15        A.   Yes.

16        Q.   Do you know why -- let me start back.

17   Was this requirement for numerous restrictive

18   covenants, including one with EBWLC, is something

19   that remained part of the deal or was changed before

20   it was ultimately finalized?

21        A.   I believe there were restrictive

22   covenants right through all the transactions,

23   including the -- the consulting agreement I believe

24   also had a restrictive covenant in it.

25             You know, when we were coming in and

Page 31

1    paying substantial amounts of a money to a business,

2    for a business we want to make sure that this

3    business and the key people don't resurrect

4    themselves and start competing with us.

5         Q.    It is fair to say you understand that

6    EBWLC, Eber Brothers Wine and Liquor Corporation, was

7    the parent company that had a number of affiliates,

8    including an entity that operated in the metro area

9    and interests in Ohio and Delaware?

10        A.    I never had a full understanding of the

11   full organizational structure, so I can't say yes to

12   that question.

13             I know that they were all interrelated.

14   I had no idea of what the ownership was of each of

15   them or if they were individually owned or owned

16   separately.

17        Q.    Do you know why no restrictive covenant

18   was ultimately entered into between EBWLC and

19   Southern?

20        A.    I have no idea, but I would like to

21   clarify that.  I have no idea if there really was one

22   or the there wasn't one entered into.

23        Q.    So if there was one not entered into you

24   don't know why that wouldn't be the case?

25        A.    Absolutely not, no.

Page 32

1        Q.   Can you think of any reason why Southern

2   would have agreed not to impose a restrictive

3   covenant on EBWLC or other Eber entities?

4            MR. CALIHAN:   Objection to form.

5            MR. RAMSEY:   Form.

6            THE WITNESS:   I would have no idea.

7   BY MR. BROOK:

8        Q.   Why did you want to have a restrictive

9   covenant with Lester Eber specifically?

10       A.   Well, again, as we learned a lot we

11  learned that the -- we made the right decision, first

12  of all, by trying to make a deal with Lester and the

13  Eber companies because their reputation really did

14  precede itself and had created this business image

15  that was counter to what I will say the other

16  competition was, the big competition, our

17  competition.

18            So if you use that as the foundation and

19  again, we have learned now, we were there for a few

20  years, we said we don't want this guy or any of his

21  companies in any format coming back and competing

22  with us.

23       Q.   Turning to section 6, that describes how

24  Lester Eber will enter into a consulting agreement.

25  Do you see that?

Page 33

1          A.     Uh-huh.

2          Q.     That's a yes?

3          A.     Yes.  Excuse me.

4          Q.     And it says in item B the annual

5    compensation will be $500,000.  Do you see that?

6          A.     Yes.

7          Q.     How was that amount determined?

8          A.     The same -- I'll repeat the same answer.

9    We're into this state -- we're in this state now

10   since '04, very weak still in upstate, many needs and

11   we truly assessed what we would have to spend for

12   these resources and knowledge that, you know, we

13   valued.  We valued in entering an agreement with

14   Lester.

15         Q.     Was the amount of compensation ultimately

16   agreed to be paid to Lester Eber higher than the

17   $500,000 reflected in this letter of intent?

18         A.     Yes.

19         Q.     Why did the amount increase?

20         A.     You know, that's an excellent question

21   and I think the answer is is that when this part of

22   the transaction was first envisioned, this was kind

23   of like a New York-centric part of the deal, you

24   know.

25                As it evolved -- as it really evolved, it

Page 34

1    became a much larger deal, so I believe the

2    consulting here of $500,000 was really before it

3    evolved into buying the other operations in Ohio and

4    Delaware and we had fully, fully expected to and

5    assumed that we would have to be using Lester on a

6    broader scale as it came.

7              So I believe the $500,000 in the final

8    iteration of this went to a number like $600,000 and

9    we believe we got the best -- from the business

10   standpoint, it wasn't New York-centric.  Now we had

11   other states that we were going to use Lester in.

12        Q.   And did Lester ultimately provide

13   consulting services outside of New York?

14        A.   On a limited basis.  On a limited basis

15   in a transition role.

16        Q.   For approximately how long did he provide

17   consulting services outside of New York?

18        A.    I would have to say -- I don't really

19   recollect because we -- the structure of each of his

20   other deals like this -- we had like, for instance,

21   Postiy in Ohio.  We kind of relied on what we found

22   when we got there, is knowing what you don't know.

23              We found when we got there they had a

24   relatively good management group there so we didn't

25   really have to rely as much on Lester because it's

1    simplicity of the business also, mostly a brokerage

2    business and in Delaware one of Lester's partners,

3    again, very smart from our standpoint, eventually and

4    still to this date is our landlord, you know, of the

5    building, a gentleman by the name of Ed Stegmeir.

6            Having that continuity of Lester Eber in

7    our stable of consultants having his partner --

8    ex-partner in the marketplace just made for a good

9    transition.

10           Q.   Did Southern retain Ed Stegmeir?

11           A.   No, I don't believe -- maybe for a short

12   period.  I don't really remember.  Again, he's our

13   landlord.

14           Q.   And he wants you to be able to pay the

15   rent?

16           A.   He wants us to be able to pay the rent,

17   in a terrible building.

18           Q.   He won't see that.

19           A.   On a triple net lease.  Yeah, please

20   don't let him see that.

21           Q.   With respect to Lester Eber, why did you

22   believe that he was qualified to provide the

23   consulting work that you needed?

24           A.   Well, some of it was some instinct.  Some

25   of what we learned -- you ask me good questions, by

Page 36

1   the way.

2           Some of it is what we learned after we

3   bought the business and when we were fortunate enough

4   to get some of the key middle management people and

5   senior people into our organization, we quickly

6   figured out that they were sheerly commercial

7   people.

8           They had absolutely -- they kind of

9   understood the inside of the New York business really

10  pretty well, which is important, don't get me wrong,

11  but they had no knowledge of the outside part of the

12  business, what I will call the operational part for

13  us which is very, very, very important, because we're

14  such a heavily regulated industry and we do nothing

15  without somebody yelling at us or fining us.

16          You know, they had no knowledge, the

17  salespeople we hired, so we had this gap of

18  institutional upstate New York knowledge that covered

19  everything from people to operations, to ways of

20  working, to legislative affairs to -- you know, there

21  is this group called the SLA, I call them something

22  else, which is the State Liquor Authority, which

23  heavily regulates us.

24          That in itself is -- the old statement

25  dealing with city hall, it's ten times worse.  They

1   had no knowledge and we were -- we were under -- I

2   don't want to say under attack, but we needed that

3   knowledge.  I would have to say we recognized the

4   value of our bargain after we bargained.

5          Q.   So at some point after the initial

6   bargaining was it specifically added to the

7   consulting relationship that Lester Eber would act on

8   interfacing with governmental affairs?

9          A.   Again, if I remember correctly we made

10  that consulting agreement as broad as we could and

11  then we threaded the needle as many times as we can

12  in terms of expanding it.

13         Q.   Was Southern expecting Lester to continue

14  doing work that was essentially the same kind of work

15  he had been doing when he had been in charge of Eber

16  Brothers?

17         A.   I don't know.  I can only assume the work

18  that he did when he was in Eber Brothers.  I can't

19  really answer that.

20              I know what our intentions were for

21  Lester, you know.

22         Q.   So is it fair to say that you wanted

23  Lester to use the experience and skill that he had

24  acquired through Eber Brothers to help Southern?

25              MR. RAMSEY:  Form.

1          THE WITNESS:  Well, I'm going to answer

2     it this way.  We didn't want Lester to interfere

3     in our brand building and our selling ways.

4          We had far surpassed what Eber had done

5     in terms of what I will call marketplace sort of

6     things, sort of actions.

7          We utilized Lester for those issues that

8     were out of market, let's say, not necessarily

9     the business of the business of going into a

10    customer and selling them a bottle and have the

11    customer pay.  We know how to do that.  We know

12    how to do that really pretty well.  It was all

13    the things, the environment that we did our

14    business in.

15   BY MR. BROOK:

16       Q.    When it comes to having evaluated Lester

17   Eber and his qualifications to serve as a consultant,

18   were you made aware of the Eliot Spitzer

19   investigation into Eber Brothers and other

20   distributors that had occurred?

21       A.    Absolutely.

22       Q.    And what had been disclosed to you about

23   what Lester Eber and his company had been doing that

24   was being investigated?

25       A.    I'm going to look at my counsel because

1    we were also part of that investigation.  Every

2    wholesaler was part of that investigation.

3              For those of us who are old enough to

4    know Mr. Spitzer, he did not discriminate.  He went

5    after an industry, he did not go after an individual

6    and we were involved in it and I am not really

7    prepared to talk about that, those days.

8              MR. ACKERMAN:  Just stick with the

9         question on what you knew about Mr. Eber's.

10   BY MR. BROOK:

11        Q.   I'm just staying focused on Mr. Eber.

12        A.   Specifically I knew nothing about it.  I

13   was dealing with Mr. Spitzer myself.

14        Q.   So did Lester Eber disclose to Southern

15   that he had, in fact, authorized kickbacks?

16              MR. RAMSEY:  Form.

17              THE WITNESS:  To my knowledge, no.  I

18         think every wholesaler was dealing with

19         Mr. Spitzer and their own issues.

20              It's Spitzer still alive?

21              MR. RAMSEY:  He's alive.  I'm not sure

22         where he is, but he's alive.

23   BY MR. BROOK:

24        Q.   So many jokes, so inappropriate for the

25   transcript.

Page 40

1      A.    Get it out.

2      Q.    Have Lester Eber's responsibilities as a

3   consultant changed since the beginning in 2007 and

4   2008?

5      A.    I would have -- what are the dates

6   again?

7      Q.    At the beginning, in 2007/2008, what were

8   Lester Eber's day-to-day responsibilities for

9   Southern?

10     A.    I guess, you know, I would describe it,

11   and I will go into as much detail as you want, in the

12   early days they were very broad, covered a lot of

13   different topics.

14           Now they're narrower but much deeper as

15   we matured as an organization and our needs became a

16   lot more finite.  In the early days, and this comes

17   from my firsthand knowledge and my dealing with it,

18   it was everything from where our facility should be

19   placed, what do you know about this union workforce,

20   you know, what about the trading practices.

21           It was wide ranging in the beginning

22   because, as I described, the Eber personnel we hired

23   were salespeople, so I had no context on the

24   operations and the culture of upstate New York and I

25   relied tremendously on what I saw as a neutral source

Page 41

1    to give me some advice.

2              So you go from the spectrum what I

3    describe as wide from hey, Lester, where do you

4    believe we should put our warehouse?  Now, I went to

5    school in Buffalo, okay, so I know upstate New York

6    but I don't know upstate New York.

7              I loved it up there but I know that

8    Lester lived in Rochester, which I think is a little

9    bit east of Buffalo, if I remember correctly, but we

10   knew we had to close all the warehouses and have one

11   warehouse in the state and I basically -- I was going

12   to make my own decision, hey, Lester where do you

13   think we should put our pinpoint, so that's a good

14   example of a broad thing, but then let's get into the

15   wider thing.

16             I think what we were also seeing -- and

17   you raised the thing about Spitzer and regulations.

18   I think we found ourselves as a tremendous deficit,

19   both in Metro and upstate New York, in terms of what

20   I will call our legislative strength, our knowledge

21   of the politics of New York.

22             We do pretty well in Florida.  We do

23   pretty well in Texas.  In upstate New York, it's a

24   different world up there.  It's like one union leader

25   said to me, I don't care what you do, this is New

Page 42

1    York, we do it New York way, and that was the context

2    of everything that we tried to do in New York.

3              So I think an area that I personally

4    underestimated, but had really become the focal point

5    of what Lester does, forget the operations now, we

6    understand it.  Forget about the people.  Forget

7    about labor.  I'm on top of that.  I feel pretty good

8    that we're really pretty good.

9              But what's gotten very deep, what hasn't

10   changed is the government affairs, it's the SLA

11   regulatory environment that's politically charged and

12   you cannot handicap, you know.

13             I think those are really two, and I

14   believe that there is a point that no one

15   anticipated.  We have tried to pivot ourselves in a

16   very socially responsible way and in effect used a

17   lot of our business arguments to have Lester try to

18   frame in the social consequence of the alcoholic

19   beverage industry in Albany.

20             It's really now in that venue of

21   government affairs, lobbying, SLA regulatory that

22   Lester provides our organization the value.  All that

23   other stuff we're running our business.

24        Q.   So was it your understanding that Lester

25   Eber had experience in dealing with some of these

1    legislative matters?

2         A.    Oh, absolutely.   Absolutely.

3         Q.    And he had that experience from his role

4    running the Eber Brothers company, correct?

5         A.    Again, I don't know what he specifically

6    did when he ran the Eber companies in each of the

7    states.   I don't, but it became very evident to our

8    people -- we're pretty experienced.

9              We didn't turn Lester loose without

10   watching Lester.   Even though we have other lobbyists

11   and we have other people, you know, we began to see

12   when Lester walked the halls of Albany, it wasn't

13   Mr. Eber, it was Lester.

14             You know, again, we're pretty

15   sophisticated that the relationships drive good

16   business decisions.

17        Q.    Was there a particular reason why the

18   consulting agreement was entered into with Lester

19   Eber personally rather than with Eber Brothers, the

20   company?

21             MR. RAMSEY:   Form.

22             THE WITNESS:   I can only answer that as

23        that it's a hundred percent typical that we

24        enter these things, you know, on what I will

25        describe as an individual and personal contract

Page 44

```
 1      basis.
 2             If God forbid something happened to one
 3      of our consultants, why would I want to be bound
 4      to a corporation for consulting?  These are
 5      personal services.  God forbid something
 6      happens, again, to any one of these consultants,
 7      their value is diminished.
 8             No, I would never enter -- again, these
 9      are personal services.
10  BY MR. BROOK:
11      Q.   You were aware when you entered into the
12  consulting agreement with Lester, that Lester was
13  going to continue to manage a wine and liquor
14  distributorship in Connecticut and Rhode Island
15  potentially too, correct?
16      A.   Well, the answer is we passed on the
17  ability to buy those operations.  We assessed the
18  value to our organization, so we passed on it and I
19  don't think -- by having the right to buy it and
20  passing on it, it was our assumption he was going to
21  continue it and, to be very honest, I have no idea
22  what went on in Connecticut right now, we're not in
23  Rhode Island right now, we never saw it as a creed to
24  our business.  I don't even know if he has a business
25  there.
```

Page 45

1      Q.    Was it typical for -- you mentioned other

2  consulting agreements, those are personal contracts.

3           Can you think of any other instance where

4  there was a consulting contract with someone who was

5  a former executive of a company that Southern

6  acquired and that person continued to manage a wine

7  and liquor distributorship?

8           MR. RAMSEY:  Form.

9           THE WITNESS:  I have no recollection of

10      that.  I really don't.

11  BY MR. BROOK:

12      Q.    Is it fair to say that at least on

13  Southern's part -- I don't want to know what advice

14  was given, if there was any, but there was no

15  question raised about whether it would be legal for

16  Lester Eber to receive consulting payments directly

17  from Southern while continuing to be a manager of a

18  wine and liquor distributorship?

19           MR. RAMSEY:  Form.

20           THE WITNESS:  That's kind of like more of

21      a legal.  I would imagine that as long there is

22      not a conflict of interest or conflict of duty

23      in his consulting that we would not have a

24      problem.  There are a lot of consultants that

25      have a lot of other clients.

Page 46

1            We were more focused on the business of

2       originally Ohio, Delaware and New York and that

3       would have been our focus.  If he had other

4       relationships unrelated to us --

5   BY MR. BROOK:

6       Q.   So when you say conflict of interest, you

7   are referring to interests or duties with respect to

8   Southern, right?

9            You weren't concerned about whether he

10  would be breaching a duty to this other company?

11      A.   I wouldn't know.

12           MR. RAMSEY:  Form.

13           THE WITNESS:  I wouldn't know.

14  BY MR. BROOK:

15      Q.   I was just trying to clarify.

16      A.   No, that's where I was going.  I would

17  not know.

18           MR. RAMSEY:  Brian, is this a good spot

19       to take two minutes?

20           MR. BROOK:  Sure, we can do that.

21           (Thereupon a brief recess was taken,

22  after which the following proceedings were had.)

23  BY MR. BROOK:

24      Q.   I want to return to still looking at

25  Exhibit 93, same page.  The provisions regarding the

Page 47

1    consulting agreement, Section D, I want to look at

2    the last line there.

3              It says:   "Southern will have the right

4    to reduce or eliminate your duties, so long as full

5    payment described in 6(B) is made during the term."

6    Do you see that?

7         A.   Uh-huh.

8         Q.   Is that yes?

9         A.   Yes.

10        Q.   Why was that provision part of this

11   agreement?

12             MR. ACKERMAN:   Let me give you an

13        instruction.   If that question calls upon you to

14        divulge the content of communications with

15        counsel, then I ask you to leave that out of

16        your answer.

17             If you can otherwise answer that based

18        upon discussions with Mr. Eber or your own

19        thinking, you can answer that.

