# EXHIBIT J

## EBER BROS. WINE & LIQUOR CORP.

Corporate Office
95 Allens Creek Rd., Bldg 2  Ste 10, Rochester, New York  14618
Phone: (585) 360-4240     Fax: (585) 360-4211

March 22, 2016

Dear Sally,

Enclosed is a letter that outlines the company's Current Financial situation. As you will see We are at a Critical state in our company's history Over the past Six months I have advanced the company $500,000 and In addition to those advances I gave you $4000 during the holidays to make up for the elimination of the historic distribution.

While I wish the circumstances were different, neither the Company nor I have the resources to continue to pay a monthly retainer. That Said I am enclosing a personal check in the the Amount of ($6000) which I hope will tide you over during these difficult times. The Company has been Paying you monthly out of the money I loaned them In November.

I am working diligently to rebuild the Company and maximize any returns that we may achieve. Please let me Know if I can do anything to help you.

Love,
Lester

EB-00001671

# EBER BROS. WINE & LIQUOR CORP.

Corporate Office
95 Allens Creek Rd., Bldg 2  Ste 10, Rochester, New York  14618
Phone: (585) 360-4240     Fax: (585) 360-4211

April 2, 2010

*Called*
*apr: 19, 2010*

Dear Sally,

It was good talking to you.  As I told you I am writing you to discuss with you the financial condition of the company, our capital needs and to offer you the opportunity to participate in a plan to provide capital to help the business.

As you know, the family business has experienced significant difficulties over the past few years.  During that time we have liquidated several businesses and done our best to meet the company's financial obligations while operating a financially viable business.  It hasn't been easy.   Over the past few years I have cut my salary by over 50% and made every other cut I believed we could make while retaining a financially viable business.

Today we have one operating business that is substantially smaller than the original company.   We believe that our Connecticut operation has the potential to be the foundation for the renewal of our business.  But, our Connecticut business and its parent company are facing several financial issues.  They both have liquidity issues and in order to meet our financial needs we have looked for outside financial support from several banks.  Importunely they all have turned down our loan requests.

As a result of the businesses financial needs, Connecticut's growth opportunities and our failure to find a financial institution to provide us with an adequate financial option I offered to personally loan the company the capital it needed to meet its projected obligations this year.   The amount of the loan is $1.5 million dollars.  The loan is secured by the EBWL and Metro's equity interest in our Connecticut business.   The board of directors recently approved the loan documents as well as our security arrangements.

For the next 30 days I will offer you the opportunity to participate in the loan.  If you desire to participate you would be responsible for funding 1/3 of any advances to the company.  To date I have advanced the company approximately $500,000.  Therefore if you decide to participate in the loan you would be required to remit to me approximately $167,000 to reimburse me for my advances.  Future advances would be in minimum increments of approximately $50,000 for each of us and could be done on a monthly basis.

I encourage you to review a copy of the loan documents, which I have attached to this letter.  We have made substantial progress but are still in a loss position.  Please discuss this opportunity with your financial and legal advisors.  If you wish to move forward with the loan, please sign the enclosed confidentiality agreement and I will send you the company financial statements.  Finally, please let me know if you would like any additional information about Eber Connecticut LLC.

Sincerely,

*Love,*
*Lester*

Lester Eber

# EBER BROS. WINE & LIQUOR CORP.

Corporate Office
95 Allens Creek Rd, Bldg. 2    Suite 10
Rochester, New York 14618
Phone: (585) 360-4240    Fax: (585) 360-4211

April 2, 2010

Dear Sally,

I was good talking to you. As I told you I am writing you to discuss with you the financial condition of the company, our capital needs and to offer you the opportunity to participate in a plan to provide capital to help the business.

As you know, the family business has experienced significant difficulties over the past few years. During that time we have liquidated several businesses and done our best to meet the company's financial obligation while operating a financially viable business. It hasn't been easy. Over the past few years I have cut my salary by over 50% and made every other cut I believed we could make while retaining a financially viable business.

Today we have one operating business that is substantially smaller than the original company. We believe that our Connecticut operation has the potential to be the foundation for the renewal of our business. But, our Connecticut business and its parent company are facing several financial issues. They both have liquidity issues and in order to meet our financial needs we have looked for outside financial support from several banks. Unfortunately they all have turned down our loan request

EB-00001673

# EBER BROS. WINE & LIQUOR CORP.

Corporate Office
95 Allens Creek Rd, Bldg. 2    Suite 10
Rochester, New York 14618
Phone: (585) 360-4240    Fax: (585) 360-4211

As a result of the businesses financial needs, Connecticut's growth opportunities and our failure to find a financial institution to provide us with an adequate financial option I offered to personally loan the company the capital it needed to meet its projected obligations this year. The amount of the loan is $1.5 million dollars. The loan is secured by the EB&L and Metro's equity interest in our Connecticut business. The board of directors recently approved the loan documents as well as our Security arrangements.

For the next 30 days I will offer you the opportunity to participate in the loan. If you desire to participate you would be responsible for funding 1/3 of any advances to the company. To date I have advanced the company approximately $500,000. Therefore If you decide to participate in the loan you would be required to remit to me approximately $162,000 to reimburse me for my advances. Future advances would be in minimum increments of approximately $50,000 for each of us and would be done on a monthly basis.

I encourage you to review a copy of the loan documents, which I have attached to this letter. We have made substantial progress but are still in a loss position. Please discuss this opportunity with your and legal advisors. If you wish to move forward with the loan, Please sign

EB-00001674

# EBER BROS. WINE & LIQUOR CORP.

Corporate Office
95 Allens Creek Rd, Bldg. 2    Suite 10
Rochester, New York 14618
Phone: (585) 360-4240    Fax: (585) 360-4211

The company financial statements. Finally, Please let
you know if you would like any additional information
about Eber Connecticut L.L.C.

Love,

Lester

# NON-DISCLOSURE AGREEMENT

Provider: Eber Bros. Wine and Liquor Corporation          Date: _____ April 2, 2010 _____

Recipient: _____ Sally Kleeberg _____

Purpose for Information Disclosure: Evaluation of a potential loan transaction with Eber Bros. Wine and Liquor Corporation.

THIS NON-DISCLOSURE AGREEMENT (this "Agreement") is entered into as of the date set forth above by and between Provider and Recipient.

Provider intends to provide Recipient with certain financial and/or business information which Provider considers to be confidential. Recipient is willing to assure Provider that it will receive and hold such information in confidence and trust, and use and disclose such information only in support of the purposes for which it is provided. In consideration of the foregoing and other good and valuable consideration, the parties agree as follows:

**1. Definitions.**

1.1. "Affiliate" shall mean (a) any person or entity directly or indirectly controlled by, controlling or under common control with a party, and (b) any officer, director, management employee or trustee of any such entity or a party.

1.2. "Confidential Information" shall mean all financial, technical, business, customer, sales, marketing and other information including all copies thereof (including, without limitation, all agreements, files, books, logs, charts, records, studies, reports, surveys, schedules, plans, maps, statistical information, business plans, strategic plans, ideas, projections, and documentation) which may be or already has been furnished or disclosed to Recipient by, or acquired by Recipient directly or indirectly from, Provider or Provider's Affiliates. Such term shall also include all memoranda, notes, reports, and documents relating to Confidential Information, all copies and extracts of Confidential Information and all computer-generated studies and data containing Confidential Information prepared by or for the benefit of Recipient in connection with carrying out any Purpose.

1.3. "Purpose" shall mean the reason for disclosure of Confidential Information to Recipient as described above under "Purpose."

**2. Restrictions.**

2.1. Confidential Information.     Except as provided herein, during the period required to complete the Purpose and for a period of two years thereafter:

(a) Recipient shall receive all Confidential Information in strict confidence and shall take all necessary steps to maintain the confidentiality and secrecy of the Confidential Information;

(b) Recipient may use the Confidential Information only for the Purpose and may not use the Confidential Information for any other purpose without the express written consent of Provider; and

(c) Recipient shall not disclose or provide the Confidential Information to any third party, and may only disclose the Confidential Information to those employees, agents and advisors of Recipient who (1) are assigned to participate in the Purpose, (2) have a "need to know" such Confidential Information to enable them to perform their responsibilities relating to the Purpose, and (3) are subject to legally binding confidentiality obligations relating to the use and disclosure of such Confidential Information at least as restrictive as those contained herein.

2.2. Exceptions. This Agreement shall not apply to any Confidential Information which:

(a) at the time of disclosure, is publicly available and known other than as a result of the fault or breach of Recipient;

(b) was rightfully in the possession of Recipient prior to Recipient's receipt of such Confidential Information, directly or indirectly, from Provider and/or Provider's Affiliates; or

(c) is acquired by Recipient from a third party who does not thereby breach an obligation of confidence to Provider and/or Provider's Affiliates and who discloses it to Recipient in good faith.

2.3. Legally Required Disclosure. Notwithstanding the foregoing, Recipient may disclose Confidential Information to the extent legally required by a final order of any court or administrative agency having competent jurisdiction, provided that Recipient first notifies Provider and cooperates with Provider to protect the confidentiality thereof by all means reasonably available.

**3. Return of Materials.** Recipient shall return and deliver, or cause to be returned and delivered, to Provider, all documentation, materials, media, objects and other tangible items that contain Confidential Information immediately upon the completion of the Purpose if no definitive agreement for the Purpose has been reached, or

~Doc# 1153232~

EB-00001676

otherwise immediately upon the written request of Provider. Upon Provider's request, Recipient agrees to certify it has completed such requested action.

**4. Warranty Disclaimer.** No warranty is made to any person hereby regarding the accuracy, completeness, condition, suitability, or performance of the Confidential Information.

**5. Remedies.** All Confidential Information shall, at all times and for all purposes, be deemed to have been acquired and be held by Recipient in a fiduciary capacity and solely for the benefit of Provider. It is agreed that the unauthorized use or disclosure of any Confidential Information by Recipient will cause severe and irreparable damage to Provider and/or Provider's Affiliates. In the event of any violation of this Agreement, Recipient agrees that Provider shall be authorized and entitled to obtain from any court of competent jurisdiction preliminary and/or permanent injunctive relief, as well as any other relief permitted by applicable law. Recipient agrees to indemnify Provider against any and all losses, damages, claims or expenses incurred or suffered by Provider as a result of Recipient's breach of this Agreement. In a dispute arising out of or related to this Agreement, the prevailing party shall have the right to collect from the other party its reasonable attorney fees and costs and necessary expenditures.

**6. Choice of Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

**7. Entire Agreement.** This Agreement contains the entire agreement of the parties regarding the subject matter hereof and supersedes all other prior agreements, whether written or oral, regarding such subject matter. This Agreement may be changed only by an instrument in writing executed by both parties.

**8. No Waivers.** No failure or delay by a party hereto in enforcing any right, power or privilege created hereunder shall operate as an implied waiver thereof, nor shall any single or partial enforcement thereof preclude any other or further enforcement thereof or the enforcement of any other right, power or privilege.

**9. Assignment.** This Agreement shall inure to the benefit of each party and its successors and assigns. To the extent Provider discloses, or provides for the disclosure of, Confidential Information of Provider's Affiliate, such Affiliate shall be a third-party beneficiary with respect to the confidentiality provisions of this Agreement and shall be entitled to enforce such provisions as its interests may warrant.

**10. Notice.** Any notice required or permitted under this Agreement shall be in writing and delivered by personal delivery, a nationally-recognized express courier assuring overnight delivery, confirmed facsimile transmission or first-class certified or registered mail, return receipt requested, and will be deemed given (a) upon personal delivery; (b) one business day after deposit with the express courier or confirmation of receipt of facsimile; or (c) five days after deposit in the mail. Such notice shall be sent to the party for which intended at the address set forth below its signature hereto or at such other address as that party may specify in writing pursuant to this section.

**11. Severability.** In the event that any one or more of the provisions of this Agreement shall be held invalid, illegal or unenforceable in any respect, or the validity, legality and enforceability of any one or more of the provisions contained herein shall be held to be excessively broad as to duration, activity or subject, such provision shall be construed by limiting and reducing such provision so as to be enforceable to the maximum extent compatible with applicable law.

**IN WITNESS WHEREOF,** the parties have executed this Agreement as of the date first indicated above:

**PROVIDER:**
**Eber Bros. Wine and Liquor Corporation**

By: _Lester Eber_
Signature

_LESTER EBER_
Name (Print)

_President_
Title

**RECIPIENT:**
**Sally Kleeberg**

By:_____
Signature

_____
Name (Print)

_____
Title

2

EB-00001677

# NON-DISCLOSURE AGREEMENT

Provider: <u>Eber Bros. Wine and Liquor Corporation</u>          Date: _____ <u>April 2, 2010</u> _____

Recipient: _____ <u>Sally Kleeberg</u> _____

Purpose for Information Disclosure: <u>Evaluation of a potential loan transaction with Eber Bros. Wine and Liquor Corporation.</u>

THIS NON-DISCLOSURE AGREEMENT (this "Agreement") is entered into as of the date set forth above by and between Provider and Recipient.

Provider intends to provide Recipient with certain financial and/or business information which Provider considers to be confidential. Recipient is willing to assure Provider that it will receive and hold such information in confidence and trust, and use and disclose such information only in support of the purposes for which it is provided. In consideration of the foregoing and other good and valuable consideration, the parties agree as follows:

1. **Definitions.**

1.1. "Affiliate" shall mean (a) any person or entity directly or indirectly controlled by, controlling or under common control with a party, and (b) any officer, director, management employee or trustee of any such entity or a party.

1.2. "Confidential Information" shall mean all financial, technical, business, customer, sales, marketing and other information including all copies thereof (including, without limitation, all agreements, files, books, logs, charts, records, studies, reports, surveys, schedules, plans, maps, statistical information, business plans, strategic plans, ideas, projections, and documentation) which may be or already has been furnished or disclosed to Recipient by, or acquired by Recipient directly or indirectly from, Provider or Provider's Affiliates. Such term shall also include all memoranda, notes, reports, and documents relating to Confidential Information, all copies and extracts of Confidential Information and all computer-generated studies and data containing Confidential Information prepared by or for the benefit of Recipient in connection with carrying out any Purpose.

1.3. "Purpose" shall mean the reason for disclosure of Confidential Information to Recipient as described above under "Purpose."

2. **Restrictions.**

2.1. Confidential Information.     Except as provided herein, during the period required to complete the Purpose and for a period of two years thereafter:

(a) Recipient shall receive all Confidential Information in strict confidence and shall take all necessary steps to maintain the confidentiality and secrecy of the Confidential Information;

(b) Recipient may use the Confidential Information only for the Purpose and may not use the Confidential Information for any other purpose without the express written consent of Provider; and

(c) Recipient shall not disclose or provide the Confidential Information to any third party, and may only disclose the Confidential Information to those employees, agents and advisors of Recipient who (1) are assigned to participate in the Purpose, (2) have a "need to know" such Confidential Information to enable them to perform their responsibilities relating to the Purpose, and (3) are subject to legally binding confidentiality obligations relating to the use and disclosure of such Confidential Information at least as restrictive as those contained herein.

2.2. Exceptions. This Agreement shall not apply to any Confidential Information which:

(a) at the time of disclosure, is publicly available and known other than as a result of the fault or breach of Recipient;

(b) was rightfully in the possession of Recipient prior to Recipient's receipt of such Confidential Information, directly or indirectly, from Provider and/or Provider's Affiliates; or

(c) is acquired by Recipient from a third party who does not thereby breach an obligation of confidence to Provider and/or Provider's Affiliates and who discloses it to Recipient in good faith.

2.3. Legally Required Disclosure. Notwithstanding the foregoing, Recipient may disclose Confidential Information to the extent legally required by a final order of any court or administrative agency having competent jurisdiction, provided that Recipient first notifies Provider and cooperates with Provider to protect the confidentiality thereof by all means reasonably available.

3. **Return of Materials.**   Recipient shall return and deliver, or cause to be returned and delivered, to Provider, all documentation, materials, media, objects and other tangible items that contain Confidential Information immediately upon the completion of the Purpose if no definitive agreement for the Purpose has been reached, or

~Doc# 1153212~

EB-00001678

otherwise immediately upon the written request of Provider. Upon Provider's request, Recipient agrees to certify it has completed such requested action.

**4. Warranty Disclaimer.** No warranty is made to any person hereby regarding the accuracy, completeness, condition, suitability, or performance of the Confidential Information.

