# EXHIBIT L

STATE OF NEW YORK
SUPREME COURT          COUNTY OF MONROE

ALEXBAY, LLC,

                 Plaintiff,                    **SUMMONS**

          -vs.-                              Index No.:

EBER BROS. WINE & LIQUOR CORP.;         *2012-1919*

SOUTHERN WINE & SPIRITS
OF AMERICA, INC.;

EBER BROS. WINE & LIQUOR METRO, INC.;
     and

JOHN DOES 1 – 10, being fictitious names
intended to designate other entities or persons
claiming any interest in Eber Bros. Wine &
Liquor, Inc.'s "OWNERSHIP INTEREST IN
EBER BROS. WINE & LIQUOR METRO,
INC.";

                 Defendants.

To the above-named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a
copy of your Answer on the Plaintiff's attorneys within twenty (20) days after service of this
Summons, exclusive of the day of service (or within 30 days after the service is complete if
this Summons is not personally delivered to you within the State of New York); and in case of
your failure to appear or answer, judgment will be taken against you by default for the relief
demanded in the Complaint.

Trial is to be held in the County of Monroe; the venue of this matter is based upon
Defendants' principal place of business.

DATED: 21 February 2012          **UNDERBERG & KESSLER LLP**
        Rochester, New York.          *Attorneys for Plaintiff Alexbay, LLC*

                           William E. Brueckner and Michael J. Beyma
                           300 Bausch & Lomb Place
                           Rochester, New York 14604
                           585.258.2800

G:\Microsoft\UKB\Eber\Brothers\oo foreclosure\Summons.docx

EB-00025461

STATE OF NEW YORK
SUPREME COURT.        COUNTY OF MONROE

ALEXBAY, LLC,

                                   Plaintiff,                    Index No.:

          -vs.-                                              2012-1919

EBER BROS. WINE & LIQUOR CORP.;

SOUTHERN WINE & SPIRITS
OF AMERICA, INC.;

EBER BROS. WINE & LIQUOR METRO, INC.;
and

JOHN DOES 1 – 10, being fictitious names
intended to designate other entities or persons
claiming any interest in Eber Bros. Wine &
Liquor, Inc.'s "OWNERSHIP INTEREST IN
EBER BROS. WINE & LIQUOR METRO,
INC.";

                                   Defendants.

---

## COMPLAINT FOR
## DETERMINATION OF 'COMMERCIAL REASONABLENESS'
## OF ACCEPTANCE OF COLLATERAL
## UNDER §9-627 of UNIFORM COMMERCIAL CODE

AS AND FOR ITS COMPLAINT against the Defendants herein, Plaintiff ALEXBAY,

LLC, by its attorneys Underberg & Kessler LLP, alleges and states as follows:

### OVERVIEW:

1.      By this action, Plaintiff, the secured creditor of a borrower in default, seeks a

determination, as provided under Uniform Commercial Code §9-627, that the enforcement of

the creditor's security interest, by the creditor's acceptance of certain collateral in full

satisfaction of the underlying obligation, are "commercially reasonable" and in good faith.

:uccforaclosure/ucc complaint.docx

EB-00025462

## THE PARTIES and the COLLATERAL:

2.    Plaintiff Alexbay, LLC ("*Alexbay*"), is a limited liability company organized and existing under the laws of the State of Connecticut, with an address for the transaction of business at 30 Corporate Drive, North Haven, Connecticut 06473.  As of the date of this Complaint, Alexbay is the holder of a certain promissory note executed by Eber Bros. Wine & Liquor Corp. and all the associated rights to the collateral that secures repayment of the debt memorialized by that promissory note.

3.    Defendant Eber Bros. Wine & Liquor Corp. ("*Eber Bros.*") is a corporation organized and existing under the laws of the State of New York, with an address for the transaction of business at 95 Allens Creek Drive, Suite 10, Building 2, Rochester, New York 14618.

4.    Defendant Eber Bros. Wine & Liquor Metro, Inc. ("*Metro*") is a corporation organized and existing under the laws of the State of New York, with an address for the transaction of business at 95 Allens Creek Drive, Suite 10, Building 2, Rochester, New York 14618.  Metro is a wholly owned subsidiary of Eber Bros.: that is to say, Eber Bros. owns all of Metro's capital stock.  As its name suggests, Metro was formed to carry on business as a distributor of wine and liquor.

5.    Through a series of transactions defined in greater detail subsequently in this Complaint, Eber Bros. became indebted to Lester Eber in sums exceeding $3.2Million.  Under the terms of a contemporaneously executed security agreement, Eber Bros.' indebtedness to Lester Eber (the "*Original Secured Creditor*") was secured by a pledge of virtually all of Eber Bros.' assets, including (without limitation) Eber Bros.' ownership interest in Metro. The Original Secured Creditor's rights under the notes and security agreement were thereafter

EB-00025463

assigned by the Original Secured Creditor to Alexbay. The capital stock of Metro, owned entirely by Eber Bros. and pledged to secure Eber Bros.' indebtedness and other obligations under the notes and security agreements, is the collateral that is the subject of this action ("*the Collateral*").

6.   Upon information and belief, Southern Wine & Spirits of America, Inc. ("*Southern*"), is a corporation organized and existing under the laws of the State of Florida, with an address for the transaction of business at 166 N.W. 163rd Street, Miami, Florida, 33169. Upon further information and belief, Southern may claim an interest as a secured creditor with respect to the Collateral, by virtue of a financing statement describing the Collateral: that financing statement was filed with the New York State Secretary of State on or about on or about August 31, 2007.

7.   Metro is a co-obligor with respect to some or all of the Eber Bros.' obligations that are secured by the Collateral.

8.   "John Does 1 – 10" are unknown parties identified for the purpose of this action by fictitious names: those fictitious names being intended to designate any other entities or persons who may claim any interest in the Collateral.

## THE LOAN TRANSACTIONS:

### A. The $576K Loan to Eber Bros.

9.   On or about October 1, 2002, the Original Secured Creditor loaned Eber Bros. $575,895.00. The loan was evidenced by a promissory note, and was secured by a collateral security interest in "all of the assets of (Eber Bros.) in favor of (the Original Secured Creditor)." Under the terms of the promissory note evidencing the indebtedness, all principal and interest due was to be paid in full no later than October 1, 2012.

EB-00025464

10.    On or about March 13, 2006, Eber Bros. executed an "Amended and Restated Promissory Note" in the amount of $575,895.00, together with interest at an annual rate of nine percent. The note called for payment in full of the obligations to the Original Secured Creditor on or before March 13, 2016.

### B.  The $1.5 Million Loan to Eber Bros.

11.    On or about August 15, 2005, the Original Secured Creditor loaned Eber Bros. $1,503,750.00, and Eber Bros. executed a promissory note to memorialize the obligation to repay the loan. Shortly thereafter, on or about March 13, 2006, Eber Bros. executed an "Amended and Restated Promissory Note" payable to the Original Secured Creditor, and in that Amended and Restated Promissory Note agreed to repay the principal amount of the original loan, plus interest at an annual rate of nine percent.

12.    On or about February 11, 2011, Metro, Eber Bros. and the Original Secured Creditor entered into a "Debt Assumption Agreement" ("*the Debt Assumption Agreement*") whereby Metro assumed all of Eber Bros.' obligations to the Original Secured Creditor under the March 13, 2006, Amended and Restated Promissory Note. At the time of Metro's assumption of those obligations, the remaining unpaid principal balance of the March 13, 2006, Amended and Restated Promissory Note was $1,434,710.68 plus accrued and unpaid interest. [A true and accurate copy of the Debt Assumption Agreement is attached to this Complaint as Exhibit A.]

13.    The Debt Assumption Agreement expressly provides:

> Each of (Eber Bros.), Metro and (Original Secured Creditor) agree that the unpaid principal balance of the (Eber Bros.) Loan is, as of the date hereof, One Million Four Hundred Thirty-Four Thousand Seven Hundred Ten and 68/100 Dollars ($1,434,710.68) plus accrued and unpaid interest. ... **(Eber Bros.) hereby irrevocably assigns to Metro all of (Eber Bros.') obligations to pay principal, interest and**

EB-00025465

other obligations and liabilities in respect of the (Eber Bros.) Loan, and Metro agrees to be bound by the terms of the (Eber Bros.) Note as if it were the "Maker" thereunder and promises to pay the obligations evidenced thereby in accordance with the terms thereof. (Original Secured Creditor) hereby consents to such assignment by (Eber Bros.) and assumption by Metro.

(Emphasis added.)

C.  **The $1,500,000 Line of Credit to Metro.**

14.    In October, 2009, the Original Secured Creditor agreed to lend to Metro, and Metro promised to repay the Secured Creditor, an amount not to exceed $1.5 Million under a revolving line of credit ("*the Line of Credit Note*"). Repayment of any amounts borrowed and applicable interest was to be paid in full on or before December 31, 2011. [A true and accurate copy of the Line of Credit Note is attached to this Complaint as Exhibit B.]

15. ·   The Line of Credit Note expressly provides:

FOR VALUE RECEIVED, EBER BROS. WINE & LIQUOR METRO, INC., ("Maker") a New York corporation … hereby promises to pay to the Order of (the Secured Creditor) … the principal sum of ONE MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($1,500,000.00) (the "Maximum Principal Amount") or such lesser or greater amount as may be outstanding hereunder. … This Note evidences a revolving line of credit. Accordingly, amounts hereunder may be borrowed, repaid and re-borrowed provided that at no time shall Maker permit the aggregate principal amount of all advances made under this Note to exceed the Maximum Principal Amount.

D.  **Eber Bros.' Secured Guaranty of Metro's Obligations.**

16.    On or about February 26, 2010, Eber Bros. agreed to guaranty the repayment by Metro of all its obligations to the Original Secured Creditor, then existing or thereafter incurred ("*the EB Guaranty*"). [A true and accurate copy of the EB Guaranty is annexed to this Complaint as Exhibit C.]

17.    The EB Guaranty defines the term Guarantor to mean Eber Bros., and the term Lender to mean the Original Secured Creditor, and it expressly provides:

EB-00025466

For valuable consideration, **Guarantor hereby unconditionally guarantees and promises to repay promptly to Lender,** or order, in lawful money of the United States, **any and all Indebtedness to Lender** when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. This Guaranty is cumulative and does not supersede and other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor. ... **"Borrower"** shall mean **Eber Bros Wine & Liquor Metro, Inc.** ... **"Indebtedness" shall mean any and all debts liabilities, and obligations of the Borrower and Guarantor to Lender** ... now or hereafter existing.

