EXHIBIT P

Exhibit C

## STIPULATION OF DISMISSAL OF DCL ACTION

STATE OF NEW YORK
SUPREME COURT          COUNTY OF MONROE
HARRIS BEACH PLLC,

Plaintiff,

Index No. 2014-13623

v.

EBER BROS. WINE & LIQUOR CORP., ALEXBAY, LLC
F/K/A LESTER EBER, LLC, EBER BROS. WINE &
LIQUOR METRO, INC., AND EBER-CONNECTICUT,
LLC,

Defendants.

### STIPULATION OF DISCONTINUANCE

IT IS HEREBY STIPULATED AND AGREED, by and between the undersigned, the attorneys of record for all parties to the above-entitled action, that whereas no party hereto is an infant, incompetent person for whom a committee has been appointed or conservatee, and no person not a party has an interest in the subject matter of the above-entitled action and third-party action, that the same hereby is discontinued on the merits with prejudice, without costs to any party as against the other. This stipulation may be filed without further notice with the Clerk of the Court. This Stipulation may be executed in any number of counterparts, each of which, when so executed, shall be deemed an original, but all such counterparts shall constitute one and the same agreement.

Dated: October 23, 2015

BOND SCHOENECK AND KING, PLLC

By: _____
    Edward R. Hourihan, Jr. / Ingrid C. Palermo
    350 Linden Oaks
    Suite 310
    Rochester, New York 14625
    (585) 362-4712

_____
Hon. Matthew Rosenbaum

Dated: October 23, 2015

HARRIS BEACH PLLC

By: _____
    Douglas A. Foss
    99 Garnsey Road
    Pittsford, New York 14534
    (585) 419-8612

By: _____
    James Spitz, CEO
    99 Garnsey Road
    Pittsford, New York 14534
    (585) 419-8612

Subject to a **Confidentiality Agreement**

INDEMNIFICATION AGREEMENT dated as of October 23, 2015 (this "Agreement"), between HARRIS BEACH PLLC, a professional limited liability company ("HB" or the "Indemnified Person"), and LESTER EBER ("Lester" or the "Indemnitor").

Reference is made to (a) the Agreement dated as of October 23, 2015, between HB, and Lester and Wendy Eber (the "Principal Agreement"); and (b) the Assignment of Claims dated October 23, 2015, of HB to Lester (the "Assignment of Claims"). Unless otherwise defined herein, defined terms used herein will have the meanings assigned thereto in the Principal Agreement.

1.      In consideration of the Assignment of Claims, and the covenants, representations and warranties of HB set forth in the Principal Agreement, the Indemnitor agrees to indemnify and hold harmless the Indemnified Person (and its current and former lawyers) for the Indemnitor's Share of any Loss. For purposes of this Agreement, (a) "Indemnitor's Share" means 100% of each dollar of Loss; provided, however, that the Indemnitor's liability hereunder shall not exceed $400,000.00; and (b) "Loss" means all or any portion of the $400,000.00 in cash paid by Lester to HB pursuant to Section 2(b)(i) of the Principal Agreement that is required to be paid over, whether in the form of damages, disgorgement or repayment, by HB (or any of its current or former lawyers) to the Pension Benefit Guaranty Corporation (the "PBGC") or any other creditor of Eber Bros, or Alexbay as a result of a claim asserted against HB (or any of its current or former lawyers who receive any thereof from HB) by the PBGC or any other creditor of Eber Bros, or Alexbay arising out of HB's assignment of its claims and/or the consideration tendered in exchange for such assignment pursuant to the Principal Agreement and the Assignment of Claims.

Upon receipt by the Indemnified Person of notice of a proceeding or overtly threatened proceeding (a "Proceeding") against the Indemnified Person (or a current or former HB lawyer) with respect to which indemnity may be sought hereunder, the Indemnified Person will notify the Indemnitor in writing as promptly as practicable, and in any event within ten business days, of receipt thereof. In the event any such Proceeding is brought or threatened against the Indemnified Person (or a current or former HB lawyer), the Indemnitor will be entitled to participate therein and, to the extent it may elect by written notice delivered to the Indemnified Person, to assume the defense thereof with Acceptable Counsel. If the Indemnitor so assumes such defense, the Indemnified Person shall have the right to participate in the defense of such Proceeding with counsel selected by it, subject to the Indemnitor's right to control the defense thereof, in which case the fees and disbursements of such Indemnified Person's counsel shall be at the sole expense of the Indemnified Person. In any event, the Indemnitor and the Indemnified Person shall cooperate with each other in all reasonable respects in connection with the defense of any such Proceeding. If the Indemnitor elects not to defend a Proceeding, fails to promptly notify the Indemnified Person in writing of its election to defend as provided in this Agreement, or fails to diligently prosecute the defense of such Proceeding, the Indemnified Person may pay, compromise, and defend such Proceeding and recover indemnification therefor as provided above. The Indemnitor will not be liable for any settlement of any Proceeding effected by the Indemnified Person (or a current or former HB lawyer) without the Indemnitor's prior written consent. The Indemnitor will not settle any Proceeding without the prior written consent of the Indemnified Person, unless the Indemnified Person (and any current or former HB lawyers who are defendants) would have no financial liability (present, contingent or future) to the other party to such Proceeding with respect to the Indemnitor's Share of any Loss that is not paid by the Indemnitor, and the Indemnified Person (and any current or former HB lawyers who are

defendants) receive a release from the other party to such Proceeding of all financial liability related to the Indemnitor's Share of any Loss to such party, and there is no material adverse impact on HB's business or reputation that would result therefrom. The Indemnitor will not be liable to the Indemnified Person (or a current or former HB lawyer) for expenses incurred by the Indemnified Person in connection with the defense of any Proceeding.

All the Indemnitor's obligations to the Indemnified Party under this paragraph 1 with respect to any current or former HB lawyer are subject to and conditioned on such lawyer complying with HB's obligations under this paragraph 1 with respect to any Proceeding against such lawyer for which indemnity may be sought hereunder.

After the date hereof, HB will inform Lester promptly of the substance of any communication it initiates with, or receives from, the PBGC concerning the subject matter hereof or any of the Defendants.

"Acceptable Counsel" means counsel selected by the Indemnitor, and reasonably acceptable to the Indemnified Person. Any person listed on Schedule A hereto shall be deemed to be acceptable to the Indemnified Person. If the Indemnified Person fails to accept or reject any counsel not on Schedule A within five business days after such counsel is proposed to the Indemnified Person in writing by the Indemnitor, such counsel shall be deemed to be acceptable to the Indemnified Person. Any acceptance, or deemed acceptance, of counsel by the Indemnified Person may not be revoked by the Indemnified Person.

2.    No indemnification will be payable by the Indemnitor with respect to any liability or claim made after the sixth anniversary of this Agreement, provided that once notice of such a liability or claim has been timely given, additional related liabilities or claims arising out of substantially the same circumstances may be made at any time prior to the final resolution of such claims (whether by means of a final, non-appealable judgment or a settlement approved by the parties involved), even if such resolution occurs after the sixth anniversary of this Agreement.

3.    In the event that either party seeks to enforce this Agreement, such party may seek relief in the Supreme Court of the State of New York in and for the County of Monroe. The Indemnitor and the Indemnified Person consent to personal jurisdiction of such court and agree that such court will serve as the exclusive venue for resolution of such dispute. Both parties waive any right to trial by jury. Such dispute will be resolved in accordance with and under the laws of the State of New York, other than New York rules governing choice of law that would call for application of a different state's law.

