UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DANIEL KLEEBERG, LISA STEIN
and AUDREY HAYS,

        Plaintiffs,

v.

LESTER EBER, ALEXBAY, LLC
f/k/a LESTER EBER, LLC,
ESTATE OF ELLIOTT W. GUMAER, JR
and WENDY EBER,

        Defendants,

and

EBER BROS. & CO, INC.,
EBER BROS. WINE AND LIQUOR CORP.,
EBER BROS. WINE & LIQUOR METRO, INC.,
EBER- CONNECTICUT, LLC,
EBER-RHODE ISLAND, LLC,
EBER BROS. ACQUISITION CORP.,
EBER-METRO, LLC,
SLOCUM & SONS OF MAINE, INC.,
and CANANDAIGUA NATIONAL BANK & TRUST COMPANY,

        Nominal Defendants.

Civil Action No.
16-CV-9517(LAK)

**AFFIDAVIT OF
WENDY EBER**

---

STATE OF CONNECTICUT )
          ) ss:
COUNTY OF NEW HAVEN )

  WENDY EBER, being duly sworn, deposes and states as follows:

  1. I am a defendant in the above-captioned action. I make this Affidavit in support of the motion for partial summary judgment filed by me, as well as defendants Alexbay, LLC f/k/a Lester Eber, LLC ("Alexbay") and Lester Eber (collectively "the Eber Defendants").

**Background**

  2. Nominal defendants Eber Bros. & Co., Inc. ("Eber Bros."), a New York corporation, Eber Bros. Wine and Liquor Corp., a New York corporation ("EBWLC"),

Eber Bros. Wine and Liquor Metro, Inc. ("Metro"), a New York corporation, and Eber-Connecticut, LLC a/k/a Slocum & Sons ("Eber CT"), a Delaware limited liability company, (collectively, the "Eber Entities") have operated wine and liquor distribution businesses since the early part of the 20th century.

3. The following organizational charts are attached as Exhibit A:

   a. Chart A shows the organizational structure of the Eber Entities as of June 1, 2012;

   b. Chart B shows the organizational structure of the Eber Entities as of July 31, 2012;

   c. Chart C shows the organizational structure of the Eber Bros. and EBWLC as of November 1, 2019; and

   d. Chart D shows the organizational structure of Alexbay, Metro and Eber CT as of November 1, 2019.

4. I was CFO and Secretary of EBWLC from approximately 2007 until 2012, at which time I became President.

5. I am currently the President of Eber CT.

6. Beginning in the early 2000's, the Eber Entities faced a number of financial challenges due to, *inter alia*, increasing competition and various economic difficulties.

7. Most notably, Southern Wines & Spirits ("Southern") – one of the largest wine and liquor distributors in the nation – entered the New York market in 2005. Southern ultimately drove the Eber Entities out of the New York market.

2

8.  As the business challenges mounted, Lester Eber loaned significant sums of money to the business to keep it afloat, and allow it to pay its debts. See Affidavit of Lester Eber, sworn to the 8th day of November, 2019 ("Lester Eber Affidavit").

9.  In or about March or April 2010, Lester Eber wrote letters to his sisters, Sally Kleeberg (the now deceased mother of Plaintiffs, Daniel Kleeberg and Lisa Stein), and to Plaintiff, Audrey Hays. Copies of these letters are attached as Exhibit J to the Lester Eber Affidavit.

10. The letters detailed the financial struggles of the company (Eber CT was the only operating entity at that point), and invited his sisters to participate in a $1.5 million dollar loan to the Eber Entities on a 1/3 basis. Ms. Kleeberg and Ms. Hays summarily rejected the invitation to help save their family's business.

11. Despite Lester's loans, the prospects of Eber CT remained poor. It continued to face a host of debts and liabilities, including underfunded pension liabilities.

**Pension Liabilities**

12. In 1954, the Eber Bros. Wine & Liquor Corp. Retirement Plan (the "EBWLC Plan") was adopted by EBWLC, as sponsor. A copy of the EBWLC Plan is attached as Exhibit B.

13. The EBWLC Plan required the accrual and payment of pension benefits and required EBWLC to make annual contributions to the EBWLC Plan to fund benefits thereunder.

3

14. The EBWLC Plan sponsor, and the members of its "controlled group," including Metro, were required to make certain minimum annual contributions to the EBWLC Plan.

15. Accrued benefits under the EBWLC Plan were liabilities required to be reflected on a balance sheet of EBWLC under GAAP. Benefits paid under the EBWLC Plan were expensed annually for financial accounting purposes.

16. The EBWLC Plan was a "single employer defined benefit plan" subject to the termination insurance program established under Title IV of ERISA. 29 U.S.C.S. § 1002(3), (41) and §§ 1301-1461.

17. On August 6, 2014, the Pension Benefits Guaranty Corporation ("PBGC") determined that termination of the EBWLC Plan was necessary because the EBWLC Plan would be unable to pay benefits when due. A copy of the August 6, 2014 letter is attached as Exhibit C.

18. Subsequently, by letter dated March 29, 2016, the PBGC made a demand for immediate payment of $6,237,920 of unfunded benefit liabilities and other related amounts.

19. Further the March 29, 2016 letter confirmed that although the pension plan's sponsor was EBWLC, Metro was part of the "control group," and thus liable for the debt. A copy of the March 29, 2016 letter is attached as Exhibit D.

20. On January 19, 2016, the United States District Court for the Western District of New York established April 30, 2010 as the termination date of the EBWLC

Retirement Plan. A copy of the Decision and Order of the Hon. Michael A. Telesca, dated January 19, 2016, is attached as Exhibit E.

21. The January 19, 2016 Order also held, as a matter of law, that EBWLC ceased operations by December 31, 2007, and terminated all its employees by May 31, 2009. See Exhibit E at pp. 10-11.

