## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DANIEL KLEEBERG, LISA STEIN, and AUDREY HAYS,

                Plaintiffs,

     v.

LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC; ESTATE OF ELLIOTT W. GUMAER, JR.; and WENDY EBER,

                Defendants,

    and

EBER BROS. & CO., INC.; EBER BROS. WINE AND LIQUOR CORP.; EBER BROS. WINE & LIQUOR METRO, INC.; EBER-CONNECTICUT, LLC; EBER-RHODE ISLAND, LLC; EBER BROS. ACQUISITION CORP.; EBER-METRO, LLC; SLOCUM & SONS OF MAINE, INC.; and CANANDAIGUA NATIONAL BANK & TRUST COMPANY,

                Nominal Defendants.

Civil Action No.  16-CV-9517(LAK)(KHP)

## PLAINTIFFS' STATEMENT OF MATERIAL FACTS

Pursuant to Local Civil Rule 56.1, Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays submit this Statement of Material Facts as to which there is no genuine issue to be tried, in support of their Motion for Partial Summary Judgment.

### THE ALLEN EBER TRUST

1.     Allen Eber, founder of the Eber. Bros. business, including its wine and liquor distribution business, died on July 24, 1970. (Ex. 132 at 1.) Exhibit 132 is a true and correct copy

of Allen Eber's Last Will and Testament (the "Will"), which was executed on October 27, 1969. (*Id.* at 20.) The Will provided for the creation of a testamentary trust to hold Allen Eber's residuary estate (the "Trust"), including certain marketable securities and all of the controlling stock for the Eber Bros. business. (*Id.* at 10–12 ("NINTH" item).)

2.      The original beneficiaries of the Trust were Allen Eber's three children: Mildred Eber Boslov, Sally Eber Kleeberg, and Lester Eber. Each had an "equal" one-third interest. (*Id.*) The Will provided that upon the death of any of beneficiary, the beneficial rights under the Trust would transfer *per stirpes*. (*Id.* at 11.) Mildred Eber Boslov died in 1973; thus, her only child, Audrey Nan Hays, became a one-third beneficiary of the Trust. (Hays Decl. ¶ 5.)

3.      As of mid-2012, the Trust's three beneficiaries were Lester Eber, Sally Kleeberg, and Audrey Hays. (Ex. 107 ¶ 2 (admitting TAC ¶ 18).) Sally Kleeberg died in 2014. Thus, her two children, Daniel Kleeberg and Lisa Stein, each became beneficiaries of the Trust, with a one-sixth interest held by each. (*Id.*)

4.      The Will nominated three trustees: Allen Eber's son; Elliott W. Gumaer, Jr. ("Gumaer"), Allen Eber's lawyer; and Marine Midland Trust Company. (Ex. 132 at 13.) On July 23, 2007, Canandaigua National Bank & Trust Company ("CNB") was appointed as the bank co-trustee, replacing M&T Bank, which had years earlier replaced Marine Midland. (Ex. 138; Ex. 1.)

5.      The Will provided that the Trust would be terminated upon the death of the last of Allen Eber's three children. The Trust could only be terminated earlier if "all, or substantially all," of the Eber Bros. business was sold and the trustees elected to terminate, in their "absolute discretion." (Ex. 132 at 11.)

6.      The Will expressed Allen Eber's desire that the Trust retain his interest in the Eber Bros. business, including EB&C and any other close corporations, and that his son, Lester, have

2

the opportunity to participate in the management of the business so long as it was held by the Trust. (*Id.* at 13 ("ELEVENTH") (requesting retention of EB&C and "certain other close corporations"). *See also* Ex. 9 at 2 ("It is clear from the terms of the Trust that the purpose of the Trust was to hold the shares of Eber Bros. & Co. stock for so long as it was a going concern.").)

7.     In September 2011, Sally Kleeberg requested distributions of principal to help her granddaughter, Erica Stein. (Ex. 156.) She did so with the understanding that such distributions would reduce the amount of her remainder interest in the Trust, without reducing the interests of either of the other beneficiaries, Audrey Hays or Lester Eber. (Stein Decl. ¶ 7.) Even though it would come out of her share alone, the trustees refused to authorize the request for distribution of principal without getting all the beneficiaries and contingent remaindermen to consent in writing. (*See* Ex. 157 (some of the letters that were sent seeking authorization).)

**THE EBER BROS. BUSINESS**

8.     Eber Bros. & Co., Inc. ("EB&C") is a New York corporation with a capital structure comprised of three classes of shares: Class A Common Shares (Voting); Class B Common Shares (Nonvoting); and 6% Non-Cumulative Preferred Shares (Nonvoting). As of February 2017, the Trust held the following shares of EB&C stock, registered under the name of "Lester Eber, Elliot W. Gumaer, Jr., M&T Bank, Co-Trustees U/W Allen Eber Residuary": 1850 Class A Voting Shares; 290 Class B Nonvoting Shares; 2000 6% Preferred Nonvoting Shares. (Ex. 148 (Response 21); Ex. 149 (Response 19); Ex. 135 at 33 (Sched. G).) According to EB&C corporate records, these shares are still registered under the same name. (Ex. 148 (Response 21.) The Trust has directly held all voting shares in EB&C since approximately 1980. (Ex. 11.) The only other registered shareholders of EB&C at any time over the last 20 years have been Lester Eber and Sally Kleeberg, with each holding 100 shares of Class B Nonvoting Common Shares. (Ex. 11.)

9.      EB&C has directly held all voting shares in its subsidiary, Eber Bros. Wine and Liquor Corporation ("EBWLC") since its formation until at least February 2017. (Ex. 11.) The only other shareholder of EBWLC prior to February 2017 was the Trust, which directly held nonvoting common and preferred shares in EBWLC. (*Id.*) EBWLC was a Trust asset. (L. Eber Dep. 81:22–24).

10.      Before June 5, 2012, Eber Bros. Wine & Liquor Metro, Inc. ("Eber Metro") was a wholly owned subsidiary of EBWLC. (Ex. 11.)

11.      In 2005, Eber Metro acquired Slocum & Sons, Inc. through a merger with a newly formed Delaware limited liability company called Eber-Connecticut, LLC ("Eber-CT"), although it continued to do business as "Slocum and Sons." (Ex. 55 at 1.) Until 2008, Eber-CT was a wholly owned subsidiary of Eber Metro. (Ex. 11; Ex. 56.)

