## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "**Agreement**") is made and entered into as of _february 26_ ___, 2010 by **EBER BROS. WINE AND LIQUOR CORPORATION** ("**Parent**") and **EBER BROS. WINE & LIQUOR METRO, INC.** ("**Metro**"; Parent and Metro, individually and collectively, "**Debtor**") in favor of **LESTER EBER** ("**Secured Party**").

1.      THE SECURITY.  Debtor hereby assigns and grants to Secured Party a security interest in the following described property now owned or hereafter acquired by Debtor ("**Collateral**"):

(a)      All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles, including all amounts due to Debtor from a factor; and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.

(b)      All inventory, including all materials, work in process and finished goods.

(c)      All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by Debtor.

(d)      All of Debtor's deposit accounts. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

(e)      All instruments, notes, chattel paper, documents, certificates of deposit, securities and investment property of every type.  The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing.

(f)      All general intangibles, including, but not limited to, (i) all patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems.  The Collateral shall include all good will connected with or symbolized by any of such general intangibles; all contract rights, documents, applications, licenses, materials and other matters related to such general intangibles; all tangible property embodying or incorporating any such general intangibles; and all chattel paper and instruments relating to such general intangibles.

(g)      The shares of common stock and preferred stock, or partnership, membership and other ownership interests, now or hereafter owned by Debtor, including, without limitation, any membership interest in Eber-Connecticut, LLC now or hereafter



PLAINTIFF'S
EXHIBIT
15
1/23/19
PENGAD 800-631-6989

**CNB000055**

owned, directly or indirectly, by Metro and Parent and any ownership interests in Metro now or hereafter owned by Parent (collectively, the **"Pledged Equity"**), and all certificates evidencing the same, together with, in each case, all shares, securities, monies or property representing a dividend on any of the Pledged Equity, or representing a distribution or return of capital upon or in respect of the Pledged Equity, or resulting from a split up, revision, reclassification or other like change of the Pledged Equity or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Equity (the Pledged Equity, together with all other certificates, shares, securities, properties, ownership interests, or moneys, dividends, distributions, returns of capital subscription, warrants, rights or options as may from time to time be pledged hereunder pursuant to this clause being herein collectively called the **"Equity Collateral"**).

(h)     All negotiable and nonnegotiable documents of title covering any Collateral.

(i)     All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

(j)     All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral, and all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the Collateral and sums due from a third party which has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(k)     All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory (**"Books and Records"**).

2.     INDEBTEDNESS. The Collateral secures all Indebtedness.

**"Guaranty"** means that certain Guaranty dated as of the date hereof executed by the Metro in favor of Secured Party, as amended, restated, supplemented or otherwise modified from time to time.

**"Indebtedness"** means any and all debts, liabilities, and obligations of Debtor to Secured Party arising under the Transaction Documents, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Secured Party by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Secured Party for its own account or as agent for another or others, whether Debtor may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter

- 2 -

CNB000056

become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable.  Indebtedness includes, without limitation, any and all obligations of Debtor to Secured Party for reasonable attorneys' fees and all other costs and expenses incurred by Secured Party in the collection or enforcement of any debts, liabilities, and obligations of Debtor to Secured Party.

"**Note**" means that certain Line of Credit Note dated as of _Feb 26, 2010_ executed by Metro in favor of Secured Party in the maximum principal amount of $1,500,000 as amended, restated, supplemented or otherwise modified from time to time.

"**Transaction Documents**" means the Note, the Guaranty, this Agreement and each other document, instrument and agreement executed in connection therewith.

Capitalized terms used but not defined herein have the meanings given such terms in the Note.

3.    DEBTOR'S COVENANTS.  Debtor represents, covenants and warrants that unless compliance is waived by Secured Party in writing:

(a)    Debtor will properly preserve the Collateral; defend the Collateral against any adverse claims and demands; and keep accurate Books and Records.

(b)    Debtor shall give Secured Party at least thirty (30) days notice before changing its chief executive office or state of incorporation or organization. Debtor will notify Secured Party in writing prior to any change in the location of any Collateral, including the Books and Records.

(c)    Debtor will notify Secured Party in writing prior to any change in Debtor's name, identity or business structure.

(d)    Except for liens existing on the date hereof, Debtor has not granted and will not grant any security interest in any of the Collateral except to Secured Party, and will keep the Collateral free of all liens, claims, security interests and encumbrances of any kind or nature except the security interest of Secured Party.

(e)    Debtor will promptly notify Secured Party in writing of any event which materially and adversely affects the value of the Collateral, the ability of Debtor or Secured Party to dispose of the Collateral, or the rights and remedies of Secured Party in relation thereto, including, but not limited to, the levy of any legal process against any Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise.

(f)    Debtor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect Secured Party's security interest (collectively, the "**Collateral Costs**").  Without waiving Debtor's default for failure to make any such payment, Secured Party at its option may

- 3 -

CNB000057

pay any such Collateral Costs, and discharge encumbrances on the Collateral, and such Collateral Costs payments shall be a part of the Indebtedness and bear interest at the rate set out in the Indebtedness. Debtor agrees to reimburse Secured Party on demand for any Collateral Costs so incurred.

(g)  Until Secured Party exercises its rights to make collection, Debtor will diligently collect all Collateral.

(h)  If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading Debtor shall immediately deliver such document to Secured Party, together with any necessary endorsements.

(i) Debtor will not sell, lease, agree to sell or lease, or otherwise dispose of any Collateral except with the prior written consent of Secured Party; provided, however, that Debtor may sell inventory in the ordinary course of business.

(j)  Debtor will maintain and keep in force all risk insurance covering the Collateral against fire, theft, liability and extended coverages (including without limitation windstorm coverage and hurricane coverage as applicable), to the extent that any Collateral is of a type which can be so insured. Such insurance shall be in form, amounts, coverages and basis reasonably acceptable to Secured Party, shall require losses to be paid on a replacement cost basis, shall be issued by insurance companies acceptable to Secured Party and, upon request of Secured Party, include a loss payable endorsement in favor of Secured Party in a form acceptable to Secured Party. Upon the request of Secured Party, Debtor will deliver to Secured Party a copy of each insurance policy, or, if permitted by Secured Party, a certificate of insurance listing all insurance in force.

(k)  Debtor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless Debtor first obtains the written consent of any owner, holder of any lien on the real property or fixture, or other person having an interest in such property to the removal by Secured Party of the Collateral from such real property or fixture. Such written consent shall be in form and substance acceptable to Secured Party and shall provide that Secured Party has no liability to such owner, holder of any lien, or any other person.

(l)  Exhibit A to this Agreement is a complete list of all patents, trademark and service mark registrations, copyright registrations, mask work registrations, and all applications therefor, in which Debtor has any right, title, or interest, throughout the world. Debtor will promptly notify Secured Party of any acquisition (by adoption and use, purchase, license or otherwise) of any patent, trademark or service mark registration, copyright registration, mask work registration, and applications therefor, and unregistered trademarks and service marks and copyrights, throughout the world, which are granted or filed or acquired after the date hereof or which are not listed on the Exhibit. Debtor authorizes Secured Party, without notice to Debtor, to modify this Agreement by amending the Exhibit to include any such Collateral.

- 4 -

~Doc# 1142595~

CNB000058

(m)     Debtor will, at its expense, diligently prosecute all patent, trademark or service mark or copyright applications pending on or after the date hereof, will maintain in effect all issued patents and will renew all trademark and service mark registrations, including payment of any and all maintenance and renewal fees relating thereto, except for such patents, service marks and trademarks that are being sold, donated or abandoned by Debtor pursuant to the terms of its intellectual property management program. Debtor will at its expense protect and defend all rights in the Collateral against any material claims and demands of all persons  and will, at its expense, enforce all rights in the Collateral against any and all infringers of the Collateral where such infringement would materially impair the value or use of the Collateral to Debtor or Secured Party. Debtor will not license or transfer any of the Collateral, except for such non-exclusive licenses as are customary in the ordinary course of Debtor's business, or except with Secured Party's prior written consent.

4.     ADDITIONAL REQUIREMENTS. Debtor agrees that Secured Party may at its option at any time, whether or not Debtor is in default:

(a)     Require Debtor to deliver to Secured Party (i) copies of or extracts from the Books and Records, and (ii) information on any contracts or other matters affecting the Collateral.

(b)     Examine the Collateral, including the Books and Records, and make copies of or extracts from the Books and Records, and for such purposes enter at any reasonable time upon the property where any Collateral or any Books and Records are located.

(c)     Require Debtor to deliver to Secured Party any instruments, chattel paper or letters of credit which are part of the Collateral, and to assign to Secured Party the proceeds of any such letters of credit.

(d)     Notify any account debtors, any buyers of the Collateral, or any other persons of Secured Party's interest in the Collateral.

5.     DEFAULTS.  Any one or more of the following shall be a default hereunder:

(a)     Debtor breaches any term, provision, warranty or representation under this Agreement, or under any other obligation of Debtor to Secured Party, and such breach remains uncured after any applicable cure period.

(b)     Secured Party fails to have a perfected and enforceable lien on or security interest in the Collateral.

(c)     Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

- 5 -

CNB000059

(d)     Debtor has given Secured Party any false or misleading information or representations.

(e)     A default or Event of Default occurs under the Note, the Guaranty or any other Transaction Document.

6.      SECURED PARTY'S REMEDIES AFTER DEFAULT.  In the event of any default, Secured Party may do any one or more of the following, to the extent permitted by law:

(a)     Declare any Indebtedness immediately due and payable, without notice or demand.

(b)     Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

(c)     Enforce the security interest of Secured Party in any account of Debtor maintained with Secured Party by applying such account to the Indebtedness.

(d)     Require Debtor to obtain Secured Party's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral consisting of inventory.

(e)     Require Debtor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Secured Party in kind.

(f)     Require Debtor to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under Secured Party's exclusive control.

(g)     Require Debtor to assemble the Collateral, including the Books and Records, and make them available to Secured Party at a place designated by Secured Party.

(h)     Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of Debtor's equipment, if Secured Party deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(i)     Demand and collect any payments on and proceeds of the Collateral.  In connection therewith Debtor irrevocably authorizes Secured Party to endorse or sign Debtor's name on all checks, drafts, collections, receipts and other

- 6 -

~Doc# 1142595~

CNB000060

documents, and to take possession of and open the mail addressed to Debtor and remove therefrom any payments and proceeds of the Collateral.

(j)     Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to Debtor.

(k)     Use or transfer any of Debtor's rights and interests in any Intellectual Property now owned or hereafter acquired by Debtor, if Secured Party deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.  Debtor agrees that any such use or transfer shall be without any additional consideration to Debtor.  As used in this paragraph, **"Intellectual Property"** includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which Debtor has any right or interest, whether by ownership, license, contract or otherwise.

(l)     Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral.  Debtor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(m)     Take such measures as Secured Party may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and Debtor hereby irrevocably constitutes and appoints Secured Party as Debtor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(n)     Without notice or demand to Debtor, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by Secured Party or any of Secured Party's agents or affiliates to or for the credit of the account of Debtor or any guarantor or endorser of Debtor's Indebtedness.

(o)     Assign, sell or otherwise dispose of and deliver all or any part of the Equity Collateral, at public or private sale or otherwise, either with or without special conditions or stipulations, for cash or on credit or for future delivery, in such other consideration and at such time or times and at such place or places, and upon such terms and conditions as shall be commercially reasonable and in accordance with all applicable laws.

(p)     Exercise any other remedies available to Secured Party at law or in equity.

The proceeds of any sale, lease or other disposition of the Collateral hereunder shall be applied first, to the expenses of retaking, holding, storing, processing and

- 7 -

CNB000061

preparing for sale, selling, and the like (including, without limitation, any taxes, fees and other costs incurred in connection therewith) of the Collateral, second, to the attorneys' fees and expenses, and then to satisfaction of the Indebtedness to the Secured Party (in such manner as Secured Party shall elect in its discretion), and to the payment of any other amounts required by applicable law.

Debtor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "1933 Act") and applicable state securities laws, Secured Party may be compelled, with respect to any sale of all or any part of the Equity Collateral conducted without prior registration or qualification of such Equity Collateral under the 1933 Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Equity Collateral for their own account, for investment and not with a view to the distribution or resale thereof.  Debtor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the 1933 Act) and, notwithstanding such circumstances, Debtor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Equity Collateral for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the 1933 Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.

For the purpose of enabling Secured Party, during the continuance of an Event of Default, to exercise rights and remedies under this Section at such time as Secured Party shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, Debtor hereby grants to Secured Party, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to Debtor) to use, license or sublicense any of the Intellectual Property now owned or hereafter acquired by Debtor, wherever the same may be located.

7.      ENVIRONMENTAL MATTERS.

(a)      Debtor represents and warrants: (i) it is not in violation of any health, safety, or environmental law or regulation regarding hazardous substances and (ii) it is not the subject of any claim, proceeding, notice, or other communication regarding hazardous substances.  "Hazardous substances" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

(b)      Debtor shall deliver to Secured Party, promptly upon receipt, copies of all notices, orders, or other communications regarding (i) any enforcement

- 8 -

CNB000062

action by any governmental authority relating to health, safety, the environment, or any hazardous substances with regard to Debtor's property, activities, or operations, or (ii) any claim against Debtor regarding hazardous substances.

