

Wealth Strategies Group | Canandaigua National Bank & Trust

July 12, 2017

**Rita Nischal, Esq.**
Vice President and Trust Officer
1150 Pittsford-Victor Rd
Pittsford, NY 14534
**PH** 585-419-0670 x50631
800-724-2621 x50631
**rnischal@cnbank.com**

Mr. Lester Eber
Personal & Confidential
Bldg 2 Suites 10&11
95 Allens Creek Rd.
Rochester NY 14618-3250

        **Re:    Settlement of the Allen Eber Residuary Trust**

Dear Lester:

        Enclosed please find the following documents for your review and/or signature in order to settle the above mentioned Trust:

1.  Receipt and Release, please review and sign in front of a notary public;

2.  List of Holdings and Statement showing all of the transactions that have taken place since the accounting, December 27, 2016 through June 20, 2017;

3.  Chart showing distribution of shares; and

4.  Form W9 to be completed.

In order to make any distributions to you, I will need a copy of your current government photo ID along with a completed form W9.   Also, please provide us with instructions to transfer the assets.

If you have any questions or concerns, please do not hesitate to contact me.

                        Very truly yours,

                        Rita Nischal

PLAINTIFF'S
EXHIBIT
32
1|24|19
PENGAD 800-631-6989

                **CNBank.com**

SURROGATE'S COURT OF THE STATE OF NEW YORK
COUNTY OF MONROE

| FINAL ACCOUNT OF THE CANANDAIGUA NATIONAL BANK AND TRUST COMPANY, AS SUCCESSOR CO-TRUSTEE OF RESIDUARY TRUST UNDER WILL OF ALLEN EBER DATED OCTOBER 27, 1969 | **RECEIPT AND RELEASE**<br><br>File No. 1970-1952 |

TO THE SURROGATE'S COURT, COUNTY OF MONROE

The undersigned, being of full age, sound mind and under no duress or disability, and entitled to share in the above mentioned Trust as a beneficiary,

(a) Acknowledges that The Canandaigua National Bank and Trust Company (hereinafter referred to as "CNB" or "Co-Trustee") in its capacity as Co-Trustee, has fully and satisfactorily accounted for all assets of the Trust from the date of the Accounting, December 27, 2016, through June 20, 2017, such activities prior to December 27, 2016, having been judicially approved;

(b) Acknowledges receipt of statements of transaction activities from December 27, 2016 through June 20, 2017 which is attached hereto;

(c) Acknowledges and requests that the Co-Trustee settle the Trust and distribute the assets pursuant to the Proposed Distribution Chart attached hereto which follows the Order dated June 1, 2017 with modifications to account for distributions made to Erica Stein;

(d) Acknowledges and hereby releases, discharges, indemnifies and holds harmless Canandaigua National Bank and Trust Company in its capacity as Co-Trustee and in its corporate capacity, its successors and affiliates, and the directors and employees of CNB or its affiliates, against all claims (including taxes of every kind and character), demands, suits, actions, expenses, accountants' fees, attorneys' fees and all losses and damages of every kind and character whatsoever attributable to the Co-Trustee in connection with the administration of the Trust and the settlement of the Account to the date of this Agreement.

_____
Lester Eber

County of        }ss.
State of          }ss

On the ____ day of _____ in the year 2017 before me, the undersigned, a Notary Public in and for said State, personally appeared Lester Eber personally known to me or proved to me on the basis of satisfactory evidence to be the individual whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his capacity, and that by his signature on the instrument, the individual, or the person upon behalf of which the individual acted, executed the instrument.

_____
Notary Public

EB-00000812

### Residuary TUW Allen Eber Proposed Distribution

| Assets | Total Shares on Hand to be Distributed | Total Tax Cost Basis | Market Value as of 6.20.2017 | Daniel Kleeberg (1/6) | Lisa Stein (1/6) | Audrey Hays (1/3) | Lester Eber (1/3) |
|---|---|---|---|---|---|---|---|
| AT&T | 1,000 | 24,390.00 | 38,910.00 | 170 | 170 | 330 | 330 |
| Chemours Co. | 80 – sell 2** | 916.94 | 3,040.00 | 13 | 13 | 26 | 26 |
| Clorox Co | 300 | 18,699.00 | 42,345.00 | 51 | 51 | 99 | 99 |
| Du Pont De Nemours Ei Co | 400 | 17,923.06 | 33,424.00 | 68 | 68 | 132 | 132 |
| Eber Bros & Co Class A | 1,850 | 631,238.50 | 0.00 | 315 | 315 | 610 (1 extra share) | 610 (1 extra share) |
| Eber Bros & Co Class B | 290 | 462,973.99 | 0.00 | 50 (1 extra share) | 50 (1 extra share) | 95 | 95 |
| Eber Bros & Co 6% Non-Cumulative | 2,000 | 200,000.00 | 0.00 | 340 | 340 | 660 | 660 |
| Exxon-Mobile Corp | 2,190 – sell 2** shares | 4,903.55 | 181,244.40 | 372 | 372 | 722 | 722 |
| *Lilly Eli & Co | 500 | 17,110.00 | 41,170.00 | 85 + 12 = 97 | 85 − 72 = 13 | 165 + 30 = 195 | 165 + 30 = 195 |
| Lockheed Martin Corp Com | 300 | 20,751.00 | 84,690.00 | 51 | 51 | 99 | 99 |
| Microsoft Corporation | 800 | 20,320.00 | 56,696.00 | 136 | 136 | 264 | 264 |
| Pfizer Inc. | 886 – sell 2** shares | 15,518.29 | 29,432.92 | 150 | 150 | 292 | 292 |
| Dodge & Cox Income Fund | 3,591.95 | 50,000.00 | 49,748.56 | 610.6315 | 610.6315 | 1185.3435 | 118.3435 |
| Franklin Templeton Global Bond Inst. | 3,598.27 | 48,792.52 | 44,258.71 | 611.7059 | 611.7059 | 1187.4291 | 1187.4291 |
| Vangaurd Int. Term Bd Index Admiral | 4,122.01 | 50,000.00 | 47,361.92 | 700.7417 | 700.7417 | 1360.2633 | 1360.2633 |
| Total Shares/bonds to be Distributed | 21,908.23 | | | 3736.0791 | 3,652.0791 | 7,307.0359 | 7,307.0359 |
| Money Market P | $11,779.15 (after fees and expenses) | | | $1,963.19 | $1,963.19 | $3,926.38 | $3,926.38 |
| Money Market I | $9,335.32 | | | $1,555.89 + 11.92 | $1,555.89 − 71.52 | $3,111.77 + 29.80 | $3,111.77 + 29.80 |
| Total Cash To be Distributed | | | | $3,531.00 | $3,447.56 | $7,067.95 | $7,067.95 |

* Please note - Lilly Eli was used to adjust Erica Stein's distribution for 2017 (6 months) as was Money Market income.

**Please note, proceeds from the sale of shares will be divided accordingly and will impact cash distribution amounts.

EB-00000836

CH

> At a Surrogate's Court of the State of New York
> held in and for the County of Monroe at
> Rochester, New York, on May 18, 2017.

PRESENT: HON. JOHN M. OWENS, Surrogate

| | |
|---|---|
| FINAL ACCOUNTING OF THE CANANDAIGUA NATIONAL BANK AND TRUST COMPANY, AS SUCCESSOR CO-TRUSTEE OF RESIDUARY TRUST UNDER WILL OF ALLEN EBER DATED OCTOBER 27, 1969 | **ORDER FOR JUDICIAL SETTLEMENT OF FINAL ACCOUNT OF SUCCESSOR CO-TRUSTEE, RESIGNATION AND DISCHARGE OF CO-TRUSTEE AND TERMINATION OF TRUST**<br><br>File No. 1970-1952 /D |

UPON reading and filing the duly verified Petition for Judicial Settlement of Final Account of Successor Co-Trustee, Resignation and Discharge of Co-Trustee and Termination of Trust, verified by Petitioner, Canandaigua National Bank and Trust Company, on February 15, 2017; and

UPON all proofs of service having been duly filed with the Court; and

THERE having been no Objections filed with the Court by any of the appearing parties; and

UPON, the appearance of Canandaigua National Bank through its counsel, Woods Oviatt Gilman LLP, Lorisa D. LaRocca, Esq. and William G. Bauer, Esq., and the appearance of Lester Eber, through his counsel, Wiedman, Vazzana, Corcoran and Volta, P.C., James G. Vazzana, Esq. at an adjourned return date of this Court on May 18, 2017; and

UPON, the appearance of Calihan Law PLLC, Robert B. Calihan, Esq., on behalf of Elliott W. Gumaer, Jr., having been waived by the Court at counsel's request;

NOW, THEREFORE, it is hereby

**ORDERED, ADJUDGED AND DECREED** that the Final Account of Canandaigua National Bank and Trust Company, as Successor Co-Trustee of the Residuary Trust Under Will of Allen Eber dated October 27, 1969 (the "Trust"), is hereby judicially settled and Canandaigua National Bank and Trust Company is discharged from any liability in the administration of the

{5127751: }

PLAINTIFF'S
EXHIBIT
33
1/24/19
PENGAD 800-631-6989

Trust from its receipt of assets until distribution of the Trust assets, in its capacity as Successor Co-Trustee of the Trust; and it is further

**ORDERED, ADJUDGED AND DECREED** that the Trust be terminated and that the Trust assets be distributed to the beneficiaries in accordance with the terms set forth in the Final Account and allowed as filed (and adjusted), and that the following is a summary thereof as settled:

## SUMMARY

### PRINCIPAL ACCOUNT

CHARGES:

| | | | |
|---|---|---|---|
| Schedule A | Principal received | $1,409,047.07 | |
| Schedule AA | Subsequent receipts of principal | 12,000.44 | |
| Schedule A-1 | Realized increases in principal | 5,842.73 | |
| Schedule G | Unrealized increases in principal | 163,793.19 | |
| | Total Principal Charges | | $1,590,683.43 |

CREDITS:

| | | | |
|---|---|---|---|
| Schedule B | Realized decreases in principal | $ 768,370.36 | |
| Schedule C | Administration expenses | 48,535.21 | |
| Schedule E | Distributions of principal | 88,851.48 | |
| Schedule G | Unrealized decreases in principal | 10,827.35 | |
| | Total Principal Credits | | $ 916,584.40 |
| **Principal balance on hand shown by Schedule G** | | | $ 674,099.03 |

### INCOME ACCOUNT

CHARGES:

| | | | |
|---|---|---|---|
| Schedule AA-1 | Income received | $ 2,868.90 | |
| Schedule A-2 | Income collected | 203,676.91 | |
| Schedule A-3 | Realized increases in income | 229.15 | |
| | Total Income Charges | | $ 206,774.96 |

{5127751: }

CREDITS:

| | | | |
|---|---|---|---|
| Schedule C-2 | Administrative expenses | $ 18,778.18 | |
| Schedule E-1 | Distributions of income | 170,529.29 | |
| | **Total Income Credits** | | $ 189,307.42 |
| | **Income remaining on hand as shown in Schedule G-1** | | $ 17,467.49 |

### COMBINED ACCOUNTS

| | | | |
|---|---|---|---|
| Principal on hand: | Cash | $ 35,523.28 | |
| | Other assets | 638,575.75 | |
| | Total principal on hand | | $674,099.03 |
| Income on hand: | Cash | | 17,467.49 |
| | **Total Assets on hand** | | $691,566.52 |

**ORDERED, ADJUDGED AND DECREED** that petitioner pay the remaining cash and transfer, assign and deliver the other remaining assets as shown in the account as follows:

To: Canandaigua National Bank

    As and for the commissions in the sum of             $     8,114.86

To: Woods Oviatt Gilman LLP

    For legal services rendered in the sum of            $     TBD

    For costs and disbursements                     $     TBD

                       Balance                            $ 683,451.66*

To be distributed as follows:

To: Daniel Kleeberg (1/6 share)                       $ 113,908.61*

To: Lisa Stein (1/6 share)                          $ 113,908.61*

To: Audrey Hays (1/3 share)                       $ 227,817.22*

To: Lester Eber (1/3 share)                        $ 227,817.22*

        *Less Woods Oviatt Gilman LLP fees and disbursements – amount to be determined.

{5127751: }

**ORDERED, ADJUDGED AND DECREED** that, upon its completion of the distribution of the Trust assets, as set forth in the Final Account and this Order, Canandaigua National Bank and Trust Company shall be discharged as Successor Co-Trustee of the Trust; and it is further

**ORDERED, ADJUDGED AND DECREED** that, the sum of $ 5757.50 in fees and 1460 in disbursement shall be paid from the Trust to Woods Oviatt Gilman LLP, as attorneys for Petitioner in connection with its services in regard to this proceeding.

Dated: June 1, 2017

HON. _____
JOHN M. OWENS, SURROGATE

SURROGATE'S COURT
MONROE COUNTY
JUN - 2017
FILED

{5127751: }

**WIEDMAN, VAZZANA, CORCORAN & VOLTA, P.C.**
ATTORNEYS AND COUNSELLORS
5 SOUTH FITZHUGH STREET
ROCHESTER, NEW YORK 14614
TELEPHONE (585) 454-5850
FACSIMILE (585)454-1273

FREDERICK WIEDMAN (1957)
FREDERICK WIEDMAN, JR. (1999)
------------
JAMES G. VAZZANA
CHRISTOPHER H. CORCORAN
SANDRA E. VOLTA *

PARALEGALS
JOANNE LAMAGNA
AMANDA L. BACH

*ALSO ADMITTED IN FLORIDA

July 19, 2017

Canandaigua National Bank & Trust
1150 Pittsford-Victor Road
Pitttsford, New York 14534

Attention:    Rita Nischal, Esq.,
              Vice President and Trust Officer          *E-mail to: rnischal@cnbank.com*

**Re:    Settlement of the Allen Eber Residuary Trust**

Dear Attorney Nischal:

As you know I am the personal attorney for Lester Eber. Attached is a copy of a correspondence with Lorisa LaRocca, Esq. dated June 7, 2017 which included an analysis by Wendy Eber.

Based on the documents which have been sent to my client, it does not appear that the Trust balances for Lisa Stein have been reduced by the amount of distributions which have been made to Erica Stein (daughter of Lisa Stein). This includes the balances addressed in your recent letter from July 12, 2017 for the Trust balances from Dec 31, 2016 to June 31st, 2017 where Erica Stein was paid $6000. Am I correct?

As documented in Richard Hawk's letter, ALL of Lisa Stein's balances should be reduced for the distributions made to her daughter and the lost interest over the past ten years.

Sincerely,

Wiedman, Vazzana, Corcoran & Volta, P.C.

*Jim Vazzana*

James G. Vazzana

*Dictated but not read.*
JGV/alb
Enclosure
CC:    John Herbert, Esq.
       Lorisa LaRocca, Esq.
       Lester Eber
       Wendy Eber



PENGAD 800-631-6989

PLAINTIFF'S
EXHIBIT
34
12.4 ( 9

CNB-PL0010

WIEDMAN, VAZZANA, CORCORAN & VOLTA, P.C.

