EBER BROS. WINE & LIQUOR METRO, INC.
155 Paragon Drive
Rochester, New York 14624

January 29ᵗʰ, 2008

Eder-Goodman, LLC
c/o Eder Bros., Incorporated
11 Eder Road
West Haven, Connecticut 06516
Attn: Richard M. Weiss, Manager

Eder-Goodman, LLC
c/o Allan S. Goodman, Incorporated
180 Goodwin Street
East Hartford, Connecticut 06108
Attn: David Heller, Manager

Re:    Sale of Interest in Eber-Connecticut, LLC (the "Company")

Dear Richard and Dave:

        This letter agreement ("Agreement") is between Eder-Goodman, LLC, a Connecticut limited liability company ("Buyer"), Eber Bros. Wine & Liquor Metro, Inc., a New York corporation ("Eber"), and Eber-Connecticut, LLC, a Delaware limited liability company (the "Company"), and sets forth the terms and conditions upon which Buyer has agreed to loan $4,500,000 to the Company and the terms and conditions upon which Buyer will invest $4,500,000 in the Company and acquire a 15% membership interest in the Company:

        1.    Loan. Upon execution of this Agreement, Buyer will loan to the Company $4,500,000 (the "Loan") pursuant to the terms and conditions of a certain Promissory Note in the form attached hereto as Exhibit A (the "Note"). The Loan is secured by all of the assets of the Company pursuant to the terms and conditions of a Security Agreement, in the form attached hereto as Exhibit B (the "Security Agreement"). All amounts owing under the Note and the security interest granted to the Buyer in the assets of the Company will be subject and subordinate in all respects to the amounts owing from time to time from the Company to The Canandaigua National Bank and Trust Company ("CNB"), up to a maximum principal amount of $3,000,000 (excluding interest, fees and costs), and the security interest in the Company's assets granted to CNB by the Company. In accordance with the foregoing, Buyer is entering into an Intercreditor Agreement in the form attached hereto as Exhibit C (the "Intercreditor Agreement"). The Loan is further secured by a Limited Recourse Guaranty and Pledge made by Eber in favor of Buyer in the form attached hereto as Exhibit D (the "Guaranty").

        2.    Sale of Ownership Interest. The Company hereby agrees to sell to Buyer, and Buyer hereby agrees to purchase from the Company, a 15% ownership interest in the Company (the "Units") for a purchase price of $4,500,000. The closing of the sale of the Units by the Company to Buyer (the "Closing") shall be conditioned only upon (a) the receipt by the Company of all necessary Regulatory Approvals, as such term is defined below, for such sale, and (b) for the benefit of Buyer only, the absence of the occurrence of any Event of Default under the Note. The Closing shall take place not more than five (5) business days following the receipt of the Regulatory Approvals. The Purchase Price shall be paid by forgiving all amounts outstanding under the Note, including all principal and interest accrued thereon, if any. At the closing, Buyer, Eber and the Company shall enter into the Amended and Restated Limited Liability Company Agreement of Eber-Connecticut,___

-1-



PLAINTIFF'S EXHIBIT
56
2/27/19 ao
PENGAD 800-631-6989

LLC in the form attached hereto as Exhibit E (the "LLC Agreement"). The parties agree to work in good faith to obtain all necessary Regulatory Approvals as quickly as practicable following the execution of this Agreement. For purposes hereof, "Regulatory Approvals" shall mean: (i) a "final approval" from the Department of Consumer Protection as may be required under Title 30 of the Connecticut General Statutes and the Regulations promulgated there under, including but not limited Regulation 30-6-A4; and (ii) the furnishing of notice to the U.S. Department of Treasury, Alcohol and Tobacco Tax and Trade Bureau as may be required under Title 27 U.S.C. and the regulations promulgated there under, including but not limited to 27 CFR Subchapter A §1.42. For the purposes of this section "final approval" shall mean any approval from which an administrative or other subsequent action could be taken but for which the requisite time period for commencing such action has passed with no such action having been commenced or, if any such action is commenced, upon the exhaustion of all available remedies and with the proceedings terminating with a favorable determination.

3. Representations and Warranties.

a. Representations and Warranties of Eber and the Company. Eber and the Company represent and warrant to Buyer as follows:

(i) Eber is duly incorporated, validly existing and in good standing as a corporation under the law of the State of New York. The Company is duly organized, validly existing and in good standing as a limited liability company under the law of the State of Delaware, and is duly qualified and in good standing as a foreign limited liability company in the State of Connecticut. Eber is the sole member of the Company, and no third party holds any membership interests or units or other securities of any nature of the Company, or options, warrants or other rights to acquire membership interests, units or other securities of any nature of the Company.

(ii) Eber and the Company each has all necessary right, power and authority to execute, deliver and perform this Agreement and each of the Note, the Security Agreement, the Intercreditor Agreement, the Guaranty and the LLC Agreement (the "Other Documents") to which it is or is to be a party, and has obtained all necessary shareholder, board of director, member and manager consents to do the same. Neither the execution, delivery nor performance of this Agreement or any of the Other Documents by Eber and/or the Company will, either alone or with the giving of notice or the passage of time, (A) violate any law, statute, ordinance, rule, regulation, judgment or order binding upon Eber, the Company or any affiliate of either of them, (B) violate any of the organizational or governance documents of Eber or the Company, or (C) violate, or give rise to any lien, claim or other encumbrance under, any agreement, contract, instrument or other obligation of or binding upon Eber, the Company or any affiliate of them or the property or assets of any of the foregoing.

(iii) This Agreement and each of the other Documents to which it is, or is to be, respectively a party constitutes the legal, valid and binding obligation of Eber and the Company, enforceable against Eber and the Company in accordance with its terms.

(iv) The financial statements of the Company, copies of which are attached hereto as Exhibit F (the "Financial Statements"), were prepared in accordance with generally accepted accounting principles consistently applied and accurately reflect the financial condition and results of operations of the Company as of the dates and for the periods thereof, subject to normal

-2-

EB-00017088

year end adjustments which will not be material in amount and the absence of footnote disclosures, and provided that immediately prior to the making of the Loan, all amounts owing by the Seller to Eber Bros. Wine and Liquor Corporation ("EBWLC") will be satisfied by the payment of $4,500,000 by delivery of a promissory note in such amount to EBWLC (the "EBWLC Note") and the assignment to EBWLC of all amounts owing to the Company from Eber-Rhode Island, LLC (the "Clean-up Transactions"). Upon the completion of the Clean-up Transactions the Company has no obligations to EBWLC or to any affiliate of EBWLC or the Company (including Eber and Lester Eber and members of his immediate family), and neither BBWLC nor any affiliate of EBWLC or the Company (including Eber and Lester Eber and members of his immediate family) has any obligation to the Company. Upon receipt of the proceeds of the Loan, the same will be applied to pay the EBWLC Note in full, either by payment to EBWLC and/or to one or more third parties at EBWLC's direction.

      b.    Representations and Warranties of Buyer. Buyer represents and warrants to Eber and the Company as follows:

      (i)    Buyer is duly organized, validly existing and in good standing as a limited liability company under the law of the State of Connecticut.

      (ii)    Buyer has all necessary right, power and authority to execute, deliver and perform this Agreement and each of the Other Documents to which it is or is to be a party, and has obtained all necessary member and manager consents to do the same. Neither the execution, delivery nor performance of this Agreement or any of the Other Documents by Buyer will, either alone or with the giving of notice or the passage of time, (A) violate any law, statute, ordinance, rule, regulation, judgment or order binding upon Buyer or any affiliate of it, (B) violate any of the organizational or governance documents of Buyer, or (C) violate, or give rise to any lien, claim or other encumbrance under, any agreement, contract, instrument or other obligation of or binding upon Buyer or any affiliate of it or the property or assets of any of the foregoing.

      (iii)    This Agreement and each of the other Documents to which it is, or is to be, a party constitutes the legal, valid and binding obligation of Buyer, enforceable against Buyer in accordance with its terms.

      (iv)    Subject to the conditions hereof concerning such purchase, Buyer will purchase the Units for Buyer's own account and for investment and not with a view toward the distribution thereof. Buyer understands that the Units have not been registered under the Securities Act of 1933 (the "Securities Act") or the securities laws of any state and will be sold in reliance on an exemption from registration requirements. Buyer represents, warrants and agrees that it will not sell or otherwise transfer the Units without registration under the Securities Act or an exemption therefrom. Buyer acknowledges that because of the restrictions on the transferability of the Units, Buyer must bear the economic risk of such the investment in the Units for an indefinite period of time.

    4.    Other Agreements.

      a.    From and after the date hereof until the first to occur of (a) the Buyer has purchased the Units or (b) the first anniversary of the date of this Agreement, the Company shall not (i) make any distributions to Eber, the sole member of the Company, except for cash distributions in

-3-

EB-00017089

an amount no greater than the tax liability of Buyer arising from the taxable income of the Company ("Tax Distributions"), or (ii) issue any membership interests or units or other securities of any nature, or options, warrants or other rights to acquire membership interests, units or other securities of any nature to any third party.

    b.  From and after the date hereof until such time as the Buyer has purchased the Units or the Note has been paid in full, the parties hereto shall be bound by Sections 3.4, 5.4.3, 5.4.4, 5.4.5, 5.4.7, 5.4.8, 5.4.9, 7.3.1, 8.1, 8.4, 8.5 and 8.6 of the LLC Agreement as though such provisions were fully set forth in this Agreement, which provisions shall be interpreted and construed as though Buyer is the "Minority Member" and Eber is the "Majority Member," as such terms are defined in the LLC Agreement.

    c.  The Company and Eber agree, jointly and severally, from and after the date of this Agreement, provided that the Buyer has not theretofore purchased the Units and the Note has not been paid in full, if the Company makes any distribution to Eber other than a Tax Distribution, 15% of such distribution shall be paid directly to the Buyer and shall be applied to the partial or full, as applicable, repayment of the Note. Lester Eber guaranties the payment of such amounts to Buyer, and Buyer may proceed against Lester Eber for any amounts not so paid to Buyer without first having to proceed against the Company or Eber.

    5.  General.

    a.  The terms and conditions of this Agreement, including its existence, shall remain confidential. Each party agrees that neither it nor any of its affiliates will disclose to anyone (other than their respective attorneys, accountants and financial institutions) their negotiations or any information concerning the transaction contemplated herein, whether before or after the consummation thereof, without the prior consent of Buyer and Eber, which consent will be required with respect to the contents as well as the fact of any such disclosure. Each party hereby acknowledges and agrees that a violation of this Section 5(a) would cause irreparable injury to the non-breaching party(ies), not adequately compensated by money damages. Accordingly, any non-breaching party may seek and obtain injunctive relief (without the need for a bond or other security therefor) against the breach or threatened breach of this Section 5(a), in addition to any other legal remedies that may be available to it. Notwithstanding the foregoing, nothing herein shall be interpreted or construed to prohibit any party from disclosing (i) to any applicable regulatory body any information necessary to obtain the Regulatory Approvals or (ii) otherwise disclosing any information to any party to the most limited extent required by applicable law.

    b.  Any and all controversies arising out of or relating to this Agreement shall be resolved by final and binding arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association for complex cases, and judgment upon the award rendered by the Arbitrator may be entered in any court having jurisdiction thereof. Notwithstanding anything to the contrary, the Commercial Arbitration Rules shall be modified as follows:

      (i)  The place of hearing shall be North Haven, Connecticut.

EB-00017090

(ii)     The arbitration shall be before a panel of three (3) arbitrators. Eber on the one hand, and Buyer on the other hand, shall each select one (1) arbitrator. The two (2) arbitrators so selected shall select the third (3rd) arbitrator.

(iii)    The Arbitrators shall be governed by the laws of the State of Connecticut.

(iv)    The Arbitrators' award shall be made within thirty (30) days after the hearing.

(v)     No party shall waive the right to arbitration, unless Eber and Buyer both so agree.

(vi)    The Arbitrators shall award all costs and attorneys' fees to the prevailing party, including reimbursement of the Arbitrators' fees.

(vii)   The parties intend to resolve all of their disputes as expeditiously as possible in a single, binding arbitration. Thus, if a dispute arises over or relating to this Agreement or any of the transactions contemplated hereby at the same time that there is a pending issue arising out of or related to any Other Documents, the Arbitrators shall endeavor to consolidate all disputes into a single arbitration proceeding, unless the posture of the proceedings would make consolidation a manifest waste of party resources or would impose an undue hardship on one of the parties.

c.    The terms and conditions set forth in this Agreement, except to the extent expressly set forth herein, shall be binding on each of the parties hereto, their successors and/or assigns.

If you are in agreement with the terms and conditions set forth in this letter, please evidence your agreement by signing this letter in the space provided below.

Sincerely,

*Lester Eber*

Lester Eber, President of Eber and the Company

-5-

Acknowledged and Agreed to this 29 th

Day of January, 2008:

Eder-Goodman, LLC

By: *Richard M Weiss, Manager*                    By:  :_____

     Richard M. Weiss, Manager                         David Heller, Manager

Solely for purposes of Section 4(c) hereof:

_____

Lester Eber, Individually

-6-

Acknowledged and Agreed to this 29ᵘ

Day of January, 2008:

Eder-Goodman, LLC

By: _____

    Richard M. Weiss, Manager

Solely for purposes of Section 4(c) hereof:

_____

Lester Eber, Individually

By: _____

    David Heller, Manager

-6-

EB-00017093

Acknowledged and Agreed to this ___

Day of January, 2008:

Eder-Goodman, LLC

By: _____          By: _____

Richard M. Weiss, Manager                David Heller, Manager

Solely for purposes of Section 4(c) hereof:

_____

Lester Eber, Individually

-6-

EB-00017094

## AMENDED AND RESTATED
## LIMITED LIABILITY COMPANY AGREEMENT
## OF
## EBER-CONNECTICUT, LLC

This Amended and Restated Limited Liability Company Agreement (this "Agreement") of EBER-CONNECTICUT, LLC (the "Company"), dated as of April 1, 2008, is by and among EBER-CONNECTICUT, LLC, a Delaware limited liability company having its principal offices located at 30 Corporate Drive, North Haven, Connecticut 06473 (the "Company"), and the entities that are admitted as members and whose names appear on Schedule A to this Agreement (the "Members").

WHEREAS, the Company was formed on February 16, 2005 as a limited liability company pursuant to and in accordance with the Delaware Limited Liability Company Act (6 Del. C. " 18-101 et seq.), as amended from time to time (the "Act"); and

WHEREAS, the Members desire that this Agreement constitute the Limited Liability Company Agreement of the Company within the meaning of Section 18-201(d) of the Act to supersede and completely replace any Limited Liability Company Agreement heretofore entered into by and among the Company and the Members, or either of them and/or any prior member of the Company;

NOW, THEREFORE, the Members states as follows:

## SECTION 1
## DEFINED TERMS

1.1.   **Definitions.** When used in this Agreement, the following terms not otherwise defined herein, shall have the following meanings:

"Act" has the meaning set forth in the preamble to this Agreement.

