UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL KLEEBERG, LISA STEIN
and AUDREY HAYS,

                    Plaintiffs,

          v.

                                                    Civil Action No. 16-CV-9517(LAK)

LESTER EBER,
ALEXBAY, LLC f/k/a LESTER EBER, LLC,
CANANDAIGUA NATIONAL CORPORATION d/b/a
CANANDAIGUA NATIONAL BANK AND TRUST,          **AMENDED RESPONSES TO**
ELLIOT W. GUMAER, JR.,                        **PLAINTIFF KLEEBERG'S FIRST**
EBER BROS. & CO, INC.,                        **SET OF INTERROGATORIES TO**
EBER BROS. WINE AND LIQUOR CORP.,             **DEFENDANT WENDY EBER**
EBER BROS. WINE & LIQUOR METRO, INC.,
EBER CONNECTICUT, LLC, and
WENDY EBER,

                    Defendants.

Pursuant to the Federal Rules of Civil Procedure, Rule 26(a)(1), Defendant, Wendy

Eber, by her attorneys, Underberg & Kessler LLP, for her Amended Responses to Plaintiff

Daniel Kleeberg's First Set of Interrogatories to Defendant Wendy Eber (the

"Interrogatories"), hereby responds as follows:

## SPECIFIC OBJECTIONS AND RESPONSES

1.      Identify all your sources of income since 2007 by year:

**Response to No. 1:**

**2007: EBWLC**
**2008 - 2017: Eber-Conn**
**2012-2017: Slocum of Maine**



2.      Identify all positions of full or part-time employment and the dates of such

employment since 1990.

**Response to No. 2:**

**Eber-CT: 2008- Present**
**Eber Bros WL Corp.:  2001 to 2008**
**Pegasystems, Inc.:  1998-2001**
**M&T Bank: 1995-1998**
**Emerald Capital: 1992-1993**
**Alumax: 1990- 1992**
**Deloitte and Touche:  1989-1990**


3.      Identify all businesses in which you have been a member, partner, officer,

or director since 1990.

**Response to No. 3:**

**EWLC, Eber Bros and Co, Eber Bros Metro Inc., Eber-CT, Slocum of Maine, LLC,
Segwey, LLC, Eber-Rhode Island, PW&S, Eber Acquisition Corp, Eber Metro, LLC.**

4.      Identify all email accounts that you have used (either personal or business)

since 2000.

**Response to No. 4:**

**Weber@eberbros.com**
**weber@slocumandsons.com**
**weber4@nyc.rr.com**
**wendyefry@gmail.com**

5.      Describe how you took notes during Board meetings for any of the Eber

Defendant entities, including what you did with the notes after the meetings.

**Response to No. 5:**

**To the extent notes were made, they were either written down or typed.  Notes were
not retained.**

2

6.     Identify all documents in the Eber Defendants' document production that

you contend were disclosed to Plaintiffs prior to the filing of this lawsuit.

**Response to No. 6:**

**The Eber Defendants object to this demand on the basis that it is overbroad and places on undue burden on the Eber Defendants. Without waiving said objections, documents that were disclosed to Plaintiffs prior to the filing of this lawsuit were the letters sent by Lester to Sally Kleeberg and Audrey Hays in March/April 2010. In additional, Lester Eber recalls that a variety of trust documents were provided to one or more of the plaintiffs, but does not have a specific recollection of which documents.**

7.     Identify all companies with which you or Lester Eber have been involved as

employees, shareholders, members, or directors that are not parties to this lawsuit.

**Response to No. 7:**

**Slocum of ME, LLC, Segwey, LLC, Eber Metro, LLC., PW&S, LLC, Eber Acquisition Corp. Delaware Importers, LLC, Monroe Display, Inc., Eber-Rhode Island, LLC.**

8.     As to each company you identified in response to Interrogatory No. 7,

describe (a) the nature of its business operations, (b) the dates when it was in operation,

(c) the geographic region in which it operated, (d) any positions in it that you or Lester

held and the dates you held them, and (e) the Eber Defendants' respective ownership

interest.

**Response to No. 8:**

**Slocum of Maine, LLC.- Licensed out of state shipper in Maine which provides out of state services as a registered agent to vendors of Eber-CT with no mark up to Eber-CT.   Lester and Wendy Eber were 50/50 shareholders from 2012 to present time.**

**Segwey, LLC- Non-operating New York LLC which partially funded settlement of EBWLC's Teamsters Conference Pension withdrawal liability in exchange for assigned EBWLC assets, including customer uncollected account receivables and Insurance Co's. deposits. Wendy Eber is sole member 2013 to current.**

**Eber Metro, LLC formerly ENDC, LLC - Delaware limited liability company, and Metro New York wine and Liquor distributor which operated from approximately**

3

2005 to 2007. Wendy was Secretary and Treasurer of the company in or about 2007, and Lester was President of company until it was closed in approximately 2008.

PW&S, LLC- Non-operating Ohio limited liability company which was a wine and spirits brokerage company in Ohio from date unknown to approximately 2008. Wendy was Secretary and Chief Financial Officer of the Company in or about 2007, and Lester was President until approximately 2008.

Eber Acquisition Corp. - New York Corporation and holding company. Wendy was Secretary and Chief Financial Officer in or about 2007, and Lester was a Director until approximately 2008.

Delaware Importers, LLC- Non-operating Delaware limited liability company which distributed wine and liquor in the State of Delaware. Wendy was Secretary and Treasurer in or about 2007, and Lester was Manager until approximately 2008.

Monroe Display Company, Inc. - Non-operating New York corporation providing merchandising and advertising services for wine and spirits brands in New York. Approximate dates of operation 1990's to early 2000's.

9.    State whether Patrick L. Dalton was required to sign the Affidavit dated

October 27, 2015 as a condition of settlement of the Harris Beach lawsuit.

**Response to No. 9:**

Yes.

10.    State whether Lester Eber was reimbursed for moneys paid to him in

connection with the settlement of the Harris Beach lawsuit (and if so, who reimbursed him

for it and for how much).

**Response to No. 10:**

No.

11.    State whether any Defendant incurred additional debt to Lester as a result

of the Harris Beach settlement (and if so, who incurred the debt, how much was the

principal, what the interest rate was, and how much is currently outstanding).

**Response to No. 11:**

No.

4

12.     Identify any off-shore (i.e. outside the United States) bank accounts owned, managed or controlled by you.

**Response to No. 12:**

**None.**

13.     State whether you recall having had any verbal communications since January 1, 2012 with any of Plaintiffs or their parents concerning the Allen Eber Trust, the 2012 Action, Alexbay, Eber-Conn, or this lawsuit. If so, state the date, location, means, participants, and topics discussed.

**Response to No. 13:**

**Wendy Eber had multiple conversations with Daniel Kleeberg since 2012, and cannot recall each and every one. However, such conversations included:**

- **Many conversations with Daniel Kleeberg relating to Eber-CT, the products that he sold Eber-CT, and products that he did not sell Eber-CT.**

- **General conversations about the performance of Eber-CT with Daniel Kleeberg.**

- **A couple conversations with Daniel Kleeberg about his gratitude for working at Eber Bros. and respect for Lester including Lester's personal financial support to Eber companies. He specifically stated that he spoke to Lester more often after he left Eber Bros. than when he worked at Eber Bros.**

- **Extensive conversations with Daniel Kleeberg with respect to the lawsuit brought by Gail Kleeberg, his ex-wife, regarding his pension benefits which should have been paid to her, and Gail Kleeberg's lawsuit with Eber Bros. relating to the same issue.**

- **A couple of conversations with Daniel Kleeberg regarding his conversations with the PBGC and his pension benefits which should have been paid to his ex-wife. Also, a conversation with Dan Kleeberg about the PBGC's lawsuit against Eber Companies for the pension liability.**

5

14.     Identify any documents concerning the communications described in your answer to Interrogatory No. 13.

**Response to No. 14:**

**Dan sent one page of his divorce stipulation from the lawsuit with ex-wife.**

DATED:   July 26, 2018

UNDERBERG & KESSLER LLP

By: _____

Paul F. Keneally, Esq.
Colin D. Ramsey, Esq.
*Attorneys for Eber Defendants*
300 Bausch & Lomb Place
Rochester, New York 14604
(585) 258.2800
pkeneally@underbergkessler.com
cramsey@underbergkessler.com

TO:   Brian C. Brook, Esq.
      Clinton Brook & Peed
      *Attorneys for Plaintiffs*
      641 Lexington Avenue, Fl. 13
      New York, New York 10022
      (212) 328-9559
      brian@clintonbrook.com

STATE OF NEW YORK   )
COUNTY OF MONROE   ) ss:

    **WENDY EBER**, being duly sworn, deposes and says that:  she is one of the Defendants in the within action; that deponent has read the foregoing Amended Responses to Plaintiff Daniel Kleeberg's First Set of Interrogatories to Defendant Wendy Eber and knows the contents thereof, and that the same is true to deponent's own knowledge, except as to those matters stated therein to be alleged upon information and belief, and that as to those matters deponent believes it to be true.

<div style="text-align:right">

_____

**Wendy Eber**

</div>

Sworn to before me this
___ day of July, 2018

_____
    Notary Public

<div style="text-align:center">7</div>

MAR. 14. 2007  4:02PM   SOUTHERN WINE&SPIRIT                    NO. 343   P. 2



*Southern Wine & Spirits of America, Inc.*

Dedicated to Sales & Service
**SINCE 1968**

*1600 N. W. 163rd Street • Miami, Florida 33169-3562 • 305.625.4172 • Fax 305.625.2674*

March 8, 2007

**WAYNE E. CHAPLIN**
President
Chief Operating Officer

Mr. Lester Eber, President
Eber Bros. Wine & Liquor Corporation
Eber-Metro, LLC
155 Paragon Drive
Rochester, New York 14624

> Re:   Letter of Intent-Southern Wine & Spirits of America, Inc.
> ("Southern")/Eber Bros. Wine & Liquor Corporation ("EBWLC")
> and Eber-Metro, LLC f/k/a Eber-NDC, LLC ("Eber-Metro")

Dear Mr. Eber:

Pursuant to the Letter of Intent dated February 7, 2007 ("Letter of Intent"), this letter is designed to be a first amendment to the Letter of Intent ("First Amendment"). In connection therewith, the section titled "Termination" shall be amended and restated as follows:

### Termination

This Letter of Intent may be terminated (i) by the mutual agreement of the parties; or, (ii) by either party in the event the definitive purchase agreement is not executed on or before March 31, 2007. This Letter of Intent may be extended by mutual agreement of the parties.

All of the other terms contained in the Letter of Intent are hereby ratified and confirmed. Furthermore, the parties agree that as a result of the above, the section titled, "Exclusivity" shall continue to be binding and of full force and effect until the termination of the Letter of Intent.

This First Amendment may be executed in one or more counterparts, each of which when executed shall be deemed to be an original but all of which when taken together shall constitute one and the same First Amendment.



**PLAINTIFF'S
EXHIBIT
93**
5/9/19 C



CONFIDENTIAL

SGWS-000124

Mr. Lester Eber, President                                    March 8, 2007
Eber Bros. Wine & Liquor Corporation                          Page 2
Eber-Metro, LLC

Re:   Letter of Intent-Southern Wine & Spirits of America, Inc.
      ("Southern")/Eber Bros. Wine & Liquor Corporation ("EBWLC")
      and Eber-Metro, LLC f/k/a Eber-NDC, LLC ("Eber-Metro")

The parties hereby acknowledge and agree that facsimile signatures of this First Amendment shall
have the same force and effect as original signatures.

                              Very truly yours,

                              SOUTHERN WINE & SPIRITS OF AMERICA, INC.

                              By:
                                 Wayne E. Chaplin, President and Chief Operating
                                 Officer

Accepted and agreed to this 14th day of March, 2007.

EBER BROS. WINE & LIQUOR CORPORATION

By:
   Lester Eber, President

By:
   John T. Ryan, Chief Financial Officer

EBER-Metro, LLC

By:
   Lester Eber, President

LESTER EBER, Individually

JAN-25-1996  08:11                                                      P.13/14



*Southern Wine & Spirits of America, Inc.*

Dedicated to Sales & Service
**SINCE 1968**

*1600 N. W. 163rd Street • Miami, Florida 33169-2562 • 305.625.4171 • Fax 305.625.2674*

WAYNE E. CHAPLIN
President
Chief Operating Officer

February 7, 2007

Mr. Lester Eber, President
Eber Bros. Wine & Liquor Corporation
155 Paragon Drive
Rochester, New York 14624

        Re:    Letter Agreement between Southern Wine & Spirits of America, Inc.
             ("Southern") and Eber Bros. Wine & Liquor Corporation ("EBWLC")

Dear Lester:

In consideration of the closing of the transactions contemplated by the letter of intent (the "Closing") entered into by and among Southern, EBWLC and Eber-NDC, LLC ("Eber-NDC") of even date ("Letter of Intent"), Southern and EBWLC further agree that:

    At the Closing, EBWLC will grant to Southern the right of first negotiation and refusal with respect to the sale of any equity interest in its subsidiaries, including Delaware Importers, LLC, Eber-Connecticut, LLC, Eber-Rhode Island, LLC, and PW&S, LLC (d/b/a Postiv Wine & Spirits). In addition, EBWLC shall, to the extent permissible, assign to Southern its call right to purchase the fifty (50%) interest in Delaware Importers, LLC owned by a third party. Notwithstanding the preceding to the contrary, in the event the call right is not assignable, at Southern's election, EBWLC shall exercise its call right and simultaneously sell the purchased interest to Southern for an amount equal to the call price (which price shall be paid in cash at the closing of said sale if required under the terms of the call transaction.

    The parties agree that EBWLC or its designee shall control the day-to-day operations of Delaware Importers, LLC.

CONFIDENTIAL

SGWS-000126

Feb. 8. 2007  2:08PM   NEW YORK PALACE                          No. 1349   P. 15

JAN-25-1996  00:11                                              P.14/14

Mr. Lester Eber, President                        February 7, 2007
Eber Bros. Wine & Liquor Corporation              Page 2

Re:   Letter Agreement between Southern Wine & Spirits of America, Inc.
      ("Southern") and Eber Bros. Wine & Liquor Corporation ("EBWLC")

This letter agreement shall become effective upon the closing of the transactions set forth in the
Letter of Intent. At the request of either party hereto and without further consideration, the other
party will execute and deliver any documents and take any action that may reasonably be
required in order to complete the transactions contemplated herein.

If the terms of this Letter Agreement are acceptable to you, please sign below and return one
original copy to Southern.

                              Very truly yours,

                              SOUTHERN WINE & SPIRITS OF AMERICA, INC.

                              By: _____
                                  Wayne E. Chaplin, President and Chief Operating Officer


Accepted and agreed to this ____ day of February, 2007.

EBER BROS. WINE & LIQUOR
CORPORATION

By: _____              _____   President
    Lester Eber, President               LESTER EBER, Individually   Eber bros.

By: _____
    John T. Ryan, Chief Financial Officer


K:\CLIENTS.8-U\SOUTHERN\m43C\lRestLTRINT-002\Kdk 2 ltr Agreement.Eber Bros.[20107.wpd

                                                               TOTAL P.14

CONFIDENTIAL                                                    SGWS-000127

Feb. 8. 2007  2:05PM    NEW YORK PALACE                 No. 1349  P. 3

JAN-25-1996  00:07                                        P.02/14



*Southern Wine & Spirits of America, Inc.*

*Dedicated to Sales & Service*
**SINCE 1968**

1600 N. M. 169TH STREET • MIAMI, FLORIDA 33169-5903 • 305.633.9611 • FAX 305.633.2674

February 7, 2007

WAYNE E. CHAPLIN
President
Chief Operating Officer

Mr. Lester Eber, President
Eber Bros. Wine & Liquor Corporation
Eber-NDC, LLC
155 Paragon Drive
Rochester, New York 14624

> Re: Nonbinding Letter of Intent-Southern Wine & Spirits of America,
> Inc.("Southern")/Eber Bros. Wine & Liquor Corporation ("EBWLC")
> and Eber-NDC, LLC ("Eber-NDC")

Dear Mr. Eber:

What follows are the terms and conditions setting forth Southern's intention in connection with the acquisition of certain assets from EBWLC and Eber-NDC.  It is anticipated that Southern will assign its rights under this Letter of Intent to an affiliate (or affiliates) of Southern.  All obligations of any such Southern affiliate will be guaranteed by Southern.

Any reference herein to "EBWLC" shall include the wholly owned divisions operating under the names of "The House of Burgundy" and "Liberty Wine Company." EBWLC and Eber-NDC shall sometimes together be referred to as "EBER." Any reference to "Southern" shall include Southern and any affiliates that will be a party to the transaction.

It is not the intention of the parties that this Letter of Intent, or any obligation of the parties with respect hereto, be, or be deemed to constitute, a legally binding obligation of the parties hereto, except for the paragraphs under the headings: "Contact with Suppliers," "Exclusivity," "Press Release," "Confidentiality" and "Termination." Any other legally binding obligation with respect to the proposed transactions shall exist only upon the execution and delivery of a definitive purchase agreement, and all rights and obligations of the parties (other than set forth



Arkansas . California . Colorado . Florida . Hawaii . Illinois . Kentucky . Nevada . New Mexico . Pennsylvania . South Carolina

CONFIDENTIAL                    SGWS-000128

Mr. Lester Eber, President                          February 7, 2007
Eber Bros. Wine & Liquor Corporation                  - Page 2 -
Eber-NDC, LLC

Re: Nonbinding Letter of Intent-Southern Wine & Spirits of America,
Inc.("Southern")/Eber Bros. Wine & Liquor Corporation ("EBWLC")
and Eber-NDC, LLC ("Eber-NDC")

under the headings described in the preceding sentence) shall be governed by such agreements.

Subject to: (i) acceptance by you, EBWLC and Eber-NDC; (ii) a definitive purchase agreement being executed by all necessary parties to reflect the details of what follows; and (iii) EBWLC, Eber-NDC, you and each of the other shareholders, owners and affiliates of both EBWLC and Eber-NDC entering into the Restrictive Covenants (described below), this Letter of Intent outlines the basic terms of our understanding of the acquisition of certain assets of EBER and matters related thereto. Based upon our preliminary discussions, and subject to the negotiation and preparation of relevant agreements between and among us, the principal terms of the proposed acquisition are as follows:

1.  Southern will purchase certain assets and properties of EBER used in its wholesale wine and spirits business in New York (the "Business"). The assets being purchased (the "Assets") include, the following:

    (a)  All inventory and prepaid wine purchased from Suppliers (defined below), whether or not included in the definition of Inventory;

    (b)  Any and all records related to the Business;

    (c)  All intellectual property, including, without limitation, web sites, trade names (including the names "The House of Burgundy" and "Liberty Wine Company" and any other trade names used by EBER), trademarks, software, patents and applications, and registrations;

    (d)  All goodwill and rights held by EBER under any Supplier Contracts (defined below). The term "Supplier Contracts" includes written and oral agreements with all of EBER's wine, spirits and alcoholic beverage suppliers;

    (e)  All technical and marketing information, including new developments, inventions, know-how, processes, ideas, and trade secrets and documentation, and all related claims and rights;

    (f)  All orders in process in connection with sales of merchandise from Suppliers as well as the customer order backlog related thereto; and

    (g)  All sales materials, customer records, logs, customer lists, vendor lists,

CONFIDENTIAL

P.04/14

JAN-25-1996  00:08

Mr. Lester Eber, President                                    February 7, 2007
Eber Bros. Wine & Liquor Corporation                          - Page 3 -
Eber-NDC, LLC

Re: Nonbinding Letter of Intent-Southern Wine & Spirits of America,
Inc.("Southern")/Eber Bros. Wine & Liquor Corporation ("EBWLC")
and Eber-NDC, LLC ("Eber-NDC")

web sites, domain names and other books and records.

