**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DANIEL KLEEBERG, LISA STEIN,
and AUDREY HAYS,

                       Plaintiffs,

        vs.

LESTER EBER, ALEXBAY, LLC f/k/a
LESTER EBER, LLC., ELLIOT W. GUMAER,
JR. and WENDY EBER,

                Defendants,

  and

EBER BROS. & CO., INC., EBER
BROS. WINE AND LIQUOR
CORP., EBER BROS. WINE
& LIQUOR METRO, INC., EBER
CONNECTICUT, LLC, EBER-RHODE
ISLAND, LLC, EBER BROS. ACQUISITION
CORP, EBER-METRO, LLC, and SLOCUM &
SONS OF MAINE, INC.,

            Nominal Defendants,

  and

CANANDAIGUA NATIONAL BANK
& TRUST,

         Nominal Intervenor Defendant.

Civil Action No. 16-CV-9517(LAK) (KDP)

**EXPERT REPORT OF FRANK C. TORCHIO**

June 28, 2019



# TABLE OF CONTENTS

I. INTRODUCTION AND SUMMARY OF OPINIONS ............................................................ 1

II. QUALIFICATIONS AND COMPENSATION ...................................................................... 3

III. MATERIALS RELIED UPON ............................................................................................. 5

IV. GLOSSARY ....................................................................................................................... 5

V. FACTUAL BACKGROUND ................................................................................................ 6
    A.  The Trust ...................................................................................................................... 6
    B.  Eber-Related Companies ............................................................................................. 7
    C.  The 2012 Assignment to Alexbay ............................................................................... 9

VI. LIABILITIES OF EBER METRO AND EBER W&L ...................................................... 12
    A.  Reasonableness of Interest Rates for Lester Eber's Loan and Line of Credit .... 12

VII. THE EBER-CT ASSET .................................................................................................... 14
    A.  Valuation Methods Considered for Eber-CT ........................................................ 15
    B.  Valuations based on prior Transactions and an Offer for Eber-CT Stock ......... 24
        i)   Acquisition of Slocum – 2005 ........................................................................ 26
        ii)  15% Sale to Eder-Goodman – 2008 ............................................................... 27
        iii) 15% Offer by Southern Wine & Spirits – 2007 ........................................... 31
        iv) Sale of 6% to Polebridge Bowman – 2010 .................................................... 33
    C.  Valuation Indications from Transactions for and Trading in Comparable
    Companies ................................................................................................................... 34
        i)   Transaction Comparables ............................................................................... 34
        ii)  Trading Comparables ...................................................................................... 35

VIII. OTHER ASSETS OF EBER COMPANIES ................................................................... 36

IX. SOLVENCY/MVE OF EBER METRO AND EBER W&L .............................................. 37
    A.  Eber Metro ................................................................................................................. 37
    B.  Eber W&L .................................................................................................................. 37

# I.  INTRODUCTION AND SUMMARY OF OPINIONS

1.      I am the President of Forensic Economics, Inc. and have been retained by the

Eber Defendants in this Action.[1]  For this Report, I have been asked to provide an opinion

regarding the market value of equity ("MVE") of the capital stock of Eber Bros. Wine & Liquor

Metro, Inc., a New York corporation ("Eber Metro"), as of May 23, 2012 (the "Valuation

Date").[2]  The market value of equity, as I apply the term in this Report, is also known as fair

market value which is defined as:

> … the amount at which property would change hands between a
> willing seller and a willing buyer when neither is acting under
> compulsion and when both have reasonable knowledge of the
> relevant facts.[3]

2.      Based on my conclusions about the MVE of Eber Metro stock as of May 23,

2012, I have also been asked to provide an opinion as to whether, immediately prior to the

assignment of the capital stock of Eber Metro to Alexbay in June 2012, Eber Bros. Wine and

Liquor Corp., a New York corporation ("Eber W&L") and Eber Metro, were insolvent, within

---

[1] A Complaint was filed in this matter on December 9, 2016 (the "Complaint").  The Plaintiffs filed a Third Amended Complaint on June 14, 2019 (the "Amended Complaint").  The Eber Defendants include: Defendants Lester Eber, Alexbay LLC ("Alexbay"), and Wendy Eber and Nominal Defendants Eber Bros. & Co., Inc., Eber W&L, Eber Metro, Eber Connecticut LLC ("Eber-CT"), Eber-Rhode Island, LLC, Eber Bros. Acquisition Corp, Eber-Metro, LLC, and Slocum & Sons of Maine, Inc..

[2] May 23, 2012 is the date of the filing with Monroe County Clerk of the Order of Hon. Matthew A. Rosenbaum, J.S.C. in Alexbay, LLC v. Eber Bros. Wine & Liquor Corp., et al. (Sup. Ct., Monroe County, Index No. 2012-1919), that Alexbay's acceptance by assignment in lieu of foreclosure of all the capital stock of Eber Metro (collateral securing $3.65 million of obligations of Eber Metro to Alexbay, LLC then in default), in full satisfaction of such obligations, was "commercially reasonable" under NY UCC 9-620 and 9-627 (the "2012 Transaction").

[3] See S. Pratt, Valuing a Business: The Analysis and Appraisal of Closely Held Companies, Fifth Edition, McGraw-Hill, 2000, pp. 41-42, quoting the American Society of Appraisers, Business Valuation Standards – Definitions.  Shannon Pratt also notes that this definition of fair market value "comports" with the Internal Revenue Code and Revenue Ruling 59-60.

the meaning of New York Debtor and Creditor Law, Sections 273 and 276.  I have been advised, and I understand, for purposes of New York Debtor and Creditor Law, Sections 273 and 276, that a company would be insolvent when the present "fair salable value" of its assets is less than the amount that will be required to pay its probable liability on its existing debts as they become absolute and matured.  Debt includes any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent.  I interpret "fair salable value" to be equivalent to the definition of fair market value herein.

3.      As of May 23, 2012, (a) Eber W&L owned 100% of the outstanding capital stock of Eber Metro, all of which was subject to a validly perfected first priority security interest in favor of Alexbay; (b) Eber Metro owned 79% of the membership units ("Units") of Eber-CT, a Delaware limited liability company.  As of such date, Eder-Goodman, LLC ("Eder-Goodman"), and Polebridge Bowman Partners, LLC ("Polebridge Bowman), both of which I understand are not affiliated with any of the Eber entities, owned 15% and 6% of the Units, respectively.[4]

4.      As of the Valuation Date, the only operating entity owned by Eber Metro, and therefore beneficially owned by Eber W&L, was Eber-CT.  Therefore, I analyzed several different indicators of MVE for Eber-CT.  These indicators include valuations based on: 1) prior transactions in or offers to buy Eber-CT shares; 2) traded comparable companies; and 3) transactions for comparable companies.  Due to the financial status of Eber-CT on the Valuation Date and a lack of future financial projections, I calculate my MVE of Eber-CT by applying various ratios of Enterprise Value to last 12 months revenue ("EV/Revenue") to Eber-CT's last 12 months of revenue as of the Valuation Date.  Enterprise Value for a company is defined as the market capitalization of its operating assets, which is equal to its MVE, plus any debt, minus

---

[4] *See* Amended Complaint, ¶¶ 38-39, 90, 97, 127, and 129(c).

cash.  Cash is subtracted because it is not an operating asset.  I also adjust Eber-CT's MVE due to the priority claims of Eder-Goodman on the Valuation Date and discussed in VII. B. ii).[5]

5.       The MVE for Eber Metro is computed as the MVE of Eber-CT attributed to Eber Metro's percentage ownership of Eber-CT, plus other Eber Metro assets, minus liabilities for which Eber Metro was an obligor.  The MVE for Eber W&L is computed as the MVE of Eber Metro attributed to Eber W&L's percentage ownership of Eber Metro, plus other Eber W&L assets, minus liabilities for which Eber W&L was an obligor.

6.       I assessed the solvency of Eber Metro and Eber W&L by determining the difference between the present fair saleable value of its assets and the amount that will be required to pay its probable liability on its existing debts as they become absolute and matured.  If the liabilities exceed the assets, then the entity is deemed to be insolvent based on my valuation.  If the assets exceed the liabilities, then the entity is deemed to be solvent based on my valuation.

7.       I reserve the right to amend my conclusions to reflect new information available to me in the discovery process, information provided by other experts in the litigation, future rulings from the Court in this Action, other rulings binding on this Court, or any motions and trial proceedings.

## II.  QUALIFICATIONS AND COMPENSATION

8.       I am the President of Forensic Economics, Inc., located in Rochester, New York. I founded Forensic Economics, Inc. in 1989.  I have consulted on issues pertaining to financial

---

[5] Eder-Goodman's priority claims are detailed in Sections 8.2 and 8.3 of the Amended and Restated Limited Liability Company Agreement of Eber-Connecticut, LLC.  I have attached Section 8 of this document as Exhibit E.  *See* EB-00022891-95.

valuations, regulatory economics, transfer pricing, financial-economic analysis, and analysis of the response of stock prices to public information in securities fraud lawsuits for about 30 years. Forensic Economics, Inc. historically has been retained by both plaintiffs and defendants in such cases.

9.      I am an Executive Professor of finance at the Simon Business School at the University of Rochester.  I have taught courses that cover topics including market efficiency, event studies, damages in securities litigation, and valuation of businesses and securities.

10.      I have submitted expert reports in numerous litigation matters in the United States, Australia, Canada, and the U.K.  I have testified at trials, arbitrations, and depositions in United States Federal District Courts, in state courts including the Delaware Court of Chancery, Canada, the U.K, and in Switzerland.

11.      I have co-authored an article with Professor Michael Barclay about trading models used for calculating damages in securities lawsuits.  The article is published in *Duke University School of Law's Law and Contemporary Problems* (Volume 64, Spring-Summer 2001).  I have authored a published article about the proper event study analysis in securities litigation, which was published in *The Journal of Corporation Law* (Volume 35:1, 2009).  I have also co-authored a paper about the effect of size premiums from the lack of liquidity, which was published in the *Journal of Business Valuation and Economic Loss Analysis* (Volume 9:1, 2014).

12.      I hold an MBA in Finance and Economics (1982) from the University of Rochester's Simon Business School.  I was the 1991 Rosenthal Fellow at the University of Rochester for innovative developments in applying financial economic theory.  I have also been awarded the Chartered Financial Analyst (CFA®) designation and am a member of the CFA Institute.  My resume is attached as Exhibit A.

13.     My compensation is based on the number of hours worked on this assignment, as well as out-of-pocket expenses.  My hourly rate is $550.  To assist me, I used employees of Forensic Economics, Inc. who worked under my supervision and at my direction for this assignment.  Forensic Economics, Inc.'s hourly rates for those employees range from $155 to $315.

### III.  MATERIALS RELIED UPON

14.     In the course of my assignment in this Action, I have reviewed numerous documents, including: the Complaint and Amended Complaints; and other case documents produced by various parties to this litigation.  The attached Exhibit B is a comprehensive list of materials I relied upon in connection with this Report.  Specific documents and information relied upon in reaching my opinions are cited throughout this Report.

### IV.  GLOSSARY

15.     The following are selected terms/abbreviation and definitions used in this Report and Exhibits to this Report:

| Term/Abbreviation | Definition |
|---|---|
| Assets | Resources that an individual, corporation or country owns or controls with the expectation that it will provide a future benefit |
| Cash | Currency and coins, negotiable checks, and balances in bank accounts. |
| Debt | The amount of money owed by a firm to a lender. |
| Earnings | A term with no precise meaning but used to mean income or sometimes profit, such as NPAT or net income. |
| EBIT | Earnings Before Interest and Taxes. |
| EBITDA | Earnings before interest, tax, depreciation and amortization. |

| Term/Abbreviation | Definition |
|---|---|
| Enterprise Value or EV | The market capitalization of its operating assets, which is equal to its market value of equity plus the amount of debt owed to its debtors minus its cash balance. |
| Equity | The common stock of a company. |
| Face Value | The dollar amount stated for a security on the balance sheet, sometimes referred to as par value. |
| Market Value of Equity or MVE or Fair Market Value | The amount at which property would change hands between a willing seller and a willing buyer when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts |
| Liabilities | The dollar amount of claims on a firm's assets that must be satisfied before equity claims. |
| Revenue | The income that a firm receives from the sale of a good or service to its customers |
| Valuation Ratio (or Valuation Multiples) | Valuation ratios are usually the ratios of either price per share or enterprise value to financial variables such as earnings per share, EBIT, EBITDA, or revenue. |

## V.  FACTUAL BACKGROUND

16.     In this Section, I will describe below the parties involved, certain transactions, and other events that are relevant to this matter.

### A.  The Trust

17.     Allen Eber created a trust in his will dated October 27, 1969 (the "Trust").  The Trust had three beneficiaries, Allen's children, each with a 1/3 interest: Lester Eber, Sally Kleeberg, and Mildred Boslov.  Due to the passing of Sally Kleeberg and Mildred Boslov, the beneficiaries of the Trust were, at the Valuation Date: Lester Eber (1/3); Audrey Hays (1/3); Daniel Kleeberg (1/6); and Lisa Stein (1/6).

## B. Eber-Related Companies

18.     There are several Eber-related companies.  The following is a brief description of some of the Eber-related companies, as well as a flow-chart that provides a summary of the ownership structure.

19.     Eber Brothers & Co., Inc. ("Eber Bros.") is a New York company founded in 1917.  At the Valuation Date, Eber Bros. had been owned by the Trust since the 1970's and had no operations since the late 1980's, and therefore was dormant.

20.     Eber W&L is a New York company founded in 1935 and was a wholesale wine and liquor distributor in upstate New York.  At the Valuation Date, Eber W&L was majority owned by Eber Bros., with the Trust having a direct minority interest.  Eber W&L had not been an operating entity since 2007, and therefore was dormant.

21.     Eber Metro is a New York company founded in 1996 and was a wholesale wine and liquor distributor in downstate New York.  Prior to the 2012 Transaction, Eber Metro was a wholly-owned subsidiary of Eber W&L.  After the 2012 Transaction, Eber Metro became a wholly-owned subsidiary of Alexbay.  Eber Metro has not been an operating entity since 2004 and was a holding company as of the Valuation Date.

22.     Eber-CT is a Delaware limited liability company founded in 2005.  Eber-CT acquired a wine and liquor distributorship from Slocum & Sons ("Slocum") in 2005.  Eber-CT currently operates as a wine and liquor distributor in Connecticut and is the only operating entity in the Eber-related companies.  At the time of the 2012 Transaction, Eber Metro owned 79% of Eber-CT.

