## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DANIEL KLEEBERG, LISA STEIN, and
AUDREY HAYS,

               Plaintiffs,

     v.

LESTER EBER; ALEXBAY, LLC f/k/a
LESTER EBER, LLC; ESTATE OF
ELLIOTT W. GUMAER, JR.; and
WENDY EBER,

               Defendants,

     and

EBER BROS. & CO., INC.; EBER BROS.
WINE AND LIQUOR CORP.; EBER
BROS. WINE & LIQUOR METRO, INC.;
EBER-CONNECTICUT, LLC; EBER-
RHODE ISLAND, LLC; EBER BROS.
ACQUISITION CORP.; EBER-METRO,
LLC; SLOCUM & SONS OF MAINE,
INC.; and CANANDAIGUA NATIONAL
BANK & TRUST COMPANY,

               Nominal Defendants.

Civil Action No.  16-CV-9517 (LAK)(KAP)

---

## EXPERT REPORT OF GLENN LIEBMAN

---

Submitted July 26, 2019



PLAINTIFF'S
EXHIBIT

**127**

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................................ 1

II.     QUALIFICATIONS ............................................................................................ 2

III.    STANDARD OF VALUE ................................................................................... 2

IV.     SUMMARY OF THE TORCHIO REPORT'S CONCLUSIONS ............................ 3

        TORCHIO'S VALUE OF EBER-CT AS OF MAY 23, 2012 .................................................. 3

V.      KLG REVIEW AND CRITIQUE OF THE TORCHIO ESTIMATES
        OF EBER-CT ENTERPRISE VALUE AND EQUITY VALUE .............................. 4

        1.      2001 Prospect Beverages ................................................................... 4

        2.      2012 Farmers Brothers Comparable ................................................. 5

        3.      Sale of 6% of Eber-CT Equity to Polebridge Bowman ..................... 6

        4.      2007 Southern Wine & Spirits Offer for 15% of Eber-CT ............... 7

        5.      2008 Sale of 15% of Eber-CT Equity to Eder-Goodman .................. 9

VI.     KLG'S VALUATION OF EBER-CT AS OF JUNE 5, 2012 .................................. 13

VII.    VALUE OF EBER METRO'S INTEREST IN EBER-CT AS OF
        JUNE 31, 2012 ................................................................................................ 14

VIII.   CRITIQUE OF THE TORCHIO REPORT'S VALUATION OF EBER
        METRO AS OF MAY 23, 2012 ......................................................................... 14

        ANALYSIS OF EBER METRO LIABILITIES AS OF MAY 23, 2012 .................................... 15

        CONCLUSIONS ABOUT THE TORCHIO REPORT'S ANALYSIS OF
        LIABILITIES ................................................................................................................... 17

IX.     THE VALUE OF EBER METRO TO EBER BROS. AS OF JUNE 5,
        2012 ................................................................................................................ 18

X.      KLG'S VALUATION OF EBER-CT AS OF MAY 31, 2018 ................................ 19

XI.     THE ECONOMIC RATIONALITY OF THE EBER BROS.
        BOARD'S DECISION TO CONSENT TO THE ALEXBAY
        TRANSFER ...................................................................................................... 20

## I.   **INTRODUCTION**

I am a business appraiser and forensic accountant with over 23 years of experience in valuing privately held businesses of all sizes.  Most of my experience is in the area of business valuation in litigated matters, primarily shareholder and partnership disputes and matrimonial matters.  I have been asked in the shareholder dispute matter of *Daniel Kleeberg, et al. v. Lester Eber, et al.* to review and critique the June 28, 2019 valuation report prepared by Frank Torchio ("Torchio" or the "Torchio Report") and to provide my opinion of the Market Value of the Equity of Eber-Connecticut, LLC ("Eber-CT") and Eber Bros. Wine & Liquor Metro, Inc. ("Eber Metro") as of June 5, 2012[1] (the date that Lester Eber transferred the assets of Eber Metro and Eber-CT to Alexbay, LLC, ("Alexbay"), an entity wholly owned by Lester Eber).

Additionally, I have provided my opinion of the value of Eber-CT as of May 31, 2018 (the date nearest to the current date for which financial information was provided) and I have also evaluated the economic rationality of the decision by Eber Bros Wine & Liquor Corp.'s board to consent to the transfer of Eber Metro to Alexbay.

I have not at this time been asked to provide my opinion on the valuation method that was used for Eber-CT and Eber Metro in 2012 in connection with the transfer of Eber Metro to Alexbay. Specifically, the method used was to use the unadjusted valuation based on a prior transaction and then subtract net income losses since the date of the transaction. Based on Torchio's report, it does not appear that the Defendants intend to defend that valuation method, let alone rely on it. If that changes, I shall respond at that time.

To the extent permitted by the Court, I intend to offer my expert testimony on this and any related issues as reflected in my opinions contained in this report.

I have relied upon the information listed in Exhibit 1, attached hereto.  Should additional information become available, we reserve the right to amend this report and the conclusions presented herein.

This Report is subject to the Statement of Limiting Conditions attached hereto.  In addition, this Report has been prepared for use only in connection with this particular matter, and is not to be disseminated to any other parties, or used for any other purpose without the express written consent of KLG.

---

[1] Note that financial information was utilized through May 31, 2012, which is the fiscal year end of Eber Metro and Eber-CT.  There are no material differences in the value of either company from May 31 to June 5, 2012

## II.   QUALIFICATIONS

I have been Member/Partner in the business valuation, forensic accounting and litigation consulting support firm of Klein Liebman & Gresen, LLC since 1997.  I am a Certified Public Accountant (CPA) licensed in New York State and hold an Accredited in Business Valuation (ABV) Designation issued by the American Institute of Certified Public Accountants.  With over 23 years of experience, I have assisted hundreds of closely held companies, attorneys, accountants and financial professionals with valuation and forensic accounting issues relating to equitable distribution, estate and gift tax planning, business planning, the acquisition and sale of businesses, and shareholder disputes.  During the course of my career I have worked on over 1,500 matters and have been Court appointed as a neutral financial expert in hundreds of matters.  I have provided expert witness testimony on 46 occasions in the New York State Supreme Court in Nassau, Suffolk, New York, Queens, Westchester, and Kings Counties, as well as the Superior Court in Fairfield County, CT, on issues concerning business valuation and forensic accounting.  I have been a frequent speaker, lecturing over 50 times in my career on the topic of business valuation, forensic accounting and litigation support and have presented to the Bar Associations of Manhattan, Nassau, Suffolk, Queens, Westchester, and Stamford, CT, as well as various accounting organizations and law firms.  I have been a guest lecturer at Fordham Law School, New York Law School and St. John's University Law School.

The fee paid to Klein Liebman & Gresen, LLC for the analyses and valuation summarized herein is not contingent on the values or other opinions set forth in this report, nor is it contingent in any way on the outcome of the litigation.  My hourly rate is $450.  David Gralnick, CPA/ABV, Member of KLG, and Louis Panariello CPA/ABV, Senior Associate of KLG, assisted me in preparing this report.

## III.   STANDARD OF VALUE

Generally, Fair Value is the standard of value applicable in cases such as this, where there is a shareholder dispute.

The definition of Fair Value varies from state to state and is generally based on legal precedents applicable in each state.  In New York State, Fair Value is the same as Fair Market Value *except* that there is no discount for a minority/lack of control of a shareholder's interest.[2]  The definition of Fair Market Value is provided below.

*Definition of Fair Market Value*

Fair Market Value is defined as the amount at which property would change hands between a willing buyer and a willing seller, each having reasonable knowledge of relevant facts and neither being under any compulsion to buy or sell.  This concept of

---

[2] See S. Pratt, Business Valuation Discounts and Premiums, p. 353 (2d Ed., John Wiley & Sons, Inc., 2009) ("[G]enerally New York courts have accepted a discount for lack of marketability in oppression cases, but not a discount for lack of control.").

value is supported by definitions set forth by the Internal Revenue Service, specifically in Revenue Ruling 59-60.

