Page 1

1

2      UNITED STATES DISTRICT COURT

3      SOUTHERN DISTRICT OF NEW YORK

4      Civil Action No. 16-cv-951 (LAK)

5      -----------------------------------x

6      DANIEL KLEEBERG, LISA STEIN and

7      AUDREY HAYS,

8                              Plaintiffs,

9                -against-

10     LESTER EBER; ALEXBAY, LLC f/k/a LESTER

11     EBER, LLC; CANANDAIGUA NATIONAL

12     CORPORATION d/b/a CANANDAIGUA NATIONAL

13     BANK & TRUST; ELLIOT W. GUMAER, JR.;

14     EBER BROS. & CO., INC.; EBER BROS.

15     WINE AND LIQUOR CORPORATION; EBER

16     BROS. WINE AND LIQUOR METRO, INC.,

17     EBER-CONNECTICUT, LLC; and WENDY EBER,

18                              Defendants.

19     -----------------------------------x

20

21                              January 24, 2019

22

23       Videotaped deposition of LESTER EBER

24

25

Page 2

```
1
2          January 24, 2019
3          9:33 a.m.
4
5
6          Videotaped deposition of LESTER EBER,
7  held at the offices of Veritext New York City,
8  1250 Broadway, New York, New York, pursuant to
9  Notice, before Lynne D. Metz, a Shorthand Reporter
10 and Notary Public of the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1
2  A P P E A R A N C E S:
3
4      BROOK & ASSOCIATES PLLC
5      Attorneys for Plaintiffs
6          100 Church Street
7          8th Floor
8          New York, New York 10007
9      BY:   BRIAN C. BROOK, ESQ.
10
11
12     UNDERBERG & KESSLER LLP
13     Attorneys for Defendants LESTER EBER;
14     ALEXBAY, LLC f/k/a LESTER EBER, LLC; EBER
15     BROS. & CO., INC.; EBER BROS. WINE AND
16     LIQUOR CORPORATION; EBER BROS. WINE AND
17     LIQUOR METRO, INC., EBER-CONNECTICUT, LLC;
18     and WENDY EBER
19         50 Fountain Plaza
20         Buffalo, New York 14202
21     BY:   COLIN D. RAMSEY, ESQ.
22
23     (Appearances continued on next page)
24
25
```

Page 4

```
1
2  A P P E A R A N C E S: (Cont'd):
3
4          JOHN HERBERT, ESQ. (Telephonically)
5          Attorneys for Defendants LESTER EBER and
6          WENDY EBER
7              P.O. Box 1031
8              Tiburone, California 94920
9
10
11         CALIHAN LAW PLLC
12         Attorneys for Defendant Estate of ELLIOT W.
13         GUMAER
14             16 East Main Street
15             Rochester, New York 14614
16         BY:   ROBERT B. CALIHAN, ESQ.
17
18
19         ALSO PRESENT:
20             Wayne Saline - Videographer
21             Dan Kleeberg
22
23
24
25
```

Page 5

```
1
2
3
4      IT IS HEREBY STIPULATED AND AGREED, by and
5  between the attorneys for the respective parties
6  herein, that filing and sealing be and the same
7  are hereby waived.
8      IT IS FURTHER STIPULATED AND AGREED
9  that all objections, except as to the form of the
10 question, shall be reserved to the time
11 of the trial.
12     IT IS FURTHER STIPULATED AND AGREED that the
13 within deposition may be signed and sworn to
14 before any officer authorized to administer an
15 oath, with the same force and effect as if signed
16 and sworn to before the officer before whom the
17 within deposition was taken.
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1
2        THE VIDEOGRAPHER:  We are going on the
3    record at 9:33 on January 24, 2019.  Please
4    note that the microphones are sensitive and
5    may pick up whispering and private
6    conversations.  Please turn off all cell
7    phones and place them away from the
8    microphones as they may interfere with the
9    deposition audio.  Recording will continue
10   until all parties agree to go off the
11   record.
12       This is media unit one of the video
13   recorded deposition of Lester Eber taken by
14   counsel for plaintiff in the matter of Dan
15   Kleeberg et al versus Lester Eber et al
16   filed in the United States District Court
17   Southern District of New York, case number
18   16-CV-9517 (LAK).  This deposition is being
19   held at Veritext located at 1250 Broadway
20   New York, New York.
21       My name is Wayne Saline from the firm
22   Veritext.  I am the videographer.  The court
23   reporter is Lynne Metz from the firm
24   Veritext.
25       At this time the attorneys will

Page 7

1                L. Eber
2    introduce themselves and their affiliations
3    for the record.  The court reporter will
4    swear in the witness and we can proceed.
5        MR. BROOK:  On behalf of the
6    plaintiffs Brian Brook of Brook and
7    Associates PLLC.
8        MR. RAMSEY:  Colin Ramsey from
9    Underberg and Kessler on behalf of the Eber
10   defendants.
11       MR. CALIHAN:  Robert Calihan on behalf
12   of the Estate of Elliot Gumaer.
13       MR. KLEEBERG:  Dan Kleeberg.
14   L E S T E R   E B E R,
15   called as a witness, having been first duly
16   sworn by the Notary Public (Lynne D. Metz),
17   was examined and testified as follows:
18   EXAMINATION BY
19   MR. BROOK:
20   Q.   Good morning Mr. Eber.
21       Have you been deposed before?
22   A.   Yes.
23   Q.   When is the last time you were
24   deposed?
25   A.   A couple of years ago.

Page 8

1                L. Eber
2    Q.   Just because no matter how many times
3    you do this it is worth going over it again.  I
4    will go over some of the differences between
5    today's deposition and a typical conversation to
6    make sure that we are as efficient and have as
7    clean a record as possible.
8        One major difference is there is a
9    court reporter writing down everything that we
10   say.  So even though there is a videographer
11   recording it too, it is important that we do our
12   best not to talk over each other.  Even if you
13   know where I am going with the question, please
14   let me finish the question before you answer it.
15       Okay?
16       MR. RAMSEY:  Yes?
17   A.   Yes.
18   Q.   And that brings me to the next point.
19   All responses need to be verbal meaning yes or no
20   rather than shaking your head or grunts like aha.
21       Okay?
22   A.   Yes.
23   Q.   Another thing is that if I ask a
24   question and you answer it, I am going to assume
25   that you understood the question.  So if there is

Page 9

1                L. Eber
2    something in my question that you don't understand
3    be sure to ask me to clarify my question before
4    you answer it.
5        Okay?
6    A.   Yes.
7    Q.   How do you feel today?
8    A.   Okay.
9    Q.   Is there any reason such as being
10   tired, overly stressed or on prescription
11   medications or something like that that would
12   impair your ability to testify fully and
13   truthfully today?
14   A.   Not that I know of.
15   Q.   What is your date of birth?
16   A.   1/26/38.
17   Q.   And what is your home address?
18   A.   15 Coral Way, Rochester, New York.
19   Q.   When you were last deposed, what was
20   the legal matter that was in connection with?
21   A.   It was part of being a lobbyist for
22   Southern Glazer Wine and Liquor.
23   Q.   And how was that part of the being a
24   lobbyist, sir?
25   A.   It was guarding legislation that had

3 (Pages 6 - 9)

L. Eber
1
2      Q.    And then the next year you received a
3   W-2 from Eber Connecticut LLC; correct?
4      A.    Yes.
5      Q.    And in that year Eber Connecticut LLC
6   paid you wages, tips and other compensation
7   totalling 189,788 dollars; correct?
8      A.    Yes.
9      Q.    So not quite as much paid by Eber
10  Connecticut as you had made the year before from
11  Eber Brothers Wine and Liquor; correct?
12     A.    That's correct.
13     Q.    Just under two thirds of the amount;
14  correct?
15     A.    Yes.
16     Q.    Now the consulting agreement provided
17  for an annual sum for five years of six hundred
18  thousand dollars per year; correct?
19     A.    Yes.
20     Q.    So that was more than twice what you
21  were paid in terms of salary by Eber Brothers Wine
22  and Liquor Corp.?
23     A.    Yes.
24     Q.    How did that amount get determined in
25  the course of negotiations?

L. Eber
1
2      A.    They are a very large company.  They
3   are 17 billion today.  They do 2 billion in New
4   York.  Two thousand employees.  They pay big
5   salaries.
6      Q.    So did you ask for this consulting
7   agreement?
8      A.    They offered it to me.
9      Q.    And did they ask for anything else in
10  return besides your governmental affairs services?
11         MR. RAMSEY:  Form.
12     A.    They gave me the freedom to set up a
13  lobbying governmental affairs structure in the
14  State of New York for them.
15     Q.    Did they ask for anything else in
16  return for agreeing to this six hundred thousand
17  dollars a year for five years payment?
18         MR. RAMSEY:  Form.
19     A.    No.
20         MR. RAMSEY:  Form objection to that
21  question.
22     Q.    So Southern did not -- let's step
23  back.
24         So six hundred thousand a year for
25  five years, that's three million dollars total;

L. Eber
1
2   correct?  Is that a yes?
3      A.    Yes.
4      Q.    In connection with the overall
5   transaction, Southern ended up giving what was, I
6   suppose some kind of a loan in the amount of three
7   million dollars to one of the Eber companies; is
8   that right?
9      A.    Yes.  I don't know if it was a loan.
10  It was money that the Eber companies owned, owed
11  Southern for the money they came up with to keep
12  us out of bankruptcy.
13     Q.    So it wasn't a loan per se but one or
14  more of the Eber companies agreed that they owed
15  Southern three million dollars as a result of the
16  deal; correct?
17     A.    Yes.  As a result of moneys that were
18  paid to them to pay them back for the money they
19  advanced us to keep us out of bankruptcy.
20     Q.    So how much money did Southern advance
21  to the Eber companies not counting your consulting
22  agreement?
23     A.    I don't remember the figure.  It was
24  substantial.
25     Q.    Was it more than three million

L. Eber
1
2   dollars?
3      A.    Yes.
4      Q.    So of the amount of money that was
5   advanced, Eber Brothers agreed to pay back three
6   million of it; correct?
7          MR. RAMSEY:  Form.
8      A.    They paid back all the money that was
9   advanced to them.
10     Q.    So separate from advancements, did
11  Southern also make payments that were not subject
12  to repayment to Eber Brothers not counting
13  payments for inventory?
14     A.    No.
15     Q.    So is it just a coincidence then that
16  the amount of money that Eber Brothers was
17  required to pay Southern three million dollars is
18  the same amount that the consulting agreement
19  provided to be paid to you?
20         MR. RAMSEY:  Form.
21     A.    I never thought of it that way at all.
22  I never thought of that.
23     Q.    Besides Patrick Dalton, was anyone
24  else involved in negotiating or reviewing your
25  consulting agreement with Southern?

18 (Pages 66 - 69)

Page 70

L. Eber

1
2      A.   I don't remember.
3      Q.   Was Mike Gumaer involved in the
4   consulting agreement with Southern?
5      A.   He would be aware of anything I was
6   involved in.  Everything I did he knew about.
7      Q.   Do you have any specific recollections
8   of discussing the consulting agreement with Mike
9   Gumaer?
10     A.   I don't remember, but there is nothing
11  that I would have done that he would not be aware
12  of.
13     Q.   And do you recall discussing the
14  consulting agreement with any other employees of
15  Eber Brothers?
16     A.   Possibly the financial officer John
17  Ryan.
18     Q.   You say possibly.
19         You don't specifically recall doing
20  so?
21     A.   I can't remember.
22     Q.   And the consulting agreement was not
23  specifically approved by the board of directors;
24  correct?
25     A.   I don't know.

Page 71

L. Eber

1
2      Q.   In addition to providing governmental
3   affairs services, Southern also required you to
4   enter into a restrictive covenant; correct?
5      A.   Yes.
6      Q.   Why was that?
7      A.   It was what they wanted so that I
8   wouldn't compete or someone else would hire me for
9   doing governmental work.  It is a specialty.
10     Q.   And after the initial five-year term,
11  did you continue to have -- withdrawn.
12         After the initial five-year term, were
13  there subsequent agreements between you and
14  Southern for consulting services?
15     A.   There is no agreement.  I am a
16  consultant for them.
17         MR. BROOK:  Let's go to the next
18  Exhibit 29.
19         (Plaintiffs' Exhibit 29, a series of
20  letters that appears to be written on Lester
21  Eber's letterhead bearing Bates stamps EB
22  695 through 701, marked for identification,
23  as of this date.)
24     Q.   I am showing you what has been marked
25  as Plaintiffs' Exhibit 29.  It is a series of

Page 72

L. Eber

1
2   letters that appears to be written on Lester
3   Eber's letterhead bearing Bates stamps EB 695
4   through 701.
5      Do you see these letters?
6      A.   Yes.
7      Q.   Do these refresh your recollection
8   that there was a subsequent agreement, subsequent
9   agreements between you and Southern concerning
10  consulting?
11     A.   I think you are a little confused on
12  this.
13     Q.   Okay.  Help me understand.
14     A.   This is an agreement.  I am a
15  registered lobbyist in the State of New York.
16  JACO is the regulatory agency that supervises
17  lobbyists and they pay me to be a lobbyist.  I
18  think it is ten thousand dollars a year and I
19  happen to have an agreement in order to lobby with
20  the governmental agencies and the Governor's
21  Office in the State of New York and that's what
22  this is.
23     Q.   So are you saying are there any other
24  -- let's step back.
25         So just looking at the first page of

Page 73

L. Eber

1
2   this exhibit that's a letter dated January 1, 2012
3   addressed to Steven Becker.
4      Do you see that?
5      A.   Yes.
6      Q.   Who is Steven Becker?
7      A.   He is principal in charge of
8   governmental affairs for the United States for
9   Southern Glazers.
10     Q.   And this letter, is this something you
11  wrote up or the language was given to you by
12  someone else?
13     A.   I don't remember, but it is what has
14  to be done to give the JACO in New York.  I have
15  to be a registered lobbyist.  It is required.
16     Q.   And is the contract between you and
17  the company that you are lobbying for something
18  that has to be disclosed to the government?
19     A.   Yes, the State of New York.  It is
20  disclosed to the State of New York, yes.
21     Q.   So when we were looking at the
22  consulting agreement, Exhibit 27, is that a
23  document that was disclosed to the State of New
24  York?
25     A.   No.

19 (Pages 70 - 73)

Page 74

L. Eber
1
2    Q.   Why not?
3    A.   It's not a lobbying agreement.  This
4  is a governmental lobbying agreement that I have
5  to have as being a lobbyist, a registered
6  lobbyist.
7    Q.   So --
8    A.   The other is a private agreement
9  between myself and Southern.
10   Q.   So for the years 2007 through 2011,
11 was there a separate lobbying agreement between
12 you and Southern?
13   A.   There should have been.
14   Q.   Do you recall whether there was an
15 actual one?
16   A.   I don't remember, but I don't know if
17 they required the agreements changed and I can't
18 remember everything, but I think with the JACO
19 regulations Southern told me that, you know, I
20 have to have a -- because of the time I am
21 spending in Albany with the legislature and the
22 State Liquor Authority or with the Governor's
23 Office that I have to register as a lobbyist and I
24 had not registered as a lobbyist before.
25   Q.   So for the year 2012, the year covered

Page 75

L. Eber
1
2  by page one of Exhibit 29, what was your total
3  compensation received from Southern Wine and
4  Spirits for all your activities on their behalf
5  lobbying, consulting or otherwise?
6    A.   I don't remember.
7    Q.   According to this document it says the
8  fee for your services covered by it was ten
9  thousand dollars?
10   A.   Oh, for lobbying.  Yes, for being a
11 registered lobbyist was 10,833 a month is what I
12 get from them.
13   Q.   And were you paid other sums as well?
14   A.   I was paid yes, as a consultant.  Yes.
15 RQ      MR. BROOK:  We request that all
16      payment records between Mr. Eber and
17      Southern be produced including tax forms and
18      any other agreements that may exist that
19      show fees for consulting or other services
20      beyond the amount reflected on this Exhibit
21      29.
22      MR. RAMSEY:  I understand your
23      request.
24 BY MR. BROOK:
25   Q.   You said you don't remember the exact

Page 76

L. Eber
1
2  compensation.
3      What is your best estimate of what
4  your annual compensation from Southern has been in
5  total for any of the years from 2012 through the
6  present?
7      MR. RAMSEY:  Form.
8      Go ahead.  If you can give an
9      estimate, go ahead.
10   A.   Yeah, I think it's twenty-five
11 thousand a month.
12   Q.   Do you recall attending a settlement
13 conference in this case in early September last
14 year?
15   A.   Yes, I believe so.
16   Q.   Do you remember that at one point
17 everyone except for Mr. Gumaer's attorney was
18 sitting in the courtroom with the judge in a
19 circle and we were talking about certain fact
20 questions that the plaintiffs had?
21   A.   I believe it went on.  I don't
22 remember the questions.
23   Q.   Do you recall that I brought up the
24 topic of your consulting agreement with Southern
25 at that point?

Page 77

L. Eber
1
2    A.   I don't remember it.
3    Q.   So you don't remember saying that that
4  consulting agreement and the payments relating to
5  it ended back in 2012?
6      MR. RAMSEY:  Form.
7    A.   Yes.  I do remember the agreement
8  ended after five years, the consulting agreement.
9    Q.   But is it your testimony that at least
10 half or approximately half of the payments
11 continued in the years afterwards?
12      MR. RAMSEY:  Form.
13   A.   Yes.
14   Q.   It is your testimony that's not
15 pursuant to any kind of agreement between you and
16 Southern?
17   A.   Yes.
18   Q.   So how does the amount of money that
19 Southern pays you get determined?
20   A.   It is what they feel my services are
21 worth.
22   Q.   So what happens if Southern decides to
23 pay you nothing for your services?
24   A.   I am through.
25   Q.   Meaning you are not going to provide

20 (Pages 74 - 77)

L. Eber
1
2  services for Southern anymore?
3      A.   I won't be involved with them, that's
4  correct, yes.
5      Q.   Other than monthly payments of
6  approximately twenty-five thousand dollars per
7  month, are there any other benefits or perks that
8  you receive from Southern?
9          MR. RAMSEY:  Form.
10     A.   I don't get any fringe benefits from
11 them of any kind.  I do get expenses, legitimate
12 business expenses.
13     Q.   Do you have an expense credit card for
14 Southern?
15     A.   No.
16     Q.   So how do you submit your expenses to
17 Southern?
18     A.   I submit them monthly.
19     Q.   And are you still bound by any kind of
20 restrictive covenant with Southern?
21         MR. RAMSEY:  Form.
22     A.   I don't believe so.
23     Q.   So you believe at this point if you
24 went and tried to start up the Eber Brothers Wine
25 and Liquor business in New York that would not be

L. Eber
1
2  something that would violate any agreement you
3  have with Southern?
4          MR. RAMSEY:  Form.
5      A.   I don't know about that.  It's not
6  something I am going to do.
7      Q.   I am going to change topics now.
8          How did you, if you know, how did it
9  come to pass that you were named a trustee of the
10 Allen Eber trust?
11     A.   I do not know.
12     Q.   Is this something that you had
13 discussed with your father before his passing?
14     A.   No.
15     Q.   What is your understanding of what
16 your responsibilities were as a named trustee of
17 the Allen Eber trust?
18     A.   My responsibilities?
19     Q.   Yes.
20         As a trustee, what did that mean that
21 you had to do?
22         MR. RAMSEY:  Form.
23     A.   With the -- work with the other
24 co-trustees in managing the Eber assets.
25     Q.   And for whom's benefit did you have to

L. Eber
1
2  manage the Eber assets?
3          MR. RAMSEY:  Form.
4      A.   For the beneficiaries of the trust.
5      Q.   Who were the beneficiaries of the
6  trust?
7      A.   Myself and my sisters.
8      Q.   And after your sisters passed, who
9  were the other beneficiaries of the trust at that
10 point?
11     A.   It was their children.
12     Q.   And that is for your sister Nan.
13         What was her child's name?
14     A.   Mildred was my sister.
15     Q.   Sorry.  I think I was using her middle
16 name.
17         What was Mildred's daughter's name?
18     A.   Audrey.
19     Q.   And your sister Sally, what were her
20 kid's names?
21     A.   Danny and Lisa.
22     Q.   After your sisters passed, did you
23 continue to understand you had an obligation to
24 manage the trust for the benefit of your nieces
25 and nephew?

L. Eber
1
2      A.   I didn't manage the trust.  I worked
3  with the other two trustees.
4      Q.   Who were the other two trustees?
5      A.   Mike Gumaer and the bank.
6      Q.   What was Mike Gumaer's involvement in
7  managing the trust?
8      A.   He was a lawyer and he was put there
9  by my father to work and guide me in the
10 management of the business and to work with me in
11 the trust.
12     Q.   Was Mike Gumaer a lawyer for the
13 trust?
14         MR. RAMSEY:  Form.
15     A.   No.  He was a lawyer for Eber Brothers
16 but he was a trustee of the trust.
17     Q.   What was the bank's responsibility
18 with respect to the trust?
19     A.   They were there.  They did a lot of
20 the paperwork and legal work of the operation of
21 the trust.
22     Q.   You understood that the Eber Brothers
23 business was a trust asset; correct?
24     A.   Yes.
25     Q.   What did that mean in terms of how it

21 (Pages 78 - 81)

Page 82

L. Eber

1
2    affected your management of the Eber Brothers
3    business?
4           MR. RAMSEY:  Form.
5           MR. CALIHAN:  Form.
6        A.   I don't understand the question.
7        Q.   Did the fact that the Eber Brothers
8    business was owned by the trust affect the way in
9    which you managed the Eber Brothers business at
10   all?
11          MR. RAMSEY:  Form.
12       A.   I reported to the trust.
13       Q.   So since you were a co-trustee --
14   withdrawn.
15          Putting aside who you reported to, did
16   you understand that you had an obligation to run
17   the Eber Brothers business for the benefit of the
18   trust beneficiaries?
19          MR. RAMSEY:  Form.
20       A.   Could you repeat that question?
21       Q.   The Eber Brothers business, at the top
22   level there was Eber Brothers and Co., Inc.;
23   correct?
24       A.   Yes.
25       Q.   And is it correct that all of the

Page 83

L. Eber

1
2    shares of that business, at least all the voting
3    shares, were controlled by the Allen Eber trust?
4        A.   Yes.
5        Q.   And is it your understanding that it
6    is the voting common shareholders to whom a
7    corporate officer owes a primary duty of care?
8           MR. RAMSEY:  Form.
9        A.   I don't have an answer for you on
10   that.  I don't know.
11       Q.   Who are the other shareholders in Eber
12   Brothers and Co., Inc. besides the Allen Eber
13   Trust?
14       A.   There was common non-voting stock was
15   owned by myself and my sisters.
16       Q.   Did anyone else own Eber Brothers and
17   Co., Inc. stock?
18       A.   No.
19       Q.   Did you have any understanding as to
20   whether -- withdrawn.
21          So you did understand that as a
22   corporate officer and a director you had a
23   fiduciary duty towards the shareholders of the
24   company; correct?
25          MR. CALIHAN:  Objection to form.

Page 84

L. Eber

1
2           MR. RAMSEY:  Form.
3        A.   Yes, I believe so.
4        Q.   So with respect to the company Eber
5    Brothers and Co., Inc., you understood you had a
6    fiduciary duty with respect to the trust, your
7    sisters and yourself?
8           MR. RAMSEY:  Form.
9        Q.   Correct?
10       A.   Yes.
11       Q.   And did you understand that when you
12   owe fiduciary duties to multiple individuals at
13   the same level like that that you are not allowed
14   to prefer one individual shareholder over another
15   individual shareholder?
16          MR. CALIHAN:  Objection to form.
17          MR. RAMSEY:  Form.
18       A.   I never got into any of this.  This is
19   something I just did my job with the company and
20   reported to the trustees of the trust.
21       Q.   Was it your understanding that you
22   could issue dividends or distributions to some
23   shareholders but not others?
24       A.   I don't understand the question.  It's
25   is something I never -- I don't have an

Page 85

L. Eber

1
2    understanding of what you are asking.
3        Q.   In terms of Eber Brothers and Co.,
4    Inc., that held the stock of other Eber Brothers
5    entities; correct?
6        A.   Yes.
7        Q.   Which entities did it control?
8        A.   Whatever ones that were there at the
9    time.
10       Q.   So that included Eber Brothers Wine
11   and Liquor Corp.; correct?
12       A.   Yes.
13       Q.   Were there other businesses such as a
14   framing business?
15       A.   No.
16       Q.   Or --
17       A.   The produce business.
18       Q.   Produce business.
19          What was that called?
20       A.   Eber and Co.
21       Q.   When did Eber and Co. stop operations?
22       A.   Eber and Co. was a produce business.
23   Stopped quite a few years ago.  I don't have the
24   date.
25       Q.   Did you ever work for that produce

22 (Pages 82 - 85)

Page 86

L. Eber

1
2 business?
3     A.   Yes.
4     Q.   When was that?
5     A.   In high school and college.
6     Q.   Was it still operating at the time
7 that you graduated from college?
8     A.   Yes.
9     Q.   Who managed that?
10     A.   Audrey Hays' father.
11     Q.   What was his name?
12     A.   Darwin Boslov, B-O-S-L-O-V.
13     Q.   So not likely a creationist?
14     A.   What?
15     Q.   Bad joke.
16          Returning to Eber Brothers Wine and
17 Liquor Corp., you were the president of that
18 entity; correct?
19     A.   Eventually.
20     Q.   And what was your position with
21 respect to Eber Brothers and Co., Inc. at the same
22 time you were president of Eber Brothers Wine and
23 Liquor Corp.?
24     A.   I was president of that too.
25     Q.   Besides Eber Brothers and Co., Inc.,

Page 87

L. Eber

1
2 were there any other shareholders in Eber Brothers
3 Wine and Liquor Corp. when you were president of
4 it?
5     A.   Not that I remember.
6     Q.   So as president of Eber Brothers Wine
7 and Liquor Corp. you understood that your
8 fiduciary duties to the shareholders ran to
9 ultimately the Allen Eber Trust; correct?
10          MR. RAMSEY:  Form.
11     A.   I reported to the Allen Eber Trust.
12     Q.   And Eber Brothers Wine and Liquor
13 Corp. in turn opened all of the shares in Eber
14 Brothers Wine and Liquor Metro Inc. once that was
15 created in the nineties; correct?
16     A.   I don't remember.  It's possible, but
17 I don't remember.
18     Q.   Are there any Eber Brothers entities
19 that were owned or at one point controlled by Eber
20 Brothers and Co., Inc., where you did not believe
21 that you had fiduciary duties to the beneficiaries
22 of the trust?
23          MR. RAMSEY:  Form.
24     A.   No.
25     Q.   At some point you ended up resigning

Page 88

L. Eber

1
2 as president of Eber Brothers Wine and Liquor
3 Corp.; correct?
4     A.   Yes.
5     Q.   But you remained president of Eber
6 Brothers and Co., Inc.?
7     A.   Yeah, it's possible.  I don't
8 remember.  There are a lot of companies.  It can
9 get confusing.
10     Q.   What is your current position with
11 Eber Brothers and Co., Inc.?
12     A.   My current position with Eber Brothers
13 and Co.?  I could be a director.  I don't remember
14 what else.  The company actually there are so many
15 of them it confuses me.  I would have to look at
16 what it actually is.
17     Q.   Other than yourself, do you recall
18 anyone else whoever served as president of Eber
19 Brothers and Co., Inc.?
20     A.   It's possible there could be somebody
21 else.
22     Q.   What is Wendy's position with Eber
23 Brothers and Co., Inc.?
24     A.   She may be president of it.
25     Q.   When is the last time there was any

Page 89

L. Eber

1
2 kind of election of either officers or directors
3 for Eber Brothers and Co., Inc.?
4     A.   I don't remember.
5     Q.   Why did you resign as president of
6 Eber Brothers Wine and Liquor Corp.?
7     A.   Because it didn't see -- it didn't --
8 there was nothing for me to do in Eber Wine and
9 Liquor Corp. anymore.  I was working for Southern
10 in New York and then I was involved in Eber
11 Connecticut.
12     Q.   Did someone replace you as president
13 of Eber Brothers Wine and Liquor Corp.?
14     A.   I believe so.
15     Q.   Who was that?
16     A.   It could be Wendy Eber.  I don't
17 remember.
18     Q.   Well, if there was nothing for you to
19 do, was there something for Wendy Eber to do?
20     A.   Yes.
21          MR. RAMSEY:  Form.
22     Q.   What was that?
23     A.   She has a very strong financial
24 background and there were a lot of problems there
25 and she was very capable in relating to solving

23 (Pages 86 - 89)

L. Eber

1  
2  those problems and dealing with regulatory
3  agencies and moneys that were owed and different
4  things that were thrown against the company.
5     Q.  Which regulatory agencies are you
6  referring to?
7     A.  Anyone that would -- any financial
8  ones that would be involved in any business.  No
9  one in particular but there are different agencies
10  that any business confronts with.
11     Q.  So there was no particular regulatory
12  agency or governmental or quasi governmental body
13  that you were specifically referring to when you
14  said that Wendy would need to interact with them
15  as president of the Eber Brothers Wine and Liquor
16  Corp.?
17     A.  Well, you know the problems the
18  company had with the past Pension Benefit
19  Guarantee Corporation.
20     Q.  So that's one.
21     A.  And whatever other ones in different
22  situations that the company was faced with.
23     Q.  What was the situation with Pension
24  Benefit Guarantee Corp.?
25     A.  That Eber Brothers had a defined

L. Eber

1  
2  benefit pension plan going back to 1950s and after
3  they couldn't afford to make the payments and so
4  the Pension Benefit Guarantee Corporation put the
5  company in default under the ERISA laws and we had
6  a deal with it.
7     Q.  When was the default that you just
8  referred to?
9     A.  I don't have the exact -- I don't
10  remember the exact date.
11     Q.  By default do you mean place the lien
12  against the corporate assets?
13     A.  Yes.
14     Q.  Yes?
15     A.  Yes.
16     Q.  When did that occur?
17     A.  I don't remember the exact date.
18     Q.  Was it in approximately 2014?
19     A.  It could have been.  If you have it
20  there. I can't remember these dates. I am glad I
21  remember what I did yesterday.
22     Q.  So your resignation was in 2012 to the
23  best of your recollection; correct?
24     A.  Yes.
25     Q.  So as of 2012 were you anticipating

L. Eber

1  
2  that PBGC would be placing a lien on corporate
3  assets?
4     A.  No.
5     Q.  So as of 2012, did you expect that
6  Eber Brothers would be able to continue making the
7  payments due to PBGC?
8     A.  The money wasn't there.  You know we
9  tried to resolve it.  It was a legacy that doesn't
10  go away.  If you know the ERISA laws there is no
11  way out of it.
12     Q.  Did you try to find a way out of it?
13     A.  Yes.
14     Q.  What was that?
15     A.  Hired legal counsels that specialize
16  in it who I paid personally.
17     Q.  Which counsel is that?
18     A.  Groom in Washington, D.C.
19     Q.  Anyone else?
20     A.  With the PBGC you are talking about?
21     Q.  Yes, to help get out of the ERISA laws
22  as you said.
23     A.  We hired a law firm.  They have a
24  branch in Rochester.  Hourihan, he was the lawyer
25  on it.

L. Eber

1  
2     Q.  Is this the Bond --
3     A.  Bond Schoeneck, thank you.
4     Q.  Any other lawyers that you hired?
5     A.  I don't remember.  It's possible, but
6  I don't remember.
7     Q.  Do you recognize the name Glenn Sturm?
8     A.  Yes.
9     Q.  Who is he?
10     A.  A lawyer.
11     Q.  Is he a lawyer who you hired?
12     A.  No.
13     Q.  Who hired Glenn Sturm?
14     A.  Well, I met him and he was hired, he
15  was hired.  I would say I was involved in hiring
16  him. I correct that, and my daughter Wendy.
17     Q.  And for what purpose was he hired?
18     A.  To help Eber Connecticut out of dire
19  financial straights.
20     Q.  How specifically was Glenn Sturm
21  qualified to do that?
22     A.  He was a partner, senior partner of
23  Mullins something in Atlanta.  Very well
24  respected.  Had done a lot in turnaround companies
25  and was going to -- did help us in navigating

24 (Pages 90 - 93)

Page 94

L. Eber

1
2 through a very difficult financial period.
3      Q.   How were you introduced to Glenn
4 Sturm?
5      A.   I met him in a restaurant.
6      Q.   Where was that?
7      A.   In New Haven.
8      Q.   When was that?
9      A.   I don't have the date.
10      Q.   Was it years before you had hired him
11 or shortly beforehand?
12      A.   Shortly before we hired him.
13      Q.   And what kinds of things did Glenn
14 Sturm advise you about in terms of the subject
15 matter?
16      A.   Tried to get us bank loans.  Brought
17 in consultants to help streamline the company.
18 Talk to our management.  Education.  Had an
19 excellent legal background and everything.
20      Q.   Did he advise you or the companies
21 concerning their debts and trying to get out of
22 some of the debts that were owed to other third
23 parties like PBGC?
24      MR. RAMSEY:  Form.
25      A.   He did advise us on debt and how to

Page 95

L. Eber

1
2 restructure the company to make it look more
3 attractive to banks so we could borrow money.
4      Q.   And what were some of the ways in
5 which the company was restructured?
6      A.   I don't actually remember the actual
7 restructuring.
8      Q.   Was part of the restructuring included
9 in the sale of six percent of Eber Connecticut to
10 Polebridge Bowman?
11      A.   I think the six percent to him was
12 that he wanted to get paid.  And it was a way to
13 pay him and the company didn't have any money to
14 pay him.
15      Q.   He was associated as a partner with a
16 law firm Nelson Mullins; correct?
17      A.   Yes.
18      Q.   Wasn't he paid through payments to his
19 law firm?
20      A.   There were payments to his law firm
21 originally and then he -- I don't know what
22 happened between he and his law firm.  He went
23 more on and off on his own.
24      Q.   So it was your understanding that
25 while he was doing work for you he left Nelson

Page 96

L. Eber

1
2 Mullins; is that right?
3      A.   I believe so.  I can't remember the
4 exact but he was working on his own at some point.
5      Q.   And once he was working on his own,
6 how was the topic of selling him a piece of the
7 company broached?
8      A.   I don't know.  I don't remember.  I
9 was not involved in that.
10      Q.   Who was?
11      A.   I would say my daughter Wendy.
12      MR. RAMSEY:  When you get to a good
13 place Brian to take five minutes.
14      MR. BROOK:  We can do that, sure.
15      THE VIDEOGRAPHER:  This marks the end
16 of media unit two in the videotaped
17 deposition of Lester Eber.  We are going off
18 the record.  Time is 11:32.
19      (Recess taken.)
20      THE VIDEOGRAPHER:  This marks the
21 beginning of media unit number three in the
22 videotaped deposition of Lester Eber.  We
23 are going on the record.  The time is 11:45.
24 BY MR. BROOK:
25      Q.   Mr. Eber, when did you decide to cut

Page 97

L. Eber

1
2 your sister, nieces and nephew out of the family
3 business?
4      MR. RAMSEY:  Form.
5      A.   I didn't.
6      Q.   What do you mean by that?
7      A.   I didn't decide to cut anyone out of
8 the family business.
9      Q.   Didn't you take actions that cut your
10 sister, nieces and nephew out of the family
11 business?
12      MR. RAMSEY:  Form.
13      A.   I didn't look at it that way.  I did
14 what would save a company from going into
15 liquidation.
16      Q.   How did and -- withdrawn.
17      What did you do to save the company
18 from going into liquidation that you were just
19 referring to?
20      A.   I have personally paid legal and other
21 expenses that I was not personally liable for to
22 keep the company viable that were legacy costs
23 that were shoved -- that were Eber Connecticut was
24 obligated to.  You have a list of all of them.
25      Q.   How did those cash infusions give you

25 (Pages 94 - 97)

L. Eber

1
2    the right to take control of the business for
3    yourself?
4        MR. RAMSEY:  Form.
5        A.    That wasn't -- the cash infusions kept
6    the company alive.  If I didn't do that there
7    wouldn't be a company to talk about today.
8        Q.    But you never at the time when you
9    agreed to make the cash infusions, you never said
10   if I do this I get to own the company, do I?
11       A.    I never -- I just did what had to be
12   done to keep the company alive and if I hadn't had
13   done it there wouldn't be a company today.
14       Q.    Is it your understanding that when
15   someone loans money to a company that person has
16   the right to take over the company in the event of
17   nonpayment?
18       MR. RAMSEY:  Form.
19       A.    All I know is if you loan money you
20   got to secure the loan so you can get your money
21   back.
22       Q.    And is that what you did when you
23   loaned money to Eber Brothers?
24       A.    I eventually did that.
25       Q.    So when you say you know when you owe

L. Eber

1
2    money you have to secure the loan, at what point
3    did you come to know that?
4        A.    It was always something that as a
5    businessman that if you are lending money you got
6    to handle the companies in desperate situations
7    facing liquidation, you have to protect your, the
8    money you have lent.
9        Q.    When did you secure any of your loans
10   with Eber Brothers?
11       A.    I don't remember the exact dates.
12       MR. BROOK:  Let's mark this as
13   Plaintiffs' Exhibit 30.
14       (Plaintiffs' Exhibit 30, a document
15   entitled Amended and Restated Promissory
16   Note bearing Bates numbers EB 00031310
17   through 311, marked for identification, as
18   of this date.)
19       Q.    I am showing you what has been marked
20   as Plaintiffs' Exhibit 30.  It is a document
21   entitled Amended and Restated Promissory Note
22   bearing Bates numbers EB 00031310 through 311.
23       Do you recognize this document?
24       A.    Yes.
25       Q.    What is it?

L. Eber

1
2        A.    It's a amended and restated promissory
3    note from the company.
4        Q.    So this is Eber Brothers Wine and
5    Liquor Corp. promising to pay you; correct?
6        A.    Yes.
7        Q.    And who authorized this promissory
8    note on behalf of Eber Brothers Wine and Liquor
9    Corp.?
10       A.    I would imagine it is John Ryan, chief
11   financial officer.
12       Q.    And you also signed on behalf of Eber
13   Brothers Wine and Liquor Corp.?
14       A.    Yes.
15       Q.    And you also signed this document on
16   behalf of yourself?
17       A.    Yes.
18       Q.    Now on the first page, do you see
19   there is some handwritten amendments?
20       A.    Yes.
21       Q.    And the handwritten amendments
22   increased the interest rate from six percent to
23   nine percent?
24       A.    Yes.
25       Q.    And it looks like are those your

L. Eber

1
2    initials by that?
3        A.    Yes.
4        Q.    But John Ryan's initials don't appear
5    next to those changes, do they?
6        A.    I didn't see them.
7        Q.    Did John Ryan approve those changes?
8        A.    I would imagine he had to approve them
9    and it is very possible there was a lawyer
10   involved in this.  Would probably be Pat Dalton
11   that suggested this.
12       Q.    Do you actually remember John Ryan
13   approving increasing the interest rate by 50
14   percent?
15       A.    No.
16       Q.    When did the change to the interest
17   rate occur?
18       A.    I don't remember.
19       Q.    This note, which is dated March 13,
20   2006, that is not a secured promissory note;
21   correct?
22       A.    If that's what you say it is.  I
23   haven't had a chance to read it.
24       Q.    Do you have any recollection of
25   securing your 2006 promissory note?

26 (Pages 98 - 101)

Page 102

L. Eber

1    L. Eber
2    A.  No.
3    Q.  Let's go to Exhibit 13 which we used
4  yesterday.  That is a line of credit note with a
5  date in the upper right-hand corner of October
6  blank 2009.
7        Do you see that?
8    A.  Yes.
9    Q.  And this is a note that was issued by
10  Eber Brothers Wine and Liquor Metro Inc.; correct?
11    A.  Yes.
12    Q.  If you look on page 3 you see it was
13  authorized again by you and also Wendy Eber on
14  behalf of Eber Metro?
15    A.  Yes.
16    Q.  Was this note something that was
17  secured at the time that you executed it?
18    A.  I haven't had a chance to read this.
19  I don't know.  It probably wasn't.
20    Q.  And as you sit here today, do you have
21  any recollection of insisting that you would not
22  loan more money to the company unless you got a
23  security agreement?
24    A.  No, I don't remember saying that.  I
25  did whatever I had to to keep the company alive.

Page 103

L. Eber

1    L. Eber
2    Q.  So now let's take a look at Exhibit
3  15.  This is the security agreement entered into
4  as of February 26, 2010.
5        Do you see that?
6    A.  Yes.
7    Q.  Do you remember this agreement?
8    A.  Yes.  I don't remember the details of
9  it but I do remember the agreement.
10    Q.  Why did you enter into the security
11  agreement with Eber Brothers Metro and Eber
12  Brothers Wine and Liquor Corp.?
13    A.  To protect my loans.
14    Q.  What did the Eber companies get out of
15  this?
16        MR. RAMSEY:  Form.
17    A.  What did the Eber companies get out of
18  it?  They were kept alive by my loans.
19    Q.  But you already agreed to make loans,
20  hadn't you?
21    A.  Yes, I had.  Yes.
22    Q.  And you made those loans without
23  requiring security; correct?
24    A.  That's correct.
25        MR. RAMSEY:  Form.

Page 104

L. Eber

1    L. Eber
2    Q.  So why did the Eber companies sign the
3  security agreement?
4        MR. RAMSEY:  Form.
5    A.  The companies were in desperate
6  condition and could have been liquidated and it is
7  normal to ask for security in those circumstances.
8    Q.  Are you saying it is normal to ask for
9  security for a loan after the loan has already
10  been executed?
11        MR. RAMSEY:  Form.
12    A.  As I told you before, I did whatever I
13  had to to keep the companies alive and not be
14  liquidated.  There isn't a time to say is it
15  secured or not.  You got to do it to keep the
16  company working, being able to run a business or
17  there wouldn't be a company.
18    Q.  Who drafted the security agreement?
19    A.  I don't remember.
20    Q.  Was legal counsel retained for either
21  side of this transaction?
22    A.  Very -- yeah.  I would say yes.
23    Q.  Who was legal counsel?
24    A.  It would probably have been Pat
25  Dalton.

Page 105

L. Eber

1    L. Eber
2    Q.  Do you specifically remember Pat
3  Dalton working on this?
4    A.  I can't remember, but that's who it
5  probably would have been.
6    Q.  Do you remember when the billing
7  dispute between Eber Brothers and Pat Dalton
8  began?
9    A.  Not the exact date of it.
10    Q.  Was it in approximately 2009 or '10?
11    A.  I don't think it was then.  I can't
12  remember.  I don't remember the dates.
13    Q.  Did Glenn Sturm draft this agreement?
14    A.  He could have.
15    Q.  Let's look at one more document that
16  we covered yesterday.  Here we go.  Exhibit 16
17  this is another copy of the line of credit note
18  but you may remember this from yesterday's
19  testimony.  On the upper right-hand corner it says
20  the date is February 26, 2010.
21        Do you see that?
22    A.  Yes.
23    Q.  Do you remember this version of the
24  line of credit note?
25    A.  This one my signature is on it but I

27 (Pages 102 - 105)

Page 106

L. Eber

1  L. Eber
2  don't remember it.
3      Q.   So you don't remember why you signed
4  the same line of credit note with two different
5  dates?
6      A.   No.
7      Q.   When did -- let's look at either one
8  of the line of credit notes either Exhibit 13 or
9  16.  Take your pick.  I think the terms are all
10  the same except for the date.
11          MR. RAMSEY:  Do you have 16 in front
12      of you?  Look at this (indicating).
13      Q.   Do you see at the bottom of paragraph
14  3 it says in the final sentence that "The maturity
15  date is defined as December 31, 2011."?
16      A.   Yes.
17      Q.   What is your understanding of what the
18  maturity date means with respect to a line of
19  credit note?
20      A.   That it has to be paid then.
21      Q.   And how was the maturity date for this
22  line of credit note determined?
23      A.   I do not know.
24      Q.   Did you think that it was realistic as
25  of February 2010 to expect Eber Metro or Eber

Page 107

1  L. Eber
2  Brothers and Co., Inc. to be able to pay 1.5
3  million dollars plus interest within less than two
4  years?
5          MR. RAMSEY:  Form.
6      A.   I did not draft this.  I was involved
7  in keeping the company in business.  That was my
8  priority.  I was not involved in drafting this.
9      Q.   How does taking Eber Brothers Metro
10  shares away from Eber Brothers Wine and Liquor
11  Corp. and putting it into your own company an
12  action that helps keep the company in business?
13          MR. RAMSEY:  Form.
14      A.   It restructures the company, cleans up
15  the statement and turns a debt into an asset for a
16  bank.  So you can go -- because the company
17  couldn't get a loan.  It couldn't get any loans
18  from anyone.  So this cleans up the balance sheet
19  and makes it as an asset instead of a debt.
20      Q.   So you wanted to transfer the company
21  out from underneath the debts owed by Eber
22  Brothers Wine and Liquor Corp.; correct?
23      A.   I wanted to get a bank loan for the
24  company.  You know in our business you have to pay
25  the suppliers.  They transfer the money out of

Page 108

1  L. Eber
2  your bank account.
3      Q.   At the time of approximately 2010
4  through 2012, was Eber Brothers Wine and Liquor
5  Corp. a solvent company?
6      A.   Wine and Liquor, I don't know what --
7  I don't think they were solvent.  I think they
8  were struggling.
9      Q.   Did you have any understanding of what
10  additional fiduciary duties a corporate executive
11  has at a time period when a company is in the zone
12  of insolvency?
13          MR. RAMSEY:  Form.
14      A.   I reported to the trust.  They were
15  aware of everything that went on.  I did the best
16  I could to keep above water.
17      Q.   Why did you create the company
18  Alexbay?
19      A.   It was at the suggestion of my
20  lawyers.
21      Q.   Which lawyers?
22      A.   Would have been David Beltz and there
23  is another one.  I cannot think of the other.
24      Q.   Who is David Beltz?
25      A.   He was a lawyer that advised me in

Page 109

1  L. Eber
2  Connecticut.
3      Q.   And why did he say that you should
4  create the Alexbay company?
5          MR. RAMSEY:  Hold on.  Just be careful
6      you are not infringing on any conversation
7      you had.  The action he ultimately took you
8      can testify about that.  I don't want you
9      testifying to any conversations you had with
10      Mr. Beltz.
11      Q.   What was the purpose -- I understand
12  that you created the company because a lawyer told
13  you to do it, but what was the purpose you
14  intended to have the company Alexbay serve?
15      A.   A personal holding company.
16      Q.   What did you want to hold when you
17  created it?
18      A.   Whatever that had to be, that was, an
19  investment that I would make.
20      Q.   Were you thinking of any specific
21  investments at the time you created it?
22      A.   You know, I at the time I don't
23  remember what but it was a personal LLC that I
24  created that was created for me.
25      Q.   Do you remember when you created it?

28 (Pages 106 - 109)

Page 110

L. Eber

1
2      A.   I don't remember the date.
3      Q.   Let's mark this next exhibit
4  Plaintiffs' Exhibit 31.
5           (Plaintiffs' Exhibit 31, a copy of
6      two printouts made on October 1, 2016 from
7      the Connecticut Department of State
8      concerning the business Alexbay LLC, marked
9      for identification, as of this date.)
10     Q.   Plaintiffs' Exhibit 31 in front of you
11  is a copy of two printouts made on October 1, 2016
12  from the Connecticut Department of State
13  concerning the business Alexbay LLC.
14          Do you see it on the first page it
15  states the date of incorporation/registration as
16  December 8, 2011?  It is the fifth line down.
17     A.   Yes.
18     Q.   And is that consistent with your
19  recollection of when you created the company?
20     A.   I would believe so.
21     Q.   What was the original name that you
22  had for your company?
23     A.   Lester Eber LLC.
24     Q.   Why did you change the name?
25     A.   There were enough Eber -- a lot of

Page 111

L. Eber

1
2  Ebers.  Just too much confusion.  I think it
3  needed a separate name.
4      Q.   How did you arrive at the Alexbay LLC
5  name?
6      A.   There were other names that I tried
7  but they were taken in the state of Connecticut
8  and I go up there in the summertime and I didn't
9  think anyone would probably use that name.
10  Alexandria Bay is in upstate New York on the
11  Canadian border.
12     Q.   It is named after Alexandria Bay?
13     A.   Yes.
14     Q.   Is that a place that you visited?
15     A.   In the summer, yes.
16     Q.   So is it -- having seen the date when
17  Alexbay which was then called Lester Eber LLC was
18  created, does that refresh your recollection as to
19  what particular investments or other holdings you
20  wanted to have held by the company?
21          MR. RAMSEY:  Form.
22     A.   Yeah.  I think it would be for the
23  investment.  Would be the investment in
24  Connecticut.
25     Q.   You mean Eber Connecticut?

Page 112

L. Eber

1
2      A.   Eber Connecticut, yes.
3      Q.   And here is a document previously
4  marked Exhibit Plaintiffs' 8.
5      A.   Yes.
6      Q.   This is an affidavit that was signed
7  by you under oath on December 8, 2011; correct?
8      A.   Yes.
9      Q.   What was the purpose of this
10  affidavit?
11     A.   It's a law that any transfer of stock
12  or change in ownership of stock has to be reported
13  to the Consumer Protection Agency in Connecticut.
14     Q.   So as of December 8, 2011 you had
15  already decided to take Eber Connecticut and put
16  it in Alexbay in some way; correct?
17          MR. RAMSEY:  Form.
18     A.   I don't remember the date.
19     Q.   This affidavit is dated December 8th;
20  correct?
21     A.   Yeah.
22     Q.   And this states item number 4 or let's
23  start with item number 3.  3 says "Presently 79
24  percent of Eber Connecticut is owned by me through
25  an entity known as Eber Metro.

Page 113

L. Eber

1
2      4, I wish to transfer all of that 79
3  percent that I own from Eber Metro to Lester Eber
4  LLC, an entity which will also be wholly owned by
5  me.
6      5, this transfer is being done for no
7  consideration and that it is being done strictly
8  for organizational purposes.  No money or other
9  consideration will change hands."
10          Did I read that correctly?
11     A.   Yes.
12     Q.   As of December 8, 2011 you had decided
13  to take Eber Connecticut and have it be held by
14  Lester Eber LLC; correct?
15          MR. RAMSEY:  Form.
16     A.   Yes.
17     Q.   Had any of the debt to you been
18  defaulted on at that point?
19     A.   Hadn't been defaulted.  Hadn't been
20  paid either.  There was no way of it being paid.
21     Q.   So you were still president of Eber
22  Wine and Liquor and Eber Metro at that point;
23  correct?
24     A.   Eber Metro but I don't know about Eber
25  Wine and Liquor.

29 (Pages 110 - 113)

Page 114

L. Eber

1
2    Q.   Eber Metro had assumed all the debt to
3  you; correct?
4    A.   Yes.
5    Q.   And so as president of Eber Metro
6  weren't you obligated to try or -- withdrawn.
7         Was it your understanding that as
8  president of Eber Metro you had an obligation to
9  attempt to either pay outstanding debts that were
10  coming due or to renegotiate the terms of those
11  debts to avoid default?
12         MR. RAMSEY:  Form.
13    A.   I don't understand the question.  You
14  got me confused.
15    Q.   As the president of a company, do you
16  want to see that company be liquidated?
17         MR. RAMSEY:  Form.
18    A.   I did everything possible to stop a
19  liquidation.
20    Q.   And isn't the liquidation something
21  that is often times a result of a default on a
22  large amount of debt?
23    A.   Yes.
24    Q.   And as a secured lender at that point
25  of Eber Metro, you had the right to require a

Page 115

L. Eber

1
2  liquidation of the company if it went into
3  default; correct?
4    A.   That's what it says.  I don't know
5  what -- I don't know the law of what you are
6  talking about.  So the only thing I knew was that
7  I had to keep -- I had invested a lot of money.  I
8  continue to invest money and if I hadn't invested
9  money there would have been no Eber Connecticut
10  and what I did here was to clean up the statement
11  to make it look taking debt and making it into
12  assets so a bank would want to give us a loan.
13  When Wells Fargo left us we were nowhere's.  We
14  had nothing.  They put a workout team in our
15  company and we were desperate and I personally
16  lent enough money to keep this company, the last
17  vestige afloat and paid legal fees and everything
18  personally to do it.  You got all those copies.
19         MR. RAMSEY:  You answered the
20      question.
21    Q.   Why didn't you create an entity that
22  rather than being held entirely by you was held by
23  the Allen Eber Trust and transfer the company into
24  that new entity?
25         MR. RAMSEY:  Form.

Page 116

L. Eber

1
2    A.   I had asked my sister and my niece to
3  contribute money and they both declined.
4    Q.   When did you ask them to contribute
5  money?
6    A.   I don't have the exact date, but I
7  did.  There are letters that we submitted that
8  prove it.
9    Q.   Does the timing of April 2010 sound
10  correct for when he sent those letters?
11    A.   You probably have them here.  So
12  that's what it is.  I don't remember that date.
13      2010, can you remember?
14    Q.   Unfortunately yes, but --
15    A.   Good.
16    Q.   -- it is -- do you have any
17  recollection of after those letters were sent to
18  your sister and your niece ever raising the topic
19  again with them about putting money into the
20  Connecticut business?
21    A.   Yes.
22    Q.   When was that?
23    A.   I don't remember the date but I will
24  let you know what my sister said.  She said I want
25  to get money out.  I don't want to put money in.

Page 117

L. Eber

1
2    Q.   And when did she say that?
3    A.   I don't remember the date.
4    Q.   Was it around the time when you sent
5  her the letter?
6    A.   It could have been and then later on.
7  I don't have the dates.
8    Q.   Did you ever tell your sister that if
9  she didn't put money in that you were going to
10  take it away from the trust?
11         MR. RAMSEY:  Form.
12    A.   No, I didn't say that to her.
13    Q.   Why not?
14    A.   Because it wasn't that desperate a
15  situation.  I did it when the company, it became
16  desperate that if I didn't put the money in no one
17  else was going to put it in and there wouldn't be
18  a company.
19    Q.   How do you know if no one else was
20  going to put money in if they knew what was at
21  stake was the continuation of the family business
22  under the family trust?
23         MR. RAMSEY:  Form.
24    A.   They both refused and had no interest
25  in putting any money into the company.

30 (Pages 114 - 117)

Page 118

L. Eber
2      Q.   But you never told them of the
3  possibility that if they did not put money in they
4  would lose their interest in the family business;
5  correct?
6           MR. RAMSEY:  Form.  Asked and
7      answered.
8           Go ahead.  You can answer it again.
9           MR. BROOK:  It was asked but not
10     answered.
11     A.   I don't remember saying that to them.
12     Q.   Do you know anyone else who talked
13  with your sister or your niece about the need to
14  put money into the family business in 2010 or
15  2011?
16     A.   I don't know.
17     Q.   Looking at Exhibit 8 in front of you,
18  you signed that based upon your own knowledge and
19  belief it says at the top; right?
20     A.   Yes.
21     Q.   So and this was also something where
22  you made the statement or made the affidavit under
23  penalty of false statement; correct?
24     A.   Yes.
25     Q.   So you understood that it was a

Page 119

L. Eber
2  statement being made under oath like your
3  testimony today?
4      A.   Yes.
5      Q.   So you knew how important it was to
6  tell the truth?
7      A.   Yes.
8      Q.   The whole truth; correct?
9           MR. RAMSEY:  Form.
10     A.   Yes.
11     Q.   And nothing but the truth; correct?
12          MR. RAMSEY:  Form.
13     A.   Yes.
14     Q.   So item 3 you wrote in this affidavit
15  "Presently 79 percent of Eber Connecticut is owned
16  by me through an entity known as Eber Metro."
17          Was that a true statement?
18          MR. RAMSEY:  Form.
19     A.   If that's what I said at the time and
20  signed it, yes.
21     Q.   So it is your understanding that at
22  the time that you signed this Eber Connecticut or
23  Eber Metro was not owned by the trust?
24     A.   Yes.
25     Q.   And you said that item number 4 though

Page 120

L. Eber
2  is that you wish to transfer that 79 percent from
3  Eber Metro to Lester Eber LLC.
4           Do you see that?
5      A.   Yes.
6      Q.   So isn't it true that actually this
7  affidavit was written at a time when Eber
8  Connecticut was still ultimately or 79 percent of
9  Eber Connecticut was owned by the trust?
10          MR. RAMSEY:  Form.
11     A.   I don't understand what you -- I just
12  don't understand what you are saying here.
13     Q.   You agree with me that if Eber Metro
14  was still an entity that was owned and controlled
15  by the trust, then the statement in item number
16  three would not be correct?
17          MR. RAMSEY:  Form.
18     A.   Could you repeat that?
19          (Record read.)
20     A.   That's correct.
21     Q.   Now item number 4 emphasizes that by
22  saying that Lester Eber LLC is an entity which
23  will also be wholly owned by me.
24          Do you see that?
25     A.   Yes.

Page 121

L. Eber
2      Q.   So you were making it clear that you
3  were telling the recipient of this affidavit that
4  Eber Metro was wholly owned by you; correct?
5           MR. RAMSEY:  Form.
6      A.   Yes.
7      Q.   And you said in item number 5 "This
8  transfer is being done for no consideration."
9           Do you see that?
10     A.   Yes.
11     Q.   What did you mean by that?
12     A.   It is whatever it says.  No
13  consideration.
14     Q.   So no consideration means nothing is
15  being received by Eber Metro in return for giving
16  up the 79 percent of Eber Connecticut; is that
17  right?
18          MR. RAMSEY:  Form.
19     A.   I didn't write this and I would have
20  to talk to whoever did write this to explain it to
21  me.
22     Q.   Who wrote this?
23     A.   I think it's probably something that
24  the Consumer Protection Agency of The State of
25  Connecticut required.

31 (Pages 118 - 121)

Page 122

L. Eber

1
2     Q.   That doesn't answer who wrote this.
3     A.   I don't know.
4     Q.   So was it true that you wanted to
5  transfer the 79 percent of Eber Connecticut to
6  Lester Eber LLC for no consideration?
7         MR. RAMSEY:  Form.
8     A.   I can't explain that to you.
9     Q.   Let's jump ahead in time for a little
10 bit here to late 2016 through 2017.
11    Around the time when this lawsuit was
12 first filed and months afterwards, do you recall
13 that at that point you sought to acquire all of
14 the shares of Eber Brothers and Co., Inc. from the
15 Allen Eber Trust?
16    A.   Yeah.  I believe so.
17    Q.   What did you offer to provide to the
18 Allen Eber Trust in exchange for that?
19    A.   I don't remember the transaction.  I
20 was not -- I was aware of it but I was not
21 actually into the details of it.
22    Q.   Did you have any lawyer who was
23 helping you try to acquire Eber Brothers and Co.,
24 Inc.?
25    A.   Yes.

Page 123

L. Eber

1
2     Q.   Who was that?
3     A.   John Herbert.
4     Q.   Anyone else?
5     A.   I believe he was the lawyer.
6     Q.   Who is Jim Vazzana?
7     A.   Yes.  He is trust and estate lawyer.
8     Q.   Is he a lawyer that you hired?
9     A.   Yes.
10    Q.   To represent you individually?
11    A.   Yes.
12    Q.   And did you also ask him to help you
13 acquire the stock of Eber Brothers and Co., Inc.?
14    A.   I believe so at one time.
15    Q.   Why did you want the Eber Brothers and
16 Co., Inc. stock at that time?
17    A.   You know, I just don't remember the
18 details of it.
19    Q.   But you asked for the stock on
20 multiple occasions; correct?
21    A.   I believe so, yes.
22    Q.   And let's -- withdrawn.
23    Who was it that you were asking to
24 authorize the transfer of the stock?
25    A.   I don't understand the question.

Page 124

L. Eber

1
2     Q.   You yourself were a co-trustee of the
3  trust; correct?
4     A.   Yes.
5     Q.   So why didn't you just transfer the
6  stock to yourself?
7     A.   I didn't do it.
8     Q.   Why not?
9     A.   I just didn't.  I don't have an answer
10 for you.
11    Q.   Did you think that you had the power
12 or authority to do that?
13    A.   I don't know.  It's possible I did.  I
14 just didn't do it.
15        MR. BROOK:  I think this next segment
16    is going to be best done on one continuous
17    whole.  So why don't we go ahead and break
18    for lunch right now.
19        THE VIDEOGRAPHER:  We are going off
20    the record.  The time is 12:20.
21        (Luncheon recess:  12:20 p.m.)
22
23
24
25

Page 125

L. Eber

1
2     A F T E R N O O N   S E S S I O N.
3        (12:57 p.m.)
4  L E S T E R   E B E R,
5     having been previously sworn, resumed the
6     stand and testified further as follows:
7  EXAMINATION (Cont'd)
8  BY MR. BROOK:
9        THE VIDEOGRAPHER:  We are going back
10    on the record.  The time is 12:59.
11    Q.   After breaking for lunch Mr. Eber,
12 were you able to get some food?
13    A.   Yes.
14    Q.   And are you feeling okay to continue
15 this deposition?
16    A.   Yes.
17    Q.   Any reason at all you can think of why
18 you wouldn't be able to provide full and truthful
19 testimony?
20    A.   No.
21    Q.   After this lawsuit was filed, did you
22 become aware of the plans by your co-trustee
23 Canandaigua National Bank and Trust to seek a
24 judicial order terminating the trust?
25    A.   Yes.

32 (Pages 122 - 125)

Page 126

L. Eber

1
2    Q.   How did you find out about that?
3    A.   I believe my lawyer Vazzana told me
4  about it.
5    Q.   Did you know about that before it was
6  filed in the court?
7    A.   No.
8    Q.   And so you appointed Mr. Vazzana to be
9  your lawyer for that court proceeding; correct?
10   A.   Yes.
11   Q.   Had he represented you on anything
12  before then?
13   A.   Yes.
14   Q.   What?
15   A.   Personal issues.
16   Q.   How long had he been representing you
17  for personal issues?
18   A.   I don't remember.  Could have been a
19  couple of years.  I don't remember.
20   Q.   Did any of those personal issues
21  concern the Allen Eber Trust?
22   A.   No.
23   Q.   What was your understanding of what
24  would happen with the assets or what was going to
25  happen with the assets of the Allen Eber Trust if

Page 127

L. Eber

1
2  Canandaigua National Bank had been successful in
3  terminating the trust?
4    A.   Never would happen with the
5  disbursement of the trust.  You know, whatever the
6  procedure was.  I didn't know.
7    Q.   You didn't know what would happen with
8  the assets?
9    A.   The assets would be distributed among
10  the trustees.  Not the trustees.  The
11  beneficiaries, excuse me.
12   Q.   How would the percentages or amounts
13  of distribution be determined?
14   A.   By the percentage of the trustees.
15  You know, there were -- not the trustees.  Excuse
16  me, by the beneficiaries divided three ways which
17  would also Danny and his sister would split one of
18  the thirds.
19   Q.   So it was going to be divided into
20  thirds between one third going to you, one third
21  going to Audrey Hays and one third being split
22  between Lisa Stein and Dan Kleeberg; is that
23  right?
24   A.   Yes.
25   Q.   And did you oppose that distribution

Page 128

L. Eber

1
2  of the assets?
3    A.   No.
4    Q.   And you understood that the assets
5  included the trust stock in Eber Brothers and Co.,
6  Inc.; correct?
7    MR. RAMSEY:  Form.
8    A.   You know, I think that was
9  questionable.  I can't give you an answer on that.
10  I don't know.
11   Q.   What was questionable about that?
12   A.   I don't know of the status of what the
13  stock was or wasn't and I think that would be a
14  question you would have to ask my lawyer.
15   MR. BROOK:  Let's mark this as the
16  next exhibit Plaintiffs' 32.
17   (Plaintiffs' Exhibit 32, a letter
18  and some attachments that are dated July 12,
19  2017 from Rita Nischal of Canandaigua
20  National Bank and Trust to Lester Eber,
21  marked for identification, as of this date.)
22   MR. BROOK:  Go ahead and do 33 as
23  well.
24   (Plaintiffs' Exhibit 33, a order in
25  the Surrogates Court of The State of New

Page 129

L. Eber

1
2  York in Monroe County dated June 1, 2017
3  signed by Surrogate Judge John M. Owens,
4  marked for identification, as of this date.)
5    Q.   You have Exhibits 32 and 33 in front
6  of you.  Exhibit 32 is a letter and some
7  attachments that are dated July 12, 2017 from Rita
8  Nischal, N-I-S-C-H-A-L, of Canandaigua National
9  Bank and Trust to Lester Eber.
10   And Exhibit 33 is a order in the
11  Surrogates Court of The State of New York in
12  Monroe County dated June 1, 2017 signed by
13  Surrogate Judge John M. Owens.
14   Have you seen either or both of these
15  documents before Mr. Eber?
16   A.   Yes.
17   Q.   When did you see the judicial order
18  Exhibit 33?
19   A.   I don't remember.
20   Q.   Was it around the time that the order
21  was entered?
22   A.   It was whenever my lawyer sent it to
23  me.
24   Q.   And do you have any reason to doubt
25  that your lawyer sent it to you promptly after

33 (Pages 126 - 129)

L. Eber

1
2 receiving it himself?
3    A.   No.
4    Q.   And Exhibit 32, when did you see that?
5    A.   I saw it when it was sent to me.  It
6 is July 12th.  So whenever that time period.
7    Q.   Did you review the documents that were
8 enclosed with it?
9    A.   Yes.
10    Q.   Look at page 2 of this exhibit.
11        It says receipt and release in the
12 upper right-hand corner?
13    A.   Yes.
14    Q.   Did you ever sign a receipt and
15 release for Canandaigua National Bank?
16    A.   You know, I don't think I did, but I
17 could have.  I don't remember.
18    Q.   Take a look at page 3.
19        You see it is a table saying residuary
20 TUW Allen Eber proposed distribution?
21    A.   Yes.
22    Q.   And you saw that too; correct?
23    A.   Yes.
24    Q.   And so you saw presumably that listed
25 on the assets here was three line items for Eber

L. Eber

1
2 Brothers and Co. stock?
3    A.   Yes.
4    Q.   And this shows that stock being
5 distributed in roughly the proportions you said
6 the trust assets should be distributed; correct?
7    A.   That I had said?
8    Q.   Well, you previously testified that
9 you understood that the distribution would be one
10 third to you, one third to Audrey Hays and one
11 third split between Dan Kleeberg and Lisa Stein?
12    A.   Yes.
13    Q.   And this reflects close to that
14 distribution; correct?
15    A.   Yes.
16    Q.   Did you have any objection to that
17 distribution of shares of Eber Brothers and Co.
18 stock as specified in this proposed distribution
19 chart?
20    A.   I don't remember it.  I could have.
21 There has been some discussion about it, but I
22 don't remember what I said or didn't say or what
23 our position was.
24    Q.   It is your understanding ultimately
25 the publicly traded stocks and the cash held by

L. Eber

1
2 the Allen Eber Trust was distributed to the
3 beneficiaries of the trust?
4    A.   Yes.
5    Q.   Did you insist that there be certain
6 adjustments made to the distribution after you saw
7 this chart page 3 of Exhibit 32?
8        MR. RAMSEY:  Form.
9    A.   (Indicating.)
10    Q.   Yes.
11    A.   I don't remember.
12        MR. BROOK:  Let's mark this next
13 exhibit Plaintiffs' Exhibit 34.
14        (Plaintiffs' Exhibit 34, a letter
15    and attachments that was produced yesterday
16    by Canandaigua National Bank Bates stamped
17    CNB-PL 0010 through 12, marked for
18    identification, as of this date.)
19    Q.   Exhibit 34 in front of you is a letter
20 and attachments that was produced yesterday by
21 Canandaigua National Bank and is Bates stamp by me
22 as CNB-PL 0010 through 12.
23        Do you recognize this document?
24    A.   Yes.
25    Q.   What is it?

L. Eber

1
2    A.   It's a letter to Canandaigua Bank
3 reducing the money to Lisa Stein from the money
4 that was given by the trust to her daughter Erica
5 Stein.
6    Q.   And is this a letter that you asked to
7 have sent on your behalf?
8    A.   I am copied on it.  So I was aware of
9 it.
10    Q.   Did you authorize Mr. Vazzana to send
11 it?
12    A.   I was aware of it and I was involved
13 in that knew what was going on.  I was aware of
14 it.  That's what I can say to you.
15    Q.   Were you aware of the letter going out
16 before it was sent?
17    A.   Yes.
18    Q.   This was not the first letter that was
19 sent on your behalf asking Canandaigua National
20 Bank to reduce the amount of distribution from the
21 trust to Lisa Stein, was it?
22        MR. RAMSEY:  Form.
23    A.   No.  You are asking questions that
24 show in the other letters.  So you know the
25 answer.

34 (Pages 130 - 133)

Page 134

L. Eber
2   Q.   Why did you want the amount of
3   distribution from the trust to Lisa Stein reduced
4   versus what Canandaigua had proposed?
5       A.   I believe the reason and you say me, I
6   think there were other people involved in this as
7   you see who were copied, lawyers, that there was
8   money had been given to, from the trust to her
9   daughter.
10      Q.   So you wanted to make sure that only
11  the cost of the money being given to Lisa Stein's
12  daughter was borne solely by Lisa Stein; is that
13  right?
14      A.   It was for her daughter out of Lisa
15  Stein's money, the money that was to go to Lisa
16  Stein.  The trust, the way I understood it, took
17  the money out of Lisa Stein's account.
18      Q.   And is it your understanding that
19  based on your request Canandaigua National Bank
20  the amount of the distribution to Lisa Stein was
21  reduced in full by the amount that had been paid
22  previously to Erica Stein?
23      A.   Yes.
24      Q.   And is there any amount of money
25  that's still owed back to the other trust

Page 135

L. Eber
2   beneficiaries by Lisa Stein?
3       A.   Not that I know.
4       Q.   Did you ask the Canandaigua National
5   Bank also reduce the number of shares of Eber
6   Brothers and Co. Inc. that were distributed to
7   Lisa Stein?
8       A.   Did I, no.  I don't remember that.  I
9   don't remember that, no.
10      Q.   Can you think of any reason why the
11  number of shares that Eber Brothers and Co., Inc.
12  should have been reduced, the numbers of shares --
13  let me restart this.
14          Can you think of any reason why the
15  trusts distribution of shares of Eber Brothers and
16  Co., Inc. should have been reduced for Lisa Stein
17  based upon either the prior distributions to Erica
18  Stein or for any other reason?
19      MR. RAMSEY:  Form.
20      A.   I think --
21      MR. BROOK:  I will withdraw that.
22      That was still bad.
23      Q.   So can you think of any reason why the
24  trusts distribution of Eber Brothers and Co., Inc.
25  shares to Lisa Stein should have been reduced?

Page 136

L. Eber
2       MR. RAMSEY:  Form.
3       Go ahead.
4       A.   I believe that it is a legal question
5   and I am not a lawyer.
6       Q.   What was your belief as of July 2017
7   about the value of the Eber Brothers and Co., Inc.
8   stock?
9       MR. RAMSEY:  Form.
10      A.   As I thought it was worthless.
11      Q.   Why did you believe that?
12      A.   Because it had no assets.  What were
13  the assets.
14      Q.   Why did you want to obtain the shares
15  of Eber Brothers and Co., Inc. stock for yourself?
16      A.   I think, as I told you before, I think
17  it is a legal question that you should ask the
18  lawyers.  I am not capable of answering it.
19      Q.   Was your goal to try to prevent
20  plaintiffs from pursuing their lawsuit against
21  you?
22      MR. RAMSEY:  Form.
23      A.   I said ask the lawyers.  I don't have
24  an answer for you.
25      MR. BROOK:  Let's go to this next

Page 137

L. Eber
2   Exhibit 35.
3       (Plaintiffs' Exhibit 35, a e-mail
4   and attachment dated October 31, 2018 sent
5   by Paul Keneally with multiple recipients
6   CNB-PL 0001 to 2, marked for identification,
7   as of this date.)
8       Q.   Exhibit 35 in front of you is a e-mail
9   and attachment dated October 31, 2018 sent by Paul
10  Keneally with multiple recipients CNB-PL 0001 to
11  2.
12          Have you seen this before?
13      A.   I signed it, so I must have.
14      Q.   You're referring to the second page of
15  the exhibit?
16      A.   Behind it, yeah.
17      Q.   So that is your signature?
18      A.   Yes.
19      Q.   And do you remember signing this
20  document?
21      A.   I don't remember, but I did sign it.
22      Q.   How do you know that you signed it if
23  you don't remember it?
24      A.   That's my signature.  So nobody is
25  putting my -- that's my signature on it.

35 (Pages 134 - 137)

Page 138

L. Eber

1
2     Q.    The second page is addressed to the
3   Allen Eber Trust care of the Canandaigua National
4   Bank and Trust Company; correct?
5     A.    Yes.
6     Q.    And it says in all caps below that
7   notice of intent to purchase shares; correct?
8     A.    Yes.
9     Q.    Then the body of it states "The
10  undersigned hereby gives notice of my intent to
11  purchase all shares of capital stock of Eber
12  Brothers and Co., Inc. defined as the company of
13  which the Allen Eber Trust is the registered
14  holder that are proposed to be transferred to
15  Daniel Kleeberg, Lisa Stein or Audrey Hays
16  pursuant to Article 12 of the bylaws of the
17  company." Then your signature.
18        Did I read that correctly?
19    A.    Yes.
20    Q.    What was your purpose in sending this
21  notice of intent?
22    A.    If you look at the bylaws of the
23  company I had the right to do it.
24    Q.    Why do you say that?
25    A.    Read the bylaws.

Page 139

L. Eber

1
2     Q.    Did you read the bylaws?
3     A.    I have.
4     Q.    And it is your belief that the bylaws
5   of the company permitted you to purchase the
6   shares of capital stock of Eber Brothers and Co.
7   stock?
8     A.    On the advice of counsel, yes.
9     Q.    Why did you wait until October 31,
10  2018 to send this notice?
11    A.    Ask my lawyer.
12    Q.    Now you knew that Canandaigua National
13  Bank and Trust Company had proposed to and
14  attempted to transfer the Eber Brothers and Co.,
15  Inc. shares to Dan Kleeberg, Lisa Stein and Audrey
16  Hays a year before this date; correct?
17        MR. RAMSEY: Form.
18    A.    If you are saying that you probably
19  have something that shows that. I don't remember.
20    Q.    And you said here, what you signed
21  your name to, you intended to purchase the shares;
22  correct?
23    A.    That's what it says here.
24    Q.    How much money did you intend to
25  purchase the shares for?

Page 140

L. Eber

1
2     A.    You have to ask my lawyer.
3     Q.    So you signed this without knowing how
4   much money you were committing to pay?
5         MR. RAMSEY: Form.
6     A.    I signed it. I don't have an answer
7   for you on that. I think it's a legal question.
8     Q.    So for all you know you might need to
9   pay the plaintiffs over two million dollars each
10  in order to get the shares that you agreed to
11  purchase?
12        MR. RAMSEY: Form.
13    A.    No.
14    Q.    Why do you say no?
15    A.    Because it isn't worth it.
16    Q.    Well, why do you say that?
17    A.    What's the -- where does it show that
18  it is worth that kind of money? Can you show
19  that?
20    Q.    Again, if it is not -- if you don't
21  know how much the shares are worth, then how can
22  you agree to purchase them?
23        MR. RAMSEY: Form.
24    A.    I told you I am not qualified to
25  answer your question. Please consult my lawyer.

Page 141

L. Eber

1
2     Q.    So you are authorizing us to ask these
3   questions of your lawyer?
4   DI    MR. RAMSEY: Don't answer that.
5         MR. BROOK: I think he already did,
6   but I am just trying to make it clear.
7         MR. CALIHAN: I don't agree, but.
8         MR. BROOK: I know.
9         Let's do two more exhibits after that.
10  We are up to 36 and 37.
11        (Plaintiffs' Exhibit 36, a printout
12  of a table with some notes entitled
13  Residuary TUW Allen Eber Proposed
14  Distribution of Securities, marked for
15  identification, as of this date.)
16        (Plaintiffs' Exhibit 37, a e-mail
17  dated September 15, 2017 sent by Jim Vazzana
18  to R. Nischal at CNB, Canandaigua National
19  Bank, with yourself as one of the people
20  copied on it Bates stamped CNB-PL 0005,
21  marked for identification, as of this date.)
22    Q.    Looking first at Exhibit 36. This is
23  a printout of a table with some notes entitled
24  Residuary TUW Allen Eber Proposed Distribution of
25  Securities.

36 (Pages 138 - 141)

Page 142

L. Eber
1
2        Do you see that?
3    A.   Yes.
4    Q.   And have you seen this version of the
5    chart before?
6    A.   Yes.
7    Q.   When do you recall first seeing this?
8    A.   I don't remember.
9    Q.   Do you see that this table also
10   includes distribution numbers for the shares of
11   Eber Brothers and Co. stock held by the trust?
12   A.   Yes.
13   Q.   Do you recall making any objection to
14   the distribution proposed in this chart after you
15   saw it?
16   A.   I don't remember.
17   Q.   After you saw this chart, do you
18   recall contacting anyone and saying you wanted to
19   buy the shares of Eber Brothers and Co., Inc.
20   stock that were proposed to be distributed to
21   Daniel Kleeberg, Lisa Stein and Audrey Hays?
22       MR. RAMSEY:  Form.
23   A.   I don't remember.
24   Q.   Please take a look at Exhibit 37 now
25   which is a e-mail dated September 15, 2017 sent by

Page 143

L. Eber
1
2    Jim Vazzana to R. Nischal at CNB, Canandaigua
3    National Bank, with yourself as one of the people
4    copied on it Bates stamped CNB-PL 0005.
5        Do you see that?
6    A.   Yes.
7    Q.   Do you recognize this e-mail?
8    A.   I assume I saw it.  It was sent.  I
9    was copied on.
10   Q.   In this e-mail, which was sent by your
11   lawyer, it begins by saying "Dear Rita, as you
12   know we represent Lester Eber and he and the other
13   beneficiaries are reticent to sign a release and
14   receipt as submitted.  However, he will sign it
15   without the release provision."
16       Do you see that?
17   A.   Yes.
18   Q.   So you had talked to your lawyer about
19   signing a receipt prior to him sending this
20   e-mail; correct?
21       MR. RAMSEY:  Well, hold on.
22       Don't tell him what you talked to your
23       lawyer about.
24   Q.   Did you authorize your lawyer to send
25   this e-mail?

Page 144

L. Eber
1
2        MR. RAMSEY:  You can answer that.
3    A.   Yes.
4    Q.   And so is it fair to say that as of
5    September 15, 2017 you agreed with the proposed
6    distribution that Canandaigua National Bank had
7    sent to you?
8        MR. RAMSEY:  Form.
9    A.   No, I don't.  This is only to sign a
10   release.
11   Q.   Okay, so what did you understand to be
12   the significance of signing or not signing a
13   release?
14   A.   Whatever liability that would waive or
15   what have you.
16       MR. BROOK:  Let's go to the next
17       Exhibit 38.
18       (Plaintiffs' Exhibit 38, a letter
19       dated October 11, 2017 on letterhead for
20       Woods Oviatt Gilman LLP addressed to Jim
21       Vazzana and me, marked for identification,
22       as of this date.)
23   Q.   Exhibit 38 is a letter dated October
24   11, 2017 on letterhead for Woods Oviatt Gilman LLP
25   addressed to Jim Vazzana and me.

Page 145

L. Eber
1
2        Do you see that?
3    A.   Yes.
4    Q.   Have you seen this letter before?
5    A.   You know I don't remember.  It doesn't
6    show me copied on it, but I could have.  I don't
7    remember.
8    Q.   And do you recall seeing that there
9    were stock powers that were signed by someone from
10   Canandaigua National Bank purporting to transfer
11   to you shares in Eber Brothers and Co., Inc.?
12   A.   Could you repeat the question?
13   Q.   Sure.
14       Do you recall seeing that around the
15   time of this letter there were stock powers that
16   had been signed by someone from Canandaigua
17   National Bank and Trust purporting to transfer
18   Eber Brothers and Co., Inc. stock to you?
19   A.   I don't remember.
20   Q.   Do you know what stock powers are?
21   A.   Yes.
22   Q.   What are stock powers?
23   A.   The ability to vote the stock.
24   Q.   And how do the stock powers once
25   executed get turned into actual voting rights for

37 (Pages 142 - 145)

Page 210

L. Eber

1
2     bearing the caption of Alexbay versus Eber
3     Brothers and it states it is the affidavit
4     of Lester Eber bearing Bates numbers EB
5     00001059 through 1063, marked for
6     identification, as of this date.)
7         Q.   Exhibit 45 is a document bearing the
8     caption of Alexbay versus Eber Brothers and it
9     states it is the affidavit of Lester Eber bearing
10    Bates numbers EB 00001059 through 1063.
11            Do you recognize this document?
12        A.   Yes.
13        Q.   What is it?
14        A.   It's an affidavit in support of
15    judicial determination for commercial
16    reasonableness under UCC 9-627.
17        Q.   And that's your signature on the last
18    page of this document; correct?
19        A.   Yes.
20        Q.   It states below your signature that it
21    was sworn before a notary public on the 14th day
22    of March 2012.
23            Do you see that?
24        A.   Yes.
25        Q.   You understood this was a statement

Page 211

L. Eber

1
2     under oath like today's deposition; correct?
3         A.   Yes.
4         Q.   Did you review this document carefully
5     before you signed it?
6         A.   Yes.
7         Q.   And you knew that this was a document
8     that the court might rely upon in deciding whether
9     to find the transaction that you had proposed to
10    be commercially reasonable or not; correct?
11        A.   Yes.
12            MR. RAMSEY:  Form.
13        Q.   Please turn to the second page
14    paragraph 6.
15            Are you there?
16        A.   Yes.
17        Q.   That states "Based upon very recent
18    arms length sales on the open market, Eber Conn's
19    value as a going concern is best established at
20    4,633,300 dollars as of December 2011."
21            Do you see that?
22        A.   Yes.
23        Q.   What sales were you referring to in
24    that sentence?
25        A.   I don't know.  I don't remember.

Page 212

L. Eber

1
2         Q.   Based upon your knowledge of the Eber
3     Metro, Eber Connecticut business, which sales do
4     you think you were referring to?
5         A.   I don't remember.
6         Q.   And you can't determine what sales you
7     were referring to based upon your knowledge of the
8     company?
9         A.   I just don't remember.  It is December
10    of 2011.
11        Q.   Why are you reluctant to state that
12    the sales you were referring to were the sales of
13    six percent to Polebridge Bowman?
14            MR. CALIHAN:  Objection to form.
15            MR. RAMSEY:  Form.  That's not what he
16    said.
17        A.   I didn't say that.
18        Q.   Besides Polebridge Bowman, what other
19    sales could you have possibly been referring to?
20        A.   I don't remember.
21        Q.   I am not asking you what you remember.
22    I am asking you as you sit here today.
23        A.   I don't know.
24        Q.   So you can't think of anything else
25    you might have been referring to?

Page 213

L. Eber

1
2            MR. RAMSEY:  Form.
3         A.   As I told you, going back to 2011 I
4     don't remember.
5         Q.   How many times has Eber Connecticut,
6     how many times has Eber Connecticut membership
7     units ever been sold?
8         A.   The only ones I remember are
9     Eder-Goodman and Polebridge Bowman.
10        Q.   And then besides those two
11    transactions, there was also a third transaction
12    in which the Polebridge Bowman shares were
13    transferred to your daughter; correct?
14        A.   Yes.
15        Q.   But that was not a sale; correct?
16        A.   I am not a lawyer.  The lawyers
17    handled that and I can't give you an answer to it.
18    I think you have to ask a lawyer.
19        Q.   To your knowledge, did Wendy pay
20    anything to Polebridge Bowman to acquire its
21    shares?
22            MR. RAMSEY:  Form.
23        A.   I do not know.  You know, I know the
24    transaction took place, but I do not know the
25    details of the transaction.

54 (Pages 210 - 213)

Page 254

L. Eber
1
2    as of this date.)
3        Q.    Exhibit 47 is a two-page letter on the
4    letterhead for Elliot W. Gumaer, Jr. dated January
5    2, 2001 Bates stamped January 8, 2001 and Bates
6    number EB 00001556 to 57.
7            Do you recognize this document?
8        A.    Yes.
9        Q.    What is it?
10       A.    It is a letter from Mike Gumaer to
11   myself regarding his retirement from Nixon Peabody.
12       Q.    And do you see on the back page there
13   is a line below the signature of Mike Gumaer
14   stating the terms and conditions of this letter
15   are agreed by the Eber companies?
16       A.    Yes.
17       Q.    And is that your signature below?
18       A.    Yes.
19       Q.    Do you remember signing this document?
20       A.    I don't remember signing it but I did.
21   It is January of '01.
22       Q.    And when is the last time that you
23   remember seeing this document?
24       A.    I don't remember.
25       Q.    Do you have any reason to believe that

Page 255

L. Eber
1
2    there are any amendments to this letter agreement?
3        A.    I don't know.  I don't remember.  I
4    don't know.
5        Q.    Turning to the second page at the top,
6    do you see he, Mike writes "As a director and
7    consultant to the companies I have endorsed your
8    strategic plan to grow our companies thus enabling
9    us to compete in an industry that's changed
10   radically over the years since your father's
11   death."
12           Do you see that?
13       A.    Yes.
14       Q.    Do you know what he meant by referring
15   to himself as a consultant to the companies?
16       A.    Yeah.  He was into the business.  My
17   father put him right into the business to work
18   with me and help me.
19       Q.    So is it fair to say that Mike Gumaer
20   did nonlegal work for the companies?
21           MR. RAMSEY:   Form.
22       A.    He did legal work.  He did consulting.
23   He did everything.
24       Q.    Second paragraph on page 2 reads "With
25   the foregoing as historical records I would

Page 256

L. Eber
1
2    propose to you the following A, I shall continue
3    to waive any direct annual compensation as a
4    trustee of the Allen Eber Trust.  B, I shall
5    continue as a director of the Eber companies
6    without any compensation commensurate with my
7    responsibilities as a director.  And C, I shall
8    continue to serve as a consultant to the companies
9    and as counsel to you personally and as chief
10   executive officer."
11           Do you see that?
12       A.    Yes.
13       Q.    The letter then continues in the next
14   paragraph, "As compensation for all of these
15   duties the Eber companies will pay me an annual
16   consulting fee of forty thousand dollars payable
17   quarterly on the first of February, May, August
18   and November beginning February 1, 2001.  This
19   relationship shall remain in place until modified
20   by you and me in the manner established by this
21   letter."
22           Do you see that?
23       A.    Yes.
24       Q.    And you agreed to those terms that he
25   proposed?

Page 257

L. Eber
1
2        A.    Yes.
3        Q.    How long did the annual consulting fee
4    of forty thousand dollars continue for?
5        A.    As long as we could pay it and I don't
6    have the date that it changed, but it had to be
7    after Wells foreclosed on us and we didn't have
8    the money to pay him.
9        Q.    After that point was his consulting
10   fee reduced?
11       A.    Yes.
12       Q.    What was it reduced to?
13       A.    I don't remember.
14           MR. BROOK:   Let's go to the next
15   exhibit.  This will be Plaintiffs' Exhibit
16   48.
17           (Plaintiffs' Exhibit 48, an e-mail
18   from Mike Gumaer to Wendy Eber and Lester
19   Eber dated October 29, 2013 bearing Bates
20   number GUM 000023, marked for
21   identification, as of this date.)
22       Q.    Exhibit 48 is an e-mail from Mike
23   Gumaer to Wendy Eber and Lester Eber dated October
24   29, 2013 bearing Bates number GUM 000023.
25           Do you recognize this document?

65 (Pages 254 - 257)

Page 258

L. Eber

1
2    A.   I got it so I do, yes.
3    Q.   I would like to draw your attention to
4    the second paragraph of Mike's e-mail.  He writes
5    "You will recall I hope our conversation last
6    December when I was asked to continue as
7    director/trustee/confidant."
8        Do you see that?
9    A.   Yes.
10   Q.   "While I was prepared to conclude my
11   relationship after 40 or so years, I was happy to
12   continue.  My annual compensation for some time
13   has been twenty two thousand dollars payable in
14   quarterly installments."
15       Do you see that?
16   A.   Yes.
17   Q.   Does that refresh your recollection as
18   to what the compensation amount was reduced to
19   from forty thousand dollars?
20   A.   I knew it was reduced but I didn't
21   remember the amount.
22   Q.   And is it your best recollection that
23   twenty two thousand dollars was the amount?
24   A.   It is very possible.
25   Q.   Which of the Eber companies was

Page 259

L. Eber

1
2    responsible for paying Mike Gumaer's consulting
3    fee?
4    A.   Eber Wine and Liquor originally paid
5    him.
6    Q.   And at a certain point was the
7    responsibility changed to Eber Connecticut?
8    A.   Yes.
9    Q.   What about after the Alexbay
10   acquisition of Eber Connecticut, who paid the
11   consulting fee then?
12   A.   I believe -- I don't know.  I would
13   have to find out.  I don't know.
14   Q.   Is it correct that at some point the
15   consulting fee was reduced even more below twenty
16   two thousand dollars?
17   A.   It is very possible.
18   Q.   Did you ever pay Mike Gumaer directly
19   for work that he did as an attorney for you
20   personally?
21   A.   I don't remember.  I believe most of
22   it was paid through the company.
23   Q.   And that procedure that you just
24   described would be consistent with the proposal
25   that Mike made in Exhibit 47; correct?

Page 260

L. Eber

1
2    A.   Would you repeat that again for me?
3    Q.   Sure.
4        The proposal that Mike had made in
5    2001 is that he would --
6    A.   Yes.
7    Q.   -- be counsel to you personally --
8    A.   Yes.
9    Q.   -- as chief executive officer without
10   seeking compensation beyond an annual consulting
11   fee of forty thousand dollars?
12   A.   Yes.  That would be consistent.
13   Q.   To whom did you disclose the terms of
14   your engagement of Mike Gumaer pursuant to this
15   letter?
16   A.   To this letter it would be Wendy Eber.
17   Q.   And were these terms disclosed to
18   anyone else?
19   A.   I don't -- I don't believe so.
20   Basically when Eber could have been I don't know.
21   I would like you to read the last paragraph.
22   Q.   You are talking about the last
23   paragraph on Exhibit 48?
24   A.   Yes.  You like to read paragraphs.  So
25   I'd like you to.

Page 261

L. Eber

1
2    Q.   If you would like to read it aloud I
3    will allow you to do so now.
4    A.   No, you're the --
5        MR. RAMSEY:  You want to read it go
6    ahead.
7    A.   Yeah.  I am taking over your job.
8        "I wish to accommodate you two as
9    members of a team.  Lord knows that Lester has
10   committed an incredible amount to bring about the
11   company's success.  I am prepared to do my share
12   if the kitty calls for it.  Please give me your
13   thoughts.  All the best, Mike."
14   Q.   Do you have an understanding as to
15   what Mike meant when he said I am prepared to do
16   my share if the kitty calls for it?
17   A.   I think -- I just think he wants --
18   supportive as he can be to help us through a
19   difficult period.
20   Q.   Now the two sentences immediately or
21   the three sentences I guess it is actually -- I am
22   not going to count the number of sentences.  Let's
23   read the part in between the part that I read
24   earlier and the part that you just read.  It says
25   "I have been paid eleven thousand dollars so far

66 (Pages 258 - 261)

Page 278

L. Eber

1         L. Eber
2 know this was December 18, 2012 and the
3 foreclosure was in February; wasn't it?  So they
4 didn't hold Connecticut if that's the...
5     Q.   When you saw this at the time in
6 December of 2012, did you do anything to try to
7 correct the misstatement?
8        MR. RAMSEY:  Form.
9     A.   I think they -- there were -- Wendy
10 Eber did do something on that to get it because it
11 wasn't right.
12     Q.   What did Wendy Eber do?
13     A.   I don't remember.  But I know it was a
14 mistake and it is very possible he sent this out
15 without showing it to us.
16     Q.   Why was it Wendy Eber's responsibility
17 to do anything to correct this letter sent by a
18 co-trustee?
19        MR. RAMSEY:  Form.
20     A.   She was the financial person who
21 watched the finances at that time.
22     Q.   What finances?
23     A.   CFO of the companies, the Eber
24 companies.
25     Q.   Did she have any role or

Page 279

L. Eber

1         L. Eber
2 responsibility in connection with the Allen Eber
3 Trust?
4     A.   No.  She was not involved in the Allen
5 Eber Trust.
6     Q.   You were a co-trustee of the trust
7 though; is that right?
8     A.   That's correct.
9     Q.   So --
10     A.   As I told you, this letter shouldn't
11 have been sent out and it was a mistake and I
12 refer you to your deposition with Hawks which you
13 had in Rochester and I don't know if you are going
14 to see or talk to him again.  This was something
15 that was handled by Richard Hawks.  Now Richard,
16 what's his name?  Yeah, Richard Hawks.
17     Q.   Did you contact either Sally Kleeberg
18 or Audrey Hays after seeing this letter to advise
19 them of the sale or the transfer rather of the
20 Eber Connecticut business to Alexbay?
21        MR. RAMSEY:  Form.
22     A.   I don't remember doing that.
23     Q.   Why not?
24     A.   I don't know.
25        MR. CALIHAN:  Objection to form.

Page 280

L. Eber

1         L. Eber
2     Q.   In hindsight, do you believe you
3 should have contacted either Audrey Hays or Sally
4 Kleeberg or both of them after you saw this
5 letter?
6        MR. RAMSEY:  Form.  Go ahead.
7     A.   Yes.  If I had seen it before it came
8 out I would have known that it should have been
9 corrected.
10     Q.   I am going to show you a new exhibit.
11 This I believe now 50.
12       (Plaintiffs' Exhibit 50, a chain of
13     two e-mails possible another e-mail that
14     appears to have been redacted Bates number
15     EB 00031202, marked for identification, as
16     of this date.)
17     Q.   Plaintiffs' Exhibit 50 is a chain of
18 two e-mails possibly another e-mail that appears
19 to have been redacted.  The document bears Bates
20 number EB 00031202.  The top e-mail is from Wendy
21 Eber to Lester Eber and Mike Gumaer dated January
22 10, 2013.  The subject is Allen Eber Trust.
23      Do you see that?
24     A.   Mm-hmm.
25     Q.   Is that a yes?

Page 281

L. Eber

1         L. Eber
2     A.   Yes.
3     Q.   The e-mail states "Lester and Mike,
4 attached is the December 2012 statement for the
5 trust of Allen Eber from Canandaigua Bank.  It
6 values Eber stock at approximately 655,000
7 dollars.  It should be zero per our conversation
8 in June with Rick Hawks.  Regards Wendy."
9      Do you see that?
10     A.   Yes.
11     Q.   Do you know what valuation she is
12 referring to?
13     A.   No.
14     Q.   Do you know what the 655,000 dollars
15 number is?
16     A.   No.
17     Q.   Do you know where Canandaigua got that
18 number from?
19     A.   No.
20     Q.   Do you know what Wendy was referring
21 to when she referred to a conversation in June
22 with Rick Hawks?
23     A.   I would believe that she told him that
24 it should be zero.  That the Eber Brothers stock
25 should be valued at zero per our conversation in

71 (Pages 278 - 281)

Page 290

L. Eber

1
2  marked.
3       Do you have that in front of you?
4    A.   Yes.
5    Q.   And comparing Exhibit 5 against
6  Exhibit 4, it appears that the paragraph that you
7  had asked to change was simply deleted in the
8  December 2013 letter?
9    A.   Yes.
10   Q.   So no correction of the fact was made?
11       MR. RAMSEY:  Form.
12   Q.   Is that right?
13   A.   Looks like that.
14   Q.   To your knowledge, did any of the
15  co-trustees or anyone on their behalf ever inform
16  either Audrey Hays or Sally Kleeberg or Sally
17  Kleeberg's children about the misstatement that
18  had been made in the December 18, 2012 letter?
19       MR. RAMSEY:  Form.
20   A.   I don't know.
21   Q.   Did you ever discuss the transfer of
22  Eber Metro to Alexbay with any of Sally Kleeberg,
23  Audrey Hays, Dan Kleeberg or Lisa Stein?
24   A.   I talked to my sister Sally.
25   Q.   When was that?

Page 291

L. Eber

1
2    A.   Could have been a year before she died
3  or so.
4    Q.   Approximately, when was that?
5    A.   It was in the summer when she died in
6  what, '14 or '15.  Probably a year before I told
7  her about that.
8    Q.   What did you tell her specifically?
9    A.   That the company had lost a lot of
10  money and I had lent in a lot of money and that I
11  took it over to protect my interest.
12   Q.   How did she respond?
13   A.   She didn't -- I don't think she liked
14  it very much.
15   Q.   Why do you say that?
16   A.   She didn't respond very much.
17   Q.   Do you recall anything that she said?
18   A.   No.
19   Q.   Do you recall --
20   A.   She --
21   Q.   Go ahead.
22   A.   She didn't say much.
23   Q.   Was she sick at that time?
24   A.   No.
25   Q.   Was she typically someone that didn't

Page 292

L. Eber

1
2  say much when you talked to her?
3    A.   It depends.  She was very personable
4  and had a lot of friends and she just didn't say
5  much.
6    Q.   Where did this conversation occur?
7    A.   In a restaurant where we had dinner.
8    Q.   Where was that?
9    A.   In Buffalo.
10   Q.   Do you recall the restaurant?
11   A.   800.
12   Q.   Is this a restaurant that you
13  frequently went to?
14   A.   She would go to.
15   Q.   Did she live in the Buffalo area?
16   A.   Yes.
17   Q.   Was anyone else present for this
18  conversation?
19   A.   My wife was with me but she had
20  excused herself to go to the bathroom and it was
21  just the two of us.
22   Q.   By the time your wife came back the
23  conversation was over?
24   A.   Yeah.  It wasn't a long conversation.
25   Q.   And after that conversation, did you

Page 293

L. Eber

1
2  make any effort to memorialize the fact what you
3  had told her?
4    A.   I don't remember that.
5    Q.   Why didn't you?
6       MR. RAMSEY:  Form.
7       MR. CALIHAN:  Form.
8    A.   I have been absorbed by keeping the
9  company going and seeing that it's viable and not
10  going into liquidation.
11   Q.   Was there any benefit to either of the
12  other trust beneficiaries at the time Audrey Hays
13  or Sally Kleeberg from your transferring Eber
14  Metro to Alexbay?
15       MR. RAMSEY:  Form.
16   A.   Benefit?
17   Q.   Did it benefit them in any way?
18   A.   I don't know.  I don't have an answer
19  for you.
20   Q.   Did you think about whether it
21  benefitted them at the time that you did it?
22       MR. RAMSEY:  Form.
23   A.   I thought about -- no.  I thought
24  about keeping Connecticut viable and not facing
25  liquidation.  That's what my thinking was about.

74 (Pages 290 - 293)

Page 294

L. Eber

1
2    Q.   So you weren't thinking about whether
3    that transaction would have any positive or
4    negative impact on the shareholders of the
5    company; is that right?
6        A.   I was thinking about keeping the
7    company alive and if I didn't do it there wouldn't
8    be a business today.
9        Q.   So that was a yes that you were not
10   thinking about the shareholders?
11       MR. CALIHAN:  Objection to form.
12       MR. RAMSEY:  Form.
13       A.   I didn't say that.
14       Q.   So walk me through your reasoning.
15       In what way did you consider the
16   shareholders' interests benefitted or harmed by
17   the Alexbay acquisition of Eber Metro?
18       A.   I had asked the shareholders to
19   invest.  They chose not to.  I proceeded on my
20   own.  I spent millions of dollars, lent.  Paid
21   legal fees and I did not -- I was absorbed with
22   keeping the company alive.
23       Q.   Did you -- sorry, go ahead.
24       A.   That's it.
25       Q.   Did you describe your request for

Page 295

L. Eber

1
2    money to either Audrey Hays or Sally Kleeberg as
3    an investment opportunity?
4        A.   Originally I did and in original
5    letters I asked for them to invest.
6        Q.   And did you make it sound like a very
7    good investment?
8        MR. RAMSEY:  Form.
9        A.   You see what it said.  The letters
10   speak for themselves.
11       Q.   Was the family business important to
12   your sister Sally?
13       A.   Yes.  I believe so.
14       Q.   So wasn't it important for you to make
15   clear to her that you intended to take the company
16   for yourself and away from the rest of the family
17   if she didn't invest?
18       MR. RAMSEY:  Form.
19       A.   I didn't feel -- I asked her to
20   invest.  I am not going to say to her what I was
21   going to do or not do.  I did what I had to do to
22   keep the company alive to make -- so we can clean
23   up our statement and get a bank loan.  Otherwise,
24   there wouldn't be a company.
25       Q.   Do you think your father would be

Page 296

L. Eber

1
2    proud of what you did?
3        A.   Yes.
4        MR. RAMSEY:  Form.
5        Q.   Why?
6        A.   I did what I had to do to keep -- you
7    know, it is all speculation.  So I did what I had
8    to do to survive to keep the company alive.
9        Q.   Your father wanted the company to
10   remain with the full family; right?
11       A.   Well, he took the family -- he took
12   the family really out of it and set up trusts
13   outside of the family that had control of
14   everything.
15       Q.   So he wanted the business to remain
16   with the trust?
17       MR. RAMSEY:  Form.
18       Q.   Correct?
19       A.   He just took family members out of it.
20   So I don't know what he did.  I have no idea what
21   his thinking was.  I never saw his will or
22   anything.  I was handed a copy of his estate when
23   I first met Mr. Gumaer.  I knew from nothing.
24       Q.   Just to wrap this up, did you ever
25   discuss the transfer of Eber Metro to Alexbay with

Page 297

L. Eber

1
2    anyone else in your family besides Sally Kleeberg
3    and Wendy Eber?
4        A.   No.  There wouldn't be anyone else to
5    discuss it with.
6        MR. BROOK:  I have no further
7    questions.
8        MR. CALIHAN:  I have no questions at
9    this time.
10       MR. RAMSEY:  We are done.
11       THE VIDEOGRAPHER:  This marks the end
12   of media unit number six in the videotaped
13   deposition of Lester Eber.  We are going off
14   the record.  The time is 5:08.
15       (Time Noted:  5:08 p.m.)
16
17
18       LESTER EBER
19
20   Subscribed and sworn to before me
21   this       day of        , 2019.
22
23
24   (Notary Public)     My Commission Expires:
25

75 (Pages 294 - 297)

Page 298

```
 1
 2              C E R T I F I C A T E
 3   STATE OF NEW YORK   )
                         : ss.
 4   COUNTY OF NEW YORK  )
 5        I, LYNNE D. METZ, a Shorthand Reporter
 6   and a Notary Public within and for the State of
 7   New York, do hereby certify that the foregoing
 8   deposition of LESTER EBER was taken before me on
 9   the 24th day of January, 2019;
10        That the said witness was duly sworn
11   before the commencement of his testimony; that the
12   said testimony was taken stenographically by me
13   and then transcribed.
14        I further certify that I am not
15   related by blood or marriage to any of the parties
16   to this action or interested directly or
17   indirectly in the matter in controversy; nor am I
18   in the employ of any of the counsel in this
19   action.
20        IN WITNESS WHEREOF, I have hereunto
21   set my hand this 8th day of February, 2019.
22
23
24              LYNNE D. METZ
25
```

Page 299

```
 1
 2   January 24, 2019
 3
 4              I N D E X
 5   WITNESS            EXAMINATION BY      PAGE
 6   LESTER EBER        MR. BROOK        7
 7
 8   ---------- INFORMATION REQUESTS ----------
 9   DIRECTIONS (DI):    141, 161
10   INSERT:       None
11   RULINGS (RL):      None
12   REQUESTS (RQ):     75, 181
13   CERTIFIED (CE):    None
14   MOTIONS (MO):      None
15
16          E X H I B I T S
17   Plaintiffs' Exhibits       For ID
18   Exhibit 25, a document entitled    15
19   Unanimous Written Consent of the Board
20   of Directors of Eber Brothers Wine and
21   Liquor Corporation Bates numbered EB
22   00001338 through 1340
23   Exhibit 26, an article found online on    37
24   casshilldevelopment.com
25   Exhibit 27, a document entitled    61
```

Page 300

```
 1
 2   Consulting Agreement Bates numbers EB
 3   00000702 through 711
 4   Exhibit 28, a series of W-2s that were    64
 5   produced by the parties in discovery
 6   Bates numbers EB 00021420 through 428
 7   Exhibit 29, a series of letters that    71
 8   appears to be written on Lester Eber's
 9   letterhead bearing Bates stamps EB 695
10   through 701
11   Exhibit 30, a document entitled Amended    99
12   and Restated Promissory Note bearing
13   Bates numbers EB 00031310 through 311
14   Exhibit 31, a copy of two printouts    110
15   made on October 1, 2016 from the
16   Connecticut Department of State
17   concerning the business Alexbay LLC
18   Exhibit 32, a letter and some    128
19   attachments that are dated July 12,
20   2017 from Rita Nischal of Canandaigua
21   National Bank and Trust to Lester Eber
22   Exhibit 33, an order in the Surrogates    128
23   Court of The State of New York in
24   Monroe County dated June 1, 2017 signed
25   by Surrogate Judge John M. Owens
```

Page 301

```
 1
 2   Exhibit 34, a letter and attachments    132
 3   that was produced yesterday by
 4   Canandaigua National Bank Bates stamped
 5   CNB-PL 0010 through 12
 6   Exhibit 35, a e-mail and attachment    137
 7   dated October 31, 2018 sent by Paul
 8   Keneally with multiple recipients
 9   CNB-PL 0001 to 2
10   Exhibit 36, a printout of a table with    141
11   some notes entitled Residuary TUW Allen
12   Eber Proposed Distribution of
13   Securities
14   Exhibit 37, a e-mail dated September    141
15   15, 2017 sent by Jim Vazzana to R.
16   Nischal at CNB, Canandaigua National
17   Bank, with yourself as one of the
18   people copied on it Bates stamped
19   CNB-PL 0005
20   Exhibit 38, a letter dated October 11,    144
21   2017 on letterhead for Woods Oviatt
22   Gilman LLP addressed to Jim Vazzana and
23   me
24   Exhibit 39, a four-page letter dated    148
25   November 5, 2018 by Paul Keneally
```

76 (Pages 298 - 301)

Page 302

```
1
2      addressed to Magistrate Judge Katherine
3      Parker
4      Exhibit 40, a e-mail dated June 2, 2017   151
5      from Jim Vazzana to Lorisa LaRocca
6      Bates number CNB-PL 0022
7      Exhibit 41, an e-mail dated August 18,   151
8      2017 from Jim Vazzana to Lorisa LaRocca
9      Exhibit 42, a copy of a letter dated      155
10     October 10, 2018 from Audrey Hays to
11     Wendy Eber and Lester Eber
12     Exhibit 43, a series of documents that    167
13     were produced together Bates range EB
14     00001166 through 1173
15     Exhibit 44, a copy of a summons and       191
16     complaint dated February 21, 2012
17     bearing Bates number KSH 00070 through
18     83
19     Exhibit 45, a document bearing the        209
20     caption of Alexbay versus Eber Brothers
21     and it states it is the affidavit of
22     Lester Eber bearing Bates numbers EB
23     00001059 through 1063
24     Exhibit 46, Affidavit of Lester Eber      218
25     bearing Bates numbers EB 00017525
```

Page 303

```
1
2      through 544
3      Exhibit 47, a two-page letter on the      253
4      letterhead for Elliot W. Gumaer, Jr.
5      Dated January 2, 2001 Bates stamped
6      January 8, 2001 and Bates number EB
7      00001556 to 57
8      Exhibit 48, an e-mail from Mike Gumaer    257
9      to Wendy Eber and Lester Eber dated
10     October 29, 2013 bearing Bates number
11     GUM 000023
12     Exhibit 49, a letter on Eber Brothers     264
13     Wine and Liquor Corp. Letterhead signed
14     by Lester Eber Bates number KSH 00004
15     dated April 2, 2010
16     Exhibit 50, a chain of two e-mails        280
17     possible another e-mail that appears to
18     have been redacted Bates number EB
19     00031202
20     Exhibit 51, an e-mail from Mike Gumaer    286
21     to Lester Eber copying Wendy Eber dated
22     December 1, 2013 bearing Bates numbers
23     EB 00031106
24
25         ***Exhibits retained by counsel.***
```

Page 304

```
1               ERRATA SHEET
            VERITEXT LEGAL SOLUTIONS
2            330 OLD COUNTRY ROAD
              MINEOLA, NEW YORK 11501
3               516-608-2400
4   NAME OF CASE: Kleeberg, et al v. Eber, et al
     NAME OF DEPONENT: Lester Eber
5   DATE OF DEPOSITION: January 24, 2019
6   PAGE  LINE(S)    CHANGE        REASON
7
8     ___|_____|_____|_____
9     ___|_____|_____|_____
10    ___|_____|_____|_____
11    ___|_____|_____|_____
12    ___|_____|_____|_____
13    ___|_____|_____|_____
14    ___|_____|_____|_____
15    ___|_____|_____|_____
16    ___|_____|_____|_____
17    ___|_____|_____|_____
18    ___|_____|_____|_____
19    ___|_____|_____|_____
20    ___|_____|_____|_____
21         _____
                Lester Eber
22
     SUBSCRIBED AND SWORN TO BEFORE ME
23  THIS___DAY OF _____, 20__.
24
     _____
25  (NOTARY PUBLIC)      MY COMMISSION EXPIRES:
```

77 (Pages 302 - 304)

Page 305

1

2    UNITED STATES DISTRICT COURT

     SOUTHERN DISTRICT OF NEW YORK

3    Civil Action No.:  16-cv-951 (LAK)

     -------------------------------------------x

4

5    DANIEL KLEEBERG, LISA STEIN and AUDREY HAYS,

6

7                              Plaintiff,

8              -against-

9

10   LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER,

     LLC; CANANDAIGUA NATIONAL CORPORATION d/b/a

11   CANANDAIGUA NATIONAL BANK & TRUST; ELLIOT

     W. GUMAER, JR.; EBER BROS. & CO., INC., EBER

12   BROTHERS WINE AND LIQUOR CORPORATION;

     BROS. WINE AND LIQUOR METRO, INC.,

13   EBER-CONNECTICUT, LLC; and WENDY EBER,

14                             Defendants.

15   ----------------------------------------x

16   1250 Broadway

17   New York, New York 10001

18   June 27, 2019

19   1:35 p.m.

20

21        CONTINUED VIDEOTAPED DEPOSITION OF LESTER EBER,

22   held at the above-mentioned time and place before

23   ANNMARIE OAKLEY, a Notary Public of the State of

24   New York.

25

Page 306

```
 1
 2
 3        A P P E A R A N C E S
 4
 5  BROOK & ASSOCIATES PLLC
      Attorneys for Plaintiffs
 6        100 Church Street, 8th Floor
          New York, New York 10007
 7
 8  BY:    BRIAN BROOK, ESQ.
 9
10  UNDERBERG & KESSLER LLP
      Attorneys for Defendants
11  LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC;
      EBER BROTHERS & CO., INC; EBER BROS. WINE AND LIQUOR
12  CORPORATION; EBER BROS. WINE AND LIQUOR METRO, INC.,
      EBER-CONNECTICUT, LLC; and WENDY EBER
13        50 Fountain Plaza
          Buffalo, New York 14202
14
      BY:    COLIN RAMSEY, ESQ.
15
16  CALIHAN LAW PLLC
      Attorneys for Defendant
17  THE ESTATE OF ELLIOT W. GUMAER
          16 Main Street
18        Rochester, New York 14614
19  BY:    ROBERT B. CALIHAN, ESQ.
20
21  Also present: Phil Glauberson, videographer
22             Wendy Eber, telephonically.
23
24
25
```

Page 307

L. EBER

```
 2      VIDEOGRAPHER:  Good afternoon.  We are
 3  going on the record at 1:39 p.m. on June 27,
 4  2019.  Please, note that the microphones are
 5  sensitive and may pick up whispering, private
 6  conversations and cellular interference.
 7  Please, turn off all cellphones and place them
 8  away from the microphones as they can interfere
 9  with the deposition audio.  Audio and video
10  recording will continue to take place unless
11  all parties agree to go off the record.
12      This is media unit one, day two of the
13  video recorded deposition of Lester Eber in the
14  matter of Daniel Kleeberg et al. versus Lester Eber
15  et al. filed in the United States District Court
16  Southern District of New York, Civil Action number
17  16-cv-951 LAK.  This deposition is being held at
18  Veritext, located at 1250 Broadway New York, New
19  York.  My name is Phil Glauberson from the firm
20  Veritext and I am the videographer.  The court
21  reporter is AnnMarie Oakley from the firm Veritext.
22      I am not authorized to administer an oath.
23  I am not related to any party in this action nor am
24  I financially interested in the outcome.  Counsel
25  and all present in the room, please, and everyone
```

Page 308

L. EBER

```
 2  attending remotely will now state their appearances
 3  and affiliations for the record.
 4      MR. BROOK:  Brian Brook, Brook &
 5  Associates, PLLC for the plaintiffs.
 6      MR. RAMSEY:  Colin Ramsey, Underberg &
 7  Kessler for the Eber defendants.
 8      MR. CALIHAN:  Robert Calihan of Calihan
 9  Law on behalf of the estate of Elliot Gumaer.
10      VIDEOGRAPHER:  Will the court reporter,
11  please, swear in the witness.
12      MR. RAMSEY:  Wendy Eber is on the phone.
13  L E S T E R   E B E R, having first been duly sworn
14  or affirmed by a Notary Public of the State of
15  New York, was examined and testified as follows:
16  EXAMINATION BY MR. BROOK:
17      Q    Would you state your name for the record,
18  please.
19      A    Lester Eber.
20      Q    Would you state your address for the
21  record, please.
22      A    95 Allens Creek Road, Rochester, New York
23  14618.
24      Q    Good afternoon, Lester.  Good to see you
25  again.  I already deposed you one previous day.  Do
```

Page 309

L. EBER

```
 2  you need me to go over any of the instructions or
 3  rules for how this works?
 4      A    Your choice.  I --
 5      MR. RAMSEY:  Did you need him to?
 6      THE WITNESS:  I -- you know I --
 7      MR. RAMSEY:  I think we can skip those.
 8      Q    Do you have any questions about how this
 9  works today?
10      A    Not yet.
11      Q    Just to refresh at least one thing, if you
12  don't understand something in my question it's
13  important that you let me know because if you answer
14  my question I'm going to assume that you understood
15  it.  Okay?
16      A    Okay.
17      Q    And as I think you just recalled, it's
18  also important to give verbal answer not just nods
19  or uh-uh.
20      A    Yes.
21      Q    How are you feeling today?
22      A    So far okay.
23      Q    Is there any reason why you would not be
24  able to testify fully and truthfully today, such as
25  being under the influence of medication or undue
```

2 (Pages 306 - 309)

Page 330

L. EBER

1
2    A   Oh, in the back.  Yes.  It comes from him,
3    yes.  He's the one who handled it.
4    Q   So if you think you talked to him why
5    didn't he send this to you?
6        MR. RAMSEY:  Form.
7    A   I'm not the administrative person.  I'm
8    not the secretary there.
9    Q   Where are you referring to?
10   A   There weren't any employees there.  It was
11   just -- Wendy was the only one that could -- that
12   was there.  We had no secretaries, no people to do
13   anything.
14   Q   I'm asking what company you're referring
15   to.
16   A   Well, with anything that would have
17   involved getting a security for the loans.
18   Q   So you can't say which entity you're
19   referring to that Wendy was doing the secretarial
20   work for?
21       MR. RAMSEY:  Form.
22   A   I could not -- I would not remember that
23   because there were so many there and I wouldn't want
24   to pin it down to one and say it wasn't another one.
25   I can't.  To the best of my recollection I can't

Page 331

L. EBER

1
2    give you a definite one that she was working for.
3    Q   Now, this memo is also sent to Glenn
4    Sturm.  We discussed him before but was Glenn Sturm
5    ever your personal attorney?
6    A   Not my personal attorney, no.  Yeah, well
7    he did some work for me personally but he did
8    corporate work for us to.
9    Q   What work did he do for you personally?
10   A   Well, I think after I would ask him
11   questions.  He was a lawyer and he would give me
12   legal advice.
13   Q   Did you ever pay him for that advice?
14   A   I personally don't remember paying him.
15   Q   Who paid Glenn Sturm for his services?
16   A   I don't remember who.
17   Q   Beside yourself individually -- well,
18   let's step back.  Can you give any specific examples
19   of a transaction or document where Glenn Sturm gave
20   you advice as your personal lawyer?
21   A   I don't remember.
22   Q   Did you ever sign an engagement agreement
23   with Glenn Sturm?
24   A   I don't remember doing that.
25   Q   Did you ever -- just looking at this memo,

Page 332

L. EBER

1
2    the last sentence of the first paragraph there is
3    referring to a conversation between the author,
4    Michael Beamer, and Glenn Sturm and it says, quote,
5    "Glenn told me that he wanted to protect the loans
6    and guarantee that the Article 9 transfer was
7    somehow upset in the future." end quote.  Do you see
8    that?
9    A   Yeah, Glenn told me.  Yes.
10   Q   Do you recall why Glenn Sturm was
11   concerned about the Article 9 transfer being upset
12   in the future?
13       MR. RAMSEY:  Form.
14   A   I think Glenn was a very intelligent man.
15   We relied on him for his legal advice and he just
16   wanted to protect us to the best of his ability or
17   protect me.
18   Q   Did you discuss with him the possibility
19   that the Article 9 transfer might be upset in the
20   future?
21   A   No.
22   Q   Did you discuss that with Wendy.
23   A   I don't remember any kind of discussion.
24   The whole discussion was to protect the loans that I
25   had given the company.

Page 333

L. EBER

1
2    Q   And as you sit here today do you recall
3    any loans that you had given in to any Eber Brothers
4    company that had not been assigned to Alex Bay by you
5    earlier in the year in 2012?
6    A   I don't remember.
7    Q   When is the last time that you spoke to
8    Glenn Sturm?
9    A   Could be a year or two or a year ago or
10   more.
11   Q   Did you discuss this case with him?
12   A   The man has been very sick.  I have not
13   talked to him.
14   Q   He's had cancer; correct?  Is that yes?
15   A   Yes.
16   Q   But he's had cancer since you've known
17   him; correct?
18   A   Yes.
19   Q   Is it your understanding that the cancer
20   has gotten worse recently?
21   A   Yes.
22   Q   Do you know, did he move out of his home?
23   A   I don't know.
24   Q   Was Glenn Sturm the first person to
25   suggest to you that you should secure the loans that

8 (Pages 330 - 333)

Page 334

L. EBER

1
2 you made to the company?
3        MR. RAMSEY:  Form.
4        A    I don't remember but he did say that to
5 me.
6        Q    Having had the chance to review the
7 document that you did does that refresh your
8 recollection that it was Glenn Sturm's law firm,
9 Nelson Mullins, that drafted the original security
10 agreement that you signed in 2010?
11       A    It could have been.  You have it there and
12 I read it.  I believe that they did it.
13       Q    And you previously testified that you
14 thought Pat Dalton had drafted the security
15 agreement so you would now conceive that was an
16 incorrect recollection?
17       MR. RAMSEY:  Form.
18       A    I don't remember saying that about Pat
19 Dalton.  You might have some records that show that
20 but it could have been.  Dalton could have been the
21 first one too, I mean before Glenn --
22       MR. RAMSEY:  Just what you recollect.
23       Don't assume.
24       MR. BROOK:  This one marked as Plaintiff's
25 Exhibit 99 bears Bates numbers EB714 through

Page 335

L. EBER

1
2 728.  It's an email and one of the attachments.
3 The other attachments do not appear to have
4 been produced.
5        (EB714 to EB728 was marked as
6        Plaintiff's Exhibit 99 for
7        identification.)
8        Q    Do you recognize this document?
9        A    This was sent to me care of my secretary.
10       Q    So copied to you?
11       A    Copied to me, yeah.
12       Q    And it was being sent to Mike Gumaer?
13       A    Yeah.  Yes.
14       Q    And the attachment that's there that is a
15 draft of the 2010 security agreement that was not
16 yet signed; correct?
17       A    That is correct.
18       Q    Why were you -- in the email sent by your
19 assistant says, "I have attached some documents that
20 Mr. Eber would like you to look over and is asking
21 for your comments.  He's is mailing each of the
22 three documents plus a letter all attached to each,
23 Sally Kleeberg and Audrey Hays.  Also attached is a
24 personal letter to Sally."  Do you see that?
25       A    Yes.

Page 336

L. EBER

1
2        Q    Why did you want Mike Gumaer to look over
3 these documents and give you comments?
4        A    After talking to Mike as my counsel that I
5 thought was the prudent thing to do.
6        Q    So as of March 2010 was it your belief
7 that Mike Gumaer was still representing you as your
8 personal attorney?
9        A    Yes.
10       Q    At what point did Mike Gumaer stop being
11 your personal attorney?
12       A    He didn't.
13       MR. CALIHAN:  He's not representing him
14 today.
15       Q    When you met is that -- it is your belief
16 that he continued to be your personal attorney until
17 the day he died; is that right?
18       A    Yes.
19       Q    When did he first become your personal
20 attorney?
21       A    1970, July of 1970.
22       Q    At that time did you have any sort of a
23 documentation of that representation?
24       A    No.
25       Q    Do you recall any documentation of Mike

Page 337

L. EBER

1
2 Gumaer's agreement to be your personal attorney?
3        A    No.
4        Q    You don't recall the January 2001 letter
5 that you signed that we looked at last time?
6        A    If that's what it was, but you asked me
7 when he started as my personal attorney, it's when
8 my father passed away in July of 1970.
9        Q    Did you ever pay Mike Gumaer for his
10 services as your personal attorney yourself?
11       A    Not personally, no.
12       Q    How was he's compensated for those
13 services?
14       A    The company usually paid him.
15       Q    In what capacity was he being paid?
16       MR. RAMSEY:  Form.
17       A    As counsel to the company, advising them
18 on legal questions.
19       Q    Was he also paid after the year 2000 when
20 he resigned from Nixon Peabody through director
21 fees?
22       A    Yes.
23       Q    So that director fee encompassed his legal
24 advice for you; is that correct?
25       MR. CALIHAN:  Objection to form.

9 (Pages 334 - 337)

Page 358

L. EBER

1
2  Q   And do you see -- so this email is being
3  sent to Mike for his signature or March 12, 2012,
4  and the consent form states that it's executed as of
5  the blank day of February 2012. Do you see that,
6  comparing the last and the first page?
7  A   Yes.
8  Q   Do you know why the consent form was being
9  dated in February when it wasn't being sign or sent
10 to Mike Gumaer for signature until sometime in
11 March?
12 A   No.
13 Q   Can you think of any reason why it would
14 be dated in February?
15    MR. RAMSEY: Form.
16 A   No.
17 Q   Looking at the bottom of the first page,
18 it's an email from Wendy to someone named Melinda
19 Parker copying you stating, "Melinda, Can you,
20 please, substitute my name for Elliot Gumaer as
21 president since I will be replacing Lester as
22 president." Do you see?
23 A   Yes.
24 Q   Does that fresh your recollection as when
25 the decision was made for Wendy to be your

Page 359

L. EBER

1
2  replacement?
3  A   No.
4  Q   Did you have a say in who replaced you as
5  president of Eber Brothers Wine and Liquor Corp.?
6     MR. RAMSEY: Form.
7  A   I don't remember.
8  Q   Did you resign as just president or also
9  as director of Eber Brothers Wine and Liquor Corp.?
10 A   I think it could have been just president.
11 I don't remember if it was both.
12 Q   So if you look at the last page of this
13 document it says that you're resigning as director
14 and president. Do you see that?
15 A   Yes.
16 Q   And is it your recollection that that was
17 changed prior to being signed so that you only
18 resigned as president?
19    MR. RAMSEY: Form.
20 A   I resigned as both of them. That's what
21 it says. That's what I did.
22 Q   When did you become a director of Eber
23 Brothers Wine and Liquor Corp. again?
24 A   I don't remember the exact date.
25 Q   Did you have an understanding that there

Page 360

L. EBER

1
2  needed to be three directors of the company, Eber
3  Brothers Wine & Liquor Corp.?
4  A   I never had that discussion.
5  Q   Did you discuss with anyone besides Wendy
6  and Mike Gumaer about having that third person serve
7  as director Eber Brothers Wine & Liquor?
8  A   I don't remember.
9  Q   Do you remember this document at all?
10    MR. RAMSEY: The last page?
11    MR. BROOK: The last page.
12 A   You know its been since, over nine years.
13 I don't remember it but it's here, so it's here.
14 Q   Do you see the first resolution there says
15 that the resignation is accepted and approved
16 effective February 1, 2012. Do you see that?
17 A   Yes.
18 Q   How was that date selected?
19 A   I don't remember.
20 Q   This is Exhibit 104, Bates EB31202. It's
21 a chain of emails between you, Wendy and Mike
22 Gumaer. Do you see that?
23    (EB31202 was marked as
24    Plaintiff's Exhibit 104 for
25    identification.)

Page 361

L. EBER

1
2  A   Yes.
3  Q   And these are on January 10, 2013, subject
4  Alan Eber trust.
5  A   Yes.
6  Q   I want to look at the second email first
7  the one from Wendy where she is referring to the
8  December 2012 statement for the Alan Eber trust
9  deposition by Canandaigua Bank and it says, quote,
10 "It values Eber Brothers stock at approximately
11 $655,000. It should be zero per our conversation in
12 January with Rick Hawks." Do you see that?
13 A   Yes.
14 Q   And in your email and response you said,
15 "Mike, I think you and I should get Rick on the
16 phone to discuss this with him. This was supposed
17 to have been done." Do you see?
18 A   Yes.
19 Q   What did you mean by that?
20 A   That it should have been valued at zero.
21 That was a mistake for 655,000.
22 Q   Why was it that you believe the stock
23 should be valued at zero?
24 A   Because it had no assets. There wasn't
25 any business.

15 (Pages 358 - 361)

Page 362

L. EBER

1
2    Q    And why was that?
3    A    The company was -- had been consolidated
4 and out of business.
5    Q    Are you referring to the --
6    A    Eber Brothers.
7    Q    Eber Metro had been transferred to Alex
8 Bay?
9        MR. RAMSEY:  Form.
10   A    I'm not referring to that.  I'm referring,
11 there were no assets in the company so there was
12 nothing in Eber Brothers.
13   Q    What was the last asset that Eber Brothers
14 had that you can recall?
15   A    It probably was Eber Connecticut.
16   Q    Through Eber Metro; correct?
17   A    Yes.
18   Q    Is this the first -- January 2013, is that
19 the first time you recall having a discussion with
20 anyone about the valuation of Eber Brothers stock on
21 the trust statements being inaccurate?
22   A    I don't remember.
23   Q    So prior to the transfer of Eber
24 Connecticut out of Eber Brothers, was it your belief
25 that the value of Eber Brothers stock was

Page 363

L. EBER

1
2 approximately $655,000?
3    A    I don't remember.
4    Q    Did you think that the Eber Brothers stock
5 had any value before Eber Connecticut was transfer
6 to Alex Bay?
7        MR. RAMSEY:  Form.
8    A    I think with all the debts I think it was
9 questionable whether there was any value to it
10 because of the monies that were owed.
11   Q    Which debts are you referring to?
12   A    Well, the debts of Eber Brothers, the
13 Teamsters Pension Plan, the public PBGC and
14 Vendersen, it's a real estate company.
15   Q    And also there was debt to Harris Beach;
16 correct?
17   A    Yes.
18   Q    Any other debts?
19   A    There were others, I can't remember them
20 all.  There were a lot of them.
21   Q    And you're referring to debts that were
22 owed by Eber Brothers Wine & Liquor Corp. or is it
23 another entity?
24   A    I think Eber Brothers Wine & Liquor.
25   Q    Had you disclosed the debts of Eber

Page 364

L. EBER

1
2 Brothers Wine & Liquor Corp. to Canandaigua National
3 Bank?
4    A    Yes, we had.
5    Q    When did you do that?
6    A    I don't remember.
7    Q    Had you told Canandaigua National Bank
8 that you thought that the Eber Brothers stock
9 valuation was questionable in light of the debts?
10       MR. RAMSEY:  Form.
11   A    I would have but I wasn't talking to them
12 but I would have said that.
13   Q    Why did you say you would have said that?
14   A    Because it's the facts.
15   Q    But you don't remember doing it; correct?
16       MR. RAMSEY:  Form.
17   A    You can say whatever you wants I --
18   Q    Well, I'm asking you, you don't remember
19 doing that, do you?
20   A    I don't remember not doing it.  I don't
21 remember.
22   Q    Okay.  So just to we're clear, you don't
23 remember ever telling Canandaigua National Bank
24 about the debts of Eber Brothers Wine & Liquor Corp.
25 possibly affecting the value of the Eber Brothers &

Page 365

L. EBER

1
2 Co. stock --
3        MR. RAMSEY:  Form.
4    A    You're putting word into my mouth.  You're
5 making up words that I did not say.  I said I don't
6 remember.
7        MR. RAMSEY:  I think we established what
8    didn't happen so move on.
9    Q    Do you recall ever having -- when is the
10 first time you recall trying to having a formal
11 valuation done of Eber Brothers Wine & Liquor Corp.
12 or Eber Brothers & Co. Inc.?
13   A    I don't remember.
14   Q    How did Canandaigua National Bank, how did
15 the trust statements that it was issuing come to
16 have the number $655,000 for the Eber Brothers & Co.
17 stock?
18   A    I don't know.
19   Q    Would you have you been the source of that
20 information?
21       MR. RAMSEY:  Form.
22   A    No.
23   Q    Why did you say that?
24   A    Because I don't know where it came from.
25   Q    I'm asking you, could it have been from

16 (Pages 362 - 365)

Page 394

L. EBER

2  MR. RAMSEY:  The question is:  Do you have
3  any reason to believe that Wendy saw a copy of
4  your will.
5  A   No.
6  Q   Is David Eber involved in the wine and
7  liquor business?
8  A   Yes.
9  Q   How so?
10  A   He's an importer.
11  Q   Who does he work for?
12  A   Himself.
13  Q   Has he worked for Southern Wine & Spirits
14  at any point in time?
15  A   Yes.
16  Q   When was that?
17  A   After we went out of business.
18  Q   How long did he work for Southern Wine &
19  Spirits?
20  A   I don't remember.
21  Q   Did you help him get that job?
22  A   I believe so.  I don't remember.  I think
23  he got it himself.  He applied there and they hired
24  him.
25  Q   Did he ever work from Eber Brothers?

Page 395

L. EBER

2  A   Yes.
3  Q   What was his position?
4  A   He had a variety of positions.  He had
5  management positions in different areas.
6  Q   Are you familiar with the bylaws of Eber
7  Brothers Wine & Liquor Corp.?
8  A   I have read them.
9  MR. BROOK:  This is marked Exhibit 108, it
10  was a document that was produced as the bylaws
11  of Eber Brothers Wine & Liquor Corporation.
12  The Bates number is EB22533 through 544.
13  (EB22533 to EB22544 was marked
14  as Plaintiff's Exhibit 108 for
15  identification.)
16  Q   Do you recognize this?
17  A   I haven't seen it in years.
18  Q   When is the last time that you recall
19  seeing the bylaws of Eber Brothers Wine & Liquor
20  Corp.?
21  A   I don't remember.
22  Q   Who drafted the bylaws?
23  A   I do not know.
24  Q   Were you involved in the drafting of the
25  bylaws?

Page 396

L. EBER

2  A   No.
3  Q   Were the bylaws every amended after you
4  became involved in the business?
5  A   I don't know.
6  Q   Do you have a copy of the bylaws?
7  A   No.
8  Q   Where was a copy of the bylaws maintained?
9  A   Corporate offices.
10  Q   Did you ever give a copy of the bylaws to
11  Canandaigua National Bank?
12  A   I did not.
13  Q   Did you ever discuss the bylaws with
14  anyone from Canandaigua National Bank?
15  A   No.
16  Q   To your knowledge did anyone else from
17  Eber Brothers do so?
18  A   I do not know.
19  Q   I want to draw your attention to page 11
20  of this Exhibit 108, Article 12, transfer
21  restriction.  Do you see that?
22  A   Yes.
23  Q   Are you familiar with this provision or of
24  the bylaws?
25  A   I don't remember it.

Page 397

L. EBER

2  Q   Do you recall ever discussing this
3  provision of the bylaws with anyone else?
4  A   I don't remember.
5  Q   What is your understanding of the purpose
6  of Article 12 of the bylaws?
7  MR. RAMSEY:  Form.
8  A   I believe it's to transfer -- how the
9  stock would be transferred.  That's what it says.
10  Q   Why was this put into the bylaws?
11  A   I don't know.
12  Q   To your knowledge has this provision of
13  the bylaws ever been enforced?
14  A   I don't remember.
15  Q   We're looking at the bylaws of Eber
16  Brothers Wine & Liquor Corp. have you seen the
17  bylaws of Eber Brothers & Co. Inc.?
18  A   Possibly I have seen them over the years.
19  Q   Do you recall ever discussing those with
20  anyone from CNB?
21  A   No.
22  Q   Do you recall giving a copy of this Eber
23  Brothers & Co. Inc. bylaws to CNB?
24  A   No.
25  Q   Do you know whether the Eber Brothers &

24 (Pages 394 - 397)

Page 434

L. EBER

1
2       MR. RAMSEY: I'm reading this. I'm going
3  to stipulate to withdraw. That doesn't make
4  sense. I will stipulate to withdraw that one.
5       MR. BROOK: He did sign this thing.
6       MR. RAMSEY: I understand. Whatever the
7  change was, let's not go back in time but right
8  now if it's going to short circuit we can agree
9  that it didn't clarify it very well.
10   Q   Did you review this document, Exhibit 110
11  and check it against the transcript for accuracy
12  before you signed it?
13   A   Yes, I did go with it with them but I
14  don't remember. I just can't remember all those
15  details.
16       MR. RAMSEY: All right you answered the
17  question.
18   Q   Was this another instance where you were
19  given a document to sign by a lawyer and you signed
20  it without reading it carefully?
21       MR. RAMSEY: Form.
22   A   No.
23   Q   Do you recall any other instance when you
24  signed a document given to you by a lawyer without
25  reading it carefully besides the Affidavit that was

Page 435

L. EBER

1  prepare for you by Jerry?
2       MR. RAMSEY: Form.
3   A   That one was an exception but I don't
4  remember any others.
5   Q   So, for example, with respect to the
6  answer, even though you didn't sign that document
7  you knew if was important to make sure that that
8  answer was correct and accurate?
9
10   A   Yes.
11   Q   And you made sure it was so; correct?
12       MR. RAMSEY: Form. He's not submitting
13  the answer.
14   Q   All right. I want to turn now to the next
15  change that you made, page 241 of the last
16  transcript. I asked you -- I will wait for you to
17  get there.
18   A   241?
19   Q   241.
20   A   This goes up to 300.
21   Q   Bottom right, are you there?
22   A   Yes.
23   Q   So at that point I'm discussing your
24  decision to foreclose on the debt that was owed to
25  you by Eber Metro after it assumed the debt of Eber

Page 436

L. EBER

1   Brothers Wine & Liquor Corp. So we're talking
2  roughly December, January, December 2011,
3  January 2012. Are you with me? That's what we were
4  talking about?
5   A   Yes.
6   Q   My question was: "Why did you not -- and
7  this is a typo. "Why did you not extend the
8  maturity date of your line of credit note rather
9  than begin foreclosure proceedings?" and your new
10  answer to that is, "I consulted with my lawyers and
11  then decided to do so." So as before I would like
12  an answer to my actual question which is: Why
13  didn't you extend the maturity date on the line of
14  credit here?
15   A   I did consult with my lawyers but I don't
16  remember why I didn't do it.
17   Q   Isn't it true the reason you didn't
18  extended the maturity date on the line of credit
19  note was because you wanted to take control of the
20  company away from them?
21       MR. RAMSEY: Form.
22   A   I don't remember why I didn't extend it.
23   Q   Did you want to take personal control of
24  Eber Brothers operating assets away from the trust?
25

Page 437

L. EBER

1
2       MR. RAMSEY: Form.
3   A   I wanted to stop the company going into
4  liquidation, and that's what would have happened if
5  I had not given the money and support to the
6  company, and there wouldn't be a case even.
7   Q   So is it your testimony that if you had
8  extended the maturity date on your line of credit
9  note that would have caused the company to go into
10  liquidation?
11       MR. RAMSEY: Form.
12   A   I don't know. I made the decision at the
13  time. I don't remember why but my whole mission was
14  to keep the company out of liquidation, to keep it
15  alive.
16   Q   Did you want to prevent Eber Connecticut
17  from being run for the benefit of Eber Brothers
18  pension plan?
19       MR. RAMSEY: Form.
20   A   I supported -- I gave up my pension of 1.5
21  million to the PBGC to erase that benefit, to erase
22  that debt and I was not personally liable to do it.
23   Q   They did sue Eber Connecticut before you
24  did that; correct?
25   A   That is correct.

34 (Pages 434 - 437)

Page 438

L. EBER

1
2    Q    So you said that you consulted with
3 lawyers and then you acted, which lawyers did you
4 consult with about whether to extend the line of
5 credit note?
6    A    I don't remember.
7    Q    So how did you know that you consulted
8 with lawyers?
9        MR. RAMSEY:  Form.
10    A    Because I would not sign a document unless
11 I talked to legal counsel.
12    Q    So that's your standard practice; correct?
13    A    Usually, there could be exceptions, but
14 usually.
15    Q    So do you know whether that was legal
16 counsel for you personally or was that corporate
17 counsel?
18    A    I don't remember.
19    Q    Did you ever discuss whether to extend the
20 line of credit note with Mike Gumaer?
21    A    I don't remember.
22    Q    You're aware that Glenn Sturm ended up
23 providing promissory note to Eber Metro; correct?
24    A    Yes.
25    Q    The maturity date on that was extended

Page 439

L. EBER

1
2 twice; correct?
3    A    I don't remember that.
4    Q    And Eber Metro never tried to collect on
5 that, did it?
6    A    I really don't know about it.  I shouldn't
7 say.  I do not remember it.
8    Q    Is it fair to say that with respect to
9 CNB, one of the things that you and Wendy tried to
10 do, for several years, was to get them to continue
11 to extend their credit that they had given to you?
12    A    Yes.
13    Q    Why was an extension of credit a good
14 thing for the company?
15    A    Businesses need credit to buy product and
16 run, to make a payroll.
17    Q    So you didn't want them to foreclose on
18 the credit?
19    A    That is correct.
20    Q    Foreclose is a bad thing; right?
21        MR. RAMSEY:  Form.
22    A    It would have liquidated the company.
23    Q    So foreclosure on credit is a bad thing
24 when CNB does it.  Why was foreclosure on a line of
25 credit when you did it a bad thing?

Page 440

L. EBER

1
2        MR. RAMSEY:  Form.
3    A    CNB was very well protected by my personal
4 guarantee and the 500,000 and 120,000 in stock that
5 I left with them.  I wasn't protected on anything.
6    Q    Well, you were in control of the company
7 weren't you?
8    A    The money I lent them, there was no
9 security.  I had no protection on it.  As a creditor
10 I would not have had any protection.
11    Q    Well, for several years you said that you
12 gave money to Eber Brothers without having any
13 security on it; right?
14    A    Yes.
15    Q    Why did you suddenly change your mind?
16        MR. RAMSEY:  Form.
17    A    On advice of counsel that's what I did.
18    Q    And which counsel was that?
19    A    I don't remember.
20    Q    It was Glenn Sturm; correct?
21    A    It could have been.
22    Q    And Glenn Sturm then prepared a security
23 agreement for you to sign in March 2010; correct?
24    A    If there's one that I signed he did.
25    Q    What did Eber Brothers get out of giving

Page 441

L. EBER

1
2 you security at that time?
3        MR. RAMSEY:  Form.
4    Q    Was there any benefit to Eber Brothers for
5 signing that security agreement with you then?
6    A    Benefit to Eber Brothers?  Eber Brothers
7 kept -- I kept my loans and monies and more than I
8 had given them, kept the company alive.
9    Q    But you already agreed to loan them money;
10 correct?
11    A    I agreed to loan them money, yes.
12    Q    So if you already agreed to loan them
13 money what new did the company get by agreeing to
14 secure your loan?
15    A    I wouldn't of foreclosed.  I didn't
16 foreclose on them at that time.
17    Q    So you believe that you could have
18 foreclosed on the loan in or around February or
19 March of 2010?
20        MR. RAMSEY:  Form.
21    A    I don't have the dates but I could have
22 foreclosed on the loans.
23    Q    Even though you don't have the dates, at
24 the time that you sign the security agreement you
25 believed that you could have foreclosed on the loan;

35 (Pages 438 - 441)

Page 442

L. EBER

1    is that right?
2        MR. RAMSEY:  Form.
3    A   I think the security agreement gave me
4    preference as a creditor, gave me comfort, as any
5    good businessman would do.
6        Q   Was there any benefit to the Eber
7    Brothers -- I'm sorry.  Withdrawn.  Was there any
8    benefit to Eber Brothers Wine & Liquor Corp. as a
9    result of you foreclosing on the loan and taking
10   over Eber Metro?
11       MR. RAMSEY:  Form.
12   A   Benefit?
13   Q   Yes.
14   A   Well, I think it's how you describe a
15   benefit.
16   Q   How do you describe benefit?
17       MR. RAMSEY:  Form.
18   A   Keeping the entity alive.
19   Q   Is taking away the only remaining asset to
20   the company beneficial to the company, in your
21   definition?
22       MR. RAMSEY:  Form.
23   A   I did what any reasonable creditor would
24   do to protect my investment.  The money that I
25

Page 443

L. EBER

1    loaned and put into the company that kept it afloat
2    otherwise it would have been liquidated, the whole
3    system would have.
4        Q   So that's what a reasonable creditor would
5    do, but why would a trustee allow that to happen?
6        MR. RAMSEY:  Form.
7        Q   Did you think about it from that
8    prospective at the time?
9        MR. RAMSEY:  Form.
10   A   I discussed it with the other trust
11   people.  They knew about it.
12   Q   And so what was your understanding as to
13   why it was beneficial for the trust for you to
14   foreclose on the loan?
15       MR. RAMSEY:  Form.
16   A   There wouldn't be a loan to foreclose on
17   if I didn't come up with the money.  There wouldn't
18   be anything.  The whole Eber Brothers, Eber
19   Connecticut would all go away.
20   Q   Where did you get the money to loan to the
21   company?
22   A   Where did I get the money?
23   Q   Yes.
24   A   I gave up 1.5 million in my pension plan,
25

Page 444

L. EBER

1    PBGC took that away from me.
2        MR. RAMSEY:  Brian, I know we covered
3    this.
4        THE WITNESS:  He goes over and over.
5        Q   I'm transitioning to another topic here,
6    but we discussed before that you were getting from
7    mid-2007 through 2012 $600,000 a year from Southern
8    Wine and Spirits; correct?
9    A   Yes.
10   Q   Now, if that $600,000 a year had been paid
11   to Eber Brothers Wine & liquor Corp. instead of to
12   you and then you just received your salary, maybe
13   with an increase in it, would Eber Brothers Wine &
14   Liquor Corp. have needed any loans from you?
15       MR. RAMSEY:  Form.
16   A   Yes.
17   Q   What is your basis for saying that?
18   A   If you look, I put 7, 8million,
19   $9 million.
20   Q   Well --
21   A   But I worked for that money.
22   Q   As of 2012, as of mid-2012 you put in
23   according to your foreclosure action that you filed,
24   a little over $3 million and then with interest it
25

Page 445

L. EBER

1    was roughly $3,650,000.  Does that sound about
2    right?
3    A   I don't know.  It could have been more
4    with interest.  I thought it was more but I would
5    have to check it.
6        Q   And of that a lot of that was a loan that
7    had been given in 2006; is that right?
8    A   I don't remember the dates of the loan.
9        Q   Do you remember how much money you loaned
10   to Eber Brothers between mid-2007 and mid-2012?
11   A   No.
12       MR. RAMSEY:  Brian, unless you're
13   transitioning, we have done this.  We have done
14   Southern before.  There's nothing new about
15   this or about Southern.
16   Q   With respect to the Southern transaction
17   did you discuss -- let me step beck.  You testified
18   before about your responsibilities was largely in
19   governmental relations work; correct?
20   A   That was the start of it.
21   Q   Okay.  Did have any experience with
22   government relations?
23   A   Yes.
24   Q   How did you get that experience?
25

36 (Pages 442 - 445)

L. EBER

1
2   A   From working over the years in the
3   legis -- with the -- we're regulated by the laws in
4   Albany and federally.
5   Q   Who was paying your salary during that
6   time?
7   A   Eber Brothers.
8   Q   Eber Brothers Wine & Liquor Corp?
9   A   Yes.
10   Q   So other than your experience from working
11   with Eber Brothers Wine & Liquor Corp. did you have
12   any other way in which you acquired experience that
13   was relevant to your work with Southern?
14   A   Yeah.  I had taken courses, my education.
15   Q   When was that?
16   A   Well, I went after college and I worked.
17   I worked for the company but I had extra time.  I
18   got into governmental affairs.
19   Q   Did you ever think about whether your
20   consulting agreement with Southern was taking
21   anything away from Eber Brothers Wine & Liquor
22   Corp.?
23       MR. RAMSEY:  Form.
24   A   No.
25       MR. RAMSEY:  Brian, you already asked

L. EBER

1
2   these questions.
3       MR. BROOK:  I don't know if I asked that.
4       MR. RAMSEY:  Southern was covered in
5   depth.
6       MR. BROOK:  Let's change the topic.  Let's
7   mark this at Exhibit 111.  So we're clear at
8   the outset, the topic was covered but a
9   document has not yet been produced.  Exhibit
10   111 bears Bates numbers 33279 through 300.
11       (EB33279 to EB33300 was marked
12       as Plaintiff's Exhibit 111 for
13       identification.)
14   Q   This is an excerpt to a larger file that
15   followed the cover letter.  Do you recognize this at
16   all?
17   A   I don't remember it.
18   Q   Do you know who John Ryan is?
19   A   Yes.
20   Q   He was their chief financial officer;
21   correct?
22   A   Yes.
23   Q   This is a letter dated November 17, 2004
24   from David Dean.
25   A   Yes.

L. EBER

1
2   Q   Do you know who David Dean is?
3   A   Yes.
4   Q   Who is he?
5   A   He was the chief financial officer of
6   Slocum.
7   Q   Did he continue working with Slocum after
8   Eber Brothers acquired it?
9   A   Short period of time.
10   Q   So this letter it says, it's a letter from
11   David Dean to John Ryan saying, "Enclosed, please,
12   find the due diligence binder responding to your
13   recent information request."  Do you know what the
14   due diligence binder is?
15   A   I have an idea.
16   Q   What is your idea?
17   A   After they done an audit of the company
18   what it shows.
19   Q   So is it fair to say that this was
20   documentation that was relevant to whether Eber
21   Brothers would acquire Slocum & Sons and if so at
22   what price?
23   A   It was something that they looked at but I
24   don't think it determined the price.
25   Q   What did determine the price of Slocum &

L. EBER

1
2   Sons?
3   A   What someone would pay for it.
4   Q   So the financials didn't have any impact
5   on that; is that right?
6   A   It's something but the important thing is
7   what a willing buyer will pay to buy a company.
8   Q   How did you determine that?
9   A   What the market would -- I did not do this
10   but it was what the market could pay in the
11   competitive bidding and how Strategic it was to Eber
12   Brothers in New York.
13   Q   All right.  So were you involved in
14   setting the price to pay?
15   A   I was aware of some of it but I couldn't
16   say I was directly involved in the whole deal.
17   Q   Who was involved in determining what price
18   Eber Brothers would pay from Slocum & Sons?
19   A   Probably John Ryan and Pat Dalton.
20   Q   Did you have any input on that?
21   A   Yeah, I had input, and that it was
22   strategically, not on the price, but it was
23   strategically important to the welfare of New York
24   that we buy this company as opposed to a competitor
25   who would take the lines away from us in New York.

37 (Pages 446 - 449)

Page 1

```
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   Civil Action No.:  16-cv-951 (LAK)
     ---------------------------------------x
 4
 5   DANIEL KLEEBERG, LISA STEIN and AUDREY HAYS,
 6
 7                          Plaintiff,
 8              -against-
 9
10   LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER,
     LLC; CANANDAIGUA NATIONAL CORPORATION d/b/a
11   CANANDAIGUA NATIONAL BANK & TRUST; ELLIOT
     W. GUMAER, JR.; EBER BROS. & CO., INC., EBER
12   BROTHERS WINE AND LIQUOR CORPORATION;
     BROS. WINE AND LIQUOR METRO, INC.,
13   EBER-CONNECTICUT, LLC; and WENDY EBER,
14                          Defendants.
15   ---------------------------------------x
16                     1250 Broadway
17                     New York, New York 10001
18                     February 28, 2019
19                     9:45 a.m.
20
21        EXAMINATION BEFORE TRIAL OF WENDY EBER, held at
22   the above-mentioned time and place before ANNMARIE
23   OAKLEY, a Notary Public of the State of New York.
24
25
```

Page 2

```
1
2          A P P E A R A N C E S
3
4  BROOK & ASSOCIATES PLLC
     Attorneys for Plaintiffs
5        100 Church Street, 8th Floor
         New York, New York 10007
6
7  BY:    BRIAN BROOK, ESQ.
8
9  UNDERBERG & KESSLER LLP
     Attorneys for Defendants
10 LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC;
     EBER BROTHERS & CO., INC; EBER BROS. WINE AND LIQUOR
11 CORPORATION; EBER BROS. WINE AND LIQUOR METRO, INC.,
     EBER-CONNECTICUT, LLC; and WENDY EBER
12        50 Fountain Plaza
          Buffalo, New York 14202
13
   BY:    COLIN RAMSEY, ESQ.
14
15 JOHN HERBERT, ESQ. (Telephonically)
     Attorneys for Defendants
16 LESTER EBER and WENDY EBER
          PO Box 1031
17        Tiburone, California 94920
18
19 CALIHAN LAW PLLC
     Attorneys for Defendant
20 THE ESTATE OF ELLIOT W. GUMAER
          16 Main Street
21        Rochester, New York 14614
22 BY:    ROBERT B. CALIHAN, ESQ.
23
24 Also present:  Howard Brodsky, videographer
25
```

Page 3

```
1
2          S T I P U L A T I O N S
3      IT IS HEREBY STIPULATED AND AGREED, by and
4  among counsel for the respective parties hereto,
5  that the filing, sealing and certification of the
6  within deposition shall be and the same are waived;
7
8      IT IS FURTHER STIPULATED AND AGREED that
9  all objections, except as to the form of the
10 question, shall be reserved to the time of trial;
11
12     IT IS FURTHER STIPULATED AND AGREED that
13 the within deposition may be signed before a Notary
14 Public with the same force and effect as if signed
15 and sworn to before the court.
16
17         *       *       *
18
19
20
21
22
23
24
25
```

Page 4

```
1                  W. EBER
2      VIDEOGRAPHER:  Good morning.  Here begins
3  the video recorded testimony of Wendy Eber taken by
4  the plaintiffs in the matter or Daniel Kleeberg et
5  al plaintiffs versus Lester Eber et al defendants,
6  index number 16-cv-9517 (LAK) in the United States
7  District Court Southern District of New York.  This
8  deposition is proceeding at Veritext Legal Solution
9  1250  Broadway, Suite 2400, New York, New York
10 10001, on Thursday February 28, 2019 at
11 approximately 9:46.
12     My name is Howard Brodsky and I'm a legal
13 video specialist in association with Veritext Legal
14 Solutions with offices located in New York, New
15 York.  The court reporter is AnnMarie Oakley in
16 association with Veritext.  Will counsel, please,
17 state their appearances for the record.
18     MR. BROOK:  Brian Brook of Brook &
19 Associates, PLLC, for the plaintiffs.
20     MR. RAMSEY:  Colin Ramsey from Underberg &
21 Kessler for the Eber defendants.
22     MR. CALIHAN:  Rob Calihan from Calihan
23 Law on behalf of the estate of Mike Gumaer.
24     VIDEOGRAPHER:  Will remote counsel,
25 please, state his appearance.
```

Page 5

```
1                  W. EBER
2      MR. HERBERT:  John Herbert for Wendy and
3  Lester Eber.
4      THE FOREMAN:  Will the court reporter,
5  please, swear in the witness.
6  W E N D Y   E B E R, having first been duly sworn by
7  a Notary Public of the State of New York, was
8  examined and testified as follows:
9  EXAMINATION BY MR. BROOK:
10 Q    Would you state your name for the record,
11 please.
12 A    Wendy Eber.
13 Q    Would you state your address for the
14 record, please.
15 A    201 East 80th Street, Apartment 21A, New
16 York, New York 10075.
17     MR. RAMSEY:  Like yesterday we're going to
18 read and sign.
19 Q    Good morning, Ms. Eber.
20 A    Good morning.
21 Q    Because we have done this a couple of
22 times with the 30(b)6 depositions I'm going to
23 presume that you know how this works but if you have
24 any questions, please, let me know.  I'm going to
25 use the same general definitions as before in terms
```

2 (Pages 2 - 5)

Page 42

W. EBER

1
2    Q   Yes.
3    A   Yes.
4    Q   When did that occur, the negotiation?
5    A   I don't remember.  What year is this?
6    Q   Again, your email is dated June 2011.
7    A   I know he claimed he had another offer
8 from another company so I don't remember the
9 details.
10   Q   In the notes on the right of that table it
11 says, "John Slocum has an employment contract which
12 expires in January 2012."  Do you see that?
13   A   Yes.
14   Q   When was that employment contract executed
15 to the best of your recollection?
16   A   I don't know if I was involved at the
17 time.  I did note when I was reading the merger
18 document there were a lot of contracts in there.  He
19 may have had one at the time, but I wasn't involved
20 in his contract.
21       THE WITNESS:  Can we take a break.
22       MR. BROOK:  Sure.
23       VIDEOGRAPHER:  The time is 10:52.  We're
24 off the record.
25       VIDEOGRAPHER:  Time is 11:04.  We are on

Page 43

W. EBER

1
2 the record.
3       MR. BROOK:  All right.  Go to another
4 exhibit now.  This one is being marked as
5 Exhibit 69.  It bears Bates EB31025 through
6 034.
7       (Ten-page document was marked
8       as Plaintiff's Exhibit 69 for
9       identification.)
10   Q   Do you recognize this document?
11       (Witness reviewing document.)
12   A   Sort of.  I'm confused by this date,
13 12/29/2017.
14   Q   So according to the first page where it
15 say Slocum and Sons December 2011 in the middle and
16 the bottom left it says 12/29/17.
17   A   Yes.
18   Q   Is that the date when you printed this
19 document perhaps from Microsoft Power Point?
20   A   I don't remember.  I believe it was
21 created December 12, 2011.
22   Q   Was it a presentation that was given on
23 December 12, 2011?
24   A   I believe so, yes.
25   Q   What was the presentation given to?

Page 44

W. EBER

1
2    A   It could have been the Teamsters.
3    Q   Could it have been PBGC?
4    A   No.
5    Q   Why do you say that?
6    A   This isn't something that I recall giving
7 to the PBGC.
8    Q   Do you recall giving a presentation to the
9 Teamsters in or about December 2011?
10   A   I did meet with them a couple of times.
11 This could have been to maybe a bank too, trying to
12 get a loan from a bank.
13   Q   Who prepared this presentation?
14   A   I believe I did.
15   Q   Did anyone assist you in preparing the
16 presentation?
17   A   I don't remember.  It may have been to a
18 bank.  I'm not sure.
19   Q   In terms of, you know, the date of
20 December 29th of 2017 that's printed on this there
21 is -- I got some questions in terms of just how
22 documents were generally were prepared for
23 production in this case, because that date is after
24 this lawsuit was filed; correct?
25   A   Yes.

Page 45

W. EBER

1
2    Q   Who was involved in reviewing documents
3 that were on computers for Slocum and Sons in order
4 to respond to document requests in this case?
5    A   Me.
6    Q   Anyone else?
7    A   No.
8    Q   So do you recall opening up Microsoft Word
9 and Microsoft Power Point files and printing those
10 out?
11   A   Yeah, I did print out or send them to Paul
12 electronically, our lawyer electronically, yes.
13   Q   And when you searched for emails did you
14 follow the same process of either forwarding the
15 email or printing them?
16   A   Yes.
17   Q   How did you decide whether to print an
18 email or to forward it?
19   A   I don't recall individual things.
20   Q   When you saw emails with attachments did
21 you print out the attachments as well?
22   A   I believe I did.  I believe I did, yes,
23 but I don't know if I did everyone but I believe so.
24   Q   Prior to this litigation was it your
25 practice to regularly print out emails that you sent

12 (Pages 42 - 45)

W. EBER

1
2 or received?
3    A    Sorry?
4    Q    Before getting involved in with litigation
5 and having to look for documents was it your
6 practice just in terms of your day-to-day operation
7 of the business to print out emails that you sent or
8 received?
9    A    You know, I printed out some emails, yes,
10 if they were, I thought something that I thought was
11 important or that I wanted to remember to do
12 something I would at times print the email.
13   Q    What did you do with the emails that you
14 printed out during the regular course of business
15 after you printed them, meaning what you did with
16 the hard copies?
17   A    It depends, sometimes I file them
18 sometimes left them on my desk, sometimes I did
19 whatever I needed to do with them and I throw them
20 in the garbage.  It depends on what the email was.
21   Q    Did you have any particular practice or
22 routine when it came to organizing your email inbox?
23   A    No.
24   Q    Did you regularly delete emails that you
25 received?

W. EBER

1
2    A    I did delete emails.
3    Q    Did you also save emails in some way such
4 as through an archive or folder system?
5    A    No, not really.  No.
6    Q    What email service did you use?  Was it
7 Microsoft Outlook?
8    A    Yes.
9    Q    Did you use Microsoft Outlook at all times
10 since 2008?
11   A    Yes.
12   Q    Did you use Microsoft Outlook for both
13 business and personal accounts or only business
14 accounts?
15   A    I have a Gmail account but I have Outlook
16 for work.
17   Q    Since about 2008, I just want to focus on
18 the time period from 2008 forward.  Please, tell me
19 all the different email addresses that you have used
20 to send or receive email whether for business or
21 personal reasons.
22   A    From 2008 I have my work email which is
23 weber@slocumandsons.com and then I have an email
24 address weber4@nyc.rr.com and then I have a Gmail
25 account which I started in 2013, or something.  It's

W. EBER

1
2 wendyefry@Gmail.com.
3    Q    Why did you start that account?
4    A    I got married and I, you know, thought it
5 would be nice.  Sometimes I go by Fry socially
6 because of my husband.
7    Q    Did you legally change your name to Fry?
8    A    My driver's license says Wendy Eber.
9    Q    When you filed for your marriage license
10 did you request to change your name with the state?
11   A    Yes.
12   Q    What is your legal name as a result of
13 that?
14   A    Wendy Fry.
15   Q    And what is your middle name or initial?
16   A    P.
17   Q    Do you ever use your nyc.rr.com email
18 account to communicate with individuals relating to
19 the Eber businesses?
20   A    No.
21   Q    Do you use the nyc.rr.com account to
22 communicate with Lester?
23   A    I don't recall.  I may have used it but
24 not typically.
25   Q    Have you used the Gmail account to

W. EBER

1
2 communicate with Lester?
3    A    I don't recall.
4    Q    Have you used the Gmail account to
5 communicate with anyone related to the Eber
6 businesses?
7    A    No.
8    Q    In responding to Discovery requests in his
9 case did you search your nyc.rr.com email account?
10   A    No.
11   Q    Did you search your Gmail account?
12   A    No.
13   Q    Why not?
14   A    I don't use that typically to communicate
15 with people from work, for work related things.
16   Q    But when you responded to my questions a
17 moment ago you weren't sure if you communicated with
18 Lester using those accounts; correct?
19       MR. RAMSEY:  Form.
20   A    I don't typically communicate with Lester
21 with my -- if I'm communicating with Lester it's for
22 work.  It's with my work account.  If maybe my
23 mother emails my father and I'm on it with him about
24 a family thing it might be on another account but
25 typically I communicate with Lester about work

13 (Pages 46 - 49)

Page 50

W. EBER

1
2  related thing with my work account.
3     Q    And you're -- how confident are you about
4  the fact that you probably have not communicated
5  with Lester through your personal email accounts at
6  any point since 2008?
7         MR. RAMSEY:  Form.
8     A    What?
9     Q    Are you saying that you remember that you
10 didn't communicate with Lester using your personal
11 account at that time?
12        MR. RAMSEY:  Form.
13    A    I don't typically use -- if I'm going to
14 communicate with Lester I usually talk to him.  It's
15 usually a conversation.  I call him all the time.  I
16 call him a couple of times a day or we talk by phone
17 or I see him in the office.  You know, that's how I
18 communicate with Lester.
19    Q    Have any of your friends or family members
20 who are not parties to this lawsuit communicated
21 with you about this lawsuit or the issues in it?
22    A    I have spoken to my mother, yes.
23    Q    What did you and your mother discuss about
24 this lawsuit?
25    A    Not a lot of details, just it's more her

Page 51

W. EBER

1
2  concern it's and it's more the hurt feelings.  Were a
3  family and I went to Danny's wedding in 1974.  I
4  went to Lisa's wedding.  I went to Audrey's wedding.
5  We celebrate Passover together.  We celebrated
6  Thanksgiving together.  We celebrated Rosh Hashanah
7  together for the last, for Lester 60- 70 years, and,
8  um, it's more about just how hurtful it is and those
9  type of emotional feelings.
10    Q    When you got married to Eric Fry were any
11 of my clients in attendance?
12    A    They were.  They came to my wedding.
13    Q    All of them?
14    A    Lisa was there.  Sally was there.  Danny
15 was there, and Danny's son was there.
16    Q    Was Audrey Hays there?
17    A    Audrey was not there.  Her husband was
18 very sick at the time.  She couldn't make it.
19    Q    When is the first time that you recall
20 discussing with Dan Kleeberg the fact that the trust
21 no longer owned Eber Connecticut?
22    A    I didn't have that conversation with him.
23    Q    Not before this lawsuit was filed?
24    A    No.  Lester had that conversation with
25 him.

Page 52

W. EBER

1
2     Q    What is your understanding as to when
3  Lester had that conversation with him?
4     A    When?
5     Q    Yes.
6     A    My understanding was that, um, Dan
7  Kleeberg had a conversation with Mark Stein and Mark
8  Stein said he had learned about the Article 9 sale
9  and that he told Danny about it and then Danny told
10 Lester about it and then Lester told me about his
11 conversation with Danny.
12    Q    What did Lester tell you about that
13 conversation?
14    A    I believe it was before Sally died.
15    Q    What do you recall Lester telling you
16 about what Dan said in response to him informing him
17 about the transaction?
18    A    Danny was well aware of the monies that
19 Lester had been lending into the company and
20 understood all these third-party creditors,
21 specifically the PBGC.
22    Q    Just let me clarify.  You're talking about
23 what Lester told you Dan had said at the time?  I'm
24 not asking what you think Dan would do.  I'm asking
25 you specifically what you recall Lester telling you

Page 53

W. EBER

1
2  that Dan had said in response to him informing him
3  of the transaction.
4     A    That he understood.  I mean, I don't -- I
5  think what I was trying to say is he understood that
6  Lester had been putting in a lot of money into the
7  company, loaning money into the companies to save
8  the companies and he understood that and that, you
9  know.
10    Q    Was anything about this conversation ever
11 documented?
12        MR. RAMSEY:  Form.
13    A    Well, there was an email from Danny to
14 Lester which basically Danny was asking Lester for
15 to find him another job and to continue paying him a
16 consulting fee from the company and, um, he, you
17 know, he knew Lester was loaning money into the
18 company so if Lester had to loan the money in he
19 didn't necessarily need the money but he would like
20 to continue to get the consulting fee so, um.
21    Q    So that email was after the conversation
22 that he had with Lester?
23    A    No.  I think that was before.  That was
24 in, I think, 209 when he was looking to get, looking
25 for money to be paid as a consultant.

14 (Pages 50 - 53)

Page 54

W. EBER

1
2    Q   My question is focused on whether there
3  was any documentation, whether just email
4  memorializing it or notes or anything like that that
5  was made about the conversation that Lester said he
6  had with Dan Kleeberg in or around 2014 at the time
7  or afterwards not something that you think supports
8  it before.
9        MR. RAMSEY:  Form.  Go ahead.
10   A   I didn't document it.  I don't know if
11  Lester documented it.  I didn't document that
12  phonecall or that conversation.
13   Q   Did Lester explain to you how the topic
14  came up?
15   A   No.  I think that Danny and Lester spoke
16  very frequently about lots of subjects, especially
17  after the company closed or wound down and, you
18  know, also Danny was a supplier of Connecticut so we
19  did business with him and sold his products.
20   Q   I'm sorry.  Can you -- I think you may
21  have said this but was this conversation that Lester
22  said he had with Dan before or after Sally died?
23   A   I believe it was before Sally died but
24  I -- yeah.  I believe it was before and he
25  understood.  I don't think Danny was angry.  I don't

Page 55

W. EBER

1
2  think he -- you know, nothing comes up in my mind
3  that Danny was upset about anything because my
4  understanding was that Danny knew that Lester had
5  been lending money into the company, and I had
6  conversations with Danny about the pension
7  obligations with the PBGC and he was aware of that
8  liability.
9    Q   When was the conversation that you had
10  with Dan regarding the PBGC?
11   A   Um, do you have the interrogatories?
12  Because you know this is -- they're all detailed in
13  the interrogatories.
14       MR. RAMSEY:  Just whatever your best
15       recollection is today.  Whatever your best
16       recollection is today.
17   A   I had several conversation with Danny
18  about the PBGC.  His wife sued Eber -- excuse me.
19  His ex-wife, Gail Kleeberg sued Eber Brothers
20  because he falsified a document saying that he
21  didn't have a Quadro to get his pension plan and so
22  he wasn't paying his ex-wife the pension, the
23  pension she was entitled to through the Quadro so at
24  that point there was no administrator on the pension
25  plan to change the designation of the ex-wife to get

Page 56

W. EBER

1
2  the pension benefit so then her lawyer sued Eber
3  Brothers and then he got into negotiations with the
4  PBGC and Eber Brothers.
5    Q   This was all before the Alexbay
6  transaction; right?
7    A   No.  This was after -- well, he signed
8  where he misrepresented that they didn't have a
9  Quadro, that was before the Alexbay.
10   Q   What do you mean by a Quadro?
11   A   A  Qualified Domestic Relations Order, which
12  designated that Gail Kleeberg was entitled to half
13  of his pension plan.
14   Q   What is your basis for saying that he made
15  that representation with intentional falsity?
16       MR. RAMSEY:  Form.
17   A   Because he signed a document that said
18  that he didn't have one when, in fact, he did have
19  one.
20   Q   So it's your view that if someone signs a
21  document that says something then they are
22  responsible for ensuring the accuracy of everything
23  that's in that document?
24       MR. RAMSEY:  Form.  He testified at this
25       own deposition.

Page 57

W. EBER

1
2       THE WITNESS:  Right.  He testified to this
3       at his own deposition.
4    Q   Have you ever signed a document that
5  contained any factual inaccuracies?
6    A   I don't recall.  I mean, I may have, yes,
7  signed something.
8    Q   Has Lester signed any documents that
9  contain factual inaccuracies that you're aware of?
10       MR. RAMSEY:  Form.
11   A   May have, I don't know all the specifics.
12  I'm just --
13       MR. RAMSEY:  Wait.  Wait for a question.
14   Q   I wants to focus on your conversations
15  with Dan Kleeberg after the transfer of Eber Metro
16  to Alexbay.  During any of those conversations with
17  Dan Kleeberg did you tell Dan Kleeberg that PBGC was
18  trying to collect money from Eber Connecticut?
19   A   I didn't use those words but I did use the
20  words that the companies had a pension liability and
21  the companies were responsible for that pension
22  liability which is going back to why -- just stay
23  with me here.  Eber Brothers had a lawyer
24  representing it with the PBGC.  Dan Kleeberg wanted
25  to use Eber Brothers lawyer to represent him with

Page 58

W. EBER

1          W. EBER
2 the PBGC because Gail Kleeberg's lawyer had
3 contacted the PBGC about Gail's Kleeberg's situation
4 about not receiving her benefit.  So all of those
5 things I had discussed with Dan so Dan knew we were
6 talking to the PBGC about the liability there.  He
7 knew that.
8     Q    And did you tell anything to Dan about the
9 specifics of what PBGC was trying to find out in
10 terms of the information about Eber Connecticut?
11     A    What do you mean?
12     Q    Well, PBGC was trying to get a lot of
13 information from you about Eber Connecticut and what
14 its financials were and its operations; correct?
15     A    Well, at some points they were and at
16 other points we were talking negotiating with them.
17 It went on for a very long time.
18     Q    I'm asking about the inquiries regarding
19 Eber Connecticut.  I understand there's other things
20 there.  Did you tell Dan Kleeberg about the fact
21 that PBGC was making inquiries about Eber
22 Connecticut's finances?
23     A    I may have.  I don't remember the
24 specifics.  I remember him saying that he called the
25 PBGC without an attorney and spoke with an attorney

Page 59

1          W. EBER
2 there and I said, Danny, you need a lawyer to speak
3 to them.  You can't just call them up, and so that's
4 what we got into this whole conversation about
5 having Eber Brothers represent Danny.
6     Q    I really want to try to get this done
7 today so I would really appreciate if you answered
8 my question about a minute earlier, so let's stay
9 focused on that.  So when you might have spoken with
10 Dan about PBGC making inquiries about Eber
11 Connecticut's finances and operations did you
12 indicate to Dan Kleeberg that Eber Connecticut was
13 trying to avoid making payments to PBGC to fund the
14 pension benefit?
15     A    What?
16     Q    Well, Eber Connecticut wasn't willingly
17 making payment to PBGC for a period of years;
18 correct?
19          MR. RAMSEY:  Form.
20     A    The companies could not afford to make
21 payments.  Yes, we were not making payments.
22     Q    And Eber Connecticut took the position
23 that it did not have to make payments to PBGC; isn't
24 that correct?
25          MR. RAMSEY:  Form.

Page 60

1          W. EBER
2     A    We were always trying to negotiate with
3 the PBGC to determine what we could pay, afford to
4 pay.
5     Q    So my question is --
6     A    So, yes.
7     Q    -- PBGC took the position during those
8 negotiations -- I'm sorry.  Eber Connecticut took
9 the position during the negotiation with PBGC that
10 Eber Connecticut was not legally obligated to make
11 payments to the pension plan of Eber Brothers Wine
12 and Liquor Corp.; correct?
13          MR. RAMSEY:  Form.
14     A    There was negotiations.  We always knew
15 that we had to pay something.  There were liens on
16 Connecticut.
17     Q    Well, you fought against the lien on
18 Connecticut; correct?
19     A    Well, originally they put a lien on
20 Connecticut.  There's -- I'm not an ERISA lawyer.
21     Q    I'm not asking you --
22     A    Well, I think this is an important point.
23 There are things called statutory liens, which I
24 don't know if you took this class in law school or
25 not but these things just arise so they don't even

Page 61

1          W. EBER
2 have to put a lien on it.  These are theoretical
3 liens.  Right.  So there were liens.  And I don't
4 understand all the legalese to it but there were
5 liens that came on and then a lien came off and a
6 lien went back on.
7          MR. RAMSEY:  All right.  You answered
8     question.
9     A    I mean it's a very --
10     Q    Did you tell Dan Kleeberg that Eber
11 Connecticut was taking the position that it did not
12 have to fund the pension benefits as a result of the
13 Alexbay transaction?
14     A    No.  I didn't tell him.  I don't believe I
15 told him something like that because I always
16 believed that --
17          MR. RAMSEY:  You answered the question.
18     Q    I'm going to focus to you on this Exhibit
19 69, page three of it.  See the bulletpoints?  The
20 third one says, "While we're losing money we have a
21 plan in place to become profitable this year.  As a
22 result of our efforts are projecting our EBITDA to
23 go from negative $535,000 to positive 305,000 by May
24 24 of 2012."  Do you see that?
25     A    Yes.

16 (Pages 58 - 61)

W. EBER

1
2    Q    And EBITDA is different than net income;
3 correct?
4    A    Correct.
5    Q    What does EBITDA stand for?
6    A    Earning before interest, tax,
7 depreciation.
8    Q    And amortization?
9    A    Amortization.
10    Q    Did Eber Connecticut keep track of what
11 its EBITDA was?
12    A    I believe so, for the bank.
13    Q    Were there financial statements prepared
14 that included lines on what the EBITDA was?
15    A    You mean audited financial statements?
16    Q    Not necessarily, maybe just a simple
17 spreadsheet or regular emails saying what the EBITDA
18 was.
19    A    Yes.  I think we had convenance around
20 these types of, um, convenance which was related to
21 the EBITDA, yes.
22    Q    So why in this presentation were you
23 pointing out what the EBITDA was rather than talking
24 about net income numbers?
25    A    I think this was for the bank.  I think

W. EBER

1
2 this presentation was for a bank, trying to get a
3 bank loan.
4    Q    And so why was EBITDA being used with the
5 banks instead of net income.
6    A    Just to show -- I think the banks look at
7 EBITDA.
8    Q    What is your understanding as to why they
9 use EBITDA instead of net income?
10    A    It's before interest and tax and
11 depreciation.  I still think EBITDA may have been
12 negative in 2012.
13    Q    It says that right there.  I wasn't asking
14 about that.  For the EBITDA numbers that Eber
15 Connecticut prepared for the bank, or otherwise,
16 were all of the taxes that were paid by Eber
17 Connecticut taken out or were there some taxes that
18 remained there in there as expenses effecting the
19 EBITDA number?
20       MR. RAMSEY:  Form.  Go ahead.
21    A    I don't know.
22    Q    So as far as Eber Connecticut's business
23 is it fair to say it had to be licensed by the State
24 of Connecticut to be a distributor?
25    A    Yes.

W. EBER

1
2    Q    And was it taxed as a distributor as well?
3    A    What kind?  You mean state tax?
4    Q    What kind of state taxes were imposed on
5 Eber Connecticut as a result of its business as a
6 distributor?
7    A    You mean sales tax?
8    Q    Did it pay sales taxes?
9    A    I believe there are some -- there's, like,
10 gallonage tax but I don't know if that relates to
11 this tax number here.
12    Q    Were there sales taxes?
13    A    I'm not sure.  I'm not sure.  I don't do
14 the taxes so I don't know specifically.  I don't
15 know if -- this is an LLC and I think this tax
16 number -- I'm not sure necessarily relates to, um,
17 the tax.  I think it's more the depreciation and the
18 interest that would be an add back here.  Those
19 would be the factors really impacting this number.
20    Q    So the interest was primarily interest on
21 bank loans; is that right?
22    A    Yes.
23    Q    Was there any other significant interest
24 expense?
25    A    I don't think so.  I think it all related

W. EBER

1
2 to loans.
3    Q    I want to focus your attention on page
4 nine of this.  Actually, I'm sorry page eight.  So
5 refers here to cost savings efforts, identify the
6 following opportunities, and it refers to three
7 things there.  Is it correct to understand this as
8 saying these are opportunities for further cost
9 savings or that these are the three items that are
10 not things that had not already taken place by that
11 point?
12    A    So this is something from December.  This
13 is fiscal year 2012.  It may have been something we
14 were in the process of implementing because it would
15 have been during our fiscal 2012 year.  So it was
16 probably in process.
17    Q    So finance contracted out resulting in
18 $100,000 savings.  What is that referring to?
19    A    That was going back to Wally being hired
20 as a consultant as opposed to Dave Dean who was a
21 full-time employee who had FICA and health care and
22 all that stuff.
23    Q    When was Wally given the title of CFO?
24 Was it at some point later?
25    A    Yeah.  Well, he would start out as a

17 (Pages 62 - 65)

Page 218

1

2   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
3   Civil Action No.:  16-cv-9517 (LAK)
    ---------------------------------------------x
4

5   DANIEL KLEEBERG, LISA STEIN and AUDREY HAYS,

6

7                              Plaintiff,

8              -against-

9

10  LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER,
    LLC; CANANDAIGUA NATIONAL CORPORATION d/b/a
11  CANANDAIGUA NATIONAL BANK & TRUST; ELLIOT
    W. GUMAER, JR.; EBER BROS. & CO., INC., EBER
12  BROTHERS WINE AND LIQUOR CORPORATION;
    BROS. WINE AND LIQUOR METRO, INC.,
13  EBER-CONNECTICUT, LLC; and WENDY EBER,

14                             Defendants.

15  ---------------------------------------x

16  1250 Broadway

17  New York, New York 10001

18  June 28, 2019

19  9:42 a.m.

20

21      CONTINUED VIDEOTAPED DEPOSITION OF WENDY EBER

22  held at the above-mentioned time and place before

23  ANNMARIE OAKLEY, a Notary Public of the State of

24  New York.

25

Page 219

```
 1
 2        A P P E A R A N C E S
 3
 4  BROOK & ASSOCIATES PLLC
       Attorneys for Plaintiffs
 5        100 Church Street, 8th Floor
          New York, New York 10007
 6
 7  BY:    BRIAN BROOKS, ESQ.
 8
 9  UNDERBERG & KESSLER LLP
       Attorneys for Defendants
10  LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC;
       EBER BROTHERS & CO., INC; EBER BROS. WINE AND LIQUOR
11  CORPORATION; EBER BROS. WINE AND LIQUOR METRO, INC.,
       EBER-CONNECTICUT, LLC; and WENDY EBER
12        50 Fountain Plaza
          Buffalo, New York 14202
13
    BY:    COLIN RAMSEY, ESQ.
14
15
16  CALIHAN LAW PLLC
       Attorneys for Defendant
17  THE ESTATE OF ELLIOT W. GUMAER
          16 Main Street
18        Rochester, New York 14614
19  BY:    ROBERT B. CALIHAN, ESQ.
20
21  Also present:  PHIL GALUBERSON, videographer
22              DAN KLEEBERG, telephonically
23
24
25
```

Page 220

```
 1              W. EBER
 2      VIDEOGRAPHER:  Good morning, we are going
 3  on the record at 9:42 a.m. on June 28, 2019.
 4  Please, note that the microphones are sensitive
 5  and may pick up whispers, private conversation
 6  and cellular interference.  Please, turn off
 7  all cellphones or place them away from the
 8  microphones as they can interfere with the
 9  deposition audio.  Audio and video recording
10  will continue to take place unless all parties
11  agree to go off the record.  This is media unit
12  one, day two of the video recorded deposition
13  of Wendy Eber in the matter of Daniel Kleeberg
14  versus Lester Eber et al. filed in the United
15  States District Court Southern District of New
16  York, Civil Action number 16-cv-9517(LAK)
17      MR. BROOK:  9517.
18      VIDEOGRAPHER:  This deposition is being
19  held at Veritext, located at 1250 Broadway, New
20  York, New York.  My name is Phil Glauberson
21  from the firm Veritext and I am the
22  videographer.  The court reporter is Annmarie
23  Oakley from the firm Veritext.  I am not
24  authorized to administer an oath.  I am not
25  related to any party in this action, nor am I
```

Page 221

```
 1              W. EBER
 2  financially interested in the outcome.  Counsel
 3  and all present in the room will now state
 4  their appearances and affiliations for the
 5  record.
 6      MR. BROOK:  Brian Brook of Brook &
 7  Associates, counsel for plaintiff is here, and
 8  one of my clients, Daniel Kleeberg, is on the
 9  telephone.
10      MR. RAMSEY:  Colin Ramsey from Underberg &
11  Kessler for the Eber defendants.
12      MR. CALIHAN:  Rob Calihan on behalf of
13  Calihan Law representing the estate of Elliot
14  Gumaer.
15      VIDEOGRAPHER:  Will the record, please,
16  swear in the witness.
17  W E N D Y  E B E R, having been previously sworn by
18  a Notary Public of the State of New York, was
19  examined and testified as follows:
20  EXAMINATION BY MR. BROOK:
21  Would you state your name for the record, please.
22      A    Wendy Eber.
23      Q    Would you state your address for the
24  record, please.
25      A    201 East 80th Street, Apartment 21A, New
```

Page 222

```
 1              W. EBER
 2  York, New York 10075.
 3      Q    Good morning, Ms. Eber.
 4      A    Good morning.
 5      Q    I want to start out by asking if, you know
 6  we had three days before in these depositions, if
 7  there's any reason why you may think that I may need
 8  to go over how this deposition is going to work or
 9  how you should be addressing my questions, if you
10  don't understand and things like that?
11      MR. RAMSEY:  The grounds rule.
12      Q    Do we need to go over the ground rules?
13      A    Okay, you can.
14      Q    Well, the court reporter is taking down
15  everything that we say so the most important thing
16  is we try not to talk over each other.  If I ask you
17  a question if there's any part of it that you don't
18  understand you should say that to me because if you
19  answer the question I'm going to assume that you
20  understood it.
21      A    Okay.
22      Q    And those are the, I think, two of the
23  basics.  We have a limited amount of time here but
24  breaks don't count for that so if you need to take a
25  break you can do so, just say it.  The only thing I
```

2 (Pages 219 - 222)

Page 323

W. EBER

1
2       MR. BROOK: Who at Eder Goodman.
3     A   It was also between Pat Dalton. I think
4  the lawyers were involved in it as well.
5     Q   So you think the lawyers might have wanted
6  you to get the right of first refusal?
7     A   No. I'm saying the lawyers were involved
8  in the whole thing so the whole negotiation as well.
9     Q   So are you -- but what does that have to
10  do with who at Eder Goodman insisted that you get
11  this right of first refusal?
12     A   I don't remember exactly.
13       MR. BROOK: This is Exhibit 121 and
14  jumping forward this is an email dated March 9,
15  2012, Bates number EB31199.
16       (EB31199 was marked as
17       Plaintiff's Exhibit 121 for
18       identification.)
19     Q   This is an email that you printed out;
20  correct?
21     A   Yes.
22     Q   And it's one that you sent to Mike Gumaer;
23  correct?
24     A   Yes.
25     Q   And the subject says it's a forward of

Page 324

W. EBER

1
2  something January Eber CT. Do you see that?
3     A   Yes.
4     Q   Where's the forwarded text?
5     A   I don't know.
6     Q   Did you delete that.
7     A   No. I mean, I didn't delete anything. I
8  haven't deleted anything from the time you sued us
9  so, I mean, I don't know if this may have been a
10  printout. I don't know.
11     Q   In the email you said, "Mike, Please
12  confirm that you have a conference call today at 4
13  p.m. with Glenn and that he will be in Rochester on
14  Tuesday and Wednesday next week. You need to speak
15  with Rick Hawks." message importance is high;
16  correct?
17     A   Yes.
18     Q   Why was it that you said that Mike Gumaer
19  needed to speak with Rick Hawks?
20     A   I think this is the time of the
21  foreclosure or the filing of the foreclosure
22  documents and there were numerous phonecalls, I
23  think, and meetings that week regarding the
24  foreclosure.
25     Q   Had you already apprized Mike Gumaer of

Page 325

W. EBER

1
2  the foreclosure action so he knew what you were
3  talking about here?
4     A   I don't remember the exact dates because
5  this is, you know, seven years ago here but I know
6  that Mike was aware of all of the loans that Lester
7  had put into the company. He was aware of all of
8  the liabilities that the company faced and he was,
9  he knew generally what was going on in the company.
10     Q   My question is about the foreclosure
11  action.
12     A   I don't recall exactly when he found out
13  but he was aware.
14       MR. BROOK: Let's mark this as Exhibit
15  122, Bates EB26652.
16       (EB26652 was marked as
17       Plaintiff's Exhibit 122.)
18     Q   This is sent four days later on March 13,
19  2012 from Mike to you; correct?
20     A   Right.
21     Q   And he says, "Wendy, We'll talk at 4 p.m.
22  I'm not in a position to discuss in any depth the
23  Alex Bay matter as I learned of the matter yesterday
24  afternoon in the email from Underberg." Let me stop
25  there. Do you know what email from Underberg he was

Page 326

W. EBER

1
2  referring to there?
3     A   I'm not certain. I mean, I do have a copy
4  of it.
5     Q   I'm asking if you know. When you say
6  you're not certain what are you referring to?
7       MR. RAMSEY: You're not certain what he's
8       referring to?
9       THE WITNESS: No.
10     Q   Do you believe you asked Underberg to
11  forward him a copy of the Alex Bay Complaint?
12     A   I may have. I just don't remember.
13     Q   And so is it fair to say that you had not
14  discussed the Alex Bay foreclosure action with Mike
15  Gumaer prior to Monday, March 12, 2012?
16       MR. RAMSEY: Form.
17     A   Well, he was well aware of the loans that
18  Lester put into --
19     Q   Focus on the foreclosure action not the
20  loans themselves.
21     A   Right. He was well aware but I'm not sure
22  exactly when he was notified of the foreclosure
23  action but he knew about the loans and he knew about
24  the financial situation of the company and all the
25  liabilities out there that Lester was financing

28 (Pages 323 - 326)

Page 327

W. EBER

1
2 everything.
3     Q    Just so we're clear, because you gave a
4 long answer there, are you disputing the statement
5 here that according to Mike Gumaer he learned of the
6 matter the day before the date of this email in an
7 email from Underberg?
8         MR. RAMSEY:  Form.
9     A    He learned of the foreclosure?
10     Q    Yes.  Do you dispute that?
11     A    Well, that's what's written here.
12     Q    Do have any basis to dispute that?
13     A    I don't know.
14     Q    Next line says, he wrote, "Hawks will be
15 interested in knowing as will I what will be the
16 status of the Eber trust with respect to Eber assets
17 held in the trust.  You may wish to have someone
18 from Underburg on hand to address these issues." and
19 then it says "on the survive" which I think means
20 surface, "it looks like Lester is moving against the
21 trust to which he is a cotrustee."  Do you see that?
22     A    Yes.
23     Q    Can you think of anything other than what
24 surface, what word he might have meant if it wasn't
25 surface in that last sentence?

Page 328

W. EBER

1
2     A    I don't know.
3     Q    Do you recall discussing this concern with
4 Gumaer?
5     A    Yes.  Yes.
6     Q    What did say to him about it?
7     A    Well, you know, just as I have said
8 throughout this deposition we -- and actually this
9 week we, you know, that March 13th week we had many,
10 many calls about, you know, all the monies that
11 Lester had loaned into the company.  The --
12     Q    He was already well aware of that though;
13 right?
14     A    Who?
15     Q    You just said that Mike Gumaer was already
16 well aware of the loans and everything and he still
17 had these concerns, so I'm asking you to focus on
18 what you said after this point in response to his
19 concerns.
20     A    Right.  That we talked about what Lester
21 was doing.  I had a lot of conversations with him
22 about the loans that were secured loans, all the
23 debts that Eber Brothers had, the continued legacy
24 liabilities, all that information, the financial
25 distress of the companies and he was -- we had, I

Page 329

W. EBER

1
2 think, board meetings.  I had numerous call with
3 him.
4     Q    So I'm asking, I'm try together
5 understand, do you recall anything specifically that
6 you told him in terms of new information that he
7 didn't already have to allay his concern that on the
8 surface it looked like Lester was moving against the
9 trust of which he was a cotrustee.
10         MR. RAMSEY:  Form.
11     A    He's stating that that's what it looks
12 like and that's what it was.  Lester was moving
13 against company.  Yes.
14         MR. BROOK:  This is going to be 123.  This
15     is an email and an attachment sent on March 12,
16     2012 from you to, looks like, Marino Fernandez
17     and Mike Gumaer.
18         (March 12, 2012 email was
19         marked as Plaintiff's Exhibit
20         123 for identification.)
21     Q    Do you see that.
22     A    Yes.
23     Q    It looks like you had scanned or someone
24 had scanned for you a term sheet with CNB about Eber
25 Connecticut, well, not just a term sheet but a

Page 330

W. EBER

1
2 signed and executed term sheet to Mike Gumaer and
3 Marino Fernandez.  Why were you doing that?
4     A    I don't know.  I don't remember.
5     Q    And Marino Fernandez asked -- just to make
6 sure we're on the same page, Marino Fernandez was
7 the lawyer that was retained by Eber Brothers Wine &
8 Liquor Corp. to represent it in the foreclosure
9 action; is that right?
10     A    Yes.
11     Q    Can you recall what he was doing looking
12 at this bank loan?
13     A    I don't remember.
14     Q    Can you recall what the relevance was of
15 the bank loan to anything that was going on at the
16 time?
17         MR. RAMSEY:  Form.
18     A    No.  I mean that we were --
19         MR. RAMSEY:  Hold on.  If you remember you
20     remember.  Don't speculate.
21     A    No.
22         MR. BROOK:  All right.  We're up to 124.
23     Now in is email with Bates number 26650 with an
24     attachment, Bates number 26650 and the
25     attachment with Bates numbers 26650A and B.

29 (Pages 327 - 330)

Page 331

W. EBER

1
2    (Bates 26650A to 26650B was
3       marked as Plaintiff's Exhibit
4       124 for identification.)
5    A   Yes.
6    Q   So this is the consent form by which the
7  board of Eber Brothers Wine & Liquor, at the time
8  was just you and Mike Gumaer, consented to the
9  transfer of stock from Alex Bay to satisfy the
10  obligations to Alex Bay; correct?
11   A   Yes.
12   Q   Is it correct that this is a document that
13  was drafted by Underberg Kessler?
14   A   Looks like it was.
15   Q   Why was Underberg Kessler drafting a
16  resolution for Eber Brothers Wine & Liquor Corp.?
17      MR. RAMSEY:  Form.
18   A   I don't know.
19   Q   And this email was sent by someone at
20  Underberg Kessler, looking at the second one before
21  you forwarded it, sent from somebody named Marcy
22  McQue (phonetic) from Marcy Davis McQue.  I'm not
23  sure I follow that.  Do you know that that is?
24   A   Where?
25   Q   In the email that you were forwarding, so

Page 332

W. EBER

1
2  looking down about a third way of the page, it's
3  from somebody named Marcy McQue.  It looks like
4  she's an administrative assistant.  Do you know her
5  personally?
6    A   No.
7    Q   And she was sending this to you, to
8  Lester, to Glenn Sturm, to David Belt; right?  Do
9  you see that?
10   A   Yes.
11   Q   And copying several lawyers at Underberg &
12  Kessler; is that right?
13   A   Yes.
14   Q   So there were a lot of lawyers on this
15  email; correct?
16   A   There's a lot of lawyers on this email.
17  Yes.
18   Q   But Marino Fernandez was not one of the
19  lawyers on this; correct?
20   A   He's not on this email, no.
21   Q   And you never sent him this document to
22  review?
23      MR. RAMSEY:  Form.
24   A   I don't remember.
25   Q   And so is it correct there was no one on

Page 333

W. EBER

1
2  this email who was a lawyer representing Eber
3  Brothers Wine & Liquor Corp.?
4    A   On this email that is correct.
5    Q   Was there a lawyer for Eber Brothers Wine
6  & Liquor Corp. that every reviewed this document?
7    A   Maybe.  I don't remember.
8    Q   Who did you think that lawyer might have
9  been?
10   A   Marino, Mike Gumaer was also a lawyer too.
11   Q   I want to ask you some questions about
12  your communications with Marino Fernandez now that
13  the court has ruled that's something that is subject
14  to Discovery.  When did you first speak with Marino
15  Fernandez about the foreclosure action?
16   A   I don't remember the exact date.  I don't
17  remember.
18   Q   Do you recall what you discussed?  About
19  what our needs were?
20   A   I don't -- I mean, that's many years ago.
21  It's, like, seven years ago.  I don't really
22  remember all the details.
23   Q   What, if any, questions did you ask Marino
24  Fernandez to look into?
25   A   I don't remember.  Like, specific

Page 334

W. EBER

1
2  conversations and stuff?
3    Q   Or just general issues.  Was there
4  anything in particular that you wanted Marino
5  Ferandez to do to protect the rights of Eber
6  Brothers Wine & Liquor Corp.?
7    A   I mean, sitting here I just don't
8  remember.  I don't recall.
9    Q   What did he tell you his qualifications
10  were to do this kind of corporate work?
11      MR. RAMSEY:  Form.
12   A   Well, he was a lawyer that was recommended
13  to us by Paul Keneally.  So it's a small community
14  in Rochester.  Everyone, kind of, knows each other
15  on the legal front so I thought he was a good
16  choice.
17   Q   Did Marino Fernandez offer any opinions
18  about the foreclosure action?
19      MR. RAMSEY:  Form.
20      MR. CALIHAN:  Form.
21   A   As far as what?
22      MR. BROOK:  What's the objection?
23      MR. CALIHAN:  A formal opinion or --
24   Q   Did he offer any opinions on whether Eber
25  Brothers Wine & Liquor Corp. should consent to

30 (Pages 331 - 334)

Page 335

W. EBER

2 Lester's request to take the shares of Eber Metro in
3 full satisfaction of the debts?
4    A    If we should?
5    Q    Yes.
6    A    There weren't any alternatives.  I mean,
7 Brian, there's no money to pay for anyone here.
8 There are no alternatives.  So, yeah, I mean it's
9 just -- this is, kind of, a situation where we
10 waived all of our defenses and that was suggested by
11 him.
12    Q    He suggested waiving all your defenses?
13    A    There weren't any defenses.  There's no
14 money here.  There's no money to pay Marino, let
15 alone, you know, do anything.  Who's going to pay
16 for the defenses?  Yeah.
17    Q    It was a decision to waive defenses out of
18 the concern of the cost; is that right?
19        MR. RAMSEY:  Form.
20    A    Well, just resources, cost, there's no
21 defenses.  Yeah.  I mean, yes, he supported that.
22    Q    And did you get anything in writing from
23 him in terms of any legal opinions?
24        MR. RAMSEY:  Form.
25    A    A written legal opinion?

Page 336

W. EBER

2    Q    Any written legal opinion, even just an
3 email?
4    A    No.  I don't know if -- I don't think
5 there was a written opinion.  No.
6    Q    And who was on the discussion with him
7 when he apparently gave you the opinion about waving
8 all the defenses?
9        MR. RAMSEY:  Form.
10    A    You have the minutes right, so there was a
11 meeting, I think, in --
12    Q    Just the board meeting, then with Lester
13 and Mike Gumaer?
14    A    And I believe he was on one of the calls
15 too.  We had many calls and he was on the call,
16 Gumaer was on the call.  Then I called Gumaer, Mike
17 at a later date.  I spoke with Marino later dates.
18 I don't know if you have the minutes or not.
19        MR. RAMSEY:  All right.  You answered the
20    question.
21    Q    Did you consult with any other lawyers,
22 besides Marino Fernandez, about how the transfer of
23 Eber Metro would affect Eber Brothers Wine & Liquor
24 Corp.?
25    A    I may have talked to Glenn about it.

Page 337

W. EBER

2    Q    And in terms of your discussions with
3 either Marino Fernandez or Glenn Sturm was there any
4 discussion about how the transfer of Eber Metro to
5 Alex Bay would effect the shareholders and the value
6 of the shareholders in Eber Brothers Wine & Liquor
7 Corp.?
8        MR. RAMSEY:  Form.
9    A    Say that again.
10    Q    Let me rephrase.  Was there any discussion
11 about how the transfer of Eber Metro to Alex Bay
12 would effect the value of the shares of Eber
13 Brothers Wine & Liquor Corp. for the shareholders?
14    A    With?
15    Q    With either Glenn Sturm or Marino
16 Fernandez?
17    A    You know, sitting here today I don't
18 recall.  I'm sure there were conversations.  I just
19 don't remember, like, a specific conversation.
20        MR. RAMSEY:  Okay.  Then you answered the
21    question.
22    Q    And so when you say you're sure it makes
23 it a little confusing.  Do you recall any general
24 conversation or what their conclusion was about the
25 value of the shares and how that would be effected?

Page 338

W. EBER

2    A    I just don't.  You know, there was a lot
3 of things going on I don't remember.  The companies
4 were insolvent.
5        MR. RAMSEY:  You answered the question.
6    You don't remember.  The answer is okay.
7        MR. BROOK:  Let's go to Exhibit 125.
8    Start off by asking -- well, let me put the
9    Bates number.  It appears to be part of an
10    email with Bates number EB31212 and an
11    attachment of EB31212A.
12        (EB31212 and EB31212A was
13        marked as Plaintiff's Exhibit
14        125 for identification.)
15    Q    What happened to the top part of this
16 email?
17    A    I don't know.
18        MR. BROOK:  We'll request that a complete
19    copy of this be provided or that the redaction
20    log be provided that explains why a document
21    that has already been produced is being
22    produced in redacted form, and I just want to
23    request that I am requesting it for the record.
24    Q    So because one of the problems here is
25 this doesn't have a date or anything on it but I

31 (Pages 335 - 338)

Page 339

W. EBER

1
2  will -- hopefully if you need a second to read it
3  but hopefully you can answer some questions on it
4  anyway.  Do you know who Jim is in this email?
5      A   I believe it's Jim Frizano.  (phonetic)
6      Q   And you're sending to him a proforma
7  analysis of how the trust should be distributed; is
8  that right?
9      A   Yes.
10     Q   Why was this prepared?
11     A   Well, this was prepared because
12  Canandaigua wanted to distribute the trust and they
13  sent out, like, their -- how they were going to
14  distribute it, and one of the items that they didn't
15  take into consideration was that Erica Stein was
16  getting distributions from the trust, which were
17  supposed to be subtracted from Lisa Stein's portion
18  of the trust.
19     Q   Okay.  So you were providing different
20  numbers for how you believe the assets should be
21  distributed versus what CNB had initially proposed?
22     A   For the -- not anything to do with the
23  Eber Brothers equity, only the marketable securities
24  so the Eber, you notice, was taken out.  I didn't do
25  anything with that.  This was just on the account

Page 340

W. EBER

1
2  balance of the marketable cash and, you know, traded
3  stocks and things like that.
4      Q   Okay.  So it was in your view appropriate
5  to change the distribution of marketable securities
6  and other liquid assets but not to change anything
7  having to do with Eber Brothers & Co. stock; is that
8  right?
9      A   Right.  So you will see, like, the bank
10  said that, like, Lisa and Danny should get $113,000
11  but -- well, Lisa should get $113,000 but see she
12  should have been adjusted out the monies that were
13  advanced to Erica, about $75,217, that were advanced
14  to Erica.  So, you know, her adjusted distribution
15  on the marketable security should been about
16  $50,566.
17     Q   Who created this proforma analysis?
18     A   I worked on it.
19     Q   Did anyone else help you with it?
20     A   I may have had some help with it.
21     Q   Who may have helped you with it?
22     A   I don't remember.
23     Q   Are you proficient on how to use Microsoft
24  Excel yourself?
25     A   Yes.  I have a business degree.

Page 341

W. EBER

1
2      Q   Subsequent to sending this proforma
3  analysis to Jim Frizano did you make any further
4  adjustments to what you thought the distribution of
5  marketable assets should be?
6      A   What do you mean?
7      Q   Well, after, whenever you sent this to Jim
8  Frizano, did you find any errors in here or find
9  anything that you think needed to changed in how it
10  would effect the ultimate distribution?
11     A   I think this was the only -- I don't
12  remember if this was the final.  I think this was
13  the final one.  I mean, I don't know if they used
14  this one.  They used something else I think.
15     Q   But this is what you believe they should
16  have done; is that fair?
17     A   I believe so, yes.
18     Q   In your email you also mention something
19  in this second paragraph, "Since the Woods Oviatt
20  bills are being paid by the trust include charges
21  from the SDNY litigation, it's only fair that our
22  legal bills are paid as well by the trust."  Did you
23  ever take any further steps to try to get legal
24  bills paid for by the trust?
25     A   I don't believe so, no.  I did note that

Page 342

W. EBER

1
2  they were -- there were a lot of bills from Woods
3  Oviatt that were taken out of the trust, yeah.
4      Q   And do you know whether it's correct that
5  that included the SDNY litigation bills, that those
6  were actually taken from the trust?
7      A   They may have been.  They may have been.
8  I don't remember at this time.  I don't remember if
9  I wrote this or not.  You know, I would have gotten
10  it from -- I think there's an allocation of
11  something and I was going through that report or
12  that document and I saw this so that's why I would
13  have asked for this but --
14     Q   You saw Woods Oviatt bills; right?
15     A   Yeah.
16     Q   Do you know whether those were bills for
17  the SDNY litigation or for the surrogates court
18  proceeding?
19     A   I'm not sure.  I don't know.
20     Q   Did you ever see the Woods Oviatt bills?
21     A   For the trust or the SDNY?
22     Q   For whatever was paid for by the trust.
23     A   There were some details in some documents
24  I believe that did have some -- you could see the
25  lawyers billings, so there were some bills I think.

32 (Pages 339 - 342)

```
                                              Page 1
 1
 2   UNITED STATES DISTRICT COURT
 3   SOUTHERN DISTRICT OF NEW YORK
 4   Civil Action No. 16-cv-951 (LAK)
 5   ------------------------------------x
 6   DANIEL KLEEBERG, LISA STEIN and
 7   AUDREY HAYS,
 8                       Plaintiffs,
 9            -against-
10   LESTER EBER; ALEXBAY, LLC f/k/a LESTER
11   EBER, LLC; CANANDAIGUA NATIONAL
12   CORPORATION d/b/a CANANDAIGUA NATIONAL
13   BANK & TRUST; ELLIOT W. GUMAER, JR.;
14   EBER BROS. & CO., INC.; EBER BROS.
15   WINE AND LIQUOR CORPORATION; EBER
16   BROS. WINE AND LIQUOR METRO, INC.,
17   EBER-CONNECTICUT, LLC; and WENDY EBER,
18                       Defendants.
19   ------------------------------------x
20
21
22                     January 23, 2019
23
24
25
```

Page 2

```
 1
 2                January 23, 2019
 3                9:41 a.m.
 4
 5
 6        Videotaped 30(b)(6) Deposition of
 7  WENDY EBER on behalf of Eber Bros. Wine & Liquor
 8  Metro, Inc., held at the offices of Veritext New
 9  York City, 1250 Broadway, New York, New York,
10  pursuant to Notice, before Lynne D. Metz, a
11  Shorthand Reporter and Notary Public of the State
12  of New York.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1
 2  A P P E A R A N C E S: (Cont'd):
 3
 4        JOHN HERBERT, ESQ. (Telephonically)
 5     Attorneys for Defendants LESTER EBER and
 6  WENDY EBER
 7        P.O. Box 1031
 8        Tiburone, California 94920
 9
10
11     CALIHAN LAW PLLC
12     Attorneys for Defendant THE ESTATE of
13  ELLIOT W. GUMAER
14        16 East Main Street
15        Rochester, New York 14614
16  BY:   ROBERT B. CALIHAN, ESQ.
17
18
19     ALSO PRESENT:
20        Wayne Saline - Videographer
21        Dan Kleeberg
22        Lester Eber
23
24
25
```

Page 3

```
 1
 2  A P P E A R A N C E S:
 3
 4     BROOK & ASSOCIATES PLLC
 5     Attorneys for Plaintiffs
 6        100 Church Street
 7        8th Floor
 8        New York, New York 10007
 9  BY:   BRIAN C. BROOK, ESQ.
10
11
12     UNDERBERG & KESSLER LLP
13     Attorneys for Defendants LESTER EBER;
14  ALEXBAY, LLC f/k/a LESTER EBER, LLC; EBER
15  BROS. & CO., INC.; EBER BROS. WINE AND
16  LIQUOR CORPORATION; EBER BROS. WINE AND
17  LIQUOR METRO, INC., EBER-CONNECTICUT, LLC;
18  and WENDY EBER
19        50 Fountain Plaza
20        Buffalo, New York 14202
21  BY:   COLIN D. RAMSEY, ESQ.
22
23
24
25
```

Page 5

```
 1
 2
 3
 4        IT IS HEREBY STIPULATED AND AGREED, by and
 5  between the attorneys for the respective parties
 6  herein, that filing and sealing be and the same
 7  are hereby waived.
 8        IT IS FURTHER STIPULATED AND AGREED
 9  that all objections, except as to the form of the
10  question, shall be reserved to the time
11  of the trial.
12        IT IS FURTHER STIPULATED AND AGREED that the
13  within deposition may be signed and sworn to
14  before any officer authorized to administer an
15  oath, with the same force and effect as if signed
16  and sworn to before the officer before whom the
17  within deposition was taken.
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 70

W. Eber

1
2    A.   I think the first part where loans
3  that were made into Eber Brothers Wine and Liquor
4  Corp. I don't know all the legalese but there
5  were --
6         MR. RAMSEY:  The first line she is
7    referring to, correct me if I am wrong.
8    There is no B in the first line.
9    A.   Oh, you are saying this one EWLC loan
10  versus EB.
11   Q.   Yes.
12   A.   Oh, no.  I think that's a typo.
13   Q.   So --
14   A.   Oh, I thought you were talking about
15  that.
16   Q.   I am getting to that next.
17   A.   Sorry.  No, I think that's a typo.
18   Q.   So then below the lines that say, we
19  will just say EBWLC loan for all of them.
20        It says EBWL Metro Inc. loan on a
21  number of lines; right?
22   A.   Right.
23   Q.   So how did you determine for creating
24  this document whether to describe it as EBWLC or
25  EBWL Metro?

Page 71

W. Eber

1
2    A.   I don't remember.
3    Q.   Did you base it on the dates when Eber
4  Metro assumed the loan obligations of Eber
5  Brothers Wine and Liquor Corp.?
6    A.   I don't remember Brian.  I just don't
7  remember.
8    Q.   Do you recall that there was a 1.5
9  million dollar line of credit note between Eber
10  Metro and Lester Eber?
11   A.   I don't remember all the details of
12  the notes.
13   Q.   Who -- was there anyone on behalf of
14  Eber Metro that was involved in negotiating the
15  line of credit note between Lester Eber and Eber
16  Metro?
17   A.   What year was that?
18   Q.   Let's get it in writing.
19        MR. BROOK:  Please mark this as
20    Plaintiffs' Exhibit 13.
21        (Plaintiffs' Exhibit 13, a document
22    entitled Line of Credit Note bearing Bates
23    numbers EB 00017871 through 73, as well as
24    Bates numbers KSH 00001 through 3, marked
25    for identification, as of this date.)

Page 72

W. Eber

1
2    Q.   Plaintiffs' Exhibit 13 is a document
3  entitled Line of Credit Note bearing Bates numbers
4  EB 00017871 through 73, as well as Bates numbers
5  KSH 00001 through 3.
6         Do you recognize this document?
7    A.   Vaguely.
8    Q.   Is that your -- please turn to page 3.
9         Is that your signature?
10   A.   Yeah.
11   Q.   Does this refresh your recollection
12  that there was a line of credit note in the amount
13  of 1,500,000 dollars between Eber Metro and Lester
14  Eber?
15   A.   Yes.
16   Q.   And who negotiated the terms of this
17  note on behalf of Eber Metro?
18   A.   I think Harris Beach was the lawyer.
19  So I don't specifically remember.  You know, this
20  was the recession.  We were -- we needed money.
21  No banks would give us money and this was -- we
22  were trying to get money and I don't remember the
23  details who negotiated this.
24   Q.   Who determined the amount?
25   A.   I don't remember.

Page 73

W. Eber

1
2    Q.   Take a look at page 1 paragraph 2 sets
3  out an interest rate of a non-default interest
4  rate of 12.5 percent per year.
5         Do you see that?
6    A.   Yes.
7    Q.   How was that interest rate determined?
8    A.   Can I just take a minute to read this?
9         MR. RAMSEY:  Sure.  Take as much time
10    as you need.
11        Off the record.
12        (Discussion off the record.)
13  BY MR. BROOK:
14   A.   Do you want me to read the whole
15  document or just the interest rate?
16   Q.   No.  I was just asking about the
17  interest rate.
18        How was that determined?
19   A.   I don't remember.
20   Q.   Do you recall there being any
21  negotiation of that amount?
22   A.   I don't remember.  I just don't
23  remember.  You know, it's ten years ago.
24   Q.   If you look at just the bottom of
25  paragraph 3 on that first page it sets the

19 (Pages 70 - 73)

Page 74

1                W. Eber
2   maturity date at December 31, 2011.
3        Do you see that?
4     A.   Can I read that paragraph?
5     Q.   If you really need to, yes.
6     A.   Do you know what this word is here
7   (indicating)?
8        MR. RAMSEY:  Which one?
9        THE WITNESS:  (Indicating.)
10       MR. RAMSEY:  Annum.
11    A.   Okay.
12    Q.   So do you see the December 31, 2011 is
13  set as the maturity date?
14    A.   Yes.
15    Q.   How is the maturity date determined?
16    A.   I don't remember.
17    Q.   From the date on the top of the
18  document, it doesn't have a day but it says
19  October 2009.
20       Do you see that?
21    A.   Yeah.
22    Q.   Do you believe that date to be
23  generally accurate as to when this note was
24  executed?
25    A.   Yes.

Page 75

1                W. Eber
2     Q.   Was that in the time period of the
3   extremely difficult times?
4     A.   October 2009?
5     Q.   Yes.
6     A.   Yes.
7     Q.   So the maturity date is set at just
8   over two years after that; correct?
9     A.   Yes.
10    Q.   From the perspective of Eber Metro and
11  given the extremely difficult times it was facing,
12  was it better to have as long a maturity date as
13  possible?
14       MR. CALIHAN:  Objection to form.
15       MR. RAMSEY:  Form.
16       You can answer.
17    A.   Can you repeat the question?
18    Q.   Given the difficult times that were
19  facing Eber Metro in October 2009, do you believe
20  that it was in Eber Metro's interest to have a
21  note that was not required to be paid back for as
22  long as possible?
23       MR. RAMSEY:  Form.
24       MR. CALIHAN:  Objection to form.
25       MR. BROOK:  That was a bad one.

Page 76

1                W. Eber
2        Go back and read my question two
3   questions ago.  I think I said it better
4   then.
5        (Record read.)
6        MR. RAMSEY:  Same objection.
7        MR. BROOK:  I guess as long of a
8   maturity date as possible.
9        MR. CALIHAN:  Same objection.
10    A.   I just don't remember the specifics
11  around how the maturity date was determined.  I
12  just don't.  I just don't remember.  I know we
13  were in desperate need of cash.  You know, we had
14  a lot of liabilities and needed money.  I believe
15  Mike Gumaer also looked at this document.  He was
16  involved in it and our lawyers Harris Beach was
17  involved in it as well.  Both attorneys and at the
18  time we didn't have any other options.
19    Q.   But you don't recall the maturity date
20  being something that was a topic of discussion at
21  the time?
22    A.   I don't remember.  This is ten years
23  ago.  I just don't remember it.
24    Q.   This is the note, this Exhibit 13 is
25  the note on which Eber Metro defaulted by failing

Page 77

1                W. Eber
2   to make payment in full by December 31, 2011; is
3   that right?
4     A.   I don't remember.  There were several
5   notes.  You know, I don't have all of the notes in
6   front of me.  There were -- it was over three
7   million dollars in what was owed in loans, but I
8   don't remember the specifics of it.
9     Q.   So was it your understanding that Eber
10  Metro defaulted on more than one note?
11    A.   I remember it being three point
12  something million dollars of loans that Lester
13  made and plus interest, plus the interest.
14    Q.   But putting aside the other notes and
15  I shouldn't have used the word the in my previous
16  question, it is your understanding that Eber Metro
17  did default on this note; correct?
18    A.   I just don't remember all the
19  specifics Brian.  I don't remember all the
20  specifics of all the loans.  I know that he, that
21  Lester loaned in over three million dollars plus
22  interest and I know we had the lawyers look at all
23  of this, but I don't remember all the specifics.
24  I haven't reviewed all the documents.
25    Q.   What is your understanding of what it

20 (Pages 74 - 77)

Page 78

W. Eber

1
2 means to default on a note?
3     A.   That's, you know, there is no payments
4 made or interest made.
5     Q.   So for example --
6     A.   I don't know what the legal definition
7 is.
8         MR. RAMSEY:  All he is asking for is
9     your understanding.
10     A.   There were no payments or interest
11 made.
12     Q.   For example, in your understanding it
13 would be a default if the full amount of this note
14 were not paid by the maturity date of December 31,
15 2011; is that right?
16         MR. RAMSEY:  Form.
17         Go ahead.
18     A.   Can you rephrase the question?
19     Q.   In your understanding of what it means
20 to default, would it have constituted default if
21 Eber Metro did not pay the amount of this note
22 including all principal and interest in full on or
23 before December 31, 2011, the maturity date?
24         MR. RAMSEY:  Form.
25         You can answer.

Page 79

W. Eber

1
2     A.   Sorry?
3         MR. RAMSEY:  Go ahead and answer.
4     A.   Yes, that would be default if they
5 didn't pay on it.
6     Q.   Do you have any reason to believe that
7 Eber Metro paid all principal and interest on this
8 note in full on or before December 31, 2011?
9     A.   Rephrase that.  Did?
10     Q.   Did Eber Metro pay this note in full?
11     A.   No, no.
12     Q.   So I am having a hard time trying to
13 understand how you can be so confused.
14         So you understand that this note was
15 not paid by the maturity date; right?
16     A.   No.  It was not paid.
17     Q.   So in your understanding of what a
18 default is you understand that there was a default
19 on this note; correct?
20     A.   Yes.
21         MR. RAMSEY:  You have answered the
22     question.  You are good, okay.
23     A.   I just haven't looked at these
24 documents in a long time.
25         MR. RAMSEY:  Okay.  Wait for a

Page 80

W. Eber

1
2     question.
3     Q.   At the time of the default December
4 31, 2011 you were the CFO and secretary of Eber
5 Metro; correct?
6     A.   Yes.
7     Q.   So as CFO were you aware that this
8 note was coming due at the end of the month in
9 December 2011?
10     A.   I don't remember.  I mean there were
11 -- I don't remember all the specifics.  There was
12 a lot of financial distress Brian.  There was a
13 lot going on.  So for me to step back whatever
14 eight years.
15         MR. RAMSEY:  The answer is you don't
16     remember.
17     A.   I just don't remember.  I don't
18 remember everything that went on.
19     Q.   Was there any attempt to try to
20 renegotiate this note and try to extend the
21 maturity date prior to the maturity date of
22 December 31st?
23     A.   I don't remember.
24     Q.   In your role with various Eber
25 entities you have been involved with bank loans;

Page 81

W. Eber

1
2 correct?
3     A.   Yes.
4     Q.   And are you generally aware of when
5 those loans are becoming due, maturing and have to
6 be paid in full?
7         MR. RAMSEY:  You are talking just in
8     general or --
9     A.   In general?
10     Q.   The Eber entities.
11         I don't know if there was a bank loan
12 specific to Eber Metro, but in your role with
13 various Eber entities have you been involved in
14 tracking whether any bank loans are about to
15 mature and become due?  And by be involved you
16 doing it or someone else is doing it and telling
17 you about it.
18     A.   Someone else is doing it and telling
19 me about it.
20         MR. CALIHAN:  I am sorry.
21         Could you read back the question?  I
22     missed it completely.
23         (Record read.)
24     A.   And I also have been aware of when
25 some loans have come due too.

21 (Pages 78 - 81)

Page 82

1                  W. Eber
2       Q.   Are you also in those situations aware
3   of whether the company is going to be able to pay
4   those loans or not?
5            MR. RAMSEY:  Form.  Go ahead.
6       A.   Yeah.  I had some idea, yes.
7       Q.   And when the company has not been in a
8   position where it can pay those loans, what have
9   you done?
10           MR. RAMSEY:  Form.
11           MR. BROOK:  Basis?
12           MR. RAMSEY:  You are assuming she did
13      something or had to do something.
14           You can answer the question.
15      A.   What's the question?
16      Q.   In those situations where the company
17  has a loan to a bank that's becoming due but the
18  company is not able to pay it in full back on the
19  maturity date what, if anything, have you done
20  about it?
21           MR. RAMSEY:  Same objection.
22           Go ahead.  Don't let me throw you off.
23      A.   Well, let's talk about the Wells Fargo
24  loan, okay.  With Eber Brothers 130 million
25  dollars.  I had no idea.  I was not involved in

Page 83

1                  W. Eber
2   that.
3       Q.   I am talking about when you were
4   involved.  Situations when you were involved you
5   were being made aware of it becoming due and you
6   realized that the company could not just pay the
7   loan off in full.
8            What, if anything, did you do in that
9   situation?
10      A.   In some circumstances we had to ask
11  Lester to loan them money.
12      Q.   And in other circumstances did you
13  talk to the banks?
14      A.   We had to hire -- yeah.  We talked to
15  banks.  We talked to them.  We had lawyers.
16      Q.   What did you talk about, the banks?
17      A.   I mean, like with Canandaigua Bank?
18      Q.   If that's one that meets the
19  situation.
20      A.   You know, I don't remember all the
21  specific conversations we had with them.  You
22  know, we tried to extend or Lester had to
23  personally put money in to secure the loan.  He
24  had to put more money in to secure it.  He had to
25  leave more security than he had to put more cash

Page 84

1                  W. Eber
2   in to secure it.
3       Q.   So you asked the bank to extend the
4   loan, that was one of the things you did; right?
5            MR. RAMSEY:  Form.
6       A.   Or we had lawyers try to help us
7   extend it.
8       Q.   Without getting into the details of
9   what you specifically discussed with the lawyers
10  since there was a pending objection on that, what
11  was it that the lawyers -- what was your
12  understanding of what the lawyers were going to do
13  to extend the note without the bank's consent?
14           MR. RAMSEY:  Form.
15      A.   Say that -- ask that question again.
16      Q.   Were the lawyers doing something that
17  would involve -- was it your understanding that
18  the lawyers could do something to extend the loans
19  without the bank agreeing to it?
20           MR. CALIHAN:  Objection to form.
21      A.   Say it again the lawyers.
22      Q.   Was it your understanding that by
23  hiring lawyers that could be a way to extend the
24  loan without having the bank agree to extend the
25  loan?

Page 85

1                  W. Eber
2            MR. RAMSEY:  Form.
3       A.   I don't remember.  I don't remember.
4   I don't know.
5       Q.   When you asked or when one of the Eber
6   companies has asked banks to extend the loans such
7   as Canandaigua Bank, it has sometimes been
8   successful in getting that to happen; hasn't it?
9       A.   They extended some loans, yes.  But
10  they always said they wanted to get out of the
11  loan.
12      Q.   But they extended it anyway; didn't
13  they?
14           MR. CALIHAN:  Objection to form.
15           MR. RAMSEY:  Form.
16           Go ahead.
17      A.   Yes, they did extend it, but they
18  would only do it under the circumstances of Lester
19  personally guaranteeing it and securing it with
20  five hundred thousand and then pledging more
21  assets and more assets and --
22      Q.   Sorry.  Go ahead.
23           MR. RAMSEY:  Are you done with your
24      answer?
25           THE WITNESS:  Yes.

22 (Pages 82 - 85)

Page 86

W. Eber

2    Q.   When was the first time that a bank
3  asked Lester to pledge personal assets to support
4  his loan?
5    A.   I don't know.
6    Q.   Was it before the Alexbay deal or
7  after the Alexbay deal?
8    A.   I don't remember.  I know that I think
9  the 120 thousand was -- it may have been after.  I
10  am not sure of the additional securities he had to
11  put there.  I don't remember specifically.
12    Q.   Why didn't you ask Lester to extend
13  the maturity date on the line of credit note
14  Exhibit 13?
15        MR. RAMSEY: Form.
16        MR. BROOK:  Basis?
17        MR. RAMSEY:  I don't know she had an
18  obligation to.
19        MR. BROOK:  Whatever.
20    A.   Sorry?
21    Q.   You can answer the question.
22    A.   What was the question?
23        MR. BROOK:  Can you read it back
24  please?
25        (Record read.)

Page 87

W. Eber

2    A.   I didn't have to.
3    Q.   Why do you say that?
4    A.   I don't remember all the details
5  around it.  There was a lot going on and I just
6  don't remember.  I don't know that, you know, he
7  -- I don't remember.  I may have talked to Mike
8  Gumaer the attorney.  I don't remember.
9    Q.   Are you referring to Mike Gumaer as
10  the attorney or are you referring to another
11  attorney and Mike Gumaer?
12    A.   I don't remember all the attorneys
13  involved, that were involved specifically.  I mean
14  I did talk to Mike about these notes.  He
15  definitely.
16        MR. CALIHAN:  Don't disclose any legal
17  --
18        MR. BROOK:  She is absolutely allowed
19  to do that.
20        MR. RAMSEY:  Well, there is either two
21  hats.  There is a lawyer hat and there is a
22  non-lawyer hat.  So if you are asking about
23  the non-lawyer questions with Gumaer that's
24  one thing, but he also served --
25    A.   I saw him as the lawyer.

Page 88

W. Eber

2        MR. BROOK:  I mean it is her corporate
3  rep.
4    Q.   You said a minute ago you didn't think
5  that you had to ask to extend the maturity.
6        What was your basis for that belief?
7    A.   I don't remember.
8    Q.   Did you think it was a good thing for
9  Eber Metro to default on the note?
10        MR. RAMSEY: Form.
11    A.   Did I think it was a good thing for
12  Metro?  I don't remember.  I just remember there
13  was no -- there weren't a lot of alternatives
14  here.  And I spoke with Mike.
15        MR. CALIHAN:  Don't disclose legal
16  advice.
17    A.   Okay.  I spoke with Mike.  He was an
18  attorney representing us.  I definitely spoke with
19  him.
20        MR. BROOK:  Just so the record is
21  clear, we do not waive the right to insist
22  on getting complete answers to what the
23  basis was for her action if she is going to
24  say anything like that.
25        MR. CALIHAN:  Brian, would you say

Page 89

W. Eber

2  that again?
3        MR. BROOK:  Just saying reserving
4  rights with respect to these instructions to
5  the witness not to answer questions when she
6  has already said what she thought and
7  appears to be relying on advice that she got
8  at the time.  We don't have to litigate that
9  now.
10        MR. CALIHAN:  Just to make sure there
11  is no misunderstanding, so your position is
12  is that testimony, that reliance constitutes
13  a waiver or that she can not raise it
14  without disclosing the underlying advice?
15        MR. BROOK:  I think that if there is
16  going to be -- I don't know that that
17  testimony does, but if there is going to be
18  reliance on the assertion that she believed
19  at the time that she didn't have an
20  obligation to do so as far as purporting her
21  good faith and such, then that is
22  essentially the advice of counsel and it
23  does not constitute a waiver.
24        MR. CALIHAN:  I will consider it and
25  get back to you after lunch.

23 (Pages 86 - 89)

Page 1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3   _____/

4   DANIEL KLEEBERG, LISA STEIN and AUDREY HAYS,

5                       Plaintiffs,

6

                        - v -
7
    LESTER EBER; ALEXBAY, LLC f/k/a
8   LESTER EBER; LLC; CANANDAIGUA NATIONAL
    CORPORATION d/b/a CANANDAIGUA NATIONAL
9   BANK & TRUST; ELLIOT W. GUMAER, JR.;
    EBER BROS. & CO., INC.; EBER BROS. WINE AND
10  LIQUOR CORPORATION; EBER BROS. WINE &
    LIQUOR METRO, INC.; EBER-CONNECTICUT, LLC ; and WENDY
11  EBER,

12                      Defendants.

13  _____/

14

15          Examination Before Trial of Richard Harris

16  Hawks Jr., held at 700 Crossroads Building, 2 State

17  Street, Rochester New York 14614, on August 20, 2018

18  at a time of 9:00 a.m.

19

20

21

22

23

24

25  REPORTED BY:   ASHLEY FALCONE

Page 2

```
 1  A P P E A R A N C E S
 2
 3       BRIAN BROOK, ESQ.,
 4          Clinton Brook & Peed,
 5          100 Church Street, 8th Floor,
 6          New York, New York 10007.
 7          Counsel for Plaintiffs Daniel Kleeberg,
 8          Lisa Stein, and Audrey Hays
 9
10       COLIN RAMSEY, ESQ.,
11       PAUL KENEALLY, ESQ.,
12          Underberg & Kessler LLP,
13          300 Bausch & Lomb Place,
14          Rochester, New York 14604.
15          Counsel for Eber Defendants
16
17       ROBERT CALIHAN, ESQ.,
18          Calihan Law PLLC,
19          The Powers Building, Suite 761
20          16 West Main Street
21          Rochester, New York 14614
22          Counsel for Defendant Mike Gumaer
23
24
25
```

Page 3

```
 1  A P P E A R A N C E S
 2
 3       DONALD O'BRIEN, JR., ESQ.,
 4          700 Crossroads Building
 5          2 State Street
 6          Rochester, New York 14614
 7          Counsel for the Defendant Canandaigua
 8          National Corporation d/b/a Canandaigua
 9          National Bank & Trust
10
11       Patrick Martin
12          Co-executor of Gumaer Estate
13
14
15                  *   *   *
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1              WITNESS INDEX PAGE
 2
 3  WITNESS:          EXAMINED BY:        PAGE
 4  -------------------------------------------------
 5  Richard Hawks     Brian Brook           6
 6                    Colin Ramsey        119
 7                    Robert Calihan      153
 8
 9
10                  *   *   *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
 1              EXHIBIT INDEX PAGE
 2
 3  EXHIBIT
 4  NUMBER          DESCRIPTION         PAGE
    -------------------------------------------------
 5
    PLF. 1   e-mail                      51
 6
    PLF. 2   e-mail                      52
 7
    PLF. 3   Letter                      55
 8
    PLF. 4   Letter                      58
 9
    PLF. 5   Letter                      63
10
    PLF. 6   File of documents           73
11
    PLF. 7   e-mail                      96
12
    PLF. 8   Affidavit                  112
13
    PLF. 9   e-mail                     114
14
15
16                  *   *   *
17
18
19
20
21
22
23
24
25
```

Page 6

1          (It is hereby stipulated and agreed by
2   and among counsel that sealing, certification, and
3   filing are waived; and that all objections, except as
4   to the form of the question, are reserved until the
5   time of trial.)
6          MR. O'BRIEN: Well, we probably need to
7   clarify what that is, I do want the witness to be
8   able to read and sign.
9
10          R I C H A R D  H A R R I S  H A W K S  J
11  R., 6483 Cooks Point Road Naples, New York, 14512,
12  after having been duly called and sworn, testified as
13  follows:
14
15  EXAMINATION BY MR. BROOK:
16  Q.   Good morning.  Would you please provide your
17  home and business address?
18  A.   My home address is 6483 Cooks Point Road Naples,
19  New York, and my work address is 72 South Main
20  Street, Canandaigua, New York.
21  Q.   And you're aware you are being deposed in the
22  matter of Kleeberg v. Eber, is that right?
23  A.   Yes.
24  Q.   Have you ever been deposed before?
25  A.   Yes.

Page 7

1   Q.   How many times?
2   A.   About three times.
3   Q.   When was the last time you were deposed?
4   A.   Probably 15 years ago.
5   Q.   Okay.  Now, I'm sure you have discussed this
6   with your lawyer, but I'm going to go over a few of
7   the basics of how this is going to work.  In this
8   deposition I'm going to be asking you questions, and
9   you're going to be answering them under oath, do you
10  understand that?
11  A.   Yes.
12  Q.   And there are a few differences between a
13  deposition and a typical conversation that I want to
14  make sure you are aware of, and these are not easy to
15  remember, not as easy as it sounds.  First, the Court
16  Reporter is attempting to transcribe everything you
17  say.  So, in a normal conversation you might know
18  where I'm going with a question before I finish it
19  and go ahead and answer, or we might end up talking
20  over each other, we need to do our best to try to
21  avoid that.  Do you understand that?
22  A.   Yes.
23  Q.   And another difference is that since this is an
24  oral transcription, the Court Reporter cannot
25  indicate head nods or other gestures or um-hum is

Page 8

1   another one that drives them crazy.  So, to the best
2   of you're ability if you're answering in the
3   affirmative, give yes, or correct, and so on.  Do you
4   understand that?
5   A.   Yes.
6   Q.   Another difference between a typical
7   conversation and today, that your answers are under
8   oath and you understand what that means, correct?
9   A.   Yes.
10  Q.   Now, if I ask a question and you answer it, I'm
11  going to assume that you understood my question.  So,
12  if there's something in my question that you don't
13  understand, it's important you let me know, okay?
14  A.   Yes.
15  Q.   And another thing that may happen from time to
16  time, is there may be objections from Counsel here,
17  and unlike what you see on TV, there's no Judge here
18  to rule on these sort of things, so unless you're
19  instructed not to answer a question, if you're able
20  to answer the question, and you understand it, please
21  proceed to do so, do you understand that?
22  A.   I understand that, yes.
23  Q.   Now, is there any reason such as being under
24  unusual stresses, or physical or a mental condition,
25  or being under the influence of any substances, that

Page 9

1   would prevent or limit your ability to testify today
2   fully and truthfully?
3   A.   There is no limitation.
4   Q.   I'm going to do a few general background
5   questions, standard stuff, but I have to go through
6   it so -- have you ever been arrested?
7   A.   No.
8   Q.   Have you ever been --
9   A.   You mean a traffic ticket?
10  Q.   No, arrested meaning put in the clink overnight.
11  A.   No.
12  Q.   Okay.  Have you ever testified under oath in any
13  proceeding besides the three depositions you just
14  mentioned?
15  A.   No.
16  Q.   Have you been a party to a Court case?
17  A.   No.
18  Q.   Are you represented by Counsel here today?
19  A.   Yes.
20  Q.   And who's that Counsel?
21  A.   Dan O'Brien.
22  Q.   And does Dan O'Brien represent you individually,
23  or Canandaigua National Bank?
24  A.   He represents the organization that I work for.
25  Q.   And without telling me anything about your

Page 42

```
1   BY MR. BROOK:
2   Q.   But not in his individual capacity. I'm not
3   asking you to say what other people may have done, do
4   you understand that?
5   A.   Yes.
6   Q.   To your knowledge did anyone else from
7   Canandaigua National Bank ever review any
8   transactions that any Eber Brothers' entity was
9   involved in?
10         MR. O'BRIEN: In the trust side?
11         MR. BROOK: In the trust side, yes.
12         MR. O'BRIEN: Okay.
13  A.   Not in the trust side.
14  Q.   Now, on the commercial lending side, was there
15  involvement by Canandaigua National Bank in reviewing
16  transactions that Eber Brothers was engaged with
17  there?
18  A.   I believe there were -- I was not aware of them.
19         MR CALIHAN: I'm sorry, read the question
20  back again.
21         (Read back Page 42, Lines 14 to 17.)
22  Q.   Now, when I use the term transaction, do you
23  understand the term transaction to include a loan?
24  A.   Yes.
25  Q.   When did you first meet Lester Eber?
```

Page 43

```
1   A.   When did I first meet him?
2   Q.   Yes.
3   A.   Shortly after our assuming the relationship,
4   which would have been probably early 2007.
5   Q.   And who in connection with Eber Brothers, or the
6   Allen Eber trust, did you communicate with about
7   assuming the relationship before you actually did so?
8   A.   It would have been probably Lester Eber and
9   probably Elliot Gumaer.
10  Q.   Now, Elliot, he also goes by Mike?
11  A.   Mike, yes.
12  Q.   How did you refer to him?
13  A.   Mike, most of the time.
14  Q.   When did you first meet him?
15  A.   I was aware of Mr. Gumaer years before that in
16  his capacity of working with the law firm Nixon
17  Peabody, Nixon Hargrave at the time.
18  Q.   And have you personally interacted with him?
19  A.   Not personally, professionally in other trust
20  relationships.
21  Q.   Okay. So, just making sure I understand. So,
22  this is not a situation like with Lester where you
23  had heard about him just because of his reputation,
24  you had actually worked with Mr. Gumaer, correct?
25  A.   Yes.
```

Page 44

```
1   Q.   So, you knew that Mr. Gumaer was a lawyer at
2   Nixon Hargrave, correct?
3   A.   Yes.
4   Q.   Do you know when he retired?
5   A.   No.
6   Q.   Approximately when was his retirement?
7         MR. CALIHAN: Objection to form.
8         MR. O'BRIEN: He said he didn't know.
9   A.   I don't know.
10  Q.   Do you know if he was retired at the time he
11  contacted you -- let me withdraw. Was Mr. Gumaer
12  still practicing law at Nixon Hargrave, to the best
13  of your knowledge, at the time when you and he first
14  discussed the Allen Eber trust?
15  A.   I believe so.
16  Q.   Are you aware that at some point Mr. Gumaer
17  relocated to Georgia and to Massachusetts for most of
18  the year?
19  A.   Yes.
20  Q.   Approximately when was that?
21  A.   That was shortly after we took the relationship
22  over, so it had to be 2007 or 2008.
23  Q.   And what was Mr. Gumaer's role in connection
24  with the Allen Eber trust?
25  A.   He was a co-trustee.
```

Page 45

```
1   Q.   Did he have any the role that you were aware of?
2         MR. RAMSEY: Form.
3         MR. CALIHAN: Objection as to form.
4   A.   The form or -- excuse me. The other role might
5   have been an advisor to the Eber family, to the Eber
6   relationship.
7   Q.   And what do you mean by advisor?
8   A.   I believe he was handling various legal
9   activities and affairs.
10  Q.   And for which members of the Eber family was he
11  handling various legal matters and affairs?
12         MR. RAMSEY: Form.
13         MR. CALIHAN: Form.
14  A.   My understanding that it was for the Eber
15  Corporation, and in some cases maybe Lester
16  personally.
17  Q.   And was it significant to you in terms of how
18  you dealt with the trust's responsibility that Mr.
19  Gumaer might be representing Lester Eber personally?
20         MR. CALIHAN: Objection to form.
21  A.   It became a concern because of the conflict.
22  Q.   What do you mean by the conflict?
23  A.   Well, in handling being a co-trustees with us,
24  and then also handling certain legal activities for
25  the Corporation.
```

Page 185

1
2              UNITED STATES DISTRICT COURT
3             SOUTHERN DISTRICT OF NEW YORK
4      ---------------------------------X    *
                                             *
5      DANIEL KLEEBERG, LISA STEIN and       *
       AUDREY HAYS,                          *
6                                            *
7                   PLAINTIFFS,              *
                                             *
8              vs                            *
                                             *     INDEX NO:
9      LESTER EBER, ALEXBAY, LLC f/k/a       *   16-CV-9517
       LESTER EBER, LLC, CANANDAIGUA         *        LAK
10     NATIONAL CORPORATION d/b/a            *
       CANANDAIGUA NATIONAL BANK & TRUST,    *
11     THE ESTATE OF ELLIOT W. GUMAER,       *
       JR., EBER BROS & CO, INC, EBER        *
12     BROS, WINE AND LIQUOR CORPORATION,    *
       EBER BROS WINE & LIQUOR METRO,        *     VOL II
13     INC, EBER-CONNECTICUT, LLC and        *
       WENDY EBER,                           *
14                                           *
                    DEFENDANTS.              *
       ---------------------------------X    *
15
16
17
18       Deposition of RICHARD HARRIS HAWKS, JR
19               Rochester, New York
20            Thursday, April 11, 2019
21
22
23     Reported by:
24     Mary Agnes Drury, RPR, NYACR, CLR
25     JOB NO. 158944

Page 262

1      RICHARD HARRIS HAWKS, JR
2   that prohibited the combination of the trust --
3   the trust and lending sides?
4        A.   I cannot give you specific
5   situations.
6        Q.   Has CNB ever brought an action on
7   behalf of a trust that it managed against a
8   co-trustee in court?
9        A.   Not to my knowledge.
10       Q.   Going back to 2012, and when you
11  learned about the Eber-Connecticut transfer;
12  you described how there was a -- I believe, a
13  phone conversation, and then a brief meeting;
14  is that right, or was it just one phone
15  conversation?
16       A.   It was a phone conversation, and
17  then -- we're talking about the same meeting;
18  it would have been with Mike Gumaer, and
19  Lester, and Wendy, and then we went into a
20  short trustees meeting, which -- at which time
21  we discussed the annual distribution and where
22  that was going to be funded from.
23       Q.   Okay.  So was the phone
24  conversation, was that the first time that you
25  were made aware that there was anything going

Page 263

1      RICHARD HARRIS HAWKS, JR
2   on with the transfer of the Eber-Connecticut
3   business?
4        A.   It was a quick, brief review of that
5   information where different sub-corporations
6   were listed as -- where we were looking to
7   transfer certain assets over to it.
8        Q.   Okay.  So at the time of that phone
9   conversation, were you aware that the proposed
10  transfer or transfer that had either had
11  occurred or was about to occur, involved
12  transferring the Connecticut business to an
13  entity that was outside the trust?
14       A.   At that point, we were not aware
15  that it was an entity outside of the trust; it
16  was a transfer of restricted promissory notes.
17       Q.   Okay.  So are you talking about a
18  meeting in 2011, when you ratified promissory
19  notes that had already been issued?
20       A.   Yes.
21       Q.   Okay.  And so I'm talking about
22  later, after that.
23            At some point you became aware that
24  the Eber-Connecticut business had been
25  transferred out of the trusts --

Page 264

1      RICHARD HARRIS HAWKS, JR
2        MR. O'BRIEN:  Form.
3        MR. BROOK:  -- assets, correct?
4        THE WITNESS:  Yes, we did become
5   aware of that.
6   BY MR. BROOK:
7        Q.   Okay.  And how did you become aware
8   of that; was it a phone conversation or email
9   or --
10       A.   Through review of some of the
11  documents that we had seen, and part of the
12  meeting notes from a meeting in 2012, I believe
13  it was.
14       Q.   Okay.  And by that point, had the
15  transfer already occurred, or was it something
16  that was just being contemplated?
17       A.   I believe it had already been
18  transferred.
19       Q.   Okay.  So --
20       A.   I --
21       Q.   -- you testified earlier that you
22  recall CNB being asked to ratify that
23  transaction, or were you talking about the
24  loans?
25       A.   I'm talking about the loans.

Page 265

1      RICHARD HARRIS HAWKS, JR
2        Q.   Was CNB ever asked to ratify the
3   transfer of Eber-Connecticut to Alexbay?
4        A.   Not to my knowledge.
5        Q.   Did CNB ever ratify that
6   transaction?
7        A.   I don't believe so.
8        Q.   Did you ever discuss the
9   Eber-Connecticut transfer with Mike Gumaer?
10       A.   Yes, when it was recognized that he
11  had -- excuse me, that this transfer had
12  occurred, and he had recommended that this --
13  that the transfer was appropriate to do for the
14  continuation of the company.
15       Q.   Okay.  So Mike -- what do you
16  specifically recall Mike saying?  You said he
17  recommended that it occur?
18       A.   He recommended, and through
19  discussions that he and Lester had had in
20  helping to manage the company, that this was in
21  the best interest of the company at that time.
22       Q.   So was it your understanding, based
23  on that conversation that Mike Gumaer had
24  actually suggested the course of conduct or
25  that he had just approved it after the fact?

Page 266

RICHARD HARRIS HAWKS, JR

1
2    A.   I'm not sure if he was the architect
3    or put it together.  I know he was directly
4    involved with helping run the business for a
5    number of years, and was winding down, but this
6    was a suggested transaction to protect the
7    assets of the corporation.
8    Q.   What was your understanding as to
9    who or what the assets of the corporation were
10   being protected from?
11   A.   The transfers here being protected
12   to preserve what value there might have been.
13   Q.   Preserve it from what?  What was the
14   concern about it, the assets being in the
15   existing location where they had been?
16   MR. CALIHAN:  Form.
17   THE WITNESS:  The concern might have
18   been for the ability to be able to continue
19   to run what was now the Connecticut
20   subsidiary, and the need to have
21   appropriate funding over there.
22   BY MR. BROOK:
23   Q.   So I'm still not sure I'm
24   understanding.
25   So what -- what was it that you were

Page 267

RICHARD HARRIS HAWKS, JR

1
2    told about the problems that Eber-Connecticut
3    was facing with getting funding in its current
4    corporate structure, prior to being transferred
5    to Alexbay?
6    A.   What was I told --
7    Q.   Yes.
8    A.   -- about that?
9    It was indicated that there had been
10   previous funding that had taken place, that it
11   came directly from one of the shareholders who
12   was -- happened to be Lester.  And that the
13   transfer here was to allow for capitalization
14   or providing capital for Eber-Connecticut to be
15   operating.
16   Q.   So was it your understanding that
17   Lester was providing additional capital to
18   Eber-Connecticut?
19   A.   It was my understanding that the
20   capital that would have been provided here, he
21   was not providing additional capital, he was
22   looking to take some of the assets from the
23   parent corporation to Connecticut, to relieve
24   certain lending obligations and so forth, that
25   he had previously made to the company.

Page 268

RICHARD HARRIS HAWKS, JR

1
2    Q.   Okay.  So in other words, Lester was
3    looking to convert his debt position with the
4    company where he loaned money to it, into a
5    capital or equity position where he was an
6    owner of the company; is that right?
7    A.   It appeared that, yes.
8    Q.   And was there any discussion about
9    whether Lester could do that, given his role as
10   co-trustee of the trust?
11   A.   Through the discussion with Mike,
12   Lester, and the bank as the co-trustees, we had
13   reviewed that.  But, once again, Mike had
14   assured that, as far as the
15   corporation was concerned, this was in the best
16   interest.
17   We were not assured at that point
18   and did not find out until later that this was
19   going to mean that Lester was going to become a
20   major shareholder or the sole shareholder of
21   the Connecticut.
22   Q.   Did you ever have a one-on-one
23   discussion with Mike Gumaer where neither
24   Lester, nor Wendy were part of the conversation
25   about --

Page 269

RICHARD HARRIS HAWKS, JR

1
2    A.   From time-to-time, we would have
3    been, but it was direct phone calls, where
4    Lester, it may not have been available to
5    discuss the annual distribution.
6    Q.   Did you ever discuss during a
7    one-on-one discussion with Mike Gumaer the Eber
8    Connecticut transfer?
9    A.   No.
10   Q.   Why not?
11   MR. O'BRIEN:  If you know.
12   THE WITNESS:  Huh?
13   MR. O'BRIEN:  If you know.
14   MR. BROOK:  You don't have to do
15   that.
16   MR. O'BRIEN:  No.  No.  You asked
17   him why not; and that also requires him to
18   speculate as to what Mike Gumaer may have
19   been thinking or what Lester may have been
20   thinking.
21   BY MR. BROOK:
22   Q.   I'm asking for your recollection as
23   to why you didn't try to have a one-on-one
24   conversation with Mike Gumaer?
25   A.   We believed that Mike had been the

RICHARD HARRIS HAWKS, JR

1
2 Brothers stock?  How to account for the value
3 of the Eber Brothers stock?
4     A.   How to account for it?
5     Q.   Yeah.
6     A.   With Wendy --
7          MR. O'BRIEN:  It requires a "yes" or
8 "no" answer, okay.
9     Q.   The answer is "yes"?
10     A.   Yes.
11     Q.   Who do you recall talking to about
12 that?
13     A.   Both Wendy and Lester.
14     Q.   In sum and substance, what was the
15 conversation that you had with Wendy or Lester
16 on that topic?
17     A.   Basically, the sum of it would be
18 where are financial statements that we can use,
19 current financial statements to use to do or to
20 have a valuation done.
21     Q.   Okay.  So it was less about what the
22 value is; it was more following up on this
23 request for additional financial information?
24     A.   Right.
25     Q.   At some point were you provided with

RICHARD HARRIS HAWKS, JR

1
2 additional financial information?
3     A.   No.
4          MR. RAMSEY:  I might have one or two
5 follow-ups, but you go, just in the
6 interest of time.
7 EXAMINATION BY
8 MR. CALIHAN:
9     Q.   Very quickly.  I'm not sure I heard
10 you completely, but you testified to the effect
11 that there was some issue of Mr. Gumaer signing
12 the petition for the dissolution of the trust.
13          What was your understanding of that
14 issue?
15     A.   My understanding was there was an
16 issue of competency at the time.
17     Q.   When's the last time you had direct
18 contact with Mike Gumaer?
19     A.   Probably in the late 2014 timeframe.
20     Q.   And did he appear competent to you
21 at that time or already starting to suffer from
22 some debilitation?
23     A.   My conversation would have been he
24 was a little disoriented.  And when I made
25 contact, his wife answered the phone and

RICHARD HARRIS HAWKS, JR

1
2 indicated to me that he was not having a good
3 day.
4     Q.   Okay.  Had you been told before
5 that, that Mike was having health problems?
6     A.   Somewhat, yes.
7     Q.   Okay.  Were you surprised by your
8 exchange with Mrs. Gumaer when she answered the
9 phone?
10     A.   Yes.
11     Q.   Okay.  Did you try to have any
12 conversations with Mr. Gumaer after that
13 conversation?
14     A.   We -- the conversation would be by
15 either letter or our annual statement would go
16 out to him; and I'm assuming that he received
17 it.  But I also found out later that there was
18 a -- someone who was representing him.
19     Q.   And who was that?
20     A.   I believe it was Pat Martin, at the
21 time.
22     Q.   Did you raise with anyone, any
23 concerns about Mr. Gumaer's competency at any
24 time?
25     A.   No, I did not.

RICHARD HARRIS HAWKS, JR

1
2     Q.   Okay.  Did you think that it was an
3 obligation of yours, if you had concerns about
4 the competency of a co-trustee, to raise those
5 concerns?
6     A.   In retrospect, yes, okay.  However,
7 because of the statute and the ability and
8 respect that we have for individuals here, we
9 looked to hopefully have this play out.
10     Q.   Okay.  It's a difficult thing to do,
11 is it not?
12     A.   Yes.  Yes.
13     Q.   You had known Mike Gumaer for some
14 time?
15     A.   I had known of him for some time,
16 yes.
17     Q.   And you testified earlier about
18 relying on Mike Gumaer in connection with the
19 appropriateness of the transfer involving
20 Eber-Connecticut.
21          Do you recall that?
22     A.   Yes.
23     Q.   And I think you had testified
24 earlier; although, I may be confusing two
25 deposition days, about Mike, in your view,

Page 282

RICHARD HARRIS HAWKS, JR

1
2  wearing two hats sometimes as a lawyer and as a
3  trustee?
4      A.   Yes.
5      Q.   And when you were relying on
6  Mr. Gumaer with respect to the Eber-Connecticut
7  transaction, did you understand that he was
8  functioning as a -- as a lawyer or as a
9  trustee?
10      A.   I understood he was --
11      MR. BROOK:  Objection to form.
12      THE WITNESS:  -- he was functioning
13  in both capacities.
14      Q.   And when you say as a lawyer or you
15  answered my question as a lawyer; as a lawyer
16  for whom?
17      A.   A lawyer for the Eber Brothers
18  business.
19      Q.   Okay.  And did you view then that he
20  was in a conflict position when he was
21  providing that advice?
22      A.   Yes.  Yes.  And that would have
23  referred us then to go back to our conflict of
24  interest policy.
25      Q.   And did you do that?

Page 283

RICHARD HARRIS HAWKS, JR

1
2      A.   We did, and we reviewed that with
3  our counsel.
4      Q.   And did you get a clean bill of
5  health in connection with relying on
6  Mr. Gumaer, as you testified?
7      MR. BROOK:  Objection to form.
8      THE WITNESS:  It was deemed that his
9  competence at that point was sufficient.
10      Q.   Was sufficient?
11      A.   Yes.
12      Q.   That his competence was sufficient.
13      You're talking now about competence
14  or conflict of interest?
15      A.   His confidence -- or the conflict of
16  interest was not a major issue for us at that
17  time.
18      Q.   All right.  Do you recall with
19  specificity, anything that Mike Gumaer said to
20  you or in your presence regarding the
21  Eber-Connecticut transaction?
22      A.   No, I do not recall any specific.
23      Q.   Okay.  Do you recall anything in
24  writing that you received from him with respect
25  to the Eber-Connecticut transaction?

Page 284

RICHARD HARRIS HAWKS, JR

1
2      A.   Nothing in writing from him.
3      Q.   Okay.  Did you ever inform any of
4  the beneficiaries about the Harris Beach
5  fraudulent action -- strike that.
6      Did you ever inform any of the Eber
7  Trust beneficiaries of the Harris Beach
8  fraudulent transfer action?
9      A.   I did not.
10      Q.   Okay.
11      MR. CALIHAN:  Those are all the
12  questions I have.  Thank you.
13      MR. BROOK:  All right.  Well, I do
14  have a few matters for follow-up, and I
15  appreciate everyone sticking around for
16  this.
17  EXAMINATION BY
18  MR. BROOK:
19      Q.   So I'm going to show you what was
20  previously marked as Plaintiffs' Exhibit 47.
21      (Whereupon, Plaintiffs' Exhibit 47,
22  Gumaer Letter, Dated 1/2/01, Bates Stamped
23  EB-0001556 to '1557, 2-Pages was previously
24  marked for identification.)
25      MR. O'BRIEN:  Do you have a copy?

Page 285

RICHARD HARRIS HAWKS, JR

1
2      MR. BROOK:  Unfortunately, I don't.
3  It is the engagement letter between Mike
4  Gumaer and Lester Eber.
5      MR. O'BRIEN:  You say 47?
6      MR. BROOK:  Yes.
7  BY MR. BROOK:
8      Q.   If you could, please.
9      That letter is dated January of
10  2001, which I know is well before you got
11  involved or Canandaigua National Bank got
12  involved with the trust.
13      Is that a letter that you recall
14  ever seeing in terms of Mike Gumaer's tension,
15  as trustee, lawyer, and director of the Eber
16  companies.
17      MR. CALIHAN:  Objection to form.
18      THE WITNESS:  I do not recall seeing
19  it.
20      Q.   Are you aware of how Mike Gumaer was
21  being compensated for his work as either
22  trustee, director, or lawyer?
23      A.   I was not aware of how he was being
24  compensated.  I did know that neither Lester
25  nor Mike Gumaer were taking any kind of a

Page 1

1              UNITED STATES DISTRICT COURT
               SOUTHERN DISTRICT OF NEW YORK
2
3              CIVIL ACTION NO. 16-cv-951 (LAK)
4
    DANIEL KLEEBERG, et al.,
5
                     Plaintiffs,
6
        v.
7
    LESTER EBER, et al.,
8
                     Defendants.
9
    - - - - - - - - - - - - - - - - - -x
10
11
12                       98 Southeast 7th Street
                         Suite 1100
13                       Miami, Florida
                         Thursday, May 9, 2019
14                       9:35 a.m.- 11:55 a.m.
15
16
17
18      DEPOSITION OF SOUTHERN GLAZER'S WINE & SPIRITS, LLC
19                 THROUGH LEE HAGER
20
21
22           Taken before Edward Varkonyi, Registered
23    Merit Reporter and Notary Public for the State of
24    Florida at Large, pursuant to Notice of Taking
25    Deposition filed in the above cause.

Page 2

1          APPEARANCES
2
BRIAN BROOK, ESQ.,
3    Brook & Associates PLLC
100 Church Street, 8th Floor
4    New York, New York 10007
on behalf of the Plaintiffs.
5
6    COLIN D. RAMSEY, ESQ.,
Underberg & Kessler LLP
7    50 Fountain Plaza, Suite 320
Buffalo, New York 14202
8    on behalf of Defendants Lester Eber,
Alexbay, LLC f/k/a Lester Eber, LLC
9    Eber Brothers & Co., Inc., Eber Bros. Wine
and Liquor Corporation, Eber Bros. Wine and
10   Liquor Metro, Inc., Eber Connecticut, LLC,
and Wendy Eber
11
12   JOHN HERBERT, ESQ. (Telephonically)
P.O. Box 1031
13   Tiburone, California 94920
on behalf of Defendants Lester Eber and
14   Wendy Eber
15
DAVID P. ACKERMAN, ESQ.,
16   Akerman LLP
777 S. Flagler Drive West
17   Palm Beach, Florida 33401
on behalf of the Witness.
18
19   ROBERT B. CALIHAN, ESQ.,
Calihan Law PLLC
20   16 Main Street
Rochester, New York 14614
21   on behalf of Defendant Estate of Elliot W.
Gumaer
22
23   ALSO PRESENT: Alan Greenspan, Esq.,
Executive VP and General Counsel
24            Southern Glazer's Wine and Spirits
25

Page 3

1          I N D E X
2    Witness    Direct  Cross   Red.    Rec.
3    LEE HAGER         4      78      83     --
4
5
6
7          E X H I B I T S
8    Plaintiff's              For Ident.
9    Exhibit 92  Subpoena                8
10   Exhibit 93  SGWS-000124 to 138          19
11   Exhibit 94  EB-00035524 to 43          58
12   Exhibit 95  Restrictive Covenant EB-644 to 652   63
13   Exhibit 96  EB-688 to 691              75
14
15
16
17
18
19   NOTE: THE ORIGINAL EXHIBITS WERE RETAINED BY MR.
20       BROOK AND ARE NOT ATTACHED TO THE TRANSCRIPT.
21
22
23
24
25

Page 4

1  Thereupon--
2         LEE HAGER
3  was called as a witness by the Plaintiff and having
4  been first duly sworn responded as follows:
5         THE WITNESS:  Yes, I do.
6         DIRECT EXAMINATION
7  BY MR. BROOK:
8     Q.  Good morning.
9     A.  Good morning.
10    Q.  Could you please state your full name.
11    A.  Lee F. Hager.
12    Q.  And you are aware you're being deposed in
13  the case of Kleeberg versus Lester Eber?
14    A.  Yes.
15    Q.  And you are here as a corporate
16  representative for Southern Glazer's Wine and Spirits
17  of America, LLC; is that correct?
18    A.  Yes.
19    Q.  Did I get that name, right?
20    A.  Yes.
21    Q.  Okay.  Is it fair to say that that is
22  a -- that that entity can be referred to herein as
23  just generally Southern, and that would include that
24  entity and also its predecessors and affiliates?
25    A.  Yes.

Page 5

1     Q.  Have you ever been deposed before?
2     A.  Yes.
3     Q.  How many times?
4     A.  I would have to say three, four times.
5     Q.  When was the last time you were deposed?
6     A.  Approximately two years ago.
7     Q.  Even though you probably discussed these
8  sorts of things with your lawyers and I don't want to
9  know specific advice or anything that was given
10  there, I'm just going to go over some of the ground
11  rules generally.
12        In this deposition I'm going to be asking
13  you questions and you're going to be answering them
14  under oath.  You understand that?
15    A.  Yes.
16    Q.  And there is a few differences between a
17  deposition and a typical conversation that I want to
18  make sure we remain conscious of.
19        First, the court reporter is trying to
20  transcribe everything that we say and if he doesn't
21  put it in the transcript, it might as well not have
22  been said.  So that means it's important for us to
23  try our best not to speak over each other.  Do you
24  understand that?
25    A.  Yes.

2 (Pages 2 - 5)

Page 18

1 in terms of what an acquisition deal might look like?
2     A.  Well, you know, you skipped a big part,
3 as I remember this.
4         The substantive discussions in '05
5 related to the Delaware and the Ohio acquisitions or
6 mergers into the business -- let's call it
7 acquisitions into our business.
8         Prior to that -- just so we're all on the
9 same page, prior to that the New York operations had
10 already, from my standpoint, ceased to exist.
11     Q.  Let's just step back for one second.  We
12 might be off on the timing here and that could be the
13 source of confusion.
14     A.  Yeah, I'm a little confused.
15     Q.  So how long was it between the time when
16 you started talking about acquiring Ohio and Delaware
17 interests and that transaction actually being
18 consummated, a matter of months, weeks?
19     A.  It was rapid.  I would have to say you
20 could measure it in weeks.  Now, if it was six weeks
21 or eight weeks, it happened -- it happened rather
22 quickly.  It was the summer of '05, I remember,
23 because it was a lost summer for me.  It was the
24 summer of '05 when this transaction all came
25 together.  Yeah.  '07?

Page 19

1     Q.  Let's look at an exhibit.
2         MR. ACKERMAN:  Look at a document.
3         MR. BROOK:  Let's mark this as 93.
4         THE WITNESS:  Excuse me, it was the
5 summer of '07.  Excuse me, summer of '07.
6         MR. BROOK:  Let's mark this Exhibit 93.
7         MR. ACKERMAN:  You may want to clarify
8 the prior answers.
9         THE WITNESS:  Yeah.
10         (The document referred to was thereupon
11 marked Plaintiff's Exhibit 93 for Identification, a
12 copy of which is not attached hereto.)
13 BY MR. BROOK:
14     Q.  Do you recognize what has been marked as
15 Exhibit 93?
16     A.  Yes.
17     Q.  What is it?
18     A.  This was our -- what I will say is our
19 initial letter of intent regarding the -- yeah, this
20 is our initial letter of intent regarding the
21 purchase of the New York operation.
22     Q.  Okay.  So that was -- it's dated March
23 2007, and February 2007, looks like there is a few
24 amendments?
25     A.  Yes.

Page 20

1     Q.  Let's jump back in time a little bit to
2 before this.
3         Prior to the discussions that immediately
4 preceded the letter of intent, had there been any
5 substantive discussions about an acquisition of Eber
6 Brothers in either '05 or '06?
7     A.  No.
8     Q.  So was there only one previous discussion
9 with Lester Eber about a potential acquisition?
10     A.  To the best of my knowledge, yes.
11     Q.  Who participated in that discussion?
12     A.  It would have been myself and Mr. Chaplin
13 at that time.  Wayne Chaplin had it.  Possibly Harvey
14 Chaplin at the initial one about joining forces with
15 us.  I am referring to that early one now in that --
16 right after we entered the state.
17     Q.  In that early discussion had it been
18 conveyed to Lester Eber that he would have a
19 continuing role in the business if Eber Brothers was
20 acquired?
21         MR. RAMSEY:  Form.
22         THE WITNESS:  Excuse me?
23 BY MR. BROOK:
24     Q.  Sometimes when a company is acquired the
25 existing management goes, sometimes it stays.  During

Page 21

1 those initial discussions with Lester Eber, was it
2 contemplated by Southern that Lester Eber would
3 continue on in a senior role with the New York
4 operations if Southern acquired Eber Brothers?
5     A.  It was never really our intentions for
6 Lester to have a long-term role, and especially that
7 of an employee.
8         We really kind of looked at it as being,
9 you know, we have done this before as a consultant as
10 a transition for our business, you know, ways of
11 working.
12         We did realize very, very early on when
13 we started in New York, we had a fairly good
14 understanding about metro, we thought, and then we
15 had an awful lot to learn about metro and we had very
16 little understanding about the ways of working in
17 upstate New York, which to me should be a different
18 state.
19         It's just a totally different way of
20 working, customer, supplier preference.  Everything
21 is just totally different and we realized our initial
22 fore up there and going up there when we did was
23 without knowledgeable source, so we really believed
24 that we needed to have a transition with it.  I think
25 it was always anticipated that there would be some

6 (Pages 18 - 21)

Page 22

1 sort of consultive role.
2     Q.  And in terms of a consulting role, was
3 that meant to be more limited than the role of say
4 someone who was actually managing the operation
5 itself?
6     A.  A hundred percent.  We already had -- we
7 already moved at kind of great thought and expense
8 what we thought at that time was our future
9 leadership up there, both on the commercial point and
10 operational point but, again, through years of
11 expansion, acquisition, we realized that sending the
12 best minds to a foreign country where they couldn't
13 speak the language was never going to be successful.
14       So the answer to that question is, you
15 know, we had, we thought, the core of the nucleus of
16 the commercial people now in place, but needed to
17 really have some knowledge given to them.
18     Q.  So when Southern moved into other states,
19 not counting New York, was it typical business
20 practice to acquire a local distributor?
21     A.  I would have to say it's not only
22 Southern's, but it's probably the industry's way of
23 doing it because of the regulations, the laws and
24 whatever.
25       No wholesaler will ever go up and just

Page 23

1 plant their flag because, you know, a wholesaler owns
2 nothing.  They have to have the brands.  They have to
3 have the distribution rights.  They have to have
4 employees.  You very, very rarely go to what people
5 typically say is green field.  No, that's a -- that's
6 a very costly and long route to go.
7     Q.  And in those typical situations where a
8 local distributor was acquired in a new state, what
9 typically happened to the existing management of
10 those companies that were acquired?
11     A.  If we were successful in charming the old
12 owners, which are traditionally family owned, very
13 prideful people, we were successful in getting some
14 sort of transition plan and it varies.  You know,
15 some sort of -- like I might say, consulting,
16 advisory, whatever it might want to be.  Yes, that
17 would be part of our game plan.
18     Q.  Then for more junior employees like
19 salespeople, was it typically your goal to retain
20 them as employees?
21     A.  Yeah, quite contrary you want to keep the
22 continuity of the people that are selling and making
23 money for you and it's usually those middle executive
24 managers are the ones that have chances of being
25 either replaced or reorganized.  So it's the very,

Page 24

1 very top and the very, very bottom.
2     Q.  You made a gesture there.  Were you
3 suggesting that if you kept the middle or higher
4 executive people around, that they might butt heads
5 with Southern management?
6     A.  No, my gesture was my figure of speech.
7 I have some European blood in me.
8     Q.  I was trying to understand.
9     A.  Nothing was not spoken.
10    Q.  Okay.  Who initially proposed -- when it
11 came to Southern acquiring Eber and its assets, who
12 first proposed that Lester Eber have a consulting
13 role?
14    A.  I would very much like to say it was a
15 joint -- for us it was almost like it was a part of
16 our all our deals, as I have said.
17       It wasn't like one person proposed it.
18 It was almost accepted.  So as we sit down, as say
19 this executive group, and I would represent mostly
20 organizationally from my point as being secretary of
21 the company in charge of all the back office and all
22 the administration, and then there would be our
23 salespeople or administrative people.  It's almost a
24 natural thing, you know, to benefit us.
25       It wasn't one.  It was almost like it was

Page 25

1 our challenge to get -- again, to me it's all
2 business continuity.  It's all long term for me,
3 short term/long term.
4     Q.  Were the terms of the consulting
5 arrangement negotiated?
6       MR. RAMSEY:  Form.
7       THE WITNESS:  Am I supposed to answer
8 that?
9       MR. ACKERMAN:  Yes.
10      THE WITNESS:  As in all of them, they
11 were made as broad as possible for my advantage,
12 you know, giving me the ability to expand or
13 contract as my business was going to progress.
14      You know, no insult to Mr. Eber in this
15 room, to us it was very, very typical to
16 negotiate as broad as you can and then utilize
17 the services and the knowledge as they became
18 needed.
19 BY MR. BROOK:
20    Q.  How was the amount of the consulting fee
21 determined?
22    A.  Again, from experience for what we had
23 expected, to -- again, being way now in advance and
24 being up there now a couple of years before, two,
25 three years from '04 to this period of '07 when the

7 (Pages 22 - 25)

Page 26

1 consulting agreement was actually done, we had
2 learned a lot, but probably from my standpoint, being
3 critical like I am, we learned so much that we did
4 not know that, you know, from my standpoint, you
5 know, I just saw this agreement replacing other sort
6 of consultants that I would have had to hire, be them
7 operational consultants, be them industry
8 consultants, be them lobbyists in their things.
9       This is one of the things that maybe
10 doing these transactions I saw Lester, Mr. Eber, as
11 almost like a one stop shop of knowledge of a lot of
12 different things that I was going to have to
13 purchase, you know, in the marketplace.
14       It was -- again, we thought it was fair
15 and we thought it was arm's length and we thought it
16 was equitable from our standpoint. We would have
17 spent a lot more trying to buy these services some
18 other place.
19    Q.  And who was negotiating the consulting
20 agreement on behalf of Lester Eber? Was it just him
21 or did he have someone else negotiating for him?
22       MR. RAMSEY:  Form.
23       THE WITNESS:  I don't remember. I don't
24 really remember. I know that they had a very
25 large law firm.

Page 27

1       Any discussions about any of the work
2 product that came out of that -- I'm sure Lester
3 had the right attorneys working with him. Any
4 discussions about things -- you know, like any
5 sort of consulting agreement, we pushed what we
6 wanted and they pushed back.
7       I don't really think it was Lester
8 pushing back but his attorneys. I'm sure he had
9 counsel.
10 BY MR. BROOK:
11    Q.  Does the name Harris Beach ring a bell?
12    A.  Yeah, they were pretty good. Yeah.
13 Harris Beach, yeah.
14    Q.  I want to ask you a couple of questions
15 about this Exhibit 93. Do you have that in front of
16 you still?
17    A.  Yes.
18    Q.  If you could, please, turn to the page
19 that has the Bates number in the bottom right ending
20 in 130. It's about halfway in.
21    A.  Okay.
22    Q.  Are you there?
23    A.  130, yes, sir.
24    Q.  There section 2 specifies a purchase
25 price for the assets. Do you see that?

Page 28

1    A.  Uh-huh.
2    Q.  That's a yes?
3    A.  Yes. Excuse me.
4    Q.  And it refers to in the first item
5 purchasing the value of the inventory. Do you see
6 that?
7    A.  Yes, sir.
8    Q.  Not necessarily specific to this letter
9 of intent, but do you know was the inventory of Eber
10 Brothers ultimately acquired by Southern?
11    A.  Yes.
12    Q.  Was all the inventory acquired by
13 Southern or was some of it not able to be agreed upon
14 as to the amount of the price?
15    A.  I would have to say substantially all of
16 the inventory. We would not have bought things we
17 didn't feel we can represent. We would not have
18 bought unsaleable or unmarketable merchandise and we
19 wouldn't have bought oddball things that we would
20 have to just write down or write off. So we would
21 have bought saleable, marketable merchandise.
22    Q.  Do you recall there being any oddball
23 things that couldn't be bought?
24    A.  There always is. There always is but I
25 don't recollect. It would be a de minimis amount in

Page 29

1 any wholesaler's operation.
2    Q.  And the third item under 2, it says $10
3 million for the intangible assets that have been
4 listed and I think it's on the preceding page.
5       Was that amount ultimately paid or was
6 that amount changed?
7    A.  I believe that amount was ultimately
8 changed. I believe that was like a placeholder as
9 this -- as this transaction evolved from amendment to
10 amendment to amendment. So I would have to say at
11 this point it was a placeholder.
12    Q.  How was that amount changed? Did it go
13 up or down?
14    A.  I can't tell you now exactly.
15    Q.  Please turn to the next page.
16    A.  Uh-huh.
17    Q.  It says in the first full paragraph
18 there:  "At closing Southern shall pay Eber in cash
19 the purchase price less, (i), an amount to be
20 allocated to the restrictive covenants."
21       Do you see that?
22    A.  Uh-huh.
23    Q.  What was the amount being referred to
24 there?
25    A.  I don't specifically recollect what

8 (Pages 26 - 29)

Page 30

1 amount that was.
2     Q.  Is it typical to enter into restrictive
3 covenants with companies when you are acquiring their
4 assets?
5     A.  Absolutely.
6     Q.  If you look at, I believe it's the next
7 page, section 5.
8         It says "Eber, you", and I will note for
9 the record that this letter is addressed to Lester
10 Eber.
11         It says:  "Eber, you, and each of the
12 current shareholders, owners and affiliates of both
13 EBWLC and Eber NDC will enter into restrictive
14 covenants."  Do you see that?
15     A.  Yes.
16     Q.  Do you know why -- let me start back.
17 Was this requirement for numerous restrictive
18 covenants, including one with EBWLC, is something
19 that remained part of the deal or was changed before
20 it was ultimately finalized?
21     A.  I believe there were restrictive
22 covenants right through all the transactions,
23 including the -- the consulting agreement I believe
24 also had a restrictive covenant in it.
25         You know, when we were coming in and

Page 31

1 paying substantial amounts of a money to a business,
2 for a business we want to make sure that this
3 business and the key people don't resurrect
4 themselves and start competing with us.
5     Q.  It is fair to say you understand that
6 EBWLC, Eber Brothers Wine and Liquor Corporation, was
7 the parent company that had a number of affiliates,
8 including an entity that operated in the metro area
9 and interests in Ohio and Delaware?
10     A.  I never had a full understanding of the
11 full organizational structure, so I can't say yes to
12 that question.
13         I know that they were all interrelated.
14 I had no idea of what the ownership was of each of
15 them or if they were individually owned or owned
16 separately.
17     Q.  Do you know why no restrictive covenant
18 was ultimately entered into between EBWLC and
19 Southern?
20     A.  I have no idea, but I would like to
21 clarify that.  I have no idea if there really was one
22 or the there wasn't one entered into.
23     Q.  So if there was one not entered into you
24 don't know why that wouldn't be the case?
25     A.  Absolutely not, no.

Page 32

1     Q.  Can you think of any reason why Southern
2 would have agreed not to impose a restrictive
3 covenant on EBWLC or other Eber entities?
4         MR. CALIHAN:  Objection to form.
5         MR. RAMSEY:  Form.
6         THE WITNESS:  I would have no idea.
7 BY MR. BROOK:
8     Q.  Why did you want to have a restrictive
9 covenant with Lester Eber specifically?
10     A.  Well, again, as we learned a lot we
11 learned that the -- we made the right decision, first
12 of all, by trying to make a deal with Lester and the
13 Eber companies because their reputation really did
14 precede itself and had created this business image
15 that was counter to what I will say the other
16 competition was, the big competition, our
17 competition.
18         So if you use that as the foundation and
19 again, we have learned now, we were there for a few
20 years, we said we don't want this guy or any of his
21 companies in any format coming back and competing
22 with us.
23     Q.  Turning to section 6, that describes how
24 Lester Eber will enter into a consulting agreement.
25 Do you see that?

Page 33

1     A.  Uh-huh.
2     Q.  That's a yes?
3     A.  Yes.  Excuse me.
4     Q.  And it says in item B the annual
5 compensation will be $500,000.  Do you see that?
6     A.  Yes.
7     Q.  How was that amount determined?
8     A.  The same -- I'll repeat the same answer.
9 We're into this state -- we're in this state now
10 since '04, very weak still in upstate, many needs and
11 we truly assessed what we would have to spend for
12 these resources and knowledge that, you know, we
13 valued.  We valued in entering an agreement with
14 Lester.
15     Q.  Was the amount of compensation ultimately
16 agreed to be paid to Lester Eber higher than the
17 $500,000 reflected in this letter of intent?
18     A.  Yes.
19     Q.  Why did the amount increase?
20     A.  You know, that's an excellent question
21 and I think the answer is that when this part of
22 the transaction was first envisioned, this was kind
23 of like a New York-centric part of the deal, you
24 know.
25         As it evolved -- as it really evolved, it

9 (Pages 30 - 33)

Page 34

1 became a much larger deal, so I believe the
2 consulting here of $500,000 was really before it
3 evolved into buying the other operations in Ohio and
4 Delaware and we had fully, fully expected to and
5 assumed that we would have to be using Lester on a
6 broader scale as it came.
7        So I believe the $500,000 in the final
8 iteration of this went to a number like $600,000 and
9 we believe we got the best -- from the business
10 standpoint, it wasn't New York-centric.  Now we had
11 other states that we were going to use Lester in.
12    Q.   And did Lester ultimately provide
13 consulting services outside of New York?
14    A.   On a limited basis.  On a limited basis
15 in a transition role.
16    Q.   For approximately how long did he provide
17 consulting services outside of New York?
18    A.   I would have to say -- I don't really
19 recollect because we -- the structure of each of his
20 other deals like this -- we had like, for instance,
21 Postiy in Ohio.  We kind of relied on what we found
22 when we got there, is knowing what you don't know.
23        We found when we got there they had a
24 relatively good management group there so we didn't
25 really have to rely as much on Lester because it's

Page 35

1 simplicity of the business also, mostly a brokerage
2 business and in Delaware one of Lester's partners,
3 again, very smart from our standpoint, eventually and
4 still to this date is our landlord, you know, of the
5 building, a gentleman by the name of Ed Stegmeir.
6        Having that continuity of Lester Eber in
7 our stable of consultants having his partner --
8 ex-partner in the marketplace just made for a good
9 transition.
10    Q.   Did Southern retain Ed Stegmeir?
11    A.   No, I don't believe -- maybe for a short
12 period.  I don't really remember.  Again, he's our
13 landlord.
14    Q.   And he wants you to be able to pay the
15 rent?
16    A.   He wants us to be able to pay the rent,
17 in a terrible building.
18    Q.   He won't see that.
19    A.   On a triple net lease.  Yeah, please
20 don't let him see that.
21    Q.   With respect to Lester Eber, why did you
22 believe that he was qualified to provide the
23 consulting work that you needed?
24    A.   Well, some of it was some instinct.  Some
25 of what we learned -- you ask me good questions, by

Page 36

1 the way.
2        Some of it is what we learned after we
3 bought the business and when we were fortunate enough
4 to get some of the key middle management people and
5 senior people into our organization, we quickly
6 figured out that they were sheerly commercial
7 people.
8        They had absolutely -- they kind of
9 understood the inside of the New York business really
10 pretty well, which is important, don't get me wrong,
11 but they had no knowledge of the outside part of the
12 business, what I will call the operational part for
13 us which is very, very, very important, because we're
14 such a heavily regulated industry and we do nothing
15 without somebody yelling at us or fining us.
16        You know, they had no knowledge, the
17 salespeople we hired, so we had this gap of
18 institutional upstate New York knowledge that covered
19 everything from people to operations, to ways of
20 working, to legislative affairs to -- you know, there
21 is this group called the SLA, I call them something
22 else, which is the State Liquor Authority, which
23 heavily regulates us.
24        That in itself is -- the old statement
25 dealing with city hall, it's ten times worse.  They

Page 37

1 had no knowledge and we were -- we were under -- I
2 don't want to say under attack, but we needed that
3 knowledge.  I would have to say we recognized the
4 value of our bargain after we bargained.
5    Q.   So at some point after the initial
6 bargaining was it specifically added to the
7 consulting relationship that Lester Eber would act on
8 interfacing with governmental affairs?
9    A.   Again, if I remember correctly we made
10 that consulting agreement as broad as we could and
11 then we threaded the needle as many times as we can
12 in terms of expanding it.
13    Q.   Was Southern expecting Lester to continue
14 doing work that was essentially the same kind of work
15 he had been doing when he had been in charge of Eber
16 Brothers?
17    A.   I don't know.  I can only assume the work
18 that he did when he was in Eber Brothers.  I can't
19 really answer that.
20        I know what our intentions were for
21 Lester, you know.
22    Q.   So is it fair to say that you wanted
23 Lester to use the experience and skill that he had
24 acquired through Eber Brothers to help Southern?
25        MR. RAMSEY:  Form.

10 (Pages 34 - 37)

Page 38

1      THE WITNESS:  Well, I'm going to answer
2  it this way.  We didn't want Lester to interfere
3  in our brand building and our selling ways.
4      We had far surpassed what Eber had done
5  in terms of what I will call marketplace sort of
6  things, sort of actions.
7      We utilized Lester for those issues that
8  were out of market, let's say, to the necessarily
9  the business of the business of going into a
10  customer and selling them a bottle and have the
11  customer pay.  We know how to do that.  We know
12  how to do that really pretty well.  It was all
13  the things, the environment that we did our
14  business in.
15  BY MR. BROOK:
16      Q.  When it comes to having evaluated Lester
17  Eber and his qualifications to serve as a consultant,
18  were you made aware of the Eliot Spitzer
19  investigation into Eber Brothers and other
20  distributors that had occurred?
21      A.  Absolutely.
22      Q.  And what had been disclosed to you about
23  what Lester Eber and his company had been doing that
24  was being investigated?
25      A.  I'm going to look at my counsel because

Page 39

1  we were also part of that investigation.  Every
2  wholesaler was part of that investigation.
3      For those of us who are old enough to
4  know Mr. Spitzer, he did not discriminate.  He went
5  after an industry, he did not go after an individual
6  and we were involved in it and I am not really
7  prepared to talk about that, those days.
8      MR. ACKERMAN:  Just stick with the
9  question on what you knew about Mr. Eber's.
10  BY MR. BROOK:
11      Q.  I'm just staying focused on Mr. Eber.
12      A.  Specifically I knew nothing about it.  I
13  was dealing with Mr. Spitzer myself.
14      Q.  So did Lester Eber disclose to Southern
15  that he had, in fact, authorized kickbacks?
16      MR. RAMSEY:  Form.
17      THE WITNESS:  To my knowledge, no.  I
18  think every wholesaler was dealing with
19  Mr. Spitzer and their own issues.
20      It's Spitzer still alive?
21      MR. RAMSEY:  He's alive.  I'm not sure
22  where he is, but he's alive.
23  BY MR. BROOK:
24      Q.  So many jokes, so inappropriate for the
25  transcript.

Page 40

1      A.  Get it out.
2      Q.  Have Lester Eber's responsibilities as a
3  consultant changed since the beginning in 2007 and
4  2008?
5      A.  I would have -- what are the dates
6  again?
7      Q.  At the beginning, in 2007/2008, what were
8  Lester Eber's day-to-day responsibilities for
9  Southern?
10      A.  I guess, you know, I would describe it,
11  and I will go into as much detail as you want, in the
12  early days they were very broad, covered a lot of
13  different topics.
14      Now they're narrower but much deeper as
15  we matured as an organization and our needs became a
16  lot more finite.  In the early days, and this comes
17  from my firsthand knowledge and my dealing with it,
18  it was everything from where our facility should be
19  placed, what do you know about this union workforce,
20  you know, what about the trading practices.
21      It was wide ranging in the beginning
22  because, as I described, the Eber personnel we hired
23  were salespeople, so I had no context on the
24  operations and the culture of upstate New York and I
25  relied tremendously on what I saw as a neutral source

Page 41

1  to give me some advice.
2      So you go from the spectrum what I
3  describe as wide from hey, Lester, where do you
4  believe we should put our warehouse?  Now, I went to
5  school in Buffalo, okay, so I know upstate New York
6  but I don't know upstate New York.
7      I loved it up there but I know that
8  Lester lived in Rochester, which I think is a little
9  bit east of Buffalo, if I remember correctly, but we
10  knew we had to close all the warehouses we have one
11  warehouse in the state and I basically -- I was going
12  to make my own decision, hey, Lester where do you
13  think we should put our pinpoint, so that's a good
14  example of a broad thing, but then let's get into the
15  wider thing.
16      I think what we were also seeing -- and
17  you raised the thing about Spitzer and regulations.
18  I think we found ourselves as a tremendous deficit,
19  both in Metro and upstate New York, in terms of what
20  I will call our legislative strength, our knowledge
21  of the politics of New York.
22      We do pretty well in Florida.  We do
23  pretty well in Texas.  In upstate New York, it's a
24  different world up there.  It's like one union leader
25  said to me, I don't care what you do, this is New

11 (Pages 38 - 41)

Page 42

1 York, we do it New York way, and that was the context
2 of everything that we tried to do in New York.
3        So I think an area that I personally
4 underestimated, but had really become the focal point
5 of what Lester does, forget the operations now, we
6 understand it.  Forget about the people.  Forget
7 about labor.  I'm on top of that.  I feel pretty good
8 that we're really pretty good.
9        But what's gotten very deep, what hasn't
10 changed is the government affairs, it's the SLA
11 regulatory environment that's politically charged and
12 you cannot handicap, you know.
13        I think those are really two, and I
14 believe that there is a point that no one
15 anticipated.  We have tried to pivot ourselves in a
16 very socially responsible way and in effect used a
17 lot of our business arguments to have Lester try to
18 frame in the social consequence of the alcoholic
19 beverage industry in Albany.
20        It's really now in that venue of
21 government affairs, lobbying, SLA regulatory that
22 Lester provides our organization the value.  All that
23 other stuff we're running our business.
24    Q.  So was it your understanding that Lester
25 Eber had experience in dealing with some of these

Page 43

1 legislative matters?
2    A.  Oh, absolutely.  Absolutely.
3    Q.  And he had that experience from his role
4 running the Eber Brothers company, correct?
5    A.  Again, I don't know what he specifically
6 did when he ran the Eber companies in each of the
7 states.  I don't, but it became very evident to our
8 people -- we're pretty experienced.
9        We didn't turn Lester loose without
10 watching Lester.  Even though we have other lobbyists
11 and we have other people, you know, we began to see
12 when Lester walked the halls of Albany, it wasn't
13 Mr. Eber, it was Lester.
14        You know, again, we're pretty
15 sophisticated that the relationships drive good
16 business decisions.
17    Q.  Was there a particular reason why the
18 consulting agreement was entered into with Lester
19 Eber personally rather than with Eber Brothers, the
20 company?
21        MR. RAMSEY:  Form.
22        THE WITNESS:  I can only answer that as
23        that it's a hundred percent typical that we
24        enter these things, you know, on what I will
25        describe as an individual and personal contract

Page 44

1 basis.
2        If God forbid something happened to one
3 of our consultants, why would I want to be bound
4 to a corporation for consulting?  These are
5 personal services.  God forbid something
6 happens, again, to any one of these consultants,
7 their value is diminished.
8        No, I would never enter -- again, these
9 are personal services.
10 BY MR. BROOK:
11    Q.  You were aware when you entered into the
12 consulting agreement with Lester, that Lester was
13 going to continue to manage a wine and liquor
14 distributorship in Connecticut and Rhode Island
15 potentially too, correct?
16    A.  Well, the answer is we passed on the
17 ability to buy those operations.  We assessed the
18 value to our organization, so we passed on it and I
19 don't think -- by having the right to buy it and
20 passing on it, it was our assumption he was going to
21 continue it and, to be very honest, I have no idea
22 what went on in Connecticut right now, we're not in
23 Rhode Island right now, we never saw it as a creed to
24 our business.  I don't even know if he has a business
25 there.

Page 45

1    Q.  Was it typical for -- you mentioned other
2 consulting agreements, those are personal contracts.
3        Can you think of any other instance where
4 there was a consulting contract with someone who was
5 a former executive of a company that Southern
6 acquired and that person continued to manage a wine
7 and liquor distributorship?
8        MR. RAMSEY:  Form.
9        THE WITNESS:  I have no recollection of
10        that.  I really don't.
11 BY MR. BROOK:
12    Q.  Is it fair to say that at least on
13 Southern's part -- I don't want to know what advice
14 was given, if there was any, but there was no
15 question raised about whether it would be legal for
16 Lester Eber to receive consulting payments directly
17 from Southern while continuing to be a manager of a
18 wine and liquor distributorship?
19        MR. RAMSEY:  Form.
20        THE WITNESS:  That's kind of like more of
21        a legal.  I would imagine that as long there is
22        not a conflict of interest or conflict of duty
23        in his consulting that we would not have a
24        problem.  There are a lot of consultants that
25        have a lot of other clients.

12 (Pages 42 - 45)

Page 46

1      We were more focused on the business of
2   originally Ohio, Delaware and New York and that
3   would have been our focus.  If he had other
4   relationships unrelated to us --
5   BY MR. BROOK:
6      Q.  So when you say conflict of interest, you
7   are referring to interests or duties with respect to
8   Southern, right?
9      You weren't concerned about whether he
10  would be breaching a duty to this other company?
11     A.  I wouldn't know.
12     MR. RAMSEY:  Form.
13     THE WITNESS:  I wouldn't know.
14  BY MR. BROOK:
15     Q.  I was just trying to clarify.
16     A.  No, that's where I was going.  I would
17  not know.
18     MR. RAMSEY:  Brian, is this a good spot
19  to take two minutes?
20     MR. BROOK:  Sure, we can do that.
21     (Thereupon a brief recess was taken,
22  after which the following proceedings were had.)
23  BY MR. BROOK:
24     Q.  I want to return to still looking at
25  Exhibit 93, same page.  The provisions regarding the

Page 47

1   consulting agreement, Section D, I want to look at
2   the last line there.
3      It says: "Southern will have the right
4   to reduce or eliminate your duties, so long as full
5   payment described in 6(B) is made during the term."
6   Do you see that?
7      A.  Uh-huh.
8      Q.  Is that yes?
9      A.  Yes.
10     Q.  Why was that provision part of this
11  agreement?
12     MR. ACKERMAN:  Let me give you an
13  instruction.  If that question calls upon you to
14  divulge the content of communications with
15  counsel, then I ask you to leave that out of
16  your answer.
17     If you can otherwise answer that based
18  upon discussions with Mr. Eber or your own
19  thinking, you can answer that.
20     THE WITNESS:  Understood.
21     MR. ACKERMAN:  Thanks.
22     THE WITNESS:  Understood.  I believe I
23  answered that previously, it gave us full
24  control of what we wanted Lester to do or not in
25  terms of our business.

Page 48

1      We had really -- at this point, you know,
2   it was dating.  There was nothing there, so we
3   wanted to have the ability as we ramped up our
4   own people or our own capabilities to say okay,
5   we don't need you to do this now.  It was
6   control for me of the relationship.
7   BY MR. BROOK:
8      Q.  So is it typical to have in these sorts
9   of acquisition situations a consulting agreement
10  where the consulting fee may be paid even though no
11  services are being rendered?
12     MR. RAMSEY:  Form.
13     THE WITNESS:  It was never our intention
14  for doing it that way.  Ours was to control the
15  relationship.  We always envisioned a set or
16  subset, of when I describe wide versus narrow
17  and deep, that's what we -- eventually
18  happened.
19     I don't know if we ordained it that way
20  or we just believed it but we thought the
21  relationship would continue and evolve.  We
22  wanted to have control of it.
23  BY MR. BROOK:
24     Q.  So the initial contract with Lester Eber
25  was for a five year period, correct?

Page 49

1      A.  Yes.
2      Q.  Then it also locked him up in terms of
3   the restrictive covenant for another five years after
4   that, correct?
5      A.  Yes.
6      Q.  After the initial five year period did
7   Southern enter into new consulting agreements with
8   Lester Eber so he would be paid more money after that
9   point?
10     A.  We negotiated with Lester.  This initial
11  agreement, I believe this five year period ended in
12  2012.  Yeah, from '07 to '12.  Yes, we entered
13  negotiations with Lester and, again, I remember them
14  and we narrowed his responsibilities and we cut his
15  consultive pay down significantly.
16     Q.  What was the amount of pay that you
17  agreed on in 2012?
18     A.  I believe it was -- we cut him back 50
19  percent.  I believe it went from a monthly of 50 on
20  the first agreement from the '07 to the '12 agreement
21  from 50, to 25 going forward.
22     Q.  Just so we're sure we're clear on the
23  record here, I'm going to show you what was
24  previously marked as Plaintiff's Exhibit 27.
25     A.  Uh-huh.

13 (Pages 46 - 49)

Page 50

1     Q.  I have a few copies here.
2         MR. ACKERMAN:  Thank you.
3  BY MR. BROOK:
4     Q.  Do you recognize this document?
5     A.  Yes.
6     Q.  Is this the consulting agreement that was
7  entered into in 2007 with Lester Eber?
8     A.  Yes.
9     Q.  When the consulting agreement was
10 renegotiated in 2012 was there any similar such
11 documentation prepared at that time?
12    A.  At this point -- at this point we decided
13 it was better that it was a totally at will
14 agreement.
15        You know, again, for us it was to have
16 what we thought was control of the relationship.  We
17 understood that he is still bound by the covenant
18 that he had, as long as it was mutually satisfactory
19 to us.
20        I know Mr. Eber is in the room so it's
21 little uncomfortable but we had already started to
22 build some resources to plan for the transition, you
23 know, of certain of the responsibilities, some work,
24 some hadn't worked.  We wanted to have greater
25 control and not be bound long term by anything.

Page 51

1     Q.  Is that consulting relationship
2  continuing today?
3     A.  Yes.
4     Q.  Is it at the same amount of $300,000 a
5  year?
6     A.  Yes.
7     Q.  And the restrictive covenant ended in
8  2017; is that correct?
9     A.  It would have been -- yeah.  Yes.
10    Q.  So you have not sought to renew that
11 restrictive covenant?
12    A.  No.
13    Q.  Why not?
14    A.  We're fully established.  We believe that
15 any threat that we could have with Lester joining a
16 competition right now is negligible.
17        Again, we're fully established and
18 running our commercial business up there.
19    Q.  You're aware that the consulting
20 agreement required up to 40 hours a week from Lester
21 Eber, correct?
22    A.  Yes.
23    Q.  Do you know how many hours a week on
24 average Lester Eber put in for Southern during the
25 initial five year period of the consulting

Page 52

1  relationship?
2     A.  No.
3     Q.  Do you have any sense of what that number
4  might be ballpark?
5     A.  I would just be speculating.  I would
6  think some weeks it could be more, some weeks it
7  could be less.  It was on call, on duty.
8     Q.  Were there some weeks when there was no
9  work being done by Lester?
10        MR. RAMSEY:  Form.
11        THE WITNESS:  I could not say that.  I
12 can't say that.
13 BY MR. BROOK:
14    Q.  Who was involved in being the primary
15 interface with Lester Eber for his consulting duties?
16    A.  On two levels I mentioned both names.  On
17 a day-to-day level it would have been our general
18 manager, a gentleman who I mentioned, Mr. Larry
19 Goodrich.  He was the primary leader of the
20 day-to-day of our entire New York State operation,
21 one of the people that I did speak to that I had
22 mentioned, and he would have worked very, very
23 closely with Lester in the early days of this -- of
24 the transaction moving right now almost until current
25 as -- as Mr. Goodrich's responsibilities are just

Page 53

1  recently transitioning there will be another group of
2  leaders.
3     Q.  Now, Lester Eber was given the role of
4  senior vice president or the title of senior vice
5  president, correct?
6     A.  Uh-huh.  Yes.
7     Q.  Why was that?
8     A.  More of a -- first of all, I've never
9  seen him use this title.  I think it was more of a --
10 how can I describe it?  More of an ego introduction
11 sort of moniker for Lester to have.
12    Q.  So was it in part so that he could wear
13 the hat of being an agent of Southern when he
14 interacted with third parties?
15    A.  I think to the contrary.  I think the
16 world knows Lester as a registered lobbyist and, you
17 know, I think that independence to us works to our
18 advantage.
19        I do believe, as I said, I don't ever
20 remember seeing Lester using that title.  You know, I
21 can't really remember how it evolved from the
22 agreement or if it's actually really in place.
23    Q.  As part of the consulting agreement
24 Lester Eber was entitled to reimbursement for
25 expenses, correct?

14 (Pages 50 - 53)

Page 62

1 believe that's the lobbying services fee that is paid
2 to Lester, yes.
3     Q. So when did Lester first become a
4 lobbyist for Southern?
5     A. I believe that it was somewhere when --
6 again -- let me answer by just saying I am not
7 certain, but I believe it really came at this period
8 of time when he started to be without -- you know,
9 underneath the initial agreement, on the second one
10 and not necessarily -- but underneath the new
11 agreement.
12         So I would have to say it probably is
13 around this period of time, but I would be
14 speculating.
15     Q. And so this $10,000 fee is paid in
16 addition to the $300,000 consulting fee, correct?
17     A. Yes.
18     Q. And how were those amounts determined, in
19 terms of the proportion for one versus the other?
20     A. I'm not really certain. I'm not really
21 certain. I don't know but I have seen that amount as
22 a disclosed amount to the State of New York as a
23 lobbyist fee too, so it was a -- I have no idea. I
24 have no idea how that one was ascertained.
25     Q. Has the State of New York been informed

Page 63

1 that Lester Eber is also receiving a consulting fee
2 of $300,000 a year from Southern?
3     A. I don't know. I don't know if that's a
4 required disclosure. If it was, I'm sure we did.
5     Q. Let's go to a new exhibit. We will mark
6 this one 95.
7         (The document referred to was thereupon
8 marked Plaintiff's Exhibit 95 for Identification, a
9 copy of which is not attached hereto.)
10 BY MR. BROOK:
11     Q. Do you recognize this document that's
12 been marked as Exhibit 95? I will just note for the
13 record it bears Bates numbers EB644 through 652.
14     A. I don't remember seeing this.
15     Q. Do you see it appears to be a restrictive
16 covenant entered into on the 30th day of November
17 2007 between Lester Eber and Southern Wine and
18 Spirits of America? Do you see that?
19     A. Yes.
20     Q. You are aware that there is a restrictive
21 covenant contained in the consulting agreement
22 between Lester and Southern, correct?
23     A. Yes.
24     Q. Do you know why there was a separate
25 restrictive covenant executed by Lester Eber in

Page 64

1 addition to the one that appears in the consulting
2 agreement?
3     A. No.
4     Q. Can you think of any reason why that
5 might have been done?
6     MR. RAMSEY: Form.
7     THE WITNESS: I don't know.
8 BY MR. BROOK:
9     Q. Going back to 2007 after the initial
10 letter of intent regarding the purchase of New York
11 assets, you mentioned that there were discussions and
12 ultimately acquisitions of some of Eber Brothers'
13 interests in other states. Specifically Delaware and
14 Ohio were acquired, correct?
15     A. Correct.
16     Q. And is it correct that there was also at
17 one point at least a preliminary agreement for
18 Southern to acquire a 15 percent stake in Eber
19 Connecticut?
20     A. Yes.
21     Q. What was the reason for that part of the
22 transaction?
23     A. We wanted to -- there was two parts of
24 it. At that point in time, if I remember correctly,
25 we wanted as much security as we could for the monies

Page 65

1 that were being advanced to get it done and we saw
2 this was an asset that we could secure ourselves and,
3 as I believe I noted before, we had no idea what 15
4 percent of Connecticut meant. We had done no due
5 diligence. We had done nothing.
6         Connecticut sounds like a nice state. We
7 really took it more as a -- what I will say as a
8 security interest for the deal and if it worked out
9 and made sense, which it didn't really make sense, we
10 would have gone forward.
11     Q. So why did that part of the transaction
12 ultimately not go forward?
13     A. We didn't see it really having a creed of
14 value. We don't really like -- not that we don't
15 like partners. We don't really do well with partners
16 long term and when you're a minority partner it often
17 doesn't work out right and 15 percent -- maybe I
18 could wince at 49 percent or 51 percent, but 15
19 percent is a weak partner, so we -- what we
20 understood, which was limited, we decided it wasn't
21 what we wanted to do.
22     Q. Now, Southern, did it also agree to give
23 a loan to Eber Connecticut at some point or to
24 another Eber entity?
25     A. There were a number of, I will call them

17 (Pages 62 - 65)

Page 66

1 advances. There were a number of advances done to
2 what I can describe as keeping the Eber entities
3 themselves afloat while an orderly transaction was
4 being maintained.
5        So one of -- one that I remember clearly
6 was with a trucking company where, you know, as we
7 understood it, we advanced money for this trucking
8 company. I'm not sure if it was a relationship. I
9 think it was called GT or GP Trucking or something
10 like that.
11    Q.   General Trucking Company?
12    A.   Yes, GT, where we advanced them money so
13 they don't repossess the trucks that would have ended
14 the business.
15        It was -- you know, then we took that
16 advance, which -- we took that advance and we ended
17 up credited against the total purchase.
18    Q.   That was $1.5 million that was advanced
19 early on after the letter of intent; does that sound
20 about right?
21    A.   Somewhere in that period of time, yes,
22 sir.
23    Q.   Were you made aware of how much Eber
24 Brothers had paid to acquire Slocum & Sons, the
25 Connecticut operation?

Page 67

1    A.   No, not I. I had no idea.
2    Q.   So even though it wasn't consummated, at
3 one point there was an agreement of some sort for the
4 acquisition of 15 percent of Eber Connecticut in
5 exchange for $3 million, correct?
6    A.   We had the right or the option -- I'm not
7 sure if there is a difference between the two but we
8 had the right or the option to do Connecticut.
9        I personally, nor my team at that time, I
10 can't recollect doing any due diligence around that
11 transaction. I think us passing on it was more of a
12 did it make sense for us commercially and from
13 suppliers and customers to invest any money there.
14    Q.   Are you aware that eventually that 15
15 percent interest was sold to another third party?
16    A.   No. No. Again, I don't know whatever
17 happened in Connecticut or Rhode Island.
18    Q.   Has Southern done business with Eber
19 Connecticut?
20    A.   Not to my knowledge. Possibly wholesaler
21 to wholesaler if we have common suppliers but that's
22 100 percent speculation. It would all be normal
23 business if we did. I have no idea.
24    Q.   Do you know whether Eber Connecticut has
25 imported wines that were then sold into the New York

Page 68

1 metro area through Southern?
2    A.   That would be a bad thing.
3    Q.   Why? Why do you say that?
4    A.   Because it's one of the things that
5 protects our industry, is that, you know, you are
6 giving distribution rights for a particular area.
7        It's one of the biggest things that we
8 try to do, so it would be undermining the
9 distribution rights. Now, if they sell items that I
10 don't represent, that could be my competitor's
11 business. You know, first of all, if it was legal
12 it's one thing and number two, you know, if I knew he
13 was selling my products that I have distribution
14 rights for and traditionally contracted with the
15 supplier I would not take it lying down. I would go
16 tell the supplier.
17    Q.   Do you know who David Eber is?
18    A.   Yes.
19    Q.   Who is David Eber?
20    A.   No. Excuse me, I don't know David Eber.
21 No, I thought you were going to say David Taub.
22 Excuse me, I take that back.
23    Q.   So you don't know Lester Eber's son
24 David?
25    A.   No, I've never met David.

Page 69

1    Q.   Do you know whether he was at some point
2 a Southern employee?
3    A.   No, I have no idea. I have no idea. We
4 have 22,000 employees.
5    Q.   So you don't know whether there were ever
6 discussions between David Eber and his father or
7 sister about having a business relationship between
8 Southern and some of the continuing Eber Brothers
9 entities?
10        MR. RAMSEY: Form.
11        THE WITNESS: Absolutely not.
12 BY MR. BROOK:
13    Q.   If Lester as part of the consulting
14 agreement had told you that he would agree to all the
15 terms, but the money should be paid to another Eber
16 Brothers entity rather than to him personally, would
17 that have effected your willingness to enter into the
18 agreement?
19        MR. RAMSEY: Form.
20        THE WITNESS: The answer is, you know,
21 subject to whatever my attorneys might have
22 said, I would have objected vehemently.
23        From what I was told these are personal
24 services sort of agreements that Lester -- at
25 the end of the day we viewed Lester having the

18 (Pages 66 - 69)

Page 70

1  value, not the older entity after they ceased --
2  after they ceased to exist, so I would have been
3  a very -- I would think most of the people in my
4  executive team would have been the same way.
5  The answer is no.  If that question was posed,
6  it's speculative, but I would answer it that
7  way.
8  BY MR. BROOK:
9      Q.   What if the contract included a personal
10 services guarantee that the contract would only
11 continue so long as Lester Eber was able to provide
12 the services that were being contracted for?
13     MR. RAMSEY:  Form.
14     THE WITNESS:  Again, I would go to my
15   attorneys and say is this going to accomplish
16   what I want or not.
17 BY MR. BROOK:
18     Q.   Let me ask you this way.  As long as it
19 accomplished what you described that you wanted did
20 you care who ultimately got the money, as long as you
21 got what you wanted from Lester?
22     MR. RAMSEY:  Form.
23     THE WITNESS:  Call me myopic if you want,
24   after a business is done, it's done.  We deal
25   with the individual.

Page 71

1      It's kind of historically what we have
2  done and what we have known.  When you work
3  through the halls of Albany they don't say hey,
4  mister, you know, Eber acquisitions.  It's kind
5  of like a personal thing.
6      We haven't given that up yet.  I can't
7  answer your questions if because, you know, I'm
8  not an attorney.  I'm the guy who has to run the
9  business and been basically taken advantage of
10 many times.  This gray hair didn't come here
11 just naturally, so I know who I do business
12 with.
13 BY MR. BROOK:
14     Q.   You said when business is done it's done
15 but as I mentioned before, and we have discussed, you
16 haven't had another situation where a consultant like
17 Lester for Southern has continued to operate a
18 business in some manner at the same time as he was
19 consulting with Southern, correct?
20     A.   To my recollection I never had a business
21 that competed with us in our same trading area.  I
22 don't know if we have ever had a successor consultant
23 who might have been in the industry doing something
24 unrelated to us.  I can't remember that.  But within
25 our trading area, I really can't think of one.

Page 72

1      Q.   Do you know whether Eber Brothers Wine
2  and Liquor Corporation continued to exist long after
3  it sold off its inventory and stopped as an operating
4  business?
5      A.   I have no idea what they have done
6  organizationally.
7      Q.   What was your understanding as to who the
8  owners were of Eber Brothers Wine and Liquor Corp.?
9      A.   I have no idea.
10     Q.   Were you aware that Lester was a trustee
11 of a trust that owned the Eber Brothers Wine and
12 Liquor Corp.?
13     A.   No.
14     Q.   Were you made aware of that as part of
15 your preparation for the testimony today?
16     A.   No.
17     Q.   You were aware that Eber Brothers Wine
18 and Liquor Corp. had pension liabilities, correct?
19     A.   We didn't -- we traditionally did not
20 assume pension liabilities.  That's the black hole of
21 assumption.
22      In the acquisitions that we have done in
23 the past -- I'm being specific.  In multiple
24 acquisitions we have done to assume a pension
25 liability is very few and far between, especially in

Page 73

1  certain states, like New York, where some of the
2  pension liabilities could be very big.
3      Unless we can define them.  Unless we can
4  really define them.
5      Q.   Do you know what happened in terms of
6  Eber Brothers' ability to pay its pension
7  liabilities?
8      A.   No.  No.
9      Q.   Was Southern at some point in time in
10 2012 made a party to a civil action in New York
11 Supreme Court in connection with the transfer of
12 assets belonging to Eber Brothers Wine and Liquor
13 Corp.?
14     A.   In 2012?
15     Q.   Yes.
16     A.   The only -- the only real action that I
17 remember was when we were sued by Eber, Lester, the
18 company for, I think your word was poaching.  My word
19 was more taking the employees coming to us.  That's
20 the only action that I really remember.
21     Q.   So were you aware that at some point
22 Lester Eber had foreclosed on certain assets that
23 belonged to Eber Brothers Wine and Liquor Corp. and
24 had been required to name Southern as a party to that
25 action?

19 (Pages 70 - 73)

Page 1

```
 1      UNITED STATES DISTRICT COURT
 2      SOUTHERN DISTRICT OF NEW YORK
 3      _____
 4
 5      DANIEL KLEEBERG, LISA STEIN, AND
        AUDREY HAYS,
 6
 7                   Plaintiffs,
 8
                     -vs-
 9      LESTER EBER, ALEXBAY, LLC, F/K/A LESTER EBER, LLC,
        ESTATE OF ELLIOT W. GUMAER, JR., AND WENDY EBER,
10
11                   Defendants,
12
        and
13
        EBER BROTHERS & CO., INC., EBER BROS. WINE & LIQUOR
14      CORP., WINE & LIQUOR METRO, INC., EBER-CONNECTICUT, LLC,
        EBER-RHODE ISLAND, LLC, EBER BROS. ACQUISITION CORP.,
15      EBER-METRO, LLC, SLOCUM & SONS OF MAINE, INC., AND
        CANANDAIGUA NATIONAL BANK & TRUST COMPANY,
16
17                   Nominal Defendants.
        _____
18
                     Deposition of FRANK TORCHIO, held pursuant to
19      Article 31 of the Civil Practice Law and Rules, at
        Underberg and Kessler, 300 Bausch and Lomb Place,
20      Rochester, New York, on the 23rd day of August, 2019,
        commencing at 9:30 a.m., before Leah Didsbury Reporter,
21      Notary Public.
22
23
24
25
```

Page 2

1    APPEARANCES:
2
3    BROOK & ASSOCIATES, PLLC
     BY: BRIAN C. BROOK, ESQ.
     100 Church Street, 8th Floor
4    New York, New York 10007
     Appearing for the Plaintiffs
5
6    UNDERBERG & KESSLER, LLP
     BY: COLIN D. RAMSEY, Esq.
7    50 Fountain Plaza, Suite 320
     Buffalo, New York 14202
8    cramsey@underbergkessler.com
     Appearing for the Defendants
9
10   CALIHAN LAW, PC
     BY:  ROBERT CALIHAN, ESQ.
11   620 Reynolds Arcade Building
     16 East Main Street, Suite 620
12   Rochester, New York 14614
     rcalihan@calihanlaw.com
13   Appearing for the Gumaer Estate
14
     WOODS, OVIATT, GILMAN
15   BY: ERIN ELMOUJI, ESQ.
     1900 Bausch and Lomb Place,
16   Rochester, New York 14604
     eelmouji@woodsoviatt.com
17   Appearing for Canandaigua National Bank & Trust Company
18
     Also Present: John Herbert (telephonically)
19        Patrick Martin
20
21
22
23
24
25

Page 3

1         INDEX TO WITNESS
2
             PAGE
3    FRANK TORCHIO
         EXAMINATION BY MR. BROOK    5-200
4
5
6         INDEX TO EXHIBITS
          (Retained by counsel)
7
8    EXHIBITS       DESCRIPTION          PAGE
9    Exhibit 126   Expert report          8
10   Exhibit 127   Glenn Liebman report    16
11   Exhibit 128   Drawing                30
12   Exhibit 129   Eder-Goodman transaction   41
13   Exhibit 130   Letter to Vincent DeBella   80
              from Wendy Eber
14
     Exhibit 131   Letter to Wendy Eber from   194
15         Mike Gallagher
16
17        REQUESTS
18   DOCUMENT             PAGE    LINE
19   Bruner site            45     16
20   Citations for number      174    10
21
22
23
24
25

Page 4

1         COURT REPORTER:  Do you want him to read and
2    sign?
3         MR. RAMSEY:  Yes, please.
4         COURT REPORTER:  Usual stipulations?
5         MR. RAMSEY:  Other than read and sign,
6    that's fine.
7         MR. BROOK:  Actually, I don't as a matter
8    of -- I've always been trained don't as a matter
9    of what I've always been trained to do, agree to
10   usual stipulations, because it seems everywhere
11   usual stipulations means something different.  I
12   agree to the federal rules of civil procedure
13   governing this deposition.
14        MR. RAMSEY:  That's fine.
15   (Whereupon, the following stipulations were entered into
16   by the respective parties.)
17
18   It is hereby stipulated by and between counsel for the
19   respective parties that the oath of the referee is
20   waived, filing and certification of the transcript are
21   waived, and all objections, except as to the form of the
22   question, are reserved until the time of trial.
23        FRANK TORCHIO,
24   of Rochester, New York, having been first duly sworn, was
25   examined and testified as follows:

Page 5

1    EXAMINATION BY MR. BROOK:
2         Q.  Good morning.  This is not your first time
3    being deposed, correct?
4         A.  Correct.
5         Q.  Is there anything about how this deposition
6    works that you would like to go over before we begin?
7         A.  I don't think so.
8         Q.  When is the last time you were deposed?
9         A.  Let's see.  I think it was in May of this year.
10        Q.  All right.  So if any issues come up, usually
11   the biggest one is just talking over each other.  I
12   sometimes am a little slow to get out my question.  I am
13   sure the court reporter will let us know, but that's just
14   human nature.  So what is your understanding of what this
15   lawsuit is about?
16        A.  Well, my understanding of my involvement in
17   this lawsuit is to valuation, principally of
18   Eber-Connecticut, the operating company that is owned by
19   Eber-Metro, in turn owned by Eber Wine and Liquor.
20        Q.  Or was owned by Eber Wine and Liquor, rather?
21        A.  Sorry.  That was correct.  Was owned at that
22   time.
23        Q.  And do you understand this lawsuit is largely
24   about whether the transfer of Eber-Metro from Eber Wine
25   and Liquor to Alexbay was a valid transaction?

2 (Pages 2 - 5)

Page 70

1   predicated on my valuation of Connecticut.
2     Q.   Right.  I am just looking at your report
3   Paragraph 1.  I have been asked to provide an opinion
4   regarding the market value of equity of the capital stock
5   of Eber Brothers Wine and Liquor Metro, Inc. as of May
6   23, 2012.
7     A.   Right.
8     Q.   But in your view, the work you were focused on
9   was just the Eber-Connecticut asset; is that right?
10     A.   If you go further, I think I actually state
11   this.
12     Q.   I don't think there is a dispute here.  I am
13   going to you know, I guess, what I am trying to
14   understand a little better, you know, if you're really
15   saying you were focused on Eber-Connecticut, then that
16   would make sense as to why you did not spend much of your
17   report analyzing the liabilities involved here.
18     A.   If you look at Paragraph 4, that puts my
19   analysis in perspective.  So it builds up from that
20   valuation.  That's the valuation.
21     Q.   Right.
22     A.   There is no operating asset at Metro.  There is
23   no operating asset at Wine and Liquor.  The only
24   operating asset is their ownership of Eber-Connecticut.
25   So all the valuation work I did revolved around

Page 71

1   Eber-Connecticut.
2     Q.   Right.  And then -- but you also valued
3   Eber-Metro and Eber Wine and Liquor to the extent that
4   you said it was they were insolvent no matter what the
5   value of Eber-Connecticut was, right?
6        MR. RAMSEY:  Form.
7     A.   I wouldn't say it that way.
8     Q.   No matter which valuation of yours you used for
9   Eber-Connecticut, right?
10     A.   My opinion is that the value of
11   Eber-Connecticut was plus any other assets of Metro and
12   Wine and Liquor were less than the liabilities.
13     Q.   And do you understand why it is that I am
14   drawing a distinction between Eber-Metro and Eber
15   Brothers Wine and Liquor for the liabilities?
16     A.   You know, I have a vague understanding that
17   it's some kind of legal machination that's going on here.
18   From my perspective as an economist, what I am looking at
19   is what I think is relevant is what the heck is the value
20   to these ultimate -- the beneficiaries of this trust.
21   And in order to do that, you've got to go up the chain of
22   command.  Now, I understand there is some reason why it's
23   important to assess Metro vis-à-vis Wine and Liquor.  I
24   don't pretend to understand that.  It doesn't make
25   economic sense to me.  If it doesn't make economic sense,

Page 72

1   then it must be some kind of legal stuff that's going on
2   here that allows you to put a wedge between Wine and
3   Liquor -- put a wedge between Wine and Liquor that
4   ultimately puts a wedge between what the beneficiaries of
5   the trust really own.
6     Q.   Right.  I think -- let me help you put it in
7   perspective here.  So maybe we can have a more productive
8   discussion.  So Lester Eber foreclosed on debt that was
9   owned by Eber-Metro and guaranteed by Eber Wine and
10   Liquor.  And the company agreed to just give him
11   Eber-Metro.  And eliminate the debt to Eber-Metro too, as
12   a result.  So there is a legal question certainly as to
13   whether that was done for fair value.  Did Lester Eber,
14   given his fiduciary obligations and his various roles,
15   get more value by acquiring Eber-Metro through the amount
16   of his loans?  And so that's why drawing this line here
17   is fairly significant.  And do you understand at least
18   the general fact patterns as I described it?
19        MR. RAMSEY:  Form.  Go ahead.
20     A.   I am trying.
21     Q.   So would you agree that if Eber-Metro did not
22   have all of the liabilities for the pension and Harris
23   Beach that you mentioned on this chart here, then the
24   value of Eber-Metro would have been significantly higher
25   than the 3.8 million dollars in debt that you listed here

Page 73

1   that was owed to Lester Eber?
2        MR. RAMSEY:  Form.  Go ahead.
3     A.   When you say, "did not have," what do you mean
4   by that?
5     Q.   Equal that it was not legally -- at the time of
6   the transaction it was believed that Eber-Metro would not
7   be liable for any of those debts.
8     A.   So --
9        MR. CALIHAN:  Objection.
10     Q.   Let me sort of give you my take on this.  And I
11   mentioned to you before in one of your questions my
12   experience.  And again, putting myself in the position of
13   willing buyer with knowledge of all the relevant facts.
14   I know from experience that when you try -- when you try
15   to play a shell game with a PBGC about who was the
16   controlling entity and who owns what and where does this
17   liability set, you run an awful risk.  I have seen it
18   firsthand.  I worked in the case called White
19   Consolidate.  That is not unlike this where the company
20   itself tried to say this is not -- the pension is not our
21   liability.  It belongs to -- and they sold the company
22   and without the liabilities.  And did not have enough
23   money to pay those liabilities.  And said, well PBGC, you
24   pick up the rest.  And the PBGC said nuts to you.  We're
25   going after you.  This is fraudulent conveyance.  Now,

19 (Pages 70 - 73)

Page 74

1  that kind of knowledge is the kind of thing that any
2  individual investor would reflect. So you can tell me
3  well, you know, legally I've got a legal opinion that
4  says this these pension obligations don't -- have nothing
5  to do with Eber-Metro. And I can -- I feel fairly
6  confident that had they sold Eber-Metro and the proceeds
7  were not enough to cover the amount of that pension,
8  either the PBGC is going to say you can't do this
9  transaction or in the case that I have seen, they go
10  after the buyer. And say well, now you bought this.
11  Those liabilities are now on your books and you have more
12  assets than what you just bought because you merged with
13  Connecticut. So now you're on the hook to pay those.
14  And, you know, again, these kinds of quote hidden
15  liabilities are the kind of things that are affected in
16  the ultimate purchase price even if one is -- if a
17  purchase price is offered because they-re going -- a
18  buyer is going to price protect themselves. They're not
19  going to sit there and say, I got this great legal
20  opinion that is not going to be a problem. I can
21  separate the assets from this pension liability.
22     Q. But what if it actually happened in this case?
23     A. What if what actually happened?
24     Q. What if the buyer in this case, Alexbay because
25  it bought it by giving up debt, actually believed that by

Page 75

1  engaging in this transaction it would acquire Eber-Metro
2  free and clear of pension obligations, would that be
3  relevant to your analysis?
4        MR. RAMSEY: Form. Go ahead.
5     A. No. Again, if you go back to that paragraph, I
6  am talking about a willing buyer aware of the facts. You
7  seem to be focused on what is kind of referred to as
8  specific investigators valuation as opposed to a fair
9  market value. Again, we seem to be flipping over into
10  the process as to why something was done and was it done
11  for legitimate reasons. I am out of that. That's not my
12  right here.
13     Q. You have not made any opinion on whether in
14  this case because Lester Eber was a judiciary, his
15  opinion of the valuation would be relevant to this
16  litigation?
17        MR. RAMSEY: Form.
18     A. I don't know what the judge is going to
19  consider relevant or not relevant. I am telling you what
20  is relevant to my valuation is what I have done in this
21  report. You know, whether Lester thought that he could
22  skate on the PBGC, that's Lester's view. I am telling
23  you as a measure of fair market value under the
24  definition that I provided here an investor is going to
25  take into account those obligations for sure.

Page 76

1     Q. Are you sure that was the case in 2012? There
2  has been a number of elements of the law recently.
3     A. My involvement going back before 2012 -- I mean
4  look, I didn't -- I don't see anything that would
5  contradict that. The PBGC, as far as I can see, fight
6  like a dog when you try to hide, you know, or skirt and
7  force the PBGC to pay for or to be the trustee for
8  pension obligations. You know, you're in for a fight. I
9  guarantee that.
10     Q. To what extent in connection with your work in
11  this case did you become familiar with the fight that
12  erupted between PBGC and the Eber entities?
13     A. Well, you know, I familiarized myself with some
14  of the analysis that the PBGC did. And I think there was
15  a document that I saw that provided some kind of -- I
16  don't know. I guess call it a settlement of some kind.
17  I don't know if that's the right legal term. I read
18  those things.
19     Q. For this chart, the summary of liabilities, did
20  you consider whether there was other obligors beyond
21  Eber-Metro and Eber Wine and Liquor for any of these
22  debts?
23        MR. RAMSEY: Form.
24     A. No. I don't specifically recall that.
25     Q. Would that affect your analysis of the

Page 77

1  liabilities if there was a third obligor?
2        MR. RAMSEY: Form.
3     A. Possibly.
4     Q. So are you aware of that after the Alexbay
5  transfer PBGC put a lien on Eber-Metro?
6     A. Yes.
7     Q. Are you aware that at the same time PBGC put a
8  lien on Eber-Connecticut?
9     A. Yes. I think that is consistent with my view
10  of how the PBGC operates. They take fraudulent
11  conveyance very seriously. If they think you're trying
12  to escape, they're going to certainly at least do that.
13     Q. So is it fair to say then that in addition to
14  Eber-Metro and Eber Wine and Liquor in your opinion
15  Eber-Connecticut was also an obligor for pension
16  liability?
17        MR. RAMSEY: Form.
18     A. Certainly from an investor's perspective that's
19  exactly what they are going to expect to happen.
20     Q. Does it affect your ultimate valuation analysis
21  as to whether you put that liability in the
22  Eber-Connecticut analysis or further up the chain?
23     A. So if the liabilities are at the
24  Eber-Connecticut level, that would reduce valuation for
25  Eber-Connecticut by the pension.

20 (Pages 74 - 77)

Page 78

1     Q.   Okay.  But you did not do an analysis with
2  running the numbers in that way; is that right?
3     A.   No.
4     Q.   Do you think that you perhaps should have?
5        MR. RAMSEY:  Form.
6     A.   Well, I don't think -- it doesn't matter.  So I
7  didn't -- it's kind of like a -- what is the point?  The
8  solvency opinion has to do with Eber-Metro and Eber Wine
9  and Liquor.  For I mean -- this gets back to what I said
10  before about the economics of it.  I am still a little
11  fuzzy about why the hell it matters between Eber Wine and
12  Liquor and Eber-Metro.  But notwithstanding, to me it
13  didn't really matter whether I put the liabilities of
14  Connecticut as long as they are there with Eber-Metro
15  when I am doing a solvency analysis of Eber-Metro that's
16  what counts.  So it's like what's the point.
17     Q.   So would you include the liabilities at each
18  level for the balance sheet of all three companies?
19     A.   If the total liability is at Eber-Connecticut,
20  then I've accounted for the liability relative to
21  Eber-Metro.  I netted it out against the Eber-Connecticut
22  assets.
23     Q.   How do you decide where that goes?
24     A.   As I said, it's difference.  Not a distinction.
25  It doesn't matter to me.  It's an economic matter.  You

Page 79

1  know, what is the point to make more paper?  To say well
2  if it's Eber-Connecticut then Eber-Connecticut value is
3  lower, then it's the same flip side that Eber-Metro
4  has less operating assets.  I am not sure I understand.
5  I know it must make such kind of legal difference, but
6  from my perspective, I just don't see what the point
7  would be to do that analysis.
8     Q.   We were talking about PBGC.  What about the
9  Teamsters liability?  What is your basis for believing
10  that is something -- that a reasonable investor would
11  attribute to Eber-Metro?
12     A.   Same basis.  I think -- I know that there was a
13  lawsuit over payment of the Harris Beach amount.  And
14  they sued for fraudulent conveyance.
15     Q.   Do you know the timing of those lawsuits?
16     A.   That would have been a post-valuation date.
17     Q.   Right.
18     A.   But my point is that from an investor's
19  perspective, it's like day follows night.  You start
20  playing around with pension obligations whether it's the
21  PBGC insured and pension from Teamsters, you are going to
22  price protect yourself.  And I think the same holds true
23  with the other obligations as well.
24     Q.   If a liability is contingent upon a creditor
25  successfully pursuing a fraudulent conveyance lawsuit, is

Page 80

1  it really in your opinion appropriate to include that as
2  probable contingent liability?
3     A.   That's not what I said.
4     Q.   For Harris --
5     A.   I said that day follows night.  If you tried to
6  separate the liabilities from the operating assets,
7  you're going to get fraudulent conveyance.  An investor
8  is going to certainly reflect that.  They will not say,
9  "I will roll the dice on this."  No.  These are serious
10  obligations.  Particularly the PBGC and I would also
11  include the Teamsters in that.  And the only point I
12  raise about the Harris Beach is that look, that's exactly
13  what an investor is going to anticipate.  You try to hide
14  liabilities from the assets, and this is what you're
15  going to get.  An investor knows that.  You just can't
16  ignore that.  You can't put blinders on and say this
17  doesn't matter.  Yes, it matters.  It matters a lot.
18  Particularly with a company for which the assets are less
19  than the liabilities, it matters a whole hell of a lot.
20        MR. RAMSEY:  Take another five, Brian.
21     (Whereupon, Exhibit Number 130 was marked for
22  identification at this time.)
23     Q.   Let's do one more document for now.  So for the
24  record, I am showing you what's been previously marked as
25  Exhibit 73 and newly marked Exhibit 130.  Have you seen

Page 81

1  either of these documents before today?
2     A.   Let me read it.  I think I have seen
3  Exhibit 74 before.  It looks familiar.  I am not sure I
4  recollect 130.
5     Q.   So looking at Exhibit 74 then, you see it is a
6  confession of judgment signed by Wendy Eber on behalf of
7  the Eber Brothers Wine and Liquor Corp.  And that's as to
8  the Teamsters liability?
9     A.   Right.
10     Q.   And that number matches within five cents the
11  number you've got in your summary of liabilities, right?
12     A.   Yes.
13     Q.   Do you see that this confession of judgment
14  only as to Eber Brothers Wine and Liquor Corp and not
15  Eber-Metro?
16     A.   So I think you're referring to the heading in
17  there that says the defendant is Eber Wine and Liquor
18  corporation.
19     Q.   Yes.
20     A.   Yes.  It says Eber Wine and Liquor Corporation.
21  It does not say Eber-Metro.
22     Q.   Then looking at 130.  That's the exhibit in
23  front of you.  Wendy Eber is explaining the reason for
24  that.  She says in the last paragraph, "I had modified
25  the confession of judgment to reflect that it is against

21 (Pages 78 - 81)

Page 82

1    Eber Brothers Wine and Liquor Corporation and not the
2    Eber companies."  Do you see that?
3        A.  I see that.
4        Q.  So is it your opinion that these documents
5    reflecting that the liability was only against
6    Eber Brothers Wine and Liquor Corp does not change your
7    assessment that that liability belonged to Eber-Metro?
8            MR. RAMSEY:  Form, legal opinion.
9            MR. CALIHAN:  Objection to form.
10       A.  Yeah.  You keep saying belonged to.  I am
11   saying that an investor is going to take that into
12   account.  They are not going to put little compartments
13   and say this is not the obligation of Metro.  You know,
14   what this says, it says.  It doesn't alter my opinion as
15   to how an investor is going to look at these kind of
16   obligations.
17       Q.  And by these kind of obligations, do you mean
18   pension obligations specifically, or any debt belonging
19   to the parent company that is transferring its
20   subsidiary?
21       A.  Most certainly it's going to reflect the
22   pension, both the PBGC as well as the Teamsters, but yes.
23   Clearly for a company that -- I say the company -- for
24   the situation where the assets of Metro are such that
25   obligations, even if you consider them up the line, can't

Page 83

1    be covered, yes.  It will.  They just -- it just can't be
2    ignored.
3        Q.  Because of the likelihood of fraudulent
4    conveyance?
5        A.  That is a distinct possibility.  Like I said, I
6    think that any time you have a situation where you're
7    selling assets and you're receiving a price that is less
8    than the liabilities, that is exactly what you're going
9    to encounter and an investor is going to know that.
10       Q.  So focusing on Harris Beach, that's not a
11   pension obligation.  Does it change your conclusions in
12   any way that at the time of the Alexbay transfer in 2012
13   the only party being sued by Harris Beach and that owed
14   money to Harris Beach according to its engagement
15   agreement was Eber Brothers Wine and Liquor?
16           MR. RAMSEY:  Form.  I will make the same
17       objection.  I think you're looking for a legal
18       conclusion here.
19       A.  Yeah.  I mean -- look, I know that they did sue
20   all the entities at some point for payment.
21       Q.  I do want to be clear.  I am not looking for a
22   legal conclusion because your valuation is not based upon
23   what the actual law was, right?  What the actual
24   liabilities were as determined by later courts, correct?
25       A.  Fair enough.

Page 84

1        Q.  Just as if you're doing a valuation based upon
2    what people knew at the time, they wouldn't be based upon
3    what restated numbers were a year later, correct?
4        A.  Fair enough.
5        Q.  So in this instance, why isn't the
6    determination of what the liabilities of Eber-Metro were
7    something that should be based on what the understanding
8    was at the time of management and the purchaser of what
9    the liabilities of what Eber-Metro would be?
10           MR. RAMSEY:  Form.
11       A.  Because I am trying to understand how an
12   investor, a willing buyer, is going to view this company.
13   That is my analysis.  I mean, I don't know how else to
14   say that.  I've said it five times now.  And you keep
15   trying to say, "Well, don't you want to value it the way
16   that Wendy valued it?"  No.  That's not my task here.  I
17   mean, she did what she did.  She wrote what she wrote.
18   Her view is what it is.  I am telling you how I am doing
19   the valuation.
20       Q.  And I am just -- I am not trying to be obtuse
21   here.  I'm trying to get a clear record.  So the
22   reasonable investor in your view would conclude that
23   Eber-Metro would still be on the hook because upon
24   transfer, Eber Wine and Liquor was left with insufficient
25   assets to meet its debt; is that fair to say?

Page 85

1        A.  You're talking about all the items?
2        Q.  Yes.
3        A.  So number one, there is the legal determination
4    that I said before.
5        Q.  Right.
6        A.  That I have been given.  Number two, it makes
7    absolutely sense to me from an economic perspective.
8    That any investor is going to price protect themselves,
9    particularly for a company that's in financial distress.
10   And that I think there is no dispute.  Certainly without
11   question even Eber-Metro is in financial distress.  And
12   when you are a company in financial distress and you've
13   got liabilities attached to those assets, boy, oh boy,
14   you know, you just can't ignore that.  And that's my
15   opinion.  That investor would not ignore that.  And would
16   not put it in compartments notwithstanding what Wendy
17   thinks.  It's interesting, but it doesn't affect my
18   opinion.
19       Q.  Okay.  Let's take that break.
20       (Whereupon, there is a short recess in the
21   proceedings.)
22       Q.  Okay.  So going to your report in general, you
23   did five valuation analyses for Eber-Connecticut; is that
24   correct?
25       A.  Yes.

22 (Pages 82 - 85)

Page 86

1    Q.   But you did not offer an opinion on which of
2    those valuation is most reliable or some combination of
3    them to arrive at a final number, did you?
4    A.   No.  I provided a range of values from each of
5    those five.  The range of values results from each of
6    those five measurements.
7    Q.   Why didn't you offer an opinion on what the
8    correct value should have been?
9    A.   Well, in my view, the range that I developed
10   and applied told me that this was an insolvent company.
11   Q.   Not Eber-Connecticut though?
12   A.   No.  Up the chain, yes.
13   Q.   Right.  But as we have been suggesting, there
14   are potential questions as to whether or not the numbers
15   for the debt are correct or legally relevant or something
16   like that.
17        MR. RAMSEY:  Form.
18   Q.   So in that instance, wouldn't it be important
19   about to what the value of Eber-Connecticut is if the
20   value would determine whether or not it was solvent --
21   the parent companies were solvent?
22   A.   You mean a point estimate?
23   Q.   Yes.
24   A.   Well, if you want a point estimate.  Just take
25   the midpoint, that's fine.

Page 87

1    Q.   Why is that appropriate?
2    A.   There are five measures of value.  Each of them
3    has problems.  But these are the kinds of things -- not
4    with understanding problems -- these are the kind of
5    thing that investors are going to look at in formulating
6    their opinion.  If you're so inclined to only want to
7    point an estimate, I mean, you know, in my view a
8    reasonable range is more informative.  I think it
9    provides more information.
10   Q.   Do you think --
11        MR. RAMSEY:  Go ahead, finish your answer.
12   A.   I think a reasonable range provides more
13   information.  It is un essence the sensitivity analysis
14   or effective sensitivity analysis of what you were
15   referring to earlier about well, is there uncertainly
16   with numbers.  Well, the more numbers you have, the more
17   certain you are about what ultimately that range of value
18   is.
19   Q.   Do you consider all five methods to be equally
20   reliable?
21   A.   You know, so first I would say that these
22   measurements are things that an investor would look at.
23   Each of these methods has problems perhaps multiple
24   problems.  I think if you start with the offers or the
25   transactions.  So start with the Eder-Goodman

Page 88

1    transaction.  That has a significant problem because of
2    the substantial rights.  I've got two pages in my report
3    talking about the substantial rights.  Now, I try to do a
4    conservative estimate as to what those rights are to come
5    up with some value.  But, look, for a company in
6    financial distress in particular, the preferred stock
7    aspect of it is going to be huge -- absolutely huge.  So
8    is that a problem?  Yeah. I mean you try to adjust away
9    from it.  That is a problem.  You know, that is one of
10   those things that make that valuation uncertain.
11   Southern offer to a lesser extent -- the Southern offer
12   also has this right of first refusal that causes one to
13   do again an adjusted valuation of the Southern offer.
14   Q.   And the Southern offer wasn't actually
15   accepted?
16   A.   Look, you know, the Southern offer wasn't
17   accepted, but I view that as a bona fide offer.  And a
18   bona fide offer is a reasonable thing to use in the
19   analysis.  So I wouldn't -- I am not going to discount it
20   because it wasn't an actual transaction.  I think it's
21   still relevant.
22   Q.   Can you please explain what you mean by bona
23   fide offer?
24   A.   Well, there were something -- I think it was
25   like 14 amendments.  It was far along.  There was a lot

Page 89

1    of paperwork involved -- due diligence.
2    Q.   I mean in general what a bona fide offer is?
3    Like how does something constitute that?
4        MR. RAMSEY:  Form.
5    A.   I draw a distinction between, you know, saying
6    I have, you know, a preliminary offer of interest.  That
7    I wouldn't consider a bona fide offer.  But if you've got
8    a substantial amount of paperwork behind an offer with a
9    lot of conditions and things that have been formulated,
10   that to me is a bona fide offer.  That's what I view
11   anyway.
12   Q.   Is a --
13   A.   You want me to finish my answer?  I was not
14   done.  So we can go back to any one you want to.  So with
15   regard to the Pole-Bridge Bowman offer, that to me has
16   problems too.  It's a transaction that I am not 100
17   percent comfortable with that being the measure of value.
18   I don't know that I would -- I think that has problems as
19   well.
20   Q.   Why aren't you comfortable with it?
21   A.   Well, I am concerned that it could possibly not
22   be an arm-lengths transaction.  I can't make a
23   determination one way or the other, but it causes me
24   concern.
25   Q.   Why -- just to follow up on that, what about it

23 (Pages 86 - 89)

Page 90

1  does not appear to be arm's-length?
2        MR. RAMSEY:  Form.
3        A.  I was concerned that the company was
4  repurchased at the same price.  It could be -- there
5  could be explanations why that occurred, but the fact of
6  that doesn't sound right to me.
7        Q.  I am sorry.  What do you mean by that?
8        A.  It was unwound.
9        Q.  Okay.  The terms of the exercising how Wendy
10  Eber ended up acquiring it?
11        A.  Yes.  I didn't see anything contemporaneous to
12  the transaction itself that could indicate this.  The
13  ultimate unwinding caused me a little bit of questioning
14  whether the transaction was a pristine transaction.  And
15  also problem -- the other problem I had with that is that
16  there was a right of first refusal in that offer.  So you
17  have to adjust that.  Now with regard to the farmers --
18        Q.  I just want to stay on that one for a second,
19  then we will jump to the other just so the transcript
20  is -- in forming your opinion, were you aware of who were
21  the owners of Pole-Bridge Bowman and Partners?
22        A.  I know that it was a gentleman named Steurm was
23  the principal.
24        Q.  And what is your understanding of what his
25  relationship was to the Ebers?

Page 91

1        A.  He was the consultant.  My understanding he was
2  a consultant.  Maybe the term is workout consultant for
3  companies in financial distress to get to them to work
4  out of their distress.  And I think he was a lawyer.
5        Q.  And are you aware that the Ebers have said that
6  he was their lawyer?
7        MR. RAMSEY:  Form.
8        A.  I know he was their consultant.  I don't know
9  that he gave legal opinions.
10        Q.  Would it affect your assessment of whether this
11  was an arm-length transaction if you found out that Glenn
12  Steurm had an attorney/client relationship with the Ebers
13  individually or with one of their companies?
14        A.  No, I don't think so.  I am not sure why that
15  would affect my view of things whether he is providing
16  consulting services or legal services.  I am not sure
17  that matters.
18        Q.  Is a fiduciary relationship an arm-length
19  relationship in your opinion?
20        MR. RAMSEY:  Form.
21        A.  Is a fiduciary relationship an arm's-length
22  relationship?  I am not sure what you mean by that.
23        Q.  Do you understand the term fiduciary
24  relationship?
25        A.  The transaction -- because he is a fiduciary

Page 92

1  that the transaction would not be arm's-length.
2        Q.  I am asking if the fact that there is a
3  fiduciary relationship between two individuals prevents
4  that transaction for being characterized as an
5  arm's-length transaction?
6        MR. RAMSEY:  Form.
7        A.  I would think it would be just the opposite.  I
8  think the fiduciary would have an obligation to make sure
9  that whatever transaction took place was a fair market
10  value unless I am missing something.  You seem to have a
11  different --
12        MR. RAMSEY:  I think we're in the legal
13        realm here.
14        Q.  So the term arm-length, is that fair to say
15  that is a term that is important to your valuation work?
16        A.  Well, it is a shortcut to Page 1 of my report
17  that talks about a willing buying and willing seller with
18  knowledge of all relevant facts and no compulsion to buy
19  or compulsion to sell.  And so those are the things that
20  in my view constitute an arm's-length transaction.
21        Q.  So let me pose to you the hypothetical.  If the
22  transaction was entered into between a lawyer and his
23  client to acquire an equity interest in a company and the
24  lawyer did not actually want to buy that interest, but it
25  was done for structural your purposes to benefit the

Page 93

1  client, would you consider that to be an arm's-length
2  transaction?
3        MR. RAMSEY:  Form.
4        A.  Structural purposes to -- that's way beyond --
5  I mean I don't know how to answer that question.
6  Structural purposes to benefit --
7        Q.  One simple thing.  I will rephrase.  If a
8  person -- you refer to as a will buyer?
9        A.  Yes.
10        Q.  What did the buyer actually did not have any
11  economic interest in acquiring the equity and he did it
12  solely to fulfill his legal obligation to a client.
13        MR. RAMSEY:  Form.
14        Q.  Could you rely on that transaction to determine
15  the value of the equity?
16        A.  You're saying a fiduciary would have a legal
17  obligation.
18        Q.  I am not saying necessarily as a fiduciary.  I
19  am talking about a particular circumstance where a lawyer
20  decides -- a lawyer specifically says, "I do not want to
21  buy this, but I will do so if I have to.  So that the
22  sale can go through."
23        MR. RAMSEY:  Form.
24        Q.  Is that just impossible to believe?
25        A.  It's a little hard to believe.

24 (Pages 90 - 93)

Page 94

1    Q.  I will show you a document.
2    A.  Okay.
3    Q.  All right.  I will read for you a memo from
4  Glenn Steurm, the owner of Pole-Bridge Bowman.
5    A.  Uh-huh.
6    Q.  To Pat Dalton, a lawyer for Wendy and Lester
7  Eber and copying Wendy and Lester Eber dated May 26,
8  2010.  That is I think two days before -- two to four days
9  before the effective date of the Pole-Bridge Bowman
10  transaction?
11    A.  Okay.
12    Q.  This memo states, "The current proposal is for
13  a single-member LLC New-co to acquire the interest and
14  that I be the only equity holder of the new LLC.  Here
15  are the terms that we discussed.  One, New-co purchases a
16  six percent equity interest in Connecticut for a secured
17  non-recourse note in the amount of blank dollars.  Wendy
18  Eber has an exclusive right of first refusal to purchase
19  the entire equity interest from New-co.  If Ms. Eber
20  does not exercise her right, then Metro has the next
21  right of first refusal to purchase the entire equity
22  interest. If Metro does not exercise its right, then
23  Eder-Goodman has the final right of first refusal to
24  purchase the stock.  If neither Ms. Eber, Metro or
25  Eder-Goodman elects their right, then New-co will be

Page 95

1  required to retain its interest.  The Ms. Eber will have
2  a proxy to vote the equity interest held by New-co and a
3  limited Power of Attorney.  I have no pride of authorship
4  in this outline.  If we can find a different structure
5  that works that would be better for me.  Based on that
6  memo, does that sound like a transaction that was
7  negotiated at arm's-length?
8        MR. RAMSEY:  Form.
9    A.  I am trying to understand.  How these items
10  that you listed to me indicated that it's not arm-length.
11    Q.  Those items actually aren't.  I was mostly
12  doing that because you don't have the document in front
13  of you and I want to be fully transparent and read
14  everything.  I think the point I want to focus on is that
15  you said -- I actually left out the first line.  That's
16  really important.  Pat, as we discussed this morning, we
17  need to identify an alternative purchaser of the six
18  percent interest the Connecticut, LLC.  The current
19  proposal is for a single-member LLC.  New-co to acquire
20  the interest and that I be the only equity holder of the
21  LLC.  And then at the end he says if we can find a
22  different structure that works that would be better for
23  me.
24    A.  So read that first sentence again?
25    Q.  As we discussed this morning, we need to

Page 96

1  identify at an alternative purchaser of the six percent
2  interest in the Connecticut, LLC.
3        MR. RAMSEY:  And what is the question.
4    Q.  So the question is, based on the fact that
5  Glenn Steurm is saying Wendy and Lester Eber and their
6  lawyer -- that he does not want to actually buy the six
7  percent, does that sound like an arm's-length transaction
8  to you?
9        MR. RAMSEY:  Form.  I am not sure that's an
10      accurate interpretation.
11    A.  I am -- you're asking me to interpret this
12  letter to mean that he does not want to buy this?
13    Q.  I am asking you if someone were to conclude --
14  so this is a hypothetical now.  If someone were to
15  conclude that Glenn Steurm did not actually have an
16  economic interest in purchasing the six percent equity
17  that was sold to Pole-Bridge Bowman and Partners, would
18  that affect your opinion of whether that was an
19  arm's-length transaction?
20    A.  It could.  If there is no economic interest --
21        MR. RAMSEY:  You've answered it.  It could.
22    A.  It could.
23    Q.  Have you ever heard of a round-trip
24  transaction?
25    A.  Well, I know a round-trip transaction with

Page 97

1  regard to a security.  You buy and then you sell it.
2    Q.  Are you familiar with a round-trip transaction
3  in which it creates an appearance of economic substance,
4  but in fact because money is going both ways there is no
5  real economic substance to it?
6    A.  Yes.  I've actually offered opinions on this
7  for the Department of Justice.
8    Q.  And in the case of the Pole-Bridge Bowman
9  transaction, it was funded by the note for the same
10  purchase price.  Do you see any similarities between that
11  and a round-trip transaction?
12        MR. RAMSEY:  Form.
13    A.  I mean note in lieu of cash.  I mean it's a
14  still an asset on the balance sheet for the company.  So
15  I am not sure what you mean.  That only cash counts?
16    Q.  No.  I am just saying if someone supposedly
17  purchases equity in a company, but they receive the money
18  to do that from the company itself such as a company
19  receives no cash.
20        MR. RAMSEY:  Form.
21    Q.  Does that affect?
22    A.  If the asset has value whether it's cash or
23  not, it shouldn't matter.
24    Q.  Well, okay.
25    A.  If the buyer is providing a note saying, "I owe

25 (Pages 94 - 97)

Page 98

1  you this money." There is a note. That's my obligation
2  to you in lieu of giving cash. You seem to be drawing a
3  distinction between the value of a note and the value of
4  cash. Is that what you're saying?
5      Q. I am not necessarily drawing a distinction
6  there. What I am saying is, you know, let's step back
7  for a minute. For what reasons does a company -- a
8  privately held company generally sell equity in a company
9  that it holds?
10     A. You mean like a secondary offering?
11     Q. A secondary offering or where like in this case
12  where Eber-Metro sold some of the interest it held in
13  Eber-Connecticut?
14     A. Well, for a secondary offering they generally
15  are trying to sell new shares to investors too, you know,
16  for a variety of reasons. But, for example, make a
17  capital investment of some kind. Selling shares, selling
18  existing shares held by some other entity. You know,
19  selling existing shares doesn't raise any new capital per
20  se. Other than that, I don't know how to answer your
21  question as a general matter.
22     Q. Did you review the critique of this
23  transactions economic substance from Glenn Liebman?
24     A. Yes. My recollection is that he also had
25  issues with regard to whether this was arm's-length.

Page 99

1      Q. Right. And one of the things he pointed out
2  was the interest rate on the note was only two percent
3  when the company was at the time borrowing money from
4  Lester Eber at 12.5 percent. Does that make sense to
5  you?
6          MR. RAMSEY: Form.
7      A. You know, I have a hard time with that. When
8  the company borrows money, it's paying. And it's the
9  company credit that dictates the interest rate. So if a
10 company is in financial distress and it wants to borrow
11 money, it's likely that it's going to pay a high interest
12 rate. Now, in this case, this is an asset that is being
13 provided to the company. A company is not borrowing
14 this. Unless I am missing something.
15     Q. Isn't the company loaning money?
16     A. Huh?
17     Q. The company is loaning money, is it not?
18     A. How? If it's an asset on the company's
19 books -- it's giving shares to the LLC and the LLC is
20 getting a note.
21     Q. Right. So it's giving up shares that were in a
22 company a going concern, right? So that comes off the
23 balance sheet?
24     A. Yes.
25     Q. And on the balance, it gets this nonrecourse

Page 100

1  note?
2      A. Right.
3      Q. At the end of the day the only thing it can
4  really get for that is just the shares back that is
5  initially transferred if it were to foreclose on, right?
6      A. Where does it say that?
7      Q. It's a nonrecourse note, right?
8      A. They couldn't pay it.
9      Q. Would it matter whether Pole-Bridge Bowman had
10 any other assets to you?
11     A. No. I am just questioning your -- you draw a
12 conclusion that the only way -- you said that the only
13 way is to get the shares back. And I never saw that
14 written anywhere.
15     Q. I realize that. And that's where I was jumping
16 ahead. I may have left out some facts from here. Do you
17 know anything about Pole-Bridge Bowman and what kind of
18 investments or businesses it was involved in?
19     A. I know it was an LLC. I know that Steurm was
20 the principal of that LLC. Beyond that, I don't.
21     Q. Would it affect your assessment of whether this
22 was an arm's-length deal to find out that Pole-Bridge
23 Bowman was an entity that was created with no other
24 assets solely for purposes of engaging in this
25 transaction?

Page 101

1          MR. RAMSEY: Form.
2      A. No. I don't think so.
3      Q. So if an entity has no other assets and it's a
4  nonrecourse note, if the note isn't repaid, then isn't it
5  true that the company's only recourse is to require the
6  shares that it initially distributed?
7      A. Well, I mean, imagine that if one state of the
8  world is where the value of the shares go up -- would the
9  LLC just say, "Oh. Okay. Here is your shares back."
10 Why wouldn't they just pay off the note and keep the
11 shares? That makes economic sense to me. And you're
12 dismissing that as a possibility.
13     Q. Well, isn't that what actually happened? The
14 value of the company definitely went up once it become
15 profitable, right?
16     A. It became profitable, but I can't say I am
17 hypothesizing -- look, you said the only possible outcome
18 is if they give the shares back. And I'm saying that
19 doesn't make sense to me. I can imagine -- I am not
20 saying it happened. But I can imagine the state of the
21 world where it is in the economic interest to Steurm to
22 say, "Hey, the values of these shares is increased 10
23 times what it was in 2010. Hell. Here is the money for
24 the note. We will close this off. I will take the
25 shares." Why not?

26 (Pages 98 - 101)

Page 102

1    Q.   Would it affect your assessment with whether
2  the Pole-Bridge Bowman transaction was arm's-length if
3  you were to learn that it was engaged in part to
4  compensate Glenn Steurm for his services?
5    A.   Well, I don't think that would be a sufficient,
6  you know, indication to eliminate that as an indication
7  of value.
8    Q.   Would it require an adjustment at least?
9         MR. RAMSEY:  Form.
10   A.   Look, you know, you want to have an assessment
11 as to whether it was a deal at fair market value.  That's
12 ultimately what you're talking about.  Do stock
13 transactions occur for parties that are consultants to
14 particularly small firms?  Yes.  Does it mean that they
15 are necessarily not an arm's-length transaction?  Well,
16 no.  In fact, I can imagine, you know, that you would want
17 to strike a deal at fair market value.  So I don't know
18 that I can agree that it's a de facto collusion that
19 someone is being -- instead of providing cash, they are
20 given stock in a company.  I don't know that is
21 necessarily a non-arm's-length transaction or to put
22 differently that transaction took place at something
23 other than fair market value based solely on that.
24   Q.   Isn't it a reason to question the fair market
25 value more though?

Page 103

1    A.   Well, it's certainly one of those indications
2  that you are concerned about it.  And that's what I said
3  a minute ago, I am concerned.  I think it is a
4  transaction that an investor is going to look at.  But
5  with full knowledge at least of the information that I
6  had, yes.  I would say that there are problems with it.
7  Just like there is problems with all these transactions.
8  I mean everything has an issue.  There is no question
9  about that.  So that's the best way I can answer your
10 question.  It's a concern.  It's a problem, but all these
11 metrics have problems.  And that's why the range is
12 important to get a sense as to whether there is some kind
13 of assessment of valuation range each year that allows
14 you to draw a conclusion.
15   Q.   Just so I am clear, and correct me if I am
16 wrong.  In your opinion, the fact that the Pole-Bridge
17 Bowman transaction was in part compensation to Glenn
18 Steurm would not necessarily affect any of your
19 calculations in terms of what the valuation would be
20 based on the Pole-Bridge transaction?
21   A.   No.  Not in and of itself it would not.
22   Q.   But just on the broader point, if a fact-finder
23 were to conclude that a transaction was not conducted at
24 arm's-length, would that mean in your view the
25 transaction should be excluded from a valuation analysis?

Page 104

1         MR. RAMSEY:  Form.
2    A.   Well, I think the question is whether the trier
3  of fact would conclude that it's outside of it.  Not so
4  much a valuation expert.  If a trier of fact concludes
5  that it's not arm's-length transaction, could well be I
6  am not going to consider this transaction.  From my
7  perspective, I guess I kind of take in a little different
8  view of this.  Like I said, the ultimate determination is
9  whether it's a fair market value.  And one of the things
10 that is kind of interesting is whether or not the
11 valuation is within the range of other evaluations.
12 That's kind of interesting to me.  That may not convince
13 a trier of fact.  The trier of fact says, "No.  It's not
14 arm's-length.  I am not going to think about that."
15 Okay.  So be it.  Cross it off your list.  But for me --
16 and I think for an investor it is a data point of
17 interest.
18   Q.   For an investor, do you believe that would be
19 appropriate to rely solely on the Pole-Bridge Bowman
20 transaction as a basis for value?
21   A.   If it was determined to be non-arm's-length?
22   Q.   Either way.  Just based on the facts that you
23 know about the transaction where you question it, do you
24 believe that it would be appropriate for an investor to
25 base valuations solely on that transaction and not

Page 105

1  consider any other valuation method?
2         MR. RAMSEY:  Form.  Go ahead.
3    A.   The way I can answer that question is I don't
4  know that I would look at any of these five alone and say
5  that's the only thing you should look at or if that was
6  the only thing available.  Is it a precise, accurate
7  measure of value?  The only one that I really like that I
8  think has the least amount of problems is the Prospect
9  Beverage.  That one -- I mean the problem with that is
10 that it's 10 years old at that time of transaction.  But,
11 you know, look at the other dates.  I mean the
12 Eder-Goodman is four years old -- five years old.
13   Q.   You're missing -- -
14   A.   Six years old.  Like I said before, so each of
15 these has problems.  You've got all of these right issues
16 in many of these transactions.  The Prospect, is in my
17 view, one of the tightest comparable transactions that I
18 have encountered in doing valuations.
19   Q.   Is it a coincidence that is the transaction
20 that results in by far the lowest value for
21 Eber-Connecticut?
22         MR. RAMSEY:  Form.
23   A.   It is a coincidence.  It turns out that way.
24 But maybe that is not a coincidence.  Maybe that really
25 reflects what the value of what Eber-Connecticut was.

27 (Pages 102 - 105)