UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL KLEEBERG, LISA STEIN, and AUDREY HAYS,

Plaintiffs,

v.

LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC; ESTATE OF ELLIOTT W. GUMAER, JR.; and WENDY EBER,

Defendants,

and

EBER BROS. & CO., INC.; EBER BROS. WINE AND LIQUOR CORP.; EBER BROS. WINE & LIQUOR METRO, INC.; EBER-CONNECTICUT, LLC; EBER-RHODE ISLAND, LLC; EBER BROS. ACQUISITION CORP.; EBER-METRO, LLC; SLOCUM & SONS OF MAINE, INC.; and CANANDAIGUA NATIONAL BANK & TRUST COMPANY,

Nominal Defendants.

Civil Action No. 16-CV-9517(LAK)(KHP)

**DECLARATION OF AUDREY NAN HAYS**

1. I, Audrey Nan Hays, provide this declaration in support of Plaintiffs' Motion for Partial Summary Judgment. I have personal knowledge of all of the statements made below.

2. I am the sole child of Mildred Eber Boslov, who was one of three children of Allen Eber, the founder of Eber Bros. and its wine and liquor distribution business.

1

3. My grandfather, Allen Eber, died in 1970, and upon his death a testamentary trust was created to hold and manage Eber Bros. and certain other investments that remained in his estate (the "Trust").

4. At its creation, the Trust had three beneficiaries: My mother, Mildred Eber Boslov; my aunt, Sally Eber Kleeberg; and my uncle, Lester Eber.

5. My mother died in 1973. Afterwards, I assumed her role as one of the three Trust beneficiaries. I also inherited from my mother some shares of Eber Bros. & Co., Inc. ("EB&C") Class B Non-Voting Common Stock.

6. In 1986, due to the financial strain caused by my husband's battle with terminal pancreatic cancer, I sought to sell some of my Class B shares in EB&C to generate some cash, but the trustees refused to authorize the purchase of any of my shares unless I agreed to sell all of them. So, I reluctantly agreed to sell all of my Class B shares in EB&C back to EB&C.

7. I have never been involved in Eber Bros. or the wine and liquor business, nor have I, before this lawsuit was filed, had any clear understanding of the different companies that made up the family business. In my communications with the trustees, it was always presented to me as one family business owned by the Trust, even after most of the business was sold or destroyed and all that was left was the business in Connecticut.

8. Most of my communications about the trust and the family business were with the bank trustee, which was initially Marine Midland Bank, followed by M&T Bank, and most recently followed by Canandaigua National Bank ("CNB"). The point of contact for me at CNB was Rick Hawks.

9. Before 2017, it was my understanding that my uncle, Lester Eber, was the chief executive officer (I did not know what his exact title was) of the entire wine and liquor business. I

was never informed that Lester had resigned in that role with any of the companies. Specifically, before this lawsuit, I did not know that Lester had resigned as President and director of Eber Bros. Wine and Liquor Corporation in or around February 2012. I also did not know that Wendy Eber had replaced Lester as President of Eber-Connecticut, LLC at any point in time.

10. Most of what I knew about the family business I learned from casual conversations or passing comments from Lester and my cousin, Danny Kleeberg, who worked for Eber Bros. until about 2007.

11. I knew that Elliott "Mike" Gumaer was one of the trustees of the Trust, and he was one of the trustees I dealt with in 1986. I knew that he had been a lawyer for my grandfather and the family business. Before this lawsuit, I did not know that Mike had been Lester's personal lawyer at any time. While I believed that Mike probably favored Lester and did not do enough to ensure that the family business was run well and for the benefit of the entire family, I did not realize that it had gone beyond friendship to that level of a relationship.

12. I first heard about Southern Wine & Spirits ("Southern") from Lester, when he informed me that he had formed a partnership with an Atlanta-based distributor in order to fight against Southern in New York. I do not recall all of my conversations around that time on the subject, but I recall learning that Southern had been buying up family businesses like ours around the country for years and that they were paying very well. I did not understand why Lester was trying to fight Southern because I did not feel like he was smart enough or had the resources to fight this company, but I know he spent years doing it.

13. I remember receiving a phone call from Lester in or around 2007, when he told me the business had been sold to Southern. He said, "It's going to be in the papers tomorrow and I'm

3

giving you the courtesy of a phone call." Lester told me that the sale produced "zero monetary value to the family."

14. I eventually came to understand that as a result of the Southern sale, the family business would be focused on Connecticut going forward. It was my understanding that Lester would continue to run the business for the benefit of the family.

