UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL KLEEBERG, LISA STEIN, and AUDREY HAYS, <br><br> Plaintiffs, <br><br> v. <br><br> LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC; ESTATE OF ELLIOTT W. GUMAER, JR.; and WENDY EBER, <br><br> Defendants, <br><br> and <br><br> EBER BROS. & CO., INC.; EBER BROS. WINE AND LIQUOR CORP.; EBER BROS. WINE & LIQUOR METRO, INC.; EBER-CONNECTICUT, LLC; EBER-RHODE ISLAND, LLC; EBER BROS. ACQUISITION CORP.; EBER-METRO, LLC; SLOCUM & SONS OF MAINE, INC.; and CANANDAIGUA NATIONAL BANK & TRUST COMPANY, <br><br> Nominal Defendants. | Civil Action No.  16-CV-9517(LAK)(KHP) |

### DECLARATION OF DANIEL KLEEBERG

1.     I, Daniel Kleeberg, provide this declaration in support of Plaintiffs' Motion for Partial Summary Judgment. I have personal knowledge of all of the statements made below.

2.     I am one of two children of Sally Eber Kleeberg, who was one of three children of Allen Eber, the founder of Eber Bros. and its wine and liquor distribution business. My mother

1

was also one of three beneficiaries of the testamentary trust that my grandfather formed to hold the family business after he died (the "Trust").

3. After my mother passed away in 2014, I became a beneficiary of the Trust, along with my sister, Lisa Stein.

4. Since my grandfather died in 1970, my grandfather's Trust has owned and controlled the Eber. Bros. family business, including its wine and liquor distribution business, which operated as Eber Bros. Wine and Liquor Corp. ("EBWLC").

5. I worked for EBWLC from 1975 to 2007. I was never involved in the corporate governance of EBWLC or any of its subsidiaries. I did not know specifically who sat on its board of directors and I never saw its Certificate of Incorporate or Bylaws.

6. I generally knew that EBWLC's parent company was Eber Bros. & Co., Inc. I had no knowledge of its governance, I did not know specifically who sat on its board of directors, and I never saw its Certificate of Incorporate or Bylaws.

7. I knew that Elliott "Mike" Gumaer was one of the trustees of the Trust and that he and his law firm, Nixon Hargrave, performed some legal work for EBWLC. I had the sense that Mr. Gumaer had some role in advising Lester on the management of the business and was on the board at one point in time, though I did not know he continued to serve on the board after 2007. I met Mr. Gumaer a few times over the years while I worked at EBWLC, but we never discussed the Eber. Bros. business or the Trust. Before this lawsuit, I had no clue that Mr. Gumaer had ever represented Lester or Wendy Eber as their personal attorney.

8. I knew that Lester Eber was in charge EBWLC and that he had an enormous expense account with the business, which he used for his personal benefit beyond what work required. I had no idea that Lester had ever loaned any money to EBWLC or any other Eber Bros.

2

entity—I thought, if anything, it was the other way around. The first time I heard about Lester loaning any money into the business was in about 2010, when Lester asked my mother for money.

9. I discussed the family business with Lester on occasion after 2008. He never mentioned anything to me that indicated that he resigned from EBWLC at any time.

10. In approximately February 2017, I received papers from co-trustee Canandaigua National Bank ("CNB") about a filing in the Surrogate's Court for Monroe County. I came to understand that CNB was petitioning to terminate the Trust and distribute its assets, most of which were stocks, including the Trust's shares of Eber Bros. & Co., Inc. ("EB&C"). I understood that obtaining direct title to the EB&C stock might make it easier to obtain the relief we were seeking in this lawsuit, which had been filed several weeks earlier. Based on my understanding that my share of all of the assets would be distributed to me, including the EB&C stock needed for this lawsuit, my sister, my cousin, and I agreed to allow CNB's petition to proceed without objection or request for modification from us.

11. Based on my experience with business, I have generally been the main point of contact with my attorney, Brian Brook, for myself, my sister, and my cousin. I immediately forwarded everything I received from CNB to Brian. Without revealing the legal advice I received from Brian, I can say that, after discussions with him in February and March 2017, I decided not to ask him to enter an appearance in the Surrogate's Court unless or until Lester either opposed CNB's petition or tried to make a move against the distribution of EB&C stock to us. I had expected Lester to do something, and I was relieved when he did not.

12. I understood that if my cousin, my sister and I owned the EB&C stock directly, as CNB was proposing, we could remove our request in this lawsuit to have a new trustee appointed to replace Lester, Gumaer, and CNB, because we would be able to vote the company's shares

ourselves. Based on my decades of experience in the wine and liquor business, that seemed far preferable than having to find and retain someone new to fill the role of trustee.

13. I remember specifically instructing my attorney that he should appear in the Surrogate's Court proceeding if Lester tried to prevent the stock from being distributed to us or tried to have his legal fees paid out of the Trust's assets, which was another concern. It was my understanding that Lester did neither of those things, so Brian did not have to do anything in the Surrogate's Court proceeding.

14. I wish I could say I was shocked when, last Fall, Lester suddenly claimed that we did not own any shares of EB&C, and then he tried to take our shares in exchange for nothing in return, but I had learned too much about him over the last few years to have anything he does surprise me anymore. It is really quite sad if you think about it, given that we are family and I had worked for him for most of my adult life. I had wanted to continue in the family business too, but he did not offer me the same chance that he gave to his own son and daughter.

15. I understand that Lester and Wendy Eber have now taken the position that, based on the Surrogate Court's order, I should own 308.33 Class A Voting shares, 48.33 Class B Non-Voting shares, and 333.33 6% Preferred shares in EB&C. I agree with their position.

16. If and when I have the opportunity to vote my shares of EB&C, I intend to nominate and vote for myself as one of the directors, along with a proven veteran of the wine and liquor industry. I expect that Lester will vote for himself or his daughter, Wendy. I think it is in the best interest of moving forward that the third seat be occupied by someone who knows the business and is a friend of mine, but who is not part of the family drama and can help make sure that the right decisions are made.

17. I understand that removing Lester and Wendy will make for a difficult transition, but their years of dishonesty and conspiring against us cannot be forgotten when deciding what is best for the business, our inheritance, and our grandfather's legacy.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on 11/8/19, 2019

_____
Daniel Kleeberg