## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL KLEEBERG, LISA STEIN, and AUDREY HAYS,<br><br>        Plaintiffs,<br><br>    v.<br><br>LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC; ESTATE OF ELLIOTT W. GUMAER, JR.; and WENDY EBER,<br><br>        Defendants,<br><br>    and<br><br>EBER BROS. & CO., INC.; EBER BROS. WINE AND LIQUOR CORP.; EBER BROS. WINE & LIQUOR METRO, INC.; EBER-CONNECTICUT, LLC; EBER-RHODE ISLAND, LLC; EBER BROS. ACQUISITION CORP.; EBER-METRO, LLC; SLOCUM & SONS OF MAINE, INC.; and CANANDAIGUA NATIONAL BANK & TRUST COMPANY,<br><br>        Nominal Defendants. | Civil Action No.  16-CV-9517(LAK)(KHP) |

## BRIEF IN SUPPORT OF PLAINTIFFS' MOTION
## FOR PARTIAL SUMMARY JUDGMENT

Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Brian@brook-law.com
*Attorneys for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iii

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ............................................................................................................. 2

I.    Plaintiffs Own 2/3 of EB&C, and Lester Cannot "Purchase" Their Shares ......................... 2

   A.   The Parties Agree About How to Construe the Surrogate's Court Order.......................... 2

   B.   Lester's Attempt to Intercept the Trust's Distribution of Assets Is Barred for Multiple Independent Legal Reasons ......................................................................... 3

      1.    Lester Was the Transferring Shareholder as a Matter of Law ....................................... 3

      2.    Lester Cannot Ignore His Duties as Trustee ................................................ 4

      3.    Lester's Objection to the Surrogate's Court Order as Providing Inadequate Notice to Avoid a Transfer Restriction Is Barred by Res Judicata ........................................ 5

      4.    Lester Is Equitably Estopped from Asserting the Transfer Restriction. ......................... 5

      5.    The Bylaw Restriction Is Invalid .......................................................... 6

   C.   Additional Injunctive Relief Is Necessary (Count V)...................................... 6

II.   Eber Metro Must Return to the Trust.......................................................... 7

   A.   Lester's Strict Foreclosure Was a Credit-Crisis-Era Twist on the "Classic" Example of a Self-Dealing Trustee ........................................................... 7

      1.    Lester's Rights as a Secured Creditor under the UCC.................................. 7

      2.    By Transferring Title to Lester, EBWLC Essentially Sold Eber Metro to Lester .......... 8

      3.    Eber Metro Was a Trust Asset .......................................................... 9

   B.   The Transfer Is Void Under the "No Further Inquiry" Doctrine Because It Was Self-Dealing by Lester—Acquiring a Trust Asset While He Was Trustee ........................... 10

      1.    Lester's Opportunity to Participate in the Management of the Business Clearly Did Not Convey a Right to Take the Business.......................................... 11

      1.    The Power to Make Secured Loans Did Not Create a Backdoor for Trustees to Purchase Trust Property Themselves .................................................. 12

      2.    The UCC Article 9 Foreclosure Action Did Not Even Mention the Trust .................. 13

3. The Other Trust Beneficiaries Did Not Consent............................................................ 14

C. Constructive Trust, Forced Reconveyance, and Accounting Are Appropriate Remedies 14

III. Alternatively, Corporate Law Mandates a Similar Result .................................................... 16

A. The Transfer Is So Bad It Fails the "Business Judgment Rule" ....................................... 17

B. Defendants Cannot Meet Their Burden Under the "Entire Fairness" Doctrine............... 18

1. Unfair Process: No Informed Consent, No Third-Party Appraisal, Etc. ..................... 20

2. Unfair Consideration: The Metro Transfer Undisputedly Produced No Benefits for EBWLC, and There Is No Economically Irrational ...................................................... 21

3. Lester's Resignation Does Not Shield Him as a Matter of Corporate Law................. 22

C. Failure to Exercise Reasonable Care, Diligence and Prudence ........................................ 23

D. Failure to Comply with BCL § 909 ................................................................................... 23

E. The Security Agreement and Guaranty Were Invalid........................................................ 25

IV. The Post-Metro Transfer Asset Transfers Are Voidable, Too............................................. 25

A. The Call Option to Acquire Slocum of Maine Belonged to Eber Metro ......................... 25

B. Wendy Eber's Shares of Eber Metro ................................................................................. 26

V. The Issuance of 750 Shares of Preferred Stock Was an Unauthorized Taking of Trust Property and Violated Corporation Law ............................................................................... 26

VI. Lester's "Consulting" For Southern Violated His Duties As Trustee ................................. 27

A. Consulting for Southern Was a Tangible Corporate Opportunity ..................................... 28

B. In the M&A Context, the Consulting Agreement Was a Classic Form of "Merger Bonus" or "Side Payment" to Lester—And Improper Because Undisclosed................................. 30

C. An Eber Bros. Entity Was a Potential Party to the Consulting Agreement...................... 32

D. Damages.............................................................................................................................. 33

VII. Gumaer Breached His Duty of Undivided Loyalty and Was a Faithless Servant (Count II) ................................................................................................................................................ 33

VIII. Attorneys' Fees Should Be Awarded.................................................................................... 34

CONCLUSION...................................................................................................................... 35

# TABLE OF AUTHORITIES

## Cases

*Ackerman v. 305 East 40th Owners Corp.*, 592 N.Y.S.2d 365 (App. Div. 1st Dep't 1993) .......... 5

*Albert v. Alex. Brown Mgmt. Servs., Inc.,* 2005 WL 2130607 (Del. Ch. Aug. 26, 2005)............. 15

*Alpert v. 28 Williams Street Corp.*, 63 N.Y.2d 557 (1984)............................................................. 17

*Auerbach v. Bennett*, 47 N.Y.2d 619 (1979)................................................................................. 19

*Bender v. City of Rochester, N.Y.*, 765 F.2d 7 (2d Cir. 1985)......................................................... 4

*Birnbaum v. Birnbaum*, 503 N.Y.S.2d 451 (App. Div. 4th Dep't 1986)........................................ 15

*Bruce v. Cauthen*, 515 S.W.3d 495 (Tex. App. 2017).................................................................... 8

*Community Nat. Bank v. Medical Ben. Adm'rs, LLC*, 626 N.W.2d 340 (Wis. App. 2001) ... 29, 32

*Dolby v. Key Box "5" Operatives, Inc.,* 1996 WL 741883 (Del. Ch. Dec. 17, 1996)................. 15

*Donovan v. Van de Mark*, 78 N.Y. 244 (1879)............................................................................. 3

*Drobbin v. Nicolet Instrument Corp.*, 631 F. Supp. 860 (S.D.N.Y. 1986) ................................... 19

*Electrolux Corp. v. Val–Worth, Inc.,* 6 N.Y.2d 556 (1959)........................................................ 5, 6

*Fed. Ins. Co. v. Mertz*, No. 12-CV-1597-NSR-JCM, 2016 WL 164618 (S.D.N.Y. Jan. 12, 2016) .......................................................................................................................................... 34

*Flaum v. Birnbaum*, 508 N.Y.S.2d 115 (App. Div. 4th Dep't 1986) ........................................... 14

*Fransmart, LLC v. Freshii Development, LLC*, 768 F.Supp.2d 851 (E.D.Va. 2011)................... 32

*Gratz v. Claughton*, 187 F.2d 46 (2d Cir. 1951)......................................................................... 13

*Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290 (S.D.N.Y. 2006)................................... 5

*In re Adelphia Communications Corp.*, 323 BR 345 (Bankr. SDNY 2005) ............................... 20

*In re CBGB Holdings, LLC*, 439 B.R. 551 (Bankr. S.D.N.Y. 2010)............................................. 8

*In re Croton River Club, Inc.*, 52 F.3d 41 (2d Cit. 1995) ........................................................... 19

*In re Kenneth Cole Productions, Inc.*, 27 N.Y.3d 268 (2016)................................................ 18, 19

*In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1 (Del. Ch. 2014)...................................... 15

*In re Parisi*, 34 Misc. 3d 1204(A), 946 N.Y.S.2d 68 (Sur. Ct. Queens County 2011), *aff'd as modified,* 975 N.Y.S.2d 459................................................................................................... 10

*In re Parisi,* 975 N.Y.S.2d 459 (App. Div. 2d Dep't 2013) ....................................................... 10

*In re Perry H. Koplik & Sons, Inc.*, 476 B.R. 746 (Bankr. S.D.N.Y. 2012), *adopted in relevant part*, 499 B.R. 276 (S.D.N.Y. 2013), <u>aff'd,</u> 567 F. App'x 43 (2d Cir. 2014) ............................ 17

*In re Scarborough Properties Corp.*, 25 N.Y.2d 553 (1969) ........................................................ 14

*In re Signature Apparel Grp. LLC*, 577 B.R. 54 (Bankr. S.D.N.Y. 2017) .............................. 28, 29

*Jones v. Surrey Cooperative Apartments, Inc.,* 700 N.Y.S.2d 118 (App. Div. 1st Dept., 1999).. 16

*Kahn v. M&F Worldwide Corp.*, 88 A.3d 635 (Del. 2014) .......................................................... 18

*Lewis v. S.L. & E., Inc.*, 629 F.2d 764 (2d Cir. 1980) ................................................................... 19

*Lincoln Guild Hous. Corp. v. Halper*, 556 N.Y.S.2d 50) .............................................................. 5

*Lippman v Shaffer*, 15 Misc. 3d 705 (Sup. Ct. 2006) ................................................................... 20

*Matter of Greenberg*, 614 N.Y.S.2d 825 (App. Div. 4th Dep't 1994) ......................................... 28

*Meinhard v. Salmon,* 249 N.Y. 458 (1928) ................................................................................... 15

*Meridian Financial Advisors, Ltd. v. Pence*, 763 F.Supp.2d 1046 (S.D. Ind. 2011) ................... 29

*Moser v. Devine Real Estate, Inc. (Fla.),* 839 N.Y.S.2d 843 (App. Div. 3d Dep't 2007) ........... 28

*O'Hayer v. de St. Aubin*, 293 N.Y.S.2d 147 (App. Div. 2d Dep't 1968) ............................. passim

*Patrick v Allen*, 355 F Supp 2d 704 (S.D.N.Y. 2005) .................................................................. 16

*Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184 (2d Cir. 2003) ............................. 34

*Readco, R.D.P. v. Marine Midland Bank,* 81 F.3d 295 (2d Cir.1996) .......................................... 5

*Renz v. Beeman*, 589 F.2d 735 (2d Cir. 1978) ....................................................................... 10, 28

*Sardanis v. Sumitomo Corp.*, 723 N.Y.S.2d 466 (App. Div. 1st Dep't 2001) ............................. 24

*Sarner v. Fox Hill, Inc.,* 199 A.2d 6 (Conn. 1964) ...................................................................... 19

*Schwartz v. Marien,* 37 N.Y.2d 487 (1975) ................................................................................. 16

*See Erie Cty. Sav. Bank v. Coit*, 104 N.Y. 532 (1887) ............................................................... 25

*Shapiro v. Rockville Country Club, Inc.*, 2 Misc. 3d 1002(A), 784 N.Y.S.2d 924 (Table) (Sup. Ct. Nassau County 2004) ................................................................................................................... 25

*Shapiro v. Rockville Country Club, Inc.*, 2004 WL 398980 (N.Y. Sup. 2004) ...................... 16, 25

