# EXHIBIT "A"

Page 1

1    UNITED STATES DISTRICT COURT
2    SOUTHERN DISTRICT OF NEW YORK
3    _____
4
5    DANIEL KLEEBERG, LISA STEIN, AND
     AUDREY HAYS,
6
7                    Plaintiffs,
8
                    -vs-
9    LESTER EBER, ALEXBAY, LLC, F/K/A LESTER EBER, LLC,
     ESTATE OF ELLIOT W. GUMAER, JR., AND WENDY EBER,
10
11                  Defendants,
12
     and
13
     EBER BROTHERS & CO., INC., EBER BROS. WINE & LIQUOR
14   CORP., WINE & LIQUOR METRO, INC., EBER-CONNECTICUT, LLC,
     EBER-RHODE ISLAND, LLC, EBER BROS. ACQUISITION CORP.,
15   EBER-METRO, LLC, SLOCUM & SONS OF MAINE, INC., AND
     CANANDAIGUA NATIONAL BANK & TRUST COMPANY,
16
17                  Nominal Defendants.
     _____
18
            Deposition of FRANK TORCHIO, held pursuant to
19   Article 31 of the Civil Practice Law and Rules, at
     Underberg and Kessler, 300 Bausch and Lomb Place,
20   Rochester, New York, on the 23rd day of August, 2019,
     commencing at 9:30 a.m., before Leah Didsbury Reporter,
21   Notary Public.
22
23
24
25

```
 1     APPEARANCES:
 2

       BROOK & ASSOCIATES, PLLC
 3     BY: BRIAN C. BROOK, ESQ.
       100 Church Street, 8th Floor
 4     New York, New York 10007
       Appearing for the Plaintiffs
 5
 6     UNDERBERG & KESSLER, LLP
       BY: COLIN D. RAMSEY, Esq.
 7     50 Fountain Plaza, Suite 320
       Buffalo, New York 14202
 8     cramsey@underbergkessler.com
       Appearing for the Defendants
 9
10     CALIHAN LAW, PC
       BY:  ROBERT CALIHAN, ESQ.
11     620 Reynolds Arcade Building
       16 East Main Street, Suite 620
12     Rochester, New York 14614
       rcalihan@calihanlaw.com
13     Appearing for the Gumaer Estate
14
       WOODS, OVIATT, GILMAN
15     BY: ERIN ELMOUJI, ESQ.
       1900 Bausch and Lomb Place,
16     Rochester, New York 14604
       eelmouji@woodsoviatt.com
17     Appearing for Canandaigua National Bank & Trust Company
18
       Also Present: John Herbert (telephonically)
19                    Patrick Martin
20
21
22
23
24
25
```

Page 3

1                   INDEX TO WITNESS

2

                                                    PAGE

3      FRANK TORCHIO

                     EXAMINATION BY MR. BROOK     5-200

4

5

6                    INDEX TO EXHIBITS

                   (Retained by counsel)

7

8      EXHIBITS        DESCRIPTION                    PAGE

9      Exhibit 126     Expert report                   8

10     Exhibit 127     Glenn Liebman report           16

11     Exhibit 128     Drawing                        30

12     Exhibit 129     Eder-Goodman transaction       41

13     Exhibit 130     Letter to Vincent DeBella      80

                       from Wendy Eber

14

       Exhibit 131     Letter to Wendy Eber from     194

15                     Mike Gallagher

16

17                      REQUESTS

18     DOCUMENT                        PAGE        LINE

19     Bruner site                      45          16

20     Citations for number           174          10

21

22

23

24

25

```
                                         Page 4
 1              COURT REPORTER:  Do you want him to read and
 2         sign?
 3              MR. RAMSEY:  Yes, please.
 4              COURT REPORTER:  Usual stipulations?
 5              MR. RAMSEY:  Other than read and sign,
 6         that's fine.
 7              MR. BROOK:  Actually, I don't as a matter
 8         of -- I've always been trained don't as a matter
 9         of what I've always been trained to do, agree to
10         usual stipulations, because it seems everywhere
11         usual stipulations means something different. I
12         agree to the federal rules of civil procedure
13         governing this deposition.
14              MR. RAMSEY:  That's fine.
15    (Whereupon, the following stipulations were entered into
16    by the respective parties.)
17
18    It is hereby stipulated by and between counsel for the
19    respective parties that the oath of the referee is
20    waived, filing and certification of the transcript are
21    waived, and all objections, except as to the form of the
22    question, are reserved until the time of trial.
23              FRANK TORCHIO,
24    of Rochester, New York, having been first duly sworn, was
25    examined and testified as follows:
```

```
                                                    Page 5
 1      EXAMINATION BY MR. BROOK:

 2           Q.   Good morning.  This is not your first time

 3      being deposed, correct?

 4           A.   Correct.

 5           Q.   Is there anything about how this deposition

 6      works that you would like to go over before we begin?

 7           A.   I don't think so.

 8           Q.   When is the last time you were deposed?

 9           A.   Let's see.  I think it was in May of this year.

10           Q.   All right.  So if any issues come up, usually

11      the biggest one is just talking over each other.  I

12      sometimes am a little slow to get out my question.  I am

13      sure the court reporter will let us know, but that's just

14      human nature.  So what is your understanding of what this

15      lawsuit is about?

16           A.   Well, my understanding of my involvement in

17      this lawsuit is to valuation, principally of

18      Eber-Connecticut, the operating company that is owned by

19      Eber-Metro, in turn owned by Eber Wine and Liquor.

20           Q.   Or was owned by Eber Wine and Liquor, rather?

21           A.   Sorry.  That was correct.  Was owned at that

22      time.

23           Q.   And do you understand this lawsuit is largely

24      about whether the transfer of Eber-Metro from Eber Wine

25      and Liquor to Alexbay was a valid transaction?
```

```
                                              Page 6
 1          A.   Yes, I am.

 2          Q.   And what else do you understand about what the

 3     issues are in this lawsuit?

 4          A.   Can you be a little more specific about what

 5     issues you're talking about?

 6          Q.   Sure.  I know you were retained for a

 7     relatively limited purpose.  But do you understand that

 8     there are a series of transactions that are being

 9     challenged in this case?

10          A.   I understand the transaction that you're

11     referring to.  The foreclosure of stock that was through

12     the layers owned by the beneficiaries of the trust.

13          Q.   Okay.  And so what is your understanding as to

14     how the ownership of Eber-Connecticut changed in terms of

15     the actual individuals who had an ownership interest as a

16     result of that transaction?

17          A.   Well, at prior to the transaction and I think

18     my report has a pretty decent depiction of what the chart

19     looks like.  At the top is the trust that I understand

20     is -- I believe a third of a third of a third to Lester.

21     A third to Lester.  A third to another trust beneficiary

22     and a third to another trust beneficiary.  And as you

23     make your way down that chart, it is then the entity Eber

24     Wine and Liquor that owns assets and has other

25     liabilities.  The asset principally then of Eber Wine and
```

Page 7

1      Liquor Eber-Metro.  And then the main company, the main

2      operating company -- the main asset of Eber-Metro is then

3      Eber-Connecticut.  And Eber-Connecticut is the principal

4      entity that I valued.

5           Q.   You also looked at liabilities for the parent

6      companies at some point though, correct?

7           A.   Parent companies if you mean Wine and Liquor

8      and Metro, yes.

9           Q.   Why did you do that?

10          A.   Well, in conducting a solvency opinion it is

11     necessary to assess the value of the assets vis-a-vis the

12     liabilities -- obligations that those entities have to

13     pay as a going to concern or in liquidation.

14          Q.   And I will get more into this later.  Did you

15     conduct any sort of forensic accounting work as part of

16     your work?

17          A.   I am not an accountant.  Therefore, I do not do

18     forensic accounting work.  Does that answer your

19     question?

20          Q.   Sure.  How did you -- and so calculating

21     liabilities, what kind of work did you do for that

22     portion of your report?

23          A.   There are a number of liabilities that sat

24     above -- Eber-Connecticut sat between.  Eber-Connecticut

25     and ultimately the trust.  My first assessment is to

Page 8

1    provide a legal opinion of the from the attorneys about

2    whether or not those are legal liabilities of these

3    entities.  I am not a lawyer, either.  But principally

4    what I relied on is my expertise and valuing and

5    understanding how investors view a company and view

6    liabilities of a company.  So that is the -- you know,

7    once I had an established legal opinion that this was the

8    case then it was well, okay.  Now, let me do the

9    assessment as to how a willing buyer knowledgeable about

10   all the facts would assess the company.

11        Q.   Okay.  So who provided the legal opinion on

12   what the liabilities were?

13        A.   I posed the question to the attorneys that were

14   on this case and there were a number of them.  If you're

15   asking me who ultimately gave me that opinion, I couldn't

16   tell you.  But it was a conglomerate of the attorneys

17   that worked on this case.

18        Q.   Okay.  Is it correct you did not reference that

19   legal opinion as something you relied upon in your

20   report, correct?

21        A.   I don't know.  I thought I had.

22        (Whereupon, Exhibit Number 126 was marked for

23   identification at this time.)

24        Q.   Let's go ahead and mark this as our first

25   exhibit.  Officially, have you looked at this one?

1    A.   Okay.  I believe the materials relied upon are

2    stated in Exhibit B.  B as in boy.  Yes.

3    Q.   If you want to take a quick look at it.  Maybe

4    I missed it, but I don't see any reference to a legal

5    opinion that you relied upon your report.

6    A.   No.  I didn't mean to imply that there was a

7    written document.  These were in conversations I had.

8    Q.   Okay.  So it's fair to say then that you only

9    mentioned written materials relied upon in this report?

10   A.   That's correct.

11   Q.   Is that your standard practice?

12   A.   It is.

13   Q.   And is it your understanding that -- are given

14   instructions to only include written materials?

15   A.   No. This has been my practice for 30 years.

16   Q.   Okay.  So let's go over then what else you

17   relied upon.  So outside the written materials, you

18   relied on at least a legal opinion of Underberg and

19   Kessler of Eber-Metro and Eber Wine and Liquor, correct?

20   A.   That is right.

21   Q.   What else that is not a written document did

22   you rely upon in forming your opinions?

23   A.   Well, my experience.  I mean I can go through

24   this.

25   Q.   I mean specific to the facts of this case.

```
                                                        Page 10
 1          A.   Well, specific to the case of this case.
 2          Q.   Did you have conversations with anyone else
 3     other than the lawyers?
 4          A.   My staff, beyond that -- well, I know I spoke
 5     with Lester and Wendy a number of times.
 6          Q.   Okay.  Then did you rely on those
 7     conversations?
 8          A.   Well, I can't point specifically to anything
 9     that I relied on for this particular question that you're
10     asking, but there were a number of things that I did
11     incorporate into my analysis.
12          Q.   All right.  Let's go to one example and maybe
13     you can help me understand where you got it from.  So
14     please turn to Page 9 of your report on Exhibit 126.
15          A.   Okay.
16          Q.   In Paragraph 27 you refer to your understanding
17     of what Eber-Connecticut's financial situation was in the
18     winter of 2011 to 2012 and then you got a number of items
19     listed there.  Do you see that?
20          A.   I do.
21          Q.   Where did you get that information from?
22          A.   Well, with a footnote 10 the information in
23     Paragraph 27 is referenced to the auditor's report.  And
24     the numbers A, B, C and D, they would have been from
25     conversations I had with the attorneys, with Wendy, with
```

1    Lester.  Was there anything else?  My recollection is I

2    also reviewed an affidavit that Lester signed.  I believe

3    that it concerned the Harris Beach litigation.  But it

4    did recount certain facts that lead to -- among other

5    things, the 2012 transaction.

6         Q.   Okay.  And did you conduct any attempt to

7    determine the accuracy of the information that Lester and

8    Wendy provided either verbally or there in that

9    affidavit?

10                  MR. RAMSEY:  Form.  Go ahead.

11        A.   Well, I certainly did look at the financials.

12   And I did have those financials recounted there in my

13   report.  I can't up come up with anything more specific

14   than that.  If you ask me some specific questions, I will

15   try to respond to them.

16        Q.   Is it correct that you did not perform any work

17   to verify the accuracy of the financials?

18        A.   No.

19        Q.   Did you conduct any effort to determine the

20   truthfulness of the individuals who were providing

21   information to you?

22                  MR. RAMSEY:  I am not sure what you mean

23            about that.  Form.

24        Q.   Is it your practice in providing expert

25   opinions to rely on people and what they say if you

1              determine that those individuals are not trustworthy?

2                         MR. RAMSEY:  Form.  Go ahead.

3              A.   I am not sure how to respond to that.  You want

4              me to determine whether someone is trustworthy or not?

5              Q.   If someone provides information to you that

6              sounds absurd, would that be something that you would

7              rely on just because it was provided?

8              A.   That sounds absurd.

9              Q.   That sounds like it doesn't make any sense to

10             you?

11                        MR. RAMSEY:  Hypothetically, you're talking

12                        here?

13             Q.   Yes, in your experience.

14             A.   I mean I suppose.  I can't recall a situation

15             where someone's statement rose to the level of what you

16             would -- what I would consider absurdity.  I can't

17             recollect any particular instance of that occurring.  I

18             suppose that if someone said to me, you know, the sun is

19             rising from the west.  I could consider that absurd, yes.

20             That hasn't happened to me.

21             Q.   Okay.  And what about have you ever relied on

22             the statements of individuals who were determined to have

23             committed fraud?

24             A.   Yes.  There have been instances.  Generally, my

25             approach is that if my opinion is predicated on something

                                                          Page 13

 1       that is given to me, recounted to me and it turns out to

 2       be false, then I will respond whether or not in court

 3       that particular issue has an impact on my analysis.

 4             Q.   If you included facts in your report, does that

 5       mean it necessarily had any impact on your analysis?

 6             A.   Well, insofar as the background section is

 7       giving the background.  That's basically what it's there

 8       to do.  Provide whatever factual basis I have and my

 9       understanding of the situation that occurred back in

10       2012.  You would have to be specific as to whether or not

11       a line of information or a particular piece of background

12       affects my opinion.

13             Q.   So let's look at this Paragraph 27-B.  You said

14       it was your understanding that quote, "Eber-Connecticut

15       suffered as a result of the aggressive competitive

16       actions of Southern and other competitors and fliers."

17       Do you see that?

18             A.   I do.

19             Q.   Is that something that was important to your

20       opinion?

21             A.   Indirectly.  It wasn't important to my opinion,

22       but it fit the circumstances of the case.  And I think

23       that piece of information was derived from the

24       affidavit -- the signed affidavit by Lester.

25             Q.   What was your understanding of the relationship

1       between Southern and Eber-Connecticut at the time?

2                   MR. CALIHAN:  Objection to form.  Brian,

3             what time period?

4       Q.    Sorry.  Paragraph 27 refers to the winter of

5       2011 to 2012.

6       A.    I believe during that time period Southern, as

7       I understood from the affidavit -- Southern basically

8       took over the business -- that's a poor way of putting

9       it -- made an effort to become a distributor in New York

10      State.  And for the most part, I think it was the single

11      biggest factor as to why Eber Brothers or whatever the

12      entity was in New York State left New York State.

13      Q.    Well, this paragraph or this subpar paragraph

14      refers to Eber-Connecticut.  So it was only operating in

15      Connecticut, correct?

16      A.    Sorry.

17      Q.    And so was it your understanding that Southern

18      was affecting Eber-Connecticut?

19      A.    You know, I don't recall.  I remember the

20      effect on Southern in New York State.  It may well have

21      been that they were trying to do the same thing in

22      Connecticut or attempting to, but I don't remember

23      specifically.

24      Q.    And were you aware of any business relationship

25      between anyone associated with Eber-Connecticut and

```
                                               Page 15
 1       Southern?
 2            A.   I recall an offer made for Southern for
 3       Eber-Connecticut, an offer for 50 percent interest.
 4            Q.   Were you aware when you formulated your opinion
 5       that Lester Eber was a paid consultant for Southern?
 6            A.   I do remember that, yes.
 7            Q.   And did that affect your opinion in any way?
 8            A.   It did not.
 9            Q.   Why not?
10            A.   It just didn't.
11            Q.   What is your understanding of how that
12       consulting agreement came to be?
13            A.   I believe it had to do with the Southern's
14       movement into my New York State.  And I can't remember if
15       there was a transaction of some kind, but there was some
16       payment made as I recollect from Southern to Lester or to
17       Eber Brothers.  I can't remember which.
18            Q.   Other than speaking with a Lester and Wendy and
19       other lawyers from Underberg and Kessler, did you speak
20       with anyone else in connection with obtaining facts for
21       this case?
22            A.   Again, I think I would include my staff in
23       that.  They assisted me going through documents -- those
24       conversations.
25            Q.   Did your staff also speak directly with Lester
```

Page 16

```
 1      and Wendy?
 2           A.   With me, yes.
 3           Q.   Was it your practice to take notes of your
 4      conversations with Lester and Wendy?
 5           A.   It's not my practice to take notes.
 6           Q.   Did you take notes in this instance?
 7           A.   No.
 8           (Whereupon, Exhibit Number 127 was marked for
 9      identification at this time.)
10           Q.   All right.  And since you've issued the report
11      my client's expert Glenn Liebman has issued a report.
12      Have you seen that?
13           A.   I have.
14           Q.   And I don't have any specific questions about
15      this now other than -- so after having reviewed this
16      report, you were given the opportunity to provide a
17      rebuttal report; is that right?
18           A.   Could be.
19           Q.   Why was the -- why didn't you end up providing
20      a rebuttal report?
21           A.   I didn't feel it was necessary.  I can't
22      remember exactly if I was that specifically -- if I had
23      to do a rebuttal report, but I said I am not bothered by
24      anything in this report.  Let's go to trial.
25           Q.   Okay.  And so let me go ahead and ask you about
```

1     this.  There were a couple of issues that Glenn Liebman

2     gave an opinion on that were not topics that you directly

3     addressed, correct?

4          A.   If you can be specific, I will be happy to

5     respond.

6          Q.   Do you recall Glenn Liebman provided an opinion

7     of the value of Eber-Connecticut as of May 31, 2018?

8          A.   I think, as I remember, that there was some

9     criticism that the valuation date that I used was several

10    days removed from the valuation date that he was using or

11    determined to be appropriate.

12         Q.   I will stop you.  That's not what I am not

13    referring to.  I am referring to 2012.

14         A.   I beg your pardon.

15         Q.   If you turn to Page 19 of Exhibit 127.  That

16    will refresh your recollection.

17         A.   Page?

18         Q.   19.

19         A.   Okay.  I am there.

20         Q.   So this was essentially based on the most

21    recently available financial information providing a

22    valuation of Eber-Connecticut using eventually the same

23    general approach that both you and Mr. Liebman used,

24    correct?

25         A.   The same general approach, yes.

1          Q.    And you reviewed this and you said you did not

2     see any problems with this; is that right?

3                     MR. RAMSEY:   Form.   Go ahead.

4          A.    I was not asked to respond to this analysis.

5          Q.    Okay.   And so you have not, in your work in

6     this case, formed any opinions as to whether this is

7     correct or not is that right?

8          A.    Well, if you're asking me if I looked at this

9     and formed an opinion, I have.

10          Q.    But that is not an opinion that you intend to

11     introduce in this case?

12          A.    I would be happy to introduce it in the case.

13     You want to ask me what it is?

14          Q.    Since it's not in a report, I think it's just

15     as well.   Well, look.   I don't think it changes the

16     admissibility.   So, go.   Please, do tell me your opinion

17     on part of it.

18          A.    I didn't do a full assessment of the valuation,

19     but I tried to do a bit of a sanity check on this

20     valuation.   And my recollection -- and this was back at

21     envelope stuff.   But my recollection is that if you took

22     EBITDA ratio -- I believe that EBITDA ratio -- his value

23     to the -- pardon me.   His value to EBITDA as of 2018, I

24     believe that number is something like 40 times EBITDA.

25     The valuation is 40 times the amount of EBITDA in that

1     year.  So I asked my people, I said, "Well, it seems high

2     to me.  Let's see if that really is high."  So we went

3     and we have access to all the companies -- all the

4     publicly traded companies on Nasdaq and NYSE.  So there

5     was approximately 2,800 companies we downloaded their

6     EBITDA ratios for all those 2,800 companies.  The ratio

7     of 40 would put you into the upper 10 percentile bracket.

8     So the highest 10 percent of all 2,800 companies traded

9     in the United States.  This would put them in that

10    category.  So I said, "Well, that's interesting."  I said

11    that indicates, you know, substantial growth rate implied

12    by the EBITDA multiple.  I said let's take a look at the

13    last three years' growth rate -- compounded growth rate

14    for those companies in the upper 10 percentile --  these

15    public traded companies.  So the average and median

16    growth rates for the last three years leading up to the

17    2018 valuation was 14 and a half and 15 percent median

18    and mean.  So it is showing very substantial growth in

19    the last three years, which is consistent with a high

20    EBITDA multiple.  I then said let's look and said what

21    the growth rate has been for Eber-Connecticut over the

22    same three years.  Now that growth rate is something --

23    the compounded average growth rate is something like

24    three percent.  So you start to see the somewhat

25    inconsistencies here that this valuation at least at a

1    sanity-check level appears to be quite aggressive given

2    the growth rate that Eber-Connecticut has exhibited given

3    that the implied multiple is in the 40 percentile

4    bracket -- excuse me -- in the upper 10 percentile

5    bracket.  There is an inconsistency with the degree of

6    growth.  So effectively what this analysis would imply is

7    that you could -- one would expect given this multiple a

8    growth rate of 15 percent over the next three years

9    compound annual growth rate or more.  And that seems

10   highly unlikely to me.  So that is the, you know, the

11   only analysis I did.  Just to say -- this appears high.

12   Is it high?  It is high.  And it is inconsistent with the

13   market data.

14        Q.   Well, the market data there is a lot of things

15   that doesn't account for any particular circumstances of

16   any particular company, right?  It's just you're looking

17   at a --

18        A.   On average it does account for what the

19   expectation of growth rate is for companies that have

20   high multiples.  I mean, if you would like I can write

21   down for you the formula that explains the relationship

22   between a multiple and growth rate.  It is a algebraic

23   relationship.

24        Q.   As a part of your -- did you do anything else,

25   as you called it, a sanity check on this number?

```
                                                    Page 21
 1          A.    No.  I think that's all I did.
 2          Q.    Did you consider the fact it's still a lower
 3     number than what Eber-Connecticut was bought for 14 years
 4     ago?
 5          A.    My sanity check is what it is.  I looked at the
 6     analysis of how this fit with publicly traded companies.
 7     And all I am saying it was well outside the norm for
 8     these publicly traded companies that have those kinds of
 9     EBITDA multiples.
10          Q.    Are you aware of any publicly traded companies
11     that operate as wine or liquor distributors in franchise
12     states?
13          A.    I know that we did search for that, but that
14     would have been as of 2012 from my valuation work.  And I
15     know why we limited it to those companies that had
16     negative EBITDA.  And we did not find any liquor
17     distributors -- pure-play liquor distributors that would
18     fit that criteria.
19          Q.    And why didn't you even look to see if there
20     was someone that was in the same line of business, but
21     with a positive EBITDA?
22          A.    There was a strong relationship between the
23     multiples -- valuation multiples and whether or not
24     you're profitable.  And at that point in time
25     Eber-Connecticut had exhibited a number of years -- I
```

Page 22

1      think maybe as back as far as 2007 -- that showed
2      negative profit -- negative EBITDA.  So that has a very
3      specific relationship between your comparables.  One of
4      the strongest relationships between comparables that
5      you're going to choose.  So I limited it accordingly to
6      those companies that had negative EBITDA.
7            Q.   You can do an enterprise value revenue
8      assessment of a company whether or not its EBITDA is
9      positive or negative, right?
10           A.   You certainly can.  But it's not relevant if
11     the company you're looking at has extraordinarily high
12     profitability.  Let's say their profit margin is 10
13     percent and the company you are trying to  elevate has
14     continual profit margins of negative percentage 10, 15,
15     whatever the case may be.  That would imply those are not
16     comparable.  And one of the key areas for comparability
17     is profitability.
18           Q.   So in your opinion when a company is
19     profitable, is the enterprise to value to revenue ratio
20     multiple higher or lower than when it's not profitable?
21           A.   Generally when a company is not profitable the
22     radio is lower.
23           Q.   So in this case on Page 19, the enterprise
24     value to revue multiple, that was based off of indicators
25     of value that occurred when Eber-Connecticut was not

                                                    Page 23

1        profitable, correct?

2              A.    I don't recall what he based it on.

3              Q.    The Southern offer and Eder-Goodman transaction

4        refers to negative EBITDA on both of those time periods.

5        Do you see that?

6              A.    So he is referring to the EBITDA of

7        Eber-Connecticut?

8              Q.    Correct.

9              A.    Yes.

10             Q.    And so in your opinion then as of 2018, once

11       the company was profitable, value to revenue multiple

12       should actually be higher, correct?

13             A.    Well, it would be higher than what it was in

14       2012.  Of course I disagree with the numbers he has got

15       here.  I've got numbers that are lower than that.

16             Q.    If we used your numbers say, those would still

17       be too low as of 2018 profitable, correct?

18             A.    I am sorry.

19             Q.    Putting aside the exact number, it's your

20       opinion that once the company became profitable by 2018

21       at least that the enterprise value to revenue multiple

22       that was used from a period of unprofitability would be

23       too low to accurately value the company?

24             A.    That is a plausible inference.  That would be

25       something that one would do in assessing.  To do to a

1    comprehensive analysis, I would certainly think about

2    that.  It wouldn't be the only thing I would think about.

3    As I said, I did not do an analysis valuation.  I am just

4    giving my insights as to what the implications of his

5    valuation is period.

6         Q.   What do you ever consider what settlement

7    offers have been made in a case in determining whether,

8    you know, a particular valuation meets a sanity check?

9    Have you ever considered --

10        A.   A settlement offer in litigation like this?

11        Q.   Yes.

12        A.   To use that as the basis?

13        Q.   Not as the basis.  You referred earlier to a

14   sanity check.  What did you mean by that?

15        A.   Well, I think I fairly well described to you

16   what I mean by that sanity check is to look at the

17   implication in this instance -- the implication of the

18   valuation vis-à-vis companies that have a high EBITDA

19   multiples who have on average high growth rates.  And

20   compare that with the growth rates for Eber-Connecticut

21   over that same pre-three-year time period.  That was the

22   sanity check.  It's very simple.  It's just looking at

23   publicly traded companies and saying whether or not the

24   inference from this analysis makes sense with regard to

25   publicly traded companies.

Page 25

1        Q.    Does management's opinion of what a company is

2    worth ever affect your assessment of whether a valuation

3    is reasonable or not?

4        A.    Well, I guess it depends on the assignment.  I

5    certainly listen to what management has to say.

6    Management are the frontline.  They know the business.  I

7    am not an expert in wine or liquor or any other business

8    for that matter other than consulting.  But I am a

9    valuation expert.  So I do consider anything that

10   frontline managers have to say about how they run their

11   business, how other companies run their businesses.  So I

12   consider it.  Whether or not it's used in any meaningful

13   way is -- that's really depending on the particular facts

14   and circumstances.

15       Q.    Did you discuss the approximate current value

16   of Eber-Connecticut with Wendy or Lester?

17       A.    No.

18       Q.    So you did not ask Lester, for example, whether

19   he thought the value used by Mr. Liebman of 20.4 million

20   dollars was an reasonable valuation for the company at

21   this time?

22       A.    No.

23       Q.    Why not?

24       A.    Well, as I said before, all I did was do a

25   sanity check based upon publicly traded companies.  I was

Page 26

1      not trying to do my own comprehensive analysis or opinion

2      as to what the valuation was in 2018.  I wasn't asked to

3      do it.  I didn't do it.  But I was curious, and I wanted

4      to see whether or not the numbers put forward by Liebman

5      made sense relative to publicly traded companies.

6           Q.   This is not a publicly traded company though,

7      correct?

8           A.   No.  Not that it matters.  But no, it's not

9      publicly traded.

10          Q.   Why doesn't that matter?

11          A.   Why would it matter?  Publicly traded companies

12     are often used to value private companies.  Your question

13     seems to implicate or imply that it's not within the

14     principles valuation to use multiples for publiclytraded

15     companies to value a private company.  That is false.

16     You can.  You do.  It's actually prescribed in valuation

17     textbooks like Pratt.  So I, you know, that's why I

18     answered the question that way I answered.  The only

19     thing that is very important when you're valuing a

20     private company use public multiples is that you've got

21     to take an account of marketability for the private

22     companies.  So if anything the value is going to be

23     lower.  Not higher.

24          Q.   So the inability for the private company owners

25     to transfer their shares, for example, results in a lower

                                                      Page 27

1        valuation?

2            A.   Yes.   There generally is a marketability

3        discount if you're trying to sell let's say, you know,

4        you're thinking about five shares to somebody.   Well,

5        then you normally would be taking a marketability

6        discount because the buyers of a private company are

7        going to price protect themselves when they try to sell

8        those shares.

9            Q.   I want to turn your attention next session,

10       which is another part of the Liebman report that was not

11       responding to something that you did.   It's concerning

12       the economic rationality of the Eber Brothers board's

13       decision to consent to the transaction of Eber-Metro from

14       Eber Wine and Liquor to Alexbay.   Did you review that

15       part of the Liebman report?

16           A.   I know I read it, but point me to the page and

17       I will reread it.

18           Q.   The very next page.

19                MR. RAMSEY:   Do you want him to read the

20                whole thing?

21           Q.   I was just wondering if he had read it before.

22           A.   I had, but it's been a while.

23           Q.   Let me know when you had a chance to refresh

24       yourself.

25           A.   Okay.   What is your question?

1         Q.   So did you form any opinions -- I understand

2    you didn't put it in a report and it's nothing official,

3    but I want to know -- did you form any opinions about

4    whether you agreed with any of the statements in this

5    section?

6         A.   Well, I generally disagree with the conclusion,

7    you know.

8         Q.   Just so we're clear, there are a couple of

9    conclusions in here, which conclusion are you referring

10   to?

11        A.   There is no economic rationale.

12        Q.   Okay.

13        A.   When -- again, if you go to the hierarchy and

14   you look at the numbers that I came up with, yeah.  I do

15   agree that Eber-Connecticut had positive value.  The

16   implication of expected values -- the present value of

17   those cash flows are greater than the liabilities at the

18   Eber-Connecticut level.  As you work that way up that

19   chain when the other liabilities start to present

20   themselves and are offset by these assets of

21   Eber-Connecticut, in my opinion, that turns negative.  If

22   it's negative there is an economic rationale.

23        Q.   What is that rationale?  Maybe I can direct

24   your attention to the fourth paragraph on Page 20.  It

25   addresses that specific thing, and I am curious as to

1      whether --

2                    MR. RAMSEY:  Let him answer the question.

3           A.   I am not sure what -- you asked me about

4      rationale.  Let me explain it to you.  So I am just going

5      to draw you a picture.  You can have this.  This is

6      something that -- it's an analysis that applies option

7      theory to the various claims in a publicly traded

8      company.  So these are debt obligations and these are the

9      equity.  These are the payoff functions.  Now what

10     happens that when the value of the firm is high -- this

11     is the line that's the value of the firm -- when it's

12     high, the equity has value.  As the value of the firm

13     declines, we go this way.  You see the value of the

14     equity declines.  Ultimately it goes to zero when the

15     obligations kick in.  So you can think of -- this is kind

16     of a payoff of a call option.  But you can think of this

17     where this is the exercise price.  You can think of this

18     as face value of the liabilities.  Okay.  So if the value

19     in the case of Metro Wine and Liquor -- if the value of

20     that goes down such that now you got a situation where

21     the value of the company is actually less than the value

22     of the liabilities.  You're down here someplace.  Now, in

23     those situations the value of equity has zero value.  Not

24     negative, but zero.

25          Q.   At least at that sliver of time, right?

```
                                                      Page 30
  1            A.    Yes.
  2            Q.    Value changes over time all the time in a
  3       company, right?
  4            A.    Well, I mean, look, you can always speculate
  5       about whether value is going to go up or down.  But the
  6       point up when you do a valuation as of a particular date,
  7       you're doing a valuation that it accounts for, you know,
  8       what those expectations are, what your best guess of
  9       those expectations are.  That's how you do a valuation.
 10       So there is the economic rationale.  If the value of that
 11       equity goes to zero, then the debt holders become de
 12       facto the residual claimant for those assets.  That's why
 13       you see this thing declining.  It looks kind of like
 14       equity, doesn't it?  That's exactly what happens.  The
 15       debt holders become de facto the residual claimant or the
 16       equity holder to the company.  And the equity holders go
 17       away.
 18            Q.    So it's your understanding then --
 19            A.    You can keep that.
 20            Q.    We will mark that as Exhibit 128.
 21            (Whereupon, Exhibit Number 128 was marked for
 22       identification at this time.)
 23            A.    This is actually an analysis by Robert Merton
 24       who has won a Noble prize for this.
 25            Q.    Let me make sure I understand you correctly.
```

```
                                             Page 31

 1        So in your understanding of how a corporation works, once

 2        a corporation determines that it is insolvent in that its

 3        debts exceed the valuation of its equity or its assets --

 4             A.   Assets.

 5             Q.   Then at that point there is no longer any

 6        obligation for that company to generate shareholder

 7        value?

 8             A.   There is an -- this is interesting because once

 9        a company goes to financial stress, the company not only

10        has an obligation to maximize shareholder value but to

11        maximum all claimants' values.

12             Q.   Right.

13             A.   So, yes.  That's right.  Now in this

14        situation --

15             Q.   Let me stop you there because I think the

16        transcript is going to be a little crazy.  So you said

17        not only maximize shareholder value --

18             A.   Sure.

19             Q.   So the obligation to maximize shareholder value

20        still exists then if the opportunity were to arise,

21        correct?

22             A.   Sure.

23             Q.   Okay.  It's not like the obligation to act for

24        the benefit of shareholders vanishes upon insolvency?

25             A.   Right.  Let me finish.  Now you've got an
```

Page 32

1   obligation to the debt holders, the obligors here in this

2   particular instance.  And you cannot then, you know, do

3   something that would harm them because of the equity

4   holders.  That would be incorrect.

5        Q.   That would be a breach of judiciary?

6        A.   Yes, it would.  So you can't just say, you

7   know, by gosh.  I like these shareholders.  I am going to

8   give them some carrot here to keep them going.  And the

9   bondholders are going, wait a second.  Wait a second

10  here.  You've got an obligation to me.  This thing is

11  below my face value of debt.  Now the obligation goes to

12  me.  And you can't just wealth transfer to shareholders

13  because you like them.

14       Q.   Well, can you wealth transfer to one creditor

15  the exclusion of the others?

16       A.   Generally, you've got take in.  So I can make

17  this more complicated by looking at the priority of these

18  claims.  So you're going to have some claims that have

19  higher priority than others.  Unsecured debt has a lower

20  priority than secured debt.  So you can have a series of

21  these kinds of charts where the first unsecured debt

22  starts to go down.  But the value of secured debt does

23  not change.

24       Q.   Right.

25       A.   Then if goes below the unsecured debt, now you

1     got a situation where the secured debt becomes the

2     residual claims.

3         Q.   Are you aware that at least two of the

4     unsecured creditors of Eber Wine and Liquor ended up

5     suing in relation to the transfer to Alexbay?

6         A.   I know that there was lawsuits.  I think you

7     might be referring to Harris Beach.

8         Q.   And Harris Beach and also the Pension Benefit

9     Guarantee Corp -- PBGC?

10        A.   Yes, absolutely.

11        Q.   It was your understanding that Lester's loans

12    were secured, correct?

13        A.   That is my recollection.

14        Q.   And do you understand in the case the

15    plaintiffs have challenged the legitimacy of that

16    security agreement?

17             MR. RAMSEY:  Form.  Go ahead.

18        A.   That could be.  I don't remember.

19        Q.   I will represent to you -- you're an expert.

20    So we do some hypotheticals.  So hypothetically speaking,

21    if the security agreement between Lester and the company

22    were invalidated --

23        A.   The security agreement is invalidated.

24        Q.   So those are not secured loans anymore.

25        A.   It is a loan though -- unsecured loan.

1      Q.   In that instance, could the company have given

2      a preference to Lester's loans over other unsecured

3      loans --

4                  MR. RAMSEY:   Form.  Go ahead.

5      Q.   -- when it was insolvent?

6                  MR. CALIHAN:   Objection to form.

7      A.   It sounds like you're asking me for a legal

8      conclusion here.  I can tell you as an economist, as a

9      valuation expert, if you tell me it has priority over the

10     equity holders, that's all I care about.  Whether they

11     stand in line of or in front of PBGC, I am not sure at

12     all how that affects this analysis that I just provided

13     to you.  As I mentioned before, this would -- if I drew

14     this chart -- one more chart below these could be

15     unsecured debt.  The same analysis would apply.  They

16     stand ahead of -- they are in front of the secured debt,

17     but they certainly have priority on the equity.  And

18     that's the question you initially posed to me, the

19     economic rationale of that transaction.  So I am not sure

20     how the hypothetical of whether it's secured or unsecured

21     affects this analysis.

22     Q.   Let me ask you this then.  In terms of economic

23     rationale, in your opinion, was there any conceivable

24     benefit for the shareholders by consenting to let

25     Eber-Connecticut and Eber-Metro be transferred out of the

Page 35

1      trust assets and over to Lester Eber alone?

2                    MR. RAMSEY:   Form.   Go ahead.

3           A.   Was there any benefit?   Could you repeat that

4      question?   That was confusing.

5           Q.   I will rephrase.   I guess, let's just look at

6      this fourth paragraph.   There are a few statements and I

7      am curious whether you agree with them.

8           A.   Okay.   Paragraph what?

9           Q.   The fourth paragraph on Page 20.   We will go

10     line by line.   In this paragraph -- and you don't have to

11     agree with the first one for the record.   Here Mr.

12     Liebman states that the lack of economic justification is

13     apparent even if the net value was significantly lower or

14     even negative at the time.   And it was, just so we're

15     clear, in your opinion the net value was negative at that

16     time of the Alexbay transfer, correct?

17          A.   Correct.

18          Q.   So the next sentence says that is because

19     Eber-Metro reflected Eber Wine and Liquor Corp sole

20     operating asset.   The fact stated there that it was the

21     sole operating asset, you would agree with that, correct?

22          A.   Yes.   You know, because Eber-Metro owned

23     Eber-Connecticut, which is the operating asset.   With

24     that caveat, yes.

25          Q.   And next sentence says quote, "As long as

1    company remains going concern it has the potential for

2    positive value."  Do you see that?

3          A.    Uh-huh.

4          Q.    Do you agree with that statement?

5          A.    I mean as a general matter, that's fine.

6          Q.    Next sentence quote, "This could happen in any

7    number of ways.  Even if it was insolvent it could

8    potentially restructure through bankruptcy proceedings

9    and emerge capable of generating positive shareholder

10   value."  Do you agree with that statement?

11         A.    Sure, it's possible.  You can always imagine

12   restructuring.  This was a form of restructuring.  It's

13   eliminating the equity holders.  And it allows the debt

14   holder to become the residual claimant.  So it is in fact

15   restructuring.  As far as I know, there is no legal

16   obligation to continue to keep equity holders as equity

17   holders when the value of their equity is zero.  Again,

18   that's a legal determination.  And all I can tell you is

19   from my experience that's the case.  Let me give you a

20   specific example.  There is a company that was in

21   Delaware -- a big case in Delaware called Trados.  Very

22   similar circumstances to this.  It was a merger.  You can

23   think of it as a restructure.  And the preferred had --

24   again, it was a priority claim on the preferred

25   shareholders.  And the opinion is that because the

Page 37

```
 1      company did not do well -- wasn't doing well.  And the

 2      merger price -- it didn't even cover the value of the

 3      preferred stock.  So in the merger the preferred stock

 4      got all the proceeds from the merger.  Common stock got

 5      zero.  The common stock sued saying, "Well, you know, why

 6      is the responsibility on us?"  The court says, "Doesn't

 7      exist."  As of this date, this valuation is zero.

 8              Q.   So valuation was based on an actual

 9      transaction?

10              A.   Yes.  Well, the value -- the merger transaction

11      was the merger transaction.  The valuation was based upon

12      the value of the common stock at appraisal.

13              Q.   Was that an arm-length transaction?

14              A.   The price paid?

15              Q.   Yes.

16              A.   Certainly the judge accepted it as such.

17              Q.   In this case, you understand that this was not

18      an arm's-length transaction that occurred between Lester

19      Eber and --

20                      MR. RAMSEY:  Objection.  Form.  Go ahead.

21              A.   I am sorry.

22              Q.   In terms -- Lester Eber was an insider to the

23      company, correct?

24              A.   Yes.

25              Q.   And did the fact that Lester Eber was a
```

Page 38

```
1      co-trustee of the trust that owned the company affect

2      your opinion in any way?

3           A.   Are you asking me whether that it somehow

4      caused me to change the numbers or do a different

5      valuation?

6           Q.   I am asking if it affected your opinion in any

7      way.

8           A.   No, it didn't.

9           Q.   Do you consider that to be more a legal matter

10     than a valuation matter?

11          A.   Well, I am taking the structure as given.

12     Look, if somehow someway you convince the judge that none

13     of this stuff is valid.  Not my valuation, but the whole

14     structure of this thing is invalid, then my valuation

15     becomes invalid.  It's predicated on this being a valid

16     transaction on the company with providing me with valid

17     information.  If those things go out the window because

18     you've proven your case that everything is fraud, so be

19     it.  I am out of it.

20          Q.   So is it fair to say -- let's step back.  Have

21     you ever heard of the entire fairness doctrine?

22          A.   Yes.

23          Q.   Is it fair to say -

24          A.   This comes up in mergers.

25          Q.   There are two components to that.  One is fair
```

Page 39

1       value and fair process, correct?

2            A.   Exactly.

3            Q.   And is it fair to say you are only an expert on

4       the issue of valuation, not process?

5            A.   I think that is generally the case.  So I have

6       been in a number of appraisal actions where the process

7       as well as the price issues the contention.  As a general

8       matter, I do not get involved in the process.  If the

9       judge finds the process is invalid, well okay.  So be it.

10      But my valuation is my valuation.

11           Q.   Okay.  So let me ask you this.  So getting back

12      to the issue of the economic rationality.  So you agree

13      there is at least potentially -- some potential for

14      positive value as long as the company has a going concern

15      as one of its assets; is that correct?

16                MR. RAMSEY:  Form.  Go ahead.

17           A.   I am sorry.

18           Q.   Some potential for future positive value?

19           A.   Maybe.  Maybe not.

20           Q.   So that's a yes, there is potential?

21           A.   It's possible.

22           Q.   Once the going concern asset is removed from

23      the company and all that's left with is liabilities and a

24      small amount of cash that is way less than the amount of

25      liabilities, there is no possibility of future value,

```
                                              Page 40

 1        correct?

 2             A.   Say that again.

 3             Q.   Once the company no longer has any going

 4        concern assets and only has a huge amount of liability

 5        and a much smaller amount of assets, at that point there

 6        is no shareholder value for good, correct?

 7             A.   I mean it depends, right?  It depends on what

 8        those assets are.

 9             Q.   Say it's just cash in a bank.

10             A.   Cash in bank.  Okay.  Go ahead.

11             Q.   So at that point, do you see any way in which

12        the shareholder can ever have positive value?

13             A.   I don't know.  It could be.  Anything is

14        possible.

15             Q.   Can you think of any way that would happen?

16             A.   Boy.  I mean something that could cause the

17        liabilities to go down over time and the cash remain the

18        same.  I don't know.

19             Q.   So short of liabilities being reduced and for

20        some reason the debt holder is deciding not to take the

21        cash --

22             A.   You get double-digit inflation like we had in

23        the 1970s, you know.  It's very difficult to respond with

24        a specific answer to those kind of questions.  It's a

25        strange hypothetical.
```

Page 41

1          Q.   Sure.  So let's use specific numbers if it's a

2     little bit easier.  Not the exact dollar amounts in your

3     analysis, but roughly there.  After the Alexbay transfer,

4     the debt to Lester Eber and Alexbay was eliminated,

5     correct?

6          A.   Yes.

7          Q.   So you were left with approximately eight

8     million dollars in debt owed by, according to your

9     report, Eber Brothers Wine and Liquor, and then a little

10    bit less than that, let's say 7.5 million by Eber

11    Brothers Metro.  Okay.  Does sound about right?

12         A.   I think so.

13         Q.   Okay.  So let's say 7.5 million dollars in debt

14    and $362,000 in assets for Eber-Metro.  Were those of the

15    holdings of the company short of stagflation and banks

16    deciding to pay incredible interest rates or making a

17    remarkable investment with that amount of cash, can you

18    think of any way in the normal operation of a business or

19    holding company that the shareholders in that situation

20    that the company could receive value -- positive value?

21              MR. CALIHAN:  Objection to form.

22         A.   I don't know.  Not sitting here I can't think

23    of a plausible way other than the things that I talked

24    about before.

25              (Whereupon, Exhibit Number 129 was marked for

1     identification at this time.)

2          Q.   This is Exhibit 129.  I am showing you what's

3     been marked as Exhibit 129.  Do you recognize this?

4          A.   Yes.

5          Q.   What is this?

6          A.   This is the exhibit that underlies the

7     valuation based upon the Eder-Goodman transaction in

8     2008.  And it is revised to account for the incorrect

9     methodology of applying the premium reduction for two

10    items with regard to this transaction.

11         Q.   Which two items are that?

12         A.   So there are two things that are required to

13    adjust the actual purchase price.  One is that the

14    transaction included -- both reflect the transaction

15    included certain valuable rights that were obtained by

16    Eder-Goodman extensively part of the purchase price.  So

17    they have to be reduced -- the purchase price has to be

18    reduced to reflect the value of those particular rights

19    in order to come up with a valuation or an attempt to

20    come up with valuation of Eber-Connecticut absent the

21    rights.

22         Q.   And so one of those rights, the right of first

23    refusal, you analogize to a control premium; is that

24    right?

25         A.   Well, I don't know if the analogy is what I am

1       referring to.  I think it to put in a more direct

2       connection the ROFR effectively limit to obtain a control

3       premium in the future.

4           Q.   So we're clear for the record, by ROFR you mean

5       right of first refusal?

6           A.   Yes.

7           Q.   So were these the corrections that were based

8       on what the Liebman report had pointed out in terms of

9       flipping a discount with a premium?

10          A.   Exactly.

11          Q.   In fact on some of your of analysis, you didn't

12      have to make the correction because you did it correct in

13      the first instance, right?

14          A.   Correct.

15          Q.   When you first did the calculation, you

16      combined the two premiums 15 percent and 25 percent and

17      then you did a 40 percent reduction, correct?

18          A.   Yes, I don't remember.

19          Q.   Okay.

20          A.   It could be.

21          Q.   All right.  If you want to take a look at

22      Exhibit 126.  If you want to check, 1.8 million, which is

23      the premium you calculated here, is 40 percent of

24      4.5 million, right?

25          A.   Yes, it is.

```
                                              Page 44
 1          Q.   Okay.  So it's fair to say that you took the
 2     15 percent ROFR premium and the 25 percent preferred
 3     premium and just combined them?
 4          A.   Let me double-check because it seems odd to me.
 5     So does the discount.
 6               MR. RAMSEY:  She is taking down everything
 7               you say.  So keep it to yourself.
 8          A.    So I multiplied them independently and then
 9     added up the one.  So it is .15 to times 4.5 million and
10     then .25 times and 4.5 million.  Added those two numbers
11     up.
12          Q.   And so both instances you made sure the premium
13     was applied to the base price.  Not the enhanced price?
14          A.   In the initial report.
15          Q.   Do you believe that was incorrect?
16          A.   Yes.  I think I agree with what Liebman said is
17     that these things should be divided by one plus premium.
18     I originally had written the report to reflect it as a
19     discounted and decided to change it to a premium and
20     somehow it didn't get to my people who did the
21     spreadsheets.
22          Q.   There was a couple of sentences that seemed to
23     conflict with each other.  But treating it as a premium,
24     but you didn't just change the way it was calculated to a
25     discount to a premium.  You also made it so the premiums
```

1      were consecutive or accumulative in your revised chart.

2           A.    That's the appropriate methodology after he

3      pointed out I didn't divide -- I multiplied the price

4      instead of dividing to get the stand-alone.  I made sure

5      that we adhered to the way that the literature

6      suggests -- well, requires to accommodate that.

7           Q.    So when dealing with the situation of multiple

8      premiums, the literature says that the way you calculated

9      in the revised C1 is the way to do it?

10          A.    Yes.  I think it's Bruner that discusses this.

11     And if you give me a second, I think I can give you the

12     exact site.  Well, I can't seem to put my finger on it.

13     But I know the author is Bruner.

14          Q.    I will --

15          A.    I can dig it out.

16          Q.    I will request that.  I am not saying it's

17     going to be sufficient for whatever disclosure reason or

18     anything, but I request that the underlying rationale,

19     whatever is being used to support the calculation

20     methodology, be disclosed to us.  I just want to make

21     sure we're talking about the same thing.  In your view,

22     if you take what the adjusted price -- the base price --

23     the real equity value of the common shares --

24          A.    Uh-huh.

25          Q.    -- you then add a premium for the preferred.

Page 46

1        A.   Yes.  And divide by one plus the premium for

2     the preferred.

3        Q.   Okay.  So once you actually -- after having

4     calculated the preferred, but I am actually doing it

5     backwards.  Not how you got to here.  I am just trying to

6     see how it works and to make sure this is right -- sanity

7     check.  Starting from the adjusting price.

8        A.   Yes.  Okay.

9        Q.   So you're saying that the way, you know, if you

10    were calculating what Eber or Eder-Goodman should have

11    paid based on that price, you would add a two premiums,

12    right?  One for preferred and one for right of first

13    refusal, correct?

14       A.   So I would first account for the preferred

15    premium by multiplying the stand-alone price times one

16    plus the premium.  Then I get a value.  Then I take that

17    value and multiply it times one plus the ROFR.

18       Q.   And why do you do the preferred premium first?

19       A.   You can do the ROFR first if that's okay.

20       Q.   Does that affect the ultimate value?

21       A.   No.

22       Q.   And so why is it appropriate to apply -- if you

23    can do it either way, why is it important to apply one

24    premium to the enhanced value or the already premium

25    enhanced value rather than applying both to the based

Page 47

1      value, right?  Because it's a premium paid on the true

2      equity value, shouldn't the premiums both be based on

3      that true equity value and not taking into account a

4      totally separate premium?  Because then you're paying a

5      premium on a premium, right?

6           A.    No.  I think that's the formula.

7           Q.    In this instance the parties themselves did not

8      break out any particular allocation of premiums, correct?

9           A.    No.

10           Q.    And in terms of how it affects your ultimate

11      opinion on insolvency, it's actually very important to do

12      it the way that you did and not the way I was describing

13      where you apply both premiums to the base value, correct?

14           A.    To my ultimate opinion?

15           Q.    Yes.

16           A.    No.

17           Q.    So you haven't done the math to see that if you

18      do it the way you originally did it and apply the

19      premiums to the base value that it actually ends up being

20      a solvent company?

21           A.    I think you're suggesting does that particular

22      valuation result in a positive number if you did the --

23      computed the premiums differently.

24           Q.    Yes.

25           A.    And the answer to that is yes, it would.  Would

1    it change my opinion?  No, it would not.

2         Q.   So this was -- so in fact in addition to

3    correcting the error that the Liebman pointed out, you

4    corrected another error.  And that helped you to maintain

5    an opinion --

6                   MR. RAMSEY:  Form.  Go ahead.

7         A.   So that's the appropriate methodology to assess

8    the premiums.  When you have discrete premiums for

9    different rights that are being applied.  So I adhered to

10   what the literature stated to do.  The prior analysis had

11   to do with discounts.  And as I discussed earlier, that

12   was a mistake.

13        Q.   Right.

14        A.   It was an error made in that calculation.

15        Q.   And because actually when you're doing it in

16   terms of discounts, doing it the way you originally did

17   it resulted in the lowest number, right?

18        A.   Well, it does.

19        Q.   You have been shopping before, right, and they

20   say take an additional 10 percent off.  That doesn't end

21   up being accumulative.  That's how the stores actually

22   make you feel like you're getting a better discount than

23   you are.  You did in the way the first instance that

24   would result in the lowest number.  And in the second

25   instance you switch the order and did it again in the way

Page 49

1      that results in the lowest number?

2                   MR. RAMSEY:   Form.

3           A.   I don't know if that's true.  I just tried to

4      correct the error that Liebman pointed out and tried to

5      correct it in the proper way based on what the literature

6      suggests.

7           Q.   I look forward to seeing that literature.  Is

8      there any margin of error when you conduct a valuation?

9           A.    Well, no valuation is so precise that it is

10     with 100 percent certainty.  So there is always some

11     degree of uncertainty that reflects a valuation.  That's

12     why you do a number of different valuations, you know,

13     try to do different measures to try to understand, if you

14     will, the degree of uncertainty and to account for that

15     in having a range of values that obtains from different

16     measures of valuations.

17          Q.   Suppose you're -- we're talking hypothetical

18     world.  Say that you are dealing with a valuation.  You

19     don't have anything except for one sort of calculation.

20     Not like the five here.  You got one prior transaction

21     and that's what you're basing your valuation on.  Are you

22     saying in that instance there would not be any margin for

23     error in your valuation?

24          A.   No.  I am not saying that.

25          Q.   So there is -- is there any sort of way to

Page 50

1      quantify that margin of error in that valuation method?

2           A.   Well, you could.  You could.  I think the

3      key -- let's go through each of the valuations.  So I

4      would say that the key problems with these valuations are

5      the kinds of things that you would do sensitivity

6      analysis on to see whether or not or see how that affects

7      the --

8                     MR. RAMSEY:  Are we still in hypothetical

9                world here?

10          Q.   We're talking about general principles of

11     valuation.

12          A.   Yes.  Sorry.  Thank you.

13          Q.   Were you talking specifically about --

14          A.   Let me respond to your question correctly.  So

15     what would one do is look at the key variables that are

16     responsible for the uncertainty.  And you first -- in

17     your determination, depending upon which side you're on,

18     you decide you go with an expected value for those key

19     variables that are conservative.  Then you start making

20     changes to those values of that variable to see how it

21     affects the valuation.  That would be one way to ascribe

22     a degree of uncertainty to a particular valuation or to a

23     range of valuations.

24          Q.   I know you're not a CPA, but are you familiar

25     with the concept of materiality and gap?

1          A.   Well, I am.  Materiality is one of those loaded

2     phrases that means different things to different people,

3     you know, legally, accountants, economists.  So, you

4     know, if you want to give me a definition, I will be

5     happy to use it.

6          Q.   Well, I think there -- I am not going to

7     purport to try to define it either.  Basically, is it

8     fair to say that the concept of materiality takes into

9     the consideration that there is margin for error in any

10     sort of financial reporting under gap --

11               MR. RAMSEY:  Form.

12          Q.   -- and that sometimes that it's small enough

13     that it doesn't really matter?

14          A.   I have a hard time agreeing with that

15     characterization.  The latter part seems to be perfectly

16     reasonable.  If something that, you know, if it's General

17     Electric and in the market cap is billions of dollars and

18     General Electric has a truck blow up, is that small

19     enough not to -- if that value is small enough not to

20     report to shareholders -- it's not material enough.  I

21     would agree with that.  It's small.  Whether that's

22     because of uncertainty -- that's kind of a new concept

23     that I have not heard.

24          Q.   Let me put it this way.  So I am talking mainly

25     in terms of let's say income numbers.  So accounting can

Page 52

```
1        oftentimes lead to -- especially when you're talking
2        about accrual accounting and companies have things coming
3        in after the end of the year, it's not clear where you
4        put it, different accounting methodologies being applied
5        to the exact same numbers can result in significant
6        differences in terms of reported income for a company; is
7        that fair to say?
8              A.   Can you repeat that question back?  That was
9        kind of a long-winded setup.  Make sure I got it all.
10             Q.   I will rephrase.  Is it fair to say that the
11       choice of accounting policies by a company can affect
12       what its reported financials say in terms of the dollar
13       amount of income earned?
14             A.   Yes.
15             Q.   So if an accounting policy were to simply be
16       changed, then the numbers would be different?
17             A.   Yes.
18             Q.   And in not all instances would those
19       differences necessarily be materials to the value of the
20       company; is that fair to say?
21             A.   So there is a lot of literature -- economic
22       literature on this particular point.  And the upshot of
23       the literature is that investigators see through
24       accounting fiction.  So if one company is using some
25       straight-line depreciation and another company is using
```

1      accelerated depreciation, are those companies valued

2      differently?  No.  Investors see through those kind of

3      accounting choices that companies make, and they are able

4      to adjust their valuations accordingly.  I don't know if

5      that answers your question.  That's kind of my reaction

6      to your point about accounting choices.

7           Q.   Let's say putting aside that kind of thing.  So

8      are you familiar with the concept of how sometimes income

9      might be taken all at once, or it might be amortized,

10     capitalized over time or same thing with expenses, right,

11     sometimes say there is a three-year contract, but a

12     company gets paid all up at once.  The accountants would

13     probably say you have to report that over a three-year

14     period, the life of the contract; fair to say?

15          A.   Could be.

16          Q.   So in that instance how would that -- does the

17     choice of whether or not to record that money all up

18     front or over time affect a valuation analysis?

19          A.   Well, I mean the choice certainly has an effect

20     on the numbers.  But does it affect a  valuation?  Let's

21     deal with the situation of an expense.  If you have a

22     cost that's capitalized, what you're basically saying is

23     that the benefits from this particular expenditure are

24     going to accrue over a number of years.  And is it

25     appropriate to reflect a fraction of that cost in a given

1    particular year, yes, because that's kind of how the

2    economics relates to the accounting numbers.

3    Consequently, if you have a cost that is a one-time

4    period expense, then you would reflect it in that

5    particular year because the benefits from that particular

6    expenditure are expected to happen in the year that those

7    expenses are occurred and recorded as an accounting.

8         Q.    Right.  I actually wanted to stay away from

9    expense because an EBITDA capitalized expense is actually

10   taken out of the calculation, right, because it's part of

11   amortization?

12        A.    So the depreciation on the equipment?

13        Q.    Yes.

14        A.    Fair enough.

15        Q.    I mean the --

16        A.    The reason that it's done is because you've

17   got -- you're trying to assess the cash flow.  And EBITDA

18   is probably the closest accounting number to cash flows

19   because that's true.  It doesn't account for

20   depreciation, but it doesn't account for the offset

21   capital expenditures.  So in a simplified world where

22   capital expenditures equals depreciation or they're

23   similar, it is reasonable to and it is done by a lot by

24   financial analysts and in security reports that you

25   would use EBITDA as a closest surrogate proxy, if you

1      will, for cash flows from the accounting income

2      statement.

3              Q.    Okay.  So going back to my example if a company

4      that has a three-year contract, gets paid all upfront.

5      Let's say the company is valued after year one.

6      Depending on whether that company amortizes that income

7      or records it all at once, its reported income that would

8      be going into your valuation analysis could be very

9      different, correct?

10             A.    Well, if you're reporting income that in one

11     year that you had not earned, then that's a mistake.  And

12     that would be a, you know, in my experience in security

13     litigation, which is the last 30 years, that would be a

14     big problem.  And you would get sued for misrepresenting

15     your revenue.  So like I said, whether it's income,

16     whether it's expenses, if you are reporting numbers that

17     you shouldn't be reporting, does that make a difference,

18     yes.  And you're going to get sued for misrepresenting

19     your income for that particular year.

20             Q.    I am not trying to get into liability issues

21     right now.  Is it fair to say in accounting there are a

22     number of gray areas in consistently evolving standards

23     where contracts have complexities that, you know, would

24     not be encompassed easily within a hypothetical question

25     in a deposition?

```
 1                    MR. RAMSEY:  Form.
 2        A.   You're asking me an accounting question?
 3        Q.   No.  I'm asking you -- accounting answers are
 4   not always black and white; fair to say?
 5                    MR. RAMSEY:  Form.
 6        A.   I suppose no answer is black and white.
 7   Accountants have problems with how they do their job just
 8   like economists do.
 9        Q.   So let's just assume that for the sake of this
10   hypothetical that this income and whether it's recorded
11   all at once or over time is within a gray area and that
12   both would be reasonable accounting choices.
13        A.   Well, that sure doesn't fit the example that
14   you gave me about a revenue.  You better come up with
15   another example if you accept that as a hypothetical.
16        Q.   Let's say that it is revenue that is connected
17   to a vendor with whom there is a separate contractual
18   relationship and a number of different ties with it such
19   that there are arguably -- I am getting way ahead of
20   myself.  Let's stop this line here.  Is it fair to say
21   that if accounting decisions are made that affect the
22   numbers that go into your equation, that effects the
23   ultimate valuation number that gets spit out?
24                    MR. RAMSEY:  Form, go ahead.
25        A.   I am trying to understand what that question
```

```
                                              Page 57
 1     means.
 2               MR. RAMSEY:  Are you saying if he's
 3          providing different numbers by accounting, it's
 4          going to change his number?
 5     Q.   I am just saying -- yeah.  If a company
 6     restates its financials, for example, after a valuation
 7     date -- ?
 8     A.   Uh-uh.
 9     Q.   -- is that going to affect the ultimate number
10     potentially in terms of your valuation?
11     A.   So would the restatement -- if I had been
12     provided with the restated numbers at the time they
13     incorrectly provided their profit, would that affect the
14     valuation?  Sure.
15     Q.   Now in the --
16     A.   It could if it's material.
17     Q.   When you're valuating a company on a particular
18     date when a transaction occurred and trying to say that
19     the transaction say, had fair value, do you use the
20     financial numbers as they were believed to be at the time
21     by the participants of the transaction, or do you use the
22     real numbers if they thought the numbers were different?
23               MR. RAMSEY:  Form.
24     Q.   Just to be clear, so before a restatement
25     occurs later.
```

```
 1        A.   So with regard to statement?
 2        Q.   Yes.  Say you're using -- do you use the
 3   unrestated financials that are referenced at the time of
 4   the transaction or the restated financials?
 5        A.   You know, that's a difficult question to answer
 6   without the facts and circumstances surrounding it.  Let
 7   me try to give you the best response I can.  It is a
 8   principal in valuation that you're not allowed to peek
 9   forward.  That has been upheld in a number of litigation
10   cases.  So, you know, as a general matter of what you're
11   trying to do is put yourself in the position of someone
12   at that particular point in time that has access to all
13   relevant information about the asset, the company is
14   object -- subject of the valuation.  And as a general
15   matter, it's called no peeking.  I think that's kind of a
16   silly phrase.  That's how the courts have viewed it.  And
17   that's how people like Shannon Pratt talk about it.
18   Bruner talks about it.  Cornell talks about it.  You're
19   trying to understand how someone at that particular point
20   in time with the information available to them would have
21   valued that particular asset company.  So if your
22   hypothetical -- if your assumption is that they should
23   have had that information, fine.  Like a restatement.
24   Restatement is one of those situations where look -- this
25   is what should have been reported.  It's not like it's
```

1    information that is new.  It's that information that was

2    there, but they incorrectly reported it.  They

3    fraudulently reported the information.  So if the

4    question is, well, what would the valuation had been had

5    investors known the fraudulent information?  Okay.  Then

6    you would reflect it.  Then if the question is, well,

7    what is the valuation given the information that's

8    available to any given investor that's a willing buyer at

9    that point in time?  That's a different question.

10       Q.   Right.

11       A.   So that's the best way I can respond to your

12   question is to kind of give you my full explanation.

13       Q.   Right.  So in this case, is it fair to say that

14   you were looking at the valuation of Eber-Metro and

15   Eber-Connecticut as it was understood by the people who

16   were involved in the transaction at the time and not

17   trying to second guess it based upon what they should

18   have known based upon subsequent events?

19              MR. RAMSEY:  Form.  Go ahead.

20       A.   Yes.  I always try to not peek to events that

21   happen after the valuation date.  So I think you're

22   talking about the valuation date of 2012.

23       Q.   Yes.

24       A.   So yes, I do.  I do.  You know, whether there

25   were specific outcomes that happened after 2012, I try

1    really hard not to have that effect, you know, my opinion

2    as to what the valuation was at 2012.

3         Q.   In terms of a -- does that apply for both

4    assets and liabilities?

5         A.   Yes, as a general matter it does.  You know,

6    look, there are many circumstances in which after the

7    valuation date -- I will give you a perfect example.  I

8    have been involved in a number of cases, appraisal

9    actions in Delaware, involving pharmaceutical companies

10   involving a drug that is it pending.  Well, you know, the

11   drug that is pending, you've got to take a particular

12   view as to what that drug is going to yield in the

13   future.  And two years down the road it got FDA approval.

14   Well, that changes the picture, but you didn't know it

15   was going to get FDA approval at that particular point in

16   time.  So, you know, those are the kinds of things that

17   you don't want to peek ahead and say well that was known

18   by everybody.  Yes, it was known that it would be get

19   approval.

20        Q.   So in that instance where there is the

21   uncertainty about whether this future event will occur

22   that would increase the likelihood of this drug going to

23   market, was there a discount applied for the earlier

24   uncertainty?  How did that work?

25        A.   Well, the cash flows where the cash flows.

Page 61

1      And, you know, when we looked at cash flows that were

2      projected by management at that particular point in time,

3      those were the cash flows that we used, and it was a

4      discounted cash flow analysis that I am referring to.

5      And we used those cash flows because those were the cash

6      flows available to management at that time and reflected

7      what it reflected.  We didn't adjust them.

8           Q.   Okay.  Now, this is a case where you did not

9      have projections to rely on; is that right?

10          A.   That's correct.

11          Q.   Did you get any explanation as to why there

12     were no projections provided to you?

13          A.   No.  I certainly got the information that there

14     weren't.  Not uncommon for small private companies.  They

15     don't spend a lot of time preparing forecasts in my

16     experience as do large companies that have staff that do

17     nothing but prepare budget forecasts.  I don't prepare a

18     budget forecast for my company.

19          Q.   I am shocked.

20          A.   It is shocking.

21          Q.   So talking about liability.

22          A.   Uh-huh.

23          Q.   As a general matter, how is a contingent

24     liability valued?

25          A.   Well, again, you're kind of in the realm of

```
                                              Page 62
 1      accounting here.
 2           Q.   In your analysis, how do you -- if you know
 3      something is a contingent liability --
 4           A.   Uh-huh.
 5           Q.   -- or maybe like a disputed liability, how do
 6      you end up figuring out what number to use?
 7           A.   Generally, if it's truly a contingent liability
 8      that you're waiting for some outcome, I kind of take the
 9      approach that accountants take.  Is there a way to
10      estimate first what the value is of this particular
11      liability?  Well, that's kind of generally going to be
12      value of the lawsuit.  What are they suing for and to
13      look at that particular lawsuit and what the numbers
14      represent.  And the second piece is well, is it probable?
15      Those two things get into the valuation.  Again, the idea
16      is to put yourself in the position of an investor at that
17      particular point in time.  If you're looking at a
18      particular lawsuit and unpaid invoices for example, well,
19      you've got to a particular number there.  And what is the
20      dispute?  Why isn't it paid?  If it's not paid because
21      you don't have the money, then it's probable that
22      liability exists.
23           Q.   And if it's probable, do you include the full
24      amount of the potential liability, or do you discount it?
25           A.   It depends upon the liability, but, you know,
```

Page 63

```
1        so, for example, for companies that I have been involved
2        with where they provide their estimate of what that
3        liability, is if there is a contention of what that
4        liability is, and if it's listed as a contingent
5        liability, then it's generally used -- that number is
6        generally used in assessing the valuation of a firm.
7            Q.    In this case -- turning to Page 12 of the
8        report.  You listed a number of liabilities for
9        Eber-Metro and Eber Wine and Liquor?
10           A.    Yes.
11           Q.    And a lot of these numbers you got them from
12       documents that were not existent at the time of the
13       transaction in 2012, correct?
14           A.    There were a couple that were past the
15       transaction, but my view the numbers would have been
16       known.  It wasn't like it was hidden, but in the
17       documentation I had, some of them were not too far away,
18       but they did go past.
19           Q.    Did you see any documentation or evidence
20       regarding the probability of these liabilities -- the
21       second component that you mentioned?
22           A.    How probable they were?
23           Q.    Yes.
24           A.    I mean indirectly.  I did read the complaint
25       that Harris Beach filed.  I think that's what you're
```

1    talking about -- the Harris Beach and Benderson

2    Development.  So these were two items that unlike a --

3    let's say unlike a product liability lawsuit or a

4    class-action security lawsuit, these were specific

5    invoices that were not paid.  They were owed, but not

6    paid.  I didn't see any dispute that these were

7    legitimate invoices.  My take on this is that they were

8    amounts that were for whatever reason there wasn't enough

9    monies to be paid, and these guys were not happy about it

10   and sued.  So in my view when I looked at this, I said

11   these are numbers that can be estimated.  They are

12   estimated.  And it is probable that it exists.

13        Q.   So for the Harris Beach litigation, would it

14   have affected your analysis that these were just invoices

15   that were not disputed if you learned that there was a

16   counterclaim for malpractice?

17        A.   No.

18        Q.   Why not?  Isn't that a dispute of the invoices?

19        A.   It could be.  I viewed this as probable.

20        Q.   And did you discuss whether this was a probable

21   liability with anyone as part of forming that conclusion?

22        A.   Well, as I said, I did discuss these

23   liabilities with the attorneys, with Wendy and Lester.

24   And I was satisfied that these were legitimate

25   liabilities of the company.

Page 65

```
 1              Q.    Which company?

 2              A.    Well, in the case of --

 3              Q.    Let's say Harris Beach.

 4              A.    Harris Beach, both Metro and Wine and Liquor.

 5              Q.    Okay.  And how did you conclude that this was a

 6         liability of both entities?  Is that typical to have two

 7         entities?  You know, I am not referring to the first two

 8         lines here where you mentioned one is a guarantor.  The

 9         next four lines or three lines say Metro and Wine and

10         Liquor.

11              A.    So this duck tailed into the legal world and

12         again, as I said before, I asked specifically as a legal

13         matter because it just gets beyond my area of expertise

14         to determine whether or not it is an obligation

15         specifically of Wine and Liquor or Wine and Liquor and

16         Metro.  So that was something that I relied upon --

17         counsel.

18              Q.    Okay.  And this was an opinion from counsel

19         now.  Not one that had been provided at the time of the

20         transaction?

21              A.    No.

22              Q.    Okay.  So --

23              A.    What their basis was I don't know.

24              Q.    Okay.  So wouldn't it be more important for

25         your analysis to determine what the probability was
```

Page 66

1    believed to be at the time of the transaction?

2         A.   Well, that was the question posed, yes.  You

3    asked me if it was an opinion that they provided to me

4    now, or if it was an opinion they provided in 2012.  It

5    was an opinion provided now but related to what was in

6    existence in 2012.

7         Q.   Okay.  So you asked them legally which entities

8    were on the hook for this; is that right?

9         A.   That's correct.

10        Q.   Did you ask anyone what management believed the

11   probabilities were in terms of the entities being on the

12   hook at that time on in 2012?

13        A.   I don't know if I couched the question in that

14   way.  But I certainly did talk to Wendy and maybe just

15   Wendy at that particular instance about these

16   liabilities.

17        Q.   And what did she tell you about that?

18        A.   That these were real liabilities that the

19   company had.

20        Q.   Which company?

21        A.   Well, again, for Harris Beach it was Metro Wine

22   and Liquor.

23        Q.   Right.

24        A.   For Benderson it was wine and liquor.

25        Q.   Now, you cite a number of documents here.  You

                                                          Page 67

1          read the Liebman report.  You know that in his view none

2          of those documents indicate any liability from Eber-Metro

3          for the three times in the middle there.

4                  A.    Three times in the middle.

5                  Q.    Pension plan determination, Teamsters and the

6          Harris Beach.  Do you see anything different in those

7          documents that indicate liability by Eber-Metro?

8                          MR. RAMSEY:  Object to form.  That's really

9                     a legal question.

10                         MR. BROOK:  He cited these documents.

11                         MR. RAMSEY:  He also said he's relied on

12                    what was going to be a legal obligation.  Go ahead

13                    with that objection, if you can answer.

14                 A.    I lost track of the question.

15                 Q.    Sure.  Where you cited the reference documents,

16         were you just citing that for the amount that you listed

17         there and not for the obligor?

18                 A.    The citations are principally for the amount.

19         So I can put some numbers down and do the quantification.

20         But, you know, I do have some experience with pension

21         obligations.  I worked for the PBGC on a number of cases.

22         So I have an understanding from an economic perspective

23         of how investors perceive the liabilities owed to the

24         PBGC or how the PBGC handles these things.  And

25         consequently I have a fairly good understanding of how

Page 68

1      investors would account for these kind of obligations. So

2      that -- and in fact, one of the courses I teach on merges

3      and acquisitions take in account hidden liabilities.  One

4      has to do with pension obligations and how that affects

5      the buyer's decision to move forward.  So there is, you

6      know, that layered on top of the legal determination is

7      my experience and my understanding of how investors treat

8      pension obligations.

9          Q.   In this case, just so we're clear on

10     everything, in this case the investor is also management

11     of the company, right?  So is it fair to say that --

12     would you agree with that statement here?

13         A.   No. I mean, take a look at that first page of

14     what I discussed in terms of what I am trying to

15     accomplish here.  The amount in which the property would

16     change hands between the willing seller and buyer when

17     neither is acting under compulsion and when both have

18     reasonable knowledge of the relevant facts.  So that's

19     what I am trying to -- I know it's a bit esoteric, but

20     that's kind of the general approach that I am trying to

21     take here.

22         Q.   But you understand that overall your opinion

23     will be used to argue that the transfer of Eber-Metro to

24     Alexbay was a transfer that was done for fair value; is

25     that correct?

Page 69

1           A.   A transfer done for fair value.  I am not sure

2      I can agree with that.  It's a transfer that was done

3      consistent with the valuation I performed.  I am

4      valuing -- specifically valuing the entity,

5      Eber-Connecticut.  And in my opinion when you go up the

6      chain, it yields a conclusion that the solvency -- that

7      Eber-Metro and Eber Wine and Liquor are not solvent.  So

8      I am -- and yes, that supports the transaction, but I am

9      not if you can find an opinion where I am opining on the

10     transaction's fairness, I don't.

11          Q.   Well, you picked the valuation date that you

12     did because that was when the transaction was deemed

13     commercially reasonable by a court, correct?

14          A.   I didn't pick the valuation date.  I was asked

15     to perform a valuation as of that particular date.

16          Q.   Understood.  And your primary task though was

17     to value Eber-Metro, not Eber-Connecticut?

18               MR. RAMSEY:  Form.

19          A.   Well, if you read my report, I specifically say

20     that Eber-Connecticut is the only operating asset of

21     Eber-Metro and Eber Wine and Liquor.  So ultimately what

22     I am valuing is the Eber-Connecticut valuation.  From

23     that valuation I subtract the liabilities for Eber-Metro

24     and Eber Wine and Liquor.  But I am not -- the only

25     valuation I am doing of Eber Wine and Liquor is

                                                    Page 70

1         predicated on my valuation of Connecticut.

2              Q.    Right.   I am just looking at your report

3         Paragraph 1.   I have been asked to provide an opinion

4         regarding the market value of equity of the capital stock

5         of Eber Brothers Wine and Liquor Metro, Inc. as of May

6         23, 2012.

7              A.    Right.

8              Q.    But in your view, the work you were focused on

9         was just the Eber-Connecticut asset; is that right?

10             A.    If you go further, I think I actually state

11        this.

12             Q.    I don't think there is a dispute here.   I am

13        going to you know, I guess, what I am trying to

14        understand a little better, you know, if you're really

15        saying you were focused on Eber-Connecticut, then that

16        would make sense as to why you did not spend much of your

17        report analyzing the liabilities involved here.

18             A.    If you look at Paragraph 4, that puts my

19        analysis in perspective.   So it builds up from that

20        valuation.   That's the valuation.

21             Q.    Right.

22             A.    There is no operating asset at Metro.   There is

23        no operating asset at Wine and Liquor.   The only

24        operating asset is their ownership of Eber-Connecticut.

25        So all the valuation work I did revolved around

Page 71

1      Eber-Connecticut.

2           Q.   Right.  And then -- but you also valued

3      Eber-Metro and Eber Wine and Liquor to the extent that

4      you said it was they were insolvent no matter what the

5      value of Eber-Connecticut was, right?

6                     MR. RAMSEY:  Form.

7           A.   I wouldn't say it that way.

8           Q.   No matter which valuation of yours you used for

9      Eber-Connecticut, right?

10          A.   My opinion is that the value of

11     Eber-Connecticut was plus any other assets of Metro and

12     Wine and Liquor were less than the liabilities.

13          Q.   And do you understand why it is that I am

14     drawing a distinction between Eber-Metro and Eber

15     Brothers Wine and Liquor for the liabilities?

16          A.   You know, I have a vague understanding that

17     it's some kind of legal machination that's going on here.

18     From my perspective as an economist, what I am looking at

19     is what I think is relevant is what the heck is the value

20     to these ultimate -- the beneficiaries of this trust.

21     And in order to do that, you've got to go up the chain of

22     command.  Now, I understand there is some reason why it's

23     important to assess Metro vis-à-vis Wine and Liquor.  I

24     don't pretend to understand that.  It doesn't make

25     economic sense to me.  If it doesn't make economic sense,

1     then it must be some kind of legal stuff that's going on

2     here that allows you to put a wedge between Wine and

3     Liquor -- put a wedge between Wine and Liquor that

4     ultimately puts a wedge between what the beneficiaries of

5     the trust really own.

6         Q.   Right.  I think -- let me help you put it in

7     perspective here.  So maybe we can have a more productive

8     discussion.  So Lester Eber foreclosed on debt that was

9     owned by Eber-Metro and guaranteed by Eber Wine and

10    Liquor.  And the company agreed to just give him

11    Eber-Metro.  And eliminate the debt to Eber-Metro too, as

12    a result.  So there is a legal question certainly as to

13    whether that was done for fair value.  Did Lester Eber,

14    given his fiduciary obligations and his various roles,

15    get more value by acquiring Eber-Metro through the amount

16    of his loans?  And so that's why drawing this line here

17    is fairly significant.  And do you understand at least

18    the general fact patterns as I described it?

19            MR. RAMSEY:  Form.  Go ahead.

20         A.   I am trying.

21         Q.   So would you agree that if Eber-Metro did not

22    have all of the liabilities for the pension and Harris

23    Beach that you mentioned on this chart here, then the

24    value of Eber-Metro would have been significantly higher

25    than the 3.8 million dollars in debt that you listed here

Page 73

1     that was owed to Lester Eber?

2              MR. RAMSEY:   Form.  Go ahead.

3         A.   When you say, "did not have", what do you mean

4     by that?

5         Q.   Equal that it was not legally -- at the time of

6     the transaction it was believed that Eber-Metro would not

7     be liable for any of those debts.

8         A.   So --

9              MR. CALIHAN:   Objection.

10        Q.   Let me sort of give you my take on this.  And I

11    mentioned to you before in one of your questions my

12    experience.  And again, putting myself in the position of

13    willing buyer with knowledge of all the relevant facts.

14    I know from experience that when you try -- when you try

15    to play a shell game with a PBGC about who was the

16    controlling entity and who owns what and where does this

17    liability set, you run an awful risk.  I have seen it

18    firsthand.  I worked in the case called White

19    Consolidate.  That is not unlike this where the company

20    itself tried to say this is not -- the pension is not our

21    liability.  It belongs to -- and they sold the company

22    and without the liabilities.  And did not have enough

23    money to pay those liabilities.  And said, well PBGC, you

24    pick up the rest.  And the PBGC said nuts to you.  We're

25    going after you.  This is fraudulent conveyance.  Now,

1      that kind of knowledge is the kind of thing that any

2      individual investor would reflect.  So you can tell me

3      well, you know, legally I've got a legal opinion that

4      says this these pension obligations don't -- have nothing

5      to do with Eber-Metro.  And I can -- I feel fairly

6      confident that had they sold Eber-Metro and the proceeds

7      were not enough to cover the amount of that pension,

8      either the PBGC is going to say you can't do this

9      transaction or in the case that I have seen, they go

10     after the buyer.  And say well, now you bought this.

11     Those liabilities are now on your books and you have more

12     assets than what you just bought because you merged with

13     Connecticut.  So now you're on the hook to pay those.

14     And, you know, again, these kinds of quote hidden

15     liabilities are the kind of things that are affected in

16     the ultimate purchase price even if one is -- if a

17     purchase price is offered because they-re going -- a

18     buyer is going to price protect themselves.  They're not

19     going to sit there and say, I got this great legal

20     opinion that is not going to be a problem.  I can

21     separate the assets from this pension liability.

22          Q.    But what if it actually happened in this case?

23          A.    What if what actually happened?

24          Q.    What if the buyer in this case, Alexbay because

25     it bought it by giving up debt, actually believed that by

Page 75

1     engaging in this transaction it would acquire Eber-Metro

2     free and clear of pension obligations, would that be

3     relevant to your analysis?

4                   MR. RAMSEY:  Form.  Go ahead.

5          A.   No. Again, if you go back to that paragraph, I

6     am talking about a willing buyer aware of the facts.  You

7     seem to be focused on what is kind of referred to as

8     specific investigators valuation as opposed to a fair

9     market value.  Again, we seem to be flipping over into

10    the process as to why something was done and was it done

11    for legitimate reasons.  I am out of that.  That's not my

12    right here.

13         Q.   You have not made any opinion on whether in

14    this case because Lester Eber was a judiciary, his

15    opinion of the valuation would be relevant to this

16    litigation?

17                   MR. RAMSEY:  Form.

18         A.   I don't know what the judge is going to

19    consider relevant or not relevant.  I am telling you what

20    is relevant to my valuation is what I have done in this

21    report.  You know, whether Lester thought that he could

22    skate on the PBGC, that's Lester's view.  I am telling

23    you as a measure of fair market value under the

24    definition that I provided here an investor is going to

25    take into account those obligations for sure.

```
                                                        Page 76
 1              Q.    Are you sure that was the case in 2012?  There
 2        has been a number of elements of the law recently.
 3              A.    My involvement going back before 2012 -- I mean
 4        look, I didn't -- I don't see anything that would
 5        contradict that.  The PBGC, as far as I can see, fight
 6        like a dog when you try to hide, you know, or skirt and
 7        force the PBGC to pay for or to be the trustee for
 8        pension obligations.  You know, you're in for a fight.  I
 9        guarantee that.
10              Q.    To what extent in connection with your work in
11        this case did you become familiar with the fight that
12        erupted between PBGC and the Eber entities?
13              A.    Well, you know, I familiarized myself with some
14        of the analysis that the PBGC did.  And I think there was
15        a document that I saw that provided some kind of -- I
16        don't know.  I guess call it a settlement of some kind.
17        I don't know if that's the right legal term.  I read
18        those things.
19              Q.    For this chart, the summary of liabilities, did
20        you consider whether there was other obligors beyond
21        Eber-Metro and Eber Wine and Liquor for any of these
22        debts?
23                    MR. RAMSEY:  Form.
24              A.    No.  I don't specifically recall that.
25              Q.    Would that affect your analysis of the
```

1      liabilities if there was a third obligor?

2                   MR. RAMSEY:  Form.

3           A.    Possibly.

4           Q.    So are you aware of that after the Alexbay

5      transfer PBGC put a lien on Eber-Metro?

6           A.    Yes.

7           Q.    Are you aware that at the same time PBGC put a

8      lien on Eber-Connecticut?

9           A.    Yes.  I think that is consistent with my view

10     of how the PBGC operates.  They take fraudulent

11     conveyance very seriously.  If they think you're trying

12     to escape, they're going to certainly at least do that.

13          Q.    So is it fair to say then that in addition to

14     Eber-Metro and Eber Wine and Liquor in your opinion

15     Eber-Connecticut was also an obligor for pension

16     liability?

17                   MR. RAMSEY:  Form.

18          A.    Certainly from an investor's perspective that's

19     exactly what they are going to expect to happen.

20          Q.    Does it affect your ultimate valuation analysis

21     as to whether you put that liability in the

22     Eber-Connecticut analysis or further up the chain?

23          A.    So if the liabilities are at the

24     Eber-Connecticut level, that would reduce valuation for

25     Eber-Connecticut by the pension.

```
                                                    Page 78
 1          Q.   Okay.  But you did not do an analysis with
 2     running the numbers in that way; is that right?
 3          A.   No.
 4          Q.   Do you think that you perhaps should have?
 5               MR. RAMSEY:  Form.
 6          A.   Well, I don't think -- it doesn't matter.  So I
 7     didn't -- it's kind of like a -- what is the point?  The
 8     solvency opinion has to do with Eber-Metro and Eber Wine
 9     and Liquor.  For I mean -- this gets back to what I said
10     before about the economics of it.  I am still a little
11     fuzzy about why the hell it matters between Eber Wine and
12     Liquor and Eber-Metro.  But notwithstanding, to me it
13     didn't really matter whether I put the liabilities of
14     Connecticut as long as they are there with Eber-Metro
15     when I am doing a solvency analysis of Eber-Metro that's
16     what counts.  So it's like what's the point.
17          Q.   So would you include the liabilities at each
18     level for the balance sheet of all three companies?
19          A.   If the total liability is at Eber-Connecticut,
20     then I've accounted for the liability relative to
21     Eber-Metro.  I netted it out against the Eber-Connecticut
22     assets.
23          Q.   How do you decide where that goes?
24          A.   As I said, it's difference.  Not a distinction.
25     It doesn't matter to me.  It's an economic matter.  You
```

Page 79

1    know, what is the point to make more paper?  To say well

2    if it's Eber-Connecticut then Eber-Connecticut value is

3    lower, but then it's the same flip side that Eber-Metro

4    has less operating assets.  I am not sure I understand.

5    I know it must make such kind of legal difference, but

6    from my perspective, I just don't see what the point

7    would be to do that analysis.

8         Q.   We were talking about PBGC.  What about the

9    Teamsters liability?  What is your basis for believing

10   that is something -- that a reasonable investor would

11   attribute to Eber-Metro?

12        A.   Same basis.  I think -- I know that there was a

13   lawsuit over payment of the Harris Beach amount.  And

14   they sued for fraudulent conveyance.

15        Q.   Do you know the timing of those lawsuits?

16        A.   That would have been a post-valuation date.

17        Q.   Right.

18        A.   But my point is that from an investor's

19   perspective, it's like day follows night.  You start

20   playing around with pension obligations whether it's the

21   PBGC insured and pension from Teamsters, you are going to

22   price protect yourself.  And I think the same holds true

23   with the other obligations as well.

24        Q.   If a liability is contingent upon a creditor

25   successfully pursuing a fraudulent conveyance lawsuit, is

Page 80

1      it really in your opinion appropriate to include that as

2      probable contingent liability?

3            A.    That's not what I said.

4            Q.    For Harris --

5            A.    I said that day follows night.  If you tried to

6      separate the liabilities from the operating assets,

7      you're going to get fraudulent conveyance.  An investor

8      is going to certainly reflect that.  They will not say,

9      "I will roll the dice on this."  No.  These are serious

10     obligations.  Particularly the PBGC and I would also

11     include the Teamsters in that.  And the only point I

12     raise about the Harris Beach is that look, that's exactly

13     what an investor is going to anticipate.  You try to hide

14     liabilities from the assets, and this is what you're

15     going to get.  An investor knows that.  You just can't

16     ignore that.  You can't put blinders on and say this

17     doesn't matter.  Yes, it matters.  It matters a lot.

18     Particularly with a company for which the assets are less

19     than the liabilities, it matters a whole hell of a lot.

20                  MR. RAMSEY:  Take another five, Brian.

21          (Whereupon, Exhibit Number 130 was marked for

22     identification at this time.)

23            Q.    Let's do one more document for now.  So for the

24     record, I am showing you what's been previously marked as

25     Exhibit 73 and newly marked Exhibit 130.  Have you seen

1       either of these documents before today?

2            A.   Let me read it.  I think I have seen

3       Exhibit 74 before.  It looks familiar.  I am not sure I

4       recollect 130.

5            Q.   So looking at Exhibit 74 then, you see it is a

6       confession of judgment signed by Wendy Eber on behalf of

7       the Eber Brothers Wine and Liquor Corp.  And that's as to

8       the Teamsters liability?

9            A.   Right.

10           Q.   And that number matches within five cents the

11      number you've got in your summary of liabilities, right?

12           A.   Yes.

13           Q.   Do you see that this confession of judgment

14      only as to Eber Brothers Wine and Liquor Corp and not

15      Eber-Metro?

16           A.   So I think you're referring to the heading in

17      there that says the defendant is Eber Wine and Liquor

18      corporation.

19           Q.   Yes.

20           A.   Yes.  It says Eber Wine and Liquor Corporation.

21      It does not say Eber-Metro.

22           Q.   Then looking at 130.  That's the exhibit in

23      front of you.  Wendy Eber is explaining the reason for

24      that.  She says in the last paragraph, "I had modified

25      the confession of judgment to reflect that it is against

```
                                              Page 82
 1      Eber Brothers Wine and Liquor Corporation and not the

 2      Eber companies."  Do you see that?

 3           A.   I see that.

 4           Q.   So is it your opinion that these documents

 5      reflecting that the liability was only against

 6      Eber Brothers Wine and Liquor Corp does not change your

 7      assessment that that liability belonged to Eber-Metro?

 8                    MR. RAMSEY:  Form, legal opinion.

 9                    MR. CALIHAN:  Objection to form.

10           A.   Yeah.  You keep saying belonged to.  I am

11      saying that an investor is going to take that into

12      account.  They are not going to put little compartments

13      and say this is not the obligation of Metro.  You know,

14      what this says, it says.  It doesn't alter my opinion as

15      to how an investor is going to look at these kind of

16      obligations.

17           Q.   And by these kind of obligations, do you mean

18      pension obligations specifically, or any debt belonging

19      to the parent company that is transferring its

20      subsidiary?

21           A.   Most certainly it's going to reflect the

22      pension, both the PBGC as well as the Teamsters, but yes.

23      Clearly for a company that -- I say the company -- for

24      the situation where the assets of Metro are such that

25      obligations, even if you consider them up the line, can't
```

1    be covered, yes.  It will.  They just -- it just can't be

2    ignored.

3         Q.   Because of the likelihood of fraudulent

4    conveyance?

5         A.   That is a distinct possibility.  Like I said, I

6    think that any time you have a situation where you're

7    selling assets and you're receiving a price that is less

8    than the liabilities, that is exactly what you're going

9    to encounter and an investor is going to know that.

10        Q.   So focusing on Harris Beach, that's not a

11   pension obligation.  Does it change your conclusions in

12   any way that at the time of the Alexbay transfer in 2012

13   the only party being sued by Harris Beach and that owed

14   money to Harris Beach according to its engagement

15   agreement was Eber Brothers Wine and Liquor?

16             MR. RAMSEY:  Form.  I will make the same

17             objection.  I think you're looking for a legal

18             conclusion here.

19        A.   Yeah.  I mean -- look, I know that they did sue

20   all the entities at some point for payment.

21        Q.   I do want to be clear.  I am not looking for a

22   legal conclusion because your valuation is not based upon

23   what the actual law was, right?  What the actual

24   liabilities were as determined by later courts, correct?

25        A.   Fair enough.

Page 84

1      Q.   Just as if you're doing a valuation based upon

2   what people knew at the time, they wouldn't be based upon

3   what restated numbers were a year later, correct?

4      A.   Fair enough.

5      Q.   So in this instance, why isn't the

6   determination of what the liabilities of Eber-Metro were

7   something that should be based on what the understanding

8   was at the time of management and the purchaser of what

9   the liabilities of what Eber-Metro would be?

10                  MR. RAMSEY:  Form.

11     A.   Because I am trying to understand how an

12  investor, a willing buyer, is going to view this company.

13  That is my analysis.  I mean, I don't know how else to

14  say that.  I've said it five times now.  And you keep

15  trying to say, "Well, don't you want to value it the way

16  that Wendy valued it?"  No.  That's not my task here.  I

17  mean, she did what she did.  She wrote what she wrote.

18  Her view is what it is.  I am telling you how I am doing

19  the valuation.

20     Q.   And I am just -- I am not trying to be obtuse

21  here.  I'm trying to get a clear record.  So the

22  reasonable investor in your view would conclude that

23  Eber-Metro would still be on the hook because upon

24  transfer, Eber Wine and Liquor was left with insufficient

25  assets to meet its debt; is that fair to say?

1          A.    You're talking about all the items?

2          Q.    Yes.

3          A.    So number one, there is the legal determination

4     that I said before.

5          Q.    Right.

6          A.    That I have been given.  Number two, it makes

7     absolutely sense to me from an economic perspective.

8     That any investor is going to price protect themselves,

9     particularly for a company that's in financial distress.

10    And that I think there is no dispute.  Certainly without

11    question even Eber-Metro is in financial distress.  And

12    when you are a company in financial distress and you've

13    got liabilities attached to those assets, boy, oh boy,

14    you know, you just can't ignore that.  And that's my

15    opinion.  That investor would not ignore that.  And would

16    not put it in compartments notwithstanding what Wendy

17    thinks.  It's interesting, but it doesn't affect my

18    opinion.

19         Q.    Okay.  Let's take that break.

20         (Whereupon, there is a short recess in the

21    proceedings.)

22         Q.    Okay.  So going to your report in general, you

23    did five valuation analyses for Eber-Connecticut; is that

24    correct?

25         A.    Yes.

1          Q.   But you did not offer an opinion on which of

2     those valuation is most reliable or some combination of

3     them to arrive at a final number, did you?

4          A.   No.  I provided a range of values from each of

5     those five.  The range of values results from each of

6     those five measurements.

7          Q.   Why didn't you offer an opinion on what the

8     correct value should have been?

9          A.   Well, in my view, the range that I developed

10    and applied told me that this was an insolvent company.

11         Q.   Not Eber-Connecticut though?

12         A.   No.  Up the chain, yes.

13         Q.   Right.  But as we have been suggesting, there

14    are potential questions as to whether or not the numbers

15    for the debt are correct or legally relevant or something

16    like that.

17                   MR. RAMSEY:  Form.

18         Q.   So in that instance, wouldn't it be important

19    about to what the value of Eber-Connecticut is if the

20    value would determine whether or not it was solvent --

21    the parent companies were solvent?

22         A.   You mean a point estimate?

23         Q.   Yes.

24         A.   Well, if you want a point estimate.  Just take

25    the midpoint, that's fine.

Page 87

1          Q.    Why is that appropriate?

2          A.    There are five measures of value.  Each of them

3     has problems.  But these are the kinds of things -- not

4     with understanding problems -- these are the kind of

5     thing that investors are going to look at in formulating

6     their opinion.  If you're so inclined to only want to

7     point an estimate, I mean, you know, in my view a

8     reasonable range is more informative.  I think it

9     provides more information.

10         Q.    Do you think --

11               MR. RAMSEY:  Go ahead, finish your answer.

12         A.    I think a reasonable range provides more

13    information.  It is un essence the sensitivity analysis

14    or effective sensitivity analysis of what you were

15    referring to earlier about well, is there uncertainly

16    with numbers.  Well, the more numbers you have, the more

17    certain you are about what ultimately that range of value

18    is.

19         Q.    Do you consider all five methods to be equally

20    reliable?

21         A.    You know, so first I would say that these

22    measurements are things that an investor would look at.

23    Each of these methods has problems perhaps multiple

24    problems.  I think if you start with the offers or the

25    transactions.  So start with the Eder-Goodman

Page 88

1    transaction.  That has a significant problem because of

2    the substantial rights.  I've got two pages in my report

3    talking about the substantial rights.  Now, I try to do a

4    conservative estimate as to what those rights are to come

5    up with some value.  But, look, for a company in

6    financial distress in particular, the preferred stock

7    aspect of it is going to be huge -- absolutely huge.  So

8    is that a problem? Yeah. I mean you try to adjust away

9    from it.  That is a problem.  You know, that is one of

10   those things that make that valuation uncertain.

11   Southern offer to a lesser extent -- the Southern offer

12   also has this right of first refusal that causes one to

13   do again an adjusted valuation of the Southern offer.

14        Q.   And the Southern offer wasn't actually

15   accepted?

16        A.   Look, you know, the Southern offer wasn't

17   accepted, but I view that as a bona fide offer.  And a

18   bona fide offer is a reasonable thing to use in the

19   analysis.  So I wouldn't -- I am not going to discount it

20   because it wasn't an actual transaction.  I think it's

21   still relevant.

22        Q.   Can you please explain what you mean by bona

23   fide offer?

24        A.   Well, there were something -- I think it was

25   like 14 amendments.  It was far along.  There was a lot

Page 89

1      of paperwork involved -- due diligence.

2          Q.    I mean in general what a bona fide offer is?

3      Like how does something constitute that?

4                MR. RAMSEY:   Form.

5          A.    I draw a distinction between, you know, saying

6      I have, you know, a preliminary offer of interest.  That

7      I wouldn't consider a bona fide offer.  But if you've got

8      a substantial amount of paperwork behind an offer with a

9      lot of conditions and things that have been formulated,

10     that to me is a bona fide offer.  That's what I view

11     anyway.

12         Q.    Is a --

13         A.    You want me to finish my answer?  I was not

14     done.  So we can go back to any one you want to.  So with

15     regard to the Pole-Bridge Bowman offer, that to me has

16     problems too.  It's a transaction that I am not 100

17     percent comfortable with that being the measure of value.

18     I don't know that I would -- I think that has problems as

19     well.

20         Q.    Why aren't you comfortable with it?

21         A.    Well, I am concerned that it could possibly not

22     be an arm-lengths transaction.  I can't make a

23     determination one way or the other, but it causes me

24     concern.

25         Q.    Why -- just to follow up on that, what about it

Page 90

```
 1        does not appear to be arm's-length?
 2                     MR. RAMSEY:  Form.
 3            A.   I was concerned that the company was
 4        repurchased at the same price.  It could be -- there
 5        could be explanations why that occurred, but the fact of
 6        that doesn't sound right to me.
 7            Q.   I am sorry.  What do you mean by that?
 8            A.   It was unwound.
 9            Q.   Okay.  The terms of the exercising how Wendy
10        Eber ended up acquiring it?
11            A.   Yes.  I didn't see anything contemporaneous to
12        the transaction itself that could indicate this.  The
13        ultimate unwinding caused me a little bit of questioning
14        whether the transaction was a pristine transaction.  And
15        also problem -- the other problem I had with that is that
16        there was a right of first refusal in that offer.  So you
17        have to adjust that.  Now with regard to the farmers --
18            Q.   I just want to stay on that one for a second,
19        then we will jump to the other just so the transcript
20        is -- in forming your opinion, were you aware of who were
21        the owners of Pole-Bridge Bowman and Partners?
22            A.   I know that it was a gentleman named Steurm was
23        the principal.
24            Q.   And what is your understanding of what his
25        relationship was to the Ebers?
```

Page 91

1          A.   He was the consultant.   My understanding he was

2     a consultant.   Maybe the term is workout consultant for

3     companies in financial distress to get to them to work

4     out of their distress.   And I think he was a lawyer.

5          Q.   And are you aware that the Ebers have said that

6     he was their lawyer?

7                    MR. RAMSEY:   Form.

8          A.   I know he was their consultant.   I don't know

9     that he gave legal opinions.

10         Q.   Would it affect your assessment of whether this

11    was an arm-length transaction if you found out that Glenn

12    Steurm had an attorney/client relationship with the Ebers

13    individually or with one of their companies?

14         A.   No, I don't think so. I am not sure why that

15    would affect my view of things whether he is providing

16    consulting services or legal services.   I am not sure

17    that matters.

18         Q.   Is a fiduciary relationship an arm-length

19    relationship in your opinion?

20                    MR. RAMSEY:   Form.

21         A.   Is a fiduciary relationship an arm's-length

22    relationship?   I am not sure what you mean by that.

23         Q.   Do you understand the term fiduciary

24    relationship?

25         A.   The transaction -- because he is a fiduciary

1       that the transaction would not be arm's-length.

2            Q.    I am asking if the fact that there is a

3       fiduciary relationship between two individuals prevents

4       that transaction for being characterized as an

5       arm's-length transaction?

6                    MR. RAMSEY:   Form.

7            A.    I would think it would be just the opposite.   I

8       think the fiduciary would have an obligation to make sure

9       that whatever transaction took place was a fair market

10      value unless I am missing something.   You seem to have a

11      different --

12                    MR. RAMSEY:   I think we're in the legal

13              realm here.

14           Q.    So the term arm-length, is that fair to say

15      that is a term that is important to your valuation work?

16           A.    Well, it is a shortcut to Page 1 of my report

17      that talks about a willing buying and willing seller with

18      knowledge of all relevant facts and no compulsion to buy

19      or compulsion to sell.   And so those are the things that

20      in my view constitute an arm's-length transaction.

21           Q.    So let me pose to you the hypothetical.   If the

22      transaction was entered into between a lawyer and his

23      client to acquire an equity interest in a company and the

24      lawyer did not actually want to buy that interest, but it

25      was done for structural your purposes to benefit the

Page 93

1   client, would you consider that to be an arm's-length

2   transaction?

3                   MR. RAMSEY:  Form.

4       A.   Structural purposes to -- that's way beyond --

5   I mean I don't know how to answer that question.

6   Structural purposes to benefit --

7       Q.   One simple thing.  I will rephrase.  If a

8   person -- you refer to as a will buyer?

9       A.   Yes.

10      Q.   What did the buyer actually did not have any

11  economic interest in acquiring the equity and he did it

12  solely to fulfill his legal obligation to a client.

13                  MR. RAMSEY:  Form.

14      Q.   Could you rely on that transaction to determine

15  the value of the equity?

16      A.   You're saying a fiduciary would have a legal

17  obligation.

18      Q.   I am not saying necessarily as a fiduciary.  I

19  am talking about a particular circumstance where a lawyer

20  decides -- a lawyer specifically says, "I do not want to

21  buy this, but I will do so if I have to.  So that the

22  sale can go through."

23                  MR. RAMSEY:  Form.

24      Q.   Is that just impossible to believe?

25      A.   It's a little hard to believe.

Page 94

1          Q.   I will show you a document.

2          A.   Okay.

3          Q.   All right.  I will read for you a memo from

4     Glenn Steurm, the owner of Pole-Bridge Bowman.

5          A.   Uh-huh.

6          Q.   To Pat Dalton, a lawyer for Wendy and Lester

7     Eber and copying Wendy and Lester Eber dated May 26,

8     2010. That is I think two days before -- two to four days

9     before the effective date of the Pole-Bridge Bowman

10    transaction?

11         A.   Okay.

12         Q.   This memo states, "The current proposal is for

13    a single-member LLC New-co to acquire the interest and

14    that I be the only equity holder of the new LLC.  Here

15    are the terms that we discussed.  One, New-co purchases a

16    six percent equity interest in Connecticut for a secured

17    non-recourse note in the amount of blank dollars.  Wendy

18    Eber has an exclusive right of first refusal to purchase

19    the entire equity interest from New-co.  If Ms. Eber

20    does not exercise her right, then Metro has the next

21    right of first refusal to purchase the entire equity

22    interest. If Metro does not exercise its right, then

23    Eder-Goodman has the final right of first refusal to

24    purchase the stock.  If neither Ms. Eber, Metro or

25    Eder-Goodman elects their right, then New-co will be

Page 95

```
 1      required to retain its interest.  The Ms. Eber will have
 2      a proxy to vote the equity interest held by New-co and a
 3      limited Power of Attorney.  I have no pride of authorship
 4      in this outline.  If we can find a different structure
 5      that works that would be better for me.  Based on that
 6      memo, does that sound like a transaction that was
 7      negotiated at arm's-length?
 8                 MR. RAMSEY:  Form.
 9           A.    I am trying to understand.  How these items
10      that you listed to me indicated that it's not arm-length.
11           Q.    Those items actually aren't.  I was mostly
12      doing that because you don't have the document in front
13      of you and I want to be fully transparent and read
14      everything.  I think the point I want to focus on is that
15      you said -- I actually left out the first line.  That's
16      really important.  Pat, as we discussed this morning, we
17      need to identify an alternative purchaser of the six
18      percent interest the Connecticut, LLC.  The current
19      proposal is for a single-member LLC.  New-co to acquire
20      the interest and that I be the only equity holder of the
21      LLC.  And then at the end he says if we can find a
22      different structure that works that would be better for
23      me.
24           A.    So read that first sentence again?
25           Q.    As we discussed this morning, we need to
```

```
 1        identify at an alternative purchaser of the six percent
 2        interest in the Connecticut, LLC.
 3                     MR. RAMSEY:  And what is the question.
 4        Q.   So the question is, based on the fact that
 5        Glenn Steurm is saying Wendy and Lester Eber and their
 6        lawyer -- that he does not want to actually buy the six
 7        percent, does that sound like an arm's-length transaction
 8        to you?
 9                     MR. RAMSEY:  Form.  I am not sure that's an
10                accurate interpretation.
11        A.   I am -- you're asking me to interpret this
12        letter to mean that he does not want to buy this?
13        Q.   I am asking you if someone were to conclude --
14        so this is a hypothetical now.  If someone were to
15        conclude that Glenn Steurm did not actually have an
16        economic interest in purchasing the six percent equity
17        that was sold to Pole-Bridge Bowman and Partners, would
18        that affect your opinion of whether that was an
19        arm's-length transaction?
20        A.   It could.  If there is no economic interest --
21                     MR. RAMSEY:  You've answered it.  It could.
22        A.   It could.
23        Q.   Have you ever heard of a round-trip
24        transaction?
25        A.   Well, I know a round-trip transaction with
```

1      regard to a security.  You buy and then you sell it.

2          Q.   Are you familiar with a round-trip transaction

3      in which it creates an appearance of economic substance,

4      but in fact because money is going both ways there is no

5      real economic substance to it?

6          A.   Yes.  I've actually offered opinions on this

7      for the Department of Justice.

8          Q.   And in the case of the Pole-Bridge Bowman

9      transaction, it was funded by the note for the same

10     purchase price.  Do you see any similarities between that

11     and a round-trip transaction?

12                   MR. RAMSEY:  Form.

13         A.   I mean note in lieu of cash.  I mean it's a

14     still an asset on the balance sheet for the company.  So

15     I am not sure what you mean.  That only cash counts?

16         Q.   No.  I am just saying if someone supposedly

17     purchases equity in a company, but they receive the money

18     to do that from the company itself such as a company

19     receives no cash.

20                   MR. RAMSEY:  Form.

21         Q.   Does that affect?

22         A.   If the asset has value whether it's cash or

23     not, it shouldn't matter.

24         Q.   Well, okay.

25         A.   If the buyer is providing a note saying, "I owe

Page 98

1     you this money."  There is a note.  That's my obligation

2     to you in lieu of giving cash.  You seem to be drawing a

3     distinction between the value of a note and the value of

4     cash.  Is that what you're saying?

5          Q.   I am not necessarily drawing a distinction

6     there.  What I am saying is, you know, let's step back

7     for a minute.  For what reasons does a company -- a

8     privately held company generally sell equity in a company

9     that it holds?

10         A.   You mean like a secondary offering?

11         Q.   A secondary offering or where like in this case

12    where Eber-Metro sold some of the interest it held in

13    Eber-Connecticut?

14         A.   Well, for a secondary offering they generally

15    are trying to sell new shares to investors too, you know,

16    for a variety of reasons.  But, for example, make a

17    capital investment of some kind.  Selling shares, selling

18    existing shares held by some other entity.  You know,

19    selling existing shares doesn't raise any new capital per

20    se.  Other than that, I don't know how to answer your

21    question as a general matter.

22         Q.   Did you review the critique of this

23    transactions economic substance from Glenn Liebman?

24         A.   Yes.  My recollection is that he also had

25    issues with regard to whether this was arm's-length.

1        Q.    Right.  And one of the things he pointed out

2     was the interest rate on the note was only two percent

3     when the company was at the time borrowing money from

4     Lester Eber at 12.5 percent.  Does that make sense to

5     you?

6                    MR. RAMSEY:  Form.

7        A.    You know, I have a hard time with that.  When

8     the company borrows money, it's paying.  And it's the

9     company credit that dictates the interest rate.  So if a

10    company is in financial distress and it wants to borrow

11    money, it's likely that it's going to pay a high interest

12    rate.  Now, in this case, this is an asset that is being

13    provided to the company.  A company is not borrowing

14    this.  Unless I am missing something.

15       Q.    Isn't the company loaning money?

16       A.    Huh?

17       Q.    The company is loaning money, is it not?

18       A.    How?  If it's an asset on the company's

19    books -- it's giving shares to the LLC and the LLC is

20    getting a note.

21       Q.    Right.  So it's giving up shares that were in a

22    company a going concern, right?  So that comes off the

23    balance sheet?

24       A.    Yes.

25       Q.    And on the balance, it gets this nonrecourse

1    note?

2         A.    Right.

3         Q.    At the end of the day the only thing it can

4    really get for that is just the shares back that is

5    initially transferred if it were to foreclose on, right?

6         A.    Where does it say that?

7         Q.    It's a nonrecourse note, right?

8         A.    They couldn't pay it.

9         Q.    Would it matter whether Pole-Bridge Bowman had

10   any other assets to you?

11        A.    No.  I am just questioning your -- you draw a

12   conclusion that the only way -- you said that the only

13   way is to get the shares back.  And I never saw that

14   written anywhere.

15        Q.    I realize that.  And that's where I was jumping

16   ahead.  I may have left out some facts from here.  Do you

17   know anything about Pole-Bridge Bowman and what kind of

18   investments or businesses it was involved in?

19        A.    I know it was an LLC.  I know that Steurm was

20   the principal of that LLC.  Beyond that, I don't.

21        Q.    Would it affect your assessment of whether this

22   was an arm's-length deal to find out that Pole-Bridge

23   Bowman was an entity that was created with no other

24   assets solely for purposes of engaging in this

25   transaction?

1           MR. RAMSEY:  Form.

2      A.   No.  I don't think so.

3      Q.   So if an entity has no other assets and it's a

4  nonrecourse note, if the note isn't repaid, then isn't it

5  true that the company's only recourse is to require the

6  shares that it initially distributed?

7      A.   Well, I mean, imagine that if one state of the

8  world is where the value of the shares go up -- would the

9  LLC just say, "Oh.  Okay.  Here is your shares back."

10  Why wouldn't they just pay off the note and keep the

11  shares?  That makes economic sense to me.  And you're

12  dismissing that as a possibility.

13      Q.   Well, isn't that what actually happened?  The

14  value of the company definitely went up once it become

15  profitable, right?

16      A.   It became profitable, but I can't say I am

17  hypothesizing -- look, you said the only possible outcome

18  is if they give the shares back.  And I'm saying that

19  doesn't make sense to me.  I can imagine -- I am not

20  saying it happened.  But I can imagine the state of the

21  world where it is in the economic interest to Steurm to

22  say, "Hey, the values of these shares is increased 10

23  times what it was in 2010.  Hell.  Here is the money for

24  the note.  We will close this off.  I will take the

25  shares."  Why not?

1       Q.    Would it affect your assessment with whether

2   the Pole-Bridge Bowman transaction was arm's-length if

3   you were to learn that it was engaged in part to

4   compensate Glenn Steurm for his services?

5       A.    Well, I don't think that would be a sufficient,

6   you know, indication to eliminate that as an indication

7   of value.

8       Q.    Would it require an adjustment at least?

9            MR. RAMSEY:   Form.

10      A.    Look, you know, you want to have an assessment

11  as to whether it was a deal at fair market value.  That's

12  ultimately what you're talking about.  Do stock

13  transactions occur for parties that are consultants to

14  particularly small firms?  Yes.  Does it mean that they

15  are necessarily not an arm's-length transaction?  Well,

16  no. In fact, I can imagine, you know, that you would want

17  to strike a deal at fair market value.  So I don't know

18  that I can agree that it's a de facto collusion that

19  someone is being -- instead of providing cash, they are

20  given stock in a company.  I don't know that is

21  necessarily a non-arm's-length transaction or to put

22  differently that transaction took place at something

23  other than fair market value based solely on that.

24      Q.    Isn't it a reason to question the fair market

25  value more though?

1         A.   Well, it's certainly one of those indications
2    that you are concerned about it.  And that's what I said
3    a minute ago, I am concerned.  I think it is a
4    transaction that an investor is going to look at.  But
5    with full knowledge at least of the information that I
6    had, yes.  I would say that there are problems with it.
7    Just like there is problems with all these transactions.
8    I mean everything has an issue.  There is no question
9    about that.  So that's the best way I can answer your
10   question.  It's a concern.  It's a problem, but all these
11   metrics have problems.  And that's why the range is
12   important to get a sense as to whether there is some kind
13   of assessment of valuation range each year that allows
14   you to draw a conclusion.
15        Q.   Just so I am clear, and correct me if I am
16   wrong.  In your opinion, the fact that the Pole-Bridge
17   Bowman transaction was in part compensation to Glenn
18   Steurm would not necessarily affect any of your
19   calculations in terms of what the valuation would be
20   based on the Pole-Bridge transaction?
21        A.   No.  Not in and of itself it would not.
22        Q.   But just on the broader point, if a fact-finder
23   were to conclude that a transaction was not conducted at
24   arm's-length, would that mean in your view the
25   transaction should be excluded from a valuation analysis?

1           MR. RAMSEY:  Form.

2      A.   Well, I think the question is whether the trier

3  of fact would conclude that it's outside of it.  Not so

4  much a valuation expert.  If a trier of fact concludes

5  that it's not arm's-length transaction, could well be I

6  am not going to consider this transaction.  From my

7  perspective, I guess I kind of take in a little different

8  view of this.  Like I said, the ultimate determination is

9  whether it's a fair market value.  And one of the things

10  that is kind of interesting is whether or not the

11  valuation is within the range of other evaluations.

12  That's kind of interesting to me.  That may not convince

13  a trier of fact.  The trier of fact says, "No.  It's not

14  arm's-length.  I am not going to think about that."

15  Okay.  So be it.  Cross it off your list.  But for me --

16  and I think for an investor it is a data point of

17  interest.

18      Q.   For an investor, do you believe that would be

19  appropriate to rely solely on the Pole-Bridge Bowman

20  transaction as a basis for value?

21      A.   If it was determined to be non-arm's-length?

22      Q.   Either way.  Just based on the facts that you

23  know about the transaction where you question it, do you

24  believe that it would be appropriate for an investor to

25  base valuations solely on that transaction and not

1      consider any other valuation method?

2                    MR. RAMSEY:  Form.  Go ahead.

3           A.   The way I can answer that question is I don't

4      know that I would look at any of these five alone and say

5      that's the only thing you should look at or if that was

6      the only thing available.  Is it a precise, accurate

7      measure of value?  The only one that I really like that I

8      think has the least amount of problems is the Prospect

9      Beverage.  That one -- I mean the problem with that is

10     that it's 10 years old at that time of transaction.  But,

11     you know, look at the other dates.  I mean the

12     Eder-Goodman is four years old -- five years old.

13          Q.   You're missing -- -

14          A.   Six years old.  Like I said before, so each of

15     these has problems.  You've got all of these right issues

16     in many of these transactions.  The Prospect, is in my

17     view, one of the tightest comparable transactions that I

18     have encountered in doing valuations.

19          Q.   Is it a coincidence that is the transaction

20     that results in by far the lowest value for

21     Eder-Connecticut?

22                    MR. RAMSEY:  Form.

23          A.   It is a coincidence.  It turns out that way.

24     But maybe that is not a coincidence.  Maybe that really

25     reflects what the value of what Eder-Connecticut was.

1     And that the value that I ascribed to the rights for

2     let's say Eder-Goodman and Southern are just way too low.

3          Q.   Did you perform any sort of sanity checks on

4     that given that is so far away from what the actual

5     transactions involving Eber-Connecticut were?

6          A.   I am not sure what you mean.

7               MR. CALIHAN:  Objection to form.

8          A.   It is what it is.  It depicts exactly what the

9     valuations are from each of these metrics.

10         Q.   Isn't it important to perform a sanity check on

11    each of these valuation metrics that you arrive at?  You

12    mentioned that earlier today.

13         A.   The numbers are here.  What is it in addition

14    to this that you think is necessary that I am not

15    understanding?

16         Q.   Well, does it seem rational to you that the

17    company would be worth under $700,000 for its equity just

18    a few years after it was purchased for 21.6 million

19    dollars?

20               MR. RAMSEY:  Form.

21         A.   Sure, sure.  Valuations change all the time.

22               MR. RAMSEY:  You've answered the question.

23         A.   Look at Hewlett Packard.  They were worth

24    billions.  How much are they worth now?

25         Q.   That earlier transaction was closer in time to

Page 107

1    the Prospect Beverage transaction, right?  2005 Slocum

2    acquisition for 21.6 million dollars.  That was much

3    closer in time than Prospect Beverages, right?

4         A.   Yes.

5         Q.   And did you try to see whether using the

6    Prospect Beverages ratios matched up with the price that

7    was paid for Slocum in 2005 as a sanity check?

8         A.   I don't have financials for Slocum in 2005.

9    What I do know is that there are similarities between

10   what the state of affairs -- good similarities for what

11   the state of affairs was for Eber-Connecticut in 2012 and

12   what Prospect looked like in 2010.  You know, I talk

13   about that.  The market cap was very close.  The amount

14   of revenues was close.  It was negative EBITDA, which is

15   what the position of Eber-Connecticut was in.  They are a

16   distributor of alcoholic beverages.  That's pretty darn

17   good.  The only concern is the time value.  And you will

18   note because of the time difference here there is

19   deduction that is applied to the revenue ratio to account

20   for the general change in the market conditions.  Well,

21   look.  Even if you eliminate that adjustment, you know,

22   you're still getting values of Eber-Connecticut, you

23   know, maybe two and a half -- three million.  So, you

24   know, the one problem -- even if you transported that

25   ratio to today or to 2012, it's still not a very big

1     number.  And the characteristics in my view are quite

2     tight.

3           Q.   I am going to do a couple more things on

4     Prospect Beverages before we go to Farmers.  Looking at

5     Exhibit C4.  You're missing a lot of numbers there for

6     the total price, premium for additional rights,

7     percentage ownership, things like that.  Why is that?

8                     MR. CALIHAN:  Brian, could you repeat that

9                question, please?  I lost you.

10          Q.   I was asking why it is that there are a number

11    of line items for which there is missing information,

12    such as total price for the transaction?

13                    MR. CALIHAN:  You referred to a page number.

14          Q.   Sorry.  Exhibit C4 in Exhibit in the Torchio

15    report.

16          A.   Because I was able to obtain the enterprise

17    value and the recent revenue figures from I believe it's

18    Capital IQ.

19          Q.   How do you know that those numbers are reliable

20    when you don't have the price for the transactions?

21          A.   They are as reliable as Capital IQ is reliable.

22    So if you're asking me whether I am relying on Capital

23    IQ, I am.

24          Q.   And did you attempt to find out why Capital IQ

25    didn't have data on the total price?

                                                        Page 109

1            A.    No.

2            Q.    Did you look at the SCC filings in connection

3       with this acquisition?

4            A.    I don't recollect.

5            Q.    Are you aware that this was not a complete

6       asset sale?  It was more of a merger?

7            A.    Yes.

8            Q.    And so Prospect Beverages ended up with four

9       seats on the new company for example?

10           A.    Yes.

11           Q.    Okay.  Did that factor into your analysis?

12           A.    No.

13           Q.    Aren't those additional rights that need to be

14      accounted for?

15           A.    No.  You're effectively merging your companies

16      together.  That's a controlled transaction.  I don't draw

17      a distinction there.

18           Q.    So when do you -- so if an acquisition involves

19      additional rights, when do you decide to include that in

20      value or not?

21           A.    This involved a sale of control, which is even,

22      you know, considering the fact that the ROFR that existed

23      as of 2012 was a significant deterrent of sell control, I

24      am still reflecting that the value of control in this

25      transaction.  So this is not a minority interest

1    valuation.  This is a valuation of control.  You're

2    taking this company and you're merging it with your

3    company.  That's a control transaction.

4         Q.   Were you conducting a minority interest

5    valuation in this case?

6         A.   No, I did not.  But if you're going to assess

7    whether what the price would be to disburse investors,

8    then you would have to take into account what the

9    minority interest is or, put more specifically what the

10   marketability discount it is.

11        Q.   Are you aware that under my New York law, when

12   you do value a minority interest in a company, an

13   appraisal valuation expert is not permitted to make any

14   discounts for lack of control?

15                  MR. RAMSEY:  Form.  You're asking for a

16             legal conclusion.

17        Q.   I am asking if he is aware in that work.

18        A.   In the context of a merger when you're

19   assessing fair value for a company, you are not allowed

20   to take discounts for a minority interest or discounts

21   for marketability.

22        Q.   And would that be the case also in assessing a

23   freeze-out merger?

24        A.   Yes.

25        Q.   Did you make those discounts in this case?

1          A.    No.

2          Q.    By removing the controlled premium or right of

3     first refusal premium, which has some similarities to it,

4     didn't you effectively make those discounts?

5                     MR. RAMSEY:   Form.

6          A.    No.   That's not true.   What I am assessing is

7     the ability for the company to get a controlled premium.

8     To the extent there is a merger and the merger provides a

9     controlled premium and you're trying to assess fair

10    value, you're assessing that fair value relative to what

11    they got.   How much of that controlled premium is being

12    paid?   And what fraction of that controlled premium is

13    part of fair value?   And what I am saying here is

14    different.   What I am saying here is that it's highly

15    unlikely that there would be a controlled premium paid

16    given the existence of the ROFR.

17         Q.    And you say that even though you're aware of

18    what happened in 2012 with the transfer of Eber-Metro?

19                    MR. RAMSEY:   Form.

20         A.    I don't understand that.

21         Q.    Well, was it your understanding that the ROFR

22    was implicated of the transfer to Eber-Metro?

23         A.    Was implicated?

24         Q.    Did Eder-Goodman have a right to try to acquire

25    it instead of Alexbay?

1      A.   I don't know.

2      Q.   Okay.  I will represent to you for the sake of

3  our, you know, discussion here hypothetical-type-thing

4  since I know you don't have time to look it at and

5  you're not a lawyer.  Assume that Eber-Metro and its

6  control was not restricted at all by the Eder-Goodman

7  transaction.  That they did not cover for that

8  contingency while Eber-Metro could not sell its units in

9  Eber-Connecticut, it could sell itself and with it

10  control of Eber-Connecticut bypassing all of

11  Eder-Goodman's rights.  Do you follow me?

12      A.   Okay.

13      Q.   And in that circumstance, shouldn't Eber-Metro

14  and its interest in Eber-Connecticut receive a control

15  premium?

16           MR. RAMSEY:  Form.  Go ahead.

17      A.   Let me make sure I understand this.  You're

18  saying that the ROFR in Eber-Connecticut was relevant or

19  nonbinding to the sale of Eber-Metro?

20      Q.   Correct.  There was no change of control clause

21  in there like you would see in certain contracts to

22  trigger a, you know, a bonus or gold parachute or

23  something.  They did not include that in the document.

24      A.   Uh-huh.

25      Q.   So taking that representation that that's the

Page 113

1    lay of the land, would that affect your valuation here?

2         A.    I have to think about that.  My natural

3    reaction is how is that going to Eber-Connecticut?

4         Q.    What do you mean?

5         A.    Well, if you sell Eber-Metro, who is still

6    controlling Eber-Connecticut?  What about the decisions

7    at the level of the operating company?

8         Q.    Eber-Metro continues to be the legal entity

9    that controls it.

10        A.    I get that.  I understand that.  But when it

11   comes to making decisions about Eber-Connecticut the

12   actual operations of that company and the ability to

13   merge that company with, you know, another large

14   distribution company -- I mean, look, I am not a lawyer.

15   I can't -- it sounds strange to me that you could

16   effectively merge the assets -- merge the company of

17   Eber-Connecticut with another company.

18        Q.    By selling its parent?

19        A.    By selling its parent.

20        Q.    That's exactly what happened in 2012 though,

21   isn't it?

22                   MR. RAMSEY:  Form.

23        Q.    It went from Eber Wine and Liquor to Alexbay.

24   Abdomen.

25        A.    What operating company?  What operating company

1      merged with them?

2           Q.   I'm not suggesting it's necessarily an

3      operating company.

4           A.   That's the point.  Let me explain something to

5      you because I think you don't understand the concept of

6      what a control premium constitutes.

7           Q.   Okay.  Explain it to me.

8           A.   Look, a control premium is not something that

9      is going to be given on high.  This is a transaction

10     where there must be a control premium.  A control premium

11     comes from the fact that by combining assets with another

12     company that you can have synergies.  Synergies means one

13     plus one equals three.  Are you with me?

14          Q.   I am with you so far.

15          A.   All right.  So now -- and what happens in a

16     merger is that when you've got synergies when you can

17     take that company and you can do something different with

18     it by combining it with other assets and create

19     synergies.  You take some of that synergies and you pay

20     the target above and beyond its stand-alone value.  That

21     part of the synergies that's paid to the company above

22     and beyond its stand-alone value, that's what's referred

23     to as the control premium.  Let me finish.  Now, if you

24     got a situation where you're trying to get a control

25     premium what are you going to look for?  Who is going to

1      pay the control premium?  It's going to be a company that

2      when you combine it -- when you put those assets together

3      it creates synergies.  Well, there is no synergies

4      created by Alexbay.  That's just a shell game.  And what

5      the ROFR is intended to prevent -- effectively prevent

6      from Eder-Goodman's standpoint is they don't want these

7      assets to merger with, for example, Southern or any other

8      distribution to get a leg in.  They are using that as a

9      means of preventing or almost de facto establishing a

10     quasi-monopoly in order to prevent that from happening.

11     And I didn't see anything in transaction with Alexbay

12     that would put -- that would create a control premium.

13     There is no synergies involved that would constitute a

14     control premium.

15          Q.   I thought you were not focusing on these

16     particular parties, right?  It doesn't matter that it's

17     Alexbay.  It could be any reasonable investor.  Which is

18     it?  Is it Alexbay?

19          A.   Any reasonable investor.  That's exactly right.

20          Q.   Forget Alexbay.  We're talking about any

21     reasonable -- say it's Carol Icon.  He's not in the

22     business yet, but he loves to get into companies and pay

23     control premium.  You with me so far?

24          A.   Yes.

25          Q.   You are you telling me he wouldn't pay a

1        control premium for this?

2              A.   Only if he could combine it.  And I can't

3        understand how with the ROFR that he could combine the

4        asset of Eber-Connecticut.  That seems like it would be

5        directly ---

6              Q.   Isn't it fair to say that synergies is only one

7        way in which a control premium can come about?  And do

8        you agree with that much or no?

9              A.   No.

10             Q.   Is it fair to say that a control premium is

11       paid where a person believed -- the buyer believes he can

12       manage the company more effectively?

13             A.   That's fine.  You can refer to that as a

14       synergy.

15             Q.   Okay.  So they aren't necessarily in the

16       business themselves already active, correct?

17             A.   Fine.

18             Q.   And so what you've seen from the

19       Eber-Connecticut financials, is it fair to say that the

20       reasonable investor can look at that and go almost anyone

21       can manage that company better?

22             A.   No.

23             Q.   Do you have any reason to believe that it was

24       well managed?

25                       MR. RAMSEY:  Form.

1          A.    I mean I have no reason to believe it wasn't

2     managed.

3          Q.    Right.

4          A.    Operating the company for decades as far as I

5     can remember.  No, I don't see that as a plausible

6     scenario.

7          Q.    They have been run out of business in New York,

8     right?

9          A.    Yes.

10         Q.    And then in Connecticut this company that had

11    been making money was then losing money for six years in

12    a row?

13         A.    Yes.

14         Q.    Do you think a reasonable investor would think

15    that company has been well managed?

16              MR. RAMSEY:  Form.

17         A.    Sure.  That in and of itself is not to dictate

18    that it's poorly managed.  I mean there is exogenous

19    events -- competition.  That just doesn't follow.

20         Q.    So let's say -- I am not saying necessarily,

21    but let me rephrase then.  Do you think that a reasonable

22    investor could conclude that the company was not well

23    managed based on the facts that I just described?

24         A.    No.

25              MR. CALIHAN:  Form.

1           MR. RAMSEY:   Form.

2      A.   Could or would?

3      Q.   Could.

4      A.   You can draw any kind possibilities, yes.

5      Q.   We're focused only on reasonable possibilities?

6      A.   Then I am not sure that it was reasonable.  I

7  think that the facts about the degree of competition that

8  occurred is going to dictate whether or not any other can

9  manage this any better.

10          MR. RAMSEY:   Whenever you get to a good

11             breaking point, but the lunch is here.

12     Q.   Almost there.  Let me just finish up this train

13 of thought.  Just so we're clear then, you can't foresee

14 any circumstances in which you think a control premium

15 would apply to Eber-Metro's controlling interest in

16 Eber-Connecticut; is that right?

17     A.   The essence of the control premium is going to

18 come about by someone who is able to combine assets.  And

19 that's exactly what the ROFR is trying to prevent.  And

20 even -- I mean, look, even if you thought you could run

21 it better, you're not going to pay for something that

22 you're not going to get value out of.  And if you're not

23 going to significantly improve the valuation beyond the

24 stand-alone value, you're not going to pay a control

25 premium.  That's just economics.  That's all I am saying.

1     The big synergies and consequently the control premium

2     come about by combining, let's say, Eber-Connecticut with

3     Southern.  And Southern wanted in Connecticut.  And that

4     could be a way for them to get in.  And this is exactly

5     what the ROFR is meant to prevent.

6          Q.   Right.  So what if as a matter of law to

7     conclude that the ROFR did not prevent Southern in

8     combining with or acquiring Eber-Metro and control of

9     Eber-Connecticut, would that affect your opinion on the

10    valuation?

11                   MR. RAMSEY:  Form.

12         A.   It could have an effect.  I would have to think

13    about what -- what does that mean as a matter of law.  Is

14    that definitive --

15         Q.   In determining the contract.

16         A.   That an investor would completely know that

17    that's the case.  That the ROFR that exists at the level

18    could not be used to prevent the merger of assets.  I

19    don't know.  You know, it's again -- it is a legal point.

20    And if I am told that no -- Eder-Goodman screwed up.

21    They had a loophole they didn't think about.  This could

22    be accomplished through this loophole.  Okay.

23         Q.   Let's take our lunch break.

24         (Whereupon, there is a short recess in the

25    proceedings.)

1           Q.    So still talking a little bit about Prospect

2      Beverages, which you said you think is the best of the

3      different --

4           A.    I said I liked it, yes.

5           Q.    You liked it the best.  You know what the

6      literature says the best of the five would be?

7           A.    The literature?

8           Q.    Yes.

9                 MR. RAMSEY:  Form.

10          Q.    The literature in your field of valuation.

11                MR. RAMSEY:  Literature of what?  I missed

12                the last part.

13          Q.    In your field of valuation.

14          A.    Well, I mean it's all based on facts and

15     circumstances.  I don't know whether literature is going

16     to say definitively which metric is the best in all

17     circumstances.  As I said in my report, you know, if you

18     have the legitimate transaction close in time, that's a

19     very good indication of value.

20          Q.    Legitimate transaction for the company in

21     question?

22          A.    For stock in the company.  That's a good one.

23     Comparables are good, but comparables can be, you know,

24     disputed about whether it's comparable enough.  That's

25     with regard to the training comps.  Ideally you would

1    like to find a company that is the exact perfect mirror

2    image of the company you're trying to value.  That never

3    occurs.  So you're left with trying to find enough

4    sufficient characteristics that the same microeconomics

5    that drive -- are comparable of driving your company.

6    And if that exists then there is a pretty good chance

7    that is a decent measure.  But more often than not, what

8    the literature is going to suggest is that you have a

9    number of different valuations.  Relying on one is

10   chancy.  And the more you have, the better you get a fair

11   assessment as to what the value of the company is.

12        Q.   Now, in terms of Prospect Beverages, did you

13   see the microeconomics as being -- let me step back and

14   ask that.  When you say the microeconomics are

15   comparable, what are the degrees of comparability and how

16   do you factor in the differences to weigh those?  Just

17   walk me through the process when you look at --

18        A.   So going to start SIC code.  Let me look at the

19   SIC code and see who is the SIC code that encompasses the

20   company in question.  That's problematic because many

21   companies that have a SIC code --

22        Q.   Let's define SIC code for the record?

23        A.   Standard industrial classification.  And so now

24   you're kind of looking at maybe a four-digit SIC code or

25   maybe look at individual companies in that SIC code and

1    try to understand based upon the general characteristics

2    of the company whether there is a good fit or not a good

3    fit.  So if you're looking at a company that is

4    publiclytraded or is a transaction, you know, you're

5    going to look for the kind of characteristics that

6    generally dictate risk and reward in that particular

7    industry or that SIC segment.  So the size of the company

8    matters.  So, you know, the market capitalization

9    matters.  The growth -- the historic growth of a company

10   matters.  Probability matters.  The line of business can

11   also be a relevant factor.  Those are the, you know,

12   generally the kinds of things that one looks at.  Now,

13   with that said I taught and I have been involved in a

14   number of transactions.  And all those transactions the

15   investment bankers use and rely on comparable

16   transactions, comparable trading multiples.  And

17   notwithstanding that you're never going to find a pure

18   play that matches your company exactly.  So you try as

19   best you can in understanding that from an investor's

20   perspective what you're looking at is effectively risk

21   and reward.  You're trying to understand the growth rate

22   and the riskiness of the company is similar.  And those

23   characteristics that I talked about generally go to those

24   characteristics.  So that's kind of what you're going to

25   focus on.  And then secondary is whether the same kinds

1    of general economic factors that dictate the expected

2    growth are similar.  So, for example, you know, while not

3    a close fit looking at distribution companies to the

4    extent there are no pure play liquor distribution

5    companies, it's reasonable.  Is it great?  No.  It's one

6    the problems with the trading comp that I am using.  It's

7    not a tight condition.  There are a similarities with

8    regard to the economics, but not great.  So can you rely

9    on that solely?  Probably not.

10        Q.   What were the products that Prospect Beverages

11   distributed?

12        A.   I believe it was mostly beer.  I think Pabst

13   maybe.

14        Q.   Pabst.  And some malt liquor as well?

15             MR. RAMSEY:  My favorite brand.

16        Q.   I am not from Rochester.  No offense.  And what

17   do you see as comparable about that to Wine and Liquor?

18        A.   Well, look, I saw what Mr. Liebman said that to

19   me is a difference without substance.  If you're asking

20   any investment banker, would you think it's comparable to

21   look at a distribution company that sells beer and a

22   distribution company that sells wine?  And I would

23   guarantee you that ten out of ten would say yes, that's

24   comparable.  Are they exact matches?  Is it a mirror

25   image?  No.  But the economics are the same.  Not exactly

1      the same, but they are similar enough.

2           Q.    Is it true in New York?

3           A.    Pardon?

4           Q.    Did you adjust that view for the geographic

5      locations?

6           A.    That's the other thing.  I mean, come on.  In

7      other words, you know, if I took what Mr. Liebman is

8      saying literally I would have to find a company that

9      distributes wine in Connecticut and that sells Spanish

10     wines -- Australian wines.  I mean, come on.  That is

11     such a straw man.  That I mean -- it just to me that was

12     ridiculous.  I have to say.

13          Q.    Didn't you have a comparable like that?

14          A.    Did I have a comparable like what?

15          Q.    Eber-Connecticut had gone through a couple of

16     prior transactions it was engaged in and it had those

17     similarities because it was still in Connecticut and

18     doing those sorts of thing.

19          A.    I did look at those transactions.

20          Q.    Right.  So isn't the point that given the

21     distinctions and the difficulty in finding other

22     comparables, given the legal landscape for the

23     regulations of wine and liquor, isn't it better to use

24     the comparables of the actual prior transactions for the

25     company in this instance because everything else is just

1    too different and too many different variables?

2                    MR. RAMSEY:  Form.

3         A.   No.  I think you mischaracterized and

4    misinterpreted what I just said.  I think these

5    differences that are being put forward, that it does

6    business in Connecticut and not New York, that it sells

7    wine and not beer, those are differences without

8    distinction.  From an investor's perspective is that

9    really going to matter?  Does that change the riskiness?

10   Does that change the potential growth rate?  I think

11   that's just -- like I said, it's a fallacy.  It's a straw

12   man.  If you're asking me --

13        Q.   Have you actually asked any business people

14   about that?  You're saying if you asked a business person

15   or an investor, you know, about the difference they

16   wouldn't see one.  Have you actually asked anyone that or

17   are you just speculating?

18                    MR. RAMSEY:  Form.

19        A.   It's not speculation.  It's by experience.

20        Q.   Have you actually asked anyone that?

21        A.   No.

22        Q.   Do you see a difference between beer

23   distribution and wine and liquor distribution?

24        A.   Of course there is a difference.  But it's a

25   difference without a distinction.

1      Q.    Have you asked anyone that question?  My

2      question is, have you asked anyone else that question?

3      A.    No.

4      Q.    Why not?

5      A.    I don't have to.  I know how to do valuations.

6      I know how to look at comparable companies.  I have been

7      doing it for 30 years.  I don't have to ask anybody.

8      That's my belief.  That's what I am going to.  That's

9      taught in school.  That's what investment bankers do all

10     the time in merges.  That's what I am using.

11     Q.    Have you ever valued a power company or energy

12     company?

13     A.    Yes.

14     Q.    What kind of energy company was that?

15     A.    It was an electric and generation and gas

16     distribution company.

17     Q.    How did it generate electricity?

18     A.    They had coal fire power plants.  They had

19     nuclear power plants and gas.

20     Q.    And were the -- did you value the different

21     components of that separately nuclear from coal?

22     A.    The different generations of electricity?

23     Q.    Yes.

24     A.    No.

25     Q.    Do you believe that a nuclear company -- say a

Page 127

1      company is just doing nuclear and another company is

2      burning coal.  Do you believe that those two companies

3      would be deemed comparable?

4           A.   I would include, yes.  You got to take into

5      account that there are different characteristics, but in

6      terms of developing a range of values, yeah.  I would

7      include them.

8           Q.   Riskiness factors are very different, correct?

9                MR. RAMSEY:  Form.

10          A.   There is risk for a variety of different

11     reasons.  Nuclear plants have risk because the risk of

12     regularity control is quite substantial.  Although small,

13     the risk of something, a catastrophe happening.  Coal

14     fire plants have risk because you're going to have

15     environmental regulations that you've got to adhere to

16     that make those plants very costly.  And can result in

17     some substantial, you know, uncertainty about the future.

18     So there are differences in risk characteristics, but

19     there are risks that cross all those kinds of powers

20     plants.

21          Q.   So the difference in regularity control is

22     something that has to be taken into consideration; is

23     that fair to say?

24          A.   No.  What I said is that the riskiness of each

25     of those things can be narrowed down to where it comes

Page 128

1    from.  And the riskiness, it permeates the industry

2    itself.

3        Q.   Did you, for purposes of this case, familiarize

4    yourself with the Connecticut franchise laws for liquor

5    and wine distributors?

6        A.   You know, I have some recollection.  I didn't

7    read anything.  I have some recollection of discussing

8    some of that with either Wendy or Lester?

9        Q.   And what did they tell you about that?

10       A.   I don't recall specifically.

11       Q.   If you don't recall specifically, do you recall

12   what you concluded based on what they told you?

13       A.   Well, that like many states in the northeast

14   there is a lot of regulation involving liquor sales.  The

15   principal discussion I remember having is what would

16   happen under a liquidation scenario.  And that there

17   would be limited buyers for inventory under a liquidation

18   scenario due primary to the restrictions in the

19   Connecticut law.  But there were similar restrictions in

20   the other states, particularly those states in the

21   northeast.

22       Q.   Did you discuss with them how those same laws

23   also create barriers and entry for competitors?

24              MR. RAMSEY:  Form.

25       A.   You know, I do remember talking about that.  I

1    remember also reading something.  I think it might have

2    been in Lester's affidavit about the differential

3    barriers to entry.  And I think it was concerning the

4    notion of an exclusive distributorship and that vague

5    recollection about ways in which other distributors can

6    become distributors of the products that you're carrying.

7         Q.   Okay.  So is it fair to say that barriers for

8    entry for competitors is something -- if there are such

9    barriers, that is something that reduces the riskiness of

10   the business?

11        A.   It's possible.

12        Q.   I will show you a business plan from December

13   2009 from Eber-Connecticut that's been previously marked

14   as Exhibit 65.  And I want to draw your attention to the

15   second to last paragraph there.

16        A.   Okay.  I see that.

17        Q.   Is that consistent with what Wendy and Lester

18   told you?

19        A.   Well, let me -- so I am reading from the

20   affidavit from Lester that the Connecticut laws do not

21   insulate a distributor from the risk of losing exclusive

22   right or to sell wine product in Connecticut.  Rather at

23   most they prevented a distributor from being completely

24   excluded from the sale of a wine product.  Although,

25   Connecticut law prevents a supplier from completely

1    terminating its relationship with the distributor --

2    which I think what this paragraph says -- without good

3    cause, a supplier may still dual -- in quotes -- dual a

4    distributor at any time.  Meaning that the supplier can

5    sell to a new preferred distributor in addition to the

6    original distributor.  Thus the original distributor can

7    be deprived of the benefit of being an exclusive

8    distributor of a product within Connecticut without any

9    protection under the franchise law.  In my experience,

10   the new preferred distributor typically ends up selling

11   the majority of the supplier's particular product in

12   Connecticut since the new preferred distributor receives

13   marketing support and programming that is not offered to

14   the original distributor.  So I think that paragraph is

15   consistent with what I just read, but also the paragraph

16   provides additional information that is not reflected in

17   that paragraph.

18        Q.    Okay.  But combining what you just read with

19   what Lester and Wendy just told you about the limited

20   number of people out there, it's fair to say that the

21   competitive pressures facing Eber-Connecticut given

22   Connecticut's regulations were lower than they would be

23   for a similar company in a state that did not have those

24   franchise laws protecting it?

25                  MR. RAMSEY:  Form.

```
                                                Page 131

 1            A.    I mean there is some protection, but based upon

 2       what I just read, it's minimal.  If you can basically

 3       skirt those laws by having new supplier and while they

 4       have to still -- sorry -- new distributor -- and while

 5       the supplier still has to sell to you under the law, if

 6       they have taken away your business -- it's really pretty

 7       much a hollow guarantee.  I mean it's -- you can lose

 8       your business.  And according to this article, it's not

 9       uncommon.

10            Q.    Well, in a case of -- do you know how many

11       distributors of wine and liquor there were at the time of

12       the transfer?

13            A.    No.

14            Q.    Would that be important information for you to

15       know?

16            A.    No.

17            Q.    So if it was just Eber-Goodman and Eber

18       Brothers.  And Eber-Goodman was an investor in this

19       company and subject to all sorts of restrictions in terms

20       of poaching their different customers, you're saying that

21       wouldn't affect your opinion?

22                      MR. RAMSEY:  Form.

23            A.    It didn't factor into my opinion and no.  I

24       mean, you set up very extreme examples that I don't think

25       exist in order to try to get me to answer to a
```

1      hypothetical that is outrageously simplified.

2          Q.   It's more I am testing the integrity of your

3      opinion.

4          A.   But the integrity of my opinion is based on

5      reality.  Not upon some figment of the hypothetical world

6      where one distributor exists in the State of Connecticut.

7      It didn't factor into my opinion.  If ultimately at trial

8      you think it is a factor, bring it up and we will discuss

9      it.  And let the court decide.

10         Q.   In New York is beer sold in the same place as

11     wine and liquor to customers?

12         A.   No.

13         Q.   Did that affect your opinion at all?

14         A.   It did not factor into my opinion.

15         Q.   Have you ever worked with companies that are

16     involved in retail sales of beer?

17         A.   Retail sales of beer.  So conjunctively I have

18     been involved in valuations of grocery stores that sell

19     beer.  And I have been in valuations of producers of

20     beer.  Close as they come.

21         Q.   So is it fair to say the customer profile for a

22     beer distributor is very different than the customer

23     profile for a wine and liquor distributor in the State of

24     New York?

25                    MR. RAMSEY:  Form.

1          A.   I don't know about very different.

2          Q.   The same stores can't sell the same things,

3     right?

4          A.   That's true.  Ultimately there is a drive

5     demand for alcohol.  The demand comes from customers and

6     that's the key.  That's where the sales come from.  If

7     the customers aren't buying as a distributor, you're not

8     making sales.  So the economic model -- it starts for the

9     retail customer who is buying alcohol.  And what drives

10    those customers' desire for alcohol.  And so that's

11    what's driving.  And whether you're selling to a grocery

12    or a wine or liquor store, it's still the same derived

13    demand that is the ultimate microeconomic factors that

14    are driving sales and just driving the value to the

15    distributor.

16         Q.   Are you aware of -- well, if you dealt with

17    grocery stores did you encounter -- what kind of size of

18    grocery store chain are we talking about here?  National?

19    Regional?

20         A.   I think it was regional.  It was stores owned

21    by the Half Brothers.  I think it was down in Virginia or

22    D.C.

23         Q.   And did they operate largely on generating

24    profits through vendor credits?

25         A.   I don't recall.

Page 134

1          Q.    Are you familiar with how vendor credits work

2      in the retail industry?

3          A.    I don't remember.

4          Q.    And do you know how purchase orders are placed

5      by wine and liquor companies in New York?

6          A.    No.

7          Q.    So in your report you noted that generally

8      forward projections provide a better way of valuating a

9      company than past results; is that a correct statement?

10         A.    Well, let me put a fine point on it.  A company

11     valuation is predicated on the present value of future

12     cash flows to the extent that the history provides you

13     with a yardstick to estimate future cash flows.  That's

14     the importance of the historical numbers.

15         Q.    But if history -- are there circumstances in

16     which history does not provide a useful yardstick?

17         A.    Sure.

18         Q.    Like what?

19         A.    Well, like a complete shift in the business of

20     a company.  You getting into something different.  You

21     develop a new product.  Could be all kinds of reasons

22     that history is not an indication of the future.

23         Q.    And so, for example, if a company had recently

24     hired a strategic consultant and changed the focus of its

25     business, is that one reason why historical results would

1       be a less reliable yardstick?

2                     MR. RAMSEY:   Form.

3            A.   Well, I don't know about a consultant but

4       clearly.

5            Q.   Following your consultant's advice.

6            A.   If you're changing your business, if you're

7       doing something different than you did historically you

8       could -- it could alter your expected growth in the

9       company.  Different products of course have different

10      expected growth rates or potential growth rates.

11           Q.   In a valuation analysis, if a company doesn't

12      have its own projections at the time of the transaction,

13      have you ever attempted to create projections based upon

14      what historical cash flows have been?

15           A.   It's been my practice not to do that.  I think

16      it entails speculation.  And effectively what your -- the

17      most I have done is to try to assess what the expected

18      growth rate is.  But I generally do not when there are no

19      projections, I generally do not try to come up with my

20      own projections.

21           Q.   In those circumstances is it relevant to the

22      analysis if management believes, without putting a

23      particular number on it, that the business is turning

24      around and will be profitable in the new future?

25           A.   I think management expectations are always

1      consideration I would say.

2          Q.    And what is your understanding of what

3      management's expectations were at the time of the Alexbay

4      transfer in the terms of the business returning to

5      profitability?

6          A.    My recollection is that there was no immediate

7      return of profitability and no substantial change in the

8      growth rate from the historical numbers.

9          Q.    And where did you get that understanding?

10         A.    Discussing it with Wendy.

11         Q.    Okay.  And if Wendy made different statements

12     at the time and around the transaction such as to banks

13     expressing her optimism in the business improving in the

14     future, would you consider those statements more reliable

15     or statements in further interest of her litigation?

16              MR. RAMSEY:  Form.

17         A.    Yeah.  I think there are -- look, my experience

18     with providing information to banks, you're always

19     presenting an optimistic case because you want funding.

20     And you're not going to say that it looks like we're

21     going down the tube.  Why would you want to give us any

22     money?  Would I weigh those things?  Sure.  I consider

23     those two.  Those are equally important.

24         Q.    So the context in which someone makes a

25     statement about management expectations is relevant?

1              MR. RAMSEY:  Form.

2         A.   It's relevant.

3         Q.   Put a spin on it for whatever reason, fair to

4    say?

5         A.   Sure.

6         Q.   And much more so than historical earnings it's

7    easier for management to play with the numbers a little

8    bit when it comes to forward projections without doing

9    anything that might get them sued for security fraud; is

10   that fair to say?

11             MR. CROWE:  Form.

12        A.   I don't know what you mean.

13        Q.   In terms of taking a more aggressive position

14   than what the projections are.

15        A.   Behavior being what it is.  You know, certainly

16   if you're banker and you're being presented with

17   projections and not projections, but with some kind of,

18   you know, qualitative view as to what you think is going

19   to happen.  You take it into account.  I hear you.  But

20   the historic numbers don't bear that out.  What is it

21   that you're going to do differently that is going to

22   create better profits?  I mean -- look, to the extent

23   that something has positive valuation what is baked into

24   that is profits in the future.  There can't be a positive

25   valuation if it's never expected to generate profits.

Page 138

1          Q.   In the case of Eber-Connecticut although it had
2     not yet turned profitable, it's correct that the company
3     was reducing its losses consistently every year as of
4     2012, right?
5          A.   There was big losses that I occurred in the
6     maybe 2008/2009 time frame in the recession.  But it was
7     still negative as of 2012.  And I think it stayed
8     negative until I don't know, 2015 or 2016 is my
9     recollection.
10          Q.   But the overall trend was going towards
11     positive, correct?
12               MR. RAMSEY:  Form.
13          A.   Well, let's take a look.  Okay.  So I am
14     looking at Paragraph 50 that shows the financials or
15     revenue profit from operations and EBITDA from 2007 to
16     2012.  So the first line revenue indicates that the
17     growth is actually somewhat flat or declining from 2007.
18     The profitability from operations that is pretty
19     volatile.  It's negative $656,000 in 2007.  And then it's
20     improved slightly in 2008 to $140,000 negative.  But then
21     in 2009 -- I think this is what I was referring to -- in
22     2009 it's minus 2.3 million.  And 2010 it is $920,000
23     negative.  And then we're kind of back to where we were
24     in 2007.  In 2011 the profit from operations is negative
25     $687,000, which is similar to what it was in 2007.  And

1    then there was an improvement in 2012 that reduced the

2    loss to negative $299,000, which is again sort of similar

3    to what happened in 2008.  So if you're asking for a

4    discernable trend there, no.  I don't see that.  It's

5    bouncing around.  It's sort of -- the only improvement

6    that I see there is -- is well, it looks like the same

7    improvement.  I mean, you know, if you look at the

8    difference between 2007 and 2008 and say that's

9    improvement.  Then in 2009 it's negative 2 million.  You

10   look at the improvement -- well, then in 2010 it's

11   negative $120,000.

12        Q.   So looking at 2009 to 2012 each of those years

13   it goes from really bad to bad to less bad each year

14   after that?

15             MR. RAMSEY:  Form.

16        A.   Let's look at 2007 to 2012.  Why are you

17   limiting?

18        Q.   Do you know what happened in 2009?

19        A.   Yes.  There was a recession.

20        Q.   No.  Do you know what happened to

21   Eber-Connecticut in 2009 that explains that?

22        A.   I don't recall.

23        Q.   Are you familiar with the brand Yellow Tail

24   wine?

25        A.   Yes.

1      Q.   And you heard about how Eber got dualed?

2      A.   Dualed.

3      Q.   They also tell you that Yellow Tail in any

4   event was a very low margin wine for them?

5           MR. RAMSEY:  Form.

6      Q.   They sold a lot of volume, but never made much

7   profit off it.

8      A.   Okay.

9      Q.   And in 2010 that's when the company retained

10  Glenn Steurm and began to reorganize and restructure

11  their business plan.  Did you know that?

12     A.   Yes.

13     Q.   And did you ask when that Wendy and Lester --

14  whether they actually were implementing changes that

15  explained the positive trend from 2009 to 2012?

16          MR. RAMSEY:  Form.

17     A.   To explain the trend?  No.

18     Q.   Does it matter why the financials were

19  improving from 2009 to 2012 in your analysis?

20     A.   Well, I mean I am looking at the whole series

21  and I don't see any drastic improvement.  You want to

22  focus on 2009.  Okay.  That explains a big loss in that

23  year.  I just don't -- looking at the numbers it doesn't

24  look like -- you can say the same thing.  Put a blinder

25  on and look at 2007 and 2008.  And by your conclusion you

1    would say, "Oh, my gosh.  Look at the improvement.  It

2    lost $656,000 in 2007, but it only lost $140,000.  What a

3    drastic improvement.  This is great.  What a growth rate

4    it's going to be.  Let's look at 2009.  There is

5    explanations, but look at the loss for 2009.  Look at

6    2010.  There is a big loss for 2010.  So taking a

7    snapshot of 2007 and 2008 didn't give a very good

8    indication about what was going to happen in 2009 and

9    2010, did it?

10        Q.   And by the same token it does -- looking at

11   2007 and 2008, including that with all this and refusing

12   to look at the trend within the most recent four years,

13   doesn't give you a very good snapshot of what the future

14   is going to hold, does it?

15        A.   Well, I think the more data you have, the

16   better you can understand what the trend is.  Looks to me

17   as it's bouncing around.  I get it.  They hire Steurm.  I

18   don't see any drastic improvement here.  It's bouncing

19   around.  Big negatives.  Slightly less negatives.  Big

20   negatives.  Slightly less negatives.

21        Q.   It didn't happen that many times.

22        A.   It did.  Big negative 2007.  Slightly less

23   negative 2008.  Big negative 2009.  Slight less negative

24   in 2010.  Big negative in 2011.  Slightly less negative

25   in 2012.

1          Q.   You just did it wrong there.  It went slightly

2     less negative in 2010.  Slightly less negative in 2011.

3     Slightly less negative in 2012.  That's the trend as far

4     as earning goes.  It doesn't jump back up, does it?

5                    MR. RAMSEY:  Form.  Are you testifying,

6               Brian, or are you asking him the question?

7          A.   I am looking at the bouncing around.  It's

8     bouncing.

9          Q.   Do you see that revenue?

10         A.   I see it.  Do you see it?  You're trying to

11    assess a trend here.  I don't see a trend.

12         Q.   Do you see revenue is essentially flat from

13    2010, 2011 and 2012 right around 36.5 million dollars?

14         A.   Here is what I see.  I see that the beginning

15    of this series looks like the end of the series.  That's

16    what I see.

17         Q.   So you would predict based on this that in

18    2013 there would be another huge loss like after 2008?

19    Is that what you're saying?

20                    MR. RAMSEY:  Form.

21         A.   No.  I said what I said.  I am looking at what

22    the profitability looks like in 2007 and 2008.  That

23    looks awfully similar to what happened in 2011 and 2012.

24    So where is the trend?

25         Q.   Do you think that the Yellow Tail was going to

1    dual them again?

2         A.   Yellow Tail went out in 2009.  That's what you

3    just told me.

4         Q.   So past event couldn't reoccur, right?

5              MR. RAMSEY:  Form.

6         A.   Whether it could occur with another wine, I

7    don't know.

8         Q.   Do you know whether Yellow Tail --

9         A.   I am looking at these numbers and I don't see

10   the trend that you see.

11        Q.   Okay.  That's fine.  And as part of your

12   analysis you did not attempt to determine whether Lester

13   and Wendy Eber were making changes in the business to

14   improve profitability; is that right?

15             MR. RAMSEY:  Form.

16        A.   My analysis reflects and all these analysis

17   reflects that there will be improvement in profits

18   because it's positive equity value for Eber-Connecticut.

19   So in all those scenarios, there is improvement in

20   profit.

21        Q.   As part of your analysis you've reviewed the

22   May 23, 2012 order of the court in which it declared that

23   Alexbay's acceptance of Eber-Metro's stock in

24   satisfaction of the debt was commercially reasonable,

25   correct?

1        A.    Yes.

2        Q.    Did you rely on that in any way?

3        A.    No.

4        Q.    Did you make any attempt to asses whether that

5     the information to provided to that court was accurate?

6        A.    No. I mean only to the extent that I am doing a

7     valuation with regard to Pole-Bridge Bowman, which the

8     court relied on.

9        Q.    And do you know if the court actually relied on

10    anything?

11       A.    I thought so.  I may be mistaken, but thought

12    the transaction was the key factor that the court used.

13       Q.    It was disclosed to the court.  But did you see

14    anything indicating that the court actually looked at the

15    papers given that it was uncontested?

16              MR. RAMSEY:  Form.

17       A.    Maybe if you show me the document, I can

18    refresh my recollection.  Sitting here today, I don't

19    remember.

20       Q.    Do you remember that action was not contested?

21       A.    I don't remember.

22       Q.    In terms of what was submitted to that court,

23    did you consider the description that Lester Eber gave to

24    the court of what Eber-Metro was worth in your analysis?

25              MR. RAMSEY:  Form.

1          A.   My valuation analysis is indicated in this

2     report.  I don't remember what Lester said when

3     reflecting my valuation.  So I would have to look at what

4     he said.  Maybe what he said is in there.  I just don't

5     know.

6          Q.   Okay.  This is previously marked Exhibit 45.

7     It's an affidavit from Lester Eber dated March 14, 2012.

8     I am going to direct your attention specifically to

9     Paragraph 6.  Okay.

10          A.   If you don't mind, I am going to read the

11     context of this.

12          Q.   Sure.  Okay.

13          A.   Okay.

14          Q.   Have you seen this before today?

15          A.   I don't remember seeing this.

16          Q.   And is there any new information in there for

17     you?

18          A.   I don't know if this is new.  It is valuing

19     Eber-Connecticut at 4.6 million.

20          Q.   And that's based on the Pole-Bridge Bowman

21     transaction you understand, correct?

22          A.   It doesn't say that.

23          Q.   I guess it says very recent arm's-length sales

24     on the open market.  Do you think that's referring to

25     Pole-Bridge Bowman?

Page 146

```
 1                  MR. RAMSEY:  Form.
 2          A.   I don't know.
 3          Q.   Is it your understanding that the Pole-Bridge
 4     Bowman transaction was conducted on the open market?
 5          A.   I think by open market it means at fair market
 6     value.  I don't know.  I am not sure what open market
 7     means in this context.  But does it say that Pole-Bridge
 8     Bowman is n here somewhere?
 9          Q.   I am not sure it's in this document.  I will
10     represent to you another document filed by the lawyers
11     reference only the Pole-Bridge Bowman transaction and did
12     not reference any other transactions involving the
13     company.
14          A.   Okay.
15          Q.   So I want to draw your attention in particular
16     to the last line there.  It says, "Because it,
17     Eber-Connecticut, is Metro's only significant asset that
18     79 percent interest valued 3.66 million itself
19     establishes the value of Metro."  So he didn't mention
20     anything about any liabilities there, correct?
21          A.   No.
22          Q.   Do you know why that is?
23                  MR. RAMSEY:  Form.
24          A.   No.
25          Q.   Do you consider this statement by the purchaser
```

Page 147

1    of Eber-Metro about his understanding of its value to be

2    relevant to your analysis?

3         A.   Well, it seems to be contradicted on its face

4    anyways.  It seems to contradict what I have been

5    provided as a legal assumption.  I don't know.  I mean,

6    you know, whether -- so this seems to be consistent with

7    your legal definition as opposed to the legal definition

8    that I was provided with.  But it also seems to

9    contradict what I said earlier, that an investor would

10   certainly reflect those liabilities and any assessment of

11   Eber-Metro.  Best I can do with that.

12        Q.   And I think you may have answered this before,

13   but I wanted to make sure I understand.  In your opinion,

14   the purpose that Lester Eber and Eber Wine and Liquor

15   had for entering into this transaction doesn't affect

16   your valuation analysis; is that right?

17        A.   The purpose?

18        Q.   Such if the purpose was to shield assets from

19   creditors, would that affect your analysis?

20        A.   I mean it doesn't affect my solvency opinion.

21   It doesn't affect my valuation the Eber-Connecticut.

22   Those stand independent.  Whether the trier of fact

23   somehow because of what you say is true that they think

24   this transaction should be undone accordingly -- that's

25   really a finding that the court may or may not.  But it

Page 148

1    doesn't -- no.  It doesn't really affect my opinion.

2         Q.   Okay.

3         A.   Unless I am missing something.

4         Q.   If the transaction is engaged in for the

5    purposes of shielding assets, doesn't that affect the

6    probability that contingent liabilities would be assessed

7    against it?

8                   MR. RAMSEY:  Form.

9         A.   I think if that was the -- for example, if an

10   investor -- let's hypothetically say Lester did that, it

11   may affect his view -- specific investment view.  But it

12   doesn't affect, you know, what I think that a reasonable

13   investor would assess in this particular instance.

14        Q.   So in your opinion, you think a reasonable

15   investor would look at this transaction and think that it

16   would not be a successful way of shielding Eber-Metro and

17   its interest in Eber-Connecticut from the creditors of

18   Eber Brothers Wine and Liquor Corp; is that right?

19        A.   I think that's fair.

20        Q.   Now, you have done a lot of corporate

21   transactions and valuating them.  Have you ever seen a

22   transaction with the same general setup as this, where an

23   officer or director of a company transfers it to himself

24   on the grounds that he is a creditor foreclosing on a

25   loan that he had given to the company?

1        A.    It's pretty specific facts.

2        Q.    We can open it to officer or director.

3        A.    Okay.  I mean the best I can think of -- I have

4    been involved in cases where the company has been taken

5    private by officers or directors.  And as I said, there

6    has been cases in which in a transaction the common

7    shareholders got nothing because of priority claims.  But

8    nothing is coming to my mind about a single case that

9    contains all those facts.

10       Q.    Right.  I think is it fair to say the

11   distinguishing feature is how this company was acquired

12   through a creditor foreclosure attempt as opposed to a

13   more transparent sale or purchase?

14             MR. RAMSEY:  Form.

15       A.    So you're asking me if I have been involved in

16   a case --

17       Q.    Let me step back.  In those cases where

18   management acquired the company, took it private and

19   whatnot, is it fair to say there were a number of

20   procedural protections that were involved to ensure that

21   shareholders were not getting shafted?

22             MR. RAMSEY:  Form.

23             MR. CALIHAN:  Form.

24       Q.    Ensure that shareholders were not being taken

25   advantage of?

```
                                        Page 150
 1              MR. RAMSEY:  Form.

 2              MR. CALIHAN:  Form.

 3         A.   So the cases that I am thinking about are cases

 4    in which the shareholders believed they were being taken

 5    advantage of and the process to determine that was in

 6    litigation, if that answers you.

 7         Q.   Were there any steps taken by management at the

 8    time of the transaction?  Did they get a fairness

 9    opinion?

10         A.   Yes.  There were steps, but the steps were

11    contested.

12         Q.   Was the transaction disclosed to the

13    shareholders before it was commenced or closed?

14         A.   Yes.

15         Q.   And do you know whether this transaction in

16    this case was disclosed to the trust beneficiaries before

17    it was concluded?

18         A.   Well, let's see.  My recollection is that the

19    other trust members or beneficiaries were provided with

20    the opportunity to participate in raising new capital.

21    That I do remember.  I have seen a letter.  And I just

22    don't remember whether that particular letter also

23    contained the -- or any other letter contained the, you

24    know, my words -- the foreclosure, the extinguishing of

25    the common equity.
```

1          Q.   So I think I know what you're referring to.  I

2     think you're referring to giving other trust

3     beneficiaries, you know, the opportunity to loan money to

4     the company under the line of credit that Lester

5     established?

6          A.   Kind of like a rights offering.  You want to

7     maintain your position, you've got to pony up the money

8     or else you're going to get left out.  It's kind of like

9     that.  Not exactly.

10         Q.   An equity offering is different than a loan

11    offering, right?  Typically creditors don't get to just

12    convert their debt to equity unless it's clearly labeled

13    as a convertible note of some kind?

14              MR. RAMSEY:  Form.

15         A.   Or unless the equity is worth zero.

16         Q.   Then you're saying in that case the creditor

17    would convert the debt to equity that's worth zero?

18         A.   The creditor de facto becomes the residual

19    claimant, I.E. the equity holder.  If there is no equity

20    above it, it becomes the front line and it bears all the

21    risk and reward for the prospects of the that company at

22    that point in time, which is what happened here.

23         Q.   Do you know what the typical remedy is for a

24    creditor who is trying to foreclose on a debt that has

25    not been paid by a company?

1              MR. RAMSEY:  Form.

2        Q.   What usually happens?

3        A.   Sorry?

4        Q.   So a creditor loans money to a company.

5    Company doesn't pay it.  Creditor tries to foreclose on

6    the debt.  Does he acquire ownership of the company?

7              MR. RAMSEY:  Form.

8        A.   You're kind of in an area, I am not sure what

9    the legal steps are.  My recollection here is that there

10   is -- if you default on your debt payments, the next step

11   is bankruptcy.  And then following bankruptcy there could

12   be  some kind of reorganization or it could be that the

13   debt holders become the residual claimants.

14       Q.   Did you inquire as to why there was no

15   bankruptcy in the case of Eber-Metro, Eber Wine and

16   Liquor or Eber-Connecticut?

17              MR. RAMSEY:  Form.

18       A.   No.  That goes beyond what I was considering.

19   You know, if you're suggesting to me that was illegal to

20   do that, that's not under my purview.

21       Q.   In your report you also offer an opinion on the

22   reasonableness of the interest rates on Lester's loans,

23   correct?

24       A.   Yes.

25       Q.   Now, is it fair to say you didn't conduct any

Page 153

1     sort of work like forensic accounting and whatnot to
2     determine whether those loans were correctly stated or
3     validly entered into in the first place?
4          A.   No.
5          Q.   So you simply assumed them to be valid on their
6     face at the stated rates of interest?
7          A.   Yes.
8          Q.   And you used the 9 percent interest rate on the
9     2006 loan even though it was just handwritten in by
10    Lester?
11         A.   I did.
12         Q.   Have you seen that before, where the person who
13    is getting the interest unilaterally increases the
14    interest rate by a handwritten notation?
15                   MR. RAMSEY:  Form.
16                   MR. CALIHAN:  Objection to form.
17         A.   I don't remember one way or other.
18         Q.   And one of the things you said it was -- those
19    rates were consistent with the debt by distress companies
20    that you had tracked?
21         A.   Yes.
22         Q.   Would it affect your opinion about whether the
23    interest rates that Lester, himself, was receiving were
24    reasonable if Lester, himself, was responsible for the
25    company being distressed?

1              MR. RAMSEY:   Form.

2        A.   So you're saying that there was some

3    impropriety and I don't know purposely driving down the

4    value or something?

5        Q.   If something like that happened, would that

6    affect the reasonableness of the interest rates?

7              MR. CALIHAN:   Form.

8        A.   Well, it goes well beyond the reasonableness of

9    the interest rate.   No.   I don't think -- the interest

10   rate is predicated on the financial distress of the firm.

11   If you're saying the firm itself is in financial distress

12   because Lester wanted it to be in financial distress that

13   goes to the valuation in its entity.

14       Q.   And so you're saying that if there was evidence

15   and a fact finder concluded that Lester wanted the

16   company to be in financial distress so he could foreclose

17   on his loan and take ownership of it, that would make

18   your valuation analysis less reliable?

19             MR. RAMSEY:   Form.

20       A.   Let me be specific.   If there -- I mean

21   analysis implies that this company is being run to

22   maximize shareholder value.   There is no fraud being

23   imposed upon shareholders.   And that there is no purpose

24   in fully driving down the value.   If the finder of fact

25   concludes that's the case, then yes.   You know, the

Page 155

1      financial numbers that I am using would be fraudulent.

2      It's kind of like your example of statements.  I don't

3      know what I would do with that.

4           Q.   Would diverting corporate opportunities outside

5      the company constitute conduct on your view -- would be

6      the sort of misconduct to drive down the value of the

7      company along the lines that you mentioned?

8                     MR. RAMSEY:  Form.

9           A.   Well, you've can kind of gone to, you know, if

10     a trier fact concluded there were improprieties.  Now

11     that I am drawing conclusions about improprieties.

12     That's not in my purview.

13          Q.   You mentioned fraud.  Is it fair to say that

14     diverting corporate opportunities is another kind of

15     misconduct that could be something that would affect

16     valuation?

17                     MR. RAMSEY:  Form.

18          A.   That's not my purview.  If the judge determines

19     it, so be it.  I am not going to weigh in what

20     constitutes whether it's poor management, mismanagement,

21     fraudulent management.  Those are not issues that I am

22     going to weigh in on or I consider my expertise.

23          Q.   Have you ever been retained to value a

24     corporate opportunity under the doctrine of usurp -- of

25     corporate opportunities or diversion of corporate

                                                    Page 156

1      opportunities?

2           A.   I don't even know what that is.  Doctrine of

3      what?

4           Q.   You're not familiar with the corporate

5      opportunity doctrine?

6           A.   No.

7           Q.   So is it correct to say that you have not, in

8      connection with this case, looked at all into whether

9      Lester Eber diverted corporate opportunity when he

10     received $600,000 a year from Southern while he was still

11     being employed as the president and CEO of Eber Brothers?

12               MR. RAMSEY:  Form.  Go ahead.

13          A.   I have not.

14          Q.   And you have not conducted an analysis to see

15     whether if Eber Brothers was receiving $600,000 a year

16     from Southern from 2007 through 2012 or how that would

17     have affected the valuation as of mid-2012; is that

18     right?

19               MR. RAMSEY:  Form.

20          A.   As a side payment thing?  Is that what you're

21     saying?

22          Q.   I will set the facts from you.  Lester Eber has

23     part of the transaction in which -- and we're just -- I

24     am not necessarily saying these are the facts.  We can

25     call this a hypothetical.  Lester Eber when he is

Page 157

1      negotiating the sale of assets New York, Ohio and

2      Delaware of Eber Brothers.  And money for that is

3      transferred to Eber Brothers from Southern.  He also

4      negotiates a side deal for himself in which he gets

5      $600,00 a year for five years for Southern for consulting

6      while remaining president of Eber Brothers and also

7      becoming president of Eber-Connecticut and receiving a

8      salary in accordance with that work at the same time.  So

9      with that fact pattern and what my question is, did you

10     conduct any sort of analysis to see whether if $600,00

11     more income had been paid to Eber Brothers rather than to

12     Lester Eber for that five-year period, the valuation of

13     the company as of 2012 would have been significantly

14     positive?

15                  MR. RAMSEY:  Form.

16          A.    No.

17          Q.    On Page 16 of your report footnote 25, you've

18     got a citation notion case where it says, "While it is

19     true that an arm's-length transaction thus so called

20     willing buyer, willing selling test is the best evidence

21     of and often the easiest method to determine fair market

22     value is by no means the only such evidence."  Do you see

23     that?

24          A.    Yes.

25          Q.    Do you agree with that statement, that an

1    arm's-length transaction is the best evidence of fair

2    market value?

3         A.   Well, it's certainly a key piece of evidence if

4    the arm's-length transaction is for the same thing.  As I

5    said before, when the transaction itself has substantial

6    rights being granted to either the purchaser or the

7    seller, then you can't use that transaction on its face.

8    You have to make adjustments.  And those adjustments of

9    course become, you know, a difficult thing to measure in

10   and of themselves.  What is the value of those particular

11   rights?  And that tends to be a function of the facts and

12   circumstances of function of the value of the company

13   itself -- the capital structure.  So it's just difficult.

14   And that's kind of the situation that were at here.

15        Q.   So it sort of leads me to my next point.  So on

16   the Eder-Goodman transaction is the most obvious

17   arm's-length transaction -- closest in time, anyway.  Why

18   didn't you make any -- I understand you made adjustments

19   for the additional rights that Eder-Goodman for some of

20   them.  You didn't make any adjustments in the other

21   direction for the restrictions on their stock that was

22   atypical, did you?

23        A.   Restrictions on their stock?  I thought the two

24   issues that I thought were highly material and highly

25   valuable had to do with the ROFR and, you know, the

1    preferred characteristics.  There are other rights that
2    they got that I did not value that presumably had value.
3    And, you know, not as much as those two.  To the extent
4    there were restrictions, I don't remember the exact
5    restrictions.  But the thing I was most concerned about
6    were the two key -- the two key rights that without
7    question have value.  I mean I think even in your
8    complaint suggested that is significant value to the
9    rights of first refusal.  I don't think there is any
10   disagreement.
11        Q.   We certainly appreciated that part of your
12   opinion.  So, no.  I am not talking about that.  You
13   earlier testified that a restriction of marketability is
14   something you need to discount for; is that still your
15   view?
16        A.   If you're trying to sell to an individual -- a
17   number of small individuals -- then marketability becomes
18   an issue.  If the marketability discount generally when
19   you ask a practitioner -- a valuation practitioner and
20   you're saying I am selling a large block of shares, then
21   the marketability discount becomes pretty much de minimis
22   and nobody factors that in.  So it's really relevant if
23   you're selling one share or two shares and trying to
24   understand, you know, what would you get if you sell, you
25   know, a very, very small fraction of the total shares.

 1          Q.   Are you aware of whether there were

 2     marketability restrictions on Eder-Goodman's 15 percent

 3     interest?

 4          A.   I don't remember.

 5          Q.   Direct you to -- this is what's been previously

 6     marked as Exhibit 57, Section 7.1.  Restriction on

 7     disposition.  And actually I'll let you take a look at

 8     that.  I need to take a five-minute break here.

 9          (Whereupon, there is a short recess in the

10     proceedings.)

11          Q.   Let's go back to this.

12          A.   Uh-huh.

13          Q.   All right.  I want to ask you a little bit more

14     about your decision to not consider the acquisition of

15     Slocum in 2005 as a valuation.

16               MR. RAMSEY:  Are we not doing this?

17          Q.   I am sorry.  I didn't have it in my hands.

18     Let's stick with that.  You had a chance to review

19     Section 7.1?

20          A.   Yes.

21          Q.   And do you see there that it limits the

22     potential transferees of Eder-Goodman's interest to the

23     parent companies of Eder-Goodman?

24          A.   Yes.  No provision of the agreement governs the

25     proposed disposition?  What were the provisions of this

```
 1     agreement?

 2         Q.   Well, I think it's a legal question.  So for

 3     purposes of today, let's assume this is a restriction on

 4     transfer for Eder-Goodman.  I don't want to have you go

 5     through the whole document.  I will represent to you to

 6     assume that Eder-Goodman cannot transfer its 15 percent

 7     interest without complying with this section.

 8         A.   Okay.

 9         Q.   Because there is tag-along rights.  I think

10     those are the other provisions.  Based on that, this is a

11     restriction to the marketability of those shares; fair to

12     say?

13         A.   Under your hypothetical.

14         Q.   Okay.  And under this hypothetical, would that

15     affect your valuation of the transaction?

16         A.   Well, it could.  I mean I think what you're

17     basically suggesting to me that your interpretation of

18     what you're saying is that look you've got to, you know,

19     if you're going to do the most important right, you've

20     got to do all the rights and all the restrictions and do

21     valuation of all these things if they are not present for

22     the purchaser of the shares.  So I would have to do some

23     real hard thinking here to see what -- what are the

24     restrictions that would govern the sale of

25     Eber-Connecticut -- not the 15 percent interest, but all
```

1    the other shares -- the ownership interest given this

2    agreement.  And I haven't.  You know, there are other

3    marketability discounts no matter who buys these shares,

4    even if it's a block interest.  So I haven't really

5    thought about the marketability.  I haven't taken any

6    marketability discount on any of these valuations.  So I

7    would have to consider that and weigh all of the

8    restrictions that would normally apply to anybody who is

9    buying these shares, you know, outside of the Eder.

10        Q.   So as compared to right of first refusal where

11   a party can transfer it, but someone else who has the

12   right of refusal can come in and take it away from them

13   to -- that impairs transfer because it makes potential

14   buyers less willing to go in for it; is that correct?

15        A.   Yes.  I think that's fair.  In this case in

16   particular it makes it extraordinarily difficult for any

17   distribution company that wants to retain synergies by

18   acquiring Eder to do so because of the Eder right of

19   first refusal.

20        Q.   Although since Eder is also in the wine and

21   liquor business it would have the same synergies?

22                   MR. RAMSEY:  Form.

23        A.   Didn't they pay for it through this right of

24   first refusal?  That's the point.  Now you finally get

25   it.  That's exactly what they paid for.  They got

Page 163

1    effectively paid a control premium because now they are

2    retaining the synergies.  I think you finally understand

3    the point.

4         Q.   But they also can't ever get out of this

5    investment by transferring it to someone else themselves?

6         A.   Again, I would have to take a hard look at

7    this.

8         Q.   Let's assume that's true.  They are restricted

9    on the ability to depose of the stock.  So as long as the

10   company is going concern, they have to keep their money

11   in there.  Doesn't that affect the value of it?

12              MR. RAMSEY:  Form.  Go ahead.

13        A.   If there is no similar restrictions when the

14   other 85 percent interest is sold, you know, what a

15   willing buyer would be interested in paying for this is

16   going to be dictated by the other terms and conditions.

17   I am not sure whether the marketability discount would

18   apply to a buyer, too.

19        Q.   I believe that it does say in there that in

20   order to comply with this potential thing -- if they were

21   to transfer it to their parent companies, then they have

22   to agree to the same terms as all other parties in this

23   agreement or if there is any transfer that may be allowed

24   by this for any member has to -- they have to be bound by

25   any agreement.  And I think it was mainly for Eber-Metro.

1    But is it -- this is a restriction on transfer that says

2    the others party can simply veto it.  That's not a right

3    of first refusal, right?

4          A.   Say that again?

5          Q.   So assuming that this permits Eber-Metro to

6    simply say no to any potential transfer, that's a right

7    of first refusal, correct?

8          A.   No.

9          Q.   That's just a right of refusal?

10         A.   Yes.

11         Q.   Have you seen that before?

12         A.   Yes.  In fact, it doesn't -- yes.  I have seen

13   that before.  When there is restrictions on who you can

14   sell to, when you can sell.  Restricted stock is kind of

15   like that.

16         Q.   So for the right of first refusal you came up

17   with a percentage of 15 percent as far as what the

18   potential value is.  What percentage would you assign to

19   the right of refusal, assuming that's what this is?

20                   MR. RAMSEY:  Form.

21         A.   You can't get control for buying 15 percent of

22   this company.  And that's what they owned is 15 percent

23   of the company.  So, again, we're sort of missing each

24   other on the level what the ROFR is accomplishing.

25         Q.   Well, they can't transfer the ROFR either.

                                        Page 165

1        That's the point, I guess.  Remember that's part of it.

2            A.   Why would they have to?  The point is -- and I

3        think we just touched on this point -- is that this was

4        effectively paying a control premium.  That is what's

5        impounded in that price that they paid.  I mean, that's

6        the economics behind it.  So the essence of the value of

7        the ROFR has to do with the direct effect on obtaining a

8        control premium and some later transaction.  There is no

9        premium associated with the 15 percent.  So the same

10       logic can't apply.  Whether there is a marketability

11       restriction, possibly -- possibly.  I would have to go

12       through the entire document to understand exactly what

13       would occur and what other members are facing with regard

14       to the marketability discount vis-a-vis this document or

15       other documents for the members.  But, you know, yeah.

16       It's possible that the ultimate conclusion is that there

17       may be with some marketability discount whether that

18       applies to all shares, now we're in the realm of well

19       minority discounts and marketability discounts.  And by

20       the way, that also opens the door, I think, to

21       understanding these other rights.  You know, for example,

22       on Page 28, Line E, no major decisions shall be effective

23       binding on the company unless approved by unanimous

24       consent of all members.  They are one of the members.

25       That's a pretty substantial right, too.  That says, "Hey,

1      we can veto whatever we want to veto."

2           Q.    It's limited to ten items.

3           A.    They are pretty important items, aren't they?

4           Q.    But none of the business decisions about the

5      direction of the company?

6                      MR. RAMSEY:   Form.

7           A.    Or do they?  You know, selling the company.  I

8      mean, you know, look, my attempt here was to try to

9      understand the two key valuable rights in particular

10     eliminating -- in my opinion, eliminating the control

11     premium is substantial.  For a company in distress, the

12     priority rights on the preferred stock is very

13     substantial.

14          Q.    All right.  Now, did you see anything in the

15     LLC agreement that gives Eder-Goodman any right to

16     control the day-to-day operation of the business?

17          A.    I have to go back and look.

18          Q.    Do you recall seeing that?

19          A.    You know, I have a recollection, but I would

20     have go back and read the document.

21          Q.    Does a control premium usually convey along

22     with it when someone pays that the ability to manage the

23     company?

24          A.    Yes.

25          Q.    And in this case, it does not, correct?  They

1    get one seat out of the seven on the board.

2             MR. RAMSEY:  Form.

3        Q.   Does that sound like control of the management?

4        A.   Well, when you eliminate the potential for a

5    company to -- the potential to get a bidder to come in

6    and buy your company and get a control premium, you've

7    effectively limited the control premium.

8        Q.   Now, what if in this case the Eber family that

9    owns Eber-Metro and Eber-Connecticut has no desire to

10   ever sell the business.  Does that not reduce the adverse

11   effect of the right of first refusal and also the

12   guaranteed purchase price?

13       A.   So your question is if the Eber --

14       Q.   If Eber-Metro has no intention to ever consider

15   selling the business.

16            MR. RAMSEY:  Form.  Go ahead.

17       A.   Let me see if I can explain this in terms you

18   can understand.  If someone bought an asset that you

19   owned as valuable, but you don't put a lot of value into

20   it.  But you know that they think it's valuable.  Would

21   you give it away for free?  Would you say, "I don't put

22   much value into it.  And even though you do, I going

23   number charge you for it.  Here it is.  Take it away."

24   That doesn't make sense to me.  There is an opportunity

25   there.  And so why would an economic player when money is

1    at stake just give away something that the buyer thinks

2    is valuable?  That, for reasons I am talking about here,

3    is why it's valuable.  Understanding full well even

4    though today I may not have interest in selling, it

5    pretty much locks me in. And I am giving that up for

6    nothing.  That doesn't make sense to me.  That's kind of

7    what you're proposing.  If I don't value it, I am going

8    to give it away.  I wouldn't.  I don't think you would

9    either.

10         Q.   And by the same token, is it correct that if

11   Eber-Metro understood it had created a loophole in the

12   right of first refusal by allowing it to sell Eber-Metro

13   itself without triggering any of that, that would not

14   effect the valuation either?

15                   MR. RAMSEY:  Form.

16         A.   Well, if it created a loophole and it knew it

17   created a loophole, it's not going to undercut its price

18   from Eder, right?

19         Q.   As long as Eder doesn't see it, right?

20         A.   You're saying they didn't see it.  Well, you're

21   making two suppositions.  One, there is a loophole and

22   the other is they didn't see it.

23         Q.   Okay.  Assuming that was the case and perhaps

24   it was even something that was concealed from them and

25   intention to transfer Eber-Metro and the transaction was

Page 169

```
1      deemed to be fraudulent, is the fact that a transaction
2      was fraudulent in terms of the intent of the seller, does
3      that affect its ability to be used as a precedent
4      transaction?
5                      MR. RAMSEY:  Form.
6           Q.   If the buyer bought it in good faith?
7           A.   Wow.  You lost me on this one.  I'm sorry.  I
8      don't understand the question.
9                      MR. CALIHAN:  Objection to form.
10          Q.   So I just want to make sure I understand what
11     may come out of your mouth at trial.
12          A.   Fair enough.
13          Q.   If a transaction was entered into with
14     fraudulent intent by the seller, but the buyer was a
15     bonafide purchaser, would the fact that the transaction
16     had fraudulent intent on the seller's part affect the use
17     of the transaction as precedent for valuation purchases?
18                      MR. RAMSEY:  Form.  Go ahead.
19          A.   I don't know.
20          Q.   Me either.  I am genuinely asking.  In terms of
21     the guaranteed purchase price, for that you put in a
22     25 percent premium, correct, for Eder-Goodman?
23          A.   The priority claims?
24          Q.   Yes.
25          A.   Yes.  I mean at minimum 25 percent.  The
```

1      company distress, you know, it could be substantially

2      more than that.

3           Q.   Why wasn't that Eder-Goodman's interest ever on

4      any balance sheets listed at preferred interest?

5           A.   I don't know.

6           Q.   Did that affect opinion at all?

7           A.   I mean, I looked at that contract.  That seemed

8      pretty clear to me.  They get priority.  I don't know how

9      else to interpret it.  Why that doesn't appear -- it's

10     technically not preferred stock.  I don't know what the

11     accounting rules are.  I can't tell you why it's not

12     listed as much.

13          Q.   Now, in your experience does preferred stock

14     typically have some sort of way of accreting value beyond

15     what the common stock does prior to it being redeemed?

16          A.   You mean like a dividend?

17          Q.   Like a dividend or interest rate, essentially

18     that.

19          A.   Well, preferred stock wouldn't have an interest

20     rate.

21          Q.   Not exactly interest.  But there is a

22     percentage that it will increase overtime, say?

23          A.   Sometimes.

24          Q.   And there was nothing like that associated with

25     the Eder-Goodman?

1        A.    This was not preferred stock.  It was common

2    stock that had priority.  You know, I call it preferred

3    stock, but I say it is the similar characteristics and

4    similar economic analysis of the convertibility preferred

5    stock, but it wasn't.  It was common stock that had this

6    right attached to it.

7        Q.    When there is preferred stock and common stock

8    and there is distribution to shareholders in a typical

9    corporation, does that money typically bypass the

10    preferred stockholders, or do the preferred stockholders

11    have some greater interest --

12        A.    It depends.  I have seen arrangements where

13    common stockholders cannot get any distributions unless

14    the preferred stockholders are paid.  I have seen other

15    instances where that's not the case.  I don't know there

16    is any steadfast rule governing.

17        Q.    Preferred stock is essentially a creature of

18    contract; is that fair to say?

19        A.    A company is a nexus of contracts.  Contracts

20    with suppliers.  Contracts with employees.  Contracts

21    with stockholder, bondholders.  You know, the economic

22    term is that a firm is a nexus of contracts.

23        Q.    But the relationship between a company and its

24    common shareholders is not something that is defined by

25    any sort of contract between the common shareholder and

1    the company.  It's defined by laws, correct?

2        A.   Well, I mean, I can only tell you that when

3    economists write about the theory of a firm they call the

4    firm a nexus of contracts.  It's not a person.  It's not

5    an entity.  It's a nexus of contracts.  If you dispute

6    that, then you can talk to Professor Jensen because that

7    was his insight.

8        Q.   With respect to preferred stock; is it correct

9    that preferred stock can have almost any terms that it

10   wants to have in there?

11       A.   I don't know.  I have seen preferred stock with

12   different terms.  I don't know what the rules are with

13   regard to preferred stock.

14       Q.   Do you know whether corporations owe fiduciary

15   duties to stockholders?

16              MR. RAMSEY:  Form.  Go ahead.

17       A.   They certainly owe a duty to the preferred

18   stockholders if the company gets into financial distress

19   because they are next in line.  I don't know whether that

20   only kicks in when the value of the equity starts to

21   diminish close to zero.  I just don't remember.

22       Q.   In terms of the Eder-Goodman interest in

23   Eber-Connecticut, what rights did it have with respect to

24   ordinary distributions during the course of business that

25   did not occur upon a change of control or a sale of the

1    assets?

2         A.   I don't remember.

3         Q.   Okay.  I will represent to you that it received

4    a pro rata that was 15 percent of any distribution.

5         A.   Okay.

6         Q.   Is that consistent with your recollection?

7         A.   I just don't remember.

8         Q.   Does the fact that Eder-Goodman had no right to

9    a greater amount of regular distributions that didn't

10   occur upon a sale of the company or substantially all of

11   its assets affect your valuation?

12        A.   No.  My analysis has to do with a company like

13   this in financial distress and in who is on the front

14   line, who gets paid first if any money comes in.  So if

15   you have a company that is in financial distress and it's

16   either liquidation or there is some kind of acquisition,

17   if the valuation is low with regard to its liabilities

18   and these guys get first dibs on anything that is coming

19   in on 4.5 million dollars, that is pretty substantial.

20        Q.   So the answer to that was no?  Just making sure

21   in terms of the ordinary dividends were not a factor.

22        A.   That did not factor into my analysis.

23        Q.   Where did you get the 30 percent number for the

24   historical control premium that you used?

25        A.   You know, that is a number that has been kind

Page 174

1    of used as a general finding from the academic literature

2    on merges and acquisitions.  I think if you looked to

3    some of the papers written by Professor Gerald, Bradley

4    Desai Kim, recently papers by Professor Berneil

5    (phonetic).  Those pretty much kind of provide some rough

6    approximation of what the premiums have been.

7         Q.   Did you actually reference that for your

8    report?

9         A.   I don't remember if I have or not.

10        Q.   Consistent with the general rule of providing

11   things, I request the citation for this number, wherever

12   it came from, be provided.  So in terms of going back to

13   the 2005 acquisition of Slocum, you said you did not

14   consider that because, I guess, two reasons.   One is the

15   2003 financial results indicated positive net income.

16   And because you did not have 2004 financial results; is

17   that right?

18        A.   Yes.

19        Q.   Would you expect to see 2004 final results as

20   something that was taken into consideration in this

21   transaction given that it was closed in April of 2005?

22        A.   Yes.

23             MR. RAMSEY:  Form.

24        Q.   Do you know whether those were even available

25   before the transaction was priced?

Page 175

1           MR. RAMSEY:  Form.

2      A.   I don't know.

3      Q.   Did you ask anyone?

4      A.   Yes.

5      Q.   What did they say?

6      A.   They couldn't find any financials for 2004.

7      Q.   And no one indicated to you that they will

8  related to 2004 financials when pricing the transaction;

9  is that right?

10      A.   No.

11      Q.   Did anyone indicate that they relied on

12  Slocum's earnings at all in pricing the transaction?

13      A.   No.  I don't remember having that conversation.

14      Q.   What would your opinion change in terms of

15  whether -- would any of your opinions change in your

16  report if you learned that Slocum's earnings prior to

17  being acquired did not significantly affect the purchase

18  price that Lester Eber was willing to pay for it?

19           MR. RAMSEY:  Form.  Go ahead.

20      A.   No.

21      Q.   Why not?

22      A.   Well, I am trying to establish a relationship

23  between -- however you arrive at your valuation, I am

24  trying to establish a relationship between the value and

25  profitability to apply that ratio at a later point in

Page 176

1    time in 2012.  So, you know, if he didn't consider it and

2    the ratio was high because he thought it was valuable,

3    that would be applied in 2012.  But I mean I just got to

4    have the numbers.  You could say that for any

5    transaction.  What did you look at?  Did you look at

6    this?  Well, you can't use the ratio.  That don't make

7    sense.

8         Q.   I am asking specifically here if you learned

9    that Lester Eber said that whether the company made money

10   or not did not affect his decision about how much to pay

11   for the company, would that affect your opinions?

12                  MR. RAMSEY:  Form.

13        A.   No.  I don't think so.  I would have to think

14   about that.  I mean -- I just don't know what to do with

15   that.  You're saying there is no economic basis

16   completely detached.

17                  MR. RAMSEY:  Don't start speculating.

18        Q.   If the purchase was made for purely strategic

19   reasons without an expectation of necessarily generating

20   profits from the Eber-Connecticut entity itself, would

21   that affect which valuation you relied on?

22        A.   I suppose that is another reason not to use it.

23   If it's completely divorced from the expected cash flows.

24   That there is some kind of strategic reason.  I don't

25   know how that would apply in 2012.

1        Q.    You're familiar with the concept of goodwill in

2    an acquisition, correct?

3        A.    I am.

4        Q.    And do you know what the amount of goodwill

5    that was associated with the Eber-Connecticut by

6    Eber-Metro on its balance sheet?

7        A.    I do not.

8        Q.    Does 14 million dollars sound about right?

9        A.    I don't remember.

10       Q.    Does the amount of goodwill that is allocated

11   by a company after an acquisition affect your valuation

12   analysis?

13       A.    The goodwill is the difference between the

14   purchase price and the value of the assets.  I forget

15   which kind of transaction where the value of the assets

16   grossed up.  But in large measure it's going to be the

17   difference between the book value of the assets and the

18   purchase price.  So whether the book value of their

19   assets at that time represent the market value is the

20   question.  So consequently you can have substantial

21   amount of goodwill on the books, but that can also

22   translate to the fact that assets as they're on the

23   balance sheet do not reflect market value.

24       Q.    In order to determine -- let's step back.  If

25   you actually valued the assets of Slocum rather, you

                                        Page 178

1      know, saying you used the Prospect Beverages multiple

2      apply it to Slocum beforehand.  And then you get the

3      assets value and you find out the amount paid was

4      10 million dollars over that.  What do you do with that

5      10 million dollars in terms of your other valuations or

6      trying to value the company at a later date?  Does it

7      affect it at all?

8                    MR. RAMSEY:  Form.

9          A.   I mean the steps you just went into are not

10     what I do.  Why would I apply -- I am confused.  It

11     sounds like you're saying you first have to value Slocum

12     in order to value Eber-Connecticut and value Slocum using

13     another multiple, but not the purchase price of Slocum.

14         Q.   I am asking you, I guess, if you could test the

15     reliability of your preferred multiple by applying it to

16     that actual transaction.  The company was acquired.  And

17     saying, "Okay.  Based upon the financials at the time

18     this company should have been worth X amount the dollars,

19     but they paid Y amount of dollars more than that."  And,

20     therefore, use that as a way to test whether your

21     preferred metric is actually something that is a reliable

22     indicator of the market value of the company given there

23     is a disparity between of the actual market value for the

24     transaction and your calculation?

25                    MR. RAMSEY:  Form.

1          A.    Let me see.  I am having a hard time.  Let me

2     see if I can -- see if this responds to your question.

3     And I think you began with the hypothetical that the

4     price paid for Slocum far exceeds what any one

5     stand-alone valuation of Slocum would be.  Now, you

6     called strategic, but frankly nobody would pay a price

7     above a stand-alone value unless someone believed that

8     it's going to generate synergies from this acquisition.

9     So that is a proxy.  The incremental piece is a proxy for

10    what I say is given up by the ROFR.  That huge premium

11    that you're talking about is exactly my point.  That's

12    what's given up.  That's the kind of -- if that is -- if

13    what you're proposing is correct, then that's exactly

14    what I am talking about.  Somebody is paying for the

15    company a lot more than its stand-alone value because

16    they think that they are going to be able to extract a

17    lot a value from it.

18          Q.    Sure.

19          A.    And that's exactly what you're giving up from

20    this ROFR.

21          Q.    It goes back to the ROFR, I guess.  But in that

22    instance does it at least call into the question the

23    other comparable based methodologies that you're using.

24    If the comp transactions that you want to use cannot come

25    close to accounting for the actual amount of money that

Page 180

1    was paid either in the Slocum purchase by

2    Eber-Connecticut or in the Eder-Goodman acquisition,

3    which had its ROFR, doesn't that cause you -- wouldn't

4    that cause you to question the reliability of the metric

5    based on Prospect Beverages?

6                    MR. RAMSEY:  Form.

7         A.    No.  Quite the contrary.  I think, you know,

8    under the hypothetical that you gave me if it's correct,

9    it indicates that my adjustment based on the ROFR is way

10   too small.

11        Q.    Okay.  So the ROFR adjustment could be larger,

12   correct, is what you're saying in that instance?

13        A.    Yes.  I mean predicated on your conclusion that

14   is exactly what it would tell me.  That I was too

15   conservative in assessing the value.  And I ought to

16   increase it substantially if what you tell me about

17   Slocum is true.  You know, if the strategic alliance

18   between two companies causes Lester to pay a huge amount

19   in excess of the stand-alone value to Slocum, that's

20   presumably what would accrue to another company, but

21   that's precluded.  And I say effectively precluded by the

22   ROFR.  So that's what you're giving up.  And that's what

23   I was trying to say before.  You know, whether if Lester

24   valued it or not, if he knows they valued it and put in

25   their contract as to how many they valued that.  So did

Page 181

1       Southern.  While doggone it.  I am going to charge you

2       for that.  I paid for it back here.  I am going to charge

3       you for that same.

4            Q.   Right.

5            A.   Now in this transaction price.  Yeah.  I mean

6       that's a very interesting point.  And I think it does

7       provide me with a lot of comfort with regard to this

8       ROFR.

9            Q.   Unless of course the ROFR is not applicable of

10      the sale of Eber-Metro which is ultimately the entity

11      that you were valuing, right?

12                    MR. RAMSEY:  Form.

13           A.   Your legal construct there.

14           Q.   Right.  So is that an agreement that that would

15      change things?

16                    MR. RAMSEY:  Form.

17           A.   Again, I would have to go through and

18      understand that, you know, given what you said -- I've

19      got to understand the documents and make my own

20      determination of it.  If you're representing to me that

21      Metro could do whatever it wanted.  It could sell --

22      effectively sell Eber-Connecticut and they couldn't do

23      anything about it.  Then they overpaid.

24           Q.   But that wouldn't change it from being a

25      reliable basis for determining the actual value of

Page 182

1          Eber-Metro with its true control just because they were

2          tricked into paying a high amount, doesn't mean that it's

3          not a fair value for the true control premium, correct?

4                         MR. RAMSEY:  Form.

5               A.   So --

6               Q.   Let me rephrase.  Eder-Goodman paid the

7          high-end price because they thought it was getting a ROFR

8          that was partial control interest essentially or half of

9          a control premium in your view, correct?

10              A.   Yes.

11              Q.   If it turns out they were wrong about that,

12         then ultimate control rested with Eber-Metro.  So if

13         you're valuing Eber-Metro, then there shouldn't be a

14         discount based upon the earlier price by Eder-Goodman.

15         And, in fact, it would be effective of Eber-Metro would

16         be worth.

17              A.   So the court determines that Eber-Metro could

18         effectively sell control of Eber-Connecticut.  I agree.

19         Then you can have a control premium.  I find it hard to

20         believe, but who knows.

21              Q.   So the training comparable is the part of your

22         analysis.  You used four companies that had been

23         identified by Wendy Eber in a presentation to the PBGC?

24                         MR. RAMSEY:  Form.

25              A.   Yes.

1        Q.    Why did you look at those companies?

2        A.    As I said before, one of the things that I

3    always take into account is front-line managers.  What do

4    they think about their company.  They typically have the

5    best view as to what they think are reasonable proxies

6    for their company.  And, you know, Wendy is a CPA.  She

7    has an MBA from the Simon School.  She's been running

8    this company since I think 2008.  I can't remember.  So

9    she has been involved in this company.  She is an

10   intelligent person and she looked at these.  I thought

11   well, okay.  And if she looked at these and she thinks

12   they are reasonable proxies, then let me do the same

13   thing.  Let me take a look at that.  Although I looked at

14   them, I felt that three out the four really didn't fit

15   the characteristics that I was looking for.

16       Q.    You're saying that you didn't see

17   Eber-Connecticut as similar to Cisco Corporation?

18       A.    Or Pepsi Cola.  As I said earlier, one of the

19   key determinations is, you know, market capitalization.

20   There generally is a premium associated with the high

21   market companies.  This company was in financial

22   distress.  So there was profitability.  There is

23   profitability at these other companies.  So for those

24   financial reasons it didn't seem appropriate for me to

25   make use of those figures.

Page 184

1          Q.    And so you did end up doing some calculations

2     based on Farmer Brothers, right?

3          A.    Yes.  I included Farmer's.  That was a negative

4     EBITDA as of 2012.  It's not in the liquor distribution,

5     but it is a distribution company.  So there were some

6     similarities with regard to the business characteristics.

7     So I felt it was appropriate to include that.  And as I

8     said, I think that an investor would also be interested

9     in what the front-line managers have to say.  I think

10    they would have engaged in that same analysis.  And they

11    would have done that estimate based upon Farmers and

12    included that in this range of potential possible values.

13         Q.    When did the Farmer Brothers transaction close?

14         A.    That's not a transaction.  That's a trading

15    print up.  So that's based upon their trading multiple.

16         Q.    And is there any indication that Farmer

17    Brothers were considered to be a comparable company at

18    the time of the transaction?

19         A.    I don't know.

20         Q.    So did you review the entire response that

21    Wendy Eber gave to PBGC in which these trading comps were

22    included?

23         A.    You know, I have a vague recollection.  I

24    couldn't -- I know I put my eyes on it at one point.  My

25    recollection is that PBGC came up with some kind of value

Page 185

1    of like 7 million for Eber-Connecticut.  Whatever Wendy

2    gave them, that's what they came up with.

3         Q.   And what was your sense of what Wendy -- what

4    objective Wendy had when she was communicating with the

5    PBGC and providing these trading comparables?

6                   MR. RAMSEY:  Form.

7         A.   Well, that there was -- I mean they had these

8    liabilities.  And PBGC was looking at this as the key

9    operating company that stood behind these liabilities.

10   And I suspect that the motivation was look, we don't have

11   any money.  We can't pay these substantial liabilities.

12   That would be my sense.  And the PBGC of course and

13   looked at and said it's worth 7 million.

14        Q.   Did that context cause you to be skeptical of

15   the comparables that she was suggesting even though she

16   is closely connected to the business?

17                   MR. RAMSEY:  Form.

18        A.   You know, as I said, I didn't use three out of

19   the four anyway.  I thought they were inappropriate.  So

20   you know, again, there is problems with all these

21   metrics.  This was done for a particular purchase.  You

22   know, I don't think she would have provided those

23   comparables if she thought they weren't comparable.

24        Q.   Even she was trying to avoid paying a 5 million

25   dollar liability?

Page 186

1              MR. RAMSEY:  Form.

2         A.   Pardon?

3         Q.   Do you know what position Wendy Eber took with

4    PBGC about whether Eber-Connecticut was liable for the

5    pension plan?

6         A.   I don't know.

7         Q.   Would that affect your opinion, the reliability

8    of Farmer Brothers as a trading comp based on her

9    selection of it?

10        A.   I don't know why.

11        Q.   Why didn't you look for other trading comps

12   beyond the four that Wendy selected?

13        A.   I did.  I did look for any kind of liquor

14   distribution company -- pure play liquor distribution

15   company that again was similar of size or close to the

16   size that had negative profit.  And I did not find any.

17   There are companies that engage in liquor distribution.

18   But, for example, Constellation is one, but they also

19   make their own liquor.  So it was, you know, and they are

20   profitable.  They were profitable in 2012.  I didn't find

21   any.

22        Q.   I want to turn your attention to Page 36 of

23   your report.  You got a summary of assets there.  And you

24   list the first one the demand note receivable from

25   Pole-Bridge Bowman.

1          A.    Uh-uh.

2          Q.    How did you come up with that number?  Just for

3     the record, $350,000.

4          A.    So that was from the 2011 tax return --

5     corporate rate tax return for Eber Brothers Wine and

6     Liquor.  Well, it's Eber Brothers Wine and Liquor Metro.

7     And on Page 5 of that there is lists on Line 14 other

8     assets $350,001.

9          Q.    So why didn't you account for any of the

10    accrued interest on that note?

11         A.    Was there any?

12         Q.    Yes.  The two percent number was very small,

13    but I don't know that it's so small as to not to show up

14    on the thing.

15         A.    Yeah.  I don't see it.

16         Q.    So from the tax return, it appears that the

17    company ignored the interest on that?

18              MR. RAMSEY:  Form.

19         A.    I don't know.  You think it would be here.

20         Q.    If the company itself did not appear to treat

21    the two percent interest under the note as an actual part

22    of the note, would that further affect your willingness

23    to reply on the Pole-Bridge Bowman transaction as a

24    legitimate arm's-length transaction?

25              MR. RAMSEY:  Form.

Page 188

1          A.   I don't know if it's further.  I told you

2     before that I have a problem with the transaction.  I've

3     got a problem with it -- a problem with all the

4     transactions, but that's an issue that I have with

5     Pole-Bridge Bowman.

6          Q.   Prior to being engaged in this lawsuit, did you

7     know Lester or Wendy Eber?

8          A.   No.

9          Q.   Had you heard of Eber Brothers?

10         A.   No.

11         Q.   Did you know any of the lawyers at Underberg

12    and Kessler before this lawsuit?

13         A.   Yes.

14         Q.   Who did you know?

15         A.   Paul Keneally.

16         Q.   And you worked with him before?

17         A.   I worked with him on a case back in the '90s.

18    I think he was just an associate at that point.  I don't

19    think I've had another case with him since then.

20         Q.   Is that how you met him, or did you know him

21    separately from work?

22         A.   No.  I think that's how I met him.

23         Q.   Did you have any interactions with Paul

24    Keneally since then prior to this case?

25              MR. RAMSEY:  Professional or in general?

```
 1          Q.    Professional or personal.
 2          A.    Rochester is a small town.  So, yes.  I would
 3     see him on the golf course occasionally, you know, out at
 4     dinner.  Things like that -- same restaurant.
 5          Q.    And when were you engaged for this case?
 6          A.    That's a good question.  I meant to look at
 7     that.  I forgot.  I just don't know how long it's been.
 8     Several months.
 9          Q.    Was it over a year ago?
10          A.    I don't think so.
11          Q.    And I understand you disclosed your hourly
12     rates and you might not have the dollar amount right on
13     you.  Approximately, how much have you been paid so far
14     for your work in this case?
15          A.    I've been paid all that's been billed.  But I
16     don't know what the amount is.  Like I said, I meant to
17     look at the invoices.  I haven't done so.
18          Q.    The last time I asked this question I got
19     $40,000 to $400,000.  So could you be a little more
20     specific?
21          A.    I can't give you that range.  I just don't
22     know.  It's not 400,000.
23          Q.    Ballpark figure is it over $100,000?
24          A.    No.
25          Q.    And in terms of preparing the exhibits, was
```

```
                                        Page 190

 1      that something that you did personally, or was that done

 2      by your assistant?

 3             A.   I haven't prepared a spreadsheet in 2015 years.

 4             Q.   Okay.  So we won't blame you for the few

 5      errors.

 6             A.   No.  You can blame me.  I am responsible.  I

 7      will take the blame.

 8             Q.   Okay.  Do you know Judge Rosenbaum?

 9             A.   I don't think so.

10             Q.   Did you know Elliot Gumaer, Mike Gumaer?

11             A.   No.

12             Q.   You've obviously testified a ton of times.

13      Have you ever had your testimony excluded by a court?

14             A.   There was a security litigation matter in which

15      one of my opinions was excluded by Judge Rakoff in a case

16      called Lehman Brothers.  And he said that he said --

17      well, he said a lot of things.  He said that my analysis

18      was not reliable with regard to loss causation with

19      regard to how analysis recommendation affects stock

20      prices.

21                      MR. RAMSEY:  A portion of your testimony.

22             Not the entity at of it?

23                      THE WITNESS:  Right.

24             Q.   Any other times has your testimony been

25      excluded?
```

1        A.   Not that I can recall, no.  That was the one

2    case.  And that was, I think 2008.  Maybe 2009.

3        Q.   Have you withdrawn from an engagement based

4    upon your belief that your client or the clients in the

5    case were misleading you?

6        A.   Well, I've withdrawn from cases.  I don't

7    remember if it was -- I don't think it was because I felt

8    I was being misled.  It was -- the cases that I've

9    withdrawn from are cases where as the facts become known

10   to me, I felt that it was not something that I could --

11   didn't fit into the financial opinion.  It was not

12   supported.  So, yes.  I have a number of cases.

13       Q.   And to be clear, you don't expect that to

14   happen in this case because your opinions are all based

15   on the facts as they have been presented to you, correct?

16   You haven't attempted to engage in your own fact-finding?

17            MR. RAMSEY:  Form.

18       A.   That's fair.  I have not.

19       (Whereupon, there is a short recess in the

20   proceedings.)

21       Q.   All right.  So before we get to the exhibit.  I

22   want to ask you a little bit more about -- I am not going

23   to make you go through the documents, the way in which

24   the value of the Eber-Connecticut and Eber-Metro was

25   presented to the court in 2012 in connection with the

Page 192

1    transaction when they were trying to get it deemed
2    commercially reasonable.  In that case, one of the things
3    they did was took the value at the date of the
4    Pole-Bridge Bowman transaction and said that's the value
5    of the company.  And they subtracted the company's
6    reported losses from that value to arrive at a current
7    valuation. Were you familiar with that methodology that
8    was put in there?
9         A.   No, I don't remember.
10        Q.   Does that methodology sound correct to you?
11        A.   No.
12        Q.   Why not?
13        A.   Well, I mean I understand the logic, but I
14   wouldn't do it that way.  You know, as I said before,
15   ultimately the valuation is the expected future cash
16   flows.  So if you're valuing it based upon that
17   transaction and you think that's a reasonable
18   transaction, what happened that ensuing years is not
19   something I would reflect.  I would take that multiple
20   and apply it to 2012.
21        Q.   So if the same math was done with the 2005
22   acquisition the Slocum taking 21.6 million and then just
23   subtracting the losses from the next seven years, you
24   would disagree with that valuation method?
25        A.   Yes.

Page 193

1          Q.    But would it also be logical?

2          A.    I understand why someone would think about

3     doing it.  If you think that multiple has bearing as of

4     today, then you think that the growth rate implied by

5     that multiple has equal bearing.  And regardless of what

6     it was for the last two years, you would take that

7     multiple and apply it times to today's revenue or

8     whatever it was.  That is the general way that I think

9     about how multiples are applied.  I'm not a fan of trying

10    to take the valuation as of that point in time and then

11    subtract out the ensuing profits or losses.  Whatever the

12    case may be.

13         Q.    Is that methodology something that you

14    discussed with Wendy Eber or Lester Eber?

15         A.    No.  That's my methodology.

16         Q.    I meant the one that was used in the court

17    proceeding?

18         A.    No.

19         Q.    So you never asked why did you use that

20    methodology?

21         A.    No.

22         Q.    Did you consider using that methodology here as

23    an alternative?

24         A.    No.

25         Q.    Were you aware that methodology had been used?

1        A.   I may have been.   I mean I am not influenced by

2   it.

3        Q.   You don't remember it as you sit here today?

4        A.   Like I said, I understand the logic behind it.

5   But I would be hard pressed to find any authoritative

6   book that suggests to apply that kind of methodology to

7   do valuation.

8        Q.   And given the credentials that Wendy Eber has,

9   would it surprise you that she would use that method for

10  a valuation like that?

11                 MR. RAMSEY:   Form.   Go ahead.

12       A.   Like I said, I understand the logic behind it.

13  But if your valuation -- if you studied that stuff --

14  teach it, you don't do it that way.   I mean, you know, I

15  could appreciate if you pick up a Brielle Myers textbook

16  that you may be able to rationalize using that approach.

17  But, you know, if you study this stuff, you realize

18  that's not what's done.

19       (Whereupon, Exhibit Number 131 was marked for

20  identification at this time.)

21       Q.   Okay.   So I've got in front of you

22  Exhibit 131, which is the December 2018 letter regarding

23  the pension liability with respect to PBGC that you

24  reference in your report.   Do you see that?

25       A.   Yes.

1        Q.   Did you have any contact with the person who

2    prepared this, Michael Gallagher?

3        A.   I have a vague recollection of being on a

4    conference call in which he participated in.

5        Q.   What was discussed on the conference call?

6        A.   What the value of the pension liability was.

7        Q.   And there was a number of contemporaneous

8    records indicating what it was believed to be at the

9    time?

10        A.   There were some calculations I think that he

11    had done at that point in time.  But it didn't provide

12    the number of present value of these liabilities.  That's

13    my recollection.

14        Q.   The pension liability that was listed -- that

15    was not an amount that was due and payable at the time,

16    right, that was a future funding obligation?

17        A.   Yes.

18        Q.   So in an event of a liquidation, it wouldn't be

19    the case that PBGC would be entitled to receive that full

20    amount that you used the 5 million dollars in such a --

21        A.   You're asking a real question?

22        Q.   If the amount of money is not currently due and

23    it's essentially based on actuarially estimates and it

24    could change wildly, why do you use a particular --

25                 MR. RAMSEY:  Form.

1     Q.   We're almost done here.  Why do you use that

2     particular number for an insolvency analysis?

3     A.   You've got to account for the underfunded

4     pension liabilities.  So it's the assets minus the

5     present value of future liabilities.  That's the

6     prescription.  That's what's done in valuation and

7     exercises.  You can pretty much find that in any book.

8     And I am not doing a liquidation analysis.

9     Q.   Right.

10    A.   So your premise is that under liquidation the

11    number would be different.  Okay.  But I am not doing a

12    liquidation analysis.  I am trying to understand what is

13    the underfunded nature of this pension plan per actuarial

14    analysis, and that's what this guy provided.

15    Q.   Do you know whether that sort of analysis could

16    be used to file a voluntary bankruptcy petition by saying

17    that, you know, we can't fund this pension plan for the

18    next twenty years.  So therefore we're insolvent?

19              MR. RAMSEY:  Form.

20    A.   I don't know.

21    Q.   This is not a liability that appears in a

22    company's balance sheet, right?

23    A.   Well, if it did, we could have got the balance

24    sheet number.  But this was a number that he prepared as

25    you say 2018 to estimate what that underfunded pension

Page 197

1    plan was.

2         Q.   And do you know whether -- did you have anyone

3    check the work that was done by Michael Gallagher for

4    this?  Did any of your staff?

5         A.   I am not an actuary.  None of the people I work

6    with are actuaries.  So I relied upon his calculations

7    for that number.

8         Q.   You said it's typically your practice not to

9    rely on information that becomes available after the

10   event -- after the date of valuation that you're using,

11   correct?

12        A.   Uh-huh.

13             MR. RAMSEY:  Yes?

14        A.   Yes.

15        Q.   So is it fair to say that you it is not your

16   typical practice to rely on a letter like this from a

17   third party to try to calculate the value of a contingent

18   liability from six years earlier?

19             MR. RAMSEY:  Form.

20        A.   No.  That's incorrect.  He is not using

21   information beyond this year -- beyond 2012.  So the test

22   is is it known or knowable at that point in time.  So

23   presumably if somebody is thinking about making an

24   investment -- under due diligence they are going to say

25   what is the amount of underfunded pension liabilities.

1      Call Michael.  He will tell you.  So notwithstanding the

2      information was provided to me as of 2018.  The analysis

3      itself was based upon information that was available as

4      the 2012.  So it's known or knowable as of that point of

5      time.

6          Q.    Again, just so the record is clear here, you're

7      not someone who is qualified to perform this sort of

8      actuarial analysis, correct?

9          A.    No.

10         Q.    And to your knowledge, Michael Gallagher is not

11     going to be testifying as an expert alongside you,

12     correct?

13         A.    I have no idea.

14         Q.    All right.

15              MR. RAMSEY:  You didn't utilize him other

16              than this letter?

17              THE WITNESS:  No.

18         Q.    Did you engage him to prepare this letter?

19         A.    No.

20         Q.    And do you have any way of knowing whether the

21     numbers in this letter are accurate or reliable?

22         A.    No.

23         Q.    Now, you have done a lot of work relating to

24     PBGC in the past you said, correct?

25         A.    Yes, several cases.

```
 1        Q.   Have you ever seen a situation where PBGC

 2    insisted on taking a company's last assets in order to

 3    fund a pension?

 4        A.   Now, I think general rule -- I am not sure what

 5    circumstances this applies.  I think their general rule

 6    is if the value of the assets is less than the

 7    liabilities that they have some kind of default of taking

 8    30 percent of the assets.

 9        Q.   So in this case, you determined that the value

10    of the assets was less than the liabilities, correct?

11        A.   Yes.

12        Q.   Did you apply any sort of discount to take into

13    account PBGC's usual conduct?

14        A.   No.

15        Q.   Why not?

16        A.   I didn't think it was appropriate.  And, you

17    know, I noted that notwithstanding they had the lien of

18    30 percent.  There was a term that the remainder of the

19    employee liability in the amount of at this point

20    4 million in accordance with their demand for payment.

21        Q.   What are you referencing?

22        A.   A letter dated 2016 from PBGC Eber Brothers

23    Wine and Metro.

24        Q.   Can you read the bates number on that just for

25    the record?
```

Page 200

1          A.   EB00030922.

2          Q.   And I am not going to make you go through the

3     process of actually giving me your entire binder and

4     making it an exhibit as I think I have the right to do.

5     Instead I am going to ask you, what is in that binder?

6          A.   As you note in my report, I cite many, many

7     things.  Notwithstanding the 30 percent control premium

8     question.  There is lot of footnotes that cite to a lot

9     of documents.  Some internal documents, some papers, some

10    books.  So what my people do as a regular matter is they

11    put all the citations, the back-up citations behind each

12    page in my report based upon those footnotes.  So for

13    Page 11 there is a bunch of things that I reference.

14         Q.   That's what has been -- I haven't noted it

15    every time, but just for the record, that has been

16    referenced a few times during this deposition.

17                   MR. RAMSEY:  Fair enough.

18                   MR. BROOK:  I think that is all I've got.

19                   COURT REPORTER:  Who wants a transcript?

20                   Are you each paying for your own?

21                   MR. RAMSEY: Yes.

22                   MR. BROOK: Yes.

23         (Whereupon the deposition concluded at

24    3:32 p.m.)

25                        ***

Page 201

1    STATE OF NEW YORK

     COUNTY OF MONROE

2

3        I, Leah Didsbury, a Notary Public in and for the

4    State of New York, do hereby certify:

5        That the witness whose testimony appears herein

6    before was, before the commencement of his testimony,

7    duly sworn to testify the truth, the whole truth and

8    nothing but the truth; that such testimony was taken

9    pursuant to notice at the time and place herein set

10   forth; that said testimony was taken down in shorthand by

11   me and thereafter under my supervision transcribed into

12   the English language, and I hereby certify the foregoing

13   testimony is a full, true and correct transcription of

14   the shorthand notes so taken.

15   I further certify that I am neither counsel for nor

16   related to any parties to said action, nor in anywise

17   interested in the outcome thereof.

18        IN WITNESS WHEREOF, I have hereunto subscribed

19   my name on this 6th day of September 2019.

20

21

22

23        Leah Didsbury

24

25

Page 202

1

2             A C K N O W L E D G E M E N T

3

4

5             I, FRANK TORCHIO, certify

6        that I have read the transcript of my

7        testimony taken under oath on AUGUST 23,

8        2019, and that the transcript is a

9        true, complete and correct record of

10       what was asked, answered and said

11       during this deposition, and that the

12       answers on the record as given by me

13       are true and correct.

14

15                     _____

16                     FRANK TORCHIO

17

18    Signed and subscribed to

19    before me, this _____ day

20    of _____, 201_.

21    _____

22       Notary Public

23

24

25

Page 203

**ERRATA SHEET**

**VERITEXT LEGAL SOLUTIONS**

**330 OLD COUNTRY ROAD**

**MINEOLA, NEW YORK 11501**

**516-608-2400**

NAME OF CASE: Kleeberg, et al. v. Eber, et al.

NAME OF DEPONENT: FRANK TORCHIO

DATE OF DEPOSITION: 8/23/2019

PAGE    LINE(S)      CHANGE           REASON

\_\_\_\_|_____|_____|_____

\_\_\_\_|_____|_____|_____

\_\_\_\_|_____|_____|_____

\_\_\_\_|_____|_____|_____

\_\_\_\_|_____|_____|_____

\_\_\_\_|_____|_____|_____

\_\_\_\_|_____|_____|_____

\_\_\_\_|_____|_____|_____

\_\_\_\_|_____|_____|_____

\_\_\_\_|_____|_____|_____

\_\_\_\_|_____|_____|_____

\_\_\_\_|_____|_____|_____

\_\_\_\_|_____|_____|_____

                        _____

                         **FRANK TORCHIO**

SUBSCRIBED AND SWORN TO BEFORE ME

THIS\_\_\_DAY OF _____, 20\_\_.

_____       _____

(NOTARY PUBLIC)            MY COMMISSION EXPIRES:

**&**

**&**   1:13,13,14,15
1:15 2:2,6,17

**1**

**1**   70:3 92:16
**1.8**   43:22
**10**   3:20 10:22 19:7
19:8,14 20:4
22:12,14 48:20
101:22 105:10
178:4,5
**100**   2:3 49:10
89:16
**100,000**   189:23
**10007**   2:4
**11**   200:13
**11501**   203:2
**12**   63:7
**12.5**   99:4
**120,000**   139:11
**126**   3:9 8:22 10:14
43:22
**127**   3:10 16:8
17:15
**128**   3:11 30:20,21
**129**   3:12 41:25
42:2,3
**130**   3:13 80:21,25
81:4,22
**131**   3:14 194:19,22
**14**   19:17 21:3
88:25 145:7 177:8
187:7
**140,000**   138:20
141:2
**14202**   2:7
**14604**   2:16
**14614**   2:12
**15**   19:17 20:8
22:14 43:16 44:2

44:9 160:2 161:6
161:25 164:17,21
164:22 165:9
173:4
**16**   2:11 3:10,19
157:17
**174**   3:20
**19**   17:15,18 22:23
**1900**   2:15
**194**   3:14
**1970s**   40:23

**2**

**2**   139:9
**2,800**   19:5,6,8
**2.3**   138:22
**20**   28:24 35:9
203:23
**20.4**   25:19
**2003**   174:15
**2004**   174:16,19
175:6,8
**2005**   107:1,7,8
160:15 174:13,21
192:21
**2006**   153:9
**2007**   22:1 138:15
138:17,19,24,25
139:8,16 140:25
141:2,7,11,22
142:22 156:16
**2008**   42:8 138:20
139:3,8 140:25
141:7,11,23
142:18,22 183:8
191:2
**2008/2009**   138:6
**2009**   129:13
138:21,22 139:9
139:12,18,21
140:15,19,22
141:4,5,8,23 143:2

191:2
**201**   202:20
**2010**   94:8 101:23
107:12 138:22
139:10 140:9
141:6,6,9,24 142:2
142:13
**2011**   10:18 14:5
138:24 141:24
142:2,13,23 187:4
**2012**   10:18 11:5
13:10 14:5 17:13
21:14 23:14 59:22
59:25 60:2 63:13
66:4,6,12 70:6
76:1,3 83:12
107:11,25 109:23
111:18 113:20
138:4,7,16 139:1
139:12,16 140:15
140:19 141:25
142:3,13,23
143:22 145:7
156:16,17 157:13
176:1,3,25 184:4
186:20 191:25
192:20 197:21
198:4
**2013**   142:18
**2015**   138:8 190:3
**2016**   138:8 199:22
**2018**   17:7 18:23
19:17 23:10,17,20
26:2 194:22
196:25 198:2
**2019**   1:20 201:19
202:8
**21.6**   106:18 107:2
192:22
**23**   70:6 143:22
202:7

**23rd**   1:20
**25**   43:16 44:2,10
157:17 169:22,25
**26**   94:7
**27**   10:16,23 13:13
14:4
**28**   165:22
**299,000**   139:2

**3**

**3.66**   146:18
**3.8**   72:25
**30**   3:11 9:15 55:13
126:7 173:23
199:8,18 200:7
**300**   1:19
**31**   1:19 17:7
**320**   2:7
**330**   203:2
**350,000**   187:3
**350,001**   187:8
**36**   186:22
**36.5**   142:13
**362,000**   41:14
**3:32**   200:24

**4**

**4**   70:18 199:20
**4.5**   43:24 44:9,10
173:19
**4.6**   145:19
**40**   18:24,25 19:7
20:3 43:17,23
**40,000**   189:19
**400,000**   189:19,22
**41**   3:12
**45**   3:19 145:6

**5**

**5**   185:24 187:7
195:20
**5-200**   3:3

**50** 2:7 15:3 138:14
**516-608-2400**
203:3
**57** 160:6

**6**

**6** 145:9
**600,00** 157:5,10
**600,000** 156:10,15
**620** 2:11,11
**65** 129:14
**656,000** 138:19
141:2
**687,000** 138:25
**6th** 201:19

**7**

**7** 185:1,13
**7.1** 160:19
**7.1.** 160:6
**7.5** 41:10,13
**700,000** 106:17
**73** 80:25
**74** 81:3,5
**79** 146:18

**8**

**8** 3:9
**8/23/2019** 203:5
**80** 3:13
**8393** 201:22
**85** 163:14
**8th** 2:3

**9**

**9** 10:14 153:8
**90s** 188:17
**920,000** 138:22
**9:30** 1:20

**a**

**a.m.** 1:20
**abdomen** 113:24

**ability** 111:7
113:12 163:9
166:22 169:3
**able** 53:3 108:16
118:18 179:16
194:16
**absent** 42:20
**absolutely** 33:10
85:7 88:7
**absurd** 12:6,8,19
**absurdity** 12:16
**academic** 174:1
**accelerated** 53:1
**accept** 56:15
**acceptance** 143:23
**accepted** 37:16
88:15,17
**access** 19:3 58:12
**accommodate**
45:6
**accomplish** 68:15
**accomplished**
119:22
**accomplishing**
164:24
**account** 20:15,18
26:21 42:8 46:14
47:3 49:14 54:19
54:20 68:1,3
75:25 82:12
107:19 110:8
127:5 137:19
183:3 187:9 196:3
199:13
**accountant** 7:17
**accountants** 51:3
53:12 56:7 62:9
**accounted** 78:20
109:14
**accounting** 7:15
7:18 51:25 52:2,4

52:11,15,24 53:3,6
54:2,7,18 55:1,21
56:2,3,12,21 57:3
62:1 153:1 170:11
179:25
**accounts** 30:7
**accreting** 170:14
**accrual** 52:2
**accrue** 53:24
180:20
**accrued** 187:10
**accumulative** 45:1
48:21
**accuracy** 11:7,17
**accurate** 96:10
105:6 144:5
198:21
**accurately** 23:23
**acquire** 75:1 92:23
94:13 95:19
111:24 152:6
**acquired** 149:11
149:18 175:17
178:16
**acquiring** 72:15
90:10 93:11 119:8
162:18
**acquisition** 1:14
107:2 109:3,18
160:14 173:16
174:13 177:2,11
179:8 180:2
192:22
**acquisitions** 68:3
174:2
**act** 31:23
**acting** 68:17
**action** 64:4 144:20
201:16
**actions** 13:16 39:6
60:9

**active** 116:16
**actual** 6:15 37:8
42:13 83:23,23
88:20 106:4
113:12 124:24
178:16,23 179:25
181:25 187:21
**actuarial** 196:13
198:8
**actuarially** 195:23
**actuaries** 197:6
**actuary** 197:5
**add** 45:25 46:11
**added** 44:9,10
**addition** 48:2
77:13 106:13
130:5
**additional** 48:20
108:6 109:13,19
130:16 158:19
**addressed** 17:3
**addresses** 28:25
**adhere** 127:15
**adhered** 45:5 48:9
**adjust** 42:13 53:4
61:7 88:8 90:17
124:4
**adjusted** 45:22
88:13
**adjusting** 46:7
**adjustment** 102:8
107:21 180:9,11
**adjustments** 158:8
158:8,18,20
**admissibility**
18:16
**advantage** 149:25
150:5
**adverse** 167:10
**advice** 135:5

**affairs** 107:10,11
**affect** 15:7 25:2
38:1 46:20 52:11
53:18,20 56:21
57:9,13 76:25
77:20 85:17 91:10
91:15 96:18 97:21
100:21 102:1
103:18 113:1
119:9 131:21
132:13 147:15,19
147:20,21 148:1,5
148:11,12 153:22
154:6 155:15
161:15 163:11
169:3,16 170:6
173:11 175:17
176:10,11,21
177:11 178:7
186:7 187:22
**affidavit** 11:2,9
13:24,24 14:7
129:2,20 145:7
**aggressive** 13:15
20:1 137:13
**ago** 21:4 103:3
189:9
**agree** 4:9,12 28:15
35:7,11,21 36:4,10
39:12 44:16 51:21
68:12 69:2 72:21
102:18 116:8
157:25 163:22
182:18
**agreed** 28:4 72:10
**agreeing** 51:14
**agreement** 15:12
33:16,21,23 83:15
160:24 161:1
162:2 163:23,25
166:15 181:14

**ahead** 8:24 11:10
12:2 16:25 18:3
33:17 34:4,16
35:2 37:20 39:16
40:10 48:6 56:19
56:24 59:19 60:17
67:12 72:19 73:2
75:4 87:11 100:16
105:2 112:16
156:12 163:12
167:16 169:18
172:16 175:19
194:11
**al** 203:4,4
**alcohol** 133:5,9,10
**alcoholic** 107:16
**alexbay** 1:9 5:25
27:14 33:5 35:16
41:3,4 68:24
74:24 77:4 83:12
111:25 113:23
115:4,11,17,18,20
136:3
**alexbay's** 143:23
**algebraic** 20:22
**alliance** 180:17
**allocated** 177:10
**allocation** 47:8
**allowed** 58:8
110:19 163:23
**allowing** 168:12
**allows** 36:13 72:2
103:13
**alongside** 198:11
**alter** 82:14 135:8
**alternative** 95:17
96:1 193:23
**amendments**
88:25
**amortization**
54:11

**amortized** 53:9
**amortizes** 55:6
**amount** 18:25
39:24,24 40:4,5
41:17 52:13 62:24
67:16,18 68:15
72:15 74:7 79:13
89:8 94:17 105:8
107:13 173:9
177:4,10,21 178:3
178:18,19 179:25
180:18 182:2
189:12,16 195:15
195:20,22 197:25
199:19
**amounts** 41:2 64:8
**analogize** 42:23
**analogy** 42:25
**analyses** 85:23
**analysis** 10:11
13:3,5 18:4 20:6
20:11 21:6 24:1,3
24:24 26:1 29:6
30:23 34:12,15,21
41:3 43:11 48:10
50:6 53:18 55:8
61:4 62:2 64:14
65:25 70:19 75:3
76:14,25 77:20,22
78:1,15 79:7
84:13 87:13,14
88:19 103:25
109:11 135:11,22
140:19 143:12,16
143:16,21 144:24
145:1 147:2,16,19
154:18,21 156:14
157:10 171:4
173:12,22 177:12
182:22 184:10
190:17,19 196:2,8

196:12,14,15
198:2,8
**analysists** 54:24
**analyzing** 70:17
**annual** 20:9
**answer** 7:18 29:2
40:24 47:25 56:6
58:5 67:13 87:11
89:13 93:5 98:20
103:9 105:3
131:25 173:20
**answered** 26:18
26:18 96:21
106:22 147:12
202:10
**answers** 53:5 56:3
150:6 202:12
**anticipate** 80:13
**anybody** 126:7
162:8
**anymore** 33:24
**anyway** 89:11
158:17 185:19
**anyways** 147:4
**anywise** 201:16
**apparent** 35:13
**appear** 90:1 170:9
187:20
**appearance** 97:3
**appearances** 2:1
**appearing** 2:4,8
2:13,17
**appears** 20:1,11
187:16 196:21
201:5
**applicable** 181:9
**applied** 44:13 48:9
52:4 60:23 86:10
107:19 176:3
193:9

**applies**   29:6
165:18 199:5
**apply**   34:15 46:22
46:23 47:13,18
60:3 118:15 162:8
163:18 165:10
175:25 176:25
178:2,10 192:20
193:7 194:6
199:12
**applying**   42:9
46:25 178:15
**appraisal**   37:12
39:6 60:8 110:13
**appreciate**   194:15
**appreciated**
159:11
**approach**   12:25
17:23,25 62:9
68:20 194:16
**appropriate**   17:11
45:2 46:22 48:7
53:25 80:1 87:1
104:19,24 183:24
184:7 199:16
**approval**   60:13,15
60:19
**approved**   165:23
**approximate**
25:15
**approximately**
19:5 41:7 189:13
**approximation**
174:6
**april**   174:21
**arcade**   2:11
**area**   56:11 65:13
152:8
**areas**   22:16 55:22
**arguably**   56:19

**argue**   68:23
**arm**   37:13 89:22
91:11,18 92:14
95:10
**arm's**   37:18 90:1
91:21 92:1,5,20
93:1 95:7 96:7,19
98:25 100:22
102:2,15,21
103:24 104:5,14
104:21 145:23
157:19 158:1,4,17
187:24
**arrangements**
171:12
**arrive**   86:3 106:11
175:23 192:6
**article**   1:19 131:8
**ascribe**   50:21
**ascribed**   106:1
**aside**   23:19 53:7
**asked**   18:4 19:1
26:2 29:3 65:12
66:3,7 69:14 70:3
125:13,14,16,20
126:1,2 189:18
193:19 202:10
**asking**   8:15 10:10
18:8 34:7 38:3,6
56:2,3 92:2 96:11
96:13 108:10,22
110:15,17 123:19
125:12 139:3
142:6 149:15
169:20 176:8
178:14 195:21
**aspect**   88:7
**asses**   144:4
**assess**   7:11 8:10
48:7 54:17 71:23
110:6 111:9

135:17 142:11
148:13
**assessed**   148:6
**assessing**   23:25
63:6 110:19,22
111:6,10 180:15
**assessment**   7:25
8:9 18:18 22:8
25:2 82:7 91:10
100:21 102:1,10
103:13 121:11
147:10
**asset**   6:25 7:2
35:20,21,23 39:22
58:13,21 69:20
70:9,22,23,24
97:14,22 99:12,18
109:6 116:4
146:17 167:18
**assets**   6:24 7:11
28:20 30:12 31:3
31:4 35:1 39:15
40:4,5,8 41:14
60:4 71:11 74:12
74:21 78:22 79:4
80:6,14,18 82:24
83:7 84:25 85:13
100:10,24 101:3
113:16 114:11,18
115:2,7 118:18
119:18 147:18
148:5 157:1 173:1
173:11 177:14,15
177:17,19,22,25
178:3 186:23
187:8 196:4 199:2
199:6,8,10
**assign**   164:18
**assignment**   25:4
**assistant**   190:2

**assisted**   15:23
**associate**   188:18
**associated**   14:25
165:9 170:24
177:5 183:20
**associates**   2:2
**assume**   56:9 112:5
161:3,6 163:8
**assumed**   153:5
**assuming**   164:5,19
168:23
**assumption**   58:22
147:5
**attached**   85:13
171:6
**attempt**   11:6
42:19 108:24
143:12 144:4
149:12 166:8
**attempted**   135:13
191:16
**attempting**   14:22
**attention**   27:9
28:24 129:14
145:8 146:15
186:22
**attorney**   91:12
95:3
**attorneys**   8:1,13
8:16 10:25 64:23
**attribute**   79:11
**atypical**   158:22
**auditor's**   10:23
**audrey**   1:5
**august**   1:20 202:7
**australian**   124:10
**author**   45:13
**authoritative**
194:5
**authorship**   95:3

**available** 17:21
58:20 59:8 61:6
105:6 174:24
197:9 198:3
**average** 19:15,23
20:18 24:19
**avoid** 185:24
**aware** 14:24 15:4
21:10 33:3 75:6
77:4,7 90:20 91:5
109:5 110:11,17
111:17 133:16
160:1 193:25
**awful** 73:17
**awfully** 142:23

**b**

**b** 9:2,2 10:24
13:13
**back** 13:9 18:20
22:1 38:20 39:11
52:8 55:3 75:5
76:3 78:9 89:14
98:6 100:4,13
101:9,18 121:13
138:23 142:4
149:17 160:11
166:17,20 174:12
177:24 179:21
181:2 188:17
200:11
**background** 13:6
13:7,11
**backwards** 46:5
**bad** 139:13,13,13
**baked** 137:23
**balance** 78:18
97:14 99:23,25
170:4 177:6,23
196:22,23
**ballpark** 189:23

**bank** 1:15 2:17
40:9,10
**banker** 123:20
137:16
**bankers** 122:15
126:9
**bankruptcy** 36:8
152:11,11,15
196:16
**banks** 41:15
136:12,18
**barriers** 128:23
129:3,7,9
**base** 44:13 45:22
47:13,19 104:25
**based** 17:20 22:24
23:2 25:25 37:8
37:11 42:7 43:7
46:11,25 47:2
49:5 59:17,18
83:22 84:1,2,7
95:5 96:4 102:23
103:20 104:22
117:23 120:14
122:1 128:12
131:1 132:4
135:13 142:17
145:20 161:10
178:17 179:23
180:5,9 182:14
184:2,11,15 186:8
191:3,14 192:16
195:23 198:3
200:12
**basically** 13:7 14:7
51:7 53:22 131:2
161:17
**basing** 49:21
**basis** 13:8 24:12
24:13 65:23 79:9
79:12 104:20

176:15 181:25
**bates** 199:24
**bausch** 1:19 2:15
**beach** 11:3 33:7,8
63:25 64:1,13
65:3,4 66:21 67:6
72:23 79:13 80:12
83:10,13,14
**bear** 137:20
**bearing** 193:3,5
**bears** 151:20
**becoming** 157:7
**beer** 123:12,21
125:7,22 132:10
132:16,17,19,20
132:22
**beg** 17:14
**began** 140:10
179:3
**beginning** 142:14
**behalf** 81:6
**behavior** 137:15
**belief** 126:8 191:4
**believe** 6:20 9:1
11:2 14:6 15:13
18:22,24 44:15
93:24,25 104:18
104:24 108:17
116:23 117:1
123:12 126:25
127:2 163:19
182:20
**believed** 57:20
66:1,10 73:6
74:25 116:11
150:4 179:7 195:8
**believes** 116:11
135:22
**believing** 79:9
**belonged** 82:7,10

**belonging** 82:18
**belongs** 73:21
**benderson** 64:1
66:24
**beneficiaries** 6:12
71:20 72:4 150:16
150:19 151:3
**beneficiary** 6:21
6:22
**benefit** 31:24 33:8
34:24 35:3 92:25
93:6 130:7
**benefits** 53:23
54:5
**berneil** 174:4
**best** 30:8 58:7
59:11 103:9 120:2
120:5,6,16 122:19
147:11 149:3
157:20 158:1
183:5
**better** 48:22 56:14
70:14 95:5,22
116:21 118:9,21
121:10 124:23
134:8 137:22
141:16
**beverage** 105:9
107:1
**beverages** 107:3,6
107:16 108:4
109:8 120:2
121:12 123:10
178:1 180:5
**beyond** 10:4 65:13
76:20 93:4 100:20
114:20,22 118:23
152:18 154:8
170:14 186:12
197:21,21

**bidder** 167:5
**big** 36:21 55:14
  107:25 119:1
  138:5 140:22
  141:6,19,19,22,23
  141:24
**biggest** 5:11 14:11
**billed** 189:15
**billions** 51:17
  106:24
**binder** 200:3,5
**binding** 165:23
**bit** 18:19 41:2,10
  68:19 90:13 120:1
  137:8 160:13
  191:22
**black** 56:4,6
**blame** 190:4,6,7
**blank** 94:17
**blinder** 140:24
**blinders** 80:16
**block** 159:20
  162:4
**blow** 51:18
**board** 167:1
**board's** 27:12
**bona** 88:17,18,22
  89:2,7,10
**bonafide** 169:15
**bondholders** 32:9
  171:21
**bonus** 112:22
**book** 177:17,18
  194:6 196:7
**books** 74:11 99:19
  177:21 200:10
**borrow** 99:10
**borrowing** 99:3,13
**borrows** 99:8
**bothered** 16:23

**bought** 21:3 74:10
  74:12,25 167:18
  169:6
**bouncing** 139:5
  141:17,18 142:7,8
**bound** 163:24
**bowman** 89:15
  90:21 94:4,9
  96:17 97:8 100:9
  100:17,23 102:2
  103:17 104:19
  144:7 145:20,25
  146:4,8,11 186:25
  187:23 188:5
  192:4
**boy** 9:2 40:16
  85:13,13
**bracket** 19:7 20:4
  20:5
**bradley** 174:3
**brand** 123:15
  139:23
**breach** 32:5
**break** 47:8 85:19
  119:23 160:8
**breaking** 118:11
**brian** 2:3 14:2
  80:20 108:8 142:6
**bridge** 89:15
  90:21 94:4,9
  96:17 97:8 100:9
  100:17,22 102:2
  103:16,20 104:19
  144:7 145:20,25
  146:3,7,11 186:25
  187:23 188:5
  192:4
**brielle** 194:15
**bring** 132:8
**broader** 103:22

**brook** 2:2,3 3:3
  4:7 5:1 67:10
  200:18,22
**bros** 1:13,14
**brothers** 1:13
  14:11 15:17 27:12
  41:9,11 70:5
  71:15 81:7,14
  82:1,6 83:15
  131:18 133:21
  148:18 156:11,15
  157:2,3,6,11 184:2
  184:13,17 186:8
  187:5,6 188:9
  190:16 199:22
**bruner** 3:19 45:10
  45:13 58:18
**budget** 61:17,18
**buffalo** 2:7
**building** 2:11
**builds** 70:19
**bunch** 200:13
**burning** 127:2
**business** 14:8,24
  21:20 25:6,7,11
  41:18 115:22
  116:16 117:7
  122:10 125:6,13
  125:14 129:10,12
  131:6,8 134:19,25
  135:6,23 136:4,13
  140:11 143:13
  162:21 166:4,16
  167:10,15 172:24
  184:6 185:16
**businesses** 25:11
  100:18
**buy** 92:18,24
  93:21 96:6,12
  97:1 167:6

**buyer** 8:9 59:8
  68:16 73:13 74:10
  74:18,24 75:6
  84:12 93:8,10
  97:25 116:11
  157:20 163:15,18
  168:1 169:6,14
**buyer's** 68:5
**buyers** 27:6
  128:17 162:14
**buying** 92:17
  133:7,9 162:9
  164:21
**buys** 162:3
**bypass** 171:9
**bypassing** 112:10

**c**

**c** 2:3 10:24 202:2
**c1** 45:9
**c4** 108:5,14
**calculate** 197:17
**calculated** 43:23
  44:24 45:8 46:4
**calculating** 7:20
  46:10
**calculation** 43:15
  45:19 48:14 49:19
  54:10 178:24
**calculations**
  103:19 184:1
  195:10 197:6
**calihan** 2:10,10
  14:2 34:6 41:21
  73:9 82:9 106:7
  108:8,13 117:25
  149:23 150:2
  153:16 154:7
  169:9
**calihanlaw.com**
  2:12

call   29:16 76:16
  156:25 171:2
  172:3 179:22
  195:4,5 198:1
called   20:25 36:21
  58:15 73:18
  157:19 179:6
  190:16
canandaigua   1:15
  2:17
cap   51:17 107:13
capable   36:9
capital   54:21,22
  70:4 98:17,19
  108:18,21,22,24
  150:20 158:13
capitalization
  122:8 183:19
capitalized   53:10
  53:22 54:9
care   34:10
carol   115:21
carrot   32:8
carrying   129:6
case   6:9 8:8,14,17
  9:25 10:1,1 13:22
  15:21 18:6,11,12
  22:15,23 24:7
  29:19 33:14 36:19
  36:21 37:17 38:18
  39:5 59:13 61:8
  63:7 65:2 68:9,10
  73:18 74:9,22,24
  75:14 76:1,11
  97:8 98:11 99:12
  110:5,22,25
  119:17 128:3
  131:10 136:19
  138:1 149:8,16
  150:16 151:16
  152:15 154:25

156:8 157:18
  162:15 166:25
  167:8 168:23
  171:15 188:17,19
  188:24 189:5,14
  190:15 191:2,5,14
  192:2 193:12
  195:19 199:9
  203:4
cases   58:10 60:8
  67:21 149:4,6,17
  150:3,3 191:6,8,9
  191:12 198:25
cash   28:17 39:24
  40:9,10,17,21
  41:17 54:17,18
  55:1 60:25,25
  61:1,3,4,5,5 97:13
  97:15,19,22 98:2,4
  102:19 134:12,13
  135:14 176:23
  192:15
catastrophe
  127:13
category   19:10
causation   190:18
cause   40:16 130:3
  180:3,4 185:14
caused   38:4 90:13
causes   88:12 89:23
  180:18
caveat   35:24
cents   81:10
ceo   156:11
certain   11:4 42:15
  87:17 112:21
certainly   11:11
  22:10 24:1 25:5
  34:17 37:16 53:19
  61:13 66:14 72:12
  77:12,18 80:8

82:21 85:10 103:1
  137:15 147:10
  158:3 159:11
  172:17
certainty   49:10
certification   4:20
certify   201:4,12
  201:15 202:5
chain   28:19 69:6
  71:21 77:22 86:12
  133:18
challenged   6:9
  33:15
chance   27:23
  121:6 160:18
chancy   121:10
change   32:23 38:4
  44:19,24 48:1
  57:4 68:16 82:6
  83:11 106:21
  107:20 112:20
  125:9,10 136:7
  172:25 175:14,15
  181:15,24 195:24
  203:6
changed   6:14
  52:16 134:24
changes   18:15
  30:2 50:20 60:14
  140:14 143:13
changing   135:6
characteristics
  108:1 121:4 122:1
  122:5,23,24 127:5
  127:18 159:1
  171:3 183:15
  184:6
characterization
  51:15
characterized
  92:4

charge   167:23
  181:1,2
chart   6:18,23
  34:14,14 45:1
  72:23 76:19
charts   32:21
check   18:19 20:1
  20:25 21:5 24:8
  24:14,16,22 25:25
  43:22 44:4 46:7
  106:10 107:7
  197:3
checks   106:3
choice   52:11 53:17
  53:19
choices   53:3,6
  56:12
choose   22:5
church   2:3
circumstance
  93:19 112:13
circumstances
  13:22 20:15 25:14
  36:22 58:6 60:6
  118:14 120:15,17
  134:15 135:21
  158:12 199:5
cisco   183:17
citation   157:18
  174:11
citations   3:20
  67:18 200:11,11
cite   66:25 200:6,8
cited   67:10,15
citing   67:16
civil   1:19 4:12
claim   36:24
claimant   30:12,15
  36:14 151:19
claimants   31:11
  152:13

**claims** 29:7 32:18
32:18 33:2 149:7
169:23
**class** 64:4
**classification**
121:23
**clause** 112:20
**clear** 28:8 35:15
43:4 52:3 57:24
68:9 75:2 83:21
84:21 103:15
118:13 170:8
191:13 198:6
**clearly** 82:23
135:4 151:12
**client** 91:12 92:23
93:1,12 191:4
**client's** 16:11
**clients** 191:4
**close** 101:24
107:13,14 120:18
123:3 132:20
172:21 179:25
184:13 186:15
**closed** 150:13
174:21
**closely** 185:16
**closer** 106:25
107:3
**closest** 54:18,25
158:17
**coal** 126:18,21
127:2,13
**code** 121:18,19,19
121:21,22,24,25
**coincidence**
105:19,23,24
**cola** 183:18
**colin** 2:6
**collusion** 102:18

**combination** 86:2
**combine** 115:2
116:2,3 118:18
**combined** 43:16
44:3
**combining** 114:11
114:18 119:2,8
130:18
**come** 5:10 11:13
42:19,20 56:14
88:4 116:7 118:18
119:2 124:6,10
132:20 133:6
135:19 162:12
167:5 169:11
179:24 187:2
**comes** 38:24 99:22
113:11 114:11
127:25 133:5
137:8 173:14
**comfort** 181:7
**comfortable** 89:17
89:20
**coming** 52:2 149:8
173:18
**command** 71:22
**commenced**
150:13
**commencement**
201:6
**commencing** 1:20
**commercially**
69:13 143:24
192:2
**commission**
203:25
**committed** 12:23
**common** 37:4,5,12
45:23 149:6
150:25 170:15
171:1,5,7,13,24,25

**communicating**
185:4
**comp** 123:6
179:24 186:8
**companies** 7:6,7
19:3,4,5,6,8,14,15
20:19 21:6,8,10,15
22:6 24:18,23,25
25:11,25 26:5,11
26:12,15,22 52:2
53:1,3 60:9 61:14
61:16 63:1 78:18
82:2 86:21 91:3
91:13 109:15
115:22 121:21,25
123:3,5 126:6
127:2 132:15
134:5 153:19
160:23 163:21
180:18 182:22
183:1,21,23
186:17
**company** 1:15
2:17 5:18 7:1,2
8:5,6,10 20:16
22:8,11,13,18,21
23:11,20,23 25:1
25:20 26:6,15,20
26:24 27:6 29:8
29:21 30:3,16
31:6,9,9 33:21
34:1 36:1,20 37:1
37:23 38:1,16
39:14,23 40:3
41:15,19,20 47:20
52:6,11,20,24,25
53:12 55:3,5,6
57:5,17 58:13,21
61:18 64:25 65:1
66:19,20 68:11
72:10 73:19,21

80:18 82:19,23,23
84:12 85:9,12
86:10 88:5 90:3
92:23 97:14,17,18
97:18 98:7,8,8
99:3,8,9,10,13,13
99:15,17,22
101:14 102:20
106:17 109:9
110:2,3,12,19
111:7 113:7,12,13
113:14,16,17,25
113:25 114:3,12
114:17,21 115:1
116:12,21 117:4
117:10,15,22
120:20,22 121:1,2
121:5,11,20 122:2
122:3,7,9,18,22
123:21,22 124:8
124:25 126:11,12
126:14,16,25
127:1,1 130:23
131:19 134:9,10
134:20,23 135:9
135:11 138:2
140:9 146:13
148:23,25 149:4
149:11,18 151:4
151:21,25 152:4,5
152:6 153:25
154:16,21 155:5,7
157:13 158:12
162:17 163:10
164:22,23 165:23
166:5,7,11,23
167:5,6 170:1
171:19,23 172:1
172:18 173:10,12
173:15 176:9,11
177:11 178:6,16

178:18,22 179:15
180:20 183:4,6,8,9
183:21 184:5,17
185:9 186:14,15
187:17,20 192:5
**company's** 99:18
101:5 192:5
196:22 199:2
**comparability**
22:16 121:15
**comparable** 22:16
105:17 120:24
121:5,15 122:15
122:16 123:17,20
123:24 124:13,14
126:6 127:3
179:23 182:21
184:17 185:23
**comparables** 22:3
22:4 120:23,23
124:22,24 185:5
185:15,23
**compare** 24:20
**compared** 162:10
**compartments**
82:12 85:16
**compensate** 102:4
**compensation**
103:17
**competition**
117:19 118:7
**competitive** 13:15
130:21
**competitors** 13:16
128:23 129:8
**complaint** 63:24
159:8
**complete** 109:5
134:19 202:9
**completely** 119:16
129:23,25 176:16

176:23
**complexities** 55:23
**complicated** 32:17
**comply** 163:20
**complying** 161:7
**component** 63:21
**components** 38:25
126:21
**compound** 20:9
**compounded**
19:13,23
**comprehensive**
24:1 26:1
**comps** 120:25
184:21 186:11
**compulsion** 68:17
92:18,19
**computed** 47:23
**concealed** 168:24
**conceivable** 34:23
**concept** 50:25
51:8,22 53:8
114:5 177:1
**concern** 7:13 36:1
39:14,22 40:4
89:24 99:22
103:10 107:17
163:10
**concerned** 11:3
89:21 90:3 103:2
103:3 159:5
**concerning** 27:11
129:3
**conclude** 65:5
84:22 96:13,15
103:23 104:3
117:22 119:7
**concluded** 128:12
150:17 154:15
155:10 200:23

**concludes** 104:4
154:25
**conclusion** 28:6,9
34:8 64:21 69:6
83:18,22 100:12
103:14 110:16
140:25 165:16
180:13
**conclusions** 28:9
83:11 155:11
**condition** 123:7
**conditions** 89:9
107:20 163:16
**conduct** 7:15 11:6
11:19 49:8 152:25
155:5 157:10
199:13
**conducted** 103:23
146:4 156:14
**conducting** 7:10
110:4
**conference** 195:4
195:5
**confession** 81:6,13
81:25
**confident** 74:6
**conflict** 44:23
**confused** 178:10
**confusing** 35:4
**conglomerate** 8:16
**conjunctively**
132:17
**connected** 56:16
185:16
**connecticut** 1:14
5:18 6:14 7:3,3,24
7:24 13:14 14:1
14:14,15,18,22,25
15:3 17:7,22
19:21 20:2 21:3
21:25 22:25 23:7

24:20 25:16 28:15
28:18,21 34:25
35:23 42:20 59:15
69:5,17,20,22 70:1
70:9,15,24 71:1,5
71:9,11 74:13
77:8,15,22,24,25
78:14,19,21 79:2,2
85:23 86:11,19
94:16 95:18 96:2
98:13 105:21,25
106:5 107:11,15
107:22 112:9,10
112:14,18 113:3,6
113:11,17 116:4
116:19 117:10
118:16 119:2,3,9
124:9,15,17 125:6
128:4,19 129:13
129:20,22,25
130:8,12,21 132:6
138:1 139:21
143:18 145:19
146:17 147:21
148:17 152:16
157:7 161:25
167:9 172:23
176:20 177:5
178:12 180:2
181:22 182:18
183:17 185:1
186:4 191:24
**connecticut's**
10:17 130:22
**connection** 15:20
43:2 76:10 109:2
156:8 191:25
**consecutive** 45:1
**consent** 27:13
165:24

consenting 34:24
consequently 54:3
  67:25 119:1
  177:20
conservative
  50:19 88:4 180:15
consider 12:16,19
  21:2 24:6 25:9,12
  38:9 75:19 76:20
  82:25 87:19 89:7
  93:1 104:6 105:1
  136:14,22 144:23
  146:25 155:22
  160:14 162:7
  167:14 174:14
  176:1 193:22
consideration 51:9
  127:22 136:1
  174:20
considered 24:9
  184:17
considering
  109:22 152:18
consistent 19:19
  69:3 77:9 129:17
  130:15 147:6
  153:19 173:6
  174:10
consistently 55:22
  138:3
consolidate 73:19
constellation
  186:18
constitute 89:3
  92:20 115:13
  155:5
constitutes 114:6
  155:20
construct 181:13
consultant 15:5
  91:1,2,2,8 134:24

135:3
consultant's 135:5
consultants
  102:13
consulting 15:12
  25:8 91:16 157:5
contact 195:1
contained 150:23
  150:23
contains 149:9
contemporaneous
  90:11 195:7
contention 39:7
  63:3
contested 144:20
  150:11
context 110:18
  136:24 145:11
  146:7 185:14
contingency 112:8
contingent 61:23
  62:3,7 63:4 79:24
  80:2 148:6 197:17
continual 22:14
continue 36:16
continues 113:8
contract 53:11,14
  55:4 119:15 170:7
  171:18,25 180:25
contracts 55:23
  112:21 171:19,19
  171:20,20,22
  172:4,5
contractual 56:17
contradict 76:5
  147:4,9
contradicted
  147:3
contrary 180:7
control 42:23 43:2
  109:21,23,24

110:1,3,14 112:6
112:10,14,20
114:6,8,10,10,23
114:24 115:1,12
115:14,23 116:1,7
116:10 118:14,17
118:24 119:1,8
127:12,21 163:1
164:21 165:4,8
166:10,16,21
167:3,6,7 172:25
173:24 182:1,3,8,9
182:12,18,19
200:7
controlled 109:16
  111:2,7,9,11,12,15
controlling 73:16
  113:6 118:15
controls 113:9
conversation
  175:13
conversations 9:7
  10:2,7,25 15:24
  16:4
convert 151:12,17
convertibility
  171:4
convertible 151:13
convey 166:21
conveyance 73:25
  77:11 79:14,25
  80:7 83:4
convince 38:12
  104:12
copying 94:7
cornell 58:18
corp 1:14,14 33:9
  35:19 81:7,14
  82:6 148:18
corporate 148:20
  155:4,14,24,25,25

156:4,9 187:5
corporation 31:1
  31:2 81:18,20
  82:1 171:9 183:17
corporations
  172:14
correct 5:3,4,21
  7:6 8:18,20 9:10
  9:19 11:16 14:15
  17:3,24 18:7 23:1
  23:8,12,17 26:7
  31:21 33:12 35:16
  35:17,21 37:23
  39:1,15 40:1,6
  41:5 43:12,14,17
  46:13 47:8,13
  49:4,5 55:9 61:10
  63:13 66:9 68:25
  69:13 83:24 84:3
  85:24 86:8,15
  103:15 112:20
  116:16 127:8
  134:9 138:2,11
  143:25 145:21
  146:20 152:23
  156:7 162:14
  164:7 166:25
  168:10 169:22
  172:1,8 177:2
  179:13 180:8,12
  182:3,9 191:15
  192:10 197:11
  198:8,12,24
  199:10 201:13
  202:9,13
corrected 48:4
correcting 48:3
correction 43:12
corrections 43:7
correctly 30:25
  50:14 153:2

cost 53:22,25 54:3
costly 127:16
couched 66:13
counsel 3:6 4:18
    65:17,18 201:15
counterclaim
    64:16
country 203:2
counts 78:16
    97:15
county 201:1
couple 17:1 28:8
    44:22 63:14 108:3
    124:15
course 23:14
    125:24 135:9
    158:9 172:24
    181:9 185:12
    189:3
courses 68:2
court 1:1 4:1,4
    5:13 13:2 37:6
    69:13 132:9
    143:22 144:5,8,9
    144:12,13,14,22
    144:24 147:25
    182:17 190:13
    191:25 193:16
    200:19
courts 58:16 83:24
cover 37:2 74:7
    112:7
covered 83:1
cpa 50:24 183:6
cramsey 2:8
crazy 31:16
create 114:18
    115:12 128:23
    135:13 137:22
created 100:23
    115:4 168:11,16

168:17
creates 97:3 115:3
creature 171:17
credentials 194:8
credit 99:9 151:4
creditor 32:14
    79:24 148:24
    149:12 151:16,18
    151:24 152:4,5
creditors 33:4
    147:19 148:17
    151:11
credits 133:24
    134:1
criteria 21:18
criticism 17:9
critique 98:22
cross 104:15
    127:19
crowe 137:11
curious 26:3 28:25
    35:7
current 25:15
    94:12 95:18 192:6
currently 195:22
customer 132:21
    132:22 133:9
customers 131:20
    132:11 133:5,7,10

    d
d 2:6 10:24 202:2
d.c. 133:22
dalton 94:6
daniel 1:5
darn 107:16
data 20:13,14
    104:16 108:25
    141:15
date 17:9,10 30:6
    37:7 57:7,18
    59:21,22 60:7

69:11,14,15 79:16
    94:9 178:6 192:3
    197:10 203:5
dated 94:7 145:7
    199:22
dates 105:11
day 1:20 79:19
    80:5 100:3 166:16
    166:16 201:19
    202:19 203:23
days 17:10 94:8,8
de 30:11,15 102:18
    115:9 151:18
    159:21
deal 53:21 100:22
    102:11,17 157:4
dealing 45:7 49:18
dealt 133:16
debella 3:13
debt 29:8 30:11,15
    32:1,11,19,20,21
    32:22,25 33:1
    34:15,16 36:13
    40:20 41:4,8,13
    72:8,11,25 74:25
    82:18 84:25 86:15
    143:24 151:12,17
    151:24 152:6,10
    152:13 153:19
debts 31:3 73:7
    76:22
decades 117:4
december 129:12
    194:22
decent 6:18 121:7
decide 50:18 78:23
    109:19 132:9
decided 44:19
decides 93:20
deciding 40:20
    41:16

decision 27:13
    68:5 160:14
    176:10
decisions 56:21
    113:6,11 165:22
    166:4
declared 143:22
declines 29:13,14
declining 30:13
    138:17
deduction 107:19
deemed 69:12
    127:3 169:1 192:1
default 152:10
    199:7
defendant 81:17
defendants 1:11
    1:17 2:8
define 51:7 121:22
defined 171:24
    172:1
definitely 101:14
definition 51:4
    75:24 147:7,7
definitive 119:14
definitively
    120:16
degree 20:5 49:11
    49:14 50:22 118:7
degrees 121:15
delaware 36:21,21
    60:9 157:2
demand 133:5,5
    133:13 186:24
    199:20
department 97:7
depending 25:13
    50:17 55:6
depends 25:4 40:7
    40:7 62:25 171:12

depiction  6:18
depicts  106:8
deponent  203:4
depose  163:9
deposed  5:3,8
deposition  1:18
  4:13 5:5 55:25
  200:16,23 202:11
  203:5
depreciation
  52:25 53:1 54:12
  54:20,22
deprived  130:7
derived  13:23
  133:12
desai  174:4
described  24:15
  72:18 117:23
describing  47:12
description  3:8
  144:23
desire  133:10
  167:9
detached  176:16
determination
  36:18 50:17 67:5
  68:6 84:6 85:3
  89:23 104:8
  181:20
determinations
  183:19
determine  11:7,19
  12:1,4 65:14,25
  86:20 93:14
  143:12 150:5
  153:2 157:21
  177:24
determined  12:22
  17:11 83:24
  104:21 199:9

determines  31:2
  155:18 182:17
determining  24:7
  119:15 181:25
deterrent  109:23
develop  134:21
developed  86:9
developing  127:6
development  64:2
dibs  173:18
dice  80:9
dictate  117:17
  118:8 122:6 123:1
dictated  163:16
dictates  99:9
didsbury  1:20
  201:3,23
difference  55:17
  78:24 79:5 107:18
  123:19 125:15,22
  125:24,25 127:21
  139:8 177:13,17
differences  52:6
  52:19 121:16
  125:5,7 127:18
different  4:11 38:4
  48:9 49:12,13,15
  51:2,2 52:4,16
  55:9 56:18 57:3
  57:22 59:9 67:6
  92:11 95:4,22
  104:7 111:14
  114:17 120:3
  121:9 125:1,1
  126:20,22 127:5,8
  127:10 131:20
  132:22 133:1
  134:20 135:7,9,9
  136:11 151:10
  172:12 196:11

differential  129:2
differently  47:23
  53:2 102:22
  137:21
difficult  40:23
  58:5 158:9,13
  162:16
difficulty  124:21
dig  45:15
digit  40:22 121:24
diligence  89:1
  197:24
diminish  172:21
dinner  189:4
direct  28:23 43:1
  145:8 160:5 165:7
direction  158:21
  166:5
directly  15:25
  17:2 116:5
director  148:23
  149:2
directors  149:5
disagree  23:14
  28:6 192:24
disagreement
  159:10
disburse  110:7
discernable  139:4
disclosed  45:20
  144:13 150:12,16
  189:11
disclosure  45:17
discount  27:3,6
  43:9 44:5,25
  48:22 60:23 62:24
  88:19 110:10
  159:14,18,21
  162:6 163:17
  165:14,17 182:14
  199:12

discounted  44:19
  61:4
discounts  48:11,16
  110:14,20,20,25
  111:4 162:3
  165:19,19
discrete  48:8
discuss  25:15
  64:20,22 128:22
  132:8
discussed  48:11
  68:14 94:15 95:16
  95:25 193:14
  195:5
discusses  45:10
discussing  128:7
  136:10
discussion  72:8
  112:3 128:15
dismissing  101:12
disparity  178:23
disposition  160:7
  160:25
dispute  62:20 64:6
  64:18 70:12 85:10
  172:5
disputed  62:5
  64:15 120:24
distinct  83:5
distinction  71:14
  78:24 89:5 98:3,5
  109:17 125:8,25
distinctions
  124:21
distinguishing
  149:11
distress  85:9,11,12
  88:6 91:3,4 99:10
  153:19 154:10,11
  154:12,16 166:11
  170:1 172:18

173:13,15 183:22
**distressed** 153:25
**distributed** 101:6
123:11
**distributes** 124:9
**distribution**
113:14 115:8
123:3,4,21,22
125:23,23 126:16
162:17 171:8
173:4 184:4,5
186:14,14,17
**distributions**
171:13 172:24
173:9
**distributor** 14:9
107:16 129:21,23
130:1,4,5,6,6,8,10
130:12,14 131:4
132:6,22,23 133:7
133:15
**distributors** 21:11
21:17,17 128:5
129:5,6 131:11
**distributorship**
129:4
**district** 1:1,2
**diversion** 155:25
**diverted** 156:9
**diverting** 155:4,14
**divide** 45:3 46:1
**divided** 44:17
**dividend** 170:16
170:17
**dividends** 173:21
**dividing** 45:4
**divorced** 176:23
**doctrine** 38:21
155:24 156:2,5
**document** 3:18 9:7
9:21 76:15 80:23

94:1 95:12 112:23
144:17 146:9,10
161:5 165:12,14
166:20
**documentation**
63:17,19
**documents** 15:23
63:12 66:25 67:2
67:7,10,15 81:1
82:4 165:15
181:19 191:23
200:9,9
**dog** 76:6
**doggone** 181:1
**doing** 30:7 37:1
46:4 48:15,16
69:25 78:15 84:1
84:18 95:12
105:18 124:18
126:7 127:1 135:7
137:8 144:6
160:16 184:1
193:3 196:8,11
**dollar** 41:2 52:12
185:25 189:12
**dollars** 25:20 41:8
41:13 51:17 72:25
94:17 106:19
107:2 142:13
173:19 177:8
178:4,5,18,19
195:20
**door** 165:20
**double** 40:22 44:4
**downloaded** 19:5
**drastic** 140:21
141:3,18
**draw** 29:5 89:5
100:11 103:14
109:16 118:4
129:14 146:15

**drawing** 3:11
71:14 72:16 98:2
98:5 155:11
**drew** 34:13
**drive** 121:5 133:4
155:6
**drives** 133:9
**driving** 121:5
133:11,14,14
154:3,24
**drug** 60:10,11,12
60:22
**dual** 130:3,3 143:1
**dualed** 140:1,2
**duck** 65:11
**due** 89:1 128:18
195:15,22 197:24
**duly** 4:24 201:7
**duties** 172:15
**duty** 172:17

**e**

**e** 165:22 202:2,2,2
**earlier** 24:13
48:11 60:23 87:15
106:12,25 147:9
159:13 182:14
183:18 197:18
**earned** 52:13
55:11
**earning** 142:4
**earnings** 137:6
175:12,16
**easier** 41:2 137:7
**easiest** 157:21
**easily** 55:24
**east** 2:11
**eb00030922** 200:1
**eber** 1:9,9,9,13,13
1:14,14,14,15 3:13
3:14 5:18,19,19,20
5:24,24 6:14,23,25

7:1,2,3,3,24,24
9:19,19 10:17
13:14 14:1,11,14
14:18,25 15:3,5,17
17:7,22 19:21
20:2 21:3,25
22:25 23:7 24:20
25:16 27:12,13,14
28:15,18,21 33:4
34:25,25 35:1,19
35:19,22,23 37:19
37:22,25 41:4,9,10
41:14 42:20 46:10
59:14,15 63:9,9
67:2,7 68:23 69:5
69:7,7,17,17,20,21
69:21,22,23,24,25
70:5,9,15,24 71:1
71:3,3,5,9,11,14
71:14 72:8,9,9,11
72:11,13,15,21,24
73:1,6 74:5,6 75:1
75:14 76:12,21,21
77:5,8,14,14,15,22
77:24,25 78:8,8,11
78:12,14,15,19,21
78:21 79:2,2,3,11
81:6,7,14,15,17,20
81:21,23 82:1,2,6
82:7 83:15 84:6,9
84:23,24 85:11,23
86:11,19 90:10
94:7,7,18,19,24
95:1 96:5 98:12
98:13 99:4 105:21
105:25 106:5
107:11,15,22
111:18,22 112:5,8
112:9,10,13,14,18
112:19 113:3,5,6,8
113:11,17,23

116:4,19 118:15
118:16 119:2,8,9
124:15 129:13
130:21 131:17,17
131:18 138:1
139:21 140:1
143:13,18,23
144:23,24 145:7
145:19 146:17
147:1,11,14,14,21
148:16,17,18
152:15,15,16
156:9,11,15,22,25
157:2,3,6,7,11,12
161:25 163:25
164:5 167:8,9,9,13
167:14 168:11,12
168:25 172:23
175:18 176:9,20
177:5,6 178:12
180:2 181:10,22
182:1,12,13,15,17
182:18,23 183:17
184:21 185:1
186:3,4 187:5,6
188:7,9 191:24,24
193:14,14 194:8
199:22 203:4
**ebers** 90:25 91:5
91:12
**ebitda** 18:22,22,23
18:24,25 19:6,12
19:20 21:9,16,21
22:2,6,8 23:4,6
24:18 54:9,17,25
107:14 138:15
184:4
**economic** 27:12
28:11,22 30:10
34:19,22 35:12
39:12 52:21 67:22

71:25,25 78:25
85:7 93:11 96:16
96:20 97:3,5
98:23 101:11,21
123:1 133:8
167:25 171:4,21
176:15
**economics** 54:2
78:10 118:25
123:8,25 165:6
**economist** 34:8
71:18
**economists** 51:3
56:8 172:3
**eder** 3:12 23:3
42:7,16 46:10
87:25 94:23,25
105:12 106:2
111:24 112:6,11
115:6 119:20
158:16,19 160:2
160:22,23 161:4,6
162:9,18,18,20
166:15 168:18,19
169:22 170:3,25
172:22 173:8
180:2 182:6,14
**eelmouji** 2:16
**effect** 14:20 53:19
60:1 119:12 165:7
167:11 168:14
**effective** 87:14
94:9 165:22
182:15
**effectively** 20:6
43:2 109:15 111:4
113:16 115:5
116:12 122:20
135:16 163:1
165:4 167:7
180:21 181:22

182:18
**effects** 56:22
**effort** 11:19 14:9
**eight** 41:7
**either** 8:3 11:8
46:23 51:7 74:8
81:1 104:22 128:8
158:6 164:25
168:9,14 169:20
173:16 180:1
**electric** 51:17,18
126:15
**electricity** 126:17
126:22
**elects** 94:25
**elements** 76:2
**elevate** 22:13
**eliminate** 72:11
102:6 107:21
167:4
**eliminated** 41:4
**eliminating** 36:13
166:10,10
**elliot** 1:9 190:10
**elmouji** 2:15
**emerge** 36:9
**employed** 156:11
**employee** 199:19
**employees** 171:20
**encompassed**
55:24
**encompasses**
121:19
**encounter** 83:9
133:17
**encountered**
105:18
**ended** 33:4 90:10
109:8
**ends** 47:19 130:10

**energy** 126:11,14
**engage** 186:17
191:16 198:18
**engaged** 102:3
124:16 148:4
184:10 188:6
189:5
**engagement** 83:14
191:3
**engaging** 75:1
100:24
**english** 201:12
**enhanced** 44:13
46:24,25
**ensuing** 192:18
193:11
**ensure** 149:20,24
**entails** 135:16
**entered** 4:15 92:22
153:3 169:13
**entering** 147:15
**enterprise** 22:7,19
22:23 23:21
108:16
**entire** 38:21 94:19
94:21 165:12
184:20 200:3
**entities** 7:12 8:3
65:6,7 66:7,11
76:12 83:20
**entitled** 195:19
**entity** 6:23 7:4
14:12 69:4 73:16
98:18 100:23
101:3 113:8
154:13 172:5
176:20 181:10
190:22
**entry** 128:23
129:3,8

envelope 18:21
environmental 127:15
equal 73:5 193:5
equally 87:19 136:23
equals 54:22 114:13
equation 56:22
equipment 54:12
equity 29:9,12,14 29:23 30:11,14,16 30:16 31:3 32:3 34:10,17 36:13,16 36:16,17 45:23 47:2,3 70:4 92:23 93:11,15 94:14,16 94:19,21 95:2,20 96:16 97:17 98:8 106:17 143:18 150:25 151:10,12 151:15,17,19,19 172:20
erin 2:15
errata 203:1
error 48:3,4,14 49:4,8,23 50:1 51:9
errors 190:5
erupted 76:12
escape 77:12
esoteric 68:19
especially 52:1
esq 2:3,6,10,15
essence 87:13 118:17 165:6
essentially 17:20 142:12 170:17 171:17 182:8 195:23

establish 175:22 175:24
established 8:7 151:5
establishes 146:19
establishing 115:9
estate 1:9 2:13
estimate 62:10 63:2 86:22,24 87:7 88:4 134:13 184:11 196:25
estimated 64:11 64:12
estimates 195:23
et 203:4,4
evaluations 104:11
event 60:21 140:4 143:4 195:18 197:10
events 59:18,20 117:19
eventually 17:22
everybody 60:18
evidence 63:19 154:14 157:20,22 158:1,3
evolving 55:22
exact 23:19 41:2 45:12 52:5 121:1 123:24 159:4
exactly 16:22 30:14 39:2 43:10 77:19 80:12 83:8 106:8 113:20 115:19 118:19 119:4 122:18 123:25 151:9 162:25 165:12 170:21 179:11,13 179:19 180:14

examination 3:3 5:1
examined 4:25
example 10:12 25:18 26:25 36:20 55:3 56:13,15 57:6 60:7 62:18 63:1 98:16 109:9 115:7 123:2 134:23 148:9 155:2 165:21 186:18
examples 131:24
exceed 31:3
exceeds 179:4
excess 180:19
excluded 103:25 129:24 190:13,15 190:25
exclusion 32:15
exclusive 94:18 129:4,21 130:7
excuse 20:4
exercise 29:17 94:20,22
exercises 196:7
exercising 90:9
exhibit 3:9,10,11 3:12,13,14 8:22,25 9:2 10:14 16:8 17:15 30:20,21 41:25 42:2,3,6 43:22 80:21,25,25 81:3,5,22 108:5,14 108:14 129:14 145:6 160:6 191:21 194:19,22 200:4
exhibited 20:2 21:25

exhibits 3:6,8 189:25
exist 37:7 131:25
existed 109:22
existence 66:6 111:16
existent 63:12
existing 98:18,19
exists 31:20 62:22 64:12 119:17 121:6 132:6
exogenous 117:18
expect 20:7 77:19 174:19 191:13
expectation 20:19 176:19
expectations 30:8 30:9 135:25 136:3 136:25
expected 28:16 50:18 54:6 123:1 135:8,10,17 137:25 176:23 192:15
expenditure 53:23 54:6
expenditures 54:21,22
expense 53:21 54:4,9,9
expenses 53:10 54:7 55:16
experience 9:23 12:13 36:19 55:12 61:16 67:20 68:7 73:12,14 125:19 130:9 136:17 170:13
expert 3:9 11:24 16:11 25:7,9 33:19 34:9 39:3

104:4 110:13
198:11
**expertise** 8:4
65:13 155:22
**expires** 203:25
**explain** 29:4 88:22
114:4,7 140:17
167:17
**explained** 140:15
**explaining** 81:23
**explains** 20:21
139:21 140:22
**explanation** 59:12
61:11
**explanations** 90:5
141:5
**expressing** 136:13
**extensively** 42:16
**extent** 71:3 76:10
88:11 111:8 123:4
134:12 137:22
144:6 159:3
**extinguishing**
150:24
**extract** 179:16
**extraordinarily**
22:11 162:16
**extreme** 131:24
**eyes** 184:24

**f**

**f** 1:9
**face** 29:18 32:11
147:3 153:6 158:7
**facing** 130:21
165:13
**fact** 21:2 35:20
36:14 37:25 43:11
48:2 68:2 72:18
90:5 92:2 96:4
97:4 102:16
103:16,22 104:3,4

104:13,13 109:22
114:11 147:22
154:15,24 155:10
157:9 164:12
169:1,15 173:8
177:22 182:15
191:16
**facto** 30:12,15
102:18 115:9
151:18
**factor** 14:11
109:11 121:16
122:11 131:23
132:7,8,14 144:12
173:21,22
**factors** 123:1
127:8 133:13
159:22
**facts** 8:10 9:25
11:4 13:4 15:20
25:13 58:6 68:18
73:13 75:6 92:18
100:16 104:22
117:23 118:7
120:14 149:1,9
156:22,24 158:11
191:9,15
**factual** 13:8
**fair** 9:8 38:20,23
38:25 39:1,3 44:1
51:8 52:7,10,20
53:14 54:14 55:21
56:4,20 57:19
59:13 68:11,24
69:1 72:13 75:8
75:23 77:13 83:25
84:4,25 92:9,14
102:11,17,23,24
104:9 110:19
111:9,10,13 116:6
116:10,19 121:10

127:23 129:7
130:20 132:21
137:3,10 146:5
148:19 149:10,19
152:25 155:13
157:21 158:1
161:11 162:15
169:12 171:18
182:3 191:18
197:15 200:17
**fairly** 24:15 67:25
72:17 74:5
**fairness** 38:21
69:10 150:8
**faith** 169:6
**fallacy** 125:11
**false** 13:2 26:15
**familiar** 50:24
53:8 76:11 81:3
97:2 134:1 139:23
156:4 177:1 192:7
**familiarize** 128:3
**familiarized** 76:13
**family** 167:8
**fan** 193:9
**far** 22:1 36:15
63:17 76:5 88:25
105:20 106:4
114:14 115:23
117:4 142:3
164:17 179:4
189:13
**farmer** 184:2,13
184:16 186:8
**farmer's** 184:3
**farmers** 90:17
108:4 184:11
**favorite** 123:15
**fda** 60:13,15
**feature** 149:11

**federal** 4:12
**feel** 16:21 48:22
74:5
**felt** 183:14 184:7
191:7,10
**fiction** 52:24
**fide** 88:17,18,23
89:2,7,10
**fiduciary** 72:14
91:18,21,23,25
92:3,8 93:16,18
172:14
**field** 120:10,13
**fight** 76:5,8,11
**figment** 132:5
**figure** 189:23
**figures** 108:17
183:25
**figuring** 62:6
**file** 196:16
**filed** 63:25 146:10
**filing** 4:20
**filings** 109:2
**final** 86:3 94:23
174:19
**finally** 162:24
163:2
**financial** 10:17
17:21 31:9 51:10
54:24 57:20 85:9
85:11,12 88:6
91:3 99:10 154:10
154:11,12,16
155:1 172:18
173:13,15 174:15
174:16 183:21,24
191:11
**financials** 11:11
11:12,17 52:12
57:6 58:3,4 107:8
116:19 138:14

**[financials - four]**

140:18 175:6,8
178:17
**find**   21:16 69:9
95:4,21 100:22
108:24 121:1,3
122:17 124:8
175:6 178:3
182:19 186:16,20
194:5 196:7
**finder**   103:22
154:15,24
**finding**   124:21
147:25 174:1
191:11
**finds**   39:9
**fine**   4:6,14 36:5
58:23 86:25
116:13,17 134:10
143:11
**finger**   45:12
**finish**   31:25 87:11
89:13 114:23
118:12
**fire**   126:18 127:14
**firm**   29:10,11,12
63:6 154:10,11
171:22 172:3,4
**firms**   102:14
**first**   4:24 5:2 7:25
8:24 32:21 35:11
42:22 43:5,13,15
46:12,14,18,19
48:23 50:16 62:10
65:7 68:13 87:21
88:12 90:16 94:18
94:21,23 95:15,24
111:3 138:16
153:3 159:9
162:10,19,24
164:3,7,16 167:11
168:12 173:14,18

178:11 186:24
**firsthand**   73:18
**fit**   13:22 21:6,18
56:13 122:2,3
123:3 183:14
191:11
**five**   27:4 49:20
80:20 81:10 84:14
85:23 86:5,6 87:2
87:19 105:4,12
120:6 157:5,12
160:8
**flat**   138:17 142:12
**fliers**   13:16
**flip**   79:3
**flipping**   43:9 75:9
**floor**   2:3
**flow**   54:17 61:4
**flows**   28:17 54:18
55:1 60:25,25
61:1,3,5,6 134:12
134:13 135:14
176:23 192:16
**focus**   95:14 122:25
134:24 140:22
**focused**   70:8,15
75:7 118:5
**focusing**   83:10
115:15
**follow**   89:25
112:11 117:19
**following**   4:15
135:5 152:11
**follows**   4:25 79:19
80:5
**footnote**   10:22
157:17
**footnotes**   200:8,12
**force**   76:7
**forecast**   61:18

**forecasts**   61:15,17
**foreclose**   100:5
151:24 152:5
154:16
**foreclosed**   72:8
**foreclosing**   148:24
**foreclosure**   6:11
149:12 150:24
**foregoing**   201:12
**forensic**   7:15,18
153:1
**foresee**   118:13
**forget**   115:20
177:14
**forgot**   189:7
**form**   4:21 11:10
11:23 12:2 14:2
18:3 28:1,3 33:17
34:4,6 35:2 36:12
37:20 39:16 41:21
48:6 49:2 51:11
56:1,5,24 57:23
59:19 67:8 69:18
71:6 72:19 73:2
75:4,17 76:23
77:2,17 78:5 82:8
82:9 83:16 84:10
86:17 89:4 90:2
91:7,20 92:6 93:3
93:13,23 95:8
96:9 97:12,20
99:6 101:1 102:9
104:1 105:2,22
106:7,20 110:15
111:5,19 112:16
113:22 116:25
117:16,25 118:1
119:11 120:9
125:2,18 127:9
128:24 130:25
131:22 132:25

135:2 136:16
137:1,11 138:12
139:15 140:5,16
142:5,20 143:5,15
144:16,25 146:1
146:23 148:8
149:14,22,23
150:1,2 151:14
152:1,7,17 153:15
153:16 154:1,7,19
155:8,17 156:12
156:19 157:15
162:22 163:12
164:20 166:6
167:2,16 168:15
169:5,9,18 172:16
174:23 175:1,19
176:12 178:8,25
180:6 181:12,16
182:4,24 185:6,17
186:1 187:18,25
191:17 194:11
195:25 196:19
197:19
**formed**   18:6,9
**forming**   9:22
64:21 90:20
**formula**   20:21
47:6
**formulated**   15:4
89:9
**formulating**   87:5
**forth**   201:10
**forward**   26:4 49:7
58:9 68:5 125:5
134:8 137:8
**found**   91:11
**fountain**   2:7
**four**   65:9 94:8
105:12 109:8
121:24 141:12

182:22 183:14 185:19 186:12
**fourth** 28:24 35:6 35:9
**fraction** 53:25 111:12 159:25
**frame** 138:6
**franchise** 21:11 128:4 130:9,24
**frank** 1:18 3:3 4:23 202:5,16 203:4,21
**frankly** 179:6
**fraud** 12:23 38:18 137:9 154:22 155:13
**fraudulent** 59:5 73:25 77:10 79:14 79:25 80:7 83:3 155:1,21 169:1,2 169:14,16
**fraudulently** 59:3
**free** 75:2 167:21
**freeze** 110:23
**front** 34:11,16 53:18 81:23 95:12 151:20 173:13 183:3 184:9 194:21
**frontline** 25:6,10
**fulfill** 93:12
**full** 18:18 59:12 62:23 103:5 168:3 195:19 201:13
**fully** 95:13 154:24
**function** 158:11 158:12
**functions** 29:9
**fund** 196:17 199:3
**funded** 97:9

**funding** 136:19 195:16
**further** 70:10 77:22 136:15 187:22 188:1 201:15
**future** 39:18,25 43:3 60:13,21 127:17 134:11,13 134:22 135:24 136:14 137:24 141:13 192:15 195:16 196:5
**fuzzy** 78:11

**g**

**g** 202:2
**gallagher** 3:15 195:2 197:3 198:10
**game** 73:15 115:4
**gap** 50:25 51:10
**gas** 126:15,19
**general** 17:23,25 36:5 39:7 50:10 51:16,18 58:10,14 60:5 61:23 68:20 72:18 85:22 89:2 98:21 107:20 122:1 123:1 148:22 174:1,10 188:25 193:8 199:4,5
**generally** 12:24 22:21 27:2 28:6 32:16 39:5 62:7 62:11 63:5,6 98:8 98:14 122:6,12,23 134:7 135:18,19 159:18 183:20
**generate** 31:6 126:17 137:25

179:8
**generating** 36:9 133:23 176:19
**generation** 126:15
**generations** 126:22
**gentleman** 90:22
**genuinely** 169:20
**geographic** 124:4
**gerald** 174:3
**getting** 39:11 48:22 56:19 99:20 107:22 134:20 149:21 153:13 182:7
**gilman** 2:14
**give** 32:8 36:19 45:11,11 51:4 58:7 59:12 60:7 72:10 73:10 101:18 136:21 141:7,13 167:21 168:1,8 189:21
**given** 9:13 13:1 16:16 20:1,2,7 34:1 38:11 53:25 59:7,8 72:14 85:6 102:20 106:4 111:16 114:9 124:20,22 130:21 144:15 148:25 162:1 174:21 178:22 179:10,12 181:18 194:8 202:12
**gives** 166:15
**giving** 13:7 24:4 74:25 98:2 99:19 99:21 151:2 168:5 179:19 180:22 200:3

**glenn** 3:10 16:11 17:1,6 91:11 94:4 96:5,15 98:23 102:4 103:17 140:10
**go** 5:6 8:24 9:16 9:23 10:12 11:10 12:2 16:24,25 18:3,16 28:13 29:13 30:5,16 32:22 33:17 34:4 35:2,9 37:20 38:17 39:16 40:10 40:17 48:6 50:3 50:18 56:22,24 59:19 63:18 67:12 69:5 70:10 71:21 72:19 73:2 74:9 75:4,5 87:11 89:14 93:22 101:8 105:2 108:4 112:16 116:20 122:23 156:12 160:11 161:4 162:14 163:12 165:11 166:17,20 167:16 169:18 172:16 175:19 181:17 191:23 194:11 200:2
**goes** 29:14,20 30:11 31:9 32:11 32:25 78:23 139:13 142:4 152:18 154:8,13 179:21
**going** 7:13 15:23 22:5 26:22 27:7 29:4 30:5 31:16 32:7,8,9,18 36:1 39:14,22 40:3

45:17 51:6 53:24
55:3,8,18 57:4,9
60:12,15,22 62:11
67:12 70:13 71:17
72:1 73:25 74:8
74:17,18,19,20
75:18,24 76:3
77:12,19 79:21
80:7,8,13,15 82:11
82:12,15,21 83:8,9
84:12 85:8,22
87:5 88:7,19 97:4
99:11,22 103:4
104:6,14 108:3
110:6 113:3 114:9
114:25,25 115:1
118:8,17,21,22,23
118:24 120:15
121:8,18 122:5,17
122:24 125:9
126:8 127:14
136:20,21 137:18
137:21,21 138:10
141:4,8,14 142:25
145:8,10 151:8
155:19,22 161:19
163:10,16 167:22
168:7,17 174:12
177:16 179:8,16
181:1,2 191:22
197:24 198:11
200:2,5
**gold**   112:22
**golf**   189:3
**good**   5:2 40:6
67:25 107:10,17
118:10 120:19,22
120:23 121:6
122:2,2 130:2
141:7,13 169:6
189:6

**goodman**   3:12
23:3 42:7,16
46:10 87:25 94:23
94:25 105:12
106:2 111:24
112:6 119:20
131:17,18 158:16
158:19 160:23
161:4,6 166:15
169:22 170:25
172:22 173:8
180:2 182:6,14
**goodman's**   112:11
115:6 160:2,22
170:3
**goodwill**   177:1,4
177:10,13,21
**gosh**   32:7 141:1
**govern**   161:24
**governing**   4:13
171:16
**governs**   160:24
**granted**   158:6
**gray**   55:22 56:11
**great**   74:19 123:5
123:8 141:3
**greater**   28:17
171:11 173:9
**grocery**   132:18
133:11,17,18
**grossed**   177:16
**grounds**   148:24
**growth**   19:11,13
19:13,16,18,21,22
19:23 20:2,6,8,9
20:19,22 24:19,20
122:9,9,21 123:2
125:10 135:8,10
135:10,18 136:8
138:17 141:3
193:4

**guarantee**   33:9
76:9 123:23 131:7
**guaranteed**   72:9
167:12 169:21
**guarantor**   65:8
**guess**   25:4 30:8
35:5 59:17 70:13
76:16 104:7
145:23 165:1
174:14 178:14
179:21
**gumaer**   1:9 2:13
190:10,10
**guy**   196:14
**guys**   64:9 173:18

# h

**half**   19:17 107:23
133:21 182:8
**handles**   67:24
**hands**   68:16
160:17
**handwritten**
153:9,14
**happen**   36:6 40:15
54:6 59:21 77:19
128:16 137:19
141:8,21 191:14
**happened**   12:20
59:25 74:22,23
101:13,20 111:18
113:20 139:3,18
139:20 142:23
151:22 154:5
192:18
**happening**   115:10
127:13
**happens**   29:10
30:14 114:15
152:2
**happy**   17:4 18:12
51:5 64:9

**hard**   51:14 60:1
93:25 99:7 161:23
163:6 179:1
182:19 194:5
**harm**   32:3
**harris**   11:3 33:7,8
63:25 64:1,13
65:3,4 66:21 67:6
72:22 79:13 80:4
80:12 83:10,13,14
**hays**   1:5
**heading**   81:16
**hear**   137:19
**heard**   38:21 51:23
96:3 140:1 188:9
**heck**   71:19
**held**   1:18 95:2
98:8,12,18
**hell**   78:11 80:19
101:23
**help**   10:13 72:6
**helped**   48:4
**herbert**   2:18
**hereunto**   201:18
**hewlett**   106:23
**hey**   101:22 165:25
**hidden**   63:16 68:3
74:14
**hide**   76:6 80:13
**hierarchy**   28:13
**high**   19:1,2,19
20:11,12,12,20
22:11 24:18,19
29:10,12 99:11
114:9 176:2 182:2
182:7 183:20
**higher**   22:20
23:12,13 26:23
32:19 72:24
**highest**   19:8

highly   20:10
111:14 158:24,24
hire   141:17
hired   134:24
historic   122:9
137:20
historical   134:14
134:25 135:14
136:8 137:6
173:24
historically   135:7
history   134:12,15
134:16,22
hold   141:14
holder   30:16
36:14 40:20 94:14
95:20 151:19
holders   30:11,15
30:16 32:1,4
34:10 36:13,16,17
152:13
holding   41:19
holdings   41:15
holds   79:22 98:9
hollow   131:7
hook   66:8,12
74:13 84:23
hourly   189:11
huge   40:4 88:7,7
142:18 179:10
180:18
huh   36:3 45:24
61:22 62:4 94:5
99:16 112:24
160:12 197:12
human   5:14
hypothesizing
101:17
hypothetical
34:20 40:25 49:17
50:8 55:24 56:10

56:15 58:22 92:21
96:14 112:3 132:1
132:5 156:25
161:13,14 179:3
180:8
hypothetically
12:11 33:20
148:10
hypotheticals
33:20

**i**

i.e.   151:19
icon   115:21
idea   62:15 198:13
ideally   120:25
identification   8:23
16:9 30:22 42:1
80:22 194:20
identified   182:23
identify   95:17
96:1
ignore   80:16 85:14
85:15
ignored   83:2
187:17
illegal   152:19
image   121:2
123:25
imagine   36:11
101:7,19,20
102:16
immediate   136:6
impact   13:3,5
impairs   162:13
implementing
140:14
implicate   26:13
implicated   111:22
111:23
implication   24:17
24:17 28:16

implications   24:4
implied   19:11 20:3
193:4
implies   154:21
imply   9:6 20:6
22:15 26:13
importance
134:14
important   13:19
13:21 26:19 46:23
47:11 65:24 71:23
86:18 92:15 95:16
103:12 106:10
131:14 136:23
161:19 166:3
imposed   154:23
impossible   93:24
impounded   165:5
improprieties
155:10,11
impropriety   154:3
improve   118:23
143:14
improved   138:20
improvement
139:1,5,7,9,10
140:21 141:1,3,18
143:17,19
improving   136:13
140:19
inability   26:24
inappropriate
185:19
inclined   87:6
include   9:14 15:22
62:23 78:17 80:1
80:11 109:19
112:23 127:4,7
184:7
included   13:4
42:14,15 184:3,12

184:22
including   141:11
income   51:25 52:6
52:13 53:8 55:1,6
55:7,10,15,19
56:10 157:11
174:15
inconsistencies
19:25
inconsistency   20:5
inconsistent   20:12
incorporate   10:11
incorrect   32:4
42:8 44:15 197:20
incorrectly   57:13
59:2
increase   60:22
170:22 180:16
increased   101:22
increases   153:13
incredible   41:16
incremental   179:9
independent
147:22
independently
44:8
index   3:1,6
indicate   67:2,7
90:12 175:11
indicated   95:10
145:1 174:15
175:7
indicates   19:11
138:16 180:9
indicating   144:14
195:8
indication   102:6,6
120:19 134:22
141:8 184:16
indications   103:1

**indicator** 178:22
**indicators** 22:24
**indirectly** 13:21
  63:24
**individual** 74:2
  121:25 159:16
**individually** 91:13
**individuals** 6:15
  11:20 12:1,22
  92:3 159:17
**industrial** 121:23
**industry** 122:7
  128:1 134:2
**inference** 23:24
  24:24
**inflation** 40:22
**influenced** 194:1
**information** 10:21
  10:22 11:7,21
  12:5 13:11,23
  17:21 38:17 58:13
  58:20,23 59:1,1,3
  59:5,7 61:13 87:9
  87:13 103:5
  108:11 130:16
  131:14 136:18
  144:5 145:16
  197:9,21 198:2,3
**informative** 87:8
**initial** 44:14
**initially** 34:18
  100:5 101:6
**inquire** 152:14
**insider** 37:22
**insight** 172:7
**insights** 24:4
**insisted** 199:2
**insofar** 13:6
**insolvency** 31:24
  47:11 196:2

**insolvent** 31:2
  34:5 36:7 71:4
  86:10 196:18
**instance** 12:17
  16:6 24:17 32:2
  34:1 43:13 47:7
  48:23,25 49:22
  53:16 60:20 66:15
  84:5 86:18 124:25
  148:13 179:22
  180:12
**instances** 12:24
  44:12 52:18
  171:15
**instructions** 9:14
**insufficient** 84:24
**insulate** 129:21
**insured** 79:21
**integrity** 132:2,4
**intelligent** 183:10
**intend** 18:10
**intended** 115:5
**intent** 169:2,14,16
**intention** 167:14
  168:25
**interactions**
  188:23
**interest** 6:15 15:3
  41:16 89:6 92:23
  92:24 93:11 94:13
  94:16,19,22 95:1,2
  95:18,20 96:2,16
  96:20 98:12 99:2
  99:9,11 101:21
  104:17 109:25
  110:4,9,12,20
  112:14 118:15
  136:15 146:18
  148:17 152:22
  153:6,8,13,14,23
  154:6,9,9 160:3,22

161:7,25 162:1,4
  163:14 168:4
  170:3,4,17,19,21
  171:11 172:22
  182:8 187:10,17
  187:21
**interested** 163:15
  184:8 201:17
**interesting** 19:10
  31:8 85:17 104:10
  104:12 181:6
**internal** 200:9
**interpret** 96:11
  170:9
**interpretation**
  96:10 161:17
**introduce** 18:11
  18:12
**invalid** 38:14,15
  39:9
**invalidated** 33:22
  33:23
**inventory** 128:17
**investigators**
  52:23 75:8
**investment** 41:17
  98:17 122:15
  123:20 126:9
  148:11 163:5
  197:24
**investments**
  100:18
**investor** 59:8
  62:16 68:10 74:2
  75:24 79:10 80:7
  80:13,15 82:11,15
  83:9 84:12,22
  85:8,15 87:22
  103:4 104:16,18
  104:24 115:17,19
  116:20 117:14,22

119:16 125:15
  131:18 147:9
  148:10,13,15
  184:8
**investor's** 77:18
  79:18 122:19
  125:8
**investors** 8:5 53:2
  59:5 67:23 68:1,7
  87:5 98:15 110:7
**invoices** 62:18
  64:5,7,14,18
  189:17
**involved** 39:8
  59:16 60:8 63:1
  70:17 89:1 100:18
  109:21 115:13
  122:13 132:16,18
  149:4,15,20 183:9
**involvement** 5:16
  76:3
**involves** 109:18
**involving** 60:9,10
  106:5 128:14
  146:12
**iq** 108:18,21,23,24
**island** 1:14
**issue** 13:3 39:4,12
  103:8 159:18
  188:4
**issued** 16:10,11
**issues** 5:10 6:3,5
  17:1 39:7 55:20
  98:25 105:15
  155:21 158:24
**items** 10:18 42:10
  42:11 64:2 85:1
  95:9,11 108:11
  166:2,3

**j**

**jensen** 172:6
**job** 56:7
**john** 2:18
**jr** 1:9
**judge** 37:16 38:12
 39:9 75:18 155:18
 190:8,15
**judgment** 81:6,13
 81:25
**judiciary** 32:5
 75:14
**jump** 90:19 142:4
**jumping** 100:15
**justice** 97:7
**justification** 35:12

**k**

**k** 1:9 202:2
**keep** 30:19 32:8
 36:16 44:7 82:10
 84:14 101:10
 163:10
**keneally** 188:15
 188:24
**kessler** 1:19 2:6
 9:19 15:19 188:12
**key** 22:16 50:3,4
 50:15,18 133:6
 144:12 158:3
 159:6,6 166:9
 183:19 185:8
**kick** 29:15
**kicks** 172:20
**kim** 174:4
**kind** 7:21 15:15
 29:15 30:13 40:24
 51:22 52:9 53:2,5
 53:7 54:1 58:15
 59:12 61:25 62:8
 62:11 68:1,20

71:17 72:1 74:1,1
74:15 75:7 76:15
76:16 78:7 79:5
82:15,17 87:4
98:17 100:17
103:12 104:7,10
104:12 118:4
121:24 122:5,24
126:14 133:17
137:17 138:23
151:6,8,13 152:8
152:12 155:2,9,14
158:14 164:14
168:6 173:16,25
174:5 176:24
177:15 179:12
184:25 186:13
194:6 199:7
**kinds** 21:8 32:21
 50:5 60:16 74:14
 87:3 122:12,25
 127:19 134:21
**kleeberg** 1:5 203:4
**knew** 84:2 168:16
**know** 5:13 6:6 8:6
 8:21 10:4 12:18
 14:19 19:11 20:10
 21:13,15 24:8
 25:6 26:17 27:3
 27:16,23 28:3,7
 30:7 32:2,7 33:6
 35:22 36:15 37:5
 40:13,18,23 41:22
 42:25 45:13 46:9
 49:3,12 50:24
 51:3,4,16 53:4
 55:12,23 58:5,10
 59:24 60:1,5,10,14
 60:16 61:1 62:2
 62:25 65:7,23
 66:13 67:1,20

68:6,19 70:13,14
71:16 73:14 74:3
74:14 75:18,21
76:6,8,13,16,17
79:1,5,12,15 82:13
83:9,19 84:13
85:14 87:7,21
88:9,16 89:5,6,18
90:22 91:8,8 93:5
96:25 98:6,15,18
98:20 99:7 100:17
100:19,19 102:6
102:10,16,17,20
104:23 105:4,11
107:9,12,21,23,24
108:19 109:22
112:1,3,4,22
113:13 119:16,19
119:19 120:5,15
120:17,23 122:4,8
122:11 123:2
124:7 125:15
126:5,6 127:17
128:6,25 131:10
131:15 133:1
134:4 135:3
137:12,15,18
138:8 139:7,18,20
140:11 143:7,8
144:9 145:5,18
146:2,6,22 147:5,6
148:12 150:15,24
151:1,3,23 152:19
154:3,25 155:3,9
156:2 158:9,25
159:3,24,25
161:18 162:2,9
163:14 165:15,21
166:7,8,19 167:20
169:19 170:1,5,8
170:10 171:2,15

171:21 172:11,12
172:14,19 173:25
174:24 175:2
176:1,14,25 177:4
178:1 180:7,17,23
181:18 183:6,19
184:19,23,24
185:18,20,22
186:3,6,10,19
187:13,19 188:1,7
188:11,14,20
189:3,7,16,22
190:8,10 192:14
194:14,17 196:15
196:17,20 197:2
199:17
**knowable** 197:22
 198:4
**knowing** 198:20
**knowledge** 68:18
 73:13 74:1 92:18
 103:5 198:10
**knowledgeable**
 8:9
**known** 59:5,18
 60:17,18 63:16
 191:9 197:22
 198:4
**knows** 80:15
 180:24 182:20

**l**

**l** 202:2
**labeled** 151:12
**lack** 35:12 110:14
**land** 113:1
**landscape** 124:22
**language** 201:12
**large** 61:16 113:13
 159:20 177:16
**largely** 5:23
 133:23

**larger** 180:11

**law** 1:19 2:10 76:2 83:23 110:11 119:6,13 128:19 129:25 130:9 131:5

**laws** 128:4,22 129:20 130:24 131:3 172:1

**lawsuit** 5:15,17,23 6:3 62:12,13,18 64:3,4 79:13,25 188:6,12

**lawsuits** 33:6 79:15

**lawyer** 8:3 91:4,6 92:22,24 93:19,20 94:6 96:6 112:5 113:14

**lawyers** 10:3 15:19 146:10 188:11

**lay** 113:1

**layered** 68:6

**layers** 6:12

**lead** 11:4 52:1

**leading** 19:16

**leads** 158:15

**leah** 1:20 201:3,23

**learn** 102:3

**learned** 64:15 175:16 176:8

**left** 14:12 39:23 41:7 84:24 95:15 100:16 121:3 151:8

**leg** 115:8

**legal** 8:1,2,7,11,19 9:4,18 34:7 36:15 36:18 38:9 65:11 65:12 67:9,12

68:6 71:17 72:1 72:12 74:3,19 76:17 79:5 82:8 83:17,22 85:3 91:9,16 92:12 93:12,16 110:16 113:8 119:19 124:22 147:5,7,7 152:9 161:2 181:13 203:1

**legally** 51:3 66:7 73:5 74:3 86:15

**legitimacy** 33:15

**legitimate** 64:7,24 75:11 120:18,20 187:24

**lehman** 190:16

**length** 37:13,18 90:1 91:11,18,21 92:1,5,14,20 93:1 95:7,10 96:7,19 98:25 100:22 102:2,15,21 103:24 104:5,14 104:21 145:23 157:19 158:1,4,17 187:24

**lengths** 89:22

**lesser** 88:11

**lester** 1:9,9 6:20 6:21 10:5 11:1,2,7 13:24 15:5,16,18 15:25 16:4 25:16 25:18 33:21 35:1 37:18,22,25 41:4 64:23 72:8,13 73:1 75:14,21 94:6,7 96:5 99:4 128:8 129:17,20 130:19 140:13 143:12 144:23

145:2,7 147:14 148:10 151:4 153:10,23,24 154:12,15 156:9 156:22,25 157:12 175:18 176:9 180:18,23 188:7 193:14

**lester's** 33:11 34:2 75:22 129:2 152:22

**letter** 3:13,14 96:12 150:21,22 150:23 194:22 197:16 198:16,18 198:21 199:22

**level** 12:15 20:1 28:18 77:24 78:18 113:7 119:17 164:24

**liabilities** 6:25 7:5 7:12,21,23 8:2,6 8:12 28:17,19 29:18,22 39:23,25 40:17,19 60:4 63:8,20 64:23,25 66:16,18 67:23 68:3 69:23 70:17 71:12,15 72:22 73:22,23 74:11,15 76:19 77:1,23 78:13,17 80:6,14 80:19 81:11 83:8 83:24 84:6,9 85:13 146:20 147:10 148:6 173:17 185:8,9,11 195:12 196:4,5 197:25 199:7,10

**liability** 40:4 55:20 61:21,24

62:3,5,7,11,22,24 62:25 63:3,4,5 64:3,21 65:6 67:2 67:7 73:17,21 74:21 77:16,21 78:19,20 79:9,24 80:2 81:8 82:5,7 185:25 194:23 195:6,14 196:21 197:18 199:19

**liable** 73:7 186:4

**liebman** 3:10 16:11 17:1,6,23 25:19 26:4 27:10 27:15 35:12 43:8 44:16 48:3 49:4 67:1 98:23 123:18 124:7

**lien** 77:5,8 199:17

**lieu** 97:13 98:2

**life** 53:14

**liked** 120:4,5

**likelihood** 60:22 83:3

**limit** 43:2

**limited** 6:7 21:15 22:5 95:3 128:17 130:19 166:2 167:7

**limiting** 139:17

**limits** 160:21

**line** 3:18 13:11 21:20 29:11 34:11 35:10,10 52:25 56:20 72:16 82:25 95:15 108:11 122:10 138:16 146:16 151:4,20 165:22 172:19 173:14 183:3 184:9 187:7 203:6

lines 65:8,9,9
  155:7
liquidation 7:13
  128:16,17 173:16
  195:18 196:8,10
  196:12
liquor 1:13,14
  5:19,20,25 6:24
  7:1,7 9:19 21:11
  21:16,17 25:7
  27:14 29:19 33:4
  35:19 41:9 63:9
  65:4,10,15,15
  66:22,24 69:7,21
  69:24,25 70:5,23
  71:3,12,15,23 72:3
  72:3,10 76:21
  77:14 78:9,12
  81:7,14,17,20 82:1
  82:6 83:15 84:24
  113:23 123:4,14
  123:17 124:23
  125:23 128:4,14
  131:11 132:11,23
  133:12 134:5
  147:14 148:18
  152:16 162:21
  184:4 186:13,14
  186:17,19 187:6,6
lisa 1:5
list 104:15 186:24
listed 10:19 63:4,8
  67:16 72:25 95:10
  170:4,12 195:14
listen 25:5
lists 187:7
literally 124:8
literature 45:5,8
  48:10 49:5,7
  52:21,22,23 120:6
  120:7,10,11,15

121:8 174:1
litigation 11:3
  24:10 55:13 58:9
  64:13 75:16
  136:15 150:6
  190:14
little 5:12 6:4
  31:16 41:2,9
  70:14 78:10 82:12
  90:13 93:25 104:7
  120:1 137:7
  160:13 189:19
  191:22
llc 1:9,9,14,14,15
  94:13,14 95:18,19
  95:21 96:2 99:19
  99:19 100:19,20
  101:9 166:15
llp 2:6
loaded 51:1
loan 33:25,25
  148:25 151:3,10
  153:9 154:17
loaning 99:15,17
loans 33:11,24
  34:2,3 72:16
  152:4,22 153:2
locations 124:5
locks 168:5
logic 165:10
  192:13 194:4,12
logical 193:1
lomb 1:19 2:15
long 35:25 39:14
  52:9 78:14 163:9
  168:19 189:7
longer 31:5 40:3
look 9:3 11:11
  13:13 18:15 19:12
  19:20 21:19 24:16
  28:14 30:4 35:5

38:12 43:21 49:7
  50:15 58:24 60:6
  62:13 68:13 70:18
  76:4 80:12 82:15
  83:19 87:5,22
  88:5,16 101:17
  102:10 103:4
  105:4,5,11 106:23
  107:21 109:2
  112:4 113:14
  114:8,25 116:20
  118:20 121:17,18
  121:25 122:5
  123:18,21 124:19
  126:6 136:17
  137:22 138:13
  139:7,10,16
  140:24,25 141:1,4
  141:5,5,12 145:3
  148:15 160:7
  161:18 163:6
  166:8,17 176:5,5
  183:1,13 185:10
  186:11,13 189:6
  189:17
looked 7:5 8:25
  18:8 21:5 61:1
  64:10 107:12
  144:14 156:8
  170:7 174:2
  183:10,11,13
  185:13
looking 20:16
  22:11 24:22 32:17
  59:14 62:17 70:2
  71:18 81:5,22
  83:17,21 108:4
  121:24 122:3,20
  123:3 138:14
  139:12 140:20,23
  141:10 142:7,21

143:9 183:15
  185:8
looks 6:19 30:13
  81:3 122:12
  136:20 139:6
  141:16 142:15,22
  142:23
loophole 119:21
  119:22 168:11,16
  168:17,21
lose 131:7
losing 117:11
  129:21
loss 139:2 140:22
  141:5,6 142:18
  190:18
losses 138:3,5
  192:6,23 193:11
lost 67:14 108:9
  141:2,2 169:7
lot 20:14 52:21
  54:23 61:15 63:11
  80:17,19 88:25
  89:9 108:5 128:14
  140:6 148:20
  167:19 179:15,17
  181:7 190:17
  198:23 200:8,8
loves 115:22
low 23:17,23
  106:2 140:4
  173:17
lower 21:2 22:20
  22:22 23:15 26:23
  26:25 32:19 35:13
  79:3 130:22
lowest 48:17,24
  49:1 105:20
lunch 118:11
  119:23

| m | | | |
|---|---|---|---|
| **m** 202:2 | **mark** 8:24 30:20 | 78:25 80:17 97:23 | 180:13 181:5 |
| **machination** | **marked** 8:22 16:8 | 98:21 100:9 | 182:2 185:7 |
| 71:17 | 30:21 41:25 42:3 | 115:16 119:6,13 | 192:13 194:1,14 |
| **main** 2:11 7:1,1,2 | 80:21,24,25 | 125:9 140:18 | **meaning** 130:4 |
| **maine** 1:15 | 129:13 145:6 | 162:3 190:14 | **meaningful** 25:12 |
| **maintain** 48:4 | 160:6 194:19 | 200:10 | **means** 4:11 51:2 |
| 151:7 | **market** 20:13,14 | **matters** 26:8 | 57:1 114:12 115:9 |
| **major** 165:22 | 51:17 60:23 70:4 | 78:11 80:17,17,19 | 146:5,7 157:22 |
| **majority** 130:11 | 75:9,23 92:9 | 91:17 122:8,9,10 | **meant** 119:5 189:6 |
| **making** 41:16 | 102:11,17,23,24 | 122:10 | 189:16 193:16 |
| 50:19 113:11 | 104:9 107:13,20 | **maximize** 31:10 | **measure** 75:23 |
| 117:11 133:8 | 122:8 145:24 | 31:17,19 154:22 | 89:17 105:7 121:7 |
| 143:13 168:21 | 146:4,5,5,6 157:21 | **maximum** 31:11 | 158:9 177:16 |
| 173:20 197:23 | 158:2 177:19,23 | **mba** 183:7 | **measurements** |
| 200:4 | 178:22,23 183:19 | **mean** 7:7 9:6,23 | 86:6 87:22 |
| **malpractice** 64:16 | 183:21 | 9:25 11:22 12:14 | **measures** 49:13,16 |
| **malt** 123:14 | **marketability** | 13:5 19:18 20:20 | 87:2 |
| **man** 124:11 | 26:21 27:2,5 | 24:14,16 30:4 | **median** 19:15,17 |
| 125:12 | 110:10,21 159:13 | 36:5 40:7,16 43:4 | **meet** 84:25 |
| **manage** 116:12,21 | 159:17,18,21 | 53:19 54:15 63:24 | **meets** 24:8 |
| 118:9 166:22 | 160:2 161:11 | 68:13 73:3 76:3 | **member** 94:13 |
| **managed** 116:24 | 162:3,5,6 163:17 | 78:9 82:17 83:19 | 95:19 163:24 |
| 117:2,15,18,23 | 165:10,14,17,19 | 84:13,17 86:22 | **members** 150:19 |
| **management** 25:5 | **marketing** 130:13 | 87:7 88:8,22 89:2 | 165:13,15,24,24 |
| 25:6 61:2,6 66:10 | **martin** 2:19 | 90:7 91:22 93:5 | **memo** 94:3,12 |
| 68:10 84:8 135:22 | **matched** 107:6 | 96:12 97:13,13,15 | 95:6 |
| 135:25 136:25 | **matches** 81:10 | 98:10 101:7 | **mention** 146:19 |
| 137:7 149:18 | 122:18 123:24 | 102:14 103:8,24 | **mentioned** 9:9 |
| 150:7 155:20,21 | **material** 51:20 | 105:9,11 106:6 | 34:13 63:21 65:8 |
| 167:3 | 57:16 158:24 | 113:4,14 117:1,18 | 72:23 73:11 |
| **management's** | **materiality** 50:25 | 118:20 119:13 | 106:12 155:7,13 |
| 25:1 136:3 | 51:1,8 | 120:14 124:6,10 | **merge** 113:13,16 |
| **managers** 25:10 | **materials** 9:1,9,14 | 124:11 131:1,7,24 | 113:16 |
| 183:3 184:9 | 9:17 52:19 | 137:12,22 139:7 | **merged** 74:12 |
| **march** 145:7 | **math** 47:17 192:21 | 140:20 144:6 | 114:1 |
| **margin** 22:12 49:8 | **matter** 4:7,8 25:8 | 147:5,20 149:3 | **merger** 36:22 37:2 |
| 49:22 50:1 51:9 | 26:10,11 36:5 | 154:20 159:7 | 37:3,4,10,11 109:6 |
| 140:4 | 38:9,10 39:8 | 161:16 165:5 | 110:18,23 111:8,8 |
| **margins** 22:14 | 51:13 58:10,15 | 166:8 169:25 | 114:16 115:7 |
| | 60:5 61:23 65:13 | 170:7,16 172:2 | 119:18 |
| | 71:4,8 78:6,13,25 | 176:3,14 178:9 | |

mergers 38:24
merges 68:2
  126:10 174:2
merging 109:15
  110:2
merton 30:23
met 188:20,22
method 50:1 105:1
  157:21 192:24
  194:9
methodologies
  52:4 179:23
methodology 42:9
  45:2,20 48:7
  192:7,10 193:13
  193:15,20,22,25
  194:6
methods 87:19,23
metric 120:16
  178:21 180:4
metrics 103:11
  106:9,11 185:21
metro 1:14,15
  5:19,24 7:1,2,8
  9:19 27:13 29:19
  34:25 35:19,22
  41:11,14 59:14
  63:9 65:4,9,16
  66:21 67:2,7
  68:23 69:7,17,21
  69:23 70:5,22
  71:3,11,14,23 72:9
  72:11,11,15,21,24
  73:6 74:5,6 75:1
  76:21 77:5,14
  78:8,12,14,15,21
  79:3,11 81:15,21
  82:7,13,24 84:6,9
  84:23 85:11 94:20
  94:22,24 98:12
  111:18,22 112:5,8

112:13,19 113:5,8
  119:8 144:24
  146:19 147:1,11
  148:16 152:15
  163:25 164:5
  167:9,14 168:11
  168:12,25 177:6
  181:10,21 182:1
  182:12,13,15,17
  187:6 191:24
  199:23
metro's 118:15
  143:23 146:17
michael 195:2
  197:3 198:1,10
microeconomic
  133:13
microeconomics
  121:4,13,14
mid 156:17
middle 67:3,4
midpoint 86:25
mike 3:15 190:10
million 25:19 41:8
  41:10,13 43:22,24
  44:9,10 72:25
  106:18 107:2,23
  138:22 139:9
  142:13 145:19
  146:18 173:19
  177:8 178:4,5
  185:1,13,24
  192:22 195:20
  199:20
mind 145:10 149:8
mineola 203:2
minimal 131:2
minimis 159:21
minimum 169:25
minority 109:25
  110:4,9,12,20

165:19
minus 138:22
  196:4
minute 98:7 103:3
  160:8
mirror 121:1
  123:24
mischaracterized
  125:3
misconduct 155:6
  155:15
misinterpreted
  125:4
misleading 191:5
misled 191:8
mismanagement
  155:20
misrepresenting
  55:14,18
missed 9:4 120:11
missing 92:10
  99:14 105:13
  108:5,11 148:3
  164:23
mistake 48:12
  55:11
mistaken 144:11
model 133:8
modified 81:24
money 53:17
  62:21 73:23 83:14
  97:4,17 98:1 99:3
  99:8,11,15,17
  101:23 117:11,11
  136:22 151:3,7
  152:4 157:2
  163:10 167:25
  171:9 173:14
  176:9 179:25
  185:11 195:22

monies 64:9
monopoly 115:10
monroe 201:1
months 189:8
morning 5:2 95:16
  95:25
motivation 185:10
mouth 169:11
move 68:5
movement 15:14
multiple 19:12,20
  20:3,7,22 22:20,24
  23:11,21 45:7
  87:23 178:1,13,15
  184:15 192:19
  193:3,5,7
multiples 20:20
  21:9,23,23 24:19
  26:14,20 122:16
  193:9
multiplied 44:8
  45:3
multiply 46:17
multiplying 46:15
myers 194:15

**n**

n 146:8 202:2,2
name 201:19
  203:4,4
named 90:22
narrowed 127:25
nasdaq 19:4
national 1:15 2:17
  133:18
natural 113:2
nature 5:14
  196:13
necessarily 13:5
  52:19 93:18 98:5
  102:15,21 103:18
  114:2 116:15

117:20 156:24
176:19
**necessary**  7:11
16:21 106:14
**need**  95:17,25
109:13 159:14
160:8
**negative**  21:16
22:2,2,6,9,14 23:4
28:21,22 29:24
35:14,15 107:14
138:7,8,19,20,23
138:24 139:2,9,11
141:22,23,23,23
141:24,24 142:2,2
142:3 184:3
186:16
**negatives**  141:19
141:19,20,20
**negotiated**  95:7
**negotiates**  157:4
**negotiating**  157:1
**neither**  68:17
94:24 201:15
**net**  35:13,15
174:15
**netted**  78:21
**never**  100:13
121:2 122:17
137:25 140:6
193:19
**new**  1:2,20 2:4,4,7
2:12,16 4:24 14:9
14:12,12,20 15:14
51:22 59:1 94:13
94:14,15,19,25
95:2,19 98:15,19
109:9 110:11
117:7 124:2 125:6
130:5,10,12 131:3
131:4 132:10,24

134:5,21 135:24
145:16,18 150:20
157:1 201:1,4
203:2
**newly**  80:25
**nexus**  171:19,22
172:4,5
**night**  79:19 80:5
**noble**  30:24
**nominal**  1:17
**non**  94:17 102:21
104:21
**nonbinding**
112:19
**nonrecourse**  99:25
100:7 101:4
**norm**  21:7
**normal**  41:18
**normally**  27:5
162:8
**northeast**  128:13
128:21
**notary**  1:21 201:3
202:22 203:25
**notation**  153:14
**note**  94:17 97:9,13
97:25 98:1,3 99:2
99:20 100:1,7
101:4,4,10,24
107:18 151:13
186:24 187:10,21
187:22 200:6
**noted**  134:7
199:17 200:14
**notes**  16:3,5,6
201:14
**notice**  201:9
**notion**  129:4
157:18
**notwithstanding**
78:12 85:16

122:17 198:1
199:17 200:7
**nuclear**  126:19,21
126:25 127:1,11
**number**  3:20 7:23
8:14,22 10:5,10,18
16:8 18:24 20:25
21:3,25 23:19
30:21 36:7 39:6
41:25 47:22 48:17
48:24 49:1,12
53:24 54:18 55:22
56:18,23 57:4,9
58:9 60:8 62:6,19
63:5,8 66:25
67:21 76:2 80:21
81:10,11 85:3,6
86:3 108:1,10,13
121:9 122:14
130:20 135:23
149:19 159:17
167:23 173:23,25
174:11 187:2,12
191:12 194:19
195:7,12 196:2,11
196:24,24 197:7
199:24
**numbers**  10:24
23:14,15,16 26:4
28:14 38:4 41:1
44:10 51:25 52:5
52:16 53:20 54:2
55:16 56:22 57:3
57:12,20,22,22
62:13 63:11,15
64:11 67:19 78:2
84:3 86:14 87:16
87:16 106:13
108:5,19 134:14
136:8 137:7,20
140:23 143:9

155:1 176:4
198:21
**nuts**  73:24
**nyse**  19:4

**o**

**o**  202:2
**oath**  4:19 202:7
**object**  58:14 67:8
**objection**  14:2
34:6 37:20 41:21
67:13 73:9 82:9
83:17 106:7
153:16 169:9
**objections**  4:21
**objective**  185:4
**obligation**  31:6,10
31:19,23 32:1,10
32:11 36:16 65:14
67:12 82:13 83:11
92:8 93:12,17
98:1 195:16
**obligations**  7:12
29:8,15 67:21
68:1,4,8 72:14
74:4 75:2,25 76:8
79:20,23 80:10
82:16,17,18,25
**obligor**  67:17 77:1
77:15
**obligors**  32:1
76:20
**obtain**  43:2 108:16
**obtained**  42:15
**obtaining**  15:20
165:7
**obtains**  49:15
**obtuse**  84:20
**obvious**  158:16
**obviously**  190:12
**occasionally**  189:3

occur 60:21
102:13 143:6
165:13 172:25
173:10
occurred 13:9
22:25 37:18 54:7
57:18 90:5 118:8
138:5
occurring 12:17
occurs 57:25
121:3
odd 44:4
offense 123:16
offer 15:2,3 23:3
24:10 86:1,7
88:11,11,13,14,16
88:17,18,23 89:2,6
89:7,8,10,15 90:16
152:21
offered 74:17 97:6
130:13
offering 98:10,11
98:14 151:6,10,11
offers 24:7 87:24
officer 148:23
149:2
officers 149:5
official 28:2
officially 8:25
offset 28:20 54:20
oftentimes 52:1
oh 85:13 101:9
141:1
ohio 157:1
okay 6:13 8:8,11
8:18 9:1,8,16 10:6
10:15 11:6 12:21
16:25 17:19 18:5
27:25 28:12 29:18
31:23 35:8 39:9
39:11 40:10 41:11

41:13 43:19 44:1
46:3,8,19 55:3
59:5 61:8 65:5,18
65:22,24 66:7
78:1 85:19,22
90:9 94:2,11
97:24 101:9
104:15 109:11
112:2,12 114:7
116:15 119:22
129:7,16 130:18
136:11 138:13
140:8,22 143:11
145:6,9,12,13
146:14 148:2
149:3 161:8,14
168:23 173:3,5
178:17 180:11
183:11 190:4,8
194:21 196:11
old 105:10,12,12
105:14 203:2
once 8:7 23:10,20
31:1,8 39:22 40:3
46:3 53:9,12 55:7
56:11 101:14
open 145:24 146:4
146:5,6 149:2
opens 165:20
operate 21:11
133:23
operates 77:10
operating 5:18 7:2
14:14 35:20,21,23
69:20 70:22,23,24
79:4 80:6 113:7
113:25,25 114:3
117:4 185:9
operation 41:18
166:16

operations 113:12
138:15,18,24
opining 69:9
opinion 7:10 8:1,7
8:11,15,19 9:5,18
12:25 13:12,20,21
15:4,7 17:2,6 18:9
18:10,16 22:18
23:10,20 25:1
26:1 28:21 34:23
35:15 36:25 38:2
38:6 47:11,14
48:1,5 60:1 65:18
66:3,4,5 68:22
69:5,9 70:3 71:10
74:3,20 75:13,15
77:14 78:8 80:1
82:4,8,14 85:15,18
86:1,7 87:6 90:20
91:19 96:18
103:16 119:9
131:21,23 132:3,4
132:7,13,14
147:13,20 148:1
148:14 150:9
152:21 153:22
159:12 166:10
170:6 175:14
186:7 191:11
opinions 9:22
11:25 18:6 28:1,3
91:9 97:6 175:15
176:11 190:15
191:14
opportunities
155:4,14,25 156:1
opportunity 16:16
31:20 150:20
151:3 155:24
156:5,9 167:24

opposed 75:8
147:7 149:12
opposite 92:7
optimism 136:13
optimistic 136:19
option 29:6,16
order 42:19 48:25
71:21 115:10
131:25 143:22
163:20 177:24
178:12 199:2
orders 134:4
ordinary 172:24
173:21
original 130:6,6
130:14
originally 44:18
47:18 48:16
ought 180:15
outcome 62:8
101:17 201:17
outcomes 59:25
outline 95:4
outrageously
132:1
outside 9:17 21:7
104:3 155:4 162:9
overall 68:22
138:10
overpaid 181:23
overtime 170:22
oviatt 2:14
owe 97:25 172:14
172:17
owed 41:8 64:5
67:23 73:1 83:13
owned 5:18,19,20
5:21 6:12 35:22
38:1 72:9 133:20
164:22 167:19

owner   94:4
owners   26:24
   90:21
ownership   6:14,15
   70:24 108:7 152:6
   154:17 162:1
owns   6:24 73:16
   167:9

**p**

p.m.   200:24
pabst   123:12,14
packard   106:23
page   3:2,8,18
   10:14 17:15,17
   22:23 27:16,18
   28:24 35:9 63:7
   68:13 92:16
   108:13 157:17
   165:22 186:22
   187:7 200:12,13
   203:6
pages   88:2
paid   15:5 37:14
   46:11 47:1 53:12
   55:4 62:20,20
   64:5,6,9 107:7
   111:12,15 114:21
   116:11 151:25
   157:11 162:25
   163:1 165:5
   171:14 173:14
   178:3,19 179:4
   180:1 181:2 182:6
   189:13,15
paper   79:1
papers   144:15
   174:3,4 200:9
paperwork   89:1,8
parachute   112:22
paragraph   10:16
   10:23 13:13 14:4

14:13,13 28:24
   35:6,8,9,10 70:3
   70:18 75:5 81:24
   129:15 130:2,14
   130:15,17 138:14
   145:9
pardon   17:14
   18:23 124:3 186:2
parent   7:5,7 82:19
   86:21 113:18,19
   160:23 163:21
part   7:15 14:10
   18:17 20:24 27:10
   27:15 42:16 51:15
   54:10 64:21 102:3
   103:17 111:13
   114:21 120:12
   143:11,21 156:23
   159:11 165:1
   169:16 182:21
   187:21
partial   182:8
participants   57:21
participate   150:20
participated   195:4
particular   10:9
   12:17 13:3,11
   20:15,16 24:8
   25:13 30:6 32:2
   42:18 47:8,21
   50:22 52:22 53:23
   54:1,5,5 55:19
   57:17 58:12,19,21
   60:11,15 61:2
   62:10,13,17,18,19
   66:15 69:15 88:6
   93:19 115:16
   122:6 130:11
   135:23 146:15
   148:13 150:22
   158:10 162:16

166:9 185:21
   195:24 196:2
particularly   80:10
   80:18 85:9 102:14
   128:20
parties   4:16,19
   47:7 102:13
   115:16 163:22
   201:16
partners   90:21
   96:17
party   83:13
   162:11 164:2
   167:17
pat   94:6 95:16
patrick   2:19
pattern   157:9
patterns   72:18
paul   188:15,23
pay   7:13 41:16
   73:23 74:13 76:7
   99:11 100:8
   101:10 114:19
   115:1,22,25
   118:21,24 152:5
   162:23 175:18
   176:10 179:6
   180:18 185:11
payable   195:15
paying   47:4 99:8
   163:15 165:4
   179:14 182:2
   185:24 200:20
payment   15:16
   79:13 83:20
   156:20 199:20
payments   152:10
payoff   29:9,16
pays   166:22
pbgc   33:9 34:11
   67:21,24,24 73:15

73:23,24 74:8
   75:22 76:5,7,12,14
   77:5,7,10 79:8,21
   80:10 82:22
   182:23 184:21,25
   185:5,8,12 186:4
   194:23 195:19
   198:24 199:1,22
pbgc's   199:13
pc   2:10
peek   58:8 59:20
   60:17
peeking   58:15
pending   60:10,11
pension   33:8 67:5
   67:20 68:4,8
   72:22 73:20 74:4
   74:7,21 75:2 76:8
   77:15,25 79:20,21
   82:18,22 83:11
   186:5 194:23
   195:6,14 196:4,13
   196:17,25 197:25
   199:3
people   11:25 19:1
   44:20 51:2 58:17
   59:15 84:2 125:13
   130:20 197:5
   200:10
pepsi   183:18
perceive   67:23
percent   15:3 19:8
   19:17,24 20:8
   22:13 43:16,16,17
   43:23 44:2,2
   48:20 49:10 89:17
   94:16 95:18 96:1
   96:7,16 99:2,4
   146:18 153:8
   160:2 161:6,25
   163:14 164:17,21

164:22 165:9
169:22,25 173:4
173:23 187:12,21
199:8,18 200:7
**percentage** 22:14
108:7 164:17,18
170:22
**percentile** 19:7,14
20:3,4
**perfect** 60:7 121:1
**perfectly** 51:15
**perform** 11:16
69:15 106:3,10
198:7
**performed** 69:3
**period** 14:3,6
23:22 24:5,21
53:14 54:4 157:12
**periods** 23:4
**permeates** 128:1
**permits** 164:5
**permitted** 110:13
**person** 93:8
116:11 125:14
153:12 172:4
183:10 195:1
**personal** 189:1
**personally** 190:1
**perspective** 67:22
70:19 71:18 72:7
77:18 79:6,19
85:7 104:7 122:20
125:8
**petition** 196:16
**pharmaceutical**
60:9
**phonetic** 174:5
**phrase** 58:16
**phrases** 51:2
**pick** 69:14 73:24
194:15

**picked** 69:11
**picture** 29:5 60:14
**piece** 13:11,23
62:14 158:3 179:9
**place** 1:19 2:15
92:9 102:22
132:10 153:3
201:9
**placed** 134:4
**plaintiffs** 1:7 2:4
33:15
**plan** 67:5 129:12
140:11 186:5
196:13,17 197:1
**plants** 126:18,19
127:11,14,16,20
**plausible** 23:24
41:23 117:5
**play** 21:17 73:15
122:18 123:4
137:7 186:14
**player** 167:25
**playing** 79:20
**plaza** 2:7
**please** 4:3 10:14
18:16 88:22 108:9
**pllc** 2:2
**plus** 44:17 46:1,16
46:17 71:11
114:13
**poaching** 131:20
**point** 7:6 10:8
21:24 27:16 30:6
31:5 40:5,11
52:22 53:6 58:12
58:19 59:9 60:15
61:2 62:17 78:7
78:16 79:1,6,18
80:11 83:20 86:22
86:24 87:7 95:14
103:22 104:16

114:4 118:11
119:19 124:20
134:10 151:22
158:15 162:24
163:3 165:1,2,3
175:25 179:11
181:6 184:24
188:18 193:10
195:11 197:22
198:4 199:19
**pointed** 43:8 45:3
48:3 49:4 99:1
**pole** 89:15 90:21
94:4,9 96:17 97:8
100:9,17,22 102:2
103:16,20 104:19
144:7 145:20,25
146:3,7,11 186:25
187:23 188:5
192:4
**policies** 52:11
**policy** 52:15
**pony** 151:7
**poor** 14:8 155:20
**poorly** 117:18
**portion** 7:22
190:21
**pose** 92:21
**posed** 8:13 34:18
66:2
**position** 58:11
62:16 73:12
107:15 137:13
151:7 186:3
**positive** 21:21
22:9 28:15 36:2,9
39:14,18 40:12
41:20 47:22
137:23,24 138:11
140:15 143:18
157:14 174:15

**possibilities** 118:4
118:5
**possibility** 39:25
83:5 101:12
**possible** 36:11
39:21 40:14
101:17 129:11
165:16 184:12
**possibly** 77:3
89:21 165:11,11
**post** 79:16
**potential** 36:1
39:13,18,20 62:24
86:14 125:10
135:10 160:22
162:13 163:20
164:6,18 167:4,5
184:12
**potentially** 36:8
39:13 57:10
**power** 95:3 126:11
126:18,19
**powers** 127:19
**practice** 1:19 9:11
9:15 11:24 16:3,5
135:15 197:8,16
**practitioner**
159:19,19
**pratt** 26:17 58:17
**pre** 24:21
**precedent** 169:3
169:17
**precise** 49:9 105:6
**precluded** 180:21
180:21
**predicated** 12:25
38:15 70:1 134:11
154:10 180:13
**predict** 142:17
**preference** 34:2

**preferred** 36:23
36:24 37:3,3 44:2
45:25 46:2,4,12,14
46:18 88:6 130:5
130:10,12 159:1
166:12 170:4,10
170:13,19 171:1,2
171:4,7,10,10,14
171:17 172:8,9,11
172:13,17 178:15
178:21
**preliminary** 89:6
**premise** 196:10
**premium** 42:9,23
43:3,9,23 44:2,3
44:12,17,19,23,25
45:25 46:1,15,16
46:18,24,24 47:1,4
47:5,5 108:6
111:2,3,7,9,11,12
111:15 112:15
114:6,8,10,10,23
114:25 115:1,12
115:14,23 116:1,7
116:10 118:14,17
118:25 119:1
163:1 165:4,8,9
166:11,21 167:6,7
169:22 173:24
179:10 182:3,9,19
183:20 200:7
**premiums** 43:16
44:25 45:8 46:11
47:2,8,13,19,23
48:8,8 174:6
**prepare** 61:17,17
198:18
**prepared** 190:3
195:2 196:24
**preparing** 61:15
189:25

**prescribed** 26:16
**prescription** 196:6
**present** 2:18 28:16
28:19 134:11
161:21 195:12
196:5
**presentation**
182:23
**presented** 137:16
191:15,25
**presenting** 136:19
**president** 156:11
157:6,7
**pressed** 194:5
**pressures** 130:21
**presumably** 159:2
180:20 197:23
**pretend** 71:24
**pretty** 6:18 107:16
121:6 131:6
138:18 149:1
159:21 165:25
166:3 168:5 170:8
173:19 174:5
196:7
**prevent** 115:5,5,10
118:19 119:5,7,18
**prevented** 129:23
**preventing** 115:9
**prevents** 92:3
129:25
**previously** 80:24
129:13 145:6
160:5
**price** 27:7 29:17
37:2,14 39:7
42:13,16,17 44:13
44:13 45:3,22,22
46:7,11,15 74:16
74:17,18 79:22
83:7 85:8 90:4

97:10 107:6 108:6
108:12,20,25
110:7 165:5
167:12 168:17
169:21 175:18
177:14,18 178:13
179:4,6 181:5
182:7,14
**priced** 174:25
**prices** 190:20
**pricing** 175:8,12
**pride** 95:3
**primary** 69:16
128:18
**principal** 7:3 58:8
90:23 100:20
128:15
**principally** 5:17
6:25 8:3 67:18
**principles** 26:14
50:10
**print** 184:15
**prior** 6:17 48:10
49:20 124:16,24
170:15 175:16
188:6,24
**priority** 32:17,19
32:20 34:9,17
36:24 149:7
166:12 169:23
170:8 171:2
**pristine** 90:14
**private** 26:12,15
26:20,21,24 27:6
61:14 149:5,18
**privately** 98:8
**prize** 30:24
**pro** 173:4
**probabilities**
66:11

**probability** 63:20
65:25 122:10
148:6
**probable** 62:14,21
62:23 63:22 64:12
64:19,20 80:2
**probably** 53:13
54:18 123:9
**problem** 55:14
74:20 88:1,8,9
90:15,15 103:10
105:9 107:24
188:2,3,3
**problematic**
121:20
**problems** 18:2
50:4 56:7 87:3,4
87:23,24 89:16,18
103:6,7,11 105:8
105:15 123:6
185:20
**procedural** 149:20
**procedure** 4:12
**proceeding** 193:17
**proceedings** 36:8
85:21 119:25
160:10 191:20
**proceeds** 37:4
74:6
**process** 39:1,4,6,8
39:9 75:10 121:17
150:5 200:3
**producers** 132:19
**product** 64:3
129:22,24 130:8
130:11 134:21
**productive** 72:7
**products** 123:10
129:6 135:9
**professional**
188:25 189:1

**professor** 172:6
174:3,4
**profile** 132:21,23
**profit** 22:2,12,14
57:13 138:15,24
140:7 143:20
186:16
**profitability** 22:12
22:17 136:5,7
138:18 142:22
143:14 175:25
183:22,23
**profitable** 21:24
22:19,20,21 23:1
23:11,17,20
101:15,16 135:24
138:2 186:20,20
**profits** 133:24
137:22,24,25
143:17 176:20
193:11
**programming**
130:13
**projected** 61:2
**projections** 61:9
61:12 134:8
135:12,13,19,20
137:8,14,17,17
**proper** 49:5
**property** 68:15
**proposal** 94:12
95:19
**proposed** 160:25
**proposing** 168:7
179:13
**prospect** 105:8,16
107:1,3,6,12 108:4
109:8 120:1
121:12 123:10
178:1 180:5

**prospects** 151:21
**protect** 27:7 74:18
79:22 85:8
**protecting** 130:24
**protection** 130:9
131:1
**protections** 149:20
**proven** 38:18
**provide** 8:1 13:8
16:16 63:2 70:3
134:8,16 174:5
181:7 195:11
**provided** 8:11
11:8 12:7 17:6
34:12 57:12,13
61:12 65:19 66:3
66:4,5 75:24
76:15 86:4 99:13
144:5 147:5,8
150:19 174:12
185:22 196:14
198:2
**provides** 12:5 87:9
87:12 111:8
130:16 134:12
**providing** 11:20
11:24 16:19 17:21
38:16 57:3 91:15
97:25 102:19
136:18 174:10
185:5
**provision** 160:24
**provisions** 160:25
161:10
**proxies** 183:5,12
**proxy** 54:25 95:2
179:9,9
**public** 1:21 19:15
26:20 201:3
202:22 203:25

**publicly** 19:4 21:6
21:8,10 24:23,25
25:25 26:5,6,9,11
29:7
**publiclytraded**
26:14 122:4
**purchase** 42:13,16
42:17 74:16,17
94:18,21,24 97:10
134:4 149:13
167:12 169:21
175:17 176:18
177:14,18 178:13
180:1 185:21
**purchased** 106:18
**purchaser** 84:8
95:17 96:1 146:25
158:6 161:22
169:15
**purchases** 94:15
97:17 169:17
**purchasing** 96:16
**pure** 21:17 122:17
123:4 186:14
**purely** 176:18
**purport** 51:7
**purpose** 6:7
147:14,17,18
154:23
**purposely** 154:3
**purposes** 92:25
93:4,6 100:24
128:3 148:5 161:3
**pursuant** 1:18
201:9
**pursuing** 79:25
**purview** 152:20
155:12,18
**put** 19:7,9 26:4
28:2 43:1 45:12
51:24 52:4 58:11

62:16 67:19 72:2
72:3,6 77:5,7,21
78:13 80:16 82:12
85:16 102:21
110:9 115:2,12
125:5 134:10
137:3 140:24
167:19,21 169:21
180:24 184:24
192:8 200:11
**puts** 70:18 72:4
**putting** 14:8 23:19
53:7 73:12 135:22

## q

**qualified** 198:7
**qualitative** 137:18
**quantification**
67:19
**quantify** 50:1
**quasi** 115:10
**question** 4:22 5:12
7:19 8:13 10:9
26:12,18 27:25
29:2 34:18 35:4
50:14 52:8 53:5
55:24 56:2,25
58:5 59:4,6,9,12
66:2,13 67:9,14
72:12 85:11 93:5
96:3,4 98:21
102:24 103:8,10
104:2,23 105:3
106:22 108:9
120:21 121:20
126:1,2,2 142:6
157:9 159:7 161:2
167:13 169:8
177:20 179:2,22
180:4 189:6,18
195:21 200:8

**questioning** 90:13
  100:11
**questions** 11:14
  16:14 40:24 73:11
  86:14
**quick** 9:3
**quite** 20:1 108:1
  127:12 180:7
**quote** 13:14 35:25
  36:6 74:14
**quotes** 130:3

**r**

**radio** 22:22
**raise** 80:12 98:19
**raising** 150:20
**rakoff** 190:15
**ramsey** 2:6 4:3,5
  4:14 11:10,22
  12:2,11 18:3
  27:19 29:2 33:17
  34:4 35:2 37:20
  39:16 44:6 48:6
  49:2 50:8 51:11
  56:1,5,24 57:2,23
  59:19 67:8,11
  69:18 71:6 72:19
  73:2 75:4,17
  76:23 77:2,17
  78:5 80:20 82:8
  83:16 84:10 86:17
  87:11 89:4 90:2
  91:7,20 92:6,12
  93:3,13,23 95:8
  96:3,9,21 97:12,20
  99:6 101:1 102:9
  104:1 105:2,22
  106:20,22 110:15
  111:5,19 112:16
  113:22 116:25
  117:16 118:1,10
  119:11 120:9,11

123:15 125:2,18
  127:9 128:24
  130:25 131:22
  132:25 135:2
  136:16 137:1
  138:12 139:15
  140:5,16 142:5,20
  143:5,15 144:16
  144:25 146:1,23
  148:8 149:14,22
  150:1 151:14
  152:1,7,17 153:15
  154:1,19 155:8,17
  156:12,19 157:15
  160:16 162:22
  163:12 164:20
  166:6 167:2,16
  168:15 169:5,18
  172:16 174:23
  175:1,19 176:12
  176:17 178:8,25
  180:6 181:12,16
  182:4,24 185:6,17
  186:1 187:18,25
  188:25 190:21
  191:17 194:11
  195:25 196:19
  197:13,19 198:15
  200:17,21
**range** 49:15 50:23
  86:4,5,9 87:8,12
  87:17 103:11,13
  104:11 127:6
  184:12 189:21
**rata** 173:4
**rate** 19:11,13,13
  19:21,22,23 20:2,8
  20:9,19,22 99:2,9
  99:12 122:21
  125:10 135:18
  136:8 141:3 153:8

153:14 154:9,10
  170:17,20 187:5
  193:4
**rates** 19:16 24:19
  24:20 41:16
  135:10,10 152:22
  153:6,19,23 154:6
  189:12
**ratio** 18:22,22
  19:6 22:19 107:19
  107:25 175:25
  176:2,6
**rational** 106:16
**rationale** 28:11,22
  28:23 29:4 30:10
  34:19,23 45:18
**rationality** 27:12
  39:12
**rationalize** 194:16
**ratios** 19:6 107:6
**rcalihan** 2:12
**reaction** 53:5
  113:3
**read** 4:1,5 27:16
  27:19,21 63:24
  67:1 69:19 76:17
  81:2 94:3 95:13
  95:24 128:7
  130:15,18 131:2
  145:10 166:20
  199:24 202:6
**reading** 129:1,19
**real** 45:23 57:22
  66:18 97:5 161:23
  195:21
**reality** 132:5
**realize** 100:15
  194:17
**really** 19:2 25:13
  51:13 60:1 67:8
  70:14 72:5 78:13

80:1 95:16 100:4
  105:7,24 125:9
  131:6 139:13
  147:25 148:1
  159:22 162:4
  183:14
**realm** 61:25 92:13
  165:18
**reason** 40:20
  45:17 54:16 64:8
  71:22 81:23
  102:24 116:23
  117:1 134:25
  137:3 176:22,24
  203:6
**reasonable** 25:3
  25:20 51:16 54:23
  56:12 68:18 69:13
  79:10 84:22 87:8
  87:12 88:18
  115:17,19,21
  116:20 117:14,21
  118:5,6 123:5
  143:24 148:12,14
  153:24 183:5,12
  192:2,17
**reasonableness**
  152:22 154:6,8
**reasons** 75:11 98:7
  98:16 127:11
  134:21 168:2
  174:14 176:19
  183:24
**rebuttal** 16:17,20
  16:23
**recall** 12:14 14:19
  15:2 17:6 23:2
  76:24 128:10,11
  128:11 133:25
  139:22 166:18
  191:1

receivable 186:24
receive 41:20
  97:17 112:14
  195:19
received 156:10
  173:3
receives 97:19
  130:12
receiving 83:7
  153:23 156:15
  157:7
recess 85:20
  119:24 160:9
  191:19
recession 138:6
  139:19
recognize 42:3
recollect 12:17
  15:16 81:4 109:4
recollection 11:1
  17:16 18:20,21
  33:13 98:24 128:6
  128:7 129:5 136:6
  138:9 144:18
  150:18 152:9
  166:19 173:6
  184:23,25 195:3
  195:13
recommendation
  190:19
record 35:11 43:4
  53:17 80:24 84:21
  121:22 187:3
  198:6 199:25
  200:15 202:9,12
recorded 54:7
  56:10
records 55:7 195:8
recount 11:4
recounted 11:12
  13:1

recourse 94:17
  101:5
redeemed 170:15
reduce 77:24
  167:10
reduced 40:19
  42:17,18 139:1
reduces 129:9
reducing 138:3
reduction 42:9
  43:17
refer 10:16 93:8
  116:13
referee 4:19
reference 8:18 9:4
  67:15 146:11,12
  174:7 194:24
  200:13
referenced 10:23
  58:3 200:16
referencing
  199:21
referred 24:13
  75:7 108:13
  114:22
referring 6:11
  17:13,13 23:6
  28:9 33:7 43:1
  61:4 65:7 81:16
  87:15 138:21
  145:24 151:1,2
refers 14:4,14 23:4
reflect 42:14,18
  44:18 53:25 54:4
  59:6 74:2 80:8
  81:25 82:21
  147:10 177:23
  192:19
reflected 35:19
  61:6,7 130:16

reflecting 82:5
  109:24 145:3
reflects 49:11
  105:25 143:16,17
refresh 17:16
  27:23 144:18
refusal 42:23 43:5
  46:13 88:12 90:16
  94:18,21,23 111:3
  159:9 162:10,12
  162:19,24 164:3,7
  164:9,16,19
  167:11 168:12
refusing 141:11
regard 24:24
  42:10 58:1 89:15
  90:17 97:1 98:25
  120:25 123:8
  144:7 165:13
  172:13 173:17
  181:7 184:6
  190:18,19
regarding 63:20
  70:4 194:22
regardless 193:5
regional 133:19,20
regular 173:9
  200:10
regularity 127:12
  127:21
regulation 128:14
regulations 124:23
  127:15 130:22
related 66:5 175:8
  201:16
relates 54:2
relating 198:23
relation 33:5
relationship 13:25
  14:24 20:21,23
  21:22 22:3 56:18

90:25 91:12,18,19
  91:21,22,24 92:3
  130:1 171:23
  175:22,24
relationships 22:4
relative 26:5 78:20
  111:10
relatively 6:7
relevant 22:10
  58:13 68:18 71:19
  73:13 75:3,15,19
  75:19,20 86:15
  88:21 92:18
  112:18 122:11
  135:21 136:25
  137:2 147:2
  159:22
reliability 178:15
  180:4 186:7
reliable 86:2 87:20
  108:19,21,21
  135:1 136:14
  154:18 178:21
  181:25 190:18
  198:21
relied 8:4,19 9:1,5
  9:9,17,18 10:9
  12:21 65:16 67:11
  144:8,9 175:11
  176:21 197:6
rely 9:22 10:6
  11:25 12:7 61:9
  93:14 104:19
  122:15 123:8
  144:2 197:9,16
relying 108:22
  121:9
remain 40:17
remainder 199:18
remaining 157:6

**remains** 36:1
**remarkable** 41:17
**remedy** 151:23
**remember** 14:19
  14:22 15:6,14,17
  16:22 17:8 33:18
  43:18 117:5
  128:15,25 129:1
  134:3 144:19,20
  144:21 145:2,15
  150:21,22 153:17
  159:4 160:4 165:1
  172:21 173:2,7
  174:9 175:13
  177:9 183:8 191:7
  192:9 194:3
**removed** 17:10
  39:22
**removing** 111:2
**reoccur** 143:4
**reorganization**
  152:12
**reorganize** 140:10
**repaid** 101:4
**repeat** 35:3 52:8
  108:8
**rephrase** 35:5
  52:10 93:7 117:21
  182:6
**reply** 187:23
**report** 3:9,10 6:18
  7:22 8:20 9:5,9
  10:14,23 11:13
  13:4 16:10,11,16
  16:17,20,23,24
  18:14 27:10,15
  28:2 41:9 43:8
  44:14,18 51:20
  53:13 63:8 67:1
  69:19 70:2,17
  75:21 85:22 88:2

  92:16 108:15
  120:17 134:7
  145:2 152:21
  157:17 174:8
  175:16 186:23
  194:24 200:6,12
**reported** 52:6,12
  55:7 58:25 59:2,3
  192:6
**reporter** 1:20 4:1
  4:4 5:13 200:19
**reporting** 51:10
  55:10,16,17
**reports** 54:24
**represent** 33:19
  62:14 112:2
  146:10 161:5
  173:3 177:19
**representation**
  112:25
**representing**
  181:20
**repurchased** 90:4
**request** 45:16,18
  174:11
**requests** 3:17
**require** 101:5
  102:8
**required** 42:12
  95:1
**requires** 45:6
**reread** 27:17
**reserved** 4:22
**residual** 30:12,15
  33:2 36:14 151:18
  152:13
**respect** 172:8,23
  194:23
**respective** 4:16,19
**respond** 11:15
  12:3 13:2 17:5

  18:4 40:23 50:14
  59:11
**responding** 27:11
**responds** 179:2
**response** 58:7
  184:20
**responsibility**
  37:6
**responsible** 50:16
  153:24 190:6
**rest** 73:24
**restated** 57:12
  58:4 84:3
**restatement** 57:11
  57:24 58:23,24
**restates** 57:6
**restaurant** 189:4
**rested** 182:12
**restricted** 112:6
  163:8 164:14
**restriction** 159:13
  160:6 161:3,11
  164:1 165:11
**restrictions**
  128:18,19 131:19
  158:21,23 159:4,5
  160:2 161:20,24
  162:8 163:13
  164:13
**restructure** 36:8
  36:23 140:10
**restructuring**
  36:12,12,15
**result** 6:16 13:15
  47:22 48:24 52:5
  72:12 127:16
**resulted** 48:17
**results** 26:25 49:1
  86:5 105:20 134:9
  134:25 174:15,16
  174:19

**retail** 132:16,17
  133:9 134:2
**retain** 95:1 162:17
**retained** 3:6 6:6
  140:9 155:23
**retaining** 163:2
**return** 136:7
  187:4,5,16
**returning** 136:4
**revenue** 22:7,19
  23:11,21 55:15
  56:14,16 107:19
  108:17 138:15,16
  142:9,12 193:7
**revenues** 107:14
**review** 27:14
  98:22 160:18
  184:20
**reviewed** 11:2
  16:15 18:1 143:21
**revised** 42:8 45:1
  45:9
**revolved** 70:25
**revue** 22:24
**reward** 122:6,21
  151:21
**reynolds** 2:11
**rhode** 1:14
**ridiculous** 124:12
**right** 5:10 9:20
  10:12 16:10,17
  18:2,7 20:16 22:9
  29:25 30:3 31:12
  31:13,25 32:24
  40:7 41:11 42:22
  42:24 43:5,13,21
  43:24 46:6,12,12
  47:1,5 48:13,17,19
  53:10 54:8,10
  55:21 59:10,13
  61:9 66:8,23

68:11 70:2,7,9,21
71:2,5,9 72:6
75:12 76:17 78:2
79:17 81:9,11
83:23 85:5 86:13
88:12 90:6,16
94:3,18,20,21,22
94:23,25 99:1,21
99:22 100:2,5,7
101:15 105:15
107:1,3 111:2,24
114:15 115:16,19
117:3,8 118:16
119:6 124:20
129:22 133:3
138:4 142:13
143:4,14 147:16
148:18 149:10
151:11 156:18
160:13 161:19
162:10,12,18,23
164:2,3,6,9,16,19
165:25 166:14,15
167:11 168:12,18
168:19 171:6
173:8 174:17
175:9 177:8 181:4
181:11,14 184:2
189:12 190:23
191:21 195:16
196:9,22 198:14
200:4

**rights** 42:15,18,21
42:22 48:9 88:2,3
88:4 106:1 108:6
109:13,19 112:11
151:6 158:6,11,19
159:1,6,9 161:9,20
165:21 166:9,12
172:23

**rising** 12:19
**risk** 73:17 122:6
122:20 127:10,11
127:11,13,14,18
129:21 151:21
**riskiness** 122:22
125:9 127:8,24
128:1 129:9
**risks** 127:19
**road** 60:13 203:2
**robert** 2:10 30:23
**rochester** 1:20
2:12,16 4:24
123:16 189:2
**rofr** 43:2,4 44:2
46:17,19 109:22
111:16,21 112:18
115:5 116:3
118:19 119:5,7,17
158:25 164:24,25
165:7 179:10,20
179:21 180:3,9,11
180:22 181:8,9
182:7
**roles** 72:14
**roll** 80:9
**rose** 12:15
**rosenbaum** 190:8
**rough** 174:5
**roughly** 41:3
**round** 96:23,25
97:2,11
**row** 117:12
**rule** 171:16 174:10
199:4,5
**rules** 1:19 4:12
170:11 172:12
**run** 25:10,11
73:17 117:7
118:20 154:21

**running** 78:2
183:7

**s**

**s** 203:6
**sake** 56:9 112:2
**salary** 157:8
**sale** 93:22 109:6
109:21 112:19
129:24 149:13
157:1 161:24
172:25 173:10
181:10
**sales** 128:14
132:16,17 133:6,8
133:14 145:23
**sanity** 18:19 20:1
20:25 21:5 24:8
24:14,16,22 25:25
46:6 106:3,10
107:7
**sat** 7:23,24
**satisfaction**
143:24
**satisfied** 64:24
**saw** 76:15 100:13
123:18
**saying** 21:7 24:23
37:5 45:16 46:9
49:22,24 53:22
57:2,5 70:15
82:10,11 89:5
93:16,18 96:5
97:16,25 98:4,6
101:18,20 111:13
111:14 112:18
117:20 118:25
124:8 125:14
131:20 142:19
151:16 154:2,11
154:14 156:21,24
159:20 161:18

168:20 176:15
178:1,11,17
180:12 183:16
196:16
**says** 35:18,25 37:6
45:8 74:4 81:17
81:20,24 82:14,14
93:20 95:21
104:13 120:6
130:2 145:23
146:16 157:18
164:1 165:25
**scc** 109:2
**scenario** 117:6
128:16,18
**scenarios** 143:19
**school** 126:9 183:7
**screwed** 119:20
**se** 98:20
**search** 21:13
**seat** 167:1
**seats** 109:9
**second** 32:9,9
45:11 48:24 59:17
62:14 63:21 90:18
129:15
**secondary** 98:10
98:11,14 122:25
**section** 13:6 28:5
160:6,19 161:7
**secured** 32:20,22
33:1,12,24 34:16
34:20 94:16
**security** 33:16,21
33:23 54:24 55:12
64:4 97:1 137:9
190:14
**see** 5:9 9:4 10:19
13:17 18:2 19:2
19:24 21:19 23:5
26:4 29:13 30:13

36:2 40:11 46:6
47:17 50:6,6,20
52:23 53:2 63:19
64:6 67:6 76:4,5
79:6 81:5,13 82:2
82:3 90:11 97:10
107:5 112:21
115:11 117:5
121:13,19 123:17
125:16,22 129:16
139:4,6 140:21
141:18 142:9,10
142:10,11,12,14
142:14,16 143:9
143:10 144:13
150:18 156:14
157:10,22 160:21
161:23 166:14
167:17 168:19,20
168:22 174:19
179:1,2,2 183:16
187:15 189:3
194:24
**seeing** 49:7 145:15
166:18
**seen** 16:12 73:17
74:9 80:25 81:2
116:18 145:14
148:21 150:21
153:12 164:11,12
171:12,14 172:11
199:1
**segment** 122:7
**selected** 186:12
**selection** 186:9
**sell** 27:3,7 92:19
97:1 98:8,15
109:23 112:8,9
113:5 129:22
130:5 131:5
132:18 133:2

159:16,24 164:14
164:14 167:10
168:12 181:21,22
182:18
**seller** 68:16 92:17
158:7 169:2,14
**seller's** 169:16
**selling** 83:7 98:17
98:17,19 113:18
113:19 130:10
133:11 157:20
159:20,23 166:7
167:15 168:4
**sells** 123:21,22
124:9 125:6
**sense** 12:9 24:24
26:5 70:16 71:25
71:25 85:7 99:4
101:11,19 103:12
167:24 168:6
176:7 185:3,12
**sensitivity** 50:5
87:13,14
**sentence** 35:18,25
36:6 95:24
**sentences** 44:22
**separate** 47:4
56:17 74:21 80:6
**separately** 126:21
188:21
**september** 201:19
**series** 6:8 32:20
140:20 142:15,15
**serious** 80:9
**seriously** 77:11
**services** 91:16,16
102:4
**session** 27:9
**set** 73:17 131:24
156:22 201:9

**settlement** 24:6,10
76:16
**setup** 52:9 148:22
**seven** 167:1
192:23
**shafted** 149:21
**shannon** 58:17
**share** 159:23
**shareholder** 31:6
31:10,17,19 36:9
40:6,12 154:22
171:25
**shareholders**
31:24 32:7,12
34:24 36:25 41:19
51:20 149:7,21,24
150:4,13 154:23
171:8,24
**shares** 26:25 27:4
27:8 45:23 98:15
98:17,18,19 99:19
99:21 100:4,13
101:6,8,9,11,18,22
101:25 159:20,23
159:25 161:11,22
162:1,3,9 165:18
**sheet** 78:18 97:14
99:23 177:6,23
196:22,24 203:1
**sheets** 170:4
**shell** 73:15 115:4
**shield** 147:18
**shielding** 148:5,16
**shift** 134:19
**shocked** 61:19
**shocking** 61:20
**shopping** 48:19
**short** 40:19 41:15
85:20 119:24
160:9 191:19

**shortcut** 92:16
**shorthand** 201:10
201:14
**show** 94:1 129:12
144:17 187:13
**showed** 22:1
**showing** 19:18
42:2 80:24
**shows** 138:14
**sic** 121:18,19,19
121:21,22,24,25
122:7
**side** 50:17 79:3
156:20 157:4
**sign** 4:2,5
**signature** 201:22
**signed** 11:2 13:24
81:6 202:18
**significant** 52:5
72:17 88:1 109:23
146:17 159:8
**significantly** 35:13
72:24 118:23
157:13 175:17
**silly** 58:16
**similar** 36:22
54:23 122:22
123:2 124:1
128:19 130:23
138:25 139:2
142:23 163:13
171:3,4 183:17
186:15
**similarities** 97:10
107:9,10 111:3
123:7 124:17
184:6
**simon** 183:7
**simple** 24:22 93:7
**simplified** 54:21
132:1

**simply** 52:15
153:5 164:2,6
**single** 14:10 94:13
95:19 149:8
**sit** 74:19 194:3
**site** 3:19 45:12
**sitting** 41:22
144:18
**situation** 10:17
12:14 13:9 29:20
31:14 33:1 41:19
45:7 53:21 82:24
83:6 114:24
158:14 199:1
**situations** 29:23
58:24
**six** 94:16 95:17
96:1,6,16 105:14
117:11 197:18
**size** 122:7 133:17
186:15,16
**skate** 75:22
**skeptical** 185:14
**skirt** 76:6 131:3
**slight** 141:23
**slightly** 138:20
141:19,20,22,24
142:1,2,3
**sliver** 29:25
**slocum** 1:15 107:1
107:7,8 160:15
174:13 177:25
178:2,11,12,13
179:4,5 180:1,17
180:19 192:22
**slocum's** 175:12
175:16
**slow** 5:12
**small** 39:24 51:12
51:18,19,21 61:14
102:14 127:12

159:17,25 180:10
187:12,13 189:2
**smaller** 40:5
**snapshot** 141:7,13
**sold** 73:21 74:6
96:17 98:12
132:10 140:6
163:14
**sole** 35:19,21
**solely** 93:12
100:24 102:23
104:19,25 123:9
**solutions** 203:1
**solvency** 7:10 69:6
78:8,15 147:20
**solvent** 47:20 69:7
86:20,21
**somebody** 27:4
179:14 197:23
**someone's** 12:15
**someplace** 29:22
**someway** 38:12
**somewhat** 19:24
138:17
**sons** 1:15
**sorry** 5:21 14:4,16
23:18 37:21 39:17
50:12 90:7 108:14
131:4 152:3
160:17 169:7
**sort** 7:15 49:19,25
51:10 73:10 106:3
139:2,5 153:1
155:6 157:10
158:15 164:23
170:14 171:25
196:15 198:7
199:12
**sorts** 124:18
131:19

**sound** 41:11 90:6
95:6 96:7 167:3
177:8 192:10
**sounds** 12:6,8,9
34:7 113:15
178:11
**southern** 1:2
13:16 14:1,6,7,17
14:20 15:1,2,5,16
23:3 88:11,11,13
88:14,16 106:2
115:7 119:3,3,7
156:10,16 157:3,5
181:1
**southern's** 15:13
**spanish** 124:9
**speak** 15:19,25
**speaking** 15:18
33:20
**specific** 6:4 9:25
10:1 11:13,14
13:10 16:14 17:4
22:3 28:25 36:20
40:24 41:1 59:25
64:4 75:8 148:11
149:1 154:20
189:20
**specifically** 10:8
14:23 16:22 50:13
65:12,15 69:4,19
76:24 82:18 93:20
110:9 128:10,11
145:8 176:8
**speculate** 30:4
**speculating**
125:17 176:17
**speculation**
125:19 135:16
**spend** 61:15 70:16
**spin** 137:3

**spit** 56:23
**spoke** 10:4
**spreadsheet** 190:3
**spreadsheets**
44:21
**staff** 10:4 15:22,25
61:16 197:4
**stagflation** 41:15
**stake** 168:1
**stand** 34:11,16
45:4 46:15 114:20
114:22 118:24
147:22 179:5,7,15
180:19
**standard** 9:11
121:23
**standards** 55:22
**standpoint** 115:6
**start** 19:24 28:19
50:19 79:19 87:24
87:25 121:18
176:17
**starting** 46:7
**starts** 32:22 133:8
172:20
**state** 14:10,12,12
14:20 15:14 70:10
101:7,20 107:10
107:11 130:23
132:6,23 201:1,4
**stated** 9:2 35:20
48:10 153:2,6
**statement** 12:15
36:4,10 55:2 58:1
68:12 134:9
136:25 146:25
157:25
**statements** 12:22
28:4 35:6 136:11
136:14,15 155:2

**states** 1:1 19:9
21:12 35:12 94:12
128:13,20,20
**stay** 54:8 90:18
**stayed** 138:7
**steadfast** 171:16
**stein** 1:5
**step** 38:20 98:6
121:13 149:17
152:10 177:24
**steps** 150:7,10,10
152:9 178:9
**steurm** 90:22
91:12 94:4 96:5
96:15 100:19
101:21 102:4
103:18 140:10
141:17
**stick** 160:18
**stipulated** 4:18
**stipulations** 4:4,10
4:11,15
**stock** 6:11 37:3,3,4
37:5,12 70:4 88:6
94:24 102:12,20
120:22 143:23
158:21,23 163:9
164:14 166:12
170:10,13,15,19
171:1,2,3,5,5,7,7
171:17 172:8,9,11
172:13 190:19
**stockholder**
171:21
**stockholders**
171:10,10,13,14
172:15,18
**stood** 185:9
**stop** 17:12 31:15
56:20

**store** 133:12,18
**stores** 48:21
132:18 133:2,17
133:20
**straight** 52:25
**strange** 40:25
113:15
**strategic** 134:24
176:18,24 179:6
180:17
**straw** 124:11
125:11
**street** 2:3,11
**stress** 31:9
**strike** 102:17
**strong** 21:22
**strongest** 22:4
**structural** 92:25
93:4,6
**structure** 38:11,14
95:4,22 158:13
**studied** 194:13
**study** 194:17
**stuff** 18:21 38:13
72:1 194:13,17
**subject** 58:14
131:19
**submitted** 144:22
**subpar** 14:13
**subscribed** 201:18
202:18 203:22
**subsequent** 59:18
**subsidiary** 82:20
**substance** 97:3,5
98:23 123:19
**substantial** 19:11
19:18 88:2,3 89:8
127:12,17 136:7
158:5 165:25
166:11,13 173:19
177:20 185:11

**substantially**
170:1 173:10
180:16
**subtract** 69:23
193:11
**subtracted** 192:5
**subtracting**
192:23
**successful** 148:16
**successfully** 79:25
**sue** 83:19
**sued** 37:5 55:14,18
64:10 79:14 83:13
137:9
**suffered** 13:15
**sufficient** 45:17
102:5 121:4
**suggest** 121:8
**suggested** 159:8
**suggesting** 47:21
86:13 114:2
152:19 161:17
185:15
**suggests** 45:6 49:6
194:6
**suing** 33:5 62:12
**suite** 2:7,11
**summary** 76:19
81:11 186:23
**sun** 12:18
**supervision**
201:11
**supplier** 129:25
130:3,4 131:3,5
**supplier's** 130:11
**suppliers** 171:20
**support** 45:19
130:13
**supported** 191:12
**supports** 69:8

**suppose** 12:14,18
49:17 56:6 176:22
**supposedly** 97:16
**suppositions**
168:21
**sure** 5:13 6:6 7:20
11:22 12:3 29:3
30:25 31:18,22
34:11,19 36:11
41:1 44:12 45:4
45:21 46:6 52:9
56:13 57:14 67:15
69:1 75:25 76:1
79:4 81:3 91:14
91:16,22 92:8
96:9 97:15 106:6
106:21,21 112:17
117:17 118:6
134:17 136:22
137:5 145:12
146:6,9 147:13
152:8 163:17
169:10 173:20
179:18 199:4
**surprise** 194:9
**surrogate** 54:25
**surrounding** 58:6
**suspect** 185:10
**switch** 48:25
**sworn** 4:24 201:7
203:22
**synergies** 114:12
114:12,16,19,19
114:21 115:3,3,13
116:6 119:1
162:17,21 163:2
179:8
**synergy** 116:14

**t**

**t** 202:2
**tag** 161:9
**tail** 139:23 140:3
  142:25 143:2,8
**tailed** 65:11
**take** 9:3 16:3,5,6
  19:12 26:21 32:16
  40:20 43:21 45:22
  46:16 48:20 60:11
  62:8,9 64:7 68:3
  68:13,21 73:10
  75:25 77:10 80:20
  82:11 85:19 86:24
  101:24 104:7
  110:8,20 114:17
  114:19 119:23
  127:4 137:19
  138:13 154:17
  160:7,8 162:12
  163:6 167:23
  183:3,13 190:7
  192:19 193:6,10
  199:12
**taken** 53:9 54:10
  127:22 131:6
  149:4,24 150:4,7
  162:5 174:20
  201:8,10,14 202:7
**takes** 51:8
**talk** 58:17 66:14
  107:12 172:6
**talked** 41:23
  122:23
**talking** 5:11 6:5
  12:11 45:21 49:17
  50:10,13 51:24
  52:1 59:22 61:21
  64:1 75:6 79:8
  85:1 88:3 93:19
  102:12 115:20

120:1 128:25
  133:18 159:12
  168:2 179:11,14
**talks** 58:18,18
  92:17
**target** 114:20
**task** 69:16 84:16
**taught** 122:13
  126:9
**tax** 187:4,5,16
**teach** 68:2 194:14
**teamsters** 67:5
  79:9,21 80:11
  81:8 82:22
**technically** 170:10
**telephonically**
  2:18
**tell** 8:16 18:16
  34:8,9 36:18
  66:17 74:2 128:9
  140:3 170:11
  172:2 180:14,16
  198:1
**telling** 75:19,22
  84:18 115:25
**ten** 123:23,23
  166:2
**tends** 158:11
**term** 76:17 91:2
  91:23 92:14,15
  171:22 199:18
**terminating** 130:1
**terms** 6:14 34:22
  37:22 43:8 47:10
  48:16 51:25 52:6
  52:12 57:10 60:3
  66:11 68:14 90:9
  94:15 103:19
  121:12 127:6
  131:19 136:4
  137:13 144:22

163:16,22 167:17
  169:2,20 172:9,12
  172:22 173:21
  174:12 175:14
  178:5 189:25
**test** 157:20 178:14
  178:20 197:21
**testified** 4:25
  159:13 190:12
**testify** 201:7
**testifying** 142:5
  198:11
**testimony** 190:13
  190:21,24 201:5,6
  201:8,10,13 202:7
**testing** 132:2
**textbook** 194:15
**textbooks** 26:17
**thank** 50:12
**theory** 29:7 172:3
**thereof** 201:17
**thing** 14:21 24:2
  26:19 27:20 28:25
  30:13 32:10 38:14
  45:21 53:7,10
  74:1 87:5 88:18
  93:7 100:3 105:5
  105:6 112:3 124:6
  124:18 140:24
  156:20 158:4,9
  159:5 163:20
  183:13 187:14
**things** 10:10 11:5
  20:14 38:17 41:23
  42:12 44:17 50:5
  51:2 52:2 60:16
  62:15 67:24 74:15
  76:18 87:3,22
  88:10 89:9 91:15
  92:19 99:1 104:9
  108:3,7 122:12

127:25 133:2
  136:22 153:18
  161:21 174:11
  181:15 183:2
  189:4 190:17
  192:2 200:7,13
**think** 5:7,9 6:17
  13:22 14:10 15:22
  17:8 18:14,15
  21:1 22:1 24:1,2
  24:15 29:15,16,17
  31:15 33:6 36:23
  39:5 40:15 41:12
  41:18,22 43:1
  44:16 45:10,11
  47:6,21 50:2 51:6
  58:15 59:21 63:25
  70:10,12 71:19
  72:6 76:14 77:9
  77:11 78:4,6
  79:12,22 81:2,16
  83:6,17 85:10
  87:8,10,12,24
  88:20,24 89:18
  91:4,14 92:7,8,12
  94:8 95:14 101:2
  102:5 103:3 104:2
  104:14,16 105:8
  106:14 113:2
  114:5 117:14,14
  117:21 118:7,14
  119:12,21 120:2
  123:12,20 125:3,4
  125:10 129:1,3
  130:2,14 131:24
  132:8 133:20,21
  135:15,25 136:17
  137:18 138:7,21
  141:15 142:25
  145:24 146:5
  147:12,23 148:9

148:12,14,15,19
149:3,10 151:1,2
154:9 159:7,9
161:2,9,16 162:15
163:2,25 165:3,20
167:20 168:8
174:2 176:13,13
179:3,16 180:7
181:6 183:4,5,8
184:8,9 185:22
187:19 188:18,19
188:22 189:10
190:9 191:2,7
192:17 193:2,3,4,8
195:10 199:4,5,16
200:4,18
**thinking** 27:4
150:3 161:23
197:23
**thinks** 85:17 168:1
183:11
**third** 6:20,20,20
6:21,21,22 77:1
197:17
**thought** 8:21
25:19 57:22 75:21
115:15 118:13,20
144:11,11 158:23
158:24 162:5
176:2 182:7
183:10 185:19,23
**three** 19:13,16,19
19:22,24 20:8
24:21 53:11,13
55:4 65:9 67:3,4
78:18 107:23
114:13 183:14
185:18
**ties** 56:18
**tight** 108:2 123:7

**tightest** 105:17
**time** 4:22 5:2,8,22
8:23 14:1,3,6 16:9
21:24 23:4 24:21
25:21 29:25 30:2
30:2,22 35:14,16
40:17 42:1 51:14
53:10,18 54:3
56:11 57:12,20
58:3,12,20 59:9,16
60:16 61:2,6,15
62:17 63:12 65:19
66:1,12 73:5 77:7
80:22 83:6,12
84:2,8 99:3,7
105:10 106:21,25
107:3,17,18 112:4
120:18 126:10
130:4 131:11
135:12 136:3,12
138:6 150:8
151:22 157:8
158:17 176:1
177:19 178:17
179:1 184:18
189:18 193:10
194:20 195:9,11
195:15 197:22
198:5 200:15
201:9
**times** 10:5 18:24
18:25 44:9,10
46:15,17 67:3,4
84:14 101:23
141:21 190:12,24
193:7 200:16
**timing** 79:15
**today** 81:1 106:12
107:25 144:18
145:14 161:3
168:4 193:4 194:3

**today's** 193:7
**token** 141:10
168:10
**told** 86:10 119:20
128:12 129:18
130:19 143:3
188:1
**ton** 190:12
**top** 6:19 68:6
**topics** 17:2
**torchio** 1:18 3:3
4:23 108:14 202:5
202:16 203:4,21
**total** 78:19 108:6
108:12,25 159:25
**totally** 47:4
**touched** 165:3
**town** 189:2
**track** 67:14
**tracked** 153:20
**traded** 19:4,8,15
21:6,8,10 24:23,25
25:25 26:5,6,9,11
29:7
**trading** 122:16
123:6 184:14,15
184:21 185:5
186:8,11
**trados** 36:21
**train** 118:12
**trained** 4:8,9
**training** 120:25
182:21
**transaction** 3:12
5:25 6:10,16,17
11:5 15:15 23:3
27:13 34:19 37:9
37:10,11,13,18
38:16 42:7,10,14
42:14 49:20 57:18
57:19,21 58:4

59:16 63:13,15
65:20 66:1 69:8
69:12 73:6 74:9
75:1 88:1,20
89:16,22 90:12,14
90:14 91:11,25
92:1,4,5,9,20,22
93:2,14 94:10
95:6 96:7,19,24,25
97:2,9,11 100:25
102:2,15,21,22
103:4,17,20,23,25
104:5,6,20,23,25
105:10,19 106:25
107:1 108:12
109:16,25 110:3
112:7 114:9
115:11 120:18,20
122:4 135:12
136:12 144:12
145:21 146:4,11
147:15,24 148:4
148:15,22 149:6
150:8,12,15
156:23 157:19
158:1,4,5,7,16,17
161:15 165:8
168:25 169:1,4,13
169:15,17 174:21
174:25 175:8,12
176:5 177:15
178:16,24 181:5
184:13,14,18
187:23,24 188:2
192:1,4,17,18
**transaction's**
69:10
**transactions** 6:8
87:25 98:23
102:13 103:7
105:16,17 106:5

108:20 122:14,14
122:16 124:16,19
124:24 146:12
148:21 179:24
188:4
**transcribed**
201:11
**transcript** 4:20
31:16 90:19
200:19 202:6,8
**transcription**
201:13
**transfer** 5:24
26:25 32:12,14
33:5 35:16 41:3
68:23,24 69:1,2
77:5 83:12 84:24
111:18,22 131:12
136:4 161:4,6
162:11,13 163:21
163:23 164:1,6,25
168:25
**transferees** 160:22
**transferred** 34:25
100:5 157:3
**transferring** 82:19
163:5
**transfers** 148:23
**translate** 177:22
**transparent** 95:13
149:13
**transported**
107:24
**treat** 68:7 187:20
**treating** 44:23
**trend** 138:10
139:4 140:15,17
141:12,16 142:3
142:11,11,24
143:10

**trial** 4:22 16:24
132:7 169:11
**tricked** 182:2
**tried** 18:19 49:3,4
73:20 80:5
**trier** 104:2,4,13,13
147:22 155:10
**tries** 152:5
**trigger** 112:22
**triggering** 168:13
**trip** 96:23,25 97:2
97:11
**truck** 51:18
**true** 47:1,3 49:3
54:19 79:22 101:5
111:6 124:2 133:4
147:23 157:19
163:8 180:17
182:1,3 201:13
202:9,13
**truly** 62:7
**trust** 1:15 2:17
6:12,19,21,22 7:25
35:1 38:1 71:20
72:5 150:16,19
151:2
**trustee** 38:1 76:7
**trustworthy** 12:1
12:4
**truth** 201:7,7,8
**truthfulness** 11:20
**try** 11:15 27:7
49:13,13 51:7
58:7 59:20,25
73:14,14 76:6
80:13 88:3,8
107:5 111:24
122:1,18 131:25
135:17,19 166:8
197:17

**trying** 14:21 22:13
26:1 27:3 46:5
54:17 55:20 56:25
57:18 58:11,19
59:17 68:14,19,20
70:13 72:20 77:11
84:11,15,20,21
95:9 98:15 111:9
114:24 118:19
121:2,3 122:21
142:10 151:24
159:16,23 175:22
175:24 178:6
180:23 185:24
192:1 193:9
196:12
**tube** 136:21
**turn** 5:19 10:14
17:15 27:9 186:22
**turned** 138:2
**turning** 63:7
135:23
**turns** 13:1 28:21
105:23 182:11
**twenty** 196:18
**two** 33:3 38:25
42:9,11,12 43:16
44:10 46:11 60:13
62:15 64:2 65:6,7
85:6 88:2 92:3
94:8,8 99:2
107:23 127:2
136:23 158:23
159:3,6,6,23 166:9
168:21 174:14
180:18 187:12,21
193:6
**type** 112:3
**typical** 65:6
151:23 171:8
197:16

**typically** 130:10
151:11 170:14
171:9 183:4 197:8

**u**

**uh** 36:3 45:24 57:8
57:8 61:22 62:4
94:5 112:24
160:12 187:1,1
197:22
**ultimate** 46:20
47:10,14 56:23
57:9 71:20 74:16
77:20 90:13 104:8
133:13 165:16
182:12
**ultimately** 7:25
8:15 29:14 69:21
72:4 87:17 102:12
132:7 133:4
181:10 192:15
**un** 87:13
**unanimous** 165:23
**uncertain** 88:10
**uncertainly** 87:15
**uncertainty** 49:11
49:14 50:16,22
51:22 60:21,24
127:17
**uncommon** 61:14
131:9
**uncontested**
144:15
**underberg** 1:19
2:6 9:18 15:19
188:11
**underbergkessle...**
2:8
**undercut** 168:17
**underfunded**
196:3,13,25
197:25

**underlies** 42:6
**underlying** 45:18
**understand** 5:23
6:2,7,10,19 10:13
28:1 30:25 33:14
37:17 49:13 56:25
58:19 68:22 70:14
71:13,22,24 72:17
79:4 84:11 91:23
95:9 111:20
112:17 113:10
114:5 116:3 122:1
122:21 141:16
145:21 147:13
158:18 159:24
163:2 165:12
166:9 167:18
169:8,10 181:18
181:19 189:11
192:13 193:2
194:4,12 196:12
**understanding**
5:14,16 6:13 8:5
9:13 10:16 13:9
13:14,25 14:17
15:11 30:18 31:1
33:11 67:22,25
68:7 71:16 84:7
87:4 90:24 91:1
106:15 111:21
122:19 136:2,9
146:3 147:1
165:21 168:3
**understood** 14:7
59:15 69:16
168:11
**undone** 147:24
**unilaterally**
153:13
**united** 1:1 19:9

**units** 112:8
**unpaid** 62:18
**unprofitability**
23:22
**unrestated** 58:3
**unsecured** 32:19
32:21,25 33:4,25
34:2,15,20
**unwinding** 90:13
**unwound** 90:8
**upfront** 55:4
**upheld** 58:9
**upper** 19:7,14
20:4
**upshot** 52:22
**use** 24:12 26:14,20
41:1 51:5 54:25
57:19,21 58:2
62:6 88:18 122:15
124:23 158:7
169:16 176:6,22
178:20 179:24
183:25 185:18
193:19 194:9
195:24 196:1
**useful** 134:16
**usual** 4:4,10,11
199:13
**usually** 5:10 152:2
166:21
**usurp** 155:24
**utilize** 198:15

**v**

**v** 203:4
**vague** 71:16 129:4
184:23 195:3
**valid** 5:25 38:13
38:15,16 153:5
**validly** 153:3
**valuable** 42:15
158:25 166:9

167:19,20 168:2,3
176:2
**valuating** 57:17
134:8 148:21
**valuation** 5:17
17:9,10,22 18:18
18:20,25 19:17,25
21:14,23 24:3,5,8
24:18 25:2,9,20
26:2,14,16 27:1
30:6,7,9 31:3 34:9
37:7,8,11 38:5,10
38:13,14 39:4,10
39:10 42:7,19,20
47:22 49:8,9,11,18
49:21,23 50:1,11
50:21,22 53:18,20
55:8 56:23 57:6
57:10,14 58:8,14
59:4,7,14,21,22
60:2,7 62:15 63:6
69:3,11,14,15,22
69:23,25 70:1,20
70:20,25 71:8
75:8,15,20 77:20
77:24 79:16 83:22
84:1,19 85:23
86:2 88:10,13
92:15 103:13,19
103:25 104:4,11
105:1 106:11
110:1,1,5,13 113:1
118:23 119:10
120:10,13 134:11
135:11 137:23,25
144:7 145:1,3
147:16,21 154:13
154:18 155:16
156:17 157:12
159:19 160:15
161:15,21 168:14

169:17 173:11,17
175:23 176:21
177:11 179:5
192:7,15,24
193:10 194:7,10
194:13 196:6
197:10
**valuations** 49:12
49:16 50:3,4,23
53:4 104:25
105:18 106:9,21
121:9 126:5
132:18,19 162:6
178:5
**value** 7:11 17:7
18:22,23 22:7,19
22:24,25 23:11,21
23:23 25:15,19
26:12,15,22 28:15
28:16 29:10,11,12
29:12,13,18,18,19
29:21,21,23,23
30:2,5,10 31:7,10
31:17,19 32:11,22
35:13,15 36:2,10
36:17 37:2,10,12
39:1,14,18,25 40:6
40:12 41:20,20
42:18 45:23 46:16
46:17,20,24,25
47:1,2,3,13,19
50:18 51:19 52:19
57:19 62:10,12
68:24 69:1,17
70:4 71:5,10,19
72:13,15,24 75:9
75:23 79:2 84:15
86:8,19,20 87:2,17
88:5 89:17 92:10
93:15 97:22 98:3
98:3 101:8,14

102:7,11,17,23,25
104:9,20 105:7,20
105:25 106:1
107:17 108:17
109:20,24 110:12
110:19 111:10,10
111:13 114:20,22
118:22,24 120:19
121:2,11 126:20
133:14 134:11
143:18 146:6,19
147:1 154:4,22,24
155:6,23 157:22
158:2,10,12 159:2
159:2,7,8 163:11
164:18 165:6
167:19,22 168:7
170:14 172:20
175:24 177:14,15
177:17,18,19,23
178:3,6,11,12,12
178:22,23 179:7
179:15,17 180:15
180:19 181:25
182:3 184:25
191:24 192:3,4,6
195:6,12 196:5
197:17 199:6,9
**valued** 7:4 53:1
55:5 58:21 61:24
71:2 84:16 126:11
146:18 177:25
180:24,24,25
**values** 28:16 31:11
49:15 50:20 86:4
86:5 101:22
107:22 127:6
184:12
**valuing** 8:4 26:19
69:4,4,22 145:18
181:11 182:13

192:16
**vanishes** 31:24
**variable** 50:20
**variables** 50:15,19
125:1
**variety** 98:16
127:10
**various** 29:7 72:14
133:24 134:1
**verbally** 11:8
**verify** 11:17
**veritext** 203:1
**veto** 164:2 166:1,1
**view** 8:5,5 45:21
60:12 63:15 64:10
67:1 70:8 75:22
77:9 84:12,18,22
86:9 87:7 88:17
89:10 91:15 92:20
103:24 104:8
105:17 108:1
124:4 137:18
148:11,11 155:5
159:15 182:9
183:5
**viewed** 58:16
64:19
**vincent** 3:13
**virginia** 133:21
**vis** 7:11,11 24:18
24:18 71:23,23
165:14,14
**volatile** 138:19
**volume** 140:6
**voluntary** 196:16
**vote** 95:2
**vs** 1:8

**w**

**w** 1:9 202:2
**wait** 32:9,9
**waiting** 62:8
**waived** 4:20,21
**walk** 121:17
**want** 4:1 9:3 12:3
18:13 27:9,19
28:3 43:21,22
45:20 51:4 60:17
83:21 84:15 86:24
87:6 89:13,14
90:18 92:24 93:20
95:13,14 96:6,12
102:10,16 115:6
129:14 136:19,21
140:21 146:15
151:6 160:13
161:4 166:1
169:10 179:24
186:22 191:22
**wanted** 26:3 54:8
119:3 147:13
154:12,15 181:21
**wants** 99:10
162:17 172:10
200:19
**way** 6:23 14:8
15:7 25:13 26:18
28:18 29:13 38:2
38:7 39:24 40:11
40:15 41:18,23
44:24 45:5,8,9
46:9,23 47:12,12
47:18 48:16,23,25
49:5,25 50:21
51:24 56:19 59:11
62:9 66:14 71:7
78:2 83:12 84:15
89:23 93:4 100:12
100:13 103:9

104:22 105:3,23
106:2 116:7 119:4
134:8 144:2
148:16 153:17
165:20 170:14
178:20 180:9
191:23 192:14
193:8 194:14
198:20
**ways** 36:7 97:4
129:5
**wealth** 32:12,14
**wedge** 72:2,3,4
**weigh** 121:16
136:22 155:19,22
162:7
**wendy** 1:9 3:13,14
10:5,25 11:8
15:18 16:1,4
25:16 64:23 66:14
66:15 81:6,23
84:16 85:16 90:9
94:6,7,17 96:5
128:8 129:17
130:19 136:10,11
140:13 143:13
182:23 183:6
184:21 185:1,3,4
186:3,12 188:7
193:14 194:8
**went** 19:2 101:14
113:23 142:1
143:2 178:9
**west** 12:19
**whatnot** 149:19
153:1
**whereof** 201:18
**white** 56:4,6 73:18
**wildly** 195:24
**willing** 8:9 59:8
68:16 73:13 75:6

84:12 92:17,17
157:20,20 162:14
163:15 175:18
**willingness** 187:22
**winded** 52:9
**window** 38:17
**wine** 1:13,14 5:19
5:20,24 6:24,25
7:7 9:19 21:11
25:7 27:14 29:19
33:4 35:19 41:9
63:9 65:4,9,15,15
66:21,24 69:7,21
69:24,25 70:5,23
71:3,12,15,23 72:2
72:3,9 76:21
77:14 78:8,11
81:7,14,17,20 82:1
82:6 83:15 84:24
113:23 123:17,22
124:9,23 125:7,23
128:5 129:22,24
131:11 132:11,23
133:12 134:5
139:24 140:4
143:6 147:14
148:18 152:15
162:20 187:5,6
199:23
**wines** 124:10,10
**winter** 10:18 14:4
**withdrawn** 191:3
191:6,9
**witness** 3:1 190:23
198:17 201:5,18
**won** 30:24
**wondering** 27:21
**woods** 2:14
**woodsoviatt.com**
2:16

**words** 124:7
150:24
**work** 7:15,16,18
7:21 11:16 18:5
21:14 28:18 60:24
70:8,25 76:10
91:3 92:15 110:17
134:1 153:1 157:8
188:21 189:14
197:3,5 198:23
**worked** 8:17 67:21
73:18 132:15
188:16,17
**workout** 91:2
**works** 5:6 31:1
46:6 95:5,22
**world** 49:18 50:9
54:21 65:11 101:8
101:21 132:5
**worth** 25:2 106:17
106:23,24 144:24
151:15,17 178:18
182:16 185:13
**wow** 169:7
**write** 20:20 172:3
**written** 9:7,9,14
9:17,21 44:18
100:14 174:3
**wrong** 103:16
142:1 182:11
**wrote** 84:17,17

| **x** |
| --- |
| **x** 178:18 |

| **y** |
| --- |
| **y** 178:19 |

**yardstick** 134:13
134:16 135:1
**yeah** 28:14 57:5
82:10 83:19 88:8
127:6 136:17

165:15 181:5
187:15
**year** 5:9 19:1
24:21 52:3 53:11
53:13 54:1,5,6
55:4,5,11,19 84:3
103:13 138:3
139:13 140:23
156:10,15 157:5
157:12 189:9
197:21
**years** 9:15 19:13
19:16,19,22 20:8
21:3,25 53:24
55:13 60:13
105:10,12,12,14
106:18 117:11
126:7 139:12
141:12 157:5
190:3 192:18,23
193:6 196:18
197:18
**yellow** 139:23
140:3 142:25
143:2,8
**yield** 60:12
**yields** 69:6
**york** 1:2,20 2:4,4
2:7,12,16 4:24
14:9,12,12,20
15:14 110:11
117:7 124:2 125:6
132:10,24 134:5
157:1 201:1,4
203:2

| **z** |
| --- |
| **zero** 29:14,23,24 |
| 30:11 36:17 37:5 |
| 37:7 151:15,17 |
| 172:21 |

| **à** |
| --- |
| **à** 24:18 71:23 |

Federal Rules of Civil Procedure

Rule 30


(e) Review By the Witness; Changes.

(1) Review; Statement of Changes. On request by the
deponent or a party before the deposition is
completed, the deponent must be allowed 30 days
after being notified by the officer that the
transcript or recording is available in which:

(A) to review the transcript or recording; and

(B) if there are changes in form or substance, to
sign a statement listing the changes and the
reasons for making them.

(2) Changes Indicated in the Officer's Certificate.
The officer must note in the certificate prescribed
by Rule 30(f)(1) whether a review was requested
and, if so, must attach any changes the deponent
makes during the 30-day period.



DISCLAIMER:  THE FOREGOING FEDERAL PROCEDURE RULES
ARE PROVIDED FOR INFORMATIONAL PURPOSES ONLY.
THE ABOVE RULES ARE CURRENT AS OF APRIL 1,
2019.  PLEASE REFER TO THE APPLICABLE FEDERAL RULES
OF CIVIL PROCEDURE FOR UP-TO-DATE INFORMATION.

VERITEXT LEGAL SOLUTIONS
COMPANY CERTIFICATE AND DISCLOSURE STATEMENT

Veritext Legal Solutions represents that the foregoing transcript is a true, correct and complete transcript of the colloquies, questions and answers as submitted by the court reporter. Veritext Legal Solutions further represents that the attached exhibits, if any, are true, correct and complete documents as submitted by the court reporter and/or attorneys in relation to this deposition and that the documents were processed in accordance with our litigation support and production standards.

Veritext Legal Solutions is committed to maintaining the confidentiality of client and witness information, in accordance with the regulations promulgated under the Health Insurance Portability and Accountability Act (HIPAA), as amended with respect to protected health information and the Gramm-Leach-Bliley Act, as amended, with respect to Personally Identifiable Information (PII). Physical transcripts and exhibits are managed under strict facility and personnel access controls. Electronic files of documents are stored in encrypted form and are transmitted in an encrypted fashion to authenticated parties who are permitted to access the material. Our data is hosted in a Tier 4 SSAE 16 certified facility.

Veritext Legal Solutions complies with all federal and State regulations with respect to the provision of court reporting services, and maintains its neutrality and independence regardless of relationship or the financial outcome of any litigation. Veritext requires adherence to the foregoing professional and ethical standards from all of its subcontractors in their independent contractor agreements.

Inquiries about Veritext Legal Solutions' confidentiality and security policies and practices should be directed to Veritext's Client Services Associates indicated on the cover of this document or at www.veritext.com.