### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

DANIEL KLEEBERG, LISA STEIN and AUDREY HAYS,

Plaintiffs,

v.

LESTER EBER, ALEXBAY, LLC f/k/a LESTER EBER, LLC,
ESTATE OF ELLIOTT W. GUMAER, JR. and WENDY EBER,

Defendants,

and

EBER BROS. & CO, INC., EBER BROS. WINE AND LIQUOR
CORP., EBER BROS. WINE & LIQUOR METRO, INC., EBER-
CONNECTICUT, LLC, EBER-RHODE ISLAND, LLC, EBER BROS.
ACQUISITION CORP., EBER-METRO, LLC, SLOCUM & SONS
OF MAINE, INC., and CANANDAIGUA NATIONAL BANK &
TRUST COMPANY,

Nominal Defendants.

Civil Action No.
16-CV-9517(LAK/KHP)

### EBER DEFENDANTS' RESPONSE TO
### PLAINTIFFS' STATEMENT OF MATERIAL FACTS

1.  **Undisputed.**

2.  **Undisputed.**

3.  **Undisputed.**

4.  **Undisputed.**

5.  **Undisputed.**

6.  The Will expressed Allen Eber's desire that the Trust retain his interest in the Eber Bros. business, including EB&C and any other close corporations, and that his son, Lester, have the opportunity to participate in the management of the business so long as it was held by the Trust. (*Id.* At 13 ("ELEVENTH")(requesting retention of EB&C and "certain other close corporations"). *See also* Ex. 9 at 2 ("It is clear from the terms of

the Trust that the purpose of the Trust was to hold the shares of Eber Bros. & Co. stock for so long as it was a going concern.).)

**Disputed:** **The Co-Trustees had no duty to retain the capital stock of Eber Bros, EBWLC, Metro or Eber-CT during the life of the Trust. The Will clearly provides (a) …"it is my <u>wish</u> that my voting control of Eber Bros. & Co., Inc., can be retained and, subject to that primary wish, I <u>hope</u> that my interests in certain other close corporations can also be retained….I accordingly expressly <u>authorize</u> my …Trustee to retain my stock of Eber Bros. & Co., Inc. and my interests in any other close corporations… with which I may be connected at the time of my death, and, although <u>this shall not be deemed a direction to retain such corporate stocks or business interests</u>, I, nevertheless, direct that…my Trustee shall [not] be responsible or accountable for any loss to my estate resulting from the retention of any such corporate stocks or business interests, provided only that it shall have acted in good faith". (Will, Article ELEVEN); and "I grant to my…Trustee…the following powers…with respect to all property…at any time forming part of…any trust hereunder, including… B - To … dispose of any such property…for any consideration…." <u>See</u> Will, Article 12, Para. B).**

7.    In September 2011, Sally Kleeberg requested distributions of principal to help her granddaughter, Erica Stein (Ex. 156).  She did so with the understanding that such distributions would reduce the amount of her remainder interest in the Trust, without reducing the interests of either of the other beneficiaries, Audrey Hays or Lester Eber. (Stein Decl. ¶7).  Even though it would come out of her share alone, the trustee refused to authorize the request for distribution of principal without getting all the beneficiaries

and contingent remaindermen to consent in writing.  (*See* Ex. 157 (some of the letters that were sent seeking authorization)).

**Disputed:  The demand that the beneficiaries and remaindermen consent to the distribution was a requirement of Canandaigua National Bank ("CNB"), not of Lester Eber.  See 12/5/19 Affidavit of Lester Eber at ¶26-30.**

8.      Eber Bros. & Co., Inc. ("EB&C") is a New York corporation with a capital structure comprised of three classes of shares: Class A Common shares (Voting); Class B Common Shares (Nonvoting); and 6% Non-Cumulative Preferred Shares (Nonvoting). As of February 2017, the Trust held the following shares of EB&C stock, registered under the name of "Lester Eber, Elliot W. Gumaer, Jr., M&T Bank, Co-Trustees U/W Allen Eber Residuary": 1850 Class A Voting Shares; 290 Class B Nonvoting Shares; 2000 6% Preferred Nonvoting Shares. (Ex. 148 (Response 21); Ex. 149 (Response 19); Ex. 135 at 33 (Sched. G)).  According to EB&C corporate records, these shares are still registered under the same name. (Ex. 148 (Response 21)).  The Trust has directly held all voting shares in EB&C since approximately 1980. (Ex. 11). The only other registered shareholders of EB&C at any time over the last 20 years have been Lester Eber and Sally Kleeberg, with each holding 100 shares of Class B Nonvoting Common Shares. (Ex. 11).

**Disputed:  The appropriate reference depicting the shares are the charts filed as Ex. A to the 11/8/2019 Affidavit of Wendy Eber.**

9.      EB&C has directly held all voting shares in its subsidiary, Eber Bros. Wine and Liquor Corporation ("EBWLC") since its formation until at least February 2017. (Ex. 11.) The only other shareholder of EBWLC prior to February 2017 was the Trust, which directly held nonvoting common and preferred shares in EBWLC. (*Id.*) EBWLC was a

Trust asset. (L. Eber Dep. 81:22-24).

**Disputed:  The first sentence should refer to the charts attached as Ex. A to 11/8/2019 Affidavit of Wendy Eber.  The second sentence is wrong.  The shares were not outstanding in February 2017.  See Id.**

10.   **Undisputed.**

11.   **Undisputed.**

12.   **Undisputed.**

13.   **Undisputed.**

14.   After transferring some of Eber Metro's interest to third parties, Eber-CT remained a Trust asset, with 79% of its equity owned by Eber Metro. (L. Eber Dep. 87:6-24; Ex. 4; Ex. 11; *see also e.g.* Ex. 123 (showing the Trust guaranteed and secured a loan from CNB to Eber-CT: "the Allen Eber Trust agrees to pledge their shares of capital stock in the various corporations"); Ex. 161 at 3 (Lester letter to Audrey Hays accompanying Trust letter from CNB re: "Our business is limited to Connecticut")).

