UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DANIEL KLEEBERG, LISA STEIN, and
AUDREY HAYS,

                Plaintiffs,

     v.

LESTER EBER; ALEXBAY, LLC f/k/a
LESTER EBER, LLC; ESTATE OF
ELLIOTT W. GUMAER, JR.; and WENDY
EBER,

                Defendants,

    and

EBER BROS. & CO., INC.; EBER BROS.
WINE AND LIQUOR CORP.; EBER
BROS. WINE & LIQUOR METRO, INC.;
EBER-CONNECTICUT, LLC; EBER-
RHODE ISLAND, LLC; EBER BROS.
ACQUISITION CORP.; EBER-METRO,
LLC; SLOCUM & SONS OF MAINE, INC.;
and CANANDAIGUA NATIONAL BANK
& TRUST COMPANY,

                Nominal Defendants.

Civil Action No.  16-CV-9517(LAK)(KHP)

**PLAINTIFFS' COUNTERSTATEMENT OF MATERIAL FACTS**

       Pursuant to Local Civil Rule 56.1, Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey

Hays submit this Response to the Statement of Material Facts submitted by Lester Eber, Wendy

Eber, and Alexbay, LLC, and adopted by the Estate of Elliott W. Gumaer, Jr. For the avoidance

of doubt, Plaintiffs only respond as to the matters contended, and nothing herein should be

construed as any concession that the facts asserted are material. Nor do Plaintiffs concede any

inferences or implications from those facts that have not been expressly stated by the Ebers,

1

irrespectively of whether these responses specifically identify or challenge such inferences or implications. After responding to the Ebers' numbered paragraphs, Plaintiffs include additional paragraphs of facts that are material to the arguments presented by Defendants for summary judgment. In some cases, these additional paragraphs substantially duplicate Plaintiffs' Rule 56.1 Statement of Material Facts submitted in support of their own motion. This is done based on our reading Local Civil Rule 56.1's requirements.

### OBJECTIONS APPLICABLE TO THE ENTIRE RULE 56.1 STATEMENT

Though objections are not expressly permitted by Rule 56.1, courts have considered objections to Rule 56.1 statements for decades. *See, e.g., Building Serv. 32B-J Pension Fund v. Vanderveer Estates Holding, LLC*, 121 F. Supp. 2d 750, 754 n. 1 (S.D.N.Y. 2000) (noting that the defendant's objections to the plaintiffs' Rule 56.1 statement were either to immaterial facts or on the basis that the statement in question was an issue of law to be decided by the court). If this Court considers the following objections improper for inclusion in the Counterstatement, Plaintiffs respectfully request that this Court treat this section as a motion to strike and, if the Court deems it appropriate, impose sanctions to punish the misconduct and compensate Plaintiffs' counsel for the substantial amount of additional effort required due to the inexcusable failure to follow basic rules. *See Ofudu v. Barr Laboratories, Inc.*, 98 F.Supp.2d 510, 513 (S.D.N.Y. 2000) (granting motion to strike where "Rule 56.1 Statement appears to be the statement of counsel, as it is argumentative without demonstrating any personal knowledge of the matters set forth therein," and many of the entries "are obviously opinions or arguments").

The Rule 56.1 Statement is objectionable because it fails to include citations to the actual admissible evidence, as required. *See* L. Civ. R. 56.1(d) ("Each statement by the movant …. must be followed by citation to evidence which would be admissible, set forth as required by Fed. R.

Civ. P. 56(c)."). Instead of citing to admissible evidence, the Ebers' 56.1 Statement cites to the affidavits that summarize the evidence.[1] The Ebers' characterization of documents is inadmissible under the best evidence rule. See Fed. R. Evid. 1004 (identifying circumstances when the document itself is not required, none of which apply here). Thus, even when the documents are referenced in the underlying affidavits, the Ebers' affidavits (which are supposed to be based on personal knowledge of facts) are effectively functioning as the Rule 56.1 statement.

As detailed further in the accompanying brief and in response to specific assertions below, the Ebers' affidavits are highly irregular and were clearly written by counsel with virtually no review by the witnesses. This is demonstrated by the multitude of clearly incorrect statements in the affidavits, often contradicted by the Ebers' own prior testimony. In some instances, the incorrect or inconsistent factual assertions are, according to the Ebers, as highly material. The affidavits are also replete with explicit legal conclusions along with characterizations of documents that speak for themselves.

The affidavits' inaccuracies and legal conclusions are particularly demonstrative of bad faith given that the Ebers routinely refused to answer questions that sought their legal understanding during depositions, and the Ebers have expressly waived any right to assert the advice of their counsel in their defense. We do not cite to all of these instances again now because this Court already dealt with this extensively during the protracted discovery dispute over privilege assertions, at the end of which this Court concluded that the Ebers' discovery conduct was inexcusable, including withholding numerous documents that were "clearly" not privileged, May

---

[1] Only one exhibit to any affidavit is cited in the Rule 56.1 Statement, and it is the Allen Eber Will. However, the Rule 56.1 Statement fails to cite to the specific page of the exhibit, as required. *See Brown v. City of New York*, 2018 WL 3821620, at *5 (S.D.N.Y. Aug. 10, 2018) (noting the need to cite to specific pages and lines of deposition transcripts).

13, 2019 Op. 33, and failing to disclose documents early on in an apparent "effort to conceal a waiver" of privilege, *id.* at 52.

Between the clearly erroneous facts and inclusion of legal conclusions and other assertions not based on personal knowledge, this Court should be "satisfied" that the affidavits were submitted in bad faith or solely for delay. *See* Fed. R. Civ. P. 56(h).

### RESPONSES TO THE EBERS' RULE 56.1 STATEMENT

1.      Defendant, Lester Eber ("Lester") began working for Nominal Defendant Eber Bros. & Co. lnc. ("Eber Bros."), a wine and liquor distributorship, in or about 1959. He eventually held the titles of President and Director of Eber Bros.

**Response:** Disputed in part. Eber Bros. & Co., Inc. (referred to by Plaintiffs as "EB&C") was a produce business. (L. Eber Dep. 85:22.) Unless Lester was still in high school in his 20s, he began working for EB&C before 1959. (L. Eber Dep. 85:25–86:5 (noting he worked for EB&C in high school); id. at 9:16 (Lester was born in January 1938). EB&C's subsidiary, EBWLC, was the wine and liquor distributorship.

2.      Lester's father, Allen Eber, the founder of Eber Bros., created a Testamentary Trust in his 1969 Will (the "Will") known as the Allen Eber Trust ("the Trust").

**Response:** Undisputed, except insofar as the Will provided for the creation of the testamentary Trust upon Allen Eber's demise, rather than the Trust being created at the time of the Will's execution.

3.      Lester served as Co-Trustee of the Trust, along with Elliott W. Gumaer, Jr., and an institutional trustee, eventually Canandaigua National Bank ("CNB").

**Response:** Undisputed.

4.     Plaintiffs, Daniel Kleeberg, Lisa Stein and Audrey Hays were beneficiaries or contingent remaindermen of a combined two-thirds interest of the Trust. One third of the interest in the Trust was held by Lester.

**Response:** Undisputed.

5.     Prior to its termination in June 2017, the Trust held a number of assets, most relevantly for the present dispute, all of the voting stock in Eber Bros.

