# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL KLEEBERG, LISA STEIN, and AUDREY HAYS,<br><br>Plaintiffs,<br><br>v.<br><br>LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC; ESTATE OF ELLIOTT W. GUMAER, JR.; and WENDY EBER,<br><br>Defendants,<br><br>and<br><br>EBER BROS. & CO., INC.; EBER BROS. WINE AND LIQUOR CORP.; EBER BROS. WINE & LIQUOR METRO, INC.; EBER-CONNECTICUT, LLC; EBER-RHODE ISLAND, LLC; EBER BROS. ACQUISITION CORP.; EBER-METRO, LLC; SLOCUM & SONS OF MAINE, INC.; and CANANDAIGUA NATIONAL BANK & TRUST COMPANY,<br><br>Nominal Defendants. | Civil Action No.  16-CV-9517(LAK)(KHP) |

---

## COMBINED BRIEF IN OPPOSITION TO DEFENDANTS' TWO MOTIONS FOR PARTIAL SUMMARY JUDGMENT, INCLUDING A CROSS-MOTION TO STRIKE

---

Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Brian@brook-law.com
*Attorneys for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................... 1

ARGUMENT .................................................................................................................................. 2

I.    The Ebers Flouted Their Procedural Obligations Under the Rules and There Should Be
Consequences for That ........................................................................................................ 2

    A.   The Ebers Include Immaterial Facts as a Distraction from the Clear Law ........................ 2

    B.   They Include Legal Conclusions in the Ebers' Affidavits and the Rule 56.1 Statement as
If They Were Facts ............................................................................................................. 3

    C.   At the Same Time, They Omit Material Facts that They Rely Upon When Arguing that
the Clear Law Does Not Apply .......................................................................................... 4

    D.   They Also Omit the Law, Which Precludes Them from Meeting their Burden to Show No
Dispute of Material Facts ................................................................................................... 4

    E.   Portions of the Ebers' Affidavits Should Be Stricken ....................................................... 5

    F.   The Request for "Judgment" About ERISA Questions Litigated in the PBGC Lawsuit Is
Decidedly Immaterial and Procedurally Improper ............................................................ 6

        1.   Whether Eber Metro Was Jointly Liable with EBWLC for any Debt Is Immaterial to
the Issue in this Case of Whether the Metro Transfer Was in Good Faith .................... 7

        2.   Hindsight Is Generally Improper in Valuation, but if Used, It Should Be 20/20 ........... 9

        3.   At the Time of the Metro Transfer, Defendants Did Not Believe This ......................... 9

    G.   The Gallagher Affidavit Must Be Excluded Under Rule 37(c)(1) .................................... 10

II.   The Will Did Not Permit Trustees to Purchase *Any* Trust Property with Debt, But
Especially Not the Operating Business .............................................................................. 11

    A.   As Already Briefed, Any Provision of the Will That Arguably Permits Self-Dealing Must
Be Strictly Construed Against Self-Dealing .................................................................... 12

    B.   Given That There Were Three Co-Trustees, the Will Did Not Authorize a Trustee to
Make Secured Loans through Unilateral Self-Dealing ..................................................... 14

    C.   Lester Certainly Had a Duty to Inform the Trust Beneficiaries ........................................ 15

III.  Justice Rosenbaum's 2012 Decision Is Largely Irrelevant, and Certainly Not a Shield
Against Plaintiffs' Claims ................................................................................................. 15

IV.  A Collusive Declaratory Judgment Has No Res Judicata Effect ......................................... 18

V.  The UCC Does Not Eliminate the Remedy of Rescission Where Appropriate for Violation of Fiduciary Duties ........................................................................................................... 20

VI.  CNB's Failure to Complete "Due Presentment" Under the UCC Article 8 Is Undisputed and Irrelevant to the Relief Plaintiffs Seek ........................................................................ 22

VII.  Lester's "Consulting" for Southern Was Disloyal to EBWLC and Its Affiliates ............... 22

   A.  The Ebers' Argument Is Narrow .................................................................................. 22

   B.  The Factual Assertion Underlying the Ebers' Argument Is Demonstrably and Conclusively False, and Contrary to Their Prior Assertions to Another Court ............... 23

VIII. The Ebers' Argument for Dismissal of the Indemnification Claim (Count X) Ignores the Facts and Law Already Discussed by This Court ............................................................... 24

IX.  Nothing Should Be Dismissed as Duplicative at This Stage ............................................. 24

   A.  A Declaratory Judgment May Be the Appropriate Step .............................................. 24

   B.  Wendy Was Merely an Accomplice to the Violations of Trustee Duties ........................ 25

X.  Response to the Gumaer Estate's Motion for Summary Judgment ..................................... 25

   A.  Certain Arguments in the Estate's Motion Should Be Denied for Failure to File a Statement of Material Facts Pursuant to Local Rule 56.1 ............................................. 25

   B.  The Unwithdrawn Argument from the Estate's *Rooker-Feldman* Section Is Inscrutable and Immaterial ........................................................................................................... 26

   C.  The Estate Confuses the Law to Argue Against Part of Count I ..................................... 28

      1.  Gumaer's Reliance on the Law of the Case Doctrine Rather than Complying with Rules 56 and 56.1 Is Inexcusable Given this Court's Prior Holding .......................... 29

      2.  Lester's Purchase of Trust Assets Through Debt Was Not Authorized ...................... 31

   D.  Gumaer Must Account for Be Disgorged of the Fees He Received ................................. 32

   E.  Count VII – Fraudulent Concealment .......................................................................... 34

   F.  Plaintiffs Do Not Intend to Seek "Punitive Damages" Against the Estate, but the Surcharge Remedy Should Remain ............................................................................. 36

CONCLUSION ........................................................................................................................ 37

# TABLE OF AUTHORITIES

**Cases**

*AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*, 11 N.Y.3d 146 (2008) .... 13

*Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557 (1984) ................................................................ 20

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ................................................................. 4

*Burgos v. Hopkins*, 14 F.3d 787 (2d Cir. 1994) .......................................................................... 19

*Burton v. Exxon Corp.*, 583 F.Supp. 405 (S.D.N.Y. 1984) ......................................................... 14

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365 (2d Cir. 1997) ..................................... 19

*Constantinou v. United States*, No. 3:16-CV-608, 2017 WL 8776958 (D. Conn.
    Nov. 17, 2017) ......................................................................................................................... 5

*Corines v. Am. Physicians Ins. Tr.*, 769 F. Supp. 2d 584 (S.D.N.Y. 2011) ................................ 20

*Dabney v. Chase Nat. Bank of City of New York*, 196 F.2d 668 (2d Cir. 1952),
    *supplemented*, 201 F.2d 635 (2d Cir. 1953) ............................................................................ 13

*Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co.*, 600 F.3d 190 (2d Cir. 2010) .............. 20

*Dutton v. Willner*, 52 N.Y. 312 (1873) ........................................................................................ 34

*Ebert v. Holiday Inn*, No. 11-cv-4102(ER), 2014 WL 349640 (S.D.N.Y. Jan. 31, 2014),
    *aff'd*, 628 F. App'x 21 (2d Cir. 2015) ................................................................................ 2, 23

*Fed. Ins. Co. v. Mertz*, No. 12-CV-1597, 2016 WL 164618 (S.D.N.Y. Jan. 12, 2016) .............. 32

*Flaum v. Birnbaum*, 582 N.Y.S.2d 853 (App. Div. 4th Dep't 1992) ...................................... 3, 36

*Gibbs v. Breed, Abbott & Morgan*, 693 N.Y.S.2d 426 (Sup. Ct. N.Y. 1999), *rev'd*,
    710 N.Y.S.2d 578 (App. Div. 1st Dep't 2000). ....................................................................... 32

*H. Sand & Co. v. Airtemp Corp.*, 738 F. Supp. 760, 769–70 (S.D.N.Y. 1990), *aff'd in part,
    rev'd in part on other grounds*, 934 F.2d 450 (2d Cir. 1991) .................................................... 4

*Harborside Refrigerated Servs., Inc. v. Vogel*, 959 F.2d 368 (2d Cir.1992) ............................... 20

*Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000) ........................... 32

*Hoblock v. Albany County Board of Elections*, 422 F.3d 77 (2d Cir. 2005) ............................... 17

*In re Allonhill, LLC*, No. 14-10663 (KG), 2019 WL 1868610 (Bankr. D. Del. Apr. 25, 2019) .... 9

*In re Blumenthal*, 822 N.Y.S.2d 27 (App. Div. 1st Dep't 2006) .................................................. 36

*In re Hall*, 713 N.Y.S.2d 622 (App. Div. 4th Dep't 2000) ........................................................... 33

*In re Lawrence*, 24 N.Y.3d 320 (2014) ....................................................................................... 13

*Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373 (1985) ....................................... 19

*Marvel Characters, Inc. v. Simon*, 310 F.3d 280 (2d Cir. 2002). ................................................. 19

*Matter of Rothko's Estate*, 43 N.Y.2d 305 (1977) ................................................................. 28, 29

*McDowell v. Price*, No. 4:08CV03979, 2011 WL 13233781 (E.D. Ark. Feb. 28, 2011) ........... 11

*Meinhard v. Salmon*, 249 N.Y. 458 (1928) ................................................................................. 28

*O'Neill v. Hernandez*, No. 08CIV.1689(KMW), 2010 WL 1257512 (S.D.N.Y. Mar. 25, 2010). 27

*Rodriguez v. Schneider*, No. 95-cv-4083 (RPP), 1999 WL 459813 (S.D.N.Y. June 29, 1999) ..... 3

*Samba Enterprises, LLC v. iMesh, Inc.*, No. 06 CIV. 7660 (DC), 2009 WL 705537 (S.D.N.Y. Mar. 19, 2009), *aff'd sub nom. Samba Enterprises, Ltd. v. iMesh, Inc.*, 390 F. App'x 55 (2d Cir. 2010). ...................................................................................................................................... 34

*Senno v. Elmsford Union Free Sch. Dist.*, 812 F.Supp.2d 454 (S.D.N.Y.2011) ............................ 2

*Sung Cho v. City of New York*, 910 F.3d 639 (2d Cir. 2018) ................................................... 17, 18

*United States v. Vogel Fertilizer Co.*, 455 U.S. 16 (1982) ............................................................ 10

*Webb v. Robert Lewis Rosen Assocs., Ltd.*, No. 03 CIV. 4275 (HB), 2003 WL 23018792 (S.D.N.Y. Dec. 23, 2003), *aff'd*, 128 F. App'x 793 (2d Cir. 2005). .......................................... 32

**Statutes**

N.Y. Estates Powers and Trusts Law § 10-10.7 .......................................................................... 15

NY BCL § 909 ............................................................................................................................. 14

NY SCPA § 1807 ......................................................................................................................... 36

NY UCC § 1-103 ......................................................................................................................... 21

NY UCC § 9-620 ............................................................................................................... 16, 17, 18

**Rules**

Fed. R. Civ. P. 26 ................................................................................................................... 10, 11

Fed. R. Civ. P. 37 ................................................................................................................... 7, 10

Fed. R. Civ. P. 56 .................................................................................................................. 3, 7, 30

Fed. R. Civ. P. 57 .................................................................................................................... 24

Fed. R. Evid. 602 ..................................................................................................................... 5

Fed. R. Evid. 702 ................................................................................................................... 11

L. Civ. R. 56.1 ........................................................................................................ 7, 16, 25, 26

**Treatises**

Restatement (Second) of Judgments § 26 ................................................................................ 19

Restatement (Third) of Trusts § 37 (2003) ............................................................................. 33

Plaintiffs Audrey Hays, Daniel Kleeberg, and Lisa Stein respectfully submit the following combined brief in opposition to Defendants' two motions for summary judgment.

