## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL KLEEBERG, LISA STEIN, and AUDREY HAYS,<br><br>                Plaintiffs,<br><br>     v.<br><br>LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC; ESTATE OF ELLIOTT W. GUMAER, JR.; and WENDY EBER,<br><br>                Defendants,<br><br>   and<br><br>EBER BROS. & CO., INC.; EBER BROS. WINE AND LIQUOR CORP.; EBER BROS. WINE & LIQUOR METRO, INC.; EBER-CONNECTICUT, LLC; EBER-RHODE ISLAND, LLC; EBER BROS. ACQUISITION CORP.; EBER-METRO, LLC; SLOCUM & SONS OF MAINE, INC.; and CANANDAIGUA NATIONAL BANK & TRUST COMPANY,<br><br>                Nominal Defendants. | Civil Action No.  16-CV-9517(LAK)(KHP) |

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION
## FOR PARTIAL SUMMARY JUDGMENT

Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Brian@brook-law.com
*Attorneys for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................... ii

ARGUMENT ......................................................................................................................... 1

I.    Lester Cannot Prevent the EB&C Share Distribution .................................................... 2

II.    Neither the UCC nor the Will Permitted the Metro Transfer ................................. 3

    A.   The UCC Did Not Trump Lester's Multiple Fiduciary Duties ............................................ 4

    B.   The Ebers' Arguments Based on the Will Are Even Worse Than Before ......................... 6

    C.   Trust Law Supplies the Right to Equitable Relief ............................................... 7

III.   There Is No Viable Corporate Law Defense ........................................................ 9

    A.   The Metro Transfer Was a Death Sentence for EBWLC ................................... 9

    B.   There Is No Real Dispute That the Consideration Exchanged Was Unfair ..................... 10

    C.   Assuming Pre-Transfer Insolvency for the Sake of Summary Judgment, Management Still Had Fiduciary Duties to Shareholders ............................................... 11

    D.   The Security Agreement and Guaranty Were Waste ........................................ 11

IV.   Consulting for Southern Was Disloyal to the Trust and EBWLC ....................................... 12

V.    Gumaer's Estate Likewise Fails to Raise a Material Fact Dispute ...................................... 12

    A.   Gumaer Was Clearly Prohibited from Representing Lester Personally .......................... 13

    B.   Independent Contractors and Trustees Are on Opposite Ends of the Spectrum .............. 15

CONCLUSION ...................................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Atlas MF Mezzanine Borrower, LLC v Macquarie Tex. Loan Holder LLC*, 174 A.D.3d 150
(App. Div. 1st Dep't 2019) ............................................................................................ 5

*Boston Safe Deposit & Trust Co. v. Lewis*, 317 Mass. 137 (1944) ................................... 7

*Bowles v. Superior Court*, 44 Cal.2d 574 (Cal App. 1 Dist. 1955) ................................. 14

*Brown v. Bedell*, 263 NY 177 (1934) ............................................................................. 15

*Case v. Abeel*, 1829 WL 2134, 1 Paige Ch. 393 (N.Y. Ch. 1829) ................................... 1

*Dabney v. Chase Nat. Bank of City of New York*, 196 F.2d 668 (2d Cir. 1952) ............. 16

*Diamond v. Oreamuno*, 24 N.Y.2d 494 (1969) .............................................................. 16

*Dutton v. Willner*, 52 N. Y. 312 (1873) ......................................................................... 16

*Fed. Ins. Co. v. Mertz*, No. 12-CV-1597-NSR-JCM, 2015 WL 5769945
(S.D.N.Y. Sept. 29, 2015) ............................................................................................ 15

*Fed. Ins. Co. v. Mertz*, No. 12-CV-1597-NSR-JCM, 2016 WL 164618
(S.D.N.Y. Jan. 12, 2016) ............................................................................................. 15

*Feresi v. The Livery, LLC*, 232 Cal. App. 4th 419, 182 Cal. Rptr. 3d 169 (2d Div. 2014),
*as modified* (Jan. 8, 2015) ............................................................................................ 2

*Florida Bar v. Moore*, 194 So.2d 264 (Fla. 1966) ........................................................ 14

*Hughes v. BCI Int'l Holdings, Inc.*, 452 F.Supp.2d 290 (S.D.N.Y. 2006) ..................... 11

*In re Bank of New York Mellon*, 4 N.Y.S.3d 204 (App. Div. 2015) ............................... 14

*In re Bear Stearns Litigation*, 870 N.Y.S.2d 709 (N.Y.Sup. 2008) ............................... 11

*In re Trados*, 73 A.3d 17 (Del. Ch. 2013) ..................................................................... 10

*Kahn v. Tremont Corp.*, 695 A.2d 422 (Del. 1997) ....................................................... 10

*Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008 (Del. Ch. 2010) ..................................... 9

*Matter of Bulova*, 30 A.D.2d 321 (App. Div. 1st Dep't 1968) ........................................ 8

*Matter of Wood*, 177 A.D.2d 161 (App. Div. 2d Dep't 1992) ..................................................... 3, 8

*Murray v. Beard*, 102 N.Y. 505 (1886) ................................................................................... 16

*O'Hayer v. de St. Aubin*, 293 N.Y.S.2d 147 (1968) ................................................................. 6

*Rapillo v. CitiMortgage, Inc.*, 2018 WL 1175127 (E.D.N.Y. Mar. 5, 2018) ............................. 5

*Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238 (1984) .............................................................. 5

**Statutes**

NYBCL § 909 ............................................................................................................................ 9

NYUCC § 1-103 ....................................................................................................................... 5

NYUCC § 9-620 ....................................................................................................................... 4

NYUCC § 9-625 ....................................................................................................................... 5

**Rules**

L. Civ. R. 56.1 ......................................................................................................................... 13

**Treatises**

Restatement (Second) of Trusts § 345 ..................................................................................... 3

Restatement (Third) of Trusts § 37 .......................................................................................... 13

Restatement (Third) of Trusts § 78 ..................................................................................... 12, 14

