|  Page 62 | Page 64 |
|---|---|
| L. Eber | L. Eber |

**Page 62**

1  L. Eber
2  A.  If that's what it says, yes.
3  Q.  What was Southern Wine and Spirits
4  Upstate Inc.?
5  A.  That would be their upstate business
6  as opposed to Metropolitan New York.
7  Q.  Earlier you referred to a company
8  called Southern Glazer.
9      What is that?
10 A.  They merged with Glazer out of Dallas,
11 Texas.
12 Q.  When did that merger occur?
13 A.  A couple of years ago I believe.
14 Q.  But for all intents and purposes in
15 terms of your relationship with that, with the
16 Southern company, the merger did not, with Glazer
17 did not affect that relationship; correct?
18 A.  No.
19 Q.  How was the consulting agreement
20 Exhibit 27 negotiated?
21 A.  You have to ask a lawyer.  Probably
22 Pat Dalton.
23 Q.  So Pat Dalton negotiated this for you?
24 A.  I would -- I believe so.  I can't
25 think of anyone else.

**Page 63**

1  L. Eber
2  Q.  Did you pay Pat Dalton for negotiating
3  this agreement yourself?
4  A.  I believe he billed the company.
5  Q.  And why did he bill the company for
6  doing work to negotiate an agreement between you
7  personally?
8  A.  I don't remember who paid him.
9  Q.  But is it fair to say you don't
10 remember paying Pat Dalton yourself; correct?
11     MR. RAMSEY:  Form.
12 A.  I just don't remember.  It's possible
13 but I don't remember who paid him.
14 Q.  And just to be totally clear, if you
15 look at the last page 9, what's listed page 9 of 9
16 that's your signature; correct?  There are
17 two-page 9s.
18     MR. RAMSEY:  (Indicating.)
19 A.  Yes, the first one.
20 Q.  That is your signature?
21 A.  Yes.
22 Q.  How was -- let's step back.
23     So this was an agreement originally
24 drafted with a five year term; correct?
25 A.  Yes.

**Page 64**

1  L. Eber
2  Q.  Why was it limited to five years?
3  A.  That's what they would give me because
4  I needed a job and they had worked with us to help
5  us stay out of bankruptcy and I felt an obligation
6  to work with them and they thought that was a fair
7  amount of time and gave me the time to set up a
8  structure for them of lobbyists with the state.  I
9  am a lobbyist myself and to represent them in the
10 legislature with the State Liquor Authority and
11 the Governor's Office.
12 Q.  Why do you say that you needed a job?
13 A.  Everyone needs a job.  We lost the
14 business.  We lost everything in New York.
15 Q.  You still had a job with Eber
16 Connecticut; correct?
17 A.  Eber Connecticut was not in very good
18 condition at that time.
19     MR. BROOK:  Let's go ahead and get
20     another exhibit going here.  Mark this as
21     Plaintiffs' 28.
22     (Plaintiffs' Exhibit 28, a series of
23     W-2s that were produced by the parties in
24     discovery Bates numbers EB 00021420 through
25     428, marked for identification, as of this

**Page 65**

1  L. Eber
2  date.)
3  Q.  Plaintiffs' 28 is a series of W-2s
4  that were produced by the Eber parties in
5  discovery bearing Bates numbers EB 00021420
6  through 428.
7      Do you recognize the documents that
8  are copied off of this exhibit?
9  A.  Yes.
10 Q.  What are they?
11 A.  W-2s.
12 Q.  And do you see on the first page it
13 has W-2s for the years 2007, 2008 and 2009?
14 A.  Mm-hmm.
15     MR. RAMSEY:  Yes?
16 Q.  Is that a yes?
17 A.  Yes.
18 Q.  And so is it correct that according to
19 this exhibit Eber Brothers Wine and Liquor Corp.
20 paid you 303,021 dollars for the year 2007?
21 A.  Yes.
22 Q.  So that was the year when the
23 consulting agreement we were just looking at was
24 executed; correct?
25 A.  Yes.

