Page 1

1

2       UNITED STATES DISTRICT COURT

3       SOUTHERN DISTRICT OF NEW YORK

4       Civil Action No. 16-cv-951 (LAK)

5       -------------------------------------x

6       DANIEL KLEEBERG, LISA STEIN and

7       AUDREY HAYS,

8                              Plaintiffs,

9                 -against-

10      LESTER EBER; ALEXBAY, LLC f/k/a LESTER

11      EBER, LLC; CANANDAIGUA NATIONAL

12      CORPORATION d/b/a CANANDAIGUA NATIONAL

13      BANK & TRUST; ELLIOT W. GUMAER, JR.;

14      EBER BROS. & CO., INC.; EBER BROS.

15      WINE AND LIQUOR CORPORATION; EBER

16      BROS. WINE AND LIQUOR METRO, INC.,

17      EBER-CONNECTICUT, LLC; and WENDY EBER,

18                             Defendants.

19      -------------------------------------x

20

21                             January 24, 2019

22

23        Videotaped deposition of LESTER EBER

24

25

**PLAINTIFF'S EXHIBIT**

**176**

Page 2

```
1
2          January 24, 2019
3          9:33 a.m.
4
5
6          Videotaped deposition of LESTER EBER,
7   held at the offices of Veritext New York City,
8   1250 Broadway, New York, New York, pursuant to
9   Notice, before Lynne D. Metz, a Shorthand Reporter
10  and Notary Public of the State of New York.
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
1
2   A P P E A R A N C E S: (Cont'd):
3
4          JOHN HERBERT, ESQ. (Telephonically)
5          Attorneys for Defendants LESTER EBER and
6      WENDY EBER
7          P.O. Box 1031
8          Tiburone, California 94920
9
10
11      CALIHAN LAW PLLC
12      Attorneys for Defendant Estate of ELLIOT W.
13      GUMAER
14          16 East Main Street
15          Rochester, New York 14614
16      BY:   ROBERT B. CALIHAN, ESQ.
17
18
19      ALSO PRESENT:
20          Wayne Saline - Videographer
21          Dan Kleeberg
22
23
24
25
```

Page 3

```
1
2   A P P E A R A N C E S:
3
4      BROOK & ASSOCIATES PLLC
5      Attorneys for Plaintiffs
6          100 Church Street
7          8th Floor
8          New York, New York 10007
9      BY:   BRIAN C. BROOK, ESQ.
10
11
12      UNDERBERG & KESSLER LLP
13      Attorneys for Defendants LESTER EBER;
14      ALEXBAY, LLC f/k/a LESTER EBER, LLC; EBER
15      BROS. & CO., INC.; EBER BROS. WINE AND
16      LIQUOR CORPORATION; EBER BROS. WINE AND
17      LIQUOR METRO, INC., EBER-CONNECTICUT, LLC;
18      and WENDY EBER
19          50 Fountain Plaza
20          Buffalo, New York 14202
21      BY:   COLIN D. RAMSEY, ESQ.
22
23      (Appearances continued on next page)
24
25
```

Page 5

```
1
2
3
4          IT IS HEREBY STIPULATED AND AGREED, by and
5   between the attorneys for the respective parties
6   herein, that filing and sealing be and the same
7   are hereby waived.
8          IT IS FURTHER STIPULATED AND AGREED
9   that all objections, except as to the form of the
10  question, shall be reserved to the time
11  of the trial.
12          IT IS FURTHER STIPULATED AND AGREED that the
13  within deposition may be signed and sworn to
14  before any officer authorized to administer an
15  oath, with the same force and effect as if signed
16  and sworn to before the officer before whom the
17  within deposition was taken.
18
19
20
21
22
23
24
25
```

2 (Pages 2 - 5)

Page 6

1
2          THE VIDEOGRAPHER:  We are going on the
3    record at 9:33 on January 24, 2019.  Please
4    note that the microphones are sensitive and
5    may pick up whispering and private
6    conversations.  Please turn off all cell
7    phones and place them away from the
8    microphones as they may interfere with the
9    deposition audio.  Recording will continue
10   until all parties agree to go off the
11   record.
12         This is media unit one of the video
13   recorded deposition of Lester Eber taken by
14   counsel for plaintiff in the matter of Dan
15   Kleeberg et al versus Lester Eber et al
16   filed in the United States District Court
17   Southern District of New York, case number
18   16-CV-9517 (LAK).  This deposition is being
19   held at Veritext located at 1250 Broadway
20   New York, New York.
21         My name is Wayne Saline from the firm
22   Veritext.  I am the videographer.  The court
23   reporter is Lynne Metz from the firm
24   Veritext.
25         At this time the attorneys will

Page 7

1                    L. Eber
2    introduce themselves and their affiliations
3    for the record.  The court reporter will
4    swear in the witness and we can proceed.
5          MR. BROOK:  On behalf of the
6    plaintiffs Brian Brook of Brook and
7    Associates PLLC.
8          MR. RAMSEY:  Colin Ramsey from
9    Underberg and Kessler on behalf of the Eber
10   defendants.
11         MR. CALIHAN:  Robert Calihan on behalf
12   of the Estate of Elliot Gumaer.
13         MR. KLEEBERG:  Dan Kleeberg.
14   L E S T E R   E B E R,
15   called as a witness, having been first duly
16   sworn by the Notary Public (Lynne D. Metz),
17   was examined and testified as follows:
18   EXAMINATION BY
19   MR. BROOK:
20   Q.   Good morning Mr. Eber.
21        Have you been deposed before?
22   A.   Yes.
23   Q.   When is the last time you were
24   deposed?
25   A.   A couple of years ago.

Page 8

1                    L. Eber
2    Q.   Just because no matter how many times
3    you do this it is worth going over it again.  I
4    will go over some of the differences between
5    today's deposition and a typical conversation to
6    make sure that we are as efficient and have as
7    clean a record as possible.
8          One major difference is there is a
9    court reporter writing down everything that we
10   say.  So even though there is a videographer
11   recording it too, it is important that we do our
12   best not to talk over each other.  Even if you
13   know where I am going with the question, please
14   let me finish the question before you answer it.
15        Okay?
16        MR. RAMSEY:  Yes?
17   A.   Yes.
18   Q.   And that brings me to the next point.
19   All responses need to be verbal meaning yes or no
20   rather than shaking your head or grunts like aha.
21        Okay?
22   A.   Yes.
23   Q.   Another thing is that if I ask a
24   question and you answer it, I am going to assume
25   that you understood the question.  So if there is

Page 9

1                    L. Eber
2    something in my question that you don't understand
3    be sure to ask me to clarify my question before
4    you answer it.
5          Okay?
6    A.   Yes.
7    Q.   How do you feel today?
8    A.   Okay.
9    Q.   Is there any reason such as being
10   tired, overly stressed or on prescription
11   medications or something like that that would
12   impair your ability to testify fully and
13   truthfully today?
14   A.   Not that I know of.
15   Q.   What is your date of birth?
16   A.   1/26/38.
17   Q.   And what is your home address?
18   A.   15 Coral Way, Rochester, New York.
19   Q.   When you were last deposed, what was
20   the legal matter that was in connection with?
21   A.   It was part of being a lobbyist for
22   Southern Glazer Wine and Liquor.
23   Q.   And how was that part of the being a
24   lobbyist, sir?
25   A.   It was guarding legislation that had

3 (Pages 6 - 9)

L. Eber

2    A.    If that's what it says, yes.
3    Q.    What was Southern Wine and Spirits
4 Upstate Inc.?
5    A.    That would be their upstate business
6 as opposed to Metropolitan New York.
7    Q.    Earlier you referred to a company
8 called Southern Glazer.
9          What is that?
10   A.    They merged with Glazer out of Dallas,
11 Texas.
12   Q.    When did that merger occur?
13   A.    A couple of years ago I believe.
14   Q.    But for all intents and purposes in
15 terms of your relationship with that, with the
16 Southern company, the merger did not, with Glazer
17 did not affect that relationship; correct?
18   A.    No.
19   Q.    How was the consulting agreement
20 Exhibit 27 negotiated?
21   A.    You have to ask a lawyer.  Probably
22 Pat Dalton.
23   Q.    So Pat Dalton negotiated this for you?
24   A.    I would -- I believe so.  I can't
25 think of anyone else.

L. Eber

2    Q.    Did you pay Pat Dalton for negotiating
3 this agreement yourself?
4    A.    I believe he billed the company.
5    Q.    And why did he bill the company for
6 doing work to negotiate an agreement between you
7 personally?
8    A.    I don't remember who paid him.
9    Q.    But is it fair to say you don't
10 remember paying Pat Dalton yourself; correct?
11        MR. RAMSEY:  Form.
12   A.    I just don't remember.  It's possible
13 but I don't remember who paid him.
14   Q.    And just to be totally clear, if you
15 look at the last page 9, what's listed page 9 of 9
16 that's your signature; correct?  There are
17 two-page 9s.
18        MR. RAMSEY:  (Indicating.)
19   A.    Yes, the first one.
20   Q.    That is your signature?
21   A.    Yes.
22   Q.    How was -- let's step back.
23        So this was an agreement originally
24 drafted with a five year term; correct?
25   A.    Yes.

L. Eber

2    Q.    Why was it limited to five years?
3    A.    That's what they would give me because
4 I needed a job and they had worked with us to help
5 us stay out of bankruptcy and I felt an obligation
6 to work with them and they thought that was a fair
7 amount of time and gave me the time to set up a
8 structure for them of lobbyists with the state.  I
9 am a lobbyist myself and to represent them in the
10 legislature with the State Liquor Authority and
11 the Governor's Office.
12   Q.    Why do you say that you needed a job?
13   A.    Everyone needs a job.  We lost the
14 business.  We lost everything in New York.
15   Q.    You still had a job with Eber
16 Connecticut; correct?
17   A.    Eber Connecticut was not in very good
18 condition at that time.
19        MR. BROOK:  Let's go ahead and get
20   another exhibit going here.  Mark this as
21   Plaintiffs' 28.
22        (Plaintiffs' Exhibit 28, a series of
23   W-2s that were produced by the parties in
24   discovery Bates numbers EB 00021420 through
25   428, marked for identification, as of this

L. Eber

2 date.)
3    Q.    Plaintiffs' 28 is a series of W-2s
4 that were produced by the Eber parties in
5 discovery bearing Bates numbers EB 00021420
6 through 428.
7          Do you recognize the documents that
8 are copied off of this exhibit?
9    A.    Yes.
10   Q.    What are they?
11   A.    W-2s.
12   Q.    And do you see on the first page it
13 has W-2s for the years 2007, 2008 and 2009?
14   A.    Mm-hmm.
15        MR. RAMSEY:  Yes?
16   Q.    Is that a yes?
17   A.    Yes.
18   Q.    And so is it correct that according to
19 this exhibit Eber Brothers Wine and Liquor Corp.
20 paid you 303,021 dollars for the year 2007?
21   A.    Yes.
22   Q.    So that was the year when the
23 consulting agreement we were just looking at was
24 executed; correct?
25   A.    Yes.

Page 66

L. Eber
1
2    Q.   And then the next year you received a
3    W-2 from Eber Connecticut LLC; correct?
4        A.   Yes.
5        Q.   And in that year Eber Connecticut LLC
6    paid you wages, tips and other compensation
7    totalling 189,788 dollars; correct?
8        A.   Yes.
9        Q.   So not quite as much paid by Eber
10   Connecticut as you had made the year before from
11   Eber Brothers Wine and Liquor; correct?
12       A.   That's correct.
13       Q.   Just under two thirds of the amount;
14   correct?
15       A.   Yes.
16       Q.   Now the consulting agreement provided
17   for an annual sum for five years of six hundred
18   thousand dollars per year; correct?
19       A.   Yes.
20       Q.   So that was more than twice what you
21   were paid in terms of salary by Eber Brothers Wine
22   and Liquor Corp.?
23       A.   Yes.
24       Q.   How did that amount get determined in
25   the course of negotiations?

Page 67

L. Eber
1
2        A.   They are a very large company.  They
3    are 17 billion today.  They do 2 billion in New
4    York.  Two thousand employees.  They pay big
5    salaries.
6        Q.   So did you ask for this consulting
7    agreement?
8        A.   They offered it to me.
9        Q.   And did they ask for anything else in
10   return besides your governmental affairs services?
11           MR. RAMSEY:  Form.
12       A.   They gave me the freedom to set up a
13   lobbying governmental affairs structure in the
14   State of New York for them.
15       Q.   Did they ask for anything else in
16   return for agreeing to this six hundred thousand
17   dollars a year for five years payment?
18           MR. RAMSEY:  Form.
19       A.   No.
20           MR. RAMSEY:  Form objection to that
21   question.
22       Q.   So Southern did not -- let's step
23   back.
24           So six hundred thousand a year for
25   five years, that's three million dollars total;

Page 68

L. Eber
1
2    correct?  Is that a yes?
3        A.   Yes.
4        Q.   In connection with the overall
5    transaction, Southern ended up giving what was, I
6    suppose some kind of a loan in the amount of three
7    million dollars to one of the Eber companies; is
8    that right?
9        A.   Yes.  I don't know if it was a loan.
10   It was money that the Eber companies owned, owed
11   Southern for the money they came up with to keep
12   us out of bankruptcy.
13       Q.   So it wasn't a loan per se but one or
14   more of the Eber companies agreed that they owed
15   Southern three million dollars as a result of the
16   deal; correct?
17       A.   Yes.  As a result of moneys that were
18   paid to them to pay them back for the money they
19   advanced us to keep us out of bankruptcy.
20       Q.   So how much money did Southern advance
21   to the Eber companies not counting your consulting
22   agreement?
23       A.   I don't remember the figure.  It was
24   substantial.
25       Q.   Was it more than three million

Page 69

L. Eber
1
2    dollars?
3        A.   Yes.
4        Q.   So of the amount of money that was
5    advanced, Eber Brothers agreed to pay back three
6    million of it; correct?
7            MR. RAMSEY:  Form.
8        A.   They paid back all the money that was
9    advanced to them.
10       Q.   So separate from advancements, did
11   Southern also make payments that were not subject
12   to repayment to Eber Brothers not counting
13   payments for inventory?
14       A.   No.
15       Q.   So is it just a coincidence then that
16   the amount of money that Eber Brothers was
17   required to pay Southern three million dollars is
18   the same amount that the consulting agreement
19   provided to be paid to you?
20           MR. RAMSEY:  Form.
21       A.   I never thought of it that way at all.
22   I never thought of that.
23       Q.   Besides Patrick Dalton, was anyone
24   else involved in negotiating or reviewing your
25   consulting agreement with Southern?

18 (Pages 66 - 69)

Page 70

L. Eber

1  L. Eber
2  A.  I don't remember.
3  Q.  Was Mike Gumaer involved in the
4  consulting agreement with Southern?
5  A.  He would be aware of anything I was
6  involved in.  Everything I did he knew about.
7  Q.  Do you have any specific recollections
8  of discussing the consulting agreement with Mike
9  Gumaer?
10  A.  I don't remember, but there is nothing
11  that I would have done that he would not be aware
12  of.
13  Q.  And do you recall discussing the
14  consulting agreement with any other employees of
15  Eber Brothers?
16  A.  Possibly the financial officer John
17  Ryan.
18  Q.  You say possibly.
19  You don't specifically recall doing
20  so?
21  A.  I can't remember.
22  Q.  And the consulting agreement was not
23  specifically approved by the board of directors;
24  correct?
25  A.  I don't know.

Page 71

1  L. Eber
2  Q.  In addition to providing governmental
3  affairs services, Southern also required you to
4  enter into a restrictive covenant; correct?
5  A.  Yes.
6  Q.  Why was that?
7  A.  It was what they wanted so that I
8  wouldn't compete or someone else would hire me for
9  doing governmental work.  It is a specialty.
10  Q.  And after the initial five-year term,
11  did you continue to have -- withdrawn.
12  After the initial five-year term, were
13  there subsequent agreements between you and
14  Southern for consulting services?
15  A.  There is no agreement.  I am a
16  consultant for them.
17  MR. BROOK:  Let's go to the next
18  Exhibit 29.
19  (Plaintiffs' Exhibit 29, a series of
20  letters that appears to be written on Lester
21  Eber's letterhead bearing Bates stamps EB
22  695 through 701, marked for identification,
23  as of this date.)
24  Q.  I am showing you what has been marked
25  as Plaintiffs' Exhibit 29.  It is a series of

Page 72

1  L. Eber
2  letters that appears to be written on Lester
3  Eber's letterhead bearing Bates stamps EB 695
4  through 701.
5  Do you see these letters?
6  A.  Yes.
7  Q.  Do these refresh your recollection
8  that there was a subsequent agreement, subsequent
9  agreements between you and Southern concerning
10  consulting?
11  A.  I think you are a little confused on
12  this.
13  Q.  Okay.  Help me understand.
14  A.  This is an agreement.  I am a
15  registered lobbyist in the State of New York.
16  JACO is the regulatory agency that supervises
17  lobbyists and they pay me to be a lobbyist.  I
18  think it is ten thousand dollars a year and I
19  happen to have an agreement in order to lobby with
20  the governmental agencies and the Governor's
21  Office in the State of New York and that's what
22  this is.
23  Q.  So are you saying are there any other
24  -- let's step back.
25  So just looking at the first page of

Page 73

1  L. Eber
2  this exhibit that's a letter dated January 1, 2012
3  addressed to Steven Becker.
4  Do you see that?
5  A.  Yes.
6  Q.  Who is Steven Becker?
7  A.  He is principal in charge of
8  governmental affairs for the United States for
9  Southern Glazers.
10  Q.  And this letter, is this something you
11  wrote up or the language was given to you by
12  someone else?
13  A.  I don't remember, but it is what has
14  to be done to give the JACO in New York.  I have
15  to be a registered lobbyist.  It is required.
16  Q.  And is the contract between you and
17  the company that you are lobbying for something
18  that has to be disclosed to the government?
19  A.  Yes, the State of New York.  It is
20  disclosed to the State of New York, yes.
21  Q.  So when we were looking at the
22  consulting agreement, Exhibit 27, is that a
23  document that was disclosed to the State of New
24  York?
25  A.  No.

19 (Pages 70 - 73)

L. Eber

1
2    Q.   Why not?
3    A.   It's not a lobbying agreement.  This
4  is a governmental lobbying agreement that I have
5  to have as being a lobbyist, a registered
6  lobbyist.
7    Q.   So --
8    A.   The other is a private agreement
9  between myself and Southern.
10   Q.   So for the years 2007 through 2011,
11 was there a separate lobbying agreement between
12 you and Southern?
13   A.   There should have been.
14   Q.   Do you recall whether there was an
15 actual one?
16   A.   I don't remember, but I don't know if
17 they required the agreements changed and I can't
18 remember everything, but I think with the JACO
19 regulations Southern told me that, you know, I
20 have to have a -- because of the time I am
21 spending in Albany with the legislature and the
22 State Liquor Authority or with the Governor's
23 Office that I have to register as a lobbyist and I
24 had not registered as a lobbyist before.
25   Q.   So for the year 2012, the year covered

L. Eber

1
2  by page one of Exhibit 29, what was your total
3  compensation received from Southern Wine and
4  Spirits for all your activities on their behalf
5  lobbying, consulting or otherwise?
6    A.   I don't remember.
7    Q.   According to this document it says the
8  fee for your services covered by it was ten
9  thousand dollars?
10   A.   Oh, for lobbying.  Yes, for being a
11 registered lobbyist was 10,833 a month is what I
12 get from them.
13   Q.   And were you paid other sums as well?
14   A.   I was paid yes, as a consultant.  Yes.
15 RQ      MR. BROOK:  We request that all
16    payment records between Mr. Eber and
17    Southern be produced including tax forms and
18    any other agreements that may exist that
19    show fees for consulting or other services
20    beyond the amount reflected on this Exhibit
21    29.
22       MR. RAMSEY:  I understand your
23    request.
24 BY MR. BROOK:
25   Q.   You said you don't remember the exact

L. Eber

1
2  compensation.
3       What is your best estimate of what
4  your annual compensation from Southern has been in
5  total for any of the years from 2012 through the
6  present?
7       MR. RAMSEY:  Form.
8       Go ahead.  If you can give an
9    estimate, go ahead.
10   A.   Yeah, I think it's twenty-five
11 thousand a month.
12   Q.   Do you recall attending a settlement
13 conference in this case in early September last
14 year?
15   A.   Yes, I believe so.
16   Q.   Do you remember that at one point
17 everyone except for Mr. Gumaer's attorney was
18 sitting in the courtroom with the judge in a
19 circle and we were talking about certain fact
20 questions that the plaintiffs had?
21   A.   I believe it went on.  I don't
22 remember the questions.
23   Q.   Do you recall that I brought up the
24 topic of your consulting agreement with Southern
25 at that point?

L. Eber

1
2    A.   I don't remember it.
3    Q.   So you don't remember saying that that
4  consulting agreement and the payments relating to
5  it ended back in 2012?
6       MR. RAMSEY:  Form.
7    A.   Yes.  I do remember the agreement
8  ended after five years, the consulting agreement.
9    Q.   But is it your testimony that at least
10 half or approximately half of the payments
11 continued in the years afterwards?
12       MR. RAMSEY:  Form.
13   A.   Yes.
14   Q.   It is your testimony that's not
15 pursuant to any kind of agreement between you and
16 Southern?
17   A.   Yes.
18   Q.   So how does the amount of money that
19 Southern pays you get determined?
20   A.   It is what they feel my services are
21 worth.
22   Q.   So what happens if Southern decides to
23 pay you nothing for your services?
24   A.   I am through.
25   Q.   Meaning you are not going to provide

Page 78

L. Eber

1
2 services for Southern anymore?
3     A.   I won't be involved with them, that's
4 correct, yes.
5     Q.   Other than monthly payments of
6 approximately twenty-five thousand dollars per
7 month, are there any other benefits or perks that
8 you receive from Southern?
9         MR. RAMSEY:  Form.
10    A.   I don't get any fringe benefits from
11 them of any kind.  I do get expenses, legitimate
12 business expenses.
13    Q.   Do you have an expense credit card for
14 Southern?
15    A.   No.
16    Q.   So how do you submit your expenses to
17 Southern?
18    A.   I submit them monthly.
19    Q.   And are you still bound by any kind of
20 restrictive covenant with Southern?
21        MR. RAMSEY:  Form.
22    A.   I don't believe so.
23    Q.   So you believe at this point if you
24 went and tried to start up the Eber Brothers Wine
25 and Liquor business in New York that would not be

Page 79

L. Eber

1
2 something that would violate any agreement you
3 have with Southern?
4         MR. RAMSEY:  Form.
5     A.   I don't know about that.  It's not
6 something I am going to do.
7     Q.   I am going to change topics now.
8         How did you, if you know, how did it
9 come to pass that you were named a trustee of the
10 Allen Eber trust?
11    A.   I do not know.
12    Q.   Is this something that you had
13 discussed with your father before his passing?
14    A.   No.
15    Q.   What is your understanding of what
16 your responsibilities were as a named trustee of
17 the Allen Eber trust?
18    A.   My responsibilities?
19    Q.   Yes.
20        As a trustee, what did that mean that
21 you had to do?
22        MR. RAMSEY:  Form.
23    A.   With the -- work with the other
24 co-trustees in managing the Eber assets.
25    Q.   And for whom's benefit did you have to

Page 80

L. Eber

1
2 manage the Eber assets?
3         MR. RAMSEY:  Form.
4     A.   For the beneficiaries of the trust.
5     Q.   Who were the beneficiaries of the
6 trust?
7     A.   Myself and my sisters.
8     Q.   And after your sisters passed, who
9 were the other beneficiaries of the trust at that
10 point?
11    A.   It was their children.
12    Q.   And that is for your sister Nan.
13        What was her child's name?
14    A.   Mildred was my sister.
15    Q.   Sorry.  I think I was using her middle
16 name.
17        What was Mildred's daughter's name?
18    A.   Audrey.
19    Q.   And your sister Sally, what were her
20 kid's names?
21    A.   Danny and Lisa.
22    Q.   After your sisters passed, did you
23 continue to understand you had an obligation to
24 manage the trust for the benefit of your nieces
25 and nephew?

