UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No.: 16-cv-951 (LAK)
--------------------------------------------x

DANIEL KLEEBERG, LISA STEIN and AUDREY HAYS,

Plaintiff,

-against-

LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC; CANANDAIGUA NATIONAL CORPORATION d/b/a CANANDAIGUA NATIONAL BANK & TRUST; ELLIOT W. GUMAER, JR.; EBER BROS. & CO., INC., EBER BROTHERS WINE AND LIQUOR CORPORATION; BROS. WINE AND LIQUOR METRO, INC., EBER-CONNECTICUT, LLC; and WENDY EBER,

Defendants.
----------------------------------------x

1250 Broadway
New York, New York 10001
February 28, 2019
9:45 a.m.

EXAMINATION BEFORE TRIAL OF WENDY EBER, held at the above-mentioned time and place before ANNMARIE OAKLEY, a Notary Public of the State of New York.

PLAINTIFF'S EXHIBIT 177

A P P E A R A N C E S

BROOK & ASSOCIATES PLLC
Attorneys for Plaintiffs
100 Church Street, 8th Floor
New York, New York 10007

BY: BRIAN BROOK, ESQ.

UNDERBERG & KESSLER LLP
Attorneys for Defendants
LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC; EBER BROTHERS & CO., INC; EBER BROS. WINE AND LIQUOR CORPORATION; EBER BROS. WINE AND LIQUOR METRO, INC., EBER-CONNECTICUT, LLC; and WENDY EBER
50 Fountain Plaza
Buffalo, New York 14202

BY: COLIN RAMSEY, ESQ.

JOHN HERBERT, ESQ. (Telephonically)
Attorneys for Defendants
LESTER EBER and WENDY EBER
PO Box 1031
Tiburone, California 94920

CALIHAN LAW PLLC
Attorneys for Defendant
THE ESTATE OF ELLIOT W. GUMAER
16 Main Street
Rochester, New York 14614
BY: ROBERT B. CALIHAN, ESQ.

Also present: Howard Brodsky, videographer

S T I P U L A T I O N S

IT IS HEREBY STIPULATED AND AGREED, by and among counsel for the respective parties hereto, that the filing, sealing and certification of the within deposition shall be and the same are waived;

IT IS FURTHER STIPULATED AND AGREED that all objections, except as to the form of the question, shall be reserved to the time of trial;

IT IS FURTHER STIPULATED AND AGREED that the within deposition may be signed before a Notary Public with the same force and effect as if signed and sworn to before the court.

* * *

VIDEOGRAPHER: Good morning. Here begins the video recorded testimony of Wendy Eber taken by the plaintiffs in the matter or Daniel Kleeberg et al plaintiffs versus Lester Eber et al defendants, index number 16-cv-9517 (LAK) in the United States District Court Southern District of New York. This deposition is proceeding at Veritext Legal Solution 1250 Broadway, Suite 2400, New York, New York 10001, on Thursday February 28, 2019 at approximately 9:46.

My name is Howard Brodsky and I'm a legal video specialist in association with Veritext Legal Solutions with offices located in New York, New York. The court reporter is AnnMarie Oakley in association with Veritext. Will counsel, please, state their appearances for the record.

MR. BROOK: Brian Brook of Brook & Associates, PLLC, for the plaintiffs.

MR. RAMSEY: Colin Ramsey from Underberg & Kessler for the Eber defendants.

MR. CALIHAN: Rob Calihan from Calihan Law on behalf of the estate of Mike Gumaer.

VIDEOGRAPHER: Will remote counsel, please, state his appearance.

MR. HERBERT: John Herbert for Wendy and Lester Eber.

THE FOREMAN: Will the court reporter, please, swear in the witness.

W E N D Y E B E R, having first been duly sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY MR. BROOK:

Q Would you state your name for the record, please.

A Wendy Eber.

Q Would you state your address for the record, please.

A 201 East 80th Street, Apartment 21A, New York, New York 10075.

MR. RAMSEY: Like yesterday we're going to read and sign.

Q Good morning, Ms. Eber.

A Good morning.

Q Because we have done this a couple of times with the 30(b)6 depositions I'm going to presume that you know how this works but if you have any questions, please, let me know. I'm going to use the same general definitions as before in terms

Page 42

W. EBER

Q Yes.
A Yes.
Q When did that occur, the negotiation?
A I don't remember. What year is this?
Q Again, your email is dated June 2011.
A I know he claimed he had another offer from another company so I don't remember the details.
Q In the notes on the right of that table it says, "John Slocum has an employment contract which expires in January 2012." Do you see that?
A Yes.
Q When was that employment contract executed to the best of your recollection?
A I don't know if I was involved at the time. I did note when I was reading the merger document there were a lot of contracts in there. He may have had one at the time, but I wasn't involved in his contract.
THE WITNESS: Can we take a break.
MR. BROOK: Sure.
VIDEOGRAPHER: The time is 10:52. We're off the record.
VIDEOGRAPHER: Time is 11:04. We are on

Page 43

W. EBER

the record.
MR. BROOK: All right. Go to another exhibit now. This one is being marked as Exhibit 69. It bears Bates EB31025 through 034.
(Ten-page document was marked as Plaintiff's Exhibit 69 for identification.)
Q Do you recognize this document?
(Witness reviewing document.)
A Sort of. I'm confused by this date, 12/29/2017.
Q So according to the first page where it say Slocum and Sons December 2011 in the middle and the bottom left it says 12/29/17.
A Yes.
Q Is that the date when you printed this document perhaps from Microsoft Power Point?
A I don't remember. I believe it was created December 12, 2011.
Q Was it a presentation that was given on December 12, 2011?
A I believe so, yes.
Q What was the presentation given to?

