Page 86
1  earlier than that discussion of terminating the
2  trust, or was that the first time that you looked
3  into that?
4  A.  We had been considering it for some time, and it
5  was soon after the various lawsuits had been filed
6  that we felt we were in a position to follow through,
7  and continue to look to distribute the assets to the
8  trust beneficiaries, would be in the best interest of
9  all the beneficiaries here.  Short of that, a
10 valuation of the Eber assets was a stumbling block.
11 Q.  Now, to the extent that you can, please walk me
12 through your analysis in determining to terminating
13 the trust was the best thing for the beneficiaries of
14 the trust, in that situation?
15 A.  Well, in looking at ensuring that all of the
16 beneficiaries and the step down here to the second
17 and third generations who are receiving the assets,
18 our determination was to ensure that assets get to
19 the appropriate hands, rather than having much of it
20 depleted by one sector -- one side of the family.
21 And so, as we took a look at it, because we had
22 assets that are non-marketable, we were looking at
23 distributing and benefiting the family units
24 themselves, the three family units, to the greatest
25 extent to avoid any loss of value.  And also, to

Page 87
1  consider providing for those family members, because
2  there had been a decrease and a loss in income coming
3  from the other Eber assets.
4  Q.  Now, to what extent, if at all, did the
5  possibility of filing a claim alleging a fraudulent
6  transfer factor into your analysis of whether
7  terminating the trust was beneficial for the
8  beneficiaries?
9           MR. O'BRIEN:  Form.
10          MR. RAMSEY:  Form.
11 A.  To what extent -- can you restate the question,
12 please?
13 Q.  Now, we had been talking a minute ago about the
14 possibility of filing a claim on behalf of the trust,
15 as the equity holder of the parents of the company
16 had authorized the transfer here, whether there could
17 be a claim filed there.  And you said, rather than do
18 that, the decision was made to terminate the trust.
19 Is that a fair description?
20 A.  Yes.
21 Q.  So, how did that possibility of the filing of
22 the claim factor into the determination that
23 terminating the trust was beneficial for the
24 beneficiaries?
25 A.  How did the --

Page 88
1  Q.  The possibility of a claim --
2  A.  Okay.
3  Q.  -- factor into the determination that
4  terminating the trust would be the best course for
5  the beneficiaries?
6           MR. O'BRIEN:  If at all.
7           MR. BROOK:  If at all.
8  A.  If at all, it factored into the lack of ability
9  to be able to provide a fair value for the stock.  It
10 would allow for the trustee to be able to distribute
11 the stock to the beneficiaries, possibly equally, so,
12 that they would be able to then reap any kind of
13 benefit there, if there was a need to bring any kind
14 of action.
15 Q.  So, is it --
16 A.  We felt our hands were tied, so to speak,
17 because we were not -- we had two co-trustees that
18 had an interest in this, and by looking to distribute
19 to the beneficiaries, if there was a desire, then the
20 beneficiaries could take appropriate action.
21 Q.  So, is it fair to say, that it factored into the
22 decision in that, if an action was to be brought by
23 terminating the trust, that action could be brought
24 directly by the former beneficiaries, because they
25 then owned the shares directly?

Page 89
1  A.  They would be looking at owning the shares
2  directly, yes.
3  Q.  If you would please turn to the fourth page of
4  the Exhibit.  It says at the top, minutes from
5  meeting of Officers for the trust of Allen Eber, do
6  you see that?
7  A.  Yes.
8  Q.  And this is with the last three page numbers
9  857.  So, this refers to a meeting on August 18th,
10 2011, do you see that?
11 A.  Yes.
12 Q.  It says that Elliot Gumaer, Lester Eber, and
13 Richard Hawks, trustees of the trust of Allen Eber,
14 met at the Canandaigua National Bank in Rochester,
15 New York, to discuss and ratify the actions of the
16 subsidiaries as described below, and discuss other
17 trust business.  Is that a fair description of what
18 happened during that meeting?
19 A.  At the meeting there were various forms that
20 were presented --
21          MR. CALIHAN:  There were various what?
22 A.  Forms presented.  The actual documentation and
23 so forth was discussed, but I did not see specific
24 references to the loans.  We discussed the fact that
25 there are several things that were going on here and

