1  UNITED STATES DISTRICT COURT

2  SOUTHERN DISTRICT OF NEW YORK

3  _____/

4  DANIEL KLEEBERG, LISA STEIN and AUDREY HAYS,

5              Plaintiffs,

6
                - v -
7
   LESTER EBER; ALEXBAY, LLC f/k/a
8  LESTER EBER; LLC; CANANDAIGUA NATIONAL
   CORPORATION d/b/a CANANDAIGUA NATIONAL
9  BANK & TRUST; ELLIOT W. GUMAER, JR.;
   EBER BROS. & CO., INC.; EBER BROS. WINE AND
10 LIQUOR CORPORATION; EBER BROS. WINE &
   LIQUOR METRO, INC.; EBER-CONNECTICUT, LLC ; and WENDY
11 EBER,

12             Defendants.

13 _____/

14

15      Examination Before Trial of Richard Harris

16 Hawks Jr., held at 700 Crossroads Building, 2 State

17 Street, Rochester New York 14614, on August 20, 2018

18 at a time of 9:00 a.m.

19

20

21

22

23

24

25 REPORTED BY:   ASHLEY FALCONE

PLAINTIFF'S EXHIBIT 180

Page 2

 1  A P P E A R A N C E S
 2
 3      BRIAN BROOK, ESQ.,
 4          Clinton Brook & Peed,
 5          100 Church Street, 8th Floor,
 6          New York, New York 10007.
 7          Counsel for Plaintiffs Daniel Kleeberg,
 8          Lisa Stein, and Audrey Hays
 9
10      COLIN RAMSEY, ESQ.,
11      PAUL KENEALLY, ESQ.,
12          Underberg & Kessler LLP,
13          300 Bausch & Lomb Place,
14          Rochester, New York 14604.
15          Counsel for Eber Defendants
16
17      ROBERT CALIHAN, ESQ.,
18          Calihan Law PLLC,
19          The Powers Building, Suite 761
20          16 West Main Street
21          Rochester, New York 14614
22          Counsel for Defendant Mike Gumaer
23
24
25

Page 3

 1  A P P E A R A N C E S
 2
 3      DONALD O'BRIEN, JR., ESQ.,
 4          700 Crossroads Building
 5          2 State Street
 6          Rochester, New York 14614
 7          Counsel for the Defendant Canandaigua
 8          National Corporation d/b/a Canandaigua
 9          National Bank & Trust
10
11      Patrick Martin
12          Co-executor of Gumaer Estate
13
14
15              * * *
16
17
18
19
20
21
22
23
24
25

Page 4

 1              WITNESS INDEX PAGE
 2
 3  WITNESS:        EXAMINED BY:           PAGE
 4  ----------------------------------------------------
 5  Richard Hawks   Brian Brook             6
 6                  Colin Ramsey          119
 7                  Robert Calihan        153
 8
 9
10              * * *

Page 5

 1              EXHIBIT INDEX PAGE
 2
 3  EXHIBIT
 4  NUMBER          DESCRIPTION           PAGE
    ----------------------------------------------------
 5
    PLF. 1    e-mail                       51
 6
    PLF. 2    e-mail                       52
 7
    PLF. 3    Letter                       55
 8
    PLF. 4    Letter                       58
 9
    PLF. 5    Letter                       63
10
    PLF. 6    File of documents            73
11
    PLF. 7    e-mail                       96
12
    PLF. 8    Affidavit                   112
13
    PLF. 9    e-mail                      114
14
15
16              * * *
17
18
19
20
21
22
23
24
25

Page 6

1  (It is hereby stipulated and agreed by
2  and among counsel that sealing, certification, and
3  filing are waived; and that all objections, except as
4  to the form of the question, are reserved until the
5  time of trial.)
6       MR. O'BRIEN: Well, we probably need to
7  clarify what that is, I do want the witness to be
8  able to read and sign.
9
10      R I C H A R D  H A R R I S  H A W K S  J
11 R., 6483 Cooks Point Road Naples, New York, 14512,
12 after having been duly called and sworn, testified as
13 follows:
14
15 EXAMINATION BY MR. BROOK:
16 Q.  Good morning.  Would you please provide your
17 home and business address?
18 A.  My home address is 6483 Cooks Point Road Naples,
19 New York, and my work address is 72 South Main
20 Street, Canandaigua, New York.
21 Q.  And you're aware you are being deposed in the
22 matter of Kleeberg v. Eber, is that right?
23 A.  Yes.
24 Q.  Have you ever been deposed before?
25 A.  Yes.

