1    Q. You just did it wrong there. It went slightly
2 less negative in 2010. Slightly less negative in 2011.
3 Slightly less negative in 2012. That's the trend as far
4 as earning goes. It doesn't jump back up, does it?
5    MR. RAMSEY: Form. Are you testifying,
6    Brian, or are you asking him the question?
7    A. I am looking at the bouncing around. It's
8 bouncing.
9    Q. Do you see that revenue?
10    A. I see it. Do you see it? You're trying to
11 assess a trend here. I don't see a trend.
12    Q. Do you see revenue is essentially flat from
13 2010, 2011 and 2012 right around 36.5 million dollars?
14    A. Here is what I see. I see that the beginning
15 of this series looks like the end of the series. That's
16 what I see.
17    Q. So you would predict based on this that in
18 2013 there would be another huge loss like after 2008?
19 Is that what you're saying?
20    MR. RAMSEY: Form.
21    A. No. I said what I said. I am looking at what
22 the profitability looks like in 2007 and 2008. That
23 looks awfully similar to what happened in 2011 and 2012.
24 So where is the trend?
25    Q. Do you think that the Yellow Tail was going to

1 dual them again?
2    A. Yellow Tail went out in 2009. That's what you
3 just told me.
4    Q. So past event couldn't reoccur, right?
5    MR. RAMSEY: Form.
6    A. Whether it could occur with another wine, I
7 don't know.
8    Q. Do you know whether Yellow Tail --
9    A. I am looking at these numbers and I don't see
10 the trend that you see.
11    Q. Okay. That's fine. And as part of your
12 analysis you did not attempt to determine whether Lester
13 and Wendy Eber were making changes in the business to
14 improve profitability; is that right?
15    MR. RAMSEY: Form.
16    A. My analysis reflects and all these analysis
17 reflects that there will be improvement in profits
18 because it's positive equity value for Eber-Connecticut.
19 So in all those scenarios, there is improvement in
20 profit.
21    Q. As part of your analysis you've reviewed the
22 May 23, 2012 order of the court in which it declared that
23 Alexbay's acceptance of Eber-Metro's stock in
24 satisfaction of the debt was commercially reasonable,
25 correct?

1    A. Yes.
2    Q. Did you rely on that in any way?
3    A. No.
4    Q. Did you make any attempt to asses whether that
5 the information to provided to that court was accurate?
6    A. No. I mean only to the extent that I am doing a
7 valuation with regard to Pole-Bridge Bowman, which the
8 court relied on.
9    Q. And do you know if the court actually relied on
10 anything?
11    A. I thought so. I may be mistaken, but thought
12 the transaction was the key factor that the court used.
13    Q. It was disclosed to the court. But did you see
14 anything indicating that the court actually looked at the
15 papers given that it was uncontested?
16    MR. RAMSEY: Form.
17    A. Maybe if you show me the document, I can
18 refresh my recollection. Sitting here today, I don't
19 remember.
20    Q. Do you remember that action was not contested?
21    A. I don't remember.
22    Q. In terms of what was submitted to that court,
23 did you consider the description that Lester Eber gave to
24 the court of what Eber-Metro was worth in your analysis?
25    MR. RAMSEY: Form.

1    A. My valuation analysis is indicated in this
2 report. I don't remember what Lester said when
3 reflecting my valuation. So I would have to look at what
4 he said. Maybe what he said is in there. I just don't
5 know.
6    Q. Okay. This is previously marked Exhibit 45.
7 It's an affidavit from Lester Eber dated March 14, 2012.
8 I am going to direct your attention specifically to
9 Paragraph 6. Okay.
10    A. If you don't mind, I am going to read the
11 context of this.
12    Q. Sure. Okay.
13    A. Okay.
14    Q. Have you seen this before today?
15    A. I don't remember seeing this.
16    Q. And is there any new information in there for
17 you?
18    A. I don't know if this is new. It is valuing
19 Eber-Connecticut at 4.6 million.
20    Q. And that's based on the Pole-Bridge Bowman
21 transaction you understand, correct?
22    A. It doesn't say that.
23    Q. I guess it says very recent arm's-length sales
24 on the open market. Do you think that's referring to
25 Pole-Bridge Bowman?

