```
                                                              Page 1

 1      UNITED STATES DISTRICT COURT
 2      SOUTHERN DISTRICT OF NEW YORK
 3      _____
 4
 5      DANIEL KLEEBERG, LISA STEIN, AND
        AUDREY HAYS,
 6
 7                   Plaintiffs,
 8
                     -vs-
 9      LESTER EBER, ALEXBAY, LLC, F/K/A LESTER EBER, LLC,
        ESTATE OF ELLIOT W. GUMAER, JR., AND WENDY EBER,
10
11                   Defendants,
12
        and
13
        EBER BROTHERS & CO., INC., EBER BROS. WINE & LIQUOR
14      CORP., WINE & LIQUOR METRO, INC., EBER-CONNECTICUT, LLC,
        EBER-RHODE ISLAND, LLC, EBER BROS. ACQUISITION CORP.,
15      EBER-METRO, LLC, SLOCUM & SONS OF MAINE, INC., AND
        CANANDAIGUA NATIONAL BANK & TRUST COMPANY,
16
17                   Nominal Defendants.
        _____
18
                 Deposition of FRANK TORCHIO, held pursuant to
19      Article 31 of the Civil Practice Law and Rules, at
        Underberg and Kessler, 300 Bausch and Lomb Place,
20      Rochester, New York, on the 23rd day of August, 2019,
        commencing at 9:30 a.m., before Leah Didsbury Reporter,
21      Notary Public.
22
23
24
25
```

PLAINTIFF'S EXHIBIT 182

Page 2

```
 1   APPEARANCES:
 2
     BROOK & ASSOCIATES, PLLC
 3   BY: BRIAN C. BROOK, ESQ.
     100 Church Street, 8th Floor
 4   New York, New York 10007
     Appearing for the Plaintiffs
 5
 6   UNDERBERG & KESSLER, LLP
     BY: COLIN D. RAMSEY, Esq.
 7   50 Fountain Plaza, Suite 320
     Buffalo, New York 14202
 8   cramsey@underbergkessler.com
     Appearing for the Defendants
 9
10   CALIHAN LAW, PC
     BY:  ROBERT CALIHAN, ESQ.
11   620 Reynolds Arcade Building
     16 East Main Street, Suite 620
12   Rochester, New York 14614
     rcalihan@calihanlaw.com
13   Appearing for the Gumaer Estate
14
     WOODS, OVIATT, GILMAN
15   BY: ERIN ELMOUJI, ESQ.
     1900 Bausch and Lomb Place,
16   Rochester, New York 14604
     eelmouji@woodsoviatt.com
17   Appearing for Canandaigua National Bank & Trust Company
18
     Also Present: John Herbert (telephonically)
19            Patrick Martin
20
21
22
23
24
25
```

Page 3

```
 1           INDEX TO WITNESS
 2
                   PAGE
 3   FRANK TORCHIO
          EXAMINATION BY MR. BROOK    5-200
 4
 5
 6           INDEX TO EXHIBITS
            (Retained by counsel)
 7
 8   EXHIBITS    DESCRIPTION          PAGE
 9   Exhibit 126   Expert report          8
10   Exhibit 127   Glenn Liebman report  16
11   Exhibit 128   Drawing               30
12   Exhibit 129   Eder-Goodman transaction  41
13   Exhibit 130   Letter to Vincent DeBella  80
              from Wendy Eber
14
     Exhibit 131   Letter to Wendy Eber from  194
15          Mike Gallagher
16
17           REQUESTS
18   DOCUMENT              PAGE    LINE
19   Bruner site            45      16
20   Citations for number   174     10
21
22
23
24
25
```

Page 4

 1    COURT REPORTER:  Do you want him to read and
 2 sign?
 3    MR. RAMSEY:  Yes, please.
 4    COURT REPORTER:  Usual stipulations?
 5    MR. RAMSEY:  Other than read and sign,
 6 that's fine.
 7    MR. BROOK:  Actually, I don't as a matter
 8 of -- I've always been trained don't as a matter
 9 of what I've always been trained to do, agree to
10 usual stipulations, because it seems everywhere
11 usual stipulations means something different.  I
12 agree to the federal rules of civil procedure
13 governing this deposition.
14    MR. RAMSEY:  That's fine.
15 (Whereupon, the following stipulations were entered into
16 by the respective parties.)
17
18 It is hereby stipulated by and between counsel for the
19 respective parties that the oath of the referee is
20 waived, filing and certification of the transcript are
21 waived, and all objections, except as to the form of the
22 question, are reserved until the time of trial.
23    FRANK TORCHIO,
24 of Rochester, New York, having been first duly sworn, was
25 examined and testified as follows:

Page 5

 1 EXAMINATION BY MR. BROOK:
 2    Q.  Good morning.  This is not your first time
 3 being deposed, correct?
 4    A.  Correct.
 5    Q.  Is there anything about how this deposition
 6 works that you would like to go over before we begin?
 7    A.  I don't think so.
 8    Q.  When is the last time you were deposed?
 9    A.  Let's see.  I think it was in May of this year.
10    Q.  All right.  So if any issues come up, usually
11 the biggest one is just talking over each other.  I
12 sometimes am a little slow to get out my question.  I am
13 sure the court reporter will let us know, but that's just
14 human nature.  So what is your understanding of what this
15 lawsuit is about?
16    A.  Well, my understanding of my involvement in
17 this lawsuit is to valuation, principally of
18 Eber-Connecticut, the operating company that is owned by
19 Eber-Metro, in turn owned by Eber Wine and Liquor.
20    Q.  Or was owned by Eber Wine and Liquor, rather?
21    A.  Sorry.  That was correct.  Was owned at that
22 time.
23    Q.  And do you understand this lawsuit is largely
24 about whether the transfer of Eber-Metro from Eber Wine
25 and Liquor to Alexbay was a valid transaction?

Page 70

1  predicated on my valuation of Connecticut.
2     Q. Right. I am just looking at your report
3  Paragraph 1. I have been asked to provide an opinion
4  regarding the market value of equity of the capital stock
5  of Eber Brothers Wine and Liquor Metro, Inc. as of May
6  23, 2012.
7     A. Right.
8     Q. But in your view, the work you were focused on
9  was just the Eber-Connecticut asset; is that right?
10    A. If you go further, I think I actually state
11 this.
12    Q. I don't think there is a dispute here. I am
13 going to you know, I guess, what I am trying to
14 understand a little better, you know, if you're really
15 saying you were focused on Eber-Connecticut, then that
16 would make sense as to why you did not spend much of your
17 report analyzing the liabilities involved here.
18    A. If you look at Paragraph 4, that puts my
19 analysis in perspective. So it builds up from that
20 valuation. That's the valuation.
21    Q. Right.
22    A. There is no operating asset at Metro. There is
23 no operating asset at Wine and Liquor. The only
24 operating asset is their ownership of Eber-Connecticut.
25 So all the valuation work I did revolved around

