**BROOK & ASSOCIATES, PLLC**
——— NEW YORK | NEW JERSEY | WASHINGTON DC ———

**BRIAN C. BROOK**
BRIAN@BROOK-LAW.COM

100 CHURCH STREET
FLOOR 8
NEW YORK, NY 10007
TEL: (212) 256-1957

January 10, 2020

**By ECF**

The Honorable Katherine H. Parker
United States Magistrate Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

**Re:**   *Daniel Kleeberg et al. v. Lester Eber et al.,* 1:16-cv-09517-LAK-KHP
  **Oral Argument Follow-up Letter**

Dear Judge Parker,

As directed by the Court, I write concerning *Odyssey Partners v. Fleming Companies*, which I sought to raise to highlight Mr. Herbert's important rebuttal concession that the Metro Transfer was *not* the mere exercise of Lester's rights as a secured creditor.

*Odyssey* involved a UCC Article 9 foreclosure by a secured creditor (Fleming) who acquired the debtor's (ABCO) operating subsidiary at the foreclosure sale. Fleming's winning bid at the auction was simply the amount of its secured debt. The plaintiff shareholders filed a direct (not derivative) action challenging the foreclosure as breaching fiduciary duties—both by Fleming, for failing to pay fair price, and by ABCO's directors, for failing to consider bankruptcy instead. A bench trial was held to determine whether Fleming (the majority shareholder) could be liable as a fiduciary based on having *de facto* control ABCO and its board of directors.

The Chancery Court found that Fleming had controlled ABCO's board, in large part because Fleming utilized the "statutory process" for a creditor to acquire pledged collateral, by auction:

> The ABCO foreclosure sale was **not a negotiated transaction** between Fleming and ABCO. With the announcement of its intention to foreclose, Fleming set in motion a statutory process, in which it acted in its creditor capacity. ***The governing statutory scheme did not require ABCO directors' approval*** of either the notice of foreclosure or the terms of the winning bid at the foreclosure sale.

735 A.2d at 414 (bold emphasis added). By contrast, here (as Mr. Herbert emphasized as the first point in his rebuttal), the strict foreclosure was a "negotiated" transaction.[1] And it required the

---

[1] The transcript is not yet available, but my notes specifically reflect that Mr. Herbert used the word "negotiated." Although there is no evidence of negotiation of terms actually occurring, Mr. Herbert's characterization nonetheless amounted to a concession that Lester could not have effected the Metro Transfer unilaterally as a secured creditor.

January 10, 2020  
Page 2

BROOK & ASSOCIATES

debtor's consent (i.e. approval). UCC § 9-620(a)(1), (c). Thus, unlike *Fleming*, Lester did not simply exercise his rights as a creditor, and EBWLC did not merely sit on the sidelines.

These differences are important for evaluating both (a) the application of the no-further-inquiry rule to Lester's acquisition of Eber Metro, and (b) the board's responsibility for the transaction.

*a.* Given Lester's status as trustee, the Ebers' *only* argument for sustaining the Metro Transfer is that the Will necessarily implied a power to acquire Trust assets so long as those assets were pledged as collateral for a secured loan. Although *Odyssey* did not involve a trustee, *Odyssey* helps illustrate why Lester's status as a secured creditor did not necessarily confer any right to acquire title to pledged collateral. The only "statutory process" that could permit a secured creditor to acquire the collateral for itself is a public auction. *See* UCC § 9-610 (prohibiting the secured party itself from acquiring the collateral through a private sale).

b. Heightened fiduciary duties apply under Delaware law when a company is for sale, but those were deemed inapplicable in *Odyssey* because "the *ABCO board* … did not approve a transaction resulting in 'a … change of control' of ABCO. Instead, *Fleming* initiated a statutory process that led to a sale at auction…. That process was, as a matter of law, controlled by Fleming, not ABCO." 735 A.2d at 416 (emphasis in original). By contrast, here, EBWLC's board approved the Metro Transfer, meaning it implicated the directors' fiduciary duties: Although both UCC § 9-610 foreclosure auctions and § 9-620 acceptances of collateral are statutory processes, only the former can be carried out by the creditor alone without the debtor's consent.

