```
 1                    UNITED STATES DISTRICT COURT
                     SOUTHERN DISTRICT OF NEW YORK
 2

 3   --------------------------------------X
                                          :
 4   KLEEBURG, et al.,                    : 16-CV-09517 (LAK)(KHP)
                                          :
 5                        Plaintiffs,     :
                                          :
 6              v.                        :
                                          : 500 Pearl Street
 7   LESTER EBER, et al.,                 : New York, New York
                                          :
 8                        Defendants.     : January 8, 2020
     --------------------------------------X
 9

10        TRANSCRIPT OF CIVIL CAUSE FOR ORAL ARGUMENT
            BEFORE THE HONORABLE KATHARINE H. PARKER
11               UNITED STATES MAGISTRATE JUDGE

12
     APPEARANCES:
13
     For the Plaintiffs:      BRIAN BROOK, ESQ.
14                            Brook & Associates, PLLC
                              100 Church Street, Suite 8th Floor
15                            New York, New York 10007

16
     For the Eber Defendants: COLIN RAMSEY, ESQ.
17                            Underberg & Kessler LLP
                              50 Fountain Plaza, Suite 320
18                            Buffalo, New York 14202

19                            PAUL KENEALLY, ESQ.
                              Underberg & Kessler LLP
20                            300 Bausch & Lomb Place
                              Rochester, New York 14604
21
                              (Appearances continued on next page.)
22

23   Court Transcriber:       SHARI RIEMER, CET-805
                              TypeWrite Word Processing Service
24                            211 N. Milton Road
                              Saratoga Springs, New York 12866
25


     Proceedings recorded by electronic sound recording,
     transcript produced by transcription service
```

```
 1                                                               2

 2

 3       APPEARANCES (CONTINUED):

 4

 5       For Lester Eber and      JOHN HERBERT, ESQ.
         Wendy Eber:              96 Engle Street
 6                                Englewood, New Jersey 07631

 7

         For Estate of Elliott    ROB CALIHAN, ESQ.
 8       W. Gumaer, Jr.:          Calihan Law PLLC
                                  The Power Building, Suite 761
 9                                16 East Main Street
                                  Rochester, New York 14614
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

                                                                    3

 1            THE CLERK:  Calling Case 16-CV-9517, <u>Kleeburg v.</u>

 2    <u>Eber</u>.

 3            Counsel, please make your appearance for the record.

 4            MR. BROOK:  Good afternoon, Your Honor.  Brian Brook

 5    for plaintiffs Dan Kleeburg, Lisa Stein, and Audrey Hayes.

 6    And with me at counsel table with the Court's permission is

 7    Dan Kleeburg.

 8            THE COURT:  Good afternoon.

 9            MR. RAMSEY:  Good afternoon, Judge.  Colin Ramsey

10    for the Eber defendants.

11            MR. HERBERT:  Good afternoon.  John Herbert for

12    Lester Eber and Wendy Eber.

13            MR. CALIHAN:  Good afternoon.  Rob Calihan on behalf

14    of the Estate.

15            MR. KENEALLY:  Good afternoon, Judge.  Paul Keneally

16    on behalf of the Eber defendants.

17            THE COURT:  All right.  Good afternoon all of you.

18            We are here for oral argument on the various motions

19    for summary judgment.  By my read, plaintiffs have moved for

20    summary judgment on Count 2 with respect to Gumaer and Count 4

21    with respect to certain transactions and with respect to

22    certain claims for damages and/or equitable relief.  Plaintiff

23    has also moved to strike affidavits submitted by the Eber

24    defendants.

25            The Eber defendants, as I understand their motion,

4

 1    have moved for summary judgment and/or declaratory judgment as

 2    to several issues and argue that the Rooker-Feldman doctrine

 3    precludes plaintiffs from challenging the metro transfer and

 4    the foreclosure action; and that the breach of fiduciary duty

 5    claim in Count 1 is barred by res judicata and/or issue

 6    preclusion principles; and that Count 2, the breach of

 7    fiduciary duty claim, should be dismissed pursuant to the

 8    faithless -- should be dismissed as well; and also moving to

 9    dismiss Count 6 and 7 as duplicative of other counts; and

10    lastly, that Count 10, the claim for indemnity for CMB's legal

11    fees should be dismissed.

12            And then, Gumaer is moving for dismissal of Count 1,

13    breach of fiduciary duty as to him; and dismissal of Count 2,

14    again, breach of fiduciary duty as to him; and also dismissal

15    of Count 7, the fraudulent concealment claim and claim for

16    punitive damages and surcharge.

17            Have I accurately listed plaintiff's key motion

18    points?

19            MR. BROOK:  Well, I think it is a little

20    complicated, part of it is because of the issue that the

21    defense raises about the overlap between -- to some extent

22    between the declaratory relief and certain others claims.

23            THE COURT:  Yeah.

24            MR. BROOK:  So as we had to sort of summarized is in

25    the first sentence of our opening brief --

5

1          THE COURT:  Right.

2          MR. BROOK:  -- where we say that we're seeking Count

3  1 in part and also Count 6 in part.  And that was --

4          THE COURT:  Right.

5          MR. BROOK:  -- primarily focused on the Alexbay

6  transactions and the Metro transfer --

7          THE COURT:  Right.

8          MR. BROOK:  -- and a couple of other transactions --

9          THE COURT:  Right.

10          MR. BROOK:  -- that are sort of necessarily related

11  to sort of re-establishing control of that company.

12          THE COURT:  Okay.  Have I accurately listed the main

13  arguments by the Eber defendants?

14          MR. RAMSEY:  You have, Your Honor.

15          THE COURT:  And for Gumaer?

16          MR. CALIHAN:  You have, Your Honor.  I think the key

17  issue between us on this motion is the Count 2.

18          THE COURT:  Right.  Okay.  All right.  And, lastly,

19  with respect to the Ebers, have I accurately listed the

20  arguments?

21          MR. HERBERT:  Yes, Your Honor.

22          THE COURT:  Okay.  Great.  So, one other question

23  before we get started with argument, there's a jury demand in

24  the case.  Are there any claims to which the parties believe a

25  jury trial would not be appropriate if the motions are denied?

6

1          MR. BROOK:  I think that when it comes to certainly

2  the manner of relief that is awarded, a jury trial for

3  equitable relief is not considered appropriate.  That said, I

4  can't remember which rule it is.

5          THE COURT:  That's the fashioning of equitable

6  relief.

7          MR. BROOK:  Right.  And so, my understanding is that

8  oftentimes courts will empanel the jury to provide essentially

9  an advisory verdict.  And I think -- so I don't think on any

10 of the claims that we have here because we're primarily

11 seeking equitable relief even as to the Gumaers, you know, the

12 faithless servant doctrine, I'm honestly not a hundred percent

13 sure if it's a jury trial, but I know for our purposes, we

14 believe that that is something that is best tried by a judge

15 because disgorgement or restitution which is how that relief

16 is oftentimes characterized is equitable even if it ultimately

17 results in a money award.

18         THE COURT:  Right.  But there is a jury demand.  So

19 what are -- I'd like to hear each of the defendants' position

20 as to jury versus bench trial and the various causes of

21 action.

22         MR. BROOK:  May I add one additional point, Your

23 Honor?

24         THE COURT:  Uh-huh.

25         MR. BROOK:  So to the extent of punitive damages

7

1   that are awarded though, I believe that that is something that

2   would be appropriately submitted to a jury if everything else

3   is resolved.

4          THE COURT:  Okay.

5          MR. RAMSEY:  Judge, I think that question to an

6   extent is going to flow from some of the rulings the Court

7   makes here as far as what we believe is appropriate or not as

8   it were.  From the Ebers' perspective, as much as we can have

9   before a jury, that is the preference.  I agree with Mr. Brook

10  that equitable relief is obviously in the --

11         THE COURT:  Right.

12         MR. RAMSEY:  -- province of the Court.  But

13  generally speaking, if it can go to a jury, that's the

14  preference.

15         MR. CALIHAN:  I agree with Mr. Ramsey.

16         THE COURT:  Okay.

17         MR. HERBERT:  I believe I'm of the same view.

18         THE COURT:  Okay.  All right.  There's a mix of

19  legal and equitable issues, I understand.  Okay.

20         So, what I'd like to do is divide oral argument by

21  the arguments related to the different defendant entities.  So

22  I'd first like to address the arguments with respect to

23  Gumaer.  I think those are relatively succinct.  And then

24  we'll -- then we can address the arguments as to the Lester

25  and Wendy Eber and then the Eber defendants, okay.

8

1          All right.  So let's first start since they're cross

2   motions for summary judgment, I'm going to ask the plaintiff

3   to file for -- to argue first and then each side can get a

4   surreply if you want, okay?

5          MR. BROOK:  Okay.

6          THE COURT:  So we're starting with Gumaer.

7          MR. BROOK:  When it comes to Gumaer, the fundamental

8   argument in our motion for summary judgment which I'll focus

9   on since I'm going first here, and I'm not sure which of the

10  arguments that were presented are really still going to be

11  argued by their motion.  It really comes down to the

12  undisputed fact, at least there's no -- and I say undisputed

13  because in the sense of no genuine dispute.  Every person who

14  has testified in this case including even people who just

15  heard about it representing Canandaigua National Bank has

16  asserted that Lester Eber was represented personally by

17  Elliott Gumaer while Gumaer was a trustee of the trust.

18         There's also no dispute that that relationship was

19  never disclosed to plaintiffs.  And, in fact, if the Court

20  recalls in the series of motions to compel in this case, when

21  it was the first motion to compel, we didn't even have the

22  engagement agreement that was signed in 2001 that makes

23  explicit the fact that he was going to represent Lester Eber

24  personally and in his capacity as CEO of the companies.  That

25  did not provide for him to represent the companies.

9

1      It was a representation of Lester individually, and

2 that is a breach of his duty of Gumaer's duty of undivided

3 loyalty because there are -- you know, looking at the case

4 law, there are two context, two types of relationships in

5 which courts most often talk about a duty of undivided loyalty

6 to avoid conflicts of interest.  And those are trustees with

7 respect to their duties to the trust and lawyers with respect

8 to their duties to their clients.  And so to enter into the

9 attorney/client relationship with a co-trustee and beneficiary

10 without even telling so much as including the other

11 beneficiaries of the trust or getting approval for it from the

12 Surrogates Court somehow was to put himself in an impossibly

13 conflicted position.

14      He could not do his job as a trustee under those

15 circumstances because if he heard from Lester Eber something

16 presented to him in confidence, that would have constituted a

17 breach of trust.  He could not report that without violating

18 his duty to Lester.  He would have been violating the

19 attorney/client privilege potentially putting at risk his

20 license.  Now we don't know when his license elapsed.  We

21 assume it did at some point.  There's been no evidence

22 presented of when that was.  I know he's not in the current

23 state register, but he's also been deceased for a while at

24 this point, too.

25      And I understand that there may be some reluctance

1  to find that he was Lester Eber's lawyer without him having

2  been here to say it and in light of the fact that a lot of

3  times the payments to him were characterized as for

4  consulting.  But on that note, it's worth remembering that

5  that letter agreement, and the parties do not dispute this,

6  also reflects that a single payment was to be made for Gumaer

7  in his services both a consultant -- not just both, but as a

8  consultant, as a director, as a trustee, and as Lester's

9  lawyer.  It was all lumped together, but the only payments

10 that are reflected are consulting payments.

11        So it's clear from the record and it's beyond

12 dispute, beyond any genuine dispute that those payments were

13 both for the trust, for his role as trustee and his role as a

14 director as well as for his role as an attorney because that's

15 what the letter agreement makes clear.  And so if there were

16 any sort of dividing up of those payments, if we sought a

17 single payment to him as a trustee or as a director, then

18 perhaps the estate's argument that there is a genuine dispute

19 here might have some merit to it, but there's just -- there's

20 no evidence on that.

21        And even though, you know, this is our motion, he is

22 the fiduciary here.  And it is -- and there's incontrovertible

23 evidence that there was a breach of that duty when he entered

24 into this conflicted relationship.  And, frankly, the burden

25 must be on the estate not withstanding Mr. Gumaer's passing to

1  present some evidence to call into question the end of that

2  duty of confidence.  But as the Ebers themselves have

3  testified, they believe that Gumaer continued to be their

4  personal lawyer until the end, notwithstanding him having

5  strokes.  They thought that relationship never ended.  And so

6  his conflict continued for that entire period of time.

7          And I think one question the Court may wrestle with,

8  and it's a fair one, is does this constitute just a breach of

9  fiduciary duty or does it involve application of the faithful

10  servant doctrine.  Both -- you know, the faithful servant

11  doctrine is sort of automatically applied to disgorge all

12  compensation from the beginning of disloyalty which we contend

13  was at the absolute latest when he signed this agreement

14  conflicting himself and not getting that even disclosed.  It

15  doesn't matter that no demonstrable injury occurred later.

16          It's the same thing as if an employee signed a

17  contract to, you know, get evidence or get trade secrets for a

18  competitor but didn't act on it for three years.  The

19  compensation would be disgorged from the beginning of the

20  demonstrable disloyalty.  And so the fact that it was only

21  2007 when then injury started occurring shouldn't mean that

22  that's when disgorgement occurs from.

23          Under the -- you know, and I think that the argument

24  for not applying the faithful servant doctrine here is

25  essentially that a trustee is not subject to it because he's

1  not an agent, but a trustee is more than an agent.  The law

2  says the trustee is a principal.  The case relied on to say

3  that, you know, it wouldn't apply is -- I can't remember the

4  name of it, but I think Federal Insurance or something like

5  that, and it's -- it involved independent contractors and the

6  assertion that independent contractors aren't agents and,

7  therefore, the duty of loyalty does not amount to -- you know,

8  when there's a breach of the duty of loyalty, it doesn't

9  amount to application of the faithful servant doctrine.  And

10  it makes sense.

11       I mean an independent contractor cannot bind to the

12  company, just as an employer is not obligated to supervise the

13  employee's conduct.  And so there's a distance between an

14  independent contractor and the employer or the principal that

15  just doesn't exist even close to it in the case of a trustee.

16  And the case law oftentimes talks in terms of trustees even

17  though at least as far as the parties have been able to find,

18  we haven't been able to find a case actually applying it to a

19  trustee which I think is, if anything, evidence that the

20  doctrine is working and at least when trustees are breaching

21  their duties and it certainly happens a lot, there hasn't been

22  anything close to this brazen where someone has literally, you

23  know, obligated themselves to be unable to complete their

24  role.

25       And I think, you know, there may be some arguments

13

1   made about, well, it wasn't substantial or something like

2   that, but the fact is it's certainly a disqualifying interest.

3   It wasn't disclosed.  If it was insubstantial and they thought

4   it would have been consented to either by the beneficiaries or

5   by the surrogate, they should have gone that route.  They

6   didn't.  And that relationship did not exist at the time that

7   Alan Eber made this trust, and that's also important because

8   when the settler knows of a conflict and it appoints the

9   trustees nonetheless, then that's not a problem.  But as

10   Lester Eber testified, he had never even spoken with Mr.

11   Gumaer before his father passed.  So there was no dispute that

12   Alan Eber and the trust document did not authorize this

13   conflict of interest.

14        To the extent that, you know, the doctrine of or

15   just general breach of fiduciary duty is applied in that case,

16   there would be some discretion in terms of the amount of

17   damages to be awarded.  Sometimes courts have done half the

18   fees.  And I would not be surprised if Mr. Calihan argued that

19   something less than full disgorgement is appropriate here

20   because it was a -- you know, this was not a strict employment

21   relationship and because there were services that were not

22   separable, that were -- although they were a lump sum, they

23   were not breach of trust.

24        So, for example, his services as a lawyer to Lester,

25   that's not something where he was breaching a duty to

14

1   plaintiffs.  But by the same token, and the reason why
2   faithless servant doctrine applies or, you know, as a matter
3   of law this Court can conclude that full disgorgement is
4   nonetheless is appropriate is because that opportunity to be
5   Lester's lawyer, it only arose because of his position of
6   trust.
7           And, you know, I could have easily written a
8   treatise on all the different trust law issues that are
9   implicated by this case, one of which is the fact that
10  typically a trustee cannot hire himself to perform services
11  for the trust without disclosure and some sort of overriding
12  concerns.  And so, putting everything into context and
13  especially in view of the Restatement rules, I think that it's
14  really beyond question that at the minimum, there was a breach
15  of fiduciary duty and a violation.
16          And, you know, it would be I think fine and
17  appropriate to defer deciding whether that is full
18  disgorgement or partial until later because regardless of what
19  happens, we need an accounting of the full set of
20  transactions.  There is a period of several years where the
21  evidence has just not been produced.  We can infer what those
22  amounts are, but ultimately, the benefit of an accounting is
23  that it puts the onus on the fiduciary to account for it.  And
24  in the absence of that, you know, the period that's
25  specifically missing is about 2006 to 2009.

1        You know, the Court could infer at that point that

2   it was -- that the amount being paid was 40,000 versus the

3   22,000 which is what at some point in that period of time the

4   trust payments were lowered down to.  So I think that is an

5   open question, and that's why we have not sought to have an

6   award of damages in a specific amount at this time.  But at

7   least establishing liability and, you know, ordering that

8   accounting, I think, is a good first step.

9        So -- and the reason why I do emphasize that is

10  because I know this Court said they wanted to deal with Gumaer

11  first, but -- and I will not dwell on it now, but there are

12  reasons which I will get to later why we would -- why we have

13  drafted the proposed order to focus on the Alexbay transaction

14  and related issues.  I was planning to inform the Court about

15  that.  There was an event and a separate lawsuit in

16  Connecticut just yesterday that occurred that really put a

17  clock on trying to essentially save the company here.  And so

18  that's why I'm more than willing to the extent that it helps

19  this Court deal with fewer issues to say we would defer, you

20  know, deciding the amount of damages or even the basis for

21  calculating damages at this time if that would expedite the

22  other proceedings.

23        THE COURT:  Okay.  What happened in Connecticut?

24        MR. BROOK:  So, Eber Connecticut as Your Honor

25  knows, is a going concern.  The CEO is Lester Eber.  The

16

1  president is Wendy Eber.  It does business as Slocum & Sons

2        THE COURT:  Right.

3        MR. BROOK:  And a few Slocums are on the board.

4  There was one Slocum who was the general manager of the

5  company who managed the sales team and who -- you know, and I

6  can present it to Your Honor now if you want to see it, but in

7  one of the presentations that Wendy Eber and her lawyers

8  prepared for PBGC about five years ago, he was described as

9  one of two key employees of the company because he was

10  essential to maintaining the relationships with suppliers,

11  managing the sales team.  And, in fact, his salary was even

12  higher than Lester Eber's.

13        He left the company in September for a competitor.

14  When I heard about this, my client Dan Kleeburg had only

15  learned about it because he saw a Facebook post from John

16  Slocum's wife congratulating him on his new job which was

17  promptly taken down.  And I had to go after these guys and

18  find out what was going on.  It turns out they had filed a

19  complaint trying to get a preliminary injunction against John

20  Slocum because he'd gone to work for a competitor in violation

21  of a non-competition clause in his contract.

