# Exhibit A

| D.N. NNH-CV19-5046986-S | : | SUPERIOR COURT |
| | : | |
| EBER-CONNECTICUT, LLC d/b/a SLOCUM & SONS | : | J.D. OF NEW HAVEN |
| | : | |
| | : | AT NEW HAVEN |
| v. | : | |
| | : | |
| JOHN SLOCUM | : | December 20, 2019 |

### PLAINTIFF'S POST-HEARING REPLY BRIEF
### IN FURTHER SUPPORT OF MOTION FOR TEMPORARY INJUNCTION

Plaintiff, Eber-Connecticut, LLC ("Eber-CT"), respectfully submits this reply to the post-hearing memorandum (#118.00) filed by the Defendant, John Slocum.

Defendant devotes fifty-four pages to arguing under the wrong legal standards, failing to bring to the court's attention controlling Connecticut law, in favor of weak reliance on law from other states, and attempting to confuse this very straightforward case on the facts. Once these legal infirmities and efforts to confuse are laid plain, as we do below, what is left is a cynical, shameless play for the court's sympathy, which is not a bona fide defense to the modest non-compete agreed to by the parties, and does not stand up to even modest scrutiny. Of the many legal and factual errors in Defendant's brief, there are three that are so glaring and fundamental that they warrant special attention here. They are:

1. <u>Defendant attempts to persuade the Court to apply the wrong legal standard for granting temporary injunctions relating to non-compete agreements.</u> Defendant (a) incorrectly asserts that non-competes are disfavored in Connecticut, (b) fails to acknowledge the more lenient standard for a non-compete that permits the grant of a temporary injunction based on a showing of likelihood of success on the merits and the equities tipping in Plaintiff's favor, and (c) utterly ignores the clear legal principle that, in Connecticut, irreparable harm is presumed to result from breach of a non-compete. *See Mattis v. Lally*, 138 Conn. 51, 56 (Conn. 1951); *Sabatasso v. Bruno*, No. CV030284486S, 2004 WL 886968, at *3 (Conn. Super. Ct. Apr. 8, 2004). Defendant's demand for hard evidence of "lost sales" or "lost suppliers and customers" is both legal error and a procedural trap that would punish Plaintiff for moving diligently to preserve the status

quo prior to obtaining real discovery. Nonetheless, in addition to the presumption of harm here, Defendant's begrudging admission that the proprietary knowledge in his head would provide CDI with a competitive advantage, along with reasonable inferences drawn from the facts in this record, provides more than enough evidence even under the wrong standard asserted by Defendant.

2. <u>Defendant's contract defenses are incoherent</u>. Defendant seems to characterize its principle legal defense to the Agreement as "lack of consideration." That defense itself is infirm due to Defendant's misunderstanding of the definition of consideration and mischaracterization of the facts. But it also is infirm because it attempts to mix and match the elements of various contract defenses – such as mistake, fraud in the inducement, expiration, and prior material breach – without citing or satisfying the elements of any of them. Indeed, neither the lack of consideration argument nor any of these other half-baked defenses to the Agreement withstand even modest scrutiny.

3. <u>Defendant continues to play the victim</u>. Defendant asserts a false equivalence that Plaintiff's effort to restore its right to protection under the non-compete is somehow "inequitable" because, since he has already begun breaching it, it would be inconvenient for him to stop.

Each of these will be addressed in further detail below, followed by an additional list of corrections regarding other errors in Defendant's brief.

## A. Defendant attempts to persuade the Court to apply the wrong evidentiary standard.

### 1. Non-competes are generally accepted in Connecticut.

Defendant is flatly wrong when it posits that Connecticut law disfavors non-competes. Defendant cites no Connecticut precedent for that notion because there is none. To the contrary, although "[i]nitially, the common law disfavored noncompete restrictions," the current "rule of thumb" is that a non-compete "is valid if it is reasonable."[1] *Ineo, LLC v. Lenehan*, No.

---

[1] By way of further explanation:

> With respect to employers, the courts recognized that, at least in cases involving business sales, restrictive covenants constitute "a valuable asset of the business and upon the sale of that business the benefits of the covenant may be assigned to the purchaser." *Torrington Creamery v. Davenport*, 126 Conn. 515, 521, 12 A.2d 780 (1940). Moreover, courts came to acknowledge that an employer had interests, more generally, "in protecting the goodwill of the business and in protecting its trade secrets." M. Garrison & J. Wendt, supra, 45 Am. Bus. L.J. 116.

*Ineo, LLC v. Lenehan*, 2018 WL 1386221 at *4-5.

MMXCV186019598S, 2018 WL 1386221, at *4-5 (Conn. Super. Ct. Feb. 20, 2018) (Pierson, J.) (internal citations and quotation marks omitted).

### 2. Irreparable harm and lack of adequate legal remedy are presumed

In fact, non-competes are so generally approved in Connecticut that the standard for injunctive enforcement of non-competes is more lenient than for other types of contractual provisions. The rule is clear: **"While ordinarily proof of imminent harm is essential, in this type of [non-compete/non-solicitation] case there is no such requirement."** *See Sabatasso v. Bruno*, No. CV030284486S, 2004 WL 886968, at *3 (Conn. Super. Ct. Apr. 8, 2004); *see also Mattis v. Lally*, 138 Conn. 51, 56 (Conn. 1951); *ATI Eng'g Servs., LLC v. Millard*, No. NNHCV186079777S, 2018 WL 6016705, at *12 (Conn. Super. Ct. Aug. 7, 2018); *Webster Bank v. Ludwin*, No. CV106006194, 2011 WL 522050, at *2 (Conn. Super. Ct. Jan. 7, 2011); *Money Mailer Franchise Corp. v. Wheeler*, No. CV084010066S, 2008 WL 4415942, at *3-4 (Conn. Super. Ct. Sept. 16, 2008) (collecting cases); *Gartner Grp. Inc. v. Mewes*, No. CV91 0118332 S, 1992 WL 4766, at *2 (Conn. Super. Ct. Jan. 3, 1992). Likewise, there is a presumption that there is a lack of adequate remedy at law if an ongoing breach of a non-compete is not curtailed. *See id.* Thus, when seeking a status quo injunction to restrain breaches of a non-compete, the plaintiff need only show likelihood of success on the merits and that the balance of the equities tips in its favor. *See id.*

This rule dispensing with proof of irreparable harm and lack of an adequate remedy at law is necessary to prevent a non-compete plaintiff from being prejudiced.

