**BROOK & ASSOCIATES, PLLC**
— NEW YORK | NEW JERSEY | WASHINGTON DC —

**BRIAN C. BROOK**
BRIAN@BROOK-LAW.COM

100 CHURCH STREET
FLOOR 8
NEW YORK, NY 10007
TEL: (212) 256-1957

April 13, 2020

**By ECF**

The Honorable Katherine H. Parker
United States Magistrate Judge
United States Courthouse
500 Pearl Street
New York, NY 10007

Re: *Daniel Kleeberg et al. v. Lester Eber et al.,* 1:16-cv-09517-LAK-KHP
**Reply to Response by C. Ramsey for Wendy Eber (ECF No. 303)**

Dear Judge Parker,

I write to address just four significant points in Colin Ramsey's response letter.

*First*, and most importantly, the assertion that the Court lacks jurisdiction over Alexbay, LLC due to Lester's passing is unsupported and illogical. The case cited with a "see generally" signal does not help them. In *English v. Murphy-Lattanzi*, there was *only one* defendant: an individual who died. As a result, summary judgment motions were put on hold until a proper party could be substituted—otherwise, there was *no one* to enter judgment against. 2015 WL 630248, at *1.

Despite the fact that Mr. Ramsey avoided checking the box for "Alexbay, LLC" when filing on ECF, it is simply untrue that Alexbay is currently "unrepresented"—Mr. Ramsey and two of his colleagues continue to represent Alexbay, which is legally separate from and survives Lester's death. Unlike Lester Eber himself, there will be no "substitution" of any new party for Alexbay.

*Second*, submitting the email from Mr. Ramsey for the factual statements it contained was not "improper." A settlement communication is not a license to lie. Indeed, Rule 408 only precludes the use of such communications "to prove or disprove the validity or amount of a disputed claim," FRE 408(a), or for impeachment, *id.*, but Plaintiffs were using this one "for another purpose," FRE 408(b); namely, to show that the Eber-CT situation was *undisputedly* bad (at least until we asked the Court to empower my clients to remedy the situation).

*Third*, the disclosure of "the Ebers' long term succession plan" is somewhat surprising—at least in terms of how different it is than the Ebers' sworn deposition testimony. *Compare* Ramsey Ltr. 3–4 ("It has long been the expectation that Wendy would take over the running of the business one day.") *with* L. Eber Dep. 393:7–16 (after refusing to answer questions about the disposition of assets in his will, denying ever having "any discussion with Wendy Eber about what will happen in terms of control of Eber Connecticut and the related entit[ies'] business upon your

demise"); W. Eber Dep. 230:7–232:18 (denying any discussions with Lester about succession of interest in Alexbay while playing coy about what she thought and wanted (e.g., "You know, I haven't really thought about it that closely.")). Like their depiction of a failing business that they desperately wanted to keep, which supposedly became "stable" after its CEO passed away, this is just one more instance where their story changes depending on the objective of the day.

*Finally*, my clients certainly recognized the sensitivity of this situation, but necessity trumped sensitivity. Notably, Wendy did not even tell her cousins of their uncle's illness or passing. My clients' longstanding distrust of Wendy predates her disingenuous deposition testimony. It certainly has nothing to do with her gender (indeed, two of my clients are women who are not at all afraid to speak their minds and tell me what to do, including filing this motion despite the risks). Rightly or wrongly, my clients believe that removing Wendy and reinstating John Slocum, if possible, is the only way to protect their inheritance of 2/3 of the business.

I myself recently spoke with Mr. Slocum directly, as I told Eber-CT's lawyer in the non-competition case.[1] While he was understandably non-committal, Mr. Slocum expressed interest in returning to help run the company that his grandfather founded—a company previously owned by the company that my clients' grandfather founded before being transferred to Alexbay, divesting my clients' of their majority share, so that Lester's child could be entrenched in power when this day ultimately came to pass. *That* was "the Ebers' long term succession plan."

