UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------X

DANIEL KLEEBERG, et al.,

                              Plaintiffs,

                 -against-

LESTER EBER, et al.,

                           Defendants.

------------------------------------------------------------------X

```
┌─────────────────────────────────┐
│ USDC SDNY                        │
│ DOCUMENT                         │
│ ELECTRONICALLY FILED             │
│ DOC #:_____            │
│ DATE FILED: 8/10/2020            │
└─────────────────────────────────┘
```

**16-CV-9517 (LAK) (KHP)**

<u>**OPINION AND ORDER ON
THE PARTIES' MOTIONS FOR
PARTIAL SUMMARY JUDGMENT**</u>

**KATHARINE H. PARKER, United States Magistrate Judge**

        The instant diversity action is an intrafamily dispute for control of the family business:

Eber Bros. & Co., Inc. ("EB&C"); EB&C's subsidiary, Eber Bros. Wine and Liquor Corp. ("EBWLC");

Eber Bros. Wine & Liquor Metro, Inc. ("Eber Metro"), a former subsidiary of EBWLC; and Eber

Metro's subsidiary, Eber-Connecticut ("Eber-CT" and, collectively with the aforementioned

companies, the "Eber Entities").  There are presently two Cross-Motions for Partial Summary

Judgment before this Court – the Partial Summary Judgment Motion of Plaintiffs Daniel

Kleeberg, Audrey Hays, and Lisa Stein on one side, and the Partial Summary Judgment Motion

of Defendants Lester Eber, Wendy Eber, and Alexbay, LLC[1] ("Alexbay," and, collectively with the aforementioned Defendants, the "Eber Defendants"), on the other.[2]

Plaintiffs have moved for summary judgment on the following claims: breach of fiduciary duty for improper transactions (Count I, in part); new elections pursuant to New York Business Corporation Law ("B.S.C.") § 619 (Count V); declaratory judgement with respect to Plaintiffs' rights as shareholders (Count VI); and for an accounting (Count IX).  Plaintiffs also have moved for attorneys' fees pursuant to B.S.C. § 626(e).

For their part, in addition to opposing Plaintiffs' Motion, the Eber Defendants have cross-moved for summary judgment to dismiss the following claims asserted by Plaintiffs: breach of fiduciary duty under New York's faithless servant doctrine (Count II); declaratory judgment claim (Count VI); aiding and abetting breach of fiduciary duty and fraudulent concealment claim (Count VIII); and common law (equitable) indemnification (Count X).[3]  The Eber Defendants also have asked this Court to make several holdings regarding the valuation of the Eber Entities and the transactions at issue in this case.  First, the Eber Defendants have

---

[1] Lester Eber passed away on April 5, 2020 after the parties' Motions were filed. Thus, Lester's Estate and Alexbay are currently unrepresented in this action. (Dkt. No. 301.) Lester named his daughter and co-defendant, Wendy, executrix of his Estate.  Wendy's counsel, Underberg & Kessler LLP, has advised the Court that the Monroe County Surrogate's Court is in the process of appointing an executor for Lester's Estate. (*Id.*; *see also* Dkt. Nos. 309 and 312.) Plaintiffs' counsel advised that Wendy's mother and brother have objected to Wendy's appointment as executrix of the Estate. (Dkt. No. 311.)  In a prior order, this Court granted Plaintiffs until August 31, 2020 to make their motion to substitute another party to replace Lester Eber in this action. (Dkt. No. 313.)

[2] Defendant the Estate of Elliot Gumaer also filed a Cross-Motion for Partial Summary Judgment and opposed Plaintiffs' Motion for Partial Summary Judgment against Gumaer for his alleged breach of fiduciary duties under the faithless servant doctrine (Count II).  However, since filing their respective Motions, Plaintiffs and the Gumaer Estate have asked the Court to stay decision on Gumaer's Cross-Motion and those portions of Plaintiffs' Cross-Motion pertaining to Gumaer to allow the finalization of a formal settlement between the parties. (Dkt. No. 300.) Accordingly, Gumaer's Cross-Motion and his opposition to Plaintiff's Motion will not be addressed in this opinion.

[3] The Eber Defendants withdrew a portion of their Motion seeking to dismiss Plaintiffs' Counts I, II, III, IV, and VII as barred by the applicable statute of limitations. (Dkt. No. 270.)

asked the Court to find that EB&C, EBWLC, and Eber Metro were jointly and severally liable for certain pension liabilities as of June 2012.  Second, Defendants request that this Court hold that Plaintiffs are barred by the *Rooker-Feldman* doctrine and the principles of *res judicata* from challenging a 2012 New York Supreme Court order finding that Alexbay's acceptance of all of EBWLC's interest in the capital stock of Eber Metro was "commercially reasonable" during strict foreclosure.  Third, the Eber Defendants have asked this Court to hold that the transfer of EBWLC's interest in Eber Metro to Alexbay, through strict foreclosure, cannot be rescinded under the New York Uniform Commercial Code ("U.C.C.").  Fourth, and finally, Defendants request that this Court find that Canandaigua National Bank & Trust Company's ("CNB") attempt to distribute certain shares of EB&C stock to Plaintiffs, which were formerly held in trust, was ineffective.

In opposing the Eber Defendants' Motion for Partial Summary Judgment, Plaintiffs also have moved to strike certain portions of the Eber Defendants' Rule 56.1 Statement as well as certain portions of Lester and Wendy Eber's Affidavits.  Plaintiffs also seek to preclude the affidavit of Michael Gallagher, a witness who Plaintiffs contend was not timely disclosed.

The parties consented to the undersigned's jurisdiction to issue a final opinion and order on all summary judgment motions.  (Dkt. No. 271); *see also generally* 28 U.S.C. § 636(c)(1)).  For the reasons set forth below, the Eber Defendants' Motion for Partial Summary Judgment is granted, in part, and Plaintiffs' Motion for Partial Summary Judgment is denied.

## BACKGROUND[4]

### I.    Allen Eber's Will and the Testamentary Trust

Allen Eber founded EB&C, including its wine and liquor distribution business.  (Dkt. No. 265 ("Pls.' Rule 56 Statement") ¶ 1.)  He died in 1970 and his last will and testament (the "Allen Eber Will" or "Will") provided for the creation of a testamentary trust to hold his residuary estate, including all of the controlling stock for EB&C (the "Trust").  (*Id.*; Dkt. No. 266-8 ("Brook Decl. in Supp.") Ex. 132 (the "Will").)  The Will stated that it was Allen Eber's "wish that [his] voting control of [EB&C] can be retained and, subject to that primary wish, . . . that [his] interests in certain other close corporations can also be retained and that [his] son, Lester [Eber], may have an opportunity to participate in the management thereof."  (Will § 11.)

The Allen Eber Will nominated three trustees to manage the Trust: Lester Eber; Allen Eber's attorney, Elliott W. Gumaer, Jr. ("Gumaer"); and Marine Midland Trust Company, a bank.  (*Id.* § 12.)  M&T Bank subsequently replaced Marine Midland Trust Company as co-trustee, and CNB replaced M&T Bank in July of 2007.  (Pls.' Rule 56 Statement ¶ 4.)  The Will provided that the Trust assets would transfer to the Trust beneficiaries per stirpes, that is, "[p]roportionately . . . according to their deceased ancestor's share."  Black's Law Dictionary (11th ed. 2019); (*see also* Will § 9.)  Allen Eber's three children, Mildred Eber Boslov, Sally Eber Kleeberg, and Lester Eber, were the original beneficiaries of the Trust and each held a one-third "equal" interest in

---

[4] Familiarity with the procedural history and facts of this case is presumed.  *See, e.g.*, *Kleeberg v. Eber*, 331 F.R.D. 302 (S.D.N.Y. 2019).  As such, only the facts relevant to the parties' cross-motions for summary judgment will be addressed in this opinion.  The facts relied upon by the Court are taken from the parties' Rule 56.1 Statements and the exhibits annexed to their Declarations, and are considered in the light most favorable to the non-moving party.

For clarity, the Court notes that all citations to page numbers refer to the page numbers provided on ECF.

the Trust. (Will § 9.)  When Mildred Eber Boslov died in 1973, her only child, Plaintiff Audrey

Hays, became a one-third beneficiary of the Trust.  (Pls.' Rule 56 Statement ¶ 2.)  When Sally

Kleeberg passed away in 2014, her two children, Plaintiffs Daniel Kleeberg and Lisa Stein, each

became a beneficiary of the Trust, each holding a one-sixth interest in the Trust.  (*Id.*)

Under the terms of the Will, the Trust could be terminated in one of two ways.  The

Trust would automatically terminate upon the death of the last of Allen Eber's three children.

In the alternative, the Will provided that the Trust could be terminated if "all, or substantially

all, [the] stock of [EB&C] . . . [was] sold."  Such a decision to terminate the Trust early would be

made at the "absolute discretion" of the Trustees.  (Will § 9.)

## II.    The Corporate Structure of the Eber Entities

### a.   EB&C

EB&C is a New York corporation. (Pls.' Rule 56 Statement ¶ 8.)  In their Third Amended

Complaint ("TAC"), Plaintiffs represented that EB&C functions primarily as a holding company.

(Dkt. No. 236 ("TAC") ¶¶ 26, 29.)  EB&C's capital structure is comprised of three classes of

shares: Class A Common Shares (Voting); Class B Common Shares (Nonvoting); and 6% Non-

Cumulative Preferred Shares (Nonvoting).  As of February 2017, the Trust held the following

shares of EB&C stock registered in the name of the Trustees: 1,850 Class A Voting Shares; 290

Class B Nonvoting Shares; 2,000 6% Preferred Nonvoting Shares. (Pls.' Rule 56 Statement ¶ 8;

Brook Decl. in Supp. Ex. 134 ("EB&C Stock Certificates"); *see also* Dkt. No. 262-21 ("Wendy Eber

Aff. in Supp. Ex. A").)   It appears that these shares are still registered under the names of the

Trust's former co-trustees.  (Pls.' Rule 56 Statement ¶ 8; *see also* EB&C Stock Certificates.)  The

parties contend that the only other registered shareholders of EB&C at any time over the last

20 years have been Lester Eber and Sally Kleeberg, with each holding 100 shares of Class B

Nonvoting Common Shares. (Pls.' Rule 56 Statement ¶ 8; Wendy Eber Aff. in Supp. Ex. A; Brook

Decl. in Supp. Ex. 11.)

### b. EBWLC

EBWLC is a direct subsidiary of EB&C.  (Pls.' Rule 56 Statement ¶ 9; Dkt. No. 277-8 ("Eber

Defs.' Rule 56 Counterstatement") ¶ 9; Wendy Eber Aff. in Supp. Ex. A; Brook Decl. in Supp. Ex.

11.)  Plaintiffs represented in the TAC that EBWLC is a New York corporation and, like EB&C,

operates as a holding company.  (TAC ¶¶ 27, 29.)  Plaintiffs also allege that EBWLC is the sole

owner of nominal defendant Eber Bros. Acquisition Corp. ("Eber Acquisition"), a New York

corporation that maintained its principal place of business in Rochester, New York.  (*Id*. ¶ 32.)

Plaintiffs contend that, until at least February 2017, EB&C directly held all of EBWLC's

voting shares. (Pls.' Rule 56 Statement ¶ 9; Brook Decl. in Supp. Ex. 11.)  They also maintain

that, prior to February 2017, the Trust held at least some of EBWLC's nonvoting common and

preferred shares of stock. (*Id.*)  For their part, the Eber Defendants contend that EBWLC was a

wholly-owned subsidiary of EB&C.  (Eber Defs.' Rule 56 Counterstatement ¶ 9; Wendy Aff. in

Supp. Ex. A.)

### c. Eber Metro

Eber Metro was a wholly-owned subsidiary of EBWLC until June 5, 2012, when all 20,000

shares of Eber Metro stock were transferred to Lester Eber's company, Alexbay. (Pls.' Rule 56

Statement ¶¶ 10, 61; Eber Defs.' Rule 56 Counterstatement ¶ 10.)  Plaintiffs represent that, like

EB&C and EBWLC, Eber Metro also is primarily a holding company without its own business

operations.  (TAC ¶ 29.)  Plaintiffs also aver that Eber Metro is the sole owner of nominal

defendants Eber-Rhode Island, LLC ("Eber-RI") and Eber-Metro, LLC ("Eber-NDC").  (*Id*. ¶¶ 31, 33.)  Plaintiffs contend that both Eber-RI and Eber-NDC are Delaware limited liability companies, and Eber-RI was registered to do business in New York.  (*Id.*)

### d.  Eber-CT

Eber-CT is Delaware limited liability company that operates as a wine and liquor distributorship in Connecticut.  (Pls.' Rule 56 Statement ¶ 11; Eber Defs.' Rule 56 Counterstatement ¶ 11.)   Out of all the Eber Entities, it is the sole operating business.  (Pls.' Rule 56 Statement ¶ 70; Eber Defs.' Rule 56 Counterstatement ¶ 70.)

Eber-CT conducts business under the trade name Slocum & Sons.[5]  (Pls.' Rule 56 Statement ¶ 11; Eber Defs.' Rule 56 Counterstatement ¶ 11.)  The Slocum & Sons distributorship was the result of a 2005 merger between Slocum & Sons, Inc. and Eber-CT. (Pls.' Rule 56 Statement ¶ 11.)  At the time of the merger, Eber-CT was a wholly owned subsidiary of Eber Metro.  (*Id.*)  As part of the 2005 merger, Eber Metro acquired a call option to acquire Slocum & Sons of Maine, Inc. ("Slocum Maine") at an exercise price of $10.  (*Id*. ¶ 15.)

Eber-CT remained a wholly owned subsidiary of Eber Metro until 2008, when Eber Metro sold 15 percent of its interest in Eber-CT to a company named Eder-Goodman, LLC for consideration that included a $4.5 million payment to Eber Metro. (*Id*. ¶¶ 11-12; Eber Defs.' Rule 56 Counterstatement ¶¶ 11-12.)   Eder-Goodman also acquired a right of first refusal on any further sales by Eber Metro of Eber-CT stock, allowing it to purchase the stock for itself on the same terms that were offered.  (Pls.' Rule 56 Statement ¶¶ 11-12.)

---

[5] Although Eber-CT does business as Slocum & Sons, for clarity, the Court will refer to the company as Eber-CT.

Eber Metro retained an 85 percent interest in Eber-CT until 2010, when Eber Metro transferred six percent of its remaining interest in Eber-CT to Polebridge Bowman Partners, LLC ("Polebridge") in exchange for a $350,000 non-recourse promissory note with two percent interest (the "Polebridge Transaction").  (Pls.' Rule 56 Statement ¶¶ 13-14; Brook Decl. in Supp. Ex. 14 ("Polebridge Stock Purchase Agreement").)  Eder-Goodman declined to exercise its right of first refusal in connection with this transfer.  (Pls.' Rule 56 Statement ¶ 13.)  At the time of the transfer, Polebridge was solely owned by Glenn Sturm, an attorney who sometimes advised Lester and Wendy Eber and the Eber Entities.  (*Id*. ¶ 63; *see also* Polebridge Stock Purchase Agreement.)  Following the Polebridge Transaction, Eber Metro retained a 79 percent interest in Eber-CT.  When Eber Metro was transferred to Alexbay on June 5, 2012, that transfer included Eber Metro's 79 percent interest in Eber-CT. (*See* Pls.' Rule 56 Statement ¶¶  10, 61.)

## III.   Lester Eber's, Gumaer's, and Wendy Eber's Roles Within the Eber Entities

Lester Eber wore many hats within the Eber Entities.  He was President of EB&C from before 2000 until his death in April 2020; President of EBWLC from prior to 2000 until at least February 1, 2012; President of Eber Metro from prior to 2000 until his death; and Chief Executive Officer of Eber-CT from at least 2008 until his death.  (*Id*. ¶ 23.)  At all times that Lester was an officer, he was also a director.  And, in the case of Eber-CT, he was Chairman of the Board of Managers.  (*Id*.)  Lester also served as co-trustee of the Trust from the time of Allen Eber's death in 1970 until the Trust was terminated in 2017. (*Id*. ¶¶ 4, 23.)

