UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF NEW YORK


In re:                            :
                                      Docket #1:16-cv-09517-
 KLEEBERG, et al.,                : LAK-KHPGWG

                Plaintiffs,        :

   - against -                     :

 EBER, et al.,                    : New York, New York
                                     March 5, 2021
                Defendants.        :
                                     TELEPHONE CONFERENCE
----------------------------------- :


                      PROCEEDINGS BEFORE
           THE HONORABLE JUDGE KATHARINE H. PARKER,
                 UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

For Plaintiff:          BROOK & ASSOCIATES, PLLC
                        BY:  BRIAN CHRISTOPHER BROOK, ESQ.
                        100 Church Street, Ste 8th Floor
                        New York, New York 10007
                        212-256-1957


For Eber Defendants:    UNDERBERG & KESSLER LLP
                        BY:  COLIN D. RAMSEY, ESQ.
                        50 Fountain Plaza, Suite 320
                        Buffalo, New York 14202
                        716-847-9103




Transcription Service:  Carole Ludwig, *Transcription Services*
                        155 East Fourth Street #3C
                        New York, New York 10009
                        Phone:  (212) 420-0771
                        Email:  Transcription420@aol.com


Proceedings conducted telephonically and recorded by
electronic sound recording;
Transcript produced by transcription service

<u>APPEARANCES - CONTINUED:</u>

```
For Eber Defendants:      UNDERBERG & KESSLER LLP
                          BY:  PAUL FRANCIS KENEALLY, ESQ.
                          300 Bausch & Lomb Place
                          Rochester, New York 14604
                          585-258-2882

For Defendant Wendy
Eber and Estate of
Lester Eber:               JOHN C. HERBERT, ESQ.
                           240 Beaconview Court
                           Rochester, New York 14617-1406
                           585-232-6500

For Intervenor,
Canandaigua National
Bank & Trust Company:      DANIEL O'BRIEN, ESQ.
                           175 Creekwood Drive
                           Rochester, New York 14626-1521
                           585-520-4541
```

**INDEX**

**E X A M I N A T I O N S**

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None    |        |       |           |          |

**E X H I B I T S**

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|----|----|-----------|
| None           |             |    |    |           |

```
 1                        PROCEEDINGS                    4

 2              THE CLERK:   Calling case 16 civil 9517, Kleeberg

 3   vs. Eber; the Honorable Katharine H. Parker, presiding.

 4              Beginning with counsel for the plaintiff, can you

 5   please make your appearance for the record?

 6              MR. BRIAN BROOK:  Yes. Good afternoon.  Brian

 7   Brook for all plaintiffs.

 8              MR. COLIN RAMSEY:  Colin Ramsey from Underberg &

 9   Kessler for the Eber defendants.

10              MR. PAUL F. KENEALLY:  Paul Keneally, Underberg &

11   Kessler, also Eber defense.  Thank you. Good afternoon.

12              MR. JOHN C. HERBERT:  John Herbert for the Lester

13   Eber Estate and Wendy Eber.

14              MR. DANIEL P. O'BRIEN:  Dan O'Brien for the

15   intervenor, Canandaigua National Bank.

16              THE HONORABLE KATHARINE H. PARKER (THE COURT):

17   Okay, very good.  Welcome, everyone. I hope everyone and their

18   families are doing well. We are still amid the COVID crisis,

19   although there is a light at the end of the tunnel. And I

20   want to remind everyone that I'd like you to keep your

21   phones, on mute unless you're speaking, to eliminate

22   background noise.

23              The Court's making an official recording of this

24   oral argument, and you can order a transcript within three

25   days of today. Please state your name before speaking for
```

```
 1                        PROCEEDINGS                    5
 2   the benefit of the court reporter who may be asked to
 3   transcribe the conference.
 4            This line is open to the press and public on a
 5   listen-only basis. And I want to remind everyone on the
 6   call that the Court prohibits recording and rebroadcasting
 7   of court conferences. Violations of this rule may result in
 8   sanctions.
 9            We are here because there is a motion for
10   reconsideration of my decision on the Motion for Summary
11   Judgment. And the motion was a motion for partial summary
12   judgment, so the parties were always contemplating going to
13   trial as to some of the issues.  And my decision put more
14   of the issues on track for trial than resolution on the
15   papers. But the parties have raised some concerns about
16   that decision, and I have some questions for the parties
17   about that. So I wanted to first -- and I previewed some of
18   the questions in order to help you prepare for today.  And
19   so I am looking forward to hearing from you on these
20   issues.
21            Mr. Brook, I want to start with you and understand
22   your arguments. One of these is is that there was no Motion
23   for Summary Judgment on Count IV of the Complaint.  And so
24   I wonder whether there needs to be briefing on that count
25   or on elements of that.
```

```
 1                        PROCEEDINGS                    6

 2              MR. BROOK:  I don't believe so.  And I think the

 3    reason why is -- so the reason why Count IV wasn't

 4    specifically sought for summary judgment was because there

 5    is an intent element to that statute. But it doesn't change

 6    the fact that we are also seeking to set aside the

 7    transactions in Count I. And that is something that, you

 8    know, Courts have done; that is, you know, a breach of

 9    fiduciary duty, that has a standard remedy, you don't need

10    a statute for that.  So in some sense, I was really, you

11    know, sort of just doing a backup by including that statute

12    and showing that there is additional authority for

13    unwinding the transactions besides the common law of

14    fiduciary duty. So I don't think that affects any of the

15    relief that we are requesting here, if that makes sense,

16    your Honor.

17              THE COURT:  And if the Court were to unwind the

18    transfer to Alexbay, there are still issues that remain for

19    trial, are there not?

20              MR. BROOK:  Yes, there are some.  And I went

21    carefully through the Complaint in response to your Honor's

22    question, and I reviewed the transactions. I think how much

23    is left for trial really depends on the second issue that

24    we presented in our Motion for Reconsideration, which is

25    ensuring that my clients are recognized as the rightful
```

```
1                          PROCEEDINGS              7
2    shareholders of Eber Brothers & Co., and, you know, having
3    appropriate relief entered to ensure that they're able to
4    exercise those rights without interference. And if that
5    happens, I actually believe that a lot of the claims, in
6    particular the transactions that we seek to set aside,
7    don't need to be addressed by this Court because my clients
8    with control of the corporations will be able to engage in
9    self-help essentially, to -- you know, with control of the
10   corporation, you can set aside transactions.
11             THE COURT:  So take me through those alternatives
12   step by step, what your thinking is on that. If the Court
13   were to unwind the Alexbay transfer, place that in a
14   constructive trust, what is left if -- with either
15   alternative as to the claim regarding they're being
16   recognized as shareholders?
17             MR. BROOK:  Yes, your Honor. So if the claim that
18   they're recognized as -- and the fact is legally, you know,
19   there's a lot left. But what I'm saying is that I believe,
20   your Honor, that we would be willing to essentially drop
21   some of them and proceed to engage in self-help.  So, for
22   example, trying to set aside the investor's purchase of
23   preferred shares in 2017. So that's something where with
24   control of the corporation you have the ability to cancel
25   out that transfer, and then the onus would be on Lester
```

```
 1                    PROCEEDINGS              8
 2   Eber's estate to try and challenge that in a court, if they
 3   chose to do so.
 4        THE COURT:  Okay.  But let me -- I want to just
 5   go -- take me through step by step, because there's a lot
 6   of transactions that you're talking about unwinding,
 7   Mr. Brook.
 8        MR. BROOK:  Yes.
 9        THE COURT:  And so the transfer to Alex -- so
10   there's one thing winding back the transfer from Alexbay,
11   but then you've got a whole bunch of transactions where
12   ownership in the Connecticut entity, there are nonparty
13   entities that have some ownership in that entity and who
14   would be impacted by this.  They're not here.  And then --
15        MR. BROOK:  You're talking --
16        THE COURT:  -- if you go back further, which I
17   mean, you're going back and back and back, so what is the
18   impact on these others?  What issues are left? So wind it
19   back for me step by step and what would be left to be tried
20   as to those other transactions.
21        MR. BROOK:  Sure. Well, let me address first the
22   issue of nonparties invested. So the only nonparty that has
23   an interest in the Connecticut entity, either Connecticut
24   LLC, is Eder Goodman, E-d-e-r. And that would not be
25   impacted at all here because none of the transactions that
```

1
2  we're seeking to alter or set aside involve something that
3  Eber-Connecticut did. Instead, all the transactions that
4  we've focused on are either at Eber Metro or Eber Bros.
5  Wine & Liquor or Eber Bros. & Co., Inc. levels. And for
6  those companies, only parties are interested in it. And so
7  that is not an issue. So there's nothing with Eder Goodman
8  being an interested party that would affect anything
9  because we aren't asking the Court to set aside any
10 transactions that engaged in.
11         The closest that we have that even touches on it
12 is actually a transaction that involves Eber-Metro, and
13 that is the transfer of shares to Wendy Eber by Polebridge-
14 Bowman. Those were shares in Eber-Connecticut. But that has
15 already happened, so, you know, Polebridge-Bowman already
16 transferred those shares to Wendy Eber, and we argue that
17 the transaction where Polebridge-Bowman initially got the
18 shares was a sham in and of itself.  And that is a
19 transaction where, likewise, I believe that with control of
20 the company -- we don't actually need a court of law to
21 rule on that -- because with control of the company you can
22 decide that a transaction does not have economic substance
23 and essentially, you know, restate your books to correct
24 what was an error.  And that is the approach that I think
25 would be most efficient here.

```
 1                       PROCEEDINGS              10
```

 2          Now, certainly, you know, I think it is possible

 3   that it will at some point need to be adjudicated, but it

 4   doesn't necessarily need to be adjudicated by this Court

 5   even though legally those claims would still be, you know,

 6   present.  What I'm saying is, you know, we can drop those

 7   where we have control.

 8          The one exception for all the trans -- there's a

 9   couple -- let me focus on the transactions that we would

10   still need a ruling from this Court on.

11          THE COURT:  Thank you.

12          MR. BROOK:  One is the consulting fees to Lester

13   by Southern Wine & Spirits.  Now, that is something that

14   predated the Eber-Metro transfer to Alexbay, and so it's

15   not impacted by setting aside that transaction at all.

