L5IsKLEc

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DANIEL KLEEBERG, et al.,

                Plaintiffs,

        v.                              16 Civ. 9517 (LAK)

WENDY EBER, et al.,

                Defendants.

------------------------------x
                                        New York, N.Y.
                                        May 18, 2021
                                        4:00 p.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                        District Judge

                        APPEARANCES

BROOK & ASSOCIATES, PLLC
     Attorneys for Plaintiffs
BY:  BRIAN C. BROOK

UNDERBERG & KESSLER LLP
     Attorneys for Defendants
BY:  PAUL F. KENEALLY
     COLIN D. RAMSEY

ALSO PRESENT:
JOHN HEBERT


        (The Court and all parties appearing remotely)

        THE COURT:  Let's see.  Do we have everyone?

        Mr. Brook is for the plaintiffs, right?

        MR. BROOK:  Yes, your Honor.

        THE COURT:  OK.  There you are.
```

L5IsKLEc

1          And Mr. Keneally for the defendants?

2          MR. KENEALLY:  Yes, myself and Mr. Ramsey, Judge.

3    Thanks.

4          MR. RAMSEY:  Good afternoon, your Honor.

5          THE COURT:  Good afternoon, everybody.

6          When this case got filed five years ago, I remember

7    saying this may be the worst experience of everybody's life,

8    one of these family feud things, and I take it that the fact

9    that we're here and nothing has been resolved means perhaps I

10   was right, huh?

11         You don't have to comment on that.  So I've read Judge

12   Carter's decision.

13         I just lost you here.  I'll get you back.

14         You did a prestigious amount of work and all of you

15   must have as well.  I looked at the pretrial order, and the

16   first thing that occurs to me is whether you've taken a

17   sufficiently serious look at whether there is any jury trial

18   right in this case, and if so, on exactly what.

19         I know you have a list of questions you say you would

20   like a jury to decide.  But the question is, what, if any, part

21   of this case at common law would have been an action, would

22   have been an action at common law to be stayed.

23         I mean, I see all kinds of claims for breach of

24   fiduciary duty, which fundamentally is equitable, but

25   occasionally it can be regarded as an action of law.  You've

L5IsKLEc

got an accounting claim, which normally is equitable.  I

haven't tried to enumerate all the causes of action.  I gather

there are ten of them.

What's the story here?

MR. BROOK:  Well, your Honor, I'll start for

plaintiffs.  I certainly am of the view that there is a lot

here that should not go to the jury.  Everything having to do

with equitable relief is for the court to decide.  And I think

to that point, that is one of the reasons why, quite unusually,

the plaintiffs moved for summary judgment on a lot of issues

here.  There is also, for certain issues, there aren't really

any disputed issues of fact.  But, unfortunately, for

reasons -- without intending any disrespect -- I don't entirely

understand, Judge Parker did not resolve some of those issues,

such as plaintiffs' standing, whether or not they are

shareholders as a result of certain actions that the deceased,

Lester Eber, took after the trust was ordered to be terminated.

That is one example.

But we actually have won on summary judgment on the

breach of fiduciary duty, on the core transaction in this case,

and it is our view that that is something that, you know, the

relief on that is not something for a jury trial, that the

court has found that the no further inquiry rule was violated,

and New York law is very clear on the consequences for that.

It is the beneficiaries who did not consent to the transaction,

L5IsKLEc

1    have the right to void the transaction regardless of the value,

2    regardless of whether it was fair, and to get back their

3    property, and if necessary, impose a constructive trust.  And

4    given the number of years that apply here, we do believe that a

5    constructive trust is absolutely necessary.

6          THE COURT:  Now, remind me of that transaction to

7    which that applies.

8          MR. BROOK:  So that is a transaction -- so this was a

9    family business, a wine and liquor business in New York and

10   Connecticut, and the Connecticut business was all that was left

11   in 2012.

12         Starting in 2010, maybe 2009 -- the dates on the

13   documents are a little unclear -- Lester Eber, the president of

14   the company and also trustee of the trust, started loaning some

15   money to the company.  Plaintiffs contend that is because it

16   didn't have enough money to pay its bills because Lester Eber

17   took millions of dollars out of the company from an earlier

18   merger deal in 2007 or so.  But the reason is irrelevant for

19   now to your Honor's question.

20         The point is, there were a number of loans made.  And

21   in 2012, without the company making any effort to change the

22   loans' terms or try to get some sort of a stay, Lester Eber

23   filed a lawsuit and sent a demand saying he needs to be repaid

