**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DANIEL KLEEBERG, LISA STEIN,
and AUDREY HAYS,

                              Plaintiffs,

                vs.

LESTER EBER, ALEXBAY, LLC f/k/a
LESTER EBER, LLC., ELLIOT W. GUMAER,
JR. and WENDY EBER,

                              Defendants,

    and

EBER BROS. & CO., INC., EBER
BROS. WINE AND LIQUOR
CORP., EBER BROS. WINE
& LIQUOR METRO, INC., EBER CONNECTICUT,
LLC, EBER-RHODE ISLAND, LLC, EBER BROS.
ACQUISITION CORP, EBER-METRO, LLC, and
SLOCUM & SONS OF MAINE, INC.,

                              Nominal Defendants.

Civil Action No. 16-CV-9517(LAK) (KDP)

**DECLARATION OF WENDY EBER**
September 6, 2021

Plaintiffs' Objections 9/20/2021

I.     My Experience, Background, and Summary of the Relevant Facts ...................... 1

II.    Southern Wine & Spirits of America, Inc.  Enters the New York Market ............ 6

III.   Eber Metro's Acquisition of Slocum & Sons through Eber-CT .......................... 9

IV.    Eber W&L and Eber Metro Liquidate and Cease Operations as Lester Pours his own Money into the Businesses ................................................................... 13

   A.  Efforts to Secure Financing and Liquidation of Eber W&L and Eber Metro as Lester Pours his own Money into the Business ............................................ 13

   B.  Eber W&L's and Eber Metro's Legacy Pension Liabilities ................... 16

      a.   Withdrawal Liability to Teamsters Fund ............................................ 17

      b.   Termination Liability to Eber W&L Retirement Plan and PBGC .................... 18

V.     With Eber-CT Failing, Alexbay Receives Eber W&L's Equity Interest in Eber Metro in a Foreclosure of his Loans to Eber W&L and Eber Metro .......................... 25

   A.  Lester Seeks Financing for and Tries to Sell Eber-CT - - Sales to Eder Goodman and Polebridge Bowman .................................................................. 25

   B.  Lester Forecloses on his Loans and Receives Eber W&L's Equity Interest in Eber Metro in Complete Satisfaction ...................................................... 35

VI.    Lester's Loans to the Business Following the 2012 Foreclosure and Current Estate Claims Against Eber W&L/Interest Rates .......................................... 43

VII.   Lester's Consulting Agreement with Southern ................................................. 45

VIII.  My Compensation and Employment Incentives .............................................. 47

IX.    Eber Bros. Transfer Restrictions/Call Rights (1996) and the Surrogate's Court's Approval of the Administration of the 1969 Trust Through December 26, 2016 ................................................................................................. 49

**WENDY EBER**, declares under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the following statements are true and correct to the best of her knowledge:

I.        **My Experience, Background, and Summary of the Relevant Facts**

1.        I am currently the President, Chief Executive Officer, Chief Financial Officer and Secretary/Treasurer of Alexbay, LLC, a Connecticut limited liability company ("Alexbay"); the President, Secretary and Treasurer, and a director, of Eber Bros. Wine & Liquor Metro, Inc., a New York corporation ("Eber Metro"), and President, Secretary, and a member of the Board of Managers, of Eber-Connecticut, LLC, a Delaware limited liability company, which does business under the name Slocum & Sons ("Eber-CT").  I am also the President, Secretary and Treasurer, and a director, of each of Eber Bros. & Co., Inc., a New York corporation ("Eber Bros."), and Eber Bros. Wine & Liquor Corporation, A New York corporation ("Eber W&L") (collectively, the "Eber Entities").

2.        I am the sole executor of the estate (the "Estate") of my father, Lester Eber ("Lester"), who died on April 5, 2020 as a result of COVID-19.

3.        I graduated from Emory University in 1989 with a BBA in accounting. I graduated from the University of Rochester in 1995 with an MBA in finance and marketing. Thereafter, I held positions in the private sector, including positions as an auditor at Deloitte and Touche for one year.  I also worked for three years at M&T Bank.

4.        I began working with my father in the Eber family business in the early 2000s.  My first position was with Eber Metro as a divisional accounting manager.   From approximately 2005 to 2007, I worked as Sales Manager for Eber W&L.   Thereafter, I became the Chief

1

Financial Officer and Secretary of Eber Metro and worked extensively on the wind-down of operations of Eber W&L and Eber Metro in 2007.

5.      The Eber family business was a wine and liquor distribution business owned and operated by my late paternal grandfather, Allen Eber.  Allen Eber died a resident and domiciliary of Monroe County, New York on July 24, 1970, leaving a last will and testament, dated October 27, 1969 (the "Will") (Def. Ex. A).  His Will created a testamentary trust (the "1969 Trust"), and nominated my father, attorney Elliot M. Gumaer, Jr., and Marine Midland Trust Company of Rochester as Co-Trustees of the 1969 Trust.  The Monroe County Surrogate's Court issued Letters Testamentary and Letters of Trusteeship to the nominated Co-Trustees.  Later, Canandaigua National Bank succeeded as the institutional Co-Trustee serving with my father and Mr. Gumaer (Def. Exs. A, OOOO, TTTT).

6.      The 1969 Trust provided for Allen's wife, Evelyn, during her life, with the remainder to benefit his children Lester, Sally, and Mildred (or their lineal descendants in the event of any such child's death before the termination of the 1969 Trust).  The 1969 Trust provides for termination upon the death of the last of Allen's children.  Plaintiffs Daniel Kleeberg and Lisa Stein are Sally's lineal descendants entitled to an aggregate 1/3 of the 1969 Trust remainder (Sally died in 2014).  Likewise, Plaintiff Audrey Hays is entitled to 1/3 of the 1969 Trust remainder as the sole lineal descendant of Mildred who died in 1973 (Def. Ex. A).

7.      At all relevant times pertinent to this case, the 1969 Trust has been the registered owner of substantially all the capital stock of Eber Bros.  In turn, at all relevant times pertinent to this case, Eber Bros. has owned substantially all the common stock of Eber W&L.  Eber Bros. has at all times since approximately 1980 simply served as a holding company for Eber W&L. Before June 5, 2012, Eber W&L owned substantially all the capital stock of Eber Metro.

8.      Historically, Eber W&L and Eber Metro distributed wine and liquor throughout New York State.  More specifically, prior to 2004, Eber W&L was a successful wholesale distributor of wine and liquor primarily in upstate New York.   My father ran the business, for decades following Allen's death.  Eber W&L's New York business operated through facilities in Rochester, Buffalo, Syracuse and Albany.  Eber Metro, a separate corporation, operated in wine and liquor distribution in the New York City metropolitan area as a division of Eber W&L.  In 2005, Eber Metro acquired a Connecticut fine wine importer and distributor through a newly formed entity, Eber-CT.  My father ran these businesses as an officer and director / manager of these business organizations - - he devoted his entire career, and indeed his life, to these businesses.

9.      At all times relevant, one or more of Lester, Mr. Gumaer and I were directors of each of Eber Bros., Eber W&L, and Eber Metro. At all times relevant to the case, Lester or I, or both of us, were officers of Eber Bros., Eber W&L, and Eber Metro.  I was most recently reelected as a director of Eber W&L and Eber Metro at the Annual Meeting of those companies on March 13, 2021, at which all prior acts of the officers and directors of those companies were ratified (Def. Exs. OOOOO, PPPPP, RRRRR, SSSSS).

10.      These businesses were upended in 2004, when Southern Wine & Spirits of America, Inc. ("Southern"), a national competitor, entered the New York market.  By 2007, Southern had completely destroyed Eber W&L's and Eber Metro's business - - Eber W&L and Eber Metro had ceased operations and began dragging through a difficult, costly, and extended wind down.  Eber W&L and Eber Metro were forced to sell certain assets, including some of their remaining New York inventory, to Southern, and to borrow money from Southern in connection with their wind-down to avoid bankruptcy.  Southern seized upon that opportunity to acquire a

right of first refusal on the sale of any interest that Eber Metro had in Eber-CT.   Moreover, Eber

W&L and Eber Metro had millions of dollars of legacy obligations to Eber W&L's Retirement

Plan, and the New York State Teamsters pension fund that remained in place even after they

ceased operations.

11.     In 2007, Eber Metro, encumbered by its legacy obligations, still owned Eber CT,

which was its only remaining operation.  However, Eber-CT was failing - -poor operating results

and supplier defections had rendered Eber-CT unprofitable.  Moreover, Eber Metro and Eber

W&L were insolvent and facing millions of dollars of liability to Eber W&L's Retirement Plan

and the New York State Teamsters pension fund.  Within a year, Eber-CT was left with no choice

other than to work with its predatory competitors to try to raise capital.

12.     In 2008, Eber Metro sold a 15% ownership interest in Eber-CT to a Connecticut

competitor, Eder-Goodman, LLC ("Eder-Goodman"), to raise capital.  Eder-Goodman was fearful

of Southern entering into the Connecticut market and destroying its business and was motivated

to engage in this transaction to keep Southern out.  Southern did not exercise its right of first

refusal in connection with this transaction.  As part of this transaction, Eder-Goodman secured a

right of first refusal on any further sale by Eber-Metro of its membership interest in Eber-CT and

was able to secure a number of restrictive covenants to prevent Eber-CT from issuing more equity

or incurring more than $5 million in debt.

13.     Thereafter, in 2010, Eber-CT engaged a business consultant, Glenn Sturm, in an

effort to save the company.  Eber-Metro in effect, sold a 6% ownership interest in Eber-CT to Mr.

Sturm (through his business entity, Polebridge Bowman) for $350,000.  Eder-Goodman declined

to exercise its right of first refusal to purchase this 6% interest at the price paid by Mr. Sturm.

14.     Ultimately, by 2012, Eber W&L and Eber Metro had ceased operating for years, Eber W&L and Eber Metro were insolvent, and Eber-CT was in severe financial distress.  Eber CT sustained losses for five consecutive years.  At that point, Lester and I had made efforts for several years to secure adequate financing for the business without success, and marketed the business for partial or total sale without success.

15.     No one was willing to buy Eber-CT and no one was willing to provide additional long term debt financing adequate to sustain the business.  Further, from 2002 through 2012, Lester had taken on great personal risk by making enormous personal loans to the businesses when others, including banks and Plaintiffs, declined to do so.  With no other options, Lester had to choose between liquidating and dissolving the businesses entirely, and taking on the personal risk of trying to turn Eber-CT into a profitable business and resolve the claims of the creditors of the businesses.  He was not ready to give up and end his life's work.  In 2012, Lester gave up his rights as a creditor in exchange for receipt of Eber W&L's interest in Eber Metro in the process of a foreclosure.  He received Eber W&L's ownership interest in Eber Metro through his wholly owned limited liability company, Alexbay.

16.     Eber-CT continued to struggle for years following Alexbay's acquisition of its controlling interest from Eber Metro.  Further, Lester loaned millions of additional dollars to the business by paying legal fees and settlements as Eber W&L, Eber Metro, and Eber-CT wrestled with Retirement Plan funding obligations, the New York State Teamsters, and other lawsuits.  I worked full time for years devoting my entire professional life to winding down Eber W&L and Eber Metro and addressing their legacy obligations, and trying to turn Eber-CT into a profitable business, both prior to the 2012 Foreclosure and thereafter.   The work associated with the wind-down of operations in New York was all encompassing and grueling.

5

17.     The foregoing facts, which are examined in great detail below and are substantiated and corroborated by documents and testimony, rebut Plaintiffs' theme that Lester was a self-interested fiduciary who put himself and his own interests above those of the beneficiaries of the 1969 Trust and who was enriched at the expense of the beneficiaries of the 1969 Trust.  The facts further conclusively rebut Plaintiffs' thematic presentation of Lester and me as faithless employees of the businesses who put our own interests above those of the businesses.  The plain fact is that Lester and I did everything that we could to preserve and save the businesses.  Lester took on the risk of continuing a failed business only when no one else was willing to do so and no other options were available save for completely ceasing operations and liquidating as had been done with the New York businesses.

18.     As a demonstrative aid, I refer the Court to the business organization charts reflecting the ownership of the businesses before the 2012 Foreclosure, and subsequent to the 2012 Foreclosure (Def. Ex. P).  Further, I submit herewith a timeline of the events of which I am testifying herein, with reference to trial exhibits (Def. Ex.  LLLLL).

