L9EsKLE1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DANIEL KLEEBERG, et al.,

                Plaintiffs,

        v.                          16 Civ. 9517 (LAK)

WENDY EBER, et al.,

                Defendants.

------------------------------x

                                    New York, N.Y.
                                    September 14, 2021
                                    10:15 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                    District Judge

                        APPEARANCES

BROOK & ASSOCIATES, PLLC
        Attorneys for Plaintiffs
BY:  BRIAN C. BROOK

FARRELL FRITZ, P.C.
        Attorneys for Defendants
BY:  KEVIN P. MULRY
     FRANK T. SANTORO
     –and–
HERBERT LAW
        Attorneys for Defendants
BY:  JOHN HERBERT

ALSO PRESENT:
ALI L. KRAL, Paralegal
SAMANTHA SKORIAK, Paralegal

L9EsKLE1

```
 1              (Case called)
 2              THE COURT:  Good morning, everyone.
 3              THE DEPUTY CLERK:  Counsel for plaintiff, are you
 4   ready?
 5              MR. BROOK:  Yes, sir.
 6              THE DEPUTY CLERK:  Please put your appearance for the
 7   record.
 8              MR. BROOK:  Brian Brook of Brook & Associates for the
 9   plaintiffs, Daniel Kleeberg, Lisa Stein, and Audrey Hays.
10              With me in the courtroom is someone assisting me,
11   Ali Kral.
12              THE COURT:  Good morning.
13              MR. BROOK:  Good morning.
14              THE DEPUTY CLERK:  Counsel for defendant, are you
15   ready?
16              MR. MULRY:  Yes, your Honor.
17              Kevin Mulry of Farrell Fritz.  I did want to apologize
18   to the court, counsel, and all parties for my delay in getting
19   here this morning.  I appreciate the court's indulgence.
20              With me is Frank Santoro from Farrell Fritz, and our
21   paralegal, Samantha Skoriak.  Also, co-counsel John Herbert,
22   our client, Wendy Eber, is also in the courtroom.
23              Good morning, your Honor.
24              THE COURT:  Good morning.
25              Let me just make sort of an opening remark here.  I
```

L9EsKLE1

1   hoped none of us would ever see this day.  I remember that when

2   the case was filed, I read the complaint, which is what I

3   normally do, and I said family litigation like this is a

4   disaster.  It's horrible for the family, and very often the

5   legal fees exceed any sensible use of resources.

6          As the case was then a jury case, I offered to try

7   to mediate before anybody spent a fortune litigating, and the

8   parties declined my offer, which is fine.  That's their

9   privilege.

10          But here we are five years later.  And I say that

11   because some wise person once said, It doesn't matter how good

12   one thinks one's lawsuit is, a bad settlement is better than a

13   good lawsuit.  I just offer that to the principals before we

14   take another step.  The offer of mediation, of course, is off

15   the table because the case is now nonjury and I'm the trier of

16   fact.  So I would not participate in any effort to resolve it,

17   if there should be one.  If there should be one, and if people

18   want a mediator, I would try to get one of our magistrate

19   judges.  But they are all very busy and I'm just not sure I

20   could do that.

21          That's it.  I don't normally hear opening statements

22   in nonjury cases, but I will today because, shall we say, the

23   case is factually complex enough that I think it might help.

24          So, Mr. Brook.

25          MR. BROOK:  Thank you, your Honor.

L9EsKLE1

1       Since I understand it is the practice usually not to

2  have opening statements in nonjury trial, I hope the court will

3  forgive me for reading a little bit more than I normally would.

4       THE COURT:  OK.

5       MR. BROOK:  This is, in many ways, a simple case about

6  a person who was trusted to safeguard a family business, led it

7  to the brink of ruin when faced with significant competition,

8  and then when the company was at its lowest point, transferred

9  the relatively little bit of what remained to himself, cutting

10  out his extended family in the process.  That extended family

11  being my clients.

12       The individual who was trusted was Lester Eber.  He

13  was the son of Allen Eber, one of the original founders of the

14  Eber Brothers business in New York, something that started off

15  as a grocery business, and then after prohibition, moved into

16  the line of a liquor distribution business, primarily focused

17  in Upstate New York.

18       Allen Eber had three children.  Two daughters, and the

19  youngest was a boy, Lester, who he named after his brother who

20  had died and was the co-founder of the Eber Brothers business.

21  On some documents, your Honor might see the name Lester in

22  1917.  That is not Lester Eber who is the defendant in this

23  case.  And when Lester -- I'm sorry.  When Allen Eber passed

24  away, he left everything in his will into a trust that matters

25  here, that includes the entire voting stock of the Eber

L9EsKLE1

1    Brothers family business, and the will provided that each of

2    the three children would have an equal share.  The difference

3    was that Lester, being the male heir and having been working in

4    the business some, he was still relatively young at the time.

5    Lester was made a co-trustee, along with two other people,

6    Allen Eber's lawyer, a guy named Elliott Mike Gumaer, and a

7    bank.

8                 (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L9EAKLE2ps                        Opening – Mr. Brook

1          THE COURT:  It occurs to me to say that I once was

2     introduced to Mr. Gumaer, I would imagine 25 years ago, because

3     I was active at the point in University of Rochester matters

4     and he was on the board, and we were at the same meeting with

5     200 other people, but somebody introduced him to me.  And that

6     was it.

7          MR. BROOK:  Thank you, your Honor.  And I think that

8     makes me only more glad that we have actually settled with the

9     Gumaers' estate.  Unfortunately Mr. Gumaer passed away shortly

10    after this lawsuit.

11         THE COURT:  I'm aware of that.

12         MR. BROOK:  So -- but, you know, jumping ahead in

13    time, so Lester Eber was -- he was essentially the heir

14    apparent for the business.  He didn't actually take over as

15    president of Eber Brothers, though, because of his relative

16    youth, until about ten years after his father died, somewhere

17    around 1980.  And he remained president of Eber Brothers Wine &

18    Liquor Corp., which was after the early '90s or so.  That was

19    the only remaining business.  The grocery business closed down

20    sometime in the late '80s, early '90s.

21         And what happened in 2012, your Honor, was that Lester

22    Eber resigned.  And it's for an interesting reason.  It's

23    because that was when he decided that he was going to take all

24    of the trust's assets in the business and transfer them to

25    himself.  The company he created originally, named Lester Eber

1    LLC, he changed it to Alexbay LLC.  He filed a lawsuit against

2    his own company.  And then at some point after that, within a

3    few weeks, he retroactively backdated a resignation to February

4    1st, three weeks exactly before the date the lawsuit was filed.

5           And this resignation was not something that was ever

6    disclosed to either the co-trustee bank at the time, which by

7    that point had change to Canandaigua National Bank, another

8    party that settled out of the case --

9           THE COURT:  Just so that I'm clear in my mind, because

10   there are a lot of entities here --

11          MR. BROOK:  Yes.

12          THE COURT:  -- this resignation was from Eber Brothers

13   Wine & Liquor.  Is that right?

14          MR. BROOK:  Yes, your Honor.  What was referred to in

15   the papers as either EBWLC from plaintiff's papers and I think

16   in some of the expert reports it's Eber Wine & Liquor.

17          THE COURT:  And he resigned what position?

18          MR. BROOK:  He resigned as president and director,

19   according to one of the exhibits.  I can't recall the exhibit

20   number off the top of my head, but it will be in evidence, I'm

21   sure, by both sides.

22          But at the same time, he did remain the president of

23   the parent company, Eber Bros. & Co., Inc., that had been the

24   grocer but at that point was just a holding company.  And he

25   remained a co-trustee of the trust that owned the vast majority

L9EAKLE2ps                    Opening - Mr. Brook

1    of the shares of Eber Bros. & Co., Inc., and also owned

2    directly some shares in Eber Wine & Liquor, not just through

3    the pass-through entity.

4           Around he also remained president of the subsidiary,

5    Eber Wine & Liquor Metro, which we will just call Eber-Metro,

6    to try to keep things a little less confusing.  And that's

7    important because, at that point in time, the only remaining

8    operating business was an operation in Connecticut called

9    Eber-Connecticut, also sometimes referred to as Slocum &

10   Sons -- I'll get into that in a second.  That was the only

11   remaining asset.  So he remained the president of that company.

12   And at the same time that he -- shortly after he resigned, the

13   transaction to actually take ownership of Eber-Metro itself,

14   all of the stock -- it was 100 percent owned by Eber Wine &

15   Liquor -- transferred it to Alexbay.  And he did so purportedly

16   in foreclosing on an amount of debt that he had -- money that

17   he had loaned to the company leading up to that point, just

18   within the last few years.  And that's because, what I

19   mentioned before is that the company had suffered significant

20   losses due to a competitor moving into New York State.

21          So just to step back a little bit, by, say, 2005, Eber

22   Brothers, Eber Wine & Liquor, had expanded significantly.

23          THE COURT:  It had what?

24          MR. BROOK:  It had expanded significantly.  It had

25   gone beyond upstate New York, where he was the number one wine

L9EAKLE2ps                    Opening - Mr. Brook

1   and liquor distributor in upstate New York, to include the

2   metropolitan New York City area.  That's what the entity

3   Eber-Metro was created to do.  It also acquired interests in

4   Ohio, Delaware, and in 2005 it purchased a business called

5   Slocum & Sons that operated in Connecticut, Rhode Island, and

6   also had some entity in Maine, which is an -- it's an issue in

7   this case but it's a confusing one and relatively minor, so I

8   won't go into that.  Suffice it to say the operating

9   distribution business was in Connecticut and Rhode Island.  And

10  after this competitor, called Southern Wine & Spirits, came

11  into New York, then failed in its attempt to acquire Eber

12  Brothers, as Dan Kleeberg, one of my clients, who was an

13  employee of Eber Brothers, will testify and it's in his

14  statement, it's a situation where the writing was on the wall

15  that Southern, one of the biggest players if not the biggest

16  player in the Wine & Liquor I guess in the country, was just

17  going to destroy Eber Brothers if a deal was not made.  The

18  family pleaded with Lester Eber to try to make a deal, but he

19  said he did not want to work with the people who owned that

20  company, calling them ruthless and untrustworthy.  But after

21  two years of trying to fight to keep the business, he finally

22  had to capitulate.  They lost a number of key employees and

23  they ended up being essentially forced to start liquidating

24  inventory by one of their primary lenders, Wells Fargo.

25         So, faced with that situation, a number of the

L9EAKLE2ps                    Opening – Mr. Brook

1    company's assets and its inventory and such were sold off to

2    Southern Wine & Spirits, and the transaction resulted in

3    nothing going to the shareholders of the company, namely the

4    trust.  The only thing that was kept under the Eber Brothers

5    banner besides some inventory that we were going to be in the

6    process of liquidating over time and the number of -- and they

7    also kept the Slocum business in Connecticut and Rhode Island.

8    But as part of the deal, Southern did not acquire a number of

9    liabilities that the company had.  It wasn't a complete sale of

10   the company.  It wasn't a merger or something like that.  So it

11   was more of an agreement just that they would shut down and

12   then transfer some assets to Southern.

13           THE COURT:  It was an asset deal.

14           MR. BROOK:  It was an asset deal, that's right.  And

15   so the most important of those for purposes of this trial was a

16   pension obligation, actually two pension obligations, one

17   smaller one to the Teamsters and one pursuant to an ERISA plan

18   that was under the authority of the Pension Benefit Guaranty

19   Corp.

20           THE COURT:  Now, what was the purchase price for the

21   assets?

22           MR. BROOK:  It was roughly $22 million, is what the

23   consideration was that was paid.  It's a very complicated deal.

24   It involved no fewer than 20 separate agreements.  And some of

25   it is confusing because they were given loans that were later

1    forgiven, just to try to keep the company liquid enough to try

2    to finish their negotiations.  And those negotiations with

3    Southern continued from roughly late 2006 until they were

4    finalized at the end of August 2007.

5            And at the end of the day, Southern, they actually, as

6    you'll hear from the experts, Southern actually did put in some

7    rights to be able to acquire the Slocum business in Connecticut

8    and Rhode Island, even though those were something that you'll

9    learn about called fran -- or at least Connecticut was a

10   franchise state, meaning that it had certain protections for

11   distributors that the suppliers, the different brands that they

12   sold, could not just cancel contracts with them without notice

13   and good cause.  And Southern does not operate in franchise

14   states, so they weren't really interested in that.  And

15   ultimately, even though there's some paperwork about offering

16   to buy 15 percent of Slocum plus a right of first refusal, at

17   the end of the day, those deals were all canceled.

18           THE COURT:  What happened to the $22 million?

19           MR. BROOK:  The 22 million, my understanding is, went

20   to pay off different suppliers.  There was a number of accounts

21   payable that were not being met because the company just wasn't

22   bringing in the revenue that it needed.  In addition, as Dan

23   Kleeberg will testify, the company actually increased its costs

24   in a number of ways because, once it lost a number of its key

25   employees to Southern Wine and Spirits, it had to hire -- it

L9EAKLE2ps                    Opening – Mr. Brook

1    decided, rather than capitulating then, Lester decided to hire

2    new people, but this time with noncompetition clauses, so he

3    had to significantly increase the compensation he was paying to

4    these people versus what his prior contracts had been.  And

5    they did just perpetually lose more and more suppliers over

6    that period of time.  So my understanding is that that 22

7    million went only to the creditors.

8             Now, there is a part of that deal, though, that is

9    important here, in that it's not part of the deal that the

10   board of Eber Brothers ever approved.  But it's something that

11   Lester used corporate counsel to negotiate for himself at the

12   same time.  It's even in an early letter agreement that was

13   produced by, in this case, by Southern Wine & Spirits pursuant

14   to a subpoena, not something we got from the defense actually,

15   showing that by February 7, 2007, Southern had already agreed

16   with Lester Eber to give him half a million dollars a year to

17   be a, quote/unquote, consultant to the company.  And at the

18   same time, however, he was remaining the president of Eber

19   Brothers, and Eber Brothers, of course, has alluded to,

20   continued to operate, not only winding down New York

21   operations, but with the Connecticut and Rhode Island

22   operations.  The Rhode Island operations, just to close that

23   door, were sold off in 2008 to a third party for a small amount

24   of profit.

25             And so that deal ultimately morphed a little bit more.

1    By the final negotiation at the end of August 2007, Lester had

2    a contract for five years guaranteed $600,000 a year, nearly

3    double the salary he had been receiving from Eber Brothers, and

4    it could not be terminated, even if Southern decided that they

5    didn't want Lester to do anything for it.  So one of the issues

6    in this case is certainly going to be, was that transaction

7    something that was a corporate opportunity that belonged to

8    Eber Brothers, that Lester essentially usurped in order to

9    enrich himself, because this was a deal where there were a

10   number of creditors, there was a limited amount of capital

11   available, and I don't doubt that any reasonable person in

12   Lester's position would be tempted to say, I should get

13   something out of this for all the decades of time that I put

14   into this case, into this company.

15        And as I mentioned, though, he didn't just get 600,000

16   a year for consulting part time for Southern.  At the same

17   time, he was still getting a salary of over $300,000 a year

18   from Eber Brothers, even though it was in complete financial

19   disarray, everyone else was being terminated by the end of

20   August for the most part, and Dan Kleeberg, who had worked

21   there since 1975 and had become the senior vice president of

22   the company, was told that he could not continue working there

23   after the end of August 2007.

24        So 300,000 plus 600,000.  And that wasn't all.  Lester

25   at the end of August 2007 also had the pension plan amended so

L9EAKLE2ps                    Opening - Mr. Brook

1    that he could start drawing his pension of over $10,000 a

2    month, by far the largest pension in the company, while he

3    continued to work for Eber Brothers.

4         And just to foreshadow what the defense to this is

5    going to be, that this was not something that belonged to the

6    company, it is going to be that the company supposedly was

7    dead, a done deal, and therefore there were no more fiduciary

8    duties of loyalty to it.  That seems to be largely a legal

9    argument.  I'm not sure there's actually going to be too much

10   dispute about the facts.  It's going to come down to perhaps a

11   characterization of, What does it mean to stop being in

12   business?  Is someone, by remaining a president and compensated

13   for that position, still someone who owes fiduciary duties of

14   loyalty to a company?

15        And that's important because, by taking $600,000 a

16   year for himself that could have gone to the company while he

17   continued to receive a $300,000 salary -- he could have kept

18   his salary exactly the same as it was back when Eber Brothers

19   was rolling in the money and doing extremely well and then

20   just, instead of managing New York, Ohio, and Delaware, he

21   could do his part-time consulting for Southern and still get

22   paid very well for it, arguably more for the amount of work he

23   had to do than before.  But instead he was -- it jacked it up

24   to, you know, 900,000 with his salary.  And that's important

25   because, I mentioned before, the reason why Lester took the

L9EAKLE2ps                     Opening – Mr. Brook

1   company in 2012 is he was foreclosing on loans he had made to

2   the company, loans that the company, they say, needed in order

3   to pay some of their debts.  They focused primarily on pension

4   funding obligations.  And there's no dispute that there were

5   pension funding obligations for Eber Brothers.  It is certainly

6   plaintiffs' position that the evidence will show that the fact

7   that there were pension funding obligations is one reason why

8   the Southern opportunity was a corporate opportunity, because

9   whatever the status of its income was, the company needed

10  income because it had debts to pay to the people who had worked

11  for it for many decades.

12          And the thing is, when you do the math, Lester loaned

13  approximately $1.8 million from the time Eber Brothers shut

14  down in August of 2007 until the time of the transfer of

15  Eber-Metro in 2012.  That's principal not counting interest

16  that the defense wants to put on there.  But over that same

17  time period, Lester Eber collected $3 million from Southern

18  Wine & Spirits.  So if that same money had just gone to Eber

19  Brothers as additional consideration for the deal, which it

20  was, especially considering that Lester was still going to be

21  working for Eber Brothers and they needed the money, there

22  would have been no need for loans.  There would have been no

23  need –- or been no even articulable justification for Lester,

24  as a trustee, as a president of the company, to take the shares

25  of the only remaining operating assets for himself and cut out

L9EAKLE2ps                    Opening - Mr. Brook

1     the people to whom he owed the greatest duty of undivided

2     loyalty.

3              And I don't think it's worth going into in the

4     opening, some of the things that happened in between that sort

5     of led to Lester getting there.  Some of that is going to come

6     out today in the testimony.  And it will come across in the

7     next few days.  Suffice it to say it is a very complicated

8     series of steps that led to being able to paper this

9     transaction in a way that looked good.  And that is going to be

10    a recurring theme.  And I would say that there are, to the

11    extent the Court wants to hear, you know, the -- a little

12    preemptive foreshadowing of what we see the defense case to be,

13    it is threefold.  And I'd say the first part is just totally

14    legally irrelevant.  And the second part, I would say, is

15    legally insane.  The legally irrelevant part is that the

16    business was not doing well and that, you know, during the

17    economic downturn of the financial crisis, like every other

18    wine and liquor distributor in the company, the company was

19    losing money.  It was going through hard times.  But plaintiffs

20    will submit that just because a company is going through hard

21    times does not justify engaging in wrongful transactions.  If

22    anything, it is when a company is at its lowest point that the

23    fiduciary duty of loyalty is most important, because the

24    temptation to overreach will be greatest at that point.  You

25    don't hear about accounting frauds and things like that

L9EAKLE2ps                    Opening - Mr. Brook

1    happening with companies that are wildly successful.  It

2    happens with companies that are in trouble.  And it's, you

3    know, in some ways taking, you know, even assuming -- and we're

4    going to dispute this -- but the defense's argument is going to

5    be that Eber-Metro, at the time of the transfer, was worth less

6    than the total amount of debt owed to Lester combined with the

7    pension obligations.  And that's because, again, the company

8    had been losing money for a few years and arguably its

9    valuation was less than that.  There will be competing expert

10   testimony on the valuation at that moment.

11           But the analogy I would draw is, imagine a trustee is

12   overseeing a bunch of publicly traded stocks in a trust, and on

13   March 23rd, 2020, he decides, after the market close, you know,

14   I really would have liked to buy a lot of these stocks, so what

15   I'll do is, I will transfer the stocks from the trust to me and

16   I will give them the current market value of the stocks.  That

17   was the absolute low point of a very -- of the shortest bear

18   market in American history.  And I think it would be absurd for

19   anyone to suggest that a trustee could do this and be able to

20   retain all the proceeds from that stock without taking into

21   consideration the dramatic appreciation in value of those

22   assets, that a trustee, even if it was fair market value at the

23   time, is not allowed to take trust assets and then pocket

24   whatever appreciation occurs afterwards.  And that is going to

25   be part of this theme here, this, you know, "is the company

L9EAKLE2ps                    Opening - Mr. Brook

1    doing bad" justification.

2          The point that I would say is legally insane is the

3    argument that -- it's a hard one for me to even try to

4    articulate, because I don't -- I'll confess, I don't fully

5    understand it.  But one of the things that happened after the

6    transfer of Eber-Metro is that Lester Eber's companies got sued

7    by creditors.  One, a law firm that was owed a few hundred

8    thousand dollars in legal fees and actually had been the law

9    firm on some of these very transactions, accused Lester Eber of

10   engaging in a fraudulent conveyance.  And after that point,

11   PBGC learned of the lawsuit and PBGC sued.  So one of the

12   things that -- it's complicated history with PBGC, but they

13   essentially sued not for fraudulent conveyance because they're

14   suing under ERISA law; instead what they did was said, even

15   though there had been pension funding payments being made for a

16   few years after 2010, which is when the first of the

17   significant challenged transactions that led to the metro

18   transfer occurred, they said that the court in the Western

19   District of New York should instead find that the plan

20   retroactively should be deemed to have been terminated on April

21   30th, 2010.  Why?  Because doing so means that you consider

22   what was in the structure of the company for the controlled

23   group, because under ERISA they can hold subsidiaries liable as

24   long as they're at least 80 percent owned by a parent.  And on

25   that date, everything, including Eber-Connecticut, was

L9EAKLE2ps                          Opening - Mr. Brook

1    undisputedly owned, at least 80 percent, by the parent company

2    Eber Brothers that owned the pension liability.  There is a

3    transaction that is one that we'll talk about that occurred a

4    month later in which 6 percent of the company, exactly the

5    amount needed to get below the 80 percent threshold, was

6    transferred to Lester Eber's lawyer, in a transaction that

7    plaintiffs will show was a complete sham, not a real

8    transaction.  It was designed solely to try to essentially

9    defraud PBGC out of being able to tap Eber-Connecticut, Slocum

10   & Sons, for assets.

11            And so here's the thing.  So even though that was

12   the -- you know, that termination date effectively means that

13   the court in the Western District gave PBGC the ability to

14   impose liens by disregarding the transactions that the defense

15   is going to insist should be upheld.  The defense nonetheless

16   wants to use the legal conclusion of the Western District of

17   New York in 2016 to support their claim that at the date of

18   transfer in 2012, Eber-Metro, the asset that Lester took, was

19   insolvent because it was on the hook, liable for the pension

20   obligation, and also for the fees to the law firm that accused

21   it of a fraudulent conveyance, even though there was no

22   judicial ruling in that case; they settled beforehand.

23            And so it's the sort of crazy situation of like some

24   sort of quasi collateral estoppel where they want to use the

25   ruling that they fought against for years, spending probably

L9EAKLE2ps                    Opening - Mr. Brook

1   close to a million dollars in legal fees fighting again, saying

2   that this is not a liability that belongs.  These are real

3   transactions, but they lost before my clients even knew that

4   this transfer had happened.  And now they want to try to go

5   back in time and say, through a legal instruction to their

6   expert, you need to assume that even though these were

7   liabilities of Eber Brothers Wine & Liquor, and even though

8   Eber-Metro in its transaction did not assume any liability,

9   just like Southern -- when you have an asset sale, you don't

10  typically assume liabilities especially for pension plan, and

11  so this asset transfer to Lester's company was exactly the

12  same.  Nonetheless, the legal instruction the defense has given

13  their expert and that is going to be a subject that we'll have

14  to argue before your Honor is about whether you can just assume

15  as a matter of fact that that contingent liability for the

16  pension funding obligation for law firm fees that Wendy Eber

17  herself, the daughter of Lester Eber, who is now in charge of

18  the company, said were overbilling and, you know, just, I

19  guess -- I'm trying to remember exactly how to phrase it --

20  they accused the company that was doing them of actual

21  malpractice, that they failed to submit the claim to insurance

22  timely so that they shouldn't have had to pay any of these

23  legal fees anyway.  So they were deeply challenged.  But,

24  nonetheless, they're going to be arguing that based upon a sort

25  of retroactive analysis about what happened years later, that

L9EAKLE2ps                    Opening - Mr. Brook

1    the Court should just apply the largest amount possible of debt

2    to the company and by doing so, the Court can say, well, this

3    was basically a wash; you know, the trust wasn't hurt, because

4    there was so much money that was owed and the company was doing

5    so poorly at the time that there's no need to consider anything

6    else.

