L9FAKLE1ps

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   DANIEL KLEEBERG, et al.,

4                  Plaintiffs,

5          v.                        16 Civ. 9517 (LAK)

6   WENDY EBER, et al.,

7                  Defendants.        Trial

8   ------------------------------x
                                     New York, N.Y.
9                                    September 15, 2021
                                     9:55 a.m.
10
    Before:
11
                        HON. LEWIS A. KAPLAN,
12
                                       District Judge
13
                           APPEARANCES
14
    BROOK & ASSOCIATES, PLLC
15       Attorneys for Plaintiffs
    BY:  BRIAN C. BROOK
16
    FARRELL FRITZ, P.C.
17       Attorneys for Defendants
    BY:  KEVIN P. MULRY
18       FRANK T. SANTORO
         -and-
19  HERBERT LAW
         Attorneys for Defendants
20  BY:  JOHN HERBERT

21  ALSO PRESENT:
    ALI L. KRAL, Paralegal
22  SAMANTHA SKORIAK, Paralegal

23

24

25

1           (Trial resumed)

2           THE COURT:  Good morning, everyone.

3           OK.  Counselor, your next witness.

4           MR. BROOK:  Plaintiffs call Glenn Liebman to the

5    stand.

6    GLENN LIEBMAN,

7         called as a witness by the plaintiffs,

8         having been duly sworn, testified as follows:

9           THE COURT:  All right, counselor.  You may proceed.

10          MR. MULRY:  Your Honor, if I could just have a moment.

11   With respect to Mr. Liebman's testimony, we had made objections

12   and Mr. Brook had filed an opposition.  We've conferred this

13   morning, and, consistent with some of your rulings yesterday,

14   what we would ask is that Mr. Liebman's direct testimony come

15   in subject to those objections and the parties can fully

16   address those with the Court post trial.

17          THE COURT:  Yes.  OK.

18          MR. MULRY:  Thank you, your Honor.

19          (Discussion held off the record)

20          THE COURT:  OK.  Let's go ahead.

21          MR. BROOK:  Yes, your Honor.

22   DIRECT EXAMINATION

23   BY MR. BROOK:

24   Q.  Good morning, Glenn.

25   A.  Good morning.

1    Q.  This is going to be pretty brief, at least my part of this.

2              You were retained as an expert in this case a little

3    over three years ago.  Is that right?

4    A.  Yes.

5    Q.  And you prepared an expert report in connection with that

6    retention?

7    A.  Yes.

8    Q.  And since that expert report, did you work with me to

9    prepare a declaration of your testimony for this case?

10   A.  Yes.

11   Q.  Did you review that testimony carefully and contribute to

12   it as much as necessary for it to reflect your own opinions and

13   conclusions with respect to this case?

14   A.  Yes.

15   Q.  And does that report also include your qualifications to

16   testify as an expert witness?

17   A.  Yes.

18              MR. BROOK:  Your Honor, to the extent necessary,

19   plaintiffs offer Glenn Liebman as an expert witness on the

20   subject of business appraisals and to a very limited extent

21   accounting based on his --

22              THE COURT:  I do not follow the practice of having

23   proffers.

24              MR. BROOK:  OK.

25   Q.  Do you have a copy of Plaintiff's Exhibit 1004 in front of

1   you?

2   A.  Yes.

3   Q.  Could you please flip through that and check the last page

4   and see if that is your signature at the end there.

5        It's also up on the screen.

6   A.  Yes.

7   Q.  Did you sign that understanding that you were doing so

8   under penalty of perjury?

9   A.  Yes.

10  Q.  And do you reaffirm the testimony that you gave in that

11  declaration here today?

12  A.  Yes.

13        MR. BROOK:  Plaintiffs have no further questions.

14        THE COURT:  Thank you.

15        Cross-examination.

16        MR. BROOK:  Oh, sorry.  But, although no further

17  questions, plaintiffs do offer into evidence certain exhibits

18  referenced in Mr. Liebman's testimony at this time.

19        THE COURT:  Tell us what they are.

20        MR. BROOK:  Yes.  Exhibit 66, 75.  I will note that,

21  in the report -- or, I'm sorry -- in the declaration, Exhibit

22  75 is referenced at Exhibit 264 before recognizing that it was

23  a duplicate of something used at a deposition.  So I just

24  wanted to note that, that his testimony will say Exhibit 264

25  but we're offering it as 75 because it's also referenced in --

1    THE COURT:  So it's formerly 264?  Is that the idea?

2    MR. BROOK:  It was formerly both.  So it's now solely

3  Exhibit 75 to avoid duplication.

4    THE COURT:  Go ahead.

5    MR. BROOK:  Exhibits 66, 75, 119, 120, 150, 180, 186,

6  206, and then all the Exhibits 210 through 219, which are

7  financial statements for Eber-Connecticut.

8    THE COURT:  All right.

9    MR. BROOK:  And there are no objections to those

10  exhibits.

11    THE COURT:  Received.

12    MR. MULRY:  No objection.

13    (Plaintiff's Exhibits 119, 120, 150, 180, 186, 206,

14  and 210 through 219 received in evidence)

15    THE COURT:  Cross-examination.

16    MR. MULRY:  Thank you, your Honor.

17  CROSS-EXAMINATION

18  BY MR. MULRY:

19  Q.  Good morning, Mr. Liebman.

20  A.  Good morning.

21  Q.  My name is Kevin Mulry, and I'm an attorney for the

22  defendants in this case.

23    You are a member of a firm that performs business

24  valuation, forensic accounting, litigation report, and expert

25  witness testimony, correct?

L9FAKLE1ps                    Liebman - Cross

1  A.  Yes.

2  Q.  About 75 percent of your work is matrimonial?

3  A.  Roughly, yes.

4  Q.  You've developed several opinions with respect to this

5  case, correct?

6  A.  Yes.

7  Q.  And you've prepared an expert report?

8  A.  Yes.

9  Q.  And while the expert report is not going to be in evidence,

10  it's identified as Plaintiff's Exhibit 127, so we may be

11  referring to that at points during your testimony today.

12            Now, do you recall preparing your expert --

13            MR. MULRY:  Yes, your Honor.

14            THE COURT:  Let me just understand the prior answer.

15  When you say 75 percent of your work is matrimonial, is that

16  coextensive with or does it overlap with the business valuation

17  work that you do?

18            THE WITNESS:  It overlaps, your Honor.  We do -- we

19  are a firm that does litigation valuation for the most part,

20  valuations for other reasons, but the primary course of work

21  for us is litigation valuation, and within that space, it's

22  about 75 percent matrimonial business valuation and then 25

23  percent in matters such as the shareholder disputes partnership

24  and things of that nature.

25            THE COURT:  So just to have complete clarity, when you

1  talk about "matrimonial," you're talking in the main about

2  valuation of businesses usually privately held in connection

3  with the division of assets in matrimonial disputes.  Is that

4  right?

5          THE WITNESS:  Yes, your Honor.

6          THE COURT:  OK.  Let's go on.

7  BY MR. MULRY:

8  Q.  So you prepared your expert report.  At that time -- you're

9  aware that Frank Torchio is the defendants' expert in this

10 case, correct?

11 A.  Yes.

12 Q.  And at the time you prepared your expert report, you had

13 reviewed the expert report of Frank Torchio, right?

14 A.  Yes.

15 Q.  So you had an opportunity in your expert report to respond

16 to the opinions that were contained in Frank Torchio's expert

17 report.

18 A.  Yes.

19 Q.  And you put all of the opinions you had arrived at in your

20 expert report, correct?

21 A.  Yes.

22 Q.  You submitted your direct testimony today, and that is

23 Plaintiff's Exhibit 1004.  Correct?

24 A.  Yes.

25         THE COURT:  So far you have not asked a single

L9FAKLE1ps                    Liebman - Cross

1    question that called for anything that did not either occur in

2    my presence this morning or that I did not read in the report

3    that came into evidence.  And I would like to move this along.

4               MR. MULRY:  OK, your Honor.  I will do that.  My next

5    question is:

6    Q.  Is there any opinion -- if there is any opinion in your

7    expert report that is not in your direct testimony, you are not

8    offering that opinion in this case.  Is that correct?

9    A.  Could you repeat that question?

10   Q.  Sure.  If there is an opinion that was in your expert

11   report that is not in your direct testimony, Plaintiffs'

12   Exhibit 1004, you're not offering that opinion in this case.

13              MR. BROOK:  Objection.

14              THE COURT:  Sustained.

15   Q.  Let's talk about some general considerations on valuation.

16   You agree that whether economic realities are comparable in

17   given time periods is something that should be taken into

18   account in valuation?

