L9LsKLE1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DANIEL KLEEBERG, et al.,

                    Plaintiffs,

          v.                          16 Civ. 9517 (LAK)

WENDY EBER, et al.,

                    Defendants.

------------------------------x
                                      New York, N.Y.
                                      September 21, 2021
                                      9:45 a.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                      District Judge

                         APPEARANCES

BROOK & ASSOCIATES, PLLC
     Attorneys for Plaintiffs
BY:  BRIAN C. BROOK

FARRELL FRITZ, P.C.
     Attorneys for Defendants
BY:  KEVIN P. MULRY
     FRANK T. SANTORO
     -and-
HERBERT LAW
     Attorneys for Defendants
BY:  JOHN HERBERT

ALSO PRESENT:
ALI L. KRAL, Paralegal
SAMANTHA SKORIAK, Paralegal

L9LsKLE1                              Direct - W. Eber

1              (Trial resumed)

2              THE COURT:  Good morning, everyone.  We are ready to

3    start the defense case.

4              Mr. Mulry.

5              MR. MULRY:  Your Honor, Frank Santoro.

6              We call Wendy Eber, the first witness for the defense.

7     WENDY EBER,

8          called as a witness by the Defendants,

9          having been duly sworn, testified as follows:

10             THE DEPUTY CLERK:  Please state your name and spell

11   your last name for the record.

12             THE WITNESS:  Wendy Eber, E-b-e-r.

13             THE DEPUTY CLERK:  Thank you.

14             THE COURT:  You may proceed.

15             MR. SANTORO:  Thank you, your Honor.

16   DIRECT EXAMINATION

17   BY MR. SANTORO:

18   Q.  Good morning, Wendy.

19             Wendy, prior to the trial, did you work with me to

20   prepare a declaration containing your direct testimony in this

21   case?

22   A.  I did.

23   Q.  You reviewed that statement carefully?

24   A.  I did.

25   Q.  You signed that statement?

1    A.  I did.

2    Q.  When you signed that statement, you were swearing to the

3    truth of the contents of that statement, correct?

4    A.  Yes.

5    Q.  And do you reaffirm that statement today?

6    A.  I do.

7    Q.  I'm going to show you what's been marked for identification

8    as Defendants' Exhibit ZA.

9          If you can scroll to the end, please, Samantha.

10         Wendy, you've seen Defendants' Exhibit ZA.  Is that

11   the statement we were just referring to?

12   A.  Yes.

13   Q.  Is that your signature on the page in front of you?

14   A.  Yes.

15         MR. QUIJANO:  OK.  I would like to offer

16   Defendants' ZA into evidence, your Honor.

17         MR. BROOK:  Plaintiffs have a number of objections,

18   which I e-mailed to the court last night.  They are quite

19   voluminous.  If the court wants me to recite them verbally,

20   I can do so.

21         THE COURT:  No, but I don't like you e-mailing.

22         MR. BROOK:  I apologize.

23         THE COURT:  So file them.

24         MR. BROOK:  I will file it on ECF, your Honor.

25         THE COURT:  Received subject to the objections.

L9LsKLE1                          Direct - W. Eber

1              (Defendant's Exhibit ZA received in evidence)

2              Anything else, Mr. Santoro?

3              MR. SANTORO:  Yes, your Honor.

4              Since most of our exhibits are offered through

5    Ms. Wendy Eber's declaration, we would offer all of defendants

6    proposed trial exhibits into evidence at this time.

7              THE COURT:  You're going to have to give me a list of

8    what you're offering through this witness.

9              MR. SANTORO:  Sure, your Honor.

10             We're offering all of the exhibits contained on our

11   defendants' proposed trial exhibit list, which consists of

12   Exhibits A through XXXXX.

13             THE COURT:  A through?

14             MR. SANTORO:  Quadruple X.  X as in X-ray.

15             THE COURT:  X as in X-ray.

16             MR. SANTORO:  The Y exhibit, Exhibit Y is actually a

17   multi-part exhibit, Exhibit Y1 through Y33, Y Hayes 1 to

18   Y Hayes 2, and Y Stein 1 to Y Stein 7.

19             THE COURT:  All right.  I'm sure there are objections,

20   right?

21             MR. BROOK:  Yes, your Honor.  As with the other

22   exhibit list, they were e-mailed to court, and I will file

23   those online, if I'm understanding your Honor's instructions

24   correctly.

25             THE COURT:  Yes.

1              The exhibits are received subject to the objections.

2              (Defendant's Exhibits A through XXXX, Y1 through Y33,

3      Y Hayes 1 through Y Hayes 2, Y Stein 1 and Y Stein 2 received

4      in evidence)

5              MR. SANTORO:  Your Honor, thank you.  I would like to

6      ask a few questions on some issues that came up on plaintiffs'

7      case on leave of the court.

8              THE COURT:  OK.

9      BY MR. SANTORO:

10     Q.  First, Wendy, I would like to talk about the consulting

11     agreement, Lester Eber's consulting agreement.

12             What kind of work did your father do for Southern Wine

13     & Spirits under the consulting agreement?

14             MR. BROOK:  Objection, personal knowledge.

15             THE COURT:  Sustained.

16     A.  He --

17             MR. SANTORO:  The objection is sustained.

18             THE COURT:  Not appropriate.  When I say "sustained,"

19     you stop, please.

20     Q.  Wendy, when did your father begin working for Southern Wine

21     & Spirits?

22             MR. BROOK:  Same objection.

23             THE COURT:  Same ruling.

24             MR. SANTORO:  Your Honor --

25     Q.  Wendy, are you aware of the work your father did for

L9LsKLE1                          Direct - W. Eber

1   Southern Wine & Spirits?

2   A.  Yes, I am.

3   Q.  How are you aware of it?

4   A.  Because he was -- you know, I saw him and I talked to him

5   and I was around him.  And I knew that he was going to Albany.

6   I knew he had an office at Southern.  So I had spoken to him --

7             MR. BROOK:  Objection, hearsay.

8             THE COURT:  Certainly seems that way to me.

9   BY MR. SANTORO:

10  Q.  Wendy, being around your father, can you tell me when he

11  first started working for Southern Wine & Spirits?

12  A.  Sure.  It was after --

13            MR. BROOK:  Objection.

14            THE COURT:  Sustained.

15  Q.  Did your father maintain an office after August of 2007?

16  A.  At Southern?  Yes.

17  Q.  OK.  Where was that office located?

18            THE COURT:  Excuse me.  Were you present in it?

19            THE WITNESS:  No.

20            THE COURT:  OK.  Whatever you know about any office he

21  had at Southern you know because he told you, is that right?

22            THE WITNESS:  Well, he went there, yes.

23            THE COURT:  And the reason you know that he went there

24  is he told you he went there, right?

25            THE WITNESS:  Yes.

L9LsKLE1                          Direct - W. Eber

1          THE COURT:  OK.  Answer stricken.  Objection

2     sustained.

3     BY MR. SANTORO:

4     Q.  Were you ever at that office, Wendy?

5     A.  Yes.

6     Q.  When did you visit that office?

7     A.  When I interviewed for a job there.

8     Q.  Where was it located?

9     A.  I wasn't in his, per se, office.  I was in their office.

10    Q.  Where was -- and you're referring to Southern's office,

11    correct?

12         MR. BROOK:  Objection, vague.  I'm not sure who "their

13    office" is.

14    A.  Southern's office.

15         MR. SANTORO:  You have to wait for a ruling from the

16    judge.

17         THE COURT:  Go on.

18         MR. SANTORO:  I'm sorry, Judge.

19         THE COURT:  Go on.

20         MR. SANTORO:  OK.

21    BY MR. SANTORO:

22    Q.  So when did you -- when were you in that office?

23    A.  I would say, like, 2007, late 2007, maybe September or

24    something like that.  October something.

25    Q.  What year?

1    A.  2007.

2    Q.  OK.  At the time you visited that office, was your father

3    there?

4    A.  No, he was -- he was not there.

5    Q.  OK.  Now, were you aware of your father's consulting

6    agreement with Southern?

7    A.  Yes, I was.

8    Q.  How did you become aware of it?

9    A.  I remember seeing it for the first time and printing it

10   out, so I was aware of it.

11   Q.  OK.  Did your father -- how long did your father work for

12   Southern?

13           MR. BROOK:  Objection.

14           THE COURT:  Sustained as to form.

15   Q.  Well, other than your father telling you, was there any

16   other observations that you had that led you to believe that

17   your father worked for Southern?

18   A.  Other people knew besides that.  Besides my father, I had

19   conversations with other people.  Our CFO, you know, Lisa

20   Semenik, Mike Gumaer, other people who were in the industry as

21   well.

22           MR. BROOK:  Objection to testimony based on hearsay.

23           THE COURT:  Sustained.  Stricken.

24   Q.  So following August of 2007, did you spend time with your

25   father?

1    A.   Yes.

2    Q.   How often did you spend time with your father?

3    A.   All the time.  Weekly.  I worked with him.

4    Q.   OK.  In what capacity did you work with him?

5    A.   In winding down the New York business and also in

6    Connecticut, our Connecticut ...

7    Q.   And what did he do with his time?

8    A.   He split it.  He was in -- he would travel to New York.  He

9    lived in Rochester, New York.  He would travel to New York, and

10   he would spend certain days in New York City and Long Island

11   working with Southern, and then he would come up to

12   Connecticut, and then he was in Albany.

13             MR. BROOK:  Move to strike the part about Southern.

14             THE COURT:  Yes, that is all stricken.  No personal

15   knowledge.

16   Q.   OK.  Now, Wendy, there was some issue of Eber Wine &

17   Liquor's transaction with Southern in 2007 came up on

18   plaintiffs' case.

19             Can you tell me the proceeds of that transaction with

20   Southern?

21   A.   Approximately 22 million.

22   Q.   What happened to that money?

23   A.   It all went to pay down the bank, Wells Fargo, and vendor

24   suppliers.

25   Q.   OK.  Harris Beach was performing work in connection with

L9LsKLE1                          Direct - W. Eber

1   that transaction, right?

2   A.   Yes.

3   Q.   And, in fact, prior to -- well, what kind of work did

4   Harris Beach provide for the Eber entities?

5   A.   They were lawyers.

6   Q.   Who did they perform work for?

7   A.   All the companies.

8   Q.   To your knowledge, who was responsible for paying them?

9   A.   All the companies.

10  Q.   OK.  Now, finally, briefly, I think your declaration states

11  in paragraph 83 that Lester Eber received 750 shares of class B

12  junior preferred stock of Eber Wine & Liquor in February 2017.

13          Can you tell me your understanding of why he received

14  that?

15  A.   Yes.  We were in the process of settling with the PBGC.

16  And from ERISA law, their rules, in order for him to waive his

17  benefit --

18          MR. BROOK:  Objection to legal opinion.

19          THE COURT:  I'm sorry?

20          MR. BROOK:  Objection to legal opinion on ERISA.  Most

21  lawyers don't understand that.

22          THE COURT:  Objection sustained.

23          MR. SANTORO:  I asked her for her understanding at the

24  time.

25          THE COURT:  Yes, I know.  What is her understanding in

1    terms of relevance to the case?

2              MR. SANTORO:  It goes to her state of mind in her part

3    in effectuating the transaction.

4              THE COURT:  Is that an issue?

5              MR. SANTORO:  I believe so, your Honor.  I believe the

6    plaintiffs are attacking every action that Wendy Eber took

7    here.

8              THE COURT:  Every action?

9              MR. SANTORO:  That she took as an officer and director

10   of Eber Wine & Liquor.

11             THE COURT:  So far I haven't heard of any actions she

12   took.  So far what I'm hearing is that she had some awareness

13   of this transaction, and you're trying to elicit from her the

14   reason of some unknown person or persons as to why it was done.

15             MR. BROOK:  Your Honor, it's true that plaintiffs

16   generally allege that this bad state of mind and not acting in

17   good faith throughout this case due to certain indemnification

18   provisions as it relates.  As to this action, plaintiffs do not

19   challenge it based on anyone's state of mind.  It has to do

20   with various corporate rules and trustee rules not being

21   followed.

22             THE COURT:  I think that takes care of it.

23             Unless you can establish personal knowledge, there is

24   no more basic rule than that.

25             MR. SANTORO:  I understand that, your Honor.

1    BY MR. SANTORO:

2    Q.  Wendy, did you have a part in the issuance of the

3    750 shares of class B junior preferred stock?

4    A.  I believe so, yes.

5    Q.  OK.  So were you aware of it when it was happening?

6    A.  Yes.

7    Q.  And can you tell me your understanding of why it was done?

8    A.  Yes.  My father was waiving his right to his pension plan

9    benefit, the joint -- and survivor benefit.  And in order to do

10   that, he had to be the beneficial owner of a majority of the

11   Eber Wine & Liquor corporation stock.

12   Q.  OK.

13              (Counsel confer)

14              MR. SANTORO:  Thank you, Wendy.

15              Thank you, your Honor.

16              THE COURT:  All right.  Thank you.

17              Cross-examination.

18              MR. BROOK:  Just a little, your Honor.  Just to be

19   clear also with my expectations, I was being sarcastic.  I

20   apologize.

21   CROSS-EXAMINATION

22   BY MR. BROOK:

23   Q.  Good morning, Ms. Eber.

24   A.  Good morning.

25   Q.  You remember me, I'm Brian the lawyer for the plaintiffs in

1    this case, correct?

2    A.  Yes.

3    Q.  I deposed you on four separate days before today, correct?

4    A.  Yes.

5    Q.  Would you mind just speaking up a little bit when you

6    answer?  It is actually very hard to hear you.  Speak into the

7    microphone.

8    A.  Yes.

9    Q.  Thank you.

10           I just want to touch on some of the things you just

11   said to try to clarify it.

12           You said that you worked with Lester all the time

13   since 2007, correct?

14   A.  I worked -- I worked with him, yes.

15   Q.  You specifically used the words "all the time," did you

16   not?

17   A.  Yes.

18   Q.  But you never once saw him in any Southern Wine & Spirits

19   office during that time, correct?

20   A.  No.

21           THE COURT:  No, it's not correct, or no, you never saw

22   him there?

23           THE WITNESS:  I never saw him in the Southern office.

24           THE COURT:  Thank you.

25   Q.  You said that all the companies were responsible for paying

1    Harris Beach, is that right?

2    A.   That's my understanding.

3    Q.   And isn't it true that up until 2007, you were not in the

4    role of a chief financial officer with any Eber Brothers

5    company in New York, correct?

6    A.   Correct.

7    Q.   Since 2007, isn't it true that every Harris Beach bill that

8    was paid, was paid by Eber Brothers Wine & Liquor Corp.,

9    correct?

10   A.   I don't believe so.

11   Q.   Can you think of any examples where that didn't happen,

12   putting aside Lester himself buying Harris Beach's claims for

13   $400,000?

14   A.   He paid that claim.  He paid that claim.

15   Q.   OK.  So besides that payment, is there any other time when

16   any entity besides Eber Brothers Wine & Liquor Corp. paid a

17   Harris Beach bill that you personally know about?

18   A.   I don't recall.

19   Q.   You said just in your last bit of testimony that Lester had

20   to be the beneficial owner of Eber Wine & Liquor's stock in

21   order for him to waive his pension benefit, is that correct?

22   A.   No.

23            MR. SANTORO:  Objection, your Honor.

24            THE COURT:  I don't think that's what she said.

25            MR. BROOK:  I must have misheard it again.

1  Q.  Can you please restate it, what it was exactly that you

2  said that he -- why it was he had to be a shareholder as part

3  of that settlement?

4  A.  He --

5          MR. SANTORO:  Objection, mischaracterizing the

6  testimony, your Honor.

7          THE COURT:  Yes, I think that's true.  Sustained as to

8  form.

9  Q.  OK.  I'll have to go back to the transcript then.  I must

10  have misheard it.

11         All right.  In your declaration, is it fair to say,

12  Ms. Eber, that you provided an extensive amount of financial

13  information about the Eber Brothers companies and their

14  affiliates?

15  A.  Yes.

16  Q.  Were you careful to ensure that the information you

17  included was accurate?

18  A.  To the best of my ability, yes.

19  Q.  Did you do it yourself?

20  A.  Which specific?

21  Q.  Well, there's a lot of financial information in your

22  declaration, correct?

23  A.  There are references to financial statements and, yes, we

24  had a lot of financial statements in there.  And we referenced

25  losses in Connecticut specifically, and then parts of the

1   settlements.

2   Q.  So you're saying you can read a financial statement and

3   pull information out of it correctly, is that right?

4   A.  Yes.

5   Q.  And that includes a profit and loss statement, or a P and

6   L, correct?

7   A.  Yes.

8   Q.  You can also take a look at, for example, a general ledger

9   for a company and determine whether information in there is

10  accurate when putting that into your statement, correct?

11              MR. SANTORO:  Objection, your Honor.  I'm not sure

12  what the question is.

13              THE COURT:  Sustained.

14              Ms. Eber, I think I picked up somewhere in this

15  material that you have a master's degree in business

16  administration from the Simon School of Business at the

17  University of Rochester, is that right?

18              THE WITNESS:  Yes.

19              THE COURT:  Did you concentrate in any particular

20  area?

21              THE WITNESS:  Finance and marketing.

22              THE COURT:  Are you or are you not a CPA?

23              THE WITNESS:  I am a non-practicing CPA, yes.

24              THE COURT:  Non-practicing, but you have a license?

25              THE WITNESS:  Yes, I do.

L9LsKLE1                          Cross - w. Eber

1              THE COURT:  All right.  That's fine.

2              Let's go ahead.

3              What year did you get that MBA?

4              THE WITNESS:  '95.

5              THE COURT:  I was on the visiting committee of that

6    school, but much earlier.  So I have a reasonable regard for

7    counsel, as you might expect.

8    BY MR. BROOK:

9    Q.  As part of your declaration, you also provided a discounted

10   cash flow analysis or DCF, correct?

11   A.  Yes, I did.

12   Q.  And you believe that you were capable of reliably inputting

13   information into that calculation, correct?

14   A.  I created it, yes.

15   Q.  OK.  Let's look at just the first couple of instances in

16   your testimony where you provide some numbers for the court.

17   Declaration page nine of the PDF paragraph 20.

18              You say here that Dan Kleeberg abandoned the business

19   and moved to Florida in 2007 while continuing to collect

20   $10,000 a month consulting fee for more than a year and 7,500

21   per month afterwards.

22              Is that information correct?

23   A.  I believe so, yes.

24   Q.  How did you verify that information?

25   A.  He had a contract or he had an agreement -- I think there

1   was a bill somewhere I saw.  And I believe there were payments

2   that were made to him and then it went down.  I saw some

3   document that said that it went down.

4   Q.  All right.  So you did verify this information before you

5   put it in here, correct?

6   A.  To the documents, yes.

7   Q.  OK.  Did you look at the general ledger for Eber Wine &

8   Liquor when doing that?

9   A.  I -- I did look at the general ledger because I know it was

10  a document that was included in discovery.  It's a very thick

11  document, so I don't recall every single entry into it.

12  Q.  Let's pull up Exhibit 160 at page 62.

13          If you can blow out the sales expense figures, please,

14  Ali.

15          All right.  If you're able to expand that.  Great.

16          All right.  Now we're looking at the sales expense

17  category for Eber Wine & Liquor, and this is a general ledger

18  that begins August 31, 2007, right after the Southern deal,

19  correct?

20  A.  Yes.

21  Q.  It goes all the way through the end of May 2012, does that

22  sound correct, in terms of what you provided to us?

23  A.  I only see through ...

24  Q.  I'll withdraw the question.

25          What we're looking at here is the sales expenses that

L9LsKLE1                        Cross - w. Eber

1    were recorded on the general ledger that you provided and they

2    end August 31, 2009, correct?

3              Bottom left corner.

4    A.  Yes.

5    Q.  All right.  Do you see any payments in the amount of

6    $10,000 there?

7    A.  No, I don't.

8    Q.  Isn't it true, in fact, that the first payment in the

9    highlighted section is for 15,000, which is two times $7,500,

10   correct?

11   A.  Correct.

12             MR. SANTORO:  Object as to foundation.

13             THE COURT:  Overruled.

14   Q.  All right.  So you can see that there are $7,500 payments

15   until the last one seems to be November 30, 2008.

16             Do you see that?

17             2008, Ali.

18   A.  Yes.

19   Q.  Then it actually decreases into half, 3750, correct?

20   A.  Yes, it does.

21   Q.  According to this, Dan Kleeberg, in 2008, was paid $7,500 a

22   month for 11 months and 3750 for one month at the end, correct?

23             MR. SANTORO:  Object, your Honor.

24             THE COURT:  Sustained.

25   Q.  Do you have any reason to believe that this is not the

L9LsKLE1                          Cross - w. Eber

1   payment being made to Dan Kleeberg under the consulting

2   agreement?

3   A.  I don't know.  I mean, I didn't book these or put this

4   together.  I was going from a document that I saw that --

5   Q.  You were the chief financial officer of Eber Wine & Liquor

6   in 2008, correct?

7   A.  Yes.

8   Q.  You would have reviewed any 1099s that were issued to the

9   company for people working for Eber Brothers Wine & Liquor in

10   2008?

11   A.  I don't recall doing that.

12   Q.  Let's see if we can try to refresh your recollection with

13   Plaintiffs' Exhibit 310.

14            Just one moment.

15            All right.  Now, showing you what is marked as

16   Plaintiffs' Exhibit 310, this appears to be a 1099 issued in

17   2008 for Eber Brothers Wine & Liquor Corp.

18            Do you see that?

19   A.  Yes.

20   Q.  Do you see that the total amount of non-employee

21   compensation paid to Dan Kleeberg was $86,250?

22   A.  Yes.

23   Q.  So does that refresh your recollection that, in fact, Dan

24   Kleeberg was only paid $7,500 a month for the first 11 months

25   of 2008?

1          MR. SANTORO:  Object, your Honor.

2          THE COURT:  Overruled.

3    Q.  Does that refresh --

4    A.  I'm sorry.

5    Q.  Does that refresh your recollection that Dan Kleeberg was

6    not paid $10,000 a month?

7    A.  This document says that he wasn't, so ...

8    Q.  OK.  You can take that down.

9    A.  He -- yeah.

10         THE COURT:  Just give me that figure again.  86,250,

11   was it?

12         MR. BROOK:  I believe that's right, your Honor.

13         THE COURT:  That squares to the penny with --

14         MR. BROOK:  Exhibit 160.

15         THE COURT:  -- exhibit 160, page 62?

16         MR. BROOK:  Yes, your Honor.

17         THE COURT:  All right.

18   BY MR. BROOK:

19   Q.  Now, let's look at the next bit of financial information

20   you have in your paragraph 24 of your declaration.

