L9m2Kle1

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    DANIEL KLEEBERG, et al.,

4                  Plaintiffs,

5           v.                            16 Civ. 9517 (LAK)

6    WENDY EBER, et al.,

7                  Defendants.

8    ------------------------------x        Trial

9                                          New York, N.Y.
                                           September 22, 2021
10                                         9:30 a.m.

11   Before:

12                        HON. LEWIS A. KAPLAN,

13                                         District Judge

14

15                        APPEARANCES

16   BROOK & ASSOCIATES, PLLC
          Attorneys for Plaintiffs
17   BY:  BRIAN C. BROOK

18   FARRELL FRITZ, P.C.
          Attorneys for Defendants
19   BY:  KEVIN P. MULRY
          FRANK T. SANTORO
20        -and-
     HERBERT LAW
21        Attorneys for Defendants
     BY:  JOHN HERBERT
22

23

24   Also Present:
     Ali L. Kral, Paralegal
25   Samantha Skoriak, Paralegal

L9m2Kle1                    Gallagher – Direct

1              (Trial resumed)

2              THE COURT:  Good morning, everyone.

3              COUNSEL:  Good morning, your Honor.

4              THE COURT:  I have turned my camera off because there

5     isn't any particular reason for the witness to be distracted by

6     looking at me.

7              Let's call your next witness, counsel.

8              MR. MULRY:  Good morning, your Honor.  The defendants

9     call Michael Gallagher.

10     MICHAEL A. GALLAGHER,

11         called as a witness by the defendants,

12         having been duly sworn, testified as follows:

13             THE COURT:  Let's proceed.

14     DIRECT EXAMINATION

15     BY MR. MULRY:

16     Q.  Good morning, Mr. Gallagher.

17     A.  Good morning.

18     Q.  My name is Kevin Mulry.  I represent the defendants in this

19     case.

20              Did you work with me to prepare a declaration that

21     constitutes your direct testimony in this case?

22     A.  Yes, I did.

23     Q.  I will ask that we show Defendants' Exhibit ZB, the

24     declaration of Michael A. Gallagher.

25              Mr. Gallagher, can you see what's on the screen right

L9m2Kle1                        Gallagher - Cross

1   now?

2   A.  Yes, I can.

3   Q.  Is that your declaration in this case, Defendant's Exhibit

4   ZB?

5   A.  Yes.  Based on the first page, it looks like mine.

6   Q.  Okay.  And did you review that declaration carefully?

7   A.  I did.

8   Q.  And if we go to the last page which is on the screen now,

9   did you sign that declaration under penalty of perjury?

10  A.  Yes, I did.

11  Q.  Do you reaffirm your direct testimony here today?

12  A.  I do.

13          MR. MULRY:  Your Honor, defendants offer the direct

14  testimony of Michael A. Gallagher, which his declaration is

15  Exhibit ZB.

16          MR. BROOK:  Plaintiffs object on the grounds stated in

17  the motion *in limine* filed to exclude the testimony.

18          THE COURT:  I will receive it subject to that motion.

19  It may or may not stay in the record.

20          (Defendant's Exhibit ZB received in evidence)

21          MR. MULRY:  Thank you, Mr. Gallagher.

22          THE COURT:  Cross-examination.  You may proceed.

23  CROSS-EXAMINATION

24  BY MR. BROOK:

25  Q.  Good morning, Mr. Gallagher.  My name is Brian Brook, and I

L9m2Kle1                    Gallagher - Cross

1   am the attorney representing Daniel Kleeberg, Lisa Stein, and

2   Audrey Hays in this case.  You and I have never spoken before,

3   correct?

4   A.  Correct.

5   Q.  And you and I have never corresponded in any way before,

6   correct?

7   A.  Correct.

8   Q.  And just since I don't know, do you know any of my clients,

9   or do any of their names sound familiar to you?

10  A.  You mean the ones -- no, not -- no, other than I believe I

11  have seen their name in some of the papers.

12  Q.  Now, when did you start working on the Eber Brothers

13  pension plan?

14  A.  That was in 2007.

15  Q.  Okay.  So it was right when -- is it correct that at the

16  time Eber Brothers' business was going through some changes?

17  Did you understand that?

18  A.  Yeah, we were not privy to what was going on directly in

19  the business.  Our work was limited to calculating the minimum

20  funding for the retirement plan.  So the details of what was

21  happening in the business we were not really aware of.

22  Q.  And who did you primarily interact with at Eber Brothers

23  about the pension funding?

24  A.  So that would have been Mark Shevlin.

25  Q.  So human resources manager?

L9m2Kle1                        Gallagher - Cross

1    A.  Yeah, he was either human resource or finance.

2    Q.  And after Mark Shevlin left the company -- actually, do you

3    recall approximately how long it was that you worked with Mark

4    Shevlin after 2007?

5    A.  I don't.  I could look in the file, but . . .

6    Q.  No need to do that.

7           Who was the person you interacted with after Mark

8    Shevlin?

9    A.  I believe that was Wendy Eber.

10   Q.  And what was your understanding as to what her role was at

11   Eber Brothers Wine & Liquor?

12   A.  So, yeah, I knew she was the daughter of Lester, so there

13   was some ownership involved, either directly or indirectly, and

14   she was just also our contact for the calculations that we did

15   on an annual basis.

16   Q.  And based on your conversations with either Mr. Shevlin or

17   Ms. Eber, was it your understanding that Eber Wine & Liquor

18   intended to continue to pay the minimum amounts required under

19   the plan if it could?

20   A.  Yes, the minimum amount was the contribution that we

21   calculated, and that was the intention as far as I understood

22   of what they were going to pay annually.

23   Q.  Did they ever tell you that they intended to close the

24   business and terminate the plan?

25   A.  Not during the normal process of the work that we did, but

1    at one point when we found out that they were looking at

2    terminating and going to the PBGC, so up until that point in

3    time we didn't know anything about a termination.

4    Q.   Approximately when was it that you heard about the event

5    that you just described of going to the PBGC about a

6    termination?

7    A.   So it was -- I would say we did a waiver of funding in

8    2009, and so it was a couple of years after that where they

9    were unable to make the payment, and so they had to either

10   apply for a distress termination with PBGC or work directly

11   with them.  I don't have the date right in front of me.

12   Q.   Is it correct that you stopped working on the Eber Brothers

13   pension plan in or around 2014?

14   A.   Yes.

15   Q.   And is it your understanding that at that point PBGC took

16   over the administration of the plan?

17   A.   We knew that they were working with PBGC.  I don't know at

18   that point if we were aware that they were going to take it

19   over.

20   Q.   Okay.  Why did you stop working on the plan?

21   A.   At the time they were not funding the plan, and they turned

22   over the process of the termination to their -- a law firm.  I

23   believe it was Groom Law Firm, and so they took over basically

24   the handling of the plan going forward.

25   Q.   And do you recall how long was it that Eber Wine & Liquor

L9m2Kle1                        Gallagher - Cross

1   did continue to fund the plan?  Or let me say that a different

2   way.  At what time was the last funding payment made by Eber

3   Wine & Liquor to the pension plan to the best of your

4   recollection?

5   A.  Yeah, it was sometime after 2009.  Sorry, it was -- I know

6   they -- they were not able to meet the minimum funding, and we

7   were carrying a funding deficiency in our actuary reports, so I

8   could look back and find out the date.

9   Q.  And at some point after 2014 you were contacted by Wendy

10  Eber, is that right, about updating your calculations?

11  A.  Yes.

12  Q.  When was that?

13  A.  So it was -- the actual date I don't know, but we sent a

14  letter to her in December of '18, so it was probably sometime

15  in early December of 2018.

16  Q.  Did you speak to anyone besides Wendy Eber about that

17  letter?

18  A.  Not that I recollect.

19  Q.  To your knowledge, was that letter ever discussed either by

20  you, or by someone you work with, with any lawyers for Wendy

21  Eber?

22  A.  I sent it to Wendy.  I don't know if it was discussed

23  between her and the -- it would have been, as far as I know,

24  the Groom Law Firm.

25  Q.  Did you ever have any interactions with a law firm called

Underberg & Kessler?

A.   We -- in relation to this particular matter?

Q.   Yes.

A.   Yeah, okay, so I believe that they were the -- worked on
the pension plan document, but -- so, you know, we used the
document that Eber had.

Q.   But what pension plan document are you referring to?  And
one thing I should have noted is I don't know much about
actuarial work or pension plans, so please explain it to me
like you are explaining to someone who has no idea what you do
for a living.

A.   Okay.  Sure.

         So there is a legal document that outlines all of the
provisions of how the plan will operate and that has to be
maintained in accordance with IRS rules, and that's not
something that we would normally do because it's a legal
document.  So I believe Underberg & Kessler handled their plan
documents.  Again, I would have to look back and just take a
look and see what the status was with them.  But we didn't work
with them on any of these issues that I recollect.

Q.   So is it correct that that plan document prepared by
Underberg & Kessler has some effect on how you perform your
calculations?

A.   Yes.  The plan document does determine how we calculate the
benefits.

L9m2Kle1                    Gallagher - Cross

1   Q.  Sticking with 2018, were you paid for preparing that

2   opinion letter?

3   A.  Yes.

4   Q.  How much were you paid?

5   A.  I would have to look.

6   Q.  Ballpark?

7   A.  It wasn't a large amount.

8   Q.  Do you remember the hourly rate?

9   A.  Yeah, it was probably $250 an hour.

10  Q.  And are you being paid for your testimony here today?

11  A.  I hope so.

12  Q.  And is it correct you were also paid for working with

13  defense counsel to prepare your declaration that you looked at

14  earlier today?

15  A.  I haven't billed for that, but that was my intention.

16  Q.  Did you have to go through -- I'm not . . .

17          It's correct that it takes a significant amount of

18  training and experience to perform actuarial calculations, is

19  it not?

20  A.  It does.

21  Q.  And isn't it true that part of what your job entails is

22  making educated guesses about when people will die?

23  A.  Indirectly, yes.  I mean, we use prepublished mortality

24  tables, some of them required by the IRS and some are

25  discretionary.

L9m2Kle1                    Gallagher - Cross

Q.  But isn't it true that those, at the end of the day, are

simply estimates about what future funding requirements might

be based on those tables, and therefore the actual amount of

funding might end up being significantly different?

A.  So the -- yeah, I'm just trying to think of the best way to

answer that.

        For example, if you pay somebody a lump-sum benefit,

the mortality table that you are required to use is the table

that is used to pay them their benefit.  So whether or not that

properly reflects the total amount of benefit paid, it is the

number under IRS rules.

        For funding purposes, you calculate a contribution and

if the contribution is not sufficient in the big scheme of

things, it sort of self-adjusts every year into the future as

you recalculate numbers year by year.

        Does that answer you?

Q.  It does.  I appreciate that.

        I want to talk a little bit more about some of the

specific calculations that you did here.

        Now, is it correct that you calculated what the plan

termination funding amount would have been -- I'm sorry, what

the plan -- let me start over again.

        You calculated how much money it might have -- it

would have cost for Eber Brothers to terminate their pension

plan on April 30, 2010, under PBGC rules, is that right?

L9m2Kle1                    Gallagher - Cross

1   A.   Yes.   So that was the filing with the PBGC or the filing

2   for the waiver of funding deficiency?   Is that --

3   Q.   Well, I am asking you.   So you were trying to calculate the

4   termination liability for purposes of your declaration in this

5   case, correct?

6   A.   Yeah, so we did a calculation in 2009 of the estimated

7   termination liability.   That was a calculation that was

8   required to be included with the request for waiver of minimum

9   funding.

10  Q.   Okay.   And as part of your testimony here, you have updated

11  that based upon some subsequent information, is that right?

12  A.   Right.   We updated that number based on my letter in 2018.

13  We updated it to June of 2012.

14  Q.   And is it correct -- do you have an understanding as to

15  whether the term "termination liability" is a larger amount of

16  money or -- let me -- withdrawn.

17        Isn't it correct that if a pension plan is not

18  terminated that the ultimate amount of funding that is required

19  to fully fund the plan may be significantly different than an

20  estimated termination liability?

21  A.   Yes.

22  Q.   And isn't it true that one of the factors in determining

23  the funding amount is the current amount of principal held by

24  the plan and what that current market value is?

25  A.   Correct.

L9m2Kle1                        Gallagher - Cross

```
1    Q.  So if you were to value the plan as of today, when the
2    stock market is not quite still at an all-time high, but very
3    high, isn't it likely that the amount of funding that would
4    have been required would have been less?
5    A.  Yes, right, had we known that.
6    Q.  Right.
7            As -- let's take a look at an exhibit, Exhibit DDDD,
8    and only looking at the first page.
9            This is a -- you recognize this e-mail, Mr. Gallagher,
10   correct?
11   A.  Yes.
12   Q.  And this is something that you, I guess -- is it correct
13   that you yourself determined what the numbers were in here?
14   A.  So the benefits for all the participants in the plan were
15   calculated by the prior actuary at the time that the benefit
16   amounts were frozen.  So December 31, 2000, all benefits were
17   frozen under the plan and nobody earned additional benefits for
18   service after December 31, 2000.  So the prior actuary
19   calculated all of the accrued benefits at that point in time.
20   Q.  Did you ever check the prior actuary's work?
21   A.  No.
22   Q.  Okay.  And so is it correct that the benefit amount listed
23   here of $10,860.69, that's the amount that you received from
24   the company as the prior actuary's work?
25   A.  Well, so the 10,860 is adjusted for a couple of reasons,
```

L9m2Kle1                    Gallagher - Cross

1    and we did do the adjustments.  The benefit, when somebody

2    works past their normal retirement date, which age 65, I

3    believe, in this plan, is adjusted actuarially if they don't

4    start taking their payment.  So that way if they -- if they

5    could have taken their payment, let's say, at age 65 and they

6    decide to take it at 66, the benefit is increased to reflect

7    the fact that they didn't take their payment.  So --

8    Q.  And -- sorry.  Continue.  I didn't mean to cut you off.

9    A.  Yeah, okay.

10            So Lester deferred his retirement past age 65, so we

11   had to increase the benefit that the prior actuary calculated

12   for the number of years that he deferred his payment past 65.

13   And then the payment under the plan is normally paid as a life

14   annuity, and in this case he elected a joint and survivor

15   benefit with his spouse as beneficiary, and so we needed to

16   make an adjustment to the life only benefit, because the

17   benefit in effect is going to be paid over a joint lifetime,

18   and so it needs to be adjusted accordingly.

19   Q.  You are probably better at this math than I am, but at what

20   age -- I guess Lester -- he was 69 when he stared taking his

21   retirement benefit, is that right?

22   A.  I have that here.  I have to look.  Sorry.

23   Q.  1938 to 2007, I think that's right.

24   A.  Yeah, okay, that's correct.

25   Q.  All right.  And so was the amount, $10,860, the same amount

L9m2Kle1                          Gallagher - Cross

1   from September 2007 going forward each month?

2   A.  It -- yes.  Once he started taking his pension, it would

3   have stayed at the $10,860 unless he passed away, and then half

4   of that would have gone to his spouse for the rest of her life.

5   Q.  All right.  Let's look at the next paragraph.  You said the

6   next closest benefit is for a person currently age 62 with a

7   monthly benefit of $2,172.65, payable as a 10 C & C.  First

8   off, what does a 10 C & C mean?

9   A.  That's a ten-year certain and continuous.  So instead of

10  electing a life-only benefit, a person could say I want to make

11  sure that this benefit is paid for at least ten years, so if

12  they die within the first ten years of receiving, starting to

13  receive, their beneficiary would get the remainder of the

14  ten-year payment.

15  Q.  Okay.  And so is it correct that what you are saying here

16  is that Lester's current benefit as of 2014 was approximately

17  five times the next highest benefit amount being paid by the

18  pension?

19  A.  So just looking at those numbers could be deceptive,

20  because the benefits were based on years of service and

21  compensation.  It could be that that person that I mentioned

22  had a short number of years of service versus Lester's who he

23  had quite a few years of service.  But just looking at the math

24  that you offered, yes, it looks like about five times.

25  Q.  And did you ever look to see what percentage of total

1   benefit payments under the pension plan were going to Lester

2   Eber alone?

3   A.   No.

4   Q.   All right.  Let's take a look at Exhibit CCCCC, that's five

5   Cs, at page 13.  I just want to first get us on the same page

6   here.

7           This is a plan document of some kind.  Am I correctly

8   reading this line here that it says that there were 184 people

9   that were in the plan?

10  A.   So there were 184 retired participants and beneficiaries.

11  Q.   Okay.  And if we need to, maybe, Ali, zoom out, just so --

12  so if you can zoom in on the whole Section A, please, so we can

13  see that, so from A(1) to (6).

14          So does that mean that -- so 430 is the total number

15  of participants, is that right?

16  A.   Yes.

17  Q.   So 246 people as of the date of this exhibit were no longer

18  receiving anything out of the pension plan, is that right?

19  A.   So the -- they are terminated participants with deferred

20  benefits so they would be eligible to start receiving when they

21  reached their retirement date.

22  Q.   Okay.  Again, apologies.  I don't know anything about this

23  stuff.

24  A.   Okay.

25  Q.   Let's now look at Exhibit NNN, which is apparently an

L9m2Kle1                        Gallagher - Cross

1    audited financial statement for the plan for 2011 and 2012.  We

2    are looking specifically at page 5.

3            And Ali, could you actually zoom out and make sure so

4    that we get the years in there above that?

5            So am I reading this correctly as saying that in 2011

6    there was a little over $778,000 that was paid out from the

7    plan to different participants?

8    A.  Yes.

9    Q.  And then that number dropped to $593,688 in 2012.  Am I

10   reading that right?

11   A.  Yes.

12   Q.  Do you know why there was such a significant drop from 2011

13   to 2012?

14   A.  So most likely the plan allows individuals to take a

15   portion of their benefit as a lump-sum payment and then the

16   remainder of their benefit as an annuity, and so I am just

17   guessing maybe in 2011 people that elected their benefit

18   decided to take lump-sum payments, and so it inflated the -- or

19   the annual payments to include a one-time lump-sum payment.

20   Q.  And based on your involvement with the plan, you have no

21   idea what would have caused a bunch of plan participants to

22   want to try to cash out early, is that right?  Or do you?

23   A.  Well, no, we don't receive information on why they want to

24   cash out.  We just are asked to calculate the benefit.

25   Q.  Was it your understanding that in and around 2010 or 2011

L9m2Kle1                          Gallagher - Cross

1    there were notices to participants being sent about how the

2    plan was seeking, what is it, a change in how it was going to

3    be funded or a deferral of funding?

4    A.   The minimum funding waiver?

5    Q.   You got it.  Yes.

6    A.   Yes.  So that would have been a required notice to go to

7    participant if there was going to be a request for minimum

8    funding.

9    Q.   So just looking at, you know, 2012 now, so let's round that

10   up, say it's $600,000 -- I am going to assume that you are

11   going to follow the math with me on this, because I'm sure you

12   are much better at it than I am -- and Lester was getting a

13   little over $10,000 a month.  Let's say that's 120,000.  Is it

14   fair to say that Lester Eber's pension alone accounted for

15   approximately 20 percent of the pension benefits being paid by

16   the Eber Brothers pension plan for the year 2012?

17   A.   Yes.  If he was getting that 10,000 at that point in time.

18   Q.   And he wasn't even retired, was he?

19   A.   I don't know the answer to that.  He was receiving his

20   payment based on the fact that he was past retirement date.

21   Q.   And did you ever make any calculations of how much the

22   pension funding shortfall would have been if Lester Eber had

23   not started receiving his pension starting in September 2007?

24   A.   Not directly, but the short -- that wouldn't affect the

25   shortfall, because whether someone is in payment status or not,

L9m2Kle1

1    their benefit still has a value.

2    Q.   Okay.  But -- okay.  So it still has a value, so whether

3    they are taking it or not.  But if they are taking money out of

4    the plan, isn't it true that then more money has to go into the

5    plan at the current time?

6    A.   So if they are taking money out, they are also -- the value

7    of their benefit is going down.  So it's possible that it is

8    just a wash, that the amount going out is equal to the

9    reduction in the liability, and especially -- it depends again,

10   as you mentioned before, what the investment return is on the

11   plan assets.

12   Q.   Right.  And it's another factor that what I as a layperson

13   would call the time value of money or the discount rate that

14   needs to be applied.  So isn't it correct that 120,000 in 2007

15   might be significantly more value than 120,000 in 2017?

16   A.   Yes, if you were looking at it in -- yes, correct.

17             MR. BROOK:  Okay.  Thank you, Mr. Gallagher.  No

18   further questions.

19             THE COURT:  Thank you.

20             Any redirect?

21             MR. MULRY:  No questions, your Honor.

22             THE COURT:  All right.  You are excused.  Thank you,

23   Mr. Gallagher.

24             THE WITNESS:  Okay.  So I just log off?

25             THE COURT:  Yes, you may leave the conference.

1            THE WITNESS:  Okay.  Thank you very much.

2            (Witness excused)

3            THE COURT:  Next witness, please.

4            MR. MULRY:  Defendants call Frank Torchio.

5            THE COURT:  You may proceed.

6            MR. BROOK:  Your Honor we need Mr. Mohan's help to get

7    Microsoft Teams off the system.

8            THE COURT:  Let's track him down.

9            (Pause).

10   FRANK C. TORCHIO,

11        called as a witness by the defendants,

12        having been duly sworn, testified as follows:

13            THE COURT:  All right.  Let's go.  Thank you.

14   DIRECT EXAMINATION

15   BY MR. MULRY:

16   Q.  Good morning, Mr. Torchio.

17   A.  Good morning.

18   Q.  You have been retained as an expert economist by the

19   defendants in this case, is that correct?

20   A.  Yes.

21   Q.  Did you work with me to prepare a declaration that

22   constitutes your direct testimony in this case?

23   A.  Yes.

24   Q.  Okay.  Can we show you what's been marked as Defendant's

25   Exhibit DC, declaration of Frank C. Torchio.

L9m2Kle1                          Torchio - Direct

1   A.  Okay.

2   Q.  Is that your direct testimony declaration?

3   A.  It is.

4   Q.  Did you review that declaration carefully?

5   A.  I did.

6   Q.  Going to the last page, did you sign that declaration under

7   penalty of perjury?

