## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL KLEEBERG, LISA STEIN, and AUDREY HAYS, <br><br>                 Plaintiffs, <br><br>     v. <br><br> WENDY EBER, in her individual capacity and as Executrix u/w/o LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC; LUCIA GORDON GUMAER and PATRICK D. MARTIN solely in their capacities as Executors under the will of ELLIOTT W. GUMAER, JR.; and, <br><br>                 Defendants, <br>     and <br><br> EBER BROS. & CO., INC.; EBER BROS. WINE AND LIQUOR CORP.; EBER BROS. WINE & LIQUOR METRO, INC.; EBER-CONNECTICUT, LLC; EBER-RHODE ISLAND, LLC; EBER BROS. ACQUISITION CORP.; EBER-METRO, LLC; SLOCUM & SONS OF MAINE, INC.; and CANANDAIGUA NATIONAL BANK & TRUST COMPANY, <br><br>            Nominal Defendants. | Civil Action No.  16-CV-9517(LAK)(KHP) |

---

## PLAINTIFFS' PROPOSED FINDINGS OF FACT & CONCLUSIONS OF LAW

---

Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Brian@brook-law.com
*Attorneys for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

# TABLE OF CONTENTS

I.   FINDINGS OF FACT ............................................................................................. 1

   A.   Background Regarding the Trust and the Eber Bros. Business .......................... 1

      1.   Lester's Roles in the Family Business and Compensation ............................. 5

      2.   Wendy's Roles and Compensation ................................................................. 7

      3.   CNB's Roles ................................................................................................... 8

      4.   Daniel Kleeberg's Knowledge and Experience .............................................. 9

   B.   The Southern Wine & Spirits Opportunity ....................................................... 9

      1.   The Dealings with Southern............................................................................ 9

      2.   EBWLC's Business Activities ...................................................................... 16

      3.   Ultimate Findings.......................................................................................... 17

   C.   Lester's Purported "Loans" to EBWLC before December 2009 ..................... 21

      1.   Purported Amended and Restated Promissory Notes dated "as of" March 13, 2006... 21

      2.   Defendants Want Lester's Estate to Collect 9% Interest on a Loan to Wendy ........... 25

   D.   Arm's Length Transactions and Offers for Eber-CT ....................................... 27

   E.   The Preparatory Transactions in 2010 ............................................................ 29

      1.   The Double-Dated LOC Note ....................................................................... 31

      2.   The Polebridge Transaction a/k/a/ Wendy Acquiring 6% of Eber-CT.......... 36

   F.   Chronology of Events Leading Up to EBWLC's Review and Approval of the June 2012 Transfer of Eber Metro to Lester's Alexbay ......................................................... 39

   G.   Post-Foreclosure Transactions and Inaction ................................................... 50

      1.   Slocum of Maine Transfer to Wendy and Lester.......................................... 50

      2.   Wendy's Employment Agreement and Receipt of Eber Metro Shares ......... 51

      3.   Concealment of the transfer .......................................................................... 51

   H.   Exposure of the Alexbay Transaction ............................................................. 52

      1.   Harris Beach Assignment ............................................................................. 55

i

2.   PBGC Settlement ................................................................................ 58

I.   Defendants' Extra-Judicial Attempt to End This Lawsuit by Subterfuge ...................... 58

1.   Lester Invokes Undisclosed Bylaws to Purchase Plaintiffs' Shares for "$0" ............... 62

2.   Lester Took Shares of EBWLC from the Trust in February 2017 ............................. 64

3.   Erasing the Trust's shares in EBWLC ..................................................... 66

J.   The Eber Companies Above Eber-CT Lacked Any Independent Directors .................... 68

K.   Wendy's Credibility as a Witness .......................................................... 69

L.   Wendy's Culpable State of Mind ........................................................... 71

M.   Lester's Credibility as a Witness ........................................................... 73

N.   Lester's Culpable State of Mind ........................................................... 74

O.   Defendants' Testimony Overstated Eber-CT's Financial Problems ................................ 75

P.   Lester and Wendy Believed that Alexbay Received Eber Metro, and Its Interest in Eber-CT, Free and Clear of EBWLC's Liabilities ............................................ 77

Q.   Valuation of Eber Metro as of the Transfer Date ............................................ 80

1.   Value Based on Expert Testimony ......................................................... 80

2.   Value Based on Eder-Goodman Offer ...................................................... 83

3.   The Reliability of Financial Information Produced by Defendants Is Questionable .... 85

R.   Valuation as of the Most Recent Audited Financial Statements ................................. 89

S.   Bad Faith Litigation Conduct .............................................................. 89

T.   Prejudgment Interest from Reasonable Intermediate Dates ................................... 92

U.   Jurisdiction ............................................................................... 95

II.   CONCLUSIONS OF LAW ................................................................... 96

A.   Jurisdiction ............................................................................... 96

B.   Defendants Were Fiduciaries .............................................................. 96

C.   The Trust Owned EBWLC Shares, Which Shall Be Distributed .............................. 97

D.   Plaintiffs Are Owners of EB&C and Have Standing to Assert Derivative Claims .......... 98

E.  The 750 Voting Preferred Shares Are Void ................................................................ 102

F.  The Southern Opportunity Was Usurped ...................................................................... 103

G.  Lester's "Loans" Involved Improper Self-Dealing ....................................................... 105

    1.  The Co-Trustees' Approval Was Required to Comply with the Will ...................... 105

    2.  The "Loans" Were Not Approved by Disinterested Directors nor Were They Products of Fair Dealing ...................................................................................... 106

H.  Lester's Employment Agreement Was the Product of Unauthorized Self-Dealing ....... 106

I.  The Polebridge Transaction Lacked Economic Substance and Was Unfair to Eber Metro and the Trust .................................................................................................... 106

J.  The Court Must Order a Reconveyance of the Trust's Assets ........................................ 108

K.  Breach of the Duty of Loyalty and Disgorgement for Disloyalty ................................. 108

L.  Lester's Attempt to Personally Profit from the Harris Beach Settlement Was a Breach of Fiduciary Duty ............................................................................................ 111

M.  Lester Was Not Entitled to Demand Pension Payments from EBWLC After Voluntarily Agreeing to Forgo His Pension Payments from the Plan .............................. 112

N.  Lester's Estate Is Not Entitled to "Credit" for Payments Made Based on Legal Problems After the Metro Transfer to Alexbay ............................................................. 113

O.  Wendy Eber's Intentional Wrongdoing, Animated by a Fraudulent Motive, Warrants Imposition of Punitive Damages ................................................................... 114

P.  Fees and Expenses ..................................................................................................... 115

Q.  Additional Injunctive Relief ..................................................................................... 116

Plaintiffs Audrey Hays, Daniel Kleeberg, and Lisa Stein respectfully submit the following proposed Findings of Fact and Conclusions of Law.[1] Citations are in brackets and occasional footnotes offer additional explanation for the Court. Citations do not necessarily include every supporting piece of evidence available in the record.

## I.   FINDINGS OF FACT

### A.  Background Regarding the Trust and the Eber Bros. Business

1.      Eber Bros. & Co., Inc. ("EB&C" or "Eber Bros.") is a New York corporation that was founded as a produce distributor during World War I by Allen Eber and his brother. [Ex. 1002 ⁋ 2.] After Prohibition, the Eber brothers founded a wine and liquor distribution subsidiary called Eber Bros. Wine and Liquor Corporation ("EBWLC" or "Eber Wine & Liquor"), a New York corporation. [*Id.*]

2.      Allen Eber had three children: Mildred Eber Boslov, Sally Eber Kleeberg, and Lester Eber ("Lester"). [*Id.* ⁋ 3.] In 1969, Allen Eber executed a will that provided for creation of a testamentary trust upon his demise. [*Id.* ⁋ 6; Ex. 132.] When Allen Eber died in 1970, the Allen Eber Trust (the "Trust") was formed to hold the controlling stake in the Eber Bros. business and certain unrelated investments. [Ex. 135.] The Trust held all the voting stock in EB&C. [Pretrial Order § III ⁋ 3.] After the passing of Allen Eber's wife, each of his three children was entitled to a 1/3 interest in the Trust. [Ex. 132.]

3.      In addition to being a beneficiary, Lester was also one of three co-trustees of the Trust, along with Elliott W. Gumaer, Jr. ("Gumaer") and an institutional trustee, which changed from time to time. [Ex. 132; Pretrial Order § III ⁋ 4.] In 1991, M&T Bank took over as the bank

---

[1] "TAC" refers to the Third Amended Complaint (ECF No. 236); "Answer" refers to the Eber Defendants' Amended Answer to the Third Amended Complaint (ECF No. 241);

co-trustee. [Ex. 154.] In 2007, Canandaigua National Bank ("CNB") was appointed as successor co-trustee to M&T Bank. [Ex. 135 at 1–2. [2]]

4.      Lester began working for Eber Bros. in approximately 1959. [Pretrial Order § III ₱ 1.] He started running the business and its subsidiaries as President and chief executive by the early 1980s and continued in that role until he passed away on April 5, 2020.

5.      At the time this lawsuit was filed, Plaintiffs were beneficiaries of the Trust, holding a combined 2/3 interest in the Trust. [Pretrial Order § III ₱ 5.] Plaintiff Audrey Hays became a 1/3 beneficiary of the Trust after her mother, Mildred Boslov, died in 1973. [Ex. 135 at 1.] Plaintiffs Daniel Kleeberg and Lisa Stein each became 1/6 beneficiaries of the Trust when their mother, Sally Kleeberg, died in 2014. [*Id.*]

6.      As of December 31, 2006, the Trust undisputedly held the following equity interests in EB&C and EBWLC:

> 1850 Class A Voting Common Shares of EB&C
>
> 290 Class B Non-Voting Common Shares of EB&C
>
> 2000 Non-Cumulative 6% Preferred Shares of EB&C
>
> 379 Class B Non-Voting Common Shares of EBWLC
>
> 250 Preferred Shares of EBWLC

[Ex. 154 at 8.] This included 100% of the voting shares of EB&C, and in turn EB&C held 100% of the voting shares in EBWLC. [Ex. 11.]

7.      After CNB was appointed successor co-trustee in 2007, it took possession of the Trust's EB&C stock certificates. [Ex. 38; Ex. 134 (certificates for EB&C shares held by CNB).]

---

[2] Page citations for exhibits refer to the page within the PDF, and not necessarily any printed page number on the face of the documents.

8.      According to the stock certificates, the Trust's EB&C Class A Voting Common Shares were specifically held in the name of "Lester Eber, Elliott W. Gumaer, Jr. Central Trust Company 'Co - tr, U/W Allen Eber/Residuary.'" [Ex. 134.] The Class B Non-Voting Common Shares were held in the name of "Lester Eber, Elliott W. Gumaer, Jr., M&T Bank Co-Trustees U/W Allen Eber Residuary."

9.      The only credible evidence about the current location of the Trust's EBWLC certificates indicates that they may have been held by Lester or a company under his control. [Ex. 139 (copy of EBWLC Class B shares produced by Defendants); Tr. 366:18–21.]

10.     As of 2014, EB&C had two other shareholders besides the Trust: Lester Eber and Sally Kleeberg each held 100 shares of Class B Non-Voting Common Shares. [Ex. 11.] Audrey Hays had inherited similar shares from her mother but sold them in 1986. [Ex. 1002 ¶ 10.]

11.     This lawsuit was filed on December 9, 2016. [ECF No. 1.] At the time, EBWLC's only shareholders of record were EB&C, which held all of the voting stock, and the Trust, which held only non-voting and preferred stock. Specifically, EBWLC's books showed that EB&C held 2,000 Class A Voting Common Shares, 438 Class B Non-Voting Common Shares, and 250 Non-Voting Preferred Shares; the Trust held 250 Non-Voting Preferred Shares and 379 Class B Non-Voting Common Shares. [Ex. 11; Ex. 147 at 7.]

12.     In the mid-1990s, EBWLC formed a wholly owned subsidiary called Eber Bros. Wine & Liquor Metro, Inc. ("Eber Metro"), a New York corporation, for the purpose of expanding the business into the New York City metropolitan area. [Ex. 1003 ¶ 10; Ex. 11.]

13.     After initially being profitable, by 2005, Eber Metro's operations in the New York City metropolitan area were no longer profitable because it lost major lines of suppliers. The loss

of suppliers in New York City is one reason why Lester decided to enter the Connecticut wine and liquor market. [Lester Dep. 21:20–22:21; Kleeberg Decl. ¶ 14.]

14.     In 2005, Eber Metro acquired Slocum & Sons ("Slocum"), a wine and liquor distribution business in Connecticut and Rhode Island. Eber Bros. formed two new limited liability companies in Delaware to complete the merger, and both entities were wholly owned subsidiaries of Eber Metro at the time of formation. [Answer ¶ 2 (admitting TAC ¶¶ 30–31.]

15.     Slocum's Connecticut business was merged into Eber-Connecticut, LLC ("Eber-CT"), a newly formed Delaware LLC that was a wholly owned subsidiary of Eber Metro. Eber-CT's equity consisted of 100 membership units, with each unit representing 1% of the equity.

16.     Distributors in Connecticut are afforded protections against ordinary market forces by virtue of franchise laws that make it difficult for suppliers to change distributors. [Tr. 90:12–92:2; Liebman Decl ¶ 74] For example, a supplier cannot terminate a relationship with a distributor without "good cause." [Lester Dep. 24:2.] The franchise laws have discouraged large interstate distributors from entering the Connecticut market. [Tr. 138:16–23.]

17.     "The franchise laws in the state of Connecticut provide statutory protection and value to [Eber-CT's] business model. Specifically, unlike New York, suppliers in Connecticut are not permitted to terminate their relationship with Eber-CT without good cause to do so and without following a specified statutory procedure. Based on these protections, Eber-CT's suppliers must continue to sell goods to Eber-CT, ensuring an on going business operation into the future" [Ex. 65 at 3; *see also* Ex. 267 at 278 (submission to IRS under penalty of perjury: "future growth was afforded statutory protection").]

18.     All of the Eber entities operated on a fiscal year ending on May 31. [*E.g.*, Ex. 205; Exs. 210–220.] The companies referred to any given fiscal year based on the calendar year

in which the fiscal year ended, for example, "fiscal year 2008" referred to the year beginning June 1, 2007 and ending May 31, 2008. [Tr. 272:18–24.]

19.     Nominal Defendants Eber-RI, LLC, and Eber-Metro, LLC, are non-operating affiliates of Eber Metro, and Eber Acquisition Corp. is a non-operating affiliate of EBWLC.

20.     As part of the 2005 Slocum purchase, Eber Metro acquired a Call Option to purchase the Slocum family's interest in an import company, Slocum & Sons of Maine, Inc. ("Slocum of Maine"), which imports wines for Eber-CT's distribution. [Ex. 55; 94:25–96:5.]

*1.   Lester's Roles in the Family Business and Compensation*

21.     Lester Eber served in the following officer positions with Eber. Bros. companies:

    a.   EB&C: President, from before 2000 through the present [Ex. 142 at 4]

    b.   EBWLC: President, from before 2000 until Feb. 1, 2012 [*id.*]

    c.   Eber Metro: President, from before 2000 through the present [Ex. 147 at 2]

    d.   Eber-CT: Chief Executive Officer, from 2005 to the present [Ex. 57 at 36]

At all times when Lester was an officer for one of the corporations, he was also a director, and in the case of Eber-CT, he was Chairman of the Board of Managers. [*Id.*; Ex. 147 at 2.]

22.     The following chart reflects Lester Eber's employee compensation, including both salary and 401k contributions, but excluding benefits such as matching 401k contributions, car allowances, etc.:

| Year | Payor(s) | Salary and Bonuses |
|------|----------|-------------------:|
| 2006 | EBWLC | $325,289.28 |
| 2007 | EBWLC | $318,521.28 |
| 2008 | EBWLC; Eber-CT | $321,615.71 |
| 2009 | Eber-CT | $182,039.00 |

| 2010 | EBWLC | $162,650.16 |
| 2011 | Eber-CT | $172,165.89 |
| 2012 | Eber-CT | $137,698.37 |
| 2013 | Eber-CT | $191,961.08 |
| 2014 | Eber-CT; Slocum of Maine | $205,135.56 |
| 2015 | Eber-CT | $337,977.73 |
| 2016 | Eber-CT | $316,873.14 |
| 2017 | Eber-CT | $324,269.76 |
| 2018 | Eber-CT | $318,904.90 |
| 2019 | Eber-CT | $219,778.25 |
| 2020 | Eber-CT | $780,686.22 |

[Ex. 28; Ex. 89; Ex. 160 at 81; Ex. 267 at 275–76.] The total amount of gross wages Lester received from EBWLC and its affiliates from 2007 through his demise in 2020 was at least $3,990,277.05.

23.    Starting September 1, 2007, and continuing until February 2017, Lester collected monthly pension checks from EBWLC's Retirement Plan (the "Retirement Plan" or "Plan") in the amount of $10,860.69, or $130,328.28 per year. [Ex. DDDD at 2; Ex. 186 at 10.] For that period of 9 ½ years, Lester withdrew $1,238,118.66 from the Plan for his own benefit.

24.    Lester understood that the Eber Bros. business was a Trust asset and that, in his role managing the business, including all subsidiaries, his duties ultimately ran to the Trust and the Trust's beneficiaries. [Lester Dep. 81:22–24; 82:7–12; 87:6–24.] He understood that he had a fiduciary duty to Eber Bros.' shareholders, including the Trust and his sister. [Tr. 83:11–84:10.]

## 2. Wendy's Roles and Compensation

25.     Wendy Eber ("Wendy") is Lester's daughter whom he brought into this business in 2001. Wendy first became a director of EBWLC and its affiliates in late 2007. Wendy has served as some kind of an officer, inclusive of the role of Secretary, of EBWLC and its affiliates at all times since late 2007, when she became CFO of EBWLC. [Wendy Decl. ¶¶ 1, 4.]

26.     The following chart reflects Wendy Eber's employee compensation, including both salary and 401k contributions, but excluding benefits such as matching 401k contributions, car allowances, etc.

| Year | Payor(s) | Salary and Bonuses |
|------|----------|-------------------:|
| 2007 | EBWLC | $114,017.90 |
| 2008 | EBWLC; Eber-CT | $133,901.31 |
| 2009 | Eber-CT | $143,072.28 |
| 2010 | Eber-CT | $144,415.90 |
| 2011 | Eber-CT | $152,636.36 |
| 2012 | Eber-CT | $129,494.58 |
| 2013 | Eber-CT | $147,775.07 |
| 2014 | Eber-CT; Slocum of Maine | $195,471.93 |
| 2015 | Eber-CT | $230,223.56 |
| 2016 | Eber-CT | $313,299.72 |
| 2017 | Eber-CT | $285,512.32 |
| 2018 | Eber-CT | $290,378.60 |
| 2019 | Eber-CT | $200,385.83 |
| 2020 | Eber-CT | $429,372.72 |

[Ex. 158; Ex. 89.] The total amount of gross wages Wendy received from EBWLC and its affiliates from 2010 through 2020 was at least $2,518,966.59.

27.     Based on her most recent compensation and the testimony that the wine and liquor business has been booming since mid-2020, the Court infers and finds that Wendy has received at least the same amount of compensation as she was paid last year, and that since the fiscal year end is in May, there is no reason to believe that she is awaiting a bonus at the end of the 2021 calendar year. Based on these findings, the Court conservatively finds that Wendy has been paid at least $35,000 per month in 2021, or $350,000 as of November 1, 2021.

28.     In 2013, Wendy assigned several hundred thousand dollars of accounts receivable to her wholly owned company, Segway, LLC, for which she collected at least $123,000. [Tr. 349:2–14.]

### 3.  CNB's Roles

29.     Shortly after becoming a co-trustee of the Trust starting in 2007, CNB became Eber-CT's primary lender from approximately 2008 until 2017. CNB's designated loan officer was Bob Lowenthal. CNB initially sought to extend only $500,000 as a "short term loan, just to assist the company during some difficult time[s]." [Lowenthal Dep. 28:3–18, 37:5–24.] It later turned out to be a much longer-term loan. [*Id.* at 116:9–11.]

30.     As a matter of practice, CNB's loan and trust officers did not generally communicate with each other about their clients, including the Trust and Eber-CT. [Lowenthal Dep. 22:25–24:4, 101:22–102:4.]

31.     CNB's designated representative for the Trust was Rick Hawks, until his retirement immediately after this lawsuit was filed. He was then replaced by Rita Nischal. [Hawks Dep. 12:2–3, 33:2–34:13.]

32.     In three co-trustee situations, CNB's decision making policy was generally that all three had to approve of any particular action; but if there was a disagreement, then it would been two out of three that controlled. [Hawks Dep. 273:6–13.]

33.     One of CNB's first acts as co-trustee was for Hawks to authorize a series of transactions between EBWLC and the nation's largest wine and liquor distributor to transfer or otherwise dispose of most of its assets. [Ex. 195 at 7.]

### 4.  Daniel Kleeberg's Knowledge and Experience

34.     The Court finds that Daniel Kleeberg, based on his decades of working for EBWLC and other companies in the wine and liquor industry, has sufficient knowledge and experience to be appointed on a temporary basis to control the Eber companies, including Eber-CT, until new stock registrations are complete and elections can proceed. [*See generally* Kleeberg Decl.]

### B.  The Southern Wine & Spirits Opportunity

### 1.  The Dealings with Southern

35.     In approximately 2004, the largest distributor in the United States, Southern Wine & Spirits ("SWS" or "Southern"), entered the New York market and acquired a New York city wholesaler. [Hager Dep. 12:16–13:25.]

36.     Soon after Southern moved into downstate New York, Lester participated in conversations with the owners of Southern about a potential partnership with or acquisition of EBWLC's New York operations, because EBWLC was at the time the largest wine and liquor distributor in upstate New York. [Lester Dep. 40:22–41:8.] Lester's response to Southern was not positive and he conveyed he was not interested. [Hager Dep. 14.] No deal was reached.

37.     Southern proceeded to enter the New York market and quickly lured away dozens of EBWLC employees and also took suppliers' lines away from EBWLC.  Southern even paid one EBWLC sales manager a $5,000,000 bonus to leave EBWLC and help Southern recruit more EBWLC employees. EBWLC responded by suing Southern for taking EBWLC's employees and suppliers. [Lester Dep. 45:9–47:22; Kleeberg Decl. ¶¶ 18–22.]

38.     In response to Southern, Lester sold half of Eber Metro to Georgia-based distributor NDC, and formed the entity then-called Eber-NDC, LLC.[3] [Kleeberg Decl. ¶¶ 17, 25.]

39.     When Daniel Kleeberg pleaded with Lester to make a deal with Southern, Lester told Daniel, "There's no way you or I want to work for [the owners of Southern]," who Lester described as "ruthless." [Kleeberg Decl. 20–21.]

40.     In October 2006, EBWLC entered into a Confidentiality Agreement with Southern to consider transactions that could resolve their dispute. [Ex. 93 at 13.]

41.     EBWLC continued to fight for survival against Southern until 2007, when it reached an agreement with Southern to end EBWLC's operations in New York. [Lester Dep. 48:19–49:4.] That agreement was negotiated simultaneously with other agreements, including settlement of the lawsuit, sales of interests in distributors located in Ohio and Delaware, as well as an agreement for Southern to hire to Lester (the "Consulting Agreement"). [*Id.* at 49:11–50:4.]

42.     In this litigation, Plaintiffs served Southern with a subpoena directing Southern to designate a witness under Federal Rule of Civil Procedure 30(b)(6) to testify about the transactions with EBWLC and Lester's work for Southern. Southern designated Lee Hager. Both parties relied on portions of Hager's deposition testimony. [Hager Dep. 8–9.]

---

[3] Eber-NDC, LLC was subsequently renamed, confusingly, Eber-Metro, LLC, the additional Nominal Defendant.

43.     Southern's response to the subpoena included a document showing that, on February 7, 2007, Southern's President and Chief Operating Officer, Wayne Chaplin, sent a Letter of Intent ("LOI") to "Lester Eber, President," EBWLC, and Eber-NDC, all at the same business address for EBWLC. [Ex. 93 at 5.]

44.     The LOI provided for a number of transactions, including that EBWLC and its affiliates, as well as their ultimate owners, enter into restrictive covenants. [Ex. 93 at 9.]

45.     According to Hager, Lester and Southern jointly proposed that Lester should work for Southern. [Hager Dep. 24:10–17.] Lester testified that he "needed a job," even though he was continuing to run Eber-CT because "Eber Connecticut was not in very good condition at the time." [Lester Dep. 64:3–18.] Lester also said that he "felt an obligation to work with" Southern because "they had worked with [EBWLC] to help [them] stay out of bankruptcy." [*Id.*]

46.     Unlike most legitimate and arm's length employment or consulting relationships, Lester's "Consulting Agreement" with Southern required Southern to pay Lester $600,000 per year for five years regardless of whether Lester did any work at all. [*See* Ex. 27 § 3(c) ("Company shall have the right to reduce or entirely eliminate Consultant's duties hereunder so long as full payment is made pursuant to this Agreement."); *id.* § 8 (providing for continued payment in full if Lester was terminated for any reason other than death, disability, or "Cause").]

