## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DANIEL KLEEBERG, LISA STEIN, and
AUDREY HAYS,

               Plaintiffs,

    v.

WENDY EBER, in her individual
capacity and as Executrix u/w/o LESTER
EBER; ALEXBAY, LLC f/k/a LESTER
EBER, LLC; LUCIA GORDON GUMAER
and PATRICK D. MARTIN solely in their
capacities as Executors under the will
of ELLIOTT W. GUMAER, JR.; and,

               Defendants,

    and

EBER BROS. & CO., INC.; EBER BROS.
WINE AND LIQUOR CORP.; EBER
BROS. WINE & LIQUOR METRO, INC.;
EBER-CONNECTICUT, LLC; EBER-
RHODE ISLAND, LLC; EBER BROS.
ACQUISITION CORP.; EBER-METRO,
LLC; SLOCUM & SONS OF MAINE, INC.;
and CANANDAIGUA NATIONAL BANK
& TRUST COMPANY,

               Nominal Defendants.

Civil Action No.  16-CV-9517(LAK)(KHP)

---

## PLAINTIFFS' OPENING POSTTRIAL BRIEF

---

Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Brian@brook-law.com
*Attorneys for Plaintiffs Daniel Kleeberg, Lisa Stein,
and Audrey Hays*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ..................................................................................... 1

ARGUMENT ................................................................................................................ 2

I.  Plaintiffs Own 2/3 of EB&C ................................................................................. 2

II.  The Southern "Consulting Agreement" Was a Trust and EBWLC Asset, Inextricably Intertwined with the Overall Deal .................................................................... 3

  A.  Lester Usurped a Tangible Corporate Opportunity ........................................ 4

III.  Transactions that Violated the Duty of Undivided Loyalty .................................. 7

  A.  The "No Further Inquiry Rule" Means that No Further Inquiry Is Needed to Order Reconveyance and a Constructive Trust ................................................ 7

  B.  Lester's Employment Agreement Was Unauthorized Self-Dealing .................. 9

  C.  Defendants Manipulated EBWLC's Stock to Increase Lester's Share ............. 10

  D.  Transactions to Be Set Aside Under a Constructive Trust .............................. 11

  E.  Lester Acted with Malice and Fraudulent Intent, Employing Trickery and Deceit, and Should Be Denied Compensation for Those Efforts ...................... 11

IV.  Transactions that Violated the Lesser Duty of Loyalty and Good Faith .............. 13

  A.  Polebridge's "Purchase" of 6% of Eber-CT Was a Sham ............................... 13

  B.  Lester's "Loans," Even If Real, Were Tainted by Self-Dealing ...................... 14

  C.  Lester's Purchase of Harris Beach's Claims Against EBWLC ........................ 16

V.  Wendy Breached Her Own Fiduciary Duties and Induced Lester and Gumaer to Breach Theirs, Too ............................................................................................. 17

VI.  Wendy and Lester Were Faithless Servants Whose Compensation Is Rightly Forfeit ........ 18

VII.  Defendants' Compensation from Eber-CT Also Provides a Necessary Measure of Damages for Their Many Fiduciary Duty Breaches .......................................... 19

VIII. The Court Should Not Consider the New Res Judicata Defense ......................... 20

IX.  Punitive Damages ............................................................................................. 21

i

X.    The Court Should Award Attorney's Fees Against Defendants or, Alternatively, to Be Paid by EBWLC ................................................................................................ 22

   A.    Defendants' Persistent and Intractable Bad Faith Warrants Fee Shifting Under this Court's Inherent Authority ................................................................................ 22

   B.    New York Courts Permit Recovery of Fees and Expenses When Pursuing Self-Dealing by a Trustee ................................................................................................ 22

   C.    The Court Should Also Exercise Discretion to Have Fees Paid by EBWLC .................. 23

XI.    Injunctive Relief ............................................................................................................ 24

XII.   Rule 54(b) Request Because There Is No Just Reason for Delay ........................................ 25

CONCLUSION ........................................................................................................................ 26

# TABLE OF AUTHORITIES

**Cases**

*Alpert v. 28 Williams Street Corp.*, 63 N.Y.2d 557 (1984)........................................................ 13

*Birnbaum v. Birnbaum*, 157 A.D.2d 177 (N.Y. App. Div. 4th Dept. 1990).................................. 22

*BMW of N. Am. v. Gore*, 517 U.S. 559 (1996)........................................................................... 21

*Chambers v. NASCO, Inc.*, 501 U.S. 32 (1991).......................................................................... 22

*Community Nat. Bank v. Medical Ben. Adm'rs, LLC*, 626 N.W.2d 340 (Wis. App. 2001) ........... 5

*Curry v. City of Syracuse*, 316 F.3d 324 (2d Cir. 2003) ............................................................ 20

*Diamond v. Oreamuno*, 24 N.Y.2d 494 (1969) ........................................................................... 19

*Dutton v. Willner*, 52 N. Y. 312 (1873) ..................................................................................... 19

*Epperson v. Entm't Express, Inc.*, 242 F.3d 100 (2d Cir. 2001) ................................................. 20

*Evans v. Ottimo*, 469 F.3d 278 (2d Cir. 2006)........................................................................... 21

*Fed. Ins. Co. v. Mertz*, No. 12-CV-1597-NSR-JCM, 2016 WL 164618
   (S.D.N.Y. Jan. 12, 2016)...................................................................................................... 18

*Flannigan v. Vulcan Power Group, LLC*, 642 Fed. Appx. 46 (2d Cir. Mar. 15, 2016) .............. 20

*In re Parisi*, 34 Misc. 3d 1204(A), 946 N.Y.S.2d 68 (Sur. Ct. Queens County 2011).................. 8

*In re Parisi,* 975 N.Y.S.2d 459 (App. Div. 2d Dep't 2013) ......................................................... 8

*In re Perry H. Koplik & Sons, Inc.*, 476 B.R. 746 (Bankr. S.D.N.Y. 2012),
   *aff'd,* 567 F. App'x 43 (2d Cir. 2014).................................................................................... 13

*In re Signature Apparel Grp. LLC*, 577 B.R. 54 (Bankr. S.D.N.Y. 2017) ................................ 4, 5

*Lee v. Edwards*, 101 F.3d 805 (2d Cir. 1996)............................................................................ 21

*Lerner v. Fleet Bank, N.A.*, 459 F.3d 273 (2d Cir. 2006) ........................................................... 17

*Matter of Birnbaum v. Birnbaum*, 117 A.D.2d 409 (4th Dept. 1986) .................................. 7, 8, 12

*Matter of Greenberg*, 614 N.Y.S.2d 825 (App. Div. 4th Dep't 1994) ........................................... 4

*Meinhard v. Salmon*, 249 NY 458 (1928)..................................................................................... 7

*Meridian Financial Advisors, Ltd. v. Pence*, 763 F.Supp.2d 1046 (S.D. Ind. 2011)...................... 5

*Moser v. Devine Real Estate, Inc. (Fla.)*, 839 N.Y.S.2d 843 (App. Div. 3d Dep't 2007).............. 4

*Motorola Credit Corp. v. Uzan*, 509 F.3d 74 (2d Cir. 2007).......................................... 21

*O'Hayer v. de St. Aubin*, 293 N.Y.S.2d 147 (App. Div. 2d Dep't 1968) .................................. 3, 4

*Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184 (2d Cir. 2003)............................ 19

*Renz v. Beeman*, 589 F.2d 735 (2d Cir. 1978) ......................................................... 3, 8

*Shapiro v. Rockville Country Club, Inc.*, 2004 WL 398980 (N.Y. Sup. 2004) ........................... 14

*Stern v. General Electric Co.*, 837 F.Supp. 72 (S.D.N.Y.1993).................................... 14

*Vasbinder v. Scott*, 976 F.2d 118 (2d Cir. 1992) ...................................................... 21

*Wendt v. Fischer*, 243 N.Y. 439 (1926)............................................................. 8

*Whitney Holdings v. Givotovsky*, 988 F. Supp. 732 (S.D.N.Y. 1997) ............................ 7

*Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106 (2d Cir. 2015) ......................................... 21

## Statutes

BCL § 626.......................................................................................... 23

BCL § 803.......................................................................................... 10

CPLR § 5001........................................................................................ 10

## Rules

Fed. R. Civ. P. 54................................................................................. 25

## Treatises

Bogert, Trusts (5th ed 1973) ...................................................................... 7

Restatement (Third) of Trusts § 78 ............................................................... 3

Plaintiffs Audrey Hays, Daniel Kleeberg, and Lisa Stein respectfully submit the following post-trial brief in support of entering Plaintiffs' proposed Findings of Fact, Conclusions of Law, and Order Granting Injunctive Relief.

