UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL KLEEBERG, LISA STEIN,<br>and AUDREY HAYS,<br><br>         Plaintiffs,<br><br>   vs.<br><br>LESTER EBER, ALEXBAY, LLC f/k/a<br>LESTER EBER, LLC., ELLIOT W. GUMAER,<br>JR. and WENDY EBER,<br><br>        Defendants,<br><br> and<br><br>EBER BROS. & CO., INC., EBER<br>BROS. WINE AND LIQUOR<br>CORP., EBER BROS. WINE<br>& LIQUOR METRO, INC., EBER<br>CONNECTICUT, LLC, EBER-RHODE<br>ISLAND, LLC, EBER BROS. ACQUISITION<br>CORP, EBER-METRO, LLC, and SLOCUM &<br>SONS OF MAINE, INC.,<br><br>       Nominal Defendants. | Civil Action No. 16-CV-9517(LAK)(KDP) |

---

**DEFENDANTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

**FARRELL FRITZ, P.C.**
Kevin P. Mulry
Frank T. Santoro
*Attorneys for Defendants*
 *Estate of Lester Eber,*
  *Alexbay, LLC, and Wendy Eber*
400 RXR Plaza
Uniondale, NY 11556
Tel.: 516.227.0700
Email: kmulry@farrellfritz.com
   fsantoro@farrellfritz.com

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ vi

PROPOSED FINDINGS OF FACT ...................................................................................... 1

I.    THE ALLEN EBER TRUST AND THE MONROE COUNTY SURROGATE'S COURT'S EXERCISE OF JURISDICTION OVER SAME, AND THE MONROE COUNTY SURROGATE'S COURT'S FINAL ORDER, DATED JUNE 1, 2017 ................. 1

II.   EBER BROS. & CO., INC. AND THE EBER WINE AND LIQUOR CORPORATION DISTRIBUTION BUSINESS ........................................................................................ 8

III.  THE EBER ENTITIES WERE DRIVEN OUT OF BUSINESS IN NEW YORK ...... 11

IV.   EBER-CT - PERFORMANCE AND DEBT AND EQUITY TRANSACTIONS THROUGH 2012 ........................................................................................................ 16

  A.  Eber Metro forms Eber-CT as a Subsidiary and Acquires Slocum & Sons, Inc. ........ 16

  B.  Eber-CT Spirals into Non-Performance and Consecutive Years of Losses ................ 16

  C.  Eber-CT's Bank Financing is Underwritten by Lester's Selfless Acts ...................... 18

  D.  Eder-Goodman Acquires 15% of Eber-CT ................................................................ 20

  E.  Lester and Wendy Continued to Seek Bank Financing and Market Eber-CT .......... 28

  F.  The Polebridge Bowman Transaction ........................................................................ 29

V.    LESTER'S LOANS TO EBER W&L AND EBER METRO ........................................ 32

  A.  The Lester Line of Credit and Loans Made Pursuant Thereto ................................ 32

  B.  The Lester Promissory Notes .................................................................................... 36

  C.  The 2012 Foreclosure ............................................................................................... 42

VI.   LIABILITIES AND VALUE AT THE TIME OF THE 2012 FORECLOSURE ....... 52

  A. Liabilities ..................................................................................................................... 52

    i.    The Teamsters Fund ............................................................................................. 52

    ii.   Termination Liability to Eber W&L Retirement Plan and PBGC ...................... 53

    iii.  Other Liabilities .................................................................................................. 62

  B. Expert Testimony on the Issue of the Value of Metro ............................................... 62

    i.    Corporate Structure of the Eber Companies ...................................................... 63

    ii.   Valuation of the Eber-CT Asset .......................................................................... 64

    iii.  Calculation of Enterprise Value ......................................................................... 64

    iv.   Five Comparables Used By Mr. Torchio ............................................................. 66

    v.    15% Sale To Eder-Goodman – 2008 .................................................................. 66

**vi.   15% Offer by Southern – 2007** .................................................................. 69

**vii.   Sale of 6% to Polebridge Bowman - 2010** .......................................... 70

**viii.   Acquisition of Prospect Beverages, Inc. - 2001** .................................. 71

**ix.   Farmer Brothers Trading Comparable – 2012** ................................... 72

**x.   Midpoint of The Eber-CT MVE Based on the Five Comparables** ....... 73

**xi.   Liabilities of Eber Metro and Eber W&L** ......................................... 73

**xii   A Reasonable Investor Would Protect Herself Against Liabilities** .... 74

**xiii.   Valuation and Solvency of Eber-Metro and Eber W&L at the Valuation Date** 76

**xiv.   Reasonableness of Interest Rates for the 2006 Notes and the Lester Line of Credit** 77

**VII.   LESTER'S LOANS TO THE BUSINESS FOLLOWING THE 2012 FORECLOSURE** ..................................................................................... 79

**VIII.   LESTER'S CONSULTING AGREEMENT WITH SOUTHERN** .......................... 84

**IX.   WENDY'S WORK AND EMPLOYMENT INCENTIVES AND LESTER'S EMPLOYMENT AGREEMENT WITH EBER-CT** ................................ 92

**X.   PLAINTIFFS' CLAIMS FOR DISTRIBUTION OF EBER BROS. SHARES** ............ 94

**XI.   EDER-GOODMAN'S ILLUSORY 2021 "OFFER" TO PURCHASE EBER-CT** ...... 95

**XII.   CREDITS TO LESTER IF THE 2012 FORECLOSURE HAD NOT OCCURRED** .. ......................................................................................................... 96

**PROPOSED CONCLUSIONS OF LAW** ............................................................... 99

**Point I**

**THE COURT LACKS SUBJECT MATTER JURISDICTION PURSUANT TO THE** *PRINCESS LIDA* **DOCTRINE** ........................................................................ 99

**A.  The Surrogate's Court, Monroe County First Exercised In Rem Jurisdiction over the Trust in 1970** ............................................................................................. 99

**B.  Plaintiffs Seek to Invoke this Court's In Rem and Quasi In Rem Jurisdiction** .......... 104

**Point II**

**THE MONROE COUNTY SURROGATE'S COURT ORDER JUDICIALLY SETTLING THE ACCOUNTING AND TERMINATING THE TRUST PRECLUDES PLAINTIFFS' CLAIMS** ..................................................................................................... 107

**Point III**

**THE SOUTHERN CONSULTING AGREEMENT WAS NOT A BREACH OF LESTER'S FIDUCIARY DUTIES OR THE TAKING OF A CORPORATE OPPORTUNITY** .......... 113

**A.  Eber W&L Had No Tangible Expectancy In The Consulting Agreement** ................ 113

**B.  Consulting and Lobbying Were Not Necessary or Essential** ....................... 115

To The Eber W&L Wine and Liquor Distribution Business ............................................. 115

C.    Southern Would Not Have Offered The Consulting Agreement To Eber W&L ......... 116

D.  Any Damages Should Be Limited To What Eber W&L Would Have Received From An Arrangement Where Southern Contracted With Eber W&L ...................................... 117

Point IV

EBER W&L AND EBER METRO WERE INSOLVENT IN 2012 ....................................... 118

A.  The Pension Liabilities Were "Debts" ..................................................................... 119

B.  Eber W&L and Eber Metro Were Insolvent in 2012 .................................................. 121

Point V

PLAINTIFFS HAVE FAILED TO CARRY—AND HAVE FAILED TO EVEN ADDRESS—THEIR BURDEN TO DEMONSTATE BY CLEAR AND CONVINCING EVIDENCE THAT THE 2012 FORECLOSURE UNJUSTLY ENRICHED LESTER ....... 122

A.  Plaintiffs Have The Burden To Prove Unjust Enrichment ......................................... 122

B.  Plaintiffs Have Failed To Carry Their Burden of Proving Unjust Enrichment By Clear and Convincing Evidence ................................................................................... 124

C.  Lester Eber Was Not Unjustly Enriched By The 2012 Foreclosure ........................... 125

D.  In Determining Unjust Enrichment, the Court Must Consider The Facts As They Existed At the Time of the 2012 Foreclosure .................................................................. 126

E.  The Equitable Remedy of Unwinding Is Not Appropriate If The Court Determines That Lester Was Unjustly Enriched Or That The Transaction Was Not Fair and Reasonable ..................................................................................................................... 128

F.  If The 2012 Foreclosure Is Unwound, Lester Is Entitled To Receive Everything He Contributed To The Business Before And After The Foreclosure ................................... 131

Point VI

OTHER CHALLENGED TRANSACTIONS DID NOT VIOLATE THE DUTY OF UNDIVIDED LOYALTY OR BREACH ANY FIDUCIARY DUTY ..................................... 133

A.  Lester's 2012 Employment Agreement ....................................................................... 133

B.  The 2017 Issuance of Eber W&L Preferred Shares To Lester ................................... 133

C.  Other Transactions Plaintiffs Challenge Should Not Be Set Aside ........................... 134

D.  Any Failure To Follow Corporate Formalities Is Not Actionable ............................. 135

E.    Lester Did Not Act In Bad Faith ................................................................................. 136

Point VII

OTHER TRANSACTIONS ALLEGED BY PLAINTIFFS DID NOT VIOLATE LESTER'S DUTY OF LOYALTY AND GOOD FAITH .................................. 137

A.  The 2010 Polebridge Transaction ............................................................................... 137

**B. Lester's Loans** ................................................................................138

**C. Lester's Payment of the Harris Beach Liability** ...........................139

**D. Plaintiffs' Claims for Distribution of Eber Bros. Shares** ...............140

**Point VIII**

**WENDY EBER DID NOT BREACH ANY FIDUCIARY DUTIES AND DID NOT AID ANYONE IN BREACHING THEIRS** .................................141

**Point IX**

**LESTER AND WENDY EBER WERE NOT FAITHLESS SERVANTS** ............................144

**Point X**

**EBER-CT COMPENSATION SHOULD NOT BE INCLUDED IN ANY MEASURE OF DAMAGES** ..................................146

**Point XI**

**PUNITIVE DAMAGES ARE NOT WARRANTED** ......................................147

**Point XII**

**PLAINTIFFS SHOULD NOT BE AWARDED ATTORNEYS' FEES** .................149

**A. Attorneys' Fees Are Not Warranted For Bad Faith** .......................149

**B. Attorneys' Fees Are Not Warranted For Self-Dealing** ..................149

**C. Attorneys' Fees Are Not Warranted Under N.Y. B.C.L. §626(e)** .............149

**Point XIII**

**INJUNCTIVE RELIEF IS NOT WARRANTED OR SHOULD BE LIMITED** ................150

**Point XIV**

**RELIEF UNDER RULE 54(B) IS NOT WARRANTED** ..................................150

**CONCLUSION** ...............................................................................151

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re A.C.E. Elevator Co.*,
    347 B.R. 473 (Bankr. S.D.N.Y. 2006) .................................................................119

*Alexander & Alexander v. Fritzen*,
    147 A.D.2d 241, 542 N.Y.S.2d 530 (1st Dept. 1989) ..................................114, 115

*Matter of Asch*,
    NYLJ, Aug. 10, 1992 (Sur. Ct., N.Y. County) ...................................................101

*In re Balfe's Will*,
    245 A.D. 22 (2d Dept. 1943) ...............................................................................124

*Barkin Construction Co. v. Goodman*,
    221 N.Y. 156,161, 116 N.E. 770 (1917) ..............................................................135

*Matter of Bennett*,
    84 A.D.3d 1365 (2d Dept. 2011) .........................................................................106

*Bertoni v. Catucci*,
    117 A.D.2d 892 (3d Dept. 1986) ..........................................................................128

*Birnbaum v. Birnbaum*,
    117 A.D.2d 409 (4th Dept. 1986) .........................................................................127

*Birnbaum v. Birnbaum*,
    157 A.D.2d 177 (4th Dept. 1990) ........................................................ 136, 148, 149

*Matter of Blumenkrantz*,
    14 Misc.3d 462 (Sur. Ct., Nassau County) ................................................104, 106

*Boyle v. Kelley*,
    42 N.Y.2d 88 (1977) ............................................................................................128

*Bullmore v. Ernst & Young Cayman Islands*,
    45 A.D.3d 461 (1st Dept. 2007) ..................................................................142, 143

*Burg v. Horn*,
    380 F.2d 897 (2d Cir. 1967) .........................................................................114, 115

*Caldwell v. Gutman, Mintz, Baker & Sonnenfeldt., P.C.*,
    701 F. Supp. 2d 340 (E.D.N.Y. 2010) .................................................................108

*Capozzola v Oxman,*
   216 A.D.2d 509 (2d Dept. 1995)..................................................................101

*Chambers v. NASCO, Inc.,*
   501 U.S. 32 (1991)......................................................................................149

*City Bank Farmers Trust Co. v Cannon,*
   291 N.Y. 125 (1943)................................................................................... 123

*Clarkson Co. Ltd. v. Shaheen,*
   660 F.2d 506 (2d Cir. 1981).......................................................................141

*Coastal Sheet Metal Corp. v. Vassallo,*
   75 A.D.3d 422 (1st Dept. 2010)..................................................................115

*Commercial Trading Co. v. Potter Securities Corp.,*
   26 A.D.2d 761 (4th Dept. 1966)..................................................................118

*Matter of Cord,*
   58 N.Y.2d 539 (1983)..................................................................................139

*Credit Agricole Indosuez v. Rossiyskiy Kredit Bank,*
   94 N.Y. 541 (2000)......................................................................................141

*Curtiss-Wright Corp. v. Gen. Electric Co.,*
   446 U.S. 1, 100 S. Ct. 1460, 64 L.Ed.2d 1 (1980) .............................................150

*Matter of D'Onofrio,*
   97 Misc.2d 250 (Sur. Ct., N.Y. County 1978) ...........................................101, 102

*Dailey v. Nat'l Hockey League,*
   987 F.2d 172 (3d Cir. 1993)......................................................................... 99

*Denius v. Dunlap,*
   330 F.3d 919 (7th Cir.2003).......................................................................... 90

*Design Strategies, Inc. v. Davis,*
   384 F. Supp. 2d 649 (S.D.N.Y. 2005), *aff'd sub nom. Design Strategy, Inc. v.
   Davis,* 469 F.3d 284 (2d Cir. 2006)..........................................................113, 115

*DiPace v. Figueroa,*
   223 A.D.2d 949 (3d Dept. 1996)..................................................................116

*Doe v. Indyke,*
   457 F. Supp. 3d 278 (S.D.N.Y. 2020) .........................................................148

*Doe v. N.Y.C. Dep't of Social Servs.,*
   709 F.2d 782 (2d Cir. 1983).........................................................................123

*Doe v. Solera Capital LLC*,
  2019 U.S. Dist. LEXIS 55860 (S.D.N.Y. Mar. 31, 2019) .................................144

*Doyle v. Allstate Ins. Co.*,
  1 N.Y.2d 439 (1956) ...................................................................................129

*Dunsmore & Assocs., Ltd. v. D'Alessio*,
  2000 Conn. Super. LEXIS 114 (Conn. Super. Ct. Jan. 6, 2000)........................146

*Evans v. Winston & Strawn*,
  303 A.D.2d 331 (1st Dept. 2003) ...............................................................128

*Ferris v. Cuevas*,
  118 F.3d 122 (2d Cir.1997)........................................................................108

*In re Finley*,
  B.R. 882, 891-93 (Bankr. S.D.N.Y. 1993)....................................................119

*Flaherty v. Lang*,
  199 F.3d 607 (2d Cir.1999)........................................................................108

*Genovese v. Genovese*,
  No. 1:15-CV-00064-BR, 2016 WL 4945318 (W.D. Pa., Sept. 16, 2016)..............104, 105

*Gerard v. Empire Square Realty Co.*,
  195 A.D. 244 (2d Dept. 1921).....................................................................135

*Geren v. Quantum Chemical Corp.*,
  95-7454, 1995 U.S. App. LEXIS 39912 (2d Cir. Dec. 13, 1995)........................141

*Gerstle v. Gamble-Skogma, Inc.*,
  478 F.2d 1281 (2d Cir. 1973).................................................................128, 131

*Matter of Gilbert*,
  39 N.Y.2d 663 (1976)................................................................................139

*Glenn v. Hoteltron Sys., Inc.*,
  74 N.Y.2d 386 (1989)................................................................................149

*Grewal v. Cuneo*,
  2016 U.S. Dist. LEXIS 8349 (S.D.N.Y. Jan. 25, 2016) ...................................144

*Haff v. Long Island Fuel Corp.*,
  233 A.D. 117 (2d Dept. 1931).....................................................................135

*Matter of Hall*,
  183 Misc. 659 (Sur. Ct., N.Y. County 1944) ...........................................103, 104

*Hart v. BHH, LLC,*
   2019 U.S. Dist. LEXIS 58474 (S.D.N.Y. Apr. 4, 2019) ....................................123

*Heyman v Heyman,*
   33 N.Y.S.2d 235 (Sup. Ct., N.Y. County 1942)...............................................124

*Holden v Alexander,*
   39 A.D.2d 476 (2d Dept. 1976)........................................................................101

*In re Hunter,*
   4 N.Y.3d 260 (2005)................................................................... 108, 109, 112

*Matter of Iannone,*
   431 N.Y.S.2d 904 (Sur. Ct., Monroe County 1980)..........................................103

*Inc. v. Town of Rochester,*
   235 F.3d 126 (2d Cir. 2000) (per curiam)................................................ 150, 151

*Kaufman v. Cohen,*
   307 A.D.2d 113 (1st Dept. 2003) ............................................................ 142, 143

*Matter of King,*
   74 Misc.2d 61 (Sur. Ct., N.Y. County 1973) ............................................ 101, 104

*Kuo v. Kuo,*
   No. 96 CIV. 5130 (CM), 1999 WL 123379 (S.D.N.Y. Mar. 4, 1999), *aff'd,* 216
   F.3d 1072 (2d Cir. 2000).................................................................... 113, 116

*Lin v. United States,*
   2015 U.S. Dist. LEXIS 21350 (S.D.N.Y. Feb. 18, 2015)...................................123

*Lippe v. Bairnco Corp.,*
   249 F. Supp. 2d 357 (S.D.N.Y. 2003), *aff'd* 99 Fed. Appx 274 (2d Cir. 2004)...................119

*In re Lundberg's Will,*
   197 N.Y.S.2d 871 (1960) ........................................................................1, 123

*Matter of Manufacturers & Traders Trust,*
   42 A.D.3d 936 (4th Dept. 2007)......................................................................139

*Marine Midland Bank v. Stein,*
   105 Misc.2d 768 (Sup. Ct., N.Y. County 1980)...............................................118

*Moser v. Devine Real Estate,*
   42 A.D.3d 731 (3d Dept. 2007).......................................................................116

*New York Credit Men's Adjustment Bureau v. Weiss,*
   305 N.Y.1 (N.Y. 1953) ...................................................................................141

*Nicholls v. Tufenkian Import/Export Ventures, Inc.*,
   367 F. Supp. 2d 514 (S.D.N.Y. 2005) ............................................................108

*Novick v. AXA Network, LLC*,
   642 F.3d 304 (2d Cir.2011).............................................................................150

*O'Hayer v de St. Aubin*,
   30 AD2d 419 (2d Dept. 1968)........................................................................124

*In re Perry H. Koplik & Sons, Inc.*,
   476 B.R. 746 (Bankr. S.D.N.Y. 2012).............................................................135

*Phansalkar v. Anderson Weinroth & Co.*,
   344 F.3d 184200 (2d Cir, 2003)......................................................................144

*Princess Lida of Thurn & Taxis v. Thompson*,
   305 U.S. 456 (1939) ..............................................................................*passim*

*Pure Power Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*,
   813 F. Supp. 2d 489 (S.D.N.Y. 2011) ............................................................113

*Rafield v. Brotman*,
   261 A.D.2d 257 (1st Dept. 1999) .............................................................113, 116

*Matter of Richmond*,
   63 A.D. 488 (4th Dept. 1901), *aff'd,* 168 N.Y. 385 (1901)...............................109

*In re Ridings' Estate*,
   297 N.Y. 417 (1948)......................................................................................124

*Matter of Rothko*,
   43 N.Y.2d 305 (1977)..............................................................................126, 127

*Rousseau v. U.S. Tr. Co. of New York*,
   422 F. Supp. 447 (S.D.N.Y. 1976) ...................................................99, 100, 103

*RSL Communications PLC v. Bildirici*,
   649 F. Supp. 2d 184 (S.D.N.Y. 2009) ............................................................141

*Matter of Rudin*, N.Y.L.J., Mar. 2, 2000 (Sur. Ct., N.Y. County 2000)....................111

*Estate of Sakow*, N.Y.L.J. (Sur. Ct., Bronx County, Sept. 17, 1997)................127, 132

*Sardis v. Sardis*,
   56 Misc.3d 727 (Sup. Ct., Suffolk County 2017)............................................150

*Sharapata v. Town of Islip*,
   56 N.Y.2d 332 (1982).....................................................................................147

*Shelly v. Doe,*
  249 A.D. 2d 756 (3d Dept. 1998) ......................................................................119

*In re Signature Apparel Grp. LLC,*
  577 B.R. 54 (Bankr. S.D.N.Y. 2017) ................................................................117

*St. Marks Assets, Inc. v. Sohayegh,*
  167 A.D.3d 458, 90 N.Y.S.3d 30 (1st Dept. 2018) ...........................................135

*Tae H. Kim v. Ji Sung Yoo,*
  311 F. Supp. 3d 598 (S.D.N.Y. 2018) ......................................................119, 120

*Matter of Tanabaum,*
  NYLJ, Apr. 28, 1989 ........................................................................................102

*The Standard Fashion Co. v. Siegel-Cooper Co.,*
  157 N.Y. 60 (1898).....................................................................................129, 130

*Tiffany & Co. v. Costco Wholesale Corp.,*
  127 F. Supp. 3d 241 (S.D.N.Y. 2015) ..............................................................147

*Trustees of Presbytery of New York v. Westminster Presbyterian Church of W.*
  *Twenty-Third St.,*
  192 A.D. 163 (1st Dept. 1920) ..........................................................................129

*United States v. Carr,*
  557 F.3d 93 (2d Cir. 2009)................................................................................123

*United States v. Quintieri,*
  306 F.3d 1217 (2d Cir. 2002)............................................................................122

*Valentine v. Richardt,*
  126 N.Y. 272 (1891)..........................................................................................129

*Matter of Vasquez,*
  162 Misc.2d 184 (Sur. Ct., N.Y. County 1994) ...............................................106

*Washer v. Seager,*
  272 A.D. 297 (1st Dept. 1947) ..........................................................................116

*Weisinger v. Berfond,*
  21 Misc.2d 788 (Sup. Ct., Kings County 1960), *mod. on other grounds*, 11 A.D.
  2d 817 (2d Dept. 1960), *aff'd,* 9 N.Y.2d 742 (1961)........................................129

*Whitney Holdings v. Givotovsky,*
  988 F. Supp. 732 (S.D.N.Y. 1997) ...................................................................117

*Wiebusch v. Hayes,*
      263 A.D.2d 389 (1st Dept. 1999) ...................................................130

*Young-Szlapak v. Young,*
      151 A.D.3d 1646 (4th Dept. 2017) ...............................................109

*Matter of Young,*
      38 Misc.3d 1222(A) (Sur. Ct., Nassau County 2013) ........................101

*Matter of Zalaznick,*
      84 Misc.2d 715 (Sur. Ct., Bronx County 1975) .......................104, 112

*Zoeller v. Lake Shore Sav. Bank,*
      140 A.D.3d 1601 (4th Dept. 2016) ...............................................109

**Statutes**

11 U.S.C. § 101(5) ...........................................................................118

11 U.S.C. § 101(12) .........................................................................118

11 U.S.C. § 101(32)(A) ....................................................................118

26 U.S.C. § 430 (k) (l) (5) ................................................................. 54

29 U.S.C. § 1301 (a) (14 ) ................................................................. 54

29 U.S.C. § 1301(b)(1) .....................................................................119

29 U.S.C. § 1362(a) .........................................................................119

29 U.S.C. § 1362(a) (b) (1) (A)........................................................... 54

29 U.S.C. § 1368 ............................................................................. 60

29 U.S.C. § 4041.2 .......................................................................... 61

NY Business Corporation Law § 626(e) ...............................................149

Employee Retirement Income Security Act of 1974 "ERISA" ....................52, 55, 60

NY EPTL § 5-1.1A ........................................................................... 94

NY EPTL § 7-1.19 ............................................................................. 3

NY EPTL § 11-1.1 (b) (20) .............................................................95, 140

NY EPTL § 11-3.2(a)(1).....................................................................148

IRC 412(d) ................................................................................. 55

IRC 430(k) ................................................................................ 58

New York Debtor and Creditor Law, Sections 273 and 276 ................ 63

NY UCC § 9-620 ........................................................................ 42

NY UCC § 9-627 ........................................................................ 48

New York Surrogate's Court Procedure Act "SCPA" 103 (19) ............... 101

SCPA 103 (21) (34) (48) (52) ..................................................... 101

SCPA 103 ............................................................................... 101

SCPA 302 ................................................................. 104, 110, 112

SCPA 509 ............................................................................... 110

SCPA 702 ................................................................... 106, 112

SCPA 702 [8] [9] [10] ............................................................. 106

SCPA 703 [1] ......................................................................... 101

SCPA 708 ............................................................................... 102

SCPA 719 ............................................................................... 101

SCPA 1501 (1) (a) .................................................................. 101

SCPA 2205 ................................................................... 103, 104

SCPA 2205[1] [2] .................................................................... 103

SCPA  2208 ................................................................................ 3

SCPA  2210 ................................................................................. 3

SCPA  2211 ................................................................. 104, 111

SCPA Article 14 ...................................................................... 101

**Other Authorities**

29 C.F.R. 4041. 2 ....................................................................... 60

29 C.F.R. ¶ 4041.2 .................................................................. 134

29 C.F.R. 4041.47 (d)...................................................................................................... 60

Fed. R. Civ. P. 15(b)........................................................................................................108

Fed R. Evid. 201(b)........................................................................................................... 90

Fed.R.Evid. 201(c) (2)...................................................................................................... 90

**PROPOSED FINDINGS OF FACT**

I.  **THE ALLEN EBER TRUST AND THE MONROE COUNTY SURROGATE'S COURT'S EXERCISE OF JURISDICTION OVER SAME, AND THE MONROE COUNTY SURROGATE'S COURT'S FINAL ORDER, DATED JUNE 1, 2017**

1.      Allen Eber died a resident and domiciliary of Monroe County, New York on July 24, 1970, leaving a last will and testament, dated October 27, 1969 (the "Will") (Pl. Ex. 132).

2.      The Will created a testamentary trust (the "Trust"), and nominated Lester Eber "Lester"), attorney Elliot M. Gumaer, Jr., and Marine Midland Trust Company of Rochester as Co-Trustees of the 1969 Trust (Pl. Ex. 132, 5-12).

3.      The Monroe County Surrogate's Court first exercised subject matter, in rem jurisdiction, over Allen Eber's estate and the Trust when it probated the Will and issued Letters Testamentary and Letters of Trusteeship to the nominated Co-Trustees, authorizing them to act as Co-Trustees (Def. Ex. OOOO).

4.      The Court takes judicial notice of the Decree of the Surrogate's Court, Monroe County, dated August 11, 1970, which admitted the Will to probate and granted Letters Testamentary to Elliot M. Gumaer, Jr., and Marine Midland Trust Company of Rochester and Letters of Trusteeship for the Trust to Elliot M. Gumaer, Jr., and Marine Midland Trust Company of Rochester.

5.      The original Co-Trustees of the Trust were Lester Eber, Elliott W. Gumaer, Jr . and Marine Midland Trust Company of Rochester (Def. Ex. OOOO).

6.      Lester served as a Co-Trustee of the Trust under the jurisdiction of and pursuant to the authority granted to him by the Surrogate's Court, Monroe County, from the time of his appointment to his date of death (Def. Ex. OOOO).

1

7.     Mr. Gumaer served as a Co-Trustee of the Trust under the jurisdiction of and pursuant to the authority granted to him by the Surrogate's Court, Monroe County, from the time of his appointment to his date of death (Def. Ex. OOOO).

8.     Due to subsequent mergers and acquisitions, Marine Midland Trust Company of Rochester became M&T Bank, which served as Co-Trustee with Lester and Mr. Gumaer, until Canandaigua National Bank ("CNB") succeeded M&T Bank as the institutional Co-Trustee of the Trust, serving with Lester and Mr. Gumaer (Def. Ex. OOOO, TTTT).

9.     The Will provided a trust for Allen Eber's wife, Evelyn Eber, during her life, with a residuary trust to benefit his children Lester Eber, Sally Kleeberg, and Mildred Boslov (or the lineal descendants of any such child that predeceases the termination of the Trust) (Pl. Ex. 132 at Articles NINTH at 5-12).

10.    The Trust provides for termination upon the death of the last of Allen's children (Pl. Ex. 132 at Article NINTH at 10-12).

11.    Mildred Boslov died in 1973 (Pl. Ex. 1002-Hayes Direct ¶9).

12.    Plaintiff Audrey Hays is Mildren Boslov's sole lineal heir entitled to 1/3 of the Trust remainder (Pl. Ex. 1002-Hayes Direct ¶ 9).

13.    Sally Kleeberg died in 2014 (Pl. Ex. 1001-Stein Direct ¶ 32)

14.    Plaintiffs Daniel Kleeberg and Lisa Stein are Sally's lineal descendants entitled to an aggregate 1/3 of the Trust (Pl. Ex. 1001-Stein Direct ¶1, 2).

15.    The Court takes judicial notice that the Surrogate's Court, Monroe County, issued a Decree, dated January 23, 1991, settling the intermediate judicial accounting of the Trust on the petition of Lester, Elliot M. Gumaer, Jr., and Marine Midland for the time period August 11, 1976 to October 31, 1990.

16.     M&T Bank as Successor Co-Trustee to Marine Midland, Mr. Gumaer and Lester petitioned the Surrogate's Court, Monroe County, for judicial settlement of their intermediate accounting for the period May 9, 1991 through December 31, 2006 (Pl. Ex. 154; Def. Ex. OOOO).

17.     The Court takes judicial notice that the Surrogate's Court, Monroe County, issued a Decree, dated July 23, 2007, settling the intermediate judicial accounting of the Trust on the petition of Lester, Elliot M. Gumaer, Jr., and M&T Bank for the period May 9, 1991 through December 31, 2006.

18.     The Surrogate's Court, Monroe County issued Successor Letters of Trusteeship to CNB on July 23, 2007, exercising its power and authority over CNB to act as a Successor Co-Trustee to M&T Bank attendant to its subject matter jurisdiction over the Trust (Pl. Ex. 138).

19.     On February 15, 2017, CNB petitioned the Monroe County Surrogate's Court seeking (i) judicial settlement of a final accounting of the 1969 Trust for the period August 27, 2007 through December 27, 2016 pursuant to New York Surrogate's Court Procedure Act ("SCPA") §§ 2208, 2210 & 2211; and (ii) termination of the 1969 Trust pursuant to New York Estates Powers and Trusts Law ("EPTL") 7-1.19 (Def. Ex. OOOO) (the "CNB Accounting and Termination Proceeding").

20.     The Surrogate's Court, Monroe County exercised jurisdiction over all persons interested in the Trust in connection with the CNB Accounting and Termination Proceeding (Def. Ex. OOOO, TTTT).

21.     Plaintiffs received all of the documents associated with the CNB Accounting and Termination Proceeding, namely, the petition, accounting, and process issued thereon by the Surrogate's Court, Monroe County, in February 2017, and carefully considered same (Pl. Ex. 1002-Hayes Direct ¶¶ 33-36) (Pl. Ex. 1001-Stein Direct ¶ 23) (Def. Ex. OOOO).

22.     Lester appeared as a party in the CNB Accounting and Termination Proceeding (Pl. Ex. 137; Def. Ex. OOOO).

23.     Mr. Gumaer appeared as a party in the CNB Accounting and Termination Proceeding (Def Ex. OOOO).

24.     The CNB Accounting and Termination Proceeding alleged that the Trust's principal assets on hand as of December 27, 2016 were as follows:

Residuary TUW Allen Eber
Schedule G
Statement of Principal Remaining On Hand

| No. of Shares | | Market Value 12/27/2016 | | Inventory Value | |
|---|---|---|---|---|---|
| | **Cash and Cash Equivalents** | | | | |
| | First American Treasury Obligations Fund Cl Z | $ | 35,523.28 | $ | 35,523.28 |
| | **Total Cash and Cash Equivalents** | $ | 35,523.28 | $ | 35,523.28 |
| **No. of Shares** | **Stocks** | | | | |
| 1,000 | AT&T Inc. | $ | 42,730.00 | $ | 37,918.00 |
| 80 | Chemours Co | | 1,842.40 | | 916.94 |
| 300 | Clorox Co | | 36,270.00 | | 18,699.00 |
| 400 | Du Pont De Nemours Ei Co. | | 29,972.00 | | 17,923.06 |
| 2,000 | Eber Bros & Co 6% Non-Cumulative | | 0.00 | | 0.00 |
| 1,850 | Eber Bros & Co Class A | | 0.00 | | 0.00 |
| 290 | Eber Bros & Co Class B | | 0.00 | | 0.00 |
| 2,190 | Exxon-Mobil Corp | | 198,654.90 | | 187,661.10 |
| 500 | Lilly Eli & Co | | 36,895.00 | | 17,110.00 |
| 300 | Lockheed Martin Corp Com | | 74,877.00 | | 20,751.00 |
| 800 | Microsoft Corporation | | 50,592.00 | | 20,320.00 |
| 886 | Pfizer Inc. | | 28,777.28 | | 15,518.29 |
| | **Total Stocks** | $ | 500,610.58 | $ | 336,817.39 |
| **No. of Shares** | **Mutual Funds** | | | | |

**Schedule G (Continued)**

| No. of Shares | Mutual Funds | | Market Value 12/27/2016 | | Inventory Value |
|---|---|---|---|---|---|
| 3,591.954 | Dodge & Cox Income Fund | $ | 48,599.14 | $ | 50,000.00 |
| 3,598.269 | Franklin Templeton Global Bond Inst | | 43,323.16 | | 48,792.52 |
| 4,122.012 | Vanguard Int Term Bd Index Admiral | | 46,042.87 | | 50,000.00 |
| | **Total Mutual Funds** | $ | **137,965.17** | $ | **148,792.52** |
| | **Total Schedule G** | $ | **674,099.03** | $ | **521,133.19** |
| | **Unrealized Increases** | | | $ | **163,793.19** |
| | **Unrealized Decreases** | | | $ | **10,827.35** |

25.    The CNB Accounting and Termination Proceeding alleged, as a predicate for the judicial settlement of the Accounting and the grant of a termination of the Trust, as follows:

9.    Schedule "G" of the Accounting shows the market values of the Eber Bros. & Co., Inc. stock interests as follows:

| 2000 Shares | Eber Bros. & Co. 6% Non-Cumulative | $0.00 |
|---|---|---|
| 1850 Shares | Eber Bros & Co. Class A | $0.00 |
| 290 Shares | Eber Bros & Co. Class B | $0.00 |

10. Empire Valuation was retained for the purpose of providing a valuation of Eber Bros. & Co., Inc. stock. A copy of the valuation which was received is attached to the Petition for Judicial Settlement as Exhibit "A". This valuation confirms that the stock has no value and serves as the basis for the zero values set forth on Schedule "G".

11. Based upon the valuation showing that the Eber Bros. & Co., Inc. stock has no value, Petitioner asserts that the Trust can and should be terminated at this time.

12. Although the Trust is not scheduled to terminate until the death of the last surviving beneficiary pursuant to Article Ninth of the Will, in case all, or substantially all of the decedent's stock in Eber Bros. & Co., Inc. is sold, the Trustees, in their absolute discretion, can terminate the Trust and distribute the residuary of the Trust to the beneficiaries.

13. Given the lack of monetary value attributable to the Eber Bros. & Co., Inc. stock held by the Trust, termination and distribution of the Trust assets is proper.

(Def. Ex. OOOO).

26. The Surrogate's Court, Monroe County finally adjudicated the CNB Accounting and Termination Proceeding by Order, dated June 1, 2017 (Def. Ex. TTTT).

27. CNB, as the sole remaining Trustee of the Trust, has not distributed the shares of Eber Bros. & Co., Inc., which were on hand as an asset of the Trust as of December 27, 2017.

28. The shares of Eber Bros. & Co., Inc., remain reposed in the Trust as Trust assets as they have since December 27, 2017.

29. CNB's accounting in the Accounting and Termination Proceeding did not contain a proposed distribution schedule (Def. Ex. OOOO).

30. The Surrogate's Court, Monroe County's Order, dated June 1, 2017 does not order a *pro-rata* distribution of the shares of Eber Bros. & Co., Inc. (Def. Ex. TTTT).

31.     CNB's Accounting and Termination Proceeding proceeded to final adjudication without objection or request for modification (Pl. Ex. 1001-Stein Direct ¶ 23).

