# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DANIEL KLEEBERG, LISA STEIN, and
AUDREY HAYS,

Plaintiffs,

v.

WENDY EBER, in her individual
capacity and as Executrix u/w/o LESTER
EBER; ALEXBAY, LLC f/k/a LESTER
EBER, LLC; LUCIA GORDON GUMAER
and PATRICK D. MARTIN solely in their
capacities as Executors under the will
of ELLIOTT W. GUMAER, JR.; and,

Defendants,

and

EBER BROS. & CO., INC.; EBER BROS.
WINE AND LIQUOR CORP.; EBER
BROS. WINE & LIQUOR METRO, INC.;
EBER-CONNECTICUT, LLC; EBER-
RHODE ISLAND, LLC; EBER BROS.
ACQUISITION CORP.; EBER-METRO,
LLC; SLOCUM & SONS OF MAINE, INC.;
and CANANDAIGUA NATIONAL BANK
& TRUST COMPANY,

Nominal Defendants.

Civil Action No.  16-CV-9517(LAK)(KHP)

---

## PLAINTIFFS' REPLY POSTTRIAL BRIEF

---

Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Brian@brook-law.com
*Counsel for Plaintiffs Daniel Kleeberg, Lisa Stein,
and Audrey Hays*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

ARGUMENT ................................................................................................................. 1

I.      Defendants Respond to Allegations of Bad Faith with More Bad Faith ............................. 1

II.     Clearly, Lester Was Unjustly Enriched ............................................................ 4

III.    Defendants Present No Colorable Argument Against Reconveyance, Which Is Hardly
        Too "Complicated" ................................................................................ 6

IV.     Defendants Make Not One Reference to the "Entire Fairness" Doctrine ............................. 9

V.      None of Wendy's Actions Can Be Justified By Her Supposedly Looking Out for
        Creditors' Interests .............................................................................. 10

VI.     Lester's Estate Is Not Entitled to Massive Credits Sought by Defendants ......................... 11

VII.    The Southern "Consulting Agreement" Was a Corporate Opportunity ................................. 12

VIII.   The Faithless Servant Doctrine Should Be Extended to Prevent Evasion ............................ 16

IX.     If the Court Does Not Apply the Faithless Servant Doctrine, Alternative Damages for
        Breach of Fiduciary Duty Should Be Imposed ..................................................... 18

X.      Defendants' Reasons to Transfer EBWLC Shares to Lester Do Not Suffice .......................... 19

XI.     Defendants Mischaracterize their Answer to Conceal Their Waiver of *Res Judicata*,
        Which Is Inapplicable to These Defendants Anyway ............................................... 20

XII.    Punitive Damages Are More Than Warranted; They Are Necessary ................................... 23

XIII.   Dan Kleeberg Should Oversee the Eber Entities ................................................. 24

XIV.    Defendants Offer No Just Reason for Delay of Final Judgment .................................... 24

CONCLUSION ............................................................................................. 25

# TABLE OF AUTHORITIES

**Cases**

*Birnbaum v. Birnbaum*, 117 A.D.2d 409 (4th Dept. 1986) ............................................................ 5

*Birnbaum v. Birnbaum*, 157 A.D.2d 177 (4th Dept. 1990) .......................................................... 23

*Burg v. Horn*, 380 F.2d 897, 900 (2d Cir. 1967) ...................................................................... 14

*Carvel v. Thomas & Agnes Carvel Found.*, 188 F.3d 83 (2d Cir. 1999) ....................................... 3

*Dailey v. Nat'l Hockey League*, 987 F.2d 172 (3d Cir. 1993) ...................................................... 3

*Deangelis v. Corzine*, 17 F.Supp.3d 270 (S.D.N.Y. 2014) ......................................................... 23

*Doyle v. Allstate Ins. Co.*, 1 N.Y.2d 439 (1956) ....................................................................... 6

*Estate of Sakow*, N.Y.L.J., (Sur. Ct., Bronx County, Sept. 17, 1997) ...................................... 8, 9

*Gerstle v. Gamble-Skogma, Inc.*, 478 F.2d 1281 (2d Cir. 1973) ............................................... 7, 9

*In re Bear Stearns Litig.*, 870 N.Y.S.2d 709 (N.Y.Sup. 2008) .................................................. 10

*In re Hunter*, 4 N.Y.3d 260 (2005) ...................................................................................... 21

*In re Roche's Will*, 259 N.Y. 458 (1932) ............................................................................... 21

*In re Trados Inc. S'holder Litig.*, 73 A.3d 17 (Del. Ch. 2013) ...................................................... 3

*Matter of Rothko*, 43 N.Y.2d 305 (1977) ................................................................................ 7

*Phansalkar v. Andersen Weinroth & Co., L.P.* 344, F.3d 184 (2d Cir. 2003) ............................. 17

*Standard Fashion Co. v. Siegel-Cooper Co.*, 157 N.Y. 60 (1898) ................................................ 7

*Valentine v. Richardt*, 126 N.Y. 272 (1891) ........................................................................... 6

*Weisinger v. Berfond*, 21 Misc.2d 788 (Sup. Ct., Kings Cty. 1960) ............................................ 7

*Wiesbusch v. Hayes*, 263 A.D.2d 389 (N.Y. App. Div. 1st Dept. 1999) ....................................... 7

**Statutes**

28 U.S.C. § 1927 ............................................................................................................... 3

**Rules**

Fed. R. Civ. P. 11 ............................................................................................................... 3

Fed. R. Civ. P. 37 ............................................................................................................... 3

**Treatises**

7 Warren's Heaton on Surrogate's Court Practice § 102.03 (2020) ............................................. 21

Plaintiffs Audrey Hays, Daniel Kleeberg, and Lisa Stein respectfully submit the following reply to Defendants' proposed Findings of Fact and Conclusions of Law ("F&C").

## ARGUMENT

### I.   DEFENDANTS RESPOND TO ALLEGATIONS OF BAD FAITH WITH MORE BAD FAITH

From the moment this case was filed, Wendy and Lester sought to prevent any court from reaching the merits of Plaintiffs' claims. First, Wendy asked CNB to transfer the Trust's shares to Lester directly. When CNB did not agree, Wendy and Lester chose a different course: Tricking CNB, Plaintiffs, and the Monroe County Surrogate into terminating the Trust so that Lester could invoke corporate bylaws to take the shares for nothing. Unlike CNB and Gumaer, the Ebers did not move to dismiss in favor of the Surrogate Court proceeding. That omission lulled Plaintiffs into the belief that the Ebers consented to adjudicating the issues here—at least until October 2018, when the Ebers finally disclosed their plan to intercept Plaintiffs' shares.

Now that Plaintiffs have compellingly demonstrated that Defendants' extrajudicial efforts to divest Plaintiffs of derivative standing were undertaken in bad faith, Defendants have quietly dropped their longstanding effort to take Plaintiffs' rightful 2/3 share of EB&C.[1] Instead, they lead off their legal argument by imploring this Court to find that the 2017 Surrogate's Court proceeding—initiated by CNB *alone*, and *after* this case was filed—had exclusive jurisdiction to hear these claims, and that its order discharging CNB is *res judicata* barring this entire case, including claims against Lester—a non-accounting co-trustee who never sought discharge—and including derivative corporate law claims by EBWLC against Wendy Eber and Eber Metro— three essential parties who were never joined in the Surrogate's Court proceedings.

Neither of these new potentially dispositive arguments were made before the close of evidence at the trial.[2] The timing smacks of gamesmanship (specifically, whack-a-mole) and bad

---

[1] Wendy's direct testimony shows she continued to seek Plaintiffs' shares at trial. Wendy Decl. ¶¶ 162–188.

