N1Q1KLEC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DANIEL KLEEBERG, et al.,

                Plaintiffs,

          v.                        16 Civ. 9517 (LAK)

WENDY EBER, et al.,

                Defendants.         Conference
------------------------------x
                                    New York, N.Y.
                                    January 26, 2023
                                    4:09 p.m.

Before:

                    HON. LEWIS A. KAPLAN,

                                    District Judge

                        APPEARANCES

BROOK & ASSOCIATES, PLLC
     Attorneys for Plaintiffs
BY:  BRIAN C. BROOK, ESQ.

FARRELL FRITZ P.C.
     Attorneys for Defendants
BY:  FRANK T. SANTORO, ESQ.
     KEVIN P. MULRY, ESQ.


HERBERT LAW
     Attorneys for Defendants
BY:  JOHN S. HERBERT, ESQ.
     (Present Via Speakerphone)

WOODS OVIATT GILMAN LLP
     Attorneys for Canandaigua National Corporation
BY:  DONALD W. O'BRIEN, JR., ESQ.
     (Present Via Speakerphone)
```

N1Q1KLEC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel for plaintiff, are you

3   ready?

4          MR. BROOK:  Yes.  Good afternoon, your Honor.  Brian

5   Brook for the plaintiffs.

6          THE DEPUTY CLERK:  Counsel for defendant, are you

7   ready?

8          MR. SANTORO:  Yes.  Good afternoon, your Honor.  Frank

9   Santoro, Farrell Fritz, PC, counsel for the Eber defendants.

10          THE COURT:  Good afternoon.

11          MR. MULRY:  And Kevin Mulry of Farrell Fritz, also for

12   defendants.  Good afternoon, your Honor.

13          THE COURT:  Mr. Mulry.

14          THE DEPUTY CLERK:  Counsel for defendant Canandaigua.

15   Counsel, are you on the phone?  Are you ready?

16          THE COURT:  Apparently not.

17          THE DEPUTY CLERK:  They were there.  Shall I --

18          MR. O'BRIEN:  Your Honor, this is Don O'Brien calling

19   in.  I'm representing Canandaigua National Bank.

20          THE COURT:  And in your view, are they still in this

21   case or not?

22          MR. O'BRIEN:  Well, your Honor, my understanding is,

23   from reviewing the various claims and counterclaims, there is

24   relief that's being sought that could affect Canandaigua

25   National Bank, particularly with respect to some further

N1Q1KLEC

1    proceedings in the surrogate court, and, of course, your Honor,

2    we do have a settlement agreement with the plaintiff when we

3    were let out of the case, based on their claims, and so we are

4    in fact interested in the outcome with respect to that matter

5    as well, which is reimbursement of attorney's fees.

6          THE COURT:  Well, my question was actually a little

7    different than whether you're interested.  Are you a party to

8    this case today?

9          MR. O'BRIEN:  We still have a -- an interpleader claim

10   which I believe has not been resolved, and so therefore, I

11   believe we are, although every notice I get says that I've been

12   terminated.

13         THE COURT:  And you didn't show up at the trial.

14         MR. O'BRIEN:  I did not, your Honor.

15         THE COURT:  Okay.  That has whatever effect it has,

16   which I'm not going to decide now.

17         Now, Mr. Brook, I have your letter, I have

18   Mr. Santoro's letter.  Do you have any response to