20             THE WITNESS:   Understood.

21             MR. ACKERMAN:   Thanks.

22             THE WITNESS:   Understood.   I believe I

23        answered that previously, it gave us full

24        control of what we wanted Lester to do or not in

25        terms of our business.

Page 48

```
 1              We had really -- at this point, you know,
 2        it was dating.  There was nothing there, so we
 3        wanted to have the ability as we ramped up our
 4        own people or our own capabilities to say okay,
 5        we don't need you to do this now.  It was
 6        control for me of the relationship.
 7   BY MR. BROOK:
 8        Q.    So is it typical to have in these sorts
 9   of acquisition situations a consulting agreement
10   where the consulting fee may be paid even though no
11   services are being rendered?
12              MR. RAMSEY:  Form.
13              THE WITNESS:  It was never our intention
14        for doing it that way.  Ours was to control the
15        relationship.  We always envisioned a set or
16        subset, of when I describe wide versus narrow
17        and deep, that's what we -- eventually
18        happened.
19              I don't know if we ordained it that way
20        or we just believed it but we thought the
21        relationship would continue and evolve.  We
22        wanted to have control of it.
23   BY MR. BROOK:
24        Q.    So the initial contract with Lester Eber
25   was for a five year period, correct?
```

Page 49

1        A.    Yes.

2        Q.    Then it also locked him up in terms of

3    the restrictive covenant for another five years after

4    that, correct?

5        A.    Yes.

6        Q.    After the initial five year period did

7    Southern enter into new consulting agreements with

8    Lester Eber so he would be paid more money after that

9    point?

10       A.    We negotiated with Lester.  This initial

11   agreement, I believe this five year period ended in

12   2012.  Yeah, from '07 to '12.  Yes, we entered

13   negotiations with Lester and, again, I remember them

14   and we narrowed his responsibilities and we cut his

15   consultive pay down significantly.

16       Q.    What was the amount of pay that you

17   agreed on in 2012?

18       A.    I believe it was -- we cut him back 50

19   percent.  I believe it went from a monthly of 50 on

20   the first agreement from the '07 to the '12 agreement

21   from 50, to 25 going forward.

22       Q.    Just so we're sure we're clear on the

23   record here, I'm going to show you what was

24   previously marked as Plaintiff's Exhibit 27.

25       A.    Uh-huh.

Page 50

1           Q.    I have a few copies here.

2                 MR. ACKERMAN:   Thank you.

3    BY MR. BROOK:

4           Q.    Do you recognize this document?

5           A.    Yes.

6           Q.    Is this the consulting agreement that was

7    entered into in 2007 with Lester Eber?

8           A.    Yes.

9           Q.    When the consulting agreement was

10   renegotiated in 2012 was there any similar such

11   documentation prepared at that time?

12          A.    At this point -- at this point we decided

13   it was better that it was a totally at will

14   agreement.

15                You know, again, for us it was to have

16   what we thought was control of the relationship.   We

17   understood that he is still bound by the covenant

18   that he had, as long as it was mutually satisfactory

19   to us.

20                I know Mr. Eber is in the room so it's

21   little uncomfortable but we had already started to

22   build some resources to plan for the transition, you

23   know, of certain of the responsibilities, some work,

24   some hadn't worked.   We wanted to have greater

25   control and not be bound long term by anything.

Page 51

1       Q.    Is that consulting relationship
2   continuing today?
3       A.    Yes.
4       Q.    Is it at the same amount of $300,000 a
5   year?
6       A.    Yes.
7       Q.    And the restrictive covenant ended in
8   2017; is that correct?
9       A.    It would have been -- yeah.  Yes.
10      Q.    So you have not sought to renew that
11  restrictive covenant?
12      A.    No.
13      Q.    Why not?
14      A.    We're fully established.  We believe that
15  any threat that we could have with Lester joining a
16  competition right now is negligible.
17            Again, we're fully established and
18  running our commercial business up there.
19      Q.    You're aware that the consulting
20  agreement required up to 40 hours a week from Lester
21  Eber, correct?
22      A.    Yes.
23      Q.    Do you know how many hours a week on
24  average Lester Eber put in for Southern during the
25  initial five year period of the consulting

Page 52

1   relationship?

2          A.    No.

3          Q.    Do you have any sense of what that number

4   might be ballpark?

5          A.    I would just be speculating.  I would

6   think some weeks it could be more, some weeks it

7   could be less.  It was on call, on duty.

8          Q.    Were there some weeks when there was no

9   work being done by Lester?

10              MR. RAMSEY:   Form.

11              THE WITNESS:   I could not say that.   I

12       can't say that.

13  BY MR. BROOK:

14          Q.    Who was involved in being the primary

15  interface with Lester Eber for his consulting duties?

16          A.    On two levels I mentioned both names.   On

17  a day-to-day level it would have been our general

18  manager, a gentleman who I mentioned, Mr. Larry

19  Goodrich.   He was the primary leader of the

20  day-to-day of our entire New York State operation,

21  one of the people that I did speak to that I had

22  mentioned, and he would have worked very, very

23  closely with Lester in the early days of this -- of

24  the transaction moving right now almost until current

25  as -- as Mr. Goodrich's responsibilities are just

1    recently transitioning there will be another group of

2    leaders.

3          Q.    Now, Lester Eber was given the role of

4    senior vice president or the title of senior vice

5    president, correct?

6          A.    Uh-huh.  Yes.

7          Q.    Why was that?

8          A.    More of a -- first of all, I've never

9    seen him use this title.  I think it was more of a --

10   how can I describe it?  More of an ego introduction

11   sort of moniker for Lester to have.

12         Q.    So was it in part so that he could wear

13   the hat of being an agent of Southern when he

14   interacted with third parties?

15         A.    I think to the contrary.  I think the

16   world knows Lester as a registered lobbyist and, you

17   know, I think that independence to us works to our

18   advantage.

19              I do believe, as I said, I don't ever

20   remember seeing Lester using that title.  You know, I

21   can't really remember how it evolved from the

22   agreement or if it's actually really in place.

23         Q.    As part of the consulting agreement

24   Lester Eber was entitled to reimbursement for

25   expenses, correct?

Page 54

1          A.    Yes.

2          Q.    How were those expenses approved?

3          A.    Lester's expenses were scrutinized

4    obviously, like all of them.   They would have been

5    formally submitted to -- in the accountable chain,

6    which would be his local management, which was New

7    York, through an approval process, and paid through

8    our normal accounts payable like a vendor.

9                So there would have been a submission,

10   there would have been an expense report, there would

11   have been an approval and to me sitting a few

12   thousand miles away, there would have been an

13   internal audit that would have governed it to make

14   sure these are proper and being done correctly.

15               But the first line of defense is going to

16   be submission, approval at a local level.

17         Q.    What were the nature of the expenses

18   being incurred by Lester in his consulting work?

19         A.    Again, for the sake of maybe insulting

20   the frugality of Lester is huge in many ways, but

21   there would be all hotel, what I will call travel and

22   entertainment.   Those are the buckets.

23               It's his -- it's his doing our work for

24   us in terms of meeting the people and conveying what

25   we need to do.   I would think typically what somebody

Page 55

1    does who does government affairs, they are mostly --

2    as you look at it, they fall into those three

3    buckets.  I would say 99 percent travel --

4    entertainment and travel by Lester is a train most of

5    the time or something from the airport back and

6    forth.  And hotels, trust me, are reasonable.  And

7    entertainment are -- you will see a lot of them up in

8    Albany, which we look.  We're very kind of concerned

9    of where money is being spent.

10         Q.   And on average in a typical year how much

11   money was Lester Eber being reimbursed for expenses

12   by Southern?

13         A.   I never really studied that because to me

14   it was -- to me it was more of a hygiene issue, you

15   know, were there expenses being -- just like the

16   consultant fee, was the consultant fee being paid by

17   the agreement at my level in the organization and

18   were reimbursed expenses being approved as submitted

19   and whatever through the chain of command.  I would

20   just be speculating.  I think it would be unfair for

21   me to say that.

22         Q.   Do you have a ballpark sense of what --

23   in any even year, what the amount of expenses might

24   be?

25              MR. RAMSEY:  Form.

Page 56

1              THE WITNESS:   Again, I would just be

2       totally speculating.

3    BY MR. BROOK:

4         Q.   More than $10,000 a year?

5         A.   Again, I would assume it would be, you

6    know, if he goes to down to metro to meet with Larry

7    Goodrich.   Now, Larry Goodrich is based in metro, in

8    Manhattan.   You could stay in Manhattan for one hour

9    and it could cost you $1,000.   I don't mean it as a

10   joke, but it's a stupid place to go to stay in a

11   hotel.

12        Q.   It's a dumber place to live.

13        A.   Oh, sorry.   No, no.   And to dine there

14   and whatever, I don't want to do it.   It would be

15   speculating.

16              I'm sure we could look into it but I

17   would think it has to be in excess -- you know, that

18   would be very, very reasonable.   My point is it's in

19   the approval and the payment and the audit process

20   that they were reasonable and customary for what

21   Lester was doing.

22        Q.   To your knowledge have the amount of

23   expenses reimbursed to Lester Eber ever exceeded

24   $100,000 in a year?

25        A.   Again, I would just be speculating.   I

1    don't get into it.  I say it could be possible.

2         Q.   So that's not surprising?

3         A.   It really could be possible depending on

4    the urgency, the advocacy.

5              If there is a bill coming through or one

6    that is being presented, I would say to Lester get

7    out of Rochester and go walk the halls, knock the

8    doors, call on whoever you can or sometimes kick my

9    people in the butt and get them riled up about it.

10             If we have a -- one of the functions that

11   I discussed with you was the SLA regulatory sort of

12   thing.  It's not if, but when we have charges in an

13   investigation, I know that we go full force into

14   understanding it, what our options are, whatever and,

15   you know, Lester is part of -- today is part of that

16   team who really analyzes it.  So there isn't one set

17   of things.

18        Q.   Do you recall anything in particular in

19   2018 involving a significant amount of consulting

20   work by Lester Eber?

21             MR. RAMSEY:  Form.

22             THE WITNESS:  No, I don't.  I don't.

23   BY MR. BROOK:

24        Q.   I'm going to show you a new exhibit.

25   We'll mark this as 94.

1            (The document referred to was thereupon

2   marked Plaintiff's Exhibit 94 for Identification, a

3   copy of which is not attached hereto.)

4   BY MR. BROOK:

5        Q.   This is a document bearing Bates numbers

6   EB35524 through 43, produced by the Eber defendants

7   in this case.

8        A.   Uh-huh.

9        Q.   Do you recognize what these pages are?

10       A.   These are just screen captures of the

11   check total.

12       Q.   So they don't show specifically what

13   expenses are being reimbursed, but they do reflect

14   expense reports?

15       A.   They reflect an accounting coding of

16   certain expenses.  Go from the top to the bottom, you

17   know, obviously we had the payee, you know.  It's the

18   accounting coding of all this.

19       Q.   I'm just trying to see if I understand

20   these forms.  There is an invoice date; do you see

21   that?

22       A.   Uh-huh.

23       Q.   That's the date of an invoice that was

24   submitted by Lester Eber?

25       A.   Yes.

Page 59

1      Q.    Then there is invoice number and it says

2  Eber/LE -- I'm just looking at the first

3  page -- 10/21/17; do you see that?

4      A.    Uh-huh.

5      Q.    Do you know what that's referring to?

6      A.    I can just -- I would just be assuming

7  without having the underlying document that it's, you

8  know, his latest expense report through that period

9  of time.

10         That would be an assumption without

11  seeing it.

12     Q.    Then the next category, in the

13  description it refers to on the second line expense

14  report W/E 12/17/2017.  Do you know what the W/E

15  refers to?

16     A.    No, to tell you the truth I really don't,

17  other then it could be the week ending, if he does

18  weekly expense reports or not or he does monthly.  I

19  have no idea.

20     Q.    I'm not going to go through this whole

21  thing but I will represent to you that excluding

22  payments for lobbying services and consulting, that

23  the total number of expenses paid in 2018 according

24  to these documents were $118,371.21.

25         Having heard that can you now think of

Page 60

1    any reason why Lester Eber incurred so many expenses

2    in 2018?

3              MR. RAMSEY:  Form.

4              THE WITNESS:  Again, I think I answered

5         that I didn't think it was unreasonable that he

6         could incur that amount, but without the detail

7         behind it to see how many hotels, how many air

8         or trains he takes or dinners he has, it would

9         be all speculative for me to answer this.

10   BY MR. BROOK:

11        Q.   Do you know whether Southern retains

12   copies of the invoices that have been submitted by

13   Lester Eber for payment?

14        A.   For a period of time, yes.

15        Q.   For how long?

16        A.    I believe it's five or seven years,

17   depending upon what the IRS requirements are and

18   whether we're under audit or review.

19        Q.    I'm going to show another document that's

20   been previously marked.  This is Exhibit 29.  This is

21   a compilation of letters on Lester Eber's letterhead

22   addressed to someone named Steven Becker.

23             Do you remember that name?

24        A.    Yes, I believe earlier on I had answered

25   that in relationship to preparing for today I did

Page 61

1    speak to Mr. Becker, Steven Becker.

2         Q.    Do you recognize these documents?

3         A.    No, I have never seen these documents.

4         Q.    Let's look at just the first one here.

5    It's dated January 1st, 2012 and it states:   "Dear

6    Mr. Becker, this letter will confirm our agreement

7    whereby Lester Eber will provide representation to

8    Southern Wine and Spirits of America, Inc. before the

9    legislative, executive and administrative branches of

10   New York State government for a one year period

11   effective January 1, 2012 until December 31, 2012.

12   The fee for these services will be $10,000."

13              Do you see that?

14        A.    Yes.

15        Q.    So even though you haven't seen this

16   document, were you aware of this agreement?

17        A.    I believe that this is in conjunction

18   with Lester being a registered lobbyist for us and

19   fees having to be disclosed for that purpose of what

20   he's doing.

21              On your Exhibit 94 that you asked me

22   earlier, I believe that that same amount appears.   I

23   saw that number.

24        Q.    It does.

25        A.    Yeah, that same amount.   So yes, I

1    believe that's the lobbying services fee that is paid

2    to Lester, yes.

3              Q.    So when did Lester first become a

4    lobbyist for Southern?

5              A.    I believe that it was somewhere when --

6    again -- let me answer by just saying I am not

7    certain, but I believe it really came at this period

8    of time when he started to be without -- you know,

9    underneath the initial agreement, on the second one

10   and not necessarily -- but underneath the new

11   agreement.

12             So I would have to say it probably is

13   around this period of time, but I would be

14   speculating.

15             Q.    And so this $10,000 fee is paid in

16   addition to the $300,000 consulting fee, correct?

17             A.    Yes.

18             Q.    And how were those amounts determined, in

19   terms of the proportion for one versus the other?

20             A.    I'm not really certain.  I'm not really

21   certain.  I don't know but I have seen that amount as

22   a disclosed amount to the State of New York as a

23   lobbyist fee too, so it was a -- I have no idea.  I

24   have no idea how that one was ascertained.

25             Q.    Has the State of New York been informed

Page 63

1    that Lester Eber is also receiving a consulting fee
2    of $300,000 a year from Southern?
3          A.   I don't know.  I don't know if that's a
4    required disclosure.  If it was, I'm sure we did.
5          Q.   Let's go to a new exhibit.  We will mark
6    this one 95.
7               (The document referred to was thereupon
8    marked Plaintiff's Exhibit 95 for Identification, a
9    copy of which is not attached hereto.)
10   BY MR. BROOK:
11         Q.   Do you recognize this document that's
12   been marked as Exhibit 95?  I will just note for the
13   record it bears Bates numbers EB644 through 652.
14         A.   I don't remember seeing this.
15         Q.   Do you see it appears to be a restrictive
16   covenant entered into on the 30th day of November
17   2007 between Lester Eber and Southern Wine and
18   Spirits of America?  Do you see that?
19         A.   Yes.
20         Q.   You are aware that there is a restrictive
21   covenant contained in the consulting agreement
22   between Lester and Southern, correct?
23         A.   Yes.
24         Q.   Do you know why there was a separate
25   restrictive covenant executed by Lester Eber in

1    addition to the one that appears in the consulting

2    agreement?

3         A.    No.

4         Q.    Can you think of any reason why that

5    might have been done?

6              MR. RAMSEY:   Form.

7              THE WITNESS:   I don't know.

8    BY MR. BROOK:

9         Q.    Going back to 2007 after the initial

10   letter of intent regarding the purchase of New York

11   assets, you mentioned that there were discussions and

12   ultimately acquisitions of some of Eber Brothers'

13   interests in other states.   Specifically Delaware and

14   Ohio were acquired, correct?

15        A.    Correct.

16        Q.    And is it correct that there was also at

17   one point at least a preliminary agreement for

18   Southern to acquire a 15 percent stake in Eber

19   Connecticut?

20        A.    Yes.

21        Q.    What was the reason for that part of the

22   transaction?