**5. Remedies.** All Confidential Information shall, at all times and for all purposes, be deemed to have been acquired and be held by Recipient in a fiduciary capacity and solely for the benefit of Provider. It is agreed that the unauthorized use or disclosure of any Confidential Information by Recipient will cause severe and irreparable damage to Provider and/or Provider's Affiliates. In the event of any violation of this Agreement, Recipient agrees that Provider shall be authorized and entitled to obtain from any court of competent jurisdiction preliminary and/or permanent injunctive relief, as well as any other relief permitted by applicable law. Recipient agrees to indemnify Provider against any and all losses, damages, claims or expenses incurred or suffered by Provider as a result of Recipient's breach of this Agreement. In a dispute arising out of or related to this Agreement, the prevailing party shall have the right to collect from the other party its reasonable attorney fees and costs and necessary expenditures.

**6. Choice of Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

**7. Entire Agreement.** This Agreement contains the entire agreement of the parties regarding the subject matter hereof and supersedes all other prior agreements, whether written or oral, regarding such subject matter. This Agreement may be changed only by an instrument in writing executed by both parties.

**8. No Waivers.** No failure or delay by a party hereto in enforcing any right, power or privilege created hereunder shall operate as an implied waiver thereof, nor shall any single or partial enforcement thereof preclude any other or further enforcement thereof or the enforcement of any other right, power or privilege.

**9. Assignment.** This Agreement shall inure to the benefit of each party and its successors and assigns. To the extent Provider discloses, or provides for the disclosure of, Confidential Information of Provider's Affiliate, such Affiliate shall be a third-party beneficiary with respect to the confidentiality provisions of this Agreement and shall be entitled to enforce such provisions as its interests may warrant.

**10. Notice.** Any notice required or permitted under this Agreement shall be in writing and delivered by personal delivery, a nationally-recognized express courier assuring overnight delivery, confirmed facsimile transmission or first-class certified or registered mail, return receipt requested, and will be deemed given (a) upon personal delivery; (b) one business day after deposit with the express courier or confirmation of receipt of facsimile; or (c) five days after deposit in the mail. Such notice shall be sent to the party for which intended at the address set forth below its signature hereto or at such other address as that party may specify in writing pursuant to this section.

**11. Severability.** In the event that any one or more of the provisions of this Agreement shall be held invalid, illegal or unenforceable in any respect, or the validity, legality and enforceability of any one or more of the provisions contained herein shall be held to be excessively broad as to duration, activity or subject, such provision shall be construed by limiting and reducing such provision so as to be enforceable to the maximum extent compatible with applicable law.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first indicated above:

PROVIDER:
Eber Bros. Wine and Liquor Corporation

By: _Lester Eber_

Signature

_LESTER EBER_

Name (Print)

_President_

Title

RECIPIENT:
Sally Kleeberg

By:_____

Signature

_____

Name (Print)

_____

Title

~Doc# 1153232~

EB-00001679

# GUARANTY

THIS GUARANTY is executed as of _____ ___, 2010 by **EBER BROS. WINE AND LIQUOR CORPORATION** ("**Parent**" or the "**Guarantor**") in favor of **LESTER EBER** (the "**Lender**").

        1.      THE GUARANTY.  For valuable consideration, Guarantor hereby unconditionally guarantees and promises to pay promptly to Lender, or order, in lawful money of the United States, any and all Indebtedness to Lender when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. This Guaranty is cumulative and does not supersede any other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor.

        2.      DEFINITIONS.

        (a)     "**Borrower**" shall mean Eber Bros. Wine & Liquor Metro, Inc., a New York corporation.

        (b)     "**Indebtedness**" shall mean any and all debts, liabilities, and obligations of Borrower and Guarantor to Lender arising under the Transaction Documents, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Lender by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Lender for its own account or as agent for another or others, whether Borrower or Guarantor may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, any and all obligations of Borrower and Guarantor to Lender for reasonable attorneys' fees and all other costs and expenses incurred by Lender in the collection or enforcement of any debts, liabilities, and obligations of Borrower and Guarantor to Lender.

        (c)     "**Note**" means that certain Line of Credit Note dated as of _____ executed by Borrower in favor of the Secured Party in the maximum principal amount of $1,500,000, as amended, restated, supplemented or otherwise modified from time to time.

        (d)     "**Security Agreement**" means the Security Agreement dated as of the date hereof executed by the Borrower and Guarantor in favor of Lender, as amended, restated, supplemented or otherwise modified from time to time.

        (e)     "**Transaction Documents**" means the Note, the Guaranty and each other document, instrument and agreement executed in connection therewith.

EB-00001680

Capitalized terms used but not defined herein have the meanings given such terms in the Note or the Guaranty, as applicable.

3.     OBLIGATIONS INDEPENDENT.   The obligations of Guarantor are independent of the obligations of Borrower or any other guarantor, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.  Anyone executing this Guaranty shall be bound by its terms without regard to execution by anyone else.

4.     RIGHTS OF LENDER.  Guarantor authorizes Lender, without notice or demand and without affecting its liability hereunder, from time to time to:

(a)     make additional advances on the Indebtedness or renew, compromise, extend, accelerate, or otherwise change the time for payment, or otherwise change the terms, of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon, or otherwise change the terms of any Transaction Documents;

(b)     receive and hold security for the payment of this Guaranty or any Indebtedness and exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any such security;

(c)     apply such security and direct the order or manner of sale thereof as Lender in its discretion may determine; and

(d)     release or substitute any guarantor or any one or more of any endorsers or other guarantors of any of the Indebtedness.

5.     GUARANTY TO BE ABSOLUTE.   Guarantor agrees that until the Indebtedness has been paid in full and any commitments of Lender or facilities provided by Lender with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner or to any extent vary the risks of Guarantor under this Guaranty or that, but for this paragraph, might discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty.  Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Lender described in the immediately preceding paragraph of this Guaranty.  It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional.

~Doc# 1142695~

EB-00001681

6.      GUARANTOR'S WAIVERS OF CERTAIN RIGHTS AND CERTAIN DEFENSES. Guarantor waives:

(a)      any right to require Lender to proceed against Borrower or any other Guarantor, proceed against or exhaust any security for the Indebtedness, or pursue any other remedy in Lender's power whatsoever;

(b)      any defense arising by reason of any disability or other defense of Borrower, or the cessation from any cause whatsoever of the liability of Borrower;

(c)      any defense based on any claim that Guarantor's obligations exceed or are more burdensome than those of Borrower or any other Guarantor; and

(d)      the benefit of any statute of limitations affecting Guarantor's liability hereunder.

No provision or waiver in this Guaranty shall be construed as limiting the generality of any other waiver contained in this Guaranty.

7.      WAIVER OF SUBROGATION. Guarantor forever waives to the extent permitted by applicable law any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise) including, without limitation, any claim or right of subrogation under the Bankruptcy Code (Title 11, United States Code) or any successor statute (the **"Bankruptcy Code"**), arising from the existence or performance of this Guaranty, and Guarantor waives to the extent permitted by applicable law any right to enforce any remedy that Lender now has or may hereafter have against Borrower or any other Guarantor, and waives any benefit of, and any right to participate in, any security now or hereafter held by Lender.

8.      WAIVER OF NOTICES. Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of intent to accelerate, notices of acceleration, notices of any suit or any other action against Borrower or any other person, any other notices to any party liable on any Transaction Document, notices of acceptance of this Guaranty, notices of the existence, creation, or incurring of new or additional Indebtedness to which this Guaranty applies or any other Indebtedness of Borrower to Lender, and notices of any fact that might increase Guarantor's risk.

9.      SECURITY.      To secure all of Guarantor's obligations hereunder, Guarantor assigns and grants to Lender a security interest in all moneys, securities, and other property of Guarantor now or hereafter in the possession of Lender and all proceeds thereof. Upon default or breach of any of Guarantor's obligations to Lender, Lender may apply any of the foregoing to reduce the Indebtedness, and may foreclose any collateral as provided in the Uniform Commercial Code as in effect in any applicable jurisdiction and in any security agreements between Lender and Guarantor.

10.     SUBORDINATION. Any obligations of Borrower to Guarantor, now or hereafter existing are hereby subordinated to the Indebtedness. In addition to Guarantor's waiver

~Doc# 1142695~

EB-00001682

of any right of subrogation as set forth in this Guaranty with respect to any obligations of Borrower to Guarantor as subrogee of Lender, Guarantor agrees that, if Lender so requests, Guarantor shall not demand, take, or receive from Borrower, by setoff or in any other manner, payment of any other obligations of Borrower to Guarantor until the Indebtedness has been paid in full and any commitments of Lender or facilities provided by Lender with respect to the Indebtedness have been terminated. If any payments are received by Guarantor in violation of such waiver or agreement, such payments shall be received by Guarantor as trustee for Lender and shall be paid over to Lender on account of the Indebtedness, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Any security interest, lien, or other encumbrance that Guarantor may now or hereafter have on any property of Borrower is hereby subordinated to any security interest, lien, or other encumbrance that Lender may have on any such property.

      11.    REVOCATION OF GUARANTY.

      (a)    This Guaranty may be revoked at any time by Guarantor in respect to future transactions. Such revocation shall be effective upon actual receipt by Lender, at the address for notices provided herein or at such other address as may have been provided to Guarantor by Lender, of written notice of revocation. Revocation shall not affect any of Guarantor's obligations or Lender's rights with respect to transactions committed or entered into prior to Lender's receipt of such notice, regardless of whether or not the Indebtedness related to such transactions, before or after revocation, has been incurred, renewed, compromised, extended, accelerated, or otherwise changed as to any of its terms, including time for payment or increase or decrease of the rate of interest thereon, and regardless of any other act or omission of Lender authorized hereunder. Revocation by Guarantor shall not affect any obligations of any other guarantor.

      (b)    Guarantor acknowledges and agrees that this Guaranty may be revoked only in accordance with the foregoing provisions of this paragraph and shall not be revoked simply as a result of any change in name, location, or composition or structure of Borrower, the dissolution of Borrower, or the termination, increase, decrease, or other change of any personnel or owners of Borrower.

      12.    REINSTATEMENT OF GUARANTY. If this Guaranty is revoked, returned, or canceled, and subsequently any payment or transfer of any interest in property by Borrower or Guarantor to Lender is rescinded or must be returned by Lender to Borrower or Guarantor, this Guaranty shall be reinstated with respect to any such payment or transfer, regardless of any such prior revocation, return, or cancellation.

      13.    STAY OF ACCELERATION. In the event that acceleration of the time for payment of any of the Indebtedness is stayed upon the insolvency, bankruptcy, or reorganization of Borrower or otherwise, all such Indebtedness guaranteed by Guarantor shall nonetheless be payable by Guarantor immediately if requested by Lender.

~Doc# 1142695~

EB-00001683

14.   NO SETOFF OR DEDUCTIONS; TAXES.   All payments made by Guarantor hereunder will be to Lender at its designated address, in immediately available funds and shall be made without setoff, counterclaim, or other defense.  All such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction (other than the United States) or by any political subdivision or taxing authority thereof or therein (other than the United States) with respect to such payments (but excluding, any tax imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein measured by or based on the net income or net profits of Lender) (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "**Taxes**").  If any Taxes are so levied or imposed, Guarantor agrees to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under this Guaranty after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein.  Guarantor will furnish to Lender as promptly as possible after the date the payment of any Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment by Guarantor.

15.   INFORMATION RELATING TO BORROWER.   Guarantor acknowledges and agrees that it has made such independent examination, review, and investigation of the Transaction Documents as Guarantor deems necessary and appropriate, including, without limitation, any covenants pertaining to Guarantor contained therein, and shall have sole responsibility to obtain from Borrower any information required by Guarantor about any modifications thereto.  Guarantor further acknowledges and agrees that it shall have the sole responsibility for, and has adequate means of, obtaining from Borrower such information concerning Borrower's financial condition or business operations as Guarantor may require, and that Lender has no duty, and Guarantor is not relying on Lender, at any time to disclose to Guarantor any information relating to the business operations or financial condition of Borrower.

16.   BORROWER'S AUTHORIZATION.   It is not necessary for Lender to inquire into the powers of Borrower or of the officers, directors, partners, members, managers, or agents acting or purporting to act on its behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder, subject to any limitations on Guarantor's liability set forth herein.

17.   REMEDIES.  If Guarantor fails to fulfill its duty to pay all Indebtedness guaranteed hereunder, Lender shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law.  Without limiting the foregoing to the extent permitted by law, Lender may, at its option and without notice or demand:

(a)   declare any Indebtedness due and payable at once;

(b)   take possession of any collateral pledged by Borrower or Guarantor, wherever located, and sell, resell, assign, transfer, and deliver all or any part of the collateral at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Lender may impose reasonable conditions upon any such sale.

- 5 -

EB-00001684

Further, Lender, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of the collateral to be sold, free from and discharged of all trusts, claims, rights of redemption and equities of Borrower or Guarantor whatsoever. Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker, or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided herein; and

(c)     set off against any or all liabilities of Guarantor all money owed by Lender or any of its agents or affiliates in any capacity to Guarantor, whether or not due, and also set off against all other liabilities of Guarantor to Lender all money owed by Lender in any capacity to Guarantor. If exercised by Lender, Lender shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books subsequent thereto.

18.     NOTICES. Any notice, demand, request, waiver or other communication required by any provision of this Guaranty shall be in writing and may be delivered by personal service, sent by facsimile with confirmation of receipt, sent by a nationally recognized overnight delivery services or sent by registered or certified mail, return receipt requested, with postage thereon fully repaid. All such communications shall be addressed as follows:

To Guarantor:          Eber Bros. Wine And Liquor Corporation
                       95 Allens Creek Rd.
                       Bldg. 2  Suite 10
                       Rochester, New York 14618
                       Attn: _____
                       Facsimile: _____

To Lender:             Lester Eber
                       95 Allens Creek Rd.
                       Bldg. 2  Suite 10
                       Rochester, New York 14618
                       Attn: _____
                       Facsimile: _____

Notices sent by (a) first class mail shall be deemed delivered on the earlier of actual receipt or on the fourth business day after deposit in the U.S. mail, postage prepaid, (b) overnight courier shall be deemed delivered on the next business day, and (c) telecopy shall be deemed delivered when transmitted.

19.     SUCCESSORS AND ASSIGNS. This Guaranty (a) binds Guarantor and Guarantor's successors and assigns, provided that Guarantor may not assign its rights or obligations under this Guaranty without the prior written consent of Lender, and (b) inures to the

- 6 -

EB-00001685

benefit of Lender and Lender's indorsees, successors, and assigns. Lender may, without notice to Guarantor and without affecting Guarantor's obligations hereunder, sell, assign, grant participations in, or otherwise transfer to any other person, firm, or corporation the Indebtedness and this Guaranty, in whole or in part. Guarantor agrees that Lender may disclose to any assignee or purchaser, or any prospective assignee or purchaser, of all or part of the Indebtedness any and all information in Lender's possession concerning Guarantor, this Guaranty, and any security for this Guaranty.

20.   AMENDMENTS, WAIVERS, AND SEVERABILITY.  No provision of this Guaranty may be amended or waived except in writing.  No failure by Lender to exercise, and no delay in exercising, any of its rights, remedies, or powers shall operate as a waiver thereof, and no single or partial exercise of any such right, remedy, or power shall preclude any other or further exercise thereof or the exercise of any other right, remedy, or power.  The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision of this Guaranty.

21.   COSTS AND EXPENSES.  Guarantor agrees to pay all reasonable attorneys' fees to the extent permitted by applicable law, and all other costs and expenses that may be incurred by Lender (a) in the enforcement of this Guaranty or (b) in the preservation, protection, or enforcement of any rights of Lender in any case commenced by or against Guarantor or Borrower under the Bankruptcy Code.

22.   GOVERNING LAW AND JURISDICTION.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of laws principles which would require the application of the laws of a different state.