(Emphasis added.)

18.    The EB Guaranty expressly ran to the benefit of the Original Secured Creditor's endorsees, successors, and assigns.

19.    By the terms of a certain Security Agreement executed by the parties on or about February 26, 2010, Eber Bros.' obligations under the EB Guaranty were secured by a grant to the Original Secured Creditor of a security interest in substantially all of Eber Bros.' property. The agreement was subsequently reiterated in an Amended and Restated Security Agreement executed by the parties on or about February 10, 2011 ("*the Security Agreement*"). Specifically included within the grant of the security interest were Eber Bros.' membership interests in Metro. [A true and accurate copy of the Security Agreement is annexed to this Complaint as Exhibit D.]

20.    The Security Agreement defines the term "Parent" to mean Eber Bros.; defines the term "Metro" in the same manner as this Complaint; defines "Debtor" to include Eber Bros. and Metro; and defines "Secured Party" as the Original Secured Creditor. The Security Agreement expressly provides:

Debtor hereby assigns and grants to Secured Party a security interest in the following described property now owned or hereafter acquired by Debtor ... All instruments, notes, chattel papers, documents, certificates of deposit, **securities and investment property of every**

EB-00025467

type. The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing. ... **The shares of common stock and preferred stock, or partnership, membership and other ownership interests, now or hereafter owned by Debtor, including, without limitation ...any ownership interests in Metro now or hereafter owned by Parent** ... .

(Emphasis added).

### E.   The Default and the Assignment to Alexbay.

21.   Metro did not repay the sums due to the Original Secured Creditor as required under the Line of Credit Note, and is in default of its obligations under the Line of Credit Note. Metro did not repay the sums due to the Original Secured Creditor as required by the Debt Assumption Agreement, and is in default of its obligations under the Debt Assumption Agreement.

22.   Accordingly, as permitted under the terms of the EB Guaranty, the Original Secured Creditor has made demand for payment by Eber Bros. of the sums due from Metro. Despite demand duly made, Eber Bros. has failed to pay the Original Secured Creditor those sums.

23.   As a consequence of Eber Bros.' failure to pay the Original Secured Creditor the sums Metro owes the Original Secured Creditor, Eber Bros. is in default of its obligations under the EB Guaranty.

24.   On or about January 18, 2012, the Original Secured Creditor irrevocably granted, assigned and transferred all his right, title and interest in the Debt Assumption Agreement, the Line of Credit Note, and the Metro Security Agreement to Alexbay. [True and accurate copies of the assignments are collectively annexed to this Complaint as Exhibit E.]

EB-00025468

### PROPOSED ACCEPTANCE OF COLLATERAL:

25.    Alexbay has proposed to accept Eber Bros.' stock in Metro in full satisfaction of all Eber Bros. obligations to Alexbay, as assignee, under the EB Guaranty and the Security Agreement.

26.    By notice dated January 18, 2012, and as authorized by UCC 9-620, Alexbay notified Eber Bros. of its proposal to accept the Collateral in full satisfaction of Eber Bros. obligation to Alexbay.  [A true and accurate copy of Alexbay's notice to Eber Bros. is annexed to this Complaint as Exhibit F.]

### THE AMOUNT OF THE INDEBTEDNESS and the VALUE OF THE COLLATERAL:

27.    As of December 31, 2011, Metro's indebtedness to the Original Secured Creditor under the Debt Assumption Agreement was $1,951,874.26 (plus interest accruing at 9% per annum).

28.    As of December 31, 2011, Metro's indebtedness to the Original Secured Creditor under the Line of Credit Note was $1,698,808.22 (plus interest accruing at 12 ½% per annum).

29.    As a consequence of all the foregoing, Metro's indebtedness to Alexbay currently exceeds $3.650 Million.  By virtue of the EB Guaranty, Eber Bros. obligation to Alexbay also exceeds $3.650 Million.

30.    Metro does not presently operate and it conducts no business activity.  It has not generated profit of any kind in several years.  Metro has no cash reserves other than those required in the ordinary course of its business.  Metro has no tangible assets: its only intangible asset of any significant value, indeed its only valuable asset of any kind, is Metro's

*Alexbay, LLC. v. Eber Bros. Wine & Liquor Corp. et al.*
Index No.:

Complaint to Determine Commercial Reasonableness
Page 8 of 13

EB-00025469

ownership of a partial interest in yet another company, Eber-Connecticut, LLC ("*EberConn*").

31.     EberConn is a limited liability company formed under the laws of the State of Delaware.

32.     Metro owns seventy-nine percent (79%) of the membership units in EberConn. Other owners of EberConn are Eder Goodman, LLC, which owns fifteen percent (15%) of the membership units in EberConn, and Polebridge Bowman, LLC ("*Polebridge Bowman*"), which owns six percent (6%) of the membership units of EberConn.

33.     Polebridge Bowman is a party unrelated to the Original Secured Creditor, to Eber Bros., to Metro, and/or to EberConn. Polebridge Bowman acquired its ownership interest in EberConn in May, 2010, in an arms' length transaction, and became a new member of EberConn by virtue of that acquisition. The membership units Polebridge Bowman acquired were sold to it by Metro.

34.     Under the terms of the operating agreement that governs EberConn's corporate affairs, existing members are provided a right of first refusal that permits existing members to acquire any membership units proposed for sale to a potential new member, on the same terms that are proposed for sale to the potential new member. By operation of that right of first refusal, before Polebridge Bowman could acquire its membership units from Metro, Eder-Goodman had to decline to purchase those membership units on the terms Polebridge Bowman proposed for the purchase.

35.     Polebridge Bowman acquired its ownership of six percent (6%) in EberConn in May 2010 for $350,000. Eder-Goodman consented to the sale of Metro's membership units at that price.

*Alexbay, LLC. v. Eber Bros. Wine & Liquor Corp. et al.*
Index No.:

Complaint to Determine Commercial Reasonableness
Page 9 of 13

EB-00025470

36. No other sale or purchase of any interest in EberConn has occurred since. Accordingly, Polebridge Bowman's acquisition of its ownership interest in EberConn represents the best evidence of the current value of ownership rights in EberConn: it is the last time the free market has spoken with respect to the value of EberConn's membership units.

37. As established by Polebridge Bowman's acquisition, each one percent of the membership units in EberConn was worth approximately $58,333 in May, 2010.[1] Accordingly, at that time, the value of all of EberConn's membership units was $5,833,300.

38. Since the Polebridge Bowman acquisition, EberConn has lost more than $1.2 Million. As a consequence, the value of all of EberConn's membership units was reduced to $4,633,300 by December 2011.

39. Thus, as of December, 2011, Metro's ownership of 79% of the ownership units in EberConn has a value of approximately $3.660 Million.[2] That ownership interest is Metro's only valuable asset, and effectively establishes the value of the Collateral. The Collateral has a value of approximately $3.660 Million.

40. Valuation of the Collateral at $3.660 Million does not apply any discount for lack of marketability, partial ownership, costs of sale or other applicable factors that might reduce the Collateral's value. Moreover, because Metro's business as a wine and liquor distributor is highly regulated, requiring business owners to have proper licensing, there are significant barriers to entry to the ownership of Metro, and there are reasonable justifications for valuation of the Collateral at less than $3.660 Million.

---

[1] Polebridge Bowman paid $350,000 for a six percent ownership interest. 350,000 ÷ 6 = 58,333.

[2] 4,633,300 x 0.79 = 3,660,307.00.

---

*Alexbay, LLC. v. Eber Bros. Wine & Liquor Corp. et al.*
Index No.:

Complaint to Determine Commercial Reasonableness
Page 10 of 13

EB-00025471

41.   Therefore, by and through acceptance of the Collateral in full satisfaction of Eber Bros. obligations to Alexbay, Alexbay will accept a value of approximately $3.660 Million in full satisfaction of an obligation of $3.650 Million, plus continually accruing interest.

## THE PROCEDURES FOR ACCEPTING THE COLLATERAL:

42.   As required under UCC §9-620, Alexbay has provided Eber Bros. notice of its intent to accept the Collateral in full satisfaction of Eber Bros.' obligations under the EB Guaranty and Security Agreement.

43.   Upon information and belief, Southern filed a financing statement with the New York State Department of State on or about August 31, 2007, under File Number 200708310704958, by which it may claim an interest in the Collateral. As required under UCC §9-621(a), and by virtue of this action, Southern has been provided notice of Alexbay's intention to accept the Collateral in full satisfaction of Eber Bros.' obligations under the EB Guaranty and Security Agreement.

44.   The Original Secured Creditor's financing statement with respect to the Collateral was filed on February 22, 2010.

45.   Upon information and belief, no other person holds any interest in the Collateral subordinate to Alexbay's interest.

46.   By virtue of this action, Metro has been provided notice of Alexbay's intention to accept the Collateral in full satisfaction of Eber Bros.' obligations under the EB Guaranty and the Security Agreement.

*Alexbay, LLC. v. Eber Bros. Wine & Liquor Corp. et al.*
Index No.:                                                    Complaint to Determine Commercial Reasonableness
                                                              Page 11 of 13

EB-00025472

47.     As a consequence of all the foregoing, Alexbay's acceptance of the Collateral in full satisfaction of Eber Bros.' obligations under the EB Guaranty and Security Agreement: (i) it is authorized by relevant provisions of the Uniform Commercial Code; (ii) it complies with all procedures required of the Uniform Commercial Code; and (iii) by its satisfaction in full of the obligations of Eber Bros under the EB Guaranty and Security Agreement, it gives fair and reasonable consideration for the Collateral.

48.     Accordingly, Alexbay's acceptance of the Collateral in full satisfaction of Eber Bros. obligations under the EB Guaranty and Security Agreement is "commercially reasonable" as the term is used in Section 9-627 of the Uniform Commercial Code.

## PROCEDURAL PREREQUSITES:

49.     Section 9-627(c) of the Uniform Commercial Code provides, in pertinent part:

> A collection, enforcement, disposition, or acceptance is commercially reasonable if it has been approved: in a judicial proceeding ...