4.    This Agreement (along with the Principal Agreement and the other agreements and instruments delivered at the Closing pursuant thereto) constitute the entire agreement between the parties with respect to the subject matter hereof and supersede all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof. This Agreement may not be amended or modified, nor may the provisions hereof be waived, except in writing signed by the parties hereto.

5.      This Agreement will be binding upon and inure to the benefit of the parties hereto and, in the case of HB, its successors and permitted assigns, and, in Lester's case, his estate. HB shall be entitled to assign its rights under this Agreement without Lester's consent to any assignee that is a successor to all or substantially all the business and/or assets of HB. Other than as previously provided, no party may assign its rights hereunder without the prior written consent of the other parties hereto. This Agreement is not intended to benefit, or be relied upon by, any third party.  None of the parties to the Collection Action or the DCL Action (other than HB) or Wendy shall have any obligation hereunder or with respect hereto.

HARRIS BEACH PLLC

By: _____

Lester Eber

Name:  James A. Spitz, Jr.
Title:  Authorized Signatory

Address:
15 Coral Way
Rochester, New York 14618

Address:
Harris Beach PLLC
99 Garnsey Road
Pittsford, NY  14534
Attention:  James A. Spitz, Jr.

## AGREEMENT

CONFIDENTIAL

AGREEMENT dated as of October 23, 2015 (this "Agreement"), between HARRIS BEACH PLLC, a professional limited liability company ("HB"), and LESTER EBER ("Lester") and WENDY EBER ("Wendy").

WHEREAS, HB, with an address of 99 Garnsey Road, Pittsford, New York 14534, has asserted a claim against Eber Bros. Wine & Liquor Corp. ("Eber Bros.") for unpaid legal fees and unreimbursed disbursements, plus associated interest and fees, which, as of the date hereof, exceeds $1.2 million, in an action pending in the Supreme Court of the State of New York in and for the County of Monroe under Index No. 11-11436 (the "Collection Action"); and

WHEREAS, HB commenced a second action against Eber Bros., Eber Bros. Wine & Liquor Metro, Inc. ("Eber Metro"), Eber-Connecticut, LLC ("Eber-CT"), and Alexbay, LLC f/k/a Lester Eber, LLC ("Alexbay") (collectively, the "Defendants"), which is pending in the Supreme Court of the State of New York in and for the County of Monroe under Index No. 2014-13623, seeking to set aside a transfer of shares of Eber Metro to Alexbay (the "DCL Action"); and

WHEREAS, Lester, of 15 Coral Way, Rochester, New York 14618, desires to purchase from HB all claims of whatever kind or variety HB may have against the Defendants in the Collection Action; and

WHEREAS, HB is willing to transfer such claims to Lester in return for the consideration set forth herein and on the terms set forth herein;

IN CONSIDERATION of the foregoing, and the mutual covenants and agreements set forth herein, the parties hereto agree as follows:

1.     **Assignment of Claims.** HB hereby agrees to finally and irrevocably assign to Lester all its right, title and interest in all claims it may have now, or may have in the future, against the Defendants in the Collection Action, or Lester or Wendy, or any of their respective employees, officers, directors, shareholders, members or affiliates, including HB's opportunity to recover attorneys' fees, costs, and penalties against Lester and Wendy, jointly and severally, pursuant to an Order dated August 28, 2014, entered in the Collection Action (the "Claims"). Such assignment shall be a quitclaim assignment, without representation, warranty, covenant or promise of any kind or variety and is without recourse to HB, its successors or assigns, except for the warranty contained in Section 4 hereof.  HB offers no covenant, representation or warranty as to: (a) the procedural status of the Claims; (b) the presence or lack of any defense or defenses of any of the Defendants or any other person or entity to any or all of the Claims; or (c) the merit, strength, validity or any other aspect of the Claims, saving the warranty contained in the Section 4 hereof.  Following such assignment, HB will have no further involvement or claim

EB-00017514

in the Collection Action and cannot be requested or required to do more than appear under subpoena as a witness or provide documents supporting the claims in the Collection Action.

     2.    **Escrow; Closing.** (a)(i) Concurrent with the execution by all parties of this Agreement, HB shall execute and deliver originals of the Assignment of Claims to Edward P. Hourihan, Jr., Esq.

     (ii)    Concurrent with the execution by all parties of this Agreement, HB shall execute and deliver originals of the Consent to Change Attorney, the Stipulation of Dismissal in the DCL Action, the Stipulation of Dismissal for Counterclaims in the Collection Action, and its General Release to Lester's counsel.

     (iii)    Lester's counsel shall to hold such documents in escrow and may not release such documents from such escrow until such time as HB notifies counsel in writing to confirm that the funds and the documents to be delivered to HB as set forth in Section 2(b) hereof have been delivered to HB as provided herein. The release of such funds to HB and the release of such documents to the parties shall be referred to herein as the "Closing".

     Following Lester's delivery of the funds and documents to HB as set forth in Section 2 hereof, and HB's notification to Lester's counsel of its receipt of such funds and documents, Lester shall cause his counsel to file with the Monroe County Clerk's office fully executed copies of the Stipulation of Dismissal in the DCL Action, the Stipulation of Dismissal for Counterclaims in the Collection Action, and, thereafter, the Consent to Change Attorney for the Collection Action. Lester's counsel will provide HB with time-stamped copies of such filed documents within ten business days after the Closing.

     (b)    In consideration for the assignment of the Claims referenced in Section 1 hereof, Lester shall cause the following consideration to be delivered to HB not later than the close of business on October 30, 2015:

     (i)    **Cash.** Lester shall send to HB from personal sources, and not from any sources belonging to the Defendants, the amount of $400,000.00 which amount shall be delivered to HB by wire transfer of immediately available funds on or before the close of business on October 30, 2015 to the following account and ABA numbers:

| | |
|---|---|
| ABA# | ████████103 |
| SWIFT# | ████████S33 |
| Account# | █████████0096 |
| Bank | Citizens Bank<br>Timesquare Office<br>45 Exchange Blvd<br>Rochester, NY 14614 |

Please ask the originator to specify "Eber Bros. Wine & Liquor Corp." on the transfer from the originating bank.

(ii)    **Releases.** Lester shall deliver executed General Releases of himself, Wendy and the Defendants. Duly executed releases shall be held in escrow pending receipt of the wire transfer referenced in Section 2A hereof. Such executed releases may be released from escrow, and shall become effective, upon delivery of the funds to be wired as provided in Section 2A hereof.

(iii)    **Stipulation Dismissing Counterclaims in the Collection Action.** Lester shall deliver to HB a signed Stipulation Dismissing Counterclaims in the Collection Action to be held in escrow pending the Closing. Such executed Stipulation may be released from escrow and shall become effective at the Closing.

In the event that HB does not receive $400,000.00 before the close of business on October 30, 2015, this Agreement and each of the related agreements attached as exhibits hereto shall be rendered ineffective. In such event, the documents held in escrow shall be returned to the party that executed such documents.