22. Finally, the January 19, 2016 Order also held as a matter of law that "as of April 30, 2010, the [EBWLC] 'controlled group' included…Eber Metro..." See Exhibit E at p. 3.

23. Michael A. Gallagher, the President of Benefits Management Inc. ("Benefits Management"), EBWLC's independent actuary, calculated that, as of June 1, 2012, the termination liability of the EBWLC Plan was $5,063,388. See Affidavit of Michael A. Gallagher, dated November 5, 2019 ("Gallagher Affidavit").

24. Mr. Gallagher calculated that EBWLC would have needed $9,823,177 as of June 1, 2012 to satisfy the EBWLC Plan's liability for all benefits to all participants, but only had $4,759,789 in trust assets held by Canandaigua National Bank ("CNB"). See Gallagher Affidavit at ¶6, 7.

25. Simple math shows a shortfall of $5,063,388.

26. This pension liability (and Mr. Gallagher's calculations) were included in the expert report of Frank C. Torchio ("Torchio Report"), in connection with his conclusion that Metro and EBWLC were insolvent as of May 23, 2012. See Torchio Report at p. 12 attached as Exhibit F.

27. Put simply, as of the termination date, i.e. April 30, 2010, Eber Bros., EBWLC and Metro were jointly and severally liable for the underfunded EBWLC Plan.

**Teamsters**

28. Similarly, Eber Bros., EBWLC and Metro were jointly and severally liable for liabilities to the New York State Teamsters Conference & Retirement Fund (the "Teamsters Fund").

29. The Teamsters Fund was a "multi-employer employee benefit plan" as defined in Sections 3(3) and 37(A) of ERISA, 29 U.S.C. 1002(3) and 37(A).

30. EBWLC was a participating employer in the Teamsters Fund as defined in Section 3(5) of ERISA, 29 U.S.C. 1002(5). For a multiemployer employee benefit plan, all businesses "which are under common control" are treated as a single employer for purpose of withdrawal liability and jointly and severally liable for the unfunded vested benefits. 29 U.S.C. § 1301(b)(1).

31. On January 10, 2008, the Teamsters Fund assessed an employer withdrawal liability of $2,212,367.47 against the Eber "controlled group", which included Eber Bros., EBWLC and Metro. See Notice of Demand for Payment of Employer Withdrawal Liability dated January 10, 2008, from the Teamsters Fund to EBWLC attached as Exhibit G.

32. As of June 1, 2012, the remaining employer withdrawal liability to the Teamsters Fund of the Eber "controlled group" was approximately $1,421,029.95. See Amended Modification Agreement dated July 30, 2012 attached as Exhibit H.

33. This liability is further evidenced by the August 1, 2012 Confession of Judgment that I executed on behalf of EBWLC. A copy of the Confession of Judgment is attached as Exhibit I.

34. While the Confession of Judgment was formally executed on August 1, 2012, as set forth above, the debt was known well before that – and obviously known prior to the 2012 UCC proceeding discussed below.

**UCC Proceeding**

35. As set forth above, as well as in the Lester Eber Affidavit, between approximately 2002 and 2012, Lester loaned over $3.5 million (including interest) to the Eber Entities.

36. Subsequent to 2007, Eber CT was the only entity still operating. EBWLC and Metro had no business operations, and were generating no cash flow.

37. By that time, EBWLC's only material asset was its controlling equity interest in Metro, and Metro's only material asset was its controlling equity interest in Eber CT.

38. EBWLC and Metro failed to pay any of the principal or interest on the loans made by Lester Eber.

39. On or about January 18, 2012, Alexbay sent EBWLC and Metro a notice pursuant to New York UCC 9-620, proposing to accept EBWLC's controlling equity interest in Metro, and Metro's controlling equity interest in Eber CT, in full satisfaction of the loans. A copy of the Notice is attached as Exhibit J.

40. After consulting with our accountants and attorneys, the EBWLC Board made the decision to consent to the proposal.

41. In that regard, the Board believed that the termination liability of the EBWLC Plan was a "debt" of EBWLC, as plan sponsor, because of its obligations under the Plan itself.

42. Similarly, the Board believed that the termination liability was also a contingent liability of Eber Bros. and Metro. Immediately prior to the 2012 Foreclosure, the members of the "controlled group" were Eber Bros., EBWLC (as Plan sponsor), and Metro.

43. Therefore, the termination liability was a joint and several liability to the PBGC of each "controlled member" – with an extremely high probability of becoming a matured liability to the PBGC upon the inevitable termination of the EBWLC Plan.

44. Subsequent events with respect to actions of the PBGC proved that the Board's judgment immediately prior to the 2012 Foreclosure was entirely correct.

45. Finally, while there had been a Subordination Agreement between Lester Eber and Wells Fargo (relating to previous loans made by Wells Fargo to the Eber Entities), the Wells Fargo loan(s) had been paid off by 2012.

46. As Eber Metro and EBWLC were insolvent, there was no legal basis to challenge the proceeding, and no legal impediment to acquiescing to the proposed turnover. This was confirmed in consultation with EBWLC's independent counsel.

47. Accordingly, on June 5, 2012, after receiving judicial confirmation of the commercial reasonableness of the transaction, EBWLC consented to Alexbay's

8

acceptance of EBWLC's ownership interest in Metro in full satisfaction of the debt owed to Alexbay. A copy of the Written Consent is attached as Exhibit K.

*Wendy Eber*
Wendy Eber

Sworn to before me this
8th day of November 2019.

_____
Notary Public

CLIVE C BARROWES
Notary Public – State of New York
NO. 01BA6294118
Qualified in Bronx County
My Commission Expires Dec 16, 2021

11-08-19