12.      In 2008, 15% of Eber Metro's interest in Eber-CT was sold to Eder-Goodman, LLC for consideration that included a $4.5 million payment to Eber Metro. (Ex. 56.) Eder-Goodman also acquire a right of first refusal (sometimes abbreviated "ROFR") on any further sales by Eber Metro of Eber-CT membership units, allowing it to purchase the membership units for itself on the same terms that were offered. (*See* Ex. 44 (Alexbay Compl. ¶ 34); Ex. 57 § 7.3.1 (Eber-CT LLC Agreement: "Right of First Refusal").)

13.      In 2010, 6% of Eber Metro's interest in Eber-CT was transferred to Polebridge Bowman Partners, LLC ("Polebridge Bowman"), at a contractually specified purchase price of $350,000, although no cash consideration was exchanged because Eber Metro accepted payment in the form of a non-recourse promissory note from Polebridge Bowman. (Ex. 14.) Polebridge Bowman's note provided for simple interest at the fixed rate of 2%. (*Id.*) Eder-Goodman declined to exercise its ROFR and consented to the sale at that price. (Ex. 44 ¶¶ 34–35.)

14.     After transferring some of Eber Metro's interest to third parties, Eber-CT remained a Trust asset, with 79% of its equity owned by Eber Metro. (L. Eber Dep. 87:6–24; Ex. 4; Ex. 11; *see also, e.g.*, Ex. 123 (showing the Trust guaranteed and secured a loan from CNB to Eber-CT: "the Allen Eber Trust agrees to pledge their shares of capital stock in the various corporations"); Ex. 161 at 3 (Lester letter to Audrey Hays accompanying Trust letter from CNB re: "Our business is limited to Connecticut;").)

15.     As part of the over 2005 transaction with Slocum & Sons, Inc., Eber Metro acquired a Call Option to acquire Slocum & Sons of Maine, Inc. ("Slocum of Maine") at an exercise price of $10.  (Ex. 55 at 1.) The Call Option was originally set to expire in 2008 but it was extended to December 31, 2012. (*Id.*)

16.     Slocum of Maine serves as an out-of-state shipper that provides important services for the operations of Eber-CT without charging a markup to Eber-CT. (Ex. 88 at 3 (Response 8).) For example, during each of 2011 and 2012, Eber-CT purchased over $3 million a year in products through Slocum of Maine. (Ex. 158 at 7 note 4.) During those two years, neither Lester nor his daughter, Wendy Eber, who was also in the management of the business, received any compensation from Slocum of Maine. (Ex. 88 at 1; Ex. 142 at 1.)

17.     Gumaer was a director of EB&C, EBWLC, and Eber Metro from before 2000 through at least the end of 2013. (Ex. 21; Ex. 142 at 4.) Wendy was a director of the same companies from at least 2008 through 2013; Wendy also served as an officer. (Ex. 147 at 2.)

**GUMAER'S CONFLICT OF INTEREST**

18.     By letter agreement dated January 2, 2001, Gumaer agreed to perform the following tasks for a single, lump-sum fee of $40,000 per year, paid by the Trust-controlled business:

    a.   To serve as co-trustee of the Trust;

    b.   To serve as a director on the boards of Eber companies;

   c.   To serve as personal attorney to Lester Eber.

(Ex. 47; *see also* L. Eber Dep. 258:25–259:8 (fees originally paid by EBWLC then switched to Eber-CT at some point).) Even after Eber-CT was no longer controlled as a Trust asset due to the Metro Transfer, Eber-CT paid Gumaer at least in part for his services as trustee. (Ex. 67.)

19.   Significantly, Lester did not disclose the terms of the letter agreement to anyone, not even Wendy Eber. (L. Eber Dep. 260:13–19 (stating that terms were disclosed to Wendy and no one else); Ex. 110 (Errata re: 260:16, retracting answer that he disclosed the terms to Wendy).) *See also* Ex. 48 (Gumaer describing himself in 2013 as being paid to be Lester's "confid[a]nt").)

20.   The other Trust beneficiaries besides Lester Eber were not aware of the attorney-client relationship between Gumaer and Lester. (Hays Decl. ¶ 11; Stein Decl. ¶ 5.)

21.   Whenever Lester Eber abstained or recused himself from voting on resolutions as a director at board meetings, Gumaer nonetheless proceeded to vote even though he had an attorney-client relationship with Lester individually. (*See, e.g.*, Ex. 152 (recognizing "the conflict of interest inherent in the [loan] transactions"); L. Eber Dep. 336:2–18 (Lester believed Gumaer was still his personal attorney from 1970 until the day Gumaer died).)

22.   CNB, as co-trustee, knew that Gumaer was a lawyer for the Eber Bros. business and "in some cases maybe Lester personally," and they saw that as creating a conflict of interest (Hawks Dep. 45:1–25; 282:14–22.) CNB reviewed that conflict internally and concluded it "was not a major issue," but it CNB did not review the January 2001 engagement letter and was  not aware of exactly how Gumaer was being compensated for any of his services. (*Id.* at 282:22–283:3, 283:16, 285:9–287:11.) CNB is unaware of any disclosure of Gumaer's potential conflict of interest to the other Trust beneficiaries. (*Id.* at 287:12–18.)

**THE SOUTHERN WINE & SPIRITS TRANSACTIONS**

23.   Lester Eber served in the following officer positions with Eber. Bros. companies:

a. EB&C: President, from before 2000 through the present (Ex. 142 at 4)

b. EBWLC: President, from before 2000 until Feb. 1, 2012 (*id.*)

c. Eber Metro: President, from before 2000 through the present (Ex. 147 at 2)

d. Eber-CT: Chief Executive Officer, from 2008 (at the latest) to the present (Ex. 59 at EB-00022906)

At all times when Lester was an officer for one of the corporations, he was also a director, and in the case of Eber-CT, he was Chairman of the Board of Managers. (*Id.*; Ex. 147 at 2.)

24.    The following chart reflects Lester Eber's employee compensation from the Eber Bros. companies from 2006 through 2017, as reported on Form W-2s to the IRS:

| Year | Payor | Salary | 401k Contribution |
|------|-------|--------|-------------------|
| 2006 | EBWLC | $305,289.28 | $20,000.00 |
| 2007 | EBWLC | $303,021.28 | $15,500.00 |
| 2008 | Eber-CT | $189,788.84 | - |
| 2009 | Eber-CT | $182,039.12 | - |
| 2010 | EBWLC | $146,150.16 | $16,500.00 |
| 2011 | Eber-CT | $155,665.89 | $16,500.00 |
| 2012 | Eber-CT | $120.698.37 | $17,000.00 |
| 2013 | Eber-CT | $174,461.08 | $17,500.00 |
| 2014 | Eber-CT | $172,135.56 | $23,000.00 |
| 2015 | Eber-CT | $313,977.73 | $24,000.00 |
| 2016 | Eber-CT | $292,873.14 | $24,000.00 |
| 2017 | Eber-CT | $300,269.76 | $24,000.00 |

(Exs. 28, 155.)