(c)     Secured Party and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to Debtor, to enter and visit any locations where the Collateral is located for the purposes of observing the Collateral, taking and removing environmental samples, and conducting tests.   Debtor shall reimburse Secured Party on demand for the costs of any such environmental investigation and testing. Secured Party will make reasonable efforts during any site visit, observation or testing conducted pursuant to this paragraph to avoid interfering with Debtor's use of the Collateral.   Secured Party is under no duty to observe the Collateral or to conduct tests, and any such acts by Secured Party will be solely for the purposes of protecting Secured Party's security and preserving Secured Party's rights under this Agreement.   No site visit, observation or testing or any report or findings made as a result thereof ("**Environmental Report**") will (i) result in a waiver of any default of Debtor; (ii) impose any liability on Secured Party; or (iii) be a representation or warranty of any kind regarding the Collateral (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness).   In the event Secured Party has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to Debtor or any other party, Debtor authorizes Secured Party to make such a disclosure.   Secured Party may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in Secured Party's judgment. Debtor further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to Debtor by Secured Party or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of Debtor) by Debtor without advice or assistance from Secured Party.

(d)     Debtor will indemnify and hold harmless Secured Party from any loss or liability Secured Party incurs in connection with or as a result of this Agreement, which directly or indirectly arises out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance.   This indemnity will apply whether the hazardous substance is on, under or about Debtor's property or operations or property leased to Debtor.   The indemnity includes but is not limited to attorneys' fees (including the reasonable estimate of the allocated cost of in-house counsel and staff). The indemnity extends to Secured Party, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys and assigns.

8.     CONSENT TO JURISDICTION.   DEBTOR AND SECURED PARTY HEREBY AGREE THAT THE FEDERAL COURT OF THE WESTERN DISTRICT OF NEW YORK OR, AT THE OPTION OF SECURED PARTY, ANY COURT LOCATED IN THE STATE OF NEW YORK SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN DEBTOR AND SECURED PARTY PERTAINING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER

- 9 -

~Doc# 1142595~

CNB000063

CAUSE OR DISPUTE WHATSOEVER BETWEEN DEBTOR AND SECURED PARTY OF ANY KIND OR NATURE.   DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURTS, HEREBY WAIVING PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREEING THAT SERVICE OF SUCH SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED ADDRESSED TO DEBTOR AT THE ADDRESS OF DEBTOR FOR NOTICES SET FORTH HEREIN. SHOULD DEBTOR FAIL TO APPEAR OR ANSWER ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THIRTY DAYS AFTER THE MAILING THEREOF, IT SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED AGAINST IT AS PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS.   THE CHOICE OF FORUM SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE BRINGING OF ANY ACTION BY SECURED PARTY OR THE ENFORCEMENT BY SECURED PARTY OF ANY JUDGMENT OBTAINED IN SUCH FORUM IN ANY OTHER APPROPRIATE JURISDICTION.  FURTHER, DEBTOR HEREBY WAIVES THE RIGHT TO ASSERT THE DEFENSE OF FORUM NON CONVENIENS AND THE RIGHT TO CHALLENGE THE VENUE OF ANY COURT PROCEEDING.

9.    WAIVER OF JURY TRIAL.  DEBTOR AND SECURED PARTY EACH WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER  THIS AGREEMENT, THE NOTE, THE GUARANTY OR ANY TRANSACTION DOCUMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. DEBTOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST SECURED PARTY OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

10.    MISCELLANEOUS.

(a)    Any waiver, express or implied, of any provision hereunder and any delay or failure by Secured Party to enforce any provision shall not preclude Secured Party from enforcing any such provision thereafter.

(b)    Debtor shall, at the request of Secured Party, execute such other agreements, documents, instruments, or financing statements in connection with this Agreement as Secured Party may reasonably deem necessary.

- 10 -

CNB000064

(c)     All notes, security agreements, subordination agreements and other documents executed by Debtor or furnished to Secured Party in connection with this Agreement must be in form and substance satisfactory to Secured Party.

(d)     This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of laws principles which would require the application of the laws of a different state.

(e)     All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law.  Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(f)     All terms not defined herein are used as set forth in the Uniform Commercial Code as in effect in any applicable jurisdiction.

(g)     In the event of any action by Secured Party to enforce this Agreement or to protect the security interest of Secured Party in the Collateral, or to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, Debtor agrees to pay immediately the costs and expenses thereof, together with reasonable attorneys' fees and allocated costs for in-house legal services to the extent permitted by law.

(h)     In the event Secured Party seeks to take possession of any or all of the Collateral by judicial process, Debtor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action.

(i)     This Agreement shall constitute a continuing agreement, applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this Agreement, and if all transactions between Secured Party and Debtor shall be closed at any time, shall be equally applicable to any new transactions thereafter.

(j)     Secured Party's rights hereunder shall inure to the benefit of its successors and assigns.  In the event of any assignment or transfer by Secured Party of any of the Indebtedness or the Collateral, Secured Party thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Indebtedness or the Collateral not so assigned or transferred.  All representations, warranties and agreements of Debtor if more than one are joint and several and all shall be binding upon the personal representatives, heirs, successors and assigns of Debtor.

(k)     Any notice to be given hereunder shall be given in the manner prescribed in the Guaranty or the Note, as applicable.

- 11 -

~Doc# 1142595~

CNB000065

11.    FINAL AGREEMENT.  BY SIGNING THIS AGREEMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS AGREEMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS,    OR    SUBSEQUENT    ORAL    AGREEMENTS    OR UNDERSTANDINGS OF THE PARTIES.

-Doc# 1142595-

CNB000066

IN WITNESS WHEREOF, the parties executed this Agreement as of the date first written above, intending to create an instrument executed under seal.

EBER    BROS.    WINE    AND    LIQUOR
CORPORATION

By: _Wendy Eber_____

Title: _CEO_____

(Seal)

EBER BROS. WINE & LIQUOR METRO, INC.

By: _Wendy Eber_____

Title: _CEO_____

(Seal)

Accepted:

_Lester Eber_____

LESTER EBER

- 13 -

~Doc# 1142595~

CNB000067

Exhibit A

Intellectual Property

CNB000068

## LINE OF CREDIT NOTE

$1,500,000                                                                                  February 26, 2010

FOR VALUE RECEIVED, EBER BROS. WINE & LIQUOR METRO, INC., a New York corporation with an address at 155 Paragon Drive, Rochester, New York 14625 ("Maker"), hereby promises to pay to the order of LESTER EBER, an individual with an address at 155 Paragon Drive, Rochester, New York 14625 ("Holder"), the principal sum of ONE MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($1,500,000.00) (the "Maximum Principal Amount") or such lesser or greater amount as may be outstanding hereunder.

1.      Line of Credit.  This Note evidences a revolving line of credit. Accordingly amounts hereunder may be borrowed, repaid and re-borrowed provided that at no time shall Maker permit the aggregate principal amount of all advances made under this Note to exceed the Maximum Principal Amount.

2.      Interest Rate.  All amounts outstanding under this Note shall bear interest at a rate equal to twelve and one half percent (12.5%) per annum.  Upon the occurrence of an Event of Default (whether or not the Holder has accelerated payment of the outstanding balance due hereunder), or after maturity or after judgment has been rendered with respect to the obligations hereunder, the unpaid principal balance, at the option of Holder, shall bear interest at a rate equal to fifteen percent (15%).  The right of the Holder to receive such increased rate of interest shall not constitute a waiver of any other right or remedy of the Holder.  All interest shall be calculated based on 360 day year and the actual number of days elapsed.

3.      Payments.  Accrued interest will be due and payable in arrears on December 1, 2009 and on the first day of each March, June, September and December thereafter (each an "Interest Payment Date") and on the Maturity Date, as hereinafter defined.  Notwithstanding the foregoing, on each Interest Payment Date, at the request of Maker all or such portion of the interest then due and owing specified by Maker shall be added to the principal amount hereof instead of paying such interest in cash, whereupon such amount will bear interest at rate per annum specified herein.  Maker hereby agrees, upon the request of Holder, to amend this Note or execute one or more new notes in the form hereof to reflect any increase in the principal sum hereof resulting from the addition of the accrued interest to the principal; provided, however that the failure to so amend this Note or to enter into one or more new notes shall not relieve Maker of its obligation to pay such accrued interest in accordance with the terms hereof.  All amounts remaining outstanding hereunder, including all principal and interest, shall become due and payable in full on December 31, 2011 (the "Maturity Date").

4.      Late Charge.  If the entire amount of any required payment is not paid in full within five (5) days after the same is due, the Maker shall pay to Holder a late fee equal to two percent (2%) of the amount of the payment that remains unpaid.

5.      Prepayment.  Maker shall have the option of paying the amounts outstanding under this Note to Holder, in full or part, at any time and from time to time without any premium or penalty.

134782 1237719.1



PLAINTIFF'S
EXHIBIT
16
1/23/19
PENGAD 800-631-6989

CNB000040

6.    Request for Advances; Discretionary Facility.  At any time and from time to time Maker may make a request for a loan that specifies (a) the amount requested as the principal amount of such loan and (b) the business day of Holder on which such loan is requested to be made which shall not be less than three (3) days from the date of such notice.  The decision whether to honor such loan request and make such loan shall be in the sole and absolute discretion of Holder and Holder shall have no obligation or commitment to make any loans hereunder. Holder may treat as made by Maker and rely upon, and Maker shall be bound by, any loan request that Holder in good faith believes to be valid and to have been made in the name or on behalf of Maker by any officer of Maker, and Holder shall not incur any liability to Maker or any other person as a direct or indirect result of honoring such loan request and making such loan.

7.    Events of Default/Remedies.  At the option of Holder, all amounts outstanding under this Note shall become immediately due and payable in full, without further presentment, protest, notice, or demand, upon the happening of any Event of Default.  Upon the occurrence of an Event of Default, Holder shall be entitled to exercise any legal or equitable right which he or it may have, and may proceed to protect and enforce its rights by any other appropriate proceedings.  The following events shall constitute "Events of Default" under this Note:

  a.  *Nonpayment.*  Failure of Maker to make any payment of any type within fifteen (15) days after the same becomes due and payable.

  b.  *Financial Difficulties.*  Financial difficulties of Maker or any guarantor hereof as evidenced by:

    i.  the filing of a voluntary or involuntary petition in bankruptcy, or under any chapters of the Bankruptcy Code, or under any federal or state statute providing for the relief of debtors;

    ii.  making an assignment for the benefit of creditors;

    iii.  consenting to the appointment of a trustee or receiver for all or a major part of any of Maker's or such guarantor's property;

    iv.  the entry of a court order appointing a receiver or a trustee for all or a major part of Maker's or such guarantor's property; or

    v.  the admission by Maker or any guarantor in writing of the Maker's or such guarantor's inability to pay its debts as they become due.

  c.  *Change of Control.*  Maker or any guarantor hereof enters into any agreement pursuant to which Maker or such guarantor will sell all or substantially all of the assets of Maker or such guarantor, or upon the closing of any transaction or series of related transactions in which more than fifty percent (50%) of the issued and outstanding shares of capital stock of the Maker or such guarantor are issued to, or acquired by, any one or more persons or entities who are not shareholders of the Maker or such guarantor as of the date of this Note.

CNB000041

d. *Cease Operations.* Maker ceases all ongoing business operations.

e. *Sale of Eber-Connecticut, LLC.* Eber-Connecticut, LLC ("Eber-CT") enters into any agreement pursuant to which Eber-CT will sell all or substantially all of the assets of Eber-CT, or upon the closing of any transaction or series of related transactions in which more than fifty percent (50%) of the issued and outstanding units of membership interest of the Maker are issued to, or acquired by, any one or more persons or entities who are not controlled by or under common control with the Maker

f. The occurrence of a breach or default under any guaranty, security agreement or any other document, instrument or agreement executed in connection herewith or providing security or other credit support for the obligations of the Maker hereunder.

8. Expenses. Maker shall pay to Holder all amounts incurred by Holder, including without limitation attorneys' fees and disbursements, in order to collect any amount due under this Note, to negotiate or document a workout or restructuring, or to preserve its rights hereunder, whether or not any legal proceeding ins commenced.

9. Holder's Records Conclusive. Holder shall maintain a record of the date and original principal amount of each advance made by him hereunder and the date and amount of each payment to be applied to the outstanding principal amount of this Note. Such records shall be conclusive evidence of the outstanding principal amount under this Note and of all advances hereunder, absent manifest error. No failure by Holder to make any such annotation in its records shall affect Maker's obligation to pay the principal and interest of each advance or any other obligation of Maker hereunder.

10. Subordination. All amounts outstanding under this Note are subordinate to any and all amounts owed by the Maker to The Canandaigua National Bank and Trust Company.

11. Miscellaneous. The terms of this Note cannot be changed, nor may this Note be discharged in whole or in part, except by a writing executed by Holder. No delay or omission by Holder in exercising any rights hereunder shall operate as a waiver of such rights. This Note shall be governed by and construed under the laws of the State of New York.

[Signatures are on the next page.]

134782 1237719.1                                                    3

**CNB000042**

IN WITNESS WHEREOF, Maker has duly executed this Note as of the day and year first above written.

EBER BROS. WINE & LIQUOR METRO, INC.

By: _____
Lester Eber, Chief Executive Officer

By: _____
Wendy Eber, Chief Financial Officer

Accepted:

_____
Lester Eber

134782 1237719.1                                                        4

CNB000043

## DEBT ASSUMPTION AGREEMENT

**THIS DEBT ASSUMPTION AGREEMENT** (this "Agreement") is made as of the 11th day of February, 2011, by and among **EBER BROS. WINE AND LIQUOR CORPORATION** ("EWLC"), **EBER BROS. WINE AND LIQUOR METRO, INC.** ("Metro"), and **LESTER EBER** ("Holder").