ATTORNEYS AND COUNSELLORS

5 SOUTH FITZHUGH STREET

ROCHESTER, NEW YORK 14614

TELEPHONE (585) 454-5850

FACSIMILE (585) 454-1273

FREDERICK WIEDMAN (1957)
FREDERICK WIEDMAN, JR. (1999)

JAMES G. VAZZANA
CHRISTOPHER H. CORCORAN
SANDRA E. VOLTA*

*ALSO ADMITTED IN FLORIDA

PARALEGALS
JOANNE LAMAGNA
AMANDA L. BACH

June 7, 2017

Lorisa D. LaRocca, Esq.
Woods Oviatt Gilman LLP
700 Crossroads Bldg.
2 State Street
Rochester, New York 14614

Re:   Allen Eber Trust

Dear Lorisa:

Yesterday I had a telephone conversation with the Ebers and their corporate attorney John Herbert.

Wendy Eber prepared a proforma analysis of how the Trust should be distributed and taking into account the questions I raised about the distribution to Erica Stein. It is enclosed for your review and comments.

Since your statements are being paid by the Trust including SDNY litigation should not theirs be paid from the Trust? I am sure Mike Gumaer, likewise as Trustee would want his paid too.

If you agree then the balances would need to be adjusted further.

Would you please provide me with a copy of an itemized listing of all the Bank fees?

Sincerely,

Very truly yours,

Wiedman, Vazzana, Corcoran & Volta, P.C.

James Vazza / JL

James G. Vazzana
dictated but not read

JGV/jfl
cc: John Herbert, Esq.

CNB-PL0012

| Quarter Ended | Account Balance | Eber Bros Equity | Adjusted Account Balance | Income | Implied Annual Yield | Stein Disbursements | Pro Forma Adjusted Account Balance | Pro Forma Adjusted Income | Foregone Income |
|---|---|---|---|---|---|---|---|---|---|
| | A | B | C = A−B | D | E = D*4/C | F | G = C+ΣF+ΣJ | H = G*E/4 | J = H−D |
| 12/31/2011 | $1,262,852.57 | $655,000.00 | $607,852.57 | $2,999.64 | 1.97% | $3,000.00 | $610,852.57 | $3,014.44 | $14.80 |
| 3/31/2012 | 1,280,837.90 | 655,000.00 | 625,837.90 | 4,700.42 | 3.00% | 3,000.00 | 631,852.70 | 4,745.59 | 45.17 |
| 6/30/2012 | 1,281,689.68 | 655,000.00 | 626,689.68 | 3,475.28 | 2.22% | 3,000.00 | 635,749.66 | 3,525.52 | 50.24 |
| 9/30/2012 | 1,302,307.86 | 655,000.00 | 647,307.86 | 4,565.28 | 2.82% | 3,000.00 | 659,418.08 | 4,650.69 | 85.41 |
| 12/31/2012 | 1,266,746.53 | 655,000.00 | 611,746.53 | 3,621.34 | 2.37% | 3,000.00 | 626,942.16 | 3,711.29 | 89.95 |
| 3/31/2013 | 1,293,097.80 | 655,000.00 | 638,097.80 | 4,929.28 | 3.09% | 3,000.00 | 656,383.38 | 5,070.54 | 141.26 |
| 6/30/2013 | 1,288,254.97 | 655,000.00 | 633,254.97 | 4,782.00 | 3.02% | 3,000.00 | 654,681.81 | 4,943.80 | 161.80 |
| 9/30/2013 | 1,285,697.50 | 655,000.00 | 630,697.50 | 4,998.71 | 3.17% | 3,000.00 | 655,286.14 | 5,193.59 | 194.88 |
| 12/31/2013 | 1,320,553.27 | 655,000.00 | 665,553.27 | 5,370.03 | 3.23% | 3,000.00 | 693,336.80 | 5,594.20 | 224.17 |
| 3/31/2014 | 1,327,081.31 | 655,000.00 | 672,081.31 | 5,153.37 | 3.07% | 3,000.00 | 703,089.01 | 5,391.13 | 237.76 |
| 6/30/2014 | 1,336,721.98 | 655,000.00 | 681,721.98 | 5,185.62 | 3.04% | 3,000.00 | 715,967.44 | 5,446.11 | 260.49 |
| 9/30/2014 | 1,336,666.46 | 655,000.00 | 681,666.46 | 5,113.81 | 3.00% | 3,000.00 | 719,172.41 | 5,395.18 | 281.37 |
| 12/31/2014 | 1,340,850.27 | 655,000.00 | 685,850.27 | 6,938.43 | 4.05% | 3,000.00 | 726,637.59 | 7,351.06 | 412.63 |
| 3/31/2015 | 1,306,170.14 | 655,000.00 | 651,170.14 | 5,228.87 | 3.21% | 3,000.00 | 695,370.08 | 5,583.79 | 354.92 |
| 6/30/2015 | 1,299,911.84 | 655,000.00 | 644,911.84 | 5,240.03 | 3.25% | 3,000.00 | 692,466.71 | 5,626.42 | 386.39 |
| 9/30/2015 | 1,277,245.34 | 655,000.00 | 622,245.34 | 5,341.19 | 3.43% | 3,000.00 | 673,186.60 | 5,778.46 | 437.27 |
| 12/31/2015 | 1,310,634.15 | 655,000.00 | 655,634.15 | 5,343.72 | 3.26% | 3,000.00 | 710,012.68 | 5,786.93 | 443.21 |
| 3/31/2016 | 1,303,215.91 | 655,000.00 | 648,215.91 | 5,453.18 | 3.37% | 3,000.00 | 706,037.65 | 5,939.61 | 486.43 |
| 6/30/2016 | 1,348,895.24 | 655,000.00 | 693,895.24 | 5,312.88 | 3.06% | 3,000.00 | 755,208.41 | 5,782.29 | 469.41 |
| 9/30/2016 | 1,330,743.05 | 655,000.00 | 675,743.05 | 4,769.08 | 2.82% | 3,000.00 | 740,520.63 | 5,226.25 | 457.17 |
| 12/31/2016 | 1,344,255.67 | 655,000.00 | 689,255.67 | 4,452.83 | 2.58% | 3,000.00 | 757,490.42 | 4,893.65 | 440.82 |
| 3/30/2017 | 679,486.00 | – | 679,486.00 | 4,935.10 | 2.91% | 6,000.00 | 754,161.57 | 5,477.47 | 542.37 |
| Total | | | | | | 69,000.00 | | | 6,217.94 |

| | | |
|---|---|---|
| Actual Current Account Balance | $679,486.00 | |
| Total Stein Distributions (SDs) | 69,000.00 | $75,217.94 |
| Total Foregone Interest on SDs | 6,217.94 | |
| PFMA Ending Account Balance | 754,703.94 | |

| Allocation of PFMA Ending Account Balance | | | Allocation of SDs & Assoc Int | As Adjusted Distributions | Eber Bros Securities | Net Adjusted Distribution | | Bank Proposed Distributions | Difference |
|---|---|---|---|---|---|---|---|---|---|
| Name | Share | Allocation | | | | | | | |
| Lester | 1/3 | $251,567.98 | $0.00 | $251,567.98 | $0.00 | $251,567.98 | | $226,495.33 | $25,072.65 |
| Audrey | 1/3 | 251,567.98 | 0.00 | 251,567.98 | – | 251,567.98 | | 226,495.33 | 25,072.65 |
| Daniel | 1/6 | 125,783.99 | 0.00 | 125,783.99 | – | 125,783.99 | | 113,247.67 | 12,536.32 |
| Lisa | 1/6 | 125,783.99 | (75,217.94) | 50,566.05 | – | 50,566.05 | | 113,247.67 | (62,681.61) |
| | | $754,703.94 | | $679,486.00 | $0.00 | $679,486.00 | | $679,486.00 | $0.00 |

## LaRocca, Lorisa D.

| | |
|---|---|
| **From:** | Keneally, Paul F. <PKeneally@underbergkessler.com> |
| **Sent:** | Wednesday, October 31, 2018 10:29 AM |
| **To:** | LaRocca, Lorisa D.; O'Brien, Dan |
| **Cc:** | Ramsey, Colin D.; Brian C. Brook; daryoush@clintonbrook.com; john herbert Esq |
| **Subject:** | Notice |
| **Attachments:** | 10302018171620-0001.pdf |

Counsel: FYI

*CONFIDENTIALITY NOTICE: This email message and any attachments are confidential and intended solely for the named addressee(s). They may be subject to legal, professional or other privilege or may be protected by other legal rules. They must not be disclosed to anyone without the sender's authorization. If you are not the intended recipient or authorized to receive this email for the intended recipient, you may not disclose, copy, distribute or retain this message or any part of it. Please notify us if you received this message but were not the intended recipient. Thank you, Underberg & Kessler LLP*



1

To: Allen Eber Trust
   c/o Canandaigua National Bank and Trust Company
     72 South Main St.
     Canandaigua, NY 14424
     Attn: Rita Nischal, Esq.

NOTICE OF INTENT TO PURCHASE SHARES

The undersigned hereby gives notice of my intent to purchase all shares of capital stock of Eber Bros. & Co., Inc. ( the "Company") of which the Allen Eber Trust is the registered holder that are proposed to be transferred to Daniel Kleeberg, Lisa Stein or Audrey Hays pursuant to Article XII of the By-Laws of the Company.

Lester Eber

CNB-PL0002

## Residuary TUW Allen Eber Proposed Distribution of Securities

| Assets | Total Shares on Hand to be Distributed | Total Tax Cost Basis | Market Value as of 6.20.2017 | Daniel Kleeberg 68.76% of 23.595% | Lisa Stein 31.24% of 23.595% | Audrey Hays 38.202% | Lester Eber 38.202% |
|---|---|---|---|---|---|---|---|
| AT&T | 1,000        (sell 1) | 24,390.00 | 38,910.00 | 162 | 73 | 382 | 382 |
| Chemours Co. | 80        (sell 3) | 916.94 | 3,040.00 | 12 | 5 | 30 | 30 |
| Clorox Co | 300        (sell 2) | 18,699.00 | 42,345.00 | 48 | 22 | 114 | 114 |
| Du Pont De Nemours Ei Co**(now Dow DuPont) | 400 **        (sell 3) (512.8 shs; sell 2) | 17,923.06** (17,895.10) | 33,424.00 | 64** (now 83) | 29**(now 37) | 152**(now 195) | 152**(now 195) |
| Eber Bros & Co Class A # | 1,850 | 631,238.50 | 0.00 | 301 (+1) | 137 (+1) | 706 | 706 |
| Eber Bros & Co Class B # | 290 | 462,973.99 | 0.00 | 47 | 21 | 111 (+1) | 111 (+1) |
| Eber Bros & Co 6% Non-Cumulative # | 2,000 | 200,000.00 | 0.00 | 324 | 147 | 764 | 765 (+1) |
| Exxon-Mobil Corp | 2,190        (sell 2) | 4,903.55 | 181,244.40 | 355 | 161 | 836 | 836 |
| *Lilly Eli & Co | 500        (sell 1) | 17,110.00 | 41,170.00 | 81 | 36 | 191 | 191 |
| Lockheed Martin Corp Com | 300        (sell 2) | 20,751.00 | 84,690.00 | 48 | 22 | 114 | 114 |
| Microsoft Corporation | 800        (sell 2) | 20,320.00 | 56,696.00 | 129 | 58 | 305 | 305 |
| Pfizer Inc. | 886        (sell 2) | 15,518.29 | 29,432.92 | 143 | 65 | 338 | 338 |
| Dodge & Cox Income Fund | 3,591.954 (sell 0.038 units) | 50,000.00 | 49,748.56 | 582.755 | 264.765 | 1,372.198 | 1,372.198 |
| Franklin Templeton Global Bond Inst. | 3,598.269 (sell 0.038 units) | 48,792.52 | 44,258.71 | 583.780 | 265.231 | 1,374.610 | 1,374.610 |
| Vanguard Int. Term Bd Index Admiral | 4,122.012 (Sell 0.042 units) | 50,000.00 | 47,361.92 | 668.752 | 303.836 | 1,574.691 | 1,574.691 |

*Please note, proceeds from the sale of the shares will be divided accordingly and will impact cash distributions.*

*\*\* The Dow DuPont, Inc. merger 9/1/2017 (new ticker DWDP) provided former DuPont De Nemours Ei Co. shareholders 1.282 shares of new stock for each prior share held. The prior 400 shares held became 512.80 new shares; liquidation of the 0.8 share posted to our accounting system 9/13/17 and adjusted share amounts for each distributee are listed above.*

*# The attorney's office will be distributing the Eber Bros & Co securities by Deed.*



PLAINTIFF'S EXHIBIT
36
1/24/19
PENGAD 800-631-6989

## LaRocca, Lorisa D.

| | |
|---|---|
| **From:** | Jim G Vazzana <jgvazzana@frontiernet.net> |
| **Sent:** | Friday, September 15, 2017 12:15 PM |
| **To:** | rnischal@cnbank.com |
| **Cc:** | LaRocca, Lorisa D.; 'Wendy Eber'; 'Lester Eber' |
| **Subject:** | Eber Matter |

Dear Rita:

As you know, we represent Lester Eber and he and other beneficiaries are reticent to sign a Release and Receipt as submitted. However, he will sign it without the Release provision.

May I simply strike (d)?

Is it possible to extend your deadline to September 25, 2017? Mr. Eber would like his distribution in kind. I am assuming since this is a distribution of a non-pecuniary bequest and is part of the residuary estate, distribution in kind will allow our clients basis to be the date of death value and not effect Mr. Eber's share of reportable losses? Is the estate on a calendar or fiscal year?

Sincerely,

Jim

James G. Vazzanà, Esq.

Wiedman, Vazzana, Corcoran & Volta, PC
5 South Fitzhugh Street
Rochester, NY 14614

Tel. 585-454-5850 ext. 115
Fax. 585-454-1273

DISCLAIMER/CONFIDENTIALITY NOTICE:

This transmission including any attachments, is intended to be delivered and designated solely for delivery to the named addressee(s) and, may contain information that is confidential, proprietary, attorney-work product and attorney-client privileged. Any unauthorized review, use, disclosure, copying, distribution or the taking of any action because of this information is prohibited. Any unauthorized person or unintended recipient of this electronic communication is strictly prohibited and should immediately notify the sender of the matter and immediate delete the electronic communication by sending an e-mail to the sender and notifying the sender by telephone at (5850 454-5850 to obtain instructions as to the disposal of transmitted material. In no event shall this material be read, used, copied, reproduced, stored or retained by anyone other than the named addressee(s), except with the express consent of the sender or the named addressee(s).