"Adjusted Capital Account Deficit" means, with respect to any Member, the deficit balance, if any, in the Member's Capital Account as of the end of each fiscal year, after:

(i)   adding to such Capital Account any amounts that such Member is obligated to restore pursuant to any provision of this Agreement or is deemed to be obligated to restore in conformity with the penultimate sentences of Treas. Reg. §§ 1.704-2(g)(1) and 1.704-2(i)(5); and

(ii)   subtracting from such Capital Account the items described in Treas. Reg. § 1.704-1(b)(2)(ii)(d)(4), (5) and (6).

"Affiliate" means, with respect to any Person, said Person's parent, spouse or lineal descendant, as well as any other Person directly or indirectly controlling, controlled by or under common control with such Person on or after the date of this Agreement. For the purposes of this Agreement, "control" when used with respect to any Person, means the possession, directly

134782 951048.2


PLAINTIFF'S
EXHIBIT
57
2/27/19 ao

or indirectly, of the power to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or individuals holding comparable positions) of such Person, or (b) direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"Agreement" means this Amended and Restated Limited Liability Company Agreement of the Company, together with the Schedules attached hereto, as amended, restated or supplemented or otherwise modified from time to time in accordance with the terms hereof.

"Board" or "Board of Managers" means the Board of Managers of the Company.

"Capital Account" means, with respect to any Member, the Capital Account maintained for such Member in accordance with the following provisions:

(i)     To each Member's Capital Account there shall be credited such Member's Capital Contributions, such Member's allocable share of Profits and any items in the nature of income or gain which are specially allocated pursuant to Section 4.3 hereof, and the amount of any Company liabilities assumed by such Member or which are secured by any Company Property distributed to such Member;

(ii)     To each Member's Capital Account there shall be debited the amount of cash and the Gross Asset Value of any Company Property distributed to such Member pursuant to any provision of this Agreement, such Member's allocable share of Losses and any items in the nature of expenses or losses which are specially allocated pursuant to Section 4.3 hereof, and the amount of any liabilities of such Member assumed by the Company or which are secured by any Company Property contributed by such Member to the Company;

(iii)     In the event any Ownership Interest in the Company is transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent it relates to the transferred Ownership Interest; and

(iv)     In determining the amount of any liability for purposes of subparagraphs (i) and (ii) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Treasury Regulations.

The foregoing provisions and the other provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Treasury Regulations Section 1.704-1(b), and shall be interpreted and applied in a manner consistent with such Treasury Regulations. The Board of Managers is empowered to make modifications to the manner in which Capital Accounts are computed if it is determined that such adjustments are necessary in order to comply with such Treasury Regulations, provided that such adjustments are not likely to have a material effect on the amounts distributable to a Member hereunder upon the dissolution of the Company in accordance with Section 9.4 hereunder.

"Capital Contribution" shall mean the money and the Gross Asset Value of any other property contributed by the Members to the capital of the Company, and shall include the

2

EB-00022872

Members' capital contributions up to the date of this Agreement, being $4,500,000 in the case of the Minority Member and deemed to be $25,500,000 in the case of the Majority Member, and any additional capital contributions hereafter made by the Members in accordance with Section 3.2 hereof.

"Cash Flow" shall mean the total cash receipts of the Company, less (a) costs of goods sold and all operating expenses of the Company (other than expenses not involving cash expenditures, such as depreciation), (b) all principal payments on loans made to the Company or secured by property of the Company, (c) capital expenditures, and (d) reserves for working capital or other purposes in such amounts as the Board may determine.

"Certificate of Formation" means the Certificate of Formation of the Company filed with the Secretary of State of the State of Delaware on February 16, 2005, as amended or amended and restated from time to time. A copy of the Certificate of Formation as in effect on the date of this Agreement is annexed hereto as Schedule D.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Company" means Eber-Connecticut, LLC, a Delaware limited liability company.

"Company Property" means, at any time, all property (whether real, personal or mixed, tangible or intangible) in which the Company holds an ownership interest.

"Covered Persons" has the meaning set forth in Section 10.1 of this Agreement.

"Depreciation" shall mean, for each Fiscal Period or other period, an amount equal to the depreciation, amortization or other cost recovery deduction allowable under the Code with respect to an asset for such Fiscal Period or other period, except that if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such Fiscal Period or other period, Depreciation shall be an amount which bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Period or other period bears to such beginning adjusted tax basis; provided, however, that if the federal income tax depreciation, amortization or other cost recovery deduction for such Fiscal Period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Board of Managers.

"Distribution" shall mean cash or other property, from any source, including Cash Flow, distributed to the Members by the Company. All Distributions shall be made in accordance with this Agreement.

"Employment Agreements" shall mean that certain Employment Agreement, dated as of April 1, 2006, by between the Company and Thomas B. Slocum, as amended to date, and that certain Employment Agreement, dated as of April 1, 2006, by and between the Company and George E.B. Slocum, as amended to date.

3

EB-00022873

"Fiscal Period" shall mean the period from June 1 to May 31 of each year or such portion thereof as the Company shall be in existence; provided, however, that the first Fiscal Period shall commence on the date of this Agreement and conclude on the next succeeding May 31.

"Guaranteed Purchase Price" means the minimum amount to be paid to the Minority Member on account of the sale of all or substantially all of the assets of the Company and/or the liquidation of the Company, or upon the sale of the Minority Member's Units, which shall be in an amount of $4,500,000, less all the sum of all Distributions previously paid to the Minority Member pursuant to Section 7.3.2, Section 7.3.3, Section 8.5, and/or Section 8.6.

"Gross Asset Value" means, with respect to any Company Property, such property's adjusted basis for federal income tax purposes, except as follows:

(i)     The Gross Asset Value of any property contributed by any Member to the Company initially shall be the gross fair market value of such property at the time of its contribution to the Company;

(ii)    The Gross Asset Value of all Company Property shall be adjusted to equal the respective gross fair market values of such property as of the following times: (x) the acquisition of additional Units in the Company by any new or existing Member in exchange for more than a *de minimis* Capital Contribution; (y) the distribution by the Company to a Member of more than a *de minimis* amount of Company Property as consideration for Units in the Company; or (z) the liquidation of the Company within the meaning of Treasury Regulations Section 1.704-1(b)(2)(ii)(g); provided, however, that adjustments pursuant to clauses (x) and (y) above shall be made only if the Board of Managers determines that such adjustments are necessary or appropriate to reflect the relative economic interests of the Members in the Company;

(iii)   The Gross Asset Value of any Company Property distributed to a Member shall be adjusted to equal the gross fair market value of such property on the date of distribution as reasonably determined by the Board of Managers; and

(iv)    The Gross Asset Value of Company Property shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such Property pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining the Capital Accounts pursuant to Treasury Regulation Section 1.704-1(b)(2)(iv)(m), subparagraph (vi) under the definitions of Profits and Losses below and Section 4.3 hereof; provided, however, that Gross Asset Value shall not be adjusted pursuant to this subparagraph (iv) to the extent the Board of Managers reasonably determine that an adjustment pursuant to subparagraph (ii) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this subparagraph (iv).

If the Gross Asset Value of Company Property has been determined or adjusted pursuant to subparagraphs (i), (ii), or (iv) above, then such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such Company Property for purposes of computing Profits and Losses.

4

EB-00022874

"Majority-in-Interest" shall mean the Member(s) whose aggregate Percentage Interest constitutes more than one-half of the aggregate Percentage Interests in the Company.

"Majority Member" shall mean Eber Bros. Wine & Liquor Metro, Inc. and its permitted transferees, successors and assigns.

"Managers" mean the Persons elected to the Board of Managers from time to time by the Members. Each Manager is hereby designated as a "manager" of the Company within the meaning of Section 18-101(10) of the Act, subject, however, to the last sentence of Section 5.1.8.

"Member Nonrecourse Debt" shall have the same meaning as "partner nonrecourse debt," as set forth in Section 1.704-2(b)(4) of the Treasury Regulations.

"Member Nonrecourse Debt Minimum Gain" shall mean an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt was treated as a nonrecourse liability, determined in accordance with Section 1.704-2(i)(3) of the Treasury Regulations.

"Member Nonrecourse Deductions" shall have the same meaning as "partner nonrecourse deductions," as set forth in Sections 1.704-2(i)(1) and 1.704-2(i)(2) of the Treasury Regulations.

"Minimum Gain" means an amount determined by computing, with respect to each Nonrecourse Liability of the Company, the amount of gain (of whatever character), if any, that would be realized by the Company if it disposed of (in a taxable transaction) the Company asset subject to the Nonrecourse Liability in full satisfaction thereof, and then aggregating the amounts so computed, such computation to be made in accordance with Treas. Reg. §§ 1.704-2(b)(2) and 1.704-2(d).

"Minority Member" shall mean Eder-Goodman, LLC, a Connecticut limited liability company, and its permitted transferees, successors and assigns.

"Nonrecourse Deduction" has the definition set forth in Treas. Reg. § 1.704-2(b)(1).

"Nonrecourse Liability" has the definition set forth in Treas. Reg. §1.752-1(a)(2).

"Officer" means an officer of the Company described in Section 5.2 of this Agreement.

"Ownership Interests" mean the ownership interests of the Company. Ownership Interests are denominated as Units for purposes of this Agreement, and there are currently 100 Units issued and outstanding, which are held as indicated on Schedule A annexed hereto.

"Percentage Interest" shall mean, with respect to each Member, the percentage interest in the Company owned by such Member as set forth on Schedule A annexed hereto, as the same may be changed from time to time in accordance with this Agreement.

"Person" means any individual, corporation, partnership, joint venture, limited liability company, limited liability partnership, association, joint stock company, trust, unincorporated

5

EB-00022875

organization, or other organization, whether or not a legal entity, and any governmental authority.

"Profits" and "Losses" means, for any Fiscal Period, an amount equal to the taxable income or loss of the Company for such Fiscal Period, determined in accordance with Section 703(a) of the Code (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to section 703(a)(1) of the Code will be included in taxable income or taxable loss), with the following adjustments:

(i)     Any income of the Company that is exempt from U.S. federal income tax and that is not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" and "Losses" will be added to such taxable income or taxable loss;

(ii)     Any expenditures of the Company described in Section 705(a)(2)(B) of the Code (or treated as an expenditure under Section 705(a)(2)(B) of the Code pursuant to Section 1.704-1(b)(2)(iv)(i) of the Treasury Regulations) that is not otherwise taken into account in computing Profits and Losses pursuant to this definition of "Profits" and "Losses" will be subtracted from such taxable income or taxable loss;

(iii)     In the event that the Gross Asset Value of any item of Company Property is adjusted pursuant to subparagraphs (ii) and/or (iii) of the definition of Gross Asset Value, the amount of such adjustment will be taken into account as gain or loss from the disposition of such item of Company Property for purposes of computing Profits and Losses;

(iv)     Gain or loss resulting from any disposition of any item of Company Property with respect to which gain or loss is recognized for U.S. federal income tax purposes will be computed by reference to the Gross Asset Value of such item of Company Property disposed of, notwithstanding that the adjusted tax basis of such item of Company Property differs from its Gross Asset Value;

(v)     In lieu of depreciation, amortization or other cost recovery deductions taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for said Fiscal Period, computed in accordance with the definition of Depreciation;

(vi)     To the extent that an adjustment to the Gross Asset Value of any Company Property pursuant to Section 734(b) or Section 743(b) of the Code is required, pursuant to Section 1.704-1(b)(2)(iv)(m)(4) of the Treasury Regulations, to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of all of a Member's Units, the amount of such adjustment will be treated as an item of gain (if the adjustment increases the basis of such Company Property) or loss (if the adjustment decreases the basis of such Company Property) from the disposition of such Company Property and will be taken into account for purposes of computing Profits or Losses; and

(vii)     Any items of income, gain, loss or deduction that are specially allocated pursuant to Section 4.3 will not be taken into account in computing Profits or Losses.

6

EB-00022876

The amount of the items of income, gain, loss or deduction available to be specifically allocated pursuant to Section 4.3 shall be determined by applying rules analogous to those set forth in subparagraphs (i)-(vi) above.

"Tax Matters Member" means the "tax matters partner" as defined in the Code, who shall be the Majority Member.

"Treasury Regulations" shall mean the proposed, temporary and final regulations promulgated under the Code and the corresponding sections of any regulations subsequently issued that amend or supersede such regulations.

"Unanimous Consent of All the Members" shall mean the consent of 100% of the Members, whose aggregate Percentage Interest constitutes 100% of the aggregate Percentage Interest in the Company.

"Units" mean the units of Ownership Interest in the Company issued and outstanding from time to time. As of the date of this Agreement there are 100 Units issued and outstanding, which are held in the manner set forth on Schedule A annexed hereto. Majority Member acknowledges and agrees that the 85 Units held by it as of the date of this Agreement supersede and replace in all respects the 100 Units it held in the Company prior to the effectiveness of this Agreement.

> **1.2.   Rules of Construction.**

Definitions in this Agreement apply equally to both the singular and plural forms of the defined terms. The words "include" and "including" shall be deemed to be followed by the phrase "without limitation." The terms "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Section, paragraph or subdivision. The Section titles appear as a matter of convenience only and shall not affect the interpretation of this Agreement. All Section, paragraph, clause, or Schedule references not attributed to a particular document shall be references to such parts of this Agreement.

## SECTION 2
## FORMATION; PURPOSE

**2.1.   Name.**  The name of the limited liability company governed hereby is Eber-Connecticut, LLC. The name of the Company may be changed, and the Company may use any trade names or fictitious names, from time to time, all as determined by the Board.

**2.2.   Principal Business Office.**  The principal business office of the Company shall be located at 30 Corporate Drive, North Haven, Connecticut 06473 or such other location as may hereafter be determined by the Board.

**2.3.   Registered Office.**  The address of the registered office of the Company in the State of Delaware is 3500 South DuPont Highway, Dover, Delaware 19901, or at such other address as may be determined by the Board.

7

EB-00022877

2.4. **Registered Agent.** The name and address of the registered agent of the Company for service of process on the Company in the State of Delaware is Incorporating Services, Ltd., 3500 South DuPont Highway, Dover, Delaware 19901 or at such other address as may be determined by the Board.

2.5. **Members.** The mailing address each Member is set forth on Schedule A attached hereto. Each Member was admitted to the Company as a member of the Company upon its execution of this Agreement.

2.6. **Certificates.** The actions of Carla J. Penazek, as an "authorized person" within the meaning of the Act, executing, delivering and filing the Certificate of Formation of the Company with the Secretary of State of the State of Delaware, are hereby ratified and approved by the Company. Upon the filing of the Certificate of Formation with the Secretary of State of the State of Delaware, her powers as an "authorized person" ceased, and the Managers thereupon became the designated "authorized person" and shall continue as the designated "authorized person." The Managers or an Officer shall execute, deliver and file any other certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in Delaware and in any other jurisdiction in which the Company may wish to conduct business.

The existence of the Company as a separate legal entity shall continue until cancellation of the Certificate of Formation as provided in the Act.

2.7. **Purposes.** The purpose of the Company is to engage in any lawful act or activity and to exercise any powers permitted to limited liability companies organized under the laws of the State of Delaware.

2.8. **Power of the Company.** The Board of Managers and the Officers of the Company on behalf of the Company (i) shall have and exercise all powers necessary, convenient or incidental to accomplish its purposes as set forth in Section 2.7, and (ii) shall have the right to exercise all of the powers and rights conferred upon limited liability companies formed pursuant to the Act. The foregoing authorization shall not be deemed a restriction on the powers of the Managers or Officers to enter into other agreements on behalf of the Company in accordance with the terms of this Agreement.