In addition to the above, solely at Southern's discretion, Southern will have the
right to purchase any or all furniture, fixture, equipment and/or real estate used
in the Business.

At Southern's option, Southern may assume or sublease (for a period of time as
determined by Southern) any of the leases currently used in the Business.

Southern will not assume any liabilities of EBER other than obligations under: (i)
purchase orders for inventory from Suppliers (defined below) ordered and in
transit at Closing (which Southern will assume); and (ii) those employment
arrangements and/or leases that it elects to assume.

The term "Suppliers" shall mean those suppliers of EBER on the date of Closing
who are willing to continue to sell to Southern following Closing.

For the avoidance of doubt, Southern is not purchasing any of EBER's cash, cash
equivalents or ownership interests in EBER, Eber Bros. Acquisition Corp., Eber
Bros. Wine & Liquor Metro, Inc., Monroe Display Company, Inc., Delaware
Importers, LLC, Eber-Connecticut, LLC, Eber-Rhode Island, LLC and PW&S,
LLC (d/b/a Postiy Wine & Spirits).

2.  The purchase price (the "Purchase Price") for the Assets, subject to the provisions
    described in 3 below, will be equal to the total of the following:

    (a)  The value of Inventory (defined below) as determined in 3(a) below;

    (b)  The book value (but not to exceed fair market value) of the prepaid wine
         as of Closing from Suppliers;

    (c)  Ten Million ($10,000,000) Dollars for the intangible assets listed in 1(b)
         through 1(g) above;

    (d)  The book value of the furniture, fixtures, and equipment (to the extent
         Southern elects to purchase any of those items), but subject to 3(c) below;

    (e)  The value of the real estate as determined in 3(b) below if Southern elects

                    SGWS-000130

Mr. Lester Eber, President                          February 7, 2007
Eber Bros. Wine & Liquor Corporation                  - Page 4 -
Eber-NDC, LLC

    Re: Nonbinding Letter of Intent-Southern Wine & Spirits of America,
      Inc.("Southern")/Eber Bros. Wine & Liquor Corporation ("EBWLC")
      and Eber-NDC, LLC ("Eber-NDC")

    to purchase the real estate.

At Closing, Southern shall pay EBER, in cash, the Purchase Price, less: (i) an amount to be allocated to the Restrictive Covenants; (ii) amounts owed by EBER to its Suppliers net of outstanding vendor billings (such amounts to be paid directly out of the Purchase Price proceeds at Closing); and (iii) Eight Million ($8,000,000) Dollars (the "Deferred Payment").

The Deferred Payment shall be paid in four (4) equal successive annual installments, without interest, each installment being due on the anniversary of the Closing.

3.    For purposes of calculating the Purchase Price, the following shall apply:

    (a)    The term "Inventory" shall mean current, in-date, salable inventory with current labeling from Suppliers valued at an amount equal to EBER's laid in cost, computed on a first in, first out basis, less any purchase allowances, some excise taxes, and related credits, including those further described in the following sentence. Southern will receive a credit at Closing from EBER for any prepaid program credits, advertising allowances, and/or amounts similar thereto that have been received by EBER from Suppliers and that are to be applied to any period following the Closing.

    (b)    If Southern elects to purchase any of the real estate used in the Business, the purchase price shall be the fair market value as determined by a mutually agreeable appraisal process.

    (c)    The book value of the furniture, fixtures and equipment elected to be purchased shall be determined in accordance with GAAP, consistent with EBER's past business practices, but, in no event shall the book value of any asset exceed its fair market value.

4.    EBER warrants that it has not, nor will it, enter into any transaction to dispose of any Supplier Contracts, including by way of sale, transfer or release of rights. Furthermore, except as disclosed to Southern on Exhibit "A", EBER warrants that it has not received any notice of termination, or intent to terminate a Supplier

CONFIDENTIAL

Feb. 8. 2007  2:06PM    NEW YORK PALACE                    No. 1349   P. 7

JAN-25-1996   00:00                                        P.06/14

Mr. Lester Eber, President                        February 7, 2007
Eber Bros. Wine & Liquor Corporation                - Page 5 -
Eber-NDC, LLC

Re: Nonbinding Letter of Intent-Southern Wine & Spirits of America,
Inc.("Southern")/Eber Bros. Wine & Liquor Corporation ("EBWLC")
and Eber-NDC, LLC ("Eber-NDC")

Contract.

5.    EBER, you and each of the current shareholders, owners and affiliates of both
      EBWLC and Eber-NDC will enter into restrictive covenants (the "Restrictive
      Covenants"). Subject to complying with New York law regarding length of time
      and geographical restrictions, the Restrictive Covenants will be for five (5) years
      from the date of Closing for EBER, its stockholders and members (except for
      yours which will continue for five (5) years following the expiration of your
      consulting agreement), provided however, that the Restrictive Covenants for
      National Distributing Company, its shareholders, owners, subsidiaries and 30 (thirty)
      affiliates shall be for three (3) years from the date of Closing. The Restrictive months
      Covenants will prohibit competition, directly or indirectly, in the wine, spirits,
      alcoholic and nonalcoholic beverage business in New York. There will be a carve
      out allowing for the continuation of certain mutually agreeable activities, to allow
      you to wind down the portion of your current business not being purchased by
      Southern.

6.    You will enter into a consulting agreement. The basic terms of the consulting
      agreement will include:

      (a)    A five (5) year term.

      (b)    Your annual compensation will be Five Hundred Thousand ($500,000)
             Dollars each year of the agreement.

      (c)    In addition to the compensation described above, in Southern's sole
             discretion, you may be paid a bonus for extraordinary services.

      (d)    You will provide expertise in the State of New York markets, including
             in the areas of insurance, supplier relationships, retailer relationships, and
             operational issues. You will also provide your input and help in the area
             of developing and maintaining legislative relationships. The consulting
             agreement will contain typical terms and conditions, including the right to
             terminate for death, in the event that a disability prevents you from
             carrying out your duties, and for cause. Southern will have the right to
             reduce or eliminate your duties so long as full payment described in 6(b)
             is made during the term.

Mr. Lester Eber, President                          February 7, 2007
Eber Bros. Wine & Liquor Corporation                 - Page 6 -
Eber-NDC, LLC

               Re: Nonbinding Letter of Intent-Southern Wine & Spirits of America,
               Inc.("Southern")/Eber Bros. Wine & Liquor Corporation ("EBWLC")
               and Eber-NDC, LLC ("Eber-NDC")

     (e)   On a daily basis, you will report to, and be subject to, the direction of the
            General Manager of Southern Wine & Spirits of New York, Inc., along
            with additional direction from Southern's Chairman and President.

     (f)   You will be reimbursed for any pre-approved business expenses in
            connection with the performance of your duties.

     (g)   You will have the title of Senior Vice President.

     (h)   A restrictive covenant similar to that described in 5 above.

7.    Southern and EBER will each pay their own costs (e.g., accounting and attorneys'
     fees, brokerage commissions, etc.) incurred in connection with the entry into this
     transaction.

8.    At Closing, each of the parties shall execute and file a joint stipulation of
     dismissal with prejudice regarding the litigation between the parties currently
     pending in the Supreme Court of New York, County of Monroe ("Litigation").
     In connection therewith, each of the parties, as well as you individually, shall also
     execute general releases in favor of the other for all matters, only excluding
     obligations under the definitive agreements.

9.    EBER and Southern shall mutually agree on the process by which inventory shall
     be delivered by EBER to Southern at or following Closing.

10.   In addition to the transaction being contingent upon the execution of a mutually
     acceptable definitive purchase agreement, the Closing will be contingent upon:

     (a)   The compliance of the transactions contemplated hereby with all
            applicable laws and regulations, any required Bulk Sales Act compliance,
            and the receipt of all necessary regulatory approvals (including the receipt
            of all necessary licenses), consents (including Hart Scott Rodino
            compliance, if necessary) and waivers from governmental and other
            regulatory authorities and third parties;

     (b)   EBER assigning to Southern all of EBER's interests in the Supplier
            Contracts, to the extent assignable;

CONFIDENTIAL

SGWS-000133

Feb. 8. 2007  2:07PM    NEW YORK PALACE                          No. 1349   P. 9

JAN-25-1996  00:09                                               P. 09/14

Mr. Lester Eber, President                          February 7, 2007
Eber Bros. Wine & Liquor Corporation                    - Page 7 -
Eber-NDC, LLC

    Re: Nonbinding Letter of Intent-Southern Wine & Spirits of America,
    Inc.("Southern")/Eber Bros. Wine & Liquor Corporation ("EBWLC")
    and Eber-NDC, LLC ("Eber-NDC")

    (e)   EBWLC, Eber-NDC and you, joining in standard representations,
        warranties and covenants commercially reasonable in a transaction such
        as that outlined in this Letter of Intent, and those representations and
        warranties surviving for four (4) years;

    (d)   In the event any real estate is elected to be purchased by Southern, the
        receipt of a Phase I environmental report reflecting that the real estate, is
        free of all hazardous substances, and, in the event a Phase I reflects any
        hazardous substances, a Phase II environmental report reflecting that the
        Phase I issues have been remediated (such remediation and Phase II report
        to be performed at Southern's expense if it elects to undertake a Phase II);

    (e)   Except as otherwise disclosed, there are no threatened or pending lawsuits
        or investigations that have or could have a material effect on the Business;

    (f)   Southern not assuming, adopting or being adversely affected by any EBER
        unfunded pension or related plan liability, or union contracts in any way;

    (g)   EBER complying with 12 below.

11.   Southern will have the right, but not the obligation, to hire current EBER
     personnel. EBER will terminate all of its employees used in its business at
     Closing, and will be responsible for all costs related thereto (including, but not
     limited to, vacation, sick pay, obligations under employment agreements, paid
     time off, COBRA benefits, union pension withdrawal or other related liabilities,
     pension benefits, WARN liability, etc.).

12.   It is understood that EBER has a 401(k) plan. As a condition to Closing, EBER
     will fully fund that plan as may be required by law.

13.   If Southern elects to purchase any real estate used in the Business, Southern may
     assign the right to purchase to an affiliated limited liability company. In
     connection with the transfer of any real estate, EBER will make standard
     representations and warranties including that the properties are free of any
     environmental hazards.

14.   EBER, at its election, shall either collect its own accounts receivable, or, have
     Southern collect the accounts receivable on EBER's behalf, delivering the

CONFIDENTIAL

SGWS-000134

Mr. Lester Eber, President                          February 7, 2007
Eber Bros. Wine & Liquor Corporation                   - Page 8 -
Eber-NDC, LLC

     Re: Nonbinding Letter of Intent-Southern Wine & Spirits of America,
     Inc.("Southern")/Eber Bros. Wine & Liquor Corporation ("EBWLC")
     and Eber-NDC, LLC ("Eber-NDC")

     collected funds to EBER periodically upon collection. In the event Southern collects accounts receivable on behalf on EBER, Southern shall be reimbursed for all direct costs of collection, and shall not be obligated to institute any litigation in connection with the collection.

15.  EBER agrees to provide to Southern, within one (1) week after the execution of this Letter of Intent, and warrant that it is materially accurate, the following –

   (a)  Employee listings with job descriptions, title, salary, organizational charts and details of all benefit plans;

   (b)  Copies of all written Supplier Contracts and summaries of all oral Supplier Contracts; and

   (c)  A schedule reflecting the detail and book value of the furniture, fixtures and equipment.

<div align="center">Closing</div>

It is contemplated that the Closing will take place on or about March 31, 2007 ("Closing").

<div align="center">Contact with Suppliers</div>

Southern and EBER shall have the right to disclose to Suppliers the fact that discussions are taking place between Southern and EBER, but shall not disclose the details of the transaction unless permitted pursuant to a definitive written agreement or by mutual agreement. Notwithstanding the preceding, neither EBER nor you, shall have any discussions with Suppliers without Southern's consent and direct participation.

<div align="center">Exclusivity</div>

In recognition of the time, expense and effort to be incurred by Southern and pursuant to the transactions contemplated hereby, EBER, and you, agree individually and on behalf of EBER, that for so long as this Letter of Intent remains in effect, EBER and all stockholders, members, directors, officers, employees, representative or agents of EBER, will not, directly or indirectly, initiate, solicit, negotiate, accept or discuss with any third party any inquiry, proposal or offer relating to an investment in or a purchase of EBER's business or any material portion of its wine and spirits business. You represent that there is no right of first refusal or similar right, or any

CONFIDENTIAL

Mr. Lester Eber, President                                    February 7, 2007
Eber Bros. Wine & Liquor Corporation                              - Page 9 -
Eber-NDC, LLC

    Re: Nonbinding Letter of Intent-Southern Wine & Spirits of America,
     Inc.("Southern")/Eber Bros. Wine & Liquor Corporation ("EBWLC")
     and Eber-NDC, LLC ("Eber-NDC")

other restriction, that would adversely affect the ability to consummate the transactions described
herein. Further, EBWLC, Eber-NDC, and you, each acknowledge that they have the right to
enter into this Letter of Intent, and are not obligated in connection with the matters described
herein to any other individual, individuals or entity.

### Press Release

The parties will mutually agree upon a joint press release to announce the entry into this Letter
of Intent to be issued on ~~February 12, 2007.~~ ———— February 13, 2007.

*o.k. HB*
*LE. HA*
*WAC*

### Confidentiality

All terms of this Letter of Intent, including its existence, will remain confidential, subject to the
Confidentiality Agreement dated effective October 26, 2006. Additionally, neither EBWLC,
Eber-NDC, nor you, nor Southern, will disclose to anyone (other than their respective attorneys,
accountants, financial institutions, and suppliers) their negotiations or any information
concerning the contemplated transaction until the definitive purchase agreement is executed
without the prior written approval of all other parties. Notwithstanding, EBER shall have the
right to disclose to its employees, the fact that it has entered into a letter of intent with Southern,
but shall not disclose the details of the transaction.

### Amendment

This Letter of Intent may be amended from time to time, but only in writing, and executed by
all parties hereto.

### Miscellaneous

This Letter of Intent will be effective upon signing by EBWLC, Eber-NDC and you.
Notwithstanding anything in this letter to the contrary, this Letter of Intent is not intended to be
legally binding and enforceable on the parties hereto, except for paragraphs under the headings
"Exclusivity," "Confidentiality", "Press Release", "Contact with Suppliers" and "Termination,"
it being the intention of the parties to otherwise be bound only by the terms of the definitive
agreements assuming they can be negotiated by mutually satisfactory terms in a timely manner.
Each of the parties will work diligently in good faith to negotiate the definitive agreements as
to the transactions contemplated herein.

CONFIDENTIAL

JAN-25-1996  00:10                                      P.11/14

Mr. Lester Eber, President                          February 7, 2007
Eber Bros. Wine & Liquor Corporation                  - Page 10 -
Eber-NDC, LLC

   Re: Nonbinding Letter of Intent-Southern Wine & Spirits of America,
   Inc.("Southern")/Eber Bros. Wine & Liquor Corporation ("EBWLC")
   and Eber-NDC, LLC ("Eber-NDC")

### Termination

This Letter of Intent may be terminated (i) by the mutual agreement of the parties; or (ii) by
either party in the event the definitive purchase agreement is not executed on or before
March 15, 2007. This Letter of Intent may be extended by mutual agreement of the parties.

### Conclusion

If the terms of this Letter of Intent are acceptable to EBER, please sign below, attach an Exhibit
"A," and return one original copy to Southern. Our proposal set forth herein will expire, if we
have not received a signed original of this Letter of Intent by 5:00 P.M. Eastern Standard Time
on February 8, 2007.

We look forward to working on the details together. Feel free to contact the undersigned with
any questions you might have.

    Very truly yours,

    SOUTHERN WINE & SPIRITS OF AMERICA, INC.

    By:

     Wayne E. Chaplin, President and Chief Operating Officer

Accepted and agreed to this ____ day of February, 2007.

EBER BROS. WINE & LIQUOR
CORPORATION

By: _____
  Lester Eber, President

By: _____
  John T. Ryan,
  Chief Financial Officer

_____ — President
LESTER EBER, Individually     Eber bros.
        win.. d..on, a

EBER-NDC, LLC

By: _____ — President
  Lester Eber,

### Exhibit "A"

Letter of Intent - Southern Wine & Spirits of
America, Inc./Eber Bros. Wine & Liquor Corporation
Eber-NDC, LLC

List of All Supplier Contracts and Oral Agreements
Where EBER Has Received Notice of Termination or Intent to Terminate From a Supplier.

See list attached hereto.

E:\CLIENTS\UAOUTHER\MERCER\...\L.TKINT\MERCER\...\merg-Eber-KMPR\\.wpd

CONFIDENTIAL                                          SGWS-000138

## Wendy Eber

**From:**          Wendy Eber
**Sent:**          Thursday, December 13, 2012 1:47 PM
**To:**            ewgumaer@gmail.com
**Subject:**       See attached Memo
**Attachments:**   Scanned from a Xerox multifunction device001.pdf

Mike,

Please read attached memo for description of reason for the security agreement. I will be sure to get a check in the mail by the end of the year. We are working with Canandaigua to reduce the amortization schedule but, Lester will have to deposit securities of $120,000 into CNBank to reduce the payments.

Thanks,
Wendy

-----Original Message-----
From: administrator3@slocumandsons.com [mailto:administrator3@slocumandsons.com]
Sent: Thursday, December 13, 2012 1:42 PM
To: Wendy Eber
Subject: Scanned from a Xerox multifunction device


Please open the attached document. It was scanned and sent to you using a Xerox multifunction device.

Attachment File Type: pdf

multifunction device Location: machine location not set
Device Name: K7259


For more information on Xerox products and solutions, please visit http://www.xerox.com

1



EB-00026645

**Wendy Eber**

| | |
|---|---|
| **From:** | Wendy Eber |
| **Sent:** | Thursday, December 13, 2012 1:47 PM |
| **To:** | ewgumaer@gmail.com |
| **Subject:** | see attached memo |
| **Attachments:** | Scanned from a Xerox multifunction device001.pdf |

-----Original Message-----
From: administrator3@slocumandsons.com [mailto:administrator3@slocumandsons.com]
Sent: Thursday, December 13, 2012 1:50 PM
To: Wendy Eber
Subject: Scanned from a Xerox multifunction device

Please open the attached document.  It was scanned and sent to you using a Xerox multifunction device.

Attachment File Type: pdf

multifunction device Location: machine location not set
Device Name: K7259

For more information on Xerox products and solutions, please visit http://www.xerox.com

1

EB-00026646



underberg & kessler LLP  MICHAEL J. BEYMA, OF COUNSEL
585.258.2890
mbeyma@underbergkessler.com

November 7, 2012

Ms. Wendy Eber, CFO
Alexbay, LLC
30 Corporate Drive
New Haven, CT 06473

Glenn Sturm, Esq.
Atlantic Station
201 17th Street NW, Suite 1700
Atlanta, GA 30363

Dear Wendy and Glenn:

Re:   Eber Bros. Wine and Liquor Corporation

Wendy asked that our office "make sure that Lester's security interest in his loans (to Eber Metro) are perfected in New York State". Glenn Sturm clarified this request by indicating that he was wondering whether the guarantee obligation of Eber Metro survived the taking of Eber Metro in satisfaction of the obligations owed to Lester and assigned to Alexbay, LLC. Glenn told me that he wanted to protect the loans and guaranty if the Article 9 transfer was somehow upset in the future.