23.     Alexbay, LLC ("Alexbay") is a Connecticut limited liability company founded in 2011.  Alexbay is wholly owned by Lester Eber.  Alexbay was a holding company as of the Valuation Date.

24.    The figure below summarizes the organizational structure of some of the Eber Entities prior to the Valuation Date.



## C. The 2012 Assignment to Alexbay

25.     In the early 2000s, Southern Wine & Spirits ("Southern"), the largest wine and liquor distributor in the United States and based in Florida, moved into the New York market. Southern began a series of actions, such as hiring key employees away from Eber W&L and luring suppliers away from Eber W&L. Eber W&L's business began a downward spiral from which it did not recover.

26.     From time to time,[6] Lester Eber made personal loans[7] and provided lines of credit[8] to Eber W&L and Eber Metro to assist those companies to fund outstanding liabilities and to remain in business. These loans and lines of credit were secured by the assets of Eber W&L and Eber Metro.[9]

27.     In the Winter of 2011-2012, Eber-CT continued to generate negative profit. Eber-CT continued to incur annual net losses (losing $908,800 for the fiscal year ended May 30, 2011 and $363,132 for the fiscal year ended May 30, 2012).[10] It is my understanding that:

   a) the Slocum acquisition still had not lived up to the expectations of management;

   b) Eber-CT suffered as a result of the aggressive competitive actions of Southern and other competitors and suppliers;

---

[6] Lester Eber provided a loan in October 2002, which was subsequently refinanced in March 2006. Lester Eber also provided a line of credit in October 2009. *See* CNB000030.

[7] Loans totaling $1,434,710.68 were transferred from Eber W&L to Eber Metro in February 2011. *See* EB-00026433-4.

[8] *See* $1.5 million October 2009 Line of Credit Note, EB-00017871-3. As of December 31, 2011, this line of credit was fully drawn down. *See* EB-00026434.

[9] *See* Guaranty, EB-00017906-16, and Security Agreement, EB-00017917-29.

[10] *See* Eber-Connecticut, LLC Independent Auditors' Report, Financial Statements and Supplemental Schedules for the years ended May 31, 2012 and 2011, EB-00019510-22, at 19515.

    c)  All attempts to raise a new first lien credit facility had failed to attract any interest; and

    d)  Eder-Goodman's 2008 investment in Eber-CT had brought with it a number of negative covenant constraints on Eber-CT's flexibility in raising debt or equity capital.

28.    Consequently, Eber W&L and Eber Metro, which had no business operations, lacked adequate cash flows to repay the loans to Lester Eber.

29.    On January 18, 2012, Lester Eber assigned to Alexbay all of his loans due from Eber Metro.[11]  On the same day, Alexbay sent Eber Metro and Eber W&L a proposal to surrender for cancellation all of Lester Eber's loans in exchange for all of Eber W&L's ownership interest in Eber Metro, which included Eber Metro's ownership interest in Eber-CT.[12]

30.    On May 23, 2012, an Order from the Honorable Matthew A. Rosenbaum was entered determining that Alexbay's proposed acceptance of all the capital stock of Eber Metro held by Eber W&L in full satisfaction of obligations owed to it was "commercially reasonable" as defined by the UCC.[13]

31.    The figure below summarizes the organizational structure of some of the Eber Entities after the Valuation Date.

---

[11] *See* Assignment of Note and Security Agreement, EB-00017934-6.

[12] *See* EB-00017937-9.

[13] *See* Order of Judge Rosenbaum filed with the Monroe County Clerk on May 23, 2012, EB-00019409-10.



**Eber Entities Organizational Chart – Post-2012 Transaction**

# VI.   LIABILITIES OF EBER METRO AND EBER W&L

32.     At or near the Valuation Date, there were a significant amount of liabilities at Eber Metro and Eber W&L.  The following figure summarizes those liabilities.[14]

### Summary of Liabilities

| Liability | Description | Amount | Obligor: | Reference Document |
|---|---|---|---|---|
| Lester Eber's Loan and Line of Credit | Loans on Eber Metro's tax returns identified in line item Mortgages, notes, bonds payable | $3,060,711 | Eber Metro Eber W&L (guarantor) | EB-00019101 |
| Interest on Lester Eber's Loan and Line of Credit | Accrued Interest on Lester Eber's loans through Valuation Date | $837,655 | Eber Metro Eber W&L (guarantor) | EB-00026433-34, updated through Valuation Date |
| Pension Plan Termination (unfunded Pension Liability) | Eber Brothers W&L established a pension plan in 1954, and a shortfall occurred in the assets of the pension plan.  The figure here reflects the cost of terminating the plan as of June 1, 2012. | $5,063,388 | Eber Metro and Eber W&L | 12-19-2018 Letter to Wendy Eber from Michael Gallagher |
| Teamsters | In January 2008, the Teamsters determined that there was an employer withdrawal liability under the ERISA Act.  The figure here represents the amount in a Confession of Judgment. | $1,421,030 | Eber Metro and Eber W&L | EB-00030896-899 |
| Harris Beach | Eber entities were sued by Harris Beach PLLC in September 2011 to collect legal fees for services rendered by Harris Beach on behalf of the Eber-related entities. | $755,896 | Eber Metro and Eber W&L | EB-00023749 |
| D4 Litigation | Eber W&L settled a lawsuit against it by D4 LLC in February 2012 for $120,000 with $10,000 payments to be made monthly for the following year. | $80,000 | Eber W&L | EB-00030932-3 |
| Benderson Development | Eber W&L defaulted on its lease payments to Benderson in 2011 and was sued by Benderson in March 2012 pursuant to the terms of the lease. | $246,948 | Eber W&L | EB-00032638 |
| | Totals | $11,465,629 | | |
| | Totals w/o Liabilities solely of Eber W&L | $11,138,680 | | |

## A.  Reasonableness of Interest Rates for Lester Eber's Loan and Line of Credit

33.     I have also been asked if the interest rates on Lester Eber's loan and line of credit were fair and reasonable at the time Lester Eber provided the capital to Eber W&L.[15]  The stated

---

[14] I note that the sum of the Mortgages, notes, bonds payable plus the interest on Lester Eber's loans differ from the totals summarized in footnote 2.  Also, the accrued interest in this table has been updated to include additional interest accrued on these loans through the Valuation Date.  I have assumed that the payment due on May 28, 2012 for the D4 Litigation is considered paid as of the Valuation Date.

[15] The loan and line of credit were assumed by Eber Metro, and guaranteed by Eber

rate on Lester Eber's loan was 9.0% and the stated rate on the Lester Eber's line of credit was 12.5%.[16]

34.    In my opinion, Eber Metro and Eber W&L were distressed companies.  This is because there were significant liabilities at Eber Metro and Eber W&L and the only operating asset they owned was Eber-CT.  Furthermore, Eber-CT did not record a profit from operations for fiscal years 2007 through 2012.  Moreover, it is my opinion that as of the Valuation Date (*see* Section IX. ), the value of the assets of Eber Metro and Eber W&L was less than the sum of each company's liabilities.  Therefore, to determine if the interest rates on Lester's loans were fair and reasonable at the time of issuance, it is appropriate to compare the rates on Lester Eber's loans to that for other distressed companies at the time that Lester Eber committed to loan such monies.

35.    I reviewed the Bank of America Merrill Lynch ("BAML") database available on Bloomberg.  This BAML database provides market-based information for loans (*i.e.*, number of issues, effective yield, and yield to maturity) based on different metrics (*i.e.*, currency, rating level, and time to maturity).  Because of the distressed nature of Eber W&L and Eber Metro at the time the loans and line of credit were issued, as well as at the Valuation Date, I focused on several high-yield indices,[17] which reflect companies that have debt rated below investment grade at a rating of CCC and lower.

---

W&L, on February 26, 2010.  *See* CNB000030.

    [16] *See* EB-00026433-4.  Also, the terms of Lester Eber's line of credit contained a payment in kind or "PIK" feature wherein any unpaid interest could be added to the principal amount and would also bear interest at the stated rate.  *See* EB-00001363-6.  An instrument with a PIK feature will also have a higher stated interest rate to account for the risk associated with the lender forgoing cash in return for higher principal.

    [17] BAML's high yield index "… tracks the performance of US dollar denominated below investment grade corporate debt publicly issued in the US domestic market."  Source: Bloomberg.

36.     Lester Eber's loan was made in March 2006 at a stated interest rate of 9.0%.[18]
For debt that was rated CCC and lower, as of March 16, 2006, the average yield to maturity was
11.46%.[19]

37.     At the time Lester Eber provided a $1,500,000 line of credit at a stated interest
rate of 12.5% in October 2009,[20] and for debt that was rated CCC and lower in October 2009, the
average yield to maturity was 14.23%.[21]

38.     As of the Valuation Date, for debt that was rated CCC and lower, the yield to
maturity was 12.77%.[22]

39.     In my opinion, the stated rates of Lester Eber's 2006 loan and 2009 line of credit
were consistent with other debt issued by distressed companies as tracked by the BAML indices,
and therefore, fair and reasonable.

## VII.  THE EBER-CT ASSET

40.     As stated in paragraphs 1 and 2, I have been asked to provide an opinion on the
MVE of the capital stock of Eber Metro and the solvency of Eber Metro and Eber W&L at the
time of the 2012 Transaction.  As of the Valuation Date, the only remaining operating entity of
all of the Eber-related companies was Eber-CT.  Therefore, in order to provide an opinion on the

---

[18] This loan was originally made on March 16, 2006.  *See* CNB000030.

[19] Source: Bloomberg (Bank of America Merrill Lynch US CCC and Lower High Yield Index, "H0A3").

[20] For comparison to the high yield indexes, I have assumed this line of credit was made on October 15, 2009.  Due to the PIK feature of Lester Eber's line of credit, the stated 12.5% interest rate is higher than a straight non-PIK instrument.

[21] Source: Bloomberg (Bank of America Merrill Lynch US CCC and Lower High Yield Index, "H0A3").

[22] Source: Bloomberg (Bank of America Merrill Lynch US CCC and Lower High Yield Index, "H0A3").

MVE of Eber Metro and Eber W&L, I must first determine the MVE of Eber-CT.  I note that the MVE of Eber-CT should only include the assets/liabilities at Eber-CT, and exclude any of the assets/liabilities at Eber Metro and Eber W&L.  This includes the Eder-Goodman preferred investment in Eber-CT as of the Valuation Date and discussed in Section VII. B. ii).

## A.  Valuation Methods Considered for Eber-CT

41.     As a general proposition, modern finance theory holds that the market value of a company equals the discounted present value of expected future profits.[23]

42.     In finance, the measure of annual profits used to compute a company's market value is called cash flows or free cash flows.  A company's annual cash flow is essentially its annual accounting earnings adjusted for the timing of the receipt of cash from sales and the timing of cash payments for the company's costs.  Because accounting earnings are computed on an "accrual" basis, finance theory teaches that revenue and costs on an accrual basis should be converted to a cash basis before discounting to a present value.[24]  Discounting future cash flows refers to the financial concept that a dollar received today is worth more than a dollar received next year.  This is called the time value of money, which takes into account the "riskiness" of generating such cash flows.  Thus, when computing a company's present value, future years' cash flow profits are discounted to today's dollars.  This sum of future cash flows discounted to today's dollars is called a Discounted Cash Flow ("DCF") analysis.

43.     In general, business valuation methodologies can be divided into three basic groups: i) market-based methods; ii) income-based methods; and iii) asset-based methods.

---

[23] *See* Richard A. Brealey, Stewart C. Myers, Franklin Allen, Principles of Corporate Finance, Twelfth Edition, McGraw Hill, 2017, pp. 81-85.

[24] *See* Robert W. Holthausen and Mark E. Zmijewski, Corporate Valuation: Theory, Evidence & Practice, First Edition, Cambridge Business Publishers, 2014, p. 257.

Various methods are available under each approach that can be used to estimate market value.

No single valuation approach or method is appropriate for all valuations. As such, it is common

practice for financial analysts to consider several methods if possible. Various valuation

techniques have been accepted by courts.[25]

a) *Market Approach*

44.    One authoritative treatise states:

Good market comparisons can provide the most compelling
evidence of the value of a business or a business interest.[26]

45.    There is an intimate and mathematical connection between DCF analyses and

market valuation ratios.[27]  Valuation trading ratios or transaction ratios are ratios (also referred to

as multiples) of either price per share or Enterprise Value to accounting variables such as

earnings (P/E) or EBITDA (Earnings before interest, taxes, depreciation, and amortization

---

[25] *See, for example, Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 387 (2d Cir. 2006) ("[w]hile it is true that an arm's length transaction -- the so-called "willing buyer-willing seller" test -- is the best evidence of (and often the easiest method to determine) fair market value, it is, by no means, the only such evidence.") citing *Am. Soc'y of Composers, Authors & Publishers v. Showtime/The Movie Channel, Inc.*, 912 F.2d 563, 569 (2d Cir. 1990) (discussing valuation for gift tax purposes); and *Silverman v. Comm'r*, 538 F.2d 927, 933 (2d Cir. 1976) (discussing valuation for gift tax purposes); *Eisenberg v. Comm'r*, 155 F.3d 50, 53 (2d Cir. 1998) (noting that for closely held corporations for which there is no public trading market, valuation of stock is based on a variety of factors). *See* also *Iridium IP LLC v. Motorola, Inc. (In re Iridium Operating LLC)*, 373 B.R. 283, 344 (Bankr. S.D.N.Y. 2007) ("Courts generally look at a combination of valuation methodologies to determine valuation, including: (a) actual sale price, (b) discounted cash flow method, commonly referred to as DCF, (c) adjusted balance sheet method, (d) market multiple approach, (e) comparable transactions analysis, and (f) market capitalization.) citing *In re Coated Sales, Inc.,* 144 B.R. 663, 670 (Bankr. S.D.N.Y. 1992) (actual sale); *MFS/Sun Life Trust-High Yield Series v. Van Dusen Airport Servs. Co.,* 910 F. Supp. 913, 939-43 (S.D.N.Y. 1995) (asset purchase price, DCF, comparable companies or transactions).

[26] *See* S. Pratt, The Market Approach to Valuing Businesses, Second Edition, Wiley, 2005, *see* Introduction - xxxiv.

[27] "Any market multiple can be converted into a capitalization rate and vice versa." *See* Shannon P. Pratt, The Market Approach to Valuing Businesses, Second Edition, John Wiley & Sons, Inc., 2005, p. 23.

expenses).  The ratios are obtained from companies that are in some way comparable to the company that is the subject of the valuation or are obtained from prior arms-length transactions for shares of the subject company itself.