## IV.   SUMMARY OF THE TORCHIO REPORT'S CONCLUSIONS

### TORCHIO'S VALUE OF EBER-CT AS OF MAY 23, 2012

The Torchio Report utilizes the Market Approach and provides five (5) estimates of the Enterprise Value and Market Value of the Equity of Eber-CT[3].  The Torchio Report utilizes Revenue Multiples based on two (2) transactions of the Company's stock – one in 2008 and one in 2010, one (1) offer for 15% of Company's stock in 2007, one (1) comparable market transaction in 2001, and one (1) comparison to one publicly traded company as of May 23, 2012.  The following **Table A** summarizes the calculations of the five (5) estimates of the Enterprise Value and Market Value of Equity of Eber-CT as set forth in Exhibits C-1 through C-5 and Exhibit D of the Torchio Report **(NOTE – the Torchio Report does not provide a single opinion/conclusion of the Enterprise Value or Market Value of Equity of Eber-CT as of June 5, 2012 (or around that date as the end of May 2012)**:

### TABLE A

| Comparable Used | Prospect Beverages Comparable | Southern Wine & Spirits Offer for 15% of Eber-CT | Sale of 15% Eber-CT Equity to Eder-Goodman | Sale of 6% Eber-CT Equity Polebridge Bowman | Farmers Brothers Comparable |
|---|---|---|---|---|---|
| Year Comparable Transaction Occurred | 2001 | 2007 | 2008 | 2010 | 2012 |
| | | | | | |
| Eber-CT Revenue for FYE May 31, 2012 | $36,383,755 | $36,383,755 | $36,383,755 | $36,383,755 | $36,383,755 |
| EV/Revenue Multiple | 0.23 | 0.45 | 0.46 | 0.37 | 0.25 |
| | | | | | |
| **Enterprise Value of Eber-CT** | **$8,199,319** | **$16,411,833** | **$16,901,932** | **$13,446,391** | **$9,094,096** |
| Less: Eber-CT Debt | (3,590,000) | (3,590,000) | (3,590,000) | (3,590,000) | (3,590,000) |
| Less: Eber-CT Preferred Equity | (4,500,000) | (4,500,000) | (4,500,000) | (4,500,000) | (4,500,000) |
| Add; Eber-CT Cash | $586,188 | $586,188 | $586,188 | $586,188 | $586,188 |
| | | | | | |
| **Market Value of Equity of Eber-CT** | **$695,507** | **$8,908,021** | **$9,398,120** | **$5,942,579** | **$1,590,284** |

---

[3] Enterprise value is defined as the combined values of all capitalization of a company, i.e. equity, preferred equity, debt, etc.  Market Value of Equity is calculated by taking Enterprise Value and subtracting all other capitalization including debt and preferred equity.

## V.   KLG REVIEW AND CRITIQUE OF THE TORCHIO ESTIMATES OF EBER-CT ENTERPRISE VALUE AND EQUITY VALUE

Based on our review of the Torchio valuation estimates and our own independent research and analysis, we believe that the Prospect Beverage Comparable, the Farmers Brothers Comparable and the Sale of 6% of Eber-CT Equity to Polebridge Bowman should **not** be considered in the valuation of Eber-CT as of May 23, 2012.  We do believe that the Southern Wine & Spirits Offer and the Sale of 15% of Eber-CT Equity to Eder-Goodman should be considered in the valuation of Eber-CT as of May 23, 2012 (subject to adjustments as further described herein).

Our detailed analysis and critique of the five (5) estimates of value as proffered in the Torchio Report is described in detail below. In sum, we generally agree with Torchio that the best valuation metric to apply in the case of Eber-CT is the Enterprise Value to Revenue (EV/R) ratio. We generally disagree, however, with how he calculates the inputs to use in that ratio. In three of the five estimates, Torchio relies on transactions that are clearly unreliable data points. In the other two estimates, he makes overly aggressive adjustments, as well as a significant arithmetic error, that improperly diminish his value calculations.

### 1.   2001 Prospect Beverages (page 35, paragraph 94 of the Torchio Report)

The Torchio Report indicates that it conducted a search for Comparable Company Transactions in the Capital IQ database in the Alcoholic Beverage Distribution Industry. From an eleven (11) year time frame 2001 through 2012, Torchio was only able to locate a single transaction – Capital Beverage Corporation's acquisition of Prospect Beverages, Inc. in 2001, which he considered comparable.  Torchio notes that the implied Enterprise Value/Revenue Multiple paid for Prospect was 0.283 which he adjusted downward to 0.23 based on "changes in market conditions from 2001 to 2012."  No explanation is given by Torchio as to how the adjustment was calculated.

Nonetheless, the Comparable Company Transaction Method is utilized when the appraiser can identify a statistically meaningful number of comparable transactions that occurred around the time the subject company is being valued.  "If it turns out that very few data points are available for a particular valuation multiple, that problem may lead one to abandon that multiple or to put relatively little weight on it."[4]

Utilizing a single transaction to develop a multiple to value a company eleven years after the transaction is not statistically meaningful, let alone reliable.  The exercise would be akin to a real estate appraiser valuing a home in May of 2012 based on the sale price of another home in a different neighborhood eleven years prior.  Such an exercise would not be appropriate and is completely unreliable.  Furthermore,

---

[4] S. Pratt, Valuing a Business: The Analysis and Appraisal of Closely Held Companies, p. 321 (5th Ed., McGraw-Hill, 2008).

adjusting for market conditions over an eleven (11) year period of time would be highly speculative to determine a proper multiple as of the valuation date eleven years later.

In addition, Prospect Beverages is not comparable to Eber-CT because it operated in New York City whereas Eber-CT operated in Connecticut.[5] Unlike New York, Connecticut's franchise laws create barriers to entry that protect the business.  As a result, even if we could find a transaction involving a wine and liquor wholesaler, it is doubtful it would be comparable to Eber-CT. As a December 2009 Business Plan for Eber-CT explains:

> [I]t is important to reiterate that the franchise laws in the state of Connecticut provide statutory protection and value to our business model. Specifically, **unlike New York**, suppliers in Connecticut are not permitted to terminate their relationship with Eber-CT without good cause to do so and without following a specified statutory procedure. Based on these protections, Eber-CT's suppliers must continue to sell goods to Eber-CT, ensuring an on-going business operation into the future.[6]

Likewise, Prospect Beverages appeared to focus primarily on the distribution of beer and other beverages, which are subject to entirely different regulations even in New York, such that the retail customer base is likely to be very different as well.

**Based on the above, it is our opinion that the Prospect Beverage transaction in 2001 is <u>not</u> a reliable transaction to value Eber-CT as of May 23, 2012, and therefore should <u>not</u> be considered.**

2. <u>**2012 Farmers Brothers Comparable (Page 35-36, Para. 96-98 of the Torchio Report)**</u>

The Torchio Report indicates that based on a search performed by Wendy Eber, she identified four (4) publicly traded companies to compare to Eber-CT as follows:

    (i)    Cott Corporation
    (ii)   Coca-Cola Bottling Co.
    (iii)  Farmers Brothers
    (iv)  Sysco Corporation

Notably, Torchio simply uses four companies selected by Wendy Eber as a basis to determined publicly traded comparables to Eber-CT.  Wendy Eber is not a business appraiser. None of these four companies are remotely comparable to Eber-CT.

---

[5] Capital Beverage Corp. Form 8-K/A dated June 29, 2001 p. 6 at https://sec.report/Document/0001015769-01-500228.
[6] Business Plan for Eber-CT December 2009 at GUM000060 (Pl. Ex. 65) (emphasis added).

Of the above four companies, Torchio indicates that he believes only Farmers Brothers is comparable to Eber-CT because it also had negative EBITDA for 2012. Significantly, however, Torchio fails to indicate that Farmers Brother is not in the wine and liquor wholesaling business (or even the beer business, like Prospect Beverages); rather it is a distributor of coffee, teas, and spices.[7]   Additionally, we conducted a detailed search through various sources such as Pitchbook and Yahoo Finance and determined that there are no publicly traded wine and/or liquor wholesalers to compare to Eber-CT for purposes of developing valuation multiples.

To suggest that Farmers Brothers is an appropriate comparable to Eber-CT would be analogous to comparing an automobile manufacturer such as General Motors to an airplane manufacturer such as Boeing just because they are both modes of transportation.

The difference is even greater because wine and liquor are heavily regulated products at the state and local level, while coffee, teas, and spices are subject only to minimal oversight, such as informational labeling requirements at the federal level through the FDA.  The state regulations are particularly important in Eber-CT's business because of Connecticut's franchise laws, as discussed in the preceding section.

**Based on the above, it is our opinion that Farmers Brothers is <u>not</u> a good comparable company to value Eber-CT as of May 23, 2012, and therefore should not be considered.**

3. <u>Sale of 6% of Eber-CT Equity to Polebridge Bowman (page 33-34, para. 90-92 of the Torchio Report)</u>

In May 2010, Eber Metro sold a 6% share of Eber-CT to Polebridge Bowman for $350,000.  Simultaneously, Eber Metro received a promissory note from Polebridge Bowman for $350,000 with an interest rate of 2%, secured by the 6% interest that it received in Eber-CT.  In our opinion, a 2% interest rate for an investment in a private company with negative cash flow does not make economic sense.  In fact, the Torchio Report at pages 12 through 14, paragraphs 33 through 39 goes through a lengthy discussion about Lester Eber's loans being at an interest rate of 9% and that rates on distressed debt from 2006 through 2012 were 11.46% to 14.23%.  Thus the Torchio report and its own rate of return analysis and research demonstrate that the Polebridge Bowman note and equity sale does not make any economic sense: The company received no cash consideration at a time when it was borrowing money at a significantly higher interest rate than it was charging to Polebridge. There is no rational economic reason why a company would enter into such a transaction with a third party.