15. Lester never told me that he was going to be working for Southern. Nor did any of the other trustees tell me about Lester's consulting agreement with Southern. I was angry when I later learned that Lester did work for Southern because he had spent years fighting Southern and he had told me that the final deal he reached with Southern was worthless for the entire family.

16. In or around April 2010, I had a phone call with Lester about loaning money to the family business. Around the same time, I received a letter from Lester on the same topic. Specifically, Lester asked me to loan $167,000 to the business. I hung up the phone on him. Before April 2010, I had never heard that Lester had ever loaned any of his own money to the business.

17. Lester never said anything to me indicating that the loan or my participation in it would potentially affect my continued interest in the continued operations of the family business in Connecticut.

18. In 2016, my cousins Lisa Stein and Danny Kleeberg informed me that it seemed the Trust no longer had an interest in the family business in Connecticut. Before then, I had never heard of Alexbay, LLC nor had I heard anything relating to the transaction in 2012 when Lester used Alexbay to acquire direct ownership of the Connecticut business. Until then, I had believed that the Connecticut business was still part of the family business held by the Trust.

19. The annual letter that I received from CNB in December 2012 indicated to me that, as of that point, the Connecticut business still belonged to the Trust. A true and correct copy of that letter is marked as Plaintiffs' Exhibit 4.

20. The following year, I received a letter from CNB that did not mention the Connecticut business, but I did not have any understanding that this suggested that the Connecticut business had been transferred out of the Trust. A true and correct copy of that letter is marked as Plaintiffs' Exhibit 5.

21. In 2017, I received a package of documents from CNB about a proceeding in the Surrogate's Court for Monroe County to terminate the Trust and distribute its assets. I declined to pay for a lawyer to represent me in that proceeding because I liked CNB's plan to distribute the assets, including the controlling stock of EB&C, directly to me and my cousins. In this lawsuit, we had asked to get rid of the existing trustees and appoint new ones, but it seemed better and cheaper for us to just own the company stock directly, as CNB proposed.

22. It was my understanding that CNB had done everything it needed to do to make me and my cousins direct shareholders of EB&C. It was my understanding that I owned approximately one-third of the shares that had been held by the Trust, although I was hoping to get the actual paper stock certificates with the termination of the Trust, and I did not know why I did not receive the certificates.

23. Plaintiffs' Exhibit 42 is a true and correct copy of the letter I sent to my uncle, Lester, and my cousin, Wendy, requesting a shareholder meeting for EB&C. I sent that because based on everything I knew at that point I wanted to vote Lester and Wendy out of their positions in control of the company.

24. In response to my letter, Lester and Wendy refused to acknowledge me as a shareholder and denied my request for a meeting. Instead, Lester claimed to invoke some provision of EB&C's Bylaws that he said would allow him to take my shares for nothing, even though I was never made aware of any restrictions on the transfer of EB&C shares under the Bylaws or otherwise.

25. I strongly object to Lester trying to "buy" my shares of EB&C for nothing. It is just one more instance where he is trying to take the entire family business for himself and his branch of the family while cutting the rest of us out of it. I do not have any desire to be involved in the management of the business myself, but I know that based on everything I now know that he has done and is willing to do to me and my extended family, I do not want Lester or his daughter running the business, neither as directors nor as officers managing the Connecticut business's day-to-day operations.

26. If Lester had earlier disclosed his intention to try to prevent me from acquiring my one-third of the Trust's shares of EB&C upon CNB's attempt to distribute the Trust's assets, I would have directed my attorney, Brian Brook, to appear in the Surrogate's Court on my behalf and object to terminating the Trust under any conditions other than those where I retained my one-third interest EB&C.

27. I understand that Lester and Wendy Eber have now taken the position that, based on the Surrogate Court's order, I should own 616.67 Class A Voting shares, 96.67 Class B Non-Voting shares, and 666.67 6% Preferred shares in EB&C. I do not disagree with their position but I wish that they had acknowledged it sooner, saving everyone time and money.

28. If and when I have the opportunity to vote my shares of EB&C, I intend to support the nominations of two directors to fairly represent the interests of my cousins and me.

6

Specifically, I will nominate and vote for my cousin, Danny Kleeberg, who worked at Eber Bros. for many years and knows the wine and liquor business well. I will also nominate and vote for Danny's former coworker, who is an expert in the wine industry.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on _November 4th, 2019_      _/s/ Audrey Nan Hays_
                                                                              Audrey Nan Hays