*Stern v. General Electric Co.,* 837 F.Supp. 72 (S.D.N.Y.1993) ................................................... 16

*Strougo v. BEA Associates*, 188 F.Supp.2d 373 (S.D.N.Y. 2002) ............................................... 19

*United States Small Bus. Admin. v. Feinsod*, 347 F. Supp. 3d 147 (E.D.N.Y. 2018) ............ 16, 22

iv

*United States v. Fiorentino*, 2014 WL 108415 (E.D.N.Y. Jan. 6, 2014) ...................................... 19

*Wendt v. Fischer*, 154 N.E. 303 (N.Y. 1926) ........................................................................... 14

*Whitney Holdings, Ltd. v. Givotovsky*, 988 F. Supp. 732 (S.D.N.Y. 1997) ................................. 33

## Statutes

BCL § 509 ............................................................................................................................  2

BCL § 626 ........................................................................................................................... 34

BCL § 707 ........................................................................................................................... 27

BCL § 708 ........................................................................................................................... 27

BCL § 713 ........................................................................................................................... 27

BCL § 720 ........................................................................................................................... 15

BCL § 803 ........................................................................................................................... 26

BCL § 909 ........................................................................................................................... 31

NY UCC § 8-204 ..................................................................................................................  6

NY UCC § 9-609 ..................................................................................................................  7

NY UCC § 9-620 ............................................................................................................... 8, 18

NY UCC § 9-622 ..................................................................................................................  8

## Other Authorities

Brian Broughman, *CEO Side Payments in Mergers and Acquisitions*, 2017 BYU L. REV. 67

    (2017) ............................................................................................................................ 31

Charles Bryan Baron, *Self-Dealing Trustees and the Exoneration Clause: Can Trustees Ever

    Profit from Transactions Involving Trust Property?*, 72 ST. JOHN'S L. REV. 43 (1998) ...... 7, 16

## Rules

SCPA § 2215 .........................................................................................................................  5

## Treatises

RESTATEMENT (2D) OF TRUSTS, § 170 ...................................................................................  7

RESTATEMENT OF TRUSTS § 170 ......................................................................................... 13

Stephen M. Bainbridge, MERGERS AND ACQUISITIONS (3d ed. 2012) ........................................ 31

Plaintiffs Audrey Hays, Daniel Kleeberg, and Lisa Stein respectfully submit the following brief in support of their Motion for Partial Summary Judgment as to Count I (in part), Count II (in part), Count V, Count VI (in part), and Count IX.

## PRELIMINARY STATEMENT

When Allen Eber died, he put the family business into a Trust and named his son, Lester, co-trustee and one-third beneficiary. Lester was thus granted an equal share with each of his sisters, Plaintiffs' mothers. Under the "desire" expressed in Allen Eber's will, unlike his sisters, however, Lester also had the opportunity to be involved in the management of the family business, and he received a salary for doing so. To encourage the Trust's retention of the family business for the benefit of his whole family, Allen Eber also provided for limited exculpation for the Trust's three co-trustees: Their actions would be judged by the lesser standard of mere "good faith" as long as their actions kept the family business inside the family trust.

Lester's conduct in taking the family business *away* from the Trust *for himself and his children alone* is self-dealing completely contrary to his father's intent to preserve it for the entire family. Moreover, that conduct presents multiple clear-cut breaches of Lester's duty of undivided loyalty as a trustee. The operating business must be reconveyed to the corporation that held it as a Trust asset.

This is hardly the first time that portions of a family business, placed in a trust for the benefit of the entire family, were "siphoned off" by the child-trustee "for the benefit of his branch of the family." *See, e.g.*, *O'Hayer v. de St. Aubin*, 293 N.Y.S.2d 147, 154 (App. Div. 2d Dep't 1968). But this might be the most brazen. Indeed, Lester's transaction to divest the Trust of substantially all of its assets was so utterly irrational from the perspective of the Trust or the parent company that, even applying the lesser standard of good faith, the transaction still fails as a matter of law.

1

## ARGUMENT

**I.    PLAINTIFFS OWN 2/3 OF EB&C, AND LESTER CANNOT "PURCHASE" THEIR SHARES**

As requested in Count VI, Plaintiffs are entitled as a matter of law to a declaratory judgment stating that (a) they are the record owners with full legal title to two-thirds of the Trust's shares in Eber Bros. & Co., Inc. ("EB&C"), and (b) Lester Eber's attempt to "purchase" their shares was invalid and must be disregarded by all nominal defendants in this action.

### A.  The Parties Agree About How to Construe the Surrogate's Court Order

When this lawsuit was filed, Plaintiffs together held two-thirds of the equitable voting interest in EB&C through their two-thirds beneficial interest in the Trust, which held all 1850 Class A Voting Shares. SMF ¶¶ 2–3,8, 85. After this lawsuit was filed, CNB petitioned the Monroe County Surrogate's Court to terminate the Trust, accept its final accounting, distribute the Trust assets held by CNB, and discharge CNB from further responsibility as trustee. SMF ¶ 79. Lester formally entered an appearance in the Surrogate's Court proceedings and declined to make any objections to CNB's petition, including its final account or its proposed distribution. SMF ¶¶ 82–83. Plaintiffs relied on Lester's apparent consent to CNB's proposed distribution of the EB&C shares when they declined to object to terminating the Trust. SMF ¶ 84. The Surrogate's Court likewise noting "no Objections," proceeded to order the EB&C shares distributed to Plaintiffs and Lester in amounts proportionate to their respective shares in the Trust under the Will. SMF ¶85. Astonishingly, there is no dispute about how the EB&C shares should have been distributed according to the Surrogate's Order. SMF ¶ 85. *The parties actually agree on something.*

Accordingly, this Court should declare the shareholders of EB&C in accordance with the Surrogate's Court order, as agreed by the parties. *Id.*[1] Plaintiffs' Proposed Order reflects this.

---

[1] CNB seemed to be unaware that fractional shares could be issued under BCL § 509(a). Whatever CNB was thinking when it made its prior proposed distributions is immaterial, however, because CNB has committed to act in accordance with whatever this Court orders, to the extent that any actions by it are needed.

**B. Lester's Attempt to Intercept the Trust's Distribution of Assets Is Barred for Multiple Independent Legal Reasons**

Lester concedes that he has no legal basis to challenge the Surrogate's Court distribution order. Ex. 149 at 5 (Response 18). Instead, he asserts that he may invoke a "call right" to acquire the shares from the Trust himself. Specifically, Lester asserts that the Surrogate's Order directing the transfer of shares could not be carried out by the Trust because doing so would violate the "Transfer Restriction" in Article XII of EB&C's Bylaws, which required written notice to EB&C's President or Secretary before any transfer takes effect. SMF ¶88. Moreover, once such notice is received, any other shareholder then has a "five day period" to issue a notice of intent to purchase the shares itself for a price equal to their most recent official book value. *Id*.

On October 31, 2018, Lester sent the Allen Eber Trust, c/o CNB, a "Notice of Intent to Purchase" Plaintiffs shares, purporting to invoke Bylaw XII. SMF ¶ 95.

*1. Lester Was the Transferring Shareholder as a Matter of Law*

The validity of Lester's October 31, 2018 "Notice" to intercept the transfer of shares from the Trust to Plaintiffs is necessarily predicated on the belief that CNB, as the petitioning trustee, was required to give notice of its intended transfer to Lester, as President of EB&C, or Wendy, as Secretary, at least five days before its intended transfer. SMF ¶ 88.

Lester acknowledges that the EB&C stock was registered in his name *as trustee* for the benefit of the Trust (and, he contends, it still is). SMF ¶ 8. Accordingly, the "legal title" to the EB&C stock was vested in Lester.[2] *Donovan v. Van de Mark*, 78 N.Y. 244, 247 (1879). Legally, Lester *was* the transferor. The Bylaw only permits "[a]ny *other* shareholder" to purchase. SMF ¶88 (emphasis added). Lester has no "call right" available to him.

Lester's 2018 "Notice" to the Trust was far too late under the Bylaws. Lester concedes he received notice of the intended transfer from both the Surrogate's Court (as binding judicial agent for the Trust as transferor) *and* CNB (as co-trustee) in 2017. SMF ¶ 86. If some kind of more formal notice arguably was needed, Lester has only himself to blame: The Surrogate's

---

[2] Arguably, Lester's title claim was stronger than CNB's because CNB was not named on the stock certificates.

Order required Lester (as trustee) to give notice *to himself* (as President) in 2017. Instead, Lester waited over a year, until his lawyer got an email from undersigned counsel—someone who is undisputedly *not* an authorized agent of the Trust. SMF ¶ 95. His belated move to intercept the Trust's pass of shares to Plaintiffs should draw a flag for wrongful pass interference. Just as in football, the ball should be advanced to where the pass would have been caught.

### 2. *Lester Cannot Ignore His Duties as Trustee*

The decision to terminate the Trust and distribute its assets was *Lester's* decision. In order to terminate the Trust before Lester's death, the trustees, in their "absolute discretion," had to *elect* to do so. SMF ¶ 5. Therefore, since Lester was a trustee, the decision to terminate the Trust—despite being put into action by CNB—was equally Lester's own decision.

Unless and until that stock is registered in the names of the beneficiaries in accordance with the Surrogate's Order, Lester's trustee duties continued. Lester had the legal duty to deliver the Trust's assets to the remaindermen in accordance with the Will and the determination of the Surrogate's Court.[3] Moreover, a trustee is clearly prohibited from purchasing any Trust assets under any circumstances without the beneficiaries' or the Surrogate Court's consent. *See infra* § II(B). His proposed "Notice" to invoke a generic bylaw cannot overcome the fundamental proscription against trustee self-dealing.

If this Court were to conclude that CNB was required to provide notice under the Bylaws, despite (a) Lester being trustee himself and (b) CNB not being aware of the transfer restriction, then Lester was required to raise that issue before the Surrogate's Court. He could not just sit on his hands and all the Surrogate to authorize the allegedly improper transfer. Such gamesmanship is precisely what the rules of res judicata, waiver, and estoppel are designed to prevent.

---

[3] *See Bender v. City of Rochester, N.Y.*, 765 F.2d 7, 12 (2d Cir. 1985) ("Bender, as administrator of his father's estate, had the legal duty to collect and preserve his father's assets, to pay his father's debts, and to account for his acts to the distributees and deliver to them their intestate shares."); Restatement (Third) of Trusts § 89 ("[T]he trustee's duty of distribution is performed by surrendering possession of the subject matter of the trust within a reasonable time and taking steps that may be necessary to enable the beneficiary readily to establish ownership.").

3.   *Lester's Objection to the Surrogate's Court Order as Providing Inadequate Notice to Avoid a Transfer Restriction Is Barred by Res Judicata*

The Surrogate's Final Order entered an accounting decree and *directed* the payment of distribution of assets to the beneficiaries exactly as it should have. *See* SCPA § 2215(1) ("Where an account is judicially settled … and any part of the estate remains and is ready to be distributed the decree *must direct* the payment and distribution therefrom of the shares of the persons entitled thereto…") (emphasis added). The Ebers concede that the Order directs the distribution of the Trust's EB&C shares to Plaintiffs and Lester. SMF ¶ 85.