**Disputed: 79% of the units were owned by Metro. Metro's equity was not worth 79% of the whole because of Eder Goodman's preferred rights.  The Trust didn't guarantee the CNB loan. It just granted a security interest in the stock it held to secure repayment by the debtor. (Brook Decl. Ex. 123).**

15.   **Undisputed.**

16.   Slocum of Maine serves as an out-of-state shipper that provides important services for the operations of Eber-CT without charging a markup to Eber-CT (Ex. 88 at 3 (Response 8)).  For example, during each of 2011 and 2012, Eber-CT purchased over $3 million a year in products through Slocum of Maine. (Ex. 158 at 7 note 4).  During

4

those two years, neither Lester nor his daughter, Wendy Eber, who was also in the management of the business, received any compensation from Slocum of Maine. (Ex. 88 at 1; Ex. 142 at 1).

**Disputed:** **The cited evidence never characterizes Slocum of Maine as providing "important" services for the operations of Eber-CT. (Brook Decl. Ex. 88). Slocum of Maine is only minimally useful to Eber-CT.**

17.     **Undisputed**.

18.     By letter agreement dated January 2, 2001, Gumaer agreed to perform the following task for a single, lump-sum fee of $40,000 per year, paid by the Trust-controlled business:

      a.  To serve as co-trustee of the Trust;

      b.  To serve as a director on the boards of Eber companies;

      c.  To serve as personal attorney to Lester Eber.

(Ex. 47; *see also* L. Eber Dep. 258:25-259:8 (fees originally paid by EBWLC then switched to Eber-CT at some point)). Even after Eber-CT was no longer controlled as a Trust asset due to the Metro Transfer, Eber-CT paid Gumaer at least in part for his services at trustee. (Ex. 67).

**Disputed:** **The referenced letter speaks for itself.**

19.     **Undisputed**.

20.     The other Trust beneficiaries besides Lester Eber were not aware of the attorney-client relationship between Gumaer and Lester. (Hays Decl. ¶11; Stein Decl. ¶5).

**Disputed:** **The Trust beneficiaries were aware that Gumaer was a lawyer for the various Eber entities.  See 12/5/19 Affidavit of Lester Eber at ¶ 17.**

21.     Whenever Lester Eber abstained or recused himself from voting on resolutions as a director at board meetings, Gumaer nonetheless proceeded to vote even though he had an attorney-client relationship with Lester individually. (*See, e.g.,* Ex. 152 (recognizing "the conflict of interest inherent in the [loan] transactions"); L. Eber Dep. 336:2-18 (Lester believed Gumaer was still his personal attorney from 1970 until the day Gumaer died)).

**Disputed:  Gumaer was not working on Lester's personal behalf with respect to the resolutions or transactions at issue.  See 12/5/19 Affidavit of Lester Eber at ¶ 18.**

22.     CNB, as co-trustee, knew that Gumaer was a lawyer for the Eber Bros. business and "in some cases maybe Lester personally," and they saw that as creating a conflict of interest (Hawks Dep. 45:1-25; 282:14-22).  CNB reviewed that conflict internally and concluded it "was not a major issue," but it CNB did not review the January 2001 engagement letter and was not aware of exactly how Gumaer was being compensated for any of his services. (*Id.* at 282:22-283:3, 283:16, 285:9-287:11).

**Disputed:  Whatever concerns CNB allegedly had, it satisfied itself that there was no conflict and CNB never raised any alleged conflict.**

23.     **Undisputed.**

24.     **Undisputed.**

25.     **Undisputed.**

26.     **Undisputed.**

27.     Lester negotiated a personal Consulting Agreement with Southern at the same time that he negotiated other transactions with Southern on behalf of EBWLC and

related entities. (Ex. 162 at (Harris Beach Transaction Binder Table of Contents)).  Lester utilized EBWLC's corporate counsel, Patrick Dalton of Harris Beach, to negotiate his personal Consulting Agreement with Southern. (L. Eber Dep. 69:23-70:2; Ex. 27 at 7; Southern Dep. 26:19-27:13).

**Disputed:  The Consulting Agreement was not negotiated at the same time as "other transactions with Southern."  See 12/5/19 Affidavit of Lester Eber at ¶¶ 22-24.**

28.     **Undisputed.**

29.     **Undisputed.**

30.     Southern offered Lester a consulting position because Southern "didn't want Lester to interfere in [their] brand building and [their] selling ways." (Southern Dep. 38:2-3); and Southern's decision to enter into a restrictive covenant with Lester specifically was because: "we said we don't want this guy *or any of his companies* in any format coming back and competing with us." (*Id.* at 32:8-22 (emphasis added)).  Southern "[a]bsolutely" has "no idea' why there was no similar restrictive covenant executed by EBWLC or several of the other Eber entities. (*Id.* at 31:17-32:6; *see also* Ex. 162 (showing restrictive covenants entered only by PW&W and Eber Bros. Acquisition Corp – subsidiaries that were selling their assets to Southern and shutting down); Ex. 88 at 4 (Response 8, stating neither company had officers or directors after 2008)).

**Disputed:  The restrictive covenant had nothing to do with the Consulting Agreement that Lester Eber reached with Southern.  See 12/5/19 Affidavit of Lester Eber at ¶ 25.**

31.     **Undisputed**.

32.   **Undisputed**.