**Response:** Undisputed.

6.     Nominal Defendant Eber Bros. Wine and Liquor Corp ("EBWLC"), is a subsidiary of Eber Bros.

**Response:** Undisputed.

7.     Lester became President of EBWLC, a position he held until he voluntarily resigned on February 1,2012.

**Response:** Disputed in part. Lester was undisputedly President of EBWLC. However, Plaintiffs dispute both the nature and date of his purported resignation. First, the supposed resignation was a sham, lacking in real substance, as Lester remained in control of EBWLC, including attending board meetings and remaining President of both Eber Metro (its wholly owned subsidiary that held substantially all of its assets) and EB&C (its controlling shareholder, holding all of its voting shares). *See* L. Eber Dep. 192:22–194:19 (uncertain recollection about how he resigned from EBWLC, but first claiming that the resignation happened during a board meeting, then saying he submitted a letter of resignation, though one was never produced); *id.* at 87:25–89:17 (more uncertain recollections, including saying he does not remember who replaced him as President of EBWLC); Ex. 60 (March 13, 2012 board meeting minutes for EBWLC and Eber Metro, with Lester attending and listening to discussion with companies' counsel about Lester's

"suit" against the companies); Ex. 144 at 2 (Response 20, stating Lester does not recall when he resigned; and Response 21, claiming "[c]lient privileged communication" over the reason why Lester purportedly resigned); Ex. 147 at 2 (stating that as of 2018, Lester Eber is still the President of EBWLC). Second, at a minimum, the evidence is clear that Lester's resignation did not occur "on February 1, 2012," as Defendants claim, but rather several weeks later, backdated to purportedly take effect on that date. The earliest time-stamped evidence reflecting any intention for Lester to resign is an email sent on March 2, 2012, apparently attaching a draft board consent document to appoint Gumaer as President of EBWLC. (Ex. 103 at 2; *see also* L. Eber Dep. 358:2–16 (stating he cannot think of any reason why the board consent would be dated in February when it was being sent around for signature in March); *id.* at 360:14–19 (when asked how February 1, 2012 was selected as the effective date of his resignation, Lester said, "I don't remember.").)

8.      Prior to the 2012 Foreclosure, Nominal Defendant Eber Bros. Wine & Liquor Metro, Inc. ("Eber Metro") was a wholly-owned subsidiary of EBWLC.

**Response:** Undisputed.

9.      Nominal Defendant Eber-Connecticut, LLC ("Eber CT"), is a subsidiary of Eber Metro, which owns 79% of Eber CT.

**Response:** Undisputed. For the avoidance of doubt, Plaintiffs reserve the right to rescind the transfer of a 6% interest of Eber-CT to Polebridge Bowman and to disgorge Wendy Eber of her current ownership of that same 6% interest. Because Defendants have not sought to dismiss the portion of Counts I and IV challenging those transactions, Plaintiffs do not address them here.

10.      Lester is the current CEO and Director of both Eber Metro and Eber CT.

**Response:** Undisputed in substance. Eber Metro's Bylaws provide for no position of "CEO"—however, Lester is and has been Eber Metro's "President." (Ex. 147 at 2.) Also, Eber-

CT, being an LLC, does not have directors, so Lester Eber is not "Director" of Eber-CT; Lester is a member of its "Board of Managers." (Ex. 57 at EB-00022905.)

11.     Wendy Eber ("Wendy") was CFO and Secretary of EBWLC from approximately 2007 until 2012, at which time she became President.

**Response:** <u>Disputed</u>. Although Wendy purported to be named President, she never assumed executive control of EBWLC and her appointment was a sham. (*See* Ex. 142 at Interrogatory Response No. 7 (omitting to state that Wendy Eber was ever President of EBWLC).) *See also supra* Response to ¶ 7.

12.     Wendy is the current President of Eber CT.

**Response:** Undisputed.

13.     Lester, without any obligation, voluntarily provided Plaintiffs and their immediate families with gifts and benefits.

**Response:** Undisputed.

14.     Lester approved loans to Plaintiff Daniel Kleeberg that were never repaid.

**Response:** Undisputed as the "loans" were discharged in bankruptcy.

15.     Lester paid the health care expenses and health insurance costs for his sister, Sally Kleeberg.

**Response:** <u>Disputed in part</u>, because use of "the" incorrectly suggests that Lester paid all such expenses, rather than doing so for just a few months, from August through December 2010. (*See* L. Eber Aff. Ex. C at EB-00001606 (totaling $6,372.64); *id.* at EB-00001668 (showing that in December 2010, Sally Kleeberg elected to pay these costs herself going forward).) Plaintiffs hereby notify Defendants that any further filings of Sally Kleeberg's personal medical records will

be met with a motion for sanctions given the absence of any conceivable relevance to the issues in this case.

16.     Lester made payments to Trust beneficiaries when the Trust had no money to distribute.

**Response:** <u>Disputed</u>. First, the Trust always had money to distribute based on its other investments, even in 2009, which was the only year when Lester made purported to make payments to the Trust beneficiaries, including Audrey Hays, form his own funds. (*See* Ex. 161 at 1 (12/18/2009 Hawks letter showing CNB distributing "annual trust income" in December 2009); *id.* at 3 (12/15/2009 Lester letter claiming to make a gift of $4,000 to each because no dividends would be issued by EB&C).) EB&C made distributions to the Trust in 2007 and 2008. (Ex. 135 at Page 40.) Even in 2009, however, EB&C was able to issue distributions, but did not do so. (*See* Ex. 172 (emails from Wendy Eber to Rick Hawks in December 2009, indicating that there was money to distribute to the Trust, but she stopped the transfer from being completed and instead Lester purported to make personal payments).)

17.     Lester arranged for the Trust to distribute money on a monthly basis to Plaintiff, Lisa Stein and her daughter, to help with her daughter's medical expenses.

**Response:** Undisputed.

18.     ln approximately October 2004, Southern Wine and Spirits of America, lnc. ("Southern"), a national wine and liquor distributorship, entered the New York market.

**Response:** Undisputed.

19.     Southern solicited and hired approximately 20 of EBWLC's key salespeople with knowledge of EBWLC's retail customer base, distribution network and business strategies.

**Response:** Undisputed.

20.     Southern's entry into New York resulted in the Eber Entities exiting the New York market.

**Response:** Disputed in part, insofar as it is a reasonable inference that other, unmentioned factors also played a causative role in the Eber Entities' exit from the New York market.

21.     EBWLC sued Southern and previous EBWLC employees in the New York State Supreme Court, County of Monroe, Index No.: 135/05, for, *inter alia*, tortious interference, inducement of breach of fiduciary duty, unfair competition, and interference with prospective business advantage. The application for preliminary injunction was denied by the Hon. Kenneth R. Fisher.

**Response:** Undisputed.

22.     Ultimately, EBWLC entered into a settlement agreement with Southern.

**Response:** Undisputed.

23.     As a result of the impact of Southern's entry into the New York market on EBWLC, in March 2007, Wells Fargo put EBWLC's loans into default and classified the loans as a "workout", freezing all of EBWLC's working capital in order to pay down the outstanding loans. Even after the Wells Fargo loans were paid off, it declined to extend any further credit to any Eber entity.