## PRELIMINARY STATEMENT

Lester Eber was entrusted to run the family business for the benefit of the entire family. Although he accepted the title of trustee, he flouted the solemn duties that it imposed on him. When he failed in his efforts to keep the overall company afloat against the onslaught of Southern Wine & Spirits ("Southern"), Lester took everything that he could for himself and his heirs, and gave as little as possible to his own sister and niece, who were the other beneficiaries of the Trust his father created. He even tried to cover up what he was doing with token "gifts" and other minor benefits, all while effectively robbing them blind. Now, after their own expert opined that any reasonable investor would have recognized that EBWLC's transfer of Eber Metro to Alexbay was a "shell game" incapable of shielding assets from creditors, the Ebers seek to embrace the fact that one of EBWLC's creditors (namely, Pension Benefit Guaranty Corp. ("PBGC"), convinced a court to disregard that transaction. The hypocrisy is too much to bear.

Consistent with his conduct as a trustee unworthy of trust, hypocrisy and double-standards permeate the Ebers' arguments for summary judgment. For instance, on the PBGC liability issue, they withheld discovery (including concealing an expert witness) and convinced this Court to find that the issue was *not* material. Now, it is their leading issue.

The Ebers argue that they had no duty to inform Plaintiffs of Alexbay's 2012 UCC Article 9 proceeding, and that Plaintiffs had no right to participate in it even they had received notice. Def. Br. 20. At the same time, the Ebers claim that the result of that 2012 proceeding is binding on Plaintiffs. Id. at 12–13. Talk about having your cake and eating it, too. Their belated argument for dismissal on subject matter jurisdiction grounds is even more disingenuous. *Plaintiffs* do not ask this Court to vacate, reverse, or review in any way the Article 9 proceeding's declaration; *Defendants*, however, seek to use that proceeding as a shield.

Besides their ill-conceived *Rooker-Feldman* and res judicata arguments (both withdrawn by Gumaer's Estate) and limited arguments about Counts VIII and X, none of the Ebers'

1

arguments would actually result in complete dismissal of the primary counts so as to warrant "judgment" on the claims. In some cases, entire sections are devoted to what can only be charitably characterized as half-baked issues. They are, in fact, wholly immaterial.

## ARGUMENT

I.   **THE EBERS FLOUTED THEIR PROCEDURAL OBLIGATIONS UNDER THE RULES AND THERE SHOULD BE CONSEQUENCES FOR THAT**

### A. The Ebers Include Immaterial Facts as a Distraction from the Clear Law

Although counsel need not incorporate or cite to every fact in the memorandum of law, the Rule 56.1 Statement of Material Facts should have some relevance to the issues for which judgment is sought as a matter of law. Unfortunately, many of the assertions in the Eber's Rule 56.1 Statement ("Eber SMF") do not even arguably meet the standard of materiality. *See Ebert v. Holiday Inn*, No. 11-cv-4102(ER), 2014 WL 349640, at *5 (S.D.N.Y. Jan. 31, 2014), *aff'd*, 628 F. App'x 21 (2d Cir. 2015) ("A fact is 'material' if it might affect the outcome of the litigation under the governing law.") (citing *Senno v. Elmsford Union Free Sch. Dist.*, 812 F.Supp.2d 454, 467 (S.D.N.Y.2011)). Plaintiffs bring this to this Court's attention because it is indicative of a defense of smoke-and-mirrors to throw out irrelevant facts, and because it makes their omission of other facts—actually material ones, according to their brief—all the more glaring.

Perhaps they think it makes Lester look like a nice guy that he supposedly made personal gifts to his sister and niece a of a few thousand dollars while he was secretly plotting to transfer the family business to himself and his children alone. *See* Eber SMF ¶ 13; *see also id.* ¶¶ 14, 15, 16, 17 (similar). And after the Alexbay transfer, Lester ended lawsuits brought by EBWLC's creditors by making personal payments and giving up his pension. *Id.* ¶¶ 45–48. These have no conceivable relevance to any of the bases for judgment asserted by Defendants. They do not even arguably provide context for the misconduct in question. These are minor distractions.

A more significant distraction is Lester's April 2010 "offer" to Sally Kleeberg and Audrey Hays, in which he said that they could participate in the $1.5 million Line of Credit Note. *See* Eber SMF ¶¶ 30–32. There are a number of factual disputes potentially presented by these

"offer" letters in terms of the fullness and accuracy of the disclosures. But in reviewing the Defendants' memorandum of law, there is nothing in there that indicates any legal significance to the April 2010 offer. *Nothing*. As an accounting fiduciary, one possible defense to trustee self-dealing is based on first "obtaining the consent of the beneficiaries after full disclosure," *see Flaum v. Birnbaum*, 582 N.Y.S.2d 853, 861 (App. Div. 4th Dep't 1992), but here, the Ebers argue that they did not even have to disclose the fact that Lester was acquiring Eber Metro. Accordingly, this Court should disregard these factual contentions because they do not even amount to a half-baked defense.

## B. They Include Legal Conclusions in the Ebers' Affidavits and the Rule 56.1 Statement as If They Were Facts

Numerous paragraphs of the Eber SMF consist of pure legal conclusions supported by nothing but corresponding conclusions asserted in their clients' affidavits. *See* Eber SMF ¶¶ 29, 41, 53. *See also* Eber SMF ¶¶ 36 (claiming the security agreement was "validly-perfected" in the middle of a paragraph otherwise addressing factual issues); Eber SMF ¶¶ 58–60 (purporting to characterize the contents of another district court's order, citing only to Wendy Eber's affidavit). Such legal assertions are improper and objectionable. *See Rodriguez v. Schneider*, No. 95-cv-4083 (RPP), 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999) (a Rule 56.1 statement "should neither be the source nor the result of 'cut-and-paste' efforts with the memorandum of law"). It is important to notice how the Ebers were willing to sign their names, under oath, to whatever their lawyers put in front of them, even though Rule 56 requires affidavits "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4). The patent malleability of the Ebers' sworn testimony to suit whatever the lawyers say they need on a given day is a recurring pattern. This Court should exercise extreme caution before taking anything the Ebers say in their affidavits at face value, especially when they do not support those statements with additional documentary evidence that should be available to them—*if* the statements were true. *See H. Sand & Co. v. Airtemp Corp.*, 738 F. Supp. 760, 769–70 (S.D.N.Y. 1990), *aff'd in*

3

*part, rev'd in part on other grounds*, 934 F.2d 450 (2d Cir. 1991) ("If there is documentary evidence to support an assertion, Rule 56 requires a party to come forward with it.").

### C. At the Same Time, They Omit Material Facts that They Rely Upon When Arguing that the Clear Law Does Not Apply

Several key factual assertions in the Ebers' brief are inexplicably missing from the Rule 56.1 statement, and often lack any support in the record. Such omitted facts include those relied upon to argue that Lester's acquisition of Eber Metro did not involve self-dealing:

i. "Lester Eber's involvement in the 2012 Foreclosure was purely as the beneficial owner (through Alexbay) of the loans…." Eber Br. 19 (no citation to the record).

ii. "Lester Eber had no involvement in the consent process for the 2012 Foreclosure by the Boards of Directors of EBWLC and Metro…." *Id.* (no citation).

iii. "[I]n connection with the original Board approval of each of the loans made by Lester Eber to the Eber companies (and the original security documentation and guaranty), Lester Eber abstained from voting on each such approval." *Id.* (no citation).[1]

iv. "[O]n August 18, 2011, CNB and Elliott Gumaer, as Co-Trustees of the Trust, ratified the loans, while Lester Eber abstained from such ratification." *Id.* (citing Ex. I).

Under Rule 56 and Local Rule 56.1, this Court may reject their fact-intensive argument based on unsupported factual assertions. Their failure to follow procedure makes it unduly difficult for both Plaintiffs to respond and this Court to effectively review their contentions. It is entirely appropriate that such failure result in denial of their request for affirmative relief.

### D. They Also Omit the Law, Which Precludes Them from Meeting their Burden to Show No Dispute of Material Facts

In order to identify the material facts, the governing law must be understood. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will

---

[1] Based on the Ebers' document production, there is no evidence that there was ever an "original Board approval" of the loans that were purportedly made in 2002 and 2005, and amended and restated in 2006. The Ebers failed to produce even the original loan documents, much less any board approvals. Pls. CSMF ¶ 35 (citing Brook Decl. ¶ 10). And as to the 2006 amendments, Lester appears to have unilaterally increased the interest rates from 6% to 9%, without even the CFO's consent. Pls. CSMF ¶ 83.

identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted."). Nevertheless, on the same page where the Ebers launch into a myriad of preposterous factual assertions about how Lester Eber was involved in the acquisition of Eber Meto "purely as the beneficial owner (through Alexbay) of the loans), there is no citation to any substantive law that would indicate that would make these assertions material to the outcome. Eber Br. 19. *See also id.* at 16–19 (preceding arguments only discussed some of the substantive law concerning the authorization of self-dealing by the trust instrument). Similarly, when addressing whether the Southern Consulting Agreement constituted a corporate opportunity, the Ebers' brief omits to cite to any law. Eber Br. 22.

### E. Portions of the Ebers' Affidavits Should Be Stricken

As this Court may recall, the parties argued extensively about the scope of discovery, and in the course of doing so, the Ebers explicitly waived any right to rely on the advice of counsel as part of their defense. *See, e.g.*, Eber Supp. Br. at 1 n.1 ("[T]he Eber Defendants will not be proffering any 'advice of counsel' defense."). Now they submit affidavits asserting legal conclusions that are, in some instances, explicitly based on the advice of counsel. *See* W. Eber Aff. ¶¶ 40–43 (detailing what "the Board" of EBWLC supposedly "believed" about the company's liabilities "[a]fter consulting with our attorneys")[2]; *id.* ¶ 46 ("As Eber Metro and EBWLC were insolvent, there was no legal basis to challenge the proceeding, and legal impediment to acquiescing to the proposed turnover. This was confirmed in consultations with EBWLC's independent counsel."). All of these assertions based on supposed advice of counsel must be stricken and not considered.

---

[2] In addition, Wendy's assertions about what "the Board believed" are inadmissible under Fed. R. Evid. 602 because Wendy cannot speak as to the state of mind of the entire Board, which included Gumaer as well. *See Constantinou v. United States*, No. 3:16-CV-608, 2017 WL 8776958, at *13, (D. Conn. Nov. 17, 2017) (noting that a witness's testimony about another person's state of mind would violate Fed. R. Evid. 602, which requires witness testimony to be based on personal knowledge). This is an independent additional basis to strike these parts of her testimony.

This is important because the record that we do have makes it painfully obvious that the lawyer EBWLC formally retained to represent it in connection with the Metro Transfer to Alexbay, Marino Fernandez, was just a band-aid over a bullet hole. *See* Pls. SMF ¶¶ 57, 60. The real lawyers advising Wendy and Lester about how to carry out their scheme were different individuals, including Underberg & Kessler, as demonstrated by their drafting of the corporate governance documents for EBWLC to authorize the transaction, including the documents formalizing Lester's supposed "resignation" from EBWLC and the ultimate consent to the Metro Transfer itself. *See* Pls. CSMF ¶¶ 96, 100. The Ebers had their chance to say that they acted on the advice of counsel—repeatedly—and each time they refused to accept the discovery consequences, which would have included obtaining documents and allowing the taking of testimony from the real attorneys who were making things happen. For Wendy and Lester now, at summary judgment, to tell this Court that they acted based on legal advice is clear-cut bad faith litigation conduct, and precisely the stunt that undersigned counsel feared the Ebers would try to pull. It cannot be condoned.