Restatement (Third) of Trusts § 79 .......................................................................................... 14

Restatement (Third) of Trusts § 82 ........................................................................................... 3

Restatement (Third) of Trusts § 86 ........................................................................................... 7

Restatement (Third) of Trusts § 89 ....................................................................................... 2, 8

Restatement (Third) of Trusts § 95 ...................................................................................... 8, 16

Restatement (Third) of Trusts § 183 ........................................................................................ 14

Restatement (Third) of Trusts § 184 ........................................................................................ 14

# ARGUMENT

Lester's taking "to himself the sole ownership of the stock … cannot be sustained without overturning principles of equity which have long been deemed essential to protect the rights of those whose property is committed to the care or guardianship of others." *Case v. Abeel*, 1829 WL 2134, 1 Paige Ch. 393, 397–98 (N.Y. Ch. 1829). Those principles hold true today; the Court cannot sustain—and instead should void—the Ebers' self-dealing at Plaintiffs' expense. Indeed, Plaintiffs' were majority owners of the company when it was taken from them by the *minority* owner—a maneuver only possible because he abused his position of trust.

Lester argues that he *entitled* to control the business by the Will, but that is not so. The Will merely notes Allen Eber's "hope" that Lester "may have an opportunity to participate in the management" of it. Ex. 132 at 13. This language creates no entitlements. Moreover, the Will provided that upon Lester's demise the Trust automatically terminates and its corpus, including the controlling stock of Eber Bros. (if not "sold" earlier), is distributed to Allen Eber's "then living lineal descenders, per stirpes." *Id.*[1] Thus, the Will clearly foreclosed Lester's self-interested actions to give himself and his branch of the family sole ownership of the business.

The no-further-inquiry rule governs this case. Not that this Court could not consider the fairness of the transaction and reach the same result on the undisputed facts: The Metro Transfer left EBWLC with *nothing* but debts, and no means to possibly pay them. Regardless of whether Lester was attempting to circumvent the Will's mandated per stirpes distribution, or if he was just trying to defraud EBWLC's creditors, his conduct was an egregious breach of trust. From the perspective of the Trust, EB&C, and EBWLC, it is indefensible.

Ignoring their plea to entrench themselves in the management despite their malfeasance, the Ebers' legal arguments are even worse, for they are antithetical to basic principles of law and common sense. They argue that the UCC displaces fiduciary duties, permitting officers and trustees to act out of self-interest whenever they are enforcing a secured loan. In their view, it is

---

[1] By refusing to accept the characterization of the Metro Transfer as a "sale," Eber Opp'n 8, the Ebers have no argument that the per stirpes distribution of the business was not mandatory.

1

not illegal to shoot someone in the middle of Fifth Avenue—so long as it done in a crosswalk, without jaywalking. Compliance with the UCC's requirements is necessary but not sufficient when the creditor is a fiduciary; the UCC's "statutory scheme is not intended to provide a vehicle for creditors to take advantage of persons with whom they have a fiduciary relationship."[2]

## I.   LESTER CANNOT PREVENT THE EB&C SHARE DISTRIBUTION

The Ebers' endless series of double standards is cast in stark relief by their attempt to blame CNB for not inquiring about the existence of transfer restrictions before filing its petition. Eber Opp'n 3. It is literally incredible that these Defendants argue that one trustee (CNB) had the duty to inquire based on unsupported assertions about what CNB's "Corporate Trust Department knew" about general practices in small companies, while simultaneously arguing that the other trustees (Lester and Gumaer) with "*actual knowledge*" of the transfer restriction could silently watch as the Trust beneficiaries were harmed. *Id*. (emphasis added). There is no need for a trial to conclude that Lester kept silent strategically, to try to sabotage Plaintiffs' derivative claims, because the doctrines of res judicata and equitable estoppel apply regardless of his intent. *See* Pls. MSJ Br. 5–6 (arguing two grounds for estoppel, including silence).

Irrespective of whether Lester and Gumaer "ceased to be Co-Trustees" *after* the June 1, 2017 Surrogate's Court Order, Eber Opp'n 1,[3] it is undisputed that Lester was definitely a trustee *beforehand.* Thus, he was still obligated to act in the best interests of the Trust with a duty of undivided loyalty. Simple logic dictates that that duty required him to inform the Surrogate about the transfer restriction, if he believed it applied.[4] *He stayed silent.* And, independent of Lester's

---

[2] *Feresi v. The Livery, LLC*, 232 Cal. App. 4th 419, 428, 182 Cal. Rptr. 3d 169, 176 (2d Div. 2014), *as modified* (Jan. 8, 2015) (resolving dispute over assigning the priority of secured claims, where the UCC Article 9 was at the core, unlike a trustee/officer using debt to take personal ownership of a trust/corporate asset).

[3] Plaintiffs do not concede these trustees' roles ended with the Surrogate's Court Order, and the law is on their side. *See* Restatement (Third) of Trusts § 89 ("The powers of a trustee do not end on the trust's termination date but may be exercised as appropriate to the performance of the trustee's duties in winding up administration, including making distribution, in a manner consistent with the purposes of the trust and the interests of the beneficiaries.") (hereinafter "RS3d").

[4] The Ebers claim that "Lester Eber had no duty to inform the Surrogate's Court about the transfer restriction," on the grounds that Plaintiffs cited no authority, relying instead on the logic that a trustee has a duty not to hoodwink the beneficiaries, his co-trustee, or Surrogate. Eber Opp'n 2. The absence of precedent specifically prohibiting such

duty to speak as a trustee, he did make an appearance in the Surrogate's Court proceeding and declined to object—and that has legal consequences. Pls. MSJ Br. 5–6. The Ebers failed to dispute that the elements of equitable estoppel and res judicata are met here.