Page 146

1     L. Eber
2  the stock?
3     A.  I don't know.
4     Q.  Was it your understanding as a result
5  of the termination of the Allen Eber Trust and
6  distribution of assets by Canandaigua National
7  Bank you yourself became a voting common
8  shareholder of Eber Brothers and Co., Inc.?
9        MR. RAMSEY:  Form.
10    A.  I never -- I don't know.  I don't
11 remember conversations on that.  I just don't
12 remember.
13    Q.  On this document here in this letter
14 it refers to copies of stock powers being sent and
15 then I will just read the whole paragraph into the
16 record so we are all clear.  It says "Enclosed
17 please find your client's respective copies of the
18 stock powers transferring their shares of Eber
19 Brothers and Co., Inc. pursuant to Canandaigua
20 National Bank and Trust Company's distribution
21 schedule.  As the bank never had possession of the
22 company's stock book or other corporate documents
23 and despite requests, the bank has not been
24 provided with the same.  We were required to
25 complete these transfers via these stock powers as

Page 147

1     L. Eber
2  opposed to issuing new stock certificates.  We are
3  currently retaining the original stock powers
4  which I have affixed to each original stock
5  certificate that the bank received when it became
6  successor co-trustee.  We will continue to do so
7  unless and until such time as we are advised as to
8  whom these originals should be provided given the
9  apparent inability to locate the company's stock
10 book and affiliated records.  It is my
11 understanding that the securities were transferred
12 to your client's respective financial institutions
13 on September 29th and that the remaining assets
14 were electronically transferred last week as
15 well."
16       Did I read that correctly?
17    A.  Yes.
18    Q.  And so do you know what this letter
19 was referring to about the apparent inability to
20 locate the company's stock book?
21    A.  What it says there.  They couldn't
22 find it.
23    Q.  What is a stock book?
24    A.  I don't know.
25    Q.  How does new stock get issued by a

Page 148

1     L. Eber
2  company?
3     A.  I am not involved.  I don't know.
4     Q.  Whose responsibility was it for Eber
5  Brothers and Co., Inc. to take care of the stock
6  book registration of stockholders and issuance of
7  stock certificates?
8     A.  I can't remember.
9     Q.  Do you know where the stock book for
10 Eber Brothers and Co., Inc. currently is?
11    A.  No.
12    Q.  Is it your understanding that the
13 stock book for Eber Brothers and Co., Inc. was
14 misplaced for a period of time?
15    A.  I do not know.
16       MR. BROOK:  Let's go to the next
17    Exhibit 39.
18       (Plaintiffs' Exhibit 39, a four-page
19    letter dated November 5, 2018 by Paul
20    Keneally addressed to Magistrate Judge
21    Katherine Parker, marked for identification,
22    as of this date.)
23    Q.  Exhibit 39 is a four-page letter dated
24 November 5, 2018 by Paul Keneally addressed to
25 Magistrate Judge Katherine Parker.

Page 149

1     L. Eber
2       Do you recognize this document?
3     A.  I don't remember seeing it.  Yeah, I
4  probably did.  I probably was copied and got a
5  copy of it.  I just don't remember.
6     Q.  Paul Keneally is the lawyer for you,
7  your daughter and the Eber companies in this
8  litigation; correct?
9     A.  Yes.
10    Q.  And I would like to draw your
11 attention to paragraph 3 on this first page.  I
12 will read it into the record.  Mr. Keneally wrote
13 to the court in response to a letter by me "It is
14 not true that the corporate stock register was
15 quote lost.  The register is maintained by the
16 corporate secretary Wendy Eber who is solely
17 responsible for registering valid transfers of
18 stock in it.  Neither the Allen Eber Trust,
19 defined as the trust, nor CNB as one of its
20 trustees has any responsibility or role in
21 registering stock transfers.  The corporate
22 secretary never told CNB that the register was
23 lost."
24       Did you see that?
25    A.  Yes.