Page 81

L. Eber

1
2     A.   I didn't manage the trust.  I worked
3 with the other two trustees.
4     Q.   Who were the other two trustees?
5     A.   Mike Gumaer and the bank.
6     Q.   What was Mike Gumaer's involvement in
7 managing the trust?
8     A.   He was a lawyer and he was put there
9 by my father to work and guide me in the
10 management of the business and to work with me in
11 the trust.
12    Q.   Was Mike Gumaer a lawyer for the
13 trust?
14        MR. RAMSEY:  Form.
15    A.   No.  He was a lawyer for Eber Brothers
16 but he was a trustee of the trust.
17    Q.   What was the bank's responsibility
18 with respect to the trust?
19    A.   They were there.  They did a lot of
20 the paperwork and legal work of the operation of
21 the trust.
22    Q.   You understood that the Eber Brothers
23 business was a trust asset; correct?
24    A.   Yes.
25    Q.   What did that mean in terms of how it

21 (Pages 78 - 81)

Page 82

L. Eber
1
2  affected your management of the Eber Brothers
3  business?
4      MR. RAMSEY:  Form.
5      MR. CALIHAN:  Form.
6      A.  I don't understand the question.
7      Q.  Did the fact that the Eber Brothers
8  business was owned by the trust affect the way in
9  which you managed the Eber Brothers business at
10  all?
11      MR. RAMSEY:  Form.
12      A.  I reported to the trust.
13      Q.  So since you were a co-trustee --
14  withdrawn.
15      Putting aside who you reported to, did
16  you understand that you had an obligation to run
17  the Eber Brothers business for the benefit of the
18  trust beneficiaries?
19      MR. RAMSEY:  Form.
20      A.  Could you repeat that question?
21      Q.  The Eber Brothers business, at the top
22  level there was Eber Brothers and Co., Inc.;
23  correct?
24      A.  Yes.
25      Q.  And is it correct that all of the

Page 83

L. Eber
1
2  shares of that business, at least all the voting
3  shares, were controlled by the Allen Eber trust?
4      A.  Yes.
5      Q.  And is it your understanding that it
6  is the voting common shareholders to whom a
7  corporate officer owes a primary duty of care?
8      MR. RAMSEY:  Form.
9      A.  I don't have an answer for you on
10  that.  I don't know.
11      Q.  Who are the other shareholders in Eber
12  Brothers and Co., Inc. besides the Allen Eber
13  Trust?
14      A.  There was common non-voting stock was
15  owned by myself and my sisters.
16      Q.  Did anyone else own Eber Brothers and
17  Co., Inc. stock?
18      A.  No.
19      Q.  Did you have any understanding as to
20  whether -- withdrawn.
21      So you did understand that as a
22  corporate officer and a director you had a
23  fiduciary duty towards the shareholders of the
24  company; correct?
25      MR. CALIHAN:  Objection to form.

Page 84

L. Eber
1
2      MR. RAMSEY:  Form.
3      A.  Yes, I believe so.
4      Q.  So with respect to the company Eber
5  Brothers and Co., Inc., you understood you had a
6  fiduciary duty with respect to the trust, your
7  sisters and yourself?
8      MR. RAMSEY:  Form.
9      Q.  Correct?
10      A.  Yes.
11      Q.  And did you understand that when you
12  owe fiduciary duties to multiple individuals at
13  the same level like that that you are not allowed
14  to prefer one individual shareholder over another
15  individual shareholder?
16      MR. CALIHAN:  Objection to form.
17      MR. RAMSEY:  Form.
18      A.  I never got into any of this.  This is
19  something I just did my job with the company and
20  reported to the trustees of the trust.
21      Q.  Was it your understanding that you
22  could issue dividends or distributions to some
23  shareholders but not others?
24      A.  I don't understand the question.  It's
25  is something I never -- I don't have an

Page 85

L. Eber
1
2  understanding of what you are asking.
3      Q.  In terms of Eber Brothers and Co.,
4  Inc., that held the stock of other Eber Brothers
5  entities; correct?
6      A.  Yes.
7      Q.  Which entities did it control?
8      A.  Whatever ones that were there at the
9  time.
10      Q.  So that included Eber Brothers Wine
11  and Liquor Corp.; correct?
12      A.  Yes.
13      Q.  Were there other businesses such as a
14  framing business?
15      A.  No.
16      Q.  Or --
17      A.  The produce business.
18      Q.  Produce business.
19      What was that called?
20      A.  Eber and Co.
21      Q.  When did Eber and Co. stop operations?
22      A.  Eber and Co. was a produce business.
23  Stopped quite a few years ago.  I don't have the
24  date.
25      Q.  Did you ever work for that produce

22 (Pages 82 - 85)

Page 86

L. Eber

1
2  business?
3      A.  Yes.
4      Q.  When was that?
5      A.  In high school and college.
6      Q.  Was it still operating at the time
7  that you graduated from college?
8      A.  Yes.
9      Q.  Who managed that?
10     A.  Audrey Hays' father.
11     Q.  What was his name?
12     A.  Darwin Boslov, B-O-S-L-O-V.
13     Q.  So not likely a creationist?
14     A.  What?
15     Q.  Bad joke.
16         Returning to Eber Brothers Wine and
17  Liquor Corp., you were the president of that
18  entity; correct?
19     A.  Eventually.
20     Q.  And what was your position with
21  respect to Eber Brothers and Co., Inc. at the same
22  time you were president of Eber Brothers Wine and
23  Liquor Corp.?
24     A.  I was president of that too.
25     Q.  Besides Eber Brothers and Co., Inc.,

Page 87

L. Eber

1
2  were there any other shareholders in Eber Brothers
3  Wine and Liquor Corp. when you were president of
4  it?
5      A.  Not that I remember.
6      Q.  So as president of Eber Brothers Wine
7  and Liquor Corp. you understood that your
8  fiduciary duties to the shareholders ran to
9  ultimately the Allen Eber Trust; correct?
10         MR. RAMSEY:  Form.
11     A.  I reported to the Allen Eber Trust.
12     Q.  And Eber Brothers Wine and Liquor
13  Corp. in turn opened all of the shares in Eber
14  Brothers Wine and Liquor Metro Inc. once that was
15  created in the nineties; correct?
16     A.  I don't remember.  It's possible, but
17  I don't remember.
18     Q.  Are there any Eber Brothers entities
19  that were owned or at one point controlled by Eber
20  Brothers and Co., Inc., where you did not believe
21  that you had fiduciary duties to the beneficiaries
22  of the trust?
23         MR. RAMSEY:  Form.
24     A.  No.
25     Q.  At some point you ended up resigning

Page 88

L. Eber

1
2  as president of Eber Brothers Wine and Liquor
3  Corp.; correct?
4      A.  Yes.
5      Q.  But you remained president of Eber
6  Brothers and Co., Inc.?
7      A.  Yeah, it's possible.  I don't
8  remember.  There are a lot of companies.  It can
9  get confusing.
10     Q.  What is your current position with
11  Eber Brothers and Co., Inc.?
12     A.  My current position with Eber Brothers
13  and Co.?  I could be a director.  I don't remember
14  what else.  The company actually there are so many
15  of them it confuses me.  I would have to look at
16  what it actually is.
17     Q.  Other than yourself, do you recall
18  anyone else whoever served as president of Eber
19  Brothers and Co., Inc.?
20     A.  It's possible there could be somebody
21  else.
22     Q.  What is Wendy's position with Eber
23  Brothers and Co., Inc.?
24     A.  She may be president of it.
25     Q.  When is the last time there was any

Page 89

L. Eber

1
2  kind of election of either officers or directors
3  for Eber Brothers and Co., Inc.?
4      A.  I don't remember.
5      Q.  Why did you resign as president of
6  Eber Brothers Wine and Liquor Corp.?
7      A.  Because it didn't see -- it didn't --
8  there was nothing for me to do in Eber Wine and
9  Liquor Corp. anymore.  I was working for Southern
10  in New York and then I was involved in Eber
11  Connecticut.
12     Q.  Did someone replace you as president
13  of Eber Brothers Wine and Liquor Corp.?
14     A.  I believe so.
15     Q.  Who was that?
16     A.  It could be Wendy Eber.  I don't
17  remember.
18     Q.  Well, if there was nothing for you to
19  do, was there something for Wendy Eber to do?
20     A.  Yes.
21         MR. RAMSEY:  Form.
22     Q.  What was that?
23     A.  She has a very strong financial
24  background and there were a lot of problems there
25  and she was very capable in relating to solving

23 (Pages 86 - 89)

Page 90

L. Eber
1
2  those problems and dealing with regulatory
3  agencies and moneys that were owed and different
4  things that were thrown against the company.
5      Q.   Which regulatory agencies are you
6  referring to?
7      A.   Anyone that would -- any financial
8  ones that would be involved in any business.  No
9  one in particular but there are different agencies
10  that any business confronts with.
11     Q.   So there was no particular regulatory
12  agency or governmental or quasi governmental body
13  that you were specifically referring to when you
14  said that Wendy would need to interact with them
15  as president of the Eber Brothers Wine and Liquor
16  Corp.?
17     A.   Well, you know the problems the
18  company had with the past Pension Benefit
19  Guarantee Corporation.
20     Q.   So that's one.
21     A.   And whatever other ones in different
22  situations that the company was faced with.
23     Q.   What was the situation with Pension
24  Benefit Guarantee Corp.?
25     A.   That Eber Brothers had a defined

Page 91

L. Eber
1
2  benefit pension plan going back to 1950s and after
3  they couldn't afford to make the payments and so
4  the Pension Benefit Guarantee Corporation put the
5  company in default under the ERISA laws and we had
6  a deal with it.
7      Q.   When was the default that you just
8  referred to?
9      A.   I don't have the exact -- I don't
10  remember the exact date.
11     Q.   By default do you mean place the lien
12  against the corporate assets?
13     A.   Yes.
14     Q.   Yes?
15     A.   Yes.
16     Q.   When did that occur?
17     A.   I don't remember the exact date.
18     Q.   Was it in approximately 2014?
19     A.   It could have been.  If you have it
20  there. I can't remember these dates.  I am glad I
21  remember what I did yesterday.
22     Q.   So your resignation was in 2012 to the
23  best of your recollection; correct?
24     A.   Yes.
25     Q.   So as of 2012 were you anticipating

Page 92

L. Eber
1
2  that PBGC would be placing a lien on corporate
3  assets?
4      A.   No.
5      Q.   So as of 2012, did you expect that
6  Eber Brothers would be able to continue making the
7  payments due to PBGC?
8      A.   The money wasn't there.  You know we
9  tried to resolve it.  It was a legacy that doesn't
10  go away.  If you know the ERISA laws there is no
11  way out of it.
12     Q.   Did you try to find a way out of it?
13     A.   Yes.
14     Q.   What was that?
15     A.   Hired legal counsels that specialize
16  in it who I paid personally.
17     Q.   Which counsel is that?
18     A.   Groom in Washington, D.C.
19     Q.   Anyone else?
20     A.   With the PBGC you are talking about?
21     Q.   Yes, to help get out of the ERISA laws
22  as you said.
23     A.   We hired a law firm.  They have a
24  branch in Rochester.  Hourihan, he was the lawyer
25  on it.

Page 93

L. Eber
1
2      Q.   Is this the Bond --
3      A.   Bond Schoeneck, thank you.
4      Q.   Any other lawyers that you hired?
5      A.   I don't remember.  It's possible, but
6  I don't remember.
7      Q.   Do you recognize the name Glenn Sturm?
8      A.   Yes.
9      Q.   Who is he?
10     A.   A lawyer.
11     Q.   Is he a lawyer who you hired?
12     A.   No.
13     Q.   Who hired Glenn Sturm?
14     A.   Well, I met him and he was hired, he
15  was hired.  I would say I was involved in hiring
16  him.  I correct that, and my daughter Wendy.
17     Q.   And for what purpose was he hired?
18     A.   To help Eber Connecticut out of dire
19  financial straights.
20     Q.   How specifically was Glenn Sturm
21  qualified to do that?
22     A.   He was a partner, senior partner of
23  Mullins something in Atlanta.  Very well
24  respected.  Had done a lot in turnaround companies
25  and was going to -- did help us in navigating

24 (Pages 90 - 93)

Page 94

L. Eber

1
2  through a very difficult financial period.
3      Q.   How were you introduced to Glenn
4  Sturm?
5      A.   I met him in a restaurant.
6      Q.   Where was that?
7      A.   In New Haven.
8      Q.   When was that?
9      A.   I don't have the date.
10     Q.   Was it years before you had hired him
11 or shortly beforehand?
12     A.   Shortly before we hired him.
13     Q.   And what kinds of things did Glenn
14 Sturm advise you about in terms of the subject
15 matter?
16     A.   Tried to get us bank loans.  Brought
17 in consultants to help streamline the company.
18 Talk to our management.  Education.  Had an
19 excellent legal background and everything.
20     Q.   Did he advise you or the companies
21 concerning their debts and trying to get out of
22 some of the debts that were owed to other third
23 parties like PBGC?
24         MR. RAMSEY:  Form.
25     A.   He did advise us on debt and how to

Page 95

L. Eber

1
2  restructure the company to make it look more
3  attractive to banks so we could borrow money.
4      Q.   And what were some of the ways in
5  which the company was restructured?
6      A.   I don't actually remember the actual
7  restructuring.
8      Q.   Was part of the restructuring included
9  in the sale of six percent of Eber Connecticut to
10 Polebridge Bowman?
11     A.   I think the six percent to him was
12 that he wanted to get paid.  And it was a way to
13 pay him and the company didn't have any money to
14 pay him.
15     Q.   He was associated as a partner with a
16 law firm Nelson Mullins; correct?
17     A.   Yes.
18     Q.   Wasn't he paid through payments to his
19 law firm?
20     A.   There were payments to his law firm
21 originally and then he -- I don't know what
22 happened between he and his law firm.  He went
23 more on and off on his own.
24     Q.   So it was your understanding that
25 while he was doing work for you he left Nelson

Page 96

L. Eber

1
2  Mullins; is that right?
3      A.   I believe so.  I can't remember the
4  exact but he was working on his own at some point.
5      Q.   And once he was working on his own,
6  how was the topic of selling him a piece of the
7  company broached?
8      A.   I don't know.  I don't remember.  I
9  was not involved in that.
10     Q.   Who was?
11     A.   I would say my daughter Wendy.
12         MR. RAMSEY:  When you get to a good
13     place Brian to take five minutes.
14         MR. BROOK:  We can do that, sure.
15         THE VIDEOGRAPHER:  This marks the end
16     of media unit two in the videotaped
17     deposition of Lester Eber.  We are going off
18     the record.  Time is 11:32.
19         (Recess taken.)
20         THE VIDEOGRAPHER:  This marks the
21     beginning of media unit number three in the
22     videotaped deposition of Lester Eber.  We
23     are going on the record.  The time is 11:45.
24 BY MR. BROOK:
25     Q.   Mr. Eber, when did you decide to cut

Page 97

L. Eber

1
2  your sister, nieces and nephew out of the family
3  business?
4          MR. RAMSEY:  Form.
5      A.   I didn't.
6      Q.   What do you mean by that?
7      A.   I didn't decide to cut anyone out of
8  the family business.
9      Q.   Didn't you take actions that cut your
10 sister, nieces and nephew out of the family
11 business?
12         MR. RAMSEY:  Form.
13     A.   I didn't look at it that way.  I did
14 what would save a company from going into
15 liquidation.
16     Q.   How did and -- withdrawn.
17         What did you do to save the company
18 from going into liquidation that you were just
19 referring to?
20     A.   I have personally paid legal and other
21 expenses that I was not personally liable for to
22 keep the company viable that were legacy costs
23 that were shoved -- that were Eber Connecticut was
24 obligated to.  You have a list of all of them.
25     Q.   How did those cash infusions give you

25 (Pages 94 - 97)

Page 98

L. Eber

1   L. Eber
2   the right to take control of the business for
3   yourself?
4       MR. RAMSEY:  Form.
5       A.   That wasn't -- the cash infusions kept
6   the company alive.  If I didn't do that there
7   wouldn't be a company to talk about today.
8       Q.   But you never at the time when you
9   agreed to make the cash infusions, you never said
10  if I do this I get to own the company, do I?
11      A.   I never -- I just did what had to be
12  done to keep the company alive and if I hadn't had
13  done it there wouldn't be a company today.
14      Q.   Is it your understanding that when
15  someone loans money to a company that person has
16  the right to take over the company in the event of
17  nonpayment?
18      MR. RAMSEY:  Form.
19      A.   All I know is if you loan money you
20  got to secure the loan so you can get your money
21  back.
22      Q.   And is that what you did when you
23  loaned money to Eber Brothers?
24      A.   I eventually did that.
25      Q.   So when you say you know when you owe

Page 99

1   L. Eber
2   money you have to secure the loan, at what point
3   did you come to know that?
4       A.   It was always something that as a
5   businessman that if you are lending money you got
6   to handle the companies in desperate situations
7   facing liquidation, you have to protect your, the
8   money you have lent.
9       Q.   When did you secure any of your loans
10  with Eber Brothers?
11      A.   I don't remember the exact dates.
12      MR. BROOK:  Let's mark this as
13  Plaintiffs' Exhibit 30.
14      (Plaintiffs' Exhibit 30, a document
15  entitled Amended and Restated Promissory
16  Note bearing Bates numbers EB 00031310
17  through 311, marked for identification, as
18  of this date.)
19      Q.   I am showing you what has been marked
20  as Plaintiffs' Exhibit 30.  It is a document
21  entitled Amended and Restated Promissory Note
22  bearing Bates numbers EB 00031310 through 311.
23      Do you recognize this document?
24      A.   Yes.
25      Q.   What is it?

Page 100

1   L. Eber
2       A.   It's a amended and restated promissory
3   note from the company.
4       Q.   So this is Eber Brothers Wine and
5   Liquor Corp. promising to pay you; correct?
6       A.   Yes.
7       Q.   And who authorized this promissory
8   note on behalf of Eber Brothers Wine and Liquor
9   Corp.?
10      A.   I would imagine it is John Ryan, chief
11  financial officer.
12      Q.   And you also signed on behalf of Eber
13  Brothers Wine and Liquor Corp.?
14      A.   Yes.
15      Q.   And you also signed this document on
16  behalf of yourself?
17      A.   Yes.
18      Q.   Now on the first page, do you see
19  there is some handwritten amendments?
20      A.   Yes.
21      Q.   And the handwritten amendments
22  increased the interest rate from six percent to
23  nine percent?
24      A.   Yes.
25      Q.   And it looks like are those your

Page 101

1   L. Eber
2   initials by that?
3       A.   Yes.
4       Q.   But John Ryan's initials don't appear
5   next to those changes, do they?
6       A.   I didn't see them.
7       Q.   Did John Ryan approve those changes?
8       A.   I would imagine he had to approve them
9   and it is very possible there was a lawyer
10  involved in this.  Would probably be Pat Dalton
11  that suggested this.
12      Q.   Do you actually remember John Ryan
13  approving increasing the interest rate by 50
14  percent?
15      A.   No.
16      Q.   When did the change to the interest
17  rate occur?
18      A.   I don't remember.
19      Q.   This note, which is dated March 13,
20  2006, that is not a secured promissory note;
21  correct?
22      A.   If that's what you say it is.  I
23  haven't had a chance to read it.
24      Q.   Do you have any recollection of
25  securing your 2006 promissory note?

26 (Pages 98 - 101)

Page 102

L. Eber

1
2    A.   No.
3    Q.   Let's go to Exhibit 13 which we used
4  yesterday.  That is a line of credit note with a
5  date in the upper right-hand corner of October
6  blank 2009.
7       Do you see that?
8    A.   Yes.
9    Q.   And this is a note that was issued by
10  Eber Brothers Wine and Liquor Metro Inc.; correct?
11   A.   Yes.
12   Q.   If you look on page 3 you see it was
13  authorized again by you and also Wendy Eber on
14  behalf of Eber Metro?
15   A.   Yes.
16   Q.   Was this note something that was
17  secured at the time that you executed it?
18   A.   I haven't had a chance to read this.
19  I don't know.  It probably wasn't.
20   Q.   And as you sit here today, do you have
21  any recollection of insisting that you would not
22  loan more money to the company unless you got a
23  security agreement?
24   A.   No, I don't remember saying that.  I
25  did whatever I had to to keep the company alive.

Page 103

L. Eber

1
2    Q.   So now let's take a look at Exhibit
3  15.  This is the security agreement entered into
4  as of February 26, 2010.
5       Do you see that?
6    A.   Yes.
7    Q.   Do you remember this agreement?
8    A.   Yes.  I don't remember the details of
9  it but I do remember the agreement.
10   Q.   Why did you enter into the security
11  agreement with Eber Brothers Metro and Eber
12  Brothers Wine and Liquor Corp.?
13   A.   To protect my loans.
14   Q.   What did the Eber companies get out of
15  this?
16      MR. RAMSEY:  Form.
17   A.   What did the Eber companies get out of
18  it?  They were kept alive by my loans.
19   Q.   But you already agreed to make loans,
20  hadn't you?
21   A.   Yes, I had.  Yes.
22   Q.   And you made those loans without
23  requiring security; correct?
24   A.   That's correct.
25      MR. RAMSEY:  Form.