Page 44

W. EBER

A It could have been the Teamsters.
Q Could it have been PBGC?
A No.
Q Why do you say that?
A This isn't something that I recall giving to the PBGC.
Q Do you recall giving a presentation to the Teamsters in or about December 2011?
A I did meet with them a couple of times. This could have been to maybe a bank too, trying to get a loan from a bank.
Q Who prepared this presentation?
A I believe I did.
Q Did anyone assist you in preparing the presentation?
A I don't remember. It may have been to a bank. I'm not sure.
Q In terms of, you know, the date of December 29th of 2017 that's printed on this there is -- I got some questions in terms of just how documents were generally were prepared for production in this case, because that date is after this lawsuit was filed; correct?
A Yes.

Page 45

W. EBER

Q Who was involved in reviewing documents that were on computers for Slocum and Sons in order to respond to document requests in this case?
A Me.
Q Anyone else?
A No.
Q So do you recall opening up Microsoft Word and Microsoft Power Point files and printing those out?
A Yeah, I did print out or send them to Paul electronically, our lawyer electronically, yes.
Q And when you searched for emails did you follow the same process of either forwarding the email or printing them?
A Yes.
Q How did you decide whether to print an email or to forward it?
A I don't recall individual things.
Q When you saw emails with attachments did you print out the attachments as well?
A I believe I did. I believe I did, yes, but I don't know if I did everyone but I believe so.
Q Prior to this litigation was it your practice to regularly print out emails that you sent

Page 46

W. EBER

or received?

A Sorry?

Q Before getting involved in with litigation and having to look for documents was it your practice just in terms of your day-to-day operation of the business to print out emails that you sent or received?

A You know, I printed out some emails, yes, if they were, I thought something that I thought was important or that I wanted to remember to do something I would at times print the email.

Q What did you do with the emails that you printed out during the regular course of business after you printed them, meaning what you did with the hard copies?

A It depends, sometimes I file them sometimes left them on my desk, sometimes I did whatever I needed to do with them and I throw them in the garbage. It depends on what the email was.

Q Did you have any particular practice or routine when it came to organizing your email inbox?

A No.

Q Did you regularly delete emails that you received?

Page 47

W. EBER

A I did delete emails.

Q Did you also save emails in some way such as through an archive or folder system?

A No, not really. No.

Q What email service did you use? Was it Microsoft Outlook?

A Yes.

Q Did you use Microsoft Outlook at all times since 2008?

A Yes.

Q Did you use Microsoft Outlook for both business and personal accounts or only business accounts?

A I have a Gmail account but I have Outlook for work.

Q Since about 2008, I just want to focus on the time period from 2008 forward. Please, tell me all the different email addresses that you have used to send or receive email whether for business or personal reasons.

A From 2008 I have my work email which is weber@slocumandsons.com and then I have an email address weber4@nyc.rr.com and then I have a Gmail account which I started in 2013, or something. It's

Page 48

W. EBER

wendyefry@Gmail.com.

Q Why did you start that account?

A I got married and I, you know, thought it would be nice. Sometimes I go by Fry socially because of my husband.

Q Did you legally change your name to Fry?

A My driver's license says Wendy Eber.

Q When you filed for your marriage license did you request to change your name with the state?

A Yes.

Q What is your legal name as a result of that?

A Wendy Fry.

Q And what is your middle name or initial?

A P.

Q Do you ever use your nyc.rr.com email account to communicate with individuals relating to the Eber businesses?

A No.

Q Do you use the nyc.rr.com account to communicate with Lester?

A I don't recall. I may have used it but not typically.

Q Have you used the Gmail account to

Page 49

W. EBER

communicate with Lester?

A I don't recall.

Q Have you used the Gmail account to communicate with anyone related to the Eber businesses?

A No.

Q In responding to Discovery requests in his case did you search your nyc.rr.com email account?

A No.

Q Did you search your Gmail account?

A No.

Q Why not?

A I don't use that typically to communicate with people from work, for work related things.

Q But when you responded to my questions a moment ago you weren't sure if you communicated with Lester using those accounts; correct?

MR. RAMSEY: Form.

A I don't typically communicate with Lester with my -- if I'm communicating with Lester it's for work. It's with my work account. If maybe my mother emails my father and I'm on it with him about a family thing it might be on another account but typically I communicate with Lester about work

W. EBER

related thing with my work account.

Q And you're -- how confident are you about the fact that you probably have not communicated with Lester through your personal email accounts at any point since 2008?

MR. RAMSEY: Form.

A What?

Q Are you saying that you remember that you didn't communicate with Lester using your personal account at that time?

MR. RAMSEY: Form.

A I don't typically use -- if I'm going to communicate with Lester I usually talk to him. It's usually a conversation. I call him all the time. I call him a couple of times a day or we talk by phone or I see him in the office. You know, that's how I communicate with Lester.

Q Have any of your friends or family members who are not parties to this lawsuit communicated with you about this lawsuit or the issues in it?

A I have spoken to my mother, yes.

Q What did you and your mother discuss about this lawsuit?

A Not a lot of details, just it's more her

W. EBER

concern and it's more the hurt feelings. Were a family and I went to Danny's wedding in 1974. I went to Lisa's wedding. I went to Audrey's wedding. We celebrate Passover together. We celebrated Thanksgiving together. We celebrated Rosh Hashanah together for the last, for Lester 60- 70 years, and, um, it's more about just how hurtful it is and those type of emotional feelings.

Q When you got married to Eric Fry were any of my clients in attendance?

A They were. They came to my wedding.

Q All of them?

A Lisa was there. Sally was there. Danny was there, and Danny's son was there.

Q Was Audrey Hays there?

A Audrey was not there. Her husband was very sick at the time. She couldn't make it.

Q When is the first time that you recall discussing with Dan Kleeberg the fact that the trust no longer owned Eber Connecticut?

A I didn't have that conversation with him.

Q Not before this lawsuit was filed?

A No. Lester had that conversation with him.

W. EBER

Q What is your understanding as to when Lester had that conversation with him?