Page 90

1  needed to be done, but had nothing to do with -- the
2  trustees had nothing to do with the determination of
3  the various obligations.
4  Q.    Okay.  So, just to make sure we are oriented
5  here, so this is describing the meeting that occurred
6  about ten months before the one we were looking at
7  just a minute ago?  So this is --
8  A.    Yes.
9        MR. O'BRIEN: You mean the meeting?
10       MR. BROOK: The meeting, yes.
11       MR. O'BRIEN: The conference call meeting?
12       MR. BROOK: Well, the other one was a
13 conference call meeting, and this one was an in
14 person meeting, except, I think it says here, if you
15 look at the next sentence, that Gumaer participated
16 by conference call, and it says Wendy Eber was also
17 present to facilitate and document the discussion, is
18 that correct?
19       THE WITNESS: Yes.
20 BY MR. BROOK:
21 Q.   And it says -- the next paragraph reads: The
22 trustees ratified three loans made by Lester Eber to
23 Eber Brothers Metro, Inc., do you see that?
24 A.   Yes.
25 Q.   And is that a fair description of what took

Page 91

1  place during that meeting?
2  A.    The trustees discussed that, it was -- I don't
3  believe there was ever a vote taken at this meeting.
4  Once again, it comes back to -- if you refer back to
5  the --
6        MR. O'BRIEN: You answered the question.
7        THE WITNESS: Okay.
8  Q.    So, is it correct that you would not describe
9  what occurred in that meeting as a ratification by
10 you, of any loans that were made by Lester Eber to
11 Eber Brothers Metro?
12       MR. RAMSEY: Form.
13 A.   I would not characterize it as a ratification,
14 because for the first time, we are getting the
15 information of what is happening here, which led to
16 probably the second memo which was the first one here
17 --
18 Q.   Minutes.
19 A.   -- or minutes, which I had requested information
20 which I had not received.
21 Q.   So, jumping down some to the fourth paragraph,
22 it says: After a lengthy discussion about how all the
23 income beneficiaries and third parties were offered
24 the opportunity to participate in the February 26th,
25 2010 loan, but they all declined, and that only based

Page 92

1  on Lester's good will, he gave the money for the
2  loan.  The loans were ratified by Rick Hawks and Mike
3  Gumaer, Lester Eber abstained.  A copy of all the
4  documents that relate to the loan was provided to
5  Richard Hawks.  Is that paragraph -- did I read that
6  correctly, what's on the page?  Just making sure, did
7  I read that correctly?
8  A.    Yes.
9  Q.    Okay.  And is, what I just read as described on
10 the page, an accurate description of what took place
11 during this meeting on August 18th, 2011?
12 A.   A copy of all the documents related to the loan
13 was provided to me, did not occur at that time.
14 Q.   When, if ever, did that occur?
15 A.   It occurred after I made the next request which
16 was at the meeting we had in January of the following
17 year.
18       MR. O'BRIEN: June.
19 Q.   You mean -- was it at the next meeting?
20 A.   The June 7th, okay.
21 Q.   Was there a meeting in between the August 2011
22 and June 2012 meetings?
23 A.   No, I was taking the date off here, from the
24 top, which came from Wendy, which was January 2nd, of
25 '13 and it was actually June 7th of '12, when we had

Page 93

1  the second meeting, but the first meeting was in
2  August of 2011.  And that's when I -- this
3  information was first provided to us, the second
4  meeting was Mike talking about the changes that were
5  taking place I'd requested copies of the judicial
6  decision summary, and information that had not been
7  provided which actually went back to the previous
8  meeting, and did not -- had not received.
9  Q.    And continuing on the issue you raised of
10 requesting information, if you look at the last
11 paragraph, the third sentence, it says something --
12 it appears to be related to the above issues, it says
13 quote, Rick requested copies of the operating
14 statement for Eber-CT to determine the value of the
15 Corporation, they are hereto attached.  Is that
16 correct, that you requested a statement for Eber
17 Connecticut?
18 A.   I would have requested information from Eber
19 Brothers and at that time, if Eber Connecticut was
20 the lending from the commercial side, what our
21 lending entity was, I was looking to determine
22 whether or not the liability of the organization.
23 Q.   And did you ever actually receive the statement
24 that you requested?
25 A.   Not in the form that I would normally expect it