Page 7

1  Q.  How many times?
2  A.  About three times.
3  Q.  When was the last time you were deposed?
4  A.  Probably 15 years ago.
5  Q.  Okay.  Now, I'm sure you have discussed this
6  with your lawyer, but I'm going to go over a few of
7  the basics of how this is going to work.  In this
8  deposition I'm going to be asking you questions, and
9  you're going to be answering them under oath, do you
10 understand that?
11 A.  Yes.
12 Q.  And there are a few differences between a
13 deposition and a typical conversation that I want to
14 make sure you are aware of, and these are not easy to
15 remember, not as easy as it sounds.  First, the Court
16 Reporter is attempting to transcribe everything you
17 say.  So, in a normal conversation you might know
18 where I'm going with a question before I finish it
19 and go ahead and answer, or we might end up talking
20 over each other, we need to do our best to try to
21 avoid that.  Do you understand that?
22 A.  Yes.
23 Q.  And another difference is that since this is an
24 oral transcription, the Court Reporter cannot
25 indicate head nods or other gestures or um-hum is

Page 8

1  another one that drives them crazy.  So, to the best
2  of you're ability if you're answering in the
3  affirmative, give yes, or correct, and so on.  Do you
4  understand that?
5  A.  Yes.
6  Q.  Another difference between a typical
7  conversation and today, that your answers are under
8  oath and you understand what that means, correct?
9  A.  Yes.
10 Q.  Now, if I ask a question and you answer it, I'm
11 going to assume that you understood my question.  So,
12 if there's something in my question that you don't
13 understand, it's important you let me know, okay?
14 A.  Yes.
15 Q.  And another thing that may happen from time to
16 time, is there may be objections from Counsel here,
17 and unlike what you see on TV, there's no Judge here
18 to rule on these sort of things, so unless you're
19 instructed not to answer a question, if you're able
20 to answer the question, and you understand it, please
21 proceed to do so, do you understand that?
22 A.  I understand that, yes.
23 Q.  Now, is there any reason such as being under
24 unusual stresses, or physical or a mental condition,
25 or being under the influence of any substances, that

Page 9

1  would prevent or limit your ability to testify today
2  fully and truthfully?
3  A.  There is no limitation.
4  Q.  I'm going to do a few general background
5  questions, standard stuff, but I have to go through
6  it so -- have you ever been arrested?
7  A.  No.
8  Q.  Have you ever been --
9  A.  You mean a traffic ticket?
10 Q.  No, arrested meaning put in the clink overnight.
11 A.  No.
12 Q.  Okay.  Have you ever testified under oath in any
13 proceeding besides the three depositions you just
14 mentioned?
15 A.  No.
16 Q.  Have you been a party to a Court case?
17 A.  No.
18 Q.  Are you represented by Counsel here today?
19 A.  Yes.
20 Q.  And who's that Counsel?
21 A.  Dan O'Brien.
22 Q.  And does Dan O'Brien represent you individually,
23 or Canandaigua National Bank?
24 A.  He represents the organization that I work for.
25 Q.  And without telling me anything about your

Page 42

1  BY MR. BROOK:
2  Q.   But not in his individual capacity. I'm not
3  asking you to say what other people may have done, do
4  you understand that?
5  A.   Yes.
6  Q.   To your knowledge did anyone else from
7  Canandaigua National Bank ever review any
8  transactions that any Eber Brothers' entity was
9  involved in?
10          MR. O'BRIEN: In the trust side?
11          MR. BROOK: In the trust side, yes.
12          MR. O'BRIEN: Okay.
13  A.   Not in the trust side.
14  Q.   Now, on the commercial lending side, was there
15  involvement by Canandaigua National Bank in reviewing
16  transactions that Eber Brothers was engaged with
17  there?
18  A.   I believe there were -- I was not aware of them.
19          MR CALIHAN: I'm sorry, read the question
20  back again.
21          (Read back Page 42, Lines 14 to 17.)
22  Q.   Now, when I use the term transaction, do you
23  understand the term transaction to include a loan?
24  A.   Yes.
25  Q.   When did you first meet Lester Eber?

Page 43

1  A.   When did I first meet him?
2  Q.   Yes.
3  A.   Shortly after our assuming the relationship,
4  which would have been probably early 2007.
5  Q.   And who in connection with Eber Brothers, or the
6  Allen Eber trust, did you communicate with about
7  assuming the relationship before you actually did so?
8  A.   It would have been probably Lester Eber and
9  probably Elliot Gumaer.
10  Q.   Now, Elliot, he also goes by Mike?
11  A.   Mike, yes.
12  Q.   How did you refer to him?
13  A.   Mike, most of the time.
14  Q.   When did you first meet him?
15  A.   I was aware of Mr. Gumaer years before that in
16  his capacity of working with the law firm Nixon
17  Peabody, Nixon Hargrave at the time.
18  Q.   And have you personally interacted with him?
19  A.   Not personally, professionally in other trust
20  relationships.
21  Q.   Okay. So, just making sure I understand. So,
22  this is not a situation like with Lester where you
23  had heard about him just because of his reputation,
24  you had actually worked with Mr. Gumaer, correct?
25  A.   Yes.