37 (Pages 142 - 145)

Page 146

```
1            MR. RAMSEY:  Form.
2      A.  I don't know.
3      Q.  Is it your understanding that the Pole-Bridge
4  Bowman transaction was conducted on the open market?
5      A.  I think by open market it means at fair market
6  value.  I don't know.  I am not sure what open market
7  means in this context.  But does it say that Pole-Bridge
8  Bowman is here somewhere?
9      Q.  I am not sure it's in this document.  I will
10 represent to you another document filed by the lawyers
11 reference only the Pole-Bridge Bowman transaction and did
12 not reference any other transactions involving the
13 company.
14     A.  Okay.
15     Q.  So I want to draw your attention in particular
16 to the last line there.  It says, "Because it,
17 Eber-Connecticut, is Metro's only significant asset that
18 79 percent interest valued 3.66 million it
19 establishes the value of Metro."  So he didn't mention
20 anything about any liabilities there, correct?
21     A.  No.
22     Q.  Do you know why that is?
23            MR. RAMSEY:  Form.
24     A.  No.
25     Q.  Do you consider this statement by the purchaser
```

Page 147

```
1  of Eber-Metro about his understanding of its value to be
2  relevant to your analysis?
3      A.  Well, it seems to be contradicted on its face
4  anyways.  It seems to contradict what I have been
5  provided as a legal assumption.  I don't know.  I mean,
6  you know, whether -- so this seems to be consistent with
7  your legal definition as opposed to the legal definition
8  that I was provided with.  But it also seems to
9  contradict what I said earlier, that an investor would
10 certainly reflect those liabilities and any assessment of
11 Eber-Metro.  Best I can do with that.
12     Q.  And I think you may have answered this before,
13 but I wanted to make sure I understand.  In your opinion,
14 the purpose that Lester Eber and Eber Wine and Liquor
15 had for entering into this transaction doesn't affect
16 your valuation analysis; is that right?
17     A.  The purpose?
18     Q.  Such if the purpose was to shield assets from
19 creditors, would that affect your analysis?
20     A.  I mean it doesn't affect my solvency opinion.
21 It doesn't affect my valuation the Eber-Connecticut.
22 Those stand independent.  Whether the trier of fact
23 somehow because of what you say is true that they think
24 this transaction should be undone accordingly -- that's
25 really a finding that the court may or may not.  But it
```

Page 148

```
1  doesn't -- no.  It doesn't really affect my opinion.
2      Q.  Okay.
3      A.  Unless I am missing something.
4      Q.  If the transaction is engaged in for the
5  purposes of shielding assets, doesn't that affect the
6  probability that contingent liabilities would be assessed
7  against it?
8            MR. RAMSEY:  Form.
9      A.  I think if that was the -- for example, if an
10 investor -- let's hypothetically say Lester did that, it
11 may affect his view -- specific investment view.  But it
12 doesn't affect, you know, what I think that a reasonable
13 investor would assess in this particular instance.
14     Q.  So in your opinion, you think a reasonable
15 investor would look at this transaction and think that it
16 would not be a successful way of shielding Eber-Metro and
17 its interest in Eber-Connecticut from the creditors of
18 Eber Brothers Wine and Liquor Corp; is that right?
19     A.  I think that's fair.
20     Q.  Now, you have done a lot of corporate
21 transactions and valuating them.  Have you ever seen a
22 transaction with the same general setup as this, where an
23 officer or director of a company transfers it to himself
24 on the grounds that he is a creditor foreclosing on a
25 loan that he had given to the company?
```

Page 149

```
1      A.  It's pretty specific facts.
2      Q.  We can open it to officer or director.
3      A.  Okay.  I mean the best I can think of -- I have
4  been involved in cases where the company has been taken
5  private by officers or directors.  And as I said, there
6  has been cases in which in a transaction the common
7  shareholders got nothing because of priority claims.  But
8  nothing is coming to my mind about a single case that
9  contains all those facts.
10     Q.  Right.  I think is it fair to say the
11 distinguishing feature is how this company was acquired
12 through a creditor foreclosure attempt as opposed to a
13 more transparent sale or purchase?
14            MR. RAMSEY:  Form.
15     A.  So you're asking me if I have been involved in
16 a case --
17     Q.  Let me step back.  In those cases where
18 management acquired the company, took it private and
19 whatnot, is it fair to say there were a number of
20 procedural protections that were involved to ensure that
21 shareholders were not getting shafted?
22            MR. RAMSEY:  Form.
23            MR. CALIHAN:  Form.
24     Q.  Ensure that shareholders were not being taken
25 advantage of?
```

38 (Pages 146 - 149)