Page 71

1  Eber-Connecticut.
2     Q. Right. And then -- but you also valued
3  Eber-Metro and Eber Wine and Liquor to the extent that
4  you said it was they were insolvent no matter what the
5  value of Eber-Connecticut was, right?
6         MR. RAMSEY: Form.
7     A. I wouldn't say it that way.
8     Q. No matter which valuation of yours you used for
9  Eber-Connecticut, right?
10    A. My opinion is that the value of
11 Eber-Connecticut was plus any other assets of Metro and
12 Wine and Liquor were less than the liabilities.
13    Q. And do you understand why it is that I am
14 drawing a distinction between Eber-Metro and Eber
15 Brothers Wine and Liquor for the liabilities?
16    A. You know, I have a vague understanding that
17 it's some kind of legal machination that's going on here.
18 From my perspective as an economist, what I am looking at
19 is what I think is relevant is what the heck is the value
20 to these ultimate -- the beneficiaries of this trust.
21 And in order to do that, you've got to go up the chain of
22 command. Now, I understand there is some reason why it's
23 important to assess Metro vis-à-vis Wine and Liquor. I
24 don't pretend to understand that. It doesn't make
25 economic sense to me. If it doesn't make economic sense,

Page 72

1  then it must be some kind of legal stuff that's going on
2  here that allows you to put a wedge between Wine and
3  Liquor -- put a wedge between Wine and Liquor that
4  ultimately puts a wedge between what the beneficiaries of
5  the trust really own.
6     Q. Right. I think -- let me help you put it in
7  perspective here. So maybe we can have a more productive
8  discussion. So Lester Eber foreclosed on debt that was
9  owned by Eber-Metro and guaranteed by Eber Wine and
10 Liquor. And the company agreed to just give him
11 Eber-Metro. And eliminate the debt to Eber-Metro too, as
12 a result. So there is a legal question certainly as to
13 whether that was done for fair value. Did Lester Eber,
14 given his fiduciary obligations and his various roles,
15 get more value by acquiring Eber-Metro through the amount
16 of his loans? And so that's why drawing this line here
17 is fairly significant. And do you understand at least
18 the general fact patterns as I described it?
19        MR. RAMSEY: Form. Go ahead.
20    A. I am trying.
21    Q. So would you agree that if Eber-Metro did not
22 have all of the liabilities for the pension and Harris
23 Beach that you mentioned on this chart here, then the
24 value of Eber-Metro would have been significantly higher
25 than the 3.8 million dollars in debt that you listed here

Page 73

1  that was owed to Lester Eber?
2         MR. RAMSEY: Form. Go ahead.
3     A. When you say, "did not have", what do you mean
4  by that?
5     Q. Equal that it was not legally -- at the time of
6  the transaction it was believed that Eber-Metro would not
7  be liable for any of those debts.
8     A. So --
9         MR. CALIHAN: Objection.
10    Q. Let me sort of give you my take on this. And I
11 mentioned to you before in one of your questions my
12 experience. And again, putting myself in the position of
13 willing buyer with knowledge of all the relevant facts.
14 I know from experience that when you try -- when you try
15 to play a shell game with a PBGC about who was the
16 controlling entity and who owns what and where does this
17 liability set, you run an awful risk. I have seen it
18 firsthand. I worked in the case called White
19 Consolidate. That is not unlike this where the company
20 itself tried to say this is not -- the pension is not our
21 liability. It belongs to -- and they sold the company
22 and without the liabilities. And did not have enough
23 money to pay those liabilities. And said, well PBGC, you
24 pick up the rest. And the PBGC said nuts to you. We're
25 going after you. This is fraudulent conveyance. Now,

19 (Pages 70 - 73)

Page 74

1  that kind of knowledge is the kind of thing that any
2  individual investor would reflect.  So you can tell me
3  well, you know, legally I've got a legal opinion that
4  says this these pension obligations don't -- have nothing
5  to do with Eber-Metro.  And I can -- I feel fairly
6  confident that had they sold Eber-Metro and the proceeds
7  were not enough to cover the amount of that pension,
8  either the PBGC is going to say you can't do this
9  transaction or in the case that I have seen, they go
10 after the buyer.  And say well, now you bought this.
11 Those liabilities are now on your books and you have more
12 assets than what you just bought because you merged with
13 Connecticut.  So now you're on the hook to pay those.
14 And, you know, again, these kinds of quote hidden
15 liabilities are the kind of things that are affected in
16 the ultimate purchase price even if one is -- if a
17 purchase price is offered because they-re going -- a
18 buyer is going to price protect themselves.  They're not
19 going to sit there and say, I got this great legal
20 opinion that is not going to be a problem.  I can
21 separate the assets from this pension liability.
22     Q.  But what if it actually happened in this case?
23     A.  What if what actually happened?
24     Q.  What if the buyer in this case, Alexbay because
25 it bought it by giving up debt, actually believed that by

Page 75

1  engaging in this transaction it would acquire Eber-Metro
2  free and clear of pension obligations, would that be
3  relevant to your analysis?
4         MR. RAMSEY:  Form.  Go ahead.
5     A.  No. Again, if you go back to that paragraph, I
6  am talking about a willing buyer aware of the facts.  You
7  seem to be focused on what is kind of referred to as
8  specific investigators valuation as opposed to a fair
9  market value.  Again, we seem to be flipping over into
10 the process as to why something was done and was it done
11 for legitimate reasons.  I am out of that.  That's not my
12 right here.
13     Q.  You have not made any opinion on whether in
14 this case because Lester Eber was a judiciary, his
15 opinion of the valuation would be relevant to this
16 litigation?
17         MR. RAMSEY:  Form.
18     A.  I don't know what the judge is going to
19 consider relevant or not relevant.  I am telling you what
20 is relevant to my valuation is what I have done in this
21 report.  You know, whether Lester thought that he could
22 skate on the PBGC, that's Lester's view.  I am telling
23 you as a measure of fair market value under the
24 definition that I provided here an investor is going to
25 take into account those obligations for sure.

Page 76

1     Q.  Are you sure that was the case in 2012?  There
2  has been a number of elements of the law recently.
3     A.  My involvement going back before 2012 -- I mean
4  look, I didn't -- I don't see anything that would
5  contradict that.  The PBGC, as far as I can see, fight
6  like a dog when you try to hide, you know, or skirt and
7  force the PBGC to pay for or to be the trustee for
8  pension obligations.  You know, you're in for a fight.  I
9  guarantee that.
10    Q.  To what extent in connection with your work in
11 this case did you become familiar with the fight that
12 erupted between PBGC and the Eber entities?
13    A.  Well, you know, I familiarized myself with some
14 of the analysis that the PBGC did.  And I think there was
15 a document that I saw that provided some kind of -- I
16 don't know.  I guess call it a settlement of some kind.
17 I don't know if that's the right legal term.  I read
18 those things.
19    Q.  For this chart, the summary of liabilities, did
20 you consider whether there was other obligors beyond
21 Eber-Metro and Eber Wine and Liquor for any of these
22 debts?
23         MR. RAMSEY:  Form.
24    A.  No.  I don't specifically recall that.
25    Q.  Would that affect your analysis of the

Page 77

1  liabilities if there was a third obligor?
2         MR. RAMSEY:  Form.
3     A.  Possibly.
4     Q.  So are you aware of that after the Alexbay
5  transfer PBGC put a lien on Eber-Metro?
6     A.  Yes.
7     Q.  Are you aware that at the same time PBGC put a
8  lien on Eber-Connecticut?
9     A.  Yes.  I think that is consistent with my view
10 of how the PBGC operates.  They take fraudulent
11 conveyance very seriously.  If they think you're trying
12 to escape, they're going to certainly at least do that.
13    Q.  So is it fair to say then that in addition to
14 Eber-Metro and Eber Wine and Liquor in your opinion
15 Eber-Connecticut was also an obligor for pension
16 liability?
17         MR. RAMSEY:  Form.
18    A.  Certainly from an investor's perspective that's
19 exactly what they are going to expect to happen.
20    Q.  Does it affect your ultimate valuation analysis
21 as to whether you put that liability in the
22 Eber-Connecticut analysis or further up the chain?
23    A.  So if the liabilities are at the
24 Eber-Connecticut level, that would reduce valuation for
25 Eber-Connecticut by the pension.