It will be interesting to see if the Ebers' responsive letter (unlike their briefs or oral argument) finally acknowledges that the Will *must be strictly construed against self-dealing*. Regardless, interpreting the Will is a matter of law, like construing a contract; the Ebers' willful ignorance of the law does not affect this Court's duty to faithfully apply it. *Renz*, 589 F.2d at 745 ("Courts may not read exculpatory language broadly, lest they unwittingly permit erosion of the fiduciary duty itself."). *Odyssey* shows why the Will's permission for a "trustee to borrow money from itself or others … and to secure the loan [with Trust assets]," Ex. 132 at 16 (H), *at most* might have permitted Lester to put Eber Metro up for auction.[2] Such an auction undisputedly did not occur, however. The contrast between what transpired here and the statutory process used in *Odyssey* makes clear why Lester's direct acquisition of Eber Metro in exchange for the

---

[2] Even assuming *arguendo* that a trustee necessarily had the right to dispose of Trust assets as pledged collateral without approval by the co-trustees or the Surrogate's Court, that would <u>not</u> imply a right for the trustee itself to bid at a foreclosure auction like that in *Odyssey*. The Will's exculpatory clause as to Eber Bros. is limited to *retention* by the Trust. *See* Ex. 132 at 13 ("[N]either my Executor nor my Trustee shall be responsible or accountable for any loss to my estate resulting from the retention of any such corporate stocks or business interests, provided only that it shall have acted in good faith."). Even without a rule of strict construction, this extraordinary language compels the conclusion that the standard duty of undivided loyalty applied to dispositions.

   The Ebers will undoubtedly try to overplay *Odyssey*'s observation that a "fiduciary obligation does not require self-sacrifice," since they love to talk about Lester's sacrifices (without acknowledging how much he has simultaneously pocketed). Regardless, the observation is inapplicable. Lester was a *trustee* held to a *far* higher level of loyalty than a controlling shareholder. *See* Pls. MSJ Opp'n 12–13. Moreover, as discussed herein, Lester's position as secured creditor did not afford him any right to *exchange* his debt for the collateral without open bidding.

January 10, 2020　　　　　　　　　　　　　　　　　　　　　　　　　BROOK & ASSOCIATES
Page 3

elimination of debt was not within Lester's rights as a secured creditor, and thus not even arguably a viable means for him to increase his minority one-third equity stake under the Will.

Ultimately, *Odyssey* is not a watershed case; it is more important because of its differences than its similarities. Indeed, the Chancery Court ultimately concluded that, because Fleming utilized the statutory auction procedure and did not control the board's decision not to file for bankruptcy protection, "Fleming did not owe a fiduciary duty to ABCO, or its minority shareholders to bid or pay a 'fair price' at the foreclosure sale." 735 A.2d at 414.[3] Accordingly, since the buyer was not a fiduciary, the Chancery Court did not have to decide whether the bid price was fair.

Here, this Court should similarly avoid deciding whether the transaction was done at a fair price, but for the *opposite* reason: Lester was undisputedly a fiduciary of the highest order—trustee. Thus, his acquisition of Trust assets must be voided and set aside as a matter of law, irrespective of fair price, good faith, etc. *See* Pls. MSJ Br. 10 & n.6.

　　　　　　　　　　　　　　　　　　　　　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　　　　　　　　Brian C. Brook

---

[3] The ABCO board's decision not to file for bankruptcy was deemed within its business judgment because Fleming "undertook to pay all of ABCO's unsecured debt obligations, regardless of the outcome of the foreclosure sale." 735 A.2d at 418. Quite a contrast from EBWLC's board, which received nothing of the sort; even if it did believe that EBWLC was insolvent, its consent to the Metro Transfer was not rationally in EBWLC's or its creditors' interests. (In fact, two of EBWLC's other creditors were forced to sue and then settled for far less than face value.)