22        It kept getting delayed.  I wanted to update the

23  Court, but I also didn't want to jinx it because everyone

24  wanted this non-competition clause to be enforced and I didn't

25  really have anything other than speculation until yesterday

1   when that court entered a preliminary injunction saying that

2   for six months, John Slocum cannot work for any other

3   distributor in Connecticut.

4          THE COURT:  Okay.

5          MR. BROOK:  And last night --

6          THE COURT:  And what was that, the state court?

7          MR. BROOK:  That was state court, yes.

8          THE COURT:  Okay.

9          MR. BROOK:  And so, nonetheless, the company has

10  lost one of its key employees.  And John Slocum actually spoke

11  with Dan Kleeburg last night.  And although, you know, we

12  don't have like a contract or anything like that, we don't

13  have any authority on behalf of the company here yet, but the

14  discussion occurred about whether John Slocum if Wendy Eber

15  was no longer there because his lawyer and John both said

16  Wendy Eber unfortunately was the reason why he left, that if

17  she was gone and we had control, he would consider coming back

18  to the company.  You know, and I think he would be very

19  interested.

20          You know, and that's ultimately -- you know, it's

21  created a situation that we did not anticipate where the

22  company's future really is in flux, and the two key employees,

23  Lester Eber and John Slocum, you know, they're not going to --

24  if we don't get some quick relief and have the ability to try

25  to get John Slocum back, you know, the future of this company

1  is very much in question because Lester Eber's in his

2  eighties.  And John Slocum, the closer we get to that six-

3  month deadline occurring, the hard it's going to be to really

4  -- I think the more expensive at least it's going to be for

5  the company to try to bring him back into the fold.

6          You know, I don't know.  I mean we certainly would

7  hope that the Ebers might try somehow to get him back, but he

8  seemed to be --

9          THE COURT:  Okay.

10          MR. BROOK:  -- indicating otherwise.

11          THE COURT:  I just wanted --

12          MR. BROOK:  Sure.

13          THE COURT:  That's sufficient information.  Okay.

14  Now, let's hear from Gumaer.  So Mr. Calihan.

15          MR. CALIHAN:  Thank you, Your Honor.  Two things

16  that Mr. Brooks said I would like to address briefly just --

17  the first, he made a reference to the Restatement I think as

18  he was closing.  I actually spent some time recently looking

19  through the Restatement Second and Third, not for the first

20  time, Restatement of Trusts.  I could not find any mention of

21  the faithless servant doctrine.  Perhaps I missed it.

22          There is, however, the Restatement Second, Section

23  243, which addresses how and when a court may reduce

24  compensation to a trustee for breach of trust.  And it

25  provides for the consideration of five or six elements, and it

1    is discretionary.  That is the standard that should apply here

2    in lieu of the faithless servant doctrine.  And I actually

3    would request permission to submit a one- or two-page letter

4    brief just bringing that citation to the Court's attention.

5          This is an important issue here because what they

6    are seeking by using the faithless servant doctrine is to

7    recover all compensation from 2001 through the end of the

8    relationship, whatever it was, whereas, if as we believe is

9    the case if you're going to start talking about warning backs

10   and compensation, you have to look at actual active breaches

11   with damages.  They've admitted, may not agree right now, but

12   that probably starts in 2012.  Tremendous difference in the

13   size of the claim, and that's why this is so significant.

14         So let me back up for a moment.  We are not

15   contending, as I think I just suggested, that there are not

16   legal principles upon which compensation can be claimed, a

17   trustee compensation can be claimed.  We're saying that the

18   faithless servant doctrine is not one of them.  They have

19   invoked it because they want to get everything, and they have

20   invoked it because they want to get everything on a minimal

21   showing.  That's their choice.  But the fact is that that is

22   not a claim that belongs here.

23         Now let me back up and look at the elements of that.

24   The first point obviously is was Mr. Gumaer Lester's attorney.

25   I stand here obviously at something of a disadvantage.  I

20

1    could never ask him that question.  I don't know the answer to

2    that question in all honesty.  However, what we have here is

3    the plaintiff is standing up and on the basis of the same

4    evidence upon which it argued months ago that there was not

5    such a relationship when it was trying to recover the

6    documents allegedly privileged, now the plaintiff is arguing

7    that that evidence establishes that there was that

8    relationship.  I submit that at a minimum that demonstrates

9    that there is at a minimum an issue of fact about it.

10           They rely on what Lester Eber had testified to, for

11   example.  And there are two problems with that.  Number one is

12   Your Honor noted in your decision and as other case law

13   supports the view of the putative client while relevant is not

14   dispositive.  Also, I think in an actual trial where we would

15   have the ability to invoke the dead man statute, it would be

16   very difficult to establish this relationship through such

17   testimony.  And I think the dead man -- the public policy

18   behind the dead man statute fits here where counsel has to

19   stand up and say I don't know what the actual answer is, but

20   they have to have the burden of establishing it under this

21   situation.  Mr. Gumaer is not here to defend himself.

22           And as I also recited in my papers and I won't go

23   through it in detail, but Your Honor has already reviewed the

24   evidence.  And while I mistakenly said to you and made a final

25   finding because I'm not very good at footnotes and I

21

1  apologize, nonetheless, at a minimum that review and how you

2  weighed that evidence and we've recited it in our papers and

3  we made sure all of the evidence was back in the record,

4  again, it creates an issue of fact not suitable for resolution

5  here, particularly when you have the dead man statute sort of

6  hanging out there.

7          Now let me talk about this notion that there is a

8  per se conflict.  We cited interesting case law which stood

9  for the proposition that an attorney representing a trustee

10 takes on the same obligations to the trust as that trustee.

11 And that's interesting because that means there cannot be as a

12 matter of law an inherent conflict in that relationship.  The

13 law recognizes that when an attorney represents a trustee, it

14 also -- it takes on those obligations to the trust.  And if

15 there was in fact an inherent conflict in that relationship,

16 no attorney could represent a trustee.  It has to be the case

17 that as a matter of law there is not such a conflict.

18         THE COURT:  You're talking about the duty as flowing

19 to the beneficiaries of the trust --

20         MR. CALIHAN:  Yes.

21         THE COURT:  -- and any advice flows to the

22 beneficiaries of the trust, those concepts.  Is that right?

23         MR. CALIHAN:  If I understand Your Honor's question,

24 yes.  It is that the attorney takes on all the legal

25 obligations of the trustee to the beneficiaries of the trust.

22

1          And so when Mr. Gumaer if he became Lester's

2    personal attorney, by virtue of doing so, he took on all of

3    Mr. Eber's trustee obligations but he already had those same

4    obligations.  So there can't be a conflict there.  And --

5          THE COURT:  Well, if he was Mr. -- I guess my

6    question is in what capacity was Mr. Gumaer acting as Lester

7    Eber's attorney if he was acting in such a capacity because if

8    he's acting in the capacity as attorney to Lester as a

9    trustee, I understand.  But if he's serving as a personal

10   attorney to Lester as something else such as an owner of

11   Alexbay, that's a different situation.

12         MR. CALIHAN:  Well --

13         THE COURT:  He may be wearing two hats, two

14   different attorney hats.

15         MR. CALIHAN:  Well, I would suggest in fact maybe

16   that's not the case because --

17         THE COURT:  Okay.

18         MR. CALIHAN:  -- to the extent that he was advising

19   Lester on anything having to do with a trust, I think the law

20   that clearly says that when an attorney advises a trustee, he

21   takes on the same obligations.  As soon as you step into that

22   area where he is advising Lester of any related issue, he has

23   the same obligations.

24         And I think the example that's been raised which has

25   to do with confidential information is an interesting one.  If

1  Mr. Eber shared with Mr. Gumaer information related to the

2  trust to which Mr. -- for which Mr. Eber had an obligation to

3  share with the beneficiaries, Mr. Gumaer as a matter of law

4  had the same obligation.  It came with the relationship as a

5  matter of law.  It came with his stepping into the shoes of

6  advising Mr. Eber.  So in fact, there's no conflict there.

7           And I go back to my original example, if you will.

8  There's a conflict there.  There's a conflict when an

9  individual attorney represents -- who is not a trustee

10  represents a trustee and the trustee shares with that attorney

11  information that should be disclosed to the beneficiaries.

12  The law says that that attorney assumes the same obligations

13  as a trustee and, therefore, they both have to disclose that

14  information.  There simply isn't an inherent conflict --

15           THE COURT:  So you're saying --

16           MR. CALIHAN:  -- as a matter of law.

17           THE COURT:  So are you also saying that as a matter

18  of law the duty of confidentiality runs to the trust or the

19  beneficiaries of the trust and, therefore, it's not a

20  violation of professional -- the professional code of conduct?

21           MR. CALIHAN:  I'm saying the duty of disclosure.

22  The duty of disclosure.  If there was information as to which

23  Mr. Eber had an obligation to disclose it to the beneficiaries

24  and if Mr. Gumaer was advising him in that realm and obtained

25  that information because Mr. Gumaer put aside his independent

24

status as a trustee solely by virtue of his being Lester's
attorney advising him on matters pertaining to the trust, he
has the same obligation of disclosure.  So there cannot be a
per se conflict.

Can the obligations be violated?  Yes.  Can there be
individual breaches of duty?  Of course.  But there's not this
inherent conflict --

THE COURT:  Okay.

MR. CALIHAN:  -- here.  And it is notable that the
plaintiffs' counsel, I know they were going to contest his
competence after all these months, has not cited a single on-
point case which stands for this proposition.

THE COURT:  Okay.

MR. CALIHAN:  So, in essence, they're asking the
Court to establish as a matter of law a conflict, a rule of
conflict applicable to attorneys who are advising trustees
because if there is a conflict here with respect to Mr.
Gumaer, there is necessarily the same conflict with any
individual attorney representing a trustee in connection with
matters involving the trust.

THE COURT:  All right.  So you're saying that this
issue as a matter of law, there's really no facts -- there's
no factual dispute that is pertinent to the Court's resolution
of this issue of law?

MR. CALIHAN:  Yes, if I understand your question.

1          THE COURT:  Right.

2          MR. CALIHAN:  Yes.

3          THE COURT:  Okay.

4          MR. CALIHAN:  Yes, I think so.

5          THE COURT:  Okay.

6          MR. CALIHAN:  With respect to the application of the

7    faithless servant doctrine, I think I've already addressed

8    that but simply there's no direct -- I mean they're unable to

9    find direct on-point case law.  There are other bases for

10   seeking liability here, for seeking damages, but this doctrine

11   clearly applies to agents and employees.  Courts time after

12   time after time have said that the kind of analysis that's set

13   forth in Section 243, the Restatement Second, and other case

14   law is the applicable one here.

15         THE COURT:  Okay.

16         MR. CALIHAN:  And that analysis can resolve in a

17   wide range of damages here.  We obviously argue that it

18   shouldn't, but what we're talking about now is the application

19   of the faithless servant doctrine based on his being an

20   attorney and based on there being an inherent conflict of

21   interest.  And we're saying the doctrine doesn't apply.  There

22   was a material fact issue as to his status as an attorney.

23   And there is no such thing and cannot be any such thing

24   without really changing the law of trusts and how attorneys go

25   about representing trustees if this relationship created an

26

1   inherent per se matter of law conflict.

2           THE COURT:  Okay.  Thank you.

3           MR. BROOK:  May I address a few points?

4           THE COURT:  Yep, you may.

5           MR. BROOK:  Thank you, Your Honor.

6           I'll start with the Restatement.  And I'm not at all

7   surprised that the Restatement doesn't mention the faithless

8   servant doctrine because the faithless -- the Restatement's

9   purpose is to be a restatement of the law, the general common

10  law of the United States.  And the faithless servant doctrine

11  was invent in New York and has not been adopted widely in a

12  lot of states in the United States.  So if the Restatement

13  included the faithless servant doctrine, that would be an

14  anomaly.  And again, as noted before, I mean going back to,

15  you know, the nineteenth century when the doctrine was

16  invented, it talked about this in terms of duties to trusts

17  and trustees.

18          And, in fact, there was the -- I'm going to get the

19  citation here, but the case Federal Insurance Code v. Merck's

20  in which that -- that's one in which both parties have cited

21  simultaneously.  I don't know which version of an opinion Mr.

22  Gumaer's -- or Mr. Calihan's brief is referring to since it

23  talked about us citing the wrong page.  And I really think I

24  cited to the right page on that.  I don't see anything even 15

25  pages long, but that case specifically distinguished between

27

1  application of fiduciary -- finding a fiduciary relationship

2  that creates a faithless servant doctrine application versus

3  one that -- and said that that's where it arises by law.  And

4  it gave the examples of a higher degree of accountability such

5  as lawyer/client, trustee trust/beneficiary, shareholder

6  officer/director, employer/employee, et cetera, and explicitly

7  distinguished that.

8            So the fact that it hasn't been expressly applied to

9  a trustee doesn't mean that New York law isn't clear that it

10  should.  And it can be decided and it should be decided by

11  this Court because the trustee/trust relationship is the most

12  fundamental situation where there is a duty of loyalty.  It is

13  not just a duty of loyalty like in the employer/employee

14  context.  It is a duty of undivided loyalty.

15            THE COURT:  Okay.  But even if that doctrine did

16  apply, isn't there a factual issue as to whether Gumaer served

17  as an attorney for Lester Eber and what -- how do you address

18  the fact that there's not necessarily a conflict of interest

19  if he's a trustee and representing a trustee advising on the

20  trust?  What's the conflict there?

21            MR. BROOK:  Let's deal with that second part first

22  because I think that's where -- summary judgment standard

23  requires the non-movant to come forward with some evidence to

24  show that there's a genuine dispute.  And there's no evidence

25  anywhere indicating that Gumaer ever represented Lester Eber

in his capacity as a co-trustee of the trust.  None.  The
engagement agreement does not say that.  There's simply no
precedent whatsoever for one trustee to represent the other
co-trustee with legal advice.

And it makes sense.  When the Restatement says that
one of the roles that a trustee has when there are multiple
trustees is to monitor the co-trustee and to report and to act
on breaches of duty.  And that is a duty that cannot be
carried out when there's a personal relationship.  And even
assuming that there were some evidence sufficient to go to a
trial on whether he represented Lester in his capacity as
trustee.  It would still be a per se violation.

And it's telling that despite the fact that there
are multiple trustees, and trustees are frequently lawyers,
that there is no precedent that anyone can find for a co-
trustee to act as a lawyer for another co-trustee in any
capacity.  It is an inherent conflict of interest.  And I
think that, you know, the fact of the very privilege dispute
that have unfolded here before shows why.  If he was providing
that attorney/client advise to Lester, I mean there needed to
be a conflict waiver and disclosure saying, you know anything
you tell me I'm going to have to tell to the trust
beneficiaries.

I don't think that's a correct statement of the law.
I think that there's actually carveouts that are applicable

1    when someone is an attorney to an trustee under certain

2    circumstances that if they're getting advice on how to deal

3    with the beneficiaries, for example, to ensure that their

4    fiduciary duties are being met, that's not subject to the

5    fiduciary exception, for example.  So this notion that a

6    lawyer, you know, could never represent a trustee without a

7    conflict I think is just wrong as a matter of law.  It

8    absolutely is something that's permissible, and it is an

9    inherent conflict for the person to be a co-trustee and to

10   represent another co-trustee.

11           But, again, there's no evidence that it was in that

12   capacity.  And the absence of any evidence means that there's

13   no triable issue of fact.  We can't just sit here and

14   speculate.  The engagement agreement says what it says.  We

15   have been provided with a number of different documents in

16   which there were discussions about business matters, and none

17   of those indicate such a relationship.

18           I want to briefly address the characterization of

19   our past argument as there being no relationship.  That's not

20   correct.  We did not argue that there wasn't a personal

21   attorney/client relationship between Lester and Gumaer.  Our

22   arguments were two-fold.  There's probably a few more sub

23   arguments, but mainly Gumaer because he had these duties

24   directly to the trust beneficiaries, Lester had no reasonable

25   expectation that he could maintain his confidences and,

30

1   therefore, any disclosure to Gumaer required disclosure to the

2   plaintiffs.  That's not saying there was no relationship.

3          In addition, we were arguing that Gumaer was not

4   providing legal advice and we based that in part on some of

5   the things that had been disclosed to us in discovery and the

6   fact that he was a director and a trustee.  And that doesn't

7   necessarily implicate legal advise.  We never, especially -- I

8   know once we got that engagement agreement, we never said that

9   that engagement agreement wasn't real.  In fact, we folded it

10  into our complaint as soon as we did.  So it's a

11  mischaracterization to say that we ever argued certainly with

12  the evidence that we now have that there was no relationship

13  at all.

14          THE COURT:  Okay.

15          MR. BROOK:  It was a personal one.  Finally, just

16  the dead man statute, there's no reason -- this is the first

17  that we're hearing of this in this motion.  There's no reason

18  why that would need to wait until trial.  If there was a dead

19  man statute issue that made some of the evidence that we've

20  submitted inadmissible, that could have been raised at summary

21  judgment and it wasn't.  So I think that for purposes of

22  summary judgment, the dead man statute and the possibility of

23  making evidentiary objections later should not be considered

24  by this Court.

25          THE COURT:  Okay.  Anything further, Mr. Calihan?

31

1          MR. CALIHAN:  No.  I'll rest on what I --

2          THE COURT:  Okay.

3          MR. CALIHAN:  -- the points I've made.

4          THE COURT:  All right.  Thank you.  Okay.  So now

5   let's move to Lester and Wendy Eber.  To mix it up, let me

6   hear first from the Ebers concerning their motion and then

7   I'll hear from Mr. Brook and then you'll each have a chance to

8   surreply.  How's that?

9          MR. CALIHAN:  May I be excused then?

10          THE COURT:  You may be excused if you wish, but you

11   may want to be -- you may be interested in the arguments.

12          MR. CALIHAN:  I'll stay.

13          THE COURT:  Okay.

14          MR. RAMSEY:  Judge, Mr. Herbert and I have attempted

15   to divide and conquer.  I don't know if there's particular

16   issues you want to take them in a particular order.

17          THE COURT:  Oh, okay.  So you -- so which --

18          MR. RAMSEY:  So we've kind of divided amongst

19   ourselves.

20          THE COURT:  Fine.

21          MR. RAMSEY:  If there's an issue the Court wants to

22   tee up, great.  I can start with what I was going to address

23   and if the Court wants to jump ahead --

24          THE COURT:  Tell me what issues you're going to

25   address and --

32

1          MR. RAMSEY:  I'm planning on addressing the issue

2   with the Southern Consulting agreement which is also raised --

3   they're essentially overlap between the plaintiffs' motion and

4   the Eber defendants' motion on that point.

5          THE COURT:  Yep.

6          MR. RAMSEY:  I'm also going to address the Rooker-

7   Feldman issue, the res judicata issue, the duplicative counts

8   issue, and the common law indemnity claims --

9          THE COURT:  Okay.

10          MR. RAMSEY:  -- issue.  Mr. Herbert's going to

11   address broadly speaking issues with the stock and the issues

12   with the Metro transfer and the "no further inquiry" rule

13   which is implicated by all of that.