- The essential purpose of the non-compete is to prophylactically prevent harm. A plaintiff has an explicit right <u>not to incur</u> future harm regardless of whether it has <u>already incurred</u> quantifiable harm. In other words, to require the plaintiff to suffer injury before being permitted to raise its shield would be nonsensical and prejudicial. *Sabatasso v. Bruno*, 2004

WL 886968, at \*3 ("injunctive relief is . . . warranted to protect the plaintiff from harm which the restrictive covenant was intended to prevent").

- A non-compete is a business asset which, among other things, is designed to protect a plaintiff's goodwill, which is another business asset.  There is "inevitable" business loss the moment a defendant commences to deprive the plaintiff of the full value of the non-compete.  *See Sabatasso* at \*3 ("It has long been recognized in this state that a restrictive covenant is a valuable business asset which is entitled to protection."); *Mattis v. Lally*, 138 Conn. 51, 56 (Conn. 1951) ("Irreparable damage would inevitably result from a violation of the defendant's [non-compete] promises."); *POP Radio, LP v. News Am. Mktg. In-Store, Inc.*, 49 Conn. Supp. 566, 576 (Super. Ct. 2005) (citing "the need to enjoin an ongoing breach of an agreement which devalues the agreement itself and potentially the company's goodwill, both of which are business assets").

- While harm from breach of a non-compete may already be impending, it might not have materialized at the outset of a case.  *See POP Radio* at 576 (Super. Ct. 2005) (noting the "inherent difficulties of proving harm which might not occur until the future").  In this case, Wendy Eber gave testimony on November 6, only <u>five weeks</u> after Mr. Slocum commenced employment at CDI on September 30, so it would hardly be fair to expect hard proof of loss to be available.

- Furthermore, if a defendant is permitted to continue breaching a non-compete on the basis that harm has not yet materialized, that will only invite return trips to court, which would be inefficient and prejudicial to the plaintiff.  *See Sabatasso* at \*3 ("the difficulty of proof and the inefficiency of repetitive suits render inadequate the use of successive remedies at law, and injunctive relief is therefore warranted to protect the plaintiff from harm which the restrictive covenant was intended to prevent").

4

Notably, for all these same reasons, even the minority of cases that require some showing of irreparable harm in lieu of an automatic presumption apply only a "lenient" evidentiary standard that may be satisfied with reasonable conjecture or "informed prediction of future results." *POP Radio*, 49 Conn. Supp. at 577.

### 3.  Defendant cites inapposite decisions.

Defendant's brief utterly ignores this rule, cites inapposite decisions, and mischaracterizes their holdings.  (Def. Br. at 44-47.)

- Defendant cites the "Federal Practice and Procedure" treatise, as quoted by the U.S. Supreme Court in a case concerning an abortion restriction in Montana.  *See Mazurek v. Armstrong*, 520 U.S. 968, 973 (1997).

- Defendant cites two decisions that do not even involve an injunction analysis.  *See Nwachukwu v. Liberty Bank*, 257 F. Supp. 3d 280, 293 (D. Conn. 2017); *Cooke v. Williams & Pattis*, No. 3:99 CV 2223(WWE), 2002 WL 32509019, at *7 (D. Conn. Aug. 27, 2002).

- When finally citing a decision that actually involves an injunction analysis, Defendant cites to a non-relevant section of the decision concerning proof of causation.  *See E. Point Sys., Inc. v. Maxim*, No. 3:13-CV-00215 (VAB), 2016 WL 1118237, at *7 (D. Conn. Mar. 22, 2016).

Ironically, the sole decision that Defendant cites with some bearing on this case (*Opticare, P.C. v. Zimmerman*) actually supports Plaintiff's position because it held that irreparable harm must be presumed where a plaintiff seeks quick enforcement of a non-compete, as opposed to "16 months later," after harm has had time to accrue.  *See Opticare, P.C. v. Zimmerman*, No. UWYCV075003365S, 2008 WL 1734933, at *4 (Conn. Super. Ct. Mar. 27, 2008).  In short, there is no legal support for Defendant's position.

### 4.  Defendant is setting a procedural trap.

Moreover, Defendant's effort to persuade the Court to apply the wrong evidentiary standard is a procedural trap.  In expeditiously seeking a preliminary injunction to preserve the value of its non-compete, Plaintiff has not had the benefit of full discovery.  Plaintiff filed its application for

temporary injunction on September 25, 2019, <u>before</u> Defendant commenced employment with CDI on September 30, after Defendant was fully on notice of the non-compete obligations that were clearly set forth in an Agreement that he was able to locate immediately in his personal files on September 13.  Only <u>five weeks</u> had passed between Mr. Slocum's commencement of employment at CDI (September 30) and Wendy Eber's testimony (November 6) – not "a few months" or "multiple months," as incorrectly asserted in Defendant's Brief.  (Def. Br. at 3-4.)  Under these circumstances, it would not only be legal error to apply a strict evidentiary standard – it also would unfairly and prejudicially punish Plaintiff for diligently pursuing its rights.  *See Opticare* at *4 ("it may be necessary for a court to employ the presumption created in *Mattis* when faced with a request for temporary injunction when a person has just left his employ" as opposed to "16 months later").  Furthermore, if the value of the non-compete, and the protection it affords, cannot be preserved as the case winds its way toward final adjudication, then the judicial process will not be able to deliver justice.