The bottom line is this: We are not asking this Court to do anything different than we already asked before the pandemic and Lester's passing. We only respectfully request that this Court take these extraordinary circumstances into account when balancing its caseload. As our earlier Proposed Order reflected, we have always believed that bifurcating some issues for faster judgment was important. Now it is essential.[2]

                                                     Respectfully submitted,

                                                     Brian C. Brook

cc: All counsel of record

---

[1] Last month, Eber-CT subpoenaed Daniel Kleeberg to take his deposition and force him to produce an extensive volume of documents, most of which have nothing to do with John Slocum, but instead are geared towards ascertaining our plans for the company after this Court rules on summary judgment.

[2] If it would help the Court to do so, my clients will simply withdraw other portions of their pending motion. We would respectfully request a conference call be scheduled to be so advised.

Page 390

L. EBER

```
 1                L. EBER
 2   taken upon.
 3       MR. BROOK:  I will ask the questions and
 4   then the consequences will be what they are if
 5   you instruct him not to answer.
 6   Q   Does your will provide for what will
 7   happen to your interest in Alex Bay upon your
 8   demise?
 9       MR. RAMSEY:  Don't answer.
10   A   I will not answer i.
11   Q   Have you discussed what's in your will
12   with Wendy Eber?
13   A   I will not answer it.
14   Q   Have you discussed what's in your will
15   with David Eber?
16   A   I will not answer it.
17   Q   Have you told Wendy that she can expect to
18   take over Alex Bay if you pass away?
19       MR. RAMSEY:  Hold on.  That's separate and
20   apart from the will?
21       MR. BROOK:  I mean, yeah.
22       MR. RAMSEY:  That's a different
23   conversation.  What's in his will is different
24   than any conversations he might have had.  I
25   think if you want to talk about did he have a
```

Page 391

```
 1                L. EBER
 2   conversation with Wendy about what's going to
 3   happen.  Maybe it's reflected but maybe it's
 4   not.  It's different.
 5       MR. CALIHAN:  I think the most important
 6   thing about the question is you said if he
 7   passes away and recognizes that Lester might be
 8   immortal, which I think --
 9       MR. BROOK:  I'm trying to do it any way
10   that doesn't overly emphasize.
11   Q   Regardless of whether it's consistent of
12   what's in your will or not have you ever had a
13   discussion with Wendy about whether she would take
14   over Alex Bay on your demise?
15   A   I'm not answering.
16       MR. RAMSEY:  Lester, we're not talking
17   about the will just whether you had a
18   conversation with Wendy about that.  Maybe you
19   have or you haven't but you can answer that
20   question.
21   A   I don't have an answer for you.
22   Q   Are you refusing to answer the question?
23       MR. CALIHAN:  Let's take two minutes.
24       MR. BROOK:  I definitely want an answer.
25       VIDEOGRAPHER:  Going off the record the
```

Page 392

```
 1                L. EBER
 2   time is 3:30 p.m.
 3       (A break was taken.)
 4       VIDEOGRAPHER:  We are back on the record.
 5   The time is 3:37 p.m.
 6   Q   So it's been brought to my attention that
 7   during the break you had a chance to speak with your
 8   counsel about the last question that I asked you,
 9   Mr. Eber; is that right?
10   A   Yes.
11   Q   So now you're prepared to answer that
12   question?
13   A   Why don't you rephrase it again.
14   Q   Have you had any discussions with Wendy
15   Eber about what will happen with your interest in
16   Alex Bay upon your demise?
17   A   No.
18   Q   Why were you reluctant to tell me no.
19       MR. RAMSEY:  Form.  Don't answer that.
20   You can ask a new questions.
21   A   My discussions are about the management of
22   the business with her.
23   Q   If the discussion never happened why were
24   you reluctant to just tell me no?
25       MR. RAMSEY:  Form.  He's answered the
```

Page 393

```
 1                L. EBER
 2   question.
 3   Q   Have you answered the question truthfully?
 4       MR. RAMSEY:  Don't answer that.  Let's
 5   move on, Brian.
 6   A   Yes.
 7   Q   Have you had any discussion with Wendy
 8   Eber about what will happen in terms of control of
 9   Eber Connecticut and the related entity's business
10   upon your demise?
11       MR. RAMSEY:  Form.
12   A   No.
13   Q   Have you had any discussion with Wendy
14   Eber about any of your assets, what will happen to
15   them upon your demise?
16   A   No.
17   Q   Is Wendy Eber ever seen a copy of your
18   will?
19   A   No.
20   Q   Even though your probate lawyer is also
21   representing her it's your understanding that she
22   has not had access to that will; is that right?
23       MR. RAMSEY:  Form.
24   A   Does he represent her?
25   Q   You said that earlier.
```