Like Lester, Gumaer carried out many roles within the Eber Entities.  He was a director of EB&C, EBWLC, and Eber Metro from before 2000 through at least the end of 2013. (*Id*. ¶ 17.) He also served as co-trustee of the Trust from the time of Allen Eber's death in 1970 until the

Trust was terminated in 2017.  Plaintiffs contend that Gumaer was also Lester and Wendy's personal attorney.  (*Id*. ¶ 18.)

The parties dispute the role Wendy Eber played within EBWLC.  Defendants contend that Wendy Eber was CFO and Secretary of EBWLC from approximately 2007 until 2012, at which time she became President. (Dkt. No. 278 ("Eber Defs.' Rule 56 Statement")[6] ¶ 11.) Plaintiffs contend that Wendy was a director and officer of the company from 2008 through 2013, but that she was never President of the company because her appointment to the position of President by Lester was a "sham."  (*Id*.)  Wendy is the current President of Eber-CT. (Eber Defs.' Rule 56 Statement ¶ 12.)

## IV.   Lester's Non-Competition and Consulting Agreement with Southern Wine and Spirits of America, Inc.

In or about October 2004, Southern Wine and Spirits of America, Inc. ("Southern"), a national wine and liquor distributorship, entered the New York market.  (Eber Defs.' Rule 56 Statement ¶ 18.)  Southern subsequently solicited and hired approximately 20 of EBWLC's salespeople.  In response, EBWLC sued Southern and its former employees in New York State Supreme Court for, among other things, tortious interference, inducement of breach of fiduciary duty, unfair competition, and interference with prospective business advantage. It also sought a preliminary injunction against Southern.  (Dkt. No. 262-1 ("Lester Eber Aff. in Supp.") ¶ 15; *see also* Lester Eber. Aff. in Supp. Ex. E.)

EBWLC's application for a preliminary injunction was denied, and EBWLC and Southern ultimately settled the action (the "Southern Settlement Agreement"). (*Id.*; *see also* Eber Defs.'

---

[6] For simplicity and clarity, the Court will refer to Plaintiffs' Counterstatement of Material Facts at Docket Number 278 as the Eber Defendants' Rule 56 Statement.

Rule 56 Statement ¶¶ 19-22.)  Pursuant to the Settlement Agreement, entered into in or about July and August of 2007, Southern agreed to pay EBWLC millions of dollars and, in exchange, EBWLC agreed to sell its holdings located in Delaware and Ohio and cease operations in New York.  (Pls.' Rule 56 Statement ¶ 25; Brook Decl. in Supp. Ex. 154; *see also* Lester Eber Aff. in Supp. Ex. F.)  Eber-CT, however, was permitted to continue operating in Connecticut.  According to the documents submitted by the parties, EB&C's board of directors approved the Settlement in or about August 28, 2007.  (*See* Brook Decl. in Supp. Ex. 154.)

Southern hired Lester as a consultant and lobbyist effective August 30, 2007 (the "Southern Consulting Agreement").  (Pls.' Rule 56 Statement ¶ 24; Brook Decl. in Supp. Ex. 27 ("Southern Consulting Agreement"); Lester Eber Aff. in Supp. Ex. F.)  Under the Agreement, Lester was paid $600,000 in his individual capacity annually for five years.  (Pls.' Rule 56 Statement ¶ 28; Southern Consulting Agreement § 4.)  As part of the Agreement, Lester entered into a restrictive covenant that prohibited him from competing against Southern in any state where Southern operated, including New York, for five years.  (Pls.' Rule 56 Statement ¶ 29; Southern Consulting Agreement § 6.)  Thus, from August 2007 through August 2012, Lester served as a consultant for Southern while continuing to serve in his various roles at the Eber Entities – President of EB&C, President of EBWLC (until February 1, 2012), President of Eber Metro, Chief Executive Officer of Eber-CT (beginning in 2008), and director for the various Eber Entities.  (Pls.' Rule 56 Statement ¶ 23.)

The parties dispute whether the Eber Entities had fully ceased operations in New York at the time Lester negotiated the Southern Consulting Agreement and began working as a consultant and lobbyist for the Southern.  However, it is undisputed that the Southern

Settlement Agreement required that the Eber Entities stop doing business in New York. (Pls.'
Rule 56 Statement ¶ 27; Eber Defs.' Rule 56 Statement ¶ 25.)  Defendants contend that EBWLC
and Eber Metro laid off all their employees and ceased operating in New York prior to August of
2007.  (Eber Defs.' Rule 56 Statement ¶ 25.)  However, Plaintiffs maintain that EBWLC had
employees through at least the end of 2007, and that certain documents, such as W-2's and
payroll statements, show that the EBWLC had employees through as late as July 2008. (Dkt. No.
280 ("Brook Decl. in Opp'n") Ex. 168.)  The Southern Consulting Agreement was not authorized
by the board of directors of any Eber company or consented to by the co-trustees of the Trust.
(Pls.' Rule 56 Statement ¶ 35.)  Plaintiffs contend that Lester had previously performed
consulting and lobbying work on behalf of the Eber Entities. (Eber Defs.' Rule 56 Statement ¶
26.)

    At his deposition, Lee F. Hager, Southern's Executive Vice President and witness
pursuant to Federal Rule of Civil Procedure 30(b)(6), testified that Southern sought to hire
Lester, in part, due to Lester's personal contacts with the governmental authorities involved in
regulating liquor sales and distribution in New York State and his knowledge of the governing
regulations.  (Brook Decl. in Supp. Ex. 181 ("Hager Dep. Tr.") 36:11-37:12, 41:16-43:02.)  He also
explained that Southern hired Lester because it did not want Lester to interfere with Southern's
"brand building and . . . selling ways," and wanted advice from a "neutral source." (*Id*. at 38:01-
04, 40:40-41:01.)  Additionally, Hager stated that Southern entered into the Consulting
Agreement with Lester on an individual basis because Southern did not want to be tied to a
corporation for a consulting contract for "personal" services.  (*Id*. at 43:23-44:09.)  When
Plaintiffs' counsel asked Hager if Southern would have agreed to pay one of the Eber Entities

instead of Lester pursuant to the Consulting Agreement (*id*. at 69:14-18), Hager responded that, "[S]ubject to whatever my attorneys might have said, I would have objected vehemently. . . . Call me myopic if you want, after a business is done, it's done. We deal with the individual." (*Id*. at 69:20-22, 70:23-25.)

At the time EBWLC ceased operations, it was in debt to its primary lender, Wells Fargo, and owed approximately $130 million. (Lester Eber Aff. in Supp. ¶ 26; Eber Defs.' Rule 56 Statement ¶ 23.) In March of 2007, Wells Fargo had put EBWLC's loans into default and classified the loans as a "workout," freezing all of EBWLC's working capital in order to pay down the outstanding loans. (*Id*.) After the Wells Fargo loans were paid off, Wells Fargo declined to extend any further credit to any Eber Entity. (Eber Defs.' Rule 56 Statement ¶ 23.)

After the Eber Entities ceased operations in New York, Eber-CT continued operating in Connecticut. (Lester Eber Aff. in Supp. ¶ 18; Wendy Eber Aff. in Supp. ¶ 9.) The parties dispute whether Eber-CT suffered from financial problems between 2008 through 2012, and whether there were any third-party lenders willing to provide debt financing to Eber-CT. (Lester Eber Aff. in Supp. ¶ 27.)

## V. Lester's Loans and Demand for Payment by the New York State Teamsters Conference Pension and Retirement Fund

While serving as an officer and director of the Eber Entities and co-trustee of the Trust, Lester made personal loans to the Eber Entities. Defendants contend that in October 1, 2002 and August 15, 2005, Lester loaned EBWLC $2,079,645.00, and that the note was amended and restated on March 13, 2006. (Eber Defs.' Rule 56 Statement ¶ 28.) Plaintiffs dispute the amounts of these loans, and contend that Defendants have produced no documents, such as the underlying notes, showing that these loans were actually made. (*Id.*; *see also id*. ¶ 35.)

By letter dated January 10, 2008, shortly after EBWLC ceased operations and laid off its employees, the New York State Teamsters Conference Pension and Retirement Fund (the "Teamsters Fund") advised that EBWLC had incurred an employer withdrawal liability under the Employee Retirement Income Act of 1974 ("ERISA") in connection with its cessation of operations.  (Wendy Eber Aff. in Supp. Ex. G, 1.)  The Teamsters Fund contended that EBWLC had withdrawal liability totaling $2,212,367.47, and demanded payment of the entire amount within 60 days or, in the alternative, the payment of monthly installments.  (*Id.*)

The Eber Defendants represent that, in or about October of 2009, Lester executed a $1.5 million Line of Credit Note with Eber Metro providing Eber Metro with a revolving line of credit that did not require security for potential losses (the "October Line of Credit Note"). (Eber Defs.' Rule 56 Statement ¶ 28; Brook. Decl. in Supp. Ex. 13.)  Lester executed a similar line of credit note with EBWLC and Eber Metro in or about February 26, 2010 (the "February 2010 Line of Credit Note").  (Brook. Decl. in Supp. Ex. 16.)  On the same day the February 2010 Line of Credit Note was executed, EBWLC and Eber Metro executed a security agreement (the "Security Agreement") with Lester that securitized the February 2010 line of credit note against assets owned by EBWLC and Eber Metro.  (Brook Decl. in Supp. Ex. 15.)  Wendy signed the Agreement on behalf of EBWLC and Eber Metro.  (*Id.*)  That same day, EBWLC also executed a guaranty with Lester (the "Guaranty") pledging EBWLC's interest in Eber Metro as collateral for the February 2010 Line of Credit Note.  (Brook Decl. in Supp. Ex. 140.)  Wendy signed the Guaranty on behalf of EBWLC.  (*Id.*)

In or about April 2, 2010, after the Line of Credit Notes were executed and the collateral pledged, Lester sent letters to Audrey Hays and Sally Kleeberg explaining that the Eber Entities

were struggling financially and stating that Lester had personally made loans to the Entities to keep them afloat.  (Eber Defs.' Rule 56 Statement ¶ 30.)  Lester enclosed unsigned and undated copies of the 2010 Line of Credit, Security Agreement, and Guaranty with the Letters. (Lester Eber Aff. in Supp. Ex. J.)  In the letters, Lester offered Audrey and Sally the opportunity to participate in the Line of Credit Note on a one-third basis.  Both declined to participate.  (*Id*. ¶ 32.)

The parties dispute whether the Eber Entities (that is, Eber-CT as the only operating entity remaining) continued to perform poorly through 2012.  Plaintiffs believe Eber-CT was doing well and making a profit, whereas the Eber Defendants contend that the Eber Entities were insolvent. (*Id*. ¶ 33; Lester Eber Aff. in Supp. ¶ 36; Brook Decl. in Supp. Ex. 127.)

On February 11, 2011, EBWLC, Eber Metro, and Lester entered into an Amended and Restated Security Agreement (the "Amended and Restated Security Agreement") pertaining to the preexisting debt owed by EBWLC and Eber Metro to Lester.  (Brook Decl. in Supp. Ex. 18.)  Wendy signed on behalf of EBWLC and Eber Metro.  (*Id*.)  That same day, EBWLC, Eber Metro, and Lester also entered into a Debt Assumption Agreement.  (Brook Decl. in Supp. Ex. 17 ("Debt Assumption Agreement"); *see also id*. Ex. 13.)  Wendy signed on behalf of EBWLC and Eber Metro.  (*Id*.)  On August 18, 2011, Gumaer and Richard Hawks of CNB, in their capacity as co-trustees, ratified Lester's loans and the Security Agreement and Lester abstained from the vote. (Dkt. No. 277-1 ("Lester Eber Aff. in Opp'n") ¶ 12; *see also id*. Ex. A.)

Eber Metro did not repay Lester the sums due under the Line of Credit Note and Debt Assumption Agreement by December 31, 2011, the maturity date for the 2009 $1.5 line of credit note.  (Pls.' Rule 56 Statement ¶ 38; Eber Defs.' Rule 56 Counterstatement ¶ 38; Eber

Defs.' Rule 56 Statement ¶ 34.) Defendants contend that, by the end of 2011, the outstanding principal and accrued, and unpaid interest on Lester's loans totaled over $3.6 million. Plaintiffs dispute this amount and argue that, while the Eber Defendants have submitted documents showing that Lester appears to have loaned the Eber Entities $1,571,037.48, they have failed to provide documents showing that Lester made loans to EBWLC in October 1, 2002 and August 15, 2005 totaling over $2 million. (Eber Defs.' Rule 56 Statement ¶ 35.) On January 18, 2012, Lester assigned his interest in $3.6 million in loans to a company he created at about that time, Alexbay. (*Id.* ¶¶ 28, 35.) Lester was the sole owner of Alexbay until his death. (*Id.* ¶ 37.)

## VI. Alexbay's Foreclosure Action Against EBWLC and Eber Metro

On February 21, 2012, Alexbay filed an action in New York State Supreme Court, Monroe County pursuant to U.C.C. § 9-620 and § 9-627, seeking a judicial determination that Alexbay's acceptance of all of EBWLC's ownership interest in Eber Metro – and Eber Metro's 79 percent ownership interest in Eber-CT – in full satisfaction of the loans then held by Alexbay, was "commercially reasonable" (the "Foreclosure Action"). (*Id.* ¶ 40.) Neither the Trust nor any Trust beneficiary was named in or served with notice of the Foreclosure Action. (Pls.' Rule 56 Statement ¶ 53.)

In its pleadings, Alexbay contended that the proposed transfer of Eber Metro and its interest in Eber-CT to Alexbay for elimination of the debt owed by Eber Metro to Alexbay was "commercially reasonable." (*Id.* ¶ 54.) Alexbay valued Eber Metro's 79 percent interest in Eber-CT at $3,660,000, and based this valuation on the price set in the 2010 Polebridge Transaction, which Alexbay described as an "arms' length transaction." (*Id.*; Brook Decl. in Supp. Ex. 44.)

The Eber Defendants allege that Lester Eber resigned from EBWLC on or about February 28, 2012, and that his resignation was retroactive and effective as of February 1, 2012 (that is, prior to Alexbay's filing of the Foreclosure Action on the loans).  (*Id*. ¶ 56; Brook Decl. in Supp. Ex. 77.)  On March 9, 2012, Marino Fernandez, the attorney representing EBWLC and Eber Metro in the Foreclosure Action, signed a stipulation stating that: "the Eber Bros. Defendants have no objection to the relief requested by Plaintiff in this proceeding and release any claim to the Collateral as defined in the Complaint or any proceeds thereof."  (Brook Decl. in Supp. Ex. 159.)  Minutes from Board meetings subsequently held by EBWLC and Eber Metro state that EBWLC decided to waive its defenses in the Foreclosure Action to avoid expending additional resources defending the suit.  (Pls.' Rule 56 Statement ¶¶ 57-58.)  Then, on May 11, 2012, Justice Matthew A. Rosenbaum of the New York Supreme Court, Monroe County, issued an order stating: the "part of Plaintiff's Motion seeking a determination that Alexbay's acceptance of certain collateral in full satisfaction of Eber Bros' obligation is, 'Commercially Reasonable' under the Uniform Commercial Code is GRANTED . . . ." (Lester Eber Aff. in Supp. Ex. M, 3.) The Order specified that the term "commercially reasonable" was used as defined in the U.C.C. (*Id*.); *see also* U.C.C. § 9-627 (determination of whether conduct was commercially reasonable).

The transfer of Eber Metro to Alexbay was finalized on June 5, 2012, and on that date, all 20,000 shares of Eber Metro stock were registered in Alexbay's name on a certificate signed by Lester as President and Wendy as Vice President of Eber Metro.  (Pls.' Rule 56 Statement ¶ 61; Brook Decl. in Supp. Ex. 62.)  On June 6 and 9, 2012, Wendy and Gumaer, respectively, formally consented on behalf of EBWLC to "transfer and deliver to  Alexbay all of its ownership interest in [Eber] Metro in full satisfaction of [EBWLC's] Obligations to Alexbay . . . ." (Brook

16

Decl. in Supp. Exs. 61 and 63.)  EBWLC's only remaining asset following the transfer of Eber

Metro to Alexbay was less than $3,000 in cash.  (Pls.' Rule 56 Statement ¶ 70.)  EBWLC was also

left saddled with the debt it still owed to third-party creditors, including pension obligations to

the Teamsters Fund.  (*Id*. ¶ 69.)