16   There is also the -- a lot of the stuff in here, like the

17   preparatory transactions, a lot of that is just pleading

18   our case to show how bad the facts are.  So we don't need

19   rulings on that if we get the transactions set aside on the

20   no-further-inquiry rule. Another exception is Slocum of

21   Maine because that is an entity that is not in the Eber-

22   Metro or Eber Wine & Liquor chain of families because what

23   happened there, you know, is that Eber-Metro owned a call

24   option to buy that company.  And it exercised that option

25   but then, instead of taking ownership itself, the shares

```
 1                      PROCEEDINGS                    11
 2  were simply granted to Lester and Wendy Eber in their
 3  individual capacities.  So that is one where just having
 4  control of Eber-Metro would not allow us to ensure the
 5  continuation of the business in the manner that works,
 6  where this Slocum of Maine entity is involved in the
 7  importing of foreign wines, is my understanding.  So that
 8  is one thing where it would need to be adjusted.
 9            And because that transaction occurred --
10            THE COURT:  Are you saying the Slocum of Maine
11  issue would have to be addressed by the Court?
12            MR. BROOK:  It would because we don't have --
13  because we would not be able to take that back ourselves.
14  Right?  The registered shareholders are different people;
15  and my clients, having control of Eber-Metro, would not
16  automatically get control of Slocum of Maine back. But
17  because the transfer of the call option to Lester and Wendy
18  Eber occurred during the constructive trust period, your
19  Honor, really that is something that I'm not even sure we
20  would necessarily need a trial on because part of imposing
21  the constructive trust is seeing what transactions occurred
22  after the transfer that now need to be unwound because they
23  would have been wrongful if it had still been owned by the
24  trust all along.  So it's --
25            THE COURT:  Okay, but Slocum of Maine is not a
```

```
 1                         PROCEEDINGS                  12

 2  party.

 3             MR. BROOK:  Yes, it is, your Honor. It was added

 4  as a party in the Third Amended Complaint.

 5             THE COURT:  Okay. So you're saying that as part of

 6  the -- so they are part of the Eber defendants?

 7             MR. BROOK:  Yes, yes, I believe that's right,

 8  because it is owned 50/50 by Lester and Wendy Eber.

 9             THE COURT:  Okay.

10             MR. BROOK:  So other than those two things, the

11  only other -- those are the only two transactions where I

12  believe we would need a ruling of some kind by this Court.

13  And I'm not sure that it would -- for the Southern

14  consulting fees, I believe that does have to go to trial

15  because it's not something that would fall within the

16  Court's equitable jurisdiction of imposing a constructive

17  trust.  But the Slocum & Sons of Maine one probably would

18  not need to go to trial, per se, if a constructive trust is

19  imposed.

20             But other claims for trial, your Honor, would be

21  Count II, the faceless servant doctrine, and whether some

22  of the salary that was paid needs to be refunded to the

23  company because they were disloyal to the company.

24             And also then two other claims, Count VIII, aiding

25  and abetting breach of fiduciary duty and fraudulent
```

1                           PROCEEDINGS                    13

2   concealment against Wendy. You know, we would not pursue

3   the fraudulent concealment count against Lester Eber's

4   estate, mainly because I think the only thing we would have

5   to gain there, if the Court goes ahead and unwinds the

6   Alexbay transfer, is punitive damages.  And, generally

7   speaking, punitive damages are exceedingly hard to get

8   against an estate.  So we would just let that go.  But

9   Count VIII against Wendy we would like to pursue.

10              And then, finally -- and Mr. O'Brien is on the

11  line -- he'll be glad to say that the equitable

12  indemnification claim, Count X, is another one that would

13  need to be addressed.

14              THE COURT:  Okay.

15              MR. BROOK:  So is there another part of the

16  question, your Honor, that I still have yet to cover?

17              THE COURT:  No, I don't think so. So in terms of

18  the 2012 foreclosure, there's the -- there are two issues

19  with the transfer.  There's the loan, and the will

20  documentation, trust documentation permitted Lester to make

21  the loan; and it permits the putting up of collateral.  And

22  then there's the separate question of the foreclosure that

23  happened in 2012. So what duties are you saying Lester owed

24  to your clients, Mr. Brook, at the time of the foreclosure

25  and transfer?

| 1 | PROCEEDINGS | 14 |

2          MR. BROOK:  Sure, your Honor. So there are two

3    sets of duties. One is because this was, you know, done by

4    a corporate officer, you know, the usual corporate

5    fiduciary duty of good faith and duty of loyalty, those

6    both applied here.  But the more fundamental one that we're

7    talking about is the duty of undivided loyalty that is

8    implicit in every trustee relationship unless the trust

9    instrument explicitly says that it is creating an exception

10   and lowering the standard to only good faith.

11          THE COURT:  Okay. Lester --

12          MR. BROOK:  So that duty applies here.

13          THE COURT:  -- Lester was, he remained the trustee

14   of the trust during the entire period?

15          MR. BROOK:  Yes.

16          THE COURT:  So he was, as of the time of the

17   transfer, he was trustee of the trust, but he was not an

18   officer of EBWLC or EB Metro, is that right?

19          MR. BROOK:  I believe he was of Eber-Metro, and he

20   was of Eber Bros. & Co., Inc., which owned Eber Bros.

21   Wine & Liquor Corp. But you're right, your Honor, there was

22   a purported resignation by Lester Eber at some point in

23   time in 2012 prior to the transfer being formally

24   documented. I don't believe --

25          THE COURT:  Of Eber --

```
 1                      PROCEEDINGS                  15

 2           MR. BROOK:  -- that affects anything.

 3           THE COURT:  Of Eber-Metro?

 4           MR. BROOK:  Of Eber Bros. Wine & Liquor Corp.  And

 5  that appears to have been done because they recognized that

 6  there were fiduciary problems with him seeking to foreclose

 7  against the company where he was, you know, CEO and

 8  president.  So --

 9           THE COURT:  Right. This --

10           MR. BROOK:  -- but that doesn't affect the duties

11  as trustee.

12           THE COURT:  So I guess that's my question here

13  because he had three hats initially, right? He had the

14  trustee hat, where he had fiduciary obligations. He had the

15  EBWLC officer hat, and then he had the hat as officer of

16  Alexbay. At the time of the transfer, he had the hat of

17  Alexbay and the hat of the trustee but not the hat of

18  EBWLC. So he did not sign off on the transfer.  So does

19  that make a difference legally, as a matter of law, in

20  terms of the breach -- how does that -- when he did not

21  agree to the transfer on behalf of EBWLC?

22           MR. BROOK:  It doesn't affect it at all, your

23  Honor, from the perspective of trust law because he was

24  still a trustee who was taking ownership of trust property.

25  And that is what is subject to the no-further-inquiry rule.
```

```
1                         PROCEEDINGS              16
```

2  It doesn't matter if he sets up, you know, a completely

3  independent third party who's not his daughter to sell

4  Eber-Metro to his Alexbay.  That would not affect the fact

5  that he is still purchasing trust property without the

6  consent of the beneficiaries or the authorization of the

7  trust document. So the fact that he took off his corporate

8  hat, probably on the advice of counsel, didn't change the

9  fact that he owes a much stronger fiduciary to my clients

10  through his role as trustee.  And that's really all that

11  matters here.  And he wasn't terminated as trustee until

12  2017. So --

13           THE COURT:  Right. And so what --

14           MR. BROOK:  -- throughout the relevant period,

15  your Honor.

16           THE COURT:  -- what -- and does his fiduciary --

17  does the trust ownership, direct ownership of shares in

18  EBWLC, impact this analysis, in your view?

19           MR. BROOK:  I would step back and say this, just

20  to clarify things.  So -- because there's a little bit of

21  confusion as to whether the trust owns shares directly in

22  EBWLC. We have received --

23           THE COURT:  Right.

24           MR. BROOK:  -- two different sets of conflicting

25  records.  That doesn't matter, though, because even if,

```
1                            PROCEEDINGS                    17
2     let's say -- certainly, if EBWLC shares were owned directly
3     by the trust, there would be no question it's a direct
4     ownership interest. But even if there are none, it still
5     has an indirect but complete control interest in the EBWLC
6     because it completely owned Eber Bros. & Co., Inc., which
7     in turn owned all of the voting shares in EBWLC at the time
8     of the transfer.  So with complete control --
9              THE COURT:  Do you have a case that involves a
10    scenario where it's an indirect interest?
11             MR. BROOK:  I don't have one where there's two
12    layers of corporations, your Honor. But, you know, I think
13    that this is easy to resolve because there's no doubt --
14    and I do have a case saying that having just a majority of
15    voting stock by a trust is enough to have the breach of
16    fiduciary duty rules come into play, and that is *Renz v.*
17    *Beeman*, Second Circuit 1978.  So that was just ownership of
18    a majority of voting stock.  There were other stockholders,
19    as well.
20             But think about it this way, your Honor. If you
21    have fiduciary duty, the fiduciary duty of undivided
22    loyalty for a corporation that's directly owned but you
23    didn't if it was one layer removed, then why wouldn't any
24    faceless trustee just create another entity, you know, and
25    transfer all the assets into that and put two steps between
```

1                        PROCEEDINGS                    18

2   them -- boom, you know, they get to wipe their hands and

3   say, "I don't have the fiduciary duty of undivided loyalty

4   anymore"? It would be a gaping loophole in the law allowing

5   form to preside over substance.  And that is not how the

6   law is or should be.

7            So the fact that we don't have a case that

8   specifically dealt with the one-step-removed transaction I

9   don't think should -- you know, the Court should not create

10  new law and say that that is somehow a defense, and

11  particularly not when the defense itself has not raised

12  that issue with the Court. So I don't think there was any

13  question between the parties in the briefing that the duty

14  of undivided loyalty was at least generally applicable to

15  this transaction. The dispute, your Honor, was focused on

16  whether he had a defense to that by saying that the will

17  authorized the transaction.

18           THE COURT:  Okay. How does the trust ownership

19  interest in EBWLC impact the share distribution ordered by the

20  surrogate court, if at all, in your view?