24   and he wants to accept all of the corporation's stock in the

25   Connecticut entity in consideration of his loans, which total

L5IsKLEc

about $3.5 million, according to defendants.

          And then he proceeded to foreclose on it under the
UCC, without notice to a surrogate, without notice to the
beneficiaries of the trust.  And he ended up taking ownership
of the entire remaining operating business for himself through
his own wholly owned company, which was originally named
Lester Eber LLC, but for reasons that are unclear, we believe
to conceal his identity, Alex Bay LLC, and then that moved in a
New York Supreme Court for sort of a stamp of approval that it
was fair under the -- that it was commercially reasonable under
the UCC Article 9, which, of course, is not the standard for a
fiduciary duty claim.  It is a much lower bar.

          And so with those set of facts, you know, given that
Lester was trustee of a trust that controlled this entity,
Judge Parker correctly found that that constituted a breach of
fiduciary duty as a matter of law, violating New York's no
further inquiry rule, or also known as the duty of undivided
loyalty.  That says that the trustee cannot do a trust
transaction like that unless it is explicitly permitted by the
will or the trust instrument, or it is consented to by the
beneficiaries or it is approved by a court.  Obviously, for
court approval, it has to be a court that knows there is a
trust in order to approve it, and that was not the case here.

          So that is the transaction.  That is really, the
biggest part of this case is getting my clients' ownership

L5IsKLEc

1    interest in what is their inheritance, their grandfather's

2    company that they founded, back to them.

3            THE COURT:  And if that is set aside, then who owns

4    Eber Connecticut?

5            MR. BROOK:  Eber Connecticut will still be owned by

6    the entity called Eber Metro, which would be owned, you know,

7    assuming that the court applies a constructive trust and

8    eliminates certain other transactions such as stock being

9    issued after this lawsuit was filed to try to dilute my

10   client's interest, my clients would own two-thirds of the two

11   levels up holding company that would have complete control over

12   each level down.

13           So the ultimate ownership of an 85 percent interest in

14   the Connecticut entity would be 66.6 percent my clients, and

15   then one third of the remaining one third would be Wendy Eber,

16   since she is one of -- the more striking things in this case,

17   apparently, they cut out Lester's own son from any rights into

18   this business as well, even though he is in the wine and liquor

19   business himself.  Wendy Eber ended up -- I guess her father

20   changed his will at some point after that 2012 transaction to

21   name her as the sole beneficiary of this company, which she has

22   now been running, to my clients' dismay that it is continuing

23   on like this.

24           THE COURT:  OK.  Let's get back to my question,

25   though.

L5IsKLEc

 1              MR. BROOK:  I'm sorry.

 2              THE COURT:  Which causes of action are triable as of

 3     right to a jury?

 4              MR. BROOK:  My understanding of the law -- and

 5     obviously defendants can chime in here -- you know, is that the

 6     fraudulent concealment claim is one that I believe there is a

 7     right to a trial by jury.  That is the only one where I think

 8     there is actually a right as a matter of law.

 9              And to the extent that, especially since Lester Eber

10     has passed and we have already won on the breach of fiduciary

11     duty claim, to the extent that the court orders a bench trial

12     on the remaining claims, plaintiffs would waive the fraudulent

13     concealment claim in order to move this thing along.

14              THE COURT:  Which cause of action is the fraudulent

15     concealment claim?

16              MR. BROOK:  I believe it is Count Seven, if I'm --

17              I don't have it open.

18              THE COURT:  Tell me in a nutshell, what is Count

19     Seven?

20              MR. BROOK:  Count Seven is the fact that -- so there

21     is a duty of disclosure for a trustee and for a corporate

22     officer.  And in this case, Lester Eber was both a trustee and

23     a corporate officer with my client, and the trust as the

24     ultimate shareholders, he concealed this Alex Bay transaction

25     where he took ownership of it for several years.  Right.

L5IsKLEc

1           One of my clients found out about it because there

2    were two other lawsuits where creditors who were defrauded as a

3    result of that transaction sued for it, and one of those

4    creditors ending up having a lawsuit reported on in the media.

5    That concealment potentially has caused significant damages in

6    terms of the lost profits and everything for the last few

7    years, for those years in the company.

8           Depending on the equitable relief granted, we may not

9    actually have any additional damages that are worth getting on

10   that.

11          THE COURT:  What is the relief sought on Count Seven?