## II.       Southern Wine & Spirits of America, Inc.  Enters the New York Market

19.     As set forth above, Eber W&L and Eber Metro, though highly leveraged, were generally profitable in the years prior to 2004.  However, in October 2004, Southern, the largest wine and spirits distributor in the United States, entered the New York market for the first time by acquiring another small independent wholesaler.  Southern's entry into the New York market was devastating to the Eber family's New York business.  Within a few years of Southern coming in, Eber W&L and Eber Metro were liquidated, had ceased operations, and were dragging through what turned out to be an extended, difficult, and expensive wind-down process.

20.     Even Plaintiff Daniel Kleeberg, who worked as a general sales manager for Eber W&L, and had no financial, accounting, or executive function in the companies, acknowledged that what happened to Eber W&L and Eber Metro was "devastating."  Indeed, Plaintiff Kleeberg abandoned the business and moved to Florida in 2007 while continuing to collect a $10,000 per month consulting fee for more than a year, and a $7,500 per month consulting fee thereafter, rather than stay and help Lester and the rest of the staff with the issues facing the companies.

21.     Southern's takeover was swift and ruthless.  It raided Eber W&L's experienced and skilled management team. Starting in December 2004, Southern hired Daniel Sisto, Eber W&L's Vice President of Sales, who managed the company's upstate New York sales operations in Syracuse, Albany, Rochester, and Buffalo. Southern lured Mr. Sisto away by offering him above-market compensation in the sum of $10 million (Def. Ex. VV, Lester's June 24, 2015 Affidavit ¶ 23, Bates-Stamped EB-00017525-17544).  Objection to Exhibit, hearsay

22.     Southern followed by hiring 14 other key Eber W&L managers. Southern also hired at least 25 other sales, office and warehouse personnel from Eber W&L's Albany, Rochester, Buffalo and Syracuse facilities. In all, Southern had hired away more than 20 of Eber W&L's and Eber Metro's employees (Def. Ex. VV, Lester's June 24, 2015 Affidavit ¶ 23, Bates-Stamped EB-00017525-17544).  Objection, lack of personal knowledge, hearsay

23.     As Southern hired away Eber W&L talent, it also began doing business with Eber W&L's suppliers, who abandoned Eber W&L for Southern.  This devastated the business, as success in the wine and liquor wholesale distribution business hinges on personal relationships with and confidence fostered in suppliers.  In 2005, Eber W&L lost at least nine of its New York major suppliers to Southern (Def. Ex. VV, Lester's June 24, 2015 Affidavit ¶ 23, Bates-Stamped EB-00017525-17544).  This resulted in a loss of revenue of at least $63 million of revenue.

Financial statements for the years 2005 through 2006 and tax returns for the years 2007 reflect the damage to Eber W&L and Eber Metro as its suppliers abandoned it for Southern (Def. Ex. VVV, Consolidated Financial Statements for Fiscal Years Ending 2005 and 2006 for Eber W&L and Subsidiaries); (Def. Exs. AAAA, LLL, ZZZ, Eber Metro United States Income Tax Returns (Form 1120) for the years 2007, 2011, 2012); (Def. Exs. WWW, XXX, YYY, Eber W&L United States Income Tax Returns (Form 1120) for the years 2007, 2009, 2011).

24.    Eber W&L's sales dropped from approximately $460 million in the fiscal year ended May 31, 2005, to approximately $352 million in 2006. Its net income dropped from approximately $29 million in 2005 to a net loss of approximately $12.7 million in 2006 (Def. Ex. VVV, Consolidated Financial Statements for Fiscal Years Ending 2005 and 2006 for Eber W&L and Subsidiaries).[1] Tax returns for the year 2007 for both entities shows the companies' losses, and tax returns for subsequent years reflect that both entities ceased operations (Def. Ex. AAAA, Eber Metro United States Income Tax Return (Form 1120) for the year 2007); (Def. Ex. WWW, Eber W&L United States Income Tax Return (Form 1120) for the year 2007).

25.    Lester made great efforts to fend off Southern.  For example, in October 2005, Eber W&L sued Southern and the former employees for breach of fiduciary duty and contract, tortious interference, theft of confidential information and trade secrets, unfair competition, and interference with prospective business advantage (Def. Ex. X, UU).

26.    However, despite great efforts, the loss of key employees and suppliers to Southern and the resulting impact on the rest of Eber W&L's and Eber Metro's business started a

---

[1] Even in 2005, Eber W&L and Eber Metro were faltering as net income in 2005 was buoyed by the sale of half of Eber Metro's operating business to a third-party buyer, NDC, accounted for income of approximately $30 mm (Def. Ex. VVV).

8

downward spiral from which Eber W&L and Eber Metro could not recover.  As explained in detail below, the business had excessive legacy indebtedness to banks, vendors, pension plan obligations, lessors, and others, and the business could not be saved.  Efforts to secure financing, from banks and family members alike, including Plaintiffs, had fallen flat.  The financing we were able to secure quickly went into work-out status as a result of poor performance and default.  Very soon my father's personal funds were the only real source of financing for Eber Metro and Eber W&L.

27.     Eber W&L and Eber Metro ceased operations in 2007 and began winding down.  Eber W&L settled its lawsuit against Southern pursuant  to an agreement where Southern purchased certain of Eber W&L's and Eber Metro's assets, and loaned $3 million to Eber Metro to facilitate Eber Metro paying its suppliers and vendors.  Southern also secured a right of first refusal to buy Eber Metro's interest in Eber-CT (Def. Ex. YYYY, FFFF, UU, JJJ).   Thereafter, Lester and I spent years and countless hours attending to the legacy liabilities of Eber W&L and Eber Metro and Lester personally paid millions of dollars to dispose of them - lawsuits and pension liability disputes persisted for years.  The only remaining operating wine and liquor distributor in the Eber group was the failing Eber-CT, which Eber Metro had acquired only a few years earlier in a strategic transaction.  Lester and I worked to try to preserve Eber-CT and insulate it from Eber W&L and Eber Metro's legacy liabilities.

### III.     Eber Metro's Acquisition of Slocum & Sons through Eber-CT

28.     As Southern began driving Eber W&L and Eber Metro out of business in New York, my father continued his lifelong professional mission of working and strategizing to expand and preserve the family business.  In May 2005, Eber Metro acquired a family-owned fine wine distributorship operating in Connecticut and Rhode Island called Slocum & Sons, Inc.

("Slocum").  At that time, Slocum was acquired through a newly formed limited liability

company owned entirely by Eber Metro called Eber-CT (Def. Ex. RRR, HHH).

29.     Slocum was an importer of a portfolio of European fine wines and distributed these

products exclusively in Connecticut.  At that time, the prevailing understanding was that

Slocum's business would integrate well with Eber W&L and Eber Metro's existing business - -

that synergies and efficiencies would drive profitability.  For example, we expected that this new

business could supply Eber W&L and Eber Metro with its imported products for distribution in

New York markets in addition to Connecticut, and Slocum, like the New York businesses,

distributed Yellow Tail wines (Def. Ex. VV, ¶ 14).

30.     Further, there were tax advantages to the Eber business in making the Slocum

acquisition.  The transaction structure was specifically tailored to the specific facts of the

situation - - Eber Metro was situated to receive tax benefits and concomitant tax savings that

would not necessarily apply to a sale of Slocum to another buyer. Specifically, Eber Metro had

sold a portion of its business in 2005 and we were able to effect a like-kind exchange to shelter

tax gain that had been realized from this sale in the acquisition of Slocum (Def. Ex. VV, ¶ 16).

The company's net gain on the sale was $14 million, and the acquisition of Slocum resulted in

$6,000,000 of tax savings.

31.     Unfortunately, Slocum did not perform in accord with Lester's strategic vision

once it was acquired by Eber Metro through Eber-CT.   Slocum was profitable before Eber Metro

acquired it (Def. Ex. TTT), but after the acquisition, Eber-CT experienced significant losses.

Eber-CT had aggregate net losses for fiscal years 2006 to 2012 of approximately $7,275,000 (*see*

Eber-CT Audited Financial Statements and Slocum Financial Statements, Def. Exs. EEE, MMM,

NNN, VVV); (Def. Ex. VV, ¶ 17); (Def. Ex. EEEE).   A plain analysis of Eber-CT's audited

financial statements shows that Eber-CT was losing money for seven years straight through 2012:

| | FY2006 | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 |
|---|---|---|---|---|---|---|---|
| Revenue | $41,798,006 | $42,386,508 | $43,244,059 | $38,944,354 | $36,552,221 | $36,890,281 | $36,383,755 |
| Net Loss | $(651,173) | ($1,519,970) | ($211,730) | ($2,409,515) | ($1,100,710) | ($908,800) | ($363,132) |

(Def. Exs. EEE, MMM, NNN, VVV).

32.     Further, because Eber W&L and Eber Metro failed and ceased operations as of

2007, Eber Metro's acquisition of Slocum never had the opportunity to generate the material

synergies and other benefits that Lester had carefully considered and factored into the acquisition

of Slocum.

33.     Moreover, the State of Connecticut's franchise protection laws did not protect

Eber-CT.  Contrary to Plaintiffs' blinkered understanding, Eber Metro's acquisition of Slocum

was not prompted solely by the protections afforded liquor franchisees in Connecticut against

termination of distributorships in that state.  This is because the Connecticut wine and liquor

franchise laws, while offering some protection, are of limited value.

34.     My father and I experienced the limitations of the Connecticut wine and liquor

franchise protection laws first hand following Eber-CT's acquisition of Slocum.  I continue to

deal with these franchise protection laws in my current role at the head of Eber-CT.  Connecticut

laws do not insulate a distributor from the risk of losing the exclusive right to sell a wine product

line in Connecticut.  Instead, these laws prevent a distributor from being completely excluded

from the sale of a wine product (absent good cause for reasons such as failure to pay a supplier or

other factors).  Although Connecticut law prevents a supplier from completely terminating its

relationship with a distributor without good cause, a supplier may still "dual" a distributor at any

11

time, meaning that the supplier can sell to a new "preferred" distributor in addition to the original distributor.  Thus, the original distributor can be deprived of the benefit of being the exclusive distributor of a product within Connecticut without any protection under the franchise law.

35.     In Lester's and my experience, the new preferred distributor typically ends up selling the majority of a supplier's particular product in Connecticut since the new preferred distributor receives marketing support and programming that is not offered to the original distributor.  Additionally, the preferred distributor is the exclusive distributor of all new items or line extensions that typically drive revenues over the life cycle of the brand.  In my experience, once a distributor becomes "dual" on an item, revenues and profitability are negatively impacted. As a result, revenues and profitability of any distributor in Connecticut are subject to many of the same uncertainties as in any state without a franchise law.  The Connecticut franchise laws offer little protection against these kinds of risks for Eber-CT.  This could materially and adversely impact the value of the equity of Eber-CT.

36.     Eber-CT was in fact "dualed" by suppliers and this greatly and negatively affected the business.  In 2009, Deutsch Family Wine & Spirits, the producer of Yellow Tail Wines, and Eber-CT largest supplier, "dualed" Eber-CT.   Until then, Eber-CT distributed all Yellow Tail Wine products sold in Connecticut.   In the first year after Deutsch "dualed" Eber-CT, the volume and revenue of Yellow Tail Wine products that Eber-CT sold in Connecticut was reduced by a 50% (Def. Ex. EEE).[2]

37.     Deutsch was not the only supplier to "dual" Eber-CT.  From 2008 through 2012, Eber-CT was "dualed" by several other brands as well including the suppliers of Duck Horn wines.  Eber-CT's overall financial performance was materially and adversely impacted by this

_____

[2] Eber-CT now sells less than 10% of its pre-dual volume.

"dualing," as its revenues for Deutsch (Yellow Tail Wines) fell from over $11 million, for the

year ending May 31, 2009, to $2.6 million, for the year ending December 2014 (Def. Ex. EEE,

MMM, NNN, HHHH).

38.     At all times relevant, Eber-CT was among the smallest of Connecticut's state-wide

wine distributors, and the threat of a "dual" on its brands was a constant concern in 2012 and a

source of substantial risk to revenue and profitability.  As a small distributor, Eber-CT simply

does not have the resources to be competitive if it is "dualed."