7              And one of the things that was filed just yesterday is

8    a motion, and I won't get into that at that point because I

9    think it's a little beyond the scope, but it's certainly one of

10   the most important issues in this case and it could

11   significantly shorten the trial, is whether or not this quasi

12   collateral estoppel argument is something that is going to fly.

13   And if, assuming it's not, then it's going to be an easy case

14   in a lot of ways to try to effect a constructive trust, and

15   then the Court will be left with simply a complex matter of

16   trying to, you know, after reconveying the assets that are

17   still in the defendant's possession to my clients, or

18   partially -- they only have two thirds, so they're majority

19   owners but one third is for Lester Eber's estate under the

20   will.  At that point there is still going to be a lot of

21   cleanup, because one thing that will become readily apparent is

22   that the financial records of these companies are a mess.

23   Their stuff just, you know, there's no audited financial

24   statements for Eber Brothers Wine & Liquor, Eber-Metro, since

25   after 2006.  And almost every bit of accounting record that's

L9EAKLE2ps                        Opening - Mr. Brook

1    been turned over shows that it was a manually adjusted entry.

2    But what we do know -- and we also had some other things happen

3    recently that is going to raise even more questions.  For

4    example, just less than two weeks ago, we learned that there

5    was an employment agreement supposedly that Lester signed with

6    his daughter Wendy the sole approver of it in April 2012, back

7    when the company Eber-Connecticut, or Slocum, was undisputedly

8    still under the trust control.  So Lester as a trustee, this is

9    just more self-dealing.  And the only reason we learned about

10   that is because that contract apparently included a death

11   benefit, or deferred compensation, what some people would call

12   the golden parachute that, because Lester unfortunately died of

13   COVID last year, ended up on the financial statement for last

14   year.  It was in cryptic form, but we were able to figure

15   out --

16           THE COURT:  I'm sorry.  I thought this was an

17   agreement with Wendy Eber.

18           MR. BROOK:  No, no.  Wendy Eber signed it for the

19   company.

20           THE COURT:  I see.

21           MR. BROOK:  My apologies.  So we, just for the sake of

22   completeness, we did get a similar employment contract signed

23   for Wendy Eber that Lester approved.  But that contract was

24   dated after the transfer of Eber-Metro, so it was no longer

25   under the trust.  It was not something that would have had to

1   go through the trustees and the possible trust beneficiaries to

2   approve.

3           So that's just one example of how much we don't know,

4   and one of the issues the Court will be addressing today is the

5   admissibility of certain documents that we just got on Friday

6   that go to the validity of both the Metro transfer and the 2010

7   transaction that got the ownership interest in even Connecticut

8   just below 80 percent.

9           THE COURT:  I would appreciate it if you could wrap

10  this up.

11          MR. BROOK:  I'm sorry, your Honor.

12          So the point being, there will still -- there's no way

13  we get through this trial without there still being some

14  questions left unanswered, and what plaintiffs are going to ask

15  this Court to do is to go ahead and order a reconveyance of the

16  property and then to order under New York law an accounting,

17  and, in particular, once my clients are able to have the

18  control over the company and access the accounting records

19  directly, speak with the accountants, at that point to try to

20  clean up some of these things to ensure that there is an

21  appropriate equitable resolution.

22          THE COURT:  I'm sorry.  An account as of what?

23          MR. BROOK:  Accounting for where different money went

24  out of the company, because one of the things that the defense

25  is going to put in evidence on -- we may object to some of

L9EAKLE2ps                          Opening - Mr. Brook

1    it -- is money that Lester supposedly gave to the company or

2    spent on behalf of the company even after the Metro transfer,

3    for example, paying for legal bills to fight against PBGC,

4    paying for legal bills to fight against the law firm that was

5    trying to collect its fees.  So I think both sides are going to

6    ask that in the course of formulating any remedy, that the

7    Court should try to balance the equities and take into account

8    when there is appropriately credit due to someone, because the

9    case -- the law in New York is that when there is a breach of

10   trust, under the fiduc -- that is subject to the "no further

11   inquiry" rule, the Court is required to unwind the transaction,

12   but that doesn't mean that the consideration given by the

13   trustee who breached his duty just vanishes.  They're entitled

14   to compensation for that.  But there are a number of things

15   that come into play on that, for example, what is an interest

16   rate that is appropriate on the money that was spent back at

17   the time, or is interest appropriate at all.  And in the case

18   of, if there was fraudulent intent behind it, if it was not a

19   good-faith mistake for a trustee thinking that they could take

20   trust assets without violating the law, then in that case there

21   may not be credit awarded for subsequent improvements to the

22   property that were made if the trustee knew or should have

23   known that it was wrongly taken.

24           THE COURT:  But you've had five years of discovery.

25   And I don't understand this request for an accounting.

L9EAKLE2ps                    Opening – Mr. Brook

1          MR. BROOK:  Well, the reason, your Honor, is because

2    we do not believe that the information we have been given is

3    complete.  And I'll explain why.  So the documents we got on

4    Friday were all documents, produced by a third party, that

5    should have been produced in discovery.  They, as to one

6    transaction, the 2010 one, provide conclusive evidence that --

7    you know, and this is correspondence that is with, sometimes

8    with Wendy Eber and Lester Eber on it, but certainly with their

9    lawyer at the time.  So it would have had been in their files.

10   As correspondence that shows conclusively that the 2010

11   transaction for 6 percent I mentioned is a sham.

12         THE COURT:  I'm sorry.  I lost what you said.  "The

13   2010 transaction."  What came after that?

14         MR. BROOK:  I'm sorry.  Your Honor.  I missed that.

15         THE COURT:  You said "the 2010 transaction," and some

16   words followed that that I could not hear.

17         MR. BROOK:  So it's going to show that the 2010

18   transaction, where 6 percent of the company was transferred to

19   Lester Eber's lawyer and that both Wendy and Lester Eber have

20   testified under oath multiple times was meant as compensation

21   to that lawyer -- it's compensation where they -- he started

22   asking for 10 percent of the company and they negotiated down

23   to 6 percent.  Well, the documents that should have been

24   produced in discovery, years ago, but which we just got Friday

25   pursuant to a trial subpoena, show that in fact, just days

L9EAKLE2ps                    Opening - Mr. Brook

1    before, in fact the day before the decision was made to

2    transfer 6 percent to the lawyer, requests were being made of a

3    partner in the Slocum business to transfer 6 percent to Wendy

4    Eber personally, and that then there's a memo the next day

5    where the lawyer says, we need to find a different buyer.

6              So if this was compensation for legal services, why is

7    it going to Wendy Eber, in a series of documents?  And that was

8    concealed from us during discovery.  And that is a big deal.

9    So for us to -- so for me to say that my clients should just

10   accept what we've been given in terms of financial information,

11   especially unaudited financial statements, I think -- I just

12   would like to at least -- whatever happens, there should be

13   some flexibility for if we discover more --

14             THE COURT:  My question was, you've had five years of

15   discovery, and what point is there, what need is there, what

16   justification is there for an accounting now?

17             MR. BROOK:  And the answer I was getting to --

18             THE COURT:  You're effectively asking for a do-over, I

19   gather.

20             MR. BROOK:  No, your Honor.  I think the answer is

21   that because it's clear that what happened with discovery was

22   not done in an effective way -- the defense attorneys

23   essentially just let Wendy Eber collect whatever she wanted

24   without supervision or even keeping track of search terms and

25   such -- with a court order saying an accounting must be

L9EAKLE2ps                        Opening – Mr. Mulry

1   provided, we will at least have a statement of when money was

2   received, because some of the stuff happened -- you know, if

3   your Honor insists we're going to do it this way, we have

4   evidence of significant amounts of money being I taken out.

5   That is for sure.  There's enough of that to go forward.  It's

6   just that, given what we've recently learned about how much was

7   concealed, I would only ask that whatever happens at the end of

8   the day, that there be some retention of jurisdiction at least,

9   not necessarily for an accounting but to be able to correct the

10  record if it turns out that there was another million dollars

11  taken out.  For example, one of the emails that we received on

12  Friday --

13            THE COURT:  Counsel, this is the trial.

14            MR. BROOK:  Yes, your Honor.

15            THE COURT:  It's happening now.

16            MR. BROOK:  And we are prepared to show a great deal

17  of wrongdoing and to provide the numbers to back it up, your

18  Honor.

19            THE COURT:  All right.

20            MR. BROOK:  Thank you, your Honor.

21            THE COURT:  Thank you.

22            Mr. Mulry.

23            MR. MULRY:  Good morning, your Honor.

24            I'll try to briefly give a preview and address some of

25  the things Mr. Brook said.  One thing that the evidence will

L9EAKLE2ps                        Opening – Mr. Mulry

1    show in this case is that Lester Eber gave his whole life to

2    this business, to these companies.  And a number of facts along

3    the way will become very apparent.  Mr. Brook alluded to the

4    fact that this large national distributor came in, Southern.

5    The Ebers had business in New York State, both upstate and

6    downstate, and in around 2004, this large national distributor

7    came in and really attacked the New York business, hired away

8    their leading sales manager, in one day took a number of their

9    salespeople.  Essentially that put -- they put the Eber New

10   York business out of business.  And that was true as of early

11   2007.  The New York business was out of business.  And there

12   was a settlement.  There was a lawsuit with Southern.  Then

13   there was a settlement with Southern, which your Honor will

14   hear about.  Ultimately there was a settlement, and subsequent

15   to the Eber companies' going out of business, Lester Eber did

16   become a consultant to Southern under a consulting agreement.

17          One thing that's very important, though: this was not

18   a corporate opportunity.  Lee Hager, who is an official at

19   Southern, he was deposed.  He won't be here, but we have his

20   deposition.  He said this is not something that Southern would

21   ever give to a company.  It was to do consulting services.  And

22   what he testified is that Lester Eber had a number of abilities

23   with respect to lobbying and other things that Southern would

24   have to go out into the market to get.  So Southern was paying

25   for that.  And Lee Hager was very specific that this was not

L9EAKLE2ps                    Opening - Mr. Mulry

1    anything they would give to a corporation.  It was something

2    individual.

3           So that was not a corporate opportunity.  And we'll

4    present facts that will demonstrate that.

5           THE COURT:  And other than Mr. Hager's deposition,

6    what are you going to present?

7           MR. MULRY:  With respect to the consulting agreement?

8    We have Lester Eber's testimony.  Lester Eber, as I'm sure your

9    Honor knows, died at the start of the COVID pandemic.  But he

10   was deposed twice.  And he testified, with respect to that

11   transaction, what he did for Southern.  And so we will have his

12   testimony as well, with respect to that.

13          THE COURT:  The credibility of all of which is for me

14   to determine.

15          MR. MULRY:  Yes, your Honor, of course, in the light

16   of all circumstances.

17          But one important point there is, I think there has

18   been some suggestion throughout the papers that there was some

19   problem with a non-compete part of the consulting agreement.

20   At the point where Lester started to work for Southern in New

21   York, the New York business, it was out of business.  There was

22   no question of that.  And that will become very apparent, we

23   believe, your Honor, through the testimony, that the New York

24   business was out of business.  They were not going back to New

25   York.  And all the Eber energies with respect to distribution

L9EAKLE2ps                    Opening - Mr. Mulry

1    were going to happen in Connecticut, which, they had purchased

2    a Connecticut distributor in 2005 called Slocum & Sons, and the

3    company was Eber-Connecticut, doing business as Slocum & Sons.

4    And they carried out the business in distribution in

5    Connecticut.

6         Now, another transaction that is at issue in this case

7    is the 2012 transaction, where Alexbay, an LLC that's owned by

8    Lester Eber, forecloses on security interests that Lester Eber

9    has.

10        Now, one thing for this -- and the evidence will show

11   this -- you have to back up, through the years leading up to

12   that time, Lester Eber was paying millions of dollars into the

13   company to try to keep the company afloat, to meet payroll, for

14   other obligations, because the company had difficulties.  At

15   one point in 2010, when Lester was going to have a security

16   agreement, he offered both Sally Kleeberg at the time and

17   Audrey Hays, who were the other beneficiaries, the opportunity

18   to participate in that loan, a third, a third, a third.  Both

19   declined.  They said no.  So Lester did it himself.

20        Now, what we believe the evidence will show is that in

21   2012, when this transaction happens, Eber-Connecticut was going

22   out of business.  If Lester had not taken steps there, it would

23   have gone out of business and there would be nothing.

24        One issue that is very significant in this case, as

25   Mr. Brook has recognized, is the liabilities that were being

L9EAKLE2ps                        Opening – Mr. Mulry

1   faced by Eber --

2          THE COURT:  Let's just back up a minute to this

3   Alexbay transaction.  My recollection is that if you parse

4   through the draft agreements that it is claimed Lester sent to

5   the sisters, and if one were a sophisticated lawyer, one might

6   have determined that the draft agreement, "security agreement"

7   I imagine it was called but I'm not sure, with Lester gave him

8   the right to take the stock of Metro if his loan was defaulted.

9   Yes?

10         MR. MULRY:  Yes.

11         THE COURT:  And the letters he wrote to the sisters

12  were handwritten scrawls on a page or so.  Right?

13         MR. MULRY:  There were two.  One was typed.  One was

14  handwritten, yes.

15         THE COURT:  OK.  But they were very short.

16         MR. MULRY:  Yes.  They didn't -- one or the other did

17  enclose a copy of the proposed agreement.

18         THE COURT:  Allegedly.

19         And neither letter mentioned the pledge of all of the

20  shares and the right to foreclose.  Right?

21         MR. MULRY:  Neither of the letters specifically had

22  that, no, that's correct.

23         THE COURT:  Right.  And then enlighten me.  Suppose

24  they had decided to participate in the loan, whatever exactly

25  that meant.  Then would all three of them have had the right to

L9EAKLE2ps                        Opening - Mr. Mulry

foreclose on the Metro shares in the event of a default?

MR. MULRY:  Yes.  They would have all had the same
rights that Lester had.  The proposal was that it would be a
third, a third, a third.

THE COURT:  Well, that's not what the letter said.
The letter said participate in the loan.  Right?

MR. MULRY:  I want to read the letter, but I think
that's the substance of it, yes.

THE COURT:  Right.  So --

MR. MULRY:  I would have to check.  I believe it was
clear from one of the letters that it was on an equal basis,
but that will come out.

THE COURT:  Ultimately I'm not sure that's
particularly important.

So here we have the brother, the trusted brother, who
is a trustee of the trust for their benefit, saying, I've got
this deal, here's 50 pages of typewritten fine print, and if
you want to send me some more money, you too can have this
deal.  And on that basis, you're arguing that his fiduciary
duties were discharged?

MR. MULRY:  Well, your Honor, that issue has been
addressed by Judge Parker in her most recent decision in March.
And she did take issue with the transaction, not so much for --
not for what your Honor is referring to, the offer, but with
respect to not advising the beneficiaries at the time that the

L9EAKLE2ps                    Opening - Mr. Mulry

1    interest was going to be foreclosed.  And she said that was a

2    breach.  That was her holding.

3           But very importantly, what she said is, that's not the

4    end of the inquiry.  And that's, for that particular part of

5    this case, that's where we are.  She said that, in order to

6    impose a constructive trust, which is what the plaintiffs are

7    seeking, the plaintiffs would have the burden of showing by

8    clear and convincing evidence that Lester Eber was unjustly

9    enriched by the transaction.  And that is an issue that Judge

10   Parker left for trial.  And that's at pages 20 to 22 of her

11   March 2021 decision on reconsideration motions.

12          So one of the issues, one of the important issues

13   before your Honor is whether Lester Eber was unjustly enriched.

14   And that's where these significant liabilities come in.

15   Because the issue of -- and one of the issues that Judge Parker

16   framed was, what was the value of the companies at the time of

17   the foreclosure.  And that leads to the question of, among

18   other liabilities, particularly the PBGC termination liability,

19   which Mr. Brook has referenced.  And I should probably go to

20   that because he did reference the defendants' argument as, I

21   think, "legally insane," so I should probably address that.

22          THE COURT:  Distinguished from "without merit" or

23   "irrelevant."  Let me just make sure we get these technical

24   terms down right.

25          MR. MULRY:  Right.  So with respect to the PBGC

L9EAKLE2ps                    Opening – Mr. Mulry

1     liability, to back up, Eber had a pension plan that was

2     terminated in, I believe, 2000.  So in 2000, all of the

3     benefits were locked down.

4            THE COURT:  On this value-of-the-company business,

5     your adversary takes the view that unjust enrichment for this

6     purpose neither has to be shown by clear and convincing

7     evidence, nor is it limited to at the time of the transaction,

8     by virtue of, I believe, if I remember correctly, the "no

9     further inquiry" rule.  Yes?

10           MR. MULRY:  That's what they argue, but that's not

11    what Judge Parker held.  So we have -- Judge Parker's decision

12    is the law of the case.  There are certainly things on Judge

13    Parker's decision on this issue we did not agree with.

14           THE COURT:  And which one does not lightly depart

15    from.  But it's not binding on me, right?

16           MR. MULRY:  Well, we would want the opportunity to

17    address that, your Honor, as to, under what circumstances may

18    or should the Court depart from a prior finding in the case,

19    because Judge Parker also, Judge Parker on that issue set the

20    stage for this trial, as to, what was this trial going to be

21    about.  And if we're now going to change the nature of the

22    trial in some way, well, that's a significant problem.

23           So the parties have -- or certainly the defendants are

24    prepared to meet the issues that were laid out by Judge Parker.

25    So we're prepared to meet that issue and say what was the value

1    of the business at the time of the disclosure.  But the PBGC

2    liability is very important because I think Mr. Brook tries to

3    suggest, and his expert makes the suggestion in his report,

4    that the company was not really concerned about this liability.

5    And it was only several years later that this liability was

6    determined, and it was determined that the other Eber

7    companies, including Eber-Connecticut, were liable for part of

8    the control group.  But the evidence will show that the

9    management of the company was always concerned with the

10   termination liability, going back years, before the termination

11   liability had gone up to in excess of $5 million.  So the

12   company was paying periodic minimum payments to fund the

13   pension plan, but they always knew that they had to address

14   this issue.

15        For example, the evidence will show, your Honor will

16   see, in 2009, the company made an IRS waiver application with

17   respect to one of the minimum payments.  And as part of that

18   documentation, Michael Gallagher, who was their actuary for

19   several years and was their actuary assisting with this,

20   calculated what the termination liability would be.  In other

21   words, if the company were to terminate the plan in the way

22   that PBGC would require it to be done, how much would it cost.

23        So you have his calculation there as to what was the

24   termination liability to fund all of the participants through

25   either a lump sum payment or buying an annuity, what was that,

L9EAKLE2ps                    Opening – Mr. Mulry

1     it was 9 million something, and also what were the current

2     assets of the plan, which were 4 million something, so that, in

3     2009, the termination liability for PBGC for the Eber pension

4     plan was roughly $5.5 million.

5            So throughout this period, until that PBGC liability

6     was ultimately settled, this was something that was driving how

7     the company looked at whether they could survive.  So that was

8     always present.  So there's no -- the defense will not be

9     arguing that the PBGC -- that the Western District of New York

10    decided in 2016 that there's a PBGC liability and you should

11    import that fact to 2012, 2009.  No, they were dealing with

12    that issue throughout this period.

13           And why is that important for the issue that Judge

14    Parker has framed?  Well, the question is, what would a buyer

15    of Eber-Metro look at?  What Frank Torchio, our expert, will

16    say, is there's -- and there's no -- maybe -- I'll let that

17    clarify as the experts testify.  We certainly disagree with

18    Mr. Brook's characterization of what his assumptions were.  But

19    what he's looking at is, at the time, in 2012, Eber-Metro

20    management knows about this very significant pension liability.

21    Any buyer of Eber-Metro is going to be aware of that, want to

22    address it, and price-protect, so that no one is going to buy

23    Eber-Metro and just ignore the fact that there is this

24    termination liability of in excess of $5 million.  No one is

25    going to buy Eber-Metro and say, I'm sure that will get settled

L9EAKLE2ps                      Opening - Mr. Mulry

1     down the road.

2               So Eber management always knew there was a significant

3     pension fund liability, also that all of these Eber companies

4     could be in the control group and could be liable, including

5     Eber-Connecticut.  So it's not a backward look.  It's something

6     that the company was addressing as it looked at the fact of,

7     you know, are these companies going to survive.

8               And I don't want to take up too much of the Court's

9     time, but I think the PBGC liability is very important to the

10    case.

11              Quick thing on Connecticut being a franchise state.

12    Mr. Brook had referred to that.  You'll hear testimony about

13    this.  The plaintiff's suggestion is that there are significant

14    protections to distributors in Connecticut because they have

15    protections for exclusive distributors.

16              THE COURT:  Excuse me for interrupting, and we'll come

17    back to that in a second, but prior to 2007, I think it was,

18    when there was the settlement between Southern and Eber, Slocum

19    was or was not -- excuse me -- Southern was or was not

20    distributing its products in the State of New York?

21              MR. MULRY:  Slocum -- I'm sorry.

22              THE COURT:  Southern.

23              MR. MULRY:  Southern.  Southern was distributing its

24    products in the State of New York beginning in around 2004.

25              THE COURT:  That's what I thought I understood.  So

L9EAKLE2ps                    Opening – Mr. Mulry

1    Southern needed expertise, to whatever extent an alcoholic

2    beverage distributor needs such expertise, in New York with

3    respect to doing business with the Alcohol Control Board or

4    whatever it's called, the Wine and Liquor Authority, I forget,

5    in Albany, and the regulatory setup in New York for

6    alcohol-related businesses.  Yes?

7             MR. MULRY:  Yes.

8             THE COURT:  So they were somehow managing just fine in

9    New York without Lester Eber and doing well enough, in your

10   view, to have effectively put Eber Brothers out of business or

11   on the brink of collapse in New York by the time this case got

12   settled three years later.  Yes?

13            MR. MULRY:  Well, I think their --

14            THE COURT:  Yes?

15            MR. MULRY:  The second part, I think I would ask to

16   just expand on that a little bit.  Southern comes into New York

17   to distribute.  There's a downstate distributorship in

18   Manhattan, this area here, and then upstate.  What Lee Hager

19   would say is, upstate was very different.  So that's where they

20   needed some expertise, with lobbying, consulting.  When they

21   come in -- and I don't know if your Honor's question was

22   suggesting that they were just doing fine and they were able to

23   run Eber out of business without these services, let's say.  I

24   think the point is that Southern was able to run Eber out of

25   business in New York because of their predatory practices.

L9EAKLE2ps                    Opening - Mr. Mulry

1    They came in and they paid a significant, multimillion dollars,

2    salary or bonus to their leading salesperson upstate.  In one

3    day --

4              THE COURT:  Yes, I got that.  I got that.  But

5    whatever the legislative and regulatory environment in New York

6    was, I haven't heard anything to suggest that it was any

7    different in 2008 than it was in 2006.

8              MR. MULRY:  I do know, Mr. Hager will testify that

9    these were services that Lester provided in subsequent years

10   that were necessary to them, that they saw a need for, and

11   that, if they had not hired Lester Eber for them, they would

12   have had to go out in the marketplace and get those services.

13             THE COURT:  Which presumably they had been doing for

14   the three proceeding years.

15             MR. MULRY:  I don't know that Mr. Hager testified as

16   to that.  And I don't know that that's a necessary inference.

17   They came into -- there may be a -- a competing inference that,

18   as they came into the New York market and as they saw how it

19   worked and as they saw how Albany affected the distributorship

20   issues, that they determined that they needed these services,

21   and that's what they --

22             THE COURT:  I'll be very interested to hear testimony

23   about that.