19   A.  I'm not sure I understand your question.  Economic

20   realities?

21   Q.  I'll move on from there.

22              In general, valuation, in valuation, you should not

23   consider subsequent events past the valuation that you're

24   looking at.  Do you agree with that?

25   A.  I do, yes.

1    Q.  So when we're looking at the 2012 transfer to Alexbay, the

2    Court will have to look at events as they existed in 2012.

3              THE COURT:  Well, that's up to me.

4              MR. MULRY:  Let me ask that a different way, your

5    Honor.

6    Q.  For your valuation, is it correct that you looked at the

7    facts as they existed in 2012?

8    A.  For the 2012 valuation, yes.

9    Q.  Yes.  Right.

10             Now, in your expert report, you opined on the value of

11   Eber-Metro as of -- and Eber-Connecticut as of June 5th of

12   2012, correct?

13   A.  Yes.

14   Q.  And you used that date, June 5th of 2012, and Frank Torchio

15   used a date of May 23rd, 2012, correct?

16   A.  I'd have to look at Mr. Torchio's report to confirm that.

17   I --

18   Q.  Do you remember there were two different dates, close in

19   time?

20   A.  I remember there was a May fiscal year end for the company,

21   which is May 31st, 2012.  I was instructed by counsel to do

22   mine as of the June 5th date, I believe it was, which is a few

23   days later.  And there was no material changes.

24   Q.  OK.  That was my question.  There's no material difference

25   between your date for valuation and Mr. Torchio's date for

L9FAKLE1ps                    Liebman - Cross

1   valuation.

2   A.   Yes.

3   Q.   As far as the dates are concerned.

4          In your report, you respond to certain comparable

5   transactions that are identified in the Torchio report, Frank

6   Torchio's report?

7   A.   I didn't know if that was a question.

8   Q.   It is a question.

9   A.   Yes.

10  Q.   Is that correct?

11  A.   Yes.

12  Q.   And you did not add any comparables of your own.  You

13  commented on the comparables that Mr. Torchio had identified.

14  A.   To a degree.  Part of my process, though, was not only to

15  comment on his comparables and the other transactions that are

16  independent of any work that he did, Mr. Torchio, but my staff

17  and I did a search of our own comparables, and the unique

18  nature of Eber-Connecticut is such that there are really no

19  publicly traded comparable companies, and there is very limited

20  transaction data applicable, statically meaningful data, as of

21  the June 2012 date.

22  Q.   But the comparables you commented on in your report and

23  that you comment on in your direct testimony are the five

24  comparables that Mr. Torchio identified.  Is that correct?

25          THE COURT:  Mr. Mulry, isn't that obvious?

1          MR. MULRY:  It seems obvious to me, your Honor.  I'm

2     just asking --

3          THE COURT:  Well, it seems obvious to me too.  And I

4     don't, I would prefer not to have extended cross-examination

5     about how he spells his name, what time it is, or anything else

6     that's perfectly obvious.

7          MR. MULRY:  Very good, your Honor.

8     Q.  Let's go to liabilities.  In valuation, liabilities are an

9     important part of valuation.  If you're valuating a company,

10    will you agree that their liabilities are important to the

11    person doing the valuation?

12    A.  Generally yes.

13    Q.  Now, you are aware that Frank Torchio looked at certain

14    liabilities of Eber-Metro.  Is that correct?

15    A.  Using the term "look," I don't know what that means.

16    Q.  Let me rephrase that.  In coming to a valuation opinion,

17    Frank Torchio considered liabilities of Eber-Metro.  Is that

18    correct?

19    A.  I know that he considered liabilities of Eber-Metro and

20    Eber Wine & Liquor.

21    Q.  OK.  And among those are loans and lines of credit that

22    Lester Eber made to one or more of those companies.  Is that

23    correct?

24    A.  Yes.

25    Q.  And so you acknowledge in your testimony, don't you, that

L9FAKLE1ps                    Liebman - Cross

1   Lester's loan to Eber-Metro, as of fiscal year 2012, was

2   $3,060,711, on the books of Eber-Metro, right?

3   A.  Yes.

4           THE COURT:  Mr. Liebman, did you ever do any work to

5   verify whether the books accurately reflected money that in

6   fact was lent by Lester Eber, or to what extent they were

7   accurate?

8           THE WITNESS:  We attempted to, your Honor, and this is

9   part of the duality of forensic accounting as it relates to

10  business valuations that we do, in any setting.  And we

11  requested information insofar as the books and records.  And it

12  was very, very limited, in what was supplied to us to enable us

13  to verify that loan that you're asking about.

14          THE COURT:  So, insofar as loans allegedly made by

15  Lester Eber, you assumed for purposes of your analysis that the

16  books were accurate, but you have no personal knowledge about

17  whether the books accurately reflected what had happened,

18  correct?

19          THE WITNESS:  Yes.

20          THE COURT:  And you have no audit to verify that the

21  numbers on the books accurately reflected what had happened.

22  Is that right?

23          THE WITNESS:  That's correct, your Honor.

24          THE COURT:  All right.  Let's go ahead.

25  BY MR. MULRY:

1    Q.  There were interest rates on those loans and lines of

2    credit, were there not?

3    A.  Are we referring to Lester Eber's loans?

4    Q.  Lester Eber's loans, yes.

5    A.  Yes.

6    Q.  And you have not commented or challenged in any way the

7    appropriateness of the interest rate on Lester's loan or line

8    of credit.  Is that correct?

9    A.  I'd have to go back to the line items in my report, if --

10   whether I commented or not on those interest rates.

11   Q.  So we can look back at your report and we can --

12           MR. BROOK:  I will stipulate that Mr. Liebman did not

13   offer an opinion on the interest rates on Lester Eber's loans.

14           THE COURT:  OK.  Let's go.

15           MR. MULRY:  OK.

16   Q.  There were certain other liabilities that Mr. Torchio

17   considered that you did not consider in your valuation of

18   Eber-Metro.  Correct?  Particularly with respect to pension

19   liabilities.

20           MR. BROOK:  Objection to form.

21           THE COURT:  Sustained.  Rephrase.

22   BY MR. MULRY:

23   Q.  Are you aware that Mr. Torchio considered in his valuation

24   potential PBC termination liability?

25   A.  I'm struggling with the word "consider."

L9FAKLE1ps                    Liebman - Cross

1    Q.  What word would you use for what Mr. Torchio did, as you

2    understood it from reading his report?

3    A.  There's very little information that he provides on what

4    led him to include them, those loans, the pension loan and the

5    Teamsters loans.  Those were the two most significant.  He

6    makes a deduction for them in terms of valuing the net value of

7    Eber-Metro.  Again, it's in a table.  And I believe the

8    verbiage, that he relied on counsel in terms of the

9    applicability, and based on his conversation with counsel, he

10   deducted them as, from the value.

11   Q.  Is it fair to say that Mr. Torchio deducted what he saw as

12   a potential termination liability -- a potential liability of

13   in excess of $5 million, and you did not?

14   A.  Well, it's a contingent liability, just, just -- you know,

15   that's the terminology of it, at that time, in May and June of

16   2012.  And, yes, he deducted an amount that was unknown as of

17   that date because it was contingent, and it had not yet been

18   decided.  And I believe, based on a 2018 document, he elected

19   to deduct in excess of $5 million for that PBGC loan.

20           THE COURT:  I'm sorry.  Did he elect to deduct, or did

21   he deduct pursuant to instructions given him by counsel?

22           THE WITNESS:  The latter, your Honor.

23   Q.  That's your interpretation of what Mr. Torchio did.

24   A.  I can -- I have his report here.  If you give me the

25   opportunity to look I can double-check, but I'm pretty sure his

1  report, in the table, the summary table, he indicates that.

2  Q.  Ultimately, the decision of whether or not -- would you

3  agree that ultimately the decision of whether or not the PBGC

4  liability is a liability of Eber-Metro is a question for the

5  Court?

6         MR. BROOK:  Objection to form.

7         THE COURT:  It really doesn't matter whether he agrees

8  that.

9         MR. MULRY:  OK.  I'll move on, then, Judge.

10 Q.  The liability, the PBC liability of in excess of 5 million,

11 if one were to consider that a liability of Metro, that would

12 be a significant liability, would it not?

13 A.  I don't know, because it was unknown at the time, as of May

14 and June of 2012, what the outcome would be.  There were

15 certainly discussions that were going on between -- it wasn't

16 Eber-Metro, just to be clear, it was Eber Wine & Liquor and

17 PBGC.  And it was unknown at that time what amount if any would

18 result in a liability at that point.