21         All right.  Here, I'm not looking to read the whole

22   thing.  Just looking at the second sentence, you provide

23   information for the net income for Eber Wine & Liquor in 2005

24   and 2006, correct?

25   A.  Yes.

L9LsKLE1                              Cross - w. Eber

Q.  And you would have gotten this information from the P and L

statement as part of Eber Wine & Liquor's financial statement,

correct?

        MR. SANTORO:  Object, your Honor.

        THE COURT:  Objection to the form and sustained.

Q.  All right.  Where did you get this information from?

A.  The financial statement ending 2005 and 2006.

Q.  OK.  So that exhibit is already in as Exhibit 205.

        Ali, could you please put up Exhibit 205, maybe

alongside this one, I believe it's -- I can't remember if it is

page six or exactly where.  Page seven of Exhibit 205.  Then if

we can go back to paragraph 24 and put that there on the left.

        All right.  So you see that, in fact, the net

income -- the net income --

        If you can actually zoom in, Ali, from other income

expenses in the middle all the way down to the bottom.  Great.

Put that on the side so it is not blocking the other one.

Great.

        All right.  When you said that there was approximately

29 million in income in 2005, you were actually reading the net

other income, correct, not the net income?

A.  The net income on the bottom line here.  Sorry.

Q.  Oh, the net income here is for 2005 is clearly $20,362,231,

correct?

A.  Yes.

L9LsKLE1                        Cross - w. Eber

1   Q.  All right.  The number that you provided in your statement

2   was approximately 29 million, correct?

3   A.  Yeah.  Can I see -- what does it say on top?  Yeah.  Yeah,

4   it's before the -- before minority interest and other things,

5   yes.

6   Q.  So and then --

7   A.  You can't really see what this says here.

8           MR. BROOK:  Ali, close the callout on the right so she

9   can see the whole document.

10  A.  Other income and expenses, yes.  Yes, the bottom line is 20

11  and nine.

12  Q.  I'm sorry.  You're saying it is 20, not 29?

13  A.  Well, you're saying the bottom -- you're saying the net

14  income in 2005 was 20?

15  Q.  Yes.

16  A.  And then the loss was in 2006.

17  Q.  Then the loss in 2006 was $9,134,000 and change, not

18  12.7 million, correct?

19  A.  Correct.

20  Q.  And it looks like, in this instance, you misread which part

21  of the financial statement was the net income, is that correct?

22  A.  Yes.

23          MR. BROOK:  All right.  You can take that down, Ali.

24          Just one second.

25          (Pause)

L9LsKLE1                         Cross - w. Eber

1              THE COURT:  Let's just pause for a moment so that I

2    get what, I take it, you now both agree are the correct

3    figures.

4              Put up the exhibit again.

5              MR. BROOK:  Page seven.

6              THE COURT:  It does not, does it, show the sales

7    figure, right, refer to the first sentence of paragraph 24 of

8    the witness statement, am I right?

9              MR. BROOK:  Let's see.  I don't have the witness

10   statement right here.

11             THE COURT:  Oh, I see.  There we are.

12             So the 2005 sales figure in the statement is

13   approximately correct.  It is approximately correct for 2006

14   also.

15             MR. BROOK:  Yes.

16             THE COURT:  The net income figure for 2005 is about

17   20 million and the net loss the following year was about

18   9.1 million, and that's what it amounts to; yes?

19             MR. BROOK:  Yes, your Honor.

20             THE COURT:  OK.

21   BY MR. BROOK:

22   Q.  Just to be clear, so, Ms. Eber, by just looking at the

23   other income information, that does not include any of the

24   operating income or sales, correct?

25   A.  I'm sorry?

L9LsKLE1                          Cross - w. Eber

1   Q.  Other income as a category, excludes operations, does it

2   not?

3   A.  Yes.  You've got to go up, yeah.  Right, so the other

4   expenses.

5   Q.  Right.

6              THE COURT:  Ms. Eber --

7              THE WITNESS:  Operations and then other income

8   expenses.

9              THE COURT:  Ms. Eber, what was the net loss from

10  subsidiary in 2006?

11             THE WITNESS:  I'm not sure where you're referring to.

12  I don't see that.

13             MR. BROOK:  It's been highlighted.

14             THE WITNESS:  What was that?  I don't know.  I didn't

15  put these financial statements together, your Honor.  I was not

16  involved in the production of this statement.

17             THE COURT:  This precedes the time when you were chief

18  financial officer?

19             THE WITNESS:  Yes.

20             THE COURT:  OK.  Thank you.

21  BY MR. BROOK:

22  Q.  Is it correct that you did not actually become a chief

23  financial officer of Eber Brothers until after Lisa Semenik

24  resigned in October 2007?

25  A.  Correct.

L9LsKLE1                          Cross - w. Eber

1  Q.  And you were also not a board member of Eber Wine & Liquor,

2  Eber-Metro, or Eber-Connecticut until Lisa Semenik resigned in

3  October 2007, correct?

4  A.  Correct.

5  Q.  All right.  Some of the things that happened --

6        Keep up Exhibit 205.  We're going to go back to that

7  shortly.

8        You testified about Lester Eber's alleged loans in

9  2002 and 2005 in your declaration, correct?

10        Do you want us to go there to refresh your

11  recollection of what you said about those loans?

12  A.  I'm sorry?

13  Q.  Did you not testify about loans that Lester, your father,

14  purportedly made in 2002 and 2005?

15  A.  Footnoted in footnote nine.

16  Q.  Footnote nine of this financial statement?

17  A.  Yes.

18  Q.  OK.  Let's go to page 18, I believe it is, of the exhibit

19  or the PDF.

20        This is talking about the long-term debt.  So it is

21  your understanding that that first set of numbers of unsecured

22  non-interest bearing note payable to an officer with no set

23  repayment date refers to loans that your father made, is that

24  right?

25  A.  Yes.

L9LsKLE1                              Cross - w. Eber

1    Q.  And you've testified to that even though you were not

2    involved in the chief financial officer function at the time,

3    correct?

4    A.  I was not chief financial officer at the time.

5    Q.  And you did not have any bank records or canceled checks

6    indicating that Lester Eber ever made any payments to the

7    company around the time of these purported loans, correct?

8    A.  I didn't have those, but the -- no, I don't have those.

9    Q.  And you searched for them in response to the discovery

10   requests in this case, correct?

11   A.  Yes.

12   Q.  And you could not find any such evidence of payments being

13   made by Lester in that time period, correct?

14   A.  There were some checks.  We couldn't find them.

15   Q.  You say there were some checks, but you couldn't find them?

16   A.  Yes, there were checks.  We couldn't find them.

17             THE COURT:  How do you know that?

18             THE WITNESS:  He -- he had bank records where he was

19   trying to find a specific check and couldn't find them.

20             THE COURT:  So when you say there were some checks,

21   what I'm understanding you to be saying is that there were,

22   generally speaking, all sorts of checks and that you or someone

23   under your supervision went through them and you couldn't find

24   any checks that reflected payments by your father into the

25   company, is that accurate?

L9LsKLE1                         Cross - w. Eber

1              THE WITNESS:  At this time period, yes.

2              THE COURT:  At this time period?

3              THE WITNESS:  These.  These, I don't have.

4              THE COURT:  OK.  Thank you.

5              THE WITNESS:  There is --

6              THE COURT:  Go ahead.  I don't mean to cut you off.

7              THE WITNESS:  He did with the CFO.  There is a note

8     payable that was signed.

9              THE COURT:  Well, who signed the note payable?

10             THE WITNESS:  The CFO.

11             MR. BROOK:  Why don't we put them up on the screen so

12    we're all on the same page, your Honor.

13             THE COURT:  OK.

14             MR. BROOK:  Let's start with Defense Exhibit K.

15    A.   These were audited by the auditors.

16    Q.   So you're saying that these were -- you know that this

17    Exhibit K and the other note for $575,000, Exhibit L, were

18    received by the auditors, is that right?

19    A.   What I'm saying is that the auditors put together the

20    financial statement and they audit the financial statement.

21    Q.   OK.  Isn't it true that there can be many different reasons

22    why someone is given a promissory note besides that person, the

23    recipient, having loaned money to the maker, correct?

24             MR. SANTORO:  Objection, your Honor.

25             THE COURT:  Overruled.

L9LsKLE1                          Cross - w. Eber

1   A.  I don't know.

2   Q.  Let me look at this.

3            THE COURT:  Can I get a moment of clarification here?

4            The financial statements, if I remember correctly, are

5   exhibit?

6            MR. BROOK:  205.

7            THE COURT:  205.

8            MR. BROOK:  Page 18 of the PDF refers to certain

9   notes.

10           THE COURT:  Would you turn to the auditor's report

11  there on the financial statement?

12           MR. BROOK:  You're talking about the opinion, the

13  signed opinion?  I'm sorry.

14           THE COURT:  The opinion.

15           MR. BROOK:  Page three, I believe.

16           THE COURT:  Ms. Eber, is there any way of telling from

17  Plaintiffs' Exhibit 205 whether the auditors ever saw checks

18  from your father for the loans we've just been discussing to

19  the company?

20           THE WITNESS:  I don't have knowledge of that.

21           THE COURT:  Is it correct that we have no way of

22  knowing that they verified the existence of the payable to your

23  late father, that's referred to in footnote nine, beyond

24  looking at the notes, is that true?

25           THE WITNESS:  I don't know what their procedure is.  I

L9LsKLE1                         Cross - w. Eber

1   was not involved in the production of --

2           THE COURT:  That's simply what I'm trying to

3   establish.

4           THE WITNESS:  Yeah.

5           THE COURT:  Just so that I understand what the

6   evidence shows and doesn't show.  OK.

7           (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L9L2Kle2                          W. Eber – Cross

1   BY MR. BROOK:

2   Q.  I think there may be a way to see whether the auditors even

3   saw these notes.  Ali, would you please pull up Exhibit K

4   again.  Zoom in on the second paragraph.

5        All right.  Looking at the last line, do you see,

6   Ms. Eber, it says that there is interest at a rate of 6

7   percent, crossed out, by Lester Eber only, and raised to 9

8   percent from the date of the original note until paid?

9   Correct?

10  A.  Correct.

11  Q.  And the original note -- just to pull it back out, Ali, the

12  first paragraph says that was August 15, 2005, correct?

13  A.  Sorry.  Are you --

14  Q.  That says that the original note was August 15, 2005,

15  right?

16  A.  Yes.

17  Q.  And the date of this amended and restated note is March 13,

18  2006, correct?

19  A.  Yes.

20  Q.  So that is before the fiscal year end of May 31, 2006

21  reflected in the financial statement we were just looking at,

22  correct?

23  A.  Yes.

24        MR. BROOK:  And so let's go back, Ali, and let's take

25  a look at Exhibit 205.

L9L2Kle2                          W. Eber - Cross

1              THE COURT:  Before you back up, could I please see who

2       signed the note.

3              MR. BROOK:  Oh, yes, your Honor.

4              THE COURT:  Okay.  Thank you.

5       BY MR. BROOK:

6       Q.  We can see that this is dated as of the 13th day of March,

7       correct?

8              THE COURT:  I read that as "12th."

9              MR. BROOK:  Oh.

10             THE COURT:  It could be either.

11             MR. BROOK:  Either way.  Doesn't make a difference.

12             Let's now go back to Exhibit 205 at page 18 of the

13      PDF.  Let's look at that related party debt description again.

14      Q.  Do you see that the auditors described the note as being as

15      noninterest-bearing note payable --

16      A.  It's a mistake.

17      Q.  How do you know that?

18      A.  Because it was interest bearing, and the only officer that

19      was lending money, they had, you know --

20      Q.  You had no personal knowledge that this was a mistake

21      rather than simply an instance where a note was backdated to a

22      date before the date of an audit, do you?

23             MR. SANTORO:  Objection, your Honor.

24             THE COURT:  Overruled.

25      A.  Sorry.  Can you repeat the question?

L9L2Kle2                          W. Eber - Cross

1    Q.  Yes.  You have no personal knowledge that this was a

2    mistake by the auditors rather than an instance where a note to

3    your father was backdated to a date before the date of the

4    audit.

5              MR. SANTORO:  Just objection.

6              THE COURT:  Overruled.

7    A.  I am saying that it is an interest-bearing note.  What I am

8    saying is the description here is incorrect.  But I don't have

9    any knowledge about back -- I don't understand your question

10   about backdating.

11   Q.  I am just asking --

12   A.  I am just saying it is an interest-bearing note.  This

13   description is incorrect.  So --

14             THE COURT:  Well, we know that Exhibit K and Exhibit

15   L, by their terms, are interest-bearing.  The point of

16   counsel's question is, it is possible that those two pieces of

17   paper didn't exist within the audit period, is it not?

18             THE WITNESS:  No.

19             THE COURT:  Well, did you see them within the audit

20   period yourself with your own eyes?

21             THE WITNESS:  No.

22             THE COURT:  Okay.

23             MR. BROOK:  Let's look at one more thing.  Ali, could

24   you possibly leave that up and then put by the side of it the

25   Defense Exhibit L.  Sorry, let's do on the left.  I wanted to

L9L2Kle2                            W. Eber - Cross

1     have Exhibit 205, page 18 . . .

2     BY MR. BROOK:

3     Q.  Now, Exhibit L is another promissory note dated March 13,

4     2006, the same day as Exhibit K, correct?

5     A.  Yes.

6                MR. BROOK:  And just, Ali, if you can, zoom out for a

7     second and just scroll the second page on the right document.

8     Q.  See this is also signed by Lester Eber and John Ryan,

9     correct?

10    A.  Yes.

11    Q.  Zoom back out.  Let's go back to the first page.  And let's

12    zoom in on the first paragraph and the number in the upper

13    left.

14               All right.  So this is saying, this is amended and

15    restated promissory note replacing a note dated October 1,

16    2002, correct?

17    A.  Yes.

18    Q.  And it is saying that the amount due as of March 13, 2006

19    is $575,895 on that 2002 note, correct?

20    A.  Yes.

21    Q.  Now let's again move that blow up and let's blow up the

22    related party debt line on the left.  Get the date on that the

23    year above that, too.  No, no, no, just the years 2005 and '6.

24    There we go.

25               All right.  So the auditors, according to their

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    report, as of May 31, 2005, the amount of debt owed to your

2    father was $263,571, correct?

3    A.  Yes.

4    Q.  And so that is your understanding that reflects the balance

5    as of that date on the 2002 note referenced in Exhibit L,

6    correct?

7    A.  I wasn't there, but that's what the document says.

8    Q.  And you have no idea why your father and Lester Eber would

9    be restating a promissory note that had already been paid off

10   by nearly half at a higher number, do you?

11              MR. SANTORO:  Objection, your Honor.

12              MR. BROOK:  I will withdraw the question.

13              You can take that down, Ali.

14   BY MR. BROOK:

15   Q.  Now in 2005, you were living and working primarily in New

16   York City, correct?

17   A.  Yes.

18   Q.  So you were working for the Eber-Metro entity primarily, is

19   that right?

20   A.  Yes.

21   Q.  And is it correct also that at some point your father

22   wanted you to get experience in Albany, so you started working

23   with Dan Kleeberg on that?

24   A.  Well, as we -- we lost a lot of employees and then I moved

25   into a sales position, sales management position at some point,

1   you know, like 2005, '6, like that.

2   Q.  So you were -- because you were working in the New York

3   metro area, you were aware of the merger or acquisition of part

4   of Eber-Metro by MDC, the Georgia-based distributor, correct?

5   A.  Yes.

6   Q.  And that was a deal that Lester Eber helped bring about

7   himself, correct?

8   A.  Yes.

9   Q.  And are you aware that the board of directors actually

10  passed a resolution thanking Lester for having brought that

11  deal about?

12  A.  I don't recall.

13          MR. BROOK:  Okay.  Let's put up Exhibit 25.  This is

14  not yet in evidence but I believe there is no objection.

15  Plaintiffs go ahead and offer Exhibit 25.

16          MR. SANTORO:  No objection.

17          THE COURT:  Received.

18          (Plaintiff's Exhibit 25 received in evidence)

19          MR. BROOK:  Let's flip to the second page, the bottom

20  paragraph there.

21  BY MR. BROOK:

22  Q.  And you see that that says that, "The board is authorizing

23  the corporation to pay Lester Eber a commission in the amount

24  equal to $1,500,000 as consideration for all of his efforts

25  relating to the consummation of the transaction, including, but

L9L2Kle2                    W. Eber - Cross

1   not limited to, identifying NDC as a partner and negotiating

2   all of the terms and conditions of the transaction."

3           Do you see that?

4   A.  Yes.

5   Q.  And it was in your testimony, I believe, that you said that

6   Lester never got paid that amount, is that right?

7   A.  I didn't testify to that.

8   Q.  Okay.

9   A.  I don't . . .

10  Q.  To your knowledge, was Lester ever paid that $1,500,000 as

11  a commission?

12  A.  I don't know, I . . .

13          MR. BROOK:  Ali, why don't we go to the first

14  comparison that I had you pull up.

15          THE COURT:  What's the date of this document, counsel?

16          MR. BROOK:  Oh, that's exactly where I am going to, so

17  it is dated, according to the page, of May 31, 2005.

18          THE COURT:  Okay.

19          MR. BROOK:  However, there is one signature missing

20  there.

21  Q.  Do you see that, Wendy?

22  A.  Yes.

23  Q.  Okay.  Let's go to the next page and take a look at when

24  Mr. Gumaer signed it.  Can you go to the top there, fax line.

25  All right.  So that says September 19, 2005.

1          Now let's compare that against the date of the

2    original supposed promissory note that was issued to Lester.

3    Actually I think we are just looking at the numbers right now.

4    Let's go to the next comparison, Ali.

5          So as part of your work trying to determine the amount

6    that Lester had loaned, did you look into whether the

7    promissory note was just a way of paying Lester that wouldn't

8    get as much scrutiny from Wells Fargo, the lender?

9          MR. SANTORO:  Objection, your Honor.

10          THE COURT:  Overruled.  Answer if you know.

11   A.  What was the question?  Sorry.

12   Q.  If in the course of trying -- let's step back.

13          You have done a lot of work over the years trying to

14   compile different loans that Lester made and other payments

15   that he made in order to try to make sure that he got credit

16   for that, correct?

17   A.  Yes.

18   Q.  And in the course of that work, did you ever investigate

19   whether the promissory note that was apparently originally

20   dated August 15, 2005, was in fact in lieu of a payment of a

21   commission to Lester for the NDC deal?

22   A.  And what was the question if I --

23   Q.  Did you ever look into that possibility?

24   A.  I don't recall, you know, looking into that.  I mean, I

25   believe I spoke with Sumner Pearsall, our tax accountant, about

L9L2Kle2                         W. Eber - Cross

1    these loans, but I don't have specific knowledge.

2              MR. BROOK:  Move to strike the portion about speaking

3    with Sumner Pearsall to the extent it implies support for her

4    testimony.

5              I will withdraw.  Sorry.  Overkill.

6              You can take that down, Ali.

7    BY MR. BROOK:

8    Q.  Let's talk a little bit more about Exhibit L.  That's the

9    $575,000 note.  When did you find this document?

10   A.  I don't recall.

11   Q.  Isn't it correct that you -- well, let's step back.

12             So you recall that there was a meeting of the trustees

13   of the Allen Eber Trust on August 18, 2011, to discuss Lester's

14   loans, correct?

15   A.  I believe so, yes.

16   Q.  And you were present for that meeting, correct?

17   A.  Yes.

18   Q.  And you in fact prepared --

19   A.  Either there or by phone.

20   Q.  You prepared the minutes of that meeting, correct?

21   A.  Yes.

22   Q.  And isn't it true that during that meeting to discuss

23   Lester's loans in fact only two loans were ever discussed and

24   supposedly ratified.

25   A.  I'm not looking at the meeting minutes, but there were two

L9L2Kle2                         W. Eber - Cross

1  that were outstanding.  There were the old loans and the new

2  loans.

3  Q.  Let's take a look at Exhibit 234 in evidence.  Let's go to

4  the top.  Actually ignore that.

5           Just so we are clear, this is -- the top e-mail here

6  is you forwarding an e-mail from 2011 to someone named Maria

7  Soeffing, if I am saying that right.  Who is she?

8  A.  Doesn't she work for a law firm?

9  Q.  So it's your understanding she was Underberg & Kessler's

10 paralegal, is that right?

11          THE COURT:  I couldn't understand you, counsel.

12 Q.  She was Underberg & Kessler's, your former law firm's,

13 paralegal, is that right?

14 A.  I believe so.

15 Q.  So let's go to the second page.  Let's first go to the

16 third page, Ali.  It was -- let's zoom in on the bottom two

17 parts.

18          So is it correct that on about September 16, 2011, you

19 e-mailed minutes to a trustee meeting dated August 18, 2011, to

20 Glenn Sturm at two different e-mail addresses and copying your

21 father?

22 A.  Yes.

23 Q.  And in response to that, your father said, about two hours

24 later, "okay."  Do you see that?

25 A.  Yes.

L9L2Kle2                          W. Eber - Cross

1   Q.  Let's take a look at those minutes on page 2 of the

2   exhibit, Ali.  Can you blow up the second and third paragraphs.

3   Actually include the first.  Let's do that.

4           All right.  The first paragraph refers to who was

5   present for this meeting or participated by phone, correct?

6   A.  Yes.

7   Q.  Is that yes?

8   A.  Yes.

9   Q.  All right.  You don't mention yourself here, is that right?

10  Oh.  I'm sorry.  You do.  You say, "Wendy Eber was present to

11  facilitate and document the discussion," last line of that

12  paragraph.  Do you see that?

13  A.  Yes.

14  Q.  But you don't mention Glenn Sturm, do you?

15  A.  No.

16  Q.  So the person you were sending these minutes to on

17  September 16 was not present for that meeting, is that a fair

18  assumption?

19  A.  I'm not sure.  He may have been.  I --

20  Q.  Well --

21  A.  It's not in this memo, but he may have been participating

22  by phone.

23  Q.  Let's look at now the substance of the meeting.  The very

24  next line says the trustees ratified two loans made by Lester

25  Eber to Eber Brothers Metro, Inc., and it says that the first

L9L2Kle2                        W. Eber - Cross

1     loan was from October 2009, that was assumed by Metro in 2010,

2     and that's -- just to cut to the chase, that's the line of

3     credit note for $1.5 million, correct?

4     A.  Yes.

5     Q.  And then it says the second loan, for March 16, 2006, is an

6     obligation for the principal amount of $1,503,750, now looking

7     at the third paragraph.  We are highlighting the wrong thing

8     here.  Do you see that?

9     A.  Yeah, and the second loan, sorry.

10    Q.  And if you need a second to answer this you can, but there

11    is no reference to any $575,000 and change note from March

12    2006, is there?