8   A.  Yes.

9   Q.  But do you reaffirm your direct testimony here today?

10  A.  Yes, I do.

11          MR. MULRY:  Your Honor, defendants offer the

12  declaration of Frank Torchio which has been marked as

13  Defendant's Exhibit ZC as his direct testimony.

14          THE COURT:  I'm sorry.  Is that Z as in "zebra" or D

15  as in "David."

16          MR. MULRY:  Z as in "zebra," C as in "Charlie."

17          THE COURT:  Thank you.

18          MR. BROOK:  No objections.

19          MR. MULRY:  Your Honor, defendants also move into

20  evidence the exhibits to Mr. Torchio's declaration, which are

21  marked as Defendant's Exhibits TA through TF and Mr. Torchio's

22  demonstratives which are marked as Defendant's Exhibit TG.

23          THE COURT:  All right.  First of all, defendant's ZC

24  is received.

25          (Defendant's Exhibit ZC received in evidence)

L9m2Kle1                        Torchio - Direct

1          THE COURT:  What about the others?

2          MR. BROOK:  I think these are new exhibit numbers that

3     I think were just added recently, but assuming that they are

4     what I have seen before and that there is nothing sort of snuck

5     in there, there is no objection to that.

6          MR. MULRY:  Your Honor, I can represent to the Court

7     that the six exhibits marked A through F that were part of

8     Mr. Torchio's declaration have just been renumbered, for

9     consistency, to be TA through TG and it is demonstratives which

10    were previously provided to Mr. Brook and the Court in

11    connection with the pretrial package has just been marked as

12    Defendant's Exhibit TG.

13         THE COURT:  All right.  They are all received.

14         MR. BROOK:  I will actually note just for the

15    record -- I apologize, I mentioned this earlier -- plaintiffs

16    do have a motion as to Mr. Gallagher's testimony, to the extent

17    that Mr. Torchio's, and part of our motion which we already

18    have filed does involve Mr. Torchio's reliance on certain

19    statements and opinions made by Mr. Gallagher as well.

20         THE COURT:  All right.  They are all received subject

21    to the pending objections.

22         (Defendant's Exhibits TA through TG received in

23    evidence)

24         MR. MULRY:  Your Honor, we would ask that we can

25    address with Mr. Torchio several areas that were raised in the

L9m2Kle1                          Torchio - Direct

1    plaintiff's case, primarily the testimony of Mr. Liebman and

2    the testimony of Mr. Eder, which will be brief.

3              MR. BROOK:  I would object to Mr. Liebman only insofar

4    as I don't know that he said anything that's not already been

5    said before, maybe just slightly differently, but there is no

6    objection to asking questions about what Mr. Eder said because

7    that was new information for all of us, well, all of us

8    lawyers.

9              THE COURT:  Well, so far as you are concerned with

10   Mr. Eder, there is no objection, so you may do that.

11             As to the other witness, Liebman, you can ask your

12   questions; and if you want to preserve an objection, you will

13   have to object.

14             MR. BROOK:  Yes, your Honor.

15             THE COURT:  Okay.  Let's go ahead.

16   BY MR. MULRY:

17   Q.  Mr. Torchio, one of the metrics that you used in your

18   valuation is a 2008 purchase by Eder-Goodman of a 15 percent

19   interest in Eber-Connecticut, is that correct?

20   A.  Say that again, please.

21   Q.  I'm sorry.  One of the metrics you used in your valuation

22   is a 2008 purchase by Eder-Goodman of a 15 percent interest in

23   Eber-Connecticut?

24   A.  That's correct.

25   Q.  Have you ever read Andrew Eder's testimony from last

1    Tuesday?

2    A.  Yes, I have.

3    Q.  I will direct your attention, if we could put this up, to

4    his trial testimony at page 144/line 9 through 145/line 1 with

5    respect to a liquidation preference.

6            If you could read that to yourself.

7    A.  Yes.

8    Q.  Does Mr. Eder's statement with respect to a liquidation

9    preference have relevance to your assessment of the

10   Eder-Goodman metric?

11   A.  Well, he seems -- he agrees that it is consistent with a

12   convertible preferred equity security.

13   Q.  And does that affect your evaluation with respect to the

14   performance of the liquidation preference to your valuation?

15   A.  Well, it certainly is consistent with my opinion that it is

16   valuable, yeah.

17   Q.  Also, did you read in Mr. Eder's testimony that he said an

18   attorney for Eber-Connecticut, Pat Dalton, told him that

19   Southern would be in the transaction, that Lester Eber would

20   prefer Eder-Goodman, and that it would cost Eder-Goodman 4.5

21   million for 15 percent of Eber-Connecticut?

22   A.  I do recall that.

23   Q.  Did you read Mr. Eder's testimony that "there was zero due

24   diligence basically" --

25            THE COURT:  Look, counsel, this is not a help.  I

L9m2Kle1                          Torchio - Direct

 1  understand he can read.  I got that right away.  So if you have

 2  a specific question, let's get to it.

 3  BY MR. MULRY:

 4  Q.  Do those statements from Mr. Dalton and the fact that there

 5  was limited due diligence have some effect on your valuation?

 6  A.  Well, I think it is consistent with the notion that

 7  Eder-Goodman did not -- were not aware of the liabilities, the

 8  pension liabilities and the Teamsters' liabilities because they

 9  did not conduct the due diligence.

10  Q.  Did you read Mr. Eder's testimony with respect to --

11          THE COURT:  Look, that's a waste of time.  We are

12  going nowhere with that.  It is consistent also with they knew

13  the business so well that they didn't have to do due diligence.

14  Both are consistent.

15          MR. MULRY:  I will move on, your Honor.

16  BY MR. MULRY:

17  Q.  Did you read his testimony with respect to the right of

18  first refusal?

19  A.  Yes.

20  Q.  And he testified that that was an important piece that they

21  paid more for.  Why, in your view, is a right of first refusal

22  important?

23          MR. BROOK:  Objection, your Honor.  This is all in his

24  testimony already.

25          THE COURT:  Sustained.

L9m2Kle1                        Torchio - Direct

 1              MR. MULRY:  Paragraph -- if we could go to

 2    Mr. Liebman's direct testimony in his declaration, at paragraph

 3    51.

 4              THE COURT:  What's the number, please?

 5              MR. MULRY:  It's paragraph 51.

 6              THE COURT:  51 or 61?

 7              MR. MULRY:  Five one.

 8              THE COURT:  Thank you.

 9    BY MR. MULRY:

10    Q.  If you could read paragraph 51 to yourself, and

11    particularly the second sentence.

12    A.  Okay.

13    Q.  The second sentence of paragraph 51, he characterizes what

14    you did and he says you treated the additional rights as if

15    they were full, unfettered control over Eber-Connecticut.  Is

16    that what you did?

17    A.  No, I disagree with that characterization.

18    Q.  Why do you disagree?

19    A.  Well, "unfettered" means that there is unrestricted

20    control, and that's not what I am saying.  I am saying that the

21    right of first refusal, along with the other rights that were

22    granted to Eder-Goodman, would effectively eliminate the

23    potential for a control premium of any kind of magnitude.

24    Q.  Would eliminate a control premium when?  What are you

25    referring to there?

L9m2Kle1                       Torchio - Direct

A.  Control premium for the 79 percent of an ownership.

Q.  And if there were a later buyer that was seeking to
purchase the 79 percent interest, why is it that the ROFR would
affect their -- their view of control of the company?

A.  So the first issue is that a ROFR will deter takeover
prospects.  It is pretty well established in economics that
when you have a ROFR, the potential bidders are going to be
reluctant to come forward because it costs money, it costs time
to go ahead and try to engage in the process of a takeover.
Negotiations, due diligence, all that stuff takes time and
effort, and if it's all for naught, it will deter and push off
those kinds of activities.

        Secondly, you must remember that a control premium is
not something that's given on high.  A control premium is
dictated by economics, the economics being, here, is the
standalone or the existing value of the company; and a buyer
says, well, I can take this company and I could increase the
value of this company by some amount, and he is willing to pay
some fraction of that amount in terms of a control premium to
be able to exact that kind of value-enhancing strategy.  Well,
the problem here is that the biggest value enhancing strategy
would be to get new suppliers, new products for
Eber-Connecticut to distribute.  Well, but if you look at the
rights that Eder-Goodman has, that becomes very difficult,
because it's axiomatic in finance that in order to fund -- in

L9m2Kle1                          Torchio - Direct

1   order to have growth, you have got to fund growth.

2          Well, funding growth means you have got to have -- in

3   the case of Eder-Goodman, you have got to have money for

4   working capital to increase your inventory.  That's for sure.

5          Second, you have got to have enough warehouse space.

6   So they would have to increase warehouse space.  Trucks, as

7   well.  Those are all the components of the distribution network

8   that they have.  So in order to do that, you have got to have

9   funding.

10          Now, Eder-Goodman, in its, you know -- when it was

11   told 4.5 million, it introduced many conditions, two of those

12   conditions being the following:

13          One, that Eber-Connecticut cannot increase its

14   leverage without consent, so they have veto power over

15   increasing leverage-generating funding through debt issuances.

16          Second, Eder-Goodman has the veto power over issuing

17   new units.  So equity issuance, money from equity issuance is

18   not there.

19          So now a prospective buyer is going to look at this

20   and say, well, what are my opportunities here to increase the

21   value of this company above its standalone value if I am not

22   able to fund that through or at least Eder-Goodman has that

23   right to veto the funding?  So that, again, the combination of

24   the ROFR itself and these other rights severely limit any kind

25   of value that could be created through control of that 79

L9m2Kle1                          Torchio - Direct

1   percent.

2   Q.  Okay.  Another metric you used was a company called Farmers

3   Brothers.

4   A.  Yes.

5   Q.  Okay.  And last week, during Mr. Liebman's testimony with

6   respect to Farmers Brothers -- and this was at page 199/lines

7   4-5, we don't need to put it up -- the Court said that "I can't

8   wait to hear how coffee and tea is equivalent to alcoholic

9   beverages."

10          Could you explain why is it you consider Farmers

11  Brothers to be a good metric to use for valuation?

12  A.  Well, first off, your Honor is correct that they are not

13  similar products, but nowhere in the literature --

14          THE COURT:  I'm bound to get something right once in a

15  while.

16  A.  -- but nowhere in the literature of developing comparable

17  companies does it say that the products have to be similar or

18  even in the same category.  That is not one of the criteria

19  that's used.  In fact -- well, in any event, it's not one of

20  the criteria used.

21          What is important in this case and why Farmers is

22  comparable is because of the operations of this company

23  relative to the operations of Eber-Connecticut.  By that I mean

24  that both companies are engaged in logistics.  They are moving

25  products.  They are getting products from manufacturers, and

1   they are selling those products to retail establishments, to

2   stores, to restaurants, casinos, those kinds of establishments.

3   They are both engaged in net facilities.  What do they have to

4   do in order to make those things happen?  Well, they have got

5   to have inventory, they have got to have a warehouse space, the

6   capital expenditures of warehouse space, the working capital

7   investment in inventories, in order to distribute these

8   products.

9            Both products, by the way, are beverages.  Obviously

10  alcohol versus tea but they are both beverages.  And economics

11  would dictate that in a competitive marketplace, which these

12  distribution networks are, in a competitive marketplace, what

13  you are going to see is that the return is going to be

14  equivalent to the marginal cost of this business.  These are

15  not monopolist.  These are competitive businesses.

16           So what you are going to observe is that the cost

17  structure is going to be very similar.  And the cost structure

18  is similar because Farmers has, as I said, key, tangible

19  assets -- warehouses, trucks, for example.  They have similar

20  intangible assets, the relationship they have with suppliers

21  and customers, they have a team -- both have teams of regional

22  salespeople that are responsible for selling, collecting, and

23  maintaining customer accounts.

24           And then specifically, some of the companion variables

25  here that are important is that Farmers, like Eber-Connecticut,

was experiencing income losses in the years leading up to the

valuation.

And in addition to that, both companies are mature

businesses, and the size of Farmers, Farmers, it was a publicly

traded company, is a publicly traded company, and at the time

of the valuation, Farmers was in the smallest decile market

capitalization for traded firms, and Eber-Connecticut would

also be in that smallest decile based upon these valuations.

So there are, I think, very considerable similarities

between these businesses, how these businesses are run, that

makes these two businesses comparable and that, in my view, it

would be remiss to put zero weight on the comparable analysis

from Farmers.

Q.  Why do you say it would be remiss to put zero weight on

that comparable?

A.  Because, I mean, look, the valuation from Farmers comes

from the stock market, the efficient stock market.  And so this

is a marketplace where there are many, many, many investors,

and what you have is a consensus.  This is how investors are

looking at companies like this at this point in time, and it's

not based on one, two, or three, but it's based on many, many

investors who are buying and selling this stock contemporaneous

to the valuation date.  That provides very important

information to investors, and I can't imagine an investor that

would say I don't want to know anything about how companies

L9m2Kle1                        Torchio - Direct

1    like this, how logistics companies are being valued in the

2    marketplace.

3    Q.  Okay.  You used five metrics in your valuation, is that

4    correct?

5    A.  Yes.

6    Q.  Is it necessary for you, as a business valuation expert, to

7    choose one of those over the others in coming to a valuation?

8    A.  Well, you know, for example, in Delaware they have what

9    they call the Delaware block method, which is assigning weights

10   to different measures.  So you might have one weight being

11   assigned to your transaction multiples, one weight being

12   assigned to your trading multiples, one weight being assigned

13   to a DCF analysis, one to, you know, a capitalization of

14   earnings, perhaps another if there is a prior transaction.  And

15   the concept here is to assign weights to those various metrics,

16   and then you can, if you will, get a point valuation.

17           So what I -- what I am talking about here is assigning

18   some 20 percent weight to each of these five metrics.

19   Obviously that is somewhat subjective.  The Court may decide

20   that certain weights should be applied to certain of these

21   transactions.  However, I feel very strongly that zero weight

22   assigned to Farmers would be incorrect.

23   Q.  Another metric you used was the Prospect Beverages?

24   A.  That's correct.

25   Q.  Why do you consider Prospect Beverages to be a good metric

L9m2Kle1                      Torchio - Direct

1    for valuation of Eber-Connecticut?

2    A.  Well --

3              MR. BROOK:  Objection, your Honor.  At this point I

4    think we are just rehashing what is already in his testimony.

5              THE COURT:  I agree.  Sustained.

6    BY MR. MULRY:

7    Q.  Mr. Torchio, are you aware that in Mr. Liebman's expert

8    report he offered an opinion as to the value of

9    Eber-Connecticut in 2018?

10   A.  Yes.

11   Q.  And you responded to that opinion on 2018 on your

12   deposition testimony in this case, correct?

13   A.  I did.

14   Q.  Did you read Mr. Liebman's direct testimony offering an

15   opinion on the value of Eber-Connecticut in 2020?

16   A.  Yes.

17   Q.  What is your response to Mr. Liebman's testimony that he

18   gave on Tuesday with respect to 2020?

19             MR. BROOK:  Objection, your Honor.  The defense had an

20   opportunity to put in a rebuttal report to Mr. Liebman's

21   testimony on the current -- approximate current value of the

22   company and they declined to style a report, so the opportunity

23   for them to offer a new opinion --

24             THE COURT:  When did that happen?

25             MR. BROOK:  That was back in 2019.

L9m2Kle1                    Torchio - Direct

1              THE COURT:  Well, in 2019 he couldn't have given an

2      opinion on 2020, could he?

3              MR. BROOK:  No, and I would make the same objection to

4      2018, your Honor, because, you know, it is one thing for me to

5      try to see what he is going to say in a deposition, to try to

6      see what he is going to do, but it is another thing for them to

7      offer it as affirmative evidence as an opinion.

8              They have had the benefit of Mr. Liebman having had a

9      report that provides the opinion in terms of the formula he

10     used identical 2018 to 2020.  I have no idea what formula or

11     multiples or anything this witness is going to testify to about

12     the current value of the company because they have never put in

13     a report.  There were three, just for background, because I

14     know it was Judge Parker, but there were three expert

15     deadlines.  There was the defense report.  Because of the

16     entire fairness doctrine, the burden was on them.  Then there

17     was the plaintiff's report deadline.  Then there was the

18     defense rebuttal deadline.  And they declined to put in a

19     rebuttal to Mr. Liebman's opinion that was stated for the first

20     time in the -- in the plaintiff's report.  So therefore they

21     have waived the opportunity to offer an expert opinion on how

22     to value Eber-Connecticut after 2012.

23             MR. MULRY:  Your Honor, there is no question

24     Mr. Torchio addressed the 2018 valuation in his deposition

25     testimony, so the plaintiffs have been aware of what his

1    responses are for that.  We objected to the 2020 valuation

2    because the first time we received it was in the submissions

3    earlier this month, the pretrial submissions.  So we objected

4    on that ground.  I think it is a fair opportunity for

5    Mr. Torchio to respond to the trial testimony, given last week,

6    as something that should be afforded to him.

7              THE COURT:  Where was defendant's objection to

8    Liebman's 2018 opinion?

9              MR. BROOK:  They made the same objection, your Honor,

10   and if I recall correctly, they objected to any opinion of

11   value from after 2012.  He is only mischaracterizing it now --

12             THE COURT:  On what ground.

13             MR. BROOK:  On the grounds I think they are saying it

14   is irrelevant based upon Judge Parker's order.

15             THE COURT:  Is that correct?

16             MR. MULRY:  Yes.  We made the argument to your Honor

17   that any time period after 2012 was not relevant.  Your Honor

18   received that testimony from Mr. Liebman subject to that

19   objection.

20             THE COURT:  Yes.

21             MR. MULRY:  And since that's been subject to the

22   objection --

23             THE COURT:  But you didn't object to Mr. Liebman on

24   the ground that there hadn't been appropriate expert

25   disclosure, did you?

L9m2Kle1                    Torchio - Direct

1           MR. MULRY:  On 2020?

2           THE COURT:  On 2018.

3           MR. MULRY:  On 2018, no.  That was -- that was prior

4    counsel.  But there was not an objection based on a failure to

5    disclose, no.

6           THE COURT:  Okay.  But this objection is on failure to

7    disclose.  Am I right?

8           MR. BROOK:  Yes, your Honor.

9           MR. MULRY:  It was certainly disclosed in his

10   deposition testimony, in Mr. Torchio's deposition testimony.

11          THE COURT:  2020.

12          MR. MULRY:  No, 2018.  2020 has not appeared until

13   September 3rd or 7th.

14          THE COURT:  You objected to Liebman on 2020 --

15          MR. MULRY:  Yes.

16          THE COURT:  -- if I understand correctly, solely on

17   grounds of relevance, not on grounds that haven't --

18          MR. MULRY:  No.  We objected also, your Honor, on

19   grounds it was not in the expert report, that 2020 was not in

20   the expert report.

21          MR. BROOK:  I think your Honor might be flipping the

22   dates on this one.  2018 is the one where they -- 2018 was in

23   Mr. Liebman's expert report, so there is no objection to that

24   not having been in there; and 2020 is the update, and they

25   contend that even though it is just updating numbers, it's a

L9m2Kle1                        Torchio – Direct

1    new opinion.  That was an objection that they made.

2              Now I am making the objection that this actually is a

3    new opinion, not because he is using 2020 numbers rather than

4    2018, but because he never offered any opinion in any report of

5    a value after 2012.

6              THE COURT:  How about that?

7              MR. MULRY:  Well, he certainly did respond to it in

8    his deposition testimony in this case.  He was asked questions

9    about the 2018 valuation.  He responded.  He gave his response

10   there.  If Mr. Liebman is permitted to update that to 2020,

11   then I believe Mr. Torchio should be able to respond and give

12   the Court the response similar to the one he gave in his

13   deposition.

14             (Continued on next page)

15

16

17

18

19

20

21

22

23

24

25

1          THE COURT:  I will listen to it and I'll consider this

2     more carefully down the road.  I'm inclined to the view that

3     it's out, but I'll listen to it and we'll have a complete

4     record.

5     BY MR. MULRY:

6     Q.  Mr. Torchio, could you provide your response to

7     Mr. Liebman's testimony with respect to a 2020 valuation?

8     A.  Sure.  What I did is convert Mr. Liebman's analysis into

9     what is called an EBITDA ratio.  That is, Mr. Liebman's

10    enterprise value as of 2020 of Eber-Connecticut divided by the

11    EBITDA before interest depreciation and amortization as a

12    ratio.  I do that because at that point in time, there was

13    positive EBIDTA for Eber-Connecticut.  EBIDTA valuation ratios

14    are probably the most widely used valuation ratios.

15         MR. BROOK:  Your Honor, may I just request the witness

16    speak a little more slowly so I can try to get down what he's

17    saying?

18         THE COURT:  I'm not getting it either.

19    A.  I'm sorry.  Excuse me.  Let me back up.

20         So EBITDA ratios are the most widely used ratios in

21    valuation.  And what I did is to convert what Mr. Liebman's

22    valuation was into a ratio by dividing his enterprise value for

23    Eber-Connecticut by the EBITDA for Eber-Connecticut.  That

24    number is 27.  So 27 times EBITDA.

25         What I did then is, I looked into the stock market as

1   of that valuation date and looked at all stocks traded on the

2   New York Stock Exchange and NASDAQ stock exchange and ranked

3   them and ranked them from high to low by the EBITDA ratios.

4   And the 27 times ratio that Mr. Liebman, that obtains from

5   Mr. Liebman's valuation, would have put Eber-Connecticut in the

6   top 15 percentile of all companies traded on the New York Stock

7   Exchange and the NASDAQ stock exchange.

8           Now, from there, what I looked at was the median

9   growth rate for the last three years for companies in that

10  15 percentile ranking for those traded stocks.  The average

11  three-year annual growth rate for companies, or I should say

12  the median for the three-year average growth rate for companies

13  in that percentile, was 12 percent.