47.     The Consulting Agreement included a restrictive covenant that, among other things, prohibited Eber-CT—so long as it was managed by Lester—from selling products into any state in which Southern had a presence, including New York, for ten years: during the five-year term and for an additional five years thereafter. The consulting fee paid to Lester was the

sole consideration for the restrictive covenant, and no money was paid to any Eber company for the restriction. [Ex. 27 § 6.][4]

48.     Patrick "Pat" Dalton of the Harris Beach law firm represented EBWLC in the negotiations with Southern. [Hager Dep. 26:19–27:13.] Dalton also negotiated Lester's Consulting Agreement and was paid by EBWLC for doing so. [*Id.*; Lester Dep. 62:19–63:4.] The Consulting Agreement's notice provision required sending a copy of any notice to Dalton on behalf of Lester. [Ex. 27 § 11.] No one else besides Dalton was involved in negotiating or reviewing Lester's Consulting Agreement on behalf of EBWLC. [Lester Dep. 69:23–70:2.]

49.     During the entire time that Lester worked for EBWLC and its subsidiaries, Lester performed what he termed "governmental work," which included interacting with the New York state legislature and regulatory agencies. [Lester Dep. 13:6–16.] Lester admitted that, at the beginning, the work he did for Southern was "just governmental relations." [Lester Dep. 53:23–54:15.] Two or three years later, Lester says he took on additional responsibilities for compliance. [*Id.* at 54:18–55:16.]

50.     Although the LOI had required all entities and owners to enter into restrictive covenants with Southern, the final deal included restrictive covenants only from Lester and two entities that had interests in Delaware and Ohio that were acquired by Southern (Eber Acquisition Corp. and PW&S, LLC). [Ex. 194.]

51.     The final deal also increased the compensation to Lester under the Consulting Agreement from $500,000 per year to $600,000 per year.

52.     The Boards of the relevant Eber Bros. companies approved all of the final agreements with Southern except one: the Consulting Agreement with Lester. [Ex. 195.] All

---

[4] The Consulting Agreement also broadly prohibited Lester from "divert[ing] or attempt[ing] to divert from Southern any Business or Business opportunity whatsoever." [*Id.*]

three co-trustees also approved every agreement—except Lester's Consulting Agreement—on behalf of the Trust as the sole EB&C shareholder entitled to vote. [*Id.* at 1–7.]

53.    Lester did not disclose the consulting opportunity to any directors or co-trustees before undertaking the opportunity for solely his own benefit. Nor did Lester disclose the opportunity to Daniel Kleeberg, who months later heard that Lester was working for Southern through rumors from friends in the industry. [Kleeberg Decl. ¶ 27.]

54.    Lester testified that he never thought about whether his Consulting Agreement with Southern was taking anything away from EBWLC. [Lester Dep. 446:19–24.]

55.    Hager testified that if Lester had proposed to pay the consideration for the Consulting Agreement to an Eber Bros. entity rather than to himself personally, then "subject to whatever [Southern's] attorneys might have said, [he] would have objected vehemently." Hager explained that he would have been concerned about other individuals besides Lester providing the services in his stead. When asked about his view if the proposed contract with an entity included a personal services guarantee that the contract would only continue as long as Lester Eber was the one providing the services, Hager said, "Again, I would go to my attorneys and say is this going to accomplish what I want or not." [Hager Dep. 69:13–70:16.]

56.    In other transactions, Hager testified, Southern had generally contracted with an individual former owner to provide consulting services after an acquisition, rather than contracting with an entity. Hager conceded that none of those other transactions involved a "consultant" who was concurrently continuing to operate a business within the wine and liquor industry. [Hager Dep. 70:18–72:13.]

57.    Hager testified that, after the initial five-year Consulting Agreement ended, Southern decided continued paying Lester as a consultant at a reduced rate of $300,000 per year

13

($25,000 per month) but decided not to enter a new written agreement. Southern wanted to have a "totally at will agreement," because, Hager explained, "for us it was to have what we thought was control of the relationship. We understood that he is still bound by the covenant that he had, as long as it was mutually satisfactory to us…. We wanted to have greater control." [Hager Dep. 50:9–51:9.]

58.    Hager could not say how many hours a week on average Lester devoted to Southern during the initial five-year contract period without "speculating," noting that Lester's services were "on call." [Hager 51:23–52:7.]

59.    Lester and Southern misrepresented his compensation to New York's Joint Commission on Public Ethics (JCOPE), which regulates lobbying activity.

a.    The Public Integrity Reform Act of 2011 ("PIRA") established JCOPE to regulate lobbyists and their clients through disclosure and enforcement provisions, including requiring lobbyists to register with the state and requiring reporting of compensation paid to lobbyists. [19 N.Y.C.R.R. § 938.] The law includes enforcement provisions that make it illegal to file reports that "contain[] false, misleading or knowingly inaccurate statements." [19 N.Y.C.R.R. § 938.8.]

b.    After JCOPE was formed, Lester registered as a lobbyist for Southern and knew that disclosure of his compensation was "required." [Lester Dep. 72:1–75:14.]

c.    In January 2012, nine months before the Consulting Agreement's five-year term ended, Lester sent a letter on his personal letterhead to Southern; the

letter asserted that Lester's compensation for lobbying was $10,000 per year, or $833 per month. [Ex. 29.]

d.   Similar letters were sent by Lester in the following years. [Ex. 29.]

e.   The Court finds that these letters were, at the minimum, misleading, if not false, because Lester was being paid $50,000 a month at the time of the first letter ($25,833 per month at the time of the subsequent letters) and most of Lester's work was "governmental work," including lobbying. [Lester Dep 13:6–16, 67:9–14; *see also* Tr. 128:7– 15 (the only work for Southern that Lester told Eder about was that he was doing "lobbying work").]

f.   While allocating a portion of his compensation to lobbying was appropriate, given Lester's testimony about the nature of his activities for Southern, there is no question that it comprised more than 3.2% of his work for Southern, but that is the percentage of Lester's post-2012 compensation that was disclosed to the State of New York as Lester's compensation for lobbying activities.[5]

60.   Based on the foregoing facts and, in particular, the letters that Lester and Southern submitted to JCOPE, the Court finds that testimony from Southern's representative and Lester about the particulars of his work for Southern cannot be taken at face value. For example, the decision not to have another written consulting agreement in 2012 was likely at least in part to obfuscate the total amount of compensation being paid to Lester that could be construed as compensation for his lobbying and other governmental relations services.

---

[5] $10,000 (the amount reported) divided by $310,000 (the total compensation actually paid for 2013 through 2019) equals 3.23%. For the first nine months of 2012, the percentage allocated to lobbying was merely 1.67% ($833/mo reported divided by $50,000/mo actually paid).

*2. EBWLC's Business Activities*

61.     As of August 28, 2007, Lester clearly intended to continue working for EBWLC for the foreseeable future. [Ex. 162 (enabling him to collect pension while working for EBWLC); Tr. 286:14–291:3.]

62.     Even after EBWLC ceased most operations in New York, Lester continued to receive the same amount of compensation from EBWLC and its subsidiaries at least through the end of 2008, [Tr. 272–286:11 (reviewing relevant excerpts Exs. 28, 142, 158, 160 and 267)], even though Lester was managing a much smaller company, [Lester Dep. 29:11–21].

63.     Lester knew that EBWLC would continue to incur significant expenses after August 2007, including but not limited to pension funding obligations.

64.     "[EBWLC] *itself* had wine and liquor distribution operations in New York from 1933 to September 2008." [Ex. 165 at 23–24 (emphasis added); *see also id.* at 24 ¶ 9 (PBGC Assertion of Material Fact: "Eber Bros. had ceased all operations and had terminated all employees prior to April 30, 2010." EBWLC Response: "Disputed.")]

65.     Lester spent substantially all of his work week in New York City during the 2008 fiscal year to facilitate the continued wind-up of EBWLC's New York City operation. [Ex. 267 at 275.]

66.     Eber-CT "did a fair amount of business in the New York City area" selling wines that had been imported through Slocum of Maine. [Lowenthal Dep. 38:20–39:7; Lester Dep. 471:18–472:8; Tr. 95:1–96:5.] Eber-CT was licensed to distribute liquor in New York State. [Lowenthal Dep. 152:18–21.]

67.     The New York sales continued after the Southern transactions despite Lester's restrictive covenant, which precluded him from managing a business that sold wine or liquor into New York. Lester could not recall how long those sales continued, and he claimed that he never

16

discussed Eber-CT's sales in New York with Southern. Lester also claimed the New York sales ended because they were not profitable, but he admitted he does not know about any documentation that would support his claim. [Lester Dep. 471:18–475:13.[6]]

68.     Contrary to Lester's testimony about the sales stopping and not being profitable, Defendants told CNB's loan officer, Lowenthal, that New York "was a growth market for" Eber-CT, and Lowenthal was never told that Eber-CT stopped selling in that market. [Lowenthal Dep. 151:25–152:21.]

69.     EBWLC continued to have officers and directors until 2014, and according to Wendy, it maintained a director and officer insurance policy until 2014, too. [Ex. 177; Tr. 268:20–22.] EBWLC's officers and directors all resigned "as of 11:59 pm on March 31, 2014." [Ex. 165 at 26 ¶ 16.]

70.     From January 2008 until March 2009, Wendy caused EBWLC to pay at least $113,929.42 of her personal expenses. [Ex. 160 at 30.] As of May 31, 2012, she had a balance due of $94,287.92 [*Id.*] EBWLC's books classified the payments as amounts "Due from Employee," an interest-free loan to Wendy. Wendy's reliance on EBWLC to fund personal expenses is inconsistent with her position in this litigation that EBWLC was all but dead.

### 3.   *Ultimate Findings*

71.     Although the record is unclear as to precisely when Lester started negotiating for himself with Southern, it was at some point between the October 26, 2006, Confidentiality Agreement and the February 7, 2007, LOI with Southern. [Ex. 93 at 13.] The Court finds that

---

[6] Plaintiffs designated this entire section in pretrial submissions, but it seems that the entire page 72 was inadvertently not highlighted in the PDF of the parties' combined designation.

January 1, 2007, is a reasonable and conservative estimate for when Lester and Southern began negotiating a Consulting Agreement to benefit Lester personally.

72.     EBWLC had a tangible expectancy in the consulting opportunity. The opportunity was available to Lester entirely because of his position as chief executive of EBWLC and his ability to cause EBWLC to enter into the overall deal with Southern, which included numerous individual agreements. Further, all of Lester's experience and qualifications to consult for Southern came directly from his decades of compensated work for EBWLC.

73.     Throughout 2007, EBWLC continued to employ Lester as President and paid him the same salary and bonus he had received in prior years. [Ex. 267 at 275.] EBWLC and its owners expected and deserved Lester's undivided loyalty, particularly given his heightened additional duties as a co-trustee of the Trust, which was both directly and indirectly the owner of essentially all of the company.

74.     EBWLC was actively pursuing multiple different transactions to yield cash from Southern, which EBWLC had continuously sought since filed suit against Southern in 2005. EBWLC needed cash to support (a) its continuing financial obligations that were not being assumed by Southern, such as funding for the Retirement Plan, (b) investment in the operations and growth of Eber-CT, which EBWLC intended to continue to own and manage, and (c) salaries and distributions to the extended Eber family.

75.     Southern would not have entered into the Consulting Agreement with Lester if not for Lester committing EBWLC to the overall deal, which comprised numerous other transactions with Southern. [Hager Dep. 88:11–25 ("There would be nothing to consult with unless there was some sort of deal done…We were building a company.").]

76.     The Court therefore finds that the Southern Consulting Agreement was a corporate opportunity that belonged to EBWLC and its subsidiaries in the wine and liquor distribution business. EBWLC needed and sought money from Southern, and Lester was under a duty to EBWLC to acquire it. The loss of the opportunity was so severe that it threatened the viability of EBWLC, and ultimately did lead to EBWLC being rendered insolvent by Lester's own actions to take advantage of EBWLC's continuing need for cash so that Lester could profit even more from his position of trust and control.

77.     The Southern Consulting Agreement was also a business opportunity that belonged to the Trust given the significant role that the Eber Bros. business played in Allen Eber's Will. The trustees approved the other transactions between Southern and Eber Bros. affiliates, but not the Consulting Agreement.

78.     To the extent that Southern genuinely wanted Lester's consulting services, the consulting opportunity was available to EBWLC or any of its affiliates notwithstanding Hager's testimony. Hager expressly conditioned his testimony as being subject to what his attorneys told him. The Court can discern no legal or factual reason why Southern could not have contracted with EBWLC or a subsidiary for Lester's personal services (i.e. conditioned upon Lester alone performing the "consulting" services).

79.     Lester misappropriated this opportunity for himself without first disclosing the opportunity to any corporate board or the other co-trustees. Lester also attempted to conceal his payments from the Trust beneficiaries. [Hays Decl. ⁋ 19 (Lester told Hays that the Southern deal produced "zero monetary value to the family," of which Lester was still a part).]

80.     Lester's usurpation gravely harmed EBWLC, which was in desperate need of cash after August 2007, not only because of obligations to the pension plan and creditors, but also

because of the significant amount of other expenses that Lester caused EBWLC to incur between August 2007 and May 2012. [*See, e.g.,* Ex. 160 at 72–77 (over $2.4 million legal & accounting expenses); *id.* at 77 (over $50,000 in membership dues and subscriptions); *id.* at 77–79 (over $100,000 in office expenses & supplies); *id.* at 81 (over $300,000 in officers' salaries).]

     a. Lester exacerbated the injury by amending the pension plan on August 28, 2007, to allow himself to collect pension benefits of $10,860 per month while continuing to work for EBWLC, starting at the same time that he began receiving $50,000 per month from Southern. [Ex. 162; Ex. DDDD.]

     b. The total amount of compensation Lester received after the Southern deal was more than triple what he had been earning before, including in 2005 when EBWLC was still generating hundreds of millions of dollars in annual revenues. [Ex. FFFF; Ex. 267 at 275–276; Ex. 160 at 81; Tr. 272–290.]

     c. Lester's failure to reduce his compensation from EBWLC when he started shuttering the failed New York business and undertook to work for Southern confirms that his objective was to profit personally at the expense of EBWLC, its subsidiaries, and the Trust, rather than act in their best interests as he was required to do.

81.    Lester took advantage of EBWLC's lack of sufficient funding by "loaning" over $1.5 million to EBWLC from December 2009 through 2012, ultimately using those loans to take EBWLC's sole remaining operating business, Eber-CT, out of the Trust and into a holding company owned by Lester alone.

82.    If EBWLC had been receiving $50,000 per month from Southern starting in September 2007, then it could have maintained Lester's salary, or even increased it, and

continued to meet its pension funding obligations and pay for its significant expenses without needing to borrow a dime from Lester.

83.     According to Lester's tax filings, Southern paid Lester the following amounts:

| Year | Southern Payments |
|------|-------------------|
| 2007 | $250,000.00 |
| 2008 | $600,000.00 |
| 2009 | $600,000.00 |
| 2010 | $650,000.00 |
| 2011 | $600,000.00 |
| 2012 | $480,000.00 |
| 2013 | $345,900.00 |
| 2014 | $310,000.00 |
| 2015 | $310,000.00 |
| 2016 | $310,000.00 |
| 2017 | $310,000.00 |
| 2018 | $310,000.00 |
| 2019 | $322,500.00 |
| 2020 | $39,999.00 |
| **TOTAL** | **$5,438,399.00** |

[Ex. 139.]

## C.  Lester's Purported "Loans" to EBWLC before December 2009

### 1.  *Purported Amended and Restated Promissory Notes dated "as of" March 13, 2006*

84.     Lester executed two documents that purport to be "amended and restated" promissory notes to himself, both purportedly dated "as of" March 13, 2006, for the amounts of $1,503,750, [Ex. K,] and $575,895 [Ex. L].

85.     The Court finds insufficient evidence to find that these promissory notes were valid debts of the company or that they reflected any actual loans from Lester to EBWLC. Each note purports to amend and restate previously issued notes, but no copies of any earlier issued

notes exist. There are no bank statements, canceled checks, or accounting records, either from

Lester or EBWLC, reflecting any significant transfers from Lester to any company prior to 2009.

86.     The note for $575,895 as of March 13, 2006, is not referenced in any other

documents before a revised set of minutes to the August 18, 2011, trustee meeting. Importantly,

the first draft of the minutes, sent in September 2011 to Lester and a lawyer for comment

(excluding the other two co-trustee) omitted any reference to that note and mentioned only a note

for $1,503,750. [Ex. 234 at 2.]

87.     The EBWLC board authorized a $1.5 million "commission" to Lester in or

around September 2005, [Ex. 25; Tr. 261:2–264:1,] which tends to show any $1.5 million

promissory note issued in or around August 2005 was more likely some form of misrepresented

compensation, since Lester testified that he was "never paid" the commission because "[t]here

wasn't any money in the company." [Lester Dep. 16:19–17:5.][7] A promissory note might have

been issued in lieu of an actual payment, particularly if the company was facing scrutiny from

creditors. An accounting document with handwritten notes from 2011 suggests that this note was

a means of paying a concealed bonus. [Ex. 6 at 7 ("Description of $1,503,705.00    Bonus").]

88.     The EBWLC Bylaws in effect from 1996 through 2020 prohibited EBWLC from

contracting any loans to borrow money without approval by the Board of Directors. [Ex. 108 at

10.] There is no evidence that the Board ever approved borrowing money from Lester Eber

before 2009. [Tr. 270:1–4.]

---

[7] If Lester received a promissory note as compensation in lieu of cash, it would probably still be reportable as income. *See generally* Henry Brandis, Jr., *The Treatment Accorded Promissory Notes under the Federal Income Tax*, 52 U.N.C. L. REV. 93 (1973). Lester's testimony indicates that he never reported any such income, not even after the note was satisfied in 2012. Therefore, even though there is evidence to support doing so, this Court will not treat the $1,503,750 Note as if it had been a valid means of providing compensation to Lester.

89.     EBWLC's final audited financial statement, covering fiscal years 2005 and 2006, undermines the authenticity of these notes—their balances, the date they were amended, and whether they were interest bearing. [Ex. 205.]

       a.   The total balance due from EBWLC to "an officer" (presumably Lester) as of May 31, 2005, was only $263,571—less than half the alleged balance due on a 2002 note that was supposedly amended and restated at $575,895 in March 2006. [Ex. 205 at 18.] If anything was "restated," it was restated incorrectly.

       b.   The audited financial statement for the year ending May 31, 2006, was issued on August 3, 2006. [Ex. 205 at 4.] Any notes issued in March 2006 should have been available to the auditors and reflected in the financial statements.

       c.   The financial statement describes notes due to Lester as "non-interest bearing," which means that the auditors were looking at different documents than the ones presented in this case.

90.     The only accounting records relating to the loans is a general ledger in which the loan balance was entered manually as an adjusted journal entry, and no audit record was produced showing when that manual entry was created. [Ex. 160 at 50.] Notably, EBWLC's books do not reflect any accrual of interest, as one would expect to see with legitimate debts so that a company could keep track of its liabilities.

91.     At the same time Lester was supposedly loaning money to the company, the books show that Lester caused EBWLC to pay personal expenses and carry a balance due of $859,731 as of August 31, 2007. [Ex. 160 at 50; *see also* Kleeberg Decl. ¶¶ 29, 31 (Lester relied heavily on EBWLC to pay expenses, mostly written off as business expenses, and did not loan money before 2010).] The existence of such a large balance due from Lester—without any

interest accruing—cannot be reconciled with the claim that the company was simultaneously borrowing money from Lester at a 9% interest rate. Such a wide spread indicates that even if there had been loans, they were manipulated in a way to allow Lester to profit improperly.

92.     Without proof that Lester actually loaned any money to the company to support these notes, the Court finds that the terms of the transactions were not fair to the company.

93.     The Court rejects Defendants' contention that the $1,503,750 Note was based on loans made by Lester as entirely unsupported by the record. The Court finds that this Note was more likely based on a 2005 note in the amount of $1,500,000 as means of providing tax-free compensation to Lester. [*See* Ex. 46 ¶ 40 (Lester 2015 affidavit asserting that he made "cash loans" starting in 2002.]

94.     The Court nonetheless does not find sufficient evidence to conclude that the $1,503,750 actually was a means of providing deferred compensation to Lester, particularly because of Defendants' failure to provide the original 2005 note referenced therein, combined with Lester's testimony that he was "not paid" the $1.5 million authorized by the Board in 2005, and Defendants' contrary litigation position.

95.     No loans were approved by the Board, let alone a vote of disinterested directors.

96.     Given the absence of evidence that the promissory notes were approved by disinterested directors, the Court finds that the promissory notes involved self-dealing by Lester.

97.     Thus, the promissory notes were not approved through any demonstrable process, let alone one that included negotiations and fair dealing.

98.     Lester alone acted to increase the interest rate on these notes by crossing out 6% and handwriting in 9%. [Ex. K; Ex. L; Lester Dep. 100:21–101:3, 101:12–18.]

99.    Even if Wendy's testimony about the 2006 notes were admissible despite her lack of personal knowledge, the Court would not credit Wendy's testimony.

100.    Neither of Lester's co-trustees approved either of the 2006 Amended Notes or either of the 2002 and 2005 notes that may have existed.

101.    Because the two 2006 promissory notes were backdated to March 2006; were a product of self-dealing at every stage, and particularly so at the point when Lester unilaterally increased the interest rate by hand; were not approved through any formal process or fair dealing; and did not confer fair value to the company because Lester did not pay the Company for them as Defendants contend, the Court finds that two 2006 promissory notes were not real or authentic liabilities of EBWLC as of 2006.

102.    Even if the Court had found that the $1,503,750 reflected a prior note concerning deferred compensation to Lester, the Court finds insufficient evidence that any promissory note was authorized through any fair approval process or that Lester's work justified the amount.

103.    Likewise, the Court finds insufficient evidence to credit the $575,895 Note as having been a real and valid liability to Lester. There is insufficient evidence to find that the $575,895 note dated March 13, 2006, ever existed before September 2011.

104.    The Court finds that Lester did not obtain the 2006 Notes in good faith.

*2.  Defendants Want Lester's Estate to Collect 9% Interest on a Loan to Wendy*

105.    Defendants rely on a demonstrative showing, *inter alia*, how Lester purportedly loaned and withdrew from EBWLC between September 2007 and March 2009, and for each deposit, Defendants apply an interest rate of 9%. [Ex. KKKKK at 2.]

106.    The net deposits were $16,797.03, and roughly three-quarters of that balance came from a $12,363.72 deposit by Lester on March 31, 2009. [*Id.*]

107.    Defendants' demonstrative failed to disclose to what purpose that $12,363.72 loan was applied: It was used to pay Wendy's personal legal bill to Kasowitz Benson Torres & Friedman.

108.    EBWLC's general shows the following related transactions on "3/31/2009":

+$12,000        Deposit by Wendy (booked as repayment of part of Wendy's loan balance)

+$12,363.72   Deposit by Lester (booked as a loan from Lester)

-$24,363.72    Check to Kasowitz, Benson, Torres (booked as another loan to Wendy)

[Ex. 160 at 30, 44.]

109.    In words, Lester deposited $12,363.72 to EBWLC and it was booked as a note payable to Lester. After Wendy deposited $12,000 that same day, Lester's deposit was precisely the amount Wendy needed to pay a personal legal bill which EBWLC paid by check sent that same day. The bill payment was booked as a $24,363.72 interest-free loan to Wendy.

110.    EBWLC's last updated General Ledger shows that Wendy has a $94,267.92 loan balance due to EBWLC. [Ex. 160 at 30.]

111.    The Court denies Defendants' request for this Court to order EBWLC to reimburse Lester's Estate for what was effectively a personal loan to his daughter and charge EBWLC 9% interest on top.

112.    This impropriety of Defendants' request illustrates why this Court finds that it cannot rely on Defendants' representations about why EBWLC needed money for more opaque expenses, or why this Court should assume that Lester's deposits of cash conferred actual value to EBWLC. In the case of Wendy's legal bill, the deposit caused EBWLC to accrue interest without reimbursement from Wendy.

113.    The transaction itself along with Defendants' misrepresentation of it exemplifies Defendants' bad faith both in their underlying actions and in their conduct during this litigation.

**D.  Arm's Length Transactions and Offers for Eber-CT**

114.    In April 2005, Eber Metro acquired Eber-CT for the purchase price of $21,600,024. [Ex. HHH.]

115.    In August 2007, Southern offered to purchase 15% of Eber-CT for $3,000,000. Southern did not purchase that interest, but it did purchase a Right of First Refusal ("ROFR") with respect to any equity transactions involving Eber-CT for the purchase price of $100,000. [Ex. FFFF.] Southern later waived the ROFR for no apparent consideration as of January 29, 2008. [Ex. 198.]

116.    In approximately the Spring of 2007, Andrew Eder, who ran Eder Bros. (with a "d"), a Connecticut wine and spirits distributor, offered to purchase all of Eber-CT from Eber Metro for approximately $20 million plus the net asset value of Eber-CT's assets. [Tr. 96:11–97:17 ("The value would have been closer to 30 [million]"); Ex. 199 at 5–6.]

117.    Eder did not receive any response to his 2007 offer. [Tr. 97:17, 142:3.]

118.    In late December 2007, Pat Dalton, an attorney for EBWLC, "dictat[ed]" an offer to sell 15% of Eber-CT to Eder, instead of Southern, for $4,500,000. [Tr. 139:21–142:12.]

119.    Eder Bros. joined with Alan S. Goodman, Inc. to form Eder-Goodman, LLC ("Eder-Goodman") for the purpose of acquiring 15% of Eber-CT. [Tr. 99:1–4; 130:18–131:5.]