## PRELIMINARY STATEMENT

After Eber Bros.' effort to remain independent in New York failed against the onslaught of the nation's largest distributor, Lester and Wendy Eber were left with a much smaller company and fewer opportunities for growth. Despite their multiple fiduciary duties—including Lester's duty of undivided loyalty as a trustee—the Ebers undertook to defraud all other creditors and shareholders so that they alone could continue in the business and pursue their own profits, without having to share with the rest of their family. They did so knowingly and in bad faith, with the intention of causing injury. It is long since time for them not only to make restitution, but also to pay for their depraved conduct. All misappropriated property and profits should be disgorged and returned to the rightful parties in accordance with the law.

Much of this brief focuses on the appropriate standards and how Defendants fail them.[1] The standard does differ among transactions, with some subject to the no-further-inquiry-rule, some swept up by the constructive trust, and some under the entire fairness doctrine. Regardless, these facts are so outrageous that the core transactions would fail even under the vastly more deferential business judgment rule: For example, overwhelming evidence proves that the Polebridge 6% transaction was clearly a sham, wholly lacking in economic substance, for purposes of defrauding the PBGC, the Trust, and others; and the central Alexbay transaction was worse than a decision to dissolve or liquidate, because it left EBWLC a worthless shell with just $2,000 in the bank but millions of dollars in obligations.

---

[1] So as not to overwhelm the Court with needless pages, this brief limits its focus to certain legal issues of particular salience at this stage of the proceedings, and it is thus not intended as a stand-in for closing argument on the merits as a whole. For example, with respect to Lester's "loans," the brief does not repeat Plaintiffs' arguments why this Court should not credit at least two of them, but it does argue whether the loans and their interest rates should be upheld *even assuming* the loans were real. To the extent the Court has questions on other issues not addressed here, Plaintiffs stand ready to provide the Court with any additional briefing required on such topics.

These are extraordinarily bad facts, and they have been defended with extraordinary bad faith. Defendants' case consistently rests on thoroughly unreliable evidence, including backdated documents and perjured testimony. On their merits, their arguments are, if anything, worse. Defendants bizarrely *embrace* the fact that the Alexbay transaction was a fraudulent conveyance. They ask this Court to conclude that they were merely defrauding creditors, which means there was nothing taken from Plaintiffs, so they should keep what they stole. That is the Defendants' misbegotten view of *equity*.

## ARGUMENT

### I.  PLAINTIFFS OWN 2/3 OF EB&C

The parties agree about how the Surrogate's Order required the EB&C shares to be distributed: 1/3 to Lester, 1/3 to Audrey Hays, and 1/6 each to Dan Kleeberg and Lisa Stein. Ex. 149 at 5–6. Defendants have no legal basis to challenge that Order. *Id.*

The only question this Court need address is whether Lester's Estate can interfere with the distribution of shares after Lester consented to CNB's proposed distribution. It cannot. Lester waited over a year after that Order to tell CNB and Plaintiffs that EB&C's Bylaws (Ex. 133) contained a transfer restriction allowing him to force Plaintiffs to sell him their shares for book value. That value, Lester claimed, was conveniently $0.00—unsurprising, as Lester and Wendy controlled EB&C's books, and they were not about to value Plaintiffs' claims in this case.

This Court should call 'pass interference' on Lester's attempt to intercept the shares. Instead, it should recognize Plaintiffs as the majority EB&C shareholders and direct that the books reflect that. Among other reasons, Lester's act of secretly plotting to take Plaintiffs' shares after the Trust was terminated per CNB's 2017 petition (Ex. OOOO) was itself a breach of trust, clearly in Lester's self-interest and to the detriment of the beneficiaries. His lawyers who helped come up with this scheme probably thought it was clever; it was deplorable. They tried to trick Plaintiffs, CNB, and the Surrogate into believing that Lester consented to the proposed distribution, while keeping an undisclosed Bylaws provision in their back pocket.

2

Far from being rewarded with a win by default, as they hope, this Court should punish this conspiracy by recognizing it as compelling evidence of Defendants' bad faith.

## II. THE SOUTHERN "CONSULTING AGREEMENT" WAS A TRUST AND EBWLC ASSET, INEXTRICABLY INTERTWINED WITH THE OVERALL DEAL

From its inception, the Trust was supposed to ensure that the fruits of Lester's work at Eber Bros. inured to the benefit of the <u>entire</u> family. So long as he remained at the helm of the business, Lester was not entitled to take related business opportunities solely for his own benefit. That duty not to usurp opportunities is what the duty of loyalty is all about, and it is undeniably at its strongest when the person taking the opportunity is not merely an employee, or even just a corporate fiduciary, but a trustee subject to the highest duty of undivided loyalty.

Lester's conduct in 2007 to enrich himself during negotiations with Eber Bros.' competitor, Southern Wine & Spirits ("Southern"), breached his duties to put the Trust first. "The trust possessed an intangible asset which was to be free from competition from its fiduciary." *Renz v. Beeman*, 589 F.2d 735, 746 (2d Cir. 1978); *see also O'Hayer v. de St. Aubin*, 293 N.Y.S.2d 147, 154 (App. Div. 2d Dept 1968) ("A trustee in control of the corporations … was obligated to preserve and advance their economic objectives and to promote new or extended activities which legitimately would belong to them."); Restatement (3d) of Trusts § 78 cmt d(1) ("A trustee engages in self-dealing and therefore normally violates the duty of loyalty by personally accepting from a third person any fee, commission, or other compensation for an act done by the trustee in connection with the administration of the trust… Accordingly, if the trustee sells trust property and accepts (and retains) a bonus from the purchaser for making the sale, the trustee commits a breach of trust.").

Neither the Trust beneficiaries nor the other co-trustees ever gave any kind of consent to Lester personally raking in millions of dollars from the very company that put EBWLC's New York operations in the ground. Nor could Lester's taking of the Consulting Agreement even arguably be justified by the Will. Even when a trust instrument shows that the settlor explicitly wanted the trustee to profit from the trust assets, New York courts come down harshly on

maneuvers that *circumvent* the trust rather than profiting through it. *See O'Hayer*, 293 N.Y.S.2d at 154 ("Certainly, the self-dealing contemplated by the settlor could not reasonably be said to include a maneuver of the trustee which would suspend their business for the aggrandizement of the trustee; and equally it could not excuse the usurpation of corporate opportunities to the trustee's personal benefit."). Lester's maneuver here—agreeing to suspend EBWLC's business in exchange for his own aggrandizement—is precisely the type of conduct *O'Hayer* condemns.

### A.  Lester Usurped a Tangible Corporate Opportunity

In the corporate-law context, "[a] corporate opportunity is defined as any property, information, or prospective business dealing in which the corporation has an interest or tangible expectancy or which is essential to its existence or logically and naturally adaptable to its business.'" *Moser v. Devine Real Estate, Inc. (Fla.)*, 839 N.Y.S.2d 843, 848 (App. Div. 3d Dep't 2007) (quoting *Matter of Greenberg*, 614 N.Y.S.2d 825, 827 (App. Div. 4th Dep't 1994)). Arguably, the absence of disclosure of or consent to Lester's consulting for Southern alone is enough to find a breach of duty. *See In re Signature Apparel Grp. LLC*, 577 B.R. 54, 104–05 (Bankr. S.D.N.Y. 2017) ("[W]hether an expectancy is 'tangible' becomes relevant only if a principal has first made full disclosure of the opportunity to corporate creditors.") (collecting authorities). But Lester's failure to obtain consent belies the larger problem that his consulting work for Southern placed him in direct conflict with EBWLC and the Trust, enriching himself with part-time "consulting" fee twice as large as the Trust would authorize in full-time salary, while depriving the Trust of any benefits at all.