32.     Plaintiffs expected Lester to oppose CNB's petition, but he did not do so (Pl. Ex. 1001-Stein Direct ¶ 24).

33.     The Court takes judicial notice that Plaintiffs have expressly asserted that the Surrogate's Court, Monroe County's Order, dated June 1, 2017 has a preclusive effect under the doctrine of res judicata including, at trial (Tr. 492:20), and in Plaintiffs Memorandum of Law in Support of Motion for Summary Judgment, dated November 8, 2019 (Docket Document 264, p. 5).

34.     Defendants pleaded *res judicata* as an affirmative defense in paragraph 26 of their Answer to Plaintiffs' Third Amended Complaint, dated June 19, 2019 (Docket Document 238, p. 6).

## II.     EBER BROS. & CO., INC. AND THE EBER WINE AND LIQUOR CORPORATION  DISTRIBUTION BUSINESS

35.     The Eber family business was a wine and liquor distribution business owned and operated by Allen Eber prior to his death (Def. Ex. ZA-Wendy Direct ¶5).

36.     Lester began working for Nominal Defendant Eber Bros. & Co. Inc.'s ("Eber Bros.") subsidiary Nominal Defendant Eber Bros. Wine and Liquor Corp ("Eber W&L"),  a wine and liquor distributorship, in or about 1959. He eventually held the titles of President and Director of Eber Bros (Joint Pre-Trial Order, Stipulated Fact 1, p. 5).

37.     At all relevant times, Nominal Defendant Eber W&L, a New York corporation, has been a subsidiary of Eber Bros. (Joint Pre-Trial Order, Stipulated Fact 6).

38.     As of February 2012, Nominal Defendant Eber Bros. Wine & Liquor Metro, Inc. ("Eber Metro"), a New York corporation, was a wholly owned subsidiary of Eber W&L (Joint Pre-Trial Order, Stipulated Fact 7).

39.     At all relevant times pertinent to this case, the Trust has been the registered owner of substantially all the capital stock of Eber Bros. (Def. Ex. ZA-Wendy Direct ¶7).

40.     In turn, at all relevant times pertinent to this case, Eber Bros. has owned substantially all the common stock of Eber W&L (Def. Ex. ZA-Wendy Direct ¶7).

41.     Eber Bros. has at all times since approximately 1980 simply served as a holding company for Eber W&L (Def. Ex. ZA-Wendy Direct ¶7).

42.     Before June 5, 2012, Eber W&L owned substantially all the capital stock of Eber Metro (Def. Ex. ZA-Wendy Direct ¶7).

43.     Historically, Eber W&L and Eber Metro distributed wine and liquor throughout New York State (Def. Ex. ZA-Wendy Direct ¶8) (D. Kleeberg Tr. Cross).

44.     Eber W&L was a wholesale distributor of wine and liquor primarily in upstate New York (D. Kleeberg Tr. Cross).

45.     Eber Metro operated in wine and liquor distribution in the New York City metropolitan area as a division of Eber W&L (Daniel Tr. Cross).

46.     In 2005, Eber Metro acquired a Connecticut fine wine importer and distributor, Slocum & Sons, through a newly formed, wholly-owned Delaware limited liability company, Eber-Connecticut, LLC ("Eber-CT"). (Def. Ex. ZA-Wendy Direct ¶8).

47.     At all relevant times prior to February 2012, Lester was the President of Eber W&L (Joint Pre-Trial Order, p. 5, Stipulated Fact 8).

48.     As of May 2012, Wendy Eber ("Wendy"), Lester's daughter, was the President of Eber W&L (Joint Pre-Trial Order, p. 5, Stipulated Fact 9).

49.     At all times relevant, one or more of Lester, Mr. Gumaer and Wendy were directors of each of Eber Bros., Eber W&L, and Eber Metro. At all times relevant to the case, Lester or Wendy, or both of them, were officers of Eber Bros., Eber W&L, and Eber Metro (Def. Ex. ZA-Wendy Direct ¶9).

50.     Wendy began working with Lester in the Eber family business in the early 2000s (Def. Ex. ZA-Wendy Direct ¶4).

51.     Wendy's first position was with Eber Metro as a divisional accounting manager (Def. Ex. ZA-Wendy Direct ¶4).

52.     From approximately 2005 to 2007, Wendy worked as Sales Manager for Eber W&L (Def. Ex. ZA-Wendy Direct ¶4).

53.     Thereafter, Wendy served as the Chief Financial Officer and Secretary of Eber Metro (Def. Ex. ZA-Wendy Direct ¶4).

54.     Wendy is currently the President, Secretary and Treasurer, and a director, of Eber Metro (Def. Ex. ZA-Wendy Direct ¶1).

55.     Wendy is currently the President, Secretary, and a member of the Board of Managers, of Eber-CT, which still operates under the trade name Slocum & Sons (Def. Ex. ZA-Wendy Direct ¶1).

56.     Wendy is currently the President, Secretary and Treasurer, and a director of, Eber Bros. (Def. Ex. ZA-Wendy Direct ¶1).

57.     Wendy is the President, Secretary and Treasurer, and a director of, Eber W&L (Def. Ex. ZA-Wendy Direct ¶1).

58.     Wendy is the sole executor of Lester, who died on April 5, 2020 as a result of COVID-19 (Def. Ex. ZA-Wendy Direct ¶ 2).

59.     Wendy graduated from Emory University in 1989 with a BBA in accounting (Def. Ex. ZA-Wendy Direct ¶2).

60.     Wendy earned an MBA in finance and marketing form the University of Rochester in 1995 (Def. Ex. ZA-Wendy Direct ¶3).

61.     Wendy held positions in the private sector in accounting and audit roles prior to joining the Eber family business (Def. Ex. ZA-Wendy Direct ¶3).

62.     Plaintiff Daniel Kleeberg was employed by Eber W&L until August 2007 when he left the company on his own volition and moved to Florida (Daniel Dep. at 51:1-3; 52:11-20; Daniel Tr. at 70:1-4 Cross).

63.     Daniel Kleeberg was the General Manager of Eber W&L's Buffalo office in the early 2000s, and was later promoted to Senior Vice President of Eber W&L (D. Kleeberg Tr. at 70:1-4 Cross).

### III.     THE EBER ENTITIES WERE DRIVEN OUT OF BUSINESS IN NEW YORK

64.     In 2004, Southern Wine & Spirits of America, Inc. ("Southern"), a national wine and liquor distributor and competitor of Eber W&L and Eber Metro, with a presence in dozens of states entered the New York market (Def. Ex. ZA-Wendy Direct ¶10) (D. Kleeberg Tr. at 71:23-25 Cross).

65.     Andrew Eder, an experienced wine and liquor distribution executive in the State of Connecticut (Eder Tr. at l34:18-23 Cross), testified as to his familiarity with how Southern has operated upon entering a new market, observing that Southern, the largest wine and liquor distributor in the United States (Eder Tr. at 136:20-21 Cross), would take very aggressive actions

with respect to competing, by, *inter alia*, luring salespersons away from distributors and making efforts to lure suppliers way from other distributors (Eder Tr. at 134:18-25; 135:1-6 Cross), and that Southern was well-funded to engage in such aggressive competition (Andrew Tr. at 135:21-24 Cross).

66.     Plaintiff Daniel Kleeberg testified that Southern's entry into the New York market was "devastating" to the Eber family's business (D. Kleeberg Dep. at 48:3-7).

67.     Beginning in 2004, Southern hired away Eber W&L's key employees and paid them above-market compensation (Pl. Ex. 1003- D. Kleeberg Direct ¶18-19) (D. Kleeberg Dep. at 49:2-9) (Lester Dep. at 45:9-25; 46-47) (Def. Ex. ZA-Wendy Direct ¶10).

68.     Southern also began doing business with Eber W&L's suppliers, who abandoned Eber W&L for Southern (D. Kleeberg Dep. at 48:13-23; 49:1); (Def. Ex. ZA-Wendy Direct ¶23); (Pl.  Ex. 46), (Lester's June 24, 2015 Affidavit ¶ 23, Bates-Stamped EB-00017525-17544)).

69.     Eber W&L suffered tremendous upheaval with its suppliers (D. Kleeberg Dep. at 48:18-21, 49:1-9)).

70.     Daniel Kleeberg testified that at the time that Southern was hiring away Eber W&L's employees it was clear that Eber W&L would go out of business, stating that at that time "the handwriting was on the wall," and that suppliers starting leaving Eber W&L once they realized that Eber W&L had lost key salespersons (D. Kleeberg Dep. at 226-227:20-23,1-11).

71.     Eber W&L's sales dropped from approximately $460 million in the fiscal year ended May 31, 2005, to approximately $352 million for the fiscal year ending May 31, 2006, and it sustained a net income loss for the tax year ending May 31, 2006 in the amount of $9,134,699 (Def. Ex. VVV).

72.     Prior to March 2006, Eber W&L had a $50 million senior secured revolving line of credit with M&T Bank, Rochester, New York, and a $11.9 million senior secured revolving credit facility with Wilmington Trust, expiring in October 2006 (Def. Ex. VVV).

73.     In March, 2006, Eber W&L obtained a $60 million senior secured loan facility from Wells Fargo Foothill Bank (Def. Exs. VVV; Ex. ZA-Wendy Direct ¶42).

74.     Shortly after the Wells Fargo facility was put in place, Eber W&L was unable to remain in compliance with the financial covenants in the Wells Fargo facility (Def. Ex. ZA-Wendy Direct ¶42); (Lester Dep. 194:17-25, 195:1-15).

75.     An event of default occurred under the terms of the Wells Fargo credit facility (Def. Ex. ZA-Wendy Direct ¶42); (Lester Dep. 194:17-25, 195:1-15).

76.     Wells Fargo placed the facility into "workout" status, freezing all of Eber W&L's working capital in order to pay down the outstanding Wells Fargo loans (Def. Ex. ZA-Wendy Direct ¶42); (Lester Dep. 194:17-25, 195:1-15).

77.     Wells Fargo hired Michael J. Worral of Solutions Management LLC, a consulting company for troubled businesses, to oversee the company's operations and working capital management (Def. Ex. ZA-Wendy Direct ¶42).

78.     All of Eber W&L's incoming cash and deposits were seized and applied to repay Wells Fargo's loans (Def. Ex. ZA-Wendy Direct ¶42) (Def. Ex. TTTTT at 5-6).

79.     When Wells Fargo was finally paid off, it declined to extend further credit to any Eber entity (Def. Ex. ZA-Wendy Direct ¶42) (Def. Ex. TTTTT).

80.     Eber W&L then made attempts to secure a new senior bank facility, obtain new suppliers, or to partner with other wholesalers in order to continue in business (Def. Ex. ZA-Wendy Direct ¶44).

81.     By 2007, Southern had completely destroyed Eber W&L's and Eber Metro's business - - Eber W&L and Eber Metro had ceased operations and began dragging through a difficult, costly, and extended wind down (Def. Ex. ZA-Wendy Direct ¶44; Lester Dep. at 26:2-7).

82.     By early 2007, Eber W&L had begun the process of liquidation (D. Kleeberg Tr. at 74: 15-17).

83.     Indeed, in early February 2007, Eber W&L made a final determination to liquidate and wind down and cease all New York operations (Def. Ex. DD, at 9-10); (Def. Ex. ZA-Wendy Direct ¶44); Def. Ex. CCCC).

84.     On February 13, 2007, Lester sent a Notice of Closing to Eber W&L employees announcing the complete and permanent shutdown of its New York operations and the layoff of its employees (Defs. Ex. DD, at 9-10, Bates Stamp EB-0010510-11; Def. Ex. CCCC).

85.     On February 21, 2007, Employee Notices under the Federal Worker Adjustment and Retraining Notification Act ("WARN Notice") were sent to Eber W&L employees (Def. Exs. DD, at 9-10; ZZZZ).

86.      Eber W&L and Eber Metro's tax returns for the year 2007 and for subsequent years reflect that both entities ceased operations (Def. Ex. AAAA, Eber Metro United States Income Tax Return (Form 1120) for the year 2007; Def. Ex. WWW, Eber W&L United States Income Tax Return (Form 1120) for the year 2007).

87.     On March 30, 2007, Eber W&L ceased New York operations resulting in the termination of employment of over 90% of the active employees with vested balances in the Retirement Plan (Def. Ex. NNNN).

88.     By March 2007, Eber W&L and Eber Metro were on the verge of bankruptcy and were unable to satisfy outstanding debts to their bank lenders, lessors, vendors and suppliers.   At that point, a bankruptcy would have severely impacted many of Eber W&L and Eber Metro's vendors, who were also vendors to Southern.   Southern's business stood the chance of being negatively impacted by Eber W&L and Eber Metro falling into bankruptcy (Def. Ex. ZA-Wendy Direct ¶48).

89.     As a part of its wind-down and liquidation, Eber W&L reached an agreement in principle to sell Southern certain of its remaining inventory and other remaining non-New York assets (but not with respect to Eber-CT) in order to generate needed liquidity to pay its debts. Eber W&L entered into an agreement with Southern on July 5, 2007, providing for a number of complex inter-related transactions that helped Eber W&L accomplish its plan to liquidate and wind down Eber W&L's remaining assets.   The proceeds all went to paying Eber W&L's debts and obligatons.   Part of this agreement included Southern making a $3 million bridge loan to Eber Metro to satisfy various Eber trade creditors, and granting Southern a right of first refusal to buy Eber-CT (Def. Ex. ZA-Wendy Direct ¶27) (Wendy Tr. 234: 16-24) (Def. Exs. YYYY, UU, FFFF).

90.     As part of the agreement closing on August 30, 2007, Southern made its $3 million loan (with 10% interest thereon, payable on demand and secured by its interest in Eber-CT) to Eber W&L (Def. Exs. YYYY, FFFF, UU).

91.     As part of the Agreement Southern also secured a right of first refusal to buy Eber Metro's interest in Eber-CT (Def. Exs. YYYY, FFFF, UU).

92.     In the Summer of 2007, Eber W&L was no longer operating as a business, other than working through the process of liquidation (D. Kleeberg Tr. at 74:18-25,75:1 Cross).

93.     Daniel Kleeberg left the employ of Eber W&L in August 2007, for two reasons: i) because the company was in the final stages of liquidation, and ii) because he wanted to move on with a new career (D. Kleeberg Dep. at 50:6-10).

94.     By the Summer of 2007, the only Eber entity operating as an active wine and liquor distribution company was Eber-CT, which operated in Connecticut, and had been acquired by Eber Metro in 2005 (Def. Exs. RRR, HHH).

### IV.     EBER-CT - PERFORMANCE AND DEBT AND EQUITY TRANSACTIONS THROUGH 2012

#### A.  Eber Metro forms Eber-CT as a Subsidiary and Acquires Slocum & Sons, Inc.

95.     In May 2005, Eber Metro through its wholly owned subsidiary Eber-CT, acquired a family-owned fine wine distributorship operating in Connecticut and Rhode Island called Slocum & Sons, Inc. ("Slocum") (Def. Exs. RRR, HHH).

96.     Slocum was an importer of a portfolio of European fine wines and distributed these products exclusively in Connecticut (Def. Ex. ZA-Wendy Direct ¶29; Eder Tr. 90:2-9 Direct).

97.     Slocum was profitable before Eber Metro acquired it (Def. Ex. TTT).

98.     Lester believed that Slocum's business would integrate well with Eber W&L and Eber Metro's existing business - - that synergies and efficiencies would drive profitability (Lester Dep. 30:2-12).

#### B.  Eber-CT Spirals into Non-Performance and Consecutive Years of Losses

99.     After Eber-CT acquired Slocum, it experienced significant losses.  Eber-CT had aggregate net losses for fiscal years 2006 to 2012 of approximately $7,275,000 (Def. Exs., EEE, MMM, NNN, VVV; VV, EEEE; Lester Dep. at 227-228:21-25,1-6, 20-25).

100.     Eber-CT's audited financial statements show that Eber-CT was losing money for seven straight years through 2012, in the aggregate sum of $7,165,030.

|         | FY 2006     | FY 2007       | FY 2008      | FY 2009       | FY 2010       | FY 2011      | FY 2012      |               |
|---------|-------------|---------------|--------------|---------------|---------------|--------------|--------------|---------------|
| Revenue | $41,798,006 | $42,386,508   | $43,244,059  | $38,944,354   | $36,552,221   | $36,890,281  | $36,383,755  |               |
| Net Loss| $(651,173)  | ($1,519,970)  | ($211,730)   | ($2,409,515)  | ($1,100,710)  | ($908,800)   | ($363,132)   | **($7,165,030)** |

(Def. Exs., EEE, MMM, NNN, VVV; Lester Dep. at 228-229:20-25).

101.    Prior to 2009, Eber-CT distributed all Yellow Tail Wine products sold in Connecticut (Def. Ex. ZA-Wendy Direct ¶36).

102.    In 2009, Deutsch Family Wine & Spirits, the producer of Yellow Tail Wines, and Eber-CT's largest supplier, began distributing its products through one of Eber-CT's competitors rather than exclusively through Eber-CT (Def. Ex. ZA-Wendy Direct ¶36) (Lester Dep. at 229:22-24).

103.    In the wine and liquor distribution industry in Connecticut, when a product supplier (such as Deutsch Family Wine & Spirits) which previously did business with a single distributor (such as Eber-CT), adds another distributor, it is known as "dualing" (Eder Tr. at 92:5-19 Direct); (Def. Ex. ZA-Wendy Direct ¶36).

104.    Andrew Eder testified that in Connecticut, having an exclusive distributorship is not a guarantee that the distributor will be the only distributor for a supplier (Eder Tr. at 133:14-17 Cross).

105.    Andrew Eder testified that a supplier has to keep a distributor for at least six months, unless the distributor fails to pay or loses its license, but the supplier can thereafter appoint as many other distributors as it wants to.  Tr. at 91:12-25; 133:24 to 134:4.   Andrew Eder confirmed that this practice, where the supplier adds another distributor known as "dualing" (Eder Tr. at 92:5-8 Direct; 133:18-20 Cross).

106.    Andrew Eder testified that if a supplier dualed his company on a brand, his sales volume and profit on that brand would decrease.  (Eder Tr. at 134:5-8 Cross).

107.    Andrew Eder testified that the industry practice of "dualing" could be very detrimental to the business of a wine and liquor distributor that previously was the sole distributor of a supplier's brand/product (Eder Tr. 92:.5-19 Direct).

108.    In the first year after Deutsch "dualed" Eber-CT, the volume and revenue of Yellow Tail Wine products that Eber-CT sold in Connecticut was reduced by 50% (Def. Ex. EEE).

109.    From 2008 through 2012, several other suppliers that had previously used Slocum as their exclusive distributor began supplying their products to other Eber-CT competitors – Eber-CT was "dualed" by these suppliers, and this negatively impacted profit and revenues (Def. Ex. ZA-Wendy Direct ¶37).

### C.  Eber-CT's Bank Financing is Underwritten by Lester's Selfless Acts

110.    In June 2008, CNB provided a $1.5 million short-term senior secured line of credit to Eber-CT (the "CNB Line of Credit") (Def. Ex. ZA-Wendy Direct ¶84; Def. Ex. MMM, at 6) (Pl. Ex. 222) (Lester Dep. at 404;7-19).

111.    Lester personally guaranteed the credit that CNB extended to Eber-CT pursuant to an unlimited guarantee (Lowenthal Dep. at 79:3-14;103:8-19); (Def. Ex. MMM, at 6) (Pl. Ex. 222) (Pl. Ex. 225); (Lester Dep. at 404:7-19; 439:23-25, 440:3-10).

112.    Lester collateralized his guaranty of the CNB Line of Credit with his personal assets, assigning a certificate of deposit in the amount of $500,000 to secure the CNB Line of Credit (Def. Ex. MMM, p.6) (Pl. Ex. 222, 225) (Lowenthal Dep. at 114:7-19)(Lester Dep. at 404 :l7-19; 439:23-25, 440:3-10).

113.    CNB subsequently, in 2009, increased its short-term senior secured line of credit to Eber-CT to $4,000,000, leaving all of the terms and conditions the same, with Lester continuing to provide his personal $500,000 certificate of deposit as collateral for his guaranty (Def. Ex. MMM) (Lester Dep. at 404:7-19; 439:23-25, 440:3-10).

114.    In October 2010, CNB committed to convert the line of credit to a term $3.9 million term loan with a maturity date of April 1, 2011, and required Lester to guaranty the entire amount of the loan and continue to collateralize his guaranty of the loan with cash in the sum of $500,000, and was extended thereafter (Def. Ex. EEE) (Pl. Exs. 227, 239, 248) Lester Dep. at 404:7-19; 439: 23-25; 440:3-10).

115.    In December 2009 and continuing past March of 2012, CNB desired that that its credit facility to CNB be paid off entirely and that and that Eber-CT find financing elsewhere (Lowenthal Dep. at 82: 6-25, 83:1-11; 116:2-11) (Pl. Ex. 225).

116.    In March 2012, after CNB advised Eber-CT that it was not interested in continuing to extend credit to Eber-CT (Def. Ex. MMMM) (Lester Dep. at 404:7-19).

117.    Lester continued to collateralize his personal guaranty of CNB's loans to Eber-CT through 2013 – on January 31, 2013, Lester guaranteed a loan from CNB to Eber-CT of approximately $3.5 million, assigned his personal $500,000 certificate of deposit to collateralize the loan and pledged his personal securities to collateralize the guaranty (Def. Exs., NNN, IIIII).

118.    Ultimately, CNB stopped extending credit to Eber-CT and forced Eber-CT to find another lender (Lowenthal Dep. at 43-45).

119.    There is no evidence that Lester ever received compensation for the use of his personal credit and personal collateral to induce CNB loan money and extend credit to Eber-CT.

120.    Wendy in advocating for Eber-CT to CNB to try to convince CNB to continue to issue credit to Eber-CT, sent e-mails expressing confidence in Eber-CT's performance in 2011 and 2012 (Pl. Exs. 232, 250, 225).

121.    The Court finds that Wendy's advocacy in this regard was entirely inconsistent with the financial condition of Eber-CT at the time of these communications, did not convey her concern and belief that Eber W&L's, Eber Metro's, and Eber CT's fixed and contingent liabilities (including with respect to Eber W&L's Retirement Plan), and the effect that those fixed and contingent liabilities could have on Eber-CT's business, including Eber W&L's liability associated with its Retirement Plan, and Eber Metro's and Eber-CT's contingent liability associated with the Eber W&L Retirement Plan as members of Eber W&L's "controlled group" (Pl. Exs. 212, 213) (see Point VI. A. below).

122.    Nevertheless, the Court finds that Wendy's advocacy, through her expressions of ostensible opinions and feelings, were effectuated in an effort to keep CNB's extension of credit to Eber-CT, as that credit was a lifeline to Eber-CT, which was operating at a loss, and was thus consistent with her obligations as an officer and manager.

**D.   Eder-Goodman Acquires 15% of Eber-CT**

123.    Andrew Eder is a beverage/alcohol distributor operating out of West Haven, Connecticut, and his company distributes wine and liquor to half of Connecticut (Eder Tr. at 87:16-22 Direct).

124.    Andrew Eder's company is Eder Brothers, Inc. ("Eder Brothers")  (Eder Tr. at 88:3-4 Direct).

125.    Eder Brothers is a competitor of Eber-CT d/b/a Slocum & Sons.  (Eder Tr. at 90:10-11 Direct, 132:19-21 Cross).

126.    Allan S. Goodman, Inc. ("Allen Goodman") is another distributorship operating in Connecticut, which competes with Eber-CT in the northern part of the state (Eder Tr. at 133:1-8 Cross).

127.    Eder-Goodman, LLC is a shell company formed by Eder Brothers and Allan Goodman, for the exclusive purpose of purchasing a 15% interest in Eber-CT (Eder Tr. at 99:1-4 Direct, 131:3-5 Cross).

128.    Eder-Goodman does not do anything other than hold a 15% interest in Eber-CT (Eder Tr. at 131:6-8 Cross).

129.    Dave Heller works for Allan Goodman and is the manager of Eder-Goodman. Richard Weiss works for Eder Brothers and is the manager of Eder-Goodman.  Cutter Smith is the president of Eder Brothers  (Eder Tr. at 108:5-9 Direct).

130.    Andrew Eder refers to Eber-CT throughout his testimony as both Eber-CT and as "Slocum" (Eder Tr. at 93:21-23 Direct).

131.    On January 29, 2008, Eder-Goodman, LLC acquired a 15% interest in Eber-CT from Eber Metro for $4.5 million (the "E-G 2008 Transaction")  (Eder Tr. at 86:22 to 87:15 Direct); (Pl. Ex. 56).

132.    Prior to the E-G 2008 Transaction, at some point in 2007, Andrew Eder was approached by Lester to make an investment in Eber-CT, but responded by making an offer to buy all of Eber-CT (Eder Tr. at 94:8-21 Direct).

133.    Andrew Eder testified that Eder-Goodman considered Eber-CT's gross profit, the inventory, and what they knew of liabilities, and used a number of $20 million, plus net asset value, so the number would have been closer to $30 million (Eder Tr. at 96:15 to 97:11 Direct).

134.    Andrew Eder was shown Pl. Ex. 199, which he said was "more than back-of-napkin kind of calculation to look at what we might be willing to pay (Eder Tr. at 100:20-25 Direct); (Pl. Ex. Exhibit 199).

135.    Andrew Eder testified that this was a pro forma or model for purchasing all of Eber-CT, where "we're attempting to take our own fixed costs, drop [Eber-CT's] costs into it, and what does that mean for the net"  (Eder Tr. at 146:18 to 147:2 Cross).

136.    Eder-Goodman did not know Eber-CT's debts (Eder Tr. at 147:3-6 Cross).

137.    The pro forma did not take into account any debt of Eber-CT, and Andrew Eder could not remember if the model assumed Eder-Goodman would be taking over any of Eber-CT's debt (Eder Tr. at 147:3-16 Cross).

138.    The pro forma did not take into account any fixed or contingent liabilities of Eber-CT or Eber Metro (Eder Tr. at 148:23 to 149:7 Cross).

139.    If a sale transaction with Eber-CT were to have gone forward, Eder-Goodman would have had to factor in the existing debt of Eber-CT, and Andrew Eder testified that Eder-Goodman would have assumed Eber-CT's debt  (Eder Tr. at 147:17 to 148:5; 148:9-18 Cross).

140.    If the Eber-CT debt were included, the purchase price for a sale would go down (Eder Tr. at 148:6-8 Cross).

141.    That is true of the liabilities of Eber-CT as well, if they were included, the purchase price would go down (Eder Tr. at 148:9-18 Cross).

142.    Later, in late December 2007/early January 2008, Eber-CT through its attorney, Pat Dalton of the law firm Harris Beach, approached Eder-Goodman with a different proposal. Eder-Goodman was informed that Southern was interested in acquiring a 15% interest in Eber-CT, and

Pat Dalton "dictated" that if Eder-Goodman wanted the 15% interest in Eber-CT, that it was going to cost Eder-Goodman $4.5 million (Eder Tr. 139:21-25;140:1-7 Cross).

143.    Prior to Mr. Dalton's call to Andrew Eder, Eber Metro had been in discussion with Southern about Southern potentially acquiring a 15% interest in Eber-CT in exchange for its $3 million bridge note. Southern proposed that it exchange its $3 million note for a 15% ownership (Def. Ex. ZA-Wendy Direct ¶86) (Eder Tr. 139:21-25;140:1-7 Cross).

144.    Lester swore that he believed the principal motivation for Southern's proposal was that Southern was not then in the Connecticut market, and it could only enter the market by acquiring an interest in an existing distributorship. The 15% interest in EberCT would have given Southern a way to enter the Connecticut market, and thus, Southern's interest in Eber-CT was strategic and opportunistic (Lester HB Aff Pl. Ex. 46, ¶ 25).

145.    Andrew Eder was aware that Southern entered the New York market in 2004, took salespeople and suppliers from the Eber New York companies, and helped to put the New York Eber companies out of operation  (Tr. at 135:7-9; 135:25 to 136:12, 136:24 to 137:1).

146.    Eder agreed that Southern coming into the Connecticut market would not be a good thing for Eder-Goodman, and he would rather not see Southern in Connecticut (Eder Tr. at 137:25 to 138:2; 138:16-21 Cross).

147.    Eder-Goodman and Eber Metro entered into a letter agreement, dated January 29, 2008, providing for Eder-Goodman to acquire a 15% ownership interest in Eber-Ct in consideration for $4.5 million (Pl. Exs. 56, 57).

148.    Eder-Goodman performed almost no due diligence before the E-G 2008 Transaction (Eder Tr. p. 142:20-23 Cross).

149.    Eder-Goodman negotiated for and received a host of rights associated with the 15% membership interest that it acquired in the E-G 2008 Transaction, namely,

a.      Preference rights on the distribution of proceeds from the sale of the company or all its assets or a specific product line, or from Eber-CT's liquidation, i.e, a liquidation preference of $4.5 million (Eder Tr. at 144: 9-12 Cross) (Pl. Exs. 56, 57). Andrew Eder testified, in sum and substance, that this liquidation preference was a *sine qua non* to the transaction (Eder Tr. at 144:9-12 Cross);

b.      A right of first refusal over a proposed transfer by Eber Metro of any of its interest in Eber-CT to a third party (Eder Tr. at 145:2-4 Cross) (Pl. Exs. 56, 57).  Andrew Eder testified that this was an "important piece" and a "very important right."  (Eder Tr. at 99:5-20 Direct; 145:2-4 Cross);

c.      A right to veto any other transfer by Eber Metro of any of its equity interest in Eber-CT to a third party (Eder Tr. 145:5-7 Cross) (Pl. Exs. 56, 57);

d.      A right to veto any new issuance of equity and any new debt over a $5 million ceiling, thus limiting Eber-CT's opportunity to grow, and such right was actually exercised by Eder-Goodman (Eder Tr. at 145:5-7; 45:19-25,146:1-4 Cross) (Pl. Ex 56, 57) (Lester Dep at 43-244, 1. 17-25, 1-10).

e.      A right to veto any transaction between Eber-CT and Lester or Wendy (Pl. Exs. 56, 57);

f.      "Tag along rights" allowing Eder-Goodman to participate pro rata in any sale by Eber Metro of its interest in Eber-CT on the same terms (thus ensuring that Eder-Goodman could share in any control premium received by Eber Metro (Eder Tran. p. 145: 8-12 Cross) (Pl. Exs. 56, 57).

24

150.    Andrew Eder testified that Eder-Goodman would not have entered into the E-G 2008 Transaction without the preference rights on the distribution of proceeds from the sale of the company or all its assets or a specific product line, or from Eber-CT's liquidation, i.e., the liquidation preference of $4.5 million (Eder Tr. at 144:4-15;145:1 Cross).

151.    Andrew Eder testified that the right of first refusal over a proposed transfer by Eber Metro of any of its interest in Eber-CT to a third party attendant to the 15% interest was an important consideration that increased the value of the 15% interest that it acquired (Eder Tr. at 91:5-15 Direct).

152.    Lester sworn affidavit speaks to his state of mind  -  he swore that "The competing motivations of Southern and Eder Goodman in late 2007 and early 2008 were unique to their particular circumstances. One was trying to buy its way into the Connecticut market; the other was paying to keep a competitor out of the same market. Their motivations and circumstances were completely different from those I faced in 2012, when I foreclosed on my loans to Eber Metro" (Lester HB Aff Pl. Ex. 46, ¶27) (Lester Dep. at 246).

153.    The Court, as the trier of fact, infers that Eder-Goodman was, in part, motivated in entering into the E-G 2008 Transaction by keeping Southern, the largest wine and liquor distributer in the country, which Andrew Eder had personally observed having engaged in aggressive competitive business tactics, out of the Connecticut wine and liquor distribution market.

154.    Southern did not exercise its right of first refusal to purchase 15% of Eber-CT at the price paid by Eder-Goodman in the E-G 2008 Transaction (Def. Ex. ZA-Wendy Direct ¶88).

155.   Eder-Goodman was not aware of whether any of the Eber entities were exposed to employer "withdrawal liability" to the Teamsters Fund at time of the 2008 Transaction (Eder Tr. at 152:9-12 Cross).

156.   Eder-Goodman was not aware of any potential pension plan termination liability of the Eber entities at the time of the E-G 2008 Transaction (Eder Tr. at151, l. 11-18 Cross).

157.   In 2015, Eder-Goodman complained about their own lack of due diligence.  They claimed that Eber Metro should have warned Eder-Goodman about Eber W&L's and Eber Metro's exposure to pension fund liabilities at the time of the E-G 2008 Transaction, and suggested that Eder-Goodman would never had purchased its interest in Eber-CT in 2008 had it known about those pension fund liabilities (Def. Ex. ZA-Wendy Direct ¶87).

158.   In 2008, Eder-Goodman did not know of any Eber company pension plan termination liability for which Eber-CT could have been responsible, and did not know of any Teamsters pension plan withdrawal liability for which Eber-CT could have been responsible (Eder Tr. at 151:15-18; 152:9-12 Cross).

159.   Andrew Eder did have familiarity with his own company pension plans, one for Teamsters and one for non-Teamster employees, and knew that issues concerning unfunded pension plans are "to a tune of a lot of money"  (Eder Tr. at 150:10-20 Cross).

160.   In addition, the pro forma would have to account for accounts payable, warehouse expenses, truck expenses and vendor contracts, and Eder-Goodman might not be taking on all the employees of Eber-CT  (Eder Tr. at 149:8-18 Cross).

161.   Eder did not remember what multiple of gross profit was used for valuation in 2008 (Eder Tr. at 104:14-22 Direct).

162.    The last three pages of Pl. Ex. 199 are handwritten notes, and Eder did not know whose notes they are (Eder Tr. at 150:1-9 Cross).

163.    As to the liquidation preference, Andrew Eder testified that Eder-Goodman received a liquidation preference, so that Eder-Goodman would receive the return of its $4.5 million investment prior to the other equity holders in the event of a liquidation  Tr. at (Eder Tr. at 144:9-14 Cross) (Pl. Ex. 56).

164.    The liquidation preference made the Eder-Goodman membership units substantially equivalent to a convertible preferred equity security.  (Eder Tr. at 144:15-18 Cross).

165.    Andrew Eder testified that the liquidation preference had significant value, because "we were looking at a company whose balance sheet was pretty darn poor.  So we wanted to be sure that, since there were potentially other creditors, that we would get our money first"  (Eder Tr. at 144:19-23. Cross).

166.    In fact, Eder testified that "without [the liquidation preference], we would never have signed this agreement" (Eder Tr. at 144:25 to 145:1 Cross).

167.    As to Eder-Goodman's right to veto Eber-CT taking on indebtedness in excess of $5 million, Tr. at 145:13-16, Andrew Eder testified that Eder-Goodman exercised this right in furtherance of protecting its liquidation preference; when Eber-Ct had borrowing opportunities in excess of $5 million -- Eder-Goodman objected (Eder Tr. at 145:17 to 146:4 Cross).

168.    As to Eder-Goodman's exercise of this right, Andrew Eder testified that "we didn't think the balance sheet could support additional dollars. …  They were already greatly in debt" (Eder Tr. at 146:7-10 Cross).

**E.  Lester and Wendy Continued to Seek Bank Financing and Market Eber-CT**

169.    Following the E-G 2008 Transaction, Lester and Wendy made efforts to arrange

new senior debt financing for Eber-CT with independent third-party lenders (Def. Ex. ZA-Wendy

Direct ¶90).

170.    Wendy and Lester had discussions with at least six different banks and finance

companies in the Northeast about obtaining additional financing. None of these lenders was

willing to provide any credit to Eber-CT, on a senior basis or otherwise (Def. Ex. ZA-Wendy

Direct ¶90).

171.    Following the E-G 2008 Transaction, Wendy and Lester made efforts to explore

the sale of all or a portion of Eber-CT (Def. Ex. ZA-Wendy Direct ¶85) (Lester Dep. at 232:6-25;

233:1-3).

172.    In late 2008, Lester sent financial data about Eber-CT to a wine and spirits

distributor in an effort to interest that party in acquiring Eber-CT.   This distributor showed no

interest after reviewing the data (Def. Ex. ZA-Wendy Direct ¶91).

173.    In January 2009, Lester and Wendy met with another wine and spirits distributor,

and provided detailed financial, sales and operational data about Eber-CT.   This distributor

returned the data to Eber-CT by mail less than a week later informing Wendy and Lester that they

were not interested (Def. Ex. ZA-Wendy Direct ¶92).

174.    In or around 2010, Wendy met with another regional distributor who was not

interested in purchasing Eber-CT (Def. Ex. ZA-Wendy Direct ¶93).

175.    Wendy and Lester met with another regional wine distributor in November 2009,

June 2010, and July 2012, about buying Eber-CT.  Ultimately it had no interest in buying the

company or pursuing a joint venture (Def. Ex. ZA-Wendy Direct ¶93).

176.    Shortly after Lester and Wendy met with one of these distributors about a possible

sale of Eber-CT, two of Eber-CT's major brand suppliers "dualed" Eber-CT, including Yellow

Tail.  As a result, Eber-CT lost the exclusive right to distribute these brands (Def. Ex. ZA-Wendy

Direct ¶94).