[2] *Res judicata* is addressed on the merits below. Subject matter jurisdiction/abstention will be addressed separately.

faith tactics, particularly when coupled with Defendants last-instant jettisoning of heavily litigated affirmative defenses[3] and their pervasive pattern of strategic misconduct, such as:

- Concealing a compensated expert witness during discovery, even when this purported "fact" witness sent Wendy an opinion letter long before the close of discovery;[4]

- Dumping material, unproduced documents on Plaintiffs days before trial;[5]

- Concealing critical documents like Lester's employment agreement (Ex. 180) until shortly before trial;[6]

- Concealing correspondence with Eder-Goodman (Exs. 292–296)—conclusively proving the Polebridge transaction was a sham—until that non-party responded to Plaintiffs' trial subpoena;

- Concealing the February 7, 2007 Letter of Intent with Southern—showing that Lester had already negotiated a "consulting" deal and in tandem with all the other transactions—until that non-party responding to Plaintiffs' subpoena;[7]

- Erasing the Trust's shares of EBWLC stock from the corporate register after the close of all discovery—to reduce the number of directors required by the Bylaws;

- Backdating at least one transaction document to February 2017 when it was only prepared after Plaintiffs filed for summary judgment based on its absence;[8]

- Withholding numerous documents that were "clearly" not privileged and attempting to "conceal a waiver" from Magistrate Judge Parker;[9]

---

[3] To avoid the clear conflict with their new arguments, Defendants have dropped their Eleventh, Twelfth, and Fifteenth Affirmative Defenses. Their F&C says nothing about the EB&C bylaws or Lester's attempt to "purchase" Plaintiffs' shares for "$0." Pl. F&C ¶ 303. Relatedly they dramatically reversed themselves on whether Lester's duties as co-trustee ended in June 2017 when the Surrogate judicially settled CNB's account. *Compare, e.g.*, Ex. 148 at Nos. 20, 22 ("[T]he June 1, 2017 Surrogate's Court Order makes clear that Lester Eber is no longer a trustee, but that CNB is still a trustee due to unfulfilled duties and responsibilities.") *with* Def. F&C ¶ 6 ("Lester served as a Co-Trustee of the Trust under the jurisdiction of and pursuant to the authority granted to him by the Surrogate's Court, Monroe County, from the time of his appointment to his date of death.").

[4] See Motion *in Limine* 2–10 (ECF No. 373).

[5] *See id.* at 11–13.

[6] *See* Liebman Decl. ¶¶ 124–128.

[7] *See* Ex. 93 (production Bates prefix of "SGWS" instead of "EB").

[8] The transaction documents produced during discovery had headers and footers, though they concealed the year when they were printed. Ex. 43 (showing page number in the upper right and a "1/24/20" date in bottom right on each page). By contrast, the document that Mr. Herbert supposedly sent to Wendy by means "other than by email" has no header or footer. Ex. 270 at 2. *See also* Ex. 271 at 8.

[9] Opinion and Order on Pl. 2d Mot. to Compel 33, 52 (ECF No. 216).

- Withholding privileged documents concerning the PBGC issues, despite Judge Parker's ruling that the fiduciary exception applies to material issues,[10] and then making it their principal factual issue raised at summary judgment and trial;

- Materially altering Lester's deposition testimony through errata to render answers non-responsive and attempt to reverse Lester's evasive testimony that Plaintiffs should ask his lawyers because he did not know why he did almost any of the challenged transactions;[11]

- Attempting to depose Lisa Stein's daughter (who had received Trust distributions due to a health problem) for no conceivable proper purpose while simultaneously opposing depositions of key lawyers behind the transactions;[12]

- Continuing to insist on sustaining the Alexbay transaction when their own expert opined that the assets were worth more than Lester was purportedly owed and even characterized the transaction as an apparent "fraudulent conveyance;"

- Changing Wendy's testimony about the purpose of the Polebridge transaction.[13]

*See In re Trados Inc. S'holder Litig.*, 73 A.3d 17, 78–79 (Del. Ch. 2013) (listing examples of bad faith conduct such as "reversing positions on issues and changing testimony to suit the moment," as well as prolonging litigation, falsifying records, knowingly asserting frivolous claims, and "[s]erial failures to produce documents"). Defendants' latest decision to drop three affirmative defenses after trial ended and, in their stead, adopt a brand-new affirmative defense of *Princess Lida* abstention—while misrepresenting that defense as a subject matter jurisdiction issue[14]—is another striking example of the kind of conduct that warrants this Court's exercise of its inherent power to deviate from the "American Rule" on attorneys' fees and impose fee shifting.[15]

---

[10] *Id.* at 44–45.

[11] *See* Pl. F&C ¶ 279, 355–357.

[12] *See* Joint Discovery Letter dated 10/30/2018 at 2 (ECF No. 137).

[13] Pl. F&C ¶¶ 336–340. *See also generally id.* at 334–335, 341–343.

[14] *See Carvel v. Thomas & Agnes Carvel Found.*, 188 F.3d 83, 86 (2d Cir. 1999) (holding that *Princess Li*da is "a rule of comity or abstention, rather than one of subject matter jurisdiction"). Plaintiffs found this precedent very quickly, on the morning of this Court's grant of an extension of time to address the issue, because the Third Circuit case cited by Defendants suggested that the Second Circuit followed a different approach. *See Dailey v. Nat'l Hockey League*, 987 F.2d 172, 176 n.3 (3d Cir. 1993) (same page Defendants cite). Plaintiffs have served a Rule 11 motion since the argument is objectively unreasonable, though the failure to present binding precedent to this Court may well have been intentional.

[15] The Court could also require defense counsel to pay some of the costs under Rule 37 and 28 U.S.C. § 1927.

In the face of all of this, Defendants have the chutzpah to characterize Plaintiffs' argument that Defendants litigated in bad faith as "completely conclusory"—ironically, without *any* discussion—as if this Court did not attend the trial and has not read Plaintiffs' many supporting submissions.

## II.   CLEARLY, LESTER WAS UNJUSTLY ENRICHED

The credible evidence at trial showed that Lester was unjustly enriched. From 2009 through 2012, he deposited roughly $2 million into EBWLC's bank accounts, and in return he received an asset conservatively valued at 12 or 13 million dollars at the time. If this Court also takes into consideration the fact that Lester's $2 million in deposits was essentially just the money from the Southern "consulting" opportunity after taxes, it looks like outright theft.

Defendants' own expert could not offer an opinion that the value of Eber Metro itself was less than or equal to the amount of money allegedly owed to Lester (excluding EBWLC's liabilities that were never assumed by Eber Metro or Alexbay). That alone constitutes clear and convincing evidence that Lester was unjustly enriched.[16] Not that this Court should accept Torchio's opinion, which was far less credible than that of Glenn Liebman and Andy Eder, both of whom established Eber Metro's value to be more than double what Torchio opined. Combine that with the fact that Lester did not even loan half the money he claimed to have loaned, and the evidence shows *beyond any reasonable doubt* that Lester was unjustly enriched by transferring Eber Metro to Alexbay, receiving an asset worth at least four times what he paid for it.

From EBWLC's perspective, the transaction was unjustifiable. EBWLC was left with nothing but $2,000 in the bank and millions in debt. Lester and Wendy intentionally killed the company. And they did so without even trying to sell the business—Wendy's own testimony implicitly admits that she never spoke to anyone from Eder-Goodman about the possibility, even after Eder offered to buy the entire business and paid to acquire the right of first refusal.

---

[16] Defendants assert that Plaintiffs do not even address this standard, but that is untrue. *See* Pl. F&C ¶ 500 and n. 24. *See also* Brook Letter dated 9/13/2021 at 2 n.3 (ECF No. 380). Moreover, given that Judge Parker's conclusion that Plaintiffs must prove unjust enrichment was merely an interlocutory ruling, no motion for reconsideration was necessary; this Court can and should revisit it now if the Court believes it was incorrect.