19   Mr. Santoro's letter?

20         MR. BROOK:  I mean, a lot of the letter doesn't say

21   all that much other than throwing out terms like Princess Lida

22   and stuff like that.  I just want to clarify what we're asking

23   the Court to do.  We're not asking the Court to step into the

24   shoes of the missing surrogate.  All we're asking --

25         THE COURT:  Is there a missing surrogate?

N1Q1KLEC

1          MR. BROOK:  From my understanding -- I'm not the

2    estate lawyer, but the docket shows no acting surrogate was

3    appointed even after the surrogate in June of last year

4    referred the matter to the administrative judge for an

5    assignment.  So I spoke to my estate lawyers and they talked to

6    someone and confirmed that no acting surrogate had yet been

7    appointed.

8          THE COURT:  But Mr. Santoro, on what basis do you say

9    that there is or was an acting surrogate?

10          MR. SANTORO:  Any application would require

11    adjudication by an acting surrogate, in the event there was a

12    recusal by the sitting surrogate, elected by the folks of

13    Monroe County.

14          THE COURT:  So you're saying that there's an acting

15    surrogate not because one has been appointed but because in

16    your view, somebody would have to be appointed if something was

17    before the surrogate's court requiring decision; is that right?

18          MR. SANTORO:  Not quite, your Honor.  My understanding

19    is that surrogate Ciaccio, if I'm pronouncing his name

20    properly, is no longer recusing himself with respect to the

21    estate of Lester Eber but during any period of time --

22          THE COURT:  How do we know that?

23          MR. SANTORO:  That's what I've been informed by estate

24    counsel in Monroe County.

25          THE COURT:  Is there anything on the record that he

N1Q1KLEC

1    recused himself?

2               MR. SANTORO:  Yes, there is.

3               THE COURT:  Is there anything on the record that says

4    he unrecused himself?

5               MR. SANTORO:  That was with respect to a proceeding

6    that was brought for fees, but no, the answer is no.

7               THE COURT:  So there is no acting surrogate at the

8    moment.  And there --

9               MR. SANTORO:  Every county has an acting surrogate.

10   Once an application is made in the surrogate's court, if the

11   sitting surrogate has recused him- or herself, it's referred to

12   the acting surrogate.  That's my understanding of how it works.

13              THE COURT:  And that's where, in the Surrogate's Court

14   Procedure act or somewhere else?

15              MR. SANTORO:  I think it's a function of the

16   administrative judge in each county taking cases in the

17   surrogate's court, whether they're administrative cases or

18   actual litigations where they're contested matters, and once an

19   application is made, if the surrogate has recused himself or

20   herself, it is then referred to an acting surrogate.

21              THE COURT:  Is there anything that's been referred to

22   an acting surrogate?

23              MR. SANTORO:  Not that I've seen, your Honor.

24              THE COURT:  Because there's nothing pending, right?

25              MR. BROOK:  Your Honor --

N1Q1KLEC