23        A.    We wanted to -- there was two parts of

24   it.  At that point in time, if I remember correctly,

25   we wanted as much security as we could for the monies

Page 65

1   that were being advanced to get it done and we saw

2   this was an asset that we could secure ourselves and,

3   as I believe I noted before, we had no idea what 15

4   percent of Connecticut meant.  We had done no due

5   diligence.  We had done nothing.

6           Connecticut sounds like a nice state.  We

7   really took it more as a -- what I will say as a

8   security interest for the deal and if it worked out

9   and made sense, which it didn't really make sense, we

10  would have gone forward.

11          Q.   So why did that part of the transaction

12  ultimately not go forward?

13          A.   We didn't see it really having a creed of

14  value.  We don't really like -- not that we don't

15  like partners.  We don't really do well with partners

16  long term and when you're a minority partner it often

17  doesn't work out right and 15 percent -- maybe I

18  could wince at 49 percent or 51 percent, but 15

19  percent is a weak partner, so we -- what we

20  understood, which was limited, we decided it wasn't

21  what we wanted to do.

22          Q.   Now, Southern, did it also agree to give

23  a loan to Eber Connecticut at some point or to

24  another Eber entity?

25          A.   There were a number of, I will call them

Page 66

1    advances.   There were a number of advances done to

2    what I can describe as keeping the Eber entities

3    themselves afloat while an orderly transaction was

4    being maintained.

5              So one of -- one that I remember clearly

6    was with a trucking company where, you know, as we

7    understood it, we advanced money for this trucking

8    company.  I'm not sure if it was a relationship.  I

9    think it was called GT or GP Trucking or something

10   like that.

11        Q.    General Trucking Company?

12        A.    Yes, GT, where we advanced them money so

13   they don't repossess the trucks that would have ended

14   the business.

15             It was -- you know, then we took that

16   advance, which -- we took that advance and we ended

17   up credited against the total purchase.

18        Q.    That was $1.5 million that was advanced

19   early on after the letter of intent; does that sound

20   about right?

21        A.    Somewhere in that period of time, yes,

22   sir.

23        Q.    Were you made aware of how much Eber

24   Brothers had paid to acquire Slocum & Sons, the

25   Connecticut operation?

Page 67

1        A.    No, not I.   I had no idea.

2        Q.    So even though it wasn't consummated, at

3    one point there was an agreement of some sort for the

4    acquisition of 15 percent of Eber Connecticut in

5    exchange for $3 million, correct?

6        A.    We had the right or the option -- I'm not

7    sure if there is a difference between the two but we

8    had the right or the option to do Connecticut.

9              I personally, nor my team at that time, I

10   can't recollect doing any due diligence around that

11   transaction.   I think us passing on it was more of a

12   did it make sense for us commercially and from

13   suppliers and customers to invest any money there.

14       Q.    Are you aware that eventually that 15

15   percent interest was sold to another third party?

16       A.    No.   No.   Again, I don't know whatever

17   happened in Connecticut or Rhode Island.

18       Q.    Has Southern done business with Eber

19   Connecticut?

20       A.    Not to my knowledge.   Possibly wholesaler

21   to wholesaler if we have common suppliers but that's

22   100 percent speculation.   It would all be normal

23   business if we did.   I have no idea.

24       Q.    Do you know whether Eber Connecticut has

25   imported wines that were then sold into the New York

Page 68

```
 1   metro area through Southern?
 2           A.    That would be a bad thing.
 3           Q.    Why?  Why do you say that?
 4           A.    Because it's one of the things that
 5   protects our industry, is that, you know, you are
 6   giving distribution rights for a particular area.
 7                 It's one of the biggest things that we
 8   try to do, so it would be undermining the
 9   distribution rights.  Now, if they sell items that I
10   don't represent, that could be my competitor's
11   business.  You know, first of all, if it was legal
12   it's one thing and number two, you know, if I knew he
13   was selling my products that I have distribution
14   rights for and traditionally contracted with the
15   supplier I would not take it lying down.  I would go
16   tell the supplier.
17           Q.    Do you know who David Eber is?
18           A.    Yes.
19           Q.    Who is David Eber?
20           A.    No.  Excuse me, I don't know David Eber.
21   No, I thought you were going to say David Taub.
22   Excuse me, I take that back.
23           Q.    So you don't know Lester Eber's son
24   David?
25           A.    No, I've never met David.
```

Page 69

```
 1        Q.   Do you know whether he was at some point
 2   a Southern employee?
 3        A.   No, I have no idea.  I have no idea.  We
 4   have 22,000 employees.
 5        Q.   So you don't know whether there were ever
 6   discussions between David Eber and his father or
 7   sister about having a business relationship between
 8   Southern and some of the continuing Eber Brothers
 9   entities?
10             MR. RAMSEY:  Form.
11             THE WITNESS:  Absolutely not.
12   BY MR. BROOK:
13        Q.   If Lester as part of the consulting
14   agreement had told you that he would agree to all the
15   terms, but the money should be paid to another Eber
16   Brothers entity rather than to him personally, would
17   that have effected your willingness to enter into the
18   agreement?
19             MR. RAMSEY:  Form.
20             THE WITNESS:  The answer is, you know,
21        subject to whatever my attorneys might have
22        said, I would have objected vehemently.
23             From what I was told these are personal
24        services sort of agreements that Lester -- at
25        the end of the day we viewed Lester having the
```

Page 70

1          value, not the older entity after they ceased --

2          after they ceased to exist, so I would have been

3          a very -- I would think most of the people in my

4          executive team would have been the same way.

5          The answer is no.  If that question was posed,

6          it's speculative, but I would answer it that

7          way.

8     BY MR. BROOK:

9          Q.   What if the contract included a personal

10    services guarantee that the contract would only

11    continue so long as Lester Eber was able to provide

12    the services that were being contracted for?

13              MR. RAMSEY:  Form.

14              THE WITNESS:  Again, I would go to my

15          attorneys and say is this going to accomplish

16          what I want or not.

17    BY MR. BROOK:

18          Q.   Let me ask you this way.  As long as it

19    accomplished what you described that you wanted did

20    you care who ultimately got the money, as long as you

21    got what you wanted from Lester?

22              MR. RAMSEY:  Form.

23              THE WITNESS:  Call me myopic if you want,

24          after a business is done, it's done.  We deal

25          with the individual.

Page 71

1          It's kind of historically what we have
2      done and what we have known.  When you work
3      through the halls of Albany they don't say hey,
4      mister, you know, Eber acquisitions.  It's kind
5      of like a personal thing.
6          We haven't given that up yet.  I can't
7      answer your questions if because, you know, I'm
8      not an attorney.  I'm the guy who has to run the
9      business and been basically taken advantage of
10     many times.  This gray hair didn't come here
11     just naturally, so I know who I do business
12     with.
13  BY MR. BROOK:
14     Q.   You said when business is done it's done
15  but as I mentioned before, and we have discussed, you
16  haven't had another situation where a consultant like
17  Lester for Southern has continued to operate a
18  business in some manner at the same time as he was
19  consulting with Southern, correct?
20     A.   To my recollection I never had a business
21  that competed with us in our same trading area.  I
22  don't know if we have ever had a successor consultant
23  who might have been in the industry doing something
24  unrelated to us.  I can't remember that.  But within
25  our trading area, I really can't think of one.

Page 72

1      Q.   Do you know whether Eber Brothers Wine

2  and Liquor Corporation continued to exist long after

3  it sold off its inventory and stopped as an operating

4  business?

5      A.   I have no idea what they have done

6  organizationally.

7      Q.   What was your understanding as to who the

8  owners were of Eber Brothers Wine and Liquor Corp.?

9      A.   I have no idea.

10     Q.   Were you aware that Lester was a trustee

11 of a trust that owned the Eber Brothers Wine and

12 Liquor Corp.?

13     A.   No.

14     Q.   Were you made aware of that as part of

15 your preparation for the testimony today?

16     A.   No.

17     Q.   You were aware that Eber Brothers Wine

18 and Liquor Corp. had pension liabilities, correct?

19     A.   We didn't -- we traditionally did not

20 assume pension liabilities.  That's the black hole of

21 assumption.

22          In the acquisitions that we have done in

23 the past -- I'm being specific.  In multiple

24 acquisitions we have done to assume a pension

25 liability is very few and far between, especially in

Page 73

1    certain states, like New York, where some of the

2    pension liabilities could be very big.

3            Unless we can define them.  Unless we can

4    really define them.

5        Q.    Do you know what happened in terms of

6    Eber Brothers' ability to pay its pension

7    liabilities?

8        A.    No.  No.

9        Q.    Was Southern at some point in time in

10   2012 made a party to a civil action in New York

11   Supreme Court in connection with the transfer of

12   assets belonging to Eber Brothers Wine and Liquor

13   Corp.?

14       A.    In 2012?

15       Q.    Yes.

16       A.    The only -- the only real action that I

17   remember was when we were sued by Eber, Lester, the

18   company for, I think your word was poaching.  My word

19   was more taking the employees coming to us.  That's

20   the only action that I really remember.

21       Q.    So were you aware that at some point

22   Lester Eber had foreclosed on certain assets that

23   belonged to Eber Brothers Wine and Liquor Corp. and

24   had been required to name Southern as a party to that

25   action?

Page 74

1          MR. RAMSEY:  Form.

2          THE WITNESS:  I think that's why we're

3      here today.  So to restate my answer, I have had

4      nothing to do with this case, other than up to

5      in preparation for today.

6          So I don't know any of the real basis of

7      the case or whatever else.

8   BY MR. BROOK:

9      Q.   Well, so it's fair to say that in

10  preparation for today's testimony you did not become

11  aware of anyone who dealt with the 2012 foreclosure

12  action at the time on behalf of Southern?

13      A.   I think that states it correctly.

14      Q.   When you were negotiating the consulting

15  agreement were you made aware of what Lester Eber's

16  salary was that he was receiving from Eber Brothers

17  at the time?

18      A.   I have no recollection, no.

19      Q.   Do you know whether his salary was, you

20  know, in the same ballpark as $600,000 a year?

21          MR. RAMSEY:  Form.

22          THE WITNESS:  I think I answered, I had

23      no idea.  In privately held companies it's not

24      only salary but it's distributions and

25      everything else.  It's a whole gamut of

Page 75

1          compensation.  It wasn't in my reconciliation
2          when we were trying to value it.
3                    MR. BROOK:  Why don't we take a break
4          now.  I'm going to see if I can narrow this
5          down.
6                    (Thereupon a brief recess was taken,
7     after which the following proceedings were had.)
8                    MR. BROOK:  We will do one more exhibit.
9          We will mark this one as 96.
10                   (The document referred to was thereupon
11    marked Plaintiff's Exhibit 96 for Identification, a
12    copy of which is not attached hereto.)
13    BY MR. BROOK:
14         Q.   This is bearing Bates numbers EB688
15    through 691.  It is a letter on Harris Beach
16    letterhead dated November 30, 2007, addressed to
17    Southern Wine & Spirits.  Do you recognize this
18    document?
19         A.   No, I don't.
20         Q.   Do you know why Harris Beach was
21    providing a letter to Southern when they were
22    representing the Eber Brothers companies?
23         A.   I would only be assuming that they -- can
24    you give me a minute to take a look at it?
25         Q.   Sure.

Page 76

1         A.    Okay.

2         Q.    Have you had a chance to review it?

3         A.    Briefly, yes.

4         Q.    So do you know why this was --

5         A.    It seems to be a standard opinion letter

6    by seller's counsel as to the opinion of the

7    contemplated transaction, covering a wide range of

8    areas about power, going into sales duties and rights

9    and the abilities to enter this transaction.

10        Q.    So you say a standard letter.  Is this

11   something that typically is requested by Southern in

12   these transactions?

13        A.    In every closing I have been involved in

14   both attorneys, both seller and buyer, require an

15   opinion letter of their counsel as the ability to

16   enter into a transaction.

17        Q.    So it says here on the first page that

18   they reviewed four documents in order to enter

19   into -- in order to render the opinions set forth

20   herein.  Do you see that?

21        A.    Yes.

22        Q.    Do you know why the consulting agreement

23   was not one of the documents that was considered as

24   part of this opinion letter?

25              MR. RAMSEY:  Form.

1              THE WITNESS:  I can't answer that.

2    BY MR. BROOK:

3        Q.   Do you know whether an opinion letter was

4    sought from Harris Beach as to the consulting

5    agreement?

6        A.   I can't answer that, no.

7        Q.   When you say you can't answer that, you

8    don't know?

9        A.   I don't know.  I don't know.

10       Q.   Okay.  Have you discussed this deposition

11   with anyone other than your attorneys and the three

12   individuals in the company that you named earlier?

13       A.   No.

14       Q.   Have you discussed this deposition with

15   Lester Eber?

16       A.   No.

17       Q.   Do you know whether your lawyers have

18   spoken with lawyers for Lester Eber?

19            MR. ACKERMAN:  I'm going to ask you not

20       to divulge the content of any communication

21       between your lawyers and you.

22            THE WITNESS:  I have no idea about the

23       communications between the attorneys.

24   BY MR. BROOK:

25       Q.   Do you know whether the substance of what

Page 78

1   your anticipated testimony here today was going to be

2   was communicated to Lester Eber or his lawyers in

3   advance?

4           MR. ACKERMAN:  Same instruction.

5           THE WITNESS:  I have no idea what the

6       attorneys discussed.

7           MR. BROOK:  I have no further questions.

8           MR. RAMSEY:  I'm not going to be long at

9       all.  I just want to talk to Lester for five

10      minutes.

11          MR. BROOK:  Sure.

12          (Thereupon a brief recess was taken,

13  after which the following proceedings were had.)

14                  CROSS EXAMINATION

15  BY MR. RAMSEY:

16      Q.   Good morning, Mr. Hager.  We met off the

17  record.  My name is Colin Ramsey and I represent the

18  Eber entities in this lawsuit.

19          I just have a couple of follow-up

20  questions.  Same rules apply that Mr. Brook gave

21  you.  If you don't understand a question, don't hear

22  it, I will be happy to repeat it.  Fair enough?

23      A.   Yes.

24      Q.   If I could have you turn your attention

25  to what was previously shown to you as Exhibit 27,

Page 79

1    the consulting agreement that Lester Eber entered

2    into with Southern.   Just let me know when you're

3    there.

4            A.    Yes.

5            Q.    Can you turn to the last page of Exhibit

6    27, specifically paragraph 22.   I'll just read it

7    into the record.   It's short.

8                  It's entitled:   "Entire Agreement.   This

9    agreement contains the entire agreement of the

10   parties relating to consultant's relationship with

11   the company for the term."   Do you see that?

12           A.    Yes.

13           Q.    Do you understand what was intended by

14   that paragraph?

15           A.    I signed it.

16           Q.    Okay.   What's your understanding of what

17   paragraph 22 means?

18           A.    There is nothing -- there is nothing else

19   that Lester is bound to or I am bound to, other than

20   what's in this document.

21           Q.    In other words, fair to say that there is

22   not a side deal of any kind that Lester and Southern

23   entered into that would be in addition in any way to

24   Exhibit 27?

25           A.    No.

1      Q.   You were asked a number of questions

2   about whether the consulting agreement, the

3   compensation arrangement with Lester Eber was similar

4   or typical as other consulting agreements that

5   Southern entered into.

6           Do you recall that line of questions?

7      A.   Yes.

8      Q.   I believe, if I can summarize your

9   testimony was yeah, this is typical practice with

10  Southern; is that fair?

11     A.   The methodology is typical.  The value

12  could change.  Here we had a -- you know, what we

13  thought was a high value, high use, high whatever, so

14  the methodology is the same.

15     Q.   If I understood what -- you anticipated

16  my next question.  The particular compensation

17  structure or compensation arrangement with the

18  consultant would depend on what value Southern

19  believed could be derived from utilizing that

20  consultant; is that fair?

21     A.    I believe I explained that's exactly the

22  thought process that I personally go through.

23     Q.   And just to put a bow on it, that's how

24  Southern and Lester ultimately arrived at the

25  compensation arrangement that was agreed upon back in

Page 81

1    2007?

2         A.   Yes.

3         Q.   Did I understand the entirety of your

4    deposition testimony, at least with respect to the

5    consulting services that Lester has provided, to be

6    that Southern has been happy with the services that

7    Lester has provided pursuant to the consulting

8    agreement?

9         A.   We believe we have gotten our fair

10   bargain.

11        Q.   To the extent Southern at any time did

12   not believe they were getting what they paid for

13   there would have been a mechanism whereby they could

14   end that relationship with Lester Eber, correct?

15        A.   We, in fact, did change the relationship

16   from the initial agreement that went out and, again,

17   we narrowed the responsibilities and we adjusted the

18   consulting fees.

19        Q.   Certainly.  And you testified to that and

20   to the extent you thought that you weren't getting

21   the benefit of the bargain whether under the original

22   terms or the renegotiated terms with Lester, Southern

23   could avail themselves of a mechanism to end that

24   relationship, correct?

25        A.   I would have ended it.

Page 82

1        Q.    You were asked a number of questions

2   about reimbursements that Lester submitted and was

3   ultimately paid.  Do you recall that?