23.   CONSENT TO JURISDICTION.  GUARANTOR, AND LENDER BY ACCEPTING THIS GUARANTY, HEREBY AGREE THAT THE FEDERAL COURT OF THE WESTERN DISTRICT OF NEW YORK OR, AT THE OPTION OF LENDER, ANY COURT LOCATED IN THE STATE OF NEW YORK SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN GUARANTOR AND LENDER PERTAINING DIRECTLY OR INDIRECTLY TO THIS GUARANTY OR ANY OTHER CAUSE OR DISPUTE WHATSOEVER BETWEEN GUARANTOR AND LENDER OF ANY KIND OR NATURE.  GUARANTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURTS, HEREBY WAIVING PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREEING THAT SERVICE OF SUCH SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED ADDRESSED TO GUARANTOR AT THE ADDRESS OF GUARANTOR FOR NOTICES SET FORTH HEREIN.  SHOULD GUARANTOR FAIL TO APPEAR OR ANSWER ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THIRTY DAYS AFTER THE MAILING THEREOF, IT SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED AGAINST IT AS PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS.  THE CHOICE OF FORUM SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE BRINGING OF ANY ACTION BY LENDER OR THE

~Doc# 1142695~

EB-00001686

ENFORCEMENT BY LENDER OF ANY JUDGMENT OBTAINED IN SUCH FORUM IN ANY OTHER APPROPRIATE JURISDICTION. FURTHER, GUARANTOR HEREBY WAIVES THE RIGHT TO ASSERT THE DEFENSE OF FORUM NON CONVENIENS AND THE RIGHT TO CHALLENGE THE VENUE OF ANY COURT PROCEEDING.

24. WAIVER OF JURY TRIAL. GUARANTOR AND LENDER EACH WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS AGREEMENT OR ANY TRANSACTION DOCUMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. GUARANTOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST LENDER OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

25. LIMITATION ON GUARANTOR LIABILITY.

(a) It is the intent of Guarantor and Lender that Guarantor's maximum liability hereunder shall be (and shall not be in excess of):

(i) (x) in a Proceeding commenced by or against Guarantor under the Bankruptcy Code on or within one year from the date on which any of the Indebtedness is incurred, the maximum amount which would not otherwise cause the Indebtedness (or any other obligations of Guarantor to Lender) to be avoidable or unenforceable against Guarantor under (A) Section 548 of the Bankruptcy Code or (B) any state fraudulent transfer or fraudulent conveyance act or statute applied in such case or proceeding by virtue of Section 544 of the Bankruptcy Code; or

(y) in a Proceeding commenced by or against Guarantor under the Bankruptcy Code subsequent to one year from the date on which any of the Indebtedness is incurred, the maximum amount which would not otherwise cause the Indebtedness (or any other obligations of Guarantor to Lender) to be avoidable or unenforceable against Guarantor under any state fraudulent transfer or fraudulent conveyance act or statute applied in any such case or proceeding by virtue of Section 544 of the Bankruptcy Code; or

(z) in a Proceeding commenced by or against Guarantor under any law, statute or regulation other than the Bankruptcy Code (including, without limitation, any other bankruptcy, reorganization, arrangement, moratorium, readjustment of debt, dissolution, liquidation or similar debtor relief laws), the maximum amount which would not otherwise

- 8 -

EB-00001687

cause the Indebtedness (or any other obligations of Guarantor to Lender) to be avoidable or unenforceable against Guarantor under such law, statute or regulation including, without limitation, any state fraudulent transfer or fraudulent conveyance act or statute applied in any such case or proceeding.

The substantive laws under which the possible avoidance or unenforceability of the Indebtedness (or any other obligations of Guarantor to Lender) shall be determined in any such case or proceeding shall hereinafter be referred to as the "**Avoidance Provisions**."

(ii)     To the end set forth in Section 25(a)(i), but only to the extent that the Indebtedness would otherwise be subject to avoidance under the Avoidance Provisions, if Guarantor is not deemed to have received valuable consideration, fair value or reasonably equivalent value for the Indebtedness, or if the Indebtedness would render Guarantor insolvent, or leave Guarantor with an unreasonably small capital to conduct its business, or cause Guarantor to have incurred debts (or to have intended to have incurred debts) beyond its ability to pay such debts as they mature, in each case as of the time any of the Indebtedness are deemed to have been incurred under the Avoidance Provisions, the maximum Indebtedness for which Guarantor shall be liable hereunder shall be reduced to that amount which, after giving effect thereto, would not cause the Indebtedness (or any other obligations of Guarantor to Lender), as so reduced, to be subject to avoidance under the Avoidance Provisions.

(iii)     This Section 25(a) shall be applicable only in connection with a Proceeding brought by or against Guarantor and is intended solely to preserve the rights of Lender hereunder to the maximum extent that would not cause the Indebtedness of Guarantor to be subject to avoidance under the Avoidance Provisions in connection with any such Proceeding. Neither Guarantor nor any other person or entity shall have any right or claim under this Section 25(a) against Lender that would not otherwise be available to Guarantor or such other person or entity outside of any Proceeding.

For the purposes of the this Section, "**Proceeding**" means any of the following: (a) the Borrower or Guarantor shall commence a voluntary case concerning itself under the Bankruptcy Code or any other applicable bankruptcy laws; (b) any involuntary case is commenced against the Borrower or Guarantor; or a custodian (as defined in the Bankruptcy Code or any other applicable bankruptcy laws) is appointed for, or takes charge of, all or any substantial part of the property of the Borrower or Guarantor; (c) the Borrower or Guarantor commences any other proceedings under any reorganization arrangement, adjustment of debt, relief of debtor, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Borrower or Guarantor, or any such proceeding is commenced against the Borrower or Guarantor, or the Borrower or Guarantor is adjudicated insolvent or bankrupt; (d) any order of relief or other order approving any such case or proceeding is entered; (e) the Borrower or Guarantor suffers any appointment of any custodian or the like for it or any substantial part of its property; (f) the Borrower or Guarantor makes a general assignment for the

- 9 -

EB-00001688

benefit of creditors; (g) the Borrower or Guarantor shall fail to pay, or shall state that it is unable to pay, or shall be unable to pay, its debts generally as they become due; (h) the Borrower or Guarantor shall call a meeting of its creditors with a view to arranging a composition or adjustment of its debts; (i) the Borrower or Guarantor shall by any act or failure to act indicate its consent to, approval of or acquiescence in any of the foregoing; or (j) any corporate action shall be taken by the Borrower or Guarantor for the purpose of effecting any of the foregoing.

26.     FINAL AGREEMENT.   BY SIGNING THIS GUARANTY EACH PARTY REPRESENTS AND AGREES THAT:  (A) THIS GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS GUARANTY SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS GUARANTY MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

[SIGNATURES NEXT PAGE]

~Doc# 1142695~

EB-00001689

IN WITNESS WHEROF, the parties have executed this Agreement as of the date first set forth above.

**EBER   BROS.   WINE   AND   LIQUOR CORPORATION**

By:_____

Title:_____

(Seal)

_____
**LESTER EBER**

- 11 -

~Doc# 1142695~

EB-00001690

## LINE OF CREDIT NOTE

$1,500,000                                                                    _____, 2010

FOR VALUE RECEIVED, EBER BROS. WINE & LIQUOR METRO, INC., a New York corporation with an address at 155 Paragon Drive, Rochester, New York 14625 ("Maker"), hereby promises to pay to the order of LESTER EBER, an individual with an address at 155 Paragon Drive, Rochester, New York 14625 ("Holder"), the principal sum of ONE MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($1,500,000.00) (the "Maximum Principal Amount") or such lesser or greater amount as may be outstanding hereunder.

1.    Line of Credit.  This Note evidences a revolving line of credit.  Accordingly amounts hereunder may be borrowed, repaid and re-borrowed provided that at no time shall Maker permit the aggregate principal amount of all advances made under this Note to exceed the Maximum Principal Amount.

2.    Interest Rate.  All amounts outstanding under this Note shall bear interest at a rate equal to twelve and one half percent (12.5%) per annum.  Upon the occurrence of an Event of Default (whether or not the Holder has accelerated payment of the outstanding balance due hereunder), or after maturity or after judgment has been rendered with respect to the obligations hereunder, the unpaid principal balance, at the option of Holder, shall bear interest at a rate equal to fifteen percent (15%).  The right of the Holder to receive such increased rate of interest shall not constitute a waiver of any other right or remedy of the Holder.  All interest shall be calculated based on 360 day year and the actual number of days elapsed.

3.    Payments.  Accrued interest will be due and payable in arrears on December 1, 2009 and on the first day of each March, June, September and December thereafter (each an "Interest Payment Date") and on the Maturity Date, as hereinafter defined.  Notwithstanding the foregoing, on each Interest Payment Date, at the request of Maker all or such portion of the interest then due and owing specified by Maker shall be added to the principal amount hereof instead of paying such interest in cash, whereupon such amount will bear interest at rate per annum specified herein.  Maker hereby agrees, upon the request of Holder, to amend this Note or execute one or more new notes in the form hereof to reflect any increase in the principal sum hereof resulting from the addition of the accrued interest to the principal; provided, however that the failure to so amend this Note or to enter into one or more new notes shall not relieve Maker of its obligation to pay such accrued interest in accordance with the terms hereof.  All amounts remaining outstanding hereunder, including all principal and interest, shall become due and payable in full on December 31, 2011 (the "Maturity Date").

4.    Late Charge.  If the entire amount of any required payment is not paid in full within five (5) days after the same is due, the Maker shall pay to Holder a late fee equal to two percent (2%) of the amount of the payment that remains unpaid.

5.    Prepayment.  Maker shall have the option of paying the amounts outstanding under this Note to Holder, in full or part, at any time and from time to time without any premium or penalty.

EB-00001691

6.   <u>Request for Advances; Discretionary Facility</u>.  At any time and from time to time Maker may make a request for a loan that specifies (a) the amount requested as the principal amount of such loan and (b) the business day of Holder on which such loan is requested to be made which shall not be less than three (3) days from the date of such notice.  The decision whether to honor such loan request and make such loan shall be in the sole and absolute discretion of Holder and Holder shall have no obligation or commitment to make any loans hereunder.  Holder may treat as made by Maker and rely upon, and Maker shall be bound by, any loan request that Holder in good faith believes to be valid and to have been made in the name or on behalf of Maker by any officer of Maker, and Holder shall not incur any liability to Maker or any other person as a direct or indirect result of honoring such loan request and making such loan.

7.   <u>Events of Default/Remedies</u>.  At the option of Holder, all amounts outstanding under this Note shall become immediately due and payable in full, without further presentment, protest, notice, or demand, upon the happening of any Event of Default.  Upon the occurrence of an Event of Default, Holder shall be entitled to exercise any legal or equitable right which he or it may have, and may proceed to protect and enforce its rights by any other appropriate proceedings.  The following events shall constitute "Events of Default" under this Note:

   a.   *Nonpayment.*  Failure of Maker to make any payment of any type within fifteen (15) days after the same becomes due and payable.

   b.   *Financial Difficulties.*  Financial difficulties of Maker or any guarantor hereof as evidenced by:

      i.   the filing of a voluntary or involuntary petition in bankruptcy, or under any chapters of the Bankruptcy Code, or under any federal or state statute providing for the relief of debtors;

      ii.   making an assignment for the benefit of creditors;

      iii.   consenting to the appointment of a trustee or receiver for all or a major part of any of Maker's or such guarantor's property;

      iv.   the entry of a court order appointing a receiver or a trustee for all or a major part of Maker's or such guarantor's property; or

      v.   the admission by Maker or any guarantor in writing of the Maker's or such guarantor's inability to pay its debts as they become due.

   c.   *Change of Control.*  Maker or any guarantor hereof enters into any agreement pursuant to which Maker or such guarantor will sell all or substantially all of the assets of Maker or such guarantor, or upon the closing of any transaction or series of related transactions in which more than fifty percent (50%) of the issued and outstanding shares of capital stock of the Maker or such guarantor are issued to, or acquired by, any one or more persons or entities who are not shareholders of the Maker or such guarantor as of the date of this Note.

EB-00001692

    d. *Cease Operations*. Maker ceases all ongoing business operations.

    e. *Sale of Eber-Connecticut, LLC*. Eber-Connecticut, LLC ("Eber-CT") enters into any agreement pursuant to which Eber-CT will sell all or substantially all of the assets of Eber-CT, or upon the closing of any transaction or series of related transactions in which more than fifty percent (50%) of the issued and outstanding units of membership interest of the Maker are issued to, or acquired by, any one or more persons or entities who are not controlled by or under common control with the Maker

    f. The occurrence of a breach or default under any guaranty, security agreement or any other document, instrument or agreement executed in connection herewith or providing security or other credit support for the obligations of the Maker hereunder.

    8.    <u>Expenses</u>. Maker shall pay to Holder all amounts incurred by Holder, including without limitation attorneys' fees and disbursements, in order to collect any amount due under this Note, to negotiate or document a workout or restructuring, or to preserve its rights hereunder, whether or not any legal proceeding ins commenced.

    9.    <u>Holder's Records Conclusive</u>. Holder shall maintain a record of the date and original principal amount of each advance made by him hereunder and the date and amount of each payment to be applied to the outstanding principal amount of this Note. Such records shall be conclusive evidence of the outstanding principal amount under this Note and of all advances hereunder, absent manifest error. No failure by Holder to make any such annotation in its records shall affect Maker's obligation to pay the principal and interest of each advance or any other obligation of Maker hereunder.

    10.    <u>Subordination</u>. All amounts outstanding under this Note are subordinate to any and all amounts owed by the Maker to The Canandaigua National Bank and Trust Company.

    11.    <u>Miscellaneous</u>. The terms of this Note cannot be changed, nor may this Note be discharged in whole or in part, except by a writing executed by Holder. No delay or omission by Holder in exercising any rights hereunder shall operate as a waiver of such rights. This Note shall be governed by and construed under the laws of the State of New York.

[Signatures are on the next page.]

EB-00001693

IN WITNESS WHEREOF, Maker has duly executed this Note as of the day and year first above written.

EBER BROS. WINE & LIQUOR METRO, INC.

By: _____
Lester Eber, Chief Executive Officer

By: _____
Wendy Eber, Chief Financial Officer

Accepted:

_____
Lester Eber

EB-00001694

# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "**Agreement**") is made and entered into as of _____ ___, 2010 by **EBER BROS. WINE AND LIQUOR CORPORATION** ("**Parent**") and **EBER BROS. WINE & LIQUOR METRO, INC.** ("**Metro**"; Parent and Metro, individually and collectively, "**Debtor**") in favor of **LESTER EBER** ("**Secured Party**").

     1.    THE SECURITY. Debtor hereby assigns and grants to Secured Party a security interest in the following described property now owned or hereafter acquired by Debtor ("**Collateral**"):

     (a)    All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles, including all amounts due to Debtor from a factor; and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.

     (b)    All inventory, including all materials, work in process and finished goods.

     (c)    All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by Debtor.

     (d)    All of Debtor's deposit accounts. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

     (e)    All instruments, notes, chattel paper, documents, certificates of deposit, securities and investment property of every type. The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing.

     (f)    All general intangibles, including, but not limited to, (i) all patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems. The Collateral shall include all good will connected with or symbolized by any of such general intangibles; all contract rights, documents, applications, licenses, materials and other matters related to such general intangibles; all tangible property embodying or incorporating any such general intangibles; and all chattel paper and instruments relating to such general intangibles.

     (g)    The shares of common stock and preferred stock, or partnership, membership and other ownership interests, now or hereafter owned by Debtor, including, without limitation, any membership interest in Eber-Connecticut, LLC now or hereafter

EB-00001695

owned, directly or indirectly, by Metro and Parent and any ownership interests in Metro now or hereafter owned by Parent (collectively, the "**Pledged Equity**"), and all certificates evidencing the same, together with, in each case, all shares, securities, monies or property representing a dividend on any of the Pledged Equity, or representing a distribution or return of capital upon or in respect of the Pledged Equity, or resulting from a split up, revision, reclassification or other like change of the Pledged Equity or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Equity (the Pledged Equity, together with all other certificates, shares, securities, properties, ownership interests, or moneys, dividends, distributions, returns of capital subscription, warrants, rights or options as may from time to time be pledged hereunder pursuant to this clause being herein collectively called the "**Equity Collateral**").

(h)     All negotiable and nonnegotiable documents of title covering any Collateral.

(i)     All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

(j)     All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral, and all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the Collateral and sums due from a third party which has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(k)     All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("**Books and Records**").

2.     INDEBTEDNESS. The Collateral secures all Indebtedness.

"**Guaranty**" means that certain Guaranty dated as of the date hereof executed by the Metro in favor of Secured Party, as amended, restated, supplemented or otherwise modified from time to time.