50.     CPLR Section 3001 provides, in pertinent part:

> Declaratory judgment.  The supreme court may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed.

51.     Alexbay requests that the acceptance of its collateral be "approved in a judicial proceeding."  Its proposal to accept the Collateral presents a justiciable controversy among the parties to this action.  The Court's determination of the "commercial reasonableness" of the proposed acceptance will determine the rights and other legal relations of the parties to that controversy.

52.     No previous request has been made for the relief requested in this action.

//

//

EB-00025473

//

//

WHEREFORE, Plaintiff Alexbay LLC requests that this Court determine, adjudge, and order, that Alexbay LLC's acceptance, as a secured creditor, of Eber Bros. Wine & Liquor Corporation's ownership interests in Eber Bros. Wine & Liquor Metro, LLC, (which ownership interests serve as collateral securing the obligations of Eber Bros. Wine & Liquor Corporation's obligations to Alexbay LLC) in full satisfaction of the secured obligations owed to Alexbay LLC, is "commercially reasonable," together with such other and further relief as the Court may deem just and reasonable.

DATED: 21 February 2012
      Rochester, New York.

UNDERBERG & KESSLER LLP
*Attorneys for Plaintiff Alexbay, LLC*

William E. Brueckner and Michael J. Beyma
300 Bausch & Lomb Place
Rochester, New York 14604
585.258.2800

*Alexbay, LLC, v. Eber Bros. Wine & Liquor Corp. et al.*
Index No.:

Complaint to Determine Commercial Reasonableness
Page 13 of 13

EB-00025474

# EXHIBIT "A"

EB-00025475

## DEBT ASSUMPTION AGREEMENT

THIS DEBT ASSUMPTION AGREEMENT (this "Agreement") is made as of the 11th day of February, 2011, by and among EBER BROS. WINE AND LIQUOR CORPORATION ("EWLC"), EBER BROS. WINE AND LIQUOR METRO, INC. ("Metro"), and LESTER EBER ("Holder").

## RECITALS:

WHEREAS, Holder made a loan to EWLC (the "EWLC Loan") evidenced by that certain Amended and Restated Promissory Note dated March 13, 2006, in the original principal amount of $1,503,750.00 (the "EWLC Note"); and

WHEREAS, as of the date hereof, the remaining principal balance of the EWLC Loan is $1,434,710.68, plus accrued and unpaid interest; and

WHEREAS, upon the terms and conditions set forth herein, Metro has agreed to assume the outstanding principal and interest of the EWLC Loan and all other liabilities and obligations in respect thereof (the "Assumption"), and Holder has agreed to fully release EWLC from its obligations under the EWLC Note; and

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby agree as follows:

1.     Acknowledgment.  Each of EWLC, Metro and Holder agree that the unpaid principal balance of the EWLC Loan is, as of the date hereof, One Million Four Hundred Thirty-Four Thousand Seven Hundred Ten and 68/100 Dollars ($1,434,710.68), plus accrued and unpaid interest.

2.     Assumption.   EWLC hereby irrevocably assigns to Metro all of EWLC's obligations to pay principal, interest and other obligations and liabilities in respect of the EWLC Loan. Metro hereby irrevocably assumes all of EWLC's obligations to pay principal, interest and other obligations and liabilities in respect of the EWLC Loan, and Metro agrees to be bound by the terms of the EWLC Note as if it were the "Maker" thereunder and promises to pay the obligations evidenced thereby in accordance with the terms thereof. Holder hereby consents to such assignment by EWLC and assumption by Metro. At any time on or after the date hereof, Holder may require Metro to issue a replacement note to Holder, in replacement of the EWLC Note, which replacement note shall be acceptable to Holder.

3.     Conditions; Advance.   Holder's obligation to consent to the Assumption is conditioned upon Holder's receipt of an amended and restated security agreement (the "Security Agreement"), in form and substance acceptable to Holder, which amends and restates the Security Agreement dated February 26, 2010, made by EWLC and Metro in favor of Holder (which for the avoidance of doubt shall continue to include a grant of a security interest in and pledge of all limited liability company interests or other equity interests in Eber-Connecticut, LLC). In connection with and in reliance upon Holder's receipt of executed copies of this

~44843-8258-1000 v.1~

EB-00025476

Agreement and the Security Agreement, Holder shall make an advance of funds to Metro in the amount of $100,000, which advance shall be pursuant to the terms of and evidenced by that certain Line of Credit Note dated February 26, 2010, made by Metro in favor of Holder in the stated principal amount of $1,500,000.

    4.      Release; Continuation.

        a.  Upon the effectiveness of this Agreement, Holder hereby releases EWLC from any and all obligations and liabilities (the "Assumed Liabilities") under the EWLC Note.

        b.  Upon the effectiveness of this Agreement, all obligations of BWLC to pay the Assumed Liabilities shall continue as obligations of Metro under the EWLC Note.

    5.      No Novation.  Each of the parties hereto hereby agrees and intends that this Agreement shall not create, result in or evidence a novation of any of the Assumed Liabilities, the EWLC Loan or the EWLC Note.

    6.      Successors and Assigns.  This Agreement shall bind and inure to the benefit of the parties hereto and their heirs, personal representatives, successors, and assigns.

    7.      Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to conflict of law principals.

    8.      Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

-#4843-8256-1099 v.1-

EB-00025477

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed and sealed as of the date first above written.

EBER BROS. WINE AND LIQUOR CORPORATION

By: _Wendy Eber_
Name: Wendy Eber
Title: CFO

EBER BROS. WINE & LIQUOR METRO, INC.

By: _Wendy Eber_
Name: Wendy Eber
Title: CFO

_Lester Eber_
Name: Lester Eber

-#843-3258-1000 v.1-

EB-00025478

# EXHIBIT "B"

EB-00025479

## LINE OF CREDIT NOTE

$1,500,000                                                          October ___, 2009

FOR VALUE RECEIVED, EBER BROS. WINE & LIQUOR METRO, INC., a New York corporation with an address at 155 Paragon Drive, Rochester, New York 14625 ("Maker"), hereby promises to pay to the order of LESTER EBER, an individual with an address at 155 Paragon Drive, Rochester, New York 14625 ("Holder"), the principal sum of ONE MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($1,500,000.00) (the "Maximum Principal Amount") or such lesser or greater amount as may be outstanding hereunder.

1.    Line of Credit. This Note evidences a revolving line of credit. Accordingly amounts hereunder may be borrowed, repaid and re-borrowed provided that at no time shall Maker permit the aggregate principal amount of all advances made under this Note to exceed the Maximum Principal Amount.

2.    Interest Rate. All amounts outstanding under this Note shall bear interest at a rate equal to twelve and one half percent (12.5%) per annum. Upon the occurrence of an Event of Default (whether or not the Holder has accelerated payment of the outstanding balance due hereunder), or after maturity or after judgment has been rendered with respect to the obligations hereunder, the unpaid principal balance, at the option of Holder, shall bear interest at a rate equal to fifteen percent (15%). The right of the Holder to receive such increased rate of interest shall not constitute a waiver of any other right or remedy of the Holder. All interest shall be calculated based on 360 day year and the actual number of days elapsed.

3.    Payments. Accrued interest will be due and payable in arrears on December 1, 2009 and on the first day of each March, June, September and December thereafter (each an "Interest Payment Date") and on the Maturity Date, as hereinafter defined. Notwithstanding the foregoing, on each Interest Payment Date, at the request of Maker all or such portion of the interest then due and owing specified by Maker shall be added to the principal amount hereof instead of paying such interest in cash, whereupon such amount will bear interest at rate per annum specified herein. Maker hereby agrees, upon the request of Holder, to amend this Note or execute one or more new notes in the form hereof to reflect any increase in the principal sum hereof resulting from the addition of the accrued interest to the principal; provided, however that the failure to so amend this Note or to enter into one or more new notes shall not relieve Maker of its obligation to pay such accrued interest in accordance with the terms hereof. All amounts remaining outstanding hereunder, including all principal and interest, shall become due and payable in full on December 31, 2011 (the "Maturity Date").

4.    Late Charge. If the entire amount of any required payment is not paid in full within five (5) days after the same is due, the Maker shall pay to Holder a late fee equal to two percent (2%) of the amount of the payment that remains unpaid.

5.    Prepayment. Maker shall have the option of paying the amounts outstanding under this Note to Holder, in full or part, at any time and from time to time without any premium or penalty.

134762 1237719.1

6.  Request for Advances; Discretionary Facility. At any time and from time to time Maker may make a request for a loan that specifies (a) the amount requested as the principal amount of such loan and (b) the business day of Holder on which such loan is requested to be made which shall not be less than three (3) days from the date of such notice. The decision whether to honor such loan request and make such loan shall be in the sole discretion of Holder. Holder may treat as made by Maker and rely upon, and Maker shall be bound by, any loan request that Holder in good faith believes to be valid and to have been made in the name or on behalf of Maker by any officer of Maker, and Holder shall not incur any liability to Maker or any other person as a direct or indirect result of honoring such loan request and making such loan.

7.  Events of Default/Remedies. At the option of Holder, all amounts outstanding under this Note shall become immediately due and payable in full, without further presentment, protest, notice, or demand, upon the happening of any Event of Default. Upon the occurrence of an Event of Default, Holder shall be entitled to exercise any legal or equitable right which he or it may have, and may proceed to protect and enforce its rights by any other appropriate proceedings. The following events shall constitute "Events of Default" under this Note:

   a. *Nonpayment.* Failure of Maker to make any payment of any type within fifteen (15) days after the same becomes due and payable.

   b. *Financial Difficulties.* Financial difficulties of Maker as evidenced by:

      i.  the filing of a voluntary or involuntary petition in bankruptcy, or under any chapters of the Bankruptcy Code, or under any federal or state statute providing for the relief of debtors;

      ii.  making an assignment for the benefit of creditors;

      iii.  consenting to the appointment of a trustee or receiver for all or a major part of any of Maker's property;

      iv.  the entry of a court order appointing a receiver or a trustee for all or a major part of Maker's property; or

      v.  the admission by Maker in writing of the Maker's inability to pay its debts as they become due.

   c. *Change of Control.* Maker enters into any agreement pursuant to which Maker will sell all or substantially all of the assets of Maker, or upon the closing of any transaction or series of related transactions in which more than fifty percent (50%) of the issued and outstanding shares of capital stock of the Maker are issued to, or acquired by, any one or more persons or entities who are not shareholders of the Maker as of the date of this Note.

   d. *Cease Operations.* Maker ceases all ongoing business operations.

   e. *Sale of Eber-Connecticut, LLC.* Eber-Connecticut, LLC ("Eber-CT")

134782 1237719.1

EB-00025481

enters into any agreement pursuant to which Eber-CT will sell all or substantially all of the assets of Eber-CT, or upon the closing of any transaction or series of related transactions in which more than fifty percent (50%) of the issued and outstanding units of membership interest of the Maker are issued to, or acquired by, any one or more persons or entities who are not controlled by or under common control with the Maker.