(c)    The form of the Assignment of Claims to be delivered to Lester shall be that attached hereto as **Exhibit A.** The form of the Consent to Change Attorney shall be that attached hereto as **Exhibit B.** The form for dismissing the DCL action on the merits with prejudice is attached hereto as **Exhibit C.** The form for dismissing the counterclaims in the Collection Action on the merits with prejudice is attached hereto as **Exhibit D.** The form of General Releases are attached hereto as **Exhibit E.**

3.    **Confidentiality and Non-Disparagement.**    (a) The parties hereto will keep confidential and will not disclose to any person (i) in the case of each party, this Agreement and any other agreement or instrument by or between HB, any Defendant, Lester or Wendy entered into in connection therewith (the "Documents") and the existence and terms of any thereof; (ii) in the case of HB, all information, documents and records, in any form, relating to, or arising out of, the Collection Action or the DCL Action and the subject matter of each thereof, and all information, documents, and records, in any form, relating to the relationship between the Pension Benefit Guaranty Corporation ("PBGC") and the Defendants or Lester or Wendy (the "PBGC Matter") and the subject matter thereof; and (iii) in the case of Lester and Wendy, all information, documents and records, in any form, relating to, or arising out of, the Defendants' claims against HB in connection with the Collection Action or the DCL Action; provided, however, that (A) any party hereto may disclose any thereof to its legal counsel or accountants who need to know any thereof for the purpose of advising such party (and such party will be responsible for any such counsel or accountant's compliance with the applicable terms of this Section 3), and (B) nothing herein shall prohibit, limit, restrict or otherwise impair or encumber (1) responses from a party from whom such information may be sought under a subpoena or pursuant to an order from a court or from an administrative agency, or (2) the right of Lester or Wendy to provide a copy of any Document to the PBGC. Should HB be served with a subpoena, court order or inquiry from any governmental agency, whether state or federal, it shall, to the extent permitted by law, within three business days of such delivery, service or inquiry, give notice to Lester of such development. After the giving of any permitted notice, Lester shall have the right to challenge or respond to such effort to obtain such information.

EB-00017516

(b)   HB agrees that, after the Closing, the attorney client privilege owed to former clients (as contained in New York Rules of Professional Conduct Rule 1.9) will thereafter apply to the maximum extent possible to HB's former representation of Lester and all the Defendants, except as otherwise ordered by a court of competent jurisdiction. HB will not thereafter take the position that any exception to such privilege applies or is available to it and will not take the position that any such privilege has been waived.

(c)   HB, on the one hand, and Lester and Wendy, on the other hand, each agree that, after the Closing, they will not make, directly or indirectly, any disparaging or pejorative remarks, comments, statements or other communications about the other relating to or arising out of the subject matter of this Agreement or the Collection Action or the DCL Action or the PBGC Matter to the extent any thereof occurred prior to the Closing.

(d)   In the event any party hereto or any Defendant receives an inquiry from any member of the press or other media concerning developments in the Collection Action or the DCL Action or the PBGC Matter following the Closing, the parties hereto shall respond and may say only that the matters that are the subject hereof have been resolved.

4.  **Representations and Warranties.**  (a)  HB represents and warrants to Lester as follows:

(i)      HB knows of no claim it may have against Lester, Wendy or the Defendants, other than those to be assigned to Lester under the Assignment of Claims or those to be dismissed by the Stipulation of Dismissal of DCL Action;

(ii)     The signature on the General Release of HB is genuine, and the documents executed on behalf of HB are all valid, binding and duly authorized;

(iii)    HB has unencumbered title to the Claims; and

(iv)     HB has all the necessary power and authority to assign the Claims to Lester.

(b)      Lester (as to Sections (b)(i), (ii), (iii), (iv), (v) and (vi), and Wendy (as Sections 4(b)(i), (iv), (v) and (vi)), severally and not jointly, represent and warrant to HB as follows:

(i)      He (or she) knows of no claim he (or she) or the Defendants have against HB or any of the attorneys presently or formerly associated with HB, other than the claims to be dismissed by the Stipulation of Dismissal of DCL Action or the Stipulation of Dismissal for Counterclaims in the Collection Action;

(ii)     The funds to be wired as provided in Section 2A hereof, will be owned and held by Lester immediately prior to the transfer, free and clear of liens, claims, encumbrances and will not be from sources belonging to the Defendants;

(iii)    Lester is solvent both before and after consummation of the wire transfer contemplated in Section 2A hereof;

EB-00017517

(iv)    The signatures on the General Releases of Lester, Wendy and the Defendants are all genuine, and the documents executed on behalf of such persons and entities are all valid, binding and duly authorized;

(v)     Prior to the execution of this Agreement and the releases contemplated and called for by it, he (or she) has not assigned, transferred, conveyed, encumbered or otherwise alienated, in whole or in part, any claim they may ever have had against HB or any of its attorneys (both present and former); and

(vi)    Prior to the execution of this Agreement and the releases and stipulations contemplated and called for by it, the Defendants have not assigned, transferred, conveyed, encumbered or otherwise alienated, in whole or in part, any claim they may ever have had against HB or any of its attorneys (both present and former).

5.      **Remedies.**  If any party breaches this Agreement, the other parties may seek relief in the Supreme Court of the State of New York in and for the County of Monroe.  Lester, Wendy and HB consent to personal jurisdiction of such court and agree that such court shall serve as the venue for resolution of such dispute.  The parties waive any right to trial by jury.  Such dispute shall be resolved in accordance with and under the laws of the State of New York other than New York rules governing choice of law that would call for application of a different state's law.

6.      **Notices.**  Notices required under this Agreement shall be delivered by e-mail to the following persons at the following addresses:

To HB, all of the following:

dfoss@harrisbeach.com
dmoore@harrisbeach.com
jspitz@harrisbeach.com
ciagel@harrisbeach.com

To Lester or Wendy:

leber@slocumandsons.com
weber@slocumandsons.com

7.      **Merger Clause.**  This Agreement (and the other agreements and instruments delivered at the Closing, including without limitation, the indemnification agreement dated as of the date hereof between HB and Lester) constitute the entire agreement among the parties with respect to the subject matter hereof and supersede all other prior agreements and understandings, both written and oral, among the parties with respect to the subject matter hereof. This agreement may not be amended or modified, nor may the provisions hereof be waived, except in writing signed by the parties hereto. No party may assign its rights hereunder without the prior written consent of the other parties hereto. This Agreement will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns. This Agreement is not intended to benefit, or be relied upon by, any third party. Except as expressly provided herein and in the Exhibits hereto, none of the parties to the Collection Action or the DCL Action shall have any obligation hereunder or with respect hereto.

This Agreement (and any other written agreement or instrument entered into in connection herewith) are the construct and draftsmanship of all the parties, and all the parties acknowledge and agree that given the equal input as to these terms, no party shall have the terms of this Agreement or its exhibits construed against him/her/it as a result. Each acknowledges the opportunity to review the provisions of this Agreement carefully with counsel and confirms that the terms appearing herein have been approved by his/her/its respective counsel. The terms of this Agreement shall in all respects survive the delivery of the documents and funds contemplated herein, and shall not merge into such deliveries.

8.      Choice of Law. This Agreement shall be governed by the laws of the State of New York other than New York rules governing choice of law that would call for application of a different state's law.

IN WITNESS WHEREOF, The parties hereto have executed and delivered this Agreement as of the date first above written.