25.     In 2007, the Eber Bros. companies entered into many interrelated agreements with their competitor, Southern Wine & Spirits ("Southern") and its affiliates, including a settlement of litigation between Eber Bros. and Southern, agreements to sell Eber Bros.' wine and liquor holdings in Delaware and Ohio, and an agreement that Eber Bros. would wind down its operations in the State of New York. (*See generally* Exs. 154, 162.)

26.     Most of the transactions with Southern were authorized by written consents from the shareholders of EB&C, EBWLC, and Eber Metro, including written consent by each of the co-trustees on behalf of "The Allen Eber Trust, Shareholder." (Ex. 154 at EB-00000463–465 (reflecting signatures by Lester Eber, Elliott Gumaer, and Richard Hawks for CNB).) Lester also personally informed the Trust beneficiaries about the transaction while it was happening. (Hays Decl. ¶ 13.)

27.     Lester negotiated a personal Consulting Agreement with Southern at the same time that he negotiated other transactions with Southern on behalf of EBWLC and related entities. (Ex. 162 at (Harris Beach Transaction Binder Table of Contents).) Lester utilized EBWLC's corporate counsel, Patrick Dalton of Harris Beach, to negotiate his personal Consulting Agreement with Southern. (L. Eber Dep. 69:23-70:2; Ex. 27 at 7; Southern Dep. 26:19–27:13.)

28.     The Consulting Agreement provided for an annual sum payment to Lester personally, every year for five years, in the amount of $600,000, which was approximately twice what Lester was paid in terms of salary by EBWLC as of 2007, and almost quadruple what he was paid by EBWLC in 2010. (Ex. 27 § 4; Ex. 28 at 1; Ex. 155; L. Eber Dep. 66:16–68:2.)

29.     As part of his Consulting Agreement, Lester entered into a restrictive covenant so that he would not compete against Southern. (L. Eber Dep. 71:2–9; Ex. 27 § 6.) The restriction lasted for the term of the Consulting Agreement and five years thereafter. Ex. 27 § 6.) The

"Restricted Business Activity" was defined as, among other things, acts to "otherwise divert or attempt to divert from Southern any Business or Business opportunity whatsoever." (*Id.* § 6(a)(vi).)

30.     Southern offered Lester a consulting position because Southern "didn't want Lester to interfere in [their] brand building and [their] selling ways," (Southern Dep. 38:2–3), and Southern's decision to enter into a restrictive covenant with Lester specifically was because: "we said we don't want this guy *or any of his companies* in any format coming back and competing with us." (*Id.* at 32:8–22 (emphasis added).) Southern "[a]bsolutely" has "no idea" why there was no similar restrictive covenant executed by EBWLC or several of the other Eber entities. (*Id.* at 31:17–32:6; *see also* Ex. 162 (showing restrictive covenants entered only by PW&S and Eber Bros. Acquisition Corp—subsidiaries that were selling their assets to Southern and shutting down); Ex. 88 at 4 (Response 8, stating neither company had officers or directors after 2008).)

31.     Lester's consulting role with Southern was meant to be significantly more limited than the role of someone who was actually managing business operations. (Southern Dep. 22:2–17 ("A hundred percent [more limited].").)

32.     Southern offered Lester the Consulting Agreement at least in part because "charming the old owners" with "consulting, advisory, whatever" contracts was part of Southern's "game plan" when pursuing a "family owned" business. (Southern Dep. 18–24:1 (stating that "the very, very top" management was usually retained).) It was also at least in part because of the knowledge and experience Lester had acquired as the President of EBWLC. (Southern Dep. 21:5–22:1.) Southern wanted Lester to consult on government affairs in New York, among other things, with the understanding that Lester "absolutely" had experience in such work, and had already seen "Lester walk[ing] the halls of Albany" and being on a first-name basis with people there. (*Id.* at

41:16–43:16.) Lester gained that experience while working for EBWLC as a salaried employee. (L. Eber Dep. 445:17–446:9.)

33.     Southern was only interested in retaining Lester if it had a contract that required his "personal services" because Southern did not "want to be bound to a corporation for consulting." (Southern Dep. 43:17–9 (expressing concern that it would have to keep paying even if Lester died).) Southern was not presented with the option of executing the Consulting Agreement wit any of the Eber Bros. companies, but if Lester had proposed doing the Consulting Agreement through one of the Eber Bros. companies instead of directly with himself, Southern's only material concern would have been whether the contract was legally enforceable to procure Lester's personal services. (*Id.* at 69:13–71:12 ("I would go to my attorneys and say is this going to accomplish what I want or not.").)

34.     Although Southern regularly entered into consulting relationships with the former owners of businesses it acquired, Lester Eber is the only consultant who continued to manage a wine and liquor distributorship contemporaneously with the consulting relationship. (Southern Dep. 45:1–10, 71:14–25.)

35.     Lester's personal Consulting Agreement with Southern was never authorized by the board of directors of any Eber company, nor was it part of the written consent by the co-trustees (*See* Ex. 154 (omitting any mention of the Consulting Agreement).)

36.     Since the five-year term of the Consulting Agreement ended, Lester has continued to consult for Southern at the reduced rate of $310,000 per year ever since, without a complete written agreement. (L. Eber Dep. 71:12–16, 75:7–76:11, 78:10–22; Southern Dep. 49:16–51:6, 62:15–17). The original Consulting Agreement's restrictive covenant expired in 2017. (Southern

Dep. 51:7–12.) Although the amount of the consulting fee decreased, the amount of time Lester has devoted to the consulting work has probably increased. (*Id.* at 85:10–13.)

**LESTER'S LOANS**

37.    In October 2009, Lester executed a Line of Credit Note (the "LOC Note") in which he agreed to loan up to $1.5 million to Eber Metro, at a compound interest rate of 12.5%. (Ex. 13.) Lester executed the LOC Note without requiring security for the potential loans that would be made pursuant to the LOC Note. (L. Eber Dep. 102:16–25, 103:10–24.)