## RECITALS:

WHEREAS, Holder made a loan to EWLC (the "EWLC Loan") evidenced by that certain Amended and Restated Promissory Note dated March 13, 2006, in the original principal amount of $1,503,750.00 (the "EWLC Note"); and

WHEREAS, as of the date hereof, the remaining principal balance of the EWLC Loan is $1,434,710.68, plus accrued and unpaid interest; and

WHEREAS, upon the terms and conditions set forth herein, Metro has agreed to assume the outstanding principal and interest of the EWLC Loan and all other liabilities and obligations in respect thereof (the "Assumption"), and Holder has agreed to fully release EWLC from its obligations under the EWLC Note; and

**NOW, THEREFORE,** in consideration of the foregoing and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties do hereby agree as follows:

1.    Acknowledgment. Each of EWLC, Metro and Holder agree that the unpaid principal balance of the EWLC Loan is, as of the date hereof, One Million Four Hundred Thirty-Four Thousand Seven Hundred Ten and 68/100 Dollars ($1,434,710.68), plus accrued and unpaid interest.

2.    Assumption. EWLC hereby irrevocably assigns to Metro all of EWLC's obligations to pay principal, interest and other obligations and liabilities in respect of the EWLC Loan. Metro hereby irrevocably assumes all of EWLC's obligations to pay principal, interest and other obligations and liabilities in respect of the EWLC Loan, and Metro agrees to be bound by the terms of the EWLC Note as if it were the "Maker" thereunder and promises to pay the obligations evidenced thereby in accordance with the terms thereof. Holder hereby consents to such assignment by EWLC and assumption by Metro. At any time on or after the date hereof, Holder may require Metro to issue a replacement note to Holder, in replacement of the EWLC Note, which replacement note shall be acceptable to Holder.

3.    Conditions; Advance. Holder's obligation to consent to the Assumption is conditioned upon Holder's receipt of an amended and restated security agreement (the "Security Agreement"), in form and substance acceptable to Holder, which amends and restates the Security Agreement dated February 26, 2010, made by EWLC and Metro in favor of Holder (which for the avoidance of doubt shall continue to include a grant of a security interest in and pledge of all limited liability company interests or other equity interests in Eber-Connecticut, LLC). In connection with and in reliance upon Holder's receipt of executed copies of this

-44843-8258-1000 v.1-

PLAINTIFF'S EXHIBIT 17 1/23/19

CNB000072

Agreement and the Security Agreement, Holder shall make an advance of funds to Metro in the amount of $100,000, which advance shall be pursuant to the terms of and evidenced by that certain Line of Credit Note dated February 26, 2010, made by Metro in favor of Holder in the stated principal amount of $1,500,000.

4.      Release; Continuation.

a.  Upon the effectiveness of this Agreement, Holder hereby releases EWLC from any and all obligations and liabilities (the "Assumed Liabilities") under the EWLC Note.

b.  Upon the effectiveness of this Agreement, all obligations of EWLC to pay the Assumed Liabilities shall continue as obligations of Metro under the EWLC Note.

5.      No Novation.  Each of the parties hereto hereby agrees and intends that this Agreement shall not create, result in or evidence a novation of any of the Assumed Liabilities, the EWLC Loan or the EWLC Note.

6.      Successors and Assigns.  This Agreement shall bind and inure to the benefit of the parties hereto and their heirs, personal representatives, successors, and assigns.

7.      Governing Law.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to conflict of law principals.

8.      Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

CNB000073

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be signed and sealed as of the date first above written.

EBER BROS. WINE AND LIQUOR
CORPORATION

By: _____
Name: Wendy Eber
Title: CFO

EBER BROS. WINE & LIQUOR METRO, INC.

By: _____
Name: Wendy Eber
Title: CFO

_____
Name: Lester Eber

CNB000074

## AMENDED AND RESTATED SECURITY AGREEMENT

**THIS AMENDED AND RESTATED SECURITY AGREEMENT** (this "Agreement") is made and entered into as of February 11, 2011 by **EBER BROS. WINE AND LIQUOR CORPORATION ("Parent")** and **EBER BROS. WINE & LIQUOR METRO, INC. ("Metro"**; Parent and Metro, individually and collectively, **"Debtor")** in favor of **LESTER EBER ("Secured Party").**

1.     THE SECURITY.  Debtor hereby assigns and grants to Secured Party a security interest in the following described property now owned or hereafter acquired by Debtor ("**Collateral**"):

(a)     All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles, including all amounts due to Debtor from a factor; and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.

(b)     All inventory, including all materials, work in process and finished goods.

(c)     All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by Debtor.

(d)     All of Debtor's deposit accounts. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

(e)     All instruments, notes, chattel paper, documents, certificates of deposit, securities and investment property of every type. The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing.

(f)     All general intangibles, including, but not limited to, (i) all patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems. The Collateral shall include all good will connected with or symbolized by any of such general intangibles; all contract rights, documents, applications, licenses, materials and other matters related to such general intangibles; all tangible property embodying or incorporating any such general intangibles; and all chattel paper and instruments relating to such general intangibles.

(g)     The shares of common stock and preferred stock, or partnership, membership and other ownership interests, now or hereafter owned by Debtor, including,

PLAINTIFF'S
EXHIBIT
18
1/23/19
PENGAD 800-631-6989

without limitation, any membership interest in Eber-Connecticut, LLC now or hereafter owned, directly or indirectly, by Metro and Parent and any ownership interests in Metro now or hereafter owned by Parent (collectively, the "**Pledged Equity**"), and all certificates evidencing the same, together with, in each case, all shares, securities, monies or property representing a dividend on any of the Pledged Equity, or representing a distribution or return of capital upon or in respect of the Pledged Equity, or resulting from a split up, revision, reclassification or other like change of the Pledged Equity or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Equity (the Pledged Equity, together with all other certificates, shares, securities, properties, ownership interests, or moneys, dividends, distributions, returns of capital subscription, warrants, rights or options as may from time to time be pledged hereunder pursuant to this clause being herein collectively called the "**Equity Collateral**").

(h)     All negotiable and nonnegotiable documents of title covering any Collateral.

(i)     All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

(j)     All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral, and all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the Collateral and sums due from a third party which has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

(k)     All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory ("**Books and Records**").

2.     INDEBTEDNESS. The Collateral secures all Indebtedness.

"**EWLC Note**" means that certain Amended and Restated Promissory Note dated as of March 13, 2006, in the original principal amount of $1,503,750.00, made by Parent in favor of Secured Party, as the same may be amended, modified, replaced or restated from time to time, the obligations and liabilities of which have been assumed by Metro pursuant to that certain Debt Assumption Agreement among Parent, Metro and Secured Party dated February 11, 2011.

"**Guaranty**" means that certain Guaranty dated as of February 26, 2010, executed by Parent in favor of Secured Party, as amended, restated, supplemented or otherwise modified from time to time.

-#4832-6820-7368 v.2--

2

"**Indebtedness**" means any and all debts, liabilities, and obligations of Debtor to Secured Party (i) arising under the Transaction Documents, or (ii) arising under the EWLC Note, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Secured Party by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Secured Party for its own account or as agent for another or others, whether Debtor may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, any and all obligations of Debtor to Secured Party for reasonable attorneys' fees and all other costs and expenses incurred by Secured Party in the collection or enforcement of any debts, liabilities, and obligations of Debtor to Secured Party.

"**Note**" means that certain Line of Credit Note dated as of February 26, 2010, executed by Metro in favor of Secured Party in the maximum principal amount of $1,500,000 as amended, restated, supplemented or otherwise modified from time to time.

"**Transaction Documents**" means the Note, the Guaranty, this Agreement and each other document, instrument and agreement executed in connection therewith.

Capitalized terms used but not defined herein have the meanings given such terms in the Note.

3.    DEBTOR'S COVENANTS. Debtor represents, covenants and warrants that unless compliance is waived by Secured Party in writing:

(a)    Debtor will properly preserve the Collateral; defend the Collateral against any adverse claims and demands; and keep accurate Books and Records.

(b)    Debtor shall give Secured Party at least thirty (30) days notice before changing its chief executive office or state of incorporation or organization. Debtor will notify Secured Party in writing prior to any change in the location of any Collateral, including the Books and Records.

(c)    Debtor will notify Secured Party in writing prior to any change in Debtor's name, identity or business structure.

(d)    Except for liens existing on February 26, 2010, Debtor has not granted and will not grant any security interest in any of the Collateral except to Secured Party, and will keep the Collateral free of all liens, claims, security interests and encumbrances of any kind or nature except the security interest of Secured Party.

(e)    Debtor will promptly notify Secured Party in writing of any event which materially and adversely affects the value of the Collateral, the ability of Debtor or Secured Party to dispose of the Collateral, or the rights and remedies of Secured Party in relation thereto, including, but not limited to, the levy of any legal process against any

EB-00018381

Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise.

(f)     Debtor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect Secured Party's security interest (collectively, the **"Collateral Costs"**). Without waiving Debtor's default for failure to make any such payment, Secured Party at its option may pay any such Collateral Costs, and discharge encumbrances on the Collateral, and such Collateral Costs payments shall be a part of the Indebtedness and bear interest at the rate set out in the Indebtedness. Debtor agrees to reimburse Secured Party on demand for any Collateral Costs so incurred.

(g)     Until Secured Party exercises its rights to make collection, Debtor will diligently collect all Collateral.

(h)     If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading Debtor shall immediately deliver such document to Secured Party, together with any necessary endorsements.

(i)     Debtor will not sell, lease, agree to sell or lease, or otherwise dispose of any Collateral except with the prior written consent of Secured Party; provided, however, that Debtor may sell inventory in the ordinary course of business.

(j)     Debtor will maintain and keep in force all risk insurance covering the Collateral against fire, theft, liability and extended coverages (including without limitation windstorm coverage and hurricane coverage as applicable), to the extent that any Collateral is of a type which can be so insured. Such insurance shall be in form, amounts, coverages and basis reasonably acceptable to Secured Party, shall require losses to be paid on a replacement cost basis, shall be issued by insurance companies acceptable to Secured Party and, upon request of Secured Party, include a loss payable endorsement in favor of Secured Party in a form acceptable to Secured Party. Upon the request of Secured Party, Debtor will deliver to Secured Party a copy of each insurance policy, or, if permitted by Secured Party, a certificate of insurance listing all insurance in force.

(k)     Debtor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless Debtor first obtains the written consent of any owner, holder of any lien on the real property or fixture, or other person having an interest in such property to the removal by Secured Party of the Collateral from such real property or fixture. Such written consent shall be in form and substance acceptable to Secured Party and shall provide that Secured Party has no liability to such owner, holder of any lien, or any other person.

(l)     Exhibit A to this Agreement is a complete list as of February 26, 2010, of all patents, trademark and service mark registrations, copyright registrations,

-#4832-6820-7368 v.2-

4

EB-00018382

mask work registrations, and all applications therefor, in which Debtor has any right, title, or interest, throughout the world. Debtor will promptly notify Secured Party of any acquisition (by adoption and use, purchase, license or otherwise) of any patent, trademark or service mark registration, copyright registration, mask work registration, and applications therefor, and unregistered trademarks and service marks and copyrights, throughout the world, which are granted or filed or acquired after February 26, 2010, or which are not listed on the Exhibit. Debtor authorizes Secured Party, without notice to Debtor, to modify this Agreement by amending the Exhibit to include any such Collateral.

(m)     Debtor will, at its expense, diligently prosecute all patent, trademark or service mark or copyright applications pending on or after February 26, 2010, will maintain in effect all issued patents and will renew all trademark and service mark registrations, including payment of any and all maintenance and renewal fees relating thereto, except for such patents, service marks and trademarks that are being sold, donated or abandoned by Debtor pursuant to the terms of its intellectual property management program. Debtor will at its expense protect and defend all rights in the Collateral against any material claims and demands of all persons and will, at its expense, enforce all rights in the Collateral against any and all infringers of the Collateral where such infringement would materially impair the value or use of the Collateral to Debtor or Secured Party. Debtor will not license or transfer any of the Collateral, except for such non-exclusive licenses as are customary in the ordinary course of Debtor's business, or except with Secured Party's prior written consent.

4.     ADDITIONAL REQUIREMENTS. Debtor agrees that Secured Party may at its option at any time, whether or not Debtor is in default:

(a)     Require Debtor to deliver to Secured Party (i) copies of or extracts from the Books and Records, and (ii) information on any contracts or other matters affecting the Collateral.

(b)     Examine the Collateral, including the Books and Records, and make copies of or extracts from the Books and Records, and for such purposes enter at any reasonable time upon the property where any Collateral or any Books and Records are located.

(c)     Require Debtor to deliver to Secured Party any instruments, chattel paper or letters of credit which are part of the Collateral, and to assign to Secured Party the proceeds of any such letters of credit.

(d)     Notify any account debtors, any buyers of the Collateral, or any other persons of Secured Party's interest in the Collateral.

EB-00018383

5.    DEFAULTS. Any one or more of the following shall be a default hereunder:

(a)    Debtor breaches any term, provision, warranty or representation under this Agreement, or under any other obligation of Debtor to Secured Party, and such breach remains uncured after any applicable cure period.

(b)    Secured Party fails to have a perfected and enforceable lien on or security interest in the Collateral.

(c)    Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

(d)    Debtor has given Secured Party any false or misleading information or representations.