1



PLAINTIFF'S
EXHIBIT
37
1 2 [ 19
PENGAD 800-631-6989

CNB-PL0005

700 *Crossroads Building*
2 *State Street, Rochester, New York* 14614
P 585.987.2800    F 585.454.3968



**WOODS**
**OVIATT**
**GILMAN**
LLP

**ATTORNEYS**
woodsoviatt.com

1900 *Main Place Tower*
*Buffalo, New York* 14202
P 716.248.3200    F 716.854.5100

*Writer's Direct Dial Number:* 585.987.2834
*Writer's Direct Fax Number:* 585.987.2934
*Email:* llarocca@woodsoviatt.com

October 11, 2017

James G. Vazzana, Esq.
Wiedman, Vazzana, Corcoran & Volta, P.C.
5 S. Fitzhugh Street, Room 230
Rochester, New York 14614

Brian C. Brook, Esq.
Clinton Brook & Peed
641 Lexington Avenue, 13th Floor
New York, NY 10022

**Re:    Transfer of Eber Bros. & Co., Inc. stock**

Dear Jim and Brian:

Enclosed please find your clients' respective copies of the Stock Powers transferring their shares of Eber Bros. & Co., Inc. pursuant to Canandaigua National Bank and Trust Company's distribution schedule. As the Bank never had possession of the company's stock book or other corporate documents and, despite request, the Bank has not been provided with the same, we were required to complete these transfers via these Stock Powers as opposed to issuing new stock certificates. We are currently retaining the original Stock Powers which I have affixed to each original Stock Certificate that the Bank received when it became Successor Co-Trustee. We will continue to do so unless and until such time as we are advised as to whom these originals should be provided given the apparent inability to locate the company's stock book and affiliated records. It is my understanding that the securities were transferred to your clients' respective financial institutions on September 29th and that the remaining assets were electronically transferred last week as well.

Very truly yours,

WOODS OVIATT GILMAN LLP

*Lorisa D. LaRocca*

Lorisa D. LaRocca
Please direct responses to Rochester Office

LDL/ldl/kdk
Enclosures
cc:    Rita Nischal, Esq.
       William G. Bauer, Esq.

{5491869: }          *The art of representing people*

**PLAINTIFF'S EXHIBIT**
38
1/24/19

## LaRocca, Lorisa D.

| | |
|---|---|
| **From:** | Jim G Vazzana <jgvazzana@frontiernet.net> |
| **Sent:** | Friday, June 02, 2017 1:15 PM |
| **To:** | LaRocca, Lorisa D. |
| **Subject:** | Eber |

Dear Lorisa:

I trust you received my voice mail of yesterday afternoon regarding your inquiry as to the Corporate Stock Book of Eber Bros. and Co, Inc. I am fairly confident that they do not have it, however, to be sure Wendy will be in Rochester for the 4th of July weekend and will double check.

My clients are questioning the distribution to Lisa Stein and it was their understanding that Lisa Stein was receiving a distribution for the benefit of her daughter of $1,000.00 per month for the last five years which should reduce Lisa's one-sixth share by at least $69,000.00 and instead of receiving $113,908.00, she should receive $44,908.00.

Additionally, there is a "time value" for the money distributed that needs to be taken into account. Would you please clarify this? If we are correct, all other adjustments need to be changed.

Have a great weekend.

Sincerely,

Jim

James G. Vazzana, Esq.

Wiedman, Vazzana, Corcoran & Volta, PC
5 South Fitzhugh Street
Rochester, NY 14614

Tel. 585-454-5850 ext. 115
Fax. 585-454-1273

DISCLAIMER/CONFIDENTIALITY NOTICE:

This transmission including any attachments, is intended to be delivered and designated solely for delivery to the named addressee(s) and, may contain information that is confidential, proprietary, attorney-work product and attorney-client privileged. Any unauthorized review, use, disclosure, copying, distribution or the taking of any action because of this information is prohibited. Any unauthorized person or unintended recipient of this electronic communication is strictly prohibited and should immediately notify the sender of the matter and immediate delete the electronic communication by sending an e-mail to the sender and notifying the sender by telephone at (5850 454-5850 to obtain instructions as to the disposal of transmitted material. In no event shall this material be read, used, copied, reproduced, stored or retained by anyone other than the named addressee(s), except with the express consent of the sender or the named addressee(s).

1



CNB-PL0022

## LaRocca, Lorisa D.

| | |
|---|---|
| **From:** | Jim G Vazzana <jgvazzana@frontiernet.net> |
| **Sent:** | Friday, August 18, 2017 9:27 AM |
| **To:** | LaRocca, Lorisa D. |
| **Cc:** | 'Lester Eber'; 'Wendy Eber' |
| **Subject:** | Eber Bros |

Lorisa:

Have you or your client ever found the stock register on Eber Bros., Co.? My client indicated in June that she would make a special trip to Rochester in July to see if she could find them.

Please advise.

With kindest personal regards, I remain.

Sincerely,

Jim

James G. Vazzana, Esq.

Wiedman, Vazzana, Corcoran & Volta, PC
5 South Fitzhugh Street
Rochester, NY 14614

Tel. 585-454-5850 ext. 115
Fax. 585-454-1273

DISCLAIMER/CONFIDENTIALITY NOTICE:

This transmission including any attachments, is intended to be delivered and designated solely for delivery to the named addressee(s) and, may contain information that is confidential, proprietary, attorney-work product and attorney-client privileged. Any unauthorized review, use, disclosure, copying, distribution or the taking of any action because of this information is prohibited. Any unauthorized person or unintended recipient of this electronic communication is strictly prohibited and should immediately notify the sender of the matter and immediate delete the electronic communication by sending an e-mail to the sender and notifying the sender by telephone at (5850 454-5850 to obtain instructions as to the disposal of transmitted material. In no event shall this material be read, used, copied, reproduced, stored or retained by anyone other than the named addressee(s), except with the express consent of the sender or the named addressee(s).

1



PLAINTIFF'S
EXHIBIT
41
1|24|19

CNB-PL0006

# Audrey Hays

26725 Henderson Park Rd.
Oak Creek, Colorado 80467

October 10, 2018

**Via First Class Mail & Email**

Wendy Eber
Lester Eber
Eber Bros. & Co., Inc.
30 Corporate Dr.
North Haven, CT 06473
weber@slocumandsons.com
leber@slocumandsons.com

Dear Wendy and Lester:

On behalf of myself, Lisa Stein, and Daniel Kleeberg, representing more than one-third of the shares, I write to request a special meeting of the shareholders of Eber Bros. & Co., Inc. (the "Company") pursuant to Article 1 Section 1 of the By-Laws. The special meeting of the shareholders shall be for the following purposes:

1. Appointing and/or removing directors of the Company;

2. To consider amendments to the By-Laws so that they conform to the current status of the Company; and

3. Such other items as the shareholders may deem necessary in connection with the above or for the operation of the Company's business which are subject to the control of the shareholders.

We request that the special meeting be held at the Southern District of New York, 500 Pearl Street, Courtroom 17-D, New York, New York, 10007 on November 7, 2018 at 9:30 AM (local time). We also note that there has not been an annual meeting of the shareholders in over a year, even though it was required by Article 1 Section 1 of the By-Laws.

Audrey Hays

cc:     Daniel Kleeberg, 6957 Pisano Dr., Lake Worth, FL 33467
        Lisa Stein, 104 Holly Lane, Linwood, NJ 08221



PLAINTIFF'S
EXHIBIT
42
1/24/19

## WRITTEN CONSENT OF THE SOLE MEMBER OF THE
## BOARD OF DIRECTORS OF EBER BROS. WINE AND LIQUOR CORPORATION

The undersigned, being the sole member of the Board of Directors of Eber Bros. Wine and

Liquor Corporation, a New York corporation (the "Corporation"), in accordance with Section 708

of the Business Corporation Law of the State of New York, authorizing the taking of this action

by written consent, hereby consents to the adoption of the following resolutions, in the same

manner as if duly presented to, and approved at, a meeting of the Board of Directors of the

Corporation, duly called and held for such purpose:

### Certificate of Amendment

RESOLVED, that the form, terms and provisions of the Certificate of Amendment of the Certificate of Incorporation of the Corporation dated February 14, 2017, in the form filed in the records of the Corporation, be, and they hereby are, authorized and approved in all respects, and that any officer of the Corporation be, and each of them hereby is, authorized to sign such Certificate on behalf of the Corporation, with such changes, additions or modifications as the signing officer may approve, such signature to be conclusive evidence of such approval, and to submit such Certificate to the stockholders of the Corporation for approval, and to deliver such Certificate to the Department of State of the State of New York for filing;

### Uncertificated Shares

RESOLVED, that all the issued and outstanding shares of Class B junior preferred stock shall be uncertificated;

### Purchase Agreement

RESOLVED, that the form, terms and conditions of the Purchase Agreement dated as of February ___, 2017, between the Corporation and Lester Eber, in the form filed in the records of the Corporation, providing for the purchase of 750 shares of Class B junior preferred stock, be, and they hereby are, authorized and approved in all respects, and that any officer of the Corporation be, and each of them hereby is, authorized to sign such agreement on behalf of the Corporation, with such changes, additions or modifications as the signing officer may approve, such signature to be conclusive of such approval;



PLAINTIFF'S
EXHIBIT
43
1 24 19
FEBGAD 800-631-6989

Miscellaneous

RESOLVED, that any director or officer of Corporation and its counsel be, and each of them acting alone hereby is, authorized to take all such further action and to execute and deliver all such further instruments and documents in the name and on behalf of Corporation, under its corporate seal or otherwise, and to pay all such expenses as in his or her judgment shall be necessary, proper or advisable in order to carry out the intent and effectuate the purposes of the foregoing resolution.

IN WITNESS WHEREOF, the undersigned has caused this written consent to be executed as of February 15, 2017.

Name: Wendy Eber

Eber Bros. Wine and Liquor Corporation (the "Corporation") hereby issues to Lester Eber 750 shares of Class B junior preferred stock, par value $50.00 per share (the "Shares") of the Corporation, in consideration of Lester Eber's agreement hereby to reimburse the Corporation, at its request, for up to $37,500.00 of expenses incurred or to be incurred by the Corporation in connection with its general operations. Upon the execution and delivery of this agreement by the parties hereto, the Shares will be duly authorized, validly issued, fully paid and nonassessable, without further action by either party.

Dated: February 15, 2017

EBER BROS. WINE AND LIQUOR CORPORATION

By: _____
    Name: Wendy Eber
    Title: Assistant Secretary

_____
Name: Lester Eber

out:blank                                                                1/24/20

### CERTIFICATE OF AMENDMENT
### OF THE
### CERTIFICATE OF INCORPORATION
### OF
### EBER BROS. WINE AND LIQUOR CORPORATION

#### Under Section 805 of the Business Corporation Law

The undersigned being the Assistant Secretary of Eber Bros. Wine and Liquor Corporation (the "Corporation"), hereby certifies that:

1.     The name of the Corporation is Eber Bros. Wine and Liquor Corporation.

2.     The Certificate of Incorporation of the Corporation was filed by the Department of State of the State of New York on September 3, 1935.

3.     The Certificate of Incorporation of the Corporation, as heretofore amended, is hereby further amended to effect the following amendment, which is authorized by the Business Corporation Law:

To amend Paragraph III, relating to the aggregate number of shares that the Corporation shall have the authority to issue, so as to create and designate as Class B junior preferred stock a new class of preferred stock.

4.     To effect the foregoing:

Paragraph III is amended so that it shall read in its entirety as follows:

"III.  A.  The total number of shares, including those previously authorized, which the corporation shall have authority to issue is 6,817 shares, consisting of: (i) 2,000 shares of Class A common stock, no par value per share; (ii) 2,817 shares of Class B common stock, no par value per share; (iii) 1,000 shares of preferred stock, $100.00 per value per share; and (iv) 1,000 shares of Class B junior preferred stock, $50.00 per share par value.

The relative rights, preferences and limitations of the shares of Class A common stock and Class B common stock shall be in all respects equal, except that only the Class A common stock shall have voting rights, and the Class B common stock shall have no voting rights whatsoever, except as may be required by law.

B.     The preferred stock shall have and be subject to designations, preferences, privileges, voting powers, restrictions and qualifications, as follows:  the holders of the preferred stock shall be entitled to receive, when and as declared from the surplus or net profits of the corporation, a fixed yearly dividend at the rate of 5% per annum, to be calculated from the date of issue of the respective shares, payable quarterly on the 25th day of February, May, August and November in each year, or on such other dates as may be determined by the Board of Directors from time to time.  The said dividends upon the preferred stock shall be non-cumulative, so that if for any year or

EB-00001169

5%, nor shall it have any preemptive right to share in or subscribe for any further issue of stock or other securities of the corporation.

The corporation shall have the right at any time and from time to time to redeem all or any part of the Class B junior preferred stock, at such time issued and outstanding, at $50.00 per share, plus accrued and unpaid dividends for such quarter if authorized. Redemption of all of said Class B junior preferred stock shall be made only on 30 days' notice by mail to all the holders of the Class B junior preferred stock. Any partial redemption shall be made in the manner following: the Board of Directors shall cause notice of at least 30 days to be given by mail to all the holders of the Class B junior preferred stock so to be redeemed of their intention to redeem the same and shall invite offerings of such Class B junior preferred stock. They shall, to the extent of the amount available and to be devoted to the purpose of redemption, accept and retire the stock offered at the lowest price, not exceeding $50.00 per share, plus accrued and unpaid dividends for said quarter if authorized. Written notice of at least 10 days shall be given to the holders of the Class B junior preferred stock so to be redeemed of the time and place at which said Class B junior preferred stock shall be presented for redemption. Such notice having been given, dividends shall cease to accrue upon the Class B junior preferred stock so called for redemption from the date fixed therefor, unless default shall be made in the payment of the redemption price. All Class B junior preferred stock redeemed or purchased under any provision hereof, may, at the option of the Board of Directors, be retired and cancelled, or held in the treasury of the corporation to be re-issued from time to time.

D.    In case of liquidation or dissolution of the corporation or upon any distribution of its capital after all the debts of the corporation shall have been paid, the remaining assets, properties and effects of the corporation shall be applied, first, to the payment of the entire amount of said preferred stock then issued and outstanding, at par; second, to the payment of all unpaid dividends on the preferred stock, for said quarter if authorized, such unpaid dividends to be paid out of capital assets if the surplus earnings be insufficient to pay the same; third, to the payment of the entire amount of the Class B junior preferred stock then issued and outstanding, at par; fourth, to the payment of all unpaid dividends on said Class B junior preferred stock, for said quarter if authorized, such unpaid dividends to be paid out of capital assets if the surplus earnings be insufficient to pay the same; and fifth, after such payment the remainder of said assets, properties and effects of the corporation shall belong to and be divided pro rata among the holders of the shares of common stock.