## SECTION 3
## CAPITAL CONTRIBUTIONS AND CAPITAL ACCOUNTS

3.1. **Capital Accounts.** A separate Capital Account shall be maintained for each Member and shall be credited with the amount of each Member's initial and subsequent Capital Contributions and such Member's share of the Company's Profits as determined in Section 4 hereof. Each such Capital Account shall be charged to reflect all Distributions and withdrawals of a Member's capital and such Member's share of the Company's Losses. The Capital Account of each of the Members, as of the date of this Agreement, is reflected on Schedule A annexed hereto.

3.2. **Additional Capital Contributions.** If the Board of Managers determines that additional Capital Contributions are required for the operation of the Company, each Member

8

EB-00022878

shall have the right, but not the obligation, to participate in such Capital Contributions in an amount equal to the aggregate amount of such Capital Contributions multiplied by such Member's Percentage Interest. No Member is required to make any additional Capital Contribution to the Company except upon the Unanimous Consent of All the Members; for the avoidance of doubt, no Member shall at any time, whether prior to or following the dissolution or liquidation of the Company, be required to make any Capital Contribution to restore any negative Capital Account Balance, whether such negative Capital Account Balance arises prior to or as a result of any liquidating distribution pursuant to Section 9.4. The provisions of this Agreement, including this Section 3.2, are intended to benefit the Members and, to the fullest extent permitted by law, shall not be construed as conferring any benefit upon any creditor of the Company (and no such creditor of the Company shall be a third-party beneficiary of this Agreement) and the Members shall not have any duty or obligation to any creditor of the Company to make any contribution to the Company or to issue any call for capital pursuant to this Agreement.

**3.3.    No Priority.** Subject to the provisions of Sections 4.6, 8.2, 8.3 and 9.4, or any other provision hereof pertaining to the Minority Member's right to receive the Guaranteed Purchase Price, no Member shall have priority over any other Member as to the return of Capital Contributions, the allocation of Profits or Losses, or Distributions.

**3.4.    Loans.** Subject to Section 5.4, any Member may, at any time at such Member's option and without obligation to do so, make or cause a loan to be made to the Company in any amount and on those terms as approved by the Board of Managers, provided that the terms of such loan shall be negotiated at arm's length. In the event that the Board of Managers determines to obtain a loan from any Member, the Board of Managers shall notify each Member of the terms and conditions on which such loans will be made, and each Member shall have three (3) business days to notify the Company of such Member's intent to loan to the Company up to its pro-rata share (based on Percentage Interest) of the funds to be loaned upon the terms and conditions set forth in such notice. If either Member determines not to fund its pro-rata share of such loan, then the other Member shall have the option (but not the obligation) to loan the deficiency to the Company upon the terms and conditions set forth in the notice delivered to the Members pursuant to this Section 3.4.

**3.5.    Member's Interest.** Each Member's Units shall for all purposes be personal property. All real and other property owned by the Company shall be deemed owned by the Company as a limited liability company, and no Member, individually, shall have any individual ownership rights in and to such property. No Member shall have any right of partition with respect to assets of the Company.

**3.6.    Withdrawal by Members.** No Member shall have the right to withdraw any part of its Capital Contribution from the Company or to withdraw or resign as a member prior to the Company's dissolution and winding up pursuant to Section 9 hereof, unless such withdrawal is expressly provided for in this Agreement. No Member shall have any right to have interest accrued or paid to it with respect to its Capital Contribution.

EB-00022879

## SECTION 4
## ALLOCATION OF PROFITS AND LOSSES; DISTRIBUTIONS

### 4.1.   Allocation of Profits and Losses and Cash Flow.

4.1.1   Profits. After giving effect to the special allocations set forth in Section 4.3, the Profits for each Fiscal Period will be allocated first, to the Minority Member to the extent of losses previously allocated which had the effect of decreasing the Minority Member's Capital Account below the "Guaranteed Purchase Price," second, proportionately to the Members to the extent of previously allocated aggregate Losses, and third, to the Members in accordance with their respective Percentage Interests.

4.1.2   Losses. After giving effect to the special allocations set forth in Section 4.3, and subject to the limitation set forth in following paragraph, the Losses for each Fiscal Period will be allocated to the Members in proportion to their respective Percentage Interests. Losses allocated in accordance with the preceding sentence to the Minority Member may not cause the Minority Member's capital account to be reduced below the "Guaranteed Purchase Price."

Notwithstanding the preceding, no allocation of Loss, or item of loss or deduction, will be made to a Member for any Fiscal Period if such allocation would cause or increase an Adjusted Capital Account Deficit with respect to such Member as of the end of such Fiscal Period. Losses, and items of loss or deduction, that must be reallocated pursuant to the preceding sentence will be allocated (i) first, in the manner determined by the Board of Managers that allocates the maximum permissible Losses, and items of loss and deduction, to each Member, as permitted by section 1.704-1(b)(2)(ii)(d) of the Treasury Regulations; and (ii) second, to the Members in proportion to their respective Percentage Interests.

4.1.3.   Transfers. In the event of a transfer of a Member's Ownership Interest in accordance with Section 7 of this Agreement, Profits and Losses for that Fiscal Period shall be allocated between the Members pursuant to the terms of this paragraph. The Company shall make an interim closing of its books, as of the transfer of the Ownership Interest, and compute Profits and Losses applicable to the period of time before and after that date using the Company's method of accounting in accordance with Section 706(d) of the Code and the Treasury Regulations promulgated under Code Section 706(c).

4.2   Built-in Gains and Losses. In accordance with Section 704(c) of the Code and the Treasury Regulations promulgated thereunder, income, gain, loss and deduction with respect to the property contributed to the capital of the Company shall, solely for income tax purposes, be allocated among the Members so as to take account of variations between the adjusted basis of the property contributed to the Company for federal income tax purposes and its initial Gross Asset Value (computed in accordance with subparagraph (i) under the definition of Gross Asset Value herein).

In the event the Gross Asset Value of any Company Property is adjusted pursuant to subparagraph (ii) under the definition of Gross Asset Value, subsequent allocations of income,

10

EB-00022880

gain, loss and deduction with respect to such asset shall take account of any variation between the adjusted basis of such Property for federal income tax purposes and its Gross Asset Value in the same manner as under Section 704(c) of the Code and the Treasury Regulations thereunder.

Any elections or other decisions relating to such allocations shall be made by the Board of Managers in any manner that reflects the purpose and intention of this Agreement. Allocations pursuant to this Section 4.2 are solely for purposes of federal, state, and local taxes and shall not affect, or in any way be taken into account in computing, any Member's Capital Account or share of Profits, Losses, other items, or Distributions pursuant to any provisions of this Agreement.

### 4.3   Special Allocations.

4.3.1   Minimum Gain Chargeback.   Except as otherwise provided in Treasury Regulations Sections 1.704-2(f), notwithstanding any other provision of this Section 4, if there is a net decrease in Minimum Gain during any Company Fiscal Period, each Member shall be specially allocated items of Company income and gain for such Fiscal Period (and, if necessary, subsequent Fiscal Periods) in an amount equal such Member's share of the net decrease in Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 4.3.1 is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be applied and interpreted consistently therewith, including the exceptions to the minimum gain chargeback requirement set forth in Treasury Regulations Section 1.704-2(f), and shall be interpreted consistently therewith.

4.3.2   Member Minimum Gain Chargeback.   Except as otherwise provided in Treasury Regulations Section 1.704-2(i)(4), notwithstanding any other provision of this Section 4, if there is a net decrease in Member Nonrecourse Debt Minimum Gain attributable to a Member Nonrecourse Debt during any Company Fiscal Period, each Member who has a share of the Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such Fiscal Period (and, if necessary, subsequent Fiscal Periods) in an amount equal to such Member's share of the net decrease in Member Nonrecourse Debt Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Treasury Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 4.3.2 is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith, including the exceptions set forth in Treasury Regulations Section 1.704-2(f)(2) and (3) to the extent that such exceptions apply to Treasury Regulations Section 1.704(2)(i)(4).

11

EB-00022881

4.3.3  Qualified Income Offset.  In the event a Member unexpectedly receives any adjustments, allocations, or distributions described in Sections 1.704-1(b)(2)(ii)(d)(4), 1.704-1(b)(2)(ii)(d)(5), or 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 4.3.3 shall be made only if and to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided for in this Section 4 have been tentatively made as if this Section 4.3.3 were not in the Agreement.

4.3.4  Intentionally Omitted.

4.3.5  Intentionally Omitted.

4.3.6  Nonrecourse Deductions.  Nonrecourse Deductions for any Fiscal Period or other period shall be specially allocated among the Members in proportion to their Percentage Interests.

4.3.7  Member Nonrecourse Deductions.  Any Member Nonrecourse Deductions for any Fiscal Period or other period shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

4.3.8  Offsetting Allocations.  The allocations set forth in Sections 4.1.1, 4.1.2, 4.3.1, 4.3.2, 4.3.3, 4.3.5, 4.3.6 and 4.3.7 hereof (the "Regulatory Allocations") are intended to comply with certain requirements of the Treasury Regulations. It is the intent of the Members that, to the extent possible, all Regulatory Allocations shall be offset either with other Regulatory Allocations or with special allocations of other items of Company income, gain, loss, or deduction pursuant to this Section 4.3.8. Therefore, notwithstanding any other provisions of this Section 4 (other than the Regulatory Allocations), the Board of Managers shall make such offsetting special allocations of Company income, gain, loss, or deduction so that, after such offsetting allocations are made, each Member's Capital Account balance is, to the extent possible, equal to the Capital Account balance such Member would have had if the Regulatory Allocations were not part of the Agreement and all Company items were allocated pursuant to Sections 4.1.1 and 4.1.2. In exercising its discretion under this Section 4.3.8, the Board of Managers shall take into account future Regulatory Allocations under Sections 4.3.1 and 4.3.2 that, although not yet made, are likely to offset other Regulatory Allocations previously made under Sections 4.3.6 and 4.3.7.

4.4  Allocations for Income Tax Purposes.  Except as provided in Section 4.1 and Section 4.2 above, for federal and state income tax purposes each item of income, gain, loss or deduction shall be allocated to each Member in accordance with such Member's Percentage Interest.

4.5  Distributions of Cash Flow from Operations.  Subject to the provisions of Sections 4.6 and 4.7 below, the timing and amount of Distributions of available Cash Flow to the

12

EB-00022882

Members shall be determined by the Board of Managers, and all such Distributions will be made to the Members in proportion to their respective Percentage Interests.

### 4.6     Distribution from Sale or Refinancing.

4.6.1   Distributions of proceeds received from a sale, exchange or other disposition of all or substantially all of the assets of the Company, or upon liquidation of the Company, shall be made as determined by the Board of Managers to the Members in proportion to their respective Percentage Interests, subject to the terms of this Agreement with respect to the Guaranteed Purchase Price.

4.6.2   Notwithstanding the foregoing provisions of this Section 4.6, Distributions of proceeds from the sale, exchange or other disposition of all or substantially all of the assets of the Company or upon liquidation of the Company shall be distributed and applied in the following order of priority:

(a)     to the payment of debts of the Company;

(b)     to the payment of all expenses of the Company incurred in connection with any liquidation;

(c)     to establish reserves which the liquidator (or the Board of Managers) deems reasonably necessary for contingent, unmatured or unforeseen liabilities or obligations of the Company; and

(d)     the balance, as calculated in accordance with Section 8.2, if any, to the Members.

### 4.7     Distributions to Pay Taxes.

4.7.1   Amount of Tax Distributions.  Within forty-five (45) days after the end of each Fiscal Period, the Company will distribute cash to the Members in an amount equal to the Blended Tax Rate times the aggregate amount of taxable income of the Company (as determined for federal income tax purposes); provided, however, that no such distribution shall be made to the extent, after giving effect to said distribution, the Company would be in breach of any financial covenant required by the Company's primary lending institution.  The amount distributable to each Member pursuant to this Section 4.7.1 shall be the aggregate amount determined pursuant to the preceding sentence multiplied by such Member's Percentage Interest (and shall not necessarily reflect the taxable income allocable to such Member pursuant to the remaining provisions of this Agreement).  For these purposes, the "Blended Tax Rate" means the highest combined marginal rate of federal and state income tax rate for individuals for the Fiscal Period in question, taking into account the deductibility of state income taxes in determining federal income tax liability, and applying for the state income tax rate the highest marginal rate of income tax applicable to individuals in the State of New York or the State of Connecticut during the applicable Fiscal Period.

13

EB-00022883

4.7.2   Treatment of Other Distributions. Any Distribution of cash made to any Member pursuant to Section 4.5 with respect to the applicable Fiscal Period will be credited against any amounts otherwise required to be distributed to such Member with respect to such Fiscal Period pursuant to Section 4.7.1.

**4.8    Set-Off.** Notwithstanding any provision to the contrary set forth in this Section 4, if, as of any date, a Member shall have a legal obligation to the Company for the payment of money or the contribution of property, and such obligation is past due, such Member's share of the Distributions shall be reduced by an amount equal to such past due monetary legal obligation or the designated value of the legal obligation to contribute such past due property.

**4.9    Tax Returns.** The Managers will cause all tax and information returns (including Form 1065) to be prepared that the Company is required to file pursuant to the Code or state or local law. Each such tax and information return (including Schedule K-1 to Form 1065) shall be presented to the Minority Member for approval, which approval shall not be unreasonably withheld, prior to filing. In connection with the foregoing, in the event that the Minority Member fails to object to any such tax and information return within ten (10) business days after its receipt thereof, the Minority Member shall be deemed to have approved of such tax and information return except to the extent of any manifest error set forth therein.

**4.10    Intended Allocation of Distributions.** Subject to the terms and conditions of Section 4.6, Section 8.2 and Section 8.3 hereof, notwithstanding anything to the contrary in this Agreement, all Distributions shall be made to the Members in accordance with their respective Percentage Interests.

## SECTION 5
## MANAGEMENT

### 5.1.    Board of Managers.

5.1.1. Number of Managers. The business, property and affairs of the Company shall be managed by or under the direction of a Board of Managers comprised of seven (7) individuals (the "Managers"). Subject to the terms and conditions of the Employment Agreements, a Majority-in-Interest of the Members shall have the power to remove (with or without cause) any Manager by delivering written notice of such removal to the Company. Subject to the terms of the Employment Agreements, each Manager shall serve until his resignation, removal, death or inability to serve. Any Manager may resign at any time upon written notice to the Company. Vacancies on the Board of Managers shall be filled by the Members. A Manager need not be a Member. The Managers as of the date of this Agreement are listed on Schedule B hereto.

5.1.2. Powers. The Board of Managers shall have the power to do any and all acts necessary, convenient or incidental to or for the furtherance of the purposes described herein, including all powers, statutory or otherwise, subject to the express terms of this Agreement. Approval by or action taken by the Board of Managers in accordance with this Agreement shall constitute approval or action by the Company, subject to the express terms of this Agreement.