We obtained a New York State Uniform Commercial Code search for Eber Bros. Wine and Liquor Metro, Inc. A copy of the same is enclosed. Glenn indicated to me that the obligations due to Manufacturers and Traders Trust Company (number 2) and Eder Goodman (number 7) LLC no longer exist. If this is so, the creditors ought to be contacted (or we will contact them on your behalf) to have the UCCs terminated. Glenn was unsure of any debt owed to NMHG Financial Services, Inc. (number 4). Lester Eber does have in his favor a filed UCC financing statement covering all assets of Eber Bros. Wine and Liquor Metro (number 8).

We have prepared and enclose herewith a security agreement from Eber Bros. Wine and Liquor Metro, Inc. to Alexbay, LLC. Also enclosed is an appropriate consent authorizing the same. We have filed a UCC financing statement (copy enclosed). We believe that this security agreement should be executed in case there is any debt now or hereafter owed by Eber Bros. Wine and Liquor Metro, Inc. to Alexbay, LLC. We filed a new financing statement in favor of Alexbay as opposed to Lester Eber assigning his present position so that Lester will remain protected in case he is owed any funds now or in the future by Eber Bros. Wine and Liquor Metro, Inc.

300 Bausch & Lomb Place, Rochester, NY 14604
585-258-2800 PHONE 585-258-2821 FAX

www.underbergkessler.com

Additional Offices
Buffalo, Canandaigua, Newark, Greece and
Geneseo, NY

EB-00026647

Ms. Wendy Eber
Glenn Sturm, Esq.
November 7, 2012
Page 2


underberg & kessler LLP

It should be noted that Eber Bros. Wine and Liquor Metro, Inc. has indemnified Lester Eber and Alexbay LLC for various items. Hence, there might be obligations owed to either sometime in the future.

The Order which approved the Article 9 acceptance by Alexbay of Eber Bros. Wine and Liquor Metro, Inc. does not refer to the guarantee of Eber Brothers Wine and Liquor Metro, Inc. However, it would appear that since the obligations which were guaranteed, were extinguished, that the guarantee obligations were similarly extinguished. It also would appear that if the obligations were ever reinstated that the guarantee obligation would also be reinstated.

In paragraph 10 of the Agreement for Turnover and Acceptance of Eber Bros. Wine and Liquor Metro, Inc., there is the following statement:

*"...Eber Bros. and Metro and Alexbay agree that to the extent that there is any inter-company and intra-company debt between or among them (specifically including the obligations) it is hereby cancelled, released and should forever be considered void."*

Please have the written consent and security agreement executed and send me copies of the security agreement and unanimous consent. The originals of these should be retained by Wendy in her file.

In accordance with our telephone conversation of November 7, 2012, I also enclose a copy of a UCC search for Eber Bros Wine and Liquor Corporation.

If you would like to discuss any part of the above, please do not hesitate to contact me.

Very truly yours,

Michael J. Beyma

MJB/mdm
Enclosures

cc: Paul F. Keneally, Esq.

EB-00028648

## Lester Eber

| | |
|---|---|
| **From:** | Janet lissow |
| **Sent:** | Monday, March 22, 2010 2:34 PM |
| **To:** | 'egumaer1@yahoo.com'; Gumaer, Elliott |
| **Cc:** | Lester Eber |
| **Subject:** | Lester Eber Request |
| **Importance:** | High |
| **Attachments:** | ATLANTA-#1142595-v4-Eber_Security_Agreement.DOC; ATLANTA-#1142695-v3-Eber_Guaranty_of_Note.DOC; ATLANTA-#1143283-v1-Execution_Copy_-_Line_of_Credit_Note.DOC; Audrey Hays 032210.doc; Lester letter to Sally.pdf; Sally Kleeberg 032210.doc |

Hello Mr. Gumaer,

        I have attached some documents that Mr. Eber would like you to look over and is asking for your comments. He is mailing each of the three documents plus a letter (all attached) to each, Sally Kleeberg and Audrey Hays. Also attached is a personal letter to Sally.

Many Thanks,

*Janet Lissow*
Administrative Assistant
**Eber Bros. Wine & Liquor**

*NEW ADDRESS:*
**95 Allens Creek Rd
Bldg 2  Suites 10 & 11
Rochester NY 14618
Ph: (585) 360-4240
Fax: (585) 360-4211**



3/22/2010

**EB-00000714**

## SECURITY AGREEMENT

**THIS SECURITY AGREEMENT** (this "**Agreement**") is made and entered into as of _____ ___, 2010 by **EBER BROS. WINE AND LIQUOR CORPORATION** ("**Parent**") and **EBER BROS. WINE & LIQUOR METRO, INC.** ("**Metro**"; Parent and Metro, individually and collectively, "**Debtor**") in favor of **LESTER EBER** ("**Secured Party**").

   1. THE SECURITY.  Debtor hereby assigns and grants to Secured Party a security interest in the following described property now owned or hereafter acquired by Debtor ("**Collateral**"):

   (a) All accounts, contract rights, chattel paper, instruments, deposit accounts, letter of credit rights, payment intangibles and general intangibles, including all amounts due to Debtor from a factor; and all returned or repossessed goods which, on sale or lease, resulted in an account or chattel paper.

   (b) All inventory, including all materials, work in process and finished goods.

   (c) All machinery, furniture, fixtures and other equipment of every type now owned or hereafter acquired by Debtor.

   (d) All of Debtor's deposit accounts. The Collateral shall include any renewals or rollovers of the deposit accounts, any successor accounts, and any general intangibles and choses in action arising therefrom or related thereto.

   (e) All instruments, notes, chattel paper, documents, certificates of deposit, securities and investment property of every type. The Collateral shall include all liens, security agreements, leases and other contracts securing or otherwise relating to the foregoing.

   (f) All general intangibles, including, but not limited to, (i) all patents, and all unpatented or unpatentable inventions; (ii) all trademarks, service marks, and trade names; (iii) all copyrights and literary rights; (iv) all computer software programs; (v) all mask works of semiconductor chip products; (vi) all trade secrets, proprietary information, customer lists, manufacturing, engineering and production plans, drawings, specifications, processes and systems. The Collateral shall include all good will connected with or symbolized by any of such general intangibles; all contract rights, documents, applications, licenses, materials and other matters related to such general intangibles; all tangible property embodying or incorporating any such general intangibles; and all chattel paper and instruments relating to such general intangibles.

   (g) The shares of common stock and preferred stock, or partnership, membership and other ownership interests, now or hereafter owned by Debtor, including, without limitation, any membership interest in Eber-Connecticut, LLC now or hereafter

EB-00000715

owned, directly or indirectly, by Metro and Parent and any ownership interests in Metro now or hereafter owned by Parent (collectively, the **"Pledged Equity"**), and all certificates evidencing the same, together with, in each case, all shares, securities, monies or property representing a dividend on any of the Pledged Equity, or representing a distribution or return of capital upon or in respect of the Pledged Equity, or resulting from a split up, revision, reclassification or other like change of the Pledged Equity or otherwise received in exchange therefor, and any subscription warrants, rights or options issued to the holders of, or otherwise in respect of, the Pledged Equity (the Pledged Equity, together with all other certificates, shares, securities, properties, ownership interests, or moneys, dividends, distributions, returns of capital subscription, warrants, rights or options as may from time to time be pledged hereunder pursuant to this clause being herein collectively called the **"Equity Collateral"**).

        (h)    All negotiable and nonnegotiable documents of title covering any Collateral.

        (i)    All accessions, attachments and other additions to the Collateral, and all tools, parts and equipment used in connection with the Collateral.

        (j)    All substitutes or replacements for any Collateral, all cash or non-cash proceeds, product, rents and profits of any Collateral, all income, benefits and property receivable on account of the Collateral, all rights under warranties and insurance contracts, letters of credit, guaranties or other supporting obligations covering the Collateral, and any causes of action relating to the Collateral, and all proceeds (including insurance proceeds) from the sale, destruction, loss, or other disposition of any of the Collateral and sums due from a third party which has damaged or destroyed the Collateral or from that party's insurer, whether due to judgment, settlement or other process.

        (k)    All books, data and records pertaining to any Collateral, whether in the form of a writing, photograph, microfilm or electronic media, including but not limited to any computer-readable memory and any computer hardware or software necessary to process such memory (**"Books and Records"**).

    2.    INDEBTEDNESS. The Collateral secures all Indebtedness.

**"Guaranty"** means that certain Guaranty dated as of the date hereof executed by the Metro in favor of Secured Party, as amended, restated, supplemented or otherwise modified from time to time.

**"Indebtedness"** means any and all debts, liabilities, and obligations of Debtor to Secured Party arising under the Transaction Documents, now or hereafter existing, whether voluntary or involuntary and however arising, whether direct or indirect or acquired by Secured Party by assignment, succession, or otherwise, whether due or not due, absolute or contingent, liquidated or unliquidated, determined or undetermined, held or to be held by Secured Party for its own account or as agent for another or others, whether Debtor may be liable individually or jointly with others, whether recovery upon such debts, liabilities, and obligations may be or hereafter

<div align="center">- 2 -</div>

EB-00000716

become barred by any statute of limitations, and whether such debts, liabilities, and obligations may be or hereafter become otherwise unenforceable. Indebtedness includes, without limitation, any and all obligations of Debtor to Secured Party for reasonable attorneys' fees and all other costs and expenses incurred by Secured Party in the collection or enforcement of any debts, liabilities, and obligations of Debtor to Secured Party.

"**Note**" means that certain Line of Credit Note dated as of _____ executed by Metro in favor of Secured Party in the maximum principal amount of $1,500,000 as amended, restated, supplemented or otherwise modified from time to time.

"**Transaction Documents**" means the Note, the Guaranty, this Agreement and each other document, instrument and agreement executed in connection therewith.

Capitalized terms used but not defined herein have the meanings given such terms in the Note.

       3.     DEBTOR'S COVENANTS. Debtor represents, covenants and warrants that unless compliance is waived by Secured Party in writing:

       (a)     Debtor will properly preserve the Collateral; defend the Collateral against any adverse claims and demands; and keep accurate Books and Records.

       (b)     Debtor shall give Secured Party at least thirty (30) days notice before changing its chief executive office or state of incorporation or organization. Debtor will notify Secured Party in writing prior to any change in the location of any Collateral, including the Books and Records.

       (c)     Debtor will notify Secured Party in writing prior to any change in Debtor's name, identity or business structure.

       (d)     Except for liens existing on the date hereof, Debtor has not granted and will not grant any security interest in any of the Collateral except to Secured Party, and will keep the Collateral free of all liens, claims, security interests and encumbrances of any kind or nature except the security interest of Secured Party.

       (e)     Debtor will promptly notify Secured Party in writing of any event which materially and adversely affects the value of the Collateral, the ability of Debtor or Secured Party to dispose of the Collateral, or the rights and remedies of Secured Party in relation thereto, including, but not limited to, the levy of any legal process against any Collateral and the adoption of any marketing order, arrangement or procedure affecting the Collateral, whether governmental or otherwise.

       (f)     Debtor shall pay all costs necessary to preserve, defend, enforce and collect the Collateral, including but not limited to taxes, assessments, insurance premiums, repairs, rent, storage costs and expenses of sales, and any costs to perfect Secured Party's security interest (collectively, the "**Collateral Costs**"). Without waiving Debtor's default for failure to make any such payment, Secured Party at its option may

EB-00000717

pay any such Collateral Costs, and discharge encumbrances on the Collateral, and such Collateral Costs payments shall be a part of the Indebtedness and bear interest at the rate set out in the Indebtedness. Debtor agrees to reimburse Secured Party on demand for any Collateral Costs so incurred.

(g)     Until Secured Party exercises its rights to make collection, Debtor will diligently collect all Collateral.

(h)     If any Collateral is or becomes the subject of any registration certificate, certificate of deposit or negotiable document of title, including any warehouse receipt or bill of lading Debtor shall immediately deliver such document to Secured Party, together with any necessary endorsements.

(i) Debtor will not sell, lease, agree to sell or lease, or otherwise dispose of any Collateral except with the prior written consent of Secured Party; provided, however, that Debtor may sell inventory in the ordinary course of business.

(j)     Debtor will maintain and keep in force all risk insurance covering the Collateral against fire, theft, liability and extended coverages (including without limitation windstorm coverage and hurricane coverage as applicable), to the extent that any Collateral is of a type which can be so insured. Such insurance shall be in form, amounts, coverages and basis reasonably acceptable to Secured Party, shall require losses to be paid on a replacement cost basis, shall be issued by insurance companies acceptable to Secured Party and, upon request of Secured Party, include a loss payable endorsement in favor of Secured Party in a form acceptable to Secured Party. Upon the request of Secured Party, Debtor will deliver to Secured Party a copy of each insurance policy, or, if permitted by Secured Party, a certificate of insurance listing all insurance in force.

(k)     Debtor will not attach any Collateral to any real property or fixture in a manner which might cause such Collateral to become a part thereof unless Debtor first obtains the written consent of any owner, holder of any lien on the real property or fixture, or other person having an interest in such property to the removal by Secured Party of the Collateral from such real property or fixture. Such written consent shall be in form and substance acceptable to Secured Party and shall provide that Secured Party has no liability to such owner, holder of any lien, or any other person.

(l)     Exhibit A to this Agreement is a complete list of all patents, trademark and service mark registrations, copyright registrations, mask work registrations, and all applications therefor, in which Debtor has any right, title, or interest, throughout the world. Debtor will promptly notify Secured Party of any acquisition (by adoption and use, purchase, license or otherwise) of any patent, trademark or service mark registration, copyright registration, mask work registration, and applications therefor, and unregistered trademarks and service marks and copyrights, throughout the world, which are granted or filed or acquired after the date hereof or which are not listed on the Exhibit. Debtor authorizes Secured Party, without notice to Debtor, to modify this Agreement by amending the Exhibit to include any such Collateral.

- 4 -

~Doc# 1142595~

EB-00000718

(m)     Debtor will, at its expense, diligently prosecute all patent, trademark or service mark or copyright applications pending on or after the date hereof, will maintain in effect all issued patents and will renew all trademark and service mark registrations, including payment of any and all maintenance and renewal fees relating thereto, except for such patents, service marks and trademarks that are being sold, donated or abandoned by Debtor pursuant to the terms of its intellectual property management program.  Debtor will at its expense protect and defend all rights in the Collateral against any material claims and demands of all persons and will, at its expense, enforce all rights in the Collateral against any and all infringers of the Collateral where such infringement would materially impair the value or use of the Collateral to Debtor or Secured Party.  Debtor will not license or transfer any of the Collateral, except for such non-exclusive licenses as are customary in the ordinary course of Debtor's business, or except with Secured Party's prior written consent.

4.     ADDITIONAL REQUIREMENTS. Debtor agrees that Secured Party may at its option at any time, whether or not Debtor is in default:

(a)     Require Debtor to deliver to Secured Party (i) copies of or extracts from the Books and Records, and (ii) information on any contracts or other matters affecting the Collateral.

(b)     Examine the Collateral, including the Books and Records, and make copies of or extracts from the Books and Records, and for such purposes enter at any reasonable time upon the property where any Collateral or any Books and Records are located.

(c)     Require Debtor to deliver to Secured Party any instruments, chattel paper or letters of credit which are part of the Collateral, and to assign to Secured Party the proceeds of any such letters of credit.

(d)     Notify any account debtors, any buyers of the Collateral, or any other persons of Secured Party's interest in the Collateral.

5.     DEFAULTS.  Any one or more of the following shall be a default hereunder:

(a)     Debtor breaches any term, provision, warranty or representation under this Agreement, or under any other obligation of Debtor to Secured Party, and such breach remains uncured after any applicable cure period.

(b)     Secured Party fails to have a perfected and enforceable lien on or security interest in the Collateral.

(c)     Any involuntary lien of any kind or character attaches to any Collateral, except for liens for taxes not yet due.

- 5 -

~Doc# 1142595~

EB-00000719

(d)    Debtor has given Secured Party any false or misleading information or representations.

(e)    A default or Event of Default occurs under the Note, the Guaranty or any other Transaction Document.

6.    SECURED PARTY'S REMEDIES AFTER DEFAULT.  In the event of any default, Secured Party may do any one or more of the following, to the extent permitted by law:

(a)    Declare any Indebtedness immediately due and payable, without notice or demand.

(b)    Enforce the security interest given hereunder pursuant to the Uniform Commercial Code and any other applicable law.

(c)    Enforce the security interest of Secured Party in any account of Debtor maintained with Secured Party by applying such account to the Indebtedness.

(d)    Require Debtor to obtain Secured Party's prior written consent to any sale, lease, agreement to sell or lease, or other disposition of any Collateral consisting of inventory.

(e)    Require Debtor to segregate all collections and proceeds of the Collateral so that they are capable of identification and deliver daily such collections and proceeds to Secured Party in kind.

(f)    Require Debtor to direct all account debtors to forward all payments and proceeds of the Collateral to a post office box under Secured Party's exclusive control.

(g)    Require Debtor to assemble the Collateral, including the Books and Records, and make them available to Secured Party at a place designated by Secured Party.

(h)    Enter upon the property where any Collateral, including any Books and Records, are located and take possession of such Collateral and such Books and Records, and use such property (including any buildings and facilities) and any of Debtor's equipment, if Secured Party deems such use necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral.

(i)    Demand and collect any payments on and proceeds of the Collateral.  In connection therewith Debtor irrevocably authorizes Secured Party to endorse or sign Debtor's name on all checks, drafts, collections, receipts and other

- 6 -

EB-00000720

documents, and to take possession of and open the mail addressed to Debtor and remove therefrom any payments and proceeds of the Collateral.

(j)     Grant extensions and compromise or settle claims with respect to the Collateral for less than face value, all without prior notice to Debtor.

(k)     Use or transfer any of Debtor's rights and interests in any Intellectual Property now owned or hereafter acquired by Debtor, if Secured Party deems such use or transfer necessary or advisable in order to take possession of, hold, preserve, process, assemble, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral. Debtor agrees that any such use or transfer shall be without any additional consideration to Debtor. As used in this paragraph, "**Intellectual Property**" includes, but is not limited to, all trade secrets, computer software, service marks, trademarks, trade names, trade styles, copyrights, patents, applications for any of the foregoing, customer lists, working drawings, instructional manuals, and rights in processes for technical manufacturing, packaging and labeling, in which Debtor has any right or interest, whether by ownership, license, contract or otherwise.

(l)     Have a receiver appointed by any court of competent jurisdiction to take possession of the Collateral. Debtor hereby consents to the appointment of such a receiver and agrees not to oppose any such appointment.

(m)    Take such measures as Secured Party may deem necessary or advisable to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, and Debtor hereby irrevocably constitutes and appoints Secured Party as Debtor's attorney-in-fact to perform all acts and execute all documents in connection therewith.

(n)     Without notice or demand to Debtor, set off and apply against any and all of the Indebtedness any and all deposits (general or special, time or demand, provisional or final) and any other indebtedness, at any time held or owing by Secured Party or any of Secured Party's agents or affiliates to or for the credit of the account of Debtor or any guarantor or endorser of Debtor's Indebtedness.

(o)     Assign, sell or otherwise dispose of and deliver all or any part of the Equity Collateral, at public or private sale or otherwise, either with or without special conditions or stipulations, for cash or on credit or for future delivery, in such other consideration and at such time or times and at such place or places, and upon such terms and conditions as shall be commercially reasonable and in accordance with all applicable laws.

(p)     Exercise any other remedies available to Secured Party at law or in equity.

The proceeds of any sale, lease or other disposition of the Collateral hereunder shall be applied first, to the expenses of retaking, holding, storing, processing and

- 7 -

EB-00000721

preparing for sale, selling, and the like (including, without limitation, any taxes, fees and other costs incurred in connection therewith) of the Collateral, second, to the attorneys' fees and expenses, and then to satisfaction of the Indebtedness to the Secured Party (in such manner as Secured Party shall elect in its discretion), and to the payment of any other amounts required by applicable law.