46.     After such ratios are computed, the ratios are applied to the accounting variables for the subject company that are available at the time of the valuation.

47.     One type of valuation multiple or ratio that most people are familiar with is the home selling price to home square footage.  As applied to valuing your house, one would obtain the recent selling prices for homes that are comparable to yours, then divide each home's selling price by that home's square footage to get a multiple per square foot of a home.  Then, the ratio is multiplied by the square footage of your house to obtain a market value of your house.

48.     The same principle applies for valuing a company.  Thus, if one were using a P/E (price – earnings) multiple valuation approach, one would obtain the P/E ratio from comparable companies and then multiply the P/E ratio by the earnings of the company to be valued, which would then result in a valuation of the firm.

49.     The two most common types of valuations for a business interest under the market approach are called "trading multiples" and "transaction multiples".[28]  The market approach requires access to data on comparable companies and comparable transactions.  The strength of this approach is that it relies on an actual sale transaction in the company or transactions for comparable companies that are between a willing buyer and a willing seller both working to establish a price that is in their respective best interests.  The resulting transaction embodies the highest value and best use of the property sold.  Extending the real estate example

---

[28] In addition, prior transactions in the subject company's securities are often considered under the market approach.

above, if the house you want to buy had recently been purchased, then the prior purchase price

can be a good measure of the value, after adjusting for any changes in market conditions.

50.    As can be seen in the figure below, Eber-CT had a loss from operations for every

fiscal year from 2007-2012.[29]

|  | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 |
|---|---|---|---|---|---|---|
| *Revenue* | $42,386,508 | $43,244,059 | $38,944,354 | $36,552,221 | $36,890,281 | $36,383,755 |
| *Profit/(Loss) from Operations* | ($656,146) | ($140,178) | ($2,338,886) | ($920,061) | ($687,297) | ($299,060) |
| *EBITDA* | ($436,516) | ($31,058) | ($2,238,284) | ($806,908) | ($539,963) | ($204,223) |

51.    For Eber-CT, I am unable to apply any valuation ratio that is based on a profit

measure (*i.e.*, earnings or EBITDA) in the denominator.  This is because Eber-CT did not have

positive EBITDA, EBIT, or earnings as of the Valuation Date.[30]  Mechanically applying an

EBITDA (or other profit) valuation ratio to negative EBITDA would yield a negative market

value of equity, which is not logical.  Such valuation ratios that use EBITDA as the denominator

cannot be used for Eber-CT as of the Valuation Date.  Likewise, because other measures of

profitability such as EBIT (earnings before interest and taxes) for Eber-CT was also negative as

of the Valuation Date, other profit-based ratios cannot be used to value Eber-CT at that time.

Negative profitability measures (for a non-technology company) over several time periods

generally indicate a company that is in some financial distress.  Consequently, all else the same,

a company with negative profits will be generally valued lower than a similar company with

---

[29] *See* Eber-Connecticut LLC Financial Statements and Supplemental Schedules for the years ended May 31, 2007-2012, EB00019487-88, EB-00019502-03, EB-00019515-16.

[30] *See* Section IV.

18

positive profits.  This is particularly the case for a company such as Eber-CT that had negative profit for six straight fiscal years leading up to the Valuation Date.

52.     One valuation ratio that can be used for Eber-CT is Enterprise Value ("EV") to revenue.[31]  Enterprise Value excludes non-operating assets such as cash and is computed as the MVE, plus debt, minus cash (and minus other non-operating assets).  The following are the steps to calculate the subject company's MVE based on an EV/Revenue ratio.

53.     The first step is to compute the Enterprise Value for a comparable company (*e.g.* a trading comparable).  This calculation starts with the market value of equity, which is generally calculated as the price paid for the equity in the transaction divided by the percentage of ownership acquired.  If other rights are acquired in a comparable transaction beyond the percentage ownership, these rights must be taken into account and the market value of equity must be adjusted accordingly.  The amount of debt (both the current portion and non-current portion of debt) of the comparable company (if available) is added to the market value of equity. This summation represents the total market capitalization of the target company regardless of how it is financed.  From this figure, the amount of cash is subtracted to yield Enterprise Value for the target company in the comparable transaction.

54.     The second step is to divide the Enterprise Value for the comparable transaction by the amount of annual revenue that is contemporaneous to the transaction.  This yields a comparable EV/Revenue ratio.

55.     The third step is to multiply the estimated EV/Revenue ratio by the revenue for the subject company.  This then yields an estimate of Enterprise Value for the subject company.

---

[31] The denominator, revenue, could be either from an amount prior to a valuation date, (*i.e.*, last 12 months or LTM), or from a forward-looking forecast of revenue.  Because there are no contemporaneous projections for Eber-CT, I rely on Eber-CT's LTM revenue.

Cash is then added, and debt is subtracted from Enterprise Value to yield the market value of equity for the subject company.

56.     If there is a substantial temporal difference between the date of the comparable transaction and the valuation date of the subject company, an additional step is necessary.  The analyst must assess whether general market conditions that existed as of the date of the comparable transaction are similar to conditions as of the valuation date of the subject company. One way this can be done is by comparing the average EV/Revenue ratio for all companies in the stock market (*i.e.*, the S&P 500 and/or Nasdaq companies) as of the date of the comparable transaction to the average EV/Revenue ratio for all companies in the same stock market as of the valuation date.[32]  If the ratios are sufficiently different, then the analyst would adjust the EV/Revenue for the comparable transaction by multiplying it by the quotient of average EV/Revenue for all companies in the stock market as of the valuation date to the average EV/Revenue for all companies in the stock market as of the comparable transaction date.

---

[32] To ensure an apples-to-apples comparison, I only analyzed the average change for those companies with multiples on both the respective transaction date and the Valuation Date.

57.     These general steps explained above are represented by the following mathematical equations below:

[1]     $E_C = P_C \div \%$

[2]     $AE_C = E_C$ adjusted for any other rights purchased beyond % ownership

[3]     $EV_C = AE_C + D_C - C_C$

[4]     $EV_C/R_C = EV_C \div R_C$

[5]     $AEV_C/R_C = EV_C/R_C \times (EV_M/R_M{}^V \div EV_M/R_M{}^C)$

[6]     $EV_S = AEV_C/R_C \times R_S$

[7]     $E_S = EV_S + C_S - D_S - P_S$

Where,
$E_C$    = market value of equity for comparable company
$P_C$    = price paid in comparable transaction assuming no other rights in transaction
$\%$     = percentage of ownership acquired in comparable transaction
$AE_C$  = market value of equity adjusted for other rights acquired in transaction
$EV_C$ = enterprise value for comparable company
$D_C$    = debt outstanding comparable company
$C_C$    = cash held by comparable company
$EV_C/R_C$ = enterprise value to revenue ratio for comparable transaction
$AEV_C/R_C$ = adjusted enterprise value to revenue ratio for comparable transaction
$EV_M/R_M{}^V \div EV_M/R_M{}^C$ = adjustment for change in overall market conditions from the date of the comparable transaction to the valuation date
$EV_S$ = enterprise value for subject company
$R_S$    = revenue for subject company
$D_S$    = debt outstanding subject company
$C_S$    = cash held by subject company
$P_S$    = preferred-like security for subject company
$E_S$    = market value of equity for subject company

58.     I apply the EV/Revenue ratios ($AEV_C/RC$) from several transactions for Eber-CT stock and one offer for Eber-CT stock.  I also apply EV/Revenue ratios ($AEV_C/R_C$) from a transaction for a comparable company and from a comparable company trading on a stock

exchange at the time of the 2012 Transaction.  These transactions provide me the necessary metrics to estimate the MVE ($E_S$) for the subject company, Eber-CT.

b)  *Income Approach*

59.     The two most common methods for valuing a business interest under the income approach are the *discounted future benefits methodology* and the *capitalization of benefits methodology*.  The discounted future benefits methodology, commonly referred to as the discounted cash flow ("DCF") methodology, estimates enterprise value based on multi-year <u>projected</u> future income or net cash flows and an estimated discount rate.  The capitalization of benefits methodology is simply a single-period (as opposed to multi-period) analysis and is a common income-based method for businesses.[33]

60.     Again, because the net cash flows for Eber-CT, like other measures of profitability, was negative as of 2012, it is not logical to use a capitalization approach of the then existing net cash flow.  In addition, there were no contemporaneous forecasts of future net cash flows in 2012.  Consequently, a DCF analysis is not possible given the available information. Therefore, the income approach for valuation is not useful in this matter.

c)  *Asset-Based Approach*

61.     The *asset-based approach* is based on the economic principal of substitution where the market value of an asset is determined by the market value of a replacement or substitute for the asset or security.  In the asset-based approach, the appraiser restates assets and liabilities of the subject company from their historical cost basis to a market value.  After the revaluation of all assets from their historical cost basis to a current market value, the appraiser

---

[33] *See* S. Pratt and R. Grabowski, <u>Cost of Capital</u>, Fifth Edition, Wiley, 2014, pp. 36-37.

can then apply the assets minus liabilities formula to measure the market value of equity for the subject business enterprise.[34]

62.     The asset-based approach is typically employed when valuing holding companies or companies whose assets are mostly financial assets that are routinely "marked to market" or are contemplating liquidation.[35]  In addition, since the asset-based approach requires the valuation of all of the company's assets, this approach may require the involvement of several appraisal specialists in various asset valuation disciplines.[36]

63.     Eber-CT was not a holding company in 2012, but rather was an operating company.  As such, the book value of its assets represents the historical cost of such assets and not the market value of the assets.  The book value of a company's equity is merely the arithmetic difference between the historical cost of its assets (accounting for depreciation) and the face value of its liabilities.  Remember, a market value represents the future profit or cash flows that the asset is expected to generate.  The relevance of using book value is to derive a starting point in order to compute a liquidation value.  For a liquidation analysis, it is necessary to adjust the stated book value of assets to reflect what the assets would yield in a liquidation sale.  This adjustment is necessary because it is the historical cost of the asset that is reflected on the balance sheet.

64.     The main asset of Eber-CT was its inventory.  For a wine and liquor distributor such as Eber-CT, the prices at which inventory is sold to customers is generally greater than its

---

[34] *See* D. Laro and S. Pratt, <u>Business Valuation and Federal Taxes</u>, Second Edition, John Wiley & Sons, 2011, pp. 243-244

[35] *See* D. Laro and S. Pratt, <u>Business Valuation and Federal Taxes</u>, Second Edition, John Wiley & Sons, 2011, p. 243-44.

[36] *See* S. Pratt, <u>Valuing A Business: The Analysis and Appraisal of Closely Held Companies</u>, Fifth Edition, McGraw Hill, 2008, p. 269.

original cost.  This is one reason why a going concern market value is generally greater than liquidation value.  The second reason is that liquidating inventory will likely garner less money than the original cost of the inventory.  This is eminently true for wine and liquor distributors because of the Connecticut state laws governing sale of liquor and wine inventory.  These laws provide a number of restrictions about who can purchase wine and liquor inventory.  It is an economic axiom that by significantly reducing competition among potential buyers, there will be downward pressure on the ultimate price for the product.[37]  Consequently, the proceeds from the liquidation sale of Eber-CT's inventory would likely be less than the cost of the inventory on Eber-CT's balance sheet.[38]  As of May 31, 2012, the stated book value of Eber-CT's inventory was $7,801,306.[39]  Any reasonable discount to this inventory cost is generally lower than the values I computed below for Eber-CT's assets as a going concern.  Therefore, because the liquidation value is less than the going concern value, I rely on measures of value based on Eber-CT as a going concern.

**B.  Valuations based on prior Transactions and an Offer for Eber-CT Stock**

65.     Generally, the most comparable transactions to use in a valuation of a subject company are those transactions for ownership interest in the subject company itself.  According to a widely cited author of valuation texts, past transactions for the stock of the subject company may be an excellent source of valuation multiples.[40]

---

[37] This is known as a monopsony or monopoly buying power.  *See* P. Samuelson, Economics, An Introductory Analysis, Second Edition, McGraw-Hill, 1951, p. 541.

[38] *See* Regulations of Connecticut State Agencies, TITLE 30. Intoxicating Liquors, §§ 30-6-A1—30-6-F4.

[39] *See* Eber-Connecticut, LLC Independent Auditors' Report, Financial Statements and Supplemental Schedules for the years ended May 31, 2012 and 2011, EB-00019513.

[40] *See* S. Pratt, Valuing a Business: The Analysis and Appraisal of Closely Held Companies, Fifth Edition, McGraw-Hill, 2008, p. 318.

66.     If a transaction for the subject company is contemporaneous to the valuation date, then equations [3] through [7] in paragraph 57 collapse and the general valuation steps are simplified to steps [1] and [2].  This can be demonstrated mathematically because if the transaction is in the subject company itself and it is contemporaneous to the valuation date, then the following must be true:

$$D_C = D_S$$
$$C_C = C_S$$
$$EV_C = EV_S$$
$$EV_M/R_M^V = EV_M/R_M^C = 1$$

Therefore,
$$E_S = AE_C$$

67.     This simplified formula of dividing the price paid by the percentage of ownership acquired does not yield reliable results if the values of key variables differ between the transaction date and the valuation date.  That is, changes in revenue, the debt level, and cash holdings between the transaction date and valuation date can result in substantially overstated or understated results using the simplified formula.  In addition, major changes in general market conditions between the transaction date and valuation date can also result in substantially overstating or understating the results using the simplified formula.

68.     Such is the case for Eber-CT because between the various transaction dates and the Valuation Date there were substantial differences between most of the key variables that influence the valuation.  Therefore, I apply the generalized method described above in paragraph 57.  Below, I provide valuation indications from prior transactions and an offer for Eber-CT where sufficient data has been provided.

i)      *Acquisition of Slocum – 2005*

69.      In April 2005, Slocum & Sons, Inc. merged with Eber-Connecticut LLC and Slocum & Sons of Rhode Island, Inc. merged with Eber-Rhode Island, LLC.[41,42]  This formed the entity I refer to as Eber-CT, which acquired Slocum & Sons wine and liquor distributorship. The total merger consideration paid was the difference between "Asset Value" and "Liability Value."[43]

70.      "Asset Value" was equal to the sum of: 1) $14 million; 2) Inventory at cost for Slocum & Sons and Slocum & Sons of Rhode Island; 3) Net book value of equipment; 4) Face value of net receivables; and 5) Book value of the tangible assets of Slocum & Sons and Slocum & Sons of Rhode Island.[44]

71.      "Liability Value" was equal to the book value of all the liabilities on the closing date of the transaction.[45]

72.      The Merger Consideration was $21,600,024.[46]

73.      At this time, I have been unable to find, among the documents I reviewed, any financial statements for the last fiscal year ending December 31, 2004 before this transaction. However, I was provided documentation with Slocum's financial results as of December 31,

---

[41] *See* EB-00025860-71.  It is my understanding that before the Valuation Date, Eber-Rhode Island was no longer a part of Eber-CT and had no operations.