---

[7] Based on review of Farmer Brothers' website at www.farmerbrothers.com.

The lack of economic sense appears to be explained by the fact that it was not an arm's length transaction.[8]   The sole owner of Polebridge Bowman was Glenn Sturm, a lawyer representing the Eber companies.  A contemporaneous memorandum from Sturm[9] shows that Sturm was not really interested in acquiring the 6% interest in Eber-CT.  It also indicates that the price for the transaction not the product of arm's length negotiation, and that it was not intended to serve any apparent economic purpose.  The transaction also appears to have been backdated to appear as if it occurred prior to the close of the Eber companies' fiscal year on May 31, 2010.[10] Therefore, it is our conclusion that the Polebridge Bowman transaction lacked legitimate economic substance.

**Accordingly, in our opinion, this transaction does not serve as a reliable indicator to value Eber Metro's controlling interest in Eber-CT and therefore should not be considered.**

As Torchio notes, the membership interest conveyed to Polebridge Bowman was encumbered by a right of first refusal.[11]  Therefore, we agree with Torchio that this impairs the ability to use the transaction to value Eber Metro's equity interest since that equity was not impaired.  But for the reasons stated above, we disagree that this transaction is capable of being used reliably through the use of adjustments because it was not an arm's length transaction and it lacked economic substance.

### 4. <u>2007 Southern Wine & Spirits Offer for 15% of Eber-CT (page 31, para 86-89 of the Torchio report)</u>

The Torchio Report indicates that in "mid-late 2007," Southern Wine & Spirits ("Southern") negotiated a proposed deal with Eber-CT, where Southern would acquire 15% of Eber-CT from Eber Metro for $3,000,000 ("Southern Offer").[12]  The Southern Offer implies a value of $20,000,000 ($3,000,000 / 15%) for the Equity of Eber-CT.  Interestingly, Southern made this offer around the fiscal year-end May 31, 2007, a year in which Eber-CT had revenue of $42.38 million and negative EBITDA of $436,516, which was worse than the negative EBITDA of $204,223 as of fiscal year-end May 31, 2012.

The 15% interest pursuant to the Southern Offer represents a minority interest in the Company.  A minority interest in a business is defined as less than 50%.  Minority interests are generally afforded little to no control of a company.  Control rights are

---

[8] Value must be calculated based on what a willing purchaser, <u>in an arm's length transaction</u>, would offer for the corporation as an operating business," meaning that non-arm's length transactions are inherently not reliable. <u>Matter of Pace Photographers (Rosen)</u>, 71 N.Y.2d 737, 748 (1988) (emphasis added) (quoting <u>Matter of Blake v. Blake Agency</u>, 107 A.D. 139, 146 (App. Div. 2d Dept. 1985)).
[9] Pl. Ex. 119 at EB-00026654.
[10] Pl. Ex. 120 at EB-00031220.
[11] Torchio Report p. 34 ¶ 92.
[12] <u>Id.</u> at 31 ¶ 86.

typically afforded to shareholders owning more than 50% of a company.  Some of control rights include the following:

    a)  Control of the day to day operations of the Company.
    b)  Control of profits, losses and distributions to shareholders.
    c)  Control of negotiating contracts with customers and suppliers.
    d)  Ability to sell or acquire assets of the Company.

Southern would have been provided none of the above control rights and privileges. Notwithstanding, Torchio does list various other rights that would have been afforded to Southern had the deal been consummated including tag-along rights, rights of first refusal, and provisions to protect against events and transactions between Eber-CT among others.  Based on these provisions, Torchio assumes that a right of first refusal can be "viewed as a minimum control premium"[13] and, based on that, believes that a 15% control premium was built into the $3 million offer by Southern.[14]  We disagree with that assumption and believe that the rights of first refusal afforded to Southern would have been more than offset by the above substantial control features that Eber Metro would have maintained with its net 85% interest had the deal gone through.

Accordingly, we have recalculated the implied Enterprise/Revenue multiple to 0.51 from 0.45 as determined by Torchio.  We have also recalculated the Market Value of the Equity of Eber-CT to $11,051,903 from $8,908,021 as determined by Torchio. Our calculations are presented in **Table B** on the following page.

---

[13] Id. at 31 ¶ 83.
[14] Id. at 32 ¶¶ 87-88.

**TABLE B**

|  | Torchio Report | KLG Recalculated |
|---|---|---|
|  |  |  |
| Total Price | $3,000,000 | $3,000,000 |
| Premium for additional rights | 450,000 | - |
| Adjusted Price | 2,550,000 | 3,000,000 |
| Percentage Ownership (%) | 15% | 15% |
| Equity | 17,000,000 | 20,000,000 |
| + Debt | 7,320,849 | 7,320,849 |
| - Cash | 1,644,197 | 1,644,197 |
| = Enterprise Value (EV) | 22,676,652 | 25,676,652 |
| Revenue (R) | 42,386,508 | 42,386,508 |
| EV/R Multiple | 0.53 | 0.61 |
| Multiple Adjustment | 0.84 | 0.84 |
| **Adjusted EV/R Multiple** | **0.45** | **0.51** |
| Revenue for Eber-CT (f/y/e 5/31/2012) | 36,383,755 | 36,383,755 |
| Implied Enterprise Value for Eber-CT | 16,411,833 | 18,555,715 |
| - Debt for Eber-CT | 3,590,000 | 3,590,000 |
| -Preferred for Eber-CT | 4,500,000 | 4,500,000 |
| + Cash for Eber-CT | 586,188 | 586,188 |
|  |  |  |
| **Market Value of Equity of Eber-CT** | **$8,908,021** | **$11,051,903** |

The Torchio Report states that "Generally, the most comparable transactions to use in the valuation of a subject company are those transactions for ownership interest in the subject company itself.  According to a widely cited author of valuation texts, past transactions for the stock of the subject company may be an excellent source of valuation multiples.").[15]  We agree with that commentary.  While not a final, consummated transaction in the equity of Eber-CT, the Southern Offer does represent a bona-fide arms-length offer that was, at least temporarily, accepted by Eber Bros., and it provides guidance into the market's perception of the value of Eber-CT.

**Based on the above, it is our opinion that the Southern Offer serves as a reliable indicator of value Eber-CT as of June 5, 2012, and therefore should be considered.**

5. **2008 Sale of 15% of Eber-CT Equity to Eder-Goodman (page 27-31, para. 74-85 of the Torchio Report)**

On January 29, 2008, Eder-Goodman (unrelated to Eber-CT) agreed to purchase a 15% interest in Eber-CT for $4,500,000 in an arms-length transaction.  Eder-Goodman was provided with the audited financial statements and was fully aware that

---

[15] Torchio Report at 24 ¶ 65 (citing S. Pratt, Valuing a Business, supra note, p.318).

Eber-CT had negative ($1.3 million) EBITDA in the prior fiscal year end May 31, 2007.  For the fiscal year ended May 31, 2008, Eber-CT had negative ($102,610) EBITDA. **For many of the same reasons as the Southern Offer, we conclude that the Eder-Goodman Transaction serves as a reliable indicator of value Eber-CT as of June 5, 2012, and therefore should be considered.**

The Torchio Report points out that Eder-Goodman obtained certain rights in connection with the acquisition of its 15% interest which include rights of first refusal on a sale of Eber-CT stock, allocation of profits first should their capital account fall below $4,500,000, drag along and tag along rights in the event of a sale of the Company and its assets, involvement in major decisions which involve transactions among members, member owned companies and affiliates.  The Torchio Report also points out that among Eder-Goodman's rights was a liquidation preference which calls for them to receive their $4,500,000 investment back on a sale of the Company prior to the other equity shareholders receiving their proportionate share of the sale proceeds.

Torchio assumes that the aforementioned rights obtained by Eder-Goodman in connection with its purchase of 15% of Eber-CT are more attractive than the rights of Eber Metro which held an **85% controlling interest** in Eber-CT after the transaction, and assumes that Eder-Goodman's purchase price included a 25% premium for its liquidation preference and a 15% premium for its right of first refusal[16], for a total premium of 40%.

We disagree with these assertions as the Torchio Report fails to consider that offsetting Eder-Goodman's rights are the substantial and significant rights and privileges of Eber Metro's 85% controlling interest as follows:

- Lester Eber is the Chief Executive Officer (CEO) of Eber-CT and is "responsible for the general and active management of the Business of the Company and shall see that all orders and resolutions of the Board are carried into effect.   The Chief Executive Officer shall have ***sole responsibility for managing all day-to-day operations of the Company***." (para. 5.2.3 of the Amended and Restated Limited Liability Company Agreement of Eber-Connecticut, LLC) (emphasis added).