"As a general rule, an accounting decree is conclusive and binding with respect to all issues raised and as against all persons over whom Surrogate's Court obtained jurisdiction," and "as to issues that were decided *as well as those that could have been raised in the accounting*." *In re Hunter*, 4 N.Y.3d 260, 270 (2005) (emphasis added). Thus, Lester is bound by the consequences of this Order and cannot now say it is ineffective, regardless of whether his silence in Court was intentional gamesmanship (though the undisputed facts show that it was).

4.   *Lester Is Equitably Estopped from Asserting the Transfer Restriction.*

By being a trustee himself and entering an appearance in the Surrogate's Court proceeding, Lester had a duty to speak up and inform the Surrogate's Court if he was aware of any reason why the transfer of Trust assets to the beneficiaries was objectionable, improper, or incapable of being carried out. He chose to remain silent instead. "Silence constitutes an estoppel where there is a duty to speak." *Ackerman v. 305 East 40th Owners Corp.*, 592 N.Y.S.2d 365, 367 (App. Div. 1st Dep't 1993) (citing *Electrolux Corp. v. Val–Worth, Inc.,* 6 N.Y.2d 556 (1959) ; *Lincoln Guild Hous. Corp. v. Halper,* 161 A.D.2d 546, 556 N.Y.S.2d 50)).

The elements of equitable estoppel under New York law are that the person to be estopped "'(1) engaged in conduct which amounts to a false representation or concealment of material facts; (2) intended that such conduct would be acted upon by the other party; and (3) knew the real facts.'" *Hughes v. BCI Int'l Holdings, Inc.*, 452 F. Supp. 2d 290, 307 (S.D.N.Y. 2006) (quoting *Readco, R.D.P. v. Marine Midland Bank,* 81 F.3d 295, 301 (2d Cir.1996)). And

the party asserting estoppel must "'show with respect to [itself]: (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in [its] position.'" *Id.* (quoting *Readco*, 81 F.3d at 302) (alterations in original). It is undisputed that (1) Lester concealed the fact of the transfer restriction from the Surrogate's Court and Plaintiffs, SMF ¶¶ 83, 90; (2) Lester wanted to acquire the EB&C shares all for himself, but CNB would not agree, SMF ¶ 78; and (3) Lester knew about the transfer restriction, SMF ¶ 89. As to Plaintiffs, (1) they had no copy of the Bylaws, SMF 94; (2) they relied on Lester's silence and apparent consent to distribution in deciding not to oppose the Trust termination, SMF ¶ 84; and (3) that termination would be prejudicial if it permitted Lester to purchase Trust property.

Lester is also estopped from challenging the Trust's termination and distribution because he accepted the benefits of it, including receiving his share of the other assets. SMF ¶ 93. *See Electrolux.,* 6 N.Y.2d at 564 (1959) ("Where a person wronged … by an act or declaration recognizes the wrong as an existing and valid transaction, and in some degree, at least, gives it effect so as to benefit himself … he acquiesces in and assets to it and is equitably estopped from impeaching it.") (internal quotation marks omitted).

   5. *The Bylaw Restriction Is Invalid*

"A restriction on transfer if a security imposed by the issuer, even though otherwise lawful, is ineffective against a person without knowledge of the restriction unless … the restriction is noted conspicuously on the security certificate." UCC § 8-204. Here, the stock certificates issued to the trustees affirmatively state that they are "transferable," without any use of the word "restriction" or anything like it in that relevant sentence. SMF ¶ 91. And because Lester failed to mention the transfer restriction either to the Surrogate's Court or to Plaintiffs or their counsel prior to entry of the Surrogate's Order, it cannot prevent the transfer to Plaintiffs.

## C.  Additional Injunctive Relief Is Necessary (Count V)

Given Defendants' actions to block Plaintiffs' exercise of their interests and rights, including refusing to hold an annual meeting or elect directors for EB&C for several years, and

issuing new shares to themselves even while the Trust was still active, this Court's partial summary judgment should include declaratory and injunctive relief to ensure that Plaintiffs' voting rights as shareholders are able to be exercised promptly (as indeed it is long overdue). The specific relief requested for entry is set forth in the Proposed Order.

## II.   EBER METRO MUST RETURN TO THE TRUST

### A.   Lester's Strict Foreclosure Was a Credit-Crisis-Era Twist on the "Classic" Example of a Self-Dealing Trustee

It is undisputed that Lester acquired Eber Metro from EBWLC by agreeing to cancel the debt to himself. For purposes of this motion, Plaintiffs assume *arguendo* that the debts were legitimate, authorized, and secured, and that the default on some of the debt by Eber Metro in December 2011 was not planned at the outset. Even so, Lester's conduct was indistinguishable from purchasing Trust property for the amount of the debt—classic self-dealing:

> The "classic ' example of a self-dealing trustee, however, involves a trustee's purchase of trust property in his individual capacity. A trustee may not sell trust property to himself (or his spouse) privately or by auction, even if the sale is made in good faith and for adequate consideration.

Charles Bryan Baron, *Self-Dealing Trustees and the Exoneration Clause: Can Trustees Ever Profit from Transactions Involving Trust Property?*, 72 ST. JOHN'S L. REV. 43, 49–50 (1998) (citing RESTATEMENT (2D) OF TRUSTS, § 170(1)). During contemporaneous discussions about Lester's foreclosure on the debt, Gumaer and Wendy agreed that "Lester was moving against the trust of which he was a cotrustee," and that "Lester was moving against the company" held by the Trust. SMF ¶56. New York law does not condone such betrayals.

#### 1.   Lester's Rights as a Secured Creditor under the UCC

In the event of a debtor's default, a secured creditor has the right to take possession of the collateral, UCC § 9-609, and to sell or otherwise dispose of the collateral in any "commercially reasonable" manner, UCC § 9-610. But unless the collateral is sold "at a public disposition," or if it "is of a kind that is customarily sold on a recognized market or the subject of widely

distributed standard price quotations" then in a private sale, the secured creditor is ineligible to purchase the collateral for himself. UCC § 9-610(c); *see, e.g.*, *Bruce v. Cauthen*, 515 S.W.3d 495, 503 (Tex. App. 2017) ("If commercially reasonable, a secured party may *dispose* of collateral by public or private proceeding . . . . However, the secured party may not *purchase* the collateral at a private sale if the collateral is not 'of a kind customarily sold,'" which minority corporate ownership interests are not.). The only other alternative is a "strict foreclosure" under UCC § 9-620, see *In re CBGB Holdings, LLC*, 439 B.R. 551, 558 (Bankr. S.D.N.Y. 2010) , UCC § 9-620–622 which may allow the secured creditor to assume title to the subject collateral in consideration for extinguishment of the defaulted debt. But that procedure is subject to a non-waivable duty of good faith, UCC § 9-620 cmt. 11, in addition to the fiduciary duties of loyalty and good faith that Lester independently bore as trustee and corporate director of EBWLC.

When Eber Metro defaulted on the LOC Note by failing to repay it in full by December 31, 2011, EBWLC had no obligation to turn over ownership of Eber Metro to Lester just because he was a secured creditor. Such a strict foreclosure is only permitted if the debtor consents *after* default.[4] Thus, in scrutinizing the challenged strict foreclosure, this Court need only focus on 2012, without delving into the weedy terms of the various security agreements or guaranty; all of those were undisputedly executed *before* default. The crucial question is, following the default, did Lester and EBWLC act in complete good faith in granting ownership of EBWLC's essentially only asset to Lester himself. *See* UCC § 9-620 cmt. 11. They did not.

> 2. *By Transferring Title to Lester, EBWLC Essentially Sold Eber Metro to Lester*

It is no wonder that several defense witnesses characterized the Metro Transfer as a sale. SMF ¶69. Several aspects of the transaction make it more analogous to a sale of Eber Metro than to a secured lender's foreclosure on collateral. By taking title to the collateral himself, registering all of Eber Metro's 20,000 common shares in the name of Alexbay, Lester effectively purchased

---

[4] The UCC Article 9 prohibits any agreement to a strict foreclosure unless it occurs "after default." *See* NY UCC § 9-620(c)(2) (requiring that the debtor's consent be "authenticated after default" or the secured party's proposal be "sen[t] to the debtor after default").

Eber Metro. SMF ¶ 60. The purchase price paid was, simply, the amount of his debt that was eliminated. Absent some undiscovered, on-point authority specifically addressing trustee fiduciary obligations in the context of self-dealing strict foreclosures, this Court should treat the transaction as if it were sale.

### 3. *Eber Metro Was a Trust Asset*

For the sake of completeness, we note that there can be no question that Eber Metro was a Trust asset. SMF ¶ 9–14. As such, Lester's duties as a co-trustee were implicated whenever he dealt with Eber Metro or its subsidiaries, including Eber-CT.

The finding that Eber Metro was a Trust asset is further compelled by the terms of the Trust instrument, the Allen Eber Will, which made clear that family business was to be retained by the Trust so long as the family remained involved. SMF ¶ 6. Indeed, a sale of the business was the *only* possible condition that could permit the termination of the Trust prior to Lester's death. SMF ¶ 5. And, as the Surrogate's Court implicitly found (since it agreed to terminate the Trust even though Lester is still alive), the transfer of Eber Metro to Alexbay was effectively a sale of the Eber Bros. business because it rendered EB&C a worthless shell.[5]

Lester's concealment of the Metro Transfer to Alexbay stands in stark contrast to how this very Trust was operated when other transactions were potentially damaging to the Trust, or involved a special benefit to a contingent remainderman of the Trust not shared by the others. Consider the sale of assets and other agreements with Southern Wine & Spirits ("Southern") in 2007. Most of the transactions were formally authorized by shareholder consent, including EB&C and the Trust. SMF ¶ 26. Moreover, Lester called the beneficiaries to tell them what was happening. *Id*. By contrast, neither EB&C nor the Trust ever formally consented to the transfer of Eber Metro to Alexbay, even though, unlike in 2007, this transaction involved self-dealing by a trustee and was a disposition of substantially all of EB&C's assets, because now the last remaining going concern was gone. SMF ¶ 70. And it was concealed from the family. SMF ¶ 71.

---

[5] The one remaining asset was this very lawsuit, which the Ebers' lawyer incorrectly told an appraisal firm to treat as a liability instead. SMF ¶ 79.

The cloak-and-dagger antics in 2012 seem only when one considers that, just months earlier, when Sally Kleeberg requested distributions of principal to help her granddaughter, the Trust refused to give her even the modest sum of $1,000 a month (taken out of Sally's share alone) without getting all the beneficiaries and contingent remaindermen to consent. SMF ¶ 7.

## B. The Transfer Is Void Under the "No Further Inquiry" Doctrine Because It Was Self-Dealing by Lester—Acquiring a Trust Asset While He Was Trustee

Lester's greed to acquire undivided ownership of the family business was an indisputable breach of his duty of undivided loyalty to the family trust. He may have resigned his post at EBWLC prior to completing the taking (we assume that he did so for purposes of this motion), but he did not resign as trustee. And since Eber Metro was a Trust asset as a matter of law, Lester's taking it was an act of self-dealing by a trustee, no matter the mechanism by which it was acquired.

The "no further inquiry" rule applies to void a self-dealing transaction with a trustee or entity in which he has an interest, *even if* the transaction's terms were fair, the trustee acted in good faith, and the trust suffered no loss or the trustee received no profit.[6] "Under that per se rule, the court is generally required, upon challenge by a beneficiary, to set aside a transfer of property, held in trust by a fiduciary, to the fiduciary himself or an entity in which he or she has an interest." *In re Parisi,* 975 N.Y.S.2d 459, 462 (App. Div. 2d Dep't 2013).