33.   Southern was only interested in retaining Lester if it had a contract that required his "personal services" because Southern did not "want to be bound to a corporation for consulting." (Southern Dep. 43:17-9 (expressing concern that it would have to keep paying even if Lester died)). Southern was not presented with the option of executing the Consulting Agreement with any of the Eber Bros. companies, but if Lester had proposed doing the Consulting Agreement through one of the Eber Bros. companies instead of directly with himself, Southern's only material concern would have been whether the contract was legally enforceable to procure Lester's personal services. (*Id.* at 69:13-71:12 ("I would go to my attorneys and say is this going to accomplish what I want or not")).

**Disputed: There was no requirement that Lester Eber propose to Southern that the Consulting Agreement be with an Eber entity rather than him personally, and Southern was not interested in a Consulting Agreement with an Eber corporation. <u>See</u> 12/5/19 Affidavit of Lester Eber at ¶ 24, 25.**

34.   Although Southern regularly entered into consulting relationships with the former owners of businesses it acquired, Lester Eber is the only consultant who continued to manage a wine and liquor distributorship contemporaneously with the consulting relationship. (Southern Dep. 45:1-10, 71:14-25).

**Disputed: Eber Defendants are not in a position to know the nature of the myriad consultants utilized by Southern across the country. Further, Lester continued in business in Connecticut, not in New York. <u>See</u> 12/5/19 Affidavit of Lester Eber at ¶ 20.**

8

35.    Lester's personal Consulting Agreement with Southern was never authorized by the board of directors of any Eber company, nor was it part of the written consent by the co-trustees (*See* Ex. 154 (omitting any mention of the Consulting Agreement).)

**Disputed:   The Board of EBWLC was fully aware of the Consulting Agreement at the time it was negotiated and acquiesced in Lester signing it.   See 12/5/19 Affidavit of Lester Eber at ¶ 23.**

36.    **Undisputed.**

37.    In October 2009, Lester executed a Line of Credit Note (the "LOC Note") in which he agreed to loan up to $1.5 million to Eber Metro, at a compound interest rate of 12.5%. (Ex. 13).  Lester executed the LOC Note without requiring security for the potential loans that would be made pursuant to the LOC Note. (L. Eber Dep. 102:16-25; 103:10-24).

**Disputed:  Lester required a security interest in the collateral subsequent to executing the LOC Note.  See 11/8/19 Affidavit of Lester Eber, Exhibit I.**

38.    **Undisputed.**

39.    **Undisputed.**

40.    Lester Eber executed a document titled "Security Agreement" with Eber Metro and EBWLC that was dated "as of February 26, 2010." (Ex. 15; L. Eber Dep. 103:2-13).  Lester acted out of self-interest when he entered into the Security Agreement. (L. Eber Dep. 103:10-13).  Lester also signed a Guaranty with EBWLC, providing further security for his LOC Note, "as of February 26, 2010." (Ex. 140).  And then Lester signed an identical version of the October 2009 LOC Note with a new date of "February 26,

2010." (Ex. 15).

**Disputed:  Lester Eber did not act out of "self-interest", but rather availed himself of an entirely appropriate legal process for secured loans to give him priority over junior creditors, including the Teamsters Fund and Pension Benefit Guarantee Corp.  Secured or not, his loan was senior to Plaintiffs' interests.  See UCC §9-620.**

41.    **Undisputed**.

42.    On March 4, 2010, Wendy circulated draft minutes of the February 26, 2010 board of directors meetings for EBWLC and Eber Metro (Ex. 117).  The minutes falsely described Lester as being unwilling to provide financing under the LOC Note "if he had a secured interest in substantially all of the assets of [Eber Metro]," and omitted the fact that Lester had already executed the LOC Note in October 2009. (*Id.* at 2). In fact, Lester had not insisted that he would not loan more money to the company unless he was given a security agreement, because he was willing to do "whatever [he] had to keep the company alive." (L. Eber Dep. 102:16-25).

**Disputed:  The meeting minutes are not false and speak for themselves, as Lester Eber did require a security interest.  See 11/8/19 Affidavit of Lester Eber at ¶¶ 29, 30.**

43.    In April 2010, Lester sent correspondence to Audrey Hays and Sally Kleeberg purporting to offer them the chance to loan money to Eber Metro on the same terms as Lester did pursuant to the LOC Note, to support "our Connecticut business and its parent company." (*E.g.,* Ex. 49 (Letter to Sally)).  After sending the letters, Lester also spoke to Sally Kleeberg and Audrey Hays about loaning money to Eber Metro. (Lester

Dep. 116:16-7; Hays Decl. ¶16).  Both Sally Kleeberg and Audrey Hays declined to loan money to Eber Metro at the time. (L. Eber Dep. 116:2-3, 117:24-25; Hays Decl. ¶16). Lester never informed Sally Kleeberg or Audrey Hays about the possibility that he would take control of the Connecticut business away from the Trust if they declined to loan money to Eber Metro. (L. Eber Dep. 118:2-11; 117:8-12; Hays Decl. ¶17).

**Disputed:  There was nothing "purported" about the offer to Ms. Hays and Ms. Kleeberg, as Lester Eber explicitly offered them the chance to participate in loans to the company; they declined to do so; and they did not object to Lester Eber making the loans.  See 11/8/19 Affidavit of Lester Eber at ¶¶ 31-35.**

44.    **Undisputed**.

45.    **Undisputed**.

46.    On December 31, 2011, Eber Metro defaulted on the LOC Note by failing to repay Lester the full amount borrowed from Lester. Lester did not extend the maturity date on the LOC Note but he does not remember why he did not. (L. Eber Dep. 435:23–437:15.) Eber Metro made no attempt to extend the maturity date. (*See* Eber Metro Dep. 86:12–88:14,  106:5–110:19  (generally  extremely  evasive  testimony  surrounding questions about why not).)