**Response:** Disputed in part, insofar as no admissible evidence has been presented to show what motivated Wells Fargo's actions, and it is a reasonable inference that other, unmentioned rationales factored into Wells Fargo's decision. Lester's affidavit is not admissible evidence of Wells Fargo's state of mind since he cannot have such personal knowledge. Fed. R. Evid. 602.

24.     Lester was hired by Southern in August of 2007 as a consultant and lobbyist at the specific request of Southern based on its needs.

**Response:** <u>Disputed in part</u> to the extent this suggests that Southern made this request of its independent volition, without Lester's participation and desire for Southern to pay him money directly. (*See* Lester Dep. 64:2–4 (stating that a five-year term is "what [Southern] would give me because I needed a job"); Interrogatory Response No. 3 (stating that the Southern Consulting Agreement was the product of the overall "Settlement of lawsuit and Sale of Delaware and Ohio").)

25.    Prior to August 2007, EBWLC and Metro had laid off all employees and ceased New York operations.

**Response:** <u>Disputed</u>. Both assertions are false; indeed, the Ebers contradict themselves on these points only a few pages later in their Statement. *See* Eber SMF ¶ 59 ("The January 19, 2016 Order also held, as a matter of law, that EBWLC ceased operations by December 31, 2007, and terminated all of its employees by May 31, 2009.").)

First, EBWLC's operations as a wine and liquor distributor in New York did not cease until September 2008. (Ex. 165 at 2 (Response to PBGC SMF ¶ 2: "Undisputed that [EBWLC] itself had wine and liquor distribution operations in New York from 1933 to September 2008."); Ex. 166 at 5 (arguing in PBGC MSJ Reply that EBWLC continued its "business operations" long after its "[t]he shutdown of the New York portion of Eber Bros.' Northeastern business in 2008"). *See also* Ex. 165 at 6–8 (asserting all the things EBWLC did to continue existing as a holding company actively "overseeing its investments" in Eber Metro and Eber-CT).)

Second, EBWLC continued to have employees during and after August 2007:

    a.  Lester and Wendy Eber have already admitted in interrogatories that they remained EBWLC employees throughout at least 2007. (Ex. 88 at 1 (Response 1, stating only entity to pay Wendy in 2007 was EBWLC); Ex. 142 at 1

(Response 1, same as to Lester).) But even though those responses contradict their current assertion, even those responses were not truthful.

b.  EBWLC issued a form W-2 to Wendy Eber for 2008, showing employee wages paid to her in the amount of $50,834.45, slightly less than half her salary paid by EBWLC in 2007, indicating she remained employed by EBWLC until approximately late May 2008. (*See* Ex. 184 (W-2s for 2007 and 2008, but omitting W-2 from Eber-CT for 2008 even though one must have been issued); *see also* Ex. 28 at 1 (2007 W-2 issued by EBWLC to Lester, but only W-2 for 2008 from Eber-CT (the opposite of what was produced for Wendy)).)

c.  EBWLC's general ledger also reveals that both Lester and Wendy continued to be paid officer salaries by EBWLC until June 2008. (*See* Ex. 168 at Page 81 (showing monthly "Officers Salaries" paid of over $35,000 per month until June 2008); Ex. 142 at 4 (Response 7, identifying Lester and Wendy as the only officers of EBWLC after October 2007.) The amount of "Officers Salaries" reflected on EBWLC's books as paid in 2008 significantly exceeds the amount reported to Wendy on her W-2 (Ex. 184), indicating that Lester was also still receiving compensation from EBWLC in 2008 as well.

d.  Lisa Semenick remained employed as EBWLC's CFO until October 2017. (*See* Ex. 142 at 4 (Response 6).)

e.  EBWLC's general ledger also shows continued payroll expenses through July 2008—over a year after the Ebers now claim everyone was laid off. (*See* Ex. 168 at Page 45 (showing withholding of payroll taxes, both state and federal, until 7/31/2008); *id.* at Page 71 (showing payment of workers compensation

and disability insurance premiums for warehouse and sales employees through 10/31/2007); *id.* at Page 79 (showing "payroll expense" for "Office Salaries" through 7/31/2008); id. at Page 87 (showing FICA taxes paid for general and administrative ("G&A") employees through 7/31/2008.)

    f.   In 2010, Lester Eber was again a salaried employee of EBWLC. (Ex. 155; *see also* Ex. 168 at Page 79 (showing more "Office Salaries" payroll ("PR") expenses incurred in 2010, with reimbursements coming from Eber-CT).)

26.    No Eber company ever did any consulting or lobbying work.

**Response:** Disputed in part. Plaintiffs do not dispute that no Eber company performed consulting or lobbying work on behalf of non-Eber third parties. However, Lester Eber, in his capacities as an officer of various Eber entities, performed lobbying work on behalf of the Eber companies for years. (*See* L. Eber. Dep. 445:18–446:9 (Lester had years of experience in governmental relations, both federally and in New York state, while being paid by EBWLC specifically); Southern Dep. 41:16–43:16.) Lester Eber also performed substantially the same consulting services for the Eber companies as he did for Southern, although he did so as a full-time employee, officer, and director rather than as a "consultant." (Ex. 93 at SGWS-000132 § 6(d); Southern Dep. 21:5–22:1.) However, Lester's consulting role with Southern was meant to be significantly more limited than the management role that he had with EBWLC. (Southern Dep. 22:2–17 ("A hundred percent [more limited].").)

27.    Between 2008 and 2012, the Eber Nominal Defendants (specifically Eber-Connecticut, LLC) continued to have serious financial problems and made numerous attempts to arrange new first lien debt financing with third-party lenders, without success.

**Response:** <u>Disputed</u>. Eber-CT successfully renegotiated new terms for its first lien debt financing with CNB on multiple occasions during the 2008 to 2012 time period. (*See, e.g.*, Ex. 123 at EB-00020084 (waiving financial covenants and extending maturity date).) Nominal Defendant Eber-Rhode Island, LLC sold its assets for a value that exceeded its debts in 2008. (Ex. 171.) Nominal Defendant Eber Metro's books reflect over $2 million in income in 2009. (Ex. 170.) The Ebers did not acquire Slocum & Sons of Maine, Inc. until Eber Metro exercised its Call Option in mid-2012, so Plaintiffs assume that entity is not included in the Ebers' assertion. But if the Ebers did include Slocum of Maine, then the assertion would be rebutted by the fact that the Ebers made the decision to acquire it and doing so would have been irrational if it had "serious financial problems."

28.     Lester made a number of personal loans to the Eber companies evidenced by the following:

> A. October 1,2002 and August 15, 2005: $2,079,645.00 in Notes to EBWLC which were amended and restated on March 13, 2006

> B. October 2009: $1.5 Million LOC Note to Eber Metro; Board Resolutions

> C. February 26,2010: EBWLC Guaranty

> D. February 26,2010: Security Agreement by EBWLC and Metro; Board Resolutions; Minutes

> E. February 11, 2011'. Amended and Restated Security Agreement EBWLC and Metro

> F. February 11,2011 Debt Assumption Agreement Between EBWLC, Metro (Metro assumed all of EBWLC's obligation under the $1.5 Million Note); Board Resolutions

> G. August 18,2011: Metro Board Meeting Minutes

H. January 18,2012: Assignments (EBWLC & Metro) of Line of Credit Note and

Security Agreement by and among Lester and Alexbay, LLC

I. March 13,2012: Joint Meeting Minutes for EBWLC and Metro.

**Response:** Undisputed only insofar as, as phrased, Lester Eber made "a number of loans"

and that the documents referenced constitute evidence to support that claim. Plaintiffs dispute the

existence, validity, and amounts of the purported loans, as well as whether the referenced

documents, some of which have never been produced, satisfy the Ebers' burden of proving those

facts under the entire fairness doctrine. *See infra* Response to ¶ 35.