### F. The Request for "Judgment" About ERISA Questions Litigated in the PBGC Lawsuit Is Decidedly Immaterial and Procedurally Improper

The Ebers withheld discovery from Plaintiffs about the PBGC litigation on grounds of attorney-client privilege. In approving of their doing so, this Court held that the communications concerning the PBGC litigation and "provision and administration of employee benefits" could be withheld because "[n]one of these communications concern issues that directly impact the Trust beneficiaries *or are material to the issues in this case*." May 13, 2019 Op. 44–45 (emphasis added). Accordingly, the fact discovery in this case was conducted under the view that these legal issues involving the pension were immaterial. Now, it is the Ebers' *lead* point.

Specifically, the Ebers ask this Court for a declaratory judgment about Eber Metro's liability for certain pension debts, including debt to PBGC, relying on ERISA-law rulings made in the PBGC litigation. Eber Br. 3–6. They do not indicate how this relates to any elements of any claims or defenses—essential context for the granting of even partial "judgment"—and

especially necessary given this Court's prior ruling that the issue was not material. This failure alone is reason enough to disregard this portion of their motion, for without appropriate context showing that this is material to the claims or defenses, this Court has no basis to decide it.

As a general matter, however, Plaintiffs agree that this Court should do as the District Court in the PBGC case did and disregard both the May 2010 Polebridge Bowman transaction and the 2012 transfer of Eber Metro to Alexbay. *Id.* at 5 (noting that the District Court "established April 30, 2010 as the termination date of the EBWLC Plan"— precisely one month before the effective date of the Polebridge Bowman transfer). It is worth reflecting on just how incredible the Ebers' request is, considering that they are now embracing a legal conclusion that they spent untold sums fighting against for years. Pls. CSMF ¶¶ 109–110. While they are not judicially estopped based on those prior positions, since they lost, it does reflect a total lack of integrity, nonetheless. More important, in terms of evaluating whether Defendants' breached their fiduciary duties, their contrary belief about the pension liability at the time of the transfer is what matters for determining whether they acted in bad faith.[3]

Under principles of waiver and Fed. R. Civ. P. 37(c), this Court should bar the Ebers from seeking this "judgment." At a minimum, summary judgment should be denied under Rule 56(d), because the Ebers withheld the relevant facts showing what the Ebers and their counsel really were thinking. Fed. R. Civ. P. 56(d); Brook Decl. ¶ 7. It is highly probable that the documents would explicitly contradict the position that that they now ask the Court to take.

1. *Whether Eber Metro Was Jointly Liable with EBWLC for any Debt Is Immaterial to the Issue in this Case of Whether the Metro Transfer Was in Good Faith*

The Ebers seek to establish the amount of Eber Metro's liabilities at the time of its transfer from EBWLC to Alexbay. They seem to believe that if this Court finds that Eber Metro

---

[3] The Ebers implicitly acknowledge that their belief at the time is what is relevant by including the assertions about what the "the Board believed" based on supposed (undisclosed) advice of counsel. W. Eber Aff. ¶¶ 40–43. Notably, the Ebers' Rule 56.1 Statement stops short of contending that EBWLC's Board "believed" that Eber Metro would still be liable to PBGC even after being transferred to Alexbay. Eber SMF ¶ 54 (asserting only that the Board believed that it was a debt of EBWLC, not Eber Metro). If the Board actually believed that Eber Metro was liable to PBGC after the Alexbay transfer, then it is admitting to engaging in a massive amount of corporate waste by spending hundreds of thousands of dollars on legal fees fighting against PBGC.

was "insolvent" at the time that Alexbay took ownership of it away from EBWLC, that would establish a defense (or perhaps part of one). Not so.

As explained more fully in Plaintiffs' Motion for Partial Summary Judgment, Pls. MSJ Br. 18–22, in order to demonstrate good faith in a transaction like this, which freezes out current equity holders, the defendants must show the intrinsic fairness of the transaction, including both fair process and fair price. But neither of these components would be affected by holding that the ERISA pension liabilities were joint and several between EBWLC and Eber Metro. Indeed, Plaintiffs' own Rule 56.1 Statement chose to adopt Torchio's legal assumptions, which included the view that Eber Metro was jointly liable with EBWLC. Pls. SMF ¶ 68.

The issue of fair price is determined by what was *exchanged* (i.e., the consideration), not by what was retained. Here, the sole consideration received by EBWLC for Eber Metro was the extinguishment of EBWLC's guaranty of Eber Metro's debt. After the transfer, *EBWLC* remained undisputedly liable to PBGC and the Teamsters for the full amount of the pension liabilities. It remained liable regardless of whether Eber Metro was also liable. Since the Metro Transfer did not reduce or eliminate any of the pension liabilities, the pension liabilities are simply immaterial to the core legal question of whether EBWLC received fair value in exchange for giving up Eber Metro.[4]

Even if this Court were to consider the value of Eber Metro in the abstract, rather than the value of the consideration received by EBWLC, the Ebers' contention is still fraught with problems that preclude summary judgment. For one, the Ebers rely on the PBGC court ruling to disregard the Metro Transfer, but that was a product of the specific, terrible facts surrounding the transaction, whereby EBWLC was left with nothing but debts. If Eber Metro had been sold to an unrelated third party at fair value, such that EBWLC could have at least continued making

---

[4] It would be a different case entirely if Eber Metro or Alexbay had agreed to assume the liabilities to PBGC or the Teamsters as part of the transaction. That would have given EBWLC additional debt relief, i.e. additional consideration. But all EBWLC got was the elimination of its guaranty of the Eber Metro's debts to Alexbay. Therefore, the only amounts that matter in the "fair price" analysis under the entire fairness doctrine are (a) the amount of debt that was extinguished and (b) the amount that Eber Metro was reasonably worth.

pension payments longer, the result would have been entirely different. And if the Metro Transfer had not occurred at all, PBGC would not likely have sued at all.

Another problem is that the Ebers' request fails to account for the fact that they disputed Eber Metro's post-Transfer liability to PBGC until at least 2016. Pls. CSMF ¶ 109.

### 2.   *Hindsight Is Generally Improper in Valuation, but if Used, It Should Be 20/20*

In valuation analyses, experts generally agree that they should avoid considering subsequent events. *See* Torchio Dep. 158:7–60:5 (calling the principle "no peeking" and saying it applies to both assets and liabilities). Here, the Ebers seek to sidestep that general principle by asking this Court to rule on the amount of Eber Metro's debt as a matter of law based on a 2016 legal ruling that they contended at the time was wrong, and even initially sought to appeal. Pls. CSMF ¶ 109–110. But the Ebers only want this Court to use partial hindsight, without considering the fact that the amount paid ended up being substantially less than face value. *See* Pls. CSMF ¶¶ 111–112 (even using the Ebers' unsupported valuation for the pension benefits that Lester waived, the amount actually paid to PBGC in full discharge of the liability was $3.4 million). If liability is determined through hindsight, the amount of the liability should be as well. *See In re Allonhill*, LLC, No. 14-10663 (KG), 2019 WL 1868610, at *50 (Bankr. D. Del. Apr. 25, 2019) ("The ultimate resolution of a liability, be it through judgment or settlement, is the proper amount to use in valuing a disputed liability.").

### 3.   *At the Time of the Metro Transfer, Defendants Did Not Believe This*

Summary judgment is also inappropriate on this issue because the requested legal conclusion is contradicted by contemporaneous documentary evidence. Pls. CSMF ¶ 94 (noting that Defendants' own expert conceded this). Ironically, the closest thing to any contemporaneous evidence that the Ebers even contemplated the possibility that Eber Metro would still be liable to PBGC after being transferred to Alexbay is the infamous November 7, 2012 Underberg letter. Pls. CSMF ¶ 102. But that letter expressed concern about the Metro Transfer being rescinded, and nothing in it evinces any belief that Eber Metro would be financially vulnerable in any other

way. *Id.* (noting Wendy and Sturm's concern about "if the Article 9 transfer was somehow upset in the future"). That concern was warranted, because the PBGC court ruling effectively "upset" the transfer by setting an earlier Plan termination date. It was creative lawyering on PBGC's part that got to the same result, even though PBGC lacked Plaintiffs' standing to void the transfer.

The Ebers may argue that the termination date was chosen irrespective of the bad transactions, but that would be false. In fact, that termination date was chosen despite the facts that, *inter alia*, EBWLC made substantial contributions to the Plan *after* April 30, 2010, made benefits determinations, and EBWLC continued to manage the Eber-CT operating business. *See* Ex. 165 at 6– 9 (material facts presented by EBWLC to the district court in the PBGC case). The only practical reason the court chose the date that it did was to ensure that Eber-CT was liable.[5] The Ebers simply cannot argue with a straight face that a prior court decision disregarding the very transactions challenged here somehow helps them.

### G.  The Gallagher Affidavit Must Be Excluded Under Rule 37(c)(1)

The Ebers are precluded from obtaining judgment in the specific amount they seek because they failed to identify Michael Gallagher a witness, withheld his December 19, 2018 letter during fact discovery, and failed to provide an appropriate disclosure for him to offer expert testimony. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) ..., the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). Here, the Ebers' failure to disclose Gallagher was not substantially justified and would not be harmless unless this Court agrees to disregard the ERISA issue.

---

s[5] By transferring 6% of Eber-CT to Polebridge Bowman in May 2010, the Ebers sought to remove Eber-CT from the "controlled group" by reducing EBWLC's ultimate stake to less than 80%. *See United States v. Vogel Fertilizer Co.*, 455 U.S. 16, 25 (1982) (construing "controlled group" as requiring 80 percent of the ownership interest in a company). At trial, Plaintiffs will show that the Polebridge Bowman transaction was a sham transaction, lacking in economic substance, for it was concocted for the purpose of protecting Eber-CT from the pension plan obligations. Plaintiffs will also show that the Polebridge Bowman deal was—like almost everything else—significantly backdated. *See* Pls. Ex. 120 (showing that Wendy Eber was seeking Gumaer's review of the Polebridge Bowman transaction authorization document on July 29, 2010, though the draft consent was dated two months earlier).

The first time Gallagher's name ever appeared in any of the Ebers' disclosures to Plaintiffs was in the June 28, 2019 Torchio Report, which relied on a December 19, 2018 letter from Gallagher to Wendy Eber. Ex. 126 at 12; *see also id.* at Ex. B (identifying "Materials Relied Upon"). That letter was not even attached as an exhibit and had inexplicably not been produced to Plaintiffs in discovery. It was not produced until almost two weeks later, on July 10, 2019—a week after Plaintiffs specifically demanded it. Brook Opp'n Decl. ¶ 8. Thus, even that conclusory letter was not provided to Plaintiffs by the June 28, 2019 deadline for the close of fact discovery and service of Defendants' expert reports. *See* Scheduling Order, ECF No. 221.

If Gallagher was intended to testify as a fact witness, then the Ebers were required to disclose his name, contact information, and subjects of his testimony long ago. *See* Fed. R. Civ. P. 26(a)(1)(A). They did not. The Ebers' failure to disclose Gallagher is inexcusable given that they asked him to provide an actuarial opinion over *six months* before the close of fact discovery and the deadline for Defendants' expert reports. *See* Gallagher Aff. ¶ 3.