Even if he were not barred from making them now, Lester's arguments for trying to take Plaintiffs' shares in EB&C fail. *See* Pls. MSJ Br. 4 n.3.[5] Lester attacks CNB's undisputedly flawed post-June 2017 efforts to transfer the shares[6] and incorrectly equates the executed stock powers, which were intended to effectuate the final transfer of legal title, with the "notice of a *proposed* transfer" contemplated by the Bylaws. Ebers Opp'n 1–3. However, that is incorrect as a matter of law—the Surrogate's Court Order had already vested Plaintiffs and Lester with equitable title to the EB&C shares. *See* Restatement (Second) of Trusts § 345 cmt. a (1959) ("Although the title to the trust property vests in the beneficiary on the termination of the trust, the court may in order to give the beneficiary a marketable title direct the trustee to make a conveyance to the beneficiary."); *Matter of Wood*, 177 A.D.2d 161, 166 (App. Div. 2d Dep't 1992) (applying § 345). There was no new proposed transfer for Lester to intercept.

As for the stock certificates' sufficiency, the Ebers conveniently ignore the first sentence on their face: "transferable on the books of the Corporation by the holder hereof in person or by duly authorized attorney upon surrender of this Certificate properly endorsed." Ex. 134. Period.

Accordingly, the Court should enter declaratory judgment in Plaintiffs' favor and provide the injunctive relief specified by the Proposed Order to compel the corporations' compliance.

## II.   NEITHER THE UCC NOR THE WILL PERMITTED THE METRO TRANSFER

---

manifestly self-interested and harmful conduct by a trustee is no defense—to the contrary, it underscores how outrageous this conduct is.

Regardless, the Restatement offers all the authority necessary. Its black letter provides that the "trustee has a duty: … (c) to keep fairly representative beneficiaries reasonably informed of changes involving the trusteeship and about other significant developments concerning the trust and its administration, particularly material information needed by beneficiaries for the protection of their interests." RS3d § 82; *see also id.* Cmt. on Subsection (1) at d. ("[A] trustee's duty to provide information to beneficiaries may apply when … plans are being made for distribution on termination … of the trust").

[5] The brief's citation to the Restatement incorrectly omitted that it was citing to comment g, not the black letter.

[6] For purposes of this motion, we do not dwell on how Lester and Wendy made CNB's job more difficult.

### A.  The UCC Did Not Trump Lester's Multiple Fiduciary Duties

In their motion for summary judgment, the Ebers argued (wrongly) that the UCC foreclosures the remedy of rescission. Eber MSJ Br. 14–16. Now they contend (again wrongly) that it offers a complete defense of the Metro Transfer, arguing the UCC alone defines secured creditors' duties, regardless of whether the creditor is also a fiduciary. *See* Eber Opp'n 7, 14.[7] Unsurprisingly, the Ebers have no case law saying anything even close to what they contend, which fundamentally misapprehends how duties overlap and laws interrelate. *See* Pls. Opp'n 20–21. A statute imposing duties on one in the role of a secured creditor does not even arguably alter other duties, imposed by other law, as the result of a fiduciary relationship.

The Ebers first argue that the 2012 Metro Transfer "was not a sale, but the enforcement of the secured party's package of preexisting rights…." Eber Opp'n 8. "It was all part of an integral whole created long before July 2012," they say. *Id.* at 9. Poppycock.

In the next breath, the Ebers contend that "§ 9-620 foreclosures are not governed by the business judgment rule or the entire fairness doctrine, but only conditioned on the consent of the owner of the collateral." *Id.* at 13.[8] Because such consent can only be obtained after default, Pls. MSJ Br. 8, it was necessarily a new transaction that occurred in 2012. In other words, even if Lester's loans "were guaranteed by EBWLC assets and were secured by a validly-perfected first priority security interest," Eber SMF ¶ 36, Lester did not have the *right* to acquire Eber Metro.

Conflating Lester's loans with his acquisition of Eber Metro lies at the core of the Ebers' opposition. *See, e.g.*, Eber Opp'n 10 (distinguishing *Scarborough* solely because, there, "the

---

[7] While the UCC is important, Plaintiffs do not assert any claims based on *violations* of the UCC. One sentence in Plaintiffs' opening brief was poorly phrased to suggest that the "crucial question" here was one of good faith under the UCC (i.e., the low hurdle of honesty-in-fact). The Ebers seize on this as if it had been a constructive amendment of the TAC. Eber Opp'n 5–7 (seemingly realizing the error as "misstat[ing] the issue"). This was a drafting error, as the subsection was merely discussing the UCC as background to rebut the Defendants' fiction about Lester's creditor's "rights." The brief proceeded to clarify that the no-further-inquiry rule renders a transaction voidable regardless of whether the trustee acted in good faith. Pls. MSJ Br. 10.

[8] The Ebers themselves tried to distinguish the loans from the post-default foreclosure proposal and consent in support of their own motion, arguing—preposterously—that it was not self-dealing since Lester Eber supposedly had no involvement in causing the Metro Transfer to occur. *See* Eber MSJ Br. 19 ("Lester Eber's involvement in the 2012 Foreclosure was purely as the beneficial owner (through Alexbay) of the loans, which were then in default. Lester Eber had no involvement in the consent process…"). As previously briefed, the Ebers failed to support these fantastical assertions of fact.

Trustee sought permission to purchase an asset of the trust, not lend the Trust corporations money as Lester Eber did"). This Court cannot turn a blind eye to reality: A secured loan does not convey title in the security to the secured party, not even after a default.

Considering that the Ebers are the ones arguing statutory abrogation of fiduciary duties, they have the burden of persuading this Court to disregard centuries of consistently unforgiving precedent.[9] The absence of any precedent or commentary even *suggesting* that his duties of good faith and loyalty were excused by his status as a secured creditor is the hallmark of a fatal problem with Defendants' argument.[10] If Lester thinks that this Court will carve out a brand-new exception to the rules against trustee self-dealing and conflicts, he is sorely mistaken.