38 (Pages 146 - 149)

```
                                                      Page 150                                                        Page 152
 1            L. Eber                                             1            L. Eber
 2     Q.   And did you authorize Mr. Keneally to                 2   daughter Wendy as well as you?
 3   make this statement?                                         3     A.   He was my lawyer.
 4         MR. RAMSEY:  Form.                                     4     Q.   Now do you see the second paragraph
 5     A.   He is my lawyer.                                      5   here.  It refers to first two words say my
 6     Q.   And does that refresh your                            6   clients.
 7   recollection as to whose responsibility it was to            7         Do you see that plural?
 8   deal with the stock book and issue stock                     8     A.   Yes.
 9   certificates on behalf of Eber Brothers and Co.,             9     Q.   Who else --
10   Inc.?                                                       10     A.   It would be my daughter.
11         MR. RAMSEY:  Form.                                    11     Q.   I would like to point your attention
12     A.   If that's what he says that's what it                12   now to the substance of the first paragraph which
13   is.  He represents me.                                      13   I will also read for the record.  "Dear Lorisa, I
14     Q.   So do you know how looking back at                   14   trust you received my e-mail of yesterday
15   Exhibit 38, do you know why the lawyers for                 15   afternoon regarding your inquiry as to the
16   Canandaigua National Bank appeared to believe that          16   corporate stock book of Eber Brothers and Co.,
17   the stock book was not able to be located as of             17   Inc.  I am fairly confident that they do not have
18   October 2017?                                               18   it.  However, to be sure, Wendy will be in
19     A.   No.                                                  19   Rochester for the fourth of July weekend and will
20     Q.   And to the best of your knowledge, has               20   double check."
21   Wendy Eber always been in possession of the                 21         Do you see that?
22   company's stock book?                                       22     A.   Yes.
23         MR. RAMSEY:  Form.                                    23     Q.   So your lawyer told counsel for
24     A.   I don't know.                                        24   Canandaigua National Bank that you and Wendy could
25         MR. BROOK:  Let's do two more                         25   not locate the corporate stock book; correct?

                                                      Page 151                                                        Page 153
 1            L. Eber                                             1            L. Eber
 2   exhibits.  This is 40 and 41.                                2         MR. RAMSEY:  Form.
 3         (Plaintiffs' Exhibit 40, a e-mail                      3     A.   I don't remember that.  It's very
 4   dated June 2, 2017 from Jim Vazzana to                       4   confusing and I just don't remember.
 5   Lorisa LaRocca Bates number CNB-PL 0022,                     5     Q.   Did you have an understanding as to
 6   marked for identification, as of this date.)                 6   why Canandaigua National Bank wanted the corporate
 7         (Plaintiffs' Exhibit 41, an e-mail                     7   stock book?
 8   dated August 18, 2017 from Jim Vazzana to                    8     A.   No.
 9   Lorisa LaRocca, marked for identification,                   9     Q.   Please turn to Exhibit 41 which is an
10   as of this date.)                                           10   e-mail dated August 18, 2017 again from Jim
11     Q.   Exhibit 40 is a e-mail dated June 2,                 11   Vazzana to Lorisa LaRocca this time with you and
12   2017 from Jim Vazzana to Lorisa LaRocca Bates               12   your daughter Wendy copied on it.
13   number CNB-PL 0022.                                         13         Do you see that?
14         Do you recognize that e-mail?                         14     A.   Yes.
15         MR. RAMSEY:  You are not suggesting he                15     Q.   This has Bates numbers CNB-PL 0006.
16   was copied on it; right?                                    16   And this e-mail reads "Lorisa, have you or your
17         MR. BROOK:  No.                                       17   client ever found the stock register on Eber
18     A.   I'm not.  I wasn't copied.                           18   Brothers Co.  My client indicated in June that she
19     Q.   Nonetheless, are you aware that your                 19   would make a special trip to Rochester in July to
20   lawyer sent an e-mail along these lines to Lorisa           20   see if she could find them.  Please advise."
21   LaRocca who was representing Canandaigua National           21         Do you see that?
22   Bank?                                                       22     A.   Yes.
23     A.   You know, I think it's possible.  I                  23     Q.   Do you remember this e-mail?
24   don't remember but it is very possible.                     24     A.   I got it.
25     Q.   Was Jim Vazzana representing your                    25     Q.   Do you remember seeing it?
```

39 (Pages 150 - 153)

L. Eber

any debts that were owed directly by Eber Connecticut; correct?