Page 104

L. Eber

1
2    Q.   So why did the Eber companies sign the
3  security agreement?
4       MR. RAMSEY:  Form.
5    A.   The companies were in desperate
6  condition and could have been liquidated and it is
7  normal to ask for security in those circumstances.
8    Q.   Are you saying it is normal to ask for
9  security for a loan after the loan has already
10  been executed?
11      MR. RAMSEY:  Form.
12   A.   As I told you before, I did whatever I
13  had to to keep the companies alive and not be
14  liquidated.  There isn't a time to say is it
15  secured or not.  You got to do it to keep the
16  company working, being able to run a business or
17  there wouldn't be a company.
18   Q.   Who drafted the security agreement?
19   A.   I don't remember.
20   Q.   Was legal counsel retained for either
21  side of this transaction?
22   A.   Very -- yeah.  I would say yes.
23   Q.   Who was legal counsel?
24   A.   It would probably have been Pat
25  Dalton.

Page 105

L. Eber

1
2    Q.   Do you specifically remember Pat
3  Dalton working on this?
4    A.   I can't remember, but that's who it
5  probably would have been.
6    Q.   Do you remember when the billing
7  dispute between Eber Brothers and Pat Dalton
8  began?
9    A.   Not the exact date of it.
10   Q.   Was it in approximately 2009 or '10?
11   A.   I don't think it was then.  I can't
12  remember.  I don't remember the dates.
13   Q.   Did Glenn Sturm draft this agreement?
14   A.   He could have.
15   Q.   Let's look at one more document that
16  we covered yesterday.  Here we go.  Exhibit 16
17  this is another copy of the line of credit note
18  but you may remember this from yesterday's
19  testimony.  On the upper right-hand corner it says
20  the date is February 26, 2010.
21      Do you see that?
22   A.   Yes.
23   Q.   Do you remember this version of the
24  line of credit note?
25   A.   This one my signature is on it but I

27 (Pages 102 - 105)

Page 106

L. Eber

1   L. Eber
2   don't remember it.
3       Q.   So you don't remember why you signed
4   the same line of credit note with two different
5   dates?
6       A.   No.
7       Q.   When did -- let's look at either one
8   of the line of credit notes either Exhibit 13 or
9   16.  Take your pick.  I think the terms are all
10  the same except for the date.
11      MR. RAMSEY:  Do you have 16 in front
12      of you?  Look at this (indicating).
13      Q.   Do you see at the bottom of paragraph
14  3 it says in the final sentence that "The maturity
15  date is defined as December 31, 2011."?
16      A.   Yes.
17      Q.   What is your understanding of what the
18  maturity date means with respect to a line of
19  credit note?
20      A.   That it has to be paid then.
21      Q.   And how was the maturity date for this
22  line of credit note determined?
23      A.   I do not know.
24      Q.   Did you think that it was realistic as
25  of February 2010 to expect Eber Metro or Eber

Page 107

L. Eber

1   L. Eber
2   Brothers and Co., Inc. to be able to pay 1.5
3   million dollars plus interest within less than two
4   years?
5       MR. RAMSEY:  Form.
6       A.   I did not draft this.  I was involved
7   in keeping the company in business.  That was my
8   priority.  I was not involved in drafting this.
9       Q.   How does taking Eber Brothers Metro
10  shares away from Eber Brothers Wine and Liquor
11  Corp. and putting it into your own company an
12  action that helps keep the company in business?
13      MR. RAMSEY:  Form.
14      A.   It restructures the company, cleans up
15  the statement and turns a debt into an asset for a
16  bank.  So you can go -- because the company
17  couldn't get a loan.  It couldn't get any loans
18  from anyone.  So this cleans up the balance sheet
19  and makes it as an asset instead of a debt.
20      Q.   So you wanted to transfer the company
21  out from underneath the debts owed by Eber
22  Brothers Wine and Liquor Corp.; correct?
23      A.   I wanted to get a bank loan for the
24  company.  You know in our business you have to pay
25  the suppliers.  They transfer the money out of

Page 108

L. Eber

1   L. Eber
2   your bank account.
3       Q.   At the time of approximately 2010
4   through 2012, was Eber Brothers Wine and Liquor
5   Corp. a solvent company?
6       A.   Wine and Liquor, I don't know what --
7   I don't think they were solvent.  I think they
8   were struggling.
9       Q.   Did you have any understanding of what
10  additional fiduciary duties a corporate executive
11  has at a time period when a company is in the zone
12  of insolvency?
13      MR. RAMSEY:  Form.
14      A.   I reported to the trust.  They were
15  aware of everything that went on.  I did the best
16  I could to keep above water.
17      Q.   Why did you create the company
18  Alexbay?
19      A.   It was at the suggestion of my
20  lawyers.
21      Q.   Which lawyers?
22      A.   Would have been David Beltz and there
23  is another one.  I cannot think of the other.
24      Q.   Who is David Beltz?
25      A.   He was a lawyer that advised me in

Page 109

L. Eber

1   L. Eber
2   Connecticut.
3       Q.   And why did he say that you should
4   create the Alexbay company?
5       MR. RAMSEY:  Hold on.  Just be careful
6       you are not infringing on any conversation
7       you had.  The action he ultimately took you
8       can testify about that.  I don't want you
9       testifying to any conversations you had with
10      Mr. Beltz.
11      Q.   What was the purpose -- I understand
12  that you created the company because a lawyer told
13  you to do it, but what was the purpose you
14  intended to have the company Alexbay serve?
15      A.   A personal holding company.
16      Q.   What did you want to hold when you
17  created it?
18      A.   Whatever that had to be, that was, an
19  investment that I would make.
20      Q.   Were you thinking of any specific
21  investments at the time you created it?
22      A.   You know, I at the time I don't
23  remember what but it was a personal LLC that I
24  created that was created for me.
25      Q.   Do you remember when you created it?

28 (Pages 106 - 109)

Page 110

L. Eber

2    A.  I don't remember the date.
3    Q.  Let's mark this next exhibit
4  Plaintiffs' Exhibit 31.
5        (Plaintiffs' Exhibit 31, a copy of
6  two printouts made on October 1, 2016 from
7  the Connecticut Department of State
8  concerning the business Alexbay LLC, marked
9  for identification, as of this date.)
10   Q.  Plaintiffs' Exhibit 31 in front of you
11 is a copy of two printouts made on October 1, 2016
12 from the Connecticut Department of State
13 concerning the business Alexbay LLC.
14       Do you see it on the first page it
15 states the date of incorporation/registration as
16 December 8, 2011?  It is the fifth line down.
17   A.  Yes.
18   Q.  And is that consistent with your
19 recollection of when you created the company?
20   A.  I would believe so.
21   Q.  What was the original name that you
22 had for your company?
23   A.  Lester Eber LLC.
24   Q.  Why did you change the name?
25   A.  There were enough Eber -- a lot of

Page 111

L. Eber

2  Ebers.  Just too much confusion.  I think it
3  needed a separate name.
4    Q.  How did you arrive at the Alexbay LLC
5  name?
6    A.  There were other names that I tried
7  but they were taken in the state of Connecticut
8  and I go up there in the summertime and I didn't
9  think anyone would probably use that name.
10 Alexandria Bay is in upstate New York on the
11 Canadian border.
12   Q.  It is named after Alexandria Bay?
13   A.  Yes.
14   Q.  Is that a place that you visited?
15   A.  In the summer, yes.
16   Q.  So is it -- having seen the date when
17 Alexbay which was then called Lester Eber LLC was
18 created, does that refresh your recollection as to
19 what particular investments or other holdings you
20 wanted to have held by the company?
21       MR. RAMSEY:  Form.
22   A.  Yeah.  I think it would be for the
23 investment.  Would be the investment in
24 Connecticut.
25   Q.  You mean Eber Connecticut?

Page 112

L. Eber

2    A.  Eber Connecticut, yes.
3    Q.  And here is a document previously
4  marked Exhibit Plaintiffs' 8.
5    A.  Yes.
6    Q.  This is an affidavit that was signed
7  by you under oath on December 8, 2011; correct?
8    A.  Yes.
9    Q.  What was the purpose of this
10 affidavit?
11   A.  It's a law that any transfer of stock
12 or change in ownership of stock has to be reported
13 to the Consumer Protection Agency in Connecticut.
14   Q.  So as of December 8, 2011 you had
15 already decided to take Eber Connecticut and put
16 it in Alexbay in some way; correct?
17       MR. RAMSEY:  Form.
18   A.  I don't remember the date.
19   Q.  This affidavit is dated December 8th;
20 correct?
21   A.  Yeah.
22   Q.  And this states item number 4 or let's
23 start with item number 3.  3 says "Presently 79
24 percent of Eber Connecticut is owned by me through
25 an entity known as Eber Metro.

Page 113

L. Eber

2        4, I wish to transfer all of that 79
3  percent that I own from Eber Metro to Lester Eber
4  LLC, an entity which will also be wholly owned by
5  me.
6        5, this transfer is being done for no
7  consideration and that it is being done strictly
8  for organizational purposes.  No money or other
9  consideration will change hands."
10       Did I read that correctly?
11   A.  Yes.
12   Q.  As of December 8, 2011 you had decided
13 to take Eber Connecticut and have it be held by
14 Lester Eber LLC; correct?
15       MR. RAMSEY:  Form.
16   A.  Yes.
17   Q.  Had any of the debt to you been
18 defaulted on at that point?
19   A.  Hadn't been defaulted.  Hadn't been
20 paid either.  There was no way of it being paid.
21   Q.  So you were still president of Eber
22 Wine and Liquor and Eber Metro at that point;
23 correct?
24   A.  Eber Metro but I don't know about Eber
25 Wine and Liquor.

29 (Pages 110 - 113)

Page 114

L. Eber

1
2    Q.   Eber Metro had assumed all the debt to
3  you; correct?
4    A.   Yes.
5    Q.   And so as president of Eber Metro
6  weren't you obligated to try or -- withdrawn.
7         Was it your understanding that as
8  president of Eber Metro you had an obligation to
9  attempt to either pay outstanding debts that were
10  coming due or to renegotiate the terms of those
11  debts to avoid default?
12         MR. RAMSEY:  Form.
13    A.   I don't understand the question.  You
14  got me confused.
15    Q.   As the president of a company, do you
16  want to see that company be liquidated?
17         MR. RAMSEY:  Form.
18    A.   I did everything possible to stop a
19  liquidation.
20    Q.   And isn't the liquidation something
21  that is often times a result of a default on a
22  large amount of debt?
23    A.   Yes.
24    Q.   And as a secured lender at that point
25  of Eber Metro, you had the right to require a

Page 115

L. Eber

1
2  liquidation of the company if it went into
3  default; correct?
4    A.   That's what it says.  I don't know
5  what -- I don't know the law of what you are
6  talking about.  So the only thing I knew was that
7  I had to keep -- I had invested a lot of money.  I
8  continue to invest money and if I hadn't invested
9  money there would have been no Eber Connecticut
10  and what I did here was to clean up the statement
11  to make it look taking debt and making it into
12  assets so a bank would want to give us a loan.
13  When Wells Fargo left us we were nowhere's.  We
14  had nothing.  They put a workout team in our
15  company and we were desperate and I personally
16  lent enough money to keep this company, the last
17  vestige afloat and paid legal fees and everything
18  personally to do it.  You got all those copies.
19         MR. RAMSEY:  You answered the
20      question.
21    Q.   Why didn't you create an entity that
22  rather than being held entirely by you was held by
23  the Allen Eber Trust and transfer the company into
24  that new entity?
25         MR. RAMSEY:  Form.

Page 116

L. Eber

1
2    A.   I had asked my sister and my niece to
3  contribute money and they both declined.
4    Q.   When did you ask them to contribute
5  money?
6    A.   I don't have the exact date, but I
7  did.  There are letters that we submitted that
8  prove it.
9    Q.   Does the timing of April 2010 sound
10  correct for when he sent those letters?
11    A.   You probably have here.  So
12  that's what it is.  I don't remember that date.
13         2010, can you remember?
14    Q.   Unfortunately yes, but --
15    A.   Good.
16    Q.   -- it is -- do you have any
17  recollection of after those letters were sent to
18  your sister and your niece ever raising the topic
19  again with them about putting money into the
20  Connecticut business?
21    A.   Yes.
22    Q.   When was that?
23    A.   I don't remember the date but I will
24  let you know what my sister said.  She said I want
25  to get money out.  I don't want to put money in.

Page 117

L. Eber

1
2    Q.   And when did she say that?
3    A.   I don't remember the date.
4    Q.   Was it around the time when you sent
5  her the letter?
6    A.   It could have been and then later on.
7  I don't have the dates.
8    Q.   Did you ever tell your sister that if
9  she didn't put money in that you were going to
10  take it away from the trust?
11         MR. RAMSEY:  Form.
12    A.   No, I didn't say that to her.
13    Q.   Why not?
14    A.   Because it wasn't that desperate a
15  situation.  I did it when the company, it became
16  desperate that if I didn't put the money in no one
17  else was going to put it in and there wouldn't be
18  a company.
19    Q.   How do you know if no one else was
20  going to put money in if they knew what was at
21  stake was the continuation of the family business
22  under the family trust?
23         MR. RAMSEY:  Form.
24    A.   They both refused and had no interest
25  in putting any money into the company.

30 (Pages 114 - 117)

Page 118

```
                 L. Eber
 1
 2      Q.   But you never told them of the
 3   possibility that if they did not put money in they
 4   would lose their interest in the family business;
 5   correct?
 6          MR. RAMSEY:  Form.  Asked and
 7      answered.
 8          Go ahead.  You can answer it again.
 9          MR. BROOK:  It was asked but not
10      answered.
11      A.   I don't remember saying that to them.
12      Q.   Do you know anyone else who talked
13   with your sister or your niece about the need to
14   put money into the family business in 2010 or
15   2011?
16      A.   I don't know.
17      Q.   Looking at Exhibit 8 in front of you,
18   you signed that based upon your own knowledge and
19   belief it says at the top; right?
20      A.   Yes.
21      Q.   So and this was also something where
22   you made the statement or made the affidavit under
23   penalty of false statement; correct?
24      A.   Yes.
25      Q.   So you understood that it was a
```

Page 119

```
                 L. Eber
 1
 2   statement being made under oath like your
 3   testimony today?
 4      A.   Yes.
 5      Q.   So you knew how important it was to
 6   tell the truth?
 7      A.   Yes.
 8      Q.   The whole truth; correct?
 9          MR. RAMSEY:  Form.
10      A.   Yes.
11      Q.   And nothing but the truth; correct?
12          MR. RAMSEY:  Form.
13      A.   Yes.
14      Q.   So item 3 you wrote in this affidavit
15   "Presently 79 percent of Eber Connecticut is owned
16   by me through an entity known as Eber Metro."
17          Was that a true statement?
18          MR. RAMSEY:  Form.
19      A.   If that's what I said at the time and
20   signed it, yes.
21      Q.   So it is your understanding that at
22   the time that you signed this Eber Connecticut or
23   Eber Metro was not owned by the trust?
24      A.   Yes.
25      Q.   And you said that item number 4 though
```

Page 120

```
                 L. Eber
 1
 2   is that you wish to transfer that 79 percent from
 3   Eber Metro to Lester Eber LLC.
 4          Do you see that?
 5      A.   Yes.
 6      Q.   So isn't it true that actually this
 7   affidavit was written at a time when Eber
 8   Connecticut was still ultimately or 79 percent of
 9   Eber Connecticut was owned by the trust?
10          MR. RAMSEY:  Form.
11      A.   I don't understand what you -- I just
12   don't understand what you are saying here.
13      Q.   You agree with me that if Eber Metro
14   was still an entity that was owned and controlled
15   by the trust, then the statement in item number
16   three would not be correct?
17          MR. RAMSEY:  Form.
18      A.   Could you repeat that?
19          (Record read.)
20      A.   That's correct.
21      Q.   Now item number 4 emphasizes that by
22   saying that Lester Eber LLC is an entity which
23   will also be wholly owned by me.
24          Do you see that?
25      A.   Yes.
```

Page 121

```
                 L. Eber
 1
 2      Q.   So you were making it clear that you
 3   were telling the recipient of this affidavit that
 4   Eber Metro was wholly owned by you; correct?
 5          MR. RAMSEY:  Form.
 6      A.   Yes.
 7      Q.   And you said in item number 5 "This
 8   transfer is being done for no consideration."
 9          Do you see that?
10      A.   Yes.
11      Q.   What did you mean by that?
12      A.   It is whatever it says.  No
13   consideration.
14      Q.   So no consideration means nothing is
15   being received by Eber Metro in return for giving
16   up the 79 percent of Eber Connecticut; is that
17   right?
18          MR. RAMSEY:  Form.
19      A.   I didn't write this and I would have
20   to talk to whoever did write this to explain it to
21   me.
22      Q.   Who wrote this?
23      A.   I think it's probably something that
24   the Consumer Protection Agency of The State of
25   Connecticut required.
```

31 (Pages 118 - 121)

Page 122

L. Eber

1
2    Q.   That doesn't answer who wrote this.
3    A.   I don't know.
4    Q.   So was it true that you wanted to
5    transfer the 79 percent of Eber Connecticut to
6    Lester Eber LLC for no consideration?
7        MR. RAMSEY:  Form.
8    A.   I can't explain that to you.
9    Q.   Let's jump ahead in time for a little
10   bit here to late 2016 through 2017.
11   Around the time when this lawsuit was
12   first filed and months afterwards, do you recall
13   that at that point you sought to acquire all of
14   the shares of Eber Brothers and Co., Inc. from the
15   Allen Eber Trust?
16   A.   Yeah.  I believe so.
17   Q.   What did you offer to provide to the
18   Allen Eber Trust in exchange for that?
19   A.   I don't remember the transaction.  I
20   was not -- I was aware of it but I was not
21   actually into the details of it.
22   Q.   Did you have any lawyer who was
23   helping you try to acquire Eber Brothers and Co.,
24   Inc.?
25   A.   Yes.

Page 123

L. Eber

1
2    Q.   Who was that?
3    A.   John Herbert.
4    Q.   Anyone else?
5    A.   I believe he was the lawyer.
6    Q.   Who is Jim Vazzana?
7    A.   Yes.  He is trust and estate lawyer.
8    Q.   Is he a lawyer that you hired?
9    A.   Yes.
10   Q.   To represent you individually?
11   A.   Yes.
12   Q.   And did you also ask him to help you
13   acquire the stock of Eber Brothers and Co., Inc.?
14   A.   I believe so at one time.
15   Q.   Why did you want the Eber Brothers and
16   Co., Inc. stock at that time?
17   A.   You know, I just don't remember the
18   details of it.
19   Q.   But you asked for the stock on
20   multiple occasions; correct?
21   A.   I believe so, yes.
22   Q.   And let's -- withdrawn.
23   Who was it that you were asking to
24   authorize the transfer of the stock?
25   A.   I don't understand the question.

Page 124

L. Eber

1
2    Q.   You yourself were a co-trustee of the
3    trust; correct?
4    A.   Yes.
5    Q.   So why didn't you just transfer the
6    stock to yourself?
7    A.   I didn't do it.
8    Q.   Why not?
9    A.   I just didn't.  I don't have an answer
10   for you.
11   Q.   Did you think that you had the power
12   or authority to do that?
13   A.   I don't know.  It's possible I did.  I
14   just didn't do it.
15        MR. BROOK:  I think this next segment
16   is going to be best done on one continuous
17   whole.  So why don't we go ahead and break
18   for lunch right now.
19        THE VIDEOGRAPHER:  We are going off
20   the record.  The time is 12:20.
21        (Luncheon recess:  12:20 p.m.)
22
23
24
25

Page 125

L. Eber

1
2    A F T E R N O O N   S E S S I O N.
3        (12:57 p.m.)
4    L E S T E R   E B E R,
5    having been previously sworn, resumed the
6    stand and testified further as follows:
7    EXAMINATION (Cont'd)
8    BY MR. BROOK:
9        THE VIDEOGRAPHER:  We are going back
10   on the record.  The time is 12:59.
11   Q.   After breaking for lunch Mr. Eber,
12   were you able to get some food?
13   A.   Yes.
14   Q.   And are you feeling okay to continue
15   this deposition?
16   A.   Yes.
17   Q.   Any reason at all you can think of why
18   you wouldn't be able to provide full and truthful
19   testimony?
20   A.   No.
21   Q.   After this lawsuit was filed, did you
22   become aware of the plans by your co-trustee
23   Canandaigua National Bank and Trust to seek a
24   judicial order terminating the trust?
25   A.   Yes.