A When?

Q Yes.

A My understanding was that, um, Dan Kleeberg had a conversation with Mark Stein and Mark Stein said he had learned about the Article 9 sale and that he told Danny about it and then Danny told Lester about it and then Lester told me about his conversation with Danny.

Q What did Lester tell you about that conversation?

A I believe it was before Sally died.

Q What do you recall Lester telling you about what Dan said in response to him informing him about the transaction?

A Danny was well aware of the monies that Lester had been lending into the company and understood all these third-party creditors, specifically the PBGC.

Q Just let me clarify. You're talking about what Lester told you Dan had said at the time? I'm not asking what you think Dan would do. I'm asking you specifically what you recall Lester telling you

W. EBER

that Dan had said in response to him informing him of the transaction.

A That he understood. I mean, I don't -- I think what I was trying to say is he understood that Lester had been putting in a lot of money into the company, loaning money into the companies to save the companies and he understood that and that, you know.

Q Was anything about this conversation ever documented?

MR. RAMSEY: Form.

A Well, there was an email from Danny to Lester which basically Danny was asking Lester for to find him another job and to continue paying him a consulting fee from the company and, um, he, you know, he knew Lester was loaning money into the company so if Lester had to loan the money in he didn't necessarily need the money but he would like to continue to get the consulting fee so, um.

Q So that email was after the conversation that he had with Lester?

A No. I think that was before. That was in, I think, 209 when he was looking to get, looking for money to be paid as a consultant.

Page 54

W. EBER

Q My question is focused on whether there was any documentation, whether just email memorializing it or notes or anything like that that was made about the conversation that Lester said he had with Dan Kleeberg in or around 2014 at the time or afterwards not something that you think supports it before.

MR. RAMSEY: Form. Go ahead.

A I didn't document it. I don't know if Lester documented it. I didn't document that phonecall or that conversation.

Q Did Lester explain to you how the topic came up?

A No. I think that Danny and Lester spoke very frequently about lots of subjects, especially after the company closed or wound down and, you know, also Danny was a supplier of Connecticut so we did business with him and sold his products.

Q I'm sorry. Can you -- I think you may have said this but was this conversation that Lester said he had with Dan before or after Sally died?

A I believe it was before Sally died but I -- yeah. I believe it was before and he understood. I don't think Danny was angry. I don't

Page 55

W. EBER

think he -- you know, nothing comes up in my mind that Danny was upset about anything because my understanding was that Danny knew that Lester had been lending money into the company, and I had conversations with Danny about the pension obligations with the PBGC and he was aware of that liability.

Q When was the conversation that you had with Dan regarding the PBGC?

A Um, do you have the interrogatories? Because you know this is -- they're all detailed in the interrogatories.

MR. RAMSEY: Just whatever your best recollection is today. Whatever your best recollection is today.

A I had several conversation with Danny about the PBGC. His wife sued Eber -- excuse me. His ex-wife, Gail Kleeberg sued Eber Brothers because he falsified a document saying that he didn't have a Quadro to get his pension plan and so he wasn't paying his ex-wife the pension, the pension she was entitled to through the Quadro so at that point there was no administrator on the pension plan to change the designation of the ex-wife to get

Page 56

W. EBER

the pension benefit so then her lawyer sued Eber Brothers and then he got into negotiations with the PBGC and Eber Brothers.

Q This was all before the Alexbay transaction; right?

A No. This was after -- well, he signed where he misrepresented that they didn't have a Quadro, that was before the Alexbay.

Q What do you mean by a Quadro?

A Qualified Domestic Relations Order, which designated that Gail Kleeberg was entitled to half of his pension plan.

Q What is your basis for saying that he made that representation with intentional falsity?

MR. RAMSEY: Form.

A Because he signed a document that said that he didn't have one when, in fact, he did have one.

Q So it's your view that if someone signs a document that says something then they are responsible for ensuring the accuracy of everything that's in that document?

MR. RAMSEY: Form. He testified at this own deposition.

Page 57

W. EBER

THE WITNESS: Right. He testified to this at his own deposition.

Q Have you ever signed a document that contained any factual inaccuracies?

A I don't recall. I mean, I may have, yes, signed something.

Q Has Lester signed any documents that contain factual inaccuracies that you're aware of?

MR. RAMSEY: Form.

A May have, I don't know all the specifics. I'm just --

MR. RAMSEY: Wait. Wait for a question.

Q I wants to focus on your conversations with Dan Kleeberg after the transfer of Eber Metro to Alexbay. During any of those conversations with Dan Kleeberg did you tell Dan Kleeberg that PBGC was trying to collect money from Eber Connecticut?

A I didn't use those words but I did use the words that the companies had a pension liability and the companies were responsible for that pension liability which is going back to why -- just stay with me here. Eber Brothers had a lawyer representing it with the PBGC. Dan Kleeberg wanted to use Eber Brothers lawyer to represent him with

Page 58

W. EBER

the PBGC because Gail Kleeberg's lawyer had contacted the PBGC about Gail's Kleeberg's situation about not receiving her benefit. So all of those things I had discussed with Dan so Dan knew we were talking to the PBGC about the liability there. He knew that.

Q And did you tell anything to Dan about the specifics of what PBGC was trying to find out in terms of the information about Eber Connecticut?

A What do you mean?

Q Well, PBGC was trying to get a lot of information from you about Eber Connecticut and what its financials were and its operations; correct?

A Well, at some points they were and at other points we were talking negotiating with them. It went on for a very long time.

Q I'm asking about the inquiries regarding Eber Connecticut. I understand there's other things there. Did you tell Dan Kleeberg about the fact that PBGC was making inquiries about Eber Connecticut's finances?

A I may have. I don't remember the specifics. I remember him saying that he called the PBGC without an attorney and spoke with an attorney

Page 59

W. EBER

there and I said, Danny, you need a lawyer to speak to them. You can't just call them up, and so that's what we got into this whole conversation about having Eber Brothers represent Danny.