Page 138

1 copy of all documents related to the loan was
2 provided to you, do you recall being provided with
3 those documents at any point?
4 A.  After the fact, after the second meeting, we did
5 get some of those documents, and some of them
6 actually came from our own commercial lending area
7 who had received them.
8 Q.  And the second meeting is the June 12th, year
9 2012 meeting?
10 A.  Yes.
11 Q.  Is there a reason that you didn't follow up, or
12 push harder to get those documents sooner than June
13 of 2012?
14 A.  We did not see a reason set forth other than the
15 fact we were not aware of a corporate structure
16 change until we had been informed of that by Mike
17 Gumaer later on.
18 Q.  Do you recall following up at all to request
19 those documents prior to the June 2012 meeting?
20 A.  I would say verbally we had requested it a
21 couple of times directly from Wendy.
22 Q.  Do you know whether you ever reduced that
23 request to writing?
24 A.  No.
25 Q.  You didn't or you don't recall?

Page 139

1 A.  We may have.  It may have been in an e-mail
2 request, I would have to go back to the electronic to
3 find out.
4 Q.  The last paragraph from the meeting minutes from
5 August 18th, 2011, makes a reference to Eber CT, and
6 your request for the operating statement relating to
7 Eber Ct.  Do you see that?
8 A.  Yes.
9 Q.  Do you recall discussing Eber CT at that
10 meeting?
11 A.  The discussion at that time would have been
12 trying to find out what had been presented to us, and
13 what Eber CT was.  We were aware that there was
14 lending on the commercial side to Eber, but trying to
15 determine exactly where that corporate structure fit
16 into our organization it was unclear, and that's why
17 we had not specifically requested until then, the
18 information on Eber CT.
19 Q.  So, you at least heard the name Eber CT during
20 that meeting?  You weren't entirely sure where Eber
21 CT fit into --
22 A.  The Corporation.
23 Q.  -- the Corporation, but you remember discussions
24 about that entity, Eber CT?
25 A.  As I sit here today remembering it, I believe I

Page 140

1 did, okay.  Long time ago.
2 Q.  Understood.  The last couple sentences there
3 talk about a request by Sally Kleeberg for payment of
4 medical expenses.  I know you were asked a couple
5 questions about this earlier, do you recall Lester
6 ever paying -- Lester or the trust ever paying
7 Sally's medical expenses?
8 A.  The trust never paid, I'm not sure about Lester.
9 As I told you, there was a period of time when things
10 were closing down with Eber Brothers, and certain
11 people have been either laid off, or were no longer
12 with the organization, and Lester did pick up two to
13 three years of medical expenses and medical insurance
14 for some of the family members who had actually
15 worked for the organization, and then, I believe it
16 was in 2011, he discontinued that.
17 Q.  Okay.  So, the money came from Lester
18 personally, not from the trust?
19 A.  Money never came from the trust.
20 Q.  When is the first time you recall seeing a copy
21 of these meeting minutes?
22 A.  My first recollection would be sometime shortly
23 after our June meeting.
24 Q.  At that point, based on your testimony earlier,
25 you indicated that you didn't believe -- you didn't

Page 141

1 agree that there was a ratification of the loans, you
2 didn't recall a vote taking place.  Given that
3 testimony, did you ever make any type of request to
4 amend or correct these meeting minutes, to better
5 reflect what you recall taking place?
6 A.  I did not.
7 Q.  Was there a reason that you didn't?
8 A.  Probably the only reason would be, in our mind,
9 at that point it wouldn't matter because there
10 appeared to be conflicting roles that were taking
11 place during the minute taker and what we were doing.
12 The corporate portion of the meeting is really what
13 was being recorded here, and, you know, I think there
14 was an attempt to bring in the trustee, the corporate
15 trustee, who had previously indicated that they were
16 not managing this particular asset from a financial
17 standpoint, but to bring us in to make it look like
18 we were agreeing to that.
19 Q.  Given that dynamic, or that dynamic as you just
20 described it, would it be all the more reason to make
21 sure, on behalf of Canandaigua National Bank, that I
22 disagree with certain aspects of these meeting
23 minutes?
24        MR. BROOK: Objection to form.
25 A.  I would say in retrospect, yes.