Page 44

1  Q.   So, you knew that Mr. Gumaer was a lawyer at
2  Nixon Hargrave, correct?
3  A.   Yes.
4  Q.   Do you know when he retired?
5  A.   No.
6  Q.   Approximately when was his retirement?
7          MR. CALIHAN: Objection to form.
8          MR. O'BRIEN: He said he didn't know.
9  A.   I don't know.
10  Q.   Do you know if he was retired at the time he
11  contacted you -- let me withdraw.  Was Mr. Gumaer
12  still practicing law at Nixon Hargrave, to the best
13  of your knowledge, at the time when you and he first
14  discussed the Allen Eber trust?
15  A.   I believe so.
16  Q.   Are you aware that at some point Mr. Gumaer
17  relocated to Georgia and to Massachusetts for most of
18  the year?
19  A.   Yes.
20  Q.   Approximately when was that?
21  A.   That was shortly after we took the relationship
22  over, so it had to be 2007 or 2008.
23  Q.   And what was Mr. Gumaer's role in connection
24  with the Allen Eber trust?
25  A.   He was a co-trustee.

Page 45

1  Q.   Did he have any the role that you were aware of?
2          MR. RAMSEY: Form.
3          MR. CALIHAN: Objection as to form.
4  A.   The form or -- excuse me.  The other role might
5  have been an advisor to the Eber family, to the Eber
6  relationship.
7  Q.   And what do you mean by advisor?
8  A.   I believe he was handling various legal
9  activities and affairs.
10  Q.   And for which members of the Eber family was he
11  handling various legal matters and affairs?
12          MR. RAMSEY: Form.
13          MR. CALIHAN: Form.
14  A.   My understanding that it was for the Eber
15  Corporation, and in some cases maybe Lester
16  personally.
17  Q.   And was it significant to you in terms of how
18  you dealt with the trust's responsibility that Mr.
19  Gumaer might be representing Lester Eber personally?
20          MR. CALIHAN: Objection to form.
21  A.   It became a concern because of the conflict.
22  Q.   What do you mean by the conflict?
23  A.   Well, in handling being a co-trustees with us,
24  and then also handling certain legal activities for
25  the Corporation.

Page 86

1   earlier than that discussion of terminating the
2   trust, or was that the first time that you looked
3   into that?
4   A.   We had been considering it for some time, and it
5   was soon after the various lawsuits had been filed
6   that we felt we were in a position to follow through,
7   and continue to look to distribute the assets to the
8   trust beneficiaries, would be in the best interest of
9   all the beneficiaries here.  Short of that, a
10  valuation of the Eber assets was a stumbling block.
11  Q.   Now, to the extent that you can, please walk me
12  through your analysis in determining to terminating
13  the trust was the best thing for the beneficiaries of
14  the trust, in that situation?
15  A.   Well, in looking at ensuring that all of the
16  beneficiaries and the step down here to the second
17  and third generations who are receiving the assets,
18  our determination was to ensure that assets get to
19  the appropriate hands, rather than having much of it
20  depleted by one sector -- one side of the family.
21  And so, as we took a look at it, because we had
22  assets that are non-marketable, we were looking at
23  distributing and benefiting the family units
24  themselves, the three family units, to the greatest
25  extent to avoid any loss of value.  And also, to

Page 87

1   consider providing for those family members, because
2   there had been a decrease and a loss in income coming
3   from the other Eber assets.
4   Q.   Now, to what extent, if at all, did the
5   possibility of filing a claim alleging a fraudulent
6   transfer factor into your analysis of whether
7   terminating the trust was beneficial for the
8   beneficiaries?
9        MR. O'BRIEN: Form.
10       MR. RAMSEY: Form.
11  A.   To what extent -- can you restate the question,
12  please?
13  Q.   Now, we had been talking a minute ago about the
14  possibility of filing a claim on behalf of the trust,
15  as the equity holder of the parents of the company
16  had authorized the transfer here, whether there could
17  be a claim filed there.  And you said, rather than do
18  that, the decision was made to terminate the trust.
19  Is that a fair description?
20  A.   Yes.
21  Q.   So, how did that possibility of the filing of
22  the claim factor into the determination that
23  terminating the trust was beneficial for the
24  beneficiaries?
25  A.   How did the --

Page 88

1   Q.   The possibility of a claim --
2   A.   Okay.
3   Q.   -- factor into the determination that
4   terminating the trust would be the best course for
5   the beneficiaries?
6        MR. O'BRIEN: If at all.
7        MR. BROOK: If at all.
8   A.   If at all, it factored into the lack of ability
9   to be able to provide a fair value for the stock.  It
10  would allow for the trustee to be able to distribute
11  the stock to the beneficiaries, possibly equally, so,
12  that they would be able to then reap any kind of
13  benefit there, if there was a need to bring any kind
14  of action.
15  Q.   So, is it --
16  A.   We felt our hands were tied, so to speak,
17  because we were not -- we had two co-trustees that
18  had an interest in this, and by looking to distribute
19  to the beneficiaries, if there was a desire, then the
20  beneficiaries could take appropriate action.
21  Q.   So, is it fair to say, that it factored into the
22  decision in that, if an action was to be brought by
23  terminating the trust, that action could be brought
24  directly by the former beneficiaries, because they
25  then owned the shares directly?