20 (Pages 74 - 77)

Page 78

1   Q.  Okay.  But you did not do an analysis with
2   running the numbers in that way; is that right?
3   A.  No.
4   Q.  Do you think that you perhaps should have?
5       MR. RAMSEY:  Form.
6   A.  Well, I don't think -- it doesn't matter.  So I
7   didn't -- it's kind of like a -- what is the point?  The
8   solvency opinion has to do with Eber-Metro and Eber Wine
9   and Liquor.  For I mean -- this gets back to what I said
10  before about the economics of it.  I am still a little
11  fuzzy about why the hell it matters between Eber Wine and
12  Liquor and Eber-Metro.  But notwithstanding, to me it
13  didn't really matter whether I put the liabilities of
14  Connecticut as long as they are there with Eber-Metro
15  when I am doing a solvency analysis of Eber-Metro that's
16  what counts.  So it's like what's the point.
17  Q.  So would you include the liabilities at each
18  level for the balance sheet of all three companies?
19  A.  If the total liability is at Eber-Connecticut,
20  then I've accounted for the liability relative to
21  Eber-Metro.  I netted it out against the Eber-Connecticut
22  assets.
23  Q.  How do you decide where that goes?
24  A.  As I said, it's difference.  Not a distinction.
25  It doesn't matter to me.  It's an economic matter.  You

Page 79

1   know, what is the point to make more paper?  To say well
2   if it's Eber-Connecticut then Eber-Connecticut value is
3   lower, but then it's the same flip side that Eber-Metro
4   has less operating assets.  I am not sure I understand.
5   I know it must make such kind of legal difference, but
6   from my perspective, I just don't see what the point
7   would be to do that analysis.
8   Q.  We were talking about PBGC.  What about the
9   Teamsters liability?  What is your basis for believing
10  that is something -- that a reasonable investor would
11  attribute to Eber-Metro?
12  A.  Same basis.  I think -- I know that there was a
13  lawsuit over payment of the Harris Beach amount.  And
14  they sued for fraudulent conveyance.
15  Q.  Do you know the timing of those lawsuits?
16  A.  That would have been a post-valuation date.
17  Q.  Right.
18  A.  But my point is that from an investor's
19  perspective, it's like day follows night.  You start
20  playing around with pension obligations whether it's the
21  PBGC insured and pension from Teamsters, you are going to
22  price protect yourself.  And I think the same holds true
23  with the other obligations as well.
24  Q.  If a liability is contingent upon a creditor
25  successfully pursuing a fraudulent conveyance lawsuit, is

Page 80

1   it really in your opinion appropriate to include that as
2   probable contingent liability?
3   A.  That's not what I said.
4   Q.  For Harris --
5   A.  I said that day follows night.  If you tried to
6   separate the liabilities from the operating assets,
7   you're going to get fraudulent conveyance.  An investor
8   is going to certainly reflect that.  They will not say,
9   "I will roll the dice on this."  No.  These are serious
10  obligations.  Particularly the PBGC and I would also
11  include the Teamsters in that.  And the only point I
12  raise about the Harris Beach is that look, that's exactly
13  what an investor is going to anticipate.  You try to hide
14  liabilities from the assets, and this is what you're
15  going to get.  An investor knows that.  You just can't
16  ignore that.  You can't put blinders on and say this
17  doesn't matter.  Yes, it matters.  It matters a lot.
18  Particularly with a company for which the assets are less
19  than the liabilities, it matters a whole hell of a lot.
20      MR. RAMSEY:  Take another five, Brian.
21  (Whereupon, Exhibit Number 130 was marked for
22  identification at this time.)
23  Q.  Let's do one more document for now.  So for the
24  record, I am showing you what's been previously marked as
25  Exhibit 73 and newly marked Exhibit 130.  Have you seen

Page 81

1   either of these documents before today?
2   A.  Let me read it.  I think I have seen
3   Exhibit 74 before.  It looks familiar.  I am not sure I
4   recollect 130.
5   Q.  So looking at Exhibit 74 then, you see it is a
6   confession of judgment signed by Wendy Eber on behalf of
7   the Eber Brothers Wine and Liquor Corp.  And that's as to
8   the Teamsters liability?
9   A.  Right.
10  Q.  And that number matches within five cents the
11  number you've got in your summary of liabilities, right?
12  A.  Yes.
13  Q.  Do you see that this confession of judgment
14  only as to Eber Brothers Wine and Liquor Corp and not
15  Eber-Metro?
16  A.  So I think you're referring to the heading in
17  there that says the defendant is Eber Wine and Liquor
18  corporation.
19  Q.  Yes.
20  A.  Yes.  It says Eber Wine and Liquor Corporation.
21  It does not say Eber-Metro.
22  Q.  Then looking at 130.  That's the exhibit in
23  front of you.  Wendy Eber is explaining the reason for
24  that.  She says in the last paragraph, "I had modified
25  the confession of judgment to reflect that it is against

Page 82

1  Eber Brothers Wine and Liquor Corporation and not the
2  Eber companies."  Do you see that?
3      A.  I see that.
4      Q.  So is it your opinion that these documents
5  reflecting that the liability was only against
6  Eber Brothers Wine and Liquor Corp does not change your
7  assessment that that liability belonged to Eber-Metro?
8          MR. RAMSEY:  Form, legal opinion.
9          MR. CALIHAN:  Objection to form.
10     A.  Yeah.  You keep saying belonged to.  I am
11 saying that an investor is going to take that into
12 account.  They are not going to put little compartments
13 and say this is not the obligation of Metro.  You know,
14 what this says, it says.  It doesn't alter my opinion as
15 to how an investor is going to look at these kind of
16 obligations.
17     Q.  And by these kind of obligations, do you mean
18 pension obligations specifically, or any debt belonging
19 to the parent company that is transferring its
20 subsidiary?
21     A.  Most certainly it's going to reflect the
22 pension, both the PBGC as well as the Teamsters, but yes.
23 Clearly for a company that -- I say the company -- for
24 the situation where the assets of Metro are such that
25 obligations, even if you consider them up the line, can't

Page 83

1  be covered, yes.  It will.  They just -- it just can't be
2  ignored.
3      Q.  Because of the likelihood of fraudulent
4  conveyance?
5      A.  That is a distinct possibility.  Like I said, I
6  think that any time you have a situation where you're
7  selling assets and you're receiving a price that is less
8  than the liabilities, that is exactly what you're going
9  to encounter and an investor is going to know that.
10     Q.  So focusing on Harris Beach, that's not a
11 pension obligation.  Does it change your conclusions in
12 any way that at the time of the Alexbay transfer in 2012
13 the only party being sued by Harris Beach and that owed
14 money to Harris Beach according to its engagement
15 agreement was Eber Brothers Wine and Liquor?
16         MR. RAMSEY:  Form.  I will make the same
17     objection.  I think you're looking for a legal
18     conclusion here.
19     A.  Yeah.  I mean -- look, I know that they did sue
20 all the entities at some point for payment.
21     Q.  I do want to be clear.  I am not looking for a
22 legal conclusion because your valuation is not based upon
23 what the actual law was, right?  What the actual
24 liabilities were as determined by later courts, correct?
25     A.  Fair enough.