14          THE COURT:  Okay.  So, Mr. Ramsey, why don't you go

15   first on these issues.  Then I'll hear from Mr. Brook and then

16   you'll each have a chance to reply.  And then I'll hear

17   argument from Mr. Herbert on the points that you're going to

18   be arguing and --

19          MR. RAMSEY:  Very good.

20          THE COURT:  -- so we'll take it that way.

21          MR. RAMSEY:  Perfect.  So let me start, Judge, with

22   the whole issue surrounding the Southern Consulting agreement.

23          THE COURT:  Yeah.

24          MR. RAMSEY:  We've moved on the -- and that's raised

25   in two of plaintiffs' causes of action.  We've moved

33

1   affirmatively on the faithless servant doctrine aspect of

2   that.  If I'm reading Mr. Brook's motion correctly, his is

3   more focused on the usurpation of a corporate opportunity.  I

4   think reading the motions together, they're almost

5   interchangeable.  So where the Court lands on one, I think

6   whether it's usurpation of a corporation opportunity to

7   faithless servant, either if there's a question of fact on

8   both, one side wins on both, the other side wins on both.

9         So I'm going to treat it in that respect.  I think

10   we can fold them together --

11         THE COURT:  Okay.

12         MR. RAMSEY:  -- for the purposes of the argument.

13   Basically what plaintiffs' argument is Lester entering in this

14   consulting agreement with Southern, either usurped to cover

15   opportunity or made them a faithless servant.  And I think we

16   can agree that the standard that the Court's looking at there

17   is was there a reasonable expectation, was there a tangible

18   expectancy for one of the corporate entities to obtain this

19   consulting work from Southern.

20         And in order to analyze that, we've got to go back

21   to the operative time period.  Lester signs this agreement in

22   late 2007.  What's going on in late 2007?  Eber Metro, Eber

23   Wine & Liquor are out of business for all intents and

24   purposes.  They've been driven out of the New York market by

25   Somer Wine & Spirits.  They're not actively in business in any

34

1  capacity in which can reasonably said to be conducting

2  business.  There's simply nothing for Lester to be competing

3  against vis-a-vis either corporation at that point.  The

4  writing unfortunately was on the wall for their prospects in

5  the New York market.  That's point one.

6         Point two, neither corporation had ever done any

7  type of consulting or lobbying work.  They simply didn't.

8  They weren't in that line of business.  So in our view, those

9  two points alone are enough to knock those claims out.  You

10 weren't -- the companies weren't in business.  They never

11 performed the type of business that Lester entered into this

12 consulting agreement with Southern to perform services for.

13        We've got a third strike here.  We've got the

14 explicit testimony of one of the bigwigs at Southern who

15 testified in this case that he was responsible for

16 facilitating, for negotiating this consulting agreement.  He

17 wasn't interested in Metro.  He wasn't interested in Wine &

18 Liquor or Southern wasn't.  They were interested in Lester

19 Eber, Lester Eber's unique sets of skills, Lester Eber's

20 contacts in this world, Lester Eber's experience in the wine

21 and liquor business in New York, his acumen.  He could not

22 have been clearer that, look, I'm not interested in entering

23 into some contract with some corporate entity where if Lester

24 leaves, passes away, et cetera, that I'm stuck with this

25 corporation that's meaningless to me.  Lester's personal

35

1    contacts were what they were after.

2         THE COURT:  But under the faithless servant

3    doctrine, the idea behind that doctrine is that the individual

4    is taking on a role for a competitor that undermines or to the

5    disadvantage of the entity to which he has a duty.  And so,

6    how do you address the argument that Lester still had a duty

7    to those Eber entities at the time he entered into the

8    consulting agreement and why do you say the consulting he was

9    providing didn't disadvantage the Eber entities?

10        MR. RAMSEY:  The primary reason, Judge, is there was

11   nothing to compete with anymore in New York.  Those companies

12   weren't doing business in New York.  That's the long and the

13   short of it.  I think there's a different issue here if

14   Lester's performing the same services in Connecticut, for

15   instance, which he wasn't.  That's different.  I think that

16   raises some thornier problems.  But the reality on the ground

17   which kind of throughout the case and throughout the summary

18   judgment motion the plaintiffs really disregard is the

19   economic reality, the business reality on the ground that

20   there was nothing to compete with at this point.

21        THE COURT:  So was it your contention that there are

22   no issues of material fact with regard to whether these two

23   New York Eber entities were defunct, not transacting business

24   in New York?

25        MR. RAMSEY:  I don't think there's any dispute they

1  weren't transacting business.  Were they defunct in the legal

2  sense?  They were still going concerns primarily because they

3  had so many creditors.  But certainly, they weren't conducting

4  business.  I don't think that's a -- there's a dispute that

5  they were selling booze.

6          THE COURT:  They weren't selling liquor --

7          MR. RAMSEY:  Yeah.

8          THE COURT:  They weren't selling liquor.  They

9  weren't earning revenues, and there's no dispute as to that.

10          MR. RAMSEY:  Exactly.  They weren't selling it, and

11  as I said before, they'd never been in the consulting

12  business.  So in our view, this is ripe for summary judgment.

13  Again, we've moved on this issue as did plaintiffs.  It's ripe

14  for summary judgment for us at the very least if the Court's

15  not inclined to go that direction, at the very least, there's

16  a question of fact with respect to plaintiffs' motion on that

17  point.

18          The next issue, if we can move on, Judge, is the

19  issue of joint and several liability on the pension

20  liabilities, the Wine & Liquor pension plan and the Teamster

21  pension liability.  Unless I completely misread plaintiffs'

22  opposition, they don't dispute that there was joint and

23  several liability between -- on the part of Metro and Wine &

24  Liquor.  They say, hey, it's irrelevant, it doesn't matter,

25  you're looking at this the wrong way.  But they don't actually

37

1   dispute that there's joint and several liability.

2           And we can fight about what the import of that is, I

3   suppose, down the line.  We fight about everything else in

4   this case.  But, again, unless I'm missing it and I'm sure Mr.

5   Brook will tell me if I am, the narrow issue of was there

6   joint and several liability is not contested by plaintiffs.

7           THE COURT:  Well, isn't that something that the PBGC

8   would have dealt with already, and that case was settled?

9           MR. RAMSEY:  Absolutely, Judge.  The PBGC has

10  certainly weighed in that all the more part of the control

11  group that there was joint and several liability.

12          THE COURT:  So why is that not controlling?  Why is

13  that something that I even have to decide?

14          MR. RAMSEY:  Because plaintiffs apparently -- again,

15  my understanding that the argument is plaintiffs do not accept

16  or at least are raising some issue whether or not joint and

17  several liability was applicable, at least before the motion.

18  And --

19          THE COURT:  Mr. Brook, are you contesting this?

20          MR. BROOK:  Here's the situation.  This Court ruled

21  that the PBGC litigation was irrelevant and said that we

22  couldn't get documents regarding attorney/client

23  communications about that litigation --

24          THE COURT:  Right.

25          MR. BROOK:  -- and what their position was.  In

38

1    terms of valuating the company if we go to that stage for

2    2012, the valuation analysis looks at what the condition was

3    at the time.  The PBGC decision was issued in 2016.  As a

4    general rule, you don't use hindsight, so there's no dispute

5    that, yes, the Ebers lost that case.  The court refused to

6    consider not only the Honestbay transaction but the earlier

7    [indiscernible] deal and set an earlier date.  We love that

8    decision.  I still don't understand how this helps them.

9          The only thing that's relevant for purposes of

10   establishing valuation and possibly good faith is what did the

11   Ebers believe or other parties believe at the time in

12   question.  So this 2016 decision, it doesn't have anything to

13   do with anything.  The fact that --

14          THE COURT:  Okay.

15          MR. BROOK:  -- anyhow.

16          THE COURT:  So you're not contesting joint and

17   several liability per se.  You're just saying it's not

18   relevant?

19          MR. BROOK:  It's not relevant.

20          THE COURT:  Okay.

21          MR. BROOK:  And there is -- and to enter judgment on

22   that basis, I think --

23          THE COURT:  Okay.

24          MR. BROOK:  -- as long as it's clearly not a --

25          THE COURT:  You can make this argument.

39

 1          MR. BROOK:  Sure.

 2          THE COURT:  -- when you --

 3          MR. BROOK:  I apologize.

 4          THE COURT:  -- when it's your turn.  So, Mr. Ramsey,

 5  can you explain to me why joint -- why this Court even needs

 6  to address this issue?

 7          MR. RAMSEY:  Because assuming this case goes

 8  forward, completely disposed of one way or the other on these

 9  motions -- which I think even if we all got everything we

10  wanted, I think it would still be going forward -- there's a

11  potential if not a likelihood that we're going to be talking

12  about when were these companies insolvent, were they

13  insolvent, what was the impact of that.  And one of the

14  primary issues here, one of the primary contentions we have is

15  this joint and several liability is what either led to or

16  certainly significantly contributed to the insolvency that

17  then was the precursor to many of the actions that took place.

18          So I know there's certainly a question of fact on

19  the insolvency issue which is why neither party moved on it,

20  but we do feel it's important that the joint and several

21  liability's recognized because of the impact it has on the

22  company's, the assessment of the insolvency issue.

23          MR. HERBERT:  Can I add something to that point?

24  Just to be clear, in 2012, they're two different potential

25  ERISA liabilities here.  There's one withdrawal liability from

1    the multi-employer plan to the New York State Teamsters.

2              THE COURT:  Right.

3              MR. HERBERT:  That liability was already mature in

4    2008.  So there was most definitely joint and several

5    liability of all these companies, all the companies in 2012.

6    So that's not really contested.

7              THE COURT:  Okay.  So --

8              MR. HERBERT:  But the rest of it as he just

9    explained, there's really two issues.  One is how does the

10   joint and several liability of the companies impact their

11   solvency in 2012.

12             THE COURT:  Okay.  I understand.

13             MR. HERBERT:  But there's another one.  Two is how

14   does it affect the value of Eber Metro for purposes of

15   comparing that value with the outstanding balance of Lester --

16             THE COURT:  I understand.  But, Mr. Ramsey, since

17   you're addressing this point, why does it need to be resolved

18   now if it's wrapped into the insolvency issue?  This is just a

19   -- isn't it just a factual issue of what the union said was

20   the withdrawal liability and what the -- and ultimately what

21   was paid?  Because if there was a claim by the union for

22   withdrawal liability, that was an amount of money that was

23   being sought against the business.  That's a factual issue

24   that impacts the value of the company at that time and going

25   forward until that is resolved, however it's resolved.

41

1          Likewise, to the extent there was an outstanding --
2     a second pension obligation, that's a debt or an alleged debt
3     that was outstanding as of a certain date and however it got
4     resolved, it gets resolved.  But isn't the fact that just that
5     there was this potential obligation something that impacts the
6     value of the company and who its creditors were at that time?
7     Why does this joint and several liability issue -- I just
8     don't understand why that needs to be resolved now.
9          MR. RAMSEY:  Certainly, I agree that the insolvency
10    issue is a question of fact.  The Court, however, as a matter
11    of law can say, look, mathematical computations aside, they
12    were seeking this amount, they were seeking that amount,
13    whatever the amount is, I can concede that that's a question
14    of fact, too.  The joint and several liability itself that
15    this was going to be an obligation of everyone in the control
16    group, that could be decided as a matter of law.
17         Now, again, the import of that I suppose we can
18    argue about, but it does clean up some of those issues as far
19    as the insolvency if we say, hey, look, we can't dispute that
20    there was joint and several liability here.
21         THE COURT:  Well, it doesn't sound to me like Mr.
22    Brook is saying that entities within a control group are not
23    jointly and severally liable for an ERISA obligation.  I think
24    that's not a controversial issue.  What he's saying is it's
25    not relevant.

42

1           MR. RAMSEY:  Well, his expert I think did in sum and

2    substance say, hey, look, this wasn't a liability of all of

3    the corporations.  But if we're arguing over something that's

4    not really an issue, all the better.  I'm fine with that,

5    Judge.  Just the lead-up to this prior to the response to our

6    motion, it was our understanding that it was being contested.

7    If it's not, then I can certainly move on and be happy that

8    it's not contested.

9           THE COURT:  Okay.  All right.  So let's --

10          MR. HERBERT:  Let me add another thing to that just

11   for clarity.  We're confusing joint and several liability with

12   contingent liability.  With respect to their pension plan --

13          THE COURT:  Maybe you can argue -- if it's a

14   different point for your argument, just to be clear, why don't

15   you sit down.  I'm going to have Mr. Ramsey continue his

16   arguments and he can have a surreply if there's something else

17   that needs to be addressed.  But let's stick with the

18   arguments Mr. Ramsey is --

19          MR. RAMSEY:  Sure.

20          THE COURT:  -- handling right now.

21          MR. RAMSEY:  Okay.  The next point, Judge, is the

22   issue of the Rooker-Feldman doctrine.

23          THE COURT:  Yeah.

24          MR. RAMSEY:  And I think we're all on the same page

25   that there's essentially four tenets that need to be satisfied

43

1   is this going to be applicable: that the plaintiffs lost or

2   opposed the result in state court, they complain of injuries

3   caused by the state court judgment, they ask this Court to

4   review and reject at least in part that judgment, and that the

5   state court judgment preceded this action.

6          Working backwards, I think the last one's the

7   easiest.  We can all agree that 2012 UCC proceeding preceded

8   this, so no issue there.  Next, did plaintiffs lose or oppose

9   the result in state court and do they complain of the injuries

10  caused by that judgment?  In their motion, they say no.

11  Essentially, look, Judge Rosenbaum's order is irrelevant.  It

12  doesn't have anything to do with what the relief we're seeking

13  in this case.

14         That just doesn't square with the arguments that

15  they're making.  A significant portion of their third amended

16  complaint references specifically the 2012 proceeding and

17  everything that flowed from it.  That order was really the

18  genesis of Eber Metro going to Alexbay of the decision

19  essentially affirming the validity of Lester's loans and the

20  validity of the transactions, and the finding that the entire

21  process was commercially reasonable.

22         So it's hard to square the circle when they're

23  saying, hey, look, Judge Rosenbaum's order is completely

24  irrelevant, that's not what we're moving under, when in this

25  very motion they're asking this Court to return Metro to the

44

1   trust which, again, had its genesis in Judge Rosenbaum

2   approving the UCC Article 9 proceeding allowing Alexbay to

3   proceed with what it was seeking to do.

4           THE COURT:  Well, I understand plaintiffs to be

5   saying that that transaction harmed the trust.

6           MR. RAMSEY:  Well, they're saying it harmed them.

7   They're saying it harmed them as --

8           THE COURT:  But they're also bringing claims

9   derivatively on behalf of the trust.  And I think they're

10  saying that this transaction that the Court deemed

11  commercially reasonable harmed the trust.  What is your

12  position as to whether it harmed the trust?

13          MR. RAMSEY:  Well, I don't -- I think at that point

14  there was, to put it bluntly, nothing left to harm vis-a-vis

15  Metro.  This goes back to the insolvency question.  My

16  understanding what their argument is is Metro leaving the

17  trust harmed me as a plaintiff as a contingent beneficiary.

18  That's what they're arguing here.  And not to jump ahead, but

19  Mr. Brook's comments about this action in Connecticut,

20  ultimately, what they want to do is they want to take over

21  Eber Connecticut.  So they're saying, hey, look, this harmed

22  me because all of a sudden Metro's no longer part of the

23  trust.  Me as a contingent beneficiary has been deprived

24  allegedly of certain rights.

25          They're certainly asking the Court to review and act

45

1   with respect to what the state court did.  They explicitly are

2   seeking a rescission of that.  So that really is to my way of

3   thinking impossible to dispute that they're asking this Court

4   to do that.  And, again, just the sheer amount of time that

5   they spent in this in the third amended complaint, it's

6   inconsistent to say, hey, look, this whole Rosenbaum order

7   doesn't mean anything to me.  It's totally separate, totally

8   irrelevant from what the relief that we're ultimately seeking.

9            THE COURT:  Well, the trust -- at the point of the

10  2012 action and court decision approving the transaction, the

11  trust itself had only the value of the businesses, whatever

12  they were taking into account any liabilities, right?

13           MR. RAMSEY:  Yes.

14           THE COURT:  And I know there's a dispute about what

15  that value is.

16           MR. RAMSEY:  Yes.

17           THE COURT:  So is it -- I'm just wondering whether

18  or not there's an issue as to whether there's actually any

19  injury from this whole transaction because that element, is

20  that element of the Rooker-Feldman doctrine at issue?  Is

21  there an issue of fact because you don't know what the --

22  whether there in fact was an injury?  Because if the business

23  really didn't -- if the business and the trust was getting a

24  benefit by writing off a loan that was more than the value of

25  the company, then arguably there wouldn't be a harm.  But if

46

1  the business was more valuable than its liabilities, then

2  arguably it was harmed.

3          MR. RAMSEY:  I don't disagree, Judge.  In your first

4  example, if that's ultimately determined whether it's by the

5  Court or a trier of fact, I think the case is largely over if

6  there was no harm because this was an insolvent corporation.

7  The issue I guess is plaintiffs are saying, hey, we were

8  harmed.  So taking plaintiffs at their face value that there

9  was a harm to them, that's why in our view the doctrine's

10  applicable.

11          From the Eber defendants' perspective, if it's

12  ultimately determined that, look, there was no harm because

13  this company was worthless, that's what we've been saying

14  along.  But certainly that's not the position the plaintiffs

15  are taking.

16          THE COURT:  Right, I understand.  But it seems to me

17  that maybe there's an issue of fact that's tied into whether

18  or not this Rooker-Feldman doctrine can even apply here.

19          MR. RAMSEY:  Well, I understand what Your Honor is

20  saying.  I guess the issue as it were is is plaintiff

21  complaining of this, is plaintiff alleging a harm.  To our

22  reading of what they're saying is they're alleging a harm

23  flowing out of what that order precipitated.

24          THE COURT:  Right, but there can be no harm to the

25  beneficiaries of the trust if there was no harm to the trust.

47

1           MR. RAMSEY:  Agreed.

2           THE COURT:  Okay.

3           MR. RAMSEY:  Agreed.

4           THE COURT:  All right.

5           MR. RAMSEY:  Similar, Judge, and then I'll move on

6   and I know we've got a lot to get through here.  The res

7   judicata argument is similar in many ways to the Rooker-

8   Feldman argument.  In opposition, plaintiffs say, hey, look,

9   it doesn't apply because of the declaratory judgment

10  exception.  The response there is this was more than a

11  declaratory judgment.  This order granted, it wasn't just a

12  declaration kind of rubber stamping something, and that's the

13  argument both in response to the Rooker-Feldman and the res

14  judicata is plaintiffs are saying, hey, look, this was a sword

15  or this was a rubber stamp.  That's all this was.

16          There was a lot more to it than that.  The order

17  granted the request to accept Wine & Liquor's interest in

18  Metro in satisfaction of the secured debt.  It confirmed the

19  validity of underlying debts and the related transactions.

20  This was far more than just a declaration.  This was

21  substantively -- there's substantive issues that were reviewed

22  and ultimately essentially blessed by Judge Rosenbaum in that

23  order.  So that takes it out of the context of the declaratory

24  judgment exception.

25          I'm sure plaintiffs' other argument is, hey, look,

48