**5.  Although unnecessary, the record here would even satisfy the higher standard.**

Finally, although it is very clear that irreparable harm should be presumed here, there is more than adequate evidence in the record to support a finding of irreparable harm under a higher standard.  First and foremost, Eber-CT has been deprived of its business asset – the non-compete – and the prophylactic protections thereunder that it bargained for.  *See Sabatasso v. Bruno*, No. CV030284486S, 2004 WL 886968, at *3 (Conn. Super. Ct. Apr. 8, 2004) ("[A] restrictive covenant is a valuable business asset which is entitled to protection . . . Irreparable harm would invariably result from a violation of the defendant's promises.").  In other words, being shorn of promised protection from harm is a harm in itself.

Second, when Mr. Slocum took the Slocum name to a direct competitor, it devalued the goodwill in that name for "Slocum & Sons," which is the name that Eber-CT does business under. Mr. Slocum admitted that the Slocum name has goodwill value in and of itself, which he described as follows:

> [L]ocally it's a name that represents, you know, cutting edge. And the book is fantastic; there's no denying.

(Tr. 11/7 at 128.)  He went on to boast:

> Q.    And I take it that you're very well known in the industry?
> . . .
> A.    I think I'm well known in Connecticut.
> Q.    Right. And are you very well respected among the supplier community?
> A.    I would hope so.
> Q.    Yeah. And are you very well respected among the retail community?
> A.    I would hope so.
> Q.    And – And is your – your reputation is for delivering results; right?
> A.    I think that's the – that's the definition of the – that's the house's – that's the image of the house.

(Tr. 11/7 at 128-29.)  Thus, Eber-CT is suffering a particular kind of damage as the purchaser of a business from Mr. Slocum's father bearing the family name.  It would be one thing if Mr. Slocum just retired, or went to another state, or another industry.  In that case, Eber-CT would have the opportunity to solidify the goodwill in the "Slocum & Sons" name and demonstrate that it still means "delivering results," even if John Slocum is not the point person.  But it is another thing entirely for Mr. Slocum to take the goodwill in the "Slocum" name directly to a competitor, without providing the promised one-year buffer for Eber-CT to prove it can carry on the legacy without him. The irreparable harm is inevitable.  *See POP Radio* at 576 (recognizing that goodwill is another business asset lost when a non-compete is violated).

Additionally, Wendy Eber expressly testified at the hearing seven weeks ago that Mr. Slocum is "trying to replace" Eber-CT's exclusive tequila (Luna Azul) with CDI's exclusive tequila (Mi Campo).  (Tr. 11-6 at 45-46.)  As footnoted in Plaintiff's Post-Hearing Brief, since the hearing,

CDI has lowered its price for Mi Campo bar liters to less than the Luna Azul price, and has targeted the bars and restaurants that had been purchasing Luna Azul from Eber-CT. This sort of example – occurring after an early presentation of incomplete evidence based on minimal discovery where the breach is ongoing and the harm is metastasizing – is exactly why Connecticut law does not require a showing of hard and comprehensive evidence to justify a temporary injunction to enforce a noncompete.

### B.  Defendant's contract defenses are incoherent.

Defendant's theories regarding the enforceability of the non-compete are similarly contrary to Connecticut law. As a threshold matter, from pages 24 through 30 of its Brief, Defendant cites a total of 22 decisions – of which only 7 concern Connecticut law. The law of Massachusetts, Ohio, Missouri, Virginia, Wisconsin, Pennsylvania, Florida, and South Carolina does not govern this case. (*See* Def. Br. at 24-30.)

More importantly Defendant does not assert a coherent contract defense.

### 1.  Consideration

First, Defendant posits that "the Agreement lacks consideration because Eber withdrew Slocum's compensation and benefits provided in the Agreement." (Def. Br. at 23.) This is a complete distortion of the term "consideration." What Defendant appears to be alleging is not lack of consideration but a failure to perform some payment obligation – i.e., breach – and, of course, Defendant admits that he was paid every penny owed under the Agreement, and that his salary adjustment occurred after the payment obligation "expired." (Tr. 11/7 at 100-101.) Thus, either Defendant does not understand the basic concept of consideration, or he is attempting to sow confusion.

### a. Adequacy of consideration is evaluated as of the making of the contract.

As explained in the very case that Defendant cites, a lack of consideration is a failure to make a valid agreement at its <u>inception</u>, not a failure to perform:

> "Section 71 of the Restatement (Second) of Contracts relates the familiar legal sense of the term 'consideration': '(1) To constitute consideration, a performance or a return promise must be bargained for.  (2) A performance or return promise is bargained for if it is sought by the promisor in exchange for his promise and is given by the promisee in exchange for that promise.' "  *Mandell v. Gavin*, 262 Conn. 659, 668, 816 A.2d 619 (2003).[2]

*Thoma v. Oxford Performance Materials, Inc.*, 153 Conn. App. 50, 56-57 (2014).  The Appellate Court goes on to explain: "Consideration, therefore, requires intent by the parties to incur benefits or detriments **at the time an agreement is entered into**." *Id.* at 57 (emphasis added) (citing *Willamette Management Associates, Inc. v. Palczynski*, 134 Conn. App. 58, 70 (2012) (determining whether contract was supported by consideration "at the time that the parties entered into the . . . agreement").