23 (Pages 390 - 393)

Veritext Legal Solutions
212-267-6868    www.veritext.com    516-608-2400

Page 227

```
 1                W. EBER
 2  regardless of when it was but with the slurred
 3  speech.
 4      A   Mm-hmm.
 5      Q   What was topic of the conversation during
 6  that conversation?
 7      A   You know, offhand I don't quite remember
 8  what it was.  It may have been around, winding down
 9  the trust or I don't know.  Maybe we were trying to
10  get him off the board.  He was trying to resign off
11  the board.  I don't, like, just off the top of my
12  head I don't remember.
13      Q   Have you ever -- with respect to Lester
14  Eber have you ever noticed any instance where his
15  mental faculties have declined over the years?
16          MR. RAMSEY:  Form.
17      A   No.  Not to any great extent.  I have
18  known him a long time, you know, 50-something years.
19  No.  I mean I think, you know, I played tennis with
20  him last weekend so he's pretty spry.
21      Q   So you said not to a great extent has his
22  --
23      A   I noticed my memory is -- you know, I
24  think as you get older -- you know, nothing out to
25  the ordinary I think as you get older you're still
```

Page 228

```
 1                W. EBER
 2  very young I think certain things you just don't
 3  remember as well.  You know, like, your body doesn't
 4  move as well.
 5      Q   I want to stay focused on Lester.  So you
 6  noticed his memory has declined over the recent
 7  years?
 8          MR. RAMSEY:  Form.
 9      A   I mean, not materially, I mean, just, you
10  know.
11      Q   But some?
12      A   Some.
13          MR. RAMSEY:  Form.
14      A   I don't really -- like, I'm not an expert
15  in it.  I'm just saying nothing other than normal.
16  I think my memory has declined too as I have gotten
17  older.  I think that's just the way the brain, kind
18  of, works.  I think with Mike, when I spoke to him I
19  think it was 2017-ish you could see a remarkable
20  difference.
21      Q   So focusing just on the last few months,
22  has anything happened with respect to your father
23  have any decline in his memory?
24          MR. RAMSEY:  Form.
25      A   I don't think.
```

Page 229

```
 1                W. EBER
 2      Q   So you're not aware of any health issues
 3  that have arisen in the past few months that have
 4  effected his memory?
 5      A   Health issue?
 6      Q   Yes.
 7      A   No.
 8      Q   And are you aware of any other non-health
 9  issues that have effected his memory in the last few
10  months?
11      A   No, my mother is very sick, has some
12  health issues.
13      Q   And how, if at all.  Do you believe that
14  has affected your father?
15          MR. RAMSEY:  Form.
16      A   You were just asking.  You know, I think
17  it's the stress, as it's stressful on me too.
18      Q   For you does encountering stress affect
19  your memory?
20          MR. RAMSEY:  Form.
21      A   I don't know.  I mean, I don't really know
22  how to answer that question.  I feel like it's more
23  an age factor sometime that, you know, normal as you
24  get older your memory probably is not as good as it
25  was when you were younger.  I guess, that's --
```