Neither Sally Kleeberg nor Audrey Hays were informed about Alexbay's proposal to

accept the stock of Eber Metro in consideration for the elimination of Eber Metro's debt to

Alexbay before its approval in 2012.  (*Id*. ¶ 71; Dkt. No. 266-12 ("Hays Decl. in Supp.") ¶ 18.)

Nor were they advised of the Foreclosure Action.  (*Id*.)

## VII.   Continuing Liability to the Teamsters Fund, Subsequent Transactions, and Wendy's Promotions Within the Eber Entities

In July of 2012, Eber Metro exercised the Call Option to acquire Slocum Maine for $10.

(Pls.' Rule 56 Statement ¶ 75.)  However, Eber Metro did not acquire any assets or stock and,

instead, Lester and Wendy Eber each individually received a 50 percent interest in Slocum

Maine. (*Id.*)

The parties do not dispute that, as of June 1, 2012, the remaining employer withdrawal

liability to the Teamsters Fund of the Eber "controlled group" was approximately

$1,421,029.95.  (Eber Defs.' Rule 56 Statement ¶ 67.)  In August of 2012, Wendy signed a

confession of judgment on behalf of EBWLC agreeing to a judgment of $1,421,029.95 against

EBWLC by the Teamsters Fund for the remaining underfunded Plan liabilities. (*Id*. ¶¶ 67-68;

Wendy Aff. in Supp. Ex. I.)  That same month, Lester approved a new employment contract with

Wendy in which she was awarded shares in Eber Metro, that vested over time. (Pls.' Rule 56

Statement ¶ 76.)  Pursuant to her new employment agreement, signed by Lester, Wendy

became the new President of Eber-CT. (*Id.*) Wendy subsequently acquired 2,000 shares (or 9.1

percent) of Eber Metro's stock. (*Id.*)  The Eber Defendants also contend that Wendy was

promoted to President of EBWLC at some point in 2012, a contention that Plaintiffs dispute.

(Eber Defs.' Rule 56 Statement ¶ 11.)

**VIII.    The  EBWLC Retirement Plan and Pension Benefit Guaranty Corporation Law Suit and
the Commencement of the Instant Action**

EBWLC was the Plan Administrator and contributing sponsor of the EBWLC Retirement

Plan.  (Eber Defs.' Rule 56 Statement ¶ 49; Wendy Eber Aff. in Supp. Ex. E ("PBGC Action

Decision and Order").)  The Plan required the accrual and payment of pension benefits, and

annual contributions to the Plan to fund benefits.  (Eber Defs.' Rule 56 Statement ¶ 50.)  EBWLC

and the members of its "controlled group," including Eber Metro and Eber-CT, were required to

make certain minimum annual contributions to the EBWLC Plan.  (*Id*. ¶ 51; *see also* PBGC Action

Decision and Order 4.)  The EBWLC Plan was a "single employer defined benefit plan" subject to

the termination insurance program established under ERISA.  (Eber Defs.' Rule 56 Statement ¶

53; *see also* PBGC Action Decision and Order 7.)   The Eber Defendants contend that the EBWLC

Plan was a "debt" of EBWLC. (Eber Defs.' Rule 56 Statement ¶ 54.)

On August 6, 2014, the Pension Benefits Guaranty Corporation ("PBGC") sought to

terminate the EBWLC Plan because it determined that the Plan would be unable to pay benefits

once they became due.  (*Id*. ¶ 55.)  The PBGC subsequently sued EWBLC in the United States

District Court for the Western District of New York and sought "to declare the Plan terminated

and to have PBGC appointed as statutory trustee."  (PBGC Action Decision and Order 2.)  On

January 19, 2016, the District Court established April 30, 2010  — a date preceding both the

Polebridge Transaction and the transfer of EBWLC's interest in Eber Metro to Alexbay — as the

termination date of the EBWLC Retirement Plan, and found that Eber Metro and Eber-CT were

in the "controlled group" as of that date.  (Eber Defs.' Rule 56 Statement ¶¶ 58, 60; *see also*

PBGC Action Decision and Order 4, 16.)

Then, by letter dated March 29, 2016, the PBGC demanded immediate payment for

unfunded benefit liabilities and other related amounts. (Wendy Eber Aff. in Supp. Ex. D.)  The

demand letter advised EBWLC that the PBGC had determined that, as of April 30, 2010, EB&C,

EBWLC, Eber Metro, and Eber-CT "constituted a parent-subsidiary controlled group based on

(a) [EB&C's] direct ownership of 100% of EBWLC, (b) EBWLC's direct ownership of 100% of Eber

Metro, and (c) Eber Metro's direct ownership of 85% of Eber-CT" and, as such, "EBWLC, [EB&C],

Eber Metro, and Eber-CT are jointly and severally liable for the ERISA liabilities resulting from

the termination of the Plan."  (*Id*. at 3.)

On December 9, 2016, Plaintiffs commenced the instant action alleging individual and

derivative claims against Lester, Gumaer, CNB, and Wendy.  The gravamen of their Complaint

was, and remains, that Lester, Gumaer, CNB, and Wendy conspired to divest the Trust and the

Eber Entities of their only valuable asset — Eber Metro and its subsidiary Eber-CT — for the sole

benefit of Lester and his heirs.  (*See* Dkt. No. 1 ("Initial Complaint").)

### IX.    The 2017 Issuance of EBWLC Voting Preferred Shares of Stock to Lester Eber

On February 14, 2017, Lester Eber, as President of EB&C and the "holder of all

outstanding shares of Class A common stock of [EBWLC]," appointed Wendy Eber the sole

director of EBWLC. (Brook Decl. in Supp Ex. 43, 26; *see also* Pls.' Rule 56 Statement ¶ 98.)

That same day, Wendy Eber executed a Certificate of Amendment of the Certificate of

Incorporation of EBWLC, authorizing the creation of Class B junior preferred stock with voting

rights.  (Pls.' Rule 56 Statement ¶ 100; Brook Decl. in Supp. Ex. 43, 22-25.)  Plaintiffs contend

19

that the Amendment to the Certificate of Incorporation was not approved by a vote of EBWLC's shareholders or by a written consent in lieu of a shareholder meeting. (Pls.' Rule 56 Statement ¶ 99.)  Defendants counter that because EB&C was the sole owner of EBWLC, Lester, as President of EB&C, was authorized to approve the amendment.  (Lester Eber Aff. in Opp'n ¶ 31.)

The next day, Wendy signed a Resolution on behalf of EBWLC issuing 750 shares of Class B junior preferred stock to Lester in exchange for Lester's "agreement to reimburse the Corporation, at its request, for up to $37,500.00 of expenses incurred or to be incurred by the Corporation in connection with its general operations." (Brook Decl. in Supp. Ex. 43, 21; *see also* Pls.' Rule 56 Statement ¶ 100.)  Lester also signed the Resolution.  (*Id.*)

## X.   The Surrogate's Court Order and the Termination of the Trust

In February of 2016, shortly after the District Court's ruling in the PBGC Action against EBWLC, CNB advised Lester and Gumaer of its desire to petition the Surrogate's Court to terminate the Trust.  (Pls.' Rule 56 Statement ¶ 79.)  On December 15, 2016, Wendy Eber advised CNB that Lester "would like to move forward with closing the [T]rust, finalizing the accounting of the [T]rust, and acquiring the stock of Eber Bros Wine and Liquor [i]mmediately." (Brook Decl. in Supp. Ex. 153.)

Then, in February of 2017, CNB petitioned the Surrogate's Court in Monroe County to terminate the Trust and to be released from its duties as co-trustee by distributing the remaining assets of the Trust, as specified in its final accounting, to the beneficiaries in accordance with their respective interests in the Trust.  (Brook Decl. in Supp. Ex. 135 (the "Surrogate's Court Petition").)  CNB sought to terminate the Trust because "the Eber Bros. &

Co., Inc. stock ha[d] no (or nominal) monetary value." (Surrogate's Court Petition ¶ 12; *see also id*. ¶ 16.)

CNB's accounting, submitted in connection with the Petition, included the Trust's shares in EB&C on the list of Trust assets to be distributed to the beneficiaries. (Surrogate's Court Petition 33-34, 40, 73-74.)[7] The accounting also stated that the EB&C stock – comprised of 2,000 shares of six percent non-cumulative stock; 1,850 shares of Class A voting stock; and 290 shares of Class B stock – were worth $0. (*Id.*) CNB's accounting did not list EBWLC shares of stock. (*See id.*)

Lester was served with notice of the Petition, in his capacity as both co-trustee and beneficiary of the Trust, but did not join in the Petition. (*See id*. 2.) Gumaer was also served with notice in his capacity as co-trustee, but declined to join the Petition. (*See id.*) Lester appeared in the proceeding, through counsel James Vazzana, on or about March 13, 2017. (Pls.' Rule 56 Statement ¶ 82; Brook Decl. in Supp. Ex. 137.) Lester did not object to the termination of the Trust or CNB's proposed accounting. (Pls.' Rule 56 Statement ¶ 83.) Plaintiffs were also served notice, but did not enter an appearance or otherwise object to CNB's petition or accounting. (*Id*. ¶ 84.) On June 1, 2017, the Surrogate's Court adopted CNB's proposed accounting and granted the Petition. The Court ordered CNB to:

> [P]ay the remaining cash and transfer, assign and deliver the other remaining assets shown in the account as follows (less certain specified fees and commissions):
>
> 1/3 to Lester Eber                    $113,908.61*

---

[7] Because the ECF page numbers on this document are illegible, the Court cites to this document by using the page numbers listed at the bottom of each page.

> 1/3 to Audrey Hays                $113,908.61*
>
> 1/6 to Daniel Kleeberg             $227,817.22*
>
> 1/6 to Lisa Stein                  $227,817.22*
>
> *Less Woods Oviatt Gilman LLP fees and disbursements - amount to be
> determined.

(Brook Decl. in Supp. Ex. 33 ("Surrogate's Court Order") 6.)

XI.    **CNB's Proposed Distributions and the Transfer Restriction on the EB&C Stock**

After the Surrogate's Court issued its Order terminating the Trust, CNB sent the Trust

beneficiaries, Plaintiffs and Lester, its proposed final distribution.  Plaintiffs contend, and the

Eber Defendants do not dispute, that Lester received his share of the Trust's cash and

marketable securities, as outlined in CNB's proposed distribution.  (Pls.' Rules 56 Statement ¶

93.)  CNB communicated with the same attorney who represented Lester in the Surrogate's

Court Proceeding, James Vazzana, when making these distributions  (Brook Decl. in Supp. Ex.

37; *id*. at Ex. 40; *id*. at Ex. 41; *see also* Dkt. No. 188-1 ("CNB's Decl. in Supp. of Mot. to

Intervene") Ex. 2.)  On October 11, 2017, CNB purportedly sent a letter to Lester's counsel,

Vazzana, and Plaintiffs' counsel, Brian Brook, enclosing "the Stock Powers transferring their

shares of Eber Bros. & Co., Inc. pursuant to [CNB's] distribution schedule."  (Brook Decl. in Supp.

Ex. 38; *see also* CNB's Decl. in Supp. of Mot. to Intervene Ex. 7 (copies of stock powers).  In its

letter, CNB explained that because it "never had possession of the company's stock book or

other corporate documents and, despite request, . . . [was] not . . . provided with the same . . .

[it was] required to complete these transfers via these Stock Powers as opposed to issuing new

stock certificates."  (Brook Decl. in Supp. Ex. 38.)  The stock powers purported to allocate the

1,850 shares of EB&C voting stock as follows: Audrey Hays (706 shares); Daniel Kleeberg (301

22

shares); and Lisa Stein (137 shares).  (CNB's Decl. in Supp. of Mot. to Intervene Ex. 7.)  From the

evidence in the record, it does not appear that CNB issued shares to Lester through stock

powers.  (*See id.*)  The Eber Defendants contend that, although Vazzana received CNB's letter,

the copies of the stock powers were not enclosed with the Letter.  (Eber Defs.' Rule 56

Counterstatement ¶ 93; Lester Eber Aff. in Opp'n ¶ 32.)

At the time the Surrogate's Court issued its Order, EB&C's Bylaws provided that "shares

of the corporation shall be represented by certificates . . . ."  (Brook Decl. in Supp. Ex. 133

("EB&C Bylaws") Art. VI.)  The Bylaws also included a provision restricting the transfer of shares

unless the transferring shareholder first gave notice to EB&C's President (*i.e.*, Lester) or

Secretary. (*Id*. at Art. XII.)  The Bylaws provide, in relevant part, that:

> A shareholder shall not transfer, sell or assign any shares of the
> corporation's stock without first personally delivering to the
> president or secretary written notice of a proposed transfer at least
> five (5) days before the effective date of transfer, stating the terms
> of the proposed transfer. Any other shareholder may, but is not
> required to, give notice within said five day period to the
> transferring shareholder of said other shareholder's intent to
> purchase the shares for a price equal to the book value thereof as
> appears by the books of the corporation of the end of the
> immediately preceding fiscal year.

(*Id.*)  The Bylaws further stated that, "No transfer of any stock shall be valid until such notice

shall be given and the other shareholders have the opportunity to purchase the same as

aforesaid" (the "EB&C Transfer Restriction").  (*Id.*)  Lester knew about the Transfer Restriction

before the Surrogate's Court issued its Final Accounting Order.  (Pls.' Rule 56 Statement ¶ 89;

Eber Defs.' Rule 56 Counterstatement ¶ 89.)  Neither Lester nor his attorney advised CNB or the

Surrogate's Court about the Transfer Restriction before the Court issued its Order terminating

the Trust and directing CNB to make distributions.  (Pls.' Rule 56 Statement ¶ 90; *see also id*. ¶

23

89.)  CNB ultimately failed to issue stock certificates for the Trust beneficiaries' shares of EB&C

stock.  (*See* Pls.' Rule 56 Statement ¶ 93.)

XII.   **Plaintiffs Dismiss CNB from the Instant Action with Prejudice, Lester Seeks to Acquire All Remaining Shares of EB&C Voting Stock by Invoking EB&C's Transfer Restriction, and Plaintiffs Supplement Their Second Amended Complaint**

On August 7, 2018, the Honorable Judge Lewis A. Kaplan so ordered a stipulation signed

by all parties permitting the dismissal of CNB from this action, with prejudice, pursuant to

Federal Rule of Civil Procedure 41(a)(1)(A)(ii).  (Dkt. No. 117.)  In connection with the

settlement of their claims against CNB, "Plaintiffs agreed to indemnify CNB for certain legal

costs incurred by CNB in connection with further proceedings relating to the Allen Eber Trust."

(TAC ¶ 390); *see also Kleeberg*, 331 F.R.D. at 324.

As of October 31, 2018, because it never issued stock certificates for the shares of EB&C

stock, CNB had yet to finish distributing the EB&C stock to the Trust beneficiaries pursuant to

the Surrogate's Court Order.  On that date, Lester, through his attorneys, sent a "Notice of

Intent to Purchase" to the Allen Eber Trust, in the care of CNB, and sought to invoke the EB&C

Transfer Restriction to acquire all of the EB&C stock for himself.  (Brook Decl. in Supp. Ex. 35.)

Then, on or about December 17, 2018, Lester sent an updated notice clarifying that his

proposed purchase price for the shares was "$0."  (*Id*. Ex. 164.)  Plaintiffs balked at Lester's

attempt to acquire all of the EB&C stock, and their attorney Brian Brook instructed CNB to

refuse Lester's request.  As a result, CNB found itself caught between the competing demands

of Plaintiffs and the Eber Defendants, with the former demanding the distribution of two-thirds

of the EB&C stock, pursuant to the Surrogate's Court Order, and the latter demanding all of the

shares of stock under the Transfer Restriction in EB&C's Bylaws.  CNB subsequently moved to

24

intervene and was rejoined to this litigation as a nominal defendant.  (*See* Dkt. Nos. 200 and 237.)