21           MR. BROOK:  I don't think it impacts it at all.

22  What that means, your Honor, is what I was saying at the

23  beginning of this argument, which is the thing that's

24  important is that once those shares are distributed in fact to

25  my clients, what it means is they will have effective control

```
 1                        PROCEEDINGS                 19
 2   over EBWLC. So as long as the relevant assets are returned to
 3   EBWLC, my clients will be able to exercise substantial
 4   control over that without needing to turn to judicial
 5   intervention, you know, because at the end of the day, the
 6   way that corporate law works in the real world is that
 7   corporations, you know, do what the people in control want,
 8   and it's the people with the minority interest who then
 9   have to go to court and ask for relief.  And when we
10   started this lawsuit, we were effectively like a minority
11   because we were trust beneficiaries and therefore lacked
12   control despite having a beneficial interest that was a
13   majority interest.  But now that the trust has been
14   terminated and once the shares are recognized, my clients
15   will no longer be in that position.
16             THE COURT:  Okay. And with respect to the
17   surrogate court order distributing the shares, what
18   authority, if any, do you believe this Court has to act on
19   that ruling? In other words, the surrogate court --
20             MR. BROOK:  I understand, your Honor.
21             THE COURT:  -- authority ruled and required that
22   distribution.
23             MR. BROOK:  Yes, your Honor.  But it only required
24   it of the parties to that surrogate court's action.  And
25   Eber Bros. & Co., Inc. was not a party; it was instead an
```

1                              PROCEEDINGS                    20

2  asset that was being distributed.  And that's what this

3  Court has jurisdiction over. Eber Bros. & Co., Inc. is a

4  party to this action, and the problem that we have now is

5  not that my clients don't have the right to the shares;

6  it's that when the Eber in control of Eber Bros. & Co.,

7  Inc. has refused to recognize my clients as the rightful

8  shareholders and instead it's been held up. So what this

9  Court has jurisdiction over is, as a matter of corporate

10 law, to direct Eber Bros. & Co., Inc. to recognize my

11 clients as the shareholders and to impose appropriate

12 equitable relief to ensure that their rights as

13 shareholders are recognized by the company.

14         THE COURT:  Okay. Okay. Now, another question for

15 you with respect to this defense of consent.  The

16 defendants have raised various defenses, including that

17 there was no breach of fiduciary duty. Why is this consent

18 issue not subsumed within the missing defenses, in your

19 view?

20         MR. BROOK:  I think it's missing because of the

21 distinction between affirmative and negative defenses. So

22 let me just -- I looked at this, and I'll just -- for frame

23 of reference, *Black's Law Dictionary* says an affirmative

24 defense is, "a defendant's assertion raising new facts and

25 arguments that if true will defeat the plaintiff's or the

1                          PROCEEDINGS                    21

2   prosecution's claim even if all allegations in the

3   Complaint are true." So that is what makes this different.

4   So what is labeled an affirmative defense is really not.

5   So that's the first and the fourth are both negative

6   defenses; they merely state that the -- especially the

7   first one, that there's no cause of action for which relief

8   may be granted.  That's attacking the sufficiency of the

9   allegation. You know, on a legal ground it's not asserting

10  new facts that if true would negate any of the claims.

11          The only one -- and I think that's -- and you also

12  asked about the 15th defense, which was Lester Eber had no

13  fiduciary duties as trustee following the surrogate court's

14  termination order. That's not applicable to 2012 because

15  that happened in 2017. So the only affirmative defense that

16  the defense has even argued could subsume the defense of

17  beneficiary consent is the third one where they say that

18  the cause of actions are barred by the doctrines of waiver,

19  laches and/or estoppel.  And those are all fairly

20  established common law doctrines, and none of them involve

21  beneficiary consent.  And, certainly, as we briefed, you

22  know, the notion of consent is simply different than waiver

23  in a lot of ways.

24          So there's certainly no allegation that my clients

25  consented to a transaction. That would be the fact.  You

```
 1                          PROCEEDINGS              22
 2   know, and I looked at the case law and, you know,
 3   affirmative defenses aren't required to meet the standards
 4   of pleading of Iqbal and Twombly, but they're still
 5   required to meet the notice pleading standard. And just as
 6   a matter of basic common sense, there's nothing in here
 7   that at least certainly I interpreted as asserting a
 8   consent defense.
 9            And I think ultimately, your Honor, though, it
10   doesn't really matter whether they alleged it earlier or
11   not because failure to allege an affirmative defense in the
12   Complaint is something that this Court could grant some
13   discretion to -- you exercise discretion to allow them to
14   cure if they tried to present --
15            THE COURT:  Right, right.
16            MR. BROOK:  -- it at summary judgment and there
17   was no prejudice.  The problem, your Honor, is they never
18   presented this defense, even at summary judgment; and in
19   fact, explicitly said we are not raising this defense.  So,
20   you know, and I do apologize, your Honor, I don't normally
21   do this, but in this instance I thought I'd -- you know,
22   it's not exactly laying a trap but sort of doing that -- so
23   I didn't mention that quotation in the opening brief from
24   their reply brief when they denied it, just to see what
25   would happen.  And then sure enough, they said we asserted
```

```
 1                          PROCEEDINGS                    23
 2    this defense, and then I pointed out they actually said
 3    Lester Eber -- you know, quote, "Lester Eber does not argue
 4    that he sought, received or needed plaintiffs' consent at
 5    the 2012 foreclosure." That's their -- that's Summary
 6    Judgment Reply Brief at 10.  So they were contending there
 7    was no duty to inform the trust beneficiaries.
 8              So, you know, so for this Court to order a trial,
 9    there has to be some dispute of material fact so that a
10    reasonable juror would possibly find that there was
11    beneficiary consent.  And it's hard to imagine how that
12    could be when they did not present any such facts and in
13    fact, if we had a trial, I could read this statement, this
14    admission by them into evidence as an admission by party
15    opponent that would severely undermine their credibility.
16              So I think it's basically -- you know, putting
17    aside the arguments that we made in our brief about how
18    there are no facts sufficient to justify this because
19    there's nothing that actually constitutes consent, you
20    know, there's an affirmative responsibility on the part of
21    the nonmovant in summary judgment to present facts and
22    arguments that would establish a defense.  And that was a
23    complete failure of that here, your Honor.  So there's no
24    need for a trial in this case.  And I hesitate to think,
25    you know, what a jury would think if we wasted their time
```

```
 1                        PROCEEDINGS                    24
 2  with that.
 3            THE COURT:  Okay. Are there other points you
 4  wanted to make, Mr. Brook?
 5            MR. BROOK:  I don't believe so, your Honor. I
 6  think I addressed all the Court's questions. You know, I
 7  would ask for the opportunity to briefly reply at the end
 8  of the argument if there's something that comes up that I
 9  feel the need to do so.
10            THE COURT:  Okay. I'd like to hear next from the
11  Eber defendants.
12            MR. RAMSEY:  Judge, this is Colin Ramsey. If you
13  remember from summary judgment, John Herbert and I kind of
14  split up the issues. So depending on which one you'd like
15  to hear from first, John or I will address whatever the
16  Court wants to tee up.
17            THE COURT:  I don't have anything in my mind. Why
18  don't you start, Mr. Ramsey, and we'll take it from there?
19            MR. RAMSEY:  Yes. I could start where we ended
20  with Mr. Brook on the consent issue. There continues to be,
21  I think, a fundamental misunderstanding of what we're
22  arguing. He's technically right when we say that we've
23  maintained that Lester didn't need to seek consent in 2012
24  for the foreclosure.  And the reason was what happened two
25  years prior to that, which from the beginning we have made
```

1                           PROCEEDINGS                    25

2    one of the cornerstones of our defense, that Lester

3    afforded the plaintiffs the opportunity to participate in

4    the loans, provided him with all the loan documents that

5    the Court indicates in its decision.  And that's where the

6    consent flows from, what happened was it two or three years

7    prior to 2012.  So --

8              THE COURT:  Right. You're saying that there was

9    prospective consent because the foreclosure was part of the

10   documentation provided by Lester to his sisters --

11             MR. RAMSEY:  Exactly.

12             THE COURT:  -- aunts.

13             MR. RAMSEY:  Exactly. So --

14             THE COURT:  I understand that to be -- I've

15   understood that to be your argument for the entirety of the

16   case.

17             MR. RAMSEY:  Okay.  Very good.  Very good. I just

18   want to make sure that there was no confusion about what we

19   were arguing because --

20             THE COURT:  But I do want to press you on this,

21   though, because what Mr. Brook has said is that you really

22   have to have a separate consent at the time of the actual

23   transfer because of the fiduciary obligations that Lester

24   still had as trustee.  And so -- and he is initiating,

25   essentially, this issue, he's initiating the transfer in a

1                          PROCEEDINGS                    26

2   sense because he is deciding to foreclose and accept -- and

3   on behalf of Alexbay accept the transfer.  So what do you

4   say to that; is a second consent required to actually have

5   this transfer rather than, say, a public auction.  And if

6   not, why not, and what case would you cite me to on that?

7              MR. RAMSEY:  Well, in our view, no. The initiation

8   of the consent that occurred, again, occurred back in 2010,

9   when the plaintiffs were aware of or were given the

10  opportunity to participate in the loan and whatever the

11  terms would be.  And one of the terms or one of the

12  conditions would be that, you know, what happens if there's

13  a default.  And so they were aware what could have happened

14  or what would happen in 2010.  So the need to go back and

15  get, you know, an additional consent in 2012 was, in our

16  view, superfluous.

17             I'm not sure -- and I know we don't have a case

18  exactly on those facts, your Honor -- but that's been our

19  position all along is, again, it would be superfluous to do

20  it in 2012, when it was already teed up two years prior.

21             MR. HERBERT:  Right.  Colin, can I add to that?

22             THE COURT:  So why not -- why not give them -- why

23  not give them notice of the foreclosure proceeding?