12          MR. BROOK:  The relief sought is compensatory damages.

13   And, you know, I will confess, it is something where if we get

14   a constructive trust, and certainly if we get a win on the

15   faithless servant doctrine where Wendy and Lester Eber's

16   salaries have to be paid back as a result of their disloyal

17   conduct, then --

18          THE COURT:  Well, that's a jury claim, isn't it?

19          MR. BROOK:  I believe you're right, your Honor.  Until

20   I was just going through it, I had forgotten that that is one

21   as well, you know, when the first date of disloyalty began.

22          Although in this case, at least as to Lester Eber, we

23   do already have a finding as a matter of law that he breached

24   his fiduciary duty at least as a trustee.  I understand that

25   the faithless servant doctrine is more about employees, but it

L5IsKLEc

1    is possible that that is something that could be decided as a

2    matter of law.

3              THE COURT:  Anything else sought on Count Seven,

4    except compensatory damages?

5              MR. BROOK:  I'm sorry, yes, and punitive damages as

6    well.

7              At this point, we recognize -- although I haven't seen

8    any conclusive authority on it -- I believe that the law is

9    generally adverse to imposing punitive damages against an

10   estate because you can't punish someone who is dead.  Since

11   Lester Eber has passed away, the remaining person would be

12   Wendy Eber.

13             Again, I think that at a certain point, we have a lot

14   of other claims and we have a lot of other ones where I believe

15   the compensatory damages will be extremely large.  So my

16   clients' view, as I have talked to them about this, if it would

17   streamline things, we will waive the jury trial.  We will waive

18   the claim on fraudulent concealment.  In large part because,

19   you know, we asserted that claim before we knew that we were

20   going to win on the key part of Count One.

21             THE COURT:  Are there any other causes of action in

22   which you seek other than equitable relief?

23             MR. BROOK:  Yes, your Honor.

24             For the breach of fiduciary duty claim as well, we

25   seek punitive damages.

L5IsKLEc

1          THE COURT:  Which count is that?

2          MR. BROOK:  That is Count One.

3          Then as to Count Two, that is the faithless servant

4   doctrine, my understanding is that the relief there is

5   equitable and that is considered discouragement of all payments

6   received from the point of the first date of disloyalty.  That

7   doesn't mean, however, necessarily that the relief is

8   equitable, that the claim isn't one that there is a jury right

9   to if there is disputed issues of fact.

10         THE COURT:  Well, what relief do you seek on Count One

11   other than punitive damages?

12         MR. BROOK:  We seek a number of transactions to be set

13   aside.

14         Primarily, count One is almost entirely seeking

15   equitable relief.  Putting my clients back in a position they

16   were in, except for one transaction where it was -- this deal

17   in 2007, when Lester Eber essentially took millions of dollars

18   in consideration for selling the company for himself for a

19   consulting agreement.  That ended up causing the company to

20   have to borrow money back from him that put it in the supposed

21   financial distress that they say, you know, caused all these

22   transactions.

23         So that money was a corporate opportunity.  I mean,

24   they were selling all their assets to a competitor, and so that

25   is --

L5IsKLEc

1          THE COURT:  It's like I push a button, counselor.

2          Count One fundamentally seeks to set aside

3  transactions.  And in the bargain, you want punitive damages,

4  is that about right?

5          MR. BROOK:  Yes, except for that one transaction I was

6  mentioning to your Honor, because the corporate opportunity

7  doctrine requires compensatory damages, I believe.  And I think

8  that it probably is, although I honestly don't know for sure,

9  but I can see a good argument that the question of whether

10  something was a corporate opportunity is a mixed question of

11  law and fact that there might be a right to a jury trial on.

12          THE COURT:  Look, whether something is a mixed

13  question of law or fact hasn't got anything to do, as I

14  understand it, with whether there is a right to a jury.

15          The question is, if this case had been brought in 1789

16  in the British courts, would it have been in chancery or would

17  it have been at law?

18          That's the question.

19          MR. BROOK:  And now your Honor is admittedly testing

20  my recollection of what I learned in law school, but I believe

21  that the gist of this complaint is something -- that is

22  something that would be decided by a judge, because it has to

23  do with corporate and trust matters that are typically dealt

24  with even by a surrogate or a judge in a state court.  I have

25  not seen too many jury trials.

L5IsKLEc

1          Plaintiffs' position -- and defense is welcome to step