### IV.   Eber W&L and Eber Metro Liquidate and Cease Operations as Lester Pours his own Money into the Businesses

#### A. *Efforts to Secure Financing and Liquidation of Eber W&L and Eber Metro as Lester Pours his own Money into the Business*

39.     Eber W&L's and Eber Metro's wind-down of operations involved a host of

complicated issues.

40.     As Southern engaged in its takeover, Eber W&L lost access to financing and went

into "workout" status with its senior bank lender. While great efforts were made to secure

financing, Lester was the only reliable source of financing.

41.     Prior to March 2006, Eber W&L relied upon a $50 million senior secured

revolving line of credit with M&T Bank, Rochester, New York, and a $11.9 million senior

secured revolving credit facility with Wilmington Trust, expiring in October 2006 (Def. Ex.

VVV).

42.     Then in March, 2006, Eber W&L obtained a $60 million senior secured loan

facility from Wells Fargo Foothill Bank.  The loan facility was set to expire in March, 2011.

Because of the turmoil then surrounding Eber W&L's operations, shortly after the Wells Fargo

facility was put in place, Eber W&L was unable to remain in compliance with the financial

covenants in the Wells Fargo facility.  As a result, an event of default thereunder occurred under the terms of the facility. Wells Fargo placed the facility into "workout" status, freezing all of Eber W&L's working capital in order to pay down the outstanding Wells Fargo loans.  Wells Fargo hired Michael J. Worral of Solutions Management LLC, a consulting company for troubled businesses, to oversee the company's operations and working capital management. All of Eber W&L's incoming cash and deposits were seized and applied to repay their loans.  When Wells Fargo was finally paid off, it declined to extend further credit to any Eber entity.[3]

43.     Critically, while Wells Fargo was directing Eber W&L's cash to pay off its credit facility, Eber W&L and Eber Metro had massive payment obligations to suppliers and to other creditors that they could not pay.  Lester loaned money to Eber W&L and Eber Metro to meet those obligations. During the period 2002 through 2011, Lester loaned an aggregate principal amount of approximately $3,000,000 to Eber W&L and Eber Metro (Def. Ex. K, L, T, U, SS, XX) (Def. Ex. VV, ¶ 29).  In the years 2009, 2010, and 2011 alone, Lester loaned approximately $1.8 million of cash to Eber W&L to cover its obligations, principally, it pension funding obligations, which were the most prominent of Eber W&L and Eber Metro's legacy liabilities (Def. Ex. T).

*Objection: Hearsay, lack of personal knowledge as to any loans before 2009*

44.     Ultimately, in early February 2007, after attempts to secure a new senior bank facility, obtain new suppliers or to partner with other wholesalers in order to continue in business

_____

[3] At May 31, 2006, the prime rate of interest was 8.0%, Eber W&L's $60 million senior secured bank facility with Wells Fargo Foothill Bank was accruing interest at an effective rate of 8.75%, and Eber W&L's $11.9 million senior secured bank facility with Wilmington Trust was accruing interest at an effective rate of 7.76% (Def. Ex. VVV)

failed, Eber W&L made a final determination to liquidate and wind down and cease all New York operations.  Eber W&L was insolvent.

45.     On February 13, 2007, Lester sent a Notice of Closing to Eber W&L employees announcing the complete and permanent shutdown of its New York operations and the layoff of its employees. The date of these layoffs was expected to be late March 2007. It was anticipated that a small number of administrative employees would be retained temporarily to help wind up the company's operations. (Def. Ex. CCCC).

46.     On February 21, 2007, an Employee Notice under the Federal Worker Adjustment and Retraining Notification Act ("WARN Notice") was sent to Eber W&L employees (Def. Ex. ZZZZ).

47.     On March 30, 2007, Eber W&L and Eber Metro ceased operations resulting in the termination of employment of over 90% of its active employees.   Ultimately, the process of liquidating and winding down Eber W&L's operations took longer than originally expected. In some cases, layoffs were delayed to June 2007 (Def. Ex. NNNN).

48.     Indeed, by March 2007, Eber W&L and Eber Metro were on the verge of bankruptcy and were unable to satisfy outstanding debts to their bank lenders, lessors, vendors and suppliers.   At that point, a bankruptcy would have severely impacted many of Eber W&L and Eber Metro's vendors, who were also vendors to Southern.  Southern's business stood the chance of being negatively impacted by Eber W&L and Eber Metro falling into bankruptcy.

49.     Thus, as a part of the wind-down, after lengthy negotiations, Eber W&L reached an agreement in principle to sell Southern certain of its remaining inventory and other remaining non-New York assets (but not with respect to Eber-CT) in order to generate needed liquidity to

pay its debts.   Eber W&L entered into an agreement with Southern on July 5, 2007, providing for a number of complex inter-related transactions that helped Eber W&L accomplish its plan to liquidate and wind down Eber W&L's remaining assets.  Part of this agreement included Southern making a $3 million bridge loan to Eber Metro to satisfy various Eber trade creditors, and granting Southern of a right of first refusal to buy Eber-CT (Def. Ex. YYYY, UU, FFFF).

50.     The disposition of Eber W&L's inventory and the other non-New York assets (aside from Eber-CT) was complex and took a substantial amount of time to close.  The principal closing occurred on August 30, 2007. As part of the closing, Southern made its $3 million loan (with 10% interest thereon, payable on demand and secured by its interest in Eber-CT) to Eber W&L.  Eber W&L's lawsuit against Southern was settled at the same time.  Southern secured a right of first refusal to buy Eber Metro's interest in Eber-CT (Def. Ex. YYYY, FFFF, UU).

### B. Eber W&L's and Eber Metro's Legacy Pension Liabilities

51.     The liquidation and wind down of Eber W&L and Eber Metro involved an arduous and expensive process of addressing legacy pension liabilities.  Most prominent among them were the pension liabilities to the New York State Teamsters Fund and to Eber W&L's Retirement Plan.  Both were liabilities that Lester and the Eber W&L Board of Directors recognized in assessing the value of Eber Metro in connection with the 2012 Foreclosure.  I dealt directly with the issues surrounding these legacy pension liabilities beginning in and around 2008 and extending through 2017.

a.   <u>Withdrawal Liability to Teamsters Fund</u>

52.     For many years prior to 2008, Eber W&L was a participating "employer" in the New York State Teamsters Conference Pension & Retirement Fund (the "<u>Teamsters Fund</u>"). The Teamsters Fund was a 'multiemployer employee benefit plan" as defined in the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>") (Def. Ex. PP).

53.     In or before 2007, Eber W&L incurred a "complete withdrawal" from the Teamsters Fund as defined in ERISA.  As a result, Eber W&L and all the members of its "controlled group" (including Eber W&L and Eber Metro) under ERISA incurred "withdrawal liability" to the Teamsters Fund.  On January 10, 2008, the Teamsters Fund assessed an employer "withdrawal liability" against Eber W&L, and all the members of its "controlled group" (including Eber W&L, Eber Metro and Eber-CT), in the amount of $2,212,367.47 pursuant to ERISA (Def. Ex. PP).

54.     In the course of the last 20 years working in this business, I have come to learn and understand that for a multiemployer employee benefit plan, all businesses "which are under common control" as a result of at least 80% ownership are treated as a single employer for purposes of determining "withdrawal liability" and are jointly and severally liable for such "withdrawal liability".  I understand that this derives from ERISA.

55.     In light of the financial difficulties being experienced by Eber W&L and Eber Metro, on August 17, 2009, the Teamsters Fund, Eber W&L and Eber Metro entered into a Modification Agreement providing for a lower monthly payment schedule for such "withdrawal liability." The Teamsters Fund and Eber Metro executed a Guaranty and Security Agreement, under which Eber Metro guaranteed the obligation of Eber W&L to pay the "withdrawal

<span style="color:red">Objection: Mischaracterizes the evidence since the guaranty is dated July 2012, after the Alexbay transaction, not August 2009</span>

17

liability" and granted the Teamsters Fund a security interest in future distributions by Eber-CT to Eber Metro (Def. Ex. M).

56.     Then, prior to the 2012 Foreclosure, I negotiated a revised agreement with the Teamsters Fund further reducing the monthly payment amount.  In that agreement, Eber W&L and Eber Metro jointly and severally agreed to pay the full amount of the "withdrawal liability." The Revised Modification Agreement was finally executed on July 30, 2012, and Eber W&L executed a Confession of Judgment for $1,421,029.95 on August 1, 2012 (Def. Exs. M, F).

57.     Ultimately, Eber W&L, Eber Metro, and Eber-CT were released from their remaining unpaid obligation to the Teamsters Fund when Lester funded payment to the Teamsters Fund of $653,134 in July, 2013 (Def. Ex. JJJJ).

### b.  Termination Liability to Eber W&L Retirement Plan and PBGC

58.     As of April 30, 2010, Eber W&L's Retirement Plan was terminated, and Eber W&L's "controlled group" (including Eber W&L, Eber Metro, as well as Eber-CT) thereupon became jointly and severally liable for all liabilities under Title IV of ERISA, in connection with the Retirement Plan's termination, including Plan unfunded benefit liabilities, due and unpaid contributions, premiums and interest.  The Pension Benefit Guaranty Corporation[4] ("PBGC") asserted a termination liability as of April 30, 2010, of approximately $5.2 mm (Def. Ex. GGGG).  This termination liability totaled $7,985,670 as of August 31, 2016 (Def. Ex. HHHH). PBGC pursued Eber W&L, Eber Metro, and the other members of this "controlled group" for years thereafter, and Lester funded payments to lawyers of hundreds of thousands of dollars to

---

[4] The PBGC in a United States government owned and controlled entity that has enforcement powers under ERISA for the purposes of protecting worker benefits under private sector defined benefit plans.

defend against and negotiate with PBGC.  Ultimately, in February 2017, the members of the Eber
W&L "controlled group" and Lester entered into a settlement agreement that released the Eber
parties from all termination liabilities.  Once again, Lester footed the bill.  He waived the
remainder of his own (and his wife's) pension benefit, in the amount of approximately $1.4
million.

59.     The pension fund liability arose out of the Eber Bros. Wine and Liquor
Corporation Retirement Plan (the "<u>Retirement Plan</u>"), which was adopted by Eber W&L in 1954,
as sponsor, for the benefit of substantially all non-union employees of Eber W&L and Eber Metro
and their beneficiaries (Def. Exs. DD, BB, BBBBB, DDDDD, NNNN).

60.     The Retirement Plan was a "single employer defined benefit plan", subject to
minimum funding standards and the termination insurance program established under ERISA
(Def. Exs. DD, BB, BBBBB, DDDDD, NNNN).

61.     The Retirement Plan required the accrual and payment of pension benefits.
Benefits under the Retirement Plan accrue at the time services are performed for the employer by
the participant (Def. Exs. DD, BB, BBBBB, DDDDD, NNNN).

62.     Eber W&L, as Retirement Plan sponsor, was required to make certain minimum
annual contributions to the Retirement Plan to fund benefits thereunder (Def. Ex. DD, BBBB,
NNNN).

63.     The Retirement Plan was amended to freeze the accrual of plan benefits as of
December 31, 2000.  As a result of the freeze, all participants were fully vested (Def. Ex. DD,
BBBB, NNNN).  Eber W&L continued to be responsible for minimum annual contributions to
fund the Retirement Plan (Def. Ex. DD, BBBB, NNNN).

64.     Accumulated benefit obligations under the Retirement Plan were liabilities required to be reflected on the balance sheet of Eber W&L (Def. Ex. NNNN).  Benefits paid under the Retirement Plan were expensed annually by Eber W&L for financial accounting purposes.  (Def. Ex. VVV).

65.     Davie Kaplan, independent auditors based in Rochester, NY, delivered an Independent Auditors' Report on these financial statements on August 3, 2006 (Def. Ex. VVV). Eber W&L's financial statements for the fiscal years ended May 31, 2005 and 2006, were the last financial statements of Eber W&L for which there was an audit report.

66.     As set forth above, on March 30, 2007, Eber W&L ceased New York operations resulting in the termination of employment of over 90% of the active employees with vested balances in the Retirement Plan (Def. Ex. NNNN).