24             MR. MULRY:  OK.

25             THE COURT:  Because I think you may have a big problem

L9EAKLE2ps                    Opening – Mr. Mulry

1    here.

2              OK.

3              MR. MULRY:  I just want to check if there were other

4    things in particular that we want to go through.  And, again,

5    we don't want to take too much time.

6              THE COURT:  This is helpful.  You're getting me better

7    oriented.

8              MR. MULRY:  Just another point on that, your Honor.

9    And this will come out through probably Mr. Lester Eber's

10   testimony as well as Lee Hager's testimony, that they kept

11   Lester Eber on for several years after his consulting agreement

12   was over, which they would not have had to do -- and Mr. Hager

13   said that they were still getting value.  So we'll be mindful

14   of your --

15             THE COURT:  What rate of pay after the five years were

16   up?

17             MR. MULRY:  It went down.  Offhand I don't -- it will

18   come out what that was.

19             THE COURT:  The services became less valuable.

20             MR. MULRY:  I believe he is because I think he -- I

21   think there were less services, but we'll be mindful of making

22   sure that we've addressed -- we're addressing your Honor's

23   issues in our -- as we address this or in post-trial briefing.

24             One other issue to raise.  And this is the last issue

25   you raised with Mr. Brook, is with respect to an accounting and

L9EAKLE2ps                      Opening - Mr. Mulry

1    where does that fit in.  One thing that is very important to

2    point out is that there was, there had been an accounting.

3    There was an accounting in the Monroe County Surrogates Court.

4              THE COURT:  That was an entirely different matter.

5              MR. MULRY:  No.  It bears directly on these issues,

6    your Honor.  And that's something that we'll be presenting

7    evidence on and will work to address with your Honor at the

8    appropriate time.

9              THE COURT:  Go ahead.

10             MR. MULRY:  Could I look with co-counsel if there is

11   anything else we want to raise for your Honor, or if your Honor

12   had questions we'll be happy to do that.  Otherwise we'll be

13   happy to move forward.

14             THE COURT:  Well, I haven't had the pleasure of a

15   trial with either of you before, but as you will find out, I'm

16   not particularly bashful, especially in a non-jury case.  If

17   something is bothering me, you're going to know about that.

18             MR. MULRY:  We'll be prepared for that.  Thank you,

19   your Honor.

20             THE COURT:  OK.  We'll take a ten-minute break and

21   then we'll start testimony.

22             (Recess)

23             (Continued on next page)

24

25

L9EsKLE3                              Stein – Direct

1               THE COURT:  OK, folks.

2               Mr. Brook, call your witness.

3               MR. BROOK:  Plaintiffs call Lisa Stein to the stand.

4     LISA STEIN,

5          called as a witness by the Plaintiffs,

6          having been duly sworn, testified as follows:

7               THE DEPUTY CLERK:  Please be seated and pull your

8     chair up to the microphone.

9               Please state your name and spell your last name for

10    the record.

11              THE WITNESS:  Lisa Stein, S-t-e-i-n.

12              THE COURT:  Counsel, you may proceed.

13              MR. BROOK:  Yes, your Honor.

14              I do apologize.  I think this is my mistake.  I don't

15    have the declaration loaded up and ready to go.  I might need

16    30 seconds to get that up there, if your Honor wants me to put

17    that on the screen.

18              THE COURT:  Yes, I think you need to do that.

19              MR. BROOK:  Yes, just to make sure it is the same

20    thing.

21              (Pause)

22              I'll lay a foundation, I guess, now.

23    DIRECT EXAMINATION

24    BY MR. BROOK:

25    Q.  Ms. Stein, before this trial, did you work with me to

L9EsKLE3                          Stein – Direct

1   prepare a written statement of what you would say in this case?

2   A.  I did.

3   Q.  Did you review that statement carefully?

4   A.  I did.

5   Q.  And did you sign that statement realizing that you were

6   doing so under penalty of perjury?

7   A.  Yes.

8   Q.  Do you reaffirm the statements that you made in that

9   declaration today?

10  A.  Yes.

11  Q.  OK.  We will, as soon as possible, put it up on the screen

12  to confirm that it is your signature on it.

13          (Pause)

14          THE COURT:  Is it on the screen?

15          MS. KRAL:  Yes.  It's taking a moment.

16          MR. BROOK:  The first exhibit of the day, I guess.

17          THE COURT:  Does it have an exhibit number?

18          MR. BROOK:  It does not.  I don't believe that either

19  party has put exhibit numbers on the declarations.

20          THE COURT:  We will make this Plaintiffs' Exhibit

21  1001.

22          MR. BROOK:  OK.

23          THE COURT:  You'll get it marked in due course.

24          MR. BROOK:  Yes, sir.

25          MS. KRAL:  All right there.

L9EsKLE3                          Stein - Direct

| | |
|---|---|
| 1 | THE COURT:  Ms. Stein, can you see it on your screen? |
| 2 | THE WITNESS:  I cannot. |
| 3 | MS. KRAL:  One moment, please. |
| 4 | MR. BROOK:  The software crashed, your Honor. |
| 5 | MS. KRAL:  This is not coming on either.  I can't get |
| 6 | this on. |
| 7 | MR. SANTORO:  We might be able to pull it up. |
| 8 | THE COURT:  Do you have a hard copy? |
| 9 | MR. BROOK:  We're actually not sure we do, your Honor. |
| 10 | THE COURT:  Why don't we mark the hard copy. |
| 11 | MR. BROOK:  I'm sorry, your Honor.  I actually don't |
| 12 | believe I have a hard copy it of it.  I traveled here from |
| 13 | California rather than my local office. |
| 14 | (Counsel confer) |
| 15 | We're not able to switch other. |
| 16 | MS. KRAL:  We're not able to switch over. |
| 17 | THE WITNESS:  Something just happened. |
| 18 | MS. KRAL:  It's this system that closed it. |
| 19 | MR. BROOK:  We're working on it. |
| 20 | THE WITNESS:  No.  It's back to the main page. |
| 21 | (Discussion off the record) |
| 22 | THE COURT:  All right.  We'll use my hard copy. |
| 23 | MR. BROOK:  Thank you, your Honor. |
| 24 | THE COURT:  Ms. Stein, I show you a document marked |
| 25 | Plaintiffs' Exhibit 1001 for identification. |

L9EsKLE3                          Stein - Direct

1            THE WITNESS:  Thank you.

2            THE COURT:  Next question, counselor.

3   BY MR. BROOK:

4   Q.  Do you recognize this document?

5   A.  Yes.

6   Q.  What do you recognize it to be?

7   A.  My statement.

8   Q.  If you look at the last page, is that your signature?

9   A.  It is.

10           MR. BROOK:  Your Honor, plaintiffs offer, for your

11  Honor's individual practices, Exhibit 1001 into evidence.

12           MR. SANTORO:  Your Honor, for the defendants, we have

13  several objections to the content of the declaration on

14  evidentiary grounds.

15           THE COURT:  Are you going to share any of them with

16  me?

17           MR. SANTORO:  Yes, your Honor.  I just didn't know

18  your Honor's practices with respect to them.  I can recite them

19  and we can go through them.

20           THE COURT:  Let's get the ground rules straight.  It

21  is almost always the case, key word being almost, that I will

22  take anything that's offered subject to whatever objections are

23  made.  And I will make clear either by my ruling or otherwise

24  what ultimately I decide about admissibility.  In a nonjury

25  trial, the rules are relaxed, in many cases by many judges and

L9EsKLE3                        Stein - Direct

1    no point taking a lot of time.

2                If you want to make your record, make your record.

3                MR. SANTORO:  I will, your Honor, very quickly.

4                So with paragraph three, we would move to strike the

5    last sentence on the grounds of hearsay.

6                Paragraph seven, we would move to strike the last full

7    sentence on the grounds of hearsay.

8                Paragraph 11, we would seek to strike in its entirety

9    on the grounds of relevance.

10               Paragraph 16, we would move to strike in its entirety

11   on the grounds of hearsay.

12               Paragraph 17, we would like to strike in its entirety

13   on the grounds of hearsay.

14               Paragraph 12, the first sentence and the last sentence

15   contain content that are barred by New York's Dead Man's

16   Statute, CPLR 4519, and we would object on those grounds.

17               THE COURT:  It's received subject to the objections.

18               MR. SANTORO:  Thank you, your Honor.

19               (Plaintiffs' Exhibit 1001 received in evidence)

20               MR. BROOK:  Your Honor, I should note, this is the

21   first time I'm hearing these objections.

22               THE COURT:  Spare me.

23               MR. BROOK:  No further questions for this witness

24   then, your Honor.

25               THE COURT:  Cross-examination, Mr. Santoro.

L9EsKLE3                          Cross - Stein

1           MR. SANTORO:  Thank you, your Honor.

2    CROSS-EXAMINATION

3    Q.  Good morning, Ms. Stein.

4           MR. SANTORO:  May I proceed, your Honor?

5           THE COURT:  Yes, you may.

6    Q.  Good morning, Ms. Stein.

7    A.  Good morning.

8    Q.  I would like to direct you to paragraph 20 -- rather,

9    paragraph 24 of your declaration.

10          In that paragraph, you refer to Exhibit 33, which I'm

11   going to share with you on the screen.

12          MR. SANTORO:  OK.  If you could scroll through that,

13   Samantha, so that the witness can see it.  It's a four-page

14   document.

15   Q.  Now, this is the order of the Monroe County surrogate's

16   court that you refer to in your declaration that's in evidence,

17   correct?

18   A.  Yes.

19   Q.  Now, in paragraph 20 of --

20          THE COURT:  Excuse me.  Let's clarify one thing.

21          Mr. Brock, I assume when you offered Plaintiffs' 1001,

22   you were also offering the exhibits referred to in it?

23          MR. BROOK:  Yes, your Honor.

24          THE COURT:  So the record is clear, would you recite

25   what those are?

L9EsKLE3                          Cross - Stein

1          MR. BROOK:  Well, I will, so the record is clear, I

2     will note that the plaintiffs and defense just agreed before

3     your Honor agreed to the courtroom that we will essentially

4     admit everything on our prospective lists except for that to

5     which is objected and --

6          THE COURT:  Just tell me what the exhibits are.

7          MR. BROOK:  I just have to do a word search.

8          THE COURT:  I don't need a statement.

9          MR. BROOK:  We offer Exhibits 155, 178, 258, 33 being

10    shown now, 32.  And that appears to be all the exhibits for

11    this witness, your Honor.

12         THE COURT:  OK.

13         MR. SANTORO:  Your Honor, the only objection we have

14    to those exhibits is to Exhibit 178, which is a news article,

15    on the ordinary grounds, hearsay, relevance.

16         (Plaintiffs' Exhibits 155, 178, 258, 33 and 32

17    received in evidence)

18         THE COURT:  Received subject to the objections.

19         Go ahead.

20    BY MR. SANTORO:

21    Q.  Ms. Stein, if you look at paragraph 20 of your declaration,

22    you have the hard copy in front of you?

23    A.  I do.

24    Q.  OK.  It states that you received a stack of papers from

25    CNB, that's Canandaigua National Bank, correct?

L9EsKLE3                           Cross - Stein

1    A.   Yes.

2    Q.   About a filing in the surrogate's court for Monroe County,

3    is that correct?

4    A.   Yes.

5    Q.   Do you see that there?

6    A.   Yes.

7    Q.   So I would like to show you what's been marked as

8    Defendants' Exhibit OOOO, and we'll pull it up on the screen

9    for you.   It's 107-page document entitled Petition for Judicial

10   Settlement of Final Account, with an accounting and various

11   proofs of service.

12           Now, if you want, we can scroll through that, but is

13   that the stack of papers that you received from Canandaigua

14   National Bank?

15   A.   I can't remember totally if they are the exact amount, the

16   exact papers.

17   Q.   OK.   Can you tell me the papers you received from CNB

18   National Bank were?

19   A.   To be honest, I'm not a real detailed person, so I cannot

20   give you that answer.

21   Q.   OK.   So, now, at the time --

22           MR. SANTORO:   You can take that down, Samantha.

23   Q.   Now, at the time that you received that stack of papers

24   from CNB, you understood that CNB was passing the Monroe County

25   surrogate's court to terminate the trust, correct?

L9EsKLE3                          Cross - Stein

1    A.  Yes.

2    Q.  And you understood that CNB was asking the Monroe County

3    surrogate's court to terminate the trust on the grounds that

4    the stock of Eber Brothers had no value, correct?

5    A.  The grounds of the stock had no value.

6            I'm not --

7            To terminate the trust because the grounds that it had

8    no value?  To be honest, I thought we were terminating the

9    trust and I didn't really relate it to the stock.  I just knew

10   that my mom had -- that it came from my mom, and that's what my

11   mother had done, had received.  I thought our stock was in

12   check, that there was not a problem with our stock.

13   Q.  So I point you to paragraph 21 of your declaration.

14           Do you have that in front of you?

15   A.  Yes.

16   Q.  It states that, CNB's petition argued that it could

17   terminate the trust early based on a provision in my

18   grandfather's will that allowed the trustee to terminate the

19   trust if Eber Brothers was sold.  Even though Eber was not

20   sold, CNB argued that the stock was worthless since it no

21   longer held the Connecticut assets.

22           Do you see that?

23   A.  I do.

24   Q.  Was that your understanding at the time you received the

25   stack of papers from CNB?

L9EsKLE3                          Cross - Stein

```
1    A.  It was my understanding that the stock was worthless, but I
2    thought I was going to retain my shares.
3    Q.  Now, that proceeding moved forward, correct?
4    A.  I'm sorry.  Repeat that?
5    Q.  I'm sorry.
6            The surrogate's court Monroe County proceeding moved
7    forward, correct?
8            THE COURT:  How would she know?
9            THE WITNESS:  Thank you.
10           MR. SANTORO:  If we can show the witness
11   Plaintiffs' 33, Samantha.
12           THE COURT:  Counsel, what are we wasting all this time
13   for?
14           THE WITNESS:  Thank you.
15           THE COURT:  There is absolutely no dispute, right?
16           There was a petition filed of which I can take
17   judicial notice.  There was a decree of which I can take
18   judicial notice.  Nobody disputes any of this, right?
19           That was a question.
20           MR. SANTORO:  I'm sorry, your Honor.
21           Yes, I think that is the case.  The plaintiffs are
22   relying on the preclusive effect of that order.
23           THE COURT:  Yes.
24           But with all due respect for Ms. Stein, I'm sure she
25   is an extremely bright lady, I don't think she has yet taken
```

L9EsKLE3                          Cross - Stein

1    trust in estates at an accredited law school.

2              Let's get on.

3              MR. SANTORO:  OK.  Just one further question on that.

4    Q.  Your declaration talks about what you did after receiving

5    that stack of papers.

6              You didn't take any steps to ask the Monroe County --

7    the Monroe County surrogate's court to hold that proceeding in

8    abeyance, did you?

9    A.  To hold the proceeding in what?

10   Q.  In abeyance.

11   A.  I didn't have a reason to do that.

12   Q.  Well, did you?

13   A.  No.

14   Q.  And there was no request by your brother to ask the Monroe

15   County surrogate's court to stand down in the face of this

16   proceeding, correct?

17   A.  I don't know -- I cannot say yes or no to that.

18             MR. SANTORO:  OK.  I have no further questions,

19   your Honor.

20             THE COURT:  Thank you.

21             Anything else, Mr. Brook?

22             MR. BROOK:  No, your Honor.

23             THE COURT:  All right.  Thank you, Ms. Stein.

24             THE WITNESS:  Thank you.

25             I'll leave this here for the next person.

L9EsKLE3                          Hays - Direct

1          THE COURT:  That's great.  I'll put it back in my
2     notebook.  Thank you.
3          (Witness excused)
4          MR. BROOK:  Your Honor, I'm told that my assistant
5     needs a couple minutes to load the next declaration still, but
6     why don't we go ahead, and plaintiffs will call Audrey Hays to
7     the stand.
8      AUDREY HAYS,
9          called as a witness by the Plaintiffs,
10         having been duly sworn, testified as follows:
11         THE DEPUTY CLERK:  Please be seated.  If you can pull
12    your chair up to the microphone a little bit.
13         Thank you.
14         Please state your name and spell your last name for
15    the record.
16         THE WITNESS:  Audrey Hays, H-a-y-s.
17         THE COURT:  You may proceed, counsel.
18         MR. BROOK:  Thank you.
19    DIRECT EXAMINATION
20    BY MR. BROOK:
21    Q.  Good morning, Audrey.
22    A.  Good morning.
23    Q.  You got in late last night from Colorado, is that right?
24    A.  I did.
25    Q.  Are you not too jet lagged?

1   A.  No, I'm fine.

2   Q.  Do you remember a little over a week ago working with me to

3   prepare a declaration of your testimony in this case?

4   A.  Yes.

5   Q.  And when you did so, did the information that you provided

6   to me, did you endeavor it to be completely truthful in doing

7   that?

8   A.  Yes.

9   Q.  And did you review the written statement that I prepared

10  for you?

11  A.  Yes.

12  Q.  And did you make corrections to it, if necessary?

13  A.  Initially or at the end?

14  Q.  Just over the course of the back and forth?

15  A.  Yes.

16  Q.  And you ultimately signed that under penalty of perjury,

17  correct?

18  A.  That's correct.

19  Q.  And before doing so, did you review the document again one

20  more time to make sure it was truthful?

21  A.  Yes.

22  Q.  OK.  Are we able to put that up on the screen?

23       MS. KRAL:  We're actually not getting a signal here.

24  I don't know if something has come up, but we don't have a

25  signal.

1          I've used two computers now.  Do we have the tech

2     person here?

3          THE DEPUTY CLERK:  Well, they aren't here now,

4     although ...

5          (Discussion off the record)

6          THE COURT:  Let's proceed.  The statement is marked

7     Plaintiffs' 1002 for identification.

8          MR. BROOK:  Yes, your Honor.

9          THE COURT:  According to my notes, the statement

10    references Plaintiffs' Exhibits 32, 154, 78, 4, 133 through

11    135, 42, 35, 164, and 149.

12          Anyone disagree with that, or are there any omissions?

13          MR. BROOK:  Not to my knowledge, your Honor.

14          THE COURT:  Mr. Mulry?

15          MR. MULRY:  No.

16          THE COURT:  OK.  Let's go.

17          MR. MULRY:  No, your Honor.  Sorry.

18          MR. BROOK:  Plaintiffs offer into evidence

19    Exhibit 1002 the exhibits referenced therein.

20          THE COURT:  Same objections?

21          MR. SANTORO:  Yes, your Honor.

22          I'll recite our objections to the content of the

23    cross-examination.

24          With respect to paragraph 12, we would object in its

25    entirety on the grounds of relevance, foundation, and barred

L9EsKLE3                           Hays - Direct

1    lay opinion.

2             Paragraph 18, we would object to the first sentence

3    and the last sentence on the grounds of the Dead Man's Statute.

4             We would also object to the last sentence on the

5    grounds of relevance.

6             Paragraph 17, we would object on the grounds of

7    relevance and foundation.

8             Paragraph 21, we would object to the entire paragraph

9    on the grounds of the Dead Man's Statute, CPLR 4519.

10             Paragraph 24, the same, the entirety of the program

11    based on the Dead Man's Statute.

12             Paragraph 30, we would object to references to Lester

13    on the Dead Man's Statute.

14             And then I think that's it.

15             Thanks, your Honor.

16             THE COURT:  They are all received subject to the

17    objections.

18             (Plaintiff's Exhibits 1002, 32, 154, 78, 4, 133

19    through 135, 42, 35, 164, and 149 received in evidence)

20             MR. BROOK:  Given that one of the objections is

21    foundation, I will ask Ms. Hays a couple of followup questions

22    with your Honor's permission.

23             THE COURT:  Of course.

24             MR. BROOK:  If you could, please, Ali, flip to

25    paragraph 12.  I think that's one page up.

L9EsKLE3                        Cross - Hays

1    BY MR. BROOK:

2    Q.  Audrey, would you please read that paragraph?

3    A.  I recall one time when my cousin --

4            THE COURT:  Ms. Hays, just read it to yourself.

5            MR. BROOK:  Just read to to yourself and let me know

6    when you're done.

7    A.  I'm sorry.

8            Done.

9    Q.  What is, in this case, you mentioned that you had an

10   opinion about Wendy.

11           Could you elaborate on how you came to form that

12   opinion?

13           What happened?

14           THE COURT:  I'm not going to allow it.

15           MR. BROOK:  OK, your Honor.  Worth a try.

16           Nothing further.

17           THE COURT:  Cross-examination?

18           MR. SANTORO:  Yes, your Honor.

19   CROSS-EXAMINATION

20   BY MR. SANTORO:

21   Q.  Good morning, Ms. Hays.  I want to show you Petitioner's

22   Exhibit 135.

23           If you look at paragraph 33 of your declaration, I

24   think you say that this exhibit, which is 11 pages, was part of

25   a larger package that you received about the proceeding by CNB

L9EsKLE3                          Cross - Hays

1    and the Monroe County surrogate's court, correct?

2    A.  Correct.

3    Q.  I would like to show you Exhibit OOOO.

4           MR. SANTORO:  Your Honor, I would like to offer OOOO

5    into evidence.  I don't believe there are any objection to it.

6    It is a complete copy of the petition and the accounting and

7    the proofs.

8           MR. BROOK:  No objection.

9           THE COURT:  Received.

10          (Defendant's Exhibit OOOO received in evidence)

11          MR. SANTORO:  Thank you, your Honor.  I have no

12   further questions.

13          THE COURT:  Thank you.

14          Anything, counselor?

15          MR. BROOK:  Plaintiffs next call Daniel Kleeberg.

16          THE COURT:  I'm sorry.  You're excused, Ms. Hays.

17          THE WITNESS:  Thank you.

18          (Witness excused)

19          THE COURT:  Just for everybody's guidance, we are

20   going to take a lunch break from 12:30 until 2:00.  If everyone

21   is here at four o'clock in another matter, we will break for a

22   sentencing.  Otherwise, we will continue to 4:30.

23    DANIEL KLEEBERG,

24       called as a witness by the Plaintiffs,

25       having been duly sworn, testified as follows:

L9EsKLE3                          Kleeberg - Direct

1          THE DEPUTY CLERK:  Please state your name and spell

2     your last name for the record.

3          THE WITNESS:  Daniel Kleeberg, K-l-e-e-b-e-r-g.

4          THE COURT:  You may proceed, counselor.

5     DIRECT EXAMINATION

6     BY MR. BROOK:

7     Q.  Good morning, Dan.

8     A.  Good morning.

9     Q.  Is it correct that, about two weeks ago, you and I started

10    working on preparing a written statement for your testimony in

11    this case?

12    A.  That is correct.

13    Q.  And you and I discussed that significantly back and forth

14    over many days?

15    A.  Yes, we did.

16    Q.  And at the end of the day, there was a final version that

17    was produced, correct?

18    A.  Yes.

19    Q.  Did you review that document carefully?

20    A.  Yes.

21    Q.  And did you ultimately sign that document, knowing you were

22    doing so under penalty of perjury?

23    A.  Yes, I did.

24          MR. BROOK:  OK.  I would like to put up Exhibit 1003.

25          If you can please scroll to the last page.

1          MS. KRAL:  Is that Kleeberg?

2          MR. BROOK:  This is the declaration of Daniel

3     Kleeberg, please, Ali.  Scroll to the last page.  I believe

4     it's page 12.

5     BY MR. BROOK:

6     Q.  Do you see that in front of you, Dan?

7     A.  Yes, I do.

8     Q.  Is that your signature?

9     A.  Yes, it is.

10         MR. BROOK:  OK.  Now, your Honor, in accordance with

11    your Honor's individual rules, I would like to broach a topic

12    that was not in the statement.

13         Does your Honor require me to go into the good cause

14    for that at this time?