19 Q.  OK.  We could go to your direct testimony, which is

20 Plaintiff's Exhibit 1004, to paragraph 106, which is on page

21 29.

22        THE COURT:  Well, it's not on page 29 in mine.

23        THE WITNESS:  Mine either.

24        MR. MULRY:  Oh, you know, I apologize.  I think I was

25 using the one with the caption, but it is page 1 -- paragraph

1    106.

2    Q.  When that comes up, if you could just read that paragraph

3    to yourself.

4    A.  OK.

5    Q.  You've seen that?

6    A.  Yes.

7    Q.  So is it correct in paragraph 106 you are saying, among

8    other things, that contingent liabilities --

9            THE COURT:  Please don't read back what he just read

10   to himself, that I have already received in evidence, and asked

11   him whether it said.

12           MR. MULRY:  All right.

13   Q.  Contingent liabilities are not considered a valuation.  Is

14   it your opinion that a willing buyer will not take contingent

15   liabilities of a company they're considering to purchase into

16   account, when valuing a transaction?

17   A.  They may.

18   Q.  So there are certain times when a contingent liability will

19   be of importance to a potential buyer of a company; isn't that

20   correct?

21   A.  Well, as it relates to this case, it, it also -- it depends

22   on what the willing buyer is buying.  We're looking first at

23   the value of Eber-Connecticut, and this pension plan liability

24   is not a liability of Eber-Connecticut as of May and June of

25   2012.  Contingent liabilities can also vary to a degree as to

1  where they are in relation to the litigation or the dispute

2  that may be involved between debtor and lender.  So when you

3  say, would they take it into account, the willing buyer, they'd

4  have to understand the contingent liability, where it is in the

5  process, if the amount is estimable or not and to what degree,

6  and if in fact there's any potential burden on the entity that

7  they are acquiring.

8  Q.  So a willing buyer would have to consider all of those

9  things with respect to a contingent liability; is that correct?

10         THE COURT:  No.  It's not on the tablets Moses came

11  down from Mt. Sinai with.  An interested buyer might or might

12  not consider it depending on the buyer's point of view, the

13  objectives of the transaction, and what he thinks makes sense.

14  Isn't that perfectly obvious, counsel?

15         MR. MULRY:  Yes, your Honor.  I'm trying to --

16         THE COURT:  OK.  It's perfectly obvious.  Let's get on

17  with it.

18         You know, if somebody gets bitten by a dog and sues

19  the dog as owner for $28 million, there is a contingent

20  liability of $28 million.  Now, that may matter, to the

21  insurance company asked to underwrite coverage, or it may not

22  matter.  And certainly the odds that it's going to be valued at

23  $28 million is extraordinarily slim, wouldn't you think?

24         MR. MULRY:  In your Honor's example, yes.

25         THE COURT:  Right.  So this is a factor all across the

L9FAKLE1ps                    Liebman - Cross

1   world of valuation, as we all know.

2   BY MR. MULRY:

3   Q.  Is it your view that the potential PBGC liability that

4   Mr. Torchio discussed is something akin to the judge's example

5   of something a willing buyer would look at but just not

6   consider because it's not important, or is not significant?

7              THE COURT:  Sustained.

8   Q.  Let's go to paragraph -- will you go to paragraph 108 of

9   your direct testimony, and when we get to 108, if you could

10  read that to yourself.

11             You've read that, Mr. Liebman?

12  A.  Yes.

13  Q.  Going five lines down from the top, your understanding that

14  Eber-Metro's management believed that the pension funding

15  liability would not follow Eber-Metro after the transfer to

16  Alexbay, where did that understanding come from?

17  A.  My review of the documents that I had available and my

18  understanding of the facts.

19  Q.  What documents or facts lead you to that understanding?

20  A.  The pension liability with the PBGC ties directly to Eber

21  Wine & Liquor, a company that was defunct long before 2012 in

22  terms of its New York business operations.  Eber Wine & Liquor

23  owns Eber-Metro, which in turn owns Eber-Connecticut.  There

24  was a point, I believe it was in 2010, where Eber-Metro had

25  owned 85 percent of Eber-Connecticut at that point, and there

L9FAKLE1ps                    Liebman - Cross

1   was this transfer, sale of a 6 percent interest, to take

2   Eber-Metro's interest down to 79 percent, which effectively, at

3   that precise amount, based on that transaction, resulting in 79

4   percent interest for Eber-Metro and Eber-Connecticut, takes it

5   out of the control group, as defined under ERISA, by the PBGC.

6           So if now this transfer to Alexbay occurs -- and this

7   is up to the Court of course, to decide if it's valid or not --

8   the liability does not transfer, from Eber Wine & Liquor,

9   regardless of whether it's 5 million, 5 cents, or 50 million,

10  because it's no longer -- it would have no longer been in the

11  control group and no longer been considered.

12  Q.  The last part of what you --

13          THE COURT:  Excuse me.  So when you said "took it out

14  of the control group," do I correctly understand that the "it"

15  referred to Eber-Connecticut?

16          THE WITNESS:  Yes, Eber-Connecticut and Eber-Metro,

17  yes, your Honor.

18          THE COURT:  Well, "it" is singular, so it can't be

19  both.

20          THE WITNESS:  It's Eber-Metro's interest, 79 percent

21  effective interest in Eber-Connecticut.

22          THE COURT:  Right.  And so what I'm understanding you

23  to say -- and please correct me if I'm wrong -- is that you

24  understood that Eber-Metro's management believed that any

25  pension liability would not follow Eber-Metro to Alexbay after

L9FAKLE1ps                    Liebman - Cross

1    Alexbay acquired ownership of Eber-Connecticut because

2    Eber-Connecticut was owned only 79 percent and therefore wasn't

3    in the control group that was responsible for the pension

4    funding shortfall at the Eber-Metro level or the higher level

5    of Eber Wine & Liquor.

6              THE WITNESS:  Exactly, your Honor.  Just to clarify

7    that last point that you said, the liability with the PBGC, is

8    all up at the top at the Eber Wine & Liquor level, so --

9              THE COURT:  OK.

10             THE WITNESS:  Yes.

11             THE COURT:  I understand.

12   BY MR. MULRY:

13   Q.  So you have not made a legal conclusion as to all those

14   liabilities as to which party -- which company is or is not

15   within the control group or which company is or is not liable;

16   is that correct?

17   A.  I'm just purely looking at the percentages and explaining

18   to the Court what happened, what existed, and that 79 is 1

19   percent -- is 1 percent less than 80, which is the definition

20   of a control group.

21   Q.  And are you aware that there was -- let me just stay on the

22   issue of Metro's management.  The fact that you've highlighted

23   percentages, leading to certain conclusions you've made, but

24   with respect to the conclusion that Eber-Metro's management

25   believed the pension liability would not apply, do you have

anything that specifically addresses what they believed that

led you to that conclusion?

A.   Sure.  I mean, they were intimate with -- Eber-Metro's

management is intimately involved in everything that had been

going on from the early 2000s when this whole thing apparently

stemmed from, back to 2003 and '4, and then when it surfaced

around 2008 and continued onward through the valuation date in

June of 2012.  Eber-Metro's management was involved in the 6

percent transfer to bring their 85 percent interest down to 79

percent.

          So knowing that they were intimately involved in

making these decisions, I can't get in their head, but I can't,

you know, fathom, having been doing this as long as I have in a

25-year career, that they didn't know, by going under 80

percent and doing that 6 percent transaction themselves, that

the pension liability wouldn't follow to Alexbay.

Q.   If Eber-Metro's management did believe that the pension

liability would apply to Eber-Metro, would that change your

analysis, factually, if that were the conclusion?

A.   If the Court decides that, then possibly.  The Court can

then do what it pleases, if they believe or don't believe that

management believed it or not.

Q.   Were you aware -- in your review of documents for this

case, did you review a decision from the Western District of

New York holding that Eber-Metro and Eber-Connecticut were part

1    of the control group with respect to this pension plan

2    liability?

3    A.   I think, if you're referring to a document, there's a lot

4    of documents --

5    Q.   Sure.  I think it's Defendants' Exhibit DD.  We could put

6    that up for you.  We could just scroll through that.  If you

7    could just look at that.  If you need to stop anywhere, let us

8    know, just to see if that's a document you recognize as having

9    reviewed for your testimony.