13    A.  No.  I think they were consolidated, though.  It was, as I

14    recall, how they were put together.  There were the old loans

15    and then the new ones.  The new ones were the line of credit,

16    which was, you know, 1.5 million.

17    Q.  Okay.  Let's look and see how these minutes changed after

18    you send them to Glenn Sturm.  Pull up Exhibit 19, please.  And

19    let's look at the second and third paragraphs again.

20          Do you see that now it says the trustees ratified

21    three loans instead of two?

22    A.  Yes.

23    Q.  And it now refers to a third loan of $575,895 in the second

24    sentence of the third paragraph of this document, correct?

25    A.  Okay.  It replaces the original one dated October 1, so

L9L2Kle2                        W. Eber - Cross

1    there was another one, too, from October 1, 2002, as well, and

2    they got consolidated.

3    Q.  Well, let's -- that's the same note as the $575,895,

4    Exhibit L, we were just looking at a few minutes ago, right?

5    A.  Well, there was another one I think October 1, which this

6    says, which replaced the original note dated October 1, 2002.

7    Q.  Let's pull up Exhibit L, just so that we can clear up this

8    confusion, and zoom in on the first paragraph of that.

9           Do you see there that it is that $575,000 and change

10   note that replaces in its entirety the promissory note dated

11   October 1, 2002?  So we are talking about the same thing,

12   right?

13   A.  Yes.

14   Q.  Now, as of -- you are currently president of Eber Brothers

15   Wine & Liquor Corp., correct?

16   A.  Yes.

17   Q.  And you have been an officer or director of that company

18   most of the time since 2008, is that fair to say?

19   A.  During the relevant periods, yes.

20   Q.  Except for a period of time in around 2014 or 2015 when the

21   entire board of directors resigned, correct?

22   A.  Because we didn't have insurance, yes.

23   Q.  And most recently, and we will talk about this more later,

24   you actually amended the bylaws for Eber Wine & Liquor earlier

25   this year, correct?

L9L2Kle2                          W. Eber - Cross

1    A.  Yes.

2    Q.  So is it fair to say that you were familiar with the bylaws

3    of Eber Wine & Liquor as they existed before the amendment?

4    A.  It's a document that I had seen before, yes.

5    Q.  And isn't it true that, according to the bylaws that were

6    in place in 2002 through 2006, the company was prohibited from

7    contracting any loans without board authorization?

8    A.  Sorry.  Can you repeat that?

9    Q.  Isn't it true that Eber Brothers Wine & Liquor was

10   prohibited from contracting any loans, taking any loans from

11   anyone without board authorization?

12   A.  I -- I wasn't aware of that.  I mean, I -- I didn't -- I

13   don't know if I have read them that carefully.  I thought

14   the --

15   Q.  Let's pull up Exhibit 108 at page 10.

16   A.  The will authorized loans.

17   Q.  I have not asked you any questions about the will,

18   Ms. Eber.

19          Let's do, yeah, number 2 there, under finance.  Do you

20   see that, it says at the top of what's blown up, "No loans

21   shall be contracted on behalf of the corporation, and no bonds

22   or notes shall be issued, unless authorized by the board or

23   made by properly designated officers as shown on the corporate

24   borrowing resolution"?

25   A.  I'm reading that.

L9L2Kle2                         W. Eber - Cross

1    Q.  And isn't it true that you have never found any corporate

2    borrowing resolution authorizing Lester to loan any money to

3    any Eber Brothers company prior to February 2010?

4    A.  I don't know.

5    Q.  You don't know whether -- I'm just asking whether you found

6    one?

7              MR. SANTORO:  Objection, your Honor.  She answered the

8    question already.

9              THE COURT:  I think so.

10             MR. BROOK:  Okay.

11             I know there had been some concerns about water breaks

12   for the witness.  I know I could use one.  Could we take five

13   minutes, your Honor?

14             THE COURT:  I can't make out what you are saying.

15             MR. BROOK:  There has been some concern about getting

16   water breaks, to step outside for the witness, and I know I

17   could use one.  Can we take five minutes, your Honor?

18             THE COURT:  Okay.  We will take ten minutes.

19             (Recess)

20             THE COURT:  Okay.  Let's continue.

21   BY MR. BROOK:

22   Q.  Now, after Southern and Eber Brothers reached their deal in

23   2007, there was a significant amount of winding up that had to

24   happen in New York from that point forward, correct?

25   A.  I wouldn't characterize it as them reaching a deal.  Eber

L9L2Kle2                      W. Eber - Cross

1    Brothers went out of business.

2    Q.  Well, Eber Brothers signed no fewer than 15 different

3    agreements with Southern Wine & Spirits in August 2007,

4    correct?

5    A.  It was out of business.

6    Q.  I'm just asking if it signed the agreements.  Is that

7    correct?

8    A.  After it went out of business, yes.  And then it was --

9    Q.  And then after that point, Eber Brothers continued to have

10   to sell liquor and do other things to try to wind up its

11   business in New York, correct?

12   A.  By August of 2007, there was -- a liquidator had come, so

13   it was -- had sold all of its inventory.  It was out of

14   business.

15   Q.  Isn't it true that, in connection with the winding-up

16   process, that Lester Eber spent substantially all of his work

17   week in the New York City area during the 2008 fiscal year?

18   A.  I don't -- I don't know.  I mean . . .

19   Q.  You don't know if that's true or not?

20           MR. SANTORO:  Objection, your Honor.  She asked the

21   question -- she answered the question that was asked.

22           THE COURT:  Proceed.

23           MR. BROOK:  Let's pull up Exhibit 267 and go to page

24   5.

25           I will represent that this is a very large document

L9L2Kle2                           W. Eber - Cross

1   that is a waiver for the minimum funding of pension

2   requirements in 2000 -- can you pull that down, Ali?  It's a

3   little bit high, blocking the top part.  It's a declaration for

4   2008.

5   Q.  Do you see that?

6   A.  Yes.

7   Q.  And you remember signing this document under penalty of

8   perjury?

9   A.  Yes.

10  Q.  Okay.  Let's --

11  A.  I thought it was for --

12  Q.  -- take a look at page 275 of the document.  And I am

13  actually -- so just looking above the line first, so this is a

14  page that shows how much money was paid to different executives

15  for Eber Brothers Wine & Liquor for different fiscal years,

16  2006 through 2009, correct?

17  A.  Yes.

18  Q.  And fiscal year 2008, just so we are on the same page, that

19  would be June 1, 2007 through May 31, 2008, correct?

20  A.  Sorry, which fiscal year?

21  Q.  Fiscal year 2008 began on June 1, 2007, correct?

22  A.  Yes.

23  Q.  And ended May 31, 2008, correct?

24  A.  Yes.

25  Q.  So in that time period, according to this document, Lester

L9L2Kle2                          W. Eber - Cross

1   was paid $141,404 by Eber Wine & Liquor, correct?

2   A.  I don't -- I know at some point they moved to the payroll,

3   yeah, I assume so.

4          MR. BROOK:  Okay.  There is a footnote there, footnote

5   2.  Ali, would you please zoom in on footnote 2.  It's the

6   second.  There you go.

7   Q.  And do you see that footnote 2 says that this amount does

8   not include payments in an aggregate amount equal to $12,816

9   made to Mr. Eber for apartment maintenance in New York City.

10  These payments were required as the wind-up of the New York

11  City operation required Mr. Eber to spend substantially all of

12  his work week in the New York City area during the 2008 fiscal

13  year.

14         Do you see that?

15  A.  I do.

16  Q.  And that was part of the submission that you gave to the

17  IRS, correct?

18  A.  Apparently it was.

19         MR. BROOK:  You can close that, Ali.

20  A.  I don't think that's an accurate statement.

21  Q.  Well, actually, let's go ahead, pull up Exhibit 267 at 276

22  while we are looking at it.  Sorry.  That's confusing page 276

23  of 267.

24         So this is the page after the one we were just looking

25  at.  Can you zoom in on the top half of that, Ali.

L9L2Kle2                          W. Eber - Cross

1                   So this is showing that during those same years there

2      were payments made to at least some of the same executives, you

3      and your father, from Eber-Connecticut, correct?  That's the

4      first line compensation paid by Eber-Ct?

5      A.  Yes.

6      Q.  So in fiscal 2008, Lester was also paid $195,272 by

7      Eber-Ct, correct?

8      A.  Which fiscal year?  Because, you know, I'm not sure where

9      these numbers are coming from.  But on a W-2, that would be for

10     a different fiscal year than the fiscal year of the company.

11                  THE COURT:  What was the company's fiscal year?

12                  THE WITNESS:  It's May 31.

13                  THE COURT:  And right there on the page it says "for

14     the year ended May 31," does it not?

15                  THE WITNESS:  Okay, yes.

16                  THE COURT:  Okay.

17     BY MR. BROOK:

18     Q.  Right.  So just to clarify what you were saying, you are

19     referring to the fact -- and this is apparent in some

20     documents, your Honor -- that when you say fiscal year 2009,

21     the IRS in its forms would call that fiscal year 2008, correct?

22     A.  '8.  Yes.  It's confusing.  And I have --

23     Q.  Because you count from when the year ended and the IRS

24     counts from when the year began, correct?

25     A.  Yeah, it's always a year back.

L9L2Kle2                          W. Eber - Cross

1    Q.  Now, for the year of 2008, you were paid -- now I am

2    talking calendar year, you were paid by both Eber Brothers

3    Wine & Liquor and Eber-Connecticut, correct?

4    A.  Well, this shows Connecticut, yes, and -- did the other

5    one?  I can't remember what the other dates were on the other

6    one.

7    Q.  Let's look at the W-2s so we can stay focused on the

8    calendar year.  That's Exhibit 158.  We are going to be looking

9    at the first and second pages, I believe.

10            So 2008 is in the middle there.  So do you see that

11   that shows that you were paid by Eber Wine & Liquor 50,834 in

12   2008?

13   A.  Yes.

14   Q.  Is that a yes?

15   A.  Yes.

16   Q.  And as a general matter, if you could please try to speak

17   up or speak into the microphone, it's very hard to hear you

18   from back here.

19            Okay.  If you could go to the next page, please, Ali,

20   and at the bottom half.  If you can scroll down.

21            And this shows that in the same calendar year 2008,

22   you were paid, inclusive of 401K contributions, $81,517 and

23   change, correct?

24   A.  $78,000.

25   Q.  Well, you know what -- looking in the middle right side

L9L2Kle2                        W. Eber - Cross

1    there, you see box 12A, code D, that refers to 401K

2    contributions, does it not?

3    A.  Okay.

4    Q.  And you see that those are counted towards Medicare and

5    Social Security depending on the amount, correct?

6    A.  Yes.

7    Q.  All right.

8            Now, for your father, you have only provided us with

9    one W-2 for 2008, is that right?

10   A.  We looked for all of the documents that you requested.

11   Q.  But is it correct that there was a W-2 issued to your

12   father from both entities for 2008, you just could not find one

13   of them?

14   A.  We looked for whatever we could find.  I don't -- I gave

15   you what we had or what he had.

16   Q.  Okay.  So let's look at what you gave us for your father.

17   Let's go to Exhibit 2008 -- I'm sorry, blah, blah.  Let's go to

18   I believe it is page 2 of Exhibit 28.

19           A VOICE:  Two eight?

20           MR. BROOK:  Yes.  In the middle there at the top.

21   Q.  So we can see that there is a payment recognized from

22   Eber-Connecticut only, is that right?

23   A.  It says Eber-Connecticut, yes.

24   Q.  And you looked for one from Eber Wine & Liquor and you

25   could not find one, correct?

L9L2Kle2                        W. Eber - Cross

1   A.  This is from 2008.  Is this from --

2   Q.  Yeah.  Ali, can you zoom in not quite as much, please.  Get

3   the whole thing there.

4           All right.  So looking at the amount, $189,788,

5   inclusive of I guess that's everything, does that seem like the

6   correct amount of money that your father was paid in calendar

7   year 2008?

8   A.  From Eber-Connecticut, yes.

9   Q.  And based on that amount, is it fair to infer that there

10  was an amount that was paid to your father from Eber Wine &

11  Liquor just as there was for you?

12          MR. SANTORO:  Objection, your Honor.

13          THE COURT:  Overruled.

14  A.  I gave you what we -- I mean, did you go back to his tax

15  return?  Because I think we gave you the tax return, too.

16  Q.  Isn't it true that your father did not reduce the amount

17  that he was paid until the last quarter of 2009 or thereabouts,

18  last quarter of fiscal 2009, so in calendar year 2009?

19  A.  I don't recall the exact dates.  I know he did take some --

20  he did take pay cuts and reduced his salary.  You know, it is

21  hard for me to know exactly when that happened, but . . .

22  Q.  Just so we can be clear here and don't lose a lot of

23  money --

24  A.  I know in 2012 he did.  But part of that could be that this

25  is a W-2, you know, covering, you know, January to December,

L9L2Kle2                       W. Eber - Cross

1    whereas our fiscal year, like we said, was June to May, so

2    maybe he took it later on or in a different -- like the time

3    periods didn't exactly correspond.  So unless you are looking

4    at like apples to apples --

5    Q.  Let's take a look at what you said to the IRS.  Let's go

6    back to Exhibit 267 at page 279.  Let's blow up the first few

7    lines of the last paragraph.

8            Do you see there it says, "During the last fiscal

9    quarter of fiscal year 2009, Eber-Connecticut decreased its

10   expenses by more than $1 million"?

11   A.  No, I don't --

12   Q.  "These cost cutting measures included downsizing the sales

13   management team and" --

14           THE COURT:  Counselor?

15           MR. BROOK:  Sorry.  You can read, I guess.

16           THE COURT:  You are a 45 r.p.m. record, if anybody

17   knows what that is, being played at 78 r.p.m.s.

18   BY MR. BROOK:

19   Q.  All right.  So looking at the third sentence, after talking

20   about reducing executive compensation, it says, "Indeed,

21   Mr. Eber has agreed to decrease his annual compensation by

22   $150,000 to an amount equal to $186,675."  And then it says

23   that the benefit will be recognized during physical year 2010.

24   Do you see that?

25   A.  So our fiscal year 2010, the company's fiscal year 2010.

L9L2Kle2                          W. Eber - Cross

1    So it -- yeah.  Is that what --

2    Q.  Just so we are clear, the last fiscal quarter of fiscal

3    2009, we are talking about the months of March, April, and May

4    2009, so after 2008, correct, when is the last fiscal quarter

5    of your year?  What months does that encompass?

6    A.  March, April, May.

7    Q.  Okay.

8           Let's also look, just to try to close this, Exhibit

9    142, interrogatory response number 1, do you see that the

10   second line there says that in identifying all of the sources

11   of income, he was paid by Eber Brothers, Southern Wine &

12   Spirits and Eber-Connecticut in 2008?

13   A.  Yes.

14   Q.  All right.  And now let's go to Exhibit 160 at page 81 and

15   let's blow up count 40 to 80, third one down.  No, no, above

16   that.  And if you are able to make that more readable, that

17   would be great.

18           So we are again looking at the general ledger for Eber

19   Wine & Liquor, and this is the count covering officers'

20   salaries.  Do you see that?

21   A.  So this is -- yes.

22   Q.  And the officers of Eber Brothers at this point, after --

23   it starts August 30 -- let me pull back.

24           This starts August 2007, correct?

25   A.  Yes.

L9L2Kle2                         W. Eber - Cross

1   Q.   And it goes through June 2008, correct?

2   A.   Yes.

3   Q.   And the officers of Eber Wine & Liquor were you and your

4   father, is that correct?

5   A.   Yes, and it may have included administrative assistant.  I

6   don't know.  I mean, I'm -- I didn't put this together.  I

7   wasn't doing payroll.  So there could have been other people

8   involved in this.  I don't know.

9   Q.   Well --

10  A.   I don't know exactly who this covers, so.

11  Q.   We will stipulate that there are other payroll expenses on

12  this general ledger.  I am just referring to officers.

13          Putting aside this exhibit, who were the officers of

14  Eber Brothers Wine & Liquor during this time period?

15  A.   My father and myself.  But I don't know if this didn't also

16  include other people as well because there were some other

17  people.

18          THE COURT:  So if they included other people, then the

19  description of the account is incorrect, is that right?

20          THE WITNESS:  It could be, yes.

21          THE COURT:  Well, no, if they included somebody who

22  wasn't an officer, then it was not an accurate account

23  description, right.

24          THE WITNESS:  Yes, right.

25          THE COURT:  And if the contract description was

L9L2Kle2                          W. Eber - Cross

1   accurate and adhered to, it doesn't include anybody else,

2   right?

3           THE WITNESS:  Right.

4           THE COURT:  Okay.  We don't have to worry about the

5   New York Mets' payroll being in here.

6           MR. BROOK:  Ali, I believe we have prepared a

7   demonstrative to try to combine the information we have looked

8   at.  This is defense -- I'm sorry, not defense.  It's

9   Demonstrative 01, D01.  This is combining what we have just

10  looked at.  You can zoom in on that.

11  Q.  So the information that we were just looking at on page 81

12  shows a total of $204,661 in officers' salaries, and that's net

13  of any credits.

14          And if you can go to the next part, Ali, just show the

15  whole thing, I don't think there is a need to zoom here, and

16  then it says the amount you were paid in 2008, we were just

17  looking at this, was $50,834, meaning there is $153,000 and

18  change that is unaccounted for.  Does that not sound right to

19  you?

20  A.  You said -- sorry?

21  Q.  Does that math sound right to you?

22  A.  Yes, the math.

23  Q.  So combining that amount with the under $200,000 that your

24  father was paid from Eber-Connecticut, does that sound like

25  approximately the right amount for his salary in 2008, roughly

1    $350,000?

2    A.  I don't know offhand.  I don't know these numbers offhand.

3    Because there were other employees there as well.

4    Q.  Well, I guess let's do one thing just to clean this up.  It

5    actually just occurred to me.  Ali, can you go back to Exhibit

6    267 at page 275.  So actually this lists -- even though Mike

7    Gumaer was only a director not an officer, correct?

8    A.  Sorry?

9    Q.  Mike Gumaer, Elliot Mike Gumaer, he was a director of Eber

10   Brothers?

11   A.  Yes.

12   Q.  He was not technically an officer, correct?

13   A.  Correct.

14   Q.  But it says here that he was paid $22,000 a year for the

15   years ending in 2008 and 2009, correct?

16   A.  Correct.

17   Q.  Is that a yes?

18   A.  Correct.

19   Q.  So if we were to -- I'm not going to do it on the fly, but

20   if you subtract $22,000 from roughly $150,000, you end up with,

21   what is it, $128,000?

22   A.  Yes.

23   Q.  I'm sorry, $328,000 if you -- I have gotten myself

24   completely confused.  Please allow me to start that over again.

25           So looking on the right side of the screen right now,

L9L2Kle2                           W. Eber - Cross

1    we see that the reported salary for Lester Eber was $336,675,

2    correct?

3    A.  In 2006.

4    Q.  And in 2007, correct?

5    A.  Yes.

6    Q.  And then what we were looking at before showed that, in

7    2008, Eber-Connecticut paid your father $189,000 and change, so

8    he got about 190?

9            THE COURT:  Sorry.  Was that from --

10   Q.  Sorry.  Let's go back to Exhibit 28, page 2.  Okay.

11           You see it is 189,788, so let's call that $190,000,

12   okay?

13   A.  Yes.

14   Q.  Then let's go back to Demonstrative 1, and we can see that

15   the difference was roughly $154,000.  So if we subtract $22,000

16   from Mike Gumaer, we end up with 132, which if we add to

17   $190,000 ends up being 2 -- sorry, 322,000.  Does that sound

18   about right?

19           MR. SANTORO:  Objection, your Honor.

20   A.  I can't follow.

21           MR. SANTORO:  To the extent that he is asking the

22   witness to perform a mathematical calculation, I don't know the

23   relevance.

24           THE COURT:  Overruled.

25   A.  So can you repeat the question?

L9L2Kle2                          W. Eber - Cross

1   Q.  Sure.  So we saw Lester was typically getting -- let's

2   forget what he was typically being paid.

3           He was being paid $190,000 by Eber-Connecticut in

4   2008, correct?

5   A.  Yes.  He was paid -- I thought it was 180-something.

6   Q.  $189,000 and change.

7   A.  All right.

8   Q.  Let's call it 190.  We will subtract elsewhere to make sure

9   it's tare.  Let's say according to this it was $153,000, we

10  will round down, is the difference between what you were paid

11  and what was unaccounted for in the general ledger.

12  A.  Yes, but I don't know if there were other salaries included

13  in this or if it was just Lester.

14          THE COURT:  We have run that track a few times

15  already.

16          THE WITNESS:  Okay.

17  Q.  So if we take another step here, it's not on the screen,

18  maybe we can, and we subtract 22, we subtract 22,000, we end up

19  with, what is it, let's call it -- let's round down, 131,000.

20  A.  Okay.

21  Q.  Which if we then add that to the $190,000 that we round

22  that up to, we end up with $321,000, correct?

23  A.  Yes.

24  Q.  That is approximately the exact same amount that Lester

25  Eber was paid in calendar years 2006 and 2007.  Pull up Exhibit

L9L2Kle2                         W. Eber – Cross

1    2000 –– sorry Exhibit 28, pages 1 and 2.  Nope.  Not that one,

2    left one.

3             So that year, with his 401K, it says he was paid three

4    hundred eighteen five.  That was very close to what we just

5    calculated if we consider the officers as including Mike

6    Gumaer, correct?

7    A.  Yes.

8             (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L9LsKLE3                        Cross - W. Eber

 1   BY MR. BROOK:

 2   Q.  And isn't it true that there was, in addition to what was

 3   reported on a W-2 for 401(k) contributions, that Eber Brothers

 4   did 401(k) matching?

 5   A.  It did do some matching, yes.

 6   Q.  OK.  Would that explain the difference between the amount

 7   reported here on the W-2 and the amount that you reported to

 8   the IRS on Exhibit -- you can put it up -- 267, page 275?

 9   A.  I don't know.

10   Q.  You don't know?

11   A.  I don't know.

12           MR. BROOK:  OK.  We can move on to something else.

13   Let's take this down, Ali.

14   Q.  Now, isn't it true that right at the end of August 2007,

15   your father had Lisa Semenik, the CFO, at that time, change the

16   company's pension plan to allow him to start receiving his

17   pension?

18   A.  I don't quite recall.  There may have been something done,

19   but I'm not sure when he started receiving his pension.

20   Q.  But you do remember he started receiving his pension before

21   he quit Eber Brothers, correct?

22   A.  I don't remember.  I mean, I wasn't involved in that.

23   Q.  Take a look at Plaintiffs' Exhibit 162.

24           You recognize the name Lisa Semenik at the bottom?

25   A.  Yes.

L9LsKLE3                          Cross - W. Eber

1    Q.  And she was the chief financial officer and board member

2    prior to you?