14          In contrast, I looked at the three-year compounded

15  annual growth rate --

16          THE COURT:  Growth rate in what?

17          THE WITNESS:  I'm sorry.  EBITDA.  Excuse me.

18          THE COURT:  Go ahead.

19  A.   Growth rate in EBITDA, and that was two and a half percent.

20  So there is a big difference between how companies are being

21  valued at 27 times EBITDA versus how companies that would have

22  a lower growth rate, historic growth rate, would be valued.  So

23  that -- that presented, I believe, an inconsistency with the

24  valuation that Mr. Liebman obtained.

25          MR. MULRY:  Thank you, Mr. Torchio.

1            THE COURT:  OK.  Cross-examination.

2            MR. BROOK:  Yes, your Honor.

3   CROSS-EXAMINATION

4   BY MR. BROOK:

5   Q.  Hello again, Mr. Torchio.  You remember me, I assume?

6   A.  I do.  Good morning.

7   Q.  I hope the trip wasn't too bad for you.

8            Let's start with the last little bit we were talking

9   about while it is fresh in my head, make sure I'm understanding

10  you correctly.

11           So is it fair to say your chief criticism of

12  Mr. Liebman's 2020 valuation is that it results in an EBITDA

13  multiple or EBIDTA ratio that is too high considering the

14  growth rate of the company?

15  A.  Yes.  The historic growth rate or the last three years'

16  growth for Eber-Connecticut.  In fact, you can go back further

17  than three years, but just looking at the three years, it

18  doesn't seem to warrant the kind of EBIDTA multiple that

19  obtains from Mr. Liebman's valuation.

20  Q.  You said that you compared it against the public stock

21  market as of the valuation date, correct?

22  A.  Yes.

23  Q.  So you used May 31, 2020?

24  A.  Whatever the date was that Mr. Liebman used for his

25  valuation.

L9MsKLE2                          Cross - Torchio

1    Q.  All right.  Was May 2020 a particularly good year for the

2    public stock market, good month for the stock market?

3    A.  A good month?  I mean, I think this has been a pretty good

4    bull run for the market, yes.

5    Q.  Sure.  That had started a little before May 2020, correct?

6    A.  Sure, yes.

7    Q.  And that's because there was a dramatic plummet in March of

8    2020, correct?

9    A.  Yes.

10   Q.  And it took several months before valuations even

11   approached their pre-pandemic levels, correct, putting aside

12   technology stocks?

13   A.  I just don't remember.  It could well be.

14   Q.  Did you attempt to -- in looking at the public stock

15   market, did you attempt to distinguish between different

16   sectors of the stock market?

17   A.  No.  I did what I did.

18          THE COURT:  Well, I think that goes without saying.

19   Look, let me see if I can clarify something here for a minute.

20          You said that you converted Mr. Liebman's valuation

21   into a ratio with respect to EBITDA, E-B-I-T-D-A?

22          THE WITNESS:  That's correct.

23          THE COURT:  And you got, the figure was 27, right?

24          THE WITNESS:  Yes.

25          THE COURT:  Sir?

L9MsKLE2                          Cross - Torchio

1                THE WITNESS:  Yes, that's correct.

2                THE COURT:  And then you looked at all the stocks

3       traded on NASDAQ and the New York Stock Exchange and ranked

4       them by EBITDA; yes?

5                THE WITNESS:  By the EBITDA ratios, your Honor.

6                THE COURT:  Yes.  Excuse me.  I stand corrected.

7                You concluded that Mr. Liebman's valuation, which

8       produced an EBITDA of 27, was too high, put it in the top

9       15 percent of all companies traded on those exchanges, because

10      you looked at the growth rate for the last three years for

11      companies in the 15th percentile on the stock exchanges ranked

12      by EBITDA ratios; yes?

13               THE WITNESS:  That's correct.

14               THE COURT:  And I asked you, growth rate of what?

15               THE WITNESS:  This would be the growth rate of revenue

16      in EBITDA.

17               THE COURT:  Well, that's not what you said before.

18      What you said before was that it was the growth rate in EBITDA.

19               THE WITNESS:  Right.

20               THE COURT:  Was that accurate?

21               THE WITNESS:  No.  I think it's the growth rate of

22      revenue.  I must have misspoke.

23               THE COURT:  Yeah, I think so.  Because if, in fact, it

24      was what you said before, your entire discussion was completely

25      and absolutely circular, as I understand it.

L9MsKLE2                          Cross - Torchio

 1              THE WITNESS:  Yeah.  It is growth rate in revenue that
 2     I focused on, your Honor.  Excuse me if I said EBITDA, I
 3     apologize.
 4              THE COURT:  So you were comparing then growth rates
 5     of all the companies on the stock exchanges in the top
 6     15 percentile, right?
 7              THE WITNESS:  Yes.
 8              THE COURT:  With this privately held beer and liquor
 9     distributor in Connecticut; yes?
10              THE WITNESS:  Yes.
11              THE COURT:  OK.
12              THE WITNESS:  Sorry.
13     BY MR. BROOK:
14     Q.  We will actually get to this later.  It's your
15     understanding, Mr. Torchio, Eber-Connecticut did not sell beer,
16     right?
17              THE COURT:  I cannot understand a word you said.
18              MR. BROOK:  I just wanted to make sure, it is
19     important later that, because your Honor said beer and liquor.
20     Q.  It is actually high-end wines that Eber-Connecticut sold,
21     right, Mr. Torchio?
22     A.  I believe liquor as well.
23     Q.  And liquor, yes.
24              But not beer?
25     A.  That's correct.

1    Q.  To your knowledge, they have never sold beer?

2    A.  That's correct.

3            THE COURT:  So inherit in your comparison here is

4    Apple, Microsoft and the like; yes?

5            THE WITNESS:  Sure, they are included in the thousands

6    of companies.

7            THE COURT:  Right.  OK.

8            MR. BROOK:  Let's not forget Tesla, which I think has,

9    perhaps, the highest of any of the multiples.

10           THE COURT:  OK.

11           THE WITNESS:  I don't know if that's true.

12           MR. BROOK:  It may have one point.

13           THE COURT:  Look, Mr. Torchio, this isn't a seminar,

14   and your job is just to answer the questions, not to get into

15   an interesting discussion, however interesting it might be.

16           THE WITNESS:  Yes, sir.

17   BY MR. BROOK:

18   Q.  We can talk about that later.

19           EBITDA includes things like administrative and general

20   expenses, correct?

21   A.  Yes.

22   Q.  So it's only excluding interest, taxes, depreciation and

23   amortization, correct?

24   A.  That's correct.

25   Q.  So things like extraordinary legal expenses would have

L9MsKLE2                         Cross - Torchio

1   affected Eber-Connecticut's EBITDA numbers, correct?

2   A.  Sure.

3   Q.  Even just ordinary legal expenses, correct?

4   A.  Sure, yes.

5   Q.  And also any salaries paid to officers would have been

6   included in that and, therefore, reducing the amount of EBITDA,

7   correct?

8   A.  Sure, just like any other company, yes.

9   Q.  And that included, in the case of the 2020 numbers, a death

10  benefit paid to Lester Eber's estate, correct?

11  A.  That, I don't know.

12  Q.  So you didn't -- in trying to examine the EBITDA of the

13  company, you didn't make any attempt to try to normalize it

14  based on extraordinary expenses?

15  A.  Well, to answer your question, I didn't try to normalize

16  any of the thousands of companies, as well as Eber-Connecticut.

17        THE COURT:  How about answering the question he asked?

18        THE WITNESS:  No, I didn't.  I didn't normalize any

19  company, including Eber-Connecticut.

20  Q.  So off the top of your head, what was Eber-Connecticut's

21  EBITDA in 2020, do you remember?

22  A.  No, I don't.

23  Q.  What's the ballpark number?

24  A.  I really don't remember.

25  Q.  Was it over a million?

L9MsKLE2                           Cross - Torchio

1   A.  I can't remember.

2   Q.  OK.  Let's just -- I don't know it.  Sitting right near,

3   let's assume it is $500,000.  OK?

4   A.  OK.

5   Q.  If one expense for $675,000 was taken off above that line,

6   that would increase EBITDA to a $1,575,000, correct?

7   A.  Yes.

8   Q.  And at that point, the multiple that you found would be

9   approximately half or a little bit more?

10  A.  Sure.

11  Q.  OK.  Have you looked into how that would stack up against

12  the S&P 500?

13  A.  No, I didn't.  I don't think that that is the correct way

14  of doing the analysis.

15  Q.  You mentioned that you considered Andy Eder's testimony on

16  different things, this is the principal of Eder-Goodman,

17  correct?

18  A.  Correct.

19  Q.  And did you consider his testimony about the offer that he

20  has made to buy Eber-Connecticut?

21  A.  The current offer as of today?

22  Q.  Yes.

23  A.  No, I didn't.  I didn't analyze that.  I mean, other than

24  what I did for Mr. Liebman's valuation, I didn't do any work on

25  current valuations.

L9MsKLE2                          Cross - Torchio

1   Q.  Is it your opinion as an expert that a bona fide offer from

2   an interested third party who is aware of the business should

3   be considered when determining how to value that business?

4   A.  As of today?

5   Q.  Yes.

6   A.  Sure.

7   Q.  Would you agree that it is important when trying to pick a

8   comparable company to look at what the earnings trends are for

9   that company?

10  A.  I'm OK with that, yes.

11  Q.  In fact, that is something that is specified by Revenue

12  Rule 59-60, is it not?

13  A.  I don't recollect.

14  Q.  Do you -- you are familiar with Revenue Rule 59-60,

15  correct?

16  A.  I am.

17  Q.  And that's an important part of any business value -- any

18  person who is valuing a privately held business, that their

19  repertoire of information to rely on, correct?

20  A.  Well, the analysis ought to include the expected growth in

21  the comparable company whether there is reason to believe that

22  the expected growth and riskiness of that -- of those companies

23  are the same.  That's the basic tenet.

24  Q.  Let's take a look at part of Revenue Rule 59-60.  It is

25  Exhibit 596.

L9MsKLE2                          Cross - Torchio

1          Specifically, let's go to Section 4H at pages four to

2    five of the exhibit, Ali.  And if you can actually go to page

3    five, I want to focus on the last sentence of Section H.  So

4    you can blow up the last part of the highlighted section, just

5    blow up the highlighted section.  Thank you.

6          All right.  Last sentence here says, A company with a

7    declining business and decreasing market is not comparable to

8    one of a record of current progress and market expansion.

9          Do you see that?

10   A.  Yes.

11   Q.  Do you agree with that?

12   A.  Generally.

13   Q.  All right.  You can take that down.

14         Now, another thing you said in your direct

15   testimony -- and this is an approximate quote -- is that no

16   where does the literature say that companies have to sell the

17   same products, is that fair?

18   A.  That's fair.

19   Q.  But the literature does say that you should use multiple

20   data points when using comparable companies, correct?

21   A.  If available, sure.

22   Q.  And that is, in fact, a significant point that is made by

23   Shannon Pratt, one of the leading authors in this field,

24   correct?

25   A.  Yes.  To expand the amount of data points that you have,

L9MsKLE2                          Cross - Torchio

1   you expand the criteria to include them.

2   Q.  And would you also agree that if you did not have

3   multiple -- if a very few data points are available, that might

4   be a reason to reject a comparable company analysis entirely?

5   A.  No, I wouldn't.  In fact, quite the opposite.  I think that

6   it's important to provide some aspect.  I mean, I'm sure that

7   had I included companies that were less similar than Farmers or

8   Prospect that would also be objected to.

9           So I tried to find companies that at least had some,

10  you know, substantial similarities, that would allow me to use

11  them and not -- and not provide ammunition to tear it down and

12  throw the baby out with the bath water.

13          Again, to assign zero weight to something that is,

14  in my view, would be relevant to an investor, I think is

15  incorrect.

16          THE COURT:  Just pause there for a minute.  I think a

17  word was missed in the transcript in the answer to the last

18  question.

19          What I heard in the fourth sentence was the witness

20  say the following: "I mean, I'm sure that had I included" --

21          No, I'm sorry.  I'm reading the wrong sentence.

22          So I tried to find companies that at least had some,

23  you know, substantial similarity and so forth.  And the word

24  "some" is not in the realtime transcript.

25          Does everybody agree that's what he said?

L9MsKLE2                          Cross - Torchio

1            MR. BROOK:  I have no reason to disagree.

2            MR. MULRY:  No, your Honor.

3            MR. BROOK:  Perhaps the witness --

4            MR. MULRY:  Perhaps we'll ask the question.

5            THE COURT:  You said "some" and then you --

6            THE WITNESS:  Possibly.

7            THE COURT:  That's what I heard.  If there is no

8    objection, the transcript will be corrected in that regard.

9            I hear no objection.

10   BY MR. BROOK:

11   Q.  All right.  You wouldn't put zero weight on the fact that

12   there is only one or two available data points, correct?

13   A.  I would not.

14   Q.  But wouldn't it be fair to give it relatively little weight

15   if there are few data points available?

16   A.  Well, if it was -- I mean, I do have five metrics that I'm

17   using and trying to rate them.

18   Q.  I'm focusing specifically on the comparable transaction

19   metric involving different companies.

20   A.  I understand.  But I think it has to be taken in context of

21   what the valuation exercise is that includes five metrics.  If

22   there were two, perhaps.  But to me, I think that it's

23   necessary to include that.  If 20 percent weight is, in the

24   judge's opinion, too high, fine.  Lower it.  But to go to zero,

25   I think, is -- is incorrect.  It is just not in keeping with

L9MsKLE2                          Cross - Torchio

1    what an investor would want to look at.

2            THE COURT:  You used on your earlier testimony a

3    reference to the Delaware block method.  Just so I'm sure

4    you're talking about what I understand that to be, tell me what

5    you understand that to be.

6            THE WITNESS:  So in Delaware, when you've got a number

7    of different valuation metrics, like DCF analysis and

8    comparable trading multiple analysis, transaction multiple

9    analysis, maybe even adjusted book value analysis, that there's

10   weights assigned to those various measures to come up with a

11   point estimate.

12           THE COURT:  And that's by virtue of case law, right?

13           THE WITNESS:  Yes.

14           THE COURT:  And it applies in the Delaware Chancery

15   Court and the Delaware Supreme Court in certain types of cases,

16   right?

17           THE WITNESS:  I know it applies in appraisal cases,

18   your Honor.

19           THE COURT:  In what?

20           THE WITNESS:  Appraisal.

21           THE COURT:  Appraisal, yes.

22           Well, I'll leave it to others, the question of the law

23   of New York.

24           There are other methods used in other states in

25   appraisal proceedings, are there not?

1              THE WITNESS:  I would assume so, yes.

2              THE COURT:  OK.  Let's go.

3        BY MR. BROOK:

4        Q.  All right.  Let's just make sure I'm understanding you

5        correctly and see if --

6              Let's put up Exhibit 305, page five.  This is an

7        excerpt --

8              Actually, let's first show page one.

9              Do you recognize this book?

10       A.  Yes.

11       Q.  This is the fifth edition of the Shannon Pratt treatise

12       which you yourself have relied upon, correct?

13             THE COURT:  Let's not do this.  All right?

14             MR. BROOK:  Yes, your Honor.  Force of habit.

15             THE COURT:  It is finite.

16       Q.  Were a number of data points available -- we won't read a

17       whole thing.  It says, If it turns out that very few data

18       points are available for a particular valuation multiple, that

19       problem may lead one to abandon that multiple or to put

20       relatively little weight on it.  This is true even though it

21       might be quite conceptually significant if there were more

22       data.

23             Do you see that?

24       A.  Yes.

25       Q.  And do you agree with that?

L9MsKLE2                            Cross - Torchio

1    A.  I think that's a valid point.

2    Q.  OK.  You can take that down, Ali.

3            Let's talk about some of the multiples that you have

4    used.  One is Prospect Beverages --

5    A.  Yes.

6    Q.  -- correct?

7            And that is a transaction that occurred in 2001,

8    right?

9    A.  It is.

10   Q.  More than ten years before the valuation date you're

11   looking at, correct?

12   A.  Yes.

13   Q.  And that amount of time is a factor that reduces its

14   reliability, correct?

15           The amount of time between the transaction that you're

16   comparing and the transaction that you're valuing, that

17   matters, doesn't it?

18   A.  Yes.

19   Q.  And you said that in your testimony, correct?

20   A.  Yes, yes.

21   Q.  But, otherwise, you think that this is one of the tightest

22   comparisons you have ever found in your career, is that right?

23   A.  I do, yes.

24   Q.  All right.  What was Prospect Beverages selling?

25   A.  My recollection is they were selling Pabst beer and Colt 45

L9MsKLE2                          Cross - Torchio

1   malt liquor.

2   Q.  In fact, they were only selling malt liquor, isn't that

3   right?

4   A.  I thought they were selling Pabst beer too.

5   Q.  Do you know who the manufacturer of Colt 45 malt liquor is?

6           Pabst.

7   A.  OK.

8   Q.  They also sold Olde English 800, does that sound right?

9   A.  I don't remember.

10  Q.  Do you know what kind of liquor or alcohol that is?

11  A.  I do not.

12  Q.  When is the last time you saw a malt liquor on a menu in a

13  nice restaurant?

14  A.  I don't drink malt liquor.  I wouldn't be looking at it.

15  Q.  But you do drink wine?

16  A.  A little bit.

17  Q.  All right.  And did you do any research to see whether or

18  not the types of customers and distributors are generally the

19  same for any companies with respect to malt liquor on the one

20  hand and Eber Wine & Liquor on the other?

21  A.  I did not.

22  Q.  Did you look into what the sales trends were like for Pabst

23  products at the time of the transaction in 2001?

24  A.  No, I did not.

25  Q.  Do you occasionally use Google to try to research these

L9MsKLE2                          Cross - Torchio

1   things about a company?

2   A.   Occasionally.

3   Q.   And you didn't do that in this instance?

4   A.   No.

5   Q.   Even though you only had a few data points, you didn't do

6   much of a deep dive into what Prospect Beverages was selling,

7   is that correct?

8   A.   Correct.

9   Q.   Let's put up Exhibit 307.

10          Do you not have it?

11          MS. KRAL:  One moment.  One second.  It will be up in

12   just a second.

13          MR. BROOK:  One moment, please.  It's coming.

14          MS. KRAL:  There you go.

15   Q.   Now, have you ever heard of Quartz website?

16   A.   I have not.

17   Q.   OK.  I want to just look at -- I'll represent that this is

18   an article that can be found through Google.

19          Second paragraph, if you can blow that up, Ali.

20          This says, The past decade has been an incredible one

21   for the brewery -- and this is an article dated in 2014 -- and

22   especially for its namesake beer.  The pale fizzy lager was

23   popular in the 1970s, but lost its way in the 1980s and 1990s,

24   hitting a low in 2001, when PBR sales dipped beneath a million

25   barrels.

L9MsKLE2                        Cross - Torchio

1              I'll stop it there.  So that's talking about Pabst
2      Blue Ribbon, which it's your understanding is a beer that was
3      sold by Prospect?
4      A.   Right.
5              MR. MULRY:  Your Honor, just object to this exhibit on
6      the grounds of hearsay.
7              THE COURT:  I hear you.
8              MR. BROOK:  Does that mean it's sustained, your Honor?
9              THE COURT:  It means go on.
10             MR. BROOK:  OK.
11             You can take that down, Ali.
12             MR. MULRY:  Your Honor, I believe these are new
13     exhibits for cross-examination that we are seeing for the first
14     time.  These are our objections.  They would not have been made
15     already.
16             THE COURT:  I appreciate that.
17             MR. BROOK:  We're not offering it into evidence.
18             THE COURT:  It all went bad for Pabst when they got
19     rid of Burton Ale, but you're all too young to know what that
20     means.
21             MR. BROOK:  Yes, your Honor, that is true.
22     BY MR. BROOK:
23     Q.   In 2001, what that just said was, the low point for Pabst's
24     most possible similar beer, the blue ribbon band, that was the
25     date of the Prospect transaction, correct?

L9MsKLE2                         Cross - Torchio

1   A.  It was.

2   Q.  Let's talk about Farmer Brothers.

3          Unlike Prospect, which was a transaction-based

4   multiple, this is one where you pull the multiple from the

5   public stock market, correct?

6   A.  Correct.

7   Q.  And you characterize it as a tea company, but did you

8   actually look into what the company does?

9   A.  Well, they distribute coffee and tea.  I think they provide

10  some coffee products.

11  Q.  They are, in fact, a coffee roaster themselves independent,

12  correct?

13  A.  I think they do some blending of coffee.  I'm not sure if

14  they do roasting.

15  Q.  To your knowledge, they don't actually distribute a variety

16  of different brands from suppliers, correct?

17  A.  I don't know that to be true.

18  Q.  Because you didn't research it, correct?

19  A.  I didn't look to see whether -- all the suppliers they had.

20  Q.  So when someone -- withdrawn.

21         For Eber-Connecticut, you understood that they sold

22  hundreds, perhaps thousands, of different labels of wine and

23  liquor, correct?

24  A.  Correct.

25  Q.  And from a variety of different suppliers to cater to a

L9MsKLE2                         Cross - Torchio

1  variety of different tastes, correct?

2  A.  You mean the end customers, the individuals?

3  Q.  Yes, the end customers.

4  A.  Sure.

5  Q.  But if a company like Farmer Brothers is only selling its

6  own coffees, someone doesn't like their coffee, that is not a

7  potential customer; they can't just switch to a different

8  roaster, correct?

9  A.  I suppose so, yeah.

10 Q.  In being publicly traded, there is no control premium in

11 buying a share on the stock market of Farmer Brothers, is

12 there?

13 A.  Well, I can't agree with that.

14 Q.  If I bought one share of Microsoft, would I be paying a

15 control premium for that on the stock market in your view?

16 A.  That depends.

17 Q.  On how many shares I already have?

18 A.  No, no.  It depends -- I mean, a control premium, as I have

19 said, is dictated by how some investors could possibly take

20 that company and increase its value.  If that company is fully

21 valued, then there is no control premium that can be expected.

22 In fact, if you look at some of the recent opinions that have

23 come out of the Delaware Chancery Court, that is exactly what

24 they are saying.  In many cases, the fair value is the publicly

25 traded price.  So that for many companies, there is no

1    potential control premium.