120.    Effective January 29, 2008, Eder-Goodman agreed to purchase 15% of Eber-CT for $4,500,000. It was conditioned on the parties entering into an Amended and Restated LLC Agreement for Eber-CT (the "LLC Agreement") upon closing. [Ex. 56.]

121.    Eder-Goodman's decision to purchase 15% of Eber-CT was based on genuine interest in acquiring the Eber-CT business, and it was not substantially animated by fear of Southern entering the state of Connecticut. [Tr. 137:25–138:23.]

122.    Effective as of April 1, 2008, the transaction closed and Eber Metro and Eder-Goodman approved the LLC Agreement. [Ex. 57.]

123.    The LLC Agreement included several provisions that were beneficial to protecting the value of Eder-Goodman's minority interest in a competitor. The most "important" additional piece of the transaction beyond the 15% equity interest was Eder-Goodman's acquisition of the right of first refusal ("ROFR") to purchase the remaining 85% of Eber-CT. Eder-Goodman valued the ROFR separately from the 15% of equity, and the ROFR which caused Eder-Goodman to pay "slightly more" than they would have paid without the ROFR. [Tr. 99:8–100:5 (there were no other pieces to the transaction that caused Eder-Goodman to increase its valuation of an appropriate purchase price for the transaction).]

124.    Other LLC Agreement provisions were important to offset Eder-Goodman's concerns about Eber-CT's balance sheet and lack of control over Eber-CT, since Eder-Goodman was placing a substantial investment in the hands of a competitor. The primary protection provision was a liquidation preference, along with tag along rights, and certain oversight and veto rights to guard against dilution by the Ebers. [Ex. 57.] Without the liquidation preference, Eder-Goodman would not have signed the January 29, 2008, agreement. [Tr. 144:9–145:7.]

125.    Since there was no liquidation preference in the Southern offer and the price was not negotiated, the Court finds that EBWLC did not offer Eder a liquidation preference when Dalton dictated that the purchase price would be $4,500,000.

126.    At the same time, the LLC Agreement imposed detriments on Eder-Goodman, including encumbering the investment with drag along rights, and, most significantly, a complete restriction on Eder-Goodman being able to transfer the 15 units of Eber-CT without approval from the Ebers. [Ex. 57; Tr. 459:22–461:2.]

127.    Eber Metro represented and warranted to Eder-Goodman that, after completing certain specified clean-up transactions to satisfy intercompany debts, Eber-CT "has no obligations to EBWLC or to any affiliate of EBWLC…." [Ex. 56 at 3.]

**E.  The Preparatory Transactions in 2010**

128.    By 2010, Wendy knew and understood all of the following: ERISA governed EBWLC's non-union pension plan (the "Retirement Plan" or "Plan"). The Pension Benefit Guaranty Corp. ("PBGC") was the governmental authority that ensured such plans were adequately funded, among other things. ERISA also governed EBWLC's participation in and contributions to the New York State Teamsters Conference Pension & Retirement Fund (the "Teamsters Fund"). EBWLC's subsidiaries were considered part of a "controlled group" that could be tapped by PBGC to fund the Plan if and when EBWLC ceased funding the Plan. [Wendy Decl. ¶¶ 52–53, 58–60.]

129.    Wendy also knew that the "controlled group" was limited to those subsidiaries in which the employer (here, EBWLC) owned 80% or more of equity. [Wendy Decl. ¶ 54.] After the Eder-Goodman Sale, EBWLC owned 85% of Eber-CT's equity.

130.    In January 2010, Eber-CT sought to refinance its line of credit loan from CNB, including the cash collateral coverage and the repayment plan. In evaluating the request, Lowenthal sought to have a better understanding of Lester's personal finances, since he was a guarantor on the loan. Lowenthal specifically sought to understand how much of "the liquidity

shown on Lester's personal financial statement form may be committed to making the pension

shortfall payments." In response, Lester asked Lowenthal to "work with Wendy on this directly."

After a phone conversation with Wendy about the repayment plan, Lowenthal still lacked any

understanding about how Lester's personal finances were affected by the pension:

> I do need to have a better understanding as to Lester's arrangement to cover the
> Pension liability funding to answer the question about additional cash collateral
> for the line…. Please provide me with the details about this arrangement and
> about any other needs for the personal cash and marketable securities listed on the
> most recent personal financing statement.

Lowenthal sent that request on January 30, 2010. After no response, on February 15, 2010,

Lowenthal told Wendy, "I need your response to the below request before I can submit the line

[of credit] for extension." [Ex. 225.]

131. In response to Lowenthal's request, Wendy told Lowenthal: "We have reviewed

the question that you raised and at this time do not believe that it will have any financial impact

on our business. While we do not believe that it will have any impact we discussed the issue

internally and wondered how you heard about the matter. Please let us know."

[Ex. 225.]

132. Lowenthal was not aware of any debts owed by Eber-CT's corporate parents or

guarantors, even though CNB repeatedly requested the information and CNB's Term Sheet

expressly required Lester and Wendy to disclose "all contingent liabilities" to CNB. [Lowenthal

Dep. 41:3–13, 160:3–14, 161:14–162:14; Ex. 7 at 6.] Most of the information Lowenthal

received about Eber-CT came from Wendy and Eber-CT's CFO; he only spoke to Lester

periodically. [Lowenthal Dep. 40:2–10.]

133. In response to CNB's requests for financial information on the companies in

Eber-CT's ownership chain, Wendy and Lester did not provide much information and "[t]he

conversation would always come back to being, the companies were shells." [Lowenthal Dep.

41:8–13, 100:12–101:8, 143:20–145:9.] Based on that description, Lowenthal did not have cause to question whether the parent corporations had any substantial undisclosed liabilities. [*Id.*]

134.    Wendy and Lester intentionally misled Lowenthal and CNB about the pension liability. It was not a personal liability of Lester's at all; Lester himself was collecting $10,860 each month from the pension. [Tr. 399:25–400:3.]

135.    Contrary to what she told Lowenthal, Wendy was concerned about the pension obligations. In the months following Wendy's false assurance to Lowenthal, Wendy and Lester engaged in a transaction designed to try to make what Wendy told Lowenthal true, even though it was not true when she said it on February 18, 2010.

136.    Lowenthal did not suspect that there were any debts owed by the parent companies because he "didn't see anything coming out of Eber-Connecticut that seemed unusual." [Lowenthal Dep. 144:13–16.] CNB did not see money coming out of Eber-CT because Lester proceeded to front cash himself, keeping CNB in the dark.

### 1. The Double-Dated LOC Note

137.    In late 2009 or early 2010, Eber Metro made a Line of Credit Note ("LOC Note") with Lester that provided for Lester to loan up to $1,500,000 at an interest rate of 12.5%, due and payable with interest accrued on December 31, 2011. [Ex. HH.]

138.    The LOC Note was signed by Lester and Wendy on behalf of Eber Metro, and by Lester for himself. [Ex. HH.] EBWLC's Board purportedly authorized the LOC Note, as well as a Security Agreement granting Lester a security interest in all of Eber Metro's assets, and a Guaranty of Eber Metro's debt from EBWLC.  [Ex. HH at 4; Ex. GG at 26–28.]

139.    The terms of the LOC were not the product of any negotiations between Eber Metro and Lester. [Metro Dep. 72:2–74:16.]

140.     It is unclear *when* the LOC Note was made and authorized (if ever) because both the LOC Note itself and the board authorization were dated on two dates months apart: "October __ 2009" and February 26, 2010. [Ex. HH (October 2009 note and written consent); Ex. GG at 26–28 (2010 Board resolution and minutes); Lester Dep. 105:15–106:6 (2010 note).]

141.     Although Wendy and Lester both signed the "October __, 2009" "Unanimous Written Consent," Eber Metro's third director, Gumaer, did not sign. [Ex. HH at 5.]

142.     The February 26, 2010, Board resolutions and minutes, prepared by Wendy, assert that Wendy and Gumaer voted in favor of the LOC Note, Security Agreement, and Guaranty, while Lester abstained; Glenn Sturm ("Sturm"), a partner in the Atlanta-based law firm of Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins"), participated in the telephonic meeting as "Mr. Eber's counsel." [Ex. GG at 26–28; *see* Lester Dep. 331:3–24, 333:24–334:5 (regarding the nature of Sturm's services and who may have him).]

143.     The LOC Note, Security Agreement, Guaranty, Board Resolutions, and other related documents were drafted or edited by Nelson Mullins in late February 2010, under Sturm's supervision. There is no indication that the Nelson Mullins attorney who sent these drafts to Wendy had any understanding that the LOC Note was already executed. [Ex. 226.]

144.     Lester never told Wendy or Gumaer that he would not loan more money to the company unless he received a security agreement. [Lester Dep. 102:20–25 ("I don't remember saying that. I did whatever I had to to keep the company alive."); *see also id.* at 103:10–24.]

145.     The minutes to the February 26, 2010, telephonic Board meeting falsely asserted that Lester had refused to loan more money—even though he had entered into the LOC note several months earlier—unless he received a security interest in Eber Metro's assets. [Ex. GG at 28 ("Lester Eber would only agree to provide financing under the Line of Credit Note up to $1.5

million dollars to be loaned into Eber [Metro] if he had a secured interest in substantially all of the assets of Eber [Metro].").] No evidence has been presented about how or when these minutes were drafted, or by whom, but Wendy's name as Secretary appears at the bottom. [*Id*.] The minutes note that Sturm attended the meeting, apparently in the capacity as "Mr. Eber's counsel." [*Id*.]

146.     Even if the LOC Note had been executed in 2009, as Defendants contend, the Court finds that neither Wendy nor Lester had any intention of causing Eber Metro to pay off any portion of the LOC Note by the maturity date. [Lester Dep. 106:13–107:8.]

147.     The cash flow difficulties facing Eber-CT are what Defendants insist necessitated loans from Lester. Without any anticipated stream of cash flow, however, there was reasonable expectation that Eber Metro would be able to repay up to $1.5 million within such a short time.

148.     Wendy's conduct during the weeks leading up to the LOC Note's maturity date shows that she *wanted* Eber Metro to default on the LOC Note. Among other things, from October 2011 through January 2012, she helped Lester's lawyer calculate the amount of money he should claim in his anticipated lawsuit against Eber Metro. [Ex. 109; Ex. 112; Ex. 114; Lester Dep. 402:7–16.]

149.     Wendy never made any attempt to try to renegotiate the LOC Note to try to extend the maturity date to avoid default. [Metro Dep. 80:3–23; *see also id.* at 86:12–88:19 (claiming she "didn't have to" try to prevent Eber Metro from defaulting on its debts).]

150.     In contrast, the record shows that Wendy did not want Eber-CT to default on its debt to CNB, and she worked hard to avoid default by continuously asking CNB to amend the terms of its loan, including multiple extensions of the maturity date. [Exs. 227, 239, 242; Metro Dep. 85:5–21]

a. By December 15, 2011, Eber-CT had missed certain covenants under the CNB bank loan and was in default, but Wendy sought a waiver of the default from CNB. [Ex. 240.]

b. On December 21, 2011—just days before the LOC Note's maturity date— Wendy pleaded with Lowenthal to "[p]lease issue the waiver [of default] at your earliest convenience recognizing that this is critical and HIGHLY time sensitive." [Ex. 242.]

c. Wendy was even willing to mislead Lowenthal to cause CNB to extend the maturity date on the loan. [Ex. 225; Tr. 333:14–337:12.]

d. Lester agreed with Gumaer that CNB's duty as a fiduciary to the Trust required it to extend its loan to Eber-CT, because an attempt to collect the debt from Eber-CT could cause Eber-CT to go out of business, and that the Trust's "[EB&C] stock would be rendered worthless." [Lester Dep. 351:11– 353:10.] Thus, Lester knew that a default by Eber-CT on the loan to CNB could damage the Trust in the same way as Eber Metro's default on his loans.

151. Wendy's approval of the LOC Note, with the short maturity date of December 31, 2011, is Wendy's earliest proven disloyal act against EBWLC and Eber Metro. Because the date when it was actually approved is uncertain, the Court will use the intermediate date of December 31, 2009.

152. In March 2010, Glenn Sturm drafted a letter for Lester to send to Sally Kleeberg and Audrey Hays, the other two Trust beneficiaries, to offer them the "opportunity" to participate in the loan. [Ex. 228.] On March 20, 2010, Sturm used an email address that was separate from

his Nelson Mullins email to send the draft to Wendy Eber's personal email address, rather than her work email address. [*Id.*]

153.    On April 2, 2010, at the instruction of Wendy and Sturm, a Nelson Mullins attorney prepared a non-disclosure agreement for Sally Kleeberg and Audrey Hays to sign if they wanted to see EBWLC's financial statements. [Ex. 229.] After seeing the draft, Lester asked, "Do we want to put in the cross shifting of legal fees if we have a problem with them?" [*Id.*]

154.    In April 2010, Lester sent the letter to Sally Kleeberg and Audrey Hays. [Ex. 49 at 1; Hays Decl. ¶ 23.] The terms of Lester's proposal were determined by Sturm. [Lester Dep.267:21–268:20.]

155.    Lester's letter to Sally enclosed blank, unexecuted copies of the LOC Note (the misdated version with a "____ 2010" date), Guaranty, and Security Agreement.  [Ex. 49.]

156.    Nothing in the LOC Note documents, including the Security Agreement, purported to give Lester (or his assignee) the right to acquire the collateral (Eber Metro and/or its interest in Eber-CT) in satisfaction of the debt. [Ex. HH; Ex. GG.[8]]

157.    Audrey Hays refused to speak to Lester about the letter or the LOC Note after he asked her to loan $167,000. [Hays Decl. ¶ 22.]

158.    Lester spoke to Sally Kleeberg over the phone at least once about the LOC Note, but he never told her that if she did not put money in then Lester was going to take Eber-CT from the Trust, nor that there was even a possibility that they would lose their interest in the family business. [Lester Dep. 116:16–118:11.] Lester did not explain what the letter meant when it said the loan was secured by an equity interest in the Connecticut business. [Lester Dep. at 273.]

---

[8] Any such right in the contracts would have been void the Uniform Commercial Code, which precludes a debtor from consenting to a creditor's proposed acceptance of collateral in satisfaction of a secured debt until *after* there has been a default. N.Y.U.C.C. § 9-620(c) (requiring either (1) affirmative consent in a "record authenticated after default" or (2) implied consent from a failure to respond to a proposal from the creditor that is sent "after default").

Lester knew that the family business was important to his sister, Sally, but he did not believe it was important to make clear to her what his intentions were for the business if she did not "invest." [*Id.* at 295:11–24.]

159.    The "offer" made to Sally Kleeberg and Audrey Hays was never intended to entice either of them to actually give money to the business, but rather for the purpose of trying to provide cover for Lester's eventual foreclosure after default. Indeed, neither Lester nor Wendy ever contacted Sally Kleeberg or Audrey Hays again about putting money into the company, not even when the LOC Note was on the brink of default. [Metro Dep. 106:5–110:19.]

### 2.    The Polebridge Transaction a/k/a/ Wendy Acquiring 6% of Eber-CT

160.    In mid-2010, Lester and Wendy Eber sought to transfer 6% of Eber-CT away from Eber Metro so that EBWLC's total ownership interest in Eber-CT dropped to 79%, just below the 80% threshold under ERISA for treating Eber-CT as part of EBWLC's "controlled group" that could be tapped by the PBGC to help fund EBWLC's Retirement Plan.

161.    Defendants, through their attorney Pat Dalton, disclosed the transaction to Eder-Goodman in order to obtain Eder-Goodman's consent to a transfer. [Ex. 292 at 2 (letter dated May 17, 2010, referencing "recent telephone conversations" with Eder-Goodman's counsel).]

162.    Before May 17, 2010, Dalton initially conveyed that Eber Metro wanted to transfer 6% of Eber-CT to Wendy. [Ex. 292 at 2.]

163.    Eder-Goodman was given two different reasons for the transfer to Wendy. One was that the transfer had something to do with a divorce. The other reason, which Lester personally conveyed to Andy Eder, was that it was because Wendy had been doing so well in helping the business. [Tr. 105:15–106:3; Ex. 292 at 2.]

164.     Defendants' desire to transfer 6% to Wendy was repeated in multiple communications, including in a draft Joinder Agreement for the parties' signatures sent on May 25, 2010. [Ex. 292 at 2; Ex. 293 at 1–2; Ex. 294 at 2 (draft Joinder Agreement); Ex. 295.]

165.     On May 26, 2010, Glenn Sturm sent a memorandum to Dalton, copying Lester and Wendy, memorializing a discussion with Dalton about the "need to identify an alternative purchaser of the 6% interest in the CT LLC." The memorandum reflected the plan to have a "NewCo" purchase 6% of Eber-CT "for a secured nonrecourse note in the amount of $____." The NewCo would be an LLC with Sturm as the sole member. Instead of receiving the shares directly, Wendy would receive "an exclusive first right of first refusal [ROFR] to purchase the entire equity interest from NewCo." Until the point when Wendy chose to acquire the 6% herself, Wendy would "have a proxy to vote the equity interest held by NewCo and a limited power of attorney." Sturm concluded the memo by advising, "If we can find a different structure that works that would be better for me." [Ex. 119 at 2.]

166.     The proposal to grant Wendy the first ROFR caused Gumaer to be concerned that she would receive an improper benefit at the expense of the beneficiaries of the Trust (which did not include her). [Ex. 119 at 1.] Wendy assuaged Gumaer's concerns by telling him—falsely— that Eder-Goodman had requested that she receive the ROFR. [Tr. 339:24–342:22.]

167.     The Polebridge transaction was not authorized before July 29, 2010, but it was backdated to "as of" May 30, 2010—one day before the fiscal year end. [Ex. 120.]

168.     Lester testified that the Polebridge transaction was compensation to Sturm: "it was a way to pay him and the company didn't have any money to pay him." [Lester Dep. 95:8– 14.] Lester claimed, consistent with an affidavit submitted in the Harris Beach litigation, that Sturm wanted ten percent originally, but he was negotiated down to six percent. [*Id.* at 184:15–

23; *see also* Ex. 46 at 15 ⁋ 39 (Affidavit: "Mr. Sturm originally proposed a 10% ownership interest in Eber-CT, but was eventually negotiated down to 6% by May of 2010.").]

169.   From April 1, 2010, through May 31, 2012, EBWLC paid over $1.1 million to various different law firms and accountants, contradicting Lester's claim about a lack of money to pay Sturm. [Ex. 160 at 75–77 (showing the balance increased from $2,763,516 to $3,876,837).]

170.   Eder-Goodman, despite holding a right of first refusal—which was limited to a "bona fide third Person offer" [Ex. 57 at 20]—was not told that Polebridge paid anything for the 6% and was not given any opportunity to purchase the 6% for itself. [Tr. 112:6–22.]

171.   Wendy was the Defendant primarily involved in devising the transaction with Sturm. [Lester Dep. 96:5–11, 184:7–14; Eber Metro Dep. 40:8-42:20.]

172.   Defendants have failed to prove either that the "price" paid by Polebridge was fair to Eber Metro or that the transaction involved fair dealing. No appraisal or valuation work was performed to determine whether the price was fair. Neither the transfer of 6% of Eber-CT to Wendy (via Polebridge, with Wendy always known to be the eventual recipient) nor the sham right of first refusal were disclosed to or approved by co-trustee CNB or the other Trust beneficiaries.

173.   The Court finds that the Polebridge Transaction was a sham conducted for improper purposes and lacking in real economic substance.

174.   Wendy unilaterally extended the Polebridge note twice, including a ten-year extension in May 2016. [Ex. 58; Ex. 260.]

175.   In February 2017, Wendy formally acquired the 6 units of Eber-CT from Polebridge in exchange for assuming the nonrecourse note debt. [Ex. RRRR.]

176.    Wendy did not exercise her right of first refusal because no one else made an offer to Polebridge. [Wendy Decl. ¶ 159.]

177.    Wendy did not disclose or offer the opportunity to buy Polebridge's 6% of Eber-CT to any of the companies she worked for.

178.    Since acquiring the 6 units of Eber-CT, Wendy has received $154,102 in distributions from Eber-CT. [Ex. 218 at 7 (showing 2017 and 2018 distributions).]

179.    The concealed and unapproved transfer of 6% of Eber-CT to Wendy—a Trust asset potentially worth over $1 million based on the Eder-Goodman sale price—stands in stark contrast to the extensive disclosure and approval process the trustees employed when considering Lisa Stein's request to distribute just $1,000 per month, taken entirely out of her mother's own share of Trust principal, to help her daughter's medical needs. [Stein Decl. ¶¶ 11–15; *see* Exs. 155, 156, 157.] Unlike a grant of equity or a right of first refusal, Allen Eber's Will expressly permitted need-based distributions to be made in the co-trustees' "absolute and uncontrolled discretion." [Ex. 132 at 8.] Despite their discretion to approve Stein's request on their own, the trustees said they would not approve Stein's request unless each beneficiary and next-in-line contingent remainderman consented to the request, too. [Stein Decl. ¶ 13; Ex. 155.]

180.    Lester's and Gumaer's disparate treatment of Wendy versus Stein—both of whom were contingent remaindermen—demonstrates that those co-trustees knowingly subverted the aims of the Allen Eber Will and thus the directives of the Trust.

### F.  Chronology of Events Leading Up to EBWLC's Review and Approval of the June 2012 Transfer of Eber Metro to Lester's Alexbay

181.    Wendy executed two documents dated "as of" February 11, 2011, primarily to cause Eber Metro to assume EBWLC's supposed debts to Lester. [Ex. W.]

a.  No contemporaneous evidence indicates that these documents were actually executed in February 2011. The first reference to them in another document is in the September 16, 2011, draft minutes for the August 18, 2011, meeting of the co-trustees. [Ex. 234.]

b.  Faded writing on first page of the document states, "7/2011 Wendy [illegible]" [Ex. W.] Similarly, an accounting report reflecting the supposed 2/11/2011 assumption of debt was printed on July 18, 2011. [Ex. 6 at 7.]

182.    On August 12, 2011, Wendy emailed Hawks to request a meeting with her and Lester on August 18, 2011, in Hawks' office. [Ex. 233.] Wendy did not indicate to Hawks what the meeting would be about ahead of time.

183.    On August 18, 2011, Wendy and Lester met with Hawks at CNB's Rochester office, and Gumaer participated by telephone. [Ex. 234 at 2.] The co-trustees and Wendy primarily discussed Lester's purported loans to EBWLC and Eber Metro.

184.    After the meeting, Wendy drafted minutes and sent the draft to Lester and Sturm only for review and comment. [Ex. 234 at 3.] That initial draft sent on September 16, 2011, referenced only "two loans made by Lester," omitting any mention of a third. [*Id.* at 2.]

185.    On September 29, 2011, David Belt, another attorney representing Lester, sent an email to Lester requesting "information concerning the moneys loaned by you that relate to the notes and security agreements with respect to which you want us to bring suit." [Ex. 112 at 1.]

186.    Lester forwarded Belt's email to Wendy Eber and asked for her to provide the requested information. [Ex. 112 at 1.]

187.    On October 5, 2011, Wendy responded with most of the requested information, except that she did not send the "[c]opies of all journals, if any, reflecting the sums loaned and

sums repaid." Belt explained that "[t]his information will be necessary to, among other things, verify the interest due on the payments." [Ex. 112 at 1–2.]

188.    In response to Belt's request for "[t]he date, amount and payer of each sum repaid," Wendy wrote:

> None for the $1.5 million dollar loan from October 2009. The March 13, 2006, loan of $1,503,750, $69,040 was repaid. I do not have the details but this was offset by personal expenses that Lester charged to the company."

Wendy did not mention any third note for $575,895. [Ex. 112 at 1–2.]

189.    Sometime thereafter, the August 18, 2011, Board minutes were altered to reference "three loans," and that appears to be the first document that references any $575,895 note from 2002 or 2006. [Ex. 6 at 4.] It is uncertain when those minutes were altered.

190.    The final August 18, 2011, Board minutes incorrectly stated that the "trustees ratified three loans made by Lester Eber to [Eber Metro]." [Ex. 6 at 4.] According to Hawks, the minutes' description of the meeting as involving any kind of a vote or "ratification" of loans is inaccurate. [Hawks Dep. 90:21–91:20 ("I would not characterize it as a ratification"); *see also id.* at 140:20–141:25.] Neither at nor before the meeting was Hawks presented with any financial statements that corroborated the existence of Lester's purported loans. [*Id.* at 94:10–15.]

191.    On October 24, 2011, an accountant with Davie Kaplan, CPA, P.C. ("Davie Kaplan") emailed Wendy regarding "Accrued Interest" and told Wendy that she "plan[ned] to do the accrued interest calculation change...." [Ex. 237.] The record does not reflect what "change" Wendy had requested the accountant to make to Lester's loan balances or interest rates.

192.    On December 8, 2011, Lester formed Lester Eber, LLC in Connecticut. [Ex. 31.]

193.    Also on December 8, 2011, Lester executed a notarized affidavit for the purpose of telling the Connecticut Department of Consumer Protection Liquor Control Division that he was transferring Eber Metro's 79 percent interest in Eber-CT to Lester Eber, LLC "for no

41

consideration, in that it is being done strictly for organizational purposes." [Ex. 8; Lester Dep. 112:3–114:4, 121:7–122:8.]