Given the sheer volume of the other contemporaneous transactions with Southern, Ex. 194, EBWLC's clear need for additional income sources to pay substantial continuing expenses, and the fact that Lester was ostensibly committing to lead the family business forward by focusing on New England, it would be absurd for Lester to argue that EBWLC did not have a tangible expectancy in the monies Southern paid him. Especially because part of the Consulting Agreement imposed a restrictive covenant with collateral impact on the Eber Bros. companies,

even though they did not sign one themselves, it was wrong for Lester alone to pocket that portion of the merger consideration.

Courts have held that a consulting agreement can constitute a corporate opportunity, even when the corporation is insolvent and on the verge of closing. *See Community Nat. Bank v. Medical Ben. Adm'rs, LLC*, 626 N.W.2d 340, 345 (Wis. App. 2001) (holding as a matter of law that the consulting agreement with the acquiring company constituted a corporate opportunity that belonged to the insolvent company, and that the receiver violated its fiduciary duty by taking the consulting agreement for itself); *Signature Apparel*, 577 B.R. at 107 (finding a breach of the duty of loyalty by entering into a consulting agreement for $100,000 per month); *cf. Meridian Financial Advisors, Ltd. v. Pence*, 763 F.Supp.2d 1046, 1057–58 (S.D. Ind. 2011) (finding that consulting work, though arguably not in the line of business, presented triable issue of usurping corporate opportunity where there were other transactions between employer and consulting customer, and the employee gained the consulting business from the customer "at least in part as a result of his position" with the employer).[2]

Here, Defendants contend that Lester's duty of loyalty to EBWLC effectively ended when its New York operations ended. That's nonsense—EBWLC continued in existence, with Lester at its helm. But even if it had not, he violated his duty of loyalty by taking the Consulting Agreement without first getting it approved by the Board and the shareholders.

Critically, Lester used his position, *and EBWLC's corporate counsel*, to get this side deal for himself, and he did so months before EBWLC started winding up its New York operations. Lester Dep. 62:19–63:4; Ex. 93. That winding-up process took over a year to complete. *See* Ex. 165 at 23 ("[EBWLC] itself had wine and liquor distribution operations in New York from 1933 to September 2008"); Ex. 267 at 275 (EBWLC paid Lester's salary plus an extra $12,816 in 2008 for him to have an apartment in Manhattan because "the wind-up of the New York City

---

[2] As damages, the *Signature Apparel* court ordered the breaching fiduciary to be disgorged of all $2,050,000 paid under the consulting agreement. 577 B.R. at 109–110. And, because $1,800,000 of the consulting payments went to the fiduciary's personal company rather than himself, the Bankruptcy Court also ordered that the consulting payments be returned on grounds of unjust enrichment. *Id.* at 117, 120.

operation required Mr. Eber to spend substantially all of his work week in the New York City area during the 2008 fiscal year"). And, of course, EBWLC did not end after it stopped selling products itself. Lester continued to be President and Director of EBWLC, and EBWLC continued to function as a holding company that supervised the management of Eber Metro and in turn Eber-CT, until 2012. It also administered its Retirement Plan.[3]

Lester was only offered the opportunity to consult for Southern because he was the person in control of EBWLC at the time when Southern was trying to dismantle it, and Southern needed Lester to go along with it. Under such circumstances, Defendants cannot plausibly argue that EBWLC was incapable of taking advantage of this opportunity. EBWLC, through Lester as its President, could undoubtedly have provided the same consulting services as Lester did personally, and it, not Lester, should have been compensated for the restriction on its business activities that Lester's arrangement mandated. Moreover, EBWLC managed to continue paying Lester's and Wendy's salaries until May 2008, and it did so without receiving the significant income from Southern that it would have received for contracting with Southern to have Lester provide part-time consulting services.

Whether or not Lester actually did the work to earn his Southern consulting payoff is mostly irrelevant. To the extent it matters, the volume of his actual work only cuts against Lester—the more work he did for Southern, the more he diverted his attention from EBWLC and its subsidiaries while remaining a full-time salaried employee and trustee of a Trust that depended on those companies' performance. In any event, the real issue is whether Lester was permitted to do that work at all without doing so under the EBWLC umbrella, given that he only received the opportunity because of his position of power in EBWLC and exploitation of corporate resources. The answer to that is a resounding "no."

---

[3] Defendants' lawyer in the PBGC case, under Wendy's direction, persuasively argued the opposite position six years ago with a laundry list of EBWLC's continuing activities that proved it was an ongoing enterprise, including as a holding company supervising Eber-CT, "which was clearly an operating company." Ex. 166 at 18. These facts plus continued partial pension payments were not enough, however, to convince Judge Telesca to ignore the evidence—far less developed in that case than here—that EBWLC was just pretending to try to continue to the fund the Plan after it already decided to terminate (i.e., evade) the Retirement Plan in 2010.

As to the remedy, this Court has previously held in a case of diverted consulting fees:

> Under New York law, the impression of a constructive trust on the diverted assets is among the remedies for diversion of a corporate opportunity by a fiduciary. The value of the diverted asset is the amount plaintiff would have received but for the defendant's wrongful interference, "including opportunities for profit on the accounts diverted from it through defendant's conduct."

*Whitney Holdings v. Givotovsky*, 988 F. Supp. 732, 736 (S.D.N.Y. 1997) (Kaplan, J.) (footnotes collecting authorities omitted).[4] Here, that is at the minimum the $600,000 per year that Lester Eber received as compensation under the original Consulting Agreement. And because Lester was able to continue profiting from that relationship after the initial five-year term and could not have done so but for the initial diversion—among other reasons—his continuing compensation of $310,000 per year is also subject to disgorgement and restitution.[5]

## III.   TRANSACTIONS THAT VIOLATED THE DUTY OF UNDIVIDED LOYALTY

### A.   The "No Further Inquiry Rule" Means that No Further Inquiry Is Needed to Order Reconveyance and a Constructive Trust

Judge Parker correctly held that "Lester committed a breach of [t]rust and the transfer of Eber-CT to Alexbay is void under the no further inquiry rule." Recon. Op. 18. New York law is clear that when a trustee engages in a transaction that violates the no-further-inquiry rule, the beneficiaries "are entitled to imposition of a constructive trust and subsequent reconveyance":

> The remedy of a constructive trust is peculiarly suited to circumstances in which a fiduciary has been guilty of self-dealing. "A constructive trust is then the remedial device through which preference of self is made subordinate to loyalty to others"

*Matter of Birnbaum v. Birnbaum*, 117 A.D.2d 409, 420 (4th Dept. 1986) (quoting *Meinhard v. Salmon*, 249 NY 458, 467 (1928) (Cardozo, C.J.); citing Bogert, Trusts § 87 (5th ed 1973)).

---

[4] *Whitney* involved allegations that consulting services were a diverted corporate opportunity where a New York Supreme Court Justice had previously "made clear his view that [defendant] had breached his fiduciary duty by diverting a corporate opportunity to provide consulting services to [a third party]." *Id.* at 735. But, unlike here, the fiduciary in *Whitney* had resigned on the same day that the consulting agreement was made, and that had been more than six years before the case was filed, so it was barred by the statute of limitations. *Id.* at 746. Here, the fact that Lester remainder a fiduciary while "consulting"—both as a corporate fiduciary and as a co-trustee—not only extended the statute of limitations, but also made the diversion completely indefensible.