177.    Lester identified some of the wine and liquor distributors with whom he and

Wendy spoke about Eber-CT as Peerless, Allied and Fedway (Lester Transcript p. 232-233, l. 6-

25, 1-3).  Lester also testified that immediately after providing Peerless with Eber-CT's financial

information, Eber-CT was "dualed" (Lester Dep. at 234:14-25).

**F.    The Polebridge Bowman Transaction**

178.    In the Spring of 2010, Eber-CT approached Sturm seeking his assistance in

formulating a plan to turn around the company.  Eber-CT had no prior contact or affiliation with

Mr. Sturm before 2010.  The goal was to retain Mr. Sturm as both a lawyer and a senior strategic

business consultant, and that he would provide strategies and channels to secure new financing

and help manage Eber-CT's relationship with CNB (Lester Dep. at 93-94:7-25,1-2) (Def. Ex. ZA-

Wendy Direct ¶105).

179.    Mr. Sturm was then a Senior Partner at Nelson Mullins Riley & Scarborough LLP,

a prominent Atlanta law firm, where he practiced corporate and securities law, focusing on

investment banks, private equity funds and emerging companies, with extensive experience in the

financing and mergers and acquisitions markets.  Mr. Sturm also chaired his firm's corporate

department and served on its executive committee.  At the same time, he was a well-known

business advisor at The White Oak Group, a prominent private equity firm in Atlanta that is in the

business of investing in, and growing the value of, lower middle market emerging companies.  He

had served as chief executive officer of a number of emerging companies and had served on the boards of numerous private and public companies (Def. Ex. ZA-Wendy Direct ¶106).

180.    Eber-CT resolved to sell a partial equity interest in Eber-CT after retaining Mr. Sturm (Def. Ex. ZA-Wendy Direct ¶105-115).

181.    Based on the facts set forth below in Point VI. A. ii. below, the Court infers that one of Eber Metro's goals, in seeking to sell a partial interest in Eber-CT, was to reduce Eber Metro's total equity interest in Eber-CT below 80% in an attempt to insulate Eber-CT from Eber W&L's ERISA "controlled group" liability that would otherwise make Eber-CT jointly and severally liable for the "termination liability" of the Eber W&L Retirement Plan.

182.    Initially, Wendy was considered as a purchaser of such a partial equity interest (Pl. Ex).

183.    Ultimately however, Mr. Sturm received such a partial equity interest in Eber-CT through a company called Polebridge Bowman as compensation for his services (the "Polebridge Bowman Transaction").  At the time, Mr. Sturm typically proposed to new clients that he be paid fees in cash and that he be given an opportunity to make a minority investment in the client's common equity at a fair market value purchase price (Lester Dep. at 95:8-14) (Def. Ex. ZA-Wendy Direct ¶109).

184.    Mr. Sturm originally proposed a 10% ownership interest in Eber-CT, but Lester negotiated him down to 6% in May 2010, with all members, including Eder-Goodman, joining in consenting to the transaction (Def. Ex. ZA-Wendy Direct ¶109) (Def. Exs., UUU, HHHHH).

185.    Wendy received a right of first refusal on any potential future sale of Polebridge Bowman's interest in Eber-CT if Polebridge received a bona fide offer for its interest from a third party (Def. Exs., UUU, HHHHH).

186.    In 2010, Eder-Goodman was presented with a potential transaction for 6% of Eber-CT to be transferred to Wendy Eber because Lester Eber was "quite pleased with Wendy's performance at Eber-Connecticut, LLC" (Pl. Ex. 292).

187.    Eder-Goodman could have, but declined to, exercise its right of first refusal to purchase the 6% interest that Eber Metro sold to Mr. Sturm/Polebridge Bowman at this $350,000 purchase price without paying any cash up front (Def. Exs. UUU, OOO, HHHHH).

188.    The Court finds that Eder-Goodman, by entering into the Polebridge Bowman Transaction, acknowledged that Wendy's award of a right of first refusal was fair given the work that she was doing for Eber-CT at the time (Def. Exs., UUU, HHHHH).

189.    At the time of the Polebridge Bowman Transaction, Eber-CT's total annual sales had declined by nearly $7 million, or more than 15%, over the then-most recent two fiscal years (Def. Exs. EEE).  Total net losses were more than $3.5 million over the then-most recent two fiscal years.  The company's operations were generating negative cash flow and as a result its total indebtedness increased by 160% from $1.5 million to $3.9 million over the then-most recent two fiscal years (Def. Exs., EEE).

190.    The Court finds that Eder-Goodman, by entering into the Polebridge Bowman Transaction and refraining from exercising its right of first refusal, believed that the 6% interest in Eber-CT that was acquired by Polebridge Bowman was worth less than $350,000 (Def. Exs., UUU, HHHHH).

191.    The Court further rejects Plaintiffs' contention that the Polebridge Bowman Transaction was conducted for "improper" purposes.  Insofar as the Polebridge Bowman Transaction was effectuated in seeking to defer or avoid the imposition of ERISA "controlled group liability" after consultation with professionals, including attorneys and a business advisor, even if it was not meritorious, it was prudent, and was effectuated to protect Eber-CT from liability – it was an exercise in business judgment (see Point VI. A. ii. below).

192.    In the years leading up to 2016, Glenn Sturm suffered from cancer. In light of Glenn Sturm's health, on May 25, 2015, Eber Metro extended the maturity of the Polebridge Bowman note to May 29, 2016.  On May 26, 2016, the note was amended to increase the interest rate to 3% for the following two years, and thereafter increase by 1% every two years. The maturity of the note was extended to May 29, 2026 (Def. Ex. ZA-Wendy Direct ¶160) (Def. Ex. AAAAA).

193.    In 2017, Glenn Sturm's health took a turn for the worse.  On February 15, 2017, Polebridge Bowman entered into a Stock Purchase Agreement with Wendy, pursuant to which Wendy acquired  Polebridge Bowman's 6% interest in consideration of Wendy assuming Polebridge's Bowman's promissory note (Def. Ex. ZA-Wendy Direct ¶161) (Def. Ex. RRRR).

## V.    LESTER'S LOANS TO EBER W&L AND EBER METRO

### A.    The Lester Line of Credit and Loans Made Pursuant Thereto

194.    Beginning in 2010 and continuing through May 2012, Lester deposited personal funds to Eber W&L and Eber Metro in the principal amount of $1,829,000 (Def. Exs. T, U) (Pl. Ex. 22) (Pl. Ex. 160), as follows:

| Date of Deposit | Amount of Deposit | Def. Exs. | Check # |
|---|---|---|---|
| 02/18/2010 | $150,000.00 | T | 106 & 108 |
| 03/11/2010 | $165,000.00 | T | 104 |
| 06/8/2010 | $220,000.00 | T | 105 |
| 7/22/2010 | $20,000.00 | T | 107 |
| 02/11/2011 | $100,000.00 | T | 916 |
| 03/12/2011 | $250,000.00 | T | 112 & 934 |
| 04/11/2011 | $50,000.00 | T | 1017 |
| 04/26/2011 | $64,000.00 | T | 1026 |
| 05/25/2011 | $32,000.00 | T | 993 |
| 06/13/2011 | $179,000.00 | T | 1000 |
| 07/07/2011 | $275,000.00 | T | 1010 |
| 10/07/2011 | $46,000.00 | T | 1087 |
| 10/27/2011 | $25,000.00 | T | 1093 |
| 11/25/2011 | $15,000.00 | T | 815 |
| 02/26/2012 | $20,000.00 | T | 1175 |
| 03/14/2012 | $203,000.00 | U | 1188 |
| 04/16/2012 | $5,000.00 | U | 1214 |
| 05/10/2012 | $10,000.00 | U | 1288 |
| **Total** | **$1,829,000.00** | | |

195.   The foregoing loans were made pursuant to a $1,500,000 revolving line of credit note (the "Lester Line of Credit") in favor of Eber Metro, payable in full on December 31, 2011, bearing "pay in kind" interest at 12.5%, increased to 15% after default or maturity, plus a 2% late payment charge (Def. Ex. GG, Pl. Ex 16, Def. Ex. HH, FFF).

33

196.    In February 2010, the Line of Credit was collateralized and guaranteed.  Eber W&L executed a Guaranty (the "2010 Guaranty") guaranteeing any and all debts, liabilities, and obligations of Eber Metro and Eber W&L to Lester, and Eber W&L and Eber Metro executed a Security Agreement (the "2010 Security Agreement") securing all such  Indebtedness (including the 2010 Guaranty) with a security interest in all the capital stock of Eber Metro and the other assets of Eber W&L and Eber Metro (Def. Exs., GG, HH, FFF).

197.    The Board of Directors of Eber W&L and the Board of Directors of Eber Metro, with Lester abstaining, approved the Lester Line of Credit (Def. Ex. GG).

198.    The Lester Line of Credit was subordinated to the CNB Line of Credit (Def. Exs., GG, HH, FFF Pl. Ex 16).

199.    Frank Torchio has offered unrebutted expert testimony opining that the interest rates set forth in the Lester Line of Credit were fair and reasonable (Def. Ex. ZC- Torchio Direct ¶¶ 54-60).

200.    Plaintiffs have not offered any testimony to rebut Defendants' evidence that the interest rates set forth in the Lester Line of Credit were fair and reasonable.

201.    Lester extended the opportunity to loan on the same terms that he was loaning to the Eber entities from 2010 through 2012 to Sally Kleeberg and Audrey Hays - -  he did so by transmitting letters and loan documentation to them in April 2010.  His letters reminded them of the significant difficulties the Eber entities had experienced in the preceding years, and the steps that he had taken to continue in business (Def. Ex. D; Plaintiffs Exhibit 49) (Hays Direct ¶ 23).

202.    Lester informed Audrey Hays and Sally Kleeberg in his April 2010 letters that he agreed to loan the family business $1.5 million secured by Eber W&L and Eber Metro's equity

interest in Eber-CT.  He enclosed the documents that he ultimately signed in connection with the Lester Line of Credit (Def. Ex. D; Plaintiffs Exhibit 49).

203.    Lester spoke with Sally Kleeberg about the Lester Line of Credit and the offer that he made to her in the April 2010 letter (Lester Dep. 272:16-25).

204.    Lester attempted to speak with Audrey Hays about the Lester Line of Credit and the offer that he made to her in April 2010 letter, but she hung up on him, by slamming the telephone down (Pl. Ex. 1002-Hayes Direct at 22.)

205.    Neither Sally Kleeberg, nor Audrey Hays, accepted the offer to loan money on the same terms as Lester (Def. Ex. ZA-Wendy Direct ¶96) (Lester Transcript p. 155 l. 21-25, p. 116).

206.    Neither Sally Kleeberg, nor Audrey Hays, objected to the Lester Line of Credit or the Lester Line of Credit's terms (Def. Ex. ZA-Wendy Direct ¶ 97-98).

207.    Audrey Hays was aware, as early as 2007, that the Eber family business in New York was liquidated and that the only remaining business was in Connecticut (Hays ¶¶ 19-20).

208.    Lester openly discussed making personal loans to the Eber entities with Daniel Kleeberg, dating back to 2007 and 2008 (D. Kleeberg Dep. at 228-229:12-23, 1-15).

209.    The Court finds that Lester loaned the principal amount of $1,829,000.00 to Eber Metro from 2010 through May 2012.

210.    The Court finds that Lester's loans in the principal amount of $1,829,000.00 were made pursuant to the Lester Line of Credit, the 2010 Guaranty, and the 2010 Security Agreement.

211.    The Court finds that under the facts and circumstances, the interest rates set forth in the Lester Line of Credit were fair and reasonable.

### B.   The Lester Promissory Notes

212.    On October 1, 2002, Eber W&L issued a promissory note (the "2002 Note") to Lester in the original principal amount of $575,895.00.  The 2002 Note was thereafter amended and restated pursuant to a promissory note, dated March 13, 2006 in the same amount, payable on demand and bearing an interest rate of 9% (Def. Ex. L).

213.    Eber W&L issued another promissory note, dated August 15, 2005 (the "2005 Note") to Lester, which was thereafter amended and restated pursuant to a note dated March 13, 2006 in the amount of $1,503,750.00, payable on demand, and bearing interest at 9% (Def. Ex. K).

214.    At the time the 2002 Note and 2005 Note were amended and restated, the 2006 Wells Fargo credit agreement was secured by all the assets of Eber W&L, was accruing interest at a prime-based rate or a LIBOR-based rate which varied (effective rate at May 31, 2006 was 8.75%), and was drawn on by the company in the sum of $48,335,377 as of May 31, 2006 (Def. Ex. VVV).

215.    The 2002 Note and the 2005 Note, as amended and restated provide, on their face, that Lester's loans were subordinated to Eber W&L's then senior lender, Well Fargo Foothill, which established its credit facility at the same time (Def. Exs., K and L).

216.    Eber W&L's audited financial statements for the years ending 2005 and 2006, reflect indebtedness to Lester insofar as they state the existence of an unsecured, non-interest bearing note payable to an officer as of May 31, 2005 (before the August 15, 2005 Note), in the amount of $263,571, and as of May 31, 2006 (after the August 15, 2005 Note in the amount of $1,780,764 (Def. Ex. VVV).

217.   Wendy testified as to her belief that reference to the notes as "non-interest bearing" was in error (Wendy Tr. at 257:14-16 Cross).

218.   Thereafter, Lester deposited the sum of $212,000 into Eber W&L, depositing two checks, one in the sum of $200,000, and one in the sum of $12,000 (the "2009 Checks") (Def. Ex. T, Check Nos. 543 and 559 Bates Stamp EB00019449-51) (Pl. Ex. 160 at 44).   The 2009 Checks were recorded as loans from Lester to Eber W&L in the company ledger together with other journal entries (Pl. Ex. 160, at 44).

219.   Lester also had a personal account payable to Eber W&L referred to on the company general ledger as Account 2100 (Plaintiffs Exhibit 160 at 50, EB-00032567; Pl. Ex. 83 at p. 7, Bates Stamp EB-0026433).   Interest accrued on Lester's personal account payable to Eber W&L at 9% per annum (Pl. Ex. 83 at p. 7, Bates Stamp EB-0026433).

220.   On February 11, 2011, Eber Metro assumed the remaining indebtedness under the 2002 Note and 2005 Notes as amended and restated (collectively, the "2006 Notes"), and Eber W&L and Eber Metro executed an Amended and Restated Security Agreement (the "2011 Security Agreement") confirming the security interest in the capital stock of Eber Metro and the other assets of Eber W&L and Eber Metro to secure the indebtedness under the Lester Line of Credit, the 2006 Notes and the 2010 Guaranty (Def. Ex. W).

221.   Eber W&L's general ledger also reflects Eber Metro assuming Lester's personal account payable to Eber W&L in the amount of $855,298.04; and, Eber W&L's loan payable to Lester which included the 2009 Checks in the amount of $210,363.72 on February 11, 2011 (Pl. Ex. 160, at 50).

222.    On August 18, 2011, the three Co-Trustees of the 1969 Trust met to discuss the status of the 2006 Notes and the Lester Line of Credit. After a lengthy discussion the Co-Trustees ratified all of these loans (with Lester abstaining) (Def. Ex. ZA-Wendy Direct ¶126) Def. ex ).

223.    On December 31, 2011, the Lester Line of Credit matured.  The 2006 Notes were already payable on demand (Def. Exs. K, L).

224.    As is evidenced by documents in the record, in late 2011, Wendy and the company accountants worked to try to ascertain the companies' financial obligations to Lester under the 2006 Notes and the Lester Line of Credit, and Lester's financial obligations to the companies pursuant to his personal account payable as of December 31, 2011 (Pl. Exs. 236, 237, and 83).

225.    On October 5, 2011, Wendy requested the details on 2006 Notes and the Lester Line of Credit from the companies' accountant, and forwarded same by e-mail to Lester, explaining that

> The NP transaction EWLC attached file contains the detail of the increases/decreases of the 2006 Loan which was moved and secured by Eber Metro Inc stock in Feb 2011.
>
> The NP transaction Metro Inc attached file list the details of the Oct, 2009 Loan which was moved and Secured in Feb 2010

(Pl. Ex. 236).

226.    Wendy continued to follow up with the companies' accountants with respect to interest accrued on the 2006 Notes and the Lester Line of Credit on October 24, 2011 (Pl. Ex. Exhibit 237).

227.    Thereafter, in January 2012, Wendy followed up with the companies' accountants who prepared a detail as of December 31, 2011 with respect to Eber Metro's liability to Lester under the 2006 Notes, the Lester Line of Credit, and the 2009 Checks (which were treated as

loans); and Lester's liability to Eber Metro, which carefully takes into account and deducts Lester's personal account payable to Eber W&L from the company's obligations to Lester (Pl. Ex. 83 at 7) (Def. Ex. SSS).

228.    The accountant's detail reflects the principal net amount of the payables and receivables that were assumed by Eber Metro from Eber W&L in the sum of $1,434,710.68 as follows:

> a    It reflects Lester's personal account payable to Eber W&L in the principal sum of $855,298.04 as of February 11, 2011.

> b    It reflects the 2006 Notes in the principal sum of $2,079,645.00 as of February 11, 2011.

> c    It reflects Lester's loans payable comprised principally of the 2009 Checks in the principal sum of $210,363.72.

(Pl. Ex. 83 at 7).

229.    The accountant's detail also reflects accrued interest on each of the foregoing principal amounts and arrives at a net interest figure of number of $517,163.58 due to Lester as of December 31, 2011. (Pl. Ex. 83 at 7).

230.    The accountant's detail also reflects the principal and interest due on the Lester Line of Credit as of December 31, 2021 as $1,566,000.00 (Pl. Ex. 83 at 7).

231.    The accounting detail appears to make two errors.  First, it short changes Lester by failing to account for Lester's $25,000 loan made to Eber Metro on October 27, 2011 pursuant to the Lester Line of Credit (Def. Ex. T, Check No. 1093).  Second, it short changes Lester by calculating interest using simple interest rather than interest compounding on a quarterly basis pursuant to the terms of the Lester Line of Credit note (Def. Ex. HH).  Third, it short changes

Eber W&L by accounting for Lester's payment of $12,363.72 to Eber W&L in satisfaction of

Wendy's obligation to the company as a loan (Pl. Ex. 83 at 7) (see Plaintiffs' Proposed Findings

of Fact and Conclusions of Law ¶ 108-109).

232.    Defendants carried forward the accountant's error insofar as their demonstrative in

this case includes the $12,363.72 as a loan from Lester to Eber W&L (Def. Ex. KKKKK).

233.    The Court infers, contrary to Plaintiffs' contentions, that Defendants' assertion

that the aforementioned $12,363.72 was a loan made to Eber W&L was an error and oversight,

and not an exemplar of "bad faith both in their underlying actions and in their conduct during this

litigation."

234.    Further, the Court notes that the accountant's detail provides as follows with

respect to Lester's personal account, reflecting interest accruing thereon through December 31,

2011:

**Accunt 2100 - Personal Accounts**

| Date | Loan amount | Cumulative Loan | 9% Interest | # days |
|---|---|---|---|---|
| 8/31/2007 | (859,731.35) | (859,731.35) | (6,359.66) | 30.00 |
| 9/30/2007 | 389.21 | (859,342.14) | (211.89) | 1.00 |
| 10/1/2007 | 298.25 | (859,043.89) | (6,354.57) | 30.00 |
| 10/31/2007 | 808.54 | (858,235.35) | (6,348.59) | 30.00 |
| 11/30/2007 | 1,070.38 | (857,164.97) | (6,552.03) | 31.00 |
| 12/31/2007 | 418.80 | (856,746.17) | (6,548.83) | 31.00 |
| 1/31/2008 | (1,277.07) | (858,023.24) | (6,135.45) | 29.00 |
| 2/29/2008 | (1,574.01) | (859,597.25) | (6,570.62) | 31.00 |
| 3/31/2008 | 1,604.22 | (857,993.03) | (6,346.80) | 30.00 |
| 4/30/2008 | 2,323.23 | (855,669.80) | (6,540.60) | 31.00 |
| 5/31/2008 | 2,000.00 | (853,669.80) | (6,314.82) | 30.00 |
| 6/30/2008 | (950.25) | (854,620.05) | (6,532.58) | 31.00 |
| 7/31/2008 | (677.99) | (855,298.04) | (195,078.25) | 925.00 |
| 2/11/2011 | 855,298.04 | - | - | |
| | | | | 1260.00 |
| **Total Interest** | | | $ (265,894.68) | |

235.    The Court finds that Plaintiffs, in fact, have attempted to mislead the Court as to a material fact, namely, that Lester's personal account payable to Eber W&L did not accrue interest, by requesting that the Court find as follows:

> At the same time Lester was supposedly loaning money to the company, the books show that Lester caused EBWLC to pay personal expenses and carry a balance due of $859,731 as of August 31, 2007 [Ex. 160 at 50; see also Kleeberg Decl. ¶¶ 29, 31 (Lester relied heavily on EBWLC to pay expenses, mostly written off as business expenses, and did not loan money before 2010.]   The existence of such a large balance due from Lester – without any interest accruing - cannot be reconciled with the claims that the company was simultaneously borrowing money from Lester at a 9% interest rate.   Such a wide spread indicates that even if there had been loans, they were manipulated in a way to allow Lester to profit improperly.

(Plaintiffs' Proposed Findings of Fact and Conclusions of Law ¶ 91).

The foregoing proposed finding of fact is demonstratively and materially false as to the accrual of interest on Lester's personal account payable as evident from Plaintiffs' own exhibit (Pl. Ex. 83 at 7).  It is also demonstratively false as to whether Lester loaned money to the company before 2010, as Def. Ex. T reflects two checks from Lester to the company in December 2009 in the aggregate sum of $212,000.

236.    The Court rejects Plaintiffs contention that Wendy acted in a disloyal fashion to any of the Eber Entities in attempting to reconcile the amounts payable to Lester from the Eber entities pursuant to the 2006 Notes, the Lester Line of Credit, the 2009 Checks; and, the amounts payable to the Eber entities from Lester pursuant to his personal account. The Court finds that ascertaining Eber W&L and Eber Metro's receivables and payables and confirming them with Lester and his representatives was an appropriate task for Wendy to undertake as an officer. The

Court finds that there was nothing wrongful about Wendy's conduct in attempting to reconcile these obligations.

### C.     The 2012 Foreclosure

237.    On January 18, 2012, Lester assigned his entire interest in the Lester Line of Credit Note, the 2006 Notes, the 2010 Guaranty and the 2011 Security Agreement to his wholly owned, single member limited liability company, Alexbay LLC (Def. Ex. N).

238.    At the same time, Alexbay sent Eber W&L a Notice of Proposal to accept all the capital stock of Eber Metro (the collateral for the indebtedness to be foreclosed on) in full satisfaction of the Lester Line of Credit, the 2006 Notes, the 2010 Guaranty, and the 2011 Security Agreement pursuant to the Uniform Commercial Code (NY UCC 9-620).  All of the 2006 Notes, the Lester Line of Credit, and the 2010 Guaranty were then secured by a validly perfected security interest in the assets of Eber W&L (principally all the capital stock of Eber Metro) and in the assets of Eber Metro (principally all of Eber Metro's 79% ownership interest in Eber-CT) (Def. Exs., J, YY, XX).

239.    The Notice of Proposal, consistent with the accountant's detail, reflects the aggregate principal and interest owed to Alexbay as $3,650,702.48 (Def. Ex. J; Pl. Ex. 83 at 7). This amount does not take into account the errors on the accountant's detail.

240.    Correcting the accountants detail by adding Lester's October 27, 2011 loan of $25,000 under the Lester Line of Credit and properly calculating interest, brings the principal and interest on the Lester Line of Credit as of December 31, 2011 to $1,803,292.69:

| DATE OF ADVANCE | AMOUNT OF ADVANCE | INTEREST THRU 12/31/2011 | PLUS INTEREST AS OF 12/31/11 |
|---|---|---|---|
| | *INTEREST RATE:* | 12.5% | |
| 2/18/2010 | $150,000 | $38,723.81 | $188,723.81 |
| 3/11/2010 | 165,000 | 41,131.25 | 206,131.25 |
| 06/8/2010 | 220,000 | 46,715.42 | 266,715.42 |
| 7/22/2010 | 20,000 | 3,889.74 | 23,889.74 |
| 02/11/2011 | 100,000 | 11,507.68 | 111,507.68 |
| 03/12/2011 | 250,000 | 26,056.26 | 276,056.26 |
| 04/11/2011 | 50,000 | 4,655.51 | 54,655.51 |
| 04/26/2011 | 64,000 | 5,606.07 | 69,606.07 |
| 05/25/2011 | 32,000 | 2,464.34 | 34,464.34 |
| 06/13/2011 | 179,000 | 12,553.62 | 191,553.62 |
| 07/7/2011 | 275,000 | 16,914.13 | 291,914.13 |
| 10/7/2011 | 46,000 | 1,337.62 | 47,337.62 |
| 10/27/2011 | 25,000 | 554.04 | 25,554.04 |
| 11/25/2011 | 15,000 | 183.21 | 15,183.21 |
| TOTAL | $1,591,000 | $212,292.69 | $1,803,292.69 |

Further, the aggregate owed with respect to the 2006 Notes and the 2009 Checks as of December 31, 2011 was $1,936,447.71, after deducting the $12,363.72 payment that was erroneously treated as a loan.

241.   Thus, the actual aggregate amount owed to Lester as of December 31, 2011 was **$3,739,740.40**.  This figure represents the sum of (*x*) principal and accrued interest payable under the 2006 Notes and the 2009 Checks, plus (*y*) the principal and accrued interest payable to Lester

43

under the Lester Line of Credit, minus (*z*) the principal of Lester's personal account payable to Eber W&L plus accrued interest thereon at 9% per annum.  This amount was all guaranteed under the 2010 Guaranty.

242.     As set forth above in paragraph 194 Lester made an additional $238,000 in principal loans under the Lester Line of Credit which continued to accrue interest through May 31, 2012 (see table entries in paragraph 194 for 2/26/12, 3/14/12, 4/16/12, and 5/10/12).

243.     Shortly after Alexbay's January 18, 2012 notice, Lester resigned from the Eber W&L Board of Directors (Def. Ex. Q).

244.     The remaining Board members, namely, Wendy and Mr. Gumaer, then retained Marino Fernandez Esq., an attorney from Rochester, NY, as independent special counsel  (Def. Ex. ZA-Wendy Direct ¶130).

245.     Thereafter, the Board met and had numerous discussions regarding Alexbay's proposal. These meetings and discussions included, without limitation, discussions on March 13, 2012, and throughout the weeks of March 13, May 30, and June 1, 2012, as well as many phone conversations throughout that period. Lester did not participate in those Board discussions (Def. Exs., NN, AAA, OOO, R, KK, LL, MM).

246.     Approximately five months after Alexbay's Notice of Proposal was received, the Board members executed a unanimous written consent dated June 6, 2012, finding "after consideration of the financial statements and records of the Corporation and other information deemed relevant by the Board of Directors, the Board of Directors has determined in good faith that the value of Metro is less than the [the debt] owed to Alexbay….".   Lester did not participate in this determination (Def. Ex. AAA).

247. Alexbay foreclosed on the 2006 Notes and the Lester Line of Credit and in the process received Eber W&L's entire interest in Eber Metro.  Specifically, Eber W&L, Eber Metro and Alexbay entered into an Agreement for Turnover and Acceptance, dated June 5, 2012, providing for the transfer of the capital stock of Eber Metro to Alexbay in full satisfaction of the 2006 Notes, the Lester Line of Credit and the 2010 Guaranty made prior to June 5, 2012.  As a part of such agreement, Eber W&L and Eber Metro acknowledged their belief that "ownership of Metro is worth less than the Obligations." Eber W&L and Eber Metro also agreed to indemnify Alexbay against, and hold Alexbay harmless from and against, "any and all claims, damages, losses, costs and expenses at any time asserted against or incurred by Alexbay as a direct or indirect result of Alexbay's acceptance of the collateral (Def. Ex. H) (the "2012 Foreclosure").

248. As of July 5, 2012, 2006 Notes (including the 2009 Checks), the Lester Line of Credit (which had been assigned to Alexbay) aggregated, with interest calculated in accordance with the 2006 Notes and the Lester Line of Credit, and after taking into account Lester's payable to the company, was **$4,157,586.31**.

249. The amount owed pursuant to the Lester Line of Credit as of June 5, 2012 is properly calculated as follows:

| Date of Advance | Amount of Advance | Interest Through 12/31/2011 | Total Principal and interest as of 12/31/11 | Interest from 1/1/2012 through 6/5/2012 | Total Principal and Interest as of 6/5/2012 |
|---|---|---|---|---|---|
| Interest rate: | | 12.5% | | 15.0% | |
| 2/18/2010 | $150,000 | $38,723.81 | $188,723.81 | $12,259.40 | $200,983.21 |
| 3/11/2010 | 165,000 | 41,131.25 | 206,131.25 | 13,390.18 | 219,521.43 |
| 6/8/2010 | 220,000 | 46,715.42 | 266,715.42 | 17,325.70 | 284,041.12 |
| 7/22/2010 | 20,000 | 3,889.74 | 23,889.74 | 1,551.87 | 25,441.61 |
| 2/11/2011 | 100,000 | 11,507.68 | 111,507.68 | 7,243.48 | 118,751.16 |
| 3/12/2011 | 250,000 | 26,056.26 | 276,056.26 | 17,932.47 | 293,988.73 |
| 4/11/2011 | 50,000 | 4,655.51 | 54,655.51 | 3,601.30 | 58,256.81 |
| 4/26/2011 | 64,000 | 5,606.07 | 69,606.07 | 4,521.58 | 74,127.64 |
| 5/25/2011 | 32,000 | 2,464.34 | 34,464.34 | 2,238.79 | 36,703.12 |
| 6/13/2011 | 179,000 | 12,553.62 | 191,553.62 | 12,443.23 | 203,996.84 |
| 7/7/2011 | 275,000 | 16,914.13 | 291,914.13 | 18,962.59 | 310,876.72 |
| 10/7/2011 | 46,000 | 1,337.62 | 47,337.62 | 3,075.03 | 50,412.65 |
| 10/27/2011 | 25,000 | 554.04 | 25,554.04 | 1,659.98 | 27,214.02 |
| 11/25/2011 | 15,000 | 183.21 | 15,183.21 | 986.29 | 16,169.50 |
| 2/26/2012 | 20,000 | | | 823.38 | 20,823.38 |
| 3/14/2012 | 203,000 | | | 6,912.67 | 209,912.67 |
| 4/16/2012 | 5,000 | | | 101.88 | 5,101.88 |
| 5/10/2012 | 10,000 | | | 105.45 | 10,105.45 |
| Total | $1,829,000 | $212,292.69 | $1,803,292.69 | $125,135.26 | **$2,166,427.95** |

250. The amount due under the 2006 Notes (including the 2009 Checks) as of the date of the 2012 Foreclosure is properly calculated as follows:

| Date | Principal Amount | Interest per Day | Total Interest through 12/31/11 | Total Principal and Intest as of 12/31/11 | Interest from 1/1/2012 through 6/5/2012 | Total Principal and Interest as of 6/5/2012 |
|---|---|---|---|---|---|---|
| 8/31/2007 | $1,219,913.65 | $300.80 | $476,167.39 | $1,696,081.04 | $46,924.90 | $1,743,005.94 |
| 9/30/2007 | 389.21 | 0.10 | 149.04 | 538.25 | 14.97 | 553.22 |
| 10/1/2007 | 298.25 | 0.07 | 114.14 | 412.39 | 11.47 | 423.86 |
| 10/31/2007 | 808.54 | 0.20 | 303.44 | 1,111.98 | 31.10 | 1,143.08 |
| 11/30/2007 | 1,070.38 | 0.26 | 393.78 | 1,464.16 | 41.17 | 1,505.34 |
| 12/31/2007 | 418.80 | 0.10 | 150.87 | 569.67 | 16.11 | 585.78 |
| 1/31/2008 | (1,277.07) | (0.31) | (450.30) | (1,727.37) | (49.12) | (1,776.49) |
| 2/29/2008 | (1,574.01) | (0.39) | (543.74) | (2,117.75) | (60.55) | (2,178.30) |
| 3/31/2008 | 1,604.22 | 0.40 | 541.92 | 2,146.14 | 61.71 | 2,207.85 |
| 4/30/2008 | 2,323.23 | 0.57 | 767.62 | 3,090.85 | 89.36 | 3,180.22 |
| 5/31/2008 | 2,000.00 | 0.49 | 645.53 | 2,645.53 | 76.93 | 2,722.47 |
| 6/30/2008 | (950.25) | (0.23) | (299.68) | (1,249.93) | (36.55) | (1,286.48) |
| 7/31/2008 | (677.99) | (0.17) | (208.64) | (886.63) | (26.08) | (912.70) |
| 12/31/2009 | 212,000.00 | 52.27 | 38,160.00 | 250,160.00 | 8,154.74 | 258,314.74 |
| 7/30/2010 | (14,000.00) | (3.45) | (1,791.62) | (15,791.62) | (538.52) | (16,330.14) |
| Total | $1,422,346.96 | | $514,099.75 | $1,936,446.71 | $54,711.65 | $1,991,158.36 |

251.    The aggregate amount owed to Alexbay, **$4,157,586.31,** was satisfied in full in the

2012 Foreclosure. [1]

252.    If the 2012 Foreclosure had not taken place, interest would have continued to

accrue pursuant to the terms of the 2006 Notes and the Lester Line of Credit, and the total

principal and interest would have ballooned to approximately $11.5 million through July 31, 2021

(Def. Ex. KKKKK).

---

[1] Defendants' demonstrative (Def. KKKKK) calculates the aggregate principal and interest pursuant to the terms of the 2006 Notes and Lester Line of Credit through July 5, 2012 as $4,173,489.44. However, that figure includes the principal amount of $12,363.72 plus interest that should not have been included as in the calculation as a loan from Lester as set forth in paragraphs 231-234 above. That $12,363.72 should not have been considered a debt of Eber W&L or a credit to Lester and is thus deducted here.

253.     After the 2012 Foreclosure, Wendy repeatedly wrote to Rick Hawks at CNB that some of their internal records and statements for the Trust, including those transmitted to the beneficiaries, which reflected the Trust's ownership interest in the Eber entities and the value thereof, were no longer accurate given the foreclosure (Def. Exs., VVVVV, WWWWW, XXXXX). Wendy asked CNB to ensure that their records and statements to the beneficiaries were clear as to the Trust's interests in the Eber entities and the value thereof (id., Def. Ex. ZA-Wendy Direct ¶145).

254.     The Court finds that Wendy made good faith efforts as an officer and director of Eber W&L to ensure that the books and records of the Trust properly reflected that Eber Bros. and Eber W&L no longer had any value in the wake of the 2012 Foreclosure, as they no longer held an interest in Eber Metro and Eber-CT.

255.     Lester informed Sally Kleeberg about the 2012 Foreclosure in or about 2013 (Lester Dep. at 290: 21-25; 291:1-11).

256.     At the time of the 2012 Foreclosure, Eber Metro did not operate or conduct any business activity. It had not generated operating revenue or profit of any kind in several years. Eber Metro had no cash reserves, other than those required in the ordinary course of its business. Its only intangible asset of any significant value and its only valuable asset of any kind was ownership of a 79% interest in Eber-CT (Lester Dep. at 199-200:18-25, 1-9).

257.     Prior to the Eber W&L Board's determination to consent, Alexbay obtained an order from J. Matthew Rosenbaum (Sup. Ct., Monroe County), in a public filing, that the 2012 Foreclosure was "commercially reasonable" under NY UCC § 9-627 (Def. Exs. I, G, OO).

258.     In order to show "commercial reasonableness", Lester, through Alexbay, sought to show that the value of the Eber Metro stock was less than the outstanding principal of and interest

on the 2006 Notes and the Lester Line of Credit that he made prior to June 5, 2012, not to fix a specific value of Eber Metro. Naturally, as the record was public, it was not in the best interests of Eber-CT for Alexbay/Lester to present an unnecessarily gloomy picture of the value of Eber CT's financial situation for suppliers, customers, employees, bank lenders, and competitors (Def. Exs. ZA-Wendy Direct ¶142, I).

259.    Lester, at his deposition, and in previous sworn affidavits upon which he was cross-examined at his deposition (Pl. Exs. 45, 46), was consistent as to his view of the consideration exchanged in the 2012 Foreclosure.  According to Lester, the value of the equity in Eber-CT in 2012 was uncertain and could not be derived with precision (Lester Dep. at 238-239:8-25, 1-3).  He used the Polebridge Bowman transaction as a measuring stick in support of the determination of commercial reasonableness, not just because it was the most recent sale, but also because of the circumstances surrounding the company's business prospects or lack thereof - Lester did not believe that the company had any value in 2012 (Lester Dep. at 240:97-98).

260.    In connection with the 2012 Foreclosure, The Board of Eber W&L received advice from counsel, Marino Fernandez, as well as from Gary Ford, a senior partner of the Groom Law Group, and consulted with Glenn Sturm, Mike Gumaer, Sumner Pearsall, a Rochester, N.Y., tax accountant, and Mr.  Gallagher, President of Benefits Management Inc., Fairport, NY, Eber W&L's actuarial consultant.  It also communicated with Lester's counsel, David Belt and Michael Beyma, senior bank finance partner of Underberg & Kessler (Def. Ex. ZA-Wendy Direct ¶132).