Defendants' resort to arguing insolvency is a red herring, even assuming *arguendo* that EBWLC's debts exceeded the value of its assets and that all of the claimed debts to Lester were legitimate. As a matter of corporate law, the fairness of the Alexbay transaction is gauged from the perspective of EBWLC, because it (a) was the entity that gave up 100% of Eber Metro and (b) was the only entity that was directly liable for contingent debts to PBGC, the Teamsters, and Harris Beach. It does not matter if Eber Metro could have also been characterized as technically "insolvent" as a matter of law. EBWLC transferred Eber Metro to Alexbay merely to eliminate its guaranty of Eber Metro's alleged debts to Lester. EBWLC was left with no means to pay any of its debts, nor any hope of ever generating value for its shareholders. Alexbay meanwhile received a going concern with the controlling stake in Eber-CT.

Even if Eber Metro was burdened by EBWLC's unpaid debts after the transfer, Lester was still unjustly enriched because the transfer of equity meant that he alone (and Wendy) could ever hope to profit from the company. The best-case scenario for EBWLC was that Eber Metro and Eber-CT *might* help pay its remaining debts to bring its value up to—but not above—zero. But for Lester, once those debts were eliminated, the upside was all his. Because Lester had no authority to transfer the right to profit from the family business away from the Trust and to himself and his daughter alone, Lester was unjustly enriched by doing so.

Nothing in the record indicates that Defendants' "business skills" were responsible for the modest appreciation in value of Eber-CT since 2012, as Defendants contend. Def. F&C ¶¶ 557–560. Lester did resolve some debts of EBWLC to the benefit of Eber-CT given the ultimate ruling in the PBGC litigation. Nevertheless, that alone does not tip the scales. As explained in *Birnbaum*, Defendants' intent matters, and they acquired Eber-CT by employing deceit, trickery, and concealment. *Birnbaum v. Birnbaum*, 117 A.D.2d 409, 420 (4th Dept. 1986). Therefore, any improvements made are not entitled to compensation, especially not beyond the substantial salaries they already paid themselves (to the extent they are allowed to keep them). Defendants offered no evidence to indicate that they did anything useful when managing the business. Defendants say Slocum was profitable before Eber Metro acquired it, Def. F&C ¶ 97, but then it

floundered for years under Defendants' stewardship as they failed to retain exclusive contracts with suppliers, *id.* ¶ 109—exhibiting the opposite of valuable business skills. Over the last eight years, Eber-CT has not demonstrably appreciated in value any more or less than other similar businesses. Defendants—both of whom were New York residents at all relevant times—have not even provided evidence that they ever visited Connecticut in person to oversee the business.

Lester's enrichment is confirmed by the fact that he managed to pay down EBWLC's supposedly insurmountable debts at less than half the sticker price, and the company appreciated in value along with the rest of the US economy since 2012. His estate now controls an asset worth well over than $20 million and with no remaining debts at the holding company level. Even if this Court were to include Lester's post-transaction payments to lawyers and creditors, the value of the unsubstantiated pre-2006 loans, and the value of his remaining pension that he relinquished, Lester could not have possibly provided value greater than $7 million. Without even taking into consideration all the salary, "consulting" income, and death benefits that were paid, that is still a gain of over $13 million as a direct and proximate result of his breach of his fiduciary duties. If that is not unjust enrichment, then it is hard to imagine what is.

## III. DEFENDANTS PRESENT NO COLORABLE ARGUMENT AGAINST RECONVEYANCE, WHICH IS HARDLY TOO "COMPLICATED"

Much of Defendants' quasi-brief is focused on convincing the Court that Wendy should be able to keep what her father stole. They cite a couple of courts that considered the *possibility* of awarding money damages as part of an equitable remedy, Def. F&C at 564, but those opinions make clear that doing so is preferable only "when it is for any reason impracticable to grant the specific relief demanded." *Valentine v. Richardt*, 126 N.Y. 272, 277 (1891); *see Doyle v. Allstate Ins. Co.*, 1 N.Y.2d 439 (1956) ("[E]quity may grant damages in addition to or as an incident of some other special equitable relief or, where the granting of equitable relief appears to be impossible or impracticable, equity may award damages in lieu of the desired equitable remedy."). There is absolutely nothing in Defendants' filing that argues, much less establishes, that the relief sought is "impossible or impracticable."

Instead, Defendants brazenly suggest that this Court lacks the "ingenuity" to fashion an equitable remedy. Def. F&C ¶ 563. Far from the rationale for timidity Defendants suggest, the case they cite is actually an exhortation to creativity in fashioning appropriate relief: "Uniqueness of the problem which confronts a court of equity does not bar relief, but serves rather as a challenge to the court's ingenuity in finding means whereby justice may be done between the parties." *Weisinger v. Berfond*, 21 Misc.2d 788, 796 (Sup. Ct., Kings Cty. 1960). To the extent that Plaintiffs' proposed order does not accomplish the objectives deemed appropriate by this Court, Plaintiffs place full faith in the Court's ingenuity.

Other cases relied on by Defendants are far afield, and often over a century old. *Gerstle v. Gamble-Skogma, Inc.*, 478 F.2d 1281 (2d Cir. 1973), involved alleged misrepresentations in a proxy statement and was evaluated under federal securities laws. The case did not involve a breach by a trustee or New York's statute permitting unlawful corporate transactions to be set aside, B.C.S. § 720; Judge Friendly's decision not to award appreciation damages in that 1973 case is contrary to New York law established by *Rothko*. *Wiesbusch* was an appeal of a criminal contempt order based on failure to make payments on a judgment, and the appellate court remanded for a trial court to consider alternative equitable relief in order to correct a prior judgment that had imposed an excessive amount of restitution. *Wiesbusch v. Hayes*, 263 A.D.2d 389, 389–90 (N.Y. App. Div. 1st Dept. 1999). Like the others cited, the case does absolutely nothing to undermine Plaintiffs' requested relief.[17]

Arguments based on the supposed "perseverance and business skills" of the Ebers should be rejected. Def F&C ¶ 559. These same people were in charge when, they claim, Eber-CT stood on the brink of bankruptcy. Literally zero evidence has been offered by Defendants to show that

---

[17] *E.g.*, *Standard Fashion Co. v. Siegel-Cooper Co.*, 157 N.Y. 60 (1898), involved a plaintiff seeking specific performance of a contract requiring certain retailers to sell its products exclusively for a certain period of time; that is the context of the "multiplicity of orders" and "peculiar business" language Defendants like. Def. F&C ¶ 565. Nothing here would require the Court's ongoing supervision of any of the Eber companies in a similar fashion. The only intervention sought in the operating entity, Eber-CT, is to void the Ebers' 2012 employment agreements.

they did anything other than avoid causing Eber-CT to collapse.[18] Defendants themselves emphasize how low Eber-CT's "historic[al] growth rate of revenues" has been. Def. F&C at 128 n.21. And yet the Ebers already received sizeable salaries and bonuses for their work. There is no reason to allow them to keep the assets under these facts.

Defendants' contentions that there is an adequate remedy at law are both wrong and inapposite. The parties' cited New York cases concerning misappropriation of trust property uniformly require reconveyance upon request.

In any event, if the Court wants to satisfy itself that there is no adequate remedy at law, Plaintiffs have made the necessary showing. The controlling interest in Eber-CT is a unique asset and a valuation of the business, in the absence of an actual negotiated arm's-length transaction, would yield a figure that is inherently uncertain. Even if the Court did calculate the value based on recent offers by an interested buyer, that would not necessarily reflect what a willing seller would accept. Defendants have withheld all recent financial information about Eber-CT, which would likely show a dramatic increase in revenues during the pandemic. Defendants do not suggest what amount of damages should be awarded instead of equitable relief, nor even a mechanism for reaching such a number. Perhaps Wendy just wants to keep the company for free. Her objection to Liebman's testimony about the current value of the company without offering her own expert opinion should be construed as a waiver of any right to claim that damages should be awarded instead. Simply put, despite Defendants' protestations to the contrary, fashioning an equitable remedy would be much less complicated than calculating an amount of damages, especially on this record.