```
1              MR. SANTORO:  Well, that's an interesting question.  I
2      mean, the administration of the estate of Lester Eber is
3      ongoing and it's subject to the surrogate's court's
4      jurisdiction, so any application that's made that requires
5      adjudication must be made in the surrogate's court.
6              THE COURT:  So I take it the answer is no.
7              MR. SANTORO:  If --
8              THE COURT:  You're telling me that if something
9      happens, then something else happens, but nothing has happened
10     yet, right?
11             MR. SANTORO:  Nothing has happened that requires
12     adjudication.
13             THE COURT:  Okay.  Thank you.
14             Back to you, Mr. Brook.
15             MR. BROOK:  Yes.  Just on that point, so there was a
16     petition filed in early December for the payment of fees that
17     was withdrawn on the last day of the year.  And in the three
18     weeks or so after that was filed, there was still no acting
19     surrogate who had been appointed by the court, so I don't know
20     what Mr. Santoro is referring to there.  But it doesn't really
21     matter, other than the fact that what's been going on there, or
22     has been going on with the estate, sort of gives additional
23     concern to my clients about the state of Eber Connecticut,
24     because that's what we're really here about is the nominal
25     defendant, Eber Connecticut, which is not a party to the
```

N1Q1KLEC

1    surrogate's court.  So this has nothing to do with the

2    jurisdictional limitations of this court, or whatever it is

3    that they're referring to there.  We are just asking for

4    information to be disclosed pending a decision, because that

5    asset is likely going to be the only asset left in Mr. Lester

6    Eber's estate at the end of the day, so it's all the more

7    important to preserve its value.

8              THE COURT:  Have you asked the other side for the

9    information you want?

10             MR. BROOK:  Yes, your Honor, and we were getting

11   information and regular updates I thought for the last year.

12   We had, you know -- I think the bills that they submitted show

13   that they billed over $50,000 in the first -- in December,

14   January, February, after the trial and all the briefing was

15   over, because we were talking so much, we were exchanging

16   information, and we had an agreement that anything else

17   happens, any employees give notice of termination or thinking

18   about leaving or any suppliers dualing them -- that's always

19   been one of the main points of concern because, you know, I've

20   talked to the potential buyer Andy Eder's lawyers; that's a

21   factor for them that would affect the price that they pay.

22   They were supposed to share that, and we found out just right

23   at the end of the last year, I believe it was, Mr. Kleeberg,

24   who is in the industry, heard from someone, and then we

25   confirmed with Andy Eder, who had heard this information as

N1Q1KLEC

1    well –– or his attorneys, rather –– that the second–largest

2    supplier had dualed them months ago.

3          THE COURT:  You wrote me a letter nine days ago saying

4    you weren't getting information.  Have you gotten it in the

5    interim?

6          MR. BROOK:  No, your Honor, because the information

7    that we're aware of, we already got on our own.  The issue here

8    is, you know, if there's anything else that hasn't been

9    disclosed and really going forward pending a decision, you

10   know –– and in particular, the thing I didn't want to put in

11   the letter, but it's our understanding and sort of from rumors

12   and such –– which is apparently how this industry works –– that

13   a number of senior Eber Connecticut –– or Slocum & Sons, as

14   it's called –– employees are actively looking for other

15   employment.  It's our understanding that Wendy Eber long ago

16   said that if and when my clients get control of the company, a

17   lot of people are going to lose their jobs, and so, you know, I

18   don't –– again, I didn't hear this myself.  That's what the

19   word on the street is; the sort of attitude of, if I can't have

20   it, no one can.  And that's what we're concerned about is, will

21   it happen again.  And it already did happen ––

22         THE COURT:  I suppose if she's done that, she's wide

23   open to liability for another reason.

24         MR. BROOK:  And the last thing we want to do, your

25   Honor, is file another lawsuit against Wendy Eber.

N1Q1KLEC

1          But more importantly, you know, those employees are

2     the key part of this company.  The relationship that they have

3     with suppliers are what makes sure that those suppliers

4     continue to use Eber Connecticut as their exclusive

5     distributor.  So we got word at the end of last year, for

6     example, that a key employee —- we didn't know who, Wendy