4        A.    Yes.

5        Q.    Was there ever any concern on the part of

6   Southern that Lester was in any way abusing the

7   reimbursement process?

8        A.    Not that I can recall.

9        Q.    You were asked by Mr. Brook whether you

10  were aware of the ownership structure of the various

11  Eber entities and whether or not you were aware of an

12  Allen Eber will or an Allen Eber trust, and I believe

13  your answer was you weren't aware of either?

14        A.    Correct.

15        Q.    Probably I know the answer to this

16  question, but let me ask it anyway.  Did you ever

17  have any discussions with Lester Eber about this

18  trust?

19        A.    Never.

20        Q.    Any discussion with Lester Eber about

21  arranging his compensation structure to somehow do an

22  end-around the trust?

23        A.    Never.

24        Q.    Do you know an individual named Dan

25  Kleeberg?

Page 83

1        A.    No.

2        Q.    I will represent to you that Mr. Kleeberg

3   is one of the plaintiffs in this action and is a

4   former employee of Eber Brothers.   Does that refresh

5   your recollection of anything?

6        A.    You asked if I know him and no, I don't

7   know him.   Did I recognize the name?   I have seen the

8   name, but I have no idea of the association --

9        Q.    So I am assuming then --

10       A.    -- or employee or not.

11       Q.    -- you don't recall any conversations that

12   you would have had with Mr. Kleeberg?

13       A.    Never.

14       Q.    Any recollection of any conversations you

15   had with the two other plaintiffs, Audrey Hays or

16   Lisa Stein?

17       A.    I have no recollection of ever talking to

18   them.

19            MR. RAMSEY:   That's all I have.   Thank

20       you.

21                 REDIRECT EXAMINATION

22   BY MR. BROOK:

23       Q.    I have one follow-up question.

24       A.    Okay.

25       Q.    You mentioned narrowing the

Page 84

1   responsibilities.   How were Lester Eber's

2   responsibilities narrowed?

3          A.    They went from the initial agreement,

4   where I described as being very wide, which was --

5   maybe I didn't explain it well enough.

6                Very wide, where they were operational,

7   location, logistics.   In the beginning of the

8   relationship we had no idea who even the key

9   customers were.

10                We had a fairly good idea of the

11   suppliers.   We had no idea of the trading practices

12   up there because they were individual upstate trading

13   practices, different than metro.   In addition, in the

14   wide spectrum there was the -- you know, the

15   regulatory, the SLA, you know, the government

16   representation.

17                That's how it was really widened.   We

18   then narrowed it.   When I say we narrowed it, we cut

19   off a lot of those buckets since we had built some

20   muscle and we understood how to do business up there

21   and we're now focusing Lester on the narrow thing of

22   government affairs.

23                I discussed policy -- governmental policy

24   with alcoholic beverage I think is very, very

25   important for our future and the whole idea of the

Page 85

1    SLA regulation.  But it's much deeper now, you know.

2    So we went from wide, with a lot of topics, going

3    from deep to now narrow, but really, really pretty

4    deep in those things and thrusting him into

5    everything that comes our way and holding him

6    accountable for letting us know what's happening in

7    the terms of the bill that might be coming or some

8    legislator who might have some temperance movement

9    that wouldn't be good for our business.

10         Q.   Has the amount of time that Lester has

11   spent consulting decreased as a result of the

12   narrowing of his responsibilities?

13         A.   I would say probably it's gotten more

14   because it went a lot deeper on more complex things.

15   I think the certainty of what I think the work is

16   might vary, but I think the topics that come through,

17   when you have a law coming out that can affect your

18   industry or affect your business or your operation,

19   you know, that's deep.

20              You're going to go very, very deep.  It

21   could be weeks of lobbying or discussing or

22   politicking or whatever else.  I think it's probably

23   equivalent but, you know.

24         Q.   But the amount of money he's being paid

25   has been decreased?

Page 86

1          A.    Exactly.  Exactly.  Why?

2          Q.    Yeah, why?

3          A.    Why?  Because it gets back to the

4    muscle -- you know, the muscle that we built.  Like,

5    for instance, in metro New York we brought in this

6    young kid.  Adam Hasson is it?  Or something like

7    that.  Is it Adam Hasson?

8                Because we were getting so many SLA

9    violations.  So Lester, a few years ago we had him

10   kind of oversee Adam to bring him along, an attorney

11   himself that we brought in-house to deal with the SLA

12   issues.

13               So we kind of like -- we took that and we

14   were transferring knowledge from Lester to now

15   somebody who is dealing with it.  Will his

16   responsibilities grow into upstate New York one day?

17   I think we started a little bit, you know, but that's

18   how I describe it.

19         Q.    I apologize, as I mentioned on the

20   record, I'm a little off today.  Who threw out the

21   first number when you were initially negotiating

22   Lester's consulting fee in 2007?

23               MR. RAMSEY:  Form.

24               THE WITNESS:  I think -- I don't really

25         remember who threw out the first number.  I

1      don't really remember.

2    BY MR. BROOK:

3          Q.   Do you remember what Lester's largest

4    demand was?

5          A.   No.  No.

6          Q.   Do you remember what Southern's smallest

7    offer was?

8          A.   No.  But, you know, again, I thought we

9    did pretty well in that first round.

10          Q.   Were those negotiations carried out at

11    the same time as the negotiations for the other price

12    terms for the purchase agreements that were entered

13    into?

14          A.   I would like to say it and I think, as I

15    said, I think we always envisioned it being a

16    consulting agreement.  The thrust of everything that

17    we were doing in those early deal days I will say was

18    business survival and figuring out workouts so his

19    business did not implode and we would be picking up

20    pieces.  We always kind of knew there would be a

21    consulting.  That was not the focus of us.

22          Q.   Just trying to get the timing.  Those

23    were discussed at the same time, it wasn't like you

24    had a separate meeting to discuss the consulting

25    agreement; is that right?

1          MR. RAMSEY:  Form.

2          THE WITNESS:  If I recollect, the

3     consulting agreement was finalized when we knew

4     we had a deal and we had the structure of the

5     deal that -- you know, I can't tell you -- I

6     don't remember if it came up in the deal

7     discussions, but what I can tell you is it was

8     always our intention to enter, hopefully entice

9     him to also stay there.

10    BY MR. BROOK:

11         Q.   Did you consider the negotiation of the

12    consulting agreement to be something that was

13    separate from the rest of the deal that you were

14    negotiating or was it part of the overall deal you

15    were looking for?

16         MR. RAMSEY:  Form.

17         THE WITNESS:  By design we had to get the

18    deal done to make the business survive,

19    otherwise there would be no consulting agreement

20    and I think Lester realized that.

21         There would be nothing to consult with

22    unless there was some sort of deal done.  It

23    wasn't the primary focus.  It surely wasn't the

24    primary focus on what we were doing.  We were

25    building a company.

Page 89

1           MR. BROOK:  Thank you.  Nothing further.

2           MR. ACKERMAN:  Anything else or is the

3      deposition concluded?

4           MR. RAMSEY:  No questions here.

5           MR. ACKERMAN:  Thank you.

6           (Thereupon the taking of the deposition

7 was concluded.)

8      _____

9                    LEE HAGER

10

11 Subscribed and sworn to before me

12 this _____ day of _____, 2019.

13

14 _____

15           NOTARY PUBLIC

16

17

18

19

20

21

22

23

24

25

Page 90

1                    CERTIFICATE OF OATH

2

3    STATE OF  FLORIDA:

4                    SS:

5    COUNTY OF   DADE:

6

7

8              I, the undersigned authority, certify that

9    LEE HAGER personally appeared before me and was duly

10   sworn.

11             WITNESS my hand and official seal this 20th

12   day of May 2019.

13

14

15

16

                    *Edmed Varhonyi*

17                  Notary Public, State of Florida at

18                  Large; my commission expires

19                  February 26, 2023. Bonded through

20                  Troy Fain Insurance, Inc.

21

22

23

24

25

Page 91

1          CERTIFICATE OF REGISTERED PROFESSIONAL REPORTER

2

3              I, EDWARD VARKONYI, and Registered
Professional Reporter and a Notary Public for the

4  State of Florida at Large, do hereby certify that I
reported the deposition of LEE HAGER; that the

5  foregoing pages, numbered from 1 to 89, inclusive,
constitute a true and correct transcription of my

6  shorthand report of the deposition by said witness on
this date.

7              I further certify that I am not an
attorney or counsel of any of the parties, nor a

8  relative or employee of any attorney or counsel
connected with the action, nor financially interested

9  in the action.
              WITNESS my hand and official seal in the

10 City of Miami, County of Dade, State of Florida, this
20th day of May 2019.

11

12

13

14

15

16

17         Notary Public, State of Florida at

18         Large; my commission expires

19         February 26, 2023.  Bonded through

20         Troy Fain Insurance, Inc.

21

22

23

24

25

Page 92

1                    E R R A T A   S H E E T

2    PAGE        LINE                      CORRECTION AND REASON

3    _____       _____        _____

4    _____       _____        _____

5    _____       _____        _____

6    _____       _____        _____

7    _____       _____        _____

8    _____       _____        _____

9    _____       _____        _____

10   _____       _____        _____

11   _____       _____        _____

12   _____       _____        _____

13   _____       _____        _____

14   _____       _____        _____

15   _____       _____        _____

16   _____       _____        _____

17   _____       _____        _____

18   _____       _____        _____

19   _____       _____        _____

20   _____       _____        _____

21   _____       _____        _____

22   _____       _____        _____

23

24   _____               _____

25   (DATE)                         LEE HAGER

Page 93

1                    E R R A T A   S H E E T

2   PAGE      LINE                    CORRECTION AND REASON

3   _____     _____     _____

4   _____     _____     _____

5   _____     _____     _____

6   _____     _____     _____

7   _____     _____     _____

8   _____     _____     _____

9   _____     _____     _____

10  _____     _____     _____

11  _____     _____     _____

12  _____     _____     _____

13  _____     _____     _____

14  _____     _____     _____

15  _____     _____     _____

16  _____     _____     _____

17  _____     _____     _____

18  _____     _____     _____

19  _____     _____     _____

20  _____     _____     _____

21  _____     _____     _____

22  _____     _____     _____

23

24  _____     _____

25  (DATE)                    LEE HAGER

[& - acquired]                                                    Page 1

| & | 1st  61:5 | 4 | 95  3:12 63:6,8,12 |

**&**

**&**   1:18 2:3,6,9
  66:24 75:17

**0**

**000124**   3:10
**00035524**   3:11
**04**   12:24,25 25:25
  33:10
**05**   15:15,15 18:4
  18:22,24 20:6
**06**   20:6
**07**   18:25 19:5,5
  25:25 49:12,20

**1**

**1**   8:24 11:5 61:11
  91:5
**1,000**   56:9
**1.5**   66:18
**10**   29:2
**10,000**   56:4 61:12
  62:15
**10/21/17**   59:3
**100**   2:3 67:22
**100,000**   56:24
**10007**   2:4
**1031**   2:12
**1100**   1:12
**118,371.21.**   59:24
**11:55**   1:14
**12**   49:12,20
**12/17/2017**   59:14
**130**   27:20,23
**138**   3:10
**14202**   2:7
**14614**   2:20
**15**   64:18 65:3,17
  65:18 67:4,14
**16**   1:3 2:20
**19**   3:10

**1st**   61:5

**2**

**2**   10:24 11:6 27:24
  29:2
**2005**   15:24 17:25
**2007**   10:22 19:23
  19:23 40:3 50:7
  63:17 64:9 75:16
  81:1 86:22
**2007/2008**   40:7
**2008**   40:4
**2012**   49:12,17
  50:10 61:5,11,11
  73:10,14 74:11
**2017**   51:8
**2018**   57:19 59:23
  60:2
**2019**   1:13 89:12
  90:12 91:10
**2023**   90:19 91:19
**20th**   90:11 91:10
**22**   79:6,17
**22,000**   69:4
**2454**   90:16 91:16
**25**   49:21
**26**   90:19 91:19
**27**   49:24 78:25
  79:6,24
**29**   60:20

**3**

**3**   11:6 67:5
**30**   75:16
**300,000**   51:4 62:16
  63:2
**30th**   63:16
**31**   61:11
**320**   2:7
**33401**   2:17

**4**

**4**   3:3 11:6
**40**   51:20
**43**   3:11 58:6
**49**   65:18

**5**

**5**   30:7
**50**   2:7 49:18,19,21
**500,000**   33:5,17
  34:2,7
**51**   65:18
**58**   3:11

**6**

**6**   32:23 47:5
**600,000**   34:8 74:20
**63**   3:12
**644**   3:12
**652**   3:12 63:13
**688**   3:13
**691**   3:13 75:15

**7**

**75**   3:13
**777**   2:16
**78**   3:3
**7th**   1:12

**8**

**8**   3:9
**83**   3:3
**89**   91:5
**8th**   2:3

**9**

**9**   1:13
**92**   3:9 8:11,13
**93**   3:10 19:3,6,11
  19:15 27:15 46:25
**94**   3:11 57:25 58:2
  61:21
**94920**   2:13

**95**   3:12 63:6,8,12
**951**   1:3
**96**   3:13 75:9,11
**98**   1:12
**99**   55:3
**9:35**   1:14

**a**

**a.m.**   1:14,14
**abilities**   76:9
**ability**   17:15 25:12
  44:17 48:3 73:6
  76:15
**able**   28:13 35:14
  35:16 70:11
**absolutely**   30:5
  31:25 36:8 38:21
  43:2,2 69:11
**abusing**   82:6
**accepted**   24:18
**access**   11:25
**accomplish**   70:15
**accomplished**
  70:19
**accountable**   54:5
  85:6
**accounting**   11:9
  11:12,22,24 12:2
  58:15,18
**accounts**   54:8
**ackerman**   2:15
  17:14 19:2,7 25:9
  39:8 47:12,21
  50:2 77:19 78:4
  89:2,5
**acquire**   22:20
  64:18 66:24
**acquired**   20:20,24
  21:4 23:8,10
  28:10,12 37:24
  45:6 64:14

[acquiring - assuming]                                                                      Page 2

**acquiring** 13:9
  18:16 24:11 30:3
**acquisition** 13:12
  13:14,19 14:10,14
  15:6,9,12 18:1
  20:5,9 22:11 48:9
  67:4
**acquisitions** 18:5
  18:7 64:12 71:4
  72:22,24
**act** 37:7
**action** 1:3 73:10
  73:16,20,25 74:12
  83:3 91:8,9
**actions** 38:6
**adam** 86:6,7,10
**added** 37:6
**addition** 11:8
  62:16 64:1 79:23
  84:13
**addressed** 30:9
  60:22 75:16
**adjusted** 81:17
**administration**
  24:22
**administrative**
  24:23 61:9
**advance** 25:23
  66:16,16 78:3
**advanced** 65:1
  66:7,12,18
**advances** 66:1,1
**advantage** 25:11
  53:18 71:9
**advice** 5:9 41:1
  45:13
**advisory** 23:16
**advocacy** 57:4
**affairs** 36:20 37:8
  42:10,21 55:1
  84:22

**affect** 85:17,18
**affiliated** 12:10
**affiliates** 4:24
  30:12 31:7
**afloat** 66:3
**agent** 53:13
**ago** 5:6 8:9 86:9
**agree** 65:22 69:14
**agreed** 28:13 32:2
  33:16 49:17 80:25
**agreement** 26:1,5
  26:20 27:5 30:23
  32:24 33:13 37:10
  43:18 44:12 47:1
  47:11 48:9 49:11
  49:20,20 50:6,9,14
  51:20 53:22,23
  55:17 61:6,16
  62:9,11 63:21
  64:2,17 67:3
  69:14,18 74:15
  76:22 77:5 79:1,8
  79:9,9 80:2 81:8
  81:16 84:3 87:16
  87:25 88:3,12,19
**agreements** 45:2
  49:7 69:24 80:4
  87:12
**ahead** 7:21 12:5
**air** 60:7
**airport** 55:5
**akerman** 2:16
**al** 1:4,7
**alan** 2:23
**albany** 42:19
  43:12 55:8 71:3
**alcoholic** 42:18
  84:24
**alexbay** 2:8
**align** 14:25

**alignment** 14:23
**alive** 39:20,21,22
**allen** 82:12,12
**allocated** 29:20
**allowed** 7:19
**amendment** 29:9
  29:10,10
**amendments**
  19:24
**america** 4:17 61:8
  63:18
**amount** 25:20
  28:14,25 29:5,6,7
  29:12,19,23 30:1
  33:7,15,19 49:16
  51:4 55:23 56:22
  57:19 60:6 61:22
  61:25 62:21,22
  85:10,24
**amounts** 31:1
  62:18
**analyzes** 57:16
**annual** 33:4
**answer** 6:5,23 7:3
  7:12,16,21 11:4,5
  17:14 22:14 25:7
  33:8,21 37:19
  38:1 43:22 44:16
  47:16,17,19 60:9
  62:6 69:20 70:5,6
  71:7 74:3 77:1,6,7
  82:13,15
**answered** 47:23
  60:4,24 74:22
**answering** 5:13
**answers** 6:20 8:3
  19:8
**anticipated** 21:25
  42:15 78:1 80:15
**anyway** 82:16