"**Indebtedness**" means any and all debts, liabilities, and obligations of Debtor to Secured Party arising under the Transaction Documents, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Secured Party by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Secured Party for its own account or as agent for another or others, whether Debtor may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter

- 2 -

EB-00001696

become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, any and all obligations of Debtor to Secured Party for reasonable attorneys' fees and all other costs and expenses incurred by Secured Party in the collection or enforcement of any debts, liabilities, and obligations of Debtor to Secured Party.

"**Note**" means that certain Line of Credit Note dated as of _____ executed by Metro in favor of Secured Party in the maximum principal amount of $1,500,000 as amended, restated, supplemented or otherwise modified from time to time.

"**Transaction Documents**" means the Note, the Guaranty, this Agreement and each other document, instrument and agreement executed in connection therewith.

Capitalized terms used but not defined herein have the meanings given such terms in the Note.

3.     DEBTOR'S COVENANTS. Debtor represents, covenants and warrants that unless compliance is waived by Secured Party in writing:

(a)     Debtor will properly preserve the Collateral; defend the Collateral against any adverse claims and demands; and keep accurate Books and Records.

(b)     Debtor shall give Secured Party at least thirty (30) days notice before changing its chief executive office or state of incorporation or organization. Debtor will notify Secured Party in writing prior to any change in the location of any Collateral, including the Books and Records.

(c)     Debtor will notify Secured Party in writing prior to any change in Debtor's name, identity or business structure.

(d)     Except for liens existing on the date hereof, Debtor has not granted and will not grant any security interest in any of the Collateral except to Secured Party, and will keep the Collateral free of all liens, claims, security interests and encumbrances of any kind or nature except the security interest of Secured Party.

(e)     Debtor will promptly notify Secured Party in writing of any event which materially and adversely affects the value of the Collateral, the ability of Debtor or Secured Party to dispose of the Collateral, or the rights and remedies of Secured Party in relation thereto, including, but not limited to, the levy of any legal process against any Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise.

(f)     Debtor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect Secured Party's security interest (collectively, the "**Collateral Costs**"). Without waiving Debtor's default for failure to make any such payment, Secured Party at its option may

- 3 -

EB-00001697

pay any such Collateral Costs, and discharge encumbrances on the Collateral, and such Collateral Costs payments shall be a part of the Indebtedness and bear interest at the rate set out in the Indebtedness. Debtor agrees to reimburse Secured Party on demand for any Collateral Costs so incurred.

(g)     Until Secured Party exercises its rights to make collection, Debtor will diligently collect all Collateral.

(h)     If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading Debtor shall immediately deliver such document to Secured Party, together with any necessary endorsements.

(i)  Debtor will not sell, lease, agree to sell or lease, or otherwise dispose of any Collateral except with the prior written consent of Secured Party; provided, however, that Debtor may sell inventory in the ordinary course of business.

(j)     Debtor will maintain and keep in force all risk insurance covering the Collateral against fire, theft, liability and extended coverages (including without limitation windstorm coverage and hurricane coverage as applicable), to the extent that any Collateral is of a type which can be so insured. Such insurance shall be in form, amounts, coverages and basis reasonably acceptable to Secured Party, shall require losses to be paid on a replacement cost basis, shall be issued by insurance companies acceptable to Secured Party and, upon request of Secured Party, include a loss payable endorsement in favor of Secured Party in a form acceptable to Secured Party. Upon the request of Secured Party, Debtor will deliver to Secured Party a copy of each insurance policy, or, if permitted by Secured Party, a certificate of insurance listing all insurance in force.

(k)     Debtor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless Debtor first obtains the written consent of any owner, holder of any lien on the real property or fixture, or other person having an interest in such property to the removal by Secured Party of the Collateral from such real property or fixture. Such written consent shall be in form and substance acceptable to Secured Party and shall provide that Secured Party has no liability to such owner, holder of any lien, or any other person.

(l)     Exhibit A to this Agreement is a complete list of all patents, trademark and service mark registrations, copyright registrations, mask work registrations, and all applications therefor, in which Debtor has any right, title, or interest, throughout the world. Debtor will promptly notify Secured Party of any acquisition (by adoption and use, purchase, license or otherwise) of any patent, trademark or service mark registration, copyright registration, mask work registration, and applications therefor, and unregistered trademarks and service marks and copyrights, throughout the world, which are granted or filed or acquired after the date hereof or which are not listed on the Exhibit. Debtor authorizes Secured Party, without notice to Debtor, to modify this Agreement by amending the Exhibit to include any such Collateral.

- 4 -

EB-00001698

(m)     Debtor will, at its expense, diligently prosecute all patent, trademark or service mark or copyright applications pending on or after the date hereof, will maintain in effect all issued patents and will renew all trademark and service mark registrations, including payment of any and all maintenance and renewal fees relating thereto, except for such patents, service marks and trademarks that are being sold, donated or abandoned by Debtor pursuant to the terms of its intellectual property management program.  Debtor will at its expense protect and defend all rights in the Collateral against any material claims and demands of all persons  and will, at its expense, enforce all rights in the Collateral against any and all infringers of the Collateral where such infringement would materially impair the value or use of the Collateral to Debtor or Secured Party.  Debtor will not license or transfer any of the Collateral, except for such non-exclusive licenses as are customary in the ordinary course of Debtor's business, or except with Secured Party's prior written consent.

4.     ADDITIONAL REQUIREMENTS.  Debtor agrees that Secured Party may at its option at any time, whether or not Debtor is in default:

(a)     Require Debtor to deliver to Secured Party (i) copies of or extracts from the Books and Records, and (ii) information on any contracts or other matters affecting the Collateral.

(b)     Examine the Collateral, including the Books and Records, and make copies of or extracts from the Books and Records, and for such purposes enter at any reasonable time upon the property where any Collateral or any Books and Records are located.

(c)     Require Debtor to deliver to Secured Party any instruments, chattel paper or letters of credit which are part of the Collateral, and to assign to Secured Party the proceeds of any such letters of credit.

(d)     Notify any account debtors, any buyers of the Collateral, or any other persons of Secured Party's interest in the Collateral.

5.     DEFAULTS.  Any one or more of the following shall be a default hereunder:

(a)     Debtor breaches any term, provision, warranty or representation under this Agreement, or under any other obligation of Debtor to Secured Party, and such breach remains uncured after any applicable cure period.

(b)     Secured Party fails to have a perfected and enforceable lien on or security interest in the Collateral.

(c)     Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

- 5 -

EB-00001699

(d)     Debtor has given Secured Party any false or misleading information or representations.

(e)     A default or Event of Default occurs under the Note, the Guaranty or any other Transaction Document.

6.     SECURED PARTY'S REMEDIES AFTER DEFAULT.  In the event of any default, Secured Party may do any one or more of the following, to the extent permitted by law:

(a)     Declare any Indebtedness immediately due and payable, without notice or demand.

(b)     Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

(c)     Enforce the security interest of Secured Party in any account of Debtor maintained with Secured Party by applying such account to the Indebtedness.

(d)     Require Debtor to obtain Secured Party's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral consisting of inventory.

(e)     Require Debtor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Secured Party in kind.

(f)     Require Debtor to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under Secured Party's exclusive control.

(g)     Require Debtor to assemble the Collateral, including the Books and Records, and make them available to Secured Party at a place designated by Secured Party.

(h)     Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of Debtor's equipment, if Secured Party deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(i)     Demand and collect any payments on and proceeds of the Collateral.  In connection therewith Debtor irrevocably authorizes Secured Party to endorse or sign Debtor's name on all checks, drafts, collections, receipts and other

- 6 -

EB-00001700

documents, and to take possession of and open the mail addressed to Debtor and remove therefrom any payments and proceeds of the Collateral.

(j)     Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to Debtor.

(k)     Use or transfer any of Debtor's rights and interests in any Intellectual Property now owned or hereafter acquired by Debtor, if Secured Party deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. Debtor agrees that any such use or transfer shall be without any additional consideration to Debtor. As used in this paragraph, "**Intellectual Property**" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which Debtor has any right or interest, whether by ownership, license, contract or otherwise.

(l)     Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. Debtor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(m)     Take such measures as Secured Party may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and Debtor hereby irrevocably constitutes and appoints Secured Party as Debtor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(n)     Without notice or demand to Debtor, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by Secured Party or any of Secured Party's agents or affiliates to or for the credit of the account of Debtor or any guarantor or endorser of Debtor's Indebtedness.

(o)     Assign, sell or otherwise dispose of and deliver all or any part of the Equity Collateral, at public or private sale or otherwise, either with or without special conditions or stipulations, for cash or on credit or for future delivery, in such other consideration and at such time or times and at such place or places, and upon such terms and conditions as shall be commercially reasonable and in accordance with all applicable laws.

(p)     Exercise any other remedies available to Secured Party at law or in equity.

The proceeds of any sale, lease or other disposition of the Collateral hereunder shall be applied first, to the expenses of retaking, holding, storing, processing and

- 7 -

EB-00001701

preparing for sale, selling, and the like (including, without limitation, any taxes, fees and other costs incurred in connection therewith) of the Collateral, second, to the attorneys' fees and expenses, and then to satisfaction of the Indebtedness to the Secured Party (in such manner as Secured Party shall elect in its discretion), and to the payment of any other amounts required by applicable law.

Debtor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "**1933 Act**") and applicable state securities laws, Secured Party may be compelled, with respect to any sale of all or any part of the Equity Collateral conducted without prior registration or qualification of such Equity Collateral under the 1933 Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Equity Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Debtor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the 1933 Act) and, notwithstanding such circumstances, Debtor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Equity Collateral for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the 1933 Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.

For the purpose of enabling Secured Party, during the continuance of an Event of Default, to exercise rights and remedies under this Section at such time as Secured Party shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, Debtor hereby grants to Secured Party, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to Debtor) to use, license or sublicense any of the Intellectual Property now owned or hereafter acquired by Debtor, wherever the same may be located.

7.   ENVIRONMENTAL MATTERS.

(a)   Debtor represents and warrants: (i) it is not in violation of any health, safety, or environmental law or regulation regarding hazardous substances and (ii) it is not the subject of any claim, proceeding, notice, or other communication regarding hazardous substances. "**Hazardous substances**" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

(b)   Debtor shall deliver to Secured Party, promptly upon receipt, copies of all notices, orders, or other communications regarding (i) any enforcement

- 8 -

EB-00001702

action by any governmental authority relating to health, safety, the environment, or any hazardous substances with regard to Debtor's property, activities, or operations, or (ii) any claim against Debtor regarding hazardous substances.

(c)     Secured Party and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to Debtor, to enter and visit any locations where the Collateral is located for the purposes of observing the Collateral, taking and removing environmental samples, and conducting tests.   Debtor shall reimburse Secured Party on demand for the costs of any such environmental investigation and testing. Secured Party will make reasonable efforts during any site visit, observation or testing conducted pursuant to this paragraph to avoid interfering with Debtor's use of the Collateral. Secured Party is under no duty to observe the Collateral or to conduct tests, and any such acts by Secured Party will be solely for the purposes of protecting Secured Party's security and preserving Secured Party's rights under this Agreement. No site visit, observation or testing or any report or findings made as a result thereof ("**Environmental Report**") will (i) result in a waiver of any default of Debtor; (ii) impose any liability on Secured Party; or (iii) be a representation or warranty of any kind regarding the Collateral (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness).  In the event Secured Party has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to Debtor or any other party, Debtor authorizes Secured Party to make such a disclosure.   Secured Party may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in Secured Party's judgment. Debtor further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to Debtor by Secured Party or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of Debtor) by Debtor without advice or assistance from Secured Party.

(d)     Debtor will indemnify and hold harmless Secured Party from any loss or liability Secured Party incurs in connection with or as a result of this Agreement, which directly or indirectly arises out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance. This indemnity will apply whether the hazardous substance is on, under or about Debtor's property or operations or property leased to Debtor.  The indemnity includes but is not limited to attorneys' fees (including the reasonable estimate of the allocated cost of in-house counsel and staff). The indemnity extends to Secured Party, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys and assigns.

8.     CONSENT TO JURISDICTION. DEBTOR AND SECURED PARTY HEREBY AGREE THAT THE FEDERAL COURT OF THE WESTERN DISTRICT OF NEW YORK OR, AT THE OPTION OF SECURED PARTY, ANY COURT LOCATED IN THE STATE OF NEW YORK SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN DEBTOR AND SECURED PARTY PERTAINING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER

- 9 -

EB-00001703

CAUSE OR DISPUTE WHATSOEVER BETWEEN DEBTOR AND SECURED PARTY OF ANY KIND OR NATURE.   DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURTS, HEREBY WAIVING PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREEING THAT SERVICE OF SUCH SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED ADDRESSED TO DEBTOR AT THE ADDRESS OF DEBTOR FOR NOTICES SET FORTH HEREIN. SHOULD DEBTOR FAIL TO APPEAR OR ANSWER ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THIRTY DAYS AFTER THE MAILING THEREOF, IT SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED AGAINST IT AS PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS.   THE CHOICE OF FORUM SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE BRINGING OF ANY ACTION BY SECURED PARTY OR THE ENFORCEMENT BY SECURED PARTY OF ANY JUDGMENT OBTAINED IN SUCH FORUM IN ANY OTHER APPROPRIATE JURISDICTION.   FURTHER, DEBTOR HEREBY WAIVES THE RIGHT TO ASSERT THE DEFENSE OF FORUM NON CONVENIENS AND THE RIGHT TO CHALLENGE THE VENUE OF ANY COURT PROCEEDING.

9.   WAIVER OF JURY TRIAL.  DEBTOR AND SECURED PARTY EACH WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS AGREEMENT, THE NOTE, THE GUARANTY OR ANY TRANSACTION DOCUMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. DEBTOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST SECURED PARTY OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

10.   MISCELLANEOUS.

(a)   Any waiver, express or implied, of any provision hereunder and any delay or failure by Secured Party to enforce any provision shall not preclude Secured Party from enforcing any such provision thereafter.

(b)   Debtor shall, at the request of Secured Party, execute such other agreements, documents, instruments, or financing statements in connection with this Agreement as Secured Party may reasonably deem necessary.

- 10 -

EB-00001704

(c)     All notes, security agreements, subordination agreements and other documents executed by Debtor or furnished to Secured Party in connection with this Agreement must be in form and substance satisfactory to Secured Party.

(d)     This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of laws principles which would require the application of the laws of a different state.

(e)     All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law.  Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(f)     All terms not defined herein are used as set forth in the Uniform Commercial Code as in effect in any applicable jurisdiction.

(g)     In the event of any action by Secured Party to enforce this Agreement or to protect the security interest of Secured Party in the Collateral, or to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, Debtor agrees to pay immediately the costs and expenses thereof, together with reasonable attorneys' fees and allocated costs for in-house legal services to the extent permitted by law.

(h)     In the event Secured Party seeks to take possession of any or all of the Collateral by judicial process, Debtor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action.

(i)     This Agreement shall constitute a continuing agreement, applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this Agreement, and if all transactions between Secured Party and Debtor shall be closed at any time, shall be equally applicable to any new transactions thereafter.

(j)     Secured Party's rights hereunder shall inure to the benefit of its successors and assigns.  In the event of any assignment or transfer by Secured Party of any of the Indebtedness or the Collateral, Secured Party thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Indebtedness or the Collateral not so assigned or transferred.  All representations, warranties and agreements of Debtor if more than one are joint and several and all shall be binding upon the personal representatives, heirs, successors and assigns of Debtor.

(k)     Any notice to be given hereunder shall be given in the manner prescribed in the Guaranty or the Note, as applicable.

- 11 -

EB-00001705

11.   FINAL AGREEMENT.   BY SIGNING THIS AGREEMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS AGREEMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

~Doc# 1142595~

EB-00001706

**IN WITNESS WHEREOF**, the parties executed this Agreement as of the date first written above, intending to create an instrument executed under seal.

EBER    BROS.    WINE    AND    LIQUOR CORPORATION

By:_____

Title:_____

(Seal)

**EBER BROS. WINE & LIQUOR METRO, INC.**

By:_____

Title:_____

(Seal)

Accepted:

_____
**LESTER EBER**

- 13 -

EB-00001707

Exhibit A

Intellectual Property

~Doc# 1142595~

EB-00001708

# EBER BROS. WINE & LIQUOR CORP.

Corporate Office
95 Allens Creek Rd., Bldg 2  Ste 10, Rochester, New York  14618
Phone: (585) 360-4240    Fax: (585) 360-4211

Apr. 27, 2010

Dear Sally,

Thank you, for taking the time to discuss the Company and for considering Participating in the secured loan to the company. I understand and respect your decision to not participate.