8. Expenses. Maker shall pay to Holder all amounts incurred by Holder, including without limitation attorneys' fees and disbursements, in order to collect any amount due under this Note, to negotiate or document a workout or restructuring, or to preserve its rights hereunder, whether or not any legal proceeding ins commenced.

9. Holder's Records Conclusive. Holder shall maintain a record of the date and original principal amount of each advance made by him hereunder and the date and amount of each payment to be applied to the outstanding principal amount of this Note. Such records shall be conclusive evidence of the outstanding principal amount under this Note and of all advances hereunder, absent manifest error. No failure by Holder to make any such annotation in its records shall affect Maker's obligation to pay the principal and interest of each advance or any other obligation of Maker hereunder.

10. Subordination. All amounts outstanding under this Note are subordinate to any and all amounts owed by the Maker to The Canandaigua National Bank and Trust Company.

11. Miscellaneous. The terms of this Note cannot be changed, nor may this Note be discharged in whole or in part, except by a writing executed by Holder. No delay or omission by Holder in exercising any rights hereunder shall operate as a waiver of such rights. This Note shall be governed by and construed under the laws of the State of New York.

IN WITNESS WHEREOF, Maker has duly executed this Note as of the day and year first above written.

EBER BROS. WINE & LIQUOR METRO, INC.

By: _____
Lester Eber, Chief Executive Officer

By: _____
Wendy Eber, Chief Financial Officer

Accepted:

_____
Lester Eber

134782 1237719.1

3

EB-00025482

# EXHIBIT "C"

EB-00025483

## GUARANTY

THIS GUARANTY is executed as of February 26, 2010 by EBER BROS. WINE AND LIQUOR CORPORATION ("Parent" or the "Guarantor") in favor of LESTER EBER (the "Lender").

1.   THE GUARANTY.   For valuable consideration, Guarantor hereby unconditionally guarantees and promises to pay promptly to Lender, or order, in lawful money of the United States, any and all Indebtedness to Lender when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. This Guaranty is cumulative and does not supersede any other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor.

2.   DEFINITIONS.

(a)   "Borrower" shall mean Eber Bros. Wine & Liquor Metro, Inc., a New York corporation.

(b)   "Indebtedness" shall mean any and all debts, liabilities, and obligations of Borrower and Guarantor to Lender arising under the Transaction Documents, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Lender by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Lender for its own account or as agent for another or others, whether Borrower or Guarantor may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, any and all obligations of Borrower and Guarantor to Lender for reasonable attorneys' fees and all other costs and expenses incurred by Lender in the collection or enforcement of any debts, liabilities, and obligations of Borrower and Guarantor to Lender.

(c)   "Note" means that certain Line of Credit Note dated as of February 26, 2010 executed by Borrower in favor of the Secured Party in the maximum principal amount of $1,500,000, as amended, restated, supplemented or otherwise modified from time to time.

(d)   "Security Agreement" means the Security Agreement dated as of the date hereof executed by the Borrower and Guarantor in favor of Lender, as amended, restated, supplemented or otherwise modified from time to time.

(e)   "Transaction Documents" means the Note, the Guaranty and each other document, instrument and agreement executed in connection therewith.

-Doc# 1142695-

EB-00025484

Capitalized terms used but not defined herein have the meanings given such terms in the Note or the Guaranty, as applicable.

3.    OBLIGATIONS INDEPENDENT.  The obligations of Guarantor are independent of the obligations of Borrower or any other guarantor, and a separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or any other guarantor or whether Borrower or any other guarantor be joined in any such action or actions.  Anyone executing this Guaranty shall be bound by its terms without regard to execution by anyone else.

4.    RIGHTS OF LENDER.  Guarantor authorizes Lender, without notice or demand and without affecting its liability hereunder, from time to time to:

(a)    make additional advances on the Indebtedness or renew, compromise, extend, accelerate, or otherwise change the time for payment, or otherwise change the terms, of the Indebtedness or any part thereof, including increase or decrease of the rate of interest thereon, or otherwise change the terms of any Transaction Documents;

(b)    receive and hold security for the payment of this Guaranty or any Indebtedness and exchange, enforce, waive, release, fail to perfect, sell, or otherwise dispose of any such security;

(c)    apply such security and direct the order or manner of sale thereof as Lender in its discretion may determine; and

(d)    release or substitute any guarantor or any one or more of any endorsers or other guarantors of any of the Indebtedness.

5.    GUARANTY TO BE ABSOLUTE.  Guarantor agrees that until the Indebtedness has been paid in full and any commitments of Lender or facilities provided by Lender with respect to the Indebtedness have been terminated, Guarantor shall not be released by or because of the taking, or failure to take, any action that might in any manner or to any extent vary the risks of Guarantor under this Guaranty or that, but for this paragraph, might discharge or otherwise reduce, limit, or modify Guarantor's obligations under this Guaranty.  Guarantor waives and surrenders any defense to any liability under this Guaranty based upon any such action, including but not limited to any action of Lender described in the immediately preceding paragraph of this Guaranty.  It is the express intent of Guarantor that Guarantor's obligations under this Guaranty are and shall be absolute and unconditional.

-Doc# 1142695-

- 2 -

EB-00025485

6.   GUARANTOR'S WAIVERS OF CERTAIN RIGHTS AND CERTAIN DEFENSES. Guarantor waives:

(a)   any right to require Lender to proceed against Borrower or any other Guarantor, proceed against or exhaust any security for the Indebtedness, or pursue any other remedy in Lender's power whatsoever;

(b)   any defense arising by reason of any disability or other defense of Borrower, or the cessation from any cause whatsoever of the liability of Borrower;

(c)   any defense based on any claim that Guarantor's obligations exceed or are more burdensome than those of Borrower or any other Guarantor; and

(d)   the benefit of any statute of limitations affecting Guarantor's liability hereunder.

No provision or waiver in this Guaranty shall be construed as limiting the generality of any other waiver contained in this Guaranty.

7.   WAIVER OF SUBROGATION. Guarantor forever waives to the extent permitted by applicable law any right of subrogation, reimbursement, indemnification, and contribution (contractual, statutory, or otherwise) including, without limitation, any claim or right of subrogation under the Bankruptcy Code (Title 11, United States Code) or any successor statute (the "Bankruptcy Code"), arising from the existence or performance of this Guaranty, and Guarantor waives to the extent permitted by applicable law any right to enforce any remedy that Lender now has or may hereafter have against Borrower or any other Guarantor, and waives any benefit of, and any right to participate in, any security now or hereafter held by Lender.

8.   WAIVER OF NOTICES. Guarantor waives all presentments, demands for performance, notices of nonperformance, protests, notices of protest, notices of dishonor, notices of intent to accelerate, notices of acceleration, notices of any suit or any other action against Borrower or any other person, any other notices to any party liable on any Transaction Document, notices of acceptance of this Guaranty, notices of the existence, creation, or incurring of new or additional Indebtedness to which this Guaranty applies, or any other Indebtedness of Borrower to Lender, and notices of any fact that might increase Guarantor's risk.

9.   SECURITY. To secure all of Guarantor's obligations hereunder, Guarantor assigns and grants to Lender a security interest in all moneys, securities, and other property of Guarantor now or hereafter in the possession of Lender and all proceeds thereof. Upon default or breach of any of Guarantor's obligations to Lender, Lender may apply any of the foregoing to reduce the Indebtedness and may foreclose any collateral as provided in the Uniform Commercial Code as in effect in any applicable jurisdiction and in any security agreement between Lender and Guarantor.

10.   SUBORDINATION. Any obligations of Borrower to Guarantor now or hereafter existing are hereby subordinated to the Indebtedness. In addition to Guarantor's waiver

- 5 -

DOC# [1426576]

EB-00025486

of any right of subrogation as set forth in this Guaranty with respect to any obligations of Borrower to Guarantor as subrogee of Lender, Guarantor agrees that, if Lender so requests, Guarantor shall not demand, take, or receive from Borrower, by setoff or in any other manner, payment of any other obligations of Borrower to Guarantor until the Indebtedness has been paid in full and any commitments of Lender or facilities provided by Lender with respect to the Indebtedness have been terminated. If any payments are received by Guarantor in violation of such waiver or agreement, such payments shall be received by Guarantor as trustee for Lender and shall be paid over to Lender on account of the Indebtedness, but without reducing or affecting in any manner the liability of Guarantor under the other provisions of this Guaranty. Any security interest, lien, or other encumbrance that Guarantor may now or hereafter have on any property of Borrower is hereby subordinated to any security interest, lien, or other encumbrance that Lender may have on any such property.

## 11.   REVOCATION OF GUARANTY.

(a)   This Guaranty may be revoked at any time by Guarantor in respect to future transactions. Such revocation shall be effective upon actual receipt by Lender, at the address for notices provided herein or at such other address as may have been provided to Guarantor by Lender, of written notice of revocation. Revocation shall not affect any of Guarantor's obligations or Lender's rights with respect to transactions committed or entered into prior to Lender's receipt of such notice, regardless of whether or not the Indebtedness related to such transactions, before or after revocation, has been incurred, renewed, compromised, extended, accelerated, or otherwise changed as to any of its terms, including time for payment or increase or decrease of the rate of interest thereon, and regardless of any other act or omission of Lender authorized hereunder. Revocation by Guarantor shall not affect any obligations of any other guarantor.