HARRIS BEACH PLLC

By: _____
Name: James A. Spitz, Jr.
Type: Authorized Signatory

_____
Lester Eber

_____
Wendy Eber

BOND, SCHOENECK, AND KING, PLLC

By: _____
Edward P. Hourihan, Jr., Esq., / Ingrid C. Palermo, Esf
Counsel to Lester Eber
350 Linden Oaks
Suite 310
Rochester, New York 14625
(585) 362-4712

EB-00017520

Exhibit A

## ASSIGNMENT OF CLAIMS

1.     **Assignment of Claims.** In consideration of the covenants, representations and warranties of Lester Eber ("Lester") set forth in the Agreement (the "Principal Agreement") dated as of October 23, 2015, between HB and Lester and Wendy Eber ("Wendy"), HB hereby finally and irrevocably assigns to Lester all its right, title and interest in all claims it may have now, or may have in the future, against the defendants in the Collection Action, or Lester or Wendy, or any of their respective employees, officers, directors, shareholders, members or affiliates, including HB's opportunity to recover attorneys' fees, costs, and penalties against Lester and Wendy, jointly and severally, pursuant to an Order dated August 28, 2014, entered in the Collection Action. This assignment is a quitclaim assignment, without representation, warranty, covenant or promise of any kind or variety and is without recourse to HB, its successors or assigns, saving the warranty contained in Section 4 of the Principal Agreement.

2.     **Governing Law.** This Assignment of Claims shall be governed by, and construed in accordance with, the laws of the State of New York.

3.     **Defined Terms.** Unless otherwise defined herein, defined terms used herein shall have the meaning assigned thereto in the Principal Agreement.

HARRIS BEACH PLLC

By: _____

Name:
Title: Authorized Signatory

ACCEPTED:

_____
Lester Eber

AFFIDAVIT

**CONFIDENTIAL**

STATE OF NEW YORK)
COUNTY OF MONROE) ss.:

PATRICK J. DALTON, being duly sworn, deposes and says:

1.    I am, and at all times pertinent have been, a member of the law firm Harris Beach PLLC ("Harris Beach").

2.    For several years, Harris Beach served as outside general counsel to Eber Bros. Wine & Liquor Corp. ("Eber Bros."), Eber Bros. Wine & Liquor Metro, Inc. ("Eber Metro"), and Eber-Connecticut LLC ("Eber-CT; collectively, the "Eber Entities") on a variety of litigation and transactional matters.   I served as the lead attorney to the Eber Entities for more than a decade.     As is relevant here, the Eber Entities engaged Harris Beach to represent them in the following transactions:  (a) the acquisition of Slocum & Sons, Inc., which became Eber-CT in April 2005; (b) the exchange, proposed by Southern Wine & Spirits ("Southern"), but never consummated, of a $3 million interest free note for a 15% ownership interest in Eber-CT in the Fall of 2007; (c) the sale of the 15% ownership interest in Eber-CT, originally sought by Southern, to Eder-Goodman LLC in January 2008; and (d) certain limited matters on the transfer of a 6% ownership interest in Eber-CT to Polebridge Bowman in May 2010.   Harris Beach had no involvement at all with Alexbay, LLC ("Alexbay") or any transactions with Alexbay.

3.    As a result of my role in such representation, I have personal knowledge of the matters set forth below other than those stated upon information and belief, and, as to those, I believe them to be true for the reasons stated.

4.    I have reviewed again my affidavit dated December 11, 2014("My Affidavit"), and have reviewed the affidavit of Lester Eber dated June 24, 2015 (the "Eber Affidavit"), which I have seen for the first time in September 2015. Such affidavits are attached hereto.

5.    Harris Beach is a law firm.  I have always understood that the Eber Entities hired Harris Beach solely in its capacity as a law firm.  Harris Beach is not, and has not claimed to be, an investment banking, financial advisory, appraisal or accounting firm.  It is not a registered broker-dealer.  Harris Beach does not provide, and has never provided, services as an expert in the valuation of businesses of any kind.

6.    I have no reason to disagree with Lester's statements of his experience in paragraph 13 of the Eber Affidavit, which reads:

> "13.     I have spent my entire life running private businesses. Over the course of 50 years, I have bought and sold many private businesses.  In my experience, privately held businesses are very hard to value.  A wide variety of considerations go into every decision about what to pay or what to accept in the purchase or sale of a private business.  The principal considerations that are relevant in one purchase and sale may be quite different than those applicable in another.  Industries change over time and

through business cycles. Therefore, mechanical formulas rarely apply. In my experience, competitors in the liquor industry hold the same view in making their own purchases and sales of private businesses."

7.   The statements in My Affidavit about the appropriate range of valuation for any of the Eber Entities, as of any date, were based on my recollection in December 2014 of events and discussions I believe occurred during the period of Harris Beach's representation between 2005 and 2010. I had no role in determining, and was not privy to discussions concerning, the valuation of Eber-CT in connection with the transfer of a 6% ownership interest therein to Polebridge Bowman in May 2010. I gained no firsthand knowledge, as the Eber Entities' counsel, during the period of Harris Beach's representation, of anything relating to the Alexbay foreclosure proceedings in June 2012 on $3.6 million of loans owed to Alexbay by Eber Metro and guaranteed by Eber Bros. Since Harris Beach did not represent the Eber Entities after 2010, I, of course, had no role in determining, and was not privy to discussions concerning, the valuation of any of the Eber Entities as of June 2012 for any purpose. I acknowledge that I have never seen the financial statements of Eber-CT for its 2013, 2014 or 2015 fiscal years. My Affidavit expresses no view on the current value of any Eber Entity as of the date of this Affidavit.

8.   I acknowledge that My Affidavit was not offered as a professional in the valuation of businesses of any kind. I also acknowledge that, after reviewing the Eber Affidavit, my statements with respect to valuation did not take into consideration certain of the relevant circumstances described therein. I acknowledge that circumstances of a business can change over time and that the appropriate range of valuation of any of the Eber Entities on any date, whatever it may have been on any other date, should be based on all the relevant facts as they exist on such date. Some or all of such facts may have changed since Harris Beach ceased representing the Eber Entities, and, accordingly, the appropriate range of valuation of any of such Eber Entities may have changed as a result thereof. I acknowledge that certain facts relating to the Eber Entities in May 2010 and June 2012 described in the Eber Affidavit were different from facts that I was aware of at the time of the 2005, 2007 and 2008 transactions described above.

9.   With the foregoing in mind, I confirm that my statements in My Affidavit with respect to the appropriate range of valuation of any of the Eber Entities, as of May 2010 and June 2012, involved significant assumptions and contained elements of speculation.

Patrick J. Dalton

Sworn to before me this
27th day of October, 2015

Notary Public

Marilyn M. Greason
Notary Public, State of New York
Monroe County #4843332
Commission Expires Nov. 30, 2017

EB-00017523

*  *   *   *   *   *

THE FOREGOING AFFIDAVIT OF PATRICK J. DALTON DOES NOT
CONSTITUTE A LEGAL OPINION OR OTHER LEGAL ADVICE OF HARRIS
BEACH PLLC OR PATRICK J. DALTON. IT MAY NOT BE RELIED ON BY ANY
THIRD PARTY.