38.    The LOC Note had a maturity date of December 31, 2011, meaning that the entire amount loan had to be paid back by that date. (Ex. 13 at 1; L. Eber Dep. 106:13–20.) Lester does not know how the maturity date for the LOC Note was determined. (L. Eber Dep. 106:21–23.) Neither does Eber Metro. (Eber Metro Dep. 74:12–76:23 (Wendy as corporate representative).)

39.    Glenn Sturm, an attorney and consultant to one or more of the Eber Bros. corporations who also gave legal advice to Lester personally, told Lester that he should secure the loans that he had made to the company. (L. Eber Dep. 331:3–14, 333:24–334:5, 440:11–24.)

40.    Lester Eber executed a document titled "Security Agreement" with Eber Metro and EBWLC that was dated "as of February 26, 2010." (Ex. 15; L. Eber Dep. 103:2–13.) Lester acted out of self-interest when he entered into the Security Agreement. (L. Eber Dep. 103:10-13). Lester also signed a Guaranty with EBWLC, providing further security for his LOC Note, "as of February 26, 2010." (Ex. 140.) And then Lester signed an identical version of the October 2009 LOC Note with a new date of "February 26, 2010." (Ex. 15.)

41.    On February 26, 2010, the boards of EBWLC and Eber Metro met along with Glenn Sturm to discuss and ultimately vote on whether to approve the LOC Note, the Security Agreement, and the Guaranty. (Ex. 117 at 2; Ex. 152.) Lester abstained from the vote, but Gumaer and Wendy voted yes, approving the LOC Note, Security Agreement, and Guaranty. (*Id.*)

11

42.     On March 4, 2010, Wendy circulated draft minutes of the February 26, 2010 board of directors meetings for EBWLC and Eber Metro. (Ex. 117.) The minutes falsely described Lester as being unwilling to provide financing under the LOC Note "if he had a secured interest in substantially all of the assets of [Eber Metro]," and omitted the fact that Lester had already executed the LOC Note in October 2009.  (*Id.* at 2.) In fact, Lester had not insisted that he would not loan more money to the company unless he was given a security agreement, because he was willing to do "whatever [he] had to to keep the company alive." (L. Eber Dep. 102:16–25.)

43.     In April 2010, Lester sent correspondence to Audrey Hays and Sally Kleeberg purporting to offer them the chance to loan money to Eber Metro on the same terms as Lester did pursuant to the LOC Note, to support "our Connecticut business and its parent company." (*E.g.*, Ex. 49 (Letter to Sally).) After sending the letters, Lester also spoke to Sally Kleeberg and Audrey Hays about loaning money to Eber Metro. (Lester Dept. 116:16–7; Hays Decl. ¶ 16.). Both Sally Kleeberg and Audrey Hays declined to loan money to Eber Metro at the time. (L. Eber Dep. 116:2–3, 117:24–25; Hays Decl. ¶ 16.). Lester never informed Sally Kleeberg or Audrey Hays about the possibility that he would take control of the Connecticut business away from the Trust if they declined to loan money to Eber Metro. (L. Eber Dep. 118:2–11, 117:8–12; Hays Decl. ¶ 17.).

44.     On February 11, 2011, Eber Metro agreed to assume preexisting debt that was owed by EBWLC to Lester. (Ex. 17.) At the same time, both EBWLC and Eber Metro executed an Amended and Restated Security Agreement "in favor of" Lester Eber. (Ex. 18.) On August 18, 2011, a meeting of the Trust's co-trustees was held at CNB in Rochester, and minutes reflect that they voted (with Lester abstaining) to ratify Lester's prior loans to the Eber Bros. companies and these associated security and assumption agreements as well. (Ex. 6 at EB-00000847.)

45.     On December 27, 2011, CNB advised Wendy that CNB agreed to "extend the maturity date" of its $3,680,000 line of credit to Eber-CT to March 1, 2012. (Ex. 123 at EB-0020084.) Under the then-existing terms of the CNB line of credit, it was in default because its maturity date of November 1, 2011 had already passed without payment in full being made. (*Id.* at EB-00020076.) CNB extended the maturity dates on its loans on multiple occasions. (Eber Metro Dep. 85:5–9; L. Eber Dep. 439:8–19 (acknowledging that extending the time to repay credit was a good thing for the company).)

46.     On December 31, 2011, Eber Metro defaulted on the LOC Note by failing to repay Lester the full amount borrowed from Lester. Lester did not extend the maturity date on the LOC Note but he does not remember why he did not. (L. Eber Dep. 435:23–437:15.) Eber Metro made no attempt to extend the maturity date. (*See* Eber Metro Dep. 86:12–88:14, 106:5–110:19 (generally extremely evasive testimony surrounding questions about why not).)

47.     After the maturity date passed and Eber Metro defaulted on the LOC Note, Lester continued loaning money to Eber Metro. (*See* Ex. 12 (showing $238,000 loaned by Lester between January and May 2012).)

**THE METRO TRANSFER TO LESTER'S ALEXBAY**

48.     Through the strict foreclosure transfer to Alexbay, Lester converted his debt position with the company into an equity position, and thereby went from being a lender to Eber Metro to being the owner of Eber Metro. (Hawks Dep. 268:2–7.)

49.     On December 8, 2011, Lester registered a new entity called Lester Eber, LLC with the State of Connecticut. Lester Eber, LLC was subsequently renamed Alexbay, LLC. (Ex. 31.) Lester has always personally owned 100% of Alexbay. (*Id.*)

50.     On or about January 18, 2012, Lester assigned all outstanding debts owed to him by Eber Metro to Alexbay. (Ex. 44 ¶ 24.) That same day, Alexbay sent Eber Metro a notice under

UCC § 9-620 of its intent to accept its 79% interest in Eber-CT in full satisfaction of Eber Metro's debts to Lester, which had been assigned to Alexbay. (Ex. 163.) Notice was also sent to the Teamsters. (*Id.*; Ex. 109.) Wendy Eber helped Lester's attorney, David Belt, prepare these notices. (Exs. 112, 114.)

51.     Lester did not proceed to take Eber Metro's interest in Eber-CT, however. If Lester had proceeded to try to transfer Eber Metro's interest in Eber-CT to Alexbay for the amount of the debt, Eber Metro would have been required to permit Eder-Goodman, LLC to exercise its right of first refusal, giving it the opportunity to acquire control of Eber-CT. (*See supra* ¶ 12.) Instead, Alexbay revised its UCC § 9-620 notice to be addressed to EBWLC and to offer to accept EBWLC's 100% interest in Eber Metro in full satisfaction of Eber Metro's debts to Lester, which had been assigned to Alexbay. (Ex. 59; *see also* Ex. 44 ¶ 26.)