(e)    A default or Event of Default occurs under the EWLC Note, the Note, the Guaranty or any other Transaction Document.

6.    SECURED PARTY'S REMEDIES AFTER DEFAULT. In the event of any default, Secured Party may do any one or more of the following, to the extent permitted by law:

(a)    Declare any Indebtedness immediately due and payable, without notice or demand.

(b)    Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

(c)    Enforce the security interest of Secured Party in any account of Debtor maintained with Secured Party by applying such account to the Indebtedness.

(d)    Require Debtor to obtain Secured Party's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral consisting of inventory.

(e)    Require Debtor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Secured Party in kind.

(f)    Require Debtor to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under Secured Party's exclusive control.

-44832-6820-7368 v.2-

6

EB-00018384

(g)     Require Debtor to assemble the Collateral, including the Books and Records, and make them available to Secured Party at a place designated by Secured Party.

(h)     Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of Debtor's equipment, if Secured Party deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(i)     Demand and collect any payments on and proceeds of the Collateral. In connection therewith Debtor irrevocably authorizes Secured Party to endorse or sign Debtor's name on all checks, drafts, collections, receipts and other documents, and to take possession of and open the mail addressed to Debtor and remove therefrom any payments and proceeds of the Collateral.

(j)     Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to Debtor.

(k)     Use or transfer any of Debtor's rights and interests in any Intellectual Property now owned or hereafter acquired by Debtor, if Secured Party deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. Debtor agrees that any such use or transfer shall be without any additional consideration to Debtor. As used in this paragraph, "**Intellectual Property**" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which Debtor has any right or interest, whether by ownership, license, contract or otherwise.

(l)     Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. Debtor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(m)     Take such measures as Secured Party may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and Debtor hereby irrevocably constitutes and appoints Secured Party as Debtor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(n)     Without notice or demand to Debtor, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by Secured

EB-00018385

Party or any of Secured Party's agents or affiliates to or for the credit of the account of Debtor or any guarantor or endorser of Debtor's Indebtedness.

(o)    Assign, sell or otherwise dispose of and deliver all or any part of the Equity Collateral, at public or private sale or otherwise, either with or without special conditions or stipulations, for cash or on credit or for future delivery, in such other consideration and at such time or times and at such place or places, and upon such terms and conditions as shall be commercially reasonable and in accordance with all applicable laws.

(p)    Exercise any other remedies available to Secured Party at law or in equity.

The proceeds of any sale, lease or other disposition of the Collateral hereunder shall be applied first, to the expenses of retaking, holding, storing, processing and preparing for sale, selling, and the like (including, without limitation, any taxes, fees and other costs incurred in connection therewith) of the Collateral, second, to the attorneys' fees and expenses, and then to satisfaction of the Indebtedness to the Secured Party (in such manner as Secured Party shall elect in its discretion), and to the payment of any other amounts required by applicable law.

Debtor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the "1933 Act") and applicable state securities laws, Secured Party may be compelled, with respect to any sale of all or any part of the Equity Collateral conducted without prior registration or qualification of such Equity Collateral under the 1933 Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Equity Collateral for their own account, for investment and not with a view to the distribution or resale thereof.    Debtor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the 1933 Act) and, notwithstanding such circumstances, Debtor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Equity Collateral for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the 1933 Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.

For the purpose of enabling Secured Party, during the continuance of an Event of Default, to exercise rights and remedies under this Section at such time as Secured Party shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, Debtor hereby grants to Secured Party, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to Debtor) to use, license or sublicense any of the Intellectual Property now owned or hereafter acquired by Debtor, wherever the same may be located.

-#4832-6820-7368 v.2-

8

7.    ENVIRONMENTAL MATTERS.

(a)    Debtor represents and warrants: (i) it is not in violation of any health, safety, or environmental law or regulation regarding hazardous substances and (ii) it is not the subject of any claim, proceeding, notice, or other communication regarding hazardous substances. "**Hazardous substances**" means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

(b)    Debtor shall deliver to Secured Party, promptly upon receipt, copies of all notices, orders, or other communications regarding (i) any enforcement action by any governmental authority relating to health, safety, the environment, or any hazardous substances with regard to Debtor's property, activities, or operations, or (ii) any claim against Debtor regarding hazardous substances.

(c)    Secured Party and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to Debtor, to enter and visit any locations where the Collateral is located for the purposes of observing the Collateral, taking and removing environmental samples, and conducting tests.    Debtor shall reimburse Secured Party on demand for the costs of any such environmental investigation and testing. Secured Party will make reasonable efforts during any site visit, observation or testing conducted pursuant to this paragraph to avoid interfering with Debtor's use of the Collateral. Secured Party is under no duty to observe the Collateral or to conduct tests, and any such acts by Secured Party will be solely for the purposes of protecting Secured Party's security and preserving Secured Party's rights under this Agreement. No site visit, observation or testing or any report or findings made as a result thereof ("**Environmental Report**") will (i) result in a waiver of any default of Debtor; (ii) impose any liability on Secured Party; or (iii) be a representation or warranty of any kind regarding the Collateral (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness). In the event Secured Party has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to Debtor or any other party, Debtor authorizes Secured Party to make such a disclosure.    Secured Party may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in Secured Party's judgment. Debtor further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to Debtor by Secured Party or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of Debtor) by Debtor without advice or assistance from Secured Party.

(d)    Debtor will indemnify and hold harmless Secured Party from any loss or liability Secured Party incurs in connection with or as a result of this Agreement,

–#4832-6820-7368 v.2–

9

which directly or indirectly arises out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance. This indemnity will apply whether the hazardous substance is on, under or about Debtor's property or operations or property leased to Debtor. The indemnity includes but is not limited to attorneys' fees (including the reasonable estimate of the allocated cost of in-house counsel and staff). The indemnity extends to Secured Party, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys and assigns.

8.    CONSENT TO JURISDICTION. DEBTOR AND SECURED PARTY HEREBY AGREE THAT THE FEDERAL COURT OF THE WESTERN DISTRICT OF NEW YORK OR, AT THE OPTION OF SECURED PARTY, ANY COURT LOCATED IN THE STATE OF NEW YORK SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN DEBTOR AND SECURED PARTY PERTAINING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER CAUSE OR DISPUTE WHATSOEVER BETWEEN DEBTOR AND SECURED PARTY OF ANY KIND OR NATURE. DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURTS, HEREBY WAIVING PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREEING THAT SERVICE OF SUCH SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED ADDRESSED TO DEBTOR AT THE ADDRESS OF DEBTOR FOR NOTICES SET FORTH HEREIN. SHOULD DEBTOR FAIL TO APPEAR OR ANSWER ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THIRTY DAYS AFTER THE MAILING THEREOF, IT SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED AGAINST IT AS PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS. THE CHOICE OF FORUM SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE BRINGING OF ANY ACTION BY SECURED PARTY OR THE ENFORCEMENT BY SECURED PARTY OF ANY JUDGMENT OBTAINED IN SUCH FORUM IN ANY OTHER APPROPRIATE JURISDICTION. FURTHER, DEBTOR HEREBY WAIVES THE RIGHT TO ASSERT THE DEFENSE OF FORUM NON CONVENIENS AND THE RIGHT TO CHALLENGE THE VENUE OF ANY COURT PROCEEDING.

9.    WAIVER OF JURY TRIAL. DEBTOR AND SECURED PARTY EACH WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS AGREEMENT, THE EWLC NOTE, THE NOTE, THE GUARANTY OR ANY TRANSACTION DOCUMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT, THE EWLC NOTE OR ANY TRANSACTION DOCUMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. DEBTOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST SECURED PARTY OR ANY OTHER

-#4832-6820-7368 v.2-

10

PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

10.   MISCELLANEOUS.

(a)   Any waiver, express or implied, of any provision hereunder and any delay or failure by Secured Party to enforce any provision shall not preclude Secured Party from enforcing any such provision thereafter.

(b)   Debtor shall, at the request of Secured Party, execute such other agreements, documents, instruments, or financing statements in connection with this Agreement as Secured Party may reasonably deem necessary.

(c)   All notes, security agreements, subordination agreements and other documents executed by Debtor or furnished to Secured Party in connection with this Agreement must be in form and substance satisfactory to Secured Party.

(d)   This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of laws principles which would require the application of the laws of a different state.

(e)   All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law. Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(f)   All terms not defined herein are used as set forth in the Uniform Commercial Code as in effect in any applicable jurisdiction.

(g)   In the event of any action by Secured Party to enforce this Agreement or to protect the security interest of Secured Party in the Collateral, or to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, Debtor agrees to pay immediately the costs and expenses thereof, together with reasonable attorneys' fees and allocated costs for in-house legal services to the extent permitted by law.

(h)   In the event Secured Party seeks to take possession of any or all of the Collateral by judicial process, Debtor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action.

(i)   This Agreement shall constitute a continuing agreement, applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this Agreement, and if all transactions between Secured Party and Debtor shall be closed at any time, shall be equally applicable to any new transactions thereafter.

EB-00018389

(j)     Secured Party's rights hereunder shall inure to the benefit of its successors and assigns. In the event of any assignment or transfer by Secured Party of any of the Indebtedness or the Collateral, Secured Party thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Indebtedness or the Collateral not so assigned or transferred. All representations, warranties and agreements of Debtor if more than one are joint and several and all shall be binding upon the personal representatives, heirs, successors and assigns of Debtor.

(k)     Any notice to be given hereunder shall be given in the manner prescribed in the Guaranty or the Note, as applicable.

11.     FINAL AGREEMENT.  BY SIGNING THIS AGREEMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS AGREEMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

12.     Effect of Amendment and Restatement. On and after the date hereof, this Agreement shall restate and replace the Prior Security Agreement in full, and the provisions of the Prior Security Agreement shall be superseded by the provisions hereof; provided, that the effectiveness hereof shall not be deemed to be a waiver of or consent to any breach or default under the Prior Security Agreement occurring or existing prior to the date hereof. Such restatement and replacement shall not be and is not intended by the parties to constitute a novation of the obligations or the liens arising under or created by the Prior Security Agreement, all of which shall continue in full force and effect under and as set forth in this Agreement. The EWLC Note, the Note, the Guaranty and the other Transaction Documents shall and are hereby intended by the parties to continue in full force and effect pursuant to their terms. The "Prior Security Agreement" means the Security Agreement dated February 26, 2010, made by Debtor in favor of Secured Party.

EB-00018390

IN WITNESS WHEREOF, the parties executed this Agreement as of the date first written above, intending to create an instrument executed under seal.

EBER BROS. WINE AND LIQUOR CORPORATION

By: _____

Title: _____

(Seal)

EBER BROS. WINE & LIQUOR METRO, INC.

By: _____

Title: _____

(Seal)

Accepted:

_____

**LESTER EBER**

-#4837-6820-7368 v.2~

13

Exhibit A

Intellectual Property

**Trademarks Owned by EBER BROS. WINE AND LIQUOR CORPORATION**

| Registration Number | Registration Date | Trademark |
|---|---|---|
| 1131932 | March 11, 1980 | DOMSKI |

—44832-6820-7368 v,2—

Minutes from meeting of the Board of Eber Bros. Wine and Liquor Metro Inc. August 18, 2011

On August 18th, 2011 at 2:15 the board of directors for Eber Brothers Wine and Liquor Metro Inc. which include Elliot Gumaer, Lester Eber and Wendy Eber, met at the Canandaigua National Bank in Rochester, NY to discuss and ratify the actions of the subsidiaries as described below.   Mr. Elliot Gumaer participated by conference call. Wendy Eber documented the discussion.

The trustees ratified three loans made from Lester Eber to Eber Brothers Wine and Liquor Corp. The first loan for $1,500,000 from October, 2009 was assumed by Eber Metro Inc. on February 26, 2010. Eber Metro Inc. granted a secured interest in Metro's assets to secure this loan. This secured loan has an outstanding balance of $1,500,000 plus accrued interest.

The second loan from March 16, 2006, an obligation of Eber Brothers Wine and Liquor Corp. to Lester Eber for the original principal amount of $1,503,750.  The third loan of $575,895 from March 16, 2006 (which replaced the original note dated October 1, 2002) of which $ 1,222,710.68 plus accrued interest is outstanding. The loan for $1.503750 was amended in Feb 11th, 2011 to reflect Eber Bros. Metro, Inc. assumption of this debt. Also the security agreement from Feb 26, 2010 was restated to reflect Eber Bros. Metro Inc. assumption of this debt. Lester Eber made funds available after Feb 11, 2011 to Eber Bros Metro Inc. inconsideration of Metro Inc.'s assumption of this debt and security interest in Eber Bros Metro Inc.

After a lengthy discussion about how all the income beneficiaries and third parties were offered the opportunity to participate in the February 26th, 2010 loan but, they all declined and that only based on Lester's goodwill he gave the money for the loan, the loans were ratified by Wendy Eber and Mike Gumaer. Lester Eber abstained. A copy of all the documents relating to the loan was provided to the participants.



PLAINTIFF'S
EXHIBIT
19
1 2-3 19

## Wendy Eber

| | |
|---|---|
| **From:** | Wendy Eber |
| **Sent:** | Tuesday, February 07, 2017 2:26 PM |
| **To:** | Lester Eber |
| **Cc:** | janet lissow |
| **Subject:** | Gumaer Resignation |
| **Attachments:** | 02072017140432-0001.pdf |

Please file.