E.    The holders of the Class A common stock and the Class B junior preferred stock, voting together as a single class, shall have full voting rights, that is to say, one vote for each share of Class A common stock and one vote for each share of Class B junior preferred stock. The holders of the Class B common stock and the holders of the preferred stock shall not be entitled to vote at the election of Directors, or at any other meeting of stockholders, nor shall the holders of such stock be entitled to vote on a proceeding for mortgaging the property and franchises of the corporation, pursuant to Section Sixteen of the Stock Corporation Law, for guaranteeing the bonds of another corporation, pursuant to Section Nineteen of said Law, for sale of the franchises and

3

EB-00001170

out:blank                                                                    1/24/20

years, dividends at the rate of 5% per annum shall not have been paid on all the issued and outstanding preferred stock, the deficiency shall not be fully paid or set apart before any dividend shall be paid upon the common stock or the Class B junior preferred stock. Only the net earnings or profits of the corporation in excess of said non-cumulative dividend of 5% per annum may be distributed by the Directors to the holders of common stock or the Class B junior preferred stock. The preferred stock shall not be entitled to participate in the profits of the corporation, whether by stock dividends or otherwise, beyond such non-cumulative annual dividend of 5%, nor shall it have any preemptive right to share in or subscribe for any further issue of stock or other securities of the corporation.

The corporation shall have the right at any time and from time to time to redeem all or any part of the preferred stock, at such time issued and outstanding, at $50.00 per share, plus accrued and unpaid dividends for such quarter if authorized. Redemption of all said preferred stock shall be made only on 30 days' notice by mail to all the holders of the preferred stock. Any partial redemption shall be made in the manner following: the Board of Directors shall cause notice of at least 30 days to be given by mail to all the holders of the preferred stock so to be redeemed of their intention to redeem the same and shall invite offerings of such preferred stock. They shall, to the extent of the amount available and to be devoted to the purpose of redemption, accept and retire the stock offered at the lowest price, not exceeding $50.00 per share, plus accrued and unpaid dividends for said quarter if authorized. Written notice of at least 10 days shall be given to the holders of the preferred stock so to be redeemed of the time and place at which said preferred stock shall be presented for redemption. Such notice having been given, dividends shall cease to accrue upon the preferred stock so called for redemption from the date fixed therefor, unless default shall be made in the payment of the redemption price. All preferred stock redeemed or purchased under any provision hereof, may, at the option of the Board of Directors, be retired and cancelled, or held in the treasury of the corporation to be re-issued from time to time.

C.    The Class B junior preferred stock shall be junior to the preferred stock and shall have and be subject to designations, preferences, privileges, voting powers, restrictions and qualifications, as follows: the holders of the Class B junior preferred stock shall be entitled to receive, when and as declared from the surplus or net profits of the corporation, a fixed yearly dividend at the rate of 5% per annum, to be calculated from the date of issue of the respective shares, payable quarterly on the 25th day of February, May, August and November in each year, or on such other dates as may be determined by the Board of Directors from time to time. The said dividends upon the Class B junior preferred stock shall be non-cumulative, so that if for any year or years, dividends at the rate of 5% per annum shall not have been paid on all the issued and outstanding Class B junior preferred stock, the deficiency shall not be fully paid or set apart before any dividend shall be paid upon the common stock. Only the net earnings or profits of the corporation in excess of said non-cumulative dividend of 5% per annum may be distributed by the Directors to the holders of common stock. The Class B junior preferred stock shall not be entitled to participate in the profits of the corporation, whether by stock dividends or otherwise, beyond such non-cumulative annual dividend of

2

EB-00001171

out:blank                                                                                          1/24/20

property of the corporation, pursuant to Section Twenty of said Law, for establishing priorities or creating preferences among the several classes of stock, pursuant to Section Thirty-Six of said Law, for consolidation, pursuant to Section Eighty-Six of said Law, for voluntary dissolution, pursuant to Section One Hundred Five of said Law, or for change of name, pursuant to the General Corporation Law.

F.    The capital of the corporation shall be at least equal to the sum of the aggregate par value of all issued shares having a par value plus the aggregate amount of consideration received by the corporation for the issuances of shares without par value, plus such amounts as from time to time by resolution of the Board of Directors may be transferred thereto."

5.    The amendment to the certificate of incorporation of the Corporation effected hereby was authorized by the unanimous written consent of the Board of the Directors of the Corporation and by the unanimous written consent of the shareholders of the Corporation entitled to vote thereon.

IN WITNESS WHEREOF, I have signed this Certificate this 14th day of February, 2017 and hereby affirm the truth of the statements contained herein under penalties of perjury.


_____
Wendy Eber, Assistant Secretary

4

EB-00001172

out:blank

1/24/20

## WRITTEN CONSENT OF THE STOCKHOLDERS OF
## EBER BROS. WINE AND LIQUOR CORPORATION

The undersigned, being the holder of all the outstanding shares of Class A common stock of Eber Bros. Wine and Liquor Corporation, a New York corporation (the "Corporation"), in accordance with Section 615 of the Business Corporation Law of the State of New York, does hereby consent to the adoption of the following resolution, in the same manner as if duly presented to, and approved at, a meeting of the stockholders of the Corporation, duly called and held for such purpose:

### Appointment of Director

RESOLVED, that Wendy Eber be, and she hereby is, appointed as a director of the Corporation, until her successor is duly elected and qualified or until her earlier death, resignation or removal.

IN WITNESS WHEREOF, the undersigned has caused this written consent to be executed as of February 1, 2017.

EBER BROS. & CO., INC.

By: _Lester Eber_

Name:  *LESTER EBER*
Title:  *President*

EB-00001173

out:blank                                                                1/24/20

**STATE OF NEW YORK**
**SUPREME COURT**        **COUNTY OF MONROE**

---

ALEXBAY, LLC,

                            Plaintiff,                    **SUMMONS**

          -vs.-                                   **Index No.:**
                                                  $2012 - 1919$
EBER BROS. WINE & LIQUOR CORP.;

SOUTHERN WINE & SPIRITS
OF AMERICA, INC.;

EBER BROS. WINE & LIQUOR METRO, INC.;
          and

JOHN DOES 1 – 10, being fictitious names
intended to designate other entities or persons
claiming any interest in Eber Bros. Wine &
Liquor, Inc.'s "OWNERSHIP INTEREST IN
EBER BROS. WINE & LIQUOR METRO,
INC.";

                            Defendants.

---

To the above-named Defendants:

**YOU ARE HEREBY SUMMONED** to answer the Complaint in this action and to serve a
copy of your Answer on the Plaintiff's attorneys within twenty (20) days after service of this
Summons, exclusive of the day of service (or within 30 days after the service is complete if
this Summons is not personally delivered to you within the State of New York); and in case of
your failure to appear or answer, judgment will be taken against you by default for the relief
demanded in the Complaint.

Trial is to be held in the County of Monroe; the venue of this matter is based upon
Defendants' principal place of business.

DATED:   21 February 2012          **UNDERBERG & KESSLER LLP**
         Rochester, New York.      *Attorneys for Plaintiff Alexbay, LLC*


                                   William E. Brueckner and Michael J. Beyma
                                   300 Bausch & Lomb Place
                                   Rochester, New York 14604
                                   585.258.2800

**PLAINTIFF'S EXHIBIT**
44
1 2 8 19
PENGAD 800-631-6989

KSH00070

**STATE OF NEW YORK**
**SUPREME COURT**      **COUNTY OF MONROE**

---

ALEXBAY, LLC,

                     Plaintiff,

    -vs.-

EBER BROS. WINE & LIQUOR CORP.;

SOUTHERN WINE & SPIRITS
OF AMERICA, INC.;

EBER BROS. WINE & LIQUOR METRO, INC.;
and

JOHN DOES 1 – 10, being fictitious names
intended to designate other entities or persons
claiming any interest in Eber Bros. Wine &
Liquor, Inc.'s "OWNERSHIP INTEREST IN
EBER BROS. WINE & LIQUOR METRO,
INC.";

                     Defendants.

Index No.:

2012-1919

---

**COMPLAINT FOR**
**DETERMINATION OF 'COMMERCIAL REASONABLENESS'**
**OF ACCEPTANCE OF COLLATERAL**
**UNDER §9-627 of UNIFORM COMMERCIAL CODE**

**AS AND FOR ITS COMPLAINT** against the Defendants herein, Plaintiff ALEXBAY,

LLC, by its attorneys Underberg & Kessler LLP, alleges and states as follows:

**OVERVIEW:**

1.      By this action, Plaintiff, the secured creditor of a borrower in default, seeks a

determination, as provided under Uniform Commercial Code §9-627, that the enforcement of

the creditor's security interest, by the creditor's acceptance of certain collateral in full

satisfaction of the underlying obligation, are "commercially reasonable" and in good faith.

KSH00071

## THE PARTIES and the COLLATERAL:

2.    Plaintiff Alexbay, LLC ("*Alexbay*"), is a limited liability company organized and existing under the laws of the State of Connecticut, with an address for the transaction of business at 30 Corporate Drive, North Haven, Connecticut 06473.  As of the date of this Complaint, Alexbay is the holder of a certain promissory note executed by Eber Bros. Wine & Liquor Corp. and all the associated rights to the collateral that secures repayment of the debt memorialized by that promissory note.

3.    Defendant Eber Bros. Wine & Liquor Corp. ("*Eber Bros.*") is a corporation organized and existing under the laws of the State of New York, with an address for the transaction of business at 95 Allens Creek Drive, Suite 10, Building 2, Rochester, New York 14618.

4.    Defendant Eber Bros. Wine & Liquor Metro, Inc. ("*Metro*") is a corporation organized and existing under the laws of the State of New York, with an address for the transaction of business at 95 Allens Creek Drive, Suite 10, Building 2, Rochester, New York 14618. Metro is a wholly owned subsidiary of Eber Bros.:  that is to say, Eber Bros. owns all of Metro's capital stock.  As its name suggests, Metro was formed to carry on business as a distributor of wine and liquor.

5.    Through a series of transactions defined in greater detail subsequently in this Complaint, Eber Bros. became indebted to Lester Eber in sums exceeding $3.2 Million.  Under the terms of a contemporaneously executed security agreement, Eber Bros.' indebtedness to Lester Eber (the "*Original Secured Creditor*") was secured by a pledge of virtually all of Eber Bros.' assets, including (without limitation) Eber Bros.' ownership interest in Metro. The Original Secured Creditor's rights under the notes and security agreement were thereafter

assigned by the Original Secured Creditor to Alexbay. The capital stock of Metro, owned entirely by Eber Bros. and pledged to secure Eber Bros.' indebtedness and other obligations under the notes and security agreements, is the collateral that is the subject of this action (*"the Collateral"*).

6.      Upon information and belief, Southern Wine & Spirits of America, Inc. (*"Southern"*), is a corporation organized and existing under the laws of the State of Florida, with an address for the transaction of business at 166 N.W. 163rd Street, Miami, Florida, 33169. Upon further information and belief, Southern may claim an interest as a secured creditor with respect to the Collateral, by virtue of a financing statement describing the Collateral: that financing statement was filed with the New York State Secretary of State on or about on or about August 31, 2007.

7.      Metro is a co-obligor with respect to some or all of the Eber Bros.' obligations that are secured by the Collateral.

8.      "John Does 1 – 10" are unknown parties identified for the purpose of this action by fictitious names: those fictitious names being intended to designate any other entities or persons who may claim any interest in the Collateral.

## THE LOAN TRANSACTIONS:

### A.   The $576K Loan to Eber Bros.

9.      On or about October 1, 2002, the Original Secured Creditor loaned Eber Bros. $575,895.00. The loan was evidenced by a promissory note, and was secured by a collateral security interest in "all of the assets of (Eber Bros.) in favor of (the Original Secured Creditor)." Under the terms of the promissory note evidencing the indebtedness, all principal and interest due was to be paid in full no later than October 1, 2012.

10. On or about March 13, 2006, Eber Bros. executed an "Amended and Restated Promissory Note" in the amount of $575,895.00, together with interest at an annual rate of nine percent. The note called for payment in full of the obligations to the Original Secured Creditor on or before March 13, 2016.

### B. The $1.5 Million Loan to Eber Bros.

11. On or about August 15, 2005, the Original Secured Creditor loaned Eber Bros. $1,503,750.00, and Eber Bros. executed a promissory note to memorialize the obligation to repay the loan. Shortly thereafter, on or about March 13, 2006, Eber Bros. executed an "Amended and Restated Promissory Note" payable to the Original Secured Creditor, and in that Amended and Restated Promissory Note agreed to repay the principal amount of the original loan, plus interest at an annual rate of nine percent.

12. On or about February 11, 2011, Metro, Eber Bros. and the Original Secured Creditor entered into a "Debt Assumption Agreement" (*"the Debt Assumption Agreement"*) whereby Metro assumed all of Eber Bros.' obligations to the Original Secured Creditor under the March 13, 2006, Amended and Restated Promissory Note. At the time of Metro's assumption of those obligations, the remaining unpaid principal balance of the March 13, 2006, Amended and Restated Promissory Note was $1,434,710.68 plus accrued and unpaid interest. [A true and accurate copy of the Debt Assumption Agreement is attached to this Complaint as Exhibit A.]

13. The Debt Assumption Agreement expressly provides:

> Each of (Eber Bros.), Metro and (Original Secured Creditor) agree that the unpaid principal balance of the (Eber Bros.) Loan is, as of the date hereof, One Million Four Hundred Thirty-Four Thousand Seven Hundred Ten and 68/100 Dollars ($1,434,710.68) plus accrued and unpaid interest. ... **(Eber Bros.) hereby irrevocably assigns to Metro all of (Eber Bros.') obligations to pay principal, interest and**

---

*Alexbay, LLC, v. Eber Bros. Wine & Liquor Corp. et al.*
Index No.:

Complaint to Determine Commercial Reasonableness
KSH000574 of 13

**other obligations and liabilities in respect of the (Eber Bros.) Loan, and Metro agrees to be bound by the terms of the (Eber Bros.) Note as if it were the "Maker" thereunder and promises to pay the obligations evidenced thereby in accordance with the terms thereof. (Original Secured Creditor) hereby consents to such assignment by (Eber Bros.) and assumption by Metro.**

(Emphasis added.)

### C. **The $1,500,000 Line of Credit to Metro**.

14. In October, 2009, the Original Secured Creditor agreed to lend to Metro, and Metro promised to repay the Secured Creditor, an amount not to exceed $1.5 Million under a revolving line of credit (*"the Line of Credit Note"*). Repayment of any amounts borrowed and applicable interest was to be paid in full on or before December 31, 2011. [A true and accurate copy of the Line of Credit Note is attached to this Complaint as Exhibit B.]

15. The Line of Credit Note expressly provides:

FOR VALUE RECEIVED, EBER BROS. WINE & LIQUOR METRO, INC., ("Maker") a New York corporation ... hereby promises to pay to the Order of (the Secured Creditor) ... the principal sum of ONE MILLION FIVE HUNDRED THOUSAND AND 00/100 DOLLARS ($1,500,000.00) (the "Maximum Principal Amount") or such lesser or greater amount as may be outstanding hereunder. ... This Note evidences a revolving line of credit. Accordingly, amounts hereunder may be borrowed, repaid and re-borrowed provided that at no time shall Maker permit the aggregate principal amount of all advances made under this Note to exceed the Maximum Principal Amount.