14

EB-00022884

5.1.3. Meetings of the Board; Notice. Regular meetings of the Board of Managers shall be held at least once a quarter at the offices of the Company or at such other times and places as may be fixed by the Board of Managers, and may be held without further notice. Special meetings of the Board of Managers may be called by a majority of all Managers upon at least five (5) days' prior written notice, which notice shall identify the purpose of the special meeting and the business to be transacted. Notice of any meeting may be waived before or after a meeting by a written waiver of notice signed by the Manager entitled to notice. A Manager's attendance at a meeting shall constitute waiver of notice unless the Manager states at the beginning of the meeting his objection to the transaction of business because the meeting was not lawfully called or convened.

5.1.4. Quorum; Acts of the Board. At all meetings of the Board, a majority of the Managers, in person or by proxy, shall constitute a quorum for the transaction of business and, except as otherwise provided in any other provision of this Agreement, the act of a majority of the Managers present at any meeting at which there is a quorum shall be the act of the Board. Any Manager may authorize any Person to act for him by proxy at all meetings in which the Manager is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting; provided, however, that the Person so authorized as proxy must be a Manager. Every proxy must be signed by the Person exercising the proxy. If a quorum shall not be present at any meeting of the Board, the Managers present at such meeting may adjourn the meeting from time to time until a quorum shall be present, provided that the all of the Managers receive at least five (5) days' prior written notice to all of the date and time to which the meeting was adjourned. Any action required or permitted to be taken at any meeting of the Board or of any committee thereof may be taken without a meeting if all of the members of the Board or committee, as the case may be, consent thereto in writing.

5.1.5. Electronic Communications. Managers or members of any committee designated by the Board, may participate in meetings of the Board, or any committee, as the case may be, by means of telephone conference or similar communications equipment that allows all Persons participating in the meeting to hear each other, and such participation in a meeting shall constitute presence in person at the meeting. If all the participants are participating by telephone conference or similar communications equipment, the meeting shall be deemed to be held at the principal place of business of the Company.

5.1.6. Committees of the Board.

(a) The Board may, by resolution passed by a majority of the Board, designate one or more committees, each committee to consist of two or more Managers. The Board may designate one or more Managers as alternate members of any committee, who may replace any absent or disqualified member at any meeting of the committee.

(b) Any such committee, to the extent provided in the resolution of the Board, shall have and may exercise all the powers and authority of the Board in the management of the business and affairs of the Company. Such committee or committees shall have such name or names as may be determined from time to time by resolution adopted by the Board. Each committee shall keep regular minutes of its meetings and report the same to the Board when required.

15

EB-00022885

5.1.7. Compensation of Managers; Expenses. No Manager shall receive any compensation for service as a member of the Board of Managers or any committee or subcommittee thereof. Membership on the Board of Mangers shall not preclude any Manager from serving the Company in any other capacity and receiving compensation therefor.

5.1.8. Managers as Agents. To the extent of their powers set forth in this Agreement, the Managers are agents of the Company for the purpose of the Company's business, and the actions of the Managers taken in accordance with such powers set forth in this Agreement shall bind the Company. Notwithstanding the last sentence of Section 18-402 of the Act or the preceding sentence, except as provided in this Agreement or in a resolution of the Board, no Manager may, acting on his own, bind the Company.

### 5.2. Officers.

5.2.1. Appointment. The Officers of the Company shall be chosen by the Board and shall consist of at least a Chairman of the Board of Managers, a Chief Executive Officer, a President, a Secretary and a Treasurer. The Board of Directors may also choose a Chief Administrative Officer, a Chief Operating Officer, a Chief Financial Officer and one or more Vice Presidents, Assistant Secretaries and Assistant Treasurers. Any number of offices may be held by the same person. The Board may appoint such other Officers, including a General Manager, and agents as it shall deem necessary or advisable who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board. The salaries of all Officers and agents of the Company shall be fixed by or in the manner prescribed by the Board. The Officers of the Company as of the date hereof are listed on Schedule C hereto.

5.2.2. Chairman of the Board of Managers. The Chairman of the Board of Managers shall preside at all meetings of the Board and shall perform such other duties as the Board may from time to time prescribe.

5.2.3. Chief Executive Officer. The Chief Executive Officer of the Company shall be responsible for the general and active management of the Business of the Company and shall see that all orders and resolutions of the Board are carried into effect. The Chief Executive Officer shall have sole responsibility for managing all day-to-day operations of the Company. In connection with the foregoing, the Chief Executive Officer will be responsible for managing all supplier relationships and activities. The President of the Company (who shall be appointed by the Board of Managers) shall report to the Chief Executive Officer of the Company. The Chief Executive Officer or any other Officer authorized by the Chief Executive Officer shall execute all bonds, mortgages and other contracts, except those required or permitted by law or this Agreement to be otherwise signed and executed.

5.2.4. President. The President shall have such duties and powers as the Board may from time to time prescribe. The President shall be Thomas B. Slocum, who shall have the right to serve as such in accordance with the terms of his Employment Agreement with the Company and until a successor is selected and duly appointed by the Board of Managers.

16

EB-00022886

5.2.5. <u>Treasurer</u>. The Treasurer shall be responsible for causing the financial statements to be prepared. The Treasurer shall cooperate with the Chief Executive Officer in an effort to maintain banking arrangements and, shall have such other powers and duties as may be properly designated by the Board of Managers.

5.2.6. <u>Secretary and Assistant Secretary</u>. The Secretary shall be responsible for filing legal documents and maintaining records for the Company. The Secretary shall attend all meetings of the Board and record all the proceedings of the meetings of the Company and of the Board in a book to be kept for that purpose and shall perform like duties for the standing committees when required. The Secretary shall give, or shall cause to be given, notice of all special meetings of the Board, and shall perform such other duties as may be prescribed by the Board or the Chief Executive Officer, under whose supervision the Secretary shall serve. The Assistant Secretary, or if there be more than one, the Assistant Secretaries in the order determined by the Board (or if there be no such determination, then in order of their election), shall, in the absence of the Secretary or in the event of the Secretary's inability to act, perform the duties and exercise the powers of the Secretary and shall perform such other duties and have such other powers as the Board may from time to time prescribe.

5.2.7. <u>Other Officers</u>. Subject to Section 5.2.1 above, the Board may appoint other officers who shall have such duties as shall be delegated to them by the Board.

### 5.3. Meetings of the Members.

5.3.1. A meeting of the Members may be called at any time by the Board of Managers or any Member. Meetings of the Members shall be held at the Company's principal place of business or at any other place designated by the Board of Managers. Not less than ten (10) nor more than sixty (60) days before each meeting, the Secretary shall give written notice thereof to each of the Members entitled to vote at the meeting. The notice shall state the place, date, hour and purpose of the meeting. Notwithstanding the foregoing provisions, each of the Members who is entitled to notice shall be deemed to waive such notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of the meeting, or is present at the meeting in person or by proxy without objecting to the lack of notice. Unless this Agreement provides otherwise, at a meeting of the Members, the presence in person or by proxy of a majority of the Members constitutes a quorum. A Member may vote either in person or by written proxy signed by the Member or by the Member's duly authorized attorney-in-fact.

5.3.2. Except as otherwise provided in this Agreement, the consent of a Majority-in-Interest shall be required to approve any matter coming before the Members.

5.3.3. In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of Members holding the requisite Percentage Interest as will be required for Members to take action under this Agreement. If such consent is not unanimous, prompt notice shall be given to those Members who have not consented in writing, but who would have been entitled to vote thereon had such action been taken at a meeting.

5.3.4. No Member is an agent of the Company solely by virtue of being a Member, and no Member has authority to act for the Company solely by virtue of being a Member. Unless

17

approved by the Board, no Member shall be entitled to compensation for services performed for the Company. Upon substantiation of the amount and purposes thereof, however, a Member shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

5.4. **Member Consent.** Notwithstanding anything to the contrary herein, no authorization or action taken with respect to the "Major Decisions" subsequently enumerated in this Section 5.4 shall be effective or binding on the Company unless approved by the Unanimous Consent of All the Members:

5.4.1. the taking of any action which would have the effect of changing the Company's classification for federal and state tax purposes;

5.4.2. the issuance of new or additional Units or other Ownership Interests of the Company;

5.4.3. the entering into of any transaction between the Company and a Member, or any Affiliate of the Company or a Member, except for: (a) loans made to the Company by a Member pursuant to Section 3.4 hereof, (b) transactions expressly required or permitted by this Agreement and (c) transactions (including those contemplated by Section 5.4.8 or Section 5.4.9) entered into in the ordinary course of business, negotiated at arm's length and containing terms that are substantially equivalent to those the Company would obtain in a like transaction with a third Person who is not an Affiliate of the Company or a Member;

5.4.4. except for the loans given to the Company in accordance with Section 3.4 above, incurring additional indebtedness such that the aggregate amount of indebtedness of the Company (including amounts currently owing to The Canandaigua National Bank and Trust Company and refinancings thereof, but exclusive of indebtedness of the Company to suppliers of wine, spirits and other alcoholic beverage inventory), exceeds $5,000,000;

5.4.5. making any loan to any Member, Lester Eber or to any Affiliate of the foregoing or the Company;

5.4.6. except as otherwise specifically contemplated in this Agreement, making any Distribution to the Members other than in accordance with each Member's Percentage Interest;

5.4.7. guaranteeing any obligation of any Member, Lester Eber or any Affiliate of the foregoing or the Company;

5.4.8. purchasing inventory from any Member, or any Affiliate of any Member, Lester Eber or the Company: (i) for an amount in excess of the actual cost paid for such inventory by the selling party; or (ii) in an amount in excess of the amount of inventory necessary to meet the reasonably foreseeable needs of the Company, as determined in good faith consistent with past practices;

5.4.9. selling inventory to any Member, or any Affiliate of any Member, Lester Eber or the Company: (i) for an amount less than the actual cost paid for such inventory by the

18

EB-00022888

Company, or (ii) in quantities which reasonably may be deemed to constitute the Company's providing a financing and/or warehousing arrangement for the purchasing Person; and

5.4.10. the payment of compensation, however denominated, to Lester Eber, or any spouse or lineal descendant of Lester Eber, to the extent that the compensation paid is in excess of the fair market value of services actually rendered for the benefit of the Company.

**5.5.** **Limited Liability.** Except as otherwise expressly provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort or otherwise, shall be the debts, obligations and liabilities solely of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member, unless such debt, obligation or liability shall have been the result of the gross negligence, dishonesty, fraud or willful misconduct of, or breach of this Agreement by, such Member, in which case the Member shall indemnify and hold harmless the Company and the other Member from all losses, claims and damages incurred as a result thereof.

## SECTION 6
## BOOKS AND RECORDS

**6.1.** **Books and Records.** The books and records of the Company shall at all times be maintained at the principal office of the Company. Each Member, or his duly authorized agent, shall have full, complete and unrestricted access to all of the Company's books and records at all times, provided that such access shall not interfere with the daily operations of the Company. The Company will file income tax returns on a fiscal year basis based on the Fiscal Period. At the close of each Fiscal Period, an accounting shall be made of the operations for the year, which shall include the preparation of a balance sheet as at the close of the Fiscal Period and a statement of the operations of the Company for the Fiscal Period. Based on the determinations so made, the Company shall, within the time required (including extensions), file all necessary information returns.

**6.2.** **Bank Accounts.** The Company shall maintain bank accounts in such banks as the Board of Managers designates exclusively for the deposit and disbursement of all funds of the Company. All funds of the Company shall be promptly deposited in such accounts. The Chief Executive Officer and Treasurer from time to time shall authorize signatories for such accounts.

**6.3.** **Tax Matters Member.** The Majority Member shall be the Company's "tax matters partner," as that term is defined in the Code. The Majority Member shall have the authority to make all Company elections permitted under the Code, including without limitation elections of methods of depreciation and elections under Section 754 of the Code. Notwithstanding the foregoing, the Company shall make any necessary election under Section 754 of the Code in connection with the Minority Member acquiring its fifteen percent (15%) Ownership Interest.

**6.4.** **Other Business.** Members and Affiliates of the Members may engage in or possess an interest in other business ventures of every kind and description, independently or

19

EB-00022889

with others. The Company shall not have any rights in or to such independent ventures or the income or profits therefrom by virtue of this Agreement.

## SECTION 7
## WITHDRAWAL AND TRANSFERS OF OWNERSHIP INTERESTS

7.1.    **Restrictions on Disposition.**  No Member shall encumber, hypothecate or transfer, by sale, gift, bequest, assignment, operation of law or otherwise (each a "Disposition"), any Ownership Interests now or hereafter owned by him except in accordance with this Agreement.  If no provision of this Agreement governs the proposed Disposition, then such Disposition shall be deemed to be prohibited by this Agreement, except with the written consent of all other parties to this Agreement. The foregoing notwithstanding, the Minority Member may make a Disposition of any of its Units to Eder Bros., Incorporated, a Connecticut corporation, and/or Allan S. Goodman, Incorporated, a Connecticut corporation, and upon the effectiveness of such Disposition the transferee shall be a Member under this Agreement, enjoying the rights of the Minority Member, appropriately pro-rated in the event such Disposition is of less than all of the Minority Member's Units.

7.2.    **Condition Precedent for Transfer.**  No Member shall effect, in any manner, any transfer of any Ownership Interest unless the transferee, as a condition precedent to such transfer, consents in writing to the continuance of the terms and conditions of this Agreement by dating and executing a counterpart copy thereof and delivering it to the Company with copies to the other Member.

7.3.    **Right of First Refusal; Drag Along Rights; Tag-Along Rights.**

7.3.1.  Right of First Refusal.  If the Majority Member desires, or becomes obligated by operation of law or other legal requirement, to sell, assign, transfer or otherwise dispose of any Units (the "Offered Units") to a third Person pursuant to a bona fide third Person offer, it shall give written notice of the terms and conditions of such offer to the Minority Member, including the name and address of the proposed transferee, the cash price or other consideration offered for the Offered Units and all other material terms and conditions of the proposed sale within ten (10) days after the Majority Member's receipt thereof (the "Notice of Offer").  The Minority Member shall have thirty (30) days from the date of such Notice of Offer to agree to purchase all, but not less than all, of the Offered Units upon the same terms and conditions set forth in the Notice of Offer by giving written notice to the Majority Member and fixing a closing date not more than ninety (90) days after delivering written notice of the intent to exercise.  Subject to Sections 7.3.2 and 7.3.3 below, if the Minority Member declines to exercise its rights to buy the Offered Units pursuant to this Section 7.3.1, then the Majority Member shall be free to dispose of the Offered Units for a period of ninety (90) days thereafter; provided, however, that the Majority Member may only sell the Offered Units to the proposed transferee identified in the Notice of Offer, on terms and conditions no less beneficial (from the Majority Member's perspective) than those set forth in the Notice of Offer.  Upon the expiration of said ninety (90) day period, the transfer or disposition of the Offered Units shall once again be subject to the terms and conditions of this Section 7.3.1.  Notwithstanding the foregoing, if the Minority Member has breached any term or condition of Section 8.6 of this Agreement, the right of first refusal granted to the Minority Member in this Section 7.3.1 shall be null and void, and the Majority Member shall be permitted

20

EB-00022890

to dispose of the Offered Units to a third Person without regard to the terms and conditions of this Section 7.3.1.