Debtor recognizes that, by reason of certain prohibitions contained in the Securities Act of 1933, as amended (the **"1933 Act"**) and applicable state securities laws, Secured Party may be compelled, with respect to any sale of all or any part of the Equity Collateral conducted without prior registration or qualification of such Equity Collateral under the 1933 Act and/or such state securities laws, to limit purchasers to those who will agree, among other things, to acquire the Equity Collateral for their own account, for investment and not with a view to the distribution or resale thereof. Debtor acknowledges that any such private sale may be at prices and on terms less favorable than those obtainable through a public sale without such restrictions (including a public offering made pursuant to a registration statement under the 1933 Act) and, notwithstanding such circumstances, Debtor agrees that any such private sale shall be deemed to have been made in a commercially reasonable manner and that Secured Party shall have no obligation to engage in public sales and no obligation to delay the sale of any Equity Collateral for the period of time necessary to permit the issuer thereof to register it for a form of public sale requiring registration under the 1933 Act or under applicable state securities laws, even if such issuer would, or should, agree to so register it.

For the purpose of enabling Secured Party, during the continuance of an Event of Default, to exercise rights and remedies under this Section at such time as Secured Party shall be lawfully entitled to exercise such rights and remedies, and for no other purpose, Debtor hereby grants to Secured Party, to the extent assignable, an irrevocable, non-exclusive license (exercisable without payment of royalty or other compensation to Debtor) to use, license or sublicense any of the Intellectual Property now owned or hereafter acquired by Debtor, wherever the same may be located.

7.    ENVIRONMENTAL MATTERS.

(a)    Debtor represents and warrants: (i) it is not in violation of any health, safety, or environmental law or regulation regarding hazardous substances and (ii) it is not the subject of any claim, proceeding, notice, or other communication regarding hazardous substances. **"Hazardous substances"** means any substance, material or waste that is or becomes designated or regulated as "toxic," "hazardous," "pollutant," or "contaminant" or a similar designation or regulation under any current or future federal, state or local law (whether under common law, statute, regulation or otherwise) or judicial or administrative interpretation of such, including without limitation petroleum or natural gas.

(b)    Debtor shall deliver to Secured Party, promptly upon receipt, copies of all notices, orders, or other communications regarding (i) any enforcement

- 8 -

EB-00000722

action by any governmental authority relating to health, safety, the environment, or any hazardous substances with regard to Debtor's property, activities, or operations, or (ii) any claim against Debtor regarding hazardous substances.

(c)    Secured Party and its agents and representatives will have the right at any reasonable time, after giving reasonable notice to Debtor, to enter and visit any locations where the Collateral is located for the purposes of observing the Collateral, taking and removing environmental samples, and conducting tests.   Debtor shall reimburse Secured Party on demand for the costs of any such environmental investigation and testing.  Secured Party will make reasonable efforts during any site visit, observation or testing conducted pursuant to this paragraph to avoid interfering with Debtor's use of the Collateral.  Secured Party is under no duty to observe the Collateral or to conduct tests, and any such acts by Secured Party will be solely for the purposes of protecting Secured Party's security and preserving Secured Party's rights under this Agreement.  No site visit, observation or testing or any report or findings made as a result thereof (**"Environmental Report"**) will (i) result in a waiver of any default of Debtor; (ii) impose any liability on Secured Party; or (iii) be a representation or warranty of any kind regarding the Collateral (including its condition or value or compliance with any laws) or the Environmental Report (including its accuracy or completeness).  In the event Secured Party has a duty or obligation under applicable laws, regulations or other requirements to disclose an Environmental Report to Debtor or any other party, Debtor authorizes Secured Party to make such a disclosure.    Secured Party may also disclose an Environmental Report to any regulatory authority, and to any other parties as necessary or appropriate in Secured Party's judgment.  Debtor further understands and agrees that any Environmental Report or other information regarding a site visit, observation or testing that is disclosed to Debtor by Secured Party or its agents and representatives is to be evaluated (including any reporting or other disclosure obligations of Debtor) by Debtor without advice or assistance from Secured Party.

(d)    Debtor will indemnify and hold harmless Secured Party from any loss or liability Secured Party incurs in connection with or as a result of this Agreement, which directly or indirectly arises out of the use, generation, manufacture, production, storage, release, threatened release, discharge, disposal or presence of a hazardous substance.  This indemnity will apply whether the hazardous substance is on, under or about Debtor's property or operations or property leased to Debtor.  The indemnity includes but is not limited to attorneys' fees (including the reasonable estimate of the allocated cost of in-house counsel and staff).  The indemnity extends to Secured Party, its parent, subsidiaries and all of their directors, officers, employees, agents, successors, attorneys and assigns.

8.    CONSENT TO JURISDICTION.  DEBTOR AND SECURED PARTY HEREBY AGREE THAT THE FEDERAL COURT OF THE WESTERN DISTRICT OF NEW YORK OR, AT THE OPTION OF SECURED PARTY, ANY COURT LOCATED IN THE STATE OF NEW YORK SHALL HAVE JURISDICTION TO HEAR AND DETERMINE ANY CLAIMS OR DISPUTES BETWEEN DEBTOR AND SECURED PARTY PERTAINING DIRECTLY OR INDIRECTLY TO THIS AGREEMENT OR ANY OTHER

- 9 -

EB-00000723

CAUSE OR DISPUTE WHATSOEVER BETWEEN DEBTOR AND SECURED PARTY OF ANY KIND OR NATURE. DEBTOR EXPRESSLY SUBMITS AND CONSENTS IN ADVANCE TO SUCH JURISDICTION IN ANY ACTION OR PROCEEDING COMMENCED IN SUCH COURTS, HEREBY WAIVING PERSONAL SERVICE OF THE SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS ISSUED THEREIN, AND AGREEING THAT SERVICE OF SUCH SUMMONS AND COMPLAINT, OR OTHER PROCESS OR PAPERS MAY BE MADE BY REGISTERED OR CERTIFIED MAIL, RETURN RECEIPT REQUESTED ADDRESSED TO DEBTOR AT THE ADDRESS OF DEBTOR FOR NOTICES SET FORTH HEREIN. SHOULD DEBTOR FAIL TO APPEAR OR ANSWER ANY SUMMONS, COMPLAINT, PROCESS OR PAPERS SO SERVED WITHIN THIRTY DAYS AFTER THE MAILING THEREOF, IT SHALL BE DEEMED IN DEFAULT AND AN ORDER AND/OR JUDGMENT MAY BE ENTERED AGAINST IT AS PRAYED FOR IN SUCH SUMMONS, COMPLAINT, PROCESS OR PAPERS. THE CHOICE OF FORUM SET FORTH IN THIS SECTION SHALL NOT BE DEEMED TO PRECLUDE THE BRINGING OF ANY ACTION BY SECURED PARTY OR THE ENFORCEMENT BY SECURED PARTY OF ANY JUDGMENT OBTAINED IN SUCH FORUM IN ANY OTHER APPROPRIATE JURISDICTION. FURTHER, DEBTOR HEREBY WAIVES THE RIGHT TO ASSERT THE DEFENSE OF FORUM NON CONVENIENS AND THE RIGHT TO CHALLENGE THE VENUE OF ANY COURT PROCEEDING.

9. WAIVER OF JURY TRIAL. DEBTOR AND SECURED PARTY EACH WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY ACTION OR PROCEEDING TO ENFORCE OR DEFEND ANY RIGHTS (A) UNDER THIS AGREEMENT, THE NOTE, THE GUARANTY OR ANY TRANSACTION DOCUMENT OR UNDER ANY AMENDMENT, INSTRUMENT, DOCUMENT OR AGREEMENT DELIVERED OR WHICH MAY IN THE FUTURE BE DELIVERED IN CONNECTION WITH THIS AGREEMENT OR (B) ARISING FROM ANY RELATIONSHIP EXISTING IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION DOCUMENT, AND AGREES THAT ANY SUCH ACTION OR PROCEEDING WILL BE TRIED BEFORE A COURT AND NOT BEFORE A JURY. DEBTOR AGREES THAT IT WILL NOT ASSERT ANY CLAIM AGAINST SECURED PARTY OR ANY OTHER PERSON INDEMNIFIED UNDER THIS AGREEMENT ON ANY THEORY OF LIABILITY FOR SPECIAL, INDIRECT, CONSEQUENTIAL, INCIDENTAL OR PUNITIVE DAMAGES.

10. MISCELLANEOUS.

(a) Any waiver, express or implied, of any provision hereunder and any delay or failure by Secured Party to enforce any provision shall not preclude Secured Party from enforcing any such provision thereafter.

(b) Debtor shall, at the request of Secured Party, execute such other agreements, documents, instruments, or financing statements in connection with this Agreement as Secured Party may reasonably deem necessary.

- 10 -

EB-00000724

(c)     All notes, security agreements, subordination agreements and other documents executed by Debtor or furnished to Secured Party in connection with this Agreement must be in form and substance satisfactory to Secured Party.

(d)     This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without regard to conflict of laws principles which would require the application of the laws of a different state.

(e)     All rights and remedies herein provided are cumulative and not exclusive of any rights or remedies otherwise provided by law.  Any single or partial exercise of any right or remedy shall not preclude the further exercise thereof or the exercise of any other right or remedy.

(f)     All terms not defined herein are used as set forth in the Uniform Commercial Code as in effect in any applicable jurisdiction.

(g)     In the event of any action by Secured Party to enforce this Agreement or to protect the security interest of Secured Party in the Collateral, or to take possession of, hold, preserve, process, assemble, insure, prepare for sale or lease, market for sale or lease, sell or lease, or otherwise dispose of, any Collateral, Debtor agrees to pay immediately the costs and expenses thereof, together with reasonable attorneys' fees and allocated costs for in-house legal services to the extent permitted by law.

(h)     In the event Secured Party seeks to take possession of any or all of the Collateral by judicial process, Debtor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action.

(i)     This Agreement shall constitute a continuing agreement, applying to all future as well as existing transactions, whether or not of the character contemplated at the date of this Agreement, and if all transactions between Secured Party and Debtor shall be closed at any time, shall be equally applicable to any new transactions thereafter.

(j)     Secured Party's rights hereunder shall inure to the benefit of its successors and assigns.  In the event of any assignment or transfer by Secured Party of any of the Indebtedness or the Collateral, Secured Party thereafter shall be fully discharged from any responsibility with respect to the Collateral so assigned or transferred, but Secured Party shall retain all rights and powers hereby given with respect to any of the Indebtedness or the Collateral not so assigned or transferred.    All representations, warranties and agreements of Debtor if more than one are joint and several and all shall be binding upon the personal representatives, heirs, successors and assigns of Debtor.

(k)     Any notice to be given hereunder shall be given in the manner prescribed in the Guaranty or the Note, as applicable.

- 11 -

EB-00000725

11.     FINAL AGREEMENT. BY SIGNING THIS AGREEMENT EACH PARTY REPRESENTS AND AGREES THAT: (A) THIS AGREEMENT REPRESENTS THE FINAL AGREEMENT BETWEEN THE PARTIES WITH RESPECT TO THE SUBJECT MATTER HEREOF, (B) THIS AGREEMENT SUPERSEDES ANY COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS RELATING TO THE SUBJECT MATTER HEREOF, UNLESS SUCH COMMITMENT LETTER, TERM SHEET, OR OTHER WRITTEN OUTLINE OF TERMS AND CONDITIONS EXPRESSLY PROVIDES TO THE CONTRARY, (C) THERE ARE NO UNWRITTEN ORAL AGREEMENTS BETWEEN THE PARTIES, AND (D) THIS AGREEMENT MAY NOT BE CONTRADICTED BY EVIDENCE OF ANY PRIOR, CONTEMPORANEOUS, OR SUBSEQUENT ORAL AGREEMENTS OR UNDERSTANDINGS OF THE PARTIES.

~Doc# 1142595~

EB-00000726

**IN WITNESS WHEREOF**, the parties executed this Agreement as of the date first written above, intending to create an instrument executed under seal.

> **EBER BROS. WINE AND LIQUOR CORPORATION**
>
> By:_____
>
> Title:_____
>
> (Seal)
>
> **EBER BROS. WINE & LIQUOR METRO, INC.**
>
> By:_____
>
> Title:_____
>
> (Seal)

Accepted:

_____

**LESTER EBER**

- 13 -

EB-00000727

Exhibit A

Intellectual Property

~Doc# 1142595~

EB-00000728

## Wendy Eber

| | |
|---|---|
| **From:** | Lester Eber |
| **Sent:** | Friday, March 02, 2012 10:15 AM |
| **To:** | egumaer@yahoo.com |
| **Cc:** | Wendy Eber |
| **Subject:** | FW: January Eber-CT |

Mike I have tried to get in touch with you , but have not been able. I need you to come to this meeting. We should talk first with Wendy and Glen. We have not talked to Hawks yet and I believe it is important to do so. It is important you respond to me as soon as possiable.

)



EB-00031201

**Lester Eber**

| | |
|---|---|
| **From:** | Wendy Eber |
| **Sent:** | Friday, March 09, 2012 3:51 PM |
| **To:** | elliot gumaer |
| **Cc:** | Lester Eber |
| **Subject:** | RE: Prep for Trustee Meeting |

Mike
Please call Glenn at 4pm  today 404 304 8862.

**From:** elliot gumaer [mailto:ewgumaer@gmail.com]
**Sent:** Friday, March 09, 2012 3:19 PM
**To:** Wendy Eber
**Cc:** l.ebert@Eberbros.com
**Subject:** Re: Prep for Trustee Meeting

**Wendy, this e-mail will confirm my telephone call with Glenn at 4PM this afternoon.  I note that you have also scheduled a conference call on Monday March 12 from 1-2PM.  You have given me an access number to call into that call.  I shall wait until those calls are concluded before speaking with Dick Hawks.  I may have an issue in getting to Rochester on Tuesday/Wednesday.  We'll talk about that.  It seems to me to be highly unethical to decline to providce 6 mos to a year to establish a new bankning relatonship.  Given the fiduciary relationship between CNB and the Eber Trust that is an issue that may have to be addressed by the Monroe County Surrogate Court should it become necessary.  Someone will have to explain to me why the action Lester may take to secure his indebtedness will adversely effect the relationship with CNB.  I assume that notice of that action will be given to all parties interestrod in the trust and the action will be affimed by Court order.  Best, EWG**
**PS  Please forward this memo to Glenn as I do not have his email address.  E**

On Fri, Mar 9, 2012 at 11:56 AM, Wendy Eber <weber@slocumandsons.com> wrote:



**PLAINTIFF'S EXHIBIT**
102

PENGAD 800-631-6989

EB-00000741

·1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL KLEEBERG, LISA STEIN
and AUDREY HAYS,

                              Plaintiffs,

          vs.

LESTER EBER,
ALEXBAY, LLC f/k/a LESTER EBER, LLC,,
ELLIOT W. GUMAER, JR. and
WENDY EBER,

                              Defendants,

          and

EBER BROS. & CO, INC.,
EBER BROS. WINE AND LIQUOR CORP.,          **AMENDED ANSWER**
EBER BROS. WINE & LIQUOR METRO, INC.,
EBER CONNECTICUT, LLC, and                 1:16-cv-09517
EBER-RHODE ISLAND, LLC,
EBER BROS. ACQUISTION CORP,
EBER-METRO, LLC, and
SLOCUM & SONS OF MAINE, INC.,

                              Nominal
                              Defendants,

          and

CANANDAIGUA NATIONAL BANK &
TRUST COMPANY,

                              Nominal
                              Intervenor
                              Defendant.

          Defendants, Lester Eber, Alexbay LLC, and Wendy Eber, and Nominal

Defendants Eber Bros. & Co., Inc., Eber Bros. Wine and Liquor Corporation, Eber Bros.

Wine & Liquor Metro, Inc., Eber Connecticut LLC, Eber-Rhode Island, LLC, Eber Bros.

Acquisition Corp., Eber-Metro, LLC and Slocum & Sons of Maine, Inc. (collectively

1



PLAINTIFF'S
EXHIBIT
107
PENGAD 800-631-6989

"Eber Defendants"), as and for their Answer to Plaintiffs' Third Amended Complaint, by their attorneys, Underberg & Kessler LLP, respectfully state the following:

1.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraphs 12, 17, 19, 20, 24, 25, 35, 38, 39, 40, 41, 42, 43, 44, 45, 47, 49, 57, 72, 78, 95, 96, 110, 111, 154, 157, 160, 162, 163, 164, 168, 174, 176, 178, 179, 186, 187, 188, 204, 218, 242, 251, 273, 290, 294, 297, 331, 343, 344, 345, 353, 354, 355, 359, 372, 378, 386, 387, 388, 389, 390 and 393 of Plaintiffs' Third Amended Complaint.

2.    Admit the allegations contained in paragraphs 4, 18, 21, 23, 26, 27, 28, 29, 30, 31, 32, 33, 34, 46, 50, 53, 55, 56, 59, 60, 63, 64, 68, 69, 75, 80, 82, 83, 87, 89, 90, 91, 93, 97, 99, 101, 105, 106, 107, 108, 109, 113, 114, 115, 120, 121, 122, 123, 142, 172, 175, 229, 230, 245, 247, 254, 283, 284, 311, 324 and 362 of Plaintiffs' Third Amended Complaint.

3.    Deny the allegations contained in paragraphs 1, 3, 5, 6, 7, 8, 9, 10, 11, 13 14, 15, 16, 22, 36, 37, 48, 52, 54, 58, 61, 62, 65, 66, 67, 71, 77, 79, 81, 84, 85, 86, 88, 92, 94, 100, 116, 117, 119, 124, 125, 126, 128, 129, 131, 133, 134, 135, 136, 137, 138, 139, 140, 141, 144, 145, 146, 147, 148, 149, 150, 151, 152, 156, 158, 161, 165, 169, 170, 171, 177, 180, 181, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 199, 200, 201, 202, 203, 205, 206, 207, 208, 209, 210, 211, 212, 213, 214, 215, 216, 217, 219, 220, 221, 222, 223, 224, 225, 226, 227, 228, 231, 232, 233, 234, 235, 236, 238, 239, 240, 243, 244, 246, 248, 249, 250, 252, 253, 255, 256, 257, 258, 259, 260, 262, 263, 264, 265, 266, 267, 268, 269, 270, 271, 272, 275, 276, 277, 278, 279, 280, 281, 287, 288, 289, 291, 292, 293, 296, 298, 299, 300, 301, 302, 303, 304, 307, 309, 313, 314,

315, 316, 317, 318, 319, 320, 321, 322, 323, 326, 328, 329, 330, 334, 335, 336, 337, 338, 339, 340, 341, 342, 346, 347, 348, 349, 350, 351, 352, 357, 358, 360, 361, 363, 364, 365, 366, 367, 368, 369, 370, 371, 373, 374, 375, 376, 377, 380, 381, 382, 384, 385, 391, 392, 394, 395, 396 and 397 of Plaintiffs' Third Amended Complaint.

4.     With respect to the allegations in paragraphs 2, 51, 70, 73, 74, 102, 103, 104, 118, 127, 132, 143, 153, 155, 159, 173, 237, 241, 261, 285, 306, 308, 310 and 325 of Plaintiffs' Third Amended Complaint, Eber Defendants state that the referenced documents speak for themselves.

5.     With respect to the allegations in paragraph 76 of Plaintiffs' Third Amended Complaint, Eber Defendants admit that the consulting fee was lower, but deny the remainder of the allegations in that paragraph.