[42] The Slocum acquisition also included Slocum & Sons of Maine.  Eber-CT uses the Maine entity to facilitate the acquisition of inventory for out-of-state suppliers.  It is my understanding that payments to the Maine entity by Eber-CT are pass-through payments with no markup on the price of the inventory received from the Maine entity.

[43] *See* EB-00025866.

[44] *See* EB-00025866-67.

[45] *See* EB-00025867.

[46] *See* EB-00033200.

2003. Slocum's 2003 financial results indicate that Slocum had positive net income for 2003,[47] and hence was not comparable to Eber-CT's position as of the Valuation Date. Therefore, it is not instructive to compute an MVE of Eber-CT as of May 23, 2012 based on the 2005 Slocum transaction based on the 2003 Slocum financial results.[48]

### ii)   *15% Sale to Eder-Goodman – 2008*

74.   On January 29, 2008, Eder-Goodman agreed to purchase a 15% interest in Eber-CT for $4.5 million.[49]

75.   Eder-Goodman acquired a substantial set of rights in addition to a 15% equity ownership detailed in the Amended and Restated Limited Liability Company Agreement of Eber-Connecticut, LLC,[50] and summarized as follows:

    a)   Eder-Goodman was to be treated equally "…as to the return of Capital Contributions, the allocation of Profits or Losses, or Distributions."[51]

    b)   Eder-Goodman was to be allocated Profits first "… to the extent of losses previously allocated which had the effect of decreasing the Minority Member's Capital Account below the 'Guaranteed Purchase Price'"[52]

    c)   Losses allocated to the Minority Member [Eder-Goodman] "… may not cause the Minority Member's capital account to be reduced below the 'Guaranteed Purchase Price.'"[53]

---

[47] *See* EB-00033287.

[48] I reserve the right to determine the market value for Eber-CT based on the 2005 Slocum transaction if the 2004 financial results are produced.

[49] *See* EB-00016856-68.

[50] *See* EB-00022871-908.

[51] *See* EB-00022879, Section 3.3.

[52] *See* EB-00022880, Section 4.1.1.

[53] *See* EB-00022880, Section 4.1.2.

d) The distributions of proceeds from the sale of all or most of Eber-CT's assets shall be made in proportion to the respective interests of each member, subject to the Guaranteed Purchase Price.[54]

e) No "Major Decisions" "… shall be effective or binding on the Company unless approved by the Unanimous Consent of All the Members."[55]

f) Eder-Goodman has the right of first refusal on the disposition of any outstanding Units of Eber-CT.[56]

g) Eder-Goodman had "Drag Along Rights" which entitled it to receive a portion of the total sales proceeds from a sale of outstanding equity at least equal to Guaranteed Purchase Price, or a pro-rata rate if the entire company is not sold.[57]

h) Eder-Goodman had "Tag Along Rights" which entitled it to receive a portion of the total sales proceeds from a sale of outstanding equity at least equal to Guaranteed Purchase Price, or a pro-rata rate if the entire company is not sold.[58]

i) Eder-Goodman had the right of first refusal on the disposition of any or all of Eber-CT's assets to a third party.[59]

j) If Eber-CT (or its assets) are sold, or the company is liquidated, the net sale proceeds, or the net assets to be distributed in liquidation, are allocated among the members so that Eder-Goodman receives 15% of the total of such proceeds and any debt repayments to affiliates and other debt that financed non-operating assets or expenses, but not less than the Guaranteed Purchase Price.[60]

76.    In return for its $4.5 million investment, Eder-Goodman received a security that had rights that were materially more attractive than the security held by Eber Metro.  Eder-

---

[54] *See* EB-00022883, Section 4.6.1.

[55] *See* EB-00022888, Section 5.4.  Section 5.4.1-10 lists ten different actions that Eder-Goodman could veto in its role as a Minority Member, including the issuance of new Units (Section 5.4.2) and Eber-CT could not incur additional indebtedness if the additional debts of Eber-CT totaled more than $5 million (Section 5.4.4).

[56] *See* EB-00022890, Section 7.3.1.

[57] *See* EB-00022891, Section 7.3.2.

[58] *See* EB-00022891, Section 7.3.3.

[59] *See* EB-00022891-2, Section 8.1

[60] *See* EB-00022892-3, Sections 8.2 and 8.3.

Goodman's units were substantially equivalent to a convertible preferred equity security. Upon the sale of Eber-CT (or its assets), Eder-Goodman was entitled to a liquidation preference of $4.5 million, plus 15% of the difference between (a) the total of such proceeds and any debt repayments to affiliates and other debt that financed non-operating assets or expenses, and (b) the $4.5 million Guaranteed Purchase Price - a complete downside liquidation preference, and a 15% upside common equity return.[61]

77.     Convertible preferred stock is often used as a common source of capital for companies that have a risk of financial distress. As discussed above, Eber-CT had negative profit for 2007 and 2008. Consequently, the right of priority acquired by Eder-Goodman in the transaction had significant value.

78.     In my opinion, the portion of the purchase price that is attributed to the rights of priority is conservatively estimated to be 25%. In my experience, a 25% premium above common equity is reasonable. Therefore, the price of 15% of the equity after adjusting for the 25% preferred premium is $3.38 million.[62]

79.     In addition to the priority rights acquired by Eder-Goodman, it also acquired the right of first refusal ("ROFR") for any offer for control for Eber-CT.

80.     Generally, a ROFR requires the owner of a particular piece of property that is subject to the ROFR to offer such property for sale to the ROFR-holder on the same terms as those offered by a third party before the owner can sell the property to that third party.[63]

---

[61] Consequently, this $4.5 million preferred-like investment must be accounted for in any determination of the MVE of Eber-CT. This would be $P_S$ in the formula in ¶57, line [7].

[62] $3.38 million equals $4.5 million multiplied by $(1 - 25\%)$ where 25% equals the preferred rights premium.

[63] *See* Marcel Kahan, "An Economic Analysis of Rights of First Refusal," New York University Center for Law and Business, Working Paper #CLB-99-009, June 1999 ("Kahan"), at

81.     Although the details will vary, such ROFRs are ubiquitous in many kinds of commercial contracts and are attached to a wide range of assets.[64]  ROFRs are particularly common in closely-held corporations.[65]  In fact, it has been reported that over half of U.S. corporations restrict the transfer of shares, and that ROFRs are the most common form of transfer restriction.[66]

82.     The presence of ROFRs in many types of contracts for many different kinds of assets is strong evidence that the economic benefits of ROFRs as a contractual device are often greater than the costs of ROFRs.  A key benefit derives for closely-held corporations for which there is a potential for opportunistic conduct among shareholders, especially when shareholders hold relatively large blocks of voting shares.  In particular, a disgruntled or antagonistic shareholder may threaten to sell to an outsider who is known to be incompatible with existing management, or who has interests adverse to the company, in order to exert leverage over the other shareholders in advancing his/her interests in the dispute.[67]  Thus, ROFRs are an important and valuable mechanism to prevent sales of ownership interests to individuals or entities that may disrupt or undermine the management of the company and potentially reduce the market value of

---

4.

[64] *See id.*; *see also* David I. Walker, "Rethinking Rights of First Refusal," *Stanford Journal of Law, Business & Finance* 5(1), 1999, 1-58 ("Walker"), at 10-15.

[65] Closely-held corporations are characterized by stock that is not freely traded and often held by only a few shareholders (often within the same family).  J.A. Brickley, C.W. Smith, Jr. and J.L. Zimmerman, Managerial Economics and Organizational Architecture, McGraw Hill, 3rd ed., p. 492.

[66] *See* Walker at 11 (referring to F. Hodge O'Neal & Robert B. Thompson, *O'Neal's Close Corporations* § 7.02 (3d ed. 1996)).

[67] *See* Kahan at 17 (discussing how such strategies reduce economic efficiency); *see also* Walker at 28-31.

the company's assets. It is my understanding that the ROFR sold to Eder-Goodman was to lessen the possibility of Southern gaining control of Eber-CT.

83. Potential bidders view the ROFR as a takeover deterrent, *i.e.*, the existence of ROFR will chill any potential takeover because the bidder knows that the party with the ROFR can match the bid. Thus, a ROFR can be viewed as a minimum control premium. In general, historical control premiums represent 30% of a company's stand-alone market value, where stand-alone means the market value if the company is to be continually run as an independent entity as opposed to be merged with another company. For purposes of valuing the ROFR, I use a smaller 15% figure to represent the value of the ROFR purchased by Eder-Goodman. This 15% control premium translates to $675,000 of the $4.5 million investment price.

84. After adjusting the $4.5 million investment for its right to a priority claim over other equity holders (25%) and adjusting for the ROFR acquired (15%), Eder-Goodman's 15% ownership translates to an equity market value for Eber-CT of $18.0 million as of 2008.[68]

85. Utilizing the formula set forth in paragraph 57 and my $18.0 million estimate of the equity market value from the $4.5 million Eder-Goodman investment, I estimate the MVE of Eber-CT as of May 23, 2012 to be $9.40 million. *See* Exhibit C-1.

### iii) 15% Offer by Southern Wine & Spirits – 2007

86. In mid-late 2007, Southern and Eber W&L negotiated a proposed deal wherein Southern would acquire a 15% interest in Eber-CT from Eber Metro for $3 million (the "Southern Offer").[69] Although this deal was never consummated, according to a widely-cited

---

[68] $18.0 million equals $2.7 million divided by 15%. $2.7 million equals $4.5 million minus $1.13 million for the rights of priority minus $0.68 million value of ROFR, and 15% equals Eder-Goodman's equity percentage of Eber-CT.

[69] *See* Letter from Mr. Lester Eber to Mr. Lee F. Hager of Southern dated August 29,

author of a valuation texts, documentable, arm's-length, bona-fide offers to buy or sell may also

be useful evidence of determining market value.[70]

87.    The Southern Offer contained several substantial rights for Southern in addition to

the 15% interest in Eber-CT, including:

    a)  A tag-along right;

    b)  A right of first refusal;

    c)  Super-majority provisions for fundamental events and transactions between
       Eber-CT and related parties;

    d)  No obligation for Southern to make any representations or warranties to any
       purchaser of Eber-CT;

    e)  Mutually agreed upon limitations on amounts of debt and the use thereof; and

    f)  Mechanisms to protect the proceeds Southern would receive upon the sale of
      Eber-CT from the effect of Eber-CT's related parties and/or Eber-CT's debt
      obligations not arising out of Eber-CT's operations.[71]

88.    These additional rights, specifically the right of first refusal, have considerable

value, as discussed above in paragraphs 79 to 83.  For purposes of estimating the MVE for Eber-

CT, I apply the same 15% to represent the value of the ROFR as part of the Southern Offer.  This

15% control premium translates to $450,000 of the $3.0 million potential investment price.

89.    Using the formula set forth in paragraph 57 and the $3.0 million Southern Offer in

August 2007, I estimate the MVE of Eber-CT as of May 23, 2012 to be $8.91 million.  *See*

Exhibit C-2.

---

2007, p. 3.  This letter served as a Fifth Amendment to discussions between Eber W&L and
Southern.

   [70] *See* S. Pratt, <u>Valuing a Business: The Analysis and Appraisal of Closely Held
Companies</u>, Fifth Edition, McGraw-Hill, 2008, p. 318.

   [71] *See* Letter from Lester Eber to Mr. Lee F. Hager of Southern dated August 29, 2007, p.
3.

*iv)*     ***Sale of 6% to Polebridge Bowman – 2010***

90.     In May 2010, Eber Metro sold a 6% share of Eber-CT to Polebridge Bowman for a purchase price of $350,000.[72]  Polebridge Bowman paid for its investment by providing a non-recourse promissory note to Eber Metro for $350,000 payable in 5 years with a stated interest rate of 2%.[73]

91.     The price paid by Polebridge Bowman also reflected a ROFR granted to Wendy Eber and the Seller:

> To the extent that Buyer proposes to sell all or a portion of the Units to a third party, then Buyer shall comply with the rights of refusal set forth in this Section. Upon receipt by Buyer of a bona fide, written offer from a third party to purchase all or a portion of the Units, then Buyer shall submit a written notice to each of Wendy Eber, Seller and [EG] (the "*Proposed Sale Notice*") setting forth the material terms under which the proposed sale is to take place and offering to sell such amount of Units on the terms described therein. Ms. Eber shall have the first right to purchase all the Units set forth on the Proposed Sale Notice (and on the terms described therein). In order to accept the right of first refusal hereunder, Ms. Eber must provide written notice to Buyer, Seller and [EG] within 5 days of the receipt (as calculated under Section 6.02 below) of the Proposed Sale Notice. If Ms. Eber does not submit her notice of acceptance within the allotted time, then Seller shall have five additional days to submit a written notice to Buyer and [EG] that it wishes to accept a second right of first refusal and purchase all of the Units set forth in the Proposed Sale Notice (and on the terms described therein). If Seller does not submit its notice of acceptance within the allotted time, then [EG] shall have five additional days to submit a written notice to Buyer that [EG] wishes to accept a third right of refusal and purchase all of the Units set forth in the Proposed Sale Notice (and on the terms described therein). If any of Ms. Eber, Seller or [EG] deliver an acceptance notice under this provision, then the closing for the transaction shall take place on or before the 30th day following Buyer's receipt of the acceptance notice from the applicable party. If none of Ms. Eber, Seller or [EG] deliver an acceptance notice under this Section within the require timeframes or if any of Ms.

---

[72] *See* EB-00022190.

[73] *See* EB-00022190.

> Eber, Seller or [EG] fail to consummate the purchase of the Units within 30 days of their acceptance, then Buyer shall be permitted to consummate the sell of the Units to any party (but on terms no less favorable than set forth in the Proposed Sale Notice) for a period of 180 days after the expiration of the time periods for the receipt of acceptance notices hereunder.[74]

92.    As discussed previously in the discussion of the Eder-Goodman transaction, a ROFR has value.  In this instance because the ROFR is granted to the seller (as opposed to the buyer in the Eder-Goodman transaction) the purchase price must be adjusted upwards to account for the buyer who relinquished the right to sell to any other party.  Similar to my estimate in the Eder-Goodman transaction using a 15% premium for the ROFR, I also translate a 15% discount for the ROFR in the Polebridge Bowman transaction to be $61,675.[75]  Utilizing the formula set forth in paragraph 57 and the equity market value from the $350,000 Polebridge Bowman investment, I estimate the MVE of Eber-CT as of May 23, 2012 to be $5.94 million.  *See* Exhibit C-3.