- Lester Eber as CEO will be "responsible for managing all supplier relationships and activities." (para 5.2.3 of the Amended and Restated Limited Liability Company Agreement of Eber-Connecticut, LLC).

- Lester Eber as CEO or any other Officer authorized by CEO "shall execute all bonds, mortgages, and other contracts." (para 5.2.3 of the Amended and Restated Limited Liability Company Agreement of Eber-Connecticut, LLC).

---

[16] Torchio asserts that the 15% premium for right of first refusal is based on historical control premiums that he asserts are 30% and that he selects a "smaller 15% figure" for rights of first refusal only.

- "The business, property and affairs of the Company shall be managed by or under the direct of a Board of Managers comprised of seven (7) individuals as follows;

     1. Lester Eber
     2. David Eber [son of Lester Eber]
     3. Wendy Eber [daughter of Lester Eber]
     4. Thomas Slocum [former owner of Slocum & Sons]
     5. George E.B. Slocum [former owner of Slocum & Sons]
     6. Carl Krause [Eder-Goodman appointee]
     7. Elliot W. Gumaer, Jr. [Trustee of the Alan Eber Trust and Lester's attorney]

   Note that of the seven (7) board managers, three (3) are Eber family members and a fourth is a trustee of an Eber family member trust, which allows the Eber family under the direction of Lester Eber to control the Board and thus all major business affairs of the Company. Eder-Goodman with only one Board member has minimal say in the day-to-day operations of the Company and can be outvoted by the Eber family.

We believe that the Torchio calculation of the Adjusted Price is incorrect. In assuming a 25% premium for liquidation preference and another 15% premium for right of first refusal (40% total premium), Torchio incorrectly takes a 40% discount on the $4,500,000 to arrive at an Adjust Price of $2,700,000, thereby incorporating a 66% premium. Had Torchio applied the 40% premium correctly, the Adjusted Price should have been $3,214,286 (calculated $4,500,000 / 1.40).

As such Eber Metro had a controlling 85% interest in Eber-CT after the Eder-Goodman stock purchase. Furthermore, the Defined Terms section of the Amended and Restated Limited Liability Company Agreement of Eber-Connecticut, LLC at page 5 specifically refers to Eder-Goodman as the Minority Member. Controlling interests with their significant rights relative to Minority interests, carry a premium. Research from Mergerstat Review 2013 (data through 2012), indicates that control premiums during the period 2008 through 2012, across all industries, averaged between 46% and 59%, and a median between 35% and 40%. Accordingly, we believe that the liquidation rights and privileges obtained by Eder-Goodman in its acquisition of 15% of Eber-CT stock are more than offset by other rights and privileges that they did not have, which were afforded to Eber Metro as controlling majority member. In fact, it is our opinion that Eber Metro's control of Eber-CT day to day operations and the Board of Managers implies an additional control premium to Eber Metro's interest.[17] Notwithstanding, we have not applied a control premium in an effort to take a conservative approach.

---

[17] An additional control premium would be particularly appropriate for use in valuing a potential sale of Eber Metro itself, because such a sale does not appear to be restricted by the rights granted to Eder-Goodman. For the same reason, we believe that Torchio over-valued Eder-Goodman's right of first refusal:

Accordingly, we have recalculated the implied Enterprise/Revenue multiple to 0.62 from 0.46 as determined by Torchio.  We have also recalculated the Market Value of the Equity of Eber-CT to $15,054,116 from $9,398,120 as determined by Torchio. Our calculations are presented in **Table C** below.

**TABLE C**

|  | **Torchio Report** | **KLG Recalculated** |
|---|---|---|
| Total Price | $4,500,000 | $4,500,000 |
| Premium for additional rights | 1,800,000 | 675,000 |
| Adjusted Price | 2,700,000 | 3,825,000 |
| Percentage Ownership (%) | 15% | 15% |
| Equity | 18,000,000 | 25,500,000 |
| + Debt | 10,870,421 | 10,870,421 |
| - Cash | 6,144,197 | 6,144,197 |
| = Enterprise Value (EV) | 22,726,224 | 30,226,224 |
| Revenue (R) | 43,244,059 | 43,244,059 |
| EV/R Multiple | 0.53 | 0.70 |
| Multiple Adjustment | 0.88 | 0.88 |
| **Adjusted EV/R Multiple** | **0.46** | **0.62** |
| Revenue for Eber-CT (f/y/e 5/31/2012) | 36,383,755 | 36,383,755 |
| Implied Enterprise Value for Eber-CT | 16,901,932 | 22,557,928 |
| - Debt for Eber-CT | 3,590,000 | 3,590,000 |
| -Preferred for Eber-CT | 4,500,000 | 4,500,000 |
| + Cash for Eber-CT | 586,188 | 586,188 |
|  |  |  |
| **Market Value of Equity of Eber-CT** | **$9,398,120 (a)** | **$15,054,116 (b)** |

(a)  Had Torchio properly applied the 40% control premium correctly as discussed herein on page 8, the Adjusted Price should be $3,214,286, and the resulting Torchio conclusion of EV/R Multiple should be 0.53 and its conclusion of Market Value of Equity of Eber-CT should be $11,779,578.

(b)  Had we applied a conservative control premium of 15% for the controlling rights and privileges of Eber Metro, the valuation of Eber-CT as of June 5, 2012, would be $17,312,233.

---

It was capable of being circumvented by selling Eber Metro itself rather than Eber Metro's membership units in Eber-CT.

## VI.   KLG'S VALUATION OF EBER-CT AS OF JUNE 5, 2012

As previously discussed, it is our opinion that the 2001 Prospect Beverages transaction, the use of Farmers Brothers as a comparable company, and the 2010 Polebridge Bowman transaction are **not** reliable indicators of the value of Eber-CT.  We do believe that the 2007 Southern Offer and the 2008 Eder-Goodman transaction are reliable measures of the value of Eber-CT. The following is a summary of our recalculated EV/R Multiples based on the three indicators of value and the EBITDA as of each date, which are important to consider in the selection of an EV/R Multiple as of June 5, 2012:

| Indicator of Value | Fiscal Year-End May 31 | EBITDA | Implied EV/R Multiple |
|---|---|---|---|
| | | | |
| Southern Offer | 2007 | ($436,516) | 0.51 |
| Eder-Goodman Transaction | 2008 | ($31,058) | 0.62 |

As of fiscal year end May 31, 2012, Eber-CT's EBITDA was ($204,223).  Based on the two indicators of value and the relationship between EBITDA and the EV/R Multiple, it is our opinion that as of June 5, 2012, a conservative EV/R valuation multiple is 0.55. Noteworthy is that despite having negative EBITDA for the fiscal year ended May 31, 2012, the Company's EBITDA had improved every year from 2009 through 2012 and was trending positively.[18]

Accordingly, we conclude with reasonable certainty that the fair market value of Eber-CT as of June 5, 2012 was $12,500,000, calculated as follows:

| | |
|---|---|
| Revenue for Eber-CT (f/y/e 5/31/2012) | $36,383,755 |
| **EV/R Multiple** | **.55** |
| Implied Enterprise Value for Eber-CT | 20,011,065 |
| - Debt for Eber-CT | 3,590,000 |
| -Preferred for Eber-CT | 4,500,000 |
| + Cash for Eber-CT | 586,188 |
| | |
| **Market Value of Equity of Eber-CT (Rd.)** | **$12,500,000** |

---

[18] As Torchio correctly notes (at page 19 note 31), an EV/R valuation can be based on forward projections of revenue rather than historical results, and in our view doing so is particularly appropriate when the company's revenue has been on upward trend, indicating successful efforts to redirect the business. Such projections were not produced to us, but it is also noteworthy that, beginning in the fiscal year ended May 31, 2013, EBITDA continued to trend upward each year through fiscal year May 31, 2018 (last year of financial statements provided to us).

## VII.   VALUE OF EBER METRO'S INTEREST IN EBER-CT AS OF JUNE 31, 2012

The Torchio Report opines at page 37, footnote 78 that Eber Metro's effective interest in Eber-CT is 93% because Eder-Goodman's 15% preferred interest at $4,500,000 was included in the overall value, Eber Metro owns 79% of the remaining 85% (with Polebridge Bowman owning the other 6% of 85%).  79% of 85% is an effective 93% interest (79%/85%).  Assuming that the Polebridge Bowman transaction is considered legitimate, we agree with that determination.

Because the Polebridge Bowman transaction lacks economic substance, we understand that the Plaintiffs have asked the Court to set aside or unwind the transaction.[19] If that occurs, then Eber Metro would effectively own a 100% interest in Eber-CT after deducting Eder-Goodman's 15% preferred interest.