It is clear that Lester engaged in a variety of transactions that had the consequence of circumventing and contravening the express provisions of the Allen Eber Will and to thereby transfer to one branch of the family that which was supposed to be for all three branches. The case is very close to that of *Renz v. Beeman*, 589 F.2d 735, 746–47 (2d Cir. 1978): "To upset the balance of control for selfish gain is to commit a breach of the high fiduciary duty of undivided loyalty." *Renz*, 589 F.2d at 747. That was so even when the trust instrument in *Renz* expressly

---

[6] *In re Parisi*, 34 Misc. 3d 1204(A), 946 N.Y.S.2d 68 (Sur. Ct. Queens County 2011), *aff'd as modified*, 975 N.Y.S.2d 459 ("Where self-dealing is found, the fairness or unfairness of the transaction is immaterial and not considered by the court. Thus, where a fiduciary has transferred estate or trust property to himself, the court will not consider the fairness or unfairness of the transaction nor consider whether or not full consideration was paid.") (internal citation omitted).

permitted stock transactions. *Id.* Here, the duty of undivided loyalty was unquestionably stronger than in *Renz*, especially since the Trust could not be terminated so long as Lester was alive and working in the family business, and because here the branch of the family taking control had merely one-third of the interest in the Trust. Because Lester's transfer was not authorized by the settlor's intent and was not consented to by the beneficiaries, Lester has no defense.

> 1. *Lester's Opportunity to Participate in the Management of the Business Clearly Did Not Convey a Right to Take the Business*

"[T]he rule of undivided loyalty from a trustee may be relaxed by a settlor by appropriate language in the trust instrument in which he, either expressly or by necessary implication, recognizes that the trustee may have interests potentially in conflict with the trust." *O'Hayer*, 293 N.Y.S.2d at 151. (citations omitted).

Here, by implication, Allen Eber permitted Lester to engage in some conduct out of self-interest: namely, getting paid for working for Eber Bros. Ex. 132 at 13. This reasonably He could reasonably be expected to seek substantial compensation for his services. Although even then, even where he is allowed to act out of self-interest, Lester does not have "free rein to deal with the trust" for "the law interposes to require that the trustee always exercise good faith in his administration." *O'Hayer*, 293 N.Y.S.2d at 151. Accordingly, the language in the Will anticipating that Lester would work for the company imposes a duty of good faith, even when he is seeking compensation for his services.

Importantly, the Will's implied grant of permission for Lester to seek compensation for his services must be "strictly construed" because the general rule remains one of undivided loyalty. *O'Hayer*, 293 N.Y.S.2d at 151.

Quite the opposite of the trust instrument examined in *O'Hayer* (which expressly abrogated the "general rule of law that a trustee shall not profit from his trusteeship," 293 N.Y.S.2d at 157 (appendix excerpting the will)), Lester's ability to profit was unmistakably circumscribed. Indeed, if he accepted his father's nomination, he was required to serve as

11

executor and trustee *without compensation* for doing so.  *See* Ex. 132 at 13 ("I direct that my son shall serve in each such fiduciary capacity without compensation.").

Most striking is the fact that Lester's opportunity to participate in the management" of Eber Bros. was "*subject to [his] primary wish*" that the Trust retaining its "voting control" of the business *Id*. And it was also expressly stated that the interests in "certain other close corporations can also be retained," sweeping in Eber and related "close corporations." Ex. 132 at 13.

In short, Allen Eber expressly wanted this to remain a family business and to ensure that Lester could not operate the business for anyone other than his entire family's benefit. Nothing in the Will even approaches permitting Lester to take individual possession of any corporate assets, let alone an entire corporate subsidiary, let alone the sole remaining operating business!

1. *The Power to Make Secured Loans Did Not Create a Backdoor for Trustees to Purchase Trust Property Themselves*

Lester may contend that the Will's general provision permitting secured loans from trustees (one of which was, after all, a bank) for the benefit of the Trust empowered him to take these actions. *See* Ex. 132 at 16 (empowering the trustee "[t]o borrow money from itself or others for the benefit of my estate or any trust hereunder, and to secure the loan by pledge or mortgage of the property of my estate or any trust and to renew existing loans"). This language cannot be construed to permit Lester to acquire *ownership* of *any* Trust property, much less take control of the family business away from the Trust. *See O'Hayer*, 293 N.Y.S.2d at 151 (such grants must be "strictly construed" against permitting self-dealing).

Only self-dealing in *lending* was permitted, not self-dealing in *disposing* of property. Notably, the Will does not say that the trustee may actually *foreclose* on the security without obtaining the beneficiaries' or the Surrogate Court's approval. But even if we assume for the sake of argument that the ability to foreclose was permitted, it is important to remember that an ordinary foreclosure, though undoubtedly self-interested, does not involve *self-dealing* because the secured creditor is required to dispose of the property in a commercially reasonable manner

and then apply the proceeds towards the debt and costs of disposition, and give any surplus to the debtor; at no point does the secured creditor take ownership of the property.

Under the UCC, there are limited ways in which an ordinary foreclosure can result in the secured lender acquiring title to the collateral: (i) if the secured lender is the winning bidder at a public auction, or (ii) through a strict foreclosure. *See supra* § II(A)(1). And it is notable that trust cases have held that a trustee cannot purchase trust assets *even at an auction*. *See Gratz v. Claughton*, 187 F.2d 46, 49 (2d Cir. 1951) ("'A trustee with power to sell trust property is under a duty not to sell to himself either at private sale or at auction, whether the property has a market price or not, and whether the trustee makes a profit thereby.'") (quoting Restatement of Trusts § 170(1) cmt. b). And so, it is vital to remember that the UCC provides a set of rules for *any* secured transaction and does not address the rules if and when the secured creditor stands in a fiduciary relationship to the debtor. The rules offer no safe haven to breach any other duties, especially not the unusually strong duties of those designated trustees.

More importantly, reading the Will as permitting Lester to acquire the operating business himself—cutting out the rest of his family—would ignore the overwhelming language that precedes this clause in the Will that is specific to Eber Bros. and Lester's role in it. *See supra* § II(B)(1). Lester's desired interpretation of this clause (which was almost certainly intended for the bank, not Lester, to be able to loan money) cannot be reconciled with Allen Eber's explicit desire to retain the business, *and* to make his desire for Lester to be involved "subject to that primary wish." Ex. 132 at 13. Everything in the Will discussing the business forecloses the possibility that Lester would end up in sole control of those assets. Accordingly, the absence of an express exculpation or power in the Will means that Lester's only way of acquiring Eber Metro was by informed consent from the beneficiaries or the Surrogate's Court. He got neither.

### 2.   *The UCC Article 9 Foreclosure Action Did Not Even Mention the Trust*

A judicially approved foreclosure might have protected Lester, but only if it was done with due process, *starting with* notice to the Trust beneficiaries. *See In re Scarborough*

*Properties Corp.*, 25 N.Y.2d 553, 558–59 (1969) ("[T]he rule against self-dealing has not been applied, and does not apply, to interdict the purchase of trust property by a trustee where the court, *after conducting a full adversary hearing at which all interested parties are represented*, approves proves and authorizes the sale.") (emphasis added). Here, none of the beneficiaries or trustees were parties to the Alexbay suit (not even Lester himself). None of the filings in the Supreme Court proceeding even mentioned that there was a trust.[7] And even if the Court were to excuse the inexcusable failure to provide notice or adequate disclosure, legal standard discussed was the UCC's standard of "commercial reasonableness," which governs a *non-fiduciary* secured creditor's duties. Accordingly, as a matter of law, the Article 9 UCC foreclosure proceeding could not have condoned Lester's self-dealing.

   *3.   The Other Trust Beneficiaries Did Not Consent*

   Informed consent by the Trust beneficiaries might have been a possible defense, *Flaum v. Birnbaum*, 508 N.Y.S.2d 115, 122 123 (App. Div. 4th Dep't 1986), if it were not undisputed that Lester never even told them about it. SMF ¶ 71. Lester's concealment and self-interested behavior was fundamentally at odds with his solemn duty as a trustee. His disregard of that to advance his own and his children's interest cannot be sustained without fundamentally gutting the core legal precedents and public policies of the State of New York.

   **C.   Constructive Trust, Forced Reconveyance, and Accounting Are Appropriate Remedies**

   "[I]mposition of a constructive trust, forced reconveyance, and an accounting are appropriate remedies in these circumstances." *Flaum*, 508 N.Y.S.2d at 123. "The remedy of a constructive trust is peculiarly suited to circumstances in which a fiduciary has been guilty

---

[7] To obtain valid judicial approval over trustee self-dealing, Lester needed to file in the Surrogate's Court, which has equitable jurisdiction over trust administration. *See Scarborough*, 25 N.Y.2d at 559 (1969) ("'The reason why the permission or approval of the court is sufficient to justify a sale of trust property to the trustee personally is that a court of equity is a court having general supervision over the administration of trusts, and if the parties are properly represented before it, it has authority to authorize what would otherwise not be permissible.'") (quoting 2 Scott, Trusts 1319 (3d ed. 1967)). Regardless of what court it was in, the non-disclosure of Lester's trustee relationship was a fatal omission. *See Wendt v. Fischer*, 154 N.E. 303, 304 (N.Y. 1926) ("It stops the inquiry when the relation is disclosed, and sets aside the transaction . . . .").

of self-dealing." *Birnbaum v. Birnbaum*, 503 N.Y.S.2d 451, 458 (App. Div. 4th Dep't 1986)

(citing *Meinhard v. Salmon,* 249 N.Y. 458, 467 (1928) ("A constructive trust is then the remedial

device through which preference of self is made subordinate to loyalty to others") and

Bogert, *Handbook of the Law of Trusts*, § 87 (1973)).

   "'If the trustee has not resold the property, or has resold it to a person who is not a bona

fide purchaser, the beneficiaries can insist upon a reconveyance of the property; and the trustee is

accountable for any income received by him from the property …."' *Birnbaum*, 503 N.Y.S.2d at

458 (quoting II Scott, *The Law of Trusts*, § 170.2, pp. 1304–1305 (1967)).[8] By combining

reconveyance and constructive trust, the ultimate remedial aim is "to place the beneficiaries in

the same position they would have been in had the misappropriation not occurred." *Id.* (citations

omitted).[9] Thus, profits earned by Lester or his affiliates after the transfer are to be transferred to

EBWLC.

   An accounting is a necessary step to balance the equities before entry of a final

judgment.[10] It is especially necessary here because Defendants' discovery has failed to paint a

clear portrait of everything Lester and Wendy have taken out of the business, and as this Court

has recognized, their disclosures have been far from forthcoming, and certainly nowhere near

what is expected of a fiduciary compelled to account for their actions.

---

[8] A reconveyance is also expressly authorized by BCL § 720(a)(2). But because that statute requires a finding that "the transferee knew of [the conveyance's] unlawfulness," *id.*—a measure of subjective intent—that statutory provision is not invoked in this motion. Importantly, that statute is expressly <u>not</u> an exclusive remedy, even in cases solely concerning corporate law. *See* BCL § 720(c) ("This section shall not affect any liability otherwise imposed by law upon any director or officer."). Here, this Court has even greater power to enter equitable relief because of Lester's self-dealing as a trustee, where reconveyance is unquestionably the preferred remedy, whenever it is possible.