**Disputed:  Lester was under no obligation to extend the maturity of his loans. EBWLC and Metro had no ability to repay Lester's loans and no viable alternative source of financing to refinance CNB's loan. EBWLC and Metro had no ability to pay its liabilities to the Teamsters Fund and under the Pension Plan, or to any of the other creditors.  See 12/5/19 Affidavit of Wendy Eber at ¶9-10, 12, 15, 19-21.**

47.    **Undisputed**.

48.    **Undisputed.**

49.    **Undisputed.**

50.    **Undisputed.**

51.    Lester did not proceed to take Eber Metro's interest in Eber-CT, however. If Lester had proceeded to try to transfer Eber Metro's interest in Eber-CT to Alexbay for the amount of the debt, Eber Metro would have been required to permit Eder-Goodman, LLC to exercise its right of first refusal, giving it the opportunity to acquire control of Eber-CT. (*See supra* ¶12). Instead, Alexbay revised its UCC §9-620 notice to be addressed to EBWLC and to offer to accept EBWLC's 100% interest in Eber Metro in full satisfaction of Eber Metro's debts to Lester, which had been assigned to Alexbay. (Ex. 59; *se also* Ex. 44 ¶26).

   **Disputed:  Hypothetical statements and/or legal arguments do not warrant a response.  The UCC §9-620 notice and foreclosure was of the common stock of Eber Metro.  (Brook Decl. Ex. 44 and 59).**

52.    Lester resigned as President and Director of EBWLC effective February 1, 2012. (Ex. 77).  Lester remained President and Director of Eber Metro after his resignation from EBWLC and was President when Alexbay formally acquired Eber Metro (Ex. 62). Lester also remained President and Director of EB&C after his resignation from EBWLC. (Ex. 147 at 2). Lester has never resigned as trustee of the Trust and has never provided an accounting of any of his transactions with the Trust in accordance with SCPA §2208.

   **Disputed:  The termination of the Trust negated any hypothetical obligation of Lester Eber to resign, and co-trustee CNB has always undertaken the Trust's administrative responsibilities, such as to provide an accounting.  (Brook Decl. Ex.**

135).

53.   **Undisputed.**

54.   The pleadings filed by Alexbay contended that the proposed transfer of Eber Metro to Alexbay for elimination of the debt owed by Eber Metro to Alexbay was "commercially reasonable" because all of Eber Metro's assets were equivalent in value to the amount of debt owed to Alexbay. (Ex. 44 ¶24; *see also* Ex. 45 ¶6 (Lester Eber Affidavit)). Alexbay's valuation relied primarily on the 2010 Polebridge Bowman transaction to derive a base value of the equity at that point in time, and then subtracted the amount of subsequent losses as reflected by Eber-CT's books. (*See* Ex. 44 ¶30-39; Ex. 45 ¶6).  Based on this one prior transaction and part of Eber-CT's books, Alexbay calculated the value of Eber-CT at $4,633,300 as of December 2011, and Eber Metro's 79% interest in it as approximately $3,660,000. (Ex. 44 (Alexbay Complaint ¶¶32-39; Ex. 45 ¶6).

**Disputed: The referenced pleadings speak for themselves.  The complaint filed by Alexbay sought a determination that the acceptance of the Metro stock in full satisfaction of the loans, pursuant to N.Y U.C.C. 9-620, was commercially reasonable. Commercial reasonableness is a determination based on all the facts and circumstances of the foreclosure. It is not dependent solely on the relationship between the value of the collateral and the face value of the loans.**

**Nor it there a requirement that there be an equivalency one way or the other between the value of the collateral and the face amount of the loans.**

**The value of a small private company in financial distress is, obviously, uncertain.  The Polebridge Bowman transaction was cited in the pleadings because**

it was the most recent transaction in the equity of any Eber company. It was also the only transaction in the equity of any Eber company since the beginning of the Recession in the Fall of 2008. EBWLC and Metro were in financial distress and had no money to hire an independent appraisal firm to assist it.

The value of Metro's interest in Eber-CT was cited in the complaint as approximately $3.66 million, subject, importantly, to discount for a variety of other applicable factors not specifically explained in the pleadings. The complaint did not go into detail about these other factors since all that was required was to demonstrate that the face value of the loans was greater than the value of the Metro stock. Importantly, Alexbay elected to not expressly disclose the amount of the massive liabilities that Metro was then subject to, which materially reduced the real value of the Metro stock. Alexbay believed that disclosure, in a public document like the complaint, of the massively negative equity value of Metro would not have been in its best interest, since it could easily have caused its suppliers to stop doing business with it, and have caused CNB and its other creditors to force the dissolution or sale of the Eber business.

The Boards of EBWLC and Metro, in determining to consent to Alexbay's foreclosure proposal, understood well that the real value of the Metro equity was far less than $3.66 million. The Agreement for Turnover dated June 5, 2012, not a public document, acknowledges that "Eber Bros. and Metro believe ownership of Metro is worth less that the [Alexbay loans]" (Agreement for Turnover, section 13). See 12/5/19 Affidavit of Wendy Eber at ¶ 21.

55.   On March 9, 2012, Gumaer sent an email to Wendy and Lester Eber in

which he stated: "Someone will have to explain to me why the action Lester may take to secure his indebtedness will adversely affect the relationship with CNB. I assume that notice of that action will be given to all parties interested in the trust and the action will be affirmed by Court order." In response, Wendy directed Gumaer to "Please call Glenn [Sturm] at 4pm today . . ." (Ex. 102).

**Disputed: Any concerns raised by Gumaer were subsequently addressed to his satisfaction, as Gumaer voted to authorize the disputed transactions. See 11/8/19 Affidavit of Lester Eber, Exhibit O.**

56.     On March 13, 2012, shortly before a board meeting scheduled later that day, Gumaer sent an email to Wendy stating: "I am not in a position to discuss in any depth the Alexbay matter as I learned of the matter yesterday afternoon in the email from Underberg. Hawks will be interested in knowing (as will I) what will be the status of the Eber Trust with respect to Eber assets held in the trust . . . On the s[urfac]e it looks like Le[]ster is moving against the trust of which he is a co-trustee." (Ex. 122; W. Eber Dep. 329:4-13 (agreeing that Gumaer was stating that "it looked like Lester was moving against the trust of which he was a cotrustee," and admitting that that "that's what it was": "Lester was moving against the company. "Yes").