29.    The Will expressly permitted Lester, as a Co-Trustee, to make a secured loan to the

Trust or the companies owned by it - and concomitantly, to enforce his security interest in the

collateral.

**Response:** Disputed and objected to as improper legal assertion.

First, this is a conclusory legal assertion improperly inserted into the Eber SMF *and* Lester

Eber's affidavit. *See Rodriguez v. Schneider*, No. 95-cv-4083 (RPP), 1999 WL 459813, at *1 n.3

(S.D.N.Y. June 29, 1999) (a Rule 56.1 statement "should neither be the source nor the result of

'cut-and-paste' efforts with the memorandum of law"). The text of the Allen Eber Will is

undisputed and speaks for itself, subject to interpretation by the Court consistent with the

established New York rule of strict construction against permitting self-dealing.

Second, to the extent that this is construed as an assertion of fact about Allen Eber's state

of mind based on evidence extrinsic to the Will, that is refused by Lester's assertion during his

deposition that he had never read the Will and was unaware of its contents. (L. Eber Dep. 296:9–

23.) To the extent that this is construed as an assertion of fact about Lester's state of mind, Lester's

testimony suggests that he never saw the Will even after his father died. (*Cf. id.* ("I never saw his

will or anything. I was handed a copy of his estate when I first met Mr. Gumaer. I knew from nothing.").

30.     Lester Eber wrote to Plaintiffs Sally Kleeberg and Audrey Hays on March 22, 2010 and April 2, 2010 explaining the dire financial situation faced by EBWLC.

**Response:** <u>Disputed in part</u>. Plaintiffs do not dispute that Lester's April 2, 2010 letters portrayed a dire financial situation at EBWLC, or that the typewritten copies of those letters were sent to Sally Kleeberg and Audrey Hays.

There is no evidence that Lester wrote to Audrey Hays on March 22, 2010. (*See* L. Eber Aff. Ex. J (showing only a March 22, 2010 letter to Sally Kleeberg).) Moreover, the evidence itself suggests that the March 22, 2010 letter to Sally was not sent, and was instead at most a draft of some kind, if not an after-the-fact fabrication, because it includes assertions that make no sense. (*See, e.g.*, *id*. at EB-00001671 (asserting that it is enclosing a letter but is followed by a letter dated afterwards).) Notably, each typewritten letter in the cited evidence states that the phone call referenced in it was made on "April 9, 2010," and the handwritten draft to Audrey Hays was actually dated "April 9, 2010." Therefore, it is reasonable to conclude that the letters were not sent until after the April 9, 2010 calls, or that, alternatively, the handwritten versions of the April 2 letters were forged in an attempt to lend credibility to the March 22, 2010 handwritten letter. Because Defendants do not assert that that the contents of these letters have any significance, Plaintiffs reserve their remaining arguments for trial in the event that Lester attempts to rely on these handwritten documents.

31.     The March 22,2010 and April 2, 2010 correspondence from Lester to Sally Kleeberg and Audrey Hays explained that Lester had already loaned significant sums of money, and additional sums would be needed to keep the Eber companies from going under.

**Response:** <u>Disputed</u>. The contents of the purported letters speak for themselves. The implication that the March 22, 2010 letter was sent is disputed. *See supra* Response ¶ 30.

32.     Lester offered Sally Kleeberg and Audrey Hays the opportunity to participate in the loans on a 1/3 basis and both rejected Lester's offer to participate.

**Response:** <u>Disputed</u>, however it would be undisputed if the term "loans" refers solely to the Line of Credit Note that was referenced in the April 2, 2010 letters, which is all that Lester's Affidavit claims was offered. *See* Lester Aff. ¶ 34.

33.     Throughout 2011, the companies continued to perform poorly.

**Response:** <u>Disputed</u>. (*See* Ex. 127 (Liebman report, noting that Eber-CT's earnings had improved every year from 2009 through 2012 and was trending positively").)

34.     EBWLC and Metro failed to pay any of the principal or interest on the loans made by Lester Eber.

**Response:** Undisputed.

35.     By the end of 2011, the outstanding principal and accrued but unpaid interest on Lester's loans was an aggregate $3,650,682.48.

**Response:** <u>Disputed</u>. Plaintiffs dispute the amount of Lester's loans that were made prior to 2009 and the amount that was remaining due and unpaid. The Ebers have the burden of proof to establish the validity and amount of the debt due to Lester under the entire fairness doctrine, and the evidence they have adduced is incomplete and reasonably subject to question such that a reasonable jury could find that some of the alleged debts were not legitimate. *See Beyer v. Cnty. of Nassau*, 524 F.3d 160, 163 (2d Cir. 2010); *see also* Ex. 49 (letter dated April 2, 2010 asserting that Lester had loaned $500,000 as of that date); Ex. 169 at 3/24/2009 7:56 AM (email from EBWLC accountant asserting that, as of that date, the only "officer loans on the Company books"

were loans from EBWLC to Wendy (presumably interest-free loans)). For example, although the Ebers reference 2002 and 2005 notes (Eber SMF ¶ 28(A)) that were supposedly amended and restated in 2006, those earlier notes have never been produced, nor have there been any records of related payments or deposits. (Brook Opp'n Decl. ¶ 10)

36.     The loans were the primary obligation of Eber Metro, but all of the loans were guaranteed by EBWLC assets and were secured by a validly-perfected first priority security interest.

**Response:** <u>Disputed and objected to in part as containing an improper legal assertion</u>. Plaintiffs do not dispute that, as of 2012, the terms on the face of the various loan documents provided that Eber Metro was the debtor and EBWLC was merely the guarantor. Plaintiffs dispute that the security interest was validly perfected on the grounds that no consideration was exchanged since the LOC Note had already been executed months before the time when the Security Agreement and Guaranty were executed. (Ex. 13 at 1; L. Eber Dep. 102:16–25, 103:10–24.)

37.     Lester Eber assigned the loans to Alexbay LLC, a newly formed Connecticut limited liability company owned by Lester.

**Response:** <u>Disputed</u>. Lester failed to execute the assignment agreement until after the transfer of Eber Metro to Alexbay was complete. (*See* L. Eber Aff. Ex. L at EB-00025513 (Alexbay Complaint Exhibit E is an *unsigned* assignment agreement).)

38.     Eber Metro did not repay the sums due as required under the Line of Credit Note and Debt Assumption Agreement.

**Response:** <u>Disputed in part</u>. Plaintiffs do not dispute that Eber Metro did not make payments to Lester that were required by the terms on the face of the Line of Credit Note. The

17

Debt Assumption Agreement, however, did not specify any dates when repayment was "due" at all. (*See* Ex. 17.)