The bigger problem, of course, is that Gallagher's actuarial calculations constitute expert testimony that must be admitted through Rule 702, not as lay opinion, because they required "specialized knowledge" that is beyond the ken of the layperson. *See McDowell v. Price*, No. 4:08CV03979, 2011 WL 13233781, at *4 (E.D. Ark. Feb. 28, 2011) (finding actuary's testimony about calculating plan benefits relied on "his technical and/or specialized knowledge" and constituted expert testimony).[6] In addition to being untimely, neither Gallagher's letter nor his affidavit meets the requirements of an expert report. *See* Fed. R. Civ. P. 26(a)(2)(B); *see also* Gallagher Aff. ¶ 3.

## II.   THE WILL DID NOT PERMIT TRUSTEES TO PURCHASE *ANY* TRUST PROPERTY WITH DEBT, BUT ESPECIALLY NOT THE OPERATING BUSINESS

At least this much is true: The parties agree that whether Lester engaged in prohibited self-dealing is a matter of law that can be decided without a trial.

---

[6] In *McDowell*, the actuary in question was disclosed as a witness but not specifically as an expert witness. *Id.* at *3. The court found that the "failure to identify Turpin as an expert witness is not substantially justified," but it was harmless, so the court imposed the lesser sanction of paying a portion of Turpin's fees rather than exclusion. *Id.*

11

### A.  As Already Briefed, Any Provision of the Will That Arguably Permits Self-Dealing Must Be Strictly Construed Against Self-Dealing

While he was a trustee, Lester transferred a trust asset to himself when he transferred the operating business entity, Eber Metro, to Lester's newly formed Alexbay, LLC. The situation reflects a classic example of prohibited self-dealing where a trustee purchases trust property, with the minor twist that the trustee here used debt as currency. The substance of the transaction was one in which Lester purchased Trust property. Undisputedly, *nothing* in the Will even arguably permitted a trustee to purchase Trust property, especially not the business. Thus, the transaction is voidable under the no-further-inquiry rule against self-dealing. Pls. MSJ Br. 7–10.

The Ebers' primary defense against the application of the no-further-inquiry rule is that Lester was allowed to make secured loans, so therefore he necessarily could enforce them. Eber Br. 16–18. Plaintiffs' motion for summary judgment already anticipated and refuted this argument. *See* Pls. MSJ Br. 11 –13. Nowhere in the Ebers' brief do they acknowledge that any deviation from the rule against self-dealing must be "strictly construed." *Id.* That basic rule of construction renders their reading of Allen Eber's Will incorrect as a matter of law—without even looking at the totality of the Will, which only strengthens the conclusion that the Will prohibited Lester from removing the operating business from the Trust for his own benefit.

The Ebers' argument is inconsistent with the rigid approach taken in New York trust law. *See* Pls. MSJ Br. 10–11. For purposes of trustee liability, Lester breached his duty simply by seeking to acquire Eber Metro without the beneficiaries' consent, regardless of how the "consent" process occurred. As explained by Judge Learned Hand in a case that concerned a situation of a trustee/creditor's conflicting duties:

> The duty of a creditor to take no more than his aliquot share of the assets of an insolvent debtor is imposed by law; the duty of a trustee, not to profit at the possible expense of his beneficiary, is the most fundamental of the duties which he accepts when he becomes a trustee. It is a part of his obligation to give his beneficiary his undivided loyalty, free from any conflicting personal interest; an obligation that has been nowhere more jealously and rigidly enforced than in New York….

*Dabney v. Chase Nat. Bank of City of New York*, 196 F.2d 668, 670 (2d Cir. 1952), *supplemented*, 201 F.2d 635 (2d Cir. 1953) ("In some relations the fiduciary element is more intense than in others; it is peculiarly intense in the case of a trust."). *Dabney* held that if the trustee's power to collect on a loan conflicts with the trustee's duty to the beneficiaries, "the power to collect should have yielded to the duty of loyalty, for all powers are to be interpreted as conditional upon observance of that duty." *Id.* at 672.[7] Here, it is undisputed that there was such a conflict. Pls. SMF ¶ 56.

The Ebers also argue (unsupported by anything in their Rule 56.1 statement or the record) that Lester "had no involvement in the consent process for the 2012 Foreclosure by the Boards of Directors of EBWLC and Metro," as though that means there was not "self-dealing." Eber Br. 19. Even assuming that the unsupported factual characterization were true (and it is not), such reasoning has never been adopted in a case involving trustee self-dealing, and for good reason.

This Court should reject the self-serving characterization of the transaction as not self-dealing. *See In re Lawrence*, 24 N.Y.3d 320, 344 (2014) ("Self-dealing occurs when an attorney (or other fiduciary) takes advantage of his position in a transaction and acts in his own interests rather than in the best interests of the client."). If it proves anything, the fact that Lester went through the motions of seemingly stepping aside at the final moment and letting his daughter and heir complete the final step to give the two of them complete control of the business proves that Lester *knew* he was taking advantage of his position in charge of the business to benefit himself to detriment of the Trust, and tried to cover it up. Pls. CSMF ¶ 7.

To hold otherwise would create a gaping loophole in the law that is completely contrary to New York trust law and policy. To condone what Lester did here would merely serve as a manual for how to circumvent the per se prohibition on self-dealing by transferring trust assets

---

[7] Similarly, there is no question that Lester's taking of substantially all of EBWLC's assets rendered it insolvent, and *Dabney* held that it is a breach of fiduciary duty for a trustee/creditor to collect on a debt when the trustee/creditor believes that the debtor is "insolvent or in imminent danger of insolvency." *Id.* at 671. Notably, Dabney involved a situation where there was an "indenture trustee" rather than an ordinary trustee, and therefore the law actually applied less scrutiny to that trustees' actions than would apply here. *AG Capital Funding Partners, L.P. v. State Street Bank & Trust Co.*, 11 N.Y.3d 146, 157 (2008).

first to a subsidiary corporation owned by the trust, appointing a controlled third person CEO, and then having that person officially transfer the assets to the trustee. This would-be blueprint for trustee mischief must be rejected as a matter of law in favor of the recognized and time-tested approach of simply prohibiting the trustee from acquiring trust assets absent explicit consent from the settlor in the trust instrument or from the beneficiaries, and only after full disclosure.

The argument is also flawed because it ignores the reality that Lester was in a position of ultimate *control* over EB&C and thus over EBWLC.[8] Lester remained President of EB&C, which was required to approve the transaction as shareholder of EBWLC. NY BCL § 909. EB&C also had full voting control of EBWLC itself, meaning Lester had the power to remove and appoint EBWLC's officers and directors. Lester also remained President of Eber Metro, the debtor that conveniently defaulted and did not seek to renegotiate the LOC Note's maturity date. Pls. SMF ¶¶ 45–48. Wendy was his daughter, and even after the transfer extinguished the debts, Wendy to ensure that those debts would be protected if the transfer was "upset." Pls. CSMF ¶ 102. To characterize her as anything other than controlled by Lester would be to engage in pure fantasy. There are a dozen ways in which Lester retained formal and practical control over the Metro Transfer, *see* Pls. CSMF ¶¶ 91–100.

### B. Given That There Were Three Co-Trustees, the Will Did Not Authorize a Trustee to Make Secured Loans through Unilateral Self-Dealing

Although the Court need not reach this issue, the Will should not be read as permitting a trustee to make a secured loan and set its own terms through self-dealing because the Will provided for three trustees, one of which was a bank (the presumptive lender), and one of which was expected to be acting on behalf of the business (Lester). This dynamic ensured that loans from the bank trustee were the product of active negotiations to reach fair terms.

Lester making loans unilaterally, without the other trustees' involvement in negotiating their terms, is inconsistent with Allen Eber's intentions given that he appointed three co-trustees.

---

[8] Corporate law is clear that "self-dealing" occurs when a controlling party receives something of value to the exclusion of the other shareholders. *Burton v. Exxon Corp.*, 583 F.Supp. 405, 415 (S.D.N.Y. 1984).

It is also inconsistent with New York law's general approach when there are multiple trustees. *See* N.Y. Estates Powers and Trusts Law § 10-10.7 (providing that the exercise of any "power in a trustee to invade trust principal … conferred upon three or more fiduciaries … may be exercised by a majority of such fiduciaries …."). Against this backdrop, including the obligation to read any authorization of self-dealing narrowly, this Court should find that the Will only permitted a trustee to make a secured loan if the other two non-interested trustees approved it.

Here, the loans in question were never even disclosed to CNB until August 2011—years after they were executed. By that point, the other trustees' involvement was at best superficial— they had no real power to affect the terms of the loans to ensure that they were fair. Even assuming *arguendo* that a post hoc ratification could save the self-dealing loans from a beneficiary challenge under the no-further-inquiry rule, in this case, CNB denies that it "ratified" the loans. Pls. CSMF ¶ 90.

Plaintiffs did not make this argument in their own motion for summary judgment because of the factual dispute about whether Lester's loans were "ratified" by the other trustees. *See id.* (Wendy drafted trustee meeting minutes that mischaracterized CNB as ratifying the loans). By contrast, there is no dispute that CNB never ratified the transfer of Eber Metro to Alexbay.

### C.  Lester Certainly Had a Duty to Inform the Trust Beneficiaries

Unless this Court were to manufacture a new loophole in New York trust law, Lester Eber had an indisputable duty to disclose his proposal before engaging in the transaction. *See Flaum*, 582 N.Y.S.2d at 861 (the fiduciary has "the burden of proving that he engaged in the transactions only after obtaining the consent of the beneficiaries after full disclosure"). Consent cannot be obtained without, first disclosing the transaction for which consent is sought.

### III.   JUSTICE ROSENBAUM'S 2012 DECISION IS LARGELY IRRELEVANT, AND CERTAINLY NOT A SHIELD AGAINST PLAINTIFFS' CLAIMS

None of Plaintiffs' claims ask this Court to decide whether the Alexbay transaction was a "commercially reasonable" acceptance of collateral under UCC Article 9. The issues may

involve the same transaction, but they are independent and quite distinct. Nonetheless, Defendants devote over a third of their brief to arguments predicated on mischaracterizing the nature of Plaintiffs' claims in multiple ways to try to use Justice Rosenbaum's declaration, procured through the parties' collusion, as a shield against breaches by self-interested fiduciaries.

Defendants' brief effectively acknowledges their mischaracterization when they affirmatively argue that Plaintiffs "would have had no standing, as beneficiaries to [the] shareholder trust, to intervene in Alexbay's action nor object to the N.Y. U.C.C. § 9-620 transaction." Eber Br. 20. That is correct, because the UCC action was inconsequential in and of itself.[9] If Plaintiffs could not intervene, how could they appeal it?

Plaintiffs could have proceeded to the Surrogate's Court—a court of equity with jurisdiction over the Trust, its assets, and the trustees—to enjoin Lester's self-dealing, had they known about it. Just as they could have gone to that same Surrogate's Court to pursue their claims after the fact. Instead, because Plaintiffs are not New York residents, they invoked their right to diversity jurisdiction over their claims in federal court. This Court has jurisdiction to hear those claims, because they in no way seek to "appeal" Justice Rosenbaum's ruling—no UCC Article 9 claims are asserted.