Finally, UCC § 9-625 expressly applies only to violations of the UCC itself. *See* NYUCC § 9-625(a)-(b) (concerning judicial orders and damages for "a failure to comply with this article"). All of the cases cited by the Ebers involved alleged violations of the UCC alone. Eber Opp'n 4–5; *see, e.g.*, *Rapillo v. CitiMortgage, Inc.*, 2018 WL 1175127, at *8 (E.D.N.Y. Mar. 5, 2018) (the complaint alleged "failure to comply with article 9"). As the First Department recently explained, permitting courts to unwind "nonjudicial sales conducted pursuant to article 9 of the UCC" would "deter potential buyers from bidding in nonjudicial sales, which would, in turn, harm the debtor and the secured party attempt to collect after a default." *Atlas MF Mezzanine Borrower, LLC v Macquarie Tex. Loan Holder LLC*, 174 A.D.3d 150, 152 (App. Div. 1st Dep't 2019). This policy reason underlying § 9-625 does not even arguably apply here. More importantly, the court recognized that the UCC's specified remedies are *not* exclusive. *See id.* at 160 (deeming two bankruptcy cases inapplicable because they "arise in the context of a bankruptcy court's statutory power to order the turnover of property," even though those cases also concerned alleged UCC violations).

---

[9] Given UCC § 1-103, the Ebers' novel argument requires them to show that the legislature intended to abrogate trust and corporate law. *Cf. Silkwood v. Kerr-McGee Corp.*, 464 U.S. 238, 255 (1984). They cannot do so.

[10] *See* Pls. Opp'n 12–13 (citing authority going the other way, even when applied to a mere indenture trustee).

**B. The Ebers' Arguments Based on the Will Are Even Worse Than Before**

The Ebers' attempt to defend the Metro Transfer based on the language of the Will is equally unavailing. The Will's permission for a trustee to make a secured loan to the Trust cannot reasonably be construed as permitting the acquisition of Trust property, not even in the case of a foreclosure, and especially not in light of the other Will provisions regarding the settlor's intentions. *See* Pls. MSJ Br. 11–13, § (II)(B)(1). For instance, the Will expressed the settlor's "wish" to retain the business, and it limited the trustees' duty to that of "good faith" in respect of that desire. Ex. 132 at 13.[11] That Allen Eber chose to abrogate the trustees' duties only as to decisions to retain the business means, by necessary implication, that he did not similarly intend to dispense with the duty of undivided loyalty when it came to decisions to dispose of it.[12]

The Ebers simply ignore Plaintiffs' arguments, failing even to acknowledge that courts "strictly construe" any provisions limiting trustee's general duties. *Id.* Instead, they assert conclusory nonsense, characterizing the Will here as being like *O'Hayer* and containing "strong and precise language," without even addressing Plaintiffs' argument that the language in the *O'Hayer* trust instrument was "the opposite" of that in the Allen Eber Will. Pls. MSJ Br. 11–12.[13] Notably, however, the Ebers' conclusory argument that Will's permission to make secured loans necessarily implied a power to foreclose in the event of default, *id.* at 11–12, fails to take the next step and expressly contend that the power to foreclose necessarily implies a power to

---

[11] The Ebers purport to dispute this on the grounds that the Will did not impose a "duty to retain." Def. CSMF ¶ 6. There is no dispute, and this Court should reject the Ebers' attempt to distort the issue and prolong this litigation. Although we do not dwell on it, the Ebers' Counterstatement is a textbook example of inadequacy. Though purporting to dispute 54 of the 100 paragraphs, almost all of these are purely argumentative and/or assert additional facts that are not contrary to Plaintiffs' assertions. Even when they do cite to evidence, it is almost invariably to conclusory assertions in their clients' own affidavits—which themselves are often just more legal-ish arguments.

[12] The trustees could sell the Eber business assets, and they indeed did so in 2007, to Southern. The question in this case is whether the Will authorized a sale or any other kind of transfer of those assets to a *trustee*, specifically Lester. The language in the Will about Allen Eber's desires—including to retain the business in the Trust and to have Lester in its management—is also compelling evidence that the settlor never intended to permit Lester to run the business on his own, outside the Trust.

[13] *O'Hayer* characterized the trust instrument there as granting "broad powers of administration far beyond the traditional notions of trusteeship." *O'Hayer v. de St. Aubin*, 293 N.Y.S.2d 147, 149 (1968). *See also id.* at 152 (describing the "language of the trust used by the settlor to permit self-dealing by the trustee" as "strong and precise"). The specific language was cited in our brief and is in the appendix to *O'Hayer*.

acquire *title* himself, rather than merely selling the property at auction and using the proceeds to repay the debt.[14] Again, they just conflate the secured loans with the transfer of title in conclusory fashion and hope this Court will not recognize the difference.

It makes no difference whether "[t]he clear and unambiguous language of the Will gives the Trustee the power to dispose of the Trust assets." Eber Opp'n 11. The general power to dispose of Trust assets is not unusual and generally implied. *See* RS3d § 86 cmt. c. In contrast, a provision abrogating the general rule against self-dealing and conflicts of interest is extraordinary, and subject to strict construction. And that is the critical point here: The Will did not give any trustee the right to profit from or acquire Trust assets.

In addition to the Metro Transfer, Plaintiffs challenged Lester's acquisition of 750 preferred shares on grounds that it was the unauthorized acquisition of trust property. Pls. MSJ Br. 26–27. The Ebers' trust-law response is to argue that the Will broadly eliminated the general rule of undivided loyalty from the trustees. Eber Opp'n 21. Their unwillingness to acknowledge even a single misstep reveals that their uber-broad interpretation of the Will is *ridiculous*. Thus, despite their apparently fabricating a shareholder consent document post-discovery to address the corporate-law deficiency, the transaction is still indefensible given Lester's continuing duty of undivided loyalty as trustee in February 2017.[15]

### C.  Trust Law Supplies the Right to Equitable Relief

New York law expressly permits trust beneficiaries to require a trustee to return property to the trust that he has taken from it. *See* Pls. MSJ Br. 14–15. The Ebers suggest that the cases applying this rule are "inapposite" for reasons that entirely depend on this Court adopting their

---

[14] Only if there was no other reasonably likely outcome besides further self-dealing could it be implied. *See Boston Safe Deposit & Trust Co. v. Lewis*, 317 Mass. 137, 141 (1944) ("[W]here the method selected by a [settlor] for the accomplishment of the purpose and object of the trust cannot be adopted by a trustee without dealing with himself individually, it may be fairly assumed that such dealing was contemplated by the [settlor]").