MR. RAMSEY: Form.

A. I don't -- I can't give you an answer. I don't -- I would like to give you an answer but I don't have an answer for you.

Q. So was it your understanding that Eber Connecticut was weighed down by the debt of Eber Brothers Wine and Liquor Corp.?

MR. RAMSEY: Form.

A. Eber Wine and Liquor Corp. yeah, it could have -- it didn't help it. If it cleaned up the debt and made a cleaner statement so we could go to a bank and they could lend us money based on the inventory or receivables of Connecticut.

Q. And what were the debts that Eber Brothers Wine and Liquor Corp. had at the time that you were trying to clean up the balance sheet?

A. I don't remember.

Q. There was PBGC; right?

A. Yes.

Q. There was the Teamsters?

A. Yes.

L. Eber

Q. There was Harris Beach?

A. Yes.

Q. Anyone else?

A. Benderson.

Q. What is Benderson?

A. A real estate company.

Q. How much was owed to them approximately?

A. It was over two hundred thousand I believe at the time.

Q. Anyone else?

A. There could have been. I just can't remember now.

Q. At some point in February 2012 you through Alexbay filed a lawsuit against Eber Brothers Wine and Liquor Corp.; correct?

A. I don't remember.

MR. BROOK: Let's go to our next exhibit. Up to 44 I think.

(Plaintiffs' Exhibit 44, a copy of a summons and complaint dated February 21, 2012 bearing Bates number KSH 00070 through 83, marked for identification, as of this date.)

L. Eber

Q. Exhibit 44 is a copy of a summons and complaint dated February 21, 2012 bearing Bates number KSH 00070 through 83.

Do you recognize this document?

A. Yes.

Q. What is it?

A. It is summons before a State Supreme Court. It is on an action for the foreclosure.

Q. Who is the listed plaintiff here?

A. Alexbay.

Q. That's your company; right?

A. Yes.

Q. Who is the lawsuit against?

A. Eber Wine and Liquor, Southern Eber Wine and Liquor Metro, John Doe et cetera.

Q. So does this refresh your recollection that in February 2012 you did authorize the filing of a lawsuit on behalf of Alexbay against Eber Brothers Wine and Liquor Corp.?

A. Yes.

Q. At the time this lawsuit was filed, had you resigned as president of Eber Brothers Wine and Liquor Corp.?

A. I believe so.

L. Eber

Q. How did you resign? How did you go about doing this?

A. I believe there was a board meeting and I submitted my resignation to it. I don't actually remember going. You know, how many years ago that was. It was when, in 2012 or before that.

Q. It is your recollection that it happened at a board meeting; correct?

A. I believe so, yes. To the best of my recollection.

Q. Do you recall any board meetings of Eber Brothers Wine and Liquor Corp. within the two or three month period before this document Exhibit 44 was filed?

A. I don't remember. You know, it could have been at a board meeting. I could have just submitted it. Going back I don't remember.

Q. What do you mean by submitted it, what is it?

A. Submitted a letter of resignation.

Q. Do you recall ever signing a letter of resignation?

A. I can't remember. I could have, but I

Page 194

L. Eber

1  don't remember the whole scenario of what
2  happened.
3     Q.  It had to have been a pretty big deal
4  when you resigned as president of your father's
5  company; correct?
6        MR. CALIHAN:  Objection to form.
7        MR. RAMSEY:  Form.
8     Q.  Was that an emotional moment for you?
9     A.  With what we have been through nothing
10 is emotional anymore.
11    Q.  So this was just strictly business; is
12 that right?
13       MR. RAMSEY:  Form.
14    Q.  You are nodding.
15       Is that a yes?
16    A.  It was part of the nightmare that was
17 going on with all these companies and trying to
18 keep them from being liquidated to survive.
19    Q.  What was your understanding as to what
20 might cause the business to be liquidated since
21 you were afraid of that?
22    A.  Lack of funds to pay the bills, pay
23 the suppliers and you are out.
24    Q.  So it was your understanding that