32 (Pages 122 - 125)

Page 126

L. Eber

1          L. Eber
2      Q.   How did you find out about that?
3      A.   I believe my lawyer Vazzana told me
4   about it.
5      Q.   Did you know about that before it was
6   filed in the court?
7      A.   No.
8      Q.   And so you appointed Mr. Vazzana to be
9   your lawyer for that court proceeding; correct?
10      A.   Yes.
11      Q.   Had he represented you on anything
12   before then?
13      A.   Yes.
14      Q.   What?
15      A.   Personal issues.
16      Q.   How long had he been representing you
17   for personal issues?
18      A.   I don't remember.  Could have been a
19   couple of years.  I don't remember.
20      Q.   Did any of those personal issues
21   concern the Allen Eber Trust?
22      A.   No.
23      Q.   What was your understanding of what
24   would happen with the assets or what was going to
25   happen with the assets of the Allen Eber Trust if

Page 127

1          L. Eber
2   Canandaigua National Bank had been successful in
3   terminating the trust?
4      A.   Never would happen with the
5   disbursement of the trust.  You know, whatever the
6   procedure was.  I didn't know.
7      Q.   You didn't know what would happen with
8   the assets?
9      A.   The assets would be distributed among
10   the trustees.  Not the trustees.  The
11   beneficiaries, excuse me.
12      Q.   How would the percentages or amounts
13   of distribution be determined?
14      A.   By the percentage of the trustees.
15   You know, there were -- not the trustees.  Excuse
16   me, by the beneficiaries divided three ways which
17   would also Danny and his sister would split one of
18   the thirds.
19      Q.   So it was going to be divided into
20   thirds between one third going to you, one third
21   going to Audrey Hays and one third being split
22   between Lisa Stein and Dan Kleeberg; is that
23   right?
24      A.   Yes.
25      Q.   And did you oppose that distribution

Page 128

1          L. Eber
2   of the assets?
3      A.   No.
4      Q.   And you understood that the assets
5   included the trust stock in Eber Brothers and Co.,
6   Inc.; correct?
7      MR. RAMSEY:  Form.
8      A.   You know, I think that was
9   questionable.  I can't give you an answer on that.
10   I don't know.
11      Q.   What was questionable about that?
12      A.   I don't know of the status of what the
13   stock was or wasn't and I think that would be a
14   question you would have to ask my lawyer.
15      MR. BROOK:  Let's mark this as the
16   next exhibit Plaintiffs' 32.
17      (Plaintiffs' Exhibit 32, a letter
18   and some attachments that are dated July 12,
19   2017 from Rita Nischal of Canandaigua
20   National Bank and Trust to Lester Eber,
21   marked for identification, as of this date.)
22      MR. BROOK:  Go ahead and do 33 as
23   well.
24      (Plaintiffs' Exhibit 33, a order in
25   the Surrogates Court of The State of New

Page 129

1          L. Eber
2   York in Monroe County dated June 1, 2017
3   signed by Surrogate Judge John M. Owens,
4   marked for identification, as of this date.)
5      Q.   You have Exhibits 32 and 33 in front
6   of you.  Exhibit 32 is a letter and some
7   attachments that are dated July 12, 2017 from Rita
8   Nischal, N-I-S-C-H-A-L, of Canandaigua National
9   Bank and Trust to Lester Eber.
10      And Exhibit 33 is a order in the
11   Surrogates Court of The State of New York in
12   Monroe County dated June 1, 2017 signed by
13   Surrogate Judge John M. Owens.
14      Have you seen either or both of these
15   documents before Mr. Eber?
16      A.   Yes.
17      Q.   When did you see the judicial order
18   Exhibit 33?
19      A.   I don't remember.
20      Q.   Was it around the time that the order
21   was entered?
22      A.   It was whenever my lawyer sent it to
23   me.
24      Q.   And do you have any reason to doubt
25   that your lawyer sent it to you promptly after

33 (Pages 126 - 129)

Page 130

```
1              L. Eber
2   receiving it himself?
3       A.  No.
4       Q.  And Exhibit 32, when did you see that?
5       A.  I saw it when it was sent to me.  It
6   is July 12th.  So whenever that time period.
7       Q.  Did you review the documents that were
8   enclosed with it?
9       A.  Yes.
10      Q.  Look at page 2 of this exhibit.
11          It says receipt and release in the
12  upper right-hand corner?
13      A.  Yes.
14      Q.  Did you ever sign a receipt and
15  release for Canandaigua National Bank?
16      A.  You know, I don't think I did, but I
17  could have.  I don't remember.
18      Q.  Take a look at page 3.
19          You see it is a table saying residuary
20  TUW Allen Eber proposed distribution?
21      A.  Yes.
22      Q.  And you saw that too; correct?
23      A.  Yes.
24      Q.  And so you saw presumably that listed
25  on the assets here was three line items for Eber
```

Page 131

```
1              L. Eber
2   Brothers and Co. stock?
3       A.  Yes.
4       Q.  And this shows that stock being
5   distributed in roughly the proportions you said
6   the trust assets should be distributed; correct?
7       A.  That I had said?
8       Q.  Well, you previously testified that
9   you understood that the distribution would be one
10  third to you, one third to Audrey Hays and one
11  third split between Dan Kleeberg and Lisa Stein?
12      A.  Yes.
13      Q.  And this reflects close to that
14  distribution; correct?
15      A.  Yes.
16      Q.  Did you have any objection to that
17  distribution of shares of Eber Brothers and Co.
18  stock as specified in this proposed distribution
19  chart?
20      A.  I don't remember it.  I could have.
21  There has been some discussion about it, but I
22  don't remember what I said or didn't say or what
23  our position was.
24      Q.  It is your understanding ultimately
25  the publicly traded stocks and the cash held by
```

Page 132

```
1              L. Eber
2   the Allen Eber Trust was distributed to the
3   beneficiaries of the trust?
4       A.  Yes.
5       Q.  Did you insist that there be certain
6   adjustments made to the distribution after you saw
7   this chart page 3 of Exhibit 32?
8           MR. RAMSEY:  Form.
9       A.  (Indicating.)
10      Q.  Yes.
11      A.  I don't remember.
12          MR. BROOK:  Let's mark this next
13  exhibit Plaintiffs' Exhibit 34.
14          (Plaintiffs' Exhibit 34, a letter
15  and attachments that was produced yesterday
16  by Canandaigua National Bank Bates stamped
17  CNB-PL 0010 through 12, marked for
18  identification, as of this date.)
19      Q.  Exhibit 34 in front of you is a letter
20  and attachments that was produced yesterday by
21  Canandaigua National Bank and is Bates stamp by me
22  as CNB-PL 0010 through 12.
23          Do you recognize this document?
24      A.  Yes.
25      Q.  What is it?
```

Page 133

```
1              L. Eber
2       A.  It's a letter to Canandaigua Bank
3   reducing the money to Lisa Stein from the money
4   that was given by the trust to her daughter Erica
5   Stein.
6       Q.  And is this a letter that you asked to
7   have sent on your behalf?
8       A.  I am copied on it.  So I was aware of
9   it.
10      Q.  Did you authorize Mr. Vazzana to send
11  it?
12      A.  I was aware of it and I was involved
13  in that knew what was going on.  I was aware of
14  it.  That's what I can say to you.
15      Q.  Were you aware of the letter going out
16  before it was sent?
17      A.  Yes.
18      Q.  This was not the first letter that was
19  sent on your behalf asking Canandaigua National
20  Bank to reduce the amount of distribution from the
21  trust to Lisa Stein, was it?
22          MR. RAMSEY:  Form.
23      A.  No.  You are asking questions that
24  show in the other letters.  So you know the
25  answer.
```

34 (Pages 130 - 133)

Page 134

L. Eber

1
2    Q.   Why did you want the amount of
3    distribution from the trust to Lisa Stein reduced
4    versus what Canandaigua had proposed?
5    A.   I believe the reason and you say me, I
6    think there were other people involved in this as
7    you see who were copied, lawyers, that there was
8    money had been given to, from the trust to her
9    daughter.
10    Q.   So you wanted to make sure that only
11    the cost of the money being given to Lisa Stein's
12    daughter was borne solely by Lisa Stein; is that
13    right?
14    A.   It was for her daughter out of Lisa
15    Stein's money, the money that was to go to Lisa
16    Stein.  The trust, the way I understood it, took
17    the money out of Lisa Stein's account.
18    Q.   And is it your understanding that
19    based on your request Canandaigua National Bank
20    the amount of the distribution to Lisa Stein was
21    reduced in full by the amount that had been paid
22    previously to Erica Stein?
23    A.   Yes.
24    Q.   And is there any amount of money
25    that's still owed back to the other trust

Page 135

L. Eber

1
2    beneficiaries by Lisa Stein?
3    A.   Not that I know.
4    Q.   Did you ask the Canandaigua National
5    Bank also reduce the number of shares of Eber
6    Brothers and Co. Inc. that were distributed to
7    Lisa Stein?
8    A.   Did I, no.  I don't remember that.  I
9    don't remember that, no.
10    Q.   Can you think of any reason why the
11    number of shares that Eber Brothers and Co., Inc.
12    should have been reduced, the numbers of shares --
13    let me restart this.
14    Can you think of any reason why the
15    trusts distribution of shares of Eber Brothers and
16    Co., Inc. should have been reduced for Lisa Stein
17    based upon either the prior distributions to Erica
18    Stein or for any other reason?
19    MR. RAMSEY:  Form.
20    A.   I think --
21    MR. BROOK:  I will withdraw that.
22    That was still bad.
23    Q.   So can you think of any reason why the
24    trusts distribution of Eber Brothers and Co., Inc.
25    shares to Lisa Stein should have been reduced?

Page 136

L. Eber

1
2    MR. RAMSEY:  Form.
3    Go ahead.
4    A.   I believe that it is a legal question
5    and I am not a lawyer.
6    Q.   What was your belief as of July 2017
7    about the value of the Eber Brothers and Co., Inc.
8    stock?
9    MR. RAMSEY:  Form.
10    A.   As I thought it was worthless.
11    Q.   Why did you believe that?
12    A.   Because it had no assets.  What were
13    the assets.
14    Q.   Why did you want to obtain the shares
15    of Eber Brothers and Co., Inc. stock for yourself?
16    A.   I think, as I told you before, I think
17    it is a legal question that you should ask the
18    lawyers.  I am not capable of answering it.
19    Q.   Was your goal to try to prevent
20    plaintiffs from pursuing their lawsuit against
21    you?
22    MR. RAMSEY:  Form.
23    A.   I said ask the lawyers.  I don't have
24    an answer for you.
25    MR. BROOK:  Let's go to this next

Page 137

L. Eber

1
2    Exhibit 35.
3    (Plaintiffs' Exhibit 35, a e-mail
4    and attachment dated October 31, 2018 sent
5    by Paul Keneally with multiple recipients
6    CNB-PL 0001 to 2, marked for identification,
7    as of this date.)
8    Q.   Exhibit 35 in front of you is a e-mail
9    and attachment dated October 31, 2018 sent by Paul
10    Keneally with multiple recipients CNB-PL 0001 to
11    2.
12    Have you seen this before?
13    A.   I signed it, so I must have.
14    Q.   You're referring to the second page of
15    the exhibit?
16    A.   Behind it, yeah.
17    Q.   So that is your signature?
18    A.   Yes.
19    Q.   And do you remember signing this
20    document?
21    A.   I don't remember, but I did sign it.
22    Q.   How do you know that you signed it if
23    you don't remember it?
24    A.   That's my signature.  So nobody is
25    putting my -- that's my signature on it.

35 (Pages 134 - 137)

Page 138

L. Eber

2    Q.    The second page is addressed to the
3  Allen Eber Trust care of the Canandaigua National
4  Bank and Trust Company; correct?
5    A.    Yes.
6    Q.    And it says in all caps below that
7  notice of intent to purchase shares; correct?
8    A.    Yes.
9    Q.    Then the body of it states "The
10 undersigned hereby gives notice of my intent to
11 purchase all shares of capital stock of Eber
12 Brothers and Co., Inc. defined as the company of
13 which the Allen Eber Trust is the registered
14 holder that are proposed to be transferred to
15 Daniel Kleeberg, Lisa Stein or Audrey Hays
16 pursuant to Article 12 of the bylaws of the
17 company." Then your signature.
18        Did I read that correctly?
19    A.    Yes.
20    Q.    What was your purpose in sending this
21 notice of intent?
22    A.    If you look at the bylaws of the
23 company I had the right to do it.
24    Q.    Why do you say that?
25    A.    Read the bylaws.

Page 139

L. Eber

2    Q.    Did you read the bylaws?
3    A.    I have.
4    Q.    And it is your belief that the bylaws
5  of the company permitted you to purchase the
6  shares of capital stock of Eber Brothers and Co.
7  stock?
8    A.    On the advice of counsel, yes.
9    Q.    Why did you wait until October 31,
10 2018 to send this notice?
11    A.    Ask my lawyer.
12    Q.    Now you knew that Canandaigua National
13 Bank and Trust Company had proposed to and
14 attempted to transfer the Eber Brothers and Co.,
15 Inc. shares to Dan Kleeberg, Lisa Stein and Audrey
16 Hays a year before this date; correct?
17        MR. RAMSEY: Form.
18    A.    If you are saying that you probably
19 have something that shows that. I don't remember.
20    Q.    And you said here, what you signed
21 your name to, you intended to purchase the shares;
22 correct?
23    A.    That's what it says here.
24    Q.    How much money did you intend to
25 purchase the shares for?

Page 140

L. Eber

2    A.    You have to ask my lawyer.
3    Q.    So you signed this without knowing how
4  much money you were committing to pay?
5        MR. RAMSEY: Form.
6    A.    I signed it. I don't have an answer
7  for you on that. I think it's a legal question.
8    Q.    So for all you know you might need to
9  pay the plaintiffs over two million dollars each
10 in order to get the shares that you agreed to
11 purchase?
12        MR. RAMSEY: Form.
13    A.    No.
14    Q.    Why do you say no?
15    A.    Because it isn't worth it.
16    Q.    Well, why do you say that?
17    A.    What's the -- where does it show that
18 it is worth that kind of money? Can you show
19 that?
20    Q.    Again, if it is not -- if you don't
21 know how much the shares are worth, then how can
22 you agree to purchase them?
23        MR. RAMSEY: Form.
24    A.    I told you I am not qualified to
25 answer your question. Please consult my lawyer.

Page 141

L. Eber

2    Q.    So you are authorizing us to ask these
3  questions of your lawyer?
4  DI    MR. RAMSEY: Don't answer that.
5        MR. BROOK: I think he already did,
6  but I am just trying to make it clear.
7        MR. CALIHAN: I don't agree, but.
8        MR. BROOK: I know.
9        Let's do two more exhibits after that.
10 We are up to 36 and 37.
11        (Plaintiffs' Exhibit 36, a printout
12 of a table with some notes entitled
13 Residuary TUW Allen Eber Proposed
14 Distribution of Securities, marked for
15 identification, as of this date.)
16        (Plaintiffs' Exhibit 37, a e-mail
17 dated September 15, 2017 sent by Jim Vazzana
18 to R. Nischal at CNB, Canandaigua National
19 Bank, with yourself as one of the people
20 copied on it Bates stamped CNB-PL 0005,
21 marked for identification, as of this date.)
22    Q.    Looking first at Exhibit 36. This is
23 a printout of a table with some notes entitled
24 Residuary TUW Allen Eber Proposed Distribution of
25 Securities.

36 (Pages 138 - 141)

Page 142

```
 1              L. Eber
 2       Do you see that?
 3       A.   Yes.
 4       Q.   And have you seen this version of the
 5  chart before?
 6       A.   Yes.
 7       Q.   When do you recall first seeing this?
 8       A.   I don't remember.
 9       Q.   Do you see that this table also
10  includes distribution numbers for the shares of
11  Eber Brothers and Co. stock held by the trust?
12       A.   Yes.
13       Q.   Do you recall making any objection to
14  the distribution proposed in this chart after you
15  saw it?
16       A.   I don't remember.
17       Q.   After you saw this chart, do you
18  recall contacting anyone and saying you wanted to
19  buy the shares of Eber Brothers and Co., Inc.
20  stock that were proposed to be distributed to
21  Daniel Kleeberg, Lisa Stein and Audrey Hays?
22       MR. RAMSEY:  Form.
23       A.   I don't remember.
24       Q.   Please take a look at Exhibit 37 now
25  which is a e-mail dated September 15, 2017 sent by
```

Page 143

```
 1              L. Eber
 2  Jim Vazzana to R. Nischal at CNB, Canandaigua
 3  National Bank, with yourself as one of the people
 4  copied on it Bates stamped CNB-PL 0005.
 5       Do you see that?
 6       A.   Yes.
 7       Q.   Do you recognize this e-mail?
 8       A.   I assume I saw it.  It was sent.  I
 9  was copied on.
10       Q.   In this e-mail, which was sent by your
11  lawyer, it begins by saying "Dear Rita, as you
12  know we represent Lester Eber and he and the other
13  beneficiaries are reticent to sign a release and
14  receipt as submitted.  However, he will sign it
15  without the release provision."
16       Do you see that?
17       A.   Yes.
18       Q.   So you had talked to your lawyer about
19  signing a receipt prior to him sending this
20  e-mail; correct?
21       MR. RAMSEY:  Well, hold on.
22       Don't tell him what you talked to your
23       lawyer about.
24       Q.   Did you authorize your lawyer to send
25  this e-mail?
```

Page 144

```
 1              L. Eber
 2       MR. RAMSEY:  You can answer that.
 3       A.   Yes.
 4       Q.   And so is it fair to say that as of
 5  September 15, 2017 you agreed with the proposed
 6  distribution that Canandaigua National Bank had
 7  sent to you?
 8       MR. RAMSEY:  Form.
 9       A.   No, I don't.  This is only to sign a
10  release.
11       Q.   Okay, so what did you understand to be
12  the significance of signing or not signing a
13  release?
14       A.   Whatever liability that would waive or
15  what have you.
16       MR. BROOK:  Let's go to the next
17       Exhibit 38.
18       (Plaintiffs' Exhibit 38, a letter
19       dated October 11, 2017 on letterhead for
20       Woods Oviatt Gilman LLP addressed to Jim
21       Vazzana and me, marked for identification,
22       as of this date.)
23       Q.   Exhibit 38 is a letter dated October
24  11, 2017 on letterhead for Woods Oviatt Gilman LLP
25  addressed to Jim Vazzana and me.
```

Page 145

```
 1              L. Eber
 2       Do you see that?
 3       A.   Yes.
 4       Q.   Have you seen this letter before?
 5       A.   You know I don't remember.  It doesn't
 6  show me copied on it, but I could have.  I don't
 7  remember.
 8       Q.   And do you recall seeing that there
 9  were stock powers that were signed by someone from
10  Canandaigua National Bank purporting to transfer
11  to you shares in Eber Brothers and Co., Inc.?
12       A.   Could you repeat the question?
13       Q.   Sure.
14       Do you recall seeing that around the
15  time of this letter there were stock powers that
16  had been signed by someone from Canandaigua
17  National Bank and Trust purporting to transfer
18  Eber Brothers and Co., Inc. stock to you?
19       A.   I don't remember.
20       Q.   Do you know what stock powers are?
21       A.   Yes.
22       Q.   What are stock powers?
23       A.   The ability to vote the stock.
24       Q.   And how do the stock powers once
25  executed get turned into actual voting rights for
```

37 (Pages 142 - 145)

Page 146

L. Eber

1
2  the stock?
3      A.  I don't know.
4      Q.  Was it your understanding as a result
5  of the termination of the Allen Eber Trust and
6  distribution of assets by Canandaigua National
7  Bank you yourself became a voting common
8  shareholder of Eber Brothers and Co., Inc.?
9          MR. RAMSEY:  Form.
10     A.  I never -- I don't know.  I don't
11 remember conversations on that.  I just don't
12 remember.
13     Q.  On this document here in this letter
14 it refers to copies of stock powers being sent and
15 then I will just read the whole paragraph into the
16 record so we are all clear.  It says "Enclosed
17 please find your client's respective copies of the
18 stock powers transferring their shares of Eber
19 Brothers and Co., Inc. pursuant to Canandaigua
20 National Bank and Trust Company's distribution
21 schedule.  As the bank never had possession of the
22 company's stock book or other corporate documents
23 and despite requests, the bank has not been
24 provided with the same.  We were required to
25 complete these transfers via these stock powers as

Page 147

L. Eber

1
2  opposed to issuing new stock certificates.  We are
3  currently retaining the original stock powers
4  which I have affixed to each original stock
5  certificate that the bank received when it became
6  successor co-trustee.  We will continue to do so
7  unless and until such time as we are advised as to
8  whom these originals should be provided given the
9  apparent inability to locate the company's stock
10 book and affiliated records.  It is my
11 understanding that the securities were transferred
12 to your client's respective financial institutions
13 on September 29th and that the remaining assets
14 were electronically transferred last week as
15 well."
16         Did I read that correctly?
17     A.  Yes.
18     Q.  And so do you know what this letter
19 was referring to about the apparent inability to
20 locate the company's stock book?
21     A.  What it says there.  They couldn't
22 find it.
23     Q.  What is a stock book?
24     A.  I don't know.
25     Q.  How does new stock get issued by a

Page 148

L. Eber

1
2  company?
3      A.  I am not involved.  I don't know.
4      Q.  Whose responsibility was it for Eber
5  Brothers and Co., Inc. to take care of the stock
6  book registration of stockholders and issuance of
7  stock certificates?
8      A.  I can't remember.
9      Q.  Do you know where the stock book for
10 Eber Brothers and Co., Inc. currently is?
11     A.  No.
12     Q.  Is it your understanding that the
13 stock book for Eber Brothers and Co., Inc. was
14 misplaced for a period of time?
15     A.  I do not know.
16         MR. BROOK:  Let's go to the next
17     Exhibit 39.
18         (Plaintiffs' Exhibit 39, a four-page
19     letter dated November 5, 2018 by Paul
20     Keneally addressed to Magistrate Judge
21     Katherine Parker, marked for identification,
22     as of this date.)
23     Q.  Exhibit 39 is a four-page letter dated
24 November 5, 2018 by Paul Keneally addressed to
25 Magistrate Judge Katherine Parker.

Page 149

L. Eber

1
2         Do you recognize this document?
3      A.  I don't remember seeing it.  Yeah, I
4  probably did.  I probably was copied and got a
5  copy of it.  I just don't remember.
6      Q.  Paul Keneally is the lawyer for you,
7  your daughter and the Eber companies in this
8  litigation; correct?
9      A.  Yes.
10     Q.  And I would like to draw your
11 attention to paragraph 3 on this first page.  I
12 will read it into the record.  Mr. Keneally wrote
13 to the court in response to a letter by me "It is
14 not true that the corporate stock register was
15 quote lost.  The register is maintained by the
16 corporate secretary Wendy Eber who is solely
17 responsible for registering valid transfers of
18 stock in it.  Neither the Allen Eber Trust,
19 defined as the trust, nor CNB as one of its
20 trustees has any responsibility or role in
21 registering stock transfers.  The corporate
22 secretary never told CNB that the register was
23 lost."
24         Did you see that?
25     A.  Yes.