Q I really want to try to get this done today so I would really appreciate if you answered my question about a minute earlier, so let's stay focused on that. So when you might have spoken with Dan about PBGC making inquiries about Eber Connecticut's finances and operations did you indicate to Dan Kleeberg that Eber Connecticut was trying to avoid making payments to PBGC to fund the pension benefit?

A What?

Q Well, Eber Connecticut wasn't willingly making payment to PBGC for a period of years; correct?

MR. RAMSEY: Form.

A The companies could not afford to make payments. Yes, we were not making payments.

Q And Eber Connecticut took the position that it did not have to make payments to PBGC; isn't that correct?

MR. RAMSEY: Form.

Page 60

W. EBER

A We were always trying to negotiate with the PBGC to determine what we could pay, afford to pay.

Q So my question is --

A So, yes.

Q -- PBGC took the position during those negotiations -- I'm sorry. Eber Connecticut took the position during the negotiation with PBGC that Eber Connecticut was not legally obligated to make payments to the pension plan of Eber Brothers Wine and Liquor Corp.; correct?

MR. RAMSEY: Form.

A There was negotiations. We always knew that we had to pay something. There were liens on Connecticut.

Q Well, you fought against the lien on Connecticut; correct?

A Well, originally they put a lien on Connecticut. There's -- I'm not an ERISA lawyer.

Q I'm not asking you --

A Well, I think this is an important point. There are things called statutory liens, which I don't know if you took this class in law school or not but these things just arise so they don't even

Page 61

W. EBER

have to put a lien on it. These are theoretical liens. Right. So there were liens. And I don't understand all the legalese to it but there were liens that came on and then a lien came off and a lien went back on.

MR. RAMSEY: All right. You answered question.

A I mean it's a very --

Q Did you tell Dan Kleeberg that Eber Connecticut was taking the position that it did not have to fund the pension benefits as a result of the Alexbay transaction?

A No. I didn't tell him. I don't believe I told him something like that because I always believed that --

MR. RAMSEY: You answered the question.

Q I'm going to focus to you on this Exhibit 69, page three of it. See the bulletpoints? The third one says, "While we're losing money we have a plan in place to become profitable this year. As a result of our efforts are projecting our EBITDA to go from negative $535,000 to positive 305,000 by May of 2012." Do you see that?

A Yes.

Page 62

W. EBER

Q And EBITDA is different than net income; correct?
A Correct.
Q What does EBITDA stand for?
A Earning before interest, tax, depreciation.
Q And amortization?
A Amortization.
Q Did Eber Connecticut keep track of what its EBITDA was?
A I believe so, for the bank.
Q Were there financial statements prepared that included lines on what the EBITDA was?
A You mean audited financial statements?
Q Not necessarily, maybe just a simple spreadsheet or regular emails saying what the EBITDA was.
A Yes. I think we had convenance around these types of, um, convenance which was related to the EBITDA, yes.
Q So why in this presentation were you pointing out what the EBITDA was rather than talking about net income numbers?
A I think this was for the bank. I think

Page 63

W. EBER

this presentation was for a bank, trying to get a bank loan.
Q And so why was EBITDA being used with the banks instead of net income.
A Just to show -- I think the banks look at EBITDA.
Q What is your understanding as to why they use EBITDA instead of net income?
A It's before interest and tax and depreciation. I still think EBITDA may have been negative in 2012.
Q It says that right there. I wasn't asking about that. For the EBITDA numbers that Eber Connecticut prepared for the bank, or otherwise, were all of the taxes that were paid by Eber Connecticut taken out or were there some taxes that remained there in there as expenses effecting the EBITDA number?
MR. RAMSEY: Form. Go ahead.
A I don't know.
Q So as far as Eber Connecticut's business is it fair to say it had to be licensed by the State of Connecticut to be a distributor?
A Yes.

Page 64

W. EBER

Q And was it taxed as a distributor as well?
A What kind? You mean state tax?
Q What kind of state taxes were imposed on Eber Connecticut as a result of its business as a distributor?
A You mean sales tax?
Q Did it pay sales taxes?
A I believe there are some -- there's, like, gallonage tax but I don't know if that relates to this tax number here.
Q Were there sales taxes?
A I'm not sure. I'm not sure. I don't do the taxes so I don't know specifically. I don't know if -- this is an LLC and I think this tax number -- I'm not sure necessarily relates to, um, the tax. I think it's more the depreciation and the interest that would be an add back here. Those would be the factors really impacting this number.
Q So the interest was primarily interest on bank loans; is that right?
A Yes.
Q Was there any other significant interest expense?
A I don't think so. I think it all related

Page 65

W. EBER

to loans.
Q I want to focus your attention on page nine of this. Actually, I'm sorry page eight. So refers here to cost savings efforts, identify the following opportunities, and it refers to three things there. Is it correct to understand this as saying these are opportunities for further cost savings or that these are the three items that are not things that had not already taken place by that point?
A So this is something from December. This is fiscal year 2012. It may have been something we were in the process of implementing because it would have been during our fiscal 2012 year. So it was probably in process.
Q So finance contracted out resulting in $100,000 savings. What is that referring to?
A That was going back to Wally being hired as a consultant as opposed to Dave Dean who was a full-time employee who had FICA and health care and all that stuff.
Q When was Wally given the title of CFO? Was it at some point later?
A Yeah. Well, he would start out as a

W. EBER

Q Under the terms of the will if Lester had died in 2016 who would have gotten control of Eber Brothers and Co. Inc. stock?

A It's irrelevant.

Q Is it irrelevant when you're determining the interpretation of what the intent of the will was?

MR. RAMSEY: Form.

A The intent of the will, it's right in there that says Lester while he is living is running the company.

Q It doesn't say that.

A It says Lester's running the company.