Page 89

1   A.   They would be looking at owning the shares
2   directly, yes.
3   Q.   If you would please turn to the fourth page of
4   the Exhibit.  It says at the top, minutes from
5   meeting of Officers for the trust of Allen Eber, do
6   you see that?
7   A.   Yes.
8   Q.   And this is with the last three page numbers
9   857.  So, this refers to a meeting on August 18th,
10  2011, do you see that?
11  A.   Yes.
12  Q.   It says that Elliot Gumaer, Lester Eber, and
13  Richard Hawks, trustees of the trust of Allen Eber,
14  met at the Canandaigua National Bank in Rochester,
15  New York, to discuss and ratify the actions of the
16  subsidiaries as described below, and discuss other
17  trust business.  Is that a fair description of what
18  happened during that meeting?
19  A.   At the meeting there were various forms that
20  were presented --
21       MR. CALIHAN: There were various what?
22  A.   Forms presented.  The actual documentation and
23  so forth was discussed, but I did not see specific
24  references to the loans.  We discussed the fact that
25  there are several things that were going on here and

Page 90

1  needed to be done, but had nothing to do with -- the
2  trustees had nothing to do with the determination of
3  the various obligations.
4  Q.   Okay.  So, just to make sure we are oriented
5  here, so this is describing the meeting that occurred
6  about ten months before the one we were looking at
7  just a minute ago?  So this is --
8  A.   Yes.
9        MR. O'BRIEN:  You mean the meeting?
10       MR. BROOK:  The meeting, yes.
11       MR. O'BRIEN:  The conference call meeting?
12       MR. BROOK:  Well, the other one was a
13 conference call meeting, and this one was an in
14 person meeting, except, I think it says here, if you
15 look at the next sentence, that Gumaer participated
16 by conference call, and it says Wendy Eber was also
17 present to facilitate and document the discussion, is
18 that correct?
19       THE WITNESS:  Yes.
20 BY MR. BROOK:
21 Q.   And it says -- the next paragraph reads: The
22 trustees ratified three loans made by Lester Eber to
23 Eber Brothers Metro, Inc., do you see that?
24 A.   Yes.
25 Q.   And is that a fair description of what took

Page 91

1  place during that meeting?
2  A.   The trustees discussed that, it was -- I don't
3  believe there was ever a vote taken at this meeting.
4  Once again, it comes back to -- if you refer back to
5  the --
6        MR. O'BRIEN:  You answered the question.
7        THE WITNESS:  Okay.
8  Q.   So, is it correct that you would not describe
9  what occurred in that meeting as a ratification by
10 you, of any loans that were made by Lester Eber to
11 Eber Brothers Metro?
12       MR. RAMSEY:  Form.
13 A.   I would not characterize it as a ratification,
14 because for the first time, we are getting the
15 information of what is happening here, which led to
16 probably the second memo which was the first one here
17 --
18 Q.   Minutes.
19 A.   -- or minutes, which I had requested information
20 which I had not received.
21 Q.   So, jumping down some to the fourth paragraph,
22 it says: After a lengthy discussion about how all the
23 income beneficiaries and third parties were offered
24 the opportunity to participate in the February 26th,
25 2010 loan, but they all declined, and that only based

Page 92

1  on Lester's good will, he gave the money for the
2  loan.  The loans were ratified by Rick Hawks and Mike
3  Gumaer, Lester Eber abstained.  A copy of all the
4  documents that relate to the loan was provided to
5  Richard Hawks.  Is that paragraph -- did I read that
6  correctly, what's on the page?  Just making sure, did
7  I read that correctly?
8  A.   Yes.
9  Q.   Okay.  And is, what I just read as described on
10 the page, an accurate description of what took place
11 during this meeting on August 18th, 2011?
12 A.   A copy of all the documents related to the loan
13 was provided to me, did not occur at that time.
14 Q.   When, if ever, did that occur?
15 A.   It occurred after I made the next request which
16 was at the meeting we had in January of the following
17 year.
18       MR. O'BRIEN:  June.
19 Q.   You mean -- was it at the next meeting?
20 A.   The June 7th, okay.
21 Q.   Was there a meeting in between the August 2011
22 and June 2012 meetings?
23 A.   No, I was taking the date off here, from the
24 top, which came from Wendy, which was January 2nd, of
25 '13 and it was actually June 7th of '12, when we had

Page 93

1  the second meeting, but the first meeting was in
2  August of 2011.  And that's when I -- this
3  information was first provided to us, the second
4  meeting was Mike talking about the changes that were
5  taking place I'd requested copies of the judicial
6  decision summary, and information that had not been
7  provided which actually went back to the previous
8  meeting, and did not -- had not received.
9  Q.   And continuing on the issue you raised of
10 requesting information, if you look at the last
11 paragraph, the third sentence, it says something --
12 it appears to be related to the above issues, it says
13 quote, Rick requested copies of the operating
14 statement for Eber-CT to determine the value of the
15 Corporation, they are hereto attached.  Is that
16 correct, that you requested a statement for Eber
17 Connecticut?
18 A.   I would have requested information from Eber
19 Brothers and at that time, if Eber Connecticut was
20 the lending from the commercial side, what our
21 lending entity was, I was looking to determine
22 whether or not the liability of the organization.
23 Q.   And did you ever actually receive the statement
24 that you requested?
25 A.   Not in the form that I would normally expect it