Page 84

1      Q.  Just as if you're doing a valuation based upon
2  what people knew at the time, they wouldn't be based upon
3  what restated numbers were a year later, correct?
4      A.  Fair enough.
5      Q.  So in this instance, why isn't the
6  determination of what the liabilities of Eber-Metro were
7  something that should be based on what the understanding
8  was at the time of management and the purchaser of what
9  the liabilities of what Eber-Metro would be?
10         MR. RAMSEY:  Form.
11     A.  Because I am trying to understand how an
12 investor, a willing buyer, is going to view this company.
13 That is my analysis.  I mean, I don't know how else to
14 say that.  I've said it five times now.  And you keep
15 trying to say, "Well, don't you want to value it the way
16 that Wendy valued it?"  No.  That's not my task here.  I
17 mean, she did what she did.  She wrote what she wrote.
18 Her view is what it is.  I am telling you how I am doing
19 the valuation.
20     Q.  And I am just -- I am not trying to be obtuse
21 here.  I'm trying to get a clear record.  So the
22 reasonable investor in your view would conclude that
23 Eber-Metro would still be on the hook because upon
24 transfer, Eber Wine and Liquor was left with insufficient
25 assets to meet its debt; is that fair to say?

Page 85

1      A.  You're talking about all the items?
2      Q.  Yes.
3      A.  So number one, there is the legal determination
4  that I said before.
5      Q.  Right.
6      A.  That I have been given.  Number two, it makes
7  absolutely sense to me from an economic perspective.
8  That any investor is going to price protect themselves,
9  particularly for a company that's in financial distress.
10 And that I think there is no dispute.  Certainly without
11 question even Eber-Metro is in financial distress.  And
12 when you are a company in financial distress and you've
13 got liabilities attached to those assets, boy, oh boy,
14 you know, you just can't ignore that.  And that's my
15 opinion.  That investor would not ignore that.  And would
16 not put it in compartments notwithstanding what Wendy
17 thinks.  It's interesting, but it doesn't affect my
18 opinion.
19     Q.  Okay.  Let's take that break.
20     (Whereupon, there is a short recess in the
21 proceedings.)
22     Q.  Okay.  So going to your report in general, you
23 did five valuation analyses for Eber-Connecticut; is that
24 correct?
25     A.  Yes.

22 (Pages 82 - 85)

Page 86

1  Q.  But you did not offer an opinion on which of
2  those valuation is most reliable or some combination of
3  them to arrive at a final number, did you?
4  A.  No.  I provided a range of values from each of
5  those five.  The range of values results from each of
6  those five measurements.
7  Q.  Why didn't you offer an opinion on what the
8  correct value should have been?
9  A.  Well, in my view, the range that I developed
10 and applied told me that this was an insolvent company.
11 Q.  Not Eber-Connecticut though?
12 A.  No.  Up the chain, yes.
13 Q.  Right.  But as we have been suggesting, there
14 are potential questions as to whether or not the numbers
15 for the debt are correct or legally relevant or something
16 like that.
17     MR. RAMSEY:  Form.
18 Q.  So in that instance, wouldn't it be important
19 about to what the value of Eber-Connecticut is if the
20 value would determine whether or not it was solvent --
21 the parent companies were solvent?
22 A.  You mean a point estimate?
23 Q.  Yes.
24 A.  Well, if you want a point estimate.  Just take
25 the midpoint, that's fine.

Page 87

1  Q.  Why is that appropriate?
2  A.  There are five measures of value.  Each of them
3  has problems.  But these are the kinds of things -- not
4  with understanding problems -- these are the kind of
5  thing that investors are going to look at in formulating
6  their opinion.  If you're so inclined to only want to
7  point an estimate, I mean, you know, in my view a
8  reasonable range is more informative.  I think it
9  provides more information.
10 Q.  Do you think --
11     MR. RAMSEY:  Go ahead, finish your answer.
12 A.  I think a reasonable range provides more
13 information.  It is un essence the sensitivity analysis
14 or effective sensitivity analysis of what you were
15 referring to earlier about well, is there uncertainly
16 with numbers.  Well, the more numbers you have, the more
17 certain you are about what ultimately that range of value
18 is.
19 Q.  Do you consider all five methods to be equally
20 reliable?
21 A.  You know, so first I would say that these
22 measurements are things that an investor would look at.
23 Each of these methods has problems perhaps multiple
24 problems.  I think if you start with the offers or the
25 transactions.  So start with the Eder-Goodman

Page 88

1  transaction.  That has a significant problem because of
2  the substantial rights.  I've got two pages in my report
3  talking about the substantial rights.  Now, I try to do a
4  conservative estimate as to what those rights are to come
5  up with some value.  But, look, for a company in
6  financial distress in particular, the preferred stock
7  aspect of it is going to be huge -- absolutely huge.  So
8  is that a problem?  Yeah.  I mean you try to adjust away
9  from it.  That is a problem.  You know, that is one of
10 those things that make that valuation uncertain.
11 Southern offer to a lesser extent -- the Southern offer
12 also has this right of first refusal that causes one to
13 do again an adjusted valuation of the Southern offer.
14 Q.  And the Southern offer wasn't actually
15 accepted?
16 A.  Look, you know, the Southern offer wasn't
17 accepted, but I view that as a bona fide offer.  And a
18 bona fide offer is a reasonable thing to use in the
19 analysis.  So I wouldn't -- I am not going to discount it
20 because it wasn't an actual transaction.  I think it's
21 still relevant.
22 Q.  Can you please explain what you mean by bona
23 fide offer?
24 A.  Well, there were something -- I think it was
25 like 14 amendments.  It was far along.  There was a lot

Page 89

1  of paperwork involved -- due diligence.
2  Q.  I mean in general what a bona fide offer is?
3  Like how does something constitute that?
4      MR. RAMSEY:  Form.
5  A.  I draw a distinction between, you know, saying
6  I have, you know, a preliminary offer of interest.  That
7  I wouldn't consider a bona fide offer.  But if you've got
8  a substantial amount of paperwork behind an offer with a
9  lot of conditions and things that have been formulated,
10 that to me is a bona fide offer.  That's what I view
11 anyway.
12 Q.  Is a --
13 A.  You want me to finish my answer?  I was not
14 done.  So we can go back to any one you want to.  So with
15 regard to the Pole-Bridge Bowman offer, that to me has
16 problems too.  It's a transaction that I am not 100
17 percent comfortable with that being the measure of value.
18 I don't know that I would -- I think that has problems as
19 well.
20 Q.  Why aren't you comfortable with it?
21 A.  Well, I am concerned that it could possibly not
22 be an arm-lengths transaction.  I can't make a
23 determination one way or the other, but it causes me
24 concern.
25 Q.  Why -- just to follow up on that, what about it