```
1   we weren't parties there.  But as Your Honor mentioned in a

2   different context a moment ago, they're essentially assuming

3   in this case on a derivative basis.  And both Wine & Liquor

4   and Metro were parties to that 2012 action.  So, since they're

5   essentially standing in the shoes of those corporations here,

6   as a technical matter of law, those parties were present both

7   in 2012 and in this proceeding.

8             THE COURT:  So, there may be, and I think there are,

9   factual issues with respect to the value of the company and

10  whether it was insolvent as all parties seem to agree.  But

11  what I hear you saying is that nonetheless, there are certain

12  legal decisions made by the court in Connecticut such as the

13  debt to the company owed to Lester Eber was a valid debt.

14            MR. RAMSEY:  Right.

15            THE COURT:  And that that is not something that this

16  Court can reverse or override under either the Rooker-Feldman

17  doctrine or the res judicata doctrine.

18            MR. RAMSEY:  Correct.

19            THE COURT:  Is that right?

20            MR. RAMSEY:  Correct.

21            THE COURT:  Okay.

22            MR. RAMSEY:  And just to complete the loop, there's

23  other transactions that are intertwined with those loans that

24  were similarly reviewed and approved by --

25            THE COURT:  Right.  The key issue though, as I'm
```

49

1   hearing your argument, is whether or not this Court must

2   respect the decision of that court as to the validity of the

3   debts because I don't think there's any dispute that Lester

4   deemed the transaction to be fully in satisfaction of the debt

5   that he perceived that he had.

6           MR. RAMSEY:  Absolutely.

7           THE COURT:  So really the only legal finding that's

8   pertinent relates to the validity of the debt?

9           MR. RAMSEY:  I think that's --

10          THE COURT:  Is that right?

11          MR. RAMSEY:  I think that's accurate, Judge; yes.

12          THE COURT:  Okay.

13          Okay.

14          MR. RAMSEY:  Briefly, Judge, and I don't need to

15  spend much time on this.  It's set forth in our paper.  The

16  claims or many of the claims in 6 and 7, Count 6 and 7, we've

17  requested be dismissed as duplication.  In opposition,

18  plaintiffs don't even really dispute that.  They essentially

19  say, hey, look, the Court may fashion some hypothetical remedy

20  that requires these counts to maintain.  They don't say what

21  that hypothetical remedy might be.  I think it's clear that

22  the relief they're seeking is contained in other counts and

23  those can be dismissed as duplicative.

24          Finally, the common law indemnity issue relating to

25  Canandaigua National Bank, plaintiffs for reasons unknown to

50

1    us made the independent decision to indemnify Canandaigua

2    National Bank for attorneys fees incurred in this action.  The

3    Eber defendants, the Ebers had no say and no involvement in

4    that negotiation.  They certainly didn't approve it, didn't

5    bless it.  Plaintiffs nonetheless say, hey, look, you should

6    indemnify us for that.

7         The biggest problem with that argument is one of the

8    few things that the parties agree on in this case is

9    Canandaigua has screwed up allocating or distributing the

10   stock on multiple occasions.  Canandaigua intervened or got

11   back in this case, intervened basically saying, hey look,

12   Court, tell me what to do and I'll do it.

13        Given that the parties agree that Canandaigua has

14   made multiple mistakes in what they were prepared to do as far

15   as allocation of distributions, I don't see how we then make

16   the leap that plaintiffs cut this deal for whatever reason

17   with the plaintiffs to indemnify them.  Oh, by the way, Ebers,

18   you had no involvement in it, you didn't bless it, but you

19   should pay Canandaigua's legal fees.  That -- it doesn't make

20   sense factually.  It doesn't make sense from a legal

21   perspective.

22        THE COURT:  Okay.  Now, I have one question though

23   --

24        MR. RAMSEY:  Sure.

25        THE COURT:  -- with respect to the -- I don't know

1    if this question is -- I think it relates to this, to

2    CANANDAIGUA NATIONAL BANK.  But the question is is it your

3    position that the parties are in agreement that plaintiffs

4    have or own two-thirds of EB&C voting shares and Lester owns

5    one-third of the voting shares?

6              MR. RAMSEY:  No is the short answer.  I'm going to

7    let Mr. Herbert --

8              THE COURT:  Okay.

9              MR. RAMSEY:  -- delve into that --

10             THE COURT:  Fine.

11             MR. RAMSEY:  -- because it's more nuanced than that.

12             THE COURT:  Fine, okay.

13             MR. RAMSEY:  If we can flip that on --

14             THE COURT:  Sure.

15             MR. RAMSEY:  -- the plate for Mr. Herbert.

16             THE COURT:  Okay.  Got it.  Okay.

17             MR. RAMSEY:  Thank you.

18             THE COURT:  So, Mr. Brook, why don't you address the

19   matters raised by Mr. Ramsey.

20             MR. BROOK:  Thank you, Your Honor.  I was going to

21   plead for that.  Given otherwise, it would be quite a long

22   list.

23             So let's go in order.  PBGC, this really is

24   something that it's a sneaky attempt to try to get a factually

25   relevant issue which is that may be reached about insolvency

52

1   decided beforehand.  And that's why it's their first and

2   foremost issue because they know that if the fact-finder

3   ultimately says that either, you know, what Lester believed at

4   the time or what a reasonable investor would have believed at

5   the time was that Eber Metro would not have been liable after

6   it was transferred to a third part, then it's not insolvent.

7   Because the ERISA liability for controlled group members only

8   applies to the controlled group if the actually -- if the plan

9   sponsor can't put in enough money.  And so that's really the

10  question here.

11          So if Eber Brothers Wine & Liquor which transferred

12  Eber Metro to Lester for the amount of his debt had gotten

13  more consideration that it could have funded the plan, Eber

14  Metro would have never been liable for anything.

15          THE COURT:  Right.  So take that more slowly.

16          MR. BROOK:  Sure.

17          THE COURT:  What is the factual issue?  How are you

18  stating it?

19          MR. BROOK:  So to the extent that we're deciding

20  whether it was solvent at the time --

21          THE COURT:  Right.

22          MR. BROOK:  -- which I don't think we need to get

23  to, but if we are for purposes of some sort of a damages

24  calculation to the shareholders or what have you, the relevant

25  fact is what was the probable liability and was the

53

1   transaction that occurred one that was made in good faith.

2   So, that's two things.  One is what was the actual value of

3   the assets and the liabilities.  And it's true that when a

4   liability is not -- when it's disputed or when it's not

5   believed that it would continue, you know, you don't charge

6   that to it just because a court many years later found

7   otherwise.

8            And that's the thing.  The Ebers fought tooth and

9   nail for years arguing that there was no liability.  So they

10  lost that.  But the fact is in 2012, they believed it was not

11  going to be liable.  And so if they get a ruling as a matter

12  of law that Eber Metro was liable when that's not what they

13  believed at the time, that would only confuse the issue.  So

14  what I would propose is this.  If and when we get to a trial

15  on the issue of insolvency or not, they can put in the PBGC

16  court order from Connecticut in 2016 and try to get it

17  admitted as evidence that which would be considered about the

18  liabilities.  Or maybe they can make a motion for collateral

19  estoppel, not that that would even arguably apply here but

20  they could try.

21           But it's not something that is appropriately decided

22  on summary judgment because, A, I don't even know what they're

23  getting judgment on.  There's no affirmative defense that

24  asserts this.  There's no counterclaim.  They just want an

25  early legal ruling that they think will help them I don't know

54

1   with what.

2        THE COURT:  Well, you do not dispute -- am I correct

3   that you do not dispute the legal proposition that entities

4   within a control group are jointly and severally liable for

5   ERISA obligations?

6        MR. BROOK:  Correct, Your Honor.

7        THE COURT:  You don't dispute that legal principle.

8        MR. BROOK:  Absolutely not.

9        THE COURT:  What you are saying is is that how that

10  principle is applied in this case for purposes of valuing the

11  company at any time is a fact issue.

12       MR. BROOK:  As is what the parties believed --

13       THE COURT:  Or how the facts -- it's just --

14       MR. BROOK:  Yeah.

15       THE COURT:  It just impacts --

16       MR. BROOK:  Absolutely.

17       THE COURT:  -- how the company is valued is what

18  you're saying.

19       MR. BROOK:  Right, because if Lester believed that

20  by doing the Alexbay, the transfer to Alexbay, he was getting

21  Eber Metro out of the controlled group, then that's really

22  relevant to understanding whether the transaction occurred in

23  good faith because if he believed that this was a way to avoid

24  the PBGC liability, then it would be absolutely incorrect to

25  say that as a matter of law the Court should conclude that it

55

 1    was liable notwithstanding the parties' actual beliefs in good

 2    faith or bad faith at the time of the transaction because

 3    valuation is inherently forward-looking.  You don't know the

 4    future.

 5              And that brings up another prong --

 6              THE COURT:  But wouldn't it be beneficial to get the

 7    one valuable entity out of the control group?  Isn't that

 8    something that would be helpful to the trust?

 9              MR. BROOK:  If it was done for fair consideration,

10    yes.  But when it's done simply to eliminate debt to one of

11    five creditors leaving the company holding nothing but debts

12    with no means to pay it, there's absolutely no way that was

13    beneficial to the trust or to the company, which gets into the

14    issues that I'm sure Mr. Herbert will bring up which is, you

15    know, $3.8 million in debt and we're assuming for purposes of

16    our motion at least that all that debt is legitimate.  We have

17    a lot of reasons to challenge it as we point out in our

18    counter statement of material facts, but we're assuming for

19    purposes of our motion that it is all legitimate debt.

20              But the fact is it was only 3.8 million, and the

21    Ebers own expert says that the assets that were transferred to

22    Eber Metro were worth about five and a half million.  So the

23    question really does become, well, was Eber Metro -- were

24    there liabilities attached to it.

25              You know, and on that point, it's noteworthy that at

56

1   his deposition, the Ebers' expert admitted that Lester Eber's

2   affidavit submitted in connection with the Alexbay court

3   proceeding in 2012 provided contradictory -- or I'll maybe use

4   the word inconsistent information versus the legal presumption

5   he was told to make.  He was told to presume as a matter of

6   law that Eber Metro was jointly and severally liable for all

7   these debts at the time in question.

8          And as I think both experts agree, you're not

9   supposed -- I think Mr. Torkio [Ph.] or Torchio [Ph.]

10  described it best, he called it the no-peeking rule.  When

11  valuing a company, you're supposed to use the information

12  that's available at the time.  And the 2016 PBGC decision was

13  obviously not available at the time.  And there has been

14  certainly a dearth of evidence that's been produced on this

15  because, as Your Honor previously ordered, we didn't get any

16  discovery about what the actual, you know, attorney/client

17  communications were about the PBGC liability that were going

18  on at the time.

19         We have really good reason to believe that quite

20  contrary to what they're asking this Court to rule that at the

21  relevant time, they did not believe that this was a liability

22  that was going to continue after the Metro transfer.  And so,

23  if the liability didn't continue with the Metro transfer, then

24  the value that Lester Eber perceived himself as getting was

25  far greater than what they have -- that they would otherwise

57

want.

And I think that it would really be jumping the gun for this Court to enter any kind of order as a matter of law that would seem to be contrary to actually fact-finding what the value of the company was, what its actual liabilities and assets were worth at the time.  And so that's out problem. And it's really exacerbated by the fact that the Ebers themselves argued completely opposite positions with respect to PBGC for many, many years.  And I think they actually have really good arguments.

You know, so what happened was -- and I know Your Honor did a lot of labor law so you're probably more familiar with this than me, but PBGC rather than challenging the Metro transaction and the Polebridge Bowman deal which took Eber Connecticut out of the control group by dropping its ownership interest from 85 to 79 percent just below that 80 percent threshold.  Rather than saying those were fraudulent transfers, it asked the Court to simply set a retroactive termination date for the plan to one month before the Polebridge Bowman deal so that both Eber Metro and Eber Connecticut were jointly and severally liable for the plan's benefits because at the termination date, that's when you use the control group.

So, the court agreed to disregard those subsequent transactions even though the Ebers pointed out they continued

1    to fund the plan through 2012.  So that's a fairly significant

2    thing.  So if we actually had to argue in terms of substance

3    whether they thought that there would ever be entered an order

4    saying that the plan was terminated later, I mean the fact is

5    all contemporaneous evidence we've seen shows that the Ebers

6    believed that it would not be a liability that continued after

7    the transactions that they engaged in.  That's why they did

8    it.

9          And that's why the court in the PBGC lawsuit did

10   something that was fairly extraordinary which is to say that a

11   plan that was still being funded by the plan sponsor had

12   terminated earlier.  And I think more than a million dollars

13   in -- in terms of contributions earlier, it's kind of unheard

14   of.  And it's really unheard of for a party to say that

15   because a court decided to disregard these transactions that

16   the plaintiffs are challenging, that that means these

17   plaintiffs should lose.

18         I don't understand the logic behind it.  And it's

19   certainly contrary to all logic and reason to say that that

20   court's decision to say that we're going to treat ownership as

21   it was in 2010 should be honored.  But plaintiffs can't reset

22   the table to 2010 themselves, which is what we're asking to

23   do.  We're asking this Court to say that that ownership table

24   should be set back to where it was in April 2010 including the

25   Polebridge Bowman deal which we have not raised on summary

59

1    judgment just to keep things somewhat reasonable here.

2            But that decision decided to disregard the

3    transaction and that's exactly what we're asking for here.

4    So, if this Court were to say that there was joint and several

5    liability, it would at the same time I think have to adopt the

6    reasoning which is that the subsequent transactions have to be

7    disregarded as well.  And at a minimum, we certainly -- if

8    this is going to be an issue that goes to trial, we need to

9    get that discovery that was previously determined by this

10   Court that we didn't have good cause to get.  I really don't

11   want me clients to incur more discovery costs to deal with an

12   issue that had been -- and we cited to the point of Your

13   Honor's opinion.  It was in dealing with the fiduciary

14   exception where --

15           THE COURT:  Right.

16           MR. BROOK:  -- good cause had been shown.

17           THE COURT:  Right.

18           MR. BROOK:  And the court said that we didn't show

19   good cause --

20           THE COURT:  Right, but still I don't understand why

21   you would need additional discovery because there's exposure

22   to the pension liability.  There's a pension and there's a

23   responsibility by the sponsor and entities within the

24   sponsor's control group to fund the pension.  And so whatever

25   that -- whatever funding is required is required at any given

60

1  point in time.  There's a trust and there are 550s filed

2  annually that are publicly available.  And the actuary for the

3  fund should know what is owed.  So that pension obligation is

4  there regardless.

5         So, I just -- again, I don't understand what

6  discovery or why what Lester believed or not as to whether

7  he'd get it out is pertinent.

8         MR. BROOK:  Well, I think the parties agree that

9  even if somehow Lester was authorized by the will to do this

10  transaction, he was still subject to an unwavering duty of

11  good faith.  And good faith is oftentimes been interpreted by

12  the Court to mean that a fair price was set.  So -- and it's a

13  subjective inquiry.  So if Lester believed that he was going

14  to get Alexbay to acquire Eber Metro free and clear of this

15  debt, then it would be improper to consider that debt in

16  considering his good faith.  That's why we would need it to

17  see what they actually believed at the time because the actual

18  liability was not known.

19         If this decision that they want to have reached

20  existed at the time of the transfer, there would be absolutely

21  no dispute that it should be considered even though they did

22  appeal it later.

23         THE COURT:  I don't understand why a belief in a

24  disputed debt is relevant to the valuation.  It's a disputed

25  debt, period, end of story.  Why is Lester's belief as to that

1   pertinent?  Any accountant is going to just say, okay, here's

2   a disputed debt.  Why do you need discovery on a state of

3   mind?  It's a fact as to what is the disputed debt.

4        MR. BROOK:  Well, we would need it because of every

5   other thing in here, because good faith is not something that

6   is determined by reference to an objective standard of

7   valuation.  That's something that's independently required

8   under the entire fairness doctrine or what have you.  But

9   whether if Lester believed based on advice of counsel or

10   whatever it is that, you know, they don't want to show us, you

11   know, or even just because he was delusional.  But if he

12   believed he was getting a $20 million company in exchange for

13   eliminating $3.8 million debt only and that he was getting it

14   free and clear of debts as they argued for years that he was,

15   then that is absolutely relevant to whether he'd conducted the

16   transaction in bad faith.

17        THE COURT:  But you've already said that the company

18   -- you have information already showing that the company was

19   worth more than the 3.8 million.  So what does it matter if

20   it's 20 million more or -- if it's worth more, it's worth more

21   and why does it matter what he believed?  At this point, I

22   don't see how that discovery is really necessary.

23        MR. BROOK:  I certainly hope we don't get to it, but

24   I do believe and I can -- if necessary, you know, depending on

25   the -- I don't want to get -- I think we should not get into

62

1    it if Your Honor's okay with --

2              THE COURT:  Okay.

3              MR. BROOK:  -- not to get into the discovery issue.

4              THE COURT:  Yeah.  No.

5              MR. BROOK:  But it is worth considering that this is

6    an issue that was specifically determined not to be relevant

7    --

8              THE COURT:  Right.

9              MR. BROOK:  -- to our case and then all of a sudden

10   at summary judgment it is.

11             THE COURT:  Yeah.

12             MR. BROOK:  So that definitely caught us off guard.

13   Not that it affects anything because at the end of the day,

14   another reason independent why this Court can't grant them the

15   judgment they want is that the number they're using is

16   actually contrary to the liability numbers that they were

17   using in real time.

18             Your Honor referenced that there's the actuary

19   that's actually engaged at the time and reports that were

20   given.  And what we submitted in opposition to their motion

21   show that there was almost a million dollars difference there

22   in terms of what that liability was represented as being.  And

23   their other opinion, this Michael Gallagher guy, it's an

24   undisclosed expert report.  They don't even defend that in

25   their reply.  And I'm not going to rehash the issues there,

63

1   but actuarial testimony is obviously not within the

2   [indiscernible] of the jury.  So it's -- and I still have no

3   idea how he calculated this number or what have you.

4           And even the letter that they relied on giving to

5   their expert was dated December 2018.  We didn't get it until

6   after their expert report cited it.  So there wasn't even a

7   disclosure of that.  We had -- that was an absolute blind-

8   siding to see actuarial issues coming up in their expert

9   report.

10          Okay.  So turning to Rooker and res judicata, this

11  is -- there's a reason why the estate withdrew its arguments

12  in response to a Rule 11 notice of motion that we sent and a

13  brief.  And that's because their arguments about what happened

14  in the Alexbay lawsuit are totally misrepresenting the

15  proceedings.  There was no injunction as they claim in their

16  reply.  That's absurd.  I mean and I think that it's -- it can

17  be -- let's look at two things here just so that we're totally

18  clear on the same page.  And this is relevant again because

19  the Second Circuit has made clear Rooker-Feldman does not

20  apply if a court is merely putting its stamp of approval or

21  consenting to or approving of something that has occurred

22  outside of court.  It hasn't done that even in the context of

23  settlement agreements for a pending lawsuit.

24          And on that, even Mr. Ramsey said that there were

25  other issues essentially blessed, that's a quote, by Judge

64

1    Rosenbaum in that order.  And that's exactly where Rooker-

2    Feldman doesn't apply is when a court is merely blessing

3    things that occurred.  The order itself was the product of a

4    request in the complaint for declaratory relief.

5              This is Exhibit 44.  And, you know, the wherefore

6    clause in Alexbay's complaint says" "Alexbay, LLC, requests

7    that this Court determine adjudge, and order that Alexbay,

8    LLC's acceptance as a secured creditor of EBW, LLC's ownership

9    interests in Eber Metro which ownership interests serve as

10   collateral securing the obligations of Eber Win & Liquors'

11   obligations to Alexbay, LLC, in full satisfaction of the

12   obligations owed to the LLC is commercially reasonable

13   together with such other and further relief as the Court may

14   deem just and reasonable."

15             So it's a request that the acceptance is

16   commercially reasonable, not to order the transaction to

17   occur.  And in fact, in Paragraph 40 of the Ebers' own

18   statement of material facts, they emphasize the fact that this

19   was a totally voluntary filing, the Alexbay lawsuit.  There's

20   no need for judicial foreclosure in the context of a straight

21   foreclosure.  It is an agreement that is reached by a debtor

22   and a secured creditor after default.  And they went this

23   extra round presumably to be able to make these kinds of

24   arguments down the line, but it's not something that actually

25   hurt us.

1          The order itself, you know, maybe we would have made

2     some UCC commercially reasonable arguments, too, if not for

3     that, but it wasn't -- it didn't seem to be worth getting into

4     it.  I mean it's just not a -- it's not an order that affected

5     us because the fact that it's commercially reasonable under

6     the UCC is in no way, you know, issue preclusive on any of the

7     issues that we're raising.

8          THE COURT:  But what about the fact that the Court