So, when Defendant asserts that the Agreement lacks "consideration" because Eber-CT allegedly "cut Slocum's annual salary in 2012 **after** the agreement expired" (Def. Br. at 25), that is just a word salad with unintelligible internal contradictions.  By definition, the adequacy of consideration at the time the Agreement was made could not be affected by some conduct of Plaintiff after the Agreement allegedly expired.

---

[2] Defendant's citation of this rule contains a confusing omission.  (Def. Br. at 26.)  Defendant quotes the first half of a sentence from the Appellate Court ("**Although an exchange of promises usually will satisfy the consideration requirement . . .**"), but neglects to include the rest (". . . **a promise to do that which one is already bound by his contract to do is not sufficient consideration to support an additional promise by the other party to the contract.**").  *Christian v. Gouldin*, 72 Conn. App. 14, 23 (2002).  Regardless, the concept has no bearing on this case.

### b.  The "unilateral modification" argument makes no sense.

In further confusion of the concept of "consideration," Defendant also incorrectly asserts that "Courts have found when an employer changes the compensation terms contained in an employment agreement the agreement lacks consideration and the restrictive covenants contained therein are no longer enforceable." (Def. Br. at 24.)  This misstates both the law and facts.  First, lack of consideration affects the agreement for which there was no consideration, not a prior agreement.  For example, in the sole Connecticut case that Defendant cites (*Thoma v. Oxford Performance Materials*), the employer attempted to replace a written agreement of guaranteed employment (which included a 6-month non-compete) with a second written agreement that revoked the guarantee of employment (which included an ambiguous non-compete that could be read either to last indefinitely or not at all).  Having found the second non-compete to be fatally ambiguous, the trial court determined that it was not adequate consideration for the second agreement and, therefore, concluded that the first agreement had not been superseded and remained in force, and the court found that the defendant owed money under the first agreement.  *See Thoma v. Oxford Performance Materials, Inc.*, 153 Conn. App. 50, 52 (2014).

*Thoma* has no application to the facts here.  First, as noted above, *Thoma* found lack of consideration at the time the second agreement was made and, therefore, found it invalid.  Here, Defendant does not attempt to argue that the Employment Agreement lacked consideration at the time it was made, so it cannot be void for lack of consideration.

Second, there never was any "second agreement" in this case purporting to terminate or replace the Employment Agreement.[3]  In a tortured reading of the facts, Defendant attempts to

---

[3] Defendant does not – and cannot – assert that the Addendum signed in January 2009 (Ex. 15 at CDI000097) terminated any right or obligation under the Employment Agreement.  Instead, in very precise terms, the Addendum extended Section 2 for two years until January 2011, including Mr.

argue that the provision of at-will employment after the guaranteed period expired was a "unilateral modification of the terms of the Employment Agreement." (Def. Br. at 26.) This flatly contradicts what Defendant purported to argue on the prior page, that Eber-CT changed Mr. Slocum's compensation "<u>after</u> the agreement expired." (Def. Br. at 25.) Both assertions are factually incorrect. It is indisputable that only two provisions in the Agreement had an expiration date: the guarantee of employment in Section 2 (one or two years) and the non-compete in Section 6 (one year after separation). The guarantee of employment – i.e., Section 2 only – was extended for an additional two years by the Addendum, then it expired, which Defendant concedes. At that point, Eber-CT had no obligation to employ Mr. Slocum or pay him any particular amount. Nonetheless, it continued to employ him, and later adjusted his pay as it had every right to do. Meanwhile, he chose not to exercise his right to walk away. None of this constitutes a "new" agreement, let alone a "unilateral modification" of any term under the Employment Agreement.

Third, even assuming that there was some sort of "second agreement," any purported lack of consideration would only invalidate the "second agreement" at the time of its making, and not the Employment Agreement which was made long before. Thus, there is no viable argument that the at-will employment and adjustment of compensation had any impact on the non-compete provisions in the Employment Agreement, which had been made four years prior and remained in force by its own express terms.

### c. Consideration is not fluid.

The punchline of Defendant's argument is equally incoherent. According to Defendant, "Without Slocum's compensation, the only terms of the expired Agreement that remain are the restrictive covenants. Such restriction, without the compensation promised, is insufficient

---

Slocum's right to guaranteed employment and Eber-CT's obligation to pay a certain rate of compensation.

consideration under Connecticut law." (Def. Br. at 26.)  There is no way to make sense of this.
First, Defendant does get one thing right – the restrictive covenants remain in force.  But to the
extent that Defendant is arguing that different provisions of an agreement cannot have different
duration, this is simply untrue – courts routinely enforce survival provisions providing for certain
obligations (including non-competes) to remain in force after other rights and obligations terminate.
*See*, *e.g., Discoverytel SPC, Inc. v. Pinho*, No. CV106011816S, 2010 WL 4515414, at *6 (Conn.
Super. Ct. Oct. 14, 2010) (enforcing non-compete and confidentiality provisions that survived by
express agreement).  Second, Defendant appears to suggest that consideration is fluid, such that its
adequacy may fluctuate over time, which is likewise contrary to law.  *See Thoma*, 153 Conn. App.
at 57 (validity of consideration is measured as of time the parties enter the agreement).

In summary, for Defendant to prevail on "lack of consideration," he would have to prove
that there was no exchange of promises at the time the Employment Agreement was made.  He
cannot.  Indeed, Defendant not only admits that promises were made regarding his rate of pay –
which was more than adequate consideration to support the Employment Agreement, *see*, *e.g.*, *A.H.
Harris & Sons, Inc. v. Naso*, 94 F. Supp. 3d 280, 292-93 (D. Conn. 2015) – but he also admits that
he was paid every penny of the promised compensation during the guaranteed employment period.
(Tr. 11/7 at 100-101.)  In short, the lack of consideration argument is completely infirm.

### 2.  No Breach

Next, as noted above, Defendant's arguments appear to mix and match elements of other
defenses to a contract.  For the sake of clarity, each such half-baked defense is addressed as follows,
starting with his implied allegation that there was some failure of payment.