Page 230

```
 1                W. EBER
 2          MR. CALIHAN:  Should I take personal
 3      offense to this line of questioning?
 4          MR. RAMSEY:  You are the oldest individual
 5      in the room.
 6          MR. BROOK:  No.
 7      Q   What is your understanding of what will
 8  happen to Lester's ownership interest in Alex Bay
 9  when he dies?
10          MR. RAMSEY:  Form.
11      A   His ownership?  I don't know.
12      Q   Did you have any sense or what will happen
13  to Alex Bay when Lester dies?
14          MR. RAMSEY:  Form.
15      A   No.
16      Q   Have you ever had a discussion with your
17  father about what will happen to Alex Bay when he
18  dies?
19      A   No.
20      Q   Have you ever wonders about what will
21  happen to Alex Bay when he dies?
22          MR. RAMSEY:  Form.
23      A   I may have wondered.  You know, nothing
24  out of the ordinary.  He's going to work until the
25  day he dies.  I mean, he is a tremendous resource
```

```
                                                 Page 231
 1                    W. EBER
 2   there and he has a lot of contacts and a lot of
 3   relationships and it's something that is very
 4   valuable to the company so one of things that, you
 5   know, I'm trying to do is get more in front of with
 6   our suppliers and building my own relationships in
 7   the business because at some point, you know, he --
 8   you know, obviously, we're all going to die, so at
 9   some point he won't be there.
10       Q   You do understand, just so we're clear,
11   that Alex Bay has a controlling interest in Eber
12   Connecticut; correct?
13       A   Yes.
14       Q   So whoever owns Alex Bay owns Eber
15   Connecticut; right?
16       A   Yes.
17       Q   And do you have any understanding of how
18   trust and estate law works in general in the absence
19   of a will?
20           MR. RAMSEY:  Form.
21       A   How trust and estate law works?
22       Q   Let's just say estate law, when someone
23   dies what happens to their assets?  Do you have any
24   sense of that?
25           MR. RAMSEY:  Form.
```

```
                                                 Page 232
 1                    W. EBER
 2           MR. CALIHAN:  Form.
 3       A   I'm not a lawyer so I don't know the
 4   details.
 5       Q   Do you believe that you will probably
 6   inherit some or all of Alex Bay when your father
 7   dies?
 8           MR. RAMSEY:  Form.
 9       A   I don't know.
10       Q   Do you want to inherit Alex Bay when your
11   father dies?
12           MR. RAMSEY:  Form.
13       A   Do I want to inherit?  You know, I haven't
14   really thought about it that closely.  You know,
15   where I have, like, made a decision on that or not.
16   It's a very challenging, day-to-day business,
17   continuing to struggle and it's a lot of
18   responsibility.
19       Q   Well, so if you haven't made a decision on
20   that do you have an opinion about whether Alex Bay's
21   ownership of Eber Metro should be rescinded or not?
22           MR. RAMSEY:  Form.
23       A   I'm sorry.
24       Q   Are you aware of the relief that my
25   clients are seeking in this action?
```

```
                                                 Page 233
 1                    W. EBER
 2           MR. RAMSEY:  Form.
 3       A   As far as?
 4       Q   Do you know what my clients are asking the
 5   court to do?
 6       A   Why don't you update me again.
 7       Q   Well, I'm asking you.  Do you have any
 8   understanding of --
 9           MR. RAMSEY:  Do you understand the legal?
10       A   Well, a little bit.  I don't know all the
11   details.  I don't remember all the details.
12       Q   Are you aware that my clients are seeking
13   as their primary relief to have the court rescind
14   the transfer of Eber Metro from Eber Brothers Wine &
15   Liquor Corp. to Alex Bay so that Eber Brothers Wine
16   & Liquor Corp. regains its controlling interest in
17   Eber Connecticut?
18       A   Well, now that you repeat it, yes.
19       Q   So in the absence of my clients getting
20   their requested relief Alex Bay would continue to
21   control Eber Connecticut; right?
22           MR. RAMSEY:  Form.
23       A   Right.
24       Q   If -- well, let me withdraw that.  What is
25   your opinion about whether the transfer of Eber
```

```
                                                 Page 234
 1                    W. EBER
 2   Metro to Alex Bay should be rescinded or not?
 3           MR. RAMSEY:  Form.
 4       A   If it should be rescinded?
 5       Q   Yes.
 6       A   Because of your client's request?
 7       Q   Yes.  Do you think my clients -- do you
 8   have an opinion about whether my clients should get
 9   ownership of the company back under Eber Brothers
10   Wine & Liquor Corp?
11       A   Yes, I have an opinion.
12       Q   What is your opinion?
13       A   No, absolutely not.
14       Q   Why?
15       A   Why?
16       Q   You're not sure about whether you would
17   want to inherit ownership of Eber Connecticut
18   yourself; right?
19           MR. RAMSEY:  Form.
20       A   Well, your asking me why Lester should own
21   the company?
22       Q   I'm not asking you -- do you see the Eber
23   Connecticut business as something that's worth
24   keeping?
25           MR. RAMSEY:  Form.
```