Soon thereafter, Plaintiffs moved to amend and supplement their Second Amended Complaint ("SAC") to allege, among other things, that "[b]y engaging in conduct to prevent the transfer of shares of EB&C to Plaintiffs, including purporting to exercise an option to acquire Plaintiffs' shares for nothing, Lester and Wendy may have caused and may continue to cause Plaintiffs to incur indemnification liability to CNB."  (TAC ¶ 391.)  Plaintiffs contend that the Eber Defendants' "conduct has caused CNB to incur legal expenses that are likely to be subject to the indemnification agreement executed by Plaintiffs."  (*Id*. ¶ 393.)  For the reasons stated in the Order granting Plaintiffs leave file the TAC, this Court granted Plaintiffs' request to assert an equitable indemnification claim against the Eber Defendants.  *See Kleeberg v. Eber*, 331 F.R.D. at 324.

## LEGAL STANDARDS

I.   **Legal Standard Governing Summary Judgment Under Federal Rule of Civil Procedure 56**

Under Rule 56 of the Federal Rules of Civil Procedure ("Rule 56"), a court may grant summary judgment when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is 'material' when it 'might affect the outcome of the suit under the governing law.'" *Anderson v. Hertz Corp.*, 507 F. Supp. 2d 320, 326 (S.D.N.Y. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), *aff'd*, 303 F. App'x 946 (2d Cir. 2008).  "The movant bears the burden of demonstrating the absence of a genuine dispute of fact, and, to award summary judgment, the court must be able to find 'after drawing all reasonable inferences in favor of a non-movant' that 'no reasonable

trier of fact could find in favor of that party.'" *Palmer/Kane LLC v. Rosen Book Works LLC*, 204 F. Supp. 3d 565, 568 (S.D.N.Y. 2016) (internal citation omitted) (first citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 256; then quoting *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993)); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (explaining that the moving party is entitled to summary judgment where the "nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof").

"In evaluating whether the parties have met their respective burdens, th[e] Court 'examine[s] the record as a whole, just as a jury would . . . .'" *Sealy v. Hertz Corp.*, 688 F. Supp. 2d 247, 254 (S.D.N.Y. 2009) (alteration in original) (quoting *Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001), *superseded on other grounds by* Fed. R. Civ. P. 37(e)). Thus, to receive consideration, evidence submitted in support of or in opposition to a motion for summary judgment must be admissible at trial.  Fed. R. Civ. P. 56(c)(4); *see Santos v. Murdock*, 243 F.3d 681, 683 (2d Cir. 2001) ("Affidavits submitted to defeat summary judgment must be admissible themselves or must contain evidence that will be presented in an admissible form at trial." (citing *Celotex Corp.*, 477 U.S. at 323–24)); *see also Burlington Coat Factory Warehouse Corp. v. Esprit De Corp.*, 769 F.2d 919, 924 (2d Cir. 1985) (plaintiff could not rely on inadmissible hearsay to oppose motion for summary judgment).

The Rule also provides that a "party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . . or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

Fed. R. Civ. P. 56 (c)(1).  A non-moving party cannot create a material issue of fact to defeat summary judgment by making conclusory statements that are unsupported by admissible evidence.  *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012); *see also Chartis Seguros Mexico, S.A. de C.V. v. HLI Rail & Rigging, LLC*, 3 F. Supp. 3d 171, 179 (S.D.N.Y. 2014) ("There is no issue of material fact where the facts are irrelevant to the disposition of the matter.  Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact.").  Additionally, any legal conclusion framed as an undisputed fact must be disregarded. *See Wojcik v. 42nd St. Dev. Project*, 386 F. Supp. 2d 442, 448 n.5 (S.D.N.Y. 2005).

Where a party "fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c)," courts have discretion to:

> (1) give an opportunity to properly support or address the fact; (2) consider the fact undisputed for purposes of the motion; (3) grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it; or (4) issue any other appropriate order.

Fed. R. Civ. P. 56(e); *see also* Fed. R. Civ. P. 56(c)(2).  Additionally, "[i]f satisfied that an affidavit or declaration under this rule is submitted in bad faith or solely for delay, the court—after notice and a reasonable time to respond--may order the submitting party to pay the other party the reasonable expenses, including attorney's fees, it incurred as a result. An offending party or attorney may also be held in contempt or subjected to other appropriate sanctions."  Fed. R. Civ. P. 56(h).

When determining whether a grant of summary judgment is appropriate, the court's decision should not hinge on whether it "'believes that the plaintiff will be unable to meet his or her burden of persuasion at trial.'"  *Walder v. White Plains Bd. of Educ.*, 738 F. Supp. 2d 483,

493 (S.D.N.Y. 2010) (alteration in original) (quoting *Danzer v. Norden Sys., Inc.,* 151 F.3d 50, 54

(2d Cir. 1998)).  Instead, the court must determine whether there is such a "'lack of evidence in

support of the plaintiff's position" or evidence that is "'so overwhelmingly tilted in one

direction that any contrary finding would constitute clear error.'" *Id.*  "It is well settled that

'[c]redibility assessments, choices between conflicting versions of the events, and the weighing

of evidence are matters for the jury, not for the court on a motion for summary judgment.' "

*Anderson v. New York City Health & Hosps. Corp.*, No. 16-CV-1051 (GBD) (KHP), 2020 WL

2866960, at *9 (S.D.N.Y. Mar. 2, 2020) (quoting *Curry v. City of Syracuse*, 316 F.3d 324, 333 (2d

Cir. 2003) (alteration in original), *adopted by* 2020 WL 1528101 (S.D.N.Y. Mar. 31, 2020).

Typically, "[o]n cross-motions for summary judgment, the court must consider each

motion independently of the other and when evaluating each, the court must consider the facts

in the light most favorable to the non-moving party."  *Chartis Seguros Mexico, S.A. de C.V.*, 3 F.

Supp. 3d at 179.  "[E]ven when both parties move for summary judgment, asserting the

absence of any genuine issues of material fact, a court need not enter judgment for either

party." *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001) (citing *Heublein,*

*Inc.,* 996 F.2d at 1461).  Where "the motion and cross-motion seek a determination of the same

issues, the Court may consider them together."  *ExteNet Sys., Inc. v. Village of Pelham*, 377 F.

Supp. 3d 217, 223 (S.D.N.Y. 2019); *see also Chartis Seguros Mexico, S.A. de C.V.*, 3 F. Supp. 3d at

179 (considering cross motions for partial summary judgment together where two parties

moved on the issue of defendant's limitation of liability defense because the motions presented

"two sides of the same coin").

## II.   Substantive Law

Federal Courts sitting in diversity apply the choice of law rules of the forum state. *See Sparrow Fund Mgmt., LP v. Mimedx Grp., Inc.*, No. 18-CV-04921 (PGG) (KHP), 2019 WL 8955307, at *4 (S.D.N.Y. Nov. 7, 2019) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)), *adopted by* 2020 WL 1330283 (S.D.N.Y. Mar. 22, 2020); *see also Krumme v. WestPoint Stevens Inc.*, 238 F.3d 133, 138 (2d Cir. 2000) (applying New York law where the parties' briefs assumed New York law controlled).  In the instant diversity action, Plaintiffs' claims are asserted under New York law and the parties' briefs assume that New York law controls.  Accordingly, the substantive issues in the parties motions will be evaluated under New York law.  *See generally Kleeberg*, 331 F.R.D. 302 (applying New York law).

### DISCUSSION

## I.   Plaintiffs' Motion to Strike and Preclude Witness Testimony Under Federal Rule of Civil Procedure 37

The Court first turns to Plaintiffs' Motion to Strike and to Preclude, in which they have moved to strike portions of Defendants' Rule 56 Statement, portions of Lester's and Wendy's affidavits, and to preclude the affidavit of Michael Gallagher, an undisclosed witness.  Despite having the opportunity to do so, the Eber Defendants did not oppose or otherwise respond to the Motion.

District courts have "broad discretion to manage pre-trial discovery" and appellate courts "review [their] decisions on these matters only for abuse of discretion." *Montgomery v. New York City Transit Auth.*, 806 F. App'x 27, 30 (2d Cir. 2020) (internal quotation marks and citation omitted).  Where a court does not rely on contested submissions in deciding a motion for summary judgment, it may deny a party's motion to strike as "academic."  *See Williams v. New*

*York City Transit Auth.*, No. 10-cv-882 (ENV)(CLP), 2014 WL 11474810, at *1 n.2 (E.D.N.Y. Sept. 16, 2014), *aff'd*, 620 F. App'x 63 (2d Cir. 2015).  Here, Plaintiffs seek to strike portions of the Eber Defendants' Rule 56 Statement on the basis that those assertions: are immaterial; constitute legal conclusions; omit essential underlying facts; and omit the governing law.  (Dkt. No. 279 ("Pls.' Mem. of Law in Opp'n") 8-16.)  They also seek to strike certain portions of Lester's and Wendy's affidavits that, they contend, suggest that they intend to raise advice of counsel as a defense, as well as an assertion made by Wendy regarding what the board of EBWLC allegedly believed about EBWLC's outstanding liabilities.  (*Id*. at 11-12.)  Here, because the Court has not relied on the facts and representations Plaintiffs seek to strike from the Eber Defendants' Rule 56 Statement and Affidavits in deciding the parties' motions, Plaintiffs' Cross-Motion to Strike is denied as moot.

Next, the Court considers whether the affidavit of Michael Gallagher, an undisclosed witness who provided actuarial calculations regarding the Eber Entities' pension liabilities as of June 1, 2012 – a few days before EBWLC transferred its interest in Eber Metro to Alexbay – should be precluded. Federal Rule of Civil Procedure 37(c)(1) provides that "[i]f a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."  The party moving for Rule 37 sanctions has the burden of demonstrating that the opposing party failed to timely disclose information, as required by Rule 26. *See New World Sols., Inc. v. NameMedia Inc.*, 150 F. Supp. 3d 287, 304 (S.D.N.Y. 2015).  "To determine whether preclusion is warranted under Rule 37, a court must consider '(1) the party's explanation for the failure to comply with the disclosure requirement;

(2) the importance of the testimony of the precluded witnesses; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new [evidence]; and (4) the possibility of a continuance.' " *Id*. (*quoting Design Strategy, Inc. v. Davis*, 469 F.3d 284, 296 (2d Cir. 2006)); s*ee also City of Almaty, Kazakhstan v. Ablyazov*, No. 15-CV-05345 (AJN) (KHP), 2019 WL 4126445, at *4 (S.D.N.Y. Aug. 30, 2019) (citing *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)).   It is well settled that "preclusion is not a mandatory sanction," and is a "harsh remedy that should be imposed only in rare situations." *New World Sols., Inc.*, 150 F. Supp. 3d at 304 (internal quotation marks and citations omitted); *see also Design Strategy*, 469 F.3d at 297–98; *Update Art, Inc. v. Modiin Pub., Ltd.*, 843 F.2d 67, 71 (2d Cir. 1988).

Plaintiffs' allegation that the Eber Defendants failed to disclose a witness that they now seek to use to support their Motion for Partial Summary Judgment is concerning.   However, because the Court has not relied on Gallagher's Affidavit to decide the instant motions, it concludes that the Affidavit, at least at this stage, is harmless.   Accordingly, Plaintiffs' Motion to Preclude Gallagher's Affidavit is denied, without prejudice to renew before trial.

II.   **Applicability of the *Rooker-Feldman* Doctrine and Doctrine of *Res Judicata* to the Foreclosure Action Order**

The Eber Defendants have asked this Court to find that Plaintiffs are barred by the *Rooker-Feldman* doctrine and the principles of *res judicata* from seeking to unwind the transfer of Eber Metro to Alexbay because Justice Rosenbaum already found that Alexbay's strict foreclosure of EBWLC's interest in Eber Metro's stock, in satisfaction of the outstanding secured loans Lester assigned to Alexbay pursuant to U.C.C. § 9-620, was "commercially reasonable" under  U.C.C. §9-627.  (Dkt. No. 262-35 ("Eber Defs.' Mem. of Law in Supp.") 15-16.)  The Eber Defendants contend that the *Rooker-Feldman* doctrine and the principles of *res judicata* apply

because, "[t]he crux of Plaintiffs' claims is that Justice Rosenbaum's Order approving the 2012 Foreclosure divested Plaintiffs of their beneficial interest, as beneficiaries of the Trust, in Metro and Eber CT." (*Id*. at 17.)

Plaintiffs counter that their claims are not barred by the *Rooker-Feldman* doctrine and the doctrine of *res judicata* because their injuries were not caused by the outcome in the Foreclosure Action. Indeed, and as acknowledged by the Eber Defendants, no court proceeding or court order was required to finalize the foreclosure of EBWLC'S interest in Eber Metro by Alexbay under U.C.C. § 9-620. Thus, Plaintiffs contend they were not harmed by the foreclosure itself. Rather, they were harmed by the Security Agreements and Guaranty that gave Lester the option of foreclosing on Eber Metro to settle the debt owed to him by EBWLC and by EBWLC's consent to transfer its interest in Eber Metro to Alexbay following its default on the loans owed to Alexbay. The Court agrees with Plaintiffs.

It is well established that the *Rooker-Feldman* doctrine constrains " 'state-court losers [from] complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments.' " *Hoblock v. Albany Cty. Bd. of Elections*, 422 F.3d 77, 85 (2d Cir. 2005) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)). As explained by the Second Circuit, "[u]nderlying the Rooker–Feldman doctrine is the principle, expressed by Congress in 28 U.S.C. § 1257, that within the federal judicial system, [with the exception of habeas corpus review,] only the Supreme Court may review state-court decisions." *Id*. at 85. Four requirements must be met for the *Rooker-Feldman* doctrine to apply: (1) "the federal-court plaintiff must have lost in state court"; (2) "the plaintiff must 'complain[ ] of injuries

caused by [a] state-court judgment' ";  (3) "the plaintiff must 'invit[e] district court review and rejection of [that] judgment[ ]' ";  (4) "the state-court judgment must have been 'rendered before the district court proceedings commenced.' "  *Id*. at 85.

Under U.C.C. § 9-620, a secured creditor may accept collateral from a debtor to satisfy a debt, so long as: (1) the creditor provides notice of its proposal to the debtor (who may waive this right following default) and other parties with interest in the collateral, as set forth in U.C.C. § 9-621(b); and (2) the debtor consents to the acceptance of the collateral in satisfaction of the debt after default. *See also* U.C.C. § 9-620 official comment; *see also generally*; *Remedies Outside the Box: Enforcing Security Interests Under Article 9 of the Uniform Commercial Code*, AMERICAN BAR ASSOCIATION (Aug. 31, 2012), https://www.americanbar.org/groups/business_law/publications/blt/2012/08/03_cabral/.  No court action is required to effectuate a strict foreclosure under U.C.C. § 9-620.

In May of 2012, Justice Rosenbaum issued an Order finding that Alexbay's acceptance of EBWLC's interest in Eber Metro was "commercially reasonable" under the U.C.C. (Lester Aff. in Supp. ¶ 50; *id*. at Ex. M.)  However, the Order did not purport to award Alexbay anything, nor did it require EBWLC to give anything to Alexbay.  Then, in June of 2012, EBWLC's Board, consisting of Wendy and Gumaer, consented to Alexbay's acceptance of EBWLC's interest in Eber Metro.  All 20,000 shares of Eber Metro stock were registered in Alexbay's name that same month.  (Pls.' Rule 56.1 Statement ¶ 59, ¶ 62; Dkt. No. 266-4 Ex. 61, 52-54.)  Thus, Plaintiffs' alleged injuries did not flow from the Foreclosure Action or Judge Rosenbaum's Order, but rather, from the underlying agreements that gave Lester (and later Alexbay) the right to Foreclose on EBWLC's assets to satisfy its debt and EBWLC's decision to transfer all of

its shares of Eber Metro stock to Alexbay.  Because a core requirement of the *Rooker-Feldman*

doctrine is that a causal connection exist between the state court judgement and plaintiffs'

injury, the *Rooker-Feldman* doctrine does not bar Plaintiffs from challenging the validity of

Alexbay's strict foreclosure on EBWLC's interest in Eber Metro and, by extension, all of Eber

Metro's interest in Eber-CT.  *See McKithen v. Brown*, 481 F.3d 89, 97–98 (2d Cir. 2007).