24             MR. RAMSEY:  Well, the statute didn't require it I

25  think is the short answer, Judge. That's the short answer.

```
1                       PROCEEDINGS                  27

2             THE COURT:  And -- okay.  And with respect to the

3    consent in 2010, Mr. Brook also makes the argument that there

4    really can't be a factual dispute because there's no

5    affirmative document where his sisters say, yes, go right

6    ahead.  There's clearly -- there's no dispute that they

7    received these papers; they knew that the loans were being --

8    I don't think that there can be any dispute that they were

9    well aware that Lester was giving money to the entity and that

10   they were given notice of the terms of the loan.  But there's

11   no affirmative objection to it; there's also no affirmative

12   consent. I think what Mr. Brook is arguing is that under the

13   case law, you don't need -- that you actually would need

14   something affirmative.  What do you say to that?

15             MR. RAMSEY:  Well, I think that's where the

16   question of fact is. I don't know that the case law says

17   absolutely absent some written document saying, "I hereby

18   consent to X, Y, Z," you can never find consent. And I think

19   that's where we have the question of fact that the Court

20   highlighted in its decision, saying okay, plaintiff says

21   this, defendants say that, this is for the trier of fact to

22   ultimately determine.

23             THE COURT:  Okay.

24             MR. HERBERT:  Colin, can I add something to this?

25             MR. RAMSEY:  Sure, John. Go ahead.
```

```
 1                      PROCEEDINGS              28
 2               MR. HERBERT:  Yes. John Herbert. I think one of the
 3    reasons why you don't see any case where, you know, you have a
 4    preexisting loan that went into default and the creditor tried
 5    to get the consent of beneficiaries of the trust that own the
 6    borrower company is that it wouldn't make any sense. You know,
 7    of course, if the loan has been made and a couple of years go
 8    by and the loan goes into default, I mean, if you asked the
 9    equity holders of the borrower to consent to a foreclosure of
10    its security, well, obviously, they're not going to give it
11    to you.  So nobody would ever do that.  So that's why the
12    whole transaction, any loan transaction, the whole
13    transaction is all bundled into one set of documents. It
14    provides for the making of the loans, the repayment of the
15    loans, you know, the specific consideration for making the
16    loan and provides for what happens if you don't pay; in
17    other words, how do you -- you could foreclose on the
18    collateral.  And that's what happened here.
19               And I think there's a whole 'nother layer here
20    that I think was addressed in your question number three,
21    is who could have consented to the foreclosure. I mean,
22    what actually happened here was that, you know, Lester
23    believed that the trustees of the trust were the
24    appropriate people to consent, in effect, right.  So this
25    is a different situation here than -- this is not a loan to
```

1                          PROCEEDINGS                    29

2   the trust where the trustees would have had to act at the

3   front end of the loan transaction. This is a loan to a

4   company owned by the trust.  Right?  So here the consents,

5   Lester sought the ratification of the loans, the loan

6   package, from the nonconflicted trustees.  Remember, he's

7   not the only trustee; there are three trustees here.  So he

8   concluded that the right place to go for ratification of

9   the loans and his rights was to the other two trustees.

10          Canandaigua here, clearly independent, they were,

11  you know, a bank, they're experts in commercial lending and

12  in creditor's remedies in the case of a default on a loan.

13  In fact, they had their own loans outstanding with the

14  company throughout this entire time.  They knew about the

15  loan, they knew about the collection provisions in the

16  loans and that they were all part of one package.  They

17  knew about the deteriorating condition of the business.  So

18  there were a number of conversations between the Ebers and

19  the two other trustees about ratifying a loan.  And there

20  was a meeting of the trustees on August 18, 2011, where

21  they very clearly went over the provisions of the loans,

22  the status of the loans, the fact that the beneficiaries

23  had been given an opportunity to participate in the loans

24  and declined to and that the two trustees, they ratified

25  the loan.  And that document -- the Bates number is

```
 1                         PROCEEDINGS                    30
 2  CNB00030. Nobody is contending here that there was anything
 3  defective about that ratification at all. I mean, it seems
 4  to me that's what's the most important thing here is that
 5  the majority act here, the majority act of two of the three
 6  trustees is adequate to bind the trust under EPTO 10-10.1.
 7  And Lester wouldn't have gone forward with the foreclosure
 8  if he hadn't gotten that ratification.
 9          THE COURT:  I see.  So your sense is that the
10  trust -- that the beneficiary consent is really not
11  pertinent here when you have the two independent trustees
12  of the trust agreeing to the foreclosure and transfer?
13          MR. HERBERT:  Right.  And, you know, it could be
14  if you could get it, but obviously you're not going to get
15  it from the beneficiaries. Here the trustees --
16          THE COURT:  I see.
17          MR. HERBERT:  -- or the trust itself with the
18  controlling shareholder of Eber Bros. & Co., Inc., they
19  owed a fiduciary --
20          THE COURT:  And --
21          MR. HERBERT:  Sorry.
22          THE COURT:  Okay.  And they owed a fiduciary duty
23  to the beneficiaries, as well?
24          MR. HERBERT:  No. They owed a fiduciary duty as
25  the controlling shareholder to the minority shareholders of
```

```
 1                        PROCEEDINGS                    31
 2    Eber Bros. & Co., Inc., hence the minority shareholders of
 3    Eber-Connecticut.  And if -- you know, that was the --
 4              THE COURT:  I'm get --
 5              MR. HERBERT:  -- right place to go.
 6              THE COURT:  So I'm getting confused here. The bank
 7    was a co-trustee of the trust --
 8              MR. HERBERT:  Correct.
 9              THE COURT:  -- which was the owner and indirect
10    owner of the various Eber entities?
11              MR. HERBERT:  Correct.
12              THE COURT:  And what you're saying is the two
13    independent trustees approved and ratified the foreclosure
14    and transfer?
15              MR. HERBERT:  Well, they ratified the loan
16    package, which included the security agreement, which very
17    clearly provided that Lester could foreclose in the manner
18    that he did foreclose.
19              THE COURT:  Okay.
20              MR. HERBERT:  It was another six months before he
21    actually did foreclosure.
22              THE COURT:  But those trustees have a fiduciary
23    obligation to the trust that flows to the beneficiaries,
24    right?
25              MR. HERBERT:  Well, they have a duty, fiduciary
```

```
 1                          PROCEEDINGS                    32

 2    duty, to the beneficiaries of the trust, and as the

 3    majority shareholder of the Eber companies, they have a

 4    fiduciary duty to those companies, too. So those are the

 5    right people to consent, because here the beneficiaries,

 6    they don't have any --

 7              THE COURT:  So who were the majority shareholders

 8    of the relevant Eber entities at that time -- at that time

 9    that that occurred?

10              MR. HERBERT:  Well, the majority shareholder of

11    Eber Bros. & Co., Inc., the top company, was the trust. And

12    the majority shareholder of Eber Wine & Liquor was Eber

13    Bros. & Co., and on down the line.  So it was all a

14    majority-owned chain. So the trust at the top layer, you

15    know, as a majority shareholder, they have a fiduciary

16    obligation, you know, not to do something unfair or abusive

17    to the companies down below and to their minority

18    shareholders, particularly when one of the minority

19    shareholders, Peter Goodman, owned the 15% of Eber-

20    Connecticut, and they had a preferred shareholder interest,

21    which was basically superior to the equity interests of the

22    beneficiaries.

23              THE COURT:  Okay.  So you're saying -- so is that

24    ratification or approval then effectively the -- is that

25    viewed, properly viewed as consent?
```

```
 1                        PROCEEDINGS                    33
 2              MR. HERBERT:  Well, I mean, you know, what's a
 3   consent. I mean, if you look at some of the other cases
 4   that are cited here, the Renz case, the Benedict case, the
 5   [indiscernible] case, there's a lot of discussion in each
 6   of those situations between the fiduciary defendant and, in
 7   some cases, the beneficiaries, in some cases their co-
 8   executor that was involved in some of those cases.  And it
 9   doesn't always say that there was some formal document that
10   said Consent on top, but there was a lot of discussion and
11   there was an awareness of what was going on, and those
12   people either did or didn't sign off on whatever it is that
13   was an issue in those cases.  So I don't think there's any
14   form or requirement that there has to be some document that
15   says Consent on the top.
16              THE COURT:  Okay.
17              MR. HERBERT:  So I think the central issue on this
18   consent thing, it depends on what's the -- you know, what's
19   the deal here. You know, I know Mr. Brook has tried very
20   hard throughout this whole case to segregate the
21   foreclosure in 2012 from the rest of the loan transaction.
22   We would very vigorously disagree with that, that the whole
23   loan transaction and the security for the loan was all one
24   integrated transaction, two sets of promises given in
25   consideration for each other.  And, yes, they were -- you
```

```
1                         PROCEEDINGS                34
2   know, what's happened in connection with the loans was
3   separated in time.  But so what?  So are all loans are made
4   up year one and paid or repaid in, you know, year five or
5   whenever. That doesn't make any difference.
6              But the important thing is the Security Agreement
7   for Lester's loan very clearly permitted them to take
8   whatever action was permitted under the Uniform Commercial
9   Code, which is exactly what they did and exactly what they
10  got the Supreme Court in Rochester to sign off on as being
11  commercially reasonable. So, you know --
12             THE COURT:  And the trust allowed loans and for
13  collateral -- the companies to be put up as collateral for
14  them?
15             MR. HERBERT:  Absolutely.  They know that. It
16  really -- to be honest with you, the collateral here
17  doesn't make that much difference, to be honest with you.
18  You know, Lester, I guess he could have, you know, been an
19  unsecured creditor here, you know, and I think that's
20  something that this issue about what his other
21  alternatives, and you can talk about this in another
22  context, but, you know, the collateral here was to protect
23  Lester from all the other creditors, not from the
24  plaintiffs.
25             THE COURT:  Yes.
```

```
 1                          PROCEEDINGS                    35

 2               MR. HERBERT:  Because -- and the creditors,

 3    secured or not, he's always senior to all the equity

 4    holders of the borrower. But he may or may not be senior

 5    to, here, the New York State Teamster Fund and the PBGC.

 6    But that's --

 7               THE COURT:  Right.

 8               MR. HERBERT:  -- a [indiscernible] issue.

 9               THE COURT:  Right, right.

10               MR. HERBERT:  I also should mention that --

11               THE COURT:  Okay, so let me just restate your

12    position.  From your position, there really should not be

13    any fiduciary breach found because the two independent --

14    because, one, the trust documents permitted this type of

15    loan agreement; two, the independent trustees signed off on

16    the agreement and ratified it and followed it; and the

17    trust itself also had obligations to the companies, which

18    had debts to other entities, like the PBGC and the union in

19    connection with the whole pension debacle, and so it was

20    not unreasonable to have this kind of loan transaction and

21    ultimately, you know, what happened, what unfolded. Is that

22    basically what you're arguing?

23               MR. HERBERT:  Right. I think to put a little finer

24    point on it, that the consent alone would have made this

25    not a fiduciary problem for Lester.  And --
```

```
 1                        PROCEEDINGS                    36

 2              THE COURT:  Say that one more time?

 3              MR. HERBERT:  Well, if he had a valid consent,

 4    right, to the loan transactions, then that should be the

 5    end of the story there, right?

 6              THE COURT:  Yes.

 7              MR. HERBERT:  Separately, I think maybe our main

 8    argument is that the will authorized the loan transaction

 9    and all the incidents of the loan transaction and that

10    that's -- that in and of itself will cause you to go to the

11    next step, which would be that we would have to show at a

12    trial that Lester acted in good faith.  And I think that,

13    as we mentioned in our papers, there's plenty of authority

14    for that proposition.

15              You know, the issue here might be whether or not

16    the foreclosure itself was authorized by the will language.

17    I think we're -- you know, we've already accepted,

18    everybody's already accepted that the loan was authorized,

19    the security was authorized, the collection of the loan was

20    authorized.  The only thing we're arguing about now is

21    whether or not this particular form of collection was

22    authorized. And I think we would argue, and I think it's a

23    matter of fact for a trial, that there really wasn't any

24    other realistic alternative here.  A public auction was not

25    realistic, and it wouldn't have solved Lester's alleged
```

```
 1                        PROCEEDINGS              37
 2   fiduciary problems with beneficiaries, anyway. And it
 3   probably would have destroyed the company.  But those are
 4   all factual things that would be brought out at trial.
 5             THE COURT:  Okay. Okay. Thank you.
 6             Mr. Ramsey, were there other points that you
 7   wanted to make?
 8             MR. RAMSEY:  Just briefly, your Honor, on the
 9   issue of the unwinding in a constructive trust.
10             THE COURT:  Yes.
11             MR. RAMSEY:  In our view, it's tough -- it's tough
12   to see how a constructive trust would operate short of
13   having the ownership/stock issue first determined as far as
14   who's going to be operating.  And, obviously, Mr. Brook's
15   comments presupposed that it would be the plaintiffs. Until
16   that determination is made, certainly we would object to
17   that result.
18             And then just practically speaking, whether it's
19   the plaintiffs operating it, whether it's some type of
20   special master independent trustee, or whether it's a
21   constructive trust and the current management and ownership
22   stays on, the on-the-ground issues that they are going to
23   cause, I just need to note those, whether it's the
24   uncertainty for vendors and clients, the uncertainty that's
25   going to cause with the banking and lending relationships.
```

```
 1                         PROCEEDINGS                    38
 2   I think -- I don't want to speak in hyperbole, but the
 3   imposition of a constructive trust at this point has the
 4   very real potential, if not likelihood, of imperiling the
 5   business, just given all of the new issues that would be
 6   injected into it at that point.  So that certainly would
 7   not be a desired result from our perspective.
 8             THE COURT:  So let's just talk about this
 9   surrogate court -- the surrogate court order because in
10   2017 the trust dissolved.  And it's ordered to be
11   distributed per stirpes, right? So that's the order. And
12   then there's an objection to that.  Why, in your view, is
13   the Court authorized to change what the surrogate court --
14   effectively change what the surrogate court has already
15   determined?
16             MR. RAMSEY:  John, do you want to jump in here?
17             MR. HERBERT:  Again -- John Herbert again.  Well,
18   I think that their order, you know, it says what it says.
19   But the implementation of their order -- right -- that's
20   something that has to be done by the remaining trustee,
21   Canandaigua.  And I think, going back to a discussion long
22   ago, they never did what they were supposed to do in order
23   to get themselves into a position where they could require
24   the issuer of the Eber Bros. stock to register or transfer
25   into the names of the beneficiaries.  They never did that.
```

```
 1                        PROCEEDINGS                  39
 2  I don't think anybody's claiming that they did.
 3            THE COURT:  You're talking about Lester and Wendy
 4  Eber didn't do what they needed to --
 5            MR. HERBERT:  No, no, no, no, no.  As far as
 6  implementing the surrogate court's order, okay, that was up
 7  to Canandaigua to take the action necessary to get the
 8  shares transferred into the names of the three
 9  beneficiaries.
10            THE COURT:  Right.
11            MR. HERBERT:  Whatever they did in October of
12  2017, it wasn't valid.  And I don't think that's an issue
13  anymore. I think everybody agrees with that.  And so if
14  there was -- you know, whatever is necessary to be done in
15  the future doesn't really have anything to do with the
16  Lester Eber estate here.  And so the plaintiffs' claim that
17  somehow, you know, it requires action by them is just --
18  that's just not the case.
19            But I think maybe the more important issue is
20  that, you know, our position is that Lester Eber timely
21  exercised his right to call the shares of the plaintiffs
22  away from them pursuant to the transfer restriction
23  provision in the Eber Bros. bylaws.  And that, you know, we
24  say that that call right was validly exercised, and the
25  posture of it now is that Canandaigua has just declined to
```

```
 1                        PROCEEDINGS              40
 2   comply with the call rights, because they're kind of
 3   waiting for further instruction.  Whether or not that was
 4   valid or not, you know, if there's another attempt to
 5   transfer shares to the three beneficiaries, the estate's
 6   going to exercise their call rights yet again, which they
 7   clearly have the right to do.
 8             So I think there are a whole host of issues
 9   relating to the call right exercise in 2018 and any
10   prospective call rights that the estate would have now.
11   So --
12             MR. O'BRIEN:  Your Honor, this is Dan O'Brien. If
13   I may be heard?
14             THE COURT:  Yes. I want to --
15             MR. O'BRIEN:  And this --
16             THE COURT:  -- I do want to hear from you. I just
17   want to make sure that Mr. Ramsey and Mr. Herbert don't
18   have any other points.
19             MR. HERBERT:  I do have one other point that's
20   important to note about the share ownership at Eber Bros. &
21   Co., okay?
22             THE COURT:  Yes.
23             MR. HERBERT:  So let's just go over what the facts
24   are here for a minute so you see the context.  You know,
25   the trust doesn't have any ownership interest in the Eber
```