2     in -- is that if your Honor decides that, you know, this is

3     something that should be decided on the bench, plaintiffs do

4     not disagree.  That sounds right to us.  I think it is a close

5     call, but it sounds right, given just all the case law,

6     especially with trust matters.  That is almost always decided

7     solely by a judge without a jury.

8          THE COURT:  Look, that is just not the test here.

9          MR. BROOK:  I understand, your Honor.  I apologize

10    that I'm not more knowledgeable about the specific test at this

11    time.

12         THE COURT:  Mr. Keneally, I'll give you a shot on

13    this.

14         MR. KENEALLY:  Mr. Ramsey will address that for us.

15    Thanks.

16         THE COURT:  Mr. Ramsey.

17         MR. RAMSEY:  Judge, well, I think the court, and to a

18    certain extent plaintiffs' counsel, has identified there are a

19    couple issues here that are jury.  Fraudulent concealment has

20    been mentioned, faithless servant has been mentioned.

21         As we have laid out in the pretrial order, I know this

22    isn't directly what the court is asking, there is a lot of

23    factual issues that, at least in part, it's been our

24    position -- I believe Mr. Brook has not disagreed -- are

25    properly the province of the jury.

L5IsKLEc

| | |
|---|---|
| 1 | THE COURT:  But it is not the issue that determines |
| 2 | whether it is the province of the jury, it is whether the cause |
| 3 | of action is equitable or legal. |
| 4 | MR. RAMSEY:  Understood, Judge. |
| 5 | I think the two the court has already touched on would |
| 6 | be at least two of the causes of action that would be entitled |
| 7 | to be tried by a jury. |
| 8 | THE COURT:  Yes, but maybe I'm just not making myself |
| 9 | sufficiently clear. |
| 10 | I am told that the first count fundamentally seeks to |
| 11 | set aside the transaction.  Is that an accurate statement? |
| 12 | MR. BROOK:  Yes, your Honor. |
| 13 | THE COURT:  OK.  Now, doesn't any action to set aside |
| 14 | a transaction arise only on the equity side? |
| 15 | MR. BROOK:  Yes, your Honor. |
| 16 | THE COURT:  I'm talking to Mr. Ramsey. |
| 17 | MR. BROOK:  I apologize. |
| 18 | MR. RAMSEY:  I don't disagree with that narrow |
| 19 | construct, Judge.  I agree with that. |
| 20 | But there is more I think Mr. Brook said to Count One |
| 21 | than just the set aside of the transfer. |
| 22 | THE COURT:  Like what? |
| 23 | MR. RAMSEY:  Like the punitive damage aspect of it. |
| 24 | THE COURT:  Well -- |
| 25 | MR. RAMSEY:  And I believe -- |

L5IsKLEc

        THE COURT:  -- equity can award cleanup damages where the damages are incidental to the equitable relief.

        MR. RAMSEY:  Understood, Judge.

        That is not, perhaps, the best cause of action to illustrate the right to a jury.  I think the causes of action directed towards fraudulent concealment and faithless servant doctrine are better, cleaner examples of where a jury would be appropriate.

        THE COURT:  Is there any relief sought on what you both are calling the fraudulent concealment claim except damages?

        MR. BROOK:  No, your Honor.

        MR. RAMSEY:  That's my understanding as well, your Honor.  They are seeking damages.

        THE COURT:  Are there any other causes of action that seek only damages?

        MR. BROOK:  Well, I will say that Count Ten is a little bit tricky.  It is called equitable indemnification, so I believe it is something where, you know, defense actually suggested that that was an issue for your Honor.  But it's also called common law indemnification.

        So that is one where it is actually a relatively small amount of money having to do with just certain conduct that forced one of the defendants to settle with us to get back into this case.  And per our settlement agreement, that company,

L5IsKLEc

1    Canandaigua National Bank, argues we have to pay their legal

2    fees.  And we just think that we shouldn't have to pay the

3    legal fees when we didn't do anything wrong on that one.

4            So it is one where it is a serious question mark for

5    me, your Honor.  My belief is that, despite the names given to

6    it, it is fundamentally just seeking -- actually, I'm going to

7    take all that back, your Honor.

8            That is an equitable claim and I'll tell you why.  It

9    is because -- it just hit me -- what we need, actually, is a

10   continuing order.  Because the jury can't tell us the amount of

11   money on that.  So if jury can't give us a dollar amount, it is

12   not going to help us.

13           What we need is an order saying all of those bills

14   that are being sent to me by Canandaigua's lawyer should be

15   paid by the defendants instead, and that includes bills going

16   forward, to the extent they need to do more legal work on this.

17   That is sort of continuing relief that I believe is equitable

18   in nature.

19           THE COURT:  Well, maybe it is a declaratory judgment.

20           MR. BROOK:  The entire declaratory judgment count was

21   dismissed by Judge Parker as being punitive.

22           THE COURT:  As you pleaded it.