67.     The exposure of the Eber W&L "controlled group" (including Eber W&L and Eber Metro, and Eber-CT) to liability from the Retirement Plan became a fixture in my life for years after Eber W&L and Eber Metro ceased operations.  In August 2009, Eber W&L applied to the IRS for a waiver of the Internal Revenue Code's minimum funding requirement for the Plan year ended May 31, 2009 (Def. Ex. BBBB). At the time that I was preparing this minimum funding waiver request, I came to the conclusion that the company's termination liability, for which all entities in the "controlled group" would be responsible, would be in excess of $5 million – indeed, the waiver application reflects a termination liability, if the plan were to be terminated as of May 31, 2009, in an amount in excess of $5.5 million.   Objection, Improper Opinion Rule 701

68.     Then, in 2010, Eber W&L began discussions with the PBGC about the failure of Eber W&L to make all required contributions to the Retirement Plan and how Eber W&L was going to address its funding obligations under the Plan.  Recognizing the gravity of the situation,

Lester and I hired the Groom Law Group, a Washington, D.C. law firm specializing in PBGC matters, in 2010 to advise Eber W&L on its Retirement Plan issues.  For years to come, Lester funded payment to the Groom Law Group for the services that it rendered from his personal funds (Def. Ex. CCC).

69.     As set forth above, and as I learned in the course of dealing with these issues, under ERISA, a sponsor must contribute to its pension plan to fund the pension benefits promised to its workers. When the aggregate amount of missed minimum funding contributions (including interest) exceeds $1 million, a lien arises on behalf of the pension plan against all assets of the plan sponsor and the members of its "controlled group."  This lien is enforceable by the PBGC.

70.     From 2009 to 2012, Eber W&L made minimum contributions to the Retirement Plan in a total amount of $2,415,247.  Such contributions were in amounts sufficient to avoid the imposition of Federal tax liens. Eber W&L was only able to make the contributions because of Lester.  Lester funded the money to Eber W&L to pay these contributions (Def. Ex. T).

71.     Eber W&L sent notices to Plan participants of missed contributions to the Plan on or about November 11, 2011, February, 10, 2012, August 15, 2012, November 11, 2012, February 15, 2013 and July 10, 2013 (Def. Ex. IIII).

72.     On February 14, 2012, the IRS granted our request for a waiver of the funding standards for the Retirement Plan year ended May 31, 2009, subject to certain conditions.  This resulted in an accumulated funding deficiency, as of May 31, 2012, of $805,119.  Also, quarterly installments of $224,946 that were due on September 15, 2012, and December 15, 2012, were not paid (Def. Ex. NNNN).

Objection to the numbers coming from Ex. NNNN, which is subject to Plaintiffs' Motion to Exclude Evidence

73.   The Retirement Plan's financial statements for the fiscal years ended May 31, 2011 and 2012, on which Davie Kaplan gave an Independent Auditors' Report, dated March 4, 2013, stated in footnote 8 - "This funding deficiency raises substantial doubt about the Plan's ability to continue as a going concern" (Def. Ex. NNNN).   *Same objection*

74.   Michael A. Gallagher, President of Benefits Management Inc., Eber W&L's independent actuary, performed work for Eber W&L in connection with the Retirement Plan for years.  He calculated that as of June 1, 2012, the termination liability to the Retirement Plan was $5,063,388.  Gallagher calculated that the Retirement Plan would have needed $9,823,177, as of June 2012, to satisfy the Retirement Plan liability for all benefits to all participants, but only had $4,759,789 in trust assets held by CNB, as Plan administrator.  As of that date, there was an unfunded liability shortfall of $5,063,388 (Def. Ex. JJ).   *Same objection*

75.   As of June 4, 2012, Eber W&L had missed a total of $1,106,891 of required minimum funding contributions to the Retirement Plan. As a result of such missed contributions exceeding $1 million, a Federal tax lien then arose against all the assets of Eber W&L and the members of its "controlled group", including Eber Metro. PBGC could enforce this lien at any time. On April 29, 2013, PBGC perfected these liens by filing of Notices of Federal Tax Lien against Eber W&L and Eber Metro and Eber-CT (Def. Ex. WWWW).   *Objection to the legal conclusion that Eber Metro was in the "controlled group" after the Alexbay transaction.  Also, relevance.*

76.   Lester and I continued negotiations with the PBGC following the 2012 Foreclosure because this termination liability persisted as what I believed to be an inevitable liability of both Eber W&L and Eber Metro, and very likely, Eber CT.  The negotiation was extremely difficult, and we found ourselves with little leverage as we tried to convince the PBGC to give us time to turn Eber-CT around to meet obligations to the Retirement Plan.

*Objection: Foundation, mischaracterizes the evidence since "this termination liability" has not been established. Paragraph 78 asserts that there was no conclusion of termination reached by PBGC until 8/6/2014.*

77.     In April 2013, after Eber W&L failed to make contributions owed to the Retirement Plan (including interest) exceeding $1 million, PBGC perfected statutory liens by filing Notices of Federal Tax Lien under IRC 430(k) against Eber Bros., Eber Metro and Eber-CT as well  (Def. Exs. WWWW, JJJJJ).  By July 2013, I concluded that the Eber Entities could no longer sustain the funding obligations for the Retirement Plan.    Objection, relevance, waste of time

78.     On August 6, 2014, PBGC informed Eber W&L that it had made an administrative determination that the termination of the Retirement Plan was necessary because the Retirement Plan would be unable to pay benefits when due (Def. Ex. RR).  Thereafter, by Complaint, dated May 11, 2015, the PBGC brought suit against Eber W&L (Def. Ex. GGGG).  On January 19, 2016, the United States District Court for the Western District of New York entered an order, as requested by PBGC, retroactively establishing April 30, 2010, two years before the 2012 Foreclosure, as the termination date of the Retirement Plan.  The order also held as a matter of law that as of April 30, 2010, the Eber W&L "controlled group" included Eber Bros., Eber W&L, Eber Metro, and Eber CT (Def. Ex. DD).    Objection, relevance, waste of time, confusion of issues

79.     Upon termination of the Retirement Plan on April 30, 2010, each of the Eber W&L "controlled group" members became jointly and severally liable for all liabilities under Title IV of ERISA, in connection with the Retirement Plan's termination, including Plan unfunded benefit liabilities, due and unpaid contributions, premium and interest (the "Title IV Liabilities").  The Title IV Liabilities totaled $7,985,670 as of August 31, 2016 (Def. Ex. HHHH).    Objection relevance, waste of time, confusion of issues, legal opinion

80.     On March 29, 2016, PBGC issued its "controlled group" determination, liability determination, net worth determination, and jeopardy determination in demand letters to each member of the Eber W&L "controlled group", including Eber W&L,  Eber Metro and Eber CT. The final demand letters notified the Eber "controlled group" members of PBGC's final

determinations and demanded immediate payment of $2,187,500, and agreement to terms with PBGC for payment of the remainder of the termination liabilities, $4,050,420, by April 4, 2016 (Def. Ex. QQ).

81.     On July 31, 2016, PBGC filed federal tax lien notices against the Eber W&L "controlled group" members, including Eber W&L, Eber Metro and Eber CT, in favor of PBGC under U.S.C. sec. 1368 for the amount of the demand. The liens arose retroactively as of the   *legal opinions* Retirement Plan termination date — April 30, 2010. The tax liens were perfected on August 2, 2016 (Def. Ex. XXXX). The perfection of the federal tax liens caused an immediate event of default under Eber-CT's first lien senior bank debt facility with CNB (Def. Ex. IIIII).

82.     Finally, after years of negotiations with PBGC, the Eber W&L "controlled group" members and Lester entered into a settlement agreement with PBGC on February 24, 2017, under which PBGC agreed to release the Eber W&L "controlled group", including Eber Metro, and Eber-CT from all Title IV Liabilities, in return for Lester waiving his (and Lester's wife waiving her) entire future benefit entitlement under the Retirement Plan, in the amount of $1.4 million, plus an additional cash payment of $2 million (Def. Ex. SS).

83.     In order to provide additional liquidity to Eber W&L and to facilitate a settlement with PBGC, and to permit Lester to waive his benefit under the Retirement Plan as part of the settlement, Eber W&L issued 750 shares of Class B Junior Preferred Stock to Lester.  On February 15, 2017, Eber W&L issued to Lester 750 shares of its Class B Junior Preferred Stock, par value $50 per share (the "Class B Junior Preferred Stock"), in consideration of Lester's binding obligation to reimburse Eber W&L, at its request, for up to $37,500 of expenses incurred or to be incurred by it for general operations. The Class B Junior Preferred Stock is redeemable at any time at the option of Eber W&L at its par value—$37,500. It is not common stock, stock

*Legal opinion, disputed as illusory consideration given Lester's control of Eber W&L and no payment being "request[ed]"*

convertible into common stock or any kind of common stock equivalent. The holder of the Class B Junior Preferred Stock is entitled to cast an aggregate of 750 votes (27.3% of the aggregate votes entitled to be cast by all shareholders of Eber W&L) on matters that shareholders may vote on generally. Eber Bros. is entitled to cast 2000 votes (72.7% of the aggregate votes entitled to be cast by all shareholders of Eber W&L) on matters that shareholders may vote on generally (Def. Ex. AA).

## V. With Eber-CT Failing, Alexbay Receives Eber W&L's Equity Interest in Eber Metro in a Foreclosure of his Loans to Eber W&L and Eber Metro

### A. Lester Seeks Financing for and Tries to Sell Eber-CT - - Sales to Eder Goodman and Polebridge Bowman

84.     Prior to 2012, Lester and I made great efforts to buoy Eber-CT as the only remaining operating Eber wine and liquor distribution business.  For example, in June 2008, Lester was able to persuade CNB to provide a $1.5 million loan on a six-month basis thereafter (Def. Exs. MMM, UU).  Lester also dipped into his own pocket to loan money to Eber-CT on a short term basis to permit the company to make payroll or pay its vendors.

85.     At the same time, Lester and I explored and considered the potential for the sale of Eber Metro's equity interest in Eber-CT.  In the Fall of 2007, Lester and Southern had discussions about a possible exchange of its $3 million bridge note for a 15% ownership interest in Eber-CT and an offer was discussed.   The proposed equity for debt exchange with Southern was never agreed to (temporarily or otherwise) or consummated (Def. Exs. JJJ, VV, ¶ 23).   *Lack of personal knowledge*

86.     While he was in discussions with Southern, Lester approached Eder-Goodman, another unaffiliated Connecticut distributor (and a competitor), and offered to sell the 15% to Eder-Goodman rather than to Southern. Eder-Goodman ultimately agreed to pay $4.5 million for

the 15% ownership interest in Eber-CT. Eder-Goodman's agreement to pay more than Southern to acquire the 15% interest in Eber-CT materialized very quickly. Personal knowledge.

87.    The negotiation between Eder-Goodman and Lester took place over one long weekend and was signed on Tuesday morning, January 29, 2008.  In the process, Eder-Goodman did not consider Eber Entities' employer "withdrawal liability" to the Teamsters Fund and their contingent liability for the unfunded pension obligations of, and "termination liability" to, the Retirement Plan, and as a result did not appear to consider these liabilities in making its offer.  In fact, in 2015, Eder-Goodman bitterly complained about their own lack of due diligence.  They claimed that Eber Metro should have warned Eder-Goodman about Eber W&L's and Eber Metro's exposure to pension fund liabilities when Eder-Goodman acquired its 15% interest in Eber-CT in 2008, and suggested that Eder-Goodman would never had purchased its interest in Eber-CT in 2008 had it known about the those pension fund liabilities. Lack of personal knowledge, hearsay

88.    I have concluded that Eder-Goodman was motivated in this transaction by a strong desire to keep Southern out of the Connecticut market in which Southern was not then doing business.  Eder-Goodman was willing to pay a premium in order to protect itself from Southern and to be able to market to new suppliers that would have otherwise been taken by Southern.  At the time, I was aware that Southern was an aggressive competitor in the market.  It had a record, beyond what it did to the Eber companies in New York, of luring and raiding suppliers, employees, and customers of competing distributors and putting competitors out of business upon entering new markets.  Eder-Goodman was under significant pressure to pay a premium because Southern's presence in Connecticut would have been devastating to Eder Goodman's business.  Southern did not exercise its right of first refusal to buy the 15% interest that Eder-Goodman purchased.  In 2007 and 2008, Eder-Goodman was afraid of Southern - Eder-

Lack of personal knowledge, speculation about E-G's motivations
[objection applies to all highlighted parts of paragraph 88]

Goodman's conduct demonstrates that they were willing to pay a steep premium to keep a competitor out of the Connecticut market.