15         THE COURT:  I can't understand what you're saying.

16         MR. BROOK:  Your Honor's individual rules say that

17    questions are limited to the statement without showing good

18    cause.  There was something that my client told me yesterday

19    about what he had to say in response to something that was in

20    Wendy Eber's declaration that I would like to elicit with your

21    Honor's consent.

22         THE COURT:  Go ahead.

23    BY MR. BROOK:

24    Q.  Dan, are you familiar with the brand Yellow Tail Wines?

25    A.  Yes, I am.

1    Q.  Who owned Yellow Tail Wines?

2    A.  William Deutsch & Company.

3    Q.  Do you know William Deutsch?

4    A.  Bill Deutsch, I know him very well.

5    Q.  Did you ever discuss the company Eber-Connecticut with

6    Bill Deutsch?

7              MR. SANTORO:  Objection, your Honor.

8              THE COURT:  Overruled.

9    A.  Yes, I did.

10             THE COURT:  Next question.

11             THE WITNESS:  Overruled?  Sorry.

12   Q.  Was it your understanding at the time that he was in a

13   business relationship with Eber-Connecticut?

14   A.  Yes, I did.

15   Q.  What did he tell you about his current state of affairs

16   with Eber-Connecticut?

17             MR. SANTORO:  Objection, your Honor, hearsay.

18             THE COURT:  Purpose for which it is offered?

19             MR. BROOK:  It is being offered to show the then

20   existing state of mind for Bill Deutsch, as it goes to a

21   decision that he made that is something that Wendy Eber

22   testified about a lot in her testimony.  So it is a present

23   sense impression is the exception to the hearsay.

24             THE COURT:  It is a present sense?

25             MR. BROOK:  Then existing state of mind.  It goes to

L9EsKLE3                          Kleeberg - Direct

1   his mental state, he is going to testify.

2          THE COURT:  How is his mental state at issue?

3          MR. BROOK:  His mental state is at issue, I will

4   concede, it is totally tangential, to the extent that Wendy

5   Eber is offering testimony whining about how Eber-Connecticut

6   lost this major supplier, as it lost the exclusive rights to

7   it.  Mr. Kleeberg can offer testimony that will show that it

8   was because Lester Eber was distracted and not paying enough

9   attention to --

10          THE COURT:  What does Wendy Eber say about why they

11   lost the account?

12          MR. BROOK:  She actually does not offer a reason.  She

13   just references it several times as the reason why the company

14   was doing poorly, and Lester needed to loan it money.

15          THE COURT:  Mr. Santoro?

16          MR. SANTORO:  Your Honor, I think the idea that it is

17   a state of mind is stretching the hearsay rules to the degree

18   where they don't go.  Then I'm not sure the anticipatory direct

19   for really what is a rebuttal question is appropriate here.

20          THE COURT:  Well, if it were asked on rebuttal, would

21   you have an objection to it?

22          MR. SANTORO:  I would.  It falls squarely within the

23   realm of hearsay without an exception.

24          THE COURT:  Sustained.

25          MR. BROOK:  OK.  Nothing further, your Honor.

L9EsKLE3                          Kleeberg - Direct

1              THE COURT:  All right.  Thank you.

2              Are you offering 1003?

3              MR. BROOK:  Of course.  I jumped ahead.

4              Your Honor, I offer Exhibit 1003 and the exhibits

5    referenced therein, which I --

6              THE COURT:  There are not, I believe.  Is that right?

7              MR. BROOK:  There actually are a few.  I'm not sure

8    there is anything new in there, except perhaps Exhibit 1 --

9              THE COURT:  Tell me what they are, please.

10             MR. BROOK:  I'll go through the exhibits.

11   Exhibits 132, the will of Allen Eber, Exhibit 49, Exhibit 4,

12   Exhibit 78, Exhibit 5 --

13             I'm sorry.  I'm reading Hays' declaration.  I

14   apologize, your Honor.

15             Are there no exhibits in there?  In that case there

16   are no exhibits, your Honor.

17             THE COURT:  1003 is received.

18             (Plaintiffs' Exhibit 1003 received in evidence)

19             THE COURT:  Cross-examination.

20             MR. SANTORO:  Your Honor, we have objections, if I can

21   recite them.  These are a little longer.  I just beg the

22   court's indulgence.

23             On the grounds of the Dead Man's Statute, we object to

24   the first sentence of paragraph 16 in its entirety and the last

25   sentence of paragraph 16.

L9EsKLE3                         Kleeberg – Direct

1          Paragraph 17, we object on the Dead Man's Statute, to

2     the extent that it reflects a transaction with Lester,

3     discussion with Lester.

4          Paragraph 19, we object on the Dead Man's Statute on

5     the grounds of observation of Lester.

6          Paragraph 20, same objection, Dead Man's Statute.

7          Paragraph 21, we object on the grounds of the Dead

8     Man's Statute.

9          Paragraph 23, we object to the first two full

10    sentences.

11         Paragraph 24, we object to the second third and first

12    sentence on the grounds of the Dead Man's Statute.

13         Paragraph 27, insofar as it recites what Lester was

14    doing, we object on the Dead Man's Statute.

15         Paragraph 29, 30, and 34, we object in their entirety.

16         And we object to paragraph 42 on the Dead Man's

17    Statute for the first full sentence and the last sentence.

18         THE COURT:  They are all received subject to the

19    objections.

20         But let's focus on this Dead Man's Statute for a

21    minute.

22         You are excused.

23         Do you have any questions for Mr. Kleeberg?

24         MR. SANTORO:  Yes, I do.

25         THE COURT:  You do.  Let's hold off a minute.

1             MR. SANTORO:  I just have a couple of other objections

2    on the grounds of hearsay.

3             Paragraphs 20 contain hearsay statements.

4             Paragraph 37, in its entirety.

5             Paragraph 46.

6             And then on the grounds of foundation, we object to

7    paragraph 15 and paragraph 29 in its entirety.

8             That's it.

9             THE COURT:  All right.  Received subject to the

10   objections.

11            Before we start on the cross, let me just clarify

12   something in my mind.

13            It's been a long time since I've had a Dead Man's

14   Statute case, though I've had at least one that I can remember.

15   It's an objection, I believe, that is assertable only by the

16   estate.

17            Am I right about that?

18            MR. SANTORO:  That's correct, your Honor.

19            My client, Wendy Eber, is the fiduciary of the estate

20   of Lester Eber.

21            THE COURT:  She's also sued in her individual

22   capacity, is she not?

23            MR. SANTORO:  That's correct.

24            THE COURT:  All right.  So to whatever extent there is

25   merit to the Dead Man's Statute argument, it does not affect

L9EsKLE3                        Kleeberg - Direct

1    its admissibility with respect to Wendy Eber, right?

2            MR. SANTORO:  Well, I don't believe so, your Honor,

3    because the transactions that are being objected to and

4    transactions in the broadest sense -- observations,

5    discussions -- are with Lester Eber.

6            THE COURT:  Yes, I understand that.

7            But the first question I put to you is that it is an

8    objection assertable by the estate, and I thought I understood

9    you to say you agreed with that.

10           MR. SANTORO:  That's correct.

11           THE COURT:  OK.  And Wendy Eber is sued both in her

12   capacity as executor and in her individual capacity, yes?

13           MR. SANTORO:  Yes.

14           THE COURT:  And to the extent the objection has any

15   validity with respect to the claims against the estate and

16   Wendy Eber as trustee, or fiduciary, that's one thing.

17           But the objection doesn't affect the claim against her

18   individually, am I right?

19           MR. SANTORO:  Well, it's a question of whether it

20   comes into evidence.

21           THE COURT:  Of course, but you got two defendants.

22   Three defendants.  You've got the estate, the fiduciary for the

23   estate, and Wendy Eber.  They could, in theory, be all separate

24   persons, right?

25           And the law treats them as at least two different

1    persons, the estate sued and the person of the fiduciary of the

2    estate, and Wendy Eber personally.

3              I understand your answer to be inconsistent.  You're

4    saying it is not admissible against the estate, but it is

5    admissible against her in her individual capacity.  That's one

6    proposition.

7              And then you say but it goes to whether it comes into

8    evidence, to which I say, yeah, you're right, insofar as it

9    affects the state only and her suit, her being sued in her

10   representative -- or fiduciary, excuse me -- capacity, it does

11   not affect the claim against her.

12             It comes into evidence against her, isn't that right?

13             MR. SANTORO:  Frankly, your Honor, I'm not sure.  I

14   would be happy to brief that issue for your Honor.

15             THE COURT:  Well, you're welcome to do that, but

16   that's my understanding.

17             Now, we also have some corporate entities that are

18   named as defendants, and if I'm right about it being

19   admissible, notwithstanding even a valid Dead Man's Statute

20   objection on behalf of the estate against Wendy Eber in her

21   individual capacity, it would be admissible against any of the

22   entity defendants, yes?

23             MR. SANTORO:  The entity defendants are nominal

24   defendants.

25             THE COURT:  Maybe they are, maybe they aren't,

L9EsKLE3                    Kleeberg - Direct

1    actually.  I know you've identified them as such, but...

2              MR. SANTORO:  I'm not certain, your Honor.

3              Your Honor very well may be right, but my

4    understanding of the statute under these circumstances that

5    would bar it from evidence, but we can certainly look into that

6    issue and provide a full brief.

7              THE COURT:  OK.  Your position, counselor?

8              MR. BROOK:  Well, I will confess, I am not

9    particularly familiar with the Dead Man's Statute other than it

10   came up a lot in discussions with the lawyer for the estate

11   extensively.

12             I believe we debated whether it was really applicable

13   in federal court at all.  I believe it can be, but I think --

14             THE COURT:  It is.  It is in a diversity case.

15             MR. BROOK:  Certainly.  I believe your Honor is

16   correct.  There are numerous defendants in this case, and even

17   though some are denominated as nominal defendants because there

18   is derivative claims on behalf of them, the fact is they are

19   controlled by or were controlled by the defendants.  Therefore,

20   there is diversity.  In addition, other hearsay exceptions that

21   should be considered as to these other entities, I believe most

22   of the statements still considered admissions by party

23   opponent, given Lester was saying them, unless it has something

24   to do with purely personal life.  If he is saying here is the

25   business, here is what we're doing with that --

L9EsKLE3                    Cross - Kleeberg

1              THE COURT:  I understand.  Well, you know --

2              MR. SANTORO:  Your Honor, just if I may address that?

3         There is no admission exception to the Dead Man's

4    Statute rule, as far as I know.

5              THE COURT:  I understand that.  Of course.  But you've

6    got to focus on this capacity issue.  If a statement was made

7    by Lester Eber, and it was a statement on behalf of, speaking

8    loosely, corporation X.  My understanding is that there is no

9    hearsay objection assertable by corporation X because he's an

10   agent.  And on my assumption, operating within the scope of his

11   employment in making the statement -- and there would be

12   possibly, but you're going to have an opportunity to brief

13   it -- no Dead Man's Statute objection on behalf of the entity

14   because it's not a claim against the estate, or the estate's

15   fiduciary, in the representative or fiduciary capacity.

16             That's my present understanding, but, of course, I'm

17   willing to be educated.

18             MR. SANTORO:  Thank you, your Honor.

19             THE COURT:  OK.  Now let's have the cross-examination.

20             MR. SANTORO:  Thank you.

21   CROSS-EXAMINATION

22   BY MR. SANTORO:

23   Q.  Good morning, Mr. Kleeberg.

24   A.  Good morning.

25             MR. SANTORO:  May I proceed, your Honor?

L9EsKLE3                          Cross - Kleeberg

1            THE COURT:  Yes, of course.

2    Q.  So, Mr. Kleeberg, you worked for Eber Wine & Liquor,

3    correct?

4    A.  Correct.

5    Q.  This was, as you say in your direct testimony, a family

6    business?

7    A.  That is correct.

8    Q.  And you're a general manager of the Buffalo office of

9    Eber Wine & Liquor he in the early 2000s, correct?

10   A.  That is correct.

11   Q.  And then shortly thereafter you became a senior vice

12   president, right?

13   A.  Correct.

14   Q.  And that was the number two position in Eber Wine & Liquor?

15   A.  That is correct.

16   Q.  OK.  In that role as senior vice president, in the number

17   two position, you oversaw the entire New York State market?

18   A.  No.

19   Q.  That's right.  You oversaw only the Upstate New York

20   market, correct?

21   A.  That is correct.

22   Q.  OK.  And Upstate is, for these purposes, Albany through the

23   Buffalo area and to the southern tier, correct?

24   A.  Yes.

25   Q.  You didn't oversee at all the New York Metropolitan area?

L9EsKLE3                              Cross - Kleeberg

1   A.   No, I did not.

2   Q.   And that was within the realm of Eber-Metro, correct?

3   A.   Correct.

4   Q.   So Eber-Metro, just to make it more clear, Eber-Metro was

5   the company that handled operations under the wine and liquor

6   umbrella in the New York City market, correct?

7   A.   Correct.

8   Q.   And you were never employed by Eber-Metro, right?

9   A.   No, I was never employed by them.

10  Q.   And then when it came to Eber Wine & Liquor, your oversight

11  responsibility was really limited to sales, correct?

12  A.   Correct.

13  Q.   OK.  Supervising sales managers?

14  A.   Yes.

15  Q.   Now, in the course of your employment with Eber Wine &

16  Liquor, did you ever perform any work relating to the

17  Eber-Metro business?

18  A.   Not specifically.  I would attend meetings there and work

19  with some of their managers, but I did not get involved in

20  their daily business.

21  Q.   OK.  And you never worked for Eber-Connecticut, correct?

22  A.   That is correct.

23  Q.   Now, as your declaration states, in 2005, Southern Wine &

24  Spirits entered into the New York State market, right?

25  A.   Yes.

L9EsKLE3                         Cross - Kleeberg

1  Q.  And that was devastating to Eber Wine & Liquor's business,

2  right?

3           THE COURT:  Sustained as to form.

4  Q.  Would you agree with me that Southern entering into

5  New York State was devastating to Eber Wine & Liquor's

6  business?

7           THE COURT:  Same ruling.

8  Q.  How would you characterize Southern entering into the New

9  York State market insofar as it affected Eber Wine & Liquor's

10 business?

11 A.  It was well anticipated.  We knew that this was going to

12 happen, and it did affect our business.  There is no deny -- we

13 can't deny that.

14          But it also presented an opportunity, in my mind, of

15 solidifying our situation with a company that was worth

16 billions of dollars and making some kind of arrangement to stay

17 afloat.

18 Q.  It, nevertheless, affected Eber Wine & Liquor's business,

19 right?

20 A.  It negatively affected it.

21 Q.  Is that right?

22 A.  Initially, yes.

23 Q.  So soon after Southern entered the New York State market,

24 started poaching Eber Wine & Liquor employees, correct?

25 A.  Yes.

L9EsKLE3                              Cross - Kleeberg

1              THE COURT:  That's what it says in paragraph 18.

2              MR. SANTORO:  Just foundationally, your Honor, I'm

3    trying to orient the witness to my next question.

4    Q.  So you referenced Dan Sisto, correct?

5    A.  Yes.

6    Q.  Where did he work from?

7    A.  Syracuse, New York.

8    Q.  And he was employed by Eber Wine & Liquor?

9    A.  That is correct.

10   Q.  And not Eber-Metro, is that correct?

11   A.  Correct.

12   Q.  And Southern poached at least 30 other salespeople from

13   Eber Wine & Liquor, right?

14   A.  No, that's not correct.  Dan Sisto approached them by

15   working through Southern.  Southern didn't directly go after

16   them.  It was Dan Sisto who specifically made the calls and

17   went after the employees, mostly in Albany and Syracuse.

18   Q.  And that was when he was working with Southern?

19   A.  That's when Southern gave him a bonus to approach our

20   employees.

21   Q.  So is it fair to say that Southern was, at that point,

22   attempting to take over the Upstate New York market?

23   A.  Yes.

24   Q.  OK.  Not just the New York City market?

25   A.  Correct.

L9EsKLE3                         Cross - Kleeberg

```
1   Q.  So you left Eber Wine & Liquor in August 31, 2007?
2   A.  That is correct.
3   Q.  And the reason why you did was because Eber Wine & Liquor
4   was in the final process of liquidation and you wanted to move
5   on with a new career, correct?
6   A.  Not totally correct.  There was another part to that.
7   Q.  OK.  You didn't see a future with Eber Brothers that time,
8   right?
9   A.  No.  I was told there was no future by -- Lester Eber told
10  me that I would be -- I would no longer be paid at the end of
11  August and it was time for me to move on.
12           MR. SANTORO:  Just move to strike as nonresponsive,
13  your Honor.
14           THE COURT:  Overruled.
15  Q.  OK.  So by early 2007, Eber Wine & Liquor began the process
16  of liquidation, correct?
17  A.  That is correct.
18  Q.  And it was at the -- it was no longer operating by the
19  summer of 2007, correct?
20  A.  No.  We were still operating.  We were going through a
21  liquidation.
22  Q.  OK.  But other than liquidating its assets, was there any
23  operations going on?
24  A.  Not that I'm aware of.
25  Q.  OK.  And you were working there at the time?
```

L9EsKLE3                         Cross - Kleeberg

1  A.  Yes.

2  Q.  You moved to Florida in September 2007, correct?

3  A.  Correct.

4  Q.  OK.  At that time, you started devoting your efforts to

5  your new business?

6  A.  Yes.

7  Q.  And that was a lawn care business, right?

8  A.  Yes.

9  Q.  At that time, you had made up your mind that you no longer

10  wished to work in the Eber Brothers business, the family

11  business?

12  A.  Well, I was, yes, because I was never asked to work for

13  them.  I would have, if I was asked.

14  Q.  Now, you met with representatives from Southern in 2007 to

15  discuss a possible position with them, correct?

16  A.  That is correct.

17  Q.  OK.  A position didn't come out of that, correct?

18  A.  There was no position.  I was told to go to New York, meet

19  with Southern, they would discuss a position.

20        When I arrived in New York, met with the top

21  principals of Southern in New York, they said -- they basically

22  said to me, We're not sure why you're here because we have no

23  viable position for you.

24  Q.  But at the time, they said they would create a position for

25  you, right?

L9EsKLE3                          Cross - Kleeberg

1    A.  No, they did not.  They said that they would look into

2    something, but there was nothing there that I could fill.

3    Everything was filled.

4    Q.  So I just want to make sure it is clear.  At the time you

5    met with them, they didn't tell you that they could create a

6    position for you?

7    A.  No, they did not.  I was told by Lester to go to New York,

8    meet with them, they would have something that they could

9    arrange for you.  When I got there, it was the opposite.

10   Q.  So you continued to receive payments from Eber Wine &

11   Liquor following August 31, 2007?

12   A.  Yes.

13   Q.  Correct?

14   A.  Correct, as a consultant.

15   Q.  And that lasted for about two years, right?

16   A.  I don't know if it lasted a full two years.  It got cut

17   back after about four or five months, and then my recollection,

18   it was like a year and a half, possibly two, but...

19   Q.  OK.  And at first you received $10,000 per month?

20   A.  Correct.

21   Q.  At some point that was cut down to $7,500 per month?

22   A.  Correct.

23   Q.  OK.  And Lester made that decision to hire Eber Wine &

24   Liquor continue to pay you, correct?

25   A.  I'm sorry.  Could you repeat the question?

L9EsKLE3                          Cross - Kleeberg

1   Q.  Lester made the decision to have Eber Wine & Liquor

2   continue to pay you, correct?

3   A.  Correct.

4   Q.  And you indicate in paragraph 28 of your direct testimony

5   it was severance, right?

6   A.  Yeah.  I indicated it was severance.  The terminology was

7   either severance or consulting agreement.

8   Q.  OK.  Now, as a consultant, you did two things, right, in

9   your role as a consultant?

10  A.  I'm not sure what two things you're alluding to.

11  Q.  Well, you were charged with trying to negotiate the lease

12  with Eber Wine & Liquor's landlord in Buffalo, right?

13  A.  With the Bennison Corporation, right.

14  Q.  And you failed in those efforts, right?

15  A.  Yes.  We weren't able to get any reduction.

16  Q.  And then you made some efforts to negotiate reductions for

17  payables to suppliers, right?

18  A.  Yes.  I made numerous calls on behalf of Lester.

19  Q.  And you really didn't perform any other services as a

20  consultant, right?

21  A.  No, that's not true.  Lester and I would talk quite often

22  about the industry, what was happening within the industry, and

23  he would ask for my advice on other matters.  So indirectly, we

24  continued to talk and consult on the industry.

25  Q.  OK.  So, Mr. Kleeberg, I would like to show you what's been

L9EsKLE3                         Cross - Kleeberg

1   marked for identification as Defendants' Exhibit Y12.  It is a

2   one-page document.

3          Mr. Kleeberg, do you recognize that document?

4   A.  Yes, I do.

5   Q.  It's a printout of an e-mail that you transmitted to Lester

6   Eber, correct?

7   A.  Yes.

8   Q.  And it was composed by you and transmitted to Lester Eber

9   on Tuesday, September 1, 2009, right?

10  A.  That is correct.

11  Q.  And as far as you know, he received it, correct?

12  A.  I'm sorry?

13  Q.  Did you receive any indication that he did not receive this

14  e-mail?

15  A.  No.  I believe he received it.

16         MR. SANTORO:  OK.  I would like to offer Exhibit Y12

17  into evidence.

18         MR. BROOK:  No objection.

19         THE COURT:  Received.

20         (Defendant's Exhibit Y12 received in evidence)

21  BY MR. SANTORO:

22  Q.  So, now, one of the reasons why you sent this e-mail to

23  Lester was to applaud him for his resolve in taking care of the

24  Eber Wine & Liquor supplier debt, right?

25  A.  That's one of the reasons, yes.

L9EsKLE3                          Cross - Kleeberg

1    Q.  And now we're in September of 2009, that's two years after

2    you left the employer of Eber Wine & Liquor, and you were, in

3    this e-mail, one of the other reasons why you sent this e-mail

4    to Lester was to ask him to have Eber Wine & Liquor continue to

5    pay you?

6    A.  That is correct.

7    Q.  OK.  So that payment lasted for about two years then?

8              THE COURT:  Mr. Santoro, I can read.

9              MR. SANTORO:  OK.

10   Q.  So then if you look at paragraph -- in your declaration,

11   rather -- you talk about your anger with Lester, right, in his

12   dealings with Southern?

13   A.  That is correct.

14   Q.  Now, part of the reason why you sent that Exhibit Y12 was

15   to ask Lester to intervene on your behalf with Southern, right?

16             THE COURT:  Mr. Santoro, please.

17   Q.  At that time, did you know that Lester was working for

18   Southern?

19   A.  No, I did not.

20   Q.  So if you look -- and that's September 2009, right?

21   A.  Yes.

22   Q.  If you look at paragraph -- just bear with me here, I'm

23   sorry -- 27 of your declaration.

24   A.  I don't see it.

25             MR. SANTORO:  Can you put his declaration up.

L9EsKLE3                        Cross - Kleeberg

1              No, that's his deposition.  His declaration.

2              The versions we were working with did not have a

3    caption, Brian.  So perhaps you can put it up on your screen

4    since that's the official exhibit.

5              MR. BROOK:  Sure.

6              Are you able to put up Exhibit 1003?

7              MS. KRAL:  Yes, just a moment.

8    BY MR. SANTORO:

9    Q.  If you look at paragraph 27.

10   A.  27?

11   Q.  Yes.

12             So there it states that about six months after you

13   left the employ of Eber Wine & Liquor, that you learned that

14   Lester had taken a job at Southern, right?

15             So that was in roughly 2007, 2008, right?

16   A.  I had heard that it was possible that he had taken a job,

17   but I had no idea from Lester that he had taken any job from

18   Southern.  At that point, there were a lot of rumors going

19   around.

20   Q.  In 2009, you didn't know that Lester was working at

21   Southern?

22   A.  No, I did not.

23   Q.  But you, nevertheless, you asked him to intervene or your

24   behalf with respect to a potential position, right?

25             THE COURT:  Isn't that what the e-mail said?

L9EsKLE3                          Cross - Kleeberg

1                MR. SANTORO:  Yes, it is, your Honor.

2                THE COURT:  OK.

3    Q.  Your understanding was that Lester was to be a liaison

4    between Southern and the New York State Liquor Authority,

5    right?

6    A.  That is correct.

7    Q.  And to be a lobbyist, correct?

8    A.  Yes.

9    Q.  At that point, Eber Wine & Liquor was basically out of

10   business, right?