10   A.   I mean, I could tell from the first page what it is, and,

11   yes, I --

12          THE COURT:  So the document that's being exhibited is

13   DD as in David David, not EE as in Eisenhower Eisenhower.

14   Q.   So were you aware that a final report determined that

15   Eber-Metro was part of the control group?

16          MR. BROOK:  Objection.

17          THE COURT:  Sustained.

18   Q.   In looking at -- I think you talked about Eber-Connecticut.

19   If you were looking at a purchaser of Eber-Metro, if the

20   potential PBGC liability were a liability of Eber-Metro, would

21   you agree that fact would be relevant to a purchaser of

22   Eber-Metro?

23   A.   As of what date?

24   Q.   As of any date, if it were a liability.

25   A.   I can't really answer that question.  You would have to

1    tell me a purchaser as of a date.  A purchaser of any business,

2    as an example, of any business in -- on February 1st of 2020,

3    before COVID effectively shut down our economy, that's

4    different than what they would have looked at and what they

5    would have considered on March 31st or April 1st of 2020.  So

6    the date, I can't answer that without you providing me with a

7    purchaser looking at it on a certain date.

8    Q.  Is it fair to say that, in your experience in valuation,

9    you are not very familiar with valuations where PBGC or pension

10   plan liability is -- was involved?

11   A.  I have had experience with them, with pension liabilities

12   for businesses.

13   Q.  In addition to the PBGC termination liability, Mr. Torchio

14   also considered and had a deduction for Teamsters withdrawal

15   liability.  Are you familiar with that?

16   A.  Yes.

17   Q.  You do not consider any withdrawal liability to the

18   Teamsters in your valuation; isn't that correct?

19   A.  I'm struggling with the word "consider."

20   Q.  What did you -- when -- what did you do when you were

21   looking at the question of whether or not liabilities should be

22   part of your analysis?  Did you consider, did you value, did

23   you --

24            THE COURT:  Mr. Mulry, which of those many questions

25   would you like to stick with?

1           MR. MULRY:  Your Honor, just, I really -- "rely on."

2    Is that something that's helpful?  Is that -- "did you rely

3    on?"

4           THE COURT:  "Did you rely on" what?

5           MR. MULRY:  Let me back up.

6    Q.  In your final valuation, your final valuation for

7    Eber-Metro and Eber-Connecticut does not have any deduction for

8    Teamsters withdrawal liability; is that correct?

9    A.  Yes.

10   Q.  Did you see, at some point in your review for your

11   testimony and for your expert report, that there was a

12   confession of judgment with respect to Teamsters liability?

13   A.  Yes.

14          MR. MULRY:  I'll ask that that be brought up.  That's

15   Defendant's Exhibit F.

16   A.  I see it.  Could you continue to scroll through it?  I want

17   to make sure I recognize the entirety of the document.

18   Q.  Mr. Liebman, have you had a chance to review that?

19   A.  Yes.

20   Q.  So you're familiar with the confession of judgment on the

21   Teamsters withdrawal liability?

22   A.  Yes.

23   Q.  OK.  Now, that was signed on behalf of Wine and Liquor,

24   correct?

25   A.  Yes.

1   Q.  And you don't -- you have not reached a legal opinion as to

2   whether Eber-Metro would be liable for the Teamsters liability;

3   is that correct?

4           MR. BROOK:  Plaintiffs will stipulate that Mr. Liebman

5   has reached no legal opinions on anything.

6   BY MR. MULRY:

7   Q.  Were you aware, in the course of your review of documents,

8   that the Teamsters pension fund had assessed an employer

9   withdrawal liability against the Eber control group for over $2

10  million in January of 2008?

11  A.  Again, I don't want to comment.  If you have a document,

12  because there are so many documents on all these issues, I'd

13  feel more comfortable answering.

14  Q.  Why don't we go to Exhibit Z as in zebra.  You can let us

15  know when you've had a chance to recognize that if you do

16  recognize it.

17  A.  This first page I do, yes.

18  Q.  In your --

19  A.  Could you scroll back to the top, please.

20  Q.  Sure.

21  A.  OK.  And, I'm sorry, if you can scroll down a bit.  Thank

22  you.  OK.

23  Q.  OK.  You've looked at that?

24  A.  Yes.

25  Q.  So are you familiar with the fact that the PBGC made that

1  determination?

2          MR. BROOK:  Objection to form.  Not be the PBGC.

3          MR. MULRY:  I'm sorry.

4          THE COURT:  I couldn't hear whatever.

5          MR. MULRY:  I misspoke.

6          MR. BROOK:  I'm just correcting, he used the wrong

7  entity name.

8  BY MR. MULRY:

9  Q.  Were you aware that the Teamsters pension fund made that

10 assessment?

11 A.  I think it's a demand.  I don't know if you're using that

12 word interchangeably, but it's a demand for payment.  I don't

13 know if it's an assessment.

14 Q.  Did you consider whether Eber-Metro would be considered

15 part of the control group for that liability, the Teamsters

16 liability?

17 A.  Well, this would fall under my same line of analysis and

18 logic as I just testified a short while ago with the PBGC

19 liability in regard to the control group.  The acts of the

20 management of Eber-Metro, by taking their interest in

21 Eber-Connecticut down to 79 percent, would have taken them out

22 of the control group.  And this demand is to Eber Brothers Wine

23 & Liquor and its control group.

24 Q.  But you're not making that as a legal conclusion, correct?

25 Correct?

L9FAKLE1ps                    Liebman - Cross

A.  Making what as a legal conclusion?

            THE COURT:  Mr. Mulry, did you hear what Mister --

            MR. MULRY:  I did, your Honor, although he's making a

statement that Eber-Metro is not part of the control group.

            THE COURT:  I don't care.

            MR. MULRY:  OK.  I'll move on, then, your Honor.

            Your Honor, we would move Defendant's Exhibit Z into

evidence, as in zebra.

            MR. BROOK:  No objection as to the first document.

It's actually a fairly large compilation, I now see.  So

there's like, I think, maybe 20 documents in this portion.

            THE COURT:  So which is the portion that's undisputed?

            MR. BROOK:  Just the first document.

            THE COURT:  Yes, but you've got to tell me what that

is.

            MR. BROOK:  It looks like I missed that in going

through it, so I have no objection.

            THE COURT:  All right.  If there's no objection,

Defendants' Z, as in zebra, is received.

            (Defendant's Exhibit Z received in evidence)

BY MR. MULRY:

Q.  Let's move on, Mr. Liebman, to the comparables.  We

discussed those at the start.  There were five comparable

transactions in Mr. Torchio's report, correct?

A.  Yes.

L9FAKLE1ps                    Liebman - Cross

1    Q.  And you do not accept three of them and you accept two of

2    them, correct?  Is that correct?

3    A.  Yes.

4    Q.  OK.  Let me just go through the ones that you did not agree

5    should be included, just to check on some of the particulars.

6    The first comparable is an acquisition by Capital Beverage

7    Corporation of a company called Prospect Beverages.  Do you

8    recall that?

9    A.  Yes.

10   Q.  And Prospect Beverages was a beer distributor?

11   A.  Are you asking me that?

12   Q.  Yes, I'm asking you that.

13   A.  Yes.  Yes.

14   Q.  And that transaction, is it correct that transaction took

15   place in 2001?

16   A.  Yes.

17   Q.  You disregard this transaction, correct?

18   A.  Yes.

19   Q.  But you do agree that beer distribution and wine

20   distribution are in a parallel broad industry?

21   A.  Broadly, yes.

22            THE COURT:  So is Mountain Dew.  Could we move it

23   along.

24            MR. MULRY:  Yes.  Sorry.

25   Q.  So that's -- the fact that one sells beer and one sells

1    wine, that does not disqualify it from being a useful

2    comparable, correct?

3    A.   In and of itself that one fact?

4    Q.   Yes.

5    A.   Beer and wine?  No, that would not alone disqualify it.

6    Q.   If we could go to Plaintiff's Exhibit 1004, to paragraph

7    74, and I'd ask you to read to yourself the sentence that

8    begins "among other things."

9    A.   OK.

10   Q.   It is correct you don't have a day-to-day knowledge of the

11   franchise laws for wine and liquor in Connecticut?

12          THE COURT:  Well, I imagine whatever knowledge he has

13   continues from day to day.

14          MR. MULRY:  Yes, your Honor.  It was a reference from

15   the deposition, but why don't I move on.

16   Q.   Are you familiar with the concept of dualing in

17   Connecticut?

18   A.   No.

19   Q.   Are you aware that in Connecticut a supplier has the right

20   to allow another distributor to become a distributor for that

21   product even if it had an exclusive distributorship with the

22   first distributor?  Are you familiar with that concept?

23   A.   As of today or when?

24   Q.   As of today and going back to the time period at issue in

25   this lawsuit.