3    A.  She was.

4    Q.  All right.  Then let's look at the amendment.  It says

5    Section 5.13.  It's the block there in the middle there, Ali.

6          So it says, This is a plan amendment being done --

7    just to look at the date also there, Ali, if you can blow it

8    up -- below it in witness thereof.  That's fine.

9          Effective September 1, 2007, do you see that?

10   A.  Yes.

11   Q.  So that's the point where you say, Eber Brothers Wine &

12   Liquor was done, correct?

13   A.  Wait.  Can I just read this for a second?

14   Q.  Sure.

15   A.  OK.

16   Q.  All right.  So having read this, let's just summarize

17   rather than read.  Is it fair to say that this amendment

18   allowed someone who was going to continue working for Eber

19   Brothers Wine & Liquor to start receiving their pension early

20   as long as they had achieved a normal retirement age?

21   A.  That's what it says, but it -- you know, the company didn't

22   really have any operations after that point.  So I -- you know,

23   I'm not that familiar with exactly what needed to be done.  So,

24   you know, I'm assuming she did what --

25   Q.  I'm not asking you to assume what she was thinking.

1    A.  OK.  You know, I don't -- I don't really know all the

2    details of this.  I wasn't involved in it.

3    Q.  My question is going to be -- please listen -- were there

4    any other employees of Eber Brothers Wine & Liquor besides your

5    father who were planning to keep working for their employer

6    Eber Wine & Liquor after September 1, 2007?

7    A.  I'm sorry.

8    Q.  And who had already achieved retirement age?

9    A.  Well, I know Mark Shevlin was there too.

10   Q.  How long did he continue working for Eber Wine & Liquor

11   after September 1, 2007?

12   A.  Well, he was in HR.  I don't remember exactly.

13   Q.  Is it correct that when your father began to receive his

14   retirement -- I'm sorry -- his pension payments early, he was

15   paid cash?

16   A.  It wasn't early.  He was already 70, so I think you qualify

17   when you're 55 or something.

18   Q.  All right.  So let's say it would have been early before

19   this amendment we're looking at, though, right?

20   A.  Well, it would have been, you know, if he was still working

21   for the company.  I mean, the company was essentially closed,

22   so ...

23   Q.  And --

24   A.  You know, I'm not, obviously, a lawyer, so I don't know.

25   Q.  I'm not asking you --

1          What was the amount of your father's pension on a
2      monthly basis?
3      A.  I think maybe nine or 10,000, maybe 7,000.  I think it was
4      between seven and something.  10,000 maybe.
5      Q.  OK.  So between seven and 10,000 maybe?
6      A.  Perhaps.  I don't recall the exact amount.  I know that the
7      plan was frozen, so...
8      Q.  So the amounts didn't change, is that your understanding?
9      A.  Right.
10     Q.  Let's pull up Defense Exhibit DDDD.  4Ds.
11             Ali, it's the wrong exhibit.  There you go.  It's hard
12     to read this scan.  This is one that we just got less than two
13     weeks ago.  Can you zoom in on that first e-mail?  I think it's
14     in there.
15             All right.  I'm going to try to read this because it
16     is nearly illegible, at least part of it.  Correct me if you
17     think I'm saying anything wrong, Ms. Eber.
18             Is this e-mail from Michael Gallagher copying you,
19     correct?
20     A.  Yes.
21     Q.  It's copying someone from *groom.com*, correct?
22     A.  Yes.
23     Q.  Those were your lawyers in connection with the dispute with
24     PBGC, correct?
25     A.  Yes.

1   Q.  Some of the lawyers?

2   A.  The lawyers.

3   Q.  And it says here in the middle paragraph, also Michael

4   Gallagher was the actuary for your plan, is that right?

5   A.  Yes.

6   Q.  So he kept track of what each person was entitled to

7   receive, is that fair?

8   A.  Well, he was involved in calculating -- you know, he worked

9   with the company and he was involved in calculating the

10  benefits.  Mark Shevlin also worked for the company in human

11  resources, and he also kept track of, you know, benefits.

12  Q.  OK.  So let's see.  So he says here, Lester's current

13  benefit -- this is in 2014 -- is $10,860 a month payable as a

14  50 percent J and S benefit.

15          Do you know what that means?

16  A.  Yeah.  It means joint and survivor benefit, so a part of

17  that would be for my mother.

18  Q.  If he died, correct?

19  A.  If he died and if he actually got the benefit.  I mean, he

20  ended up waiving it.

21  Q.  Right.  But according to this, the last part of this

22  highlighted section says the benefit started on September 1,

23  2007.

24          Do you see that?

25  A.  Yes.

L9LsKLE3                        Cross - W. Eber

1  Q.  You don't have any reason to believe that Mr. Gallagher was

2  providing you with incorrect information?

3  A.  No.

4  Q.  You can take that down.

5         For most of his career, isn't it true your father, to

6  the best of your knowledge, did not have any written employment

7  agreement with any of his companies?

8  A.  I wasn't aware of -- you know, I came into Eber Brothers in

9  20 -- you know, August, September of 2007.  So I don't know

10  what he had.

11  Q.  So that is why when I asked you during your deposition

12  whether your father had ever had a written employment

13  agreement, you said there may have been, but you don't

14  remember, is that right?

15  A.  I don't recall exactly what I said during the deposition,

16  but, you know ...

17  Q.  It's correct, is it not, that in April 2012 you granted

18  your father an employment agreement with Eber-Connecticut?

19  A.  Yes.  He did have an employment agreement with

20  Eber-Connecticut.

21  Q.  Let's pull that up.  It's Exhibit 180.  Flip to the last

22  page.

23         You were the one who authorized this on behalf of

24  Eber-Connecticut?

25  A.  And I believe it was -- yes, and I believe it was approved

L9LsKLE3                          Cross - W. Eber

1    by the board.

2    Q.  And you have no documentary evidence that shows it was ever

3    approved by the board, do you?

4    A.  I believe it was.

5            THE COURT:  Could you please answer the question you

6    were asked, Ms. Eber?

7    A.  I -- sitting here, I don't know.

8    Q.  OK.

9    A.  But I assume it was.

10           THE COURT:  But what?

11           THE WITNESS:  I assume it was approved by the board.

12   I'm not looking at the document right now.

13   Q.  Is it correct that this is not a document that you

14   disclosed to me when I asked you about employment agreements

15   when I was deposing you as Eber-Connecticut's corporate

16   representative?

17   A.  I provided the information the attorneys said that I needed

18   to provide.  So I gave whatever they -- you know, whatever they

19   requested, I gave to them.

20   Q.  You did give me a copy or me and my clients a copy of your

21   own employment agreement dated August 2012, correct?

22   A.  If you requested it, I gave it to you, yes.

23   Q.  Not any more than this document, but I shouldn't be

24   testifying, so ...

25           Is it correct that as a result of this employment

1    agreement, Exhibit 180, after Lester passed away last year, his

2    estate received a deferred compensation amount of three times

3    his salary and bonus?

4    A.  Yes.

5    Q.  Have there been any other payments to his estate since he

6    died?

7    A.  No.

8    Q.  I want to focus you on the first page, the section one

9    positions and duties.

10            We can blow up that whole thing, both A and B, Ali.

11            THE COURT:  Counselor, just a point of information.

12   Is Lester Eber's will in evidence?

13            MR. BROOK:  It has been offered and it has been

14   objected to, your Honor.  I contend it goes to motive and bias.

15   The defense has their objection, I believe, on relevance

16   grounds.

17            THE COURT:  Why isn't that so -- why isn't it relevant

18   on motive and bias?

19            MR. SANTORO:  On motive and bias as to whom?

20            I'm not sure I understand.

21            THE COURT:  For one thing, this witness, possibly --

22            MR. SANTORO:  We don't think it is relevant to the

23   issues presented and the motive and bias of this witness.  I

24   still don't connect it.

25            THE COURT:  That's a really rather remarkable

1    statement.

2              MR. BROOK:  Why don't we go to that will and take a

3    quick look at that.

4              THE COURT:  Yes.  Let's do that.

5              MR. BROOK:  Exhibit 175, please.

6              We don't need that first part.  Zoom out, actually.  I

7    don't know this document like the back of my hand because we

8    only got it recently.

9              Let's go to the fifth section.

10   BY MR. BROOK:

11   Q.  So this is the part where your father said, I give and

12   bequeath all of my business interests of any kind and where so

13   ever situate -- situated, I assume -- including stock in Eber

14   Brothers Wine & Liquor, Metro Inc., Eber-Connecticut LLC,

15   Slocum & Sons, and Alexbay LLC, or any other business entity

16   I am involved with at the time of my death, to my daughter,

17   Wendy Eber.

18             So did I read this correctly, Ms. Eber?

19   A.  Yes.

20   Q.  And you do have a brother, do you not, David Eber?

21   A.  I do.

22   Q.  And he was entitled to receive an equal share of everything

23   else under your father's will as you, correct?

24   A.  Yes.

25   Q.  And your brother was also, he was involved in the Wine &

L9LsKLE3                          Cross - W. Eber

1     Liquor for most of his life, was he not?

2                MR. SANTORO:  Objection, your Honor, relevance.

3                THE COURT:  Sustained.

4                Now, I hope this isn't a sensitive subject, but is the

5     witness's mother still with us?

6                MR. SANTORO:  She's in the courtroom, your Honor.

7                THE COURT:  Very much so.

8                Is her will in evidence?

9                MR. BROOK:  Her will is not in evidence, and I do

10    believe -- all I can say is this.  Their are separate lawyers

11    for my clients representing them in the estate matter.  My

12    understanding is that Lester's will requested that his

13    ex-spouse or his widow forego her one third election under

14    New York law.  I believe the last thing I heard from those

15    attorneys is that she is making her one third election.  There

16    is some question as to exactly where that goes.  It is beyond

17    my knowledge and expertise.

18               THE COURT:  I'm sorry?

19               MR. BROOK:  All that estate stuff, spouse's one third

20    election is well beyond anything I can speak to intelligibly.

21               THE COURT:  The question that might be useful to

22    address is whether the witness also had an interest in the

23    deferred compensation that was paid pursuant to the employment

24    agreement with Lester Eber and Eber-Connecticut.

25               MR. BROOK:  If we pull that back.

L9LsKLE3                          Cross - W. Eber

1   Q.  I mean, I think, correct me if I'm wrong, Ms. Eber, you're

2   the executor of your father's estate, correct?

3   A.  I am.

4   Q.  And as far as the -- I want to call it golden parachute,

5   what do you call it -- the deferred compensation that he was

6   paid after he died, is that how you refer to it?

7   A.  Death benefit?

8   Q.  The death benefit.

9            Are you treating that as executor as part of your

10  father's business interest or part of his residuary estate?

11           MR. SANTORO:  Objection, your Honor.

12           THE COURT:  Overruled.

13  A.  I believe it is part of the residuary.

14           THE COURT:  I'm sorry.  You believe?

15           THE WITNESS:  It is part of the residuary.

16           THE COURT:  The question was:  How you are treating it

17  in your role as executor of the estate?

18           THE WITNESS:  As residuary.

19           THE COURT:  All right.  Thank you.

20  BY MR. BROOK:

21  Q.  Depending on whether your mother takes an election or not,

22  you would get between one third and one half of that amount

23  that was paid to your father as a death benefit, correct?

24  A.  It depends if there is anything left.  I mean, if --

25  Q.  Right.  I mean, I'm assuming that this lawsuit didn't

L9LsKLE3                          Cross - W. Eber

1  exist?

2  A.  I mean, there is legal fees, there's, you know ...

3  Q.  OK.  Let's go back to Exhibit 180.  Let's zoom in on that

4  section one, positions and duties.

5          Just so we're not playing unfair here, this is not a

6  document that you personally drafted, correct?

7  A.  I'm sorry.  Which document is this?

8  Q.  Is this the employment agreement you signed in April 2012

9  for your father?

10  A.  Yes.

11  Q.  OK.  As position and duties, let me step back.

12          One of the things you testified about in your

13  statements is what different kinds of compensation arrangements

14  and contracts are reasonable and customary in your opinion,

15  correct?

16  A.  I believe so, yes.

17  Q.  OK.  So the first paragraph here states that your father

18  would be employed as chief executive officer of the company and

19  that he would report to the board and have duties and

20  responsibilities consistent with that, correct?

21  A.  Yes.

22  Q.  That's a fairly reasonable and customary description of

23  position and duties, would you agree?

24  A.  Yes.

25  Q.  And then the very next paragraph is a provision providing

L9LsKLE3                        Cross - W. Eber

1    for your father to be indemnified and held harmless under a

2    variety of different circumstances, correct?

3    A.   It's in 1(b).

4    Q.   Talking about 1(b), yes.  This is one of his positions?

5    A.   I haven't read it all.

6    Q.   All right.  And in particular, I want to direct your

7    attention to the last couple of sentences in this.

8         This contract that you gave your father says that any

9    act or failure to act, based upon authority given pursuant to a

10   resolution, duly adopted by the board or based upon the advice

11   of counsel for the company or any affiliate thereof, shall be

12   conclusively presumed to be done, or omitted to be done, by

13   executive in good faith and in the best interest of the company

14   or any affiliate thereof.

15        Just focusing on that sentence, is it also your

16   opinion that that is a reasonable and customary provision in an

17   employment contract?

18   A.   This was written by the lawyer, so ...

19   Q.   Then the last sentence says, The company agrees that it

20   shall advance expenses to or on behalf of the executive in

21   connection with the company's obligations pursuant to this

22   section.

23        Do you see that?

24   A.   Yes, I see that.

25   Q.   And has Eber-Connecticut been advancing your father's

L9LsKLE3                          Cross - W. Eber

1    expenses in connection with this litigation?

2    A.  With this litigation?

3    Q.  Yes.

4            THE COURT:  I couldn't hear your answer.

5    A.  I'm sorry, no.  Bankrupt the company.

6    Q.  In the event that your father is held liable in any regard,

7    is it your intention to make a payment to his estate equal to

8    the amount of his liability pursuant to this section?

9            MR. SANTORO:  Objection, your Honor.

10           THE COURT:  Grounds?

11           MR. SANTORO:  Speculation and relevance.

12           THE COURT:  I think it is appropriate.  If she has an

13   intention, she will tell us.  If not, she won't.

14   A.  What was the question?  Can you just repeat the question?

15   I'm a little confused.

16           THE COURT:  Repeat the question.

17   BY MR. BROOK:

18   Q.  Is it your intention, either in your capacity as

19   executor -- let me break this up into two separate parts.

20           In your capacity as executor of Lester Eber's estate,

21   is it your in intention to seek indemnification for any

22   liability he receives in this case pursuant to this employment

23   contract?

24   A.  You mean the legal fees?

25   Q.  Legal fees or liability.

1    A.  I mean --

2    Q.  Damages.

3    A.  I'm sorry.  I'm not -- can you just explain to me again?

4    Q.  Do you know what indemnification is?

5    A.  Yes.

6    Q.  OK.  So is it your intention, as executor of Lester Eber's

7    estate, to seek indemnification from Eber-Connecticut for any

8    legal fees or damages that are incurred as a result of this

9    litigation we're in right now?

10   A.  Well, no.  I mean, I --

11   Q.  Is that no?

12          THE COURT:  Ms. Eber, have you finished your answer?

13          THE WITNESS:  I don't know.  You know, I -- right now,

14   the estate is paying the legal fees.

15   Q.  Who are the current members of the board of managers of

16   Eber-Connecticut?

17   A.  Um, right now the current managers are myself, um, Eric

18   Fry, and Jeff Slocum.

19   Q.  Eric Fry is your husband, correct?

20   A.  He is.

21   Q.  Aren't there supposed to be five managers on the board?

22   A.  I don't recall how many.

23   Q.  In the past there have been five managers, though, correct?

24   A.  Yes.

25   Q.  Just make sure I heard you correctly.  You said Jeff

1    Slocum?

2    A.  Jeff, I think --

3    Q.  There are a number of different Slocums, correct?

4            Until recently, about two years ago, John Slocum was

5    actively working for the business, correct?

6    A.  He was working for the business, yes.

7    Q.  Was he the general manager?

8    A.  He was VP of sales.

9    Q.  VP of sales.

10           Who is now the VP of sales?

11   A.  We have Owin Conners.  Owin Conners.

12   Q.  Is there a general manager as well?

13   A.  No.

14   Q.  Who is the number two person in the company after you?

15   A.  Wally Crumb.

16   Q.  He's the CFO?

17   A.  Yes.

18   Q.  Who are the other officers of Eber-Connecticut that you

19   haven't mentioned yet, if any?

20   A.  I've mentioned them all.

21   Q.  I'm sorry.  You really need to speak up.

22   A.  You know, Wally Crumb is the CFO.

23   Q.  Is there a COO or anything like that?

24   A.  He's the CFO and the COO.

25   Q.  OK.  So if you were to make a request for indemnification

L9LsKLE3                          Cross - W. Eber

1    in your capacity as executor of Lester Eber's estate for

2    indemnification, who would decide whether or not to make that

3    payment?

4            MR. SANTORO:  Objection, your Honor.

5            THE COURT:  Sustained.

6    Q.  All right.

7            THE COURT:  Are we getting close, counselor?

8            MR. BROOK:  Unfortunately not, your Honor.  I will try

9    to trim things down.

10           THE COURT:  The witness has asked for a break.  We'll

11   take ten minutes.

12           MR. BROOK:  OK.

13           (Recess)

14           THE COURT:  Let's continue.

15           Do try to condense, Mr. Brook.

16           MR. BROOK:  I've spent the break crossing things off.

17           THE COURT:  Let's continue.

18           MR. BROOK:  All right.

19   BY MR. BROOK:

20   Q.  Ms. Eber, in your declaration you testify about how, based

21   upon your finance and accounting background, you were generally

22   not optimistic about Eber-Connecticut for a significant period

23   of time, is that right?

24   A.  We lost $7 million.  Yes.

25   Q.  What period of time specifically are you talking about when

L9LsKLE3                          Cross - W. Eber

1  you were not optimistic?

2  A.  Well, in my declaration, I think it was from 2006, '7,

3  through 2000 -- you know, it went on.  Specifically,

4  Eber-Connecticut lost $7.2 million, I believe.

5  Q.  I'm just asking for the time period.  Approximately when is

6  the time period --

7          Let me rephrase it this way.  At what point in time

8  did you start to become optimistic about Eber-Connecticut's

9  future?

10  A.  Well, I actually did do a discounted cash flow, which I put

11  into the -- my statement.

12  Q.  I'm not asking for that.

13  A.  Well, but that -- you did ask me, though, about when --

14          THE COURT:  He asked you when, Ms. Eber.  And this

15  isn't like a political campaign where the candidate's objective

16  is to say something loosely related to a question and then to

17  go on and talk about whatever he wants to talk about.  That

18  seems to be the drill.

19          This is an answer to the question and the question was

20  when.  And either you have a general idea of when or a

21  particular idea of when or you don't remember or you disagree

22  with the premise that you ever became optimistic, but that's

23  the nature of the answer, something along those lines.

24  A.  You know, it was very -- it's very uncertain.  I don't

25  think there was specific date at which I know.  Just the last

L9LsKLE3                         Cross - W. Eber

1  year with COVID, it became -- we had an increase in sales, but

2  it's been a struggle for a long time.

3  Q.  All right.  Is it fair to say that you were not optimistic

4  until sometime after the calendar year 2012 ended?

5  A.  I don't know if I've ever been that optimistic.

6  Q.  OK.  So that includes April 2012, you were not optimistic

7  about Eber-Connecticut's future?

8  A.  Yeah, I was not optimistic.

9  Q.  But that's when you gave your father a new employment

10 contract with a death benefit, correct?

11 A.  It was in April of 2012.

12 Q.  Isn't it true that during the time period of, say, 2009

13 through 2012, you repeatedly expressed optimism about

14 Eber-Connecticut's future to numerous different people and

15 organizations?

16 A.  The financial situation of the company was -- it was in

17 financial distress during that time.  And I was trying to, you

18 know, make arguments that it would, you know, to the bank,

19 because they were going to leave us and other organizations.

20 But the company itself was going through tremendous financial

21 distress.

22       THE COURT:  Ms. Eber, you know, if you think you're

23 helping yourself this way, I suggest you reconsider and just

24 answer the questions.  Your lawyer gets a chance on redirect to

25 ask you anything else.  But this is going to go on for a long

L9LsKLE3                        Cross - W. Eber

1   time if what you do is sidestep all the questions.

2   A.  All right.  Are you going to ask --

3         MR. BROOK:  I think that was a relatively responsive

4   answer, not to disagree.

5         THE COURT:  I'm happy for you.

6   Q.  Is what you're saying then, is you said something different

7   to banks and others than what you really believed, is that

8   right?

9   A.  Well, I -- you know, I was trying to be optimistic with the

10  bank.  Yes, yes.

11  Q.  All right.  So let's look at some of that.

12        The bank we're talking about here is Canandaigua

13  National Bank, or CNB, correct?

14  A.  Yes.

15  Q.  And they, in addition to being a co-trustee of the trust,

16  they were also the primary lender to Eber-Connecticut from 2007

17  or so until 2017, correct?

18  A.  Yes.

19  Q.  All right.  During that time period, Eber-Connecticut --

20  I'm sorry -- CNB, through Bob Lowenthal as the loan officer,

21  repeatedly expressed his desire to get out of a loan, correct?

22  A.  Yes.

23  Q.  They wanted you instead to find an asset-based lender who

24  could loan you more money, correct?

25  A.  Any lender.  They wanted us to find anybody.

1   Q.  But didn't he specifically try to help you find an

2   asset-based one?

3   A.  He didn't help me find anyone.

4   Q.  Is it fair to say that you repeatedly asked CNB to extend

5   the loans that they were giving you past the early maturity

6   dates?

7   A.  We asked for extensions, yes.

8   Q.  And you repeatedly got them, too, correct?

9   A.  We did get extensions, yes.

10  Q.  And isn't it correct that by July of 2011, you told Bob

11  Lowenthal that you were confident that Eber-Connecticut was

12  turning the corner and would be profitable in 2012?

13  A.  I don't recall that specific conversation.

14  Q.  Exhibit 232, let's look at that last sentence of the first

15  paragraph.

16          Here, in an e-mail to Bob Lowenthal dated July 1,

17  2011, copying your father and attaching some financial

18  information that you didn't produce to us, you said, we are --

19          Can you go back, Ali.

20          You said, We are confident that we are turning the

21  corner and will be profitable in 2012, correct?

22  A.  It's written there, but we weren't.

23  Q.  So is it your testimony that you were lying to

24  Mr. Lowenthal?

25  A.  No.  No.

1    Q.   OK.  So what you're saying then is that, ultimately,

2    despite the optimism and confidence, there was not a profit

3    realized in 2012, is that right?