2              And, in fact, you know, if you think about this

3    logically, if every company had an inherent control premium,

4    you would see a lot more takeover proposals than you do.  The

5    reason that you don't is because there is no value-enhancing

6    strategy that is going to increase the value for most companies

7    on the stock exchange to warrant or justify a control premium.

8    Q.  So did you, as part of your analysis of Farmer Brothers,

9    look at --

10             THE COURT:  So are we now getting Mr. Torchio as an

11   expert on Delaware law, is that the idea?

12             MR. BROOK:  Your Honor, I've not objected on the

13   assumption the court can differentiate between legal and --

14             THE COURT:  Yeah, I think I can manage.

15   BY MR. BROOK:

16   Q.  So in looking at Prospect's -- I'm sorry -- Farmer

17   Brothers, did you examine whether the publicly traded stock

18   price incorporated any kind of control premium?

19   A.  I think that you probably misunderstood my answer then if

20   you're asking this question.

21   Q.  I probably did, I guess.  I'll withdraw the question then.

22             Just talking about, you know, you criticize Glenn

23   Liebman for putting zero weight on the multiples of Prospect

24   and Farmer Brothers, correct?

25   A.  Yes.

L9MsKLE2                         Cross - Torchio

1    Q.   Because he rejected those as invalid comparable methods,

2    correct?

3    A.   He did.

4    Q.   And you put equal weight on those comparable methods with

5    something like the Eder-Goodman purchase of 15 percent,

6    correct?

7    A.   To be specific, I put 20 percent weight on each.

8    Q.   OK.  So in your view, and this is your honest opinion, the

9    transaction for Prospect Beverages in 2001, a seller of malt

10   liquor in Brooklyn, is an equal measure of value for

11   Eber-Connecticut as a transaction involving the sale of

12   Eber-Connecticut's stock to another wine and liquor distributor

13   in 2008?

14   A.   With the caveat that the problem with those actual

15   transactions have to do with valuing the ROFR value --

16   Q.   Is that a yes, you agreed?

17   A.   With the caveat I do --

18   Q.   Again, you're just nodding.  I am just trying to confirm

19   you're saying yes.  I'll let you finish your caveat.  Don't

20   worry.

21   A.   I do think that is equivalent because the transactions that

22   you're referring to have a difficulty in assessing what is the

23   true value of the equity because they contain so many different

24   rights.

25               So yes, I would place equal value on them as sitting

L9MsKLE2                         Cross - Torchio

1    here today.  20 percent weight, as I said before.

2    Q.  And your opinion is that, therefore -- let me step back.

3          Using Prospect Beverages, you value the company at a

4    little over $600,000 as of 2012, correct?

5    A.  Let me look at my table.

6    Q.  All right.  I think there may be an exhibit -- we're not

7    offering it as this -- I know it is Plaintiffs' Exhibit 129, if

8    we want to put it up on the screen.

9          I'm sorry.  I'm going to take that back.  Last page of

10   this.  Last page of this.

11   A.  It's C-4, if that helps.

12   Q.  Yes, very last page.  This is where we see everything.

13   A.  OK.  OK.

14   Q.  Then on the far right, we see $646,413 as the value of what

15   you see as Eber-Metro's ownership interest, correct?

16   A.  Correct.

17   Q.  And then under the Eder-Goodman 2008 transaction, it is

18   $10,718 -- I'm sorry -- $10,718,000, correct?

19   A.  Under -- say it again.

20   Q.  Eder-Goodman 2008 valuation in the middle.

21   A.  In the Eder-Goodman?

22   Q.  Yes.

23   A.  Yes.

24   Q.  So that's just looking at 79 percent of the company's total

25   equity after giving preference to 4.5 million, correct?

L9MsKLE2                      Cross - Torchio

1   A.  Correct.

2   Q.  So would you agree that that's a pretty widespread in

3   valuation between the two different data points?

4   A.  Yes.

5   Q.  I mean, it's a factor of more than 13 or 14, correct?

6   A.  Yes.

7   Q.  And that didn't cause you to question whether you should

8   give more or less weight to one of those over the other?

9   A.  Well, what I did when I saw Mr. Eder's testimony is, I'm

10  thinking that I undervalued that -- that preference, right.

11  So, you know, you can look at it both ways, I suppose.  And I'm

12  trying to give equal weight to those two things to come up with

13  some kind of value.

14        But as I said in my deposition, there is difficulties

15  with each of these, and to just gloss over those other

16  valuations, what I would term to be very pertinent rate

17  valuations, I think is -- is incorrect.  So is the error in

18  Prospect Beverages or is the error in undervaluing the rights

19  that Eder-Goodman got.

20  Q.  Let's talk about another one of these transactions.  And we

21  can flip to -- keep this up, Ali -- I think it is page three of

22  this exhibit.

23        So this is your exhibit, what was marked in your

24  deposition as C-2, for the Southern Wine & Spirits offer,

25  correct?

L9MsKLE2                              Cross - Torchio

1    A.  Yes.

2    Q.  OK.  On this one, there was no liquidation preference, only

3    a right of first refusal, correct?

4    A.  That's correct.

5    Q.  You value that right of first refusal at $391,000 and

6    change and, therefore, subtracted that from the offer price,

7    correct?

8    A.  That's correct.

9    Q.  Is it fair to say that as a general matter in your

10   testimony, you received instructions from defense counsel on

11   what to do, such as how to treat liabilities of Eber Wine &

12   Liquor?

13   A.  Liabilities outside of the valuation?

14   Q.  Yes.  Just generally you received information and

15   instructions from defense counsel?

16   A.  Yes.

17   Q.  Did they tell you about the separate transaction for right

18   of first refusal with Southern Wine & Spirits?

19   A.  I do have a recollection of a ROFR that Southern had.

20   Q.  All right.  Let's put it up.  It's Defense Exhibit FFFF.

21        Could you blow up, I guess, everything from below

22   Mr. Hager, please?  Perfect.

23        Does this document look familiar to you?

24   A.  No.

25   Q.  OK.  Let's look at the paragraph one.

1               It says, Southern shall pay Metro the amount of

2     $100,000 in exchange for Metro granting the purchase right to

3     Southern.  Southern shall pay Metro the purchase price and

4     immediately available funds upon execution of the agreement by

5     both parties hereto.

6               I would represent that the second -- that the third

7     and fourth pages show the signatures of both parties thereto.

8               Does this affect your valuation of how much that right

9     of first refusal was worth to Southern Wine & Spirits?

10    A.  Can I read the whole document?

11              I've never seen this before.

12    Q.  Sure.  I think I have a copy without too much notes on it.

13              MR. BROOK:  Your Honor, may I hand it to the witness?

14              THE COURT:  Yes.

15              MR. BROOK:  Perhaps, actually, your Honor, maybe now

16    would be a good time to take a break so he can look at this.

17              THE COURT:  OK.

18              (Recess)

19              (Continued on next page)

20

21

22

23

24

25

L9m2Kle3                        Torchio - Cross

1    BY MR. BROOK:

2    Q.  Have you had a chance to review that document?

3    A.  Yes, I have.

4    Q.  And is it still your recollection that you have not seen

5    this document before?

6    A.  No, I have not.

7    Q.  Okay.  And having looked at this now, seeing that there was

8    a separate contract for the Southern right of first refusal,

9    does that affect your opinion on the valuation of the right of

10   first refusal in the Southern offer?

11   A.  Well, subject to looking at this letter agreement on July

12   5, I would say, yeah, I think that I would certainly factor

13   this letter into my analysis.

14   Q.  And would it be fair to say that if an extra $100,000 was

15   paid in a separate transaction, the total transaction value

16   would also have to go up from 3 million to 3.1 million?  Well,

17   the offer was to buy Eber-Connecticut, 15 percent of it, for $3

18   million, correct.

19   A.  Yes.

20   Q.  So if there was already a transaction where a right of

21   first refusal was bought for $100,000, then the total

22   transaction value for the right of first refusal and the 15

23   percent would be 3.1 million, or do you disagree with that

24   math?

25   A.  Yeah, I don't understand that.  If the total purchase price

L9m2Kle3                        Torchio - Cross

1    is 3 million and that purchase price contains a right of first

2    refusal, then the analysis, I mean, if you look at my page C2,

3    you would subtract the premium for that right from the 3

4    million and get 2.9 million instead of 2.6 million.

5            THE COURT:  But there is a separate $100,000 changing

6    hands for the right of first refusal.

7            THE WITNESS:  Well, but this is not the same offer, is

8    it not?

9            THE COURT:  Well, that's a very interesting question,

10   isn't it?

11           THE WITNESS:  I guess I would have to see what the

12   letter is because I assume that the one, the 100,000 is part of

13   the total price.

14           THE COURT:  Well, why would you assume that?  It says,

15   "Southern shall pay Metro the purchase price in the immediately

16   available funds upon the execution of this agreement by both

17   parties."

18           THE WITNESS:  Okay.

19           MR. BROOK:  All right.

20           THE COURT:  So if you regard this as part of the same

21   transaction, it is three million one.

22           THE WITNESS:  Yes, if this letter is completely

23   separate from the three million.  I just don't know.

24           MR. BROOK:  Maybe I just note the exhibit numbers for

25   the record for the Court to reference later?  The Court can

L9m2Kle3                          Torchio - Cross

1   look at Exhibit 194 at page 5, which is a transaction closing

2   binder that references this agreement at number 13, and it can

3   also look at Exhibit 198, which is a letter dated January 29,

4   2008, in which Southern agreed to terminate the right of first

5   refusal to allow the Eder-Goodman transaction to go through.

6           THE COURT:  Okay.  Now would you put up Plaintiff's

7   194, page 5.

8           MR. BROOK:  Sure.  Let's do that.  That is item 13

9   there, a little more than halfway down.

10          THE COURT:  Okay.  Don't highlight that.  It's

11  blocking the screen.  Back up to the first page now, please.

12          Can you hold it still?

13          PARALEGAL:  I'm not touching it.

14          THE COURT:  Go to the next page, please.

15          Next page, please.

16          Next page, please.

17          Next page, please.

18          Next page, please.

19          Next page, please.

20          Thank you.

21          Now, what is the exhibit number of the employment

22  agreement between Southern and Lester Eber?

23          MR. BROOK:  I want to say it is 27 off the top of my

24  head, but I can check that.  Yes.

25          THE COURT:  Could we put Exhibit 27 on the screen?

1          MR. BROOK:  It's on the screen, your Honor.

2          THE COURT:  Have you ever seen that before,

3   Mr. Torchio.

4          THE WITNESS:  The consulting agreement, your Honor?

5          THE COURT:  Yes.

6          THE WITNESS:  No, I did not.

7          THE COURT:  Were you ever informed of it?

8          THE WITNESS:  I -- yes, I was informed that there was

9   a consulting agreement.

10          THE COURT:  And what were you told about it.

11          THE WITNESS:  I was told that when Southern took over

12   New York, that Lester received an agreement to be a lobbyist, I

13   believe, on behalf of Southern in New York State.

14          THE COURT:  Were you told that he was to be paid $3

15   million over five years?

16          THE WITNESS:  I don't remember the amount, but I was

17   told that he was paid for three years.

18          THE COURT:  For five years, right?

19          THE WITNESS:  Was it five years?  Okay.

20          THE COURT:  Now, if and to whatever extent the money

21   payable to Lester under the consulting agreement were treated

22   as part of the purchase price, that would have quite an impact

23   on your valuation, wouldn't it?

24          THE WITNESS:  Absolutely.

25          THE COURT:  What would it do to your valuation?

L9m2Kle3                      Torchio - Cross

1           THE WITNESS:  Well, it would certainly increase the

2    valuation, if that was -- if that consulting agreement was part

3    of the proceeds, absolutely.

4           THE COURT:  Perhaps by as much as double, true?

5           THE WITNESS:  That's correct.

6           THE COURT:  Let's go on.  Thank you.

7    BY MR. BROOK:

8    Q.  All right.  Let's move on.

9           Let's talk about Eder-Goodman a little bit more.  And

10   you reviewed all the testimony that Eder -- Andy Eder gave last

11   week, is that right?

12   A.  Yes.

13   Q.  So you saw that in fact the way that Eder-Goodman valued

14   the transaction in 2008 was based on gross profit, correct?

15   A.  I saw that that was -- when they were -- I believe the

16   document you are referring to is where they were thinking about

17   buying the whole company.

18   Q.  And you saw that he said that his offer to buy the whole

19   company in late 2007 early 2008 was for approximately $20

20   million plus the net asset value, correct?

21   A.  I believe that that's correct.

22   Q.  And have you done any work to try to calculate what that

23   net asset value would have been at that time?

24   A.  Using -- well, it would include the control premium you are

25   talking about.

1    Q.  I am talking about just the numbers that he gave for buying

2    all of Eber-Connecticut.  Do you have any ballpark sense, even

3    as to what number it was that Andy Eder was saying he would

4    have paid for Eber-Connecticut all 100 percent of it in 2007 or

5    '8?

6    A.  Well, my recollection was that he couldn't remember what

7    the actual multiple was.  I think I saw on page -- the first

8    page was like a multiple of one times gross profit, and then on

9    the third page I believe --

10   Q.  So is it fair to say that you have not attempted to

11   calculate a number based upon Andy Eder's testimony as far as

12   what he offered?

13   A.  Well, I did --

14   Q.  That's all I am asking.

15   A.  I did look at page one, and that looked like it was in the

16   ballpark of what I was talking about.

17   Q.  Is it you are talking about page one of his -- was it

18   Exhibit 199?

19   A.  Yes, yes.

20   Q.  The part that has at the top the numbers for -- so you did

21   notice that actually the different columns here are labeled ASG

22   and Eder?

23   A.  Yes, I saw that.

24   Q.  So did you recognize that that's referring to their

25   existing companies, Alan S. Goodman and Eder Brothers, not

L9m2Kle3                    Torchio - Cross

1    Eber-Connecticut?

2    A.   That they were combining the companies.

3    Q.   Right, but what do you think that relevance has to the

4    value of Eber-Connecticut?

5    A.   Well, they were considering whether there would be any

6    synergies that could be attained from combining the companies.

7    That's my take on that.

8    Q.   Okay.  But this is not something that reflects their

9    valuation of Eber-Connecticut because it's not

10   Eber-Connecticut's financial information there?

11   A.   Well, the revenue on top I believe is awfully close to what

12   Eber-Connecticut's revenue was, and I believe that gross profit

13   margin, the percentage, I think that's pretty close, too.  And

14   so the good will multiple that they are using is a multiple of

15   one.

16   Q.   Okay.  And have you tried to use this document to try to

17   see what number you think it reflects for Eber-Connecticut's

18   value?

19   A.   Well --

20   Q.   I'm not asking you to do --

21   A.   I think I did.  If I just go to -- give me a second here.

22            MR. BROOK:  Your Honor, I would like to withdraw the

23   question.

24            THE COURT:  Okay.

25   BY MR. BROOK:

```
 1   Q.  You focused a lot of your testimony on the different rights
 2   that were afforded to Eder-Goodman under the LLC agreement,
 3   fair?
 4   A.  Yes.
 5   Q.  Including the right of first refusal and preemptive rights
 6   and liquidation preferences, etc., correct?
 7   A.  Yes.
 8   Q.  Isn't it true that there were also some restrictions on
 9   their rights that were carried with that LLC agreement, as
10   well?
11   A.  Well, there were some restrictions.  I know that there was
12   a nonsolicitation, kind of a joint nonsolicitation clause about
13   suppliers, suppliers that Eder had, suppliers that Eber had.
14   That I do recall.
15   Q.  Okay.  Well, let me ask you this:  Is it fair to say that
16   the reason why a right of first refusal diminishes the value of
17   remaining equity is because it reduces the alienability of that
18   property, the marketability of it?
19   A.  Well, I suppose you could think of it that way.  I think it
20   deters potential buyers from even considering approaching or
21   providing an offer.
22   Q.  Right.  And so that would explain why -- withdrawn.
23            THE COURT:  Excuse me.  But, Mr. Torchio, that depends
24   on who has the right of first refusal, where they are in
25   business at the time the right might be triggered, what their
```

L9m2Kle3                          Torchio - Cross

1    ability to finance the exercise of the right is, and probably

2    other factors that just haven't occurred to me yet, right?

3              THE WITNESS:  Of course.

4              THE COURT:  If the holder of right of first refusal is

5    insolvent, a prospective buyer can pretty much figure that it's

6    not going to be exercised, true?

7              THE WITNESS:  Fair enough.

8              THE COURT:  And if the property in respect of which

9    the right of first refusal is of unique or specialized value to

10   the prospective buyer, that prospective buyer may be able to

11   offer a price that no rational holder of the right of first

12   refusal would match, true?

13             THE WITNESS:  Well, considering the other rights that

14   they have, I think that would be difficult to justify a kind of

15   premium.

16             THE COURT:  I'm not talking about the other rights.  I

17   am talking about my question.

18             THE WITNESS:  Well --

19             THE COURT:  Suppose we had another bidder who had an

20   empty warehouse and 15 unionized truck drivers with trucks whom

21   he can't lay off for some reason and could absorb Eber Brothers

22   Connecticut, for the sake of argument, without any material

23   increase in his cost structure.

24             THE WITNESS:  Yeah, if -- if your Honor is assuming

25   that, number one, Eder-Goodman wouldn't exercise its right of

1    first refusal because of financial reasons and, number two,

2    that the buyer would not consider or would think that

3    Eder-Goodman's other rights are irrelevant, then, yeah, you can

4    imagine that there would be synergies they could combine these

5    companies together and attain the increase in value that I am

6    referring to.  But the facts and circumstances here don't seem

7    to jive with that.

8              THE COURT:  But my questions were not addressed to the

9    facts and circumstances.

10             THE WITNESS:  Oh.

11             THE COURT:  Here, they were addressed to the

12   hypotheticals I put to you.  I know you are advocating, and I

13   understand that's what experts do often, but --

14             THE WITNESS:  Honestly, your Honor, I'm not trying to

15   advocate at all.  I am trying to be objective.

16             THE COURT:  I accept your assertion.  Let's go.

17             MR. BROOK:  Your Honor has partially preempted my next

18   hypothetical I was going to get to, but I think it is important

19   anyway.

20             THE COURT:  Well, I would like to get to the point.

21   BY MR. BROOK:

22   Q.  There were drag-along rights also associated with this

23   agreement, right?

24   A.  Yes.

25   Q.  And those are a negative for the person who has -- who is

1    subject to the drag-along rights, correct?

2    A.  Yes.

3    Q.  So in this case, the drag-along rights mean they can be

4    forced to sell something less than fair market value, correct?

5    A.  Correct.

6    Q.  So assume that the company expands, does really well, and

7    ten years down the line you yourself value it at $100 million.

8    Are you with me so far?

9    A.  Uh-huh.

10   Q.  And at the same time, Eder-Goodman goes in the opposite

11   direction and becomes insolvent.  You follow me?

12   A.  Yes.

13   Q.  So it cannot afford to exercise its right of first refusal

14   for any amount of money, correct?

15   A.  Right.

16   Q.  At that point Eber-Connecticut could decide to sell the

17   company for $10 million, I don't know, maybe to a family

18   member, and Eder-Goodman only gets $4.5 million, even though

19   you yourself would value its equity at $15 million, correct?

20   A.  I think that that's a fair reading, yes.

21   Q.  And isn't it true that there are also -- there is an actual

22   restriction on disposition, that there cannot be a sale without

23   the consent of the Eber-Metro majority owners?

24   A.  I think it has to be unanimous.

25   Q.  Yeah, so, Eder-Goodman is buying something that it can't

L9m2Kle3                    Torchio - Cross

1   get rid of without the consent of the majority owner, fair?

2   A.  That's right.

3   Q.  And you didn't make any sort of discount for that, did

4   you?

5   A.  Well, I wouldn't say that.  I think I looked at all of the

6   rights that were available and I thought 15 percent was a very

7   conservative estimate considering everything.

8   Q.  All right.  Last topic.

9         As part of your analysis, you conclude about -- you

10  make conclusions about the solvency of Eber Wine & Liquor and

11  Eber-Metro, correct?

12  A.  Yes, sir.

13  Q.  And that was based in substantial part on an instruction

14  you received from counsel about how to treat those liabilities

15  of Eber Brothers Wine & Liquor, correct?

16  A.  That's correct.

17  Q.  And but during your deposition you indicated it was also

18  your opinion that a reasonable investor aware of all the facts

19  would nonetheless agree that those liabilities would follow

20  Eber-Metro and Eber-Connecticut after any transaction.  Is that

21  a fair characterization of your testimony?

22  A.  Yes, that -- the legal determination that I have been given

23  had it been provided to an investor with regard to the

24  magnitude of these liabilities and that they were joint and

25  several liabilities with a high degree of certainty that that

L9m2Kle3                          Torchio - Cross

1    information would be highly relevant to an investor.

2    Q.  And that's because in your view an investor aware of all

3    the facts would see Alexbay's acquisition of Eber-Metro as a

4    fraudulent conveyance, correct?

5    A.  Well, in -- what I was talking about in my deposition was a

6    situation -- at least in my mind, was a situation where you

7    sell the company, you sell -- effectively you are selling

8    Eber-Connecticut and the cash proceeds are distributed, but the

9    liabilities remain with Metro and then, in my view, from my

10   experience with working for the PBGC, the PBGC would go after

11   it, and I think the term that they use is we follow the assets,

12   we are not going to let that occur.  So that was my discussion

13   in the deposition.

14   Q.  And so --

15            THE COURT:  So, excuse me, is that a "yes"?

16            THE WITNESS:  That's a "yes."

17            THE COURT:  Thank you.

18   BY MR. BROOK:

19   Q.  And in your deposition you also said that an investor aware

20   of all the facts would recognize the transaction as a shell

21   game, correct?

22   A.  If you tried to sell the assets and leave the liabilities

23   with a company that has no assets, then yes.

24   Q.  But just to be clear, that's based on the purchase price

25   that was paid, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

L9m2Kle3                        Torchio - Cross

1   A.  I'm not sure I follow you.

2   Q.  All right.  It is not the world we live in where every time

3   a subsidiary is sold the company buying the subsidiary has to

4   be afraid of the parent's pension plan, is it?