194.    The affidavit falsely asserted that Lester personally owned all of Eber Metro, when in fact it was owned almost entirely by the Trust, and Lester's beneficial interest in it was less than a majority. [Ex. 8; Lester Dep. 118:17–121:6.]

195.    In December 2011, Lester and Wendy, along with their attorney, Jerry Farrell, sought to obtain Eder-Goodman's consent to transfer Eber Metro's 79 units of Eber-CT to Lester Eber, LLC. [Ex. 286; Ex. 287; Ex. 288.]

196.    On January 12, 2012, Lester changed the name of Lester Eber, LLC to Alexbay, LLC ("Alexbay"). [Ex. 31 at 3.]

197.    On January 18, 2012, Lester assigned all of EBWLC's and Eber Metro's purported notes to Alexbay, LLC. [Ex. N.]

198.    On January 18, 2012, Wendy sent Lester's attorney, David Belt, an email ("Subject: Loan Balance and Interest | Importance: High") giving him amounts to claim as the balances of principal and interest for Lester's claimed loans as of 12/31/2011. [Ex. 114.]

199.    On January 18, 2012, Alexbay sent EBWLC and Eber Metro notices, pursuant to UCC Article 9 § 620, of its proposal to accept Eber Metro's 79 units of Eber-CT in full satisfaction of Eber Metro's debts to Alexbay. [Ex. J.]

200.    At the time of Alexbay's proposal, Farrell was still attempting to procure Eder-Goodman's consent to transfer Eber Metro's 79 units of Eber-CT directly to Lester's personal holding company. [Ex. 290 (referring to scheduling a meeting between Farrell's "clients" (plural) on January 23rd or 24th).]

201.    On February 21, 2012, Alexbay filed a lawsuit in the Supreme Court of Monroe County, New York, seeking a judicial declaration that Alexbay's revised proposal to take EBWLC's stock in Eber Metro was "commercially reasonable" under the UCC. Neither the Trust nor any other Trust beneficiary was named in or served with Alexbay's suit. [Ex. 44.]

202.    Lester testified in his deposition that he filed the Alexbay suit "to solidify showing that [he] wasn't doing anything underhanded. There would be a public record of what I had done on advice of counsel." [Lester Dep. 196:17–197:4.] However, in a December 21, 2011, email, attorney Farrell told Eder-Goodman that the reason Lester planned to file a "foreclosure action in court against Metro" was to avoid taxes. [Ex. 286 at 1.]

203.    Lester also testified that "everything" done in connection with the Alexbay foreclosure "was to clean up the balance sheet and to transfer debt into assets so that we could get a bank loan to run the business. We were in dire straits and we needed a bank to be able to run a business and pay our suppliers." [Lester Dep. 189:9–24.]

204.    The pleadings filed by Alexbay contended that the proposed transfer of Eber Metro to Alexbay for elimination of the debt owed by Eber Metro to Alexbay was "commercially reasonable" because all of Eber Metro's assets were equivalent in value to the amount of debt owed to Alexbay. [Ex. 44 ¶ 24; *see also* Ex. 45 ¶ 6 (Lester Eber Affidavit).] Alexbay's valuation relied primarily on the 2010 Polebridge transaction to derive a base value of the equity at that point in time, and then subtracted the amount of subsequent losses as reflected by Eber-CT's books. [Ex. 44 ¶ 30–39; Ex. 45 ¶ 6.] Based on this one prior transaction and part of Eber-CT's books, Alexbay asserted that the value of Eber-CT as of December 2011 was $4,633,300, and that Eber Metro's 79% interest in it was worth approximately $3,660,000. [Ex. 44 ¶¶ 32–39; Ex. 45 ¶ 6.]

205.    Alexbay and Lester made material misrepresentations of fact to the Supreme

Court relating to the value of Eber Metro. For example, they claimed that the Polebridge

transaction had been "arms' length"; conducted on the "free market" or "open market;" and that

Polebridge was "unrelated" to Lester. They omitted to disclose that Polebridge was a shell

owned by Lester's lawyer, Sturm; that Lester's daughter had a right of first refusal on the

Polebridge 6%; or that Polebridge was a sham, at best a concealed placeholder for a transfer to

Lester's own daughter. They also omitted the Polebridge note (an asset worth $350,000 plus

interest at 2%) when listing Eber Metro's assets. [Ex. 44 (Complaint); Ex. 45 (Lester Aff.);

Lester Dep. 188:10–189:2, 199:18–200:9, 203:5–209:6, 210:7–214:5.]

206.    Alexbay and Lester also falsely claimed that Eder-Goodman had decided not to

exercise its right of first refusal to buy the 6% for just $350,000. [Ex. 44 ¶¶ 34 ("By operation of

that right of first refusal, before Polebridge Bowman could acquire its membership units from

Metro, Eder-Goodman had to decline to purchase those membership units on the terms

Polebridge Bowman proposed for the purchase.").]

207.    The Alexbay suit against EBWLC was filed by Underberg & Kessler LLP, which

was at the time doing an extensive amount of work for EBWLC since they had replaced Harris

Beach as EBWLC's "general counsel." [Lester Dep. 198:9–19; Ex. 144 at No. 16.]

208.    In March 2012, Lester resigned as President and Director of EBWLC. Lester's

resignation was backdated to February 1, 2012, in an attempt to make it appear, falsely, that

Lester did not sue EBWLC while he was still President and Director.

       a.    A Unanimous Written Consent of EBWLC's Board of Directors (a "Board

           Consent") purported to accept and approve of Lester's resignation as a

Director and President of EBWLC "effective February 1, 2012." The same Board Consent elected Wendy as President of EBWLC. [Ex. 77.]

b. This Board Consent was signed by Wendy and Gumaer "as of" February 28, 2012, but the fax header shows that it was only faxed to Gumaer (at a 912-area-code number) for his signature on March 23, 2012, and that Gumaer only faxed it back with his signature on March 26, 2012. [Ex. 77.]

c. The only evidence offered indicating that Lester resigned on February 1, 2012—or at any time before the Alexbay suit was filed on February 21, 2012—is Wendy's testimony that she recalls a meeting among her, Lester, and Gumaer on February 1, 2012, where Lester resigned and Wendy was made the new President to replace him. [Tr. 313:16–314:10.]

d. Wendy's testimony was conclusively impeached by contemporaneous emails showing that, as of March 2, 2012, Wendy intended for Gumaer to be named the replacement President of EBWLC. [Ex. 103 at 2.]

e. Underberg—the same firm that had just sued EBWLC on behalf of Alexbay—prepared the Board Consent for EBWLC and sent a draft naming Gumaer as President to Wendy on March 2, 2012. [Ex. 103 at 2.]

f. It was only March 12, 2012, that Wendy requested that Underberg substitute her name for Gumaer's as the next President of EBWLC. [Ex. 103 at 1.]

g. March 12, 2012, was also when Gumaer first learned of the Alexbay lawsuit, via an email from Underberg. [Ex. 122.]

209. On March 13, 2012, shortly before a board meeting scheduled later that day, Gumaer sent an email to Wendy stating: "I am not in a position to discuss in any depth the

Alexbay matter as I learned of the matter yesterday afternoon in the email from Underberg. Hawks will be interested in knowing (as will I) what will be the status of the Eber Trust with respect to Eber assets held in the trust. . . . On the surface it looks like Lester is moving against the trust of which he is a co-trustee." [Ex. 122 (cleaned up).]

210.    Three days before Gumaer even learned about the Alexbay lawsuit, Marino A. Fernandez, counsel of record representing EBWLC and Eber Metro, had already signed a stipulation consenting to the relief requested by Alexbay. [Ex. 159.]

211.    Fernandez was the sole "independent" lawyer, consultant, or advisor of any kind retained to advise EBWLC and its board of directors in connection with Alexbay's UCC Article 9 proposal and lawsuit. [Ex. 60.] His total amount of legal fees and expenses billed to EBWLC for advising the company in connection with Alexbay's proposal to take Eber Metro was just $586.25. [Ex. 160 at 76 (5/9/2012 entry).] Wendy testified that Fernandez was "paid more than that" by Lester personally, meaning that Fernandez was not remotely "independent." [Tr. 318:3–319:5, 320:15–20.]

212.    Lester provided an affidavit in support of the Alexbay UCC declaratory action that contained numerous materially false and misleading misstatements and omissions in an attempt to materially understate the value of Eber Metro and its interest in Eber-CT.

    a.  Lester mischaracterized the Polebridge transaction as constituting "very recent arm's length sales on the open market." [Ex. 45 ¶ 6.]

    b.  Lester omitted the fact that Polebridge was owned by a lawyer whom Lester and/or the company had retained.

    c.   Lester omitted his contention that the Polebridge transaction was "a way to pay [Sturm]," which, if true, would have meant it was not an "open market" transaction and was likely done for significantly less than market value.

    d.   Lester omitted the fact that the Polebridge purchase was made without any cash consideration, but only a non-recourse note, which undermined the legitimacy of the transaction and also constituted an undisclosed Eber Metro asset that would have made Eber Metro worth $4.01 million, or approximately 10% more than the $3.65 million of debt that Lester claimed was due.  [Ex. 45 ¶¶ 5–7 (claiming that Metro was worth only $3.66 million because that was the value of its "only significant asset," 79% of Eber-CT); Ex. 14 (showing amount of non-recourse promissory note of $350,000 plus 2% interest).]

213.    No appraisal of any kind, let alone an independent appraisal, was ever sought or obtained by Lester, Wendy, or any of the companies they controlled before completing the Alexbay transfer. [Lester Dep. 248 ("I didn't do anything" to try to value Eber-CT in 2012).] Defendants knew that it was extremely difficult to value a private business, [Lester Dep. 219:10–22, 238–239, 248] and that is why they made sure to avoid seeking any appraisals that might prevent Lester from claiming that Eber-CT was worth less than a quarter of what Eber Metro had paid for it in 2005.[9]

214.    In March 2012, Wendy directed the companies' accounts to write down Eber Metro's assets and liabilities to make the Alexbay transaction appear plausible. [Ex. 247 at 2–3.]

215.    Eber Metro's tax returns show that, as of May 31, 2010, Eber Metro's assets were worth $17,251,552 – including a $14,000,000 intangible asset (Eber-CT Goodwill) – and Eber

---

[9] Torchio's report was the first time we know any appraiser looked at Eber-CT, and he valued Eber-CT (inclusive of Eder-Goodman's $4.5 million preferred) at almost double what Lester told the Monroe County Supreme Court.

Metro owed $15,881,848 to "Shareholders" (EBWLC and Lester). As of May 31, 2011, however, the intangible asset was written off, so that assets were down to $2,205,243 and the amount due to shareholders was reduced to $3,015,316 (the balance purportedly due to Lester alone). The Additional paid-in capital balance increased by the same dollar amount as the loans were reduced. By converting a loan to EBWLC into capital, EBWLC would not have any continuing financial interest in Eber Metro after it was transferred. [Ex. 207 at 51.]

216.    While the Alexbay action was pending, in April 2012, Wendy, on behalf of Eber-CT, executed an Employment Agreement with Lester that provided for enhanced benefits, including severance payments equal to three times all compensation (including salary plus bonuses) upon termination or change of control, and a similarly sized payment in the event of death. [Ex. 180.]

217.    On May 21, 2012, Supreme Court Justice Matthew Rosenbaum granted Alexbay's unopposed request for a declaration that the proposed transfer of Eber Metro to Alexbay was "commercially reasonable" as that term is defined by the U.C.C.

218.    On May 29, 2012, Lowenthal informed Wendy and Lester that CNB was finally willing to "come up with a longer term arrangement instead of these shorter term renewals," and proposed "a 7 year term loan for $3,090,000" with Lester's cash collateral applied to the balance. [Ex. 248.] Wendy and Lester apparently discussed this proposal, [*id.*], but there is nothing in the record showing that they disclosed CNB's change of heart to Gumaer before asking Gumaer to approve the transfer of Eber Metro to Alexbay.

219.    Given that the Alexbay transaction was done, according to Lester, for the ostensible purpose of helping Eber-CT get longer-term financing, and given that Gumaer had been directly involved in the CNB discussions up to that point, the failure to disclose CNB's

seven-year loan offer to Gumaer constituted a material omission to a director and co-trustee, such that his subsequent signoff on the transaction is tainted by fraud.

220.    On May 31. 2012, after the Supreme Court granted Alexbay's motion, Gumaer still did not understand that the intended transaction would remove Eber-CT from the Trust. [Ex. 84 ("Answer this question? Eber Conn. is owned by Eber Metro and Eber Metro is owned[] by Eber & Co. The Trust owns Eber & Co. Does it still own []indirectly an interest in Conn?").]

221.    On June 5, 2012, the transfer of Eber Metro to Alexbay was completed when Wendy on behalf of EBWLC signed an agreement to transfer the shares. [Ex. 63.] That same day, Wendy on behalf of Eber Metro issued new stock certificates to Alexbay. [Ex. 62.]

222.    EBWLC's Board did not authorize the transaction until four days after Wendy completed it. [Ex. 61 (unanimous written consent showing Wendy signed on June 6 and Gumaer signed on June 9).]

223.    In June 2012, Wendy, Lester, and Gumaer met with Hawks to discuss the Alexbay transaction, and Gumaer assured Hawks that it was in the best interest of the corporation. Hawks "did not find out until later that this was going to mean that Lester was going to become a major shareholder or the sole shareholder of the Connecticut [business]." [Hawks Dep. 268:11–21.]

224.    Lester knew that his acts to take over control of Eber-CT were entirely harmful to EBWLC's shareholders and the Trust beneficiaries. [Lester Dep. 293:11–294:24 (evasive testimony showing he could not articulate any conceivable way the transaction benefitted them).]

225.    Wendy knew that the Alexbay transaction was illegal and worked with Sturm and Underberg to try to protect Lester's "loans"—extinguished as they were—in the event that the

transaction was overturned by a court. [Ex. 98 at 3 (November 7, 2012, Underberg letter); Lester Dep. 312–313.]

226.     Neither Lester nor Wendy contacted Eder-Goodman in any attempt to sell some or all of Eber-CT instead of undertaking the foregoing actions, which started no later than January 1, 2010. Based on Eder's testimony and in part on Defendants' conspicuous attempt to avoid talking to Eder at the time, the Court finds that Eder-Goodman was interested and willing to pay to acquire the remainder of Eber-CT in 2010.

227.     The Court cannot say that Eder would have paid as much in 2010 as he offered in 2007, but it is clear that he would have paid significantly more than the less than $4 million Lester "paid" to EBWLC—an amount less than Eder had paid for less than 20% of the amount Lester acquired. That is particularly clear since Lester's form of "payment" was merely to eliminate debts that were substantially illegitimate, and to the extent they were legitimate, at least in the sense that they reflected actual money being demonstrably deposited into EBWLC's bank account, they were entirely the product of unfair self-dealing.

### G.  Post-Foreclosure Transactions and Inaction

*1.  Slocum of Maine Transfer to Wendy and Lester*

228.     In July 2012, Eber Metro exercised a call option to acquire Slocum of Maine. Rather than go to Eber Metro, 100% of the equity of Slocum of Maine was transferred to Lester and Wendy, 50% to each. No consideration was provided by either to Eber Metro. [Ex. 55.]

229.     Lester admits to having received income from Slocum of Maine every year starting in 2012, but documentary evidence shows only one $10,000 "bonus" payment in 2014. [Ex. 142 at 1–2; Ex. 89.] In strict reliance on Defendants' representation that all requested documents have been disclosed in discovery, the Court finds that Lester and Wendy each

50

received $10,000 of compensation from Slocum of Maine in 2014 and have received no other compensation from it.

### 2. Wendy's Employment Agreement and Receipt of Eber Metro Shares

230.   On August 14, 2012, Lester granted Wendy an Employment Agreement from Eber-CT, which included substantially similar benefits to the Employment Agreement Wendy had granted Lester just four months earlier, including a substantial severance bonus payable upon termination or a change of control of Eber-CT. [Ex. 151 at 8–16.]

231.   Lester alone approved Wendy's new contract; it was not approved by Eber-CT's Board of Managers. [Ex. 151 at 16.]

232.   On that same date, Lester granted Wendy an award of 2,000 shares of Eber Metro stock, all of which has now vested. [Ex. 151 at 1.] Wendy says that this was an inducement for her to enter into the Employment Agreement. [Wendy Decl. ₧ 158.]

233.   By conveying equity in Eber Metro, a New York holding company, to Wendy as an incentive for her work in Eber-CT, a Connecticut operating subsidiary, Lester recognized that there interests of the two companies were intertwined. Work performed for a subsidiary inures to the benefit of the parent, even when it is a non-operating holding company in another state.

### 3. Concealment of the transfer

234.   In December 2012, CNB sent the annual trustee letter to the Trust beneficiaries. In it, Rick Hawks described the Connecticut business as a continuing asset of the Trust. [Ex. 4.]

235.   The December 2012 misstatement corroborates Hawks' testimony that even after the June 7, 2012, meeting of the co-trustees and Wendy, Hawks did not understand that the transaction had divested the Trust of its interest in Eber-CT. [Hawks Dep. 268:11–21.]

236.    Wendy, Lester, and Gumaer saw the December 2012 trustee letter and knew that it contained false information. [Ex. 50; Lester Dep. 280:17–282:12.]

237.    None of the co-trustees or Wendy ever communicated with the other Trust beneficiaries to correct CNB's December 2012 misstatement about the Trust continuing to own Eber-CT. [Lester Dep. 282:13–283:18 (regarding giving Trust beneficiaries accurate information: "That wasn't my job"); *id.* at 368 ("that was not my job").] Nor did Defendants or Gumaer ever tell Hawks that it was his and CNB's sole responsibility to inform the beneficiaries about the removal of Eber-CT from the Trust. [Hawks 294:14–24.]

238.    The Court does not credit Lester's uncorroborated testimony that he verbally told Sally and Dan Kleeberg about the Alexbay transaction. [Lester Dep. 290–292.]

### H.  Exposure of the Alexbay Transaction

239.    In 2011, Harris Beach, EBWLC's longtime counsel, filed a lawsuit in the Monroe County Supreme Court against EBWLC for unpaid legal fees and unreimbursed disbursements.  EBWLC alleged that Harris Beach had committed malpractice and asserted a counterclaim and two affirmative defenses based on that contention. [Ex. 241.]

240.    In April 2013, the Supreme Court granted summary judgment against EBWLC, dismissing most of its counterclaim along with two affirmative defenses based on malpractice. In January 2014, the Supreme Court granted summary judgment in favor of Harris Beach's claims and entered a judgment in favor of Harris Beach for $1,031,116.65. [Ex. 255 at 2.]

241.    Shortly after obtaining the seven-figure judgment against EBWLC for unpaid legal fees, Harris Beach filed a second lawsuit against Alexbay, Eber Metro, and Eber-CT, to set aside the transfer of Eber Metro to Alexbay, alleging that transaction amounted to a fraudulent conveyance. [Ex. 176 at 3.]

242.     On April 29, 2013, after EBWLC made its final contribution to the Retirement

Plan in March 2012, PBGC filed federal tax liens against EBWLC, Eber Metro, and EBWLC.

[Wendy Decl. ⁋ 75.]

243.     PBGC and Wendy proceeded to engage in lengthy negotiations, during which

Wendy and EBWLC's lawyers sought to convince PBGC that Eber Metro and Eber-CT were not

liable for EBWLC's Retirement Plan funding shortfall.

244.     After learning about the second Harris Beach suit, PBGC filed a complaint

against EBWLC, the Retirement Plan administrator, to retroactively establish a Plan termination

date of April 30, 2010—a date when "[e]ach of Eber Bros., Eber Metro, and Eber-CT was under

common control with EBWLC and a member of EBWLC's 'controlled group'" [Ex. 186 at 2.]

245.     On May 29, 2015, the Rochester Business Journal wrote an article covering Harris

Beach's fraudulent conveyance lawsuit. Early that morning, Lester received a copy of the article

from the President of the Rochester Business Journal. Lester forwarded the article to Wendy,

saying, "We will get through it." [Ex. 257.]

246.     On January 16, 2016, a federal court entered a judgment in favor of PBGC against

EBWLC, holding that the Retirement Plan was deemed retroactively terminated as of April 30,

2010—a date which benefitted PBGC by disregarding the Polebridge and Alexbay transactions

that had removed Eber-CT and Eber Metro from EBWLC's controlled group. [Ex. 165 at 16.]

247.     At some point after CNB learned of the Harris Beach fraudulent conveyance suit,

it considered filing a claim on behalf of the Trust against Lester, but instead decided "to look at

termination of the trust." [Hawks Dep. 84:3–85:9, 87:13–20.]

248.     On February 24, 2016, Hawks sent a letter to Lester and Gumaer, referencing the

fact that PBGC "successfully sued" EBWLC, that it had concluded that the Trust's EB&C stock

had zero value and that, as a result, "the purpose of the Trust has been exhausted under the circumstances surrounding the [EB&C] stock." [Ex. 9.]

249.    Hawks informed Lester and Gumaer that CNB planned to petition the Monroe Country Surrogate's Court to settle the accounts of all three co-trustees and distribute the remaining assets to the remaindermen of the Trust. Hawks' letter concluded with a request that Lester and Gumaer sign their approval for the process of petitioning to settle the Trust. [Ex. 9.]

250.    Neither Lester nor Gumaer signed their approval to CNB's proposal. [*Id.* at 2.]

251.    CNB's Hawks understood that by terminating the trust, "[i]t would allow for the trustee to be able to distribute the stock to the beneficiaries, possibly equally, so, that they would be able to then reap any kind of benefit there, if there was a need to bring any kind of action." [Hawks Dep. 87:21–89:2.]

252.    Within a week of CNB's letter, Alexbay had applied for a D&O insurance policy from QBE Insurance Company. [Ex. 259 at 26 (showing that AIG generated a Loss Run Report on March 2, 2016).] Alexbay obtained a one-year policy effective March 31, 2016. [*Id.* at 1.] The premium cost was $49,860. [*Id.*]

253.    At some point (the exact date is not in the record) after this lawsuit was filed, Wendy submitted an insurance claim on behalf of Alexbay to QBE, seeking coverage for the defense costs in this case. On February 14, 2017, QBE informed Wendy that the claim was denied. [Ex. 263 (addressed to Wendy Eber at Alexbay LLC).]

254.    In light of the claim submitted by Wendy, the application for D&O insurance in response to CNB's proposal to terminate the Trust demonstrates Defendants' consciousness of guilt. Defendants feared Plaintiffs finally learning about Lester's taking of the Connecticut business as a result of CNB's petition, and they correctly surmised that a lawsuit would follow.

255.     At the time, Defendants were unaware that Lisa Stein had independently stumbled upon the Alexbay transaction less than three weeks earlier. [Stein Decl. ⁋ 17; Ex. 178.]

256.     The foregoing facts lead this Court to find that Defendants intentionally concealed the Polebridge and Alexbay transactions from Sally Kleeberg, Audrey Hays, Daniel Kleeberg, and Lisa Stein. The Court rejects Lester's uncorroborated claim that he verbally informed any of them.

257.     After deciding to retain counsel to pursue claims based what they discovered in 2016, Plaintiffs agreed among themselves to share any damages awards in this case equally, with one third going to each, even though Audrey Hays held a larger beneficial interest in the Trust assets under the terms of the Trust. [Hays Decl. ⁋ 31.]

1.   *Harris Beach Assignment*

258.     In October 2014, the Fourth Department reversed the first summary judgment ruling and reinstated the malpractice counterclaims and affirmative defenses. [*Id.* at 3.] In January 2015, the Supreme Court vacated the judgment in favor of Harris Beach. [*Id.* at 9.]

259.     In October 2015, Harris Beach entered into a partial settlement agreement with EBWLC, Eber Metro, Eber-CT, and Alexbay. [Ex. 176 at 3.]

260.     As part of the October 2015 Agreement, Defendants executed General Releases to Harris Beach themselves and on behalf of EBWLC, Eber Metro, and Eber-CT. Defendants also stipulated to dismissing their malpractice counterclaims against Harris Beach. [Ex. 176 at 5.]

261.     In return, Defendants received Harris Beach's agreement to safeguard the attorney-client privilege and keep confidential all of its documents relating to Harris Beach's lawsuits and anything having to do with PBGC. Harris Beach also agreed not to disparage Lester and Wendy. [Ex. 176 at 5–6.]

262.     Harris Beach executed what was purportedly a "General Release" to Defendants, EBWLC, and affiliates, but that document stated that "this Release shall not, and shall be construed or interpreted to, impair, waive, release or otherwise compromise any claims of Releasor arising out of the terms of that [October 2015] Agreement…." [Ex. 176 at 22.]

263.     The first and foremost provision of the October 2015 Agreement was an "Assignment of Claims" from Harris Beach to Lester. [Ex. 176 at 3.]

264.     Lester personally paid Harris Beach $400,000 to receive the assignment. [Ex. 176 at 3.] The Agreement required Lester to send the money by wire transfer and to specify "Eber Bros. Wine & Liquor Corp." on the transfer. [*Id.* at 4.]

265.     Lester acquired all of Harris Beach's claims against EBWLC from the 2011 collection action, along with Harris Beach's "opportunity to recover attorney's fees, costs, and penalties against Lester and Wendy, jointly and severally," pursuant to a conditional contempt order issued by the Supreme Court on August 28, 2014. [Ex. 176 at 3; Ex. 255 at 3.]

266.     The October 2015 pseudo-settlement Agreement was negotiated by attorney John Herbert on behalf of Lester. [Ex. 176 at 25–28 (emails between Herbert and Judge Rosenbaum.]