[5] Unlike the consulting compensation in *Whitney* (a right to receive 300,000 shares of corporate stock), Lester only received money from Southern. Therefore, there is no need for a constructive trust.

"Where self-dealing is found, the fairness or unfairness of the transaction is immaterial and not considered by the court. Thus, where a fiduciary has transferred estate or trust property to himself, the court will not consider the fairness or unfairness of the transaction nor consider whether or not full consideration was paid." *In re Parisi*, 34 Misc. 3d 1204(A), 946 N.Y.S.2d 68 (Sur. Ct. Queens County 2011); *see also In re Parisi,* 975 N.Y.S.2d 459, 462 (App. Div. 2d Dep't 2013) ("Under that per se rule, the court is generally required, upon challenge by a beneficiary, to set aside a transfer of property, held in trust by a fiduciary, to the fiduciary himself or an entity in which he or she has an interest.").[6] The Court should return to the position articulated in the first summary judgment decision:

> As explained by the Second Circuit: "Under the higher standard of undivided loyalty, the law 'stops the inquiry when the relation is disclosed, and sets aside the transaction or refuses to enforce it, at the instance of the party whom the fiduciary undertook to represent, ***without undertaking to deal with the question of abstract justice in the particular case***.'"

MSJ Op. 50 (quoting *Renz*, 589 F.2d at 744 (quoting *Wendt v. Fischer*, 243 N.Y. 439, 444 (1926); and *Munson v. Syracuse, Geneva & Corning R.R.*, 103 N.Y. 58, 74 (1886))) (emphasis added). The no-further-inquiry rule means exactly what its name says: there need be, and should be, no further inquiry whether a transaction must be unwound. Here, the no-further-inquiry rule applies, and the case law makes clear that Plaintiffs are entitled to a reconveyance and a constructive trust, irrespective of the (un)fairness of the Alexbay transaction.

The Court should find that even under the lower standard of good faith, which would consider whether the transaction was fair, Lester was not merely unjustly enriched, but also animated by fraudulent and malicious intent to harm the other Trust beneficiaries and the beneficiaries of EBWLC's Retirement Plan. Defendants' own expert, Frank Torchio, values Eber Metro as of June 2012 at over $5.7 million, while Lester's debts—assuming they are credited and given the full interest rates that Lester awarded to himself—were less than $4 million. It is

---

[6] The only exception to this "per se rule" is if the trustee has resold the property to a bona fide purchaser. *Birnbaum*, 117 A.D. 2d at 420. Otherwise, "the beneficiaries can insist upon a reconveyance of the property." *Id*.

not difficult math. If the Court finds that Lester also inflated the amount he supposedly loaned and that Torchio's valuation was tainted with bad data points—or if this Court considers the current value of Eber-CT[7]—then the extent of Lester's (now Wendy's) enrichment goes off the charts. A reconveyance and a constructive trust is the only plausible remedy given the substantial current value of the misappropriated assets and the absence of any evidence that Defendants would pay even a fraction of such damages before declaring bankruptcy—and the evidence indicates they would do so regardless of whether they had the financial wherewithal to pay.

## B.  Lester's Employment Agreement Was Unauthorized Self-Dealing

Lester's April 2012 Employment Agreement was concealed during discovery. Tr. 292:13–19. And it is easy to see why a dishonest litigant would want to hide it. Entering into an employment agreement with enhanced benefits—especially the golden parachute upon change of control, termination, or death—is utterly inconsistent with the story Defendants have tried to spin about a company facing existential threats but for Lester's grace.

This Court should order the Employment Agreement be set aside. First, Eber-CT was still a Trust asset in April 2012. This was self-dealing by Lester to confer upon himself a lucrative Employment Agreement without approval by the co-trustees. Under the Will, Lester was permitted and, indeed, encouraged to "participate in the management" of Eber Bros., which reasonably meant that Lester could get paid for doing so. Ex 132. at 13. The Will said that Lester should serve as a co-trustee without compensation, however, indicating that Allen Eber was concerned about Lester receiving excessive compensation. *Id*. There is no basis under the Will to conclude that Lester had the authority to unilaterally increase his compensation from a Trust-controlled company.[8]

Second, there is no evidence that this was approved by Eber-CT's Board of Managers. The LLC Agreement specified that "[t]he salaries of all Officers and agents of the Company

---

[7] *See* 9/13/21 Letter re: Liebman Testimony at 1–3 (ECF No. 380) (presenting the argument for admissibility). Wendy refused to even negotiate with Eder after receiving an offer that valued the company north of $23 million.

[8] Under first principles of trustee compensation, all of Lester's compensation from Eber Bros. and its subsidiaries should have been under closer supervision by the co-trustees, and perhaps even the beneficiaries.

shall be fixed by or in the manner prescribed by the Board." Ex. 57 § 5.2.1. Andrew Eder, who was an observer to the Board, had never heard about this until long after the fact, Tr. 119:14–25. Thus, the preponderance of the evidence shows that it was not approved. Accordingly, it is void.

The Employment Agreement should be set aside and the Estate should pay restitution of $675,991 (the death benefit) plus interest to Eber-CT. Stated differently, the Court could award damages for this breach of fiduciary duty in the principal amount of at least $675,991, plus prejudgment interest at 9%.[9] CPLR § 5001.

### C. Defendants Manipulated EBWLC's Stock to Increase Lester's Share

Regardless of whatever reason Lester and Wendy had for granting Lester 750 Voting Preferred shares of EBWLC to make him the majority owner, there is no question that the transaction was a breach of fiduciary duty. At the time, EBWLC was still a Trust asset—it had not moved over to Alexbay. Therefore, Lester was strictly prohibited from purchasing Trust property. MSJ Op. 50.[10] There is no colorable argument that the Will permitted this, or that Plaintiffs consented to it. It is void and must be set aside.

Separate from the trust-law problem, the shares are also void because EBWLC's amendment to the Certificate of Incorporation was not approved by the shareholders (EB&C), as required by New York law, which required approval by "vote of a majority … of shareholders" to create a new class of shares. N.Y. B.C.S. § 803(a). No such vote ever took place, and there was no written authorization in lieu of a vote. Defendants' late-produced authorization form should be rejected as a backdated fabrication. Tr. 360:7–363:19 (no corroborating evidence and defense counsel claiming incredulously that it was "given to Ms. Eber other than by email").

---

[9] Lester died on April 5, 2020, and the exact date of payment is unclear, although we know it was no later than 5/31/2020 because it was on that year's financial statement. Ex. 220 at 14. To be conservative, Plaintiffs submit that the Court should compute interest from May 31, 2020. As of October 31, 2021, that 17 months of interest comes to $86,188.85. If this Court applies the faithless servant doctrine, then the Court should note that this $675,991 payment is already included in the damages calculation.

[10] Judge Parker denied summary judgment on the grounds that Plaintiffs did not say when they learned about the transaction, implying that they may have consented to it. MSJ Op. 63. As Judge Parker's reconsideration opinion acknowledges, that understanding of beneficiary consent as to the Alexbay transaction was overbroad, though she did not revisit this particular transaction. In any event, the record demonstrates no such consent ever was granted.

Finally, EBWLC's Bylaws required the number of directors to be at least equal to the number of shareholders. Ex. 108 Art. II § 1. Since Wendy could not just erase the Trust's shares from EBWLC's stock register (another wrongful transaction itself), that is another basis to declare these transactions void.

### D.  Transactions to Be Set Aside Under a Constructive Trust

In order to place Plaintiffs in the position they would have been in if not for Defendants' misappropriations, the Court must set aside transactions that Lester engaged in post-foreclosure that would have required approval from the co-trustees, the Surrogate, and/or the beneficiaries. In particular, the stock of Slocum of Maine that Defendants acquired using Eber Metro's Call Option and the 2000 shares of Eber Metro granted to Wendy should be reconveyed.