261.    The Board concluded that, based on the facts and circumstances at that time, Eber W&L and Eber Metro were then "insolvent" because it believed the present fair salable value of their respective assets was less than the amount required to pay their respective probable liability on their existing debts, including the "termination liability" under the Retirement Plan and the

Teamsters Fund employer "withdrawal liability," as they became absolute and matured, and because the sum of each such company's debts was greater than all of its property.  The Board also considered the possibility of filing for bankruptcy (Def. Ex. ZA-Wendy Direct ¶133).

262.    The Board also concluded that its fiduciary obligation to the corporation required that it properly prioritize the interests of the company's creditors.  It identified Eber W&L's principal creditors as the Retirement Plan (and very likely eventually PBGC), the Teamsters Fund, Harris Beach, certain warehouse lessors, all of which were unaffiliated third parties, and Alexbay  (Def. Ex. ZA-Wendy Direct ¶134).

263.    The Board also considered the interests of other constituencies and considerations, including, the impact of the Board's actions on short-term or long term growth, development, productivity and profitability of the Eber entities, on their creditors, employees, retired employees with vested rights in the Eber W&L Retirement Plan, and the Eber business' customers, suppliers, lessors, and vendors (Def. Ex. ZA-Wendy Direct ¶135).

264.    The Board also considered the Eber Entities' immediate need to obtain additional liquidity in order to pay the legacy liabilities of Eber W&L (and probably Eber Metro) to unaffiliated third party creditors (since it was then out of business) (Wendy). It also considered the fact that there were no other unaffiliated third party lenders or equity investors willing to lend to or invest in Eber W&L.  It also considered the fact that a sale of the company at a public auction was not feasible (Def. Ex. ZA-Wendy Direct ¶136).

265.    The Board considered the facts surrounding the then accrued unfunded benefit liability and "termination liability" of the Retirement Plan, as well as the existing employer "withdrawal obligation" to the Teamsters Fund. The Board believed that negotiating a settlement with PBGC was necessary to avoid having to liquidate Eber- CT's entire business (id. at ¶ 137).

266.    Based on the existing facts and circumstances, the Board did not then believe a settlement with PBGC was likely to occur on terms that would allow Eber-CT to stay in business unless the proposed 2012 Foreclosure went forward (Def. Ex. ZA-Wendy Direct ¶137).

267.    The Board understood that, unless such a settlement could be reached, PBGC had many legal options available to it, which they were highly likely to successfully pursue, including, exercising  its power to:

> a.   Involuntarily terminate the Retirement Plan as of a then current date;
>
> b.   Make a statutory demand for payment of the Retirement Plan's termination liability (of over $5 million), which would make it a fixed and matured joint and several liability of Eber W&L and Eber Metro, since Eber W&L then owned more than 100% of Eber Metro as of such then current termination date; and,
>
> c.   Automatically impose a statutory federal tax liens on the assets of both Eber W&L and Eber Metro, including Eber W&L's 100% interest in Eber Metro, and Eber Metro's interest in Eber-CT (Def. Ex. ZA-Wendy Direct ¶138).

268.    The Board believed this would mean the collapse of Eber-CT, or at least the end of the Trust's indirect interest therein.  The Board also considered that PBGC could set an earlier retroactive termination date for the Retirement Plan, including before the Polebridge Bowman Transaction, which would make Eber-CT jointly and severally liable for the Plan's "termination liability," since Eber Metro would have owned more than 80% of Eber-CT as of such an earlier termination date.  This, in fact, is exactly what eventually happened (Def. Ex. DD);(Def. Ex. ZA-Wendy Direct ¶139).

269.    The Court finds that the Board acted in good faith with respect to the 2012 Foreclosure

## VI.     LIABILITIES AND VALUE AT THE TIME OF THE 2012 FORECLOSURE

270.     The market value of the equity of Eber Metro at the time of the 2012 Foreclosure involves ascertaining both its liabilities and the value of its assets.

### A.  Liabilities

#### i.  The Teamsters Fund

271.     For many years prior to 2008, Eber W&L was a participating "employer" in the New York State Teamsters Conference Pension & Retirement Fund (the "Teamsters Fund"). The Teamsters Fund was a "multiemployer employee benefit plan" as defined in the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (Def. Ex. PP).

272.     In or before 2007, Eber W&L incurred a "complete withdrawal" from the Teamsters Fund as defined in ERISA.  As a result, Eber W&L and all the members of its "controlled group" (including Eber W&L, Eber Metro and Eber-CT) under ERISA incurred "withdrawal liability" to the Teamsters Fund.  On January 10, 2008, the Teamsters Fund assessed an employer "withdrawal liability" against Eber W&L, and all the members of its "controlled group" (including Eber W&L, Eber Metro and Eber-CT), in the amount of $2,212,367.47 pursuant to ERISA and required payment on a monthly payment schedule (Def. Ex. PP).

273.     On August 17, 2009, Eber W&L and Eber Metro and the Teamsters Fund entered into a Modification Agreement providing for a lower monthly payment schedule for such "withdrawal liability." The Teamsters Fund and Eber Metro executed a Guaranty and Security Agreement, under which Eber Metro guaranteed the obligation of Eber W&L to pay the "withdrawal liability" and granted the Teamsters Fund a security interest in future distributions by Eber-CT to Eber Metro (Def. Ex. M).

274.     Prior to the 2012 Foreclosure, Wendy negotiated a revised agreement with the Teamsters Fund further reducing the monthly payment amount.  In that agreement, Eber W&L and Eber Metro jointly and severally agreed to pay the full amount of the "withdrawal liability." The Revised Modification Agreement was finally executed on July 30, 2012, and Eber W&L executed a Confession of Judgment for **$1,421,029.95** on August 1, 2012 (Def. Exs., M, F).

275.     Ultimately, Eber W&L, Eber Metro, and Eber-CT were released from their remaining unpaid obligation to the Teamsters Fund when Lester funded payment to the Teamsters Fund of $653,134 in July, 2013 (Def. Ex. JJJJ).

### ii.  Termination Liability to Eber W&L Retirement Plan and PBGC

276.     The Eber Bros. Wine and Liquor Corporation Retirement Plan (the "Retirement Plan"), was adopted by Eber W&L in 1954, as sponsor, for the benefit of substantially all non-union employees of Eber W&L and Eber Metro and their beneficiaries (Def. Ex. ZA-Wendy Direct ¶59) Def. Exs. DD, BB, BBBBB, DDDDD, NNNN).

277.     The Retirement Plan was a "single employer defined benefit plan", subject to minimum funding standards and the termination insurance program established under ERISA (Def. Exs. DD, BB, BBBBB, DDDDD, NNNN).

278.     The Retirement Plan required the accrual and payment of pension benefits. Benefits under the Retirement Plan accrue at the time services are performed for the employer by the participant (Def. Exs. DD, BB, BBBBB, DDDDD, NNNN).

279.     Eber W&L, as Retirement Plan sponsor, was required to make certain minimum annual contributions to the Retirement Plan to fund benefits thereunder (Def. Ex. DD, BBBB, NNNN).

280.    The Retirement Plan was amended to freeze the accrual of plan benefits as of December 31, 2000 (Def. Ex. ZA-Wendy Direct ¶63) (Pl. Ex. 244 at 4).

281.    As a result of the freeze, all participants were fully vested (Def. Exs., DD, BBBB, NNNN) (Def. Ex. ZA-Wendy Direct ¶63).

282.    Eber W&L continued to be responsible for minimum annual contributions to fund the Retirement Plan (Def. Exs., DD, BBBB, NNNN).

283.    The employer/contributing sponsor of a pension plan (such as Eber W&L) and each member of its "controlled group" are jointly and severally liable to the pension plan for contributions necessary to satisfy the minimum funding standards imposed by the Internal Revenue Code and ERISA.

284.    When the aggregate amount of missed minimum funding contributions plus interest exceeds $1 million, a lien, enforceable only by PBGC, arises on behalf of the pension plan against all assets of both the plan's sponsor and of the members of the sponsor's "controlled group." See 26 U.S.C. § 430 (k) (l) (5).

285.    A "controlled group" is a group of businesses under common control, such as a parent company and its 80% owned subsidiary. See 29 U.S.C. § 1301 (a) (14 ). Upon termination of an underfunded pension plan, the plan sponsor and any entity that is a member of its "controlled group" on the termination date becomes jointly and severally liable to PBGC for, inter alia, the total amount of the unfunded benefit liabilities (as of the termination date) to all participants and beneficiaries under the plan, together with reasonable interest calculated from the termination date. See 29 U.S.C. § 1362(a) (b) (1) (A).

54

286.     On March 30, 2007, Eber W&L ceased New York operations resulting in the termination of employment of over 90% of the active employees with vested balances in the Retirement Plan (Def. Ex. NNNN; see paragraph 87 above).

287.     Michael A. Gallagher ("Gallagher"), the President of Benefits Management, Inc. ("Benefits Management"), testified with respect to the consulting and administrative services that Benefits Management provided to Eber W&L Retirement Plan from 2007 through 2014.  (Def. Ex. ZB-Gallagher Direct at ¶¶ 1-2)

288.     The services provided by Benefits Management included preparing an annual valuation report for the Retirement Plan, determining the annual minimum funding requirement for the Retirement Plan, and preparing financial statement disclosures and benefit election paperwork for participants who retired.  (Def. Ex. ZB-Gallagher Direct at ¶4)

289.     Mr. Gallagher confirmed that the Plan was frozen as of December 31, 2000.  As of that date, all benefits were calculated for Plan members by the prior actuary (Def. Ex. ZB-Gallagher Direct at ¶3).

290.     With Mr. Gallagher's help, in August 2009, Eber W&L applied to the Internal Revenue Service for a waiver of the Internal Revenue Code's minimum funding standard for the Retirement Plan under section 412(d) of the Internal Revenue Code and section 303 of ERISA. (*See* Def. Ex. ZB-Gallagher Direct at ¶3) (Def. Ex. BBBB).

291.     In connection with the August 2009 waiver application, Gallagher calculated an estimate of the amount that would be necessary to terminate the Retirement Plan under the standard termination procedures of the Pension Benefit Guaranty Corporation ("PBGC")[2] (Def.

_____

[2] The PBGC in a United States government owned and controlled entity that has enforcement powers under ERISA for the purposes of protecting worker benefits under private sector defined benefit plans.

Ex. DD).  He determined this amount by calculating the amount needed to cover all potential liabilities to Retirement Plan participants using the applicable Internal Revenue Service interest rates, and then subtracting the amount of Plan assets  (Def. Ex. ZB-Gallagher Direct at ¶¶ 6-8).

292.    As of May 31, 2009, the present value of benefits for all Plan participants, calculated as though the Plan then terminated, was $9,665,422, which was the amount needed as of May 31, 2009, for the Plan to provide a lump sum payment to each participant under the Plan that would satisfy the Plan's liability to all Plan participants on termination (Def. Ex. ZB-Gallagher Direct at ¶¶ 6-8) (Def. Ex. BBBB, at 2).

293.    As Plan assets as of May 31, 2009 were $4,109,667 (*see* Def. Ex. BBBB, at 2), Eber W&L would have needed to make a contribution to the Plan of **$5,555,755** in order terminate under the PBGC standard termination procedures as of May 31, 2009 (Def. Ex. ZB-Gallagher Direct at ¶¶ 11-12).  Gallagher provided this information to Wendy Eber and other officials at Eber W&L (Def. Ex. ZB-Gallagher Direct at ¶13).

294.    After 2009, Eber W&L was unable to meet the minimum funding requirement, and was carrying a funding deficiency (Gallagher Tr. at 392:4-11, 393:2-7 Cross) (Def. Ex. DD at 4).

295.    From 2009 to 2012, Eber W&L made minimum contributions to the Retirement Plan in a total amount of $2,415,247 (Def. Ex. ZA-Wendy Direct ¶70) (Pl. Ex. 160 at 88-89) (Def. Ex. T).

296.    Lester funded the money to pay contributions that could be made (Def. Exs. ZA-Wendy Direct ¶70) (Def. Ex. T).

297.    In 2010, Eber W&L began discussions with the PBGC about the failure of Eber W&L to make all required contributions to the Retirement Plan and how Eber W&L was going to address its funding obligations under the Plan (Def. Ex. ZA-Wendy Direct ¶68).

298.     Eber W&L hired the Groom Law Group, a Washington, D.C. law firm specializing in PBGC matters, in 2010 to advise Eber W&L on its Retirement Plan issues (Lester Transcript p. 92, l. 5-25) (Def. Ex. DD at 4).

299.     Eber W&L sent notices to Plan participants of missed contributions to the Plan on or about November 11, 2011, February 10, 2012, August 15, 2012, November 11, 2012, February 15, 2013 and July 10, 2013 (Def. Ex. IIII).

300.     On February 14, 2012, the IRS granted Eber W&L's request for a waiver of the funding standards for the Retirement Plan year ended May 31, 2009, subject to certain conditions. This resulted in an accumulated funding deficiency, as of May 31, 2012, of $805,119.  Also, quarterly installments of $224,946 that were due on September 15, 2012, and December 15, 2012, were not paid (Def. Ex. NNNN).

301.     The Retirement Plan's financial statements for the fiscal years ended May 31, 2011 and 2012, on which Davie Kaplan gave an Independent Auditors' Report, dated March 4, 2013, stated in footnote 8 - "This funding deficiency raises substantial doubt about the Plan's ability to continue as a going concern" (Def. Ex. NNNN).

302.     In December 2018, Gallagher provided an updated calculation of the Plan's termination liability under the PBGC standard termination procedures for the Plan as of June 1, 2012, a date when Benefits Management was providing actuarial services to Eber W&L (Gallagher Direct at ¶¶ 2, 14-16) (Def. Ex. JJ).

303.     The amount needed as of June 1, 2012 to provide a lump sum payment to each participant under the Plan that would satisfy the Plan's liability on termination for all benefits to all participants—including $6,268,918 for those in pay status, and $3,554,259 for those entitled to future benefits—was $9,823,177  (Gallagher Direct at ¶19; Def. Ex. JJ, at 1).

304.    As Plan assets as of May 31, 2012 were $4,759,789, Eber W&L would have needed to make a contribution to the Plan of **$5,063,388** in order terminate under the PBGC standard termination procedures as of May 31, 2012 (Gallagher Direct at ¶¶ 20-21; *see* Def. Ex. JJ, at 2).

305.    At the time that Wendy was preparing the minimum funding waiver request to the IRS in 2009, she believed that Eber W&L's termination liability, for which all entities in the "controlled group" would be responsible, would be in excess of $5 million.  This is consistent with the waiver application itself - - the waiver application reflects a termination liability, if the Plan were to be terminated as of May 31, 2009, in an amount in excess of $5.5 million (Def. Ex. BBBB, at 2).

306.    As of June 4, 2012, Eber W&L had missed a total of $1,106,891 of required minimum funding contributions to the Retirement Plan. As a result of such missed contributions exceeding $1 million, a Federal tax lien then arose against all the assets of Eber W&L and the members of its "controlled group", including Eber Metro. PBGC could enforce this lien at any time (Def. Ex. DD, at 4, Bates Stamp EB-0010505; Def. Ex. WWWW).

307.    Lester and Wendy continued negotiations with the PBGC following the 2012 Foreclosure, and Wendy, at the time, believed that liability to the PBGC arising out of the Plan was certain, and sooner or later the Eber entities would be have to negotiate a settlement with the PBGC (Def. Ex. ZA-Wendy Direct ¶76).

308.    In April 2013, after Eber W&L failed to make contributions owed to the Retirement Plan (including interest) exceeding $1 million, PBGC perfected statutory liens by filing Notices of Federal Tax Lien under IRC 430(k) against Eber Bros. and Eber Metro as well as Eber-CT (Def. Exs. WWWW, JJJJJ; Def. Ex. DD, at 2).

309.    On August 6, 2014, the PBGC informed Eber W&L that it had made an administrative determination that the termination of the Retirement Plan was necessary because the Retirement Plan would be unable to pay benefits when due (Def. Ex. RR; Def. Ex. DD at 5).

310.    Thereafter, by Complaint, dated May 11, 2015, the PBGC brought suit against Eber W&L (Def. Ex. GGGG).

311.    On January 19, 2016, the United States District Court for the Western District of New York entered an order, as requested by PBGC, retroactively establishing April 30, 2010, two years before the 2012 Foreclosure, as the termination date of the Retirement Plan.  The order also held as a matter of law that as of April 30, 2010, the Eber W&L "controlled group" included Eber Bros., Eber W&L, Eber Metro, and Eber-CT (Def. Ex. DD).

312.    Upon termination of the Retirement Plan, effective April 30, 2010, each of the Eber W&L "controlled group" members (including Eber W&L, Eber Metro, and Eber-CT) became jointly and severally liable for all liabilities under Title IV of ERISA, in connection with the Retirement Plan's termination, including Plan unfunded benefit liabilities, due and unpaid contributions, premium and interest.  These liabilities totaled $7,985,670 as of August 31, 2016 (Def. Ex. HHHH).

313.    On March 29, 2016, PBGC issued its "controlled group" determination, liability determination, net worth determination, and jeopardy determination in demand letters to each member of the Eber W&L "controlled group", including Eber W&L,  Eber Metro and Eber CT. The final demand letters notified the Eber "controlled group" members of PBGC's final determinations and demanded immediate payment of $2,187,500, and agreement to terms with PBGC for payment of the remainder of the termination liabilities, $4,050,420, by April 4, 2016 (Def. Ex. QQ).

314.     On July 31, 2016, PBGC filed federal tax lien notices against the Eber W&L "controlled group" members, including Eber W&L, Eber Metro and Eber CT, in favor of PBGC under 29 U.S.C. sec. 1368 for the amount of the demand.  The liens arose retroactively as of the Retirement Plan termination date — April 30, 2010.  The tax liens were perfected on August 2, 2016 (Def. Ex. XXXX).  The perfection of the federal tax liens caused an immediate event of default under Eber-CT's first lien senior bank debt facility with CNB (Def. Ex. IIIII).

315.     Finally, the Eber W&L "controlled group" members and Lester entered into a settlement agreement with PBGC on February 24, 2017, under which PBGC agreed to release the Eber W&L "controlled group", including Eber W&L, Eber Metro, and Eber-CT from all Title IV Liabilities, in return for Lester waiving his (and Lester's wife waiving her) entire future benefit entitlement under the Retirement Plan, in the amount of  approximately $1.4 million, plus an additional cash payment of $2 million (Def. Ex. SS at 2) (Lester Dep. at 180:5-25, 181:1-20) (Def. Ex. DDDD; Def. Ex. DD at 14-15).

316.     In order to fund the PBGC settlement, the Board of Eber-CT made a distribution to Eber-CT's members, namely Eber Metro, Eder-Goodman, and Wendy of $25,000 per unit.  Wendy, who had recently acquired her 6% interest (6 units) in Eber-CT from Polebridge Bowman, received $150,000 which she contributed, almost entirely, to the settlement of with the PBGC (Wendy Tr. 343:14-25, 344:1-25, 345:1-2 Cross).

317.     The settlement agreement recites that Lester waived his entire future benefit under 29 C.F.R. 4041.47 (d), which provides that a "majority owner" may waive plan benefits to facilitate a plan termination provided, that "the conditions in § 4041.21(b)(2) (i) through (iv) are met."  29 CRF §4041.21(b)(2) requires a majority owner to waive in writing and where applicable requires his spouse to waive within a certain time frame.  Under 29 C.F.R. 4041. 2, a "majority

owner" means with respect to a contributing sponsor, an individual who owns, directly or indirectly, 50 percent or more of (1) an unincorporated trade or business; (2) the capital or profits interest in the partnership; or (3) either the voting stock of a corporation or the value of all of the stock of a corporation." The settlement agreement recites that Lester was a "majority owner" of Eber W&L within the meaning of 29 U.S.C. sec 4041.2.

318.    However, Lester was not a "majority owner" of Eber W&L prior to February 2017 within the meaning of 29 U.S.C. sec 4041.2 (Def. Ex. SS).

319.    Thus, Eber W&L issued 750 shares of Class B Junior Preferred Stock to Lester. On February 15, 2017, Eber W&L issued to Lester 750 shares of its Class B Junior Preferred Stock, par value $50 per share (the "Class B Junior Preferred Stock"), in consideration of Lester's binding obligation to reimburse Eber W&L, at its request, for up to $37,500 of expenses incurred or to be incurred by it for general operations. The Class B Junior Preferred Stock is redeemable at any time at the option of Eber W&L at its par value—$37,500. It is not common stock, stock convertible into common stock or any kind of common stock equivalent. The holder of the Class B Junior Preferred Stock is entitled to cast an aggregate of 750 votes (27.3% of the aggregate votes entitled to be cast by all shareholders of Eber W&L) on matters that shareholders may vote on generally. Eber Bros. is entitled to cast 2000 votes (72.7% of the aggregate votes entitled to be cast by all shareholders of Eber W&L) on matters that shareholders may vote on generally (Def. Ex. AA).

320.    Just as she did in her communications with CNB, Wendy in advocating for Eber-CT to the PBGC to try to avoid, defer, and/or reduce liability to then PBGC, expressed confidence in Eber-CT's performance (Wendy 345:15-20 Cross). The Court finds that Wendy's expressions of confidence in her attempt to help the Eber entities avoid liability were unwarranted.

### iii.   Other Liabilities

321.    As set forth above, as of the date of the 2012 Foreclosure, the aggregate principal and interest on Lester's 2006 Notes, the Lester Line of Credit and the 2010 Guaranty after deducting Lester's personal account payable was **$4,157,586.31**

322.    Further, Harris Beach PLLC sued Eber W&L in September 2011 to collect legal fees for services rendered by Harris Beach on behalf of the Eber entities seeking recovery of **$755,896** (Def. Ex. QQQ) (Lester Tr. p. 190-191, l.17-15, 1-11).

323.    Harris Beach represented the Eber entities in connection with a wide variety of matters, including (a) the acquisition of Slocum & Sons; (b) the exchange, proposed by Southern, but never consummated, of a $3 million bridge note for a 15% ownership interest in Eber-CT in the Winter of 2007/2008; (c) the sale of the 15% ownership interest in Eber-CT, originally sought by Southern, to Eder-Goodman in January 2008; and (d) the sale of a 6% ownership interest in Eber-CT to Polebridge Bowman in May 2010 (see Point IV. above and exhibits annexed thereto). Under the terms of Harris Beach's engagement, all of the Eber entities were jointly and severally responsible for fees (Wendy Tr. at 235:8-9 Direct).

324.    As of the date of the 2010 Foreclosure, the Eber entities had **$80,000** remaining to be paid under a settlement agreement with D4 LLC dated February 2012 (Def. Ex. Z).

325.    Eber W&L defaulted on its lease payments to its former landlord, Benderson Development, in 2011 and was sued by Benderson in March 2012 pursuant to the terms of the lease for **$256,948** (Def. Ex. III) (Lester Dep. at 190-191:17-15, 1-11).

### B.   Expert Testimony on the Issue of the Value of Metro

326.    Frank Torchio, the President of Forensic Economics, Inc., testified for Defendants as an expert witness on valuation.  He provided an opinion regarding the market value of equity

("MVE") of the capital stock of Eber Metro as of May 23, 2012 (the "Valuation Date")  (Def. Ex. ZC-Torchio Direct ¶1).

327.    The market value of equity is also known as fair market value which is defined as:

> … the amount at which property would change hands between a willing seller and a willing buyer when neither is acting under compulsion and when both have reasonable knowledge of the relevant facts.

(Torchio Direct Testimony at ¶ 1).

328.    Mr. Torchio also provided an opinion as to whether, immediately prior to the transfer of the capital stock of Eber Metro to Alexbay in June 2012 (the 2012 Foreclosure), Eber W&L and Eber Metro, were insolvent, within the meaning of New York Debtor and Creditor Law, Sections 273 and 276 as then in effect (Def. Ex. ZC-Torchio Direct ¶2).

329.    Mr. Torchio also provided an opinion that the stated rates of the 2006 Notes and the Lester Line of Credit were fair and reasonable (Def. Ex. ZC-Torchio Direct ¶60)

### i.    Corporate Structure of the Eber Companies

330.    As of May 23, 2012, (a) Eber W&L owned 100% of the outstanding capital stock of Eber Metro; (b) Eber Metro owned 79% of the membership units ("Units") of Eber-CT, (c) Eder-Goodman owned 15% of the Units, and (d) Polebridge Bowman, owned 6% of the Units (Def. Ex. ZC-Torchio Direct ¶ 3).

331.    As of the Valuation Date, the only operating entity owned by Eber Metro, and therefore beneficially owned by Eber W&L, was Eber-CT (Def. Ex. ZC-Torchio Direct ¶4).

332.    Mr. Torchio computed the Market Value of Equity ("MVE") for Eber Metro as the MVE of Eber-CT attributable to Eber Metro's 79% ownership of Eber-CT, plus other Eber Metro assets, minus liabilities of Eber Metro.  The MVE for Eber W&L is computed as the MVE of Eber

Metro attributable to Eber W&L's 100% percentage ownership of Eber Metro, plus other Eber W&L assets, minus liabilities of Eber W&L (Def. Ex. ZC-Torchio Direct ¶5).

333.    Mr. Torchio assessed the solvency of Eber Metro and Eber W&L by determining the difference between the present fair saleable value of their assets and the amount that would be required to pay their probable liability on their existing debts as they became absolute and matured.  If the liabilities exceed the assets, then the entity is deemed to be insolvent based on his valuation.  If the assets exceed the liabilities, then the entity is deemed to be solvent based on his valuation (Def. Ex. ZC-Torchio Direct ¶6).

### ii.   Valuation of the Eber-CT Asset

334.    As of the Valuation Date, the only remaining operating entity of all the Eber-related companies was Eber-CT, so Mr. Torchio first determined the MVE of Eber-CT (Def. Ex. ZC-Torchio Direct ¶61).

335.    In beginning his analysis, Mr. Torchio recognized that Eber-CT had a loss from operations for every fiscal year from 2007-2012  (Def. Ex. ZC-Torchio Direct ¶71):

|  | FY 2007 | FY 2008 | FY 2009 | FY 2010 | FY 2011 | FY 2012 |
|---|---|---|---|---|---|---|
| *Revenue* | $42,386,508 | $43,244,059 | $38,944,354 | $36,552,221 | $36,890,281 | $36,383,755 |
| *Profit/(Loss) from Operations* | ($656,146) | ($140,178) | ($2,338,886) | ($920,061) | ($687,297) | ($299,060) |
| *EBITDA* | ($436,516) | ($31,058) | ($2,238,284) | ($806,908) | ($539,963) | ($204,223) |

### iii.   Calculation of Enterprise Value

336.    The valuation ratio Mr. Torchio used for Eber-CT is Enterprise Value ("EV") to revenue.  Enterprise Value excludes non-operating assets such as cash and is computed as the MVE, plus debt, minus cash (and minus other non-operating assets)  (Def. Ex. ZC-Torchio Direct

¶74).  He used this valuation method because it would indicate the value a third party would likely pay for the business.

337.    Mr. Torchio's first step was to compute the EV Value for a comparable company (*e.g.* a trading comparable).  This calculation starts with the market value of equity, which is generally calculated as the price paid for the equity in the transaction divided by the percentage of ownership acquired.  If other rights are acquired in a comparable transaction beyond the percentage ownership, these rights must be taken into account and the market value of equity must be adjusted accordingly.  The amount of debt (both the current portion and non-current portion of debt) of the comparable company (if available) is added to the market value of equity.  From this figure, the amount of cash is subtracted to yield EV for the target company in the comparable transaction  (Def. Ex. ZC-Torchio Direct ¶75).

338.    The second step was to divide the EV for the comparable transaction by the amount of annual revenue that is contemporaneous to the transaction.  This yields a comparable EV/Revenue ratio (Def. Ex. ZC-Torchio Direct ¶76).

339.    The third step was to multiply the estimated EV/Revenue ratio by the revenue for the subject company.  This then yields an estimate of EV for the subject company.  Cash is then added, and debt is subtracted from EV, to yield the market value of equity for the subject company (Def. Ex. ZC-Torchio Direct ¶77).

340.    If there was a substantial temporal difference between the date of the comparable transaction and the valuation date of the subject company, Mr. Torchio assessed whether general market conditions that existed as of the date of the comparable transaction were similar to conditions as of the valuation date of the subject company, and made adjustments accordingly (Def. Ex. ZC-Torchio Direct ¶78).

### iv.   Five Comparables Used By Mr. Torchio

341.   Mr. Torchio used five comparables in his valuation.  He used two transactions involving Eber-CT stock, one offer for Eber-CT stock, one transaction for a comparable company, and one comparable company trading on a stock exchange at the time of the 2012 Foreclosure (Def. Ex. ZC-Torchio Direct ¶80).

### v.   15% Sale To Eder-Goodman – 2008

342.   On January 29, 2008, Eder-Goodman agreed to purchase a 15% interest in Eber-CT for $4.5 million (Torchio Direct Testimony at ¶96; see Def. Ex. KKK, at 16856-68.

343.   Eder-Goodman acquired a substantial set of rights in addition to a 15% equity ownership detailed in the Amended and Restated Limited Liability Company Agreement of Eber-Connecticut, LLC, (see Def. Ex. PPP, at 22871-908) and summarized as follows:

a) Eder-Goodman was to be treated equally "…as to the return of Capital Contributions, the allocation of Profits or Losses, or Distributions." *(See* Def. Ex. PPP, at 22879, Section 3.3)

b) Eder-Goodman was to be allocated Profits first "… to the extent of losses previously allocated which had the effect of decreasing the Minority Member's Capital Account below the 'Guaranteed Purchase Price'" (*See* Def. Ex. PPP. at 22880, Section 4.1.1)

c) Losses allocated to the Minority Member [Eder-Goodman] "… may not cause the Minority Member's capital account to be reduced below the 'Guaranteed Purchase Price.'" (*See* Def. Ex. PPP, at 22880, Section 4.1.2)

d) The distributions of proceeds from the sale of all or most of Eber-CT's assets shall be made in proportion to the respective interests of each member, subject to the Guaranteed Purchase Price. (*See* Def. Ex. PPP, at 22883, Section 4.6.1)

e) No "Major Decisions" "… shall be effective or binding on the Company unless approved by the Unanimous Consent of All the Members."  (*See* Def. Ex. PPP, at 22888, Section 5.4.  Section 5.4.1-10 lists ten different actions that Eder-Goodman could veto in its role as a Minority Member, including the issuance of new Units (Section 5.4.2) and Eber-CT could not incur additional

indebtedness if the aggregate debt of Eber-CT would total more than $5 million (Section 5.4.4))

    f)   Eder-Goodman has the right of first refusal on the disposition of any outstanding Units of Eber-CT. (*See* Def. Ex. PPP, at 22890, Section 7.3.1)

    g)   Eder-Goodman had "Drag Along Rights" which entitled it to receive a portion of the total sales proceeds from a sale of outstanding equity at least equal to Guaranteed Purchase Price, or a pro-rata rate if the entire company is not sold. (*See* Def. Ex. PPP, at 22891, Section 7.3.2)

    h)   Eder-Goodman had "Tag Along Rights" which entitled it to receive a portion of the total sales proceeds from a sale of outstanding equity at least equal to Guaranteed Purchase Price, or a pro-rata rate if the entire company is not sold. (*See* Def. Ex. PPP, at 22891, Section 7.3.3)

    i)   Eder-Goodman had the right of first refusal on the disposition of any or all of Eber-CT's assets to a third party. (*See* Def. Ex. PPP, at 22891-2, Section 8.1)

    j)   If Eber-CT (or its assets) are sold, or the company is liquidated, the net sale proceeds, or the net assets to be distributed in liquidation, are allocated among the members so that Eder-Goodman receives 15% of the total of such proceeds and any debt repayments to affiliates and other debt that financed non-operating assets or expenses, but not less than the Guaranteed Purchase Price. (*See* Def. Ex. PPP, at 22892-3, Sections 8.2 and 8.3)

(Def. Ex. ZC-Torchio Direct ¶ 97)

    344.    In return for its $4.5 million investment, Eder-Goodman received a security that was substantially equivalent to a convertible preferred equity security.  Upon the sale of Eber-CT (or its assets), Eder-Goodman was entitled to a liquidation preference of $4.5 million, plus 15% of the difference between (a) the total of such proceeds and any debt repayments to affiliates and other debt that financed non-operating assets or expenses, and (b) the $4.5 million Guaranteed Purchase Price - a complete downside liquidation preference, and a 15% upside common equity return.  (Def. Ex. ZC-Torchio Direct ¶ 98)

    345.    Andrew Eder agreed that the liquidation preference is consistent with a convertible preferred equity security.  (Eder Tr. at 144:15-18, 409:8-12) .

346.     Convertible preferred stock is often used as a common source of capital for companies that have a risk of financial distress.  As discussed above, Eber-CT had negative profit for 2007 and 2008.  Consequently, the right of priority acquired by Eder-Goodman in the transaction had significant value.  (Def. Ex. ZC-Torchio Direct ¶ 99)

347.     Mr. Torchio conservatively estimated the portion of the purchase price that is attributed to the rights of priority to be 25%.  This is a conservative premium for this valuation because the preference right becomes significantly more valuable when a firm is in financial distress, as Eber-CT was for several years.  (Def. Ex. ZC-Torchio Direct ¶100)

348.     In addition to the priority rights acquired by Eder-Goodman, it also acquired the right of first refusal ("ROFR") for any offer for control for Eber-CT.  (Def. Ex. ZC-Torchio Direct ¶101)

349.     ROFRs are an important and valuable mechanism to prevent sales of ownership interests to individuals or entities that may disrupt or undermine the management of the company and potentially reduce the market value of the company's assets.  (Def. Ex. ZC-Torchio Direct ¶ 104)

350.     Mr. Torchio explained that the right of first refusal that Eder-Goodman received, along with all the other rights that were granted to Eder-Goodman, would effectively eliminate the potential for a control premium from a later purchaser for the 79% ownership share of Eber-CT. (Torchio Tr. at 411:13 to 412:1 Direct).

351.     Potential bidders view the ROFR as a takeover deterrent, *i.e.*, the existence of ROFR will chill any potential takeover because the bidder knows that the party with the ROFR can match the bid, so a ROFR can be viewed as a minimum control premium.  In general, historical control premiums represent 30% of a company's stand-alone market value.  Mr. Torchio

used a smaller 15% figure to represent the value of the ROFR purchased by Eder-Goodman to be conservative.  (Def. Ex. ZC-Torchio Direct ¶105)

352.    The ROFR deters takeover prospects, as potential bidders will be reluctant to come forward because the ROFR holder has the right to match any third party offer, which increases time and money required by the third party to engage in the takeover process.  (Torchio Tr. at 412:5-12 Direct.)

353.    In addition, a potential purchaser would only be willing to pay a control premium if it could increase the value of the company in some way.  That would be difficult because Eder-Goodman had veto power over funding increases through both debt issuances and raising capital by issuing new units.  (Torchio Tr. at 412:13 to 414:1 Direct.)

354.    Based on the mathematical calculations set out in his direct testimony and exhibits, Mr. Torchio estimated the MVE of Eber-CT based on the 2008 Eder-Goodman transaction as of the Valuation Date to be $11.53 million.  (Def. Ex. ZC-Torchio Direct ¶¶ 106-107; *see* Def, Ex. TC-1.

### vi.  15% Offer by Southern – 2007

355.    The second comparable Mr. Torchio used was a proposed deal between Southern and Eber W&L wherein Southern would acquire a 15% interest in Eber-CT as a way to repay a $3 million bridge loan previously made by Southern to the Eber companies  (Def. Ex. ZC-Torchio Direct ¶ 108; *see* Def. Ex. JJJ).

356.    The Southern Offer contained several substantial rights for Southern, including a right of first refusal (Def. Ex. ZC-Torchio Direct ¶ 109).

357.    Mr. Torchio used the same 15% to represent the value of the ROFR as part of the Southern Offer.  (Def. Ex. ZC-Torchio Direct ¶ 110).

358.     Based on the mathematical calculations set out in his direct testimony and exhibits,

Mr. Torchio estimated the MVE of Eber-CT based on the 2007 Southern Offer as of the Valuation

date to be $9.19 million (Def. Ex. ZC-Torchio Direct ¶¶ 111; *see* Def. Ex. TC-2).

**vii.  Sale of 6% to Polebridge Bowman - 2010**

359.     In May 2010, Eber Metro sold a 6% share of Eber-CT to Polebridge Bowman for a

purchase price of $350,000 (Def. Ex. ZC-Torchio Direct ¶¶ 110; *See* Def. Ex. OOO). Polebridge

Bowman paid for its investment by delivering a non-recourse promissory note to Eber Metro for

$350,000 payable in 5 years with a stated interest rate of 2% (Def. Ex. ZC-Torchio Direct ¶¶ 112;

*See* Def. Ex. OOO).