---

[18] Defendants' reliance on the unpublished opinion in *Estate of Sakow* is particularly misplaced. The *Sakow* court emphasized that the remedy it fashioned was due to "the unique facts of this case." *Sakow* PDF at 6. Comparing the relative contributions by the different defendants only illustrates how little value Defendants added. The *Sakow* defendant built businesses from scratch on properties that were sitting idle when he acquired them. That defendant was not a fiduciary in fact either, quite unlike both Lester and Wendy, so his wrongdoing was necessarily far less egregious. Moreover, complete equitable relief in *Sakow* would require examining numerous different business endeavors on numerous different properties over more than *40 years*. *See Sakow* PDF at 5 ("[T]he complexity of the issues is such that the accounting proceeding would outlive some or all of the parties."). At the end of the day, the *Sakow* court still offered the plaintiffs a significant portion of the misappropriated assets, if the plaintiffs chose not to proceed to a damages phase instead. *Id*.

This Court should award Plaintiffs equitable relief and return control of the operating business to EBWLC. The transactions to be set aside are not so numerous or difficult to unpack as Defendants contend. Ultimately, if Wendy really believes that she could make Plaintiffs whole with a monetary payment, she will welcome to make an offer to acquire Plaintiffs' interests.

Finally, for the same reasons that cases such as *Sakow* and *Gerstle* do not support letting Wendy keep the company all to herself, they do not support allowing Lester to get the first "$16,799,993.36" of proceeds from Eber-CT. Def. F&C ¶ 573. While Defendants have shown that Lester wrote checks to lawyers, bought claims from Harris Beach, and relinquished his pension plan, they have not demonstrated that doing so was actually beneficial to the companies. And even if they were partially for the company's benefit, they also inured to the benefit of Lester and Wendy personally as they faced potential liability for facilitating the fraudulent conveyance that Harris Beach challenged. More importantly, there is no evidence that any of the Eber entities ever agreed to reimburse Lester for any of these things. He paid them of his own volition without any assurances of repayment, and not reimbursing them is appropriate.[19]

## IV.   DEFENDANTS MAKE NOT ONE REFERENCE TO THE "ENTIRE FAIRNESS" DOCTRINE

All of the transactions involved self-dealing and so are at minimum subject to the entire fairness doctrine, as Plaintiffs have long argued was the standard applicable to all of the corporate transactions, even if some were also subject to the no-further-inquiry rule. *See, e.g.*, MSJ Br. 16–23. To be sure, Plaintiffs have also argued that most of these transactions are so indefensible that they fail even the vastly more deferential business judgment rule (e.g., EBWLC transferring its sole valuable asset, a going concern, to Lester, leaving no means to satisfy other creditors or ever generate any value for shareholders, TAC ¶ 209). But Plaintiffs have never wavered from their position that application of the entire fairness doctrine is required by New

---

[19] At most, the Court might credit demonstrated payments from Lester directly to the Teamsters or Harris Beach, though the latter should be reduced by at least fifty percent to account for the likelihood that the settlement amount was inflated, including paying off the Ebers' contempt sanctions entered against them individually and paying an attorney for an affidavit to help against PBGC and Plaintiffs, and because Harris Beach's legal bills included facilitating improper transactions like Polebridge. *See* Pl. F&C ¶¶ 264, 269, 271–72.

York law. Despite it being Defendants' burden to prove both fair terms and fair dealing, Defendants did not even try to meet it, choosing instead to slink away from the issue.

As to the Polebridge transaction and Lester's loans, Plaintiffs' posttrial brief expressly argued that the transactions failed the entire fairness test because Defendants failed to meet their burden. Pl. Opening Br. 13–15. In response, even when Defendants refer to fairness, it is limited to arguing that prices and interest rates were fair.[20] There is no attempt to characterize the approval or negotiation processes as having involved fair dealing. Thus, Defendants have forfeited any argument that any of the challenged transactions satisfied the entire fairness test.

## V.   NONE OF WENDY'S ACTIONS CAN BE JUSTIFIED BY HER SUPPOSEDLY LOOKING OUT FOR CREDITORS' INTERESTS

Recycling an unsuccessful argument used to avoid discovery, Wendy claims that because EBWLC was purportedly "insolvent," she only owed a fiduciary duty to creditors, not shareholders. Def. F&C ¶ 600.[21] Plaintiffs rightly called this argument "frivolous" when first made and cited extensive case law demonstrating as much. Pl. Mot. to Compel Reply 2–3 (ECF No. 150) (collecting cases with quotations).[22] Simply put, being in the zone of insolvency gives rise to additional fiduciary duties to creditors, but "[t]his does not imply that the fiduciary duties owed to the shareholders evaporate." *In re Bear Stearns Litig.*, 870 N.Y.S.2d 709, 737 (N.Y.Sup. 2008). No court has ever held otherwise.

---

[20] The sole reference to *any* legal standard for corporate transactions is to summarily characterize the Polebridge transaction as an exercise of "rational business judgment" to protect assets from PBGC. Def. F&C ¶¶ 191, 587. And yet Defendants make no attempt to argue that either of the other corporate directors, Wendy or Gumaer, were disinterested. This is a crucial concession, and it makes their failure to argue entire fairness incomprehensible.

[21] Judge Parker rejected it on the grounds that Defendants did not produce evidence to prove insolvency, rather than rejecting the argument on the law. As a result, Defendants have spent an inordinate amount of the parties' and this Court's resources trying to prove EBWLC's supposed insolvency.

[22] The policy behind the trust fund doctrine is that fiduciaries cannot damage creditors to benefit shareholders when it appears that the company is going under, because creditors have legal priority. The policy would be turned on its head if fiduciaries could take advantage of financial difficulties to buy a debt-laden company for themselves and then just settle with the creditors and thereby divest the shareholders of any potential value of their investment, without so much as filing a petition for bankruptcy. There is a reason why few courts have ever addressed this contention before: Few lawyers would be willing to present it.

Wendy then proceeds to contend that the decisions she made were about "a prioritization of the interests of the company's creditors." Def. F&C ¶ 602. This assertion is based entirely on her fictitious direct testimony, and completely unsupported by anything else in the record, including the various transaction documents and board minutes. The absence of contemporaneous evidence supporting these fantastic claims is expected because the transactions were intended to shirk obligations to creditors to benefit the Ebers themselves. Def. F&C ¶ 587.

With respect to aiding and abetting Lester's breaches as co-trustee, Wendy even goes so far as to claim that her pervasive course of conduct over a period of years constituted "mere inaction of an alleged aider and abettor." Def F&C ¶ 605. This is completely contrary to the record, which shows that Wendy actively engaged in every trustee decision relating to the Eber companies since at least 2009. *See, e.g.*, Ex. 172 (December 2009 emails to Hawks, changing her mind about whether to issue dividend payments after initially approving them); Ex. 174 (June 2012 email to Hawks regarding Alexbay); Ex. 153 (December 2016 email seeking to have CNB transfer the shares of EB&C to Lester). *See also* Exs. 233, 234, 240, 251, & 252.

Wendy also directly assisted Lester and his lawyers in initiating foreclosure proceedings, starting months before there was even a default—a default which, of course, Wendy wanted to happen in violation of her own direct fiduciary duties to Eber Metro and EBWLC. *E.g.*, Ex. 236.