7     wouldn't share the information, wouldn't let us talk to him,

8     but —- had given notice.  And essentially, you know, our hands

9     were tied, based upon that information.  We don't want that to

10    happen going forward.

11          I mean, in December or January last year, whenever it

12    was that we had heard that —- so I'm referring to December '21

13    or January '22 —- you know, we were expecting, you know, based

14    upon what your Honor had told us, a decision any day, and we

15    didn't want to bother this Court with something that --

16          THE COURT:  I wish I could have given it to you.

17          MR. BROOK:  But I think, you know, at this point we --

18    you know, we understand your Honor is extremely busy.  We just

19    want to make sure that however much longer it takes, that my

20    clients can try to do something, if they can, to intercede in

21    the event a key employee gives notice.

22          We've also talked about the possibility of having a,

23    you know, a letter from my client to employees, just basically

24    undoing whatever may have been said by Wendy Eber, reassuring

25    employees their jobs are safe, we are not planning on having

N1Q1KLEC

1    anyone terminated, you know, just -- we want to be able to do

2    something to avoid a potential destruction of the value of this

3    company.

4              THE COURT:  Mr. Santoro, what about it?

5              MR. SANTORO:  First, your Honor, on the question of

6    whether the plaintiffs asked the defendants for the information

7    that's being requested, I have not spoken or heard from

8    Mr. Brook since our last conference in September.

9              THE COURT:  I read your letter.

10             MR. SANTORO:  Okay.  Before that, the idea that there

11   was an agreement in place that we would provide some kind of

12   information dates back to more than nine months ago, when the

13   parties were still involved in settlement discussions, which

14   have long ceased.  That's the first thing.  So if Mr. Brook had

15   requested information rather than writing a letter to the

16   Court, we would have been happy to have a conversation with him

17   about the nature of the information that he's seeking.

18             THE COURT:  Well, how about now?

19             MR. SANTORO:  Well, how about now.  We can start with

20   CDI, which is this dualing that occurred.  Mr. Brook just told

21   you about the dualing of Eber Connecticut's second-largest

22   supplier.  What he didn't tell you is that CDI dualed every

23   supplier, every distributor that they had in Connecticut.

24   There is nothing about --

25             THE COURT:  Did you tell him that?

N1Q1KLEC

1          MR. SANTORO:  No, because he didn't ask me, your

2     Honor.

3          THE COURT:  You've had his letter for nine days.  Why

4     didn't you tell him?

5          MR. SANTORO:  There's been no communication.

6          THE COURT:  Why not?  Why didn't you pick up the

7     phone?  I'll grant you, maybe he should have picked up the

8     phone.  Why can't you pick up the phone?

9          MR. SANTORO:  Your Honor, because when we have

10    provided information to Mr. Brook in the past, he has acted in

11    a way, in terms of communicating with Eber Connecticut's

12    competitors in Connecticut, that is irresponsible.  So we are

13    reticent to provide the kind of information that he's asking

14    for.  Nevertheless, we have in the past.

15         THE COURT:  You know what it's beginning to sound

16    like; it's beginning to sound like what you need is a receiver.

17    And sooner rather than later.  Doesn't it?  If you guys can't

18    play in the sandbox in a responsible way like two grown

19    6-year-olds, don't I have to get an adult in here?

20         MR. SANTORO:  Your Honor, the business of Eber

21    Connecticut under Wendy Eber's administration, under her

22    stewardship, has performed exceptionally well.  The idea that

23    we're going to replace Wendy Eber with a receiver --

24         THE COURT:  If you don't yet know that your client is

25    in the middle of the Great Lakes on very thin ice, you haven't

N1Q1KLEC

1   been paying attention, because I have a very negative view of

2   her credibility and her even-handed administration of the

3   assets that have been subject to her control or influence.  And

4   I'm the finder of fact.  Getting the message?

5           MR. SANTORO:  Yes, your Honor.

6           THE COURT:  Good.  So maybe you'll be a little bit

7   more forthcoming and maybe the two of you can do what you

8   should have done —— what is this, we're in 2023? —— seven years

9   ago when this case was filed.  And I don't remember who the

10  lawyers were then, but I remember talking to both of them at

11  the beginning of it and telling them that from my days in