**apologize** 86:19
**appearances** 2:1
**appeared** 90:9
**appears** 61:22
  63:15 64:1
**apply** 78:20
**approval** 54:7,11
  54:16 56:19
**approved** 54:2
  55:18
**approximately** 5:6
  8:9 34:16
**archrival** 14:4
**area** 13:16,22 31:8
  42:3 68:1,6 71:21
  71:25
**areas** 76:8
**arguments** 42:17
**arm's** 26:15
**arrangement** 25:5
  80:3,17,25
**arranging** 82:21
**arrived** 80:24
**ascertained** 62:24
**asked** 7:20 61:21
  80:1 82:1,9 83:6
**asking** 5:12 6:11
  7:1
**assessed** 33:11
  44:17
**asset** 13:14 65:2
**assets** 24:11 27:25
  29:3 30:4 64:11
  73:12,22
**associates** 2:3
**association** 83:8
**assume** 7:4 37:17
  56:5 72:20,24
**assumed** 34:5
**assuming** 59:6
  75:23 83:9

[assumption - business]                                                    Page 3

**assumption**  44:20
   59:10 72:21
**attached**  3:20 8:14
   19:12 58:3 63:9
   75:12
**attack**  37:2
**attention**  78:24
**attorney**  7:16 71:8
   86:10 91:7,8
**attorneys**  27:3,8
   69:21 70:15 76:14
   77:11,23 78:6
**audit**  54:13 56:19
   60:18
**audrey**  83:15
**authority**  36:22
   90:8
**authorized**  39:15
**avail**  81:23
**average**  51:24
   55:10
**aware**  4:12 38:18
   44:11 51:19 61:16
   63:20 66:23 67:14
   72:10,14,17 73:21
   74:11,15 82:10,11
   82:13
**awful**  21:15

**b**

**b**  2:19 3:7 33:4
   47:5
**back**  11:22,25
   12:3,7,19 18:11
   20:1 24:21 27:6,8
   30:16 32:21 49:18
   55:5 64:9 68:22
   80:25 86:3
**bad**  68:2
**ballpark**  52:4
   55:22 74:20

**bargain**  37:4
   81:10,21
**bargained**  37:4
**bargaining**  37:6
**base**  15:2
**based**  8:25 13:20
   13:23 47:17 56:7
**basically**  16:14
   41:11 71:9
**basis**  9:6,12 34:14
   34:14 44:1 74:6
**bates**  27:19 58:5
   63:13 75:14
**beach**  2:17 27:11
   27:13 75:15,20
   77:4
**bearing**  58:5
   75:14
**bears**  63:13
**becker**  9:16 60:22
   61:1,1,6
**began**  43:11
**beginning**  40:3,7
   40:21 84:7
**beginnings**  15:15
**behalf**  2:4,8,13,17
   2:21 26:20 74:12
**believe**  8:22 9:8
   12:24,24 13:6
   14:16 15:7 16:22
   16:23 17:21 29:7
   29:8 30:6,21,23
   34:1,7,9 35:11,22
   41:4 42:14 47:22
   49:11,18,19 51:14
   53:19 60:16,24
   61:17,22 62:1,5,7
   65:3 80:8,21 81:9
   81:12 82:12
**believed**  21:23
   48:20 80:19

**bell**  27:11
**bellwether**  16:23
**belonged**  73:23
**belonging**  73:12
**benefit**  24:24
   81:21
**best**  5:23 17:2,15
   20:10 22:12 34:9
**better**  16:4 50:13
**beverage**  42:19
   84:24
**big**  18:2 32:16
   73:2
**biggest**  68:7
**bill**  57:5 85:7
**bit**  20:1 41:9 86:17
**black**  72:20
**blood**  24:7
**bonded**  90:19
   91:19
**bottle**  38:10
**bottom**  24:1 27:19
   58:16
**bought**  28:16,18
   28:19,21,23 36:3
**bound**  44:3 50:17
   50:25 79:19,19
**bow**  80:23
**box**  2:12
**branches**  61:9
**brand**  38:3
**brands**  23:2
**breaching**  46:10
**break**  7:19,22 75:3
**breakfast**  6:21
**brian**  2:2 46:18
**brief**  46:21 75:6
   78:12
**briefly**  76:3
**bring**  16:16,21
   86:10

**broad**  25:11,16
   37:10 40:12 41:14
**broader**  34:6
**brokerage**  35:1
**brook**  2:2,3 3:20
   4:7 8:15 17:23
   19:3,6,13 20:23
   25:19 27:10 32:7
   38:15 39:10,23
   44:10 45:11 46:5
   46:14,20,23 48:7
   48:23 50:3 52:13
   56:3 57:23 58:4
   60:10 63:10 64:8
   69:12 70:8,17
   71:13 74:8 75:3,8
   75:13 77:2,24
   78:7,11,20 82:9
   83:22 87:2 88:10
   89:1
**bros**  2:9,9
**brothers**  2:9 14:25
   15:9 16:5,11 20:6
   20:19 21:4 28:10
   31:6 37:16,18,24
   38:19 43:4,19
   64:12 66:24 69:8
   69:16 72:1,8,11,17
   73:6,12,23 74:16
   75:22 83:4
**brought**  86:5,11
**buckets**  54:22
   55:3 84:19
**buffalo**  2:7 41:5,9
**build**  14:7 50:22
**building**  17:19,20
   35:5,17 38:3
   88:25
**built**  84:19 86:4
**business**  13:9 14:7
   14:19 15:1,3 17:4

[business - consultant's]

17:20 18:6,7
20:19 21:10 22:19
25:2,13 31:1,2,3
32:14 34:9 35:1,2
36:3,9,12 38:9,9
38:14 42:17,23
43:16 44:24,24
46:1 47:25 51:18
66:14 67:18,23
68:11 69:7 70:24
71:9,11,14,18,20
72:4 84:20 85:9
85:18 87:18,19
88:18
**butt**  24:4 57:9
**buy**  26:17 44:17
44:19
**buyer**  76:14
**buying**  34:3

**c**

**california**  2:13
**calihan**  2:19,19
17:12 32:4
**call**  18:6 36:12,21
38:5 41:20 52:7
54:21 57:8 65:25
70:23
**called**  4:3 36:21
66:9
**calls**  47:13
**capabilities**  48:4
**captures**  58:10
**care**  41:25 70:20
**carried**  87:10
**case**  4:13 10:19,21
31:24 58:7 74:4,7
**cash**  29:18
**category**  59:12
**cause**  1:25
**ceased**  18:10 70:1
70:2

**centric**  33:23
34:10
**certain**  16:6 17:4
50:23 58:16 62:7
62:20,21 73:1,22
**certainly**  81:19
**certainty**  85:15
**certificate**  90:1
91:1
**certify**  90:8 91:4,7
**chain**  54:5 55:19
**challenge**  25:1
**chance**  76:2
**chances**  23:24
**change**  80:12
81:15
**changed**  29:6,8,12
30:19 40:3 42:10
**chaplin**  9:18,25
10:3,4,9,9,10
20:12,13,14
**chaplins**  10:8
**charge**  24:21
37:15
**charged**  42:11
**charges**  57:12
**charming**  23:11
**check**  58:11
**cheese**  16:20
**church**  2:3
**city**  36:25 91:10
**civil**  1:3 73:10
**clarification**  7:6,7
**clarify**  6:11,16
19:7 31:21 46:15
**clarity**  10:7
**clear**  13:11 49:22
**clearly**  13:19 66:5
**client**  7:16
**clients**  45:25

**close**  41:10
**closely**  9:6,11
52:23
**closing**  29:18
76:13
**coding**  58:15,18
**colin**  2:6 78:17
**come**  71:10 85:16
**comes**  38:16 40:16
85:5
**coming**  17:7 30:25
32:21 57:5 73:19
85:7,17
**command**  55:19
**commercial**  22:9
22:16 36:6 51:18
**commercially**
67:12
**commission**  90:18
91:18
**common**  67:21
**communicated**
78:2
**communication**
12:16 77:20
**communications**
47:14 77:23
**companies**  12:10
15:20 23:10 30:3
32:13,21 43:6
74:23 75:22
**company**  13:7
14:5 20:24 24:21
31:7 38:23 43:4
43:20 45:5 46:10
66:6,8,11 73:18
77:12 79:11 88:25
**compensation**
33:5,15 75:1 80:3
80:16,17,25 82:21

**competed**  71:21
**competing**  31:4
32:21
**competition**  14:4
32:16,16,17 51:16
**competitor's**
68:10
**compilation**  60:21
**complex**  85:14
**concern**  82:5
**concerned**  46:9
55:8
**concluded**  89:3,7
**condescending**
16:19
**condition**  7:25
**confirm**  61:6
**conflict**  45:22,22
46:6
**confused**  18:14
**confusion**  18:13
**conjunction**  61:17
**connected**  91:8
**connecticut**  2:10
44:14,22 64:19
65:4,6,23 66:25
67:4,8,17,19,24
**connection**  73:11
**conscious**  5:18
**consequence**
42:18
**consider**  88:11
**considered**  76:23
**constitute**  91:5
**consult**  88:21
**consultant**  21:9
38:17 40:3 55:16
55:16 71:16,22
80:18,20
**consultant's**  79:10

[consultants - decreased]

consultants  26:6,7
  26:8 35:7 44:3,6
  45:24
consulting  22:2
  23:15 24:12 25:4
  25:20 26:1,19
  27:5 30:23 32:24
  34:2,13,17 35:23
  37:7,10 43:18
  44:4,12 45:2,4,16
  45:23 47:1 48:9
  48:10 49:7 50:6,9
  51:1,19,25 52:15
  53:23 54:18 57:19
  59:22 62:16 63:1
  63:21 64:1 69:13
  71:19 74:14 76:22
  77:4 79:1 80:2,4
  81:5,7,18 85:11
  86:22 87:16,21,24
  88:3,12,19
consultive  22:1
  49:15
consummated
  13:1 18:18 67:2
contact  14:2
contacting  13:8
contained  63:21
contains  79:9
contemplated  21:2
  76:7
content  47:14
  77:20
context  40:23 42:1
continue  21:3
  37:13 44:13,21
  48:21 70:11
continued  15:17
  45:6 71:17 72:2
continuing  15:21
  20:19 45:17 51:2

69:8
continuity  15:2
  23:22 25:2 35:6
contract  25:13
  43:25 45:4 48:24
  70:9,10
contracted  68:14
  70:12
contracts  45:2
contrary  23:21
  53:15
control  47:24 48:6
  48:14,22 50:16,25
conversation  5:17
  6:19 12:22
conversations
  83:11,14
conveyed  20:18
conveying  54:24
copies  50:1 60:12
copy  8:14,16
  19:12 58:3 63:9
  75:12
core  22:15
corp  72:8,12,18
  73:13,23
corporate  4:15 8:5
corporation  2:9
  31:6 44:4 72:2
correct  4:17 43:4
  44:15 48:25 49:4
  51:8,21 53:5,25
  62:16 63:22 64:14
  64:15,16 67:5
  71:19 72:18 81:14
  81:24 82:14 91:5
correction  92:2
  93:2
correctly  12:19
  37:9 41:9 54:14
  64:24 74:13

cost  56:9
costly  23:6
counsel  2:23 9:2
  27:9 38:25 47:15
  76:6,15 91:7,8
counter  32:15
counting  22:19
country  22:12
county  90:5 91:10
couple  25:24
  27:14 78:19
court  1:1 5:19
  6:10,16 73:11
covenant  3:12
  30:24 31:17 32:3
  32:9 49:3 50:17
  51:7,11 63:16,21
  63:25
covenants  29:20
  30:3,14,18,22
covered  36:18
  40:12
covering  76:7
created  32:14
credited  66:17
creed  44:23 65:13
critical  26:3
cross  3:2 78:14
culture  40:24
current  30:12
  52:24
customary  56:20
customer  21:20
  38:10,11
customers  67:13
  84:9
cut  49:14,18 84:18
cv  1:3

**d**

d  2:6 3:1 47:1
dade  90:5 91:10
dan  82:24
daniel  1:4
date  35:4 58:20,23
  91:6 92:25 93:25
dated  19:22 61:5
  75:16
dates  12:19 40:5
dating  48:2
david  2:15 68:17
  68:19,20,21,24,25
  69:6
day  9:6,6,12,12
  40:8,8 52:17,17,20
  52:20 63:16 69:25
  86:16 89:12 90:12
  91:10
days  39:7 40:12,16
  52:23 87:17
de  28:25
deal  18:1 30:19
  32:12 33:23 34:1
  65:8 70:24 79:22
  86:11 87:17 88:4
  88:5,6,13,14,18,22
dealing  36:25
  39:13,18 40:17
  42:25 86:15
deals  24:16 34:20
dealt  74:11
dear  61:5
december  61:11
decided  50:12
  65:20
decision  32:11
  41:12
decisions  43:16
decreased  85:11
  85:25

**deep**  42:9 48:17
  85:3,4,19,20
**deeper**  40:14 85:1
  85:14
**defendant**  2:21
**defendants**  1:8 2:8
  2:13 58:6
**defense**  54:15
**deficit**  41:18
**define**  73:3,4
**definition**  12:7
  13:20
**delaware**  18:5,16
  31:9 34:4 35:2
  46:2 64:13
**demand**  87:4
**department**  11:10
  11:13 12:2
**depend**  80:18
**depending**  57:3
  60:17
**deposed**  4:12 5:1,5
**deposition**  1:18,25
  5:12,17 8:17,20
  77:10,14 81:4
  89:3,6 91:4,6
**derived**  80:19
**describe**  40:10
  41:3 43:25 48:16
  53:10 66:2 86:18
**described**  40:22
  47:5 70:19 84:4
**describes**  32:23
**description**  59:13
**design**  88:17
**detail**  40:11 60:6
**deter**  15:21
**determined**  25:21
  33:7 62:18
**difference**  67:7

**differences**  5:16
**different**  7:17
  21:17,19,21 26:12
  40:13 41:24 84:13
**diligence**  65:5
  67:10
**diminished**  44:7
**dine**  56:13
**dinners**  60:8
**direct**  3:2 4:6
**directly**  45:16
**disclose**  39:14
**disclosed**  38:22
  61:19 62:22
**disclosure**  63:4
**discriminate**  39:4
**discuss**  87:24
**discussed**  5:7 11:9
  17:25 57:11 71:15
  77:10,14 78:6
  84:23 87:23
**discussing**  15:5
  85:21
**discussion**  15:13
  20:8,11,17 82:20
**discussions**  12:6
  14:13 15:4,23
  17:9,11,21,24 18:4
  20:3,5 21:1 27:1,4
  47:18 64:11 69:6
  82:17 88:7
**disrespectful**  10:5
**distribution**  23:3
  68:6,9,13
**distributions**
  74:24
**distributor**  22:20
  23:8
**distributors**  38:20
**distributorship**
  44:14 45:7,18

**district**  1:1,1
**divulge**  47:14
  77:20
**document**  8:12
  10:20 19:2,10
  50:4 58:1,5 59:7
  60:19 61:16 63:7
  63:11 75:10,18
  79:20
**documentation**
  50:11
**documents**  9:8
  10:14 59:24 61:2
  61:3 76:18,23
**doing**  6:7 17:4
  22:23 26:10 37:14
  37:15 38:23 48:14
  54:23 56:21 61:20
  67:10 71:23 87:17
  88:24
**doors**  57:8
**drive**  2:16 43:15
**due**  65:4 67:10
**duly**  4:4 90:9
**dumber**  56:12
**duties**  46:7 47:4
  52:15 76:8
**duty**  45:22 46:10
  52:7

**e**

**e**  3:1,7 10:15,18,19
  59:14,14 92:1,1,1
  93:1,1,1
**earlier**  60:24
  61:22 77:12
**early**  17:18 20:15
  20:17 21:12 40:12
  40:16 52:23 66:19
  87:17
**east**  41:9

**eb**  3:11,12,13
**eb35524**  58:6
**eb644**  63:13
**eb688**  75:14
**eber**  1:7 2:8,8,9,9
  2:9,10,10,13,14
  4:13 9:6,12,22
  10:22,25 11:11,16
  12:8,9,9,17 13:7,8
  14:1,5,8,8,25,25
  15:9,19,23 16:5,11
  17:9 20:5,9,18,19
  21:1,2,4 24:11,12
  25:14 26:10,20
  28:9 29:18 30:8
  30:10,11,13 31:6
  32:3,9,13,24 33:16
  35:6,21 37:7,15,18
  37:24 38:4,17,19
  38:23 39:11,14
  40:22 42:25 43:4
  43:6,13,19,19
  45:16 47:18 48:24
  49:8 50:7,20
  51:21,24 52:15
  53:3,24 55:11
  56:23 57:20 58:6
  58:24 59:2 60:1
  60:13 61:7 63:1
  63:17,25 64:12,18
  65:23,24 66:2,23
  67:4,18,24 68:17
  68:19,20 69:6,8,15
  70:11 71:4 72:1,8
  72:11,17 73:6,12
  73:17,22,23 74:16
  75:22 77:15,18
  78:2,18 79:1 80:3
  81:14 82:11,12,12
  82:17,20 83:4