Again thank you, I look forward to talking to you again soon.

Love,
Lester

# EBER BROS. WINE & LIQUOR CORP.

Corporate Office
95 Allens Creek Rd., Bldg 2 Ste 10, Rochester, New York 14618
Phone: (585) 360-4240    Fax: (585) 360-4211

*Called*
*apr. 19, 2010*

April 2, 2010

Dear Audrey,

It was good talking to you. As I told you I am writing you to discuss with you the financial condition of the company, our capital needs and to offer you the opportunity to participate in a plan to provide capital to help the business.

As you know, the family business has experienced significant difficulties over the past few years. During that time we have liquidated several businesses and done our best to meet the company's financial obligations while operating a financially viable business. It hasn't been easy. Over the past few years I have cut my salary by over 50% and made every other cut I believed we could make while retaining a financially viable business.

Today we have one operating business that is substantially smaller than the original company. We believe that our Connecticut operation has the potential to be the foundation for the renewal of our business. But, our Connecticut business and its parent company are facing several financial issues. They both have liquidity issues and in order to meet our financial needs we have looked for outside financial support from several banks. Importunely they all have turned down our loan requests.

As a result of the businesses financial needs, Connecticut's growth opportunities and our failure to find a financial institution to provide us with an adequate financial option I offered to personally loan the company the capital it needed to meet its projected obligations this year. The amount of the loan is $1.5 million dollars. The loan is secured by the EBWL and Metro's equity interest in our Connecticut business. The board of directors recently approved the loan documents as well as our security arrangements.

For the next 30 days I will offer you the opportunity to participate in the loan. If you desire to participate you would be responsible for funding 1/3 of any advances to the company. To date I have advanced the company approximately $500,000. Therefore if you decide to participate in the loan you would be required to remit to me approximately $167,000 to reimburse me for my advances. Future advances would be in minimum increments of approximately $50,000 for each of us and could be done on a monthly basis.

I encourage you to review a copy of the loan documents, which I have attached to this letter. We have made substantial progress but are still in a loss position. Please discuss this opportunity with your financial and legal advisors. If you wish to move forward with the loan, please sign the enclosed confidentiality agreement and I will send you the company financial statements. Finally, please let me know if you would like any additional information about Eber Connecticut LLC.

~~Sincerely,~~ *Love,*

Lester Eber

EB-00001710

# EBER BROS. WINE & LIQUOR CORP.

Corporate Office
95 Allens Creek Rd, Bldg. 2    Suite 10
Rochester, New York 14618
Phone: (585) 360-4240    Fax: (585) 360-4211

April 9, 2010

Dear Audrey,

It was good talking to you. As I told you I am writing you to discuss with you the opportunity to Participate in a Plan to provide Capital to help the business.

As you know, the Family business has experienced Significant difficulties over the Past Few years. During that time we have liquidated Several businesses and done our best to meet the Companies Financial obligations while operating a Financially Viable business. It has not been easy. Over the Past few years I have cut my Salary by over 50% and made every other cut I believed we could make while Retaining a Financially Viable business.

Today we have one operating business that is Substantially Smaller than the Original Company. We believe that our Connecticut operation has the potential to be the Foundation for the renewal of our business. But, our Connecticut business and its Parent Company are Facing Several Financial

# EBER BROS. WINE & LIQUOR CORP.

Corporate Office
95 Allens Creek Rd, Bldg. 2   Suite 10
Rochester, New York 14618
Phone: (585) 360-4240   Fax: (585) 360-4211

issues. They both have liquidity issues and in order to mehow financial Needs we have looked for outside financial Support from Several banks. Importunely they all have turned down our loan Requests.

As a Result of the business financial Needs, Connecticut's growth opportunities and our failure to Find a financial Istitution to Provide us with an adequate Financing option I offered to personally loan the company the capital if needed to meet its projected obligations this year. The amount of the loan is $1.5 million dollars. The loan is is secured by the EB&L and retios equity interest in our Connecticut business. The board of directors recently approved the loan documents as well as our security arr security arrangements.

For the next 30 days I will offer you the opportunity to participate in the loan. If you desire to participate you would be responsible for funding 1/3 of any advances to the company. To date I have advanced the company approximitely $500,000. Therefore If you decide to participate in the loan you would be required to remit to me approximitely $167,000 to reimburse me for my advances. Future advances would be in minimum Increments of approximitely $50,000 for each of us and could a draw on a monthly basis.

EB-00001712

# EBER BROS. WINE & LIQUOR CORP.

Corporate Office
95 Allens Creek Rd, Bldg. 2    Suite 10
Rochester, New York 14618
Phone: (585) 360-4240    Fax: (585) 360-4211

I encourage you to review a copy of the loan documents, which I have attached to this letter. We have made substantial progress but are still in a loss position. Please discuss this opportunity with your financial and legal advisors. If you wish to move forward with the loan, please sign the enclosed confidentiality agreement and I will send you the Company financial statements. Finally, please let me know if you would like any additional information about Eber Connecticut L.L.C.

Love,
Lester

EB-00001713

# NON-DISCLOSURE AGREEMENT

Provider: Eber Bros. Wine and Liquor Corporation          Date: _____ April 5, 2010 _____

Recipient: _____ Audrey Hays _____

Purpose for Information Disclosure: Evaluation of a potential loan transaction with Eber Bros. Wine and Liquor Corporation.

THIS NON-DISCLOSURE AGREEMENT (this "Agreement") is entered into as of the date set forth above by and between Provider and Recipient.

Provider intends to provide Recipient with certain financial and/or business information which Provider considers to be confidential. Recipient is willing to assure Provider that it will receive and hold such information in confidence and trust, and use and disclose such information only in support of the purposes for which it is provided. In consideration of the foregoing and other good and valuable consideration, the parties agree as follows:

1. **Definitions.**

1.1. "Affiliate" shall mean (a) any person or entity directly or indirectly controlled by, controlling or under common control with a party, and (b) any officer, director, management employee or trustee of any such entity or a party.

1.2. "Confidential Information" shall mean all financial, technical, business, customer, sales, marketing and other information including all copies thereof (including, without limitation, all agreements, files, books, logs, charts, records, studies, reports, surveys, schedules, plans, maps, statistical information, business plans, strategic plans, ideas, projections, and documentation) which may be or already has been furnished or disclosed to Recipient by, or acquired by Recipient directly or indirectly from, Provider or Provider's Affiliates. Such term shall also include all memoranda, notes, reports, and documents relating to Confidential Information, all copies and extracts of Confidential Information and all computer-generated studies and data containing Confidential Information prepared by or for the benefit of Recipient in connection with carrying out any Purpose.

1.3. "Purpose" shall mean the reason for disclosure of Confidential Information to Recipient as described above under "Purpose."

2. **Restrictions.**

2.1. Confidential Information.   Except as provided herein, during the period required to complete the Purpose and for a period of two years thereafter:

(a) Recipient shall receive all Confidential Information in strict confidence and shall take all necessary steps to maintain the confidentiality and secrecy of the Confidential Information;

(b) Recipient may use the Confidential Information only for the Purpose and may not use the Confidential Information for any other purpose without the express written consent of Provider; and

(c) Recipient shall not disclose or provide the Confidential Information to any third party, and may only disclose the Confidential Information to those employees, agents and advisors of Recipient who (1) are assigned to participate in the Purpose, (2) have a "need to know" such Confidential Information to enable them to perform their responsibilities relating to the Purpose, and (3) are subject to legally binding confidentiality obligations relating to the use and disclosure of such Confidential Information at least as restrictive as those contained herein.

2.2. Exceptions.   This Agreement shall not apply to any Confidential Information which:

(a) at the time of disclosure, is publicly available and known other than as a result of the fault or breach of Recipient;

(b) was rightfully in the possession of Recipient prior to Recipient's receipt of such Confidential Information, directly or indirectly, from Provider and/or Provider's Affiliates; or

(c) is acquired by Recipient from a third party who does not thereby breach an obligation of confidence to Provider and/or Provider's Affiliates and who discloses it to Recipient in good faith.

2.3. Legally Required Disclosure.   Notwithstanding the foregoing, Recipient may disclose Confidential Information to the extent legally required by a final order of any court or administrative agency having competent jurisdiction, provided that Recipient first notifies Provider and cooperates with Provider to protect the confidentiality thereof by all means reasonably available.

3. **Return of Materials.**   Recipient shall return and deliver, or cause to be returned and delivered, to Provider, all documentation, materials, media, objects and other tangible items that contain Confidential Information immediately upon the completion of the Purpose if no definitive agreement for the Purpose has been reached, or

~Doc# 1153232~

otherwise immediately upon the written request of Provider. Upon Provider's request, Recipient agrees to certify it has completed such requested action.

**4.  Warranty Disclaimer.**  No warranty is made to any person hereby regarding the accuracy, completeness, condition, suitability, or performance of the Confidential Information.

**5.  Remedies.**  All Confidential Information shall, at all times and for all purposes, be deemed to have been acquired and be held by Recipient in a fiduciary capacity and solely for the benefit of Provider. It is agreed that the unauthorized use or disclosure of any Confidential Information by Recipient will cause severe and irreparable damage to Provider and/or Provider's Affiliates. In the event of any violation of this Agreement, Recipient agrees that Provider shall be authorized and entitled to obtain from any court of competent jurisdiction preliminary and/or permanent injunctive relief, as well as any other relief permitted by applicable law. Recipient agrees to indemnify Provider against any and all losses, damages, claims or expenses incurred or suffered by Provider as a result of Recipient's breach of this Agreement. In a dispute arising out of or related to this Agreement, the prevailing party shall have the right to collect from the other party its reasonable attorney fees and costs and necessary expenditures.

**6.  Choice of Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

**7.  Entire Agreement.**  This Agreement contains the entire agreement of the parties regarding the subject matter hereof and supersedes all other prior agreements, whether written or oral, regarding such subject matter. This Agreement may be changed only by an instrument in writing executed by both parties.

**8.  No Waivers.**  No failure or delay by a party hereto in enforcing any right, power or privilege created hereunder shall operate as an implied waiver thereof, nor shall any single or partial enforcement thereof preclude any other or further enforcement thereof or the enforcement of any other right, power or privilege.

**9.  Assignment.**  This Agreement shall inure to the benefit of each party and its successors and assigns. To the extent Provider discloses, or provides for the disclosure of, Confidential Information of Provider's Affiliate, such Affiliate shall be a third-party beneficiary with respect to the confidentiality provisions of this Agreement and shall be entitled to enforce such provisions as its interests may warrant.

**10.  Notice.**  Any notice required or permitted under this Agreement shall be in writing and delivered by personal delivery, a nationally-recognized express courier assuring overnight delivery, confirmed facsimile transmission or first-class certified or registered mail, return receipt requested, and will be deemed given (a) upon personal delivery; (b) one business day after deposit with the express courier or confirmation of receipt of facsimile; or (c) five days after deposit in the mail. Such notice shall be sent to the party for which intended at the address set forth below its signature hereto or at such other address as that party may specify in writing pursuant to this section.

**11.  Severability.**  In the event that any one or more of the provisions of this Agreement shall be held invalid, illegal or unenforceable in any respect, or the validity, legality and enforceability of any one or more of the provisions contained herein shall be held to be excessively broad as to duration, activity or subject, such provision shall be construed by limiting and reducing such provision so as to be enforceable to the maximum extent compatible with applicable law.

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first indicated above:

**PROVIDER:**
**Eber Bros. Wine and Liquor Corporation**

By: _Lester Eber_
Signature

Name (Print)  *DA LESTER EBER*

Title  *President*

**RECIPIENT:**
**Audrey Hays**

By: _____
Signature

Name (Print) _____

Title _____

2

EB-00001715

# NON-DISCLOSURE AGREEMENT

Provider: <u>Eber Bros. Wine and Liquor Corporation</u>                    Date: _____ <u>April 5, 2010</u> _____

Recipient: _____ <u>Audrey Hays</u> _____

Purpose for Information Disclosure: <u>Evaluation of a potential loan transaction with Eber Bros. Wine and Liquor Corporation.</u>

     THIS NON-DISCLOSURE AGREEMENT (this "Agreement") is entered into as of the date set forth above by and between Provider and Recipient.

     Provider intends to provide Recipient with certain financial and/or business information which Provider considers to be confidential. Recipient is willing to assure Provider that it will receive and hold such information in confidence and trust, and use and disclose such information only in support of the purposes for which it is provided. In consideration of the foregoing and other good and valuable consideration, the parties agree as follows:

## 1. Definitions.

1.1. "Affiliate" shall mean (a) any person or entity directly or indirectly controlled by, controlling or under common control with a party, and (b) any officer, director, management employee or trustee of any such entity or a party.

1.2. "Confidential Information" shall mean all financial, technical, business, customer, sales, marketing and other information including all copies thereof (including, without limitation, all agreements, files, books, logs, charts, records, studies, reports, surveys, schedules, plans, maps, statistical information, business plans, strategic plans, ideas, projections, and documentation) which may be or already has been furnished or disclosed to Recipient by, or acquired by Recipient directly or indirectly from, Provider or Provider's Affiliates. Such term shall also include all memoranda, notes, reports, and documents relating to Confidential Information, all copies and extracts of Confidential Information and all computer-generated studies and data containing Confidential Information prepared by or for the benefit of Recipient in connection with carrying out any Purpose.

1.3. "Purpose" shall mean the reason for disclosure of Confidential Information to Recipient as described above under "Purpose."

## 2. Restrictions.

2.1. Confidential Information.    Except as provided herein, during the period required to complete the Purpose and for a period of two years thereafter:

(a) Recipient shall receive all Confidential Information in strict confidence and shall take all necessary steps to maintain the confidentiality and secrecy of the Confidential Information;

(b) Recipient may use the Confidential Information only for the Purpose and may not use the Confidential Information for any other purpose without the express written consent of Provider; and

(c) Recipient shall not disclose or provide the Confidential Information to any third party, and may only disclose the Confidential Information to those employees, agents and advisors of Recipient who (1) are assigned to participate in the Purpose, (2) have a "need to know" such Confidential Information to enable them to perform their responsibilities relating to the Purpose, and (3) are subject to legally binding confidentiality obligations relating to the use and disclosure of such Confidential Information at least as restrictive as those contained herein.

2.2. Exceptions. This Agreement shall not apply to any Confidential Information which:

(a) at the time of disclosure, is publicly available and known other than as a result of the fault or breach of Recipient;

(b) was rightfully in the possession of Recipient prior to Recipient's receipt of such Confidential Information, directly or indirectly, from Provider and/or Provider's Affiliates; or

(c) is acquired by Recipient from a third party who does not thereby breach an obligation of confidence to Provider and/or Provider's Affiliates and who discloses it to Recipient in good faith.

2.3. Legally Required Disclosure. Notwithstanding the foregoing, Recipient may disclose Confidential Information to the extent legally required by a final order of any court or administrative agency having competent jurisdiction, provided that Recipient first notifies Provider and cooperates with Provider to protect the confidentiality thereof by all means reasonably available.

## 3. Return of Materials. Recipient shall return and deliver, or cause to be returned and delivered, to Provider, all documentation, materials, media, objects and other tangible items that contain Confidential Information immediately upon the completion of the Purpose if no definitive agreement for the Purpose has been reached, or

~Doc# 1153232~

otherwise immediately upon the written request of Provider. Upon Provider's request, Recipient agrees to certify it has completed such requested action.

**4.   Warranty Disclaimer.**  No warranty is made to any person hereby regarding the accuracy, completeness, condition, suitability, or performance of the Confidential Information.

**5.   Remedies.**  All Confidential Information shall, at all times and for all purposes, be deemed to have been acquired and be held by Recipient in a fiduciary capacity and solely for the benefit of Provider. It is agreed that the unauthorized use or disclosure of any Confidential Information by Recipient will cause severe and irreparable damage to Provider and/or Provider's Affiliates. In the event of any violation of this Agreement, Recipient agrees that Provider shall be authorized and entitled to obtain from any court of competent jurisdiction preliminary and/or permanent injunctive relief, as well as any other relief permitted by applicable law. Recipient agrees to indemnify Provider against any and all losses, damages, claims or expenses incurred or suffered by Provider as a result of Recipient's breach of this Agreement. In a dispute arising out of or related to this Agreement, the prevailing party shall have the right to collect from the other party its reasonable attorney fees and costs and necessary expenditures.