(b)   Guarantor acknowledges and agrees that this Guaranty may be revoked only in accordance with the foregoing provisions of this paragraph and shall not be revoked simply as a result of any change in name, location, or composition or structure of Borrower, the dissolution of Borrower, or the termination, increase, decrease, or other change of any personnel or owners of Borrower.

12.   REINSTATEMENT OF GUARANTY.   If this Guaranty is revoked, returned, or canceled, and subsequently any payment or transfer of any interest in property by Borrower or Guarantor to Lender is rescinded or must be returned by Lender to Borrower or Guarantor, this Guaranty shall be reinstated with respect to any such payment or transfer, regardless of any such prior revocation, return, or cancellation.

13.   STAY OF ACCELERATION. In the event that acceleration of the time for payment of any of the Indebtedness is stayed upon the insolvency, bankruptcy, or reorganization of Borrower or otherwise, all such Indebtedness guaranteed by Guarantor shall nonetheless be payable by Guarantor immediately if requested by Lender.

- 4 -

~Doc# 1142695~

EB-00025487

14.   NO SETOFF OR DEDUCTIONS; TAXES.   All payments made by Guarantor hereunder will be to Lender at its designated address, in immediately available funds and shall be made without setoff, counterclaim, or other defense. All such payments will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction (other than the United States) or by any political subdivision or taxing authority thereof or therein (other than of the United States) with respect to such payments (but excluding, any tax imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein measured by or based on the net income or net profits of Lender) (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "Taxes"). If any Taxes are so levied or imposed, Guarantor agrees to pay the full amount of such Taxes, and such additional amounts as may be necessary so that every payment of all amounts due under this Guaranty after withholding or deduction for or on account of any Taxes, will not be less than the amount provided for herein. Guarantor will furnish to Lender as promptly as possible after the date the payment of any Taxes is due pursuant to applicable law certified copies of tax receipts evidencing such payment by Guarantor.

15.   INFORMATION RELATING TO BORROWER.   Guarantor acknowledges and agrees that it has made such independent examination, review, and investigation of the Transaction Documents as Guarantor deems necessary and appropriate, including, without limitation, any covenants pertaining to Guarantor contained therein, and shall have sole responsibility to obtain from Borrower any information required by Guarantor about any modifications thereto. Guarantor further acknowledges and agrees that it shall have the sole responsibility for, and has adequate means of, obtaining from Borrower such information concerning Borrower's financial condition or business operations as Guarantor may require, and that Lender has no duty, and Guarantor is not relying on Lender, at any time to disclose to Guarantor any information relating to the business operations or financial condition of Borrower.

16.   BORROWER'S AUTHORIZATION.   It is not necessary for Lender to inquire into the powers of Borrower or of the officers, directors, partners, members, managers, or agents acting or purporting to act on its behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed hereunder, subject to any limitations on Guarantor's liability set forth herein.

17.   REMEDIES.   If Guarantor fails to fulfill its duty to pay all indebtedness guaranteed hereunder, Lender shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law. Without limiting the foregoing to the extent permitted by law, Lender may, at its option and without notice or demand:

(a)   declare any indebtedness due and payable at once;

(b)   take possession of any collateral pledged by Borrower or Guarantor, wherever located, and sell, resell, assign, transfer, and deliver all or any part of the collateral at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith Lender may impose reasonable conditions upon any such sale,

- 5 -

Doc# 114493

EB-00025488

Further, Lender, unless prohibited by law the provisions of which cannot be waived, may purchase all or any part of the collateral to be sold, free from and discharged of all trusts, claims, rights of redemption and equities of Borrower or Guarantor whatsoever. Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker, or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided herein; and

(c) set off against any or all liabilities of Guarantor all money owed by Lender or any of its agents or affiliates in any capacity to Guarantor, whether or not due, and also set off against all other liabilities of Guarantor to Lender all money owed by Lender in any capacity to Guarantor. If exercised by Lender, Lender shall be deemed to have exercised such right of setoff and to have made a charge against any such money immediately upon the occurrence of such default although made or entered on the books subsequent thereto.

18.   NOTICES.  Any notice, demand, request, waiver or other communication required by any provision of this Guaranty shall be in writing and may be delivered by personal service, sent by facsimile with confirmation of receipt, sent by a nationally recognized overnight delivery services or sent by registered or certified mail, return receipt requested, with postage thereon fully repaid. All such communications shall be addressed as follows:

To Guarantor:

Eber Bros. Wine And Liquor Corporation.
155 Paragon Drive
Rochester, New York 14625
Attn: _____
Facsimile: _____

To Lender:

Lester Eber
155 Paragon Drive
Rochester, New York 14625
Attn: _____
Facsimile: _____

Notices sent by (a) first class mail shall be deemed delivered on the earlier of actual receipt or on the fourth business day after deposit in the U.S. mail, postage prepaid, (b) overnight courier shall be deemed delivered on the next business day, and (c) telecopy shall be deemed delivered when transmitted.

19.   SUCCESSORS AND ASSIGNS.  This Guaranty (a) binds Guarantor and Guarantor's successors and assigns, provided that Guarantor may not assign its rights or obligations under this Guaranty without the prior written consent of Lender, and (b) inures to the benefit of Lender and Lender's indorsees, successors, and assigns. Lender may, without notice to Guarantor and without affecting Guarantor's obligations hereunder, sell, assign, grant

- 6 -

EB-00025489

participations in, or otherwise transfer to any other person, firm, or corporation the Indebtedness and this Guaranty, in whole or in part. Guarantor agrees that Lender may disclose to any assignee or purchaser, or any prospective assignee or purchaser, of all or part of the Indebtedness any and all information in Lender's possession concerning Guarantor, this Guaranty, and any security for this Guaranty.

20. AMENDMENTS, WAIVERS, AND SEVERABILITY. No provision of this Guaranty may be amended or waived except in writing. No failure by Lender to exercise, and no delay in exercising, any of its rights, remedies, or powers shall operate as a waiver thereof, and no single or partial exercise of any such right, remedy, or power shall preclude any other or further exercise thereof or the exercise of any other right, remedy, or power. The unenforceability or invalidity of any provision of this Guaranty shall not affect the enforceability or validity of any other provision of this Guaranty.

21. COSTS AND EXPENSES. Guarantor agrees to pay all reasonable attorneys' fees to the extent permitted by applicable law, and all other costs and expenses that may be incurred by Lender (a) in the enforcement of this Guaranty or (b) in the preservation, protection, or enforcement of any rights of Lender in any case commenced by or against Guarantor or Borrower under the Bankruptcy Code.

22. GOVERNING LAW AND JURISDICTION. This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of laws principles which would require the application of the laws of a different state.

23. CONSENT TO JURISDICTION. GUARANTOR, AND LENDER BY ACCEPTING THIS GUARANTY, HEREBY AGREE THAT THE FEDERAL COURT OF THE WESTERN DISTRICT OF NEW YORK OR, AT THE OPTION OF LENDER, ANY COURT LOCATED IN THE STATE OF NEW YORK SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN GUARANTOR AND LENDER PERTAINING DIRECTLY OR INDIRECTLY TO THIS GUARANTY OR ANY OTHER CAUSE OR DISPUTE WHATSOEVER BETWEEN GUARANTOR AND LENDER OF ANY KIND OR NATURE. GUARANTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURTS, HEREBY WAIVING PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREEING THAT SERVICE OF SUCH SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED ADDRESSED TO GUARANTOR AT THE ADDRESS OF GUARANTOR FOR NOTICES SET FORTH HEREIN. SHOULD GUARANTOR FAIL TO APPEAR OR ANSWER ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THIRTY DAYS AFTER THE MAILING THEREOF, IT SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED AGAINST IT AS PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS. THE CHOICE OF FORUM SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE BRINGING OF ANY ACTION BY LENDER OR THE ENFORCEMENT BY LENDER OF ANY JUDGMENT OBTAINED IN SUCH FORUM IN ANY OTHER APPROPRIATE JURISDICTION. FURTHER, GUARANTOR HEREBY

- 7 -

EB-00025490

WAIVES THE RIGHT TO ASSERT THE DEFENSE OF FORUM NON CONVENIENS AND THE RIGHT TO CHALLENGE THE VENUE OF ANY COURT PROCEEDING.

24. WAIVER OF JURY TRIAL. GUARANTOR AND LENDER EACH WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS AGREEMENT OR ANY TRANSACTION DOCUMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. GUARANTOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST LENDER OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

25. LIMITATION ON GUARANTOR LIABILITY.

(a)    It is the intent of Guarantor and Lender that Guarantor's maximum liability hereunder shall be (and shall not be in excess of):

(i)    (x)    in a Proceeding commenced by or against Guarantor under the Bankruptcy Code on or within one year from the date on which any of the Indebtedness is incurred, the maximum amount which would not otherwise cause the Indebtedness (or any other obligations of Guarantor to Lender) to be avoidable or unenforceable against Guarantor under (A) Section 548 of the Bankruptcy Code or (B) any state fraudulent transfer or fraudulent conveyance act or statute applied in such case or proceeding by virtue of Section 544 of the Bankruptcy Code; or

(y)    in a Proceeding commenced by or against Guarantor under the Bankruptcy Code subsequent to one year from the date on which any of the Indebtedness is incurred, the maximum amount which would not otherwise cause the Indebtedness (or any other obligations of Guarantor to Lender) to be avoidable or unenforceable against Guarantor under any state fraudulent transfer or fraudulent conveyance act or statute applied in any such case or proceeding by virtue of Section 544 of the Bankruptcy Code; or

(z)    in a Proceeding commenced by or against Guarantor under any law, statute or regulation other than the Bankruptcy Code (including, without limitation, any other bankruptcy, reorganization, arrangement, moratorium, readjustment of debt, dissolution, liquidation or similar debtor relief laws), the maximum amount which would not otherwise cause the Indebtedness (or any other obligations of Guarantor to Lender) to be avoidable or unenforceable against Guarantor under such law, statute

~Doc# 1142695~

- 8 -

EB-00025491

or regulation including, without limitation, any state fraudulent transfer or fraudulent conveyance act or statute applied in any such case or proceeding.

The substantive laws under which the possible avoidance or unenforceability of the Indebtedness (or any other obligations of Guarantor to Lender) shall be determined in any such case or proceeding shall hereinafter be referred to as the "Avoidance Provisions."