HARRIS BEACH AND PATRICK J. DALTON ACKNOWLEDGE THAT THE
EBER ENTITIES AND LESTER EBER MAY PROVIDE THE FOREGOING
AFFIDAVIT TO THE PENSION BENEFIT GUARANTY CORPORATION ON A
CONFIDENTIAL BASIS IN CONNECTION WITH THE POSSIBLE RESOLUTION OF
ANY OUTSTANDING ISSUES BETWEEN THE PBGC AND THE EBER ENTITIES
AND LESTER EBER. HARRIS BEACH AND PATRICK J. DALTON CONSENT TO
SUCH AFFIDAVIT BEING PROVIDED TO THE PBGC FOR SUCH PURPOSES.

STATE OF NEW YORK
SUPREME COURT          COUNTY OF MONROE

HARRIS BEACH PLLC,

                              Plaintiff,

                                                    **AFFIDAVIT OF**
                v.                                  **LESTER EBER**

EBER BROS. WINE & LIQUOR CORP., ALEXBAY, LLC        Index No. 2014-13623
F/K/A LESTER EBER, LLC, EBER BROS. WINE &
LIQUOR METRO, INC., AND EBER-CONNECTICUT,
LLC,

                              Defendants.

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF MONROE         )

     **LESTER EBER**, being duly sworn, deposes and says:

     1.    I am currently the President and Managing Member of Alexbay, LLC

("Alexbay") and the President and a Director of Eber Bros. Wine & Liquor Metro, Inc.

("Eber Metro").

     2.    I have personal knowledge of the matters set forth herein, except for those

matters stated to be on information and belief, which I believe to be true.

     3.    From 1959 until February 1, 2012, I was also affiliated with Eber Bros.

Wine and Liquor Corp. ("Eber Bros."), most recently serving as President and a Director

of Eber Bros. I resigned from serving as President and a Director of Eber Bros.

effective February 1, 2012. Accordingly, I have not held any position with Eber Bros. as

of February 1, 2012. (*See* Exhibit 1, copies of my resignation and Board Approval of my

resignation).

4.      I never held the position of Chief Executive Office of Eber Bros.  According to Eber Bros.' By-Laws, there is no CEO position within Eber Bros.  Instead, the position of President includes the responsibilities of a CEO.  (*See* Exhibit 2, Eber Bros.' By-Laws).

5.      Eber Bros. is a New York corporation that was incorporated in 1935 and previously operated as a wholesale wine and liquor distributor in upstate New York.  For the reasons described herein, Eber Bros. is not currently an operating entity.

6.      Eber Metro is a New York corporation that was incorporated in the mid-1990s and was wholly owned by Eber Bros until May 2012.  Eber Metro previously operated as a wholesale wine and liquor distributor in downstate New York.  But for the reasons described herein, Eber Metro is not currently an operating entity.

7.      Eber-Connecticut, LLC ("Eber-CT") is a Delaware limited liability company, formed on February 16, 2005.  Eber-CT operates as a wholesale wine and spirits distributor in Connecticut.

### Harris Beach's Representation of Eber Entities

8.      For several decades, the law firm of Harris Beach PLLC ("Harris Beach") served as outside general counsel to Eber Bros.; to Eber Metro from 1995 to 2010; and to Eber-CT from 2005 to 2010 in a variety of litigation and transactional matters.  During that time, various attorneys who are still associated with and/or members of Harris Beach provided legal advice to Eber Bros., Eber Metro, and Eber-CT (collectively, the "Eber Entities").  Patrick J. Dalton, a Harris Beach partner, served as corporate counsel to these Eber entities for more than a decade.  Other attorneys who are still affiliated with Harris Beach and who have worked on Eber Entity matters in the past include

2

EB-00017526

Kevin W. Tompsett, David M. Mehalick, Justine R. Runke, Charles W. Russell, Paul J. Yesawich, Daniel J. Moore and Dale A. Worrall.

9.      As is relevant here, the Eber Entities engaged Harris Beach to represent them in the following transactions:  (a) the acquisition of Slocum & Sons, Inc., which became Eber-CT in April 2005; (b) the exchange, proposed by Southern Wine & Spirits ("Southern"), but never consummated, of a $3 million interest free note for a 15% ownership interest in Eber-CT in the Fall of 2007; (c) the sale of the 15% ownership interest in Eber-CT, originally sought by Southern, to Eder-Goodman LLC in January 2008; and (d) the sale of a 6% ownership interest in Eber-CT to Polebridge Bowman in May 2010.

10.      Harris Beach had no involvement at all with the Alexbay foreclosure on the loans owed to Alexbay by Eber Metro and guaranteed by Eber Bros.' assets in June 2012, since the Eber Entities had terminated them as counsel in 2010.  In fact, it was Michael J. Beyma at Underberg & Kessler LLP who represented Alexbay in the foreclosure.  (See Exhibit 3, Mr. Beyma's Affidavit).  In fact, Mr. Beyma still believes that Eber Bros. received fair consideration in the foreclosure.  As a result, Mr. Dalton's thoughts on the value of Eber-CT in 2012 are purely speculative, clearly wrong and should be ignored.

11.      Harris Beach holds itself out only as a law firm.  We hired Harris Beach solely in its capacity as a law firm.  They are not an investment banking, financial advisory, appraisal or accounting firm.  They do not hold themselves out as experts in the valuation of businesses of any kind.  .  Mr. Dalton's thoughts on appropriate

3

methods of valuing our companies are purely speculative, clearly wrong and should be ignored.

### 2005 Acquisition of Slocum & Sons Inc./Before the Recession

12.    In April 2005, Eber Metro acquired a wine and liquor distributorship operating in Connecticut and Rhode Island called Slocum & Sons, Inc. ("Slocum"). The transaction was accomplished by merging Slocum into Eber-CT, a newly formed limited liability company. Eber-CT is currently operating solely as a distributor of wine and spirits in Connecticut.

13.    I have spent my entire life running private businesses. Over the course of 50 years, I have bought and sold many private businesses. In my experience, privately held businesses are difficult to value. A wide variety of considerations go into every decision about what to pay or what to accept in the purchase or sale of a private business. The principal considerations that are relevant in one purchase and sale may be quite different than those applicable in another. Industries change over time and through business cycles. Therefore, mechanical formulas rarely apply. In my experience, competitors in the liquor industry hold this same view when purchasing and selling private businesses.

14.    In the case of the Eber Entities' expansion through the acquisition of Slocum, Eber Metro's primary consideration was strategic; it was part of a much larger company in 2005. In 2005, Eber Entities' gross revenues were approximately $600 million compared to $36 million in 2012. Eber Bros. had significant operations in New York, and was striving to become a leading multi-state distributor. The acquisition of Slocum was strategically important because it would solidify and augment Eber Bros.'

4

EB-00017528

competitive presence and scale in the Northeast, and affirm its commitment to growth

for the benefit of key suppliers and attracting new suppliers.  Slocum also owned an

attractive import company with a portfolio of German, Austrian and Italian wines and

sold these items exclusively in Connecticut.  The Eber Entities were eager to add

Slocum's then highly profitable and vertically integrated business model to their own

and saw an opportunity to leverage the Slocum import business throughout the rest of

its distribution network.  Understandably, it is not possible to accurately pinpoint or

create a mechanically derived valuation of the benefits of such an acquisition.

15.    Eber Bros.' analysis of the appropriate purchase price for Slocum was

also significantly affected by the belief that there were other strong competitors who

were interested in buying Slocum at the same time.  They saw the strategic value of

Slocum's business as well.  It wasn't a matter of seeing how little it would cost to buy

Slocum.  Rather, it was a matter of anticipating how high the purchase price would have

to be to purchase the business and prevent key competitors from seizing this

opportunity.