52.     Lester resigned as President and Director of EBWLC effective February 1, 2012. (Ex. 77.) Lester remained President and Director of Eber Metro after his resignation from EBWLC and was President when Alexbay formally acquired Eber Metro. (Ex. 62.) Lester also remained President and Director of EB&C after his resignation from EBWLC. (Ex. 147 at 2.) Lester has never resigned as trustee of the Trust and has never provided an accounting of any of his transactions with the Trust in accordance with SCPA § 2208.

53.     On February 21, 2012, Alexbay filed a lawsuit in the Supreme Court of Monroe County, New York, seeking a judicial declaration that Alexbay's revised proposal to take EBWLC's stock in Eber Metro was "commercially reasonable" under the UCC. (Ex. 44 (Summons and Complaint).) Neither the Trust nor any other Trust beneficiary was named in or served with Alexbay's suit. (*See id.*)

54.     The pleadings filed by Alexbay contended that the proposed transfer of Eber Metro to Alexbay for elimination of the debt owed by Eber Metro to Alexbay was "commercially reasonable" because all of Eber Metro's assets were equivalent in value to the amount of debt owed to Alexbay. (Ex. 44 ¶ 24; *see also* Ex. 45 ¶ 6 (Lester Eber Affidavit).). Alexbay's valuation relied primarily on the 2010 Polebridge Bowman transaction to derive a base value of the equity at that point in time, and then subtracted the amount of subsequent losses as reflected by Eber-CT's books. (*See* Ex. 44 ¶ 30–39; Ex. 45 ¶ 6) Based on this one prior transaction and part of Eber-CT's books, Alexbay calculated the value of Eber-CT at $4,633,300 as of December 2011, and Eber Metro's 79% interest in it as approximately $3,660,000. (Ex. 44 (Alexbay Complaint ¶¶ 32–39); Ex. 45 ¶ 6.)

55.     On March 9, 2012, Guamer sent an email to Wendy and Lester Eber in which he stated: "Someone will have to explain to me why the action Lester may take to secure his indebtedness will adversely affect the relationship with CNB. I assume that notice of that action will be given to all parties interested in the trust and the action will be affirmed by Court order." In response, Wendy directed Gumaer to "Please call Glenn [Sturm] at 4pm today…" (Ex. 102.)

56.     On March 13, 2012, shortly before a board meeting scheduled later that day, Gumaer sent an email to Wendy stating: "I am not in a position to discuss in any depth the Alexbay matter as I learned of the matter yesterday afternoon in the email from Underberg. Hawks will be interested in knowing (as will I) what will be the status of the Eber Trust with respect to Eber assets held in the trust. . . . On the s[urfac]e it looks like Le[]ster is moving against the trust of which he is a co-trustee." (Ex. 122; W. Eber Dep. 329:4–13 (agreeing that Gumaer was stating that "it looked like Lester was moving against the trust of which he was a cotrustee," and admitting that that "that's what it was": "Lester was moving against the company. Yes.")

57.     Days before the board meeting, Marino Fernandez, counsel of record representing EBWLC and Eber Metro, had already signed a stipulation consenting to the relief requested by Alexbay. (Ex. 159.) During the March 13, 2012, combined board meeting for EBWLC and Eber Metro, Wendy Eber and Mr. Fernandez met in person while Elliott Gumaer and Lester Eber called in by phone. (Ex. 60.) The minutes reflect that, in preparation for the meeting, Mr. Fernandez had reviewed the pledings [sic], and appeared for EWLC and entered into the Stipulation [Ex. 159] and discussed the same with Wendy Eber and Alex Bay [sic], LLC counsel." (*Id.*)

58.     Afterwards there were "additional conference calls," and "after extensive conversation on this matter the board decided not to extend [sic] funds on defending the suit and authorized the company to waive its defenses." (Ex. 60 at 2 (undated revised minutes without dates for referenced calls or identification of which individuals participated on the calls or which board members participated in the ultimate decision); Ex. 61 at 1 (identifying meeting or calls between

59.     Wendy and Gumaer "throughout the week of March 13, 2012, May 30, 2012, and June 1, 2012").) There are no board meeting minutes suggesting that the board considered any valuation of Eber Metro besides that used in "the ple[a]dings" filed by Alexbay—the party seeking to acquire Eber Metro. (Ex. 60.) The ultimate written consent signed by Wendy and Gumaer on June 6 and 9, 2012, respectively, references "consideration of the financial statements and records of [EBWLC] and other information deemed relevant by the Board of Directors," but it does not indicate what those other records were, or if they included the financial statements of Eber-CT or Eber Metro, which, if relied upon, would have led to the conclusion that Lester might be acquiring an asset worth over $1 million more than the amount of debt that was due to him. (*See* Ex. 158 at 2 (last audited financial statement available as of Metro Transfer date reflected book value of Eber-CT's equity as $5,699,031 as of 5/31/2011.); *infra* ¶ 63.)

60.     Marino Fernandez was the sole independent lawyer, consultant, or advisor retained to advise EBWLC and its board of directors in connection with Alexbay's UCC Article 9 proposal and lawsuit. (Ex. 60.) His total amount of legal fees and expenses billed for advising the company in connection with Alexbay's proposal to take Eber Metro was just $586.25. (*See* Ex. 160 (General Ledger excerpt at 5/9/2012 Bill).)

61.     The transfer of Eber Metro to Alexbay was finalized on June 5, 2012, and on that same date, all 20,000 shares of Eber Metro stock were registered in Alexbay's name, on a certificate signed by Lester. (Exs. 62, 63.) Around the time of the transfer, Lester thought "it was questionable whether was any value to [Eber. Bros.] because of the monies that were owed" as debts to third parties. (L. Eber Dep. 363:4–20.)

62.     Alexbay and Lester represented the Polebridge Bowman transaction to the Supreme Court as having been a "very recent arms' length sale[] on the open market." (Ex. 45 ¶ 6; Ex. 44 (Alexbay Compl. ¶ 36: "Polebridge Bowman's acquisition of its ownership interest in EberConn represents the best evidence of the current value of ownership rights in EberConn: it is the last time the *free market* has spoken with respect to the value of EberConn's membership units.") (emphasis added).)