-----Original Message-----
From: CT Copier [mailto:xerox@slocumandsons.com]
Sent: Tuesday, February 07, 2017 2:05 PM
To: Wendy Eber <weber@slocumandsons.com>
Subject: Scan from a Xerox Color

Please open the attached document. It was scanned and sent to you using a Xerox Color.

Number of Images: 1
Attachment File Type: PDF

Device Name: CT Copier
Device Location:

For more information on Xerox products and solutions, please visit http://www.xerox.com/



PLAINTIFF'S
EXHIBIT
21
1 23 19

1

I, Elliot W. Gumaer, Jr., hereby resign from the:

Board of Directors of Eber Bros. & Co., Inc.
Board of Managers of Eber-Connecticut, LLC
Board of Directors of Eber Bros. Wine & Liquor Metro, Inc.

Name:  Elliot W. Gumaer, Jr.

## CONSULTING AGREEMENT

This Consulting Agreement ("Agreement") is made and entered into effective the 30th day of August, 2007 ("Effective Date"), by and between Southern Wine & Spirits of Upstate New York, Inc., a New York corporation (the "Company") and Lester Eber (the "Consultant").

### WITNESSETH:

Whereas, Consultant possesses extensive knowledge and experience regarding the alcoholic beverage markets in the state of New York;

Whereas, the Company believes that Consultant's business advice will be extremely beneficial to the Company; and

Whereas, Consultant agrees to render services to Company, upon the terms and conditions hereafter stated.

Now, therefore, in consideration of the covenants and agreements herein made, the parties agree as follows:

1.    Recitals. The above recitals are incorporated by reference herein and made a part hereof as if set forth verbatim.

2.    Term. Subject to the provisions of Section 8 below, this Agreement shall be for a term of five (5) years, commencing on the Effective Date and ending August 29, 2012 (the "Term").

3.    Duties.

(a)    Consultant agrees to consult with Company, on an as-needed basis for up to forty (40) hours per week, in connection with the alcoholic beverage industry in the State of New York, including but not limited to, providing strategic advice relating to the areas of developing and maintaining legislative relationships, insurance, supplier relationships, retailer relationships, and operational issues. Consultant shall have the title of "Senior Vice President – New York". In addition, if requested by Company, Consultant shall perform consulting services for Company's affiliates in the States of Ohio and Delaware on terms to be agreed upon.

(b)    Consultant shall report to the General Manager of Southern Wine & Spirits of New York, Inc. on daily matters. Further, Consultant shall be subject to the direction of the Chairman and President of Southern Wine & Spirits of America, Inc.

(c)    Company shall have the right to reduce or entirely eliminate Consultant's duties hereunder so long as full payment is made pursuant to this Agreement.

-Page 1 of 9-

PLAINTIFF'S EXHIBIT
27
1|24|19
PENGAD 800-631-6989

(d)     Company shall make an office available for Consultant in Company's Syracuse, New York location.

4.     Consulting Fee.

(a)     Consultant shall receive an annual fee of Six Hundred Thousand ($600,000) Dollars ("Consulting Fee") as the total compensation for Consultant's services hereunder. The Consulting Fee shall be paid over equal monthly installments of Fifty Thousand ($50,000) Dollars beginning on the Effective Date.

(b)     In addition, from time to time, Company may pay a discretionary bonus to Consultant for extraordinary services, as determined in the sole discretion of Company.

5.     Independent Contractor: No Employee Benefits.

(a)     Consultant understands that as a result of providing consulting services, he will not be entitled to any benefits ordinarily payable to Company's employees, including, but not limited to, health insurance, life insurance and/or pension benefits. Consultant acknowledges that he is an independent contractor. Additionally, Consultant further acknowledges that he will pay ordinary income taxes due on the consulting fee, and will indemnify Company in the event that any payroll taxes are assessed against the Company in connection with the consulting fee.

(b)     Consultant shall not be entitled to reimbursement of expenses in connection with his performance of this Agreement. Notwithstanding the foregoing, in the event that Company requests Consultant to take any action that would require Consultant to incur out-of-pocket expenses, Consultant shall notify Company in advance and Company shall arrange for the payment of such expenses to be made directly by Company.

6.     Restrictive Covenant.

(a)     Consultant agrees that, except as otherwise provided for in this Section 6, during the Term and for five (5) years thereafter, Consultant will not engage or participate, directly or indirectly, either as a principal, agent, employer, employee, consultant, stockholder (except for companies whose stock is publicly traded, in which Consultant does not own more than two percent of the outstanding stock), co-partner, co-venturer, member, officer, independent contractor, director or trustee of any person, partnership, entity, firm or corporation or in any other capacity whatsoever, in any Restricted Business Activity (as defined below) in any state where Southern Wine & Spirits of America, Inc., a Florida corporation, or any of its subsidiaries and/or affiliates (collectively with Company referred to as "Southern") conduct business ("Territory").

-Page 2 of 9-

The term "Restricted Business Activity" means:

(i)    to engage in the business of, or acquire or own, manage, cooperate, finance, join, control or participate in the acquisition or ownership, management, operation, financing or control of, or be connected in any way in the wholesale sale, merchandising, brokerage, delivery and/or distribution of alcoholic beverages (including but not limited to wine, spirits and beer) and non-alcoholic beverages in the Territory (the "Business");

(ii)   to consult with, advise or assist in any way which is competitive or adverse to Southern, whether or not for consideration, any person which is in any aspect of the Business, including, but not limited to, soliciting customers or otherwise serving as an intermediary for any such competitor and loaning money or rendering any other form of financial assistance to or engaging in any similar form of business transaction with any such competitor;

(iii)  directly or indirectly, either alone or in cooperation with others, attempting to solicit, encourage or induce or solicit, encourage or induce Southern's vendors, suppliers or customers to terminate, curtail or restrict their relationship with Southern, in any way interfere with the relationship of Southern and its vendors, suppliers or customers, or attempt to provide the types of services or similar products offered by Southern to those of its customers;

(iv)   directly or indirectly, either alone or in cooperation with others, attempt to hire, solicit or engage or hire, solicit or engage any person employed or contracted by Southern, to leave his or her employment or discontinue his or her engagement with Southern, whether or not the employment or contracting is full time or temporary, pursuant to a written or oral agreement, or for a determined period or at will;

(v)    have any business relationship, in any capacity whatsoever that would interfere with, diminish or impair the valuable relationships that Southern has with any entity or otherwise take any action that would interfere with, diminish or impair the valuable relationships that Southern has with any entity; or

(vi)   otherwise divert or attempt to divert from Southern any Business or Business opportunity whatsoever.

Notwithstanding the preceding, "Restricted Business Activity" shall not include: (i) any actions taken by Consultant in accordance with his duties under this Agreement; (ii) Consultant's continued direct or indirect ownership in Eber-Connecticut, LLC, Eber-Rhode Island, LLC, and/or Delaware Importers, LLC in each case only to the extent that such entities do not participate in the Business in the Territory; (iii) Consultant's participation in the continued wind-down and liquidation of Eber Bros. Wine & Liquor Corporation's operations in the State of New York, (iv) Consultant's participation in the continued wind-down and liquidation of Eber-Metro, LLC, (v) during the Term, Consultant's participation as

-Page 3 of 9-

a "Passive Investor" in any import company and/or entity that is a supplier of wine or spirits to Southern, so long as such involvement does not materially interfere with Consultant's obligations under this Agreement, or (vi) during the five (5) year period after the Term, Consultant's involvement in any import company and/or entity that is a supplier of wine or spirits to Southern. For purposes of this Agreement, Consultant shall be deemed a "Passive Investor" with respect to any investment which (i) if in a publicly-held company, results in Consultant owning no more than 2% of the issued and outstanding capital stock of said entity, and (ii) if in a privately held entity, Consultant has no right to become a director of said entity and has no control, whether contractual or otherwise, in the day-to-day operations or strategic planning of said entity. In addition to the foregoing and in addition to any other remedies that Consultant may possess, in the event that Company, prior to a termination of the Agreement pursuant to Section 8 (a), (b) or (c), fails to make payment of any installment of the Consulting Fee under Section 4(a), and such failure is not cured within ten (10) days of written notice thereof, the covenants and restrictions imposed upon Consultant under this Section 6 shall terminate and be of no further force or affect whatsoever.

Notwithstanding anything herein to the contrary, the "Territory" shall include: (i) the State of Delaware; (ii) all other States where Southern currently conducts Business; and (iii) and any other State where Southern conducts Business after the date of this Agreement. In the event that Consultant is not in breach of this Agreement, clause (iii) of the previous sentence shall not apply if Consultant is engaged in the Business in such State after the date of this Agreement but prior to Southern conducting Business in such State.

(b)    Consideration for the Restrictive Covenant. Consultant acknowledges that the payment hereunder for his services as a consultant shall be adequate consideration for his entering into this restrictive covenant.

(c)    Reformation by Court. In the event that a Court of competent jurisdiction shall determine that any provision of this Agreement is invalid or more restrictive than permitted under the governing law of such jurisdiction, then such provision shall be interpreted and enforced as if it provided for the maximum restriction permitted under such governing law, and the provision, as determined by such Court, shall be incorporated herein by reference and treated as being a part of the restrictive covenant agreed to between the parties.

(d)    Acknowledgment that the Restrictions are Reasonable. Consultant acknowledges that the restrictions contained herein are reasonable, and are reasonably related to the legitimate business interests of Southern.

(e)    Injunction. Consultant recognizes that a breach of the covenants contained in this Section 6 will cause irreparable injury and damage to Southern, the monetary amount of which may be virtually impossible to ascertain. As a result, Consultant hereby acknowledges that Southern shall be entitled, without the necessity of proof of actual damages or inadequacy of legal remedy, to a temporary or permanent injunction from any court of competent jurisdiction enjoining and restraining any violation of any or all of the

-Page 4 of 9-

EB-00000705

covenants contained in this Section 6 by Consultant, either directly or indirectly, and that such right to an injunction shall be cumulative, and is in addition to other remedies Southern may possess.

Notwithstanding the preceding, in the event of any breach or violation by Consultant of any of the provisions of this Section 6, the running of the time period described in subsection (a) above (but not the obligations under this Agreement) shall be tolled during the continuation of any breach or violation.

(f) Independent Representation. Consultant represents and warrants that he has received representation from independent counsel prior to entering into this Agreement.

7. Confidentiality. For purposes of this Section 7, the term "Southern" shall not include Eber-Connecticut, LLC or Eber-Rhode Island, LLC.

(a) Confidential Information. Consultant acknowledges that as a result of his affiliation with Southern, he has and will become informed of, and have access to, certain information which Southern deems valuable and confidential, including without limitation, the identity of clients or customers or identified potential clients or customers of Southern; Southern's financial information, methods of doing business, trade secrets, plans, pricing, contracts, agreements, licenses, descriptive materials describing the methods and procedures employed by Southern in the conduct of its business, information regarding Southern's management information systems, personnel information, computer records, written, typed or printed lists and other materials (collectively, "Confidential Information"). The term "lists" or its equivalent as used herein are not limited to a physical writing or compilation but also include any and all information whatsoever regarding the subject matter of the "list" whether or not such compilation has been reduced to writing. Consultant further agrees that even if such information is developed, contributed or acquired in whole or part by him, it is Southern's exclusive property to be held in trust by him for the sole benefit of Southern. Furthermore, except as required by law, or reasonably required in order for Consultant to perform his duties on behalf of Southern so long as such disclosure is not to the detriment of Southern, Consultant shall not at any time, use, reveal, report, publish, copy, transcribe, transfer or disclose to any person, corporation, or other entity, any of the Confidential Information without the prior written consent of Southern, except for information which legally and legitimately is or becomes available in the public domain. Consultant's obligations pursuant to this Section 7(a) shall survive the Term indefinitely.

(b) Return of Confidential Information. Upon either the termination of this Agreement or the earlier request of Southern, Consultant shall promptly deliver to Southern, all Southern property and possessions, including but not limited to, any sales material, manuals, letters, notes, notebooks, reports, copies, sales reports, printouts, Confidential Information, and all other materials relating to Southern's business which are in Consultant's possession or control.

-Page 5 of 9-

8. Termination. This Agreement may be terminated:

(a) By the mutual agreement of both parties;

(b) In the event Consultant dies or becomes disabled to the point of being unable to perform his duties for a period of at least 120 consecutive days;

(c) At the sole option of Company for "Cause". "Cause" shall mean: (i) the Consultant having been convicted of, or pleading guilty or nolo contendere to a felony; (ii) engaging in criminal or unethical conduct that in the reasonable judgment of Company may have a material adverse effect on Company's operations, its ability to conduct its business or its ability to maintain its licenses issued by regulatory authorities; (iii) in the event Consultant breaches any of the provisions of Sections 6 or 7 above; or (iv) in the event Consultant breaches any other material provision of this Agreement and such breach continues for more than ten (10) days following written notice to Consultant from Company of such breach.

If this Agreement is terminated as described in this Section 8, Consultant shall only be entitled to the pro-rata payment of the Consulting Fee described in Section 4 above, through the date of such termination. If this Agreement is terminated by Company for any reason other than death, disability (as defined above) or "Cause," Consultant shall continue to receive, and Company shall continue to pay the Consulting Fee due and owing hereunder for the remainder of the Term.

9. Intentionally Omitted.

10. Representations and Warranties. Consultant represents and warrants to Company that he is not under any contractual restrictions or other restrictions or obligations that are inconsistent with the execution of this Agreement, performance of his duties and the covenants hereunder, or the rights of Company pursuant to this Agreement.