### D. **Eber Bros.' Secured Guaranty of Metro's Obligations**.

16. On or about February 26, 2010, Eber Bros. agreed to guaranty the repayment by Metro of all its obligations to the Original Secured Creditor, then existing or thereafter incurred (*"the EB Guaranty"*). [A true and accurate copy of the EB Guaranty is annexed to this Complaint as Exhibit C.]

17. The EB Guaranty defines the term Guarantor to mean Eber Bros., and the term Lender to mean the Original Secured Creditor, and it expressly provides:

> For valuable consideration, **Guarantor hereby unconditionally guarantees and promises to repay promptly to Lender**, or order, in lawful money of the United States, **any and all Indebtedness to Lender** when due, whether at stated maturity, upon acceleration or otherwise, and at all times thereafter. This Guaranty is cumulative and does not supersede and other outstanding guaranties, and the liability of Guarantor under this Guaranty is exclusive of Guarantor's liability under any other guaranties signed by Guarantor. ... **"Borrower" shall mean Eber Bros Wine & Liquor Metro, Inc. ... "Indebtedness" shall mean any and all debts liabilities, and obligations of the Borrower and Guarantor to Lender ... now or hereafter existing.**

(Emphasis added.)

18.     The EB Guaranty expressly ran to the benefit of the Original Secured Creditor's endorsees, successors, and assigns.

19.     By the terms of a certain Security Agreement executed by the parties on or about February 26, 2010, Eber Bros.' obligations under the EB Guaranty were secured by a grant to the Original Secured Creditor of a security interest in substantially all of Eber Bros.' property. The agreement was subsequently reiterated in an Amended and Restated Security Agreement executed by the parties on or about February 10, 2011 (*"the Security Agreement"*). Specifically included within the grant of the security interest were Eber Bros.' membership interests in Metro. [A true and accurate copy of the Security Agreement is annexed to this Complaint as Exhibit D.]

20.     The Security Agreement defines the term "Parent" to mean Eber Bros.; defines the term "Metro" in the same manner as this Complaint; defines "Debtor" to include Eber Bros. and Metro; and defines "Secured Party" as the Original Secured Creditor. The Security Agreement expressly provides:

> **Debtor hereby assigns and grants to Secured Party a security interest in** the following described property now owned or hereafter acquired by Debtor ... All instruments, notes, chattel papers, documents, certificates of deposit, **securities and investment property of every**

---

*Alexbay, LLC. v. Eber Bros. Wine & Liquor Corp. et al.*
Index No.:

Complaint to Determine Commercial Reasonableness
Page 6 of 13

KSH00878

type. The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing. ... **The shares of common stock and preferred stock, or partnership, membership and other ownership interests, now or hereafter owned by Debtor, including, without limitation ...any ownership interests in Metro now or hereafter owned by Parent ... .**

(Emphasis added).

### E.  The Default and the Assignment to Alexbay.

21.     Metro did not repay the sums due to the Original Secured Creditor as required under the Line of Credit Note, and is in default of its obligations under the Line of Credit Note.  Metro did not repay the sums due to the Original Secured Creditor as required by the Debt Assumption Agreement, and is in default of its obligations under the Debt Assumption Agreement.

22.     Accordingly, as permitted under the terms of the EB Guaranty, the Original Secured Creditor has made demand for payment by Eber Bros. of the sums due from Metro. Despite demand duly made, Eber Bros. has failed to pay the Original Secured Creditor those sums.

23.     As a consequence of Eber Bros.' failure to pay the Original Secured Creditor the sums Metro owes the Original Secured Creditor, Eber Bros. is in default of its obligations under the EB Guaranty.

24.     On or about January 18, 2012, the Original Secured Creditor irrevocably granted, assigned and transferred all his right, title and interest in the Debt Assumption Agreement, the Line of Credit Note, and the Metro Security Agreement to Alexbay. [True and accurate copies of the assignments are collectively annexed to this Complaint as Exhibit E.]

## PROPOSED ACCEPTANCE OF COLLATERAL:

25.    Alexbay has proposed to accept Eber Bros.' stock in Metro in full satisfaction

of all Eber Bros. obligations to Alexbay, as assignee, under the EB Guaranty and the Security

Agreement.

26.    By notice dated January 18, 2012, and as authorized by UCC 9-620, Alexbay

notified Eber Bros. of its proposal to accept the Collateral in full satisfaction of Eber Bros.

obligation to Alexbay.  [A true and accurate copy of Alexbay's notice to Eber Bros. is

annexed to this Complaint as _Exhibit F_.]

### THE AMOUNT OF THE INDEBTEDNESS and
### the VALUE OF THE COLLATERAL:

27.    As of December 31, 2011, Metro's indebtedness to the Original Secured

Creditor under the Debt Assumption Agreement was $1,951,874.26 (plus interest accruing at

9% per annum).

28.    As of December 31, 2011, Metro's indebtedness to the Original Secured

Creditor under the Line of Credit Note was $1,698,808.22 (plus interest accruing at 12 ½%

per annum).

29.    As a consequence of all the foregoing, Metro's indebtedness to Alexbay

currently exceeds $3.650 Million.  By virtue of the EB Guaranty, Eber Bros. obligation to

Alexbay also exceeds $3.650 Million.

30.    Metro does not presently operate and it conducts no business activity.  It has

not generated profit of any kind in several years.  Metro has no cash reserves other than those

required in the ordinary course of its business.  Metro has no tangible assets: its only

intangible asset of any significant value, indeed its only valuable asset of any kind, is Metro's

ownership of a partial interest in yet another company, Eber-Connecticut, LLC ("*EberConn*").

31.     EberConn is a limited liability company formed under the laws of the State of Delaware.

32.     Metro owns seventy-nine percent (79%) of the membership units in EberConn. Other owners of EberConn are Eder Goodman, LLC, which owns fifteen percent (15%) of the membership units in EberConn, and Polebridge Bowman, LLC ("*Polebridge Bowman*"), which owns six percent (6%) of the membership units of EberConn.

33.     Polebridge Bowman is a party unrelated to the Original Secured Creditor, to Eber Bros., to Metro, and/or to EberConn. Polebridge Bowman acquired its ownership interest in EberConn in May, 2010, in an arms' length transaction, and became a new member of EberConn by virtue of that acquisition. The membership units Polebridge Bowman acquired were sold to it by Metro.

34.     Under the terms of the operating agreement that governs EberConn's corporate affairs, existing members are provided a right of first refusal that permits existing members to acquire any membership units proposed for sale to a potential new member, on the same terms that are proposed for sale to the potential new member. By operation of that right of first refusal, before Polebridge Bowman could acquire its membership units from Metro, Eder-Goodman had to decline to purchase those membership units on the terms Polebridge Bowman proposed for the purchase.

35.     Polebridge Bowman acquired its ownership of six percent (6%) in EberConn in May 2010 for $350,000. Eder-Goodman consented to the sale of Metro's membership units at that price.

36. No other sale or purchase of any interest in EberConn has occurred since. Accordingly, Polebridge Bowman's acquisition of its ownership interest in EberConn represents the best evidence of the current value of ownership rights in EberConn: it is the last time the free market has spoken with respect to the value of EberConn's membership units.

37. As established by Polebridge Bowman's acquisition, each one percent of the membership units in EberConn was worth approximately $58,333 in May, 2010.[1] Accordingly, at that time, the value of all of EberConn's membership units was $5,833,300.

38. Since the Polebridge Bowman acquisition, EberConn has lost more than $1.2 Million. As a consequence, the value of all of EberConn's membership units was reduced to $4,633,300 by December 2011.

39. Thus, as of December, 2011, Metro's ownership of 79% of the ownership units in EberConn has a value of approximately $3.660 Million.[2] That ownership interest is Metro's only valuable asset, and effectively establishes the value of the Collateral. The Collateral has a value of approximately $3.660 Million.

40. Valuation of the Collateral at $3.660 Million does not apply any discount for lack of marketability, partial ownership, costs of sale or other applicable factors that might reduce the Collateral's value. Moreover, because Metro's business as a wine and liquor distributor is highly regulated, requiring business owners to have proper licensing, there are significant barriers to entry to the ownership of Metro, and there are reasonable justifications for valuation of the Collateral at less than $3.660 Million.

---

[1]    Polebridge Bowman paid $350,000 for a six percent ownership interest. $350,000 ÷ 6 = 58,333.
[2]    4,633,300 x 0.79 = 3,660,307.00.

41. Therefore, by and through acceptance of the Collateral in full satisfaction of Eber Bros. obligations to Alexbay, Alexbay will accept a value of approximately \$3.660 Million in full satisfaction of an obligation of \$3.650 Million, plus continually accruing interest.

### THE PROCEDURES FOR ACCEPTING THE COLLATERAL:

42. As required under UCC §9-620, Alexbay has provided Eber Bros. notice of its intent to accept the Collateral in full satisfaction of Eber Bros.' obligations under the EB Guaranty and Security Agreement.

43. Upon information and belief, Southern filed a financing statement with the New York State Department of State on or about August 31, 2007, under File Number 200708310704958, by which it may claim an interest in the Collateral. As required under UCC §9-621(a), and by virtue of this action, Southern has been provided notice of Alexbay's intention to accept the Collateral in full satisfaction of Eber Bros.' obligations under the EB Guaranty and Security Agreement.

44. The Original Secured Creditor's financing statement with respect to the Collateral was filed on February 22, 2010.

45. Upon information and belief, no other person holds any interest in the Collateral subordinate to Alexbay's interest.

46. By virtue of this action, Metro has been provided notice of Alexbay's intention to accept the Collateral in full satisfaction of Eber Bros.' obligations under the EB Guaranty and the Security Agreement.

47. As a consequence of all the foregoing, Alexbay's acceptance of the Collateral in full satisfaction of Eber Bros.' obligations under the EB Guaranty and Security Agreement: (i) it is authorized by relevant provisions of the Uniform Commercial Code; (ii) it complies with all procedures required of the Uniform Commercial Code; and (iii) by its satisfaction in full of the obligations of Eber Bros under the EB Guaranty and Security Agreement, it gives fair and reasonable consideration for the Collateral.

48. Accordingly, Alexbay's acceptance of the Collateral in full satisfaction of Eber Bros. obligations under the EB Guaranty and Security Agreement is "commercially reasonable" as the term is used in Section 9-627 of the Uniform Commercial Code.

### PROCEDURAL PREREQUISITES:

49. Section 9-627(c) of the Uniform Commercial Code provides, in pertinent part:

A collection, enforcement, disposition, or acceptance is commercially reasonable if it has been approved: in a judicial proceeding … .

50. CPLR Section 3001 provides, in pertinent part:

Declaratory judgment. The supreme court may render a declaratory judgment having the effect of a final judgment as to the rights and other legal relations of the parties to a justiciable controversy whether or not further relief is or could be claimed.

51. Alexbay requests that the acceptance of its collateral be "approved in a judicial proceeding." Its proposal to accept the Collateral presents a justiciable controversy among the parties to this action. The Court's determination of the "commercial reasonableness" of the proposed acceptance will determine the rights and other legal relations of the parties to that controversy.

52. No previous request has been made for the relief requested in this action.

//

//

---

//

//

**WHEREFORE, Plaintiff Alexbay LLC** requests that this Court determine, adjudge, and order, that Alexbay LLC's acceptance, as a secured creditor, of Eber Bros. Wine & Liquor Corporation's ownership interests in Eber Bros. Wine & Liquor Metro, LLC, (which ownership interests serve as collateral securing the obligations of Eber Bros. Wine & Liquor Corporation's obligations to Alexbay LLC) in full satisfaction of the secured obligations owed to Alexbay LLC, is "commercially reasonable," together with such other and further relief as the Court may deem just and reasonable.

DATED:   21 February 2012
            Rochester, New York.

                            **UNDERBERG & KESSLER LLP**
                            *Attorneys for Plaintiff Alexbay, LLC*

                            William E. Brueckner and Michael J. Beyma
                            300 Bausch & Lomb Place
                            Rochester, New York  14604
                            585.258.2800

**STATE OF NEW YORK**
**SUPREME COURT**          **COUNTY OF MONROE**

---

ALEXBAY, LLC,

                              Plaintiff,          Index No.:

          -vs.-                                   2012-1919

EBER BROS. WINE & LIQUOR CORP.;

SOUTHERN WINE & SPIRITS
OF AMERICA, INC.;

EBER BROS. WINE & LIQUOR METRO, INC.;
and          /

JOHN DOES 1 – 10, being fictitious names intended
to designate other entities or persons claiming any
interest in Eber Bros. Wine & Liquor, Inc.'s
"OWNERSHIP INTEREST IN EBER BROS. WINE
& LIQUOR METRO, INC.";

                              Defendants.

---

## AFFIDAVIT OF LESTER EBER
### in Support of
### MOTION FOR JUDICIAL DETERMINATION
### OF 'COMMERCIAL REASONABLENESS' UNDER UCC 9-627

STATE OF _New York_ )
COUNTY OF _Monroe_ ) S.s.:

**LESTER EBER**, being first duly sworn, deposes and says:

1. I am a principal of Plaintiff Alexbay, LLC ("*Alexbay*") in this action. I have

personal knowledge of all the factual matters recounted in this Affidavit, which I submit in

support of Alexbay's request for a judicial determination of "commercial reasonableness" as the

term is defined in the provisions of Section 9-627 of the Uniform Commercial Code.



PENGAD 800-631-6989

**PLAINTIFF'S**
**EXHIBIT**
45
1|24|19

2.      This action was commenced upon the filing of Plaintiff's Summons and
Complaint on February 21, 2012. The Complaint explains the circumstances through which
Alcxbay became a secured creditor of Eber Bros. Wine & Liquor Corp. ("*Eber Bros.*"),  and its
proposal to accept the collateral that secures that obligation, certain shares of stock owned by
Eber Bros., in full satisfaction of the debt.  [A time stamped copy of the Complaint, together with
all its Exhibits, is attached to this Affidavit as Exhibit A.]  The action was brought under the
provisions of Uniform Commercial Code §9-627 to obtain this Court's judicial determination
that the proposal to accept the stock is "commercially reasonable."

3.      In pertinent part, Section 9-627(c) reads:

> A collection, enforcement, disposition, or acceptance (of collateral) is
> commercially reasonable if it has been approved:  in a judicial
> proceeding ... .

4.      As the Complaint explains, the collateral at issue in this action ("*the Collateral*")
is all the shares of capital stock of a New York corporation known as Eber Bros. Wine & Liquor
Metro, Inc. ("*Metro*").  Those shares are owned by Eber Bros., and they were pledged by Eber
Bros. to secure the repayment of an Eber Bros. obligation totaling more than $3.650 Million,
with continually accruing interest.