7.3.2. **Drag Along Rights.** If the Majority Member desires to sell, assign, transfer or otherwise dispose of any Units (the "Offered Units") to a third Person (the "Offeror") pursuant to a bona fide third Person offer and the Minority Member elects not to exercise the right of first refusal granted to the Minority Member pursuant to Section 7.3.1 hereof, then the Majority Member shall have the right, by delivery of written notice to the Minority Member, to require the Minority Member to sell to the Offeror the same percentage of its Unit as the Majority Member has agreed to sell to the Offeror at the same price per Unit and on the same terms and conditions on which the Offeror has agreed to purchase the Offered Units; provided, however, that the rights of the Majority Member under this Section 7.3.2 shall be subject to and conditioned upon the Minority Member receiving a purchase price, calculated in accordance with Section 8.3 hereof, at least equal to the Guaranteed Purchase Price (appropriately pro-rated if the Minority Member is to sell fewer than all of its Units) in connection with said transaction. Notwithstanding the foregoing, if the Majority Member has breached any term or condition of Section 8.6 of this Agreement, the rights granted to the Majority Member in this Section 7.3.2 shall be null and void, and the Minority Member shall not be subject to the obligations contemplated by this Section 7.3.2.

7.3.3. **Tag Along Rights.** If the Majority Member desires to sell, assign, transfer or otherwise dispose of any Units (the "Offered Units") to a third Person (the "Offeror") pursuant to a bona fide third Person offer and the Minority Member elects not to exercise the right of first refusal granted to the Minority Member pursuant to Section 7.3.1 hereof, and the Majority Member has not elected to exercise its rights under Section 7.3.2 above, then the Minority Member shall have the option, upon delivery of written notice to the Offeror with a copy to the Majority Member, of requiring the Offeror to purchase the same percentage of the Minority Member's Ownership Interest as the Offeror has agreed to purchase from the Majority Member at the same price per Unit and on the same terms and conditions on which the Offeror has agreed to purchase the Offered Units from the Majority Member. If the Offeror does not agree to purchase the Minority Member's Ownership Interest, the Majority Member and the Minority Member shall each sell to the Offeror a number of Units equal to the number of Offered Units multiplied by such Member's Percentage Interest, or no sale of any Units shall be made to Offeror. If the transaction proceeds, the Minority Member shall receive a purchase price, calculated in accordance with Section 8.3 hereof, at least equal to the Guaranteed Purchase Price (appropriately pro-rated if the Minority Member is to sell fewer than all of its Units) in connection with said transaction. Notwithstanding the foregoing, if the Minority Member has breached any term or condition of Section 8.6 of this Agreement, the rights granted to the Minority Member in this Section 7.3.3 shall be null and void, and the Majority Member shall not be subject to the obligations contemplated by this Section 7.3.3.

## SECTION 8
## CERTAIN COVENANTS AND AGREEMENTS

8.1. **Right of First Refusal.** If the Company desires to sell, assign, transfer or otherwise dispose of all or substantially all of its assets to a third Person pursuant to a bona fide third Person offer, it shall give written notice of the terms and conditions of such offer to the

21

EB-00022891

Minority Member, including the name and address of the proposed purchaser, the cash price or other consideration offered for such assets and all other material terms and conditions of the proposed sale within ten (10) days after the Company's receipt thereof (the "Notice of Proposed Sale"). The Minority Member shall have thirty (30) days from the date of such Notice of Proposed Sale to agree to purchase such assets upon the same terms and conditions set forth in the Notice of Proposed Sale by giving written notice to the Company of its intent and fixing a closing date not more than ninety (90) days after delivering written notice of the intent to exercise. If the Minority Member declines to exercise its rights to buy the assets pursuant to this Section 8.1, then the Company shall be free to dispose of the assets for a period of ninety (90) days thereafter; provided, however, that the Company may only sell the assets to the proposed purchaser identified in the Notice of Proposed Sale on terms and conditions no less favorable (from the Company's perspective) than those set forth in the Notice of Proposed Sale. Upon the expiration of said ninety (90) day period, the transfer or disposition of the assets shall once again be subject to the terms and conditions of this Section 8.1. Notwithstanding the foregoing, if the Minority Member has breached any term or condition of Section 8.6 of this Agreement, the right of first refusal granted to the Minority Member in this Section 8.1 shall be null and void and the Company shall be permitted to dispose of substantially all of its assets to a third party without regard to the terms and conditions of this Section 8.1.

8.2. **Calculating Distributions upon a Sale of Assets or Liquidation.** Notwithstanding anything to the contrary in this Agreement, upon a sale of all or substantially all of the assets of the Company or the liquidation of the Company, the amount of any Distribution to be made to the Minority Member shall be determined prior to providing for or, if already paid, without giving effect to:

8.2.1. the repayment of any indebtedness of the Company, the proceeds of which indebtedness were not used to pay operating expenses or for capital investments of the Company;

8.2.2. repayment of indebtedness of the Company to any Affiliate of the Majority Member, Lester Eber or the Company incurred on or prior to January 29, 2008;

8.2.3. receipt of any repayment of indebtedness to the Company by any Affiliate of the Majority Member, Lester Eber or the Company; or

8.2.4. the satisfaction, or the assumption by the purchaser of the assets of the Company, of any obligation satisfied or to be satisfied from the assets of the Company to the extent that such obligation did not arise out of the ordinary course operations of the Company.

8.2.5. Notwithstanding anything to the contrary herein, the Minority Member shall receive from such transaction in an amount equal to the Guaranteed Purchase Price plus the amount, if any, by which the Minority Member's Percentage Interest multiplied by the purchase price (after application of Sections 8.2.1 through 8.2.4 above) exceeds the Guaranteed Purchase Price.

8.3. **Allocation of the Purchase Price Upon a Sale of Units.** Notwithstanding anything to the contrary herein, upon a sale of all of the Units of the Company to a third party,

22

EB-00022892

the portion of the purchase price from such sale to be allocated to the purchase of the Minority Member's Units shall be determined without regard to any adjustment to the purchase price for:

8.3.1. any indebtedness of the Company, the proceeds of which indebtedness were not used to pay operating expenses or for capital investments of the Company;

8.3.2. repayment of indebtedness of the Company to any Affiliate of the Majority Member, Lester Eber or the Company incurred on or prior to January 29, 2008;

8.3.3. receipt of any repayment of indebtedness to the Company by any Affiliate of the Majority Member, Lester Eber or the Company; or

8.3.4. any obligation satisfied or to be satisfied from the assets of the Company to the extent that such obligation did not arise out of the ordinary course operations of the Company.

8.3.5. Notwithstanding anything to the contrary herein, the Minority Member shall receive from such transaction in an amount equal to the Guaranteed Purchase Price plus the amount, if any, by which the Minority Member's Percentage Interest multiplied by the purchase price (after application of Sections 8.3.1 through 8.3.4 above) exceeds the Guaranteed Purchase Price.

**8.4. Observation Rights.** As long as the Minority Member owns any Units, the Company shall invite a representative of the minority Member acceptable to the Company in its reasonable judgment (each an "Investor Designee," and it being agreed that any of Andrew Eder, Richard Weiss, David Heller and Roger Loeb is acceptable to the Company to serve as an Investor Designee), to attend all meetings of its Board of Managers in a nonvoting observer capacity and, in this respect, shall give such Investor Designee copies of all notices, minutes, consents, and other materials that it provides to its Managers; provided, however, that such Investor Designee shall agree to hold in confidence and trust and to act in a fiduciary manner with respect to any information provided to him or her; and, provided further, that the Company reserves the right to require such Investor Designee to execute such agreements regarding confidentiality and other related matters as may be deemed reasonably necessary by the Company to protect the confidentiality of the information provided to such Investor Designee.

**8.5. Sale of Product Lines.** If the Company desires to sell one or more product lines, the Company shall so notify the Minority Member in writing of such intent and shall first negotiate in good faith with the Minority Member for a period of thirty (30) days to permit the Minority Member to buy such product line or lines. If, during such thirty (30) day period, the Company and the Minority Member fail to agree to terms for the purchase and sale of such product line or lines and/or the Minority Member is unable to obtain the necessary consent of the affected supplier to such acquisition, then the Company shall be free to sell the product line or lines to a third Person upon terms and conditions reasonably acceptable to the Company, in the Company's sole discretion, provided that, unless the sole reason the Company has not sold such product line or lines to the Minority Member is the absence of supplier approval for the Minority Member's purchase of the same, such terms and conditions shall be no less favorable, from the Company's perspective, than those offered by the Minority Member. Notwithstanding the foregoing, if the Minority Member has breached any term or condition of Section 8.6 of this

23

EB-00022893

Agreement, the right of first negotiation granted to the Minority Member in this Section 8.5 shall be null and void, and the Company shall be permitted to dispose of the product line or lines to a third party without regard to the terms and conditions of this Section 8.5. The proceeds of such sale from any product line shall either (a) be retained by the Company to fund ongoing business operations or (b) be used to make a Distribution to the Members in accordance with each Member's Percentage Interest. Notwithstanding the foregoing, this Section 8.5 shall not be applicable to any transfer of a product line or lines by the Company in consideration of (i) a trade of one or more product lines for one or more other product lines, or (ii) a trade of one or more product lines for cash consideration and one or more other product lines.

  **8.6.** **Non-Solicitation.** Following the effectiveness of this Agreement, the Minority Member and the Company shall not, at any time, directly or indirectly through its officers, directors, managers, members, shareholders, employees, agents or Affiliates, initiate discussions with any supplier of the other (or Affiliates of the other, where the other is the Minority Member) for the purpose of obtaining distribution rights to any products distributed by such other party (or Affiliates of the other, where the other is the Minority Member) in the State of Connecticut. Notwithstanding the foregoing, the Minority Member and the Company hereby acknowledge and agree that the Minority Member's Affiliates and the Company are competitors in the same industry, that they have many common suppliers, that they are perpetually in discussions with suppliers in the industry and that suppliers may from time to time desire to move product lines from one party to the other party or its Affiliates or to appoint such other party or its Affiliates as an additional distributor of such product lines in the State of Connecticut. In the event that a supplier of either the Company on the one hand or Minority Member (or an Affiliate of Minority Member) on the other hand notifies such party (the "Initial Distributor") of its desire to move product lines (the "Dual Products") from the Initial Distributor to other party (the "Dual Distributor") or such supplier's intent to appoint the Dual Distributor as an additional distributor for the Dual Products in the State of Connecticut, and the Dual Distributor desires to accept the same:

  8.6.1. If the Initial Distributor, in its sole and absolute discretion, decides to transfer and does transfer all of the Initial Distributor's rights to distribute the Dual Products to the Dual Distributor within thirty (30) days following receipt of notice from the supplier of the supplier's desire to move such Dual products to the Dual Distributor or the appointment of the Dual Distributor as an additional distributor of the Dual Products (the "Notice Date"), as applicable, and the Dual Distributor accepts the same, then the Dual Distributor shall pay to the Initial Distributor a payment equal to two and one-half (2½) times "Gross Profits" that the Initial Distributor achieved from the Dual Products during the twelve (12) month period immediately preceding the Notice Date (or such shorter period as Gross Profits in respect of the Dual Products have actually been accrued by the Initial Distributor) and shall purchase the Initial Distributor's entire inventory of the Dual Products for the "Laid-in Costs" therefor.

  8.6.2. If the Initial Distributor, in its sole and absolute discretion, retains its rights to distribute the Dual Products but waives the six (6) month delay in the effectiveness of the appointment of the Dual Distributor as an additional distributor of the Dual Products provided in Section 30-17 of the Connecticut Liquor Control Act, as same may be amended, within thirty (30) days following the Notice Date, then the Dual Distributor shall pay to the Initial Distributor a payment equal to one (1) times "Gross Profits" that the Initial Distributor achieved from the

24

Dual Products during the twelve (12) month period immediately preceding the Notice Date (or such shorter period as Gross Profits in respect of the Dual Products have actually been accrued by the Initial Distributor).

8.6.3. If the Initial Distributor, in its sole and absolute discretion, retains its rights to distribute the Dual Products and does not waive the six (6) month delay in the effectiveness of the Dual Distributor as an additional distributor of the Dual Products provided in Section 30-17 of the Connecticut Liquor Control Act, as same may be amended, within thirty (30) days following the Notice Date, then the Dual Distributor shall pay to the Initial Distributor a payment equal to one-half (½) times "Gross Profits" that the Initial Distributor achieved from the Dual Products during the twelve (12) month period immediately preceding the Notice Date (or such shorter period as Gross Profits in respect of the Dual Products have actually been accrued by the Initial Distributor).

8.6.4. All payments to be made to the Initial Distributor under this Section 8.6 shall be paid within fifteen (15) days following the date that the Dual Distributor first may physically distribute the Dual Products in the State of Connecticut by wire transfer of immediately available funds to the account or accounts in the United States designated in writing by the Initial Distributor. The proceeds of all payments made to the Company pursuant to this Section 8.6 shall either (a) be retained by the Company to fund ongoing business operations or (b) be used to make a Distribution to the Members in accordance with each Member's Percentage Interest.

8.6.5. For purposes of this Section 8.6, the term "Gross Profits" with respect to any product or products, for any period, calculated on an accrual basis an amount equal to the aggregate revenue (less all applicable quantity discounts and cash discounts) directly attributed to the sale of such products, less the sum of all "Laid-in Costs" associated with such products.

8.6.6. For purposes of this Section 8.6, the term "Laid-in Costs" means with respect to any product the sum of (i) all product costs, (ii) all inward-bound freight costs and (iii) all taxes and duties.

## SECTION 9
## DISSOLUTION

9.1.    **Events of Dissolution.**  The Company shall be dissolved upon the first to occur of the following events:

      (a)    the written consent of the Members;

      (b)    the disposition of all or substantially all of the assets of the Company; or

      (c)    the entry of a decree of judicial dissolution under Section 18-802 of the

Act.

9.2.    **Winding Up of the Company.**  Upon dissolution of the Company, the Company's business shall be wound up and all its assets distributed in liquidation; provided, however, that the Members acknowledge and agree that, in the event of a dissolution of the Company, the business of the Company shall be operated in the normal course of events during

25

the winding up period (except for sales of assets or the business, or parts thereof, as approved by the Board), and any outstanding contracts with customers shall be completed or terminated during such period.

      **9.3.**   **Sale of the Business by Board.** During the winding up process as set forth above, the Board shall wind up the Company and, subject to Section 8.1, offer the business and the assets of the Company for sale, in whole or in part, as promptly as shall be practicable and with reasonable diligence and, upon sale, to distribute the proceeds of sale as provided in Section 9.4 below. The Board shall have the authority to decide whether to liquidate all assets of the Company or, with the unanimous consent of the Members as to the assets so distributed, make certain in-kind distributions to the Members as part of the liquidation process. Any offer for sale of the business and the assets of the Company shall be conducted in a manner customary for the sale of businesses of the type engaged in by the Company, on such terms and conditions as the Board of Managers deems appropriate in order to maximize the proceeds of such sale, subject however, to Section 8.1. During the pendency of such offer, the Members shall be entitled to participate in the bidding for the business (or any part thereof).

      **9.4.**   **Distribution of Proceeds of Liquidation.**

      **9.4.1.** The proceeds from liquidation shall be applied and distributed in accordance with Section 4.6.2.

      **9.4.2.** The Managers shall not be personally liable for the return or repayment of all or any portion of the Capital Contribution of the Members; any such return or repayment shall be made solely from assets of the Company.