6.     With respect to the allegations in paragraph 98 of Plaintiffs' Third Amended Complaint, Eber Defendants admit that the affidavit was filed, but state that the filing was done in error by local regulatory counsel.

7.     With respect to the allegations in paragraph 112 of Plaintiffs' Third Amended Complaint, Eber Defendants admit that EB&C was majority shareholder of EBWLC, but deny the remainder of the allegations in that paragraph.

8.     With respect to the allegations in paragraph 130 of Plaintiffs' Third Amended Complaint, Eber Defendants admit that the Court was not informed of the referenced valuation, but deny that the referenced valuations provide a basis for a higher valuation.

9.      With respect to the allegations in paragraphs 166 and 167 of Plaintiffs' Third Amended Complaint, Eber Defendants deny the allegations in the fraudulent conveyance action, but admit the remainder of the allegations in those paragraphs.

10.     With respect to the allegations in paragraphs 182, 183 and 184 of Plaintiffs' Third Amended Complaint, Eber Defendants admit that a duty was owed to the corporation, and deny knowledge or information sufficient to form a belief as to the remainder of the allegations.

11.     With respect to the allegations in paragraphs 185, 274, 282, 295, 312, 327, 332, 333, 356, 379 and 383 of Plaintiffs' Third Amended Complaint, Eber Defendants state that no response is required to the legal conclusion contained therein.

12.     With respect to the allegations in paragraph 286 of Plaintiffs' Third Amended Complaint, Eber Defendants state that Gumaer was paid for legal and director services, but not consulting services.

13.     With respect to the allegations in paragraph 305 of Plaintiffs' Third Amended Complaint, Eber Defendants admit that the notice of intent was sent on that date, but deny the remainder of the allegations in that paragraph.

## FIRST AFFIRMATIVE DEFENSE

14.     Plaintiffs' Third Amended Complaint fails to state a cause of action for which relief may be granted against the Eber Defendants.

## SECOND AFFIRMATIVE DEFENSE

15.     The causes of action in Plaintiffs' Third Amended Complaint are barred by the applicable statute of limitations.

### THIRD AFFIRMATIVE DEFENSE

16.    The causes of action in Plaintiffs' Third Amended Complaint are barred by the doctrines of waiver, laches and/or estoppel.

### FOURTH AFFIRMATIVE DEFENSE

17.    The Eber Defendants did not breach any fiduciary duty.

### FIFTH AFFIRMATIVE DEFENSE

18.    Plaintiffs' Third Amended Complaint is barred by the doctrine of unclean hands.

### SIXTH AFFIRMATIVE DEFENSE

19.    Plaintiffs have failed to mitigate their alleged damages.

### SEVENTH AFFIRMATIVE DEFENSE

20.    Plaintiffs' Third Amended Complaint is barred by the Rooker-Feldman doctrine.

### EIGHTH AFFIRMATIVE DEFENSE

21.    CNB's unilateral reallocation of the Eber Bros. & Co.'s stock in August 2017 is inconsistent with the Allen Eber Trust and the terms of the applicable Surrogate's Court Termination Order.

### NINTH AFFIRMATIVE DEFENSE

22.    The purported transfer of Eber Bros. & Co. stock by CNB to Trust beneficiaries after October 2017 was invalid.

### TENTH AFFIRMATIVE DEFENSE

23.    The transfer restrictions and call rights contained in Article XII of the Eber Bros. & Co.'s by-laws are/were binding on the Trust and on CNB.

5

## ELEVENTH AFFIRMATIVE DEFENSE

24.     The Eber Bros. & Co. stock certificates state "this Certificate and the
shares represented thereby...shall be held subject to all of the provisions of ... the By-
Laws and Amendments."

## TWELFTH AFFIRMATIVE DEFENSE

25.     EB&C and EBWLC were insolvent as of 2007, thus barring some or all of
Plaintiffs' claims.

## THIRTEENTH AFFIRMATIVE DEFENSE

26.     Eber Metro was insolvent as of 2007, thus barring some or all of Plaintiffs'
claims.

## FOURTEENTH AFFIRMATIVE DEFENSE

27.     Plaintiffs' Third Amended Complaint is barred by res judicata and/or
collateral estoppel relating to Judge Rosenbaum's 2012 Order.

## FIFTEENTH AFFIRMATIVE DEFENSE

28.     Lester Eber had no fiduciary duties as trustee following the Surrogate's
Court Termination Order.

## SIXTEENTH AFFIRMATIVE DEFENSE

29.     Plaintiffs' Third Amended Complaint is barred by New York Business
Corporation Law § 717.

## SEVENTEENTH AFFIRMATIVE DEFENSE

30.     Plaintiffs' Third Amended Complaint is barred by the Business Judgment
Rule.

## EIGHTEENTH AFFIRMATIVE DEFENSE

31. No Eber entity has any right or tangible expectation to the consulting or

lobbying work performed by Lester Eber for Southern Wine & Spirits.

**WHEREFORE**, the Eber Defendants respectfully request an Order dismissing

Plaintiffs' Third Amended Complaint in its entirety, and granting such other and further

relief as the Court may deem just and proper.

DATED:     June 24, 2019
         Rochester, New York           UNDERBERG & KESSLER LLP

                                     By:    s/Paul F. Keneally
                                             Paul F. Keneally, Esq., of Counsel
                                             Colin D. Ramsey, Esq., of Counsel
                                             *Attorneys for the Eber Defendants*
                                             300 Bausch & Lomb Place
                                           Rochester, New York 14604
                                           Telephone: (585) 258-2800

# BY-LAWS

## OF

## EBER BROS. WINE & LIQUOR CORPORATION

### ARTICLE I. SHAREHOLDERS

#### 1.   MEETINGS

The annual meeting of the shareholders shall be held during the month of August during each calendar year upon a day fixed by the Board of Directors for the election of directors and for the transaction of any other business which may properly come before the meeting. Annual meetings shall be held at the office of the corporation, or at the office of the attorneys for the corporation, or at such other place, within or without the State of New York, as may be set by the Board of Directors. Special meetings may be called at any time by any member of the Board of Directors or by the President, and shall be called by the Secretary at the written request of shareholders owning at least one-third of the outstanding shares of the corporation. Such request shall state the purpose or purposes of the proposed meeting.

#### 2.   NOTICE OF MEETING

Written notice of every meeting shall be delivered personally or mailed to each shareholder at his last known address. Notice of every meeting shall state the place, date and hour of the meeting, and shall be mailed not less than ten days, nor more than fifty days, before the date of the meeting. Notice of any special meeting shall state the purpose for which it was called.

#### 3.   WAIVER OF NOTICE

Notice of meeting need not be given to any shareholder who submits a waiver of notice, either before or after the meeting. The attendance of any shareholder at a meeting shall constitute a waiver by him of notice of the meeting unless, prior to the conclusion of the meeting, he protests the lack of such notice.

#### 4.   QUORUM

The holders of a majority of the shares entitled to vote at meetings shall constitute a quorum for the transaction of any business. Whenever a quorum is present, it shall not be broken by the subsequent withdrawal of any shareholders. The shareholders present may adjourn any meeting despite the absence of a quorum from time to time until a quorum is present.

PLAINTIFF'S EXHIBIT 108

PENGAD 800-631-6989

ACA:C::WPFILES\CORP.CLIENTS\EBER EBWL-BY.LAW



## 5.   VOTING

Every shareholder of record shall be entitled to one vote for each share standing in his name on the record of shareholders. Except as otherwise provided by law, the vote of the majority of the votes cast by the shareholders present at the meeting shall be the act of the shareholders. Directors shall be elected by a plurality of the votes cast by the share-holders present at the meeting.

## 6.   PROXIES

Every shareholder entitled to vote at a meeting of shareholders or to express consent or dissent without a meeting may authorize another person or persons to act for him by proxy. Every proxy must be in writing and signed by the shareholder or his attorney-in-fact. No proxy shall be valid after the expiration of eleven months from the date thereof unless otherwise provided in the proxy. Every proxy shall be revocable at the pleasure of the shareholder executing it, except as otherwise provided by law.

## 7.   WRITTEN CONSENT OF SHAREHOLDERS WITHOUT A MEETING

Any shareholder action permitted to be taken by vote may be taken without a meeting on written consent, setting forth the action so taken, and signed by the holders of all the outstanding shares entitled to vote thereon.

## 8.   AGREEMENTS AS TO VOTING

An agreement between two or more shareholders, if in writing and signed by the parties, may provide that in exercising any voting rights the shares held by them shall be voted as provided in such agreement.

### ARTICLE II.  DIRECTORS

## 1.   AUTHORITY AND NUMBER

The business of the corporation shall be managed by its Board of Directors, each of whom shall be at least twenty-one years of age. The number of directors shall be at least three, who need not be shareholders, except that where all the shares of the corporation are owned beneficially and of record by less than three shareholders, the number of directors may be less than three but shall at least equal the number of shareholders.

## 2.   ELECTION AND TERM

At the annual meeting of shareholders, the directors shall be elected to hold office until their successors have been elected. Subject to the provisions of section 706 of the New York Business Corporation Law, any director may be removed with or without cause by

2                    ACA:C:\WPFILES\CORP\CLIENTS\EBER\EBWL-BY.LAW

EB-00022534



vote of a majority of the board of directors called for such purpose. Vacancies occurring in the Board of Directors shall be filled by the shareholders.

3.   **VACANCIES**

 a. Newly created directorships resulting from an increase in the number of directors and vacancies occurring in the board for any reason may be filled by vote of the board. If the number of the directors then in office is less than a quorum, such newly created directorships and vacancies may be filled by vote of a majority of the directors then in office.

 b. The board may fill vacancies occurring in the board by reason of the removal of directors without cause.

 c. A director elected to fill a vacancy shall hold office until the next meeting of shareholders at which the election of directors is the regular order of business, and until his successor has been elected and qualified.

4.   **COMMITTEES OF THE BOARD**

 The board of directors, by resolution adopted by a majority of the entire board, may designate from among its members an executive committee and other committees, each consisting of three or more directors, and each of which, to the extent provided in such resolution, shall have all the authority of the board, except as to the following matters:

 a. The submission to shareholders of any action that needs shareholders' approval under the Business Corporation Law of the State of New York.

 b. The filling of vacancies in the board of directors or in any committee.

 c. The fixing of compensation of any director for serving on the board or on any committee.

 d. The amendment or repeal of the by-laws, or the adoption of new by-laws.

 e. The amendment or repeal of any resolution of the board which by its terms shall not be so amendable or repealable.

 The board may designate one or more directors as alternate members of any such committee, who may replace any absent member or members at any meeting of such committee. Each such committee shall serve at the pleasure of the board of directors.

ACA:C:\WPF_ES\CORP\CLIENTS\EBER\EBWL-BY.LAW

EB-00022535



## 5. MEETINGS

The organizational meeting of the Board shall be held immediately after the annual meeting of the shareholders. Special meetings of the Board may be called at any time by the President or by any member of the Board, and shall be held at the office of the corporation or at the office of the attorneys for the corporation, or at such other place, within or without the State of New York, as may be set by the Board of Directors. Any member of the Board may attend and participate in a meeting of the Board or a Board committee by means of a conference telephoned or similar communications equipment allowing all persons participating in the meeting to hear each other simultaneously. Participation by such means shall constitute presence in person at such a meeting.

## 6. NOTICE OF MEETING

Written notice of any meeting shall be either delivered personally, mailed or telegraphed to each director and shall state the place, date and hour of the meeting. Such notice shall be made at least 48 hours before the date of any meeting.

## 7. WAIVER OF NOTICE

Notice of meetings needs not be given to any director who submits a signed waiver of notice, whether before or after the meeting, or who attends the meeting without protesting prior thereto, or at its commencement, the lack of notice to him.

## 8. QUORUM

A majority of the entire Board shall constitute a quorum.

## 9. VOTING

Except as otherwise provided by law, the vote of the majority of the directors present shall be the act of the Board.

## 10. ACTION WITHOUT A MEETING

Any director action permitted to be taken by vote may be taken without a meeting on written consent, setting forth the action to be taken and signed by all the directors of the corporation.

## 11. INTERESTED PARTIES

    a.    No contract or other transaction between the corporation and one or more of its directors, or between the corporation and any other corporation, firm, association or other entity in which one or more of its directors are directors or officers, or are financially interested, shall be either void or voidable for this reason alone, or by reason alone that

4    ACA:C:\WPFILES\CORP\CLIENTS\EBER\EBWL-BY.LAW

EB-00022536

such director or directors are present at the meeting of the Board of Directors which authorizes such contract or transaction, or that his or their votes are counted for such purposes:

(1) If the material facts as to such director's interest in such contract or transaction and as to any such common directorship, officership, or financial interest are disclosed in good faith or known to the board or committee, and the board or committee, and the board or committee approves such contract or transaction by a vote sufficient for such purpose without counting the vote of such interested director or, if the votes of the disinterested directors are insufficient to constitute an act of the board as defined in section 708 of the Business Corporation Law (Action by the board), by unanimous vote of the disinterested directors; or

(2) If the material facts as to such director's interest in such contract or transaction and as to any such common directorship, officership or financial interest are disclosed in good faith or known to the shareholders entitled to vote thereon, and such contract or transaction is approved by vote of such shareholders.

b. If such good faith disclosure of the material facts as to the director's interest in the contract or transaction and as to any such common directorship, officership or financial interest is made to the directors or shareholders, or known to the board or committee or shareholders approving such contract or transaction, as provided in paragraph (a) above, the contract for transaction may not be avoided by the corporation for the reasons set forth in said paragraph (a). If there was no such disclosure or knowledge, or if the vote of such interested director was necessary for the approval of such contract or transaction at a meeting of the board or committee at which it was approved, the corporation may avoid the contract or transaction unless the party or parties thereto shall establish affirmatively that the contract or transaction was fair and reasonable as to the corporation at the time it was approved by the board, a committee or the shareholders.

## 12. COMPENSATION

The Board of Directors shall have authority to fix the compensation of directors for services in any capacity.

## 13. LOANS TO DIRECTORS

No loan shall be made by the corporation to any director unless it is approved by a majority vote of all the shareholders. For this purpose, the shares of a director who would be the borrower shall not be shares entitled to vote.

5

ACA:C:\WPFIL.ES\CORP\CLIENTS:EBER\EBWL-BY.LAW

14. MORTGAGE OF CORPORATE PROPERTY

        The Board of Directors may authorize any mortgage or pledge of corporate property.

## ARTICLE III.  OFFICERS

### 1. NUMBER

        The officers of the corporation shall be a President, Secretary and a Treasurer, each of whom shall be elected by the Board. Other officers such as one or more Vice Presidents and a Chairman of the Board may be elected by the Board. Any two or more offices may be held by the same person, except the offices of President and Secretary. When all of the issued and outstanding stock of the corporation is owned by one person, such person may hold all or any combination of officers.

### 2. ELECTION AND TERM

        The officers shall be elected at the organizational meeting of the Board, and shall hold office until their successors are elected. Any officer elected may be removed by the Board with or without cause. Any vacancy in office may be filled by the Board for the unexpired portion of the term.

### 3. PRESIDENT

        The President shall be the chief executive officer of the corporation, and shall have general supervision and control of the business of the corporation. He shall preside at all meetings of the shareholders. He shall make reports to the directors and the shareholders, and shall perform all such other duties as are incident to his office, and as are properly required of him by the Board.

### 4. VICE PRESIDENT

a. The Vice-President/Finance shall possess the powers and may perform the duties of the President in his absence or disability, and he shall perform such other duties as may be prescribed from time to time by the Board of Directors.

b. The other Vice-Presidents shall possess such powers and may perform the duties as may be assigned to them by the Board of Directors.

c. In the absence or disability of the President and Vice-President\Finance, the other Vice-President designated by the Board of Directors or the President shall perform the duties and exercise the powers of the President.

6

EB-00022538



  d. A Vice-President may sign and execute contracts and other obligations and execute contracts pertaining to the regular course of his duties.

### 5. SECRETARY

The Secretary shall keep the minutes of the meetings of the board of directors, and the minutes of all meetings of the shareholders, and also, unless otherwise directed, the minutes of all meetings of committees in books provided for that purpose. He shall give, or cause to be given, notice of all meetings of shareholders and directors, and all other notices required by law or by these by-laws, and in case of his absence or refusal to do so, any such notice may be given by any person thereunto directed by the president or by the directors or shareholders upon whose requisition the meeting is called. He shall have charge of the corporate books and records. He shall have custody of the seal of the corporation and affix the same to all instruments requiring it when authorized by the directors or the president, and attest the same. He shall file all written requests that notices be mailed to shareholders at the address other than that which appears on the record of shareholders. He shall sign with the president or vice president all certificates representing shares of the corporation. And he shall, in general perform all duties incident to the office of secretary.

### 6. TREASURER

The Treasurer shall have charge of, and be responsible for, the funds of the corporation. He shall have charge of, and be responsible for, keeping correct and complete books and records of account. He shall perform all duties incident to his office, and that are properly required of him by the Board. If required by the Board, the Treasurer shall give bond for the faithful discharge of his duties in such amount and with such surety as the Board shall determine.

### ARTICLE IV. DUTY OF OFFICERS AND DIRECTORS

Directors and officers shall discharge the duties of their respective positions in good faith and with that degree of diligence, care and skill which ordinarily prudent men would exercise under similar circumstances in like positions. In discharging their duties, directors and officers, when acting in good faith, may rely upon financial statements of the corporation represented to them to be correct by the President or the officer of the corporation having charge of its books of accounts, or stated in a written report by an independent public or certified public accountant or firm or such accountants to reflect the financial condition of such corporation.

ACA:C:\WPFILES\CORP\CLIENTS\EBER\EBWL-BY.LAW

EB-00022539

## ARTICLE V.  INDEMNITY

### 1.   ACTIONS OTHER THAN ONE BY OR IN THE RIGHT OF THIS CORPORATION

This corporation shall indemnify any person made, or threatened to be made, a party to an action or proceeding (other than one by or in the right of this corporation to procure a judgment in its favor) whether civil or criminal, including an action by or in the right of any other corporation, or any type or kind, domestic or foreign, or any partnership, joint venture trust, employee benefit plan or other enterprise, which any director or officer of the corporation served in any capacity at the request of the corporation, by reason of the fact that such person, his testator or intestate, was a director or officer of the corporation or served such other corporation, partnership, joint venture, trust, employee benefit plan or other enterprise in any capacity, against judgments, fines, amounts paid in settlement and reasonable expenses, including attorneys' fees actually and necessarily incurred as a result of such action or proceeding, or any appeal therein, if such director or officer acted in good faith for a purpose which he reasonably believed to be in or, in the case of service for any other corporation or any partnership, joint venture, trust, employee benefit plan or other enterprise not opposed to, the best interests of the corporation and, in criminal actions or proceedings, in addition, he had no reasonable cause to believe that his conduct was unlawful.

### 2.   ACTIONS BY OR IN THE RIGHT OF THIS CORPORATION

This corporation shall indemnify any person made, or threatened to be made, a party to an action by or in the right of this corporation to procure a judgment in its favor by reason of the fact that such person, his testator or intestate, is or was a director or officer of this corporation, or is or was serving at the request of this corporation as a director or officer of any other corporation of any type or kind, domestic or foreign, or any partnership, joint venture, trust, employee benefit plan or other enterprise, against amounts paid in settlement and reasonable expenses, including attorneys' fees, actually and necessarily incurred by him in connection with the defense or settlement of such action, or in connection with an appeal therein, if such director or officer acted, in good faith, for a purpose which he reasonably believed to be in, or, in the case of service for any other corporation or any partnership, joint venture, trust employee benefit plan or other enterprise, not opposed to, the best interests of the corporation. This corporation shall not indemnify such person in respect of (i) a threatened action, or a pending action which is settled or otherwise disposed of, or (ii) any claim, issue or matter as to which such person shall have been adjudged to be liable to the corporation, unless and only to the extent that the court in which the action was brought, or, if no action was brought, any court of competent jurisdiction, determines that upon application that, in view of all the circumstances of the case, the person is fairly and reasonably entitled to indemnify for such portion of the settlement amount and expenses as the court deems proper.