## C.  Valuation Indications from Transactions for and Trading in Comparable Companies

### i)    *Transaction Comparables*

93.    I researched the Capital IQ database for prior comparable sale transactions using the following criteria:

a)  Industry Classifications (Target/Issuer): Alcoholic Beverage Distribution (Primary);

b)  Company Type (Target/Issuer): Private Company;

c)  Target/Issuer LTM Financials - Total Revenue (at Announcement) ($USD, Historical rate): is greater than $1,000,000;

---

[74] *See* EB-00033750, emphasis in original.

[75] $61,675 equals the ($350,000 / (1 – 15%) minus $350,000), where $350,000 is the investment amount and 15% is the ROFR discount.

> d) Target/Issuer LTM Financials - EBITDA (at Announcement) ($USD, Historical rate): is less than $0; and
>
> e) Geographic Locations (Target/Issuer): United States of America.

94.      I was able locate a single transaction in 2001 wherein Prospect Beverages, Inc. was acquired by Capital Beverage Corporation.  Prospect Beverages had revenue of $18.1 million, negative EBIT, and negative EBITDA at the time of the transaction, similar to Eber-CT's financial position in May 2012.  The implied Enterprise Value to revenue multiple from this transaction was 0.283.  I adjust the 0.283 transaction multiple for changes in market conditions from 2001 to 2012 using the same analysis I utilized with the transactions/offer above.

95.      Utilizing the formula set forth in paragraph 57 and the Prospect Beverages comparable sale transaction, I estimate the MVE of Eber-CT as of May 23, 2012 to be $0.70 million.  *See* Exhibit C-4.

***ii)   Trading Comparables***

96.      In the case documents, I found a valuation of Eber-CT performed in August 2013 by Wendy Eber in response to an inquiry from the Pension Benefit Guaranty Corporation.[76]  In this analysis, there were four companies identified as comparable to Eber-CT:

> a) Cott Corp.;
>
> b) Coca-Cola Bottling Co.;
>
> c) Farmer Brothers; and
>
> d) Sysco Corporation.

97.      I reviewed the financial statements of these four companies as of the Valuation Date and found that Farmer Brothers had a negative EBITDA for the 12 months prior to the

---

[76] *See* EB-00017819.

Valuation Date.  Thus, among the four companies that are comparable in terms of their operations, only Farmer Brothers was comparable in that it also had negative EBITDA for the LTM as of May 23, 2012 as did Eber-CT.  The other three companies had positive EBITDA for the 12 months prior to the Valuation Date, and thus not comparable to Eber-CT's position at that time.  In addition, the three other companies had market capitalizations that were significantly larger than that of Eber-CT and of Farmer Brothers, which is also an indication that these three companies are not comparable to Eber-CT.

98.    As of the Valuation Date, Farmer Brothers had an EV/Revenue multiple of 0.25.[77] Because this measure is contemporaneous to the Valuation Date, there is no need to adjust the multiple for changes in market conditions.  Therefore, I am able to use the formula in paragraph 66.  I estimate the MVE of Eber-CT as of May 23, 2012 to be $1.59 million.  *See* Exhibit C-5.

## VIII.  OTHER ASSETS OF EBER COMPANIES

99.    At or near the Valuation Date, there were assets at Eber Metro and Eber W&L. The following figure summarizes those assets:

### Summary of Assets

| Asset | Description | Amount | Eber Entity | Reference Document |
|---|---|---|---|---|
| Demand Note Receivable | Demand Note Receivable from Polebridge Bowman's investment for 6% ownership of Eber-CT | $350,000 | Eber Metro | EB-00019101,19113 |
| Cash | Cash on tax returns at year end | $10,728 | Eber Metro | EB-00019101 |
| Cash | Cash on tax returns at year end | $2,251 | Eber W&L | EB-00020234 |

|  |  |
|---|---|
| Eber Metro Total | $360,728 |
| Eber W&L Total | $2,251 |
| Total | $362,979 |

---

[77] Source: Capital IQ.  The 0.25 EV/Revenue multiple consists of enterprise value of $123.4 million and LTM revenue of $493.7 million as of May 23, 2012.

## IX.  SOLVENCY/MVE OF EBER METRO AND EBER W&L

### A.  Eber Metro

100.    As discussed above, the MVE of Eber Metro depends on the amounts of Eber Metro's assets and liabilities.  The figure in Section VI. details the liabilities at Eber Metro, which totaled $11,138,680.  The figure in Section VIII. shows that Eber Metro's other assets, excluding the 79% Eber-CT holdings, equaled $360,728.

101.    Exhibit D shows the estimates of MVE for Eber Metro based on:

   a)  Eber-CT Asset - the MVE valuations of Eber-CT multiplied by 93%;[78]

   b)  Other Assets of Eber Metro of $360,728; and

   c)  Liabilities of Eber Metro of $11,138,680.

102.    Based on the various estimates of MVE for Eber-CT summarized in Exhibit D, together with the assets/liabilities of Eber Metro, I find that Eber Metro was insolvent as of the Valuation Date because for each of valuations for Eber Metro, the indicative market value of its assets is less than the sum of the amount of its liabilities.  Thus, the MVE of the capital stock of Eber Metro as of May 23, 2012 is zero.

### B.  Eber W&L

103.    The MVE of Eber W&L depends on the amounts of Eber W&L's assets and liabilities.  The figure in Section VI. details the liabilities at Eber W&L, which totaled $11,465,629.  The figure in Section VIII. shows that Eber W&L's other assets, excluding the 79% Eber-CT holdings, equaled $362,979.

---

[78] I multiply the estimates of MVE for Eber-CT by 93% because Eder-Goodman's 15% ownership has already been included with the $4.5 million equivalent preferred equity position. 93% is equal to 79%/85% where 79% is Eber Metro's ownership and 85% is the sum of Eber Metro's 79% ownership and Polebridge Bowman's 6% ownership.

104.    Exhibit D shows the estimates of the MVE for Eber W&L based on:

    a)    Eber-CT Asset - the MVE valuations of Eber-CT multiplied by 93%;[79]

    b)    Other Assets of Eber W&L of $362,979; and

    c)    Liabilities of Eber W&L of $11,465,629.

105.    Based on the various estimates of MVE for Eber-CT summarized in Exhibit D, together with the assets/liabilities of Eber W&L, I find that Eber W&L was insolvent as of the Valuation Date because for each of the valuations, the indicative market value of its assets is less than the sum of the amount of its liabilities.  Thus, the MVE of the capital stock of Eber W&L as of May 23, 2012 is zero.

I certify that, to the best of my knowledge and belief:

  —    the statements of fact contained in this Report are true and correct;

  —    the reported analyses, opinions and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions and conclusions;

  —    I have no present or prospective interest in the parties to this case, and I have no personal interest or bias with respect to the parties involved;

  —    I have made all the inquiries that I believe are desirable and appropriate and that no matters of significance that I regard as relevant have, to my knowledge, been withheld from the Court; and

  —    my compensation is not contingent on an action or event resulting from the analyses, opinions or conclusions in, or the use of, this Report.

_June 28, 2019_
Date

_Frank C. Torchio_ (signature)
Frank C. Torchio

---

[79] *See* Footnote 78 for calculation of 93%.

38

**Exhibit A**                                                    June 2019

## FRANK C. TORCHIO, CFA

| Business Address: | School Address: | Home Address: |
|---|---|---|
| Forensic Economics, Inc. | Simon Business School | 68 Knollwood Drive |
| 95 Allens Creek Road | University of Rochester | Rochester, NY 14618 |
| Building 2, Suite 303 | Carol Simon Hall | (585) 249-9455 |
| Rochester, NY 14618 | Rochester, NY 14627 | |
| (585) 385-7440 | (585) 275-3914 | |
| frank@forensiceconomics.com | frank.torchio@simon.rochester.edu | |

## Employment and Education

9/97-present    **Simon Business School**, University of Rochester, Rochester, NY.  Executive Professor of Finance.

8/89-present    **Forensic Economics, Inc.** (incorporated in 1993), Rochester, NY. President.  Consulting in financial valuations and financial-economic analysis in securities litigation and business disputes.

6/82-8/89    **Rochester Gas and Electric Corporation**, Rochester, NY.

6/88-8/89    Vice President for Utilicom, an RG&E venture subsidiary.

4/87-6/88    Economist - Strategic Planning Department.

6/82-3/87    Financial Analyst - Treasury Department.

9/80-12/81    **M.B.A., Economics and Finance**, Simon Business School, University of Rochester, Rochester, NY.

9/78-8/80    **Insurance Services Office**, New York, NY. Statistician - Commercial Lines.

9/74-5/78    **B.A., Mathematics**, Niagara University, Niagara Falls, NY.

## Publications

"Effect of Liquidity on Size Premium and its Implications for Financial Valuations," with Sunita Surana, *The Journal of Business Valuation and Economic Loss Analysis*, Vol. 9, Issue 1, Jan 2014.

"Event Study Analysis in Securities Litigation and the Bonferroni Correction," Working Paper, 2010.

"Proper Event Study Analysis in Securities Litigation," *The Journal of Corporation Law*, 35:1, 2009, pp.159-168.

"The Circularity of Life in Securities Class Actions," Working Paper, 2008.

"A Comparison of Trading Models Used for Calculating Aggregate Damages in Securities Litigation," with Michael Barclay, *Law and Contemporary Problems: Complex Litigation at the Millennium*, Vol. 64, Nos. 2 & 3, Spring/Summer 2001.

"University of Rochester's Endowment Fund Review," with Gregg A. Jarrell, University of Rochester Simon School Working Paper, 11/93.

"The Longer-Term Relation Between Accounting Performance and Stock Returns," with Gregg A. Jarrell, Working Paper - Bradley Policy Research Center, 8/92.

"Proper Transfer Pricing Aids Success," with Gregg A. Jarrell, *Rochester Business Journal*, 7/30/90.

"Calculating Proper Transfer Prices," with Gregg A. Jarrell, *Public Utilities Fortnightly*, 1/1/91.

## Awards and Designations

Awarded the Chartered Financial Analyst (CFA)® designation by the CFA Institute (2002).

The Richard L. Rosenthal Fellowship at the University of Rochester (1991).

William E. Simon Graduate School of Business Administration Alumni Service Award (1992).

## Activities

Presenter on Class Actions – Expert Event Study Evidence in Shareholder Class Actions at Judicial Education Seminar, Adelaide, Australia, March 23 2018.

Speaker and Panelist on Damages at DRRT's 9th Annual European Global Investor Protection Conference, Frankfurt, Germany, February 6, 2017.

Speaker and Panelist on Damages at DRRT's 8th Annual European Global Investor Protection Conference, Frankfurt, Germany, February 1, 2016.

Panelist on the Market Efficiency segment of the 2015 Winter Bench and Bar Conference (Feb. 14-21, 2015) sponsored by the *Federal Bar Council*.

Participant at Roundtable Discussion at Duke University Law School composed of 30 judges, academics, practitioners, and policy makers designed to examine the future landscape of

corporate and securities law private and public enforcement in the aftermath of recent U.S. Supreme Court and Delaware decisions, September 26, 2014.

Presenter for "Business Litigation and Regulatory Agency Review in the Era of the Roberts Court" for Institute for Law & Economic Policy, April 4, 2014.

Panelist for "Fraud on the Market" for the Federal Bar Council, February 25, 2014.

Speaker at 1st DRRT Conference on securities class actions around the world for institutional investors, Oct. 28-29, 2013

Chairperson and speaker on Transfer Pricing Economics at the International Institute of Manufacturing.

Former adjunct faculty for economics and finance at Rochester Institute of Technology Graduate School of Business.

Member of the National Association of Forensic Economics.

Volunteer for entertaining at nursing homes and senior citizen communities to raise funds for the American Cancer Society.

## Expert Testimony and Expert Consulting Experience (Last Four Years)

Expert Report of Frank C. Torchio in Mastoris & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others, Supreme Court of New South Wales Proceedings No. 52431 of 2018 and Findlay & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others, Supreme Court of New South Wales Proceedings No. 294069 of 2017 (June 23, 2019).

Expert Report of Frank C. Torchio in Tajdin Abdulla v. Canadian Solar Inc., Shawn Xiaohua Qu, and Arthur Chien in the Superior Court of Justice, Ontario, Canada, Court File No. C-710-10 (May 27, 2019).

Deposition of Frank C. Torchio in Pedro Ramirez, Jr., Individually and on Behalf of All Others Similarly Situated v. Exxon Mobil Corporation et al. in the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:16-CV-3111-K (March 20, 2019).

Expert Rebuttal Report of Frank C. Torchio in Pedro Ramirez, Jr., Individually and on Behalf of All Others Similarly Situated v. Exxon Mobil Corporation et al. in the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:16-CV-3111-K (March 1, 2019).

Expert Report of Frank C. Torchio in Clime Capital Limited v. UGL Pty Limited in the Federal Court of Australia, Victoria Registry, No. VID 1390/2017 (February 5, 2019).

Expert Response Report of Frank C. Torchio in <u>Larry Crowley v WorleyParsons Limited ACN 096 090 158</u> in the Federal Court of Australia, New South Wales District Registry, General Division, Case No. NSD 1292 of 2015 (January 31, 2019).

Expert Report of Frank C. Torchio in <u>Pedro Ramirez, Jr., Individually and on Behalf of All Others Similarly Situated v. Exxon Mobil Corporation et al.</u> in the United States District Court for the Northern District of Texas, Dallas Division, Civil Action No. 3:16-CV-3111-K (December 21, 2018).

Expert Response Report of Frank C. Torchio in <u>Inabu Pty Ltd as trustee for Alidas Superannuation Fund CIMIC Group Limited</u> in Federal Court of Australia, Australian Capital Territory District Registry, General Division, Case No. ACD 93 of 2016 (November 28, 2018).

Expert Report of Frank C. Torchio in <u>Mastoris & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 52431 of 2018 and <u>Findlay & Another v DSHE Holdings Limited (receivers and managers appointed) (in liquidation) & Others</u>, Supreme Court of New South Wales Proceedings No. 294069 of 2017 (October 31, 2018).