**Accordingly, we conclude with reasonable certainty that the fair market value of Eber Metro's interest in Eber-CT as of June 5, 2012 was $11,625,000 ($12,500,000 x 93%), unless the Polebridge Bowman transaction is unwound, in which case it was $12,500,000.**

## VIII.   CRITIQUE OF THE TORCHIO REPORT'S VALUATION OF EBER METRO AS OF MAY 23, 2012

The Torchio Report Exhibit D presents a chart setting forth five (5) amounts representing its calculations of the Market Value of Eber Metro's interest in Eber-CT ranging from $646,413 to $8,734,723 (again, the Torchio Report does not provide an opinion as to a single amount for the Market Value of Eber Metro's interest in Eber-CT).

The Torchio Report  also asserts that Eber Metro's liabilities at May 23, 2012, were $11,138,680, and that its other assets apart from its interest in Eber-CT totaled $360,728.[20]  Torchio ultimately concludes that Eber Metro was insolvent and had zero equity value based on his assertion that Eber Metro's liabilities (i.e. $11,138,680) exceeded all five (5) calculations of the Market Value of its interest in Eber-CT plus its other assets of $360,728..[21]

We disagree with Torchio's determination of Eber Metro's liabilities and the resulting value of its equity as of May 23, 2012, as discussed further below.

---

[19] Third Amended Complaint ¶¶ 232–250.
[20] Torchio Report at p. 12 ¶ 32 and Ex. D.
[21] Id. at p. 38 ¶ 105.

**ANALYSIS OF EBER METRO LIABILITIES AS OF MAY 23, 2012**

The Torchio Report at page 12, presents a chart listing seven (7) liabilities, five of which that it attributes to Eber Metro which total $11,138,680.  Our analysis of each of the five is discussed as follows:

1. Lester Eber's Loan and Line of Credit

   Lester Eber's loan to Eber Metro amounted to $3,060,711 as of the May 31, 2012 fiscal year end tax return for Eber Metro.  We agree with this amount of debt on the books of Eber Metro.[22]

2. Interest on Lester Eber's Loan and Line of Credit

   The Torchio Report asserts that the Interest Due but not paid to Lester Eber by Eber Metro on his loan was $837,655 based on interest calculations presented in Bates documents EB-00026433-34.  We agree with the amount of interest owed to Lester Eber on his loan balance.

3. Pension Plan Termination

   The Torchio Report asserts that Eber Metro has a pension plan debt in the amount of $5,063,388, which it bases solely on Bates documents EB-00035551-52.  This document that Torchio solely relies upon is a letter dated December 19, 2018 from Benefits Management, Inc. to Wendy Eber in response to her request to provide the pension plan termination liability for Eber Bros. Wine & Liquor Corp. Retirement Plan as of June 1, 2012.  We do **not** believe that this is liability of Eber Metro for the following reasons:

   a) The December 19, 2018 letter from Benefits Management Inc. to Wendy Eber does not mention Eber Metro at all as being liable for Eber Bros. Wine & Liquor Corp.'s pension plan termination liability.

   b) Eber Metro, as a subsidiary of Eber Bros. Wine and Liquor Corp. is not responsible for Eber Bros. Wine and Liquor Corp's liabilities.  In terms of entity layered ownership from an economic and business valuation standpoint, assets and liabilities of subsidiaries become assets and liabilities of the parent. Conversely, assets and liabilities of the parent do not become assets and liabilities of the subsidiary.

---

[22] We express no opinion on the accuracy of Eber Metro's books or the legal validity of the 2011 assumption of debt by Eber Metro. To the best of our knowledge, no records have been produced indicating that the 2006 loan was actually paid by Lester Eber. Instead, for purposes of this report, we assume the debt to be valid and accurately stated.

c) Based on our review of the tax returns and financial statements of Eber-CT, Eber Metro and Eber Metro and Eber Bros. Wine and Liquor Corp., there is NO pension plan termination liability on any of the three companies' balance sheets.

d) Eber Bros. Wine & Liquor Corp.'s pension plan termination liability is a contingent liability. This means that it was hypothetical, subject to change and not actually due as of June 1, 2012. As a general rule, contingent liabilities and assets are not considered in valuation as a direct reduction (for liabilities) or addition (for assets) to value because of the lack of their precise identifiable nature. Furthermore, with respect to pension plans liabilities they are subject to change – perhaps dramatically – based on investment and stock market performance. For example, a pension plan termination plan liability that is not being terminated on a certain date and therefore contingent, may reduce dramatically or even be eliminated in a period of rising stock market performance.

**Based on the foregoing, we believe that the Eber Bros. Wine and Liquor Corp. pension plan termination liability was not a liability of Eber Metro as of June 5, 2012.**

4. <u>Teamsters</u>

The Torchio Report on the chart on page 12 refers to a Teamsters liability as follows: "In January 2008, the Teamsters determined that there was an employer withdrawal liability under the ERISA Act. The figure here represents the amount in a Confession of Judgement."[23]

The lawsuit stems from the New York State Teamsters Conference Pension and Retirement Fund v. Eber Bros. Wine and Liquor Corp. The defendant who confesses judgement is Eber Bros. Wine and Liquor Corp. and **not** Eber Metro or Eber-CT. The Confession of Judgement does not reference anywhere Eber Metro or Eber-CT. As such it is Eber Bros. Wine and Liquor Corp.'s sole responsibility. As previously discussed, in terms of entity layered ownership from an economic and business valuation standpoint, assets and liabilities of subsidiaries become assets and liabilities of the parent. Conversely, assets and liabilities of the parent do not become assets and liabilities of the subsidiary.

**Based on the foregoing, we believe that the Eber Bros. Wine and Liquor Corp. liability to the Teamsters was <u>not</u> a liability of Eber Metro.**

5. <u>Harris Beach</u>

The Torchio Report on the chart on page 12 refers to a Harris Beach Liability as follows: "Eber entities were sued by Harris Beach PLLC in September 2011 to collect

---

[23] EB00030896-899 (signed by Wendy Eber).

legal fees for services rendered by Harris Beach on behalf of the Eber-related entities." To support this, the Torchio report references a single page from a 34-page Decision and Order in the action *Harris Beach PLLC v. Eber Bros. Wine & Liquor Corp.*[24]

We disagree with Torchio's conclusion that this is a liability of Eber Metro. Torchio's characterization in his chart on page 12 of his report that references the "Eber entities" with respect to the Harris Beach lawsuit is misleading and false. The only defendant named in the lawsuit and referenced in the 34-page decision is Eber Bros. Wine & Liquor Corp. There are no other Eber entities (including Eber Metro or Eber-CT) referenced in the 34-page decision so it is perplexing as to why Torchio indicates that the "Eber entities were sued by Harris Beach" and factually incorrect. Rather Eber Brothers Wine & Liquor Corp. is the only Eber entity that was sued by Harris Beach.[25]

Furthermore, page 2 of the Decision and Order provides background information regarding the lawsuit noting that the Defendant (Eber Brothers Wine & Liquor Corp.) was represented by Plaintiff (Harris Beach) with regard to a lawsuit in which Eber Brother Wine & Liquor Corp. was sued by Wolf Concept in regard to a dispute stemming from a 2004 vodka distribution agreement. The Decision and Order is very clear that Wolf's dispute was with Eber Brothers Wine & Liquor Corp. solely and no other Eber entities.

**Based on the foregoing, we believe that the Eber Bros. Wine and Liquor Corp. liability to the Harris Beach is <u>not</u> a liability of Eber Metro.**

## CONCLUSIONS ABOUT THE TORCHIO REPORT'S ANALYSIS OF LIABILITIES

Based on our analysis above, we disagree with the treatment of Torchio's characterization that $11,138,680 of liabilities that are solely Eber Bros. Wine & Liquor Corp. are attributable to its subsidiary entity Eber Metro. It is our opinion that the liabilities of Eber Bros. Wine & Liquor are not Eber Metro's liabilities and should not be considered in the valuation of Eber-Bros.

In terms of entity layered ownership from an economic and business valuation standpoint, assets and liabilities of subsidiaries become assets and liabilities of the parent. Conversely, assets and liabilities of the parent do not become assets and liabilities of the subsidiary. According to a publication from Case Western Reserve University Law School Law Review entitled *Guaranty of and Security for the Debt of a Parent Corporation by a Subsidiary Corporation*:

---

[24] EB00023749.
[25] We understand that Harris Beach later sued other entities, including Eber Metro, based on a fraudulent conveyance theory that bears several similarities to the claims asserted by the Plaintiffs here. We do not consider that subsequent lawsuit to be relevant to the valuation of Eber Metro as of June 5, 2012.