[9] *See also In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 38 (Del. Ch. 2014) ("In a case where a disloyal fiduciary wrongfully deprives its beneficiary of property, the rescissory damages measure seeks (i) to restore the plaintiff-beneficiary to the position it could have been in had the plaintiff or a faithful fiduciary exercised control over the property in the interim *and* (ii) to force the defendant to disgorge profits that the defendant may have achieved through the wrongful retention of the plaintiff's property.").

[10] "An accounting is an equitable remedy that consists of the adjustment of accounts between parties and a rendering of a judgment for the amount ascertained to be due to either as a result." *Albert v. Alex. Brown Mgmt. Servs., Inc.,* 2005 WL 2130607, at *11 (Del. Ch. Aug. 26, 2005). "It is elementary that in this accounting phase, [the party submitting the accounting] bears the burden of proving both the accuracy of its accounting and the propriety of the underlying transactions." *Dolby v. Key Box "5" Operatives, Inc.,* 1996 WL 741883, at *1 (Del. Ch. Dec. 17, 1996) (Allen, C).

### III.   ALTERNATIVELY, CORPORATE LAW MANDATES A SIMILAR RESULT

Even if Lester's acquisition of Eber Metro were not impermissible self-dealing with Trust assets subject to being set aside under the no-further-inquiry rule, it must nevertheless be set aside as a matter of law based on the undisputed facts showing that the transaction was unreasonable and, at minimum, unfair to EBWLC, its shareholders, and its other creditors.[11]

Defendants admit that they owed fiduciary duties to the corporations they served as directors and officers, but they "deny" that they owed fiduciary duties to the corporations' shareholders, too. Ex. 107 ¶ 10. The law of New York is clear, however, that "officers and directors owe fiduciary duties, including a duty of loyalty and a duty of care, to a corporation and its shareholders." *United States Small Bus. Admin. v. Feinsod*, 347 F. Supp. 3d 147, 158 (E.D.N.Y. 2018) (Bianco, J.); *see also Schwartz v. Marien,* 37 N.Y.2d 487, 491 (1975) (directors "owe a fiduciary responsibility to the shareholders in general….").

In the absence of self-dealing, discrimination, or misconduct, the business judgment rule applies and created a rebuttable presumption that the corporate's directors acted in good faith. *Jones v. Surrey Cooperative Apartments, Inc.,* 700 N.Y.S.2d 118, 121 (App. Div. 1st Dept., 1999).[12] "To overcome the business judgment rule, a shareholder must establish that 'no person of ordinary sound business judgment would say that the corporation received fair benefit' in regard to the transaction." *Shapiro v. Rockville Country Club, Inc.*, 2004 WL 398980, at *9 (N.Y. Sup. 2004) (quoting *Aronoff v. Albanese,* 85 A.D.2d 3, 5, 446 N.Y.S.2d 368, (App. Div. 2nd Dept. 1982) and *Stern v. General Electric Co.,* 837 F.Supp. 72 (S.D.N.Y.1993)).[13]

---

[11] *See also* Baron, *Self-Dealing Trustees,*, 72 ST. JOHN'S L. REV. at 45 ("[E]ven where trust language is narrowly drawn [to permit certain self-dealing], profits accruing to a trustee from the self-dealing transaction may only be 'normal' and 'reasonable' profits such as those made by a third party in an arm's length transaction, and not those realized through the sale of trust property to a trustee at a fraction of market value.").

[12] "New York's business judgment rule creates a presumption that a corporation's directors act in good faith and in the best interests of the corporation." *Patrick v Allen*, 355 F Supp 2d 704, 710 (S.D.N.Y. 2005) ("The rule is designed to bar judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes.") (internal quotations omitted).

[13] *See also Roselink Inv'rs, L.L.C. v. Shenkman*, 386 F. Supp. 2d 209, 221–22 (S.D.N.Y. 2004) ("Bad faith may be found where a business decision 'is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.'" (quoting *In re J.P. Stevens & Co., Inc. Shareholders Litigation,* 542 A.2d 770, 780–81 (Del.Ch.1988)).

By contrast, "[w]here officers or directors of a corporation considering a transaction are not disinterested and have a personal stake in the outcome, their determination is not entitled to the deference usually given under the business judgment rule. Instead they must show the entire fairness of the transaction, or that it is 'intrinsically fair.'" *In re Perry H. Koplik & Sons, Inc.*, 476 B.R. 746, 803 (Bankr. S.D.N.Y. 2012), *adopted in relevant part*, 499 B.R. 276 (S.D.N.Y. 2013), aff'd, 567 F. App'x 43 (2d Cir. 2014). The "entire fairness" doctrine in "New York law may not be as well as developed as the Delaware law, [but] it is to the same effect." *Id.* at n.307. The doctrine generally applies when shareholders are divested of their shares. There are two principal components: "fair dealing" and "fair price." *Alpert v. 28 Williams Street Corp.*, 63 N.Y.2d 557, 569–70 (1984). When there is an inherent conflict of interest—e.g., authorizing fiduciaries standing on both sides of the transaction—then "the burden shifts to the interested directors and shareholders to prove good faith and the entire fairness of the merger." *Id.* at 570.

## A.  The Transfer Is So Bad It Fails the "Business Judgment Rule"

EBWLC's decision to allow Lester's Alexbay to take sole ownership of Eber Metro was economically irrational. Consenting to transfer its sole operating asset to Alexbay was the equivalent of pushing a self-destruct button. It was left with nothing but unserviceable debt.

It is undisputed that Eber Metro's assets included the controlling stake in Eber-CT and that Eber-CT was extremely difficult if not "impossible" to value because it was a privately held going concern.[14] The undisputed uncertainty of any valuation method means that this Court need not wade into the fact question of what Eber-CT was worth and whether EBWLC was technically solvent prior to the Alexbay transfer. Its value beforehand was uncertain, but after the transfer, EBWLC was *certainly and irreparably insolvent*.

In other words, no reasonable businessperson could have thought that the modest benefit of eliminating EBWLC's guaranty of Eber Metro's debt to Lester was worth getting rid of Eber Metro. There was no possible way that this transaction could benefit for EBWLC, which is why

---

[14] Defendants' own expert declined to provide a specific valuation as of the Alexbay transfer date, instead providing an incredible range of values from $0.7 million to over $11 million.

Lester resigned effective February 1, 2012—as Wendy conceded in her fourth day of testimony, Lester's actions were a move "against" EBWLC.

As discussed above, under the UCC and the loan documents, EBWLC had no obligation to turn ownership of Eber Metro over to Lester.[15] No material business expense was required to decline Lester's proposal: All it had to do was send "a notification of objection" to Lester within 20 days. NY UCC § 9-620(c)(2)(C). Hence, cost savings cannot explain what transpired.

## B. Defendants Cannot Meet Their Burden Under the "Entire Fairness" Doctrine

The business judgment rule does not apply to Alexbay's acquisition of Eber Metro because the transaction eliminated Plaintiffs' interests in the business and consolidated control with Lester. Such a "freeze-out merger"[16] is subject to six strict requirements in order to receive the benefit of the business judgment rule. *See In re Kenneth Cole Productions, Inc.*, 27 N.Y.3d 268, 277–78 (2016) (adopting six mandatory steps that must be taken for a controller buyout (i.e., a freeze-out merger) to receive the benefit of the business judgment standard of review):

> "in controller buyouts, the business judgment standard of review will be applied *if and only if:* (i) the controller conditions the procession of the transaction on the approval of both a Special Committee and a majority of the minority stockholders; (ii) the Special Committee is independent; (iii) the Special Committee is empowered to freely select its own advisors and to say no definitively; (iv) the Special Committee meets its duty of care in negotiating a fair price; (v) the vote of the minority is informed; and (vi) there is no coercion of the minority" (*id.* at 645).

*Id.* at 277 (quoting *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 645 (Del. 2014). "[I]f the evidence demonstrates that any of the protections were not in place, then the business judgment rule is inapplicable and the entire fairness standard applies." *Id.* at 279.

---

[15] The UCC prohibits any agreement to a strict foreclosure unless it occurs "after default." *See* NY UCC § 9-620(c)(2) (requiring that the debtor's consent be "authenticated after default" or the secured party's proposal be "sen[t] to the debtor after default").

[16] To be clear, the situation is not really a freeze-out merger because Plaintiffs were not minority shareholders being pushed aside by the majority owner or a controlling faction. Rather, they were beneficiaries of a controlling trust. Hence, the primary lens through the which the transaction should be viewed is that of trust law. But, if this Court does not apply trust law, then the most analogous situation is the freeze-out merger, since Lester's status as trustee enabled him to act like a majority stock owner even though his beneficial interest was only about one-third.

The undisputed evidence is more than sufficient to show that at least one of the procedural safeguards for the non-controlling interests was not in place. Conditions (i) and (v) were not met because the Metro Transfer was not even disclosed to the non-controlling stakeholders (Plaintiffs), much less approved by "a majority" of them. Conditions (iii) and (iv) was not met because there was no "Committee" and it certainly had no demonstrable independence from Lester, who attended the board's meetings even after he purportedly *resigned* as a director and officer himself.  Furthermore, there is no evidence that the directors attempted any negotiations whatsoever. Finally, and most crucially, condition (ii) was not met because the directors who approved the transaction were not remotely independent: Wendy was Lester's daughter and Gumaer was Lester's personal attorney. SMF ¶¶ 16–19. Such relationships are plainly "material in the sense that they could affect impartiality." *Kenneth Cole*, 27 N.Y.3d at 279. *See Drobbin v. Nicolet Instrument Corp.*, 631 F. Supp. 860, 879–80 (S.D.N.Y. 1986) ("An attorney-director of a corporation is regarded in law as just as interested as is his client, also a director.") (citing *Sarner v. Fox Hill, Inc.,* 199 A.2d 6 (Conn. 1964)); *United States v. Fiorentino*, 2014 WL 108415, at *2 n.2 (E.D.N.Y. Jan. 6, 2014) (the Securities and Exchange Commission ("SEC") considers the interest of an "immediate family member of a director or officer" as creating a conflict of interest on the part of the officer or director)[17]; *see also Strougo v. BEA Associates*, 188 F.Supp.2d 373, 377 (S.D.N.Y. 2002) (Investment Company Act § 2(a)(9)(b) disqualifies directors from being non-interested "by virtue of family relationship" or "acting as legal counsel to" the company). Thus, the self-dealing transaction involving hopelessly conflicted directors lacks anything close to sufficient procedures to warrant the benefit of the business judgment rule.[18]

---

[17] *See also* SEC Conflicts of Interest Policy § B, Conflicts of Interest Transactions, *at* https://www.sec.gov/Archives/edgar/data/1537413/000119312512061200/d274377dex109.htm.

[18] Consideration of cases outside the context of freeze-out mergers leads to the same conclusion. Directors may benefit from the business judgment rule "only if they possess a disinterested independence and do not stand in a dual relation which prevents an unprejudicial exercise of judgment." *Auerbach v. Bennett*, 47 N.Y.2d 619, 631 (1979). *See also In re Croton River Club, Inc.*, 52 F.3d 41, 44 (2d Cit. 1995) ("It is black-letter, settled law that when a corporate director or officer has an interest in a decision, the business judgment rule does not apply."); *Lewis v. S.L. & E., Inc.*, 629 F.2d 764, 769 (2d Cir. 1980) ("When a shareholder attacks a transaction in which the directors have

In addition, a showing of fraud or bad faith precludes applying the business judgment rule. *Patrick*, 355 F. Supp 2d at 710 ("The business judgment rule will not protect a decision that was the product of fraud, self-dealing or bad faith."). Here, the Ebers' own expert characterized the transaction as "a shell game" that would reasonable investor would expect to be challenged by creditors as a "fraudulent conveyance." SMF ¶ 74. In other words, the transaction is undeniably subject to stricter scrutiny.