**Disputed: Any concerns raised by Gumaer were subsequently addressed to his satisfaction, as Gumaer voted to authorize the disputed transactions. See 11/8/19 Affidavit of Lester Eber, Exhibit O.**

57.     **Undisputed.**

58.     **Undisputed.**

59.     Wendy and Gumaer "throughout the week of March 13, 2012, May 30,

2012, and June 1, 2012")).   There are no board meeting minutes suggesting that the board considered any valuation of Eber Metro besides that used in "the "ple[a]dings" filed by Alexbay – the party seeking to acquire Eber Metro. (Ex. 60).   The ultimate written consent signed by Wendy and Gumaer on June 6 and 9, 2012, respectively, references "consideration of the financial statements and records of [EBWLC] and other information deemed relevant by the Board of Directors," but it does not indicate what those other records were, or if they included the financial statements of Eber-CT or Eber Metro, which if relied upon, would have led to the conclusion that Lester might be acquiring an asset worth over $1 million more than the amount of debt that was due to him. (*See* Ex. 158 at 2 (last audited financial statement available as of Metro Transfer date reflected book value of Eber-CT's equity as $5,699,031 as of 5/31/2011); *infra* ¶63).

> **Disputed:  This paragraph is an argument advanced on behalf of plaintiffs, not a statement of fact.**

60.     Marino Fernandez was the sole independent lawyer, consultant, or advisor retained to advise EBWLC and its board of directors in connection with Alexbay's UCC Article 9 proposal and lawsuit. (Ex. 60.) His total amount of legal fees and expenses billed for advising the company in connection with Alexbay's proposal to take Eber Metro was just $586.25. (*See* Ex. 160 (General Ledger excerpt at 5/9/2012 Bill).)

> **Disputed:   The Eber companies' accountants and tax attorneys were consulted as well. See 11/8/19 Affidavit of Wendy Eber at ¶40.**

61.     **Undisputed.**

62.     **Undisputed**.

63.     Alexbay did not disclose to the Supreme Court the fact that Polebridge

Bowman "Partners" was in fact solely owned by a single individual, Glenn Sturm, who was a lawyer to the Ebers and/or their companies. (Exs. 44, 45).  Nor did Alexbay disclose that the Polebridge Bowman transaction was only offered to Glenn Sturm as compensation for his services.  (W. Eber Dep. 43:11-44:21, 53:21-56:10; *see also* L. Eber Dep. 210:7-13:9 (evasive testimony refusing to acknowledge that his affidavit (ex. 45 ¶6) was describing the Polebridge Bowman transaction)).

> **Disputed:**  Plaintiffs cite no authority that any obligation existed to advise the Court that Polebridge Bowman was owned by Mr. Sturm, or that the transaction was partly to compensate Mr. Sturm for his services.  The Polebridge Bowman transaction, and all other relevant comparable transactions, indicate that Eber Metro was insolvent.  **See** Torchio Report attached as Ex. F to 11/8/19 Affidavit of W. Eber.

64.    In addition to the 79% interest in Eber-CT, Eber Metro's other assets were worth $374,728, comprising $10,728 in cash and an outstanding Note Receivable from Polebridge Bowman in the principal amount of $350,000 plus accrued interest (at 2% simple) of $14,000 as of May 31, 2012. (Ex. 126 at 36 (omitting to calculate the interest on the Note, however)).  In its filing to the Monroe County Supreme Court, Alexbay said, somewhat correctly, that "Metro has no cash reserves other than those required in the ordinary course of its business." (Ex. 44 ¶30). Alexbay made a misrepresentation, however, that there were no other "valuable" assets "of any kind" besides the interest in Eber-CT. (*Id., see also generally* Exs. 44, 45 (omitting to disclose the Polebridge Bowman note receivable)).

> **Disputed:**  Eber Metro was worthless because its debts were much greater

than its assets, so there was no misrepresentation by Alexbay.  <u>See</u> 11/8/19 Affidavit of Wendy Eber at ¶ 26; <u>See</u> Torchio Report attached as Ex. F to 11/8/19 Affidavit of W. Eber.

65.     An experienced appraiser or valuation expert relying on solely the Polebridge Bowman transaction as the basis for determining the value of Eber Metro's interest in Eber-CT would calculate the value of that interest as of May 23, 2012 at $5,523,103. (Ex. 139 (Torchio Report Rev. Ex. D).  Combining the appraisal value based on Polebridge Bowman with its other assets results in a total asset value of $5,897,831. (*See id.* (but omitting the Note interest)).

<u>Disputed:</u>   The total asset value of $5,897,831 is wholly misleading, as it ignores all of Eber Metro's liabilities.  <u>See</u> 11/8/19 Affidavit of Wendy Eber at ¶ 26; <u>See</u> Torchio Report attached as Ex. F to 11/8/19 Affidavit of W. Eber.

66.     A reasonable investor, experienced appraiser, or individual experienced in business valuation, with full knowledge of the facts concerning the Polebridge Bowman transaction, would not have relied on the Polebridge Bowman transaction alone to determine the value of Eber Metro's interest in Eber-CT (Torchio Dep. 104:18-105:6).

<u>Disputed:</u>  This is not a statement of material fact so it requires no response. The only appraiser/valuation expert to value Eber Metro as of June 2012, considered the Polebridge Bowman transaction and other relevant transactions, and found that they indicate that Eber Metro was insolvent.  <u>See</u> Torchio Report, p. 12, attached as Ex. F to 11/8/19 Affidavit of W. Eber.