39.     By late 2011, Lester stated that he no longer was willing to put more money into the companies.

**Response:** <u>Disputed</u>. Lester's 2019 affidavit claims that he was no longer willing to put money into it, but there is no evidence that "Lester stated" that in 2011. Quite to the contrary, Lester continued to put more money into the companies in late 2011 and even in 2012. (*See* Ex. 12. *See also* L. Eber Dep. 102:16–25 (denying that he ever refused to loan more more money to the company unless he was given a security agreement, because he was willing to do "whatever [he] had to to keep the company alive.").)

40.     On or about February 21,2012, despite being under no obligation to do so, in order to foreclose, Alexbay filed an action in New York State Supreme Court, Monroe County, Index No.: 201211919 (the "Article 9 Action") under UCC § 9-620 and § 9-627, seeking a judicial determination that Alexbay's acceptance of all Eber Bros. ownership interest in Eber Metro (and indirectly all of Eber Metro's 79% ownership interest in Eber CT), in full satisfaction of the loans then held by Alexbay was "commercially reasonable."

**Response:** Undisputed <u>but objected to in part as an improper legal conclusion</u>. Plaintiffs dispute that, as a matter of law, the UCC action filed by Alexbay in the Supreme Court was entirely voluntary and not required to be filed in order to effectuate a strict foreclosure. Note that this paragraph does not make any assertions about *Lester's* obligations as trustee in control of Alexbay.

41.     There is no requirement that Plaintiffs or any of the Trust beneficiaries be notified of the UCC Article 9 action.

**Response:** <u>Disputed and objected to as improper legal assertion</u>. The evidence cited by Defendants is nothing but a conclusory legal assertion in their client's affidavit, unsupported by any other evidence.

42.      Lester resigned from EBWLC.

**Response:** <u>Disputed</u>. *See supra* Response ¶ 7 (detailing record indicating that "resignation" was in form only and lacked substance).

43.      On May 24, 2012 the Court entered an Order Granting the Article 9 relief (the "Article 9 Order").

**Response:** Undisputed that the "Article 9 Order" was entered on that date and it speaks for itself. Plaintiffs dispute the characterization that it afforded any "relief" when it merely made a declaration, the "defendants" consented to it, and the parties were colluding with each other.

44.      EBWLC executed a Unanimous Written Consent consenting to the Article 9 Foreclosure and Alexbay executed an Agreement for Turnover on June 5, 2012.

**Response:** <u>Disputed in part</u>. The documents were signed but in the opposite order and on different dates. (*See* Ex. 61 at 2–3 (showing Wendy signed the Consent on June 6, 2012, and Gumaer signed the Consent on June 9, 2012, *after* the Agreement for Turnover was already executed by Wendy on June 5, 2012).)

45.      Subsequent to 2012, Lester continued to make loans to Eber companies.

**Response:** <u>Disputed</u>. The Ebers have produced no documentation of any such "loans" and have, on the contrary, asserted that payments were made by Lester directly to the third parties, purportedly for the companies' benefit. (*See* Ex. 12 (summary document prepared by Wendy Eber, showing payments made but evidencing no repayment obligation).) They cite to Lester's Affidavit which itself indicates that there were "other financial accommodations to Eber CT and the other

19

Eber Entities"—whatever that means. (L. Eber. Aff. ¶ 52.) The volume of evidence required to be discussed to rebut the vague and conclusory assertion in Lester's Affidavit would be unduly burdensome given that this factual allegation is not even material to any of the issues raised by the Ebers on summary judgment. Accordingly, without waiving the right to submit additional evidence at the appropriate time when the purported "loans" becomes material, Plaintiffs direct the Court to the following paragraphs, which further illustrate how Lester's "example[s]" of supposed "loans and other financial accommodations," (*id.*), fail to show that any "loans" were made. *See also infra* ¶¶ 83-90.

46.     Lester paid $400,000 to settlement for a lawsuit brought by Harris Beach.

**Response:** Disputed. Lester purported to take assignment of Harris Beach's claims against all of the fraudulent conveyance defendants, including claims against himself personally. *See, e.g.*, Ex. P to L. Eber Aff. at EB-00017521 ("ASSIGNMENT OF CLAIMS"). Plaintiffs will stipulate that this was a "settlement" if Lester makes clear that he is forgoing any purported right to seek payment pursuant to the assigned claims.

47.     Lester and his wife also waived his personal pension entitlement from EBWLC with a value of approximately $1.4 million in order to settle the Eber Entities dispute(s) with the PBGC.

**Response:** Disputed in part on grounds of inadmissibility. Plaintiffs do not dispute that Lester and his wife waived any rights to receive pension payments, but Defendants fail to cite to any admissible evidence that supports the assertion that the pension value was "approximately $1.4 million." (*See* L. Eber Aff. ¶ 54 (citing generally to the PBGC Settlement Agreement, attached as Ex. Q, without specifying which page(s) are referenced); *see generally* L. Eber Aff. Ex. Q (not

appearing to support the "approximately $1.4 million" valuation, not even through inadmissible hearsay or opinion).)

48.     Plaintiff, Daniel Kleeberg, was able to keep his full Eber companies' pension benefit.

**Response:** Undisputed.

### EBWLC Retirement Plan Liability

49.     ln 1954, the Eber Bros, Wine & Liquor Corp. Retirement Plan (the "EBWLC Plan") was adopted by EBWLC, as sponsor.

**Response:** Undisputed.

50.     The EBWLC Plan required the accrual and payment of pension benefits and required EBWLC to make annual contributions to the EBWLC Plan to fund benefits thereunder.

**Response:** Undisputed.

51.     The EBWLC Plan sponsor, and the members of its "controlled group," including Metro, were required to make certain minimum annual contributions to the EBWLC Plan.

**Response:** Undisputed.

52.     Benefits paid under the EBWLC Plan were expensed annually for financial accounting purposes.

**Response:** Undisputed.

53.     The EBWLC Plan was a "single employer defined benefit plan" subject to the termination insurance program established under Title IV of ERISA.

**Response:** Undisputed but objected to as improper legal assertion.

54.     The EBWLC Board believed that the termination liability of the EBWLC Plan was a "debt" of EBWLC, as plan sponsor, because of its obligations under the Plan itself.

**Response:** <u>Disputed as phrased</u>. EBWLC vigorously denied that there was any "termination liability" until 2015. (*See* Ex. 166 at 5 (showing that as of December 2, 2015, EBWLC's official position was still that the correct termination date was "May 11, 2015").) The Ebers' contrary assertion relies on nothing but Wendy Eber's self-serving conclusion about what "the Board believed," which is not even admissible to the extent that she is purporting to speak as to the state of mind of others (Gumaer and Lester) without offering specific statements that would support her opinion. Notably, nothing in the board meeting minutes from 2011 or 2012 indicate that there was even a discussion of the PBGC issue, let alone any "termination liability."

55.    On August 6, 2014, the Pension Benefits Guaranty Corporation ("PBGC") determined that termination of the EBWLC Plan was necessary because the EBWLC Plan would be unable to pay benefits when due.

**Response:** Undisputed.

56.    By letter dated March 29,2016, the PBGC demanded immediate payment of $6,237,920 for unfunded benefit liabilities and other related amounts.