Defendants' argument that this Court lacks jurisdiction under the *Rooker-Feldman* doctrine is clearly frivolous because the Supreme Court's decision did not "cause" any injuries—to the contrary, Defendants' conduct *outside that suit* caused the injuries for which they ask this Court's redress. Incredibly, the Ebers' own Rule 56.1 Statement affirmatively contends that the "Article 9 Action" was unnecessary in order for Alexbay to foreclose. Eber SMF ¶ 40; see also Ex. 47 ¶ 45 (2015 Lester Affidavit saying the action "was commenced out of an abundance of caution to alert any potential creditors of the foreclosure"). This contention is, of course, true, because the "foreclosure" here was a "strict foreclosure," or an acceptance of collateral in

---

[9] In Plaintiffs' view, the UCC action has any relevance at all only because the parties' pleadings therein, and their conduct related to the suit, are so blatantly misleading as to supply ready evidence of their bad faith.

satisfaction of the debt, which can only occur by obtaining, *after* the default already occurred, the debtor's *consent*. *See* Pls. MSJ Br. 8. It cannot be judicially awarded.

In *Hoblock v. Albany County Board of Elections*—the very case cited most by Defendants—the Second Circuit articulated the formula that guides the *Rooker-Feldman* causation inquiry: "a federal suit complains of injury from a state-court judgment, even if it appears to complain only of a third party's actions, when the third party's actions are produced by a state-court judgment and not simply ratified, acquiesced in, or left unpunished by it." 422 F.3d 77, 88 (2d Cir. 2005). Despite acknowledging *Hoblock*, Defendants' causation argument immediately proceeds to disregard its formula, even though *Hoblock* described the causation element as "the 'core requirement from which the other *Rooker-Feldman* requirements derive.'" *Sung Cho v. City of New York*, 910 F.3d 639, 646 (2d Cir. 2018) (quoting *Hoblock*, 422 F.3d at 87) (cleaned up).

Applying *Hoblock*'s formula, Justice Rosenbaum's order for the Supreme Court did not "produce" the Defendants' actions. Again, the Ebers simultaneously contend that the entire judicial proceeding was unnecessary to "foreclose," which is the harm. Eber SMF ¶ 40. Indeed, under the terms of Alexbay's January 18, 2012 proposal, EBWLC and Eber Metro had already consented to the transfer by failing to object within 20 days—i.e., before the Alexbay Supreme Court complaint *was even filed*. *See* UCC § 9-620 (providing that the debtor is deemed to have consented if it fails to file an objection within 20 days). And Justice Rosenbaum's decision did not compel the parties to complete the transfer; his declaration labeling the proposed transfer "commercially reasonable" did nothing beyond establishing that the transaction was *permissible* with respect to (and *only* with respect to) the UCC. At most, then, the decision was one that "merely ratified" or "acquiesced in" Alexbay's proposed transfer of Eber Metro. *Hoblock*, 422 F.3d at 88. It thus cannot form the basis for *Rooker-Feldman* jurisdiction stripping. *Id.*

All Justice Rosenbaum did was say that, based on the limited information provided by the parties' collusive arguments, the proposed exchange seemed "commercially reasonable." That was not a "foreclosure judgment," as Defendants contend. In a foreclosure judgment, the court

17

awards possession of the property to the secured creditor *over the objection of the debtor* and orders the debtor to vacate the premises. Because of its coercive nature, such an order cannot be characterized as a mere ratification of or acquiescence in anything. By contrast, here EBWLC, Eber Metro, and Alexbay reached an out-of-court agreement to transfer Eber Metro to Alexbay. The Supreme Court merely acquiesced in the transfer and agreed with the parties' joint presentation that it would be "commercially reasonable." The Court coerced nothing, unlike a foreclosure judgment, because, again, it did not compel the transfer.

Thus, the *Rooker-Feldman* argument here is vastly weaker than that rejected by the Second Circuit in *Sung Cho*, where the challenged settlement agreements had been "so ordered" by the state courts. 910 F.3d at 642. The *Sung Cho* plaintiffs entered into settlement agreements with the City rather than defend themselves in court; each one of their agreements was subsequently 'so-ordered' in state court. *Id.* Once "so ordered," the agreements became compulsory. *Id.* Nonetheless, the Second Circuit found no jurisdictional problem because such "state-court action was a mere 'ratification' of the injury'" caused by the settlement agreement. *Id.*[10] Here, Justice Rosenbaum's ruling was at most a ratification—although even that might be giving it too much weight, since a judicial determination was not necessary to effectuate the UCC § 9-620 acceptance. Either way, Defendants' argument that Plaintiffs are "appealing" Justice Rosenbaum's ruling is not an objectively reasonable characterization of the pleadings, the facts, or the law. Neither, accordingly, is Defendants' invocation of *Rooker-Feldman* as a basis for delaying or avoiding Plaintiffs' claims.

IV.   A COLLUSIVE DECLARATORY JUDGMENT HAS NO RES JUDICATA EFFECT[11]

---

[10] Notwithstanding the clear distinction between Plaintiffs—individual trust beneficiaries—and EBWLC—an entity indirectly owned by the trust—Defendants argue that Plaintiffs should be treated as equivalent to EBWLC for *Rooker-Feldman* purposes. Even if that were true—it is not, and Defendants have no on-point authority suggesting otherwise—the argument simply reinforces *Sung Cho*'s relevance here. The plaintiffs in *Sung Cho* were actual parties to the earlier settlements, and *Rooker-Feldman* still did not apply. Thus, even if Defendants were correct in piercing the veil to treat Plaintiffs and EBWLC equivalently, *Sung Cho* nonetheless indicates these circumstances would still not warrant application of *Rooker-Feldman* given the nature of Justice Rosenbaum's ruling.

[11] Although Plaintiffs' claims do not require review of the prior judgment, if this Court entertains Defendants' late-raised res judicata defense, it may have to consider it. Pursuant to the well-pleaded complaint rule, considering the circumstances that led to the judgment in the context of a defense would not divest this Court of jurisdiction.

Res judicata definitively lacks any valid application here. That conclusion is compelled by two different sources—New York law and Defendants' own arguments to the Court.

First, Defendants' affirmative representations make res judicata unavailable to them as a defense. Specifically, Defendants assert that Plaintiffs "would have had no standing, as beneficiaries to [the] shareholder trust, to intervene in Alexbay's action nor object to the N.Y. U.C.C. § 9-620 transaction." Eber Br. 20. However, it is fundamental that res judicata applies only to claims "that were or could have been raised" in the prior action. *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286-87 (2d Cir. 2002). It is equally fundamental that, if Plaintiffs had no standing to participate in the Alexbay suit or to challenge the Eber Metro transfer, their present claims could not have been raised there:

> Res judicata will not apply where "the initial forum did not have the power to award the full measure of relief sought in the later litigation." Even where a second action arises from some of the same factual circumstances that gave rise to a prior action, res judicata is inapplicable if formal jurisdictional or statutory barriers precluded the plaintiff from asserting its claims in the first action.

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 370 (2d Cir. 1997) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)); *see also Marrese v. Am. Acad. of Orthopaedic Surgeons*, 470 U.S. 373, 383 (1985) ("[C]laim preclusion generally does not apply where 'the plaintiff was unable to rely on a certain theory of the case or to seek a certain remedy because of the limitations on the subject matter jurisdiction of the courts.'" (quoting Restatement (Second) of Judgments § 26(1)(c); cleaned up)). Accordingly, by relying on the argument that Plaintiffs *could not* have sought relief against the Eber Metro transfer in the Alexbay action, Eber Br. 20, Defendants eliminate any ground for claiming that action has any claim-preclusive effect here.

Defendants' argument that the Alexbay suit is entitled to res judicata fails equally definitively as a matter of New York law. The Alexbay suit sought only a declaratory judgment that the proposed transfer was "commercially reasonable" under UCC Article 9; thus, its preclusive effect is limited solely to that narrow legal issue (and so is irrelevant to Plaintiffs' fiduciary-based claims). As even a modest amount of research would have shown, a declaratory

judgment action such as Alexbay's Article 9 lawsuit does *not* have broad res judicata effect: "New York law recognizes a declaratory judgment exception which 'limits the preclusive effect of the declaratory judgment to the "subject matter of the declaratory relief sought" and permits the plaintiff or defendant to "continue to pursue further declaratory or coercive relief."'" *Corines v. Am. Physicians Ins. Tr.*, 769 F. Supp. 2d 584, 591–92 (S.D.N.Y. 2011) (quoting *Duane Reade, Inc. v. St. Paul Fire and Marine Ins. Co.,* 600 F.3d 190, 196 (2d Cir. 2010) (quoting *Harborside Refrigerated Servs., Inc. v. Vogel,* 959 F.2d 368 (2d Cir.1992))). Thus, given this law and the concession that the Alexbay proceeding was limited in scope, raising res judicata as a purported bar to Plaintiffs' breach of fiduciary duty and other claims is objectively unreasonable.[12]

## V.   THE UCC DOES NOT ELIMINATE THE REMEDY OF RESCISSION WHERE APPROPRIATE FOR VIOLATION OF FIDUCIARY DUTIES

Defendants demonstrate a fundamental misunderstanding of how laws interrelate when they argue that UCC Article 9 limits the remedies available to this Court for breach of fiduciary duty, including setting aside the transaction under the no-further-inquiry rule. The UCC is a statute that broadly governs commercial transactions between presumptively arms' length parties—it has nothing to do with internal corporate governance or trust law matters.

Even when statutes specifically govern transactions involving corporate officers and directors (i.e., fiduciaries), the New York Court of Appeals has made clear that compliance with those statutes offers no protection for conduct that amounts to a breach of fundamental fiduciary duties. *See Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 569 (1984) ("Actions that may accord with statutory requirements are still subject to the limitation that such conduct may not be for the aggrandizement or undue advantage of the fiduciary to the exclusion or detriment of the stockholder.") (citations omitted).

---

[12] Res judicata is ultimately an equitable doctrine, and even if the declaratory judgment exception did not exist, it would be fundamentally inequitable to apply it against Plaintiffs, who did not even have notice of the prior action, to protect the individuals who participated in that collusive action, even from claims of breach of fiduciary duty, when the existence of that fiduciary relationship was not even disclosed the Supreme Court.

The fact that a valid acceptance of collateral by a secured creditor transfers all of the debtor's rights in the collateral and terminates subordinate interests, Eber Br. 15, does not mean that the acceptance is immune from rescission on separate grounds, such as fraud or breach of fiduciary duty. If this Court sets that acceptance aside then it follows that the legal consequences of that acceptance—terminating subordinate interests—are also vacated. Nothing in the UCC says that an acceptance of collateral is immune to rescission. Quite the opposite, the UCC states that, "[u]nless displaced by the particular provisions of the [UCC], the principles of law and equity, including [but not limited to] … estoppel, fraud, misrepresentation, … and other validating and invalidating cause shall supplement its provisions." NY UCC § 1-103. Nothing in the UCC would even arguably displace the availability of rescission as a remedy when warranted. Rescission is a common remedy for transactions where "fraud" has occurred, and the law of "fraud" is a specifically enumerated "supplement" to the UCC. There is no indication in the statute that the drafters intended to preserve rescission in cases of fraud but not in cases of breach of fiduciary duty, nor is there any logical reason why there would be such a distinction. The reason why "fraud" was specifically mentioned is because fraud is something capable of arising between any arms' length parties to a commercial transaction. And, ultimately, the UCC is about having a common code for commerce, not about governing fiduciary relationships—nothing in it displaces any causes of action, or remedies, for a breach of fiduciary duty.