[15] The Ebers rely on a document that was not produced during discovery. Eber CSMF ¶ 99. Plaintiffs will be asking this Court for discovery to ascertain whether this newly produced document was recently fabricated. Such evidence could warrant sanctions, and at the very least be compelling evidence of bad faith or supporting punitive damages.

overbroad interpretation of the Will and conflating the power to lend money with the (fictitious) power to use debt to seize trust assets. *See* Eber Opp'n 8, 22.

The Ebers' attempt to rely on the general principle that courts typically look first for an adequate remedy at law first fails because that principle does not apply to a case that arises from the inherently equitable nature of a trust. Eber Opp'n 21–22. Neither of the Ebers' cited cases involved a breach of trust, however.[16] *See* RS3d § 95 ("With limited exceptions, the remedies of trust beneficiaries are equitable in character and enforceable against trustees in a court exercising equity powers."); *id.* at cmt. a ("A beneficiary is not prevented from pursuing an equitable remedy against a trustee merely because under common-law principles, or perhaps an occasional statute, the beneficiary is allowed to bring an action at law against the trustee for the same cause.").[17] If Plaintiffs had not invoked this Court's diversity jurisdiction, their claims would likely have been filed in the Surrogate's Court, which is a court of equity.

New York courts have required trustees to deliver trusts' securities to the beneficiaries in kind, rather than selling them and paying out cash, if that is "desired by the beneficiaries." *Matter of Bulova*, 30 A.D.2d 321, 323 (App. Div. 1st Dep't 1968) (holding that, even at a time three months before termination of the trust, it was improper to try seek to sell the Bulova Watch shares with the end of the trust in sight and directing the trustees "to distribute such shares in kind"); *see also Wood*, 177 A.D.2d at 166.[18] The Ebers' various corporate machinations cannot be permitted to divest Plaintiffs of their right to receive their shares of the family business.[19]

---

[16] The Ebers first cite to a case that is not even remotely similar. *See Boyle v. Kelley*, 42 N.Y.2d 88, 91 (1977) (considering nature of claim to recover improperly seized property to determine whether notice of a "claim" was needed, and the purportedly equitable claim sought the return of *currency*, not property with an indeterminate value). They then point to a case where a group of attorneys sued their former firm seeking unpaid compensation and return of their capital contributions. *See Evans v. Winston & Strawn*, 303 A.D.2d 331, 332, 757 N.Y.S.2d 532 (App. Div. 1st Dep't 2003) (finding that the terms of the Partnership Agreement applied and dictated the outcome, requiring return of *money*). Neither has anything to do with a disloyal fiduciary, let alone a trustee.

[17] *See also* Pls. Opp'n 32 n.21 (citing the U.S. Supreme Court recognizing this "settled" law).

[18] These cases applied the Restatement (Second) §§ 345–347, the predecessor to RS3d § 89.

[19] Plaintiffs' first Complaint sought appointment of a replacement trustee, because they knew that under the explicit terms of the Trust, direct ownership was not possible until Lester died. Lester gambled when he consented to CNB's desire to terminate the Trust early, before his death. Presumably this was a calculated risk, because he knew that any replacement trustee would remove him and Wendy from management just as quickly, if not faster than Plaintiffs.

III.    THERE IS NO VIABLE CORPORATE LAW DEFENSE

Given that the Ebers advance no colorable defense to application of the no-further-inquiry rule to Lester's acquisition of Eber Metro, there is no need to delve into the weeds of whether the Ebers also violated their duties as corporate officers and directors. Nevertheless, the absurdity of the Ebers' arguments predicated on the purported insolvency of Eber Metro should give this Court comfort that the same result would obtain.

No rational businessperson could have believed that transferring substantially all of EBWLC's assets to eliminate the debt to Lester was in the best interests of EBWLC. SMF ¶ 73.[20] Unlike how corporations may merge or reorganize to stay in business, even to the detriment of some shareholders, EBWLC's board decided to give all the assets to Lester, leaving EBWLC to drown in debt and take the interests of every other creditor and shareholder down with it.

Because the same duties apply when there is a "cash sale, a break-up, or a transaction like a change of control that fundamentally alters ownership rights," *Lonergan v. EPE Holdings, LLC*, 5 A.3d 1008, 1019 (Del. Ch. 2010), the Ebers' desire to avoid labeling the Metro Transfer a "sale" fails (perhaps because even Wendy herself called it that in her deposition). SMF ¶ 70. It was still a voluntary transfer—even under the UCC alone, Lester had no right to acquire title for himself without the debtor's consent. Hence, fiduciary duties existed, and BCL § 909 applied.

A.  The Metro Transfer Was a Death Sentence for EBWLC

The Ebers do not even try to show that the process of approving the Metro Transfer was

---

[20] The Ebers attempt to dispute this with the testimony of Wendy Eber and Frank Torchio fails. As to Torchio, the Ebers declined to submit a report in rebuttal to Glenn Liebman's expert opinion on the economic irrationality of the Metro Transfer. Thus, their reliance on unspecified portions of Torchio's entire deposition transcript does not constitute admissible evidence given their failure to provide a report including any opinion on the economic rationality of the Metro Transfer.