Page 195

L. Eber

1  there were certain creditors of the company that
2  could have forced a liquidation?
3     A.  Possibly that or we had to get a bank,
4  we had to get bank loans.  We had to get a bank
5  that would give us money to survive because you
6  saw early on Wells Fargo foreclosed on it and that
7  put us right out of business in New York.
8     Q.  When was that?
9     A.  It was in two thousand and what, five,
10 six.  I don't have the exact date.
11    Q.  So you are referring to Wells Fargo
12 foreclosing on Eber Metro?
13    A.  On Eber period.  All the Eber
14 companies.
15    Q.  Was there actually like a judicial
16 proceeding relating to that?
17    A.  Not that I know of.  They just
18 notified us that our loan was in default and we
19 were in a workout.
20    Q.  So it was something short of actually
21 initiating foreclosure proceedings in court; is
22 that right?
23    A.  I don't remember being in court on it.
24    Q.  And then you found Canandaigua

Page 196

L. Eber

1  National Bank to replace Wells Fargo?
2     A.  We found them for a small amount.  I
3  think it was a million five.  That wasn't enough.
4  We needed more and we needed something that wasn't
5  renewed every month or so.  We needed somebody to
6  give us a commitment and that's why we had to
7  clean up the balance sheet to make it look like
8  for a bank to want to loan us money.
9     Q.  Returning to Exhibit 44 in front of
10 you.
11       Did you review this before it was
12 filed?
13    A.  I don't remember, but I must have.
14 You know, I can't remember all these things 2012.
15       MR. RAMSEY:  Just wait for a question.
16    Q.  So why did you file this lawsuit?
17    A.  Why did I file what lawsuit?
18    Q.  The one that we are looking at here
19 Exhibit 44.
20    A.  Oh, the foreclosure?
21    Q.  Yes.
22       MR. CALIHAN:  Objection to form.
23       MR. RAMSEY:  Form.
24    A.  I filed it to solidify showing that I

Page 197

L. Eber

1  wasn't doing anything underhanded.  There would be
2  a public record of what I had done on advice of
3  counsel.
4     Q.  Which counsel was that?
5     A.  Michael Beyma.
6     Q.  And was it your understanding from the
7  outset that Eber Wine and Liquor and Eber Metro
8  were going to consent to what you requested?
9     A.  We filed it and it took its course.
10    Q.  Had you discussed the lawsuit before
11 you filed it with Wendy, your daughter?
12    A.  I probably had a discussion with her
13 of it.  I don't remember.  I was on advice.  My
14 discussion was with Michael Beyma.
15    Q.  Was Michael Beyma also representing
16 Eber Brothers Wine and Liquor at the time?
17    A.  I don't think so.  I think he just --
18 I don't remember.  I don't remember that, but I
19 remember that's who I worked with the lawyer on
20 this.  He had another fellow Brueckner, if you
21 look at the bottom, who wasn't with them anymore.
22    Q.  Who paid the legal fees of Michael
23 Beyma and Brueckner?
24    A.  I did.

|  | Page 250 |
|---|---|
| 1 | L. Eber |
| 2 | statements value the equity of Eber Connecticut |
| 3 | in late 2011 and early 2012? |
| 4 | A.  No. |
| 5 | Q.  Do you think that information is |
| 6 | material to understanding what the value of Eber |
| 7 | Connecticut might have been at that time? |
| 8 | MR. RAMSEY:  Form. |
| 9 | A.  I think you would have to ask an |
| 10 | accountant for that, of that.  I can't answer for |
| 11 | you. |
| 12 | Q.  I want to ask you now about your |
| 13 | relationship with Mike Gumaer. |
| 14 | When did you first meet him? |
| 15 | A.  After my father died. |
| 16 | Q.  So you had not interacted with him |
| 17 | before then? |
| 18 | A.  Never. |
| 19 | Q.  What was the nature of your |
| 20 | relationship with Mike Gumaer during the first few |
| 21 | years after your father died? |
| 22 | A.  He worked, I worked very close with |
| 23 | him.  He educated me to the trust and to |
| 24 | transactions you know in settling an estate, my |
| 25 | father's estate. |