38 (Pages 146 - 149)

Page 150

L. Eber

1            L. Eber
2     Q.   And did you authorize Mr. Keneally to
3  make this statement?
4       MR. RAMSEY:  Form.
5     A.   He is my lawyer.
6     Q.   And does that refresh your
7  recollection as to whose responsibility it was to
8  deal with the stock book and issue stock
9  certificates on behalf of Eber Brothers and Co.,
10  Inc.?
11       MR. RAMSEY:  Form.
12     A.   If that's what he says that's what it
13  is. He represents me.
14     Q.   So do you know how looking back at
15  Exhibit 38, do you know why the lawyers for
16  Canandaigua National Bank appeared to believe that
17  the stock book was not able to be located as of
18  October 2017?
19     A.   No.
20     Q.   And to the best of your knowledge, has
21  Wendy Eber always been in possession of the
22  company's stock book?
23       MR. RAMSEY:  Form.
24     A.   I don't know.
25       MR. BROOK:  Let's do two more

Page 151

1            L. Eber
2  exhibits.  This is 40 and 41.
3     (Plaintiffs' Exhibit 40, a e-mail
4  dated June 2, 2017 from Jim Vazzana to
5  Lorisa LaRocca Bates number CNB-PL 0022,
6  marked for identification, as of this date.)
7     (Plaintiffs' Exhibit 41, an e-mail
8  dated August 18, 2017 from Jim Vazzana to
9  Lorisa LaRocca, marked for identification,
10  as of this date.)
11     Q.   Exhibit 40 is a e-mail dated June 2,
12  2017 from Jim Vazzana to Lorisa LaRocca Bates
13  number CNB-PL 0022.
14     Do you recognize that e-mail?
15       MR. RAMSEY:  You are not suggesting he
16  was copied on it; right?
17       MR. BROOK:  No.
18     A.   I'm not.  I wasn't copied.
19     Q.   Nonetheless, are you aware that your
20  lawyer sent an e-mail along these lines to Lorisa
21  LaRocca who was representing Canandaigua National
22  Bank?
23     A.   You know, I think it's possible.  I
24  don't remember but it is very possible.
25     Q.   Was Jim Vazzana representing your

Page 152

1            L. Eber
2  daughter Wendy as well as you?
3     A.   He was my lawyer.
4     Q.   Now do you see the second paragraph
5  here.  It refers to first two words say my
6  clients.
7     Do you see that plural?
8     A.   Yes.
9     Q.   Who else --
10     A.   It would be my daughter.
11     Q.   I would like to point your attention
12  now to the substance of the first paragraph which
13  I will also read for the record.  "Dear Lorisa, I
14  trust you received my e-mail of yesterday
15  afternoon regarding your inquiry as to the
16  corporate stock book of Eber Brothers and Co.,
17  Inc.  I am fairly confident that they do not have
18  it.  However, to be sure, Wendy will be in
19  Rochester for the fourth of July weekend and will
20  double check."
21     Do you see that?
22     A.   Yes.
23     Q.   So your lawyer told counsel for
24  Canandaigua National Bank that you and Wendy could
25  not locate the corporate stock book; correct?

Page 153

1            L. Eber
2       MR. RAMSEY:  Form.
3     A.   I don't remember that.  It's very
4  confusing and I just don't remember.
5     Q.   Did you have an understanding as to
6  why Canandaigua National Bank wanted the corporate
7  stock book?
8     A.   No.
9     Q.   Please turn to Exhibit 41 which is an
10  e-mail dated August 18, 2017 again from Jim
11  Vazzana to Lorisa LaRocca this time with you and
12  your daughter Wendy copied on it.
13     Do you see that?
14     A.   Yes.
15     Q.   This has Bates numbers CNB-PL 0006.
16  And this e-mail reads "Lorisa, have you or your
17  client ever found the stock register on Eber
18  Brothers Co.  My client indicated in June that she
19  would make a special trip to Rochester in July to
20  see if she could find them.  Please advise."
21     Do you see that?
22     A.   Yes.
23     Q.   Do you remember this e-mail?
24     A.   I got it.
25     Q.   Do you remember seeing it?

39 (Pages 150 - 153)

Page 250

L. Eber

1
2 statements value the equity of Eber Connecticut at
3 in late 2011 and early 2012?
4   A.   No.
5   Q.   Do you think that information is
6 material to understanding what the value of Eber
7 Connecticut might have been at that time?
8       MR. RAMSEY:   Form.
9   A.   I think you would have to ask an
10 accountant for that, of that.  I can't answer for
11 you.
12   Q.   I want to ask you now about your
13 relationship with Mike Gumaer.
14       When did you first meet him?
15   A.   After my father died.
16   Q.   So you had not interacted with him
17 before then?
18   A.   Never.
19   Q.   What was the nature of your
20 relationship with Mike Gumaer during the first few
21 years after your father died?
22   A.   He worked, I worked very close with
23 him.  He educated me to the trust and to
24 transactions you know in settling an estate, my
25 father's estate.

Page 251

L. Eber

1
2   Q.   At any point in time or -- withdrawn.
3       At that time Mike Gumaer was a partner
4 in the law firm of Nelson Hargrave.
5   A.   Nixon.
6   Q.   Nixon Hargrave?
7   A.   Yes.
8   Q.   Did you or Eber Brothers retain him as
9 a lawyer for the company?
10   A.   Yes.
11   Q.   Did you ever retain him as your
12 personal attorney?
13   A.   I used him as a personal attorney.
14   Q.   When did you start doing that?
15   A.   After my father died.
16   Q.   What kinds of things did you retain
17 him for?
18   A.   He advised me legally.  Send me
19 different law specialists in his firm or what have
20 you.  Everything.  Anything I had I needed a legal
21 opinion on I would go through him.
22   Q.   And for personal matters?
23   A.   Both personal and business, yes.
24   Q.   So for personal matters give an
25 example of something where you relied on Mr.

Page 252

L. Eber

1
2 Gumaer's legal advice.
3   A.   A will.
4   Q.   Did you pay him anything for that?
5   A.   I don't remember if he could have sent
6 me to someone else in his firm that charged me for
7 it.
8   Q.   Was Mr. Gumaer compensated for his
9 role as a co-trustee of the trust?
10   A.   He didn't take any money from the
11 trust.  He was paid by the company and the reason
12 he didn't take any money from the trust because it
13 would have reduced the income to the beneficiaries
14 of the trust.  So he was paid by the company.
15   Q.   Was there ever any sort of
16 documentation where Mr. Gumaer agreed to waive his
17 right to compensation as a director, I meant a
18 trustee?  I am correcting myself.
19   A.   I don't believe so.  In my father's
20 will I waived my compensation as an executor of
21 his estate.
22   Q.   What do you mean you waived?
23   A.   I served for free where the other
24 executors, the bank and Mr. Gumaer, were paid, you
25 know, whatever the law was.

Page 253

L. Eber

1
2   Q.   Was that your decision to serve for
3 free?
4   A.   It was my father's wish and I observed
5 it.
6   Q.   When did Mr. Gumaer retire from Nixon
7 Hargrave or Nixon Peabody as it became?
8       MR. CALIHAN:   Objection to form.
9   A.   It is in there.  I don't remember the
10 date.
11       MR. BROOK:   What's the basis for the
12 objection?
13       MR. CALIHAN:   I am not sure which
14 relationship with the firm you are referring
15 to.  I think there were several but I am
16 not --
17       MR. BROOK:   Understood.
18   A.   Thank you.
19       MR. BROOK:   Let's go to another
20 exhibit.  This is 47.
21       (Plaintiffs' Exhibit 47, a two-page
22 letter on the letterhead for Elliot W.
23 Gumaer, Jr. dated January 2, 2001 Bates
24 stamped January 8, 2001 and Bates number EB
25 00001556 to 57, marked for identification,

64 (Pages 250 - 253)

L. Eber

1   L. Eber
2   any debts that were owed directly by Eber
3   Connecticut; correct?
4       MR. RAMSEY:  Form.
5       A.   I don't -- I can't give you an answer.
6   I don't -- I would like to give you an answer but
7   I don't have an answer for you.
8       Q.   So was it your understanding that Eber
9   Connecticut was weighed down by the debt of Eber
10  Brothers Wine and Liquor Corp.?
11      MR. RAMSEY:  Form.
12      A.   Eber Wine and Liquor Corp. yeah, it
13  could have -- it didn't help it.  If it cleaned up
14  the debt and made a cleaner statement so we could
15  go to a bank and they could lend us money based on
16  the inventory or receivables of Connecticut.
17      Q.   And what were the debts that Eber
18  Brothers Wine and Liquor Corp. had at the time
19  that you were trying to clean up the balance
20  sheet?
21      A.   I don't remember.
22      Q.   There was PBGC; right?
23      A.   Yes.
24      Q.   There was the Teamsters?
25      A.   Yes.

1       L. Eber
2       Q.   There was Harris Beach?
3       A.   Yes.
4       Q.   Anyone else?
5       A.   Benderson.
6       Q.   What is Benderson?
7       A.   A real estate company.
8       Q.   How much was owed to them
9   approximately?
10      A.   It was over two hundred thousand I
11  believe at the time.
12      Q.   Anyone else?
13      A.   There could have been.  I just can't
14  remember now.
15      Q.   At some point in February 2012 you
16  through Alexbay filed a lawsuit against Eber
17  Brothers Wine and Liquor Corp.; correct?
18      A.   I don't remember.
19      MR. BROOK:  Let's go to our next
20      exhibit.  Up to 44 I think.
21      (Plaintiffs' Exhibit 44, a copy of a
22      summons and complaint dated February 21,
23      2012 bearing Bates number KSH 00070 through
24      83, marked for identification, as of this
25      date.)

1       L. Eber
2       Q.   Exhibit 44 is a copy of a summons and
3   complaint dated February 21, 2012 bearing Bates
4   number KSH 00070 through 83.
5       Do you recognize this document?
6       A.   Yes.
7       Q.   What is it?
8       A.   It is summons before a State Supreme
9   Court.  It is on an action for the foreclosure.
10      Q.   Who is the listed plaintiff here?
11      A.   Alexbay.
12      Q.   That's your company; right?
13      A.   Yes.
14      Q.   Who is the lawsuit against?
15      A.   Eber Wine and Liquor, Southern Eber
16  Wine and Liquor Metro, John Doe et cetera.
17      Q.   So does this refresh your recollection
18  that in February 2012 you did authorize the filing
19  of a lawsuit on behalf of Alexbay against Eber
20  Brothers Wine and Liquor Corp.?
21      A.   Yes.
22      Q.   At the time this lawsuit was filed,
23  had you resigned as president of Eber Brothers
24  Wine and Liquor Corp.?
25      A.   I believe so.

1       L. Eber
2       Q.   How did you resign?  How did you go
3   about doing this?
4       A.   I believe there was a board meeting
5   and I submitted my resignation to it.  I don't
6   actually remember going.  You know, how many years
7   ago that was.  It was when, in 2012 or before
8   that.
9       Q.   It is your recollection that it
10  happened at a board meeting; correct?
11      A.   I believe so, yes.  To the best of my
12  recollection.
13      Q.   Do you recall any board meetings of
14  Eber Brothers Wine and Liquor Corp. within the two
15  or three month period before this document Exhibit
16  44 was filed?
17      A.   I don't remember.  You know, it could
18  have been at a board meeting.  I could have just
19  submitted it.  Going back I don't remember.
20      Q.   What do you mean by submitted it, what
21  is it?
22      A.   Submitted a letter of resignation.
23      Q.   Do you recall ever signing a letter of
24  resignation?
25      A.   I can't remember.  I could have, but I

49 (Pages 190 - 193)

Page 194

L. Eber

1          L. Eber
2   don't remember the whole scenario of what
3   happened.
4       Q.   It had to have been a pretty big deal
5   when you resigned as president of your father's
6   company; correct?
7          MR. CALIHAN:  Objection to form.
8          MR. RAMSEY:  Form.
9       Q.   Was that an emotional moment for you?
10      A.   With what we have been through nothing
11  is emotional anymore.
12      Q.   So this was just strictly business; is
13  that right?
14         MR. RAMSEY:  Form.
15      Q.   You are nodding.
16         Is that a yes?
17      A.   It was part of the nightmare that was
18  going on with all these companies and trying to
19  keep them from being liquidated to survive.
20      Q.   What was your understanding as to what
21  might cause the business to be liquidated since
22  you were afraid of that?
23      A.   Lack of funds to pay the bills, pay
24  the suppliers and you are out.
25      Q.   So it was your understanding that

Page 195

L. Eber

1          L. Eber
2   there were certain creditors of the company that
3   could have forced a liquidation?
4       A.   Possibly that or we had to get a bank,
5   we had to get bank loans.  We had to get a bank
6   that would give us money to survive because you
7   saw early on Wells Fargo foreclosed on it and that
8   put us right out of business in New York.
9       Q.   When was that?
10      A.   It was in two thousand and what, five,
11  six.  I don't have the exact date.
12      Q.   So you are referring to Wells Fargo
13  foreclosing on Eber Metro?
14      A.   On Eber period.  All the Eber
15  companies.
16      Q.   Was there actually like a judicial
17  proceeding relating to that?
18      A.   Not that I know of.  They just
19  notified us that our loan was in default and we
20  were in a workout.
21      Q.   So it was something short of actually
22  initiating foreclosure proceedings in court; is
23  that right?
24      A.   I don't remember being in court on it.
25      Q.   And then you found Canandaigua

Page 196

L. Eber

1          L. Eber
2   National Bank to replace Wells Fargo?
3       A.   We found them for a small amount.  I
4   think it was a million five.  That wasn't enough.
5   We needed more and we needed something that wasn't
6   renewed every month or so.  We needed somebody to
7   give us a commitment and that's why we had to
8   clean up the balance sheet to make it look like
9   for a bank to want to loan us money.
10      Q.   Returning to Exhibit 44 in front of
11  you.
12         Did you review this before it was
13  filed?
14      A.   I don't remember, but I must have.
15  You know, I can't remember all these things 2012.
16         MR. RAMSEY:  Just wait for a question.
17      Q.   So why did you file this lawsuit?
18      A.   Why did I file what lawsuit?
19      Q.   The one that we are looking at here
20  Exhibit 44.
21      A.   Oh, the foreclosure?
22      Q.   Yes.
23         MR. CALIHAN:  Objection to form.
24         MR. RAMSEY:  Form.
25      A.   I filed it to solidify showing that I

Page 197

L. Eber

1          L. Eber
2   wasn't doing anything underhanded.  There would be
3   a public record of what I had done on advice of
4   counsel.
5       Q.   Which counsel was that?
6       A.   Michael Beyma.
7       Q.   And was it your understanding from the
8   outset that Eber Wine and Liquor and Eber Metro
9   were going to consent to what you requested?
10      A.   We filed it and it took its course.
11      Q.   Had you discussed the lawsuit before
12  you filed it with Wendy, your daughter?
13      A.   I probably had a discussion with her
14  of it.  I don't remember.  I was on advice.  My
15  discussion was with Michael Beyma.
16      Q.   Was Michael Beyma also representing
17  Eber Brothers Wine and Liquor at the time?
18      A.   I don't think so.  I think he just --
19  I don't remember.  I don't remember that, but I
20  remember that's who I worked with the lawyer on
21  this.  He had another fellow Brueckner, if you
22  look at the bottom, who wasn't with them anymore.
23      Q.   Who paid the legal fees of Michael
24  Beyma and Brueckner?
25      A.   I did.

50 (Pages 194 - 197)

Page 210

L. Eber

1
2    bearing the caption of Alexbay versus Eber
3    Brothers and it states it is the affidavit
4    of Lester Eber bearing Bates numbers EB
5    00001059 through 1063, marked for
6    identification, as of this date.)
7        Q.   Exhibit 45 is a document bearing the
8    caption of Alexbay versus Eber Brothers and it
9    states it is the affidavit of Lester Eber bearing
10   Bates numbers EB 00001059 through 1063.
11           Do you recognize this document?
12       A.   Yes.
13       Q.   What is it?
14       A.   It's an affidavit in support of
15   judicial determination for commercial
16   reasonableness under UCC 9-627.
17       Q.   And that's your signature on the last
18   page of this document; correct?
19       A.   Yes.
20       Q.   It states below your signature that it
21   was sworn before a notary public on the 14th day
22   of March 2012.
23           Do you see that?
24       A.   Yes.
25       Q.   You understood this was a statement

Page 211

L. Eber

1
2    under oath like today's deposition; correct?
3        A.   Yes.
4        Q.   Did you review this document carefully
5    before you signed it?
6        A.   Yes.
7        Q.   And you knew that this was a document
8    that the court might rely upon in deciding whether
9    to find the transaction that you had proposed to
10   be commercially reasonable or not; correct?
11       A.   Yes.
12           MR. RAMSEY:  Form.
13       Q.   Please turn to the second page
14   paragraph 6.
15           Are you there?
16       A.   Yes.
17       Q.   That states "Based upon very recent
18   arms length sales on the open market, Eber Conn's
19   value as a going concern is best established at
20   4,633,300 dollars as of December 2011."
21           Do you see that?
22       A.   Yes.
23       Q.   What sales were you referring to in
24   that sentence?
25       A.   I don't know.  I don't remember.

Page 212

L. Eber

1
2        Q.   Based upon your knowledge of the Eber
3    Metro, Eber Connecticut business, which sales do
4    you think you were referring to?
5        A.   I don't remember.
6        Q.   And you can't determine what sales you
7    were referring to based upon your knowledge of the
8    company?
9        A.   I just don't remember.  It is December
10   of 2011.
11       Q.   Why are you reluctant to state that
12   the sales you were referring to were the sales of
13   six percent to Polebridge Bowman?
14           MR. CALIHAN:  Objection to form.
15           MR. RAMSEY:  Form.  That's not what he
16   said.
17       A.   I didn't say that.
18       Q.   Besides Polebridge Bowman, what other
19   sales could you have possibly been referring to?
20       A.   I don't remember.
21       Q.   I am not asking you what you remember.
22   I am asking you as you sit here today.
23       A.   I don't know.
24       Q.   So you can't think of anything else
25   you might have been referring to?

Page 213

L. Eber

1
2           MR. RAMSEY:  Form.
3        A.   As I told you, going back to 2011 I
4    don't remember.
5        Q.   How many times has Eber Connecticut,
6    how many times has Eber Connecticut membership
7    units ever been sold?
8        A.   The only ones I remember are
9    Eder-Goodman and Polebridge Bowman.
10       Q.   And then besides those two
11   transactions, there was also a third transaction
12   in which the Polebridge Bowman shares were
13   transferred to your daughter; correct?
14       A.   Yes.
15       Q.   But that was not a sale; correct?
16       A.   I am not a lawyer.  The lawyers
17   handled that and I can't give you an answer to it.
18   I think you have to ask a lawyer.
19       Q.   To your knowledge, did Wendy pay
20   anything to Polebridge Bowman to acquire its
21   shares?
22           MR. RAMSEY:  Form.
23       A.   I do not know.  You know, I know the
24   transaction took place, but I do not know the
25   details of the transaction.

54 (Pages 210 - 213)

Page 254

L. Eber
1        L. Eber
2    as of this date.)
3    Q.   Exhibit 47 is a two-page letter on the
4    letterhead for Elliot W. Gumaer, Jr. dated January
5    2, 2001 Bates stamped January 8, 2001 and Bates
6    number EB 00001556 to 57.
7        Do you recognize this document?
8    A.   Yes.
9    Q.   What is it?
10    A.   It is a letter from Mike Gumaer to
11    myself about his retirement from Nixon Peabody.
12    Q.   And do you see on the back page there
13    is a line below the signature of Mike Gumaer
14    stating the terms and conditions of this letter
15    are agreed by the Eber companies?
16    A.   Yes.
17    Q.   And is that your signature below?
18    A.   Yes.
19    Q.   Do you remember signing this document?
20    A.   I don't remember signing it but I did.
21    It is January of '01.
22    Q.   And when is the last time that you
23    remember seeing this document?
24    A.   I don't remember.
25    Q.   Do you have any reason to believe that

Page 256

L. Eber
1        L. Eber
2    propose to you the following A, I shall continue
3    to waive any direct annual compensation as a
4    trustee of the Allen Eber Trust.  B, I shall
5    continue as a director of the Eber companies
6    without any compensation commensurate with my
7    responsibilities as a director.  And C, I shall
8    continue to serve as a consultant to the companies
9    and as counsel to you personally and as chief
10    executive officer."
11        Do you see that?
12    A.   Yes.
13    Q.   The letter then continues in the next
14    paragraph, "As compensation for all of these
15    duties the Eber companies will pay me an annual
16    consulting fee of forty thousand dollars payable
17    quarterly on the first of February, May, August
18    and November beginning February 1, 2001.  This
19    relationship shall remain in place until modified
20    by you and me in the manner established by this
21    letter."
22        Do you see that?
23    A.   Yes.
24    Q.   And you agreed to those terms that he
25    proposed?

Page 255

L. Eber
1        L. Eber
2    there are any amendments to this letter agreement?
3    A.   I don't know.  I don't remember.  I
4    don't know.
5    Q.   Turning to the second page at the top,
6    do you see he, Mike writes "As a director and
7    consultant to the companies I have endorsed your
8    strategic plan to grow our companies thus enabling
9    us to compete in an industry that's changed
10    radically over the years since your father's
11    death."
12        Do you see that?
13    A.   Yes.
14    Q.   Do you know what he meant by referring
15    to himself as a consultant to the companies?
16    A.   Yeah.  He was into the business.  My
17    father put him right into the business to work
18    with me and help me.
19    Q.   So is it fair to say that Mike Gumaer
20    did nonlegal work for the companies?
21    MR. RAMSEY:  Form.
22    A.   He did legal work.  He did consulting.
23    He did everything.
24    Q.   Second paragraph on page 2 reads "With
25    the foregoing as historical records I would

Page 257

L. Eber
1        L. Eber
2    A.   Yes.
3    Q.   How long did the annual consulting fee
4    of forty thousand dollars continue for?
5    A.   As long as we could pay it and I don't
6    have the date that it changed, but it had to be
7    after Wells foreclosed on us and we didn't have
8    the money to pay him.
9    Q.   After that point was his consulting
10    fee reduced?
11    A.   Yes.
12    Q.   What was it reduced to?
13    A.   I don't remember.
14    MR. BROOK:  Let's go to the next
15    exhibit.  This will be Plaintiffs' Exhibit
16    48.
17    (Plaintiffs' Exhibit 48, an e-mail
18    from Mike Gumaer to Wendy Eber and Lester
19    Eber dated October 29, 2013 bearing Bates
20    number GUM 000023, marked for
21    identification, as of this date.)
22    Q.   Exhibit 48 is an e-mail from Mike
23    Gumaer to Wendy Eber and Lester Eber dated October
24    29, 2013 bearing Bates number GUM 000023.
25        Do you recognize this document?