MR. RAMSEY: We're going to take five minutes here.

VIDEOGRAPHER: The time is 15:52. We are off the record.

VIDEOGRAPHER: The time is 15:57. We are on the record.

Q As secretary of Eber Brothers and Co. Inc. you are in control of the stock book and ledger for the company; correct?

A Correct.

Q Where is that located?

W. EBER

Q Where in Rochester?

A 95 Allens Creek Road.

Q How long has it been at that location for?

A Since we moved. The company moved from 155 Paragon Drive.

Q Okay, and was it in Lester Eber's personal office or in another part of the office space there?

A I'm not exactly sure where. It probably was between the two. It might have been in his personal office. They're connected.

Q Did you have some difficulty in locating that stock ledger in about mid '17?

MR. RAMSEY: Form.

A We were, um -- I told the bank or what we basically said -- I wasn't exactly sure where it was and I was going up to Rochester over Fourth of July and I said I would look for it then.

Q Why did you tell them that you would look for the stock book? What was the reason for the inquiry.

A The bank had requested.

Q What was your understanding as to what the bank wanted to do with the stock book?

MR. RAMSEY: Form.

W. EBER

A At the time I wasn't sure.

Q So did you ever tell the bank that you had found the stock book?

A Basically what I said was I would look for it. I think it was like in June and then I said I would look for it over Fourth of July weekend and I never heard back from the bank and then it was like in a black hole. No one said anything back to me.

Q So you were waiting for the bank to tell you, yes, please look for it?

A Right, but it's really irrelevant because it wouldn't be -- well, whatever.

Q Why do you say it's irrelevant?

A Because we have the stock books. We have them.

Q Okay. Had you told your lawyer that you did not have the stock book?

MR. RAMSEY: Form. Stop. Communications with your counsel.

MR. BROOK: Not when he disclosed it. Let's look at this here. This is Exhibit 40 previously marked. It's an email from Jim Pazzona to a lawyer for CNB stating, "Dear Melissa, I trust you received my voicemail of yesterday afternoon

W. EBER

regarding your inquiry as to the corporate stock book of Eber Brothers and Co. Inc. I am fairly confident that they do not have it, however to be sure Wendy will be in Rochester over the Fourth of July weekend and will double check."

A Yes. This is incorrect.

Q What about this is incorrect?

A That -- I didn't say I'm confident that they don't have it. I didn't -- I said I would look for it is what I said. I don't necessarily know where it is. I will go look for it. I'm going to be up there Fourth of July weekend and then I didn't here anything.

Q So you're saying you did not authorize your lawyer to tell CNB that he was confident that you didn't have the stock book?

A No, I didn't say that. I just said this is incorrect.

Q So you did authorize him to --

MR. RAMSEY: No. This is not a waiver of privilege here. Whatever he said, he said. But that doesn't mean a waive of any privilege. She's saying that this is inaccurate.

Q Now, was this email here forwarded to you?

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
Civil Action No.: 16-cv-9517 (LAK)
---------------------------------------------x

DANIEL KLEEBERG, LISA STEIN and AUDREY HAYS,

Plaintiff,

-against-

LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC; CANANDAIGUA NATIONAL CORPORATION d/b/a CANANDAIGUA NATIONAL BANK & TRUST; ELLIOT W. GUMAER, JR.; EBER BROS. & CO., INC., EBER BROTHERS WINE AND LIQUOR CORPORATION; BROS. WINE AND LIQUOR METRO, INC., EBER-CONNECTICUT, LLC; and WENDY EBER,

Defendants.

-----------------------------------------x

1250 Broadway
New York, New York 10001
June 28, 2019
9:42 a.m.

CONTINUED VIDEOTAPED DEPOSITION OF WENDY EBER held at the above-mentioned time and place before ANNMARIE OAKLEY, a Notary Public of the State of New York.

A P P E A R A N C E S

BROOK & ASSOCIATES PLLC
Attorneys for Plaintiffs
100 Church Street, 8th Floor
New York, New York 10007

BY: BRIAN BROOKS, ESQ.

UNDERBERG & KESSLER LLP
Attorneys for Defendants
LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC; EBER BROTHERS & CO., INC; EBER BROS. WINE AND LIQUOR CORPORATION; EBER BROS. WINE AND LIQUOR METRO, INC., EBER-CONNECTICUT, LLC; and WENDY EBER
50 Fountain Plaza
Buffalo, New York 14202

BY: COLIN RAMSEY, ESQ.

CALIHAN LAW PLLC
Attorneys for Defendant
THE ESTATE OF ELLIOT W. GUMAER
16 Main Street
Rochester, New York 14614
BY: ROBERT B. CALIHAN, ESQ.

Also present: PHIL GALUBERSON, videographer
DAN KLEEBERG, telephonically

W. EBER

VIDEOGRAPHER: Good morning, we are going on the record at 9:42 a.m. on June 28, 2019. Please, note that the microphones are sensitive and may pick up whispers, private conversation and cellular interference. Please, turn off all cellphones or place them away from the microphones as they can interfere with the deposition audio. Audio and video recording will continue to take place unless all parties agree to go off the record. This is media unit one, day two of the video recorded deposition of Wendy Eber in the matter of Daniel Kleeberg versus Lester Eber et al. filed in the United States District Court Southern District of New York, Civil Action number 16-cv-9517(LAK)

MR. BROOK: 9517.

VIDEOGRAPHER: This deposition is being held at Veritext, located at 1250 Broadway, New York, New York. My name is Phil Glauberson from the firm Veritext and I am the videographer. The court reporter is Annmarie Oakley from the firm Veritext. I am not authorized to administer an oath. I am not related to any party in this action, nor am I

W. EBER

financially interested in the outcome. Counsel and all present in the room will now state their appearances and affiliations for the record.

MR. BROOK: Brian Brook of Brook & Associates, counsel for plaintiff is here, and one of my clients, Daniel Kleeberg, is on the telephone.