Page 138

1  copy of all documents related to the loan was
2  provided to you, do you recall being provided with
3  those documents at any point?
4      A.   After the fact, after the second meeting, we did
5  get some of those documents, and some of them
6  actually came from our own commercial lending area
7  who had received them.
8      Q.   And the second meeting is the June 12th, year
9  2012 meeting?
10     A.   Yes.
11     Q.   Is there a reason that you didn't follow up, or
12 push harder to get those documents sooner than June
13 of 2012?
14     A.   We did not see a reason set forth other than the
15 fact we were not aware of a corporate structure
16 change until we had been informed of that by Mike
17 Gumaer later on.
18     Q.   Do you recall following up at all to request
19 those documents prior to the June 2012 meeting?
20     A.   I would say verbally we had requested it a
21 couple of times directly from Wendy.
22     Q.   Do you know whether you ever reduced that
23 request to writing?
24     A.   No.
25     Q.   You didn't or you don't recall?

Page 139

1      A.   We may have.  It may have been in an e-mail
2  request, I would have to go back to the electronic to
3  find out.
4      Q.   The last paragraph from the meeting minutes from
5  August 18th, 2011, makes a reference to Eber CT, and
6  your request for the operating statement relating to
7  Eber Ct.  Do you see that?
8      A.   Yes.
9      Q.   Do you recall discussing Eber CT at that
10 meeting?
11     A.   The discussion at that time would have been
12 trying to find out what had been presented to us, and
13 what Eber CT was.  We were aware that there was
14 lending on the commercial side to Eber, but trying to
15 determine exactly where that corporate structure fit
16 into our organization it was unclear, and that's why
17 we had not specifically requested until then, the
18 information on Eber CT.
19     Q.   So, you at least heard the name Eber CT during
20 that meeting?  You weren't entirely sure where Eber
21 CT fit into --
22     A.   The Corporation.
23     Q.   -- the Corporation, but you remember discussions
24 about that entity, Eber CT?
25     A.   As I sit here today remembering it, I believe I

Page 140

1  did, okay.  Long time ago.
2      Q.   Understood.  The last couple sentences there
3  talk about a request by Sally Kleeberg for payment of
4  medical expenses.  I know you were asked a couple
5  questions about this earlier, do you recall Lester
6  ever paying -- Lester or the trust ever paying
7  Sally's medical expenses?
8      A.   The trust never paid, I'm not sure about Lester.
9  As I told you, there was a period of time when things
10 were closing down with Eber Brothers, and certain
11 people have been either laid off, or were no longer
12 with the organization, and Lester did pick up two to
13 three years of medical expenses and medical insurance
14 for some of the family members who had actually
15 worked for the organization, and then, I believe it
16 was in 2011, he discontinued that.
17     Q.   Okay.  So, the money came from Lester
18 personally, not from the trust?
19     A.   Money never came from the trust.
20     Q.   When is the first time you recall seeing a copy
21 of these meeting minutes?
22     A.   My first recollection would be sometime shortly
23 after our June meeting.
24     Q.   At that point, based on your testimony earlier,
25 you indicated that you didn't believe -- you didn't

Page 141

1  agree that there was a ratification of the loans, you
2  didn't recall a vote taking place.  Given that
3  testimony, did you ever make any type of request to
4  amend or correct these meeting minutes, to better
5  reflect what you recall taking place?
6      A.   I did not.
7      Q.   Was there a reason that you didn't?
8      A.   Probably the only reason would be, in our mind,
9  at that point it wouldn't matter because there
10 appeared to be conflicting roles that were taking
11 place during the minute taker and what we were doing.
12 The corporate portion of the meeting is really what
13 was being recorded here, and, you know, I think there
14 was an attempt to bring in the trustee, the corporate
15 trustee, who had previously indicated that they were
16 not managing this particular asset from a financial
17 standpoint, but to bring us in to make it look like
18 we were agreeing to that.
19     Q.   Given that dynamic, or that dynamic as you just
20 described it, would it be all the more reason to make
21 sure, on behalf of Canandaigua National Bank, that I
22 disagree with certain aspects of these meeting
23 minutes?
24          MR. BROOK: Objection to form.
25     A.   I would say in retrospect, yes.

```
 1
 2              UNITED STATES DISTRICT COURT
 3             SOUTHERN DISTRICT OF NEW YORK
 4    ----------------------------------X    *
                                             *
 5    DANIEL KLEEBERG, LISA STEIN and         *
      AUDREY HAYS,                            *
 6                                            *
 7                  PLAINTIFFS,               *
                                              *
 8             vs                             *
                                              *    INDEX NO:
 9    LESTER EBER, ALEXBAY, LLC f/k/a         *    16-CV-9517
      LESTER EBER, LLC, CANANDAIGUA           *       LAK
10    NATIONAL CORPORATION d/b/a              *
      CANANDAIGUA NATIONAL BANK & TRUST,      *
11    THE ESTATE OF ELLIOT W. GUMAER,         *
      JR., EBER BROS & CO, INC, EBER          *
12    BROS, WINE AND LIQUOR CORPORATION,      *
      EBER BROS WINE & LIQUOR METRO,          *      VOL II
13    INC, EBER-CONNECTICUT, LLC and          *
      WENDY EBER,                             *
14                                            *
                    DEFENDANTS.               *
      ----------------------------------X    *
15
16
17
18       Deposition of RICHARD HARRIS HAWKS, JR
19               Rochester, New York
20             Thursday, April 11, 2019
21
22
23    Reported by:
24    Mary Agnes Drury, RPR, NYACR, CLR
25    JOB NO. 158944
```