23 (Pages 86 - 89)

Page 90

1  does not appear to be arm's-length?
2      MR. RAMSEY:  Form.
3      A.  I was concerned that the company was
4  repurchased at the same price.  It could be -- there
5  could be explanations why that occurred, but the fact of
6  that doesn't sound right to me.
7      Q.  I am sorry.  What do you mean by that?
8      A.  It was unwound.
9      Q.  Okay.  The terms of the exercising how Wendy
10 Eber ended up acquiring it?
11     A.  Yes.  I didn't see anything contemporaneous to
12 the transaction itself that could indicate this.  The
13 ultimate unwinding caused me a little bit of questioning
14 whether the transaction was a pristine transaction.  And
15 also problem -- the other problem I had with that is that
16 there was a right of first refusal in that offer.  So you
17 have to adjust that.  Now with regard to the farmers --
18     Q.  I just want to stay on that one for a second,
19 then we will jump to the other just so the transcript
20 is -- in forming your opinion, were you aware of who were
21 the owners of Pole-Bridge Bowman and Partners?
22     A.  I know that it was a gentleman named Steurm was
23 the principal.
24     Q.  And what is your understanding of what his
25 relationship was to the Ebers?

Page 91

1      A.  He was the consultant.  My understanding he was
2  a consultant.  Maybe the term is workout consultant for
3  companies in financial distress to get to them to work
4  out of their distress.  And I think he was a lawyer.
5      Q.  And are you aware that the Ebers have said that
6  he was their lawyer?
7      MR. RAMSEY:  Form.
8      A.  I know he was their consultant.  I don't know
9  that he gave legal opinions.
10     Q.  Would it affect your assessment of whether this
11 was an arm-length transaction if you found out that Glenn
12 Steurm had an attorney/client relationship with the Ebers
13 individually or with one of their companies?
14     A.  No, I don't think so. I am not sure why that
15 would affect my view of things whether he is providing
16 consulting services or legal services.  I am not sure
17 that matters.
18     Q.  Is a fiduciary relationship an arm-length
19 relationship in your opinion?
20     MR. RAMSEY:  Form.
21     A.  Is a fiduciary relationship an arm's-length
22 relationship?  I am not sure what you mean by that.
23     Q.  Do you understand the term fiduciary
24 relationship?
25     A.  The transaction -- because he is a fiduciary

Page 92

1  that the transaction would not be arm's-length.
2      Q.  I am asking if the fact that there is a
3  fiduciary relationship between two individuals prevents
4  that transaction for being characterized as an
5  arm's-length transaction?
6      MR. RAMSEY:  Form.
7      A.  I would think it would be just the opposite.  I
8  think the fiduciary would have an obligation to make sure
9  that whatever transaction took place was a fair market
10 value unless I am missing something.  You seem to have a
11 different --
12     MR. RAMSEY:  I think we're in the legal
13    realm here.
14     Q.  So the term arm-length, is that fair to say
15 that is a term that is important to your valuation work?
16     A.  Well, it is a shortcut to Page 1 of my report
17 that talks about a willing buying and willing seller with
18 knowledge of all relevant facts and no compulsion to buy
19 or compulsion to sell.  And so those are the things that
20 in my view constitute an arm's-length transaction.
21     Q.  So let me pose to you the hypothetical.  If the
22 transaction was entered into between a lawyer and his
23 client to acquire an equity interest in a company and the
24 lawyer did not actually want to buy that interest, but it
25 was done for structural your purposes to benefit the

Page 93

1  client, would you consider that to be an arm's-length
2  transaction?
3      MR. RAMSEY:  Form.
4      A.  Structural purposes to -- that's way beyond --
5  I mean I don't know how to answer that question.
6  Structural purposes to benefit --
7      Q.  One simple thing.  I will rephrase.  If a
8  person -- you refer to as a will buyer?
9      A.  Yes.
10     Q.  What did the buyer actually did not have any
11 economic interest in acquiring the equity and he did it
12 solely to fulfill his legal obligation to a client.
13     MR. RAMSEY:  Form.
14     Q.  Could you rely on that transaction to determine
15 the value of the equity?
16     A.  You're saying a fiduciary would have a legal
17 obligation.
18     Q.  I am not saying necessarily as a fiduciary.  I
19 am talking about a particular circumstance where a lawyer
20 decides -- a lawyer specifically says, "I do not want to
21 buy this, but I will do so if I have to.  So that the
22 sale can go through."
23     MR. RAMSEY:  Form.
24     Q.  Is that just impossible to believe?
25     A.  It's a little hard to believe.

24 (Pages 90 - 93)

Page 94

1  Q. I will show you a document.
2  A. Okay.
3  Q. All right. I will read for you a memo from
4  Glenn Steurm, the owner of Pole-Bridge Bowman.
5  A. Uh-huh.
6  Q. To Pat Dalton, a lawyer for Wendy and Lester
7  Eber and copying Wendy and Lester Eber dated May 26,
8  2010. That is I think two days before -- two to four days
9  before the effective date of the Pole-Bridge Bowman
10  transaction?
11  A. Okay.
12  Q. This memo states, "The current proposal is for
13  a single-member LLC New-co to acquire the interest and
14  that I be the only equity holder of the new LLC. Here
15  are the terms that we discussed. One, New-co purchases a
16  six percent equity interest in Connecticut for a secured
17  non-recourse note in the amount of blank dollars. Wendy
18  Eber has an exclusive right of first refusal to purchase
19  the entire equity interest from New-co. If Ms. Eber
20  does not exercise her right, then Metro has the next
21  right of first refusal to purchase the entire equity
22  interest. If Metro does not exercise its right, then
23  Eder-Goodman has the final right of first refusal to
24  purchase the stock. If neither Ms. Eber, Metro or
25  Eder-Goodman elects their right, then New-co will be

Page 95

1  required to retain its interest. The Ms. Eber will have
2  a proxy to vote the equity interest held by New-co and a
3  limited Power of Attorney. I have no pride of authorship
4  in this outline. If we can find a different structure
5  that works that would be better for me. Based on that
6  memo, does that sound like a transaction that was
7  negotiated at arm's-length?
8      MR. RAMSEY: Form.
9  A. I am trying to understand. How these items
10  that you listed to me indicated that it's not arm-length.
11  Q. Those items actually aren't. I was mostly
12  doing that because you don't have the document in front
13  of you and I want to be fully transparent and read
14  everything. I think the point I want to focus on is that
15  you said -- I actually left out the first line. That's
16  really important. Pat, as we discussed this morning, we
17  need to identify an alternative purchaser of the six
18  percent interest the Connecticut, LLC. The current
19  proposal is for a single-member LLC. New-co to acquire
20  the interest and that I be the only equity holder of the
21  LLC. And then at the end he says if we can find a
22  different structure that works that would be better for
23  me.
24  A. So read that first sentence again?
25  Q. As we discussed this morning, we need to