9     according to Mr. Ramsey found that the debts were legitimate

10    debts?

11         MR. BROOK:  I don't see that finding in there

12    anywhere.  They argue that in a foreclosure proceeding

13    generally, a court cannot order a foreclosure to occur without

14    determining necessarily the validity of the debts.  But,

15    again, this was not a foreclosure proceeding.  This was --

16    even though we've used that term.  It was a proceeding to

17    decide that the transfer of assets in a strict foreclosure

18    would be commercially reasonable or is commercially

19    reasonable.

20         There was no issue and certainly not one that was

21    actually litigated or disputed in any way about whether

22    Lester's debts were valid or not.  And in any event,

23    plaintiffs have not moved for summary judgment on their own

24    sake on anything challenging the validity of the debts.  I

25    think there's a great deal of reasons to question that, and

66

1    it's not something that -- and it's certainly not something

2    that would be subject to issue preclusion because, you know,

3    they haven't even argued that collateral estoppel can apply

4    here.

5           THE COURT:  Wasn't the trust separately represented

6    in that action?

7           MR. BROOK:  No, the trust had no notice of it.  The

8    trust was not mentioned in it.  Even the parent company, Eber

9    Brothers & Co, Inc., was not in the lawsuit.  So, yeah, I know

10   -- the trust had nothing to do with that.  It was simply a

11   case where it was a rubberstamping.  And I think the Court's

12   order is also grossly mischaracterized by the -- so it says in

13   terms of what's ordered, and this is Exhibit M to Lester's

14   November affidavit.

15          "Now upon reading the notice of motion dated March

16   15th, 2012, on behalf of plaintiff in support of the motion

17   together with the affidavit of Lester Eber, sworn to the 14th

18   day of March, 2012, together with exhibits thereto in support

19   of plaintiffs' motion and having no opposition thereto, it is

20   hereby ordered that part of plaintiff's motion seeking a

21   determination that Alexbay's acceptance of collateral in full

22   satisfaction of Eber Brothers' obligation is commercially

23   reasonable under the Uniform Commercial Code is granted.  And

24   it is ordered that part of plaintiffs' motion seeking

25   dismissal of defendant Southern Wine & Spirits, Inc., from

1   this action is granted.  Entered May 11th, 2012."

2          Where's the injunction there?  I mean no -- it is

3   just flagrant dishonesty.  And it is truly [indiscernible] for

4   them to try to make these arguments to just grossly

5   misrepresent this to preserve an argument that their co-

6   defendant recognized was not reasonable in light of the true

7   claims that are brought here.

8          If they were right that the judicial order like this

9   or even a prior litigation could foreclose breach of fiduciary

10  duty claims relating to that transaction and to the conduct of

11  the fiduciaries in connection with the litigation, then there

12  would be no such thing as a legal law practice action that

13  could ever be heard by federal courts because, you know,

14  that's what happened there.  You know, it was already decided.

15  There's no jurisdiction.  You have to reverse it.  But, no,

16  that's not what happens.  When deciding breach of fiduciary

17  duty like malpractice, the Court to some extent would consider

18  a case within a case.

19         So to the extent that we're arguing in part if and

20  when we get to a trial that their conduct during in pursuing

21  that case failing to defend it, consenting to it that that was

22  a breach of their fiduciary duty, that does not seek a

23  reversal of that order.  We are not appealing that order.  It

24  does not need to be changed, and that is why Rooker-Feldman

25  does not even arguably apply here.

68

1          If it was a real argument for it, you know, they

2   would have made it long ago before the parties spent tons of

3   money on discovery because this is a threshold jurisdiction

4   issue.  It is a fabricated argument born out of total

5   mischaracterization of the proceedings and plaintiffs' claims.

6          THE COURT:  Okay.

7          MR. BROOK:  I'll allow it if you --

8          THE COURT:  I'll -- is there something you wanted to

9   respond to specifically to --

10          MR. CALIHAN:  Just briefly.  Mr. Brook suggested

11   that we withdrew it because we recognized on the merits it was

12   not a meritorious argument.  We withdrew it because, frankly,

13   I recognize that we could be a free rider here and we didn't

14   have to argue one way or the other, that they would argue it

15   competently.  And whatever the argument was, the estate would

16   benefit or not benefit from it.

17          THE COURT:  Okay.

18          MR. CALIHAN:  The estate basically has no resources

19   left.

20          THE COURT:  Okay.

21          MR. CALIHAN:  And the --

22          THE COURT:  Well, you said that in your letter, Mr.

23   Calihan.

24          MR. CALIHAN:  Thank you.

25          THE COURT:  Okay.  Mr. Brook, go on.

1          MR. BROOK:  And I told Mr. Calihan for what it's

2     worth that that's not a real withdrawal of an argument, but

3     it's a -- you know, it's a withdrawal nonetheless.  He insists

4     that he's been, you know, invoking the safe harbor and the

5     Court should -- you know, not that it should affect anything.

6     I mean these are just frivolous mischaracterizations of Judge

7     Rosenbaum's order.

8          Turning to Count 7, we did say what relief was

9     requested.  I'm sorry, Count 6, they're saying it's

10    duplicative.  I mean the fact is, you know, our proposed order

11    includes multiple requests for declaratory relief.  The

12    suggestion that we haven't pointed out what declarations we're

13    seeking is just wrong.

14         As to Count 7, there's no reply to our point on

15    either at oral argument or in the reply brief that Wendy Eber

16    was not a trustee.  This a point that they themselves have

17    made.  Therefore, her potential liability for a breach of

18    trust only arises through aiding and abetting liability.  We

19    could have argued conspiracy, but that just seemed to be

20    unnecessary.  So aiding and abetting is the only way to hold

21    her accountable for that conduct in terms of a breach of

22    trust.

23         You know, it probably was also a breach of her duty

24    as a corporate officer and director, but if this Court doesn't

25    even reach that issue, then this should remain on the table

1   because that's the only way that she's liable for her conduct.

2   And the record is fairly substantial that she was involved in

3   every one of the -- at least the discussions between Lester

4   and Mr. Gumaer about trust actions that related to this case

5   including the disclosure or nondisclosure of this case of the

6   Alexbay transaction to plaintiffs for several years.

7        On indemnification, this is one where, you know, I

8   think it's fair to say we did not move for summary judgment on

9   it.  I think there are absolutely -- there's just a huge

10  disconnect in what the concept of indemnification is here.

11  And we largely rely on the briefs in terms of the law and what

12  the standard is for that.  But what's important here is the

13  fact that we agree that Canandaigua National Bank didn't

14  propose an allocation that was correct doesn't mean that

15  Lester isn't liable for the fact that Canandaigua National

16  Bank has had to enter this proceeding because rather than tell

17  Canandaigua this is the incorrect allocation, here's what it

18  should be, Lester said I want to take all those shares.  He

19  told them that they didn't have the stock book when they did.

20       And that conduct is something that, you know, it's

21  certainly disputed between the parties as to whether or not

22  that amounts to something that justifies equitable

23  indemnification or common law indemnification because even

24  though Eber or CNB undisputedly made wrong allocations in its

25  communications with Lester, he never told them that and in

1  fact prevented them from carrying out their duty in numerous

2  ways.  And that responsibility forced them to enter this

3  litigation and seek a declaratory judgment.

4        THE COURT:  So is it your position that there are

5  material issues of disputed fact that preclude resolution of

6  this indemnification --

7        MR. BROOK:  Yes.

8        THE COURT:  -- claim?

9        MR. BROOK:  Specifically, Lester Eber and his

10  counsel's role in causing CNB to have to intervene.  Their

11  argument is essentially that we admit that CNB was wrong in

12  terms of his allocation so there's no claim.  That was only

13  part of it, and Lester was certainly to blame for that.  That

14  also has very little if anything to do with Lester

15  subsequently invoking this bylaw provision over a year after

16  CNB tried to execute stock powers.  It's totally separate

17  things.

18        THE COURT:  Okay.  Thank you.

19        MR. BROOK:  I think that's everything that was

20  discussed.

21        THE COURT:  Mr. Ramsey, is there any reply?

22        MR. RAMSEY:  Yeah, briefly, Judge, and then we can

23  move on.  On the last point, the bigger issue is plaintiff

24  agreeing to indemnify CNB.  This isn't CNB looking for

25  indemnity from us because they got dragged back in.  This is

72

1  the deal the plaintiff caught to indemnify the bank.  That's

2  the problem is they're then trying to pass on their deal to

3  us.  That's the issue that we have with that.

4          With respect to the order, as we [indiscernible]

5  brief, the inquiry here under the tenet of are they

6  complaining about the results of that order, is there a causal

7  relationship between the state court judgment and the injury

8  which the party complains in federal court.  And, once again,

9  if we're taking Mr. Brook at face value here, Judge Rosenbaum

10 didn't even read this thing.  He just stamped it, said go on

11 your merry way.  Certainly, he did more than that.

12         And there was although we continue to contend that

13 it wasn't necessary to tee it up for Judge Rosenbaum, there

14 was a benefit to doing it in that it was reviewed and we then

15 had a court order out of it.  There was also a risk.  He could

16 have said, hey look, this doesn't make sense to me.  This

17 isn't commercially reasonable.  I have an issue with this.  I

18 have an issue with Lester's debts.  I have an issue with the

19 validity of these loans.  He didn't do any of that after

20 reviewing the submission.  So this is far more than, hey,

21 rubber stamp, I'm going to so order it which takes it out of

22 the framework of the cases cited by plaintiff.

23         Real briefly on the PBGC, Your Honor, there's no

24 question as I think Your Honor recognized and said, this debt

25 existed, the pension debt, the pension liability existed long

73

1   before the PBGC got involved.  That as always there.  The

2   exact amount, fair enough.  That as a moving target depending

3   on what date we're talking about.  The debt always existed.

4   And, ultimately, the PBGC order was retroactive back to 2010.

5          So Mr. Brook kind of went far afield of what we're

6   looking in our motion.  Once again, we're looking at the

7   narrow point.  There's joint and several liability.  What

8   flows from that, fair enough.  There probably are questions of

9   fact in that regard, but that narrow question, was there joint

10  and several liability, it doesn't seem like there's a dispute

11  on that.

12          THE COURT:  Okay.

13          MR. RAMSEY:  Thank you.

14          THE COURT:  Mr. Brook, anything else before we move

15  to Mr. Herbert?

16          MR. BROOK:  I would simply like to clarify the law

17  is not the Rooker-Feldman doctrine only doesn't apply when a

18  court is rubberstamping things.  You know, there's no

19  requirement to show that the Court didn't do its job when it

20  approved a settlement agreement or something.  The issue is

21  substantively did the Court do something, compel something

22  that requires essentially reversal of that order in order to

23  afford the plaintiffs relief, and there's nothing like that

24  here.

25          THE COURT:  Okay.

74

1          All right.  Mr. Herbert?

2          MR. HERBERT:  Your Honor, we're here really to try

3    to explain, elucidate some of the corporate and corporate-

4    related issues as they relate to Lester Eber's actions and in

5    particular the arguments that the plaintiffs make about him

6    breaching his fiduciary duty allegedly with respect to the

7    2012 foreclosure.

8          THE COURT:  Okay.

9          MR. HERBERT:  So what I'm going to cover is, number

10   one, did he have a duty to inform the trust beneficiaries

11   about the foreclosure; number two, what's all this stuff about

12   this "no further inquiry" rule and did that actually apply to

13   this situation; and then, number three, I can talk about the

14   disposition of the Eber Brothers & Co stock here if --

15         THE COURT:  Okay.

16         MR. HERBERT:  -- if ever, shall we say.

17         THE COURT:  Okay.

18         MR. HERBERT:  I think the first issue with respect

19   to the duty -- the alleged duty to inform the beneficiaries

20   about the fiduciary -- about the foreclosure in 2012, I think

21   our position as a matter of law is that there was no such

22   duty, that there's no such duty as a matter of law.

23         In the plaintiffs' briefs, particularly the most

24   recent one, they claim that this duty existed but they don't

25   cite any authority.  They don't cite any New York case

1    authority supporting any such duty.  All I see here in his

2    most recent brief is on Page 3 in a footnote he refers to

3    Restatement of Trusts Third, Section 82 which has a provision

4    in there about generally keeping beneficiaries informed about

5    the status of trust affairs.

6            The problem with that is that he doesn't cite any

7    New York case authority that actually adopted that provision

8    in Section 82 of the Restatement.  And I have to say generally

9    is that plaintiffs' briefs, particularly the last one, have

10   many references and citations to the Restatement of Trusts,

11   but they don't have any -- in most cases, they don't have any

12   cases.  They don't cite any cases that actually adopted those

13   sections of the Restatement of Trusts.

14           So as we know, the Restatement of Trusts and other

15   Restatements are an attempt to sort of homogenize the common

16   law of all states and provide something to the bar that helps

17   resolve various cases.  But the Restatement is not New York

18   law unless a case is actually adopted, a particular provision.

19   I think we all know that.

20           Here, I believe, I will say that it's my

21   understanding from other members of the trust and estates bar

22   is that no one believes that a trustee such as Mr. Eber would

23   have a general duty to inform beneficiaries about the general

24   goings-on with the trust in a New York State trust.  Now

25   that's different from other states.

1          You're probably familiar with the Uniform Probate

2   Code and the Uniform Trust Act.  Those are, you know, uniform

3   acts that were, you know, implement some parts of the

4   Restatement of Trusts and other -- and there is in Section 4-

5   213 of the Uniform Trust Act, in Section 7-303 of the Uniform

6   Probate Act a provision that's very similar to this Section 82

7   of the Restatement of Trusts.  But neither of those uniform

8   acts was ever adopted in New York.  It's been adopted in many

9   other states but not New York.  Now the law in New York is

10  just different than it is in a lot of other states, in many

11  states.  It's just, you know -- it just is.

12          So there's several cases that the plaintiffs have

13  cited to try to make it appear that Mr. Eber had a duty to

14  disclosure the foreclosure to the beneficiaries.  One of them

15  is a called <u>Flaum v. Birnbaum</u> which was actually a case in

16  Rochester, New York, which is actually a series of cases.

17  That case does not support any such duty because there the

18  Lester Eber equivalent tried to get the beneficiaries to

19  consent, to actually consent to the transaction that they were

20  complaining about and he didn't do a very good job of

21  informing them about what it was all about.  So the court

22  found that the consent was not valid because it was not a

23  well-informed on.  He didn't have to get their consent, but he

24  just chose that as a way to actually try to escape the "no

25  further inquiry" rule.

1          The other case is a case called <u>In the Matter of</u>
2    <u>Scarborough</u>.   That case was cited as support for this duty to
3    inform.   Not so.   That case involved an attempt by a fiduciary
4    to get the surrogates court to approve a particular
5    transaction that they were complaining about.   And there
6    again, the court said, sorry, you didn't tell the surrogates
7    court enough about what was going on so that avenue didn't
8    work either.   But we're not doing either one of those things,
9    so those two cases really don't have anything to do with what
10   we're talking about in this case.
11          They cite to another case called <u>Matter of Wood</u>.
12   But that doesn't have any -- that case, I'm not even going to
13   get into the case, but really doesn't have anything to do with
14   the facts and circumstances of this case.   It's about a
15   different issue.
16          All right.   So let's talk about the "no further
17   inquiry" rule then unless you have questions about that.
18          THE COURT:   No, thank you.
19          MR. HERBERT:   Okay.   So what's this "no further
20   inquiry" rule?   This is as a general matter, right, a trustee
21   of the trust is supposed to show -- abide by a duty of loyalty
22   to the beneficiaries, right?   And if there's a challenge
23   transaction which in most cases involve self-dealing between
24   the trustee and the trust, then the duty of -- the "no further
25   inquiry" rule just says that there's a presumption, a weighty

78

1   presumption that that transaction would be voidable by the

2   beneficiaries unless you could fit yourself into one of at

3   least three different exceptions.

4           One is [indiscernible] transaction, but we got the

5   consent of the beneficiaries, okay.  We're not arguing that

6   even though the beneficiaries were well aware that the loans

7   had been made, they were given an opportunity to participate

8   in them, they received the documentation.  We're not arguing

9   that that was a valid consent.  Number two exception is go to

10  the surrogates court and get them to approve it which that was

11  not done here.

12          The third and most important exception to the "no

13  further inquiry" rule is was the -- were Lester Eber's loans

14  in the foreclosure, were they authorized by the will in the

15  first place, the 1969 will.  And we would contend that

16  absolutely, they were.  Now, I think Mr. Brook has conceded in

17  his papers that the "no further inquiry" rule is relaxed if

18  there is such an authorization either by the express terms of

19  the will or by what they call "necessary implication," okay.

20  And this is all on the strength of a number of cases.  The

21  most famous one is the O'Hare case which we cited in the

22  papers.  And I think both parties have cited that case.

23          So, he's -- Mr. Brook has conceded that the making

24  of the loans and the securing of the loans were authorized by

25  the will, so that's not an issue.  So there isn't any

79

1  voidability issue with respect to the making of the loans or

2  the securing of the loans.

3           THE COURT:  Is there any dispute as to the amount of

4  the loans?

5           MR. HERBERT:  I don't know if there is, but -- I

6  don't know really if there is.

7           THE COURT:  Okay.

8           MR. HERBERT:  Do you think there is; do you know?

9           MR. RAMSEY:  Not much would be the answer.  There's

10  two sets of loans.  There's the 2009 line of credit with Eber

11  Metro.  We see the bank transactions that have occurred.

12  They're supposedly earlier loans.  There is no substantiation

13  for those having been made.  I have not seen --

14           THE COURT:  Okay.

15           MR. RAMSEY:  I've asked about it, but I have not

16  seen any bank records showing deposits made and my client has

17  guesses as to what it might be.  But even the earlier loan

18  agreements that were supposedly being amended have not been

19  produced.  So we certainly dispute that, and if we go -- and

20  if we actually went to a trial, we would put them to their

21  proof to show that those loans were real especially because in

22  the 2010 letter to the trust beneficiaries, Lester did not

23  mention any earlier loans.

24           THE COURT:  Okay.

25           MR. HERBERT:  All right.  So let's stop here.  They

80

1  could see that the loans and the security and the loans were

2  authorized, therefore, that those are not voidable.

3       THE COURT:  Yeah.

4       MR. HERBERT:  Okay?  So let's take that apart for a

5  minute.  What does that mean?  So if you enter into a loan

6  agreement that's secured, what do you have?  You've got a loan

7  agreement, you've got a security agreement, and a note, okay.

8  The average package of documents which this was, these are

9  just average plain loan documents, they provide for the making

10  of the loan, the granting of the security interest, and then

11  there's a massive number of pages about what happens if you

12  don't pay the creditor back.

13       The agreement as to what the creditor's rights are

14  in the case of a default are all spelled out in black and

15  white in the security agreement and they always are.  And in

16  this case, in all cases, the parties agreed that Lester Eber

17  would have the right to foreclose in accordance with the

18  Uniform Commercial Code just as he did.  So, again, I mean are

19  we serious here?  Their point of view is that somehow the

20  enforcement of the security interest wasn't authorized by the

21  will and it wasn't a necessary implication of what was

22  expressly authorized.

23       I mean are we serious about that?  You know, are you

24  saying that, well, you know, we had 50 pages of documents here

25  and the only ones that are authorized were the, you know, the

81

even-numbered pages and the odd-numbered pages, no, no, that's
not authorized.  Well, you know, what reasonable lender would
enter into a transaction like that if they didn't believe that
their loan agreement and security agreement was enforceable in
whole?

     THE COURT:  So if the court finds that you're
correct and that the will did authorize the loans and that the
securing of the loans, then to what and how does that help to
resolve the remaining issues in the case because there are
certain -- there's still a dispute as to the value of the
company, right?

     MR. HERBERT:  Well, if the making of the loan, the
securing the loan, and the enforcement of the loan, meaning
the foreclosure, are all authorized expressly or by
implication, then that relaxes the Lester Eber's fiduciary
duty of utmost -- duty of utmost loyalty to the beneficiaries
to -- you know, it changes it from being a voidability issue
to just being good faith test.

     So what we're arguing is that because the
enforcement mechanism in the security package was implied,
impliedly authorized by the will, that therefore the entire
foreclosure and the performance of the security agreement,
that that should just be tested by a good faith standard.  And
I think that -- and I'm going to return to that in one second.

     THE COURT:  Okay.

1      MR. HERBERT:  So, now Mr. Brook also goes on to say

2  that -- he says -- well, he probably would conceive that if

3  Lester Eber had foreclosed on the loans and had a public

4  auction of the collateral and the collateral had been bought

5  by some independent third party, that that would have been

6  okay.  But, you know, he's not going to object to that, I

7  believe.  But --

8      MR. BROOK:  [Indiscernible].

9      MR. HERBERT:  Well, okay.  But what's the difference

10  between the foreclosure that he did and a foreclosure where

11  there was a public sale to a third party?  Well, the main

12  difference would be, well, on the foreclosure that was done,

13  we're not sure that the value that was ascribed to the Eber

14  Metro stock was high enough.  That's really what it boils down

15  to.  That's what he's arguing, okay.