To the extent that Defendant is impliedly arguing that Eber-CT's adjustment of his pay
during the at-will period was a "breach" that excused his non-compete obligations – i.e., some sort
of prior material breach defense – that notion is groundless.  By Defendant's own admission,

12

Plaintiff paid what was owed under the guaranteed employment provision.  (Tr. 11/7 at 100-101.)
He also admits that the provisions of Agreement § 2 expired in January 2011 pursuant to the 2009
Addendum.[4]  (*See* Def. Br. at 10 n.6.)  Thereafter, he was an at-will employee: Eber-CT had no
obligation to maintain his pay at a certain rate, and he had no obligation to stay.  There is no
colorable argument that Eber-CT committed some breach by adjusting his at-will pay.  Nor did this
relieve him, in any way whatsoever, of his non-compete obligations under the Agreement, which
remained in force during the at-will period as expressly provided by the parties in Section 6(c) of
their Agreement.

### 3.   No expiration of the restrictive covenants

Without completely rehashing the above factual recitation, the restrictive covenants clearly
did not expire.  It is indisputable that only two provisions in the Agreement had an expiration date:
the guarantee of employment (one or two years under § 2) and the non-compete (one year after
separation under §6(c)).  The guarantee of employment was extended for an additional two years by
Addendum, then it expired – which Defendant concedes.  Thereafter, Mr. Slocum did not separate
but, rather, chose to remain as an at-will employee, as the parties expressly anticipated.  Thus, as the
parties expressly provided in the plain language of Agreement § 6(c), the restrictive covenants
remained in force, until his separation, and for one year thereafter (as tolled by his period of
violation).

### 4.   No fraud in the inducement

At times, Defendant's argument also appears to resemble a "fraud in the inducement"
defense, insofar as he falsely alleges that the non-compete was "buried in 'employment at will'

---

[4] As noted above, the Addendum only extended Agreement § 2, and did not affect the duration of
any other portion of the Agreement.  It gave Mr. Slocum a guarantee of two more years of
employment at a set rate.  (Ex. 15 at CDI000097.)

language in an Agreement that Slocum reasonably believed had expired in 2011." (Def. Br. at 1-2.)
Not only is this a mischaracterization of the plain language of the Agreement, but the allegation is
not remotely close to satisfying the elements of fraud in the inducement.  *See Peterson v.
McAndrew*, 160 Conn. App. 180 (2015) (elements of fraud in the inducement are (1) false
representation as statement of fact; (2) untrue and known to be untrue; (3) made to induce reliance;
and (4) detrimental reliance).

### 5.  No mistake

Nor does Defendant have any viable defense concerning "mistake."  In his Brief, Defendant
alleges that he "thought the Agreement expired based on his compensation being cut, the removal of
his healthcare benefits, and the change in his role and responsibilities." (Def. Br. at 14.)  This does
not even come close to satisfying the elements of a "mistake" defense.  A unilateral mistake – the
remedy for which is reformation of a contract, not avoidance – is an equitable defense that requires
a showing that "the instrument does not express the true intent of the parties owing to mistake of
one party coupled with fraud, actual or constructive, or inequitable conduct on the part of the other."
*Foremost Ins. Co. v. Biasetti*, No. 31 11 31, 1993 WL 190464, at *3 (Conn. Super. Ct. May 28,
1993).  First, Slocum would have to show that the Agreement states something other than the
parties agreed to, and he was somehow duped into signing it.  He cannot and has not done so.
Second, his assertion that "Eber effectively coerced [him] to believe the Agreement had expired
when it unilaterally reduced his compensation and eliminated his health benefits" (Def. Br. at 30) is
preposterous.   Eber-CT's adjustment of his at-will compensation – which was an ordinary business
decision to which he could have responded by walking away – was neither fraudulent nor
inequitable, nor could it possibly "coerce" him to believe anything, let alone ripple backward in
time to have some effect on his understanding of the contents of the Agreement when he signed it
four years prior.

### 6.  No unclean hands

Like all the rest of his approximate defenses, Defendant's assertion of unclean hands is preposterous because Plaintiff did nothing wrong.  "Unless the plaintiff's conduct is of such a character as to be condemned and pronounced wrongful by honest and fair-minded people, the doctrine of unclean hands does not apply." *Thompson v. Orcutt*, 257 Conn. 301 (2001).  Mr. Slocum's accusation is absurd and unjust, and is another attempt to play the bully and the victim at the same time.  If the so-called "cut" in pay was not to his liking, Mr. Slocum was entitled to leave like any at-will employee – but he chose to stay, probably because he was making a huge salary, more than anyone else at Eber-CT.  (Tr. 11/6 at 170.)  And when he demanded even more money, Eber-CT met his demands.  (Tr. 11/7 at 145.)  In short, this assertion of "unclean hands" is baseless, and his effort to blame the victim should not be countenanced.

### C.  Defendant continues to play the victim.

Stripped of all artifice, Defendant has no valid legal defense, or any good-faith basis to accuse Plaintiff of doing anything wrong.  What is left, is a very cynical, shameless play for the Court's sympathy.  It is especially troubling that Defendant has invoked his son's special needs as if life has been uniquely unfair to him, so he does not have to deal fairly with others.  In an effort to be compassionate at the hearing, Plaintiff's counsel treaded softly on the issue, especially given that both he and his client have children with special needs.  (*See* Tr. 11/6 at 141.)  However, Defendant has persisted in placing this front and center, block quoting his testimony on the topic at page 8 of his brief.