    The Eber Defendants also argue that the *Rooker-Feldman* doctrine bars Plaintiffs from

challenging the validity of the underlying debts owed by EBWLC to Lester (and later Alexbay)

because Justice Rosenbaum's Order "effectively confirmed the validity of the debts to Alexbay."

(Eber Defs.' Mem. of Law in Supp. 18-19.)  To support this contention, the Eber Defendants' cite

a litany of cases holding that the *Rooker-Feldman* doctrine bars plaintiffs from attacking state

court judgments of foreclosure.  *See, e.g.*, *Feliciano v. U.S. Bank Nat. Ass'n*, No. 13-CV-5555

(KBF), 2014 WL 2945798, at *3 (S.D.N.Y. June 27, 2014) (court lacked jurisdiction over claims

challenging default judgment of foreclosure and sale)*; Webster v. Wells Fargo Bank, N.A.*, No.

08 CIV. 10145, 2009 WL 5178654, at *6 (S.D.N.Y. Dec. 23, 2009) (court lacked jurisdiction over

plaintiffs' claims challenging state court judgment of foreclosure under the *Rooker-Feldman*

doctrine), *aff'd sub nom. Webster v. Penzetta*, 458 F. App'x 23 (2d Cir. 2012), *as amended* (Jan.

24, 2012); *Parra v. Greenpoint Mortg.*, No. CIV.A. 01-CV-02010, 2002 WL 32442231, at *2

(E.D.N.Y. Mar. 26, 2002), *aff'd sub nom. Parra v. Wilshire Credit Corp.*, 53 F. App'x 164 (2d Cir.

2002) (the fact that the state court judgment of foreclosure was obtained by fraud did not

remove claims attacking the judgment from the scope of the *Rooker-Feldman* doctrine).

    As explained above, Justice Rosenbaum's Order was not a judgment that awarded

Alexbay anything.  The cases cited by the Eber Defendants are inapposite because they all

involve plaintiffs who sought to attack state court judgments of foreclosure that awarded banks the right to foreclose upon the plaintiffs' homes.  As such, the Court rejects the Eber Defendants' argument that Plaintiffs' challenge to the validity of the underlying debt is barred by the *Rooker-Feldman* doctrine.

The Court similarly finds unpersuasive the Eber Defendants' argument that Plaintiffs' claims seeking the return of Eber Metro to a constructive trust are barred by the doctrine of *res judicata*.  For *res judicata* to apply, there must be "'a final judgment on the merits of an action [that] precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" *Greco v. Local.com Corp.*, 806 F. Supp. 2d 653, 657 (S.D.N.Y. 2011) (quoting *Allen v. McCurry*, 449 U.S. 90, 94 (1980)).  As explained above, Justice Rosenbaum's order was not a final judgment that awarded Alexbay anything and, thus, *res judicata* does not apply.  Furthermore, Plaintiffs were not parties to the Foreclosure Action.  Thus, they are not relitigating anything in this action.  Accordingly, for the reasons set forth above, this Court finds that Plaintiffs' claims are not barred by the *Rooker-Feldman* doctrine or the principles of *res judicata*.

III. **Plaintiffs' Motion for Partial Summary Judgment on Their Declaratory Judgment Claim (Count VI), and the Eber Defendants' Cross-Motion to Dismiss Plaintiffs' Declaratory Judgment Claim as Duplicative of Other Claims**

Federal Rule of Civil Procedure 57 ("Rule 57") governs the procedure for obtaining a declaratory judgment under 28 U.S.C. § 2201, the Declaratory Judgment Act, which provides that:

> In a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested

> party seeking such declaration, whether or not further relief is or
> could be sought.

28 U.S.C. § 2201; *see also Kleeberg*, 331 F.R.D. at 323.  The Act grants district courts broad

discretion to determine whether to exert jurisdiction over a declaratory judgment action. *See*

*Dow Jones & Co. v. Harrods Ltd.,* 346 F.3d 357, 359 (2d Cir. 2003).  "[T]his broad discretion is

reviewed deferentially, for abuse of discretion."  *Dow Jones & Co. v. Harrods Ltd.*, 346 F.3d 357,

359 (2d Cir. 2003) (first citing *Wilton v. Seven Falls Co.*, 515 U.S. 277, 289 (1995); then citing

*Brillhart v. Excess Ins. Co. of Am.*, 316 U.S. 491, 494–95 (1942); then citing 10B CHARLES ALAN

WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2759 (4th ed.)).  "When determining

whether to entertain a declaratory judgment claim, courts in the Second Circuit ascertain: '(1)

whether the judgment will serve a useful purpose in clarifying or settling the legal issues

involved; and (2) whether a judgment would finalize the controversy and offer relief from

uncertainty.' " *Kleeberg*, 331 F.R.D. at 323 (quoting *Duane Reade, Inc. v. St. Paul Fire & Marine*

*Ins. Co.*, 411 F.3d 384, 389 (2d Cir. 2005)).

It is well settled that "[a] declaratory judgment action 'cannot be maintained [when] it

parallels the other claims and merely seeks a declaration of the same rights and obligations.' "

*Culwick v. Wood*, 384 F. Supp. 3d 328, 343 (E.D.N.Y. 2019) (first quoting *Campione v. Campione*,

942 F. Supp. 2d 279, 285 (E.D.N.Y. 2013) (alteration in original); then citing S*mith v. Metro.*

*Prop. & Liab. Ins. Co.*, 629 F.2d 757, 760 (2d Cir. 1980); then citing *Necchi S.p.A. v. Necchi*

*Sewing Mach. Sales Corp.*, 348 F.2d 693, 696 (2d Cir. 1965)).  A claim is duplicative where "it

seeks no relief that is not implicitly sought in the other causes of action."  *Sofi Classic S.A. de*

*C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 249–50 (S.D.N.Y. 2006) (citing *Del Greco v. CVS Corp.* 337

F. Supp. 2d 475, 488 (S.D.N.Y. 2004)). "Courts routinely "dismiss[ ] declaratory judgment

[claims] as redundant when the [declaratory judgment claim] would be rendered moot by the adjudication of corresponding claims in the complaint." *Vasu v. Combi Packaging Sys. LLC*, No. 5:18-CV-1889, 2020 WL 2733756, at *9 (N.D. Ohio May 25, 2020) (first quoting *Hardiman v. McKeen*, No. 19-12949, 2020 WL 1821025, at *4 (E.D. Mich. Apr. 10, 2020); then citing *Malibu Media, LLC v. [Redacted]*, 705 F. App'x 402 405–06 (6th Cir. 2017)).

Plaintiffs have moved for summary judgment, in part, on their Declaratory Judgment Claim (Count VI) (the "Declaratory Judgment Claim"). The Declaratory Judgment Claim seeks a declaration that:

1. (a) Lester has unreasonably delayed and interfered with Plaintiffs' ability to establish legal title over the EB&C shares that were held by the Trust; and, (b) accordingly, Lester is now obligated as a matter of New York law to take all necessary steps to enable Plaintiffs to establish legal title over the EB&C shares in accordance with the Final Account entered by the Surrogate's Court (Ex. H).

2. EB&C, including its corporate Secretary, Wendy, must recognize Plaintiffs as shareholders of record in EB&C, together holding two-thirds of the shares previously held by the Trust.

3. Plaintiffs are entitled to a declaration that EB&C's board shall consist of three directors, two of whom shall be elected by Plaintiffs, and one of whom shall be elected by Lester.

4. Because neither EB&C nor EBWLC has had a validly constituted board of directors since at least February 2017, Plaintiffs are entitled to a declaration that all significant corporate actions since then, whether taken by the board or the officers appointed by the board, are deemed null and void, or at least voidable by a majority of a properly elected and constituted board.

5. Regardless of whether an injunction is issued against Lester's attempt to take Plaintiffs' shares in EB&C, a declaratory judgment should be issued specifying that it would be unlawful for Lester to take any actions to prevent Plaintiffs from exercising all legal rights

attendant to hold legal title to the shares in accordance with the Final Account.

6.   In the alternative to having their two-thirds interest in EB&C recognized in accordance with the Final Accounting, Plaintiffs seek a declaration that certain Stock Powers executed by CNB on or about October 2, 2017, must be accepted for delivery by Wendy and EB&C and recorded by Wendy on EB&C's stock book.

(TAC ¶¶ 347-52.)  For their part, the Eber Defendants have not only opposed Plaintiffs' Motion for Partial Summary Judgment on their Declaratory Judgment Claim, but have also cross-moved to dismiss Plaintiffs' Declaratory Judgment Claim in its entirety as duplicative of "Counts l [breach of fiduciary duty related to improper transactions], ll [breach of fiduciary duty under the faithless servant doctrine], lV [claim under B.S.C. § 720 to set aside and enjoin unlawful transactions,] and V [claim under B.S.C. § 619 for new elections]" in the TAC.  (Eber Defs.' Mem. of Law in Supp. 35.)  The Court addresses these arguments in detail below.

### i. Plaintiffs' Claim to Set Aside and Enjoin Unlawful Transactions (Count IV)

In Count IV, Plaintiffs seek to set aside and enjoin certain transactions under New York Business Corporation Law ("B.S.C.") § 720.  The statute provides that "[a]n action may be brought against one or more directors or officers of a corporation to procure a judgment . . . [t]o set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of its unlawfulness" and to "enjoin a proposed unlawful conveyance, assignment or transfer of corporate assets, where there is sufficient evidence that it will be made." B.S.C. § 720(a)(2)-(3).

In Count IV, Plaintiffs seek to set aside the following transactions:

- The February 14, 2017 appointment of Wendy as the sole director of EBWLC on the basis that EBWLC's Bylaws

> required the board to consist of either three directors or, if fewer, as many directors as there are shareholders, and Plaintiffs contend that EBWLC had two shareholders – EB&C and the Trust;

- The February 2017 Amendment to EBWLC's Certificate of Incorporation that issued 750 preferred shares of EBWLC stock because it was authorized by an invalidly constituted board of directors; and

- Set aside Lester's receipt of 750 preferred shares of EBWLC stock.

(TAC ¶¶ 298, 301-304.) Count VI (the Declaratory Judgment Claim) also seeks to enjoin Lester from invoking the Transfer Restriction in EB&C's Bylaws to take all of the shares of EB&C stock for himself. (*Id*. ¶¶ 305-30.)

This Court has compared the relief sought in Count IV with the Declaratory Judgment Claim (Count VI), and finds that the Declaratory Judgement Claim relies on essentially the same legal theories and seeks the same relief as Count IV. For example, with respect to Wendy's appointment as sole director of EBWLC and the issuance of the 750 preferred shares of EBWLC stock, in both Count IV and the Declaratory Judgment Claim, Plaintiffs argue that Wendy's appointment as sole director of EBWLC and her decision to amend EBWLC's Bylaws to issue the stock was invalid because EBWLC lacked a validly constituted board of directors. (*Compare* TAC ¶¶ 301-304 (Count IV); *with id*. ¶ 350 (Count VI).)

Likewise, Plaintiffs' request that a declaratory judgment be issued stating, among other things, that Lester is "obligated as a matter of New York law to take all necessary steps to enable Plaintiffs to establish legal title over the EB&C shares in accordance with the Final Account entered by the Surrogate's Court" and that "EB&C, including its corporate Secretary, Wendy, must recognize Plaintiffs as shareholders of record in EB&C, together holding two-

thirds of the shares previously held by the Trust," is duplicative of their claim to enjoin Lester from invoking the Transfer Restriction in EB&C's Bylaws to take all of the shares of EB&C for himself.  (*Compare id*. ¶¶ 305-30 (Count IV); *with id*. ¶¶ 347-48 (Count VI).)  It is telling that, in their Motion for Partial Summary Judgment, Plaintiffs have made many of the same arguments in favor of their Declaratory Judgment Claim as they made in the TAC in favor of Count IV.  For example, in both Count IV of the TAC and in their moving brief seeking Summary Judgment on their Declaratory Judgment Claim, Plaintiffs argue that Lester is enjoined from taking the EB&C shares of stock formerly held by the Trust because: (1) as the "transferor" of the shares, Lester could not invoke the Transfer Restriction against himself; (2) due to his failure to inform the Surrogate's Court of the Transfer Restriction, he is estopped from seeking to enforce the Restrictions after-the-fact; (3) the Transfer Restriction was not valid against Plaintiffs because they had no actual knowledge of the Transfer Restriction and the Restrictions were not conspicuously noted on the EB&C stock certificates; and (4) the Surrogate's Court already determined what the appropriate distribution of shares should be among the Trust beneficiaries – 1/3 to Lester Eber; 1/3 to Audrey Hays; 1/6 to Daniel Kleeberg; and 1/6 to Lisa Stein.  (*Compare* TAC ¶¶ 305-30; *with* Pls.' Mem. in Supp. 8-12.)

Despite having an opportunity to do so, Plaintiffs have not explained how the relief they seek in Count VI is distinguishable from the relief sought in their Declaratory Judgment Claim. In their opposition to the Eber Defendants' Motion for Partial Summary Judgment, Plaintiffs made the following argument:

> [S]ince Defendants have not formally conceded any of the other Counts [in the TAC], this Court might decide for some reason not to enjoin Lester's actions, order new elections, etc., for reasons that do not otherwise impair Plaintiffs' rights to be recognized as

> shareholders of EB&C. If for whatever reason that happens, then Count VI will be the appropriate means for determining Plaintiffs' shareholder rights.

(Pls.' Mem. in Supp. 30.)  This explanation is insufficient to explain how the Declaratory Judgment Claim is not duplicative of Count IV.  The Court also notes that, in their Declaratory Judgment Claim, Plaintiffs concede that "no declaration of Plaintiffs' rights to . . . [the EB&C] shares [of stock] is believed to be necessary from this Court." (TAC ¶ 346.)

Accordingly, for all the reasons discussed above, the Court finds that issuing the Declaratory Judgment sought by Plaintiffs – finding that significant corporate actions by EB&C and EBWLC since at least February 2017 are void or voidable and that Lester and Wendy must assist Plaintiffs in establishing legal title to their EB&C shares of stock pursuant to the Surrogate's Court Order – are duplicative of their claims in Count IV and will not help to clarify of settle the legal issues involved in this case or "finalize the controversy and offer relief from uncertainty.' " *Kleeberg*, 331 F.R.D. at 323 (quoting *Duane Reade, Inc.*, 411 F.3d at 389); *see also 222 Broadway, LLC v. Cont'l Cas. Co.*, 886 N.Y.S.2d 72 (Sup. Ct. N.Y. Cty. 2009) (dismissing declaratory judgment claim as duplicative of claim seeking injunctive relief).  As such, those portions of Plaintiffs' Declaratory Judgment claim must be dismissed.

Finally, it is undisputed that CNB's proposed stock distributions, through stock powers, were incorrect.  As such, Plaintiffs' request that the Court issue a declaration, in the "alternative . . . that certain Stock Powers executed by CNB on or about October 2, 2017, must be accepted for delivery by Wendy and EB&C and recorded by Wendy on EB&C's stock book," will not help clarify the issues in this case or the parties' rights.  (TAC ¶ 352; *see also* Pls.' Mem of Law in Supp. 8; Dkt. No. 271-1 ("Pls.' Proposed Order ") ¶ 1; CNB's Decl. in Supp. of Mot. to Intervene

Ex. 7 (purporting to allocate the EB&C voting shares of stock to the Trust beneficiaries as follows: Audrey Hays (706 shares); Lisa Stein (137 shares); and Daniel Kleeberg (301 shares).) Accordingly, the Court also declines to exert its jurisdiction over this portion of Plaintiffs' Declaratory Judgment Claim.