1                        PROCEEDINGS                    41

2   Wine & Liquor at all.   There's a fact issue about that, but

3   they don't have any.   But look at who owns what in Eber

4   Bros. & Co. right now. Right now Eber Bros. & Co. is owned

5   62% -- well, if you were to distribute the shares to the

6   three beneficiaries and you found that the call rights

7   weren't validly exercised, then the plaintiffs here would

8   have 62% of the votes, and the estate would have 38% of the

9   votes.

10                  THE COURT:  Yes.

11                  MR. HERBERT:  Go down one level to the Eber Wine &

12  Liquor subsidiary, right now Eber Bros. & Co. has 72% of

13  those votes, and the estate has -- the Lester Eber estate

14  has 27% of those votes.   So on a fully diluted basis, in

15  other words, if there was no Eber Bros. & Co. there, the

16  Lester Eber estate would have 56% of the voting stock of

17  Eber Wine & Liquor, and the plaintiffs would have 44%. So,

18  you know, what's really going on here is that Lester Eber's

19  estate actually on a fully diluted basis, they would have

20  control of this business -- they should have control of

21  this business; and, you know, to do something that thwarts

22  that, that's just not fair to the Lester Eber estate, and

23  we would certainly exercise our rights to, you know, pursue

24  that claim.   And I think we'd probably be seeking to

25  forcibly dissolve Eber Bros. & Co. because it's not really

```
 1                        PROCEEDINGS                42
 2   performing any useful function. It's just a block in the
 3   way of the estate exercising the voting control that they
 4   have on a fully diluted basis.
 5             THE COURT:  And Eber Bros. and -- okay, so you're
 6   saying Eber Bros. & Co. has a -- you're saying the estate
 7   through its ownership, it has 30% ownership in Eber Bros. &
 8   Co., which has a 72% interest in Eber-Metro, right?
 9             MR. HERBERT:  No, the -- no. If you look at Eber
10   Bros. & Co. and Eber Wine & Liquor & Co. together as one,
11   even if -- because they're really just two shell
12   companies --
13             THE COURT:  Well, let me -- I just want to
14   understand this again, because I'm writing down the chart.
15   We've got the trust on top; we've got Eber & Co.; then
16   we've got the EBWLC --
17             MR. HERBERT:  Right.
18             THE COURT:  -- then we have the Metro, and then --
19             MR. HERBERT:  Well, not anymore.
20             THE COURT:  -- we have -- then Eber Metro, which
21   then went to Alexbay?
22             MR. HERBERT:  Correct, yes.
23             THE COURT:  Okay.  So take me through this again.
24             MR. HERBERT:  Okay, so right now, the trust owns
25   virtually all of the voting stock of Eber Bros. & Co.,
```

```
 1                        PROCEEDINGS                  43

 2   right?

 3             THE COURT:  Right.

 4             MR. HERBERT:  And then our position is that Lester

 5   Eber's estate has validly exercised its call rights and

 6   that they're the rightful owner to all of that.  But even

 7   if you -- even if the call right wasn't defective and the

 8   shares currently held by the trust were distributed on a

 9   one-third, one-third and one-third basis, that would mean

10   that the plaintiffs would have, you know, two-thirds, and

11   at most you would have one-third.  But because Lester's

12   estate owns 27% of the vote in Eber Wine & Liquor, right,

13   if you combine those two, that would result in the estate

14   owning 56% of the votes.  And they really are the ones that

15   are entitled to -- even if you don't respect the call

16   rights, the estate is the one entitled to have voting

17   control of this whole structure.

18             Now, Mr. Brook's going to say, well, you know, he

19   wants to contest the validity of the shares that were

20   issued to Lester Eber by this Class B preferred stock of

21   Eber Wine & Liquor, well, okay, we can have a discussion

22   about that at trial.  But, you know, net-net, the estate,

23   you know, they've got effective -- owns an effective voting

24   control of the structure here.  And to strip that from them

25   is, as I say, it's just not fair.
```

```
 1                    PROCEEDINGS               44

 2           THE COURT:  Okay. All right, so next I will

 3  hear -- Mr. O'Brien, you wanted to --

 4           MR. O'BRIEN:  Yes, your Honor --

 5           THE COURT:  -- I just want to give you an

 6  opportunity to --

 7           MR. O'BRIEN:  -- I'll be very -- I'll be very

 8  brief.

 9           THE COURT:  Yes.

10           MR. O'BRIEN:  And I'm glad that you

11  [indiscernible] you're providing additional details because

12  the last question, which was regarding the impact on the

13  surrogate court, the share distribution, suggested that I

14  ought to be on the call.  And I do want to say, you know, I

15  don't necessarily agree that the estate failed to do what

16  it was ordered to do because it was never given the stock

17  ledger by Lester and could not distribute actual share

18  certificates and therefore did the next best thing, which

19  was to deliver the stock powers. Up until the surrogate

20  court issued its order, Lester remained a trustee, as well,

21  and therefore, he had an obligation to facilitate the

22  distribution of the shares themselves.  And to the extent

23  we were not able to do so, then it's kind of disingenuous

24  for Lester or now his estate to argue that somehow we

25  failed to do what we were obligated to do.
```

```
 1                          PROCEEDINGS                    45

 2              That said, to the extent that there was anything

 3    that the bank didn't do that it was supposed to do -- I

 4    assume bring a proceeding to compel the delivery of the

 5    stock ledger so that we could issue actually

 6    certificates -- we settled this case with the plaintiff

 7    and, you know, took our lumps.

 8              THE COURT:  Right.

 9              MR. O'BRIEN:  We were brought back into the case,

10    of course, because we had competing claims as to what we

11    should do with respect to the issuance of stock, again, did

12    not have the stocks ledger, and we had Lester demanding

13    that we deliver the stock, and of course Brian Brook saying

14    no, don't you dare.  So that's why we got back into this.

15    And I guess all I can say is we're prepared to do whatever

16    the Court wants us to do.  And, in fact, the prayer for

17    relief in our intervenor -- Interpleader Complaint was we

18    want the Court to adjudicate the issues with respect to the

19    disposition of the stock and give CNB guidance and/or

20    direction as to what steps, if any, CNB needs to take to

21    implement the final determination of the Court in that

22    regard.

23              And to the extent that the outcome of this case is

24    that there has to be some different shared distribution

25    formula because there was fraud or some other malfeasance,
```

```
 1                       PROCEEDINGS                    46
 2   then we will do whatever is necessary to seek a
 3   supplemental or amendatory determination from the
 4   surrogate, if that's what's called for.
 5               THE COURT:  I see.
 6               MR. O'BRIEN:  But I just wanted to --
 7               MR. BROOK:  May I respond to that, your Honor?
 8               THE COURT:  So -- in just a moment, but I just
 9   have a clarifying question for Mr. O'Brien.  So is there a
10   need for -- so if the bank were to have brought a Motion to
11   Compel delivery of the stock ledger -- that was never
12   done -- is there a separate claim?  The claims are very
13   convoluted, actually.  This is a very complex web of
14   transactions and companies.  So I'm not clear on whether
15   there's actually a claim asserted that would -- and maybe
16   this is a question for Mr. Brook, really.  What is the
17   actual claim that would cause this Court to say there was a
18   breach of -- that there was something -- something that
19   requires the just delivery of the per stirpes as opposed to
20   something else?
21               MR. BROOK:  Yes, your Honor.  So the -- the
22   claim -- this goes to another point that was raised in the
23   Motion for Reconsideration, which is, you know, if it's not
24   presented in any other claims, it's certainly presented in
25   Count VI seeking declaratory relief.  And the declaration
```