23           MR. BROOK:  Yes.

24           THE COURT:  Look, I think the very first thing that

25   has to happen here is that I've got to ask you gentlemen to go

L5IsKLEc

back to square one on this and take each cause of action,

indicate what relief is sought, and state your positions with

authority as to whether that cause of action, bearing in mind

that damages can be appropriate in an equity action where it is

cleanup damages, as opposed to fundamentally a damage claim,

and whether it is triable as of right to a jury.

Because until we do that, we can't figure out whether,

fundamentally, we've got the same ball of facts at issue

throughout or nearly throughout that are facts that have to be

decided to determine the causes of action that are triable as a

right to a jury, or whether there should be a severance of a

couple of distinct claims that are law claims triable by jury

that don't implicate the facts that go to all the equity

claims, which would be a separate bench trial.

Then, of course, you both have to give it a little

more thought, I would suggest, as to even if there is some

right to a jury trial here, and even if this goes to a larger

part of the disputed facts than I think it might be, whether it

is in anybody's interest to try this case to a jury.

Because how do you suppose you would get across to

them all the facts that are in, for example, Judge Parker's

decision in any way that would be remotely comprehensible and

without putting nine of the 12 jurors, if we had that many, to

sleep?

I mean, do you want a reasonable decision or do you

L5IsKLEc

want luck of the draw?  I mean, that is up to you.  That is

your judgment.  And I'm not putting down juries.  I have to

tell you that in all my years on the bench, I have almost never

disagreed with a jury verdict, even in some very complicated

cases, but there are cases and there are cases.

So how much time do you need to get back to me on

this?

Speak to each other before you get back to me.

MR. BROOK:  Yes, your Honor.  And we have discussed

this very issue extensively.  Probably what we discussed most

during the pretrial order stage in terms of what to do on this.

You know, I think a week, because plaintiffs

definitely want to move expeditiously.  This case has been

pending for a long time and, you know, every minute, every day

that this continues to go on, there is risk that my clients

might not be able to get full relief if something unexpected

happens.

So I would ask for a week, and to make it a joint

submission, perhaps.  And then if we disagree to have our

respective arguments under either each count.

THE COURT:  How is that with you, Mr. Ramsey?

MR. RAMSEY:  That's fine, Judge.  I can make that

work.

THE COURT:  That's good.

Really go back to first principles on what the Seventh

L5IsKLEc

 1    Amendment means.  I'm serious about that.

 2            OK.  Now, for the sake of discussion, assuming this

 3    case were to be all tried through a jury, how long a trial are

 4    we looking at?

 5            MR. BROOK:  In plaintiffs' view, it should be about a

 6    week, I think, which is relatively -- I don't know if your

 7    Honor thinks it needs to be much longer than that.  But the

 8    defense has a number of witnesses that I think are going to

 9    testify on matters that are completely irrelevant, largely

10    having to do with how the company was in financial distress,

11    which is not something that is really disputed.

12            There were all sorts of liabilities to a pension fund

13    and such like that, that couldn't be paid because Lester had

14    taken so much money out of the company.  So he loaned it money.

15    All that stuff just goes to why did Lester Eber do the Alex Bay

16    transaction, which has already been determined to be a breach

17    of fiduciary duty.

18            I don't see why we need to have a parade of

19    accountants.  I think there is at least four different

20    accountants, in addition to Wendy Eber, who was the chief

21    financial officer of the company, that the defense wants to

22    call to just sort of talk about this stuff.

23            I do worry it is just a lot of smoke and mirrors, take

24    an already complicated case for a jury, and make it seem like

25    they are going to throw up their hands.  I know that is a

L5IsKLEc

common defense tactic in a white collar case, and judges tend
to clamp down on that.  I never honestly tried a breach of
fiduciary case in front of a jury in a civil matter.  I don't
know how much additional leeway your Honor would give them to
make their case.

        For our perspective, if your Honor determines that to
be relevant, we would just ask that it be limited to one
accountant or something.  Hopefully that can shorten it.  We
don't want to give the defense any issues for appeal.  Because
the last thing we would want to do is to obtain the equitable
relief we are entitled to as a matter of New York law and have
them get a stay issued because there is a substantial question
for a stay pending appeal.

        THE COURT:  Well, I think the first thing we need to
do is resolve the jury trial issue.  So let's get that.  And in