89.    Ultimately, the deal with Eder-Goodman was consummated and it acquired a 15% equity interest in Eber-CT from Eber Metro, and negotiated for and received a host of special rights with that 15% membership interest, including, but not limited to

- A right of first refusal over a proposed transfer by Eber Metro of any of its interest in Eber-CT to a third party;

- A right to veto any other transfer by Eber Metro of any of its equity interest in Eber-CT to a third party;

- A right to veto any new issuance of equity and any new debt over a $5 million ceiling, thus limiting Eber-CT's opportunity to grow;

- A right to veto any transaction between Eber-CT and Lester or Wendy;

- Preference rights on the distribution of proceeds from the sale of the company or all its assets or a specific product line, or from Eber-CT's liquidation;

- "Tag along rights" in the event of a sale of Eber-CT on the same terms as Eber Metro receives; and,

- A representative on the Eber-CT Board.

(Def. Ex. KKK, PPP).

90.    In the wake of the Eder Goodman transaction, Lester and I continued to make efforts to arrange new senior debt financing for Eber-CT with independent third-party lenders. None of these lenders had any prior affiliation with Eber-CT. Discussions were held with at least

six different banks and finance companies in the Northeast about obtaining additional financing. None of these lenders was willing to provide any credit to Eber-CT, on a senior basis or otherwise.

91.    At the same time, Lester and I looked into other options, such as a sale of Eber-CT. In late 2008, Lester sent financial data about Eber-CT to a wine and spirits distributor in an effort to interest that party in acquiring Eber-CT.   This distributor showed no interest after reviewing our data.    Personal knowledge, hearsay

92.    In January 2009, Lester and I met with another wine and spirits distributor.  We provided detailed financial, sales and operational data about Eber-CT.   This distributor returned the data to us by mail less than a week later and told us that they were not interested. In or around 2010 we met with another regional distributor who was not interested in purchasing Eber-CT.

93.    We met with another regional wine distributor in November, 2009, June 2010, and July 2012, about buying Eber-CT.  It had no interest in buying the company or pursuing a joint venture.

94.    I believe that the people we met and communicated with in attempting to sell Eber-CT exploited these meetings and discussions in a predatory fashion.   For example, only a short time after Lester and I met with one of these distributors about a possible sale of Eber-CT, two of Eber-CT's major brand suppliers "dualed" Eber-CT, including Yellow Tail.  As a result, Eber-CT lost the exclusive right to distribute these brands. This had a serious negative financial impact on the company and highlights the inherent risks associated with marketing and attempting to sell a business like Eber-CT.  Further, rumors circulated in the industry that Eber-CT was going out of

Speculation, hearsay

business.  We had to fight that perception, as this impacted employee morale, sales, and ultimately, profitability.

95.     As set forth above, without additional third-party financing and without any meaningful opportunity for a sale of Eber-CT, Lester had no choice but to pour more of his own money into the businesses.  Critically, during the period from 2002 through 2012, Lester made in excess of $3.2 million in personal loans to Eber W&L and Eber Metro.

96.     As Lester repeatedly reached into his own pocket to keep the business alive, he solicited his sister Sally Kleeberg, and his niece Plaintiff Audrey Hays, the only child of his deceased sister Mildred, to join with him in making loans to the businesses.   Lester sent them letters and had (or attempted to have) discussions with them concerning the needed funding for the businesses.

<span style="color:red">Hearsay, lack of personal knowledge as to parts of paragraphs 96-98</span>

97.     Specifically, in April 2010, Lester reminded Audrey and Sally of significant difficulties the Eber business had experienced in the past few years. He stated that he had cut his salary and made every other cut he believed he could make in order to retain a financially viable business.  He said the business had liquidity issues and banks had turned down his request for new loans.  In February 2010, he had put the loans under the 2010 Line of Credit Note in place himself and had already funded a portion of it.  He asked that Sally and Audrey consider personally participating in one third each of the loans under the 2010 Line of Credit Note.  Both of them flatly declined Lester's offer to participate (Def. Ex. D).

98.     As Plaintiff Audrey Hays testified, prior to receiving the April 2, 2010 letter asking her to participate in lending the business money, Lester called her to discuss the matter.  She

testified that once she heard that he was inviting her to invest money in the business, she

"slammed the phone down on him."        *Why is Wendy repeating what Audrey has said? Argument*

99.    In the Spring of 2010, Eber-CT continued to struggle.  The economic recession,

which started in the Fall of 2008, continued to negatively affect Eber-CT.  Its annual losses were

mounting (losing approximately $2.4 million for the fiscal year ending May 30, 2009 and

approximately $1.1 million for the fiscal year ending May 30, 2010) (Def. Ex. EEE).  The

acquisition of the Slocum business had not lived up to Eber Metro's expectations at all.  Eber

Metro's asset base had significantly shrunk from what it was in 2005 and by then was only

comprised the Connecticut business.  Attempts to raise a new senior credit facility or sell the

company had all failed to attract any interest and Eder-Goodman's investment in Eber-CT brought

with it a number of negative covenant constraints on our flexibility in raising debt of equity

capital and in selling the company.  It also brought with it a partner who, for its own strategic

reasons, really did not have any interest in seeing the company be sold or perform well, and who I

believe spread rumors in the industry that Eber-CT would be going out of business.        *602 + speculation*

100.    In light of these unfortunate circumstances, the value of Eber-CT in 2010 was

extremely uncertain; it could not be derived with any precision at all.  Eber-CT may well have

been worthless.  The refusal of other distributors to purchase an interest in Eber-CT and the        *Rule 701*

reluctance of the lending market to advance funds confirmed that Eber-CT had little value.

101.    Lester and I concluded from the foregoing that independent third party lenders and

wine and liquor distributors, who were the ones best positioned to have an informed view, saw

little or no value in Eber-CT.  Likewise, the other 1969 Trust beneficiaries (including the

Plaintiffs), declined to infuse funds into the business, notwithstanding the fact that they had

indirect beneficial interest in Eber CT as beneficiaries of the 1969 Trust.        *Object to what Lester and Wendy supposedly "concluded" about what value others allegedly saw in Eber-Ct*

30

102.    It is no wonder that no one was interested.  Eber-CT was not making money, and it was hard to see how it would ever make money.  During this period, with my finance and accounting education and background and my analysis of the company's performance, I was not optimistic.  My default method for assigning the enterprise value to a company has always been to look at cash flows, projected cash flows based on past performance and other factors, and apply a discount rate.  As of 2010, Eber-CT had lost money for several years straight.  It had negative "EBITDA," that is, it had negative earnings before interest, taxes, depreciation and amortization ("EBITDA").  There was no earnings to project and there was no value to be assigned.  I was convinced that the business had no value.

103.    Recently, I have considered the value of Eber-CT in 2010 and 2012 by preparing a discounted cash flow analysis based on the actual results of operations of Eber-CT over the years 2013 through 2020 as reflected on Eber-CT's audited financial statements, and prepared the submitted demonstrative spreadsheets; they show no value under a discounted cash flow analysis (Def. Ex. UUUUU).

Objection, Rule 701(b), not helpful, 701(c), DCF analysis requires specialized knowledge (not the math per se but the various assumptions and selection of data points that go into it). Rule 702: Wendy Eber cannot be qualified as an expert because her opinions cannot satisfy the reliability prong.

104.    Eber-CT had no ability to raise money through long-term senior debt financing or by Eber Metro selling an interest therein.  It was performing abysmally, had high employee turnover, lacked funds to cover expenses and payroll, and was owned by Eber Metro, which was encumbered by all of the legacy liabilities of Eber W&L, which were insolvent.

105.    Under these conditions, in the Spring of 2010, Eber-CT approached Glenn Sturm seeking his assistance in formulating a plan to turn around the company.  Eber-CT had no prior contact with Mr. Sturm before 2010.  The goal was to retain Mr. Sturm as both a lawyer and a senior strategic business consultant, and that he would provide strategies and channels to secure new financing and help manage our relationship with CNB.

106.   Mr. Sturm was then a Senior Partner at Nelson Mullins Riley & Scarborough LLP, a prominent Atlanta law firm, where he practiced corporate and securities law, focusing on investment banks, private equity funds and emerging companies, with extensive experience in the financing and mergers and acquisitions markets.  Mr. Sturm also chaired his firm's corporate department and served on its executive committee.  At the same time, he was a well-known business advisor at The White Oak Group, a prominent private equity firm in Atlanta that is in the business of investing in, and growing the value of, lower middle market emerging companies.  He had served as chief executive officer of a number of emerging companies and had served on the boards of numerous private and public companies.

107.   Mr. Sturm had experience assisting and advising small privately owned businesses, and advised and consulted with Eber-CT on strategic initiatives to rehabilitate the business.  He worked with Lester and me and the entire executive team and was responsible for creating a marketing plan that focused on growing the craft spirit business and the Eber-CT imports business.

108.   Mr. Sturm was compensated for his services by receiving an interest in Eber-CT.  At the time, Mr. Sturm typically proposed to new clients that he be paid fees in cash and that he be given an opportunity to make a minority investment in the client's common equity at a fair market value purchase price.  This practice, as I understand it, is how similar advisors receive compensation from illiquid and/or distressed businesses.

Lack of personal knowledge and/or hearsay, as to how Sturm did things with other clients and how "similar advisors receive compensation"

109.   Mr. Sturm originally proposed a 10% ownership interest in Eber-CT, but Lester negotiated him down to 6% in May 2010.  The $350,000 purchase price for this interest was a negotiated value and was based on the then-current facts and circumstances regarding the company for a non-strategic purchaser (Def. Exs. UUU, HHHHH).  Critically, at the time, total

annual sales had declined by nearly $7 million, or more than 15%, over the then-most recent two fiscal years (Def. Exs. EEE).  Total net income losses were more than $3.5 million over the then-most recent two fiscal years.  The company's operations were generating negative cash flow and as a result its total indebtedness increased by 160% from $1.5 million to $3.9 million over the then-most recent two fiscal years (Def. Exs. EEE).

110.   Under the foregoing circumstances, Eder-Goodman could have exercised, but declined to, exercise its right of first refusal to purchase the 6% interest that Eber Metro sold to Mr. Sturm/Polebridge Bowman at this $350,000 purchase price (Def. Ex. OOO, HHHHH).

111.   In sum, during the period between the collapse of Eber W&L in early 2007 and the 2012 Foreclosure, the problems facing the Eber Entities made it virtually impossible to obtain sufficient third party senior debt financing or generate any serious interest from a third party in acquiring Eber-CT for three primary reasons.

112.   First, the results of operations were consistently poor. Between 2005 and 2012, Eber-CT experienced significant annual losses, with aggregate net losses of $7,275,269 during that period (Def. Exs. EEE, MMM, NNN, VVV).

113.   Second, the legacy liabilities of Eber W&L (including the Teamsters Fund "withdrawal liability" and the Retirement Plan "termination liability," which were joint and several liabilities of all the Eber Entities, including Eber-CT) were a lodestone on Eber-CT. No potential buyer would want to assume those significant liabilities or spend the time and money necessary to resolve them. Those liabilities would also be an impediment to any buyer attempting to obtain debt financing to buy Eber-CT, since a lender would have to deal with the competing rights of the Teamsters Fund and the PBGC. Southern knew this, as I understand that Lee Hager,

of Southern, testified that Southern would traditionally not assume pension liabilities, referring to

such liabilities as a "black hole." lack of personal knowledge about what Southern knew; testimony speaks for itself and
shows that, to the contrary, deals were possible w/o assuming pension liabilities, if real

114.    Third, Eber-CT was a small privately held wine and liquor distributor and is not

the kind of business that is well suited for a sale to another competitor (whether at auction or

private sale).  The core of a distributor's value is in its relationships with its suppliers, not any

hard assets. The risk that a potential acquirer would spend time doing due diligence on an

acquisition of Eber-CT, and at the same time just unilaterally try to persuade Eber-CT's suppliers

to "dual" Eber-CT and appoint them as primary distributor was very real and actually happened to

us more than once. In effect, a potential acquirer could thereby acquire much of the company's

business for free, which was essentially what happened when the New York Eber businesses

closed.