11   A.  That would be correct.

12   Q.  And Eber-Metro was out of business, right?

13   A.  That would be correct.

14               THE COURT:  At that time, did Eber-Metro own

15   Eber-Connecticut?

16               THE WITNESS:  I'm sorry?

17               THE COURT:  At that time, did Eber-Metro own

18   Eber-Connecticut?

19               THE WITNESS:  Yes, it did.

20               THE COURT:  Thank you.

21   Q.  You were a participant in Eber Wine & Liquor's retirement

22   plan, correct?

23   A.  Yes.

24   Q.  So as a participant, you received notices with respect to

25   this potential pension plan, correct?

L9EsKLE3                          Cross - Kleeberg

1    A.   In the beginning, yes.

2    Q.   Notices that the plan was under-funded, correct?

3    A.   Yes.

4    Q.   And you were noticed when the plan was frozen back in the

5    year 2000, right?

6    A.   Yes.

7    Q.   And while you still were the number two at Eber Wine &

8    Liquor, you knew that there was a liability to the company in

9    connection with the plan, correct?

10   A.   Yes.

11   Q.   And you were concerned about the viability of the plan?

12   A.   Yes.

13   Q.   You were concerned insofar it is it affected your own

14   pension plan, correct?

15   A.   Well, yes.

16   Q.   OK.  And you had discussions with Wendy Eber about it,

17   correct?

18   A.   That is correct.

19             (Continued on next page)

20

21

22

23

24

25

L9EAKLE4PS

1           MR. SANTORO:  Thank you, your Honor.  I have no
2      further questions.
3           Thank you, Mr. Kleeberg.
4           THE COURT:  Do you have any redirect?
5           MR. BROOK:  Your Honor asked the one question I was
6      going to ask, so no.
7           THE COURT:  OK.  Thank you, Mr. Kleeberg.
8           (Witness excused)
9           THE COURT:  We're in recess till 2.
10          (Luncheon recess)
11          (Continued on next page)
12
13
14
15
16
17
18
19
20
21
22
23
24
25

L9EAKLE4ps                       Eder - Direct

<pre>
 1                     A F T E R N O O N   S E S S I O N

 2                              2:00 p.m.

 3              THE COURT:  Good afternoon, everybody.  Who's next,

 4      Mr. Brook?

 5              MR. BROOK:  Plaintiffs call Andy Eder to the stand --

 6      Andrew Eber, I should say.

 7      ANDREW EDER,

 8           called as a witness by the plaintiffs,

 9           having been duly sworn, testified as follows:

10      DIRECT EXAMINATION

11      BY MR. BROOK:

12      Q.  Good afternoon, Mr. Eder.

13              THE COURT:  You may proceed.

14      Q.  My name is Brian Brook, and I am the attorney for the

15      plaintiffs in this case.  Dan Kleeberg, who I believe you know,

16      as well as his sister, his sister, Lisa Stein, and their

17      cousin, Audrey Hays.

18              You've never spoken with me before today, correct?

19      A.  Correct.

20      Q.  And you did not previously testify in any capacity in this

21      case, correct?

22      A.  Correct.

23      Q.  You're testifying today pursuant to a subpoena.  Is that

24      right?

25      A.  I'm sorry?
</pre>

L9EAKLE4ps                           Eder - Direct

Q.  You're testifying pursuant to a subpoena that I issued to

you?

A.  Yes.

Q.  And part of that subpoena also requested that you produce

certain documents at this trial.  Is that right?

A.  Correct.

Q.  What did you do in response to the document portion of the

subpoena?

A.  Those documents were produced and given to attorneys.

Q.  And to your knowledge did the attorneys provide those

documents to plaintiffs' counsel and the defense counsel last

week?

A.  To my knowledge, yes.

          MR. BROOK:  At this time, your Honor, I would like to

offer into evidence Exhibits 199, 286, 287, 288, 289, 290, 292,

293, 294, 295, and 296 as documents that were produced pursuant

to that subpoena.

          THE COURT:  Any objection?

          MR. MULRY:  Judge, we do not object on authenticity

grounds, but we do object on relevance and foundation.  We

certainly -- Mr. Eder has not testified in this case.  We don't

know what his knowledge is of these documents or what their use

is.  His name does not appear in most of the documents.  So we

do object to the documents, and we would ask that we be

permitted to -- this is not a witness who gave direct testimony

L9EAKLE4ps                          Eder - Direct

1    by a declaration.  So we would ask that we be permitted to make

2    those objections as the exhibits are referred to.

3             THE COURT:  OK.

4             MR. BROOK:  I will simply note for your Honor that

5    based upon the instructions I heard given to defense counsel

6    earlier today, I was actually not planning to have the witness

7    just go through each written document and read them, but I'll

8    see what I can do.

9             THE COURT:  Is he going to testify substantively about

10   any of them?

11            MR. BROOK:  Yes, he is, your Honor.

12            THE COURT:  Is he going to indicate where they came

13   from?

14            MR. BROOK:  Yes.  I will have him identify the

15   individuals involved with it.

16            THE COURT:  I'm sorry?

17            MR. BROOK:  I'll have him at least identify who the

18   individuals on the communications were, in order to demonstrate

19   who is representing whom when the lawyers were exchanging

20   emails regarding certain transactions.

21            THE COURT:  OK.  Let's go.

22            MR. BROOK:  I'm also going to -- let's put Exhibit 56

23   up on the screen, please.

24   Q.  Showing you what's been marked as Plaintiff's 56, do you

25   recognize this document, Mr. Eder?  And Ali, could you zoom in

L9EAKLE4ps                       Eder - Direct

1   on the top half of that so it's easier to read.  Thank you.

2            THE WITNESS:  That's a help.  Thank you.

3   A.  Yes, I do.

4   Q.  What is this document?

5   A.  It's a document about the selling of Eber, the company,

6   Eber-Connecticut.

7   Q.  And --

8   A.  About our interest, Eder-Goodman's interest, in that.  I

9   can't see the rest of the document, but that's what the title

10  is.

11  Q.  All right.  So, is it fair to say, just to orient

12  ourselves, that on January 29th, 2008, the date of this

13  document, you and the company you're associated with purchased

14  a 15 percent interest in the company?

15  A.  Yeah.  And I -- yes.

16  Q.  OK.  So let's step back.  What do you do for a living,

17  Mr. Eder?

18  A.  I'm a beverage/alcohol distributor.

19  Q.  In what locations do you operate?

20  A.  We operate out of West Haven, Connecticut.

21  Q.  Is your distribution solely in Connecticut?

22  A.  Correct, and to be specific half of Connecticut.

23  Q.  How long have you been in the liquor distribution business

24  in Connecticut?

25  A.  Personally?

L9EAKLE4ps                          Eder - Direct

1    Q.  Yes.

2    A.  Over 50 years.

3    Q.  And what is the name of the company that you work for?

4    A.  Eder Brothers, Inc.

5    Q.  OK.  So that is extraordinarily similar to the name of some

6    of the -- of the distributor here, Eber Brothers.  I assume

7    that's just a coincidence.  There's no relation, correct?

8    A.  I would assume, yes.

9    Q.  So from here on out, if you hear a term that sounds like

10   "Eder Brothers" assume in fact it's Eber Brothers.  We're only

11   going to be talking about --

12   A.  Got it.

13            THE COURT:  I don't know what you just said.

14            MR. BROOK:  Because his company is called Eder

15   Brothers, I said, from here on forward, if something sounds

16   like I'm talking about his company, I'm not; I'm referring to

17   Eber Brothers, with a B.

18            THE COURT:  OK.

19            MR. BROOK:  Just to avoid confusion for the court

20   reporter.

21            So, Ali, you can take that exhibit down, for now.

22            Although actually, before I do that:

23            Plaintiffs offer Exhibit 56 into evidence.

24            MR. MULRY:  No objection.

25            THE COURT:  Received.

L9EAKLE4ps                          Eder - Direct

1              (Plaintiff's Exhibit 56 received in evidence)

2      BY MR. BROOK:

3      Q.   Have you ever been involved in any organizations for the

4      wine and liquor distribution business?

5      A.   Yes.

6      Q.   In what capacity?

7      A.   I've been involved as the president of the National Wine

8      and Spirits Association.

9      Q.   So you were president of it?

10     A.   I was the president, yes.

11     Q.   Approximately when was that?

12     A.   It was about 30 years ago.

13     Q.   How long have you been familiar with the company Eber

14     Brothers?

15     A.   A long, long time, probably close to the 50, 50 years that

16     I've been in the business.

17     Q.   And is it correct that during that time you got to know

18     Lester Eber?

19     A.   I did.

20     Q.   Did you know Allen Eber as well?

21     A.   No, I did not.

22     Q.   He passed away, I guess, shortly before you were involved?

23     A.   I don't know.

24     Q.   Going back to the investment in Eber-Connecticut, were you

25     familiar with the predecessor business, Slocum & Sons?

L9EAKLE4ps                          Eder - Direct

1    A.  Very much so, yes.

2    Q.  Tell us a little bit about how Slocum & Sons was operating

3    in the State of Connecticut.

4    A.  They were mostly a wine company, as opposed to a wine and

5    spirits company, and they serviced the entire state -- actually

6    did -- I don't think they serviced the entire state.  They

7    serviced part of the state, as we did.  And then eventually

8    they did do the entire state.  I believe that was when Lester

9    bought the business.  I'm not positive of that.

10   Q.  So is it fair to say they were a competitor of yours?

11   A.  Slocum & Sons?  Yes.

12   Q.  One question that has come up in this case -- maybe with

13   your experience you can explain it -- how do the Connecticut

14   franchise laws for wine and liquor make distribution in that

15   state different than in other states?

16   A.  OK.  So first of all, so of the 50 states, there are 13

17   that are control states, "control states" meaning people like

18   me or Eber Brothers or Slocum don't exist.  There's no

19   middleman.  The state is the middleman.  So if we take the rest

20   of the state, when prohibition was repealed in 1933, one of the

21   things that happened was that the federal government left it up

22   to states to establish their own sets of liquor laws.  The good

23   news, or the bad news depending on how you look at it, is, that

24   makes it very complicated in the different states.

25            Your specific question: there are many states, I don't

L9EAKLE4ps                     Eder - Direct

1   know the exact number, that have no franchise protection,

2   meaning that if the supplier of a particular product is selling

3   to me as a wholesaler, if the supplier does not like the way

4   we're doing business in whatever way, they could take it away

5   from me.

6          There are states where, once the supplier has

7   designated a wholesaler -- Tennessee is one of them, off the

8   top of my head -- in that particular state, you can never take

9   the brand away except for what I would call a cardinal sin: I

10  don't pay my bills or I lose my license to do business within

11  the state.

12         Connecticut is somewheres in the middle.  So once a

13  supplier appoints me as a distributor and there's a six-month

14  period, once that six-month period has elapsed, then the

15  supplier is stuck with me for life, unless I commit one of

16  those cardinal sins.  Otherwise, there's a remedy that could be

17  sought with -- through the liquor commission: just and

18  sufficient cause.  There's a clause in the law that says just

19  or sufficient cause, which is very broad.  I'm not a lawyer,

20  but I think you recognize that that's a broad statement.  Other

21  than that, the supplier in the State of Connecticut can appoint

22  as many other people as he would like.  But he has to wait six

23  months in order for that to become effective, unless the

24  existing -- unless the existing distributor waives those six

25  months.

L9EAKLE4ps                         Eder - Direct

1           So hopefully I took something complicated and made it

2      reasonably easy for lay people to understand.

3      Q.   So are you familiar with the concept of dualing?

4      A.   Of --

5      Q.   There's a term I've heard used called dualing, like

6      d-u-a-l-i-n-g.

7      A.   Yes.  Well, dualing is adding another distributor.  But

8      that particular term would be one other distributor.  I tried

9      to say that the supplier has the ability to add as many as they

10     like.  More often than not it's dualing.  There's a certain

11     business practice that, if everybody has it, no one has it and

12     no one pays attention to it.  So the question, depending on

13     one's philosophy of business, is whether or not you like an

14     exclusive arrangement, in which case hopefully the distributor

15     works hard on that particular brand, or a dual arrangement, in

16     case a particular retailer doesn't like the salesperson or the

17     company; there's someone else.  But when products become

18     multiple, it's as if -- it's like having too many priorities.

19     If you have too many priorities, you don't have any.

20     Q.   You mentioned that your company, unlike Slocum or Eber-

21     Connecticut, only sells in part of Connecticut.  Is that right?

22     A.   We -- correct.

23     Q.   So does that mean that, for a lot of the brands that you

24     sell, there is another distributor operating in the State of

25     Connecticut?

L9EAKLE4ps                        Eder - Direct

1   A.  At least one if not more.  So in -- yes.

2   Q.  And is that something that is generally a negative for your

3   business?

4   A.  Not for us, no.  We made a choice not to be statewide.  Not

5   that it would be easy to do so at this point in time.

6   Q.  All right.  So let's jump ahead.  So you mentioned that,

7   although I guess you can't pinpoint the date, at some point you

8   became aware that Eber Brothers purchased Slocum.  Is that

9   right?

10  A.  Correct, in I think around 2005, plus or minus, somewheres

11  in there.

12  Q.  How did you learn about that?

13  A.  I don't know.  I, I don't remember.  No idea.

14  Q.  At some point were you approached about making an

15  investment in Eber Brothers, or, I'm sorry, Slocum?

16  A.  When it was Slocum, prior to Eber Brothers purchasing?

17  Q.  You've helped me identify another linguistic thing let's

18  focus on.  So Eber-Connecticut does business as Slocum still.

19  Is that right?

20  A.  Right.

21  Q.  So in your normal -- let's use how you refer to it.  Do you

22  normally refer to it as Eber-Connecticut or Slocum?

23  A.  Usually Slocum.

24  Q.  OK.  So all the questions from here on out, unless I say

25  otherwise, are from after 2005.

L9EAKLE4ps                    Eder - Direct

1          So at some point were you approached about making an

2    investment in Slocum?

3    A.  Yes.

4    Q.  And who approached you?

5    A.  Well, I'm not positive.  I think it was Lester, but I

6    wouldn't swear to that.  I think it may have been a phone call

7    to me, but I'm not positive of that.

8    Q.  And what was the offer that was made, or opportunity?

9    A.  I don't think there was an offer made at that time.  I

10   believe, as I recall, that Lester talked about an investment in

11   the company.  And somewheres around that time -- and then we

12   wound up flying to Rochester actually, I remember that, meeting

13   with Lester.  And at that point, and maybe shortly thereafter,

14   we actually put in an offer to buy the whole company.

15   Q.  Really.

16          THE COURT:  Excuse me.  What do you mean by "the whole

17   company"?

18          THE WITNESS:  Slocum & Sons.

19   Q.  So you offered to buy all of the Connecticut operation.  Is

20   that right?

21   A.  Correct.

22   Q.  Did you also offer to buy the Rhode Island operation?

23   A.  Well, we didn't know about the Rhode Island operation,

24   frankly.  Nor did we know about Maine.  We didn't know.

25   Q.  You did -- when did -- so -- I just want to get this out of

L9EAKLE4ps                        Eder - Direct

1   the way.  So you mentioned Maine.  What is the Maine operation,
2   to your knowledge?
3   A.  We were led to -- I don't know what it is, or what it was,
4   but we were led to believe that it was an import company solely
5   doing some business as an import company, in other words,
6   importing mostly wines from other countries.  And there was
7   also a piece, which I fully understand, that supposedly was to
8   register brands in the State of Connecticut.  So the State of
9   Connecticut requires registration of brands.  And it's very
10  expensive for a supplier.  And think of it in terms of not only
11  a supplier registering in Connecticut but also in X number of
12  other states.  It so happens that our state is the most
13  expensive state.  I think it's like $250 per label, per brand,
14  per label, for two years.  I think that's the current price,
15  but I'm not positive of that.  So -- and we've done this as
16  well, it's totally correct, where I think part of Maine was
17  registering some brands as the importer of record so that the
18  supplier didn't have to pay as much, because wholesalers pay
19  less than out-of-state entities.
20  Q.  OK.  So am I understanding you correctly that Slocum of
21  Maine imports wines --
22  A.  Yes.
23  Q.  -- for sale into Connecticut?
24  A.  That's the simplest answer.  They imported wine for their
25  own distribution, at Slocum.

L9EAKLE4ps                        Eder - Direct

1              THE COURT:  When you say "their own distribution,"

2      whom do you mean?

3              THE WITNESS:  Slocum.

4              THE COURT:  Meaning Slocum-Connecticut.

5              THE WITNESS:  Yes, sir.

6              THE COURT:  Thank you.

7              Go ahead.

8      Q.  And to your knowledge, though, Slocum of Maine does not

9      sell anything in Maine; is that right?

10     A.  I have no other knowledge of Slocum in Maine.

11     Q.  Now to go back, you mentioned you put in an offer to buy

12     the whole Connecticut business.  What do you recall about the

13     offer that you made?

14     A.  I'm sorry?

15     Q.  What if any details do you recall about the offer that you

16     made to buy the Connecticut business?

17     A.  Well, it's funny.  We didn't have much detail available,

18     but we looked at it from the point of view of what the gross

19     profit was, and we took some guesses at what their inven --

20     well, we knew what the inventory was, and we knew some of the

21     liabilities.  We didn't know everything.  And we threw out a

22     number based on gross profit.

23     Q.  Do you recall what that number was, at least a ballpark

24     figure?

25     A.  I'm pretty darn sure it was in the neighborhood of $20

L9EAKLE4ps                          Eder - Direct

1   million, plus whatever assets, you know, payable, accounts

2   receivable, netting out, all those kinds of things.  Right.

3   Q.  OK.  So are you saying that the -- the number you threw out

4   was a $20 million number plus --

5   A.  Plus.

6   Q.  -- the net asset value?

7   A.  The value would have been closer to 30.  They were

8   carrying, in my memory they were carrying about a 10, 11

9   million dollar inventory, what was huge, in terms of, based on

10  the volume, dollar volume of the company.  But you still have

11  to pay for it.

12  Q.  In terms of timing, was this relatively close in time to

13  when you ultimately signed a deal for 15 percent in January

14  2008?  Or was it significantly earlier?

15  A.  As I recall, I think we went to Rochester early in the

16  spring.  At some point thereafter we talked about this buying

17  the whole company.  And then there was radio silence.  And I

18  believe it was Richard Weiss from my company -- but I'm not

19  positive, it could have been Dave Heller from Goodman, but

20  either way they were representing us -- wound up calling a

21  lawyer in Rochester, I believe Pat Dalton, saying, what's going

22  on with our offer because we had heard nothing.  And that led

23  to eventually the 15 percent, which I think happened in --

24  well, it was on there, it was in January of '08.

25  Q.  Were you aware of whether there were any competing offers

L9EAKLE4ps                           Eder - Direct

1    to buy a portion of Slocum at the time?

2    A.  Well, you've said the keyword, "at the time."  The answer

3    was no, until we were -- we were in conversation with Pat

4    Dalton, after calling to say what happened from our offer.  I

5    think, to be specific, there was no offer for the entire

6    company.  But I think that there was an offer for a piece of

7    the company.

8    Q.  What were you told about who had made that offer, if

9    anything?

10   A.  That it was Southern.

11              MR. MULRY:  Objection.  Hearsay.

12              THE COURT:  I'll take it for what it's worth.

13   Q.  What was your understanding as to who made the offer?

14   A.  Southern Wines & Spirits.

15   Q.  Was that a name you were familiar with?

16   A.  Sure.

17   Q.  Did that, did the name of who it was that was making

18   another offer for 15 percent affect the ultimate price that you

19   paid for 15 percent of Eber-Connecticut?

20              THE COURT:  I'm sorry.  The witness didn't say 15

21   percent.

22              MR. BROOK:  I'm sorry.  I thought we did that earlier.

23   Q.  How much of Eber-Connecticut or Slocum did you end up

24   buying?

25   A.  15 percent.

L9EAKLE4ps                    Eder - Direct

Q.  And that was done in partnership with someone named Allan

Goodman; is that right?

A.  Correct.  And we, we formed a corporation called

Eder-Goodman to do that.

Q.  So do you recall how much you ended up paying for 15

percent, you and Mr. Goodman together?

A.  Sure.  4.5 million.

Q.  How did you come up with that million?

A.  There were two pieces to that number.  One was looking at

the gross profit of the company and what 15 percent of that

would be.  And then we increased it in order to get a ROFR --

sorry -- right of first refusal, often which I'll refer to as a

ROFR, because that was an important piece, to be able to, if

there were any other offers, to have the right of first

refusal.

Q.  And so is it fair to say, then, that the ROFR, right of

first refusal, caused you to pay more for 15 percent?

A.  Yeah, slightly more, yeah.  I don't, I don't remember the

exact calculation, but the answer would be yes.  It was an

important piece.

Q.  As a percentage of the value -- you said it was a slight

difference -- can you provide any sort of percentage estimate

of how much of the purchase price?

A.  It would be a total guess.  I don't remember discussion in

time but --

L9EAKLE4ps                        Eder - Direct

1                    (Mr. Mulry rose)

2                    THE COURT:  Sustained.

3     Q.  Were there any other pieces to the transaction that caused

4     you to change the amount of money you were willing to pay?

5     A.  No.

6     Q.  Were you aware of whether Southern had purchased its own

7     right of first refusal regarding Eber-Connecticut?

8     A.  Were not.

9     Q.  So that was not disclosed to you?

10    A.  Correct.

11    Q.  And one thing I'll say now just because we've talked over

12    each other a couple of times and we didn't do a deposition:

13    It's important if you can, for the sake of the court reporter,

14    if you let me finish the question before you start to answer,

15    even though you're going to know where I'm going.

16    A.  Sure.

17                   MR. BROOK:  Let's put up Exhibit 199.

18                   And Ali, would you just quickly sort of scroll through

19    that, and show some of the other pages.

20    Q.  Do you recognize this document?

21    A.  Yes.  There's a date on this?

22                   MR. BROOK:  I don't believe that there is.

23    A.  OK.  Yeah.  This looks like a pro forma.  In other words,

24    it's more than back-of-napkin kind of calculation to look at

25    what we might be willing to pay.

L9EAKLE4ps                    Eder - Direct

1  Q.  And is this a set of workpapers that were used in

2  connection with the purchase of 15 percent of Slocum?

3  A.  Yeah.  Yes.

4  Q.  Who was involved in preparing these notes?

5  A.  I was not.  It would have been Dave Heller and Richard

6  Weiss.

7  Q.  Who --

8  A.  Dave Heller is from Allan S. Goodman, and Richard Weiss is

9  from Eder, E-d-e-r, Brothers.

10            MR. MULRY:  Your Honor, could we just ask, if this is

11  a six-page document, could we just ask if Mr. Eder is referring

12  to the first page in the answers to the questions, or --

13            THE COURT:  You can inquire later.

14            MR. BROOK:  May I give the witness a hard copy just so

15  he can flip through it?

16            THE COURT:  Sure.

17            THE WITNESS:  Thank you.

18  Q.  This is one of the documents that you provided to us in

19  response to the subpoena, correct?

20  A.  Yeah.

21  Q.  Do you recognize any of the handwriting on this?

22            MR. MULRY:  Just again for the record, I believe, of

23  the six-page document, there's handwriting on pages 4, 5, and

24  6, which are EG 176, 177, and 178.

25  A.  Yeah.  I remember seeing this, but that's about all I can

L9EAKLE4ps                          Eder - Direct

1    say, in terms of the handwriting.  What I remember more is the

2    pro forma.

3    Q.  By "pro forma", which page are you referring to?

4    A.  The first, second, and third page.  So 173, 4, or -- I

5    don't know.  Oh, there's a number.  1, 2, and 3.  Sorry.

6    Q.  OK.  So maybe, you know, can you help explain exactly what

7    you mean by "pro forma"?  Is this the calculation of how you

8    arrived at a valuation?

9    A.  Yeah.  In other words, if you're going to buy a business --

10   and in this case you're looking at it from the point of view of

11   gross profit generally, because certain things will, quote,

12   fall to the bottom line.  As a silly example, that if indeed,

13   you know, we wouldn't need to add truck drivers, we may not

14   need to add additional salespeople, then again, even though we

15   might need to add some, how many, but not as many for the

16   entire piece of the business, kind of thing.

17   Q.  So if, for example, the existing management was spending an

18   extraordinary amount of money on litigation expenses, that was

19   not something you wanted to consider in your valuation?