L9FAKLE1ps                      Liebman - Cross

1    A.  So back to 2012?

2    Q.  Yes.

3    A.  No, I'm not.

4    Q.  So that if someone is an exclusive distributor of a product

5    in Connecticut, they are not necessarily going to remain as an

6    exclusive distributor.  Are you aware of that, under

7    Connecticut franchise laws?

8    A.  Potentially.  I guess it would depend on the supplier, but

9    potentially that could be the case.

10   Q.  Are you familiar, in the course of your review, with the

11   fact that Eber-Connecticut was dualed by certain suppliers

12   between 2008 and 2012?

13   A.  No.

14   Q.  So then you're not familiar with the fact that they were

15   dualed by their largest supplier?

16   A.  No.

17   Q.  Now, is it correct that from 2007 through 2012,

18   Eber-Connecticut had negative EBITDA -- that's E-B-I-T-D-A --

19   for each year?

20   A.  For the fiscal-year ends May 31st of each of those years,

21   yes.

22   Q.  And Prospect Beverages, that first comparable, that also

23   had negative EBITDA at the time of the transaction.  Correct?

24   A.  Could you give me a moment to check my report?

25   Q.  Sure.

```
 1   A.  Thank you.
 2            Yes, it did.
 3   Q.  It did.  OK.  Thank you.
 4            So you did not consider the Farmer Brothers
 5   transaction.  Let's move on to the -- I'm sorry -- the Prospect
 6   transaction.  So let's move on to --
 7            MR. BROOK:  Objection to saying he did not consider.
 8            THE COURT:  Sustained.
 9   Q.  Let's move on to the Farmer Brothers comparable, which was
10   a transaction in 2012.  Are you familiar with that?
11   A.  Yes.
12   Q.  In 2012, this transaction is comparable in time to the
13   Alexbay transaction; is that correct?
14   A.  I just want to -- yes.  But I want to correct it, though.
15   It's not a transaction, Farmers Brothers.  Farmers Brothers is
16   a publically traded company.  So what's going on here is, in a
17   what's called market approach to valuation, there's two
18   different methods.  One is a comparable transaction method,
19   where one company buys another company, could be a public
20   company buying a private company or a private company buying a
21   private company, but that's a comparable transaction, an
22   acquisition upon which you could calculate a multiple as an
23   indicator of value.  That's what Prospect was.  Farmers
24   Brothers is a publicly traded company.  And that is valued
25   under what's called a guideline comparable company method,
```

1    where we look at the multiples of publicly traded companies and

2    what their stock prices are trading for and how the market

3    values them.  So it's subtly different.

4    Q.   Thank you for that clarification.  Farmer Brothers, is it

5    correct that the company also had negative EBITDA for their

6    prior year, from the valuation date?

7    A.   Yes.

8    Q.   I believe you have distinguished this on the ground that

9    wine and liquor is a market that's more heavily regulated than

10   the coffee, tea, and spices market that Farmers is involved in?

11   Am I correct on that?

12   A.   That was one of the issues that I pointed out, yes.

13   Q.   And for this proposition you're relying on Connecticut

14   franchise laws?

15   A.   I don't know what you mean by "proposition."

16   Q.   This conclusion.

17   A.   Among other things.  There are other reasons.  But yes.

18   Q.   A third comparable is the 2010 transaction involving

19   Eber-Connecticut and Polebridge Bowman.  Are you familiar with

20   that one?

21   A.   Yes.

22            THE COURT:  You're just skipping over the fact that

23   Farmer and Eber are completely different businesses, with

24   different products.  You're not going to touch that subject?

25            MR. MULRY:  I've raised that with him, and our expert

1  will be -- he's identified what -- why he did not value them.

2  Our expert will explain why he did.  And your Honor will make a

3  credibility determination on those issues.

4           THE COURT:  OK.  I can't wait to hear how coffee and

5  tea is equivalent to alcoholic beverages.

6  BY MR. MULRY:

7  Q.  2010, the Polebridge Bowman transaction, you're familiar

8  with that transaction, correct?

9  A.  Yes.

10 Q.  So that was a sale of a 6 percent -- let me go back.  That

11 was -- Polebridge Bowman, was that a 6 percent interest in

12 Eber-Connecticut, correct?

13 A.  Yes.

14 Q.  And they provided a $350,000 nonrecourse promissory note;

15 is that correct?

16 A.  Yes.

17 Q.  And it was payable in five years with an interest of

18 2 percent.  Correct?

19 A.  Yes.

20 Q.  You don't have any knowledge of the negotiations or

21 discussions that led to that transaction; am I correct?

22 A.  I wasn't sitting there with the negotiations, but I have a

23 knowledge based on the documents that I received, and it was

24 between an individual who worked, did work for the company.  I

25 believe he was a consultant or did some legal work.  And it did

L9FAKLE1ps                    Liebman - Cross

1    not qualify.  That transaction really doesn't qualify as an

2    arm's-length transaction leading to a reasonable market-based

3    valuation.

4    Q.  You don't know anything of the creditworthiness of

5    Polebridge Bowman, do you?

6    A.  No.

7    Q.  Do you have -- and the 2 percent interest rate, you don't

8    know why that was arrived at.

9    A.  No.

10   Q.  You compare the 2 percent in the Polebridge Bowman

11   transaction to higher interest rates in the loans or lines of

12   credit for Lester Eber; am I correct on that?

13   A.  Yes.

14   Q.  But the Polebridge Bowman note is a very different note

15   than the loans that Lester made; is that correct?

16              MR. BROOK:  Objection, form.

17              THE COURT:  Sustained.

18   Q.  There was a right of first refusal in connection with the

19   Polebridge note.  Are you familiar with that?

20   A.  Yes.

21   Q.  And so that limited the ability of Polebridge Bowman to

22   sell its interest to another party?

23   A.  Yes.

24   Q.  Now, you're familiar with Eder-Goodman, correct?

25   A.  Yeah.

1   Q.  You mentioned that in your direct testimony.

2          MR. BROOK:  He said yes.

3   Q.  Oh, I'm sorry.  You said?  I'm sorry.  I didn't hear that.

4          MR. BROOK:  I'm sorry.  I just pointed out to counsel

5   that the witness said yes.

6          MR. MULRY:  I apologize.  I did not hear that.

7   Q.  Eder-Goodman is a market competitor of Eber-Connecticut,

8   correct?

9   A.  They're in the wine and liquor industry, yes, wholesale

10  industry.

11  Q.  And by 2010, Eder-Goodman had purchased a 15 percent

12  interest in Eber-Connecticut, correct?

13  A.  Yes.

14  Q.  And as part of that agreement, Eder-Goodman had a right of

15  first refusal with respect to transfers of stock.  Are you

16  familiar with that?

17  A.  Yes.

18  Q.  And with respect to this transaction in 2010, Eder-Goodman

19  signed a joinder agreement with respect to the transfer that

20  was also signed by Polebridge Bowman and Eber-Connecticut.  Are

21  you familiar with that?

22  A.  You have to show me a document on that one.

23          MR. MULRY:  Sure.  That would be Defendants' Exhibit

24  five Hs, HHHHH.

25          THE COURT:  Do you have a question?

L9FAKLE1ps                    Liebman - Cross

BY MR. MULRY:

Q.  Do you recognize that as the joinder agreement?

A.  I do.  If you could scroll to the bottom.  I just -- I
don't recall if it was executed or not, by all parties.

        OK.

Q.  So Eder-Goodman signed the joinder agreement with respect
to the 2010 Polebridge Bowman transaction; is that correct?

A.  Yes.

Q.  The fourth comparable is an offer from Southern for 15
percent of Eber-Connecticut.  Are you familiar with that one?

A.  Yes.

Q.  That is one that you do consider.  Right?

        MR. BROOK:  Objection to form.

        THE COURT:  Sustained as to form.

Q.  That is one that you do consider a fair comparable; is that
correct?

A.  Yeah.  I think the term really, what I did is, I considered
it in terms of analyzing it, being synonymous with considered,
and I applied it and utilized it for purposes of my valuation.

        THE COURT:  You considered it an appropriate
comparable.

        THE WITNESS:  I did, your Honor.

        THE COURT:  Is that right?

        THE WITNESS:  Yes.

        THE COURT:  All right.

BY MR. MULRY:

Q.  This was a proposed transaction where Southern would

acquire a 15 percent interest in Eber-Connecticut as a way to

repay a $3 million bridge loan; is that fair to say?

A.  Yes.

Q.  And is it correct, in looking at your valuation, that you

make a straight-line calculation that, if 3 million is the

price on the transaction for 15 percent interest, the

shareholder equity value is 30 million -- I'm sorry,

withdrawn -- is -- let me restate that.