4              MR. SANTORO:  Objection, your Honor.

5              THE COURT:  What's the objection?

6              MR. SANTORO:  What she is saying there is what is

7    written on the document.

8              MR. BROOK:  I'm asking her to clarify her testimony

9    now.

10             THE COURT:  I'll sustain an objection to the form of

11   the question.

12   BY MR. BROOK:

13   Q.   So did I understand your answer a moment ago correctly,

14   Ms. Eber, as saying that Eber-Connecticut was not profitable in

15   2012?

16   A.   It was not profitable in 2012.

17   Q.   OK.  But well before the end of 2012, Eber-Connecticut had,

18   in fact, turned the corner and was realizing profits, correct?

19   A.   No.

20   Q.   Exhibit 250.  Actually, we want to go to the third

21   paragraph starting with "I have sent."

22             Keep the whole thing visible, please, Ali.

23             MS. KRAL:  No worries.

24   Q.   All right.  This is an e-mail now from you to Mike Gumaer,

25   the director and co-trustee, copying your father, correct?

L9LsKLE3                        Cross - W. Eber

1   A.  Yes.

2   Q.  It's dated November 19, 2012, correct?

3   A.  Yes.

4   Q.  And you're apparently attaching an e-mail to Bob Lowenthal

5   of CNB, correct?

6   A.  Is there an attachment?

7   Q.  I wish there was, but this is how we got it.

8   A.  OK.

9   Q.  So isn't it correct that you told Mike Gumaer, you know,

10  who's on the board of managers of Eber-Connecticut at the time,

11  correct?

12  A.  Yes.

13  Q.  You told him you had a stellar October, your profits had

14  increased by 200 percent, and we have turned the corner and the

15  good news is that November continues to be strong.

16          So did I read that correctly?

17  A.  You read that correctly.

18  Q.  So by --

19  A.  January was the problem.

20  Q.  We just covered July 2011.  You were confident that you

21  were turning the corner, and by November 2012, you had turned

22  the corner, correct?

23  A.  I wasn't confident.

24  Q.  OK.  But right in the middle of that time period is when

25  you agreed to transfer all of Eber-Connecticut that was owned

1    by the trust out of the trust into your father, correct?

2              MR. SANTORO:  Objection, your Honor.

3              THE COURT:  Overruled.

4    A.  Can you repeat the question?

5    Q.  So we were just talking about how things changed during the

6    time period from July 2011 until November 2012.  Isn't it true

7    that it was in the middle of that time period that you decided

8    to permit your father to take all the trust's interest in

9    Eber-Connecticut and put it into his own company?

10   A.  No.

11   Q.  What part of that is incorrect?

12   A.  Well, I think it is a complete mischaracterization of --

13             THE COURT:  What part of it is incorrect?

14             THE WITNESS:  Well, my father -- I mean, my father had

15   loaned millions of dollars into the company, and the company

16   wasn't doing well.  The company had sustained many years of

17   losses, many, many years of losses.  And so I don't think that

18   this is -- from November 19, 2012, I don't think is accurate of

19   what is going on.  You know, he -- he basically -- I mean, it's

20   a -- you know, he did foreclose on loans that he made into the

21   company.  But the company had -- was not doing well, and he had

22   put millions and millions of dollars into it.

23             THE COURT:  OK.  I've heard you.

24             There was a time when you decided to permit your

25   father to take all of the trust's interest in Eber-Connecticut

L9LsKLE3                          Cross - W. Eber

1   and put it into his own company; true or false?

2            THE WITNESS:  The board did decide to -- yes, we --

3   you know, after we -- yes, it was -- it did go into Alexbay,

4   yes.

5            THE COURT:  And at what point in time was that

6   decision made?

7            THE WITNESS:  Well, he had millions of dollars of

8   loans --

9            THE COURT:  That's not what I asked you.  Answer my

10  question, please.

11           THE WITNESS:  I'm sorry.  Your question is what?

12           THE COURT:  When did you make that decision?

13           THE WITNESS:  Well, that decision was made with the

14  board.  There were multiple phone calls with --

15           THE COURT:  I didn't ask about how many phone calls.

16  I didn't ask with whom it was made.  I asked when.

17           THE WITNESS:  In June.  It was --

18           THE COURT:  Of what year?

19           THE WITNESS:  Of 2012.  '12.

20           THE COURT:  Thank you.

21           THE WITNESS:  So it was -- that's when the board

22  resolution was signed.  And he moved against the -- you know,

23  it is March where he filed an action, and the board decided --

24           THE COURT:  March of what year?

25           THE WITNESS:  2012.

1   BY MR. BROOK:

2   Q.  OK.  Now, let's talk about the loans a little bit before we

3   get into that stuff again.

4            In 2010, you and the board authorized a line of credit

5   note for Lester Eber in the amount of $1.5 million, correct?

6   A.  Can you repeat the question?

7   Q.  You authorized a line of credit note for your father to

8   loan up to $1.5 million to Eber-Metro in approximately February

9   or March of 2010, correct?

10  A.  We had been loaning.  I think it originally started in

11  2009.

12  Q.  I'm just asking when it was authorized.

13  A.  When it was -- yeah.  Sorry.  When it was authorized by the

14  board?

15  Q.  It was authorized by the board in approximately, again,

16  February or March of 2010, correct?

17  A.  Yes, yes.

18  Q.  And is it correct that maturity date on that loan was

19  December 31, 2011?

20  A.  Yes.  Sorry.  When was it?

21  Q.  December 31, 2011.

22  A.  Yes.

23  Q.  That's correct?

24  A.  But it started, I think, back in 2009.

25  Q.  OK.

1   A.  Original note started in 2009.

2   Q.  So you're referring to there was a note that was dated

3   October 2009, and then that note was predated in February 2010,

4   correct?

5   A.  Yes.

6   Q.  And at that time in 2010 is when you and the board, with

7   the assistance of Glenn Sturm, approved also granting security

8   for that note in the form of all of the assets held by

9   Eber-Metro, correct?

10  A.  Yes.  It was loaning a lot of money into the company, yes.

11  Q.  And at the same time, approved Eber Wine & Liquor to that

12  note, correct?

13  A.  Yes.  I think it was a little bit later.

14  Q.  Now, isn't it correct that even before the maturity date of

15  December 2011, you were already helping your father try to

16  calculate how much interest was due on his note so that he

17  could engage in foreclosure proceedings?

18  A.  He had been loaning a lot of money into the company.  It

19  was a very, very risky loan, and he did ask for the amount of

20  the interest and the amount of the loans.

21  Q.  And you provided that to him, correct?

22  A.  Yes.

23              (Continued on next page)

24

25

L9L2Kle4                          W. Eber - Cross

1    BY MR. BROOK:

2    Q.  And you provided that to his lawyer, David Belt?

3    A.  Yes, I did provide that.

4    Q.  And as a result of the information you gave them, Lester

5    then, after transferring his interest to a company called

6    Alexbay, made a demand -- let me rephrase that.

7         He made a proposal that he would exchange the debt

8    that he had transferred to Alexbay and make it -- cancel it all

9    out if he received all of Eber-Metro's stock from Eber Wine &

10   Liquor, correct?

11   A.  He, January 1, he made a proposal, yes.  We discussed it

12   with the board, and yes.

13   Q.  I think you are confusing two different dates.  You mean

14   January 18 was the proposal, correct?

15   A.  Yeah, I believe so, yes.

16   Q.  And the 1st, you are referring to February 1st, which is

17   when you had either a phone call or a meeting with Mike Gumaer

18   and your father to discuss his resignation, is that right?

19   A.  We had a phone call with him, yes.

20   Q.  And it is your testimony that during that phone call on

21   February 1, 2012, it was decided that Lester would resign and

22   you would replace him as president of Eber Brothers Wine &

23   Liquor?

24   A.  Yes.  Originally it was supposed to be Mike and then it

25   became me.

L9L2Kle4                          W. Eber - Cross

1   Q.  And so you acknowledge at this point, after having seen the

2   e-mail I showed you at your deposition, that actually initially

3   and for over a month, it was Mike Gumaer who was supposed to be

4   the president after Lester, not you, correct?

5   A.  Well, at that meeting then we decided it was going to be

6   me.

7   Q.  And that decision was not made until approximately March 12

8   of 2012, correct?

9   A.  No, we made the decision February 1, when we had the

10  meeting.

11  Q.  Let's just pull up Exhibit 103 and get this over with.  All

12  right.  I want to go to -- I think it is the second page,

13  please, Ali.

14          All right.  So do you see if you look at this e-mail,

15  March 2, at the bottom there, someone from Underberg & Kessler

16  is e-mailing you saying, "Attached is a consent regarding

17  Lester's resignation and the appointment of Mike Gumaer."  So

18  do you see that?

19  A.  Yes.

20  Q.  And do you remember how you responded to that e-mail?

21  A.  No.

22  Q.  Okay.  Pull out -- you didn't say that Mike wasn't going to

23  be the president, did you?  You instead asked to put in his

24  formal name.  Correct?

25  A.  This is what the e-mail says, but I --

L9L2Kle4                    W. Eber - Cross

1    Q.  Is it -- do you think this e-mail is incorrect?

2    A.  I -- what I recall is that Lester resigned on February 1,

3    and that's when we decided, instead of being Mike, it was going

4    to be me.  I'm not sure how the -- what this -- why this is --

5    Q.  Let's just go to the first page, Ali, and zoom in on the

6    last part there.

7            That shows on page 1 of Exhibit 103 that it was on

8    March 12 that you asked the lawyers to substitute your name for

9    Gumaer's as president, correct?

10   A.  Well, that's what this says, March 12, yes.  But it was, as

11   I recall it, it was the 1st of February we had the call.

12   Q.  You can take that down, Ali.

13           Now, it was on February 21 that your father, through

14   Alexbay, filed a lawsuit against Eber Brothers seeking a

15   judicial declaration that his proposal to take all the assets

16   of Eber Wine & Liquor and Eber-Metro in satisfaction of his

17   debt was commercially reasonable, correct?

18   A.  He filed a -- for a judicial decision in Judge Rosenbaum's

19   case, yes.

20   Q.  So that was few weeks before the document we were just

21   looking at, correct?

22   A.  I believe so, yes.

23   Q.  Let's talk about -- actually let me pull back.

24           The law firm Underberg & Kessler is a firm that has

25   represented your companies and your father and you since 2010,

L9L2Kle4                          W. Eber - Cross

1    correct?

2    A.  I'm not sure exactly when they started representing us, but

3    probably somewhere at that time.

4    Q.  Let's just make clear Exhibit 144, page 2, and this is the

5    interrogatory response asking for the dates when Underberg &

6    Kessler -- it's number 16, Ali, all the way down.  There you

7    go.  This is the dates and engagements for Underberg & Kessler,

8    and do you see there that the first time that --

9           THE COURT:  I can read that as well as she can.

10          MR. BROOK:  Okay.

11   Q.  So --

12          THE COURT:  No disrespect, Ms. Eber.

13   Q.  I just want -- so, Ms. Eber, does that refresh your

14   recollection that the first time Underberg & Kessler was hired

15   was actually to do estate planning for your father?

16   A.  It says that here, yes.

17   Q.  And isn't it correct that they did a bunch of other work

18   and listed here before your father's will that we just saw was

19   ultimately signed in 2013.

20   A.  What's the question?

21   Q.  So the will that was ultimately prepared that gives you all

22   of Lester's business interest was ultimately signed in 2013,

23   correct?

24   A.  I'm not sure of the date it was signed.

25   Q.  Okay.  It's on the Exhibit 175.  You can take that down,

1   Ali.

2         Now, Underberg & Kessler represented Alexbay suing

3   Eber Wine & Liquor, correct?

4   A.  Yes.

5   Q.  And it did so despite the fact that at the same time it was

6   representing Eber Wine & Liquor in other matters, such as, the

7   Harris Beach dispute, correct?

8   A.  We hired independent -- Eber Brothers hired independent

9   counsel during the -- when Judge Rosenbaum's decision was

10  filed.  Eber Brothers hired independent counsel.

11  Q.  And this is Mr. Marino Fernandez you are referring to?

12  A.  Yes.

13  Q.  And he was somebody who was referred to you by Underberg &

14  Kessler, correct?

15  A.  Yes, he is a Rochester attorney, a small community --

16  Q.  In your declaration you referred to him as an experienced

17  corporate business lawyer from Rochester, as independent

18  special counsel, correct?

19  A.  I believe so, yes.

20  Q.  And you also testified that he provided you with regular

21  advice, is that right?

22  A.  We did speak with him.  Mike and I did speak with him, yes.

23  Q.  And he participated in, for example, a board meeting on or

24  about March 13 to discuss the Alexbay lawsuit.

25  A.  He did and multiple phone calls.  I was in person.  I met

L9L2Kle4                        W. Eber - Cross

1    with him in person at that meeting, but then there were

2    multiple phone calls with him and Mike Gumaer.

3    Q.  So is it fair to say that Mr. Fernandez did a lot of work

4    to try to make sure that this transaction was fair to Eber

5    Wine & Liquor.

6    A.  He was involved in it, yes.

7    Q.  And he was ultimately paid for his work by Eber Wine &

8    Liquor, correct?

9    A.  You know, part of his -- I don't know all the specifics of

10   how he was paid.  I think my father paid for part of it and I

11   think maybe the company may have paid for part of his work.  It

12   is -- I don't really know all the specifics.

13   Q.  So you think your father, who was suing Eber Brothers to

14   take its assets, may have been paying the bills for your lawyer

15   who was retained as independent special counsel?  Is that

16   right?

17   A.  The company has no money.  There is no money.  Wine &

18   Liquor has no money.

19   Q.  Well, let's look at what Wine & Liquor paid.  Exhibit 160

20   at page 76, the second line from the bottom, and I apologize

21   for the small font.

22              A VOICE:  76?

23              MR. BROOK:  76.

24   Q.  So you see, second from the bottom, it says that Marino A.

25   Fernandez, Jr., paid $586.25 for his experienced corporate

L9L2Kle4                         W. Eber - Cross

1   business counsel?

2   A.  He was paid more than that.

3   Q.  You have no record of any such payments, do you?

4   A.  I don't, but my father paid more, paid, paid more than

5   that.  He required a retainer.  Eber Brothers Wine & Liquor

6   Corp. had no money.  It was completely insolvent, along with

7   Eber Wine & Liquor Metro, Inc.  They had nothing.

8   Q.  Isn't it true that Eber Wine & Liquor paid nearly $2.5

9   million in legal and accounting fees from the time period of

10   August 2007 through May 2012?

11   A.  I don't know exactly what -- I know there were a lot of

12   legal fees paid.

13   Q.  If the general ledger reflects legal and accounting

14   expenses of $2,480,000 and change from that time period, would

15   you have any reason to doubt that that is an accurate

16   reflection of how much in legal and accounting --

17   A.  What was the time frame?

18   Q.  The time frame of the entire time period covered by this

19   general ledger, I believe it is August 2007 through May 2012,

20   and we can look --

21   A.  It could be even more.  I mean, my father paid a tremendous

22   amount of legal fees as well.  There were lawsuits and

23   liabilities and, you know, the legal fees are sickening.

24   Q.  And they were paid by Eber Wine & Liquor, too?

25   A.  Wine & Liquor paid legal fees and my father personally

L9L2Kle4                          W. Eber - Cross

1    paid --

2    Q.   And?

3    A.   -- legal fees for the company.

4    Q.   And in this case you submitted a demonstrative exhibit, I

5    believe it is Exhibit KKKKK -- five Ks -- in which you -- don't

6    put it up -- in which you identify, what is it, hundreds of

7    thousands or millions of dollars in legal fees that you have

8    compiled together by going through your father's checks to see

9    how much he has paid different law firms, is that right?

10   A.   Which exhibit?  I know there are exhibits where I did go

11   through his checks and where he did, you know -- it has the

12   Bates number and the specific check where he did pay legal

13   fees, among other liabilities that he paid for the companies,

14   that he personally paid.

15   Q.   And isn't it true that none of those checks that you have

16   submitted either to this Court or in discovery show your father

17   paying Marino Fernandez anything.

18   A.   He did.  I mean, he did.  I don't know if we found all the

19   checks or not, but he required a retainer and he definitely was

20   paid.

21   Q.   And you have not produced any retainer agreement in this

22   case for Marino Fernandez, have you?

23   A.   I don't -- I don't recall.

24   Q.   So you don't recall seeing one or is this another

25   unproduced document?

L9L2Kle4                          W. Eber - Cross

```
 1    A.  I don't --
 2              MR. SANTORO:  Objection, your Honor.
 3              THE COURT:  What's the objection?
 4              MR. SANTORO:  The objection is that there are two
 5    options given there when there are a multiplicity of
 6    possibilities as to why that document isn't here right now.
 7              THE COURT:  Sustained as to form.
 8    BY MR. BROOK:
 9    Q.  Do you remember ever seeing a retainer agreement for Marino
10    Fernandez signed by anyone?
11    A.  No, no, I don't.
12    Q.  Did you search for one?
13    A.  We searched for -- whatever the search terms were, we
14    searched for them.
15              THE COURT:  Counsel, did anybody seek discovery from
16    this lawyer?
17              MR. BROOK:  We could not find him, your Honor.  The
18    phone number leads to a Spanish language voice mail and there
19    is no good mailing address for the lawyer, so we did endeavor
20    to try to find this guy.
21              THE COURT:  Is he a member of the bar of the State of
22    New York?
23              MR. BROOK:  He is.  The address -- my associate who
24    used to be with my firm was the one who was primarily tasked
25    with that, and I remember not being able to find much of
```

L9L2Kle4                             W. Eber – Cross

1   anything.

2            But I am actually done with this point, your Honor, I

3   think.  It is -- and just so we are clear, one of the reasons

4   that we let that go is that the defense explicitly waived the

5   advice-of-counsel defense in this case.

6            THE COURT:  It might have been very interesting to see

7   who paid him.

8            MR. BROOK:  Well, we have $586.25 in Eber Wine &

9   Liquor's general ledger, your Honor.

10           THE COURT:  But that comes from the client he

11  allegedly was representing.

12           MR. BROOK:  Right.  It would certainly be interesting

13  to see if the one who was on the other side paid him a lot of

14  money, too, your Honor, I agree.

15           THE COURT:  Okay.  We will break for lunch.  2:00.

16           (Luncheon recess)

17

18

19

20

21

22

23

24

25

L9L2Kle4                              W. Eber - Direct

                    A F T E R N O O N   S E S S I O N

 1

 2                              2:05 p.m.

 3              THE COURT:  Okay.  Let's continue.

 4              Mr. Brook.

 5   BY MR. BROOK:

 6   Q.  All right.  Before we get into more of what happened back

 7   then, I would just like to briefly cover the current status of

 8   the company to see if there have been any changes in the

 9   ownership since the last time we have spoken.

10              Is it correct that at this moment, Eber-Metro still

11   owns 79 units of Eber-Connecticut?

12   A.  Yes.

13   Q.  And you are going to have to speak up again.

14   A.  I'm sorry, yes.

15   Q.  And is Eber-Metro still 90.9 percent owned by Alexbay?

16   A.  Yes.

17   Q.  And you own 9.1 percent of Eber-Metro, correct?

18   A.  Yes.

19   Q.  And is Alexbay 100 percent owned by the Estate of Lester

20   Eber?

21   A.  Yes.

22   Q.  And do you and Lester's estate together own 100 percent of

23   Slocum of Maine?

24   A.  Yes.

25   Q.  Have any rights of first refusal, preemptive rights, or

1   call options been granted on any of those companies over the

2   last two years?

3   A.  No.

4   Q.  When we broke, we were talking a little bit about Marino

5   Fernandez and the time period of March 2012, when the board

6   approved the Alexbay trans-- or correct me if I am wrong, but

7   on March 13, 2012, the board agreed that it would not fight the

8   Alexbay lawsuit, is that correct?

9   A.  Correct.

10  Q.  That's a yes?

11  A.  Yes.

12  Q.  All right.  And participating in that discussion were you,

13  Mike Gumaer, Marino Fernandez, and Lester Eber, is that

14  correct?

15  A.  There were more than one conversations, but if you are

16  referring to the -- there was one board meeting, but then there

17  were many conversations after and before that where there were

18  various people in those conversations.  My father was not in

19  all of those conversations.

20  Q.  But your father was at the one official board meeting that

21  you wrote minutes about, right?

22  A.  That's what the minutes say, yes.

23  Q.  And you were discussing the lawsuit that he had filed

24  against the company, correct?

25  A.  Correct.

L9L2Kle4                        W. Eber - Direct

1    Q.  And Marino Fernandez was providing you with legal advice

2    with Lester there to listen to it, correct?

3    A.  He -- yes, and -- but then I spoke with Mike thereafter

4    many times, you know, thereafter, where Lester was not on the

5    phone.

6    Q.  Isn't it true that the day before that board meeting was

7    the first time that Mike Gumaer ever learned about the Alexbay

8    lawsuit?

9    A.  He knew that Lester was foreclosing.  I don't know if he

10   knew the exact method, but he knew before that.

11   Q.  Let's pull up Exhibit 122, and do you see this is an e-mail

12   from Mike Gumaer to you on March 13, 2012, telling you "I am

13   not in a position to discuss in any depth the Alexbay matter as

14   I learned of the matter yesterday afternoon in the e-mail from

15   Underberg"?

16   A.  Yes.

17   Q.  So does that refresh your recollection as to when he

18   learned about the lawsuit?

19   A.  Yes.

20   Q.  And you see -- and this is also an e-mail that you recall

21   you and I discussing during your deposition where we agreed

22   that the second to last sentence included a typo, when he wrote

23   "servive," and would you agree with me still that what

24   Mr. Gumaer was saying is that on the surface it looks like

25   Lester is moving against the trust of which he is a co-trustee?

1    A.  That's what it says.

2              THE COURT:  I'm so relieved to have had that

3    assistance.  I could never, ever have figured it out.

4              Could we move it at a little greater speed than a

5    glacier sliding uphill?

6              MR. BROOK:  Yes, your Honor.

7    BY MR. BROOK:

8    Q.  And but isn't it true that before that board meeting ever

9    occurred, Marino Fernandez had already agreed to waive all

10   defenses?

11   A.  Well, I know that he -- I know that something was filed, I

12   think, on the 9th or something, but Mike was well aware of what

13   was going on.  I don't know if -- this was --

14             THE COURT:  Ms. Eber, I'm sorry to interrupt again,

15   but this question is I don't think about Mike, unless there are

16   two of them.

17             MR. BROOK:  Yeah.  I don't think so.

18             THE COURT:  Let's pose the question to the witness

19   again and please answer the question that you are asked.