5   A.  Well, I don't know that I agree with that.  I think that

6   one of the concerns of an investor, particularly an investor

7   who has deep pockets, is that -- is that there is -- the

8   pension liability is going to come back to haunt them, whether

9   they are assuming them or not.  So I'm not sure that I can

10  completely agree with your contention.

11  Q.  Well, I'm not asking if it's one of the concerns.  I'm

12  asking if it is something that, in your view, is essentially a

13  certainty?  Because that's the position you are taking is that

14  this is an amount of money that should be counted at full value

15  and not discounted based upon any probabilities, correct?

16  A.  Well, given the assumptions about the liabilities that I

17  have been provided with, I don't see how one would legitimately

18  come up with a probability.  It seems like, from what my

19  instructions are, that those liabilities, both the amounts and

20  the degree of certainty, were so high that there would be no

21  probabilistic analysis required.

22  Q.  Let me give you a hypothetical that I think will end this,

23  and hopefully you don't disagree with me just because I

24  paraphrase it that way.

25           Let's assume that Eber-Metro has -- that Eber Wine &

1    Liquor has liabilities of $10 million even.  With me so far?

2    A.  10 million even.

3    Q.  All right.  And someone offers to buy Eber-Metro and all of

4    its assets for $20 million but without assuming any liabilities

5    of Eber Wine & Liquor.  You follow me?

6    A.  Got it.

7    Q.  So in your view, would the buyer be assuming the

8    liabilities of Eber Wine & Liquor in that purchase?

9    A.  So long as that $20 million was not distributed to the unit

10   holders and it was used to pay off the liabilities, I agree

11   with you.  To the -- what I was talking about is to the extent

12   that the cash is distributed and the liabilities are sitting

13   there naked, then I could see that the PBGC going after the

14   buyer.

15   Q.  So in other words, it really depends on the trustworthiness

16   and honorability of the parent's management as to whether or

17   not they will properly prioritize creditors over themselves?

18   A.  I think that's exactly what I am saying, but I am just

19   saying if it was distributed without considering -- without

20   paying off the liabilities, then I think they would go after

21   the buyer.

22            MR. BROOK:  No further questions.

23            THE COURT:  Thank you.

24            Any redirect?

25            MR. MULRY:  If I could just have a moment.

L9m2Kle3                    Torchio - Redirect

1          THE COURT:  Yes.

2          (Counsel confer)

3          THE COURT:  Counselor.

4   REDIRECT EXAMINATION

5   BY MR. MULRY:

6   Q.  Mr. Torchio, just a few questions on the last point with

7   respect to your understanding of the PBGC liabilities.

8          Looking at -- you were valuing primarily Metro, is

9   that correct?

10  A.  Yes.

11  Q.  And what's your understanding of what was your belief as to

12  what a buyer of Metro would be concerned about with respect to

13  any pension liabilities?

14         MR. BROOK:  Objection, your Honor.  It's asked and

15  answered in all the direct testimony that was submitted.

16         THE COURT:  I will listen.  Go ahead.

17  BY MR. MULRY:

18  Q.  Just to clarify your last questions to Mr. Brook, maybe I

19  will rephrase it a different way.

20         Why would a purchaser of Metro be concerned about the

21  Eber Wine & Liquor pension liability?

22  A.  Well, as I said, if the PBC goes after the buyer of the

23  assets because the buyer has deep pockets, there would be

24  concern and I think that was borne out in I believe it was some

25  testimony from Southern saying, you know, those pension

L9m2Kle3                    Torchio - Redirect

1    liabilities can be a black hole.  And I think that's kind of

2    what they are saying is that you never know what your exposure

3    is going to be for sure, but you know that it can be dangerous

4    because the PBGC will go after deep pockets.

5    Q.  In your view, would a purchaser look to seek some form of

6    price protection against the possibility that this pension

7    liability would be something they would have to deal with?

8    A.  So if the pension liability did not go along with the

9    assets?

10   Q.  Correct.  Yes.

11   A.  So in that case I would expect that the buyer would, you

12   know, generally, rely on reps and warranties to make sure that

13   if something adverse happened, some adverse issue with the

14   PBGC, that they were going to come after the buyer, that they

15   would have reps and warranties.  Of course that is a little

16   difficult here because if it was sold I don't know what assets

17   would back up the reps and warranties.  But as a general

18   matter, that's what you would observe from a purchase of a 79

19   percent stake.

20            MR. MULRY:  If I may just have one moment, your Honor.

21            (Counsel confer)

22   BY MR. MULRY:

23   Q.  And to what extent would the presence of this liability

24   chill, in your view, the desire of any buyer to even enter into

25   a transaction with this kind of liability?

L9m2Kle3

1  A.  Well, as I said, I think that, you know, in my view, the

2  inability of Eber-Metro providing reasonable reps and

3  warranties would deter the kind of -- it would be a measure of

4  price protection.  It wouldn't be available, and it would

5  likely result in a walkaway from the deal.

6          MR. MULRY:  Okay.  Thank you, Mr. Torchio.

7          Thank you, your Honor.

8          MR. BROOK:  No recross.

9          THE COURT:  You are excused.  Thank you, Mr. Torchio.

10          THE WITNESS:  Thank you, your Honor.

11          (Witness excused)

12          MR. MULRY:  Your Honor, with that, the defendants

13  rest.

14          THE COURT:  I take it there is no rebuttal case.

15          MR. BROOK:  No, your Honor.

16          THE COURT:  Okay.  Do you want to do your argument

17  after lunch?  Is that what you would prefer?

18          MR. BROOK:  That would be my preference, your Honor.

19          THE COURT:  All right.  We will start at 2:15.

20          MR. BROOK:  I'm sorry.  Was that 2:15?

21          THE COURT:  2:15.

22          Okay.  Thank you.  And I am genuinely appreciative

23  that we got this in in the time in which we got it in.

24          And I also want to alert you that I have made a

25  referral for settlement purposes to Judge Parker, and you

L9m2Kle3

1    should go to her chambers before the day is out to make

2    arrangements for how you are going to handle that, when you are

3    going to handle it.   Okay?

4                MR. BROOK:   Thank you.

5                MR. MULRY:   Thank you, your Honor.

6                (Luncheon recess)

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1              A F T E R N O O N   S E S S I O N

2                          2:15 p.m.

3              THE COURT:  Okay.  Mr. Brook.

4              MR. BROOK:  Your Honor, the parties do have, I think,

5      something of an update in terms of settlement conference

6      scheduling.  Do you want to hear that now or after?

7              THE COURT:  Later.

8              MR. BROOK:  What's that?

9              THE COURT:  Later.

10             MR. BROOK:  Okay.  Thank you, your Honor.

11             Lester Eber tried to beat Southern Wine & Spirits when

12     they tried to come into New York, and he did so in large part

13     by trying to partner with this Georgia-based distributor, NDC.

14     And in the course of that deal, he actually ended up getting a

15     put option -- this is in Exhibit 25, which I'm not going to put

16     on the screen -- that valued the company at $275 million.  And

17     we don't have all the details on that, but we are pretty sure

18     that there were conditions on that that weren't met.  It

19     appears that what happened was they had to -- they had to

20     actually be successful in holding Southern at bay if they

21     wanted to get to that kind of valuation.  We know that

22     discussions happened with Southern.  It was testified to by

23     various different people, including Mr. Hager in the deposition

24     on behalf of Southern Wine & Spirits, but we never got a number

25     for what it was.  But we know what Lester wanted --

1            THE COURT:  Could you speak more slowly?

2            MR. BROOK:  Sure.

3            We know what Lester wanted.  It was 275 million.  But

4    instead of beating Southern, instead of holding them at bay,

5    the partnership with NDC failed.  The company crumbled under

6    the pressure.  And when going to pick up the crumbles, the

7    evidence has shown that Lester tried to keep all those

8    crumbles -- all those crumbs for himself and his daughter to

9    the exclusion of others, even though he was the trustee of a

10   trust that held that company, that was created by his father

11   for the purpose of holding that company, and for which Lester

12   was supposed to be the trusted son to take care of the family.

13   And instead, in the process of doing a variety of transactions,

14   starting with negotiating his own consulting agreement with

15   Southern, systematically destroyed the trust's assets,

16   everything other than the publicly traded stocks that were held

17   by a bank.

18           And as a result, just to put some numbers on it, if we

19   look at everything that has happened, if the trust had gone the

20   way it was supposed to and Lester passed away when he did, none

21   of these transactions we are challenging happened, Wendy Eber

22   would have ended up with a 14 percent interest in

23   Eber-Connecticut.  But here today, Wendy Eber is claiming an 85

24   percent interest in Eber-Connecticut.  100 percent of what

25   belonged to the trust is now what Wendy Eber wants this Court

L9m2Kle3                    Summation - Mr. Brook

1     to put the stamp of approval on her taking.

2              Now, in my opening -- you know, I normally am a lawyer

3     who believes in trying not to overstate your case.  You don't

4     want to oversell something.  And I called the defense -- part

5     of the defense legally insane, and that's a pretty big promise

6     to make.  But I think, your Honor, what I was getting at is the

7     testimony of Frank Torchio today, where they have their own

8     expert witness characterizing the key transaction here, the

9     Alexbay transfer, as something that an investor, aware of all

10    the facts, would consider to be a fraudulent conveyance or a

11    shell game.  This is the kind of opinion testimony that is

12    normally elicited by a plaintiff challenging a transaction.  It

13    is objected to by the defense, and that objection is sustained

14    for usurping the fact-finder's function.

15              THE COURT:  Slow down, please.

16              MR. BROOK:  Sorry.

17              It is extraordinary testimony for the defense to

18    effectively be:  We were only defrauding creditors.  The

19    shareholders weren't harmed.  Even though, putting aside the

20    fact that the shareholders were also trust beneficiaries, and

21    the extra duties there.  It's just an extraordinary argument

22    that, as I said, and I still believe, does not make any legal

23    sense whatsoever.

24              And it is also predicated upon expert testimony that

25    is, in and of itself, highly questionable and subject to quite

L9m2Kle3                    Summation - Mr. Brook

a few different caveats and was the result primarily of a legal

instruction.  Mr. Torchio himself, you know, could -- you know,

he did not reach the conclusion that this company was insolvent

on his own.  He was told to do so basically using a bunch of

numbers that were very favorable.

        But all things being equal, and they aren't, but let's

assume that they are, between the expert testimony, on that key

transaction, this Court also has the testimony of Andy Eder,

who made perfectly clear that he has been willing and wanting

to buy this company for the better part of 14 years, and he

recently made an offer, something that Mr. Torchio himself has

not -- did not take into consideration, but he said would be

important in determining the current value of the company.

        So that transaction, of course, is the main reason why

we are here.  That was the biggest one.  But it is actually --

there is a number of different transactions, both before and

after, that we are asking this Court to set aside, and I think

that, framing that with plaintiffs' Demonstrative 2 -- if you

could put that up, please, it would be helpful -- so we will

get to the Southern consulting agreement later, but as

explained in opening and as shown through the evidence at

trial, that was -- the Southern consulting agreement was what

led to the funding shortfall that caused a lot of other

problems.

        We have also shown that there were a lot of legal --

1          THE COURT:  You know, you are speaking very quickly.

2    It is hard enough to understand when there are no masks

3    involved, but it is very hard.

4          MR. BROOK:  I will try to pace myself.

5          THE COURT:  That's a good idea.

6          MR. BROOK:  Yes.

7          Ali, can you make sure to remind me when we get close

8    on time?

9          So after Southern -- after the company is supposedly

10   in a great deal of financial distress, certainly on the books

11   that were presented to the auditors, the numbers were not

12   looking good.  And so one thing that we saw happened is the

13   Canandaigua National Bank, which was a trustee, manager of the

14   pension plan, or administrator, rather, in terms of

15   administering the benefit, the investments that were made, and

16   also the lender to Eber-Connecticut, and those three functions

17   were kept essentially separate.  That's the testimony of Bob

18   Lowenthal of CNB in deposition testimony that's been

19   designated.

20         Bob Lowenthal, we saw in February of 2010, started

21   asking what's up with this pension liability?  You know, they

22   were looking at whether Lester had to put up more collateral

23   for the loan.  And the e-mail -- I believe it is Exhibit 225 --

24   makes it perfectly clear that -- don't put it up Ali -- makes

25   it --

1          THE COURT:  Makes what perfectly clear?

2          MR. BROOK:  I'm sorry, I was -- it makes perfectly

3     clear that they were under the impression -- by "they,"

4     Canandaigua, that this was Lester's personal liability, that he

5     had something that he might have to do in terms of paying the

6     pension plan.  Bob Lowenthal's deposition testimony, designated

7     by plaintiffs, shows that he, from the entire time he was on

8     the account, did not know about any liabilities held by Eber

9     Brothers Wine & Liquor or Eber-Metro that could have affected

10    Eber-Connecticut.  He said that they repeatedly asked for

11    financial statements for those companies.  He was told that

12    they were shells.  And he --

13         THE COURT:  He was told that they were?

14         MR. BROOK:  That they were shell companies, that they

15    were empty shells.

16         THE COURT:  Shelf?

17         MR. BROOK:  Shell, S-H-E-L-L.

18         THE COURT:  Okay, got it.

19         MR. BROOK:  That's what he said, you know that --

20    either -- he couldn't remember which one, but either Lester or

21    Wendy is the one who told him that.  And of course a company

22    with potentially $10 million in liabilities, as is now claimed,

23    is not exactly a shell company if it's on its own, not to

24    mention it, of course, does own this Eber-Connecticut

25    subsidiary.  So what's important is another part of their

1    defense is effectively saying we were committing bank fraud.

2    We were lying to CNB about the different liabilities that were

3    had.

4              Now, the truth is, it's somewhere in the middle.

5    Ms. Eber was not being perfectly truthful with this Court when

6    she talked about how she believed that this pension plan and

7    other liabilities were going to follow all the subsidiaries.

8    And the very first transaction that's on this list to be set

9    aside proves that.  It was the magic number of six percent,

10   exactly the amount necessary to remove Eber-Connecticut from

11   the controlled group for Eber Wine & Liquor, because six

12   percent plus the 15 percent sold to Eder-Goodman gets them just

13   below 80.  So if they wanted to be more obvious, I don't know

14   how they could have been.

15             And that transaction is unquestionably a fraudulent

16   transaction.  Whether it was a product of the inquiry from

17   Canandaigua two or three months earlier, it's hard to know

18   exactly what the straw that broke the camel's back was in this

19   instance that caused them to start to document their loans,

20   hire Glenn Sturm, transfer the assets, but it's clear that, by

21   the middle of 2010, that was the path that they were on.

22   Lester's supposed loans to the company and, to be clear,

23   plaintiffs --

24             THE COURT:  Lester's what?

25             MR. BROOK:  Supposed loans to the company.

L9m2Kle3                    Summation - Mr. Brook

1          THE COURT:  Let's just pause on that for a minute.

2          MR. BROOK:  Sure.

3          THE COURT:  The paper record here is so gigantic that

4    I can't claim to have looked at every page of it.  Are there

5    any checks, we will start with checks, from Lester to the

6    company that are said to document loans in the record?

7          MR. BROOK:  Yes, your Honor.

8          THE COURT:  How much?

9          MR. BROOK:  It is somewhere between 1 point -- the

10   numbers I have seen -- I will confess I have not added up all

11   the checks personally.  I believe the minimum amount of checks

12   written from late 2009 through the middle of 2012 is

13   $1,526,000, and I am basing that off of an e-mail that I think

14   is dated sometime in January 2012.  It looks like there were

15   another few hundred thousand dollars in payments afterwards.

16          So if I can, you know --

17          THE COURT:  Let's just move along.

18          MR. BROOK:  Okay.  So to be clear, we do acknowledge

19   that there was money deposited into the company's accounts.

20   The reason why I call even those late payments supposed loans

21   is because, in reality, this is just Lester giving back to the

22   company that which he took through the Southern deal.  But we

23   do acknowledge that those payments were made and, as I will get

24   to later, plaintiffs do acknowledge that that is something that

25   should be taken into account when determining the final

1    balances of the equities here.

2              But --

3              THE COURT:  So you concede that point.

4              MR. BROOK:  We concede that, at least as to the

5    principal amount paid, where they can show that the money was

6    paid into the company, that that is money that should be

7    credited back.  I think it is more than offset by what was

8    taken out in other regards, but that's definitely part of the

9    calculus.

10             As far as the six percent goes, you know, there is --

11   Andy Eder said he heard three different stories about it, and

12   the fact is we actually heard four different stories about it,

13   because Andy Eder said that he heard that it was initially for

14   Wendy due to something having to do with her divorce, then it

15   was due to Wendy being a good employee, then it was due to

16   Glenn Sturm doing good work.

17             And the testimony from both Lester and Wendy under

18   oath has been that that was actually -- that Glenn Sturm wanted

19   10 percent and got negotiated down to six percent, and I

20   suppose that's some sort of magical coincidence that he got

21   negotiated down to the exact percentage that they were going to

22   give to Wendy.  So not particularly believable, but then of

23   course there is --

24             THE COURT:  Is Sturm still alive?

25             MR. BROOK:  My understanding is that he is severely

1    ill and has been suffering from significant problems with

2    cancer for a long time, so he was -- and going back to

3    something I said yesterday, the decision was made, after the

4    defense waived any advice-of-counsel defense, not to burden

5    Mr. Sturm with a deposition while he was in that state, along

6    with dealing with other lawyer witnesses.

7            And just as further background, there was a great deal

8    of litigation during discovery over the disclosure of

9    privileged information and whether or not certain information

10   was able to be accessed by the plaintiffs for various reasons.

11           So the six percent, the plaintiff's position,

12   especially since we now know, you know, in addition to all the

13   other problems with it being a nonrecourse note at a price that

14   was never disclosed to Eder-Goodman, it's in Wendy's hands now.

15   It was transferred to her simply for exchanging the note back

16   to her, her assuming that in 2017, at a time when there was

17   $150,000 dividend payment about to come due.  And even if Wendy

18   says that wasn't a value to her, surely because she just put it

19   back into the company, surely that would have been a value to

20   Glenn Sturm if this were a real transaction, if he weren't,

21   instead, just a placeholder for a transfer to Wendy.

22           So that is a transaction that should be set aside, and

23   that's important for a couple of reasons, not only because it

24   restores six percent of the ownership interest, which is not a

25   small amount, given the values that we know Eber-Connecticut

L9m2Kle3                    Summation - Mr. Brook

1     now has, but also because that transaction, that six percent

2     sale to Polebridge Bowman was the basis that Lester used when

3     he asked Judge Rosenbaum, in the Monroe County Supreme Court,

4     to declare the transfer of Eber-Metro in exchange for his debt,

5     to be commercially reasonable.  He said that is the most

6     reasoned transaction.  He said this was a transaction on the

7     open market, as if it was a market transaction.

8              Their own defense to this transaction undermines that

9     assertion.  They say it was compensation.  If it's

10    compensation, it's not a market transaction.  So in addition to

11    being a bad transaction in and of itself, it is the foundation

12    for the fraudulent Alexbay transfer.

13             THE COURT:  The fact of the holding in Monroe County,

14    that it was commercially reasonable, is really immaterial to

15    this case, isn't it?

16             MR. BROOK:  Completely agree, your Honor, yes.

17             THE COURT:  Because that question is not implicated

18    here.

19             MR. BROOK:  No.  You are absolutely right.  And that

20    was something that was argued at summary judgment, and

21    Judge Parker absolutely got it right, that compliance with the

22    Uniform Commercial Code has nothing to do with fiduciary

23    duties, especially not when that Court is severely misled.

24    But, you know, it --

25             THE COURT:  But under *Rooker-Feldman*, I think, this

L9m2Kle3                    Summation - Mr. Brook

1    Court has to respect that decision.

2              MR. BROOK:  Sure.

3              THE COURT:  But that decision doesn't decide anything

4    of moment here.

5              MR. BROOK:  That is exactly right, your Honor.  But I

6    will tell you why I am -- even though -- and of course

7    Judge Parker has already ruled that this transaction, the

8    Alexbay transaction, is void under the no-further-inquiry rule.

9              And on that point, I want to say two things:

10             One is, I believe Mr. Mulry really made a mistake in

11   terms of giving away the truth here when he characterized in

12   his opening Judge Parker's decision as saying that's not the

13   end of the inquiry.  We are having a trial here because that's

14   not the end of the inquiry, but the rule is called the

15   no-further-inquiry rule.

16             So certainly as a matter of law the Court is aware of

17   plaintiff's position.  But it's relevant anyway to talk about

18   this transaction because -- and I don't have, unfortunately,

19   the full citation with me here, but I know it is in a number of

20   briefs.  It's a case called *Birnbaum v. Birnbaum*, and it relies

21   on the treatise *Scott on Trusts*.  It is from, I want to say,

22   1983 or 1984 or so.  It's a New York Appellate Division case

23   that lays out exactly what a Court, in unwinding a violation of

24   the no-further-inquiry rule, should be doing.  And I'm going to

25   read just the part of it that -- I think is most relevant

L9m2Kle3                    Summation - Mr. Brook

1    here -- which is, "If the trustee has not resold the property

2    or has resold it to a person who is not a *bona fide* purchaser,

3    the beneficiaries can insist upon a reconveyance of the

4    property, and the trustee is accountable for any income

5    received by him from the property but is entitled to receive

6    the amount which he paid for it with interest and, unless he

7    was guilty of actual fraud, the value of all improvements made

8    by him."

9          And that last part is what I am focused on here

10   because it goes to a more overarching principle of New York

11   law, which is, that someone who wrongly takes property and then

12   improves upon it is not entitled to be compensated for it if

13   they knew it was wrong.  The no-further-inquiry rule needed to

14   be laid out like this because it applies even when there is

15   good faith.  A trustee might simply just not understand their

16   legal duties, buy something from a trust, and have to give it

17   back, and if they invested a lot of money into it, it's fair to

18   pay them back.

19         So what this Court has to decide is what was the state

20   of mind there?  Was Lester in fact acting in good faith?  And

21   if instead --

22         THE COURT:  I'm sorry, was Lester?

23         MR. BROOK:  Was Lester acting in good faith when he

24   took these actions?  And that's why even though --

25         THE COURT:  When you say when he took these actions,

L9m2Kle3                    Summation - Mr. Brook

1     be specific.  Which actions?