267.     In defense against Harris Beach's collection action, in addition to alleging malpractice, Wendy stated under penalty of perjury that Harris Beach's bills were excessive, relied on inaccurate accounting, and included hourly charges for matters that were taken on a contingency fee basis. [Ex. 281 at 3–5.]

268.     Despite her prior sworn statement, after Lester acquired Harris Beach's claims, Wendy, as executrix of Lester's Estate, demanded that EBWLC pay the Estate over $1.7 million on the full amount of Harris Beach's claims, with interest. [Tr. 356:4-357:23.]

269.     Harris Beach's unpaid legal work at the heart of its collection lawsuit included facilitating improper transactions in 2010, such as the sham Polebridge transaction and the various attempts to misrepresent the transaction to Eder-Goodman to obtain its approval. [Ex. 292 (Dalton saying Lester wanted Wendy to have 6%); Ex. 296 (Harris Beach exchanging drafts of Joinder Agreement for 6% to go to Polebridge Bowman Partners).]

270.     Defendants misrepresented the nature and amount of the Harris Beach settlement to PBGC and Judge Telesca, who presided over the PBGC lawsuit. [Ex. 166 at 8.]

271.     As part of the Harris Beach settlement, Defendants also obtained an affidavit from Dalton in which he recanted or clarified his prior sworn statements from the fraudulent conveyance lawsuit. Wendy proceeded to rely on that affidavit to dispute PBGC's claims that the Polebridge and Alexbay transactions should be disregarded. [Ex. 166 at 8; Ex. 176 at 1 (cover correspondence to settlement referencing delivery of the Dalton affidavit).]  When shown the part of the PBGC lawsuit brief that contained misrepresentations about the Harris Beach settlement, with the screen zoomed into that particular paragraph, Wendy tried to redirect the Court's attention to the subsequent part reciting Dalton's new affidavit as if she was not sure what it said. [Tr. 355:7–11 ("A. Does it say the lawyer who made the claims has recently admitted what? Can you -- Q. You want to focus on the affidavit that your lawyer signed as part of the settlement, is that right? I'm asking you about the sentence before that.".] It is clear that Wendy knew exactly what was on the rest of the page that was not on display at trial, and that confirms that Wendy placed significant value on the Dalton affidavit.

272.     The Court finds that the price paid to Harris Beach by Lester included payment for legal fees that were not appropriately charged to EBWLC in the first instance. Moreover, the price Lester paid was materially increased by Defendants' desire to extract an affidavit from

Dalton that they hoped to use against PBGC and any others who heard about Harris Beach's fraudulent conveyance action.

### 2. *PBGC Settlement*

273.   On February 24, 2017, PBGC, EBWLC, Eber Metro, and Eber-CT entered into a settlement agreement finally resolving their dispute. [Ex. 186.]

274.   As part of the PBGC Settlement, PBGC subordinated its lien to new lender, Citizens Bank, who purchased CNB's term loan to Eber-CT on the same date and agreed to increase the size of the loan by over $1.5 million so that Eber-CT could then distribute enough money Eber Metro to make the $2,000,000 settlement payment to PBGC. [Ex. 186 at 15–17.]

275.   To enable Eber Metro to pay PBGC, Defendants caused Eber-CT to distribute $2,500,000 to its members in February 2017.

276.   Because Wendy acquired the Polebridge 6% of Eber-CT just before the distribution was made, Wendy received a distribution of $150,000, just days after acquiring the 6% for no cash consideration at all, only assumption of the non-recourse note, which remains outstanding. [Tr. 343:14–345:5.]

### I. Defendants' Extra-Judicial Attempt to End This Lawsuit by Subterfuge

277.   Shortly after this lawsuit was filed in December 2016, Lester sought to acquire all of the shares of EB&C from the Trust. [Lester Dep. 122:9–16.] Lester was not involved in the details of the attempted transaction, which was orchestrated by attorney John Herbert. [*Id.* at 122:22–123:5.] Lester also asked Jim Vazzana—who was his and Wendy's trusts and estates lawyer—to help with the endeavor. [*Id.* at 123:6–14; 388:11–13.] Vazzana and Herbert both represented Lester and Wendy in dealing with CNB in 2017. [Ex. 34 at 1, 2.]

278.     On December 15, 2016, Wendy wrote Rick Hawks of CNB, "I spoke to Lester and his attorney, he would like to move forward with closing the trust, finalizing the accounting of the Trust, and acquiring the stock of Eber Bros Wine and Liquor immediately." [Ex. 153.]

279.     When asked why he wanted to obtain the stock of EB&C for himself, Lester said: "I think it is a legal question that you should ask the lawyers. I am not capable of answering it." [Lester Dep. 136:14–18.] After the deposition, Lester submitted an errata—purportedly to "clarify" his testimony, still under oath—changing his answer to say, non-responsively: "I consulted with my lawyers and then decided to do so." [Lester Dep. Errata.]

280.     On December 27, 2016, CNB informed Vazzana that it was preparing to file an accounting proceeding and advised that CNB "may seek Court approval of distribution of the Eber Brothers entities' shares in the accounting proceeding…." CNB further advised: "If Mr. Eber wishes us to consider including the proposed distribution of shares in the accounting proceeding, he should provide a proposal for the distribution…." [Ex. 262.]

281.     Neither Lester nor his attorney provided a proposal for the distribution of EB&C shares in response to CNB's December 27, 2016, request. Nor did Lester ask CNB to reduce the number of EB&C shares distributed to any Plaintiffs. [Lester Dep. 135:4–9.]

282.     On February 15, 2017, CNB petitioned the Surrogate's Court for Monroe County to accept its Final Account, distribute the Trust assets, discharge its responsibilities as co-trustee, and terminate the Trust. [Ex. OOO.] The petition only sought to discharge "the Petitioner from any liability as Successor Trustee of the Trust"—no other co-trustees were included. [*Id.* at 3.] CNB's petition omitted any mention of this lawsuit that had been filed just over two months earlier. [Ex. OOOO.] CNB's petition also omitted any mention of Lester's request to acquire all shares of EB&C himself. [*Id.*]

283.     Despite Lester supposedly wanting to join in CNB's petition just two months earlier, [Ex. 153,] Lester did not join in CNB's petition to provide an accounting of the Trust and terminate the Trust. [Ex. 135 at 2 ("Neither Lester Eber nor Elliott W. Gumaer, Jr., as Co-Trustees, have participated in the preparation and/or review of the Accounting.").] A reasonable inference for why Lester did not join in CNB's petition is because CNB did not agree to allow Lester to "acquir[e] the stock of Eber Bros Wine and Liquor Immediately," as Wendy had requested. [Ex. 153.] There could have been other reasons, such as a desire to avoid providing his own accounting once he and Wendy learned what that would entail. No matter what his precise motivations were, Lester made the choice to rely on the undisclosed transfer restriction in the Bylaws rather than be committed to a distribution of stock consistent with the terms of the Trust. In so doing, Lester forwent any potential benefits of joining in CNB's petition, such as obtaining an order discharging him as co-trustee.

284.     CNB's petition attached an appraisal of the value of EBWLC, which was determined to be worthless based on the lack of assets and the then-still-outstanding liability to PBGC for over $6 million. [Ex. OOOO at 82–107.] The appraisal did not attempt to value this derivative lawsuit because there was no review of the Complaint, which had not yet even been served; instead, the appraisers relied on an undisclosed letter from Underberg & Kessler (the "Lawsuit Letter") to conclude that this lawsuit presented a "potential liability" to EBWLC, when it was, in fact, a contingent asset. [*Id.* at 3–4.] Accordingly, the appraisal submitted with CNB's petition, lacking any attempt to value Plaintiffs' claims, was substantially distorted and unreliable.

285.     Plaintiffs were aware of CNB's Petition and understood that it would result in distribution of EB&C shares along with other Trust assets, which they considered preferable to

having to seek appointment of replacement co-trustees. Therefore, even though Plaintiffs disagreed with CNB's contention that EBWLC, and in turn, EB&C, was worthless, Plaintiffs did not oppose the petition. [Kleeberg Decl. ¶¶ 38–40; Hays Decl. ¶ 44; Stein Decl. ¶¶ 20–23.]

286.    Jim Vazzana entered an appearance on behalf of Lester in the Surrogate's Court. [Lester Dep. 126:8–10.] He lodged no objections to CNB's petition. [Ex. 33 at 1.]

287.    The Surrogate's June 1, 2017, Order ordered that all Trust assets on CNB's Final Account should be distributed 1/3 to Audrey Hays, 1/3 to Lester Eber, 1/6 to Dan Kleeberg, and 1/6 to Lisa Stein. [Ex. 33 at 3.]

288.    CNB's Final Account included the Trust's EB&C stock. [Ex. OOOO at 37.[10]]

289.    The parties agree that the Surrogate's June 1, 2017, Order required the EB&C shares to be distributed to the remaindermen as follows:

- **Class A Voting:** 616.67 (or 616 and 2/3) shares each to Lester Eber and Audrey Hays; 308.33 (or 308 and 1/3) shares each to Lisa Stein and Daniel Kleeberg.

- **Class B Nonvoting:** 96.67 (or 96 and 2/3) shares each to Lester Eber and Audrey Hays; 48.33 (or 48 and 1/3) shares each to Lisa Stein and Daniel Kleeberg.

- **6% Preferred Nonvoting:** 666.67 (or 666 and 2/3) shares each to Lester Eber and Audrey Hays; 333.33 (or 333 and 1/3) shares each to Lisa Stein and Daniel Kleeberg.

[Ex. 149 at 5–6 (Wendy affirmatively adopted this distribution in response to an interrogatory asking, "how do you contend the shares should have been distributed?").]

290.    Lester received a copy of the Order from his attorney promptly after Vazzana received a copy. [Lester Dep. 129:17–130:3.]

291.    After the Surrogate's Order was entered, CNB sought to distribute the Trust assets including the EB&C shares. [*E.g.*, Ex. 38.]

---

[10] Plaintiffs admitted excerpts of CNB's Petition and Final Account as Ex. 135, but since Defendants admitted the entire petition as Ex. OOOO, Plaintiffs cite only to the latter per the Court's request to avoid duplication.

292.     Lester and Wendy's attorney, Vazzana, told CNB's attorney that his clients did not believe that they had EB&C's stock book, and therefore could not help CNB record any transfer of EB&C shares to the remaindermen. [Lester Dep. 146:13–147:22; Ex. 38.]

293.     Over a year later, Defendants' attorney told Magistrate Judge Parker that "[i]t is not true that the corporate stock register was ['lost.'] The register is maintained by the corporate secretary Wendy Eber who is solely responsible for registering valid transfers of stock in it…. The corporate secretary never told CNB that the register was lost." [Lester Dep. 148:23–150:13.]

294.     Contrary to defense counsel's assertion, Wendy, through her counsel, led CNB to conclude that the stock register could not be located. [Lester Dep. 151:25–152:22 (quoting Ex. 40); Lester Dep. 153:9–153:24 (quoting Ex. 41, an email with Wendy copied on it); Ex. 38 (CNB's lawyer referencing "the apparent inability to locate the company's stock book and affiliated records.").]

295.     Lester and Wendy acted in bad faith in connection with the Surrogate's Court proceeding. They knew that Plaintiffs' claims had value—that is why they wanted to acquire the Trust's EB&C shares. Through one attorney's letter mischaracterizing this action, they misled the appraisal firm to obtain a tainted valuation that would suffice to induce CNB to move forward with its petition. Through another attorney's emails to CNB, they misled CNB about their ability to record changes to EB&C stock register. Their next move shows why they did so.

   1.   *Lester Invokes Undisclosed Bylaws to Purchase Plaintiffs' Shares for "$0"*

296.     On October 10, 2018, Audrey Hays sent Lester and Wendy a request to hold an overdue shareholder meeting for EB&C. [Hays Decl. ⁋ 41; Ex. 42.] She requested the meeting because Plaintiffs had become frustrated with Defendants' incomplete discovery responses,

including overbroad assertions of the attorney-client privilege on behalf of EB&C and EBWLC. [Hays Decl. ⁋ 40.][11]

297.   Lester and Wendy denied Hays' request for a meeting. [Hays Decl. ⁋ 42.]

298.   On October 31, 2018, Lester sent a "Notice of Intent to Purchase Shares" to the "Allen Eber Trust c/o [CNB]," stating his "intent to purchase all shares of the capital stock of [EB&C] of which the Allen Eber Trust is the registered holder that are proposed to be transferred to Daniel Kleeberg, Lisa Stein or Audrey Hays pursuant to Article XII of the By-Laws of [EB&C]." [Ex. 35.]

299.   After Plaintiffs' counsel told Lester's attorney that the notice failed to comply with the Bylaws because it omitted a purchase price, Lester sent a new notice on December 17, 2018, specifying that the purchase price was "$0." [Hays Decl. ⁋ 43; Ex. 164.]

300.   The timing of Lester's Notice of Intent to Purchase cannot be justified by any claim that he lacked prior notice of the intended transfer of EB&C shares to Plaintiffs.

301.   Lester waited until October 31, 2018, to send his Notice of Intent to Purchase because, after speaking with his lawyers, he decided to do so. [Lester Dep. 139:9–11 & Errata.]

302.   Whatever Lester's lawyers said to him is not in the record, but since Defendants waived any advice of counsel defense, the Court finds that Lester had actual knowledge of the intended transfer, had knowledge of the five-day period for providing a notice of intent to purchase under EB&C's Bylaws, and nonetheless elected not to provide a timely notice.

303.   Lester's attempt to acquire Plaintiffs' shares for $0 while this derivative lawsuit was pending, made almost two years after he asked CNB for the shares and more than a year after the Surrogate's Court undisputedly ordered that the shares be distributed to Plaintiffs and

---

[11] Judge Parker eventually agreed with Plaintiffs that privilege was being asserted too broadly. [ECF No. 216.]

Lester, demonstrates Lester's bad faith, both as a fiduciary and as a litigant in this Court, by seeking to divest Plaintiffs of their meritorious claims by hook or by crook.

304.   Neither the Surrogate's Court nor CNB nor Plaintiffs were ever notified by Lester or his attorney that there were any restrictions on the transfer of EB&C. Lester kept silent about the Bylaws, both with CNB and with the Surrogate's Court, in order to trick Plaintiffs so they would not oppose CNB's petition. [*Cf.* Lester Dep. 136:19–24.]

305.   Plaintiffs and CNB were unaware of any purported transfer restriction in EB&C's Bylaws until October 2018, when a copy was produced in discovery. [Hays Decl. ⁋ 40; Lester Dep. 159:10–20, 396:10–18, 397:15–24.] Although Dan Kleeberg had worked for EBWLC for most of his life, he had not been involved in the corporate governance of the company and never saw the Bylaws. [Kleeberg Decl. ⁋ 43.]

306.   Plaintiffs would have appeared in the Surrogate's Court and, if necessary, opposed termination of the Trust entirely, if they had known that Lester would interfere with the distribution of EB&C shares. [Kleeberg Decl. ⁋ 41; Hays Decl. ⁋ 35; Stein Decl. ⁋ 28.]

### 2. *Lester Took Shares of EBWLC from the Trust in February 2017*

307.   By documents dated "as of" February 14 and 15, 2017, EBWLC amended its Certificate of Incorporation to create a new class of "Voting Preferred" shares. [Ex. 43.]

308.   These corporate documents were drafted by John Herbert, whom Wendy asserts was her and Lester's personal attorney only, and never served as corporate counsel. [Tr. 362:16–23.] Lester could not say why he sought 750 shares of voting preferred stock, but he said that he did so because Herbert told him to do it. [Lester Dep. 178:5–14.]

309.   EBWLC proceeded to issue 750 Voting Preferred shares to Lester Eber without receiving anything tangible in return. The issuance document refers to the consideration as

"Lester Eber's agreement hereby to reimburse the Corporation, at its request, for up to $37,500.00 of expenses incurred or to be incurred by the Corporation in connection with its general options." [Ex. 43 at 3.]

310.    EBWLC never actually requested or received any money from Lester pursuant to the agreement incorporated into the share issuance document. [Lester Dep. 263:7–264:2.]

311.    The transaction was done for the purpose of making Lester the majority owner of EBWLC, at least in part so that he could agree to relinquish his remaining benefits under the Retirement Plan as part of EBWLC's settlement with PBGC. [Tr. 237:2–11.]

312.    Another purpose for the transaction—and the reason why the shares were made voting stock—is because Defendants believed it would give Lester voting control over EBWLC despite CNB's petition to distribute 2/3 of the voting stock of EB&C to Plaintiffs.[12]

313.    Neither of the other co-trustees nor the Trust beneficiaries were informed about or consented to letting Lester acquiring 750 shares of EBWLC.

314.    As of February 14, 2017, Lester, on behalf of EB&C, as sole voting shareholder of EBWLC, appointed Wendy to be a director of EBWLC. [Ex. 43 at 8.]

315.    Wendy Eber alone, acting as the sole director of EBWLC, authorized the amendment to the Certificate of Incorporation. [Ex. 43 at 1–2.] The authorization was dated as of February 15, 2017, [id.,] even though the Amendment itself, dated as of February 14, 2017, asserted, "under penalties of perjury," that EBWLC's Board had already authorized the amendment, [id. at 7 ¶ 5].

---

[12] 29 C.F.R. §4041.47(d) provides that a "majority owner may elect to forgo receipt of all or part of his or her plan benefits in connection with a distress termination." It does not appear to require that the "majority owner" hold or be the beneficial owner of voting stock, such as what EBWLC issued to Lester.

316.    The Amendment to the Certificate of Incorporation also asserted that the amendment "was authorized … by the unanimous written consent of the shareholders." [*Id.*] No shareholder authorization for the Amendment was produced during discovery. [Ex. 270.]

317.    Plaintiffs moved for summary judgment against this transaction on the ground that the Amendment creating the class of shares given to Lester was not approved by EB&C. In response, Defendants produced a document purporting to be a written shareholder consent dated as of February 15, 2017. [Ex. 270.]

318.    Defendants' counsel claimed that there was no email correspondence or original Word files that might show when the shareholder consent document was drafted, sent, or signed. They suggested that the document may have been sent "other than by email." [Ex. 271.]

319.    Counsel's claims are not credible. The document's author, Herbert, knew how to use email and had been doing so for years. [Ex. 176 at 25.] Either Defendants and counsel are concealing the true date of the shareholder consent, or they are concealing the true date of the entire series of documents, which just happen to fall "as of" the day before and the day of CNB's petition to terminate the Trust.

### 3.   *Erasing the Trust's shares in EBWLC*

320.    At some point in 2019, Wendy Eber, acting in concert with her attorney, John Herbert, altered EBWLC's corporate records to eliminate the Trust's shares of EBWLC common and preferred stock. [Tr. 367]

321.    Given that the Defendants produced a photocopy of at least one of the Trust's EBWLC stock certificates, and by all appearances that certificate was valid at the time it was copied, this Court does not credit Wendy Eber's testimony that the stock certificates are missing.

[Ex. 139.] Even if the certificates were missing, no evidence indicates that the Trust's shares of EBWLC were ever redeemed or canceled by any valid act of the corporation or the co-trustees.

322.    Wendy Eber's act of eliminating the Trust's shares of EBWLC from EBWLC's stock book without a shred of evidence indicating that the shares had been canceled, redeemed, or retired is strong evidence of bad faith, not only as to this transaction, but across the board.

323.    By Wendy's own admission that she and her lawyer, Herbert, "weren't certain" about what happened to the EBWLC shares, [Tr. 367:12–368:3,] erasing the shares from the books was inappropriate and not in good faith.

324.    The Trust's shares of EBWLC constituted undistributed Trust assets that were in Lester's control as co-trustee, given his position as President of EBWLC at the time that the Trust was terminated in 2017 and at the time that Wendy scrubbed the shares off of EBWLC's books in 2019.

325.    Lester died from Covid-19 on April 5, 2020. [Pretrial Order § III ¶ 2.]

326.    Lester's last will and testament made Wendy the sole executrix of his estate and also provided that Wendy would be the sole heir to any of his business interests, including without limitation Alexbay, Eber Metro, and Eber-CT. [Ex. 175.]

327.    The Court finds that Wendy knew what was in Lester's will. This is based both on the totality of circumstances of the relationship between Lester and Wendy, as well as Lester's evasive deposition testimony on the subject.

   a.   Knowing that his will would demonstrate Wendy's bias and motive, Lester refused to disclose what his will said about Alexbay during his deposition. [Lester Dep. 390:6–13.] Lester then refused to say whether he had ever told Wendy what was in his will (i.e. without any request to divulge the will's

content to Plaintiffs). [*Id.* at 391:11–21 ("I'm not answering… I don't have an answer for you."). After defense counsel requested a break and spoke with Lester, Lester decided to answer the question, "No." [Id. at 392:6–17.] Given how that answer was helpful to his case, the reasonable follow-up question, which was asked, was: "Why were you reluctant to tell me no." [*Id.* at 392:18.] Defense counsel—who worked for Underberg, the same firm that Lester retained for his estate planning in 2010 [Ex. 144 at 2]—quickly instructed Lester: "Don't answer that." [*Id.* at 392:19–393:4.]

### J.   The Eber Companies Above Eber-CT Lacked Any Independent Directors

328.    Neither Wendy nor Gumaer were independent directors.

329.    Wendy was Lester's daughter and the sole heir to his interest in Alexbay; she had a strong financial interest in whatever Lester acquired. [Ex. 175.]

330.    Another reason why Wendy, even if she were not Lester's daughter, could not be considered independent from Lester is because the Court finds that, from at least February 2010 through June 2012, Wendy was in an active conspiracy with Lester to defraud creditors, lenders, and the Trust. This secret side agreement compromised Wendy's ability to vote any other way than in favor of Lester (and herself).

331.    In at least one instance, Wendy obtained Gumaer's consent to a transaction by falsely claiming that Eder-Goodman had wanted Wendy to receive a right of first refusal to the Polebridge 6%, instead of giving Eber Metro the ROFR as the selling party. [Tr. 340:13–340:23, 341:20–342:22 (claiming she does not remember saying that to Gumaer but admitting she "may have testified to that in [her] deposition" and then having part of her deposition read).]

332.     Gumaer was conflicted because, once he left his role as a partner at Nixon Peabody, Gumaer agreed to serve as Lester's attorney, "personally and as Chief Executive Officer." [Ex. 47 at 2; Lester Dep. 251, 336:2–18.]

### K.  Wendy's Credibility as a Witness

333.     In general, Wendy Eber's testimony was not credible. During cross-examination, her answers were routinely evasive, veering off on non-responsive talking points or claiming not to recall information. If she was not intentionally concealing information, her testimony was nonetheless unreliable because she made herself appear as if she lacked the sort of essential knowledge of the business and its transactions that is reasonably expected from someone with accounting and business degrees who has been in a leadership position with the business for over a decade, and who has been involved in litigation relating to most of these issues for the better part of the last decade.

334.     When questioned by Plaintiffs' counsel about the transaction where Harris Beach assigned its claim against EBWLC to Lester instead of dismissing or releasing the claim, Wendy volunteered the story that Harris Beach had "required" that most irregular structure for the settlement. [Tr. 353:10–354:3]. There is no conceivable reason why Harris Beach would have requested let alone required such a structure for its own benefit. It might have been possible to believe that Harris Beach suggested this approach as a way to entice Lester to pay up, but Wendy's claim that Harris Beach required this approach is absurd.

335.     Given Wendy's financial background and work experience, it is also clear that Wendy feigned ignorance repeatedly during live testimony, both in Court and during depositions, often to the point of pretending she did not understand basic business concepts. [*E.g.*, Metro Dep.

106:5–109:22).] That testimony stands in stark contrast to her Declaration, which included

opinions on ERISA and a discounted cash flow analysis.

336.    For example, even though this case involves at least three different rights of first

refusal, including one that she herself acquired personally, Wendy's deposition testimony that

she was "not exactly sure" what a right of first refusal was stands out as completely

unbelievable, and evidence of bad-faith litigation conduct. [Metro Dep. 99:6–101:18 (also

claiming that she had no idea how she ended up with a right of first refusal for 6% of Eber-CT).]

337.    During her deposition as a representative of Eber Metro, Wendy testified that the

only reason for the Polebridge transaction that she could remember was to compensate Glenn

Sturm for services. [Metro Dep. 43:11–45:4.] She also claimed that the transaction was actually

the product of negotiations. [*Id.* at 50:5–54:19.]

338.    In her trial Declaration, Wendy again stated that Sturm had sought an equity

interest in Eber-CT as a form of compensation for services. [Wendy Decl. ¶¶ 108–109.] Wendy

included the additional detail that Sturm had originally sought a 10% interest, but Lester

negotiated him down to 6%. [*Id.* at ¶ 109.]

339.    On the first day of Plaintiffs' case, documents and testimony provided by Andrew

Eder conclusively demonstrated that Wendy lied in her prior testimony about the Polebridge

transaction: The transaction was always intended to be in the amount of 6%—the minimum

amount necessary to remove Eber-CT from EBWLC's "controlled group" under ERISA—and it

was originally intended to go straight to Wendy. [Tr. 105:10–106:8, 112:6–15; Exs. 292–295.]

340.    During her testimony the trial, Wendy gave three *conflicting* reasons for why Eber

Metro tried to transfer away six percent of Eber-CT in 2010: to protect Eber-CT from EBWLC's

pension obligations; to give compensation to Sturm; and originally as a grant to herself; and. [Tr. 338:22–339:10.]