In addition, Wendy should not be permitted to receive the benefits conferred by the August 2012 Employment Agreement, such as a golden parachute upon termination or change of control that might arguably be triggered by this Court's judgment alone. As well as not being authorized by the co-trustees since it was after the Alexbay transaction, there is insufficient evidence to find that the contract was approved even by Eber-CT's Board of Managers.

This list of known transactions should not limit the reach of the constructive trust, which broadly require the reconveyance of all property improperly removed from the Trust.

### E.  Lester Acted with Malice and Fraudulent Intent, Employing Trickery and Deceit, and Should Be Denied Compensation for Those Efforts

Although Defendants asserted no counterclaims or crossclaims based on Lester's "loans," they ask this Court to effectively award Lester's Estate millions in damages against EBWLC and Eber Metro. [11] They even insist on applying at least the 9% prejudgment interest rate, even though that only applies when there has been an actual *breach* that caused damages. Indeed, Wendy actually asks this Court to use a 15% interest rate, because that's what Lester's self-dealing LOC Note provided in the event of default—a default Defendants *intentionally caused*.

---

[11] Although referred to as loans, there are no loan agreements, or notes of any kind, issued after the 2010 LOC Note. Thus, Defendants' request merely asks this Court to give the Estate credit as part of its fashioning equitable relief.

The evidence overwhelmingly proves that Lester engaged in the Alexbay transaction in bad faith towards EBWLC and the Trust, and he employed trickery and deceit—i.e., fraudulent tactics—to cover his tracks with a contrived lawsuit that he filed against EBWLC while he was a fiduciary to it and its shareholders. Neither Lester nor Wendy could have believed it was fine for Underberg to sue EBWLC while continuing as EBWLC's "general counsel." Lester Dep. 198:9–19. Indeed, at this very same time, Lester and Wendy had EBWLC assert claims against Harris Beach *based on precisely that same type of conflict*. Ex. 241 at 7 ("As Eber Bros.' general counsel … HB further breached its fiduciary duties to Eber Bros. and violated the Rules of Professional Conduct in commencing an action against Eber Bros. while continuing to represent it as a client."); *see also* Ex. 281 ⁋ 14 (Wendy Aff. adopting this view).

Lester's bad faith and malice towards the Trust beneficiaries warrants denying his Estate any compensation for payments that he supposedly made to help Eber-CT stay afloat. *Birnbaum*, 157 A.D.2d at 420 (intentional misconduct warrants denying compensation for the value of improvements made to misappropriated property)  To be sure, before even getting to that point, Defendants have an uphill battle trying to prove that Lester's post-foreclosure payments provided any net benefit to EBWLC, Eber-CT, or their affiliates given the opaque financial records Defendants' pervasive use of the companies for personal ends.[12] Many of the payments were to lawyers and creditors as a direct result of the misconduct. But assuming the Court can get past all of that, Lester's Estate should still be denied compensation for trying to improve the value of the assets he had misappropriated. A clearer example than the Harris Beach "settlement" is hard to imagine, where all of the fraudulent conveyance claims against Eber Metro, Eber-CT, and Alexbay were dismissed, but the breach of contract claims against EBWLC remained, and were purchased by Lester for him to assert against EBWLC himself if and when this day came.

---

[12] Defendants' palpable overreach led Plaintiffs to discover that at least one of Lester's "loans" to EBWLC was made for the sole purpose of allowing Wendy to borrow more money without interest and have EBWLC pay her divorce lawyers' bills. *See* Pls. Proposed Findings of Fact § C(2). Whether such personal payments stopped in March 2009 as EBWLC's General Ledger suggests is dubious, since it was in late 2009 that Defendants launched their scheme to misappropriate Eber-CT from EBWLC, so they would have been more careful to cover their tracks.

## IV.   TRANSACTIONS THAT VIOLATED THE LESSER DUTY OF LOYALTY AND GOOD FAITH

Other transactions are not so clearly prohibited as self-dealing by a trustee, but they uniformly violate the lesser duty of good faith and other applicable laws and so require remedy.

### A.  Polebridge's "Purchase" of 6% of Eber-CT Was a Sham

The credible evidence shows that "Polebridge Bowman Partners, LLC" was never a real purchaser and was at best a placeholder for Wendy to receive Trust assets; at worst its sole principal, Sturm, was a participant in a scheme to defraud the PBGC. Even if Polebridge were a real purchaser, though, Wendy's receipt of a right of first refusal means that the transaction involved a conflict of interest and self-dealing, Ex. 119 (Gumaer recognized this issue).

"Where officers or directors of a corporation considering a transaction are not disinterested and have a personal stake in the outcome, their determination is not entitled to the deference usually given under the business judgment rule. Instead they must show the entire fairness of the transaction, or that it is 'intrinsically fair.'" *In re Perry H. Koplik & Sons, Inc.*, 476 B.R. 746, 803 (Bankr. S.D.N.Y. 2012), *aff'd*, 567 F. App'x 43 (2d Cir. 2014).[13] There are two principal components: "fair dealing" and "fair price." *Alpert v. 28 Williams Street Corp.*, 63 N.Y.2d 557, 569–70 (1984). When there is an inherent conflict of interest—e.g., authorizing fiduciaries standing on both sides of the transaction—then "the burden shifts to the interested directors and shareholders to prove good faith and the entire fairness of the merger." *Id.* at 570.

Defendants have utterly failed to meet their burden to prove the entire fairness of the transaction. Just the opposite. Indeed, we now know this was no ordinary right of first refusal, because Wendy was the original intended recipient of the 6%. Exs. 292–295. It was only after the lawyers decided they "need[ed] to identify an alternative purchaser" that Sturm stepped in, creating a shell company with him as sole member to stand in Wendy's shoes, to make the transfer appear more legitimate to outside observers like PBGC. Ex. 119.[14]

---

[13] "New York law may not be as well as developed as the Delaware law, [but] it is to the same effect." *Id.* at n.307.

[14] Even the name—"Polebridge Bowman Partners"—was invented to confer unwarranted legitimacy. There was no Polebridge, no Bowman, and, most importantly, *no partners*. *Cf., e.g.*, THE WOLF OF WALL STREET (2013) (dramatizing Jordan Belfort's coinage of "Stratton Oakmont" to sound legitimate, when it was anything but).

The Court has heard at least four different stories about what this transaction was intended to accomplish: First it was to help Wendy with her divorce. Then it was to compensate Wendy for good work. Then it was to compensate Glenn Sturm for good work. Finally it was to fraudulently shield assets from EBWLC's pension liability by removing Eber-CT from EBWLC's controlled group. Wendy herself admitted to three of those four. Tr. 338:22–339:10.

No matter the rationale, and no matter what standard the Court applies, the transaction must be set aside. Even under the loosest possible standard, the business judgment rule, this is still the once-in-a-blue-moon transaction that must be set aside. "To overcome the business judgment rule, a shareholder must establish that 'no person of ordinary sound business judgment would say that the corporation received fair benefit' in regard to the transaction." *Shapiro v. Rockville Country Club, Inc.*, 2004 WL 398980, at *9 (N.Y. Sup. 2004) (quoting *Aronoff v. Albanese,* 85 A.D.2d 3, 5, 446 N.Y.S.2d 368, (App. Div. 2nd Dept. 1982) and *Stern v. General Electric Co.,* 837 F.Supp. 72 (S.D.N.Y.1993)). Here, a company that was supposedly strapped for cash gave out a *non-recourse* promissory note in exchange for 6% of Eber-CT. In doing so, Eber Metro may have protected Eber-CT, but Eber Metro itself made itself worse off—still in EBWLC's controlled group and with nothing but a worthless nonrecourse promissory note to show for it. Even if one were willing to condone some shady transactions to avoid PBGC and hold the bank at bay—and Plaintiffs do not—this transaction caused only a clear detriment to Eber Metro and its sole shareholder, EBWLC. No person of ordinary sound business judgment would say they received a fair benefit from that transaction.