360.     The price paid by Polebridge Bowman also reflected a ROFR granted first to

Wendy and second to the Seller (Def. Ex. ZC-Torchio Direct ¶¶ 113; *see* Def. Ex. UUU, at 33750.

361.     Mr. Torchio adjusted the purchase price upwards to account for the buyer

relinquishing the right to sell to any other party subject the ROFR.  Mr. Torchio applied the same

15% he had used for the Eder-Goodman ROFR, and used a 15% discount for the ROFR in the

Polebridge Bowman transaction.  (Def. Ex. ZC-Torchio Direct ¶114)

362.     Mr. Torchio referred to the Joinder Agreement and Amendment No. 1 to Amended

and Restated Limited Liability Company Agreement of Eber-Connecticut, LLC" dated May 31,

2010 (the "May 2010 Joinder Agreement"), which was signed by representatives of Eber Metro

and Eber-CT, Eder-Goodman, and Polebridge Bowman (Def. Exs. ZC-Torchio Direct ¶¶115-116;

*See* Def. Ex. HHHHH).

363.     The May 2010 Joinder Agreement also gave "Observation Rights" for Eder-

Goodman representatives at Eber-CT's Board of Manager's meetings.   Eder-Goodman, and all

parties to the May 2012 Joinder Agreement, agreed to permit the transfer of 6 units of Eber-CT from Eber Metro to Polebridge Bowman (Def. Ex. ZC-Torchio Direct ¶116).

364.    Mr. Torchio stated that Eder-Goodman's non-exercise of its own right of first refusal under the Eber-CT Amended and Restated Operating Agreement (Def. Ex. HHHHH) would indicate that Eder-Goodman believed the then current value of Eber-CT was less than the purchase price, as it would have been economically rational for Eder-Goodman to have exercised its right of first refusal if the transaction price was lower than the Eder-Goodman's valuation of six-percent of Eber-CT (Def. Ex. ZC-Torchio Direct ¶117).

365.    Based on the mathematical calculations set out in his direct testimony and exhibits, Mr. Torchio estimated the MVE of Eber-CT based on the 2010 Polebridge Bowman transaction as of the Valuation Date to be $5.94 million (Def. Ex. ZC-Torchio Direct ¶114; *see* Def. Ex.  TC-3).

### viii.   Acquisition of Prospect Beverages, Inc. - 2001

366.    Mr. Torchio also used a comparable sale transaction, the acquisition in 2001 of Prospect Beverages, Inc. by Capital Beverage Corporation.  Torchio Direct Testimony at ¶ 119.

367.    Prospect Beverages had revenue of $18.1 million, negative EBIT, and negative EBITDA at the time of the transaction, similar to Eber-CT's financial position in May 2012 (Def. Ex. ZC-Torchio Direct ¶119).

368.    Based on the mathematical calculations set out in his direct testimony and exhibits, Mr. Torchio estimated the MVE of Eber-CT based on the 2001 Prospect Beverage transaction as of the Valuation date to be $646,413  (Def. Ex. ZC-Torchio Direct ¶¶119-120; *see* Def. Ex.  TC-4).

### ix.  Farmer Brothers Trading Comparable – 2012

369.    Mr. Torchio also used as a comparable a publicly traded company, Farmers

Brothers, and he analyzed its financial condition at the time of the Valuation Date (Def. Ex. ZC-

Torchio Direct ¶122).

370.    Mr. Torchio found Farmers Brothers to be a proper metric to use in his valuation

based on its similarities to Eber-CT.  It is not necessary for two companies to sell products that are

similar or even in the same category for them to be proper comparables (Torchio Tr. at 414:10-20

Direct).

371.    Mr. Torchio found Farmers to be comparable because both it and Eber-CT are

companies engaged in logistics, in moving products from manufacturers to retail establishments.

They both need inventory, warehouse space, and working capital investment in inventory to

distribute these products (Torchio Tr. at 414:21 to 415:8 Direct).

372.    In addition, both Farmers and Eber-CT distribute beverage products, and the cost

structure is similar because they both have key tangible assets, including warehouses and trucks,

and they have similar intangible assets including relationships with suppliers and customers, and

teams of regional salespeople (Torchio Tr. at 415:9-23 Direct).

373.    Also, Farmers, like Eber-CT, was experiencing income losses in the years leading

up to the valuation, and both companies are mature and similar in size.  Tr. at 415:24 to 416:8.

374.    Significantly, and similarly to Eber-CT, Farmer Brothers had a negative EBITDA

for the 12 months prior to the Valuation Date  (Def. Ex. ZC-Torchio Direct ¶ 122).

375.    Based on the mathematical calculations set out in his direct testimony and exhibits,

Mr. Torchio estimated the MVE of Eber-CT based on the 2012 Farmers Brothers valuation as of

the Valuation date to be $1.59 million (Def. Ex. ZC-Torchio Direct ¶123; *see* Def. Ex.  TC-5).

### x.   Midpoint of The Eber-CT MVE Based on the Five Comparables

376.    The estimates of Mr. Torchio's MVE for Eber-CT are summarized in his Def. Ex. TD.

377.    The midpoint of the various estimates of MVE for Eber-CT based on the five comparables is $6.20 million.  (Def. Ex. ZC-Torchio Direct ¶7; *see* Def. Ex. TD).

378.    Mr. Torchio assigned equal weights to his five metrics. The Court could assign different weights, but Mr. Torchio opined that no metrics should not be given zero weight (Tr. at 417:6-22).

### xi.   Liabilities of Eber Metro and Eber W&L

379.    Mr. Torchio considered that at or near the Valuation Date, there were a significant amount of liabilities at Eber Metro and Eber W&L, which were established by other record evidence.  The following figure summarizes those liabilities.

**Summary of Liabilities**

| Liability | Description | Amount | Obligor: | Reference Document |
|---|---|---|---|---|
| Lester Eber's Loan and Line of Credit | Loans on Eber Metro's tax returns identified in line item Mortgages, notes, bonds payable | $3,060,711 | Eber Metro Eber W&L (guarantor) | Def. Ex. LLL, at 19101 |
| Interest on Lester Eber's Loan and Line of Credit | Accrued Interest on Lester Eber's loans through Valuation Date | $837,655 | Eber Metro Eber W&L (guarantor) | Def. Ex. SS |
| Pension Plan Termination (unfunded Pension Liability) | Eber Brothers W&L established a pension plan in 1954, and a shortfall occurred in the assets of the pension plan. The figure here reflects the cost of terminating the plan as of June 1, 2012. | $5,063,388 | Eber Metro and Eber W&L | Def. Ex. JJ |
| Teamsters | In January 2008, the Teamsters determined that there was an employer withdrawal liability under the ERISA Act. The figure here represents the amount in a Confession of Judgment. | $1,421,030 | Eber Metro and Eber W&L | Def. Ex. F |
| Harris Beach | Eber entities were sued by Harris Beach PLLC in September 2011 to collect legal fees for services rendered by Harris Beach on behalf of the Eber-related entities. | $755,896 | Eber Metro and Eber W&L | Def. Ex. QQQ, at 23749 |
| D4 Litigation | Eber W&L settled a lawsuit against it by D4 LLC in February 2012 for $120,000 with $10,000 payments to be made monthly for the following year. | $80,000 | Eber W&L | Def. Ex. Z, at 30932-33 |
| Benderson Development | Eber W&L defaulted on its lease payments to Benderson in 2011 and was sued by Benderson in March 2012 pursuant to the terms of the lease. | $246,948 | Eber W&L | Def. Ex. III, at 32638 |

|  |  |  |
|---|---|---|
| Totals | $11,465,629 |
| Totals w/o Liabilities solely of Eber W&L | $11,138,680 |

(Def. Ex. ZC-Torchio Direct ¶ 46).

380.    With respect to the value of Eber Metro's liability to Alexbay pursuant to the 2006 Notes (including the 2009 Checks) and the Lester Line of Credit as of the Valuation Date, Mr. Torchio, for his purposes, utilized the principal amount of this indebtedness that Eber Metro reported on its tax return for the year ending May 2012, which was $3,015,316 (Def. Ex. LLL at 5, Bates Stamp EB-00019101), and accrued interest on such indebtedness as of December 31, 2011 in the accountant's detail in the amount of $837,655, for a total of $3,852,971 (Def. Ex. SSS) (Pl. Ex. 83).

## xii   A Reasonable Investor Would Protect Herself Against Liabilities

381.    Mr. Torchio opined that both the fixed and contingent liabilities of Eber Metro would affect what a willing investor would pay for Eber-Metro.  Based on his experience and

knowledge of corporate finance, he opined that a potential buyer of Eber-Metro would fully reflect all the fixed and contingent liabilities of Eber Metro specified in his analysis in its offer price (Def. Ex. ZC-Torchio Direct ¶¶ 47-48).

382.    Mr. Torchio assumed (based on discussions with defendants' counsel) that the unpaid Teamsters Fund "withdrawal liability" of $1,421,030 at the valuation date was a fixed joint and several liability of Eber W&L and Eber Metro as members of the same ERISA "controlled group."  Based on his own economic expertise, he opined that a reasonably knowledgeable buyer of Eber Metro would fully reflect that liability in its offered purchase price  (Def. Ex. ZC-Torchio Direct ¶49).

383.    Mr. Torchio also assumed (based on discussions with defendants' counsel) that the $5,063,388 "termination liability" of the Eber W&L Retirement Plan was a contingent liability of both Eber W&L and Eber Metro as members of the same ERISA "controlled group."  Based on his own economic expertise, he opined that a reasonably knowledgeable buyer of Eber Metro would fully reflect that contingent liability in its offered purchase price  (Def. Ex. ZC-Torchio Direct ¶ 49).

384.    Mr. Torchio's opinion was that if, as he assumed, the Retirement Plan termination liability became a fixed liability of Eber-Metro and Eber-CT (which was 79% owned by Eber Metro), that information would be highly relevant to an investor's valuation (Torchio  Tr. at 461:22 to 462:1 Cross).

385.    Mr. Torchio said that one of the concerns of any investor with respect to pension liability would be that the pension liability of companies related to the company they were purchasing would come back to haunt them  (Torchio  Tr. at 463:5-10 Cross).

386.    A purchaser of Eber-Metro would be concerned about the Eber W&L Retirement

Plan termination liability because for a purchaser, "you never know what your exposure is going

to be for sure, but you know that it can be dangerous because the PBGC will go after deep

pockets"  (Torchio  Tr. at 465:20 to 466:4 Cross).

387.    Southern, for example, "traditionally did not assume pension liabilities.  That's the

black hole of assumption" (Hager Dep. at 72:19-21).

388.    In such a case, a purchaser would seek representations and warranties from the

selling company, and an inability to provide such representations and warranties would likely

result in a walkaway from the deal (Torchio Tr. at 466:5 to 467:5 Redirect).

389.    That would be particularly relevant in this case, as here, Eber W&L lacked any

assets other than its interest in Eber Metro.

390.    Based on his experience and knowledge of corporate finance, Mr. Torchio opined

that a potential buyer of Eber-Metro would fully reflect all the liabilities of Eber Metro that he

identified, including company's indebtedness to Alexbay, the Teamsters liability, the Retirement

Plan liability, and litigation liability to Harris Beach, in its offer price (Def. Ex. ZC-Torchio Direct

¶ 47).

    **xiii.    Valuation and Solvency of Eber-Metro and Eber W&L at the Valuation Date**

391.    Mr. Torchio calculated the MVE of Eber Metro based on the amounts of Eber

Metro's assets and liabilities as of the Valuation Date.  He calculated the liabilities at Eber Metro

at $11,138,680, and the additional assets of Eber Metro at $360,728  (Def. Ex. ZC-Torchio Direct

¶¶ 46, 124, 125).

392.    Mr. Torchio's Def. Ex. TD shows the estimates of MVE for Eber Metro based on

his comparables and the midpoint of those comparables, together with the assets and liabilities of

Eber Metro.  Based on each of those calculations, Mr. Torchio opined that Eber Metro was insolvent as of the Valuation Date, because for each of his valuations for Eber Metro, the indicative market value of its assets is less than the sum of the amount of its liabilities.  Thus, Mr. Torchio opined that the MVE of the capital stock of Eber Metro as of May 23, 2012 was zero (Def. Ex. ZC-Torchio Direct ¶¶ 126-127).

393.    Mr. Torchio performed a similar calculation for Eber W&L, including liabilities of $11,465,629 and additional assets of $362,979  (Def. Ex. ZC-Torchio Direct ¶¶ 46, 124, 128).

394.    Mr. Torchio's Def. Ex.  TD shows the estimates of MVE for Eber W&L based on his comparables and the midpoint of those comparables, together with the assets and liabilities of Eber W&L.  Based on each of those calculations, Mr. Torchio opined that Eber W&L was insolvent as of the Valuation Date, because for each of valuations for Eber W&L, the indicative market value of its assets was less than the sum of the amount of its liabilities.  Thus, Mr. Torchio opined that the MVE of the capital stock of Eber W&L as of May 23, 2012 was zero (Def. Ex. ZC-Torchio Direct ¶¶ 129-130).[3]

### xiv.    Reasonableness of Interest Rates for the 2006 Notes and the Lester Line of Credit

395.    The stated rate on the 2006 Notes was 9.0% and the stated rate on the Lester Line of Credit was 12.5% (Def. Ex. SSS) (Def. Ex. ZC-Torchio Direct ¶ 54) (see ¶¶ 195, 212 above).

---

[3] Plaintiffs' post-trial briefing did not address the fact that this Court has held that Plaintiffs have the burden of proving that Lester was unjustly enriched by clear and convincing evidence.  (Reconsideration Decision at p. 21, 22). In any event, with respect to Mr. Liebman's 2020 valuation, Mr. Torchio converted Mr. Liebman's 2020 valuation into an EBITDA ratio, by dividing his enterprise value for Eber-CT by the EBITDA for Eber-CT, which calculates to 27 times EBITDA (Tr. at 423:6-24).  That EBITDA ratio would have put Eber-CT in the top 15 percentile of all companies on the New York and NASDAQ stock exchanges, with a median three-year growth rate of 12 percent.  Tr. at 423:20 to 424:13.  Mr. Torchio opined that the 2020 valuation by Mr. Liebman was inflated because there is a vast difference between companies being valued at 27 times EBITDA versus companies such as Eber-CT, at a much lower historic growth rate of revenues (Tr. at 424:14-24, 425:15-19, 427:17-22).

396.    Eber Metro and Eber W&L were distressed companies, as there were significant liabilities at Eber Metro and Eber W&L, the only operating asset they owned was Eber-CT, and Eber-CT did not record a profit from operations for fiscal years 2007 through 2012.  In addition, Mr. Torchio opined that as of the Valuation Date, the value of the assets of Eber Metro and Eber W&L was less than the sum of each company's liabilities  (Def. Ex. ZC-Torchio Direct ¶ 55)

397.    To determine if the interest rates on the 2006 Notes and the Lester Line of Credit were fair and reasonable at the time of issuance, Mr. Torchio compared these rates to those for other distressed companies at the time that Lester Eber committed to loan such monies  (Def. Ex. ZC-Torchio Direct ¶ 55).

398.    Mr. Torchio reviewed the Bank of America Merrill Lynch ("BAML") database available on Bloomberg.  Because of the distressed nature of Eber W&L and Eber Metro, he focused on several high-yield indices, which reflect companies that have debt rated below investment grade at a rating of CCC and lower (Def. Ex. ZC-Torchio Direct ¶ 56).

399.    The 2006 Notes were issued in March 2006 at a stated interest rate of 9.0%.   For debt that was rated CCC and lower, as of March 16, 2006, the average yield to maturity was 11.46%.  At the time Lester Eber provided Lester Line of Credit at a stated interest rate of 12.5% in October 2009, and for debt that was rated CCC and lower in October 2009, the average yield to maturity was 14.23%.  As of the Valuation Date, for debt that was rated CCC and lower, the yield to maturity was 12.77%  (Def. Ex. ZC-Torchio Direct ¶¶ 57-59).

400.    Mr. Torchio opined that, based on these comparisons, the stated rates of the 2006 Notes and the Lester Line of Credit were consistent with other debt issued by distressed companies as tracked by the BAML indices, and therefore, fair and reasonable  (Def. Ex. ZC-Torchio Direct ¶ 60).

401.    Plaintiffs' expert did not contradict Mr. Torchio or offer any opinion on the interest rates on Lester Eber's loan and line of credit (Liebman Tr. at 179:12-13 Cross)

## VII.    LESTER'S LOANS TO THE BUSINESS FOLLOWING THE 2012 FORECLOSURE

402.    Subsequent the 2012 Foreclosure, Lester paid legal fees and related expenses of the Eber entities in the aggregate sum of **$830,106** without reimbursement as follows:

a.    With respect to Eber W&L's, Eber Metro's, and Eber-CT's exposure to "termination liability" under the Retirement Plan:

| Date of Advance | Amount of Advance | Matter | Paid to | Def. Exs. | Check # |
|---|---|---|---|---|---|
| 6/1/2016 | $  8,846 | Pension Files Storage | Iron Mt Storage | | 1770 |
| 6/26/2015 | 20,000 | Pension/Retirement Plan | Groom Law Firm[4] | CCC, DD, EB-00010505; Wendy Direct ¶68, Pl. Ex. 244. | 1487 |
| 9/18/2015 | 35,000 | Pension/Retirement Plan | Bond Schoeneck Law Firm[5] | VVVV Lester Dep at 92-93 l. 5-25, 1-4; Pl. Ex. 165) (Pl. Ex. 176) | 2004 |
| 9/18/2015 | 15,000 | Pension/Retirement Plan | Bond Schoeneck Law Firm | VVVV | 2006 |

_____

[4] The Eber entities hired the Groom Law Firm in connection with the Pension/Retirement Plan and the dispute and litigation in connection therewith
[5] Bond Schoeneck & King, PLLC represented the Eber entities in the litigation and negotiation with the PBGC.

| Date of Advance | Amount of Advance | Matter | Paid to | Def. Exs. | Check # |
|---|---|---|---|---|---|
| 5/30/2016 | 25,000 | Pension/Retirement Plan | Groom Law Firm | CCC | 1767 |
| 10/8/2014 | 30,000 | Pension/Retirement Plan | Groom Law Firm | CCC | 1717 |
| 1/26/2015 | 10,000 | Pension/Retirement Plan | Groom Law Firm | CCC | 1856 |
| 2/8/2015 | 10,000 | Pension/Retirement Plan | Groom Law Firm | CCC | 1867 |
| 2/18/2015 | 20,000 | Pension/Retirement Plan | Groom Law Firm | CCC | 1877 |
| 2/26/2015 | 20,000 | Pension/Retirement Plan | Groom Law Firm | CCC | 1892 |
| 4/24/2015 | 20,000 | Pension/Retirement Plan | Groom Law Firm | CCC | 1951 |
| 5/30/2015 | 10,000 | Pension/Retirement Plan | Groom Law Firm | CCC | 1976 |
| 2/21/2014 | 30,000 | Pension/Retirement Plan | Groom Law Firm | CCC | 1491 |
| 3/30/2014 | 5,000 | Pension/Retirement Plan | Groom Law Firm | CCC | 1580 |
| 5/1/2014 | 30,000 | Pension/Retirement Plan | Groom Law Firm | CCC | 1520 |
| 5/20/2014 | 20,000 | Pension/Retirement Plan | Groom Law Firm | CCC | 1524 |
| 1/14/2016 | 280 | Pension/Retirement Plan | Benefit Mgmt (Michael Gallagher) | VVVV | 2102 |
| 9/18/2013 | 11,450 | Pension/Retirement Plan | Groom Law Firm | CCC | 1200 |
| 12/14/2012 | 17,000 | Groom Law Firm/Retirement Plan | Eber Metro to Groom Law Firm | | 1253 |
| **Total:** | **$ 337,576** | | | | |

b.   With respect to the Harris Beach dispute and litigation, Benderson lease dispute

and other legal matters:

| Date of Advance | Amount of Advance | Matter | Paid to | Def. Exs. | Check # |
|---|---|---|---|---|---|
| 12/18/2015 | $ 4,728 | Benderson Lease Dispute | Underberg Kessler Law Firm[6] | VVVV and Ex. Z, 30931-3) | 1331 |
| 8/8/2012 | 6,706 | Davie Kaplan - Company Accountants | Eber W&L | | 1146 |
| 5/8/2013 | 12,000 | Eber W&L Obligation | Underberg Kessler | DDD | 1054 |

[6] Underberg & Kessler represented the Eber entities in litigating and negotiating the Eber entities dispute with D4, LLC, and in connection with the Benderson lease dispute and litigation.

| Date of Advance | Amount of Advance | Matter | Paid to | Def. Exs. | Check # |
|---|---|---|---|---|---|
| 7/2/2013 | 8,754 | Eber W&L Obligation | Carmody and Torrance Law Firm[7] | VVVV and QQQ | 1243 |
| 7/6/2015 | 20,000 | Harris Beach Dispute/Litigation | Bond Schoeneck Law Firm | BBB | 1493 |
| 12/17/2015 | 65,000 | Harris Beach Dispute/Litigation | Bond Schoeneck Law Firm | BBB | 1327 |
| 10/8/2014 | 10,000 | Harris Beach Dispute/Litigation | Carmody and Torrance | VVVV | 1716 |
| 10/30/2014 | 25,000 | Harris Beach Dispute/Litigation | Bond Schoeneck Law Firm | BBB | 1734 |
| 12/4/2014 | 20,000 | Harris Beach Dispute/Litigation | Groom Law Firm | CCC | 1754 |
| 12/8/2014 | 35,000 | Harris Beach Dispute/Litigation | Bond Schoeneck Law Firm | BBB | 1755 |
| 12/26/2014 | 5,000 | Harris Beach Dispute/Litigation | Carmody and Torrance | VVVV | 1830 |
| 12/26/2014 | 25,000 | Harris Beach Dispute/Litigation | Bond Schoeneck Law Firm | VVVV | 1831 |
| 1/16/2015 | 20,000 | Harris Beach | Bond Schoeneck Law Firm |  | Wire |
| 2/1/2015 | 5,000 | Harris Beach Dispute/Litigation | Carmody and Torrance Law Firm | VVVV | 1861 |
| 2/21/2015 | 5,000 | Harris Beach Dispute/Litigation | Bond Schoeneck Law Firm | BBB | 1879 |
| 2/27/2015 | 20,000 | Harris Beach Dispute/Litigation | Bond Schoeneck Law Firm | VVVV | 1878 |
| 4/10/2015 | 40,000 | Harris Beach Dispute/Litigation | Bond Schoeneck Law Firm | VVVV | 1943 |
| 5/15/2015 | 40,610 | Harris Beach Dispute/Litigation | Bond Schoeneck Law Firm | VVVV | 1968 |
| 1/22/2014 | 8,000 | Harris Beach Dispute/Litigation | Carmody and Torrance Law Firm | VVVV | 1350 |

---

[7] Carmody & Torrance LLP represented the Eber entities in their dispute and litigation with Harris Beach.

| Date of Advance | Amount of Advance | Matter | Paid to | Def. Exs. | Check # |
|---|---|---|---|---|---|
| 5/19/2014 | 3,000 | Harris Beach Dispute/Litigation | Carmody and Torrance Law Firm | VVVV | 1525 |
| 7/18/2014 | 15,000 | Harris Beach Dispute/Litigation | Bond Schoeneck Law Firm | | 1649 |
| 7/24/2014 | 5,000 | Harris Beach Dispute/Litigation | Carmody and Torrance Law Firm | VVVV | 1654 |
| 9/4/2013 | 6,000 | Harris Beach Dispute/Litigation | Carmody and Torrance Law Firm | VVVV | 1191 |
| 7/30/2015 | 50,000 | Harris Beach Dispute/Litigation and PBGC | Bond Schoeneck Law Firm | BBB | 1514 |
| 10/25/2012 | 45 | Board Legal Representation | Marino Fernandez, Esq. | | 1236 |
| 9/14/2012 | 500 | Legal Marino | Eber W&L | VVVV | 1287 |
| 7/12/2012 | 12,000 | To Pay Legal | Eber W&L | | 1130 |
| 9/14/2012 | 50 | To Pay Expenses | Eber Metro Inc. | VVVV | 1286 |
| 12/19/2012 | 637 | To Pay Expenses | Eber Metro Inc. | VVVV | 1259 |
| 2/6/2013 | 9,500 | Wolf Concepts Litigation | Carmody and Torrance Law Firm | VVVV | 1111 |
| 3/18/2016 | 15,000 | Pension Plan | Harris Beach Law Firm | BBB | 1789 |
| **Total:** | **$ 492,530** | | | | |

(Def. Exs. UUUU, BBB, CCC, DDD, VVVV).

403.     Furthermore, after the 2012 Foreclosure, Lester paid settlements to creditors of the Eber entities from his personal assets in the aggregate sum of $2,404,393 as follows:

      a.     On October 15, 2015, he paid $27,500 to Eber W&L and Eber Metro's old landlord, Benderson (Def. Ex. O, III);

      b.     On July 1, 2013, Lester contributed $506,893 to the Teamsters to release Eber W&L, Eber Metro, and Eber-CT from liability.  The total settlement with the

Teamsters was $653,134, and Wendy paid approximately $146,000 towards the total settlement to the Teamsters, and in turn, received an assignment of company receivables to her wholly owned company, Segway, in consideration for her contribution (Def. Ex. JJJJ); (Wendy Tr. 373:8-20 Redirect, 349:2-25 Cross, 350:1-5 Cross); (Pl. Ex. 27:179); (Def. Ex. ZA-Wendy Direct ¶147).  While Defendants' demonstrative (Def. Ex. KKKKK) credits Lester for $506,893 for the payment to the Teamsters pursuant to the settlement this is not appropriate.  Defendants ought to properly at the figure of $459,993 to credit Lester, by taking ($x$) the total Teamsters settlement ($653,134), minus (y) the face value of all of the receivables that were assigned to Wendy through Segway, LLC ($193,141), and arriving at $459,993.

c.       On February 28, 2017, Lester waived his and his wife's $1.4 million retirement benefit to release Eber W&L, Eber Metro, and Eber-CT from liability to the PBGC (Def. Exs. VVV, DDD, DDDD);

d.       On October 25, 2013, Lester paid $400,000 to Harris Beach PLLC in settlement of a lawsuit by Harris Beach against the Eber entities seeking recovery of unpaid legal fees and disbursements (Def. Ex. VV, QQQ);[8]

e.       From July 2012 to January 2013, Lester paid an aggregate sum of $70,000 in settlement payments to D4 LLC in settlement of a lawsuit against the Eber entities in $10,000 monthly installments (Def. Ex. V).

---

[8] Pursuant to the Settlement Agreement Harris Beach assigned all of its right, title and interest in all claims it had against Eber W&L, Eber Metro, Eber-CT and Alexbay to Lester.  The liability was alleged to be $755,896, plus associated interest and fees, which as of such date exceeded $1.2 million.

404.     Lester contributed the principal sum of **$3,187,599** to paying the obligations of the Eber entities following the 2012 Foreclosure on the dates set forth above. He was not reimbursed for any of these payments.

405.     The Court finds that Lester made these payments to protect his property interest in the Eber entities, and that these payments facilitated the survival of the Eber entities only remaining operating business, Eber-CT.

406.     During the period 2013 through 2019, Eber-CT recognized improved (albeit modest) performance under Wendy and Lester's leadership.  While the company realized a net loss in FY 2013 and again in FY 2019, for the period 2013 through 2020, it generated aggregate net income of approximately $1.1 million over this time period, for an average net income of approximately $160,000.  Over this period, its income from operations as a percent of net sales on an annual basis was approximately 1.1% (Pl. Exs. 213-220).

## VIII.     LESTER'S CONSULTING AGREEMENT WITH SOUTHERN

407.     In 2007, Lester and Southern entered into a consulting agreement, dated as of August 30, 2007 (Def. Ex. S) (Pl. Ex. 27).

408.     Southern told Lester that as the New York operation was out of business, it could use him to help with its own government relations in New York (Lester Dep. at 54:2-8).

409.     Lester testified that he felt an obligation to Southern because it had helped the Eber companies to stay out of bankruptcy, he needed the work as Eber's New York operations had ceased, and he could represent Southern in the legislature, with the State Liquor Authority, and in the Governor's office (Lester Dep. at 64:3-14).

410.     Lee Hager was deposed as the corporate representative for Southern (Hager Dep. at 4:10-11, 15-18).

411.    Hager testified that when Southern entered New York, it thought it had a fairly good understanding of the New York metropolitan area, but then it found out that "we had an awful lot to learn about metro"  (Hager Dep. at 21:12-18).

412.    Hager also testified that Southern had "very little understanding about the ways of working in upstate New York, which [] should be a different state" (Hager Dep. at 21:12-18).

413.    The Consulting Agreement was negotiated by Southern to give it the broadest advantage, so it could expand or contract as Southern determined appropriate (Hager Dep. at 25:10-13)

414.    Hager testified that Southern was at "a tremendous deficit, both in Metro and upstate New York, in terms of what I will call our legislative strength, our knowledge of the politics of New York . . .  It's really now in that venue of government affairs, lobbying, SLA regulatory that Lester provides our organization the value" (Hager Dep. at 41:16 to 43:2).

415.    Hager testified that "the SLA regulatory environment [is] politically charged and you cannot handicap [it]"  (Hager Dep. at 42:9-12).

416.    Hager continued, by explaining that "[Southern] tried to pivot ourselves in a very socially responsible way and in effect used a lot of our business arguments to have Lester try to frame in the social consequence of the alcoholic beverage industry in Albany"  (Hager Dep. at 42:15-19).

417.    Lester was important to Southern because "governmental policy with alcoholic beverage [] is very, very important for [Southern's] future and the whole idea of the SLA regulation"  (Hager Dep. at 84:23 to 85:1).

418.   Southern "[held Lester] accountable for letting [Southern] know what's happening in the terms of the bill that might be coming or some legislator who might have some temperance movement that wouldn't be good for our business"  (Hager Dep. at 85:1-9).

419.   Hager testified that Lester himself was important: "Even though we have other lobbyists and we have other people, you know, we began to see when Lester walked the halls of Albany, it wasn't Mr. Eber, it was Lester" (Hager Dep. at 43:9-13).

420.   Consistent with Hager's testimony, the Consultant Agreement was deemed terminated in the event that Lester died or became unable to work (Def. Ex. S at 6).

421.   Over time, Lester's consulting time increased because "it went a lot deeper on more complex things. . . It could be weeks of lobbying or discussing or politicking or whatever else" (Hager Dep. at 85:10-23)[9].

422.   With respect to Lester's consulting, Hager testified that "[w]e believe we have gotten our fair bargain" under the Consulting Agreement (Hager Dep. at 81:9-10).

423.   Compared to other consultants, Lester had a "high value, high use, high whatever," so Southern believed that the amount it paid for Lester's consulting services was reasonable (Hager Dep. at 80:11-14, *see* 80:15 to 81:2).

424.   Hager testified that Southern would have had to go into the marketplace to get the services Lester provided.  He saw the Consulting Agreement "replacing other sort of consultants that [Southern] would have had to hire, be [they] operational consultants, be [they] industry consultants, be [they] lobbyists" (Hager Dep. at 26:5-8).

---

[9] Plaintiffs did not present any testimony concerning any deficiencies in Lester's reporting of his lobbying activities under New York Joint Commission on Public Ethics rules, Pl. FOF at para 59-60, and the Court declines to draw inferences based on Plaintiffs' speculative conclusions.

425.    Hager testified that Lester was "almost like a one stop of knowledge of a lot of different things that [Southern] was going to have to purchase [] in the marketplace." (Hager Dep. at 26:9-13).

426.    According to Hager, for Southern, the Consulting Agreement was a fair and arms-length agreement:  "[W]e thought it was fair and we thought it was arms length and we thought it was equitable from our standpoint.  We would have spent a lot of time trying to buy these services some other place" (Hager Dep. at 26:14-18).

427.    As to Lester's compensation under the Consulting Agreement, Hager testified that the time of the Consulting Agreement, Southern, which was in New York since 2004, was "very weak still in upstate, many needs and we truly assessed what we would have to spend for these resources and knowledge that, you know, we valued.  We valued in entering into an agreement with Lester" (Hager Dep. at 33:8-14).

428.    The Court finds, based on Mr. Hager's testimony, that Southern had a genuine need for a lobbyist like Lester with government relations expertise at the time of the Consulting Agreement, and rejects Plaintiffs contention that Southern was doing "just fine" with respect to its lobbying efforts from the time that it entered New York in 2004 through the time of the Consulting Agreement.

429.    Hager's testimony established that Southern would not have entered into a consulting agreement with an Eber company, but only with Lester.  Hager testified that Southern did not want to be tied to a corporation for a consulting contract for "personal" services  (Hager Dep. at 43:23 to 44:09).

430.    On whether Southern would agree to have the consulting agreement with one of the Eber companies, Hager testified that "I would have objected vehemently … [W]e viewed

Lester having the value, not the older entity after they ceased … The answer is no … Call me myopic is you want, after a business is done, it's done.  We deal with the individual"  (Hager Dep. at 69:20 to 70:7; 70:23-25).

431.    Hager testified that Southern sought to hire Lester due to Lester's personal contacts with the governmental authorities involved in regulating liquor sales and distribution in New York State and his knowledge of the governing relations (Hager Dep. at 36:11 to 37:12, 41:16 to 43:02).

432.    Hager testified that Southern also hired Lester because it did not want Lester to interfere with Southern's "brand building and … selling ways," and wanted advice from a "neutral source" (Hager Dep. at 38:01-04, 40:21 to 41:1).

433.    When Lester entered into the Consulting Agreement in August 2007, the Eber entities in New York were, according to Daniel Kleeberg in the last stages of liquidation – there was no business going on other than liquidation (D. Kleeberg Dep. tr. at 50:6-10; Pl. Ex. 1003-Kleeberg Direct at ¶ 27).  The New York operation was being wound down and all remaining inventory was being liquidated (Wendy Eber Direct Testimony, Def. Ex. ZA, at ¶¶ 150) (Def. Exs. CCCC, ZZZZ, NNNN).  The determination to cease doing business and liquidate in New York had been made in early 2007 (Def. Ex. ZA-Wendy Direct ¶44).

434.    After the initial five-year period of the Consulting Agreement ended, the Consulting Agreement became a totally at-will agreement and Southern cut Lester's salary by fifty percent, but it continued with him as a consultant  (Hager Dep. at 49:18-21; 50:9-14).

435.    Southern "narrowed the responsibilities and [] adjusted the consulting fees," and could have ended the relationship at any time if it chose to do so (Hager Dep. at 81:15-18, 19-25).

436.    Southern wanted to control the relationship and not be bound long-term by anything (Hager Dep. at 50:15-25).

437.    The at-will consulting agreement was continuing at the time of Hager's deposition in May 2019 (Hager Dep. at 51:1-3).

438.    Lester Eber continued to provide government relations consulting to Southern from 2007 through the time of his death in 2020 (Lester Dep. at 54:18-25).  Lester was still working when he contracted COVID-19 and died.

439.    During that period, Lester took on compliance duties in addition to government relations two or three years after the consulting relationship began  (Lester Dep. at 55:2-16).

440.    Lester's expenses for Southern were scrutinized by Southern's accounting department (Hager Dep. at 54:3-16; Pl. Ex. 94).

441.    Southern did not have any concern that Lester was in any way abusing the reimbursement process  (Hager Dep. at 82:5-8).

442.    Lester Eber was a registered lobbyist in New York State  (Lester Dep. at 72:14-22; Pl. Ex. 29).

443.    Eber W&L and Eber Metro had never provided consulting and lobbying services to any unaffiliated third party (Def. Ex. ZA-Wendy Direct at ¶150).

444.    In August 2007, neither Eber W&L nor Eber Metro had any intention, interest, or ability to continue in business after they had already liquidated and shut down their New York operations and were merely liquidating (D. Kleeberg Direct and Cross  (Def. Ex. ZA-Wendy Direct ¶150).

445.    Eber-CT has never been licensed to distribute alcoholic beverages in New York[10]

446.    Lisa Semenick and Mike Gumaer, the members of the Eber W&L board of directors in 2007, were fully aware of the discussions Lester was having with Southern about a consulting arrangement, and acquiesced in it (Def. Ex. ZA-Wendy Direct ¶155).  In 2007, contemporaneous with Eber W&L's negotiations with Southern in connection with the July 5, 2007 agreement, Southern and Lester discussed a post-closing arrangement covering consulting and lobbying by Lester for Southern in New York State.  At that time, Southern did not express any willingness to enter into the consulting arrangement with any party other than Lester.  Eber W&L and Eber Metro had never provided consulting and lobbying services to any unaffiliated third party before. Lester had no experience lobbying in Connecticut (Def. Ex. ZA-Wendy Direct ¶150).

447.    Plaintiff Daniel Kleeberg learned of Lester's employment with Southern at least within six months following his departure from Eber W&L in 2007 (Pl. Ex. 1003- D. Kleeberg Direct ¶ 27).

448.    Mr. Kleeberg himself met with Southern in 2007 concerning possible employment (D. Kleeberg Tr. at 75:14-16 Cross).