## VI.   LESTER'S ESTATE IS NOT ENTITLED TO MASSIVE CREDITS SOUGHT BY DEFENDANTS

Defendants ask this Court to award Lester's Estate the first $17 million of any profits from Eber Metro and Eber-CT.[23] The impropriety of the request and lack of support in the record was discussed in prior submissions. Pl. F&C ¶¶ 84–104, 486–488 (the unsubstantiated 2006 Notes); *id.* at ¶¶ 519–530 (post-foreclosure payments); Pl. Opening Br. 16–17 (Harris Beach).

An additional, insurmountable problem with Defendants' attempt to treat Lester's post-foreclosure payments as if they were loans to EBWLC is that there is no documentation of any

---

[23] Defendants' failure to plead these credits in their Amended Answer either as counterclaims or affirmative defenses should not prevent this Court from ruling that Defendants have failed to prove that the Eber entities have any obligation to pay Lester's Estate. Such a finding would act as collateral estoppel to prevent the Estate from litigating this issue anew in a separate lawsuit, as it would likely try to do since it omitted to plead the claims here.

kind establishing any liability, let alone documentation that was negotiated and approved to ensure fairness. They even fabricate a 9% interest rate from whole cloth, even though that is the interest rate applicable only after a breach of duty. To the extent that Defendants claim that EBWLC breached some imaginary duty to repay Lester, that would still not warrant interest because he and his daughter were responsible for any such breach. They should not profit from their own malfeasance.[24]

The payments around the time of the LOC Note are the only payments made by Lester to EBWLC or its affiliates that were both substantiated by bank records and made pursuant to any kind of agreement creating an expectation of repayment. Even then, it is doubtful that all of the payments were really to benefit the business, especially when EBWLC was simultaneously spending money on lawyers and accountants to facilitate Defendants' breach of fiduciary duties. *See, e.g.*, Pl. F&C ¶¶ 105–113 (improperly intermingling personal transactions). Nonetheless, it is likely on the whole, the amount of the payments exceeded the amount of improper expenses, and that some of the deposits were used to pay unrelated creditors. To the extent the Court credits Defendants with any payments in fashioning relief, it should limit itself accordingly.

## VII.   THE SOUTHERN "CONSULTING AGREEMENT" WAS A CORPORATE OPPORTUNITY

In trying to claim that EBWLC had no expectation or need for money from Southern, Defendants' arguments completely fail to acknowledge, let alone explain away, any of these critical facts, each of which was expressly relied upon in Plaintiffs' opening brief:

- Lester and Southern entered into a letter of intent that included EBWLC transactions and the consulting agreement, simultaneously, on February 7, 2007. Pl. F&C ¶¶ 40–43. (Defendants pretend the consulting agreement arose independently in summer 2007.)

- Lester used Eber Bros.' corporate counsel to negotiate the agreement. Pl. F&C 48. (Defendants ignore this entirely.)

---

[24] Therefore, unlike the payments pursuant to the Line of Credit Note—which though severely flawed at least purported to create an obligation to repay at a specified interest rate—any credits to Lester's Estate for post-foreclosure payments should not be deducted from the other damages awarded, because doing so would have the same net result of imposing a 9% interest rate.

- Lee Hager's testimony about whether Southern would have contracted with EBWLC instead of Lester individually was expressly conditioned on whether his attorneys said that it could guarantee Lester's personal services. Pl. F&C ¶ 55. (Defendants falsely claim Hager "unequivocally" testified it would not have happened. Def. F&C ¶¶527-28.)

- Hager admitted that Southern would not have hired Lester if he had not ensured that the entire deal with EBWLC occurred. Pl. F&C ¶ 75. (Again, Defendants just ignore this.)

These facts alone substantially distinguish every case and theory advanced by Defendants.

It is absurd to suggest that EBWLC was not actively seeking transactions with Southern or that Southern was not in the same line of business as EBWLC, so Defendants try to pigeonhole the "opportunity" as something ridiculously specific. It does not matter that EBWLC was "not in the business of providing consulting and lobbying services" to third parties because neither was Lester.[25] Lester lobbied on behalf of EBWLC for decades, so the nature of the work for Southern was not materially different. Both were wine and liquor distributors. There is no reasonable way to draw a line between them. The opportunity to continue lobbying in New York arose solely because Lester was in a position to facilitate the overall deal with Southern, he ensured that the continued benefit of his lobbying services inured solely to his personal benefit.[26]

Defendants mischaracterize the two most common tests for a corporate opportunity— "tangible expectancy" and "necessary/essential"—repeatedly. For example, they say that "the Consulting Agreement did not involve activities that had been necessary or essential to the New York operation," Def. F&C ¶ 526, but the "activities" are not the same thing as the "opportunity" when one is examining whether an executive can enter into a separate, unapproved side deal with a counterparty in a significant merger and acquisition transaction that the executive was in charge of negotiating and approving. In other words, it is not consulting was *per se* essential or necessary; rather, getting as much value as possible from Southern was essential and necessary.

---

[25] EBWLC was also not in the business of selling assets in out-of-state distributors to third parties or liquidating its inventory, both of which began after the Southern transaction, like the Consulting Agreement.

[26] Plaintiffs assume for the sake of argument that the amount paid was not primarily compensation for the overall deal with Southern that Lester effectively stole. That said, the evidence supports the conclusion that at least half of the amount paid was just that. *See, e.g.*, Pl. F&C ¶¶ 44, 57, 50, 51.

Defendants rely on *Burg v. Horn*, F&C ¶ 522, to their own detriment, because that case involved a director who found an opportunity on his own, in his individual capacity, and said that there is no duty to offer it to the company even if it would be useful to the company.[27] *Burg v. Horn*, 380 F.2d 897, 900 (2d Cir. 1967) ("holding that the scope of a director's duty to offer opportunities *he has found* to his corporation must be measured by the facts of each case") (emphasis added). The Second Circuit expressly distinguished an opportunity that comes to a director as a result of their role in the company, or even simply as a result of knowledge obtained as a director.  *See id.* ("[T]here is no evidence that the properties [Burg] seeks for Darand were offered to or sought by Darand, *came to the Horns' attention through Darand*, or were necessary to Darand's success.") (emphasis added). Here, there is no question that Lester's opportunity to "consult" for Southern came to him solely because of his position as an officer and director of EBWLC. Unlike the defendants in *Burg*, Lester was a full-time employee of EBWLC and he was not already and independently in the business of consulting for other wine and liquor distributors. *See id.* at 900 ("Had the Horns been full-time employees of Darand with no prior real estate ventures of their own, New York law might well uphold a finding that they were subject to such an implied duty [to offer any opportunity within a corporation's 'line of business' to the corporation.]"). And unlike any other known case, Lester *remained* a full-time, well-compensated employee and fiduciary to EBWLC for years after taking money to supposedly work for a competitor. Thus, this case is different from others where an employee usurped a consulting opportunity, Pl. Opening Br. 5, but only because the facts here are far worse.

Moving on from liability, Defendants argue that damages should be limited, without any proposed finding or conclusion as to what that amount should be or how to calculate it. F&C ¶¶ 531–32. The Court should not make any adjustments or deductions based on Defendants' non-specific contentions. It does not matter if the funds would have been used to pay EBWLC's creditors, because that would have benefitted the company and eliminated and supposed "need"

---

[27] *Burg* was a split decision, with the dissent arguing persuasively that even under those facts there was a breach given the high standards of New York law. *Id.* at 902–903.

to borrow from Lester to pay those same creditors. Nor does it matter that *Lester* paid personal income taxes on the usurped funds, because *EBWLC* would probably not have paid such taxes given its significant losses for the years in question—a point Defendants emphasize elsewhere, like when discussing the Polebridge and Alexbay transactions, both of which occurred during the time when Lester was receiving $50,000 a month in compensation from Southern.[28]

There is no basis in the record to infer that Lester should have been paid a higher salary from EBWLC based on his consulting for Southern given that Lester's salary from EBWLC remained the same after the Southern transactions as it had been when he was running a much larger and more profitable business that placed significantly more responsibility on Lester. If anything, the undisputed fact that Lester's workload in New York decreased "drastically" after 2007 shows that Lester should have been paid *less*, not more, even if he had undertaken to consult for Southern under EBWLC's umbrella as he should have. *See, e.g.*, Ex. 148 at No. 24 (contention interrogatory response asserting that Lester was "only a consultant and lobbyist for Southern" while his "duties with EBWLC as a CEO required him to handle all aspects of business, including but not limited to, sales, marketing, corporate governance, compensation, employee supervision, and real estate management.").