12  practice, there is nothing worse than a family litigation over

13  a business, because at the end, everybody loses except the

14  lawyers, and I urged them to sit down and settle and offered to

15  assist personally in doing that if they were interested, and

16  the answer I got back was neither side was interested.  Get

17  with it.

18          Now I expect not to hear about this fight over

19  information again.  In the meantime, I'm prepared to rule on

20  two of the issues that are pending before me.

21          Very late in the day, memory serves after the trial

22  was over, the defendants suddenly asserted the contention that

23  under something called the Princess Lida doctrine, this Court,

24  where we have been litigating for the last seven years, didn't

25  have jurisdiction and somehow there was a new *res judicata*

N1Q1KLEC

1    argument.  I'm going to assume for purposes of my remarks that
2    a reader of them will be up to date on what has happened in the
3    Surrogate's and Supreme Court in Monroe County.  I don't think
4    that the historical facts are in any way disputed, and I'm not
5    going to take the time to summarize them.

6          But let me start with the Princess Lida doctrine,
7    which the defendants claim ousts this Court of federal subject
8    matter jurisdiction.  The Princess Lida doctrine prevents
9    federal courts from adjudicating claims to a res that is
10   currently under the control of another court.  It applies when
11   there's prior pending litigation and two conditions are met:
12   first, both actions must be *in rem* or *quasi in rem* in nature;
13   second, the relief sought would require the second court to
14   exercise control over property already under the jurisdiction
15   of the first court.

16         Now the first thing to be noted is that in the Second
17   Circuit, which is where we are located, the Princess Lida
18   doctrine has nothing to do with subject matter jurisdiction.
19   The Second Circuit has said that, among other places, in the
20   *Carvel v. The Thomas and Agnes Carvel Foundation* case,
21   188 Fed.3d 83, it has to do with abstention, which is a
22   discretionary doctrine.  So the issues for me to determine are
23   whether the prerequisites to the Princess Lida doctrine are met
24   in this case and, if they are, whether I am obliged by
25   principles of abstention to defer to the courts up in Western

N1Q1KLEC

1    New York.

2              First of all, the Princess Lida doctrine doesn't apply

3    at all in this case.  The key issues in this determination are

4    timing and whether both actions are *in rem* or *quasi in rem* in

5    nature.  The timing of the filing of this action precludes any

6    need or any justification for Princess Lida abstention.  The

7    purpose of the Princess Lida doctrine is to protect one court's

8    jurisdiction over a res property from another court's

9    subsequent attempt to exercise jurisdiction over the same res.

10   The doctrine cautions courts to abstain to avoid contradictory

11   determinations of property rights.

12             The Surrogate's Court was not exercising jurisdiction

13   over the trust in this case when this action was filed.  The

14   defendants have contended, first of all, that the probate of

15   Allen Eber's will, 53 years ago, conferred continuing

16   jurisdiction over the res on the Surrogate's Court in Monroe

17   County.  But an exercise of jurisdiction in the relevant sense

18   would require that there be pending in the first court, at the

19   time of the filing of the second action, some active dispute,

20   at a minimum.  The mere existence of power to supervise the

21   administration of a trust doesn't mean that jurisdiction in

22   fact is being exercised.  There have to be affirmative steps by

23   the trustee or the court for jurisdiction to attach to the

24   trust corpus.  There were no actions open in the Surrogate's

25   Court, and there were no such actions at the time this case was

N1Q1KLEC

1   filed.  Indeed, by the time this case was filed, the

2   Surrogate's Court had terminated the testamentary trust.

3         The defendants cite an unreported and nonprecedential

4   case, *Mercer v. Bank of N.Y. Mellon*, 609 Fed. App'x 677, for

5   the proposition that the Surrogate's Court had continuing

6   jurisdiction over the trust.  *Mercer* expressly did not propound

7   a view on the minimum amount of activity that would have been

8   sufficient to give the Surrogate's Court supervisory control

9   over the trust.  In *Mercer*, there was a trial pending in the

10  Surrogate's Court.  When the federal case was filed here, there

11  were no proceedings in the Surrogate's Court.

12        Secondly, I don't need to determine whether any of the

13  claims in this case were *in rem*, *quasi in rem*, or *in personam*,

14  because at least some of the plaintiff's claims here are *in*