[eber's - filed]                                                                    Page 7

eber's  39:9 40:2,8
  60:21 68:23 74:15
  84:1
ebwlc  30:13,18
  31:6,18 32:3
ed  35:5,10
edward  1:22 91:3
effect  42:16
effected  69:17
effective  61:11
ego  53:10
eight  18:21
either  6:10 20:6
  23:25 82:13
eliminate  47:4
eliot  38:18
elliot  2:21
employee  11:19
  21:7 69:2 83:4,10
  91:8
employees  16:4
  23:4,18,20 69:4
  73:19
ended  49:11 51:7
  66:13,16 81:25
enter  30:2,13
  32:24 43:24 44:8
  49:7 69:17 76:9
  76:16,18 88:8
entered  12:20,23
  20:16 31:18,22,23
  43:18 44:11 49:12
  50:7 63:16 79:1
  79:23 80:5 87:12
entering  33:13
entertainment
  54:22 55:4,7
entice  88:8
entire  52:20 79:8,9
entirety  81:3

entities  32:3 66:2
  69:9 78:18 82:11
entitled  6:20 53:24
  79:8
entity  4:22,24
  12:11,12 31:8
  65:24 69:16 70:1
environment
  38:13 42:11
envisioned  33:22
  48:15 87:15
equitable  26:16
equivalent  85:23
especially  21:6
  72:25
esq  2:2,6,12,15,19
  2:23
essentially  37:14
established  51:14
  51:17
estate  2:21
et  1:4,7
european  24:7
evaluated  38:16
event  15:22 17:8
events  15:22
eventually  35:3
  48:17 67:14
evident  43:7
evolve  48:21
evolved  29:9 33:25
  33:25 34:3 53:21
ex  35:8
exactly  11:18
  29:14 80:21 86:1
  86:1
examination  4:6
  78:14 83:21
example  6:20
  11:20 41:14

examples  15:24
  16:2
exceeded  56:23
excellent  33:20
excess  56:17
exchange  67:5
excitement  17:5
excluding  59:21
excuse  19:4,5
  20:22 28:3 33:3
  68:20,22
executed  63:25
executive  2:23
  23:23 24:4,19
  45:5 61:9 70:4
exhibit  3:9,10,11
  3:12,13 8:11,13
  19:1,6,11,15 27:15
  46:25 49:24 57:24
  58:2 60:20 61:21
  63:5,8,12 75:8,11
  78:25 79:5,24
exhibits  3:19
exist  18:10 70:2
  72:2
existing  20:25
  23:9
expand  13:4 15:1
  15:18,21 25:12
expanding  37:12
expansion  22:11
expected  25:23
  34:4
expecting  37:13
expense  22:7
  54:10 58:14 59:8
  59:13,18
expenses  53:25
  54:2,3,17 55:11,15
  55:18,23 56:23
  58:13,16 59:23

60:1
experience  25:22
  37:23 42:25 43:3
experienced  43:8
expires  90:18
  91:18
explain  7:2 84:5
explained  80:21
extent  81:11,20

                f

f  2:8 4:11
facility  40:18
fact  39:15 81:15
fain  90:20 91:20
fair  4:21 26:14
  31:5 37:22 45:12
  74:9 78:22 79:21
  80:10,20 81:9
fairly  21:13 84:10
fall  55:2
families  16:22
family  23:12
far  6:8 11:22
  14:13 38:4 72:25
father  69:6
february  19:23
  90:19 91:19
fee  25:20 48:10
  55:16,16 61:12
  62:1,15,16,23 63:1
  86:22
feed  16:22
feel  28:17 42:7
fees  61:19 81:18
felt  14:20
field  23:5
figure  24:6
figured  36:6
figuring  87:18
filed  1:25

[final - group]                                                                    Page 8

final  34:7
finalized  30:20
   88:3
financially  91:8
find  16:19
fining  36:15
finish  6:4
finite  40:16
firm  26:25
first  4:4 5:19 10:6
   10:7 12:16 13:6
   15:11 24:12 28:4
   29:17 32:11 33:22
   49:20 53:8 54:15
   59:2 61:4 62:3
   68:11 76:17 86:21
   86:25 87:9
firsthand  40:17
five  11:25 48:25
   49:3,6,11 51:25
   60:16 78:9
flag  17:6 23:1
flagler  2:16
floor  2:3
florida  1:13,24
   2:17 41:22 90:3
   90:17 91:4,10,17
focal  42:4
focus  46:3 87:21
   88:23,24
focused  39:11 46:1
focusing  84:21
follow  78:19 83:23
following  46:22
   75:7 78:13
follows  4:4
footprint  13:24
forbid  44:2,5
force  57:13
forces  20:14

fore  21:22
foreclosed  73:22
foreclosure  74:11
foregoing  91:5
foreign  22:12
forget  42:5,6,6
form  17:13 20:21
   25:6 26:22 32:4,5
   37:25 39:16 43:21
   45:8,19 46:12
   48:12 52:10 55:25
   57:21 60:3 64:6
   69:10,19 70:13,22
   74:1,21 76:25
   86:23 88:1,16
formal  11:24 12:1
   14:16
formalized  12:3
formally  54:5
format  32:21
former  45:5 83:4
forms  58:20
forth  55:6 76:19
fortunate  36:3
forward  49:21
   65:10,12
found  34:21,23
   41:18
foundation  32:18
fountain  2:7
four  5:4 76:18
frame  42:18
front  27:15
frugality  54:20
full  4:10 6:20,23
   8:2 29:17 31:10
   31:11 47:4,23
   57:13
fully  34:4,4 51:14
   51:17

fumble  6:2
functions  57:10
further  78:7 89:1
   91:7
future  16:14,23
   17:5 22:8 84:25

g

game  23:17
gamut  74:25
gap  36:17
general  2:23 13:16
   14:15 15:5 17:25
   52:17 66:11
generally  4:23
   5:11 9:7 12:8
gentleman  9:13
   35:5 52:18
gesture  24:2,6
gestures  6:15
getting  6:4 23:13
   81:12,20 86:8
give  11:5 12:7
   15:24 16:1 41:1
   47:12 65:22 75:24
given  5:9 22:17
   45:14 53:3 71:6
giving  8:2 25:12
   68:6
glazer's  1:18 2:24
   4:16
go  5:10 7:21 11:23
   12:5 14:13 16:20
   22:25 23:4,6
   29:12 39:5 40:11
   41:2 56:10 57:7
   57:13 58:16 59:20
   63:5 65:12 68:15
   70:14 80:22 85:20
goal  23:19
god  44:2,5

goes  6:14 12:3
   20:25 56:6
going  5:10,12,13
   6:1,2 7:4 8:10,11
   12:8,11 15:20,20
   16:1,16,24 21:22
   22:13 25:13 26:12
   34:11 38:1,9,25
   41:11 44:13,20
   46:16 49:21,23
   54:15 57:24 59:20
   60:19 64:9 68:21
   70:15 75:4 76:8
   77:19 78:1,8 85:2
   85:20
good  4:8,9 21:13
   27:12 34:24 35:8
   35:25 41:13 42:7
   42:8 43:15 46:18
   78:16 84:10 85:9
goodrich  9:14
   52:19 56:7,7
goodrich's  52:25
gotten  42:9 81:9
   85:13
governed  54:13
government  42:10
   42:21 55:1 61:10
   84:15,22
governmental
   37:8 84:23
gp  66:9
gray  71:10
great  6:8 22:7
greater  50:24
green  23:5
greenspan  2:23
ground  5:10
grounds  7:16
group  24:19 34:24
   36:21 53:1

[grow - inventory]

**grow**  15:18,18
  16:16 86:16
**growth**  16:25
**gt**  66:9,12
**guarantee**  70:10
**guess**  40:10
**gumaer**  2:21
**guy**  32:20 71:8

**h**

**h**  3:7 92:1 93:1
**hager**  1:19 3:3 4:2
  4:11 78:16 89:9
  90:9 91:4 92:25
  93:25
**hair**  71:10
**halfway**  27:20
**hall**  36:25
**halls**  43:12 57:7
  71:3
**hand**  90:11 91:9
**handicap**  42:12
**happen**  6:13
**happened**  18:21
  18:21 23:9 44:2
  48:18 67:17 73:5
**happening**  85:6
**happens**  44:6
**happy**  78:22 81:6
**harris**  27:11,13
  75:15,20 77:4
**harvey**  9:25 10:4,9
  20:13
**hasson**  86:6,7
**hat**  53:13
**hays**  83:15
**heads**  24:4
**hear**  7:10 78:21
**heard**  59:25
**heavily**  36:14,23
**held**  13:17 74:23

**help**  9:3 37:24
**herbert**  2:12
**hereto**  8:14 19:12
  58:3 63:9 75:12
**hey**  41:3,12 71:3
**high**  80:13,13,13
**higher**  24:3 33:16
**hire**  26:6
**hired**  16:10,13
  36:17 40:22
**historically**  71:1
**holding**  85:5
**hole**  72:20
**home**  16:21
**honest**  44:21
**hopefully**  88:8
**hotel**  54:21 56:11
**hotels**  55:6 60:7
**hour**  56:8
**hours**  51:20,23
**house**  86:11
**huge**  54:20
**huh**  6:9 12:13 28:1
  29:16,22 33:1
  47:7 49:25 53:6
  58:8,22 59:4
**hundred**  22:6
  43:23
**hygiene**  55:14

**i**

**idea**  31:14,20,21
  32:6 44:21 59:19
  62:23,24 65:3
  67:1,23 69:3,3
  72:5,9 74:23
  77:22 78:5 83:8
  84:8,10,11,25
**ideas**  17:3
**ident**  3:8
**identification**  8:13
  19:11 58:2 63:8

75:11
**identify**  12:11
**image**  32:14
**imagine**  45:21
**immediately**  20:3
**implode**  87:19
**important**  5:22
  6:7 36:10,13
  84:25
**imported**  67:25
**impose**  32:2
**inappropriate**
  39:24
**include**  4:23
**included**  70:9
**including**  30:18,23
  31:8
**inclusive**  91:5
**increase**  33:19
**incur**  60:6
**incurred**  54:18
  60:1
**independence**
  53:17
**individual**  39:5
  43:25 70:25 82:24
  84:12
**individually**  31:15
**individuals**  9:10
  9:21 11:1 16:10
  16:13 77:12
**industry**  26:7
  36:14 39:5 42:19
  68:5 71:23 85:18
**industry's**  22:22
**inertia**  14:24
**influence**  8:1
**informed**  62:25
**initial**  19:19,20
  20:14 21:1,21
  37:5 48:24 49:6

49:10 51:25 62:9
  64:9 81:16 84:3
**initially**  24:10
  86:21
**inside**  36:9
**instance**  34:20
  45:3 86:5
**instinct**  35:24
**institutional**  36:18
**instruction**  47:13
  78:4
**instructs**  7:15
**insult**  25:14
**insulting**  54:19
**insurance**  90:20
  91:20
**intangible**  29:3
**intended**  79:13
**intent**  19:19,20
  20:4 28:9 33:17
  64:10 66:19
**intention**  12:25
  13:4 48:13 88:8
**intentions**  16:14
  21:5 37:20
**interacted**  53:14
**interest**  45:22 46:6
  65:8 67:15
**interested**  14:12
  91:8
**interests**  18:17
  31:9 46:7 64:13
**interface**  52:15
**interfacing**  37:8
**interfere**  38:2
**internal**  54:13
**interrelated**  31:13
**introduction**
  53:10
**inventory**  28:5,9
  28:12,16 72:3

Veritext Legal Solutions
www.veritext.com

invest  16:15 67:13
investigated  38:24
investigation
  38:19 39:1,2
  57:13
invoice  58:20,23
  59:1
invoices  60:12
involved  39:6
  52:14 76:13
involvement  9:1
involving  57:19
irs  60:17
island  44:14,23
  67:17
issue  55:14
issues  9:3 38:7
  39:19 86:12
item  28:4 29:2
  33:4
items  68:9
iteration  34:8

j

january  61:5,11
job  6:8
john  2:12
join  13:7
joining  20:14
  51:15
joint  24:15
joke  56:10
jokes  39:24
juice  6:22
jump  12:5 20:1
junior  23:18

k

k  2:8
keep  23:21
keeping  66:2

kept  24:3
kessler  2:6
key  31:3 36:4 84:8
kick  57:8
kickbacks  39:15
kid  86:6
kind  21:8 22:7
  33:22 34:21 36:8
  37:14 45:20 55:8
  71:1,4 79:22
  86:10,13 87:20
kleeberg  1:4 4:13
  82:25 83:2,12
knew  39:9,12
  41:10 68:12 87:20
  88:3
knock  57:7
know  5:9 6:1 10:5
  13:4 14:3,18,19
  15:16,18,19 18:2
  21:9,10 22:15
  23:1,14 24:24
  25:12,14 26:4,4,5
  26:13,24 27:4
  28:9 30:16,25
  31:13,17,24 33:12
  33:20,24 34:22
  35:4 36:16,20
  37:17,20,21 38:11
  38:11 39:4 40:10
  40:19,20 41:5,6,7
  42:12 43:5,11,14
  43:24 44:24 45:13
  46:11,13,17 48:1
  48:19 50:15,20,23
  51:23 53:17,20
  55:15 56:6,17
  57:13,15 58:17,17
  59:5,8,14 60:11
  62:8,21 63:3,3,24
  64:7 66:6,15

67:16,24 68:5,11
68:12,17,20,23
69:1,5,20 71:4,7
71:11,22 72:1
73:5 74:6,19,20
75:20 76:4,22
77:3,8,9,9,17,25
79:2 80:12 82:15
82:24 83:6,7
84:14,15 85:1,6,19
85:23 86:4,17
87:8 88:5
knowing  34:22
knowledge  8:25
  20:10 22:17 25:17
  26:11 33:12 36:11
  36:16,18 37:1,3
  39:17 40:17 41:20
  56:22 67:20 86:14
knowledgeable
  21:23
known  71:2
knows  53:16

l

labor  42:7
lack  16:4
lak  1:3
landlord  35:4,13
language  22:13
lapse  6:9
large  1:24 26:25
  90:18 91:4,18
larger  34:1
largest  87:3
larry  9:13 52:18
  56:6,7
late  12:25
latest  59:8
law  2:19 26:25
  85:17

laws  22:23
lawsuit  78:18
lawyer  7:10,15
lawyers  5:8 7:11
  77:17,18,21 78:2
le  59:2
leader  41:24 52:19
leaders  53:2
leadership  22:9
learn  21:15
learned  26:2,3
  32:10,11,19 35:25
  36:2
lease  35:19
leave  47:15
lee  1:19 3:3 4:2,11
  89:9 90:9 91:4
  92:25 93:25
legal  45:15,21
  68:11
legislative  36:20
  41:20 43:1 61:9
legislator  85:8
length  26:15
lester  1:7 2:8,8,13
  4:13 9:12,22
  10:25 11:16 12:9
  14:8,24 20:9,18
  21:1,2,6 24:12
  26:10,20 27:2,7
  30:9 32:9,12,24
  33:14,16 34:5,11
  34:12,25 35:6,21
  37:7,13,21,23 38:2
  38:7,16,23 39:14
  40:2,8 41:3,8,12
  42:5,17,22,24 43:9
  43:10,12,13,18
  44:12,12 45:16
  47:24 48:24 49:8
  49:10,13 50:7

51:15,20,24 52:9
52:15,23 53:3,11
53:16,20,24 54:18
54:20 55:4,11
56:21,23 57:6,15
57:20 58:24 60:1
60:13,21 61:7,18
62:2,3 63:1,17,22
63:25 68:23 69:13
69:24,25 70:11,21
71:17 72:10 73:17
73:22 74:15 77:15
77:18 78:2,9 79:1
79:19,22 80:3,24
81:5,7,14,22 82:2
82:6,17,20 84:1,21
85:10 86:9,14
88:20
**lester's**  35:2 54:3
  86:22 87:3
**letter**  19:19,20
  20:4 28:8 30:9
  33:17 61:6 64:10
  66:19 75:15,21
  76:5,10,15,24 77:3
**letterhead**  60:21
  75:16
**letters**  60:21
**letting**  85:6
**level**  52:17 54:16
  55:17
**levels**  52:16
**leverage**  14:6
**liabilities**  72:18,20
  73:2,7
**liability**  72:25
**limit**  8:2
**limited**  22:3 34:14
  34:14 65:20
**line**  17:17 47:2
  54:15 59:13 80:6