**6.   Choice of Law.**  This Agreement shall be governed by and construed in accordance with the laws of the State of New York.

**7.   Entire Agreement.**  This Agreement contains the entire agreement of the parties regarding the subject matter hereof and supersedes all other prior agreements, whether written or oral, regarding such subject matter. This Agreement may be changed only by an instrument in writing executed by both parties.

**8.   No Waivers.**  No failure or delay by a party hereto in enforcing any right, power or privilege hereunder shall operate as an implied waiver thereof, nor shall any single or partial enforcement thereof preclude any other or further enforcement thereof or the enforcement of any other right, power or privilege.

**9.   Assignment.**  This Agreement shall inure to the benefit of each party and its successors and assigns. To the extent Provider discloses, or provides for the disclosure of, Confidential Information of Provider's Affiliate, such Affiliate shall be a third-party beneficiary with respect to the confidentiality provisions of this Agreement and shall be entitled to enforce such provisions as its interests may warrant.

**10. Notice.**  Any notice required or permitted under this Agreement shall be in writing and delivered by personal delivery, a nationally-recognized express courier assuring overnight delivery, confirmed facsimile transmission or first-class certified or registered mail, return receipt requested, and will be deemed given (a) upon personal delivery; (b) one business day after deposit with the express courier or confirmation of receipt of facsimile; or (c) five days after deposit in the mail. Such notice shall be sent to the party for which intended at the address set forth below its signature hereto or at such other address as that party may specify in writing pursuant to this section.

**11. Severability.**  In the event that any one or more of the provisions of this Agreement shall be held invalid, illegal or unenforceable in any respect, or the validity, legality and enforceability of any one or more of the provisions contained herein shall be held to be excessively broad as to duration, activity or subject, such provision shall be construed by limiting and reducing such provision so as to be enforceable to the maximum extent compatible with applicable law.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the date first indicated above:

PROVIDER:
**Eber Bros. Wine and Liquor Corporation**

By: _Lester Eber_

Signature

Name (Print)  _LESTER EBER_

Title  _President_

RECIPIENT:
**Audrey Hays**

By:_____

Signature

Name (Print)_____

Title_____

2

~Doc# 1153232~

EB-00001717

# GUARANTY

THIS GUARANTY is executed as of _____ ___, 2010 by **EBER BROS. WINE AND LIQUOR CORPORATION** ("**Parent**" or the "**Guarantor**") in favor of **LESTER EBER** (the "**Lender**").

1.     THE GUARANTY.   For valuable consideration, Guarantor hereby unconditionally guarantees and promises to pay promptly to Lender, or order, in lawful money of the United States, any and all Indebtedness to Lender when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. This Guaranty is cumulative and does not supersede any other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor.

2.     DEFINITIONS.

(a)     "**Borrower**" shall mean Eber Bros. Wine & Liquor Metro, Inc., a New York corporation.

(b)     "**Indebtedness**" shall mean any and all debts, liabilities, and obligations of Borrower and Guarantor to Lender arising under the Transaction Documents, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Lender by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Lender for its own account or as agent for another or others, whether Borrower or Guarantor may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, any and all obligations of Borrower and Guarantor to Lender for reasonable attorneys' fees and all other costs and expenses incurred by Lender in the collection or enforcement of any debts, liabilities, and obligations of Borrower and Guarantor to Lender.

(c)     "**Note**" means that certain Line of Credit Note dated as of _____ executed by Borrower in favor of the Secured Party in the maximum principal amount of $1,500,000, as amended, restated, supplemented or otherwise modified from time to time.

(d)     "**Security Agreement**" means the Security Agreement dated as of the date hereof executed by the Borrower and Guarantor in favor of Lender, as amended, restated, supplemented or otherwise modified from time to time.

(e)     "**Transaction Documents**" means the Note, the Guaranty and each other document, instrument and agreement executed in connection therewith.

EB-00001718

Capitalized terms used but not defined herein have the meanings given such terms in the Note or the Guaranty, as applicable.

3.    OBLIGATIONS INDEPENDENT.    The obligations of Guarantor are independent of the obligations of Borrower or any other guarantor, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.  Anyone executing this Guaranty shall be bound by its terms without regard to execution by anyone else.

4.    RIGHTS OF LENDER.  Guarantor authorizes Lender, without notice or demand and without affecting its liability hereunder, from time to time to:

(a)    make additional advances on the Indebtedness or renew, compromise, extend, accelerate, or otherwise change the time for payment, or otherwise change the terms, of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon, or otherwise change the terms of any Transaction Documents;

(b)    receive and hold security for the payment of this Guaranty or any Indebtedness and exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any such security;

(c)    apply such security and direct the order or manner of sale thereof as Lender in its discretion may determine; and

(d)    release or substitute any guarantor or any one or more of any endorsers or other guarantors of any of the Indebtedness.

5.    GUARANTY TO BE ABSOLUTE.  Guarantor agrees that until the Indebtedness has been paid in full and any commitments of Lender or facilities provided by Lender with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner or to any extent vary the risks of Guarantor under this Guaranty or that, but for this paragraph, might discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty.  Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Lender described in the immediately preceding paragraph of this Guaranty.  It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional.

~Doc# 1142695~

EB-00001719

6.    GUARANTOR'S WAIVERS OF CERTAIN RIGHTS AND CERTAIN DEFENSES.  Guarantor waives:

(a)    any right to require Lender to proceed against Borrower or any other Guarantor, proceed against or exhaust any security for the Indebtedness, or pursue any other remedy in Lender's power whatsoever;

(b)    any defense arising by reason of any disability or other defense of Borrower, or the cessation from any cause whatsoever of the liability of Borrower;

(c)    any defense based on any claim that Guarantor's obligations exceed or are more burdensome than those of Borrower or any other Guarantor; and

(d)    the benefit of any statute of limitations affecting Guarantor's liability hereunder.

No provision or waiver in this Guaranty shall be construed as limiting the generality of any other waiver contained in this Guaranty.

7.    WAIVER OF SUBROGATION.  Guarantor forever waives to the extent permitted by applicable law any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise) including, without limitation, any claim or right of subrogation under the Bankruptcy Code (Title 11, United States Code) or any successor statute (the "**Bankruptcy Code**"), arising from the existence or performance of this Guaranty, and Guarantor waives to the extent permitted by applicable law any right to enforce any remedy that Lender now has or may hereafter have against Borrower or any other Guarantor, and waives any benefit of, and any right to participate in, any security now or hereafter held by Lender.

8.    WAIVER OF NOTICES.  Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of intent to accelerate, notices of acceleration, notices of any suit or any other action against Borrower or any other person, any other notices to any party liable on any Transaction Document, notices of acceptance of this Guaranty, notices of the existence, creation, or incurring of new or additional Indebtedness to which this Guaranty applies or any other Indebtedness of Borrower to Lender, and notices of any fact that might increase Guarantor's risk.

9.    SECURITY.    To secure all of Guarantor's obligations hereunder, Guarantor assigns and grants to Lender a security interest in all moneys, securities, and other property of Guarantor now or hereafter in the possession of Lender and all proceeds thereof. Upon default or breach of any of Guarantor's obligations to Lender, Lender may apply any of the foregoing to reduce the Indebtedness, and may foreclose any collateral as provided in the Uniform Commercial Code as in effect in any applicable jurisdiction and in any security agreements between Lender and Guarantor.

10.    SUBORDINATION. Any obligations of Borrower to Guarantor, now or hereafter existing are hereby subordinated to the Indebtedness.  In addition to Guarantor's waiver

- 3 -

EB-00001720

of any right of subrogation as set forth in this Guaranty with respect to any obligations of Borrower to Guarantor as subrogee of Lender, Guarantor agrees that, if Lender so requests, Guarantor shall not demand, take, or receive from Borrower, by setoff or in any other manner, payment of any other obligations of Borrower to Guarantor until the Indebtedness has been paid in full and any commitments of Lender or facilities provided by Lender with respect to the Indebtedness have been terminated. If any payments are received by Guarantor in violation of such waiver or agreement, such payments shall be received by Guarantor as trustee for Lender and shall be paid over to Lender on account of the Indebtedness, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Any security interest, lien, or other encumbrance that Guarantor may now or hereafter have on any property of Borrower is hereby subordinated to any security interest, lien, or other encumbrance that Lender may have on any such property.

11.      REVOCATION OF GUARANTY.

(a)      This Guaranty may be revoked at any time by Guarantor in respect to future transactions. Such revocation shall be effective upon actual receipt by Lender, at the address for notices provided herein or at such other address as may have been provided to Guarantor by Lender, of written notice of revocation. Revocation shall not affect any of Guarantor's obligations or Lender's rights with respect to transactions committed or entered into prior to Lender's receipt of such notice, regardless of whether or not the Indebtedness related to such transactions, before or after revocation, has been incurred, renewed, compromised, extended, accelerated, or otherwise changed as to any of its terms, including time for payment or increase or decrease of the rate of interest thereon, and regardless of any other act or omission of Lender authorized hereunder. Revocation by Guarantor shall not affect any obligations of any other guarantor.

(b)      Guarantor acknowledges and agrees that this Guaranty may be revoked only in accordance with the foregoing provisions of this paragraph and shall not be revoked simply as a result of any change in name, location, or composition or structure of Borrower, the dissolution of Borrower, or the termination, increase, decrease, or other change of any personnel or owners of Borrower.

12.      REINSTATEMENT OF GUARANTY.   If this Guaranty is revoked, returned, or canceled, and subsequently any payment or transfer of any interest in property by Borrower or Guarantor to Lender is rescinded or must be returned by Lender to Borrower or Guarantor, this Guaranty shall be reinstated with respect to any such payment or transfer, regardless of any such prior revocation, return, or cancellation.

13.      STAY OF ACCELERATION.   In the event that acceleration of the time for payment of any of the Indebtedness is stayed upon the insolvency, bankruptcy, or reorganization of Borrower or otherwise, all such Indebtedness guaranteed by Guarantor shall nonetheless be payable by Guarantor immediately if requested by Lender.

- 4 -

EB-00001721

14.     NO SETOFF OR DEDUCTIONS; TAXES.  All payments made by Guarantor hereunder will be to Lender at its designated address, in immediately available funds and shall be made without setoff, counterclaim, or other defense.  All such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction (other than the United States) or by any political subdivision or taxing authority thereof or therein (other than of the United States) with respect to such payments (but excluding, any tax imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein measured by or based on the net income or net profits of Lender) (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "**Taxes**").  If any Taxes are so levied or imposed, Guarantor agrees to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under this Guaranty after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein.  Guarantor will furnish to Lender as promptly as possible after the date the payment of any Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment by Guarantor.

15.     INFORMATION RELATING TO BORROWER.  Guarantor acknowledges and agrees that it has made such independent examination, review, and investigation of the Transaction Documents as Guarantor deems necessary and appropriate, including, without limitation, any covenants pertaining to Guarantor contained therein, and shall have sole responsibility to obtain from Borrower any information required by Guarantor about any modifications thereto.  Guarantor further acknowledges and agrees that it shall have the sole responsibility for, and has adequate means of, obtaining from Borrower such information concerning Borrower's financial condition or business operations as Guarantor may require, and that Lender has no duty, and Guarantor is not relying on Lender, at any time to disclose to Guarantor any information relating to the business operations or financial condition of Borrower.

16.     BORROWER'S AUTHORIZATION.  It is not necessary for Lender to inquire into the powers of Borrower or of the officers, directors, partners, members, managers, or agents acting or purporting to act on its behalf, and any Indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder, subject to any limitations on Guarantor's liability set forth herein.

17.     REMEDIES.  If Guarantor fails to fulfill its duty to pay all Indebtedness guaranteed hereunder, Lender shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law.  Without limiting the foregoing to the extent permitted by law, Lender may, at its option and without notice or demand:

(a)     declare any Indebtedness due and payable at once;

(b)     take possession of any collateral pledged by Borrower or Guarantor, wherever located, and sell, resell, assign, transfer, and deliver all or any part of the collateral at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Lender may impose reasonable conditions upon any such sale.

- 5 -

EB-00001722

Further, Lender, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of the collateral to be sold, free from and discharged of all trusts, claims, rights of redemption and equities of Borrower or Guarantor whatsoever. Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker, or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided herein; and

(c)     set off against any or all liabilities of Guarantor all money owed by Lender or any of its agents or affiliates in any capacity to Guarantor, whether or not due, and also set off against all other liabilities of Guarantor to Lender all money owed by Lender in any capacity to Guarantor.  If exercised by Lender, Lender shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books subsequent thereto.

18.     NOTICES.  Any notice, demand, request, waiver or other communication required by any provision of this Guaranty shall be in writing and may be delivered by personal service, sent by facsimile with confirmation of receipt, sent by a nationally recognized overnight delivery services or sent by registered or certified mail, return receipt requested, with postage thereon fully repaid.  All such communications shall be addressed as follows:

To Guarantor:

Eber Bros. Wine And Liquor Corporation
95 Allens Creek Rd.
Bldg. 2  Suite 10
Rochester, New York 14618
Attn: _____
Facsimile: _____

To Lender:

Lester Eber
95 Allens Creek Rd.
Bldg. 2  Suite 10
Rochester, New York 14618
Attn: _____
Facsimile: _____

Notices sent by (a) first class mail shall be deemed delivered on the earlier of actual receipt or on the fourth business day after deposit in the U.S. mail, postage prepaid, (b) overnight courier shall be deemed delivered on the next business day, and (c) telecopy shall be deemed delivered when transmitted.

19.     SUCCESSORS AND ASSIGNS.  This Guaranty (a) binds Guarantor and Guarantor's successors and assigns, provided that Guarantor may not assign its rights or obligations under this Guaranty without the prior written consent of Lender, and (b) inures to the

- 6 -

~Doc# 1142695~

EB-00001723

benefit of Lender and Lender's indorsees, successors, and assigns.  Lender may, without notice to Guarantor and without affecting Guarantor's obligations hereunder, sell, assign, grant participations in, or otherwise transfer to any other person, firm, or corporation the Indebtedness and this Guaranty, in whole or in part.  Guarantor agrees that Lender may disclose to any assignee or purchaser, or any prospective assignee or purchaser, of all or part of the Indebtedness any and all information in Lender's possession concerning Guarantor, this Guaranty, and any security for this Guaranty.

20.     AMENDMENTS, WAIVERS, AND SEVERABILITY.  No provision of this Guaranty may be amended or waived except in writing.  No failure by Lender to exercise, and no delay in exercising, any of its rights, remedies, or powers shall operate as a waiver thereof, and no single or partial exercise of any such right, remedy, or power shall preclude any other or further exercise thereof or the exercise of any other right, remedy, or power.  The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision of this Guaranty.

21.     COSTS AND EXPENSES.  Guarantor agrees to pay all reasonable attorneys' fees to the extent permitted by applicable law, and all other costs and expenses that may be incurred by Lender (a) in the enforcement of this Guaranty or (b) in the preservation, protection, or enforcement of any rights of Lender in any case commenced by or against Guarantor or Borrower under the Bankruptcy Code.

22.     GOVERNING LAW AND JURISDICTION.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of laws principles which would require the application of the laws of a different state.

23.     CONSENT TO JURISDICTION.  GUARANTOR, AND LENDER BY ACCEPTING THIS GUARANTY, HEREBY AGREE THAT THE FEDERAL COURT OF THE WESTERN DISTRICT OF NEW YORK OR, AT THE OPTION OF LENDER, ANY COURT LOCATED IN THE STATE OF NEW YORK SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN GUARANTOR AND LENDER PERTAINING DIRECTLY OR INDIRECTLY TO THIS GUARANTY OR ANY OTHER CAUSE OR DISPUTE WHATSOEVER BETWEEN GUARANTOR AND LENDER OF ANY KIND OR NATURE.  GUARANTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURTS, HEREBY WAIVING PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREEING THAT SERVICE OF SUCH SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED ADDRESSED TO GUARANTOR AT THE ADDRESS OF GUARANTOR FOR NOTICES SET FORTH HEREIN.  SHOULD GUARANTOR FAIL TO APPEAR OR ANSWER ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THIRTY DAYS AFTER THE MAILING THEREOF, IT SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED AGAINST IT AS PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS.  THE CHOICE OF FORUM SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE BRINGING OF ANY ACTION BY LENDER OR THE

~Doc# 1142695~

EB-00001724

ENFORCEMENT BY LENDER OF ANY JUDGMENT OBTAINED IN SUCH FORUM IN ANY OTHER APPROPRIATE JURISDICTION. FURTHER, GUARANTOR HEREBY WAIVES THE RIGHT TO ASSERT THE DEFENSE OF FORUM NON CONVENIENS AND THE RIGHT TO CHALLENGE THE VENUE OF ANY COURT PROCEEDING.