(ii)     To the end set forth in Section 25(a)(i), but only to the extent that the Indebtedness would otherwise be subject to avoidance under the Avoidance Provisions, if Guarantor is not deemed to have received valuable consideration, fair value or reasonably equivalent value for the Indebtedness, or if the Indebtedness would render Guarantor insolvent, or leave Guarantor with an unreasonably small capital to conduct its business, or cause Guarantor to have incurred debts (or to have intended to have incurred debts) beyond its ability to pay such debts as they mature, in each case as of the time any of the Indebtedness are deemed to have been incurred under the Avoidance Provisions, the maximum Indebtedness for which Guarantor shall be liable hereunder shall be reduced to that amount which, after giving effect thereto, would not cause the Indebtedness (or any other obligations of Guarantor to Lender), as so reduced, to be subject to avoidance under the Avoidance Provisions.

(iii)     This Section 25(a) shall be applicable only in connection with a Proceeding brought by or against Guarantor and is intended solely to preserve the rights of Lender hereunder to the maximum extent that would not cause the Indebtedness of Guarantor to be subject to avoidance under the Avoidance Provisions in connection with any such Proceeding. Neither Guarantor nor any other person or entity shall have any right or claim under this Section 25(a) against Lender that would not otherwise be available to Guarantor or such other person or entity outside of any Proceeding.

For the purposes of the this Section, "Proceeding" means any of the following: (a) the Borrower or Guarantor shall commence a voluntary case concerning itself under the Bankruptcy Code, or any other applicable bankruptcy laws; (b) any involuntary case is commenced against the Borrower or Guarantor; or a custodian (as defined in the Bankruptcy Code or any other applicable bankruptcy laws) is appointed for, or takes charge of, all or any substantial part of the property of the Borrower or Guarantor; (c) the Borrower or Guarantor commences any other proceedings under any reorganization arrangement, adjustment of debt, relief of debtor, dissolution, insolvency or liquidation or similar law of any jurisdiction whether now or hereafter in effect relating to the Borrower or Guarantor, or any such proceeding is commenced against the Borrower or Guarantor, or the Borrower or Guarantor is adjudicated insolvent or bankrupt; (d) any order of relief or other order approving any such case or proceeding is entered; (e) the Borrower or Guarantor suffers any appointment of any custodian or the like for it or any substantial part of its property; (f) the Borrower or Guarantor makes a general assignment for the benefit of creditors; (g) the Borrower or Guarantor shall fail to pay, or shall state that it is unable to pay, or shall be unable to pay, its debts generally as they become due; (h) the Borrower or

- 9 -

-Doc# 1142695-

Guarantor shall call a meeting of its creditors with a view to arranging a composition or adjustment of its debts; (i) the Borrower or Guarantor shall by any act or failure to act indicate its consent to, approval of or acquiescence in any of the foregoing; or (j) any corporate action shall be taken by the Borrower or Guarantor for the purpose of effecting any of the foregoing.

26.   FINAL AGREEMENT.   BY SIGNING THIS GUARANTY EACH PARTY REPRESENTS AND AGREES THAT:  (A) THIS GUARANTY REPRESENTS THE FINAL AGREEMENT BETWEEN PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS GUARANTY SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS GUARANTY MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

[SIGNATURES NEXT PAGE]

-Doc# 1142695-

- 10 -

EB-00025493

IN WITNESS WHEROF, the parties have executed this Agreement as of the date first set forth above.

EBER   BROS.   WINE   AND   LIQUOR
CORPORATION

By: _Wendy Eber_

Title: _CEO_

(Seal)

_Lester Eber_

LESTER EBER

- 11 -

~Doc# 1142695~

EB-00025494

# EXHIBIT "D"

EB-00025495

# SECURITY AGREEMENT

THIS SECURITY AGREEMENT (this "Agreement") is made and entered into as of _Cesvary 26_, 2010 by EBER BROS. WINE AND LIQUOR CORPORATION ("Parent") and EBER BROS. WINE & LIQUOR METRO, INC. ("Metro"; Parent and Metro, individually and collectively, "Debtor") in favor of LESTER EBER ("Secured Party").

1.   THE SECURITY.  Debtor hereby assigns and grants to Secured Party a security interest in the following described property now owned or hereafter acquired by Debtor ("Collateral"):

(a) .   All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles, including all amounts due to Debtor from a factor; and all returned or repossessed goods which; on sale or lease, resulted in an account or chattel paper.

(b)   All inventory, including all materials, work in process and finished goods.

(c)   All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by Debtor.

(d)   All of Debtor's deposit accounts. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

(e)   All instruments, notes, chattel paper, documents, certificates of deposit, securities and investment property of every type. The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing.

(f)   All general intangibles, including, but not limited to, (i) all patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems.   The Collateral shall include all good will connected with or symbolized by any of such general intangibles; all contract rights, documents, applications, licenses, materials and other matters related to such general intangibles; all tangible property embodying or incorporating any such general intangibles; and all chattel paper and instruments relating to such general intangibles.

(g)   The shares of common stock and preferred stock, or partnership, membership and other ownership interests, now or hereafter owned by Debtor, including, without limitation, any membership interest in Eber-Connecticut, LLC now or hereafter

~Doc# 1142395~

EB-00025496

owned, directly or indirectly, by Metro and Parent and any ownership interests in Metro now or hereafter owned by Parent (collectively, the "Pledged Equity"), and all certificates evidencing the same, together with, in each case, all shares, securities, monies or property representing a dividend on any of the Pledged Equity, or representing a distribution or return of capital upon or in respect of the Pledged Equity, or resulting from a split up, revision, reclassification or other like change of the Pledged Equity or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Equity (the Pledged Equity, together with all other certificates, shares, securities, properties, ownership interests, or moneys, dividends, distributions, returns of capital subscription, warrants, rights or options as may from time to time be pledged hereunder pursuant to this clause being herein collectively called the "Equity Collateral").

(h)     All negotiable and nonnegotiable documents of title covering any Collateral.

(i)     All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

(j)     All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral, and all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the Collateral and sums due from a third party which has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(k)     All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("Books and Records").

2.     INDEBTEDNESS. The Collateral secures all Indebtedness.

"Guaranty" means that certain Guaranty dated as of the date hereof executed by the Metro in favor of Secured Party, as amended, restated, supplemented or otherwise modified from time to time.

"Indebtedness" means any and all debts, liabilities, and obligations of Debtor to Secured Party arising under the Transaction Documents, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Secured Party by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Secured Party for its own account or as agent for another or others, whether Debtor may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter

-Doc# 1142595-

EB-00025497

become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, any and all obligations of Debtor to Secured Party for reasonable attorneys' fees and all other costs and expenses incurred by Secured Party in the collection or enforcement of any debts, liabilities, and obligations of Debtor to Secured Party.

"**Note**" means that certain Line of Credit Note dated as of _Feb 26, 2010_ executed by Metro in favor of Secured Party in the maximum principal amount of $1,500,000 as amended, restated, supplemented or otherwise modified from time to time.

"**Transaction Documents**" means the Note, the Guaranty, this Agreement and each other document, instrument and agreement executed in connection therewith.

Capitalized terms used but not defined herein have the meanings given such terms in the Note.

3.       DEBTOR'S COVENANTS. Debtor represents, covenants and warrants that unless compliance is waived by Secured Party in writing:

(a)       Debtor will properly preserve the Collateral; defend the Collateral against any adverse claims and demands; and keep accurate Books and Records.

(b)       Debtor shall give Secured Party at least thirty (30) days notice before changing its chief executive office or state of incorporation or organization. Debtor will notify Secured Party in writing prior to any change in the location of any Collateral, including the Books and Records.

(c)       Debtor will notify Secured Party in writing prior to any change in Debtor's name, identity or business structure.

(d)       Except for liens existing on the date hereof, Debtor has not granted and will not grant any security interest in any of the Collateral except to Secured Party, and will keep the Collateral free of all liens, claims, security interests and encumbrances of any kind or nature except the security interest of Secured Party.

(e)       Debtor will promptly notify Secured Party in writing of any event which materially and adversely affects the value of the Collateral, the ability of Debtor or Secured Party to dispose of the Collateral, or the rights and remedies of Secured Party in relation thereto, including, but not limited to, the levy of any legal process against any Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise.

(f)       Debtor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect Secured Party's security interest (collectively, the "**Collateral Costs**"). Without waiving Debtor's default for failure to make any such payment, Secured Party at its option may

- 3 -

EB-00025498

pay any such Collateral Costs, and discharge encumbrances on the Collateral, and such Collateral Costs payments shall be a part of the Indebtedness and bear interest at the rate set out in the Indebtedness. Debtor agrees to reimburse Secured Party on demand for any Collateral Costs so incurred.

(g)      Until Secured Party exercises its rights to make collection, Debtor will diligently collect all Collateral.

(h)      If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading Debtor shall immediately deliver such document to Secured Party, together with any necessary endorsements.

(i)      Debtor will not sell, lease, agree to sell or lease, or otherwise dispose of any Collateral except with the prior written consent of Secured Party; provided, however, that Debtor may sell inventory in the ordinary course of business.

(j)      Debtor will maintain and keep in force all risk insurance covering the Collateral against fire, theft, liability and extended coverages (including without limitation windstorm coverage and hurricane coverage as applicable), to the extent that any Collateral is of a type which can be so insured. Such insurance shall be in form, amounts, coverages and basis reasonably acceptable to Secured Party, shall require losses to be paid on a replacement cost basis, shall be issued by insurance companies acceptable to Secured Party and, upon request of Secured Party, include a loss payable endorsement in favor of Secured Party in a form acceptable to Secured Party. Upon the request of Secured Party, Debtor will deliver to Secured Party a copy of each insurance policy, or, if permitted by Secured Party, a certificate of insurance listing all insurance in force.

(k)      Debtor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless Debtor first obtains the written consent of any owner, holder of any lien on the real property or fixture, or other person having an interest in such property to the removal by Secured Party of the Collateral from such real property or fixture. Such written consent shall be in form and substance acceptable to Secured Party and shall provide that Secured Party has no liability to such owner, holder of any lien, or any other person.