16.    Another significant factor in determining the offer to buy Slocum was that

there were significant tax advantages to the Eber Entities in making the acquisition with

the transaction structure that was employed.  It was a transaction structure tailored to

the specific facts of the situation and not a structure that would apply to another sale of

Slocum.  Essentially, because of the timing of tax considerations, Eber Bros. could

afford to pay substantially more to buy the business in 2005.

17.    In retrospect, I believe Eber Metro significantly overpaid to acquire

Slocum.  Although prior to Eber Metro's acquisition Slocum was profitable, during each

5

fiscal year from 2005 through 2012 Slocum experienced significant losses, with aggregate net losses of $7,275,269 during that same period. (*See* Exhibit 4). Due to the forced wind-down of Eber Bros. as described below, the acquisition of Slocum never had the opportunity to generate the material synergies and other benefits that had been expected and had been factored into the proposed valuation at the time of the acquisition of Slocum.

18.     Harris Beach represented Eber Metro in the acquisition of Slocum. Mr. Dalton alleges that the acquisition of Slocum was prompted by certain legal protections afforded wine and liquor franchisees in Connecticut, as is stated in paragraph 15 of the affidavit of Patrick J. Dalton sworn to on December 11, 2014 ("First Dalton Affidavit"). Mr. Dalton also alleges that our acquisition of Slocum was prompted by the "legal bulwark" afforded liquor franchisees in Connecticut against termination of distributorships in that state. Neither of these allegations is correct. Mr. Dalton is a lawyer, not a businessman with the many years of experience in the wine and liquor distribution business that I have. Mr. Dalton does not have a comprehensive understanding of the competitive dynamics of this industry.

19.     The Connecticut wine and liquor franchise laws are not as valuable as Mr. Dalton alleges. They do not insulate a distributor from the risk of losing the exclusive right to sell a wine product line in Connecticut, rather - at most - they prevent a distributor from being completely excluded from the sale of a wine product. Although Connecticut law prevents a supplier from completely terminating its relationship with a distributor without good cause, a supplier may still "dual" a distributor at any time, meaning that the supplier can sell to a new "preferred" distributor in addition to the

6

original distributor. Thus, the original distributor can be deprived of the benefit of being the exclusive distributor of a product within Connecticut without any protection under the franchise law. In my experience, the new "preferred" distributor typically ends up selling the majority of a supplier's particular product in Connecticut since the new "preferred" distributor receives marketing support and programming that is not offered to the original distributor. Additionally, the preferred distributor is the exclusive distributor of all new items or line extensions which typically drive revenues over the life cycle of the brand. Once a distributor becomes "dual" on an item, revenues and profitability are negatively impacted. As a result, revenues and profitability of any distributor in Connecticut are subject to many of the same uncertainties as in any state without a franchise law, and the Connecticut franchise laws offer little protection against these kinds of risks for Eber-CT. This could materially and adversely impact the value of the equity of Eber-CT.

20. In fact, Eber-CT was "dualed" in 2009 by Deutsch, its largest supplier and the producer of Yellow Tail Wines. Until that point, Eber-CT distributed all Yellow Tail Wine products sold in Connecticut. As a result of being "dualed," the volume and revenue of Yellow Tail Wine products that Eber-CT sold in Connecticut was reduced by a catastrophic 50% in the first year of the "dual." Eber-CT now sells less than 28% of its "pre-dual" volume of Yellow Tail Wine products sold in Connecticut.

21. During the period from 2008 through 2012, Eber-CT was "dualed" not only by Yellow Tail Wines but by many other brands, as well. This "dualing" took place after the Slocum acquisition in 2005, and after the sale of the 15% ownership interest to Eder Goodman in 2008, but before the foreclosure sale in 2012. Eber-CT's overall financial

7

performance was materially and adversely impacted by this "dualing," as its revenues for Deutsch (Yellow Tail Wines) fell from over $11 million, for the year ending May 31, 2009, to $2.6 million, for the year ending December 2014.  Given that Eber-CT is among the smallest state-wide distributors, the threat of a "dual" on all its brands remains a constant concern and a source of future risk to revenue, profitability and valuation.

22.     Mr. Dalton's lawyerly theories have been disproven by what actually happened to Eber-CT since 2005.

### Fending off Southern (2005 through January 2008)/Before the Recession

23.     A number of events took place after Eber Metro's acquisition of Slocum that resulted in Eber-CT becoming the only remaining Eber Entity with any operating assets.  Southern Wine & Spirits of America, Inc. ("Southern")—the largest wine and spirits distributor in the United States—entered the New York market in 2005, and swiftly set out to destroy Eber Bros.' and Eber Metro's businesses in New York through highly predatory and aggressive business tactics.  At the time, New York was by far Eber Bros.' largest market. In 2006, Southern lured away many of Eber Bros.' and Eber Metro's significant suppliers in New York.  As a result, Eber Bros. and Eber Metro could no longer sell their longstanding portfolio of highly recognizable wine and spirits brands in New York.  In addition, Southern paid $10 million to Daniel Sisto, Eber Bros.' VP of Sales, and lured him away to work for them.  Southern then hired more than 20 additional employees of Eber Bros. in one day and eventually hired hundreds of other former Eber Bros and Eber Metro employees, all in an effort to drive the Eber Entities out of business.

8

24.    As a result, in March 2007, Eber Bros. and Eber Metro were on the verge

of bankruptcy and were unable to satisfy outstanding debts to their bank lender,

vendors and suppliers.  Eber Bros. and Eber Metro engaged in a lengthy negotiation

with Southern in the Summer of 2007 over a complex, multi-part transaction where Eber

Bros. agreed to sell its interests in its Delaware and Ohio distributorships to Southern

and, in exchange, Southern provided a significant amount of cash to Eber Bros. and

Eber Metro to allow them to pay their debts to suppliers and thereby avoid bankruptcy.

Southern did not want Eber Bros. and Eber Metro to file for bankruptcy because it would

have hurt many of Southern's vendors, who were also vendors to Eber Bros. and Eber

Metro.

25.    After Eber Bros. conveyed its interests in the Delaware and Ohio

distributorships to Southern in 2007, Eber Bros. and Eber Metro still owed Southern

$3 million.  A promissory note for this $3 million debt was offered to Southern in 2007.

In 2007, Southern proposed that it exchange its $3 million note for a 15% ownership

interest in Eber-CT.  I believe the principal motivation for Southern's proposal was that

Southern was not then in the Connecticut market, and it could only enter the market by

acquiring an interest in an existing distributorship.  The 15% interest in Eber-CT would

have given Southern a way to enter the Connecticut market, and thus, Southern's

interest in Eber-CT's equity was strategic and opportunistic.  The equity value discussed

was not the result of the application of any mechanical valuation formula.  It was a value

that was derived from the unique situation of a huge, national distributor pursuing a

strategic goal and was a measure of what they were willing to pay to enter the

9

Connecticut market at that time. The proposed equity sale to Southern was never consummated.