63.     Alexbay did not disclose to the Supreme Court the fact that Polebridge Bowman "Partners" was in fact solely owned by a single individual, Glenn Sturm, who was a lawyer to the Ebers and/or their companies. (Exs. 44, 45.) Nor did Alexbay disclose that the Polebridge Bowman transaction was only offered to Glenn Sturm as compensation for his services. (W. Eber Dep. 43:11–44:21, 53:21–56:10; *see also* L. Eber Dep. 210:7–13:9 (evasive testimony refusing to acknowledge that his affidavit (Ex. 45 ¶ 6) was describing the Polebridge Bowman transaction).)

64.     In addition to the 79% interest in Eber-CT, Eber Metro's other assets were worth $374,728, comprising $10,728 in cash and an outstanding Note Receivable from Polebridge Bowman in the principal amount of $350,000 plus accrued interest (at 2% simple) of $14,000 as of May 31, 2012. (Ex. 126 at 36 (omitting to calculate the interest on the Note, however).) In its filing to the Monroe County Supreme Court, Alexbay said, somewhat correctly, that "Metro has no cash reserves other than those required in the ordinary course of its business." (Ex. 44 ¶ 30.) Alexbay made a misrepresentation, however, that there were no other "valuable" assets "of any kind" besides the interest in Eber-CT. (*Id.*; *see also generally* Exs. 44, 45 (omitting to disclose the Polebridge Bowman note receivable).)

65.     An experienced appraiser or valuation expert relying on solely the Polebridge Bowman transaction as the basis for determining the value of Eber Metro's interest in Eber-CT would calculate the value of that interest as of May 23, 2012 at $5,523,103. (Ex. 139 (Torchio Report Rev. Ex. D.) Combining the appraisal value based on Polebridge Bowman with its other assets results in a total asset value of $5,897,831. (*See id.* (but omitting the Note interest).)

66.     A reasonable investor, experienced appraiser, or individual experienced in business valuation, with full knowledge of the facts concerning the Polebridge Bowman transaction, would not have relied on the Polebridge Bowman transaction alone to determine the value of Eber Metro's interest in Eber-CT. (Torchio Dep. 104:18–105:6)

67.     An experienced appraiser or valuation expert relying on multiple data points to determine the value of Eber Metro's interest in Eber-CT would estimate the value of that interest as of May 23, 2012 as a range of values from approximately $646,413 to $10,718,229, and an appropriate "point estimate" would be that range's "midpoint" of $5,682,321. (Torchio Dep. 86:1–25; Ex. 139 at Rev. Ex. D.) Adding the value of Eber Metro's other assets to the "point estimate"

of Eber Metro's interest in Eber-CT results in a total value of Eber Metro's assets (excluding any actual or potential liabilities) of $6,057,049.

68.     As of May 23, 2012, Eber Metro had no outstanding liabilities on its own; to the extent that Eber Metro had any liabilities, it is undisputed that EBWLC was either jointly liable or the guarantor. (*Id.* (identifying liabilities to (i) Lester Eber/Alexbay, (ii) Pension Benefit Guarantee Corp. ("PBGC"), (iii) the Teamsters, and (iv) Harris Beach, LLP).)

69.     The face value of the debts held by Alexbay as of May 23, 2012 was $3,898,366. (Ex. 126 at 12 (Summary of Liabilities chart showing $3,060,711 in principal plus $837,655 in interest due to Lester Eber).) Excluding Alexbay, as of May 23, 2012, EBWLC had liabilities of $7,567,263. (*Id.*) Immediately after the transfer of Eber Metro to Alexbay, EBWLC still had gross liabilities of approximately $7,567,263 outstanding to five different, unrelated creditors. (*Id.*) If the Guaranty assigned to Alexbay is treated as if it were outstanding debt of EBWLC, then EBWLC's disposition of Eber Metro eliminated approximately 34% of its outstanding debts. (*Id.*)

70.     Alexbay's strict foreclosure on Eber Metro was equivalent to a "sale" of Eber Metro to Alexbay for the amount of the debt. (W. Eber Dep. 62:6–12 (describing the transaction as "[t]he article nine sale."); Torchio Dep. 82:4–83:9 (acknowledging the "distinct possibility" of fraudulent conveyance because this is "a situation where you're selling assets and you're receiving a price that is less than the liabilities").) Aside from Eber Metro, EBWLC's only asset was $2,251 in cash. (Ex. 126 at 36.) EBWLC's disposition of Eber Metro constituted a disposition of substantially all of its assets. (L. Eber Dep. 361:22– 362:18; Ex. 126 at 36; Ex. 127 at 20.)

71.     Prior to it being approved by EBWLC's board, neither Sally Kleeberg nor Audrey Hays were informed about Alexbay's proposal to accept the stock of Eber Metro in consideration for the elimination of Eber Metro's debt to Alexbay. (Ex. 141 at 3–4 (Responses 12 & 14); Ex.

142 at 2 (Response 2, second bullet); Hays Decl. ¶¶ 16–18;; L. Eber Dep. 279:17–22 (admitting he did not advise the other beneficiaries of the sale even after he saw that CNB made a misrepresentation to them indicating that Eber-CT was still a Trust asset); *see also id.* at 295:11–24.) Unlike the transfers of assets to Southern in 2007, no consent was obtained from EB&C as shareholder of EBWLC, nor was consent received from the Trust as shareholder of EB&C.

72.     The transfer of Eber Metro to Alexbay produced no benefit to the Trust or the other Trust beneficiaries not named Lester Eber. (L. Eber Dep. 293:11–294:24.) Nor did it produce any benefit to EBWLC. (*Cf.* L. Eber Dep. 442:8–443:20 (evasive testimony designed to justify making the loans in the first instance rather than the challenged decision of his foreclosure).)

73.     EBWLC's consent to transfer Eber Metro to Alexbay was objectively irrational from an economic point of view, even if the net asset value of Eber Metro was estimated to be negative at the time of the transfer. (Ex. 127 at 20–21 (Liebman Report).)

74.     A reasonable investor would have recognized the transfer of Eber Metro to Alexbay as "a shell game" that would likely be deemed a "fraudulent conveyance" by creditors like PBGC and Harris Beach, and thus incapable of avoiding the debts of EBWLC. (Torchio Dep. 72:21–79:23, 114:4–14 ("[T]here are no synergies created by Alexbay. That's just a shell game.").)

**TRANSACTIONS TO BENEFIT HIMSELF AND WENDY AFTER THE TRANSFER**

75.     In July 2012, Eber Metro exercised the Call Option to acquire Slocum of Maine for $10. (Ex. 55 at 3.) Eber Metro did not acquire any assets or stock, however; instead, George and Thomas Slocum transferred their 100% ownership interest in Slocum of Maine to Lester and Wendy Eber individually, each receiving a 50% interest. (*Id.*) From 2012 through at least 2016, Lester and Wendy have received income from Slocum of Maine. (Ex. 88 at 1 (Response 1); Ex. 143 at 1–2 (Response 1).)