11. Notice. All notices under this Agreement shall be in writing and shall be given by personal delivery, or by registered or certified United States mail, postage prepaid, return receipt requested, to the addresses set forth below:

To Company:

Wayne E. Chaplin
President and Chief Operating Officer
Southern Wine & Spirits of Upstate New York, Inc.
1600 N.W. 163 Street
Miami, Florida 33169

-Page 6 of 9-

EB-00000707

With a copy to:

Robert G. Breier, Esq.
Breier, Seif, Herman & Silverman, P.A.
3000 Ponce de Leon Boulevard, Suite 1125
Coral Gables, Florida 33134

To Consultant:

Lester Eber
15 Coral Way
Rochester, New York 14618

With a copy to:

Patrick J. Dalton, Esq.
Harris Beach PLLC
99 Garnsey Road
Pittsford, New York 14534

or to such other person or persons or such other address or addresses as Consultant and Company, or their respective successors or assigns, may hereafter furnish to the other by notice similarly given. Notices, if personally delivered, shall be deemed to have been received on the date of delivery, and if given by registered or certified mail, shall be deemed to have been received on the fifth business day after mailing.

12.     Waiver.  The waiver by Company of a breach of any provisions of this Agreement by Consultant shall not operate or be construed as a waiver of any subsequent breach by Consultant.

13.     Assignment.  An assignment to an entity in which Company has a majority ownership interest is expressly permitted, and Consultant agrees to be bound by the terms of this Agreement following any such assignment, provided it does not materially change the extent or nature of the services provided by Consultant. No such assignment shall relieve Company of its obligations hereunder. With the exception of an assignment permitted in accordance with the preceding sentence, this Agreement is personal and may not be assigned or delegated by either party without first obtaining the written consent of the other. Notwithstanding any provision to the contrary set forth herein, all of the obligations of Company hereunder shall be guaranteed by Southern Wine & Spirits of America, Inc.

14.     Binding Effect.  This Agreement shall be binding upon and inure to the benefit of the parties and their respective heirs, representatives, successors and permitted assigns. Notwithstanding the preceding to the contrary, this Section shall not be construed to provide for any assignment that is prohibited by Section 13 above. The parties agree that the remedy at law for any actual or threatened breach of this Agreement by either would be inadequate

-Page 7 of 9-

and that both shall be entitled to specific performance hereof or injunctive relief, or both, by temporary or permanent injunction or other appropriate judicial remedy, writ or order, in addition to any damages which both parties may legally be entitled to recover.

15.  Amendments.  No amendments or additions to this Agreement shall be binding unless in writing and signed by both parties.

16.  Applicable Law.  This Agreement shall be construed and enforced in accordance with the local laws of the State of New York.  With respect to any matter, hereunder which may be instituted in federal or state courts, the parties hereto consent to and submit to the jurisdiction of the federal and state courts located in the State of New York, and agree that any such action or suit shall be brought by the parties in any federal or state court established or sitting in Onondaga County, New York.  The parties shall not raise in connection therewith and hereby waive any defenses based upon the venue, the inconvenience of the forum, the lack of personal jurisdiction, or the like in any such action or suit brought in the State of New York.

17.  Headings.  The section headings used in this Agreement are included solely for convenience and shall not affect, nor be used in connection with, the interpretation of this Agreement.

18.  Severability.  The invalidity of any one or more of the words, phrases, sentences, clauses, sections or subsections contained in this Agreement shall not affect the enforceability of the remaining portions of this Agreement or any part thereof, all of which are inserted conditionally on their being valid in law, and, in the event that any one or more of the words, phrases, sentences, clauses, sections or subsections contained in this Agreement shall be declared invalid by a court of competent jurisdiction, then, except to the extent that Section 6(c) hereof provides otherwise, this Agreement shall be construed as if such invalid word or words, phrase or phrases, sentence or sentences, clause or clauses, section or sections, or subsection or subsections, had not been inserted.

19.  Costs and Attorney's Fees.  The parties agree that in the event it becomes necessary for any party to institute litigation or to obtain the services of an attorney in order to enforce its rights under the terms of this Agreement, then, in that event, the prevailing party, as determined by an arbitrator or a court of competent jurisdiction, shall be entitled to recover reasonable attorney's fees expended and the costs of such litigation, including appellate litigation, from the non-prevailing party.

20.  Counterparts.  This Agreement may be executed in one or more counterparts, all of which taken together, shall constitute one and the same Agreement. Faxed signatures shall be deemed an original for purposes of the Agreement.

21  Construction.  For purposes of this Agreement, no party shall be construed as the drafter of this Agreement.  The parties expressly agree that the language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their

-Page 8 of 9-

mutual intent, and no provision of this Agreement should be construed against or interpreted to the advantage of any party hereto by any judicial authority or arbitrator by reason of such party having been deemed to have structured or dictated such provision.

22. Entire Agreement. This Agreement contains the entire agreement of the parties relating to Consultant's relationship with the Company for the Term.

In Witness Whereof, the parties hereto have executed this Agreement effective as of the date and year first written above.
**COMPANY:**

SOUTHERN WINE & SPIRITS OF UPSTATE NEW YORK, INC.

By: _____
Its: _____

**CONSULTANT:**

_____
LESTER EBER

The undersigned hereby guarantees each and every obligation of Southern Wine & Spirits of Upstate New York, Inc. ("Company") under the Consulting Agreement, made and entered into effective August 30, 2007, by and between Company and Lester Eber.

SOUTHERN WINE & SPIRITS OF AMERICA, INC.

By: _____

Its: _____

-Page 9 of 9-

EB-00000710

mutual intent, and no provision of this Agreement should be construed against or interpreted to the advantage of any party hereto by any judicial authority or arbitrator by reason of such party having been deemed to have structured or dictated such provision.

22. · Entire Agreement. This Agreement contains the entire agreement of the parties relating to Consultant's relationship with the Company for the Term.

In Witness Whereof, the parties hereto have executed this Agreement effective as of the date and year first written above.
COMPANY:

SOUTHERN WINE & SPIRITS OF UPSTATE NEW YORK, INC.

By: _____
Its: _____

CONSULTANT:

_____
LESTER EBER

The undersigned hereby guarantees each and every obligation of Southern Wine & Spirits of Upstate New York, Inc. ("Company") under the Consulting Agreement, made and entered into effective August 24, 2007, by and between Company and Lester Eber.

SOUTHERN WINE & SPIRITS OF AMERICA, INC.

By: _____

Its: _____

-Page 9 of 9-

EB-00000711

## 2007 W-2 (NY State Reference Copy)

| Box | Description | Value |
|---|---|---|
| 1 | Wages, tips, other comp. | 303021.28 |
| 2 | Federal income tax withheld | 76045.03 |
| 3 | Social security wages | 97500.00 |
| 4 | Social security tax withheld | 6045.00 |
| 5 | Medicare wages and tips | 318521.28 |
| 6 | Medicare tax withheld | 4618.56 |
| d | Control number | 104078 09/FRD |
| | Dept. | 728000 |
| | Corp. | |
| | Employer use only | A   114 |

c Employer's name, address, and ZIP code
EBER BROS WINE & LIQUOR CORP
155 PARAGON DRIVE
ROCHESTER NY 14624-1167

| Box | Description | Value |
|---|---|---|
| b | Employer's FED ID number | 16-0417450 |
| a | Employee's SSA number | |
| 7 | Social security tips | |
| 8 | Allocated tips | |
| 9 | Advance EIC payment | |
| 10 | Dependent care benefits | |
| 11 | Nonqualified plans | 12a  D  15500.00 |
| 14 | Other | |

e/f Employee's name, address, and ZIP code
LESTER EBER
15 CORAL WAY
ROCHESTER, NY 14618

| 15 | State | NY | Employer's state ID no. 16-0417450 | 16 State wages, tips, etc. | 303021.28 |
| 17 | State income tax | 21132.32 | | 18 Local wages, tips, etc. | |
| 19 | Local income tax | | | 20 Locality name | |

W-2 Wage and Tax Statement 2007

---

## 2008 W-2 (CT State Filing Copy)

| Box | Description | Value |
|---|---|---|
| 1 | Wages, tips, other comp. | 189788.84 |
| 2 | Federal income tax withheld | 38493.17 |
| 3 | Social security wages | 102000.00 |
| 4 | Social security tax withheld | 6324.00 |
| 5 | Medicare wages and tips | 189788.84 |
| 6 | Medicare tax withheld | 2751.94 |
| d | Control number | 001130 09/11Y |
| | Dept. | 001 |
| | Corp. | |
| | Employer use only | A   43 |

c Employer's name, address, and ZIP code
EBER - CONNECTICUT LLC
30 CORPORATE DRIVE
NORTH HAVEN CT 06473

| Box | Description | Value |
|---|---|---|
| b | Employer's FED ID number | 56-2501049 |
| a | Employee's SSA number | |
| 7 | Social security tips | |
| 8 | Allocated tips | |
| 9 | Advance EIC payment | |
| 10 | Dependent care benefits | |
| 11 | Nonqualified plans | |
| 14 | Other | |

e/f Employee's name, address and ZIP code
LESTER EBER
15 CORAL WAY
ROCHESTER, NY 14618

| 15 | State | CT | Employer's state ID no. 3041811-000 | 16 State wages, tips, etc. | 189788.84 |
| 17 | State income tax | 8570.70 | | 18 Local wages, tips, etc. | |
| 19 | Local income tax | | | 20 Locality name | |

W-2 Wage and Tax Statement 2008

---

## 2009 W-2 (CT State Filing Copy)

| Box | Description | Value |
|---|---|---|
| 1 | Wages, tips, other comp. | 182039.12 |
| 2 | Federal income tax withheld | 37553.09 |
| 3 | Social security wages | 106800.00 |
| 4 | Social security tax withheld | 6621.60 |
| 5 | Medicare wages and tips | 182039.12 |
| 6 | Medicare tax withheld | 2639.57 |
| d | Control number | 001130 09/11Y |
| | Dept. | 001 |
| | Corp. | |
| | Employer use only | A   40 |

c Employer's name, address, and ZIP code
EBER - CONNECTICUT LLC
30 CORPORATE DRIVE
NORTH HAVEN CT 06473

| Box | Description | Value |
|---|---|---|
| b | Employer's FED ID number | 56-2501049 |
| a | Employee's SSA number | |
| 7 | Social security tips | |
| 8 | Allocated tips | |
| 9 | Advance EIC payment | |
| 10 | Dependent care benefits | |
| 11 | Nonqualified plans | |
| 14 | Other | |

e/f Employee's name, address and ZIP code
LESTER EBER
15 CORAL WAY
ROCHESTER, NY 14618

| 15 | State | CT | Employer's state ID no. 3041811-000 | 16 State wages, tips, etc. | 182039.12 |
| 17 | State income tax | 8902.05 | | 18 Local wages, tips, etc. | |
| 19 | Local income tax | | | 20 Locality name | |

W-2 2009



PLAINTIFF'S EXHIBIT
28
1/24/19
PENGAD 800-631-6989

EB-00021420





**Safe, accurate, FAST! Use** ~~e-file~~ **Visit the IRS Web Site at www.irs.gov/efile.**

**W-2 Wage and Tax Statement 2006**

OMB No. 1545-0008

Copy C for employee's records.

| a Control number | Dept. | Corp. | Employer use only |
|---|---|---|---|
| 010034 09/K66 | 728000 | A | 1 |

c  Employer's name, address, and ZIP code
**EBER BROS WINE & LIQUOR CORP**
**155 PARAGON DRIVE**
**ROCHESTER NY 14624-1167**

Batch #01617

e/f  Employee's name, address, and ZIP code
**LESTER EBER**
**15 CORAL WAY**
**ROCHESTER NY 14618**

| b Employer's FED ID number | d Employee's SSA number |
|---|---|
| 16-0417450 | |

| 1 Wages, tips, other comp. | 2 Federal income tax withheld |
|---|---|
| | 73906.28 |

| 3 Social security wages | 4 Social security tax withheld |
|---|---|
| 94200.00 | 5840.40 |

| 5 Medicare wages and tips | 6 Medicare tax withheld |
|---|---|
| 325289.28 | 4716.69 |

| 7 Social security tips | 8 Allocated tips |
|---|---|
| | |

| 9 Advance EIC payment | 10 Dependent care benefits |
|---|---|
| | |

| 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|
| | C  6768.00 |

| 14 Other | 12b D  20000.00 |
|---|---|
| | 12c |
| | 12d |
| | 13 Stat emp Ret. plan 3rd party sick pay |

| 15 State Employer's state ID no. | 16 State wages and tips |
|---|---|
| NY  16-0417450 | 305289.28 |

| 17 State income tax | 18 Local wages, tips, etc. |
|---|---|
| 20801.56 | |

| 19 Local income tax | 20 Locality name |
|---|---|
| | |

## 2006 W-2 and EARNINGS SUMMARY

This blue Earnings Summary section is included with your W-2 to help describe portions in more detail. The reverse side includes general information that you may also find helpful.