5.      Metro is not an operating company, and its only asset of any significance is a 79%
ownership interest in yet another Company:  Eber Connecticut LLC ("*EberConn*").

6.      Based upon very recent arms' length sales on the open market, EberConn's value
as a going concern is best established at $4,633,300 as of December 2011.  That valuation of
EberConn establishes the value of Metro's only significant asset:  the 79% ownership of
EberConn.  Because it is Metro's only significant asset, that 79 percent interest (valued at $3.660
Million), itself establishes the value of Metro.

*Alexbay, LLC. v. Eber Bros. Wine & Liquor Corp. et al.*
Index No.: 2012-1919

Affidavit of Lester Eber in Support of Motion
Page 2 of 5

EB-00001060

7.      Thus, Alexbay's proposal is to accept as the Collateral all of the shares of Metro, a corporation valued at $3.660 Million, in full satisfaction of a debt of $3.650 Millon.

8.      The Uniform Commercial Code proscribes the procedure for acceptance of collateral in satisfaction of the obligation it secures in Sections 9-620 and 9-621.   In the situation presented by this case, where consumer goods are not implicated, Section 9-620(a) permits a secured creditor to accept the collateral in satisfaction of an obligation if:  (i) the debtor consents to the acceptance; and (ii) no objection to the acceptance is made by others who are entitled to notice of the proposed acceptance under Section 9-621.

9.      The Debtor, Eber Bros., has consented to the acceptance.  [A copy of the Debtor's consent to the acceptance of the Collateral and all the other relief requested in this action is annexed to this Affidavit as Exhibit B.]

10.     Section 9-621 requires that notice of the proposed acceptance be sent to:  (i) any person who has notified the secured party that the person claims an interest in the collateral; (ii) any person who has properly filed a financing statement with respect to the collateral; and (iii) a person who has properly perfected a security interest in the collateral under other applicable law.

11.     As provided under UCC 9-310(a), security interests in the Collateral are perfected by filing a financing statement in New York, where Eber Bros. is incorporated.  Attached to this Affidavit as Exhibit C are the results of a search of the financing statements filed against the Collateral with the New York Secretary of State: those results show that the only other person that has a financing statement filed with respect to the Collateral is Defendant Southern Wine & Spirits of America, Inc. ("*Southern*").

12.     Southern has consented to Alexbay's proposal to accept the Collateral in full satisfaction of Eber Bros.' obligation.  [A copy of Southern's consent to the acceptance of the

*Alexbay, LLC, v. Eber Bros. Wine & Liquor Corp. et al.*
Index No.:  2012-1919

Affidavit of Lester Eber in Support of Motion
Page 3 of 5

EB-00001061

Collateral and all the other relief requested in this action is annexed to this Affidavit as <u>Exhibit</u>

<u>B</u>.]

13.     The only other person that might claim an interest in the Collateral is Metro:

Alexbay has no knowledge that any other person claims any interest in the Collateral. Metro has

also consented to Alexbay's proposal to accept the Collateral in full satisfaction of Eber Bros.'

obligation.

14.     As the Official Comments to the Uniform Commercial Code recognize:

> It is important to make clear the conduct and procedures that are
> commercially reasonable and to provide a secured party with the
> means of obtaining, by court order of negotiation with a creditors'
> committee or a representative of creditors, advance approval of a
> proposed method of enforcement as commercially reasonable.

15.     Alexbay has complied in good faith with the conduct and procedures required to

enforce its security interest in the Collateral by accepting the Collateral, and proposes to fully

satisfy a debt of $3.650 Millon (plus accruing interest) in exchange for collateral with a value of

$3.660 Million.

16.     All parties entitled to notice of the proposal, and all parties that are known to

claim any interest in the Collateral, have consented to the proposal. It is therefore manifest that

the proposal is a commercially reasonable means of enforcing Alexbay's security interest.

17.     Alexbay's stipulation with Southern agrees that Alexbay will request an Order

dismissing Southern from this action.

**WHEREFORE, Plaintiff Alexbay, LLC,** requests that this Court grant an Order: (A)

determining that Alexbay's acceptance of the Collateral in full satisfaction of Eber Bros.'

obligation is "commercially reasonable" under the Uniform Commerical Code; (B) dismissing

<i>Alexbay, LLC, v. Eber Bros. Wine & Liquor Corp. et al.</i>
Index No.: 2012-1919

Affidavit of Lester Eber in Support of Motion
Page 4 of 5

EB-00001062

Defendant Southern Wine & Spirits of America, Inc., from this action; and (C) granting such

other and further relief as the Court may deem just, equitable and appropriate.

_Lester Eber_

LESTER EBER

Sworn to before me this
14th day of March 2012.

_Susan J. Lestrange_
Notary Public

SUSAN J. LESTRANGE
NOTARY PUBLIC STATE OF NEW YORK.
QUALIFIED IN WAYNE COUNTY,
MY COMMISSION EXPIRES 3/27 / 2015

_Alexbay, LLC. v. Eber Bros. Wine & Liquor Corp. et al._
Index No.: 2012-1919

Affidavit of Lester Eber in Support of Motion
Page 5 of 5

EB-00001063

STATE OF NEW YORK
SUPREME COURT        COUNTY OF MONROE

HARRIS BEACH PLLC,

Plaintiff,

v.

EBER BROS. WINE & LIQUOR CORP., ALEXBAY, LLC
F/K/A LESTER EBER, LLC, EBER BROS. WINE &
LIQUOR METRO, INC., AND EBER-CONNECTICUT,
LLC,

Defendants.

**AFFIDAVIT OF
LESTER EBER**

Index No. 2014-13623

STATE OF NEW YORK        )
                         ) ss.:
COUNTY OF MONROE         )

    **LESTER EBER**, being duly sworn, deposes and says:

    1.    I am currently the President and Managing Member of Alexbay, LLC

("Alexbay") and the President and a Director of Eber Bros. Wine & Liquor Metro, Inc.

("Eber Metro").

    2.    I have personal knowledge of the matters set forth herein, except for those

matters stated to be on information and belief, which I believe to be true.

    3.    From 1959 until February 1, 2012, I was also affiliated with Eber Bros.

Wine and Liquor Corp. ("Eber Bros."), most recently serving as President and a Director

of Eber Bros. I resigned from serving as President and a Director of Eber Bros.

effective February 1, 2012. Accordingly, I have not held any position with Eber Bros. as

of February 1, 2012. (See Exhibit 1, copies of my resignation and Board Approval of my

resignation).



PLAINTIFF'S
EXHIBIT
46
1/24/19

4.       I never held the position of Chief Executive Office of Eber Bros. According to Eber Bros.' By-Laws, there is no CEO position within Eber Bros. Instead, the position of President includes the responsibilities of a CEO. (*See* Exhibit 2, Eber Bros.' By-Laws).

5.       · Eber Bros. is a New York corporation that was incorporated in 1935 and previously operated as a wholesale wine and liquor distributor in upstate New York. For the reasons described herein, Eber Bros. is not currently an operating entity.

6.       Eber Metro is a New York corporation that was incorporated in the mid-1990s and was wholly owned by Eber Bros until May 2012. Eber Metro previously operated as a wholesale wine and liquor distributor in downstate New York. But for the reasons described herein, Eber Metro is not currently an operating entity.

7.       Eber-Connecticut, LLC ("Eber-CT") is a Delaware limited liability company, formed on February 16, 2005. Eber-CT operates as a wholesale wine and spirits distributor in Connecticut.

### Harris Beach's Representation of Eber Entities

8.       For several decades, the law firm of Harris Beach PLLC ("Harris Beach") served as outside general counsel to Eber Bros.; to Eber Metro from 1995 to 2010; and to Eber-CT from 2005 to 2010 in a variety of litigation and transactional matters. During that time, various attorneys who are still associated with and/or members of Harris · Beach provided legal advice to Eber Bros., Eber Metro, and Eber-CT (collectively, the · "Eber Entities"). Patrick J. Dalton, a Harris Beach partner, served as corporate counsel to these Eber entities for more than a decade. Other attorneys who are still affiliated with Harris Beach and who have worked on Eber Entity matters in the past include

2

Kevin W. Tompsett, David M. Mehalick, Justine R. Runke, Charles W. Russell, Paul J. Yesawich, Daniel J. Moore and Dale A. Worrall.

9.    As is relevant here, the Eber Entities engaged Harris Beach to represent them in the following transactions: (a) the acquisition of Slocum & Sons, Inc., which became Eber-CT in April 2005; (b) the exchange, proposed by Southern Wine & Spirits ("Southern"), but never consummated, of a $3 million interest free note for a 15% ownership interest in Eber-CT in the Fall of 2007; (c) the sale of the 15% ownership interest in Eber-CT, originally sought by Southern, to Eder-Goodman LLC in January 2008; and (d) the sale of a 6% ownership interest in Eber-CT to Polebridge Bowman in May 2010.

10.    Harris Beach had no involvement at all with the Alexbay foreclosure on the loans owed to Alexbay by Eber Metro and guaranteed by Eber Bros.' assets in June 2012, since the Eber Entities had terminated them as counsel in 2010. In fact, it was Michael J. Beyma at Underberg & Kessler LLP who represented Alexbay in the foreclosure. (See Exhibit 3, Mr. Beyma's Affidavit). In fact, Mr. Beyma still believes that Eber Bros. received fair consideration in the foreclosure. As a result, Mr. Dalton's thoughts on the value of Eber-CT in 2012 are purely speculative, clearly wrong and should be ignored.

11.    Harris Beach holds itself out only as a law firm. We hired Harris Beach solely in its capacity as a law firm. They are not an investment banking, financial advisory, appraisal or accounting firm. They do not hold themselves out as experts in the valuation of businesses of any kind. . Mr. Dalton's thoughts on appropriate

3

methods of valuing our companies are purely speculative, clearly wrong and should be ignored.

### 2005 Acquisition of Slocum & Sons Inc./Before the Recession

12.    In April 2005, Eber Metro acquired a wine and liquor distributorship operating in Connecticut and Rhode Island called Slocum & Sons, Inc. ("Slocum"). The transaction was accomplished by merging Slocum into Eber-CT, a newly formed limited liability company. Eber-CT is currently operating solely as a distributor of wine and spirits in Connecticut.

13.    I have spent my entire life running private businesses. Over the course of 50 years, I have bought and sold many private businesses. In my experience, privately held businesses are difficult to value. A wide variety of considerations go into every decision about what to pay or what to accept in the purchase or sale of a private business. The principal considerations that are relevant in one purchase and sale may be quite different than those applicable in another. Industries change over time and through business cycles. Therefore, mechanical formulas rarely apply. In my experience, competitors in the liquor industry hold this same view when purchasing and selling private businesses.

14.    In the case of the Eber Entities' expansion through the acquisition of Slocum, Eber Metro's primary consideration was strategic; it was part of a much larger company in 2005. In 2005, Eber Entities' gross revenues were approximately $600 million compared to $36 million in 2012. Eber Bros. had significant operations in New York, and was striving to become a leading multi-state distributor. The acquisition of Slocum was strategically important because it would solidify and augment Eber Bros.'

4

competitive presence and scale in the Northeast, and affirm its commitment to growth for the benefit of key suppliers and attracting new suppliers. Slocum also owned an attractive import company with a portfolio of German, Austrian and Italian wines and sold these items exclusively in Connecticut. The Eber Entities were eager to add Slocum's then highly profitable and vertically integrated business model to their own and saw an opportunity to leverage the Slocum import business throughout the rest of its distribution network. Understandably, it is not possible to accurately pinpoint or create a mechanically derived valuation of the benefits of such an acquisition.

15.     Eber Bros.' analysis of the appropriate purchase price for Slocum was also significantly affected by the belief that there were other strong competitors who were interested in buying Slocum at the same time. They saw the strategic value of Slocum's business as well. It wasn't a matter of seeing how little it would cost to buy Slocum. Rather, it was a matter of anticipating how high the purchase price would have to be to purchase the business and prevent key competitors from seizing this opportunity.

16.     Another significant factor in determining the offer to buy Slocum was that there were significant tax advantages to the Eber Entities in making the acquisition with the transaction structure that was employed. It was a transaction structure tailored to the specific facts of the situation and not a structure that would apply to another sale of Slocum. Essentially, because of the timing of tax considerations, Eber Bros. could afford to pay substantially more to buy the business in 2005.

17.     In retrospect, I believe Eber Metro significantly overpaid to acquire Slocum. Although prior to Eber Metro's acquisition Slocum was profitable, during each

5

Case 1:16-cv-09517-LAK-KHP Document 266-3 Filed 11/09/19 Page 51 of 72

fiscal year from 2005 through 2012 Slocum experienced significant losses, with aggregate net losses of $7,275,269 during that same period. (*See* Exhibit 4). Due to the forced wind-down of Eber Bros. as described below, the acquisition of Slocum never had the opportunity to generate the material synergies and other benefits that had been expected and had been factored into the proposed valuation at the time of the acquisition of Slocum.

18.    Harris Beach represented Eber Metro in the acquisition of Slocum. Mr. Dalton alleges that the acquisition of Slocum was prompted by certain legal protections afforded wine and liquor franchisees in Connecticut, as is stated in paragraph 15 of the affidavit of Patrick J. Dalton sworn to on December 11, 2014 ("First Dalton Affidavit"). Mr. Dalton also alleges that our acquisition of Slocum was prompted by the "legal bulwark" afforded liquor franchisees in Connecticut against termination of distributorships in that state. Neither of these allegations is correct. Mr. Dalton is a lawyer, not a businessman with the many years of experience in the wine and liquor distribution business that I have. Mr. Dalton does not have a comprehensive understanding of the competitive dynamics of this industry.

19.    The Connecticut wine and liquor franchise laws are not as valuable as Mr. Dalton alleges. They do not insulate a distributor from the risk of losing the exclusive right to sell a wine product line in Connecticut, rather - at most - they prevent a distributor from being completely excluded from the sale of a wine product. Although Connecticut law prevents a supplier from completely terminating its relationship with a distributor without good cause, a supplier may still "dual" a distributor at any time, meaning that the supplier can sell to a new "preferred" distributor in addition to the

6

EB-00017530

original distributor.  Thus, the original distributor can be deprived of the benefit of being the exclusive distributor of a product within Connecticut without any protection under the franchise law.  In my experience, the new "preferred" distributor typically ends up selling the majority of a supplier's particular product in Connecticut since the new "preferred" distributor receives marketing support and programming that is not offered to the original distributor.  Additionally, the preferred distributor is the exclusive distributor of all new items or line extensions which typically drive revenues over the life cycle of the brand.  Once a distributor becomes "dual" on an item, revenues and profitability are negatively impacted.  As a result, revenues and profitability of any distributor in Connecticut are subject to many of the same uncertainties as in any state without a franchise law, and the Connecticut franchise laws offer little protection against these kinds of risks for Eber-CT.  This could materially and adversely impact the value of the equity of Eber-CT.