      **9.5.**   **Orderly Liquidation.** A reasonable time shall be allowed for the orderly liquidation of the assets of the Company and the discharge of liabilities to creditors so as to enable the Members to minimize the losses normally attendant upon a liquidation.

**SECTION 10**
**EXCULPATION AND INDEMNIFICATION**

      **10.1.**   **No Liability of Covered Persons.** No Officer, Manager, employee or agent of the Company (collectively, the "Covered Persons") shall be liable to the Company or any other Person who has an interest in or claim against the Company for any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that a Covered Person shall be liable for any such loss, damage or claim incurred by reason of such Covered Person's gross negligence or willful misconduct.

      **10.2.**   **Indemnification.** To the fullest extent permitted by applicable law, a Covered Person shall be entitled to indemnification from the Company for any loss, damage or claim incurred by such Covered Person by reason of any act or omission performed or omitted by such Covered Person in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of the authority conferred on such Covered Person by this Agreement, except that no Covered Person shall be entitled to be indemnified in respect of any

26

EB-00022896

loss, damage or claim incurred by such Covered Person by reason of such Covered Person's gross negligence or willful misconduct with respect to such acts or omissions; provided, however, that any indemnity under this Section 10 by the Company shall be provided out of and to the extent of Company assets only, and the Members shall not have personal liability on account thereof.

      **10.3. Expenses.** To the fullest extent permitted by applicable law, expenses (including legal fees) incurred by a Covered Person defending any claim, demand, action, suit or proceeding shall, from time to time, be advanced by the Company prior to the final disposition of such claim, demand, action, suit or proceeding upon receipt by the Company of an undertaking by or on behalf of the Covered Person to repay such amount if it shall be determined by the Board that the Covered Person is entitled to be indemnified as authorized in this Section 10.

      **10.4. Reliance.** To the extent that, at law or in equity, a Covered Person has duties (including fiduciary duties) and liabilities relating thereto to the Company or to any other Covered Person, a Covered Person acting under this Agreement shall not be liable to the Company or to any other Covered Person for its good faith reliance on the provisions of this Agreement or any approval or authorization granted by the Company or the Board of Managers and reasonably believed by the Covered Person to have been within the scope of authority of the Company or the Board of Managers.

**SECTION 11**
**MISCELLANEOUS**

      **11.1. Notices.** Any notice, request, demand, waiver, consent, approval or other communication which is required or permitted hereunder shall be in writing and shall be deemed given only if delivered personally or sent Federal Express or other overnight delivery service providing a receipt of delivery, or sent registered or certified U.S. mail, postage prepaid, as follows:

| | |
|---|---|
| If to Majority Member, to: | Eber Bros. Wine & Liquor Metro, Inc.<br>155 Paragon Drive<br>Rochester, New York 14624<br>Attention: Mr. Lester Eber, President |
| With a required copy to: | Harris Beach PLLC<br>99 Garnsey Road<br>Pittsford, New York 14534<br>Attention: Patrick J. Dalton, Esq. |
| Minority Member: | c/o Eder Bros., Incorporated<br>11 Eder Road<br>West Haven, Connecticut 06516<br>Attention: Richard M. Weiss, Manager |

-and-

27

EB-00022897

c/o Allan S. Goodman, Incorporated
180 Goodwin Street
East Hartford, Connecticut 06108
Attention: David Heller, Manager

With a required copy to:    Reid and Riege, P.C.
One Financial Plaza
Hartford, Connecticut 06103
Attention: Mark X. Ryan, Esq.

or to such other address as the addressee may have specified in a notice duly given to the sender
as provided herein. Such notice, request, demand, waiver, consent, approval or other
communication will be deemed to have been received by recipient as of the date so delivered or
if mailed via registered or certified mail, on the third business day after said notice was mailed.

     **11.2    Amendments and Waivers.**

     11.2.1 Any provision of this Agreement may be amended or waived if, but only if, such
amendment or waiver is in writing and is signed, in the case of an amendment, by each Member,
or in the case of a waiver, by the party against whom the waiver is to be effective.

     11.2.2 No failure or delay by any party in exercising any right, power or privilege
hereunder will operate as a waiver thereof nor will any single or partial exercise thereof preclude
any other or further exercise thereof or the exercise of any other right, power or privilege. The
rights and remedies herein provided will be cumulative and not exclusive of any rights or
remedies provided by law.

     **11.3    Successors and Assigns.** The provisions of this Agreement will be binding upon
and inure to the benefit of the parties hereto and their respective successors and assigns.

     **11.4    No Third-Party Beneficiaries.** This Agreement is for the sole benefit of the
parties hereto and their permitted assigns and nothing herein expressed or implied will give or be
construed to give to any Person, other than the parties hereto and such permitted assigns, any
legal or equitable rights hereunder.

     **11.5    Governing Law.** This Agreement will be governed by, interpreted, construed
and enforced in accordance with the laws of the State of Delaware, without regard to the conflict
of laws rules of such state.

     **11.6    Dispute Resolution.**

     11.6.1 All disputes arising under or related to this Agreement shall be settled by
arbitration. The arbitration shall take place in New Haven County, Connecticut before three (3)
arbitrators pursuant to the rules of the American Arbitration Association, including specifically
the Optional Procedures for Large, Complex Commercial Disputes. In addition, the proceedings
will include conduct of depositions or propounding of interrogatories by the parties without the
need for good cause to be shown, but subject to limitations deemed reasonable by the arbitrators.

28

EB-00022898

Arbitration may be commenced at any time by any party hereto by giving written notice to each other party to the dispute that such dispute has been referred to arbitration under this Section 11.6. One arbitrator shall be selected by each of Majority Member and Minority Member (but if any party fails to select an arbitrator within twenty (20) days after the date of the notice referred to above, the selection shall be made pursuant to the rules of, and from the panel of arbitrators from, the American Arbitration Association) and the two (2) arbitrators so selected. Any award rendered by the arbitrators shall be conclusive and binding upon the parties hereto; provided, however, that any such award shall be accompanied by a written opinion of the arbitrators giving the reasons for the award. This provision for arbitration shall be specifically enforceable by the parties and the decision of the arbitrators in accordance herewith shall be final and binding and there shall be no right of appeal therefrom. Each party shall pay its own expenses of arbitration and the expenses of the arbitrators shall be equally shared; provided, however, that if in the opinion of the arbitrators any claim for indemnification or any defense or objection thereto was unreasonable, the arbitrators may assess, as part of their award, all or any part of the expenses of the other party incurred in connection with said arbitration (including reasonable attorney's fees and said party's share of the arbitrators expenses) against the party raising such unreasonable claim, defense or objection. Judgment upon an award rendered by the arbitrators may be entered in any court having jurisdiction thereof.

11.6.2 To the extent that arbitration may not be legally permitted hereunder and the parties in dispute hereunder do not at the time of such dispute mutually agree to submit such dispute to arbitration, any party may commence a civil action exclusively in state or federal court sitting in New Haven County, Connecticut. The prevailing party in any action at law or in equity shall be entitled to receive from the other party reimbursement of its costs, including court costs and reasonable attorneys' fees and disbursements, as determined by the court. The execution and delivery of this Agreement shall be deemed to be the transaction of business within the State of Connecticut for purposes of conferring jurisdiction upon the courts located within the State of Connecticut. Each party to this Agreement, by execution of this Agreement, shall be deemed to have irrevocably submitted itself to the personal jurisdiction of any court of competent jurisdiction located in the State of Connecticut and all civil actions or proceedings hereinafter commenced in the State of Connecticut and relating to or arising from this Agreement, and to have waived any objection that such party may now or hereafter have to the venue of any such action or proceeding in any such court or that such action or proceeding was brought in an inconvenient court, and each party agrees not to plead or claim the same. Service of process in such action shall be made upon any such party personally within the State of Connecticut or any other lawful manner and such alternative manner of service shall be of the same legal force and validity as if service had been made upon it or him personally within the State of Connecticut.

11.7   WAIVER OF JURY TRIAL. EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

11.8   Counterparts. This Agreement may be signed in any number of counterparts, each of which will be deemed an original and all of which, when taken together, shall constitute one and the same instrument. Any signature page delivered by any party to this Agreement to

29

EB-00022899

any other party to this Agreement by facsimile or electronic mail shall be deemed an original signature page for all relevant purposes.

**11.9   Entire Agreement.** This Agreement (including the Schedules hereto, which are incorporated herein by this reference) constitutes the entire agreement among the parties with respect to the subject matter of this Agreement. This Agreement (including the Schedules hereto) supersedes all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter of this Agreement.

**11.10   Severability; Injunctive Relief.** The provisions of this Agreement are severable. If any provision of this Agreement is held invalid, illegal or otherwise unenforceable, in whole or in part, the remaining provisions or enforceable parts thereof will not be affected thereby and will be enforced to the fullest extent permitted by law. In addition, should any provision or any portion thereof ever be adjudicated by a court of competent jurisdiction to exceed the time or other limitation permitted by applicable law as determined by such court in such action, then such provisions will be decreased, or performed to the maximum time or other limitations prescribed by applicable law, the parties acknowledging their desire that in such event such action be taken.

**11.11   No Waiver.** No action or inaction taken or omitted pursuant to this Agreement will be deemed to constitute a waiver of compliance with any representations, warranties or covenants contained in this Agreement and will not operate or be construed as a waiver of any subsequent breach, whether of a similar or dissimilar nature.

**11.12   Waiver of Partition.** Except as otherwise expressly provided in this Agreement, to the fullest extent permitted by law, each of the Members hereby irrevocably waives any right or power that such Person might have to cause the Company or any of its assets to be partitioned.

**[Signature Page Follows]**

30

EB-00022900

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Limited Liability Company Agreement as of the date first set forth above.

EBER-CONNECTICUT, LLC

By: _____

Lester Eber
Chief Executive Officer

EBER BROS. WINE & LIQUOR METRO, INC., Member

By: _____

Lester Eber
President

By: _____

Wendy Eber
Chief Financial Officer

EDER-GOODMAN, LLC, Member

By: _____

Richard M. Weiss, Manager

By: _____

David Heller, Manager

31

EB-00022901

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Limited Liability Company Agreement as of the date first set forth above.

EBER-CONNECTICUT, LLC

By: _____
        Lester Eber
        Chief Executive Officer

EBER BROS. WINE & LIQUOR METRO, INC., Member

By: _____
        Lester Eber
        President

By: _Wendy Eber_____
        Wendy Eber
        Chief Financial Officer

EDER-GOODMAN, LLC, Member

By: _____
        Richard M. Weiss, Manager

By: _____
        David Heller, Manager

31

EB-00022902

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, has duly executed this Limited Liability Company Agreement as of the date first set forth above.

EBER-CONNECTICUT, LLC

By: _____
    Lester Eber
    Chief Executive Officer

EBER BROS. WINE & LIQUOR METRO, INC., Member

By: _____
    Lester Eber
    President

By: _____
    Wendy Eber
    Chief Financial Officer

EDER-GOODMAN, LLC, Member

By: _____
    Richard M. Weiss, Manager

By: _____
    David Helber, Manager

31

EB-00022903

## SCHEDULE A

### Members

| Name | Mailing Address | Capital Account | Number of Units | Percentage Interest |
|---|---|---|---|---|
| Eber Bros. Wine & Liquor Metro, Inc. | 155 Paragon Drive Rochester, New York 14625 | $25,500,000 | 85.00 | 85% |
| Eder-Goodman, LLC | c/o Eder Bros., Incorporated 11 Eder Road West Haven, Connecticut 06516 Attn: Richard M. Weiss, Manager<br><br>c/o Allan S. Goodman, Incorporated 180 Goodwin Street East Hartford, Connecticut 06108 Attn: David Heller, Manager | $4,500,000 | 15.00 | 15% |

EB-00022904

## SCHEDULE B

## Board of Managers

1. Lester Eber
2. David Eber
3. Wendy Eber
4. Thomas B. Slocum
5. George E.B. Slocum
6. Carl Krause
7. Elliott W. Gumaer, Jr.

EB-00022905

## SCHEDULE C

### Officers

| Name | Title |
|------|-------|
| Lester Eber | Chairman of the Board of Managers and Chief Executive Officer |
| Thomas B. Slocum | President |
| George E.B. Slocum | Vice President |
| Wendy Eber | Secretary and Treasurer |
| David M. Dean | Chief Financial Officer and Chief Operating Officer |

## SCHEDULE D

### Certificate of Formation

A copy of the Company's Certificate of Formation as currently in effect is appended hereto and incorporated herein by this reference.

EB-00022907

PLAINTIFF'S
EXHIBIT
PENGAD 800-631-6989
54
2/27/19co

Wendy Eber
Chief Financial Officer
Eber Bros. Wine and Liquor Corporation.
155 Paragon Drive
Rochester, NY  14624

Re:    NOTICE TO DEBTOR OF PROPOSAL TO ACCEPT COLLATERAL IN FULL
       SATISFACTION OF AMENDED AND RESTATED PROMISSORY NOTE DATED
       MARCH 13, 2006 IN THE PRINCIPAL AMOUNT OF $1,503,750.00 AND OF THE
       LINE OF CREDIT NOTE DATED FEBRUARY 26, 2010 IN THE MAXIMUM
       AMOUNT OF $1,500,000.00

       Alexbay, LLC, the undersigned, of 30 Corporate Drive, North Haven, Connecticut

06473-3254, is the holder of the Amended and Restated Promissory Note dated March 13, 2006

in the principal amount of $1,503,750.00 executed by Eber Bros. Wine and Liquor Corporation

("EWLC")(the "EWLC Note"). Alexbay, LLC is also the holder of the Line of Credit Note

dated February 26, 2010 in the maximum principal amount of $1,500,000.00 (Line of Credit

Note"), executed by Metro, the obligations of which were guaranteed by EWLC pursuant to the

Guaranty dated February 26, 2010 ("Guaranty"). By the Debt Assumption Agreement dated

February 11, 2011, Metro irrevocably assumed all of EWLC's obligations to pay principal,

interest and other obligations and liabilities in respect of the EWLC Note.

       Payment of the EWLC Note and the Line of Credit Note are secured by EWLC pursuant

to the Amended and Restated Security Agreement dated February 11, 2011 ("Amended and

Restated Security Agreement") whereby EWLC assigned and granted to the then-holder, Lester

Eber, a security interest in "[t]he shares of common stock, preferred stock, or partnership,

membership and other ownership interest, now or hereafter owned by Debtor..." The Line of

KSH00067

Credit Note is also secured by the Security Agreement dated February 26, 2010 ("Security Agreement"), whereby EWLC assigned and granted it to the then-holder, Lester Eber, "[t]he shares of common stock and preferred stock, or partnership, membership and other ownership interests now or hereafter owned by Debtor..."

By assignment of Note and Security Agreement dated January 18, 2012, Lester Eber irrevocably granted, assigned and transferred all right, title, interest and benefits he had in and to the EWLC Note, the Security Agreement and the Amended and Restated Security Agreement to Alexbay, LLC. By Assignment of Line of Credit Note and Security Agreement dated January 18, 2012, Lester Eber irrevocably granted, assigned and transferred all right, title, interest and benefits he had in and to the Line of Credit Note, the Securities, the Guaranty, the Security Agreement and the Amended and Restated Security Agreement to Alexbay, LLC.