ACA:C:\WPFFILES\CORP-CLIENTS\EBER\EBWL-BY.1.AW

EB-00022540

### 3. ACTS COMMITTED IN BAD FAITH OR THE RESULT OF DELIBERATE DISHONESTY

No indemnification shall be made to or on behalf of any director or officer if a judgment or other final adjudication adverse to the director or officer establishes that his acts were committed in bad faith or were the result of active deliberate dishonesty and were material to the cause of action so adjudicated, or that he personally gained in fact a financial profit or other advantage to which he was not legally entitled.

### 4. AUTHORIZATION

Unless ordered by a court, indemnification shall be made by the corporation only if authorized in the specific case (i) by the board acting by a quorum consisting of directors who are not parties to such action or proceeding upon a finding that the director or officer has met the standard of conduct set forth in subparagraph 1 or 2 above, or (ii) if a quorum is not obtainable or even if obtainable, a quorum of disinterested directors so directs (A) by the board upon the opinion in writing of independent legal counsel the indemnification is proper in the circumstances because the applicable standard of conduct has been met by such director or officer or (B) by the shareholders upon a finding that the director or officer has met the applicable standard of conduct.

### 5. EXTENT OF INDEMNIFICATION

This bylaw provision is intended to indemnify the officers and directors of this corporation to the fullest extent permitted under the New York Business Corporation Law.

### ARTICLE VI. SHARES

### 1. CERTIFICATE REPRESENTING SHARES

The shares of the corporation shall be represented by certificates in the form attached to these ByLaws and shall be numbered consecutively. The certificates shall be signed by the president or a vice-president and the secretary or an assistant secretary or the treasurer or an assistant treasurer of the corporation, and may be sealed with the seal of the corporation or facsimile thereof. The signatures of the officers upon a certificate may be facsimiles if the certificate is countersigned by a transfer agent or registered by a registrar other than the corporation itself or its employee. In case any officer who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be an officer before such certificate is issued, it may be issued by the corporation with the same effect as if he were such officer at the date of issue. Each certificate shall state upon the face thereof: (1) That the corporation is formed under the laws of this state. (2) The name of the person or persons to whom issued. (3) The number and class of shares, and the designation of the series, if any, which such certificate represents.

9

EB-00022541

## 2.   LOST, DESTROYED AND STOLEN SHARE CERTIFICATES

Any person claiming a certificate representing shares to be lost, apparently destroyed or wrongfully taken shall make an affidavit or affirmation of that fact and advertise the same in such manner as the board of directors may require, and shall give the corporation an indemnity bond in such form and with one or more sureties satisfactory to the board, in such amount as the board may determine, which shall be at least double the par value of the shares represented by said certificate, to protect it or any person injured by the issue of the new certificate from any liability or expense which it or they may incur by reason of the original certificate remaining outstanding , whereupon a new certificate may be issued of the same tenor and for the same number of shares as the one alleged to be lost, destroyed or wrongfully taken if the claimant so requests prior to notice to this corporation that the lost, apparently destroyed or wrongfully taken certificate has been acquired by a bona fide purchaser.

## ARTICLE VII.  FINANCE

### 1.   BANK ACCOUNTS

The funds of the corporation shall be deposited in such banks as the Board shall designate, and shall be drawn only by check signed by properly designated officers as shown on the corporate banking resolution.

### 2.   LOANS

No loans shall be contracted on behalf of the corporation, and no bonds or notes shall be issued, unless authorized by the Board or made by properly designated officers as shown on the corporate borrowing resolution.

## ARTICLE VIII.  FISCAL YEAR

The fiscal year of the corporation shall begin June 1st and end May 31st of the next succeeding year.

## ARTICLE IX.  SEAL

The seal of the corporation shall be in the form of a circle and shall bear the name of the corporation and the year of the corporation, and the words "Corporate Seal" and "New York". An example of the corporate seal is impressed on the margin of this page.

ACA:C:\WPFFILES\CORP\CLIENTS\EBER\EBWL-BY.LAW

EB-00022542



## ARTICLE X. REIMBURSEMENT BY OFFICERS

Any payments made to an officer of the corporation such as a salary, commission, bonus, interest, or rent, or entertainment expense incurred by him, which shall be disallowed in whole or in part as a deductible expense by the Internal Revenue Service, shall be reimbursed by such officer to the corporation to the full extent of such disallowance. It shall be the duty of the directors, as a Board, to enforce payment by the officer, subject to the determination of the directors, proportionate amounts may be withheld from his future compensation payments until the amount owed to the corporation has been recovered.

## ARTICLE XI. AMENDMENT

The By-Laws may be amended or repealed by vote of the shareholders entitled to vote for the election of directors at an annual meeting or at a special meeting called for that purpose, provided that written notice of the date, time and purpose of such annual or special meeting shall be given, and such notice shall set forth the alterations, amendments or changes which are proposed to be made in such By-Laws. Only such changes as have been specified in the written notice shall be made. If, however, all the stockholders shall be present at any regular or special meeting, or those not present consent in writing to the proposed amendment, these By-Laws may be amended by a unanimous vote, without any previous written notice.

## ARTICLE XII. TRANSFER RESTRICTION

### 1.    RESTRICTION

A shareholder shall not transfer, sell or assign any shares of the corporation's stock without first personally delivering to the president or secretary written notice of a proposed transfer at least five (5) days before the effective date of transfer, stating the terms of the proposed transfer. Any other shareholder may, but is not required to, give notice within said five day period to the transferring shareholder of said other shareholder's intent to purchase the shares for a price equal to the book value thereof as appears by the books of the corporation of the end of the immediately preceding fiscal year.

### 2.    VALIDITY OF TRANSFER

No transfer of any stock shall be valid until such notice shall be given and the other shareholders have the opportunity to purchase the same as aforesaid.

### 3.    CLOSING

If any other shareholder elects to purchase the shares of a transferring shareholder, the closing on said purchase and sale shall take place at the office of the corporation

ACA:C:\WPFILES\CORP\CLIENTS\EBER\EBWL-BY.LAW

EB-00022543

not later than ninety (90) days of the date of such notice of intent to purchase. If no other shareholder elects to purchase the share of a transferring shareholder, then the transferring shareholder is free to transfer said stocks to the same person named in and on the terms set forth in the notice at a time not later than one hundred eighty (180) days of the date of the original notice.

12

ACA:C:\WPFILES-CORP\CLIENTS\EBER\EBWL-BY.LAW

EB-00022544

## janet lissow

| | |
|---|---|
| **From:** | Lester Eber [iestereber@gmail.com] |
| **Sent:** | Thursday, January 19, 2012 9:51 AM |
| **To:** | janet lissow |
| **Subject:** | Fwd: Assignmrnt of Notes and Notices of Proposal to Accept Security in Satisfaction of Debts |

**Attachments:** ASSIGNMENT OF NOTE AND SECURITY AGREEMENT.docx; ASSIGNMENT OF LINE OF CREDIT.docx; Proposal re Amended and Restated Promissory Note 1 18 12.docx; Proposal re Line of Credit Note 1 18 12.docx; Notice to Trustees of NY Teamsters Fund 1 18 12.docx; image003.jpg

     

ASSIGNMENT OF     ASSIGNMENT OF     Proposal re        Proposal re Line of  Notice to Trustees  Image003.jpg (5
OTE AND SECURIT..INE OF CREDIT.d..mended and Restat.   Credit Not...       of NY Teams...      KB)

---------- Forwarded

message ----------
From: David Belt <DBelt@hssklaw.com>
Date: Wed, 18 Jan 2012 14:49:16 -0500
Subject: Assignmrnt of Notes and Notices of Proposal to Accept Security in Satisfaction of Debts
To: "Lester Eber (lestereber@gmail.com)" <lestereber@gmail.com>

Lester:

Attached are the following documents:

1.    Assignment of Note and Security Agreement.

2.    Assignment of Line of Credit Note and Security Agreement

3.    Notice to Debtor (Metro) of Proposal to Accept Collateral in
Full Satisfaction

4.    Notice to Debtor (EWLC) of proposal to Accept Collateral in
Full Satisfaction

5.    Notice to Other Secured Party (Teamsters Pension Fund) of
Proposal to Accept Collateral in Full Satisfaction



All of these need to be signed by you and by Wendy where indicated.
The two notices also need to be dated on the last page, but this should not be done until they are ready to be mailed.
They should be dated on the same day they are mailed. They must be sent by certified mail, return receipt requested.
Please send me fully signed copies of everything after they are sent out. The 20 day clock to object does not begin to run
until the notices are mailed.

It appears that $66,000 more than the maximum amount of $1,500,000 was loaned with respect to the Line of Credit Note.
In view of the fact that the "maximum" principal to be loaned under this note was $1,500,000, I did not include the
additional $66,000 in the foreclosure.

I do not believe that this foreclosure does not foreclose the security interest of the New York State Teamsters Conference
Pension & Retirement Fund in Metro's interest in Eber-Connecticut, LLC established by the August 17, 2009 Guaranty and
Security Agreement.
This is because N.Y.U.C.C. Sec. 9-622(a)(3) provides that only the debtor's and "any subordinate security interest" is
discharged.
Because the Teamsters Pension Fund's security interest was created in August 2009, before the February 2010 Security
Agreement and the February 2011 Amended and Restated security Agreement, the Teamsters pension Fund security
interest is senior to rather than subordinate to the security interest subsequently given to you. Nor does it resolve whatever
liability you may have with respect to the Minority Member of Eber-Connecticut (Eder-Goodman) with respect to granting
this security interest and various proxies interest to the Teamster's Pension Fund despite the prohibitions on assignment in

1

the Eber-Connecticut Limited Liability Company Agreement.

[cid:image003.jpg@01CCD5F0.599954B0]

David L. Belt, Esq.
Hurwitz Sagarin Slossberg & Knuff, LLC

147 North Broad Street
Milford, CT 06460
Tel:  203-877-8000       Fax:  203-878-9800

hssklaw.com<http://www.hssklaw.com/>
DBelt@hssklaw.com<mailto:DBelt@hssklaw.com>

Any use, distribution, copying or disclosure of this e-mail is strictly prohibited.  This email and any files transmitted with it may be a confidential attorney-client communication or may otherwise be privileged and confidential. If you received this e-mail in error, please delete this e-mail and all files transmitted with it from your system and immediately notify the sender by telephone or return e-mail.

Please note that Hurwitz Sagarin Slossberg & Knuff, LLC does not accept .zip attachments.

2

EB-00000739

ERRATA SHEET
VERITEXT LEGAL SOLUTIONS
330 OLD COUNTRY ROAD
MINEOLA, NEW YORK 11501
516-608-2400

PLAINTIFF'S EXHIBIT 110

PENGAD 800-631-6989

NAME OF CASE: Kleeberg, et al. v. Eber, et al.
NAME OF DEPONENT: Lester Eber
DATE OF DEPOSITION: January 24, 2019

| PAGE | LINE(S) | CHANGE | REASON |
|---|---|---|---|
| 68 | 19 | Yes | Money advanced by Southern to Eber Companies was used to pay off Eber Companies' debts. |
| 69 | 22 | Yes | Southern advanced more than $3M to the Eber Companies for their debts. |
| 70 | 16 | No | John Ryan was no longer working for EWLC in 2007, so he would not have been shown the consulting agreement. |
| 120 | 20 | "That's, correct, but my lawyer made an error in drafting the affidavit." | Clarify testimony. |
| 122 | 8 | "I can't explain that to you. My lawyer prepared this document." | Clarify testimony. |
| 136 | 16-18 | "I consulted with my lawyers and then decided to do so." | Clarify testimony. |
| 139 | 11 | "I consulted with my lawyers and then decided to do so." | Clarify testimony. |
| 140 | 24-25 | "I consulted with my lawyers and then decided to do so." | Clarify testimony. |
| 165 | 6-7 | "I consulted with Mr. Gumaer and then decided to do so." | Clarify testimony. |
| 178 | 8-9, 12 | "I consulted with my lawyers and then decided to do so." | Clarify testimony. |
| 180 | 14 | "It was to terminate the pension plan retroactively." | Clarify testimony. |
| 206 | 9-10 | "I consulted with my lawyers and then decided to do so." | Clarify testimony. |
| 241 | 6-7 | "I consulted with my lawyers and then decided to do so." | Clarify testimony. |
| 244 | 16-19 | "I consulted with my lawyers and then decided to do so." | Clarify testimony. |
| 246 | 19 | "Southern" | Should be keep "Southern" out of the State not "Eder". |
| 260 | 16 | "I do not recall." | Letter from Gumaer to me was not disclosed to Wendy. |
| 264 | 9-11 | Yes | I paid the attorneys and the attorneys allocated the $37,500.00 to me. My commitment to reimburse the company was the consideration for the stock. |
| 297 | 4-5 | "I also discussed the 2012 assignment in lieu of foreclosure with Dan Kleeberg." | Recalled discussion with Dan Kleeberg. |

State of Ct
New Haven County

Lester Eber (signature)

Lester Eber

Subscribed and sworn to before me this 8 day of March, 2019.

AGATA TARANTOLA
Notary Public, State of Connecticut
My Commission Expires Oct. 31, 2022

(signature)

Notary Public

## Janet lissow

**From:** Wendy Eber
**Sent:** Wednesday, October 05, 2011 5:17 PM
**To:** janet lissow
**Subject:** revised FW: Request for information concerning money loaned.

**From:** Wendy Eber
**Sent:** Wednesday, October 05, 2011 4:39 PM
**To:** Lester Eber
**Cc:** janet lissow
**Subject:** RE: Request for information concerning money loaned.

**From:** Lester Eber [mailto:lestereber@gmail.com]
**Sent:** Saturday, October 01, 2011 9:07 AM
**To:** Wendy Eber
**Subject:** Re: Request for information concerning money loaned.

Do you have this information?

---------- Forwarded message ----------
From: **Lester Eber** <lestereber@gmail.com>
Date: Fri, Sep 30, 2011 at 4:18 PM
Subject: Fwd: Request for information concerning money loaned.
To: weber@slocumandsons.com

---------- Forwarded message ----------
From: **David Belt** <DBelt@hssklaw.com>
Date: Thu, Sep 29, 2011 at 10:45 AM
Subject: Request for information concerning money loaned.
To: "Lester Eber (lestereber@gmail.com)" <lestereber@gmail.com>
Cc: Russell Green <RGreen@hssklaw.com>

Lester:

Please arrange to have emailed to me the following information concerning the moneys loaned by you that relate to the notes and security agreements with respect to which you want us to bring suit.

1. The date, amount and recipient of each sum loaned.

PLAINTIFF'S
EXHIBIT
112
PENGAD 800-631-6989

Line of Credit Note October, 2009 Eber Wine and Liquor Corp. February 26th, 2010 this becomes a secured loan with Eber Bros Wine and Liquor Metro, Inc. All payments were made to Eber Brothers

10/6/2011

EB-00000729

Wine and Liquor Metro Inc.

February 28, 2010  $150,000

March 31, 2010 $165,000

June 8, 2010 $220,000

July 22,  2010  $20,000

Feb 11, 2011 $100,000- This payment was made by Lester on the condition that the March 13th 2006 loan becomes secured by Eber Brothers Metro Inc Stock.

March 4, 2011 $250,000

April 8, 2011-$50,000

April 26, 2011 64,000

May 26, 2011 32,000

June 15, 2011 $179,000

July 7th 2011, 275,000

Loan to Eber Brothers Wine and Liquor Corp March 13, 2006 $1,503,750. Feb 11, 2011 the balance was secured by Eber Bros. Wine and Liquor Metro Inc. the current balance is $1,434,710 which has not changed since May 2007.

2. The date, amount and payer of each sum repaid.

None for the $1.5 million dollar loan from Oct 2009. The March 13, 2006 loan of $1,503,750, $69,040 was repayed. I do not have the details but this was offset by personal expenses that Lester charged to the company.

3. Copies of all journals, if any, reflecting the sums loaned and sums repaid.- to be sent shortly.

This information will be necessary to, among other things, verify the interest due on the payments.- I am working on the interest payments and will get this info to you shortly.

Thanks

> David L. Belt, Esq.
> HURWITZ SAGARIN SLOSSBERG & KNUFF, LLC
>
> 147 North Broad Street
> Milford, CT  06460
> Tel:  203-877-8000      Fax:  203-878-9800

10/6/2011

EB-00000730

    hssklaw.com          DBelt@hssklaw.com

Any use, distribution, copying or disclosure of this e-mail is strictly prohibited.  This email and any files transmitted with it may be a confidential attorney-client communication or may otherwise be privileged and confidential. If you received this e-mail in error, please delete this e-mail and all files transmitted with it from your system and immediately notify the sender by telephone or return e-mail.

Please note that Hurwitz Sagarin Slossberg & Knuff, LLC does not accept .zip attachments.

10/6/2011

EB-00000731

**Wendy Eber**

| | |
|---|---|
| **From:** | Wendy Eber |
| **Sent:** | Wednesday, January 18, 2012 11:02 AM |
| **To:** | DBelt@hssklaw.com |
| **Subject:** | Loan Balance and Interest |

**Importance:**   High

David

As of 12/31/2011 the balances were as follows:

2005 Loan Principal amount -$1,434,710.68. Accrued interest $517,163.58.   $1,951,874.26$
2010 Loan Principal amount -1,500,000. Accrued interest $198,808.22   $= 1,698,808.22$

Please let me know when the notices have gone out.

$3,650,682.48$

Wendy

PLAINTIFF'S EXHIBIT 114

PENGAD 800-631-6989

EB-00033761

1

## UNANIMOUS WRITTEN CONSENT OF THE MEMBERS
## OF THE BOARD OF DIRECTORS OF EBER BROS. & CO., INC.

The undersigned, being all the members of the Board of Directors of Eber Bros. & Co.,

Inc., a New York corporation (the "Corporation"), in accordance with Section 708 of the Business

Corporation Law of the State of New York, authorizing the taking of this action by written

consent, hereby consent to the adoption of the following resolution, in the same manner as if duly

presented to, and approved at, a meeting of the Board of Directors of the Corporation, duly called

and held for such purpose:

### Appointment of Director

RESOLVED, that any officer of the Corporation be, and he hereby is, authorized to
execute a written consent of the stockholders of Eber Bros. Wine and Liquor Corporation
for the purpose of appointing Wendy Eber to serve as a director of Eber Bros. Wine and
Liquor Corporation, until her successor is duly elected and qualified or until her earlier
death, resignation or removal.

IN WITNESS WHEREOF, the undersigned have caused this written consent to be
executed as of February 1$\downarrow$$^{th}$ 2017.

_Lester Eber_

Name: Lester Eber

_Wendy Eber_

Name: Wendy Eber



PLAINTIFF'S
EXHIBIT
15
PENGAD 800-531-6989

EB-00035550

## Wendy Eber

| | |
|---|---|
| **From:** | Wendy Eber |
| **Sent:** | Thursday, March 04, 2010 5:06 PM |
| **To:** | Lester Eber; egumaer1@yahoo.com |
| **Cc:** | Glenn Sturm |
| **Subject:** | Minutes to Board Meeting |
| **Attachments:** | Minutes to Board meeting for Eber Bros W&L.doc; Minutes to Board meeting for Eber Bros Metro Inc..doc |

Please review and let me know your comments so that I can finalize these documents.   Also, Mike when are you available to discuss the Board of Directors of Eber-CT?