Expert Supplemental Report of Frank C. Torchio in <u>Larry Crowley v WorleyParsons Limited ACN 096 090 158</u> in the Federal Court of Australia, New South Wales District Registry, General Division, Case No. NSD 1292 of 2015 (October 18, 2018).

Expert Report of Frank C. Torchio in <u>Inabu Pty Ltd as trustee for Alidas Superannuation Fund CIMIC Group Limited</u> in Federal Court of Australia, Australian Capital Territory District Registry, General Division, Case No. ACD 93 of 2016 (June 29, 2018).

Expert Report of Frank C. Torchio in <u>David Scott Hopkins (As Trustee of the David Hopkins Super Fund) v. Macmahon Holdings Limited</u> in Federal Court of Australia, New South Wales District Registry, General Division, Case No. NSD 1346 of 2015 (April 6, 2018).

Expert Report of Frank C. Torchio in <u>Larry Crowley v WorleyParsons Limited ACN 096 090 158</u> in the Federal Court of Australia, New South Wales District Registry, General Division, Case No. NSD 1292 of 2015 (April 2, 2018).

Expert Report of Frank C. Torchio in <u>Findlay & Anor v DSHE Holdings Limited & Ors</u> in the Supreme Court of New South Wales, Equity Division, Case No. 2017/294069 (February 27, 2018).

Trial Testimony of Frank C. Torchio in <u>The Lloyds/HBOS Litigation</u> in the High Court of Justice, Chancery Division, London, England, Case No. HC 2014 002092, HC 2014 001010, HC 2014 001387, HC 2014 001388, HC 2014 001389, HC 2015 000103, and HC 2015 000105 (December 21, 2017).

Statement of Opinions By Mr Torchio and Dr Unni in <u>The Lloyds/HBOS Litigation</u> in the High Court of Justice, Chancery Division, London, England, Case No. HC 2014 002092, HC 2014 001010, HC 2014 001387, HC 2014 001388, HC 2014 001389, HC 2015 000103, and HC 2015 000105 (October 6, 2017).

Expert Report of Frank C. Torchio in <u>Isabel Newson v. OnX USA, LLC, et al.</u> in the United States District Court, District of New Jersey (Newark Vicinage), Civil Action No. 3:16-CV-0276-MAS-DEA (August 14, 2017).

Expert Report of Frank C. Torchio in <u>The Lloyds/HBOS Litigation</u> in the High Court of Justice, Chancery Division, London, England, Case No. HC 2014 002092, HC 2014 001010, HC 2014 001387, HC 2014 001388, HC 2014 001389, HC 2015 000103, and HC 2015 000105 (June 22, 2017).

Testimony of Frank C. Torchio at hearing in <u>Deka Investment Gmbh v. Santander Consumer USA Holdings Inc.</u> in the United States District Court, Northern District of Texas, Dallas Division, Case No. 3:15-CV-2129-K (May 31, 2017).

Expert Report of Frank C. Torchio in <u>Claire R. McDonald v. Home Capital Group, Inc., Gerald M. Soloway, Robert Morton, and Robert J. Blowes</u> in the Superior Court of Justice, Ontario, Canada, Court File No. 349/17CP (May 16, 2017).

Expert Report of Frank C. Torchio in <u>Hemlock Semiconductor Corporation v. Kyocera Corporation and Hemlock Semiconductor, LLC v. Kyocera Corporation</u> in the United States District Court, Eastern District of Michigan, Northern Division, Case No. 15-CV-11236-BC (March 15, 2017).

Deposition of Frank C. Torchio in <u>Deka Investment Gmbh v. Santander Consumer USA Holdings Inc.</u> in the United States District Court, Northern District of Texas, Dallas Division, Case No. 3:15-CV-2129-K (January 31, 2017).

Expert Report of Frank C. Torchio in <u>Deka Investment Gmbh v. Santander Consumer USA Holdings Inc.</u> in the United States District Court, Northern District of Texas, Dallas Division, Case No. 3:15-CV-2129-K (December 2, 2016).

Joint Report of the Economic Experts in <u>Blairgowrie Trading Ltd v. Allco Finance Group Ltd</u> in the Federal Court of Australia, New South Wales District Registry, General Division, No. NSD 1609 of 2013 (October 30, 2016).

Expert Report of Frank C. Torchio in <u>Caason Investments Pty Limited v. Simon Xiao Fan Cao & ORS</u> in the Federal Court of Australia, New South Wales District Registry, General Division, No. NSD 1558 of 2012 (October 20, 2016).

Expert Response Report of Frank C. Torchio in <u>Blairgowrie Trading Ltd v. Allco Finance Group Ltd</u> in the Federal Court of Australia, New South Wales District Registry, General Division, No. NSD 1609 of 2013 (September 22, 2016).

Deposition of Frank C. Torchio in <u>Terry Wright v. Detour Gold Corporation and Gerald Panneton.</u> in the Superior Court of Justice, Ontario, Canada, Court File No.: CV-14-504010 (September 21, 2016).

Expert Report of Frank C. Torchio in <u>Celso Catucci and Nicole Aubin, Es Qualité Trustee of the Aubin Family Trust v. Valeant Pharmaceuticals International Inc. et al.,</u> before the Superior Court of Justice, Province of Quebec, District of Montreal, Court File No. 500-06-000783-163 (July 21, 2016).

Expert Report of Frank C. Torchio in re: <u>Le Mouvement d'Education et de Defense des Actionnaires (Medac), and Marc Lamoureux, as a person designated for Le Mouvement d'Education et de Defense des Actionnaires (Medac) v. Manulife Financial Corporation, et al.,</u> before the Superior Court of Justice, Province of Quebec, District of Quebec City, Court File No. 200-06-000117-096 (July 8, 2016).

Joint Report of the Valuation Experts in <u>Tobias Mitic v. OZ Minerals Limited</u> in the Federal Court of Australia, Victoria Registry, No. VID114/2014 (June 3, 2016).

Joint Report of the Economic Experts in <u>Tobias Mitic v. OZ Minerals Limited</u> in the Federal Court of Australia, Victoria Registry, No. VID114/2014 (May 25, 2016).

Expert Response Report of Frank C. Torchio in <u>Tobias Mitic v. OZ Minerals Limited</u> in the Federal Court of Australia, Victoria Registry, No. VID114/2014 (April 8, 2016).

Expert Report of Frank C. Torchio in <u>Blairgowrie Trading Ltd v. Allco Finance Group Ltd</u> in the Federal Court of Australia, New South Wales District Registry, General Division, No. NSD 1609 of 2013 (March 17, 2016).

Deposition of Frank C. Torchio in <u>Bausch & Lomb Inc., v. Faezeh Mona Sarfarazi,</u> Western District of New York, Case No. 6:09-cv-06041-EAW (February 29, 2016).

Expert Response Report of Frank C. Torchio in <u>Earglow Pty Limited v. Newcrest Mining Ltd</u> in the Federal Court of Australia, Victoria District Registry, No. VID 406 of 2014 (January 21, 2016).

Supplemental Affidavit of Frank C. Torchio in <u>Terry Wright v. Detour Gold Corporation and Gerald Panneton.</u> in the Superior Court of Justice, Ontario, Canada, Court File No.: CV-14-504010 (January 8, 2016).

Declaration of Frank C. Torchio in <u>Securities and Exchange Commission against CR Intrinsic Investors, et al.,</u> United States District Court for the Southern District of New York, No. 12 Civ. 8466 (VM) (December 10, 2015).

Trial Testimony of Frank C. Torchio in <u>United States of America v. Donald L. Blankenship,</u> United States District Court for the Southern District of West Virginia, Case No. 5:14-cr-00244 (November 9, 2015).

Expert Report of Frank C. Torchio in <u>Tobias Mitic v. OZ Minerals Limited</u> in the Federal Court of Australia, Victoria Registry, No. VID114/2014 (October 27, 2015).

Expert Report of Frank C. Torchio in <u>Earglow Pty Limited v. Newcrest Mining Ltd</u> in the Federal Court of Australia, Victoria District Registry, No. VID 406 of 2014 (October 6, 2015).

Expert Report of Frank C. Torchio in <u>Bausch & Lomb Inc., v. Faezeh Mona Sarfarazi,</u> Western District of New York, Case No. 6:09-cv-06041-EAW (September 30, 2015).

Joint Memorandum of Experts in <u>Ipay Express Pte Limited & Ors v Macquarie Equities Limited</u> in the Federal Court of Australia, New South Wales District Registry, NSD508/2012 (August 21, 2015).

Trial Testimony of Frank C. Torchio in <u>Niall Iain MacFirbhisgh et al. v. CI Trustees & Executors Limited et al.</u> in the Royal Court of the Island of Jersey, File no: 2009/448, (July 21, 2015).

**Exhibit B**
**Materials Relied Upon**

**Court Filings**

    Complaint filed in the Southern District of New York on December 9, 2016.

    Third Amended Complaint filed in the Southern District of New York on June 14, 2019.

    Answer to Third Amended Complaint filed in the Southern District of New York on June 24, 2019.

    Order of Hon. Matthew A. Rosenbaum, J.S.C. in Alexbay, LLC v. Eber Bros. Wine & Liquor Corp., et al. (Sup. Ct., Monroe County, Index No. 2012-1919) dated May 23, 2012.

**Bates-Stamped Documents**

    Bates No. CNB000030, Minutes from meeting of the Officers of the Trust of Allen Eber August 18, 2011.

    Bates Nos. EB-00001363-6, Line of Credit Note.

    Bates Nos. EB-00016856-68, Sale of Eber-CT to Eder-Goodman.

    Bates Nos. EB-00017819-68, Valuation in response to an inquiry from the Pension Benefit Guaranty Corporation.

    Bates Nos. EB-00017871-3, Line of Credit Note.

    Bates Nos. EB-00017906-16, Guaranty.

    Bates Nos. EB-00017917-29, Security Agreement.

    Bates Nos. EB-00017934-6, Assignment of Note and Security Agreement.

    Bates Nos. EB-00017937-9, Notice to Debtor from Alexbay to Eber W&L.

    Bates Nos. EB-00019097-116, Eber Metro Tax Return for fiscal year ending May 31, 2012.

    Bates Nos. EB-00019482-96, Eber-Connecticut, LLC Independent Auditors' Report, Financial Statements and Supplemental Schedules for the years ended May 31, 2008 and 2007.

    Bates Nos. EB-00019497-509, Eber-Connecticut, LLC Independent Auditors' Report, Financial Statements and Supplemental Schedules for the years ended May 31, 2010 and 2009.

    Bates Nos. EB-00019510-22, Eber-Connecticut, LLC Independent Auditors' Report, Financial Statements and Supplemental Schedules for the years ended May 31, 2012 and 2011.

    Bates Nos. EB-00020230-4, Eber W&L Tax Return for fiscal year ending May 31, 2012.

    Bates Nos. EB-00022190-3, Unanimous Written Consent in Lieu of a Meeting of the Board of Directors.

    Bates Nos. EB-00022871-908, Amended and Restated Limited Liability Company Agreement of Eber-Connecticut, LLC.

    Bates Nos. EB-00023745-78, Decision and Order of Honorable J. Scott Odorisi.

    Bates Nos. EB-00025860-71, Merger of Slocum & Sons with and into Eber-CT dated April 29, 2005.

    Bates Nos. EB-00026433-4, Extracted Pages from Loan Ledger.

    Bates Nos. EB-00030896-9, Affidavit of Confession of Judgment.

    Bates Nos. EB-00030932-3, Stipulation of Settlement.

    Bates Nos. EB-00032632-707, Summons and Complaint.

    Bates Nos. EB-00032782-33269, Slocum & Sons and Eber-CT merger-related documents.

    Bates Nos. EB-00033279-747, Slocum & Sons Due Diligence Binder.

    Bates Nos. EB-00033748-60, Stock Purchase Agreement.

**Exhibit B**
**Materials Relied Upon**

**Other Materials**
Bank of America Merrill Lynch database.  Source: Bloomberg.
Regulations of Connecticut State Agencies, TITLE 30. Intoxicating Liquors, §§ 30-6-A1—30-6-F4.  Source: Counsel.
Letter from Mr. Lester Eber to Mr. Lee F. Hager of Southern dated August 29, 2007.
Letter from Michael A. Gallagher, Benefits Management Inc. to Wendy Eber dated December 19, 2018.
Source used for transaction and trading comparable financial information: Capital IQ.
Source for various market multiples: Capital IQ.
All other materials and sources referenced in the Report or Exhibits.

**Exhibit C-1**

**Eder-Goodman Transaction**
**(as of January 29, 2008)**

| | | |
|---|---|---|
| [1] | Total Price | $4,500,000 |
| [2] | Premium for additional rights | $1,800,000 |
| [3] | Adjusted Price ($P_C$) | $2,700,000 |
| [4] | Percentage Ownership (%) | 15% |
| [5] | Equity ($E_C$) | $18,000,000 |
| [6] | Debt ($D_C$) | $10,870,421 |
| [7] | Cash ($C_C$) | $6,144,197 |
| [8] | Enterprise Value ($EV_C$) | $22,726,224 |
| [9] | Revenue ($R_C$) | $43,244,059 |
| [10] | Enterprise Value/Revenue Multiple ($EV_C/R_C$) | 0.53 |
| [11] | Multiple Adjustment ($EV_M/RM^V \div EV_M/RM^C$) | 0.88 |
| [12] | Adjusted Enterprise Value/Revenue Multiple ($AEV_C/R_C$) | 0.46 |
| [13] | Revenue for Eber-CT ($R_S$) | $36,383,755 |
| [14] | Implied Enterprise Value for Eber-CT ($EV_S$) | $16,901,932 |
| [15] | Debt for Eber-CT ($D_S$) | $3,590,000 |
| [16] | Preferred for Eber-CT ($P_S$) | $4,500,000 |
| [17] | Cash for Eber-CT ($C_S$) | $586,188 |
| [18] | Market Value of Equity for Eber-CT ($E_S$) | $9,398,120 |

## Exhibit C-1

**Notes:**

* The terms here are based on those described in the Report, ¶57.

[1]   Purchase price.  EB-00016856.

[2]   = to $1.13 million (rights of priority) plus $0.68 million (ROFR value).  *See*  Report, Section VII.B.ii. for a description of the rights of priority and ROFR value.

[3]   = [1] - [2].

[4]   Percent of company sold.  EB-00016856.

[5]   = [3] / [4].