Parent's liabilities with respect to the business owned and operated by Subsidiary are limited in the sense that Subsidiary's creditors have no legal right under normal circumstances to look to Parent's assets for satisfaction of their claims.   The law recognizes separate identities for Parent and Subsidiary, each responsible only for its own dets even though both are part of a single business enterprise and form an economic unit with a single group of beneficial owners.   This recognition of separate legal identities also means that Subsidiary's liability is limited with respect to Parent. [26]

## IX.    THE VALUE OF EBER METRO TO EBER BROS. AS OF JUNE 5, 2012

Based on our analysis, as of June 5, 2012, the reasonably certain value of Eber Metro to Eber Bros. Wine and Liquor Corp. was $8,110,539, calculated as follows:

| **Assets** | |
|---|---:|
| Cash (1) | $10,728 |
| Net Accounts Receivable (1) | 64,018 |
| Note Receivable from Polebridge Bowman (1) | 350,000 |
| 93% Interest in Eber-CT | $11,625,000 |
| Total Assets | $12,049,746 |
| | |
| Liabilities | |
| Accounts Payable (1) | $2,181 |
| Accrued Expenses (1) | 38,660 |
| Lester Eber Loan | $3,060,711 |
| Interest on Lester Eber Loan | 837,655 |
| Total Liabilities | $3,939,207 |
| | |
| **Net Equity Value** | **$8,110,539** |

(1)  As reported on Eber Metro's tax return for the fiscal year ended May 31, 2012. (EB-00019101).

---

[26] William H. Coquillette, *Guaranty of and Security for the Debt of a Parent Corporation by a Subsidiary Corporation*, 30 Case W. Res. L. Rev. 433 (1980).

## X.   KLG'S VALUATION OF EBER-CT AS OF MAY 31, 2018

In preparing our valuation of Eber-CT as of the current date, we have utilized financial information through May 31, 2018 (the date of the most recent provided financial information).

We previously presented the following summary chart of EV/R Multiples based on the two indicators of value and the EBITDA as of each date for our valuation of the Company as of May 23, 2012:

| Indicator of Value | Fiscal Year-End May 31 | EBITDA | Implied EV/R Multiple |
|---|---|---|---|
| | | | |
| Southern Offer | 2007 | ($436,516) | 0.51 |
| Eder-Goodman Transaction | 2008 | ($31,058) | 0.62 |

As shown in the chart above, Eber-CT had negative EBITDA as of the date of each indication of value.  According to Eber-CT's audited financial statements for the fiscal year ended May 31, 2018, the Company had revenue of $45,959,602 and EBITDA of $753,466 (EBIT of $458,516 plus depreciation and amortization of $294,950), which is significantly higher than in 2007 and 2008.

Although this analysis provides substantiation and validation to utilize an EV/R multiple much greater than .62 times, we have conservatively utilized .65 times revenue to value Eber-CT as of May 31, 2018.

Accordingly, it is our opinion that the Market Value of the Equity of Eber-CT as of May 31, 2018 was $20,419,000 calculated as follows:

| | |
|---|---|
| Revenue for Eber-CT (f/y/e 5/31/2018) | $45,959,602 |
| **EV/R Multiple** | **.65** |
| Implied Enterprise Value for Eber-CT | 29,873,741 |
| - Debt for Eber-CT | 4,956,726 |
| -Preferred for Eber-CT | 4,500,000 |
| + Cash for Eber-CT | 1,872 |
| | |
| **Market Value of Equity of Eber-CT (Rd.)** | **$20,419,000** |

**XI.**   **THE ECONOMIC RATIONALITY OF THE EBER BROS. BOARD'S DECISION TO CONSENT TO THE ALEXBAY TRANSFER**

We understand that on June 5, 2012 Eber Metro was transferred to Alexbay (an entity wholly owned by Lester Eber) based on Eber Bros. Wine and Liquor Corp.'s board's consent to the transfer in satisfaction of the debt owed by Eber Metro to Lester Eber. It is my opinion that there was no reasonable or justifiable economic rationale to permit Alexbay to take Eber Metro because, in short, it ensured the death of the company.

The board/directors of Eber Bros. Wine & Liquor Corp. as of January 2012 were Lester Eber, Wendy Eber (Lester's daughter) and Elliott "Mike" Gumaer (Lester's attorney).   The board was clearly controlled by Lester Eber who determined all final decisions.

The only material liability that Eber Metro had as of May 31, 2012 was its debt to Lester Eber which amounted to approximately $3.9 million including interest.   Eber Metro's most significant asset (i.e. its 79% interest in Eber-CT) was not valued at the time by a qualified, experienced business appraiser.   Had a formal valuation been conducted, it is our opinion that its interest in Eber-CT was at least $11.6 million as of May 31, 2012. Eber Metro also had a receivable due from Polebridge Bowman in the amount of $350,000 and cash and accounts receivable of $75,000.   Accordingly, Eber Metro's assets exceeded its liabilities by at least $8.1 million.   **There is no economic justification that an entire company would be transferred to a creditor when its assets exceeded its liabilities (including the liability to the creditor) by over $8.1 million.**

Importantly, the lack of economic justification is apparent even if the net value was significantly lower, or even negative at the time. That is because Eber Metro reflected Eber Bros. Wine and Liquor Corp.'s sole operating asset. As long as a company remains a going concern, it has the potential for positive value. This could happen in any number of ways. Even if it were insolvent, it could potentially restructure through bankruptcy proceedings and emerge capable of generating positive shareholder value. But the potential for future value is particularly apparent when a company's financial results have been steadily improving.

The transfer of Eber Metro (along with its main asset Eber-CT) to Alexbay immediately after the fiscal year ended May 31, 2012 looks very suspicious.   The Company had been trending positively toward profitability over the prior four years, which Lester Eber as CEO of Eber-CT was fully aware of.   In fact, in the very first year after the transfer (i.e. fiscal year ended May 31, 2013) Eber-CT achieved positive EBITDA of $391,968.   Ultimately over the six fiscal years following the transfer (fiscal year ended May 31, 2013 through 2018), Eber-CT achieved total EBITDA of $$4,188,187.   **This is all indication that this was a planned transfer by Lester Eber at an opportune time for himself and has solely reaped the economic benefits post-transfer, while the Plaintiff former beneficial shareholders of Eber Metro have received nothing.**

If Lester believed that the entire structure of the Eber entities (i.e., Eber Bros. Wine and Liquor, Eber Metro, and Eber-CT) was completely insolvent (as determined by his expert Frank Torchio), why would he unilaterally assume the purported $11 + million in debts that were supposedly the responsibility of Eber Metro according to Torchio that as of June 5, 2012 would become solely his through Alexbay?  There is no reasonable economic rationale for that.

The only shareholder of Eber Metro that benefited from the transfer of Eber Metro to Alexbay was Lester Eber, who was also its sole creditor.  The remaining of shareholders suffered from the transfer in that their collective two-third's interest in Eber Metro (approximately $5.4 million (two-thirds of $8.1 million) as of June 5, 2012) was effectively stripped from them and conveyed to Lester Eber by his and the board's decision to transfer Eber Metro to Alexbay.

Respectfully submitted,

KLEIN LIEBMAN & GRESEN, LLC

GLENN LIEBMAN, CPA/ABV

- 21 -

# EXHIBIT 1

**Exhibit 1**
**Materials Considered**

**Court Filings**

The Complaint filed in the Southern District of New York on December 9, 2016.

The Third Amended Complaint filed in the Southern District of New York on June 14, 2019.

The Answer to Third Amended Complaint filed in the Southern District of New York on June 24, 2019.

Order of Hon. Matthew A. Rosenbaum, J.S. C. in Alexbay, LLC v. Eber Bros. Wine & Liquor Corp., et al. (Sup. Ct., Monroe County, Index No. 2012-1919) dated May 23, 2012.

**Documents Received in Discovery**

Bates No. CNB000030, Minutes from meeting of the officers of the Trust of Allen Eber August  18, 2011.

Bates Nos. EB-00001363, Line of Credit.

Bates Nos. EB-00016856-68, Sale of Eber-CT to Eder-Goodman.

Bates Nos. EB-00017819-68, Valuation in response to an inquiry from the Pension Benefit Guaranty Corporation.

Bates Nos. EB-00017871-3, Line of Credit.

Bates Nos. EB-00017906-16, Guaranty.

Bates Nos. EB-00017917-29, Security Agreement.

Bates Nos. EB-00017934-6, Assignment of Note and Security Agreement.

Bates Nos. EB-00017937-9, Notice of Debtor from Alexbay to Eber W&L.

Bates Nos. EB-00020189-215, Eber Bros. Wine & Liquor Metro, Inc. QuickBooks Profit & Loss Statements, Balance Sheets and Trial Balances for Fiscal Years Ended May 31, 2007 through May 31, 2011.

Bates Nos. EB-00019097-117, Eber Metro Tax Return for fiscal year ending May 31, 2012.

Bates Nos. EB-00020281-323, Eber Wine & Liquor Corp. QuickBooks Profit & Loss Statements, Balance Sheets and Trial Balances for Fiscal Years Ended May 31, 2008 through May 31, 2013.

Bates Nos. EB-00020230-4, Eber W&L Tax Return for fiscal year ending May 31, 2012.