In most breach of corporate fiduciary duty cases, "[d]eterminations as to whether the activities of defendants were undertaken in good faith for a legitimate corporate purpose" depends at least "in part on an appraisal of defendants' motives, involving as it will issues of credibility," and therefore cannot be decided by "triers of fact." *Schwartz v. Marien*, 37 N.Y.2d 487, 493 (1975) (citing *Kavanaugh v. Kavanaugh Knitting Co.*, 226 N.Y. 185, 198 (1919) ("Good faith or bad faith as the guide or the test of fiduciary conduct is a state or condition of mind—a fact—which can be proved or judged only through evidence.")). Here, however, because this was an interested director transaction, *Defendants* have the burden of showing the "entire fairness" of the transaction. The facts here are unusually atrocious.

1.  *Unfair Process: No Informed Consent, No Third-Party Appraisal, Etc.*

This was no ordinary insanely bad deal—it enlarged the controlling fiduciary's beneficial interest from one-third to complete domination, and it did so without so much as notice to the other beneficiaries, much less their consent. No consent from CNB either. No appraisal or outside bidding was received to support valuation. No attempt by the company to negotiate with Lester, even though the board was actively involved in re-negotiating loan terms with other creditors—most notably the aforementioned CNB. The closest thing to the appearance of due

---

an interest other than as directors of the corporation, the directors may not escape review of the merits of the transaction."). Accordingly, where a self-interested action or transaction is involved, "the burden shifts to the self-interested director to demonstrate the 'entire fairness' and reasonableness of the actions." *Lippman v Shaffer*, 15 Misc. 3d 705, 711 (Sup. Ct. 2006). Said another way, where "directors considering a transaction are not disinterested and have a personal stake in the outcome, their determination is not entitled to the deference usually given under the 'business judgment' rule. Instead they must show the 'entire fairness' of the transaction, or that it is 'intrinsically fair.'" *In re Adelphia Communications Corp.*, 323 BR 345, 384–85 (Bankr. SDNY 2005).

process was an unopposed lawsuit that never mentioned the Trust or flagged the issue of fiduciary duties. In fact, the company's counsel stipulated to waive defenses before Gumaer had even the slightest clue of what was going on. The whole thing was just shamelessly contrived.

Even the Polebridge Bowman transaction had a greater appearance of fair process, despite the fact that the transaction was with the company's lawyer, concealing his identity through a shell company, supposedly as "compensation" to him, and yet he wrote a memo indicating he really did not want it and would rather find "a different structure that works" because "that would be better for me." Ex. 119 at 2. At least the Polebridge Bowman transaction was ostensibly tested for fairness by Eder-Goodman, when it was deciding whether to exercise its right of first refusal. SMF ¶ 13. Here, Lester nearly tripped himself up by going after Eber Metro, but managed to avoid Eder-Goodman's right of first refusal by doing the transfer at another entity level. SMF ¶¶ 50–51.

It is undisputed that EBWLC made no attempt to renegotiate Lester's loans and even try to secure an extension of the maturity date. SMF ¶ 46. To be sure, this fact strongly suggests bad faith and supports application of the entire fairness test, but it also lends further support to a finding that there was a failure of business judgment, particularly because the same directors were contemporaneously renegotiating Eber-CT's loans with CNB. *See* SMF ¶ 45 (getting an extension on an already defaulted line of credit from CNB *four days* before the maturity date of Lester's LOC Note). So, they knew that renegotiating loans was a possibility, but they did not even explore that option here. Instead, they simply consented to giving away the company.

### 2. *Unfair Consideration: The Metro Transfer Undisputedly Produced No Benefits for EBWLC, and There Is No Economically Irrational*

Using Defendants' *own* valuations, the value of Eber Metro's assets at the time that it was transferred to Alexbay exceeded the value of the consideration received by EBWLC from Alexbay. Thus, there is no triable issue of fact here: the consideration was unfair.

The correct valuation of Eber Metro's *assets* at the time of Alexbay's acquisition is a matter of disputed fact that would come down to a battle of the experts, if it were not clear that

under the *Defendants'* best "point estimate" valuation, Eber Metro's value exceeded the amount of Lester Eber's debt by **$2,158,683**. SMF ¶¶ 67, 69. Or, using the corrected valuation based on just the Polebridge Bowman transaction that Alexbay relied on in its court filings, the loss to EBWLC was almost as bad: **$1,999,465**. SMF ¶¶ 65, 69.

Even if we use Alexbay's undisputedly too-low numbers from its court filings, the consideration exchanged was still unbalanced because Alexbay omitted to disclose Eber Metro's second-most valuable asset: The note payable from Polebridge Bowman, worth $364,000. SMF ¶ 64 (there was also cash).[19] While the amount of disparity based on this calculation (which, again, Defendants' expert does not endorse) is relatively small ($136,362), the board's failure to notice the omission of a substantial asset from the valuation points to the flawed process.

### 3. *Lester's Resignation Does Not Shield Him as a Matter of Corporate Law*

Without retreading the waters of Lester's continuing duties as a trustee, for the sake of completeness, it is worth illustrating that Lester's efforts to avoid the appearance of self-dealing fail as a matter of corporate law, despite his resignation as from EBWLC "effective" February 1, 2012. First, Lester was still President of Eber Metro, which means he owed fiduciary duties to EBWLC, not to EBWLC. "Where, as here, a corporation is a wholly-owned subsidiary, its directors and officers owe their fiduciary duties to the parent corporation." *Feinsod*, 347 F.Supp.3d at 160. Only if Eber Metro was insolvent based on its own assets and liabilities would its officers owe fiduciary duties to Eber Metro as its own entity.[20] In addition, as President of EB&C and trustee, Lester was effectively the controlling shareholder. *Kahn v. Tremont Corp.,* 694 A.2d 422, 428 (Del. 1997) ("Ordinarily, in a challenged transaction involving self-dealing by a controlling shareholder, the substantive legal standard is that of entire fairness, with

---

[19] Acknowledging the outstanding note would have completely undermined the sole datapoint used for his valuation—Polebridge Bowman—which Lester incorrectly characterized as a sale on the "open market." SMF ¶ 62. Wouldn't it be nice if we could all buy into the stock market with just a non-recourse note from a shell company.

[20] Lester will likely argue it was insolvent based on debts owed by EBWLC, but even if that could result in some variation of "insolvency," it would not diminish the wholly owned subsidiary's duties to its parent corporation, because supporting the parent corporation would be essential to paying the parent's creditors.

the burden of persuasion resting upon the defendants."); *see also Kahn v. Lynch Communication Systems, Inc.,* 638 A.2d 1110, 1115 (Del. 1994) (A controlling ... shareholder standing on both sides of a transaction ... bears the burden of proving its entire fairness").

### C.  Failure to Exercise Reasonable Care, Diligence and Prudence

A core public policy of New York is that a trustee must always, without exception, exercise reasonable care, diligence, and prudence. Accordingly, this duty offers an alternative, independently sufficient basis to grant summary judgment based on breach of fiduciary duty in connection with the Eber Metro transfer to Alexbay. Many of the facts that compel the inference of bad faith at the minimum demonstrate an indefensible dereliction of the directors' duties of reasonable care, diligence, and prudence. And because this involves an objective test, it is more clearly appropriate for decision through summary judgment.

The instant case does <u>not</u> concern a risky transaction with a low likelihood of generating returns—the prudence of such an uncertain transaction would unquestionably require a trial. Far from it, the decision to transfer Eber Metro to Alexbay was anything but uncertain, for it was guaranteed to destroy any hope of positive value in the future.[21] There was not even an informal iTo the extent that this Court does not deem such a transaction as indisputably demonstrative of bad faith, it was indisputably without any regard, much less due care, to the needs of EBWLC.

### D.  Failure to Comply with BCL § 909

EBWLC agreed to a disposition of "substantially all the assets" it had: Eber Metro. It was left with just $2,251 in a bank account. SMF ¶ 70. Accordingly, shareholder consent to the transaction was required under BCL § 909(a):

> (a) A sale, lease, exchange or other disposition of all or substantially all the assets of a corporation, if not made in the usual or regular course of the business actually

---

[21] According to EBWLC's tax returns, after the 2012 transfer, it was supposedly left with $2,251 in a bank account somewhere. SMF 70. Assuming this to be true, the company did nothing with that money that could even arguably have resulted in shareholder value. Perhaps the only path to being positive at that point would have been to buy a couple thousand lottery tickets and pray—not that doing so would have been even arguably prudent, but they did not do even that. They simply left EBWLC for dead.

conducted by such corporation, shall be authorized only in accordance with the following procedure:

(1) The board shall authorize the proposed sale, lease, exchange or other disposition and direct its submission to a vote of shareholders.

(2) Notice of meeting shall be given to each shareholder of record, whether or not entitled to vote.

(3) The shareholders shall approve such sale, lease, exchange or other disposition and may fix, or may authorize the board to fix, any of the terms and conditions thereof and the consideration to be received by the corporation therefor, which may consist in whole or in part of cash or other property, real or personal, including shares, bonds or other securities of any other domestic or foreign corporation or corporations, by vote at a meeting of shareholders of (A) for corporations in existence on the effective date of this clause the certificate of incorporation of which expressly provides such or corporations incorporated after the effective date of this clause, a majority of the votes of all outstanding shares entitled to vote thereon or (B) for other corporations in existence on the effective date of this clause, two-thirds of the votes of all outstanding shares entitled to vote thereon.

NY BCL § 909. Defendants cannot show that any shareholder authorization occurred. That alone is a basis to declare the transfer "void." *Sardanis v. Sumitomo Corp.*, 723 N.Y.S.2d 466, 469 (App. Div. 1st Dep't 2001) ("[T]he lack of approval from the board as well as shareholders rendered the assignment void.") (citations omitted). Moreover, the transfer was finalized by paperwork and issuance of stock certificates days before the board even approved it. SMF ¶¶ 59–61.

More importantly, even if a shareholder authorization had occurred, it would have been impossible for Lester Eber, as President of EB&C, to authorize that without violating his duty of loyalty to the Trust. So, again, we come back to the same basic point: Lester, as Trustee, could not acquire ownership of Eber Metro without the informed consent of the Trust beneficiaries. And it is undisputed that he never obtained such consent.[22]

---

[22] Even assuming that Lester is telling the truth about telling his sister and nephew about the transfer after it occurred, he never told Audrey Hays. Regardless, the record makes clear that as late as December 2013, Lester, Wendy and Gumaer were still discussing among themselves whether the family should be told about the transfer of Metro to Alexbay.

### E.  The Security Agreement and Guaranty Were Invalid

The Security Agreement and Guaranty were executed "as of February 26, 2010," SMF ¶ 40, but as of that date, Lester concedes he had already executed the 2009 LOC Note without requiring security *months earlier*. SMF ¶ 37. Thus, the security agreement and guaranty lacked the "settled" standard consideration of a contemporaneously executed obligation. *See Erie Cty. Sav. Bank v. Coit*, 104 N.Y. 532, 537 (1887) ("Where a contract of guaranty is entered into concurrently with the principal obligation, a consideration which supports the principal contract supports the subsidiary one also. We understand this to be the settled doctrine.").