67.     An experienced appraiser or valuation expert relying on multiple data points to determine the value of Eber Metro's interest in Eber-CT would estimate the value of

that interest as of May 23, 2012 as a range of values from approximately $646,413 to $10,718,229, and an appropriate "point estimate" would be that range's "midpoint" of $5,682,321. (Torchio Dep. 86:1-25; Ex. 139 at Rev. Ex. D).

> <u>Disputed:</u> **This is not a statement of material fact so it requires no response. The total asset value of $5,897,831 is wholly misleading, as it ignores all of Eber Metro's liabilities, and the reference to the Torchio Report is made in a vacuum. <u>See</u> 11/8/19 Affidavit of Wendy Eber at ¶ 26; <u>See</u> Torchio Report, p. 12, attached as Ex. F to 11/8/19 Affidavit of W. Eber.**

68.    As of May 23, 2012, Eber Metro had no outstanding liabilities on its own; to the extent that Eber Metro had any liabilities, it undisputed that EBWLC was either jointly liable or the guarantor. (*Id.* (identifying liabilities to (i) Lester Eber/Alexbay), (ii) Pension Benefit Guarantee Corp. ("PBGC"), (iii) the Teamsters, and (iv) Harris Beach, LLP)).

> <u>Disputed:</u> **Lester Eber's loans, the Teamsters Fund withdrawal liability, and the Harris Beach claim were liabilities of Metro.  The pension plan termination liability was a contingent liability of Metro.  <u>See</u> 11/8/19 Affidavit of Wendy Eber at ¶¶ 27, 28; <u>See</u> Torchio Report, p. 12, attached as Ex. F to 11/8/19 Affidavit of W. Eber.**

69.    **Undisputed.**

70.    Alexbay's strict foreclosure on Eber Metro was equivalent to a "sale" of Eber Metro for the amount of the debt (W. Eber Dep. 62:6-12 (describing the transaction as "[t]he article nine sale."); Torchio Dep. 82:4-83:9 (acknowledging the "distinct possibility" of fraudulent conveyance because this is "situation where you're selling assets and you've receiving a price that is less than the liabilities").) Aside from Eber Metro,

EBWLC's only asset was $2,251 in cash (Ex. 126 at 36) EBWLC's disposition of Eber Metro constituted a disposition of substantially all of its assets (L. Eber Dep. 361:22-362:18; Ex. 126 at 36; Ex. 127 at 20.)

**Disputed:** **Alexbay was not a buyer and EBWLC and Metro were not sellers. Rather, Alexbay was a secured creditor foreclosing on the collateral securing the debt of EBWLC and Metro.** **See** **§9-620; 12/6/19 Affidavit of Lester Eber at ¶8-9.**

71.     Prior to it being approved by EBWLC's board, neither Sally Kleeberg nor Audrey Hays were informed about Alexbay's proposal to accept the stock of Eber Metro in consideration for the elimination of Eber Metro's debt to Alexbay. (Ex. 141 at 3-4 (Response 12 & 14); Ex. 142 at 2 (Response 2, second bullet); Hays Decl. ¶¶16-18; L. Eber Dep. 279:17-22 (admitting he did not advise the other beneficiaries of the sale even after he saw that CNB made a misrepresentation to them indicating that Eber-CT was still a Trust asset); *see also id.* at 295:11-24).   Unlike the transfers of assets to Southern in 2007, no consent was obtained from EB&C as shareholder of EBWLC, nor was consent received from the Trust as shareholder of EB&C.

**Disputed:** **CNB's faulty report that Eber-CT was still a Trust Asset was many months after the closing of the 2012 Foreclosure.   Further, Plaintiffs cite no authority for proposition that there was a requirement that the beneficiaries be notified and there was no requirement that EB&C or the Trust consent to the 2012 Foreclosure.**

72.     The transfer of Eber Metro to Alexbay produced no benefit to the Trust or the other Trust beneficiaries not named Lester Eber. (L. Eber Dep. 293:11-294:24). Nor did it produce any benefit to EBWLC (*Cf.* L. Eber Dep. 442:8-443:20 (evasive testimony

designed to justify making the loans in the first instance rather than the challenged decision of his foreclosure)).

**Disputed:  The transfer eliminated the Lester Eber debt.  See 11/8/19 Affidavit of Lester Eber at ¶¶ 41, 42.**

73.    EBWLC's consent to transfer Eber Metro to Alexbay was objectively irrational from an economic point of view, even if the net asset value of Eber Metro was estimated to be negative at the time of the transfer. (Ex. 127 at 20-21 (Liebman Report)).

**Disputed:  The consent was rational based upon the financial realities facing EBWLC.  See 12/5/19 Affidavit of Wendy Eber at ¶ 14; See Torchio Report, pp. 12, 13 attached as Ex. F to 11/8/19 Affidavit of W. Eber; See Torchio Testimony attached as Ex. A to 12/6/19 Affidavit of J. Farrar.**

74.    A reasonable investor would have recognized the transfer of Eber Metro to Alexbay as "a shell game" that would likely be deemed a "fraudulent conveyance" by creditors like PBGC and Harris Beach, and thus incapable of avoiding the debts of EBWLC. (Torchio Dep. 72:21-79:23, 114:4-14 ("[T]here are no synergies created by Alexbay.  That's just a shell game.")).