**Response:** <u>Disputed</u>. The Ebers mischaracterize their own exhibit as demanding "immediate payment" of over $6 million. Page 2 of the letter states: "PBGC hereby demands payment of $2,187,500 no later than 2:00 p.m. Eastern Daylight Time, April 4, 2016." Ex. D to W. Eber Aff. at 2. The letter explains that PBGC was limited to seeking 30% of the collective net worth of the controlled group companies, which it determined was $7,291,666 as of April 30, 2010. *Id.* (without explaining the basis for its calculation). As to the remaining amount due (including over $1 million in accrued interest), PBGC merely sought an agreement on "deferred payment terms." *Id.* at 3–4.

57.     The March 29, 2016 letter confirmed that Metro was part of the "control group,"
and thus liable for the debt.

**Response:** <u>Disputed in part and objected to as improper legal argument</u>. It is undisputed
that the letter asserts that Metro was part of the "control group" based on the district court's order
allowing PBGC to disregard the Metro Transfer to Alexbay by setting the Plan termination date at
April 30, 2010—more than two years before the Metro Transfer. (W. Eber Aff. Ex. D at 1.)

58.     On January 19, 2016, the United States District Court for the Western District of
New York established April 30, 2010 as the termination date of the EBWLC Retirement Plan.

**Response:** Undisputed.

59.     The January 19, 2016 Order also held, as a matter of law, that EBWLC ceased
operations by December 31, 2007, and terminated all its employees by May 31, 2009.

**Response:** <u>Disputed and objected to as improper legal conclusion</u>. The court made these
findings based on undisputed facts; they were not holdings as a matter of law. Plaintiffs do not
dispute that the court reached those factual findings, however.

60.     The January 19, 2016 Order also held as a matter of law that "as of April 30, 2010,
the [EBWLC] 'controlled group' included ... Eber Metro..."

**Response:** Undisputed.

61.     EBWLC's independent actuary, calculated that, as of June 1, 2012, the termination
liability of the EBWLC Plan was $5,063,388.

**Response:** <u>Disputed</u>. It is undisputed that Gallagher made that calculation during the
course of litigation, but Plaintiffs object to the substance of the calculation it on grounds of
discovery violations, including failure to disclose the witness or the calculation letter, even though

it was received by Wendy Eber in December 2018. *See also infra* Response to ¶ 62 (noting that the amount calculated is different than contemporaneous calculations of what was due).

62.     Mr. Gallagher calculated that EBWLC would have needed $9,823,177 as of June 1, 2012 to satisfy the EBWLC Plan's liability for all benefits to all participants, but only had $4,759,789 in trust assets held by Canandaigua National Bank ("CNB").

**Response:** <u>Disputed</u>. In or before November 2012, EBWLC calculated the liability as of May 31, 2012—just *one day* earlier—at $8,916,442. Ex. 167 at "2 of 5" (also asserting the value of the assets as $4,759,790). So, while the value of the assets changed just one dollar from May 31 to June 1, the value of the liability supposedly increased by nearly a million dollars. *Id*.

63.     The EBWLC Plan was thus underfunded as of 2012 by $5,063,388.

**Response:** <u>Disputed</u>. *See supra* Response to ¶ 62.

64.     As of the termination date, i.e. April 30, 2010, Eber Bros., EBWLC and Metro were jointly and severally liable for the underfunded EBWLC Plan.

**Response:** <u>Disputed and objected to as improper legal assertion</u>. To the extent that this is construed as a factual assertion about the Ebers' state of mind, Plaintiffs do not dispute that the Ebers understood this liability to be joint and several "as of" April 30, 2010, including not only these entities, but also Eber-CT, because the date is before the Polebridge Bowman transaction, which was clearly intended to serve the purpose of eliminating Eber-CT's joint and several liability by reducing Metro's stake to below 80%. However, the fact that the Ebers fought against the April 30, 2010 termination date for years before finally relenting in 2017 dispels any possible assertion that the Ebers believed either that (a) the termination date would be set at April 30, 2010 or (b) Eber Metro would end up being liable for the EBWLC Plan even after it was transferred to

Alexbay. (*See* Ex. 166 at 5 (showing that as of December 2, 2015, the Ebers contended that the correct termination date was "May 11, 2015").)

65.     Eber Bros., EBWLC and Metro were also jointly and severally liable for liabilities to the New York State Teamsters Conference & Retirement Fund (the "Teamsters Fund").

**Response:** Disputed and objected to as improper legal assertion. The assertion is inadequately supported because it is based on nothing but the lay opinion of Wendy Eber. The assertion also omits to state the time period when the purported liability existed and omits to include Eber-CT as a party that was similarly liable. (*Cf.* Ex. 149 at 3 (contending that Eber-CT was also liable for pension funding to PBGC).)

66.     On January 10, 2008, the Teamsters Fund assessed an employer withdrawal liability of $2,212,367.47 against the Eber "controlled group", which included Eber Bros., EBWLC and Metro.

**Response:** Disputed. The Teamsters' letter states that the liability was "incurred" by EBWLC. (W. Eber Aff. Ex. G at 1.) The letter demanded payment for that liability from EBWLC and "all members of its controlled group," which included Eber-CT at the time. (*Id*.) It made this demand pursuant to federal law governing pension plans, specifically "Section 4219 of the MPAA." (*Id*.)

67.     As of June 1, 2012, the remaining employer withdrawal liability to the Teamsters Fund of the Eber "controlled group" was approximately $1,421,029.95.

**Response:** Undisputed.

68.     On August 1, 2012, EBWLC executed a Confession of Judgment regarding that amount.

**Response:** Undisputed.

## ADDITIONAL MATERIAL FACTS TO BE TRIED

Pursuant to Local Civil Rule 56.1, Plaintiffs list the following non-exhaustive list of additional facts to tried. Plaintiffs include certain factual issues here that are believed to be undisputed based on admissions by Defendants in their pleadings or during discovery, and which were included in Plaintiffs own Rule 56.1 Statement. By including them here, Plaintiffs do not concede that they are disputed or require a trial.

Nor do Plaintiffs concede that these facts are material to any actual claims or defenses. Rather, some of these additional facts were selected based on Defendants' *arguments*, several of which are immaterial to the case in their entirety, as specified in Plaintiffs' accompanying brief. If this Court does not deny certain of Defendants' arguments for failure to follow Rule 56.1, or because their overall arguments are immaterial, this Court should consider these additional facts.

This list is non-exhaustive because Defendants have only moved for partial summary judgment and, as to many claims, assert purely procedural arguments that do not require resolution of factual issues. Thus, although there are additional material factual issues that may be in dispute that go to merits-based arguments, Plaintiffs omit them at this time but reserve the right to raise them at the appropriate point.

### Elliott W. Gumaer, Jr.

69.     When Allen Eber executed the Will appointing Lester and Gumaer as two of the co-trustees, Allen Eber did not intend for Gumaer to act as Lester's personal attorney or otherwise favor Lester over the other Trust beneficiaries, as there had been no prior interactions between Lester and Gumaer. (L. Eber. Dep. 250:12–18 (admitting there were no interactions between Lester and Gumaer until after Allen Eber died in 1970).)