Plaintiffs further note that even if compliance with the UCC could in theory serve to bar claims for breach of fiduciary duty, this Court could not grant summary judgment in Defendants' favor due to numerous factual disputes. For example, the status of Lester Eber as a "secured creditor" is disputed because the underlying Security Agreement and Guaranty that made him such were invalid for lack of consideration to the corporation. Plaintiffs submit that this is a legal question and the undisputed facts permit this Court to find that Lester was not a secured creditor. If this Court concludes that a trial is necessary to determine the underlying facts, then this issue precludes summary judgment.

VI. **CNB's Failure to Complete "Due Presentment" Under the UCC Article 8 Is Undisputed and Irrelevant to the Relief Plaintiffs Seek**

The Ebers argue that CNB's conduct in 2017 failed, under the UCC Article 8, to effectively register the transfer of ownership of the Trust's shares of EB&C to Plaintiffs and Lester Eber. Eber Br. 23–26. Plaintiffs do not disagree. However, Plaintiffs dispute that this should result in any kind of "judgment" for the Ebers when *their* actions prevented CNB from formal compliance. *See* Pls. CSMF ¶¶ 103–106.[13] *See also* Pls. MSJ Br. § I.

VII. **Lester's "Consulting" for Southern Was Disloyal to EBWLC and Its Affiliates**

A. **The Ebers' Argument Is Narrow**

Count I of the TAC alleges that the Southern Consulting Agreement constituted a usurped corporate opportunity, TAC ¶ 193, *and*, in addition, constituted a diversion of profits that belonged to the Eber Entities because the Consulting Agreement included a restrictive covenant that effectively bound the Eber Entities, id. ¶¶ 190–92. The Ebers' motion does not seek dismissal of this distinct basis for liability under Count I. *See* Eber Br. 21–22 (addressing only Count II and seeking summary judgment "dismissing Plaintiffs' faithless servant claims").

Count II of the TAC alleges that Lester's negotiation of the Southern Consulting Agreement to benefit himself was an act of disloyalty triggering the faithless servant doctrine. TAC ¶ 275. Alternatively, the TAC alleges Lester's disloyalty in connection with his efforts to take control of Eber-CT. *Id.* ¶ 277.[14] The Ebers do not and cannot argue that Lester's efforts to take Eber-CT were not disloyal to EBWLC and the Trust. *See* Pls. CSMF ¶ 99 (Wendy admitted that "Lester was moving against the company").

Instead, the Ebers confine their argument for dismissal of Count II to the question of whether Lester was disloyal in taking the Southern Consulting Agreement for himself. Eber Br.

---

[13] Plaintiffs' Proposed Order includes an instruction to "complete all necessary steps under the UCC Article 8 and any other applicable law to ensure that the shares of EB&C are registered" correctly. ECF No. 267-1, 2.

[14] While the TAC alleges that Lester's efforts to take Eber-CT for himself "began by December 8, 2011," TAC ¶ 277, Plaintiffs will show that it began years earlier when Lester entered into a self-dealing Line of Credit Note that included a repayment date that he knew would not be met. *See* Ex. 13 at 1 (providing for a "Maturity Date" of December 31, 2011"). The precise date is immaterial to the Eber's summary judgment arguments, however.

21–22. The Ebers' argument is grossly underdeveloped, as it turns on whether a corporate opportunity was usurped, yet the Ebers do not cite to a *single* authority setting forth the governing law for a corporate opportunity. *Id*. Considering that it is their burden to show that there are no disputed material facts, and materiality cannot be assessed without considering the "governing law," *Ebert*, 2014 WL 349640, at *5, their failure to even reference the governing law of corporate opportunities alone is a sufficient basis to deny their motion.

### B. The Factual Assertion Underlying the Ebers' Argument Is Demonstrably and Conclusively False, and Contrary to Their Prior Assertions to Another Court

The Ebers' limited argument is predicated on the demonstrably false factual assertion that EBWLC ceased to continue as a business before "August 2007." Eber SMF ¶ 25; *see* Eber Br. 22 (claiming "EBWLC and Metro laid off all their employees in or around March 2007"). As we show in the Counterstatement, this claim is utterly meritless, because there is a mountain of evidence—all produced by the Ebers themselves—contradicting the Ebers' claim. *See* Pls. CSMF ¶ 25. At the top of this mountain is their statement of material facts filed in the PBGC case. *Id.* (*e.g.*, admitting EBWLC "itself" had "operations in New York from 1933 to September 2008").[15] The Ebers's PBGC filings went to great lengths to emphasize just how much EBWLC remained a going concern with various activities—including contributing over $2 million in funding to the Plan—after 2008. Pls. CSMF ¶¶ 25, 78–81, 107. And Lester even admitted that Eber-CT actually sold wine in New York "after" Lester started consulting for Southern. *Id.* ¶ 92.

Even if EBWLC had stopped all sales operations and laid off all its employees before Lester executed the Consulting Agreement, that would not prevent finding Lester was disloyal in pursuing the Consulting Agreement for his own personal benefit. For one thing, Lester already negotiated and agreed to most of the Consulting Agreement's key terms by February 7, 2007.

---

[15] Consistent with their general efforts to have their cake and eat it, too, the Ebers' ERISA-based argument concerning the "control group" pension liability severely undercuts their argument that Lester was free to work for Southern without offering the opportunity to EBWLC or one of its subsidiaries. ERISA compels the conclusion that EBWLC and its subsidiaries, including Eber-CT, were effectively a "single employer" because they were part of the controlled group. *See* 26 U.S.C. § 414(b). Notably, the Ebers contend Eber-CT and EBWLC were in the same controlled group even after the Metro Transfer to Alexbay. *See* Ex. 149 at 3 ("14. Do you contend that EBWLC's pension funding liability to PBGC was also a liability of Eber-CT as of July 1, 2012? Response to No. 14: Yes.").

Pls. CSMF ¶ 74. Moreover, EBWLC continued to have significant cash needs, including to fund its pensions, such that even if there were no other employees, Lester was obligated as part of his duty to the corporation of which he was an officer, to seek opportunities for the benefit of that corporation and its shareholders, and not to advantage himself alone. *See* Pls. MSJ Br. 28–32. That duty was only stronger here because Lester was both trustee and beneficiary of the Trust.

## VIII.   THE EBERS' ARGUMENT FOR DISMISSAL OF THE INDEMNIFICATION CLAIM (COUNT X) IGNORES THE FACTS AND LAW ALREADY DISCUSSED BY THIS COURT

Despite literally copying and pasting their limitations argument from their opposition to leave to amend, *compare* Eber Br. 26–27 *with* ECF No. 171 at 7–8, the Ebers did not even acknowledge this Court's previous ruling. After being served with a Rule 11 motion, Defendants have now withdrawn this point of their motion. ECF No. 270. Similarly, though without the copying-and-pasting, the Ebers still advance an argument against the indemnification claim (Count X) that ignores this Court's previous contrary resolution of the legal issue. *See* Order dated May 23, 2019 at 40, ECF No. 222. Plaintiffs rely on that reasoning here.

## IX.   NOTHING SHOULD BE DISMISSED AS DUPLICATIVE AT THIS STAGE

### A.  A Declaratory Judgment May Be the Appropriate Step

Without bothering to discuss the specific declarations sought in Count VI, the Ebers argue that Count VI is duplicative because the issues will "of necessity" be resolved when deciding Counts I, II, IV, and V. Eber Br. 27–28. It is certainly *possible* that this Court will make the requested declarations when deciding whether to enjoin Lester from attempting to take Plaintiffs' shares in EB&C (Count IV). However, since Defendants have not formally conceded any of the other Counts, this Court might decide for some reason not to enjoin Lester's actions, order new elections, etc., for reasons that do not otherwise impair Plaintiffs' rights to be recognized as shareholders of EB&C. If for whatever reason that happens, then Count VI will be the appropriate means for determining Plaintiffs' shareholder rights. *See* Fed. R. Civ. P. 57 ("The

existence of another adequate remedy does not preclude a declaratory judgment that is otherwise appropriate.").

### B. Wendy Was Merely an Accomplice to the Violations of Trustee Duties

The Ebers argue that the aiding and abetting breach of fiduciary duty count against Wendy Eber (Count VIII) is duplicative of Counts I and II. Eber Br. 28.[16] If the defendant were herself a fiduciary, an aiding and abetting count would be duplicative. However, in this case, Wendy was not herself a trustee. *See* Eber Br. 19–20 (emphasizing this). Therefore, to the extent that liability is found based on breaches by Lester or Gumaer of their duties as trustees (rather than as corporate officers or directors), Wendy can only be liable for aiding and abetting, rather than as a principal tortfeasor. Accordingly, Count VIII is not duplicative and should remain.

### X.   RESPONSE TO THE GUMAER ESTATE'S MOTION FOR SUMMARY JUDGMENT

In order to streamline filings, Plaintiffs ask this Court to treat this Part as the response to the Estate of Elliott Gumaer's motion for summary judgment, rather than file a separate brief of up to 25 pages as the rules entitle them to do.

### A. Certain Arguments in the Estate's Motion Should Be Denied for Failure to File a Statement of Material Facts Pursuant to Local Rule 56.1

Local Civil Rule 56.1(a) specifically wans that "[f]ailure to submit such a statement [of material facts] may constitute grounds for denial of the motion." Here, Gumaer's Estate failed to file its own Rule 56.1 statement, instead choosing to incorporate by reference the Rule 56.1 statement filed by the Ebers. *See* ECF No. 261. However, with reference to Gumaer, the Ebers' Rule 56.1 statement said only that he was a co-trustee of the Trust—*that is all*. Eber SMF ¶ 3. It does not otherwise address any of the facts that relate to the Estate's core arguments. The Estate nevertheless seeks summary judgment based on factual assertions that appear in no Rule 56.1 statement, repeatedly citing to the *pleadings*, without bothering to demonstrate that the facts are

---

[16] The Ebers do not assert that there is insufficient evidence to go to trial on the aiding and abetting claim.

supported by the *record*, as required. Local Civil Rule 56.1(a) thus governs the balance of the Estate's arguments.

Most notably, the Estate contends that Gumaer was never Lester's personal attorney. Gumaer Br. 11–12. There is nothing in the Ebers' Rule 56.1 statement about the attorney-client relationship between Gumaer and Lester. And as the Estate well knows, there is evidence in the record contradicting that contention, including the Ebers' own admissions. Pls. CSMF ¶¶ 69–71.

### B. The Unwithdrawn Argument from the Estate's *Rooker-Feldman* Section Is Inscrutable and Immaterial

After claiming to withdraw its *Rooker-Feldman* argument, the Estate's letter to this Court asserts that "Plaintiffs' Rule 11 contentions do not challenge the argument set forth at page 8 of the Estate Mem. contending that Plaintiffs' claims that the Defendants defrauded the state court should have been presented to that state court on grounds separate and apart from the Rooker-Feldman doctrine." Calihan Ltr. 2, ECF No. 272. The "argument" cited is under the section heading for "*Rooker-Feldman*" and was certainly encompassed within Plaintiffs' Rule 11 motion. Trying to sever this inscrutable argument makes no sense.

Plaintiffs have made no "claims" based on defrauding the Supreme Court of Monroe County, so there is nothing to dismiss. The TAC includes allegations that such fraud occurred, but those are ancillary to the claims for relief. For example, the fact that Lester submitted an affidavit to Justice Rosenbaum in which he falsely asserted under penalty of perjury that the Polebridge Bowman sale was conducted on "the open market," when in fact it was a behind-closed-doors transfer to his own lawyer, is *evidence* of malice that supports all of Plaintiffs claims. It is not a claim in and of itself.