Wendy Eber's affidavit purports to explain why she consented to Lester's proposal to take Eber Metro. She asserts that EBWLC was facing significant financial problems, separate and apart from its debt to Lester Eber. W. Eber Aff. ¶¶ 6–16. She also tries to explain why she did not even try to renegotiate Lester's loans to extend the maturity date, *id.* ¶¶ 17–20, the absence of an appraisal, *id.* ¶¶ 21–22. Assuming that she believed all of this at the time, it made her decision to consent to the Metro Transfer more improper. None of this explains how she could have rationally concluded that the transfer was in EBWLC's best interest. The fact that EBWLC was facing so many problems on different fronts is precisely why it made no sense—from EBWLC's perspective—to transfer away its only income-generating assets.

fair, even though New York law clearly requires them to show both fair process *and* fair price. Instead, they argue—relying on Delaware cases where shareholders challenged the sales of assets to third parties—that if they can prove at trial that EBWLC was insolvent at the time, then that alone will be sufficient to meet their burden.

In the cases cited, Eber Opp'n 19, management decided to merge each company with another, yielding benefits for the company, such as access to new sources of financing, that were unavailable without it. *E.g.*, *In re Trados*, 73 A.3d 17, 76 (Del. Ch. 2013). The issue therein presented was whether the transactions breached duties to the common shareholders. *Id.* Here, the issue is whether there was a breach of duty to the corporation itself: EBWLC.

Approving the Metro Transfer was passing a death sentence for EBWLC. No case suggests that a transaction leaving the corporation an empty shell could ever come close to meeting the business judgment rule, much less the entire fairness doctrine—especially not when all of the assets go to the controlling person, who unilaterally fixes the price.[21]

## B. There Is No Real Dispute That the Consideration Exchanged Was Unfair

Further separating this case from those cited by the Ebers is the fact that the consideration was undisputedly unfair to EBWLC. Despite repeatedly saying "disputed" in their counterstatement, the Ebers fail to dispute the fact that the *assets* of Eber Metro transferred to Alexbay substantially exceeded the value EBWLC received in return. *See* Eber CSMF ¶¶ 64, 65, 67 (contending that considering "[t]he total asset value of $5,897,831 is wholly misleading").

To be clear, Plaintiffs do not concede that Eber Metro was insolvent. That determination requires determining the fair value of Eber Metro's assets *and* ascertaining its actual liabilities. On this, it is important to note that aside from the Lester loans, all of Eber Metro's alleged

---

[21] *Trados* recognized that "an unfair process can infect the price," but found that this was inapplicable on its facts. *Id.* at 78 (citing *Kahn v. Tremont Corp.*, 695 A.2d 422, 432 (Del. 1997)). Notably, the case did not involve aggrandizement of the controlling person, because the controlling directors were from a venture capital firm that wanted out of the business. *See id.* at 52 (the CEO was told that his "mission is to architect an M&A exit as soon as practicable"). In stark contrast to a VC firm that sold off its entire stake to "exit" the business, Lester doubled down on his investment—exchanging a secured debt interest for a subordinate equity interest—in order to obtain a greater share of any future profits—and complete control. *See also* Pls. CSMF ¶ 39 (showing the falsity of the Eber's assertion that Lester refused to loan more money).

"liabilities" were contingent on EBWLC—the primary obligor—being unable to repay them.[22] If EBWLC had received sufficient consideration for Eber Metro, it would have been a debt-free company; thus, Eber Metro's "liabilities" were phantasms.

### C. Assuming Pre-Transfer Insolvency for the Sake of Summary Judgment, Management Still Had Fiduciary Duties to Shareholders

The Ebers argue that as long as the company was performing poorly enough, they could favor Lester over everyone else because he was a creditor. To be sure, "directors of an insolvent corporation owe a fiduciary duty to *preserve* the assets of the corporation for the benefit of creditors." *Hughes v. BCI Int'l Holdings, Inc.*, 452 F.Supp.2d 290, 308 (S.D.N.Y. 2006) (emphasis added). The "trust fund doctrine" is a means of recovering shareholder distributions. It has never been used to defend giving a preference to a single creditor, let alone one who was a corporate fiduciary.

This Court should reject the Ebers' perversion of corporate law. The trust fund doctrine exists to mitigate—not eliminate—the overriding duty of corporate directors to benefit shareholders because, when a company is insolvent, it is not uncommon for the shareholders to receive distributions that prevent creditors from receiving their due; it "does not imply that the fiduciary duties owed to the shareholders evaporate." *In re Bear Stearns Litigation*, 870 N.Y.S.2d 709, 737 (N.Y.Sup. 2008). Plaintiffs have already briefed this Court on this case and several others—all of which the Ebers ignore. *See* 2d Mot. to Compel Reply 2–3.

### D. The Security Agreement and Guaranty Were Waste

The Ebers' reliance on the general obligations law abrogating the common law of contracts regarding past consideration, Eber Opp'n 19–20, is misplaced because the transaction is challenged as a breach of fiduciary duty. TAC ¶¶ 220–221; Pls. MSJ Br. 25 (challenging it as "[c]orporate waste" and therefore "void"). This case is not about whether Lester could enforce these contracts as a matter of contract law, but whether he was wrongly awarded them.

---

[22] The Ebers also disputed these purported liabilities for several years. *See* Pls. Opp'n 8–10.

## IV.   CONSULTING FOR SOUTHERN WAS DISLOYAL TO THE TRUST AND EBWLC

Lester's conclusory assertions in his affidavit fail to create a genuine dispute about any of the material facts concerning the Southern transaction. For instance, Lester says he disputes the fact that the Consulting Agreement was negotiated at the same time as the rest of the Southern deal with the Eber companies. Eber CSMF ¶ 27. They rely solely on Lester's affidavit, which is inconsistent with (if not directly contrary to) his deposition testimony. *See* L. Eber Dep. 62:19–22, 69:23–70:25. More importantly, the contemporaneous evidence shows without a shred of a doubt that the Consulting Agreement was part of the inducement offered by Southern to Lester for him to stop fighting Southern and sell it large parts of Eber Bros. *See, e.g.*, Ex. 93 at SGWS-000129–32 (February 7, 2007 letter agreement outlining initial terms, providing for the purchase of millions of dollars in assets; it includes Lester's consulting agreement as item 6).[23]

Lester's conclusory assertion that "EBWLC's Board was aware of the Consulting Agreement," 12/5/19 L. Eber Aff. ¶ 23, is too vague to create a genuine dispute, leaving so many details unanswered. Whatever that awareness was, it did not amount to consenting to the Consulting Agreement and concomitant diversion of necessary cash flow to Lester personally and inherent conflict of interest in going to work for a competitor. The relative size of EBWLC does not excuse the absence of formal approval—not when the same board expressly approved all other parts of the Southern transaction. SMF ¶ 26. Moreover, the board of EBWLC could not have approved the breach of trust resulting from Lester's additional responsibility as trustee.