|  | Page 251 |
|---|---|
| 1 | L. Eber |
| 2 | Q.  At any point in time or -- withdrawn. |
| 3 | At that time Mike Gumaer was a partner |
| 4 | in the law firm of Nelson Hargrave. |
| 5 | A.  Nixon. |
| 6 | Q.  Nixon Hargrave? |
| 7 | A.  Yes. |
| 8 | Q.  Did you or Eber Brothers retain him as |
| 9 | a lawyer for the company? |
| 10 | A.  Yes. |
| 11 | Q.  Did you ever retain him as your |
| 12 | personal attorney? |
| 13 | A.  I used him as a personal attorney. |
| 14 | Q.  When did you start doing that? |
| 15 | A.  After my father died. |
| 16 | Q.  What kinds of things did you retain |
| 17 | him for? |
| 18 | A.  He advised me legally.  Send me |
| 19 | different law specialists in his firm or what have |
| 20 | you.  Everything.  Anything I had I needed a legal |
| 21 | opinion on I would go through him. |
| 22 | Q.  And for personal matters? |
| 23 | A.  Both personal and business, yes. |
| 24 | Q.  So for personal matters give an |
| 25 | example of something where you relied on Mr. |

|  | Page 252 |
|---|---|
| 1 | L. Eber |
| 2 | Gumaer's legal advice. |
| 3 | A.  A will. |
| 4 | Q.  Did you pay him anything for that? |
| 5 | A.  I don't remember if he could have sent |
| 6 | me to someone else in his firm that charged me for |
| 7 | it. |
| 8 | Q.  Was Mr. Gumaer compensated for his |
| 9 | role as a co-trustee of the trust? |
| 10 | A.  He didn't take any money from the |
| 11 | trust.  He was paid by the company and the reason |
| 12 | he didn't take any money from the trust because it |
| 13 | would have reduced the income to the beneficiaries |
| 14 | of the trust.  So he was paid by the company. |
| 15 | Q.  Was there ever any sort of |
| 16 | documentation where Mr. Gumaer agreed to waive his |
| 17 | right to compensation as a director, I meant a |
| 18 | trustee?  I am correcting myself. |
| 19 | A.  I don't believe so.  In my father's |
| 20 | will I waived my compensation as an executor of |
| 21 | his estate. |
| 22 | Q.  What do you mean you waived? |
| 23 | A.  I served for free where the other |
| 24 | executors, the bank and Mr. Gumaer, were paid, you |
| 25 | know, whatever the law was. |

|  | Page 253 |
|---|---|
| 1 | L. Eber |
| 2 | Q.  Was that your decision to serve for |
| 3 | free? |
| 4 | A.  It was my father's wish and I observed |
| 5 | it. |
| 6 | Q.  When did Mr. Gumaer retire from Nixon |
| 7 | Hargrave or Nixon Peabody as it became? |
| 8 | MR. CALIHAN:  Objection to form. |
| 9 | A.  It is in there.  I don't remember the |
| 10 | date. |
| 11 | MR. BROOK:  What's the basis for the |
| 12 | objection? |
| 13 | MR. CALIHAN:  I am not sure which |
| 14 | relationship with the firm you are referring |
| 15 | to.  I think there were several but I am |
| 16 | not -- |
| 17 | MR. BROOK:  Understood. |
| 18 | A.  Thank you. |
| 19 | MR. BROOK:  Let's go to another |
| 20 | exhibit.  This is 47. |
| 21 | (Plaintiffs' Exhibit 47, a two-page |
| 22 | letter on the letterhead for Elliot W. |
| 23 | Gumaer, Jr. dated January 2, 2001 Bates |
| 24 | stamped January 8, 2001 and Bates number EB |
| 25 | 00001556 to 57, marked for identification, |