65 (Pages 254 - 257)

Page 258

L. Eber

1
2    A.    I got it so I do, yes.
3    Q.    I would like to draw your attention to
4    the second paragraph of Mike's e-mail. He writes
5    "You will recall I hope our conversation last
6    December when I was asked to continue as
7    director/trustee/confidant."
8         Do you see that?
9    A.    Yes.
10    Q.    "While I was prepared to conclude my
11    relationship after 40 or so years, I was happy to
12    continue. My annual compensation for some time
13    has been twenty two thousand dollars payable in
14    quarterly installments."
15         Do you see that?
16    A.    Yes.
17    Q.    Does that refresh your recollection as
18    to what the compensation amount was reduced to
19    from forty thousand dollars?
20    A.    I knew it was reduced but I didn't
21    remember the amount.
22    Q.    And is it your best recollection that
23    twenty two thousand dollars was the amount?
24    A.    It is very possible.
25    Q.    Which of the Eber companies was

Page 259

L. Eber

1
2    responsible for paying Mike Gumaer's consulting
3    fee?
4    A.    Eber Wine and Liquor originally paid
5    him.
6    Q.    And at a certain point was the
7    responsibility changed to Eber Connecticut?
8    A.    Yes.
9    Q.    What about after the Alexbay
10    acquisition of Eber Connecticut, who paid the
11    consulting fee then?
12    A.    I believe -- I don't know. I would
13    have to find out. I don't know.
14    Q.    Is it correct that at some point the
15    consulting fee was reduced even more below twenty
16    two thousand dollars?
17    A.    It is very possible.
18    Q.    Did you ever pay Mike Gumaer directly
19    for work that he did as an attorney for you
20    personally?
21    A.    I don't remember. I believe most of
22    it was paid through the company.
23    Q.    And that procedure that you just
24    described would be consistent with the proposal
25    that Mike made in Exhibit 47; correct?

Page 260

L. Eber

1
2    A.    Would you repeat that again for me?
3    Q.    Sure.
4         The proposal that Mike had made in
5    2001 is that he would --
6    A.    Yes.
7    Q.    -- be counsel to you personally --
8    A.    Yes.
9    Q.    -- as chief executive officer without
10    seeking compensation beyond an annual consulting
11    fee of forty thousand dollars?
12    A.    Yes. That would be consistent.
13    Q.    To whom did you disclose the terms of
14    your engagement of Mike Gumaer pursuant to this
15    letter?
16    A.    To this letter it would be Wendy Eber.
17    Q.    And were these terms disclosed to
18    anyone else?
19    A.    I don't -- I don't believe so.
20    Basically when Eber could have been I don't know.
21    I would like you to read the last paragraph.
22    Q.    You are talking about the last
23    paragraph on Exhibit 48?
24    A.    Yes. You like to read paragraphs. So
25    I'd like you to.

Page 261

L. Eber

1
2    Q.    If you would like to read it aloud I
3    will allow you to do so now.
4    A.    No, you're the --
5         MR. RAMSEY: You want to read it go
6    ahead.
7    A.    Yeah. I am taking over your job.
8         "I wish to accommodate you two as
9    members of a team. Lord knows that Lester has
10    committed an incredible amount to bring about the
11    company's success. I am prepared to do my share
12    if the kitty calls for it. Please give me your
13    thoughts. All the best, Mike."
14    Q.    Do you have an understanding as to
15    what Mike meant when he said I am prepared to do
16    my share if the kitty calls for it?
17    A.    I think -- I just think he wants --
18    supportive as he can be to help us through a
19    difficult period.
20    Q.    Now the two sentences immediately or
21    the three sentences I guess it is actually -- I am
22    not going to count the number of sentences. Let's
23    read the part in between the part that I read
24    earlier and the part that you just read. It says
25    "I have been paid eleven thousand dollars so far

66 (Pages 258 - 261)

Page 278

L. Eber

1          L. Eber
2   know this was December 18, 2012 and the
3   foreclosure was in February; wasn't it?  So they
4   didn't hold Connecticut if that's the...
5      Q.   When you saw this at the time in
6   December of 2012, did you do anything to try to
7   correct the misstatement?
8        MR. RAMSEY:  Form.
9      A.   I think they -- there were -- Wendy
10  Eber did do something on that to get it because it
11  wasn't right.
12     Q.   What did Wendy Eber do?
13     A.   I don't remember.  But I know it was a
14  mistake and it is very possible he sent this out
15  without showing it to us.
16     Q.   Why was it Wendy Eber's responsibility
17  to do anything to correct this letter sent by a
18  co-trustee?
19        MR. RAMSEY:  Form.
20     A.   She was the financial person who
21  watched the finances at that time.
22     Q.   What finances?
23     A.   CFO of the companies, the Eber
24  companies.
25     Q.   Did she have any role or

Page 279

L. Eber

1          L. Eber
2   responsibility in connection with the Allen Eber
3   Trust?
4     A.   No.  She was not involved in the Allen
5   Eber Trust.
6     Q.   You were a co-trustee of the trust
7   though; is that right?
8     A.   That's correct.
9     Q.   So --
10    A.   As I told you, this letter shouldn't
11  have been sent out and it was a mistake and I
12  refer you to your deposition with Hawks which you
13  had in Rochester and I don't know if you are going
14  to see or talk to him again.  This was something
15  that was handled by Richard Hawks.  Now Richard,
16  what's his name?  Yeah, Richard Hawks.
17     Q.   Did you contact either Sally Kleeberg
18  or Audrey Hays after seeing this letter to advise
19  them of the sale or the transfer rather of the
20  Eber Connecticut business to Alexbay?
21       MR. RAMSEY:  Form.
22    A.   I don't remember doing that.
23     Q.   Why not?
24     A.   I don't know.
25       MR. CALIHAN:  Objection to form.

Page 280

L. Eber

1          L. Eber
2     Q.   In hindsight, do you believe you
3   should have contacted either Audrey Hays or Sally
4   Kleeberg or both of them after you saw this
5   letter?
6       MR. RAMSEY:  Form.  Go ahead.
7     A.   Yes.  If I had seen it before it came
8   out I would have known that it should have been
9   corrected.
10    Q.   I am going to show you a new exhibit.
11  This is I believe now 50.
12      (Plaintiffs' Exhibit 50, a chain of
13     two e-mails possible another e-mail that
14     appears to have been redacted Bates number
15     EB 00031202, marked for identification, as
16     of this date.)
17    Q.   Plaintiffs' Exhibit 50 is a chain of
18  two e-mails possibly another e-mail that appears
19  to have been redacted.  The document bears Bates
20  number EB 00031202.  The top e-mail is from Wendy
21  Eber to Lester Eber and Mike Gumaer dated January
22  10, 2013.  The subject is Allen Eber Trust.
23     Do you see that?
24    A.   Mm-hmm.
25    Q.   Is that a yes?

Page 281

L. Eber

1          L. Eber
2     A.   Yes.
3     Q.   The e-mail states "Lester and Mike,
4   attached is the December 2012 statement for the
5   trust of Allen Eber from Canandaigua Bank.  It
6   values Eber stock at approximately 655,000
7   dollars.  It should be zero per our conversation
8   in June with Rick Hawks.  Regards Wendy."
9     Do you see that?
10    A.   Yes.
11    Q.   Do you know what valuation she is
12  referring to?
13    A.   No.
14    Q.   Do you know what the 655,000 dollars
15  number is?
16    A.   No.
17    Q.   Do you know where Canandaigua got that
18  number from?
19    A.   No.
20    Q.   Do you know what Wendy was referring
21  to when she referred to a conversation in June
22  with Rick Hawks?
23    A.   I would believe that she told him that
24  it should be zero.  That the Eber Brothers stock
25  should be valued at zero per our conversation in

71 (Pages 278 - 281)

Page 290

L. Eber

1
2 marked.
3        Do you have that in front of you?
4     A.   Yes.
5     Q.   And comparing Exhibit 5 against
6 Exhibit 4, it appears that the paragraph that you
7 had asked to change was simply deleted in the
8 December 2013 letter?
9     A.   Yes.
10    Q.   So no correction of the fact was made?
11        MR. RAMSEY:  Form.
12    Q.   Is that right?
13    A.   Looks like that.
14    Q.   To your knowledge, did any of the
15 co-trustees or anyone on their behalf ever inform
16 either Audrey Hays or Sally Kleeberg or Sally
17 Kleeberg's children about the misstatement that
18 had been made in the December 18, 2012 letter?
19        MR. RAMSEY:  Form.
20    A.   I don't know.
21    Q.   Did you ever discuss the transfer of
22 Eber Metro to Alexbay with any of Sally Kleeberg,
23 Audrey Hays, Dan Kleeberg or Lisa Stein?
24    A.   I talked to my sister Sally.
25    Q.   When was that?

Page 291

L. Eber

1
2     A.   Could have been a year before she died
3 or so.
4     Q.   Approximately, when was that?
5     A.   It was in the summer when she died in
6 what, '14 or '15.  Probably a year before I told
7 her about that.
8     Q.   What did you tell her specifically?
9     A.   That the company had lost a lot of
10 money and I had lent in a lot of money and that I
11 took it over to protect my interest.
12    Q.   How did she respond?
13    A.   She didn't -- I don't think she liked
14 it very much.
15    Q.   Why do you say that?
16    A.   She didn't respond very much.
17    Q.   Do you recall anything that she said?
18    A.   No.
19    Q.   Do you recall --
20    A.   She --
21    Q.   Go ahead.
22    A.   She didn't say much.
23    Q.   Was she sick at that time?
24    A.   No.
25    Q.   Was she typically someone that didn't

Page 292

L. Eber

1
2 say much when you talked to her?
3     A.   It depends.  She was very personable
4 and had a lot of friends and she just didn't say
5 much.
6     Q.   Where did this conversation occur?
7     A.   In a restaurant where we had dinner.
8     Q.   Where was that?
9     A.   In Buffalo.
10    Q.   Do you recall the restaurant?
11    A.   800.
12    Q.   Is this a restaurant that you
13 frequently went to?
14    A.   She would go to.
15    Q.   Did she live in the Buffalo area?
16    A.   Yes.
17    Q.   Was anyone else present for this
18 conversation?
19    A.   My wife was with me but she had
20 excused herself to go to the bathroom and it was
21 just the two of us.
22    Q.   By the time your wife came back the
23 conversation was over?
24    A.   Yeah.  It wasn't a long conversation.
25    Q.   And after that conversation, did you

Page 293

L. Eber

1
2 make any effort to memorialize the fact what you
3 had told her?
4     A.   I don't remember that.
5     Q.   Why didn't you?
6        MR. RAMSEY:  Form.
7        MR. CALIHAN:  Form.
8     A.   I have been absorbed by keeping the
9 company going and seeing that it's viable and not
10 going into liquidation.
11    Q.   Was there any benefit to either of the
12 other trust beneficiaries at the time Audrey Hays
13 or Sally Kleeberg from your transferring Eber
14 Metro to Alexbay?
15        MR. RAMSEY:  Form.
16    A.   Benefit?
17    Q.   Did it benefit them in any way?
18    A.   I don't know.  I don't have an answer
19 for you.
20    Q.   Did you think about whether it
21 benefitted them at the time that you did it?
22        MR. RAMSEY:  Form.
23    A.   I thought about -- no.  I thought
24 about keeping Connecticut viable and not facing
25 liquidation.  That's what my thinking was about.

74 (Pages 290 - 293)

Page 294

L. Eber

1
2     Q.   So you weren't thinking about whether
3  that transaction would have any positive or
4  negative impact on the shareholders of the
5  company; is that right?
6     A.   I was thinking about keeping the
7  company alive and if I didn't do it there wouldn't
8  be a business today.
9     Q.   So that was a yes that you were not
10 thinking about the shareholders?
11        MR. CALIHAN:  Objection to form.
12        MR. RAMSEY:  Form.
13    A.   I didn't say that.
14    Q.   So walk me through your reasoning.
15        In what way did you consider the
16 shareholders' interests benefitted or harmed by
17 the Alexbay acquisition of Eber Metro?
18    A.   I had asked the shareholders to
19 invest.  They chose not to.  I proceeded on my
20 own.  I spent millions of dollars, lent.  Paid
21 legal fees and I did not -- I was absorbed with
22 keeping the company alive.
23    Q.   Did you -- sorry, go ahead.
24    A.   That's it.
25    Q.   Did you describe your request for

Page 295

L. Eber

1
2  money to either Audrey Hays or Sally Kleeberg as
3  an investment opportunity?
4     A.   Originally I did and in original
5  letters I asked for them to invest.
6     Q.   And did you make it sound like a very
7  good investment?
8        MR. RAMSEY:  Form.
9     A.   You see what it said.  The letters
10 speak for themselves.
11    Q.   Was the family business important to
12 your sister Sally?
13    A.   Yes.  I believe so.
14    Q.   So wasn't it important for you to make
15 clear to her that you intended to take the company
16 for yourself and away from the rest of the family
17 if she didn't invest?
18        MR. RAMSEY:  Form.
19    A.   I didn't feel -- I asked her to
20 invest.  I am not going to say to her what I was
21 going to do or not do.  I did what I had to do to
22 keep the company alive to make -- so we can clean
23 up our statement and get a bank loan.  Otherwise,
24 there wouldn't be a company.
25    Q.   Do you think your father would be

Page 296

L. Eber

1
2  proud of what you did?
3     A.   Yes.
4        MR. RAMSEY:  Form.
5     Q.   Why?
6     A.   I did what I had to do to keep -- you
7  know, it is all speculation.  So I did what I had
8  to do to survive to keep the company alive.
9     Q.   Your father wanted the company to
10 remain with the full family; right?
11    A.   Well, he took the family -- he took
12 the family really out of it and set up trusts
13 outside of the family that had control of
14 everything.
15    Q.   So he wanted the business to remain
16 with the trust?
17        MR. RAMSEY:  Form.
18    Q.   Correct?
19    A.   He just took family members out of it.
20 So I don't know what he did.  I have no idea what
21 his thinking was.  I never saw his will or
22 anything.  I was handed a copy of his estate when
23 I first met Mr. Gumaer.  I knew from nothing.
24    Q.   Just to wrap this up, did you ever
25 discuss the transfer of Eber Metro to Alexbay with

Page 297

L. Eber

1
2  anyone else in your family besides Sally Kleeberg
3  and Wendy Eber?
4     A.   No.  There wouldn't be anyone else to
5  discuss it with.
6        MR. BROOK:  I have no further
7  questions.
8        MR. CALIHAN:  I have no questions at
9  this time.
10       MR. RAMSEY:  We are done.
11       THE VIDEOGRAPHER:  This marks the end
12 of media unit number six in the videotaped
13 deposition of Lester Eber.  We are going off
14 the record.  The time is 5:08.
15       (Time Noted:  5:08 p.m.)
16
17
18       LESTER EBER
19
20 Subscribed and sworn to before me
21 this      day of        , 2019.
22
23
24 (Notary Public)      My Commission Expires:
25

75 (Pages 294 - 297)

Page 298

1
2          C E R T I F I C A T E
3  STATE OF NEW YORK   )
            : ss.
4  COUNTY OF NEW YORK   )
5       I, LYNNE D. METZ, a Shorthand Reporter
6  and a Notary Public within and for the State of
7  New York, do hereby certify that the foregoing
8  deposition of LESTER EBER was taken before me on
9  the 24th day of January, 2019;
10      That the said witness was duly sworn
11  before the commencement of his testimony; that the
12  said testimony was taken stenographically by me
13  and then transcribed.
14      I further certify that I am not
15  related by blood or marriage to any of the parties
16  to this action or interested directly or
17  indirectly in the matter in controversy; nor am I
18  in the employ of any of the counsel in this
19  action.
20      IN WITNESS WHEREOF, I have hereunto
21  set my hand this 8th day of February, 2019.
22
23
24          LYNNE D. METZ
25

Page 299

1
2  January 24, 2019
3
4          I N D E X
5  WITNESS          EXAMINATION BY     PAGE
6  LESTER EBER        MR. BROOK          7
7
8  ---------- INFORMATION REQUESTS ----------
9  DIRECTIONS (DI):    141, 161
10  INSERT:       None
11  RULINGS (RL):     None
12  REQUESTS (RQ):    75, 181
13  CERTIFIED (CE):    None
14  MOTIONS (MO):     None
15
16     E X H I B I T S
17  Plaintiffs' Exhibits       For ID
18  Exhibit 25, a document entitled      15
19  Unanimous Written Consent of the Board
20  of Directors of Eber Brothers Wine and
21  Liquor Corporation Bates numbered EB
22  00001338 through 1340
23  Exhibit 26, an article found online on   37
24  casshilldevelopment.com
25  Exhibit 27, a document entitled      61

Page 300

2  Consulting Agreement Bates numbers EB
3  00000702 through 711
4  Exhibit 28, a series of W-2s that were   64
5  produced by the parties in discovery
6  Bates numbers EB 00021420 through 428
7  Exhibit 29, a series of letters that     71
8  appears to be written on Lester Eber's
9  letterhead bearing Bates stamps EB 695
10  through 701
11  Exhibit 30, a document entitled Amended  99
12  and Restated Promissory Note bearing
13  Bates numbers EB 00031310 through 311
14  Exhibit 31, a copy of two printouts     110
15  made on October 1, 2016 from the
16  Connecticut Department of State
17  concerning the business Alexbay LLC
18  Exhibit 32, a letter and some          128
19  attachments that are dated July 12,
20  2017 from Rita Nischal of Canandaigua
21  National Bank and Trust to Lester Eber
22  Exhibit 33, an order in the Surrogates   128
23  Court of The State of New York in
24  Monroe County dated June 1, 2017 signed
25  by Surrogate Judge John M. Owens

Page 301

1
2  Exhibit 34, a letter and attachments    132
3  that was produced yesterday by
4  Canandaigua National Bank Bates stamped
5  CNB-PL 0010 through 12
6  Exhibit 35, a e-mail and attachment     137
7  dated October 31, 2018 sent by Paul
8  Keneally with multiple recipients
9  CNB-PL 0001 to 2
10  Exhibit 36, a printout of a table with  141
11  some notes entitled Residuary TUW Allen
12  Eber Proposed Distribution of
13  Securities
14  Exhibit 37, a e-mail dated September    141
15  15, 2017 sent by Jim Vazzana to R.
16  Nischal at CNB, Canandaigua National
17  Bank, with yourself as one of the
18  people copied on it Bates stamped
19  CNB-PL 0005
20  Exhibit 38, a letter dated October 11,  144
21  2017 on letterhead for Woods Oviatt
22  Gilman LLP addressed to Jim Vazzana and
23  me
24  Exhibit 39, a four-page letter dated    148
25  November 5, 2018 by Paul Keneally

76 (Pages 298 - 301)

Page 302

```
1
2    addressed to Magistrate Judge Katherine
3    Parker
4    Exhibit 40, a e-mail dated June 2, 2017  151
5    from Jim Vazzana to Lorisa LaRocca
6    Bates number CNB-PL 0022
7    Exhibit 41, an e-mail dated August 18,   151
8    2017 from Jim Vazzana to Lorisa LaRocca
9    Exhibit 42, a copy of a letter dated     155
10   October 10, 2018 from Audrey Hays to
11   Wendy Eber and Lester Eber
12   Exhibit 43, a series of documents that   167
13   were produced together Bates range EB
14   00001166 through 1173
15   Exhibit 44, a copy of a summons and      191
16   complaint dated February 21, 2012
17   bearing Bates number KSH 00070 through
18   83
19   Exhibit 45, a document bearing the       209
20   caption of Alexbay versus Eber Brothers
21   and it states it is the affidavit of
22   Lester Eber bearing Bates numbers EB
23   00001059 through 1063
24   Exhibit 46, Affidavit of Lester Eber     218
25   bearing Bates numbers EB 00017525
```

Page 303

```
1
2    through 544
3    Exhibit 47, a two-page letter on the     253
4    letterhead for Elliot W. Gumaer, Jr.
5    Dated January 2, 2001 Bates stamped
6    January 8, 2001 and Bates number EB
7    00001556 to 57
8    Exhibit 48, an e-mail from Mike Gumaer   257
9    to Wendy Eber and Lester Eber dated
10   October 29, 2013 bearing Bates number
11   GUM 000023
12   Exhibit 49, a letter on Eber Brothers    264
13   Wine and Liquor Corp. Letterhead signed
14   by Lester Eber Bates number KSH 00004
15   dated April 2, 2010
16   Exhibit 50, a chain of two e-mails       280
17   possible another e-mail that appears to
18   have been redacted Bates number EB
19   00031202
20   Exhibit 51, an e-mail from Mike Gumaer   286
21   to Lester Eber copying Wendy Eber dated
22   December 1, 2013 bearing Bates numbers
23   EB 00031106
24
25      ***Exhibits retained by counsel.***
```

Page 304

```
1              ERRATA SHEET
           VERITEXT LEGAL SOLUTIONS
2           330 OLD COUNTRY ROAD
            MINEOLA, NEW YORK 11501
3              516-608-2400
4    NAME OF CASE: Kleeberg, et al v. Eber, et al
     NAME OF DEPONENT: Lester Eber
5    DATE OF DEPOSITION: January 24, 2019
6    PAGE   LINE(S)   CHANGE         REASON
7
8    ____|_____|_____|_____
9    ____|_____|_____|_____
10   ____|_____|_____|_____
11   ____|_____|_____|_____
12   ____|_____|_____|_____
13   ____|_____|_____|_____
14   ____|_____|_____|_____
15   ____|_____|_____|_____
16   ____|_____|_____|_____
17   ____|_____|_____|_____
18   ____|_____|_____|_____
19   ____|_____|_____|_____
20   ____|_____|_____|_____
21
              _____
              Lester Eber
22
     SUBSCRIBED AND SWORN TO BEFORE ME
23   THIS___DAY OF _____, 20__.
24
     _____     _____
25   (NOTARY PUBLIC)       MY COMMISSION EXPIRES:
```

Page 305

1

2  UNITED STATES DISTRICT COURT

   SOUTHERN DISTRICT OF NEW YORK

3  Civil Action No.:  16-cv-951 (LAK)

   -------------------------------------------x

4

5  DANIEL KLEEBERG, LISA STEIN and AUDREY HAYS,

6

7                              Plaintiff,

8              -against-

9

10 LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER,

   LLC; CANANDAIGUA NATIONAL CORPORATION d/b/a

11 CANANDAIGUA NATIONAL BANK & TRUST; ELLIOT

   W. GUMAER, JR.; EBER BROS. & CO., INC., EBER

12 BROTHERS WINE AND LIQUOR CORPORATION;

   BROS. WINE AND LIQUOR METRO, INC.,

13 EBER-CONNECTICUT, LLC; and WENDY EBER,

14                              Defendants.

15 -------------------------------------------x

16 1250 Broadway

17 New York, New York 10001

18 June 27, 2019

19 1:35 p.m.