MR. RAMSEY: Colin Ramsey from Underberg & Kessler for the Eber defendants.

MR. CALIHAN: Rob Calihan on behalf of Calihan Law representing the estate of Elliot Gumaer.

VIDEOGRAPHER: Will the record, please, swear in the witness.

W E N D Y E B E R, having been previously sworn by a Notary Public of the State of New York, was examined and testified as follows:

EXAMINATION BY MR. BROOK:

Would you state your name for the record, please.

A Wendy Eber.

Q Would you state your address for the record, please.

A 201 East 80th Street, Apartment 21A, New

W. EBER

York, New York 10075.

Q Good morning, Ms. Eber.

A Good morning.

Q I want to start out by asking if, you know we had three days before in these depositions, if there's any reason why you may think that I may need to go over how this deposition is going to work or how you should be addressing my questions, if you don't understand and things like that?

MR. RAMSEY: The grounds rule.

Q Do we need to go over the ground rules?

A Okay, you can.

Q Well, the court reporter is taking down everything that we say so the most important thing is we try not to talk over each other. If I ask you a question if there's any part of it that you don't understand you should say that to me because if you answer the question I'm going to assume that you understood it.

A Okay.

Q And those are the, I think, two of the basics. We have a limited amount of time here but breaks don't count for that so if you need to take a break you can do so, just say it. The only thing I

W. EBER

MR. BROOK: Who at Eder Goodman.

A It was also between Pat Dalton. I think the lawyers were involved in it as well.

Q So you think the lawyers might have wanted you to get the right of first refusal?

A No. I'm saying the lawyers were involved in the whole thing so the whole negotiation as well.

Q So are you -- but what does that have to do with who at Eder Goodman insisted that you get this right of first refusal?

A I don't remember exactly.

MR. BROOK: This is Exhibit 121 and jumping forward this is an email dated March 9, 2012, Bates number EB31199.

(EB31199 was marked as Plaintiff's Exhibit 121 for identification.)

Q This is an email that you printed out; correct?

A Yes.

Q And it's one that you sent to Mike Gumaer; correct?

A Yes.

Q And the subject says it's a forward of

W. EBER

something January Eber CT. Do you see that?

A Yes.

Q Where's the forwarded text?

A I don't know.

Q Did you delete that.

A No. I mean, I didn't delete anything. I haven't deleted anything from the time you sued us so, I mean, I don't know if this may have been a printout. I don't know.

Q In the email you said, "Mike, Please confirm that you have a conference call today at 4 p.m. with Glenn and that he will be in Rochester on Tuesday and Wednesday next week. You need to speak with Rick Hawks." message importance is high; correct?

A Yes.

Q Why was it that you said that Mike Gumaer needed to speak with Rick Hawks?

A I think this is the time of the foreclosure or the filing of the foreclosure documents and there were numerous phonecalls, I think, and meetings that week regarding the foreclosure.

Q Had you already apprized Mike Gumaer of

W. EBER

the foreclosure action so he knew what you were talking about here?

A I don't remember the exact dates because this is, you know, seven years ago here but I know that Mike was aware of all of the loans that Lester had put into the company. He was aware of all of the liabilities that the company faced and he was, he knew generally what was going on in the company.

Q My question is about the foreclosure action.

A I don't recall exactly when he found out but he was aware.

MR. BROOK: Let's mark this as Exhibit 122, Bates EB26652.

(EB26652 was marked as Plaintiff's Exhibit 122.)

Q This is sent four days later on March 13, 2012 from Mike to you; correct?

A Right.

Q And he says, "Wendy, We'll talk at 4 p.m. I'm not in a position to discuss in any depth the Alex Bay matter as I learned of the matter yesterday afternoon in the email from Underberg." Let me stop there. Do you know what email from Underberg he was

W. EBER

referring to there?

A I'm not certain. I mean, I do have a copy of it.

Q I'm asking if you know. When you say you're not certain what are you referring to?

MR. RAMSEY: You're not certain what he's referring to?

THE WITNESS: No.

Q Do you believe you asked Underberg to forward him a copy of the Alex Bay Complaint?

A I may have. I just don't remember.

Q And so is it fair to say that you had not discussed the Alex Bay foreclosure action with Mike Gumaer prior to Monday, March 12, 2012?

MR. RAMSEY: Form.

A Well, he was well aware of the loans that Lester put into --

Q Focus on the foreclosure action not the loans themselves.

A Right. He was well aware but I'm not sure exactly when he was notified of the foreclosure action but he knew about the loans and he knew about the financial situation of the company and all the liabilities out there that Lester was financing

W. EBER

everything.

Q Just so we're clear, because you gave a long answer there, are you disputing the statement here that according to Mike Gumaer he learned of the matter the day before the date of this email in an email from Underberg?

MR. RAMSEY: Form.

A He learned of the foreclosure?

Q Yes. Do you dispute that?

A Well, that's what's written here.

Q Do have any basis to dispute that?

A I don't know.

Q Next line says, he wrote, "Hawks will be interested in knowing as will I what will be the status of the Eber trust with respect to Eber assets held in the trust. You may wish to have someone from Underberg on hand to address these issues." and then it says "on the survive" which I think means surface, "it looks like Lester is moving against the trust to which he is a cotrustee." Do you see that?

A Yes.

Q Can you think of anything other than what surface, what word he might have meant if it wasn't surface in that last sentence?

W. EBER

A I don't know.

Q Do you recall discussing this concern with Gumaer?

A Yes. Yes.

Q What did say to him about it?

A Well, you know, just as I have said throughout this deposition we -- and actually this week we, you know, that March 13th week we had many, many calls about, you know, all the monies that Lester had loaned into the company. The --

Q He was already well aware of that though; right?

A Who?

Q You just said that Mike Gumaer was already well aware of the loans and everything and he still had these concerns, so I'm asking you to focus on what you said after this point in response to his concerns.