Page 262

RICHARD HARRIS HAWKS, JR
that prohibited the combination of the trust --
the trust and lending sides?
  A.  I cannot give you specific situations.
  Q.  Has CNB ever brought an action on behalf of a trust that it managed against a co-trustee in court?
  A.  Not to my knowledge.
  Q.  Going back to 2012, and when you learned about the Eber-Connecticut transfer; you described how there was a -- I believe, a phone conversation, and then a brief meeting; is that right, or was it just one phone conversation?
  A.  It was a phone conversation, and then -- we're talking about the same meeting; it would have been with Mike Gumaer, and Lester, and Wendy, and then we went into a short trustees meeting, which -- at which time we discussed the annual distribution and where that was going to be funded from.
  Q.  Okay.  So was the phone conversation, was that the first time that you were made aware that there was anything going

Page 263

RICHARD HARRIS HAWKS, JR
on with the transfer of the Eber-Connecticut business?
  A.  It was a quick, brief review of that information where different sub-corporations were listed as -- where we were looking to transfer certain assets over to it.
  Q.  Okay.  So at the time of that phone conversation, were you aware that the proposed transfer or transfer that had either had occurred or was about to occur, involved transferring the Connecticut business to an entity that was outside the trust?
  A.  At that point, we were not aware that it was an entity outside of the trust; it was a transfer of restricted promissory notes.
  Q.  Okay.  So are you talking about a meeting in 2011, when you ratified promissory notes that had already been issued?
  A.  Yes.
  Q.  Okay.  And so I'm talking about later, after that.
      At some point you became aware that the Eber-Connecticut business had been transferred out of the trusts --

Page 264

RICHARD HARRIS HAWKS, JR
      MR. O'BRIEN:  Form.
      MR. BROOK:  -- assets, correct?
      THE WITNESS:  Yes, we did become aware of that.
BY MR. BROOK:
  Q.  Okay.  And how did you become aware of that; was it a phone conversation or email or --
  A.  Through review of some of the documents that we had seen, and part of the meeting notes from a meeting in 2012, I believe it was.
  Q.  Okay.  And by that point, had the transfer already occurred, or was it something that was just being contemplated?
  A.  I believe it had already been transferred.
  Q.  Okay.  So --
  A.  I --
  Q.  -- you testified earlier that you recall CNB being asked to ratify that transaction, or were you talking about the loans?
  A.  I'm talking about the loans.

Page 265

RICHARD HARRIS HAWKS, JR
  Q.  Was CNB ever asked to ratify the transfer of Eber-Connecticut to Alexbay?
  A.  Not to my knowledge.
  Q.  Did CNB ever ratify that transaction?
  A.  I don't believe so.
  Q.  Did you ever discuss the Eber-Connecticut transfer with Mike Gumaer?
  A.  Yes, when it was recognized that he had -- excuse me, that this transfer had occurred, and he had recommended that this -- that the transfer was appropriate to do for the continuation of the company.
  Q.  Okay.  So Mike -- what do you specifically recall Mike saying?  You said he recommended that it occur?
  A.  He recommended, and through discussions that he and Lester had had in helping to manage the company, that this was in the best interest of the company at that time.
  Q.  So was it your understanding, based on that conversation that Mike Gumaer had actually suggested the course of conduct or that he had just approved it after the fact?

Page 266

RICHARD HARRIS HAWKS, JR
A. I'm not sure if he was the architect or put it together. I know he was directly involved with helping run the business for a number of years, and was winding down, but this was a suggested transaction to protect the assets of the corporation.
Q. What was your understanding as to who or what the assets of the corporation were being protected from?
A. The transfers here being protected to preserve what value there might have been.
Q. Preserve it from what? What was the concern about it, the assets being in the existing location where they had been?
MR. CALIHAN: Form.
THE WITNESS: The concern might have been for the ability to be able to continue to run what was now the Connecticut subsidiary, and the need to have appropriate funding over there.
BY MR. BROOK:
Q. So I'm still not sure I'm understanding.
So what -- what was it that you were

Page 267

RICHARD HARRIS HAWKS, JR
told about the problems that Eber-Connecticut was facing with getting funding in its current corporate structure, prior to being transferred to Alexbay?
A. What was I told --
Q. Yes.
A. -- about that?
It was indicated that there had been previous funding that had taken place, that it came directly from one of the shareholders who was -- happened to be Lester. And that the transfer here was to allow for capitalization or providing capital for Eber-Connecticut to be operating.
Q. So was it your understanding that Lester was providing additional capital to Eber-Connecticut?
A. It was my understanding that the capital that would have been provided here, he was not providing additional capital, he was looking to take some of the assets from the parent corporation to Connecticut, to relieve certain lending obligations and so forth, that he had previously made to the company.