Page 96

1  identify at an alternative purchaser of the six percent
2  interest in the Connecticut, LLC.
3      MR. RAMSEY: And what is the question.
4  Q. So the question is, based on the fact that
5  Glenn Steurm is saying Wendy and Lester Eber and their
6  lawyer -- that he does not want to actually buy the six
7  percent, does that sound like an arm's-length transaction
8  to you?
9      MR. RAMSEY: Form. I am not sure that's an
10     accurate interpretation.
11  A. I am -- you're asking me to interpret this
12  letter to mean that he does not want to buy this?
13  Q. I am asking you if someone were to conclude --
14  so this is a hypothetical now. If someone were to
15  conclude that Glenn Steurm did not actually have an
16  economic interest in purchasing the six percent equity
17  that was sold to Pole-Bridge Bowman and Partners, would
18  that affect your opinion of whether that was an
19  arm's-length transaction?
20  A. It could. If there is no economic interest --
21     MR. RAMSEY: You've answered it. It could.
22  A. It could.
23  Q. Have you ever heard of a round-trip
24  transaction?
25  A. Well, I know a round-trip transaction with

Page 97

1  regard to a security. You buy and then you sell it.
2  Q. Are you familiar with a round-trip transaction
3  in which it creates an appearance of economic substance,
4  but in fact because money is going both ways there is no
5  real economic substance to it?
6  A. Yes. I've actually offered opinions on this
7  for the Department of Justice.
8  Q. And in the case of the Pole-Bridge Bowman
9  transaction, it was funded by the note for the same
10  purchase price. Do you see any similarities between that
11  and a round-trip transaction?
12     MR. RAMSEY: Form.
13  A. I mean note in lieu of cash. I mean it's a
14  still an asset on the balance sheet for the company. So
15  I am not sure what you mean. That only cash counts?
16  Q. No. I am just saying if someone supposedly
17  purchases equity in a company, but they receive the money
18  to do that from the company itself such as a company
19  receives no cash.
20     MR. RAMSEY: Form.
21  Q. Does that affect?
22  A. If the asset has value whether it's cash or
23  not, it shouldn't matter.
24  Q. Well, okay.
25  A. If the buyer is providing a note saying, "I owe

25 (Pages 94 - 97)

Page 98

1  you this money." There is a note. That's my obligation
2  to you in lieu of giving cash. You seem to be drawing a
3  distinction between the value of a note and the value of
4  cash. Is that what you're saying?
5      Q. I am not necessarily drawing a distinction
6  there. What I am saying is, you know, let's step back
7  for a minute. For what reasons does a company -- a
8  privately held company generally sell equity in a company
9  that it holds?
10     A. You mean like a secondary offering?
11     Q. A secondary offering or where like in this case
12 where Eber-Metro sold some of the interest it held in
13 Eber-Connecticut?
14     A. Well, for a secondary offering they generally
15 are trying to sell new shares to investors too, you know,
16 for a variety of reasons. But, for example, make a
17 capital investment of some kind. Selling shares, selling
18 existing shares held by some other entity. You know,
19 selling existing shares doesn't raise any new capital per
20 se. Other than that, I don't know how to answer your
21 question as a general matter.
22     Q. Did you review the critique of this
23 transactions economic substance from Glenn Liebman?
24     A. Yes. My recollection is that he also had
25 issues with regard to whether this was arm's-length.

Page 99

1      Q. Right. And one of the things he pointed out
2  was the interest rate on the note was only two percent
3  when the company was at the time borrowing money from
4  Lester Eber at 12.5 percent. Does that make sense to
5  you?
6          MR. RAMSEY: Form.
7      A. You know, I have a hard time with that. When
8  the company borrows money, it's paying. And it's the
9  company credit that dictates the interest rate. So if a
10 company is in financial distress and it wants to borrow
11 money, it's likely that it's going to pay a high interest
12 rate. Now, in this case, this is an asset that is being
13 provided to the company. A company is not borrowing
14 this. Unless I am missing something.
15     Q. Isn't the company loaning money?
16     A. Huh?
17     Q. The company is loaning money, is it not?
18     A. How? If it's an asset on the company's
19 books -- it's giving shares to the LLC and the LLC is
20 getting a note.
21     Q. Right. So it's giving up shares that were in a
22 company a going concern, right? So that comes off the
23 balance sheet?
24     A. Yes.
25     Q. And on the balance, it gets this nonrecourse

Page 100

1  note?
2      A. Right.
3      Q. At the end of the day the only thing it can
4  really get for that is just the shares back that is
5  initially transferred if it were to foreclose on, right?
6      A. Where does it say that?
7      Q. It's a nonrecourse note, right?
8      A. They couldn't pay it.
9      Q. Would it matter whether Pole-Bridge Bowman had
10 any other assets to you?
11     A. No. I am just questioning your -- you draw a
12 conclusion that the only way -- you said that the only
13 way is to get the shares back. And I never saw that
14 written anywhere.
15     Q. I realize that. And that's where I was jumping
16 ahead. I may have left out some facts from here. Do you
17 know anything about Pole-Bridge Bowman and what kind of
18 investments or businesses it was involved in?
19     A. I know it was an LLC. I know that Steurm was
20 the principal of that LLC. Beyond that, I don't.
21     Q. Would it affect your assessment of whether this
22 was an arm's-length deal to find out that Pole-Bridge
23 Bowman was an entity that was created with no other
24 assets solely for purposes of engaging in this
25 transaction?

Page 101

1          MR. RAMSEY: Form.
2      A. No. I don't think so.
3      Q. So if an entity has no other assets and it's a
4  nonrecourse note, if the note isn't repaid, then isn't it
5  true that the company's only recourse is to require the
6  shares that it initially distributed?
7      A. Well, I mean, imagine that if one state of the
8  world is where the value of the shares go up -- would the
9  LLC just say, "Oh. Okay. Here is your shares back."
10 Why wouldn't they just pay off the note and keep the
11 shares? That makes economic sense to me. And you're
12 dismissing that as a possibility.
13     Q. Well, isn't that what actually happened? The
14 value of the company definitely went up once it become
15 profitable, right?
16     A. It became profitable, but I can't say I am
17 hypothesizing -- look, you said the only possible outcome
18 is if they give the shares back. And I'm saying that
19 doesn't make sense to me. I can imagine -- I am not
20 saying it happened. But I can imagine the state of the
21 world where it is in the economic interest to Steurm to
22 say, "Hey, the values of these shares is increased 10
23 times what it was in 2010. Hell. Here is the money for
24 the note. We will close this off. I will take the
25 shares." Why not?