16      But I would say that if that's the case, then you've

17  got a situation where here's a trust that has -- where the

18  powers and duties section has not duty to retain the assets.

19  There's nothing in the will that says the trustees had to

20  retain the stock of the company.  It expressly says that.

21  It's also the case that the assets of the trust are not what

22  we call unique assets.  They're what's called commercial

23  assets.  So unlike the case with the Estate of Rothko where we

24  had a large group of paintings at issue, this is just stock in

25  a company in a case that I think we both cited called Atlas MF

83

1    <u>v. MacQuarie</u>.   They made very clear that there's a big

2    distinction between the two and that stock of a company is

3    just a commercial asset where, you know, the disposition of it

4    rightly or wrongly can be compensated for with damages.

5            So, if you have a case where there is no duty to

6    retain the assets, non-unique assets, and the really fiduciary

7    issue is was the right price attached, right.   Then I think

8    you'd go right to the case of <u>Estate of Rothko</u>, right, where

9    it says there specifically in that scenario that you can't get

10   rescission or restitution or reconveyance of the collateral as

11   a remedy.   You cannot.   There have to be other -- there has to

12   be other considerations involved.   But it specifically says

13   that in the Court of Appeals case in the <u>Estate of Rothko</u>.

14           And I would also point out that there's a lot of

15   speculation about what the will might have meant or could have

16   meant and, you know, who said what and what did Alan Eber

17   think.   Well, it's not a matter for us to decide what he

18   should have thought.   It's a matter of what he did think,

19   right.   He never -- none of these musings about distinctions

20   between public sales and private sales, none of that is in the

21   will.   He didn't say anything about that.   He just says that

22   any of the trustees, whether it be Lester, whether it be

23   Canandaigua Bank or anybody else, are authorized to make loans

24   to the companies and to secure them and by implication to

25   collect them and to enforce their security interest.

84

1          So, that's why we would say that if there's an issue

2   here with respect to the duty of loyalty, it's just a good

3   faith issue.

4          THE COURT:  Okay.

5          MR. HERBERT:  One thing I forgot to mention was Mr.

6   Brook cites a case <u>Boston Safe Deposit and Trust Company</u> which

7   I'm not sure why it was cited, but -- which is a Massachusetts

8   case and it stands for the proposition that even in a

9   situation where there is self-dealing by a trustee, right,

10  that a greater degree of latitude might be afforded a trustee

11  as far as what might be applied with respect to their conduct

12  depending on what alternatives the trustee had.

13         Did he have any other alternatives to what he did?

14  We would submit here that he didn't have any alternatives.

15  This company was, I think as we've all demonstrated, was out

16  of business, it had massive debts, many third -- very

17  substantial third-party creditors who were ready to come at

18  him regardless of what he did about the foreclosure.

19         Now, why did he secure the loan in 2011?  That

20  question was raised.  Well, I think that was there, but I

21  think he secured it because he was trying to protect himself

22  from the other creditors because he knew the Teamster's union

23  was coming at him.  He knew the PBGC was going to be coming at

24  him and other people as well.  He didn't need to secure the

25  loans to affect the plaintiffs because he's a creditor.

85

1   They're indirect equity holders.  He's always ahead of them,

2   sp he could have been an unsecured creditor and been in the

3   same posture vis-a-vis the beneficiaries as he was as a

4   secured creditor.  So instead of proceeding under the UCC if

5   he was unsecured, he could have sued to collect his debt,

6   gotten a judgment lien, he'd be in exactly the same place he

7   was in 2012.

8           I would -- you know, following on just a little bit

9   more on this.  If we get to the point where Lester's duty was

10  just a duty to act in good faith, then, you know, I wonder

11  again why are we here.  The plaintiffs have conceded that the

12  loan and the security of the loan were authorized by the will

13  and hopefully they'll see the light and concede that the

14  enforcement loan was authorized by the will.  They've admitted

15  that Lester complied with all the requirements of the UCC in

16  foreclosing of the loan.  One of those requirements was to act

17  in good faith under the UCC.  That's an express requirement

18  under the UCC.

19          And in doing that, he says right here on Page 4 that

20  "plaintiffs do not assert any claims based on violations of

21  the UCC."  And then he said -- he describes good faith and he

22  actually mis-describes what good faith is under the UCC.  He

23  says it's just the low hurdle of honesty in fact.  Well, no,

24  it's not.  It says -- the definition's right in the UCC.

25          THE COURT:  Yeah, but the plaintiffs wouldn't have a

1    cause under the UCC in any event.

2            MR. HERBERT:  They shouldn't.

3            THE COURT:  So why is that --

4            MR. HERBERT:  Well, but I'm saying is that they're

5    acknowledging that Lester met his burden of good faith under

6    the UCC.

7            THE COURT:  Well, in order to get the court approval

8    of the transfer.  I think they're acknowledging that the Court

9    approved the transfer.  They're not disputing that.  What I

10   understand them to be saying is that there was either a

11   violation of his duty of good faith or a higher duty by

12   ascribing a different value to the asset than was really its

13   true value and that he could have gotten -- he could have I

14   guess gotten his debt repaid without securing the transfer of

15   that asset.

16           MR. HERBERT:  Right.  The UCC, by the way, doesn't

17   even require an equivalence of value between the loan and the

18   security.  You could be off by as much as 25 percent and the

19   case law would say that that's fine and dandy.

20           I'm just saying that all these determinations of

21   good faith plaintiffs are conceding it under the UCC.  Judge

22   Rosenbaum effectively ruled that as well.  And it's the only

23   issue from a fiduciary point of view is whether or not he

24   acted in good faith and not -- you know, for their inquiry

25   rule.  I wonder why we're even here to be honest with you.

87

1          Anyway, all right, so let's talk about -- for a

2    minute about the fabled stock of Eber Brothers and Co.  So you

3    had asked earlier whether or not we were in agreement on the

4    numbers of shares.  As a hypothetical matter, sure.  I mean I

5    don't think -- when they originally allocated and then

6    reallocated, it wasn't right.  I'd heard Mr. Brook try to

7    blame Mr. Eber for that.  That's nonsense.  I mean we're the

8    ones that raised it with Canandaigua that the numbers were

9    wrong.  I was the one that raised it with Canandaigua that the

10   numbers were wrong.  If you want to know the truth of the

11   matter, it wasn't them and it's only very recently that they

12   acknowledge that they had done it wrong.  But that's neither

13   here nor there.

14          So, the plaintiffs are conceding that Canandaigua's

15   attempts to transfer the stock to the beneficiaries in 2017

16   were ineffective.  So that's just wipe the board off on that.

17          Now in the process of trying to make the transfer, I

18   guess they gave Lester Eber notice of their proposed transfer

19   and when he got it, the only thing that ever -- we ever saw

20   that looked like a notice from CNB we immediately exercised

21   the call right.  I know that because I was the one that was,

22   you know, doing it.  So, I don't know what to say about the --

23   even though that attempt to transfer the stock might be void,

24   the call right that was -- I think we feel was validly

25   exercised in 2018, we think it was but what can I say.

1          Mr. Brook has in his third brief, let's see, these

2    are just some random points.  He has a paragraph in which he

3    says that as for the stock certificate deficiencies, the Ebers

4    conveniently ignore the first sentence on the face of the

5    stock certificate that says in part "transferable on the books

6    of the corporation by the holder hereof in person or by dually

7    authorized attorney upon surrender of the certificate properly

8    endorsed."  That says period.  I have no idea what he's

9    talking about.

10          That sentence as it appears on the stock

11   certificate, that's just boilerplate and what that means, that

12   means that if there was a transfer, an actual transfer from A

13   to B by delivery of the certificates and B -- and A endorsed

14   certificate over B, then B physically surrendered the

15   certificate to the issuer, then the issuer would register the

16   transfer on their books.  You know, where it says

17   "transferable on the books," it really means the transfer is

18   registerable on the books of the corporation.  But that has

19   absolutely nothing to do with anything.  It has nothing to do

20   with anything.  There has never been a transfer.

21          I would be -- I would, you know, certainly

22   acknowledge that -- and I think I said this a year ago when we

23   were here that had there been a valid transfer between

24   Canandaigua as trustee and the beneficiaries, had they done it

25   right and they presented the certificate to the company, the

1  company would have had to register the transfer but that never

2  happened and it had nothing to do with the company.

3         The plaintiffs then go on and try to make an

4  argument about some sort of equitable transfer of the shares

5  that was accomplished by the finalization of the order

6  terminating the trust in June of 2017.  I have to tell you

7  that [indiscernible] I never heard of equitable transfer of

8  stock.  I don't know where you're getting that from.  He

9  doesn't cite any New York authority as to what an equitable

10 transfer is.  What's that?

11        And he cites the Restatement of Trusts Section 345

12 which doesn't have anything to do with the facts of this case.

13 It has to do with another issue that's not even the issue here

14 but in connection with a trust that has a single beneficiary.

15 I should have kept reading because there's another Section 347

16 that has to do with the termination of a trust with multiple

17 beneficiaries like this one where the law is totally different

18 than what was 345.  But neither one of them have anything to

19 do with what we're talking about here.

20        I think importantly here you have to look at this,

21 what rules apply here to a transfer of stock, okay.  I think

22 that Article 8 of the UCC on securities, okay, that was

23 written to provide clear, concise, simple, and predictable

24 answers to issues relating to the transfer of securities.  And

25 as you can imagine, that's quite important when there's

90

1  millions of transfers going on every five minutes in the

2  world.  Nobody ever said that you could layer on top of that

3  some notion of an equitable transfer and that that would

4  preempt what was in Article 8 of the UCC.

5          Now I think we've cited and Mr. Brook cites for

6  other purposes Section 1-103 of the UCC about the governing

7  law, the application of other governing law to the UCC where

8  it says that the UCC is the prime source of commercial law

9  rules in the areas that it covers and that principles of

10 common law and equity can supplement the UCC but they cannot

11 supplant them.  And what he's suggesting here is supplanting

12 the UCC rules on what constitutes a transfer of stock and what

13 the consequences are and who's got what responsibility when

14 with a whole another concept which he doesn't cite any New

15 York authority for.

16         The next point on this is there's an issue here

17 about whether or not the transfer restriction was binding on

18 the trust in 2012.  And I think we have and the record shows

19 that this -- the bylaw that contained the transfer restriction

20 was adopted by the trust in 1996.  That's a long time before

21 2012.  It was adopted with at least two of the three trustees.

22 Now Canandaigua wasn't a trustee in those days.  Another bank

23 was, M&T Bank.  They came into the picture about ten years

24 later.  And, you know, Canandaigua, they've got to take the

25 facts as they are when they come on board.

1      But the stock certificate, as we've noted, it

2 specifically notes on the face of it, it makes reference to

3 the transfer restriction, right.  The trust is bound by the

4 transfer restriction if either they have actual knowledge of

5 it or if the stock certificate -- if the transfer restriction

6 is noted conspicuously on the certificate, right, and that the

7 stock certificate right on the front -- and there's not --

8 there's a lot of white space on the front of that stock

9 certificate -- says that the holder takes the securities

10 subject to the terms of the charter and bylaws of the company

11 and all amendments thereto.  Well, why do we think that's

12 there?  It's for exactly this kind of thing.  You're supposed

13 to read that and say, oh, I better go look at the charter and

14 bylaws and see what's there before I go dealing with the

15 stock.

16      So we would argue that Canandaigua, they had the

17 certificates.  You know, we didn't have them.  They had them.

18 They obviously didn't look at them.  But they should have

19 looked at them and they shouldn't have gone off -- they should

20 not have gone off and tried to deal in the stock without

21 satisfying themselves that they knew what they were doing.

22 So, you know, they know -- their trust department, I mean this

23 seemed to be an issue here, their trust department knows

24 perfectly well that transfer restrictions on the stock of

25 small privately-owned family companies is rampant.  It's all

1  over the place.  I've been in this business for 40 years

2  working for private companies.  That's what we do, transfer

3  restrictions are us, basically.

4          The plaintiffs' brief also raises the question as to

5  whether we were obligated to give the surrogates court notice

6  of this transfer restriction.  I have no idea where that's

7  coming from.  There's no authority to that effect.  You'll

8  recall the record shows that Canandaigua was the driving force

9  behind the filing of the petition for the termination of the

10 trust.  Lester Eber had nothing to do with it.  The petition

11 even says he had nothing to do with it.  You know, I'm sure

12 that the surrogate didn't look at that, but, you know, I'm

13 sure -- but he could have and maybe he should have.  But

14 Canandaigua, surrogate, they both had the stock certificate

15 and both had the restriction right on the front.

16          Anyway, that's --

17          THE COURT:  Okay.

18          MR. HERBERT:  -- the high points.

19          THE COURT:  All right.  Thank you very much, Mr.

20 Herbert.

21          Mr. Brook, I'll hear from you.

22          MR. BROOK:  I want to note at the outset that I

23 realized while I was sitting there that I forgot to address

24 the consulting agreement and would ask for a chance to

25 possibly circle back to that at the end.  There's a lot of

93

1    moving parts here, but I'm going to focus as this is what we

2    were just talking about on largely the Alexbay transaction and

3    my client's right to the shares.

4           And I think that the overwhelming theme here is

5    Lester doesn't have to obey the rules.  And it's brought into

6    just stark relief by the fact that Mr. Herbert argues that

7    Canandaigua had a duty to inquire about whether there was a

8    transfer restriction but that Lester Eber, a co-trustee who

9    entered an appearance in the action, had a -- and undisputedly

10   had the right to prevent termination of the trust if he just

11   said so and had a duty to state any objections that he might

12   have had as either a trustee or a beneficiary, that he had the

13   right to just remain silent at the same time when he

14   supposedly knew of this transfer restriction.

15          And it's telling there's no reference at all in

16   either the reply brief or anywhere to the fact that res

17   judicata is binding upon accounting proceedings not only to

18   the parties who participate like Lester Eber but to plaintiffs

19   too.  And we knew about the proposed transfer and that's why

20   we didn't object to it.  If we had had any inkling that there

21   was a possibility that the transfer once it was ordered by the

22   Court or the distribution of assets once ordered by the Court

23   might be intercepted by Lester, we would have opposed.  We

24   would have absolutely opposed.  We were shocked when Lester

25   didn't oppose.  But who are we to look a gift horse in the

1  mouth?

2         So that's also why estoppel applies, another issue

3  that they do not address, the fact that Lester Eber's silence

4  on this issue which he apparently had no knowledge of induced

5  not only plaintiffs but the Court to take actions that would

6  not have occurred otherwise and for them to try to now claim,

7  oh, we didn't get notice of any intended transfer until

8  October 2018 when they acknowledge, and it's undisputed that

9  the surrogates court ordered the distribution in June 2017.

10 That's just ridiculous.

11        I mean it's possible that they overlooked something,

12 they forgot something.  There's undisputedly a five-day time

13 limit also on the bylaws even if they could apply.  And Lester

14 Eber's lawyer, like plaintiffs' lawyer, me, got the same

15 letter from Canandaigua's lawyer in October 2017.  They say

16 that's not the same because the stock powers sent to Lester's

17 lawyer were only the stock powers issued for Lester's shares,

18 the one-third share, roughly one-third shares.  And he didn't

19 cede the stock powers to plaintiffs.  Well, come on, really?

20        He sees he's only getting a third of the shares, the

21 letter is sent to me, says we're making the distributions.  He

22 doesn't have notice that there's a distribution being proposed

23 to the other two.  So the whole notion behind this is just

24 more falsehoods, just outright lies to try to get a result

25 that is inconsistent with the trial -- with the surrogates

1    court's order.  And so the fact that it's undisputed what the

2    surrogate court ordered and the distribution there should be

3    the end of the story.

4           And, you know, I can get into the rest of it but,

5    you know, Mr. Herbert, I'll just say the reason why I wrote

6    "period" after the sentence dealing with transferability is

7    because there is a period on the stock certificate.  That's

8    the sentence that talks about transferability.  There is no

9    reference to a restriction on transfer, and that does

10   distinguish these certificates from those that other courts

11   have said are sufficient.  A generic reference to the bylaws

12   and it being subject to those, how does that indicate there's

13   a restriction on transferability when the first word is

14   "transferable?"  It surely doesn't.

15          So, even if this stuff could have worked, the fact

16   is these stock certificates, they aren't good enough anyway.

17   So there's a host of reasons why that is wrong, but it really

18   does play into what is ultimately the main impetus for summary

19   judgment here and why it should be granted and why this Court

20   should not -- you know, I suppose I should say this.  If the

21   Court does believe that there's going to be -- has to be a

22   trial on the Alexbay transaction, we do respectfully implore

23   the Court to possibly even take issues out of order to try to

24   get that on Judge Kaplan's schedule as soon as possible given

25   the ticking clock to try to get John Slocum back into

96

1   business.

2           But we don't have to get there because despite, you

3   know, some very snarky commentary from my adversary, it's very

4   clear that the "no further inquiry" rule is something that is

5   implicated here because of the rule of construction imposed by

6   New York courts and is recognized by the Second Circuit most

7   strongly in <u>Rens v. Beaman</u> [Ph.] that any language permitting

8   self-dealing must be strictly construed.

9           And here's how -- you know, when reversing a trial

10  court in terms of its interpretation of something in the <u>Rens</u>

11  case, the court said: "We do not agree, however, that the

12  exculpatory clauses below justified a lowering of the standard

13  of the trustee's obligation.  Only the most explicit language

14  can protect a fiduciary from liability and a conflict of

15  interest with his [indiscernible].  Courts may not read

16  exculpatory language broadly, lest they unwittingly permit

17  erosion of the fiduciary duty itself."  And there's some

18  citations in there.  That's on Page 745.

19          That's important here because this will

20  unequivocally make clear that although there was no duty to

21  retain the business, the duty of undivided loyalty was not

22  excluded from decisions about whether to retain or get rid of

23  the business, and that's clear because the testator, Alan

24  Eber, said there will only be the standard of good faith

25  rather than undivided loyalty when it comes to decisions to

97

1  retain the business.  So he knew how to exculpate decisions to
2  retain and he only made it for decisions to retain.

3       So by necessary implication and consistent with
4  standard trust law, any decision that would result in
5  disposing of the business is still subject to the duty of
6  undivided loyalty that precludes a trustee from acquiring any
7  trust asset.  And that's ultimately why, you know, there's no
8  -- there wasn't even an artifice of a public auction here.

9       THE COURT:  Isn't -- if there needs to be good faith
10 to retain, isn't that the same thing as saying good faith to
11 dispose?

12      MR. BROOK:  Well, certainly good faith is always
13 there.  That's non-waiveable.  So saying that they're just
14 held to the lower standard when they make a decision to retain
15 it, basically saying as long as you act in good faith if you
16 decide to keep the company and it goes belly up and secured
17 assets are lost or whatever, there's no liability as long as
18 you acted in good faith.  So that is actually the opposite of
19 saying that you can dispose of the property with only good
20 faith because, you know, just pulling back, the primary wish
21 expressed in the will in that same paragraph that conveys the
22 exculpation for good faith retention says it's my primary wish
23 that the company be retained by the trust.  And subject to
24 that primary wish, it is my hope that Lester may have an
25 opportunity to participate in the management thereof.

1          So, stepping back further, more context, the very

2     first thing when establishing the residuary trust was saying

3     that upon termination which would occur when all three

4     children have deceased, Lester being the last of them, the

5     assets including the Eber Brothers' stock would be distributed

6     one-third, one-third, one-third [indiscernible].  And so there

7     was no possibility that the trust -- you know, under the

8     explicit terms as long as the trust held the business and

9     Lester Eber was alive, there was never a possibility that he

10    could personally change that ownership balance.  The ownership

11    balance was he had to act for the trust.

12         He only had a one-third interest.  He was not

13    allowed to try to get a higher ownership interest under the

14    terms of this trust.  There has to be explicit language saying

15    that he can do that.  And even in cases where there have been

16    such explicit language, you know, it's really explicit like

17    the O'Hare case I think is a great example of what explicit

18    exculpatory language permitting profiting and self-dealing

19    looks like.  And --

20         THE COURT:  Well, you're not saying that Lester

21    engaged in self-dealing by loaning the company money, are you?

22         MR. BROOK:  No, we're not.  I think that we have

23    argued in opposition to their summary judgment motion, but

24    it's not part of our motion, to be clear, that because there

25    were three trustees, Lester could not unilaterally make these

99