The idea that Mr. Slocum needs to defy his non-compete obligations – and injure Eber-CT – in order to provide for his family is offensive in too many ways to list here.  Mr. Slocum is not the first person to ever have to wait for a non-compete to expire until he can take his preferred job or to be in between jobs.  Furthermore, one in five families have children with special needs, and they

make ends meet with far less than $300,000 a year, a $1,600 car allowance, cell phone, health

benefits and a generous expense account.  Defendant complains about health insurance for his

family.  Like every other family in this country, he has options.  He could go on COBRA, or

perhaps he could even take a single step to look for another opportunity – even if not an

"opportunity I couldn't say no to" (Tr. 11/7 at 113) or the "opportunity that [he] was looking for"

(Tr. 11/7 at 151).  Even if not perfect, he would have a job that provided his family healthcare,

maybe at a lesser salary, maybe with some travel involved, for the single, modest year that is in his

non-compete.  He does not have to uproot his family, nor would his son lose services.  Indeed, there

are a multitude of services in the public schools and through the State to care for children with

special needs.

Moreover, contrary to the silly claim that this litigation is some vendetta by Plaintiff to

"disrupt Slocum's ability to make a living," (Def. Br. at 4), Plaintiff is merely seeking to reclaim its

rights under a contract – nothing more, and nothing less.  That contract was reached between Eber-

CT and its Executive Vice-President of Sales – its highest paid employee who was the face of the

organization for more than a decade with access to all of its proprietary information – in exchange

for a promotion and a period of guaranteed employment at a guaranteed rate, with eligibility for

benefits, and the potential for at-will employment thereafter.  The idea that it is inappropriate for

Eber-CT to turn to the Court to restrain Defendant's brazen violations is absurd.  There are a million

and one other things Eber-CT would rather be investing its resources in, during the "busiest time of

year" (Tr. 11/7 at 182), than having to go to court to obtain protection that it already paid for.

To cloud the straightforward facts, Mr. Slocum tries to twist the record to generate post hoc

justifications, arguing that he thought the Agreement had "expired" or that his absent-mindedness is

Plaintiff's fault.  There is a consistent theme in his conduct, and it comes through loud and clear in

his arguments as well: Mr. Slocum prefers to take what he wants, betting that the passage of time and the burdens of enforcement will discourage Plaintiff, and the Court, from restraining him.

Moreover, if he was so dissatisfied with the $25,000 reduction in his salary when his guaranteed rate expired, he was at-will and was free to leave without notice. But he stayed, for another seven years, as the highest paid employee at Eber-CT, coming and going as he pleased, exploiting his expense account, driving a nice car, using his cellphone and trading on the Slocum name. He got everything he was entitled to, and more. But now, wanting to have his cake and eat it too, he is spinning ridiculous arguments about consideration, or that he forgot, or that he does not understand how at-will employment works, or that he was duped, or that the dog ate his homework.

None of this is Plaintiff's fault. The problem here is Mr. Slocum himself. He chose to stay, and then he chose to take employment in violation of his non-compete. He has not lifted a finger to find other employment at the thousands of businesses in the State of Connecticut in the beverage industry, or the many distributors out-of-state, even in New England and the tri-state area. Nor has he sought employment in a sales position in another industry. He is determined to turn this case on its head, trying to make Plaintiff the villain for enforcing the non-compete that Defendant freely signed. In essence, Mr. Slocum does not think he should have to comply with his very modest restrictions if they would cause him even a modicum of inconvenience.

Mr. Slocum and CDI also have had the boldness to come to this court claiming they have not discussed a Plan B, forcing the court to make a ruling, even though the implication is in fact that CDI can provide a Plan B. Eber-CT does not have a Plan B. It has its eighty employees to protect and Mr. Slocum's presence, with the "equity" in his name, at its largest competitor. It is also facing what Mr. Slocum had to begrudgingly admit to the court (and which Slocum did not mention in his 54-page brief) – that the information in his head would provide CDI with a competitive advantage.

For all these reasons, Mr. Slocum's baseless effort to impugn Plaintiff, to excuse his own violations, and to seek cover to continue injuring Plaintiff is contrary to all equity, and should not be countenanced.

### D.  Other Deficiencies in Defendant's Brief

Given the numerous factual and legal misstatements in defendant's lengthy brief, Plaintiff addresses some additional errors as briefly as possible in bullet form below.  If any issue is not addressed herein, Plaintiff relies on its initial moving brief.

1.      <u>The non-compete is modest, and not even close to overbroad</u>.  In a throwaway section, Defendant briefly argues that the restriction from working in a particular segment of the beverage industry in Connecticut is "overbroad."  (Def. Br. at 26-27.)  This is not a serious argument, which is obvious from the fact that two of the three cases cited by Defendant are from other states (Virginia and Wisconsin).  The other case (*Ineo v. Lenehan*) is distinguishable on the facts.  In that case, because the plaintiff conducted business "globally," the restriction against working for "any of the plaintiff's competitors" had the effect of freezing the defendant entirely out of "the [employee mobility and relocation industry] in which she has been employed for over two decades."  *Ineo, LLC v. Lenehan*, No. MMXCV186019598S, 2018 WL 1386221, at *8 (Conn. Super. Ct. Feb. 20, 2018).  By contrast, in this case, the geographic restriction is limited to Connecticut, where all of Plaintiff's competitors and customers are located.  Thus, Mr. Slocum does not have to go far – New York, New Jersey, Massachusetts, Rhode Island, etc. – to find regions where he could work in his preferred segment of the industry (liquor distributor) without violating his non-compete.  *See*, *e.g.*, *Eastcoast Guitar Ctr., Inc. v. Tedesco*, No. CV 990337066S, 2000 WL 195097, at *2 (Conn. Super. Ct. Feb. 7, 2000) ("any competitor" restriction was reasonable when coupled with appropriately-limited geographical scope).  And, of course, because the liquor industry is tiered, Mr. Slocum could also work in Connecticut for a non-distributor (e.g., for a national

supplier doing business in Connecticut). Plaintiff also respectfully refers the Court to the other

cases cited in its Brief (Pl. Br. at 20-21) demonstrating that the restrictions in this case (one year, in