In light of the above, the Eber Defendants' Motion for Summary Judgment is granted with respect to Plaintiffs' Declaratory Judgment Claim, and Plaintiffs' Declaratory Judgment Claim is dismissed.

### ii.   Plaintiffs' Claim for New Elections (Count V)

In Count V, Plaintiffs seek new elections pursuant to B.S.C. § 619 ("Count V"), which permits courts, "upon the petition of any shareholder aggrieved by an election" to, among other things, "order a new election, or take such other action as justice may require."  In Count V, Plaintiffs request that, "[i]n connection with a new election [for the board of EB&C], Plaintiffs' voting rights in their shares distributed by the Trust must be recognized."  (TAC ¶ 336.)  As discussed above, Plaintiffs claim they are entitled to two-thirds of the EB&C shares of stock and, thus, believe they are entitled to vote for two out of three directors on EB&C's board.  (*Id.* ¶ 336-37.)  In their Declaratory Judgment Claim, Plaintiffs seek a declaration that "EB&C's board shall consist of three directors, two of whom shall be elected by Plaintiffs, and one of whom shall be elected by Lester," consistent the EB&C shares of stock they are all entitled to as beneficiaries of the Trust.  (*Id.* ¶ 349.)  As demonstrated above, this aspect of Plaintiffs' Declaratory Judgment Claim is duplicative of Count V and is, therefore, dismissed.

Having dismissed the entirety of Plaintiffs' Declaratory Judgment Claim, the Court does not address the other arguments raised by the Eber Defendants in favor of dismissing Plaintiffs' Declaratory Judgment Claim.

**IV.   Defendants' Cross-Motion to Dismiss Plaintiffs' Claim Against Wendy for Aiding and Abetting the Co-trustees' Breaches of Fiduciary Duty (Count VIII)**

The Eber Defendants contend that Plaintiffs' Count VIII against Wendy for fraudulent concealment and aiding and abetting Lester's and Gumaer's breaches of fiduciary duty, as co-trustees of the Trust, should be dismissed as duplicative of the breaches of fiduciary duty claims asserted against Wendy in Counts I and II, in her capacity as a director and officer EBWLC.  (Eber Defs.' Mem. of Law in Supp. 36.)  However, Count VII is not duplicative of Counts I and II simply because all Counts assert claims under a theory of breach of fiduciary duty.  Counts I and II expressly assert breach of fiduciary duty claims against Wendy in her capacity as director and officer of EBWLC.  (Pls.' Mem. of Law in Opp'n 31; *see also* TAC ¶ 183, 212-14, 264-69.)  In contrast, Count VIII asserts a fraudulent concealment and aiding and abetting claim against Wendy for her role in allegedly helping Lester and Gumaer violate their fiduciary duties to Plaintiffs as co-trustees of the Trust.  (TAC ¶¶ 372-77); *see also In re Platinum-Beechwood Litig.*, 400 F. Supp. 3d 2, 5 (S.D.N.Y. 2019) ("[I]t is not an element of a claim for aiding and abetting breach of fiduciary duty that the defendant must . . . owe fiduciary duty to the plaintiff, separate from the duty owed by a fiduciary to the plaintiff.").  Accordingly, Defendants' Cross-Motion to Dismiss Count VIII as duplicative of Counts I and II is denied.

## V.   Plaintiffs' Request for An Order Mandating New Elections Pursuant to B.S.C. § 619 (Count V)

Plaintiffs' request for an order mandating that new elections take place pursuant to

B.S.C. § 619 (Count V) is denied as premature.  Article V of EB&C's Bylaws state that "[e]very

shareholder of record shall be entitled to one vote for each share standing in his name on the

record of shareholders."  Article VI of the Bylaws states that "[t]he shares of [EB&C] shall be

represented by certificates . . . .  [that] shall state upon the face thereof: "The name of the

person or persons to whom issued. . . . The number and class of shares, and the designation of

the series, if any, which such certificate represents."  Because Plaintiffs have not yet been issued

stock certificates in their own names, they are not currently registered shareholders of EB&C

with voting rights.  Although Plaintiffs contend that they "together held two-thirds of the

equitable voting interest in EB&C through their two-thirds beneficial interest in the Trust," they

have not provided any legal authority to show that "equitable voting interest" is a concept that

is cognizable under New York Law.  As such, Plaintiff's Motion for Partial Summary Judgment in

their favor with respect to Count V is denied.

## VI.   Plaintiffs' Motion for Summary Judgment On Their Breach of Fiduciary Duty Claim Against Lester Eber (Count I) On the Basis that He Usurped Corporate Opportunity

Next, Plaintiffs contend that Lester usurped corporate opportunity by entering into the

Southern Consulting Agreement (Count I).  "Under the doctrine of corporate opportunity in

New York, 'corporate fiduciaries and employees cannot, without consent, divert and exploit for

their own benefit any opportunity that should be deemed an asset of the corporation.'"  *See*

*Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 205–206 (S.D.N.Y. 2008) (quoting *Alexander &*

*Alexander of N.Y. v. Fritzen*, 147 A.D.2d 241, 246 (App. Div. 1st Dep't 1989)).  "A business

opportunity is deemed an asset if the 'corporation has a 'tangible expectancy' which means 'something much less tenable than ownership, but, on the other hand, more certain than a desire or a hope.' " *Berman*, 580 F. Supp. 2d at 206 (quoting *American Fed. Group, Ltd. v. Rothenberg*, 136 F.3d 897, 906 (2d Cir. 1998)).  Courts also may consider "whether an opportunity is the same as or is necessary for, or essential to, the line of business of the corporation." *Alexander & Alexander*, 147 A.D.2d at 248 (internal quotation marks and citation omitted); *see also generally American Fed. Group, Ltd.* 136 F.3d at 906 (noting that a "shareholder, officer and director of a closely held corporation, is under a duty 'to deal fairly, in good faith, and with loyalty' to the corporation and other shareholders" (quoting *Benson v. RMJ Sec. Corp.*, 683 F. Supp. 359, 375 (S.D.N.Y. 1988)).

Plaintiffs maintain that Lester usurped corporate opportunity by entering into the Southern Consulting Agreement, in part, because, by expressly prohibiting Lester from competing against Southern in New York, the Agreement constrained the Eber Entities from continuing to do business in New York.  (TAC ¶ 191.)  For their part, Defendants argue that Plaintiffs' claim that Lester usurped corporate opportunity is without merit because Lee Hager, Southern's Rule 30(b)(6) witness, unequivocally testified that Southern had no interest in entering into a consulting agreement with the Eber Entities because Southern had a practice of only entered into consulting agreements with individuals.  (Dkt. No. 277 ("Eber Defs.' Mem. of Law in Opp'n") 28-30; Hager Dep. Tr. 36:11-37:12, 38:01-04, 40:40-41:01, 41:16-43:02, 43:23-44:09, 69:14-18, 69:20-22, 70:23-25.)  The Eber Defendants also contend that EBWLC and Eber Metro "laid off all employees and ceased New York operations" before August of 2007 – the

month Lester entered into the Southern Consulting Agreement.   (Eber Defs' Rule 56 Statement ¶ 25.)

Here, the Court finds that there is an issue of material fact with respect to whether or not Lester usurped corporate opportunity by entering into the Southern Consulting Agreement that precludes summary judgement, insofar as the parties disagree about whether Lester entered into the Agreement before or after the Eber Entities ceased operations in New York.[8] Resolution of this fact issue is material to resolving this claim.   To support their contention that EBWLC did not cease New York operations prior to August of 2007 – the time of Lester's hiring as a consultant for Southern – Plaintiffs point to, among other things, a ledger that appears to show payroll records for EBWLC's employees through July of 2010.   (Brook Decl. in Opp'n Ex. 168.)   However, the records also appear to indicate that the payroll costs were reimbursed by Eber-CT, which undisputedly operated in Connecticut.   (*Id*.)   As such, it is unclear to this Court whether the expenses incurred by EBWLC were related to salary payments to employees working in New York or Connecticut.   In sum, the dispute about when the Eber Entities ceased operating in New York is material because, if EBWLC and Eber Metro had already ceased operations in New York at the time Lester negotiated and entered into the Southern Consulting Agreement, it is plausible that there would have been no reason for Southern to give the Eber Entities any consideration in exchange for a restrictive covenant in New York.   Accordingly, both

---

[8] To the extent Defendants contend that the District Court overseeing the PBGC Action "held, as a matter of law, that EBWLC ceased operations by December 31, 2007," that is a mischaracterization of the District Court's order. (*See* Wendy Eber Aff. in Supp ¶ 21.)   In its opinion, the district court noted that the exact date EBWLC ceased its New York operations was unclear.   (PBGC Action Opinion and Order 5.)

Plaintiffs' and the Eber Defendants' Cross-Motions for Partial Summary Judgment are denied as to this claim.

### VII.   The Eber Defendants' Cross-Motion to Dismiss Part of Plaintiffs' Breach of Fiduciary Duty Claims Under the Faithless Servant Doctrine Claims (Count II), as Against Lester Eber

The Eber Defendants have moved for Summary Judgment to Dismiss the portion of Count II of the TAC alleging that Lester Eber breached his fiduciary duties to the Eber Entities by entering into the Southern Consulting Agreement.  (Defs.' Mem. of Law in Supp. 29-30.)  The Eber Defendants contend that this portion of Count II "fails as a matter of law against Lester Eber in his capacity as a Co-trustee of the Trust and corporate director" and seek a "judgment as a matter of law dismissing Plaintiffs' faithless servant claims" on the bases that claims brought pursuant to the faithless servant doctrine are not cognizable against trustees and corporate directors and Lester did not usurp corporate opportunity by entering into the Southern Consulting Agreement.  (*Id.*)

The Eber Defendants' Cross-Motion is denied.  First, the Court notes that the TAC does not expressly assert the faithless servant claim against Lester in his capacity as corporate director of the Eber Entities or as co-trustee of the Trust, but, rather, as a "fiduciary or employee" of the Eber Entities.  (TAC ¶¶ 373-79.)  This distinction is significant because, even if Defendants are correct that claims cannot be brought pursuant to the faithless servant doctrine against directors and trustees, this argument ignores Lester's undisputed role as an officer of the Eber Entities.  (Pls.' Rule 56 Statement ¶ 23; Eber Defs.' Rule 56 Counterstatement ¶ 23.)  And, courts in this Circuit applying New York Law have found that the faithless servant doctrine may apply against corporate officers.  *See, e.g.*, *Tyco Int'l, Ltd. v.*

*Kozlowski*, 756 F. Supp. 2d 553, 564 (S.D.N.Y. 2010); *Battle Fowler v. Brignoli*, 765 F. Supp.

1202, 1203 (S.D.N.Y.), *aff'd,* 952 F.2d 393 (2d Cir. 1991).

Second, and as explained above, a material factual disputes exists with respect to

whether Lester usurped a corporate opportunity from the Eber Entities by entering into the

Southern Consulting Agreement.  *See infra* Discussion Pt. VI.   Accordingly, for all the reasons

stated above, the Eber Defendants' Cross-Motion to Dismiss Plaintiffs' faithless servant claim

against Lester Eber is denied.

**VIII.   Alexbay's Foreclosure on Eber Metro and Related Corporate Transactions (Count I)**

There is no dispute that Allen Eber's Will designated Lester as both a Trustee and

beneficiary of the Trust.  (Will §§  9, 12.)  The Will also expressly permitted the Trustees to

make loans to the Trust that were securitized by Trust assets, and expressly provided that

Trustees were permitted to:

> [B]orrow money from [EB&C] or others for the benefit of my estate
> or any trust hereunder, and to secure the loan by pledge or
> mortgage of the property of my estate or any trust and to renew
> existing loans . . . .

(Will § 12 (H).)  Plaintiffs, however, dispute Lester's contention that he had the right, pursuant

to the Will, to foreclose upon and take the collateral for himself.  And they argue that, by

orchestrating Alexbay's foreclosure of EBWLC's interest in Eber Metro, Lester violated his

fiduciary duties to Plaintiffs as co-trustee of the Trust.  Plaintiffs also posit that, by agreeing to

transfer Eber Metro to Alexbay through a strict foreclosure, the Eber Defendants, as officers of

EBWLC, violated their obligation to act in the best interests of their shareholders, EB&C and the

Trust.  (Pls.' Mem. of Law in Supp. 22-31.)  Plaintiffs argue that under both New York trusts and

48

estates law and New York corporate law, Alexbay's Foreclosure on Eber Metro was improper and must be unwound, and that Eber Metro must be placed in a constructive trust.

The Eber Defendants' raise a number of defenses in response. They steadfastly maintain that EBWLC had only one shareholder – EB&C. They also contend that Lester provided the Trust beneficiaries – then Lisa Stein and Audrey Hays – with copies of the loan agreements, including the Security Agreement and Guaranty that expressly granted him the right to take EBWLC's interest in Eber Metro in the event EBWLC failed to pay back its loans. The Eber Defendants represent that the Trust beneficiaries did not object to the terms of the loans or to the Security Agreement and the Guaranty. (Eber Defs.' Rule 56 Counterstatement ¶ 43.)

The Court addresses the parties' arguments below, first pursuant to the framework of New York trusts and estate law and, second, pursuant to the framework of New York corporate law.

### a. New York Trusts and Estates Law

#### i. A Trustee's Duty of Undivided Loyalty to Trust Beneficiaries and the No Further Inquiry Rule

It is well settled that "[a] trustee who is also a beneficiary of the trust has an inherent conflict with other trust beneficiaries." *Milea v. Hugunin*, 890 N.Y.S.2d 369 (Sup. Ct. Onondaga Cty. 2009) (citing Scott on Trusts, § 107.1, 120 and § 99.1, 50); *see also generally* Karen E. Boxx, *Too Many Tiaras: Conflicting Fiduciary Duties in the Family-Owned Business Context*, 49 HOUS. L. REV. 233 (2012) (discussing fiduciary duties of trustee-beneficiaries in the context of closely-held family corporations). The mere fact that "a settlor is permitted to appoint a conflicted trustee/beneficiary does not mean that the courts may ignore the conflict," and "courts must review a trustee/beneficiary's conduct and actions with strict scrutiny and with

special care." *Milea*, 890 N.Y.S.2d 369 (first citing In *re* Heller, 6 N.Y.3d 649, 656 (2006); then citing In *re* Peabody's Will, 198 Misc. 505, 96 N.Y.S.2d 556 (Sup. Ct. Suffolk Cty. 1950), aff'd, 277 A.D. 905, 98 N.Y.S.2d 614 (App. Div. 2nd Dep't 1950); then citing Restatement of Trusts, § 50, Cmt. (b)).

"[A] fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect." *Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466 (1989). "The rule of undivided loyalty requires that a trustee 'must not, under any circumstances, place himself in a position whereby his personal interests will come in conflict with the interest of his beneficiary.' " *Benedict v. Amaducci*, No. 92 CIV. 5239 (KMW), 1993 WL 87937, at *5 (S.D.N.Y. Mar. 22, 1993) (61 N.Y. Jur. Trusts § 295, at 491 (1968)).

The no further inquiry rule enforces a trustee's duty of undivided loyalty by prohibiting a trustee from acquiring trust property for him or herself (or transfer such property to their spouse), absent certain exceptions.  As explained by the Second Circuit: "Under the higher standard of undivided loyalty, the law 'stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent, without undertaking to deal with the question of abstract justice in the particular case.' " *Renz v. Beeman*, 589 F.2d 735, 744 (2d Cir. 1978) (quoting *Wendt v. Fischer*, 243 N.Y. 439, 444 (1926); and *Munson v. Syracuse, Geneva & Corning R.R.*, 103 N.Y. 58, 74 (1886)); *see also generally Phelan v. Middle States Oil Corp.*, 220 F.2d 593, 603 (2d Cir. 1955) (a " 'trustee violates his duty to the beneficiary not only where he purchases trust property for himself individually, but also where he has a personal interest in the purchase of such a substantial nature that it might affect his judgment in making the sale' " (quoting Restatement

of Trusts § 170, Comment (c)).  Upon finding that the no further inquiry rule is implicated, "the

court is generally required, upon challenge by a beneficiary, to set aside a transfer of property,

held in trust by a fiduciary, to the fiduciary himself or an entity in which he or she has an

interest."  *In re Parisi*, 111 A.D.3d 941, 943 (2013) (father's sale of stock to his son did not

trigger no further inquiry rule).