1                           PROCEEDINGS                    47

2   of the plaintiffs' rights is something that, you know,

3   would accomplish this, certainly.   And we did move for

4   summary judgment on that.

5           If this Court does stand by its decision to

6   dismiss that claim, then, nonetheless, you know, it can

7   only do that because it's duplicative.  And how does the

8   Court get to this question otherwise? It's because if

9   it's -- it's necessary for plaintiffs to have standing to

10  bring derivative claims. If they don't still have ownership

11  of these shares, then they don't have a remedy.  So the

12  Court has to address it at some point. It's presented by

13  the Complaint. It's essentially, you know, although not

14  phrased this way, the Court could think of it as a defense

15  that the defense has made, to try to say that my clients

16  don't have standing.  And in order to address that, if not

17  done as a declaration, this Court still needs to address

18  it; otherwise, you know, what are we doing here.

19          So that's what I'd say to that, is that it's

20  not -- you know, it's not a standalone claim in and of

21  itself, but it is an essential element to numerous claims.

22  And if the Court for some reason thinks that that's not

23  necessarily decided, then it is explicitly in Count VI, as

24  well.

25          THE COURT:  So it's an element of other claims.

```
 1                         PROCEEDINGS                    48
 2   So, for example, is it in Count IV?
 3             MR. BROOK:  I say yes, it is an element in the
 4   sense that they're derivative claims; and, therefore, to
 5   establish a derivative claim, there must be -- in other
 6   words, to establish an injury, as well, it must establish
 7   that, you know, you have an ownership interest in the
 8   company that had the assets taken out of it.  So either
 9   that's done through the trust or otherwise.  So it's not a
10   claim -- an element in the sense that if you look up
11   "breach of fiduciary duty," it's listed as an element
12   there; but as a practical matter, under these
13   circumstances, it is a necessary fact to establish that my
14   clients have, you know, an ownership interest in the
15   company.
16             THE COURT:  But, Mr. Brook, your clients never had
17   an ownership. They were beneficiaries of the trust. It was
18   the trust that had the ownership interest.
19             MR. BROOK:  Right. And, your Honor, and so when
20   the trust initially had -- when we first filed, it was a
21   double-derivative claim in that they were beneficiaries of
22   the trust, which has an ownership interest.  And that is
23   a -- you know, that gives them standing. So if this company
24   was still owned by the trust and the trust were still in
25   existence, my clients would have standing, no question.
```

```
 1                          PROCEEDINGS                 49
 2   The way in which the trust was dissolved and then Lester
 3   held back his supposed cooption or mentioning that or
 4   failing to mention any transfer restriction at all during
 5   the surrogate court proceedings, you know, if he'd done
 6   that, we wouldn't be here. My clients would have objected
 7   to whatever Lester was trying to do.  But he bit his tongue
 8   on this.
 9            You know, why is he raising this in October of
10   2018? You know, he received CNB's petition to terminate the
11   trust, you know, almost two years earlier, didn't object to
12   it, certainly knew what the distribution was going to be
13   and then claims that somehow my sending him an email, you
14   know, attaching a document, you know, when trying to just
15   determine whether CNB ever actually delivered the stock
16   powers, as it requested to do, you know, somehow they say
17   that's the first time that Lester ever heard about this
18   proposed transfer, which is ridiculous. You know, he had
19   his counsel enter an appearance in the surrogate's court.
20   He absolutely waived whatever rights he may have had.  And
21   even if he didn't waive whatever rights he had, let's keep
22   in mind that he is, you know, purporting to acquire trust
23   property, you know, that -- I'm jumping around a little
24   bit.
25            I think ultimately we have a number of arguments
```

1                           PROCEEDINGS                    50

2  on this point in our motion papers; and, you know, part of

3  our Motion for Reconsideration was simply that this Court,

4  you know, resolve it. I think that, you know -- I don't --

5              THE COURT:  But there was no affirmative -- there

6  was no affirmative motion on Count IV.  This issue of the

7  ownership is certainly part and parcel of other claims, as

8  you acknowledge.  And there are so many interlocking issues

9  here. Why isn't this case more appropriate to be resolved

10  at trial with all -- why isn't it more efficient and

11  appropriate to do that? Because it seems to me that there

12  are many factual disputes that impact one another such that

13  this case really needs to be resolved at trial as opposed

14  to the papers. Why is that not so, Mr. Brook?

15              MR. BROOK:  Well, your Honor, I would respectfully

16  disagree that there are any factual issues here. Instead,

17  it's merely a question of what are the legal consequences

18  of the facts. You know, there's no dispute that Lester Eber

19  received the surrogate court's petition and that he had

20  counsel appear in that proceeding for him.  There's no

21  dispute that he did not state an objection.  There's no

22  dispute that he received CNB's proposed share distribution.

23  There's no dispute that he received a proposed stock power.

24  None of these facts are in dispute.  And the arguments that

25  we have presented to the Court are sufficient to say that,

given that those facts are not in dispute, there is no

basis for Lester to claim that he could exercise a call

option.  And once this Court finds that the call option

was, you know, waived by failing to raise it in a prior

proceeding, you know, on the basic grounds of, you know,

*res judicata* and other principles, you know, and

estoppel -- my clients relied on his failure to object in

agreeing to the termination of the trust. I mean, that's

particularly significant here because as a trustee he had a

duty still, until the trust was terminated, to inform my

clients of all material facts.  And he could not sit on

these assertions that there was a transfer restriction.

It's also undisputed, your Honor, that the face of

the stock certificate says that it says.  This Court can

interpret that.  So there are numerous independently

sufficient arguments based on undisputed facts that would

resolve this issue in our clients' favor.  And to have a

trial and to delay things when there is no factual dispute

to resolve, just a question of what the legal consequences

are of those facts, I think would be, you know,

unfortunately, wasteful and would, you know, really

prejudice my clients, who have been very, very -- you know,

they've been very eager to be able to move on with this

thing and to get this over with.  And particularly now --

```
 1                        PROCEEDINGS                52
 2   and your Honor can correct me if I'm wrong -- but we
 3   wouldn't be able to get a trial date for, you know, ages
 4   under the current circumstances.  So --
 5             THE COURT:  No, that's -- well, I don't know about
 6   that because I actually have a jury trial now scheduled for
 7   April, and I have a jury trial scheduled for June.  The
 8   courts started having jury trials again, and so we are
 9   going forward with jury trials now.  And --
10             MR. BROOK:  Well, I certainly hope that's the
11   case. I apologize --
12             THE COURT:  Yes, so that's happening.  So let me
13   ask you, Mr. Brook, if the Court were to resolve the issue
14   of the ownership of the stocks or force the ownership --
15   force the transfer of the stock so that your clients had
16   two-thirds of the trust assets but did not resolve the
17   other piece, that merely addresses portions of your --
18   eliminates standing issues and --
19             MR. BROOK:  Yes.
20             THE COURT:  -- but still potentially the issue --
21   it eliminates the standing issue, but it doesn't resolve
22   other claims.
23             MR. BROOK:  Yes, your Honor, that's right.  But it
24   is a necessary standing issue, I believe, just to unwind
25   the Alexbay transaction and impose a constructive trust
```

1                              PROCEEDINGS                      53

2  because otherwise, my clients don't see any benefit from

3  that.  So I -- yeah, without current ownership of that,

4  they would not -- and there's no point in, you know, giving

5  judgment to someone without a benefit to it.