the meantime, you might give some thought to whether there are
some motions in limine that might be productive.  A, on the
supervision it is fundamentally nonjury, and B, on the
assumption that it is a jury.  I'm not going to set a timetable
for that, but I think we need to be sure where the jury trial
comes in.

        Is there any hope that this will settle, without
getting into terms?

        MR. RAMSEY:  Judge, I raised that with Mr. Brook, and
really, from the onset of this case, we have repeatedly said

L5IsKLEc

1    that we are more than interested in talking.  And that interest

2    remains, and we have extended that invite to Mr. Brooks on

3    multiple occasions.

4         My understanding is he and his clients are just not

5    interested at this point, or if they are, it is with a certain

6    set of preconditions going into any type of settlement

7    discussion.

8         MR. BROOK:  Your Honor, that is just not true.

9         We called last week or so, where I explicitly said,

10   here is what plaintiffs' settlement offer is at that time.  It

11   was based in large part on a third party that has come forward

12   and said they are interesting in buying the company.  They saw

13   Judge Parker's order.  They see the writing on the wall what is

14   going to happen.

15        I'm not going to get into the numbers on it.  Suffice

16   it to say, the defense did not put forward an offer, as much as

17   we settled with the last codefendant, who is deceased, who was

18   just a side player in this whole thing.

19        So we are incredibly far apart, your Honor, is part of

20   the problem, by a scale of, you know, at least 25 to one in

21   terms of where plaintiffs' ask is and what the defense's last

22   offer was.  So I think it should settle, but we're not sure.

23        THE COURT:  I'm not going to get into the details of

24   that, unless and until the jury part is out.  That's very

25   pivotal for a lot of reasons.

L5IsKLEc

1          If you decide, regardless of where the rights are with

2    respect to the jury trial, you want a nonjury trial, I won't

3    get involved in the settlement at all.  If we're going to do

4    this the other way, we'll see what it looks like.

5          OK.  I'm not sure there is too much more to discuss,

6    except trial scheduling.  The last time I looked at this, which

7    was yesterday, we are still operating on the basis that we have

8    five COVID-safe courtrooms to share among 35 or 40 judges, and

9    you have to book them a long time in advance.  It is not first

10   come, first served.  There are a series of priorities that are

11   applied by a committee that determines who gets to go to trial

12   and who doesn't.  If you're not an incarcerated defendant in a

13   criminal case, the chances are you're not going to trial for a

14   while.  So that's where we are.

15         Now, if, with this relaxation that we seem to be

16   experiencing, goes further, that may change and I may have

17   control of my calendar back.  If it's nonjury, there is more

18   flexibility.  Because last I heard, in a nonjury case without

19   any people in the courtroom, I think I may be able to go

20   forward with something like that.  But I'm not really sure

21   about that.

22         I also have my own criminal calendar, and that is, to

23   some extent, defendants still waiting for trials.  So I would

24   like to get this over with, but I'm not a free agent.

25         So let's get this jury trial thing worked out.  OK?

L5IsKLEc

1              MR. BROOK:  OK.

2              MR. RAMSEY:  Yes, Judge.

3              THE COURT:  Anything else I can do for you today?

4              MR. BROOK:  I suppose one thing I would ask for is --

5     this is probably something your Honor can't do -- do you have

6     any sort of ballpark sense, if we end up having a jury trial,

7     approximately when your Honor would try to schedule that for?

8              THE COURT:  I'm not in a position to tell you that

9     now.  There are a number of things affecting my calendar.

10             MR. BROOK:  As far as your Honor presiding over a

11    bench trial, is there a sense as to approximately when that

12    could happen?

13             I need to talk to my clients to be sure they are

14    willing to waive a jury demand, which may streamline some of

15    this process as well.

16             THE COURT:  Well, it sure isn't going to be before

17    Labor Day.

18             MR. BROOK:  OK.

19             THE COURT:  It could be in that last part of the year.

20             MR. BROOK:  OK.  Thank you, your Honor.

21             THE COURT:  OK.  Anything on your end, Mr. Keneally?

22             MR. KENEALLY:  No.  Thank you, your Honor.

23             THE COURT:  OK.  Well, thank you all.

24             I look forward, assuming we're going to try the case,

25    to doing it with you.

L5IsKLEc

1              All right.  Take care, and I'll eagerly await the

2     submissions on the jury issue.

3              MR. KENEALLY:  Thank you, Judge.

4              MR. BROOK:  Thank you, your Honor.

5              (Adjourned)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25