115.    Liquidation similarly was not an option that would benefit anyone.  I performed

liquidation analyses of Eber-CT at various junctures, including as part of my efforts to convince

the PBGC to refrain from terminating the Retirement Plan and seeking payment of the Plan's

"termination liability" from the Eber Entities. A liquidation of Eber-CT would not have even

come close to covering the Eber Entities' liabilities.  For example, as part of a presentation I

made to the PBGC in 2013, I prepared a liquidation analysis of Eber-CT based on its balance

sheet as of May 31, 2012.  Based on my analysis, liquidation proceeds would not have covered

liabilities (Def. Ex. GGG Bates-Stamped EB-00017840).  Having lived through the liquidation of

the New York operations, I was certain, and remain certain today, that the arduous and expensive

process of liquidation would have yielded nothing.

### B.  *Lester Forecloses on his Loans and Receives Eber W&L's Equity Interest in Eber Metro in Complete Satisfaction*

116.    The Eber Entities consistently had difficulty in generating enough liquidity and obtaining enough third party financing to enable their businesses to continue to operate. When no one else would provide needed liquidity, Lester made personal loans to Eber W&L and Eber Metro to fill the gap and keep the businesses alive. From 2002 through the end of 2011, Lester loaned millions of dollars to the Eber Entities. *Hearsay, lack of personal knowledge as to alleged loans made before*

117.    On October 1, 2002, Eber W&L issued a promissory note (the "2002 Note") to Lester to cover personal loans and financial accommodations in an aggregate principal amount of $575,895.00, payable on demand, and bearing interest at 6%. M&T Bank, Eber W&L's then senior lender, recognized the existence of the 2002 Note and required that it be expressly subordinated to M&T's senior debt (Def. Ex. L). *Lack of foundation/personal knowledge re what M&T Bank recognized or required; not supported by cited exhibit*

118.    As Eber W&L continued to collapse in the face of competitive pressure from Southern, on August 15, 2005, Eber W&L issued another promissory note (the "2005 Note") to Lester to cover additional personal loans and financial accommodations in an aggregate principal amount of $1,503,750.00, payable on demand, and bearing interest at 9% (Def. Ex. K).

119.    In March 2006, Eber W&L obtained a $60 mm loan facility from Wells Fargo Foothill Bank, and the 2002 Note and the 2005 Note were replaced by new notes (the "2006 Notes"), each in the same principal amount as before, payable on demand, and bearing interest at 9%, plus a 2% late payment charge. Wells Fargo also recognized the existence of the 2006 Notes and required that the 2006 Notes be expressly subordinated to Wells Fargo's senior debt (Def. Exs. K, L). *same objection as paragraph 117*

120.    Eber W&L's consolidated financial statements for the periods ended May 31, 2005

and 2006, on which Wells Fargo relied, show in footnote 9 that the outstanding balance of *same objection re: Wells Fargo*

Lester's personal loans was $1,780,764 at May 31, 2006. Eber's independent auditors, Davie

Kaplan P.C., of Rochester, NY, issued an Independent Auditors' Report on these financial

statements on August 3, 2006. No financial statements were prepared for Eber W&L after May

31, 2006 (Def. Ex. VVV). *2nd objection is to the characterization of the F/S as reflecting "personal loans"*

*PX 205 (admitted) = DX VVV*

121.    On February 26, 2010, with Eber W&L and Eber Metro having ceased operations

for years, and with Eber-CT failing, the Eber W&L Board of Directors (with Lester abstaining)

determined that Lester was the only person then willing to lend up to an additional $1.5 million to

the companies.  Lester was only willing to make a further loan to the company if he received

collateral for his loans to ensure that he had priority over the companies' other substantial

unsecured creditors (Def. Ex. GG).

122.    The Eber W&L Board also recognized that it was not possible to obtain additional

long term financing from a third party lender for several reasons, including the probable liability

of the Eber W&L "controlled group" (including, Eber W&L and Eber Metro) for the "termination

liability" relating to the Retirement Plan, and the matured liability of the Eber W&L "controlled

group" for the $2,212,367.47 "withdrawal liability" to the Teamsters Fund.  It also faced the

unwillingness of Eder-Goodman to permit Eber-CT to borrow more than the maximum $5 million

of debt permitted under the restrictive covenants in the Eber-CT limited liability agreement.

123.    On February 26, 2010, Lester established an additional $1,500,000 revolving line

of credit note (the "2010 Line of Credit Note") in favor of Eber Metro, payable in full on

December 31, 2011, bearing "pay in kind" interest at 12.5%, increased to 15% after default or

maturity, plus a 2% late payment charge. CNB, Eber W&L's new senior lender, also recognized

the existence of the 2010 Line of Credit Note and required that it be expressly subordinated to

CNB's senior debt (Def. Ex. GG, HH). Lack of personal knowledge and hearsay re what CNB "recognized" or "required," unsupported by cited documents

124.   At the same time, Eber W&L executed a Guaranty (the "2010 Guaranty")

guaranteeing any and all debts, liabilities, and obligations of Eber Metro and Eber W&L to Lester,

and Eber W&L and Eber Metro executed a Security Agreement (the "2010 Security Agreement")

securing all such Indebtedness (including the 2010 Guaranty) with a security interest in all the

capital stock of Eber Metro and the other assets of Eber W&L and Eber Metro (Def. Ex. GG, HH,

FFF).

125.   On February 11, 2011, Eber Metro assumed the remaining indebtedness under the

2006 Notes, with a principal balance of $1,434,710.68, and Eber W&L and Eber Metro executed

an Amended and Restated Security Agreement (the "2011 Security Agreement") confirming the

security interest in the capital stock of Eber Metro and the other assets of Eber W&L and Eber

Metro to secure the Indebtedness under the 2010 Line of Credit Note, the 2006 Notes and the

2010 Guaranty (Def. Ex. W).

126.   On August 18, 2011, the three Co-Trustees of the 1969 Trust met to discuss the

status of the 2006 Notes, the 2005 Note and the 2010 Line of Credit Note. After a lengthy

discussion the Co-Trustees ratified all these loans (with Lester abstained). Lack of personal knowledge; hearsay

127.   On December 31, 2011, the 2010 Line of Credit Note matured. The 2006 Notes

were already payable on demand. All these Notes were in default thereafter. On January 18, 2012,

Lester assigned his entire interest in the 2010 Line of Credit Note, the 2006 Notes, the 2010

Guaranty and the 2011 Security Agreement to Alexbay (Def. Ex. N). At the same time, Alexbay

sent Eber W&L a Notice of Proposal to accept all the capital stock of Eber Metro (the collateral

for the indebtedness to be foreclosed on) in full satisfaction of the 2010 Line of Credit Note, the 2006 Notes, the 2010 Guaranty, and the 2011 Security Agreement.  Lester's loans and the 2010 Guaranty were then secured by a validly perfected security interest in the assets of Eber W&L    legal opinion (principally all the capital stock of Eber Metro) and in the assets of Eber Metro (principally all of Eber Metro's 79% ownership interest in Eber-CT) (Def. Ex. J, YY, XX).

128.    As of December 31, 2011, the outstanding principal and accrued but unpaid interest on Lester's loans was an aggregate of $3,755,167 (Def. Ex. KKKKK).  Additional principal loans were made and interest continued to accrue through the date of the 2012 Foreclosure (Def. Exs. LLL, KKKKK).   I understand that for purposes of valuing Eber Metro, Mr. Torchio has used the aggregate principal and interest on the loans as of his valuation date of $3,898,366, which was calculated by adding the principal of the loans to Lester reported on the company's tax returns as of May 31, 2012 (in the sum of $3,060,711) (Def. Ex. LLL), with an interest amount of $837,655 from December 31, 2011 to the date of valuation after reviewing the company's accountant's interest calculations as of December 31, 2011 (Def. Ex. SSS).  All of these secured loans were permitted under the express terms of the Will (Def. Ex. A).    Legal opinion; disputed whether loans not authorized by other trustees permitted

129.    Shortly after Alexbay's January 18, 2012 notice, Lester resigned from the Eber W&L Board of Directors and had no further involvement on as a Eber W&L Board Member concerning the 2012 Foreclosure (Def. Ex. Q).

130.    The remaining Board members, Elliott Gumaer and I, then retained Marino Fernandez Esq., an experienced corporate business lawyer from Rochester, NY, as independent special counsel.

131.   Thereafter, the Board met and had numerous discussions regarding Alexbay's proposal. These meetings and discussions included, without limitation, discussions on March 13, 2012, and throughout the weeks of March 13, May 30 and June 1, 2012, as well as many phone conversations throughout that period. Lester did not participate in those Board discussions (Def. Ex. NN, AAA, OOO, R, KK, LL, MM).

132.   During the Board's deliberations, the Board received regular advice from its special counsel, Marino Fernandez, as well as from Gary Ford, a senior partner of the Groom Law Group, Washington, D.C., its special counsel for matters relating to the Retirement Plan liability and the Teamsters Fund liability, Glenn Sturm, a senior corporate partner of Nelson Mullins Riley & Scarborough, Atlanta, GA., Mike Gumaer, a retired trust and estates partner from Nixon Peabody LLP in Rochester, NY, and a Co-Trustee of the 1969 Trust, Sumner Pearsall, Rochester, N.Y., Eber W&L's tax accountant, and Michael A. Gallagher, President of Benefits Management Inc., Fairport, NY, Eber W&L's actuarial consultant.  It also communicated with Lester's counsel, David Belt, senior litigation partner of Hurwitz Sagarin Slossberg & Knuff, Milford, CT, and Michael Beyma, senior bank finance partner of Underberg & Kessler, Rochester, NY.

133.   The Board concluded that, based on the facts and circumstances at that time, Eber W&L and Eber Metro were then "insolvent" because it believed the present fair salable value of their respective assets was less than the amount required to pay their respective probable liability on their existing debts, including the "termination liability" under the Retirement Plan and the Teamsters Fund employer "withdrawal liability," as they became absolute and matured, and because the sum of each such company's debts was greater than all of its property.  The Board also considered the possibility of filing for bankruptcy.

Objections here and below re: testimony about what the Board (i.e. Gumaer) "concluded," "understood," or "believed" on the grounds of (a) lack of personal knowledge of Gumaer's state of mind, (b) if based on statements Gumaer made that were not memorialized in writing (e.g. Board meeting minutes that Wendy prepared), hearsay and/or Dead Man's Statute

Plaintiffs interpret the testimony about what the Board allegedly "considered" as asserting that topics were discussed at the board meeting, and do not object.

134.   The Board also concluded that its fiduciary obligation to the corporation required that it properly prioritize the interests of the company's creditors.   It identified Eber W&L's principal creditors as the Retirement Plan (and very likely eventually PBGC), the Teamsters Fund, Harris Beach, certain warehouse lessors, all of which were unaffiliated third parties, and Alexbay.

135.   The Board also considered the interests of other constituencies and considerations, including, without limitation, the effects the Board's actions may have in the short-term or long term upon the prospects for growth, development, productivity and profitability of Eber W&L and the rest of the Eber Entities, their current creditors, employees, their retired employees entitled to receive benefits from the Retirement Plan, and the Eber businesses' customers, suppliers, lessors and other vendors.

136.   The Board also considered the Eber Entities' immediate need to obtain additional liquidity in order to pay the legacy liabilities of Eber W&L (and probably Eber Metro) to unaffiliated third party creditors (since it was then out of business). It also considered the fact that there were no other unaffiliated third party lenders or equity investors willing to lend to or invest in Eber W&L at all. CNB maintained a senior bank facility at Eber-CT, but this was not adequate for Eber-CT's needs and CNB had repeatedly stated, both in writing and orally, through its representatives, that it wanted the facility refinanced elsewhere as soon as possible (Def. Ex. MMMM). The Board believed Lester was the only remaining source of liquidity for the Eber Entities to satisfy their liabilities and remain in business.   He was not willing to extend additional credit or modify the terms of the existing loans, especially since there was little chance of his existing loans being repaid.

Object to last sentence as Wendy cannot testify to Lester's state of mind and any statements not in writing are hearsay without an exception and subject to the Dead Man's Statute to the extent that it refers to Lester offering loans personally.

137.    The Board considered in detail the facts surrounding the then accrued unfunded benefit liability and "termination liability" of the Retirement Plan, as well as the existing employer "withdrawal obligation" to the Teamsters Fund. The Board believed that negotiating a settlement with PBGC was necessary to avoid having to liquidate Eber- CT's entire business. Based on the existing facts and circumstances, the Board did not then believe a settlement with PBGC was likely to occur on terms that would allow Eber-CT to stay in business unless the proposed 2012 Foreclosure went forward.