20            MR. MULRY:  Objection.

21            THE COURT:  Overruled.

22   Q.  What was your answer, sir?

23   A.  We wouldn't care.  This is not about really looking at a

24   balance sheet or an expense sheet and where the money is going.

25   It's about, what's the gross profit of the brands that a

1    company would have of which X percent falls to the bottom line

2    of the acquiring company, and therefore paying X dollars will

3    take X years to pay back.  If that's clear.

4    Q.  So I don't have it in front of me anymore, but would you

5    flip to, it's either the third or fourth page.  I think it must

6    be the fourth.  It's the first one with handwriting.  I think

7    there's a notation that says "1.8 X" at the top.  Do you see

8    that?

9    A.  Yes.  That's probably a multiple of gross profit.

10              MR. MULRY:  Objection.

11              THE COURT:  Overruled.

12              MR. MULRY:  We haven't established whose handwriting

13   this is, so lack of foundation.

14              THE COURT:  Overruled.

15   Q.  What is your understanding of what the "1.8 X" means?

16   A.  Gross profit.  That could be the only thing it is.

17   Q.  So by that do you mean a multiple of gross profit?

18   A.  Correct, 1.8 times.

19   Q.  So to be clear, what that means is you multiplied the gross

20   profit number for the last 12 months by 1.8 times?

21   A.  Yes, or a rolling average of three years or whatever, yes,

22   but basically correct.

23   Q.  Why would you use a rolling average rather than just the

24   last 12 months?

25   A.  Because there could be extraordinary circumstances in any

1  given year or not, as an example, COVID, where we enjoyed a lot

2  of extra business.

3  Q.  There was actually extra business.

4  A.  Extra business during COVID.  People were drinking.

5  Q.  Was that true for the wine business as well, even when the

6  restaurants were closed?

7  A.  Not as much so, but that answer is still correct.

8          MR. BROOK:  OK.  If you could flip to the next page,

9  Ali, in the middle there, under "valuation," can you blow up

10 that sort of middle section.

11 A.  Yeah.

12 Q.  All right.  Do you see that, Mr. Eder?

13 A.  I do.

14 Q.  Here there are some different numbers that seem to be

15 higher than 1.8 X.  And what was going on here?

16         MR. MULRY:  Objection.

17 A.  Don't know.

18 Q.  OK.  Do you recall what multiple you ended up using for the

19 valuation in 2008?

20         MR. MULRY:  Objection.

21         THE COURT:  Overruled.

22 A.  Uh, no, I do not recall.

23         The, you know, clearly this is looking at different

24 gross profit numbers to see what the dollars would be, so --

25 Q.  I'm going to change topics a little bit here.  So as part

L9EAKLE4ps                              Eder - Direct

1   of the deal with -- to buy into Slocum, you ended up getting

2   certain rights through an LLC agreement; is that right?

3   A.   Certain rights, what?

4   Q.   Through the operating agreement for the company, you got

5   certain rights to participate in the business; is that right?

6   A.   Correct.

7   Q.   And you also had certain preemptive rights like the right

8   of first refusal, correct?

9   A.   Correct.

10   Q.   Now, were you ever contacted in around 2010 about a

11   proposed sale of a portion of Eber-Metro's remaining 85 percent

12   interest to a third party?

13   A.   Yes.

14   Q.   What exactly happened?

15   A.   I believe you're referring to -- correct me if I'm wrong --

16   a 6 percent of Slocum going to either Wendy at the time and/or,

17   because there were different stories that were told, a third

18   party, because, when he was going through a divorce, that's

19   what we were told.

20   Q.   So you were told that this 6 percent was intended for Wendy

21   but it might go to a company to avoid issues in her divorce?

22        MR. MULRY:   Objection.

23   A.   It was never said "a company," to my knowledge.  It's

24   the -- it was a person.  Basically, I heard three different

25   stories about this.  One was Wendy, because of the divorce.

1  One was Wendy -- this came from Lester in a conversation with

2  me -- Wendy because she's been doing so well in helping the

3  business.  And one was to a third person because that person

4  had been an advisor to Eber as well as Slocum.

5  Q.  Do you recall who that third person was?

6  A.  Yeah.  I'll think of his name in a second.  The name of the

7  company that -- it was Polebridge, and it might have been --

8  Glenn Sturm.  It was Glenn Sturm.

9  Q.  Did you ever speak with Glenn Sturm?

10 A.  Well, I believe so but I'm not positive.  I believe we met

11 at a Hol -- with Wendy at a Holiday Inn, where we would have

12 our meetings from time to time, in North Haven, Connecticut.

13 And I'm pretty sure Glenn Sturm was there, but I'm not

14 positive.

15        But if we did meet, that was the one time, and it was

16 brief.

17 Q.  OK.  So let's go to some of the exhibits I mentioned

18 before.

19        MR. BROOK:  Ali, could you pull up Exhibit 292,

20 please.

21        THE COURT:  Were you going to offer 199?

22        MR. BROOK:  Oh.  Yes, your Honor.  It was on the list

23 earlier, but, yes, I offer 199 into evidence.

24        MR. MULRY:  Judge, we would object to the three

25 handwritten notes.  Mr. Eder has not identified -- I believe he

L9EAKLE4ps                          Eder - Direct

1  said they were not his notes.  He has not identified whose

2  notes they are.

3          With respect to the first three --

4          THE COURT:  On recollection, as you said, you had no

5  objection to authenticity.

6          MR. MULRY:  To authenticity, but for foundation.  I

7  mean, with respect to what is this being used for.  We also had

8  a -- we maintain a hearsay as well as a foundation objection.

9  So these notes, to the extent they're being offered for their

10  truth, we don't know with whose notes they are, what they mean,

11  and Mr. Eder does not have any knowledge of what these notes

12  are.  So it would be speculation as to what these notes are.

13          THE COURT:  Mr. Eder, these notes came out of your

14  files, right?

15          THE WITNESS:  Did they come out of my files?  Probably

16  not.  They probably would have come out of whoever wrote those

17  hand notes, either Richard Weiss or Dave Heller.

18          THE COURT:  Well, your lawyers produced them in this

19  action, right?

20          MR. BROOK:  May I, your Honor?

21          THE COURT:  No.  No, no, no.

22          Please answer my question.

23          THE WITNESS:  I don't know.

24          THE COURT:  Well, how did they get here?  Do you have

25  any idea?

L9EAKLE4ps                    Eder - Direct

 1          THE WITNESS:  It was the lawyers and Richard Weiss and
 2   Dave Heller and Cutter Smith.
 3          THE COURT:  OK.  Go ahead, Mr. Brook.
 4   BY MR. BROOK:
 5   Q.  And do the individuals that you just named work for you?
 6   A.  Dave Heller works for Allan S. Goodman but is the manager
 7   of Eder-Goodman.  Richard Weiss works for Eder Brothers and is
 8   the manager for Eder-Goodman.  And Cutter Smith is the
 9   president of Eder Brothers Inc., Eder with a D.
10   Q.  So is it correct to say that these documents are company
11   files from --
12   A.  Correct.  They're in one of those three hands.  They were
13   not in my hands.
14          THE COURT:  All right.  Now, you have an objection or
15   not?
16          MR. MULRY:  Yes.  We have an objection on hearsay and
17   the fact that this witness cannot speak to these, because we
18   don't know what these say.  It would be speculation as to what
19   their meaning is.
20          THE COURT:  Are they offered for the truth of
21   anything?
22          MR. BROOK:  No, your Honor.  They're being offered to
23   show that there was -- to the extent that the defense is going
24   to try to argue that the number was something that was based
25   upon something other than doing a valuation analysis, this

1    simply shows that a valuation analysis was done to support what

2    they paid.

3          MR. MULRY:  Your Honor, we would disagree with that

4    characterization of the document.  They're handwritten notes

5    which I think Mr. Eder said were sort of a pro forma --

6          THE COURT:  He didn't say, as I understood him, he

7    didn't say the handwritten notes were a pro forma.  He said the

8    first three pages were.

9          MR. MULRY:  Well, I think he doesn't know what the

10   last three pages, the handwritten notes, are.

11         THE COURT:  Yes.

12         MR. MULRY:  That's why we would maintain a hearsay

13   objection.

14         THE COURT:  Well, but they're not offered for the

15   truth of anything they say.

16         MR. MULRY:  Well then, it's hard to say what they're

17   offered for.  Because I don't think, fairly read, if we don't

18   know what they mean, it doesn't show that there was any

19   specific valuation with respect --

20         THE COURT:  Don't you think that I'm entitled to

21   consider what they say circumstantially, in figuring out what

22   they might indicate?

23         MR. MULRY:  Your Honor, we can interpose the

24   objection, and we understand you can admit it, by overruling

25   the objection.

L9EAKLE4ps                        Eder - Direct

1          THE COURT:  Overruled.

2          (Plaintiff's Exhibit 199 received in evidence)

3          THE COURT:  I mean, I don't think 1.8 was anybody's

4    earned run average.

5          MR. BROOK:  Definitely not mine.

6          Ali, would you please put up Exhibit 292.  And if you

7    could please zoom in.

8    Q.  You mentioned the name Patrick Dalton before.

9    A.  Yeah.

10   Q.  Again, what was your understanding as to what his

11   relationship was to Eber Brothers?

12   A.  He represented Lester or Eber-Connecticut, Slocum, I'm not

13   sure exactly who, but one of those people.

14   Q.  Who is Mark Ryan?

15   A.  Mark Ryan is Eder-Goodman's attorney.

16   Q.  So this is an email that was sent to him by Pat Dalton.

17   A.  That's what it looks like, yes.

18   Q.  And it says, it's copying Lester Eber clearly.  Do you see

19   there's a second email address there?  Do you recognize that

20   email address?

21   A.  Yes.

22   Q.  Whose email address is that?

23   A.  Wendy's, most likely, because it's "W Eber," Wendy Eber.

24   Q.  What was the understanding as to Wendy Eber's role with

25   Slocum at the time of 2010?

1    A.  I don't know exactly what year Wendy became and was either

2    working at and/or running Slocum & Sons, so I can't answer that

3    question.  I don't know when that happened.

4    Q.  All right?

5          MR. BROOK:  All right.  Would you please flip to the

6    second page, Ali.  And I want to focus actually in on the third

7    paragraph, starting with "finally."

8    Q.  And you weren't in here earlier, but I'm going to ask you

9    to read this just to yourself, and let me know when you're

10   done.

11   A.  OK.

12   Q.  Is this one of those offers about -- or -- let me withdraw

13   that question.  That was terrible.

14         It says in the beginning here to confirm that you have

15   no objection to the transfer of interest to Wendy Eber.  Do you

16   see that?

17   A.  Yes.

18   Q.  So had there been discussions prior to this email about

19   transferring?

20   A.  Well, I can't answer -- first of all, I can't see the date,

21   but even when I see the date, I'm not going to be able to tell.

22   There were discussions that were ongoing.  When we first heard

23   about it, we didn't quite understand it and we didn't know what

24   was going on.  And obviously this is Pat Dalton asking our

25   team, through our lawyer, that, please confirm that once the

1    other information is provided, your clients will have no

2    objection to doing so.

3    Q.  Was it part of the rights that you had to be able to object

4    to a transfer?

5    A.  Correct.

6    Q.  What were you told about what Wendy, if anything, was going

7    to pay to Metro for the 6 percent?

8    A.  We didn't hear any kind of a number.

9    Q.  Jumping forward --

10   A.  Again, we were told three different things.  This says one

11   thing.  But there were other things.  There was a thing about

12   Glenn Sturm and the good that he was doing.  And then there was

13   the divorce side.  And right here in front of me is Wendy, as I

14   said before, had been doing a good job in running the company,

15   or working at the company.

16   Q.  So for any of those three stories, including Polebridge

17   Bowman and Glenn Sturm, did you ever hear about a number being

18   paid into Metro for the 6 percent?

19   A.  No.

20   Q.  So were you ever offered the opportunity to buy the 6

21   percent using your right of first refusal?

22   A.  No.

23           MR. BROOK:  OK.  Ali, you can take that down.

24           Plaintiffs Exhibit 292 into evidence.

25           MR. MULRY:  No objection.

L9EAKLE4ps                          Eder - Direct

1          THE COURT:  Received.

2          (Plaintiff's Exhibit 292 received in evidence)

3          MR. BROOK:  Could you put up Exhibit 293, please.

4          Please bear with us, Mr. Eder.  Technical issues.

5   Q.  OK.  So we now have Exhibit 293 up.

6          MR. BROOK:  Is that right, Ali?

7          MS. KRAL:  292.  Do you want 293?

8          MR. BROOK:  293.  Yes, we already did 292.

9   Q.  So now we're looking at an email again between Pat Dalton

10  and Mark Ryan dated May 24, so a week after the one we were

11  just looking at.  If you could just take a look at the first

12  paragraph in the email.  Do you see that your lawyer was being

13  sent some financial information regarding Slocum?

14  A.  Yes.

15  Q.  And was this in connection with deciding whether or not to

16  object to the transfer to Wendy?

17  A.  Probably, but I don't know for sure.

18  Q.  I won't have you read through the rest of it, but --

19          MR. BROOK:  Plaintiffs offer Exhibit 293.

20          THE COURT:  I thought you were up to 293.

21          MR. BROOK:  Yes.  I.  Sorry.  I'll get closer to the

22  microphone.  Yes, 293, your Honor.

23          THE COURT:  Received.

24          (Plaintiff's Exhibit 293 received in evidence)

25          MR. MULRY:  Your Honor, if we could just have a, in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    two, three minutes, if the Court wanted to take a break, if I

2    and Mr. Brook could confer with respect to these exhibits -- as

3    you know, they were produced very recently -- we may be able to

4    work out a withdrawal of our objections so that we can move

5    through this a little more quickly, if we just take two, three

6    minutes.

7             THE COURT:  You've got five.

8             MR. MULRY:  OK.  Thank you, your Honor.

9             (Recess)

10            THE COURT:  Let's proceed.

11            MR. BROOK:  I'll skip the presentation right now.  I

12   do not know what happened to Ms. Kral.

13            But, your Honor, the defense and the plaintiffs have

14   worked out an agreement that should shorten Mr. Eder's

15   examination.

16            So subject to the Court being able to rule on hearsay

17   objections at a later date, post trial, plaintiffs offer

18   Exhibits 286, 287, 288, 289, 290, 293, 294, 295, and 296.

19            THE COURT:  They are all received subject to

20   defendants' hearsay objection.

21            MR. MULRY:  Yes, your Honor.  Thank you.

22            (Plaintiff's Exhibits 286, 287, 288, 289, 290, 293,

23   294, 295, and 296 received in evidence)

24            THE COURT:  Are any of them offered for the truth of

25   the matters asserted?

L9EAKLE4ps                      Eder - Direct

1          MR. BROOK:  Yes, sir.  There are a number of

2     admissions by a party opponent through the agents of Lester and

3     Wendy.  I think there may even be one email.  No, no, I'm

4     mistaken.  It's all statements by lawyers representing the

5     defendants.

6          THE COURT:  Statements by lawyers representing whom?

7          MR. BROOK:  In some cases representing Alexbay, in

8     some cases representing Slocum, in some cases I honestly

9     doesn't know.  They seem to represent everyone.  But -- and

10    that's one of the reasons why --

11         THE COURT:  Really?

12         MR. BROOK:  I'm serious.  One of the biggest issues in

13    discovery that it was hard to get an answer on and the answers

14    would change is who was representing whom.

15         So I agree it's a significant issue, particularly when

16    some of these entities are suing each other, but the lawyers

17    were oftentimes on both sides at the same time.

18         THE COURT:  Counsel to the situation.

19         MR. BROOK:  I think that's fair to say, yeah.

20         OK.  So Ali, can you take that down.  We're actually

21    past that.  Will you please put up Exhibit 296.  We're going to

22    jump ahead now.  So --

23    BY MR. BROOK:

24    Q.  After the 6 percent to ultimately -- that went to

25    Polebridge Bowman, isn't that right?

L9EAKLE4ps                        Eder - Direct

```
 1   A.  That went to?

 2   Q.  The 6 percent, that actually eventually went to Glenn

 3   Sturm's Polebridge Bowman.  Is that right?

 4   A.  Yes.  We consented.

 5   Q.  Yes.  At some point after that, did the 6 percent revert

 6   back to Wendy Eber?

 7   A.  I have no idea.

 8   Q.  You don't know?  So do you know as of today who owns the 6

 9   percent that was transferred in 2010?

10   A.  I believe it's Wendy but I'm not positive.

11   Q.  When that 6 percent was transferred to Wendy, if it ever

12   was, were you offered any right of first refusal to purchase

13   those shares?

14            MR. MULRY:  Objection.

15            THE COURT:  Overruled.

16   Q.  Sorry, what was the answer?

17   A.  No.  We were never offered 6 percent of any part of this

18   transaction.

19   Q.  OK.  And I'm sorry.  I actually -- I gave the wrong

20   exhibit.

21            MR. BROOK:  Ali, put up Exhibit 290.

22   Q.  We're going to jump ahead now to the time period of

23   December 2011 and early 2012.  At that time, was there another

24   proposed transaction that Lester Eber presented to you?

25   A.  Yes.
```

1  BY MR. BROOK:

2  Q.  What do you remember about that proposed transaction?

3  A.  Um, I remember, I believe it was Lester's request, that we

4  go to Jerry Farrell's office, who is an attorney.  He is former

5  chair of the liquor commission who I knew, and we had a meeting

6  about something that Lester proposed to do.

7  Q.  What was Lester proposing to do?

8  A.  He was proposing something that I couldn't understand,

9  frankly.  I didn't understand it then and I still don't

10  understand it.

11  Q.  Well --

12  A.  Worse than that, my lawyers couldn't understand it.

13  Q.  That was Mr. Ryan, or were there other lawyers you are

14  referring to?

15  A.  Correct.  It seemed to be.

16          THE COURT:  First of all, can I find out what state

17  Mr. Farrell formerly was the chair of the liquor commission to?

18          THE WITNESS:  Connecticut.

19          THE COURT:  Connecticut.

20          Thank you.  Go ahead.

21  BY MR. BROOK:

22  Q.  So were there any other lawyers besides Mr. Ryan who you

23  were working with at that time?

24  A.  No.

25  Q.  At this meeting, who was present at the meeting where you

1   discussed the proposed transaction?

2   A.   Jerry Farrell, Richard Weiss from our company, Dave Heller,

3   Eder-Goodman, from Alex Goodman, and myself.  And Lester, I'm

4   pretty sure, was there.

5   Q.   Was Wendy Eber there?

6   A.   If she was, I don't remember it.

7   Q.   Even though I know you said you didn't understand it, what,

8   if any, details can you remember about what Lester or his

9   lawyer said about the transaction that they were proposing?

10  A.   It was about some forgiveness of debt in some way, shape,

11  or form, a part of loans that Lester had made to the company.

12  That part I understood.  But after that, I really didn't

13  understand how it was happening because it seemed to be

14  happening in a higher level, meaning that it was involving the

15  New York companies of which had nothing to do with Connecticut

16  dealings.

17  Q.   What was your understanding of why you were being presented

18  with this information?

19          Was it from of your --

20  A.   We had to consent in some way, shape, or form, and we

21  refused to do so.

22  Q.   Why did you refuse to do so?

23  A.   We couldn't understand what was going on.

24  Q.   Did Eder-Goodman have a representative on Slocum's board of

25  managers?

A.  I'm not sure of your exact question.  We were entitled to,
and I do know, amongst the people who could, was myself, Roger
lobe, that's a new name, Roger is father-in-law to Dave Heller,
Richard Weiss, myself, and I believe Cutter Smith, who is,
again, he's president of Eder Brothers, were acceptable to the
Slocum team to be observers.

Q.  Just to be clear, for Cutter Smith is Eder Brothers with a
D?

A.  With a D.

Q.  OK.  Even if there wasn't a representative, a member of the
board, is it correct that there was sort of a right of
observation that Eder-Goodman had?

A.  Correct.

Q.  Did you ever become aware of an employment agreement
between Slocum and Lester Eber?

A.  Eventually, by accident.

Q.  What do you mean by accident?

A.  We didn't know about it.  We didn't know there was an
employment agreement.

Q.  When did you find out about it?

A.  I don't remember.  I don't know, but I do know it was in
existence for a while.  I don't know what that means, but we --
we got very little information.  Whatever we were entitled to,
we never really got full information, and oftentimes we didn't
get very much at all.

L9EsKLE5                          Eder - Direct

1    Q.  So were you aware of sort of a deferred compensation

2    payment made under Lester's employment contract after he passed

3    away?

4    A.  No.

5    Q.  Is that something that anyone from Eber -- I'm sorry --

6    from Eder-Goodman ever approved?

7    A.  No.  We didn't know about it.

8    Q.  Now, you mentioned at one point that you and Mr. Goodman

9    had offered to buy the entire company in, say, 2007, right?

10   A.  Correct.

11   Q.  At any point in time afterwards, did you ever hear that

12   Eber-Connecticut was being put up for sale?

13   A.  No.  We did not hear that.

14   Q.  Were you ever asked whether you were interested in buying

15   the entire Slocum business?

16   A.  No.

17   Q.  If you had been asked whether you were interested in buying

18   the Slocum business, would you have considered buying it?

19   A.  Yes.

20   Q.  Have you made any offers to buy the Slocum business?

21   A.  Yes.

22   Q.  When was the last offer that you made?

23   A.  It wasn't that long ago, we were told the company wasn't

24   for sale.

25   Q.  Who told you that?

L9EsKLE5                         Eder - Direct

1   A.  It was a lawyer -- well, Wendy told us.  Wendy did not tell

2   me directly, I should say that.  Wendy told the representatives

3   of Eder-Goodman, specifically Richard Weiss and Dave Heller,

4   that the company was not for sale.  And also, there are some

5   letters back and forth to lawyers where we were told by a

6   lawyer representing Slocum that the company was not for sale.

7   Q.  OK.  Let's put up Exhibit 201 for the witness to identify.

8          This is a letter -- if you can actually, Ali, move it

9   down a little bit.

10         Do you see in the upper right corner it is marked

11  Ryan's letterhead?

12  A.  Yes.

13  Q.  As of May 6, 2021, was he still your attorney?

14  A.  Yes.

15  Q.  Do you recognize this letter?

16  A.  Let me just look at it.  Well, I need to see more.

17  Q.  Ali, can you?

18  A.  Thank you.

19         Yes, I do recognize this.

20  Q.  What is this?

21  A.  Well, I guess it speaks a little bit to what I was saying

22  before.  We rarely had a lot of information and were seeking to

23  get as much information as we could.  And in this particular

24  case, we wanted to be sure that something that was happening

25  within the family wasn't affecting Slocum and our 15 percent of

1     Slocum.

2     Q.  I want to draw your attention to the last paragraph, at

3     least what it does continue onto the next page, about your

4     second purpose for writing.

5              Ali, blow up both of those.

6              Please read that and let me know when you're done.

7              MR. MULRY:  Your Honor, we object.  This is not in

8     evidence yet, and we do object to this exhibit.  It purports to

9     be an offer for the company in a letter that contains multiple

10    contingencies with respect to that purported offer.

11             THE COURT:  It hasn't been offered yet.

12             MR. MULRY:  I'm sorry?

13             THE COURT:  It hasn't been offered yet.

14             MR. BROOK:  I'm still getting direct on it.

15    BY MR. BROOK:

16    Q.  Seeing your second purpose, does that refresh your

17    recollection as to whether there was something else that this

18    letter was sent for?

19    A.  Yes.

20    Q.  What was that second purpose?

21    A.  What was the second?

22    Q.  What was the second purpose of the letter?

23    A.  To see if we could buy it.

24    Q.  OK.  Ali, could you zoom in on the next paragraph after

25    that.