        You make a straight-line assumption that if it's 3

million for 15 percent interest, the shareholder equity value

of Eber-Connecticut is 20 million.

A.  Yes.

Q.  And you don't give any deduction off of that straight-line

assumption; am I right?

A.  Yes.

Q.  Now, Southern in this transaction would have received a lot

more than just the 15 percent; is that correct?

        THE COURT:  Sustained as to form.

Q.  If we could put that up just so you could see it.  We'll

get that up so that you can look at it.

        THE COURT:  There were certain other rights beyond the

ownership of 15 percent that apply or got in that transaction,

right?

L9FAKLE1ps                    Liebman – Cross

1          THE WITNESS:  Yes.

2          THE COURT:  One was a right of first refusal, yes?

3          THE WITNESS:  Yes.

4          THE COURT:  And there were others.  Yes?

5          THE WITNESS:  Yes.

6          THE COURT:  And you considered that, but there were

7    also detriments that came along with being a 15 percent

8    shareholder, right?

9          THE WITNESS:  Yes.

10         THE COURT:  The control of the company and its

11   operations was entirely in the hands of the majority owner.

12   Right?

13         THE WITNESS:  Yes, your Honor.

14         THE COURT:  And it was the majority owner who, had the

15   whole company been sold or had its position -- let me rephrase

16   it.  The majority owner was in a position to sell control of

17   the company and thereby obtain a control premium; isn't that

18   right?

19         THE WITNESS:  Yes, your Honor.

20         THE COURT:  But you didn't factor the control premium

21   into the $20 million valuation, did you?

22         THE WITNESS:  I did not.

23         THE COURT:  That was a conservative assumption on your

24   part.

25         THE WITNESS:  Yes, your Honor.

1      THE COURT:  And it's your opinion that whatever

2  additional benefit went along to the buyer of the 15 percent

3  was more than offset by the effect of the 85 percent owner

4  having control of the business and the possibility of securing

5  a control premium in the event of a sale; is that right?

6      THE WITNESS:  Exactly, your Honor.

7      THE COURT:  OK.  I read the whole report.  Let's move

8  on.

9      MR. MULRY:  OK, your Honor.

10  BY MR. MULRY:

11  Q.  In addition to the rights that the judge had mentioned,

12  there were also tag-along rights, is that correct, that would

13  allow Eder-Goodman to share any premium if there were a sale?

14  A.  Yes.

15      MR. MULRY:  If I could just have a moment, your Honor,

16  I'll be ready to move on to the next one.

17      THE COURT:  Good idea.

18      MR. BROOK:  The question --

19      MR. MULRY:  I said will go to Eder-Goodman after this.

20      MR. BROOK:  You just asked about Eder-Goodman having

21  tag-along rights.

22      MR. MULRY:  Oh, I'm sorry.  Apparently I misspoke.

23  The question was whether Southern under this transaction would

24  have tag-along rights.

25      THE COURT:  I'm sorry.  I couldn't understand your

L9FAKLE1ps                         Liebman - Cross

1    question.

2                MR. MULRY:  I'm sorry, your Honor.

3    Q.  I asked a previous question.  The judge had referenced

4    several rights that Southern would have received in this

5    transaction.  They also, Southern, also would have received

6    tag-along rights so that they could share in any premium on a

7    sale of the company.  Is that correct?

8    A.  Yes.

9    Q.  Now, in your report with respect to this Southern

10   transaction, you do a calculation, and it's paragraph 34 of

11   your report.

12               THE COURT:  I take it we're referring to Plaintiff's

13   Exhibit 1004 of the report.

14               MR. MULRY:  Yes, we are.

15               Oh, I'm sorry, your Honor.  Again I misspoke.  I

16   apologize.  It's the declaration, Exhibit 1004.

17               THE COURT:  All right.

18               MR. MULRY:  Page 9, 35.

19               THE COURT:  Is there going to be a question?

20               MR. MULRY:  I wanted to make sure it was up for him so

21   that he could see it.  If he can answer the question without

22   seeing it I'm happy to --

23               THE COURT:  What paragraph?

24               MR. MULRY:  It's paragraph 35.

25               THE COURT:  Thank you.

1          MR. MULRY:  You can let me know when you're there,

2     Mr. Liebman.

3     A.   I'm there.

4     Q.   OK.  With respect to these calculations and calculations

5     throughout your report, they're essentially mathematical

6     calculations, correct?

7          THE COURT:  That's what calculations are.

8          MR. MULRY:  Yes, your Honor.

9          Your Honor, these next three questions are just to

10    streamline things.  I just, I'm trying to avoid going through

11    the math with him, so that we can all do the math.  And

12    that's -- my question is:

13    Q.   With respect to your report, you say what values go into

14    various formulas, and we can plug those in.  For that reason,

15    I'm not going to go through the math with you.  But am I

16    correct that, if we read your report, we know which figures --

17    I'm sorry -- if we read your testimony, we know which

18    calculations you're making, which figures you're using for

19    those calculations, and we can rely on that?

20         THE COURT:  What are you talking about?  You're saying

21    that if we read your report we can actually see what's there.

22         MR. MULRY:  We can do --

23         THE COURT:  Is that the question?

24         MR. MULRY:  As long as -- your Honor, I'm just

25    setting -- making sure that the witness does -- I'm not going

1   to go through the math with him.  We can all do that

2   separately.  And I can just move on.

3          THE COURT:  Counsel, the question is, with all due

4   respect, meaningless.

5          MR. MULRY:  OK.  Thank you, your Honor.

6   BY MR. MULRY:

7   Q.  Let's go to the last of the five comparables, which is the

8   Eder-Goodman purchase of a 15 percent interest in 2008.  You're

9   familiar with that, right?

10  A.  Yes.

11  Q.  Now, Mr. Eder, Andrew Eder, who's a principal of

12  Eder-Goodman, testified yesterday.  You were not here.

13  Correct?

14          I'll make some statements that -- we don't have the

15  transcript either.  So I'll do them in the form of a

16  hypothetical if he were to testify that a certain fact would

17  have changed your opinion.  OK?  For example, if Andrew Eder

18  said that with respect to this transaction there were no

19  negotiations, would that affect -- that fact affect your

20  analysis of the valuation for this transaction?

21  A.  That single statement, that there were no negotiations?

22  Q.  Let me do a number of things, then.  If he were to have

23  said there were no negotiations, that a lawyer for

24  Eber-Connecticut said the proposal was for 15 percent of

25  Eber-Connecticut at 4.5 million, and that that was a

L9FAKLE1ps                    Liebman - Cross

1    take-it-or-leave-it offer, and if he further said that there

2    was no due diligence --

3            THE COURT:  Sustained.  Compound.

4    Q.  If he said there were no negotiations, would that be

5    important to you, as a valuer, as a valuation expert?

6    A.  It's hard to say.  It's a single statement.  I don't know

7    what else he would have said or did say yesterday or back then

8    when he was doing the transaction in conjunction with that.  So

9    I don't think it would alone, those couple of words, that

10   statement that you just said, would change the opinion of

11   value.

12   Q.  If he said there were no due diligence, would that be an

13   important fact for your valuation?

14   A.  Again, I don't know what he means by "due diligence."  You

15   know, due diligence can range from bringing in an army of

16   forensic valuators and auditors and accountants to bore through

17   the books and records for two months.  Due diligence to

18   somebody else could be years of financial statements and if I

19   know the industry really well and I'm familiar with it and I've

20   done a lot of acquisitions that's enough due diligence.  So I

21   don't know.

22   Q.  If you could go to paragraph 48 of your direct testimony,

23   Plaintiff's Exhibit 1004.

24   A.  Sorry.  Which paragraph?

25   Q.  48.

1              You can tell me when you're set.

2   A.   I'm set.

3   Q.   You say Eder-Goodman was provided with the financials for

4   the fiscal year end 2007.  Do you see that?

5   A.   Yes.

6   Q.   And you based your calculations on the 2007 financials,

7   correct?

8   A.   If you give me a moment.

9   Q.   Sure.

10  A.   Yes.

11  Q.   If actually they were given the financials for 2006,

12  because the 2007 financials were not prepared yet, that would

13  change the numbers that go into your mathematical calculations;

14  is that correct?

15  A.   Possibly.  I'd have to look back and see what the 2006

16  numbers were.

17             MR. BROOK:  Plaintiffs would like to note for the

18  record that the 2006 numbers have not been produced in

19  discovery.