20   BY MR. BROOK:

21   Q.  Isn't it true that before the board meeting on March 13,

22   Marino Fernandez had already waived all of Eber Brother Wine &

23   Liquor's defenses to the Alexbay lawsuit?

24   A.  I don't --

25             MR. BROOK:  Let's put up Exhibit 124.

L9L2K1e4                              W. Eber - Direct

1            THE COURT:  Could we get the answer first?

2            MR. BROOK:  I'm sorry.  I thought she actually did.

3    I'm having a hard time hearing her.  I thought she did answer.

4            THE COURT:  What's the answer to the question,

5    Ms. Eber.

6            THE WITNESS:  My understanding is that the lawsuit was

7    just to figure out the commercially reasonableness.

8            THE COURT:  Okay.  We are going to go back again.  You

9    have forgotten the question again.

10           THE WITNESS:  So I know that he signed something.  I

11   don't know -- I don't know if he had --

12   BY MR. BROOK:

13   Q.  Yeah, so what I am showing you now is Exhibit 159.  Let's

14   just go to this.

15   A.  Yeah, I'm --

16   Q.  And do you see that this is the stipulation that was signed

17   by Marino Fernandez on March 9, 2012?

18   A.  Yes, yes.

19   Q.  And it is correct that you do not have any e-mails or other

20   documents showing that Mike Gumaer was ever apprised of this

21   stipulation or even this lawsuit before the stipulation was

22   filed?

23   A.  Well, he knew about it.  He knew -- I don't know if he knew

24   about the specific lawsuit.  He knew that Lester was moving

25   forward on a foreclosure.  I had multiple conversations with

L9L2Kle4                          W. Eber - Direct

1    him and my father did as well.

2    Q.  Okay.  And isn't it correct that after the board meeting on

3    March 13, 2012, Marino Fernandez had no further involvement in

4    this Alexbay matter at all?

5    A.  He -- no.  There were multiple conversations with him.

6    Q.  Isn't it true that at some point Underberg & Kessler began

7    actually preparing Eber Wine & Liquor's own corporate documents

8    to approve this transaction?

9    A.  I believe they did, yes.

10   Q.  Yes.  So, for example, it was Underberg & Kessler who

11   drafted the board authorization to approve this transaction in

12   June 2012, correct?

13   A.  I'm not sure.

14   Q.  Exhibit 124, please.  If you can zoom in on the second part

15   there.

16           Do you see this is an e-mail from someone at

17   Underberg & Kessler to you, Lester Eber, Glenn Sturm, David

18   Belt, and a bunch of other people not named Marino Fernandez?

19   A.  Okay, yes.

20   Q.  It is attached -- subject is unanimous written consent of

21   board of directors for Eber Brothers Wine & Liquor Corp.,

22   correct?

23   A.  Yes.

24           THE COURT:  Just go back to that, please.

25           Ms. Eber, do you recognize the name Nelson Mullins

L9L2Kle4                              W. Eber – Direct

1      that appears after Glenn Sturm's name in the little at symbol?

2                THE WITNESS:  Yes.

3                THE COURT:  What is it?  Or was it at that time?

4                THE WITNESS:  A law firm.

5                THE COURT:  Was it a law firm that Mr. Sturm was

6      connected to?

7                THE WITNESS:  Yes.

8                THE COURT:  Did that law firm ever do any work for

9      your father, for you, or for any of the Eber companies?

10               THE WITNESS:  Yes.

11               THE COURT:  What kind of work?

12               THE WITNESS:  He was a consultant and he did kind of

13     general law work.

14               THE COURT:  Was he a consultant on anything other than

15     law work?

16               THE WITNESS:  No, he helped with the company as well,

17     as far as strategic.

18               MR. BROOK:  I think she means, yes, your Honor, he was

19     consultant beyond law.

20               THE WITNESS:  Yes.

21               THE COURT:  So what did he do beyond law?

22               THE WITNESS:  He helped us -- well, he has a practice

23     where he like strategically helped us with as far as the

24     company had a lot of financial issues, and we were trying to

25     strategically figure out a direction in terms of how to turn it

L9L2Kle4                          W. Eber - Direct

1     around, and he helped us with that, as far as doing -- you

2     know, coming in and doing consulting for us with the different

3     members of the team and also helping us with some banking

4     relationships as well.

5               THE COURT:  So this is a guy that your companies paid

6     legal fees, is that true?

7               THE WITNESS:  We did pay some legal fees to him.

8               THE COURT:  And you also paid business consulting

9     fees, yes?

10              THE WITNESS:  We may have paid some.  I'm -- I don't

11    know how much consulting fees we paid him.

12              THE COURT:  Well, he wasn't doing all this consulting

13    and legal work for nothing, right?

14              THE WITNESS:  No, he was not.

15              THE COURT:  And the people who were paying him was

16    you, your father, and/or the Eber companies, yes?

17              THE WITNESS:  Yes.

18              THE COURT:  Okay.  Let's go on, please.  Thank you.

19              MR. BROOK:  Okay.

20    BY MR. BROOK:

21    Q.  And isn't it true, just to finish up the point, that other

22    Nelson Mullins lawyers were also involved in 2010 at the time

23    of Lester's line of credit note?

24    A.  Yes.

25    Q.  And those lawyers drafted the line of credit note and

1    related security agreement and all of that?

2    A.  I think Harris Beach was also involved in that.

3    Q.  And is it correct that Nelson Mullins -- I'm sorry, that

4    Glenn Sturm actually drafted the April 2010 letters that Lester

5    sent to Sally Kleeberg and Audrey Hays?

6    A.  I'm not certain.  I believe Mike Gumaer may have helped on

7    those, too.

8          THE COURT:  And who is it that Mike Gumaer may have

9    helped.

10         THE WITNESS:  Lester on the letters.

11         THE COURT:  Thank you.

12   BY MR. BROOK:

13   Q.  All right.  As the CFO of these different companies and

14   having your finance background, you are familiar with the

15   concept of good will in an acquisition, correct?

16   A.  Yes.

17   Q.  And so good will is the difference between a purchase price

18   paid and the amount of the assets and the book value of the

19   assets acquired, correct?

20   A.  Yes.

21   Q.  And do you recall that as of the beginning of 2011, that

22   Eber-Metro had an asset of $14 million of good will in

23   Eber-Connecticut on its books?

24   A.  It may -- I believe so, yes.

25   Q.  And is it also correct that in or about early 2012,

L9L2Kle4                        W. Eber - Direct

1  calendar year 2012, you had your accountants write off the good

2  will on Eber-Metro's balance sheet?

3  A.  I believe I approved it, yes.

4  Q.  So the good will was erased, correct?

5  A.  The company had lost like $7 million, and many -- in over

6  eight years, yeah.

7  Q.  So that was a reason to erase another $14 million asset

8  from the books due to the losses?  Is that what you are saying?

9  A.  Well, I mean, was it fair?  No.

10  Q.  Well, at the same time, isn't it true that Eber-Metro on

11  its books had a debt to Eber Brothers Wine & Liquor Corp. of

12  over $10 million?

13  A.  I -- I don't -- I'm not certain of that.

14  Q.  Does that sound about correct, though, to you?  I don't

15  want to have to go through all the documents.

16  A.  I don't remember all the documents, so there may have been

17  some intercompany things, yes.

18  Q.  And is it correct that around the same time as the Alexbay

19  transaction, you and/or your accountants erased any debts from

20  Eber-Metro to Eber Wine & Liquor?

21  A.  I don't remember the exact details.  I mean, I wasn't

22  involved in that, so I don't really recall, but there may have

23  been.

24  Q.  Well, who else besides you would have been involved in

25  deciding whether or not to eliminate a debt between Eber-Metro

1    and Eber Wine & Liquor?

2    A.   Probably David Kaplan and the accountants, and Sumner

3    Pearsall, our tax accountant.  I'm not sure of all of the tax

4    implications.

5    Q.   But there were no other individuals besides you with

6    operational control over the company who could have approved

7    the elimination of a debt, correct?

8    A.   At Connecticut, at the Connecticut level, our CFO, if it

9    was Dave Dean, may have been involved as well.  I don't --

10   Q.   Just so we are clear, I'm talking about Eber-Metro and Eber

11   Wine & Liquor.  Do you understand that?

12   A.   No, it would have just been me or Lester, yeah, but I don't

13   recall the specific transaction.

14   Q.   All right.  Let's turn to the pension liability.  Now, in

15   your declaration, you emphasize that you thought that this was

16   a very big problem for all of the Eber companies basically from

17   2008 forward.  Is that fair?

18   A.   It was a big problem, yes.

19   Q.   And so you always knew that it was going to have a big

20   potential impact on Eber-Connecticut's business until it was

21   paid or resolved, correct?

22   A.   Yes.

23   Q.   Isn't it true that you told Bob Lowenthal of Canandaigua

24   National Bank that the pension liability would have no

25   financial impact on the Eber-Connecticut business in February

L9L2Kle4                          W. Eber - Direct

1    2010?

2    A.  I may have put that in an e-mail, but . . .

3    Q.  And if you put that into -- are you not sure?  Do you want

4    to look at the e-mail to be sure?

5    A.  No, I would have tried to have been positive because I

6    didn't want to lose the loan.  Because if we lost the loan,

7    then the company would go under, and we wouldn't be able to

8    survive.  So I was trying to be as positive as I could, knowing

9    the severity of the situation.

10   Q.  And isn't it also true that, in response to that question,

11   in addition to saying it would have no financial impact, you

12   asked Bob Lowenthal how he heard about the pension liability?

13   A.  I don't recall.

14          MR. BROOK:  Let's put it up 225.

15   A.  I didn't -- I . . .

16          MR. BROOK:  Very top.

17   Q.  Just looking at the third sentence, you wrote to Bob

18   Lowenthal, copying your father, "While we do not believe that

19   it will have any impact, we discussed the issue internally and

20   wondered how you heard about the matter.  Please let us know."

21          Do you see that?

22   A.  Yes.

23   Q.  So is it fair to say that you yourself had not disclosed

24   this pension issue to Canandaigua National Bank?

25   A.  Well, they managed the pension, so they knew.

1   Q.  But they -- is it fair to say you had not disclosed to Bob

2   Lowenthal that whatever the pension issue was might have any

3   relation to its loan to Canandaigua National Bank, correct?

4   A.  Can you repeat the question?

5   Q.  Let me rephrase.

6         Isn't it true that Canandaigua's loan officer was

7   under the belief that it was only Lester personally who was

8   liable for the pension plan?

9   A.  No.

10        MR. SANTORO:  Objection, your Honor.

11        THE COURT:  It's already been answered.

12        MR. BROOK:  Okay.  We will let the document speak for

13   itself.  You can take that down.

14        THE COURT:  Look, I want to understand something,

15   Ms. Eber.

16        THE WITNESS:  Yes.

17        THE COURT:  You testified a few minutes ago that you

18   always knew that the pension liability was going to have a big

19   potential impact on Eber-Connecticut's business until it was

20   paid or resolved.  Was that testimony truthful?

21        THE WITNESS:  Yes.

22        THE COURT:  Didn't you tell Mr. Lowenthal in 2010, in

23   words or in substance, that you believed that the pension

24   matter would not have any impact on Eber-Connecticut's

25   business?  Did you tell him that?

1             THE WITNESS:  In that e-mail I did.

2             THE COURT:  Right.

3             THE WITNESS:  Can I --

4             THE COURT:  And what you wrote in that e-mail was not

5     true, correct?

6             THE WITNESS:  No, I -- can I correct myself?  I

7     think -- I always believed that it would have an impact on

8     Metro, Eber-Metro.  Connecticut, you know -- I believed it

9     would impact all of the companies, yes.  I believed that unless

10    it was resolved, it would have an impact.

11            THE COURT:  So the statement you made to Mr. Lowenthal

12    at the time you made it was inaccurate and you knew it was

13    inaccurate, right?

14            THE WITNESS:  I -- no, I -- I just -- it was -- I was

15    trying to paint a rosier picture than --

16            THE COURT:  I understand that, and when one tries to

17    paint a rosy picture, a rosier picture, to be precise, one is

18    trying to paint a picture that looks rather different from what

19    the picture would look like if it were not rose-colored, isn't

20    that correct?  Let me withdraw that because I think it is

21    obvious.

22            You were trying to mislead him.  True?

23            THE WITNESS:  They managed the pension plan.

24            THE COURT:  I didn't ask that.  I know they were the

25    trustee, one of three.

 1              THE WITNESS:  Right.

 2              THE COURT:  I know that.  You were trying to mislead

 3     Mr. Lowenthal, right?

 4              THE WITNESS:  I wasn't trying to mislead him.  I -- I

 5     was hopeful that it wouldn't impact the company.

 6              THE COURT:  But you said that, your testimony,

 7     specifically your testimony, that you always knew it would have

 8     an impact was true, namely, that you always knew it would.

 9     That's what you said a few minutes ago.

10              THE WITNESS:  Well, I always knew that we had to get

11     it resolved with the pension plan, with the PBGC.  I always

12     knew that something had to be done to resolve these issues.

13              THE COURT:  Go ahead, Mr. Brook.

14     BY MR. BROOK:

15     Q.  So the e-mail we were just looking at was February 2010,

16     correct?

17     A.  Yes.

18     Q.  And it was within about two months of that that you then

19     had Glenn Sturm and/or Elliot Gumaer drafting letters to send

20     to Sally Kleeberg and Audrey Hays asking for money to help

21     Lester with his loans to the company, correct?

22     A.  Sorry.  Can you repeat the question?

23     Q.  Sure.  This was just a few weeks before the Lester Eber

24     $1.5 million line of credit was approved by the board,

25     correct?

L9L2Kle4                          W. Eber - Direct

1    A.   Yes.

2    Q.   And then that, in turn, was just a few weeks before six

3    percent of Eber-Connecticut was sold from Eber-Metro to a

4    company called Polebridge Bowman owned by Mr. Sturm, correct?

5    A.   Sorry, can you repeat the question?

6    Q.   Six percent of Eber-Metro --

7    A.   Yes, we did.

8    Q.   Sorry, sorry Eber-Metro sold six percent of

9    Eber-Connecticut --

10            (Court reporter confers)

11   Q.   Eber Connecticut was sold to Polebridge Bowman just a

12   couple of months after the e-mail we were just looking at,

13   correct?

14   A.   When was the e-mail that we --

15   Q.   I'm sorry.  Let me rephrase.  Just a few months.  It was

16   late May was when it was dated as of, correct?  The Polebridge

17   Bowman note.

18   A.   Yes.

19   Q.   The one where you got the right of first refusal, do you

20   remember that?

21   A.   Yes, yes.

22   Q.   And do you acknowledge that that transaction was done for

23   the purpose of trying to protect Eber-Connecticut from the

24   pension liability?

25   A.   It was done to try to help deconsolidate, yes, out of the

L9L2Kle4                      W. Eber - Direct

1    control group, yes.

2    Q.  Okay.  So you previously testified that that transaction

3    was done to compensate Glenn Sturm?

4    A.  Well, it was both.  There were two -- there were two things

5    that -- it was to compensate him, to help turn around the

6    company, so that we could then pay the pension plan and then

7    also --

8    Q.  And isn't it true that that six percent was originally

9    intended to be paid or given to you rather than Mr. Sturm?

10   A.  Yes.

11   Q.  And that was -- so did you receive any additional, you

12   know -- withdrawn.

13           And that six percent, when it was going to be

14   transferred to you, that wasn't something that was ever

15   discussed with the trustees at the trust besides Lester Eber,

16   correct?

17   A.  I believe it was discussed with Mike Gumaer.

18   Q.  And that was after -- but wasn't the discussion with Mike

19   Gumaer once it was a right of first refusal?

20   A.  No, I think we -- Mike was involved in all of these

21   conversations, so it's kind of hard for me to pick, you know,

22   to remember all of the specific details, but he definitely

23   spoke with Glenn and Lester and other attorneys as well.

24   Q.  Isn't it true that Mike Gumaer expressed concerns about the

25   fact that a right of first refusal going to you might be a

1  problem, given the trust?

2  A.   Yeah, there is an e-mail on that, yes.

3  Q.   And isn't it true that you assuaged Mr. Gumaer's concerns

4  by telling him that it was Eder-Goodman that wanted you to have

5  the right of first refusal rather than giving a right of first

6  refusal to Eber-Metro?

7  A.   Originally it was supposed to go, I think, to me and then

8  it -- based on discussions, Lester decided that it would go to

9  Glenn, and that would be for his compensation.  And as a result

10  of that, then I got the right of first refusal as far as

11  compensation that was -- I mean, that was part of

12  compensation --

13  Q.   My question was about --

14  A.   Sorry.

15  Q.   -- whether you told Mike Gumaer that Eder-Goodman wanted

16  you to get the right of first refusal.  Isn't that what you

17  told Mike Gumaer?

18  A.   I don't -- I don't remember telling him that.  I may have

19  said that in -- you know, it's -- there is a lot of, like, time

20  that's gone through.  I may have testified to that in my

21  deposition, but I don't quite remember.

22           MR. BROOK:  Your Honor --

23  A.   But they did approve it.  They did approve it.

24           MR. BROOK:  Your Honor, at this time I would like to

25  play some deposition video.  I understand that -- this is from

1   pages 316/line 7 to 317/15.

2   Q.  Your individual deposition.

3            MR. BROOK:  Hopefully sound works.

4            PARALEGAL:  Hopefully.  No, not going through the

5   sound, through the system.  I don't know why.

6            THE COURT:  Read it.

7            MR. BROOK:  Yeah, getting to it now.

8            PARALEGAL:  Is it ready now?  No, it's muted on the

9   system.  How do I unmute?

10            MR. BROOK:  I'm just going to read it.  So I will read

11   the deposition.  Are you able to put it up?

12            PARALEGAL:  Let me see if I can get it this time.  No,

13   it's not working.  I'm sorry.  I can put it up on the screen.

14            MR. BROOK:  I think that would be good, if you can get

15   to it, so everyone can make sure I am reading it right.

16            A VOICE:  What page are you on?

17            MR. BROOK:  316.

18            THE COURT:  Please just read it.

19            MR. BROOK:  Okay.  Line 7.

20   "Q   What do you recall about your discussions with Mike and

21   his concerns?

22   "A   Well, we discussed that these issues, I did send it to Pat

23   Dalton.  As I recall, the six percent, the right of first

24   refusal, we had to have that six percent approved by the

25   partner, and so that's something that they had wanted and then

L9L2Kle4                      W. Eber - Direct

1    we discussed it with the attorneys, and then this is what they

2    came up with.  You know, they came out with -- the attorneys

3    came out with what was acceptable to everyone, because there is

4    a couple of groups involved here, and then that was signed off

5    by Mike, and so we did talk about it.

6    "Q   What did you say to Mike in response to his questions

7    about whether it would be possible to have Eber-Metro have the

8    right of first refusal?

9    "A   I think Eber-Metro does have -- I'm not looking at the

10   document right now, but I do think it does" have it -- "does

11   has like after me."

12   "Q   After you, but not the first right of first refusal?

13   "A   Right, but I think this is what the partner wanted and

14   this is what was agreed to, so this is what the lawyers --

15   "Q   What do you mean by the partner?  Who are you referring

16   to?

17   "A   Eder-Goodman.

18   "Q   So Eder-Goodman, you are saying, wanted you to have the

19   first right of first refusal?

20   "A   I think that's what was decided.  That was what was

21   decided.  That was what the lawyers prepared, and then Mike

22   signed off on it, so he was okay with it."

23        And that was your testimony at the deposition,

24   Ms. Eber, correct?

25   A.  I have since looked and reviewed this, and if it had gone

1    back to Metro --

2    Q.  I don't actually have a question pending for you right

3    now.

4         Now, let's just wrap up a little bit with Polebridge

5    Bowman.  So is it correct in 2015 Polebridge Bowman's payment

6    in the form of a $350,000 nonrecourse note was going to come

7    due?

8    A.  Yes.

9    Q.  And you extended it by one year, correct?

10   A.  Correct.

11   Q.  And then in 2016, when the note was going to come due

12   again, you extended it this time by ten years, correct?

13   A.  Yes.

14   Q.  Then in February of 2017, you actually assumed the

15   Polebridge Bowman note and, with it, their six percent interest

16   in Eber-Connecticut, correct?

17   A.  He sold it to me.

18   Q.  He sold it to you for nothing but the assumption of the

19   debt, correct?

20   A.  I assumed the debt, correct.  He was in very bad health,

21   yes.

22   Q.  And so at the time that you assumed the debt of roughly

23   $350,000, isn't it true that you already knew that you were

24   expecting a $150,000 dividend payment from Eber-Connecticut?

25   A.  No.

L9L2Kle4                           W. Eber - Direct

1    Q.  So that wasn't something that was decided at the same time

2    as the Polebridge Bowman transfer?

3    A.  Well, he had -- I didn't get the payment.  It was -- he had

4    wanted to get out of -- he was in declining health, and he

5    wanted to get out of it, so he sold it to me, and then I --

6    when the distribution -- they were figuring out the

7    distribution of how much the distribution should be, I

8    designated my portion to pay the pension, the legal -- the

9    legal fees, the closing costs, and other -- you know, the vast

10   majority of it, I think it was 100 and -- what did you say? --

11   50 thousand dollars?

12   Q.  $25,000 per unit that was paid, right?

13   A.  Right, and then that went to pay the PBGC and the legal

14   closing costs and other Metro costs, expenses of Metro, like

15   legal fees.  I did get a small amount, like maybe 10 percent,

16   maybe it was a little more.  I can't remember exactly.

17   Q.  If we look at Eber-Connecticut's records, we will see a

18   $150,000 payment to you, though, in the first instance,

19   correct?

20   A.  No, no.  It went to Metro and directly to State Street Bank

21   to pay down the pension.  When we settled with the PBGC for $2

22   million, Metro and my portion --

23   Q.  All right.

24   A.  -- directed Connecticut to pay State Street Bank to pay the

25   PBGC, and then the vast majority of the rest of it went to pay

1    closing costs to the bank and other expenses of Metro, and then

2    I did get a small portion.

3    Q.  And as of today, you still owe approximately $350,000 to

4    Eber-Metro under the note, is that right?

5    A.  I don't know.  I've got to look.  I don't remember exactly.

6           THE COURT:  Whether you do or you don't, it's

7    nonrecourse, right?

8           THE WITNESS:  Correct.  That may have --

9           MR. BROOK:  So --

10          THE COURT:  Yeah.

11          MR. BROOK:  -- I was about to offer to pay $350,000

12   for it, but that would not be appropriate.

13   BY MR. BROOK:

14   Q.  All right.  Let's go back.

15          So we talked about how -- the things you said to

16   Canandaigua National Bank, and it is fair to say you tried to

17   paint a rosier picture for PBGC's people, too, in 2011, 2012,

18   or so, correct?