2              MR. BROOK:  Almost all of them, but certainly when it

3     comes to taking Eber-Metro from Eber Wine & Liquor, claiming

4     that -- and telling Judge Rosenbaum -- again, the Court doesn't

5     have to overrule that decision to recognize that Lester lied to

6     a court to try to achieve his outcome; that Lester, you know,

7     grossly misrepresented the value of the company; that he

8     omitted to mention the Eder-Goodman transaction; that -- you

9     know, and let's just -- we can go even one better than that.

10             THE COURT:  But, no, let's -- I'm a little slow,

11    right?

12             MR. BROOK:  Yes.

13             THE COURT:  So the Southern transaction is 2007,

14    right?

15             MR. BROOK:  Yes.

16             THE COURT:  And 2010, they, in your submission --

17    "they" being the defendants -- go through this little

18    Polebridge Bowman transfer, the predominant or exclusive

19    purpose of which is to insulate Eber-Connecticut from the

20    pension liability, whatever that turns out to be.  Yes so far?

21             MR. BROOK:  Yes, that's the primary purpose.

22             THE COURT:  And -- let me just check dates.  So

23    somewhere along the line between 2007 and 2010, '11, '12, if I

24    have the chronology correctly, yeah, Lester is getting a pot of

25    money from Southern personally, he is lending what you say is

L9m2Kle3                     Summation - Mr. Brook

1   around a million and a half, maybe a little more, back.  That

2   becomes the true value of the loans, and then sets up this

3   Alexbay foreclosure (a) on an inflated number, is that right?

4           MR. BROOK:  We believe his loans were inflated, yes.

5           THE COURT:  But in any case, even if they are not

6   inflated, it is on this million and a half.

7           MR. BROOK:  Or let's just even give him credit.  Let's

8   say it's 3.6, what he told the Court his loans were worth with

9   interest.  That's still way less than the value of the asset

10  that he took, which was 79 percent of Eber-Connecticut.  That

11  was the exchange.

12          THE COURT:  Okay.

13          MR. BROOK:  He told the Court, and this is what the

14  transaction documents show, that the debt is being canceled.

15  They valued it at 3.6 million with interest at that time.  And

16  in return, Eber Wine & Liquor is giving away 100 percent of its

17  ownership, which is all of the ownership of Eber-Metro, which

18  included primarily the 79 percent interest in Eber-Connecticut

19  or Slocum.  It also included that $350,000 nonrecourse note.

20  So that was another asset technically on the books.

21          THE COURT:  But you get from the million five or

22  million seven, or whatever it was --

23          MR. BROOK:  Yeah.

24          THE COURT:  -- to the three million something on the

25  basis of these alleged amended and restated notes that stick in

L9m2Kle3                    Summation - Mr. Brook

1    a nine percent interest rate --

2              MR. BROOK:  Yeah.

3              THE COURT:  -- when at the beginning they were

4    noninterest bearing, right?

5              MR. BROOK:  Correct, your Honor.

6              THE COURT:  Okay.  And would it be your position that

7    the amendment and restatement of the notes to put in this nine

8    percent is a self-dealing transaction all the way, is that

9    right?  That's your position.

10             MR. BROOK:  Yes, it is.  I mean, to -- I mean it's a

11   little complicated.  And if I may, so it is self-dealing.

12   Under the trust instrument, trustees are allowed to make

13   secured loans.  That, of course, makes sense when the trust

14   instrument says that one of the trustees will be a bank that is

15   the regular lender to the company.  I very much doubt Allen

16   Eber ever imagined his son would be making secured loans to the

17   company.  But it is self-dealing.  We are not saying it is

18   invalid on its face as a matter of that, and it does appear to

19   have at least been signed off by John Ryan.  I think at the end

20   of the day --

21             THE COURT:  Who is John Ryan?

22             MR. BROOK:  I'm sorry.  That was the CFO who signed

23   the document, but he did not initial the interest rate change.

24             THE COURT:  And he works for Lester.

25             MR. BROOK:  He works for Lester.

1          And those notes do not appear to have been authorized

2     by the board of directors, which is, as a matter of corporate

3     law, putting aside the trustee issues, that's what would

4     normally have to happen with Lester abstaining in order to

5     approve that kind of self-dealing.

6          THE COURT:  And in the absence of board approval by a

7     majority of disinterested directors, fully informed of the

8     facts, the burden would be on Lester to prove the entire

9     fairness of the insertion of the nine percent interest rate,

10    yes?

11         MR. BROOK:  Correct, your Honor.  It is our position

12    that virtually every transaction we are talking about here

13    involving the corporations is subject to the entire fairness

14    doctrine, because at no time, certainly not after 2007, when

15    the board was made up of Lester, his daughter, and his personal

16    attorney, because Mr. Gumaer in a -- I can't remember the

17    exhibit number off of the top of my head, but he actually was

18    Lester's personal attorney as well as trustee and director

19    since 2001.

20         THE COURT:  Now, is there, in your view, a complete

21    failure of proof on entire fairness even assuming everything

22    else with respect to the insertion of the interest rate?

23         MR. BROOK:  Yes, your Honor.  I think that what we

24    have is we have got -- I think there is not only failure of

25    proof, I would say that the preponderance of the evidence at

L9m2Kle3                         Summation - Mr. Brook

least weighs on the side of this being a fabrication, that we

have got -- the 2005 and '6 financial statement lists some sort

of a loan to some unnamed officer at a balance of 200-and-some

thousand dollars at the end of 2005.  How can they amend and

restate that at 575?  That same 575 note was not in the first

draft of the trustee meeting minutes when, in 2011, the

trustees met and supposedly ratified the loans.  The first

ratification minutes only mention two loans.

          And on that, it's important to note that, although he

wasn't here in person, Rick Hawks, the Canandaigua person who

was acting as co-trustee, disputed the characterization of the

meeting as involving any kind of a ratification, not that a

*post hoc* ratification would be legally valid anyway, but even

that much is --

                    (Continued on next page)

1          THE COURT:  Aren't all ratifications inherently

2     post hoc?

3          MR. BROOK:  I suppose so, but as opposed to approving

4     a transaction ahead of time, so ...

5          I think there is one other aspect of this, your Honor.

6     And I apologize it is going to involve more of the general

7     ledger on this.  Your Honor may have noticed the numbers they

8     are quoting for the value of the 2006 amended notes are

9     actually lower than even one of them.  It is usually they say

10    1.434 million in some of the documents, sometimes the minutes

11    say 1.2 million, and that's because an adjustment had to be

12    made for the fact that there was a huge balance on the books of

13    Eber Wine & Liquor for Lester's personal spending to the tune

14    of $850,000, all of which had been paid for Lester's benefit

15    without any interest at the same time that he supposedly was

16    loaning money to the company at 9 percent interest.

17         That is just for the court's reference.

18         THE COURT:  That's good action.

19         MR. BROOK:  He's the best arbitror I've ever seen.

20         That's Exhibit 160 at page 50.  Those are the personal

21    accounts balance.

22         THE COURT:  Now back to the loans.

23         MR. BROOK:  Yes.

24         THE COURT:  Are there any books of original entry that

25    are contemporaneous that document the loans from Lester to the

1    companies?

2          MR. BROOK:  Are we talking about the 2006 ones or

3    the -- because there is nothing on 2006, but the later ones --

4          THE COURT:  Anything from 2006 on.

5          MR. BROOK:  So for the later stuff, for the stuff that

6    relates to what is called the line of credit note that has two

7    different dates on it, approved by the board in February 2010,

8    there are a number of different journal entries and such in the

9    general ledger that reflect those payments.

10         Part of what I put into evidence -- just because I

11   didn't know where it was going to go, it is for the court to

12   look at, if you want to have you or your clerk do it -- there

13   is correspondence between Wendy and accountants over a period

14   from, I would say it starts probably in October 2011 through

15   July 2013, where she is trying to figure out what the balances

16   are because these books are such a mess.  Even they couldn't

17   figure it out.  They were debating it for nearly two years

18   trying to figure this stuff out.  That is part of the challenge

19   that this case certainly presents.

20         At the end of the day, I think one way that this court

21   could handle it, because of the different balances, is to look

22   at the law and the bylaws, the bylaws, to look at the law and

23   the bylaws.  As we showed, the Eber Wine & Liquor bylaws do not

24   permit contracting a loan without board authorization.  The

25   only board authorization which, you know, certainly

1    self-dealing and not independent.  But for the sake of just

2    getting this over with, plaintiffs are willing to say it is a

3    board authorization, the February 26, 2010 authorization for

4    the line of credit note.

5            Let's say that authorizes it up to $1.5 million.  That

6    means that even though there are deposits more than 1.5

7    million, and we're not exactly sure how much, the court would

8    be --

9            THE COURT:  I'm sorry.  These are deposits from where?

10           MR. BROOK:  From Lester to Eber Wine & Liquor/

11   Eber-Metro.

12           THE COURT:  This is what you referred to before?

13           MR. BROOK:  Yes.  This is the part that I think are,

14   in the law that I quoted earlier, is entitled to get this back.

15   These monies that he put into the company are the equivalent of

16   what he paid for it.  So what he paid for it in terms of what

17   was legally allowed by the company was $1.5 million, and that's

18   because anything more than that that he tries to claim would

19   have violated the same bylaws that the defendants want to try

20   to use to try to prevent my clients from even getting their

21   shares from the trust.

22           So just to try to go back to the transactions that

23   we're going to unwind.  I'll try to be quick.  You know that we

24   have relatively short time, and I do want to just cover them.

25           The Lester April 2012 employment contract that was

1    recently discovered, that should be set aside because that was

2    at a time when, undisputedly, Eber-Connecticut was a trust

3    asset.  This was before the Alexbay transaction.  And yet this

4    employment contract, which gave Lester a death benefit,

5    indemnification, etc., was never approved by any demonstrable

6    board action by any company, let alone the trustees who would

7    have had to approve that.  The trust beneficiaries would have

8    had to -- we don't have to go there.  Even the first layer of

9    approval wasn't met.  It was authorized solely by Wendy Eber,

10   his own daughter.  I can see why they concealed this document

11   It blows up their whole claim that the company was on death's

12   doorstep in April 2012.

13          What kind of company gives a CEO who is driving his

14   company into the ground and has no money an employment contract

15   with significant severance benefits, indemnification clauses

16   and such, at a time when the company doesn't have money to do

17   it?  That's when companies usually fire someone, not gives them

18   the most employment protection they've ever had.

19          And that leads me to the next point, which is -- Ali,

20   can you put it up, please -- demonstrative two, so we can all

21   follow along.

22          So it's not actually there.  The fifth one down is

23   Wendy's employment contract.  She got substantially the same

24   employment contract only that is dated afterwards.  So Lester

25   authorized that for her, and as part of that agreement, she got

1   the same sort of termination benefits.  So if this court were

2   to order that the company is returned to my client's control

3   and they decide to terminate Wendy or the court removes her

4   from her position, she is going to claim that she is entitled

5   to triple her last year's salary and bonus, which was $400,000,

6   meaning she is going to try to get a $1.2 million payment for

7   being fired.

8            And that's why we want the court to erase that -- to

9   rescind that transaction, and that is consistent with imposing

10   a constructive trust, particularly because of the component of

11   it of giving her 2,000 shares of Eber-Metro.  That was a trust

12   asset just a few months earlier, and Lester gave it away to

13   her.  It doesn't matter if it was compensation for work she was

14   actually doing.  He did not have the right to do that, and it

15   has to come back to the trust.

16            The Slocum of Maine call option we haven't talked

17   about much.  Part of the overall 2005 transaction is this Maine

18   entity that helps import things without paying too much duties

19   in Connecticut.  It was a call option that Eber-Metro bought,

20   Eber-Metro exercised for $10.  And then in the exercise

21   document, which is Exhibit 55 -- don't put it up, Ali -- it's

22   going to Lester 50 percent and Wendy 50 percent.

23            This is the kind of thing that can only work if this

24   was, in fact, just Lester and Wendy's company.  If there were

25   no other duties.  Upon imposing a constructive trust, it has to

1    be undone.  It is apparently a very important part of the

2    Eber-Connecticut business.

3            The 750 voting preferred shares to Lester issued

4    coincidentally just two months after this lawsuit was filed.

5    Those have to be unwound because, again, those are trust assets

6    that Wendy is granting to her father, him to herself.  It

7    didn't even go through Mr. Gumaer, who just a week earlier had

8    resigned from any director position with these companies.  It

9    definitely was not approved by the other trustees, and it is

10   invalid as a matter of corporate law.

11           Then there is the call option exercise by Lester.  And

12   this is where Lester tried to intercept the shares of Eber

13   Brothers & Co., Inc., that Canandaigua was trying to transfer

14   to my clients, and that is invalid for a number of reasons, not

15   the least of which is Lester was a trustee.  He had a duty to

16   act for the benefit of my clients.  And for him to keep quiet

17   and sit on his knowledge that there is some sort of transferee

18   instruction buried in the bylaws that we didn't have access to

19   was a gross breach of his fiduciary duty.  It was an attempt to

20   gain the system, and it is barred by res judicata because the

21   trust proceeding is over with.  This court shouldn't be messing

22   with it.  It is barred by New York law that says that

23   transferee instructions are not valid unless they appear on the

24   face of the certificate.

25           If the court looks at Exhibit 134, which is copies of

1    those certificates, the court will see that the first sentence

2    on the certificate says that they are transferable on the books

3    of the corporation upon being properly endorsed.  That is not a

4    restriction on transfer.  Even if it does later say, as the

5    defense will point out, that it is subject to the bylaws, the

6    fact is it says it is transferable right there.  Unless you're

7    publishing copies of the bylaws everywhere and attaching them

8    to the certificates, which they weren't, it is not a

9    restriction.

10           The bylaw amendments in 2021.  This is the most recent

11   thing, and this is just an effort to entrench management.  What

12   happened was -- this is Exhibit OOOOO, the defense put it in,

13   the court should take a look at this.  In short, Wendy

14   appointed her husband to be a director of Eber Brothers for

15   three hours, during which time he elected her as the sole

16   officer, he authorized her to amend the bylaws, and ratified

17   every decision she had ever made during her tenure.  In fact,

18   he made all those decisions after one hour, according to these

19   documents, and then resigned two hours later.  So he spent more

20   time afterwards than beforehand.  I mean, it is just -- it is,

21   perhaps, the best example of what this case is about, which is

22   a battle between form and substance, only the form isn't even

23   particularly compelling.

24           I see that your Honor, I am past my time.  The next

25   part I was going to go to was some damages and the Southern

1   agreement.

2              THE COURT:  Go ahead.

3              MR. BROOK:  OK.  So the Southern consulting agreement

4   is, as I said before, critical --

5              THE COURT:  I'm sorry.  The what?

6              MR. BROOK:  The Southern consulting agreement is a

7   critical part of this case.  Eber Brothers did not die on

8   August 30, 2007.  If you're selling wine and liquor through

9   subsidiaries, you're not out of business.  If you're paying a

10  pension plan to cover your employees who were with you for

11  decades, you're not out of business.  They didn't terminate it.

12  They tried to keep it open for years afterwards.

13             If you are still winding up and selling liquor in New

14  York, if you're telling the IRS that Lester spent substantially

15  all his time in New York City winding up the business through

16  the end of fiscal 2008, you're not out of business.  But here

17  is the thing.  Even if Eber Brothers Wine & Liquor Corp. had

18  completely shut down by the end of February 2007, let's go back

19  to a few months earlier, this would still be a violation of

20  Lester's duty of loyalty because he had negotiated by

21  February 7, 2007, using corporate counsel, his consulting

22  agreement, and I believe --

23             All right.  I was going to put it up there.  It's

24  Exhibit 93, I would ask your Honor to reference.  I don't have

25  the page number offhand, but there is --

1          Do you have it?  Page ten.  She's saying it is page

2     ten.  She does this stuff pretty well.

3          All right.  That's right.  Paragraph six of this

4     agreement shows -- this has a fax line of February 8, 2007 --

5     that by then, Lester and Southern had already agreed that he

6     would enter into a consulting agreement as part of the overall

7     deal, only then it was a five-year -- it was only $500,000 a

8     year, not the full 600 that later happened.

9          Ali, if you can zoom out.  Let's look at the paragraph

10    above that.

11         At that time, the expectation was that all of the Eber

12    entities and their owners would enter into restrictive

13    covenants.  But at the end of the day, what is notable, if the

14    court looks at that same closing binder we were looking at

15    earlier today, the only restrictive covenants were entered into

16    by Lester and one essentially one unimportant subsidiary, Eber

17    Acquisition Corp, Eber Wine & Liquor, Eber-Metro,

18    Eber-Connecticut.  None of them sign a restrictive covenant,

19    but they were restricted nonetheless because Lester Eber was

20    still running them.  So as long as Lester was getting paid for

21    his restrictive covenant by the competitor, they were

22    effectively out of business in those competing states.

23         But here is one thing that is particularly interesting

24    is Lester testified that, despite this, Eber-Connecticut sold

25    wine in New York after 2008.  So that just completely blows up

1    this idea that somehow there is a geographical distinction that

2    makes a difference here.

3             And ultimately one of the most important things is

4    that, you know, you look at --

5             THE COURT:  I thought you were talking about damages

6    now?

7             MR. BROOK:  Yes, we're talking about damages.

8             Getting to that, so I will just direct the court to

9    take a look at page 88 of Lee Hager's testimony, lines 11 to 25

10   where he says, Without the whole deal, there was no consulting

11   agreement.

12            You don't have to go to that, Ali.  Let's put up

13   exhibit -- what is it -- demonstrative three, I believe, is our

14   first set of damages for the Southern case.

15            So this is a compilation based upon the exhibit that

16   contains all of Lester's schedule Cs for the Southern

17   consulting money that he got, and it also gives some credit for

18   the loan payments.  And in this instance, I'll explain that

19   second column.  There were payments of $212,000 in 2009.

20   However, those were omitted because that was done before there

21   was a borrowing authorization by the company.  In any event, it

22   still adds up to more than 1.5 million.

23            In 2011, it was actually closer to $1 million, but

24   that is the year when we deduct the $850,000 in personal

25   expenses, even though most were incurred years earlier.  That

L9MsKLE4                     Summation - Mr. Brook

1     was the year when it was written off the books.  And so just to

2     make it easy, even though it is not as beneficial to my

3     clients, we will say that they come out then.

4               So what we have done here is, rather than the court

5     trying to do two things in parallel, say Lester's loan at

6     12.5 percent goes here, the Southern consulting payments need

7     to go back there.  The reality is -- and it is much easier for

8     the court to do it this way without having to question whether

9     that 12.5 percent was real or approved or not -- is just say,

10    every time Lester cut a check to the company that was

11    authorized by the board, he was paying down what he should have

12    paid for Southern.

13              So this is the calculation that does that.  It shows

14    that if we assume that those loan payments were paying down the

15    Southern balance, this is the amount of principal that is due

16    and the amount of interest calculated in accordance with New

17    York law, 9 percent.  It isn't every single payment, because he

18    was paid monthly.  But instead, it is a more conservative

19    approach calculating it so that interest only accrues on the

20    next calendar year after any payment.

21              As the court may know, under New York law, an

22    alternative method is appropriate where there is a number of

23    different payments.  Picking an intermediate reasonable date,

24    and we prepared a chart on that, too, with a few different

25    dates.

1          If you can go to demonstrative four.

2          This approach, I would submit, is probably going to be

3     the one that is easiest because the court can simply decide how

4     much money Lester is entitled to get back versus how much he

5     collected, balance them out, and then decide what date is

6     reasonable.

7          I'll tell you why some of these dates I think are

8     reasonable, very briefly.

9          January 1 --

10         THE COURT:  Not now, because we can't spend the rest

11    of the week on this.

12         MR. BROOK:  Understood.

13         THE COURT:  You're going to give me these?

14         MR. BROOK:  I will give you those.  I would just like

15    to close with 30 seconds, your Honor, on this.

16         We will submit similar documents to you and defense

17    counsel on the faithless servant doctrine, on the compensation

18    earned there that should be disgorged.  The reason why the

19    faithless servant doctrine applies here is not only because of

20    what we see under New York law for violating employment

21    agreements, also because it serves as a valuable proxy for what

22    would be an appropriate surcharge as a matter of trust law.

23         Lester was supposed to be the shepherd of this flock.

24    That is what his father chose him to do.  Instead, he was the

25    wolf.  And Wendy was not even the boy who cried wolf, because

1    she tried to help the wolf get the flock.

2              And that is why this court needs to impose some

3    appropriate orders and damages, not only to ensure that New

4    York law is complied with and that the trust beneficiaries are

5    restored to the position they should have been in, but also to

6    deter this kind of egregious conduct from ever happening again.

7              THE COURT:  OK.  Thank you.

8              Mr. Santoro.

9              MR. SANTORO:  Thank you, your Honor.

10             Your Honor, I think I want to start with the loans

11   that Lester made prior to the 2012 foreclosure.

12             THE COURT:  I missed a word.

13             MR. SANTORO:  The loans that Lester made to Eber Wine

14   & Liquor and Eber-Metro prior to the 2012 foreclosure.

15             THE COURT:  Loan, is that what you said?

16             MR. SANTORO:  That's what I would like to start with.

17             THE COURT:  OK.

18             MR. SANTORO:  Because I think in determining whether

19   Lester was unjustly enriched by the 2012 foreclosure, we have

20   to look at two sides of the scale:  The consideration that

21   Lester gave and what Lester received.

22             So let's start with the easy part, and that is the

23   loans made pursuant to the line of credit.  That's the 2010

24   line of credit and that's -- the line of credit is guaranteed.

25   The guarantee in the line of credit are Exhibits GG and HH.

1          And I think where we should start is with Exhibit T,

2     if we can put that up, please, Samantha.  Let me explain what

3     this is.

4          These are, you will see as we scroll through this,

5     your Honor, checks made payable to mostly to Eber Wine & Liquor

6     Metro, but also to Eber Wine & Liquor for the period 2007 up to

7     the date of foreclosure.  I think this is what you were looking

8     for earlier.  As Mr. Brook pointed out, these checks do line up

9     with the general ledgers that are in evidence.