341.    Wendy's testimony that she and Lester tried to sell Eber-CT to various unnamed distributors from late 2008 through July 2012 is unsupported by any corroborating documents. [Wendy Decl. ⁋⁋ 91–95.] Wendy's claims about being unable to sell Eber-CT are rebutted by Eder's credible testimony that, in or after the Spring of 2007, he offered to buy all of Eber-CT for approximately $20 million plus the net asset value of Eber-CT's assets. [Tr. 96:11–97:17.]

342.    Wendy's Declaration undermined her own credibility by offering speculation, primarily about what other distributors, including Eder-Goodman in particular, were thinking when they undertook certain actions, and what she believes they were doing behind closed doors to harm Eber-CT. [*See* Wendy Decl. ¶¶ 88, 94, 99, 159.] For example, she offered her unsubstantiated "belie[f]" that the unnamed "people" she met with about selling Eber-CT "exploited these meetings and discussions in predatory fashion." [Wendy Decl. ¶ 94.]

343.    Wendy has a significant financial bias beyond her personal liability because Lester's will bequeathed 100% of his interests in Alexbay, Eber Metro, Eber-CT and any other business interests to Wendy; Lester cut out his son, David Eber, who would have received a portion of the family business equal to Wendy's under the terms of the Allen Eber Trust. [Ex. 175 at FIFTH.]

## L.  Wendy's Culpable State of Mind

344.    Wendy inflicted severe economic injury on Plaintiffs, EB&C, EBWLC, and Eber Metro through affirmative acts of disloyalty and other misconduct that were outrageous, oppressive, pervasive, and substantial.

345.    Wendy acted maliciously, motivated by greed and a sense of entitlement to more than what her grandfather's Will—and the law—dictated. [*E.g.*, Kleeberg Decl. ℙ 36.]

346.    Wendy repeatedly employed trickery and deceit to intentionally harm the Trust beneficiaries, EB&C, EBWLC, and Eber Metro, along with CNB, PBGC, and others.

347.    Wendy's misconduct against Plaintiffs was simultaneously intentionally injurious to the PBGC, a public entity and critical part of the nation's social safety net. She acted with a wanton disregard for the rights of many others, reaching well beyond these Plaintiffs.

348.    Wendy acted with a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to her civil obligations.

349.    In all of the transactions detailed, Wendy did not act in good faith or in what she believed to be the best interests of any of the companies, except for Alexbay.

350.    The contrived lawsuit by Alexbay against EBWLC is a disturbing example of Wendy's willingness to misuse the judicial system to try to cover her tracks. Wendy supported the lawsuit every step of the way. She picked Marino Fernandez as an allegedly "independent" lawyer to represent EBWLC, but he was either a show lawyer who did virtually no work or he was corruptly persuaded by hidden payments from Lester, the supposed adversary. Wendy conspired with Underberg to help Lester and Alexbay take Eber Metro from EBWLC. Wendy backdated a resignation for Lester to help him conceal his breach of duty as an officer and director of EBWLC. Wendy caused Fernandez to consent to Alexbay's requested relief before the lawsuit was even disclosed to Gumaer, let alone CNB. As of the end of May, after the Supreme Court granted Alexbay's motion, Gumaer still did not know that the intended transaction would remove Eber-CT from the Trust. And then, after it was over, Wendy worked

on behalf of Alexbay to protect Lester's (and her) financial interests in the event that the transfer of Eber Metro to Alexbay was "somehow upset in the future." [Ex. 98 at 3.]

351.    Wendy's pattern of disloyal conduct intended to harm EBWLC and its affiliates to benefit herself and her father was pervasive and severe such that it permeated her entire employment relationship in its most material and substantial part.

### M. Lester's Credibility as a Witness

352.    Although the Court did not have the opportunity to observe Lester Eber's testimony in person, the Court finds that his deposition testimony was generally not credible.

353.    Like Wendy, Lester provided false and misleading testimony about Glenn Sturm, both his compensation and his role.

354.    The earliest dated sworn statement from Lester is the December 8, 2011 affidavit containing multiple materially false statements about his ownership of Eber Metro. It does however admit that Lester was seeking to acquire Eber-CT "for no consideration." [Ex. 8.]

355.    During the first day of Lester's deposition, when asked why he engaged in various challenged transactions, Lester frequently sought to disclaim memory or understanding and deflected responsibility to his lawyers. [*E.g.*, Lester Dep. 136:16–18 (telling Plaintiffs' counsel, "you should ask the lawyers").]

356.    After the first day of deposition testimony, Lester submitted a sworn errata sheet in which he changed virtually all of those responses to questions where he relied on advice of counsel. Lester's errata further evinced his willingness to change his testimony if his lawyers thought it was advantageous to do so; in this instance, he altered numerous answers in a transparent effort to erase his explicit reliance on the advice of counsel. The new lawyer-drafted responses, purportedly done to "clarify" his testimony, were rendered non-sensical and

73

nonresponsive to the questions. [Lester Dep. 408:9–409:12 (discussing the errata).] Lester's revised testimony that he "consulted with [his] lawyers and then decided to do so," [Lester Dep. Errata,] was not responsive to questions about *why* he acted.[13]

357.    During the second day of deposition testimony—conducted several months after the first—Lester provided heavily-coached testimony designed to deny Plaintiffs any insight into his mental state when he engaged in the misconduct. [*E.g.*, Lester Dep. 413–428.][14]

### N.  Lester's Culpable State of Mind

358.    Lester inflicted severe economic injury on Plaintiffs, EB&C, EBWLC, and Eber Metro through affirmative acts of disloyalty and other misconduct that were outrageous, oppressive, pervasive, and substantial.

359.    Lester knew that as a corporate officer and director of EB&C and its subsidiaries, his duties ran to the Trust and he described himself as reporting to the Trust. Accordingly, by damaging the Trust itself, Lester's disloyal conduct permeated the entire employment relationship in its most material and substantial part.

360.    As a trustee, Lester's sole objective was supposed to be to act for the Trust beneficiaries' interests. Instead, he not only sought to advance his own interests, he sought to actively divest the other Trust beneficiaries of significantly valuable interests in the Eber-CT business.

---

[13] Lester signed the errata on March 8, 2019, after Plaintiffs filed their February 25, 2019, supplemental brief in support of their second motion to compel documents being withheld on privilege grounds. The supplemental brief had argued that Lester waived the attorney-client privilege by relying on advice of counsel to explain his actions.
[14] To the extent that this Court has any doubt about Lester's lack of credibility, Plaintiffs respectfully encourage the Court to review at least some of the video of this deposition testimony, which was submitted on the storage media pretrial. Specifically, the second day starting just after 4:02 PM (corresponding to transcript page 412).

361.     Lester's repeated misrepresentations in sworn statements prior to this lawsuit were made in an effort to continue to conceal the truth of the illegal self-dealing transactions from Plaintiffs and to avoid the consequences of his wrongdoing.

362.     Lester's consciousness of his own guilt is inferred from many facts and admissions, including his assertion about why he filed the Alexbay lawsuit, which the Court has found was predicated on multiple material falsehoods and omissions: "I filed it to solidify showing that I wasn't doing anything underhanded. There would be a public record of what I had done on advice of counsel." [Lester Dep. 196:17–197:4.] In light of the facts, the Court finds that Lester filed the suit precisely because he knew that he was doing something illegal and was trying to cover his tracks.[15]

### O.  Defendants' Testimony Overstated Eber-CT's Financial Problems

363.     The Court does not credit Lester's claim that fear of Eber-CT going into liquidation is why he engaged in the Alexbay transaction and associated acts (e.g., resigning from EBWLC). [Lester Dep. 194:4–19.] While there is no doubt that the Retirement Plan and potential liability to PBGC were significant priorities, there are no contemporaneous communications corroborating the claim that Defendants ever considered liquidation. Defendants never told CNB that they thought the company was on the verge of insolvency. [Lowenthal Dep. 143:20–144:7.] Moreover, the Court cannot ignore that Lester directly contributed the funding shortfall by diverting nearly $3 million of Southern compensation from EBWLC to himself.

364.     Defendants knew that a sale of Eber-CT was possible, that many other distributors might be interested in acquiring it, and that the Eder-Goodman transaction was a reliable

---

[15] Further illustrating the nefarious objective of the suit, Defendants argued vehemently at summary judgment that the 2012 decision predicated on the UCC barred Plaintiffs from asserting derivative claims on behalf of EBWLC under res judicata and *Rooker-Feldman* because EBWLC was a party to that action, contrived though it was.

indicator of the "value of Eber-CT" as a going concern. [Ex. 267 at 278–279 (funding waiver application to IRS); *see also id.* at 5 (Wendy's signature under penalty of perjury).]

365.    The Court does not credit Defendants' contentions about their supposedly failed attempts to sell Eber-CT. [Lester Dep. 232–235.] No credible evidence supports these contentions, and Lester's admission that they never attempted to sell the business to Eder-Goodman—the party who paid handsomely for the right of first refusal for Eber-CT—is glaring, particularly since Eder-Goodman's principals had offered to buy the entire business in 2007. [Lester Dep. 246; Ex. 142 at No. 9 (Lester never discussed the valuation of Eber-CT with any potential buyers after 2007); Tr. 96:11–97:17.]

366.    CNB's repeated request to terminate the lending relationship does not support Defendants' testimony, even though CNB appears to have believed Eber-CT was experiencing financial hardship. It is important to consider that CNB was a regional bank in a region that did not include Connecticut. CNB initially wanted only a short-term loan for $500,000. That ballooned to over $3 million, quite possibly due to threats from Gumaer that failure to extend the loans would be a breach of CNB's fiduciary duties as a trustee. [Lester Dep. 351–353.]

367.    Eber-CT's business steadily improved after 2009, and by July 1, 2011, Wendy and Lester said to Lowenthal: "We are confident that we are turning the corner and will be profitable in 2012." [*See* Ex. 232 (noting May gross profit increased and they "anticipate that this trend will continue in fiscal year 2012;" "June's sales volume is strong and is up over 5%.").]

368.    On October 28, 2011, Wendy wrote to PBGC stating: "Our objective is to rebuild the business and strengthen the Company." [Ex. 238.]

369.    Wendy and Lester never disclosed to Lowenthal that Eber Metro had defaulted on any debts, let alone that foreclosure proceedings had been filed against it. [Lowenthal Dep.

148:24–149:22, 173:3–8.] Nor did they tell him that a creditor had demanded that the company

turn over all of its stock in Eber-CT to satisfy the defaulted loan. [*Id.* at 173:9–22 ("A. Wow, no.

Q. Would that have been important information for you to know? A. Yes."). And Lowenthal had

no idea that Lester had ever claimed to have loaned money to Eber-CT's parent companies. [*Id.*

at 173:23–174:11.]

### P. Lester and Wendy Believed that Alexbay Received Eber Metro, and Its Interest in Eber-CT, Free and Clear of EBWLC's Liabilities

370.    The Court rejects Wendy's testimony that she believed that paying a withdrawal

penalty to PBGC was "an inevitable liability of both [EBWLC] and Eber Metro, and very likely,

Eber CT." [Wendy Decl. ⁋ 76; *see also* Tr. 333:14–22 (Wendy thought "[i]t was a big problem"

and she "always knew that it was going to have a big potential impact on Eber-CT's business

until it was paid or resolved").]

371.    Wendy's actions demonstrate that she believed that a corporate "shell game," [Tr.

462:19–23,] could protect Eber Metro and Eber-CT from PBGC, along with EBWLC's other

creditors and stakeholders.

372.    EBWLC continued to regularly contribute to its Retirement Plan until mid-2011.

[Ex. 72 at 5.] In addition, one final contribution in the amount of $203,000 was made on March

15, 2012. [*Id.*]

373.    After Eber Metro was transferred to Alexbay, EBWLC ceased funding the Plan.

374.    As of 2012, Lester was not anticipating that PBGC would be placing a lien on any

corporate assets. [Lester Dep. 91:25–92:4.]

375.    Lester hired multiple law firms to help find a way out of the pension funding

obligation and to avoid a PBGC lien. [Lester Dep. 92:5–93:3.] They consistently argued that

both Eber Metro and Eber-CT were outside the "controlled group" thanks to the Polebridge and Alexbay transactions. [*e.g.*, Ex. 71 at 12 (they were "Former Controlled Group Members").[16]]

376.    These actions show that the Alexbay transaction was the final step that Defendants believed would legally protect Eber Metro and Eber-CT from PBGC, such that they could stop making payments to fund the Plan.

377.    Wendy gave false assurances to both CNB and Eder-Goodman that any potential pension-related liabilities "had nothing to do with Connecticut," [Tr. 151:11–153:15,] and that they would not have "any impact" on Eber-CT, [Ex. 225]. Wendy said those things to key counterparties because she thought she could get away with doing so, thanks to the shell game.

378.    Lester, when asked if Eber-CT in 2012 "was weighed down by the debt" of EBWLC, he was unsure: "yeah, it could have – it didn't help it." [Lester Dep. 189:25–190:10.]

379.    While Wendy testified that she "always knew that [EBWLC's pension] was going to have a big potential impact" on Eber-CT's business, she told CNB's loan officer, Lowenthal, that it "would not have any impact" on Eber-CT's business. [Tr. 333:14–337:12.]

380.    The Court finds that Wendy was untruthful at all times about these issues.

381.    Wendy materially overstated her belief that there was no way to protect Eber Metro and Eber-CT from EBWLC's liabilities in her testimony before this Court.

382.    Wendy materially understated the potential impact on Eber-CT when she conveyed to Eder-Goodman and Lowenthal that EBWLC's pension obligation would have no impact on Eber-CT, particularly since those statements were made before Defendants conducted the Polebridge transaction to remove Eber-CT from EBWLC's "controlled group."

---

[16] The same presentation slide described Polebridge as an "unaffiliated member[] in Eber-CT."

383.     By coordinating the Polebridge transaction with Sturm for precisely 6%, Wendy demonstrated (a) that she believed EBWLC's pension obligations presented a significant potential liability for Eber-CT, but (b) she also believed she could evade the pension obligations, and she was willing to engage in sham transactions to achieve that end.

384.     In June 2014, Defendants argued to PBGC that the pension "Plan [wa]s not terminated" for many reasons, including asserting that "[t]he Plan continues to pay PBGC premiums." [Ex. 72 at 6.] They also argued that "Eber-CT left the EBWLC controlled group as of May 30, 2010." [*Id.* at 7.]

385.     The Court finds that EBWLC's debts and contingent liabilities were not assumed by Eber Metro or Alexbay. Accordingly, in determining whether EBWLC's transfer of Eber Metro to Alexbay was done for fair consideration, the Court does not give any credit to Defendants for assumption of those debts or take those debts as offsetting any corporate value.

386.     Even if the debts of EBWLC did, as a matter of law, follow Eber Metro after the Alexbay transfer, that was because insufficient consideration was paid to EBWLC, leaving it as a shell with nothing but $2,251 in the bank and millions of dollars in contingent liabilities. [Torchio Del ¶ 124.]

387.     The Court finds that, at the time of the transfer, Lester and Wendy did not believe that EBWLC's debts would follow Alexbay or Eber Metro after the transfer. They believed that they could successfully evade EBWLC's creditors and divest the Trust of its interest in Eber-CT all in one fell swoop. The Court further finds that, in ascertaining whether Defendants acted with a culpable state of mind, their beliefs at the time are what matter—not a 2016 court ruling that landed *against* them.

388.    If this Court were to consider debts to EBWLC based on subsequent settlements and court rulings, the Court would not speculate about the amount of the debts. It would instead rely on the actual amounts paid, at the most, even though those payments appear to have been larger than they otherwise would have been if not for Defendants' egregious misconduct.

389.    For example, PBGC, after learning about Harris Beach's fraudulent conveyance action, withdrew an offer to settle for a promissory note for $700,000 due in five years, and instead ended up settling for $2,000,000 paid upfront. [Ex. 186.] Even that final, larger settlement amount is less than half the $5,063,388 that Defendants incorrectly assert as the certain, non-contingent, amount of the liability in 2012. [Torchio Decl. ¶ 46.]

### Q. Valuation of Eber Metro as of the Transfer Date

390.    The Court need not specify a particular value for Eber Metro as of June 5, 2012, to find that the value significantly exceeded the amount of debt that Lester and Wendy have claimed he and Alexbay were owed (an amount which is not credited).

#### 1.  Value Based on Expert Testimony

391.    The parties presented expert testimony on the value of Eber-CT, and by extension, Eber Metro, as of the date of the Alexbay transfer. Plaintiffs presented the testimony and calculations of Glenn Liebman. Defendants presented the testimony and calculations of Frank Torchio. Both experts were qualified to offer business valuation opinions.

392.    In many fundamental respects, the experts agreed with each other. Both experts relied on valuation multiples of revenue, rather than other metrics such as earnings, because Eber-CT had negative earnings for several years leading up to the valuation date. Both experts treated Eder-Goodman's 15% interest in Eber-CT as a form of preferred equity, and therefore subtracted $4,500,000 from each of the valuation calculations.

393.     The primary point where the experts differed was in deciding which comparable transactions or companies should be relied upon. Torchio used five different comparables, while Liebman rejected three of Torchio's comparables as unreliable data points.

394.     Torchio opined that the value of Eber Metro's 79% interest in Eber-CT was $5,757,768. [Torchio Decl. Ex. D.] At the same time, Torchio calculated that Alexbay was owed $3,060,711 of principal plus $837,655 in interest. [Torchio Decl. ¶ 46.] He also calculated that Eber Metro had $360,728 in other assets, primarily the Polebridge note. [*Id.* at ¶ 124.] Torchio did not identify any other debts of Eber Metro that were not, in fact, liabilities of EBWLC.[17]

395.     Using only Torchio's own numbers, Alexbay received assets worth $2,220,130 more than the amount of debt (with interest) that was extinguished.

396.     Therefore, this Court could rely solely on Defendants' own expert's computations and conclude that EBWLC did not receive fair consideration for Eber Metro. Lester was unjustly enriched by this transaction.

397.     The Court does not, however, rely solely on Torchio's testimony, which was often tendentious and unreliable. The Court rejects Torchio's approach of using the midpoint of five different comparables as "the" value for Eber-CT because it improperly weights each of the comparables equally, including the sham Polebridge transaction, a 2001 transaction involving a distributor of declining brands of malt liquor, and the publicly traded stock price of a coffee roasting company.

---

[17] If Torchio had included Eber Metro's accounts receivable as of May 31, 2012, the assets would have been $64,018 higher, and that would have made Eber Metro solvent by just over $4,000 using Torchio's valuation using only the Eder-Goodman 2008 transactions. [Ex. 150 at Table D & n. 1; Torchio Decl. Ex. D.] And if Torchio had included the two years of 2% interest on the Polebridge note (which he otherwise treated as legitimate), his calculation of Eber Metro's assets would have been approximately $14,000 higher still. [*See* Torchio Decl. Ex. D (stating the value of the Polebridge note at $350,000); Ex. 14 at 12 (2% interest on note).]

398.    Torchio's testimony asserts that "past transactions for the stock of the subject company may be an excellent source of valuation multiples." [Torchio Decl. ⁋ 87.]

399.    The Court finds that past transactions for Eber-CT's own equity—if they were bona fide arm's length transactions—are the most reliable source of valuation multiples.

400.    Both experts treated an unconsummated offer from Southern in 2007 as a reliable indicator of value. They disagreed on whether Southern's offer included a premium to acquire a right of first refusal to buy the rest of Eber-CT. Torchio concluded that Southern did include such a premium in the amount of $379,000.

401.    Ultimately, there was only one arm's length transaction that was actually completed: Eder-Goodman's 2008 purchase of 15% of Eber-CT.

402.    Based on the Southern Offer and the Eder-Goodman Purchase of 15% of Eber-CT, Liebman opines that Eber Metro's value in 2012 was $12,500,000. Liebman stated that this was a conservative valuation because it did not include any adjustment for the fact that a transaction to acquire 79% of Eber Metro would normally include a control premium.

403.    During Torchio's cross-examination, he conceded that it is important to consider whether a subject company is trending positive or negative. As of May 31, 2012, Eber-CT's earnings had been improving for several years in a row:

| Fiscal Year | 2009 | 2010 | 2011 | 2012 |
|-------------|-----:|-----:|-----:|-----:|
| Sales | $  38,944,354 | $  36,552,221 | $  36,890,281 | $  36,383,755 |
| COGS | $  29,941,694 | $  28,616,571 | $  28,606,509 | $  27,946,902 |
| Gross Profit | $  9,002,660 | $  7,935,650 | $  8,283,772 | $  8,436,853 |
| Selling Expenses | $  4,194,729 | $  3,534,515 | $  3,570,412 | $  3,531,098 |
| Delivery Expenses | $  2,521,141 | $  2,154,194 | $  2,152,498 | $  2,249,646 |
| Admin Expenses | $  4,625,676 | $  3,167,002 | $  3,248,159 | $  2,955,169 |
| Income (Loss) from Ops | $  (2,338,886) | $  (920,061) | $  (687,297) | $  (299,060) |
| Other Expense | $  70,629 | $  180,649 | $  221,503 | $  64,072 |

| Net Income (Loss) | $ (2,409,515) | $ (1,100,710) | $ (908,800) | $ (363,132) |
|---|---|---|---|---|

[Exs. 210, 211, 212.] From 2009 to 2012, operating losses decreased by 82%. And even though Eber-CT was "dualed" by its largest supplier, Yellowtail, during fiscal 2010, its gross profit was improving and, as of May 2012, were halfway back to the 2009 level.

404.     Consistent with the trend shown in the financial statements, Wendy expressed optimism in July 2011 that Eber-CT was "turning the corner." [Ex. 232.] And just over a year later, Wendy concluded that the company had indeed "turned the corner." [Ex. 250.]

405.     Because Torchio could not say whether the Prospect or Farmer Brothers businesses were in states of declining or improving results, the Court does not consider them to be reliable as comparables against Eber-CT.

406.     While the Court finds Liebman's calculations and testimony more reliable than Torchio's, the Court finds that the most reliable measure of value came from a fact witness, Andrew Eder, who described a different valuation approach that is used in the wine and liquor distribution industry, and which Eder-Goodman itself used in 2007 and 2008 with respect to Eber-CT.

### 2.   Value Based on Eder-Goodman Offer

407.     Defining fair value as being what a willing buyer would pay a willing seller in an arm's length transaction, the Eder-Goodman transaction in 2008 for 15% is the best metric for valuing Eber-CT, and it is supported by the fact that Eder and Goodman actually made an offer to buy the entire Eber-CT business in 2007 (and again in 2021). [Tr. 97; Ex. 201.]

408.     The Court credits Eder's testimony that the wine and liquor distribution industry relies on gross profits over other metrics such as net income, EBITDA, or even revenues.

409.    Neither expert witness provided valuations based on multiples of gross profit. Instead, both relied on multiples of revenue.

410.    In May 2021, Eder-Goodman made an arm's length offer to purchase the remaining 85% of Eber-CT using a formula based on gross profits and asset values:

1.6 x ((prior 24 months' Gross Profit) / 2) + Net Asset Value

[Ex. 201.]

411.    The Court finds that the formula used in Eder-Goodman's 2021 offer is a reliable measure to value Eber-CT, both in 2012 and now. Eder-Goodman's 2021 offer uses a multiple of 1.6 times gross profit, which is lower than the range of multiples that were apparently considered by Eder and Goodman in 2007 or 2008. [Ex. 199 at 5 ("Valuation | 2 to 2.5x plus net assets"); *id.* at 6 (showing more calculations using multiples of 2x to 2.5x).] If a 1.6x multiple had been used in January 2008, the resulting value of Eder-Goodman's 15% interest would have been approximately $3.1 million rather than the $4.5 million that was paid. [Ex. MMM at 6 (showing fiscal 2007 gross profit).] Therefore, using a multiple of 1.6x appears to be conservative, which is to be expected since Eder-Goodman's 2021 offer was a first offer and made before Eder-Goodman's 2007-08 workpapers were subpoenaed by Plaintiffs.

412.    In response to the 2021 offer, Wendy told Eder-Goodman "that the company was not for sale," and that message was repeated by a lawyer representing Eber-CT. [Tr. 121:1–6.] Thus, Wendy has confirmed that the Eder-Goodman formula is conservative and likely understates the value since it yields a price that below what a seller would willingly pay— indeed, it was too low to entice even a discussion with Wendy, let alone a counteroffer.

413.    No evidence has been submitted by either party regarding the market value of Eber-CT's assets at any time. The only evidence is the book value of the assets reflected in the

financial statements, which might vary significantly from the market value of the assets. [Tr. 126:19–128:4.]

414.    The following inputs the gross profits reported for fiscal 2011 and 2012 plus the book value of Eber-CT's net assets as of May 31, 2012, into Eder-Goodman's formula:

2.6    x (($8,283,772 + $8,436,853) / 2) + $5,335,899 = **$18,712,399**

415.    Accounting for Eder-Goodman's preference to receive the first $4.5 million of any sale proceeds, the value of the remaining 85% of Eber-CT was approximately $14.2 million. If considering only the 79% of Eber-CT that was officially left in Eber Metro after the Polebridge transaction, the value of Eber Metro's interest in Eber-CT was $13.2 million.