### B. Lester's "Loans," Even If Real, Were Tainted by Self-Dealing

There is no dispute about what the Will permitted as an exception to the duty of undivided loyalty. But that exception in no way eliminated the Trustees' concomitant duties of good faith and reasonable care. Moreover, the only appropriate interpretation of the Will is to find that it did not permit any single co-trustee to authorize a loan to himself. Given that there were three co-trustees, including a bank, combined with the standard practice of majority rule in

14

situations with three co-trustees, the Court should construe the Will as permitting loans by a co-trustee secured by Trust assets only if the two disinterested co-trustees approve the terms on behalf of the Trust.

This conclusion does not conflict with Judge Parker's statement that the loans were "not voidable," as Judge Parker's conclusion came in the context of the no-further-inquiry rule, which derives from the duty of undivided loyalty. Transactions that violate the duty of good faith are not subject to the no-further-inquiry rule and thus, Judge Parker was correct in characterizing them as "not voidable" on that basis. Recon. Op. 22 n. 9. Judge Parker was careful to avoid deciding anything that was more appropriately addressed at trial, and the question of whether the loans were legitimate or authorized was left open. Indeed, she expressly held that one of the issues to determine at trial is "the amount of money the Eber Entities owed to Lester based on the various loans he allegedly extended to those entities." *Id.* at 22.

Regardless of his duties to the Trust, Lester was still a corporate officer, and the LOC Note and 2006 notes involved self-dealing. Therefore, it is Defendants' burden to prove entire fairness. They failed to meet that burden.

Defendants presented expert testimony that the interest rates on Lester's LOC Note and promissory notes were generally reasonable at the time based on market comparables. There are two major problems Defendants fail to address: The process was unfair, and the company loaned money out at much lower rates. EBWLC allowed Lester and Wendy to borrow *without* interest, while the contemporaneously "negotiated" Polebridge Note bore a 2% interest rate.[15]

Even assuming the 2006 notes were not fabricated or otherwise altered after the fact, the 2006 notes nonetheless fail the "fair process" prong because they were never approved by the Board at all, much less after appropriate deliberation and consideration. The Bylaws prohibited contracting any loans without Board approval. Ex. 108. The financial statement that should have reflected these notes did not, characterizing the only notes due as "non-interest bearing." Ex.

---

[15] Ex. 14 at 12. And, notably, the Polebridge Note issued to Eber Metro had a maturity date of May 29, 2015—three-and-a-half years later than the maturity date on the earlier-executed LOC Note that Eber Metro issued to Lester.

205. Further undermining any assertion of fair process, on the face of the notes themselves, the interest rates were increased 50% by hand notation from Lester alone.

    With respect to the LOC Note, it is difficult to ascertain what the process was, but there is no serious argument that process was fair. The LOC Note was executed on two different dates, months apart. What purports to be a unanimous October 2009 Board authorization was never signed by Gumaer. Ex. HH at 5. Meanwhile, the February 2010 Board resolutions are written as if the LOC Note was something brand new. Ex. GG at 26–28. The February 2010 Board minutes fail to acknowledge that this LOC Note may have already been executed and falsely assert that Lester was unwilling to loan more money without security. *Id.*; Lester Dep. 102:20–25.

### C.  Lester's Purchase of Harris Beach's Claims Against EBWLC

    Even though Lester resigned from EBWLC in March 2012, he remained a fiduciary to EBWLC as a co-trustee and as President and Director of EB&C. Moreover, actions that harmed EBWLC in turn harmed EB&C and the Trust; thus, Lester's purchase of Harris Beach's disputed claims against EBWLC was self-dealing and a breach of fiduciary duty.

    If Lester had loaned $400,000 to EBWLC so it could pay Harris Beach, or if he had simply extinguished the claims against EBWLC instead of retaining them, then perhaps there would be an argument that he should recoup the principal he paid. But instead of conducting a transaction like that—self-dealing though it would have been—Lester got greedy. He put himself in an adversarial position with respect to the Trust, one exacerbated by the fact Lester took the assignment only after causing EBWLC to waive its counterclaims.[16] The Court should find that Lester's conduct was a breach of fiduciary duty, particularly as a trustee, and that his Estate is precluded from seeking to enforce the Harris Beach claims against any Trust entities, including EBWLC. To the extent the Court does not order the entire assignment forfeit, it should at the

---

[16] That position is further exacerbated by the fact that the Harris Beach claims only arose because Lester himself caused EBWLC to fail to pay Harris Beach. Thus, Lester now purports to hold claims against EBWLC based on conduct he controlled and caused EBWLC to undertake, all while he was co-trustee.

minimum set aside EBWLC's waivers of defenses and counterclaims as improper self-dealing so that EBWLC may defend itself in full against the Estate's claims.

## V.   WENDY BREACHED HER OWN FIDUCIARY DUTIES AND INDUCED LESTER AND GUMAER TO BREACH THEIRS, TOO

Wendy was not herself a fiduciary to the Trust; she was not even a beneficiary—she merely had a contingent interest to at most one-sixth of the Trust. But that did not stop her from pushing the three co-trustees to breach their fiduciary duties. The evidence shows that Wendy was the one consistently pressing forward with the various transactions, meetings, documents, etc. with the goal of ensuring that, when Lester died, she alone would control Eber-CT.

Under New York law, to support a cause of action for aiding and abetting a breach of fiduciary duty, Plaintiffs must show "(1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006).

Lester's conduct breached his fiduciary duties repeatedly since at least the beginning of 2007. And for every one of Lester's breaches of duty from the end of 2009 onward, starting with the LOC Note, Wendy knowingly induced and participated in them.[17]

For example, the November 7, 2012, letter from Underberg to Wendy in her capacity as CFO of Alexbay and to Glenn Sturm, offers a clear demonstration of Wendy's consciousness of the illegality, and fundamental unfairness to the Trust beneficiaries, of the Alexbay transaction. Ex. 98. It shows that Sturm and Underberg were hard at work planning for how to protect Lester's purported loans if and when the transfer of Eber Metro to Alexbay was "somehow upset in the future." *Id.* at 3. The letter illustrates that the lawyers had already prepared documents to ensure that money would flow to Lester before all others. For example, Eber Metro supposedly "indemnified Lester Eber and Alexbay for various items. Hence, there might be obligations owed to either in the future." *Id.* at 4. This letter, copied to and produced by Gumaer's estate, shows

---

[17] There is no evidence in the record that Wendy supported the Southern "Consulting Agreement" or that she was involved in concealing it from the EBWLC Board or the co-trustees.

why Wendy never invoked advice of counsel as a defense to disprove her guilty state of mind—Defendants determined that waiving the only arguable defense was better than waiving attorney-client privilege and having to disclose what their lawyers actually told them.[18]

Despite feigning being forgetful and aloof on the witness stand, Wendy is a shrewd businesswoman hell-bent on controlling Eber-CT, no matter how much any third party offers to pay. Wendy refused to accept one-sixth, or even one-third, of the family business. She did so with her eyes open to the consequences. She should now be forced to face those consequences head-on, both to appropriately mete out punishment, and to deter others.

The Court should find Wendy liable for aiding and abetting the co-trustees' breaches of their fiduciary duties, as well as for breaching her own duties that she owed as a corporate officer and direct to the companies and their ultimate owners, the Trust beneficiaries. She should be held fully accountable, including for punitive damages—and the amount should be particularly substantial if the Court does not require her to disgorge her compensation.

## VI.   WENDY AND LESTER WERE FAITHLESS SERVANTS WHOSE COMPENSATION IS RIGHTLY FORFEIT

Plaintiffs have proven that Lester and Wendy engaged in a pattern of perpetual misconduct for a period exceeding 10 years, during which time both were paid substantial salaries by EBWLC and its actual and constructive subsidiaries. A constructive trust remedy for the Alexbay transaction means that Eber-CT should be treated as if it remained a subsidiary of EBWLC and a Trust asset. It would severely undermine the faithless servant doctrine if it could be avoided by effectively stealing a subsidiary corporation, hiding the theft for years, and making sure compensation gets paid by that stolen subsidiary.