449.    There is no evidence that Mr. Kleeberg, upon learning of Lester's employment with Southern, ever objected to such employment in writing or otherwise prior to his commencement of this litigation.

---

[10] The Court takes judicial notice that the New York State Liquor Authority database (https://sla.ny.gov/public-license-query) reflects Eber W&L and its New York affiliates formerly holding licenses with respect to sales of wine and liquor in New York, neither Eber-CT, nor Slocum and Sons have ever held such a license.  A court may take judicial notice of "a fact that is not subject to reasonable dispute because it: (1) is generally known within the trial court's territorial jurisdiction; or (2) can be accurately and readily determined from sources who accuracy cannot reasonably be questioned." Fed R. Evid. 201(b).  A court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Fed.R.Evid. 201(c) (2). The contents of government websites are a proper item of which to take judicial notice. *Denius v. Dunlap*, 330 F.3d 919, 926 (7th Cir.2003).

450.    Mr. Kleeberg testified at trial that he met with Southern at the behest of Lester about potential employment, but Southern did not offer him a position (D. Kleeberg Tr. at 75:14-25, 76:1-9 Cross).

451.    Mr. Kleeberg's testimony at his deposition was markedly different from his trial testimony on that point.  At his deposition, Mr. Kleeberg testified that he met with Southern to discuss possible employment (D. Kleeberg Dep. 51:1-3), and was told that they would create a position for him if he wanted one, but that he decided against taking a position "because he did not want a position that was just going to be created as a favor" (D. Kleeberg Dep. 52:11-20).

452.    Later, in September 2009, Mr. Kleeberg tried to leverage himself into an employment position with Southern by using Lester's employment with Southern.  In September 2009, Mr. Kleeberg e-mailed Lester asking Lester to intervene with Southern on his behalf with respect to a potential employment position (Def. Ex. Y12 at 78-81).

453.    The Court finds that Mr. Kleeberg's credibility is undermined by his testimony on this issue, and infers that Mr. Kleeberg was attempting to minimize and disingenuously deny the selfless efforts that Lester was making to assist Mr. Kleeberg to find gainful employment.

454.    After leaving Eber W&L, Mr. Kleeberg invested in a lawn care business that ultimately failed, and he thereafter filed for bankruptcy and had his debts discharged in bankruptcy in approximately 2011 (D. Kleeberg Tr. at 7-8) (D. Kleeberg Dep. at 56, l. 5-21).

455.    The Court finds that Southern indeed offered Mr. Kleeberg a position in 2007, but that Mr. Kleeberg chose, of his own volition, not to take a position, and to leave the wine & liquor business to focus on his lawn care endeavors in Florida.

456.    Additionally, in the early 2000s, Mr. Kleeberg borrowed hundreds of thousands of dollars from Eber W&L.  As of August 11, 2004, his aggregate payable to Eber W&L was

$339,065.73.  He has never paid any of that money back to Eber W&L (Def. Ex. Y9, Y10, Y11) (D. Kleeberg Dep. at107:2-5, 20-23; 108:1-10;109-110:6-23,1-2,12-21;111:1-4, 14-15, 19-23; 112:1-4, 11-13).

457.    The Court finds that insofar as Plaintiffs seek to have Mr. Kleeberg assume a role in the stewardship of the Eber entities as part of the equitable remedies sought herein, Mr. Kleeberg's credibility, prudence, providence, and personal financial difficulties as discussed above are relevant herein.

458.    The Court further finds that Mr. Kleeberg's payable to Eber W&L is relevant insofar as he received principal loans from Eber W&L in excess of $300,000 and has not repaid any amount thereof, and Mr. Kleeberg as a Plaintiff is seeking an equitable remedy.  This Court, in doing equity, would have wide latitude to fashion a remedy to permit Mr. Kleeberg's unjust enrichment in this regard from being unaccounted for.

## IX.    WENDY'S WORK AND EMPLOYMENT INCENTIVES AND LESTER'S EMPLOYMENT AGREEMENT WITH EBER-CT

459.    Wendy has devoted the majority of her career to being an employee and an officer and director of the Eber Entities (Def. Ex. ZA-Wendy Direct ¶156).

460.    In doing so, she chose to forego other opportunities in the labor market, and was compensated for the work that she did (Def. Ex. ZA-Wendy Direct ¶156).

461.    Wendy worked tirelessly for the Eber entities (Lester Dep. at 403:6-9), spending countless hours in the wind-down of Eber W&L and Eber Metro, and in trying to turn Eber-CT into a profitable business (Wendy Direct ¶156).

462.    The Court finds that Wendy's labor has contributed, in no small part, to Eber-CT continuing to exist today as an operating business.

463.     The Court finds that in consideration of her labor, Wendy was compensated fairly by the Eber entities.

464.     After the 2012 Foreclosure, on August 14, 2012, Wendy entered into an employment agreement with Eber-CT under which Wendy became President of Eber-CT. Such employment agreement contained reasonable and customary compensation, severance, benefits, and indemnification provisions. As part of her compensation and as an inducement to enter into the employment agreement, she received a restricted stock award of 2000 shares of common stock of Eber Metro (9.1% of the shares outstanding thereafter), subject to three-year vesting.  Eber-CT's Board approved Wendy's employment agreement (Def. Ex. UUUU).

465.     The Court finds that Wendy's employment agreement with Eber Metro was fair and reasonable, and served as a prudent means of incentivizing Wendy to remain devoted to changing the failing trajectory of Eber-CT under the ownership of Eber Metro.

466.     Lester ran the Eber family business for decades following Allen Eber's death and devoted his entire career to running the businesses as an officer and director / manager (Wendy Direct ¶8).

467.     Like Wendy, Lester worked for Eber-CT from 2005 through the date of his death, and on April 10, 2012, he entered into an employment agreement with Eber-CT as the CEO of the company (Wendy Direct ¶¶ 8, 156) (Pl. Ex. 180).

468.     Lester's employment agreement with Eber-CT, *inter alia*, set his base salary and bonus, and provided for a lump sum severance benefit calculated in accordance with a formula, namely, three times Lester's salary and bonus for the year prior to his death (Pl. Ex. 180).

469.    Following Lester' death, Eber-CT paid, and Lester's estate received the severance benefit in a lump sum in accordance with the employment agreement (Wendy Tr. at 295:25, 296:1-4 Cross).

470.    Lester's will, which has been admitted to probate by the Monroe County Surrogate's Court, provides, subject to his surviving spouse's right of election pursuant to EPTL 5-1.1A, for the residuary of his estate to pass in equal shares to Wendy and Wendy's brother, David Eber, after pre-residuary bequests, including a bequest of his interest in the Eber business to Wendy (Pl. Ex. 175).

471.    Wendy, as executor, has received and treated Lester's severance benefit as a residuary asset, to be divided between her and her brother David Eber in equal shares subject to Lester's surviving spouse's right of election pursuant to EPTL 5-1.1A, rather than as a pre-residuary asset to pass exclusively to her (Wendy Tr. at 296:4-25 Cross).

472.    The Court finds, given Lester's experience as an executive in the wine and liquor distribution business, Lester's labor, and investment in the business from both a monetary and personal standpoint as described above, that Lester's employment agreement with Eber-CT was fair and reasonable, and that Wendy was not motivated by avarice and self-interest in causing Eber-CT to enter into this agreement.

## X.    PLAINTIFFS' CLAIMS FOR DISTRIBUTION OF EBER BROS. SHARES

473.    At all times since the filing of this case.  Lester has been the registered holder of 100 shares of class B nonvoting stock of Eber Bros. (Def. Ex. ZA-Wendy Direct ¶184).

474.    At no time has there ever been any delivery by any of the co-Trustees of the 1969 Trust of physical possession of the stock certificates held by the Trust to any of the beneficiaries of the Trust.

475. The Will does not require that Trust assets be distributed to the beneficiaries pro rata. The Will empowers the co-Trustees under Article TWELFTH K "to make any division or distribution required hereunder in cash or other property, real or personal, or undivided interest therein, or partly in cash and partly in such other property, and pro rata or otherwise as to any particular asset." This is consistent with EPTL § 11-1.1 (b) (20).

476. Also, the Surrogate's Court Order does not mandate the distribution of the Eber Bros Shares "1/3 to Audrey Hays; 1/3 to Lester's estate; 1/6 to Daniel Kleeberg; and 1/6 to Lisa Stein" as Plaintiff contends. The Petition and Accounting do not contain a proposed distribution schedule for final distributions of the Eber Bros. shares (Def. Ex. OOOO), and the Surrogate's June 1, 2007 Order aggregates the value of the assets on hand as of the end of the accounting period and requires that the beneficiaries receive an equal share of the aggregate value; it does not Order a pro rata distribution of the Trust's shares of Eber Bros. (Def. Ex. TTTT).

## XI.     EDER-GOODMAN'S ILLUSORY 2021 "OFFER" TO PURCHASE EBER-CT

477. Eder-Goodman sent a letter in May 2021 to attorneys for Defendants and the attorney for Plaintiffs and expressed an interest in a purchase of Eber Metro and Wendy's combined 85% interest Eber-CT (Tr. 122:22-23; Pl. Ex. 201.

478. Eder testified that using the $12 million gross profit of Eber-CT for 2020, and a multiple of 1.6, would equal $18 million plus net asset value and "all the other stuff you take into consideration"  (Eder Tr. at 126:5-14 Direct).

479. The purported offer did not include a dollar amount (Eder Tr. at 157:15-18 Cross).

480. The purported offer also was contingent on a number of things, including "something resembling the [Eber-CT] business E-G's members have known remains," and Eder-

Goodman would be deciding whether that contingency existed or did not exist.  It detailed no

transaction structure or timing (Eder Tr. 158:2 to 159:3 Cross); (Pl. Ex. 201).

481.    Eder testified that a downturn in business could come within that category.  (Eder

Tr. at 159:6-8 Cross).

482.    The purported offer was also subject to due diligence (Eder Tr. at 160:4-6 Cross).

483.    The purported offer was also contingent on supplier approvals, regulatory

approvals, and necessary financing (Pl. Ex. 201).

## XII.      CREDITS TO LESTER IF THE 2012 FORECLOSURE HAD NOT OCCURRED

484.    As set forth above, as of the date of the 2012 Foreclosure, the principal and

accrued interest on the 2006 Notes (and including the 2009 Checks) was $1,991,158, and the

principal and accrued interest on the Lester Line of Credit was $2,116,427.96, for a total of

$4,157,586.31.

485.    If the 2012 Foreclosure had never occurred, and those loans had continued to

accrued interest in accordance with the terms of the 2006 Notes and the Lester Line of Credit

through July 31, 2012, the principal and accrued interest on the 2006 Notes (including the 2009

Checks) would have been $3,163,600.91, and the principal and accrued interest on the Lester Line

of Credit would have been $8,345,999.34, for a total of $11,509,600.25.[11]

486.    Further, as set forth above, Lester contributed the aggregate sum of $3,187,599 to

paying the obligations of the Eber entities following the 2012 Foreclosure and he was not

---

[11] Defendants' demonstrative (Def. KKKKK) calculates the aggregate principal and interest pursuant to the terms of the 2006 Notes and Lester Line of Credit through July 31, 2012 as  $11,535,694.81.  However, that figure includes the principal amount of $12,363.72 plus interest that should not have been included as in the calculation as a loan from Lester as set forth in paragraph 231-234 above.  That $12,363.72 should not have been considered a debt of Eber W&L or a credit to Lester and is thus deducted here.

reimbursed for any of those amounts. Assuming interest accruing at 9% per annum from the dates of those payments through June 5, 2012, the value of those contributions would be $5,290,393.

487.    If the 2012 Foreclosure had never occurred, and the 2006 Notes (including the 2009 Checks), the Lester Line of Credit were extended and remained in place through July 31, 2021, and the value of Lester's contributions following the 2012 Foreclosure were fairly considered, the resulting aggregate value would of same would be $16,799,993.36, as illustrated on the following summary:

| Summary of Lester Eber's Loans to and Payments Made to or on Behalf of the Eber Entities | | | |
|---|---|---|---|
| *I. Principal and Interest on Promissory Notes and Line of Credit as of 2012 Foreclosure* | | | |
|  | Date | Promissory Notes | Line of Credit Note | Total |
| P&I as of | 6/5/2012 | $1,991,158.36 | $2,166,427.95 | $4,157,586.31 |
| P&I as of | 7/31/21 (at interest rates if 2012 Foreclosure had not occurred) | $3,163,600.91 | $8,345,999.34 | $11,509,600.25 |

| **II. Post Foreclosure Payments Made by Lester** | | | |
| --- | --- | --- | --- |
| Post Foreclosure Payments by Lester in Satisfaction of Legal Fees Associated and Deposits into Retirement Plan Amounts through 7/31/21 | | | |
| Principal Amount | | Rate 9% | |
| $ | 337,576 | $ | 598,104 |
| Post Foreclosure Legal Fees and Related Expenses and Settlements Paid by Lester for Harris Beach Wolf Concepts through 7/31/21 | | | |
| $ | 492,530 | $ | 868,235 |
| Harris Beach Settlement through 7/31/21 (Def. Ex. VV, QQQ) | | | |
| $ | 400,000.00 | $ | 657,753 |
| Waiver of Benefit under Pension Plan through 7/31/21 (Def. Exs. VVV, DDD, DDDD) | | | |
| $ | 1,400,000 | $ | 2,048,857 |
| D4 Settlement  through 7/31/21 (Def. Ex. O, III) | | | |
| $ | 70,000.00 | $ | 149,061.98 |
| Benderson Settlement  through 7/31/21 (Def. Ex. O, III) | | | |
| $ | 27,500 | $ | 45,306 |
| Teamsters Settlement through 7/31/21  (Def. Ex. JJJJ) | | | |
| $ | 459,993 | $ | 923,076 |
| Total | $  3,187,599 | $ | 5,290,393 |

| | |
| --- | --- |
| Principal and Interest on Promissory Notes and Line of Credit through 7/13/21 | $11,509,600.25 |
| Post Foreclosure Contributions with Interest through 7/31/21 | $    5,290,393 |
| **Total** | **$16,799,993.36** |

## PROPOSED CONCLUSIONS OF LAW

### Point I
### THE COURT LACKS SUBJECT MATTER JURISDICTION
### PURSUANT TO THE *PRINCESS LIDA* DOCTRINE

488.     Under the longstanding United State Supreme Court precedent established

in *Princess Lida of Thurn & Taxis v. Thompson*, 305 U.S. 456 (1939), and its progeny, the Court

lacks subject matter jurisdiction over the claims in this case.

489.     The *Princess Lida* Doctrine applies to divest a federal court of jurisdiction when

"(1) the litigation in both the first and second fora are in rem or quasi in rem in nature, and (2) the

relief sought requires that the second court exercise control over the property in dispute and such

property is already under the control of the first court." *Dailey v. Nat'l Hockey League*, 987 F.2d

172, 176 (3d Cir. 1993).  An action is quasi in rem within the meaning of *Princess Lida* when it

involves the "'administration and restoration of corpus' and [is] not 'merely an adjudication of [a

party's] right or interest.'" *See id*. at 77 (quoting *Princess Lida*, 305 U.S. at 466-67).

### A.     The Surrogate's Court, Monroe County First Exercised
### In Rem Jurisdiction over the Trust in 1970

490.     The question of whether and when a trust *res* has already come under the

jurisdiction and control of a court rests on the nature of the trust at issue.  Here, the Trust is a

testamentary trust and thus, this Court's ruling in *Rousseau v. U.S. Tr. Co. of New York*, 422 F.

Supp. 447, 458 (S.D.N.Y. 1976), is instructive.

491.     In *Rousseau*, the decedent died in 1972, and in that same year, the Connecticut

Fairfield District Probate Court admitted decedent's will to probate thereby creating the

testamentary trusts.  Later, the Connecticut probate court authorized the co-trustee to act as a

trustee of those testamentary trusts.  *Id*. at 450.  The beneficiaries of the testamentary trusts

brought a diversity action in this Court against the co-trustee, alleging and seeking recovery for breach of fiduciary duty on the part of the co-trustee in administering the trust.  On the same date, the co-trustee filed an accounting of its administration of the trust in the Connecticut probate court.

492.    The co-trustee moved to dismiss the federal diversity case, *inter alia*, on the grounds that the *Princess Lida* Doctrine divested the federal court of subject matter jurisdiction. Plaintiff opposed the motion, arguing, *inter alia*, that because the Connecticut accounting proceeding was filed after the federal diversity suit (claiming it was filed later on the same day), that the trust *res* was under the prior jurisdiction of the federal court sitting in diversity jurisdiction.  This Court rejected plaintiffs' argument and dismissed the suit pursuant to the *Princess Lida* Doctrine.

493.    The Court held that even if the co-trustees' filing of the accounting in Connecticut probate court followed the filing of the federal action, "it was not the filing of the account which invoked the jurisdiction of the state court."  *Rousseau*, 422 F. Supp. at 458.  The Court held that the Connecticut probate court's exercise of in rem jurisdiction over the trusts occurred long before plaintiffs commenced their action in federal court; specifically, it held that the Connecticut probate court had assumed jurisdiction over the trust *res* in 1972, at the time the decedent's will was probated, as the estate's property was then distributable to the testamentary trusts.  The *Princess Lida* Doctrine thus divested this Court's jurisdiction over the claims against the defendant trust company as a co-trustee.  *Id* at 460.

494.    Here, like the Connecticut probate court in *Rousseau*, the Surrogate's Court, Monroe County, exercised in rem jurisdiction and control over the Trust long before Plaintiffs commenced this federal diversity suit.  Indeed, Allen Eber died a resident and domiciliary of

Monroe County, and the Surrogate's Court exercised jurisdiction over his estate, the Trust, and the assets therein when it probated the Will by Decree and issued Letters Testamentary and Letters of Trusteeship appointing the Co-Trustees pursuant to SCPA Article 14.  *Matter of King*, 74 Misc.2d 61, 62 (Sur. Ct., N.Y. County 1973).

495.    The Surrogate's Court's exercise of in rem jurisdiction did not end with the probate of the Will. Under the SCPA, the Trust is a testamentary trust, as a "trust created by will," and the SCPA applies to a "trust created by the will of a domiciliary," such as decedent Allen Eber.  The Surrogate's Court has jurisdiction of a testamentary trust created by a New York domiciliary. *See* SCPA § 103 (48) (52); SCPA 1501 (1) (a); *Matter of Asch*, NYLJ, Aug. 10, 1992, p. 21, col. 1 (Sur. Ct., N.Y. County).  Letters,[12] including Letters of Trusteeship, evidence the trustees' authority, and can only be revoked by the court that issued them.  SCPA 703 [1]; *Holden v Alexander*, 39 A.D.2d 476, 482 (2d Dept. 1976); *Capozzola v Oxman*, 216 A.D.2d 509 (2d Dept. 1995).

496.    The Surrogate's Court that has issued letters to a testamentary trustee has continuing supervisory power and jurisdiction over that trust, the trustee, and the administration of that trust.  For example, the Surrogate's Court, after issuing letters, may, even on its own initiative, revoke letters pursuant to SCPA 719 in order to protect the estate[13] or trust. *Matter of Young*, 38 Misc.3d 1222(A) (Sur. Ct., Nassau County 2013).  Its continuing jurisdiction and authority over an estate after issuing letters to a fiduciary[14] was explained in this context in *Matter of D'Onofrio*, 97 Misc.2d 250, 252-253 (Sur. Ct., N.Y. County 1978):

---

[12] The definition of "letters" under the SCPA includes letters of trusteeship. SCPA 103 (34).

[13] The definition of "estate" under the SCPA includes a trust. SCPA 103 (19).

[14] The definition of "fiduciary" under the SCPA includes a testamentary trustee. SCPA 103 (21).

> Letters of administration are an authority issued by the court to a fiduciary which authority continues until terminated by revocation or otherwise. This grant of authority confers upon the fiduciary exclusive and continuing power with reference to the administration     of the estate (SCPA 703). **The fiduciary's authority is always subject to close scrutiny by the court issuing his letters.** The scope of this continuing scrutiny is embodied in the express statutory authority stated in SCPA 719 (subd 10) which allows the court on its own initiative to revoke letters of administration, '[where] any of the facts provided in 711 are brought to the attention of the court.'

(emphasis added); *see also Matter of Modell*, 2014 NYLJ LEXIS 7322, *14 (Sur. Ct., N.Y. County 2014) (following analysis of *Matter of D'Onofrio* on an application for revocation of letters of trusteeship).

497.    The Surrogate's Court frequently notes that it is in a supervisory role with respect to fiduciaries to whom it has issued letters in connection with the administration of estate and trusts under its jurisdiction.  *See Matter of Rockefeller*, 2004 NYLJ LEXIS 4753, *3 (Sur. Ct., NY County 2004) (Surrogate denied application by trustee to whom it had issued letters of trusteeship noting that the trust was under the "the continued supervision of the trust by the courts of this State and the application of New York law. The requested change of situs would make the trustees accountable in the courts of Delaware, rather than of New York, and subject the administration of this trust to the laws of Delaware"); *Matter of Tanabaum*, NYLJ, Apr. 28, 1989 p. 27, col. 4 (Sur. Ct., N.Y. County) (Surrogate's Court vested with authority to direct and control the conduct and accounts of fiduciaries)[15].

---

[15]Pursuant to SCPA a testamentary trustee must sign and submit an oath that he will discharge the duties of the office of the trust reposed in him by the issuance of letters and duly account.  He must also sign and submit an acknowledged designation of the clerk of the Surrogate's Court as his agent for service of process (SCPA 708; Section 207.4 of the Uniform Court Rules Form at 18_Petition for Probate-41618.indd (nycourts.gov) at p.5).

498.    Further, SCPA 2205 expressly states that "the [Surrogate's Court] may at any time, upon it appearing that it is for the best interests of the estate, make an order . . . requiring the fiduciary to file an intermediate or final account," and may do so "**on its own initiative.**"  *See* SCPA 2205[1] [2] (emphasis added). Additionally, any person interested in a trust, such as the beneficiaries thereof, could compel the Trustees to account under SCPA 2205.  *See* 2 Harris N.Y. Estates: Probate Admin. & Litigation §§ 18:1, 18.3, 18.4, 18.89 (6th ed.); *Matter of Iannone*, 431 N.Y.S.2d 904 (Sur. Ct., Monroe County 1980).  Here, Trust accountings were filed in the Surrogate's Court even prior to the CNB Accounting. Def. FOF at ¶¶ 15-17.  These accountings were, along with the CNB Accounting Proceeding, in rem proceedings.  *Matter of Hall*, 183 Misc. 659 (Sur. Ct., N.Y. County 1944).

499.    The Surrogate's Court's exercise of in rem subject matter jurisdiction over the Trust, a testamentary trust[16], began and continued "long before the commencement of this action in this Court."  *Rousseau* at 458.  That jurisdiction was first exercised when Allen Eber died and Surrogate probated the Will creating the Trust, continued with the Surrogate's standing grant of authority of the Co-Trustees to serve through the issuance of Letters of Trusteeship, continued with the various prior intermediate judicial accountings proceedings, and continued with the CNB Accounting Proceeding.  The Trust and the Trust *res* were already under the authority of and in the control of Surrogate's Court dating back to 1970.

---

[16] The trust at issue in *Princess Lida* was an *inter vivos* trust, as opposed to a testamentary trust.  Unlike here, and unlike in *Rousseau*, in *Princess Lida*, the state court did not exercise jurisdiction over the trust and issue letters to the trustee to act and administer the estate under the supervision and control of the state court.  Thus, in *Princess Lida*, the timing of the filing of the state court accounting proceeding (before the federal diversity case) was critical.  In *Princess Lida*, the state court's exercise of *in rem* jurisdiction in the accounting proceeding constituted the prior exercise of *in rem* jurisdiction that divested the federal court of jurisdiction.  Here, like the state probate court in *Rousseau*, the Surrogate's exercise of in rem jurisdiction in the probate proceeding and the issuance of Letters of Trusteeship was the Surrogate's Court's prior exercise of jurisdiction that divests this Court of jurisdiction.

500.     With the Surrogate's Court having exercised prior in rem jurisdiction over the Trust, this Court never had subject matter jurisdiction.  The Surrogate's Court had exercised in rem jurisdiction over the Trust and its assets dating back to 1970, and Plaintiffs had the forum to seek remedy for the breaches of fiduciary duty alleged herein, which are all derivative of their beneficial interest in the Trust.  They merely had to seek an Order compelling the Co-Trustees to account pursuant to SCPA 2205, and upon the accounting, they could have advanced the same claims of breach of fiduciary and request for remedies that they are pressing here pursuant to SCPA 2211. *See generally* 7 Warren's Heaton on Surrogate's Court Practice § 91.02 (2020); 2 Harris N.Y. Estates: Probate Admin. & Litigation Ch. 28 Summary (6th ed.); SCPA 302; *Matter of Zalaznick*, 84 Misc.2d 715 (Sur. Ct., Bronx County 1975); *Matter of Blumenkrantz*, 14 Misc.3d 462 (Sur. Ct., Nassau County).

### B.   Plaintiffs Seek to Invoke this Court's In Rem and Quasi In Rem Jurisdiction

501.     There is no question that the nature of the Surrogate's Court's jurisdiction over the testamentary trust is in rem and quasi in rem.  *Matter of Hall*, 183 Misc. 659 (Sur. Ct., NY County 1944); *Matter of King*, 74 Misc.2d 61, 62 (Sur. Ct., N.Y. County 1973).  Thus, the question is whether Plaintiffs' claims invoke this Court's in rem and quasi in rem jurisdiction; the answer is in the affirmative.

502.     In *Genovese v. Genovese*, No. 1:15-CV-00064-BR, 2016 WL 4945318 (W.D. Pa., Sept. 16, 2016), the court addressed the same issue.  There, plaintiff alleged a breach of fiduciary duty against a trustee, both individually and in his capacity as trustee.   She alleged that the trustee breached his fiduciary duties in administering the trust, including by violating the duties of good faith, loyalty, and impartiality and his duty under the trust instrument to act in the best interest of the plaintiff.  Plaintiff requested that the court, among other things, order disgorgement of the

trustee's past compensation, void all actions the trustee had taken in violation of the trust, and surcharge the trustee for damages caused by breach of his duties.   Plaintiff also requested that the Court rule as to restrictions on alienability of stock owned by the trust and issue injunctive relief with respect to such stock.  *Id.* at 4.

503.    As to these claims, the court held that Plaintiff's requested relief would require the court to exercise *quasi in rem* jurisdiction over the trust. The court reasoned that an order compelling the trustee to perform various actions respecting his management of the trust went to the heart of the administration of trust assets that were already under control of the state court. Further, the Court held that although the monetary relief sought by Plaintiff would be satisfied by the trustees' personal funds, actions for restoration of misappropriated or mismanaged trust funds are nevertheless *quasi in rem* within the context of *Princess Lida*. *Genovese* at 4-5.  The court held that it could not adjudicate these claims without interfering with the state court's jurisdiction over the trust and dismissed them for lack of subject matter jurisdiction.  *Genovese* at 5.

504.    Here, as in *Genovese*, Plaintiffs allege a litany of acts of misconduct by Lester in his capacity as Co-Trustee, all of which relate to the administration of the Trust. They ask this Court to find that Lester breached his fiduciary obligations in administering the Trust and the businesses that the Trust owned as a Co-Trustee by usurping a Trust opportunity in entering into the Southern Consulting Agreement, and they seek disgorgement of the compensation that Lester received as a Southern Consultant as an equitable remedy. Plaintiffs FFCL ¶¶ 24, 77, 79.  They allege that Lester's loans to Eber W&L and Eber Metro as Trust owned companies were not permitted under the Will without Surrogate's Court approval or Co-Trustee approval.  Plaintiffs FFCL ¶¶ 24, 489.  They seek a reconveyance of Eber Metro's shares from Alexbay, LLC, as Trust property that was "taken from the Trust" on the grounds that Lester breached his fiduciary duties

to the Trust and the Eber entities that it owned.  Plaintiffs FFCL ¶¶ 499.  They allege that Lester as Co-Trustee of the Trust engaged in impermissible self-dealing by entering into an employment agreement with Eber-CT, and they seek a surcharge against him.  Plaintiffs FFCL ¶¶ 24, 479-485. They ask the Court, contrary to the Surrogate's Court Order, dated June 1, 2007, to find that the Trust owned shares of Eber W&L and to cause them to be distributed from the Trust.  Plaintiffs FFCL ¶ 97-98.  They ask the Court to interpret and enforce the Monroe County Surrogate's Court's June 1, 2007 order as to the distribution of Eber Bros. shares.  Plaintiffs FFCL ¶ 97-98.

505.    Plaintiffs' claims, at their core, question the manner in which Lester handled the Trust property, one of his primary duties as Co-Trustee.  It follows that any claim by Plaintiff that Lester violated these duties—whether couched in terms of breach of fiduciary duty or otherwise— is beyond the subject matter jurisdiction of this Court under the *Princess Lida* Doctrine.

506.    Further, to the extent they seek remedies against Wendy, Plaintiffs' standing to do so derives strictly from their interest in the Trust over which the Surrogate's Court has exercised in rem jurisdiction.  *See Matter of Blumenkrantz*, 14 Misc.3d  462 (Sur. Ct., Nassau County 2006). Plaintiffs had full access to the Surrogate's Court in control of the Trust to bring claims against Wendy upon receiving limited letters from the Surrogate's Court pursuant to SCPA 702.  SCPA 702 provides for the issuance of limited letters of administration to perform specific acts on behalf of an estate.  SCPA 702 [8] [9] [10]. The statute provides for a issuance of letters to a separate estate representative (including a beneficiary) in the event that the primary fiduciary has a conflict, or refuses or fails to act to advance the estate's interest against a fiduciary or a third party, including by way of litigation.  *See Matter of Bennett,* 84 A.D.3d 1365 (2d Dept. 2011); *Matter of Vasquez*, 162 Misc.2d 184 (Sur. Ct., N.Y. County 1994); *Matter of Blumenkrantz*, 14 Misc.3d

462; *see also* 1 Harris, New York Estates: Probate, Administration and Litigation § 11:164 [6th ed]).

507.    Plaintiffs' claims and the remedies sought require that this Court exercise quasi in rem jurisdiction over the Trust and strike at the heart of the Surrogate's Court authority and prior exercise of in rem jurisdiction over the Trust.  This Court thus lacks subject matter jurisdiction under the *Princess Lida* Doctrine.

**Point II**
**THE MONROE COUNTY SURROGATE'S COURT ORDER**
**JUDICIALLY SETTLING THE ACCOUNTING AND**
**TERMINATING THE TRUST PRECLUDES PLAINTIFFS' CLAIMS**

508.    If the Court finds that it has subject matter jurisdiction over this case on the grounds that Plaintiffs' claims are in personam rather than in rem or quasi in rem, the instant suit must be dismissed on the grounds of res judicata.  As the Supreme Court held in *Princess Lida*,

> [I]t is settled that where the judgment sought is strictly in personam, both the state court and the federal court, having concurrent jurisdiction, may proceed with the litigation at least until judgment is obtained in one of them which may be set up as res judicata in the other. On the other hand, if the two suits are in rem, or quasi in rem, so that the court, or its officer, has possession or must have control of the property which is the subject of the litigation in order to proceed with the cause and grant the relief sought the jurisdiction of the one court must yield to that of the other.

(*Princess Lida*, at 466).

509.    Plaintiffs, anticipating that their claims are barred by res judicata, assert that res judicata was not interposed as an affirmative defense.  But Defendants pleaded res judicata as an affirmative defense in their answer to the Third Amended Complaint (Doc. No. 236).  Further, Plaintiffs cannot claim surprise or prejudice by Defendants' res judicata defense as Plaintiffs themselves have argued and conceded that the Surrogate's Court's June 1, 2017 Order has a res

judicata effect in this case.[17]  In any event, to the extent necessary, Plaintiffs' own use of res

judicata and the Court testimony on the Accounting fully support an amendment of the pleadings

to conform to the proof.  Fed. R. Civ. P. 15(b); *Nicholls v. Tufenkian Import/Export Ventures, Inc*.,

367 F. Supp. 2d 514 (S.D.N.Y. 2005).

510.    Indeed, a federal court considering the preclusive effect of a state court judgment

looks to the law of the state in which the judgment was rendered. *See Ferris v. Cuevas*, 118 F.3d

122, 125–26 (2d Cir.1997).  Here the effect of the June 1, 2017 Order is governed by New York

law.  Under both New York and federal law, the doctrine of res judicata or claim preclusion

provides that a final judgment on the merits precludes the parties or their privies from relitigating

issues that were or could have been raised in that action." *Id*. (internal quotation marks and

citations omitted); s*ee Flaherty v. Lang*, 199 F.3d 607, 612 (2d Cir.1999).  Res judicata applies in

New York where "(1) there is a previous adjudication on the merits; (2) the previous action

involved [the party against whom res judicata is invoked] or its privy; and (3) the claims involved

were or could have been raised in the previous action" *Caldwell v. Gutman, Mintz, Baker &*

*Sonnenfeldt., P.C.*, 701 F. Supp. 2d 340, 351 (E.D.N.Y. 2010) (quoting *Whelton v. Educational*

*Credit Mgmt. Corp.*, 432 F.3d 150, 155 (2d Cir. 2005)).

511.    Importantly, as to the Accounting Proceeding and the June 1, 2017 Order, res

judicata principles "apply with equal force to judicially settled accounting decrees" (*Matter of*

*Hunter*, 4 N.Y.3d 260 at 270 (2005). Generally, "an accounting decree is conclusive and binding

---

[17] Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment, dated November 8, 2019, at 5 (Doc. No. 264), aptly states that "'[a]s a general rule, an accounting decree is conclusive and binding with respect to all issues raised and as against all persons over whom Surrogate's Court obtained jurisdiction,' and 'as to issues that were decided as well as those that could have been raised in the accounting.' *In re Hunter*, 4 N.Y.3d 260, 270 (2005) (emphasis added)" and argues "[t]hus, Lester is bound by the consequences of this Order and cannot now say it is ineffective, regardless of whether his silence in Court was intentional gamesmanship (though the undisputed facts show that it was)."  Further, Plaintiffs, in closing, urged this Court to recognize the preclusive effect of the June 1, 2017 Order, explicitly invoking "res judicata (Tr. at 492:19-22).

with respect to all issues raised and ***as against all persons whom Surrogate's Court obtained***

***jurisdiction***," as well as to issues that could have been raised.  *Id.*  (emphasis added).  One of the

leading New York treatises explains:

> As to the matters embraced in the account and decree, the remedies of all
> parties over whom jurisdiction has been obtained must be obtained in the
> accounting proceeding. They cannot sit idly by and thereafter complain.
> This is so regardless of what errors may have been committed during the
> course of the accounting. The cited parties are concluded by the decree
> unless they took proper steps to assert their rights; they must have filed
> proper objections and pressed these to a conclusion. If the court rejects
> their objections, they are concluded by the decree unless they have either
> appealed or made a proper motion to open or modify the decree.

7 Warren's Heaton on Surrogate's Court Practice § 102.03 (2020).

512.    The Surrogate's Court's final adjudication of an accounting determines and is

conclusive of the accounting's validity, the correctness of the accounting and entries and

information contained therein, and of all matters necessarily related to it.  *Matter of Hunter*, 4

N.Y.3d at 270; *see also Matter of Richmond*, 63 A.D. 488, 493 (4th Dept. 1901), *aff'd,* 168 N.Y.

385 (1901).  Moreover, it is conclusive not only as to issues which were actively presented and

determined but also as to those matters which could have been raised regarding all matters set

forth in the accounting.  *See Zoeller v. Lake Shore Sav. Bank*, 140 A.D.3d 1601, 1602 (4th Dept.

2016).  The conclusive effect extends to every material matter within the issues which were

expressly litigated and determined and also to those matters which, although not expressly

determined, are comprehended and involved in the thing expressly stated and decided whether

they were or were not actually litigated or considered.  *Young-Szlapak v. Young*, 151 A.D.3d 1646

(4th Dept. 2017).

513.    The Accounting Proceeding placed all issues and claims pertaining to the Trust

before the Surrogate's Court.  The filing of an accounting provides the means for the Surrogate's

Court to determine various issues that confront an estate, including, *inter alia*, a beneficiaries'
claims for breach of fiduciary duty and remedy therefore by beneficiaries, and the proper
valuation of particular assets.  *See generally* 7 Warren's Heaton on Surrogate's Court Practice §
91.02 (2020).  The Petition and Accounting were duly filed and the Surrogate's Court issued
process thereon (the accounting citation), exercising its subject matter jurisdiction and jurisdiction
over Plaintiffs.  Plaintiffs were duly served, and in fact, had actual notice of the proceeding.  Def.
Ex. OOOO; Pl. Ex. 1002-Hays Direct at ¶¶ 33-36; Pl. Ex. 1001-Stein Direct at ¶¶ 20-28; Pl. Ex.
1003-Kleeberg Direct at ¶¶ 38-41.  The Petition and the Accounting were pleadings—SCPA 302
provides that pleadings "shall consist of the petition, answer or objects and account"—and
pursuant to SCPA 509, every allegation contained in a petition and an accounting unless contested
is due proof of the facts therein stated.  2 Harris N.Y. Estates: Probate Admin. & Litigation §
18:16 (6th ed.).  Every single transaction and entry in the Accounting and every single statement
made therein is an allegation which the June 1, 2017 Order settling the Accounting fixed (Def. Ex.
TTTT).