Lastly, Defendants offer no argument whatsoever for why the corporate opportunity doctrine "would not apply to any payments after 2012, when the original term of the Consulting Agreement expired." Def F&C ¶ 532. It is hard to speculate about how Defendants draw this line, since the post-2012 payments were a direct outgrowth of the earlier contract that was improperly usurped for Lester's benefit alone.[29]

---

[28] If Lester had not concealed the transaction from Plaintiffs for so many years, and then prolonged this litigation repeatedly, a judgment might have been entered within the window of time for amending tax returns.

[29] Even Lester's unapproved 2012 employment agreement with Eber-CT prohibited him from taking that money from Southern without approval from Eber-CT's board of managers, which was never given. Ex. 180 at ¶ 3 ("In return for the compensation payments set forth in this Agreement, Executive agrees to devote the substantial portion of his professional time and energies to his duties under this Agreement. During the Term, Executive shall not hold outside employment without the advance written approval of the Board.").

## VIII.   THE FAITHLESS SERVANT DOCTRINE SHOULD BE EXTENDED TO PREVENT EVASION

Candidly, Defendants' variety of new defenses raised for the first time after trial includes one that is truly debatable because existing case law has not considered this situation: Whether the faithless servant doctrine applies to compensation paid by Eber-CT when Connecticut does not recognize the doctrine, but the Ebers were also officers of several New York entities that controlled Eber-CT, and they resided and worked extensively from New York. As explained below, New York courts would likely recognize that the doctrine applies on the facts presented here, and this Court should avoid creating a loophole in the important faithless servant doctrine.

Defendants correctly point out that Connecticut law does not recognize the faithless servant doctrine. However, Plaintiffs do not allege that Defendants were disloyal to Eber-CT;[30] they were disloyal to the New York entities from which they attempted to wrangle Eber-CT. Moreover, Lester and Wendy were not mere employees of Eber-CT, a Delaware LLC that operated in Connecticut; the Ebers' ultimate duties ran to New York entities, of which they were both officers and directors.[31] But for their control of the New York entities, the Ebers would have had no position in Eber-CT. Both of the Ebers were New York residents at all times, Exs. 28, 158, and Defendants introduced no evidence that either Lester or Wendy regularly visited Connecticut in connection with their jobs. Notably, Eber Metro entered into an agreement with Wendy at the same time of the Eber-CT employment contract "[a]s a material inducement for Wendy Eber to enter the employment agreement." Ex. 151 at 1. And that agreement is expressly "governed by the laws of the State of New York applicable to contracts executed in and to be performed in that state." *Id.* at 6. Thus, there is a solid foundation on which this Court can find that New York corporate law should apply to Wendy's and Lester's disloyal acts against the

---

[30] The wrongdoing with respect to Eber-CT was entering into unapproved employment agreements, which, though self-dealing, arguably would not constitute disloyal conduct to trigger the faithless servant doctrine.

[31] Eber Metro was the controlling member of Eber-CT at all relevant times, and through application of a constructive trust to disregard the Alexbay transaction, Eber Metro was always a wholly owned subsidiary of EBWLC, also a New York corporation, which was entirely owned by EB&C, another New York corporation, and the Trust, a New York entity.

New York entities, and thereby apply the faithless servant doctrine notwithstanding the fact that Eber-CT was the main operating entity and the company made payroll.

Plaintiffs ask this Court to adopt a reasonable extension of existing law: That disloyal officers of a New York company cannot evade application of New York's faithless servant doctrine by transferring payroll responsibilities to an out-of-state subsidiary, as Defendants did. This logical extension of the doctrine is necessary to avoid creating a significant loophole.

The faithless servant doctrine generally requires forfeiture of all compensation received after the first disloyal act, though courts have occasionally entered limited forfeiture orders based on the circumstances. *See Phansalkar v. Andersen Weinroth & Co., L.P.* 344, F.3d 184, 204–207 (2d Cir. 2003) (collecting New York cases). Arguably, only Defendants' compensation relative to their work for the New York entities is subject to forfeiture. In *Phansalker*, the Second Circuit held that when the employee was paid "general compensation," and it was not readily capable of being broken down by task to distinguish loyal versus disloyal compensation, all of the compensation must be forfeited. *Id.* at 208. Here, Defendants' salaries were not broken down between the entities. At least *some* portion of their salaries must have been compensation for the otherwise-uncompensated positions in the many other Eber entities. Defendants' decision not to break down compensation between the entities means that all of their compensation should be forfeited. Nor is there evidence in the record to support apportioning Defendants' salaries based on the work they did, as there is virtually no evidence of what work Wendy or Lester actually performed for Eber-CT's operations.[32] Accordingly, if this Court were to conclude that New York courts would embrace a limited forfeiture approach under these facts, Plaintiffs suggest that at least a quarter of their compensation should be forfeited— recognizing that likely substantially understates the proportion of work Defendants performed for the New York entities.

---

[32] There is evidence that Wendy continued to perform significant services for EBWLC in years after 2012, mainly in connection with managing the negotiations and, later, lawsuits with PBGC and Harris Beach. *E.g.*, Exs. 70–73 (presentations to and negotiations with PBGC); Ex. 166 at 12 (directing PBGC litigation); Ex. 281 (Wendy's affidavit in Harris Beach litigation).

At a minimum, even if all Eber-CT payments were excluded, Lester's compensation paid by EBWLC is subject to the faithless servant doctrine. Lester was paid $612,998 by EBWLC since 2007, during the period of disloyalty. *See* Pl. F&C ¶ 22 (showing EBWLC paid Lester from 2007 through May 2008, and for all of 2010). That is subject to disgorgement. A reasonable intermediate date from which to accrue interest would be July 1, 2009.

## IX.    IF THE COURT DOES NOT APPLY THE FAITHLESS SERVANT DOCTRINE, ALTERNATIVE DAMAGES FOR BREACH OF FIDUCIARY DUTY SHOULD BE IMPOSED

Defendants' conduct to effectively gift Eber-CT to Lester instead of making any genuine attempt to sell to a third party resulted in them profiting by receiving compensation from Eber-CT for many years after the fact, even though the only work that they demonstrably did was to oversee litigation against angry creditors. Substantial damages must be awarded for Defendants' breaches of their fiduciary duties to effectuate the express objectives of New York law. *See* Pl. Opening Br. § VII.

Defendants' main argument against disgorging their compensation as damages is to contend that Eder-Goodman did not offer to buy Eber-CT in 2010 or 2012. That is, Defendants contend that, by their own failure to inquire if the folks who had previously offered to buy the company and paid handsomely for a right of first refusal were still interested, Defendants have insulated themselves against any possibility of computing damages.[33]

Defendants' approach should be rejected. Based on the testimony that the Court heard, the most reasonable inference is that Eder-Goodman was interested in acquiring Eber-CT at all times. The evidence also indicates that almost anyone in the business could have run the company more profitably than the Ebers did, so there is no reason to think that the absence of net income would have diminished Eder-Goodman's willingness to purchase based on gross profit.