15  *personam*, and they would not be foreclosed even if the Princess

16  Lida abstention were appropriate with respect to others.  And

17  not all claims relating to trust administration and asset

18  distribution are *in rem* or *quasi in rem*.  *In rem* jurisdiction

19  involves cases where property actually has been seized under

20  judicial process before the second suit is instituted.  *Quasi*

21  *in rem* claims are brought to marshal assets, administer trusts,

22  or liquidate estates, and if suits with similar nature were to

23  give effect to its jurisdiction, the court must control the

24  property.  Claims seeking to contest management or to effect a

25  distribution of property may be *in rem* or *quasi in rem*, but

N1Q1KLEC

those merely seeking an *in personam* judgment declaring the

plaintiff entitled to receive from the fiduciary an interest in

a trust estate are not.

In *Lefkowitz v. Bank of New York*, which is at

528 Fed.3d, the Second Circuit held that claims for breach of

fiduciary duty, aiding and abetting breach of fiduciary duty,

fraudulent misrepresentation, and fraudulent concealment are *in*

*personam* because for each of those claims, the plaintiff seeks

damages from the defendants personally rather than assets or

distributions from an estate.  Moreover, in addressing those

claims, the federal court will not be asserting control over

any res in the custody of a state court.  In this case, the

plaintiffs do not require this Court to take control of any res

property.  Even if there did, there would be an abundance of *in*

*personam* claims.

In any event, the defendants' arguments that all of

plaintiffs' claims should be dismissed under the Princess Lida

doctrine because the claims all derive from their equitable

interest in the trust res as trust beneficiaries is absolutely

clearly wrong.

Plaintiffs also bring claims derivatively on behalf of

various Eber corporations.  In any event, defendants have

forfeited any claim to abstention by actively participating in

this suit for years without raising the Princess Lida argument

until after the conclusion of the trial.  As I've discussed

N1Q1KLEC

1    already, the Princess Lida doctrine is a prudential rule of

2    abstention.  Claims to abstention, even mandatory abstention,

3    can be waived.  Defendants failed to plead or move to dismiss

4    on the basis of the Princess Lida abstention doctrine at the

5    right time, and they can't avail themselves of the Court's

6    discretionary power to abstain at this late date.

7            There is also an argument that the proceedings that

8    led to the Surrogate's Court 2017 order, which, if memory

9    serves, as was the order to allow the Canandaigua National Bank

10   to be done with its service as a trustee, placed all issues and

11   claims pertaining to the trust before the Surrogate's Court and

12   that this Court therefore is precluded from hearing any of

13   plaintiffs' claims as a matter of *res judicata*.  That argument

14   is dead wrong for two reasons:

15           First, *res judicata* is an affirmative defense that

16   normally must be pleaded in a timely manner or it's waived.

17   Contrary to their assertion in the post-trial briefs, the

18   defendants did not plead *res judicata* on the basis of the 2017

19   Surrogate's Court accounting order in their amended answer.

20   The reference there to *res judicata* pertained only to the

21   Monroe County Supreme Court decision in 2012 regarding the

22   commercial reasonableness of Alex Bay's foreclosure on Eber

23   Metro, which touched only on one of the many issues addressed

24   at trial.  Any claim the defendants might have made under *res*

25   *judicata*, any other claims, therefore, are gone.  They were

N1Q1KLEC

1   history.

2          Even if the defendants hadn't waived the claim, the

3   resolution of the Surrogate's Court accounting proceeding would

4   not preclude this Court's adjudication of the claims at issue

5   here, and the rationale is very similar to my views on the

6   Princess Lida doctrine.  *Res judicata* bars subsequent claims

7   where three things are true —— there's a previous adjudication

8   on the merits; the previous action involved a party against

9   whom *res judicata* is invoked, or someone in privity with that

10  party; and the claims involved were or could have been raised

11  in the previous action.  The claims before me, at least many of

12  them, do not concern the trust res, its management, or the

13  distribution of shares.  Instead, to the extent plaintiffs'

14  claims concern the trust, they arise from breaches of fiduciary

15  duty and other *in personam* theories.  As the accounting order

16  is not a previous adjudication on the merits, there's no

17  privity between the plaintiffs and CNB, which sought the 2012

18  accounting, and those claims could not have been raised in the

19  previous action.  The basic requirements of *res judicata* have