92:2 93:2
**liquor**  2:9,10 31:6
  36:22 44:13 45:7
  45:18 72:2,8,12,18
  73:12,23
**lisa**  83:16
**list**  8:16
**listed**  8:21 11:19
  29:4
**little**  6:3 18:14
  20:1 21:16 41:8
  50:21 86:17,20
**live**  56:12
**lived**  41:8
**llc**  1:18 2:8,8,10
  4:17
**llp**  2:6,16
**loan**  65:23
**lobbying**  42:21
  59:22 62:1 85:21
**lobbyist**  53:16
  61:18 62:4,23
**lobbyists**  26:8
  43:10
**local**  22:20 23:8
  54:6,16
**location**  84:7
**locked**  49:2
**logistics**  84:7
**long**  15:10 18:15
  21:6 23:6 25:2,3
  34:16 45:21 47:4
  50:18,25 60:15
  65:16 70:11,18,20
  72:2 78:8
**look**  7:7 8:19
  10:14 18:1 19:1,2
  30:6 38:25 47:1
  55:2,8 56:16 61:4
  75:24

**looked**  21:8
**looking**  10:13
  46:24 59:2 88:15
**looks**  19:23
**loose**  43:9
**lost**  18:23
**lot**  6:8 8:25 14:23
  21:15 26:2,11,17
  32:10 40:12,16
  42:17 45:24,25
  55:7 84:19 85:2
  85:14
**loved**  41:7
**lying**  68:15

**m**

**mails**  10:15,18,19
**main**  2:20
**maintained**  66:4
**making**  23:22
**manage**  44:13
  45:6
**management**
  20:25 23:9 24:5
  34:24 36:4 54:6
**manager**  45:17
  52:18
**managers**  23:24
**managing**  22:4
**manhattan**  56:8,8
**manner**  71:18
**march**  19:22
**mark**  19:3,6 57:25
  63:5 75:9
**marked**  8:11,13
  19:11,14 49:24
  58:2 60:20 63:8
  63:12 75:11
**market**  14:21 38:8
**marketable**  28:21
**marketplace**
  15:19 26:13 35:8

38:5
**matter**  18:18
**matters**  43:1
**matured**  40:15
**mean**  10:21 13:22
  56:9
**means**  5:22 79:17
**meant**  22:3 65:4
**measure**  18:20
**mechanism**  81:13
  81:23
**meet**  56:6
**meeting**  54:24
  87:24
**mental**  7:25
**mentioned**  11:1
  17:24 45:1 52:16
  52:18,22 64:11
  71:15 83:25 86:19
**merchandise**
  28:18,21
**mergers**  18:6
**merit**  1:23
**met**  68:25 78:16
**methodology**
  80:11,14
**metro**  2:10 13:20
  13:23 14:5,20,22
  16:24 21:14,15
  31:8 41:19 56:6,7
  68:1 84:13 86:5
**metropolitan**
  13:22
**miami**  1:13 91:10
**middle**  23:23 24:3
  36:4
**miles**  54:12
**million**  29:3 66:18
  67:5
**minds**  22:12

minimal 13:5
minimis 28:25
minority 65:16
minute 75:24
minutes 46:19
  78:10
mister 71:4
money 16:21
  23:23 31:1 49:8
  55:9,11 66:7,12
  67:13 69:15 70:20
  85:24
monies 64:25
moniker 53:11
monthly 49:19
  59:18
months 18:18
morning 4:8,9
  78:16
moved 22:7,18
movement 85:8
moving 52:24
multiple 72:23
muscle 84:20 86:4
  86:4
mutually 50:18
myopic 70:23

**n**

n 3:1
name 4:10,19 9:13
  10:7 13:2 27:11
  35:5 60:23 73:24
  78:17 83:7,8
named 60:22
  77:12 82:24
names 10:6 52:16
narrow 48:16 75:4
  84:21 85:3
narrowed 49:14
  81:17 84:2,18,18

narrower 40:14
narrowing 83:25
  85:12
natural 14:24
  24:24
naturally 71:11
nature 12:21
  14:19 16:18 54:17
ndc 30:13
necessarily 28:8
  38:8 62:10
need 7:6,20 13:20
  48:5 54:25
needed 21:24
  22:16 25:18 35:23
  37:2
needle 37:11
needs 33:10 40:15
negligible 51:16
negotiate 25:16
negotiated 25:5
  49:10
negotiating 26:19
  26:21 74:14 86:21
  88:14
negotiation 88:11
negotiations 49:13
  87:10,11
net 35:19
neutral 40:25
never 21:5 22:13
  31:10 44:8,23
  48:13 53:8 55:13
  61:3 68:25 71:20
  82:19,23 83:13
new 1:1 2:4,4,7,20
  12:20,23 13:5,22
  13:24 14:2 17:3,3
  18:9 19:21 21:3
  21:13,17 22:19
  23:8 33:23 34:10

34:13,17 36:9,18
  40:24 41:5,6,19,21
  41:23,25 42:1,2
  46:2 49:7 52:20
  54:6 57:24 61:10
  62:10,22,25 63:5
  64:10 67:25 73:1
  73:10 86:5,16
nice 65:6
non 16:19
normal 54:8 67:22
notary 1:23 89:15
  90:17 91:3,17
note 3:19 30:8
  63:12
noted 65:3
notes 12:2
notice 1:24
november 63:16
  75:16
nucleus 22:15
number 16:13,24
  27:19 31:7 34:8
  52:3 59:1,23
  61:23 65:25 66:1
  68:12 80:1 82:1
  86:21,25
numbered 91:5
numbers 15:5,8,11
  58:5 63:13 75:14
numerous 30:17

**o**

oath 5:14 90:1
objected 69:22
objection 17:12,12
  32:4
objections 7:10
obviously 9:2 54:4
  58:17
occurred 13:12
  38:20

oddball 28:19,22
offense 16:6
offer 87:7
office 24:21
official 90:11 91:9
oh 43:2 56:13
ohio 18:5,16 31:9
  34:3,21 46:2
  64:14
okay 4:21 6:5 7:4
  7:8,13,17,22 8:10
  10:11 12:12,14
  17:16 19:22 24:10
  27:21 41:5 48:4
  76:1 77:10 79:16
  83:24
old 10:19 12:3
  23:11 36:24 39:3
older 70:1
ones 23:24
operate 13:16
  71:17
operated 31:8
operating 72:3
operation 13:18
  16:17 19:21 22:4
  29:1 52:20 66:25
  85:18
operational 22:10
  26:7 36:12 84:6
operations 18:9
  21:4 34:3 36:19
  40:24 42:5 44:17
opinion 76:5,6,15
  76:24 77:3
opinions 76:19
option 67:6,8
options 57:14
orange 6:22
ordained 48:19

[order - power]                                                                Page 13

| | | | |
|---|---|---|---|
| **order** 76:18,19 | **palm** 2:17 | **pension** 72:18,20 | **plaintiff's** 3:8 8:11 |
| **orderly** 66:3 | **paragraph** 29:17 | 72:24 73:2,6 | 8:13 19:11 49:24 |
| **organization** 9:5 | 79:6,14,17 | **people** 9:5 17:7,18 | 58:2 63:8 75:11 |
| 15:1 36:5 40:15 | **parent** 31:7 | 22:16 23:4,13,22 | **plaintiffs** 1:5 2:4 |
| 42:22 44:18 55:17 | **part** 9:9 17:18,19 | 24:4,23 31:3 36:4 | 83:3,15 |
| **organizational** | 18:2 23:17 24:15 | 36:5,7,19 42:6 | **plan** 23:14,17 |
| 31:11 | 30:19 33:21,23 | 43:8,11 48:4 | 50:22 |
| **organizationally** | 36:11,12 39:1,2 | 52:21 54:24 57:9 | **plant** 23:1 |
| 24:20 72:6 | 45:13 47:10 53:12 | 70:3 | **player** 14:6 |
| **original** 3:19 | 53:23 57:15,15 | **percent** 22:6 43:23 | **plaza** 2:7 |
| 81:21 | 64:21 65:11 69:13 | 49:19 55:3 64:18 | **please** 4:10 6:3 7:7 |
| **originally** 46:2 | 72:14 76:24 82:5 | 65:4,17,18,18,19 | 27:18 29:15 35:19 |
| **outside** 34:13,17 | 88:14 | 67:4,15,22 | **pllc** 2:3,19 |
| 36:11 | **participated** 20:11 | **performed** 10:25 | **poached** 16:4,7 |
| **overall** 88:14 | **particular** 11:15 | **period** 14:17 | **poaching** 73:18 |
| **oversee** 86:10 | 43:17 57:18 68:6 | 15:14 17:21 25:25 | **point** 14:15,22 |
| **overwhelming** | 80:16 | 35:12 48:25 49:6 | 15:4 16:3,12 22:9 |
| 17:6 | **parties** 53:14 | 49:11 51:25 59:8 | 22:10 24:20 29:11 |
| **owned** 23:12 | 79:10 91:7 | 60:14 61:10 62:7 | 37:5 42:4,14 48:1 |
| 31:15,15 72:11 | **partner** 35:7,8 | 62:13 66:21 | 49:9 50:12,12 |
| **owners** 23:12 | 65:16,19 | **person** 24:17 45:6 | 56:18 64:17,24 |
| 30:12 72:8 | **partners** 35:2 | **personal** 8:25 | 65:23 67:3 69:1 |
| **ownership** 31:14 | 65:15,15 | 43:25 44:5,9 45:2 | 73:9,21 |
| 82:10 | **parts** 64:23 | 69:23 70:9 71:5 | **policy** 10:20 84:23 |
| **owns** 23:1 | **party** 67:15 73:10 | **personally** 42:3 | 84:23 |
| | 73:24 | 43:19 67:9 69:16 | **politically** 42:11 |
| **p** | **passed** 44:16,18 | 80:22 90:9 | **politicking** 85:22 |
| **p** 2:15 | **passing** 44:20 | **personnel** 40:22 | **politics** 41:21 |
| **p.o.** 2:12 | 67:11 | **physical** 7:25 | **posed** 70:5 |
| **package** 9:8 | **pause** 6:2 | **picking** 87:19 | **positive** 14:12 |
| **page** 8:19 18:9 | **pay** 29:18 35:14 | **pieces** 87:20 | **possible** 25:11 |
| 27:18 29:4,15 | 35:16 38:11 49:15 | **pinpoint** 41:13 | 57:1,3 |
| 30:7 46:25 59:3 | 49:16 73:6 | **pivot** 42:15 | **possibly** 13:7,9 |
| 76:17 79:5 92:2 | **payable** 54:8 | **place** 15:14 22:16 | 20:13 67:20 |
| 93:2 | **payee** 58:17 | 26:18 53:22 56:10 | **postiy** 34:21 |
| **pages** 58:9 91:5 | **paying** 31:1 | 56:12 | **potential** 12:17 |
| **paid** 29:5 33:16 | **payment** 47:5 | **placed** 40:19 | 14:1,9,14 15:9,12 |
| 48:10 49:8 54:7 | 56:19 60:13 | **placeholder** 29:8 | 20:9 |
| 55:16 59:23 62:1 | **payments** 11:8,10 | 29:11 | **potentially** 44:15 |
| 62:15 66:24 69:15 | 11:14 45:16 59:22 | **plaintiff** 4:3 | **power** 76:8 |
| 81:12 82:3 85:24 | | | |

[practice - recess]                                                                 Page 14

practice 22:20
  80:9
practices 40:20
  84:11,13
precede 32:14
preceded 20:4
preceding 29:4
precipitated 15:22
  17:8
predecessors 4:24
preference 21:20
preliminary 64:17
premier 13:3,12
  13:13,15,16,17
preparation 8:24
  72:15 74:5,10
prepare 10:15
  11:2,7
prepared 8:20
  39:7 50:11
preparing 9:4
  11:5 60:25
present 2:23
presented 57:6
president 53:4,5
pretty 10:19 12:3
  14:21 27:12 36:10
  38:12 41:22,23
  42:7,8 43:8,14
  85:3 87:9
prevent 8:2
previous 20:8
previously 47:23
  49:24 60:20 78:25
price 27:25 28:14
  29:19 87:11
prideful 23:13
primarily 13:17
primary 52:14,19
  88:23,24

prior 16:11 18:8,9
  19:8 20:3
privately 74:23
privilege 7:16
probably 5:7 10:5
  15:13 22:22 26:2
  62:12 82:15 85:13
  85:22
problem 45:24
proceed 7:12
proceedings 46:22
  75:7 78:13
process 54:7 56:19
  80:22 82:7
produced 58:6
product 16:20,21
  27:2
products 68:13
professional 91:1
  91:3
progress 25:13
proper 54:14
proportion 62:19
proposed 24:10,12
  24:17
protects 68:5
provide 34:12,16
  35:22 61:7 70:11
provided 81:5,7
provides 42:22
providing 75:21
provision 47:10
provisions 46:25
public 1:23 89:15
  90:17 91:3,17
purchase 13:15
  19:21 26:13 27:24
  29:19 64:10 66:17
  87:12
purchasing 28:5

purpose 61:19
pursuant 1:24
  81:7
pushed 27:5,6
pushing 27:8
put 5:21 16:4 41:4
  41:13 51:24 80:23
putting 17:6

## q

qualifications
  38:17
qualified 35:22
question 6:2,4,19
  7:2,3,6,12,21,21
  22:14 31:12 33:20
  39:9 45:15 47:13
  70:5 78:21 80:16
  82:16 83:23
questions 5:13 8:3
  27:14 35:25 71:7
  78:7,20 80:1,6
  82:1 89:4
quickly 18:22 36:5
quite 13:19 23:21

## r

r 92:1,1 93:1,1
raised 41:17 45:15
ramped 48:3
ramsey 2:6 20:21
  25:6 26:22 32:5
  37:25 39:16,21
  43:21 45:8,19
  46:12,18 48:12
  52:10 55:25 57:21
  60:3 64:6 69:10
  69:19 70:13,22
  74:1,21 76:25
  78:8,15,17 83:19
  86:23 88:1,16
  89:4

ran 43:6
range 76:7
ranging 40:21
rapid 18:19
rarely 23:4
rats 16:19
reach 13:5
reached 13:6 14:9
read 6:9 79:6
real 73:16 74:6
realize 21:12
realized 13:19
  21:21 22:11 88:20
really 14:12 21:5,8
  21:23 22:17 26:24
  27:7 31:21 32:13
  33:25 34:2,18,25
  35:12 36:9 37:19
  38:12 39:6 42:4,8
  42:13,20 45:10
  48:1 53:21,22
  55:13 57:3,16
  59:16 62:7,20,20
  65:7,9,13,14,15
  71:25 73:4,20
  84:17 85:3,3
  86:24 87:1
reason 7:24 32:1
  43:17 60:1 64:4
  64:21 92:2 93:2
reasonable 55:6
  56:18,20
rec 3:2
recall 28:22 57:18
  80:6 82:3,8 83:11
receive 45:16
receiving 63:1
  74:16
recess 46:21 75:6
  78:12

[recognize - ring]                                                    Page 15

recognize  19:14
  50:4 58:9 61:2
  63:11 75:17 83:7
recognized  37:3
recollect  28:25
  29:25 34:19 67:10
  88:2
recollection  45:9
  71:20 74:18 83:5
  83:14,17
reconciliation
  75:1
record  30:9 49:23
  63:13 78:17 79:7
  86:20
records  10:14
  11:23,24
red  3:2
redirect  83:21
reduce  47:4
refer  10:6 12:8
referred  4:22 8:12
  9:11 19:10 29:23
  58:1 63:7 75:10
referring  10:8
  12:9 20:15 46:7
  59:5
refers  28:4 59:13
  59:15
reflect  58:13,15
reflected  33:17
refresh  9:3 83:4
regarding  12:17
  19:19,20 46:25
  64:10
registered  1:22
  53:16 61:18 91:1
  91:3
regulated  36:14
regulates  36:23

regulation  85:1
regulations  22:23
  41:17
regulatory  42:11
  42:21 57:11 84:15
reimbursed  55:11
  55:18 56:23 58:13
reimbursement
  53:24 82:7
reimbursements
  82:2
related  18:5
relating  79:10
relationship  37:7
  48:6,15,21 50:16
  51:1 52:1 60:25
  66:8 69:7 79:10
  81:14,15,24 84:8
relationships
  43:15 46:4
relative  91:8
relatively  34:24
relied  34:21 40:25
rely  34:25
remain  5:18 9:5
remained  30:19
remember  12:19
  14:11 18:3,22
  26:23,24 35:12
  37:9 41:9 49:13
  53:20,21 60:23
  63:14 64:24 66:5
  71:24 73:17,20
  86:25 87:1,3,6
  88:6
remind  6:13
render  76:19
rendered  48:11
renegotiated
  50:10 81:22

renew  51:10
rent  35:15,16
reorganized  23:25
repeat  7:2 33:8
  78:22
rephrase  16:8
replaced  23:25
replacing  26:5
report  54:10 59:8
  59:14 91:6
reported  91:4
reporter  1:23 5:19
  6:11 91:1,3
reporters  6:16
reports  58:14
  59:18
repossess  66:13
represent  24:19
  28:17 59:21 68:10
  78:17 83:2
representation
  61:7 84:16
representative
  4:16 8:6
representing
  75:22
reputation  32:13
request  11:14
requested  76:11
require  76:14
required  51:20
  63:4 73:24
requirement
  30:17
requirements
  60:17
resources  33:12
  50:22
respect  10:24
  35:21 46:7 81:4

respond  14:8
responded  4:4
response  17:6
responsibilities
  40:2,8 49:14
  50:23 52:25 81:17
  84:1,2 85:12
  86:16
responsible  42:16
rest  12:1 88:13
restate  74:3
restrictive  3:12
  29:20 30:2,13,17
  30:21,24 31:17
  32:2,8 49:3 51:7
  51:11 63:15,20,25
result  85:11
resurrect  31:3
retain  23:19 35:10
retained  3:19
retains  60:11
retention  10:20
  12:4
return  46:24
review  60:18 76:2
reviewed  9:7
  76:18
rhode  44:14,23
  67:17
right  4:19 13:23
  20:16 27:3,19
  30:22 32:11 44:19
  44:22,23 46:8
  47:3 51:16 52:24
  65:17 66:20 67:6
  67:8 87:25
rights  23:3 68:6,9
  68:14 76:8
riled  57:9
ring  27:11

robert  2:19
rochester  2:20
41:8 57:7
role  20:19 21:3,6
22:1,2,3 24:13
34:15 43:3 53:3
room  25:15 50:20
round  87:9
route  23:6
rules  5:11 78:20
run  71:8
running  42:23
43:4 51:18