     24. WAIVER OF JURY TRIAL. GUARANTOR AND LENDER EACH WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS AGREEMENT OR ANY TRANSACTION DOCUMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. GUARANTOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST LENDER OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

     25. LIMITATION ON GUARANTOR LIABILITY.

     (a) It is the intent of Guarantor and Lender that Guarantor's maximum liability hereunder shall be (and shall not be in excess of):

     (i) (x) in a Proceeding commenced by or against Guarantor under the Bankruptcy Code on or within one year from the date on which any of the Indebtedness is incurred, the maximum amount which would not otherwise cause the Indebtedness (or any other obligations of Guarantor to Lender) to be avoidable or unenforceable against Guarantor under (A) Section 548 of the Bankruptcy Code or (B) any state fraudulent transfer or fraudulent conveyance act or statute applied in such case or proceeding by virtue of Section 544 of the Bankruptcy Code; or

     (y) in a Proceeding commenced by or against Guarantor under the Bankruptcy Code subsequent to one year from the date on which any of the Indebtedness is incurred, the maximum amount which would not otherwise cause the Indebtedness (or any other obligations of Guarantor to Lender) to be avoidable or unenforceable against Guarantor under any state fraudulent transfer or fraudulent conveyance act or statute applied in any such case or proceeding by virtue of Section 544 of the Bankruptcy Code; or

     (z) in a Proceeding commenced by or against Guarantor under any law, statute or regulation other than the Bankruptcy Code (including, without limitation, any other bankruptcy, reorganization, arrangement, moratorium, readjustment of debt, dissolution, liquidation or similar debtor relief laws), the maximum amount which would not otherwise

~Doc# 1142695~

EB-00001725

cause the Indebtedness (or any other obligations of Guarantor to Lender) to be avoidable or unenforceable against Guarantor under such law, statute or regulation including, without limitation, any state fraudulent transfer or fraudulent conveyance act or statute applied in any such case or proceeding.

The substantive laws under which the possible avoidance or unenforceability of the Indebtedness (or any other obligations of Guarantor to Lender) shall be determined in any such case or proceeding shall hereinafter be referred to as the "**Avoidance Provisions**."

(ii)       To the end set forth in Section 25(a)(i), but only to the extent that the Indebtedness would otherwise be subject to avoidance under the Avoidance Provisions, if Guarantor is not deemed to have received valuable consideration, fair value or reasonably equivalent value for the Indebtedness, or if the Indebtedness would render Guarantor insolvent, or leave Guarantor with an unreasonably small capital to conduct its business, or cause Guarantor to have incurred debts (or to have intended to have incurred debts) beyond its ability to pay such debts as they mature, in each case as of the time any of the Indebtedness are deemed to have been incurred under the Avoidance Provisions, the maximum Indebtedness for which Guarantor shall be liable hereunder shall be reduced to that amount which, after giving effect thereto, would not cause the Indebtedness (or any other obligations of Guarantor to Lender), as so reduced, to be subject to avoidance under the Avoidance Provisions.

(iii)      This Section 25(a) shall be applicable only in connection with a Proceeding brought by or against Guarantor and is intended solely to preserve the rights of Lender hereunder to the maximum extent that would not cause the Indebtedness of Guarantor to be subject to avoidance under the Avoidance Provisions in connection with any such Proceeding.  Neither Guarantor nor any other person or entity shall have any right or claim under this Section 25(a) against Lender that would not otherwise be available to Guarantor or such other person or entity outside of any Proceeding.

For the purposes of the this Section, "**Proceeding**" means any of the following: (a) the Borrower or Guarantor shall commence a voluntary case concerning itself under the Bankruptcy Code or any other applicable bankruptcy laws; (b) any involuntary case is commenced against the Borrower or Guarantor; or a custodian (as defined in the Bankruptcy Code or any other applicable bankruptcy laws) is appointed for, or takes charge of, all or any substantial part of the property of the Borrower or Guarantor; (c) the Borrower or Guarantor commences any other proceedings under any reorganization arrangement, adjustment of debt, relief of debtor, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Borrower or Guarantor, or any such proceeding is commenced against the Borrower or Guarantor, or the Borrower or Guarantor is adjudicated insolvent or bankrupt; (d) any order of relief or other order approving any such case or proceeding is entered; (e) the Borrower or Guarantor suffers any appointment of any custodian or the like for it or any substantial part of its property; (f) the Borrower or Guarantor makes a general assignment for the

- 9 -

EB-00001726

benefit of creditors; (g) the Borrower or Guarantor shall fail to pay, or shall state that it is unable to pay, or shall be unable to pay, its debts generally as they become due; (h) the Borrower or Guarantor shall call a meeting of its creditors with a view to arranging a composition or adjustment of its debts; (i) the Borrower or Guarantor shall by any act or failure to act indicate its consent to, approval of or acquiescence in any of the foregoing; or (j) any corporate action shall be taken by the Borrower or Guarantor for the purpose of effecting any of the foregoing.

26.    FINAL AGREEMENT.   BY SIGNING THIS GUARANTY EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS GUARANTY SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS GUARANTY MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

[SIGNATURES NEXT PAGE]

~Doc# 1142695~

EB-00001727

IN WITNESS WHEROF, the parties have executed this Agreement as of the date first set forth above.

**EBER   BROS.   WINE   AND   LIQUOR CORPORATION**

By:_____

Title:_____

(Seal)

_____

**LESTER EBER**

- 11 -

EB-00001728

# SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "**Agreement**") is made and entered into as of _____ ___, 2010 by **EBER BROS. WINE AND LIQUOR CORPORATION** ("**Parent**") and **EBER BROS. WINE & LIQUOR METRO, INC.** ("**Metro**"; Parent and Metro, individually and collectively, "**Debtor**") in favor of **LESTER EBER** ("**Secured Party**").

       1.     THE SECURITY. Debtor hereby assigns and grants to Secured Party a security interest in the following described property now owned or hereafter acquired by Debtor ("**Collateral**"):

       (a)     All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles, including all amounts due to Debtor from a factor; and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.

       (b)     All inventory, including all materials, work in process and finished goods.

       (c)     All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by Debtor.

       (d)     All of Debtor's deposit accounts. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

       (e)     All instruments, notes, chattel paper, documents, certificates of deposit, securities and investment property of every type. The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing.

       (f)     All general intangibles, including, but not limited to, (i) all patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems.  The Collateral shall include all good will connected with or symbolized by any of such general intangibles; all contract rights, documents, applications, licenses, materials and other matters related to such general intangibles; all tangible property embodying or incorporating any such general intangibles; and all chattel paper and instruments relating to such general intangibles.

       (g)     The shares of common stock and preferred stock, or partnership, membership and other ownership interests, now or hereafter owned by Debtor, including, without limitation, any membership interest in Eber-Connecticut, LLC now or hereafter

owned, directly or indirectly, by Metro and Parent and any ownership interests in Metro now or hereafter owned by Parent (collectively, the "**Pledged Equity**"), and all certificates evidencing the same, together with, in each case, all shares, securities, monies or property representing a dividend on any of the Pledged Equity, or representing a distribution or return of capital upon or in respect of the Pledged Equity, or resulting from a split up, revision, reclassification or other like change of the Pledged Equity or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Equity (the Pledged Equity, together with all other certificates, shares, securities, properties, ownership interests, or moneys, dividends, distributions, returns of capital subscription, warrants, rights or options as may from time to time be pledged hereunder pursuant to this clause being herein collectively called the "**Equity Collateral**").

(h)     All negotiable and nonnegotiable documents of title covering any Collateral.

(i)     All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

(j)     All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral, and all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the Collateral and sums due from a third party which has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(k)     All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("**Books and Records**").

2.     INDEBTEDNESS. The Collateral secures all Indebtedness.

"**Guaranty**" means that certain Guaranty dated as of the date hereof executed by the Metro in favor of Secured Party, as amended, restated, supplemented or otherwise modified from time to time.

"**Indebtedness**" means any and all debts, liabilities, and obligations of Debtor to Secured Party arising under the Transaction Documents, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Secured Party by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Secured Party for its own account or as agent for another or others, whether Debtor may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter

~Doc# 1142595~

EB-00001730

become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, any and all obligations of Debtor to Secured Party for reasonable attorneys' fees and all other costs and expenses incurred by Secured Party in the collection or enforcement of any debts, liabilities, and obligations of Debtor to Secured Party.

"**Note**" means that certain Line of Credit Note dated as of _____ executed by Metro in favor of Secured Party in the maximum principal amount of $1,500,000 as amended, restated, supplemented or otherwise modified from time to time.

"**Transaction Documents**" means the Note, the Guaranty, this Agreement and each other document, instrument and agreement executed in connection therewith.

Capitalized terms used but not defined herein have the meanings given such terms in the Note.

      3.     DEBTOR'S COVENANTS. Debtor represents, covenants and warrants that unless compliance is waived by Secured Party in writing:

      (a)     Debtor will properly preserve the Collateral; defend the Collateral against any adverse claims and demands; and keep accurate Books and Records.

      (b)     Debtor shall give Secured Party at least thirty (30) days notice before changing its chief executive office or state of incorporation or organization. Debtor will notify Secured Party in writing prior to any change in the location of any Collateral, including the Books and Records.

      (c)     Debtor will notify Secured Party in writing prior to any change in Debtor's name, identity or business structure.

      (d)     Except for liens existing on the date hereof, Debtor has not granted and will not grant any security interest in any of the Collateral except to Secured Party, and will keep the Collateral free of all liens, claims, security interests and encumbrances of any kind or nature except the security interest of Secured Party.

      (e)     Debtor will promptly notify Secured Party in writing of any event which materially and adversely affects the value of the Collateral, the ability of Debtor or Secured Party to dispose of the Collateral, or the rights and remedies of Secured Party in relation thereto, including, but not limited to, the levy of any legal process against any Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise.

      (f)     Debtor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect Secured Party's security interest (collectively, the "**Collateral Costs**"). Without waiving Debtor's default for failure to make any such payment, Secured Party at its option may

~Doc# 1142595~

EB-00001731

pay any such Collateral Costs, and discharge encumbrances on the Collateral, and such Collateral Costs payments shall be a part of the Indebtedness and bear interest at the rate set out in the Indebtedness. Debtor agrees to reimburse Secured Party on demand for any Collateral Costs so incurred.

(g)     Until Secured Party exercises its rights to make collection, Debtor will diligently collect all Collateral.

(h)     If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading Debtor shall immediately deliver such document to Secured Party, together with any necessary endorsements.

(i) Debtor will not sell, lease, agree to sell or lease, or otherwise dispose of any Collateral except with the prior written consent of Secured Party; provided, however, that Debtor may sell inventory in the ordinary course of business.

(j)     Debtor will maintain and keep in force all risk insurance covering the Collateral against fire, theft, liability and extended coverages (including without limitation windstorm coverage and hurricane coverage as applicable), to the extent that any Collateral is of a type which can be so insured. Such insurance shall be in form, amounts, coverages and basis reasonably acceptable to Secured Party, shall require losses to be paid on a replacement cost basis, shall be issued by insurance companies acceptable to Secured Party and, upon request of Secured Party, include a loss payable endorsement in favor of Secured Party in a form acceptable to Secured Party. Upon the request of Secured Party, Debtor will deliver to Secured Party a copy of each insurance policy, or, if permitted by Secured Party, a certificate of insurance listing all insurance in force.

(k)     Debtor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless Debtor first obtains the written consent of any owner, holder of any lien on the real property or fixture, or other person having an interest in such property to the removal by Secured Party of the Collateral from such real property or fixture. Such written consent shall be in form and substance acceptable to Secured Party and shall provide that Secured Party has no liability to such owner, holder of any lien, or any other person.

(l)     Exhibit A to this Agreement is a complete list of all patents, trademark and service mark registrations, copyright registrations, mask work registrations, and all applications therefor, in which Debtor has any right, title, or interest, throughout the world. Debtor will promptly notify Secured Party of any acquisition (by adoption and use, purchase, license or otherwise) of any patent, trademark or service mark registration, copyright registration, mask work registration, and applications therefor, and unregistered trademarks and service marks and copyrights, throughout the world, which are granted or filed or acquired after the date hereof or which are not listed on the Exhibit. Debtor authorizes Secured Party, without notice to Debtor, to modify this Agreement by amending the Exhibit to include any such Collateral.

- 4 -

EB-00001732

(m)     Debtor will, at its expense, diligently prosecute all patent, trademark or service mark or copyright applications pending on or after the date hereof, will maintain in effect all issued patents and will renew all trademark and service mark registrations, including payment of any and all maintenance and renewal fees relating thereto, except for such patents, service marks and trademarks that are being sold, donated or abandoned by Debtor pursuant to the terms of its intellectual property management program. Debtor will at its expense protect and defend all rights in the Collateral against any material claims and demands of all persons  and will, at its expense, enforce all rights in the Collateral against any and all infringers of the Collateral where such infringement would materially impair the value or use of the Collateral to Debtor or Secured Party. Debtor will not license or transfer any of the Collateral, except for such non-exclusive licenses as are customary in the ordinary course of Debtor's business, or except with Secured Party's prior written consent.

4.     ADDITIONAL REQUIREMENTS. Debtor agrees that Secured Party may at its option at any time, whether or not Debtor is in default:

(a)     Require Debtor to deliver to Secured Party (i) copies of or extracts from the Books and Records, and (ii) information on any contracts or other matters affecting the Collateral.

(b)     Examine the Collateral, including the Books and Records, and make copies of or extracts from the Books and Records, and for such purposes enter at any reasonable time upon the property where any Collateral or any Books and Records are located.

(c)     Require Debtor to deliver to Secured Party any instruments, chattel paper or letters of credit which are part of the Collateral, and to assign to Secured Party the proceeds of any such letters of credit.

(d)     Notify any account debtors, any buyers of the Collateral, or any other persons of Secured Party's interest in the Collateral.

5.     DEFAULTS.  Any one or more of the following shall be a default hereunder:

(a)     Debtor breaches any term, provision, warranty or representation under this Agreement, or under any other obligation of Debtor to Secured Party, and such breach remains uncured after any applicable cure period.

(b)     Secured Party fails to have a perfected and enforceable lien on or security interest in the Collateral.

(c)     Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

- 5 -

~Doc# 1142595~

(d)     Debtor has given Secured Party any false or misleading information or representations.

(e)     A default or Event of Default occurs under the Note, the Guaranty or any other Transaction Document.

6.     SECURED PARTY'S REMEDIES AFTER DEFAULT.  In the event of any default, Secured Party may do any one or more of the following, to the extent permitted by law:

(a)     Declare any Indebtedness immediately due and payable, without notice or demand.

(b)     Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

(c)     Enforce the security interest of Secured Party in any account of Debtor maintained with Secured Party by applying such account to the Indebtedness.

(d)     Require Debtor to obtain Secured Party's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral consisting of inventory.

(e)     Require Debtor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Secured Party in kind.

(f)     Require Debtor to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under Secured Party's exclusive control.

(g)     Require Debtor to assemble the Collateral, including the Books and Records, and make them available to Secured Party at a place designated by Secured Party.

(h)     Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of Debtor's equipment, if Secured Party deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(i)     Demand and collect any payments on and proceeds of the Collateral.  In connection therewith Debtor irrevocably authorizes Secured Party to endorse or sign Debtor's name on all checks, drafts, collections, receipts and other

- 6 -

EB-00001734

documents, and to take possession of and open the mail addressed to Debtor and remove therefrom any payments and proceeds of the Collateral.

(j)     Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to Debtor.