(l)      Exhibit A to this Agreement is a complete list of all patents, trademark and service mark registrations, copyright registrations, mask work registrations, and all applications therefor, in which Debtor has any right, title, or interest, throughout the world. Debtor will promptly notify Secured Party of any acquisition (by adoption and use, purchase, license or otherwise) of any patent, trademark or service mark registration, copyright registration, mask work registration, and applications therefor, and unregistered trademarks and service marks and copyrights, throughout the world, which are granted or filed or acquired after the date hereof or which are not listed on the Exhibit. Debtor authorizes Secured Party, without notice to Debtor, to modify this Agreement by amending the Exhibit to include any such Collateral.

- 4 -

EB-00025499

(m)     Debtor will, at its expense, diligently prosecute all patent, trademark or service mark or copyright applications pending on or after the date hereof, will maintain in effect all issued patents and will renew all trademark and service mark registrations, including payment of any and all maintenance and renewal fees relating thereto, except for such patents, service marks and trademarks that are being sold, donated or abandoned by Debtor pursuant to the terms of its intellectual property management program. Debtor will at its expense protect and defend all rights in the Collateral against any material claims and demands of all persons and will, at its expense, enforce all rights in the Collateral against any and all infringers of the Collateral where such infringement would materially impair the value or use of the Collateral to Debtor or Secured Party. Debtor will not license or transfer any of the Collateral, except for such non-exclusive licenses as are customary in the ordinary course of Debtor's business, or except with Secured Party's prior written consent.

4.     ADDITIONAL REQUIREMENTS. Debtor agrees that Secured Party may at its option at any time, whether or not Debtor is in default:

(a)     Require Debtor to deliver to Secured Party (i) copies of or extracts from the Books and Records, and (ii) information on any contracts or other matters affecting the Collateral.

(b)     Examine the Collateral, including the Books and Records, and make copies of or extracts from the Books and Records, and for such purposes enter at any reasonable time upon the property where any Collateral or any Books and Records are located.

(c)     Require Debtor to deliver to Secured Party any instruments, chattel paper or letters of credit which are part of the Collateral, and to assign to Secured Party the proceeds of any such letters of credit.

(d)     Notify any account debtors, any buyers of the Collateral, or any other persons of Secured Party's interest in the Collateral.

5.     DEFAULTS.  Any one or more of the following shall be a default hereunder:

(a)     Debtor breaches any term, provision, warranty or representation under this Agreement, or under any other obligation of Debtor to Secured Party, and such breach remains uncured after any applicable cure period.

(b)     Secured Party fails to have a perfected and enforceable lien on or security interest in the Collateral.

(c)     Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

- 5 -

~Doc# 1142595~

EB-00025500

(d)    Debtor has given Secured Party any false or misleading information or representations.

(e)    A default or Event of Default occurs under the Note, the Guaranty or any other Transaction Document.

6.    SECURED PARTY'S REMEDIES AFTER DEFAULT. In the event of any default, Secured Party may do any one or more of the following, to the extent permitted by law:

(a)    Declare any Indebtedness immediately due and payable, without notice or demand.

(b)    Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

(c)    Enforce the security interest of Secured Party in any account of Debtor maintained with Secured Party by applying such account to the Indebtedness.

(d)    Require Debtor to obtain Secured Party's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral consisting of inventory.

(e)    Require Debtor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Secured Party in kind.

(f)    Require Debtor to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under Secured Party's exclusive control.

(g)    Require Debtor to assemble the Collateral, including the Books and Records, and make them available to Secured Party at a place designated by Secured Party.

(h)    Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of Debtor's equipment, if Secured Party deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(i)    Demand and collect any payments on and proceeds of the Collateral. In connection therewith Debtor irrevocably authorizes Secured Party to endorse or sign Debtor's name on all checks, drafts, collections, receipts and other

- 6 -

~Doc# 1142595~

EB-00025501

documents, and to take possession of and open the mail addressed to Debtor and remove therefrom any payments and proceeds of the Collateral.

(j)     Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to Debtor.

(k)     Use or transfer any of Debtor's rights and interests in any Intellectual Property now owned or hereafter acquired by Debtor, if Secured Party deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. Debtor agrees that any such use or transfer shall be without any additional consideration to Debtor. As used in this paragraph, "Intellectual Property" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which Debtor has any right or interest, whether by ownership, license, contract or otherwise.

(l)     Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. Debtor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(m)     Take such measures as Secured Party may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and Debtor hereby irrevocably constitutes and appoints Secured Party as Debtor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(n)     Without notice or demand to Debtor, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by Secured Party or any of Secured Party's agents or affiliates to or for the credit of the account of Debtor or any guarantor or endorser of Debtor's Indebtedness.

(o)     Assign, sell or otherwise dispose of and deliver all or any part of the Equity Collateral, at public or private sale or otherwise, either with or without special conditions or stipulations, for cash or on credit or for future delivery, in such other consideration and at such time or times and at such place or places, and upon such terms and conditions as shall be commercially reasonable and in accordance with all applicable laws.

(p)     Exercise any other remedies available to Secured Party at law or in equity.

The proceeds of any sale, lease or other disposition of the Collateral hereunder shall be applied first, to the expenses of retaking, holding, storing, processing and

- 7 -

~Doc# 1142595~

EB-00025502

preparing for sale, selling, and the like (including, without limitation, any taxes, fees and other costs incurred in connection therewith) of the Collateral, second, to the attorneys' fees and expenses, and then to satisfaction of the Indebtedness to the Secured Party (in such manner as Secured Party shall elect in its discretion), and to the payment of any other amounts required by applicable law.

Debtor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "1933 Act") and applicable state securities laws, Secured Party may be compelled, with respect to any sale of all or any part of the Equity Collateral conducted without prior registration or qualification of such Equity Collateral under the 1933 Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Equity Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Debtor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the 1933 Act) and, notwithstanding such circumstances, Debtor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Equity Collateral for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the 1933 Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.

For the purpose of enabling Secured Party, during the continuance of an Event of Default, to exercise rights and remedies under this Section at such time as Secured Party shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, Debtor hereby grants to Secured Party, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to Debtor) to use, license or sublicense any of the Intellectual Property now owned or hereafter acquired by Debtor, wherever the same may be located.

7.    ENVIRONMENTAL MATTERS.

(a)    Debtor represents and warrants: (i) it is not in violation of any health, safety, or environmental law or regulation regarding hazardous substances and (ii) it is not the subject of any claim, proceeding, notice, or other communication regarding hazardous substances. "Hazardous substances" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

(b)    Debtor shall deliver to Secured Party, promptly upon receipt, copies of all notices, orders, or other communications regarding (i) any enforcement

- 8 -

~Doc# 1142595~

EB-00025503

action by any governmental authority relating to health, safety, the environment, or any hazardous substances with regard to Debtor's property, activities, or operations, or (ii) any claim against Debtor regarding hazardous substances.

(c)     Secured Party and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to Debtor, to enter and visit any locations where the Collateral is located for the purposes of observing the Collateral, taking and removing environmental samples, and conducting tests.   Debtor shall reimburse Secured Party on demand for the costs of any such environmental investigation and testing. Secured Party will make reasonable efforts during any site visit, observation or testing conducted pursuant to this paragraph to avoid interfering with Debtor's use of the Collateral. Secured Party is under no duty to observe the Collateral or to conduct tests, and any such acts by Secured Party will be solely for the purposes of protecting Secured Party's security and preserving Secured Party's rights under this Agreement.   No site visit, observation or testing or any report or findings made as a result thereof ("Environmental Report") will (i) result in a waiver of any default of Debtor; (ii) impose any liability on Secured Party; or (iii) be a representation or warranty of any kind regarding the Collateral (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness).  In the event Secured Party has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to Debtor or any other party, Debtor authorizes Secured Party to make such a disclosure.   Secured Party may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in Secured Party's judgment. Debtor further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to Debtor by Secured Party or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of Debtor) by Debtor without advice or assistance from Secured Party.

(d)     Debtor will indemnify and hold harmless Secured Party from any loss or liability Secured Party incurs in connection with or as a result of this Agreement, which directly or indirectly arises out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance.  This indemnity will apply whether the hazardous substance is on, under or about Debtor's property or operations or property leased to Debtor.  The indemnity includes but is not limited to attorneys' fees (including the reasonable estimate of the allocated cost of in-house counsel and staff). The indemnity extends to Secured Party, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys and assigns.

8.     CONSENT TO JURISDICTION.  DEBTOR AND SECURED PARTY HEREBY AGREE THAT THE FEDERAL COURT OF THE WESTERN DISTRICT OF NEW YORK OR, AT THE OPTION OF SECURED PARTY, ANY COURT LOCATED IN THE STATE OF NEW YORK SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN DEBTOR AND SECURED PARTY PERTAINING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER

- 9 -

~Doc# 1142595~

EB-00025504

CAUSE OR DISPUTE WHATSOEVER BETWEEN DEBTOR AND SECURED PARTY OF ANY KIND OR NATURE. DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURTS, HEREBY WAIVING PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREEING THAT SERVICE OF SUCH SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED ADDRESSED TO DEBTOR AT THE ADDRESS OF DEBTOR FOR NOTICES SET FORTH HEREIN. SHOULD DEBTOR FAIL TO APPEAR OR ANSWER ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THIRTY DAYS AFTER THE MAILING THEREOF, IT SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED AGAINST IT AS PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS. THE CHOICE OF FORUM SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE BRINGING OF ANY ACTION BY SECURED PARTY OR THE ENFORCEMENT BY SECURED PARTY OF ANY JUDGMENT OBTAINED IN SUCH FORUM IN ANY OTHER APPROPRIATE JURISDICTION. FURTHER, DEBTOR HEREBY WAIVES THE RIGHT TO ASSERT THE DEFENSE OF FORUM NON CONVENIENS AND THE RIGHT TO CHALLENGE THE VENUE OF ANY COURT PROCEEDING.

9.    WAIVER OF JURY TRIAL. DEBTOR AND SECURED PARTY EACH WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS AGREEMENT, THE NOTE, THE GUARANTY OR ANY TRANSACTION DOCUMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. DEBTOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST SECURED PARTY OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

10.    MISCELLANEOUS.

(a)    Any waiver, express or implied, of any provision hereunder and any delay or failure by Secured Party to enforce any provision shall not preclude Secured Party from enforcing any such provision thereafter.