26.     While we were in discussions with Southern, Mr. Dalton approached Eder Goodman, another Connecticut distributor, and offered to sell the 15% to Eder Goodman rather than to Southern. Eder Goodman ultimately agreed to pay $4.5 million for the 15% ownership interest in Eber-CT in January 2008. Eder Goodman's motivation was also strategic and opportunistic. They were clearly motivated by a strong desire to keep Southern out of the Connecticut market. Eder Goodman was willing to pay a 50% premium over Southern's offer in order to protect itself from Southern, which had a record of raiding suppliers, employees and customers of competing distributors and consequently destroying those distributors upon entering new markets. Eder-Goodman was under significant pressure to pay a premium because Southern's presence in Connecticut would have been devastating to its businesses. As Mr. Dalton knows, he was able to extract more money from Eder-Goodman by discussing the devastation Southern had inflicted on Eber Bros in New York.

27.     The competing motivations of Southern and Eder Goodman in late 2007 and early 2008 were unique to their particular circumstances. One was trying to buy its way into the Connecticut market; the other was paying to keep a competitor out of the same market. Their motivations and circumstances were completely different from those I faced in 2012, when I foreclosed on my loans to Eber Metro.

10

EB-00017534

## Failed Attempts to Obtain Financing or Sell Eber-CT (2008-2012)

28.     Until 2007, Eber Bros. had a $130 million first lien credit facility with Wells

Fargo.  In March 2007, Wells Fargo put Eber Bros. loans into default and classified the

loans as a "work out," freezing all of Eber Bros.' working capital in order to pay down the

outstanding loans.  When Wells Fargo was finally paid off, they declined to extend

further credit to any Eber entity.  Finally, in June of 2008, Canandaigua National Bank

and Trust Co. ("CNB") was willing to provide only a $1.5 million loan on a six-month

basis thereafter.  Between 2008 and 2012, Eber-CT made numerous attempts to

arrange new first lien debt financing with independent third-party lenders.  None of

these lenders had any prior affiliation with Eber-CT.  Discussions were held with at least

six different banks and finance companies in the Northeast about obtaining additional

financing.  None of these lenders was willing to provide any credit to Eber-CT, on a first

lien basis or otherwise.  It was not until after the Alexbay foreclosure sale that Eber-CT

was able to arrange a long-term seven-year loan facility with CNB.  This lending facility

is an asset-based loan, not a cash flow-based loan.  CNB relied only on the value of the

company's inventory and accounts receivable, and not on any projected cash flow or

inherent equity value of the company.  CNB has informed us that they strongly prefer

that we refinance them out of their current facility as soon as possible.

29.     During the period from 2002 through 2012, I made an aggregate of

$3.228 million in cash loans to Eber Bros. and Eber Metro to support their operations.

In the Spring of 2010, I offered several other members of my extended family an

opportunity to participate in these loans on the same terms applicable to me.  All of

them declined my offer.

11

30.     Between 2008 and 2012, Eber-CT also contacted at least four different strategic wine and liquor distributors in the Northeast to see if there was any interest in acquiring Eber-CT.  None of these distributors had any prior affiliation with Eber-CT. After discussion and due diligence with each of the parties, none of them would make a proposal to acquire Eber-CT on any basis.

31.     The foregoing clearly demonstrates that a significant group of independent third party lenders and wine and liquor distributors, all of whom were well positioned to have an educated opinion of the value of Eber-CT's business, saw little or no value in Eber-CT during the period after the onset of the economic recession in the Fall of 2008. Extended family members who had participated for many years in the companies and had a strong familial relationship with me declined to infuse new funds, as well.  This was the harsh reality confronting Eber-CT in 2010, when it negotiated the sale of 6% of its common equity to Polebridge Bowman, and in 2012, when it asked the Court to confirm its view that the foreclosure of Alexbay's $3.5 million notes was commercially reasonable.

### 2010 Sale of 6% to Polebridge Bowman/During the Economic Recession

32.     In the Spring of 2010, Eber-Ct was struggling.  The economic recession, which started in the Fall of 2008, long after the Southern and Eder Goodman transactions, was still weighing heavily on the U.S. economy and was taking its toll on Eber-CT.  Its annual losses were mounting (losing $2.4 million for the fiscal year ending May 30, 2009 and $1.1 million for the fiscal year ending May 30, 2010).  The acquisition of the Slocum business had not lived up to Eber Metro's expectations at all.  Eber Metro's asset base had significantly shrunk from what it was in 2005 and by then only

12

comprised of the Connecticut business. Eber-Ct was suffering as a result of the aggressive competitive actions of its competitors and suppliers. All attempts to raise a new first lien credit facility or sell the company had all failed to attract any interest. Eder Goodman's investment in Eber-CT brought with it a number of negative covenant constraints on our flexibility in raising debt capital and in selling the company. It also brought with it a partner who, for their own strategic reasons, really did not have any interest in seeing the company be sold or perform well.

33.     In light of these unfortunate circumstances, the value of Eber-CT in 2010 was extremely uncertain; it could not be derived with any precision at all. Eber-CT may well have been worthless. The refusal of other distributors to purchase an interest in Eber-CT and the reluctance of the lending market to advance funds confirmed that Eber-CT had little value.

34.     Mr. Dalton's statement in paragraph 18 of the First Dalton Affidavit that he believed Eber-CT "was worth in the vicinity of $20 million" is uninformed and just flatly wrong. Mr. Dalton was retained as a lawyer, not a financial advisor or valuation expert. Whatever he may think he overheard me say in 2010, he clearly misunderstood. He took my hopes and dreams about creating a valuable company and tried to change those into current facts.

35.     In the Spring of 2010, Eber-CT approached Glenn Sturm seeking his assistance in formulating a plan to turn around the company. Eber-CT had no prior contact with Mr. Strum before 2010. The goal was to retain Mr. Sturm as both a lawyer and a senior strategic consultant.

13

EB-00017537

36.    Mr. Sturm was then a Senior Partner at Nelson Mullins Riley & Scarborough LLP, a prominent Atlanta law firm, where he practiced corporate and securities law, focusing on investment banks, private equity funds and emerging companies, with extensive experience in the financing and mergers and acquisitions markets. Mr. Sturm also chaired his firm's corporate department and served on its executive committee. At the same time, he was a well-known business advisor at The White Oak Group, a prominent private equity firm in Atlanta that is in the business of investing in, and growing the value of, lower middle market emerging companies. He had served as chief executive officer of a number of emerging companies and had served on the boards of numerous private and public companies.

37.    Mr. Sturm was an expert in assisting and advising small privately owned businesses. Eber-CT was fortunate to obtain his expertise and assistance in helping to forge a plan to turn around the company. He advised and consulted with Eber-CT on strategic initiatives to rehabilitate the business. Among other things, he was responsible for creating a marketing plan that focused on growing the craft spirit business and the Eber-CT imports business.

38.    Like any outside adviser, Mr. Sturm required that he be paid for his services. In this regard, he was no different from Harris Beach. This fact does not make him any less of an independent purchaser of Eber-CT. Mr. Sturm typically proposed to new clients that he be paid fees in cash and that he be given an opportunity to make a minority investment in the client's common equity at a fair market value purchase price. This was the way Mr. Sturm did business with his clients. This is the

14

EB-00017538

same way many similar advisors do business with financially distressed or emerging private companies having liquidity constraints.