76.    In August 2012, Lester approved a new employment contract with Wendy in which she was awarded shares in Eber Metro, which vested over time. (Ex. 151 (includes "Stand-Alone Restricted Stock Award Agreement" with Eber Metro, but this equity compensation is referenced in Employment Agreement § 4(b).) Pursuant to her new employment agreement signed by Lester after he took over control of Eber Metro, Wendy became the new President of Eber-CT, replacing one of the original Slocum family members. (*Id.*) Wendy subsequently acquired 2000 shares (9.1%) Eber Metro stock. (Ex. 147 at 1.)

**TERMINATION OF THE TRUST AND DISTRIBUTION OF SHARES**

77.    CNB first expressed its desire to petition the Surrogate's Court for termination of the Trust in a letter to Lester and Gumaer dated February 24, 2016. (Ex. 9.) CNB proposed to "distribute the remaining assets to the remaindermen of the Trust or such other distribution as determined by the Court" and advised that "[t]he remaindermen will be parties to the proceeding and will have an opportunity to review and either approve or object to the accounting and the proposed distribution." (*Id.* at 2.)

78.    On December 15, 2016, Wendy Eber advised CNB that, after consulting his attorney, Lester "would like to move forward with closing the trust, finalizing the accounting of the trust, and acquiring the stock of Eber Bros Wine and Liquor [i]mmediately." (Ex. 153.) CNB refused to support Lester's request, and Lester did not formally join CNB in its petition. (Ex. 86.)

79.    In February 2017, CNB petitioned the Surrogate's Court in Monroe County for termination of the Trust to be released from its further duties to the Trust by distributing the remaining assets of the Trust (as specified on its final accounting) to the beneficiaries in accordance with their respective interests in the Trust. (Ex. 135 at 1–3 (Petition).) CNB's account, which was provided in connection with its petition, included the Trust's shares in EB&C on the list of Trust assets to be distributed to the beneficiaries. (*Id.* at 33 (Sched. G: "Statement of

Principal Remaining on Hand").) CNB described the EB&C shares as having "market values" of "$0.00," (*id.* at 73–74), or alternatively as having "nominal" value, (*id.* at 2). CNB's petition relied on a January 2017 valuation of EBWLC performed by Empire Valuation Consultants, LLC ("Empire"). (*Id.* at 74.)

80.     Wendy Eber, who provided the valuation report to CNB through Lester's personal attorney, James Vazzana ("Vazzana"), retained Empire. (Ex. 136 at CNB-PL0036.) Empire's valuation treated this lawsuit filed by Plaintiffs as a potential "liability" against EBWLC. (*Id.* at CNB-PL0054 (Report Ex. D).) Empire's decision to treat this lawsuit as a liability rather than an asset was based on a "Lawsuit Letter" that it received from Colin D. Ramsey of Underberg & Kessler; Empire did not review a copy of the original Complaint. (*Id.* at CNB-PL0038.)

81.     CNB's petition sought only CNB's resignation and discharge as co-trustee, without seeking the same relief for the other co-trustees; the other co-trustees did not join in the petition and did not provide accountings of their own transactions. (Ex. 135 at 2–3.) Lester and Gumaer were identified as interested parties and served with the petition. (*Id.*)

82.     On March 13, 2017, Vazzana entered an appearance on behalf of Lester Eber in the Surrogate's Court proceedings initiated by CNB, and Lester personally signed the Authorized Notice of Retainer and Appearance. (Ex. 137.)

83.     In the Surrogate's Court, Lester did not object to either CNB's petition for termination of the Trust or CNB's proposed distribution. (Ex. 33 at 1 (noting "no Objections").)

84.     Plaintiffs did not enter an appearance or otherwise object to CNB's petition or accounting because the petition, if granted, would require the distribution of EB&C shares directly to Plaintiffs in accordance with their respective interests in the Trust. (Kleeberg Decl. ¶¶ 11–13; Hays Decl. ¶ 21; Stein Decl. ¶ 6.) That said, Plaintiffs did not ignore the proceeding; they instructed

their counsel to intervene and object if there was any sign of an attempt by Lester to divest Plaintiffs of their shares. (Kleeberg Decl. ¶¶ 11–13; *see also* Hays Decl ¶ 26; Stein Decl. ¶ 8.)

85.     On June 1, 2017, the Surrogate granted CNB's requested relief and ordered CNB to "pay the remaining cash and transfer, assign and deliver the other remaining assets shown in the account as follows (less certain specified fees and commissions):

> 1/3 to Lester Eber
>
> 1/3 to Audrey Hays
>
> 1/6 to Daniel Kleeberg
>
> 1/6 to Lisa Stein

(Ex. 33 at 3.) Applied to the shares of EB&C held by the Trust, the Surrogate's Court ordered the following distribution of EB&C shares:

- **Class A Voting:** 616.67 (or 616 and 2/3) shares each to Lester Eber and Audrey Hays; 308.33 (or 308 and 1/3) shares each to Lisa Stein and Daniel Kleeberg.

- **Class B Nonvoting:** 96.67 (or 96 and 2/3) shares each to Lester Eber and Audrey Hays; 48.33 (or 48 and 1/3) shares each to Lisa Stein and Daniel Kleeberg.

- **6% Preferred Nonvoting:** 666.67 (or 666 and 2/3) shares each to Lester Eber and Audrey Hays; 333.33 (or 333 and 1/3) shares each to Lisa Stein and Daniel Kleeberg.

(Ex. 149 at 5–6 (Response 19); *see also id.* at 5 (Response 18).)

86.     Lester Eber received a copy of the Surrogate's June 1, 2017 Order from his lawyer promptly after his lawyer received it. (L. Eber Dep. 129:10–3.) On July 12, 2012, Lester was sent a letter from CNB, disclosing its intent to distribute approximately two-thirds of the EB&C shares to Plaintiffs. (Ex. 32 at 1 (cover letter re sending "Chart showing distribution of shares"; *id.* at 3 (chart showing distribution of 1240 Class A Voting shares to Plaintiffs, equal to 67% control).)

87.     In response to the July 12 letter, Lester's lawyer, James Vazzana, disputed the proposed distribution of cash and *marketable* securities, but <u>not</u> the distribution of EB&C stock.