1. The following information reflects your final 2006 pay stub plus any adjustments submitted by your employer.

| | | | |
|---|---|---|---|
| Gross Pay | 336675.00 | Social Security Tax Withheld Box 4 of W-2 | 5840.40 |
| | | NY. State Income Tax Box 17 of W-2 | 20801.56 |
| Fed. Income Tax Withheld Box 2 of W-2 | 73906.45 | Medicare Tax Withheld Box 6 of W-2 | 4716.69 |
| | | SUI/SDI Box 14 of W-2 | |

2. Your Gross Pay was adjusted as follows to produce your W-2 Statement.

| | Wages, Tips, other Compensation Box 1 of W-2 | Social Security Wages Box 3 of W-2 | Medicare Wages Box 5 of W-2 | NY. State Wages, Tips, Etc. Box 15 of W-2 |
|---|---|---|---|---|
| Gross Pay | 336,675.00 | 336,675.00 | 336,675.00 | 336,675.00 |
| Plus GTL (C-Box 12) | 6,768.00 | 6,768.00 | 6,768.00 | 6,768.00 |
| Less 401(k) (D-Box 12) | 20,000.00 | N/A | N/A | 20,000.00 |
| Less Medical FSA | 1,040.00 | 1,040.00 | 1,040.00 | 1,040.00 |
| Less Other Cafe 125. | 17,113.72 | 17,113.72 | 17,113.72 | 17,113.72 |
| Wages Over Limit | N/A | 231,089.28 | N/A | N/A |
| Reported W-2 Wages | 305,289.28 | 94,200.00 | 325,289.28 | 305,289.28 |

3. Employee W-4 Profile. To change your Employee W-4 Profile information, file a new W-4 with your payroll dept

**LESTER EBER**
**15 CORAL WAY**
**ROCHESTER NY 14618**

Social Security Number:
Taxable Marital Status: MARRIED
Exemptions/Allowances:
FEDERAL: 2
STATE: 2

© 2006 AUTOMATIC DATA PROCESSING, INC.

Fold and Detach Here

EB-00021421

| Void ☐ | **a** Employee's social security number [redacted] | OMB No. 1545-0008  I1Y | | 001 | 001130 |
|---|---|---|---|---|---|

| **b** Employer identification number (EIN) 56-2501049 | **1** Wages, tips, other compensation 155665.89 | **2** Federal income tax withheld 29594.89 |
|---|---|---|
| **c** Employer's name, address, and ZIP code EBER - CONNECTICUT LLC 30 CORPORATE DRIVE NORTH HAVEN CT 06473 | **3** Social security wages 106800.00 | **4** Social security tax withheld 4485.60 |
| | **5** Medicare wages and tips 172165.89 | **6** Medicare tax withheld 2496.41 |
| | **7** Social security tips | **8** Allocated tips |
| **d** Control number 001130 PITT/I1Y | **9** | **10** Dependent care benefits |
| **e** Employee's first name and initial     Last name     Suff. LESTER                         EBER 15 CORAL WAY ROCHESTER,NY 14618 | **11** Nonqualified plans | **12a** See instructions for box 12 D          16500.00 |
| | **13** Statutory employee ☐  Retirement plan ☐  Third-party sick pay ☒ | **12b** |
| | **14** Other | **12c** |
| | | **12d** |
| **f** Employee's address and ZIP code | | |

| **15** State CT | Employer's state ID number 3041811-000 | **16** State wages, tips, etc. 155665.89 | **17** State income tax 8589.96 | **18** Local wages, tips, etc. | **19** Local income tax | **20** Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

Form **W-2**   Wage and Tax Statement

**2011**

Department of the Treasury—Internal Revenue Service
**For Privacy Act and Paperwork Reduction Act Notice, see back of Copy D.**

Copy D — For Employer.

EB-00021422

| | a Employee's social security number | OMB No. 1545-0008   I1Y | | 001 | 001130 |
|---|---|---|---|---|---|
| Void ☐ | | | | | |

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 56-2501049 | 120698.37 | 20209.79 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| EBER - CONNECTICUT LLC | 110100.00 | 4624.20 |
| 30 CORPORATE DRIVE | 5 Medicare wages and tips | 6 Medicare tax withheld |
| NORTH HAVEN CT 06473 | 137698.37 | 1996.63 |
| | 7 Social security tips | 8 Allocated tips |

| d Control number | 9 | 10 Dependent care benefits |
|---|---|---|
| 001130 PITT/I1Y | | |

| e Employee's first name and initial   Last name   Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| LESTER   EBER | | D   17000.00 |
| 15 CORAL WAY | 13 Statutory employee ☐  Retirement plan ☒  Third-party sick pay ☐ | 12b |
| ROCHESTER,NY 14618 | 14 Other | 12c |
| | | 12d |
| f Employee's address and ZIP code | | |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| CT | 3041811-000 | 120698.37 | 6498.11 | | | |

Form **W-2**  Wage and Tax Statement   **2012**   Department of the Treasury—Internal Revenue Service

For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.

Copy D -- For Employer.

EB-C0021423

| | a Employee's social security number | | |
|---|---|---|---|
| Void ☐ | | OMB No. 1545-0008   I1Y | 001   001130 |

| b Employer identification number (EIN)  56-2501049 | 1 Wages, tips, other compensation  174461.08 | 2 Federal income tax withheld  30126.59 |
|---|---|---|
| c Employer's name, address, and ZIP code  EBER – CONNECTICUT LLC  30 CORPORATE DRIVE  NORTH HAVEN CT 06473 | 3 Social security wages  113700.00 | 4 Social security tax withheld  7049.40 |
| | 5 Medicare wages and tips  191961.08 | 6 Medicare tax withheld  2783.44 |
| | 7 Social security tips | 8 Allocated tips |
| d Control number  001130 PITT/I1Y | 9 | 10 Dependent care benefits |
| e Employee's first name and initial   Last name   Suff.  LESTER             EBER  15 CORAL WAY  ROCHESTER, NY 14618 | 11 Nonqualified plans | 12a See instructions for box 12  D   17500.00 |
| | 13 Statutory employee ☐   Retirement plan ☒   Third-party sick pay ☐ | 12b |
| | 14 Other  28798.78  AUTO | 12c |
| | | 12d |
| f Employee's address and ZIP code | | |

| 15 State  CT | Employer's state ID number  3041811-000 | 16 State wages, tips, etc.  174461.08 | 17 State income tax  9851.04 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

Form **W-2** Wage and Tax Statement

2013

Department of the Treasury—Internal Revenue Service  For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.

Copy D — For Employer

EB-00021424

| | a Employee's social security number | | OMB No. 1545-0008  I1Y | | 001 | 001130 |
|---|---|---|---|---|---|---|

Void ☐

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 56-2501049 | 172135.56 | 33334.12 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| EBER - CONNECTICUT LLC | 117000.00 | 7254.00 |
| 30 CORPORATE DRIVE | 5 Medicare wages and tips | 6 Medicare tax withheld |
| NORTH HAVEN CT 06473 | 195135.56 | 2829.47 |
| | 7 Social security tips | 8 Allocated tips |

| d Control number | 9 | 10 Dependent care benefits |
|---|---|---|
| 001130 PITT/I1Y | | |

| e Employee's first name and initial   Last name   Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| LESTER            EBER | | D    23000.00 |
| 15 CORAL WAY | 13 Statutory employee ☐  Retirement plan ☒  Third-party sick pay ☐ | 12b |
| ROCHESTER,NY 14618 | 14 Other | 12c |
| | | 12d |
| f Employee's address and ZIP code | | |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| CT | 3041811-000 | 172135.56 | 9680.35 | | | |

Form **W-2** **Wage and Tax Statement**   **2014**

Department of the Treasury—Internal Revenue Service
For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.

Copy D — For Employer

EB-00021425

| Void ☐ | a Employee's social security number ▓▓▓▓▓ | OMB No. 1545-0008 | I1Y | | 001 | 001130 |
|---|---|---|---|---|---|---|

| | | 1 Wages, tips, other compensation 313977.73 | 2 Federal income tax withheld 65348.47 |
|---|---|---|---|
| b Employer identification number (EIN) 56-2501049 | | | |
| c Employer's name, address, and ZIP code EBER - CONNECTICUT LLC 30 CORPORATE DRIVE NORTH HAVEN CT 06473 | | 3 Social security wages 118500.00 | 4 Social security tax withheld 7347.00 |
| | | 5 Medicare wages and tips 337977.73 | 6 Medicare tax withheld 6142.48 |
| | | 7 Social security tips | 8 Allocated tips |
| d Control number 001130 PITT/I1Y | | 9 ▓▓▓▓ | 10 Dependent care benefits |
| e Employee's first name and initial    Last name            Suff. LESTER                       EBER 15 CORAL WAY ROCHESTER,NY 14618 | | 11 Nonqualified plans | 12a See instructions for box 12 D   24000.00 |
| | | 13 Statutory employee ☐  Retirement plan ☒  Third-party sick pay ☐ | 12b |
| | | 14 Other     32068.82  AUTO | 12c |
| | | | 12d |
| f Employee's address and ZIP code | | | |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| CT | 3041811-000 | 313977.73 | 18600.43 | | | |
| | | | | | | |

Form **W-2** Wage and Tax Statement

Copy D — For Employer

**2015**

Department of the Treasury—Internal Revenue Service
For Privacy Act and Paperwork Reduction
Act Notice, see separate instructions.

EB-00021426

| | | | |
|---|---|---|---|
| Void ☐ | a Employee's social security number ████████ | OMB No. 1545-0008  I1Y | 001          001130 |

| b Employer identification number (EIN)  56-2501049 | 1 Wages, tips, other compensation  292873.14 | 2 Federal income tax withheld  77882.34 |
|---|---|---|
| c Employer's name, address, and ZIP code  EBER - CONNECTICUT LLC  30 CORPORATE DRIVE  NORTH HAVEN CT 06473 | 3 Social security wages  118500.00 | 4 Social security tax withheld  7347.00 |
| | 5 Medicare wages and tips  316873.14 | 6 Medicare tax withheld  5646.52 |
| | 7 Social security tips | 8 Allocated tips |
| d Control number  001130 PITT/I1Y | 9 | 10 Dependent care benefits |
| e Employee's first name and initial   Last name   Suff.  LESTER           EBER  15 CORAL WAY  ROCHESTER,NY 14618 | 11 Nonqualified plans | 12a See instructions for box 12  D | 24000.00 |
| | 13 Statutory employee ☐  Retirement plan ☒  Third-party sick pay ☐ | 12b |
| | 14 Other  8884.26  AUTO | 12c |
| | | 12d |
| f Employee's address and ZIP code | | |

| 15 State  Employer's state ID number  CT | 3041811-000 | 16 State wages, tips, etc.  292873.14 | 17 State income tax  22206.59 | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| | | | | | | |

Form **W-2**  **Wage and Tax Statement**  **2016**

Copy D — For Employer

Department of the Treasury—Internal Revenue Service
For Privacy Act and Paperwork Reduction
Act Notice, see separate instructions.

EB-00021427

| Void ☐ | a Employee's social security number ▓▓▓▓ | OMB No. 1545-0008 | I1Y | 001 | 001130 |
|---|---|---|---|---|---|

| b Employer identification number (EIN) | 1 Wages, tips, other compensation | 2 Federal income tax withheld |
|---|---|---|
| 56-2501049 | 300269.76 | 65537.67 |

| c Employer's name, address, and ZIP code | 3 Social security wages | 4 Social security tax withheld |
|---|---|---|
| EBER – CONNECTICUT LLC | 127200.00 | 7886.40 |
| 30 CORPORATE DRIVE | 5 Medicare wages and tips | 6 Medicare tax withheld |
| NORTH HAVEN CT 06473 | 324269.76 | 5820.34 |
| | 7 Social security tips | 8 Allocated tips |

| d Control number | 9 Verification code | 10 Dependent care benefits |
|---|---|---|
| 001130 PITT/I1Y | | |

| e Employee's first name and initial   Last name         Suff. | 11 Nonqualified plans | 12a See instructions for box 12 |
|---|---|---|
| LESTER            EBER | | D   24000.00 |
| 15 CORAL WAY | 13 Statutory employee ☐  Retirement plan ☒  Third-party sick pay ☐ | 12b |
| ROCHESTER,NY 14618 | 14 Other | 12c |
| | 11768.76  AUTO | 12d |
| f Employee's address and ZIP code | | |

| 15 State | Employer's state ID number | 16 State wages, tips, etc. | 17 State income tax | 18 Local wages, tips, etc. | 19 Local income tax | 20 Locality name |
|---|---|---|---|---|---|---|
| CT | 3041811-000 | 300269.76 | 15724.80 | | | |

Form **W-2** Wage and Tax Statement

2017

Department of the Treasury—Internal Revenue Service
For Privacy Act and Paperwork Reduction Act Notice, see separate instructions.

Copy D — For Employer

EB-00021428

# Lester Eber

95 Allens Creek Rd., Bldg. 2 Ste. 10
Rochester, NY 14618

January 1, 2012

Mr. Steven Becker
Executive Vice President & Treasurer
Southern Wine & Spirits of America, Inc.
1600 N.W. 163rd St
Miami, Fl 33169-5635

Dear Mr. Becker:

This letter will confirm our agreement whereby Lester Eber will provide representation to
Southern Wine & Spirits of America, Inc. before the Legislative, Executive and Administrative branches
of New York State Government for a one-year period, effective January 1, 2012 until December 31, 2012.
The fee for these services will be $10,000 (Ten-Thousand dollars).

If the terms of this retainer are acceptable, please sign where indicated and return the original. A
copy of this letter will be filed with the New York State Joint Commission on Public Ethics and Lester Eber
will be registered as a lobbyist for Southern Wine & Spirits of America, Inc. effective January 1, 2012.

BY: _____
    Lester Eber

ACCEPTED BY:
Name: STEVEN BECKER Signature: _____
Executive Vice President & Treasurer, Southern Wine & Spirits of America, Inc.