20.    In fact, Eber-CT was "dualed" in 2009 by Deutsch, its largest supplier and the producer of Yellow Tail Wines.  Until that point, Eber-CT distributed all Yellow Tail Wine products sold in Connecticut.  As a result of being "dualed," the volume and revenue of Yellow Tail Wine products that Eber-CT sold in Connecticut was reduced by a catastrophic 50% in the first year of the "dual."  Eber-CT now sells less than 28% of its "pre-dual" volume of Yellow Tail Wine products sold in Connecticut.

21.    During the period from 2008 through 2012, Eber-CT was "dualed" not only by Yellow Tail Wines but by many other brands, as well.  This "dualing" took place after the Slocum acquisition in 2005, and after the sale of the 15% ownership interest to Eder Goodman in 2008, but before the foreclosure sale in 2012.  Eber-CT's overall financial

7

EB-00017531

performance was materially and adversely impacted by this "dualing," as its revenues for Deutsch (Yellow Tail Wines) fell from over $11 million, for the year ending May 31, 2009, to $2.6 million, for the year ending December 2014. Given that Eber-CT is among the smallest state-wide distributors, the threat of a "dual" on all its brands remains a constant concern and a source of future risk to revenue, profitability and valuation.

22.     Mr. Dalton's lawyerly theories have been disproven by what actually happened to Eber-CT since 2005.

### Fending off Southern (2005 through January 2008)/Before the Recession

23.     A number of events took place after Eber Metro's acquisition of Slocum that resulted in Eber-CT becoming the only remaining Eber Entity with any operating assets. Southern Wine & Spirits of America, Inc. ("Southern")—the largest wine and spirits distributor in the United States—entered the New York market in 2005, and swiftly set out to destroy Eber Bros.' and Eber Metro's businesses in New York through highly predatory and aggressive business tactics. At the time, New York was by far Eber Bros.' largest market. In 2006, Southern lured away many of Eber Bros.' and Eber Metro's significant suppliers in New York. As a result, Eber Bros. and Eber Metro could no longer sell their longstanding portfolio of highly recognizable wine and spirits brands in New York. In addition, Southern paid $10 million to Daniel Sisto, Eber Bros.' VP of Sales, and lured him away to work for them. Southern then hired more than 20 additional employees of Eber Bros. in one day and eventually hired hundreds of other former Eber Bros and Eber Metro employees, all in an effort to drive the Eber Entities out of business.

8

24. As a result, in March 2007, Eber Bros. and Eber Metro were on the verge of bankruptcy and were unable to satisfy outstanding debts to their bank lender, vendors and suppliers. Eber Bros. and Eber Metro engaged in a lengthy negotiation with Southern in the Summer of 2007 over a complex, multi-part transaction where Eber Bros. agreed to sell its interests in its Delaware and Ohio distributorships to Southern and, in exchange, Southern provided a significant amount of cash to Eber Bros. and Eber Metro to allow them to pay their debts to suppliers and thereby avoid bankruptcy. Southern did not want Eber Bros. and Eber Metro to file for bankruptcy because it would have hurt many of Southern's vendors, who were also vendors to Eber Bros. and Eber Metro.

25. After Eber Bros. conveyed its interests in the Delaware and Ohio distributorships to Southern in 2007, Eber Bros. and Eber Metro still owed Southern $3 million. A promissory note for this $3 million debt was offered to Southern in 2007. In 2007, Southern proposed that it exchange its $3 million note for a 15% ownership interest in Eber-CT. I believe the principal motivation for Southern's proposal was that Southern was not then in the Connecticut market, and it could only enter the market by acquiring an interest in an existing distributorship. The 15% interest in Eber-CT would have given Southern a way to enter the Connecticut market, and thus, Southern's interest in Eber-CT's equity was strategic and opportunistic. The equity value discussed was not the result of the application of any mechanical valuation formula. It was a value that was derived from the unique situation of a huge, national distributor pursuing a strategic goal and was a measure of what they were willing to pay to enter the

9

Connecticut market at that time. The proposed equity sale to Southern was never consummated.

26.    While we were in discussions with Southern, Mr. Dalton approached Eder Goodman, another Connecticut distributor, and offered to sell the 15% to Eder Goodman rather than to Southern. Eder Goodman ultimately agreed to pay $4.5 million for the 15% ownership interest in Eber-CT in January 2008. Eder Goodman's motivation was also strategic and opportunistic. They were clearly motivated by a strong desire to keep Southern out of the Connecticut market. Eder Goodman was willing to pay a 50% premium over Southern's offer in order to protect itself from Southern, which had a record of raiding suppliers, employees and customers of competing distributors and consequently destroying those distributors upon entering new markets. Eder-Goodman was under significant pressure to pay a premium because Southern's presence in Connecticut would have been devastating to its businesses. As Mr. Dalton knows, he was able to extract more money from Eder-Goodman by discussing the devastation Southern had inflicted on Eber Bros in New York.

27.    The competing motivations of Southern and Eder Goodman in late 2007 and early 2008 were unique to their particular circumstances. One was trying to buy its way into the Connecticut market; the other was paying to keep a competitor out of the same market. Their motivations and circumstances were completely different from those I faced in 2012, when I foreclosed on my loans to Eber Metro.

10

EB-00017534

**Failed Attempts to Obtain Financing or Sell Eber-CT (2008-2012)**

28.     Until 2007, Eber Bros. had a $130 million first lien credit facility with Wells Fargo. In March 2007, Wells Fargo put Eber Bros. loans into default and classified the loans as a "work out," freezing all of Eber Bros.' working capital in order to pay down the outstanding loans. When Wells Fargo was finally paid off, they declined to extend further credit to any Eber entity. Finally, in June of 2008, Canandaigua National Bank and Trust Co. ("CNB") was willing to provide only a $1.5 million loan on a six-month basis thereafter. Between 2008 and 2012, Eber-CT made numerous attempts to arrange new first lien debt financing with independent third-party lenders. None of these lenders had any prior affiliation with Eber-CT. Discussions were held with at least six different banks and finance companies in the Northeast about obtaining additional financing. None of these lenders was willing to provide any credit to Eber-CT, on a first lien basis or otherwise. It was not until after the Alexbay foreclosure sale that Eber-CT was able to arrange a long-term seven-year loan facility with CNB. This lending facility is an asset-based loan, not a cash flow-based loan. CNB relied only on the value of the company's inventory and accounts receivable, and not on any projected cash flow or inherent equity value of the company. CNB has informed us that they strongly prefer that we refinance them out of their current facility as soon as possible.

29.     During the period from 2002 through 2012, I made an aggregate of $3.228 million in cash loans to Eber Bros. and Eber Metro to support their operations. In the Spring of 2010, I offered several other members of my extended family an opportunity to participate in these loans on the same terms applicable to me. All of them declined my offer.

11

30.     Between 2008 and 2012, Eber-CT also contacted at least four different strategic wine and liquor distributors in the Northeast to see if there was any interest in acquiring Eber-CT. None of these distributors had any prior affiliation with Eber-CT. After discussion and due diligence with each of the parties, none of them would make a proposal to acquire Eber-CT on any basis.

31.     The foregoing clearly demonstrates that a significant group of independent third party lenders and wine and liquor distributors, all of whom were well positioned to have an educated opinion of the value of Eber-CT's business, saw little or no value in Eber-CT during the period after the onset of the economic recession in the Fall of 2008. Extended family members who had participated for many years in the companies and had a strong familial relationship with me declined to infuse new funds, as well. This was the harsh reality confronting Eber-CT in 2010, when it negotiated the sale of 6% of its common equity to Polebridge Bowman, and in 2012, when it asked the Court to confirm its view that the foreclosure of Alexbay's $3.5 million notes was commercially reasonable.

### 2010 Sale of 6% to Polebridge Bowman/During the Economic Recession

32.     In the Spring of 2010, Eber-Ct was struggling. The economic recession, which started in the Fall of 2008, long after the Southern and Eder Goodman transactions, was still weighing heavily on the U.S. economy and was taking its toll on Eber-CT. Its annual losses were mounting (losing $2.4 million for the fiscal year ending May 30, 2009 and $1.1 million for the fiscal year ending May 30, 2010). The acquisition of the Slocum business had not lived up to Eber Metro's expectations at all. Eber Metro's asset base had significantly shrunk from what it was in 2005 and by then only

12

comprised of the Connecticut business. Eber-Ct was suffering as a result of the aggressive competitive actions of its competitors and suppliers. All attempts to raise a new first lien credit facility or sell the company had all failed to attract any interest. Eder Goodman's investment in Eber-CT brought with it a number of negative covenant constraints on our flexibility in raising debt capital and in selling the company. It also brought with it a partner who, for their own strategic reasons, really did not have any interest in seeing the company be sold or perform well.

33.    In light of these unfortunate circumstances, the value of Eber-CT in 2010 was extremely uncertain; it could not be derived with any precision at all. Eber-CT may well have been worthless. The refusal of other distributors to purchase an interest in Eber-CT and the reluctance of the lending market to advance funds confirmed that Eber-CT had little value.

34.    Mr. Dalton's statement in paragraph 18 of the First Dalton Affidavit that he believed Eber-CT "was worth in the vicinity of $20 million" is uninformed and just flatly wrong. Mr. Dalton was retained as a lawyer, not a financial advisor or valuation expert. Whatever he may think he overheard me say in 2010, he clearly misunderstood. He took my hopes and dreams about creating a valuable company and tried to change those into current facts.

35.    In the Spring of 2010, Eber-CT approached Glenn Sturm seeking his assistance in formulating a plan to turn around the company. Eber-CT had no prior contact with Mr. Strum before 2010. The goal was to retain Mr. Sturm as both a lawyer and a senior strategic consultant.

13

36.    Mr. Sturm was then a Senior Partner at Nelson Mullins Riley & Scarborough LLP, a prominent Atlanta law firm, where he practiced corporate and securities law, focusing on investment banks, private equity funds and emerging companies, with extensive experience in the financing and mergers and acquisitions markets. Mr. Sturm also chaired his firm's corporate department and served on its executive committee. At the same time, he was a well-known business advisor at The White Oak Group, a prominent private equity firm in Atlanta that is in the business of investing in, and growing the value of, lower middle market emerging companies. He had served as chief executive officer of a number of emerging companies and had served on the boards of numerous private and public companies.

37.    Mr. Sturm was an expert in assisting and advising small privately owned businesses. Eber-CT was fortunate to obtain his expertise and assistance in helping to forge a plan to turn around the company. He advised and consulted with Eber-CT on strategic initiatives to rehabilitate the business. Among other things, he was responsible for creating a marketing plan that focused on growing the craft spirit business and the Eber-CT imports business.

38.    Like any outside adviser, Mr. Sturm required that he be paid for his services. In this regard, he was no different from Harris Beach. This fact does not make him any less of an independent purchaser of Eber-CT. Mr. Sturm typically proposed to new clients that he be paid fees in cash and that he be given an opportunity to make a minority investment in the client's common equity at a fair market value purchase price. This was the way Mr. Sturm did business with his clients. This is the

14

same way many similar advisors do business with financially distressed or emerging private companies having liquidity constraints.

39.    Mr. Sturm originally proposed a 10% ownership interest in Eber-CT, but was eventually negotiated down to 6% by May of 2010. The $350,000 purchase price for this interest was a negotiated value and was based on the then-current facts and circumstances regarding the company for a non-strategic purchaser. These then-current (ie as of May 2010) facts and circumstances regarding the company included the following (note that the company's fiscal year ends on May 31st):

- Total annual sales had *declined* by nearly $7 million, or more than 15%, over the then-most recent two fiscal years

- Total net income *losses* were more than $3.5 million over the then-most recent two fiscal years

- The company's operations were generating negative cash flow and as a result its total indebtedness *increased* by 160% from $1.5 million to $3.9 million over the then-most recent two fiscal years

As such, the company's deteriorating financial performance (declining sales, negative cash flows, and increasing levels of indebtedness) driven by the fallout from the Great Recession and the decision by a key supplier to "dual" the company on its largest single product, made many of the valuations that arrived prior to these events and consequences irrelevant.

Furthermore, even if the company had not experienced the materially deteriorating financial performance that it did between 2008 and May of 2010, the

15

EB-00017539

valuations arrived at in the Eder Goodman transaction and the proposed, but never consummated, Southern transaction, were irrelevant for the 2010 transaction.

It is also important to note that as a highly leveraged company (the company had nearly $4 million of debt and was not generating positive cash flow from operations), even small changes in the value of the company translate into material changes in the equity value of the company.

### Foreclosure on My Loans to Eber Bros. and Eber Metro/Foreclosure

40.    Between 2002 and 2012, I personally made cash loans to Eber Bros. and Eber Metro for the purpose of enabling them to pay various operating and other liabilities of the business, including helping to fund a portion of the liabilities of the Eber Bros.' Pension Plan. (*See* Exhibit 5, copies of notes). At all times prior to June 5, 2012, all the common equity in Eber Bros. (and, indirectly, Eber Metro) was owned by a trust of which various members of the extended Eber family, including myself, were beneficiaries. As mentioned above, in the Spring of 2010, I offered several other members of my extended family an opportunity to participate in these loans on the same terms applicable to me. All of them declined my offer.

41.    I retained Harris Beach and Mr. Dalton to structure the loan transactions and prepare the necessary documentation. I instructed Mr. Dalton to put in place a first lien loan facility that was consistent with arm's length loans from unaffiliated third parties with rights, protections and enforcement mechanisms that were standard, typical and commercially reasonable for an arm's length loan. I believed that is what he did.

42.    As of December 31, 2011, the outstanding principal and accrued but unpaid interest on my loans was an aggregate of $3,650,682.48. The loans were then

16

the primary obligation of Eber Metro, but all the loans were guaranteed by Eber Bros.' assets. The loans and the guarantee were then secured by a validly perfected first priority security interest in the assets of Eber Bros. (principally all the capital stock of Eber Metro) and in the assets of Eber Metro (principally all of Eber Metro's 79% ownership interest in Eber-CT). (See Exhibit 6, Guarantees and Assignments.)

43.     I assigned the loans to Alexbay, LLC ("Alexbay"), a newly formed Connecticut limited liability company owned by me to hold these loans. As of December 31, 2011, I had priority as a secured creditor over any claim by the Pension Benefit Guaranty Corporation ("PBGC") against Eber Bros. or Eber Metro, as well as over any claim of Harris Beach as an alleged general unsecured creditor of Eber Bros. UCC filings made by me to perfect my security interest were a matter of public record. (See Exhibit 7, UCC filings)

44.     Eber Metro did not repay the sums due as required under the Line of Credit Note and the Debt Assumption Agreement. Accordingly, demand for payment was made for the sums due, but no payment was made. On February 21, 2012, Alexbay filed an action in the New York Supreme Court for Monroe County, seeking a judicial determination, pursuant to New York Uniform Commercial Code Section 9-627, that Alexbay's acceptance of all of Eber Bros.' ownership interest in Eber Metro (and, indirectly, all of Eber Metro's 79% ownership interest in Eber-CT) in full satisfaction of the loans then held by Alexbay was "commercially reasonable."