The amount due and payable pursuant to the Amended and Restated Promissory Note dated March 13, 2006 is $1,951,874.26, including principal and interest, as of December 31, 2011, plus interest accruing at the rate of nine percent (9%) per annum thereafter. The amount due and payable pursuant to the Line of Credit Note dated February 26, 2010 is $1,698,828.22, including principal and interest, as of December 31, 2011 plus interest accruing at the rate of twelve and one-half percent (12 ½%) per annum thereafter.

EWLC has defaulted and continues to remain in default on payments due under the EWLC Note, Guaranty, the Line of Credit Note, the Security Agreement and the Amended and Restated Security Agreement described above.

Pursuant to N.Y.U.C.C. § 9-620, Alexbay proposes to accept the shares of common stock owned by EWLC in Eber Bros. Wine & Liquor Metro, Inc. ("Metro") in full satisfaction of the

KSH00068

obligations created by the Amended and Restated Promissory Note, the Line of Credit Note, the Guaranty, the Securities Agreement and the Amended and Restated Security Agreement.

In accordance with N.Y.U.C.C. § 9-620, you must object in writing to this proposal by Alexbay, LLC to accept the common stock in Metro owned by EWLC in full satisfaction of the obligations created by the Note, the Guaranty, the Line of Credit Note, the Security Agreement and the Amended and Restated Security Agreement within twenty (20) days after the date this notification was sent to you.

Your objection to the acceptance by Alexbay, LLC of Metro's membership interest in Eber-Connecticut, LLC must be received by Alexbay, LLC within twenty (20) days of the date this notification was sent at the following address:

Alexbay, LLC
30 Corporate Drive
North Haven, Connecticut 06473-3254

Dated: January __, 2012

ALEXBAY, LLC

By _____
Lester Eber, its Sole Member

BY CERTIFIED MAIL
RETURN RECEIPT REQUESTED

KSH00069

Board Minutes March 13, 2012 EWLC and Eber Brothers Metro Inc.

The Eber Brothers Wine and Liquor Corporation and Eber Brothers Metro Inc. Board meeting was called to order at 4pm on Tuesday March 13th, 2011 at 95 Allens Creek Road, Rochester, New York. Wendy Eber and Marino Fernandez, attorney for EWLC, were present. Elliot Gumaer and Lester Eber called in by phone.

The Board and Counsel discussed the Alex Bay, LLC suit vs EWLC and Eber Brothers Metro Inc. suit regarding the default of Eber Brothers Metro Inc to repay Alex Bay, LLC's ( which is owned by Lester Eber) loans to the company. Mr. Fernandez had reviewed the pledings, and appeared for EWLC and entered into the Stipulation and discussed the same with Wendy Eber and Alex Bay, LLC counsel.



Board Minutes March 13, 2012 EWLC and Eber Brothers Metro Inc and minutes from additional calls there after

The Eber Brothers Wine and Liquor Corporation and Eber Brothers Metro Inc. Board meeting was called to order at 4pm on Tuesday March 13th, 2011 at 95 Allens Creek Road, Rochester, New York. Wendy Eber and Marino Fernandez, attorney for EWLC, were present. Elliot Gumaer and Lester Eber called in by phone.

The Board and Counsel discussed the Alex Bay, LLC suit vs EWLC and Eber Brothers Metro Inc. suit regarding the default of Eber Brothers Metro Inc. to repay Alex Bay, LLC's ( which is owned by Lester Eber) loans to the company. Mr. Fernandez had reviewed the pledings, and appeared for EWLC and entered into the Stipulation and discussed the same with Wendy Eber and Alex Bay, LLC counsel.

There after parties had additional conference calls, after extensive conversation on this matter the board decided not to extend funds on defending the suit and authorized the company to waive its defenses.

EP.00.016952

Minutes from meeting of the Board of Eber Bros. Wine and Liquor Metro Inc.   August 18, 2011

On August 18th, 2011 at 2:15 the board of directors for Eber Brothers Wine and Liquor Metro Inc. which include Elliot Gumaer, Lester Eber and Wendy Eber, met at the Canandaigua National Bank in Rochester, NY to discuss and ratify the actions of the subsidiaries as described below.   Mr. Elliot Gumaer participated by conference call.  Wendy Eber documented the discussion.

The trustees ratified three loans made from Lester Eber to Eber Brothers Wine and Liquor Corp.  The first loan for $1,500,000 from October, 2009 was assumed by Eber Metro Inc. on February 26, 2010. Eber Metro Inc.  granted a secured interest in Metro's assets to secure this loan. This secured loan has an outstanding balance of $1,500,000 plus accrued interest.

The second loan from March 16, 2006, an obligation of Eber Brothers Wine and Liquor Corp. to Lester Eber for the original principal amount of $1,503,750.  The third loan of $575,895 from March 16, 2006 (which replaced the original note dated October 1, 2002) of which $ 1,222,710.68 plus accrued interest is outstanding.  The loan for $1.503750 was amended in Feb 11th, 2011 to reflect Eber Bros. Metro, Inc. assumption of this debt.  Also the security agreement from Feb 26, 2010 was restated to reflect Eber Bros. Metro Inc. assumption of this debt. Lester Eber made funds available after Feb 11, 2011 to Eber Bros Metro Inc. inconsideration of Metro Inc.'s assumption of this debt and security interest in Eber Bros Metro Inc.

After a lengthy discussion about how all the income beneficiaries and third parties were offered the opportunity to participate in the February 26th, 2010 loan but, they all declined and that only based on Lester's goodwill he gave the money for the loan, the loans were ratified by Wendy Eber  and Mike Gumaer. Lester Eber abstained.  A copy of all the documents relating to the loan was provided to the participants.

**UNANIMOUS WRITTEN CONSENT**
**OF**
**BOARD OF DIRECTORS**
**OF**
**EBER BROS. WINE AND LIQUOR CORP.**

The undersigned, being all of the Directors of Eber Bros. Wine And Liquor Corp., a New York corporation ( the "Corporation"), hereby consent, pursuant to Section 708(b) of the Business Corporation Law of the State of New York, to the adoption of the following resolutions:

**WHEREAS,** The Corporation is in default of the payment of certain obligations due to Alexbay, LLC; and

**WHEREAS,** the outstanding balance due Alexbay, LLC as of the date hereof is in excess of $3,650,000 ("Obligations"); and

**WHEREAS,** the Corporation's Obligations are secured by a security interest in all of its assets, including all of its ownership interest in Eber Bros. Wine and Liquor Metro, Inc. ("Metro"); and

**WHEREAS,** Alexbay, LLC has notified the Corporation that it is going to proceed with its rights as the holder of a security interest in the Collateral and is willing to accept all of the ownership of Metro in full satisfaction of the Obligations (the "Proposed Transfer"); and

**WHEREAS,** the undersigned have met and/or had numerous conversations regarding the Proposed Transfer and fully discussed the Proposed Transfer (including but not limited to discussions on March 13, 2012, throughout the week of March 13, 2012, May 30, 2012 and June 1, 2012); and

**WHEREAS,** after consideration of the financial statements and records of the Corporation and other information deemed relevant by the Board of Directors, the Board of Directors has determined in good faith that the value of Metro is less than the Obligations owed to Alexbay, LLC; and

**WHEREAS,** the New York State Supreme Court has determined and ruled in Alexbay, LLC vs. Eber Bros. Wine and Liquor Corp., et al. (Sup Ct., Monroe County, Index No. 2012-1919) (May 24, 2012) that the taking by Alexbay, LLC of the ownership of Eber Bros. Wine & Liquor Metro, Inc. in full satisfaction of the debt due Alexbay, LLC, by the Corporation is "Commercially Reasonable" under New York's Uniform Commercial Code;



EB-00001177

**NOW, THEREFORE, BE IT**

**RESOLVED,** that the Corporation be, and hereby is, authorized and directed to transfer and deliver to Alexbay all of its ownership interest in Metro in full satisfaction of the Corporation's Obligations to Alexbay, LLC; and be it further

**RESOLVED,** that the Corporation enter into and execute the "Agreement for Turnover and Acceptance of Eber Bros. Wine and Liquor Metro, Inc., Pursuant to New York Uniform Commercial Code" in the form attached hereto, and; be it further

**RESOLVED,** that any and all actions heretofore taken by the officers of the Corporation acting for and on behalf of the Corporation in connection with the Proposed Transfer, the negotiation of the Agreement described above and the other transactions contemplated by the foregoing resolutions are hereby ratified, approved and confirmed in their entirety; and be it further

**RESOLVED,** that the appropriate officers of the Corporation are hereby authorized, empowered and directed to take all such further action and to execute, deliver, certify and file all instruments and documents in the name of and on behalf of this Corporation as the officers executing the same shall approve as necessary or advisable to effectuate and accomplish the purpose of the foregoing resolutions and the transactions contemplated thereby.

IN WITNESS WHEREOF, the undersigned have executed this Written Consent this ___ la ___ day of June, 2012.

Wendy Eber, Director

_____

Elliott Gumaer, Director

- 2 -

EB-00001178

**NOW, THEREFORE, BE IT**

**RESOLVED,** that the Corporation be, and hereby is, authorized and directed to transfer and deliver to Alexbay all of its ownership interest in Metro in full satisfaction of the Corporation's Obligations to Alexbay, LLC; and be it further

**RESOLVED,** that the Corporation enter into and execute the "Agreement for Turnover and Acceptance of Eber Bros. Wine and Liquor Metro, Inc., Pursuant to New York Uniform Commercial Code" in the form attached hereto, and; be it further

**RESOLVED,** that any and all actions heretofore taken by the officers of the Corporation acting for and on behalf of the Corporation in connection with the Proposed Transfer, the negotiation of the Agreement described above and the other transactions contemplated by the foregoing resolutions are hereby ratified, approved and confirmed in their entirety; and be it further

**RESOLVED,** that the appropriate officers of the Corporation are hereby authorized, empowered and directed to take all such further action and to execute, deliver, certify and file all instruments and documents in the name of and on behalf of this Corporation as the officers executing the same shall approve as necessary or advisable to effectuate and accomplish the purpose of the foregoing resolutions and the transactions contemplated thereby.

IN WITNESS WHEREOF, the undersigned have executed this Written Consent this ____9____ day of June, 2012.

_____
Wendy Eber, Director

_____
Elliott Gumaer, Director

- 2 -

EB-00001179



Eber Bros. Wine and Liquor Metro Inc.

Authorized Shares 20,000 Common Stock - No Par Value

This Certifies that

Alexbay, LLC

Twenty Thousand

is the owner of

fully paid and non-assessable Shares of the above Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed.

In Witness Whereof, the said Corporation has caused this Certificate to be signed by its duly authorized officers and to be sealed with the Seal of the Corporation.

Dated June 7, 2012

_____
President

_____
Vice President

PLAINTIFF'S EXHIBIT

PENGAD 800-631-6989

EB-00000882

## AGREEMENT FOR TURNOVER AND ACCEPTANCE OF EBER BROS. WINE AND LIQUOR METRO, INC. PURSUANT TO NEW YORK UNIFORM COMMERCIAL CODE

This Agreement is made $\underline{June\ 5}$ , 2012 by Eber Bros. Wine and Liquor Corp., 95 Allens Creek Drive, Suite 10, Building 2, Rochester, New York 14618 ("Eber Bros"), Eber Bros. Wine and Liquor Metro, Inc., 95 Allens Creek Drive, Suite 10, Building 2, Rochester, New York 14618 ("Metro") and Alexbay, LLC 30 Corporate Drive, North Haven, Connecticut 06473 ("Alexbay").

In consideration of the mutual promises and actions set forth herein and Section 10 and other considerations, the Parties agree as follows:

1.    Obligations. As more fully set forth in the Complaint in the New York State Supreme Court Action entitled Alexbay, LLC v. Eber Bros. Wine and Liquor Corp., (Index no. 2012-1919 ("Action"), Eber Bros. is indebted to Alexbay in the approximate amount of $3,650,000, plus interest and expenses ("Obligations"). The Complaint and its exhibits in the Action is attached hereto and incorporated herein and made a part hereof as fully set forth ("Complaint"). As set forth in the Complaint, the Obligations are fully guaranteed by Metro.

2.    Collateral. As more fully set forth in the Complaint (including but not limited to the Security Agreement attached as Exhibit D to the Complaint) the Obligations are secured by virtually all of the assets of Eber Bros., including its ownership of Metro, ("Collateral"). Eber Bros. represents and warrants to Alexbay that it owns 100% of Metro.

3.    Default. Eber Bros. and Metro are in default of their Obligations to Alexbay. Such defaults include, but are not limited to, the failure to make payments due. As a result of such defaults, Alexbay has the present right and entitlement to enforce its security interests in the Collateral (including, without limitation, by taking possession of and selling or otherwise disposing of or realizing upon the Collateral) in accordance with the Security Agreement and applicable law.

4.    Transfer and Acceptance of Collateral. Pursuant to Section 9-620 of the New York Uniform Commercial Code (the "Code"), Alexbay is willing to accept the ownership of Metro in full satisfaction of the Obligations on the terms and conditions set forth herein, and Eber Bros. and Metro hereby consent to Alexbay's acceptance of the ownership of Metro in full satisfaction of the Obligations. Eber Bros. hereby transfers all of its rights and interest in the ownership of Metro and surrenders and turns over to Alexbay possession of Metro, and/or the unqualified right to take possession of Metro.

5.    Record Changing. Eber Bros. agrees to make all and/or cause or permit Alexbay to make appropriate changes in its records, minute book and financial statements to show that Alexbay is the sole owner of Metro. Metro agrees to make



PLAINTIFF'S EXHIBIT

and/or cause Eber-Connecticut, LLC to make all appropriate changes in its records, minutes books and financial statements.

6.      Surrender and Turnover. In furtherance of such surrender and turnover by Eber Bros. Eber Bros. shall provide to Alexbay through its Representatives (i) all keys, combinations, entry codes and other access devices, appropriately labeled and identified, to enable such Representative to obtain access to any and all premises where Metro or its assets may be located (the "Premises"), (ii) a complete and current listing of all Premises at which any assets of Metro are or may be located and the names, addresses (postal and e-mail) and telephone and facsimile numbers of all contact persons in connection therewith, Metro's books and records (however maintained, whether on computer software, in hard copy or otherwise) relating to the operation of their businesses.

7.      Premises. Upon execution and delivery of this Agreement, Alexbay by and through any of its Representatives, is granted the right (but shall not have the obligation) to be at the Premises at all times necessary and appropriate for purposes of fulfilling the terms and conditions of this Agreement and protecting the Collateral and its interests therein.

8.      Collateral Proceeds. Immediately upon the execution of this Agreement, Eber Bros. or its agents shall transfer and deliver to Alexbay all ownership interests in Metro then in its possession or subject to its control, together with all assignments, endorsements and instruments of transfer necessary to effect transfer to Alexbay, and without limiting the generality of the foregoing, Eber Bros. and Metro shall take all actions necessary to transfer to and vest in Alexbay or its designees complete and exclusive control over all bank accounts maintained by Metro (collectively, the "Bank Accounts") and, in connection therewith, shall turn over to Alexbay all unused checks and check registers and records relating to the Bank Accounts and shall promptly cooperate in executing all documentation and taking all other actions necessary to permit Alexbay to control the accounts..