Thanks,
Wendy



1

EB-00031226

**Minutes to Board meeting for Eber Bros. Wine and Liquor Corp.**
**February 26, 2010**

The Board Meeting for Eber Bros. Wine & Liquor Metro. Inc. (the "Company") was called to order on February 26, 2010 at 10:00 am.  Lester Eber, Elliot Gumaer, Glenn Strum and Wendy Eber were on the conference call

The Board discussed the current financial performance of the Company.  After a detailed review of the Company's financial condition the Board discussed its financing options. Mr. Lester Eber indicated that he was willing to advance, under the conditions outlined in the loan agreement (Attached hereto as Exhibit A).

The board discussed a $1.5 million dollar Line of Credit Note and after an extensive discussion, it was determined that Lester Eber was the only person or entity who was willing to lend up to $1.5 million into the company. Lester Eber would only agree to provide financing under the Line of Credit Note up to $1.5 million dollars to be loaned into Eber Bros Wine and Liquor Metro Inc. if he had a secured interest in substantially all of the assets of Eber Bros Wine and Liquor Metro. Inc.

Mr. Eber's counsel reviewed the Company's organizational documents and various other documents with the directors.  He also reviewed certain facts concerning the Eber Connecticut LLC. subsidiary and the actions of its members that bore on the Company's various obligations.

The board discussed that the terms of the Loan Agreement and determined they were commercially reasonable.  The Board then reviewed the Resolutions attached hereto as Exhibit B.  After an extensive review of the loan documents, Mr. Elliot Gumaer made a motion to approve the resolutions. Ms. Wendy Eber seconded the motion.  The vote was as follows:  Elliot Gumaer and Wendy Eber voted yes.  Lester Eber abstained from voting. The board approved the loan.


Respectively Submitted



Wendy Eber
Meeting Secretary

EB-00031227

**Wendy Eber**

| | |
|---|---|
| **From:** | Wendy Eber |
| **Sent:** | Friday, May 28, 2010 8:56 AM |
| **To:** | Pat Dalton |
| **Cc:** | Justin P. Runke |
| **Subject:** | Fw: Fw: Draft term sheet |

I am not sure if I sent this to u?

Sent from my Verizon Wireless BlackBerry

**From:** Elliott Gumaer <egumaer1@yahoo.com>
**Date:** Wed, 26 May 2010 13:22:07 -0700 (PDT)
**To:** <weber@slocumandsons.com>
**Subject:** Re: Fw: Draft term sheet

**Wendy, I see where we are going; however, I have a cojpple of isues that stem from the fiduciary relationship under the Eber trust. Would it be possible to have Eber Metro to have the first right of refusal? I get a little nervous about the possibility that you are receiving something that will, at least in theory, benefit you individually, at the expense of the other persons holding a beneficial interest in the Eber Trust. I don't have Dalton's or Sturm's e-mail addresses, but you might wish to pass these comments on. I'll be here to help in any way possible. Mike**

--- On **Wed, 5/26/10**, weber@slocumandsons.com *<weber@slocumandsons.com>* wrote:

From: weber@slocumandsons.com <weber@slocumandsons.com>
Subject: Fw: Draft term sheet
To: "Mike Gumar" <egumaer1@yahoo.com>
Date: Wednesday, May 26, 2010, 4:02 PM

Please review at your earliest convenience.  This is Urgent.
Thanks,
Wendy

Sent from my Verizon Wireless BlackBerry

-----Original Message-----
From: Glenn Sturm <glenn@sturm.bz>
Date: Wed, 26 May 2010 09:48:04
To: <tsg@greom.com>
Cc: weber@slocumandsons.com <weber@slocumandsons.com>
Subject: Draft term sheet

1



PLAINTIFF'S
EXHIBIT
119
PENGAD 800-631-6989

EB-00026653

Nelson Mullins Riley & Scarborough LLP

**Memorandum**

To:      Pat Dalton

cc:      Wendy Eber
         Lestor Eber

From:    Glenn Sturm

Date:    May 26, 2010

Re:      Equity Transfer

Pat, as we discussed this morning we need to identify an alternative purchaser of the 6% interest in the CT LLC. The current proposal is for a single member LLC ("NewCo") to acquire the interest and that I be the only equity holder of the new LLC.

Here are the terms that we discussed:

1. NewCo purchases a 6% equity interest in CT for a secured nonrecourse note in the amount of $____.

2. Wendy Eber has an exclusive first right of first refusal to purchase the entire equity interest from NewCo.

3. If Ms Eber does not exercise her right then Metro has the next right of first refusal to purchase the entire equity interest.

4. If Metro does not exercise its right then EG has the final right of first refusal to purchase the stock.

5. If neither Ms Eber, Metro, nor EG elects their right then NewCo will be required to retain its interest.

6. Ms Eber will have a proxy to vote the equity interest held by NewCo and a limited power of attorney.

I have no pride of authorship on this outline. If we can find a different structure that works that would be better for me.

**Wendy Eber**

| | |
|---|---|
| **From:** | Wendy Eber |
| **Sent:** | Thursday, July 29, 2010 10:53 AM |
| **To:** | Elliott Gumaer |
| **Cc:** | Lester Eber |
| **Subject:** | Eber-CT |
| **Attachments:** | DOC001.PDF |

Mike
I hope you are enjoying the summer. I ran into Dodie and Michael near their apartment a few weeks ago.

Please review the attached document. Lester would like to speak with you regarding the attached document at your earliest convenience. When is a good time to speak with you?

Thank you,

Wendy

-----Original Message-----
From: administrator@slocumandsons.com [mailto:administrator@slocumandsons.com]
Sent: Thursday, July 29, 2010 7:21 AM
To: Wendy Eber
Subject: Scan from a Xerox WorkCentre

Please open the attached document. It was scanned and sent to you using a Xerox WorkCentre.

Attachment File Type: PDF

WorkCentre Location: Near Postage Machine Device Name: X_ctcopier

For more information on Xerox products and solutions, please visit http://www.xerox.com

1



PLAINTIFF'S EXHIBIT
12 o
PENGAD 800-631-6989

EB-00031220

## EBER BROS. WINE & LIQUOR METRO, INC.

### Unanimous Written Consent
### In Lieu of a Meeting of the Board of Directors

### May 28, 2010

The undersigned, being all of the directors of Eber Bros. Wine & Liquor Metro, Inc., a New York corporation (the "**Corporation**"), by execution hereof do hereby: (i) consent to and adopt the following resolutions as of the date hereof, which resolutions shall have the same force and effect as if adopted by affirmative vote at a meeting of the Board of Directors of the Corporation (the "**Board**") duly called and held; (ii) waive all requirements of notice; and (iii) direct that this Unanimous Written Consent be filed with the minutes of the proceedings of the Corporation.

### Sale of Equity Interests in Eber Connecticut, LLC

**WHEREAS,** the Corporation owns certain equity interests of Eber Connecticut, LLC;

**WHEREAS,** Polebridge Bowman Partners, LLC (the "**Purchaser**") has agreed to purchase 6% of the equity interests of Eber Connecticut, LLC from the Corporation in exchange for a non-recourse promissory note in the principal amount of $350,000, with a 2% simple interest and a maturity date of five years from the date of purchase, all in accordance with that certain purchase agreement attached to this consent as Exhibit A; and

**WHEREAS,** the Board believes it to be in the best interests of the Corporation and its shareholders to sell 6% of the equity interests of Eber Connecticut, LLC to the Purchaser on the terms described in the purchase agreement.

**NOW, THEREFORE, BE IT RESOLVED** that the Board hereby approves the sale of 6% of the equity interests of Eber Connecticut, LLC to the Purchaser on such terms as are set forth in the purchase agreement, with such changes to the purchase agreement as the officers of the Corporation, with advice of counsel, deem appropriate;

**FURTHER RESOLVED,** that all actions heretofore taken and all documentation heretofore delivered by any of said the officers of the Corporation in furtherance of the foregoing resolutions are hereby ratified, adopted, approved and confirmed and declared to be binding and enforceable obligations of the Corporation in accordance with the respective terms and provisions thereof;

**FURTHER RESOLVED,** that this unanimous written consent may be executed by facsimile signatures and in any number of counterparts, each of which counterparts shall be deemed an original, but all of which together shall constitute one and the same instrument; and

**FURTHER RESOLVED,** that the officers of the Corporation be, and each of them hereby is, authorized, empowered and directed to take, or cause to be taken, any and all other such acts and actions and to prepare, execute and deliver, or cause to be prepared, executed and delivered any and all such other documents or instruments as, with the advice of counsel, they may deem necessary,

EB-00031221

desirable or appropriate to consummate the purchase agreement and all transactions contemplated thereby, and to otherwise carry out the full intent and purpose of the foregoing resolutions.

*[Signature appears on following page.]*

2

EB-00031222

**INTENDING TO BE BOUND,** the undersigned have executed this Unanimous Written Consent of the Board as of the date set forth above.

_____  
Wendy Eber

_____  
Lester Eber

_____  
Elliot Gumaer

3

EB-00031223

**Wendy Eber**

| | |
|---|---|
| **From:** | elliot gumaer <ewgumaer@gmail.com> |
| **Sent:** | Tuesday, March 13, 2012 10:19 AM |
| **To:** | Wendy Eber |

Wendy, we'll talk at 4PM. I am not in a position to discuss in any depth the Alexbay matter as I learned of the matter yesterday afternoon in the email from Underberg. Hawks will be interested in knowing (as will I) what will be the status of the Eber Trust with respect to Eber assets held in the trust. You may wish to have some one from Underberg on hand to address these issues. On the servive it looks like Letster is moving against the trust of which he is a co-trustee. I'll be available around 3:30 should you wish to talk prior to the meeting. EWG

1



**PLAINTIFF'S EXHIBIT**

122

EB-00026652

## Wendy Eber

| | |
|---|---|
| **From:** | Wendy Eber |
| **Sent:** | Monday, March 12, 2012 3:34 PM |
| **To:** | Marino Fernandez; ewgumaer@gmail.com |
| **Subject:** | Bank Loan |
| **Attachments:** | Scanned from a Xerox multifunction device001.pdf |

Document attached.

-----Original Message-----
From: administrator3@slocumandsons.com [mailto:administrator3@slocumandsons.com]
Sent: Monday, March 12, 2012 3:27 PM
To: Wendy Eber
Subject: Scanned from a Xerox multifunction device

Please open the attached document. It was scanned and sent to you using a Xerox multifunction device.

Attachment File Type: pdf

multifunction device Location: machine location not set
Device Name: K7259

For more information on Xerox products and solutions, please visit http://www.xerox.com

1



EB-00031214

C. N. B. Slocum



Commercial
Services
Group | Canandaigua
National
Bank & Trust

**72 South Main Street**
**Canandaigua, New York 14424**
www.cnbank.com

Robert L. Lowenthal
Senior Vice President

Phone: (585) 394-4260 ext 36108
Facsimile: (585) 396-1355
E-mail: blowenthal@cnbank.com

October 14, 2010

Mr. Lester Eber, President
Eber Bros. Wine & Liquor Corp.
95 Allens Creek Rd.
Bldg 2, Suites 10
Rochester NY 14618-3250

Dear Mr. Eber:

I am pleased to confirm in writing The Canandaigua National Bank and Trust Company's (the "Bank") approval of a revision and extension of the existing line of credit for Eber – Connecticut, LLC. The terms and conditions of our approval are set forth as follows:

## TERMS

Borrower:  Eber – Connecticut, LLC.

Amount:  $3,900,000.00 Term Loan (the "Term Loan").

Purpose:  The Term Loan will repay the existing line of credit used to finance accounts receivable and inventory. Borrowings will be limited to 75% of eligible Accounts Receivable and 25% inventory. The Borrower will complete the Bank's Borrowing Base Certificate and return it with copies of items listed in paragraph 13 below.

Interest Rate:  The interest rate shall be a variable interest rate based upon the lowest base Prime Rate published in the Wall Street Journal plus 1.75%. The interest rate will increase on April 1, 2011 to Wall Street Journal plus 2.50% until maturity. The lowest Wall Street Journal Prime Rate as of today is 3.25%. The interest rate will change the day the Wall Street Journal's Prime Rate changes. The Bank has established a floor interest rate of 4% for the life of the Term Loan.

Penalty Rate:  The interest rate offered is based upon your agreement to make all payments and submit all financial statements in a timely manner. Failure to make any payments within 30 days of the due date or failure to provide the required financial statements or extension forms by October 31st, the Borrower agrees to pay a DEFAULT INTEREST RATE OF FOUR (4) PERCENT more than the interest rate indicated in this commitment letter.

10/14/2010
Page 2 of 5

The DEFAULT INTEREST RATE shall remain in effect until the default is cured and three (3) consecutive timely loan payments have been made. The enforcement of the DEFAULT INTEREST RATE is at the sole option of the Bank. In no event shall the DEFAULT INTEREST RATE exceed the maximum interest rate as allowed by law. No omission or delay by the Bank in exercising this right will operate as a waiver, and the single or partial exercise of any such right or rights will not preclude any other or further exercise of such right or rights.

Commitment Fee:

$10,000.00 due at closing. If the Term Loan is not paid in full by May 1, 2011, the bank would charge a fee of $20,000 for another 6 month extension.

Repayment Terms:

The Term Loan will mature on November 1, 2011 and is subject to annual review upon submission of the May 31, 2010 audited financial statement, which must be provided by November 30, 2010. The Bank's review shall be based on factors deemed relevant to the Bank, which include, but are not limited to, the financial condition of the Borrower and any Guarantor of the Term Loan at the time of the review, profitability of operations, and settlement of obligations between Borrower and Bank, and maintenance of a satisfactory credit record in general by Borrower and Guarantor.

The Term Loan will require monthly interest payment plus principal reductions of $15,000.00 beginning November 1, 2010 through November 1, 2011 when the remaining balance must be paid in full.

Late Charges:

If a scheduled payment is not made within ten (10) days of the due date, a late charge will be assessed at the greater of 6% of the scheduled payment amount or $50.00.

## CONDITIONS

1.   The Term Loan shall be secured by a first lien security interest under the Uniform Commercial Code in all accounts receivable, contracts, inventory, machinery, equipment, furniture, fixtures, goods and general intangibles whether now owned or hereafter acquired including proceeds thereof. The Bank will file in the State of Connecticut where the Borrower is headquartered.

2.   The Term Loan shall be secured by assignment of a $500,000.00 Bank certificate of deposit from Mr. Lester Eber.

3.   Borrower agrees to insure the equipment, machinery, inventory, furniture, and fixtures against loss by fire and other such hazards in an amount satisfactory to the Bank naming The Canandaigua National Bank and Trust Company as loss payee. Satisfactory proof of insurance must be presented prior to or at closing. Please advise your insurance agent to use the ACORD 27 Evidence of Property Insurance form.

4.   The Term Loan shall be guaranteed by Lester Eber (the "Guarantor") for the full amount borrowed by execution of the Bank's standard "Guaranty of Payment" form for this purpose.

5.   The Term Loan shall be guaranteed by Eber Bros. Wine & Liquor Metro, Inc., Eber Bro. Wine & Liquor Corporation (NY) and Eber Bros. & Co., Inc. (NY) for the full amount borrowed by execution of a Guaranty of Payment form for this purpose. The Allen Eber Trust agrees to pledge their shares of capital stock in the various corporations to the Bank for the Term Loan.

6.   Borrower to certify to Bank, in a form satisfactory to Bank, that all local, State and Federal taxes are paid current with no outstanding liens, judgments, or disputes.

EB-00020076

7.      During the term of the Term Loan, the Borrower agrees to be in compliance with all applicable local, State and Federal environmental regulations.

8.      Borrower shall provide the Bank with the proper resolution, which permits this borrowing and the pledge of assets prior to or at closing in a form satisfactory to the Bank.

9.      Any material change that may arise or was not disclosed at the time of the loan application either written or oral may result in this commitment being withdrawn.

10.     Upon the sale or other transfer of all or any portion of the Borrower's accounts receivable, contracts, equipment, machinery, inventory, furniture or fixtures ("personal property"), the entire outstanding indebtedness shall immediately become due and payable, unless (1) such personal property is no longer used in the ordinary course of the Borrower's business, (2) Borrower promptly replaces such personal property with other, functionally equivalent, personal property or (3) the inventory included the personal property is transferred in the ordinary course of the Borrower's business.

11.     Additional financing shall be permitted with the prior written approval by the Bank.

12.     All documents, title questions, designation as to applicable law and all other legal matters relating to or arising out of the Term Loan will be subject in all respects to the approval of the Bank's legal counsel.

13.     The Borrower and Guarantor agree to provide the Bank with the following financial statement items at least annually or upon request by the Bank:

    a)      Lester Eber personal financial statement including a listing of all contingent liabilities.
    b)      A complete copy of Lester Eber's Federal Income Tax Return including k-1's and w-2's.
    c)      Annual audited financial statement for their fiscal year ending May 31. Borrower has provided a draft copy of the audit for the fiscal year ending May 31, 2009, but not the final audited statement. If waivers are needed from the Bank, the Borrower should request the waivers.
    d)      Monthly income and expense statement and balance sheet by the 25th of each month.
    e)      Monthly accounts receivable and payable agings by the 10th of each month.
    f)      Monthly borrowing base information on the Bank's form by the 10th of each month.

14.     Contingencies:  The Bank shall have no obligation to make any loan under the Term Loan following the occurrence of any one of the following contingencies:

        (1) Failure by Borrower to comply with any terms of this letter or the Term Loan Promissory Note:
        (2) There is any material misstatement or material omission in the information heretofore and hereafter submitted to the Bank in connection with the Term Loan;
        (3) A material adverse change in the financial or economic condition or prospects of the Borrower or any Guarantor; and
        (4) The occurrence of an Event of Default as defined in the paragraph below or the occurrence of any event which with the passage of time or the giving of notice or both would constitute such an Event of Default.
        (5) Failure by Borrower to accept and, if provided for therein, to close under all other financing commitments offered to Borrower on or about the date of this letter.

15.     Events of Default: Acceleration of Payment:      Each of the following shall constitute an "Event of Default" under the Term Loan:

        (1)     Failure to make any payment when due under the Term Loan and the continuance of such failure for 10 days thereafter.

EB-00020077

(2)    Failure to make any payment when due under any other indebtedness of Borrower or Guarantor to Bank and the continuance of such failure for 10 days thereafter or for any longer period allowed under any note or other written evidence of such indebtedness.

(3)    The occurrence of any event of default under any other obligation of Borrower or Guarantor to Bank now existing or hereafter arising.

(4)    The occurrence of any contingency set forth in the subparagraphs (1), (2), or (3) of the Contingencies paragraph above.

Upon the occurrence of any Event of Default, Bank shall have the right to demand and to receive immediate payment in full of all indebtedness outstanding under the Term Loan.  This right shall be in addition to the right set forth in the Contingencies paragraph above to withhold any further advances under the Term Loan and all other rights Bank may have under law.

16.    Financial Covenants:    The Borrower shall meet the following annual loan covenant as of completion of their fiscal yearend financial statement for the year ending May 31, 2010 and thereafter:

A.    Maintain a minimum of $5 Million of Current Assets greater than Current Liabilities.
B.    Maintain a ratio of all liabilities to tangible net worth of not greater than 1.50 to 1.
C.    Maintain a minimum tangible net worth of $5.8 Million.

Entire
Agreement:    This commitment contains the entire agreement and understandings between the Borrower and Bank with respect to the Term Loan and supersedes all prior commitments, agreements and understanding, whether written or oral, relating thereto.

Modification:    No modification or waiver of any of the terms or conditions of this commitment shall be effective unless such modification or waiver is in writing and signed by the Bank.