[6]   Debt outstanding near time of transaction, consisting of: $1.5 million line of credit, plus $7.6 million Due to Affiliate, less $1.7 million Due from Affiliate, less $0.95 million Due to Affiliate capitalized to equity.  EB-00019485-7.  Also includes the $4.5 million preferred-like security from Eder-Goodman.

[7]   Fiscal year 2007 cash prior to transaction of $0.144 million.  EB-00019485.  Also includes the $1.5 million line of credit and $4.5 million cash received from Eder-

[8]   = [5] + [6] - [7].

[9]   Fiscal year 2008 revenue.  EB-00019487.

[10]  = [8] / [9].

[11]  Change in market multiples from 1/29/2008 (8.10) to 5/23/2012 (7.16).  Only companies that have multiples on both dates are used.  Source: Capital IQ.

[12]  = [10] x [11].

[13]  Fiscal year 2012 revenue.  EB-00019515.

[14]  = [12] x [13].

[15]  Fiscal year 2012 debt outstanding near Valuation Date.  EB-00019514.  The items included are: Demand note payable of $0.5 million; Current portion of term note payable of $0.206 million; and Term note payable, net of current portion of $2.9 million.

[16]  Eder-Goodman preferred equity position.

[17]  Fiscal year 2012 cash near Valuation Date.  EB-00019513.

[18]  = [14] - [15] - [16] + [17], as of May 23, 2012.

**Exhibit C-2**

**Southern Wine & Spirits Offer**
**(as of August 29, 2007)**

| | | |
|---|---|---:|
| [1] | Total Price | $3,000,000 |
| [2] | Premium for additional rights | $450,000 |
| [3] | Adjusted Price ($P_C$) | $2,550,000 |
| [4] | Percentage Ownership (%) | 15% |
| [5] | Equity ($E_C$) | $17,000,000 |
| [6] | Debt ($D_C$) | $7,320,849 |
| [7] | Cash ($C_C$) | $1,644,197 |
| [8] | Enterprise Value ($EV_C$) | $22,676,652 |
| [9] | Revenue ($R_C$) | $42,386,508 |
| [10] | Enterprise Value/Revenue Multiple ($EV_C/R_C$) | 0.53 |
| [11] | Multiple Adjustment ($EV_M/RM^V \div EV_M/RM^C$) | 0.84 |
| [12] | Adjusted Enterprise Value/Revenue Multiple ($AEV_C/R_C$) | 0.45 |
| [13] | Revenue for Eber-CT ($R_S$) | $36,383,755 |
| [14] | Implied Enterprise Value for Eber-CT ($EV_S$) | $16,411,833 |
| [15] | Debt for Eber-CT ($D_S$) | $3,590,000 |
| [16] | Preferred for Eber-CT ($P_S$) | $4,500,000 |
| [17] | Cash for Eber-CT ($C_S$) | $586,188 |
| [18] | Market Value of Equity for Eber-CT ($E_S$) | $8,908,021 |

**Exhibit C-2**

**Notes:**

\* The terms here are based on those described in the Report, ¶57.

[1]  Offer price.  *See* letter from Lester Eber to Mr. Lee F. Hager of Southern dated August 29, 2007.

[2]  = [1] x 15%.  See Report, Section VII.B.ii. for a description of the ROFR value.

[3]  = [1] - [2].

[4]  Percent of company negotiated to be potentially sold.  *See* letter from Lester Eber to Mr. Lee F. Hager of Southern dated August 29, 2007.

[5]  = [3] / [4].

[6]  Debt outstanding near time of potential transaction, consisting of: $1.5 million line of credit, plus $7.6 million Due to Affiliate, less $1.7 million Due from Affiliate, less $0.95 million Due to Affiliate capitalized to equity.  EB-00019485-7.

[7]  Fiscal year 2007 cash prior to potential transaction of $0.144 million.  EB-00019485.

[8]  = [5] + [6] - [7].

[9]  Fiscal year 2008 revenue.  EB-00019487.

[10]  = [8] / [9].

[11]  Change in market multiples from 8/29/2007 (8.67) to 5/23/2012 (7.31).  Only companies that have multiples on both dates are used.  Source: Capital IQ.

[12]  = [10] x [11].

[13]  Fiscal year 2012 revenue.  EB-00019515.

[14]  = [12] x [13].

[15]  Fiscal year 2012 debt outstanding near Valuation Date.  EB-00019514.  The items included are: Demand note payable of $0.5 million; Current portion of term note payable of $0.206 million; and Term note payable, net of current portion of $2.9 million.

[16]  Eder Goodman preferred equity position.

[17]  Fiscal year 2012 cash near Valuation Date.  EB-00019513.

[18]  = [14] - [15] - [16] + [17], as of May 23, 2012.

**Exhibit C-3**

**Polebridge Bowman Transaction**

**(as of May 28, 2010)**

| | | |
|---|---|---|
| [1] | Total Price | $350,000 |
| [2] | Discount for additional rights | $61,765 |
| [3] | Adjusted Price ($P_C$) | $411,765 |
| [4] | Percentage Ownership (%) | 6% |
| [5] | Equity ($E_C$) | $6,862,745 |
| [6] | Debt ($D_C$) | $8,400,000 |
| [7] | Cash ($C_C$) | $306,058 |
| [8] | Enterprise Value ($EV_C$) | $14,956,687 |
| [9] | Revenue ($R_C$) | $36,552,221 |
| [10] | Enterprise Value/Revenue Multiple ($EV_C/R_C$) | 0.41 |
| [11] | Multiple Adjustment ($EV_M/RM^V \div EV_M/RM^C$) | 0.90 |
| [12] | Adjusted Enterprise Value/Revenue Multiple ($AEV_C/R_C$) | 0.37 |
| [13] | Revenue for Eber-CT ($R_S$) | $36,383,755 |
| [14] | Implied Enterprise Value for Eber-CT ($EV_S$) | $13,446,391 |
| [15] | Debt for Eber-CT ($D_S$) | $3,590,000 |
| [16] | Preferred for Eber-CT ($P_S$) | $4,500,000 |
| [17] | Cash for Eber-CT ($C_S$) | $586,188 |
| [18] | Market Value of Equity for Eber-CT ($E_S$) | $5,942,579 |

## Exhibit C-3

**Notes:**

\* The terms here are based on those described in the Report, ¶57.

[1]   Purchase price.  EB-00022190.

[2]   Discount for seller's ROFR.  See Report Section VII.B.iv.

[3]   = [1] - [2].

[4]   Percent of company sold.   EB-00022190.

[5]   = [3] / [4].

[6]   Fiscal year 2010 debt outstanding near time of transaction.  EB-00019501.  Also includes the $4.5 million preferred-like security from Eder-Goodman.

[7]   Fiscal year 2010 cash near time of transaction.  EB-00019500.

[8]   = [5] + [6] - [7].

[9]   Fiscal year 2010 revenue.  EB-00019502.

[10]   = [8] / [9].

[11]   Change in market multiples from 5/28/2010 (7.85) to 5/23/2012 (7.09).  Only companies that have multiples on both dates are used.  Source: Capital IQ.

[12]   = [10] x [11].

[13]   Fiscal year 2012 revenue.  EB-00019515.

[14]   = [12] x [13].

[15]   Fiscal year 2012 debt outstanding near Valuation Date.  EB-00019514.  The items included are: Demand note payable of $0.5 million; Current portion of term note payable of $0.206 million; and Term note payable, net of current portion of $2.9 million.

[16]   Eder Goodman preferred equity position.

[17]   Fiscal year 2012 cash near Valuation Date.  EB-00019513.

[18]   = [14] - [15] - [16] + [17], as of May 23, 2012.

**Exhibit C-4**

**Prospect Beverages (Comparable Transaction)**
**(as of July 5, 2001)**

| | | |
|---|---|---|
| [1] | Total Price | N/A |
| [2] | Premium for additional rights | N/A |
| [3] | Adjusted Price ($P_C$) | N/A |
| [4] | Percentage Ownership (%) | N/A |
| [5] | Equity ($E_C$) | N/A |
| [6] | Debt ($D_C$) | N/A |
| [7] | Cash ($C_C$) | N/A |
| [8] | Enterprise Value ($EV_C$) | $5,130,000 |
| [9] | Revenue ($R_C$) | $18,140,000 |
| [10] | Enterprise Value/Revenue Multiple ($EV_C/R_C$) | 0.28 |
| [11] | Multiple Adjustment ($EV_M/RM^V \div EV_M/RM^C$) | 0.80 |
| [12] | Adjusted Enterprise Value/Revenue Multiple ($AEV_C/R_C$) | 0.23 |
| [13] | Revenue for Eber-CT ($R_S$) | $36,383,755 |
| [14] | Implied Enterprise Value for Eber-CT ($EV_S$) | $8,199,319 |
| [15] | Debt for Eber-CT ($D_S$) | $3,590,000 |
| [16] | Preferred for Eber-CT ($P_S$) | $4,500,000 |
| [17] | Cash for Eber-CT ($C_S$) | $586,188 |
| [18] | Market Value of Equity for Eber-CT ($E_S$) | $695,507 |

## Exhibit C-4

**Notes:**

\* The terms here are based on those described in the Report, ¶57.

[1]    N/A

[2]    N/A

[3]    N/A

[4]    N/A

[5]    N/A

[6]    N/A

[7]    N/A

[8]    Enterprise value for Prospect Beverages.  Source: Capital IQ.

[9]    Revenue for Prospect Beverages.  Source: Capital IQ.

[10]  = [8] / [9].

[11]  Change in market multiples from 7/5/2001 (7.04) to 5/23/2012 (5.61).  Only companies that have multiples on both dates are used.  Source: Capital IQ.

[12]  = [10] x [11].

[13]  Fiscal year 2012 revenue.  EB-00019515.

[14]  = [12] x [13].

[15]  Fiscal year 2012 debt outstanding near Valuation Date.  EB-00019514.  The items included are: Demand note payable of $0.5 million; Current portion of term note payable of $0.206 million; and Term note payable, net of current portion of $2.9 million.

[16]  Eder Goodman preferred equity position.

[17]  Fiscal year 2012 cash near Valuation Date.  EB-00019513.

[18]  = [14] - [15] - [16] + [17], as of May 23, 2012.

**Exhibit C-5**

**Farmer Bros. Co. (Trading Comparable)**
**(as of May 23, 2012)**

| | | |
|---|---|---|
| [1] | Total Price | N/A |
| [2] | Premium for additional rights | N/A |
| [3] | Adjusted Price ($P_C$) | N/A |
| [4] | Percentage Ownership (%) | N/A |
| [5] | Equity ($E_C$) | N/A |
| [6] | Debt ($D_C$) | N/A |
| [7] | Cash ($C_C$) | N/A |
| [8] | Enterprise Value ($EV_C$) | $123,400,000 |
| [9] | Revenue ($R_C$) | $493,700,000 |
| [10] | Enterprise Value/Revenue Multiple ($EV_C/R_C$) | 0.25 |
| [11] | Multiple Adjustment ($EV_M/RM^V \div EV_M/RM^C$) | 1.00 |
| [12] | Adjusted Enterprise Value/Revenue Multiple ($AEV_C/R_C$) | 0.25 |
| [13] | Revenue for Eber-CT ($R_S$) | $36,383,755 |
| [14] | Enterprise Value for Eber-CT ($EV_S$) | $9,094,096 |
| [15] | Debt for Eber-CT ($D_S$) | $3,590,000 |
| [16] | Preferred for Eber-CT ($P_S$) | $4,500,000 |
| [17] | Cash for Eber-CT ($C_S$) | $586,188 |
| [18] | Market Value of Equity for Eber-CT ($E_S$) | $1,590,284 |

**Exhibit C-5**

**Notes:**

\* The terms here are based on those described in the Report, ¶57.

[1]    N/A

[2]    N/A

[3]    N/A

[4]    N/A

[5]    N/A

[6]    N/A

[7]    N/A

[8]    Enterprise value for Farmer Brothers.  Source: Capital IQ.

[9]    Revenue for Farmer Brothers.  Source: Capital IQ.

[10]  = [8] / [9].

[11]  = 1.00 because analysis is contemporaneous to the Valuation Date and no adjustment is necessary.

[12]  = [10] x [11].

[13]  Fiscal year 2012 revenue.  EB-00019515.

[14]  = [12] x [13].

[15]  Fiscal year 2012 debt outstanding near Valuation Date.  EB-00019514.  The items included are: Demand note payable of $0.5 million; Current portion of term note payable of $0.206 million; and Term note payable, net of current portion of $2.9 million.

[16]  Eder Goodman preferred equity position.

[17]  Fiscal year 2012 cash near Valuation Date.  EB-00019513.

[18]  = [14] - [15] - [16] + [17], as of May 23, 2012.

**Exhibit D**

**Market Value of Equity for Eber Metro and Eber W&L**

| Year | | Farmer Bros. Co. 2012 | Polebridge Bowman 2010 | Eder-Goodman 2008 | Southern Offer 2007 | Prospect Beverages 2001 |
|---|---|---|---|---|---|---|
| Eber-CT Market Value of Equity | [1] | $1,590,284 | $5,942,579 | $9,398,120 | $8,908,021 | $695,507 |
| Eber Metro's Ownership | [2] | $1,478,029 | $5,523,103 | $8,734,723 | $8,279,220 | $646,413 |
| Eber Metro Liabilities | [3] | $11,138,680 | $11,138,680 | $11,138,680 | $11,138,680 | $11,138,680 |
| Eber Metro - Other Assets | [4] | $360,728 | $360,728 | $360,728 | $360,728 | $360,728 |
| **Eber Metro Market Value of Equity** | [5] | ($9,299,923) | ($5,254,849) | ($2,043,229) | ($2,498,733) | ($10,131,540) |
| Eber W&L Liabilities | [6] | $11,465,629 | $11,465,629 | $11,465,629 | $11,465,629 | $11,465,629 |
| Eber W&L - Other Assets | [7] | $362,979 | $362,979 | $362,979 | $362,979 | $362,979 |
| **Eber W&L Market Value of Equity** | [8] | ($9,624,621) | ($5,579,547) | ($2,367,926) | ($2,823,430) | ($10,456,237) |

**Notes:**

[1] See respective Exhibit C, line [18], for estimate of Eber-CT market value of equity as of Valuation Date.

[2] = 79%/85% multiplied by [1].

[3] Eber Metro Liabilities.  See figure in Report, Section VI.

[4] Eber Metro - Other Assets.  See figure in Report, Section VIII.

[5] = respective [2] minus [3] plus [4].

[6] Eber W&L Liabilities.  See figure in Report, Section VI.

[7] Eber W&L - Other Assets.  See figure in Report, Section VIII.