Bates Nos. EB-00019482-522, Eber-Connecticut, LLC Independent Auditors Report, Financial Statements and Supplemental Schedules for the years ended May 31, 2007 through May 31, 2012.

Bates Nos. EB-00019258-70 and EB-00030155-56, Eber-Connecticut, LLC Independent Auditors Report, Financial Statements and Supplemental Schedules for the years ended May 31, 2012 and May 31, 2013.

Bates Nos. EB-00030158-74, Eber-Connecticut, LLC Independent Auditors Report, Financial Statements and Supplemental Schedules for the years ended May 31, 2014 and May 31, 2015.

Bates Nos. EB-00030194-211, Eber-Connecticut, LLC Independent Auditors Report, Financial Statements and Supplemental Schedules for the years ended May 31, 2016 and May 31, 2017.

Bates Nos. EB-00035637-54, Eber-Connecticut, LLC Independent Auditors Report, Financial Statements and Supplemental Schedules for the years ended May 31, 2017 and May 31, 2018.

Bates Nos. EB-00022190-3, Unanimous Written Consent in Lieu of a Meeting of the Board of Directors.

Bates Nos. EB-00022871-908, Amended and Restated Limited Liability Company Agreement of Eber-Connecticut, LLC.

Bates Nos. EB-00023745-78, Decision and Order of Honorable J. Scott Odorisi.

Bates Nos. EB-00025860-71, Merger of Slocum & Sons with and into Eber-CT dated April 29, 2005.

Bates Nos. EB-00026433-4, Extracted Pages from Loan Ledger.

Bates Nos. EB-00030896-9, Affidavit of Confession of Judgment.

Bates Nos. EB-00030932-3, Stipulation of Settlement.

Bates Nos. EB-00032632-707, Summons and Complaint.

Bates Nos. EB-00032782-33269, Slocum & Sons and Eber-CT merger-related documents.

Bates Nos. EB-00033279-747, Slocum & Sons Due Diligence Binder.

Bates Nos. EB-000337748-60, Stock purchase Agreement.

Bates Nos. EB-00000864-70, Notices to Metro and Teamsters re: Promissory note and line of credit note.

Bates Nos. EB-00030212-423, Eber-CT Tax Return for the fiscal year ending May 31, 2008 through May 31, 2011 and ending May 31, 2014 through May 31, 2017.

Bates Nos. EB-00030149-54, Slocum & Sons Historical and Projected Income for 2010 through 2019.

Bates Nos. EB-00026697-7067, Form W-2s of Eber-CT for 2010 through 2017.

Bates Nos. EB-00030046-148, Form 1099s of Eber-CT for 2012 through 2017.

Bates Nos. EB-00021420-36, Wendy Eber and Lester Eber's Form W-2s from Eber-CT and Eber W&L for the years 2007 through 2009 and 2011 through 2017.

Bates Nos EB-00027092, Wendy Eber's Form W-2 from Eber-CT for 2010.

Bates No EB-00035659. Lester Eber's Form W-2 from Eber W&L for 2010.

Bates Nos. EB-00021437-68, Consulting Agreement between Southern Wine & Spirits of Upstate New York, Inc. and Lester Eber dated August 30, 2007.

Bates Nos. EB-00021497, Accounts Payable History Report for Wendy Eber and Lester Eber from Slocum & Sons of Maine, Inc. for March 1, 2014 through March 15, 2014.

Bates Nos. EB-00026649, Letter from Wendy Eber Re: New York State Teamsters Conference Pension & Retirement Fund and Eber W&L.

Bates Nos. EB-0003748-60, Stock Purchase Agreement between Polebridge Bowman Partners, LLC and Eber Metro dated May 30, 2010.

Bates No. EB-00026654, Memo from Glenn Sturm to Pat Dalton re: Equity Transfer

Bates Nos. EB-00031220-23, Unanimous Written Consent in Lieu of a Meeting of the Board of Directors dated May 28, 2010.

Bates Nos. GUM000058-60, Business Plan for Eber-CT dated December 2009.

Bates Nos. EB-00017671-86, Settlement Agreement between PBGC and Eber Parties dated February 24, 2017.

Other financial documents concerning Eber-CT and Eber Metro produced by Defendants.

## Deposition Transcripts & Exhibits

The deposition of Lester Eber on January 24, 2019 and June 27, 2019, including errata.

The Rule 30(b)(6) deposition of Eber Bros. Wine & Liquor Metro, Inc. on January 23, 2019 and February 27, 2019 (Wendy Eber as designated witness), including errata.

The Rule 30(b)(6) deposition of Eber-Connecticut, LLC at 3:27 P.M. on February 27, 2019.

The deposition of Wendy Eber on February 28, 2019, and June 28, 2019.

Plaintiffs' Deposition Exhibits 1 through 125.

## Online Resources and Databases

PitchBook Data, Inc.

DealStats (formerly known as Pratt's Stats)

BizComps

Institute of Business Appraisers (IBA)

Google (information retrieved from searches for comparable transactions)

## Additional Information

S. Pratt, Business Valuation Discounts and Premiums, (2d Ed., John Wiley & Sons, Inc., 2009.

William H. Coquillette, *Guaranty of and Security for the Debt of a Parent Corporation by a Subsidiary Corporation*, 30 Case W. Res. L. Rev. 433 (1980).

S. Pratt, Valuing a Business: The Analysis and Appraisal of Closely Held Companies, (5th Ed., McGraw-Hill, 2008).

Capital Beverage Corp. Form 8-K/A dated June 29, 2001

# Curriculum Vitae

**KLG**

# KLEIN LIEBMAN & GRESEN, LLC

6800 Jericho Turnpike • Suite 206E • Syosset, NY 11791
Tel: (516) 364-3232 • Fax: (516) 364-3186
www.goKLG.com

GLENN S. LIEBMAN, CPA / ABV
DAVID L. GRESEN, CPA / ABV / CFF, CFE
DAVID GRALNICK, CPA / ABV
JEFFREY F. GIBRALTER, CPA / ABV / CFF, CFE

NEW YORK CITY  (212) 505-5770
WESTCHESTER  (914) 831-1555
CONNECTICUT  (203) 344-3200

# GLENN S. LIEBMAN, CPA/ABV
# CURRICULUM VITAE

## PROFESSIONAL PROFILE

Glenn Liebman is a Member in the business valuation, forensic accounting and litigation consulting support firm of Klein Liebman & Gresen, LLC.  Mr. Liebman has assisted hundreds of closely-held companies, attorneys, accountants and financial professionals with valuation and forensic accounting issues relating to equitable distribution, estate and gift tax planning, business planning, the acquisition and sale of businesses, and shareholder disputes.  He has been Court appointed as a neutral financial expert and has provided expert witness testimony on 45 occasions in  Supreme Court in Nassau, Suffolk, New York, Queens, Westchester,  Kings Counties and Fairfield County, CT on issues concerning business valuation and the valuation of licenses and enhanced earning capacity and forensic accounting.  Mr. Liebman is a frequent speaker on the topic of business valuation, forensic accounting and litigation support.

Mr. Liebman holds a B.A. degree in Economics from the State University of New York at Binghamton, an M.S. degree in Accounting from the State University of New York at Albany. He is a Certified Public Accountant (CPA) and has also earned the American Institute of Certified Public Accountants' ABV designation (Accredited in Business Valuation).  Mr. Liebman is a member of the American Institute of Certified Public Accountants and the New York State Society of Certified Public Accountants.

## PROFESSIONAL EXPERIENCE

**Klein Liebman & Gresen, LLC**                                   **March 1997 – Present**
**Partner, Valuation, Forensic Accounting and Consulting Services**

Klein Liebman & Gresen, LLC specializes in the valuation of businesses, professional practices, and other assets, as well as forensic accounting relating to equitable distribution, estate and gift tax planning, shareholder disputes, business planning and transactions.

**Paragon Capital Management, Syosset, NY**                     **May 1996 - March 1997**
**Financial Advisor**

As a financial advisor for this Registered Investment Advisory firm, Mr. Liebman evaluated publicly traded securities and developed investment portfolios for clients of the firm. Additionally, he assisted clients in their personal investment and financial planning.

**Ernst & Young LLP, New York, NY**                             **June 1992 - May 1996**
**Financial Planning Consultant, Auditor**

As a financial planning consultant, Mr. Liebman assisted individuals in financial and tax planning issues. As an auditor, Mr. Liebman performed audits and analytical procedures with respect to the financial reporting of publicly and private corporations.