Corporate waste, including transferring valuable things without consideration to anyone, related or not, is inherently void. *See Shapiro v. Rockville Country Club, Inc.*, 2 Misc. 3d 1002(A), 784 N.Y.S.2d 924 (Table) (Sup. Ct. Nassau County 2004) ("A gift or waste of a corporate asset are void acts which cannot be ratified by the stockholders of the corporation. A gift involves the transfer of an asset without consideration.") (internal citations omitted).[23]

### IV.   THE POST-METRO TRANSFER ASSET TRANSFERS ARE VOIDABLE, TOO

In order to fully restore EBWLC's full ownership of Eber Metro and its assets, the relief for Lester's self-dealing acquisition of Eber Metro requires that the following transactions also be set aside.

### A.  The Call Option to Acquire Slocum of Maine Belonged to Eber Metro

As part of the 2005 acquisition of Slocum & Sons, Eber Metro acquired a Call Option to acquire Slocum & Sons of Maine, Inc. ("Slocum of Maine") for the exercise price of $10. SMF ¶ 15. Shortly after Lester's taking Eber Metro from the Trust, Eber Metro exercised the Call Option and paid the $10—but it did not receive the stock. SMF ¶ 75. The stock instead went to

---

[23] A more bizarre yet separate problem with the documents, including the later amended Security Agreement, is that none of them purports to secure the real, October 2009 LOC Note. Instead, they purport to secure a "certain Line of Credit Note dated as of February 26, 2010," which was an undisputedly misdated duplicate. *See, e.g.*, Ex. 18 at 3 (defining "Note"); Ex. 140 § 2(c) (same). Surely this is evidence of fraudulent intent, but Plaintiffs realize the Court is unlikely to draw that inference as a matter of law, even when the evidence is overwhelming and the defendants have waived their only theoretical defense—advice of counsel—because they feared opening themselves up to even more juicy discovery.

Wendy and Lester directly instead. Under principles of constructive trust, they cannot be permitted to keep that. In fact, if they tried to do so, it would constitute corporate waste and misappropriation because the Call Option was Eber Metro property, which they wrongfully acquired without consideration, let alone appropriate corporate approvals for a self-dealing transaction. The transaction must be set aside now along with the rest, or subject to restraints at least, because it is undisputed that Slocum of Maine is an integral part of how Eber-CT operates. SMF ¶ 16.

### B.  Wendy Eber's Shares of Eber Metro

Likewise, Wendy Eber's stock grant, giving her ultimately 9.1% of Eber Metro, SMF ¶ 76, must be unwound and rescinded. Otherwise, EBWLC will not be made whole: it will get only 90.9% of Eber Metro, when it used to own 100%.

### V.   THE ISSUANCE OF 750 SHARES OF PREFERRED STOCK WAS AN UNAUTHORIZED TAKING OF TRUST PROPERTY AND VIOLATED CORPORATION LAW[24]

"As of" February 14 and 15, 2017, EBWLC purportedly amended its Certificate of Incorporation to create a new class of voting preferred shares, and then it issued such shares to Lester Eber in exchange for his promise to pay the company something to cover possible future expenses if it asked him. SMF ¶ 98–100. Under the no-further-inquiry rule discussed above, this flagrant self-dealing by Lester as trustee, acquiring trust property even before CNB's petition had been served, could only be authorized by the trust beneficiaries or the Surrogate's Court. Neither the Court nor Plaintiffs heard about it until many months later, and neither ratified it afterwards.

In addition, as a matter of corporate law, the transaction must be set aside because it was not authorized by the shareholders. The amendment to EBWLC's Certificate of Incorporation creating the new class of voting preferred shares required approval by "vote of a majority … of shareholders," BCL § 803(a), but no such vote ever took place, and there was no written

---

[24] Unlike the transactions in the previous section, this is not contingent on returning Eber Metro to EBWLC because it directly involves EBWLC.

26

authorization in lieu of a vote. SMF ¶ 99. Such shareholder approval was especially necessary because this was an interested director transaction. *See* BCL § 713(a)(2).[25]

As a matter of corporate law, it was an interested director transaction because Wendy, as Lester's daughter, heir, and employee (since Lester controlled her employment with Eber Metro and Eber-CT), was materially interested in the transaction and dominated by Lester. To invoke the safe harbor of § 713, the transaction needed to be authorized by a vote of the shareholders. Even if we were to assume that the shareholders in this context meant EB&C and not the underlying Trust, there was no authorization by the shareholders.

Furthermore, under its Bylaws, EBWLC was required to have at least two directors, and a quorum of "a majority of the entire board" is required to have effective action by the board. *See* BCL §§ 707, 708. Here, the Amendment to the Certificate of Incorporation was authorized by EBWLC's "sole director," Wendy Eber. Having one director out of two is only half—and therefore not "a majority" as needed. This is another reason the amendment was invalid.

As a matter of trust and corporate governance law, Lester's acquisition of 750 shares of EBWLC under any terms was impermissible. It should be voided.

## VI.   LESTER'S "CONSULTING" FOR SOUTHERN VIOLATED HIS DUTIES AS TRUSTEE

From its inception, the Trust was supposed to ensure that the fruits of Lester's work at Eber Bros. inured to the benefit of the entire family. So long as he remained at the helm of the business, he was not entitled to take related business opportunities solely for his own benefit. That is duty not to usurp opportunities is what the duty of loyalty is all about, and it is undeniably at its strongest when the person taking the opportunity is not merely an employee, or even just a corporate fiduciary, but a trustee subject to the highest duty of undivided loyalty.[26]

---

[25] Although EB&C did not authorize the amendment, Defendants may miraculously "find" documents showing EB&C's consent though not previously produced in discovery, notwithstanding the warning in Rule 56(h) about affidavits submitted in bad faith). If that should happen, the Court may circumvent the need to assess sanctions by finding that the shareholder authorization was that of the Trust, because any action by EB&C to approve the transaction was also an interested director transaction.

[26] Before Defendants try to spin it otherwise, let us be clear: Plaintiffs do not contend that Lester was not entitled to receive fair compensation from Eber Bros. for his work. Plaintiffs believe that such a right was implied by the Will.

Lester's conduct in 2007 to enrich himself during negotiations with Eber Bros.' competitor, Southern Wine & Spirits ("Southern"), breached his duties to put the Trust first. SMF ¶¶ 25–36. "The trust possessed an intangible asset which was to be free from competition from its fiduciary." *Renz*, 589 F.2d at 746. *See also O'Hayer*, 293 N.Y.S.2d at 154 ("A trustee in control of the corporations … was obligated to preserve and advance their economic objectives and to promote new or extended activities which legitimately would belong to them.").

It is undisputed that the neither the Trust beneficiaries nor the other co-trustees ever gave any kind of formal consent to allow Lester to rake in millions of dollars from the very company that put Eber. Bros.' New York operations in the ground. SMF ¶ 35. Nor could Lester's taking of the Consulting Agreement even arguably be justified by the Will. Even when the trust instrument shows that the settlor explicitly wanted the trustee to profit from the trust assets, New York courts have come down harshly on maneuvers that *circumvent* the Trust rather than trying to profit from the Trust. *See O'Hayer*, 293 N.Y.S.2d at 154 ("Certainly, the self-dealing contemplated by the settlor could not reasonably be said to include a maneuver of the trustee which would suspend their business for the aggrandizement of the trustee; and equally it could not excuse the diversion of corporate opportunities to the trustee's personal benefit..").

## A.  Consulting for Southern Was a Tangible Corporate Opportunity

In the less-rigid but better-developed corporate context, "[a] corporate opportunity is defined as any property, information, or prospective business dealing in which the corporation has an interest or tangible expectancy or which is essential to its existence or logically and naturally adaptable to its business.'" *Moser v. Devine Real Estate, Inc. (Fla.)*, 839 N.Y.S.2d 843, 848 (App. Div. 3d Dep't 2007) (quoting *Matter of Greenberg*, 614 N.Y.S.2d 825, 827 (App. Div. 4th Dep't 1994)). Arguably, the absence of disclosure or consent of Lester's consulting for Southern alone is enough to find a breach of duty. *See In re Signature Apparel Grp. LLC*, 577 B.R. 54, 104–05 (Bankr. S.D.N.Y. 2017) ("[W]hether an expectancy is 'tangible' becomes relevant only if a principal has first made full disclosure of the opportunity to corporate

creditors.") (collecting authorities). But Lester's failure to obtain consent belies the larger problem that his consulting work for Southern placed him in direct conflict with EBWLC and the Trust, enriching himself with part-time "consulting" fee twice as large as the Trust would authorize in full-time salary, while depriving the Trust of any benefits at all.

Given the sheet volume of other transactions entered into with Southern contemporaneously, combined with the fact that Lester was ostensibly committing to lead the business forward by focusing in New England, it would be absurd for Lester to argue that Eber Bros. did not have a tangible expectancy to the money Southern paid to him. Especially since part of the Consulting Agreement imposed a restrictive covenant, which had collateral impact on the Eber Bros. companies even though they did not sign one themselves, it was wrong for Lester alone to pocket that compensation.

Courts have held that a consulting agreement can constitute a corporate opportunity, even when the corporation is insolvent and on the verge of closing. *See Community Nat. Bank v. Medical Ben. Adm'rs, LLC*, 626 N.W.2d 340, 345 (Wis. App. 2001) (holding as a matter of law that the consulting agreement with the acquiring company constituted a corporate opportunity that belonged to the insolvent company and that the receiver violated its fiduciary duty by taking the consulting agreement for itself); *Signature Apparel Group LLC*, 577 B.R. 54, 107 (Bankr. S.D.N.Y. 2017) (finding a breach of the duty of loyalty by entering into a consulting agreement for $100,000 per month); *cf. Meridian Financial Advisors, Ltd. v. Pence*, 763 F.Supp.2d 1046, 1057–58 (S.D. Ind. 2011) (finding that consulting work, though arguably not in the line of business, presented triable issue of usurping corporate opportunity where there were other transactions between employer and consulting customer, and the employee gained the consulting business from the customer "at least in part as a result of his position" with the employer).[27]

---

[27] As damages, the *Signature Apparel* court ordered the breaching fiduciary to be disgorged of all $2,050,000 paid under the consulting agreement. 577 B.R. at 109–110. And, because $1,800,000 of the consulting payments went to the fiduciary's personal company rather than himself, the Bankruptcy Court also ordered that the consulting payments be returned on grounds of unjust enrichment. *Id.* at 117, 120.

Here, there is no genuine dispute that Lester was offered the opportunity to consult for Southern because he was the person in control of EBWLC at the time when Southern was trying to dismantle it, and Southern needed Lester to go along with it. This characterization of it may be disputed, but it is fair: Southern bribed Lester. Southern got some actual benefits out of it, too, but not as much as Lester, who nearly tripled his total take-home pay, in exchange for letting the corporation itself substantially collapse.