**Disputed:  The testimony of Mr. Torchio is taken out of context, and does not at all stand for the proposition that "a reasonable investor would have recognized the transfer of Eber Metro to Alexbay as "a shell game" that would likely be deemed a "fraudulent conveyance."   Mr. Torchio ultimately concluded that the value assigned to Eber Metro was consistent with the range of values that he ultimately determined for it. See Torchio Report attached as Ex. F to 11/8/19 Affidavit of W. Eber; See Torchio Testimony attached as Ex. A to 12/6/19 Affidavit of J. Farrar.**

75.     In July 2012, Eber Metro exercised the Call Option to acquire Slocum of Maine for $10. Ex. 55 at 3).  Eber Metro did not acquire any assets or stock, however; instead, George and Thomas Slocum transferred their 100% ownership interest in Slocum of Maine to Lester and Wendy Eber individually, each receiving a 50% interest. (*Id.*) From 2012 through at least 2016, Lester and Wendy have received income from Slocum of Maine. (Ex. 88 at 1 (Response 1); Ex. 143 at 1-2 (Response 1)).

**Disputed:  While Lester and Wendy Eber have received income from Slocum of Maine, it was very modest.  See 12/5/19 Affidavit of Wendy Eber at ¶4.**

76.     **Undisputed.**

77.     **Undisputed.**

78.     **Undisputed.**

79.     **Undisputed.  The Petition speaks for itself.**

80.     **Undisputed.**

81.     CNB's petition sought only CNB's resignation and discharge as co-trustee, without seeking the same relief for the other co-trustees; the other co-trustees did not join in the petition and did not provide accountings of their own transactions. (Ex. 135 at 2–3.) Lester and Gumaer were identified as interested parties and served with the petition. (*Id.*)

**Disputed:  The Petition also sought the termination of the Trust.  (Brook Decl. Ex. 135).**

82.     **Undisputed.**

83.     In the Surrogate's Court, Lester did not object to either CNB's petition for termination of the Trust or CNB's proposed distribution. (Ex. 33 at 1 (noting "no

Objections")).

**Disputed:  While Lester did not specifically object to the Petition, he certainly did not agree to incorrect distributions.  See 12/5/19 Affidavit of Lester Eber at ¶ 27. There was no specific proposed distribution of the EB&Co. stock set forth in the Petition or the Final Account. (Brook Decl. Ex. 135).**

84.     Plaintiffs did not enter an appearance or otherwise object to CNB's petition or accounting because the petition, if granted, would require the distribution of EB&C shares directly to Plaintiffs in accordance with their respective interests in the Trust. (Kleeberg Decl. ¶¶ 11–13; Hays Decl. ¶ 21; Stein Decl. ¶ 6.) That said, Plaintiffs did not ignore the proceeding; they instructed their counsel to intervene and object if there was any sign of an attempt by Lester to divest Plaintiffs of their shares. (Kleeberg Decl. ¶¶ 11–13; *see also* Hays Decl ¶ 26; Stein Decl. ¶ 8.)

**Disputed:  Eber Defendants do not know why Plaintiffs allegedly took any actions.  The Petition did not specifically require the distribution of EB&Co. shares directly to Plaintiffs in accordance with their respective interests in the Trust. (Brook Decl. Ex. 135).**

85.     On June 1, 2017, the Surrogate granted CNB's requested relief and ordered CNB to "pay the remaining cash and transfer, assign and deliver the other remaining assets shown in the account as follows (less certain specified fees and commissions):

> 1/3 to Lester Eber
>
> 1/3 to Audrey Hays
>
> 1/6 to Daniel Kleeberg
>
> 1/6 to Lisa Stein

(Ex. 33 at 3). Applied to the shares of EB&C held by the Trust, the Surrogate's Court ordered the following distribution of EB&C shares:

- **Class A Voting:** 616.67 (616 and 2/3) shares each to Lester Eber and Audrey Hays; 308.33 (or 308 and 1/3) shares each to Lisa Stein and Daniel Kleeberg.

- **Class B Nonvoting:** 96.67 (96 and 2/3) shares each to Lester Eber and Audrey Hays; 48.33 (or 48 and 1/3) shares each to Lisa Stein and Daniel Kleeberg.

- **6% Preferred Nonvoting:** 666.67 (666 and 2/3) shares each to Lester Eber and Audrey Hays; 333.33 (or 333 and 1/3) shares each to Lisa Stein and Daniel Kleeberg.

(Ex. 149 at 5-6 (Response 19); *see also id.* at 5 (Response 18)).

<u>Disputed:</u>  **The Surrogate's Court Order speaks for itself, but did not contain any language that specifically identified the number of EB&Co. shares to be distributed to each beneficiary.**

86.    Lester Eber received a copy of the Surrogate's June 1, 2017 Order from his lawyer promptly after his lawyer received it. (L. Eber Dep. 129:10-3.)  On July 12, 2012, Lester was sent a letter from CNB, disclosing its intent to distribute approximately two-third of the EB&C shares to Plaintiffs. (Ex. 32 at 1 (cover letter re sending "chart showing distribution of shares"; *id.* At 3 (chart showing distribution of 1240 Class A Voting shares to Plaintiffs, equal to 67% control).)

<u>Disputed:</u>  **The "Chart showing distribution of shares" was incorrect.  (Brook Decl. Ex. 32).**

24

87.     In response to the July 12 letter, Lester's lawyer, James Vazzana, disputed the proposed distribution of cash and *marketable* securities, but <u>not</u> the distribution of EB&C stock. (Ex. 34).  He relied in part on Wendy Eber's own pro forma spreadsheet of changes to the distribution. (*id.* at 2-3), which did "not [have] anything to do with the Eber Brothers equity, only the marketable securities . . ." (W. Eber Dep. 338:24-341:17).

**<u>Disputed</u>:  The Eber Defendants did not agree to incorrect distributions from the Trust.  <u>See</u> 12/5/19 Affidavit of Lester Eber at ¶ 27.**

88.     **Undisputed.**

89.     As the longtime President and director of EB&C, Lester had access to and knew about the Bylaws, including the transfer restriction in Article XII. (Brook Decl. ¶8). The Bylaws of EB&C were not disclosed to Plaintiffs or their counsel until October 2, 2018. (*Id.*).