70.     In January 2001, Gumaer agreed to serve as Lester Eber's personal attorney at the same time as he was a trustee of the Trust and a director of several Eber companies. (Ex. 47 (letter agreement); Ex. 107 at 1 (Eber Amended Answer to TAC, admitting ¶ 284); *see also* L. Eber Dep. 258:25–259:8 (fees originally paid by EBWLC then switched to Eber-CT at some point).)

71.     Gumaer never terminated his attorney-client relationship with Lester, who continued to consider Gumaer his personal lawyer until the day Gumaer died. (L. Eber Dep. 336:2–18.) Lester considered Gumaer to still be his lawyer based on their long history of "loyalty" to each other. (L. Eber Dep. 466:9–14.)

72.     Before this suit, the other Trust beneficiaries were not aware of the attorney-client relationship between Gumaer and Lester. (Ex. 190 (Hays Decl.) ¶ 11; Ex. 191 (Stein Decl.) ¶ 5.)

### Southern / Faithless Servant

73.     Lester Eber worked for Eber Bros. and its affiliates beginning in high school and for his entire adult life, and there is no evidence that he performed any consulting or lobbying work for any third parties prior to his consulting for Southern. (L. Eber Dep.85:22–86:5.)

74.     By February 7, 2007, Lester and Southern had entered into a letter agreement that provided for Lester to enter into a consulting agreement. (Ex. 93 at SGWS-000132–33 (providing for $500,000 per year and the title of "Senior Vice President").) The letter agreement was addressed to "Mr. Lester Eber, President Eber Bros. Wine & Liquor Corporation Eber-NDC, LLC" on every page. (*Id.*)

75.     Southern offered Lester a lucrative "consulting" contract primarily because Lester was in control of Eber Bros. and they needed to "charm" him personally to agree to cede control to Southern. (*See* Southern Dep. 22:18–23:17 (stating that, whenever Southern acquired a local

27

distributor in a new state, Southern's "game plan" was to "charm[] the old owners" by offering existing management contracts "consulting, advisory, whatever it might want to be").)

76.     To the extent that Southern actually wanted Lester's help in New York, it was only because of the knowledge and experience Lester had acquired as the President of EBWLC and its affiliates. (Southern Dep. 21:5–22:1; Ex. 93 at SGWS-000132 § 6(d).)

77.     EBWLC's counsel, Pat Dalton, negotiated the Consulting Agreement for Lester and billed EBWLC (not Lester personally) for his work in doing so. (L. Eber Dep. 62:19–63:4.)

78.     As of and well after September 30, 2008, Eber Bros.' overall Northeastern business continued to be operated in the same holding company/operating subsidiary fashion that it had operated since 2005, and the shutdown of the New York portion of Eber Bros.' Northeastern business in 2008 does not change this fact. (Ex. 166 at 5 (EBWLC brief in PBGC litigation).)

79.     Lester Eber received a salary directly from EBWLC at the same time that he received consulting payments from Southern; specifically, from August 2007 through December 2007, and throughout all of 2010. (Ex. 28 at 1 (2007 W-2); Ex. 155 (2010 W-2).)

80.     After 2008, EBWLC continued to exist as an ongoing business endeavor. Among other things, it had officers and directors; held meetings of its Board of Directors; prepared financial statements, collected accounts receivable, conducted audits of the pension plan, and processed workers compensation claims. (Ex. 165 at 6–9; *see also* L. Eber Aff. Ex. J (showing that, in April 2010, Lester wrote to Audrey Hays and Sally Kleeberg on EBWLC letterhead).)

81.     EBWLC continued to have payroll expenses, including FICA tax withholding and workers compensation insurance, through July 2008. (*See* Ex. 168 (excerpts from EBWLC general ledger, including pages showing office and officer salaries paid well into 2008).)

82.     Eber-CT used to sell wine in New York state, and it did not stop doing so until "after" Lester started consulting for Southern. (L. Eber Dep. 472:20–473:24.)

### Lester's Loans

83.     In the March 13, 2006 Amended and Restated Promissory Note, Lester Eber crossed out the interest rate of 6% and handwrote in a rate of 9%. Lester signed the Note on behalf of EBWLC and, even though there appears to be a signature for CFO John Ryan in the signature block, only Lester Eber's initials appear next to the handwritten notations. (Ex. 30.)

84.     In 2008, a 15% equity stake in Eber-CT was sold for $4.5 million to a company controlled by a competing distributor in Connecticut. (Ex. 56.)

85.     In October 2009, Lester executed a Line of Credit Note (the "LOC Note"), without requiring security for the potential loans that would be made pursuant to the LOC Note. (Ex. 13; L. Eber Dep. 102:16–25, 103:10–24.)

86.     Lester sought to secure the LOC Note because Glenn Sturm told Lester that he should do so. (L. Eber Dep. 331:3–14, 333:24–334:5, 440:11–24.)

87.     Eber Metro and EBWLC proceeded to execute documents securing the LOC Note without receiving any additional consideration from Lester beyond that which he had already agreed to provide in the previously executed LOC Note. (*See generally* Exs. 15, 16, 17, 18.)

88.     Lester and Wendy Eber, with the support of Sturm and Gumaer, falsified documents, including a second copy of the LOC Note and EBWLC board minutes, to assert that the LOC Note had not been executed by Lester as of February 26, 2010, so that it would appear to have been approved contemporaneously with the Security Agreement and Guaranty. (*See* Ex. 16 at 1, 4 (LOC Note with incorrect date of "February 26, 2010," signed by Wendy and Lester); Ex. 117 at 2 (board minutes drafted by Wendy and sent to Lester for his approval).)

89.     An unsigned copy of the LOC Note with a "_____, 2010" date on it was sent by Lester to Audrey Hays and Sally Kleeberg in April 2010. (L. Eber Aff. Ex. J at EB-00001691.)

90.     CNB never authorized or "ratified" Lester's loans to EBWLC or Eber Metro. (*See* Hawks Dep. 90:21–91:20 (disagreeing with the Ebers' draft of minutes of an August 18, 2011 trustee meeting stating that there was "no vote taken" and disagreeing with the characterization of the meeting as involving "a ratification" of Lester's loans); *see also id.* at 140:20–141:25 (testifying that "in retrospect," he should have stated his disagreement with the draft minutes at the time when he first saw them).)

### The Metro Transfer to Alexbay

91.     On January 18, 2012, Lester Eber sent Eber Metro a notice from Alexbay under UCC § 9-620 of its proposal to accept its 79% interest in Eber-CT in full satisfaction of Eber Metro's debts to Lester, which had been assigned to Alexbay. (Ex. 163.) Lester himself signed the notice. (*Id.*)

92.     Another UCC notice was later sent to EBWLC, proposing to accept its 100% interest in Eber Metro in satisfaction of its guaranty of Eber Metro's debt, although Lester did not sign that notice, even though his name appears in the signature block. (Ex. 59; L. Eber Aff. Ex. L at Ex. F (same notice, attached to Alexbay Complaint); *see also* Ex. 44 ¶ 26 (Alexbay Complaint asserting that the notice was dated January 18, 2012 though the notice was undated).)

93.     The UCC notices sent by Lester Eber and Alexbay stated that recipient would be deemed to have consented to the proposals unless the recipient objected in writing "within twenty (20) days after the date this notification was sent" by Lester. (Ex. 59 at 3.) The UCC notices listed *Eber-CT's* office address as the address to which any objection should be sent to *Alexbay* (*Id.*).