The fraudulent statements made to the Supreme Court are also relevant evidence indicating that EBWLC's board relied on that valuation, even though it could not have reasonably done so in light of the additional information the Board had that was never presented to Justice Rosenbaum.

There a striking dearth of evidence indicating how EBWLC's board valued its operating assets before transferring them to Alexbay. The only reference to any valuation being considered was the following conclusory recital contained in the Unanimous Written Consent signed by Wendy and Gumaer: "WHEREAS, after consideration of the financial statements and records of the Corporation and other information deemed relevant by the Board of Directors, the Board of Directors has determined in good faith that the value of Metro is less than the Obligations owed to Alexbay, LLC." Ex. 61 at 1. Importantly, it was *Alexbay's* lawyers at Underberg & Kessler who drafted that Consent document, Pls. CSMF ¶ 100, making those lawyers representations to the Supreme Court strong evidence of what the Consent was referencing in its vague language about "other information" being considered by the Board.

The Estate's discussion of how Plaintiffs "could have pursued an appeal" of the Supreme Court's declaratory judgment action cites mainly to cases that discuss petitions to reopen cases under Rule 60—a wholly inapposite situation. The one exception is a case holding that the grounds of "fraud committed against a court" was not a basis for a pro se litigant to avoid the effects of collateral estoppel from a final state court judgment. *O'Neill v. Hernandez*, No. 08CIV.1689(KMW), 2010 WL 1257512, at *14 (S.D.N.Y. Mar. 25, 2010). Here, none of the Defendants even tries to argue collateral estoppel. Thus, whatever the Estate may think it is arguing on page 8 of its brief, it does not establish a basis for dismissal of anything *unless* the Court considers the frivolous *Rooker-Feldman* argument that was supposedly withdrawn. Thus, it suffers the same defects: The declaratory judgment that the transaction was "commercially reasonable" has no bearing on any of Plaintiffs' claims, which are based on fiduciary obligations not covered by the UCC. Nor, given that Plaintiffs had no standing to intervene, much less appeal, the collusive declaratory judgment, *see* Eber Br. 20, is there any conceivable basis to deny them jurisdiction.

### C.  The Estate Confuses the Law to Argue Against Part of Count I

To clarify any confusion on the part of Gumaer's Estate, *see* Gumaer Br. 11 (selectively quoting the TAC's discussion of the law), Counts I and II *both* involve breach of the duty of loyalty; Count I challenges specific transactions, whereas Count II seeks disgorgement of compensation paid to the breaching individuals. Notably, Count I also alleges breach of the duty of care, sometimes expressly, TAC ¶¶ 250, 269, and other times by plain implication, *see, e.g.*, *id.* ¶ 209 ("no person of ordinary sound business judgment would say that the corporation received a fair benefit"). The Estate ignores the duty of care entirely, and instead tries to whittle Count I (as applied to Gumaer) down to just him having a conflict of interest. Gumaer Br. at 11.

Tellingly, Gumaer's Estate offers no legal authority to narrowly construe a breach of fiduciary duty claim in the manner that it suggests—it relies entirely on the TAC's partial description of the law, combined with an overly exuberant description of this Court's preliminary fact-finding made for purposes of resolving a discovery dispute.

The law is clear that a fiduciary authorizing a transaction that damages the beneficiary may be liable for a host of reasons, including but not limited to being in a position of a conflict of interest. *See, e.g.*, *Matter of Rothko's Estate*, 43 N.Y.2d 305, 319 (1977) ("While he (a trustee) is administering the trust he must refrain from placing himself in a position where his personal interest or that of a third person does or may conflict with the interest of the beneficiaries") (quoting Bogert, Trusts (Hornbook Series 5th ed.), p. 343). Gumaer "was required as a[] [trustee] primarily to employ such diligence and prudence to the care and management of the [trust] assets and affairs as would prudent persons of discretion and intelligence, accented not by '(n)ot honesty alone, but the punctilio of an honor the most sensitive.'" *Id.* (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 464 (1928) (Cardozo, C.J.)).

Even if the transaction did not involve a conflict of interest on Gumaer's part, Gumaer was still legally responsible as trustee to ensure that fair value was received for the transfer of Trust assets. The New York Court of Appeals has held that even acting on the advice of counsel does not establish a defense: "He could not close his eyes, remain passive or move with

28

unconcern in the face of the obvious loss to be visited upon the estate by participation in those business arrangements and then shelter himself behind the claimed counsel of an attorney." *Id.* at 319–20 (1977) (discussing defendant Levine). Such reasoning would similarly hold Gumaer liable here, even though there are several distinctions that make the case against Gumaer much stronger than the case against Levine in *Rothko*. First, Gumaer did not just "close his eyes" as to many of the transactions, he affixed his signature of approval to them, including the ultimate Unanimous Written Consent to the Metro Transfer. Pls. CSMF ¶ 44.[17] Second, Gumaer himself was an attorney, not relying on some other lawyers. Third, Gumaer was not just *an* attorney—he was *Lester's* attorney, creating a conflict of interest that precluded Gumaer from exercising sound and independent judgment, neither as a trustee nor as a director. Simply put, Gumaer's Estate presents no valid legal basis to grant it summary judgment on Count I.

   1. *Gumaer's Reliance on the Law of the Case Doctrine Rather than Complying with Rules 56 and 56.1 Is Inexcusable Given this Court's Prior Holding*

   The Estate argues that it is law of the case that Gumaer did not represent Lester as his personal attorney after 2001, relying on this Court's May 13, 2019 Opinion and Order on Plaintiffs' Second Motion to Compel. Gumaer Br. 12 ("[T]his Court has found that Gumaer had not represented Lester as an attorney since 2001."); *see also id.* at 16 (same). However, this Court already explained that its discovery ruling would not be dispositive of any subsequent proceedings: "[B]ecause the Court did not explicitly find that Gumaer was not Lester Eber's personal attorney, it is possible that, once discovery is completed, Plaintiffs will be able to show that Gumaer was Lester Eber's personal attorney at the same time that he was director for the Eber Entities." May 23, 2019 Leave to Amend Op. 28 n.11, ECF No. 222.

   The Court should also be aware that no party has ever argued that Gumaer was not Lester's personal attorney. Plaintiffs did not seek discovery in their motion to compel on such a basis. It might be unprecedented for a Court to make a factual finding that was contrary to

---

[17] Gumaer's Estate only mentions one specific transaction in its argument against Count I: The Metro Transfer to Alexbay. Gumaer Br. 12. Accordingly, Plaintiffs address only that transaction.

something the parties had, for all intents and purposes, stipulated to. *See* TAC ¶ 284 (alleging that "In or about January 2011, Gumaer became engaged as a personal lawyer to Lester Eber"); Ex. 107 (Ebers' Answer to TAC admitting ¶ 284); Gumaer Estate's Answer to TAC ¶ 284, ECF No. 239 ("Denies knowledge or information sufficient to form a belief as to the truth of the allegations contained in paragraph 284."); *see also id.* at ¶ 285 ("The letter agreement referenced in paragraph 285 speaks for itself."). Gumaer's Estate is undeniably in a difficult position, not having had the chance to get Gumaer's own statements on the subject, but that does not afford a means to obtain summary judgment when the other parties all contend otherwise, including the still-living client, Lester Eber, himself.

That should be the end of the story, especially since Gumaer failed to cite to *anything* in the record to support his contention that there was no an attorney-client relationship, as he was required to do under Rule 56(c)(1)(A).[18] There is ample evidence in the record supporting the finding that Gumaer at least held himself out to Lester as his attorney, creating a clear conflict of interest that CNB recognized at the time, but which was never disclosed to the other Trust beneficiaries or to the Surrogate's Court. *See* Pls. SMF ¶¶ 18–22; Pls. CSMF ¶¶ 70–71.[19]

Even if there was no evidence produced by the Defendants showing specific instances when Gumaer *acted* as an attorney, that would not foreclose the finding that a conflict of interest arose based on Gumaer "unequivocally … offering" to act as Lester's personal attorney—an offer which Lester accepted. May 13, 2019 Op. 29 (quoting ECF No. 136-16 at 3).[20]

---

[18] This is a separate and more serious problem than failure to follow Local Civil Rule 56.1 *See* Fed. R. Civ. P. 56(c)(1) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record … or, (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.").

[19] The fact that CNB recognized the conflict of interest based on representing Lester personally and reviewed it internally was not ascertained in discovery until the second day of Richard Hawks' deposition, which occurred on April 11, 2019, after briefing for the Second Motion to Compel had been completed. Hawks Dep. at 185, Ex. 180. CNB's failure to do anything about the conflict is consistent with its failure to do anything about the Alexbay transaction—it wanted to manage the publicly traded investments and keep its hands off everything else. CNB's bad judgment and neglect does not shield the remaining defendants' direct misconduct that injured the Trust.

[20] By contrast, the Court's Opinion recognized that the letter was "ambiguous" as to whether Gumaer would *also* be counsel to the Eber companies in additional to Lester. *Id.* at 30.

2. *Lester's Purchase of Trust Assets Through Debt Was Not Authorized*

Gumaer's Estate argues that the Will authorized Lester to acquire Eber Metro as part of the exercise of "security rights." Gumaer Br. 12. For the reasons addressed in detail above in Plaintiffs' Memorandum of Law in Support of their Motion for Partial Summary Judgment, Gumaer's argument is wrong:

1.  For purposes of trust law, the Will authorized only the making of loans secured by Trust assets, and did not in any way authorize a trustee to engage in a transaction by which he converted his debt into outright ownership of any Trust assets without the knowledge and consent of the other beneficiaries or the Surrogate's Court.

2.  Under the UCC, even if the Security Agreement and Guaranty (as amended in 2011) were valid, they did not give Lester any "rights" to acquire Eber Metro in satisfaction of the debt, as the Estate seemingly contends. Gumaer Br. 12. The ability for a secured creditor (Lester/Alexbay) to acquire title the collateral (Eber Metro) only arose if the debtor and other interested parties (Eber Metro and its guarantor, EBWLC) *consented*. Pls. MSJ Br. 8. Gumaer himself eventually signed his name to the EBWLC board's "Unanimous Written Consent" authorizing the transfer. Ex. 61.

3.  As a matter of corporation law, the manner in which the Line of Credit Note was secured was wrongful because it was unsupported by any valid consideration at the time when the Security Agreement and Guaranty were executed. Pls. MSJ Br. 25. Without a valid security interest, there was no basis for engaging in a strict foreclosure.

4.  Also a matter of corporation law and a trustee's duties of a reasonable diligence and prudence, Gumaer's consent to the transaction was inexcusable for a host of reasons. Pls. MSJ Br. 16–24. In addition to those briefed as reasons to grant Plaintiffs summary judgment on this transaction, there is at least a factual dispute about whether the value of the assets transferred to Lester was not over $8 million more

31

than the value of the debts, Pls. CSMF ¶ 101, as well as a dispute about whether some of Lester's debts were legitimate, Pls. CSMF ¶ 35.

### D.  Gumaer Must Account for Be Disgorged of the Fees He Received

A fiduciary who breaches the duty of loyalty has no right to retain compensation they were paid. *See* Pls. MSJ Br. 34. Gumaer's duty of trust to the Trust was violated to the detriment of the disfavored Trust beneficiaries, and so he must account for and be disgorged of his profits earned as a result of the breach of trust.