## V.   GUMAER'S ESTATE LIKEWISE FAILS TO RAISE A MATERIAL FACT DISPUTE

The Estate complains about Plaintiffs' Notice not repeating the Defendants' names in its body but does not argue that this is a basis for denying relief. By contrast, the Estate's failure to

---

[23] *See also* Southern Dep. 22:18–23:17 (stating that, whenever Southern acquired a local distributor in a new state, Southern's "game plan" was to "charm[] the old owners" by offering existing management contracts "consulting, advisory, whatever it might want to be"); RS3d § 78 cmt d(1) ("A trustee engages in self-dealing and therefore normally violates the duty of loyalty by personally accepting from a third person any fee, commission, or other compensation for an act done by the trustee in connection with the administration of the trust... Accordingly, if the trustee sells trust property and accepts (and retains) a bonus from the purchaser for making the sale, the trustee commits a breach of trust..").

file a counterstatement to Plaintiffs' 56.1 Statement is grounds to find the facts undisputed. L. Civ. R. 56.1(c). Regardless, the three additional facts offered by the Estate do not rebut Plaintiffs' factual assertions about the existence of an attorney-client relationship that was never disclosed to the other Trust beneficiaries. Even drawing all reasonable inferences in Gumaer's favor, the fact that payments from the Eber companies were characterized as "consulting" fees rather than legal fees does not disprove that they were a lump sum payment for Gumaer's services as consultant, trustee, director, *and* Lester's lawyer. Pls. SMF ¶ 18.[24]

While no longer asserting "law of the case" based on the prior privilege ruling, the Estate misleadingly quotes a brief filed *before* Plaintiffs uncovered the engagement letter between Gumaer and Lester in the Ebers' document production.[25] Gumaer Opp'n 4.

### A.  Gumaer Was Clearly Prohibited from Representing Lester Personally

New York law is clear that Gumaer had to avoid creating new conflicts of interest while he was trustee. *See* Pls. Opp'n 28; RS3d § 37 ("A trustee's removal may be warranted, however, by a conflict of interests that existed but was unknown to the settlor at the time of the designation, or that came into being at a later time."); *see also* Pl. CSMF ¶ 69 (the Trust settlor, Allen Eber, did not know of the conflict because Gumaer and Lester had not yet met or had any interactions before he died). The Estate does not seem to disagree with this general principle, nor does it disagree that a conflict of interest, if it existed, constituted a breach of Gumaer's duty of undivided loyalty. Instead. the Estate contends that no conflict of interest arose from forming an attorney-client relationship with Lester personally at the same time that Gumaer was obligated to be trustee to the Trust. Gumaer Opp'n 7–8.

The Estate's argument seems to assume that Gumaer was merely a *lawyer* to the Trust and Lester personally.[26] Gumaer was not counsel to the Trust; he himself was a *trustee* with a

---

[24] The Ebers admit this by merely stating: "Disputed: The referenced letter speaks for itself." Eber CSMF ¶ 18.

[25] The engagement letter was particularly surprising given that the Ebers had not provided it to this Court themselves, despite their burden. Plaintiffs attached it to their Second Motion to Compel, at ECF No. 136-16.

[26] Plaintiffs confess they do not exactly understand the Estate's argument, which at one point seems to suggest that an attorney-client relationship cannot amount to a breach of fiduciary duty because a lawyer must advise his client to

direct duty of undivided loyalty to all the Trust beneficiaries. *See* RS3d § 78(2) ("Except in discrete circumstances, the trustee is strictly prohibited from engaging in transactions that … involve or create a conflict between the trustee's fiduciary duties and personal interests.").

A trustee must treat all beneficiaries equally. *See* RS3d § 79 ("Duty of Impartiality" requires trustees to avoid conflicts that result in preferring one beneficiary over another); RS3d § 183 (similar).[27] *See also Bowles v. Superior Court*, 44 Cal.2d 574. 588 (Cal App. 1 Dist. 1955) (holding that "no trustee can properly act for only some of the beneficiaries-he must represent them all or he cannot properly represent any of them" and that "[e]very beneficiary is entitled to trustees who are capable and impartial"). Although Gumaer was not a lawyer to the Trust, the case of *Florida Bar v. Moore*, 194 So.2d 264 (Fla. 1966), illustrates why, even if he had been just the Trust's lawyer, a conflict arose. That court found a serious conflict of interest when an attorney represented both the life tenant of a trust and the trustees simultaneously, and the trustees proceeded to deplete the trust for the benefit of the life tenant, to the detriment of the remainderman. In relevant part, the court held that the attorney should have withdrawn from the representation of the trustees based on his representation of the beneficiary. *Id.* at 269.

The conflict caused by representing Lester individually was significantly worse because Lester was not just a beneficiary, but also a co-trustee. Gumaer's one job as the third co-trustee was to keep an eye on Lester and the bank.[28] *See* RS3d § 184 ("If there are several trustees, each

---

follow the law. *Id.* at 8. It is unclear how such lofty hopes for this profession's duties eliminate a conflict of interest, as the rule they seem to espouse would apply to all attorney-client relationships and effectively nullify the rule against conflicts. To the extent the Estate contends that Gumaer represented Lester in his capacity as a trustee and was thus an attorney for the Trust itself rather than Lester personally, that is unsupported by anything in the record. The undisputed facts show that Gumaer agreed to serve "as counsel to [Lester], personally and as Chief Executive Officer," not to represent him as a trustee. *See* SMF ¶ 18 (citing Ex. 47 at 2 (agreeing)). It is doubtful that a trustee could serve as a lawyer for another co-trustee, given that co-trustees are supposed to be

[27] New York courts look to the Restatement of Trusts for guidance. *See, e.g.*, *In re Bank of New York Mellon*, 4 N.Y.S.3d 204, 208 (App. Div. 2015).