| | |
|---|---|
| Page 466<br>1            L. EBER<br>2  competency that he had been before?<br>3      A    I believe it's taken a lot out of him and<br>4  slowed him up.<br>5      Q    And you were relying on others at that<br>6  point.<br>7      A    Others, but I always had a lot of respect<br>8  for Mike.<br>9      Q    And when you said that you continued to<br>10 view him as the attorney for you up until the time<br>11 of his death, is it fair to say that that testimony<br>12 by you reflected a sense of loyalty to Mike Gumaer<br>13 as much as anything else?<br>14     A    Loyalty and respect.<br>15          MR. CALIHAN:  That's all questions that I<br>16     have.<br>17 CONTINUED EXAMINATION BY MR. BROOK:<br>18     Q    I do have another document that was<br>19 produced from the last time you were here.  This the<br>20 was previously marked as Plaintiff's Exhibit 94.<br>21 This is a set of documents, regarding looks like<br>22 payments that were made to you by Southern Wine &<br>23 Spirits, LLC.  Do you recognize those documents?<br>24     A    Yes.<br>25     Q    What are they? | Page 468<br>1            L. EBER<br>2      Q    And what kind of credit card is that?<br>3      A    My ordinary personal one.<br>4      Q    So it's a --<br>5      A    It's not a corporate card.  It's my own<br>6  personal one.<br>7      Q    And do you use that for anything other<br>8  than Southern expenses?<br>9      A    Not usually.<br>10     Q    But sometimes?<br>11     A    It depends.  If I lost another credit card<br>12 I might use it but I try to keep it with the<br>13 Southern expenses.<br>14     Q    Approximately how much in expenses -- let<br>15 me withdraw that.  In connection with your work for<br>16 Southern have you always tracked expenses basically<br>17 the same way?<br>18     A    Yes.<br>19     Q    And do you bill Southern for all the<br>20 expenses that you incur?<br>21          MR. RAMSEY:  Form.<br>22     A    Expenses I incur on their business.<br>23     Q    On their business.  Are there any expenses<br>24 you incur in connection with your consulting work<br>25 that you don't bill to Southern? |
| Page 467<br>1            L. EBER<br>2      A    They're what they are.  They're paying for<br>3  services that I have provided them.<br>4      Q    And they're reimbursing you for expenses?<br>5      A    Yes.<br>6      Q    What kind of expenses did you incur in<br>7  connection with your consulting work for Southern?<br>8      A    Travel to New York to Syosset, Long<br>9  Island, to 800 3rd Avenue, to Albany, to Miami for<br>10 meetings, to legislative districts throughout New<br>11 York State.<br>12     Q    And how did you keep track of those<br>13 expenses?<br>14     A    I filed reports.  I get receipts and filed<br>15 reports and send them into him.<br>16     Q    Did you also incur expenses in connection<br>17 with your work for Eber Connecticut?<br>18     A    Yes.<br>19     Q    How did you keep track of those expense?<br>20     A    Same way.<br>21     Q    Do you have separate credit cards?<br>22     A    Yes.<br>23     Q    Did you have a specific credit card that<br>24 you use just for Southern?<br>25     A    Yes. | Page 469<br>1            L. EBER<br>2      A    That I don't bill?<br>3      Q    Yeah.<br>4      A    There are things that I do for<br>5  governmental work that I feel helps my position as a<br>6  lobbyist and a governmental affairs person that I<br>7  paid for personally.<br>8      Q    What kind of expenses are those?<br>9      A    Donations to legislators or seminar if I<br>10 went to or meetings, or what have you, that could<br>11 help me.<br>12     Q    Have you acquired any significant assets<br>13 for your business, for your consulting business?<br>14     A    Assets from my consulting?<br>15     Q    Yes.<br>16     A    No.<br>17     Q    So you don't have a car specific to your<br>18 consulting business?<br>19     A    No.<br>20     Q    And according to these documents you<br>21 received reimbursement for $118,371.21 expenses from<br>22 Southern in the year 2018.  Does that sound about<br>23 right?<br>24     A    If that's what it says.<br>25     Q    Approximately how much time did you spend |

```
                                                Page 470                                                Page 472
 1              L. EBER                                  1              L. EBER
 2   doing consulting work for Southern in 2018?         2      Q    What import company was that?
 3      A    I don't remember the time.  It's whatever   3      A    Part -- it was Slocum.  It was just -- the