20

21      CONTINUED VIDEOTAPED DEPOSITION OF LESTER EBER,

22 held at the above-mentioned time and place before

23 ANNMARIE OAKLEY, a Notary Public of the State of

24 New York.

25

Page 306

```
1
2
3        A P P E A R A N C E S
4
5  BROOK & ASSOCIATES PLLC
       Attorneys for Plaintiffs
6        100 Church Street, 8th Floor
         New York, New York 10007
7
8  BY:    BRIAN BROOK, ESQ.
9
10 UNDERBERG & KESSLER LLP
       Attorneys for Defendants
11 LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC;
       EBER BROTHERS & CO., INC; EBER BROS. WINE AND LIQUOR
12 CORPORATION; EBER BROS. WINE AND LIQUOR METRO, INC.,
       EBER-CONNECTICUT, LLC; and WENDY EBER
13       50 Fountain Plaza
         Buffalo, New York 14202
14
       BY:    COLIN RAMSEY, ESQ.
15
16 CALIHAN LAW PLLC
       Attorneys for Defendant
17 THE ESTATE OF ELLIOT W. GUMAER
         16 Main Street
18       Rochester, New York 14614
19 BY:    ROBERT B. CALIHAN, ESQ.
20
21 Also present: Phil Glauberson, videographer
22             Wendy Eber, telephonically.
23
24
25
```

Page 307

```
1                   L. EBER
2        VIDEOGRAPHER:  Good afternoon.  We are
3  going on the record at 1:39 p.m. on June 27,
4  2019.  Please, note that the microphones are
5  sensitive and may pick up whispering, private
6  conversations and cellular interference.
7  Please, turn off all cellphones and place them
8  away from the microphones as they can interfere
9  with the deposition audio.  Audio and video
10 recording will continue to take place unless
11 all parties agree to go off the record.
12       This is media unit one, day two of the
13 video recorded deposition of Lester Eber in the
14 matter of Daniel Kleeberg et al. versus Lester Eber
15 et al. filed in the United States District Court
16 Southern District of New York, Civil Action number
17 16-cv-951 LAK.  This deposition is being held at
18 Veritext, located at 1250 Broadway New York, New
19 York.  My name is Phil Glauberson from the firm
20 Veritext and I am the videographer.  The court
21 reporter is AnnMarie Oakley from the firm Veritext.
22       I am not authorized to administer an oath.
23 I am not related to any party in this action nor am
24 I financially interested in the outcome.  Counsel
25 and all present in the room, please, and everyone
```

Page 308

```
1                   L. EBER
2  attending remotely will now state their appearances
3  and affiliations for the record.
4        MR. BROOK:  Brian Brook, Brook &
5  Associates, PLLC for the plaintiffs.
6        MR. RAMSEY:  Colin Ramsey, Underberg &
7  Kessler for the Eber defendants.
8        MR. CALIHAN:  Robert Calihan of Calihan
9  Law on behalf of the estate of Elliot Gumaer.
10       VIDEOGRAPHER:  Will the court reporter,
11 please, swear in the witness.
12       MR. RAMSEY:  Wendy Eber is on the phone.
13 L E S T E R   E B E R, having first been duly sworn
14 or affirmed by a Notary Public of the State of
15 New York, was examined and testified as follows:
16 EXAMINATION BY MR. BROOK:
17    Q    Would you state your name for the record,
18 please.
19    A    Lester Eber.
20    Q    Would you state your address for the
21 record, please.
22    A    95 Allens Creek Road, Rochester, New York
23 14618.
24    Q    Good afternoon, Lester.  Good to see you
25 again.  I already deposed you one previous day.  Do
```

Page 309

```
1                   L. EBER
2  you need me to go over any of the instructions or
3  rules for how this works?
4    A    Your choice.  I --
5        MR. RAMSEY:  Did you need him to?
6        THE WITNESS:  I -- you know I --
7        MR. RAMSEY:  I think we can skip those.
8    Q    Do you have any questions about how this
9  works today?
10   A    Not yet.
11   Q    Just to refresh at least one thing, if you
12 don't understand something in my question it's
13 important that you let me know because if you answer
14 my question I'm going to assume that you understood
15 it.  Okay?
16   A    Okay.
17   Q    And as I think you just recalled, it's
18 also important to give verbal answer not just nods
19 or uh-uh.
20   A    Yes.
21   Q    How are you feeling today?
22   A    So far okay.
23   Q    Is there any reason why you would not be
24 able to testify fully and truthfully today, such as
25 being under the influence of medication or undue
```

2 (Pages 306 - 309)

Page 330

L. EBER

1
2    A   Oh, in the back.  Yes.  It comes from him,
3  yes.  He's the one who handled it.
4    Q   So if you think you talked to him why
5  didn't he send this to you?
6       MR. RAMSEY:  Form.
7    A   I'm not the administrative person.  I'm
8  not the secretary there.
9    Q   Where are you referring to?
10    A   There weren't any employees there.  It was
11  just -- Wendy was the only one that could -- that
12  was there.  We had no secretaries, no people to do
13  anything.
14    Q   I'm asking what company you're referring
15  to.
16    A   Well, with anything that would have
17  involved getting a security for the loans.
18    Q   So you can't say which entity you're
19  referring to that Wendy was doing the secretarial
20  work for?
21       MR. RAMSEY:  Form.
22    A   I could not -- I would not remember that
23  because there were so many there and I wouldn't want
24  to pin it down to one and say it wasn't another one.
25  I can't.  To the best of my recollection I can't

Page 331

L. EBER

1
2  give you a definite one that she was working for.
3    Q   Now, this memo is also sent to Glenn
4  Sturm.  We discussed him before but was Glenn Sturm
5  ever your personal attorney?
6    A   Not my personal attorney, no.  Yeah, well
7  he did some work for me personally but he did
8  corporate work for us to.
9    Q   What work did he do for you personally?
10    A   Well, I think after I would ask him
11  questions.  He was a lawyer and he would give me
12  legal advice.
13    Q   Did you ever pay him for that advice?
14    A   I personally don't remember paying him.
15    Q   Who paid Glenn Sturm for his services?
16    A   I don't remember who.
17    Q   Beside yourself individually -- well,
18  let's step back.  Can you give any specific examples
19  of a transaction or document where Glenn Sturm gave
20  you advice as your personal lawyer?
21    A   I don't remember.
22    Q   Did you ever sign an engagement agreement
23  with Glenn Sturm?
24    A   I don't remember doing that.
25    Q   Did you ever -- just looking at this memo,

Page 332

L. EBER

1
2  the last sentence of the first paragraph there is
3  referring to a conversation between the author,
4  Michael Beamer, and Glenn Sturm and it says, quote,
5  "Glenn told me that he wanted to protect the loans
6  and guarantee that the Article 9 transfer was
7  somehow upset in the future." end quote.  Do you see
8  that?
9    A   Yeah, Glenn told me.  Yes.
10    Q   Do you recall why Glenn Sturm was
11  concerned about the Article 9 transfer being upset
12  in the future?
13       MR. RAMSEY:  Form.
14    A   I think Glenn was a very intelligent man.
15  We relied on him for his legal advice and he just
16  wanted to protect us to the best of his ability or
17  protect me.
18    Q   Did you discuss with him the possibility
19  that the Article 9 transfer might be upset in the
20  future?
21    A   No.
22    Q   Did you discuss that with Wendy.
23    A   I don't remember any kind of discussion.
24  The whole discussion was to protect the loans that I
25  had given the company.

Page 333

L. EBER

1
2    Q   And as you sit here today do you recall
3  any loans that you had given in to any Eber Brothers
4  company that had not been assigned to Alex Bay by you
5  earlier in the year in 2012?
6    A   I don't remember.
7    Q   When is the last time that you spoke to
8  Glenn Sturm?
9    A   Could be a year or two or a year ago or
10  more.
11    Q   Did you discuss this case with him?
12    A   The man has been very sick.  I have not
13  talked to him.
14    Q   He's had cancer; correct?  Is that yes?
15    A   Yes.
16    Q   But he's had cancer since you've known
17  him; correct?
18    A   Yes.
19    Q   Is it your understanding that the cancer
20  has gotten worse recently?
21    A   Yes.
22    Q   Do you know, did he move out of his home?
23    A   I don't know.
24    Q   Was Glenn Sturm the first person to
25  suggest to you that you should secure the loans that

8 (Pages 330 - 333)

L. EBER

2 you made to the company?
3        MR. RAMSEY:  Form.
4     A   I don't remember but be did say that to
5 me.
6     Q   Having had the chance to review the
7 document that you did does that refresh your
8 recollection that it was Glenn Sturm's law firm,
9 Nelson Mullins, that drafted the original security
10 agreement that you signed in 2010?
11    A   It could have been.  You have it there and
12 I read it.  I believe that they did it.
13    Q   And you previously testified that you
14 thought Pat Dalton had drafted the security
15 agreement so you would now conceive that was an
16 incorrect recollection?
17       MR. RAMSEY:  Form.
18    A   I don't remember saying that about Pat
19 Dalton.  You might have some records that show that
20 but it could have been.  Dalton could have been the
21 first one too, I mean before Glenn --
22       MR. RAMSEY:  Just what you recollect.
23    Don't assume.
24       MR. BROOK:  This one marked as Plaintiff's
25 Exhibit 99 bears Bates numbers EB714 through

L. EBER

2 728.  It's an email and one of the attachments.
3 The other attachments do not appear to have
4 been produced.
5       (EB714 to EB728 was marked as
6       Plaintiff's Exhibit 99 for
7       identification.)
8     Q   Do you recognize this document?
9     A   This was sent to me care of my secretary.
10    Q   So copied to you?
11    A   Copied to me, yeah.
12    Q   And it was being sent to Mike Gumaer?
13    A   Yeah.  Yes.
14    Q   And the attachment that's there that is a
15 draft of the 2010 security agreement that was not
16 yet signed; correct?
17    A   That is correct.
18    Q   Why were you -- in the email sent by your
19 assistant says, "I have attached some documents that
20 Mr. Eber would like you to look over and is asking
21 for your comments.  He's is mailing each of the
22 three documents plus a letter all attached to each,
23 Sally Kleeberg and Audrey Hays.  Also attached is a
24 personal letter to Sally."  Do you see that?
25    A   Yes.

L. EBER

2     Q   Why did you want Mike Gumaer to look over
3 these documents and give you comments?
4     A   After talking to Mike as my counsel that I
5 thought was the prudent thing to do.
6     Q   So as of March 2010 was it your belief
7 that Mike Gumaer was still representing you as your
8 personal attorney?
9     A   Yes.
10    Q   At what point did Mike Gumaer stop being
11 your personal attorney?
12    A   He didn't.
13       MR. CALIHAN:  He's not representing him
14    today.
15    Q   When you met is that -- it is your belief
16 that he continued to be your personal attorney until
17 the day he died; is that right?
18    A   Yes.
19    Q   When did he first become your personal
20 attorney?
21    A   1970, July of 1970.
22    Q   At that time did you have any sort of a
23 documentation of that representation?
24    A   No.
25    Q   Do you recall any documentation of Mike

L. EBER

2 Gumaer's agreement to be your personal attorney?
3     A   No.
4     Q   You don't recall the January 2001 letter
5 that you signed that we looked at last time?
6     A   If that's what it was, but you asked me
7 when he started as my personal attorney, it's when
8 my father passed away in July of 1970.
9     Q   Did you ever pay Mike Gumaer for his
10 services as your personal attorney yourself?
11    A   Not personally, no.
12    Q   How was he's compensated for those
13 services?
14    A   The company usually paid him.
15    Q   In what capacity was he being paid?
16       MR. RAMSEY:  Form.
17    A   As counsel to the company, advising them
18 on legal questions.
19    Q   Was he also paid after the year 2000 when
20 he resigned from Nixon Peabody through director
21 fees?
22    A   Yes.
23    Q   So that director fee encompassed his legal
24 advice for you; is that correct?
25       MR. CALIHAN:  Objection to form.

9 (Pages 334 - 337)

Page 358

L. EBER

1
2    Q    And do you see -- so this email is being
3    sent to Mike for his signature or March 12, 2012,
4    and the consent form states that it's executed as of
5    the blank day of February 2012. Do you see that,
6    comparing the last and the first page?
7    A    Yes.
8    Q    Do you know why the consent form was being
9    dated in February when it wasn't being sign or sent
10   to Mike Gumaer for signature until sometime in
11   March?
12   A    No.
13   Q    Can you think of any reason why it would
14   be dated in February?
15       MR. RAMSEY: Form.
16   A    No.
17   Q    Looking at the bottom of the first page,
18   it's an email from Wendy to someone named Melinda
19   Parker copying you stating, "Melinda, Can you,
20   please, substitute my name for Elliot Gumaer as
21   president since I will be replacing Lester as
22   president." Do you see?
23   A    Yes.
24   Q    Does this fresh your recollection as when
25   the decision was made for Wendy to be your

Page 359

L. EBER

1
2    replacement?
3    A    No.
4    Q    Did you have a say in who replaced you as
5    president of Eber Brothers Wine and Liquor Corp.?
6        MR. RAMSEY: Form.
7    A    I don't remember.
8    Q    Did you resign as just president or also
9    as director of Eber Brothers Wine and Liquor Corp.?
10   A    I think it could have been just president.
11   I don't remember if it was both.
12   Q    So if you look at the last page of this
13   document it says that you're resigning as director
14   and president. Do you see that?
15   A    Yes.
16   Q    And is it your recollection that that was
17   changed prior to being signed so that you only
18   resigned as president?
19       MR. RAMSEY: Form.
20   A    I resigned as both of them. That's what
21   it says. That's what I did.
22   Q    When did you become a director of Eber
23   Brothers Wine and Liquor Corp. again?
24   A    I don't remember the exact date.
25   Q    Did you have an understanding that there

Page 360

L. EBER

1
2    needed to be three directors of the company, Eber
3    Brothers Wine & Liquor Corp.?
4    A    I never had that discussion.
5    Q    Did you discuss with anyone besides Wendy
6    and Mike Gumaer about having that third person serve
7    as director Eber Brothers Wine & Liquor?
8    A    I don't remember.
9    Q    Do you remember this document at all?
10       MR. RAMSEY: The last page?
11       MR. BROOK: The last page.
12   A    You know its been since, over nine years.
13   I don't remember it but it's here, so it's here.
14   Q    Do you see the first resolution there says
15   that the resignation is accepted and approved
16   effective February 1, 2012. Do you see that?
17   A    Yes.
18   Q    How was that date selected?
19   A    I don't remember.
20   Q    This is Exhibit 104, Bates EB31202. It's
21   a chain of emails between you, Wendy and Mike
22   Gumaer. Do you see that?
23       (EB31202 was marked as
24       Plaintiff's Exhibit 104 for
25       identification.)

Page 361

L. EBER

1
2    A    Yes.
3    Q    And these are on January 10, 2013, subject
4    Alan Eber trust.
5    A    Yes.
6    Q    I want to look at the second email first
7    the one from Wendy where she is referring to the
8    December 2012 statement for the Alan Eber trust
9    deposition by Canandaigua Bank and it says, quote,
10   "It values Eber Brothers stock at approximately
11   $655,000. It should be zero per our conversation in
12   January with Rick Hawks." Do you see that?
13   A    Yes.
14   Q    And in your email and response you said,
15   "Mike, I think you and I should get Rick on the
16   phone to discuss this with him. This was supposed
17   to have been done." Do you see?
18   A    Yes.
19   Q    What did you mean by that?
20   A    That it should have been valued at zero.
21   That was a mistake for 655,000.
22   Q    Why was it that you believe the stock
23   should be valued at zero?
24   A    Because it had no assets. There wasn't
25   any business.

15 (Pages 358 - 361)

Page 362

1        L. EBER
2    Q    And why was that?
3    A    The company was -- had been consolidated
4 and out of business.
5    Q    Are you referring to the --
6    A    Eber Brothers.
7    Q    Eber Metro had been transferred to Alex
8 Bay?
9        MR. RAMSEY:  Form.
10   A    I'm not referring to that.  I'm referring,
11 there were no assets in the company so there was
12 nothing in Eber Brothers.
13   Q    What was the last asset that Eber Brothers
14 had that you can recall?
15   A    It probably was Eber Connecticut.
16   Q    Through Eber Metro; correct?
17   A    Yes.
18   Q    Is this the first -- January 2013, is that
19 the first time you recall having a discussion with
20 anyone about the valuation of Eber Brothers stock on
21 the trust statements being inaccurate?
22   A    I don't remember.
23   Q    So prior to the transfer of Eber
24 Connecticut out of Eber Brothers, was it your belief
25 that the value of Eber Brothers stock was

Page 363

1        L. EBER
2 approximately $655,000?
3    A    I don't remember.
4    Q    Did you think that the Eber Brothers stock
5 had any value before Eber Connecticut was transfer
6 to Alex Bay?
7        MR. RAMSEY:  Form.
8    A    I think with all the debts I think it was
9 questionable whether there was any value to it
10 because of the monies that were owed.
11   Q    Which debts are you referring to?
12   A    Well, the debts of Eber Brothers, the
13 Teamsters Pension Plan, the public PBGC and
14 Vendersen, it's a real estate company.
15   Q    And also there was debt to Harris Beach;
16 correct?
17   A    Yes.
18   Q    Any other debts?
19   A    There were others, I can't remember them
20 all.  There were a lot of them.
21   Q    And you're referring to debts that were
22 owed by Eber Brothers Wine & Liquor Corp. or is it
23 another entity?
24   A    I think Eber Brothers Wine & Liquor.
25   Q    Had you disclosed the debts of Eber

Page 364

1        L. EBER
2 Brothers Wine & Liquor Corp. to Canandaigua National
3 Bank?
4    A    Yes, we had.
5    Q    When did you do that?
6    A    I don't remember.
7    Q    Had you told Canandaigua National Bank
8 that you thought that the Eber Brothers stock
9 valuation was questionable in light of the debts?
10       MR. RAMSEY:  Form.
11   A    I would have but I wasn't talking to them
12 but I would have said that.
13   Q    Why did you say you would have said that?
14   A    Because it's the facts.
15   Q    But you don't remember doing it; correct?
16       MR. RAMSEY:  Form.
17   A    You can say whatever you wants I --
18   Q    Well, I'm asking you, you don't remember
19 doing that, do you?
20   A    I don't remember not doing it.  I don't
21 remember.
22   Q    Okay.  So just to we're clear, you don't
23 remember ever telling Canandaigua National Bank
24 about the debts of Eber Brothers Wine & Liquor Corp.
25 possibly affecting the value of the Eber Brothers &

Page 365

1        L. EBER
2 Co. stock --
3        MR. RAMSEY:  Form.
4    A    You're putting word into my mouth.  You're
5 making up words that I did not say.  I said I don't
6 remember.
7        MR. RAMSEY:  I think we established what
8    didn't happen so move on.
9    Q    Do you recall ever having -- when is the
10 first time you recall trying to having a formal
11 valuation done of Eber Brothers Wine & Liquor Corp.
12 or Eber Brothers & Co. Inc.?
13   A    I don't remember.
14   Q    How did Canandaigua National Bank, how did
15 the trust statements that it was issuing come to
16 have the number $655,000 for the Eber Brothers & Co.
17 stock?
18   A    I don't know.
19   Q    Would you have you been the source of that
20 information?
21       MR. RAMSEY:  Form.
22   A    No.
23   Q    Why did you say that?
24   A    Because I don't know where it came from.
25   Q    I'm asking you, could it have been from

16 (Pages 362 - 365)

Page 394

L. EBER

1
2     MR. RAMSEY:  The question is:  Do you have
3  any reason to believe that Wendy saw a copy of
4  your will.
5     A   No.
6     Q   Is David Eber involved in the wine and
7  liquor business?
8     A   Yes.
9     Q   How so?
10    A   He's an importer.
11    Q   Who does he work for?
12    A   Himself.
13    Q   Has he worked for Southern Wine & Spirits
14 at any point in time?
15    A   Yes.
16    Q   When was that?
17    A   After we went out of business.
18    Q   How long did he work for Southern Wine &
19 Spirits?
20    A   I don't remember.
21    Q   Did you help him get that job?
22    A   I believe so.  I don't remember.  I think
23 he got it himself.  He applied there and they hired
24 him.
25    Q   Did he ever work from Eber Brothers?

Page 395

L. EBER

1
2     A   Yes.
3     Q   What was his position?
4     A   He had a variety of positions.  He had
5  management positions in different areas.
6     Q   Are you familiar with the bylaws of Eber
7  Brothers Wine & Liquor Corp.?
8     A   I have read them.
9        MR. BROOK:  This is marked Exhibit 108, it
10 was a document that was produced as the bylaws
11 of Eber Brothers Wine & Liquor Corporation.
12 The Bates number is EB22533 through 544.
13        (EB22533 to EB22544 was marked
14        as Plaintiff's Exhibit 108 for
15        identification.)
16    Q   Do you recognize this?
17    A   I haven't seen it in years.
18    Q   When is the last time that you recall
19 seeing the bylaws of Eber Brothers Wine & Liquor
20 Corp.?
21    A   I don't remember.
22    Q   Who drafted the bylaws?
23    A   I do not know.
24    Q   Were you involved in the drafting of the
25 bylaws?

Page 396

L. EBER

1
2     A   No.
3     Q   Were the bylaws every amended after you
4  became involved in the business?
5     A   I don't know.
6     Q   Do you have a copy of the bylaws?
7     A   No.
8     Q   Where was a copy of the bylaws maintained?
9     A   Corporate offices.
10    Q   Did you ever give a copy of the bylaws to
11 Canandaigua National Bank?
12    A   I did not.
13    Q   Did you ever discuss the bylaws with
14 anyone from Canandaigua National Bank?
15    A   No.
16    Q   To your knowledge did anyone else from
17 Eber Brothers do so?
18    A   I do not know.
19    Q   I want to draw your attention to page 11
20 of this Exhibit 108, Article 12, transfer
21 restriction.  Do you see that?
22    A   Yes.
23    Q   Are you familiar with this provision or of
24 the bylaws?
25    A   I don't remember it.