A Right. That we talked about what Lester was doing. I had a lot of conversations with him about the loans that were secured loans, all the debts that Eber Brothers had, the continued legacy liabilities, all that information, the financial distress of the companies and he was -- we had, I

W. EBER

think, board meetings. I had numerous call with him.

Q So I'm asking, I'm try together understand, do you recall anything specifically that you told him in terms of new information that he didn't already have to allay his concern that on the surface it looked like Lester was moving against the trust of which he was a cotrustee.

MR. RAMSEY: Form.

A He's stating that that's what it looks like and that's what it was. Lester was moving against company. Yes.

MR. BROOK: This is going to be 123. This is an email and an attachment sent on March 12, 2012 from you to, looks like, Marino Fernandez and Mike Gumaer.

(March 12, 2012 email was marked as Plaintiff's Exhibit 123 for identification.)

Q Do you see that.

A Yes.

Q It looks like you had scanned or someone had scanned for you a term sheet with CNB about Eber Connecticut, well, not just a term sheet but a

W. EBER

signed and executed term sheet to Mike Gumaer and Marino Fernandez. Why were you doing that?

A I don't know. I don't remember.

Q And Marino Fernandez asked -- just to make sure we're on the same page, Marino Fernandez was the lawyer that was retained by Eber Brothers Wine & Liquor Corp. to represent it in the foreclosure action; is that right?

A Yes.

Q Can you recall what he was doing looking at this bank loan?

A I don't remember.

Q Can you recall what the relevance was of the bank loan to anything that was going on at the time?

MR. RAMSEY: Form.

A No. I mean that we were --

MR. RAMSEY: Hold on. If you remember you remember. Don't speculate.

A No.

MR. BROOK: All right. We're up to 124. Now in is email with Bates number 26650 with an attachment, Bates number 26650 and the attachment with Bates numbers 26650A and B.

W. EBER

(Bates 26650A to 26650B was marked as Plaintiff's Exhibit 124 for identification.)

A Yes.

Q So this is the consent form by which the board of Eber Brothers Wine & Liquor, at the time was just you and Mike Gumaer, consented to the transfer of stock from Alex Bay to satisfy the obligations to Alex Bay; correct?

A Yes.

Q Is it correct that this is a document that was drafted by Underberg Kessler?

A Looks like it was.

Q Why was Underberg Kessler drafting a resolution for Eber Brothers Wine & Liquor Corp.?

MR. RAMSEY: Form.

A I don't know.

Q And this email was sent by someone at Underberg Kessler, looking at the second one before you forwarded it, sent from somebody named Marcy McQue (phonetic) from Marcy Davis McQue. I'm not sure I follow that. Do you know who that is?

A Where?

Q In the email that you were forwarding, so

W. EBER

looking down about a third way of the page, it's from somebody named Marcy McQue. It looks like she's an administrative assistant. Do you know her personally?

A No.

Q And she was sending this to you, to Lester, to Glenn Sturm, to David Belt; right? Do you see that?

A Yes.

Q And copying several lawyers at Underberg & Kessler; is that right?

A Yes.

Q So there were a lot of lawyers on this email; correct?

A There's a lot of lawyers on this email. Yes.

Q But Marino Fernandez was not one of the lawyers on this; correct?

A He's not on this email, no.

Q And you never sent him this document to review?

MR. RAMSEY: Form.

A I don't remember.

Q And so is it correct there was no one on

W. EBER

this email who was a lawyer representing Eber Brothers Wine & Liquor Corp.?

A On this email that is correct.

Q Was there a lawyer for Eber Brothers Wine & Liquor Corp. that every reviewed this document?

A Maybe. I don't remember.

Q Who did you think that lawyer might have been?

A Marino, Mike Gumaer was also a lawyer too.

Q I want to ask you some questions about your communications with Marino Fernandez now that the court has ruled that's something that is subject to Discovery. When did you first speak with Marino Fernandez about the foreclosure action?

A I don't remember the exact date. I don't remember.

Q Do you recall what you discussed? About what our needs were?

A I don't -- I mean, that's many years ago. It's, like, seven years ago. I don't really remember all the details.

Q What, if any, questions did you ask Marino Fernandez to look into?

A I don't remember. Like, specific

W. EBER

conversations and stuff?

Q Or just general issues. Was there anything in particular that you wanted Marino Ferandez to do to protect the rights of Eber Brothers Wine & Liquor Corp.?

A I mean, sitting here I just don't remember. I don't recall.

Q What did he tell you his qualifications were to do this kind of corporate work?

MR. RAMSEY: Form.

A Well, he was a lawyer that was recommended to us by Paul Keneally. So it's a small community in Rochester. Everyone, kind of, knows each other on the legal front so I thought he was a good choice.

Q Did Marino Fernandez offer any opinions about the foreclosure action?

MR. RAMSEY: Form.

MR. CALIHAN: Form.

A As far as what?

MR. BROOK: What's the objection?

MR. CALIHAN: A formal opinion or --

Q Did he offer any opinions on whether Eber Brothers Wine & Liquor Corp. should consent to

Page 335

W. EBER

Lester's request to take the shares of Eber Metro in full satisfaction of the debts?

A If we should?

Q Yes.

A There weren't any alternatives. I mean, Brian, there's no money to pay for anyone here. There are no alternatives. So, yeah, I mean it's just -- this is, kind of, a situation where we waived all of our defenses and that was suggested by him.

Q He suggested waiving all your defenses?

A There weren't any defenses. There's no money here. There's no money to pay Marino, let alone, you know, do anything. Who's going to pay for the defenses? Yeah.

Q It was a decision to waive defenses out of the concern of the cost; is that right?

MR. RAMSEY: Form.

A Well, just resources, cost, there's no defenses. Yeah. I mean, yes, he supported that.

Q And did you get anything in writing from him in terms of any legal opinions?