Page 268

RICHARD HARRIS HAWKS, JR
Q. Okay. So in other words, Lester was looking to convert his debt position with the company where he loaned money to it, into a capital or equity position where he was an owner of the company; is that right?
A. It appeared that, yes.
Q. And was there any discussion about whether Lester could do that, given his role as co-trustee of the trust?
A. Through the discussion with Mike, Lester, and the bank as the co-trustees, we had reviewed that. But, once again, Mike had assured that, you know, as far as the corporation was concerned, this was in the best interest.
We were not assured at that point and did not find out until later that this was going to mean that Lester was going to become a major shareholder or the sole shareholder of the Connecticut.
Q. Did you ever have a one-on-one discussion with Mike Gumaer where neither Lester, nor Wendy were part of the conversation about --

Page 269

RICHARD HARRIS HAWKS, JR
A. From time-to-time, we would have been, but it was direct phone calls, where Lester, it may not have been available to discuss the annual distribution.
Q. Did you ever discuss during a one-on-one discussion with Mike Gumaer the Eber Connecticut transfer?
A. No.
Q. Why not?
MR. O'BRIEN: If you know.
THE WITNESS: Huh?
MR. O'BRIEN: If you know.
MR. BROOK: You don't have to do that.
MR. O'BRIEN: No. No. You asked him why not; and that also requires him to speculate as to what Mike Gumaer may have been thinking or what Lester may have been thinking.
BY MR. BROOK:
Q. I'm asking for your recollection as to why you didn't try to have a one-on-one conversation with Mike Gumaer?
A. We believed that Mike had been the

Page 278

1  RICHARD HARRIS HAWKS, JR
2  Brothers stock? How to account for the value
3  of the Eber Brothers stock?
4      A.   How to account for it?
5      Q.   Yeah.
6      A.   With Wendy --
7          MR. O'BRIEN:  It requires a "yes" or
8  "no" answer, okay.
9      Q.   The answer is "yes"?
10     A.   Yes.
11     Q.   Who do you recall talking to about
12 that?
13     A.   Both Wendy and Lester.
14     Q.   In sum and substance, what was the
15 conversation that you had with Wendy or Lester
16 on that topic?
17     A.   Basically, the sum of it would be
18 where are financial statements that we can use,
19 current financial statements to use to do or to
20 have a valuation done.
21     Q.   Okay.  So it was less about what the
22 value is; it was more following up on this
23 request for additional financial information?
24     A.   Right.
25     Q.   At some point were you provided with

Page 279

1  RICHARD HARRIS HAWKS, JR
2  additional financial information?
3      A.   No.
4          MR. RAMSEY:  I might have one or two
5  follow-ups, but you go, just in the
6  interest of time.
7  EXAMINATION BY
8  MR. CALIHAN:
9      Q.   Very quickly.  I'm not sure I heard
10 you completely, but you testified to the effect
11 that there was some issue of Mr. Gumaer signing
12 the petition for the dissolution of the trust.
13         What was your understanding of that
14 issue?
15     A.   My understanding was there was an
16 issue of competency at the time.
17     Q.   When's the last time you had direct
18 contact with Mike Gumaer?
19     A.   Probably in the late 2014 timeframe.
20     Q.   And did he appear competent to you
21 at that time or already starting to suffer from
22 some debilitation?
23     A.   My conversation would have been he
24 was a little disoriented.  And when I made
25 contact, his wife answered the phone and

Page 280

1  RICHARD HARRIS HAWKS, JR
2  indicated to me that he was not having a good
3  day.
4      Q.   Okay.  Had you been told before
5  that, that Mike was having health problems?
6      A.   Somewhat, yes.
7      Q.   Okay.  Were you surprised by your
8  exchange with Mrs. Gumaer when she answered the
9  phone?
10     A.   Yes.
11     Q.   Okay.  Did you try to have any
12 conversations with Mr. Gumaer after that
13 conversation?
14     A.   We -- the conversation would be by
15 either letter or our annual statement would go
16 out to him; and I'm assuming that he received
17 it.  But I also found out later that there was
18 a -- someone who was representing him.
19     Q.   And who was that?
20     A.   I believe it was Pat Martin, at the
21 time.
22     Q.   Did you raise with anyone, any
23 concerns about Mr. Gumaer's competency at any
24 time?
25     A.   No, I did not.