26 (Pages 98 - 101)

|  | Page 102 |  | Page 104 |
|---|---|---|---|
| 1 | Q. Would it affect your assessment with whether | 1 | MR. RAMSEY: Form. |
| 2 | the Pole-Bridge Bowman transaction was arm's-length if | 2 | A. Well, I think the question is whether the trier |
| 3 | you were to learn that it was engaged in part to | 3 | of fact would conclude that it's outside of it. Not so |
| 4 | compensate Glenn Steurm for his services? | 4 | much a valuation expert. If a trier of fact concludes |
| 5 | A. Well, I don't think that would be a sufficient, | 5 | that it's not arm's-length transaction, could well be I |
| 6 | you know, indication to eliminate that as an indication | 6 | am not going to consider this transaction. From my |
| 7 | of value. | 7 | perspective, I guess I kind of take in a little different |
| 8 | Q. Would it require an adjustment at least? | 8 | view of this. Like I said, the ultimate determination is |
| 9 | MR. RAMSEY: Form. | 9 | whether it's a fair market value. And one of the things |
| 10 | A. Look, you know, you want to have an assessment | 10 | that is kind of interesting is whether or not the |
| 11 | as to whether it was a deal at fair market value. That's | 11 | valuation is within the range of other evaluations. |
| 12 | ultimately what you're talking about. Do stock | 12 | That's kind of interesting to me. That may not convince |
| 13 | transactions occur for parties that are consultants to | 13 | a trier of fact. The trier of fact says, "No. It's not |
| 14 | particularly small firms? Yes. Does it mean that they | 14 | arm's-length. I am not going to think about that." |
| 15 | are necessarily not an arm's-length transaction? Well, | 15 | Okay. So be it. Cross it off your list. But for me -- |
| 16 | no. In fact, I can imagine, you know, that you would want | 16 | and I think for an investor it is a data point of |
| 17 | to strike a deal at fair market value. So I don't know | 17 | interest. |
| 18 | that I can agree that it's a de facto collusion that | 18 | Q. For an investor, do you believe that would be |
| 19 | someone is being -- instead of providing cash, they are | 19 | appropriate to rely solely on the Pole-Bridge Bowman |
| 20 | given stock in a company. I don't know that is | 20 | transaction as a basis for value? |
| 21 | necessarily a non-arm's-length transaction or to put | 21 | A. If it was determined to be non-arm's-length? |
| 22 | differently that transaction took place at something | 22 | Q. Either way. Just based on the facts that you |
| 23 | other than fair market value based solely on that. | 23 | know about the transaction where you question it, do you |
| 24 | Q. Isn't it a reason to question the fair market | 24 | believe that it would be appropriate for an investor to |
| 25 | value more though? | 25 | base valuations solely on that transaction and not |

|  | Page 103 |  | Page 105 |
|---|---|---|---|
| 1 | A. Well, it's certainly one of those indications | 1 | consider any other valuation method? |
| 2 | that you are concerned about it. And that's what I said | 2 | MR. RAMSEY: Form. Go ahead. |
| 3 | a minute ago, I am concerned. I think it is a | 3 | A. The way I can answer that question is I don't |
| 4 | transaction that an investor is going to look at. But | 4 | know that I would look at any of these five alone and say |
| 5 | with full knowledge at least of the information that I | 5 | that's the only thing you should look at or if that was |
| 6 | had, yes. I would say that there are problems with it. | 6 | the only thing available. Is it a precise, accurate |
| 7 | Just like there is problems with all these transactions. | 7 | measure of value? The only one that I really like that I |
| 8 | I mean everything has an issue. There is no question | 8 | think has the least amount of problems is the Prospect |
| 9 | about that. So that's the best way I can answer your | 9 | Beverage. That one -- I mean the problem with that is |
| 10 | question. It's a concern. It's a problem, but all these | 10 | that it's 10 years old at that time of transaction. But, |
| 11 | metrics have problems. And that's why the range is | 11 | you know, look at the other dates. I mean the |
| 12 | important to get a sense as to whether there is some kind | 12 | Eder-Goodman is four years old -- five years old. |
| 13 | of assessment of valuation range each year that allows | 13 | Q. You're missing -- - |
| 14 | you to draw a conclusion. | 14 | A. Six years old. Like I said before, so each of |
| 15 | Q. Just so I am clear, and correct me if I am | 15 | these has problems. You've got all of these right issues |
| 16 | wrong. In your opinion, the fact that the Pole-Bridge | 16 | in many of these transactions. The Prospect, is in my |
| 17 | Bowman transaction was in part compensation to Glenn | 17 | view, one of the tightest comparable transactions that I |
| 18 | Steurm would not necessarily affect any of your | 18 | have encountered in doing valuations. |
| 19 | calculations in terms of what the valuation would be | 19 | Q. Is it a coincidence that is the transaction |
| 20 | based on the Pole-Bridge transaction? | 20 | that results in by far the lowest value for |
| 21 | A. No. Not in and of itself it would not. | 21 | Eber-Connecticut? |
| 22 | Q. But just on the broader point, if a fact-finder | 22 | MR. RAMSEY: Form. |
| 23 | were to conclude that a transaction was not conducted at | 23 | A. It is a coincidence. It turns out that way. |
| 24 | arm's-length, would that mean in your view the | 24 | But maybe that is not a coincidence. Maybe that really |
| 25 | transaction should be excluded from a valuation analysis? | 25 | reflects what the value of what Eber-Connecticut was. |

27 (Pages 102 - 105)

Page 142

1  Q. You just did it wrong there. It went slightly
2  less negative in 2010. Slightly less negative in 2011.
3  Slightly less negative in 2012. That's the trend as far
4  as earning goes. It doesn't jump back up, does it?
5      MR. RAMSEY: Form. Are you testifying,
6      Brian, or are you asking him the question?
7  A. I am looking at the bouncing around. It's
8  bouncing.
9  Q. Do you see that revenue?
10  A. I see it. Do you see it? You're trying to
11  assess a trend here. I don't see a trend.
12  Q. Do you see revenue is essentially flat from
13  2010, 2011 and 2012 right around 36.5 million dollars?
14  A. Here is what I see. I see that the beginning
15  of this series looks like the end of the series. That's
16  what I see.
17  Q. So you would predict based on this that in
18  2013 there would be another huge loss like after 2008?
19  Is that what you're saying?
20      MR. RAMSEY: Form.
21  A. No. I said what I said. I am looking at what
22  the profitability looks like in 2007 and 2008. That
23  looks awfully similar to what happened in 2011 and 2012.
24  So where is the trend?
25  Q. Do you think that the Yellow Tail was going to

Page 143

1  dual them again?
2  A. Yellow Tail went out in 2009. That's what you
3  just told me.
4  Q. So past event couldn't reoccur, right?
5      MR. RAMSEY: Form.
6  A. Whether it could occur with another wine, I
7  don't know.
8  Q. Do you know whether Yellow Tail --
9  A. I am looking at these numbers and I don't see
10  the trend that you see.
11  Q. Okay. That's fine. And as part of your
12  analysis you did not attempt to determine whether Lester
13  and Wendy Eber were making changes in the business to
14  improve profitability; is that right?
15      MR. RAMSEY: Form.
16  A. My analysis reflects and all these analysis
17  reflects that there will be improvement in profits
18  because it's positive equity value for Eber-Connecticut.
19  So in all those scenarios, there is improvement in
20  profit.
21  Q. As part of your analysis you've reviewed the
22  May 23, 2012 order of the court in which it declared that
23  Alexbay's acceptance of Eber-Metro's stock in
24  satisfaction of the debt was commercially reasonable,
25  correct?