```
 1  loans and set the terms himself.  That it's -- you know, when
 2  there are multiple --
 3          THE COURT:  But isn't there evidence that Lester
 4  provided notice that he was making the loans and an
 5  opportunity to his siblings to also make a loan?  Isn't that
 6  -- aren't those undisputed facts here?
 7          MR. BROOK:  He gave notice of one loan.  He did not
 8  give notice of any of the earlier loans, first off, and those
 9  other loans were necessary for him to get to where he was
10  going.  And in any event, I don't think there's any argument
11  that that is legally significant.  They have said that they
12  don't argue that that constituted consent to the later
13  transactions.  Now, you could say that that was notice that
14  there was a loan being made.  You know, I think then you get
15  into all sorts of questions --
16          THE COURT:  What is Lester had never made these
17  loans in the first place?  What would have happened?
18          MR. BROOK:  Well --
19          THE COURT:  The business would have gone belly up.
20  And then everybody would be in a worse position.  You wouldn't
21  even be here arguing this.
22          MR. BROOK:  It's true and maybe.  I mean it's true
23  that's a possibility, let me say.  We don't know because those
24  are hypotheticals.  I mean certainly if we talk about the
25  consulting agreement, if Lester had given that to the company
```

1   as a revenue stream and then continued to be paid his $300,000

2   a year salary he was getting for doing the same work but now

3   for, you know, Southern, then in that case the company would

4   have gotten $3 million revenue stream, it would have continued

5   paying his salary in a reasonable amount.  Rather than him

6   getting that whole windfall, there would have been no need for

7   loans.

8              THE COURT:  The time that Lester got the consulting

9   agreement, was the company paying a salary to anyone?

10             MR. BROOK:  Yes.  It was paying --

11             THE COURT:  Who was it paying a salary to?

12             MR. BROOK:  To Lester Eber, to Wendy Eber.  As we

13  point out in our counter statement of material facts that

14  attach -- the books and records of the company show that they

15  were continuing to pay payroll to people well into 2008.

16  That's Eber Wine & Liquor.  And, again, in 2010, Lester Eber's

17  salary was paid entirely by Eber Brothers Wine & Liquor, not a

18  subsidiary.  That's how it was reported to the IRS on a W-2.

19             So there was unquestionably a false statement of

20  fact in their affidavit when they tried to say that this

21  company had no employees and had no further operations because

22  their wine process lasted a long time afterwards.

23             THE COURT:  But it was completely wound down by

24  2012, is that correct?

25             MR. BROOK:  In terms of its own operations, yes, I

101

1    think it was --

2           THE COURT:  There was no -- there were no salaries

3    being paid at that point.

4           MR. BROOK:  That's true by that entity.  However,

5    I'll make the point --

6           THE COURT:  And the consulting agreement occurred

7    after that, right?

8           MR. BROOK:  No, it was 2007.

9           THE COURT:  Remind me of the date, 2007?

10          MR. BROOK:  It was first -- the first documentation

11   we have showing the consulting agreement is a February 2007 --

12          THE COURT:  Okay.

13          MR. BROOK:  -- letter that includes it among the

14   rest of the Southern transaction --

15          THE COURT:  Right, okay.

16          MR. BROOK:  -- there.  And so -- and I do just want

17   --

18          THE COURT:  So you're saying that because they were

19   paying, because the company was paying Lester and Wendy after

20   2007, that it was -- that the wind down process meant that it

21   was still ongoing and should have somehow received money that

22   Lester was receiving from Southern --

23          MR. BROOK:  Yes, Your Honor.  And --

24          THE COURT:  -- in the consulting regarding New York?

25          MR. BROOK:  Yes.  And it's because what was he

1  consulting about?  He was consulting about the New York wine

2  and liquor business.  This was, as we point out, a classic

3  instance of what the literature calls a transaction bonus or a

4  merger bonus for management.  And in the standard situation,

5  these are approved by the board and they are approved by the

6  shareholders when they consent to the merger.  And there's a

7  lot of articles --

8           THE COURT:  But they're -- okay.

9           MR. BROOK:  Sorry.

10          THE COURT:  But they're --

11          MR. BROOK:  But this was not.

12          THE COURT:  Right.  Okay.  The consulting agreement

13  wasn't, but there was no --

14          MR. BROOK:  The consulting agreement --

15          THE COURT:  -- liquor being sold and no stores

16  operating --

17          MR. BROOK:  Well, they never had stores.

18          THE COURT:  -- at the time that the Southern

19  transaction --

20          MR. BROOK:  Now when it was -- Eber Brothers was

21  still in full swing in February 2007 when we see the

22  consulting agreement in writing in a document, notably a

23  document that the Ebers themselves withheld in discovery and

24  we only got because we subpoenaed Southern.  So that document,

25  you know -- and Lester in his opposition affidavit had said

1    that, you know, that these transactions were not negotiated at

2    the same time.  But that document absolutely shows otherwise.

3    I mean it's Item 6 in this transaction.

4         The amount of the consulting agreement later went

5    up, and there ended up not being as many restrictive

6    covenants.  And those are issues that, you know, we could

7    potentially deal with when coming up with -- if we had to get

8    into the weeds of, you know, what this was going on.  But the

9    point is Lester's loans -- you know, the early ones certainly,

10   you know, disputed.  There's no evidence that these were

11   actually made.  And there's evidence that they weren't.

12        As far as the later loans, those were only needed

13   because the company didn't get the revenue that Lester was

14   getting and the company needed it.  Lester got almost $900,000

15   a year at a time when the company was supposedly dying and for

16   doing substantially the same work as he was doing before only

17   both for, you know, Eber Brothers as it was winding down,

18   starting to take over Eber Connecticut, and then also working

19   for Southern Wine & Spirits on the side.

20        THE COURT:  So you're saying there's an issue of

21   material fact regarding what Lester was doing under the

22   consulting agreement?

23        MR. BROOK:  I don't think so because I think it's --

24   you know, what he says and what Southern says is undisputed.

25   And it's possible that they are -- I don't -- I'm trying to

104

1   think about it.

2        THE COURT:  Well, what I hear from defendants is

3   that there is an issue of fact.  I think Mr. Ramsey said that

4   what Lester was doing under the consulting agreement had

5   nothing to do with the business that the Eber entities engaged

6   in in New York.

7        MR. BROOK:  I think this is more fairly claimed to

8   be a characterization of the undisputed facts.  It's

9   undisputed that Lester advised, you know, Eber or Southern

10  Wine & Spirits on New York, how to navigate their legislature.

11       THE COURT:  Well, isn't a characterization of facts

12  mean that there's a dispute as to what they mean?

13       MR. BROOK:  I  don't think so, not in this instance.

14  I think to be perfectly frank, this is the closest call in

15  terms of a fact issue because most cases say that whether

16  something's a corporate opportunity is something that has to

17  be decided by the trier of fact.

18       Our argument is that here because, you know, of what

19  the Southern witness has said and because of the fact that

20  this was something that was built into the broader

21  transaction, I mean that's a fact that really does distinguish

22  this from other corporate opportunities because we have the

23  evidence beyond dispute that this was something that was

24  negotiated with Lester because of his position and as part of

25  something that was supposed to be benefitting the company but

1   a carveout of his own special bonus, as it were.  And he did

2   not get that approved by either the board even though the

3   board approved every other transaction with Southern, and he

4   did not get it approved by the trustees.  So --

5              THE COURT:  Okay.

6              MR. BROOK:  -- on that one, but coming back to the

7   other point, it is that playing the hypothetical game about

8   what would have happened to the company is hard because the

9   other thing about the reason why the "no further inquiry" rule

10  applies in the sense of corporate context too as the case law

11  says including O'Hare which actually despites broad

12  exculpatory language found a diversion of a corporate

13  opportunity by that trustee who had total exculpation.

14             It's because of the fact that the -- you know, the

15  trust beneficiaries really are in a position unlike anything

16  like a shareholder.  Shareholders get a vote.  They have the

17  ability to appoint directors.  A trust beneficiary, as Mr.

18  Herbert rightly acknowledges, the disclosure obligations they

19  are relatively limited.  And to touch on that briefly, the

20  disclosure issue here is not other than the in the fraudulent

21  conveyance -- or not fraudulent -- fraudulent transfer -- I'm

22  totally misspeaking -- fraudulent concealment count, the

23  failure of disclosure not the basis for liability.  It's doing

24  these transactions.

25             THE COURT:  Right.  I understand what you're saying.

1          THE COURT:  And I think that, you know, so bringing

2     it back, their defense, I'm not sure whether they really are

3     arguing still that the UCC compliance with that is all that's

4     necessary that it abrogates fiduciary duty.  It's an

5     incredible proposition, and it is one that is inconsistent

6     with a number of cases that they themselves have cited, one of

7     which I have a copy for the Court in case you don't have it.

8     Speaking with counsel beforehand, they apparently thought that

9     they filed certain unpublished decisions, but they did not.

10          One is called <u>Genger v. Genger</u>.  They misrepresent

11    that base as involving, you know, a trustee -- they cite it

12    for the proposition that even when a trustee engages in a

13    breach that there won't be a reconveyance to the trust

14    beneficiaries.  The problem is the defendant wasn't the

15    trustee.  There was a trust involved in some sense, but he was

16    not the trustee.  And I believe if the Court looks at Pages I

17    want to say 10 and 14, both parts make that abundantly clear.

18          But that case is also great because it shows that in

19    the kind of situation like we have here that summary judgment

20    can be appropriate, even in that case where it was involving

21    -- because it didn't involve a trust, it wasn't a "no further

22    inquiry" case, that there are circumstances where the

23    transaction can be -- in that case, the court said that there

24    was a basis to set aside the transaction, but it refused to do

25    so because the parties had so much acrimony.

1              And in that case, as the opinion makes clear, the
2    operating subsidiary at issue had already been sold off to the
3    Trump Group for $44 million, so there was a basis to award
4    damages and to believe it could be paid.  There is nothing in
5    the record that suggests that Lester Eber, Wendy Eber, even
6    with the Gumaer estate contributing that somehow money damages
7    could ever be awarded to satisfy this, not to mention the fact
8    that everyone seems to concede that valuing a private company
9    like Eber Connecticut and by extension its parents is
10   inherently uncertain.
11             And Lester in his deposition said that at the time
12   of the transfer he thought it was questionable as to whether
13   it could meet its debts.  That's an interesting admission
14   because it means that there was no -- he certainly did not
15   assert a belief that it was insolvent and it wouldn't make any
16   sense for him to because if you're -- and that brings us to --
17             THE COURT:  Well, if somebody's saying they're not
18   certain the company can meet its debts, isn't that a statement
19   that there's a concern about insolvency?
20             MR. BROOK:  Sure, a concern.  And a concern is not
21   the same thing as actually saying I think it's insolvent which
22   is what they're asserting on summary judgment.  So that's not
23   something that we rely on per se for that.  But ultimately,
24   one of the most important things for this Court to be clear on
25   and it's something that I'm not sure how often it comes into

this Court, but it's understanding what it means to actually
have rights as a secured creditor under the UCC Article 9.
There is no right for the creditor to acquire the company.
Putting aside Lester's fiduciary duties, even as a secured
creditor without any fiduciary duties, UCC Section 610
specifics the rights and remedies.

Mr. Herbert referred to the fact that there's a
laundry list of detail in these security agreements that says
what might happen if default.  Not one of those says the
secured credit may acquire ownership of the collateral
directly.  Now, the possibilities of foreclosure are to
conduct a sale in a commercially reasonable manner.  And it is
there that sort of the fact and the interplay between trust
law and the UCC I think becomes clear because the actual right
is to conduct a public auction.  There is no right to purchase
property in a private sale by the secured creditor himself.
He could do it with a third party.  There is no right for a
private sale unless it is something that has an objectively
determinable value.  By reference like say it's stock that's
traded on a market, then, yeah, you can say what the value is.
In those circumstances, then a private sale is allowed but
otherwise, it must be at a private -- or at a public auction.

And trust law is undisputedly of the view that a
public auction even then a trustee cannot bid on trust assets.
So the actual rights of foreclosure that Lester had under the

1  UCC did not give him a right to acquire title to a trust

2  asset, certainly not by necessary implication.  And that's the

3  thing is they're arguing necessary implication, that in order

4  -- by making a secured loan, Lester necessarily had the right

5  to foreclosure.

6          And I think that as the Dabney case, Judge Learned

7  Hand that we cite in the opinion points out there's a lot of

8  questions I think about whether that is true that the right --

9  that foreclosure allows a secured creditor to sort of take off

10  their creditor hat.  I don't think that's correct.  But to be

11  clear, I agree with Judge Learned Hand.  I'm not disagreeing

12  with him.

13          But in terms of the auction itself, so he can't bid

14  on it.  So instead, they do this strict foreclosure which is

15  something -- and this is where if the Court doesn't already

16  have it, there's a case that they cite called Gunnerman.

17  There's a transcript from Delaware.  If the Court would like a

18  copy, I can provide that of the transcript.  It was an oral

19  argument.  It was quite a bit of effort to try to track this

20  down, but, you know, it turned out I knew the lawyer and I

21  mention this --

22          THE COURT:  Why don't you hand up a copy of that if