Connecticut only) are reasonable under the circumstances here.[5]

        2.       <u>Defendant already admitted that the restraints are reasonable</u>. Further on this point,

there is no validity to Defendant's argument that "It would be unreasonable to require Slocum to

seek employment outside the industry he worked in for over two decades and most likely take a

substantial pay cut in the process." (Def. Br. at 36.) First, as noted above, he can work in the

industry – just not in Connecticut, and not for a distributor. There are distributor jobs in other

states, and non-distributor jobs in Connecticut. Second, he already admitted that the restrictions

were reasonable in the Agreement itself:

> The parties hereto agree that **the period of restriction and geographical areas of restriction described herein and imposed upon Employee herein are the result of arm's length bargaining, are fair and reasonable**, and are reasonably required for the protection of the interests of Company.

(Agreement § 6(f).) Even if not dispositive, this acknowledgement is entitled to some weight. *See*,

*e.g.*, *Discoverytel SPC, Inc. v. Pinho*, No. CV106011816S, 2010 WL 4515414, at *3 (Conn. Super.

Ct. Oct. 14, 2010) ("The employment agreement itself acknowledges that the restriction . . . is

reasonable as to time, scope of activities and geographic area"). Indeed, Defendant's real complaint

---

[5] While there is no need to blue pencil the patently reasonable restrictions here, it should be noted that Defendant is incorrect when it asserts that the Court has no blue pencil discretion. (Def. Br. at 28.) In Connecticut, the Court may blue pencil a restrictive covenant, especially where the contract includes a blue pencil provision. *See, e.g.*, *Grayling Assocs., Inc. v. Albert Villota*, No. CV040833521, 2004 WL 1784388, at *1 (Conn. Super. Ct. July 12, 2004) (citing *Beit v. Beit*, 135 Conn. 195, 204-05 (1998)). Here, Agreement § 6(f) provides: "In the event that any provision of any such covenant relating to the area of restriction or period of restriction shall be declared by a court of competent jurisdiction to exceed the maximum area or period of time the courts deem enforceable, said areas and periods of duration shall be the maximum area or period of time which such courts deem valid."

is not that the restrictions here are unreasonable, it is that they are <u>inconvenient</u>, even though that is not a legal basis to avoid a contract.

      3.    <u>Mr. Slocum's purported role at CDI ("selling the product CDI distributes to the retail stores and restaurants") is *not* "wholly distinguishable" from his responsibilities at Eber-CT.  Nor was his role at Eber limited to "obtaining new products from suppliers for distribution."</u>  (Def. Br. at 2.)  As Wendy Eber testified, "He ran our whole sales." (Tr. 11/6 at 33.)  Mr. Slocum admitted his involvement with retail sales at Eber-CT.  He agreed that there is a tiered system – "suppliers, distributors, customers" (Tr. 11/6 at 173) – and that the supplier was Eber-CT's "client" and not a "customer" (Tr. 11/6 at 154-155.)  The retailer was Eber-CT's "customer," and Mr. Slocum wrote on his résumé that he was responsible for "customer loyalty" (Exhibit 13), which he defined in his testimony as follows:

> Customer loyalty is – just mean[s] **continue to foster relationships** and good practice to make sure that customers, you know, they always stay happy with you and buy.

(Tr. 11/6 at 153.)  His résumé also states that it was his duty to

> Target major chains, hospitality, restaurants, and small business owners

and to

> Track and monitor sales by product, by market segment**, by customer**, by region and by Sales Representative, **using analytics to formulate strategic business plans**.

(Ex. 13.)  As Mr. Slocum also admitted,

> CDI sells products to the same customers as Eber.

(Tr. 11/6 at 179.)  In fact, Mr. Slocum testified that he had "close relationships" with Eber-CT's customers, who reached out after he accepted the offer at CDI:

> Q.    Did you tell people in the industry?
> A.    I had an awful lot of people in the industry reach out to me prior – prior to the announcement coming out. And I did reach out for some of the people that had reached out to me that I had **close relationships** with.

> Q.     Tell me about that. Who reached out to you in the industry?
> A.     Suppliers, sales reps from Slocum, former sales reps that have worked for me in the past, **customers**.

(Tr. 11/6 at 257.)  Mr. Slocum also slipped up when he testified that

> the information that could harm Slocum **the most** would be leveraging the relationships that I had with those 25 suppliers that reside exclusively with Slocum & Sons . . . .

(Tr. at 158.)  So even his fictional limitation to "retail and restaurant" sales at CDI will cause plenty

of harm to Eber-CT, even if that is not "the most" harm he can do if the non-compete is not

enforced.

4.     <u>Defendant's brief baselessly concludes that the products that Mr. Slocum sells for</u>

<u>CDI "do not compete with Eber" because customers might buy from both.</u>  (Def. Br. at 3.)  That

argument is both illogical and unsupported.  As Mr. Slocum qualified in response to leading

questions concerning to Luna Azul tequila (an Eber-CT exclusive) and Mi Campo (a CDI

exclusive), some establishments "could, **possibly**" carry both (Tr. 11/7 at 55-56), which is a far cry

from establishing that sales would be even, or stay even.

> In fact, John, when he left, I just remembered this, was that when he met with us, he said, "I don't want to turn 50 years old" – he's 45 now, or whatever he is, you know, he's – He said, "I don't want to turn 45 years old and there's not going to be a company anymore."  Because he knows that CDI is trying to put us out of business. He knows how this industry works. You know, and – and it's irreparable harm. There's no– there's no amount of money, you know what I'm saying, that could pay for the damages here.
>         It's irreparable harm.  It will put us out of business and that is why we had this non-compete in – in place.
>         And we are asking you to enforce it. It's absolutely critical.