### ii. Exceptions to the Duty of Undivided Loyalty and No Further Inquiry Rule

New York law provides three different ways in which a self-dealing Trustee may be

excused from his or her obligation of undivided loyalty and the no further inquiry rule.  First, a

trustee may engage in self-dealing when expressly permitted by the trust instrument.  *See*

*Benedict v. Amaducci*, No. 92 CIV. 5239 (KMW), 1993 WL 87937, at *4 (S.D.N.Y. Mar. 22, 1993)

("trust settlor . . . may relieve a trustee of this duty of loyalty by affirmatively condoning self-

interested transactions" (first citing *Renz*, 589 F.2d at 744; then citing *Tucker Anthony Realty*

*Corp. v. Schlesinger*, 888 F.2d 969, 972 (2d Cir. 1989)); *see also O'Hayer v. de St. Aubin*, 30

A.D.2d 419, 424, 293 N.Y.S.2d 147, 152 (1968) (holding that the settlor's son and trustee could

legally purchase trust assets for a fair price because the trust instrument expressly provided

that the son "shall benefit and profit from [his]trusteeship [ ]" and "authorized his son to

purchase at any time any part or the whole of the shares of stock held in the trust . . . ."); *cf.*

*Renz*, 589 F.2d at 741 (exculpatory clause providing that "decision of the Trustees with respect

to the exercise or non-exercise by them of any discretionary power hereunder, or the time or

manner of the exercise thereof, made in good faith, shall fully protect them and shall be

conclusive and binding upon all persons interested in the trust estate" did not lower trustee's

standard of duty to one of good faith).

51

Second, a trustee may engage in self-dealing where a court, after conducting a "full exploration of the facts" and permitting the trust beneficiaries to object, approves the transaction. *See In re Scarborough Props. Corp.*, 25 N.Y.2d 553, 559 (1969) (permitting trustee to acquire trust assets from himself following a private sale following proceeding where trust beneficiaries were represented and court conducted "full exploration of the facts" justifying the sale). As explained by the Second Circuit, limiting a trustee's ability to engage in self-dealing is paramount because a "[c]onflict can arise when a trustee becomes a competitor with the trust for a business opportunity" and "[f]avoring one beneficiary over others may also be a source of conflict." *Renz*, 589 F.2d at 746 (citing *Schwartz v. Marien*, 37 N.Y.2d 487, 491 (1975)). And, third, a trustee may engage in self-dealing with the consent of the trust beneficiaries. *See Renz*, 589 F.2d at 745–46 (first citing *In re Van Deusen*, 37 A.D.2d 131, 133 (1971); then citing *In re De Planche*, 318 N.Y.S.2d 194 (1971); then citing *City Bank Farmers Tr. Co. v. Cannon*, 291 N.Y. 125, 132 (1943)).

### iii. Application

With the respect to the first exception to the duty of undivided loyalty, although the Allen Eber Will allowed the Trustees to make loans secured by collateral held in the Trust, the Will did not expressly grant the Trustees the right to foreclose upon the collateral and keep it for themselves. The Eber Defendants contend, without citing any authority, that this provision of the Will should be interpreted as having "relax[ed] . . . [the] Trustee[s'] duties . . . expressly or by necessary implication," and, thus, allowing Lester to foreclose upon trust assets secured as collateral for the loans. (Eber Defs.' Mem. of Law in Opp'n 17.) However, applying the Eber Defendants' logic runs contrary to the prevailing case law, which states that, while trust

instruments may expressly permit self-dealing, such instruments must also be strictly construed. *See O'Hayer*, 30 A.D.2d at 423. And, as acknowledged by the Second Circuit, not adhering to this well-established tenet of strict construction risks making the fiduciary duties implicit in all trustee-beneficiary relationships a nullity. *See Renz*, 589 F.2d at 745 ("Courts may not read exculpatory language broadly, lest they unwittingly permit erosion of the fiduciary duty itself."). In this Court's view, the Trustees' ability to make loans secured by the collateral held in the Trust did not give them carte blanche to foreclose on the collateral without notice to the beneficiaries because the collateral could, for example, have been sold at a public auction. In sum, the fact that the Trustees could secure loans against the collateral held in the Trust did not automatically grant a trustee who made such a securitized loan the right to foreclose on that collateral for him or herself.

The second exception to the duty of undivided loyalty, likewise, does not apply because no court approved the Security Agreements and Guaranty that gave Lester the right to foreclose on the loans himself or the subsequent transfer of Eber Metro to Alexbay after fully exploring the facts and permitting the Trust beneficiaries to make objections. *See Scarborough*, 25 N.Y.2d at 559. Indeed, to the extent the Eber Defendants attempt to analogize the Foreclosure Action to such a proceeding, their argument falls short because the Trust beneficiaries received no notice of the Foreclosure Action and, as contended by the Eber Defendants, lacked standing to appear in that action. (Eber Defs.' Mem. of Law in Opp'n 10-11.) Additionally, the Eber Defendants do not contend that they alerted the judge presiding over the Foreclosure Action about the Trust or the effect that removing Eber Metro and, thus, Eber-CT, from the Trust would have on the value of the Trust. (Lester Aff. in Supp. Ex. L.)

However, a material issue of fact exists with respect to the third exception – whether the Trust beneficiaries consented to the terms of the Security Agreement and Guaranty that granted Lester a security interest in Eber Metro and Eber-CT and allowed him to foreclose on the collateral himself.  The initial Security Agreement and Guaranty were signed in or about February 26, 2010.  (Pls.' Rule 56 Statement ¶ 40; Eber Defs.' Rule 56 Statement ¶ 28.)  After the Security Agreement and Guaranty were signed, Lester offered Sally Kleeberg and Audrey Hays an opportunity to participate in making the loans by contributing up to one-third of the 2010 $1.5 million line of credit each in March and April of 2010, and both declined to do so.  (Pls.' Rule 56 Statement ¶ 43.)  It is, likewise, undisputed that Lester told Sally Kleeberg and Audrey Hays that the Eber companies were in dire straits and badly needed cash. (*Id.*)  From the parties' submissions, it appears that Lester sent Sally Kleeberg and Audrey Hays copies of the loan documents pertaining to the 2010 Line of Credit Note, including the Guaranty Agreement, Line of Credit Note, and Security Agreement.  (Lester Aff. in Supp. Ex. J.)  Although the documents sent to Sally Kleeberg and Audrey Hays are undated and unsigned, these appear to be the same documents executed by Lester in February of 2010.  The Security Agreement states, in relevant part that:

> To secure all of Guarantor's obligations hereunder, Guarantor assigns and grants to Lender a security interest in all moneys, securities, and other property of Guarantor now or hereafter in the possession of lender and all proceeds thereof.
>
> [. . . .]
>
> If Guarantor fails to fulfill its duty to pay all Indebtedness guaranteed hereunder, lender shall have all of the remedies of a creditor and, to the extent applicable, of a secured party, under all applicable law. Without limiting the foregoing to the extent permitted by law, lender may, *at its option and without notice or*

> *demand . . . take possession of any collateral pledged by Borrower or Guarantor*, wherever located, and sell, resell, assign, transfer, and deliver all or any part of the collateral at any public or private sale or otherwise dispose of any or all of the collateral in its then condition, for cash or on credit or for future delivery, and in connection therewith lender may impose reasonable conditions upon any such sale.
>
> Further, lender, *unless prohibited by law the provisions of which cannot be waived*, may purchase all or any part of the collateral to be sold, free from and discharged of all trusts, claims, rights of redemption and equities of Borrower or Guarantor whatsoever. Guarantor acknowledges and agrees that the sale of any collateral through any nationally recognized broker-dealer, investment banker, or any other method common in the securities industry shall be deemed a commercially reasonable sale under the Uniform Commercial Code or any other equivalent statute or federal law, and expressly waives notice thereof except as provided herein . . . .

(Lester Aff. in Supp. Ex. J, 13, 15-16, 51, 53-54 (emphasis added).)  Sally Kleeberg passed away before Plaintiffs commenced this action.  Plaintiffs concede that Lester asked Audrey Hays to make a loan to the family business and that she refused. (Hays Decl. in Supp. ¶ 16.)

Yet, Hays denies knowing about the terms of the loan and Lester's ability to foreclose on the collateral.  (*Id.*)  In particular, Plaintiffs contend that Lester never "informed Sally Kleeberg or Audrey Hays about the possibility that he would take control of the Connecticut business away from the Trust if they declined to loan money to Eber Metro."  (Pls.' Rule 56 Statement ¶ 43.)  They concede, however, that  "Lester . . . purport[ed] to offer [Sally and Audrey] the chance to loan money to Eber Metro on the same terms as Lester did pursuant to the LOC Note, to support 'our Connecticut business and its parent company.' "  (Pls.' Rule 56 Statement ¶ 43.)  For their part, the Eber Defendants contend that Sally Kleeberg and Audrey Hays "did not object to Lester making the loans" and knew about the terms of the loans.  (Eber Defs.' Rule 56 Counterstatement ¶ 43 (citing Lester Eber Aff. in Supp. ¶¶ 31-35).)

Given that the parties dispute whether the Trust beneficiaries knew about the terms of the Security Agreements and Guaranty that ultimately allowed Lester to take Eber Metro for himself, a dispute of material fact exists that must be decided by a jury.  *See Anderson*, 2020 WL 2866960, at *9 (explaining that "[c]redibility assessments, choices between conflicting versions of the events, and the weighing of evidence are matters for [trial], not for the court on a motion for summary judgment." (internal quotation marks and citation omitted)).  As such, the issue of whether Lester violated his duty of undivided loyalty to Plaintiffs, and whether an exception to the rule applies, will depend on findings of fact that must be decided at trial.  As such, Plaintiffs' Motion for Partial Summary Judgment to unwind the transfer of Eber Metro to Alexbay and place Eber Metro in a constructive trust pursuant to a trustee's duty of undivided loyalty and the no further inquiry rule is denied.

**b.  New York Corporate Law**

**i.  The Business Judgment Rule and the Entire Fairness Doctrine**

Plaintiffs also contend that, by consenting to Alexbay's strict foreclosure of Eber Metro on behalf of EBWLC, the Eber Defendants violated New York corporate law and the business judgment rule.  "New York's business judgment rule 'creates a presumption that directors of a company act in good faith and in the best interests of the corporation.' " *United States Small Bus. Admin. v. Feinsod*, 347 F. Supp. 3d 147, 159 (E.D.N.Y. 2018) (quoting *In re Sabine Oil & Gas Corp.*, 562 B.R. 211, 231 (S.D.N.Y. 2016)).  Under the rule, courts assume that directors acted in good faith and are barred from making " 'judicial inquiry into actions of corporate directors taken in good faith and in the exercise of honest judgment in the lawful and legitimate furtherance of corporate purposes.' " *Id*. at 159 (first quoting *Auerbach v. Bennett*, 393 N.E.2d

994, 1000 (1979); then citing *In re Kenneth Cole Prods., Inc.*, 52 N.E.3d 214, 218 (2016)); *see also*

*Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 429 (S.D.N.Y. 2015) (citing B.S.C. § 717 ("A

director shall perform his duties as a director, including his duties as a member of any

committee of the board upon which he may serve, in good faith and with that degree of care

which an ordinarily prudent person in a like position would use under similar circumstances.")).

The business judgment rule does not, however, protect decisions involving " 'fraud, self-

dealing, or bad faith.' " *Feinsod*, 347 F. Supp. 3d at 159 (quoting *Patrick v. Allen*, 355 F. Supp. 2d

704, 710 (S.D.N.Y. 2005)).  "Officers and directors are also 'held to a standard of due care,' "

and "[t]hey must meet this standard with 'conscientious fairness.' " *Id.*  (quoting *Hanson Tr. PLC

v. ML SCM Acquisition, Inc.*, 781 F.2d 264, 274 (2d Cir. 1986)).  Officers and directors owe a duty

of care to their shareholders and, where "a corporation is a wholly-owned subsidiary, its

directors and officers owe their fiduciary duties to the parent corporation." *Id.* at 160; *see also

In re MF Glob. Holdings Ltd. Inv. Litig.*, 998 F. Supp. 2d 157, 180 n.15 (S.D.N.Y. 2014) (same),

*aff'd sub nom. In re MF Glob. Holdings Ltd. Inv. Litig. (DeAngelis v. Corzine)*, 611 F. App'x 34 (2d

Cir. 2015).

It is well established that " 'when a corporate director or officer has an interest in a

decision, the business judgment rule does not apply.' " *Levy v. Young Adult Inst., Inc.*, 103 F.

Supp. 3d 426, 429–30 (S.D.N.Y. 2015) (quoting *In re Croton River Club, Inc.,* 52 F.3d 41, 44 (2d

Cir. 1995)).  While plaintiffs bear "the burden of proving that the [transaction] violated the duty

of fairness," where "an inherent conflict of interest" exists, "the burden shifts to the interested

directors or shareholders to prove good faith and the entire fairness of the [transaction]."

*Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 570 (1984).  The concept of fair dealing concerns

the "procedural fairness of the transaction" and whether a "fair price" was paid.  *See id.*  "The interested parties may attempt to establish this element of fair dealing by introducing evidence of efforts taken to simulate arm's length negotiations."  *Id.* Although courts are not required to precisely determine the "fair value" of shares of stock, it must nonetheless consider factors that are relevant to determining the value of the shares, such as "net asset value, book value, earnings, market value, and investment value."  *Id.* at 571.

There are material issues of fact that, at this stage, preclude summary judgment on this claim.  To start, the parties dispute whether EBWLC was a wholly owned subsidiary of EB&C.  (*Compare* Pls.' Rule 56 Statement ¶ 10 and Brook Decl. in Supp. Ex. 11; *with* Wendy Aff. in Supp. Ex. A.) The parties have failed to submit admissible evidence, such as copies of the EBWLC stock certificates, in this regard.  (*See also* Brook Decl. in Supp. Ex. 108 ("EBWLC Bylaws"), Art. VI (providing that "the shares of the corporation shall be represented by certificates").)  To argue that the Trust owned some of EBWLC's shares of stock, Plaintiffs point to an organizational chart that they claim shows the Eber Entities' corporate structure as of 2009.  (Pls.' Rule 56 Statement Brook Decl. in Supp. Ex. 11.)  Although the chart appears to indicate that the Trust owned certain shares of EBWLC stock, it is undated, is not Bates stamped, and Plaintiffs have not provided any information that would allow this Court to ascertain the authenticity and reliability of this document.  (*Id.*)  As such, this Court cannot rely on the organizational chart proffered by Plaintiffs to grant them Summary Judgment on their claim.  The Eber Defendants also submitted organizational charts that purport to show that EBWLC was a wholly-owned subsidiary of EB&C, until at least November of 2019, when Lester acquired 750 shares of EBWLC stock.  However, in this Court's view, these charts do little to clarify this issue because the Eber

Defendants have not provided the Court with any information that would allow it to conclude that these charts are reliable.  (*See* Wendy Aff. in Supp. Ex. A.)

This fact dispute is material because it will determine to whom EBWLC's directors owed their duty of good faith and fair dealing.  If EBWLC was a wholly-owned subsidiary of EB&C, EBWLC's directors – Lester (until his purported resignation), Wendy, and Gumaer – owed a duty of care only to EB&C.  If, as Plaintiffs contend, the Trust also held some of EBWLC's stock, then EBWLC's directors owed fiduciary duties to both EBWLC and the Trust.  Additionally, to the extent Lester's position as a director of EBWLC triggered heightened scrutiny under the entire fairness doctrine, whether there was "fair process" will also depend, at least in part, on whether EBWLC's directors owed fiduciary duties solely to EB&C or to both EB&C and the Trust.