6           But the other claims that I mentioned would still

7  be resolved.  I do want to briefly address Mr. Herbert's

8  assertion that, you know, Lester supposedly controlled the

9  voting stock in Eber Wine & Liquor.  That was some very

10 confusing stuff he said that is just a total fabrication

11 that ignores the reality of how corporate structures and

12 subsidiaries work. It is not the case that Eber Bros. &

13 Co., Inc. would vote its shares of Eber Wine & Liquor based

14 upon who its shareholders are.  Whoever controls the

15 majority of Eber Bros. & Co., Inc. gets to control how it

16 votes all of its shares in any subsidiary.

17          So, you know, the idea that Eber Wine & Liquor

18 shares would be split on a pro rata basis is, it's just

19 absurd.  And I'm not sure if the Court was aware that --

20 you know, yeah, it -- I'm sorry.

21          Certainly, we contend that the issuance of

22 preferred shares in Eber Bros. Wine & Liquor to Lester

23 after this lawsuit was filed was another wrongful

24 transaction. For one thing, it was more self-dealing by a

25 trustee in a trust asset, shares in the Eber Wine & Liquor.

```
 1                      PROCEEDINGS                 54
 2   But even if that isn't overturned by the Court, the control
 3   of the company is done by Eber Bros. & Co., Inc.  So
 4   whoever controls Eber Bros. & Co., Inc., boast all of its
 5   shares in a block, and that means that Eber Wine & Liquor
 6   would be controlled by my clients.
 7           Now, one thing I do want to remind the Court of is
 8   that we submitted a proposed Order along with our Motion
 9   for Summary Judgment in part because we sort of saw this
10   coming.  It's like a, you know, constant -- it's like
11   Whack-A-Mole; there's always new arguments coming up. Now,
12   this is the first time in this entire case that I have ever
13   heard from anyone on the defense that somehow Lester's
14   estate would still control Eber Wine & Liquor even if get
15   Eber Bros. & Co., Inc.  That's brand new today.
16           And so we sort of anticipated this and said there
17   needs to be a structured way in which the corporate
18   transactions occur because the problem is the only officer
19   of these companies now is Wendy, and she is not going to
20   comply with anything of her own volition without very
21   explicit instructions about how to do that. And I think
22   ultimately, because the parties agree on how many shares
23   should have been distributed under the surrogate court's
24   order, you know, the only question is if Lester and Wendy
25   can obstruct the implementation of that despite plaintiffs'
```

```
 1                        PROCEEDINGS                 55
 2   and Canandaigua's best efforts. I agree with everything
 3   Mr. O'Brien said. You know, they did the best they could,
 4   but when the company refuses to turn over the stock
 5   register and doesn't even tell them where to send stock
 6   powers to effectuate interests, it's the company and its
 7   officers that are obstructing, not CNB.
 8           And so the idea that we would need to have some
 9   sort of a trial on who's at fault there in order to decide
10   who owns the shares and whether they should have been
11   distributed, that's wrong.  We do acknowledge that there
12   needs to be a trial on whether that was done with
13   sufficient malice to warrant equitable indemnification
14   because intent is not something that the Court can resolve
15   at summary judgment.  The legal effectiveness of what
16   they're doing can be resolved, but not the intent, if that
17   distinction makes sense.
18           So --
19           THE COURT:  Okay. The Court is -- the Court could
20   resolve the issue of what the bank needs to do with the
21   shares and leave the rest for trial if it found that there
22   were factual issues precluding summary judgment on the
23   remaining issues, including the constructive trust, is that
24   correct?  Do you agree with that?
25           MR. BROOK:  I'm not sure I understand what the
```

```
 1                          PROCEEDINGS                    56

 2   distinction is.  What other issues --

 3           THE COURT:  In other words, [indiscernible] the

 4   decision of who owns or who gets the shares -- if your

 5   clients get -- if I were to order that your clients get

 6   two-thirds of the shares of the trust, period, end of

 7   story; but I found that there -- and just that, that

 8   doesn't impact the other claims. Am I correct?

 9           MR. BROOK:  It doesn't impact other claims, you're

10   right, your Honor. I just wanted to make sure, so you're

11   not -- you know, in order to get there, the Court has to

12   find whether or not Lester's call option exercise was

13   valid.  So that just resolves that predicate issue that is

14   necessary for everything else.  So, certainly, the Court

15   could resolve that issue now and leave other things for

16   trial. You know, for reasons we've stated, plaintiffs don't

17   believe that that should happen, certainly not with respect

18   to some of the claims.

19           I think if the Court would like --

20           THE COURT:  Okay.  And then I -- I just have a

21   question for Mr. O'Brien. So Mr. O'Brien, your client was a

22   trustee, was it not, at the time that the foreclosure

23   happened?

24           MR. O'BRIEN:  We were a trustee at the time the

25   foreclosure happened. We just did not know about the
```

1                         PROCEEDINGS                    57

2   foreclosure.

3            THE COURT:  And -- you did not know about the

4   what?

5            MR. O'BRIEN:  Foreclosure.

6            THE COURT:  Hold on a second. I thought I heard

7   Mr. Herbert say that your client, the bank, as a trustee of

8   the trust, agreed to the foreclosure in 2011.  And he cited

9   to a document where that -- the CNB00030.

10           MR. O'BRIEN:  There are minutes of a trustees

11  meeting at which the trustees agreed to the loan by Lester

12  which provided the stock as security.

13           MR. HERBERT:  But there was no consent to the

14  foreclosure, your Honor.

15           MR. O'BRIEN:  But we did not know of in advance

16  and did not have an opportunity, therefore, to consent to

17  the actual foreclosure.

18           MR. HERBERT:  Nor was there an after-the-fact

19  ratification --

20           THE COURT:  Hold on. Hold on. First, I can only

21  hear one person at a time, and you need to state your name

22  for the record for the court reporter. So, Mr. O'Brien, I

23  just want to --

24           MR. O'BRIEN:  So do you want me to --

25           THE COURT:  -- step back on that a little bit more

```
 1                         PROCEEDINGS                    58

 2   clearly because I thought I had understood that that

 3   document, CNB00030, was a consent by the trustees to the

 4   loan which also provided for foreclosure.

 5           MR. O'BRIEN:  Well, the loan documents

 6   obviously -- the loan documents provide for certain rights

 7   in the event of default.  And the minutes of that trustees

 8   meeting reflect that those -- these are minutes that were

 9   prepared by Wendy, and I believe -- and agreed to by all of

10   the trustees, including CNB. But it did not constitute

11   notice that a foreclosure [indiscernible].

12           THE COURT:  Okay.

13           MR. HERBERT:  Your Honor, can I follow on that,

14   just to clarify? John Herbert.

15           THE COURT:  Hang on.

16           Mr. O'Brien, so are you saying that the bank did

17   not have notice of the actual foreclosure proceeding and

18   did not participate or separately consent to that

19   proceeding; is that what you're saying?

20           MR. O'BRIEN:  Right.  And we were certainly not a

21   party.

22           THE COURT:  Okay. Now, Mr. Herbert, was that you

23   seeking to clarify something about --

24           MR. HERBERT:  Yes.

25           THE COURT:  Okay.
```

```
 1                     PROCEEDINGS              59
 2              MR. HERBERT:  Well, two things.  Number one, when
 3    I talk about the minutes of this meeting from August 18th
 4    of 2011, I did not say that the two independent trustees,
 5    Mike Gumaer and CNB, I didn't say that they consented to
 6    the eventual foreclosure.  What this meeting was about was
 7    to go over the loan package, you know, what was it all
 8    about, what was happening with the property, what was
 9    happening with the status of the loans, and they asked the
10    trustees to ratify the loans.  But, you know, it wasn't --
11    the decision to go forward with foreclosure, it wasn't made
12    for another six months after that.
13              THE COURT:  Okay. All right.
14              MR. HERBERT:  Can I also respond to what
15    Mr. O'Brien said earlier?
16              I have to say that, with all due respect to
17    Mr. O'Brien, I disagree with all of 99% of what he said. I
18    thought we were way beyond the issues relating to all --
19    the stock book and all this nonsense from 2017. I think we
20    very clearly showed -- and maybe it's still an issue --
21    there was no valid transfer of the certificates by CNB in
22    2017 because there was no physical delivery of the stock
23    certificates to the beneficiaries.  The fact that they
24    delivered the stock powers to somebody, the UCC
25    specifically says that's not effective to constitute a
```

1

2 transfer. And, you know, what's happening with the stock

3 book of the company, that has nothing to do with anything.

4 The point is that --

5          THE COURT:  But, Mr. Herbert, your client, who was

6 alive at the time, provided an obligation to provide the

7 ledger and the certificates.

8          MR. HERBERT:  No, he didn't.

9          THE COURT:  Did he --

10          MR. HERBERT:  No, he did not, your Honor. No, he

11 did not. No, he did not. Let me explain that.  There's no

12 obligation on the part of the company to give anybody the

13 stock ledger.  That's just a list of who owns what shares.

14 There's no obligation to give that to anyone.

15          And there's no obligation on the company's part to

16 issue new shares to anybody unless the transferor and the

17 transferee in the shares, whether they've gone -- you know,

18 jumped through all the required hoops under Article 8 of

19 the UCC, which they did not.  And I don't even think that

20 that's an issue that was still a factual issue.  The point

21 is they didn't do what they were supposed to do. I'm sorry.