138.    The Board understood that, unless such a settlement could be reached, PBGC had many legal options available to it, which they were highly likely to successfully pursue, including, exercising  its power to:

*Object to what Gumaer supposedly understood*

*Further object on grounds that Defendants failed to produce discovery regarding legal advice provided to EBWLC re the pension plan despite fiduciary exception.*

- Involuntarily terminate the Retirement Plan as of a then current date;

- Make a statutory demand for payment of the Retirement Plan's termination liability (of over $5 million), which would make it a matured joint and several liability of Eber W&L and Eber Metro, since Eber W&L then owned more than 100% of Eber Metro as of such then current termination date; and,

- Automatically impose a statutory federal tax liens on the assets of both Eber W&L and Eber Metro, including Eber Metro's interest in Eber-CT.

139.    The Board believed this would mean the collapse of Eber-CT, or at least the end of the 1969 Trust's indirect interest therein. The Board also considered that PBGC could set an earlier retroactive termination date for the Retirement Plan, including before the Polebridge Bowman transaction, which would make Eber-CT jointly and severally liable for the Plan's "termination liability," since Eber Metro would have owned more than 80% of Eber--CT as of

*Object to testifying about what other Board member (Gumaer) believed.*

41

such an earlier termination date.  This, in fact, is exactly what eventually happened (Def. Ex. DD).

140.    Almost five months after Alexbay's Notice of Proposal was received, the Board members executed a unanimous written consent dated June 6, 2012, finding "after consideration of the financial statements and records of the Corporation and other information deemed relevant by the Board of Directors, the Board of Directors has determined in good faith that the value of Metro is less than the [the debt] owed to Alexbay….".  (Def. Ex. AAA)  Lester did not participate in this determination.  At the time the consent was given, the Board believed the value of Eber Metro's equity to be zero.          Same objection as above to testifying about what the Board (i.e. the deceased Gumaer) "believed."

141.    Prior to the Eber W&L Board's determination to consent, Alexbay obtained, as part of a prudent vetting process, an order from J. Matthew Rosenbaum (Sup. Ct., Monroe          Rule 701 County) that the 2012 Foreclosure was "commercially reasonable" under NY UCC § 9-627 (Def. Exs. I, G, OO).

142.    In order to show "commercial reasonableness", Lester, through Alexbay, sought to show that the value of the Eber Metro stock was less than the outstanding principal of and interest on loans that he made prior to June 5, 2012, not to fix a specific value of Eber Metro. Naturally, as the record was public, it was not in the best interests of Eber-CT for Alexbay/Lester to present an unnecessarily gloomy picture of the value of Eber CT's financial situation for suppliers, customers, employees, bank lenders, and competitors (Def. Ex. I).          Argument/improper opinion/ speculation to imply what Lester may have been thinking

143.    As of July 5, 2012, Lester's loans aggregated, with interest, to $4,173,489 (Def. Ex. KKKKK).  This amount that was satisfied in the 2012 Foreclosure.   If no foreclosure had

taken place, interest would have continued to accrue pursuant to the terms of both notes and this

indebtedness would have ballooned to $11,535,694 through July 31, 2021 (Def. Ex. KKKKK).

Object to certain of Ex KKKKK calculations without sources for all underlying data being identified

144.    In connection with the 2012 Foreclosure, Eber W&L, Eber Metro and Alexbay

entered into an Agreement for Turnover and Acceptance dated June 5, 2012, providing for the

transfer of the capital stock of Eber Metro to Alexbay in full satisfaction of the loans made prior

to June 5, 2012.  As a part of such agreement, Eber W&L and Eber Metro acknowledged their

belief that "ownership of Metro is worth less than the Obligations." Eber W&L and Eber Metro

also agreed to indemnify Alexbay against, and hold Alexbay harmless from and against, "any and

all claims, damages, losses, costs and expenses at any time asserted against or incurred by

Alexbay as a direct or indirect result of Alexbay's acceptance of the collateral (Def. Ex. H).

145.    In connection with the foreclosure, I notified CNB on numerous occasions, both in

writing and orally, that their records and statements for the 1969 Trust should reflect its holdings

in the Eber Entities accurately (Def. Exs. VVVVV, WWWWW, XXXXX ).  I asked CNB

repeatedly to ensure that their records and statements were clear as to the 1969 Trust's interests

in the Eber Entities.

## VI.    Lester's Loans to the Business Following the 2012 Foreclosure and Current Estate Claims Against Eber W&L/Interest Rates

146.    The 2012 Foreclosure did not relieve the Eber Entities' liquidity problems. After

the 2012 Foreclosure Lester made over 60 unsecured loans and advances for the benefit of the

Eber Entities to satisfy a variety of obligations to pay legal and other expenses relating to Eber

W&L's and the other Eber Entities' legacy liabilities, including the employer "withdrawal

liability" to the Teamsters Fund and obligations to participants in the Retirement Plan (and

PBGC). All such advances were then, and at all times since then have remained, payable on

demand in full. Object to this legal opinion from a lay fact witness without support by a document setting forth any payment terms

147.   Lester paid settlements to creditors of the Eber Entities from his own pocket as

follows:

- On October 15, 2015, he paid $27,500 to Eber W&L and Eber Metro's old landlord,

  Benderson (Def. Ex. O, III);

- On July 1, 2013, Lester paid the Teamsters $653,134 to release Eber W&L, Eber

  Metro, and Eber-CT from liability (Def. Ex. JJJJ)[5];

- On February 28, 2017, he gave up his $1.4 million retirement benefit to release

  Eber W&L, Eber Metro, and Eber-CT from liability (Def. Exs. VVV, DDD,

  DDDD); Objection to this amount coming in. It does not appear in the documents cited, and, regardless, actuarial estimates are expert opinions

- On October 25, 2013, Lester paid the sum of $400,000 to Harris Beach PLLC in

  settlement of a lawsuit by Harris Beach against the Eber Entities seeking recovery

  of unpaid legal fees and disbursements (Def. Ex. VV, QQQ);[6]

- From July 2012 to January 2013, Lester paid an aggregate sum of $120,000 in

  settlement payments to D4 LLC in settlement of a lawsuit against the Eber Entities

  in $10,000 monthly installments (Def. Ex. V).

---

[5] The Teamsters re-assigned receivable to Lester as part of the settlement that were subsequently collected, resulting in a net payment of the obligation, in the sum of $506,893.
[6] Pursuant to the Settlement Agreement Harris Beach assigned all of its right, title and interest in all claims it had against Eber W&L, Eber Metro, Eber-CT and Alexbay to Lester.  The liability was alleged to be $755,896, plus associated interest and fees, which as of such date exceeded $1.2 million (Def. Ex. VV).

Along the way to these settlements, from the time of the 2012 Foreclosure, Lester paid legal fees

and related expenses in the aggregate sum of more than $830,000 (Def. Exs. UUUU, BBB, CCC,

DDD, VVVV).

To the extent that this references DX KKKKK, which was previously cited as substantive evidence, Plaintiffs do not object to its use solely as a demonstrative

148.   The attached demonstrative, keyed to trial exhibits and bate-stamps, reflects

Lester's payment of company obligations following the foreclosure dates, for which he has never

been reimbursed in the aggregate principal amount of $3,234,499 (the "Post 2012 Foreclosure

Payments").  With interest at 9% through July 31, 2021, the value of the Post 2012 Foreclosure

Payments would be $5,384,508.  If the pre-2012 Foreclosure Loans and the Post 2012

Foreclosure Payments aggregated with interest running through August 31, 2021, Lester would

be owed the sum of $16,920,203.

149.   I do not believe Eber-CT would have continued to exist without the 2012

Foreclosure, Lester's additional loans and financial accommodations thereafter, the settlement of

the Teamsters Fund's claim against Eber Metro, the settlement of the PBGC's claims against

Eber Metro, and the refinancing of all of Eber-CT's senior bank debt.  These good faith actions

taken by Lester after June 2012 radically transformed the balance sheet and income statement of

Eber-CT thereafter. Eber-CT was a totally different company as a result. Without all that, I

believe Eber-CT would have been out of business shortly after June 2012.

**VII.   Lester's Consulting Agreement with Southern**

150.   In 2007, contemporaneous with Eber W&L's negotiations with Southern in

connection with the July 5, 2007 agreement, Southern and Lester discussed a post-closing

arrangement covering consulting and lobbying by Lester for Southern in New York State.  At that

time, Southern did not express any willingness to enter into the consulting arrangement with any

Objection to the dramatic amount of testimony that is not based on Wendy's first hand knowledge but instead based on summarizing and commenting on other evidence.

party other than Lester.  Eber W&L and Eber Metro had never provided consulting and lobbying services to any unaffiliated third party before. Lester had no experience lobbying the Connecticut.

151.   Southern made a proposal to my father for his compensation for lobbying and consulting services, and they were not subject to negotiation.  Lester and Southern entered into a consulting agreement, dated as of August 30, 2007 (Def. Ex. S).

152.   Lester provided services to Southern in return for reasonable consulting fees for a five-year period under the consulting agreement after Eber W&L and Eber Metro were already out of business.

*Further object to characterizing the fees as "reasonable"*

153.   The consulting arrangement contained a restrictive covenant limiting Lester from actively participating (directly or as an employee or stockholder) in the alcoholic beverage marketing business in any state where Southern did business (other than Connecticut) for five years.

*Object to what Lester believed*

154.   Lester and I both believed that, while the restrictive covenant was important to Southern, it was not important to Eber W&L, Eber Metro, or Lester. In August 2007, none of Eber W&L, Eber Metro, or Lester had any intention, interest or ability whatsoever to continue in business after Eber W&L and Eber Metro had already liquidated and shut down its New York operations. Lester only provided services to Southern after Eber W&L and Eber Metro ceased operations.

155.   The members of the Eber W&L board of directors, Lisa Semenick, Mr. Gumaer and I, were fully aware of the discussions that Lester was having with Southern about a consulting arrangement. We believed that a request for a non-compete from a party like Southern was reasonable and customary. We acquiesced in the arrangement.  Lester continued to perform

*Objection to Wendy testifying about what others were aware of, especially since Wendy was not a member of Eber W&L's board at the time the board authorized a host of other transactions with Southern in or around August 2007. See PX 195 at signature pages.*

services for Southern as a lobbyist and consulting representing Southern before the New York

State even after the five-year term of the consulting agreement the five-year restrictive covenant.

## VIII.   My Compensation and Employment Incentives

156.  I have devoted the majority of my career to being an employee and an officer and

director of the Eber Entities.  Indeed, I am grateful for having the opportunity to work directly

with my father over the last decade of his life in our family business.  With my father, I put

countless hours into the wind-down of Eber W&L and Eber Metro, and in trying to turn Eber-CT

into a profitable business.  In doing so, I chose to forego other opportunities in the labor market,

and was compensated for the work that I did.  In fact, while Eber-CT was struggling, I took pay

cuts, and below market compensation together with my father.  In fact, John Slocum's

compensation from Eber-CT greatly eclipsed both my compensation and my father's

compensation from 2009 through 2014.  For example, in 2012, John Slocum received total

compensation in excess of $275,000, while I received compensation of approximately $162,000

and my father received compensation of approximately $182,000 (Def. Ex. MMMMM).  Thus,

part of my compensation involved ownership incentives, which allowed me to acquire an equity

interest in the business.

157.  My work in the business was not a "no show" position of the kind that Plaintiff

Daniel Kleeberg had with the company.   Argumentative and Rule 403

158.  After the 2012 Foreclosure, on August 14, 2012, I entered into an employment

agreement with Eber-CT under which I became the President of Eber-CT.  Such employment

agreement contained reasonable and customary compensation, severance, benefits, and   Object to this lay opinion

indemnification provisions. As part of my compensation and as an inducement to enter into the

employment agreement, I received a restricted stock award of 2000 shares of common stock of

Eber Metro (9.1% of the shares outstanding thereafter), subject to three-year vesting (Def. Ex. UUUU).

159.    Similarly, as part of the Polebridge Bowman transaction, in recognition of the work that I was performing for the Eber Entities, I received a right of first refusal on any potential future sale of Polebridge Bowman's interest in Eber-CT if Polebridge received a bona fide offer for its interest from a third party.  This was of course known by Eber Metro's board, and was even known and passed upon by Eder-Goodman, which expressly entered into the Polebridge Bowman Joinder Agreement, which granted this right to me, and in doing so, implicitly acknowledged that this was fair given the work that I was doing for the company at the time (Def. Ex.  HHHHH). Critically, I never even exercised the right of first refusal.