L9EsKLE5                        Eder - Direct

1              If you could just please review and that let me know
2       when you're done.
3       A.  Yep, I'm aware of this paragraph.
4       Q.  Did you authorize the sending of this letter?
5       A.  Yes.
6       Q.  And did you approve of the proposed valuation for
7       Eber-Connecticut in here?
8       A.  Correct.
9       Q.  At this time, let me do one more thing.
10             Is this offer still open?
11      A.  Yes.
12      Q.  And is it correct that it is your intention to keep the
13      offer open until the end of this litigation?
14      A.  I don't --
15      Q.  No promises, obviously, that's your current intention,
16      right?
17      A.  It's currently, yes.  We're interested.  We've been
18      interested since the very beginning.
19      Q.  And at the time that you sent this letter?
20             THE COURT:  When you say "the very beginning," please
21      tell me what you mean.
22             THE WITNESS:  Sure.  Since -- we were interested when
23      we bought 15 percent back in 2007, I believe.
24             THE COURT:  Thank you.
25             MR. BROOK:  At this time, plaintiffs offer exhibit --

L9EsKLE5                          Eder - Direct

1   I'm blanking on the number I have in front of me here -- 201 in

2   evidence.

3             MR. MULRY:  Objection.

4             THE COURT:  Grounds?

5             MR. MULRY:  This is an offer to sell with multiple

6   contingencies not relevant to any of the issues in the case.

7   We would object on the grounds that it is not relevant to the

8   issues before the court.

9             MR. BROOK:  I think the value, to the extent your

10  Honor has read my letter from last night, I would tend to agree

11  that the issue of value should not be relevant at this point.

12            But to the extent that it still is, because there has

13  not been an order yet to impose a constructive trust or

14  reconveyance, the valuation now is relevant in the case of The

15  Estate of Rothko, the New York Court of Appeals held that in a

16  case of a breach of trust with self-dealing.  The plaintiffs

17  are entitled to, in that case, damages of appreciation damages.

18            So the current value, which is exemplified by this

19  very recent offer, is something that is relevant to this case

20  and to this court's consideration.

21            THE COURT:  Objection's overruled.

22            201 is received.

23            (Plaintiff's Exhibit 201 received in evidence)

24            MR. BROOK:  You can take that down, Ali.

25  BY MR. BROOK:

Q.  At the time you sent this offer, were you aware of what

Slocum's approximate recent gross profit was?

A.  What was the date on this again, please?

Q.  May 2021.  May 6, 2021.

A.  Um, Slocum's fiscal year is May 30, I believe, and we

wouldn't have had financial statements for the most recent

year.  I'm trying to answer your question while thinking it

through.

          We probably would have based that on the prior year's

financial statement because they couldn't have produced their

financial statement by May, since their fiscal year just ended.

We probably would have looked at May of 2020 and then come to a

rough determination from there.

          MR. BROOK:  OK.  So why don't we put up Exhibit 220 at

page seven.

          At this time, I'll go ahead and offer Exhibit 220 into

evidence.  This is the financial statement for the year ending

May 31, 2020 for Eber-Connecticut.

          THE COURT:  Received.

          (Plaintiff's Exhibit 220 received in evidence)

Q.  OK.  So you said you were looking at 2019, not 2020.

          So Ali --

A.  OK.

Q.  So, actually, Ali, it's going to be on the right instead.

A.  This makes sense.

L9EsKLE5                              Eder - Direct

1    Q.  OK.  So according to this document, it shows that the gross

2    profit for Slocum for the year ending May 31, 2019 was a little

3    over $11.3 million, is that right?

4    A.  The gross -- well, you're looking at 19.  Yes.

5    Q.  Because that was the information that was last available to

6    you, is that right?

7    A.  I -- 20 should have been available in 2021.

8         Aren't we talking about 2021?

9    Q.  Of course.  You're right.

10   A.  You're talking 12 million, just to round up.  The number is

11   gross profits.  1.6 times 12, so it's 18 million plus.

12   Q.  Then the plus would be the net asset value, is that right?

13   A.  Right, all the other stuff that you take into

14   consideration.

15   Q.  And is that generally close, at least in number, to the

16   members equity on a balance sheet?

17        MR. MULRY:  Objection.

18   A.  There is no way of answering that question.

19   Q.  OK.  So is it fair to say that determining what the net

20   asset value component of the valuation would be is something

21   that would require more work?

22   A.  Well, the assets would be determined with due diligence.

23   So you have so many trucks, dimensions, to mention something

24   small.  You have got so much in accounts receivable, you have

25   so much in accounts payable, if you own your building or other

stuff, and whatever that is.  So anytime you do an offer, any

offers I've ever seen in our industry based on a multiple of

gross profit.

        Here, we see rounding off, again, 12 million times X.

It could be, you know, in this case it was 1.6., could be 1.8

or 2.3 or, you know, .75, depending on circumstances, plus then

netting out all the assets.

Q.  So --

A.  The person selling is entitled to their value, whatever

they are, fair market value of the assets.

Q.  Just to make sure I understand, because I haven't done more

accounting in the real world stuff than you have.  So is it

correct that sometimes you'll have assets -- you mentioned

trucks -- that might have a value that is, in the real world,

different than what its accounting value would be after all the

depreciation?

A.  Sure, that could be.  That is what due diligence is for.

You figure out what the books say, what they really are, and

then what are the assets.  And you net out the assets.  I mean,

the easiest way to understand it is probably accounts

receivable and accounts payable.

        So you have so much money outstanding, coming to me.

I'll probably collect 85 or 90 percent of it, pick a number.

And you use that.  And then you have so much that is a payable,

which is money that the company owes to vendors that have to be

L9EsKLE5                          Eder - Direct

1    paid 100 percent.

2              So in that number, because the net asset of that

3    particular calculation of receivables versus payables, and

4    there are others like that.

5    Q.  One last thing, different topic.

6              Ali, you can take that down, please.

7              Are you familiar with what relationship, if any,

8    Lester Eber had with Southern Wine & Spirits after Eber

9    Brothers in New York closed down?

10   A.  Well, I knew that he was doing "lobbying work."  He was

11   representing Southern in the New York legislature as a

12   lobbyist, and I believe he was a registered and paid lobbyist.

13   That's about all I knew.

14             THE COURT:  How do you know that?

15             THE WITNESS:  Lester told me so.

16   Q.  Did you have any sense, either from Lester or from the

17   other people who were overseeing Eder-Goodman's investment in

18   Connecticut, how much time Lester was spending divided between,

19   say, Southern and Slocum?

20   A.  I would have no idea.

21   Q.  Were you aware of whether Lester Eber's employment

22   agreement with Slocum included a noncompetition clause?

23             THE COURT:  Aren't we going to see the agreement?

24             MR. BROOK:  Sure.  We can bring that in.

25             Exhibit 180.

1           THE COURT:  Please.

2           MR. BROOK:  Let's put it up on the screen.

3           THE COURT:  Look, Mr. Brook --

4           MR. BROOK:  Yes.

5           THE COURT:  -- what are we doing this for?

6           MR. BROOK:  I just wanted --

7           THE COURT:  Does this witness have personal knowledge

8   about anything to do with it?

9           MR. BROOK:  I'm trying to ask, because I'll just tell

10  you, all I wanted to do was say whether or not

11  Eber-Connecticut's board approved of Lester working for

12  Southern, because that is a clause in this contract.  He said

13  that he knew that --

14          THE COURT:  Why don't you ask him that question.

15          MR. BROOK:  I was just trying to lay a foundation,

16  sure.

17          THE COURT:  There's no foundation.  Either he knows or

18  he doesn't know.

19          MR. BROOK:  That's fine.

20  BY MR. BROOK:

21  Q.  To your knowledge, did the board of Eber-Connecticut/

22  Slocum ever approve of Lester working for Southern Wine &

23  Spirits?

24  A.  No.  I have no knowledge there ever was a board meeting.

25          THE COURT:  Were you a member of the board?

L9EsKLE5                          Cross - Eder

1                THE WITNESS:  I was potentially observed -- I was an

2      observer.  I was on the list of observers, and myself and the

3      other members who were listed as observers of the board and

4      approved as such never attended a board meeting.

5                THE COURT:  If there were any board meetings?

6                THE WITNESS:  That's my point.  We were never given

7      notice of a board meeting.

8                THE COURT:  OK.

9                MR. BROOK:  Nothing further.

10               THE COURT:  OK.  Thank you.

11               Cross-examination.

12     CROSS-EXAMINATION

13     BY MR. MULRY:

14     Q.  Good afternoon, Mr. Eder.

15     A.  Good afternoon.

16     Q.  My name is Kevin Mulry.  I represent the defendants in this

17     case.

18               You've mentioned Eder-Goodman LLC, correct?

19     A.  Yes.

20     Q.  When was that formed?

21     A.  I don't know exactly, but my guess would be in about the

22     time that we bought -- it was formed -- maybe this is a better

23     answer.  Formed specifically for the 15 percent that we bought

24     of Slocum?  So that would have been roughly 2007.

25     Q.  You testified about some interest in buying the entire

L9EsKLE5                          Cross - Eder

1    company of Slocum or each Connecticut, right?

2    A.  Correct.

3    Q.  Was Eder-Goodman formed at that time or only later with

4    respect to the 15 percent?

5    A.  No.  Eder-Goodman was formed for the 15 percent.

6    Q.  Does Eder-Goodman do anything other than hold that interest

7    15 percent in Slocum?

8    A.  Pay lawyers' bills, but no.

9    Q.  Now --

10            THE COURT:  Wonderful, isn't it?

11            THE WITNESS:  Thank you, your Honor.  Yes.

12   Q.  Your job at Eder -- I apologize.  I'll state for the court

13   reporter, I will be using both Eder and Eber in my questions.

14   I'll try to be clear when I say those things and try not to

15   misstate that.

16            You are employed by Eder Brothers; yes?

17   A.  Correct.

18   Q.  And has Eder Brothers done any other kind of transactions

19   like the ones that Eder-Goodman did with Slocum?

20   A.  You're asking if we were involved in a purchase or

21   arrangement with another beverage alcohol wholesale in

22   Connecticut?

23            That answer is no.

24   Q.  Is there anything like that somewhere else in the country?

25   A.  Probably every state there is.  Yes, it's not unusual.

1    Q.   But Eder Brothers has done that in other states?

2    A.   Oh, Eder Brothers has never done that in other states.  I'm

3    sorry.  I didn't understand the question.

4    Q.   Who are the members of Eder-Goodman?

5    A.   We have two managers, so Richard Weiss and Dave Heller, and

6    then from there, I don't know the exact corporate structure.

7    Q.   Are you a member of --

8    A.   No, I'm not an officer.

9            MR. BROOK:  Objection.  I believe the witness just

10   doesn't understand the terminology member specific to LLCs.

11   A.   Yeah.  Explain.

12           MR. MULRY:  I can rephrase.

13   Q.   Do you have an ownership interest in Eder-Goodman?

14   A.   I do.

15   Q.   What is your ownership interest?

16   A.   It is very complicated.  It was, at the time of the sale,

17   100 percent because I owned 100 percent of Eder Brothers, Inc.

18   Since then, there were sales to my family.

19   Q.   Eder Brothers competes with Eber-Connecticut or Slocum,

20   correct, in Connecticut?

21   A.   Yes, we are competitors.

22   Q.   Now, Allan Goodman is another person with an ownership

23   interest in Eder-Goodman, correct?

24   A.   Correct.  They own 50 percent Eder Brothers and each own

25   50 percent of Eder Goodman.

L9EsKLE5                          Cross – Eder

1   Q.  And Allan Goodman has another distributorship in

2   Connecticut, is that correct?

3   A.  They do.

4   Q.  What is the name of his distributorship?

5   A.  Allen S. Goodman, Inc.

6   Q.  Does Allen S. Goodman, Inc. compete Pete with Slocum or

7   Eber-Connecticut?

8   A.  They do in the northern end of the state.

9   Q.  In direct testimony you had mentioned the franchise law in

10  Connecticut.

11          Does Eder Brothers have exclusive distributorships

12  with suppliers in Connecticut?

13  A.  We do.

14  Q.  Now, in Connecticut, is it correct that having an exclusive

15  distributorship is not a guarantee that you will be the only

16  distributor for that supplier?

17  A.  Correct.

18  Q.  And that is the concept of dualing, correct?

19  A.  Well, hopefully, it is the concept of maintaining

20  exclusivities.  But you can be dualed or tripled or quadrupled.

21  Q.  Are you familiar with the term dualing as it is used in the

22  industry in Connecticut?

23  A.  Of course.

24  Q.  And so would it be correct that in Connecticut, a supplier

25  can dual an exclusive distributor and add another distributor?

1  A.  That's correct.  Most products are sold that way.

2  Q.  But the original exclusive distributor is no longer

3  exclusive, but it is one of two distributors, or three or four?

4  A.  Correct.

5  Q.  Now, with respect to your business, Eder Brothers, would

6  you expect that if a supplier dualed you on a brand, your sales

7  volume and profit on that brand would decrease?

8  A.  Decrease?  Yes.

9  Q.  Had you mentioned that you are familiar with Southern Wine

10  & Spirits of America?

11  A.  I am.

12  Q.  They are a large national distributor?

13  A.  That's an understatement.

14  Q.  Southern does not operate in Connecticut, is that correct?

15  A.  That is correct.

16  Q.  Have they ever operated in Connecticut, to your knowledge?

17  A.  Never.

18  Q.  Have you seen how Southern operates when they come into a

19  new market?

20  A.  Yes.

21  Q.  Is it fair to say that they take very aggressive actions

22  with respect to competing?

23  A.  Yes.

24  Q.  They have been known to lure salespeople away from other

25  distributors in the market they are coming into?

L9EsKLE5                         Cross - Eder

1    A.   Yes.

2    Q.   And they will take suppliers away from other distributors

3    in the market they come into?

4    A.   They can try to do that, yes.

5    Q.   And they actually do that, don't they?

6    A.   Sure.

7    Q.   Now, are you aware that Southern entered the New York

8    market in around 2004?

9    A.   Very much so.

10   Q.   And is that something you were watching, that when Southern

11   goes into the New York market --

12   A.   The whole country, because of my former role as a national

13   association president.  So I watch all that stuff, yes.

14   Q.   So is it correct that you have seen Southern's aggressive

15   actions when they go into markets throughout the country?

16   A.   Correct.  Anyone -- if I went into another market, I would

17   act the same way.

18            THE COURT:  It's called competition?

19            THE WITNESS:  Yes, correct.

20   Q.   But Southern is a very large company, correct?

21   A.   No.  They are the largest in the United States.

22   Q.   And they have a lot of money to do this aggressive

23   competition, correct?

24   A.   Seemingly so, yes.

25   Q.   Now, you're familiar with Lester Eber, I think you

L9EsKLE5                              Cross - Eder

1   testified, right?

2   A.  Yes.  I've known him a long, long time.

3   Q.  So you knew his business was in New York when Southern came

4   in, right?

5   A.  Correct.

6   Q.  And is it correct that you saw what happened to Lester Eber

7   and his business and Eber Brothers business in State of New

8   York when Southern came in?

9   A.  Unfortunately, yes.

10  Q.  Southern took away salespeople from Eber-Metro, Eber Wine &

11  Liquor, they took away distributors?

12  A.  Yes.  Lester told me that himself.

13  Q.  And they took distributors from the Eber companies?

14          THE COURT:  Your objections as to hearsay, counsel,

15  have kind of vanished, haven't they?

16          MR. MULRY:  I'm sorry, your Honor?

17          THE COURT:  You're not so interested in precluding

18  hearsay testimony anymore, are you?

19          This is kind of like what everybody in the country has

20  told this man, and I'm sure he's being perfectly candid about

21  it.  That's not a snide remark.  He is reporting what he has

22  heard, for whatever it is worth.

23  BY MR. BROOK:

24  Q.  But you're aware, are you not, that Southern put the New

25  York Eber business out of operation, right?

1   A.  He helped put it out of operation, yes.

2   Q.  If Southern did enter the Connecticut market, would you

3   expect them to try to take away salespeople and suppliers from

4   you and other distributors?

5            MR. BROOK:  Objection, speculation.

6            THE COURT:  Counselor, if someone had wheels instead

7   of legs, would they be a bicycle?

8            MR. MULRY:  I don't believe so, your Honor.

9            THE COURT:  OK.  Let's stop speculating about what

10  might happen if something else happened.  OK?

11           MR. MULRY:  Yes, your Honor.

12  Q.  Now, you've testified that you are aware that Eber-Metro

13  had purchased an interest in Slocum, also called

14  Eber-Connecticut, in around 2005, right?

15  A.  I believe that is when that happened.

16  Q.  And you also said you were aware that there was a proposal

17  at some point for Southern to purchase an interest in

18  Eber-Connecticut, correct?

19  A.  I did not say that.

20  Q.  Were you ever aware that southern had some proposal to

21  purchase an interest in Slocum?

22  A.  We were told that, and I believe it would have been about

23  January.  It is when we met with Pat Dalton we were told that.

24  I think that was January 2009 or '10.

25  Q.  Southern entering the Connecticut market would not be a

good thing for Eder-Goodman, is that correct?

A.  Probably not, but it's not the end of the world.

Here is what you have to understand.  I hear your questions, but it depends on what kind of business you run and what you are fortunate to have.  Does Southern have a lot of power because they are in other states?  Absolutely.

But if you're really good in a particular state, and it so happens we have more exclusive brands than anyone in the state of Connecticut.  About 70 percent of what we sell is exclusive.  Now, you could look at that two ways.  Well, that makes you more vulnerable to Southern, or you could look at that as suppliers have a lot of faith.  Just because Southern is good in California, doesn't mean they are going to be good in Connecticut with someone that's been in the market literally since 1933.

Q.  But that said, is it fair to say you would rather not see Connecticut --

A.  I would rather not.

Q.  -- be in the market with Southern?

A.  There's no reason for them to be here.  They are in 45 states.

Why did they skip Connecticut?  Because we're a franchised market.

Q.  Let's talk about the 2008 transaction which you testified about.

L9EsKLE5                          Cross - Eder

1   A.   Which was that?

2   Q.   I'm sorry?

3   A.   What is the 2008 transaction you're referring to?

4   Q.   This is the Eder-Goodman purchased 15 percent interest in

5   Slocum?

6   A.   Yes.  I guess that was January 2008 money went in escrow.

7   I think that's correct.

8   Q.   Just if you could bear with me, I want to try to shorten

9   the time as much as possible.  So I'm just making --

10  A.   I appreciate that.

11  Q.   With respect to those discussions --

12  A.   Which discussions?

13  Q.   The discussions with respect to the 15 percent interest.

14  A.   15 percent, yes.

15  Q.   We'll come back to the issue of the whole company, but I

16  want to focus on the 15 percent right now.

17          What was the time between the start of those

18  discussions and the letter agreement that you were shown on

19  direct testimony?

20  A.   I don't understand the question.

21  Q.   Well, at some point there was a proposal or a discussion

22  that Eder-Goodman would take a 15 percent interest in Slocum,

23  right?

24  A.   No.  That was Pat Dalton dictating that.  That is when we

25  learned about Southern, and he said they are going to be in

L9EsKLE5                          Cross - Eder

1   this transaction.  Lester would prefer you guys, and it is

2   going to cost you four and a half million dollars if you want

3   15 percent.

4   Q.  So that was the proposal made?

5   A.  To us.

6   Q.  To you by Pat Dalton?

7   A.  Correct.

8   Q.  And did that proposal ultimately result in the letter

9   agreement we saw on, I believe it was January 29 of 2008?

10  A.  If that is the one that includes the ROFR, yes.

11  Q.  OK.  Well, if you know, how much time elapsed between a

12  discussion with Pat Dalton and the letter agreement with the

13  ROFR?

14  A.  Well, I believe the Pat discussion was January, so the date

15  of the letter, I don't know exactly.  You must have it there.

16  Q.  OK.  Are you talking about the letter agreement?

17  A.  I don't know what you're talking about, so I can't say what

18  I'm talking about.

19  Q.  You just mentioned a communication you had with Pat Dalton?

20  A.  Right.  Verbally.  Verbally.

21  Q.  Verbally?

22  A.  Correct.

23  Q.  OK.  And at some point there was a letter agreement, right,

24  which --

25          Let me just see.  That was, I believe, plaintiffs'

1    exhibit --

2    A.   If we can see that, then I can better answer your question.

3              MR. BROOK:  I'm just going to make an objection to the

4    relevance of the amount of time it took to negotiate.

5              THE COURT:  Let's just get on with this.

6              MR. MULRY:  If I could ask counsel, I just don't have

7    written down the letter agreement plaintiffs' exhibit.  Was

8    that 200, do you know?

9              MR. BROOK:  The letter agreement is Exhibit 56.

10             MR. MULRY:  There it is.

11             MR. BROOK:  It is dated January 29, 2008.

12             THE COURT:  Not the one on the screen, it isn't.

13             MR. MULRY:  No, that's --

14             MS. KRAL:  My apologies.  Do you want that one?

15             MR. BROOK:  Help him out, yes.

16             MS. KRAL:  OK.

17             MR. MULRY:  OK.  It is Exhibit 56.

18             MR. SANTORO:  I'm sorry.

19             THE COURT:  It was in January 2008, the one he had on

20    the screen.

21             MR. MULRY:  Yes, that was it, your Honor.

22             January 29 of 2008.

23             THE COURT:  The question, I believe, Mr. Eder is:  How

24    much before January 29, 2008, did Pat Dalton first call you and

25    propose that your company buy 15 percent?

1    THE WITNESS:  If that's the question, I believe I can

2    answer that approximately.  We had talked about taking a piece

3    of it roughly in June of 2007, and we heard nothing.  And we,

4    our team -- and I believe specifically that it was Richard

5    Weiss and Dave Heller, but I'm not positive of that -- called

6    Pat Dalton around Christmastime, so December, and said, What's

7    stewing?  We haven't heard from you.  And that's when we wound

8    up with this exhibit that we're talking about.

9    THE COURT:  Is that conversation around Christmastime

10   the one in which Dalton said, in substance, that if you want

11   the 15 percent, it's going to cost four and a half million?

12   THE WITNESS:  Yes.

13   THE COURT:  OK.  There's your answer, counsel.

14   Move on.

15   MR. MULRY:  Thank you.

16   BY MR. MULRY:

17   Q.  Is it fair to say that there was not an enormous amount of

18   due diligence during that meeting?

19   A.  What was that?

20   Q.  Is it fair to say there was not an enormous amount of due

21   diligence?

22   A.  There was zero due diligence, basically.  There was some,

23   but it was almost nothing.

24   Q.  But you decided to purchase?

25   A.  Yes, because we knew the gross profit and we got the ROFR.

L9EsKLE5                              Cross - Eder

1   So that was worth --

2   Q.  You talked about the ROFR.

3           You did receive a number of rights in the transaction

4   in addition to the 15 percent interest, correct?

5   A.  Yes.

6   Q.  You received a liquidation preference, correct?

7   A.  I received a list.

8   Q.  Liquidation preference?

9           So is it correct that the $4.5 million investment that

10  Eder-Goodman paid --

11          THE COURT:  Counselor, is there a written agreement?

12          MR. MULRY:  Yes, there is.

13          THE COURT:  OK.  So why are we taking secondhand

14  information about the contents of the writing?

15          MR. MULRY:  We can put that in, your Honor.  It is

16  helpful to hear this witness's understanding, but we will --

17          THE COURT:  You know, suppose it says that as part of

18  the agreement, they are going to get two zebras and a giraffe,

19  and he doesn't remember that.

20          How does his understanding matter?

21          MR. MULRY:  Yes, your Honor.

22          THE COURT:  It is a legal instrument.

23          MR. MULRY:  Your Honor, if we could put up Plaintiffs'

24  Exhibit 57.

25          THE COURT:  That's 56.

L9EsKLE5                          Cross - Eder

1              MR. MULRY:  If we could just scroll through that.

2    Q.  If you could take a look at that.

3    A.  Sure.

4    Q.  And say is that the amended and restated LLC agreement?

5    A.  That's what it looks like.

6    Q.  This transaction?

7    A.  It was redone a number of times.  I'll assume that this is

8    the final one, but I'm not positive of that.

9    Q.  Do you recall that the transaction, the deal, had a

10   liquidation preference so that the $4.5 million investment,

11   Eder-Goodman would get that back before any other equity?

12   A.  Correct.

13   Q.  If there were a sale or other transaction, is that correct?

14   A.  Correct.  Absolutely.

15   Q.  Would you agree that that made the Eder-Goodman units

16   substantially equivalent to a convertible preferred equity

17   security?

18   A.  I suppose you could say that.

19   Q.  That right has significant value, would you agree?

20   A.  Well, it has value, but don't forget, we were looking at a

21   company whose balance sheet was pretty darn poor.  So we wanted

22   to be sure that, since there were potentially other creditors,

23   that we would get our money first.