20             THE COURT:  Move it along, Mr. Mulry.

21             MR. MULRY:  Yes, your Honor.

22  BY MR. MULRY:

23  Q.   Just as, in the Southern proposed transaction, there were a

24  number of rights, there were a number of rights in the 2008

25  Eder-Goodman analysis; is that correct?

L9FAKLE1ps                    Liebman - Cross

A.  Yes.

Q.  And one was a liquidation preference.  Are you familiar
with that?

A.  Yes.

Q.  So with respect to the $4.5 million investment,
Eder-Goodman would receive that back if there was a sale of the
company before other equity shareholders received their shares.
Is that correct?

A.  Yes.

Q.  So the Eder-Goodman shares were substantially equivalent to
a convertible preferred equity security; would you agree with
that?

A.  I would, yes.

Q.  And would you agree that that, that convertible preferred
stock, is often used as a source of capital when companies --
where there's a risk of financial distress?

A.  Not necessarily.  There's companies that do preferred stock
that are not in distress.

Q.  So you did make an adjustment for the preference, correct,
of 15 percent in your valuation?

A.  Conservatively, yes.

Q.  And you made no other adjustments for any other rights.

A.  I would say, similar to my testimony before, as with
Southern, that Metro, through its control level of ownership of
85 percent that it would still have, would have been afforded

L9FAKLE1ps                    Liebman - Cross

significant, significantly more rights in terms of running the

day-to-day operation, the ability to sell the company, and so

forth, that would have more than offset, should offset many of

those rights that they had.

Q.   Would Eder-Goodman also receive --

A.   Eder-Goodman would have obtained, did obtain.

Q.   I'm sorry?

A.   That Eder-Goodman obtained.

Q.   Eder-Goodman also received the right of first refusal in

that transaction, yes?

A.   Yes.

Q.   And you would agree that's an important right?

         THE COURT:   What does "important" mean here?

         MR. MULRY:   OK.   Well, let me rephrase that.

Q.   If Anthony Eder said that this was an important right and

Anthony Eder said that they paid more for getting the right of

first refusal, would that affect your analysis or consideration

of whether there should be a deduction for the right of first

refusal?

         MR. BROOK:   Objection unless Anthony Eder means Andrew

Eder.

         MR. MULRY:   It does.

         MR. BROOK:   There are several Eders.

         MR. MULRY:   I'm sorry.

Q.   Andrew Eder.

L9FAKLE1ps                    Liebman - Cross

1    A.   Possibly.  You know, I'd have to know what he said in the

2    context of how he said that.

3    Q.   Another right that Eder-Goodman received was to enforce a

4    cap of $5 million on indebtedness for Eber-Connecticut.  Are

5    you familiar with that?

6    A.   Yes.

7                (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BY MR. MULRY:

Q.  That's not something that you gave another deduction for, correct?

A.  I don't know what you mean by deduction.

Q.  Well, you made a 15 percent adjustment for the preference, correct?

A.  The 15 percent adjustment is arrived at by taking both sides of the transaction, the buyer and the seller, into account and looking at what rights and privileges are afforded. You know, there are privileges certainly that we have been talking about, liquidation privileges, right of first refusal, things like that, that Eder-Goodman obtained there.  With other significant rights that Eber-Metro obtained by continuing to hold a large 85 percent majority interest running the company, day-to-day operations, more board seats, the ability to sell the company if they wanted to.

        You could say that those rights offset one another. There were certain aspects with regard to Eder-Goodman that they obtained relative -- for example, Southern, what they were offering, that was a little bit more than what Southern was getting.

        So that's where I arrived, at the end of the day, taking all that into account, to include that 15 percent premium.

        MR. MULRY:  Your Honor, I don't have a lot more.

L9FsKLE2                          Redirect - Liebman

1    There was one thing I would like to discuss with counsel with

2    respect to Mr. Eder's testimony, which I think just became

3    available.

4            But if we could take a short break, would be done

5    within ten minutes, at most.

6            THE COURT:  We'll take ten minutes.

7            MR. MULRY:  Thank you, your Honor.

8            (Recess)

9            THE COURT:  Any more questions, Mr. Mulry?

10           MR. MULRY:  No further questions, your Honor.

11           THE COURT:  All right.  Thank you.

12           Any redirect?

13           MR. BROOK:  Just two questions, your Honor.

14           THE COURT:  Thank you.

15           MR. BROOK:  Technically three, just to orient

16   ourselves.

17   REDIRECT EXAMINATION

18   BY MR. BROOK:

19   Q.  At the time you formed your opinion, did you know whether

20   Eder-Goodman valued Eber-Connecticut based on gross profit

21   rather than Eber revenue?

22   A.  Back in 2012?

23   Q.  Back when you formed your original opinions, before you

24   testified today.

25   A.  No, I didn't.

1   Q.   Then just to orient ourselves, you made an adjustment to

2   the valuation of Eder-Goodman based on liquidation preference,

3   correct?

4   A.   Yes.

5   Q.   Would it affect your opinion if the Eder-Goodman

6   transaction price of $4,500,000 was determined before

7   Eder-Goodman negotiated a liquidation preference for itself?

8   A.   Possibly.

9            MR. BROOK:  OK.  Nothing further.

10           THE COURT:  Thank you.

11           Recross?

12           MR. MULRY:  Nothing, your Honor.

13           THE COURT:  I have a couple of questions, just so that

14   we're all clear here.

15           The valuation of a business or an interest in a

16   business is ultimately a question of judgment, is it not?

17           THE WITNESS:  Yes.

18           THE COURT:  One of the things that you and others,

19   doing what you do, consider --

20           Well, let me withdraw that and ask a different

21   question first.

22           The search and valuation is to determine what a

23   willing buyer, under no compulsion to buy, would offer, and

24   what a willing seller, under no compulsion to sell, would

25   accept for the asset or company in question, right?

1            THE WITNESS:  Yes.

2            THE COURT:  And that's a judgment call?

3            THE WITNESS:  Yes.

4            THE COURT:  All right.  One of the things that you and

5    others consider in forming a judgment as to value, where data

6    is available, is comparable transactions, right?

7            THE WITNESS:  Yes.

8            THE COURT:  And seldom is it the case that there are

9    comparables as to which every pertinent detail of a comparable

10   to the proposed transaction or the transaction that you're

11   valuing is identical, true?

12           THE WITNESS:  That would be true, yes.

13           THE COURT:  There are differences in the nature of the

14   business, true?

15           THE WITNESS:  Yes.

16           THE COURT:  There are differences in the data that may

17   be available, true?

18           THE WITNESS:  Yes.

19           THE COURT:  There are differences in the structure of

20   the transaction, true?

21           THE WITNESS:  Yes.

22           THE COURT:  There are differences in the terms of the

23   transaction, true?

24           THE WITNESS:  Yes.

25           THE COURT:  And in selecting comparables to consider,

1   the valuer forms a professional judgment as to what is

2   sufficiently close in characteristics to warrant consideration

3   and others that are not sufficiently close in the judgment of

4   the valuer to bear on the determination of value, is that

5   right?

6            THE WITNESS:  Yes.

7            THE COURT:  All right.  And that's what you did here,

8   yes?

9            THE WITNESS:  I did, yes.

10           THE COURT:  All right.  I have no further questions.

11           If anybody wants to ask anything else in light of what

12   I've inquired...

13           MR. BROOK:  No, your Honor.

14           MR. MULRY:  No, your Honor.

15           THE COURT:  All right.  Thank you, Mr. Liebman.

16   You're excused.

17           THE WITNESS:  Thank you, your Honor.

18           (Witness excused)

19           THE COURT:  OK.  Mr. Brook.

20           MR. BROOK:  At this time, there are no further

21   witnesses.  Your Honor has received the parties' joint

22   deposition designations.  The last remaining part of

23   plaintiffs' case is to offer certain documentary exhibits into

24   evidence, which I can read into the record.  And then at the

25   end, I will note for the record which exhibits the defense

1    objects to for your Honor to later rule upon.

2              THE COURT:  OK.

3              MR. BROOK:  Let me go to the podium.  This will be a

4    long list.  And the numbers are all plaintiffs' exhibits.

5              Two, three, six, seven, eight --

6              MR. MULRY:  I apologize for interrupting.  Just three,

7    I don't think that we had that on the list.

8              Two, three?

9              MR. BROOK:  I probably don't care about it.  I don't

10   need three.  Let's omit three then, if that's not on the list.