19   A.  We were doing the best we could.  I was trying to do the

20   best we could to pay them.

21   Q.  Now, is it correct that, by the end of October 2011, you

22   were telling PBGC's representative that the company,

23   Eber-Connecticut, does not have any intention of seeking to

24   terminate the pension plan, much less terminate the plan within

25   five years of March 2007?

1    A.  Sorry, could you repeat that.

2    Q.  I will step back.

3              Is it not your testimony in your declaration that you

4    believe that the pension plan was terminated in April 2010?

5    A.  It was terminated -- it was retroactively terminated to

6    2010, yes.

7    Q.  But you fought against that ruling for many, many years,

8    correct?

9    A.  We -- we negotiated with the PBGC for many years.  I mean,

10   the termination liability was 5.1 plus million, which then

11   there was a termination letter for like $7.9 million, so it was

12   a long negotiation for many years back and forth.

13             MR. BROOK:  Move to strike the termination liability

14   amount in actuarial expert testimony.

15   A.  Well, it was in the --

16             THE COURT:  It's stricken.  The question is whether

17   you fought against the ruling for many years.

18             THE WITNESS:  We negotiated for many years, yes.

19   BY MR. BROOK:

20   Q.  And you paid, you and your father paid a lot of money to

21   lawyers to fight against having a termination date before June

22   5, 2012, correct?

23   A.  We paid lawyers to defend us, yes --

24   Q.  And --

25   A.  -- and to negotiate.

L9L2Kle4                          W. Eber – Direct

1    Q.   Is it now your testimony that you always believed that that

2    was a losing battle, and that Eber-Connecticut and Eber-Metro

3    would always be on the hook for the pension?

4    A.   Eber-Metro, yes.  Well, I mean, yes, that there was a

5    liability out there, and it had to be negotiated and it had to

6    be a negotiated settlement.

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

L9LsKLE5                          Cross - W. Eber

1  BY MR. BROOK:

2  Q.  So you would agree then that spending hundreds of thousands

3  of dollars on lawyers was just a waste of money?

4  A.  No.

5  Q.  You're trying to get this court to give your father credit

6  towards his estate for spending hundreds of thousands of

7  dollars fighting PBGC when you always knew it was a lost cause,

8  isn't that your testimony?

9          MR. SANTORO:  Objection, your Honor.  Mischaracterizes

10  her testimony.

11          THE COURT:  Answer the question, please.

12  A.  Can you repeat the question?

13  Q.  It's harder than it looks.

14          Isn't it true that --

15          Let me take that back.  So is it now your testimony --

16          MR. BROOK:  Gosh, I've completely lost it, your Honor.

17  Would it be possible to ask the court reporter to read that

18  back?

19          THE COURT:  Yes.

20          (Record read)

21  A.  No, I -- no, we were trying to negotiate with them, and if

22  they had imposed the 5.1 million or whatever, it just would

23  have -- we wouldn't have been able to survive.  It would have

24  simply crushed the company.

25  Q.  Let's talk about something else just to try to get through

1   this.

2            You created a company called Segway LLC, correct?

3   A.  Yes.

4   Q.  And in 2013, you transferred numerous accounts receivable

5   of Eber Wine & Liquor to Segway, correct?

6   A.  I'm not sure of the exact date.  There were -- there were a

7   couple of them, yeah.

8   Q.  OK.  Is it fair to say that you've collected nearly

9   $200,000, by now more than $200,000 in money from those

10  accounts?

11  A.  No, no, no.

12  Q.  All right.  Let me ask you this.  Have you collected over

13  $123,000?

14  A.  I think it was approximately 123, yes.

15  Q.  And then as of a few years ago, you were projecting to

16  potentially collect as much as 70,000 more?

17  A.  We never got it.

18  Q.  So that was money that you received after 2013, even though

19  Eber Wine & Liquor, you're saying, was already shut down for

20  six years, is that right?

21  A.  Those --

22            Should I explain this?

23            Those were receivables that were assigned to the

24  Teamsters.  OK.  Because we had a, you know, $2.2 million

25  liability with Teamsters.

L9LsKLE5                          Cross - W. Eber

1    Q.  Ms. Eber, I'm just asking if you did not use Eber Wine &

2    Liquor assets to collect $120,000, even though it was more than

3    six years after you said the business shut down?

4    A.  I paid $150,000 to settle a case -- I mean, to settle with

5    the Teamsters towards settling the Teamsters --

6              THE COURT:  Ms. Eber, we are getting no place fast

7    here --

8              THE WITNESS:  OK.  Sorry.

9              THE COURT:  -- because you just have talking points,

10   and it doesn't matter what question gets asked, you give us

11   your little speeches.

12             THE WITNESS:  OK.

13             THE COURT:  And you're not helping anybody.

14             THE WITNESS:  I'm very sorry.

15             THE COURT:  Least of all yourself.

16             THE WITNESS:  What's the question?  I'm sorry.

17             MR. BROOK:  At this point, your Honor, I would

18   actually just like to move on to another topic.

19             THE COURT:  Pardon me?

20             MR. BROOK:  At this point, I'm just going to move on

21   to another topic.  I'm trying to get through this fast.

22   BY MR. BROOK:

23   Q.  Let's talk about Harris Beach.  That was the law firm that

24   was involved in a lot of these transactions, including the

25   Polebridge transaction, correct?

1    A.   Correct.

2    Q.   They sued Eber Wine & Liquor for not paying their bills,

3    correct?

4    A.   Correct.

5    Q.   And then you counter-sued alleging they committed

6    malpractice by, among other things, failing to submit the

7    litigation claim to insurance, correct?

8    A.   Can you repeat the question?

9    Q.   Did you not have a counterclaim against Harris Beach?

10   A.   I believe so.

11   Q.   And isn't it also true that you had defenses against their

12   claims, such as claiming that they over billed?

13   A.   I don't recall those counter defenses.

14   Q.   All right.  Well, I believe --

15   A.   I know they did not submit the claim, though.

16   Q.   OK.  I believe relevant documents are in evidence, and I

17   will not take time to read through those now, but I will ask

18   you this.

19        So the Harris Beach lawsuit was ultimately -- it ended

20   up becoming a fraudulent conveyance lawsuit filed afterwards,

21   correct; they accused you of having fraudulently transferred

22   Eber-Connecticut assets away from Eber Wine & Liquor to

23   Alexbay?

24   A.   Yes.

25   Q.   That was ultimately discovered by PBGC, correct, the

L9LsKLE5                          Cross - W. Eber

1    lawsuit, fraudulent conveyance lawsuit was discovered by PBGC,

2    correct?

3    A.  I believe so.  I'm not sure.

4    Q.  PBGC sued Eber Wine & Liquor to try to change the pension

5    plan termination date, correct?

6    A.  No, I don't believe that that's how that worked.  I'm not

7    certain, but that's what happened.

8    Q.  You were the one who was directing and supervising Eber

9    Wine & Liquor's response to the PBGC lawsuit about the planned

10   termination date, weren't you?

11   A.  I'm sorry?

12   Q.  Were you not the person at Eber Wine & Liquor who was

13   directing the litigation against PBGC in 2015, 2016?

14   A.  Yes, I was.

15   Q.  OK.  Is it fair to say that during that litigation, PBGC's

16   lawyers relied heavily on the filings that have been made by

17   Harris Beach in their fraudulent conveyance lawsuit?

18              MR. SANTORO:  Objection, your Honor.

19              THE COURT:  Sustained.

20   Q.  In the PBGC litigation, didn't your lawyers not -- let me

21   withdraw that.

22              So the Harris Beach lawsuit litigation, that was

23   ultimately settled where your father paid $400,000 to Harris

24   Beach, correct?

25   A.  Yes.

L9LsKLE5                          Cross - W. Eber

1   Q.  And as part of that settlement, Eber Wine & Liquor

2   dismissed their counterclaim for malpractice, correct?

3   A.  I'm not certain.

4   Q.  Isn't it correct that Eber Wine & Liquor gave a full

5   release to Harris Beach as part of that settlement?

6   A.  I'm not -- I'm not sure.

7           THE COURT:  It's a matter of record?

8           MR. BROOK:  It is, but I promise I'm trying to go

9   somewhere and failing.

10  Q.  So it's correct, though, that Harris Beach's claims against

11  Eber Wine & Liquor were not dismissed, they were instead bought

12  by your father?

13  A.  Yes, that's what they -- that's what they required.

14  Q.  Who's they?

15  A.  Harris Beach.

16  Q.  So you're saying that Harris Beach, who is conveniently not

17  around, is the one that said that they would not dismiss their

18  claims and instead they insisted that your father buy their

19  claims against the company of which he was president, is that

20  right?

21          MR. SANTORO:  Objection, your Honor.  That question

22  was just answered.

23          THE COURT:  No, I don't think so.

24          Overruled.  Answer the question, please.

25  A.  Yes, I believe so.

1   Q.  And, again, I don't suppose you have anything in writing

2   that would support that testimony, correct?

3   A.  No.  I don't know.  I don't know.

4   Q.  And do you consider the amount of $400,000 that he paid to

5   be nothing but a nuisance to your father, given his wealth?

6           MR. SANTORO:  Objection, your Honor.

7           THE COURT:  Sustained.

8   Q.  Isn't it true that your lawyers in the PBGC case told a

9   federal judge that the Harris Beach litigation was settled for

10  nuisance value and that the claims were dismissed with

11  prejudice on the merits?

12  A.  I don't know.

13  Q.  If a statement like that was made, that would be untrue,

14  correct?

15  A.  I don't understand.

16          MR. SANTORO:  Objection, your Honor.

17          THE COURT:  Overruled.

18  A.  Could you repeat it?  I don't understand what you're

19  saying.

20  Q.  Sure.  Why don't we put it up on the screen so we can see

21  what your lawyers wrote.  It is Exhibit 166 at page 11 of the

22  PDF.  It's before the bullet points.  That's good.

23          MR. SANTORO:  166?

24          MR. BROOK:  Yes, 166.  This is the reply brief filed

25  by Eber Wine & Liquor's lawyers under Wendy Eber's supervision

L9LsKLE5                          Cross - W. Eber

1    in the PBGC litigation.

2    A.   Sorry.  Can you repeat --

3    Q.   Do you see that your lawyer or lawyers represented to the

4    judge in the Western District of New York that the Harris Beach

5    litigation had settled for nuisance value and that the claims

6    were dismissed with prejudice on the merits?

7    A.   Does it say the lawyer who made the claims has recently

8    admitted what?

9         Can you --

10   Q.   You want to focus on the affidavit that your lawyer signed

11   as part of the settlement, is that right?

12        I'm asking about the sentence before that, Ms. Eber.

13   A.   So what are you exactly -- that the litigation recently

14   settled --

15   Q.   Do you see that statement that's highlighted there that I

16   just read?  Are you with me?

17   A.   Yes.

18   Q.   And that statement, based on your testimony about Harris

19   Beach insisting that Lester buy the claims, was not true

20   because their claims were not dismissed with prejudice on the

21   merits?

22   A.   I -- I'm sorry.  It is legal terms I don't understand.  I

23   don't understand this.  What I'm simply saying is that Harris

24   Beach did require him to settle that way, and that's what my

25   understanding is.

1  Q.  Do you know what the term nuisance value means or is that
2  too legalese for you?
3  A.  It was 400,000 that he settled for.
4  Q.  And isn't it true that after Lester made that $400,000
5  payment, you later became the executor of Lester's estate and
6  sought to collect on that claim from Eber Wine & Liquor?
7  A.  I believe there was a letter written outlining his claim,
8  yes.
9  Q.  And you demanded that -- and you're talking about a letter
10  that you wrote to yourself, right?
11  A.  To the estate in the surrogate's court, there was a
12  proceeding that the plaintiffs brought there, and so this was
13  part of that, that letter, yes.
14  Q.  This is a letter, if you recall -- and I can put it up if
15  you need your recollection refreshed -- that you wrote as
16  executor of Lester's estate to Eber Wine & Liquor's board,
17  which was you and you alone, correct?
18  A.  Yes, there was a letter, but this -- this was what Harris
19  Beach --
20  Q.  I only need the yes.
21       Isn't it correct that in that letter, you made a
22  demand of over $1.7 million from Eber Wine & Liquor because
23  Lester paid $400,000 to Harris Beach to buy Harris Beach's
24  claim?
25  A.  I don't recall the exact amount.  I mean, I'm not ...

```
 1   Q.  Let's put Exhibit 400 up, second page, and refresh your
 2   recollection.  Item three.
 3           Further.
 4           Do you see that last line there, the estate intends to
 5   demand immediate payment of the HB receivable in full, plus
 6   accrued interest therein, which amounts to $1,784,566 as of May
 7   last year?
 8   A.  It was the interest on it.  I thought it was on the 400,000
 9   and the interest on it.
10   Q.  Well, let's look at the last sentence of the first
11   paragraph.
12   A.  I know there is an attachment too to it that would have the
13   detail on it.
14   Q.  We don't need to go into the detail.  We're not offering
15   this into evidence.
16           Are you standing by that demand, do you think that
17   Lester deserves to get paid the full amount that Harris Beach
18   claimed plus interest at 9 to 15 percent?
19   A.  It was the 400,000 plus the interest, yes.
20   Q.  You think that 400,000 plus interest can be $1.7 million
21   and you're the CFO of a company?
22   A.  I'm sorry.  I'm confused.
23   Q.  Clearly.
24           Let's go on to another topic.
25           THE COURT:  Just so I'm sure I understand, is it your
```

1   position, Mr. Brook, that this was a way of an attempt to milk

2   assets out of the trust?

3           MR. BROOK:  Yes, your Honor.  In particular, it was a

4   way to ensure that if and when my clients ever learned about

5   what was happening, that Lester Eber would be able to have a

6   priority over any shareholders of Eber Wine & Liquor by having

7   so much debt interest in Eber Wine & Liquor, no money could

8   ever get to them.

9           In fact, we are seeing these arguments here in this

10  case with the pension and everything else.

11          THE COURT:  Thank you.

12  BY MR. BROOK:

13  Q.  All right.  Now, shortly after this lawsuit was filed in

14  February 2017, the same time when you acquired the Polebridge

15  Bowman 6 percent, you also issued 750 preferred voting shares

16  to Lester.  We talked about that earlier, correct?

17  A.  Correct.

18  Q.  And as part of that transaction, there were a number of

19  different documents that you and Lester both signed, correct?

20  A.  I don't recall all the documents.

21  Q.  Well, let's take a look at the ones that you produced in

22  discovery before your deposition.

23          Plaintiffs' Exhibit 43.  I can give you a hard copy if

24  you need to see it.

25          Does it refresh your recollection that there were a

L9LsKLE5                          Cross - W. Eber

1    number of different consents signed in relation to amending the

2    certificate of incorporation and issuing your father preferred

3    shares?

4           You can scroll through the pages, Ali.  Perhaps that

5    might help.  Just want to make sure we're on the same page that

6    this happened.

7    A.  Yes, it -- it -- yes, it did happen.  He --

8    Q.  OK.

9    A.  There was --

10   Q.  Again, you signed a number of documents, including at the

11   end -- if you can go to the last page, Ali -- you've got the

12   written consent of the stockholders of Eber Wine & Liquor

13   Corporation, that was something that Lester signed for himself

14   appointing you as a director, correct?

15   A.  Yes.  Yes, I know that --

16   Q.  OK.  Yes is all I need.

17          MR. BROOK:  If you could, Ali, just real quick zoom in

18   on the Bates number there at the bottom there to make sure we

19   see it.

20          All right.  We're in the early stages of the

21   production.  1173 is the Bates number.

22   Q.  Then after your first day of your deposition, I deposed you

23   again, and you had produced another written consent form,

24   Exhibit 115, this is one purportedly signed by you as of

25   February 14, 2017.

1          Do you remember discussing that with me?

2     A.  No.

3     Q.  Isn't it true that you testified that you don't know why

4     this document wasn't with the other ones?

5     A.  I don't remember.  I mean, I don't recall all the details

6     of every document.

7     Q.  Do you recall that -- you can take that down.

8          Then after discovery was closed, the plaintiffs filed

9     a motion for summary judgment claiming there was one document

10    missing, a shareholder consent form to amending the certificate

11    of incorporation of Eber Brothers Wine & Liquor, which had to

12    be signed by Eber Brothers & Co.

13         Does that ring any bells?

14    A.  I don't remember specifically.

15    Q.  Do you remember finding another document much later in

16    2019?

17    A.  There are so many documents in this case, I don't remember

18    all the documents.

19    Q.  OK.  Let's pull up Exhibit 270.  This is a letter to me

20    dated December 6, 2019, from Paul Keneally.  This was your lead

21    counsel before the Farrell Fritz firm became involved, right?

22    A.  Yes.

23    Q.  And he was also a lawyer who was involved in representing

24    Eber Wine & Liquor all the way back in 2012, correct?

25    A.  Under --

1              THE COURT:  Get on with it.

2              MR. BROOK:  Sorry.

3    Q.  So do you see on the next page that shareholder consent

4    that the plaintiffs had argued was necessary for the

5    transaction to be corporately valid?

6    A.  I'm not really familiar with all these documents, so I --

7    Q.  All right.  So would I be correct in assuming that you

8    cannot tell me today where you found this document after the

9    summary judgment motions were filed?

10   A.  I don't remember all the details on all these documents.

11   There is a lot of documents here.

12   Q.  And isn't it true that the plaintiffs requested that you

13   find some contemporaneous e-mails or the Word document that

14   produced it to try to show that this document was not something

15   that was a forgery backdated by more than two years?

16   A.  No.

17              What's the question?

18   Q.  So you never -- you referred earlier to the plaintiffs'

19   request and how you tried to respond to those requests,

20   correct?

21   A.  Yes, I -- I --

22   Q.  So you were aware of the fact that plaintiffs, after seeing

23   this mysterious find, requested that you and your lawyers go

24   back and find some e-mails showing when it was actually sent or

25   signed or drafted?

L9LsKLE5                          Cross - W. Eber

1          MR. SANTORO:  I would just object, your Honor, to the

2     characterizations and him asking her to acknowledge things like

3     mysterious and so forth.

4          THE COURT:  Overruled.

5     A.   I don't -- I don't remember all the details on every single

6     document.  There is a lot of documents here.  They are in

7     different places and, you know, I --

8     Q.   You did remember during your deposition that this document

9     and the other transaction documents were prepared by

10    Mr. Herbert for you, even though he's your personal lawyer and

11    not the company's lawyer, is that right?

12         MR. SANTORO:  Objection, your Honor.  There is three

13    or four questions in there.  I don't know which one he is

14    asking her to acknowledge to.

15         THE COURT:  Overruled.

16    Q.   Mr. Herbert, you have long insisted, is only yours and

17    Lester's personal lawyer, not the company's lawyer, correct?

18    A.   Yes.

19    Q.   Yet you also testified Mr. Herbert is the one who drafted

20    the various February 14 and 15, 2017, documents to allow Lester

21    to take a new class of voting preferred shares in Eber Wine &

22    Liquor, correct?

23    A.   I believe so, yes.

24    Q.   How does Mr. Herbert his documents to you when he wants you

25    to sign them?

1   A.  He -- you know, sometimes he e-mails them.  Sometimes he's

2   given me documents.  I don't know.

3   Q.  Doesn't he live in California?

4   A.  Now he does.

5   Q.  In 2017, he didn't?

6   A.  I don't think so.  I think -- I'm not sure when he moved

7   out there.  It was recently he moved out there.

8   Q.  He's never sent you documents by means like Pony Express or

9   something like that, is that right?

10  A.  Not that I recall.

11  Q.  OK.  Let's look at Exhibit 271 to see what your lawyer said

12  about this.  Page eight.

13          It says here, paragraph one, Mr. Herbert has as yet

14  been unable to locate the Word version of the shareholder

15  consent, or any e-mail transmitting it to Ms. Eber in 2017, but

16  will continue to look for them.  If they are found, we will

17  provide them to you.  The shareholder consent form may have

18  been copied over, and the document may have been given to

19  Ms. Eber other than by e-mail.

20          All right.  You can take that down.

21          We'll go to the last topic.

22          THE COURT:  Last what?

23          MR. BROOK:  Last topic.  Actually, maybe on the same

24  exact page, if we need to go to it, Ali.

25  BY MR. BROOK:

1   Q.  When this lawsuit got started and well into discovery, you

2   acknowledge that Eber Wine & Liquor actually had two different

3   shareholders, correct; there was both Eber Brothers & Co. and

4   also the Allen Eber trust had some non-voting shares, is that

5   right?

6   A.  I'm not really certain.  I know there is a corporate chart.

7   If you have the chart, it's kind of ...

8          MR. BROOK:  Sure.  Let's look at the chart that you

9   produced in discovery before summary judgment.

10          Plaintiffs' Exhibit 147.  It looks like it is at the

11   last page.

12          If you can, zoom in on the bottom half of that,

13   please, Ali, below just everything below the Eber Brothers &

14   Co. Inc. dormant.

15          MS. KRAL:  Right here?

16          MR. BROOK:  There.

17   BY MR. BROOK:

18   Q.  All right.  So actually, if we don't count Lester's voting

19   preferred shares issued in 2017, this shows that Eber Brothers

20   & Co. Inc., had 72.7 -- let me withdraw that.

21          These numbers are actually now confusing me.  You

22   don't actually put a percentage on this on the right.

23          This chart on the right shows, without a percentage,

24   that there are shares that were held in the name of the Allen

25   Eber trust, correct?

A.  Correct.

Q.  And that was 200 non-voting preferred and 379 non-voting

common, correct?

A.  Correct.

Q.  And since the end of discovery, you have decided to write

those shares off the books of the company, correct?

A.  No.  We -- they never came up on the -- we thought that

they got retired.  This was something that was kind of handed

to me, and I didn't -- we couldn't find these shares.  And then

when we went to the Canandaigua accounting for the trust, they

weren't there either.  So it was kind of one -- it was

confusing because we thought that they had been retired.

Q.  But you saw no corporate documents saying these shares had

been redeemed or retired, correct?

A.  There was, like, a stock power or something, either

something there that --

Q.  Well, you did have a stock certificate in your files,

Plaintiffs' Exhibit 139.

           MR. BROOK:  Put it up.

           MS. KRAL:  I don't have it.

           MR. BROOK:  You don't have it?

           MS. KRAL:  Hold on.  I'll get it.

           MR. BROOK:  May I approach, your Honor, the witness?

           It's on the exhibit list, I'm sure.

           MR. MULRY:  We just don't have a copy.

1  BY MR. BROOK:

2  Q.  Well, you recognize that as a copy of the certificate

3  issued to the trust that was produced by you and your companies

4  in this litigation, correct?

5            THE COURT:  That's not what's on the screen, is it?

6            MR. BROOK:  No.  I'm sorry, your Honor, for some

7  reason the electronic version of this is not available at the

8  moment.  I have an extra hard copy, if your Honor would like.