10         So during this time period, Lester was writing checks

11    to the company, Metro and Wine & Liquor, so that those

12    companies could meet their obligations.  The principal

13    obligations being the minimum funding obligations attendant to

14    the Eber Wine & Liquor pension plan.  We are not talking

15    about --

16         We should also go to Exhibit U.  There is a few

17    additional checks, source documentation, documenting those

18    loans.  We could scroll through those, if you can, Samantha.

19         Then if we go to a demonstrative, which is exhibit

20    quintuple K, 5Ks, we can see what the principal and accrued

21    interest was on the line of credit note as of the date of

22    foreclosure.

23         If we can go to page three of that exhibit, Samantha.

24    If we can maybe zoom in a little.

25         So if you'll indulge me, your Honor, each payment is

1   made here, has a date, date of the advance, the amount of the

2   advance.  We run interest on it, and to the right of the page,

3   we line it up to the defendants' exhibit.  The total principal

4   and interest on the line of credit note, calculated pursuant to

5   its terms, was in excess of $2,150,000.  So I don't think that

6   there is any dispute, or there will be any dispute upon a

7   careful consideration of the documents, that Lester indeed

8   loaned the millions of dollars in this very short time period

9   to Eber Wine & Liquor and Eber-Metro to keep it above water.

10          THE COURT:  And the interest you're running on it is

11   12 and a half percent?

12          MR. SANTORO:  That's correct, your Honor.

13          THE COURT:  And later on at 15 percent; yes?

14          MR. SANTORO:  That was for comparison purposes, yes,

15   your Honor.

16          THE COURT:  Who fixed the --

17          MR. SANTORO:  Actually, the 15 percent is pursuant to

18   the terms of the note.  The note came due year end December 31,

19   2011.

20          THE COURT:  So why is there interest prior to that?

21          MR. SANTORO:  The interest prior to that is pursuant

22   to the terms of the note as is the interest pursuant to the

23   terms of the note on the default, the 15 percent.

24          THE COURT:  Who fixed the interest rate?

25          MR. SANTORO:  It was set forth in the terms of the

1      note, your Honor.

2                  THE COURT:  Who signed the note?

3                  MR. SANTORO:  Lester Eber and the board.  I don't have

4      the exhibit in front of me.  It's in evidence.

5                  THE COURT:  And the board?

6                  MR. SANTORO:  It was authorized by the board.

7                  THE COURT:  And the board consisted of whom?

8                  MR. SANTORO:  At that time, it was Wendy Eber, Lester

9      Eber, and Mike Gumaer.

10                 THE COURT:  So what do you do with the fact that it

11     was a totally conflicted board?

12                 There was no disinterested board.

13                 MR. SANTORO:  Your Honor, I think for these purposes,

14     we have, as a matter of law -- and maybe not from a practical

15     standpoint, as your Honor is viewing it -- Mike Gumaer and

16     Wendy Eber are indeed disinterested members of the board, and I

17     think it should also be viewed --

18                 THE COURT:  You really think so?

19                 MR. SANTORO:  From a practical standpoint, your Honor,

20     I understand the inference that you could draw.

21                 THE COURT:  You really think as a matter of law that

22     they are disinterested?

23                 MR. SANTORO:  I do, your Honor.

24                 THE COURT:  And that's why?

25                 MR. SANTORO:  Mike Gumaer has independent duties to

1    the trustee and the company, as does Wendy Eber.

2              THE COURT:  That's precisely why he is conflicted.

3              MR. SANTORO:  In dealing with a third-party lender,

4    Lester Eber, under these circumstances, I don't believe that he

5    is.

6              THE COURT:  He's the guy who signs the checks to pay

7    his fees, Lester is, right?

8              MR. SANTORO:  He may well be, your Honor, yes.  But

9    the mere fact that an attorney is being paid from one source

10   does not necessarily mean that his duty is severed with respect

11   to the beneficiaries, the trust and the company.

12             THE COURT:  You missed my point altogether.  You're

13   absolutely right, his duty to the beneficiaries and the trust

14   is not severed.  So he is subject to two conflicting duties or

15   two conflicting interests.  One is his personal interest in

16   getting paid and continuing as the attorney for Lester Eber,

17   and the other is his duty to the beneficiaries.

18             And they are incompatible, aren't they?

19             MR. SANTORO:  If, in fact, there are two conflicting

20   legal duties in what you propose there, then yes, they would be

21   incompatible.

22             THE COURT:  So that's exactly what we have here.

23             Why not?

24             MR. SANTORO:  Because I believe that Mr. Gumaer and

25   Wendy Eber could wear two different hats under those

1    circumstances as a matter of law.

2              THE COURT:  Do you have a case that says that?

3              MR. SANTORO:  Not at my disposal, your Honor.  There

4    are --

5              THE COURT:  That's startling.  That's what this case

6    is all about.

7              MR. SANTORO:  There are fiduciaries who are serving in

8    conflicted positions all the time, and especially in the case

9    of an executor, for example, who owes money to a decedent who

10   owes money to the estate, right.  That executor has two

11   conflicting duties.  He is carrying out --

12             THE COURT:  Suppose the executor owes money to the

13   estate, and in its capacity as the executor of the estate,

14   forgives the indebtedness.  You think that is a self-interested

15   transaction?

16             MR. SANTORO:  Indeed, that would be a self-interested

17   transaction.

18             THE COURT:  Yes, indeed.

19             MR. SANTORO:  The beneficiaries would have an

20   opportunity to challenge that.

21             THE COURT:  Right.

22             MR. SANTORO:  And if, indeed, the will under your

23   scenario permitted loans between the executor and the estate,

24   the standard for --

25             THE COURT:  Does that mean -- there is no dispute --

1    that a transaction between one of a number of trustees and

2    another trustee is not for that reason alone prohibited?

3              That's a different question from whether such a loan

4    can be made where the approval for the loan comes from trustees

5    who are self-interested or otherwise conflicted with respect to

6    whether or not to authorize the loan, isn't it?

7              MR. SANTORO:  I'm not sure I agree with you there,

8    your Honor.

9              THE COURT:  Really?

10             MR. SANTORO:  Yes, because if, in a case such as that

11   and such as the instant case, where the governing instrument,

12   the will here or the trust at issue, permits loans and, in

13   fact, permits collateralization on loans, the question is not

14   whether the transaction is authorized.  The question is whether

15   the transaction is done in good faith.  You look into the

16   specifics of the transaction to consider whether it is fair and

17   reasonable.

18             THE COURT:  And that's your burden.

19             MR. SANTORO:  Well, the burden under these

20   circumstances, with respect to this specific loan, we have

21   proffered evidence to meet that burden.

22             THE COURT:  And what is that evidence?

23             MR. SANTORO:  That evidence is in front of you here,

24   your Honor.  The checks that Lester Eber -- well, your Honor,

25   it's not necessarily the deposits into the company.  It was

1   that, at that point, there were no other lending opportunities

2   available to Eber Wine & Liquor or Eber-Metro.

3            THE COURT:  Says who?

4            MR. SANTORO:  Says the testimony in this case.

5            THE COURT:  Who?

6            MR. SANTORO:  Lester Eber.

7            THE COURT:  Yes.

8            MR. SANTORO:  And Wendy Eber.

9            THE COURT:  Both interested.  Why should I believe

10   either one of them?

11            MR. SANTORO:  I don't think the fact that --

12            THE COURT:  He says there were no other opportunities

13   in order to justify his authorizing a 12 and a half percent

14   loan to himself.  Duh.

15            MR. SANTORO:  That is a permissible interest, your

16   Honor, if you afford no credibility to Lester Eber's testimony

17   and Wendy Eber's testimony because they are parties and

18   interested.  That is a permissible inference that the court can

19   make.

20            I would submit that under these circumstances, during

21   this time period, with the liabilities that were piling up at

22   the Eber-Metro level and the Eber Wine & Liquor level, when the

23   company is no longer operating as a Wine & Liquor distributor

24   other than in a liquidation and winding-up mode, that there

25   really isn't a bona fide opportunity --

1          THE COURT:  And Lester raking off some millions of

2     dollars that Southern had in its account to pay for this

3     company to put in his own checking account as "consulting

4     fees."

5          MR. SANTORO:  I can talk about the consulting

6     agreement, if you wish, your Honor.

7          I think we have had testimony, again -- now, you might

8     look at Lester's testimony with respect to his consulting

9     agreement with a jaundiced eye and afford it the credibility

10    that you think it ought to be given.  But we have Lee Hager,

11    who testified -- this is one of the principals of Southern Wine

12    & Spirits -- and he testified unequivocally that this was not

13    an opportunity available to either Eber Wine & Liquor or

14    Eber-Metro.

15         MR. BROOK:  Objection.  Mischaracterizes the testimony

16    with unequivocally.

17         THE COURT:  Look, I read his testimony.

18         MR. BROOK:  I apologize.

19         THE COURT:  I know how deals sometimes get done.

20         MR. SANTORO:  So, your Honor, addressing the interest

21    rate attached to the loans, which is, I think, the genesis of

22    this conversation, there was testimony in our expert's report

23    as to the reasonableness of that interest rate under these

24    circumstances, and it was not rebutted in any way, shape, or

25    form.

1          THE COURT:  Which expert was that?

2          MR. SANTORO:  Frank Torchio.

3          THE COURT:  And was it a basis of his opinion on that

4     point?  I don't remember.

5          Was it not the premise that there was no other

6     potential lenders?

7          MR. SANTORO:  Your Honor, I don't have it in front of

8     me, but I would submit that on the record that we have in front

9     of us, there was no other potential lender under these

10    circumstances.

11         THE COURT:  I asked you a simple question.

12         MR. SANTORO:  I don't know, your Honor.

13         THE COURT:  Did you guys hire him, the defense, to go

14    out and do an evaluation of what credit would have been

15    available to this company at the time given the circumstances?

16         MR. SANTORO:  That was not the assignment that was

17    given to Mr. Torchio.

18         THE COURT:  Right.

19         So he didn't offer an opinion on the relationship

20    between the interest rates and any credit that might have been

21    available or on the availability of other credit.  What he did,

22    I assume, is that defense counsel told him to assume there was

23    no other potential lender and that the interest rate was 12 and

24    a half percent because it was the only game in town.

25         Isn't that right?

1          MR. SANTORO:  As to your assumption, I'm not sure,

2     your Honor.  As to what is actually in his report --

3          THE COURT:  Well, I'm not sure either, to tell you the

4     truth, but I didn't hear anything from the witness stand about

5     that.  And if it is in the report, it ought to be an easy

6     matter for you to bring my attention to it.  I mean, you're

7     trying the case, not me.

8          MR. SANTORO:  Your Honor, Mr. Mulry just asked me to

9     refer to paragraph 54 of Mr. Torchio's report.

10         We will certainly follow up on this issue.  I think

11    one of the important facts here is that during this time

12    period --

13         THE COURT:  Well, he is offering an opinion, you're

14    right about that.  I appreciate you calling my attention to it.

15         MR. SANTORO:  Thank my partner.

16         THE COURT:  But wait.

17         And he says because there was significant liabilities

18    and they had only Eber-Connecticut and Eber-Connecticut was

19    losing money and it had no value.

20         Well, you know, you make the right assumptions, you

21    get the right conclusions.

22         MR. SANTORO:  Well, if you look at Eber-Connecticut,

23    it had lost money by 2012 for six or seven years straight in

24    the aggregate sum of $7 million.  The only credit that was

25    available to Eber-Connecticut was a loan from Canandaigua

1    National Bank that would not be extended unless Lester

2    guaranteed the note and put up collateral, deposited money into

3    Canandaigua National Bank, and cash and marketable securities.

4            We have a company that has, as a 15 percent member, a

5    competitor in Connecticut that has the ability to prevent and,

6    in fact, did prevent Eber-Connecticut from borrowing over a

7    certain amount of money during this time period.  So the only

8    financing ability would be at the Eber-Connecticut level, and

9    efforts were made, and the only way to get financing at all was

10   on Lester's credit, and a competitor was preventing any efforts

11   beyond that.

12           So I think the availability of credit to Eber Wine &

13   Liquor and Eber-Metro and Eber-Connecticut --

14           THE COURT:  They didn't object to Lester extending the

15   credit, right?

16           MR. SANTORO:  Who didn't?

17           THE COURT:  Eder-Goodman.  That's the credit, or you

18   said could block them from getting more credit above a certain

19   amount.

20           MR. SANTORO:  Lester extended the credit to Eber Wine

21   & Liquor and Eber-Metro.  Their power to cap the indebtedness

22   was at the Eber-Connecticut level.

23           THE COURT:  So that didn't affect Eber Wine & Liquor

24   or Eber-Metro, right?

25           MR. SANTORO:  I'm sorry.  I'm not following, your

1    Honor.

2            THE COURT:  You seem to me to be arguing both ways.

3    You seem to me -- and correct me if I'm wrong -- to be arguing

4    that one of the reasons there was no other credit available was

5    because there was a 15 percent shareholder who had the ability

6    to block additional indebtedness beyond a certain amount,

7    right?

8            You just argued that.

9            MR. SANTORO:  There are for two different companies,

10   right.

11           THE COURT:  Just stay with me.  The company as to

12   which that was true was Eber-Connecticut, right?

13           MR. SANTORO:  Correct.

14           THE COURT:  Now, that didn't affect the ability of

15   Eber Wine & Liquor to borrow money, did it?

16           MR. SANTORO:  No, it did not.

17           THE COURT:  OK.  That's all.

18           MR. SANTORO:  It certainly affected the value of

19   Eber-Connecticut, which was the only asset of Eber-Metro, which

20   was the only asset of Eber Wine & Liquor at that time.

21           THE COURT:  OK.  Let's go on.

22           MR. SANTORO:  In any event, the exhibit there

23   aggregates the principal payments and it calculates interest at

24   12 and a half percent.  We have the underlying documentation

25   there, and we think it is accurate.  So if you added up the

L9MsKLE4                     Summation - Mr. Santoro

1    interest and principal, it would be in excess of $2 million.

2           Then we have the promissory notes, the other

3    indebtedness from Eber Wine & Liquor and Eber-Metro to Lester

4    Eber.  Those were the notes in the amount of roughly

5    $1.5 million, and roughly half a million dollars, with a

6    9 percent interest rate.

7           Notwithstanding the suggestions that had been made

8    here, these promissory notes, the Wells Fargo -- and this is in

9    the audited fact statement for Eber Wine & Liquor -- the Wells

10   Fargo credit facility in 2006 was taken out in March of 2006.

11          THE COURT:  Taken out meaning?

12          MR. SANTORO:  It was opened.  I'm sorry.

13          THE COURT:  Yes.

14          MR. SANTORO:  I'm not a transactional lawyer, your

15   Honor.

16          So naturally those loans would be required as part of

17   that transaction to be documented as junior to the Wells Fargo

18   line of credit.  I think that that, it's a permissible

19   inference for your Honor to make to infer that, yes.  These

20   notes were executed and made at the time of that --

21          THE COURT:  When you say "these notes," you mean what?

22          MR. SANTORO:  The promissory notes.  Each of the

23   promissory notes from March 2006, the amended and restated

24   promissory notes.

25          THE COURT:  Is there any evidence at all that Wells

1   Fargo knew of their existence?

2           MR. SANTORO:  The financial statements reflect the

3   existence of the indebtedness, and I believe that is something

4   that Wells Fargo would have been interested in at the time that

5   the credit facility was opened.

6           THE COURT:  You would think so.

7           MR. SANTORO:  So that's what I believe substantiates

8   the existence of these loans as bona fide indebtedness.

9           THE COURT:  How about -- well, go ahead.

10          MR. SANTORO:  So, again, this is our demonstrative

11  Exhibit 5 Ks.  If we can go to the promissory notes.

12          The second page, Samantha, I believe it is.

13          We reference the promissory notes and the general

14  ledger, which reflect -- they do reflect, as Mr. Brook

15  indicates, the note receivable from the officer, which is

16  Lester Eber, and that is backed out.  And we have the

17  indebtedness, the total principal and interest as of the date

18  of the foreclosure -- if you can just scroll down a little,

19  Samantha, I want to make sure I'm not -- as being just about

20  $2 million, a little north of $2 million.

21          So we have indebtedness to Lester Eber on the part of

22  Eber Wine & Liquor and Eber-Metro as of the date of foreclosure

23  in an amount in excess of $4 million.  I think that the record

24  demonstrates that, with respect to the line of credit, I don't

25  think there is any question as to the payments.  With respect

1    to the promissory notes, I think we have established our burden

2    that this is a legitimate and bona fide debt to Lester Eber.

3            So we have Lester Eber's side of the scale, which is

4    roughly $4 million, a little north of $4 million.  Then we have

5    the other side of the scale, which is the value of Eber-Metro,

6    OK.  There is a lot of references to the company, what the

7    company was worth, but we're valuing Eber-Metro here, for these

8    purposes, because that is what Lester received in the

9    foreclosure, the interest in Eber-Metro.  Alexbay received

10   Eber-Metro.

11           And we have the experts' reports which provide their

12   methodology and their opinion as to value based on assumptions,

13   and those speak for themselves.  I think it is important here,

14   for closing, to talk about the facts as they existed at that

15   time because those are the assumptions that are being given to

16   the experts.  And I think the record reflects that at the time

17   of the 2012 foreclosure, Eber Wine & Liquor's only real asset

18   was its interest in Eber-Metro, and Eber-Metro's only real

19   asset was its interest in Eber-Connecticut.

20           Eber-Connecticut, as I just indicated, for six years,

21   it had not performed.  It had lost $7 million.  Eber-

22   Connecticut had no access to financing without Lester's

23   guarantee.  Eber-Connecticut was hamstrung by its competitor,

24   who was its partner.  Documents and testimony, e-mails and

25   testimony, testimony from Robert Lowenthal indicate that

1    Canandaigua National Bank, CNB, hated this loan.  It was doing

2    everything it could to get out of this loan and to try to get

3    Eber-Connecticut to go get an asset-based loan so that they

4    wouldn't have to continue to incur the risk on this loan.  He

5    called it a challenged loan in his deposition testimony.

6    That's on page 34 to 35.  He explicitly testified that they

7    wanted out of this loan.

8            And Lester confirms this in his transcript as well,

9    day two of his testimony at pages 439 and 440, Lester was asked

10   in a question:  So foreclosure by CNB is a bad thing and

11   foreclosure by Lester is a good thing, right?

12           That was the choice he was given.  The reality is,

13   Eber-Connecticut cannot exist at that point but for Lester

14   Eber.  If Lester doesn't loan the money to pay the legacy

15   liabilities of Eber Wine & Liquor and Eber-Metro, those

16   companies are out of business.  And it is their assets, which

17   are Eber-Connecticut, are going to be liquidated.

18           During that time period --

19           THE COURT:  Tell me the year again.

20           MR. SANTORO:  The year is from the end of Eber Wine &

21   Liquor and Eber-Metro through the date of the foreclosure.  We

22   have Eber-Connecticut being dualed by its largest supplier, its

23   revenues dropped off a cliff as a result of that,

24   notwithstanding the franchise protection laws that exist in

25   Connecticut.

1          Even when we have that Polebridge Bowman transaction,

2    where six percent of Eber-Connecticut is sold to Polebridge

3    Bowman for the note, for the $350,000 note, Eder-Goodman signs

4    on and declines to exercise its right of first refusal.  If

5    Eder-Goodman wanted that company so badly, it would have

6    exercised its right of first refusal on those shares.  It

7    wasn't worth it to them.

8          Andy Eder testified.

9          THE COURT:  Did you ask Mr. Eder why he didn't?

10         MR. SANTORO:  We didn't, your Honor, but it's evident.

11   It is evident and implicit from his testimony.  I mean, he did

12   testify --

13         THE COURT:  When you say it is explicit from his

14   testimony, then tell me why.

15         MR. SANTORO:  He testified that he would not have

16   bought the 15 percent without the liquidation preference, and

17   the other side of that liquidation preference is the ability to

18   cap the debt.  He was protecting himself in that transaction

19   when he bought the 15 percent from Southern Wine & Spirits.

20   That is what was going on there.

21         He had the liquidation preference.  I'll get my four

22   and a half million dollars back if this thing collapses, but I

23   don't want Southern in my market.  Because I know exactly what

24   happened here to Wendy Eber, the loss of the largest supplier

25   could happen here to me if Southern comes into my market.

1     His lack of -- Andy Eder's lack of sensitivity and

2  apparent lack of concern about Southern entering the market,

3  I mean, it should be measured against the fact that, you know,

4  in his words, he did zero due diligence and accepted a

5  take-it-or-leave-it offer from Pat Dalton, who was Eber-Metro's

6  attorney at the time.

7     They paid an enormous premium to keep Southern out of

8  the market, protected their principal investment with a right

9  of first refusal, a liquidation preference, and an ability to

10  keep Eber-Connecticut from borrowing.

11     THE COURT:  Mr. Eder testified that deals in this

12  industry are frequently done on the basis of a multiple of

13  revenues plus net assets, right?

14     MR. SANTORO:  That's what he said, your Honor.

15     THE COURT:  Is there any contrary evidence?

16     MR. SANTORO:  The expert reports speak to that.

17     THE COURT:  Is there any contrary evidence?

18     MR. SANTORO:  I have not seen any contrary evidence

19  here.  But I will say that, just as we are measuring the

20  credibility of parties who have an interest in the proceeding,

21  I don't think for one minute that we should think that Andrew

22  Eder doesn't have an interest in this proceeding.  He is a

23  competitor.

24     THE COURT:  I understand that.  Let's focus on what

25  I'm asking.  I have no reason to question that deals of this

1    sort are done frequently or often on the basis of a multiple of

2    revenues plus net assets.

3          There is no evidence that this is an industry

4    characterized by companies comparable to Eber-Connecticut that

5    are publicly held, is that correct?

6          MR. SANTORO:  Well, I think Mr. Torchio testified as

7    to the methodology that he used, so I would think that is

8    evidence here.

9          THE COURT:  Yes.  And what did he say on that?

10         MR. SANTORO:  He testified today, your Honor.

11         THE COURT:  Listen, counselor, I don't ask you

12   questions to hear myself talk.  You're the trial lawyer.