416.    Since Defendants do not contend that the amount of debt extinguished through the Alexbay transaction exceeded $4 million, the value based on Eder-Goodman's formula is not significantly higher than the conservative $12,500,000 value offered by Liebman or Torchio's valuation of $11,532,271 based on the Eder-Goodman transaction.

### 3.   The Reliability of Financial Information Produced by Defendants Is Questionable

417.    The Court's valuation findings assume that Eber-CT's financial information was correct, even though Defendants had strong financial incentives to make Eber-CT seem less profitable than it may have actually been and despite the fact that Defendants have demonstrated a general lack of credibility, even when under oath.

418.    Managers of closely held companies that elect to have pass-through status almost always have a motive to understate net income to avoid (or evade) income taxes. Here, Defendants had even stronger motive to make Eber-CT's financial performance appear worse than it actually was because of their years-long plot to defraud EBWLC's creditors and the Trust.

419.    In stark contrast to the relatively rosy picture of Eber-CT she portrayed to PBGC, CNB, and others before the Polebridge and Alexbay transactions, once Eber-CT was removed from the Trust, Wendy portrayed Eber-CT as a cauldron of doom and gloom.

420.    A December 2011 presentation detailed a plan for Eber-CT "to become profitable this year… by May of 2012," [Ex. 70 at 3, 11,] with slides on "Balance Sheet Improvement," [*id.* at 4,] "Operational Improvement," [*id.* at 5,] "increase[d] margins," [*id.* at 6,] and how "Sales are increasing significantly," [*id.* at 7,]. [*See also* Lowenthal Dep. 169:7–171:14.]

421.    A June 6, 2014 presentation offered zero statements that could be characterized as optimistic, and made inaccurate statements about Eber-CT's finances. [Ex. 72.] For example, the presentation included a liquidation analysis that claimed that Eber-CT's bank (CNB) "would likely receive all the value of the assets of Eber-CT to be liquidated." [Ex. 72 at 11.][18]

422.    Defendants claimed that Eber-CT "continues to lose money at the net income line" and "continues to be cash flow negative." [*Id.* at 7.] In fact, for the year ending May 31, 2014, Eber-CT turned a profit and had positive cash flow. [Ex. 214 at 7 (2014 net income of $141,180); *id.* at 9 (net increase in cash of $239,214).] Because the fiscal year had closed only six days earlier, it is possible that Defendants were not yet aware of the turn-around.[19]

423.    Subsequent emails from Wendy to PBGC were significantly more dire in their predications of what horrors would result from PBGC trying to get Eber-CT to fund the pension plan with regular quarterly payments. [Ex. 73.]

---

[18] The Court should note that, in preparing these proposed findings, it was discovered that Ex. 72 includes four pages that were clearly not part of the June 6, 2014 presentation. The last four pages show projected incomes that were prepared or printed on April 4, 2016, nearly two years later, and, notably, after PBGC already won its lawsuit to set the Plan termination date at April 30, 2010.

[19] For fiscal 2013, cash flow would have been positive by $50,000 if not for a distribution to Eber-CT's members. [Ex. 213 at 8–9.] And for fiscal 2012, the audited financial statement reveals that net cash increased by $173,216. [*Id.* at 9.]

a. On December 15, 2014, PBGC conveyed a term sheet for settlement that sought a $700,000 note payable from Eber Metro (with a maturity date five years out and 7.5% interest), and minimum quarterly payments of $25,000, to settle EBWLC's Plan obligations and allow PBGC to take over the Plan, with PBGC providing a release after receiving full payment. [Ex. 73 at 6, 8–10.]

b. On December 18, 2014, Wendy sent a lengthy email that began by telling PBGC, "Unfortunately, critical elements of your proposal will lead to an outcome that is, without a doubt, not financially viable for us." [Ex. 73 at 4.]

c. Wendy repeated the false assertion that "Eber-CT does not generate positive cash flow," even though by then over six months—not merely six days—had elapsed since the 2014 fiscal year ended. [Ex. 73 at 5.] She contended that Eber-CT could not generate $100,000 per year in cash flow to satisfy the minimum quarterly payments under PBGC's proposal, [*id.*,] even though Eber-CT's cash position had increased by more than double that in fiscal 2014. [Ex. 214 at 9.] Moreover, Eber-CT's cash flows from operating activities exceeding $500,000. [*Id.* at 8.]

d. The concluding section of Wendy's email is rife with false assertions about her and her father's beliefs regarding the value and future prospects of Eber-CT, such that even as she professes her "good faith," she demonstrates the opposite to anyone with knowledge of the true facts:

Based on your most recent proposal, which does not address the facts and circumstances as we have communicated them to you over the past 12+ months, we have concluded that we and PBGC just have a fundamentally different view of reality.

We believe it is not possible to conclude a settlement on a basis other than what is reflected in our draft agreement sent to you on December 2. If you are not

prepared to proceed on that basis, we would rather retain my Father's pension, write our entire investment in the business [Eber-CT] off as an emotional mistake, and focus our energies on something else that is constructive.

As we have discussed, if PBGC attempts to assess alleged liability against Eber-CT based on a proposed termination date 4 ½ years ago, we expect that –

- Eber-CT will be unable to provide its bank with an unqualified audit and Eber-CT will be in default and the bank will be free to exercise its rights and remedies, up to and including a liquidation of the company to recover the ~$3 million it is owed;

- Eber-CT will most likely be liquidated;

- PBGC will collect nothing from the proceeds of the sale of the business;

- PBGC will not benefit from Lester Eber's waiver of his $1.4 million pension; and

- 80 employees will lose their jobs.

I am sure you would agree that this would be the worst outcome for all constituents involved, including the company's employees and PBGC.

Wendy

[Ex. 73 at 5.]

424.    None of Wendy's supposed "good faith" predications, about what would happen if PBGC attempted to assess liability based on an April 30, 2010 termination date, came to pass.

425.    Wendy's attempt to mislead PBGC about the value and prospects of Eber-CT, including claiming that she and Lester were seriously considering walking away from the business, demonstrates why this Court cannot credit any of Wendy's testimony or calculations relating to the value of Eber-CT, Eber Metro, or EBWLC. Because PBGC's modest settlement proposal presented nothing even close to the consequences facing Wendy in this proceeding, Wendy's motive to lie has increased exponentially.

426.    Wendy's aggressive position with PBGC—refusing to pay just $700,000 per year—stands in stark contrast to her testimony in this proceeding that she always believed that Eber

88

Metro, and perhaps Eber-CT, would end up having to pay EBWLC's full pension funding obligation to PBGC.

### R.  Valuation as of the Most Recent Audited Financial Statements

427.    Based on the financial information available for the year ending May 31, 2020, Eber-CT's total value (inclusive of Eder-Goodman's 15%) is between $23 and $29 million. [Ex. 150 at Table E (Liebman valuation); Ex. 201 at 2 (Eder-Goodman offer formula); Ex. 220 at 5–7 (2020 financial information).

428.    As of May 31, 2020, Eder-Goodman received total distributions of $405,343. [Exs. 213, 218 (showing distributions to Eder-Goodman (15% of the total distribution amounts) of $20,088 in 2013, $375,000 in 2017, and $10,255 in 2018).] Therefore, Eder-Goodman's remaining liquidation preference is $4,094,657. [Ex. 57.]

429.    Subtracting Eder-Goodman's remaining liquidation preference from the low end of the Court's valuation range yields a valuation of at least $18,905,343 for Eber Metro's 85% of Eber-CT.

430.    Given the wide range of possible values, and absent evidence that the Estate and Wendy combined could possibly pay damages north of $20 million, the Court finds that Plaintiffs have no adequate remedy at law.

### S.  Bad Faith Litigation Conduct[20]

431.    Defendants' misconduct on the merits was so indefensible that they and their lawyers resorted to extraordinary lengths to win, at significant cost to Plaintiffs, their counsel, and this Court.

---

[20] Plaintiffs currently intend to file a separate motion for sanctions, including attorney's fees, against both Defendants and defense counsel, based primarily on Fed. R. Civ. P. 37, 28 U.S.C. § 1927, and bad faith. In *In re*

432.    Many of Defendants' legal and factual arguments in this action directly contradict positions they took in prior litigation matters relating to the same facts.

433.    While Defendants now claim that EBWLC should be treated as if it shut down in 2007, Defendants' counsel made the following argument in 2015 against PBGC:

> On April 30, 2010, Eber Bros. had not ceased all operations, had not filed bankruptcy, had not dissolved or liquidated and was not listed as "inactive" with the New York Department of State. Rather, Eber Bros. continued existing after that date as a holding company and the sponsor and administrator of the Plan and did continue to maintain and operate the Plan. As a holding company, Eber Bros. continued to own a controlling interest in, and ***supervised management of***, Eber Metro, which in turn owned a controlling interest in ***Eber-CT***, which was clearly an operating company. Eber Bros had officers, held board meetings or passed board resolutions, filed tax returns indicating Eber Bros. was a holding company, prepared financial statements, collected accounts receivable, conducted audits of the Plan, and processed workers compensation claims.

[Ex. 166 at 18.] Although that was stated by different counsel, Wendy, as EBWLC "Assistant Secretary – Dispute Resolution," directed the litigation against PBGC. [*Id*. at 9.]

434.    Defendants' own expert valued Eber Metro higher than the amount of debt that was purportedly extinguished, and thus concluded that informed investors would recognize the Alexbay transfer as having been a "shell game" and a "fraudulent conveyance." [Tr. 462:2–23.] Defendants' position that Torchio's opinions mean that the Alexbay transaction should be *sustained* rather than overturned is taken in bad faith.

435.    Defendants instructed Torchio to assume, counterfactually, that EBWLC had already incurred a withdrawal liability from PBGC before June 2012, and that therefore it was a

---

*Trados Inc. S'holder Litig*., faced with similar breaches of fiduciary duty and "frequently less-than-credible trial testimony," Vice Chancellor Strine also considered the entire history of the litigation, particularly conduct during discovery, in deciding that the defendants there had engaged in bad faith conduct. 73 A.3d 17, 78–79 (Del. Ch. 2013). Since discovery and summary judgment were supervised by Magistrate Judge Parker, a separate motion to present a more complete (but appropriately focused) record could assist the Court. That said, Plaintiffs believe the burden for showing bad faith is already met in this extraordinary case just by considering the absurdity of their arguments regarding valuation, their expert's incredible testimony about the transaction that they want to uphold, evidence of backdating documents even during litigation, trying to strip Plaintiffs of standing through extra-judicial trickery, and Wendy's patent disrespect for this Court and the judicial system.

legal "certainty" that Eber Metro was liable for it as well, and would be until the full liability was

paid, no matter whom it was sold to afterwards. [Tr. 463:11–21.] Defendants' instruction tainted

Torchio's testimony with a bogus assumption based on Defendants' 2016 court loss to PBGC.

436.    No evidence has been offered even suggesting that PBGC imposed a withdrawal

or termination liability against EBWLC before June 2012. The only evidence even suggesting

that anyone thought such an outcome was even likely is Wendy's testimony that she thought it

was inevitable—an assertion that was impeached and which this Court does not credit.

Therefore, the instruction to Torchio was given in bad faith.

437.    Defendants' multiple attempts to strip Plaintiffs of their right to maintain this

lawsuit is compelling evidence of bad faith. Within days of the lawsuit being filed, Wendy was

pressing CNB to transfer Plaintiffs' two-thirds of the Trust's shares in EB&C to Lester, so he

could have complete control. When CNB did not agree, Defendants hatched a plan to try to

intercept the shares after the Trust ordered them to be distributed to Plaintiffs. The Court finds it

impossible to believe that Defendants thought they were acting in good faith when Lester

attempted to "purchase" Plaintiffs' shares of EB&C for "$0."

438.    Defendants concealed documents, including Lester's 2012 Employment

Agreement, during discovery in this litigation, even though they disclosed a virtually identical

Employment Agreement between Wendy and Eber-CT that Lester apparently authorized in

August 2012. [Tr. 291:11–292:21.]

439.    During discovery, Defendants also failed to disclose their intention to call

EBWLC's former actuary, Michael Gallagher, as both a fact and expert witness. The intent to

conceal is clear given that Gallagher was *retained* in December 2018 to provide new actuarial

opinions. [Tr. 393:9–395:11 ("Q. And are you being paid for your testimony here today? A. I hope so."); Ex. JJ.]

440.    Wendy's trial Declaration was rife with speculation, hearsay, legal conclusions, and demonstrably false statements. Wendy's trial testimony was at least as bad and included instances where she reversed positions and changed her testimony to suit the moment. The degree of evasiveness, double-talk, and outright falsity significantly exceeds that found in the typical situation where a factfinder must decide whether someone is telling the truth.

### T.  Prejudgment Interest from Reasonable Intermediate Dates[21]

441.    For Lester's receipt of $5,438,399 from Southern, the Court finds that a reasonable intermediate date from which to calculate interest is January 1, 2012, because by that point, more than half of the total amount had been paid to Lester.

[Option 1: *If the Court gives* _full_ *credit against this total based on Lester's deposits into EBWLC from Dec. 2009 through May 2012 and accounting for Lester's personal expenses*]

   a.  The Court finds that Lester deposited $2,041,000 to EBWLC and Eber Metro between December 2009 and May 2012.

   b.  The Court finds that Lester owed EBWLC at least $855,298, for personal expenses it paid on his behalf, as of the last recorded personal payment in July 2008. No interest accrued on the balance of this personal expense account. It is probable that the true amount of personal expenses paid was significantly higher. [Ex. 160 at 50; Kleeberg Decl. ⁋ 29.]

---

[21] Because "damages were incurred at various times," the Court may elect to apply prejudgment interest to "all of the damages from a single reasonable intermediate date" rather than calculating interest on each item. CPLR 5001. Given the multitude of payments and the lack of evidence as to precisely when money was actually deposited, Plaintiffs believe that the Court should opt for this approach to ensure that it cannot be questioned on appeal.

c. Deducting the personal account balance from the amount Lester deposited results in a net deposit of $1,185,702.

d. This Court treats Lester's net deposits as payments against the damages this Court awards to EBWLC for usurping the Southern opportunity.

e. After deducting those early payments, the principal balance due from Lester's Estate is $4,252,697.

f. Applying New York's simple prejudgment interest rate of 9%, interest is accruing at the annual rate of $382,742.73 and the daily rate of $1,048.61.

g. The prejudgment interest as of November 1, 2021, is $3,444,684.57, so the total amount of damages awarded on this claim is $7,697,381.57.

[Option 2: *If the Court gives zero credit against this total based on Lester's cash deposits into EBWLC from Dec. 2009 through May 2012 and accounting for Lester's personal expenses*]

a. The Court finds that Defendants have proven that Lester deposited $2,041,000 into EBWLC from December 2009 through May 2012.

b. Defendants have failed to prove that the money Lester deposited was for a valid business purpose for the benefit of EBWLC or its affiliates.

c. The first $855,298 of the deposits only served to pay down the balance due from Lester on his personal expense account with EBWLC, which had been effectively an interest free loan.

d. While Defendants have shown that some cash Lester deposited went out soon thereafter to PBGC and other legitimate creditors, Defendants have not shown a sufficient number of such payments were made to offset the personal expense account debt that existed as of 2008, as is necessary to have any argument that Lester is

entitled to compensation or credit for having made those payments to EBWLC or its affiliates.

e.   Applying New York's simple prejudgment interest rate of 9%, interest is accruing at the annual rate of $489,455.91 and the daily rate of $1,340.98.

f.   The prejudgment interest as of November 1, 2021, is $4,812,759.62, so the total amount of damages awarded on this claim is $10,251,158.62.

442.   For Lester's receipt of $3,990,277.05 in compensation from EBWLC and its affiliates since January 1, 2007 (but excluding the $1,238,118.66 received from the Retirement Plan and the $855,298.04 of personal debt forgiven by EBWLC), the Court finds that a reasonable intermediate date from which to calculate interest is July 1, 2014, because that is the approximate midpoint of the time period.

a.   The total amount of interest as of November 1, 2021, is $2,634,894.72, with interest accruing at the daily rate of $983.90 each day thereafter before entry of judgment.

443.   For Lester's receipt of $3,168,101.06 in compensation from EBWLC and its affiliates since January 1, 2010 (but excluding payments received from the Retirement Plan and the $855,298.04 of personal debt forgiven by EBWLC), the Court finds that a reasonable intermediate date from which to calculate interest is July 1, 2016, because that is the approximate midpoint of the time period.

a.   The total amount of interest as of November 1, 2021, is $1,521,730.08, with interest accruing at the daily rate of $781.18 each day thereafter before entry of judgment.

444.    For Wendy's receipt of $2,868,966.59 in compensation from EBWLC's affiliates since January 1, 2010 (but excluding her receipt of $123,000 in EBWLC receivables into Segway and her $94,268 personal debt balance to EBWLC), the Court finds that a reasonable intermediate date from which to calculate interest is July 1, 2016, because that is somewhat after the approximate midpoint of the time period, so as to take into account that her compensation increased in more recent years.

      a.    The total amount of interest accrued as of November 1, 2021, is $1,378,047.19, with interest accruing at the daily rate of $707.42 each day thereafter before entry of judgment.

## U.  Jurisdiction

445.    At the time this lawsuit was first filed in this Court, Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays were citizens of Florida, New Jersey, and Colorado, respectively. [Ex. 1001 ⁋ 10; Ex. 1003 ⁋ 1; Ex. 1002 ⁋ 1.] At the same time, Defendants Lester Eber ("Lester") and Wendy Eber ("Wendy") were citizens of New York. [Ex. 28 (Lester W-2s for 2016–17 showing New York residence); Ex. 158 (Wendy W-2s for 2016–17 showing New York residence).] Alexbay, LLC is a Connecticut limited liability company with a principal office in Connecticut or New York. [Ex. 31.]

## II.   CONCLUSIONS OF LAW

446.   Any finding of fact more appropriately considered a conclusion of law shall be so deemed. Likewise, any conclusion of law more appropriately considered a finding of fact shall be so found.

### A.  Jurisdiction

447.   This Court has diversity jurisdiction over the case under 28 U.S.C. § 1332, because, at the time this lawsuit was filed, there was complete diversity between Plaintiffs and Defendants. Plaintiffs asserted derivative claims on behalf of New York corporations that were under the control of Defendants at the time of filing, such that there was sufficient antagonism to support this Court's jurisdiction. *Smith v. Sperling*, 354 U.S. 91 (1957).

### B.  Defendants Were Fiduciaries

448.   Lester was a fiduciary to EB&C, EBWLC, Eber Metro, and Eber-CT at all relevant times by virtue of his various roles as co-trustee, President, and Director.

449.   Lester's purported resignation from EBWLC in March 2012 did not end his fiduciary responsibilities to EBWLC because Lester remained President and Director of its parent, EB&C, and its wholly owned subsidiary, Eber Metro.

450.   Lester was a fiduciary to Plaintiffs and, until 2014, Sally Kleeberg, by virtue of his role as co-trustee. Lester also owed fiduciary duties to them derivatively as the beneficial owners of the corporations that he was entrusted to run.

451.   Wendy was a fiduciary to EB&C, EBWLC, Eber Metro, and Eber-CT since late 2007 when she undertook officer and director roles in each of those companies or their parents. Wendy also owed fiduciary duties to the trust beneficiaries derivatively as the ultimate beneficial owners of the corporations she was involved in running.

96

452.     A core duty of being a fiduciary is the duty of loyalty, which precludes self-dealing, conflicts of interest, and usurping corporate opportunities.

453.     Gumaer had a duty to avoid creating new conflicts of interest while he was a trustee. *See Matter of Rothko's Estate*, 43 N.Y.2d 305, 319 (1977) ("While he (a trustee) is administering the trust he must refrain from placing himself in a position where his personal interest or that of a third person does or may conflict with the interest of the beneficiaries") (quoting Bogert, Trusts (Hornbook Series 5th ed.), p. 343). Thus, Gumaer's decision to become Lester's personal attorney in 2001 was not any ordinary conflict of interest that might arise on a board of directors; it was a breach of fiduciary duty.

### C.  The Trust Owned EBWLC Shares, Which Shall Be Distributed

454.     Wendy undertook an illegal corporate act, misstated EBWLC's books and records, and breached her fiduciary duty to EBWLC's shareholders by erasing the Trust's shares from EBWLC's books without any evidence that the shares had been canceled or redeemed.

455.     Even if the Court credited Wendy's claim that the shares were redeemed in 2006, such a transaction would have been a breach of fiduciary duty by Lester because there was no apparent consideration to the Trust and no authorization from the co-trustees.

456.     The appropriate remedy for this breach is to order that EBWLC reinstated the Trust's shares on EBWLC's stock register. Because the Court concludes that no transaction actually occurred with respect to the EBWLC shares, no constructive trust is necessary: the Trust is, and at all relevant times has been, a shareholder of EBWLC.

457.     Because the Trust was ordered terminated and CNB was granted discharge based on an accounting that did not include these shares, while both of the other two co-trustees are now deceased, and because this Court has jurisdiction over EBWLC, the Court orders that the

shares of EBWLC in the name of the Trust shall be distributed in accordance with the June 1,

2017, Order of the Surrogate Court, as follows:

- **Class B Nonvoting:** 126 & 1/3 shares each to Lester 's Estate and Audrey Hays; 63 & 1/6 shares each to Lisa Stein and Daniel Kleeberg.

- **Preferred Nonvoting:** 83 & 1/3 shares each to Lester's Estate and Audrey Hays; 41 & 2/3 shares each to Lisa Stein and Daniel Kleeberg.

458.     Further, based on their breach of fiduciary duties and failure to acknowledge the

existence of the shares at all, the Court concludes that the Estate and Wendy have waived any

right to assert that the EBWLC shares should have been distributed differently for any reason,

including without limitation any arguable restrictions under EBWLC's Bylaws. Defendants'

waiver does not extend to non-parties, such as David Eber, who may wish to argue that the

EBWLC shares distributed to Lester's Estate after the date of his death (which would have

automatically terminated the Trust) should be considered part of Allen Eber's estate, not

Lester's, such that Lester's bequest of any such shares to Wendy does not apply.

### D.  Plaintiffs Are Owners of EB&C and Have Standing to Assert Derivative Claims

459.     There is no dispute about how the Trust's shares should have been distributed by

CNB: 1/3 to Audrey Hays; 1/3 to Lester Eber's estate; 1/6 to Daniel Kleeberg; and 1/6 to Lisa

Stein. The only question is whether Lester Eber had the right to invoke a provision in EB&C's

Bylaws to acquire all of the Trust's shares. This Court concludes that Lester had no such right for

several alternative reasons, each one of which would be sufficient alone to reject Lester's

conduct.

a.   As a co-trustee, Lester's duty of loyalty to the beneficiaries required him to

ensure that the beneficiaries received their rightful share of Trust assets. His

acts to interfere with the distribution of shares were designed to benefit

98

himself, and to harm Plaintiffs, by divesting them of standing to pursue their meritorious claims. Lester's conduct constituted a breach of trust.

b. Since appointed trustees lack the authority to deviate from the instructions set forth in the trust instrument without consent from the beneficiaries or the Surrogate's Court, the Trust's co-trustees lacked authority to amend or construe the corporate bylaws in a way that would contravene the Allen Eber Will's express instruction about how assets were to be distributed upon termination of the Trust. In other words, while a restriction on transfer could be valid as against other transfers, it cannot apply to a distribution of Trust assets to the remaindermen.

c. The restriction is invalid, on its face and as applied, because it fails to provide fair value to transferring shareholders as compensation for the shares. Under the restriction, if a third party offered a shareholder $1 million for 20% of the company, another shareholder could pay as little as $0 (according to Lester) for the shares if that was what the company's "book value" was at the time. Such a provision inherently benefits insiders with control over the books and records of the company, and it cannot be enforced so as to divest shareholders of fair value (based on a bona fide offer, appraisal, or otherwise) for their shares. Adopting that provision—and certainly enforcing it—was harmful to shareholders and thus a breach of fiduciary duty.[22]

d. Under New York law, "[a] restriction on transfer of a security imposed by the issuer, even though otherwise lawful, is ineffective against a person without

_____

[22] New York law requires that shareholders receive fair value in exchange for their shares. N.Y. B.C. L. § 623(h)(4) (providing that a court shall fix the value of shares at "fair value").

knowledge of the restriction unless … the restriction is noted conspicuously on the security certificate." UCC § 8-204. Here, the stock certificates affirmatively state that they are "transferable," [Ex. 134], making it impossible to conclude that the subsequent boilerplate reference to the bylaws sufficed to "conspicuously" note the existence of any restriction. UCC § 8-204(1). Moreover, terms incorporated by reference to another document may "not conflict with the terms stated on the certificate." UCC § 8-202(a). And there was no actual notice of any restriction because the bylaws were not disclosed to CNB, Plaintiffs, or the Surrogate's Court before 2018.

e.  Even if the transfer restriction were valid and could be invoked without a breach of trust, Lester's October 30, 2018, notice was defective because it failed to specify a purchase price. [Ex. 133.] The notice was also untimely since the Bylaws required any such notice to be sent within five days after receiving notice of the intended transfer by another shareholder. The Bylaws' requirement of personal delivery of a notice of transfer was satisfied both by Lester's entry of an appearance in the Surrogate's Court and by Lester's receipt of actual notice of the intended transfer in 2017. [Lester Dep. 399:15–22 (acknowledging the personal delivery requirement was immaterial as long as the notice was actually delivered).]

f.  The Bylaws limited the purchase right to "[a]ny other shareholder" besides the transferor. [Ex. 133 at 11.] Lester was thus ineligible to invoke the Bylaws since he held legal title to the shares as a co-trustee. Although he did not join the petition, the decision to terminate the Trust and distribute the shares was

Lester's decision because the Will conferred "absolute discretion" on the co-trustees to decide whether to terminate the Trust. [Ex. 132.] Tellingly, Lester's Notice of Intent to Purchase Shares was addressed to the Trust. [Ex. 35.]

g.  Lester is equitably estopped from preventing a distribution in accordance with CNB's proposed distribution and the Surrogate's Order adopting it.