The faithless servant doctrine is ruthless by design. *Fed. Ins. Co. v. Mertz*, No. 12-CV-1597-NSR-JCM, 2016 WL 164618, at *7 (S.D.N.Y. Jan. 12, 2016) ("In [] cases where a

---

[18] After Defendants waived advice of counsel as a defense to try to prevent this letter from being used, Eber Supp. Br. in Opp'n to Pl.'s 2d Mot. to Compel at 1 & n. 1 (ECF No. 194), Judge Parker "changed" an earlier ruling that the letter was privileged, finding a privilege waiver anyway. Order on 2d Mot. to Compel at 52 (ECF No. 216). Notably, Judge Parker remarked that the "Court is troubled" by Defendants' submissions in what "appears to have been an effort to conceal a waiver." Order on 2d Mot. to Compel at 52 (ECF No. 216). *Id.*

fiduciary violates his position of trust, courts have held that he must account for all the profits derived therefrom."); *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 208 (2d Cir. 2003) ("We believe that forfeiture cannot appropriately be limited to only some transactions in these circumstances, where the agreement calls for general compensation, and does not limit compensation to specific amounts paid for the completion of specific tasks.").

The evidence proved that Wendy and Lester engaged in a series of disloyal acts against EBWLC and its subsidiaries. Their actions were not just inconsistent with their positions of agency and trust, their misconduct permeated their service in the most material and substantial part, and thus their actions trigger the faithless servant doctrine. *See Phansalkar*, 344 F.3d at 200 (collecting authorities). Under the doctrine, EBWLC and its subsidiaries are entitled to forfeiture of all of the Ebers' compensation, without regard to the value of the services they rendered.

## VII. DEFENDANTS' COMPENSATION FROM EBER-CT ALSO PROVIDES A NECESSARY MEASURE OF DAMAGES FOR THEIR MANY FIDUCIARY DUTY BREACHES

The faithless servant doctrine is generally applied to employees, but these Defendants were more than just disloyal employees—they were faithless fiduciaries. Disgorging compensation for the full period when the disloyal conduct existed is the only appropriate remedy consistent with New York's strong public policy. The New York Court of Appeals has expressly held that a breach of fiduciary duty claim does <u>not</u> require showing of damages, because "the function of such an action, unlike an ordinary tort or contract case, is not merely to *compensate* the plaintiff for wrongs committed by the defendant but, as this court declared many years ago, 'to *prevent* them, by removing from agents and trustees all inducement to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their agency or trust relates.'" *Diamond v. Oreamuno*, 24 N.Y.2d 494, 498 (1969) (emphasis in original) (quoting *Dutton v. Willner*, 52 N. Y. 312, 319 (1873)).) This preventative function of a breach of fiduciary duty claim would be eviscerated if a disloyal trustee could retain compensation.

Defendants' own line of defense shows why their compensation from Eber-CT is appropriately considered "profits" from the wrongdoing. Wendy and Lester both insisted that they tried—but failed—to sell Eber-CT to a third party after the collapse of EBWLC's New York operations. But now we know that story was false; they were offered close to $30 million to sell Eber-CT to Eder and Goodman, but they refused to even *negotiate*. Tr. 97:3–17.

Defendants characterize themselves as having to choose between either transferring Eber-CT to Lester or liquidating Eber-CT entirely. Under either scenario, there would have been nothing left for the Trust. That was a false choice. This Court should find that Defendants also had the option of selling Eber-CT to Eder-Goodman, a scenario in which the Trust beneficiaries would also have profited.[19] By refusing to even try to sell Eber-CT, Lester and Wendy instead set Eber-CT on the path to an unlawful transfer to themselves, while ensuring that they would continue to receive salaries and bonuses from Eber-CT in the meantime. Had they made the right choice to sell instead, they would have received none of that compensation. Thus, the compensation paid by Eber-CT after 2010, when Defendants began down their nefarious path, is also awardable as a proper measure of damages for Defendants' breaches of fiduciary duty.

## VIII.    THE COURT SHOULD NOT CONSIDER THE NEW RES JUDICATA DEFENSE

For the first time during closing argument, the Eber Defendants asserted that the equitable doctrine of res judicata barred Plaintiffs' claims. Even setting aside the issue of Defendants' extremely unclean hands, the Court should rebuff Defendants' latest attempt to evade responsibility for their actions.

Res judicata is an affirmative defense that must be pleaded in a timely manner, or it is waived. *Flannigan v. Vulcan Power Group, LLC*, 642 Fed. Appx. 46, 51 (2d Cir. Mar. 15, 2016) (citing *Curry v. City of Syracuse*, 316 F.3d 324, 330-31 (2d Cir. 2003); *Epperson v. Entm't Express, Inc.*, 242 F.3d 100, 108 (2d Cir. 2001)). Here, the Eber Defendants waived any defense of res judicata by failing to plead it, notwithstanding many opportunities to amend their answer.

---

[19] The price would have been lower in 2010 than in 2007 because gross profits declined, but it would have still been significantly better for EBWLC and its shareholders than just letting Lester have Eber-CT for himself and Wendy.

And while the Court may have some discretion to revive that defense, it should not. There is no excuse for Defendants' conduct, and the Court should not assist them in inventing one now.

## IX. PUNITIVE DAMAGES

There should be no question that Plaintiffs have met their burden to prove that punitive damages should be imposed. "[I]nfliction of economic injury, especially when done intentionally through affirmative acts of misconduct can warrant a substantial penalty." *Motorola Credit Corp. v. Uzan*, 509 F.3d 74, 87 (2d Cir. 2007) (quoting *BMW of N. Am. v. Gore*, 517 U.S. 559, 576 (1996)). The purpose of punitive damages is "'to punish the defendant and to deter him and others from similar conduct in the future.'" *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (quoting *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992)).

Because the remedies under the faithless servant doctrine and for breach of fiduciary duty disgorge profits, potentially without giving any credit to the value of the services provided, Plaintiffs would not demand that the Court impose hefty punitive damages in addition to disgorgement with prejudgment interest. New York courts have designed those claims' measures of damages with the goal of deterrence in mind.

That said, a punitive damages award is necessary given the unusual severity of the misconduct. "Punitive damages are a discretionary moral judgment that the defendant has engaged in conduct that is so reprehensible that it warrants punishment." *Wiercinski v. Mangia 57, Inc.*, 787 F.3d 106, 115 (2d Cir. 2015). Without such an award, Wendy would otherwise have no direct liability to Plaintiffs for her gross misconduct in successfully causing the co-trustees to divert the overwhelming majority of the Trust's assets to her and her alone. Lester knew what he was doing, but it is hard to believe that Lester would have gone this far if not for Wendy.[20]

---

[20] While perjury and other litigation misconduct cannot generally support the imposition of punitive damages, it is compelling circumstantial evidence that Wendy engaged in the underlying conduct with "a high degree of moral turpitude and demonstrated such wanton dishonesty as to imply a criminal indifference to civil obligations." *Evans v. Ottimo*, 469 F.3d 278, 283 (2d Cir. 2006).

## X. THE COURT SHOULD AWARD ATTORNEY'S FEES AGAINST DEFENDANTS OR, ALTERNATIVELY, TO BE PAID BY EBWLC

### A. Defendants' Persistent and Intractable Bad Faith Warrants Fee Shifting Under this Court's Inherent Authority

"[A] court may assess attorney's fees when a party has acted in bad faith, vexatiously, wantonly, or for oppressive reasons." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45-46 (1991). Several things about this case make it stand out from even extraordinary cases—extensive discovery disputes, surprise witnesses and documents at trial, and proffering testimony from witnesses who incessantly lie.[21] To point out just a few:

- Multiple extrajudicial attempts to prevent the Court from being able to afford Plaintiffs effective relief;

- Pervasive backdating of documents, and failure to keep or produce records that would expose the full scope of this practice;

- Asserting legal and factual positions that are the opposite of those asserted in prior cases on the same facts;

- Raising a claim preclusion defense for the first time during closing argument; and

- Proffering an expert opinion that the core transaction at issue was a fraudulent conveyance as a reason to *sustain* that illegal transaction.