514.    The Accounting Proceeding alleged, as a predicate for request for judicial
settlement and the termination of the Trust, on Schedule G, that the market value of the Eber Bros.
& Co., Inc. stock interests as of the end date of the Accounting was as follows:

| 2000 Shares | Eber Bros. & Co. 6% Non-Cumulative | $0.00 |
|---|---|---|
| 1850 Shares | Eber Bros & Co. Class A | $0.00 |
| 290 Shares | Eber Bros & Co. Class B | $0.00 |

The Accounting Proceeding further alleged on Schedule J as follows:

14.   Empire Valuation was retained for the purpose of providing a valuation of Eber Bros. & Co., Inc. stock. A copy of the valuation which was received is attached to the Petition for Judicial Settlement as Exhibit "A". This valuation confirms that the stock has no value and serves as the basis for the zero values set forth on Schedule "G".

15.   Based upon the valuation showing that the Eber Bros. & Co., Inc. stock has no value, Petitioner asserts that the Trust can and should be terminated at this time.

16.   Although the Trust is not scheduled to terminate until the death of the last surviving beneficiary pursuant to Article Ninth of the Will, in case all, or substantially all of the decedent's stock in Eber Bros. & Co., Inc. is sold, the Trustees, in their absolute discretion, can terminate the Trust and distribute the residuary of the Trust to the beneficiaries.

17.   Given the lack of monetary value attributable to the Eber Bros. & Co., Inc. stock held by the Trust, termination and distribution of the Trust assets is proper.

(Def. Ex. OOOO).

515.    Plaintiffs had a right to appear in the Surrogate's Court proceeding and challenge the Accounting and the foregoing assertions by taking discovery, filing objections and pressing their  objections to a conclusion.  SCPA 2211.  Plaintiffs were afforded opportunity to raise objections concerning the Accounting including its assertions as to the valuation of the Eber Bros. stocks and all other issues embraced by the Accounting, including the claims that they raised herein. *See generally* 7 Warren's Heaton on Surrogate's Court Practice CHAPTER 101; 2 Harris N.Y. Estates: Probate Admin. & Litigation Ch. 28 Summary (6th ed.).

516.    Plaintiffs chose not to object.  They acquiesced in the accuracy of the information included in the account.  *See Matter of Rudin*, N.Y.L.J., Mar. 2, 2000 (Sur. Ct., N.Y. County 2000) (precluding the objectant, who failed to file objections to the executors' account concerning

the composition of the testamentary trust, from objecting to the trust's accounting based on the same issue). They also had the opportunity to bring cross-claims against Lester and Eliot Gumaer and initiate third-party practice in the accounting proceeding with leave of Court.  SCPA 302; *Matter of Zalaznick*, 84 Misc. 2d 715 (Sur. Ct., Bronx County 1975).  But just as they chose not to secure limited letters of administration pursuant to SCPA 702, they strategically chose not to participate in the Accounting Proceeding.  Pl. Ex. 1002-Hays Direct at ¶¶ 33-36; Pl. Ex. 1001-Stein Direct at ¶¶ 20-28; Pl. Ex. 1003-Kleeberg Direct at ¶¶ 38-41.

517.    Even after this Court questioned whether and to what extent the Surrogate's Court would "stand down," Plaintiffs did nothing.  Memorandum and Opinion dated July 6, 2017 (Doc. No. 57).[18]  The Surrogate's Court carried out its charge, leading to a binding order and decree finalizing the Accounting Proceeding, and forever foreclosing the claims asserted herein before this Court reached them.  Def. Ex. TTTT.  The mere fact that the Plaintiffs had commenced the federal court action two months before the commencement of the Accounting Proceeding does not deprive the Surrogate's Court's Order settling the account of its res judicata effect.  The Surrogate reached a final adjudication first, and its Order is conclusive and binding with respect to all issues that could have been raised and as against all persons whom Surrogate's Court obtained jurisdiction, including Plaintiffs.  *Matter of Hunter*, 4 N.Y.3d at 270.

---

[18] This Court, in its July 6, 2017 Order stated that "While the avoidance of piecemeal litigation of course is an end to be desired, that fact sheds no light on whether this Court rather than the Surrogate's Court should be the one to 'stand down.'" *Id*. at 7.  The Court further observed, "It is not clear whether CNB will attempt to proceed in the Surrogate's Court in light of this ruling or, should it do so, whether the Surrogate would permit such proceedings prior to resolution of this case or whether plaintiffs or other defendants here would seek relief from this Court. This Court therefore does not now address the possibility that litigation, if unimpeded, might proceed in both courts." *Id*. at n. 13.  The Surrogate's Court did not stand down and indeed reached a final adjudication – Plaintiffs slept on their rights and are bound by the Surrogate's Court's order.

Point III

## THE SOUTHERN CONSULTING AGREEMENT WAS NOT A BREACH OF LESTER'S FIDUCIARY DUTIES OR THE TAKING OF A CORPORATE OPPORTUNITY

518.    The Southern Consulting Agreement was neither a Trust asset nor a corporate asset; it was a contract with an individual, Lester Eber, based on the value Southern perceived that individual could offer to it.

519.    Under the corporate opportunity doctrine, corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation.  *Design Strategies, Inc. v. Davis*, 384 F. Supp. 2d 649, 672 (S.D.N.Y. 2005), *aff'd sub nom. Design Strategy, Inc. v. Davis*, 469 F.3d 284 (2d Cir. 2006) (internal quotations omitted).  Whether there has been a violation of the corporate opportunity doctrine can be determined by two tests: (1) the "tangible expectancy" test; or (2) the "necessary or essential" test.  *Design Strategies, Inc*., 384 F. Supp. at 672.

### A.    Eber W&L Had No Tangible Expectancy In The Consulting Agreement

520.    The "tangible expectancy" test asks whether the corporation had an interest or "tangible expectancy" in the opportunity.  *Id*.; *see Kuo v. Kuo*, No. 96 CIV. 5130 (CM), 1999 WL 123379, at *4 (S.D.N.Y. Mar. 4, 1999), *aff'd*, 216 F.3d 1072 (2d Cir. 2000) ("It is well settled that the corporate opportunity doctrine does not apply where the corporation had no 'tangible expectancy' in the opportunity allegedly taken by the fiduciary"); *see also Rafield v. Brotman*, 261 A.D.2d 257, 258 (1st Dept. 1999) (no usurpation of corporate opportunity where corporation's "lack of any viable prospects for the future meant that it no longer had any 'line of business'").

521.    Tangible expectancy is something much less tenable than ownership, but more certain than a desire or a hope.  *Design Strategies, Inc*., 384 F. Supp. at 649; *see e.g., Pure Power*

*Boot Camp, Inc. v. Warrior Fitness Boot Camp, LLC*, 813 F. Supp. 2d 489, 524 (S.D.N.Y. 2011) (corporation had no tangible expectancy in clients who were solicited by defendants and merely chose not to renew their subscriptions with plaintiff).  A corporate opportunity cannot be created by the mere desire or hope of doing business in the future. *See Alexander & Alexander v. Fritzen*, 147 A.D.2d 241, 247-48, 542 N.Y.S.2d 530 (1st Dept. 1989).

522.    Moreover, a business opportunity must be so essential and necessary to the corporation's success that "the consequences of deprivation are so severe as to threaten the viability of the enterprise." *Alexander*, 147 A.D.2d at 248.  New York courts "reject as overbroad [ ] interpretation[s] of a business opportunity as that which embraces areas into which the corporation could naturally or easily expand." *Id.* at 249.  In addition, *Burg v. Horn*, 380 F.2d 897, 900 (2d Cir. 1967), rejects the argument that directors have a duty, as a matter of law, to acquire for the corporation any property within its "line of business" as "too broad" a standard.

523.    Eber W&L and Eber Metro had for many years been in the business of distributing wine and liquor in New York State to stores, restaurants, and bars.  They were not in the business of providing consulting and lobbying services on governmental issues, and had no tangible expectancy in a consulting and lobbying agreement with a third party.  In addition, when Lester entered into the Consulting Agreement in August 2007, the New York operation had already ceased operations and was merely being wound down and liquidated. Def. FOF at ¶¶ 81-92, 443-44, 446.  Eber W&L and Eber Metro had no expectation of continued operations in New York and no tangible expectancy in a consulting and lobbying agreement with a third party.

524.    The fact that the New York operations had ceased when Lester entered into the Consulting Agreement also disposes of any argument that the restrictive covenant preventing Lester or his affiliates from competing with Southern in New York affected in any way the Eber

New York operation.  The Eber company operations in New York were out of business, their inventory had been liquidated, and there was no intention on anyone's part of distributing wine and liquor in New York.  Any Eber wine and liquor distribution going forward would be in Connecticut, and that was unaffected by Lester's restrictive covenant because Eber-CT was only licensed to distribute in Connecticut, and not in New York.  Def. FOF at ¶¶ 81-92, 445.

**B.    Consulting and Lobbying Were Not Necessary or Essential
To The Eber W&L Wine and Liquor Distribution Business**

525.    The "necessary or essential" test asks whether an opportunity is the same as, is "necessary" for, or "essential" to, the line of business of the corporation and the consequences of deprivation are so severe as to threaten the viability of the enterprise.  *Design Strategies, Inc*., 384 F. Supp. at 674.; *see Burg v. Horn*, 380 F.2d at 899-900; *Alexander & Alexander of New York, Inc. v. Fritzen*, 147 A.D.2d 241, 248 (1st Dept. 1989); *Coastal Sheet Metal Corp. v. Vassallo*, 75 A.D.3d 422, 423 (1st Dept. 2010) (defendant's new company did not usurp employer's corporate opportunity because the new company's business of purchasing certain machinery was neither "necessary" for nor "essential" to the employer's line of business).

526.    Eber W&L and Eber Metro had been in the business of distributing wine and liquor in New York State for many years.  Neither company provided consulting or lobbying services for third parties, and those types of activities were not necessary or essential to the Eber business of wine and liquor distribution.  Def. FOF at ¶¶ 81-92, 443-444, 446.  Lester's entry into the Consulting Agreement did not involve activities that had been necessary or essential to the New York operation, which at the time had ceased active business operations.

C.     **Southern Would Not Have Offered The Consulting Agreement To Eber W&L**

527.     Evidence that a third party would not have done business with a corporation, but only the officer or employee individually, will preclude a finding that a corporate opportunity existed. *Moser v. Devine Real Estate*, 42 A.D.3d 731, 735-36 (3d Dept. 2007) (holding that because the third party "unequivocally testified" that he would not have offered an investment opportunity to the corporation, the corporation had no "tangible expectancy" in the opportunity); *DiPace v. Figueroa*, 223 A.D.2d 949, 952 (3d Dept. 1996) ("The sale cannot be considered a corporate opportunity, for the sellers unequivocally aver that they would not have sold to the corporation. . . but only to [the Defendant] individually"); *Rafield v. Brotman*, 261 A.D.2d 257, 258 (1st Dept. 1999); *Washer v. Seager*, 272 A.D. 297 (1st Dept. 1947).

528.     Here, Hager unequivocally and emphatically testified that Southern would not have entered into the Consulting Agreement with Eber W&L or any of the Eber companies: "I would have objected vehemently … [W]e viewed Lester having the value, not the older entity after they ceased … The answer is no … Call me myopic is you want, after a business is done, it's done. We deal with the individual."  Hager Dep. Tr. at 69:20 to 70:7; 70:23-25; *see generally* Def. FOF at ¶¶ 407-432.

529.     Plaintiffs speculate in arguing that Southern could have offered the lobbying and consulting arrangement to the Eber companies, and then pay Lester a salary.  Hager's testimony directly contradicts this assertion.  Plaintiffs' speculation that Southern would have entered into a contract with the Eber companies for Lester's services is not based on any evidence in the record and is not credited by the Court.  *See Kuo*, 1999 WL 123379.

116

530.    The Consulting Agreement was not a corporate opportunity because Southern

would not have offered it to one of the Eber companies.[19]

### D.    Any Damages Should Be Limited To What Eber W&L Would Have Received From An Arrangement Where Southern Contracted With Eber W&L

531.    If the Court were to find that the Consulting Agreement was a breach of Lester's

fiduciary duty or the taking of a corporate opportunity—which it was not—the damages would be

limited to the value the Eber companies would have received from the Consulting Agreement.

532.    Plaintiffs cite to this Court's decision in *Whitney Holdings v. Givotovsky*, 988 F.

Supp. 732 (S.D.N.Y. 1997), in asserting that the measure of damages should be "[t]he value of the

diverted asset[, which] is the amount plaintiff would have received but for the defendant's

wrongful interference."  *Id*. at 736; *see* Pl. Mem. at 7.  If the Court were to assess damages with

respect to the Consulting Agreement, any damages would be limited to the amount that the Eber

companies would have received.  Plaintiffs' assertion is that if Southern wanted Lester's services,

it should have—despite Hager's emphatic testimony—contracted with Eber W&L, which could

then pay Lester a salary.  Plaintiffs necessarily speculate that funds paid to Eber Metro would not

immediately go to creditors, notwithstanding Eber W&L's massive legacy liabilities, which it was

unable to pay.  Moreover, any damage amount would not include the reasonable salary that Eber

W&L would have had to pay Lester for his valuable personal services, which were being sought

by Southern.  In addition, Lester paid taxes on amounts received from Southern.  Any damage

amount would not include payments that Lester already paid in taxes.  Finally, even assuming the

---

[19]    Cases cited by Plaintiffs, Pl. Mem. at 5, are distinguishable because they did not apply New York law and were decided based on specific facts different from those in the present case.  *See, e.g., In re Signature Apparel Grp. LLC*, 577 B.R. 54 (Bankr. S.D.N.Y. 2017) (applying Delaware law, corporation still operating, defendants violated automatic bankruptcy stay by transferring the corporation asset).

Consulting Agreement in 2007 was a corporate opportunity, that conclusion would not apply to any payments after 2012, when the original term of the Consulting Agreement expired.

**Point IV**

**<u>EBER W&L AND EBER METRO WERE INSOLVENT IN 2012</u>**

533.    Under New York law, a corporation is "insolvent" if the "present fair salable value of [its] assets is less than the amount that will be required to pay [its] probable liability on its existing debts as they become absolute and mature." N.Y. D.C.L. § 271(1). "Debt" includes "any legal liability, whether matured or unmatured, liquidated or unliquidated, absolute, fixed or contingent." N.Y. D.C.L. 270.

534.    Under the U.S. Bankruptcy Code, 11 U.S.C. § 101(32)(A) defines "insolvent" for a corporation as the "financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation…." "Debt" means "liability on a claim." 11 U.S.C. § 101(12). "Claim" means a right to payment, or a right to an equitable remedy for breach of performance if such breach gives rise to a right of payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured. 11 U.S.C. § 101(5).

535.    Under the New York D.C.L., "*probable liability*, and not absolute liability, on existing debts is required." *Marine Midland Bank v. Stein*, 105 Misc.2d 768 (Sup. Ct., N.Y. County 1980) (emphasis in original) (guarantee of loan was probable liability which must be considered in determining solvency); *Commercial Trading Co. v. Potter Securities Corp.*, 26 A.D.2d 761, 762 (4th Dept. 1966) (probable liability on existing debts required, not actual liability).  Determining a debtor's "probable liability on [its] debts as they become absolute and matured" is to be determined from the viewpoint of the facts and circumstances as of the time that

insolvency is claimed to have existed. *Lippe v. Bairnco Corp.*, 249 F. Supp. 2d 357, 380 (S.D.N.Y. 2003), *aff'd* 99 Fed. Appx 274 (2d Cir. 2004). "The question ... is what [debtor's] objectively probable liability [was] on his existing debt at the time of the … conveyance." *Tae H. Kim v. Ji Sung Yoo*, 311 F. Supp. 3d 598, 616 (S.D.N.Y. 2018).

### A. The Pension Liabilities Were "Debts"

536.     The most significant liabilities of Eber W&L and Eber Metro were their pension liabilities.  The triggering event giving rise to a "claim" for pension benefit liability is not the termination of the pension plan, but rather the performance of labor by the [debtor's] employees. *See In re A.C.E. Elevator Co.*, 347 B.R. 473, 479-80 (Bankr. S.D.N.Y. 2006); *In re Finley*, B.R. 882, 891-93 (Bankr. S.D.N.Y. 1993).

537.     As of the time of the 2012 Foreclosure, the unfunded benefit liability under the Eber W&L Retirement Plan was an accrued liability, and was therefore an existing "debt" of Eber W&L.  *See Lippe*, 249 F. Supp. 2d 357 (S.D.N.Y. 2003); *Shelly v. Doe*, 249 A.D. 2d 756 (3d Dept. 1998).  That accrued liability of Eber W&L was also a contingent liability of Eber Metro to the PBGC, and was therefore an existing "debt" (which, by definition, includes contingent liabilities) of Eber Metro.  *See* 29 U.S.C. § 1362(a) (joint and several liability for member of contributing sponsor's "controlled group").  Eber Metro was a member of Eber W&L's "controlled group" at the time of the 2012 Foreclosure.

538.     As of the time of the 2012 Foreclosure, the Teamsters Fund withdrawal liability was a fixed and joint and several liability of Eber W&L and Eber Metro to the Teamsters Fund. *See* 29 U.S.C. § 1301(b)(1) (businesses "under common control" treated as single employer for withdrawal liability and jointly and severally liable for unfunded vested benefits).

539.     The termination liability for the Retirement Plan, *i.e.*, the amount needed to contribute to the plan in order terminate under the PBGC standard termination procedures was $5,555,755 as of May 31, 2009 and $5,063,388 as of May 31, 2012.  Def. Ex. ZB-Gallagher Direct at ¶¶ 11-12, 20-21; *see* Def. Ex. JJ, at 2; Def. Ex. BBBB, at 2.

540.     The withdrawal liability to the Teamsters Fund had been negotiated to be $1,421,029.95, an amount assessed by the Teamsters Fund on January 10, 2008, confirmed as a fixed liability of Eber W&L and Eber Metro in multiple Modification Agreements and Guarantees in 2009 and 2012, and memorialized in a Confession of Judgment.  Def. FOF at ¶¶ 273-74; Def. Exs. M. F.

541.     At the time of the 2012 foreclsoure, Lester and Wendy Eber reasonably believed that the Eber companies would eventually have to pay these multi-million dollar legacy pension liabilities, such that the collection on the liabilities was "objectively probable."  Tae H. Kim, 311 F. Supp. 3d at 616.   The $1.42 million Teamsters liability was embodied in a Confession of Judgment.  With respect to the $5 million Retirement Plan termination liability, the Eber W&L Board understood that the PBGC could, and very likely eventually would, pursue many legal options, including involuntarily terminating the Plan, making a statutory demand for payment, and automatically imposing a statutory federal tax lien on the assets of Eber W&L and Eber Metro, as well as Eber Metro's interest in Eber-CT.  Def. Ex. ZA-Wendy Direct, at ¶ 138.  The Board believed this would mean the collapse of Eber-CT.  Id. at ¶ 139.  Plaintiffs did not offer any evidence to suggest that it was unreasonable for the Board to believe in 2012 that the companies would be liable for the full amount of the termination liability and the full amount of the withdrawal liability.  Defendants' expert Frank Torchio stated that purchasers are always concerned with pension liability because "the PBGC will go after deep pockets."  Tr. at 465:20 to

466:4.  Southern's Lee Hager characterized pension plan liability as "the black hole of assumption."  Hager Dep. Tr. at 72:19-21.  As probable liabilities, the pension termination and withdrawal liabilities were debts of Eber W&L and Eber Metro for the purpose of determining insolvency.

### B.   Eber W&L and Eber Metro Were Insolvent in 2012

542.    Based on a blended average of comparables, Mr. Torchio valued the Eber Metro interest in Eber-CT (the only operating Eber entity) to be $5,757,768.  Def. Ex. TD.  Significantly, Eber-CT had a loss from operations and negative EBITDA for every fiscal year from 2007-2012.  Torchio Direct, Def. Ex. ZC, at ¶10.  In addition, Eber Metro had liabilities and potential liabilities of $11,131,733, including Lester's loan and line of credit ($3,060,711); and interest thereon ($837,655)[20]; the Eber Retirement Plan termination liability ($5,063,388); the Teamsters Fund withdrawal liability ($1,421,030); and the Harris Beach litigation liability ($755,896).  Torchio Direct at ¶ 55.  Eber W&L had additional liabilities, including amounts owed on a lease ($246,948) and the settlement of the D4 litigation ($80,000).  *Id.*  Based on these valuations, Eber W&L and Eber-Metro were both insolvent, and the market value of equity for Eber W&L and Eber-Metro was zero.  Torchio Direct at ¶ 66.

---

[20] Mr. Torchio arrived at a total for Lester's loan and line of credit by using indebtedness reported on Eber Metro's income tax return for the year ending May 31, 2012, and the company's accountant's calculation of interest thereon as of December 31, 2011.  Def. Ex. ZC-Torchio Direct at ¶ 46.  Lester's loans and line of credit were, as of the date of the 2012 Foreclosure, in the aggregate principal amount of $4,157,586.31. Def. FOF at ¶¶ at 248.

**Point V**
**PLAINTIFFS HAVE FAILED TO CARRY—AND HAVE FAILED**
**TO EVEN ADDRESS—THEIR BURDEN TO DEMONSTATE**
**BY CLEAR AND CONVINCING EVIDENCE THAT THE**
<u>**2012 FORECLOSURE UNJUSTLY ENRICHED LESTER**</u>

A.     <u>Plaintiffs Have The Burden To Prove Unjust Enrichment</u>

543.     With respect to the 2012 Foreclosure, this Court has ruled on the standard that must

be met at trial.  Plaintiffs seek to impose a constructive trust, and this Court has held that Plaintiffs

"must establish the facts necessitating [a constructive trust] remedy by clear and convincing

evidence."  Summary Judgment Reconsideration Decision at 20 (Doc. No. 348) (citing *Miller v.*

*Hartford Life Ins. Co.*, 64 Fed App'x 795, 797 (2d Cir. 2003)).  This includes establishing, by

clear and convincing evidence, that Lester was unjustly enriched by the 2012 Foreclosure.

Summary Judgment Reconsideration Decision at 20 (Doc. No. 348) (citing *In re First Cent. Fin.*

*Corp.*, 377 F.3d 209, 212 (2d Cir. 2004)).

544.     Plaintiffs completely ignore and disregard Judge Parker's ruling that they have the

burden of demonstrating unjust enrichment, and that they must meet the standard of clear and

convincing evidence.  Pl. Mem. at 7-9.  Judge Parker's ruling is the law of the case, however, and

it should not be disturbed.

545.     The law of the case doctrine instructs "that when a court has ruled on an issue, that

decision should generally be adhered to by that court in subsequent stages in the same case unless

cogent and compelling reasons militate otherwise."  *United States v. Quintieri*, 306 F.3d 1217,

1225 (2d Cir. 2002) (citations and internal quotations omitted).  Reconsideration of a prior

decision may be "justified in compelling circumstances, consisting principally of (1) an

intervening change in controlling law, (2) new evidence, or (3) the need to correct a clear error of law or to prevent manifest injustice."  *United States v. Carr*, 557 F.3d 93, 102 (2d Cir. 2009); *see Doe v. N.Y.C. Dep't of Social Servs.*, 709 F.2d 782, 789 (2d Cir. 1983) ("we will not depart from [the law of the case] absent cogent or compelling reasons").  Judge Parker's ruling is the law of the case and should not be disturbed.

546.    Plaintiffs effectively seek, *sub silentio*, a post-trial reconsideration of Judge Parker's decision concerning the standard they must meet.  Pl. Mem. at 8 ("The Court should return to the position articulated in the first summary judgment decision").  A request for reconsideration of Judge Parker's decision on the unjust enrichment burden is improper because it is untimely and because a litigant is entitled only to a single motion for reconsideration.  Loc. Civ. R. 6.3; *Lin v. United States*, 2015 U.S. Dist. LEXIS 21350 at *4 (S.D.N.Y. Feb. 18, 2015); *Hart v. BHH, LLC*, 2019 U.S. Dist. LEXIS 58474 at *3 (S.D.N.Y. Apr. 4, 2019).

547.    If this Court were to reconsider and revisit the Reconsideration decision, it would also reconsider that decision insofar as Court should not have applied the "no further inquiry rule" to the 2012 Foreclosure.

548.    Where the Court finds that a fiduciary is guilty of self-dealing, courts will generally apply a "no further inquiry" rule, imposing liability without questioning the fairness or unfairness of the transaction, *see City Bank Farmers Trust Co. v Cannon*, 291 N.Y. 125 (1943); *see also* Turano & Radigan, New York Estate Administration, §14.03(b) (2019), or whether the action was undertaken in good faith, *see In re Lundberg's Will*, 197 N.Y.S.2d 871, 872 (1960).  It is equally well recognized, however, that "the rule of undivided loyalty due from a trustee . . . may be relaxed by a settlor by appropriate language in the trust instrument in which he, either expressly *or by necessary implication*, recognizes that the trustee may have interests potentially in conflict with

the trust" (emphasis added).  *O'Hayer v de St. Aubin*, 30 AD2d 419, 423 (2d Dept. 1968); *see also In re Ridings' Estate*, 297 N.Y. 417 (1948).

549.     This Court held that "the Will clearly permitted trustees to make loans secured by collateral held in the Trust."  Judgment Reconsideration Decision at 16 (Doc. No. 348). Defendants had argued that by granting the executors and trustees explicit authority to loan money to the estate or trust and secure that loan by estate or trust property, the testator, by necessary implication, authorized the fiduciary to foreclose on that loan.  Magistrate Judge Parker, while agreeing that the Will permitted collateralized loans, held that "the Trust beneficiaries consent was required to permit the transfer of the Trust property to Alexbay."  Summary Judgment Reconsideration Decision at 18 (Doc. No. 348).  In the event the Court were to reconsider Judge Parker's decision as to the burden on the issue of unjust enrichment—and it does not—it would also have to reconsider the determination that the Will did not authorize foreclosure on collateralized loans, and by extension the 2012 Foreclosure.

550.     In such case, the no further inquiry rule would not apply, and the Court must examine whether liability should be imposed by examining the transaction and determining, in sum and substance, whether the transaction was fair or undertaken in good faith.  *O'Hayer v de St. Aubin*, 30 AD2d at 419; *see In re Balfe's Will*, 245 A.D. 22, 22 (2d Dept. 1943); *Heyman v Heyman*, 33 N.Y.S.2d 235, 241 (Sup. Ct., N.Y. County 1942).

### B.     Plaintiffs Have Failed To Carry Their Burden of Proving Unjust Enrichment By Clear and Convincing Evidence

551.     Plaintiffs have failed to carry their burden of proving by clear and convincing evidence that Lester was unjustly enriched by the 2012 Foreclosure, or even acknowledge that it was their burden to do so, and for that reason a constructive trust may not be imposed.

### C.    Lester Eber Was Not Unjustly Enriched By The 2012 Foreclosure

552.    Based on a blended average of comparables, Defendants' expert Frank Torchio valued the Eber Metro interest in Eber-CT (the only operating Eber entity) to be $5,757,768.  Def. Ex. TD.  Significantly, Eber-CT had a loss from operations and negative EBITDA for every fiscal year from 2007-2012.  Torchio Direct, Def. Ex. ZC, at ¶10.  In addition, excluding Lester's loan and line of credit, Eber Metro had probable liability on its fixed and contingent liabilities of $11,131,733, including Lester's loan and line of credit ($3,060,711); interest on Lester's loan and line of credit ($837,655); the Eber pension plan termination liability ($5,063,388); the Teamsters withdrawal liability ($1,421,030); and the Harris Beach litigation liability ($755,896).  Torchio Direct at ¶ 55.  Based on these valuations, Eber-Metro was insolvent, and the market value of equity for Eber-Metro was zero.  Torchio Direct at ¶ 66.

553.    In particular, the contingent pension plan termination liability and the fixed Teamsters employer withdrawal liability, totaling in excess of $6.4 million in 2012, had been and would continue to be significant problems for the Eber companies.  Eber W&L and Eber Metro had no ability to pay the termination liability.  Mr. Torchio said that a purchaser of Eber-Metro would be concerned about the pension liability because one does not know what the pension liability will be, and "the PBGC will go after deep pockets."  Tr. at 465:20 to 466:4.  Southern's Lee Hager characterized pension plan liability as "the black hole of assumption."  Hager Dep. Tr. at 72:19-21.  Eber Metro was a member of the Eber W&L "controlled group" at the time of the 2012 foreclosure.  Ultimately, Eber-CT was held to be in the Eber "controlled group" because the Court set a termination date of April 30, 2010, when Eber Metro still owned 85% of Eber-CT.  Def. Ex. DD.  Lester and Wendy knew that Eber Metro's responsibility for the pension plan termination liability was a significant risk they would have to resolve, along with finding a way to

pay for the liability.  Lester continued to use his own money to pay for the expenses of the Eber

companies, and in the ultimate settlement with the PBGC, Lester gave up his $1.4 million pension.

Def. Ex. SS.

554.    Lester Eber was not unjustly enriched by the 2012 Foreclosure because Eber Metro

was insolvent in 2012, and the estimated equity value of the Eber Metro was zero.

**D.    In Determining Unjust Enrichment, the Court Must Consider
The Facts As They Existed At the Time of the 2012 Foreclosure**

555.    For the determination of unjust enrichment and the imposition of a constructive

trust, Judge Parker held that "the Court must determine at trial the amount of money the Eber

Entities owed to Lester based on the various loans he allegedly extended to those entities, the

value of the business at the time of the foreclosure, and other accounting issues."  Summary

Judgment Reconsideration Decision at 22 (Doc. No. 348).  Whether Lester was unjustly enriched

should be determined at the time of the foreclosure, the time of the alleged breach of fiduciary

duty, and not eight years later, after Lester's death.  A valuation of any of the companies at issue

in 2020—eight years after the foreclosure—is not relevant to "the value of the business at the time

of the foreclosure," the issue the Court preserved for trial. *Id*.

556.    Plaintiffs have asserted that the Court should consider a 2020 valuation as relevant

to unjust enrichment and the imposition of a constructive trust based on the argument that they are

entitled to appreciation damages under *Matter of Rothko*, 43 N.Y.2d 305 (1977).  First, *Rothko*

was a damages case that did not involve a request for a constructive trust, so it does not address

the question of what time period the Court should consider in addressing the question of whether

the defendant was unjustly enriched.  Second, *Rothko* involved a very different *res*, 798 paintings

of tremendous value sold within three weeks, not an ongoing business concern that has operated

for nine years since the forfeiture.  Third, the defendant in *Rothko* had nothing to do with any appreciation in the value of the paintings, in contrast to this case, where Defendants were responsible for any appreciation in value of the Eber companies from 2012, when they were likely to go out of business, to the present.  Finally, in *Rothko*, the Court awarded appreciation damages because the paintings could not be returned.  In contrast, in this case the Plaintiffs want a return of the companies and they also want to strip Defendants of any amounts they may have received from the companies over the course of the last nine years, and for years before that.  *Rothko* does not support this inequitable position.

557.    Whether a court should allow damages based on appreciation in value depends on an equitable determination of the facts of each specific case.  In *Estate of Sakow*, N.Y.L.J. (Sur. Ct., Bronx County, Sept. 17, 1997), the Court noted that:

> it can be reasonably argued that a beneficiary no longer has the right to automatically void a sale for self-dealing which occurred decades ago and that to allow for this remedy without first compensating him for the expenses and the risks in developing some of the property and for the taxes paid for the vacant parcels would be unjust.

558.    The Court in *Sakow* fashioned an equitable result with this principal in mind, because the defendant did much more to enhance the value of the real property than the defendant in *Rothko*, but his conduct was less egregious that the fiduciary in the *Birnbaum* cases, cited extensively by Plaintiffs.

559.    Here, at the time of the 2012 Foreclosure, Eber W&L and Eber Metro were insolvent, and they and Eber-CT were likely to go out of business shortly given the years of losses, the uncertainty of continued bank financing, and the spectre of crushing legacy pension obligations.  Any appreciation in the value of the companies was due to the perseverance and business skills of Defendants, as well as Lester's decision to keep pouring more of his own money

into the business to pay for legacy liabilities and operational expenses. *See Gerstle v. Gamble-Skogma, Inc*., 478 F.2d 1281, 1306 (2d Cir. 1973) ("The passage of [nearly nine years] introduces so many elements—here, for example, the beneficial effects of [defendant's] management—that extreme prolongation of the period for calculating damages may be grossly unfair").

560.    It would be "grossly unfair" to impose a constructive trust on the theory that Lester was unjustly enriched by a 2012 foreclosure because a valuation estimate of the company in 2020—after his death—was positive. If Plaintiffs are entitled to some form of appreciation damages for a breach of fiduciary duty, the Court can fashion an equitable surcharge remedy with a balancing offset for amounts paid into the companies by Lester and the risks of running the business. It would be inequitable, however, to judge whether Lester was unjustly enriched based on a valuation eight years after the foreclosure.[21]

### E.    The Equitable Remedy of Unwinding Is Not Appropriate If The Court Determines That Lester Was Unjustly Enriched Or That The Transaction Was Not Fair and Reasonable

561.    The equitable remedy of unwinding the 2012 Foreclosure would be not be appropriate in this case.

562.    It is well-established under New York law that "equity will not entertain jurisdiction where there is an adequate remedy at law." *Boyle v. Kelley*, 42 N.Y.2d 88, 91 (1977). New York courts consistently hold that "[a]s an equitable remedy, a constructive trust should not be imposed unless it is demonstrated that a legal remedy is inadequate." *Bertoni v. Catucci*, 117 A.D.2d 892, 895, (3d Dept. 1986); *see e.g. Evans v. Winston & Strawn*, 303 A.D.2d 331, 333 (1st

---

[21] In any event, if the Court were to consider the 2020 valuation, it was vastly overinflated, at a rate of 27 times EBITDA, which would have put Eber-CT in the top 15 percentile of all companies on the New York and NASDAQ stock exchanges, with a median three-year growth rate of 12%. Tr. at 423:6 to 424:13. This wildly inflated Eber-CT's value because there is a vast difference between such companies and a company such as Eber-CT, which has a much lower historic growth rate of revenues. Tr. at 424:14-24, 425:15-19, 427:17-22.

Dept. 2003) ("Plaintiffs' claim for a constructive trust was properly dismissed since plaintiffs do not claim that [defendant] is unable to repay plaintiffs' capital contributions, and it does not otherwise appear that the legal remedy of damages will be inadequate").  An unwinding of the 2012 Foreclosure is not appropriate because Plaintiffs have a money damages remedy.

563.    In addition, the adaptation of an equitable remedy to the facts and circumstances of each case can be a challenge to the court's ingenuity.  *Weisinger v. Berfond*, 21 Misc.2d 788 (Sup. Ct., Kings County 1960), *mod. on other grounds*, 11 A.D. 2d 817 (2d Dept. 1960), *aff'd,* 9 N.Y.2d 742 (1961).  "A court of equity, having taken jurisdiction of the subject-matter of the action, will mould its relief so that the interest of all parties will be finally determined in the action."  *Trustees of Presbytery of New York v. Westminster Presbyterian Church of W. Twenty-Third St.*, 192 A.D. 163, 164 (1st Dept. 1920).

564.    "[A] court of equity, having obtained jurisdiction of the parties and the subject-matter of the action, will adapt its relief to the exigencies of the case.  It may order a sum of money to be paid to the plaintiff, and give him a personal judgment therefor, when that form of relief becomes necessary in order to prevent a failure of justice, and when it is for any reason impracticable to grant the specific relief demanded."  *Valentine v. Richardt*, 126 N.Y. 272, 277 (1891); *see Doyle v. Allstate Ins. Co.*, 1 N.Y.2d 439, 443 (1956).

565.    The Court declines to award the equitable relief requested by Plaintiffs because the nature of the relief requested "is so complicated as possibly to require a multiplicity of orders by the court in its efforts to superintend the details of an extensive and peculiar business. This fact does not deprive the court of jurisdiction, but justifies a refusal, in its sound discretion, to exercise it."  *The Standard Fashion Co. v. Siegel-Cooper Co.*, 157 N.Y. 60, 67 (1898).

566.     Here, the 2012 Foreclosure took at issue place over nine years ago.  The Court
would be undertaking to reverse a transaction from 2012, and put the parties in the position they
would be if that nine-year old transaction had not occurred.  The Court would also have to address
Lester's pre-foreclosure loan and line of credit, which would now be immediately due and owing.
Lester would also be entitled to receive payment for the other monies he advanced to keep
businesses alive in the years following the foreclosure, including the $1.4 million loss of his
pension, which would have inured to the benefit of his wife after his passing.  The Court would
also have to address the inequities inherent in the Plaintiffs' request for both an unwinding of the
transaction as well as their desire to extract millions of dollars from Lester and Wendy Eber, who
spent years trying to save Eber-CT and turn it around so that it would be an operating business in
2021.