---

[33] Notably, the Allen Eber Will exculpated the co-trustees from losses for decisions to retain any business interests, "provided only that [they] shall have acted in good faith." Ex. 132 at 13. This exception cannot apply here because the ultimate result of Defendants' machinations was to divest the Trust of the business interests, albeit on far less favorable terms. Even the temporary retention of the business from 2010 to 2012, so that Lester's new secured loan could mature and end up in default, meant the decision to retain was without a scintilla of "good faith."

In addition, if Wendy and Lester's Estate are permitted to retain their compensation, substantial punitive damages would be warranted. This Court should schedule an additional half-day trial to hear evidence regarding the Estate's assets and Wendy Eber's personal financial circumstances, after a short period to receive discovery on the subject, so as to ensure that it awards an amount of damages that would actually have a punitive effect and deter other fiduciaries from ever considering engaging in such self-serving conduct while in fiduciary roles.

\* \* \*

As a separate matter, the Court should include Lester's posthumous bonus in the award of damages because that was paid pursuant to an employment agreement that was the product of self-dealing with Wendy and without co-trustee knowledge or approval at a time when the Trust undisputedly controlled Eber-CT. The Estate should be ordered to repay $675,991 plus interest to Eber-CT. Pl. F&C ¶¶ 489–92.

## X. DEFENDANTS' REASONS TO TRANSFER EBWLC SHARES TO LESTER DO NOT SUFFICE

Defendants simultaneously ask this Court to reimburse Lester's Estate for relinquishing the remaining benefits under his pension plan and to allow the Estate to retain the 750 Voting Preferred shares of EBWLC that he supposedly acquired in a "selfless act to permit him to give up his own pension right" for the PBGC settlement. Def. F&C ¶ 578. The fact that EBWLC could theoretically redeem the shares for $37,500 does not mean that Lester received "no benefit" from the shares, *id.*, because (a) he paid nothing for the shares, and (b) his counsel at the time believed that it gave him voting control over EBWLC in the event that his attempt to intercept Plaintiffs' shares from the Trust failed.[34]

---

[34] Earlier this year, John Herbert argued that these 750 shares gave Lester's estate voting control over EBWLC:

> [E]ven if the call right wasn't defective and the shares currently held by the trust were distributed on a one-third, one-third and one-third basis, that would mean that the plaintiffs would have, you know, two-thirds, and at most you would have one-third. But because Lester's estate own 27% of the vote in Eber Wine & Liquor, right, if you combine those two, that would result in the estate owning 56% of the votes. And they really are the ones that are entitled to – even if you don't respect the call rights, the estate is the one entitled to have voting control of this whole structure.

3/5/21 Arg. Tr. at 43:6–17 (annexed hereto). If indeed Lester had obtained voting control, he could have also prevented the company from deciding to redeem the shares, and therefore he could have continued to control Eber-

The only relevance of the redemption value of these shares is that the cost, $37,500, is the closest thing to an obligation from any Eber Bros. affiliate to compensating Lester for giving up his pension plan to facilitate the PBGC settlement. Therefore, at most, the Court should convert the 750 Voting Preferred Shares to a credit to pay Lester's Estate $37,500 as compensation for relinquishing the remainder of his pension benefits. To hold that his pension was worth a penny more would be to undermine Defendants' claim that Lester engaged in a "selfless act."

## XI. DEFENDANTS MISCHARACTERIZE THEIR ANSWER TO CONCEAL THEIR WAIVER OF *RES JUDICATA*, WHICH IS INAPPLICABLE TO THESE DEFENDANTS ANYWAY

Defendants' F&C's first reference to *res judicata* is to falsely assert that they pleaded it broadly as an affirmative defense, when in fact they expressly limited the defense to the 2012 ruling by Justice Rosenbaum in Alexbay's UCC Article 9 proceeding. *Compare* F&C ¶ 34 *with* Eber Amended Answer ¶ 26 (ECF No. 241).[35] The omission was certainly intentional because, years earlier, CNB pled *res judicata* based on the Surrogate's June 1, 2017 Order, and the Ebers chose not to follow suit. CNB Answer ¶¶ 126–129 (ECF No. 69). It was plain that only CNB filed an accounting, sought discharge, and had any colorable *res judicata* defense.

Given that Defendants rely on misrepresenting the record to raise the defense now, the Court has indisputable grounds to find that Defendants waived the defense.[36] However, to forestall the possibility of future collateral attacks, the Court should also hold, as an alternative ground, that the defense fails, and indeed is frivolous, because *Lester never filed an accounting or obtained a judicial settlement thereof.* The only party who could arguably claim to have been discharged by the Surrogate's Court order is the one who filed an accounting and requested to be

---

CT even after it was returned to EBWLC. Now, Mr. Herbert totally misunderstood how a parent corporation votes its stock in a subsidiary, but that does not change the fact that there was malintent.

[35] *See also* Def. MSJ Br. 12–13, ECF No. 262-35 (arguing *res judicata* based on the UCC action).

[36] For example, Defendants make no argument whatsoever that their delay in presenting a *res judicata* defense based on the Surrogate's 2017 Order should be excused. Not that there is any imaginable plausible excuse: *Res judicata* is a dispositive issue that could and should have been dealt with long before Plaintiffs spent years and significant expense litigating the merits. *See Flannigan v. Vulcan Power Group, LLC*, 642 Fed. Appx. 46, 51 (2d Cir. Mar. 15, 2016).

discharged: CNB.[37] Not one case cited by Defendants involved *res judicata* attaching to a co-trustee who *failed* to provide an accounting of his own. Implicitly recognizing this, Defendants elsewhere argue that Plaintiffs "*could* compel the Trustees to account under SCPA 2205." Def. F&C ¶ 498 (emphasis added). But Plaintiffs had already filed this lawsuit, so there was no need to file for an accounting from Lester in a forum that was less experienced in evaluating complex corporate transactions. Beyond Lester's failure to join CNB's petition, CNB omitted any reference to any claims by Plaintiffs. Instead, CNB sought to terminate the Trust and distribute the assets so that Lester and Gumaer could no longer control Plaintiffs' inheritance. For Plaintiffs, the possibility of such direct ownership was worth the risk that CNB—whose major fault was in failing to supervise the co-trustees or inform the beneficiaries, not acting in its own self-interest—might get discharged and thereby insulated against the claims previously raised here.[38] But it was impossible to even imagine that a passive participant like Lester, who merely declined to object to CNB's accounting, might thereby be exculpated for everything he ever did while he was a co-trustee.

Defendants' case citations do not suggest, much less compel, that outcome. In *In re Roche's Will*, the Court of Appeals ruled that, after "[t]he trustee filed its account," any allegations of negligence in the management of the trust had to be filed in the accounting proceeding. 259 N.Y. 458, 461 (1932). From that decision, the Court of Appeals later stated that "an accounting decree is therefore conclusive as to issues that were decided as well as those that could have been raised in the accounting." *In re Hunter*, 4 N.Y.3d 260, 270 (2005). *Hunter* only considered whether prior orders of judicial settlement as *an accounting trustee* created *res*

---

[37] Even then, CNB's deliberate omissions of any of the allegations made in this first-filed lawsuit prevented *res judicata* from attaching. *See* 7 Warren's Heaton on Surrogate's Court Practice § 102.03 (2020) (cited at Def. F&C ¶ 511) (the accounting proceeding is limited to "the matters embraced in the account and decree"). This lawsuit is not about any distribution of assets held directly by the Trust, as were presented in the accounting. Rather, it is about corporate actions taken within a corporate entity that was controlled by the Trust. That is why Plaintiffs argued (correctly) that the Surrogate's ruling was *res judicata* as to the EB&C shares, because their distribution had been "embraced in the account." *Id*.