20  not been satisfied.

21          Now I will possibly include a further discussion of

22  the baselessness of the jurisdictional and *res judicata* claims

23  when I issue a final decision here, but I may not.  My remarks

24  here are I think reasonably comprehensive on that point, and

25  I'll just see how much time I have and whether I think it

N1Q1KLEC

1    worthwhile to provide all the citations and so on that a

2    full-blown, for-publication opinion would include.  But I

3    consider those arguments as very belated, insufficient

4    afterthoughts, after a trial in which the defendants saw which

5    way the wind was blowing, and they're just without merit.

6          So now move along, please, folks, in the direction

7    that is in all your interests, and I will move along as time

8    permits, with a view toward trying to reach a final conclusion,

9    in fully written form.

10          Anything else, folks?

11          MR. BROOK:  Not from me, your Honor.  The only thing I

12    would just say, so that your Honor's expectations are clear —

13    I mentioned this in the letter last September — is, this case

14    is incredibly hard to settle because we can't just do it for

15    money.  We're talking about a company here.  And so the

16    challenge is, you know, in particular things like what kind of

17    release can we get, can we see any of the books and records

18    before we grant a full general release to the defendant, and,

19    you know, the insistence on a full general release, essentially

20    buying a company for the claims, is something that is very

21    difficult.  I mean, my client Dan Kleeberg's son Justin

22    Kleeberg here, he's the head of M&A at the investment banking

23    division for a bank here in New York.  He's one who would — as

24    I tell my clients again and again, you cannot essentially take

25    control of a company and have no recourse if she's embezzled

N1Q1KLEC

1    $5 million or something like that.  So that's -- the absence of

2    being able to just pay cash is, in my view, an insurmountable

3    hurdle, but I will go back to it and see if we can maybe get

4    them to reconsider.

5         THE COURT:  Well, look, more complicated transactions

6    than this have been done, and if Mr. Kleeberg is what you say

7    he is -- I have no reason to doubt it -- he's a person who

8    understands.  Making deals is hard, and if you want a mediator

9    here, I'll appoint one.  Or you can go back to Judge Parker.

10   But if you would prefer somebody else, I have a candidate.  Not

11   that you have to take my candidate.  You can find your own.

12   There are all sorts of possibilities.

13        MR. BROOK:  I'll speak with my clients, but when I

14   last did, they are of the view that we've exhausted all of our

15   efforts in this -- and just to also correct your Honor's

16   understanding, when we got assigned to this case -- I was here

17   from the beginning -- unlike these guys, we never told your

18   Honor we wouldn't talk about it.  Your Honor had the dog bite

19   incident and we never actually met, so we got quickly assigned

20   over to Judge Parker and we did several settlement conferences

21   with her over the years.

22        THE COURT:  Let's not have another dog bite incident

23   to try to promote you to settle.  Now obviously you have a

24   right to a decision, and I will give you a decision.  And

25   sometimes I can do it very quickly and sometimes it's harder.

N1Q1KLEC

1    It's not an excuse, but the volume of evidence that was dumped

2    in —- and I don't use that pejoratively, it was nonjury and I

3    invited it in a sense, by doing it the way we did it —- is

4    huge, and it takes a lot of uninterrupted time to get my head

5    around all of it, and every time I get distracted on some other

6    emergency for a week, I've taken two steps forward and I take

7    one and a half back.  And I acknowledge that it would have been

8    better if I had gotten this done a long time ago.  I'm furious

9    with myself over it.  But that's not getting it done.  So I'm

10   working away.

11            MR. BROOK:  Thank you, your Honor.  And certainly if

12   there's anything the parties can do to assist your Honor, we're

13   open to that.  And my clients are even open to -- I know this

14   is a very unusual thing I'm about to say.  If your Honor has

15   any particular issues that are creating trouble, we would

16   consider dropping --

17            THE COURT:  It's not the law that's giving me any

18   problems here.  I can handle the law of the state of New York.

19            MR. BROOK:  All right.

20            THE COURT:  Okay.  Mr. Santoro, anything else?

21            MR. SANTORO:  Nothing, your Honor.  Thank you.

22            THE COURT:  Okay.  Thank you.

23            MR. BROOK:  Thank you.

24                              o0o

25