**s**

s  2:16 3:7 92:1
93:1
sake  10:7 54:19
salary  74:16,19,24
saleable  28:21
sales  76:8
salespeople  16:18
16:20 23:19 24:23
36:17 40:23
salmon  6:22
satisfactory  50:18
saw  14:5 16:14,24
26:5,10 40:25
44:23 61:23 65:1
saying  6:8 17:2
62:6
says  29:2,17 30:8
30:11 33:4 47:3
59:1 76:17
scale  34:6
school  41:5
screen  58:10
scrutinized  54:3
seal  90:11 91:9
search  10:19
second  8:19 18:11
59:13 62:9

secretary  24:20
section  27:24 30:7
32:23 47:1
secure  65:2
security  64:25
65:8
see  27:25 28:5
29:21 30:14 32:25
33:5 35:18,20
43:11 47:6 55:7
58:19,20 59:3
60:7 61:13 63:15
63:18 65:13 75:4
76:20 79:11
seeing  41:16 53:20
59:11 63:14
seen  8:17 53:9
61:3,15 62:21
83:7
select  14:1
sell  15:20 16:21
68:9
seller  76:14
seller's  76:6
selling  23:22 38:3
38:10 68:13
sending  22:11
senior  21:3 36:5
53:4,4
sense  52:3 55:22
65:9,9 67:12
separate  63:24
87:24 88:13
separately  31:16
serve  38:17
services  25:17
26:17 34:13,17
44:5,9 48:11
59:22 61:12 62:1
69:24 70:10,12
81:5,6

set  48:15 57:16
76:19
seven  60:16
sgws  3:10
shareholders
30:12
sheerly  36:6
shop  26:11
short  25:3 35:11
79:7
shorthand  91:6
shortly  12:20 13:3
13:18
show  49:23 57:24
58:12 60:19
shown  78:25
side  79:22
signature  90:16
91:16
signed  79:15
significant  57:19
significantly  49:15
similar  50:10 80:3
simplicity  35:1
sir  10:23 27:23
28:7 66:22
sister  69:7
sit  24:18
sitting  54:11
situation  7:17
71:16
situations  23:7
48:9
six  11:25 18:20
skill  37:23
skipped  18:2
sla  36:21 42:10,21
57:11 84:15 85:1
86:8,11
slocum  66:24

smallest  87:6
smart  35:3
social  42:18
socially  42:16
sold  67:15,25 72:3
somebody  36:15
54:25 86:15
son  68:23
sons  66:24
sophisticated
43:15
sorry  56:13
sort  22:1 23:14,15
26:5 27:5 38:5,6
53:11 57:11 67:3
69:24 88:22
sorts  5:8 10:13
15:5 48:8
sought  51:10 77:4
sound  66:19
sounds  65:6
source  18:13
21:23 40:25
southeast  1:12
southern  1:1,18
2:24 4:16,23 12:6
12:17 14:9 16:3
16:10 21:2,4
22:18 24:5,11
28:10,13 29:18
31:19 32:1 35:10
37:13,24 39:14
40:9 45:5,17 46:8
47:3 49:7 51:24
53:13 55:12 60:11
61:8 62:4 63:2,17
63:22 64:18 65:22
67:18 68:1 69:2,8
71:17,19 73:9,24
74:12 75:17,21
76:11 79:2,22

80:5,10,18,24 81:6
81:11,22 82:6
**southern's**  11:16
22:22 45:13 87:6
**speak**  5:23 9:25
22:13 52:21 61:1
**specific**  5:9 12:11
12:12 28:8 72:23
**specifically**  29:25
32:9 37:6 39:12
43:5 58:12 64:13
79:6
**specifies**  27:24
**spectrum**  41:2
84:14
**speculating**  52:5
55:20 56:2,15,25
62:14
**speculation**  67:22
**speculative**  60:9
70:6
**speech**  24:6
**spend**  33:11
**spent**  26:17 55:9
85:11
**spirits**  1:18 2:24
4:16 61:8 63:18
75:17
**spitzer**  38:18 39:4
39:13,19,20 41:17
**spoke**  9:4,10,22
**spoken**  9:2 10:25
24:9 77:18
**spot**  46:18
**ss**  90:4
**stable**  35:7
**stake**  64:18
**standard**  76:5,10
**standpoint**  17:19
18:10 26:2,4,16
34:10 35:3

**start**  6:4 8:10
30:16 31:4
**started**  18:16
21:13 50:21 62:8
86:17
**state**  1:23 4:10
12:20,23 15:21
16:15,15 20:16
21:18 23:8 33:9,9
36:22 41:11 52:20
61:10 62:22,25
65:6 90:3,17 91:4
91:10,17
**statement**  36:24
**states**  1:1 22:18
34:11 43:7 61:5
64:13 73:1 74:13
**statewide**  13:1,4
13:18
**stay**  56:8,10 88:9
**staying**  39:11
**stays**  20:25
**stegmeir**  35:5,10
**stein**  83:16
**step**  12:7 18:11
**steven**  9:16 60:22
61:1
**stick**  39:8
**stop**  26:11
**stopped**  72:3
**street**  1:12 2:3,20
**strength**  41:20
**stress**  7:25
**strongest**  14:6
**structure**  31:11
34:19 80:17 82:10
82:21 88:4
**studied**  55:13
**stuff**  42:23
**stupid**  56:10

**subject**  69:21
**submission**  54:9
54:16
**submitted**  9:8
54:5 55:18 58:24
60:12 82:2
**subpoena**  3:9 8:16
**subscribed**  89:11
**subset**  48:16
**substance**  77:25
**substances**  8:1
**substantial**  31:1
**substantially**
28:15
**substantive**  15:13
15:23 17:9,11,20
17:24 18:4 20:5
**successful**  22:13
23:11,13
**successor**  71:22
**sued**  73:17
**suggesting**  24:3
**suite**  1:12 2:7
**summarize**  80:8
**summer**  18:22,23
18:24 19:5,5
**supplier**  15:2
21:20 68:15,16
**suppliers**  14:22,23
16:16 67:13,21
84:11
**supposed**  25:7
**supreme**  73:11
**sure**  5:18 15:25
27:2,8 31:2 39:21
46:20 49:22 54:14
56:16 63:4 66:8
67:7 75:25 78:11
**surely**  88:23
**surpassed**  38:4

**surprising**  57:2
**survival**  87:18
**survive**  88:18
**sworn**  4:4 89:11
90:10
**system**  11:17 12:1

**t**

**t**  3:7 92:1,1 93:1,1
**take**  7:22 16:6
46:19 68:15,22
75:3,24
**taken**  1:22 46:21
71:9 75:6 78:12
**takes**  60:8
**talk**  39:7 78:9
**talking**  14:17
15:25 18:16 83:17
**taub**  68:21
**team**  57:16 67:9
70:4
**telephonically**
2:12
**tell**  17:10 29:14
59:16 68:16 88:5
88:7
**temperance**  85:8
**ten**  36:25
**term**  7:2 21:6 25:2
25:3,3 47:5 50:25
65:16 79:11
**terms**  8:23 10:13
11:4 12:6 15:5
17:16,25 18:1
22:2 25:4 37:12
38:5 41:19 47:25
49:2 54:24 62:19
69:15 73:5 81:22
81:22 85:7 87:12
**terrible**  35:17
**testified**  8:5 81:19

[testify - underestimated]

Page 18

testify 8:21
testimony 11:2
72:15 74:10 78:1
80:9 81:4
texas 41:23
thank 50:2 83:19
89:1,5
thanks 47:21
thing 6:7,14,18
7:20 24:24 41:14
41:15,17 57:12
59:21 68:2,12
71:5 84:21
things 5:8 26:8,9
26:12 27:4 28:16
28:19,23 38:6,13
43:24 57:17 68:4
68:7 85:4,14
think 14:15 16:6
17:4,10,16,17
21:24 27:7 29:4
32:1 33:21 39:18
41:8,13,16,18 42:3
42:13 44:19 45:3
52:6 53:9,15,15,17
54:25 55:20 56:17
59:25 60:4,5 64:4
66:9 67:11 70:3
71:25 73:18 74:2
74:13,22 84:24
85:15,15,16,22
86:17,24 87:14,15
88:20
thinking 47:19
third 29:2 53:14
67:15
thought 21:14
22:7,8,15 26:14,15
26:15 48:20 50:16
68:21 80:13,22
81:20 87:8

thousand 54:12
threaded 37:11
threat 51:15
three 5:4 11:1
25:25 55:2 77:11
threw 86:20,25
thrust 87:16
thrusting 85:4
thursday 1:13
tiburone 2:13
time 5:5 7:11,11
13:3,6 14:3,17
15:7,8,11,15 16:3
17:7,17,22 18:15
20:1,13 22:8
50:11 55:5 59:9
60:14 62:8,13
64:24 66:21 67:9
71:18 73:9 74:12
74:17 81:11 85:10
87:11,23
times 5:3,4 36:25
37:11 71:10
timing 18:12
87:22
title 53:4,9,20
toast 6:21,22,23
today 8:2 51:2
57:15 60:25 72:15
74:3,5 78:1 86:20
today's 74:10
told 69:14,23
top 24:1 42:7
58:16
topic 8:24 10:24
11:5
topics 8:17,20,21
11:6,7 40:13 85:2
85:16
total 58:11 59:23
66:17

totally 21:19,21
50:13 56:2
trading 40:20
71:21,25 84:11,12
traditionally
23:12 68:14 72:19
train 55:4
trains 60:8
transaction 9:1,7
9:23 10:4,4,21
12:18 13:2,11
18:17,24 29:9
33:22 52:24 64:22
65:11 66:3 67:11
76:7,9,16
transactions 26:10
30:22 76:12
transcribable 6:15
transcribe 5:20
transcript 3:20
5:21 6:10 39:25
transcription 91:5
transfer 73:11
transferring 86:14
transition 21:10
21:24 23:14 34:15
35:9 50:22
transitioning 53:1
travel 54:21 55:3,4
tremendous 16:25
41:18
tremendously
40:25
tried 42:2,15
triple 35:19
troy 90:20 91:20
trucking 66:6,7,9
66:11
trucks 66:13
true 91:5

truly 33:11
trust 55:6 72:11
82:12,18,22
trustee 72:10
truth 17:10 59:16
truthful 8:3
try 5:23 6:3,16,16
10:7 15:17 42:17
68:8
trying 5:19 24:8
26:17 32:12 46:15
58:19 75:2 87:22
turn 27:18 29:15
43:9 78:24 79:5
turning 32:23
two 5:6 8:9 12:18
25:24 42:13 46:19
52:16 64:23 67:7
68:12 83:15
typical 5:17 6:18
22:19 23:7 25:15
30:2 43:23 45:1
48:8 55:10 80:4,9
80:11
typically 23:5,9,19
54:25 76:11

**u**

uh 6:9 12:13 28:1
29:16,22 33:1
47:7 49:25 53:6
58:8,22 59:4
ultimately 28:10
29:5,7 30:20
31:18 33:15 34:12
64:12 65:12 70:20
80:24 82:3
uncomfortable
50:21
underberg 2:6
underestimated
42:4

[underlying - works]

underlying  59:7
undermining  68:8
underneath  62:9
  62:10
undersigned  90:8
understand  5:14
  5:24 6:24 7:3
  14:18 24:8 31:5
  42:6 58:19 78:21
  79:13 81:3
understanding
  21:14,16 31:10
  42:24 57:14 72:7
  79:16
understood  7:4,5
  7:14,18 14:21
  36:9 47:20,22
  50:17 65:20 66:7
  80:15 84:20
unfair  55:20
union  40:19 41:24
united  1:1
unmarketable
  28:18
unreasonable  60:5
unrelated  46:4
  71:24
unsaleable  28:18
unusual  7:25
upstate  13:5,24
  14:2 21:17 33:10
  36:18 40:24 41:5
  41:6,19,23 84:12
  86:16
urgency  57:4
use  10:7 32:18
  34:11 37:23 53:9
  80:13
usually  23:23
utilize  25:16

utilized  38:7
utilizing  80:19

**v**

v  1:6
value  28:5 37:4
  42:22 44:7,18
  65:14 70:1 75:2
  80:11,13,18
valued  33:13,13
varies  23:14
various  82:10
varkonyi  1:22
  91:3
vary  85:16
vehemently  69:22
vendor  11:15,16
  11:21 54:8
venue  42:20
verify  11:9,12
versus  4:13 48:16
  62:19
vice  53:4,4
viewed  69:25
violations  86:9
vp  2:23

**w**

w  2:21 59:14,14
walk  57:7
walked  43:12
want  5:8,17 19:7
  23:16,21 27:14
  31:2 32:8,20 37:2
  38:2 40:11 44:3
  45:13 46:24 47:1
  56:14 70:16,23
  78:9
wanted  27:6 37:22
  47:24 48:3,22
  50:24 64:23,25
  65:21 70:19,21

wants  35:14,16
warehouse  41:4
  41:11
warehouses  41:10
watching  43:10
way  10:11,19
  15:14,18 16:4,19
  17:2,21 21:19
  22:22 25:23 36:1
  38:2 42:1,16
  48:14,19 70:4,7,18
  79:23 82:6 85:5
wayne  9:18 10:9
  10:10 20:13
ways  17:1,3 21:10
  21:16 36:19 38:3
  54:20
weak  13:24,24
  33:10 65:19
wear  53:12
week  51:20,23
  59:17
weekly  59:18
weeks  18:18,20,20
  18:21 52:6,6,8
  85:21
wendy  2:10,14
went  10:18 11:25
  34:8 39:4 41:4
  44:22 49:19 81:16
  84:3 85:2,14
west  2:16
wholesaler  13:1,2
  22:25 23:1 39:2
  39:18 67:20,21
wholesaler's  29:1
wide  40:21 41:3
  48:16 76:7 84:4,6
  84:14 85:2
widened  84:17

wider  41:15
willingness  69:17
wince  65:18
wine  1:18 2:9,9,24
  4:16 31:6 44:13
  45:6,18 61:8
  63:17 72:1,8,11,17
  73:12,23 75:17
wines  67:25
witness  2:17 3:2
  4:3,5 17:16 19:4,9
  20:22 25:7,10
  26:23 32:6 38:1
  39:17 43:22 45:9
  45:20 46:13 47:20
  47:22 48:13 52:11
  56:1 57:22 60:4
  64:7 69:11,20
  70:14,23 74:2,22
  77:1,22 78:5
  86:24 88:2,17
  90:11 91:6,9
witnesses  6:8
word  16:7 73:18
  73:18
words  79:21
work  10:3,24 27:1
  35:23 37:14,14,17
  50:23 52:9 54:18
  54:23 57:20 65:17
  71:2 85:15
worked  9:5 50:24
  52:22 65:8
workforce  40:19
working  9:11,22
  16:11 17:1,3
  21:11,16,20 27:3
  36:20
workouts  87:18
works  15:3 53:17

**[world - young]**

| | |
|---|---|
| **world** | 41:24 53:16 |
| **worse** | 36:25 |
| **write** | 28:20,20 |
| **wrong** | 7:1 36:10 |

| **x** |
|---|

| **x** | 1:9 3:1,7 |
|---|---|

| **y** |
|---|

**yeah**   10:12 16:9
   18:14,25 19:9,19
   23:21 27:12,12,13
   35:19 49:12 51:9
   61:25 80:9 86:2
**year**   15:14 48:25
   49:6,11 51:5,25
   55:10,23 56:4,24
   61:10 63:2 74:20
**years**   5:6 8:9
   11:25 22:10 25:24
   25:25 32:20 49:3
   60:16 86:9
**yelling**   36:15
**york**   1:1 2:4,4,7
   2:20 12:20,24
   13:5,22,25 14:2
   18:9 19:21 21:3
   21:13,17 22:19
   33:23 34:10,13,17
   36:9,18 40:24
   41:5,6,19,21,23
   42:1,1,2 46:2
   52:20 54:7 61:10
   62:22,25 64:10
   67:25 73:1,10
   86:5,16
**young**   86:6