(k)     Use or transfer any of Debtor's rights and interests in any Intellectual Property now owned or hereafter acquired by Debtor, if Secured Party deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. Debtor agrees that any such use or transfer shall be without any additional consideration to Debtor. As used in this paragraph, "**Intellectual Property**" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which Debtor has any right or interest, whether by ownership, license, contract or otherwise.

(l)     Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. Debtor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(m)     Take such measures as Secured Party may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and Debtor hereby irrevocably constitutes and appoints Secured Party as Debtor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(n)     Without notice or demand to Debtor, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by Secured Party or any of Secured Party's agents or affiliates to or for the credit of the account of Debtor or any guarantor or endorser of Debtor's Indebtedness.

(o)     Assign, sell or otherwise dispose of and deliver all or any part of the Equity Collateral, at public or private sale or otherwise, either with or without special conditions or stipulations, for cash or on credit or for future delivery, in such other consideration and at such time or times and at such place or places, and upon such terms and conditions as shall be commercially reasonable and in accordance with all applicable laws.

(p)     Exercise any other remedies available to Secured Party at law or in equity.

The proceeds of any sale, lease or other disposition of the Collateral hereunder shall be applied first, to the expenses of retaking, holding, storing, processing and

- 7 -

EB-00001735

preparing for sale, selling, and the like (including, without limitation, any taxes, fees and other costs incurred in connection therewith) of the Collateral, second, to the attorneys' fees and expenses, and then to satisfaction of the Indebtedness to the Secured Party (in such manner as Secured Party shall elect in its discretion), and to the payment of any other amounts required by applicable law.

Debtor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "**1933 Act**") and applicable state securities laws, Secured Party may be compelled, with respect to any sale of all or any part of the Equity Collateral conducted without prior registration or qualification of such Equity Collateral under the 1933 Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Equity Collateral for their own account, for investment and not with a view to the distribution or resale thereof.   Debtor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the 1933 Act) and, notwithstanding such circumstances, Debtor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Equity Collateral for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the 1933 Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.

For the purpose of enabling Secured Party, during the continuance of an Event of Default, to exercise rights and remedies under this Section at such time as Secured Party shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, Debtor hereby grants to Secured Party, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to Debtor) to use, license or sublicense any of the Intellectual Property now owned or hereafter acquired by Debtor, wherever the same may be located.

7.     ENVIRONMENTAL MATTERS.

(a)     Debtor represents and warrants: (i) it is not in violation of any health, safety, or environmental law or regulation regarding hazardous substances and (ii) it is not the subject of any claim, proceeding, notice, or other communication regarding hazardous substances. "**Hazardous substances**" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

(b)     Debtor shall deliver to Secured Party, promptly upon receipt, copies of all notices, orders, or other communications regarding (i) any enforcement

- 8 -

EB-00001736

action by any governmental authority relating to health, safety, the environment, or any hazardous substances with regard to Debtor's property, activities, or operations, or (ii) any claim against Debtor regarding hazardous substances.

(c)     Secured Party and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to Debtor, to enter and visit any locations where the Collateral is located for the purposes of observing the Collateral, taking and removing environmental samples, and conducting tests.   Debtor shall reimburse Secured Party on demand for the costs of any such environmental investigation and testing. Secured Party will make reasonable efforts during any site visit, observation or testing conducted pursuant to this paragraph to avoid interfering with Debtor's use of the Collateral. Secured Party is under no duty to observe the Collateral or to conduct tests, and any such acts by Secured Party will be solely for the purposes of protecting Secured Party's security and preserving Secured Party's rights under this Agreement. No site visit, observation or testing or any report or findings made as a result thereof ("**Environmental Report**") will (i) result in a waiver of any default of Debtor; (ii) impose any liability on Secured Party; or (iii) be a representation or warranty of any kind regarding the Collateral (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness). In the event Secured Party has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to Debtor or any other party, Debtor authorizes Secured Party to make such a disclosure.   Secured Party may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in Secured Party's judgment. Debtor further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to Debtor by Secured Party or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of Debtor) by Debtor without advice or assistance from Secured Party.

(d)     Debtor will indemnify and hold harmless Secured Party from any loss or liability Secured Party incurs in connection with or as a result of this Agreement, which directly or indirectly arises out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance. This indemnity will apply whether the hazardous substance is on, under or about Debtor's property or operations or property leased to Debtor.   The indemnity includes but is not limited to attorneys' fees (including the reasonable estimate of the allocated cost of in-house counsel and staff). The indemnity extends to Secured Party, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys and assigns.

8.     CONSENT TO JURISDICTION. DEBTOR AND SECURED PARTY HEREBY AGREE THAT THE FEDERAL COURT OF THE WESTERN DISTRICT OF NEW YORK OR, AT THE OPTION OF SECURED PARTY, ANY COURT LOCATED IN THE STATE OF NEW YORK SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN DEBTOR AND SECURED PARTY PERTAINING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER

~Doc# 1142595~

EB-00001737

CAUSE OR DISPUTE WHATSOEVER BETWEEN DEBTOR AND SECURED PARTY OF ANY KIND OR NATURE.   DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURTS, HEREBY WAIVING PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREEING THAT SERVICE OF SUCH SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED ADDRESSED TO DEBTOR AT THE ADDRESS OF DEBTOR FOR NOTICES SET FORTH HEREIN.  SHOULD DEBTOR FAIL TO APPEAR OR ANSWER ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THIRTY DAYS AFTER THE MAILING THEREOF, IT SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED AGAINST IT AS PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS.   THE CHOICE OF FORUM SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE BRINGING OF ANY ACTION BY SECURED PARTY OR THE ENFORCEMENT BY SECURED PARTY OF ANY JUDGMENT OBTAINED IN SUCH FORUM IN ANY OTHER APPROPRIATE JURISDICTION.  FURTHER, DEBTOR HEREBY WAIVES THE RIGHT TO ASSERT THE DEFENSE OF FORUM NON CONVENIENS AND THE RIGHT TO CHALLENGE THE VENUE OF ANY COURT PROCEEDING.

9.     WAIVER OF JURY TRIAL.  DEBTOR AND SECURED PARTY EACH WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS AGREEMENT, THE NOTE, THE GUARANTY OR ANY TRANSACTION DOCUMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. DEBTOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST SECURED PARTY OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

10.     MISCELLANEOUS.

(a)     Any waiver, express or implied, of any provision hereunder and any delay or failure by Secured Party to enforce any provision shall not preclude Secured Party from enforcing any such provision thereafter.

(b)     Debtor shall, at the request of Secured Party, execute such other agreements, documents, instruments, or financing statements in connection with this Agreement as Secured Party may reasonably deem necessary.

~Doc# 1142595~

EB-00001738

(c)     All notes, security agreements, subordination agreements and other documents executed by Debtor or furnished to Secured Party in connection with this Agreement must be in form and substance satisfactory to Secured Party.

(d)     This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of laws principles which would require the application of the laws of a different state.

(e)     All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law.  Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(f)     All terms not defined herein are used as set forth in the Uniform Commercial Code as in effect in any applicable jurisdiction.

(g)     In the event of any action by Secured Party to enforce this Agreement or to protect the security interest of Secured Party in the Collateral, or to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, Debtor agrees to pay immediately the costs and expenses thereof, together with reasonable attorneys' fees and allocated costs for in-house legal services to the extent permitted by law.

(h)     In the event Secured Party seeks to take possession of any or all of the Collateral by judicial process, Debtor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action.

(i)     This Agreement shall constitute a continuing agreement, applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this Agreement, and if all transactions between Secured Party and Debtor shall be closed at any time, shall be equally applicable to any new transactions thereafter.

(j)     Secured Party's rights hereunder shall inure to the benefit of its successors and assigns.  In the event of any assignment or transfer by Secured Party of any of the Indebtedness or the Collateral, Secured Party thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Indebtedness or the Collateral not so assigned or transferred.  All representations, warranties and agreements of Debtor if more than one are joint and several and all shall be binding upon the personal representatives, heirs, successors and assigns of Debtor.

(k)     Any notice to be given hereunder shall be given in the manner prescribed in the Guaranty or the Note, as applicable.

- 11 -

EB-00001739

11.   FINAL AGREEMENT.  BY SIGNING THIS AGREEMENT EACH PARTY REPRESENTS AND AGREES THAT:  (A) THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS AGREEMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

- 12 -

EB-00001740

**IN WITNESS WHEREOF**, the parties executed this Agreement as of the date first written above, intending to create an instrument executed under seal.

**EBER      BROS.      WINE      AND      LIQUOR CORPORATION**

By:_____

Title:_____

     (Seal)

**EBER BROS. WINE & LIQUOR METRO, INC.**

By:_____

Title:_____

     (Seal)

Accepted:

_____

**LESTER EBER**

- 13 -

~Doc# 1142595~

EB-00001741

## Exhibit A

### Intellectual Property

EB-00001742

## LINE OF CREDIT NOTE

$1,500,000                                                                                                  _____, 2010

FOR VALUE RECEIVED, EBER BROS. WINE & LIQUOR METRO, INC., a New York corporation with an address at 155 Paragon Drive, Rochester, New York 14625 ("Maker"), hereby promises to pay to the order of LESTER EBER, an individual with an address at 155 Paragon Drive, Rochester, New York 14625 ("Holder"), the principal sum of ONE MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($1,500,000.00) (the "Maximum Principal Amount") or such lesser or greater amount as may be outstanding hereunder.

1.    Line of Credit.  This Note evidences a revolving line of credit.  Accordingly amounts hereunder may be borrowed, repaid and re-borrowed provided that at no time shall Maker permit the aggregate principal amount of all advances made under this Note to exceed the Maximum Principal Amount.

2.    Interest Rate.  All amounts outstanding under this Note shall bear interest at a rate equal to twelve and one half percent (12.5%) per annum.  Upon the occurrence of an Event of Default (whether or not the Holder has accelerated payment of the outstanding balance due hereunder), or after maturity or after judgment has been rendered with respect to the obligations hereunder, the unpaid principal balance, at the option of Holder, shall bear interest at a rate equal to fifteen percent (15%).  The right of the Holder to receive such increased rate of interest shall not constitute a waiver of any other right or remedy of the Holder.  All interest shall be calculated based on 360 day year and the actual number of days elapsed.

3.    Payments.  Accrued interest will be due and payable in arrears on December 1, 2009 and on the first day of each March, June, September and December thereafter (each an "Interest Payment Date") and on the Maturity Date, as hereinafter defined.  Notwithstanding the foregoing, on each Interest Payment Date, at the request of Maker all or such portion of the interest then due and owing specified by Maker shall be added to the principal amount hereof instead of paying such interest in cash, whereupon such amount will bear interest at rate per annum specified herein.  Maker hereby agrees, upon the request of Holder, to amend this Note or execute one or more new notes in the form hereof to reflect any increase in the principal sum hereof resulting from the addition of the accrued interest to the principal; provided, however that the failure to so amend this Note or to enter into one or more new notes shall not relieve Maker of its obligation to pay such accrued interest in accordance with the terms hereof.  All amounts remaining outstanding hereunder, including all principal and interest, shall become due and payable in full on December 31, 2011 (the "Maturity Date").

4.    Late Charge.  If the entire amount of any required payment is not paid in full within five (5) days after the same is due, the Maker shall pay to Holder a late fee equal to two percent (2%) of the amount of the payment that remains unpaid.

5.    Prepayment.  Maker shall have the option of paying the amounts outstanding under this Note to Holder, in full or part, at any time and from time to time without any premium or penalty.

134782 1237719.1

6.  <u>Request for Advances; Discretionary Facility</u>.  At any time and from time to time Maker may make a request for a loan that specifies (a) the amount requested as the principal amount of such loan and (b) the business day of Holder on which such loan is requested to be made which shall not be less than three (3) days from the date of such notice.  The decision whether to honor such loan request and make such loan shall be in the sole and absolute discretion of Holder and Holder shall have no obligation or commitment to make any loans hereunder.  Holder may treat as made by Maker and rely upon, and Maker shall be bound by, any loan request that Holder in good faith believes to be valid and to have been made in the name or on behalf of Maker by any officer of Maker, and Holder shall not incur any liability to Maker or any other person as a direct or indirect result of honoring such loan request and making such loan.

7.  <u>Events of Default/Remedies</u>.  At the option of Holder, all amounts outstanding under this Note shall become immediately due and payable in full, without further presentment, protest, notice, or demand, upon the happening of any Event of Default.  Upon the occurrence of an Event of Default, Holder shall be entitled to exercise any legal or equitable right which he or it may have, and may proceed to protect and enforce its rights by any other appropriate proceedings.  The following events shall constitute "Events of Default" under this Note:

    a.  *Nonpayment*.  Failure of Maker to make any payment of any type within fifteen (15) days after the same becomes due and payable.

    b.  *Financial Difficulties*.  Financial difficulties of Maker or any guarantor hereof as evidenced by:

        i.  the filing of a voluntary or involuntary petition in bankruptcy, or under any chapters of the Bankruptcy Code, or under any federal or state statute providing for the relief of debtors;

        ii.  making an assignment for the benefit of creditors;

        iii.  consenting to the appointment of a trustee or receiver for all or a major part of any of Maker's or such guarantor's property;

        iv.  the entry of a court order appointing a receiver or a trustee for all or a major part of Maker's or such guarantor's property; or

        v.  the admission by Maker or any guarantor in writing of the Maker's or such guarantor's  inability to pay its debts as they become due.

    c.  *Change of Control*.  Maker or any guarantor hereof enters into any agreement pursuant to which Maker or such guarantor will sell all or substantially all of the assets of Maker or such guarantor, or upon the closing of any transaction or series of related transactions in which more than fifty percent (50%) of the issued and outstanding shares of capital stock of the Maker or such guarantor are issued to, or acquired by, any one or more persons or entities who are not shareholders of the Maker or such guarantor as of the date of this Note.

EB-00001744

    d. *Cease Operations.* Maker ceases all ongoing business operations.

    e. *Sale of Eber-Connecticut, LLC.* Eber-Connecticut, LLC ("Eber-CT") enters into any agreement pursuant to which Eber-CT will sell all or substantially all of the assets of Eber-CT, or upon the closing of any transaction or series of related transactions in which more than fifty percent (50%) of the issued and outstanding units of membership interest of the Maker are issued to, or acquired by, any one or more persons or entities who are not controlled by or under common control with the Maker

    f. The occurrence of a breach or default under any guaranty, security agreement or any other document, instrument or agreement executed in connection herewith or providing security or other credit support for the obligations of the Maker hereunder.

    8.    Expenses. Maker shall pay to Holder all amounts incurred by Holder, including without limitation attorneys' fees and disbursements, in order to collect any amount due under this Note, to negotiate or document a workout or restructuring, or to preserve its rights hereunder, whether or not any legal proceeding ins commenced.

    9.    Holder's Records Conclusive. Holder shall maintain a record of the date and original principal amount of each advance made by him hereunder and the date and amount of each payment to be applied to the outstanding principal amount of this Note. Such records shall be conclusive evidence of the outstanding principal amount under this Note and of all advances hereunder, absent manifest error. No failure by Holder to make any such annotation in its records shall affect Maker's obligation to pay the principal and interest of each advance or any other obligation of Maker hereunder.

    10.    Subordination. All amounts outstanding under this Note are subordinate to any and all amounts owed by the Maker to The Canandaigua National Bank and Trust Company.

    11.    Miscellaneous. The terms of this Note cannot be changed, nor may this Note be discharged in whole or in part, except by a writing executed by Holder. No delay or omission by Holder in exercising any rights hereunder shall operate as a waiver of such rights. This Note shall be governed by and construed under the laws of the State of New York.

[Signatures are on the next page.]

EB-00001745

IN WITNESS WHEREOF, Maker has duly executed this Note as of the day and year first above written.

EBER BROS. WINE & LIQUOR METRO, INC.

By: _____

Lester Eber, Chief Executive Officer

By: _____

Wendy Eber, Chief Financial Officer

Accepted:

_____

Lester Eber

EB-00001746

# EBER BROS. WINE & LIQUOR CORP.

Corporate Office
95 Allens Creek Rd., Bldg 2  Ste 10, Rochester, New York  14618
Phone: (585) 360-4240    Fax: (585) 360-4211

April 27, 2010

Dear Audrey,

Thank you, for taking the time to discuss the company and for considering participating in the secured loan to the company. I understand and respect your decision to not participate.

Again thank you, I look Forward to talking to you again soon. Hope Abel & your dad are doing better.

Love,

Lester