(b)    Debtor shall, at the request of Secured Party, execute such other agreements, documents, instruments or financing statements in connection with this Agreement as Secured Party may reasonably deem necessary.

- 10 -

~Doc# 1142595~

EB-00025505

(c)   All notes, security agreements, subordination agreements and other documents executed by Debtor or furnished to Secured Party in connection with this Agreement must be in form and substance satisfactory to Secured Party.

(d)   This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of laws principles which would require the application of the laws of a different state.

(e)   All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(f)   All terms not defined herein are used as set forth in the Uniform Commercial Code as in effect in any applicable jurisdiction.

(g)   In the event of any action by Secured Party to enforce this Agreement or to protect the security interest of Secured Party in the Collateral, or to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, Debtor agrees to pay immediately the costs and expenses thereof, together with reasonable attorneys' fees and allocated costs for in-house legal services to the extent permitted by law.

(h)   In the event Secured Party seeks to take possession of any or all of the Collateral by judicial process, Debtor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action.

(i)   This Agreement shall constitute a continuing agreement, applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this Agreement, and if all transactions between Secured Party and Debtor shall be closed at any time, shall be equally applicable to any new transactions thereafter.

(j)   Secured Party's rights hereunder shall inure to the benefit of its successors and assigns. In the event of any assignment or transfer by Secured Party of any of the Indebtedness or the Collateral, Secured Party thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Indebtedness or the Collateral not so assigned or transferred. All representations, warranties and agreements of Debtor if more than one are joint and several and all shall be binding upon the personal representatives, heirs, successors and assigns of Debtor.

(k)   Any notice to be given hereunder shall be given in the manner prescribed in the Guaranty or the Note, as applicable.

- 11 -

-Doc# 1142595-

EB-00025506

11.   FINAL AGREEMENT.  BY SIGNING THIS AGREEMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS AGREEMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS,    OR    SUBSEQUENT    ORAL    AGREEMENTS    OR UNDERSTANDINGS OF THE PARTIES.

~Doc# 1142595~

EB-00025507

IN WITNESS WHEREOF, the parties executed this Agreement as of the date first written above, intending to create an instrument executed under seal.

EBER   BROS.   WINE   AND   LIQUOR CORPORATION

By: _Wendy Eber_

Title: _CEO_

(Seal)

EBER BROS. WINE & LIQUOR METRO, INC.

By: _Wendy Eber_

Title: _CEO_

(Seal)

Accepted:

_Lester Eber_

LESTER EBER

~Doc# 1142595~

- 13 -

EB-00025508

Exhibit A

Intellectual Property

~Doc# 1142595~

EB-00025509

# EXHIBIT "E"

EB-00025510

ASSIGNMENT OF
NOTE AND SECURITY AGREEMENT

THIS ASSIGNMENT OF NOTE AND SECURITY AGREEMENT ("Agreement") is
made as of this 18th day of January, 2012 by and among LESTER EBER ("Assignor") and
ALEXBAY, LLC ("Assignee")(the "Assignment").

RECITALS

WHEREAS, Assignor made loans to Eber Bros. Wine and Liquor Corporation
("EWLC") evidenced in a Promissory Note dated August 15, 2005 in the principal amount of
$1,503,750.00 (the "Original Note"); and

WHEREAS, the Original Note was replaced in its entirety by an Amended and Restated
Promissory Note dated March 13, 2006 in the principal amount of $1,503,750.00 (the "EWLC
Note"); and

WHEREAS, on February 11, 2011, Assignor, EWLC and Eber Bros. Wine and Liquor
Metro, Inc. ("Metro") entered into a Debt Assumption Agreement whereby the obligations of the
EWLC Note were assumed by Metro; and

WHEREAS, Assignor, Metro and EWLC entered into an Amended and Restated Security
Agreement ("Amended and Restated Security Agreement") dated February 11, 2011, granting
Assignor a security interest in certain property to secure payment of the EWLC note, the
principal balance of which at that time was $1,434,710.68, plus accrued and unpaid interest; and

WHEREAS, the Amended and Restated Security Agreement provides that "Secured
Party's rights hereunder shall inure to the benefit of its successors and assigns; " and

WHEREAS, the Guaranty provides that it "inures to the benefit of lender and lender's endorsees, successors and assigns;" and

WHEREAS, the balance presently due pursuant to the Amended and Restated Promissory Note is $1,951,874.26 as of December 31, 2011, including principal and accrued interest together with interest accruing thereafter at the rate of 9% per annum.

NOW, THEREFORE, in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties to this Agreement hereby agree as follows:

1. _Assignment_. Assignee hereby irrevocably grants, assigns and transfers all right, title, interest and benefits he has in and to the EWLC Note, and the Amended and Restated Security Agreement and the obligations set forth therein to Assignee.

2. _Discharge of Assignor from Responsibilities_. As provided in paragraph 10j of the Amended and Restated Security Agreement, the Assignor is hereafter fully discharged from any responsibility with respect to the collateral in which Metro assigned and granted to Assignor in the Security Agreement.

3. _Governing Law_. This Assignment shall be governed by and construed in accordance with the laws of the State of New York without regard to conflict of law principals.

4. _Counterparts_. This Assignment may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instruction.

2

EB-00025512

IN WITNESS WHEREOF, the parties hereto have caused this Assignment to be signed and sealed as of the date first above written.

_____ [L.S.]
Lester Eber

ALEXBAY, LLC

By:_____ [L.S.]
      Lester Eber, its Sole Owner

Acknowledgment of Notice of Assignment.

Eber Bros. Wine & Liquor Metro, Inc. hereby acknowledges that it has received notice of and a copy of the above assignment.

EBER BROS. WINE & LIQUOR METRO, INC.

By_____
      Wendy Eber, its Chief Financial Officer

3

EB-00025513

# EXHIBIT "F"

EB-00025514

Wendy Eber
Chief Financial Officer
Eber Bros. Wine and Liquor Corporation.
155 Paragon Drive
Rochester, NY 14624

Re:   NOTICE TO DEBTOR OF PROPOSAL TO ACCEPT COLLATERAL IN FULL
      SATISFACTION OF AMENDED AND RESTATED PROMISSORY NOTE DATED
      MARCH 13, 2006 IN THE PRINCIPAL AMOUNT OF $1,503,750.00 AND OF THE
      LINE OF CREDIT NOTE DATED FEBRUARY 26, 2010 IN THE MAXIMUM
      AMOUNT OF $1,500,000.00

Alexbay, LLC, the undersigned, of 30 Corporate Drive, North Haven, Connecticut

06473-3254, is the holder of the Amended and Restated Promissory Note dated March 13, 2006

in the principal amount of $1,503,750.00 executed by Eber Bros. Wine and Liquor Corporation

("EWLC")(the "EWLC Note").  Alexbay, LLC is also the holder of the Line of Credit Note

dated February 26, 2010 in the maximum principal amount of $1,500,000.00 (Line of Credit

Note"), executed by Metro, the obligations of which were guaranteed by EWLC pursuant to the

Guaranty dated February 26, 2010 ("Guaranty").  By the Debt Assumption Agreement dated

February 11, 2011, Metro irrevocably assumed all of EWLC's obligations to pay principal,

interest and other obligations and liabilities in respect of the EWLC Note.

Payment of the EWLC Note and the Line of Credit Note are secured by EWLC pursuant

to the Amended and Restated Security Agreement dated February 11, 2011 ("Amended and

Restated Security Agreement") whereby EWLC assigned and granted to the then-holder, Lester

Eber, a security interest in "[t]he shares of common stock, preferred stock, or partnership,

membership and other ownership interest, now or hereafter owned by Debtor..."  The Line of

EB-00025515

Credit Note is also secured by the Security Agreement dated February 26, 2010 ("Security Agreement"), whereby EWLC assigned and granted it to the then-holder, Lester Eber, "[t]he shares of common stock and preferred stock, or partnership, membership and other ownership interests now or hereafter owned by Debtor..."

By assignment of Note and Security Agreement dated January 18, 2012, Lester Eber irrevocably granted, assigned and transferred all right, title, interest and benefits he had in and to the EWLC Note, the Security Agreement and the Amended and Restated Security Agreement to Alexbay, LLC. By Assignment of Line of Credit Note and Security Agreement dated January 18, 2012, Lester Eber irrevocably granted, assigned and transferred all right, title, interest and benefits he had in and to the Line of Credit Note, the Securities, the Guaranty, the Security Agreement and the Amended and Restated Security Agreement to Alexbay, LLC.

The amount due and payable pursuant to the Amended and Restated Promissory Note dated March 13, 2006 is $1,951,874.26, including principal and interest, as of December 31, 2011, plus interest accruing at the rate of nine percent (9%) per annum thereafter. The amount due and payable pursuant to the Line of Credit Note dated February 26, 2010 is $1,698,828.22, including principal and interest, as of December 31, 2011 plus interest accruing at the rate of twelve and one-half percent (12 ½%) per annum thereafter.

EWLC has defaulted and continues to remain in default on payments due under the EWLC Note, Guaranty, the Line of Credit Note, the Security Agreement and the Amended and Restated Security Agreement described above.

Pursuant to N.Y.U.C.C. § 9-620, Alexbay proposes to accept the shares of common stock owned by EWLC in Eber Bros. Wine & Liquor Metro, Inc. ("Metro") in full satisfaction of the

EB-00025516

obligations created by the Amended and Restated Promissory Note, the Line of Credit Note, the Guaranty, the Securities Agreement and the Amended and Restated Security Agreement.

In accordance with N.Y.U.C.C. § 9-620, you must object in writing to this proposal by Alexbay, LLC to accept the common stock in Metro owned by EWLC in full satisfaction of the obligations created by the Note, the Guaranty, the Line of Credit Note, the Security Agreement and the Amended and Restated Security Agreement within twenty (20) days after the date this notification was sent to you.

Your objection to the acceptance by Alexbay, LLC of Metro's membership interest in Eber-Connecticut, LLC must be received by Alexbay, LLC within twenty (20) days of the date this notification was sent at the following address:

    Alexbay, LLC
    30 Corporate Drive
    North Haven, Connecticut  06473-3254

    Dated:  January ___, 2012

                      ALEXBAY, LLC

                By _____
                    Lester Eber, its Sole Member

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

EB-00025517