39.     Mr. Sturm originally proposed a 10% ownership interest in Eber-CT, but was eventually negotiated down to 6% by May of 2010. The $350,000 purchase price for this interest was a negotiated value and was based on the then-current facts and circumstances regarding the company for a non-strategic purchaser. These then-current (ie as of May 2010) facts and circumstances regarding the company included the following (note that the company's fiscal year ends on May 31st):

- Total annual sales had *declined* by nearly $7 million, or more than 15%, over the then-most recent two fiscal years
- Total net income *losses* were more than $3.5 million over the then-most recent two fiscal years
- The company's operations were generating negative cash flow and as a result its total  indebtedness *increased* by 160% from $1.5 million to $3.9 million over the then-most recent two fiscal years

As such, the company's deteriorating financial performance (declining sales, negative cash flows, and increasing levels of indebtedness) driven by the fallout from the Great Recession and the decision by a key supplier to "dual" the company on its largest single product, made many of the valuations that arrived prior to these events and consequences irrelevant.

Furthermore, even if the company had not experienced the materially deteriorating financial performance that it did between 2008 and May of 2010, the

15

valuations arrived at in the Eder Goodman transaction and the proposed, but never consummated, Southern transaction, were irrelevant for the 2010 transaction.

It is also important to note that as a highly leveraged company (the company had nearly $4 million of debt and was not generating positive cash flow from operations), even small changes in the value of the company translate into material changes in the equity value of the company.

### Foreclosure on My Loans to Eber Bros. and Eber Metro/Foreclosure

40.      Between 2002 and 2012, I personally made cash loans to Eber Bros. and Eber Metro for the purpose of enabling them to pay various operating and other liabilities of the business, including helping to fund a portion of the liabilities of the Eber Bros.' Pension Plan. (*See* Exhibit 5, copies of notes). At all times prior to June 5, 2012, all the common equity in Eber Bros. (and, indirectly, Eber Metro) was owned by a trust of which various members of the extended Eber family, including myself, were beneficiaries. As mentioned above, in the Spring of 2010, I offered several other members of my extended family an opportunity to participate in these loans on the same terms applicable to me. All of them declined my offer.

41.      I retained Harris Beach and Mr. Dalton to structure the loan transactions and prepare the necessary documentation. I instructed Mr. Dalton to put in place a first lien loan facility that was consistent with arm's length loans from unaffiliated third parties with rights, protections and enforcement mechanisms that were standard, typical and commercially reasonable for an arm's length loan. I believed that is what he did.

42.      As of December 31, 2011, the outstanding principal and accrued but unpaid interest on my loans was an aggregate of $3,650,682.48. The loans were then

16

the primary obligation of Eber Metro, but all the loans were guaranteed by Eber Bros.'
assets. The loans and the guarantee were then secured by a validly perfected first
priority security interest in the assets of Eber Bros. (principally all the capital stock of
Eber Metro) and in the assets of Eber Metro (principally all of Eber Metro's 79%
ownership interest in Eber-CT). (See Exhibit 6, Guarantees and Assignments.)

43.     I assigned the loans to Alexbay, LLC ("Alexbay"), a newly formed
Connecticut limited liability company owned by me to hold these loans. As of
December 31, 2011, I had priority as a secured creditor over any claim by the Pension
Benefit Guaranty Corporation ("PBGC") against Eber Bros. or Eber Metro, as well as
over any claim of Harris Beach as an alleged general unsecured creditor of Eber Bros.
UCC filings made by me to perfect my security interest were a matter of public record.
(See Exhibit 7, UCC filings)

44.     Eber Metro did not repay the sums due as required under the Line of
Credit Note and the Debt Assumption Agreement. Accordingly, demand for payment
was made for the sums due, but no payment was made. On February 21, 2012,
Alexbay filed an action in the New York Supreme Court for Monroe County, seeking a
judicial determination, pursuant to New York Uniform Commercial Code Section 9-627,
that Alexbay's acceptance of all of Eber Bros.' ownership interest in Eber Metro (and,
indirectly, all of Eber Metro's 79% ownership interest in Eber-CT) in full satisfaction of
the loans then held by Alexbay was "commercially reasonable."

45.     A judicial action is not required under New York law, but was commenced
out of an abundance of caution to alert any potential creditors of the foreclosure.
Alexbay named Southern as a party to the action because it had a UCC on file asserting

17

EB-00017541

it was a secured creditor of Eber Bros. and Eber Metro. While Southern originally opposed the action, it ultimately did not take any action to frustrate it. On May 11, 2012, this Court granted Alexbay's motion and determined that the foreclosure was commercially reasonable. On June 5, 2012, all the capital stock of Eber Metro was transferred to Alexbay in satisfaction of the $3.65 million loans. This occurred almost 19 months before Judge Odorisi granted Harris Beach's now reversed summary judgment motion in its Underlying Collection Action on January 14, 2014.

46.     In the Winter of 2012, Eber-Ct continued to struggle. The economic recession still weighed heavily on the U.S. economy and on Eber-CT. Eber-CT continued to incur annual net losses (losing $908,800 for the fiscal year ended May 30, 2011 and $363,132 for the fiscal year ended May 30, 2012). The acquisition of Slocum still had not lived up to its expectations at all. Eber-CT suffered as a result of the aggressive competitive actions of Southern and other competitors and suppliers. All attempts to raise a new first lien credit facility or sell the company had failed to attract any interest. Eder Goodman's investment in Eber-CT had brought with it a number of negative covenant constraints on our flexibility in raising debt capital and in selling Eber-CT. It had also brought with it a partner who, for their own strategic reasons, really did not have any interest in seeing the company be sold or expand.

47.     In light of these continuing unfortunate circumstances, the value of the equity in Eber-CT in 2012 continued to be quite uncertain. It couldn't be derived at that time with any precision at all. It certainly could have been materially less than $3.65 million. I believed at the time that the value of Eber-CT's equity had not changed materially since the sale to Polebridge Bowman in 2010. Alexbay cited the 2010

18

investment by Polebridge Bowman in support of its request for a determination of commercial reasonableness, not just because it was the most recent sale, but also because the circumstances surrounding the company's business prospects or lack thereof in 2010 were substantially the same as they were in 2012. In both years, the company was weighed down by the economic recession and the other circumstances previously described. Those were the circumstances on which the value of Polebridge Bowman's investment was based in 2010. It was, I believed, not only the most recent but also the most relevant valuation.

48.     As I explained above, Eber-CT's motivation in buying Slocum in 2005 was driven by strategic and opportunistic considerations, as well as tax considerations and the expectation of material synergies stemming from being part of the family of Eber companies. It took place when Eber was an entirely different company trying to compete in a booming economy, and the expected material synergies were never realized as the demise of the Eber businesses described above precluded such realization.

49.     The competing motivations of Southern and Eder Goodman in 2007 were unique to their particular circumstances at that time. One was trying to buy its way into the Connecticut market; the other was paying to keep a competitor out of the same market. Their motivations and circumstances were completely different than mine in 2012, when Alexbay foreclosed on the $3.65 million loans to Eber Metro.

50.     For all these reasons, I did not believe that any of the transactions that occurred in the pre-recession period between 2005 and early 2008 were relevant in

19

2012, when we asked this Court for a determination of commercial reasonableness in connection with Alexbay's foreclosure on the $3.65 million loans.

_____

LESTER EBER

Sworn to before me this
24th day of June, 2015.

_____
Notary Public

INGRID C. PALERMO
Notary Public, State of New York
Qualified in Monroe County
No. 02PA6170118
Commission Expires July 2, 20__

20

EB-00017544