(Ex. 34.) He relied in part on Wendy Eber's own pro forma spreadsheet of changes to the distribution, (*id.* at 2–3), which did "not [have] anything to do with the Eber Brothers equity, only the marketable securities …." (W. Eber Dep. 338:24–341:17.)

LESTER'S "NOTICE OF INTENT TO PURCHASE" OVER A YEAR LATER

88.     The Bylaws of EB&C in effect in 2017 included a provision restricting the transfer of shares unless the transferring shareholder first gave certain notice to EB&C's President or Secretary. (Ex. 133 at 11–12 ("Article XII. Transfer Restriction.".) Once notice of a transfer is given, "[a]ny other shareholder" may give notice "within said five day period" to the transferring shareholder of its intent to purchase the shares instead for an amount calculated based on the last available book value of EB&C. (*Id.*) Lester does not know why that provision was put into the Bylaws of both EB&C and EBWLC, and he is unaware of it ever being enforced. (L. Eber Dep. 397:2–14.)

89.     As the longtime President and director of EB&C, Lester had access to and knew about the Bylaws, including the transfer restriction in Article XII. (Brook Decl. ¶ 8.) The Bylaws of EB&C were not disclosed to Plaintiffs or their counsel until October 2, 2018. (*Id.*)

90.     Lester, Wendy, and their lawyer failed to mention the transfer restriction in EB&C's Bylaws to CNB or the Surrogate's Court at any time in 2016 or 2017, even though they repeatedly told CNB Lester was interested in acquiring the Eber Bros. stock—starting after Plaintiffs filed this lawsuit in December 2016 through March 2017. (Exs. 153, 86.)

91.     The certificates stated that they were "transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of this Certificate properly endorsed." (*Id.*) No reference to any restriction on that right to transfer is noted on any of the certificates. (*Id.*)

92.     As of 2017, CNB was unaware that EB&C's Bylaws included any provision restricting the transfer of stock. (L. Eber Dep. 397:15–24 (never had any discussions with CNB about the Bylaws).) CNB had possession of the EB&C Stock Certificates issued to Lester, Gumaer and the predecessor bank. (Ex. 134 (copies of the certificates).)

93.     In or about September 2017, Lester received a chart reflecting CNB's updated proposed distribution of Trust assets that included distribution of EB&C shares to Plaintiffs. (Ex. 36; L. Eber Dep. 141:22–142:8.) Soon thereafter, Lester received his share of the distribution of the Trust's cash and marketable securities in accordance with that chart. (Ex. 38.) On October 11, 2017, CNB sent correspondence to James Vazzana and Brian Brook concerning the outstanding need to deliver the EB&C shares and expressing a desire to do so in the amounts of shares that had been specified by the updated proposed distribution chart. (*Id.*) Plaintiffs were not thereafter informed that CNB and Lester Eber failed to complete the registration process for Plaintiffs shares in EB&C. (Hays Decl. ¶ 22.)

94.     Plaintiffs did not receive a copy of EB&C's Bylaws until October 2, 2018. (Brook Decl. ¶ 8.) On October 10, 2018, since a year had passed without any EB&C shareholder meetings, Audrey Hays formally requested a shareholder meeting for shareholders of EB&C. (Hays Decl. ¶ 23; Ex. 42.) EB&C, through Lester and Wendy Eber, refused Ms. Hays' request because they said that she was not a registered shareholder.

95.     Over a year later, on October 31, 2018, Lester sent a "Notice of Intent to Purchase" to the "Allen Eber Trust" care of CNB, invoking the Transfer Restriction in Bylaw XII. (Ex. 35.) He did so five days after Plaintiffs' counsel sent an email to Lester's lawyers in an effort to convince them they were wrong to deny Ms. Hays' meeting request and enclosing a copy of CNB's October 11, 2017 letter to James Vazzana as support. (Brook Decl. ¶ 10.)

96.     On December 17, 2018, Lester sent supplemental correspondence to "Allen Eber Trust" care of CNB in which he attempted to cure a deficiency from his October 31 Notice by stating that the purchase price he would pay for the shares was "$0." (Ex. 164; *see also* Brook Decl. ¶¶ 12–13.)

**THE 2017 VOTING PREFERRED STOCK ISSUANCE**

97.     Starting just months after the Metro Transfer, Lester, Wendy and their lawyers have worked hard to shield Lester from potential liability for that transaction and to frustrate any attempt by the Trust or Plaintiffs to reacquire control of the Connecticut business. *See, e.g.*, Ex. 98 (11/7/2012 Letter from Underberg & Kessler re: protecting Lester's money in case "the Article 9 transfer was somehow upset in the future").

98.     On February 14, 2017, Lester Eber, acting as President of EB&C, appointed Wendy Eber the sole director of EBWLC. (Ex. 42 at EB-00001173.)  That same day, Wendy Eber executed a Certificate of Amendment of the Certificate of Incorporation of EBWLC, authorizing the creation of a new class of stock—specifically, Class B junior preferred stock with voting rights. (Ex. 42 at EB-00001169–72.) In the Certificate of Amendment, Wendy affirmed under penalty of perjury that the amendment "*was authorized* by the unanimous written consent of the Board of Directors of the Corporation and by the Unanimous written consent of the shareholders of the Corporation entitled to vote thereon." (Ex. 42 at EB-00001172 (emphasis added).)

99.     The next day, on February 15, 2017, Wendy Eber signed a Written Consent of the Sole Member of the Board of Directors of EBWLC to the Certificate of Amendment that she had already signed the day before. (Ex. 43 at EB-00001166–67.) The 2017 Amendment to the Certificate of Incorporation was not approved by a vote of EBWLC's shareholders or by a written consent in lieu of a shareholder meeting. (Ex. 43.)

100.    On February 15, 2017, Wendy Eber, as "Assistant Secretary" of EBWLC, caused EBWLC to issue 750 shares of Class B junior preferred stock to Lester Eber in consideration of Lester Eber's agreement to reimburse EBWLC, "at its request, for up to $37,500.00 of expenses to be incurred by the Corporation in connection with its general operations." (Ex. 42 at EB-00001168.)

Respectfully submitted,

Dated: November 8, 2019                     /s Brian C. Brook
                                            Brian C. Brook (BB 1980)
                                            BROOK & ASSOCIATES, PLLC
                                            100 Church Street, 8th Floor
                                            New York, New York 10007
                                            Telephone: (212) 257-2334
                                            Facsimile: (646) 257-2887
                                            Brian@brook-law.com

                                            *Counsel for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*