PLAINTIFF'S
EXHIBIT
29
1/24/19
PENGAD 800-631-6989



## Lester Eber

99 Allens Creek Rd., Bldg. 2 Ste. 10
Rochester, NY 14618

January 1, 2013

Mr. Steven Becker
Executive Vice President & Treasurer
Southern Wine & Spirits of America, Inc.
1600 N.W. 163rd St
Miami, Fl 33169-5635

Dear Mr. Becker:

This letter will confirm our agreement whereby Lester Eber will provide representation to Southern Wine & Spirits of America, Inc. before the Legislative, Executive and Administrative branches of New York State Government for a one-year period, effective January 1, 2013 until December 31, 2013. The fee for these services will be $10,000 (Ten-Thousand dollars).

If the terms of this retainer are acceptable, please sign where indicated and return the original. A copy of this letter will be filed with the New York State Joint Commission on Public Ethics and Lester Eber will be registered as a lobbyist for Southern Wine & Spirits of America, Inc. effective January 1, 2013.

BY: _____
Lester Eber

ACCEPTED BY:
Name: _STEVEN BECKER_ Signature: _____
Executive Vice President & Treasurer, Southern Wine & Spirits of America, Inc.

EB-00000696

# Lester Eber

95 Allens Creek Rd., Bldg. 2 Ste. 10
Rochester, NY 14618

March 1, 2014

Mr. Steven Becker
Executive Vice President & Treasurer
Southern Wine & Spirits of America, Inc.
1600 N.W. 163rd St.
Miami, FL 33169-5635

Dear Mr. Becker:

This letter will confirm our agreement whereby Lester Eber will provide representation to Southern Wine & Spirits of America, Inc. before the Legislature, Executive and Administrative branches of New York State Government for a period commencing March 1, 2014 and ending December 31, 2014. The fee for these services will be $833.33 (Eight hundred thirty-three dollars and thirty-three cents) per month.

If the terms of this retainer are acceptable, please sign where indicated and return the original. A copy of this letter will be filed with the New York State Joint Commission on Public Ethics and Lester Eber will be registered as a lobbyist for Southern Wine & Spirits of America, Inc. effective March 1, 2014.

BY: _____
           Lester Eber


ACCEPTED BY:
Name: STEVEN BECKER   Signature: _____
Executive Vice President & Treasurer, Southern Wine & Spirits of America, Inc.

# Lester Eber

95 Allens Creek Rd., Bldg. 2 Ste. 10
Rochester, NY 14618

January 1, 2015

Mr. Steven Becker
Executive Vice President & Treasurer
Southern Wine & Spirits of America, Inc.
1600 N.W. 163rd St.
Miami, FL 33169-5635

Dear Mr. Becker:

This letter will confirm our agreement whereby Lester Eber will provide representation to Southern Wine & Spirits of America, Inc. before the Legislature, Executive and Administrative branches of New York State Government for a 12-month period, effective January 1, 2015 until December 31, 2015. The fee for these services will be $833.33 (Eight hundred thirty-three dollars and thirty-three cents) per month.

If the terms of this retainer are acceptable, please sign where indicated and return the original. A copy of this letter will be filed with the New York State Joint Commission on Public Ethics and Lester Eber will be registered as a lobbyist for Southern Wine & Spirits of America, Inc. effective January 1, 2015.

BY: _____
        Lester Eber

ACCEPTED BY:
Name: _STEVEN BECKER___  Signature: _____
Executive Vice President & Treasurer, Southern Wine & Spirits of America, Inc.

# Lester Eber

95 Allens Creek Rd., Bldg. 2 Ste. 10
Rochester, NY 14618

January 1, 2016

Mr. Steven Becker
Executive Vice President & Treasurer
Southern Wine & Spirits of America, Inc.
1600 N.W. 163rd St.
Miami, FL 33169-5635

Dear Mr. Becker:

This letter will confirm our agreement whereby Lester Eber will provide representation to Southern Wine & Spirits of America, Inc. before the Legislature, Executive and Administrative branches of New York State Government for a 12-month period, effective January 1, 2016 until December 31, 2016. The fee for these services will be $833.33 (Eight hundred thirty-three dollars and thirty-three cents) per month.

If the terms of this retainer are acceptable, please sign where indicated and return the original. A copy of this letter will be filed with the New York State Joint Commission on Public Ethics and Lester Eber will be registered as a lobbyist for Southern Wine & Spirits of America, Inc. effective January 1, 2016.

BY: _____

Lester Eber

ACCEPTED BY:
Name: _STEVEN BECKER_ Signature: _____
Executive Vice President & Treasurer, Southern Wine & Spirits of America, Inc.

EB-00000699

# Lester Eber

95 Allens Creek Rd., Bldg. 2 Ste. 10
Rochester, NY 14618

November 4, 2016

Mr. Steven Becker
Executive Vice President & Treasurer
Southern Wine & Spirits of America, Inc.
1600 N.W. 163rd St.
Miami, FL 33169-5635

Dear Mr. Becker:

This letter will confirm our agreement whereby Lester Eber will provide representation to Southern Wine & Spirits of America, Inc. before the Legislature, Executive and Administrative branches of New York State Government for a 12-month period, effective January 1, 2017 until December 31, 2018. The fee for these services will be $833.33 (Eight hundred thirty-three dollars and thirty-three cents) per month.

If the terms of this retainer are acceptable, please sign where indicated and return the original. A copy of this letter will be filed with the New York State Joint Commission on Public Ethics and Lester Eber will be registered as a lobbyist for Southern Wine & Spirits of America, Inc. effective January 1, 2017.

BY: _____

Lester Eber

ACCEPTED BY:
Name: STEVEN BECKER    Signature: _____
Executive Vice President & Treasurer, Southern Wine & Spirits of America, Inc.

EB-00000700

# Lester Eber

95 Allens Creek Rd., Bldg. 2 Ste. 10
Rochester, NY 14618

November 4, 2016

Mr. Steven Becker
Executive Vice President & Treasurer
**Southern Glazer's Wine & Spirits**
1600 N.W. 163rd St.
Miami, FL 33169-5635

Dear Mr. Becker:

This letter will confirm our agreement whereby Lester Eber will provide representation to
**Southern Glazer's Wine & Spirits of New York** before the Legislature, Executive and Administrative
branches of New York State Government for a **24-month** period, effective January 1, 2017 until
December 31, 2018. The fee for these services will be $833.33 (Eight hundred thirty-three dollars and
thirty-three cents) per month.

If the terms of this retainer are acceptable, please sign where indicated and return the original. A
copy of this letter will be filed with the New York State Joint Commission on Public Ethics and Lester
Eber will be registered as a lobbyist for **Southern Glazer's Wine & Spirits of New York** effective
January 1, 2017.

Agree to changes in authorization

_Lester Eber_ may 12, 2017
Lester Eber - Date

BY: _Lester Eber_

Lester Eber

_Steven Becker_ Date
Steven Becker   Date

ACCEPTED BY:
Name: _STEVEN BECKER_   Signature: _____
Executive Vice President & Treasurer, **Southern Glazer's Wine & Spirits**

EB-00000701

Exhibit 11

**$1,503,750.00**       **AMENDED AND RESTATED**       March ___13___, 2006
                        **PROMISSORY NOTE**

This Amended and Restated Promissory Note (this "Note") replaces in its entirety that certain Promissory Note, dated August 15, 2005 (the "Original Note"), made by Eber Bros. Wine and Liquor Corporation payable to the order of Lester Eber in the original principal amount of $1,503,750.00, which such Original Note has been marked "CANCELLED" and returned to Eber Bros. Wine and Liquor Corporation.

FOR VALUE RECEIVED, EBER BROS. WINE AND LIQUOR CORPORATION, a New York corporation with its principal place of business located at 155 Paragon Drive, Rochester, New York 14624 ("Maker"), promises to pay to the order of LESTER EBER, an individual with a mailing address at 15 Coral Way, Rochester, New York 14618 ("Payee"), at such place as shall be designated from time to time in writing by Payee, the principal sum, of One Million, Five Hundred and Three Thousand, Seven Hundred and Fifty and 00/100 Dollars ($1,503,750.00), plus interest thereon at a rate of six percent (6%) per annum, from the date of the Original Note until paid.         _L. E._ _(nice)_      (9%)

THE INDEBTEDNESS EVIDENCED BY THIS INSTRUMENT IS SUBORDINATED TO THE PRIOR PAYMENT IN FULL OF THE OBLIGATIONS (AS DEFINED IN THE SUBORDINATION AGREEMENT HEREINAFTER REFERRED TO) PURSUANT TO, AND TO THE EXTENT PROVIDED IN, THE SUBORDINATION AGREEMENT, DATED AS OF MARCH _13_ 2006, MADE BY LESTER EBER AND EBER BROS. WINE AND LIQUOR CORPORATION, IN FAVOR OF THE HOLDERS OF THE SENIOR DEBT REFERRED TO IN SUCH SUBORDINATION AGREEMENT.

No amounts shall be due and owing Payee hereunder until 90 days following the date on which all amounts due and owing the Agent and the Lenders (as such terms are defined in the Subordination Agreement) for the Obligations have been paid in full in cash, all commitments under the Credit Agreement (as such term is defined in the Subordination Agreement) have been terminated and all Letters of Credit (as such term is defined in the Subordination Agreement) have been cancelled or cash collateralized in accordance with the terms of the Credit Agreement. Thereafter, all principal and interest due and owing Payee hereunder shall be paid by Maker upon terms and conditions to be mutually agreed upon by Maker and Payee; provided, however, that Maker shall make payments of interest at least monthly, and all amounts of principal and interest shall be paid in full no later than the tenth anniversary of the date of this Note.

Subject to the foregoing, this Note is pre-payable in whole or in part at any time without any prepayment penalty or premium whatsoever. All prepayments shall be applied first to any accrued and unpaid interest due and owing hereunder and then to the reduction and payment of principal in order of maturity.

Any payment not received within thirty (30) days of the date due shall be subject to an additional late charge equal to two percent (2%) of the payment then due. All payments hereunder shall be made in lawful money of the United States of America in immediately available funds and without presentation of this Note for notation of such payment.

219027 49089.3



PLAINTIFF'S
EXHIBIT
30
1 24 19

EB-00031310

Exhibit 11

This Note shall become immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby expressly waived, upon the occurrence of any of the following events of defaults:

(a) failure of Maker to make any payments when due hereunder;

(b) failure of Maker to pay any other obligation, when due, to Payee;

(c) financial difficulties of Maker as evidenced by (i) any admission in writing of its inability to pay debts as they become due, (ii) the filing of a voluntary or involuntary petition in bankruptcy, or under any chapters of the Bankruptcy Code, or under any federal or state statute providing for the relief of debtors, (iii) the making of an assignment for the benefit of creditors, or (iv) the appointment of a receiver, a custodian or trustee for all or a major part of Maker's property; or

(d) liquidation or dissolution, or sale of all or substantially all of the assets, of Maker.

The terms of this Note cannot be changed, nor may this Note be discharged in whole or in part, except by a writing executed by Payee. In the event that Payee demands or accepts partial payments of this Note, such demand or acceptance shall not be deemed to constitute a waiver of the right to demand the entire unpaid balance of this Note at any time in accordance with the terms hereof. Any delay by Payee in exercising any rights hereunder shall not operate as a waiver of such rights. This Note shall be binding upon Maker and its successors and assigns.

The terms of this Note shall be governed by, construed, interpreted and enforced in accordance with the internal laws of the State of New York.

IN WITNESS WHEREOF, Maker has executed this Note as of the 13th day of March, 2006.

EBER BROS. WINE AND LIQUOR CORPORATION

By: _____
Lester Eber, President

By: _____
John T. Ryan, Chief Financial Officer

ACKNOWLEDGED AND CONSENTED TO:

_____
Lester Eber

2

EB-00031311



## DENISE W. MERRILL
### CONNECTICUT SECRETARY OF THE STATE

Se

## Business Inquiry

### Business Details

| | | | |
|---|---|---|---|
| Business Name: | **ALEXBAY, LLC** | Citizenship/State Inc: | **Domestic/CT** |
| Business ID: | **1055734** | Last Report Filed Year: | **2014** |
| Business Address: | **30 CORPORATE DRIVE, NORTH HAVEN, CT, 06473** | Business Type: | **Domestic Limited Liability Company** |
| Mailing Address: | **30 CORPORATE DRIVE, NORTH HAVEN, CT, 06473** | Business Status: | **Active** |
| Date Inc/Registration: | **Dec 08, 2011** | | |

### Principals Details

| Name/Title | Business Address | Residence Address |
|---|---|---|
| LESTER EBER SOLE MEMBER | 30 CORPORATE DR., NORTH HAVEN, CT, 06473 | 15 CORAL WAY, ROCHESTER, NY, 14618 |

### Agent Summary

| | |
|---|---|
| Agent Name | **GERALD E. FARRELL** |
| Agent Business Address | **6 NORTH MAIN STREET, SUITE 202, WALLINGFORD, CT, 06492** |
| Agent Residence Address | **54 NORTH ELM STREET, WALLINGFORD, CT, 06492** |



PENGAD 800-631-6989 PLAINTIFF'S EXHIBIT 31 1 24 19



DENISE W. MERRILL
CONNECTICUT SECRETARY OF THE STATE

Se

## Business Inquiry

### Name Change History

**Business ID**
1055734

**Business Name**
ALEXBAY, LLC

**Old Name**
LESTER EBER. LLC

**Filing Number**
0004502632

**Filing Date**
Jan 12, 2012