45.     A judicial action is not required under New York law, but was commenced out of an abundance of caution to alert any potential creditors of the foreclosure. Alexbay named Southern as a party to the action because it had a UCC on file asserting

17

it was a secured creditor of Eber Bros. and Eber Metro. While Southern originally opposed the action, it ultimately did not take any action to frustrate it. On May 11, 2012, this Court granted Alexbay's motion and determined that the foreclosure was commercially reasonable. On June 5, 2012, all the capital stock of Eber Metro was transferred to Alexbay in satisfaction of the $3.65 million loans. This occurred almost 19 months before Judge Odorisi granted Harris Beach's now reversed summary judgment motion in its Underlying Collection Action on January 14, 2014.

46.    In the Winter of 2012, Eber-Ct continued to struggle. The economic recession still weighed heavily on the U.S. economy and on Eber-CT. Eber-CT continued to incur annual net losses (losing $908,800 for the fiscal year ended May 30, 2011 and $363,132 for the fiscal year ended May 30, 2012). The acquisition of Slocum still had not lived up to its expectations at all. Eber-CT suffered as a result of the aggressive competitive actions of Southern and other competitors and suppliers. All attempts to raise a new first lien credit facility or sell the company had failed to attract any interest. Eder Goodman's investment in Eber-CT had brought with it a number of negative covenant constraints on our flexibility in raising debt capital and in selling Eber-CT. It had also brought with it a partner who, for their own strategic reasons, really did not have any interest in seeing the company be sold or expand.

47.    In light of these continuing unfortunate circumstances, the value of the equity in Eber-CT in 2012 continued to be quite uncertain. It couldn't be derived at that time with any precision at all. It certainly could have been materially less than $3.65 million. I believed at the time that the value of Eber-CT's equity had not changed materially since the sale to Polebridge Bowman in 2010. Alexbay cited the 2010

18

investment by Polebridge Bowman in support of its request for a determination of commercial reasonableness, not just because it was the most recent sale, but also because the circumstances surrounding the company's business prospects or lack thereof in 2010 were substantially the same as they were in 2012. In both years, the company was weighed down by the economic recession and the other circumstances previously described. Those were the circumstances on which the value of Polebridge Bowman's investment was based in 2010. It was, I believed, not only the most recent but also the most relevant valuation.

48.    As I explained above, Eber-CT's motivation in buying Slocum in 2005 was driven by strategic and opportunistic considerations, as well as tax considerations and the expectation of material synergies stemming from being part of the family of Eber companies. It took place when Eber was an entirely different company trying to compete in a booming economy, and the expected material synergies were never realized as the demise of the Eber businesses described above precluded such realization.

49.    The competing motivations of Southern and Eder Goodman in 2007 were unique to their particular circumstances at that time. One was trying to buy its way into the Connecticut market; the other was paying to keep a competitor out of the same market. Their motivations and circumstances were completely different than mine in 2012, when Alexbay foreclosed on the $3.65 million loans to Eber Metro.

50.    For all these reasons, I did not believe that any of the transactions that occurred in the pre-recession period between 2005 and early 2008 were relevant in

19

2012, when we asked this Court for a determination of commercial reasonableness in

connection with Alexbay's foreclosure on the $3.65 million loans.

LESTER EBER

Sworn to before me this
24ᵗʰ day of June, 2015.

Notary Public

INGRID C. PALERMO
Notary Public, State of New York
Qualified in Monroe County
No. 02PA6170118
Commission Expires July 2, 20__

20

JAN 08 2001

## ELLIOTT W. GUMAER, jr.
### Cottage 494 – West 28th Street
#### P. O. Box 30478
#### Sea Island, GA 31561

January 2, 2001

PERSONAL AND CONFIDENTIAL

Mr. Lester Eber, President
Eber Bros. Wine & Liquor Corporation
155 Paragon Drive
Rochester, NY 14624

Dear Les:

As you know, I shall retire from Nixon Peabody at the close of the Firm's fiscal year on January 31st. I shall, however, remain a Trustee of the Alan Eber Trust (as was your father's wish) and shall continue as a Director and Consultant of the Eber Companies and as your personal counsel as Chief Executive Officer. The source of my compensation for the responsibilities assumed in those capacities will necessarily change. This letter addresses that issue.

You and I are familiar with our past practices. For the record, however, a bit of history may be helpful. Over the past twenty-five years or so, it has been our understanding that my compensation for the responsibilities assumed on behalf of your family and the Eber Companies would be derived from fees paid to Nixon Peabody (and it's predecessor firms) which would act as general counsel to the Companies overseeing all of the legal engagements to which the Companies (or the Eber Trust) would be a party. Following my retirement from the Firm, the Companies shall select whatever counsel we believe will most effectively represent our interests from time to time as we grow and judge each engagement independently. As a Director, I heartily endorse this procedure as being in the best interests of the Companies.

In New York State, a Trustee is compensated by a commission payable annually from the income and principal of the trust. While the amount of this commission varies depending of the value of the trust, a percentage of .003% is applicable to trusts with a principal value in excess of $1,000,000. The Eber Trust consists almost exclusively of stock of Eber Bros. & Co., Inc. and of its subsidiary companies for which there is no readily determinable market value. The book value of Eber Bros. & Co., Inc., however, at the close of it's last fiscal year was in excess of $20,000,000. While book value is by no means the best (or only) factor from which to determine a corporation's value, it is one of the factors which we can use to determine the magnitude of the responsibility which you and I share as a duty to your extended family.

PLAINTIFF'S
EXHIBIT
47
1|24|19
PENGAD 800-631-6989

As a Director and consultant to the Companies, I have endorsed your strategic plan to grow our companies thus enabling us to compete in an industry that has changed radically over the years since your father's death. We are a far different entity from twenty-five years ago, becoming a major player of which our competitors are acutely aware. I am confident that without your foresight and hard work implementing the necessary changes that we would now confront much more serious issues than we now face. I have always supported and encouraged you to move forward; and, to the extent that I am able, I look forward to continuing that relationship.

With the foregoing as historical reference, I would propose to you the following:

a.) I shall continue to waive any direct annual compensation as a Trustee of the Alan Eber Trust;

b.) I shall continue as a Director of the Eber Companies without any compensation commensurate with my responsibilities as a Director; and

c.) I shall continue to serve as a consultant to the Companies and as counsel to you, personally and as Chief Executive Officer.

As compensation for all of these duties, the Eber Companies will pay me an annual consulting fee of $40,000, payable quarterly on the first of February, May, August and November, beginning on February 1, 2001. This relationship shall remain in place until modified by you and me in the manner established by this letter. If you are comfortable with our understanding as stated herein, please initial a copy of this letter (provided for that purpose) and return it to me.

I look forward with enthusiasm to the years ahead.

Sincerely,

Elliott W. Gumaer, jr.

The terms and conditions of this letter are agreed by the Eber Companies.

Lester Eber - January    , 2001

Lester Eber -
President

**M** Gmail

elliott gumaer <ewgumaer@gmail.com>

___

## Compensation
1 message

elliot gumaer <ewgumaer@gmail.com>                                      Tue, Oct 29, 2013 at 6:30 PM
To: Wendy Eber <weber@slocumandsons.com>, Lester Eber <Leber@eberbros.com>

Greetings to you both.  I now am quite confident that the issues which you, Wendy, faced in turning Slocum and
Sons into a profitable enterprise will be successfully addressed. It is a pleasure to be with the Eber family in this
endeavor.

You will recall, I hope, our conversation last December when I was asked to continue as Director/Trustee
/confident.  While I was prepared to conclude my relationship after 40 or so years, I was happy to continue.  My
annual compensation for sometime has been $22,000, payable in quarterly installments. I have been paid
$11,000 so far this year.  In August, (at Wendy's request), I agreed to defer receipt until October to ease the
cash flow during the summer.  It is now a day or so shy of November.  Two months remain to complete the
annual commitment,. It could be that you are unaware that no compensation has ben paid since July.

I wish to accommodate you two as a member of the team. Lord knows that Lester has committed an incredible
amount to bring about the company's success..  I'm prepared to do my share if the kitty calls for it..  Please give
me your thoughts .  All the best. Mike



PLAINTIFF'S
EXHIBIT
48
1/24/19
PENGAD 800-631-6989

GUM000023
3/6/2017 3:11 PM

# EBER BROS. WINE & LIQUOR CORP.

Corporate Office
95 Allens Creek Rd., Bldg 2 Ste 10, Rochester, New York 14618
Phone: (585) 360-4240    Fax: (585) 360-4211

April 2, 2010

Dear Sally,

It was good talking to you. As I told you I am writing you to discuss with you the financial condition of the company, our capital needs and to offer you the opportunity to participate in a plan to provide capital to help the business.

As you know, the family business has experienced significant difficulties over the past few years. During that time we have liquidated several businesses and done our best to meet the company's financial obligations while operating a financially viable business. It hasn't been easy. Over the past few years I have cut my salary by over 50% and made every other cut I believed we could make while retaining a financially viable business.

Today we have one operating business that is substantially smaller than the original company. We believe that our Connecticut operation has the potential to be the foundation for the renewal of our business. But, our Connecticut business and its parent company are facing several financial issues. They both have liquidity issues and in order to meet our financial needs we have looked for outside financial support from several banks. Importunely they all have turned down our loan requests.

As a result of the businesses financial needs, Connecticut's growth opportunities and our failure to find a financial institution to provide us with an adequate financial option I offered to personally loan the company the capital it needed to meet its projected obligations this year. The amount of the loan is $1.5 million dollars. The loan is secured by the EBWL and Metro's equity interest in our Connecticut business. The board of directors recently approved the loan documents as well as our security arrangements.

For the next 30 days I will offer you the opportunity to participate in the loan. If you desire to participate you would be responsible for funding 1/3 of any advances to the company. To date I have advanced the company approximately $500,000. Therefore if you decide to participate in the loan you would be required to remit to me approximately $167,000 to reimburse me for my advances. Future advances would be in minimum increments of approximately $50,000 for each of us and could be done on a monthly basis.

I encourage you to review a copy of the loan documents, which I have attached to this letter. We have made substantial progress but are still in a loss position. Please discuss this opportunity with your financial and legal advisors. If you wish to move forward with the loan, please sign the enclosed confidentiality agreement and I will send you the company financial statements. Finally, please let me know if you would like any additional information about Eber Connecticut LLC.

Sincerely,

Lester Eber

PLAINTIFF'S
EXHIBIT
49
1/24/19
PENGAD 800-631-6989

KSH00004

Mr. Thomas B. Slocum, Stockholder Agent
P.O. Box 2136
554 Cedar Crest
Lake Ozark, MO 65049

Mr. Thomas B. Slocum
P.O. Box 2136
554 Cedar Crest
Lake Ozark, MO 65049

Mr. George E.B. Slocum
257 Newton Road
Woodbridge, Connecticut 06525

        Re:    Slocum & Sons of Maine, Inc. ("Slocum-Maine")

Dear Tom:

This Letter Agreement will confirm our understanding with respect to the option you granted to Eber Bros. Wine & Liquor Metro, Inc., exercisable at any time on or before December 31, 2008, to purchase all, but not less than all, of the outstanding stock of Slocum-Maine for an aggregate purchase price of $10.00 (the "Call Option") under that certain Agreement and Plan of Merger dated February 4, 2005, by and among Slocum & Sons, Inc., Slocum & Sons of Rhode Island, Inc., Slocum Maine, TGH of Connecticut, Inc., Eber Bros. Wine & Liquor Metro, Inc. ("Purchaser"), Eber-Connecticut, LLC, Eber-Rhode Island, LLC, Eber Bros. Win & Liquor Corporation and you, as amended by that letter agreement dated April 29, 2005 (the "Agreement"), pursuant to which

Each of you acknowledge and agree that:

1.     The Call Option has been extended to December 31, 2012.

2.     Each of you, jointly and severally, represent and warrant to Purchaser and its nominees that:

     a. Slocum Maine is a corporation duly organized, validly existing and in good standing under the laws of the State of Maine.

     b. The entire authorized capital stock of the Slocum Maine consists of five thousand (5,000) shares of a single class of common stock, no par value, of which Two Hundred (200) shares are issued and outstanding (the "Stock"). There are no outstanding or authorized options, warrants, purchase rights, subscription rights,

{N0923886;2}



conversion rights, exchange rights, or other contracts or commitments that require Slocum Maine to issue, sell or otherwise cause to become outstanding any of its capital stock. There are no outstanding or authorized stock appreciation, phantom stock, profit participation, or similar rights with respect to the Slocum Maine. There are no voting trusts, proxies, or other agreements or understandings with respect to the voting of the capital stock of the Slocum Maine. There are no agreements or understandings restricting or otherwise relating to the transfer or voting of any such capital stock. All of the outstanding shares of the Slocum Maine are fully paid and nonassessable.

c. Each of you own and hold of record and beneficially and have good and marketable title to, the number of shares of stock set forth opposite each of your names, which stock represents all of the issued and outstanding shares of stock or equity securities of the Slocum Maine:

| Name of Seller | Shares of Stock |
| --- | --- |
| Thomas B. Slocum | 100 |
| George E.B. Slocum | 100 |

d. All of the shares so owned and held by each of you are free and clear of all mortgages, liens, pledges, charges, claims, security interests, proxies, voting agreements, voting trusts and other encumbrances or restrictions of any kind (collectively, "Encumbrances"). Except for the obligations of each of you under this Agreement, there are no obligations binding on either of you which require either of you to sell, transfer, assign, pledge or mortgage any of the Stock. Upon the purchase by Purchaser of the Stock, good and marketable title to the Stock will be vested in Purchaser (or its nominees) free and clear of all Encumbrances.

3.   The Purchaser hereby exercises the Call Option.

4.   Together with the execution and delivery of this Letter Agreement, George E.B. Slocum will deliver a fully executed stock power transferring all of his shares to Lester Eber and Thomas B. Slocum will deliver a fully executed stock power transferring all of his shares to Wendy Eber, each together with each of your original stock certificates.   Upon the delivery of such certificates and stock powers and recording of such transfer on the books of Slocum Maine, all right, title and interest in and to the shares beneficially and of record, shall vest in Wendy Eber and Lester Eber in proportion to the respective numbers of shares transferred to each.

5.   This Letter Agreement shall be by the law of the State of Connecticut without regard to its conflicts of law principles.

Kindly indicate your agreement with the foregoing by signing in the space indicated below and returning this Letter Agreement to the undersigned.

[signatures on the following page]

{N0923886;2}

EB-00033772

Very truly yours,

EBER BROS. WINE & LIQUOR METRO, INC.

By: _Wendy Eber_
    Name: Wendy Eber
    Title: CFO

Accepted and agreed this ___ day of July, 2012.

_____
Thomas B. Slocum, Stockholder Agent

_____
Thomas B. Slocum, individually

_____
George E.B. Slocum

{N0923886;2}

EB-00033773