9.      No Obligation with respect to Collateral Proceeds. Alexbay shall not be responsible or under any circumstance whatsoever have any liability for, and Alexbay does not in any respect whatsoever assume, any obligation of Eber Bros. and/or Metro to any of their officers, directors, managerial personnel or other employees or any of their other creditors or for any other obligation herefore or hereafter arising out of the operation of their business   including, without limitation, any obligation for their employee, officer or director wages or other compensation. In furtherance of the foregoing, Eber Bros. and Metro hereby indemnify Alexbay against, and hold Alexbay harmless from and against, any and all claims, damages, losses, costs and expenses (including, without limitation, for the actual fees and expenses of counsel) at any time asserted against or incurred by Alexbay as a direct or indirect result of any such obligations or otherwise in connection with the operation of their business or Alexbay's acceptance of the Collateral.

10.     Inter and Intra Company Debt. Eber Bros. and Metro both confirm, agree and covenant that neither owes the other any debt or obligations. Eber Bros. and Metro

both agree that neither owes Alexbay any debt or obligation other than the Obligations. All three (3) parties agree that there is no intra-company or inter-company debt between and/or among them, other than the Obligations. Notwithstanding anything herein, Eber Bros. and Metro and Alexbay agree that to the extent that there is any inter-company and intra-company debt between or among them (specifically including the Obligations) it is hereby cancelled, released and should forever be considered void. Eber Bros. and Metro hereby indemnify Alexbay against, and hold Alexbay harmless from and against, any and all claims, damages, losses, costs and expenses (including without limitation, for the actual fees and expenses of counsel), that at any time Eber Bros., Metro or any third party asserts claims that there existed or exists inter and/or intra debt between or among any of the parties.

11.   Certain Waivers. To the maximum extent permitted under Section 9-620 and 9-621 of the Code and any other applicable law, Eber Bros. and Metro hereby irrevocably (i) waive and renounce each right it may have or may have had to (A) any notification of the method, manner, time, place or terms of any disposition of any of the of Metro, or of any retention, of all or any part of the ownership of Metro by Alexbay and (B) redeem any of the ownership of Metro, and hereby acknowledge that such waiver and renunciation are made "after default" for purposes of any requirement of Section 9-620 and 9-621 of the Code and any other applicable laws, and (iii) waive any duty of Alexbay or other requirement under Section 9-620 and 9-621 of the Code and any other applicable law to the extent any such duty or other requirement is or may be inconsistent with any right of Alexbay pursuant to this Agreement. Eber Bros. and Metro hereby further irrevocably waive and renounce any right they may have or have had to any notice pursuant to any Security Agreement.

12.   No Claims.   Eber Bros. and Metro acknowledge the existence and continuation of the Defaults and that they do not have any claim, counterclaim, cause of action, defense, recoupment or right of offset relating in any way to (i) the Defaults, the outstanding Obligations or the Collateral, the Security Agreement or any other agreement, instrument or other writing that evidences or related to any of the outstanding Obligations or any of the Collateral (collectively, the "Loan Documents"), (ii) the validity, perfection or enforceability of Alexbay's security interests or other liens in or upon the Collateral, (iii) the manner or method by which any demand for payment of any of the Collateral has been made by Alexbay, (iv) the validity or enforceability of any of the Loan Documents, (v) any act, claim or statement of fact that would lessen, eliminate or modify any right or remedy of Alexbay against the Eber Bros. and Metro under any of the Loan Documents (any such claim, counterclaim, cause of action, defense, recoupment or right of offset being individually a "Claim"); provided, however, that if, notwithstanding the foregoing, they shall purport or be deemed to have any Claim, Eber Bros. and Metro hereby irrevocably and forever waive and release each such Claim.

13.   Transfer. By notice dated January 18, 2012, Alexbay notified Eber Bros. and Metro of its proposal to accept ownership in Metro in full satisfaction of the Obligations (Exhibit F to the Complaint). Eber Bros. and Metro believe ownership of Metro is worth less than the Obligations and has agreed and hereby agrees to the transfer of ownership of Metro set forth herein full satisfaction of the Obligations.

14. Further Assurances. Promptly upon Alexbay's request, Eber Bros. and Metro shall execute and deliver such further agreements, instruments and other documents, and take such further actions, as may be requested by Alexbay in order to accomplish any purpose of this Agreement and to effectuate the transactions contemplated hereby, and Eber Bros. and Metro shall otherwise cooperate with Alexbay in connection with this Agreement and such transactions. The parties acknowledge and agree that the transfer of ownership of Metro by Eber Bros. to Alexbay in full satisfaction of the Obligations pursuant to the New York Uniform Commercial Code has been declared commercially reasonable by the Court in the Action.

15. Waiver. No failure of Alexbay to exercise, and no delay by Alexbay in exercising, any right or remedy under this Agreement shall constitute a waiver of such right or remedy. Any waiver by Alexbay of any such right or remedy shall be effective only if made in a writing executed by Alexbay.

16. Binding. This Agreement is binding upon the parties and the successors and assigns, heirs, executors and legal representatives, and inures to the benefit of and is enforceable by Alexbay and its successors and assigns.

17. Headings. The headings of the paragraphs contained in this Agreement are inserted for convenience only and do not affect the meaning of this Agreement.

18. Governing Law. This Agreement shall be governed by and construed, interpreted and enforced in accordance with the internal laws of the State of New York, and any applicable law of the United States of America.

19. Entire Agreement. This Agreement contains the entire agreement between Alexbay and Eber Bros. and Metro with respect to the subject matter of this Agreement, and supersedes each course of conduct previously pursued, accepted or acquiesced in, and each oral agreement and representation previously made, by Alexbay or by Eber Bros. and/or Metro with respect thereto, whether or not relied or acted upon. No course of performance or other conduct pursued, and no oral agreement or representation made, in the future by Alexbay, whether or not relied or acted upon, and no usage of trade, whether or not relied or acted upon, shall modify or terminate this Agreement or impair or otherwise affect any right or remedy of Alexbay, or any obligation of Eber Bros. and Metro, pursuant to this Agreement. No modification of this Agreement shall be effective unless made in a writing duly executed by the parties or parties sought to be bound thereby. No termination of this Agreement shall be effective unless made in a writing duly executed by Alexbay and until any such termination is so made this Agreement shall remain in full force and effect.

20. Counterparts. This Agreement may be executed in any number of counterparts, and by the different parties hereto on separate counterparts, each of which shall be an original, but all of which together shall constitute one instrument.

21. JURISDICTIONAL CONSENTS AND WAIVERS. ANY LEGAL SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT

4

OR ANY OTHER LOAN DOCUMENT SHALL BE INSTITUTED IN ANY FEDERAL OR STATE COURT LOCATED IN MONROE COUNTY, NEW YORK PURSUANT TO SECTION 5-1402 OF THE NEW YORK GENERAL OBLIGATIONS LAW, AND THE PARTIES EACH WAIVE ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUCH SUIT, ACTION OR PROCEEDING, AND EACH HEREBY IRREVOCABLY SUBMIT TO THE JURISDICTION OF ANY SUCH COURT IN ANY SUIT, ACTION OR PROCEEDING. EACH KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES ANY RIGHT TO TRIAL BY JURY IN ANY ACTION OR OTHER LEGAL PROCEEDING RELATING TO THIS AGREEMENT OR OTHERWISE TO THE COLLATERAL OR ALEXBAY'S ACCEPTANCE THEREOF.

Eber Bros. Wine and Liquor Corp.

By: _____
Wendy Eber, CFO

Eber Bros. Wine and Liquor Metro, Inc.

By: _____
Wendy Eber, CFO

Alexbay, LLC

By: _____
Lester Eber, Sole Member

5



 **Gmail**                                                elliott gumaer <ewgumaer@gmail.com>

---

## (no subject)
1 message

---

**elliot gumaer** <ewgumaer@gmail.com>                                Fri, Apr 11, 2014 at 3:38 PM
To: Lester Eber <l.eber@eberbros.com>

Lester, April is upon us and we should reach an understanding with respect to my compensation. While the
Eber Co.s are history in that respect, I remain a trustee of the Eber Trust for which I should be compensation. I
thought that was your thought when you sent me a December check in a reduced amount. New York trustee
fees are established by statue, however you have been reluctant to charge the commission against cash flow
that would otherwise be diostributed to you, and your sister and niece.
What are your thoughts in this regard?
Best, Mike



PLAINTIFF'S
EXHIBIT

 **Gmail**                              elliott gumaer <ewgumaer@gmail.com>

---

## compensation
2 messages

---

**elliot gumaer** <ewgumaer@gmail.com>                         Sat, Jun 28, 2014 at 3:55 PM
To: Lester Eber <l.eber@eberbros.com>, Wendy Eber <weber@slocumandsons.com>

> Gree

---

**elliot gumaer** <ewgumaer@gmail.com>                         Sat, Jun 28, 2014 at 4:16 PM
To: Lester Eber <l.eber@eberbros.com>, Wendy Eber <weber@slocumandsons.com>

> Greetings Lester and Wendy,
> Thanks you very much for the payment to me on June 1, 2014, in the amount of $2,000.  I consider this payment
> a thanks by you for the responsibilities which I have assumed on behalf of the Eber Companies and the Eber
> family individually.  And, of course, this responsibility is not fully terminated in as much as I continue to act as a
> co-trustee of the Eber Trusts.  I shall not suggest any compensation level but I thank you for continuing a level of
> compensation which you, Lester, feel is appropriate recognizing our friendship and professional relationship for a
> period in excess of 40 years,  Best to you both,  Mike.

GUM000157

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

NEW YORK STATE TEAMSTERS CONFERENCE PENSION
AND RETIREMENT FUND, by its Trustees, John Bulgaro,
Daniel W. Schmidt, Michael S. Scalzo, Sr., Tom J. Ventura,
Bob Schaeffer, Eugene Delorme and Brian Hammond

                         **AFFIDAVIT OF**
                         **CONFESSION OF**
            Plaintiffs,      **JUDGMENT**

    -against-                            Case No.:

EBER BROS. WINE AND LIQUOR CORPORATION

             · Defendant.

STATE OF NEW YORK
COUNTY OF MONROE   ss.:

      Wendy Eber, being duly sworn, deposes and says that:

1.    I am an officer of the above-captioned defendant and am duly authorized to make this

Affidavit of Confession of Judgment ("Affidavit") on its behalf.

2.    The defendant hereby confesses judgment and authorizes entry thereof against it in the sum of

ONE MILLION, FOUR HUNDRED TWENTY-ONE THOUSAND, TWENTY NINE DOLLARS

AND 95/100 ($1,421,029.95).

3.    This Affidavit is for a debt justly due and owing to the plaintiffs arising from the assessment of

an employer withdrawal liability under the Employee Retirement Income Security Act of 1974, as



1

amended by the Multi-employer Pension Plan Amendments Act of 1980, against the defendant.

_Wendy Eber_
Wendy Eber
Duly authorized agent and representative
for the defendant



CONNECTICUT
STATE OF ~~NEW YORK~~ )
     NEW HAVEN ) ss.:
COUNTY OF ~~MONROE~~ )

On the _1st_ day of ~~June~~ AUG., 2012, before me personally came Wendy Eber, known to me as the individual named in and who executed the foregoing Affidavit of Confession of Judgment and she acknowledged to me that she was compe tent to execute the Affidavit of Confession of Judgment on behalf of the defendant and that on this day she executed same.

_Lorrie L. Oberdick_
NOTARY PUBLIC

LORRIE L. OBERDICK
NOTARY PUBLIC
State of Connecticut
My Commission Expires
May 31, 2013

2

EB-00023129

03/26/2012  11:00   9126387931              EWG                                           PAGE   01
MAR-23-2012 14:59 From:                                              To:9126387931       P.1/1

## UNANIMOUS WRITTEN CONSENT
## OF
## BOARD OF DIRECTORS
## OF
## EBER BROS. WINE and LIQUOR CORPORATION

The undersigned, being all of the Directors of Eber Bros Wine and Liquor

Corporation a New York corporation (the "Corporation"), hereby consent, pursuant to

Section 708(b) of the Business Corporation Law of the State of New York, to the adoption

of the following resolutions.

     RESOLVED, that the resignation of Lester Eber as a Director and
President of the Corporation is hereby accepted and approved effective
February 1, 2012; and be it further

     RESOLVED, that Wendy Eber shall be, and is hereby, elected as
President of the Corporation, to serve until the next annual meeting of the
shareholders and until her respective successor is elected and has qualified,
and be it further

     RESOLVED, that the unexpired Director's term left by the resignation
of Lester Eber be left as vacant until further action of the Board of Directors.

IN WITNESS WHEREOF, the undersigned Directors and Shareholders have

executed this Consent as of the 28th day of February, 2012.

Wendy Eber

Elliott Gumaer

U:\\AJRIDS\\F\\URUSEBER\\BROTHERS\\JOINT RESOLUTIONS.DOC

1



PLAINTIFF'S
EXHIBIT
77
2/28/1900

EB-00001185

WIEDMAN, VAZZANA, CORCORAN & VOLTA, P.C.

ATTORNEYS AND COUNSELLORS
5 SOUTH FITZHUGH STREET
ROCHESTER, NEW YORK 14614
TELEPHONE (585) 454-5850
FACSIMILE (585) 454-1273

FREDERICK WIEDMAN (1957)
FREDERICK WIEDMAN, JR. (1999)

JAMES G. VAZZANA
CHRISTOPHER H. CORCORAN
SANDRA E. VOLTA*

*ALSO ADMITTED IN FLORIDA

PARALEGALS
JOANNE LAMAGNA
AMANDA L. BACH

March 28, 2017

Lorisa D. LaRocca, Esq., Partner
Woods Oviatt Gilman LLP
700 Crossroads Building
2 State Street
Rochester, New York 14614

Re:   Lester Eber / Trust

Dear Lorisa:

As I've expressed to you many times Lester Eber would like to purchase the stock of Eber Brothers, Co.

In my conversations with Jennifer Weidner she express some concern in doing so since Canandaigua National Bank was a named defendant in the SDNY case and is hesitant to accommodate Lester until the Judicial Settlement is finalized.

In that regard has any of the beneficiaries appeared or interposed objections to the accounting.

I will make the appearance on Thursday and I have a feeling that Lester will also be there.

Please advise as soon as you hear from any other beneficiaries.

With kindest personal regards.

Sincerely,
**Wiedman, Vazzana, Corcoran & Volta, PC**

James G. Vazzana



PLAINTIFF'S
EXHIBIT
86
2/28/19 ac
PENGAD 800-631-6989

CNB-PL0025

WIEDMAN, VAZZANA, CORCORAN & VOLTA, P.C.

Page Two
March 28, 2017

JGV/jfl
Cc: Jennifer Weidner, Esq.
    Paul Keneally, Esq.
    John Hebert, Esq.
    Lester Eber
    Wendy Eber

P.S. So that we are clear on one point, I want to be certain that everyone knows that
Eber Bros and Co owns Eber Brothers Wine & Liquor Corp. and items 12 of your
Schedule J specifically mentions "...pursuant to Article Ninth of the Will, in case all, or
substantially all of the decedent's stock in Eber Bros and Co. Inc. is sold, the Trustees,
in their absolute discretion, can terminate the Trust and distribute the residuary of the
Trust to the beneficiaries."

CNB-PL0026