The undersigned Borrower and Guarantor hereby agree to execute such further and additional documents as may be deemed reasonable and necessary by the Bank to perfect and effectuate the Term Loan as set forth in this commitment letter and further agree to execute such documents as may be deemed necessary and appropriate to correct any stenographic errors or omissions.

This commitment is not assignable and will expire in the event that a signed and dated copy of this commitment is not returned to the Bank on or before October 29, 2010.

The Bank sincerely appreciates the opportunity to be of service to you in this endeavor.  Should you have any questions, please contact me at 394-4260 ext. 36108.

Sincerely,

Robert L. Lowenthal
Senior Vice President

EB-00020078

10/14/2010
Page 5 of 5

ACCEPTANCE:

THE UNDERSIGNED HEREBY ACCEPTS AND AGREES TO THE TERMS AND CONDITIONS
SET FORTH ABOVE.

Borrower: Eber – Connecticut, LLC

By: _____     Date: 10 / 18 / 10
Lester Eber, Chief Executive Officer

Guarantor: Lester Eber

By: _____     Date: 10 / 18 / 10

Guarantor: Eber Bros. Wine & Liquor Metro, Inc.

By: _____     Date: 10 / 18 / 10
Name & Title    President

Guarantor: Eber Bro. Wine & Liquor Corporation (NY)

By: _____     Date: 10 / 18 / 10
Name & Title    President

Guarantor: Eber Bros. & Co., Inc. (NY)

By: _____     Date: 10 / 18 / 10
Name & Title    President

Grantor: Allen Eber Trust

By: _____     Date: 10 / 18 / 10
Name & Title
Trustee

EB-00020079

Borrower Name Eber-Connecticut, LLC

Borrower TIN/SSN  56-2501049

Officer Initials  RLL

Account Number

Bank Use Only

Use for consumer loans over
$25,000 or business purpose
loans of any amount

# THE CANANDAIGUA NATIONAL BANK
## AND TRUST COMPANY
### 72 SOUTH MAIN STREET
### CANANDAIGUA, N.Y. 14424

### PROMISSORY INSTALLMENT NOTE
(Fixed or Floating Interest)

$ 3,900,000.00                                    Date: November 1, 2010

1. **Parties to Note:** In this Note, the words "I", "me" and "mine" mean and include each and all of the persons (the singular includes the plural) who sign or are guarantors of this Note. The words "you", and "yours" mean The Canandaigua National Bank and Trust Company or any other owner of this Note.

2. **Principal Amount and Promise to Pay:** I promise to pay to your order at 72 South Main Street, Canandaigua, New York 14424, or such other place as you will designate to me in writing, the principal amount of U. S three million nine hundred thousand and no/100 Dollars ($3,900,000.00) and interest on any principal amount that remains outstanding from time to time from and including the date of this Note until, as set forth below, all principal and interest are paid in full. I will pay principal and interest as follows (check which provision is applicable):

[ ] **Level Payments of Principal and Interest:** In _____ equal combined _____ installments of principal and interest in the amount of _____ Dollars ($_____ ) on the _____ Day of every _____ commencing on _____ and a like amount on the same day of each _____ thereafter until _____, when the entire principal balance together with all accrued and unpaid interest shall be due and payable.

If interest on this Note is computed at a variable rate, then, upon five days' notice from you, the _____ installment due may be adjusted to a level sufficient to pay interest which is accruing or which has accrued during any _____ period. After _____ years and at _____ -year intervals thereafter until the maturity date, the amount of the _____ installment may be adjusted to a level that will amortize the then existing principal balance over the remainder of the original term.

[X] **Principal Payments Plus Interest:** In 12 equal combined monthly installments of principal in the amount of fifteen thousand and no/100 Dollars ($15,000.00) plus accrued interest on the 1st day of every month commencing on November 1, 2010, and one final payment of three million seven hundred twenty thousand and no/100 Dollars ($3,720,000.00) principal plus all accrued and unpaid interest on November 1, 2011.

3. **Interest Rate:** The outstanding principal amount of this Note will bear interest at the following rate (check which provision is applicable):

[ ] **Fixed Rate:** A rate of interest of _____ percent (_____%) per year.

[X] **Floating Rate:** A rate of interest per year which will automatically increase or decrease from time to time such that at all times the rate will remain one and three quarters of one percent (1.75%) above The Wall Street Journal prime lending rate however, on April 1, 2011 the interest rate will increase to two and one half of one percent (2.50%) above The Wall Street Journal prime lending rate, but in no event in excess of the maximum rate allowed by law. The prime lending rate is the rate of interest announced by you from time to time as the prime lending rate. The prime lending rate is one of the interest rates and may not necessarily be the best or lowest interest rate. All changes in the rate of interest hereunder due to a change in the stated prime rate shall occur automatically without notice as of the effective date of the change of the prime rate. In no event will the interest rate be less than 4 (four) percent at any time in the life of the loan.

(SH) 04/09

EB-00020080

4. **Interest Computation:** Interest will be computed by using a daily rate determined by dividing the applicable yearly rate of interest by 360 and applying such daily rate to the outstanding principal amount for the actual number of days such principal is outstanding.

5. **Use of Proceeds:** I represent that the proceeds of this loan will be used for term out of line of credit #1103186190

6. **Security:** As security for my obligations under this Note, I grant to you a security interest in, but not limited to existing lien on all business assets, and an existing assignment of $500,000 Certificate of Deposit #1103187065
This property is called "collateral". If any notice concerning the collateral is required to be given to me, it will be reasonable notice if you give me (3) days written notice. You will not be required to protect any of the collateral against the claims of others.

7. **Guaranty of Loan:** This loan is guaranteed by: Lester Eber, Eber Bros Wine & Liquor Metro, Inc., Eber Bro. Wine & Liquor Corporation (NY) and Eber Bros & Co., Inc. (NY) and the Allen Eber Trust agrees to pledge their shares of capital stock in the various corporations                                                                                                                                    .

8. **Notification of Change in Condition and Default:** I will notify you promptly of any material adverse change in my financial condition or in the financial condition of my business.

9. **Events of Default:** If this Note is not payable on demand, you may for any of the following reasons, declare all amounts owing under this Note to be immediately due and payable:

   (i)     I fail to pay the principal of or interest on this Note when due; or
   (ii)    I fail to pay any other obligation of mine to you when due; or
   (iii)   I breach any promise or fail to perform any agreement in this Note or any other agreement with you; or
   (iv)    Any statement or warranty made by me in this Note or in support of this Note or under any other agreement with you is materially inaccurate or false; or
   (v)     A final judgment or order for the payment of money is rendered against me or any guarantor of this Note and is not discharged or stayed from execution within thirty (30) days after its date of entry; or
   (vi)    I or any guarantor die, become legally incompetent, or any of our businesses becomes insolvent; or
   (vii)   The signer of the Note is other than a natural person and it dissolves or ceases or suspends business; or
   (viii)  You, at any time, believe the collateral securing payment of this Note is insufficient, and I do not give you more property as collateral or repay part of this Note as you demand; or
   (ix)    Any insolvency or bankruptcy proceeding (state or federal) is brought by or against me or any guarantor of this Note, or any assignment for the benefit of creditors is made by me or any such guarantor; or
   (x)     Any property of mine or of a guarantor of this Note which is in your possession becomes subject to a court order or any restraint or lien in favor of anyone other than you.

10. **Receipt of Proceeds:** Any loan hereunder shall be conclusively presumed to have been made to me at my request and for my benefit when the proceeds of such loan are deposited to my credit in any account designated by me or in my name regardless of the fact that persons other than those authorized to borrow may have authority to draw against such account, or when you have issued a check or transferred funds in accordance with my instructions or in a manner which results in full value to me.

11. **Financial Information:** Upon request, I will furnish my financial statements to you and all such additional financial information about me as you may require from time to time. I warrant that all information about me which I have furnished to you and which I will furnish to you will be true and complete. I authorize you to make whatever credit inquiries you deem necessary while there remains any unpaid balance on this Note. I authorize any person or credit reporting agency to furnish to you any information it may have or obtain in response to your inquiries.

12. **Address For Demands, Notices and Services of Process:** All demands and notices to me will be effective when mailed to my address set forth below. If I change addresses, I will notify you within ten (10) days in writing sent to 72 South Main Street, Canandaigua, New York 14424 to the attention of the Manager of Note Operations.

13. **Costs of Collection and Legal Fees:** If I am in default under the terms of this note, or any of the loan agreements, I agree to pay any reasonable legal fees, including fees incurred for both attorney and paralegal services, and other costs incurred by you during the period of default. I agree to pay the cost of an environmental assessment and an appraisal of the property upon demand. In addition, if you refer my debt to an attorney for collection, I agree to pay any reasonable attorneys' fees plus court costs.

14. **Waiver of Notices and Demands:** If this Note is not paid when due, you do not have to notify me before you can enforce your rights to collect all amounts due. You do not have to present this Note, demand payment or protest.

(SH) 04/09

EB-00020081

15. **Consent to Jurisdiction and Governing Law:** I consent to the exclusive jurisdiction of all courts in the State of New York for trial of any claims against me arising out of, under, or in connection with this Note. This Note will be governed by and construed under the law of the State of New York without regard to any conflicts of law rules, which would require the application of the laws of any other state.

16. **No Waiver By Delay In Enforcement:** I agree that no omission or delay by you in exercising any right under this Note will operate as a waiver, and the single or partial exercise of any such right or rights will not preclude any other or further exercise of such right or rights.

17. **Entire Agreement:** This Note, together with all other written documents signed by me and given to you in connection with this Note, contain the entire agreement between you and me. This Note cannot be changed in any way except by a written document signed by you and me.

18. **For Corporations, Partnerships or Associations:** If the signer of this Note is a legal entity other than a natural person, such as a corporation, partnership or association, it warrants that it is organized and existing under the jurisdiction of its legal creation and that the execution, delivery and performance of this Note and each of the covenants and conditions in this Note are within its powers, have been authorized by all proper and necessary actions, and are not in conflict with its charter, bylaws or agreement of partnership or association, as applicable, or any similar agreement by which the signer of this Note is legally created or bound, or any indenture, contract or agreement to which it is a party or by which it is bound, or with any statute, rule, regulation, decree, judgment or order binding upon it.

19. **Liability of Each Signer:** Each signer of this Note agrees to be separately responsible for payment of all sums becoming due under this Note and for compliance with all of the terms and conditions of this Note. The release, death or incompetency of any signer of this Note will not release any other signer from any obligations or liabilities under this Note.

20. **Late Charge:** If any payment owing under this Note is overdue for more than ten (10) days, I agree to pay a late charge equal to the greater of 6% of the payment amount or $50.00.

21. **Promissory Note Default Interest Rate Agreement:** I recognize that the administrative cost to service my loan increases dramatically if my loan becomes delinquent or if I do not provide the Bank with the financial statement as required by my commitment letter and the Note in a timely manner. I understand that making timely loan payments and the timely submission of financial statement information is required by the Bank and I acknowledge that both are within my control. I hereby agree to pay a DEFAULT INTEREST RATE OF FOUR (4) PERCENT more than the interest rate indicated in this Note under either of the following conditions:

1) if I fail to make payment of principal or interest within 30 days of the due date (at maturity, by acceleration, or otherwise) as required in this Note; OR
2) if the financial statements are not submitted to the Bank as required in:
   a) the Bank's commitment letter dated October 14, 2010 OR,
   b) within _____ days after the borrower's fiscal year end.

The DEFAULT INTEREST RATE shall remain in effect until I have cured any default under the Note and I have made three (3) consecutive timely loan payments as required in this Note. The enforcement of the DEFAULT INTEREST RATE is at the sole option of the Bank. In no event shall the DEFAULT INTEREST RATE exceed the maximum interest rate as allowed by law. I agree that no omission or delay by the Bank in exercising any right under the Note will operate as a waiver, and the single or partial exercise of any such right or rights will not preclude any other or further exercise of such right or rights.

22. **Post Judgment Interest Rate.** If I am in default under the terms of this note and you obtain a money judgment against me on this note, I agree that the judgment shall bear interest at the rate of 16% per annum until the judgment is paid in full and satisfied. I acknowledge that this judgment interest rate may be higher than the statutory judgment interest rate contained in NYS CPLR §5004.

23. **Prepayments; Prepayment Premium:** NONE

Borrower: Eber-Connecticut, LLC

Signature: _Lester Eber_

Lester Eber, Chief Executive Officer

Address: 95 Allens Creek Road

Rochester, New York 14618

(SH) 04/09

Page 3 of 4

EB-00020082

## ACKNOWLEDGEMENT

STATE OF _____ )
COUNTY OF _____ ) ss:

On the _____ day of <u>November</u> in the year <u>2010</u> before me, the undersigned a notary public in and for the State of New York, personally appeared <u>Lester Eber</u>, personally known to me or proved to me on the basis of satisfactory evidence to be the individual(s) whose name(s) is (are) subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their capacity(ies), and that by his/her/their signature(s) on the instrument, the individual(s), or the person upon behalf of which the individual(s) acted, executed the instrument.

_____
Notary Public

(SH) 04/09

Page 4 of 4

EB-00020083

**Commercial**
**Services**
**Group**

Canandaigua
National
Bank & Trust

**72 South Main Street** -
**Canandaigua, New York 14424**
www.cnbank.com

**Robert L. Lowenthal**
Senior Vice President

Phone: (585) 394-4260 ext 36108
Facsimile: (585) 396-1355
E-mail: blowenthal@cnbank.com

December 27, 2011

Ms. Wendy Eber, President
Eber – Connecticut LLC
30 Corporate Drive
North Haven, CT 06473

  Canandaigua National Bank has agreed to waive the following financial covenants as set forth in a commitment letter dated October 14, 2010 for the $3,680,000 term loan for the May 31, 2011 annual audited financial statement:

  A. Maintain a minimum of $5 Million of Current Assets greater than Current Liabilities. As of a draft annual financial statement for the year ending 5/31/11, the current assets exceeded the current liabilities by $4,932,236.

  B. Maintain a minimum tangible net worth of $5.8 Million. As of a draft annual financial statement for the year ending 5/31/11, the minimum tangible net worth was $5,699,031.

  Additionally, the bank has agreed to extend the term loan's maturity date to March 1, 2012.
  If you have any questions about these waivers or the extension, please contact me. Once the final audited financial statement for the year ending 5/31/11 is available, please provide me with a copy.

Sincerely,

Robert L. Lowenthal
Senior Vice President

cc: Christopher R. Cimini, CPA
  Davie Kaplan, CPA, P.C.

EB-00020084

**Wendy Eber**

| | |
|---|---|
| **From:** | Wendy Eber |
| **Sent:** | Thursday, June 07, 2012 10:34 AM |
| **To:** | ewgumaer@gmail.com |
| **Cc:** | janet lissow |
| **Subject:** | FW: Unanimous Written Consent of Board of Directors |
| **Attachments:** | Unanimous Written Consent of Bd of Directors_Eber Bros.pdf |

Mike,

Please sign and fax or email to Janet.

Thanks,
Wendy

**From:** McHugh, Marcy K. Davis [mailto:mMcHugh@underbergkessler.com]
**Sent:** Wednesday, June 06, 2012 2:22 PM
**To:** Wendy Eber; Lester Eber; 'glenn.sturm@nelsonmullins.com'; 'dbelt@hssklaw.com'
**Cc:** Gersz, Steven R.; Keneally, Paul F.; Beyma, Michael J.
**Subject:** Unanimous Written Consent of Board of Directors

**Message from Mike Beyma:**

Attached is Unanimous Written Consent of Board of Directors of Eber Bros. Wine and Liquor Corp. for your review.

Please call or email me with any questions and/or comments.

Mike Beyma



Marcy K. Davis-McHugh
ADMINISTRATIVE ASSISTANT
mMcHugh@underbergkessler.com
www.underbergkessler.com

Underberg & Kessler LLP
300 Bausch & Lomb Place
Rochester, NY 14604
585-258-2860 PHONE
585-258-2821 FAX

## CIRCULAR 230 DISCLOSURE:

The Internal Revenue Service requires us to advise you that, if this communication or any attachment contains any tax advice, the advice is not intended to be used, and cannot be used, for the purpose of avoiding federal tax penalties or promoting, marketing, or recommending to another party any transaction or matter addressed herein.

## CONFIDENTIALITY NOTICE:

1



PLAINTIFF'S
EXHIBIT
12.4
PENGAD 800-631-6989

EB-00026660

UNANIMOUS WRITTEN CONSENT
OF
BOARD OF DIRECTORS
OF
EBER BROS. WINE AND LIQUOR CORP.

The undersigned, being all of the Directors of Eber Bros. Wine And Liquor Corp., a New York corporation ( the "Corporation"), hereby consent, pursuant to Section 708(b) of the Business Corporation Law of the State of New York, to the adoption of the following resolutions:

WHEREAS, The Corporation is in default of the payment of certain obligations due to Alexbay, LLC; and

WHEREAS, the outstanding balance due Alexbay, LLC as of the date hereof is in excess of $3,650,000 ("Obligations"); and

WHEREAS, the Corporation's Obligations are secured by a security interest in all of its assets, including all of its ownership interest in Eber Bros. Wine and Liquor Metro, Inc. ("Metro"); and

WHEREAS, Alexbay, LLC has notified the Corporation that it is going to proceed with its rights as the holder of a security interest in the Collateral and is willing to accept all of the ownership of Metro in full satisfaction of the Obligations (the "Proposed Transfer"); and

WHEREAS, the undersigned have met and/or had numerous conversations regarding the Proposed Transfer and fully discussed the Proposed Transfer (including but not limited to discussions on March 13, 2012, throughout the week of March 13, 2012, May 30, 2012 and June 1, 2012); and

WHEREAS, after consideration of the financial statements and records of the Corporation and other information deemed relevant by the Board of Directors, the Board of Directors has determined in good faith that the value of Metro is less than the Obligations owed to Alexbay, LLC; and

WHEREAS, the New York State Supreme Court has determined and ruled in Alexbay, LLC vs. Eber Bros. Wine and Liquor Corp., et al. (Sup Ct., Monroe County, Index No. 2012-1919) (May 24, 2012) that the taking by Alexbay, LLC of the ownership of Eber Bros. Wine & Liquor Metro, Inc. in full satisfaction of the debt due Alexbay, LLC, by the Corporation is "Commercially Reasonable" under New York's Uniform Commercial Code;

- 1 -

EB-00026650a

**NOW, THEREFORE, BE IT**

**RESOLVED,** that the Corporation be, and hereby is, authorized and directed to transfer and deliver to Alexbay all of its ownership interest in Metro in full satisfaction of the Corporation's Obligations to Alexbay, LLC; and be it further

**RESOLVED,** that the Corporation enter into and execute the "Agreement for Turnover and Acceptance of Eber Bros. Wine and Liquor Metro, Inc., Pursuant to New York Uniform Commercial Code" in the form attached hereto, and; be it further

**RESOLVED,** that any and all actions heretofore taken by the officers of the Corporation acting for and on behalf of the Corporation in connection with the Proposed Transfer, the negotiation of the Agreement described above and the other transactions contemplated by the foregoing resolutions are hereby ratified, approved and confirmed in their entirety; and be it further

**RESOLVED,** that the appropriate officers of the Corporation are hereby authorized, empowered and directed to take all such further action and to execute, deliver, certify and file all instruments and documents in the name of and on behalf of this Corporation as the officers executing the same shall approve as necessary or advisable to effectuate and accomplish the purpose of the foregoing resolutions and the transactions contemplated thereby.

IN WITNESS WHEREOF, the undersigned have executed this Written Consent this _____ day of June, 2012.

_____
Wendy Eber, Director

_____
Elliott Gumaer, Director

- 2 -

EB-00026650b