[8] = respective [2] minus [6] plus [7].

Exhibit E

to dispose of the Offered Units to a third Person without regard to the terms and conditions of this Section 7.3.1.

7.3.2. Drag Along Rights. If the Majority Member desires to sell, assign, transfer or otherwise dispose of any Units (the "Offered Units") to a third Person (the "Offeror") pursuant to a bona fide third Person offer and the Minority Member elects not to exercise the right of first refusal granted to the Minority Member pursuant to Section 7.3.1 hereof, then the Majority Member shall have the right, by delivery of written notice to the Minority Member, to require the Minority Member to sell to the Offeror the same percentage of its Unit as the Majority Member has agreed to sell to the Offeror at the same price per Unit and on the same terms and conditions on which the Offeror has agreed to purchase the Offered Units; provided, however, that the rights of the Majority Member under this Section 7.3.2 shall be subject to and conditioned upon the Minority Member receiving a purchase price, calculated in accordance with Section 8.3 hereof, at least equal to the Guaranteed Purchase Price (appropriately pro-rated if the Minority Member is to sell fewer than all of its Units) in connection with said transaction. Notwithstanding the foregoing, if the Majority Member has breached any term or condition of Section 8.6 of this Agreement, the rights granted to the Majority Member in this Section 7.3.2 shall be null and void, and the Minority Member shall not be subject to the obligations contemplated by this Section 7.3.2.

7.3.3. Tag Along Rights. If the Majority Member desires to sell, assign, transfer or otherwise dispose of any Units (the "Offered Units") to a third Person (the "Offeror") pursuant to a bona fide third Person offer and the Minority Member elects not to exercise the right of first refusal granted to the Minority Member pursuant to Section 7.3.1 hereof, and the Majority Member has not elected to exercise its rights under Section 7.3.2 above, then the Minority Member shall have the option, upon delivery of written notice to the Offeror with a copy to the Majority Member, of requiring the Offeror to purchase the same percentage of the Minority Member's Ownership Interest as the Offeror has agreed to purchase from the Majority Member at the same price per Unit and on the same terms and conditions on which the Offeror has agreed to purchase the Offered Units from the Majority Member. If the Offeror does not agree to purchase the Minority Member's Ownership Interest, the Majority Member and the Minority Member shall each sell to the Offeror a number of Units equal to the number of Offered Units multiplied by such Member's Percentage Interest, or no sale of any Units shall be made to Offeror. If the transaction proceeds, the Minority Member shall receive a purchase price, calculated in accordance with Section 8.3 hereof, at least equal to the Guaranteed Purchase Price (appropriately pro-rated if the Minority Member is to sell fewer than all of its Units) in connection with said transaction. Notwithstanding the foregoing, if the Minority Member has breached any term or condition of Section 8.6 of this Agreement, the rights granted to the Minority Member in this Section 7.3.3 shall be null and void, and the Majority Member shall not be subject to the obligations contemplated by this Section 7.3.3.

## SECTION 8
## CERTAIN COVENANTS AND AGREEMENTS

8.1. **Right of First Refusal.** If the Company desires to sell, assign, transfer or otherwise dispose of all or substantially all of its assets to a third Person pursuant to a bona fide third Person offer, it shall give written notice of the terms and conditions of such offer to the

21

EB-00022891

# Exhibit E

Minority Member, including the name and address of the proposed purchaser, the cash price or other consideration offered for such assets and all other material terms and conditions of the proposed sale within ten (10) days after the Company's receipt thereof (the "Notice of Proposed Sale"). The Minority Member shall have thirty (30) days from the date of such Notice of Proposed Sale to agree to purchase such assets upon the same terms and conditions set forth in the Notice of Proposed Sale by giving written notice to the Company of its intent and fixing a closing date not more than ninety (90) days after delivering written notice of the intent to exercise. If the Minority Member declines to exercise its rights to buy the assets pursuant to this Section 8.1, then the Company shall be free to dispose of the assets for a period of ninety (90) days thereafter; provided, however, that the Company may only sell the assets to the proposed purchaser identified in the Notice of Proposed Sale on terms and conditions no less favorable (from the Company's perspective) than those set forth in the Notice of Proposed Sale. Upon the expiration of said ninety (90) day period, the transfer or disposition of the assets shall once again be subject to the terms and conditions of this Section 8.1. Notwithstanding the foregoing, if the Minority Member has breached any term or condition of Section 8.6 of this Agreement, the right of first refusal granted to the Minority Member in this Section 8.1 shall be null and void and the Company shall be permitted to dispose of substantially all of its assets to a third party without regard to the terms and conditions of this Section 8.1.

**8.2.** **Calculating Distributions upon a Sale of Assets or Liquidation.** Notwithstanding anything to the contrary in this Agreement, upon a sale of all or substantially all of the assets of the Company or the liquidation of the Company, the amount of any Distribution to be made to the Minority Member shall be determined prior to providing for or, if already paid, without giving effect to:

8.2.1. the repayment of any indebtedness of the Company, the proceeds of which indebtedness were not used to pay operating expenses or for capital investments of the Company;

8.2.2. repayment of indebtedness of the Company to any Affiliate of the Majority Member, Lester Eber or the Company incurred on or prior to January 29, 2008;

8.2.3. receipt of any repayment of indebtedness to the Company by any Affiliate of the Majority Member, Lester Eber or the Company; or

8.2.4. the satisfaction, or the assumption by the purchaser of the assets of the Company, of any obligation satisfied or to be satisfied from the assets of the Company to the extent that such obligation did not arise out of the ordinary course operations of the Company.

8.2.5. Notwithstanding anything to the contrary herein, the Minority Member shall receive from such transaction in an amount equal to the Guaranteed Purchase Price plus the amount, if any, by which the Minority Member's Percentage Interest multiplied by the purchase price (after application of Sections 8.2.1 through 8.2.4 above) exceeds the Guaranteed Purchase Price.

**8.3.** **Allocation of the Purchase Price Upon a Sale of Units.** Notwithstanding anything to the contrary herein, upon a sale of all of the Units of the Company to a third party,

22

EB-00022892

**Exhibit E**

the portion of the purchase price from such sale to be allocated to the purchase of the Minority Member's Units shall be determined without regard to any adjustment to the purchase price for:

8.3.1.  any indebtedness of the Company, the proceeds of which indebtedness were not used to pay operating expenses or for capital investments of the Company;

8.3.2.  repayment of indebtedness of the Company to any Affiliate of the Majority Member, Lester Eber or the Company incurred on or prior to January 29, 2008;

8.3.3.  receipt of any repayment of indebtedness to the Company by any Affiliate of the Majority Member, Lester Eber or the Company; or

8.3.4.  any obligation satisfied or to be satisfied from the assets of the Company to the extent that such obligation did not arise out of the ordinary course operations of the Company.

8.3.5.  Notwithstanding anything to the contrary herein, the Minority Member shall receive from such transaction in an amount equal to the Guaranteed Purchase Price plus the amount, if any, by which the Minority Member's Percentage Interest multiplied by the purchase price (after application of <u>Sections 8.3.1 through 8.3.4</u> above) exceeds the Guaranteed Purchase Price.

**8.4.     Observation Rights.**  As long as the Minority Member owns any Units, the Company shall invite a representative of the minority Member acceptable to the Company in its reasonable judgment (each an "Investor Designee," and it being agreed that any of Andrew Eder, Richard Weiss, David Heller and Roger Loeb is acceptable to the Company to serve as an Investor Designee), to attend all meetings of its Board of Managers in a nonvoting observer capacity and, in this respect, shall give such Investor Designee copies of all notices, minutes, consents, and other materials that it provides to its Managers; <u>provided, however,</u> that such Investor Designee shall agree to hold in confidence and trust and to act in a fiduciary manner with respect to any information provided to him or her; and, <u>provided further,</u> that the Company reserves the right to require such Investor Designee to execute such agreements regarding confidentiality and other related matters as may be deemed reasonably necessary by the Company to protect the confidentiality of the information provided to such Investor Designee.

**8.5.     Sale of Product Lines.**  If the Company desires to sell one or more product lines, the Company shall so notify the Minority Member in writing of such intent and shall first negotiate in good faith with the Minority Member for a period of thirty (30) days to permit the Minority Member to buy such product line or lines.  If, during such thirty (30) day period, the Company and the Minority Member fail to agree to terms for the purchase and sale of such product line or lines and/or the Minority Member is unable to obtain the necessary consent of the affected supplier to such acquisition, then the Company shall be free to sell the product line or lines to a third Person upon terms and conditions reasonably acceptable to the Company, in the Company's sole discretion, <u>provided</u> that, unless the sole reason the Company has not sold such product line or lines to the Minority Member is the absence of supplier approval for the Minority Member's purchase of the same, such terms and conditions shall be no less favorable, from the Company's perspective, than those offered by the Minority Member.  Notwithstanding the foregoing, if the Minority Member has breached any term or condition of <u>Section 8.6</u> of this

23

EB-00022893

**Exhibit E**

Agreement, the right of first negotiation granted to the Minority Member in this Section 8.5 shall be null and void, and the Company shall be permitted to dispose of the product line or lines to a third party without regard to the terms and conditions of this Section 8.5. The proceeds of such sale from any product line shall either (a) be retained by the Company to fund ongoing business operations or (b) be used to make a Distribution to the Members in accordance with each Member's Percentage Interest. Notwithstanding the foregoing, this Section 8.5 shall not be applicable to any transfer of a product line or lines by the Company in consideration of (i) a trade of one or more product lines for one or more other product lines, or (ii) a trade of one or more product lines for cash consideration and one or more other product lines.

8.6. **Non-Solicitation.** Following the effectiveness of this Agreement, the Minority Member and the Company shall not, at any time, directly or indirectly through its officers, directors, managers, members, shareholders, employees, agents or Affiliates, initiate discussions with any supplier of the other (or Affiliates of the other, where the other is the Minority Member) for the purpose of obtaining distribution rights to any products distributed by such other party (or Affiliates of the other, where the other is the Minority Member) in the State of Connecticut. Notwithstanding the foregoing, the Minority Member and the Company hereby acknowledge and agree that the Minority Member's Affiliates and the Company are competitors in the same industry, that they have many common suppliers, that they are perpetually in discussions with suppliers in the industry and that suppliers may from time to time desire to move product lines from one party to the other party or its Affiliates or to appoint such other party or its Affiliates as an additional distributor of such product lines in the State of Connecticut. In the event that a supplier of either the Company on the one hand or Minority Member (or an Affiliate of Minority Member) on the other hand notifies such party (the "Initial Distributor") of its desire to move product lines (the "Dual Products") from the Initial Distributor to other party (the "Dual Distributor") or such supplier's intent to appoint the Dual Distributor as an additional distributor for the Dual Products in the State of Connecticut, and the Dual Distributor desires to accept the same:

8.6.1. If the Initial Distributor, in its sole and absolute discretion, decides to transfer and does transfer all of the Initial Distributor's rights to distribute the Dual Products to the Dual Distributor within thirty (30) days following receipt of notice from the supplier of the supplier's desire to move such Dual products to the Dual Distributor or the appointment of the Dual Distributor as an additional distributor of the Dual Products (the "Notice Date"), as applicable, and the Dual Distributor accepts the same, then the Dual Distributor shall pay to the Initial Distributor a payment equal to two and one-half (2½) times "Gross Profits" that the Initial Distributor achieved from the Dual Products during the twelve (12) month period immediately preceding the Notice Date (or such shorter period as Gross Profits in respect of the Dual Products have actually been accrued by the Initial Distributor) and shall purchase the Initial Distributor's entire inventory of the Dual Products for the "Laid-in Costs" therefor.

8.6.2. If the Initial Distributor, in its sole and absolute discretion, retains its rights to distribute the Dual Products but waives the six (6) month delay in the effectiveness of the appointment of the Dual Distributor as an additional distributor of the Dual Products provided in Section 30-17 of the Connecticut Liquor Control Act, as same may be amended, within thirty (30) days following the Notice Date, then the Dual Distributor shall pay to the Initial Distributor a payment equal to one (1) times "Gross Profits" that the Initial Distributor achieved from the

24

**Exhibit E**

Dual Products during the twelve (12) month period immediately preceding the Notice Date (or such shorter period as Gross Profits in respect of the Dual Products have actually been accrued by the Initial Distributor).

8.6.3.  If the Initial Distributor, in its sole and absolute discretion, retains its rights to distribute the Dual Products and does not waive the six (6) month delay in the effectiveness of the Dual Distributor as an additional distributor of the Dual Products provided in Section 30-17 of the Connecticut Liquor Control Act, as same may be amended, within thirty (30) days following the Notice Date, then the Dual Distributor shall pay to the Initial Distributor a payment equal to one-half (½) times "Gross Profits" that the Initial Distributor achieved from the Dual Products during the twelve (12) month period immediately preceding the Notice Date (or such shorter period as Gross Profits in respect of the Dual Products have actually been accrued by the Initial Distributor).

8.6.4.  All payments to be made to the Initial Distributor under this Section 8.6 shall be paid within fifteen (15) days following the date that the Dual Distributor first may physically distribute the Dual Products in the State of Connecticut by wire transfer of immediately available funds to the account or accounts in the United States designated in writing by the Initial Distributor.  The proceeds of all payments made to the Company pursuant to this Section 8.6 shall either (a) be retained by the Company to fund ongoing business operations or (b) be used to make a Distribution to the Members in accordance with each Member's Percentage Interest.

8.6.5.  For purposes of this Section 8.6, the term "Gross Profits" with respect to any product or products, for any period, calculated on an accrual basis an amount equal to the aggregate revenue (less all applicable quantity discounts and cash discounts) directly attributed to the sale of such products, less the sum of all "Laid-in Costs" associated with such products.

8.6.6.  For purposes of this Section 8.6, the term "Laid-in Costs" means with respect to any product the sum of (i) all product costs, (ii) all inward-bound freight costs and (iii) all taxes and duties.

## SECTION 9
## DISSOLUTION

9.1.  **Events of Dissolution.**  The Company shall be dissolved upon the first to occur of the following events:

    (a)    the written consent of the Members;

    (b)    the disposition of all or substantially all of the assets of the Company; or

    (c)    the entry of a decree of judicial dissolution under Section 18-802 of the Act.

9.2.  **Winding Up of the Company.**  Upon dissolution of the Company, the Company's business shall be wound up and all its assets distributed in liquidation; provided, however, that the Members acknowledge and agree that, in the event of a dissolution of the Company, the business of the Company shall be operated in the normal course of events during

25

EB-00022895