## EDUCATION AND PROFESSIONAL CERTIFICATION

Binghamton University (SUNY), Binghamton, NY                   BA in Economics, 1990
University at Albany (SUNY), Albany, NY              MS in Accounting and Finance, 1992
Certified Public Accountant, New York State                                      1994
CPA/Accredited in Business Valuation                                             1998
Collaborative Divorce Interdisciplinary Team Training                            2005
Certified Matrimonial Mediator – New York State Unified Court System             2009

## PROFESSIONAL AFILIATIONS

American Institute of Certified Public Accountants
New York State Society of Certified Public Accountants
New York State Society of Certified Public Accountants – Business Valuation and Litigation
    Support Committees
Nassau County Litigation Support Committee

## PUBLICATIONS

Quoted in Private Wealth Magazine in an article titled, "Dealing with Divorce", May 6, 2015

"Hedge Fund Analysis and Valuation *A Guide for Marital Attorneys"*, ALM Law Journal Newsletter The Matrimonial Strategist, March 2007

## SPEAKING ENGAGEMENTS

April 10, 2019 – St. John's University Law School – "Basics of Business Valuation"

December 12, 2018 – New York State Bar Association – New York City – "Matrimonial Law Trial Institute VI: Deconstructing a Business Valuation Report"



December 11, 2018 – New York State Bar Association – Long Island – "Matrimonial Law Trial Institute VI: Deconstructing a Business Valuation Report"

September 2018 – New York Association of Collaborative Professionals – "Thorny Financial Issues in Collaborative Cases"

January 2018 – "Valuation and Forensic Accounting Quandries-Real World Issues Facing Accountants and Forensic Accountants – Nassau Bar Association

April 2016 – Suffolk County Supreme Matrimonial Part – "Business Valuation in Connection with a Matrimonial Matter"

April 2016 – AAML Connecticut Chapter (Advanced Financial Issues Seminar) - "Buy-Sell Agreements What Role Do They Play in Valuing a Business"

October 2015 – Catalyst Interdisciplinary Conference (Association of Divorce Financial Planners and Center or Mediation & Training - "Financial and Valuation Issues in Pre and Post Nuptial Agreements"

April 2015 – Nassau County Matrimonial Judicial Seminar - "Yours, Mine, and Mine: Dividing the Marital Estate An Overview of Equitable Distribution and Separate Property"

September 2014 – Family & Divorce Mediation Council of Greater New York - "Business Valuation & Enhanced Earnings Capacity Double Dipping Issues"

May 15, 2014 – Suffolk County Matrimonial Judicial Seminar - "Yours, Mine, and Mine: Dividing the Marital Estate An Overview of Equitable Distribution and Separate Property"

April 2014 – Nassau County Association Committee - Women in the Law "Basics of Business Valuation"

March 2014 – Suffolk County Bar Association - "Neutral Court Appointments of Forensic Accountants and the Role of the Neutral Forensic Accountant",

June 2012 – Nassau County Supreme Court-Matrimonial Center Business Valuation Seminar for Judges and Law Secretaries

June 2012 – The Family Divorce & Mediation Council of Greater New York - "Art & Science of Business Valuation"

February 2011 – Nassau County Matrimonial Clerks - "Assessing Net Worth Statements and Tax Returns"

January 2011 – New York City Matrimonial Judges - "Yours, Mine and Mine – Dividing the Marital Estate – An overview of Equitable Distribution and Separate Property"

March 2010 – Nassau Academy of Law - "Matrimonial Law: Business Values – A Moving Target,"

September 2009 – New York Family Divorce Mediation Council - "Understanding Business Valuation Enhanced Earnings Valuation, Maintenance and Support and the Double Dip Issues",

April 2009 – Nassau County Matrimonial Bar Association - "Valuation Dates and Subsequent Events",

March 2009 – Estate Planning Council of Lower Fairfield County, Connecticut - "Valuation of Hedge Fund Interests"



January 2009 – New York State Bar Association General Practice Session Seminar - "The Rise of the Business Appraiser in Litigated Matters",

November 2008 – The Center for Mediation in Law Series, The Essentials of Family Law: What Family Mediators and Co9llaborative Professionals Need to Know, New York, NY - "Understanding Business Valuation Enhanced Earnings Valuation, Maintenance and Support and the Double Dip Issues"

October 2008 – Institute of Divorce Financial Analysis Advanced Topics Symposium 2008, Las Vegas, NV – "Dealing with Executive Compensation in Divorce" and "Analysis of Hedge Funds in Divorce"

March 2008 – Fairfield County Bar Association – "Hedge Fund Valuation Issues in the Context of Matrimonial Matters"

March 2008 – New York Law School – "Business Valuation and Forensic Accounting in Matrimonial Matters"

March 2008 – Nassau Academy of Law – Panel with Vincent Stempel, Esq., Steven Eisman, Esq., Honorable Anthony J. Falanga, and Joel Rakower, CPA – "How to Settle a Complex Matrimonial Matter"

February 2008 – Suffolk County Matrimonial Bar Association – "Role of the Neutral Forensic Accountant"

February 2008 – Fordham University School of Law – "Business Valuation and Forensic Accounting in Matrimonial Matters"

November 2007 – National Conference of CPA Practitioners-Nassau/Suffolk Chapter – "Identifying, Quantifying & Distributing Assets in a Matrimonial Matter"

October 2007 – Hofstra University School of Law – "The Role of Business Appraisers and Reviewing a Business Valuation Report

December 2006 – New York County Bar Association – Second Year Program for Newly Admitted Attorneys – "Bridge the Gap II"

October 2006 – Molloy College Division in Business, Business Assembly – "Careers in Business & Forensic Accounting"

August 2006 – New York County Bar Association – Second Year Program for Newly Admitted Attorneys – "Bridge the Gap II"

April 2006 – New York County Bar Association – Second Year Program for Newly Admitted Attorneys – "Bridge the Gap II"

December 2005 – New York County Bar Association – Second Year Program for Newly Admitted Attorneys – "Bridge the Gap II"

July 2005 – New York County Lawyers' Association – "Identifying Financial Assets and Structuring Settlements in a Matrimonial Matter"

May 2005 – The Estate and Personal Financial Planning Committee – Nassau Chapter – "Family Limited Partnership Valuation Discounts"



KLG KLEIN LIEBMAN & GRESEN, LLC

March 2005 – Matrimonial Bar Association of Suffolk County and SCBA Matrimonial & Family Law Committee — "The Role and Responsibilities of the Neutral Financial Expert and Soliciting Information for Enhanced Earning Capacity Cases"

February 2005 – Nassau County Bar Association Matrimonial Law Committee – "The Role and Responsibilities of the Neutral Financial Expert"

December 2004 – Westchester County Bar Association – "What's a Neutral Financial Expert To Do"

November 2004 – New York State Bar Association Matrimonial Update 2004 Seminar – "The Financial Expert: Understanding The Report and Cross Examining the Witness"

November 2004 – The Estate and Personal Financial Planning Committee & The Litigation Support Services Committee – "Family Limited Partnership Valuation Discounts"

June 2004 – Center for Mediation and Law 2004 Family Law Class – "Valuing Businesses and Enhanced Earning Capacity - The Double Dipping Problem"

May 2003 – 21st Annual All-Day Nassau Chapter – Estate Personal Financial Planning Conference – "Current Issues Relating to Valuation"

October 2002 – Matrimonial Bar Association of Suffolk County – "Discovery and Forensic Accounting in the Valuation of Closely-Held Businesses

June 2002 – National Business Institute – "Tax Aspects of Divorce in New York"

May 2001 – Foundation for Accounting Education – "Business Valuation Discounts"

November 2000 – Nassau County Bar Association – Matrimonial Committee – "The Use of Discounts in Business Valuation"

September 2000 – New York State Society of CPA's, Nassau Chapter – Estate and Financial Planning Conference – "Business Valuation Discounts"

May 2000 – Foundation for Accounting Education – "Business Valuation, What's it Really All About?"

# Statement of Limiting Conditions

## STATEMENT OF LIMITING CONDITIONS

The accompanying report assumes the following limiting conditions:

1. No investigation has been made of, and no responsibility is assumed for legal matters, including title or encumbrances. Title to the property is assumed to be good and marketable unless otherwise stated. The property is further assumed to be free and clear of any or all liens, easements or encumbrances, unless otherwise stated.

2. Information furnished by others (including, but not limited to, financial statements of the subject entity), upon which all or portions of this report are based, is believed to be reliable and has been accepted as such by Klein Liebman & Gresen, LLC except as otherwise specified in this report. This information has not been verified, and no warranty is given as to the accuracy of such information.

3. This report has been made only for the purpose stated and should not be used for any other purpose.

4. This report and any information contained herein - including any value conclusions, the identity of Klein Liebman & Gresen, LLC or any individuals signing or associated with this report - may not be disseminated or disclosed to any party without the prior written consent and approval of Klein Liebman & Gresen, LLC.

5. The fee paid to Klein Liebman & Gresen, LLC for the analyses and valuation summarized herein is not contingent on the values or other opinions set forth in this report.

6. No partner or employee of Klein Liebman & Gresen, LLC has any present or contemplated interest in the subject entities referred to in the Report.

KLG  KLEIN LIEBMAN & GRESEN, LLC