The sickest part of this transaction is that, the money Lester got for capitulating to Southern is the very same money that EBWLC and Eber Metro desperately needed so badly that they were forced to borrow $1.5 million from Lester starting in 2009. SMF ¶ 37. Lester then used the leverage that he had with that loan to take the last remnants of the business for himself. SMF ¶ 48. These undisputed facts make it is impossible to conclude that Lester's diversion of the Southern consulting opportunity to himself did not meet the essential elements of a diverted corporate opportunity. And while ordinarily a court might be reluctant to grant summary judgment against the defendant anyway, this Court should take comfort in the fact that Lester was also competing with the Trust of which he was a trustee, and he did so without obtaining the consent of the beneficiaries or the Surrogate's Court. SMF ¶ 35.

The Consulting Agreement was undisputedly negotiated by EBWLC's corporate counsel amidst the overall negotiations with Southern resulting in a shutdown of EBWLC's New York operations. SMF ¶ 27. Lester may try to argue that his duty of loyalty to EBWLC effectively ended when its New York operations ended. But even if EBWLC had not continued in existence with Lester at its helm, he violated his duty of loyalty by taking the Consulting Agreement without getting it approved by the Board of the shareholders. And, of course, EBWLC did not end. It even paid his salary in 2010 on behalf of itself and Eber-CT. SMF ¶ 24.

### B. In the M&A Context, the Consulting Agreement Was a Classic Form of "Merger Bonus" or "Side Payment" to Lester—And Improper Because Undisclosed

Consideration of the merger and acquisition ("M&A") context is helpful, because Southern undisputedly acquired numerous assets from EBWLC, including its Delaware and Ohio

interests. In the M&A context, the law "requires that any extra benefits—including side payments—received by senior management in an acquisition be disclosed to shareholders and that the entire transaction be subject to both the board *and* shareholder approval." Brian Broughman, *CEO Side Payments in Mergers and Acquisitions*, 2017 BYU L. REV. 67, 71 (2017) (citing Stephen M. Bainbridge, MERGERS AND ACQUISITIONS 50 (3d ed. 2012)).[28] Lester's Consulting Agreement was as a form of "merger bonus" for Lester alone. Broughman, *CEO Side Payments*, 2017 BYU L. REV. at 75 (CEO "payment from the acquirer for post-merger consulting or for signing a non-compete agreement" are referred to by finance studies as "'merger bonuses'")[29];. It is undisputed that Lester's Consulting Agreement was never disclosed, much less approved by the shareholders (i.e., the Trust and its beneficiaries). Even the relevant board resolutions reflect no authorization for Lester's side deal.

Of course, the M&A context does not apply precisely here. There was no merger or sale of all or substantially all of the assets that would trigger a statutory duty to disclose the side payment to Lester under BCL § 909. Instead, EBWLC continued to exist, selling products in New York into 2008 and maintained a substantial operating asset—the Connecticut business— long after that. But these facts make the situation far worse for Lester than if this were simply a case of a misappropriated merger bonus, for Lester remained a corporate fiduciary, and he continued to be paid a substantial salary by EBWLC or one of its affiliates for the entire period of his "consulting." Thus, the duty of loyalty is implicated far more severely here—and without even touching the fact that Lester was *also a trustee*.

---

[28] The Broughman article is focused on the question: Why shareholder would approve CEO side payments, given that they generally reduce the consideration received by the shareholders? *Id.* at 84–86.

[29] The average size of such bonuses in cases of complete mergers or acquisitions is between $1.2 and $1.6 million. *Id.* at 75, 77. *See also* Jay Hartzell, Eli Ofek, & David Yermack, *What's In It For Me? CEOs Whose Firms Are Acquired*, at http://people.stern.nyu.edu/eofek/Parachutes.pdf, at *10, *20 (2002) (published in 17 REVIEW OF FINANCIAL STUDIES 37) (treating "consulting contracts" or "non-competition agreements" as "merger-related payments"). Here, Lester received $3 million, even though it was not a complete acquisition because he continued to run EBWLC and some of its subsidiary operations and continued to receive a salary for doing so.

### C.  An Eber Bros. Entity Was a Potential Party to the Consulting Agreement

The only fact issue that is even arguably in dispute is whether the opportunity was available to one of the Eber Bros. companies. Since the only identified reason for Southern not wanting to contract Lester's services through an Eber Bros. company was based on *uncertainty* about whether a personal services contract with a corporation would be enforceable, *see* SMF ¶ 33, there is no factual dispute that the opportunity was available to one or more of the Eber Bros. companies. Based on the undisputed testimony of Southern, the issue of whether the opportunity was available to Eber Bros. turns on the *legal* question of whether a contract between two corporations can require the personal services of a specific individual. This Court can and should rule that, as a matter of law, that is certainly possible.

As a matter of basic contract law and the broad freedom to contract, it was legally possible for a contract between Southern and any of the Eber Bros. companies to "identify [Lester] as being material to performance," *Fransmart, LLC v. Freshii Development, LLC*, 768 F.Supp.2d 851, 864 (E.D.Va. 2011), and thereby ensuring his personal services.  Better still, there is no reason why the contract could not have included an express clause requiring automatic termination of the contract if Lester dies, becomes incapacitated, or ceases to work for the Eber Bros. companies.[30] In *Community Nat. Bank*, the Wisconsin Court of Appeals saw no issue in finding a consulting agreement was a corporate opportunity even though it contemplated personal performance by a particular individual.  *See Cmty. Nat. Bank*, 626 N.W.2d at 345 (("MBA, despite its insolvency, could have performed the contract through Jurewicz, its employee."). Lester could have gone through Eber Bros.—the company that employed him most of his life and of which he was still a well-paid officer and director. But he chose not to. That was unacceptable under corporate law, and reprehensible under trust law.

---

[30] A closer question would have been presented if Lester had resigned all of his positions with Eber Bros. and then taken a consulting contract with Southern. In that situation, there might be a triable issue as to whether Lester had a fiduciary duty to the Eber Bros. companies at the time the opportunity was presented. Here, fortunately, Lester undisputedly remained an officer and director of all the Eber Bros. companies for nearly the entire five-year term of the Southern Consulting Agreement.

### D. Damages

Under New York law, the imposition of a constructive trust on the diverted assets is among the remedies for diversion of a corporate opportunity by a fiduciary.[20] The value of the diverted asset is the amount plaintiff would have received but for the defendant's wrongful interference, "including opportunities for profit on the accounts diverted from it through defendant's conduct." *See Whitney Holdings, Ltd. v. Givotovsky*, 988 F. Supp. 732, 735–736 (S.D.N.Y. 1997) (Kaplan, J.) (collecting authorities).[31] Here, that is at the minimum the $600,000 per year that Lester Eber received as compensation under the Consulting Agreement, and partial judgment for $3,000,000 should be entered now, so that steps can begin to be taken to try to secure some possibility of recovery. Considering the demonstrable lengths that Lester and his lawyers have gone to to preserve assets for his personal benefit, this Court should be very concerned about what will come next in the absence of at least some measure of swift justice.

Assuming Lester Eber desires to press his claims for his supposed loans, including every nickel of interest, Lester Eber should be required to provide a complete accounting of his payments from Southern and the basis for each before a final judgment is entered.[32] He routinely received over $100,000 a year in supposed expense reimbursements from Southern, plus Lester had a long track record of billing personal expenses to Eber Bros.

### VII. GUMAER BREACHED HIS DUTY OF UNDIVIDED LOYALTY AND WAS A FAITHLESS SERVANT (COUNT II)

Because it is undisputed that Gumaer secretly divided his loyalty by agreeing to serve as Lester's personal attorney while he was already serving as a trustee with a duty of undivided loyalty, this Court should rule as a matter of law that Gumaer breached his fiduciary duty. He

---

[31] Notably, the *Whitney* case involved allegations that consulting services were a diverted corporate opportunity where a New York Supreme Court Justice had previously "made clear his view that [defendant] had breached his fiduciary duty by diverting a corporate opportunity to provide consulting services to [a third party]." *Id.* at 735. But, unlike here, the fiduciary in *Whitney* had resigned on the same day that the consulting agreement was made, and that had been more than six years before the case was filed, so it was barred by the statute of limitations. *Id.* at 746.

[32] Plaintiffs believe prejudgment interest is warranted, as well, but that dispute including any questions concerning the precise calculations should be deferred until final judgment—they should not delay the larger issues. Lester was paid $50,000 per month, and interest should begin accruing as to each payment on the date it was made. Such a calculation will be far easier and more accurate after we receive Lester's accounting.

was incapable of exercising independent judgment on a corporate board of director. *Sarner,* 199 A.2d at 8 (refusing to accept director-attorney's vote when his client abstained because "the attorney's vote cannot be considered other than that of his client"). And as a trustee, Gumaer's duty of *undivided* loyalty clearly conflicted with his duty as an attorney "to advance, by all legal and proper means, the interests of his client," *id.* The failure to disclose the conflict to the Trust beneficiaries or the Surrogate's Court triggers the faithless servant doctrine, and disgorgement of all compensation since the beginning of the disloyal conduct. *Murray v. Beard*, 102 N.Y. 505, 508 (1886); *Diamond v. Oreamuno,* 24 N.Y.2d 494, 498 (1969). While a corporate director being conflicted is not grounds to divest their salary, as a trustee, Gumaer's primary duty was to be unconflicted and undivided in his loyalty.

As damages, Gumaer must be disgorged of his entire $40,000 per year fee because he violated his duty of trust to the other Trust beneficiaries, and the compensation was paid as a lump sum and is not separated by task. *See Fed. Ins. Co. v. Mertz*, No. 12-CV-1597-NSR-JCM, 2016 WL 164618, at *7 (S.D.N.Y. Jan. 12, 2016) ("In [] cases where a fiduciary violates his position of trust, courts have held that he must account for all the profits derived therefrom."); *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 208 (2d Cir. 2003) ("We believe that forfeiture cannot appropriately be limited to only some transactions in these circumstances, where the agreement calls for general compensation, and does not limit compensation to specific amounts paid for the completion of specific tasks.").[33]

## VIII.   ATTORNEYS' FEES SHOULD BE AWARDED

This Court should exercise its discretion to award Plaintiffs and their counsel their "reasonable expenses, including reasonable attorney's fees…." BCL § 626(e). The BCL requires only success "in part" on a derivative claim to permit the award of fees. *Id.* Despite the clarity of

---

[33] The first step must be an accounting. We know that Gumaer was paid $40,000 per year for 2000 through 2005, but several years of payments after that have not been provided at all, and other years are incomplete. There is no excuse for this. Gumaer presumably received tax forms showing his total payments from EBWLC and Eber-CT, but these have not been provided to us. If they are not in Defendants' current possession, they can obtain the records by making appropriate requests to banks or to the IRS. Assuming that can be done promptly, getting it right is preferable to trying to infer the missing amounts of the payments.

the law and the absurdity of their ever-changing factual and legal assertions, Defendants have done everything they can to make this process exceptionally time consuming and difficult.

**CONCLUSION**

The Court should grant Plaintiffs partial summary judgment and, *inter alia*, (i) immediately impose a constructive trust on Eber Metro and Eber-CT and all funds and property transferred by them to Defendants since June 2012, (ii) reconvey Eber Metro's shares to EBWLC, (iii) declare that Plaintiffs be immediately recognized as majority shareholders in EB&C, and (iv) enjoin Defendants and their agents from engaging in any actions to interfere with or delay Plaintiffs' exercise of rights of control over EB&C and all of its assets, including but limited to ultimate voting control of Eber Metro and Eber-CT.

Respectfully submitted,

/s Brian C. Brook
Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Facsimile: (646) 257-2887
Brian@brook-law.com

*Counsel for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

Dated: November 8, 2019