**<u>Disputed</u>:  The Bylaws of EB&C were not sought until 2018. (Brook Decl. at ¶ 8).**

90.      Lester, Wendy, and their lawyer failed to mention the transfer restriction in EB&C's Bylaws to CNB or the Surrogate's Court at any time in 2016 or 2017, even though they repeatedly told CNB Lester was interested in acquiring the Eber Bros. stock – starting after Plaintiffs filed this lawsuit in December 2016 through March 2017. (Exs. 153, 86).

**<u>Disputed</u>:  Plaintiffs do not cite any authority showing any obligation to reference the transfer restriction.**

91.     The certificates stated that they were "transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of this Certificate properly endorsed." (*Id.*).  No reference to any restriction on that right to

transfer is noted on any of the certificates. (*Id.*).

**Disputed:  The transfer restriction was conspicuously noted on the stock certificates. The statement "this Certificate and the shares represented thereby are issued and shall be held subject to all of the provisions of the … By-Laws and Amendments" was printed in bold type on the face of the stock certificates. See**

92.     As of 2017, CNB was unaware that EB&C's Bylaws included any provision restricting the transfer of stock. (L. Eber Dep. 397:15-24 (never had any discussions with CNB about the Bylaws)).  CNB had possession of the EB&C Stock Certificates issued to Lester, Gumaer and the predecessor bank. (Ex. 134 (copies of the certificates)).

**Disputed:   The Eber Defendants do not know what knowledge CNB possessed.**

93.     In or about September 2017, Lester received a chart reflecting CNB's updated proposed distribution of Trust assets that included distribution of EB&C shares to Plaintiffs. (Ex. 36, L. Eber Dep. 141:22-142:8.) Soon thereafter, Lester received his share of the distribution of the Trust's cash and marketable securities in accordance with that chart. (Ex. 38)  On October 11, 1017, CNB sent correspondence to James Vazzana and Brian Brook concerning the outstanding need to deliver the EB&C shares and expressing a desire to do so in the amounts of shares that had been specified by the updated proposed distribution chart. (*Id.*)  Plaintiffs shares in EB&C.  (Hays Decl. ¶22.)

**Disputed:  The revised chart showing the possible distribution of shares received on August 1, 2017 was still incorrect.  (Brook Decl. Ex. 38).  The version of the October 11, 2017 letter Mr. Vazzana received did not have copies of stock powers endorsing shares to plaintiffs.  See 12/5/19 Affidavit of Lester Eber ¶ 32,**

Exhibit C.

94.     Plaintiffs did not receive a copy of EB&C's Bylaws until October 2, 2018. (Brook Decl. ¶ 8.) On October 10, 2018, since a year had passed without any EB&C shareholder meetings, Audrey Hays formally requested a shareholder meeting for shareholders of EB&C. (Hays Decl. ¶ 23; Ex. 42.) EB&C, through Lester and Wendy Eber, refused Ms. Hays' request because they said that she was not a registered shareholder.

**Disputed:  The Eber Defendants do not know when Plaintiffs first had the EB&C Bylaws.  Plaintiff Hays' request for a EB&C shareholder meeting was denied for a number of reasons.  12/5/19 Affidavit of Lester Eber ¶ 33.**

95.     Over a year later, on October 31, 2018, Lester sent a "Notice of Intent to Purchase" to the "Allen Eber Trust" care of CNB, invoking the Transfer Restriction in Bylaw XII. (Ex. 35.) He did so five days after Plaintiffs' counsel sent an email to Lester's lawyers in an effort to convince them they were wrong to deny Ms. Hays' meeting request and enclosing a copy of CNB's October 11, 2017 letter to James Vazzana as support. (Brook Decl. ¶ 10.)

**Disputed:  The version of the CNB letter dated October 11, 2017 that was received from Plaintiffs' counsel in October 2018 was different from the version received in October 2017. 12/5/19 Affidavit of Lester Eber ¶ 32; (Brook Decl. Ex. 38).**

96.     **Undisputed.**

97.     Starting just months after the Metro Transfer, Lester, Wendy and their lawyers have worked hard to shield Lester from potential liability for that transaction and to frustrate any attempt by the Trust or Plaintiffs to reacquire control of the Connecticut business. *See, e.g.,* Ex. 98 (11/7/2012 Letter from Underberg & Kessler re: protecting

Lester's money in case "the Article 9 transfer was somehow upset in the future").

**Disputed:** **The is a mischaracterization of the letter – which speaks for itself – as well as a mere recitation of plaintiffs' ill-conceived theory of the case which is not appropriate for a statement of allegedly undisputed facts.**

98. **Undisputed.**

99. The next day, on February 15, 2017, Wendy Eber signed a Written Consent of the Sole Member of the Board of Directors of EBWLC to the Certificate of Amendment that she had already signed the day before. (Ex. 43 at EB-00001166-67).  The 2017 Amendment to the Certificate of Incorporation was not approved by a vote of EBWLC's shareholders or by a written consent in lieu of a shareholder meeting. (Ex. 43).

**Disputed:** **There was a Consent regarding the 2017 Amendment to Certificate of Incorporation.  See Ex. B to 12/5/19 Affidavit of Lester Eber.**

100. **Undisputed.**

DATED:   December 6, 2019
        Rochester, New York                 UNDERBERG & KESSLER LLP


                                          */s/ Paul F. Keneally, Esq.*
                                          Paul F. Keneally, Esq.
                                          Colin D. Ramsey, Esq.
                                          Jillian K. Farrar, Esq.
                                          *Attorneys for Eber Defendants*
                                          300 Bausch & Lomb Place
                                          Rochester, New York 14604
                                          Telephone: (585) 258-2800