94.     The pleadings filed by Alexbay contended that the proposed transfer of Eber Metro to Alexbay for elimination of the debt owed by Eber Metro to Alexbay was "commercially reasonable" because all of Eber Metro's assets were equivalent in value to the amount of debt owed to Alexbay—there was no mention of any debts supposedly owed by Eber Metro. (Ex. 44 ¶ 24; Ex. 45 ¶ 6 (Lester Eber Affidavit submitted in 2012); *see also* Torchio Dep. 146:15–147 (acknowledging that Lester's 2012 Affidavit "seems to contradict what I have been provided as a legal assumption" about Eber Metro's supposed debts).).

95.     On March 2, 2012, Lester sent an email to Gumaer stating that he had been trying to get in touch with him without success and that he needed Gumaer "to come to this meeting," referring to the upcoming board meeting, but to first have a discussion with Lester, Wendy, and Glenn Sturm. (Ex. 101.)

96.     On March 2, 2012, Underberg & Kessler (then counsel to Alexbay) sent Wendy Eber a draft Board of Directors consent regarding Lester's resignation as President of EBWLC and appointing Gumaer as his replacement. (Ex. 103 at 2.)

97.     On March 9, 2012, counsel for EBWLC and Eber Metro executed a stipulation consenting to the Alexbay's request for a judicial declaration that the transfer of Eber Metro to Alexbay in satisfaction of the debt was "commercially reasonable," as defined by the UCC. (Ex. 159.)

98.     Gumaer was not informed about the Alexbay matter until March 12, 2012. (Ex. 122.)

99.     Lester's taking over title to Eber Metro constituted a move against the Trust of which Lester was a trustee and against EBWLC. (Ex. 122 (March 13, 2012 Gumaer email); W. Eber Dep. 329:4–13 (agreeing that Gumaer's email was stating that "it looked like Lester was

moving against the trust of which he was a cotrustee," and admitting that that "that's what it was": "Lester was moving against the company. Yes.").)

100.    Lester Eber's own counsel, Underberg & Kessler, whom Lester retained to represent him and Alexbay against EBWLC, drafted the Unanimous Written Consent of the Board of Directors of EBWLC to approve the transfer of Eber Metro from EBWLC to Alexbay. (Ex. 124.) The draft was sent to Wendy and Lester Eber, and several of Lester's lawyers, including Glenn Sturm, David Belt, and Paul Keneally, but not to EBWLC's lawyer in the matter, Marino Fernandez. (*Id.*)

101.    Eber Metro's net value at the time of the transfer to Alexbay was over $8 million higher than the amount of the debt owed to Alexbay. (*See* Ex. 127 at 18 (Liebman report calculation, assuming that the Polebridge Bowman transaction was not rescinded, which would have further increased the value of Eber Metro); *see also id.* at 13–14 (explaining that, if the Polebridge Bowman transaction were rescinded, the value of Eber Metro's stake in Eber-CT as of June 5, 2012 would be worth approximately $12,500,000.)

102.    In a letter opinion sent on November 7, 2012, Underberg responded to concerns from Wendy Eber and Glenn Sturm about protecting Lester Eber ad his loans "if the Article 9 transfer was somehow upset in the future." (Ex. 98 at 3.) Underberg opined that in the event the Article 9 transfer was reversed, then the debt obligations would be reinstated and "the guarantee obligation would also be reinstated." (*Id.* at 3–4)

### EB&C Shares

103.    In June and August 2017, Lester and Wendy, through their counsel, falsely told CNB that the EB&C stock book could not be located in order to prevent EB&C shares from being issued to Plaintiffs. (*See* Exs.40, 41 (counsel for Lester and Wendy telling CNB's counsel that the

stock book could not be located and that his clients did not believe they had it); L. Eber Dep. 149:6–150:19 (discussing Mr. Keneally's prior representation to this Court that the stock register was not lost and that "the corporate secretary never told CNB that the register was lost"); W. Eber Dep. 182:21–185:19 (evasive testimony, but admitting that she her counsel provided "incorrect" information to CNB).

104.   Based on the Ebers' failure to disclose their possession of the EB&C stock book, CNB was "required to complete these transfers [of EB&C shares] via these Stock Powers as opposed to issuing new stock certificates." (Ex. 38.)

105.   On October 11, 2017, CNB's counsel sent a letter to both the Ebers' personal counsel and Plaintiffs' counsel. (Ex. 38.) Among other things, the letter disclosed the fact that CNB had executed Stock Powers and enclosed the lawyers' "clients' respective copies of the Stock Powers transferring their shares of [EB&C] pursuant to [CNB]'s distribution schedule." (*Id.*) The letter advised  that CNB would retain the originals of the Stock Powers "unless and until such time as we are advised as to whom these original should be provided given the apparent inability to locate the company's stock book and affiliated records." (*Id.*; *see also* L. Eber Dep. 144:23–148:15 (feigning ignorance about CNB's inquiry).)

106.   When Plaintiffs requested a shareholder meeting in October 2018, they did not know that Lester and Wendy had refused to cooperate with CNB to complete the administrative steps necessary to register them as shareholders of EB&C. (Hays Decl. ¶ 22 (Ex. 190).)

## PBGC

107.   Subsequent to April 30, 2010, EBWLC made substantial payments to fund the EBWLC Plan. (Ex. 165 ¶ 35 (noting contributions from 2009 to 2012 totaling $2,415,247).)

108.    EBWLC commissioned roughly contemporaneous actuarial valuations of the PBGC pension plan, which showed that the amount of funding needed for the plan was $4,156,652 as of May 31, 2012. (Ex. 167 at 2 of 5; Brook Opp'n Decl. ¶ 9.)

109.    At least through March 2016, EBWLC disputed that there was any termination liability incurred prior to 2015. (Ex. 166 at 5.)

110.    EBWLC appealed the district court's January 19, 2016 decision to grant summary judgment in favor of PBGC against EBWLC. (Ex. 183 (Notice of Appeal in March 2016).)

111.    As of August 31, 2016, the amounts due to PBGC by EBWLC, including interest, totaled $7,985,670. (L. Eber Aff. Ex. Q at 1, Recital F.)

112.    On or around February 24, 2017, PBGC entered into a settlement agreement with EBWLC, EB&C, Eber Metro, Eber-CT, Lester Eber, and Ellen Eber (Lester's wife), in which PBGC agreed to discharge the entire amount of Title IV liabilities due to PBGC, withdraw its collection complaint against Eber-CT, and withdraw its recorded liens, in consideration for (a) a $2 million payment from the Eber Companies, with Eber-CT obligated to confirm payment, and (b) execution of a benefit election by Lester Eber and his wife to forgo receipt of all future benefit payments from PBGC. (L. Eber Aff. Ex. Q at 2 § 1–5.)

Respectfully submitted,

Dated: December 6, 2019          /s Brian C. Brook
                                 Brian C. Brook (BB 1980)
                                 BROOK & ASSOCIATES, PLLC
                                 100 Church Street, 8th Floor
                                 New York, New York 10007
                                 Telephone: (212) 257-2334
                                 Facsimile: (646) 257-2887
                                 Brian@brook-law.com

                                 *Counsel for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

34