Although Gumaer's Estate contends that disgorgement is not available as a remedy for a breach of fiduciary duty claim, Gumaer Br. 14, it is wrong. *See, e.g.*, *Fed. Ins. Co. v. Mertz*, No. 12-CV-1597, 2016 WL 164618, at *7 (S.D.N.Y. Jan. 12, 2016) ("In [] cases where a fiduciary violates his position of trust, courts have held that he must account for all the profits derived therefrom.").[21] The Estate cites two cases, neither of which contains the holding it wants. In *Webb*, the court merely recognized that a breach of fiduciary duty claim required showing damages, whereas the faithless servant doctrine does not. *Webb v. Robert Lewis Rosen Assocs., Ltd.*, No. 03 CIV. 4275 (HB), 2003 WL 23018792, at *6 (S.D.N.Y. Dec. 23, 2003), *aff'd*, 128 F. App'x 793 (2d Cir. 2005). *Gibbs*, meanwhile, expressly stated that "[w]here there has been a breach of fiduciary duty, the aggrieved party may recover profits earned by the wrongdoer." *Gibbs v. Breed, Abbott & Morgan*, 693 N.Y.S.2d 426 (Sup. Ct. N.Y. 1999), *rev'd*, 710 N.Y.S.2d 578 (App. Div. 1st Dep't 2000). Neither of these cases involved a breach of trust by a trustee.

Here, Gumaer was paid a tidy sum of $40,000 per year. Pls. SMF ¶ 18. Not only was that money that went into Gumaer's pocket (disgorgement), but it also came out of a Trust-owned asset's bank account (damages/restitution). *Id*.[22] Therefore, the Trust and the underlying

---

[21] *See also Harris Tr. & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238, 250 (2000) ("[I]t has long been settled that when a trustee in breach of his fiduciary duty to the beneficiaries transfers trust property to a third person, the third person takes the property subject to the trust, unless he has purchased the property for value and without notice of the fiduciary's breach of duty. The trustee or beneficiaries may then maintain an action for restitution of the property (if not already disposed of) or disgorgement of proceeds (if already disposed of), and disgorgement of the third person's profits derived therefrom.").

[22] Plaintiffs did not include the payment of Gumaer as damages on the contention interrogatories because of how the interrogatories were framed around particular "acts." Gumaer being paid by the company was not an "act of

companies were damaged by Gumaer's disloyalty and concealment of it, because had his conflict been disclosed, the Surrogate's Court would have removed him from his position. *See In re Hall*, 713 N.Y.S.2d 622, 623 (App. Div. 4th Dep't 2000) ("If the personal interests of a trustee conflict with her interest as a trustee, the court may remove her as a trustee."); (Restatement (Third) of Trusts § 37 (2003)  ("A trustee's removal may be warranted, however, by a conflict of interests that existed but was unknown to the settlor at the time of the designation, or that came into being at a later time."); *see also* Pl. CSMF ¶ 69 (the Trust settlor, Allen Eber, did not know of the conflict because Gumaer and Lester had not yet met or had any interactions before he died).

The requirement for Gumaer to be disgorged of his fees is supported both by the equitable remedy of disgorgement of profits earned by a fiduciary for a breach of trust, and the faithless servant doctrine. Gumaer (like the Ebers) argues in hyper-technical fashion that the faithless servant doctrine does not apply to trustees by cobbling together authorities from different areas of law to argue that (a) the faithless servant doctrine is based on agency principles, (b) a trustee is not consider an agent, but rather a principal, so (c) therefore, the faithless servant doctrine does not apply to trustees. Gumaer Br. 13–14. This argument is conceptually flawed and should be rejected as a means of unreasonably narrowing New York's faithless servant doctrine. It fails to appreciate that the faithless servant doctrine applies in a *broader* fashion than fiduciary duties, because it applies to all employees, and not just those who are defined by the law as fiduciaries. That the trustee is considered, in other legal contexts, not an agent but a principal, does not change the fact that the trustee is in a position of utmost loyalty to another. The trustee, though technically a principal since it will hold property in its own name, is still doing so for the benefit of the beneficiaries. As the above-cited authorities show, New York courts regard the trustee relationship as the most inviolable of all fiduciary relationships. It is

---

disloyalty" by him. Plaintiffs objected that these interrogatories were confusing as written, but made clear that they intended to pursue disgorgement as remedy. When Plaintiffs wrote that they were not treating forfeiture of compensation or disgorgement as "damages," ECF No. 259-1 at 6–7, that was to distinguish legal from equitable relief (which can be an important distinction in other contexts); it was not in intended to suggest that injury did not occur. To the extent that this Court believes that Plaintiffs should have included this damages theory, this Court should permit them to supplement their responses, as it would not prejudice the Estate.

inconceivable that New York courts would ever rule that its broadly applicable faithless servant doctrine did not apply to trustees, such that faithless trustees can keep their fees during the period of disloyalty, while every other type of compensated person cannot.

In some of the earliest cases in New York that created the faithless servant doctrine, the New York Court of Appeals expressly included both "agents *and trustees*":

> The rule which places it beyond the power of the agent to profit by such transactions is founded upon considerations of policy, and is intended not merely to afford a remedy for discovered frauds, but to reach those which may be concealed; and also to prevent them, by removing from agents **and trustees** all inducement to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency **or trust** relates. All profits and every advantage beyond lawful compensation made by an agent in the business, or by dealing or speculating with the effects of his principal, though in violation of his duty of agent, and though the loss, if one had occurred, would have fallen on the agent, are for the benefit of the principal.

*Dutton v. Willner*, 52 N.Y. 312, 319 (1873) (internal citations omitted) (emphasis added) (cited by *Samba Enterprises, LLC v. iMesh, Inc.*, No. 06 CIV. 7660 (DC), 2009 WL 705537, at *9 (S.D.N.Y. Mar. 19, 2009), *aff'd sub nom. Samba Enterprises, Ltd. v. iMesh, Inc.*, 390 F. App'x 55 (2d Cir. 2010). That the subsequent case law reflects apparently few if any instances when the doctrine was actually applied to a conflicted trustee is evidence that the doctrine is working as a deterrent; it is not a basis to find that trustees are immune, much less to remove the deterrent.

### E.  Count VII – Fraudulent Concealment

Again, without a statement of material facts to reference, the Estate's arguments are somewhat difficult to parse. It appears to be based on two arguments: (1) this Court's expressly non-final finding that Gumaer did not represent the Ebers, and (2) the absence of damages caused by concealing the attorney-client relationship and the subsequent Metro Transfer from Plaintiffs. The first point has already been addressed above. The second point seems predicated on a misreading of Plaintiffs' responses to the Estate's contention interrogatories.

At the outset, the Court should note that none of the Estate's contention interrogatories sought information specific to the fraudulent concealment claim. The Estate's motion cites to

case law regarding damages for breach of fiduciary duty rather than fraudulent concealment, contending that it "is a breach of fiduciary duty claim." Gumaer Br. 15. We do not understand the Estate's logic or reasoning, especially since it cites no authority for the proposition, and it would seem obvious that, if the Estate's assertion were true, Count VII should be dismissed as duplicative—a point the Estate curiously does not assert. Plaintiffs respectfully submit that the failure to articulate any argument grounded in the actual law of fraudulent concealment is grounds to deny the requested relief, because it is unfair to require Plaintiffs to present the arguments for the Estate that it could not be bothered to make itself, in order to respond to them in a logical manner.

Whatever its legal reasoning may be, Gumaer's Estate selectively quotes Plaintiffs' contention interrogatory responses to misleadingly assert that Plaintiffs have admitted there were "no direct damages" Plaintiffs do not claim that concealment of Gumaer's personal representation of Lester was itself damaging "by this act alone." Calihan Decl. Ex. A at Response 5(a). Instead, the representation impaired Gumaer's ability to act as trustee and director without a conflict of interest, and as a result he authorized or ignored transactions that were injurious to Plaintiffs, the Trust, and the companies that they derivatively represent. Plaintiffs' recognition that there were "no direct damages" just means that the nexus between the wrongful act (concealing the conflict) and the injury (Lester's transactions for his own aggrandizement at the expense of the shareholders/Trust) is indirect.

Although its argument is quite underdeveloped, it appears the Estate is arguing that Plaintiffs cannot prove damages caused by the concealment of the Metro Transfer. *See* Gumaer Br. 16 ("Essentially, plaintiffs contend that they were damaged by the failure to disclose that they were damaged, which is not a cognizable damage.") (citing no legal authority). But the amount of damages caused cannot be determined without getting an accounting, as requested, and seeing how much can be recovered through imposition of a constructive trust. *See* Pls. MSJ Br. 14–15. If it turns out that the Ebers have irrevocably dissipated assets due to the delay in

filing this suit—a delay caused by Defendants' concealment—then there will be substantial damages to recover.

F. **Plaintiffs Do Not Intend to Seek "Punitive Damages" Against the Estate, but the Surcharge Remedy Should Remain**

The decision to award punitive damages is generally committed to the discretion of the ultimate trier of fact. *Flaum*, 582 N.Y.S.2d at 857. Although Gumaer's concealment of his conflict of interest was undoubtedly wrongful and was critical to allowing Lester to manipulate the Eber Bros. business to his personal advantage in breach of his fiduciary duties, Plaintiffs concede that Gumaer's death during the pendency of this litigation makes it unlikely that punitive damages would be awarded against the Estate. *See id.* (noting the "strong policy against the assessment of punitive damages against an estate on account of the wrongful conduct of the decedent" and declining to reverse a denial of sanctions for providing an incomplete accounting after termination of the fiduciary relationship).[23]

It is unclear whether the Estate is actually seeking dismissal of the surcharge remedy, because its brief simply lumps "surcharge" into the heading its argument against punitive damages without even referencing the term in the actual body of the brief. Gumaer Br. 17–18. Lest there be any doubt, however, the imposition of a surcharge on a fiduciary is not considered "punitive damages" when it is based on wrongful conduct during the course of the fiduciary relationship. *See Flaum*, 582 N.Y.S.2d at 857 n.2 (explaining that, when authorized, as under NY SCPA § 1807, a surcharge "contemplates the assessment of compensatory damages, not punitive sanctions"); NY SCPA § 1807(1) (providing for "a surcharge against the fiduciary" who authorizes payment to a "claimant as a result of fraud, negligence or collusion" and the claimant cannot repay it, "then a surcharge shall be imposed against the fiduciary in the amount the estate has been damaged by such fraud, negligence or collusion"). In other words, "surcharge" is a term of art in the trust and estate context the fiduciary is liable to the trust or estate even though the

---

[23] Application of the faithless servant doctrine is not tantamount to the imposition of punitive damages. *In re Blumenthal*, 822 N.Y.S.2d 27, 28 (App. Div. 1st Dep't 2006).

fiduciary himself did not receive the benefits of the wrongful conduct. In that sense, it may seem somewhat punitive against the fiduciary who did not directly profit from the transaction itself, but it is still just a means to remedying the injury caused by the breach. Accordingly, the remedy of surcharge should remain available against Gumaer's Estate if a surcharge is necessary in order to fully compensate Plaintiffs for the losses caused to the Trust by Gumaer's fraud, negligence and collusion.

## CONCLUSION

The Court should deny Defendants' motions in their entirety, except insofar as the Court deems it necessary to state that Plaintiffs waive "punitive damages" against Gumaer's Estate.

Respectfully submitted,

/s Brian C. Brook
Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Facsimile: (646) 257-2887
Brian@brook-law.com

*Counsel for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

Dated: December 6, 2019