[28] Gumaer recognized his supervisory responsibility when it came to CNB. One of the most enlightening emails he sent, showing that he treated Lester differently, is one where he threatened to go to the "Monroe County Surrogate Court should it become necessary," if CNB did not give Eber-CT more time to find a new banking relationship. Ex. 102. This was ironically sent *after* Lester filed the Alexbay action—but before Gumaer knew about it. SMF ¶ 56. Lester's desired transfer would divest the Trust of all of its interest in Eber-CT anyway, and thus prevent the Surrogate Court from having jurisdiction over CNB's conduct. Worse, while Gumaer thought that the "fiduciary relationship" created by the Trust required CNB to give Eber-CT more time than the debt instruments provided , Ex.

is under a duty to … use reasonable care to prevent a co-trustee from committing a breach of trust, and if necessary to compel a co-trustee to redress a breach of trust."). By entering into a separate fiduciary relationship with Lester, one in which he committed to maintain his confidences, among other duties, Gumaer placed himself in an impossibly conflicted position. Unsurprisingly, the Estate offers no indication that any court has ever condoned a trustee himself entering into an attorney-client relationship with *either* a beneficiary or a co-trustee, let alone with someone who is both *and* managing the Trust's business besides. Such a relationship creates an obvious conflict of interest, inconsistent with the duty of undivided loyalty.

### B.  Independent Contractors and Trustees Are on Opposite Ends of the Spectrum

The Estate asks this Court to create new law and deem *trustees* equivalent to *independent contractors* for purposes of the faithless servant doctrine. Gumaer Opp'n 9. It relies on *Fed. Ins. Co. v. Mertz*, which "decline[d] to extend the faithless servant doctrine to independent contractors who owe a duty of loyalty to, but have no agency or employment relationship with, a defendant." 2015 WL 5769945, at *5 (S.D.N.Y. Sept. 29, 2015). In a subsequent opinion, Judge Ramon distinguished the situation from those where "the fiduciary relationship is one created as a matter of law and therefore involves a higher degree of accountability, such as lawyer-client, ***trustee-trust/beneficiary***, shareholder-officer/director, employer-employee, etc." *Fed. Ins. Co. v. Mertz*, 2016 WL 164618, at *3 (S.D.N.Y. Jan. 12, 2016) (emphasis added). The only similarity between contractors and trustees is that they are not subject to control. But with respect to both the duty of loyalty, and their respective power to bind a principal, trustees and independent contractors are on opposite ends of the agency spectrum: A contractor is not subject to the principal's control like an employee and has no power to bind a principal; a trustee essentially *is the principal*. *Brown v. Bedell*, 263 NY 177, 186 (1934).

---

102, there is no record of him saying the same thing to Lester, who undisputedly never even considered extending the maturity date on the debt to him. *See* Eber CSMF ¶ 46 (failing to dispute this fact, and instead arguing that "Lester was under no obligation to extend the maturity date on his loans").

Notably, the Estate fails to suggest any alternative means of discouraging a trustee from entering into impermissible conflicts of interest.[29] Disgorging compensation for the full period when the conflict demonstrably existed is the only appropriate remedy consistent with New York's strong public policy. The New York Court of Appeals has expressly held that a breach of fiduciary duty claim does not require showing of damages, because "the function of such an action, unlike an ordinary tort or contract case, is not merely to *compensate* the plaintiff for wrongs committed by the defendant but, as this court declared many years ago, 'to *prevent* them, by removing from agents and trustees all inducement to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency or trust relates.'" *Diamond v. Oreamuno*, 24 N.Y.2d 494, 498 (1969) (emphasis in original) (quoting *Dutton v. Willner*, 52 N. Y. 312, 319 (1873)).) This preventative "function" of a breach of fiduciary duty claim would be eviscerated if a disloyal trustee could retain compensation.

Moreover, exempting the trustee from the same consequences that would apply to a mere employee is contrary to New York's view of the trustee as having a duty of "undivided loyalty," stronger than the ordinary duty of loyalty and requiring more than good faith.

New York's faithless servant doctrine is implicated by the failure to disclose any interest which would naturally influence an agent or trustee's conduct in dealing with the subject of the agency or trust. *Murray v. Beard*, 102 N.Y. 505, 508 (1886). Even if New York's faithless servant doctrine did not apply to trustees, disgorgement of a trustee's compensation is a traditional equitable remedy for a breach of trust.[30]

## CONCLUSION

The Court should enter partial judgment in Plaintiffs' favor.

---

[29] Merely removing the trustee after the conflict is later discovered would be no disincentive. If anything, it would encourage greater efforts to conceal conflicts, rather than avoid them.

[30] *See Dabney v. Chase Nat. Bank of City of New York*, 196 F.2d 668, 673 (2d Cir. 1952) ("[C]ourts have denied any compensation for a trustee's services, if he has been guilty of a breach of trust; and have even refused to allow him his expenses, except in so far as they have benefitted the estate); RS3d § 95 cmt c (in addition to surcharging a trustee for a breach of trust, even if "the transaction was affirmed or caused no loss, a court a may impose one or more other remedies, as appropriate to the circumstances, for the trustee's misconduct" including "denying or reducing the trustee's compensation").

Respectfully submitted,

/s Brian C. Brook
Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Facsimile: (646) 257-2887
Brian@brook-law.com

*Counsel for Plaintiffs Daniel Kleeberg, Lisa Stein,
and Audrey Hays*

Dated: December 23, 2019

17