 4   had to be done.  I could work 24 hours.  I could    4   company was part of Slocum.
 5   work a whole week.  I could work two, three days.   5      Q    It was a Slocum entity?
 6   It depends what's going on.                         6      A    It was part of -- it was not an entity.
 7      Q    Do you ever have conflicts in terms of      7   It was just lines that Slocum had that they sold
 8   what work to do for Southern versus Eber            8   some of the wine in New York.  That ceased.
 9   Connecticut?                                        9      Q    When did that cease?
10           MR. RAMSEY:  Form.                         10      A    Quite a few years ago, it lost a lot of
11      A    Sometimes.                                 11   money.
12      Q    And how do you --                          12      Q    Why did it cease?
13      A    I do the best I can to do both.            13      A    Because it lost a lot of money.
14      Q    Would you say you do more work for         14      Q    So it was a decision that you made to stop
15   Southern or more work from Eber Connecticut?       15   that?
16           MR. RAMSEY:  Form.                         16      A    Yes.
17      A    I think it's a moot question.  I couldn't  17      Q    Okay.  Was it roughly at the same time
18   answer it.  I do what I have to for Southern and I 18   that you started consulting for Southern?
19   do it when I'm needed at Connecticut.              19      A    No.
20      Q    Has working for Southern impacted your     20      Q    So help me understand then, time wise,
21   ability to provide services for Eber Connecticut?  21   approximately when it was that the sales in New York
22           MR. RAMSEY:  Form.                         22   stopped?
23      A    No, it hasn't impacted it.  It's helped    23      A    I don't remember the exact date but it was
24   Connecticut.                                       24   not profitable and Connecticut needed to watch
25      Q    How so?                                    25   Connecticut.  The employees, I wanted them all to

                                                Page 471                                                Page 473
 1              L. EBER                                  1              L. EBER
 2      A    There are suppliers that they have that I   2   spend their time not sending, selling wine to other
 3   have been able to get to know and been able to get  3   states but spend their time in building the
 4   their lines for Connecticut.                        4   Connecticut business.
 5      Q    Which suppliers?                            5      Q    I'm just trying to get, you know, a
 6      A    I don't remember the names but there are a  6   ballpark sense, you best recollection?
 7   bunch of them.                                      7      A    I couldn't give you the date.  I just
 8      Q    Can you name even one?                      8   don't remember it.
 9           MR. RAMSEY:  Form.                          9      Q    Was it before you started consulting for
10      A    I just -- I don't want to get the wrong.   10   Southern?
11           MR. RAMSEY:  If you remember you remember. 11           MR. RAMSEY:  Form.
12      A    I can't remember there are -- it isn't     12      A    Before I started?
13   exact.  It's a relationship that they know you and 13      Q    Yes, that you stopped.  Did Eber
14   they come and see you because I met them in New York 14 Connecticut stop selling in New York before --
15   and talked to them.                                15      A    No, it was after.
16      Q    And just I want to clarify something that  16      Q    Approximately how long after?
17   came up in the deposition of Bob Lowenthal.        17      A    I don't remember.
18   (phonetic)  Does Eber Connecticut have any business 18     Q    Years after?
19   in New York?                                       19           MR. RAMSEY:  Form.
20      A    Not anymore.                               20      A    Could have been a couple of years.  I
21      Q    Did it at one point in time?               21   don't remember.
22      A    They did.                                  22      Q    Did you ever discuss Eber Connecticut's
23      Q    When was that?                             23   sales in New York with Southern?
24      A    When we first took it over they had an     24      A    No.
25   import company that they sold wine to New York.    25      Q    Did Eber Connecticut sales in New York
```