Page 397

L. EBER

1
2     Q   Do you recall ever discussing this
3  provision of the bylaws with anyone else?
4     A   I don't remember.
5     Q   What is your understanding of the purpose
6  of Article 12 of the bylaws?
7        MR. RAMSEY:  Form.
8     A   I believe it's to transfer -- how the
9  stock would be transferred.  That's what it says.
10    Q   Why was this put into the bylaws?
11    A   I don't know.
12    Q   To your knowledge has this provision of
13 the bylaws ever been enforced?
14    A   I don't remember.
15    Q   We're looking at the bylaws of Eber
16 Brothers Wine & Liquor Corp. have you seen the
17 bylaws of Eber Brothers & Co. Inc.?
18    A   Possibly I have seen them over the years.
19    Q   Do you recall ever discussing those with
20 anyone from CNB?
21    A   No.
22    Q   Do you recall giving a copy of this Eber
23 Brothers & Co. Inc. bylaws to CNB?
24    A   No.
25    Q   Do you know whether the Eber Brothers &

24 (Pages 394 - 397)

Page 434

L. EBER

1          L. EBER
2          MR. RAMSEY:  I'm reading this.  I'm going
3   to stipulate to withdraw.  That doesn't make
4   sense.  I will stipulate to withdraw that one.
5          MR. BROOK:  He did sign this thing.
6          MR. RAMSEY:  I understand.  Whatever the
7   change was, let's not go back in time but right
8   now if it's going to short circuit we can agree
9   that it didn't clarify it very well.
10       Q    Did you review this document, Exhibit 110
11   and check it against the transcript for accuracy
12   before you signed it?
13       A    Yes, I did go with it with them but I
14   don't remember.  I just can't remember all those
15   details.
16          MR. RAMSEY:  All right you answered the
17   question.
18       Q    Was this another instance where you were
19   given a document to sign by a lawyer and you signed
20   it without reading it carefully?
21          MR. RAMSEY:  Form.
22       A    No.
23       Q    Do you recall any other instance when you
24   signed a document given to you by a lawyer without
25   reading it carefully besides the Affidavit that was

Page 435

L. EBER

1   prepare for you by Jerry?
2          MR. RAMSEY:  Form.
3       A    That one was an exception but I don't
4   remember any others.
5       Q    So, for example, with respect to the
6   answer, even though you didn't sign that document
7   you knew if was important to make sure that that
8   answer was correct and accurate?
9       A    Yes.
10       Q    And you made sure it was so; correct?
11          MR. RAMSEY:  Form.  He's not submitting
12   the answer.
13       Q    All right.  I want to turn now to the next
14   change that you made, page 241 of the last
15   transcript.  I asked you -- I will wait for you to
16   get there.
17       A    241?
18       Q    241.
19       A    This goes up to 300.
20       Q    Bottom right, are you there?
21       A    Yes.
22       Q    So at that point I'm discussing your
23   decision to foreclose on the debt that was owed to
24   you by Eber Metro after it assumed the debt of Eber

Page 436

L. EBER

1   Brothers Wine & Liquor Corp.  So we're talking
2   roughly December, January, December 2011,
3   January 2012.  Are you with me?  That's what we were
4   talking about?
5       A    Yes.
6       Q    My question was:  "Why did you not -- and
7   this is a typo.  "Why did you not extend the
8   maturity date of your line of credit note rather
9   than begin foreclosure proceedings?" and your new
10   answer to that is, "I consulted with my lawyers and
11   then decided to do so."  So as before I would like
12   an answer to my actual question which is:  Why
13   didn't you extend the maturity date on the line of
14   credit here?
15       A    I did consult with my lawyers but I don't
16   remember why I didn't do it.
17       Q    Isn't it true the reason you didn't
18   extended the maturity date on the line of credit
19   note was because you wanted to take control of the
20   company away from them?
21          MR. RAMSEY:  Form.
22       A    I don't remember why I didn't extend it.
23       Q    Did you want to take personal control of
24   Eber Brothers operating assets away from the trust?

Page 437

L. EBER

1          MR. RAMSEY:  Form.
2       A    I wanted to stop the company going into
3   liquidation, and that's what would have happened if
4   I had not given the money and support to the
5   company, and there wouldn't be a case even.
6       Q    So is it your testimony that if you had
7   extended the maturity date on your line of credit
8   note that would have caused the company to go into
9   liquidation?
10          MR. RAMSEY:  Form.
11       A    I don't know.  I made the decision at the
12   time.  I don't remember why but my whole mission was
13   to keep the company out of liquidation, to keep it
14   alive.
15       Q    Did you want to prevent Eber Connecticut
16   from being run for the benefit of Eber Brothers
17   pension plan?
18          MR. RAMSEY:  Form.
19       A    I supported -- I gave up my pension of 1.5
20   million to the PBGC to erase that benefit, to erase
21   that debt and I was not personally liable to do it.
22       Q    They did sue Eber Connecticut before you
23   did that; correct?
24       A    That is correct.

34 (Pages 434 - 437)

Page 438

```
1              L. EBER
2     Q   So you said that you consulted with
3  lawyers and then you acted, which lawyers did you
4  consult with about whether to extend the line of
5  credit note?
6     A   I don't remember.
7     Q   So how did you know that you consulted
8  with lawyers?
9        MR. RAMSEY:  Form.
10    A   Because I would not sign a document unless
11 I talked to legal counsel.
12    Q   So that's your standard practice; correct?
13    A   Usually, there could be exceptions, but
14 usually.
15    Q   So do you know whether that was legal
16 counsel for you personally or was that corporate
17 counsel?
18    A   I don't remember.
19    Q   Did you ever discuss whether to extend the
20 line of credit note with Mike Gumaer?
21    A   I don't remember.
22    Q   You're aware that Glenn Sturm ended up
23 providing promissory note to Eber Metro; correct?
24    A   Yes.
25    Q   The maturity date on that was extended
```

Page 439

```
1              L. EBER
2  twice; correct?
3     A   I don't remember that.
4     Q   And Eber Metro never tried to collect on
5  that, did it?
6     A   I really don't know about it.  I shouldn't
7  say.  I do not remember it.
8     Q   Is it fair to say that with respect to
9  CNB, one of the things that you and Wendy tried to
10 do, for several years, was to get them to continue
11 to extend their credit that they had given to you?
12    A   Yes.
13    Q   Why was an extension of credit a good
14 thing for the company?
15    A   Businesses need credit to buy product and
16 run, to make a payroll.
17    Q   So you didn't want them to foreclose on
18 the credit?
19    A   That is correct.
20    Q   Foreclose is a bad thing; right?
21       MR. RAMSEY:  Form.
22    A   It would have liquidated the company.
23    Q   So foreclosure on credit is a bad thing
24 when CNB does it.  Why was foreclosure on a line of
25 credit when you did it a bad thing?
```

Page 440

```
1              L. EBER
2       MR. RAMSEY:  Form.
3     A   CNB was very well protected by my personal
4  guarantee and the 500,000 and 120,000 in stock that
5  I left with them.  I wasn't protected on anything.
6     Q   Well, you were in control of the company
7  weren't you?
8     A   The money I lent them, there was no
9  security.  I had no protection on it.  As a creditor
10 I would not have had any protection.
11    Q   Well, for several years you said that you
12 gave money to Eber Brothers without having any
13 security on it; right?
14    A   Yes.
15    Q   Why did you suddenly change your mind?
16       MR. RAMSEY:  Form.
17    A   On advice of counsel that's what I did.
18    Q   And which counsel was that?
19    A   I don't remember.
20    Q   It was Glenn Sturm; correct?
21    A   It could have been.
22    Q   And Glenn Sturm then prepared a security
23 agreement for you to sign in March 2010; correct?
24    A   If there's one that I signed he did.
25    Q   What did Eber Brothers get out of giving
```

Page 441

```
1              L. EBER
2  you security at that time?
3       MR. RAMSEY:  Form.
4     Q   Was there any benefit to Eber Brothers for
5  signing that security agreement with you then?
6     A   Benefit to Eber Brothers?  Eber Brothers
7  kept -- I kept my loans and monies and more than I
8  had given them, kept the company alive.
9     Q   But you already agreed to loan them money;
10 correct?
11    A   I agreed to loan them money, yes.
12    Q   So if you already agreed to loan them
13 money what new did the company get by agreeing to
14 secure your loan?
15    A   I wouldn't of foreclosed.  I didn't
16 foreclose on them at that time.
17    Q   So you believe that you could have
18 foreclosed on the loan in or around February or
19 March of 2010?
20       MR. RAMSEY:  Form.
21    A   I don't have the dates but I could have
22 foreclosed on the loans.
23    Q   Even though you don't have the dates, at
24 the time that you sign the security agreement you
25 believed that you could have foreclosed on the loan;
```

35 (Pages 438 - 441)

Page 442

L. EBER

1
2 is that right?
3        MR. RAMSEY:  Form.
4    A   I think the security agreement gave me
5 preference as a creditor, gave me comfort, as any
6 good businessman would do.
7    Q   Was there any benefit to the Eber
8 Brothers -- I'm sorry.  Withdrawn.  Was there any
9 benefit to Eber Brothers Wine & Liquor Corp. as a
10 result of you foreclosing on the loan and taking
11 over Eber Metro?
12        MR. RAMSEY:  Form.
13    A   Benefit?
14    Q   Yes.
15    A   Well, I think it's how you describe a
16 benefit.
17    Q   How do you describe benefit?
18        MR. RAMSEY:  Form.
19    A   Keeping the entity alive.
20    Q   Is taking away the only remaining asset to
21 the company beneficial to the company, in your
22 definition?
23        MR. RAMSEY:  Form.
24    A   I did what any reasonable creditor would
25 do to protect my investment.  The money that I

Page 443

L. EBER

1
2 loaned and put into the company that kept it afloat
3 otherwise it would have been liquidated, the whole
4 system would have.
5    Q   So that's what a reasonable creditor would
6 do, but why would a trustee allow that to happen?
7        MR. RAMSEY:  Form.
8    Q   Did you think about it from that
9 prospective at the time?
10        MR. RAMSEY:  Form.
11    A   I discussed it with the other trust
12 people.  They knew about it.
13    Q   And so what was your understanding as to
14 why it was beneficial for the trust for you to
15 foreclose on the loan?
16        MR. RAMSEY:  Form.
17    A   There wouldn't be a loan to foreclose on
18 if I didn't come up with the money.  There wouldn't
19 be anything.  The whole Eber Brothers, Eber
20 Connecticut would all go away.
21    Q   Where did you get the money to loan to the
22 company?
23    A   Where did I get the money?
24    Q   Yes.
25    A   I gave up 1.5 million in my pension plan,

Page 444

L. EBER

1
2 PBGC took that away from me.
3        MR. RAMSEY:  Brian, I know we covered
4    this.
5        THE WITNESS:  He goes over and over.
6    Q   I'm transitioning to another topic here,
7 but we discussed before that you were getting from
8 mid-2007 through 2012 $600,000 a year from Southern
9 Wine and Spirits; correct?
10    A   Yes.
11    Q   Now, if that $600,000 a year had been paid
12 to Eber Brothers Wine & liquor Corp. instead of to
13 you and then you just received your salary, maybe
14 with an increase in it, would Eber Brothers Wine &
15 Liquor Corp. have needed any loans from you?
16        MR. RAMSEY:  Form.
17    A   Yes.
18    Q   What is your basis for saying that?
19    A   If you look, I put 7, 8 million,
20 $9 million.
21    Q   Well --
22    A   But I worked for that money.
23    Q   As of 2012, as of mid-2012 you put in
24 according to your foreclosure action that you filed,
25 a little over $3 million and then with interest it

Page 445

L. EBER

1
2 was roughly $3,650,000.  Does that sound about
3 right?
4    A   I don't know.  It could have been more
5 with interest.  I thought it was more but I would
6 have to check it.
7    Q   And of that a lot of that was a loan that
8 had been given in 2006; is that right?
9    A   I don't remember the dates of the loan.
10    Q   Do you remember how much money you loaned
11 to Eber Brothers between mid-2007 and mid-2012?
12    A   No.
13        MR. RAMSEY:  Brian, unless you're
14    transitioning, we have done this.  We have done
15    Southern before.  There's nothing new about
16    this or about Southern.
17    Q   With respect to the Southern transaction
18 did you discuss -- let me step beck.  You testified
19 before about your responsibilities was largely in
20 governmental relations work; correct?
21    A   That was the start of it.
22    Q   Okay.  Did have any experience with
23 government relations?
24    A   Yes.
25    Q   How did you get that experience?

36 (Pages 442 - 445)

L. EBER

1
2    A    From working over the years in the
3    legis -- with the -- we're regulated by the laws in
4    Albany and federally.
5    Q    Who was paying your salary during that
6    time?
7    A    Eber Brothers.
8    Q    Eber Brothers Wine & Liquor Corp?
9    A    Yes.
10   Q    So other than your experience from working
11   with Eber Brothers Wine & Liquor Corp. did you have
12   any other way in which you acquired experience that
13   was relevant to your work with Southern?
14   A    Yeah.  I had taken courses, my education.
15   Q    When was that?
16   A    Well, I went after college and I worked.
17   I worked for the company but I had extra time.  I
18   got into governmental affairs.
19   Q    Did you ever think about whether your
20   consulting agreement with Southern was taking
21   anything away from Eber Brothers Wine & Liquor
22   Corp.?
23       MR. RAMSEY:  Form.
24   A    No.
25       MR. RAMSEY:  Brian, you already asked

L. EBER

1
2    these questions.
3        MR. BROOK:  I don't know if I asked that.
4        MR. RAMSEY:  Southern was covered in
5    depth.
6        MR. BROOK:  Let's change the topic.  Let's
7    mark this as Exhibit 111.  So we're clear at
8    the outset, the topic was covered but a
9    document has not yet been produced.  Exhibit
10   111 bears Bates numbers 33279 through 300.
11       (EB33279 to EB33300 was marked
12       as Plaintiff's Exhibit 111 for
13       identification.)
14   Q    This is an excerpt to a larger file that
15   followed the cover letter.  Do you recognize this at
16   all?
17   A    I don't remember it.
18   Q    Do you know who John Ryan is?
19   A    Yes.
20   Q    He was their chief financial officer;
21   correct?
22   A    Yes.
23   Q    This is a letter dated November 17, 2004
24   from David Dean.
25   A    Yes.

L. EBER

1
2    Q    Do you know who David Dean is?
3    A    Yes.
4    Q    Who is he?
5    A    He was the chief financial officer of
6    Slocum.
7    Q    Did he continue working with Slocum after
8    Eber Brothers acquired it?
9    A    Short period of time.
10   Q    So this letter it says, it's a letter from
11   David Dean to John Ryan saying, "Enclosed, please,
12   find the due diligence binder responding to your
13   recent information request."  Do you know what the
14   due diligence binder is?
15   A    I have an idea.
16   Q    What is your idea?
17   A    After they done an audit of the company
18   what it shows.
19   Q    So is it fair to say that this was
20   documentation that was relevant to whether Eber
21   Brothers would acquire Slocum & Sons and if so at
22   what price?
23   A    It was something that they looked at but I
24   don't think it determined the price.
25   Q    What did determine the price of Slocum &

L. EBER

1
2    Sons?
3    A    What someone would pay for it.
4    Q    So the financials didn't have any impact
5    on that; is that right?
6    A    It's something but the important thing is
7    what a willing buyer will pay to buy a company.
8    Q    How did you determine that?
9    A    What the market would -- I did not do this
10   but it was what the market could pay in the
11   competitive bidding and how Strategic it was to Eber
12   Brothers in New York.
13   Q    All right.  So were you involved in
14   setting the price to pay?
15   A    I was aware of some of it but I couldn't
16   say I was directly involved in the whole deal.
17   Q    Who was involved in determining what price
18   Eber Brothers would pay from Slocum & Sons?
19   A    Probably John Ryan and Pat Dalton.
20   Q    Did you have any input on that?
21   A    Yeah, I had input, and that it was
22   strategically, not on the price, but it was
23   strategically important to the welfare of New York
24   that we buy this company as opposed to a competitor
25   who would take the lines away from us in New York.

37 (Pages 446 - 449)

Page 466

1           L. EBER
2  competency that he had been before?
3      A   I believe it's taken a lot out of him and
4  slowed him up.
5      Q   And you were relying on others at that
6  point.
7      A   Others, but I always had a lot of respect
8  for Mike.
9      Q   And when you said that you continued to
10 view him as the attorney for you up until the time
11 of his death, is it fair to say that that testimony
12 by you reflected a sense of loyalty to Mike Gumaer
13 as much as anything else?
14     A   Loyalty and respect.
15         MR. CALIHAN:  That's all questions that I
16 have.
17 CONTINUED EXAMINATION BY MR. BROOK:
18     Q   I do have another document that was
19 produced from the last time you were here.  This the
20 was previously marked as Plaintiff's Exhibit 94.
21 This is a set of documents, regarding looks like
22 payments that were made to you by Southern Wine &
23 Spirits, LLC.  Do you recognize those documents?
24     A   Yes.
25     Q   What are they?

Page 467

1           L. EBER
2      A   They're what they are.  They're paying for
3  services that I have provided them.
4      Q   And they're reimbursing you for expenses?
5      A   Yes.
6      Q   What kind of expenses did you incur in
7  connection with your consulting work for Southern?
8      A   Travel to New York to Syosset, Long
9  Island, to 800 3rd Avenue, to Albany, to Miami for
10 meetings, to legislative districts throughout New
11 York State.
12     Q   And how did you keep track of those
13 expenses?
14     A   I filed reports.  I get receipts and filed
15 reports and send them into him.
16     Q   Did you also incur expenses in connection
17 with your work for Eber Connecticut?
18     A   Yes.
19     Q   How did you keep track of those expense?
20     A   Same way.
21     Q   Do you have separate credit cards?
22     A   Yes.
23     Q   Did you have a specific credit card that
24 you use just for Southern?
25     A   Yes.

Page 468

1           L. EBER
2      Q   And what kind of credit card is that?
3      A   My ordinary personal one.
4      Q   So it's a --
5      A   It's not a corporate card.  It's my own
6  personal one.
7      Q   And do you use that for anything other
8  than Southern expenses?
9      A   Not usually.
10     Q   But sometimes?
11     A   It depends.  If I lost another credit card
12 I might use it but I try to keep it with the
13 Southern expenses.
14     Q   Approximately how much in expenses -- let
15 me withdraw that.  In connection with your work for
16 Southern have you always tracked expenses basically
17 the same way?
18     A   Yes.
19     Q   And do you bill Southern for all the
20 expenses that you incur?
21         MR. RAMSEY:  Form.
22     A   Expenses I incur on their business.
23     Q   On their business.  Are there any expenses
24 you incur in connection with your consulting work
25 that you don't bill to Southern?

Page 469

1           L. EBER
2      A   That I don't bill?
3      Q   Yeah.
4      A   There are things that I do for
5  governmental work that I feel helps my position as a
6  lobbyist and a governmental affairs person that I
7  paid for personally.
8      Q   What kind of expenses are those?
9      A   Donations to legislators or seminar if I
10 went to or meetings, or what have you, that could
11 help me.
12     Q   Have you acquired any significant assets
13 for your business, for your consulting business?
14     A   Assets from my consulting?
15     Q   Yes.
16     A   No.
17     Q   So you don't have a car specific to your
18 consulting business?
19     A   No.
20     Q   And according to these documents you
21 received reimbursement for $118,371.21 expenses from
22 Southern in the year 2018.  Does that sound about
23 right?
24     A   If that's what it says.
25     Q   Approximately how much time did you spend

42 (Pages 466 - 469)

Page 470

L. EBER

1
2 doing consulting work for Southern in 2018?
3    A   I don't remember the time.  It's whatever
4 had to be done.  I could work 24 hours.  I could
5 work a whole week.  I could work two, three days.
6 It depends what's going on.
7    Q   Do you ever have conflicts in terms of
8 what work to do for Southern versus Eber
9 Connecticut?
10       MR. RAMSEY:  Form.
11    A   Sometimes.
12    Q   And how do you --
13    A   I do the best I can to do both.
14    Q   Would you say you do more work for
15 Southern or more work from Eber Connecticut?
16       MR. RAMSEY:  Form.
17    A   I think it's a moot question.  I couldn't
18 answer it.  I do what I have to for Southern and I
19 do it when I'm needed at Connecticut.
20    Q   Has working for Southern impacted your
21 ability to provide services for Eber Connecticut?
22       MR. RAMSEY:  Form.
23    A   No, it hasn't impacted it.  It's helped
24 Connecticut.
25    Q   How so?

Page 471

L. EBER

1
2    A   There are suppliers that they have that I
3 have been able to get to know and been able to get
4 their lines for Connecticut.
5    Q   Which suppliers?
6    A   I don't remember the names but there are a
7 bunch of them.
8    Q   Can you name even one?
9       MR. RAMSEY:  Form.
10    A   I just -- I don't want to get the wrong.
11       MR. RAMSEY:  If you remember you remember.
12    A   I can't remember there are -- it isn't
13 exact.  It's a relationship that they know you and
14 they come and see you because I met them in New York
15 and talked to them.
16    Q   And just I want to clarify something that
17 came up in the deposition of Bob Lowenthal.
18 (phonetic)  Does Eber Connecticut have any business
19 in New York?
20    A   Not anymore.
21    Q   Did it at one point in time?
22    A   They did.
23    Q   When was that?
24    A   When we first took it over they had an
25 import company that they sold wine to New York.

Page 472

L. EBER

1
2    Q   What import company was that?
3    A   Part -- it was Slocum.  It was just -- the
4 company was part of Slocum.
5    Q   It was a Slocum entity?
6    A   It was part of -- it was not an entity.
7 It was just lines that Slocum had that they sold
8 some of the wine in New York.  That ceased.
9    Q   When did that cease?
10    A   Quite a few years ago, it lost a lot of
11 money.
12    Q   Why did it cease?
13    A   Because it lost a lot of money.
14    Q   So it was a decision that you made to stop
15 that?
16    A   Yes.
17    Q   Okay.  Was it roughly at the same time
18 that you started consulting for Southern?
19    A   No.
20    Q   So help me understand then, time wise,
21 approximately when it was that the sales in New York
22 stopped?
23    A   I don't remember the exact date but it was
24 not profitable and Connecticut needed to watch
25 Connecticut.  The employees, I wanted them all to

Page 473

L. EBER

1
2 spend their time not sending, selling wine to other
3 states but spend their time in building the
4 Connecticut business.
5    Q   I'm just trying to get, you know, a
6 ballpark sense, you best recollection?
7    A   I couldn't give you the date.  I just
8 don't remember it.
9    Q   Was it before you started consulting for
10 Southern?
11       MR. RAMSEY:  Form.
12    A   Before I started?
13    Q   Yes, that you stopped.  Did Eber
14 Connecticut stop selling in New York before --
15    A   No, it was after.
16    Q   Approximately how long after?
17    A   I don't remember.
18    Q   Years after?
19       MR. RAMSEY:  Form.
20    A   Could have been a couple of years.  I
21 don't remember.
22    Q   Did you ever discuss Eber Connecticut's
23 sales in New York with Southern?
24    A   No.
25    Q   Did Eber Connecticut sales in New York

43 (Pages 470 - 473)