MR. RAMSEY: Form.

A A written legal opinion?

Page 336

W. EBER

Q Any written legal opinion, even just an email?

A No. I don't know if -- I don't think there was a written opinion. No.

Q And who was on the discussion with him when he apparently gave you the opinion about waving all the defenses?

MR. RAMSEY: Form.

A You have the minutes right, so there was a meeting, I think, in --

Q Just the board meeting, then with Lester and Mike Gumaer?

A And I believe he was on one of the calls too. We had many calls and he was on the call, Gumaer was on the call. Then I called Gumaer, Mike at a later date. I spoke with Marino later dates. I don't know if you have the minutes or not.

MR. RAMSEY: All right. You answered the question.

Q Did you consult with any other lawyers, besides Marino Fernandez, about how the transfer of Eber Metro would affect Eber Brothers Wine & Liquor Corp.?

A I may have talked to Glenn about it.

Page 337

W. EBER

Q And in terms of your discussions with either Marino Fernandez or Glenn Sturm was there any discussion about how the transfer of Eber Metro to Alex Bay would effect the shareholders and the value of the shareholders in Eber Brothers Wine & Liquor Corp.?

MR. RAMSEY: Form.

A Say that again.

Q Let me rephrase. Was there any discussion about how the transfer of Eber Metro to Alex Bay would effect the value of the shares of Eber Brothers Wine & Liquor Corp. for the shareholders?

A With?

Q With either Glenn Sturm or Marino Fernandez?

A You know, sitting here today I don't recall. I'm sure there were conversations. I just don't remember, like, a specific conversation.

MR. RAMSEY: Okay. Then you answered the question.

Q And so when you say you're sure it makes it a little confusing. Do you recall any general conversation or what their conclusion was about the value of the shares and how that would be effected?

Page 338

W. EBER

A I just don't. You know, there was a lot of things going on I don't remember. The companies were insolvent.

MR. RAMSEY: You answered the question. You don't remember. The answer is okay.

MR. BROOK: Let's go to Exhibit 125. Start off by asking -- well, let me put the Bates number. It appears to be part of an email with Bates number EB31212 and an attachment of EB31212A.

(EB31212 and EB31212A was marked as Plaintiff's Exhibit 125 for identification.)

Q What happened to the top part of this email?

A I don't know.

MR. BROOK: We'll request that a complete copy of this be provided or that the redaction log be provided that explains why a document that has already been produced is being produced in redacted form, and I just want to request that I am requesting it for the record.

Q So because one of the problems here is this doesn't have a date or anything on it but I

Page 339

W. EBER

will -- hopefully if you need a second to read it but hopefully you can answer some questions on it anyway. Do you know who Jim is in this email?

A I believe it's Jim Frizano. (phonetic)

Q And you're sending to him a proforma analysis of how the trust should be distributed; is that right?

A Yes.

Q Why was this prepared?

A Well, this was prepared because Canandaigua wanted to distribute the trust and they sent out, like, their -- how they were going to distribute it, and one of the items that they didn't take into consideration was that Erica Stein was getting distributions from the trust, which were supposed to be subtracted from Lisa Stein's portion of the trust.

Q Okay. So you were providing different numbers for how you believe the assets should be distributed versus what CNB had initially proposed?

A For the -- not anything to do with the Eber Brothers equity, only the marketable securities so the Eber, you notice, was taken out. I didn't do anything with that. This was just on the account

Page 340

W. EBER

balance of the marketable cash and, you know, traded stocks and things like that.

Q Okay. So it was in your view appropriate to change the distribution of marketable securities and other liquid assets but not to change anything having to do with Eber Brothers & Co. stock; is that right?

A Right. So you will see, like, the bank said that, like, Lisa and Danny should get $113,000 but -- well, Lisa should get $113,000 but see she should have been adjusted out the monies that were advanced to Erica, about $75,217, that were advanced to Erica. So, you know, her adjusted distribution on the marketable security should been about $50,566.

Q Who created this proforma analysis?

A I worked on it.

Q Did anyone else help you with it?

A I may have had some help with it.

Q Who may have helped you with it?

A I don't remember.

Q Are you proficient on how to use Microsoft Excel yourself?

A Yes. I have a business degree.

Page 341

W. EBER

Q Subsequent to sending this proforma analysis to Jim Frizano did you make any further adjustments to what you thought the distribution of marketable assets should be?

A What do you mean?

Q Well, after, whenever you sent this to Jim Frizano, did you find any errors in here or find anything that you think needed to changed in how it would effect the ultimate distribution?

A I think this was the only -- I don't remember if this was the final. I think this was the final one. I mean, I don't know if they used this one. They used something else I think.

Q But this is what you believe they should have done; is that fair?

A I believe so, yes.

Q In your email you also mention something in this second paragraph, "Since the Woods Oviatt bills are being paid by the trust include charges from the SDNY litigation, it's only fair that our legal bills are paid as well by the trust." Did you ever take any further steps to try to get legal bills paid for by the trust?

A I don't believe so, no. I did note that

Page 342

W. EBER

they were -- there were a lot of bills from Woods Oviatt that were taken out of the trust, yeah.

Q And do you know whether it's correct that that included the SDNY litigation bills, that those were actually taken from the trust?

A They may have been. They may have been. I don't remember at this time. I don't remember if I wrote this or not. You know, I would have gotten it from -- I think there's was an allocation of something and I was going through that report or that document and I saw this so that's why I would have asked for this but --

Q You saw Woods Oviatt bills; right?

A Yeah.

Q Do you know whether those were bills for the SDNY litigation or for the surrogates court proceeding?

A I'm not sure. I don't know.

Q Did you ever see the Woods Oviatt bills?

A For the trust or the SDNY?

Q For whatever was paid for by the trust.

A There were some details in some documents I believe that did have some -- you could see the lawyers billings, so there were some bills I think.