Page 281

1  RICHARD HARRIS HAWKS, JR
2      Q.   Okay.  Did you think that it was an
3  obligation of yours, if you had concerns about
4  the competency of a co-trustee, to raise those
5  concerns?
6      A.   In retrospect, yes, okay.  However,
7  because of the statute and the ability and
8  respect that we have for individuals here, we
9  looked to hopefully have this play out.
10     Q.   Okay.  It's a difficult thing to do,
11 is it not?
12     A.   Yes.  Yes.
13     Q.   You had known Mike Gumaer for some
14 time?
15     A.   I had known of him for some time,
16 yes.
17     Q.   And you testified earlier about
18 relying on Mike Gumaer in connection with the
19 appropriateness of the transfer involving
20 Eber-Connecticut.
21         Do you recall that?
22     A.   Yes.
23     Q.   And I think you had testified
24 earlier; although, I may be confusing two
25 deposition days, about Mike, in your view,

```
                                                    Page 282
 1            RICHARD HARRIS HAWKS, JR
 2   wearing two hats sometimes as a lawyer and as a
 3   trustee?
 4       A.   Yes.
 5       Q.   And when you were relying on
 6   Mr. Gumaer with respect to the Eber-Connecticut
 7   transaction, did you understand that he was
 8   functioning as a -- as a lawyer or as a
 9   trustee?
10       A.   I understood he was --
11            MR. BROOK:  Objection to form.
12            THE WITNESS:  -- he was functioning
13       in both capacities.
14       Q.   And when you say as a lawyer or you
15   answered my question as a lawyer; as a lawyer
16   for whom?
17       A.   A lawyer for the Eber Brothers
18   business.
19       Q.   Okay.  And did you view then that he
20   was in a conflict position when he was
21   providing that advice?
22       A.   Yes.  Yes.  And that would have
23   referred us then to go back to our conflict of
24   interest policy.
25       Q.   And did you do that?
```

```
                                                    Page 283
 1            RICHARD HARRIS HAWKS, JR
 2       A.   We did, and we reviewed that with
 3   our counsel.
 4       Q.   And did you get a clean bill of
 5   health in connection with relying on
 6   Mr. Gumaer, as you testified?
 7            MR. BROOK:  Objection to form.
 8            THE WITNESS:  It was deemed that his
 9       competence at that point was sufficient.
10       Q.   Was sufficient?
11       A.   Yes.
12       Q.   That his competence was sufficient.
13            You're talking now about competence
14   or conflict of interest?
15       A.   His confidence -- or the conflict of
16   interest was not a major issue for us at that
17   time.
18       Q.   All right.  Do you recall with
19   specificity, anything that Mike Gumaer said to
20   you or in your presence regarding the
21   Eber-Connecticut transaction?
22       A.   No, I do not recall any specific.
23       Q.   Okay.  Do you recall anything in
24   writing that you received from him with respect
25   to the Eber-Connecticut transaction?
```

```
                                                    Page 284
 1            RICHARD HARRIS HAWKS, JR
 2       A.   Nothing in writing from him.
 3       Q.   Okay.  Did you ever inform any of
 4   the beneficiaries about the Harris Beach
 5   fraudulent action -- strike that.
 6            Did you ever inform any of the Eber
 7   Trust beneficiaries of the Harris Beach
 8   fraudulent transfer action?
 9       A.   I did not.
10       Q.   Okay.
11            MR. CALIHAN:  Those are all the
12       questions I have.  Thank you.
13            MR. BROOK:  All right.  Well, I do
14       have a few matters for follow-up, and I
15       appreciate everyone sticking around for
16       this.
17   EXAMINATION BY
18   MR. BROOK:
19       Q.   So I'm going to show you what was
20   previously marked as Plaintiffs' Exhibit 47.
21            (Whereupon, Plaintiffs' Exhibit 47,
22       Gumaer Letter, Dated 1/2/01, Bates Stamped
23       EB-0001556 to '1557, 2-Pages was previously
24       marked for identification.)
25            MR. O'BRIEN:  Do you have a copy?
```

```
                                                    Page 285
 1            RICHARD HARRIS HAWKS, JR
 2            MR. BROOK:  Unfortunately, I don't.
 3       It is the engagement letter between Mike
 4       Gumaer and Lester Eber.
 5            MR. O'BRIEN:  You say 47?
 6            MR. BROOK:  Yes.
 7   BY MR. BROOK:
 8       Q.   If you could, please.
 9            That letter is dated January of
10   2001, which I know is well before you got
11   involved or Canandaigua National Bank got
12   involved with the trust.
13            Is that a letter that you recall
14   ever seeing in terms of Mike Gumaer's tension,
15   as trustee, lawyer, and director of the Eber
16   companies.
17            MR. CALIHAN:  Objection to form.
18            THE WITNESS:  I do not recall seeing
19       it.
20       Q.   Are you aware of how Mike Gumaer was
21   being compensated for his work as either
22   trustee, director, or lawyer?
23       A.   I was not aware of how he was being
24   compensated.  I did know that neither Lester
25   nor Mike Gumaer were taking any kind of a
```