Page 144

1  A. Yes.
2  Q. Did you rely on that in any way?
3  A. No.
4  Q. Did you make any attempt to asses whether that
5  the information to provided to that court was accurate?
6  A. No. I mean only to the extent that I am doing a
7  valuation with regard to Pole-Bridge Bowman, which the
8  court relied on.
9  Q. And do you know if the court actually relied on
10  anything?
11  A. I thought so. I may be mistaken, but thought
12  the transaction was the key factor that the court used.
13  Q. It was disclosed to the court. But did you see
14  anything indicating that the court actually looked at the
15  papers given that it was uncontested?
16      MR. RAMSEY: Form.
17  A. Maybe if you show me the document, I can
18  refresh my recollection. Sitting here today, I don't
19  remember.
20  Q. Do you remember that action was not contested?
21  A. I don't remember.
22  Q. In terms of what was submitted to that court,
23  did you consider the description that Lester Eber gave to
24  the court of what Eber-Metro was worth in your analysis?
25      MR. RAMSEY: Form.

Page 145

1  A. My valuation analysis is indicated in this
2  report. I don't remember what Lester said when
3  reflecting my valuation. So I would have to look at what
4  he said. Maybe what he said is in there. I just don't
5  know.
6  Q. Okay. This is previously marked Exhibit 45.
7  It's an affidavit from Lester Eber dated March 14, 2012.
8  I am going to direct your attention specifically to
9  Paragraph 6. Okay.
10  A. If you don't mind, I am going to read the
11  context of this.
12  Q. Sure. Okay.
13  A. Okay.
14  Q. Have you seen this before today?
15  A. I don't remember seeing this.
16  Q. And is there any new information in there for
17  you?
18  A. I don't know if this is new. It is valuing
19  Eber-Connecticut at 4.6 million.
20  Q. And that's based on the Pole-Bridge Bowman
21  transaction you understand, correct?
22  A. It doesn't say that.
23  Q. I guess it says very recent arm's-length sales
24  on the open market. Do you think that's referring to
25  Pole-Bridge Bowman?

37 (Pages 142 - 145)

| | |
|---|---|
| Page 146 | Page 148 |
| 1  MR. RAMSEY:  Form.<br>2  A.  I don't know.<br>3  Q.  Is it your understanding that the Pole-Bridge<br>4  Bowman transaction was conducted on the open market?<br>5  A.  I think by open market it means at fair market<br>6  value.  I don't know.  I am not sure what open market<br>7  means in this context.  But does it say that Pole-Bridge<br>8  Bowman is n here somewhere?<br>9  Q.  I am not sure it's in this document.  I will<br>10 represent to you another document filed by the lawyers<br>11 reference only the Pole-Bridge Bowman transaction and did<br>12 not reference any other transactions involving the<br>13 company.<br>14 A.  Okay.<br>15 Q.  So I want to draw your attention in particular<br>16 to the last line there.  It says, "Because it,<br>17 Eber-Connecticut, is Metro's only significant asset that<br>18 79 percent interest valued 3.66 million itself<br>19 establishes the value of Metro."  So he didn't mention<br>20 anything about any liabilities there, correct?<br>21 A.  No.<br>22 Q.  Do you know why that is?<br>23   MR. RAMSEY:  Form.<br>24 A.  No.<br>25 Q.  Do you consider this statement by the purchaser | 1  doesn't -- no.  It doesn't really affect my opinion.<br>2  Q.  Okay.<br>3  A.  Unless I am missing something.<br>4  Q.  If the transaction is engaged in for the<br>5  purposes of shielding assets, doesn't that affect the<br>6  probability that contingent liabilities would be assessed<br>7  against it?<br>8    MR. RAMSEY:  Form.<br>9  A.  I think if that was the -- for example, if an<br>10 investor -- let's hypothetically say Lester did that, it<br>11 may affect his view -- specific investment view.  But it<br>12 doesn't affect, you know, what I think that a reasonable<br>13 investor would assess in this particular instance.<br>14 Q.  So in your opinion, you think a reasonable<br>15 investor would look at this transaction and think that it<br>16 would not be a successful way of shielding Eber-Metro and<br>17 its interest in Eber-Connecticut from the creditors of<br>18 Eber Brothers Wine and Liquor Corp; is that right?<br>19 A.  I think that's fair.<br>20 Q.  Now, you have done a lot of corporate<br>21 transactions and valuating them.  Have you ever seen a<br>22 transaction with the same general setup as this, where an<br>23 officer or director of a company transfers it to himself<br>24 on the grounds that he is a creditor foreclosing on a<br>25 loan that he had given to the company? |
| Page 147 | Page 149 |
| 1  of Eber-Metro about his understanding of its value to be<br>2  relevant to your analysis?<br>3  A.  Well, it seems to be contradicted on its face<br>4  anyways.  It seems to contradict what I have been<br>5  provided as a legal assumption.  I don't know.  I mean,<br>6  you know, whether -- so this seems to be consistent with<br>7  your legal definition as opposed to the legal definition<br>8  that I was provided with.  But it also seems to<br>9  contradict what I said earlier, that an investor would<br>10 certainly reflect those liabilities and any assessment of<br>11 Eber-Metro.  Best I can do with that.<br>12 Q.  And I think you may have answered this before,<br>13 but I wanted to make sure I understand.  In your opinion,<br>14 the purpose that Lester Eber and Eber Wine and Liquor<br>15 had for entering into this transaction doesn't affect<br>16 your valuation analysis; is that right?<br>17 A.  The purpose?<br>18 Q.  Such if the purpose was to shield assets from<br>19 creditors, would that affect your analysis?<br>20 A.  I mean it doesn't affect my solvency opinion.<br>21 It doesn't affect my valuation the Eber-Connecticut.<br>22 Those stand independent.  Whether the trier of fact<br>23 somehow because of what you say is true that they think<br>24 this transaction should be undone accordingly -- that's<br>25 really a finding that the court may or may not.  But it | 1  A.  It's pretty specific facts.<br>2  Q.  We can open it to officer or director.<br>3  A.  Okay.  I mean the best I can think of -- I have<br>4  been involved in cases where the company has been taken<br>5  private by officers or directors.  And as I said, there<br>6  has been cases in which in a transaction the common<br>7  shareholders got nothing because of priority claims.  But<br>8  nothing is coming to my mind about a single case that<br>9  contains all those facts.<br>10 Q.  Right.  I think is it fair to say the<br>11 distinguishing feature is how this company was acquired<br>12 through a creditor foreclosure attempt as opposed to a<br>13 more transparent sale or purchase?<br>14   MR. RAMSEY:  Form.<br>15 A.  So you're asking me if I have been involved in<br>16 a case --<br>17 Q.  Let me step back.  In those cases where<br>18 management acquired the company, took it private and<br>19 whatnot, is it fair to say there were a number of<br>20 procedural protections that were involved to ensure that<br>21 shareholders were not getting shafted?<br>22   MR. RAMSEY:  Form.<br>23   MR. CALIHAN:  Form.<br>24 Q.  Ensure that shareholders were not being taken<br>25 advantage of? |