23  you have it?

24          MR. BROOK:  Yes.  Yes, Your Honor.

25          THE COURT:  I just want to make sure.

1              [Pause in proceedings.]

2         MR. BROOK:  While I'm at it, I'll provide a copy of

3    the Genger decision since that wasn't on Westlaw.  So in

4    Gunnerman, it was actually -- so they cited that for the

5    proposition that a shareholder vote is not required under the

6    relevant statute for a transfer because, you know, it's just

7    an enforcement of rights.  But I think what's clear and I've

8    tabbed this, I've given a copy to opposing counsel showing the

9    tabs and the highlight, is that the court, in this case Vice

10   Chancellor I believe it was Strine was under the impression

11   that he was -- that there it involved a strict foreclosure,

12   but he thought that the creditor was exercising rights under

13   the pledge that were within the four corners or arguably a

14   lesser included option.

15        And that's just not true because the thing about a

16   strict foreclosure is the law says it cannot be agreed to

17   before default.  So loan documents could never include a

18   taking of title in full satisfaction.  That recognizes the

19   truth that collateral value may change over time.  It may be

20   subject to disputes.  And the debtor must consent.

21        And so this brings us back to the same reason why a

22   lot of the Rooker-Feldman arguments are wrong because the

23   wrong here was Lester seeking a strict foreclosure and then

24   company consenting to it.  Both are wrong.  They were

25   something -- that was a separate transaction from the loans,

1   and it was not authorized.  And in all substantive matter, it

2   was fundamentally equivalent to a private sale of the company.

3   There was -- they didn't even go through a public auction like

4   in the <u>Genger</u> case which is, you know, a notable one for them

5   to cite because it shows how things are supposed to occur when

6   there isn't even a trustee issue involved.

7         And so, here, rather than going through the -- you

8   know, they knew they couldn't go that route.  Maybe for

9   whatever reason they ended up at this point where they just

10  transferred Eber Metro to Alexbay and eliminated the debt.

11  And that was a taking of trust assets, and they have not

12  argued somehow that, you know, that Eber Metro, Eber

13  Connecticut were not trust assets.  They clearly were.  They

14  were on the trust statements given to trustees.  And so, the

15  only real defense is the interpretation of the will's

16  language.  On that one, I come back to the fact that it needs

17  to be strictly construed.

18        And there are a number of options that were

19  available so that the Court could not conclude that any kind

20  of -- even a foreclosure with a public action was not

21  necessarily required.  Why?  Because in bankruptcy law, which

22  existed at the time the trust was settled, a secured creditor

23  has priority over unsecured creditors.  So there is value to

24  the trustee in lending money and getting it secured that is

25  short of foreclosure.

112

1          In fact, and the Court doesn't need to reach this

2    because again they did the consensual strict foreclosure

3    rather than going through a regular foreclosure.  But the law

4    is certainly not one that has ever said that a fiduciary,

5    especially a trustee, could do something that would be

6    potentially or even arguably detrimental to the trust where

7    the company as a controls without going through some sort of a

8    process when he's acting out of self-interest.

9          So that's the key is they don't deny that Lester was

10   acting out of self-interest every step of the way when it came

11   to securing the loans and after they'd already been agreed to

12   notably and when it came to foreclosing on the loans, nor is

13   there any dispute and this is where the consent aspect comes

14   into play.  Your Honor said that the issue that we have with

15   the transaction is they could have been worth more.  That's

16   not it.  The fact is Lester not only had the option, you know,

17   to try to foreclose under the statutory authority, but he

18   could have done what the other trust that had loaned money

19   did, which is to extend the loan.  And it is undisputed that

20   there was not even an attempt made by either Lester or any of

21   the directors of the company or other officers to try to

22   renegotiate the terms to extend it to avoid default.

23          And that is when we turn now to even if the good

24   faith is the standard, this was a self-dealing transaction

25   that does not pass even the business judgment rule from much

113

1   less the entire fairness doctrine from the perspective of Eber

2   Brothers Wine & Liquor because they are argue themselves it

3   was insolvent and they made a preference for one creditor who

4   happened to be Lester Eber himself leaving all the other

5   creditors potentially out to dry.

6            So, how on earth is that fair to Eber Brothers Wine

7   & Liquor Corp from its perspective to leave it with tons of

8   debt, no assets?  One of the cases that I eventually got led

9   to and it's aptly named Odyssey is a case, I have the citation

10  here somewhere, but it's -- I could provide it later if I need

11  to.  But it was cited in the briefs that I found for the

12  Gunnerman case.  And it's actually a relatively on-point case

13  in more respects except for one.  It involved a secured

14  creditor who was also a majority shareholder of a Delaware

15  company and he -- the secured creditor, it was -- I'm not

16  going to say he but it was a --

17            THE COURT:  Is this case cited in your briefs?

18            MR. BROOK:  I only found it yesterday, Your Honor.

19            THE COURT:  Okay.  Because it's already five, so --

20            MR. BROOK:  I can forego it.

21            THE COURT:  -- if you can wrap up quickly.

22            MR. BROOK:  Sure.  The point is that ultimately a

23  secured creditor has a lot of different powers and options,

24  but there's no case law that says a secured creditor can take

25  off their hat as a trustee or such at the same time.  Making

114

1   the loan, securing the loans, Lester was able to do that out

2   of self interest.  If he wanted to release -- with a conflict

3   of interest.  The trust document acknowledges that explicitly.

4           But in terms of finding other options or using that

5   power to maneuver himself into position to acquire ownership

6   to violate the basic terms of what Alan Eber specified should

7   happen upon the death of his three children, that was what was

8   wrong.  That is what is something that should be easily

9   resolved on summary judgment because it's a matter of law

10  interpreting the will.  Is there a way to strictly construe it

11  that required him to actually take ownership of it.  And it

12  can't be given the UCC and the language of both the will and

13  the backdrop of course of trust law.

14          THE COURT:  Okay.  Thank you.

15          MR. BROOK:  Thank you.

16          THE COURT:  Mr. Herbert?

17          MR. HERBERT:  All of the references that Mr. Brook

18  made to Section 9-610 of the UCC are completely irrelevant to

19  this situation.  There's two different ways to foreclose on a

20  loan under the UCC.  One is Section 9-610 which is effectively

21  a public sale in different flavors.  The other -- it has

22  nothing to do with what happened here.  The other one was

23  Section 9-620 which is a negotiated foreclosure basically with

24  the consent of the company.  So whatever might have been the

25  case under 9-610 has nothing to do with what happened here.

1  Zero.

2         He said that a secured creditor under the UCC

3  doesn't have any right to acquire the collateral.  Well, I

4  don't know if that's really right.  I mean in the first place,

5  the front end of any loan he's given a security interest, he's

6  given possession of the collateral, and he has contractual and

7  legal rights under the UCC to basically take and keep the

8  collateral.  And in this case all he needed to do was give a

9  notice to the company and to certain creditors and either get

10  the company's consent to it or have the company not object.

11  So I call that pretty close to having the right to acquire a

12  collateral.

13         He cited this case Dabney v. Chase Manhattan Bank.

14  The last time I looked that case had nothing to do with any

15  secured creditor.  The bank, Chase Manhattan Bank, there whose

16  conduct was at issue was an unsecured creditor.  It had

17  nothing to do with secured creditor's rights.  In any event,

18  the case was decided ten years before the UCC was even adopted

19  in New York so I'm not sure what relevance it has.

20         The Gunnerman case, a Delaware case, that creates a

21  lot of stir when it came out.  That stands for the proposition

22  that if you're a secured creditor and you've got a pledge of

23  the stock of your borrower, you don't have to get shareholder

24  approval of the borrower in order to foreclose and sell the

25  collateral to somebody else.  And the reason is because

116

1    there's a specific provision in Delaware, both Delaware and

2    New York law that says if you -- you don't need to get

3    shareholder approval to secure the loan in the first place so

4    it wouldn't make any sense to do it [indiscernible].  That's

5    all really that that's about.

6           Just skipping around here, what was said about the

7    consulting agreement about how this treasure troll of cash

8    would have been available for the company, well, that's not

9    correct at all.  The record shows that the people from

10   Southern testified that they were not going to enter into any

11   consulting agreement with the company.  So that scenario where

12   cash would have been going to the companies instead of to

13   Lester, that's never going to happen because they said they

14   would never have done that deal in the first place.

15          The point that Mr. Brook made about, well, Lester

16   should have just been a good guy and extend the term of the

17   loan, well, it's easy to say that here in this courtroom but

18   when you're managing a business that in 2005 had revenues in

19   the hundreds of millions of dollars and then these fine

20   gentlemen from Southern Wine & Liquor showed up and stole your

21   whole business, right, and you're sitting there with millions

22   of dollars in third-party Legacy liabilities and you've got

23   three and a half million dollars of your own money in the

24   company, what kind of incentive do you think you're going to

25   have to say, sure, pay me another ten years.  I don't care.

117

1        The point was that all his other creditors were

2   about, as I said earlier, about to come for him.  The

3   Teamsters, as we said in our latest, they said that they were

4   ready, willing, and able to come over and start seizing the

5   assets of the company any time in 2011, right.  So what

6   creditor would say, oh sure, I'll just extend my loan.  You

7   would have just gotten wiped out is all it is.  The Teamsters

8   would have wiped out the company, the company would have

9   failed.

10       I appreciate what Mr. Brook said, but he doesn't

11  understand the factual situation of what was going on.  They

12  were ready to go out of business.  Something had to be done

13  here, and the only person who saved this company from death

14  was Lester Eber.

15       So, the point was also made that somehow that this

16  foreclosure in 2012 favored one creditor and left the company

17  holding the bag with respect to -- left all the other

18  creditors hanging out to dry, that's absurd.  After the 2012

19  foreclosure, Lester Eber made another three-plus million

20  dollars worth of loans or advances to the company to pay off

21  or settle with all of those creditors which Mr. Brook claims

22  were left out to dry.  That was the whole plan here was to

23  stop the bleeding in 2012 and then work towards settling with

24  all these third-party creditors.  And that's exactly what

25  happened.

1           And I can tell you from -- as the only person in the

2    courtroom here who's a veteran of the, you know, five years of

3    negotiation with the PBGC, that was quite an accomplishment.

4    I mean I'm sure you know what those people are about, you

5    know.  Try to negotiate with somebody who has no incentive to

6    sell and no budget, you know, no limitations on their budget.

7    See where you get.

8           He cited -- and throughout here he cites the facts

9    and all these other "no further inquiry" cases.  He tries to

10   compare the facts here with the facts in other cases.  I again

11   point out that in his own favored case, Meinhard v. Salmon,

12   Judge Cardozo specifically said don't do that.  He said it's

13   fruitless effort here to try to dissect the existing cases as

14   a way to resolve a new case.  You have to look at the facts of

15   your case more so than the normal case.

16          And the one thing I should mention here, I'm just

17   going to direct this off the wall [indiscernible], I am

18   surprised to hear that Mr. Kleeburg communicated with Mr.

19   Slocum in the last couple of days because -- and I would

20   suggest to them that they study the precedents because you'll

21   find in the M&A world that there are cases where the

22   disgruntled former employee world goes off and tries to team

23   up with somebody else to take over control of his former

24   employer has gotten a lot of other people into trouble.  So I

25   would suggest that you educate yourself about that.

119

1          And that's what we have.

2          THE COURT:  Okay.  Mr. Brook, I'll give you the last

3   word.  Keep it short, please.

4          MR. BROOK:  I know it wasn't in our briefs, but I do

5   want to give the Court the citation for Odyssey Partners LP v

6   Fleming Companies, Inc., 735 A.2nd 386 (Del. Ch. 1999).  And

7   that is a case where like in Genger, it was a secured

8   transaction.  Ultimately, the Court concluded that there the

9   majority stockholder never exercised control over the board

10  and, thus, there was no duty of loyalty.  But it definitely

11  recognized that even though there was compliance with the UCC,

12  there was a public auction that these duties overlap.

13         THE COURT:  Okay.  So this is what I'm going to do.

14  I'm going to allow you to submit that case.  You should submit

15  that by Friday.  I'll allow Mr. Calihan to submit the section

16  on the UCC.  You should do that by the end of this week.  And

17  you each, you can submit letter no more than two pages if you

18  want to make a response to that Restatement section.  That

19  should be filed within a week.  And to the extent that

20  defendants want to respond to the Odyssey case, you may do

21  that in a two-page -- no more than a two-page letter also

22  within a week.  Okay?

23         MR. BROOK:  Okay.

24         THE COURT:  Thank you all --

25         MR. BROOK:   Thank you, Your Honor.

120

1          THE COURT:  -- for your briefing and well-prepared

2    arguments.  We're adjourned.

3          MR. CALIHAN:  Thank you for your patience.

4                          * * * * * *

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

121

1      I certify that the foregoing is a court transcript from

2  an electronic sound recording of the proceedings in the above-

3  entitled matter.

4

5                          *Shari Riemer*
   _____

6                          Shari Riemer, CET-805

7  Dated:   January 13, 2020