(Tr. 11/6 at 81-82.)

5.     <u>Defendant falsely asserts that Mr. Slocum's knowledge of Eber-CT operations "is</u>

<u>now multiple months old, is outdated, and of no value to CDI."</u>  (Def. Br. at 4.)  This is a brash

argument, in which Defendant is essentially challenging the Court: "The damage is done, so what's

21

the point?"  It is also incorrect.  (a) As of today's date, Mr. Slocum has been at CDI for 81 day,

which is less than one-quarter of the one-year non-compete period – so there is plenty of good that

can be accomplished by enforcing the non-compete.  And, in fact, Mr. Slocum admitted in response

to the Court's examination that (b) his knowledge is not outdated, (c) and it will give CDI a

competitive advantage if used. (Tr. 11/7 at 155-59.)

      6.    <u>The five overlapping "dual" products are not the only form of competition between</u>

<u>CDI and Eber-CT.</u>  (*See* Def. Br. at 2.)  Defendant has persisted in this argument against all

evidence and logic.

      7.    <u>Defendant persists in its illogical argument that a six-month waiting period will</u>

<u>preclude any harm from lost exclusives.</u>  (Def. Br. at 3.)  This is another argument with which

Defendant has persisted against all evidence and logic.  Assume, for example, that Mr. Slocum

interferes with a supplier relationship and, as a result, Eber-CT's formerly exclusive product is

named a "dual" for CDI on January 1.  At that point, the damage is already done; it is just a matter

of waiting for the effects to accrue.  And those effects would begin to be felt when CDI began

selling the product on July 1, which is well within the non-compete year if calculated from the date

of resignation – and even further within the non-compete period given that the one-year period is

tolled during any period in which Mr. Slocum is in breach (Agreement § 6(g)).

      8.    <u>There is no "lifetime" exclusive.</u>  Perhaps in an effort to test whether anyone is

paying attention, Defendant also floats the outlandish notion that the non-compete is unnecessary

because "Eber already has the protections of a lifetime appointment under the State's franchise law."

(Def. Br. at 38.)  As the record shows, although the franchise law makes it burdensome for a

supplier to formally drop a distributor, it can easily add them.  Thus, if an exclusive product

becomes a dual (two distributors) or a triple (three distributors), then the new distributor tends to be

preferred, and the former exclusive distributor is effectively sidelined.  (Tr. 11/7 at 63-64.)  It is simply inaccurate to assert that the regulations eliminate the need for a non-compete.

9.      <u>Defendant falsely asserts that Mr. Slocum's knowledge of Eber-CT operations is all "publicly available."</u>  (Def. Br. at 4.)  To the contrary, for example, the bar liter price of Luna Azul tequila is not publicly available (Tr. 11/6 at 45, 103.)  Moreover, as Wendy Eber testified, even prices that are published are made up of confidential information, such as:

> Our strategies, our prices internally, our gross profit, what monies we put into a price, monies we don't, our supplies put into, that's all a factor in developing our price.

(Tr. 11/6 at 102-03.)  As articulated by the Court:

> THE COURT:  . . . [Y]ou're stating that your data, the data that's on your base would be able to be used by him without him having to go through all of the groundwork to find out what that market is for that – in that particular area?
> MS. EBER:    Absolutely.

(Tr. 11/6 at 48.)

10.      <u>Defendant has already admitted his actual and future breach of confidentiality.</u> Defendant spills an inordinate amount of ink on the question of confidential information.  (Def. Br. at 15-18, 38-43.)  Perhaps this is in recognition of the weakness of his other arguments.  But his argument as to confidentiality is likewise unavailing because he (a) admitted that he took confidential information when he shipped a box of original documents back to Plaintiff after it commenced these proceedings, and (b) admitted to the Court that he has inside information that would be useful to a competitor.  (Tr. 11/7 at 155-59.)  For example, this includes non-public information described in his résumé concerning Eber-CT's "sales by product, by market segment, by customer, by region and by Sales Representative, using analytics to formulate strategic business plans."  (Ex. 13.)  He cannot help but utilize this information to benefit CDI, even in the unlikely event that he tried not to.  *Minnesota Mining And Mfg. Co. v. Francavilla*, 191 F. Supp. 2d 270, 278

(D. Conn. 2002) (former employee "cannot be expected to compartmentalize his knowledge so his decisions and disclosures are not tainted by information he is prohibited from using.").

WHEREFORE, based on all of the evidence in the hearing record and the clear requirements of the law, Plaintiff respectfully requests that the Court GRANT its application for temporary status quo injunction and order defendant to comply with its non-compete, non-solicitation and confidentiality obligations until further order of this Court.

THE PLAINTIFF
EBER-CONNECTICUT, LLC

By: */s/ David A. Slossberg*
    David A. Slossberg
    Jeffrey P. Nichols
    HURWITZ SAGARIN SLOSSBERG & KNUFF, LLC
    147 North Broad Street, Milford, CT 06460
    Tel: 203-877-8000/Fax: 203-878-9800
    Juris No. 026616
    DSlossberg@hssklaw.com
    JNichols@hssklaw.com

## **CERTIFICATION**

I hereby certify that a copy of the above was mailed or electronically delivered on December 20, 2019 to all counsel and self-represented parties of record and that written consent for electronic delivery was received from all counsel and self-represented parties of record who were electronically served:

Marc L. Zaken
Ogletree Deakins Nash Smoak & Stewart PC
281 Tresser Boulevard, 6th Floor
Stamford, CT  06901
marc.zaken@ogletreedeakins.com


  */s/ David A. Slossberg*
David A. Slossberg