Additionally, Plaintiffs have not sufficiently demonstrated, at this stage, that fair price was not paid for EBWLC's interest in Eber Metro.  The answer to this question turns, at least in part, on whether the Eber Entities were broke and needed Lester's loans in order to stay afloat at the time the Security Agreements and Guaranty were executed.  As explained by the Eber Defendants, Lester refused to loan additional money to the Eber Entities without the right to foreclose on the collateral in the event of default, and the loans were a gamble the Eber Companies made in an attempt to save the family business – a gamble the Eber Entities lost. The Eber Defendants also argue that the value of Eber Metro was less than the value of the loans Lester made to Alexbay, a contention that cannot be determined based on the facts presently before this Court.

Accordingly, for all of the reasons stated above, the Court denies Plaintiffs' request to unwind the transfer of Eber Metro to Alexbay and place Eber Metro in a constructive trust on

summary judgment.  In light of the fact that the Court has declined to unwind the transfer of Eber Metro to Alexbay and impose a constructive trust, it, likewise, declines to grant Plaintiffs' Summary Judgment on their claim seeking an accounting (Count IX).

### ii.  Compliance with B.S.C. § 909

B.S.C. § 909(a) provides a procedure that corporations must  follow if they dispose of "substantially all [of their] . . . assets" and the transactions is "not made in the [corporation's] regular course of business . . . ." This procedure, in part, requires shareholder consent.  As explained in detail above, this issue cannot be decided on summary judgment because the parties dispute who the shareholders of EBWLC actually were.  Accordingly, Plaintiffs' Motion for Summary Judgment is also denied pursuant to this theory.

### iii.  Corporate Waste

Plaintiffs contend that the Security Agreement and Guaranty executed on February 26, 2010 – which gave Lester the right to foreclose on EBWLC's interest in Eber Metro in exchange for a $1.5 million Line of Credit Note – constituted  corporate waste because it gave Lester a security interest in Eber Metro in exchange for the same terms offered by the unsecuritized 2009 Line of Credit Note.  (Pls.' Mem. of Law in Supp. 31.)

"The essence of a claim of gift is lack of consideration and the essence of waste is the diversion of corporate assets for improper or unnecessary purposes." *Aronoff v. Albanese*, 85 A.D.2d 3, 5, 446 N.Y.S.2d 368, 370 (App. Div. 2nd Dep't 1982); *see also Patrick*, 355 F. Supp. 2d at 714.  "Corporate waste occurs when assets are used in a manner 'so far opposed to the true interests [of the corporation so] as to lead to the clear inference that no one thus acting could

have been influenced by any honest desire to secure such interests.' " *Patrick*, 355 F. Supp. at 715 (quoting *Meredith v. Camp Hill Estates, Inc.*, 77 A.D.2d 649, 650 (App. Div. 2nd Dep't 1980)). Corporate waste cannot be approved by shareholder vote. *Id*. at 709 n.4 (citing *Meredith*, 430 N.Y.S.2d 383, 385).

The fact that Lester executed an unsecuritized Line of Credit Note in 2009 that appears to have been subsequently replaced by the nearly identical 2010 Line of Credit Note that gave him a security interest in Eber Metro, also poses a disputed issue of material fact because no party has been able to explain why the 2010 line of credit note was executed, beyond the fact that Lester decided that he wanted a security interest in the collateral after he executed the 2009 Line of Credit Note. (Eber Defs.' Rule 56 Counterstatement ¶ 42.) This Court cannot make a finding on summary judgment as to whether the 2010 Line of Credit Note constituted corporate waste based on the evidence submitted by the parties. Indeed, because the 2009 Line of Credit Note gave Lester "sole discretion" to "make . . . loan[s]," it is entirely possible that, as the Eber Defendants claim, he refused to make additional loans to Eber Metro without a security interest. (*Id*. ¶¶ 37, 42.) This could have made sense if the Eber Entities were, in fact, insolvent and Lester was concerned that the debt would not be repaid. The question of the Eber Entities' insolvency is another issue that has been hotly contested throughout this litigation and will need to be determined at trial. As such, summary judgment is also denied under Plaintiffs' theory of corporate waste.

### c.  The Post-Metro Transfer Asset Transfers

Plaintiffs have also asked this Court to unwind the following transactions: (1) Lester and Wendy's acquisition of Slocum Maine and (2) Wendy's stock grant of 9.1 percent of Eber Metro.

(Pls.' Mem. in Supp. 31-32.)   In making this application, they have acknowledged that the question of whether these transactions can be unwound will depend, at least in part, on the ultimate finding of whether the transfer of Eber Metro to Alexbay is voidable by the Trust beneficiaries and whether the Eber Metro stock must be placed in a constructive trust. Because this Court has declined to unwind the transfer of Eber Metro to Alexbay at this stage, it likewise declines to unwind these transactions.

### IX.   The Eber Defendants' Cross Motion for a "Judgment" That EBWLC's Transfer of Its Interest in Eber Metro to Alexbay Cannot be Rescinded Because The Transfer Met the Requirements of U.C.C. § 9-620

In their Cross-Motion for Partial Summary Judgment, the Eber Defendants contend that, to the extent that Plaintiffs' challenge to the foreclosure is not barred by the *Rooker-Feldman* doctrine or the doctrine of *res judicata*, it is nonetheless barred by the U.C.C.  (Eber Defs.' Mem. of Law in Supp. 22-24.)  Specifically, they cite to U.C.C. § 9-620, the statute that permits a creditor to accept collateral from a debtor in strict foreclosure, and U.C.C. § 9-622, which provides that: "A secured party's acceptance of collateral in full or partial satisfaction of the obligation it secures . . .  transfers to the secured party all of a debtor's rights in the collateral terminates any other subordinate interest" and "[a] subordinate interest is discharged or terminated . . . even if the secured party fails to comply with this article."  § 9-622(a)(2), (4), (b).

The Eber Defendants' argument, however, ignores the fact that Plaintiffs' claims arise from Lester's purported breaches of his fiduciary duties to the Eber Entities and to Plaintiffs, as beneficiaries of the Trust.  This omission is fatal to the Eber Defendants' argument because, as explained by the New York Court of Appeals, "Actions that may accord with statutory requirements are still subject to the limitation that such conduct may not be for the

aggrandizement or undue advantage of the fiduciary . . . ."  *Alpert*, 63 N.Y.2d at 568.  The Eber

Defendants have cited to no case law or other authority to the contrary.  Accordingly, the Eber

Defendants' Motion for a "judgment as a matter of law that the 2012 Foreclosure cannot be

rescinded" is denied.  (Eber Defs.' Mem. of Law in Supp. 24.)

X.   **Plaintiffs' Claim to Void Issuance of and Enjoin Lester's Taking of New Voting Shares of EBWLC Stock**

In Count I of the TAC, Plaintiffs argue that, as co-trustee, Lester owed Plaintiffs a duty of

undivided loyalty in February of 2017, when EBWLC issued 750 shares of voting preferred stock

and transferred them to Lester in exchange for the potential payment of certain debts.  (TAC ¶¶

270-71.)  Plaintiffs contend that, "this flagrant self-dealing by Lester as trustee, acquiring trust

property . . . could only be authorized by the trust beneficiaries or the Surrogate's Court," and

that "[n]either the Court nor Plaintiffs heard about it until many months later, and neither

ratified it afterwards." (Pls.' Mem. of Law in Supp. 32.)

This Court cannot make any finding regarding whether the issuance of the shares, and

Lester's acquisition of those shares, violated his duty of undivided loyalty to Plaintiffs because

Plaintiffs' affidavits are silent with respect to when they learned the EBWLC stock was issued

and that Lester acquired the shares, and what actions they took after they discovered that

Lester had acquired the shares.  (*See* Dkt. No. 266-14 ("Kleeberg Decl. in Supp"); Dkt. No. 266-

13 ("Stein Decl. in Supp."); Hays Decl. in Supp.)  This line of inquiry is relevant to determining

whether Plaintiffs consented to the issuance of those shares after-the-fact.  For clarity, the

Court notes that, although the stock was issued while this case was pending, Plaintiffs first

raised the issue of the 750 shares of voting preferred stock in the TAC, well over a year after the

stock was issued.  (*See* Dkt. No. 174-3 (redline comparing SAC to TAC).)  Accordingly,

clarification is needed to determine whether the issuance of the stock violated Lester's duty of undivided loyalty to Plaintiffs.

The Sections of the New York Business Corporations Law cited by Plaintiffs do not mandate a different result.  Plaintiffs argue, that "under its Bylaws, EBWLC was required to have at least two directors, and a quorum of 'a majority of the entire board' is required to have effective action by the board."  (Pls.' Mem. of Law 33 (citing B.S.C. §§ 707, 708).)  However, Article 2, Paragraph 1 of EBWLC's Bylaws provides that:

> The number of directors shall be at least three, who need not be shareholders, except that where all the shares of the corporation are owned beneficially and of record by less than three shareholders, the number of directors may be less than three but shall at least, equal the number of shareholders.

(EBWLC Bylaws Art. II(1).)   As explained above, the parties dispute how many shareholders EBWLC had.  *See infra* Discussion Pt. VIII(b).  Plaintiffs contend that EB&C and the Trust were shareholders, while the Eber Defendants steadfastly maintain that EB&C was EBWLC's sole shareholder. Thus, a material issue of fact exists that precludes summary judgment because the disputed facts directly bear on the number of directors EBWLC should have had at the time the corporate actions at issue occurred.

Plaintiffs also contend that the February 2017 amendment of the EBWLC Bylaws was barred by B.S.C. § 713(a)(2), which provides that:

> No contract or other transaction between a corporation and one or more of its directors, or between a corporation and any other corporation . . . in which one or more of its directors are directors or officers, or have a substantial financial interest, shall [not] be . . . void or voidable for this reason alone," so long as "the material facts as to such director's interest in such contract or transaction .

> . . are disclosed in good faith or known to the shareholders entitled
> to vote thereon, and such contract or transaction is approved by
> vote of such shareholders.

Although the precise date of his resignation is disputed, it is undisputed that Lester resigned

from EBWLC at some point in 2012, long before EBWLC's February 2017 issuance of 750 shares

of voting preferred stock and transferred them to Lester in exchange for the potential payment

of certain debts.  Plaintiffs contend that the issuance of the EBWLC stock was "an interested

director transaction because Wendy, as Lester's daughter, heir, and employee was materially

interested in the transaction and dominated by Lester." (Pls. Mem. of Law in Supp. 33.)

However, Plaintiffs have provided no legal authority to support this argument.  And, in any

event, the issue of whether EB&C was the sole shareholder of EBWLC or whether EB&C and the

Trust owned EBWLC's shares is material because, to the extent a conflict of interest existed, if

EB&C was the sole shareholder, it could have waived any conflict under the rule without

consulting the Trust.  Accordingly, summary judgment pursuant to this argument is also denied.

### XI.  The Eber Defendants' Request for a "Judgment" That EBWLC, Eber Metro, and Eber-CT were Jointly and Severally Liable for Pension Liabilities to the Teamsters Fund and the PBGC

The Eber Defendants seek a holding from this Court that EBWLC, Eber Metro, and Eber-

CT were jointly and severally liable for the Teamsters Fund and PBGC underfunded plan

liabilities as of June 5, 2012, the approximate date when EBWLC transferred Eber Metro to

Alexbay.  (Eber Defs.' Rule 56 Statement ¶ 44.)  The Eber Defendants' application is denied.  As

made clear during oral argument, Plaintiffs do not dispute that EBWLC, Eber Metro, and Eber-

CT were jointly-and severally liable for the Teamsters and PBGC underfunded pension plan

liabilities.  (Dkt. 295 ("Jan. 8, 2020 Hrg. Tr.") 36:18-42:08; *see also* Eber Defs.' Rule 56 Statement

¶ 20; PBGC Action Decision and Order 18.)  Moreover, the Eber Defendants concede that the amounts owed to the Teamsters Fund and PBGC by EBWLC, Eber Metro, and Eber-CT are disputed issues of fact that should be determined at trial because they bear on the ultimate issue of the valuation of EBWLC, Eber Metro, and Eber-CT as of the date of the Metro Transfer. (Jan. 8, 2020 Hrg. Tr. 41:09-20; *id.* at 72:23-11.)  Accordingly, the Eber Defendants' Application is denied.[9]

## XII.    Plaintiffs' Equitable Indemnity Claim

To extent the Eber Defendants seek to dismiss Plaintiffs' equitable indemnity claim, this request is denied.  "Under New York law, the right to indemnification may arise out of an express agreement for indemnification, or it may be implied by law in favor of one who is held liable solely by imputation of law because of his relation to the actual wrongdoer. Indemnification is an equitable concept that shifts liability when the failure to do so would result in the unjust enrichment of one party at the expense of another." *Kleeberg*, 331 F.R.D. at 324 (internal quotation marks and citations omitted).  "In other words, implied indemnification 'avoids the unfairness of holding one party liable solely on account of the negligence of another.'" *Id*. (quoting *LNC Inv., Inc. v. First Fid. Bank, Nat. Ass'n*, 935 F. Supp. 1333, 1352 (S.D.N.Y. 1996)).

In deciding Plaintiffs Motion to Amend and Supplement the SAC, this Court already held that Plaintiffs have sufficiently pleaded their equitable indemnity claim against the Eber Defendants because CNB only sought to rejoin this action after Plaintiffs settled with CNB and

---

[9] As discussed above, Plaintiffs' motion to strike the Eber Defendants' report, prepared by Michael Gallagher, purporting to value the plan termination liability for the EBWLC Retirement Plan is denied as moot because the Court did not rely on this report in rendering this opinion and it contains hearsay.  *See infra* Discussion Pt. I.

agreed to indemnify it for legal costs incurred in connection with this action, due to Lester's attempt to obtain all of the EB&C shares for himself.  *See id*. at 324.  Defendants did not object to or move for reconsideration of this Court's decision, and the case law now cited by the Eber Defendants is inapposite to the case at bar.  *See McCarthy v. Turner Const., Inc.*, 17 N.Y.3d 369, 375, 953 N.E.2d 794, 799 (2011) (personal injury case noting that, "[c]onsistent with the equitable underpinnings of common-law indemnification, our case law imposes indemnification obligations upon those actively at fault in bringing about the injury, and thus reflects an inherent fairness as to which party should be held liable for indemnity"); *Rosado v. Proctor & Schwartz, Inc.*, 66 N.Y.2d 21, 26, 484 N.E.2d 1354 (1985) (in a products liability lawsuit brought against a manufacturer by the purchaser's employee, the manufacturer could not seek indemnity from the purchaser because "the manufacturer is in the best position to know the dangers inherent in its product").  Accordingly, the Eber Defendants' request to dismiss Plaintiffs' equitable indemnification claim is also denied.[10]

## CONCLUSION

For the reasons stated above, Plaintiffs' Motion for Partial Summary Judgment (ECF No. 263) is denied.  The Eber Defendants' Motion for Partial Summary Judgment (ECF No. 262) is granted only insofar as Plaintiffs' Declaratory Judgment Claim (Count VI) is dismissed; it is otherwise denied.  The remainder of the Eber Defendants' Motion for Partial Summary Judgment is denied.  The Estate of Elliot Gumaer's Motion for Partial Summary Judgement (ECF

---

[10] Plaintiffs have moved for attorneys' fees pursuant to B.S.C. § 626(e), which provides that a court "may award" plaintiffs who have successfully asserted derivative claims an award of fees and costs.  Because this Court has not awarded Plaintiffs any relief, their application for fees is denied.

No. 258) is hereby terminated without prejudice to renew pending the Estate's settlement with Plaintiffs, and its motion to stay (ECF No. 300) is denied as moot.

The Eber Defendants are hereby directed to file a letter by no later than **August 31 2020**, advising the Court of the status of Lester Eber's Estate Proceeding and the appointment of an executor for the Estate.   The Court will schedule a conference with all parties as soon as practicable once counsel appears for the Estate of Lester Eber and Alexbay.  In light of the fact that the Estate of Lester Eber and Alexbay are currently unrepresented in this action, the deadline for the parties to file motions for reconsideration are extended to **September 15, 2020**.

**SO ORDERED.**

DATED:        New York, New York
              August 10, 2020

KATHARINE H. PARKER
United States Magistrate Judge