22          And so -- but I don't even think that's the issue

23 here.  The issue here is whether or not Lester Eber's

24 [indiscernible] exercised his call rights in 2018 and

25 whether he could do so again now, you know. I suppose

```
 1                        PROCEEDINGS              61
 2   Canandaigua could, you know, actually comply with Article 8
 3   of the UCC; I suppose they could if they wanted to. It's
 4   not up to us to do that; it's up to the transferor to do
 5   that and the transferee. They're the ones that have to do
 6   the preliminary steps leading up to, you know, there being
 7   a requirement to register a transfer on the books of the
 8   company. And if they didn't do that, I'm sorry, but that's
 9   not our fault -- no offense, Dan.
10            THE COURT:  Okay.
11            MR. O'BRIEN:  Well, your Honor, I think that
12   that's, you know, a little like the defendant who pleads
13   guilty to patricide and then throws himself on the mercy of
14   the Court because his father is dead.
15            The fact of the matter is that Lester was a
16   trustee, he participated in the proceeding before the
17   surrogate court and never took the position that the
18   disposition of the stock -- remember, there was more than
19   just disposition of Eber Bros. stock. In fact, the bank and
20   Lester agreed that the bank would not be involved in the
21   management of the closely-held company.  But there were
22   other publicly-traded stocks that were distributed amongst
23   the beneficiaries of the trust.
24            THE COURT:  Right.
25            MR. O'BRIEN:  And there's no quarrel about that.
```

```
 1                        PROCEEDINGS              62
 2  So the only stock that wasn't distributed was the stock
 3  that the bank did not have the ledger for and the
 4  certificates for.  And Lester knew that, and I do think to
 5  have the complaint made now that the bank didn't do what it
 6  was supposed to do, I think it's a little disingenuous.
 7            But, nevertheless, you know, we -- when we got a
 8  demand in 2018, we still couldn't provide the stock
 9  certificates because we did not have the stock ledger.
10  And, in fact, at that point, I don't think we knew who had
11  it other than we certainly suspected that Lester and Wendy
12  Eber had custody and control of it. So that's why we had to
13  come back to the Court because, certainly, Brian did not
14  want us to do anything to facilitate the transfer of stock
15  to Lester.  We went back to Court and said please sort this
16  out.  And we'd be more than happy, if we had the stock
17  ledger, your Honor, to deposit the stock certificates with
18  the Court and have the disposition of those stock
19  certificates determined ultimately when this proceeding is
20  resolved.  But we can't even do that because --
21            THE COURT:  Well, why --
22            MR. O'BRIEN:  -- we don't --
23            THE COURT:  -- why shouldn't those stock
24  certificates be placed with the Court now pending the
25  outcome of this case?
```

```
 1                      PROCEEDINGS              63
 2           MR. O'BRIEN:  I'd be happy to have that happen
 3   because I think at that point in time we could make a hasty
 4   exit.
 5           MR. HERBERT:  Can I respond to that? John Herbert.
 6   Really, again -- I don't know how many times I have to go
 7   over this -- it doesn't have anything -- the stock register
 8   has nothing to do with Canandaigua.  That's -- you know,
 9   what's happening with the stock register, what's happening
10   with registering transfers, that's the job of the secretary
11   of the company.  The bank has nothing to do with that.
12   They're not the transfer agent; they're just --
13           THE COURT:  But the secretary of --
14           MR. HERBERT:  -- a shareholder.
15           THE COURT:  -- the company is a party to this
16   case.
17           MR. HERBERT:  That's correct. But the explanation,
18   when Mr. O'Brien --
19           THE COURT:  And why would -- why shouldn't this
20   party to this case be required to put those certificates in
21   the possession of the Court pending outcome of this case?
22           MR. HERBERT:  Okay.  Two reasons. Number one, the
23   UCC has very specific requirements of what has to happen in
24   order for the company to be required to issue new stock
25   certificates to anybody. None of those prerequisites have
```

```
 1                        PROCEEDINGS                  64
 2   been satisfied.  And, number two, Lester Eber's estate, our
 3   position is that he validly exercised his call rights in
 4   2017 and will do so again, if necessary, in 2021. So it
 5   wouldn't be appropriate until we resolve all these issues
 6   that I just mentioned for there to be any certificates
 7   issued to anyone anywhere.
 8             THE COURT:  Okay.
 9             MR. HERBERT:  Because I know --
10             MR. BROOK:  Your Honor, this is Brian Brook --
11             MR. HERBERT:  -- the Court knows -- no offense --
12   no offense to Dan O'Brien, but I notice that he's not
13   giving you any kind of technical analysis under Article 8
14   of the UCC at all.
15             THE COURT:  Okay.
16             MR. BROOK:  Your Honor, this is Brian Brook. May I
17   briefly address this point?
18             THE COURT:  Yes. I'll hear briefly from you, and
19   then I think I -- my questions have been answered.  Go
20   ahead, Mr. Brook.
21             MR. BROOK:  Well, your Honor, the Ebers are trying
22   their best to make this issue of the stock certificates
23   unduly complicated when the only question that should be
24   resolved is whether Lester validly exercised his call
25   rights.  And that can be done based on the undisputed
```

1                              PROCEEDINGS                        65

2  facts.

3          Article 8 of the UCC, not an issue. Mr. Herbert

4  argued that CNB didn't effectively transfer the stock.

5  They made the same argument in their motion papers.

6  There's no dispute about that.  We conceded that.  We said

7  CNB did not transfer the shares under the UCC. The question

8  is, you know, how are the shares supposed to be

9  transferred, and CNB will do what needs to be done at that

10  point. And the dispute, the purely legal one, is, you know,

11  whether CNB had to deliver stock powers under the UCC

12  before Lester's call right is even effected.  And that is

13  not what the bylaws say.  The bylaws talk about notice

14  being given before the transfer occurs, but Mr. Herbert

15  points out delivering stock powers is effectuating the

16  transfer.  So it can't be the case that the notice and the

17  transfer itself are the same.  They're conflating two

18  different things because that's their only defense, and

19  they're grasping at straws. You know, there's numerous

20  other reasons why it's ineffective, but whether, you know,

21  the stock power constitutes a notice under the bylaws is

22  just one.

23          You know, I also want to briefly address one other

24  thing that's, you know, going back to Mr. Herbert's

25  argument that the trustees ratified the loans. That has

1                          PROCEEDINGS                    66

2   nothing to do with the need for beneficiary consent. You

3   know, they make this new argument at oral argument that the

4   trustees consented enough to allow self-dealing.  But that

5   is absolutely not the law.  This is more just grasping at

6   straws.  And, you know, moreover, the ratification of the

7   loans, which were authorized by the will, is not the same

8   thing as a ratification of the foreclosure.  They do not

9   argue that even the trustees ratified the foreclosure and

10  said, you know, there's no dispute that CNB wasn't aware of

11  that until after the transfer was essentially done. So that

12  is ultimately what this comes back to is that beneficiary

13  consent question.

14          You know, I think what's key here is the standard

15  that is required.  The Court asked is a second consent

16  required, and the fact is they have to consent to any self-

17  dealing that's not authorized by the will.  And the only

18  self-dealing that is explicitly authorized by the will is

19  that Lester can make a loan to the company and have it

20  secured.  And there is some self-interest that's permitted

21  under the will when it comes to decisions to retain the

22  company.  And that's really a key here because the will

23  itself says that the trustees only have a duty of good

24  faith rather than undivided loyalty when they make

25  decisions to retain the business.  And that makes sense

1
2   because Lester, as Allen Eber would have thought, Lester
3   would have a self-interest in preserving his job, and he
4   might even, you know, keep the company instead of selling
5   it because he wants to keep working in it.  And what Allen
6   Eber said is as long as he's acting in good faith, he can
7   do that. But it's really important that the will only makes
8   that for decisions to retain, not to dispose of, which
9   means the will clearly shows that any decision to actually
10  dispose of the business for any reason is subject to the
11  duty of undivided loyalty.  And the duty of undivided
12  loyalty and what constitutes consent, your Honor, has, you
13  know, recognized the high bar there.
14          It is absurd to suggest that the language in the
15  loan security agreement referring to Lester having all
16  rights under the UCC was sufficient to give Audrey Hays and
17  Sally Kleeberg any notice, let alone full notice, of
18  Lester's possibility of taking ownership of the company.
19  You know, even if it said that explicitly and it was buried
20  in 40 pages of documents, you know, rather than being
21  brought to their attention, that wouldn't be good enough.
22  You know, I think it's correct that the law says there must
23  be a clear, you know, and explicit consent. It doesn't
24  necessarily have to be in writing, but there must be a
25  consent. But certainly, it's absurd to say that there was

PROCEEDINGS                    68

1

2   any close to full disclosure and that any reasonable juror

3   could find that there was full disclosure of all material

4   facts based on a cross-reference to the UCC that

5   presupposes that my clients would then go read the UCC,

6   understand it and figure out, you know, this is what a

7   strict foreclosure is under Article -- what is it? -- 620

8   of -- Article 9, Section 620.  That's just absurd.  There's

9   no need for a trial on that, your Honor. And that's all.

10            THE COURT:  Okay, but Mr. Brook, it is not a

11   surprise to you that the defendant's estate now has for the

12   entirety of this lawsuit suggested that there was -- that

13   Lester's sisters knew about the loan and consented to it

14   when they --

15            MR. BROOK:  That is what --

16            THE COURT:  -- when they got the -- by virtue of

17   the paperwork.

18            MR. BROOK:  Yes.  And there's no need for them to

19   consent to the loan because that's authorized by the will,

20   your Honor. So that's -- it's really a red herring. You

21   know, the Court has already recognized that even the will

22   authorizing the loan is not enough to authorize the

23   foreclosure because, you know, among other things, there's

24   other alternatives.  But also, you know, as I pointed out,

25   the language in the will draws a very, you know, distinct

```
 1                        PROCEEDINGS              69
 2  difference between loans that are secured and decisions,
 3  you know, about the future of the company involved there.
 4         So I think also the -- I'm sorry, now I'm losing
 5  my train of thought a little bit here -- but they alleged
 6  that, you know, that they had gotten notice of these loans,
 7  I think, largely because we alleged fraudulent concealment.
 8  And they're trying to say no, this was disclosed.  But they
 9  never argued, until after the Court presented them with
10  this option, that that was enough to kind constitute
11  beneficiary consent.
12         And, again, I want to go back to what they said in
13  their brief because they -- Mr. Ramsey misrepresented it as
14  being that they said they didn't need the consent.  But the
15  exact words again were, "Lester does not argue that he
16  sought, received or needed plaintiffs' consent to the 2012
17  foreclosure." So he does not argue that he sought or
18  received the foreclosure. You know, that's --
19         THE COURT:  All right --
20         MR. BROOK:  -- and it makes sense because the
21  standard for consent is so high.
22         THE COURT:  Okay. I've heard enough. I'm going to
23  take this motion under advisement. I want to thank the
24  parties for being prepared today and wish you a good
25  weekend.  We are adjourned.
```

```
 1                      PROCEEDINGS                    70

 2          MR. RAMSEY:  Thank you, Judge.

 3          MR. BROOK:  Thank you, your Honor.

 4          (Whereupon, the matter is adjourned.)

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

71

C E R T I F I C A T E

        I, Carole Ludwig, certify that the foregoing

transcript of proceedings in the case of Kleeberg et al v.

Eber et al, Docket #16-cv-09517-LAK-KHP, was prepared using

digital transcription software and is a true and accurate

record of the proceedings.

Signature_____*Carole Ludwig*_____

                    Carole Ludwig

Date:    March 29, 2021