<span style="color:red">Argument and speculation about what E-G supposedly "implicitly acknowledged"</span>

160.    In the years leading up to 2016, Glenn Sturm suffered from cancer. In light of Glenn Sturm's health, on May 25, 2015, Eber Metro extended the maturity of the Polebridge Bowman note to May 29, 2016.  On May 26, 2016, the note was amended to increase the interest rate to 3% for the following two years, and thereafter increase by 1% every two years. The maturity of the note was extended to May 29, 2026 (Def. Ex. AAAAA).

161.    In 2017, Glenn Sturm's health took a turn for the worse.  On February 15, 2017, Polebridge Bowman entered into a Stock Purchase Agreement with me, pursuant to which I acquired  Polebridge Bowman's 6% interest in consideration of me assuming Polebridge's Bowman's promissory note. My purchase was not made pursuant to any right of first refusal (Def. Ex. RRRR).

Objection to all of Paragraphs 162 through 168 on multiple grounds, including lack of personal knowledge (Ms. Eber joined Eber Bros. in 2001), Rule 403 (waste of time), and constituting argument that, if construed as testimony, would be improper opinion under Rule 701. Further, speculation about what trustees were "aware of" or what Wendy "believe[s]" they were thinking.

IX.   **Eber Bros. Transfer Restrictions/Call Rights (1996) and the Surrogate's Court's**
**Approval of the Administration of the 1969 Trust Through December 26, 2016**

162.   On June 21, 1996, Eber Bros. adopted new Bylaws.  At the same time, at least two of the three co-Trustees of the 1969 Trust executed a unanimous written consent to the adoption of the new Bylaws.  The new Bylaws were provided to the third co-Trustee at the time, M&T Bank.  The Co-Trustees were well aware of the provisions of the 1969 Trust when the new Bylaws were adopted (Def. Ex. PPPP, GGGGG).

163.   The new Bylaws contained a new "ARTICLE XII. TRANSFER RESTRICTION" (the "Transfer Restriction").  Article XII prohibits an Eber Bros. shareholder from transferring, selling or assigning any Eber Bros. shares without personally delivering to the president or secretary of Eber Bros. written notice of a proposed transfer at least five days before the effective date of the transfer, stating the terms of the proposed transfer thereof.

164.   Under Article XII, any other Eber Bros. shareholder may give notice within said five-day period to the transferring shareholder of said other shareholder's intent to purchase the shares proposed to be transferred for a price equal to the book value thereof as it appears in the books of Eber Bros. as of the end of the immediately preceding fiscal year.  No transfer of any stock shall be valid until such notice shall be given and the other shareholders have the opportunity to purchase the same as aforesaid.

165.   If any other shareholder elects to purchase the shares of the transferring shareholder, the closing on said purchase and sale by the electing shareholder shall take place at the office of Eber Bros. not later than 90 days after the date of such notice of intent to purchase. If no other shareholder elects to purchase the shares of the transferring shareholder, then the transferring shareholder is free to transfer said stock to the same person named in, and on the

same terms set forth in the notice at a time not later than 180 days after the date of the original notice.  After such 180-day period, if such original transferring shareholder proposes to transfer the shares again, such shareholder must comply with the Transfer Restriction (and associated call rights) all over again.

166.   On June 21, 1996, Eber W&L and Eber Metro amended their Bylaws to add the same transfer restriction (and associated call rights) (Def. Ex. QQQQ, EEEEE, GGGGG).

167.   I believe that the Transfer Restriction (and associated call rights) was the method chosen by the Co-Trustees of the 1969 Trust in 1996 to ensure the continuity of competent family management of the Eber companies over the long-term.

168.   The Transfer Restriction was conspicuously noted on the Eber Bros. stock certificates issued to the co-Trustees on September 6, 1989, May 10, 1991, and December 2, 1997.  More specifically, the statement "this Certificate and the shares represented thereby are issued and shall be held subject to all of the provisions of the…Bylaws and Amendments" is printed in large type on the face of the stock certificates  (Def. Ex. E).

169.   On July 23, 2007, CNB became successor co-Trustee to M&T Bank (Def. Exs. OOOO, TTTT).  CNB is in the business of providing professional corporate trustee services to clients.

170.   At all times since it became co-Trustee of the 1969 Trust, CNB has had exclusive physical possession of the stock certificates evidencing all the shares of Eber Bros. registered in the name of the 1969 Trust.

171.   My understandings is that this Court (Magistrate Parker) has determined that CNB was well aware that Lester wanted to acquire all the capital stock of Eber Bros. from the Trust. In the months prior February 15, 2017, there were numerous communications by phone and

Object to Wendy offering her interpretation of a portion of Magistrate Judge Parker prior opinions

email between myself and/or Lester's counsel and CNB about the possibility of Lester acquiring all the capital stock of Eber Bros. from the 1969 Trust.

172.   Lester even offered to pay cash for the Eber Bros. shares held by the 1969 Trust, even though the price at which the call rights could be exercised was zero.   The book value of the shares of Eber Bros. at May 31, 2016, 2017 and 2018 was zero.

*Object on grounds of Dead Man Statute because no evidence of such offer in writing has been provided, and this was purportedly a personal offer from Lester.*

173.   As late as December 27, 2016, CNB advised Lester to obtain an independent valuation of the shares if he wanted to acquire them.

174.   Then, on February 15, 2017, CNB petitioned the Monroe County Surrogate's Court for judicial settlement of a final accounting of the 1969 Trust, seeking approval of the administration the 1969 Trust from August 27, 2007 through December 27, 2007, approval of all transactions reported in the Accounting and embraced by the Accounting, and seeking termination of the 1969 Trust.  The request for the termination of the 1969 Trust was predicated on the allegation that Eber Bros. had no value and did not own any interest in Eber CT (directly or indirectly) at the time of the Accounting (Def. Ex. OOOO).

175.   The Petition and Account recites and alleges that Eber Bros. stock had an inventory value of $759,000 as of August 27, 2007, and a market value of $0 on December 27, 2016, at the end of the accounting period.  It based this allegation in part on a valuation report dated January 12, 2017, by Empire Valuation Consultants, LLC, that was incorporated into and made part of the Accounting (Def. Ex. OOOO).   *Plaintiffs object to this valuation coming in for the truth of the assertion; it should be limited to evidence of what CNB presented and argued.*

176.   The Surrogate's Court gave all parties interested in the 1969 Trust, including Plaintiffs, Lester, and Mr. Gumaer, notice and an opportunity to be heard in that proceeding. None of Lester, Mr. Gumaer, or the Plaintiffs, or anyone else objected to the Accounting or raised claims arising out of or embraced by the Accounting, the assertions made in the

Accounting, and the transactions of the Accounting.   The matter came before the Surrogate's Court on March 30, 2017, and May 18, 2017, and no objections were filed by any interested parties (Def. Ex. TTTT).

177.   I understand that the Surrogate's Court proceeding was not stayed or otherwise abridged in any way.  Neither Plaintiffs nor anyone else took steps to prevent the Surrogate from judicially settling and approving the Accounting and granting the relief requested therein based on the allegations contained therein.  The Surrogate thus exercised its jurisdiction and authority to bring the administration of the 1969 Trust and all matters related thereto and all claims arising thereof to finality and conclusion, and it did so.   Legal opinion; 403

178.   I also understand that The Order for judicial settlement of final account and termination dated June 1, 2017, judicially settled the Accounting of the administration of the 1969 Trust through December 27, 2016, approved all transactions therein, and ordered the termination of the 1969 trust and the distribution of all the remaining assets of the Trust on a proportionate basis (Lester—one third; Audrey Hays—one third; Lisa Stein--one sixth; and Daniel Kleeberg—one sixth). The termination of the 1969 Trust was granted on CNB's allegation that "[b]ased upon the valuation showing that the Eber Bros. & Co., Inc. stock has no value, Petitioner asserts that the Trust can and should be terminated at this time"  (Def. Ex. OOOO).

179.   However, my understanding is that the Surrogate's Court Order did not order that each asset in the 1969 Trust be distributed in those exact proportions.  While the value of Eber Bros. was fixed by the Accounting, there was no specific proposed distribution schedule of the Eber Bros. stock set forth in the Petition or the Final Account.  The specific allocation of Eber

Object to this new legal argument presented as if it is what Wendy supposedly now understands in contradiction of past binding interrogatory responses. See PX 149 at Response to Interrogatory No. 19. Also improper lay opinion and her current understanding (as opposed to her understanding at the time) of the order is irrelevant because it does not help understand any of the actions taken or not taken in the past.

Bros. shares among the beneficiaries was left to CNB to determine in making distributions of all remaining assets in equal shares (Def. Ex. OOOO).

180.     On July 12, 2017, Lester received, for his review, a draft schedule, prepared solely by CNB, of the proposed numbers of Eber Bros. shares to be transferred to each of the 1969 Trust beneficiaries (Def. Ex. KKKK).  The relative proposed distributions were not in conformity with the Order.

181.     On August 1, 2017, Lester's counsel received another draft schedule, prepared solely by CNB, revising the proposed number of Eber Bros. shares to be transferred to each of the Trust beneficiaries (Def. Ex. FFFFF).   The relative proposed distributions were not in conformity with the Order.

182.     On or about October 11, 2017, Lester's counsel received by email a pdf of a letter from CNB's counsel, to Lester's counsel and Plaintiffs' counsel, attaching a pdf of three stock powers dated October 2, 2017, purporting to transfer to Lester 765 shares of preferred stock and 817 shares of common stock of Eber Bros (Def. Ex. E).  The letter recited that CNB was retaining the original stock powers (and the three related original stock certificates) until advised to whom originals should be sent.  The original stock certificates and stock powers were never sent to Lester, me or Eber Bros.

183.     On or about October 26, 2018, over a year later, Lester's counsel received, for the first time, from Plaintiffs' counsel, by email a pdf of a letter from CNB's counsel to Plaintiffs' counsel and Lester's counsel, attaching a pdf of nine stock powers dated October 2, 2017, purporting to transfer to the Plaintiffs a total of 1235 shares of preferred stock and 1323 shares of common stock of Eber Bros.  The letter recited that CNB was retaining the original stock powers (and the three related stock certificates) until advised to whom originals should be sent.  The

original stock certificates and stock powers were never sent to Plaintiffs, me or Eber Bros.  As corporate secretary of Eber Bros., CNB never gave Lester the notice of proposed transfer required by the Transfer Restriction prior to October 26, 2018 (Def. Exs. E).

184.    Notably, at all times since the filing of this case.  Lester has been the registered holder of 100 shares of class B nonvoting stock of Eber Bros.

185.    On October 31, 2018, Lester sent to CNB a notice of intent to purchase, pursuant to the Transfer Restriction (and the associated call right) all the Eber Bros. stock proposed to be transferred to the Plaintiffs.  The purchase price was set in 1996 by Article XII of the Bylaws (i.e., the book value of Eber Bros. as of May 31, 2017, i.e., $0) (Def. Ex. SSSS).

186.    At no time has there ever been any delivery by any of the co-Trustees of the 1969 Trust of physical possession of the stock certificates held by the 1969 Trust to any of the beneficiaries of the 1969 Trust.

187.    As I understand it, Magistrate J. Parker found that "it is undisputed that CNB's proposed stock distributions through stock powers were incorrect." (p.41 Docket) Notwithstanding the invalidity of the proposed transfers by CNB, Lester validly exercised his call right after receiving the October 11, 2017 notice, for the first time on October 26, 2018. CNB has refused to transfer to Lester the shares proposed by CNB to be transferred to Plaintiffs, unless ordered to do so by this Court.    *Lack of personal knowledge about CNB's "actual knowledge"; speculation*

188.    CNB has actual knowledge of the Transfer Restriction (and the associated call rights). Since more than 180 days have passed since CNB unsuccessfully attempted to transfer Eber Bros. shares to Plaintiffs in 2017 and 2018, compliance by CNB with the Transfer Restriction (and associated call rights) is once again required for any future transfer of Eber Bros. shares to Plaintiffs.    *Legal opinion that disregards the powers of this Court and the Surrogate's Court*

54

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 6th day of September, 2021
At New York, New York

Wendy Eber
Wendy Eber