24   Q.  OK.  Does it have some value --

25   A.  Of course, it does have some value.  But without that, we

1   never would have signed this agreement.

2   Q.  OK.  And you mentioned the right of first refusal as

3   another very important right?

4   A.  Yes, it is.

5   Q.  Eder-Goodman also had a right to veto certain transfers of

6   equity to other interests.  Do you recall that?

7   A.  It did.  It did.

8   Q.  Eder-Goodman received tagalong rights in the event of the

9   sale of the company and its assets?

10  A.  What rights?

11  Q.  Tagalong rights.  Do you recall that; yes?

12  A.  Yes.

13  Q.  Also, Eder-Goodman was able to object to the indebtedness

14  of Eber-Connecticut if it exceeded $10 million, do you recall

15  that?

16  A.  And we did so.

17  Q.  You did exercise that right?

18  A.  We did.

19  Q.  So Eber-Connecticut had lending opportunities in excess of

20  5 million and Eder-Goodman objected?

21          THE COURT:  I think you mean borrowing opportunities,

22  don't you, Counsel?

23          MR. MULRY:  I do, your Honor.  Thank you for

24  correcting me there.

25  A.  Yes.

1   Q.  Eber-Connecticut had borrowing opportunities in excess of

2   5 million and Eder-Goodman objected, correct?

3   A.  Right.  If you said, because I didn't hear it correctly, if

4   you said Eber and Eder-Goodman objected, that is correct.

5   Q.  OK.  I apologize if I confused those again.

6   A.  It's the mask.  Don't worry about it.

7   Q.  Right.

8   A.  Again, we just didn't think the balance sheet could support

9   additional dollars.  It's not that we wanted to hurt -- we had

10  15 percent of the company.  They were already greatly in debt.

11  Q.  Let's go to Plaintiffs' Exhibit 199, which was the six-page

12  document.

13          This is a six-page document, correct?

14  A.  Is the one with the handwriting on it?  We're back to that?

15  Q.  Yes.  I can tell you the first three pages are printed, the

16  last three pages are handwriting.

17  A.  Yep, yep.

18  Q.  And on the first three pages, is it correct that this is --

19  you called it a pro forma, right?

20  A.  Pro forma letter.

21  Q.  What is a pro forma?

22  A.  So, if you understand it, this is where we're attempting to

23  take our own fixed costs, drop Slocum's costs into it, and what

24  does that mean for the net.

25  Q.  And is it correct, this is a model or a pro forma for

1  purchasing the whole business, is that correct?

2  A.  Yeah.

3  Q.  Now, this model doesn't assume Eder-Goodman would be taking

4  over any of Slocum's existing debt, does it?

5  A.  I don't know.  I would have to look at it more carefully.

6  We didn't know the existing debt.

7  Q.  At least this model doesn't account for, under this model,

8  would it be correct that there is no debt that's included in

9  this model?

10  A.  Right.  That really wasn't.  From what I see quickly, that

11  really wasn't the purpose.  The purpose was to look at your

12  fixed cost, you know, drivers, warehouse, sales manager and

13  salespeople, and what does it mean to take another company and

14  drop in, drop it in.  And what is the revenue you get from that

15  and, therefore, how fast can I pay back the person I have to

16  pay to get it.

17  Q.  Would it be correct that if you were to go forward with the

18  transaction to purchase Slocum, you would have to factor into

19  this the existing debt of Slocum?

20  A.  Sure.

21  Q.  And then --

22        THE COURT:  Well, that assumes that you were assuming

23  the debt, right, Mr. Eder?

24        THE WITNESS:  Yes.  That's assuming -- yes.

25  Q.  If you were assuming the debt, that would affect all these

L9EsKLE5                          Cross - Eder

1   numbers, correct?

2   A.   You would assume the debt, because it is also a piece of

3   the Connecticut law that if I take a stock sale, the franchises

4   don't go with it.  If I take an asset sale, the franchises go

5   with the sale.  That's an important piece as well.

6   Q.   If you included in the debt, the purchase price would go

7   down, is that correct?

8   A.   Sure.  If they had debt, yes.

9   Q.   And that is true of other liabilities of Slocum, correct?

10  A.   That's correct.  Again, the reason that anyone in the state

11  of Connecticut would take on the debt is because that

12  guarantees that the franchises go with it.  That's a

13  calculation that you make.

14        If someone has -- you know, if you're paying

15  $20 million and someone has $15 million worth of debt, you

16  might have a problem.  But otherwise, you would purchase it

17  because you get the franchises with it, which is what the

18  important piece is.

19  Q.   OK.  But just as far as the numbers, what I'm trying to

20  understand is, it doesn't appear that this pro forma -- I'm

21  just looking at the first page of this exhibit.

22  A.   Yes.

23  Q.   It doesn't appear that it really takes into account all the

24  liabilities of Slocum, am I correct on that?

25  A.   On this piece that you have here?

1  Q.  Yes.

2  A.  It takes -- there is none of it.  This is about

3  Eder-Goodman.

4  Q.  So you would have to account for --

5  A.  Excuse me.  Let me correct myself.

6          They are showing it is Eder-Goodman on the top and

7  Slocum from there.

8  Q.  OK.  But is it correct you would have to account for

9  accounts payable?

10  A.  Yes.  We have been through that before.

11  Q.  OK.  And warehouse expenses, truck expenses, vendor

12  contracts, all those things, right?

13  A.  Yes, sir.

14  Q.  And also in this model, is it correct you would not be

15  taking on all the employees of Slocum?

16  A.  May or may not, but probably not.  You don't need two

17  switchboard operators, for example.  Same person answers the

18  phone.

19  Q.  OK.

20  A.  Of course there is no switchboard operators anywhere

21  anymore.

22          THE COURT:  You can't even get a machine that says

23  your call is very important, but we're not going to pick up on

24  it.

25          I know where you can get one.

L9EsKLE5                          Cross - Eder

1   Q.  Just to confirm, the last three pages of this exhibit are

2   handwritten notes?

3   A.  Yeah.

4   Q.  Is it correct you don't know whose handwritten notes these

5   are?

6   A.  I don't.  I don't recognize it as anyone from our team, but

7   that's as far as I can go.

8           I would recognize our team's handwriting, or my own,

9   obviously.  So I don't know.

10  Q.  OK.  Are you familiar generally with your business or other

11  businesses with pension plan liabilities?

12  A.  Do what?

13  Q.  Pension plan liabilities?

14  A.  I am.

15  Q.  Does your company have a pension plan?

16  A.  We do.  We have two.  One for -- one is Teamsters and one

17  was -- we just closed it -- for our non-Teamster employees.

18  Q.  OK.  So are you aware of issues concerning unfunded pension

19  plans?

20  A.  Very much so.  It's to a tune of a lot of money.

21  Q.  Are you familiar with termination liability for ending on

22  funded pension plans?

23          THE COURT:  Are we now going to have expert testimony

24  on the law of pension benefits?

25          MR. MULRY:  No.  Just to the extent that he

1   understands it.  It's not a lot of questions, Judge, but it is

2   an important issue in the case.

3            THE COURT:  That may be.

4            MR. MULRY:  It's important to the specific issue of

5   the 2008 transaction.

6            THE COURT:  It may be, but this is not a qualified

7   expert on the subject.

8            MR. MULRY:  I'll move rapidly through, Judge, and

9   skip...

10  BY MR. MULRY:

11  Q.  In 2008, did Eder-Goodman know about any potential pension

12  plan termination liability of some of the Eber companies?

13  A.  I know that at some point we knew about them, but I cannot

14  tell you what the date was.

15  Q.  Did you know about them at the time you agreed to the

16  transaction for 15 percent and paid 4.5 million?

17  A.  I would say that answer is no, because it had zero to do

18  with Connecticut.

19  Q.  Did you have an understanding at some point that

20  Eber-Connecticut was potentially liable for the Eber company

21  pension plan liability as part of the control group?

22  A.  That's an interesting question.  We never heard that from

23  Lester or Wendy.  We came to find out about it, I believe,

24  through searching somewhere about that.  But, again, and we

25  asked the question, is any of this being funded by Connecticut,

1    because we're entitled to that answer.  And the answer was no

2    and don't worry about it.  So we didn't think that there was a

3    problem.

4    Q.  Did you ever have an understanding of what the potential

5    termination liability was?

6    A.  For Eber-Metro North and all that?

7    Q.  Yes?

8    A.  No.

9    Q.  In 2008, was Eder-Goodman aware of any liability of the

10   Eber companies to the Teamsters for withdrawal liability?

11   A.  I don't think so, no.  Again, I said that before, I don't

12   know the exact date that we found out.

13   Q.  At some point, did Eder-Goodman become aware --

14   A.  We sure did, yes.

15            THE COURT:  Let's get the whole question out there so

16   we know what the answer is.

17            THE WITNESS:  Sorry.

18   Q.  At some point, did Eder-Goodman become aware of a Teamsters

19   withdrawal of liability?

20   A.  Yes.

21            THE COURT:  Teamsters withdrawal liability of what

22   entity or entities?

23            THE WITNESS:  Of the pension that was in New York

24   State.

25            THE COURT:  And who was the obligor, who was liable,

L9EsKLE5                          Cross - Eder

1    as you understood it?

2            THE WITNESS:  Several layers above Connecticut.

3    Either Lester, Eber New York, or Metro or whatever.  He had a

4    bunch of different companies.  It's up his stream, let's put it

5    that way.

6    Q.  Is it fair to say that such liabilities would be important

7    to know in terms of evaluating a transaction --

8    A.  We couldn't --

9            THE COURT:  Let him finish the question, Mr. Eder.

10   You're doing great, but let him finish the question.

11   Q.  -- in terms of valuing a transaction as far as the purchase

12   price?

13   A.  No, because it wouldn't matter because it's not in this

14   state.  And we were told it has nothing to do with Connecticut

15   by those people that own the other 85 percent.

16   Q.  Let me ask you about the six percent share that was -- that

17   transaction in 2010.

18           The transaction was with a company you had mentioned

19   Poleridge Bowman?

20   A.  Yes.

21   Q.  I ask that we put up Defendants' Exhibit HHHHH.

22           If you could look through what's been put up as

23   Defendants' Exhibit HHHHH and let us know if you recognize that

24   document.

25   A.  Yeah.  It's a joinder agreement, for, I guess, with Wendy,

L9EsKLE5                           Cross - Eder

1    and six percent that she would be, as an owner, party, and

2    subject to the same things that were required by the other

3    documents that were part of the transaction.

4    Q.  OK.  I'll ask if we can go down just a little farther to

5    the signature pages.

6           Right there.  This document reflects that the parties

7    to this agreement were Eber Brothers Wine & Liquor, Metro,

8    Eder-Goodman LLC, and Polebridge Bowman Partners, LLC.

9    A.  Yes.

10   Q.  Do you see that?

11   A.  I do.

12   Q.  Were those the parties to the 2010 joinder agreement

13   involving the six percent transaction?

14   A.  I think so.  They must be, but I don't know.

15          THE COURT:  Why do you say they must be?

16          He's put a document in front of you, and it's not

17   signed on behalf of your company.

18   A.  It's not signed by our team, correct?

19   Q.  Go a little further down.  It is signed by Eder-Goodman.

20   A.  OK.  Then that answer -- keep going, if you would.

21   Q.  Maybe there's David Heller's signature too.  I think we're

22   just coming to that.

23   A.  Then the answer is yes.

24   Q.  I believe you said that you believed that Polebridge Bowman

25   is a company owned by Glenn Sturm?

A.   I don't know.  Owned by or somehow associated with Glenn
Sturm.

Q.   Glenn Sturm you believe you met at a meeting one time in
North Haven?

A.   That's correct.

Q.   Was that at a meeting of shareholders or unit holders of
Eber-Connecticut?

A.   It was a get-together.  It may have been, but it was a
get-together between, as I recall, between Wendy and Glenn
Sturm, Richard Weiss, myself, at the time.

Q.   OK.

A.   I think that's the first time we heard about Glenn Sturm,
frankly, but I'm not sure.

Q.   Have you ever suggested to any people whether other
distributors or suppliers that Eber-Connecticut was going out
of business?

A.   No.

Q.   Have you ever said words to the effect that the lights are
going out at Slocum or Eber-Connecticut?

A.   Not that I'm aware of, no.

Q.   Do you know of anyone at Eder-Goodman or either of the
companies involved in Eder-Goodman saying anything like that?

A.   It would be counterproductive.  We own 15 percent of the
company.

Q.   If we could go to Plaintiffs' Exhibit 201, please.

L9EsKLE5                          Cross - Eder

1          You have identified that document before, correct?

2     A.  I don't know.  Keep going.

3     Q.  If we could go down a little bit.

4     A.  My firm represents Eder-Goodman.  OK.

5          Rights as a minority member, yep.  OK.

6     Q.  This is the letter you testified about previously sent in

7     May of this year by your lawyer?

8     A.  This is the one where we're talking about purchasing, or

9     no?

10    Q.  Yes.

11    A.  Yes.

12    Q.  So let's just stay where we are right now.

13         The first second -- third paragraph begins "my first

14    purpose."

15         Could you read that to yourself?

16    A.  Sure.  Yep.

17    Q.  You mentioned unique rights granted to Eder-Goodman as the

18    minority member in the LLC agreement?

19    A.  Um-hmm.

20         THE COURT:  You have to answer with words verbally.

21    We need words, not sounds, please.

22         THE WITNESS:  I'm sorry?

23         THE COURT:  You've got to answer with words.  Yes, no,

24    maybe.

25         THE WITNESS:  The answer is yes.

L9EsKLE5                          Cross - Eder

 1                THE COURT:  Thank you.

 2                THE WITNESS:  I apologize.

 3    BY MR. MULRY:

 4    Q.  And those rights, you go on to say, include among others

 5    various rights of refusal, right?

 6    A.  Yes.

 7    Q.  And then it goes on -- let's go to the second page.

 8                You testified about the paragraph that begins "in

 9    furtherance of this belief," right?

10                Do you see that there, Mr. Eder?

11    A.  Yes.  It's an offer to purchase the business.

12    Q.  It is an offer to purchase the remaining 85 percent of

13    Eber-Connecticut?

14    A.  Correct.

15    Q.  And the offer does not have a dollar amount, right?

16                THE COURT:  The offer does not have a what?

17                MR. MULRY:  A dollar amount.

18    A.  It does not.

19    Q.  The offer is contingent on several different things,

20    correct?

21    A.  Correct.  So, but it does have the 1.6 times GP.  Whatever

22    the GP is, that becomes the dollar amount plus the other

23    assets, etc.  Because we didn't have a financial statement, so

24    we didn't know what they were.

25                Again, we put this 1.6 number in.  We took a guess at

L9EsKLE5                              Cross - Eder

1   the other things and what the liabilities and assets would be.

2   Q.  OK.  In that paragraph, if you could go down one, two,

3   three, four lines.  Do you see where it starts "assuming?"

4   A.  I'm sorry.  Where are you?

5   Q.  The paragraph that begins "in furtherance."

6   A.  Assuming, we're starting there?

7   Q.  I guess it starts "this offer is currently in effect and

8   will remain in effect," and then on the next line it says

9   "assuming that something resembling the Slocum & Sons business

10  E-G's members have known remains."

11          Do you see that?

12  A.  Yep.

13  Q.  So that means that if there is something -- is it correct

14  that means that if there is something that Eder-Goodman

15  perceives as substantially different about the company, the

16  offer goes away?

17  A.  Yeah.  If you go back, please, to the top of the page.  We

18  will see the date, just so I'll be reminded of what the date

19  is.

20          This is May -- again, we're back to this piece that

21  their fiscal year ends in May.  They weren't going to have be a

22  entire year of statements available, naturally, because they

23  couldn't be produced because it wasn't even over.  So we're

24  saying, assuming the year looks something like in the past,

25  this is what we're interested in.

L9EsKLE5                          Cross - Eder

1   Q.  And would it be correct that Eder-Goodman would be deciding

2   that, whether that contingency existed or didn't exist?

3   A.  Sure, like any other contingency.

4          THE COURT:  Eder-Goodman or some judge somewhere or

5   maybe even a jury.

6   Q.  Is it correct, a downturn in business could come with that

7   category?

8   A.  Yes.

9   Q.  Also of a major supplier could come within that?

10          THE COURT:  Mr. Mulry, you're wasting time.

11          MR. MULRY:  I will move on, your Honor.

12          THE COURT:  Maybe this is too indefinite to enforce,

13   maybe it isn't.  If it isn't, it's a lawsuit, if the parties

14   are so inclined.

15          MR. MULRY:  This is my last --

16          THE COURT:  You all know that.

17          MR. MULRY:  I will look at this, your Honor, and

18   finish this up very quickly.  This is my last topic.

19   BY MR. MULRY:

20   Q.  You have no delineation of other terms in here, correct?

21   A.  I don't understand the question.

22   Q.  I'll move on.  This is also --

23          THE COURT:  Just a second.  I need to correct the

24   record because there is a mistranscription.

25          My statement was, Maybe this is too indefinite to

L9EsKLE5                              Cross - Eder

1    enforce, maybe it isn't.  That was the sentence.

2            Let's go on.

3    BY MR. MULRY:

4    Q.  OK.  The offer is subject to due diligence, is that

5    correct?

6            I can find that for you.

7    A.  Of course.

8            THE COURT:  Mr. Mulry, I have been around deals 100

9    times more complicated than this for 50 years.  I can read an

10   offer, I can read a contract, and I don't need this.

11           MR. MULRY:  OK, your Honor.  I will finish up very

12   quickly.

13           THE COURT:  Whatever it says, it says, and you have

14   your arguments.

15           MR. MULRY:  If I could have one moment, your Honor?

16           THE COURT:  Yes.

17           MR. MULRY:  Your Honor, we would offer Exhibit HHHHH

18   into evidence, that's five Hes.  That's the joinder agreement.

19           MR. BROOK:  No objection.

20           THE COURT:  Received.

21           (Defendant's Exhibit HHHHH received in evidence)

22           MR. MULRY:  No further questions.

23           Thank you, Mr. Eder.

24           THE COURT:  Thank you.

25           Any redirect?

L9EsKLE5                      Redirect - Eder

1            MR. BROOK:  I was more inclined before your Honor's

2       last few comments, but I'm going to try to ask five questions,

3       and hopefully it will be very quick, since they are not

4       explicitly in the contract.

5       REDIRECT EXAMINATION

6       BY MR. BROOK:

7       Q.  Mr. Goodman, you testified some about different rights

8       Eder-Goodman had, like a right of first refusal and right to

9       restrict the amount of debt.

10           Did Eder-Goodman have the right to decide who the

11      officers of Slocum were?

12           THE COURT:  Counselor --

13           MR. BROOK:  OK.  No further questions.

14           THE COURT:  -- don't do what he did.  I can read the

15      document.

16           MR. BROOK:  Yes.  I was asking what was in the

17      document.  I apologize.

18           THE COURT:  Anything else for this witness?

19           MR. MULRY:  No, your Honor.

20           MR. BROOK:  No, your Honor.

21           THE COURT:  Mr. Eder, thank you very much.

22           THE WITNESS:  Thank you, sir.

23           THE COURT:  You're excused.

24           (Witness excused)

25           What's left on the plaintiffs' case, while we're

L9EsKLE5                    Redirect - Eder

1   waiting to see if the next case is here?

2            MR. BROOK:  Your Honor, so the plan is, based upon

3   discussions with defense counsel, to put on our expert witness,

4   Glenn Liebman, tomorrow.

5            THE COURT:  It's the mask.  It's really aggravating to

6   all of us.  Somewhere in the middle I lost you.

7            MR. BROOK:  I apologize.  I'm normally pretty good at

8   speaking, annunciating.

9            THE COURT:  I have no doubt.

10            MR. BROOK:  Our expert, Glenn Liebman, is the last

11   witness to testify.  There have been a number of objections

12   made to his testimony by letter yesterday.  I responded to that

13   last night.  He will be the first witness on tomorrow.

14            The defense advised they expect his cross to last

15   about two hours, and at that point, your Honor, we would offer

16   deposition designations and certain other documentary evidence

17   that was produced in discovery.

18            THE COURT:  OK.  That will be the plaintiffs' case?

19            MR. BROOK:  That will be it.  I think we'll end

20   tomorrow.

21            THE COURT:  With respect to the depositions, have you

22   cross-designated from the testimony, same testimony?

23            MR. BROOK:  Yes, your Honor.  We finished that late

24   last night.  I have not had a chance to see the defendants'

25   objections yet.

1           THE COURT:  I'll take it all, subject to the

2    objections.

3           Have you got a single excerpt of each deposition that

4    contains anything either one of you has designated, color-coded

5    and marked, so I can just pick up one document?

6           MR. BROOK:  Yes, your Honor.  The only thing I would

7    ask for is at least one hour after we finish here for me to

8    just review their additional counter designation, to make sure

9    that I don't have an objection to their additional testimony.

10          THE COURT:  So, you know, I wind up sometimes in

11   trials where the plaintiff designates, you know, page 16, page

12   42, page 68, and the defendant then designates intervening

13   pages.  Now I have two copies of the deposition, and I'm taking

14   a page here and a page there.  I don't want to do that anymore.

15          MR. BROOK:  It will all be in one PDF per deposition

16   take, and we have noted the objections in the text in the side

17   where there is colored text.

18          THE COURT:  If it is reasonably convenient to do it,

19   it would be good to have a hard copy.  I only need one.  But

20   sometimes people actually read these things without having a

21   computer at hand.

22          MR. BROOK:  Defense counsel has an office somewhere in

23   this Tri-State region, unlike me.  I think they have offered

24   to --

25          THE COURT:  Is he in a franchised state or

L9EsKLE5                      Redirect - Eder

1    non-franchised state?

2              MR. BROOK:  I live in California but I practice in

3    New York.  It is a strange situation.

4              THE COURT:  You've got a lot of frequent flyer miles,

5    I guess.

6              Thank you very much.  I appreciate that it is not the

7    easiest thing in the world to deal with documents when you're

8    not dealing with a jury and the judge can read.  It's a

9    problem, and I understand that.  But the job is to do this

10   efficiently and as promptly as we can, and I'm insisting on

11   that from both sides, because it is a waste of time otherwise.

12   I mean, I really understand documents like this.

13             OK.  Thanks very much.  See you tomorrow at 9:30.

14             (Adjourned to Wednesday, September 15, 2021, at

15   9:30 a.m.)

16

17

18

19

20

21

22

23

24

25

1                          INDEX OF EXAMINATION

2    Examination of:                                    Page

3     LISA STEIN

4    Direct By Mr. Brook   . . . . . . . . . . . . . .42

5    Cross Q. . . . . . . . . . . . . . . . . . . . . .47

6     AUDREY HAYS

7    Direct By Mr. Brook   . . . . . . . . . . . . . .53

8    Cross By Mr. Santoro . . . . . . . . . . . . . .57

9     DANIEL KLEEBERG

10   Direct By Mr. Brook   . . . . . . . . . . . . . .59

11   Cross By Mr. Santoro . . . . . . . . . . . . . .69

12   ANDREW EDER

13   Direct By Mr. Brook   . . . . . . . . . . . . . .84

14   Cross By Mr. Mulry . . . . . . . . . . . . . . 130

15   Redirect By Mr. Brook   . . . . . . . . . . . 161

16

17

18

19

20

21

22

23

24

25

```
 1                      PLAINTIFF EXHIBITS

 2   Exhibit No.                                  Received

 3   1001      .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .46
     155, 178, 258, 33 and 32  .  .  .  .  .  .  .  .  .  .48
 4   1002, 32, 154, 78, 4, 133 through 135,  .  .  .  .56
               42, 35, 164, and 149
 5   1003      .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .63
     56        .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .89
 6   199       .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  110
     292       .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  113
 7   293       .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  113
     286, 287, 288, 289, 290, 293, 294, 295,  .  .  .  114
 8             and 296
     201       .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  124
 9   220       .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  125

10                      DEFENDANT EXHIBITS

11   Exhibit No.                                  Received

12   OOOO      .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .58
     Y12       .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  .78
13   HHHHH     .  .  .  .  .  .  .  .  .  .  .  .  .  .  .  160

14

15

16

17

18

19

20

21

22

23

24

25
```