11   I think you have a PDF, though.

12             MR. MULRY:  It's two...

13             MR. BROOK:  2, 6, 7, 8, 9, 11, 14, 21, 22, 23, 27, 28,

14   29, 31, 34, 35, 36, 37, 38, 40, 41, 42, 43, 44, 47, 48, 50, 53,

15   54, 55, 57, which I will note was used yesterday -- I'm not

16   sure whether it was offered into evidence by defense counsel --

17   58, 59, 61, 62, 63, 65, 66 -- I'm sorry, 66 is already in --

18   67, 68, 70, 71, 72, 73, 76, 77, 79, 80, 81, 83, 84, 86, 89, 93,

19   95, 98, 102, 103, 105, 108, 109, 112, 114, 115, 116, 121, 122,

20   124, 125, 130, 133, 134, 135, 136, 137, 138, 139, 151, 153,

21   154, 156, 157 -- I'm just going to leave out the word 100 to

22   make it faster -- 158, 159, 160, 162, 164, 165, 166, 168, 169,

23   171, 172, 174, 175, 176, 177, 179, 191, 192, 193, 194, 195,

24   196, 197, 199 -- I'm sorry, 199 is already in -- 202, 203, 205,

25   207, 209, 224, 225, 226, 227, 228, 229, 230, 231, 232, 233,

1    234, 235, 237, 238, 239, 240, 241, 242, 243, 244, 245, 246,

2    247, 248, 250, 252, 253, 254.

3            THE COURT:  Are we getting there?

4            MR. BROOK:  Very close, your Honor.

5            255, 257, 259, 260, 262, 263, 265, 267, 269, 280, 281,

6    and that is it.

7            THE COURT:  All right.  The objections that the

8    defendant has made are on a piece of paper, right?

9            MR. BROOK:  Yes.  Actually, I said that's it.  I have

10   a couple that are offered only for a limited purpose that I

11   wanted to separate.

12           Exhibits 45 and 46 are affidavits from Lester Eber

13   that are offered solely for purposes of showing what was said

14   to a court, not for the truth of the matter as asserted.

15           Then there are interrogatory responses that we also

16   would like to introduce, but not necessarily the entire

17   document.

18           Exhibit 88, we offer all of it.

19           Exhibits 141, we offer the response to number four.

20           Exhibit 142, interrogatory numbers one and nine.

21           Exhibit 143 is a letter that followed up on

22   interrogatory responses.  We offer only the three bullet points

23   on page two.

24           Exhibit 144, we offer the response to No. 16.

25           147, we offer all except for the response to number

1    22.

2              148 and 149, we offer all.

3              As to the objections, defense objects to Exhibits

4    31 --

5              THE COURT:  Is there a piece of paper that says it?

6              MR. BROOK:  Yes, your Honor, I believe the objections

7    are all on the exhibit list that has been delivered to the

8    court.

9              THE COURT:  Is that in the pretrial order, or is it

10   somewhere else?

11             MR. BROOK:  It is in the pretrial order.  It has been

12   updated recently.  We can filed it on ECF.

13             THE COURT:  Just so we know.

14             MR. MULRY:  It is in the plaintiffs' exhibits with the

15   defendants' objection submitted to the portal with Mr. Mohan.

16             We could follow up with a letter just outlining what

17   the objections are, if that would be easier for the court.

18             THE COURT:  That would be.  And don't change it from

19   what you have done.

20             MR. MULRY:  We won't.

21             THE COURT:  File it on ECF, defendants' objections to

22   plaintiffs' exhibits, then I'll have it.

23             MR. MULRY:  Thank you, your Honor.

24             THE COURT:  Plaintiffs' exhibits are all received

25   subject to the objections.

L9FsKLE2                         Redirect - Liebman

1          (Plaintiff's Exhibits 2, 6, 7, 8, 9, 11, 14, 21, 22,

2    23, 27, 28, 29, 31, 34, 35, 36, 37, 38, 40, 41, 42, 43, 44, 47,

3    48, 50, 53, 54, 55, 57, 58, 59, 61, 62, 63, 65, 67, 68, 70, 71,

4    72, 73, 76, 77, 79, 80, 81, 83, 84, 86, 89, 93, 95, 98, 102,

5    103, 105, 108, 109, 112, 114, 115, 116, 121, 122, 124, 125,

6    130, 133, 134, 135, 136, 137, 138, 139, 151, 153, 154, 156, 157

7    158, 159, 160, 162, 164, 165, 166, 168, 169, 171, 172, 174,

8    175, 176, 177, 179, 191, 192, 193, 194, 195, 196, 197, 202,

9    203, 205, 207, 209, 224, 225, 226, 227, 228, 229, 230, 231,

10   232, 233, 234, 235, 237, 238, 239, 240, 241, 242, 243, 244,

11   245, 246, 247, 248, 250, 252, 253, 254, 255, 257, 259, 260,

12   262, 263, 265, 267, 269, 280, 281 received in evidence)

13          MR. BROOK:  At this point, with the deposition

14   designations being the last piece, plaintiffs rest their case.

15          THE COURT:  OK.  Now, Mr. Mulry, what are we going to

16   have next week on your case?

17          MR. MULRY:  Next week, your Honor, we have three

18   witnesses.  The first witness will be Wendy Eber, who has

19   submitted a declaration.

20          THE COURT:  Yes.

21          MR. MULRY:  We have a remote witness, who is Michael

22   Gallagher.  He was an actuary for the companies.

23          Then the third witness is Frank Torchio, who is

24   defendants' expert.

25          THE COURT:  Are we going to need all three days?

1          MR. MULRY:  It would depend on the length of time for

2     the cross of Ms. Eber.

3          I expect Michael Gallagher to be a very short witness,

4     and I would expect -- Mr. Torchio is the defendants' expert

5     witness.  If today's testimony is some indication, he would not

6     take a full day, possibly half a day.

7          So we may only need Tuesday and Wednesday, but I would

8     defer to Mr. Brook on expectations with respect to the length

9     of Ms. Eber's cross.

10         MR. BROOK:  I would agree as to Mr. Gallagher's cross

11    being relatively short, maybe 10, 15 minutes.

12         As to Mr. Torchio, I probably won't go more than an

13    hour, hour and a half, at the absolute most.  I might not even

14    cross-examine him.

15         As to Ms. Eber -- and I want to try to say this in a

16    way without sort of sounding like I'm disparaging her.  The

17    fact is, during depositions, answers were extraordinarily slow

18    and nonresponsive.  That is going to significantly affect the

19    length of my cross.  I believe if I could get -- if I get

20    prompt, responsive answers, I would be done in less than a day.

21         I think there is a very good chance that we will be

22    done by the middle of the day on Wednesday, and I would say I'm

23    very, very optimistic we will be done before Thursday, the

24    23rd.

25         THE COURT:  OK.  I do repeat my suggestion that you

L9FsKLE2                          Redirect - Liebman

1    folks sort of figure out a way to settle this case.

2              MR. BROOK:  Understood.

3              THE COURT:  OK.  Thank you.

4              (Adjourned to Tuesday, September 21, 2021, at

5    9:30 a.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                        INDEX OF EXAMINATION

2    Examination of:                              Page

3    GLENN LIEBMAN

4    Direct By Mr. Brook  . . . . . . . . . . . 168

5    Cross By Mr. Mulry . . . . . . . . . . . . 171

6    Redirect By Mr. Brook  . . . . . . . . . . 215

7                        PLAINTIFF EXHIBITS

8    Exhibit No.                               Received

9     119, 120, 150, 180, 186, 206, and 210 . . . . 171
              through 219
10    2, 6, 7, 8, 9, 11, 14, 21, 22, 23, 27,  . . . 222
              28, 29, 31, 34, 35, 36, 37,
11            38, 40, 41, 42, 43, 44, 47,
              48, 50, 53, 54, 55, 57, 58,
12            59, 61, 62, 63, 65, 67, 68,
              70, 71, 72, 73, 76, 77, 79,
13            80, 81, 83, 84, 86, 89, 93,
              95, 98, 102, 103, 105, 108,
14            109, 112, 114, 115, 116, 121,
              122, 124, 125, 130, 133, 134,
15            135, 136, 137, 138, 139, 151,
              153, 154, 156, 157 158, 159,
16            160, 162, 164, 165, 166, 168,
              169, 171, 172, 174, 175, 176,
17            177, 179, 191, 192, 193, 194,
              195, 196, 197, 202, 203, 205,
18            207, 209, 224, 225, 226, 227,
              228, 229, 230, 231, 232, 233,
19            234, 235, 237, 238, 239, 240,
              241, 242, 243, 244, 245, 246,
20            247, 248, 250, 252, 253, 254,
              255, 257, 259, 260, 262, 263,
21            265, 267, 269, 280, 281

22                        DEFENDANT EXHIBITS

23   Exhibit No.                               Received

24    Z  . . . . . . . . . . . . . . . . . . . . 193

25
```