9            THE COURT:  That would be a good idea if you would

10  like me to look at it.

11            MR. BROOK:  It's right here.

12            MR. SANTORO:  If you wouldn't mind, could I take a

13  quick peak before you hand it up?  Thank you.

14            (Counsel confer)

15            MS. KRAL:  Your Honor, may I approach?

16            Thank you.

17  BY MR. BROOK:

18  Q.  This is something that was produced from your company's

19  files, correct?

20  A.  Apparently it was, yes.

21  Q.  And nothing on this says that the stock has been canceled

22  or redeemed or anything like that, correct?

23  A.  Nothing on this piece of paper does, but I thought there

24  was some kind of stock power.  It never showed up on

25  Canandaigua's bank -- on their statement of the trust of Allen

1    Eber when that estate was settled.

2    Q.  So is it your belief that if Canandaigua misplaced the

3    stock certificates, that gives you cause to just erase the

4    stock from the company's books?

5    A.  I don't agree with that statement.  I don't know if -- I

6    don't know if they existed.

7    Q.  You don't know what happened to them period, right?

8    A.  Yeah, we couldn't figure --

9    Q.  But you just erased them anyway?

10   A.  No.  I wasn't certain of what was the situation.  I didn't

11   know.  I don't know.

12   Q.  Isn't it true that when the previous bank trustee, M&T

13   Bank, provided its accounting, it did include these shares of

14   Eber Wine & Liquor stock held by the trust on its account?

15   A.  Right.  And then I think in 2006, they may have been

16   retired, is what my understanding was.

17              THE COURT:  Where did you get this understanding?

18              THE WITNESS:  I believe I spoke with the lawyer and we

19   couldn't -- when it came to M&T's, or Canandaigua, they didn't

20   have it.

21              THE COURT:  What lawyer did you speak to about this?

22              THE WITNESS:  John Herbert.

23              So we weren't certain as to what was going on with

24   these actual --

25              THE COURT:  So you weren't certain and therefore you

1    scrubbed them off the books of the company?

2              THE WITNESS:  I thought they had been retired is

3    what -- I thought they had been retired.

4              MR. BROOK:  No further questions, your Honor.

5              THE COURT:  All right.  We'll take a short break, and

6    then I hope we're going to wrap this up quickly.

7              (Recess)

8              MR. BROOK:  One last thing, your Honor.  I wanted to

9    do this before sitting down officially.

10             I would like to offer Exhibits 270 and 271 into

11   evidence.  Those were the ones we were looking at involving the

12   missing document, but I'm offering those only conditioned on

13   the court accepting the underlying document in evidence.  We

14   made an authenticity objection to that.

15             THE COURT:  Remind me what the underlying...

16             MR. BROOK:  I can't recall the exhibit.  It was

17   compiled with a bunch of other documents.

18             Do you know what the defense exhibit is?

19             THE COURT:  You'll file something making this clear --

20             MR. BROOK:  Yes.

21             THE COURT:  -- and subject to that filing, they are

22   received.

23             (Plaintiff's Exhibits 270 and 271 received in

24   evidence)

25             All right.  Redirect.

1    REDIRECT EXAMINATION

2    BY MR. SANTORO:

3    Q.  How are you doing, Wendy?

4    A.  I'm good.

5    Q.  All right.  On the issue of the shares that we were just

6    talking about towards the end of your direct testimony, do you

7    recall that Canandaigua National Bank filed an accounting,

8    right?

9    A.  Yes.

10          MR. SANTORO:  Samantha, can we pull up Defendants'

11   Exhibit OOOO.  If we can go to schedule A of that account.

12          THE COURT:  You're going to tell me it's not listed

13   there, right?

14          MR. SANTORO:  I'm sorry, Judge?

15          THE COURT:  You're going to tell me it's not listed

16   there, the stock?

17          MR. SANTORO:  It's not listed there or in the order

18   approving the account, which is Exhibit TTTT.

19          THE COURT:  Fine.  Next proposition.

20          MR. SANTORO:  Very good.

21   BY MR. SANTORO:

22   Q.  Wendy, there was a lot of discussion about your

23   communications with Bob Lowenthal and Canandaigua National

24   Bank, right?

25   A.  Yes.

1    Q.  Now, the line of credit -- well, withdrawn.

2             The loan that Eber-Connecticut had with Canandaigua

3    National Bank before 2012, was there a guarantor on that loan?

4    A.  Yes.

5    Q.  Who was the guarantor?

6    A.  My father.

7    Q.  Prior to the foreclosure in 2012, did anyone put up any

8    collateral in connection with that loan?

9    A.  Yes.

10   Q.  Who did so?

11   A.  My father.

12   Q.  What did he put up in the way of collateral?

13   A.  First, he put up a CD for $500,000, and then when the

14   company did worse, he put up more collateral, I think, between

15   120 and $150,000.

16   Q.  This was all before the foreclosure in 2012, right?

17   A.  Yeah, I believe so.

18   Q.  OK.  Now, when did Eber Wine & Liquor secure its credit

19   facility with Wells Fargo?

20   A.  I think it was 2006.

21   Q.  OK.  What month?

22   A.  Was it March, something like that?  March.

23   Q.  And when were the -- what were the dates of the promissory

24   notes we were looking at earlier?

25   A.  I think March.

1    Q.  Were those promissory notes signed at the same time as the

2    credit facility with Wells Fargo?

3              MR. BROOK:  Objection.

4              THE COURT:  What's the objection?

5              MR. BROOK:  Lack of personal knowledge as to when they

6    were actually signed.  We can say when they were dated, but...

7              THE COURT:  Sustained.

8    A.  I think it was with the same time.

9              THE COURT:  Answer is stricken.

10             MR. SANTORO:  There is a sustained objection.

11             THE WITNESS:  Oh, sorry.

12   BY MR. SANTORO:

13   Q.  Now, there was some questions about IRA contributions and

14   matching IRA contributions for Lester's IRA, right, the 401(k),

15   was it?

16   A.  Yes.

17   Q.  OK.  And what happened to Lester's retirement accounts?

18   A.  They -- he drained almost all of his retirement accounts to

19   make loans to the company.  He gave up his pension plan

20   entirely, and then he paid various liabilities of the company

21   with his 401(k) and his IRA --

22             MR. BROOK:  Objection, nonresponsive.

23             THE COURT:  Stricken.

24             Let's start again, if you want to get into this and

25   establish personal knowledge.

1          THE WITNESS:  I do have personal knowledge.

2          THE COURT:  I want to hear it.

3   Q.  Wendy, you're the executor of your father's estate,

4   correct?

5   A.  I am.

6   Q.  And in the course of discharging your obligations as

7   executor, have you been through your father's records?

8   A.  I have.

9   Q.  As part of going through your father's records, have you

10  reviewed his various retirement accounts?

11  A.  I --

12  Q.  And can you tell me what happened to those retirement

13  accounts?

14  A.  Yes.

15          THE COURT:  Sustained.

16          Look, you can't do it this way, counselor.  You know

17  it.  If there are records that show various things, the records

18  are the best evidence.  I will not find persuasive attempts to

19  put the rosiest face on whatever the witness thinks she may

20  recall.

21          THE WITNESS:  Your Honor --

22          MR. SANTORO:  Don't answer.

23  Q.  So you were asked about Eber-Metro's $14 million in

24  goodwill, right?

25  A.  Yes.

1   Q.  You authorized it to be written off the books?

2   A.  Yes.

3   Q.  And can you tell me at that time what the actual value of

4   that goodwill was?

5   A.  Zero.

6   Q.  OK.  What leads you to that belief?

7   A.  The companies were insolvent.  There was no value there.

8   Q.  Then there was some testimony about receivables that were

9   transferred into Segway LLC, right?

10  A.  Yes.

11  Q.  And can you tell me why those receivables were received

12  into Segway LLC?

13  A.  Yes.

14  Q.  Can you please tell me?

15  A.  Yes.  I paid 100 -- approximately 150 or 160,000 towards

16  the Teamsters withdrawal liability, and because of that, Eber

17  Brothers assigned me these receivables.

18  Q.  This payment that you made, what was the source of that

19  $160,000 that you paid?

20  A.  Personal funds.

21  Q.  Now, finally there was some discussions about the right of

22  first refusal that you received when Eber-Metro sold six

23  percent of its interest in Connecticut to Polebridge Bowman.

24          Can you give me a complete answer as to your

25  understanding of why you received that right of first refusal?

1    A.  Yes, because originally it was supposed to be -- it was

2    originally supposed to be six percent that was supposed to be

3    sold to me.  It was unable to be sold to me based on Lester

4    having discussions with his attorney and, therefore, it went to

5    Glenn as compensation.  And, therefore, I was able to get the

6    right of first refusal.

7               THE COURT:  You testified about this earlier.  You've

8    said the first reason it went to Glenn was to get it out of the

9    consolidated group.

10              THE WITNESS:  Yes.

11              THE COURT:  Then you added something about

12   compensating Glenn, and this time you didn't mention getting it

13   out of the consolidated group.

14              THE WITNESS:  Yes.  Yes, it was.  Getting it out of

15   the consolidated group was part of it as well, yes.

16   BY MR. SANTORO:

17   Q.  How, to your understanding, did it get it out of the

18   consolidated group?

19   A.  Because if the company was out of the control group, it

20   needed to be under 80 percent.  And this was part of that, to

21   get it under the 80 percent.

22   Q.  So what was given to the PBGC in consideration of the

23   release to the Eber entities?

24   A.  We paid them $2 million and my father gave up his entire --

25   my father and my mother gave up their entire pension benefit,

1   which was approximately one point --

2               MR. BROOK:  Objection to the amount as being an

3   actuary.  She is about to testify to an amount she says this

4   pension give-up was worth based upon actuary opinion, which is

5   expert testimony she is not qualified to give.

6               THE COURT:  I'll let you cross about the $2 million.

7               MR. BROOK:  The two million there is no objection to.

8   It is what she is about to say.

9               THE COURT:  Two million in cash?

10              MR. BROOK:  Two million in cash.  And she is about to

11  say how much his pension was worth based on actuary --

12              THE WITNESS:  It is joint and several --

13              THE COURT:  Are you seeking to elicit that, counsel?

14              MR. SANTORO:  Yes, your Honor.  Yes.

15              THE COURT:  Well, not from this witness.

16  BY MR. SANTORO:

17  Q.  OK.  Without telling me the amount, can you tell me what,

18  in addition to the cash amount of two million, was given to the

19  PBGC in consideration of a release of its claims to the Eber

20  entities?

21  A.  It was the joint and several benefit of my father and my

22  mother from 60 years of working for the Eber Brothers Company,

23  that my father worked for the company.

24  Q.  And can you tell me approximately how much in the way of

25  legal fees were spent fighting with the PBGC and negotiating

1     with them?

2     A.  It's hundreds and hundreds of thousands of dollars.  I

3     think it's between, like, five and 800,000, or something to

4     that neighborhood.

5     Q.  OK.

6              THE COURT:  Do you know what proportion of that was

7     spent out of company funds?

8              THE WITNESS:  It's my father.

9              THE COURT:  Pardon me?

10             THE WITNESS:  My father.  My father's personal

11    finances.

12             THE COURT:  You're telling me that all the money spent

13    on the PBGC litigation was paid personally by your father, is

14    that what you're telling me?

15             THE WITNESS:  Close to all of it, I would assume, yes.

16    Yes.

17             THE COURT:  Close to all of it, you would assume.

18             Do you know?

19             THE WITNESS:  Yes, yes.  He paid -- he paid, I would

20    say, almost all of it.  I don't know where any else of it would

21    have come from other than him.

22             THE COURT:  So when you say he paid almost of all of

23    it, you are saying that on the basis that you don't know

24    anything else, any other place it came from?

25             THE WITNESS:  There was no other money.  There was no

L9LsKLE5                        Redirect - W. Eber

1   other money to fund.

2           THE COURT:  Did you ever see checks?

3           THE WITNESS:  Yes, yes.

4           THE COURT:  Well, let's just say, counsel, you've only

5   had five years to prepare for this case, and if you can't prove

6   that in some other way, the likelihood that the court is going

7   to credit it is not overwhelming.

8   BY MR. SANTORO:

9   Q.  Wendy, as part of your declaration which contains your

10  direct testimony, you've offered into evidence checks that

11  reflect payments to lawyers and other professionals in

12  connection with the PBGC liability, correct?

13  A.  Yes.

14          MR. SANTORO:  OK.  So we will refer to the evidence

15  therein, your Honor.

16  Q.  You've added it up on a demonstrative exhibit for the court

17  as well, right?

18  A.  I have.

19          MR. SANTORO:  OK.  Thank you.

20          Thank you, Wendy.

21          Thank you, your Honor.

22          THE COURT:  Pardon me?

23          MR. SANTORO:  My redirect is finished.

24          Thank you, your Honor.

25          THE COURT:  Thank you.

1          MR. BROOK:  Very brief recross.

2    RECROSS EXAMINATION

3    BY MR. BROOK:

4    Q.  Let's go with the last thing first.

5          Could you please put you up Exhibit 160.  Let's just

6    pick page 76, in the middle of the legal fees section.

7          Do you see there are a number of different line items

8    here showing payments to Groom Law Group on Eber Wine &

9    Liquor's general ledger?

10   A.  Yes, I do.

11   Q.  Groom Law Group, they weren't representing you in anything

12   other than the dispute with PBGC, were they?

13   A.  It was PBGC pension related, yes.

14   Q.  OK.  And is it correct -- and it's correct that there were

15   no electronic records for Eber Wine & Liquor payments made

16   after May 2012, correct?

17   A.  I'm sorry?

18   Q.  After May 2012, the goal was to make Eber Wine & Liquor not

19   make payments to anyone else, right?

20          It was supposed to be a dead company, isn't that

21   right?

22   A.  I'm -- I'm not certain.  Lester put the money into Eber

23   Wine & Liquor for these to be paid.

24   Q.  So you're saying that this was only paid because Lester --

25   A.  Yes.

1    Q.   -- loaned the money?

2            So he was loaning money to pay the litigation?

3    A.   Yes.

4    Q.   To fight the pension that the money was also loaned to

5    fund, is that right?

6    A.   Yes.  He was loaning money in at this time, yes.

7    Q.   All right.  Now, you said something about, you know, paying

8    $160,000 of your own personal funds to the Teamsters, is that

9    right?

10   A.   Yes.

11   Q.   Now, isn't it true that as a general matter, you have

12   not -- the parties have agreed that we wouldn't get into

13   discovery about your personal finances in detail until after a

14   decision was made on punitive damages, correct?

15   A.   I don't know.

16           MR. SANTORO:  I object, your Honor.  I'm not sure --

17           THE COURT:  What are you objecting to?

18           MR. SANTORO:  I'm not sure what counsel is referring

19   to in terms of an agreement among counsel.

20           MR. BROOK:  He's new in the case, your Honor.

21           During discovery, there were objections to requests

22   for Lester and Wendy's personal net worth, which is relative to

23   determining punitive damages under New York law.  The parties

24   agreed at the time we were expecting a jury trial to defer

25   discovery until after there was a determination, which is

1   consistent with a number of case law presence that we saw.

2            But now I would like to ask some questions, because

3   Ms. Eber is advising that she had $160,000 in personal funds

4   just to pay when that was her entire salary for a year.

5            THE COURT:  OK.

6   BY MR. BROOK:

7   Q.  So is it fair to say, Ms. Eber, that thanks to your

8   husband, you do not have to spend any of your income on your

9   personal living expenses?

10           MR. SANTORO:  Objection, your Honor.

11           THE COURT:  Overruled.

12  A.  Can you repeat the question?

13  Q.  Yes.

14           Isn't it true that thanks to your husband and his

15  wealth, you are not required to spend any of the money that you

16  earn on your personal living expenses?

17  A.  No, that's not true.

18  Q.  Don't you live in a $7 million apartment on the Upper West

19  Side?

20  A.  No, that's not true.

21           THE COURT:  Let's not do this now.

22           MR. BROOK:  OK.

23  Q.  And is it correct, though, that you have not produced any

24  documents to us showing that you ever personally made a

25  $160,000 payment to the Teamsters?

1   A.  I -- there was a payment to the Teamsters.  So, you know,

2   we have got to go back --

3   Q.  As you sit here today, you cannot say that this is

4   something that you have given to your lawyers or to the

5   plaintiffs, correct?

6   A.  It was done in one payment with my father and my payment

7   together.

8              MR. BROOK:  OK.  Nothing further.

9              THE COURT:  OK.  Thank you.

10             Mr. Santoro?

11             All right.  Ms. Eber, you're excused.

12             (Witness excused)

13             Tell me what more there is on the defense case,

14  Mr. Mulry.

15             MR. MULRY:  Your Honor, tomorrow the first witness is

16  Michael Gallagher, who is an actuary for the company.  You have

17  heard some testimony about him today.  He will be appearing

18  remotely, via Microsoft teams, so he would be the first

19  witness.  We have spoken with Mr. Mohan to do a trial run at

20  9:15 to make sure that technologically everything is set.  We

21  expect him to be a very short witness.

22             And following him would be Frank Torchio, who is the

23  defendants' expert.  Just depending on what the cross is for

24  that, I wouldn't know that Mr. Brook can answer that, that

25  would say how much of the day we would need.

1          THE COURT:  That's it?

2          MR. MULRY:  Yes.  That's correct.

3          THE COURT:  OK.  So let me give you a heads up in a

4     couple of ways.

5          Depending on how much time is available tomorrow, I

6     would hear closing argument of somewhere not less than 20, no

7     more than 30 minutes on either side.  I say not less than.  If

8     I run out of time, I run out of time.  It could be less than,

9     but I'm thinking 20 to 30.

10         Secondly, because of the volume of paper, I will give

11    you time to submit post-trial briefs.  But I'm going to ask you

12    to do it on a short timeframe, because my general practice in

13    nonjury cases is to try to decide them right at the end of the

14    testimony, while everything is fresh in my mind.  And every day

15    that goes by makes it harder to bring to mind as much detail as

16    I can immediately after.  So I'll try to make it relatively

17    short.

18         Now, the third point I want to make is that, as I

19    remember making clear to whoever the first lawyers in this case

20    were all those years ago, and as I related to you on the first

21    day last week, I put the idea that this litigation would go

22    forward in this family context was something approaching insane

23    and highly destructive and that it should have been settled.

24    And having now heard three full days of testimony and all the

25    testimony of principals who are left to give testimony and have

anything to say, all I can tell you is that I understated my

view at the beginning.  This case cries out to be resolved, and

it can't be resolved if everybody thinks that when the Lord

came down from Mount Ararat, they won.  It is just wrong.  It's

got to be someplace in between.  And I think there is plenty of

reason for each side to understand that if the case goes to a

decision, it might be very much worse for their side than they

imagine now.  And that goes for both of you.

        I just can't imagine that there are not enough assets

and there isn't enough money around to make everybody not

whole, not happy, but less unhappy than they are or may well

wind up being.  And I suggest to you that in whatever the time

interval is between a quarter to four this afternoon and when

you file your post-trial submissions, you spend most of your

time trying to get this resolved.

        And if it would be useful for me to try to find a

magistrate judge who could help you either now or at some point

along the road, I will try.  As I'm sure you are assuming, the

pandemic has put a severe strain on the resources here.  The

magistrate judges are very busy with the criminal docket, but

if I can get one, I will, because I think it is important that

if this is going to be resolved, it be resolved.

        The last thing I'll say is, I was really surprised by

a lot of things I heard today and saw here.  OK.  I will see

you all in the morning.

1          MR. MULRY:  Your Honor, on that last point, I don't

2     know if you want a response.

3          We consent to going to a magistrate for settlement.

4     We have proposed that as well as private mediation.  If your

5     Honor is willing to do that and plaintiff are willing to do

6     that, we do consent with that.

7          MR. BROOK:  We'll try anything.  We did meet and, your

8     Honor, I believe, just to correct one thing, your Honor said on

9     the first day, we actually -- your Honor, I believe, had some

10    sort of, like, a dog injury or something.

11         We were going to mediate in front of your Honor.  We

12    ended up going in front of Judge Parker.  So we did try

13    mediation with her once, maybe twice even.  And I have

14    submitted some suggestions that have not been responded to.

15         THE COURT:  The dog incident was two years after this

16    case started.  One year.

17         MR. BROOK:  It was in 2017, if I recall correctly.

18         THE COURT:  April 30 at 10:30 in the morning.  Not

19    ever to be forgotten.

20         MR. BROOK:  That sounds awful.  Incidentally the date

21    of the PBGC court.  Anyway --

22         THE COURT:  All I can tell you is stay away from

23    pit bulls.

24         MR. BROOK:  We are certainly open to it.  We will give

25    it a try.  I just would hesitate because I'm only one person, I

1    can't be in two different places at once.

2           I would --

3           THE COURT:  Look, I understand that.

4           MR. BROOK:  If we are anywhere within a range of,

5    like, 90 percent -- like right now it's at more than ten to one

6    difference.  So the only hesitation I have is just if I spend

7    two full days trying to work on a settlement, I won't be able

8    to do as good a job on the briefing that is required for your

9    Honor.

10          I am certainly open to it.  I would love to give it a

11   try.  I do agree, this case is best resolved settled rather

12   than having to deal with an adverse process of trying to pull

13   apart a company.  That's not something that me or my clients

14   are looking forward to at all.  We planned for it, of course.

15   But there is no way that that goes smoothly and isn't expensive

16   with more lawyers than just me for possibly years to come.

17          THE COURT:  Believe me, I understand that.  I do

18   understand that.  Both I and people in my firm when I was in

19   practice had cases that were some resemblance to this, and

20   every single one was a disaster in all ways except for the

21   firm's income statement.  So I know what's involved and it's

22   not good.  And at the end of the day, people need to live with

23   each other too.  Family is family.

24          (Adjourned to Wednesday, September 22, 2021, at

25   9:30 a.m.)

INDEX OF EXAMINATION

Examination of:                                    Page

 WENDY EBER

Direct By Mr. Santoro . . . . . . . . . . . 227

Cross By Mr. Brook . . . . . . . . . . . . . 237

Redirect By Mr. Santoro . . . . . . . . . . 369

Recross By Mr. Brook . . . . . . . . . . . . 378

PLAINTIFF EXHIBITS

Exhibit No.                                    Received

 25    . . . . . . . . . . . . . . . . . . 261

 270 and 271   . . . . . . . . . . . . . . 368

DEFENDANT EXHIBITS

Exhibit No.                                    Received

 ZA    . . . . . . . . . . . . . . . . . . 229

 A through XXXX, Y1 through Y33, Y Hayes . . . 230

         1 through Y Hayes 2, Y Stein 1

         and Y Stein 2