13         Do you remember any such evidence?

14         MR. SANTORO:  No, your Honor.

15         THE COURT:  OK.  Now, in an industry characterized by

16   privately held companies, don't you think that it's common

17   knowledge that the profit and loss statements for such

18   entities, if there are any, can be radically affected by all

19   sorts of charges against income that maybe would not withstand

20   an IRS audit or, for that matter, would not satisfy generally

21   accepted accounting principles, don't you think?

22         Don't you think there are some such companies who have

23   relatives on the payroll who do nothing?

24         Don't you think there are such companies where there

25   are high-priced automobiles used by company personnel?

1          Don't you think you have some leases with entities

2     that are owned by the people who own the business at rents that

3     exceed, perhaps, fair market value for God knows what reason?

4          Don't you think that goes on?

5          I'm not talking about this company in particular.

6     Don't you think that goes on?

7          MR. SANTORO:  Yes, your Honor.

8          THE COURT:  OK.  And, therefore, to do acquisitions on

9     the basis of purported income statements in companies like

10    this, maybe it wouldn't make too much sense, agreed?

11         MR. SANTORO:  In companies like this?

12         THE COURT:  Companies like the sort I'm talking about

13    hypothetically.

14         MR. SANTORO:  In those companies, right.

15         THE COURT:  Those companies.

16         MR. SANTORO:  Yes.  In those companies it might make

17    sense to normalize some of those expenses.

18         THE COURT:  It might.

19         And somebody with years of experience in the business

20    might well feel that that person, if he is a buyer, has enough

21    of a sense about what income is legitimately thrown off by a

22    particular level of revenues to make a purchase offer that's

23    satisfactory to that person without spending a lot of money on

24    accountants and lawyers to try to normalize the sorts of things

25    we're talking about?

1          MR. SANTORO:  I don't know, your Honor.  I really

2     don't know.  I can't answer that question for you.  Maybe in

3     concept, yes.  Under those circumstances, yes.

4          THE COURT:  OK.  All right.  Let's go on.

5          MR. SANTORO:  So one thing Andy Eder was not talking

6     about was taking on the liabilities of Eber-Metro, the company

7     we're valuing.  That balance sheet, his little charts that he

8     gave us didn't contemplate what those liabilities were.

9          THE COURT:  His little chart was something else

10    altogether, but that's...

11         Go ahead.

12         MR. SANTORO:  He didn't contemplate, and I think he

13    testified that the liabilities were not of concern to him.  He

14    wasn't concerned about the PBGC liability, I think that is what

15    he said.

16         So when we look at Eber-Metro, I don't think anyone

17    here is arguing -- because I don't think you can argue -- that

18    Eber-Metro at all times was in the controlled group for ERISA

19    purposes, and that that termination liability would attach to

20    Eber-Metro, if the pension plan was terminated, Eber-Metro was

21    going to be responsible for that termination liability.

22         THE COURT:  I'm afraid that we're running late and

23    I've got another case in the hall.  So wrap it up, if you can,

24    in the next five minutes.

25         MR. SANTORO:  In the next, I'm sorry, your Honor?

1          THE COURT:  Next five minutes or so.

2          MR. SANTORO:  That termination liability, as we heard

3     from Mike Gallagher today, as of 2009, $5,500,000, a little

4     north of $5,500,000.  That's a real liability.  That's a known

5     and knowable liability that should be taken into account when

6     valuing Eber-Metro as of the date of the valuation, just as the

7     PBGC liability was known and knowable as of the date of the

8     foreclosure.

9          The Teamsters liability was fixed.  There was no

10    getting around that liability or getting around the fact that

11    Eber-Metro was in the controlled group and jointly and

12    severally liable for that liability.  The same goes with

13    respect to the other liabilities that are backed out of the

14    value in Mr. Torchio's report.

15         So if the court were to impose -- if the court were to

16    find there was an unjust enrichment here with respect to that

17    2012 foreclosure and were to impose an equitable remedy, we

18    also submit that the court ought to take into account the

19    payments that Lester made post foreclosure.

20         And for that, if we can go to pages, I think it is

21    three and four or four and five of KKKK.

22         It is the demonstrative, Samantha.  I'll try to get

23    through this quick, your Honor.

24         So these are legal fees.  This page is legal fees that

25    Lester paid for with respect to dealing with the Teamsters in

L9MsKLE4                    Summation - Mr. Santoro

1   the defined benefit plan.  We are talking in a principal amount

2   of $337,576 over the period 2012 to 2016.  And you see, your

3   Honor, this is a demonstrative that's prepared based on the

4   defendants' exhibits.  The exhibit references there reference

5   checks.

6           And I think in the interest of time -- there we go --

7   I'll refrain from going through each of those checks, but they

8   line up to those amounts.  Now, we run interest on them, so if

9   we were to impose an equitable remedy here, I think that there

10  should be some consideration taken with respect to the time

11  value of money.

12          Samantha, can we go to page five.

13          We have the same thing here.  These are legal costs

14  that Lester paid from the foreclosure through 2016, it looks

15  like, yes, to these various law firms.  I have referenced here

16  the underlying documentation which is in evidence together with

17  the Bates stamp numbers.  We are talking at about a principal

18  amount in the amount of $492,530.  We have interest rates here

19  that attach to those, just to account for the time value of

20  money.

21          In addition to these payments for legal fees, I think

22  those were the ones you asked about the other day, Lester gave

23  up his pension to settle with the PBGC.  Lester came out of

24  pocket to settle with Harris Beach.  Lester came out of pocket

25  to settle with the Teamsters with respect to the teamster

1  liabilities.  We have those --

2          THE COURT:  These points are easily covered in your

3  papers.

4          MR. SANTORO:  Yes, they are.

5          So finally, your Honor, I just heard it in closing

6  arguments that the Monroe County surrogate court's order on the

7  accounting has a preclusive effect in this litigation.

8          Now, it doesn't have a preclusive effect as to one

9  issue and not the others.  That accounting and the appraisal

10 that was attached to it was a pleading under New York

11 Surrogate's Court Procedure Act.  The entire accounting and the

12 entire appraisal.  So under SCPA 302.

13         What is in that accounting are allegations, and it is

14 an in rem proceeding, and all parties here were given notice

15 that there was going to be an order or decree issued --

16         THE COURT:  What's your point, counsel?

17         MR. SANTORO:  My point is that the claims in this

18 proceeding are embraced within that accounting.  The accounting

19 alleges that Eber Brothers has no value because it owns

20 nothing.  It annexes an appraisal to that effect, and that

21 proceeding went forward.

22         You issued an order back in 2017 that said, in a

23 footnote, it's not clear what Southern -- what CNB is going to

24 do here, whether they are going to continue to press that

25 proceeding, whether some of the parties are going to seek to

1    hold --

2              THE COURT:  What is your point?

3              MR. SANTORO:  It went forward, and it has a preclusive

4    effect on these claims.

5              THE COURT:  Really?

6              MR. SANTORO:  Yes.

7              THE COURT:  How?

8              And why am I hearing about it for the first time in

9    closing argument?

10             Are you kidding me?

11             MR. SANTORO:  Your Honor, we offered into evidence the

12   plaintiffs are seeking a res judicata effect of that order, and

13   you can't have res judicata for some of it and not for others.

14             THE COURT:  I didn't hear that, actually.  I don't

15   think I heard that.

16             MR. SANTORO:  It's in the record.  I believe we'll see

17   it.  And we have --

18             THE COURT:  I know the petition is in the record,

19   Mr. Santoro.  You have told me that several times in the last

20   60 seconds.

21             Now, is there a claim that there is a preclusive

22   effect?

23             (Continued on next page)

24

25

L9m2Kle5

1          MR. BROOK:  There is not, your Honor.

2          THE COURT:  No.

3          MR. BROOK:  I was listing five different reasons why

4    Lester could not take my client's shares, and I did say the

5    word *res judicata* would bar it, too, but it's the fourth point

6    down, and I will withdraw it anyway, so. . .

7          MR. SANTORO:  Your Honor, we will brief this in our

8    posttrial submissions.  These claims are barred.  We had two

9    proceedings where these claims were embraced.  One of them

10   wrapped up.  That's what I have to say on that.

11         THE COURT:  Okay.  So thank you both.

12         Can the plaintiff get me their papers -- their brief

13   and any proposed findings and conclusions -- by October 6?

14         MR. BROOK:  Certainly, your Honor.  That's more than

15   enough time.

16         THE COURT:  All right.  October 18 for the defendant.

17   Any problem with that?

18         MR. MULRY:  Yes, your Honor.

19         THE COURT:  There is a problem with that?

20         MR. MULRY:  No, your Honor.  We will do that.

21         THE COURT:  Reply by October 25.

22         MR. SANTORO:  Your Honor, one thing.  We did meet with

23   Magistrate Parker.

24         THE COURT:  So I gather.

25         MR. SANTORO:  I'm sorry?

L9m2Kle5

1          THE COURT:  You have been in touch with her chambers

2     and you probably have a date.

3          MR. SANTORO:  In early November.

4          THE COURT:  Well, advise her of the schedule I have

5     given you.  And all I can tell you is, with or without

6     Judge Parker, it is in everybody's interest to get this thing

7     resolved before I do.  Okay?

8          MR. BROOK:  Your Honor, may I raise one thing?

9     It's -- I can do it electronically but, after speaking with my

10    clients, especially after this testimony, plaintiffs would like

11    this Court to enter a preliminary injunction against any

12    further transactions occurring, changing the bylaws, changing

13    the equity of these companies, because otherwise I think at

14    this point it should be not changed anymore until we get to a

15    decision from this Court.

16         MR. MULRY:  Your Honor, we were just handed this

17    before the argument.  We haven't --

18         THE COURT:  What were you handed?  I haven't seen

19    anything.

20         MR. MULRY:  We were handed just a proposed order

21    granting preliminary injunction.  We would like to review it

22    and see if there are papers supporting this.  We are happy to

23    look at that and would want to respond.

24         (Pause)

25         THE COURT:  Look, I'm not going to grant a preliminary

L9m2Kle5

injunction without notice, but my recollection is that you

asked for something like this on an interim basis quite a long

time ago, I mean, a couple of weeks, maybe months.

MR. BROOK:  I don't believe --

THE COURT:  Is it in the pretrial order?

MR. BROOK:  There was -- the pretrial order includes a

final proposed injunction, but not temporary restraining order.

THE COURT:  Look, I understand the concern on the

defendants' part, but it seems to me that a temporary

restraining order of some kind is appropriate in light of what

I have seen in this trial.

And what strikes me as perhaps being along the lines

of what's reasonable is to enjoin all of the entity defendants

and the estate from engaging in any transaction not in the

ordinary course of business and to enjoin the estate and

Ms. Eber from engaging in any of the sorts of transactions

described in the second decretal paragraph of this proposed

order, and to do that as a temporary restraining order

effective immediately, and that will expire, unless extended,

two weeks from now, to enable papers to be submitted.

Is there any reason why I shouldn't do that?

MR. BROOK:  The only thing I would ask is to exclude

Canandaigua National Bank because they are a nominal defendant.

THE COURT:  Fair enough.

MR. SANTORO:  Your Honor, I want to make sure I am

L9m2Kle5

1    clear that the second decretal paragraph, you are referring to

2    the first full paragraph on page 2?

3            THE COURT:  Yes, the one that has "ordered" in front

4    of it and it is the second paragraph that says "ordered," which

5    is why it is called the second decretal paragraph.

6            MR. BROOK:  It may be the third.  Is it the one with

7    bullet points, your Honor?

8            THE COURT:  No.

9            MR. BROOK:  Okay.

10           MR. SANTORO:  That's why.  I'm sorry.

11           MR. BROOK:  Yup.

12           MR. MULRY:  Your Honor, since we are just receiving

13   this, could we -- and we understand what the Court has said,

14   could we have a few minutes to confer with our client, because

15   our client has not seen this yet.  Again, we were just handed

16   this before the summation began.

17           THE COURT:  Okay.  Here is what we will do.  As of

18   right now -- I'm sorry.  I didn't mean to refer to the second

19   decretal paragraph.  I misspoke.

20           As of right now, it is ordered that the Estate of

21   Lester Eber and Wendy Eber are enjoined, for the next 14 days,

22   unless this order is earlier terminated or dissolved, from

23   selling, transferring, distributing, or otherwise disposing of

24   any assets of, or belonging to, defendant Alexbay, LLC, or any

25   nominal defendant, other than Canandaigua National Banking, or

L9m2Kle5

1    causing any other enjoined party to dispose of such assets,

2    without prior written approval from the Court on notice to the

3    plaintiffs; and it is further ordered that the entity

4    defendants, other than Canandaigua National Bank, are enjoined,

5    for the same period any transaction other than in the ordinary

6    course of business, absent prior written approval of the Court

7    on notice to the plaintiffs.

8            Now, I have to do a sentencing briefly.  I will see

9    you at 5:15 to hear anything further given what I have just

10   said, and I think what I have said is adequate to dispose of

11   this order, but I will hear any discussions from either side

12   and --

13           MR. MULRY:  Your Honor, if we just have a moment, I

14   don't believe there is a need to come back, unless your Honor

15   wants us to, if I can just have a moment.

16           THE COURT:  I have enjoyed the pleasure of your

17   company, but I can restrain myself.

18           It would have been helpful, sir, if you had given us a

19   heads up earlier.

20           (Counsel confer)

21           MR. MULRY:  I think we will have to come back.

22           THE COURT:  So I will see you at -- wait a minute.  At

23   4:15 I will see you.  I misspoke.

24           MR. MULRY:  4:15, your Honor?

25           THE COURT:  I have 3:55, so at 4:15.

L9m2Kle5

1          MR. MULRY:  All right.  Thank you.

2          (Recess)

3          THE COURT:  Okay, gentlemen and lady, where are we?

4          MR. SANTORO:  Yes.  So, your Honor, I am trying to

5   just -- can we get a readback on it so I can understand some of

6   the language that was in there?

7          THE COURT:  Yes.  I will help you right now.

8          "It is ordered that the Estate of Lester Eber and

9   Wendy Eber are enjoined, for the next 14 days, unless this

10  order is earlier terminated or dissolved, from selling,

11  transferring, distributing, or otherwise disposing of any

12  assets of, or belonging to, defendant Alexbay, LLC, or any

13  nominal defendant, other than Canandaigua National Bank, or

14  causing any other enjoined party to dispose of such assets,

15  without the prior written approval from the Court on notice to

16  the plaintiffs; and it is further ordered that the entity

17  defendants, other than Canandaigua National Bank, are enjoined,

18  for the same period and on the same terms, from engaging in any

19  transaction other than in the ordinary course of business,

20  absent prior written approval of the Court on notice to the

21  plaintiffs."

22         (Counsel confer)

23         THE COURT:  It does occur to me that this language I

24  just read out doesn't enjoin transfer of shares.

25         MR. SANTORO:  It enjoins transfer of assets.

L9m2Kle5

1          MR. BROOK:  Assets.

2          THE COURT:  But it ought, also, to cover, I think,

3     transfer or encumbrance of shares, which I will fix in a

4     minute.  But that's the substance we have got so far, what I

5     have read out.  And then if it needs to be amplified, we will

6     do that separately, not to confuse you.

7          MR. SANTORO:  My concern, your Honor, with respect to

8     the injunction with respect to the estate is that the estate

9     is -- there is a very similar application that the plaintiffs

10    have made in the Monroe County Surrogate's Court that's

11    pending, and I am concerned about the administration of the

12    estate in the ordinary course and how -- you know, that estate

13    is under the jurisdiction of the Monroe County Surrogate's

14    Court.  I am just concerned that --

15         THE COURT:  The estate is not an entity defendant.

16         MR. SANTORO:  In the first part you enjoined the

17    estate.

18         THE COURT:  Yes, I did.

19         MR. SANTORO:  Okay.  And I think that's the same

20    relief that's being sought in the Surrogate's Court, in sum and

21    substance.

22         THE COURT:  Look.  This is 14 days, unless earlier

23    terminated or dissolved, and I don't see a problem.  I have

24    done it first.  The supremacy clause of the U.S. Constitution

25    applies, and whatever it is, my writ is superior.

L9m2Kle5

1          Now let's deal first with the language that I have

2    already dictated.  Are there any other concerns on either side?

3          MR. BROOK:  Your Honor, and this may -- I hope I am

4    wrong, but just based upon sort of the reaction to what should

5    be a nonsignificant issue here, considering how much testimony

6    we heard about how the company is not for sale, I would ask

7    that the second decretal paragraph also be added, which is to

8    disclose any transactions that would have violated this order

9    within seven days, just in case Ms. Eber wasn't being totally

10   forthright yesterday during her testimony when I tried to

11   ascertain what the current status of the companies is.

12         THE COURT:  Is there any objection to that?

13         MR. SANTORO:  Yes, your Honor.

14         THE COURT:  Why?

15         MR. SANTORO:  We object to that paragraph in the sense

16   that it is now going to require that we provide an accounting

17   to the plaintiffs in the short term, and we will almost

18   certainly be back here because the sufficiency of the

19   accounting will never be acceptable to the plaintiffs.

20         MR. BROOK:  I disagree with that characterization for

21   what it's worth.  I think it is pretty simple, trying -- I'm

22   sorry.

23         THE COURT:  I am going to --

24         MR. SANTORO:  The breadth of that decretal paragraph,

25   any distribution.

L9m2Kle5

1          THE COURT:  Way too broad.  I understand the language

2     is way too broad, because it would require them to report on

3     every can of beer they sold or bottle of wine they sold.  So

4     I'm not going to do that.  But I am going to urge you, both

5     sides, to work out some acceptable substitute there, because I

6     think it is appropriate to know what the business structure is

7     at this point and who owns what.  You know, I know what it was

8     some time ago, but I don't know for sure today.

9          MR. BROOK:  What if we excluded --

10         THE COURT:  What if you and your colleagues work it

11    out, and if you can't work it out, you can come back to me on

12    an order to show cause?

13         MR. BROOK:  Yes, your Honor.

14         THE COURT:  Now, the other thing that occurred to me,

15    as I indicated, to substitute is something to the general

16    effect that neither the estate nor Ms. Eber nor any of the

17    entity defendants, which includes nominal defendants, may sell,

18    transfer, or encumber any shares or membership interests in any

19    of the other entity defendants.

20         MR. BROOK:  Excluding Canandaigua National Bank, your

21    Honor.

22         THE COURT:  Yes, of course.

23         Any problem with that?  Defense?

24         MR. SANTORO:  We don't have a specific problem with

25    that, your Honor.  Your Honor's ruling on the application we

L9m2Kle5

1    will accept.

2              THE COURT:  Okay.  So in addition to the two

3    paragraphs that I dictated slightly earlier, my present order

4    is supplemented by adding that neither the Estate of Lester

5    Eber or Ms. Wendy Eber, nor any of the entity defendants,

6    including nominal defendants, shall transfer, sell, or encumber

7    any shares or membership interests in any of the other entity

8    defendants for the same 14-day period, provided, however, that

9    this paragraph does not apply to Canandaigua National Bank.

10             Satisfactory?

11             MR. BROOK:  Yes, your Honor.

12             THE COURT:  Satisfactory, Mr. Santoro, Mr. Mulry?

13             MR. MULRY:  Yes.  Understood, your Honor.

14             THE COURT:  Now, look.  This was done quickly, but not

15   thoughtlessly.  If there is some legitimate need that some

16   modification be made, you can apply to me.  I am available and

17   reachable on papers.  And if we are running into the 14-day

18   period, I mean, obviously the plaintiffs are going to have to

19   make a motion.  I am just freezing the status quo for now, but

20   the plaintiff will have to make a motion in order to extend

21   this unless you can work something out, which would of course

22   be very desirable.  My only concern here is to freeze the

23   status quo so that we know what the shape of the table that I

24   am dealing with is and that it is not going to change.

25             MR. BROOK:  Your Honor, I will file a formal motion

L9m2Kle5

```
1    for a preliminary injunction.  I will fix that second paragraph
2    certainly.  I was wondering if could we get a briefing schedule
3    now because --
4              THE COURT:  I gave you one.
5              MR. BROOK:  For the preliminary injunction.
6              THE COURT:  No.
7              MR. BROOK:  So if I file that by Friday this week, I
8    just want --
9              THE COURT:  You will do it by an order to show cause,
10   and there will be a schedule in the order to show cause.
11             MR. MULRY:  Judge, certainly we will speak with
12   Mr. Brook to see if the parties can engage in a stipulated
13   order that we can present to you that will address the concerns
14   you have raised, and we will try to work with Mr. Brook on
15   that.
16             THE COURT:  No, I appreciate that.  And, you know, you
17   are all good lawyers and you ought to be able to work this out.
18   This ought to be in a standstill mode until you either settle
19   it or get a decision.  That's the only sensible thing that I
20   can see.  It wouldn't make any sense to wake up to find out,
21   you know, that Eber-Connecticut's been sold to the Emirates or
22   something.  Maybe that would be a good thing.  Who knows?
23   Okay.  But I don't think they do alcohol, right?
24             Okay.  Thanks, folks.
25             MR. BROOK:  Thank you, your Honor.
```

L9m2Kle5

1              MR. MULRY:  Thank you, your Honor.

2              THE COURT:  Stay healthy, everybody.

3                                oOo

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    INDEX OF EXAMINATION

2   Examination of:                        Page

3    MICHAEL A. GALLAGHER

4   Direct By Mr. Mulry . . . . . . . . . . . . 388

5   Cross By Mr. Brook . . . . . . . . . . . . . 389

6

7    FRANK C. TORCHIO

8   Direct By Mr. Mulry . . . . . . . . . . . . 405

9   Cross By Mr. Brook . . . . . . . . . . . . . 425

10  Redirect By Mr. Mulry . . . . . . . . . . . 465

11

12                   DEFENDANT EXHIBITS

13  Exhibit No.                          Received

14   ZB   . . . . . . . . . . . . . . . . . . 389

15   ZC   . . . . . . . . . . . . . . . . . . 406

16   TA through TG  . . . . . . . . . . . . . 407

17

18

19

20

21

22

23

24

25