460.  Because Lester's bad faith conduct involved concealment and deceit and demonstrated an attempt to subvert the rule of law for his own interests, the Court finds that Plaintiffs are entitled to compensatory damages for the breach of trust in the amount of the reasonable legal fees and expenses incurred in relation to this issue.[23]

461.  Even if Lester had been able to acquire Plaintiffs' shares of EB&C, the Court would nonetheless have found that Plaintiffs have standing to assert their claims based on the Trust's ownership of non-voting and preferred shares in EBWLC.

462.  For all of these reasons, Plaintiffs have standing to pursue derivative claims in the right of EB&C, EBWLC, and their affiliates (including constructive affiliates by virtue of a constructive trust) pursuant to New York. B.C.S. § 626.

463.  EB&C is directed to remove the Trust as a shareholder and to recognize the following shareholders instead:

- **Class A Voting:** 616.67 (or 616 and 2/3) shares each to Lester Eber and Audrey Hays; 308.33 (or 308 and 1/3) shares each to Lisa Stein and Daniel Kleeberg.

- **Class B Nonvoting:** 96.67 (or 96 and 2/3) shares each to Lester Eber and Audrey Hays; 48.33 (or 48 and 1/3) shares each to Lisa Stein and Daniel Kleeberg.

---

[23] There are several instances in which damages are based on fees and expenses incurred. These are intended only as additional reasons to support at least part of the attorney's fees that should be charged to Defendants one way or another, in order to help make Plaintiffs truly whole despite the myriad breaches of trust. Concluding that there are multiple bases for fee liability does not mean Plaintiffs recover the same amount more than once

- **6% Preferred Nonvoting:** 666.67 (or 666 and 2/3) shares each to Lester Eber and Audrey Hays; 333.33 (or 333 and 1/3) shares each to Lisa Stein and Daniel Kleeberg.

464.     Under B.C.S. § 619, the Court concludes that Plaintiffs were aggrieved by Defendants actions and that new elections should be held for EB&C and its subsidiaries.

**E.  The 750 Voting Preferred Shares Are Void**

465.     The issuance of 750 Voting Preferred shares of EBWLC to Lester "as of" February 15, 2017, is void under the no-further-inquiry rule because Lester directly acquired Trust property in a self-dealing transaction that fell under no applicable exception.

466.     The amendment to the Certificate of Incorporation is also void because there was no shareholder consent, since the Court does not credit the authenticity of the one submitted in response to Plaintiffs' motion for summary judgment—the forged evidence version of submitting a sham affidavit. [B.C.S. § 803(a).] Thus, the issuance of an unapproved class of shares to Lester is also void.

467.     Because EBWLC had two shareholders as of 2017—EB&C and the Trust—EBWLC's Bylaws required at least two directors. [Ex. 108 at Art. II § 1.] EBWLC only had one director, Wendy Eber, who was appointed "as of" February 14, 2017. [Ex. 43 at 8.] Therefore, both the amendment to the Certificate of Incorporation and the authorization to issue shares were invalid corporate acts.

468.     The amendment to the Certificate of Incorporation is set aside. EBWLC shall make an appropriate corrective filing with the New York Department of State within a reasonable period of time.

469.     The voting preferred shares are void and canceled. EBWLC is ordered to remove these invalid shares from its stock register.

### F.  The Southern Opportunity Was Usurped

470.    Having found that Lester diverted a corporate and trust opportunity to himself by entering the Consultant Agreement with Southern, without offering the opportunity to the corporations or the Trust, the Court concludes that Lester breached his fiduciary duty of loyalty as an officer, director, and co-trustee.

471.    There is no merit to Defendants' attempt to limit the duty of loyalty to specific corporate entities that have active operations in a particular geographic region. That crabbed interpretation is inconsistent with the law and would effectively end the duty of loyalty altogether with respect to holding companies. This approach also fails to place adequate emphasis on how the opportunity arose: Here, because Lester was EBWLC's President and Southern needed his consent to numerous other transactions. Nor does Defendants' approach appropriately consider Lester's misuse of EBWLC resources, including its corporate counsel, to service his own personal ends.

472.    This Court need not consider whether the co-trustees or EBWLC's Board could have authorized Lester to take the Southern Consulting opportunity due to Gumaer's conflict of interest because Lester never presented it to either the Board or the Trust.

473.    EBWLC could have taken advantage of this opportunity by contracting with Southern to provide Lester's personal services as a condition of the contract. As a matter of basic contract law and the broad freedom to contract, it was legally possible for a contract between Southern and any of the Eber Bros. companies to "identify [Lester] as being material to performance," *Fransmart, LLC v. Freshii Development, LLC*, 768 F.Supp.2d 851, 864 (E.D.Va. 2011), and thereby ensuring his personal services.

474.    Alternatively, Eber-CT could have taken advantage of the opportunity in or around September 2012, when Lester and Southern entered into an oral at-will extension of the consulting agreement.

475.    Lester's 2012 decision to continue to work for Southern, and the absence of any evidence that he presented that opportunity to Eber-CT, also violated the terms of Lester April 2012 Employment Agreement, which provided: "Executive shall not hold outside employment without advance written approval of the Board." [Ex. 180 ⁋ 3; *see also* Tr. 128:7–15 (if Lester's "consulting" for Southern did extend beyond lobbying work, Lester misled Eder about it).]

476.    Lester's Estate shall be disgorged of all the profits Lester received from Southern. The damages should be paid to EBWLC, as that was the entity with the greater tangible expectancy in 2007, when the "consulting" relationship was negotiated and commenced.

477.    The Court finds that EBWLC is entitled to prejudgment interest for Lester's breach of fiduciary duty because prejudgment interest is mandatory on a claim where the only relief sought is compensatory damages:

> Although an action for breach of fiduciary duty is generally considered of an equitable nature, "even on [such] a claim with equitable underpinnings … prejudgment interest [is] *mandatory* where the only relief sought was compensatory damages."

*Panix Prods. v. Lewis*, 01-cv-2709(HB), 2003 U.S. Dist. LEXIS 11952, *7 (S.D.N.Y. July 15, 2003) (emphasis in original) (quoting *Lewis v. S.L. & E., Inc.*, 831 F.2d 37, 39 (2d Cir. 1987)).

478.    Alternatively, if EBWLC were merely eligible for prejudgment interest, this Court would exercise its discretion to award prejudgment interest. CPLR § 5001. By depriving EBWLC of additional, essential income from Southern, Lester not only deprived EBWLC of the ability to invest that money or pay down debts—justifying prejudgment interest—Lester took advantage of the cash shortfall to ultimately take EBWLC's assets for himself.

### G.  Lester's "Loans" Involved Improper Self-Dealing

*1.  The Co-Trustees' Approval Was Required to Comply with the Will*

479.    The Court is required to strictly construe any authorization for trustee self-dealing.

480.    When a trust expressly permits certain self-dealing transactions, that reduces the trustee's duty of undivided loyalty to a duty to act in good faith.

481.    The Court rejects Defendants' characterization of the Will as broadly permitting self-dealing by making secured loans because that fails to take into account the existence of three co-trustees, including the fact that one of the co-trustees was always a bank.

482.    The Will's permission for trustees to make loans secured by the Trust's assets only means that such loans could be made without obtaining consent from the Surrogate or the beneficiaries. It did not mean that individual trustees could make such loans without even obtaining approval from the other co-trustees.

483.    By acting as Lester Eber's personal attorney, Gumaer was impermissibly conflicted as a co-trustee, and therefore his approval alone could not have sufficed to authorize loans to Lester.

484.    Defendants' belated attempt to claim that CNB "ratified" Lester's loans is tantamount to a concession that CNB's approval was necessary.

485.    Because this Court credited Hawks' testimony that he did not ratify any loans to Lester, none of Lester's purported loans were ever approved by CNB. They therefore constituted unauthorized self-dealing.

2. *The "Loans" Were Not Approved by Disinterested Directors nor Were They Products of Fair Dealing*

486.    The loans also constituted self-dealing as a matter of corporate law and are subject to the entire fairness test.

487.    The 2006 Notes fail the entire fairness test because, as found above, Defendants have not proven that the Notes gave fair consideration to EBWLC nor that they were negotiated or approved through fair dealing.

488.    Accordingly, even if the Court had concluded that 2006 Notes were authentic, the Court would not enforce them. And because Defendants have failed to provide any evidence that Lester transferred any money into EBWLC or an affiliate in connection with these Notes, the Court assigns the 2006 Notes zero value.

## H. Lester's Employment Agreement Was the Product of Unauthorized Self-Dealing

489.    The April 2012 Eber-CT Employment Agreement with Lester was the product of unauthorized self-dealing with a Trust asset (Eber-CT's funds to pay compensation), and it is accordingly void under the no-further-inquiry rule.

490.    As a matter of corporate law, the transaction fails to meet the entire fairness test.

491.    The transaction is void and, per Plaintiffs' request to do so, it must be set aside.

492.    Lester's Estate is liable for restitution to Eber-CT in the amount of $675,991 plus prejudgment interest.

## I. The Polebridge Transaction Lacked Economic Substance and Was Unfair to Eber Metro and the Trust

493.    The transfer of 6% of Eber-CT to Wendy (via Polebridge, with Wendy always known to be the eventual recipient) was a breach of Lester's fiduciary duty as a co-trustee since

he gave away a Trust asset to his own daughter without consent from co-trustee CNB, much less consent from the beneficiaries.

494.    Wendy aided and abetted the breach by structuring the transaction with Sturm. Her malicious intent is apparent from her subsequently concealing the true nature of the transaction for over 11 years, when at trial, she finally admitted that at least one purpose for the transaction was to remove Eber-CT from PBGC's reach.

495.    Wendy claims that it is a "critical[]" fact that she did not exercise the right of first refusal when she acquired the 6 units of Eber-CT from Polebridge. [Wendy Decl. ⁋ 159.] This is critical in the sense that it constituted another breach of fiduciary duty.

496.    Because she did not exercise the ROFR, Wendy was obligated as an officer and director of EB&C, EBWLC, Eber Metro, and Eber-CT to present the opportunity to buy the shares to the companies to which she owed a duty of loyalty. In theory, such companies could have offered significantly more than Wendy did, and then Wendy would have had to decide whether to match it.  Her failure to do so was another breach of the duty of loyalty to each of those entities.

497.    The transfer of 6% of Eber-CT to Polebridge is deemed void and Wendy's subsequent acquisition of it was not a bona fide purchase for value. Wendy must transfer the 6 units of Eber-CT to Eber Metro. The nonrecourse note that was the consideration is rescinded, canceled, and set aside such that Wendy's assumed debt under it is extinguished.

498.    A constructive trust is imposed on the 6 units of Eber-CT. Wendy must account for and forfeit all Eber-CT distributions she received, regardless of whether or how she supposedly spent or invested that money. The Court awards Eber Metro damages in the principal amount of $154,102, with 9% interest accruing from the reasonable intermediate date of April 1,

2017, constituting $63,556.80 of interest and a total amount of $217,668.80 as of November 1, 2021 (55 months later). [Ex. 218 at 7 (showing 2017 and 2018 distributions).]

### J. The Court Must Order a Reconveyance of the Trust's Assets

499.    Because Plaintiffs have insisted upon a reconveyance of property taken from the Trust, and because that property has not been transferred to any bona fide purchasers, the Court must grant a reconveyance. *Birnbaum v. Birnbaum*, 117 A.D.2d 409, 420 (4th Dept. 1986).

500.    The Court also imposes a constructive trust on Eber Metro and its assets for all times since June 5, 2012. It does so based on application of the no-further-inquiry rule, Plaintiffs' request. and the evidence that Alexbay has dissipated certain Eber Metro assets since 2012. Alternatively, the Court finds that Plaintiffs have clearly and convincingly proven that Lester was unjustly enriched by transferring Eber Metro to Alexbay from EBWLC.[24]

501.    Alexbay must transfer all of its shares of Eber Metro to EBWLC.

502.    Wendy must transfer all of her shares of Eber Metro to EBWLC.

503.    Alexbay must account for and be disgorged of all payments from Eber Metro.

504.    Wendy's August 2012 Employment Agreement is void and shall be disregarded by Eber-CT. Wendy has no valid contractual right to claim any severance or bonuses.

### K. Breach of the Duty of Loyalty and Disgorgement for Disloyalty

505.    Based on the disloyal acts detailed above, Lester and Wendy breached their duties of loyalty repeatedly. They were faithless servants to EBWLC and its subsidiaries.

506.    As found above, Lester's first disloyal act occurred on January 1, 2007, and Wendy's first disloyal act occurred on December 31, 2009.

---

[24] Plaintiffs include this based on Defendants' position, even though neither the burden of proof nor the justice inquiry itself is appropriate when the no-further-inquiry rule applies.

507.    The compensation paid to Lester and Wendy since each of their first disloyal acts is hereby disgorged. This includes the full amount of their gross wages, inclusive of amounts allocated to 401k plans, but excludes benefits and perks because evidence of how to quantify those elements of compensation has not been offered.

508.    Although the August 28, 2007, amendment to the Retirement Plan benefitted Lester and Lester alone, and it increased the financial strain on EBWLC, the Court does not order disgorgement of the approximately $1.1 million that Lester received as pension benefits. The pension benefits accrued substantially before Lester's disloyalty began. And even though the Court will not give the Estate "credit" for Lester's doing so, the Court has taken into consideration that Lester gave up remaining pension benefits in connection with the PBGC settlement as part of the reason why, as a matter of equity, it does not order disgorgement of the pension payments received by Lester.

509.    Because Plaintiffs have not requested it, the Court does not order disgorgement or restitution based on the provision of benefits and perks, such as use of a company car, frequent hotels in New York City, matching of 401k contributions, etc.

510.    Wendy breached continued her disloyal conduct in breach of her duties of loyalty. A particularly egregious example is Wendy's efforts to help Lester and his lawyer, David Belt, sue EBWLC and Eber Metro months before there was a default, at a time when her fiduciary duties to those companies and their shareholders required her to do the opposite.

511.    Every step taken by Wendy to help Lester take Eber-CT, as well as every step she did not take to prevent him from doing so, constituted a breach of fiduciary duties and disloyal conduct towards her employers.

512.    Wendy's and Lester's multiple breaches substantially permeated their employment with EB&C, EBWLC, Eber Metro, and Eber-CT; and as to Lester, it also substantially permeated his solemn appointment as a co-trustee of the Trust.

513.    Pursuant to the faithless servant doctrine, Lester's Estate must repay all of his compensation received since January 1, 2007, a principal amount not less than $3,990,277.05.

514.    Alternatively, Lester's Estate and Wendy must be disgorged of all compensation since 2010 as damages for their breaches of their fiduciary duties when they decided to take Eber-CT for themselves instead of selling Eber-CT to any third party, such as Eder-Goodman. By their own testimony, Defendants never even contacted anyone from Eder-Goodman about purchasing the remaining 85% of Eber-CT before commencing the core part of their scheme, even though Eder-Goodman had unequivocally expressed interest in doing so and paid handsomely to acquire the right of first refusal to do so when the opportunity arose.

515.    Pursuant to the faithless servant doctrine and also as damages for her breaches of her fiduciary duties in 2010 and continuing through 2021, Wendy must repay all of her compensation received since December 31, 2009, an amount not less than $2,868,966.59.

516.    The Court's computation of gross compensation to be disgorged does not include Wendy's receipt of $123,000 in EBWLC receivables into Segway and her $94,268 personal debt balance to EBWLC. The Court finds that those were not compensation, but instead are debts owed by Wendy to EBWLC.

517.    With respect to Lester, under the alternative measure of damages based on breach of fiduciary duty, without the faithless servant doctrine, the Court would order disgorgement of the compensation paid since 2010, which was the principal amount of $3,168,101.06.

518.    The Court awards prejudgment interest calculated from the reasonable intermediate dates found above. As with the Southern opportunity damages, the Court concludes that the imposition of prejudgment interest is mandatory. If it were not mandatory because these are equitable claims, however, the Court would exercise its discretion to impose prejudgment interest.

### L.  Lester's Attempt to Personally Profit from the Harris Beach Settlement Was a Breach of Fiduciary Duty

519.    When Lester purchased Harris Beach's claims against EBWLC and other entities to which Lester was a fiduciary, while simultaneously causing all defenses to be waived and counterclaims to be dismissed, Lester breached his fiduciary duties both as a corporate officer and director and as a co-trustee.

520.    Given that Wendy Eber previously asserted under oath that Harris Beach's bills were excessive and that Harris Beach had engaged in malpractice; and given that Harris Beach's legal work included facilitating improper transactions, including through deeply damaging documents that were concealed by Defendants during this litigation; and given that Defendants misrepresented the nature and amount of the Harris Beach settlement to PBGC and a federal court (and potentially to their own lawyers in those proceedings); and given the value Defendants saw in obtaining an affidavit from Dalton to shield against PBGC's claim; and accounting for the distinct possibility that Harris Beach may have obtained a larger settlement than it otherwise would have due to Defendants' fear that the damaging documents that Defendants concealed in this litigation would have been brought to light year ago, the Court will not give Lester's estate any "credit" for having paid Harris Beach $400,000 in 2015.

521.    Lester's payment of $400,000 to Harris Beach to buy its disputed claim against EBWLC cannot be construed as loan to EBWLC. The Court therefore rejects Defendants'

demonstrative exhibit that pretends that Lester simply made a loan that accrued interest at a rate of between 9 and 15 percent. No evidence exists indicating that any party ever treated the $400,000 as a loan, and certainly no documentation does so. Even just a few months ago, Wendy, in her capacity as Executrix of Lester's estate, demanded over $1.7 million, an amount that is far in excess of $400,000 plus any imaginable rate of interest. Moreover, EBWLC's Bylaws required Board authorization for any loan contracted by EBWLC, and there is no evidence that such an authorization was obtained (regardless of whether such a hypothetical authorization would have been effective given the conflict of interest and self-dealing involved).

522.    Alternatively, if the Court were to give Lester credit for the $400,000 paid by him to Harris Beach, the Court would not permit Lester's estate to profit from his breach, and so there would be no allowance for interest. In addition, the Court would impose punitive damages against Wendy in her capacity as Executrix in the amount of $400,000 for breach of fiduciary duty, both due to Lester's conduct in structuring this transaction in the first place and due to Wendy's attempt to cause EBWLC to pay over $1.7 million to Lester's estate based on Harris Beach's full claim amount of their claim plus interest, as if Wendy and Lester had not been in control of whether and when the Harris Beach claim was paid. The Court is also swayed towards imposing punitive damages by Wendy's false testimony about this transaction having been structured as an assignment of claims because Harris Beach wanted it that way.

### M. Lester Was Not Entitled to Demand Pension Payments from EBWLC After Voluntarily Agreeing to Forgo His Pension Payments from the Plan

523.    The Court concludes that Lester's estate is not entitled to compensation from EBWLC or any of its affiliates based on his election to forgo further pension payments as part of the February 2017 settlement with PBGC.

524.    No evidence has been offered that there was any transaction by which EBWLC purportedly agreed to pay Lester for his pension benefits in lieu of him collecting from EBWLC's Retirement Plan.

### N.  Lester's Estate Is Not Entitled to "Credit" for Payments Made Based on Legal Problems After the Metro Transfer to Alexbay

525.    All of Lester's payments for which Defendants seek credit occurred while the Trust was active and controlled EB&C and EBWLC. Under the constructive trust, Eber Metro and Eber-CT are treated as having been Trust-controlled entities at those times.

526.    Because the other co-trustees—and particularly CNB, since it was independent of Lester—did not authorize any right to repayment to Lester, Lester has no right to repayment.

527.    In addition, because Lester acted in bad faith and with the intent to defraud the Supreme Court, Teamsters, PBGC, Harris Beach, Sally Kleeberg, and Audrey Hays, the Court finds that Lester is not entitled to compensation for money he spent to try to retain what he wrongfully took.

528.    The principle applies that *"a wrongdoer who makes improvements to another's property with knowledge of the true owner's rights is barred from recovering the costs of those improvements." In re Flaum*, 177 A.D.2d 170, 184 (4th Dept, 1992).

529.    Harris Beach's 2014 lawsuit sought relief that is similar to the relief Plaintiffs seek in this action. [Ex. 176 at 3 (it sought to "set aside a transfer of shares of Eber Metro to Alexbay").] To reimburse Lester's fight against Harris Beach would be akin to reimbursing Lester's defense costs in this action, which as the losing party he clearly has no right to receive.

530.    The same reasoning applies to legal fees paid regarding PBGC.

### O. Wendy Eber's Intentional Wrongdoing, Animated by a Fraudulent Motive, Warrants Imposition of Punitive Damages

531.    Wendy bears significant personal responsibility for both aiding and encouraging Lester to breach his fiduciary duties as a trustee and for her own misconduct as a corporate fiduciary. Wendy's conduct evinces moral turpitude.

532.    Based on the Court's finding that Wendy employed trickery and deceit to intentionally harm the Trust beneficiaries, EB&C, EBWLC, and Eber Metro, the Court concludes that Plaintiffs have proven the need for an award of punitive damages.

533.    The Court uses the term "punitive damages" synonymously with the equitable concept of "surcharge" referenced in certain precedent.

534.    The punitive damages award is in favor of Plaintiffs, to be divided between the three of them in equal proportions based on their agreement to split proceeds equally. The Court does not award punitive damages to any Nominal Defendant.

[Option 1: *Modest Punitive Damages Based on Disgorgement*]

      a.  Punitive damages in the amount of $600,000 are hereby awarded to Plaintiffs individually ($200,000 to each Plaintiff). The amount must be paid by Wendy Eber in her individual capacity directly to Plaintiffs and shall not be offset or reduced based on any payments that Wendy must make to the entities in which Wendy herself has an interest as heir to or executrix of Lester Eber's estate.

      b.  A significant factor in arriving at this punitive damages amount is the Court's concurrent determination that Wendy Eber is subject to disgorgement of her earnings under the faithless servant doctrine. If the Court had not ordered such disgorgement, the amount of punitive damages awarded would have been

significantly greater, and the Court may have ordered that Wendy Eber subject herself to discovery concerning her personal finances prior to determining the amount, such that the Court may have entered a punitive damages award that was larger or smaller than the current combined amount of disgorgement and punitive damages.

c.   Since $600,000 is only approximately two years' worth of Wendy's average salary and bonuses that she paid to herself, and just a fraction of the compensatory damages awarded, the Court concludes that it is proportionate to the circumstances in light of the objectives intended and not excessive. But by imposing a modest amount of punitive damages in addition to ordering disgorgement of all profits, the Court acts in accordance with its responsibility to punish and deter such morally reprehensible conduct.

[Option 2: *Deferral of Determination*]

a.   The Court shall retain jurisdiction to determine the amount of punitive damages, after giving the parties 60 days in which to complete expedited discovery concerning Wendy's personal finances and the Estate's assets.

### P.  Fees and Expenses

535.   Because Plaintiffs' lawsuit was successful, the Court exercises its discretion under N.Y. B.C.L. § 626(e) to award Plaintiffs their reasonable expenses, including reasonable attorney's fees, to be paid by EBWLC, Eber Metro, and EB&C, jointly and severally.

536.   Based on the finding that Defendants litigated this case in bad faith, the Court exercises its inherent authority to sanction such conduct by requiring Defendants, jointly and severally, (not any Nominal Defendant) to pay Plaintiffs' legal fees and expenses.

537.    The Court retains jurisdiction to determine the amount of attorney's fees and expenses to award, and the allocation of that award between EBWLC and Defendants.

### Q.  Additional Injunctive Relief

538.    The Court concludes that Wendy's conduct requires her immediate removal from any position in control of the equity of any other company, including all officer and director roles in any of the Nominal Defendants other than Eber-CT. Wendy shall remain President of Eber-CT unless or until she terminated or reassigned to another role (assuming she accepts it) by Eber-CT's Board of Managers, as may be immediately reconstituted, in whole or in part, by the President of Eber Metro.

539.    Until such time as the transfers of equity are completed and recorded by the respective corporations and elections can be held in due course, the Court appoints Daniel Kleeberg to serve as interim Sole Director, President, and Secretary of EB&C, EBWLC, Eber Metro, Slocum of Maine, Eber-RI, LLC, Eber-Metro, LLC, and Eber Acquisition Corp.

540.    In the event that income is received by EBWLC or its affiliates and distributions are to be made, EBWLC and its affiliates may take into account any unpaid liabilities of the shareholders and may withhold distributions up to the amount of the unpaid liabilities, including the appropriate amount of interest when so ordered. Such liabilities expressly include unpaid judgments by this Court, whether to EBWLC or its affiliates or to Plaintiffs individually.

*    *    *

Plaintiffs reserve the right to submit limited additional proposed findings of fact and conclusions of law after review of Defendants' posttrial submissions.

Respectfully submitted,

/s Brian C. Brook
Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Facsimile: (646) 257-2887
Brian@brook-law.com

*Counsel for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

Dated: October 7, 2021