Having observed Defendants and their counsel throughout trial, including Wendy's deeply truth-challenged testimony, the Court is no doubt aware of other examples. It should have no qualms about imposing fees as a sanction for this bad-faith litigation conduct.

### B. New York Courts Permit Recovery of Fees and Expenses When Pursuing Self-Dealing by a Trustee

An award of at least partial attorneys' fees against Lester's Estate is also warranted by a later decision in *Birnbaum v. Birnbaum*, 157 A.D.2d 177, 191 (N.Y. App. Div. 4th Dept. 1990), which held that a testamentary trust can recover its expenses incurred in uncovering self-dealing

---

[21] While new witnesses and documents after discovery may not be unusual, Defendants' cardinal variation on these usually venal sins is. For example, Michael Gallagher was retained and provided a written actuarial opinion in December 2018. Defendants withheld the opinion letter until after the expert report deadline and continued to conceal his identity as a fact witness who they intended to rely upon until they submitted a declaration at summary judgment. Like many other examples, this evidences Defendants' bad faith in this litigation.

by a trustee and pursuing claims against him. Here, the Trust still existed when this case began. The fact that Defendants terminated the Trust early does not change the fundamental nature of Plaintiffs' claims having been brought on its behalf. *Birnbaum* recognizes that the fees incurred in pursuit of a self-dealing trustee are awardable "as an element of damages." *Id.* (noting that "courts have consistently held that an estate should not bear any expense as the result of a fiduciary's misconduct and, in numerous instances, have held a fiduciary liable for the attorney's fees and other expenses incurred by the estate in exposing his misconduct"). This approach makes perfect sense given the Court's objective when fashioning a remedy: returning the Trust beneficiaries to the position they would have been in but for the self-dealing requires preventing them from paying out-of-pocket for legal fees necessitated by a dishonest trustee's bad acts.

The fact that this case involved a self-dealing trustee—not a mere corporate executive—is why the § 626 provision for the corporation to pay the legal expenses is insufficient. Indeed, the fact that Plaintiffs' interests were in a Trust is why this case differs from virtually every other corporate derivative case. The typical derivative case involves shareholders with minority interests. Here, Plaintiffs have majority control. If they had owned their shares outright without a Trust, this entire situation would have never arisen. It is only because of his role as trustee that Lester was able to pull off these shenanigans; that same role makes appropriate the repayment of Plaintiffs' fees from his Estate.

### C.  The Court Should Also Exercise Discretion to Have Fees Paid by EBWLC

This Court should also exercise its discretion to award Plaintiffs and their counsel their "reasonable expenses, including reasonable attorney's fees" under B.C.S. § 626(e). The B.C.S. requires only success "in part" on a derivative claim to permit the award of fees. *Id.*

Despite the depravity of the facts and the clarity of the law, the absurdity of Defendants' ever-changing factual and legal assertions has drawn out this case and allowed Wendy and Lester to collect several years' worth of additional salary, bonuses, and benefits. The conduct demonstrates bad faith that should result in them footing most if not all the legal costs.  The

23

Court should award fees be paid by EBWLC, both alternatively and additionally to cover any reasonable fees and expenses that are not charged against Defendants.

## XI.   INJUNCTIVE RELIEF

Since submitting the proposed order for injunctive relief several months ago, Wendy and her counsel have painted a picture that credibly suggests Eber-CT could be permanently harmed in a variety of ways (including potentially by Wendy herself) if there is virtually any delay between entry of injunctive relief and establishing control over Eber-CT. Plaintiffs and their appointed agents will need to get into the company fast, most importantly to ensure that employees do not abandon ship, and to reassure suppliers that there will be no disruption. To that end, Plaintiffs request an order that grants Plaintiffs the control that they deserve as majority owners, but also affords flexibility to determine the best path forward to protect their assets.

Plaintiffs' prior proposed order underestimated this Court's remedial powers, namely for providing for an interim replacement so that Wendy can be removed from Eber-CT's parent companies without delay. The Court's statutory authority to remove directors and officers would be unavailable in this situation where a single disloyal fiduciary is in every position of power above Eber-CT's Board of Managers. If Wendy is removed without a replacement, at least on an interim basis, no one can act as Secretary to correct the corporations' stock registers or convene meetings and elections. Nor is there a President who can vote the corporations' interests in their subsidiaries. That is why the revised proposed order seeks temporary appointment of Daniel Kleeberg to those roles until corporate formalities and elections can be carried out.

Plaintiffs considered requesting a temporary receiver but do not do so here; mere use of the term "receiver" could make the situation worse rather than better. Mr. Kleeberg's experience and standing in the industry makes him the right person to mitigate any potential damage and to supervise Wendy, if she remains in her position with Eber-CT.

The Court may wonder why Plaintiffs do not seek immediate removal of Wendy from Eber-CT as well as its parent companies. There are a couple of reasons. One is that, with Lester's

24

passing and John Slocum's departure for a competitor, Wendy is now the face of the company whether we like it or not; and as much as Plaintiffs believe she is not competent or trustworthy, there is potential benefit to maintaining an outward appearance of continuity. Another reason is that Plaintiffs remain cautiously optimistic that a verdict from this Court could bring the parties to the table to work together (for once) to ensure that the primary asset in this case does not collapse. Plaintiffs want the option to be able to negotiate with Wendy for her to remain CEO of Eber-CT, so long as it is under Plaintiffs' or their agents' supervision and without any more cloak-and-dagger antics.

The Court should enter Plaintiffs' Revised Proposed Order for Injunctive Relief (submitted herewith) immediately upon decision and without any delay to its enforcement, even though certain matters—e.g., attorney's fees, effectuating the constructive trust, punitive damages—may require further proceedings. Upon entry of an injunction, Defendants will have the right to appeal immediately, and we expect they will do so.

## XII.   RULE 54(B) REQUEST BECAUSE THERE IS NO JUST REASON FOR DELAY

Given the potential for post-verdict proceedings, such as calculating a fee award or determining the amount of punitive damages, Plaintiffs request that the Court certify at least part of its ruling as a partial final judgment under Fed. R. Civ. P. 54(b).

Specifically, the Court should enter final judgment on the following ultimate findings, focused on (a) standing to sue derivatively and (b) establishing power to control Eber-CT:

1. That Plaintiffs are the majority shareholders of EB&C, which owns 100% of the voting shares in EBWLC, since the 750 voting preferred shares to Lester are void.

2. That the transfer of shares of Eber Metro to Alexbay is set aside and Plaintiffs are entitled to a reconveyance and a constructive trust.

A judgment entered pursuant to Rule 54(b) will start the clock on any appeal of those core issues. It is in all parties' interest to see a final resolution of the ownership question as soon as possible.

25

## CONCLUSION

The Court should find for Plaintiffs on all claims and as to all transactions, enter final judgment in Plaintiffs' favor consistent with the proposed order for injunctive relief, impose disgorgement and damages payable to EBWLC in the principal amount of $12,451,744[22] plus prejudgment interest to be calculated, and award Plaintiffs punitive damages and legal expenses in amounts to be determined.

Respectfully submitted,

/s Brian C. Brook
Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Facsimile: (646) 257-2887
Brian@brook-law.com

*Counsel for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

Dated: October 7, 2021

---

[22] Combined total of compensation paid by Southern ($5,438,399), compensation paid by EBWLC and affiliates since each Defendant's first disloyal act ($3,990,277 and $2,868,966, respectively), and disbursements from Eber-CT to Wendy since acquiring 6% in 2017 ($154,102). Plaintiffs' Proposed Findings of Fact and Conclusions of Law include computations of interest as of November 1, 2021, from proposed reasonable intermediate dates.