567.     In *Wiebusch v. Hayes*, 263 A.D.2d 389 (1st Dept. 1999), the Court reversed a
judgment rescinding the sale of the defendant's accounting practice to plaintiff because the value
of the practice was materially misstated at the time.  The Court found it would be unjust to award
plaintiff full restitution of the payments for the practice without adjusting for the benefits realized
from owning the practice or the decline in value of the practice since purchase.  The Court
remanded for further consideration of what an equitable remedy could be because "it appears
impracticable if not impossible to restore the parties to the status quo ante."  *Id*. at 122.

568.     Similarly, in this case, an unwinding of the transaction, in order to be equitable,
would have to consider what would have happened in 2012 if the foreclosure did not occur (*i.e.*, a
failure of the business with no recovery to trust beneficiaries), what Plaintiffs did to support the
business with loan funding before the transaction (*i.e.*, nothing), what Defendants did to keep

Eber-CT in business and turn it into one that has turned a profit, and the payments Defendants made on behalf of the Eber companies in order to keep Eber-CT from going out of business.

569.    If the Court were to unwind the transaction and consider equitable relief, however, the sweeping relief proposed by Plaintiffs should be rejected.  Among other injunctive relief, Plaintiffs seek to have the Court unilaterally install Plaintiff Daniel Kleeberg as the president and CEO of Eber-CT, without any evidence that he would be able to carry out those responsibilities other than the fact that he worked in the wine and liquor business, and in spite of his failures with respect to running a business (his failed lawn care business), and his personal finances (his bankruptcy).  If the Court were inclined to order an unwinding of the transaction, it would order the Parties to present proposals on the relief that the Court should order based on the decision of the Court within seven days of the Court's decision.

### F.    If The 2012 Foreclosure Is Unwound, Lester Is Entitled To Receive Everything He Contributed To The Business Before And After The Foreclosure

570.    In addition, as this Court has recognized, to the extent the 2012 Foreclosure is unwound, the Estate of Lester Eber must be given credit for Lester's loan and line of credit, all of the monies Lester provided to pay for liabilities of any of the Eber companies, and Lester's relinquishment of his $1.4 million pension rights to settle the PBGC liability.  This Court has recognized that to the extent there were any award for the 2012 Foreclosure, there would be a setoff for "the amount of money the Eber Entities owed to Lester based on the various loans he allegedly extended to those entities."  Summary Judgment Reconsideration Decision at 22 (Doc. No. 348) (citing *Birnbaum v. Birnbaum*, 117 A.D.2d 409, 420 (4th Dept. 1986) (trustee entitled to receive amount he paid for property with interest and the value of all improvements)).  *See Gerstle*, 478 F.2d at 1306 (extreme prolongation of period for calculating damages may be

"grossly unfair" where nine years includes beneficial effects of defendant's management of property); *Estate of Sakow*, N.Y.L.J., (Sur. Ct., Bronx County, Sept. 17, 1997) (unjust to void sale without compensating defendant for expenses and risks in developing property).

571.    As, as of the date of the 2012 Foreclosure, the principal and accrued interest on the 2006 Notes (and including the 2009 Checks) was $1,991,158, and the principal and accrued interest on the Lester Line of Credit was $2,116,427.96, for a total of $4,157,586.31.  If the 2012 Foreclosure had never occurred, and those loans had continued to accrued interest in accordance with the terms of the 2006 Notes and the Lester Line of Credit through July 31, 2012, the principal and accrued interest on the 2006 Notes (including the 2009 Checks) would have been $3,163,600.91, and the principal and accrued interest on the Lester Line of Credit would have been $8,345,999.34, for a total of $11,509,600.25. Def. FOF ¶¶ 484-485.

572.    Further, Lester contributed the aggregate sum of $3,187,599 to paying the obligations of the Eber entities following the 2012 Foreclosure and he was not reimbursed for any of those amounts. Assuming interest accruing at 9% per annum from the dates of those payments through June 5, 2012, the value of those contributions would be $5,290,393. Def. FOF ¶ 486.

573.    If the 2012 Foreclosure had never occurred, and the 2006 Notes (including the 2009 Checks), the Lester Line of Credit were extended and remained in place through July 31, 2021, and the value of Lester's contributions following the 2012 Foreclosure were fairly considered, the resulting aggregate value would of same would be $16,799,993.36. Def. FOF 487.

574.    These amounts must be reflected in any equitable relief ordered by the Court and credited against any award of damages.

**Point VI**
**OTHER CHALLENGED TRANSACTIONS**
**DID NOT VIOLATE THE DUTY OF UNDIVIDED**
**LOYALTY OR BREACH ANY FIDUCIARY DUTY**

575.     Plaintiffs challenge other transaction as allegedly self-dealing.  As set forth below, these transactions were fair and reasonable.

**A.   Lester's 2012 Employment Agreement**

576.     Plaintiffs challenge Lester's 2012 employment agreement with Eber-CT and the severance benefit included in it payable on his death.  Pl. Mem. at 9-10.  First, the Will expressly permits the employment agreement, as trustees were permitted to take part in the management of the Eber Entities, reasonably implying that Lester could receive compensation for his work.  Lester was by all accounts experienced, knowledgeable, and a well-respected executive in the industry.  There is nothing untoward about a severance benefit for an executive employee.

577.     Wendy Eber testified that the agreement was approved by the Eber-CT Board, and she signed on behalf of the company.  Wendy Tr. 291:23 to 292:4.  Andrew Eder's testimony was vague at best about the agreement, and the fact that Andrew Eder was not aware of it until later does not lead to an inference that it was unapproved.  Andrew Eder was never a member of the Eber-CT Board.  In addition, Eder-Goodman has not objected to the severance benefit.  The Court should find that the employment agreement is fair and reasonable.

**B.     The 2017 Issuance of Eber W&L Preferred Shares To Lester**

578.     Plaintiffs challenge the issuance in 2017 of preferred shares of Eber W&L to Lester "[r]egardless of whatever reason Lester and Wendy had for granting" them.  Pl. Mem. at 10.  The reason is critically important.  PBGC required Lester to have majority beneficial ownership of the voting stock of Eber W&L at the time of the PBGC settlement so that he could give up his (and

his wife's) rights to his $1.4 million pension benefit.[22]  Def. FOF at ¶¶ 315-19.  This was hardly a

selfish act by Lester; it was a selfless act to permit him to give up his own pension right in order to

effectuate settlement of the Eber companies' $7.9 million dollar legacy pension termination

liability, a liability that had been hanging over Lester, Wendy, and the Eber companies for years.

It afforded him no benefit.  At all times since Lester's preferred stock has been outstanding, Eber

Bros, controlled by the Trust, has held a majority of the outstanding voting stock of Eber W&L.

Lester's preferred shares are redeemable by Eber W&L at any time for $37,000.  Def. Ex. AA.

Plaintiffs' speculation that the document authorizing the shares is a "backdated fabrication" are

rejected.  Pl. Mem. at 10-11.  This transaction allowed Lester to part with his pension benefit for

the good of the Eber companies and their equityholders, and was fair and reasonable.

### C.   Other Transactions Plaintiffs Challenge Should Not Be Set Aside

579.   Plaintiffs broadly argue that certain corporate transactions should be subject to a

constructive trust.  Pl. Mem. at 11.  The facts, however, do not support a finding that Defendants

breached any duties with respect to these transactions, including the transfer of Metro shares to

Wendy Eber or the Wendy Eber employment agreement.  Def. FOF at ¶¶ at 459-65.  As set forth

above, Plaintiffs have failed to satisfy their burden of proving unjust enrichment by clear and

convincing evidence.  In addition, as set forth above, unwinding transactions and attempting to put

the parties back to a status quo that is many years ago would be inherently inequitable.  *See* Point

V.E above.  To the extent Plaintiffs have any right to relief, they can be compensated by damages,

with appropriate set-offs for the funds Lester provided over many years to keep the Eber

companies in business.

---

[22] The Eber W&L Retirement Plan was involuntarily terminated by PBGC, not by a standard or distress termination. In the Settlement Agreement dated as of February 24, 2017, PBGC agreed that Lester was a "majority owner" of Eber W&L within the meaning of 29 C.F.R. ¶ 4041.2.  Def. Ex. SS.

**D.**    **Any Failure To Follow Corporate Formalities Is Not Actionable**

580.    Plaintiffs complain throughout their papers that various actions are invalid because the Eber companies failed to comply with technical corporate formalities.  Small companies such as the Eber companies, however, are not held to the same technical legal standards as large public companies with significantly greater resources.

581.    Under New York law, the failure to follow corporate formalities in a closely held corporation is not actionable by itself.  *In re Perry H. Koplik & Sons, Inc.*, 476 B.R. 746, 797-800 (Bankr. S.D.N.Y. 2012) ("failure to meet as a board and enact corporate resolutions would not … make an otherwise thoughtful decision improper"); *Barkin Construction Co. v. Goodman*, 221 N.Y. 156,161, 116 N.E. 770 (1917) ("Courts are not to shut their eyes to the realities of business life"); *Haff v. Long Island Fuel Corp.*, 233 A.D. 117, 121 (2d Dept. 1931) ("In the management and affairs of a family corporation, irregularities not directly harmful in their nature will be overlooked, and invalidity will not be sought if the declaration of illegality would work injustice"); *St. Marks Assets, Inc. v. Sohayegh*, 167 A.D.3d 458, 90 N.Y.S.3d 30 (1st Dept. 2018), citing *Leslie, Semple & Garrison v. Gavit & Co.*, 81 A.D.2d 950 (3d Dept. 1981) ("If corporate formalities are customarily dispensed with and the affairs of a close corporation are carried on through informal conferences, decisions reached by all the directors and shareholders at informal conferences bind the corporation"); *see also Gerard v. Empire Square Realty Co.*, 195 A.D. 244 (2d Dept. 1921).

### E.      Lester Did Not Act In Bad Faith

582.     Plaintiffs' assertion that Lester acted in bad faith is rejected.  Plaintiffs consistently ignore the economic peril faced by both the New York and Connecticut businesses.  They also ignore the fact Lester sought in good faith to save the Eber business, by putting his personal assets on the line to keep the business afloat.  He poured millions of dollars of his own money into the business, even giving up his pension benefit.  He personally guaranteed the only bank loan that Eber-CT could get, and collateralized that guarantee with his personal assets.

583.     He did not act in secret as Plaintiffs suggest.  Lester advised Sally Kleeberg and Audrey Hayes that he was lending money to the company and receiving a security interest, and gave them the opportunity to share equally on the same terms, but they both said no.  The New York operation was out of business and Eber-CT was failing with seven straight years of losses Lester foreclosed after unsuccessful inquiries about a sale, with CNB looking to move the loan, and with no prospects for additional financing.  Eber W&L and Eber Metro were insolvent.  .  The foreclosure action itself was a public filing.  Subsequently, Lester told Sally about the foreclosure. Daniel Kleeberg knew Lester was working for Southern, and even tried to get Daniel a job with Southern.  Def. FOF at ¶¶ 81-92, 99-109, 169-77, 201-08, 255-58, 391-94, 447-53.

584.     Even if the Court were to find certain actions in retrospect to have been improper, they in no way approach the intentional fraud at issue in *Birnbaum v. Birnbaum*, 157 A.D.2d 177 (4th Dept. 1990).  Lester is entitled to be credited with the millions of dollars which he provided that have resulted in their being an Eber company in business today.  *See* Points IV.D and V.F and the cases cited therein.

**Point VII**

**OTHER TRANSACTIONS ALLEGED BY PLAINTIFFS DID NOT
VIOLATE LESTER'S DUTY OF LOYALTY AND GOOD FAITH**

585.     Plaintiffs assert that other transactions violated Lester's duty of loyalty and good

faith.  These claims are rejected.

     **A.**     **The 2010 Polebridge Transaction**

586.     Plaintiffs have failed to prove that the 2010 sale of a 6% interest in Eber-CT to

Polebridge Bowman (the "Polebridge Transaction") was not a bona fide arms-length transaction.

The principal of Polebridge Bowman, Glenn Sturm, was providing consultation services for the

Eber companies, and this transaction was a form of payment for those services.  The percentage

was negotiated from 10% to 6%.  Def. FOF at ¶¶ 178-80, 183-84.

587.     There was no "scheme to defraud the PBGC," as asserted by Plaintiffs.  Pl. Mem.

at 13.  One of the reasons for the transaction was to lower the Eber Metro ownership of Eber-CT

below 80%, because the Eber companies would be able to argue that Eber-CT was no longer in the

Eber W&L "controlled group" and liable for the legacy pension plan liability.  Def. FOF at ¶ 181.

There is nothing wrong with entering into a bona fide transaction to seek to avoid or defer

potential liabilities.  It was rational business judgment to seek to minimize the potential pension

plan liability to Eber-CT.  At the same time, Lester and Wendy understood that the PBGC would

very likely challenge the transaction and assert that Eber-CT was still in the controlled group.  The

threat of that potential challenge continued to hang over them and the Eber companies in the years

after 2010.  Lester and Wendy knew full well that they would have to negotiate a settlement with

the PBGC someday.  Def. FOF at ¶¶ 305-14.

588.     Lester originally considered transferring a 6% interest in Eber-CT to Wendy

because of her superior performance with Eber-CT, but that fact does not change the result that the

transaction with Polebridge Bowman was bona fide, as well as fair and reasonable.  Sturm wanted

a 10% interest, but ultimately agreed to accept 6%.  The transaction was approved by the Eber-CT

Board. The 2% interest rate on the note was appropriate.  The note given as consideration was

non-recourse to Polebridge and secured by the 6% interest itself.  Polebridge's creditworthiness,

and thus the 2% interest rate, was not relevant.  If the note was not paid, Metro could merely take

the 6% interest back.  The 2% interest rate was never intended to reflect Polebridge's

creditworthiness.  The sale of the 6% interest to Polebridge was intended as an equity incentive

arrangement, much like a stock option.  Attaching a high interest rate to the loan would have

defeated the purpose of the incentive.  Def. FOF at ¶¶ 178-84, 191; Def. Ex. UUU..

589.    In addition, Eder-Goodman was aware of the transaction and entered into a Joinder

Agreement with Eber-CT and Polebridge Bowman as part of the transaction.  Eder-Goodman had

a right of first refusal on sales of Eber-CT membership units, which it failed to exercise, implicitly

recognizing that it did not believe the value for the 6% interest in Eber-CT was below market

value.  There would be no valid business reason for Eder-Goodman to waive its rights if the

Polebridge Transaction resulted in a sale of 6% of Eber-CT for less than market value.  Def. FOF

at ¶¶ 186-90, 364; Def. Ex. HHHHH.

### B.  Lester's Loans

590.    Lester's loan and line of credit were not, as argued by Plaintiffs, "tainted by self-

dealing."  Pl. Mem. at 14.  This Court has expressly held that Lester's loans were allowed by the

Will and are not voidable.  Summary Judgment Reconsideration Decision at 22 n. 9 (Doc. No.

348).

591.    Plaintiffs ask the Court to read additional language into the Will and construe it as

permitting loans by a co-Trustee secured by the Trust assets only if the two disinterested co-

trustees approve the terms on behalf of the Trust.  Pl. Mem. at 14-15.  Plaintiffs do not cite any authority for the proposition that the Court should read additional language into the Will.

592.     The interpretation or construction of a trust requires that the Court ascertain the grantor's intent as expressed therein.  *See e.g. Matter of Gilbert*, 39 N.Y.2d 663 (1976).  Absent ambiguity, the express terms of a will must be honored, and extrinsic evidence is not required (or even permissible) to ascertain a decedent's intent.  *See Matter of Cord*, 58 N.Y.2d 539 (1983).  If the trust's terms are clear and unambiguous, extrinsic evidence cannot serve to contradict those terms.  *See Matter of Manufacturers & Traders Trust*, 42 A.D.3d 936 (4th Dept. 2007).  Plaintiffs' attempt to read additional language into the Will is contrary to this fundamental principle of construction.

593.     Moreover, the evidence established that the loan and line of credit were fair.  The promissory notes are prima facie evidence of their validity, and the line of credit note is consistent with source documentation.  Unrebutted expert testimony established that the interest rates on the loan and line of credit were reasonable based on Eber-CT's poor financial condition.  Lester was loaning money to the companies to keep them running and because there were no other sources of funding.  Moreover, Lester was not just loaning money to the companies, he was guaranteeing the bank loans of the Eber companies.  Def. FOF at ¶¶ 194-236, 395-401.

594.     In addition, contrary to Plaintiffs' contentions, Lester was not a master of arbitrage. Lester paid back the loans that the company made to him by way of his personal account payable to Eber W&L with 9% interest.  Def. FOF at ¶ 219, Pl. Ex. 83 at 7.

### C.     Lester's Payment of the Harris Beach Liability

595.     Plaintiffs do not dispute that in October 2015, Lester paid $400,000 of his own money to Harris Beach PLLC in settlement of a lawsuit by Harris Beach against the Eber entities

seeking recovery of unpaid legal fees and disbursements.  Def. Ex. VV, QQQ.  There should be no dispute that this amount is a set-off to any claim for damages.  Plaintiffs concede as much.  Pl. Mem. at 16 ("If Lester had loaned $400,000 to EBWLC so it could pay Harris Beach … then perhaps there would be an argument that he should recoup the principal he paid.").

596.    Plaintiffs challenge the part of the settlement under which Harris Beach assigned all of its right, title and interest in all claims it had against Eber W&L, Eber Metro, Eber-CT and Alexbay to Lester.  Pl. Mem. at 16-17, Def. Ex. VV.  This concern can be easily remedied by the Court crediting only the amount concededly paid by Lester, $400,000, against any award of damages in this case, plus interest.  Lester should be paid for money he paid from his own pocket to settle claims made against the Eber companies.

### D.    Plaintiffs' Claims for Distribution of Eber Bros. Shares

597.    At no time has there ever been any delivery by any of the co-Trustees of the 1969 Trust of physical possession of the stock certificates held by the Trust to any of the beneficiaries of the Trust.  Further, the Will does not require that Trust assets be distributed to the beneficiaries pro rata in kind. The Will empowers the co-Trustees under Article TWELFTH K "to make any division or distribution required hereunder in cash or other property, real or personal, or undivided interest therein, or partly in cash and partly in such other property, and pro rata or otherwise as to any particular asset." This is consistent with EPTL § 11-1.1 (b) (20).

598.    The Surrogate's Court Order does not mandate the distribution of the Eber Bros Shares "1/3 to Audrey Hays; 1/3 to Lester's estate; 1/6 to Daniel Kleeberg; and 1/6 to Lisa Stein" as Plaintiff contends. The Petition and Accounting do not contain a proposed distribution schedule for final distributions of the Eber Bros. shares (Def. Ex. OOOO), and the Surrogate's

June 1, 2007 Order aggregates the value of the assets on hand as of the end of the accounting period and requires that the beneficiaries receive an equal share of the aggregate value; it does not Order a pro rata distribution of the Trust's shares of Eber Bros. (Def. Ex. TTTT).  Plaintiffs cannot unilaterally insist that the Trust's shares Eber Bros. be distributed pro rata and any construction of the Surrogate's Court's Order, dated June 1, 2017 is properly before the Surrogate's Court.

**Point VIII**
**WENDY EBER DID NOT BREACH ANY FIDUCIARY DUTIES**
**AND DID NOT AID ANYONE IN BREACHING THEIRS**

599.    Wendy Eber was never a fiduciary to the Trust, and for the reasons set forth above and in the Findings of Fact, the evidence does not support a claim for her breach of any fiduciary duties to Eber W&L or Eber Metro.

600.    With respect to the 2012 Foreclosure in particular, when Wendy Eber and Elliot Gumaer consented to the 2012 Foreclosure, EBWLC and Metro were both insolvent, *see* Point IV above.  Under New York law, directors of an insolvent corporation owe a fiduciary duty to preserve the assets of the corporation for the benefit of its creditors. *Geren v. Quantum Chemical Corp.*, 95-7454, 1995 U.S. App. LEXIS 39912 at *3 (2d Cir. Dec. 13, 1995) ("[u]nder New York law, directors of a corporation may become trustees of the creditors when the corporation is insolvent."); *New York Credit Men's Adjustment Bureau v. Weiss*, 305 N.Y.1, 7 (N.Y. 1953); *Credit Agricole Indosuez v. Rossiyskiy Kredit Bank*, 94 N.Y. 541, 549 (2000); *Clarkson Co. Ltd. v. Shaheen*, 660 F.2d 506, 512 (2d Cir. 1981); *RSL Communications PLC v. Bildirici*, 649 F. Supp. 2d 184, 202 (S.D.N.Y. 2009).

601.    Wendy and Gumaer were entitled to, and did, consider a variety of other factors in determining whether to consent to the 2012 Foreclosure under N.Y. B.S.C. § 717(b), including

"the effects that the corporation's actions may have in the short-term or in the long-term upon…(i) the prospects for potential growth, development, productivity and profitability of the corporation; (ii) the corporation's current employees; (iii) the corporation's retired employees…entitled to receive…benefits…from any plan sponsored …by the corporation; or (iv) the corporation's customers and creditors…." N.Y. B.S.C. § 717(b).

602.     Wendy Eber's testimony established that the directors met and had numerous discussions, received advice from attorneys and professionals, and considered bankruptcy.  They concluded that their fiduciary obligation to the corporation required a prioritization of the interests of the company's creditors.  In particular the Board believed that, unless there was a satisfactory settlement of the pension plan termination liability, the PBGC would very likely involuntarily terminate the Plan in a way that would include Eber-CT as a responsible party and mean the collapse of Eber-CT.  Ultimately, the Board determined that the value of Metro was less than the debt owed to Alexbay, and the value of Eber Metro's equity to be zero, and it consented to the foreclosure.  Def. FOF at ¶¶ 260-69; Def. Ex. ZA (Wendy Eber Direct) at ¶ 130-140.  Wendy Eber did not breach any fiduciary duty with respect to the foreclosure or any other transactions.

603.     Plaintiffs also seek to hold Wendy liable for aiding and abetting breaches by the trustees of the Trust.  Pl. Mem. at 17-18.  A claim for aiding and abetting a breach of fiduciary duty requires a showing of: (1) a breach of a fiduciary obligation, (2) knowing inducement or participation in the breach by giving "substantial assistance," and (3) damages to the claimant as a result of the breach.  *Kaufman v. Cohen*, 307 A.D.2d 113, 125 (1st Dept. 2003).  To satisfy the second element, an intent to harm need not be alleged, but the claimant must present specific facts that would support a finding of the aider or abettor's actual knowledge of the breach. *Id*. at 125; *Bullmore v. Ernst & Young Cayman Islands*, 45 A.D.3d 461, 464 (1st Dept. 2007).

604.     For the reasons stated above, the Court does not find breaches by Lester of his fiduciary duties to the Trust, and any aiding and abetting claim should be dismissed.  *Kaufman*, 307 A.D.2d at 125.

605.     With respect to the second element, Plaintiffs are required to establish that Wendy had actual knowledge of Lester's breach; constructive knowledge is not enough.  *Bullmore*, 45 A.D.3d at 464 (citing *S & K Sales Co. v Nike, Inc.*, 816 F.2d 843, 847-848 (2d Cir. 1987)).  Plaintiffs have failed to demonstrate that Wendy actually knew that any actions by Lester were a breach of his duties as a trustee of the trust.  In addition, Plaintiffs have failed to show that Wendy substantially assisted any breach by Lester, which requires affirmative assistance, concealment, or failure to act when required to do so.  *Kaufman*, 307 A.D.2d at 125.  Plaintiffs point to Pl. Ex. 98 (*see* Pl. Mem at 17), but this document is merely an attorney's letter on steps to protect Lester's security interest in his loans to Eber Metro.  It does not show actual knowledge by Wendy of any breach by Lester, nor does it show substantial assistance in a breach.  The mere inaction of an alleged aider and abettor constitutes substantial assistance only if the defendant owes a fiduciary duty directly to the plaintiff.  *Kaufman*, 307 A.D.2d at 125.

606.     The aiding and abetting claim against Wendy should be dismissed.

**Point IX**

**<u>LESTER AND WENDY EBER WERE NOT FAITHLESS SERVANTS</u>**

607.    New York's faithless servant doctrine addresses the disloyal or faithless performance of a defendant's employment duties to his or her employer.  *Phansalkar v. Anderson Weinroth & Co.*, 344 F.3d 184200 (2d Cir, 2003).  Plaintiffs assert that Lester and Wendy Eber were faithless servants of Eber W&L.  Plaintiffs have failed to carry their burden of demonstrating that any actions by Lester or Wendy Eber satisfied the standard for establishing an employee's faithless service.

608.    In New York, there are two standards under which an employee's conduct can be found to warrant forfeiture under the faithless servant doctrine.  Under the first standard, an employee can be found to be faithless where "the misconduct and unfaithfulness substantially violates the contract of service such that it permeates the employee's service in its most material and substantial part."  *Doe v. Solera Capital LLC*, 2019 U.S. Dist. LEXIS 55860 at *24 (S.D.N.Y. Mar. 31, 2019) (internal citations omitted).  A single act of disloyalty has been deemed insufficient to warrant forfeiture under this standard.  *Id*.

609.    The second standard requires "misconduct that rises to the level of a breach of a duty of loyalty or good faith."  *Id*. at *25.  This Court has determined that finding a breach of the duty of loyalty is "limited to cases where the employee, acting as the agent of the employer, unfairly competes with his employer, diverts business opportunities to himself or others to the financial detriment of the employer, or accepts improper kickbacks."  *Grewal v. Cuneo*, 2016 U.S. Dist. LEXIS 8349 at *21-22 (S.D.N.Y. Jan. 25, 2016).

610.    Plaintiffs have failed to establish that Lester was a faithless servant of Eber W&L. Much to the contrary, Lester did everything he could to try to save Eber W&L and the New York

business from failure, including loaning millions of dollars into the business when his family members refused to do so.  After the New York business failed, he spent years—and continued to pay in millions of dollars—to try to address the legacy Eber W&L liabilities, particularly the multi-million dollar pension liabilities, and to try to build up the Eber-CT business.  Lester entered into the 2012 Foreclosure when Eber W&L and Eber Metro were insolvent, when Eber-CT had insufficient liquidity and a bank that wanted its loan moved elsewhere, and when he was unwilling to loan more of his own funds into the business.  Far from being enriched by this transaction, he continued to pour money into the family business in the years following 2012 in order to satisfy legacy liabilities of Eber W&L and Eber Metro, including giving up his own $1.4 million pension.  His actions were not those of a faithless servant under any standard.

611.    With respect to Wendy Eber, Plaintiffs provide even less support and fail in their argument that Wendy was a faithless servant of Eber W&L.  After the wind-down and liquidating of the New York business, Wendy continued for years to address and resolve its legacy liabilities along with Lester.  At the same time, she was managing Eber-CT through very difficult years, with annual losses, eventually bringing the company to a point where it began to see profits.  Plaintiffs' stated desire to have Wendy continue running Eber-CT in the event they are successful in obtaining control of the company, Pl. Mem. at 24-25, completely undercuts the argument that she was a faithless servant.  Absent the actions of Lester and Wendy, the Eber companies all would have gone out of business and there would be no company for the Plaintiffs to seek to recover.

612.    To the extent that the Court were to determine there were any breaches of fiduciary duty by Lester or Wendy Eber—and it does not—any damages would be limited to damages for those breaches.  The evidence of the years of service by Lester and Wendy Eber to Eber W&L and

the family business demonstrates that their service was in no way faithless.  The faithless servant claims should be dismissed.

### Point X

### EBER-CT COMPENSATION SHOULD NOT BE
### INCLUDED IN ANY MEASURE OF DAMAGES

613.     Plaintiffs offer no authority for the proposition that any damages for the claims against Lester and Wendy Eber for breach of fiduciary duty or as faithless servants of Eber W&L would include compensation from their employment with Eber-CT.  Pl. Mem. at 19-20.  Plaintiffs do not allege—and did not prove—any improper acts by Lester or Wendy in their capacity as officers or managers of Eber-CT, and they point to no provision of Eber-CT's Limited Liability Agreement that was breached.  Even assuming such claims were asserted, Connecticut does not recognize a faithless servant claim.  *Dunsmore & Assocs., Ltd. v. D'Alessio*, 2000 Conn. Super. LEXIS 114 (Conn. Super. Ct. Jan. 6, 2000).

614.     Under any damages analysis, Plaintiffs must be required to tie their damages claim to a specific claim for which the Court has found liability.  If Lester or Wendy Eber breached any duty to Eber W&L, Plaintiffs may have a claim for some of the compensation paid to them by Eber W&L.  However, such damages should not extend to Eber-CT compensation. Moreover, any damages award must in equity take into account the millions of dollars Lester provided to try to keep the Eber companies alive, as well as the efforts of both Lester and Wendy in maintaining and growing Eber-CT after the loss of the New York business.

615.     Plaintiffs' attempt to connect the Eber-CT compensation to their claims based on breaches of duty to Eber W&L should be rejected.  Pl. Mem. at 20.  Andrew Eder never testified that Eder-Goodman would have been interested in buying Eber-CT in 2010 or 2012.  In addition,

the "back-of-the-napkin" amount Eder stated for what Eder-Goodman might have paid in 2007 did not include Eber-CT debt (which Eder-Goodman would have assumed) or Eber-CT liabilities, including accounts payable and any pension plan liabilities.  Tr. at 100:20-25; 147:3 to 148:18; 148:23 to 149:7.  Lester and Wendy made several inquiries with respect to a potential sale of Eber-CT from 2009 to 2011, but these were unsuccessful and even harmful to Eber-CT.  Def. FOF at ¶¶ 171-77.

616.    If the Court were to award any damages, they would not include any compensation from Eber-CT.

## Point XI

## PUNITIVE DAMAGES ARE NOT WARRANTED

617.    The alleged conduct in this case does not come close to the conduct required for punitive damages to be imposed.

618.    Under New York law, punitive damages "may only be awarded for exceptional misconduct which transgresses mere negligence, as when the wrongdoer has acted maliciously, wantonly, or with a recklessness that betokens an improper motive or vindictiveness or has engaged in outrageous or oppressive intentional misconduct or with reckless or wanton disregard of safety or rights."  *Sharapata v. Town of Islip*, 56 N.Y.2d 332, 335 (1982).  "New York state law sets an exceptionally high bar for awarding punitive damages, permitting them only when 'the defendant's wrongdoing is not simply intentional but evince[s] a high degree of moral turpitude and demonstrate[s] such wanton dishonesty as to imply a criminal indifference to civil obligations.'" *See Tiffany & Co. v. Costco Wholesale Corp.*, 127 F. Supp. 3d 241, 261 (S.D.N.Y. 2015) (internal citation omitted).

619.    Moreover, as punitive damages are not recoverable against an estate, *see* NY EPTL § 11-3.2(a)(1); *Doe v. Indyke*, 457 F. Supp. 3d 278 (S.D.N.Y. 2020), punitive damages could only arguably imposed against Wendy Eber.  Plaintiffs seem to recognize this proposition, as they do not specifically argue for punitive damages against the Estate of Lester Eber.  *See* Pl. Mem. at 21.

620.    In any event, punitive damages are completely unwarranted against Wendy Eber. Plaintiffs broadly and conclusorily assert that Wendy's conduct was "unusual[ly] sever[e]," conducted with a "high degree of moral turpitude," and showed "wanton dishonesty" and "criminal indifference," based on an argument that "Lester knew what he was doing," but Wendy helped.  Pl. Mem. at 21.  Wendy Eber, however, was not a trustee of the Trust, and she was acting in good faith as on officer and director of the Eber companies to keep them in business and pay liabilities.  As set forth above, Wendy's actions were not breaches of fiduciary duty.  Even assuming the Court found that certain actions were breaches, Wendy's actions do not even arguably approach the kind of conduct for which Courts have found punitive damages to be warranted.  *See, e.g.*, *Birnbaum v. Birnbaum*, 157 A.D.2d 177 (4th Dept. 1990) (punitive damages not awarded in case involving actual fraud).

621.    Punitive damages should not be awarded.

**Point XII**

**PLAINTIFFS SHOULD NOT BE AWARDED ATTORNEYS' FEES**

**A.**   **Attorneys' Fees Are Not Warranted For Bad Faith**

622.   Plaintiffs seek attorneys' fees based on completely conclusory allegations of bad faith.  Plaintiffs have entirely failed to establish Defendants acted "in bad faith, vexatiously, wantonly, or for oppressive reasons."  *Chambers v. NASCO, Inc*., 501 U.S. 32, 45-46 (1991).  The Court should not award attorneys' fees for bad faith.

**B.**   **Attorneys' Fees Are Not Warranted For Self-Dealing**

623.   Plaintiffs have also failed to establish that Lester's Estate should pay their attorneys' fees on a breach of fiduciary duty theory.  *Birnbaum v. Birnbaum*, 157 A.D.2d 177 (4th Dept. 1990), cited by Plaintiffs, holds only that under certain circumstances a court may award attorneys' fees in favor of a trust.  Here, the action has not been brought by the trust, but instead by the Plaintiff beneficiaries.  Plaintiffs cite no authority providing that beneficiaries of a trust asserting their own individual claims can recover attorneys' fees against a trustee.  Moreover, for the reasons stated above and in Defendants' Findings of Fact, the facts in this case do not warrant the Court's exercise of its discretion to award attorneys' fees against Lester's Estate.

**C.**   **Attorneys' Fees Are Not Warranted Under N.Y. B.C.L. §626(e)**

624.   Plaintiffs also seek attorneys' fee under Business Corporation Law § 626(e). Attorneys' fees under section 626(e) could only arguably be awarded for successful derivative claims, not Plaintiffs' individual claims for damages or equitable relief.  In addition, to the extent any such fees were awarded, they would be paid by the corporation and not the Defendants. Finally, whether and to what extent to award attorney's fees is addressed to the discretion of the court in the exercise of its equitable powers.  *Glenn v. Hoteltron Sys., Inc.*, 74 N.Y.2d 386, 393

(1989); *Sardis v. Sardis*, 56 Misc.3d 727, 738-39 (Sup. Ct., Suffolk County 2017).  The Court does not exercise its discretion to award attorneys fees under the facts of this case.

## Point XIII

## INJUNCTIVE RELIEF IS NOT WARRANTED OR SHOULD BE LIMITED

625.    As demonstrated above at Point V.E. above, the equitable remedy of unwinding the 2012 Foreclosure would be not be appropriate in this case, and the sweeping injunctive relief requested by Plaintiffs is not warranted.

## Point XIV

## RELIEF UNDER RULE 54(B) IS NOT WARRANTED

626.    "Respect for the historic federal policy against piecemeal appeals requires that a Rule 54(b) certification not be granted routinely. The power should be used only in the infrequent harsh case where there exists some danger of hardship or injustice through delay which would be alleviated by immediate appeal." *Citizens Accord, Inc. v. Town of Rochester*, 235 F.3d 126, 128-29 (2d Cir. 2000) (per curiam) (internal citations and quotation marks omitted). *See also Curtiss-Wright Corp. v. Gen. Electric Co.*, 446 U.S. 1, 8, 100 S. Ct. 1460, 64 L.Ed.2d 1 (1980) (examining the "historic federal policy against piecemeal appeals").  Although the decision to grant a Rule 54(b) application is left to the sound discretion of the district court, such discretion should be exercised "sparingly." *Novick v. AXA Network, LLC*, 642 F.3d 304, 310 (2d Cir.2011).

627.    Plaintiff conclusorily state that a partial final judgment under Fed. R. Civ. P. 54(b) should be granted because there is an interest in seeing a final resolution of ownership issues.  Pl. Mem. at 25.  Plaintiffs do not provide any rationale for the need to sidestep the federal policy against piecemeal appeals.  Nor do Plaintiffs articulate the "hardship or injustice through delay

which would be alleviated by an immediate appeal." *Citizens Accord, Inc.*, 235 F.3d at 128-29. Plaintiffs have failed to establish that this is the "infrequent harsh case" where a 54(b) application is appropriate.

628.    A partial final judgment under Fed. R. Civ. P. 54(b) is not warranted.

## CONCLUSION

Defendants respectfully request that the Court enter their proposed findings of fact and conclusions of law.


Dated: Uniondale, New York
      October 21, 2021

                                  FARRELL FRITZ, P.C.


                            By:       S/ Frank T. Santoro
                                  Kevin P. Mulry
                                  Frank T. Santoro
                                  *Attorneys for Defendants*
                                    *Estate of Lester Eber,*
                                      *Alexbay, LLC, and Wendy Eber*
                                  400 RXR Plaza
                                  Uniondale, NY 11556
                                  Tel.: 516.227.0700
                                  Kmulry@farrellfritz.com
                                  fsantoro@farrellfritz.com


TO:   Brian C. Brook, Esq.
       Brook & Associates, PLLC
       *Attorneys for Plaintiffs*
       100 Church Street, Floor 8
       New York, New York 10007
       (212) 256.1957