[38] Once EB&C Plaintiffs, a majority stake no less, Plaintiffs could have caused EB&C and EBWLC to file <u>direct</u> claims against Lester and Wendy—not merely shareholder derivative claims, which are typically reserved as remedies for minority stockholders.

*judicata* as to objections that could have been raised based on management of the trust.[39] There is no suggestion that a co-trustee who does not provide an accounting gets to enjoy the benefits of *res judicata*. Such a holding would, in fact, grossly subvert the goals of trust law, by allowing a conniving co-trustee to convince another co-trustee to seek an accounting, and then just sit back, place their fingertips together, and cackle maniacally when the beneficiaries lodge no objections, completely unaware that they just lost their ability to ever hold the wrongdoer accountable. That is ridiculous. No wonder Defendants' previous counsel, despite doing all manner of other questionable things, chose not to claim *res judicata* based on CNB's accounting.

Citing no authority, Defendants insist that Plaintiffs' argument about *res judicata* barring Lester's attempt to intercept the Trust's shares means that now they can argue *res judicata*, too; and not only on how directly held Trust assets were to be distributed, but as to any issue that could have been raised before the Surrogate if Plaintiffs had not already filed this lawsuit. Importantly, Plaintiffs argued *res judicata* against Lester's extrajudicial attempt to divest them of standing—an issue that Defendants have now withdrawn, thereby mooting Plaintiffs' invocation of the doctrine. This Court cannot entertain the last-minute *res judicata* defense without setting a disturbing precedent: A defendant who fails to plead *res judicata* can circumvent the Rules of Civil Procedure and invoke *res judicata* without showing good cause, even at the last moment of trial, as long as they can somehow trick Plaintiffs into saying the words "*res judicata*," and then withdraw the issue that caused Plaintiffs to say those words.

Lastly, even if *res judicata* applied, it would not require dismissal of Plaintiffs' *entire* case, as Defendants assert. The corporate law claims against Lester, Wendy, and Alexbay are asserted on behalf of the corporate entities, not Plaintiffs individually. None of the corporate entities were parties to CNB's accounting petition, and Plaintiffs had no privity with them as

---

[39] *Hunter* also recognizes that an accounting can only result in a *res judicata* bar "if a fiduciary gives full disclosure in his accounting." *Id.* at 271. None of the co-trustees even mentioned the transfer of Eber Metro or anything of the sort, and therefore there was no full disclosure. Nor did the listing of EB&C's fair market value at zero implicitly constitute "full disclosure." Corporate stock can have a "fair market value" of zero without it being rendered valueless to persons who beneficially owned the stock at the relevant time and therefore would have standing to sue for past wrongdoing—something a subsequent purchaser of the stock could not do. The "market" value was zero.

they were under Defendants' control. Therefore, the derivative claims asserted on their behalf cannot be barred by *res judicata*. Nor was Wendy a party to the accounting. At most, applying *res judicata* might mean that the Alexbay transaction and others should be judged under the corporate law standard of entire fairness, and Defendants have completely failed to meet that standard as to any of the challenged transactions. But again, even that much would be a bridge too far given that Lester never provided his own account or sought any kind of judicial settlement for his benefit.

## XII.   PUNITIVE DAMAGES ARE MORE THAN WARRANTED; THEY ARE NECESSARY

Defendants contend that punitive damages should not be imposed because they were not imposed in *Birnbaum*, which involved actual fraud. However, the Appellate Division recognized that the conduct supported the imposition of punitive damages, if the Surrogate had elected to exercise its discretion to impose them, and refused to disturb that judgment call on appeal. *Birnbaum v. Birnbaum*, 157 A.D.2d 177, 192–93 (4th Dept. 1990) ("Imposition of punitive damages is discretionary, not mandatory.").

Defendants' conduct here was worse than that in *Birnbaum*, where the fraud was merely in an executor purchasing from the estate a partnership interest while concealing the fact that the executor had already nominally owned an additional interest in a partnership. *Id.* at 182. Here, Plaintiffs have proven a concerted scheme carried out over years, that included making material misrepresentations and omissions to many, including the PBGC (i.e., the federal government and EBWLC's pensioners[40]), Gumaer, CNB, and at least three different judges in the Rochester area (Justice Rosenbaum, District Judge Telesca, and Surrogate Owens). The end result also substantially damaged Plaintiffs' interests. The evidence shows a pervasive pattern of deception and self-aggrandizement that cries out for punishment. To preserve the integrity of American

---

[40] New York permits punitive damages even in breach of contract cases when there is a public harm from the wrongdoing, *Deangelis v. Corzine*, 17 F.Supp.3d 270, 288 (S.D.N.Y. 2014), as there was here by engaging in sham and fraudulent transactions for the purpose of harming PBGC. This is not a case where fiduciary duties arise out of any contract, but the point is that, even if it were, punitive damages would still be warranted. This public injury— which Defendants' latest submission *embraces*, claiming that insulating assets from PBGC made the Polebridge transaction acceptable under the inapplicable business judgment rule—is all the more reason for a substantial award.

business corporations, and ensure that this remains an attractive destination in which corporations and individuals from around the world can invest their money safely with the assurance that there is a well-developed body of law to protect their investments, such behavior—even from a private company—cannot be treated lightly without serious and public consequences being included in this Court's ultimate judgment.

## XIII.   DAN KLEEBERG SHOULD OVERSEE THE EBER ENTITIES

Defendants object that Mr. Kleeberg is not a good selection to be interim officer and director of the Eber companies because he had a personal bankruptcy over a decade ago, at the same time when Defendants say that they nearly drove Eber-CT into bankruptcy themselves. Defendants base their objection in part on the false assertion that Kleeberg left EBWLC of his own volition, when his testimony made clear that Lester told him that he would be fired if he did not leave, and he received a severance that quickly evaporated. Tr. 74:1–11. Plaintiffs will have the controlling stake in the business, and Mr. Kleeberg will be their choice. There is no good reason not to appoint him to that role an interim basis until formal elections can be held.[41]

## XIV.   DEFENDANTS OFFER NO JUST REASON FOR DELAY OF FINAL JUDGMENT

The presumption against piecemeal appeals must give way in circumstances like these, where Defendants are transparently seeking to extend litigation as long as possible to prevent Plaintiffs from ever being able to even consider selling the business so that the parties may divide the proceeds and end this. There is no good reason to delay sending the core issues to the Court of Appeals for resolution; whatever relatively minor issues may arise when considering

---

[41] To the extent the Court declines to appoint Mr. Kleeberg, Plaintiffs alternatively propose appointing undersigned counsel to be interim officer and director of the Eber companies, based on the longstanding relationship of trust with Plaintiffs combined with the undersigned's experience in business as well as law. This alternative has been explicitly discussed between counsel and Plaintiffs and is not being suggested by counsel alone. Given that most of the steps to be completed in the near term entail corporate secretary matters such as registering new shareholders and holding elections, it is likely that counsel would end up being retained to do that work anyway. As background, Brook relocated to San Diego in July 2020 to serve as Chief Executive Officer of a former client, EXO Incubator, Inc., a biotech startup seeking primarily to improve cancer diagnostics. Brook also has experience managing a law firm with employees, Clinton Brook & Peed, for over five years. Brook serves as outside general counsel to the U.S. corporate entities of two international companies, Surya Nature, Inc. and Amodo, Inc. Although these experiences are different than the wine and liquor distribution business, Brook would not undertake any actions to affect Eber-CT's operations without the input and direction of Mr. Kleeberg.

further proceedings on punitive damages or other issues pale in comparison to what this Court can now finally decide.

## CONCLUSION

The Court should reject Defendants' unsupported proposed findings of fact and conclusions of law and enter judgment for Plaintiffs on all counts.

Respectfully submitted,

/s Brian C. Brook
Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Facsimile: (646) 257-2887
Brian@brook-law.com

*Counsel for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

Dated: October 29, 2021