# **<u>Exhibit 2</u>**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
DANIEL KLEEBERG, et al.,

                               Plaintiffs,

       – against –

WENDY EBER, in her individual capacity and as
Executrix u/w/o Lester Eber, et al.,

                               Defendants,

         – and –                                                       16-cv-9517 (LAK)

EBER BROS. & CO., INC., et al.,

                               Nominal Defendants,

         – and –

CANANDAIGUA NATIONAL BANK & TRUST
COMPANY,

                             Intervenor Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## OPINION

Appearances:

                           Brian C. Brook
                           *Attorney for Plaintiff*

                           Kevin P. Mulry
                           Frank T. Santoro
                           FARRELL FRITZ, P.C.

                           Paul Francis Keneally
                           Colin D. Ramsey
                           Jillian K. Farrar
                           UNDERBERG & KESSLER LLP

                           John S. Herbert
                           HERBERT LAW

                           *Attorneys for Defendants Wendy Eber in her*
                           *individual capacity and as Executrix of the Estate of*
                           *Lester Eber and for Defendant Alexbay, LLC*

                           Donald W. O'Brien, Jr.
                           WOODS OVIATT GILMAN LLP
                           *Attorneys for Intervenor Defendant*

*Table of Contents*

Facts – The Cross-Motions for Summary Judgment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
    A.    The Facts and the Parties' Positions on the Partial Summary Judgment Motions
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
        I. Allen Eber's Will and the Testamentary Trust . . . . . . . . . . . . . . . . . . . . . . . 3
        II. The Corporate Structure of the Eber Entities . . . . . . . . . . . . . . . . . . . . . . . . 4
            a. EB&C . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
            b. EBWLC. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
            c. Eber Metro . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5
            d. Eber-CT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
        III. Lester Eber's, Gumaer's, and Wendy Eber's Roles Within the Eber Entities
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        IV. Lester's Non-Competition and Consulting Agreement with Southern Wine and
            Spirits of America, Inc. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7
        V. Lester's Loans and Demand for Payment by the New York State Teamsters
            Conference Pension and Retirement Fund . . . . . . . . . . . . . . . . . . . . . . 10
        VI. Alexbay's Foreclosure Action Against EBWLC and Eber Metro . . . . . . . . 12
        VII. Continuing Liability to the Teamsters Fund, Subsequent Transactions, and
            Wendy's Promotions Within the Eber Entities. . . . . . . . . . . . . . . . . . . . 13
        VIII. The EBWLC Retirement Plan and Pension Benefit Guaranty Corporation Law
            Suit and the Commencement of the Instant Action . . . . . . . . . . . . . . . 14
        IX. The 2017 Issuance of EBWLC Voting Preferred Shares of Stock to Lester Eber
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15
        X. The Surrogate's Court Order and the Termination of the Trust. . . . . . . . . . . 15
        XI. CNB's Proposed Distributions and the Transfer Restriction on the EB&C Stock
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17
        XII. Plaintiffs Dismiss CNB from the Instant Action with Prejudice, Lester Seeks to
            Acquire All Remaining Shares of EB&C Voting Stock by Invoking EB&C's
            Transfer Restriction, and Plaintiffs Supplement Their Second Amended
            Complaint . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
    B.    The Partial Summary Judgment Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19
    C.    The Trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22
    D.    The Belated Jurisdictional and Res Judicata Defenses . . . . . . . . . . . . . . . . . . . 22

Analysis and Additional Findings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    A.    Jurisdiction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
    B.    General Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        1.    Breach of Trust Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
        2.    Derivative Claims . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
        3.    Aiding and Abetting . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        4.    The Corporate Opportunity Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . 30
        5.    The Faithless Servant Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    C.    Self-Dealing Transactions Void Under the No Further Inquiry Rule . . . . . . . . . 34
        1.    Plaintiffs Own Two-Thirds of EB&C. . . . . . . . . . . . . . . . . . . . . . . . . . . 34
        2.    Lester's Diversion to His Own Benefit of Over $5 Million from Southern

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>38</u>
        a.    The Background – Lester's Expansion of the Business . . . . . . . <u>38</u>
        b.    The Initial Southern Approach . . . . . . . . . . . . . . . . . . . . . . . . . . <u>39</u>
        c.    The Southern Asset Purchase and Lester's 2007 "Consulting" Agreement and Non-Compete . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>41</u>
        d.    Lester's "Consulting" Agreement Is Void Under "No Further Inquiry" . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>44</u>
        e.    The Southern "Consulting" Arrangement and Non-Compete Was a Corporate Opportunity Usurped by Lester . . . . . . . . . . . . . . . <u>48</u>
    3.    Lester's Fraudulent Acquisition of Eber Metro – the June 2012 Alexbay Foreclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>50</u>
        a.    Lester Was Enriched Unjustly by the Alexbay Foreclosure . . . . . <u>52</u>
            i.    The Purported 2006 Notes . . . . . . . . . . . . . . . . . . . . . . . <u>53</u>
            ii.    The LOC Note Was Not a Valid Debt of the Eber Companies . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>58</u>
            iii.    Valuation of Eber Metro as of June 5, 2012 . . . . . . . . . . <u>62</u>
    4.    The $400,000 Harris Beach Assignment Is Not a Valid Debt of EBWLC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>65</u>
        a.    The Harris Beach Litigation and Assignment of Claims . . . . . . <u>65</u>
        b.    Litigation with PBGC . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>67</u>
        c.    The Harris Beach Settlement Constituted Self-Dealing by Lester . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>70</u>
    5.    Lester's April 2012 Employment Contract Is Set Aside . . . . . . . . . . . . <u>72</u>
    6.    The 2017 Issuance of EBWLC Voting Preferred Shares to Lester Is Void . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>74</u>
D.    Other Transactions Set Aside . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>77</u>
    1.    The Polebridge Transaction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>77</u>
    2.    Post-Foreclosure Transactions . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>85</u>
        a.    Slocum Maine Transfer to Wendy and Lester . . . . . . . . . . . . . . <u>85</u>
        b.    Wendy's Employment Agreement and Receipt of Eber Metro Shares . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>87</u>
E.    The Faithless Servant Doctrine Requires Disgorgement of Defendants' Compensation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>89</u>
F.    Punitive Damages . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>92</u>
G.    Equitable Relief Pending Entry of Final Judgment . . . . . . . . . . . . . . . . . . . . . . <u>94</u>
Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . <u>96</u>

1

Lewis A. Kaplan, *District Judge*.

Sadly, disputes concerning family businesses can poison relationships, sometimes for generations, and dissipate family assets. This case exemplifies the point.

Allen Eber – who died more than 50 years ago – founded a successful business. He and his wife had one son, Lester, and two daughters. Eventually, the ownership of the business wound up in a testamentary trust created under Allen's will for the equal benefit of Lester, Lester's sisters, and their respective heirs. Lester, the family lawyer Elliott Gumaer, and a bank were the trustees, and Lester ran the business.

Allen, his wife, and all three of their children now are deceased. This lawsuit is a battle between Lester's sole heir, daughter Wendy, both in her own right and as Lester's executrix, and Wendy's cousins. The cousins, who are the plaintiffs, claim that their uncle Lester and, in time, their cousin Wendy engaged in extensive self-dealing and other misconduct in breach of their duties as officers and directors of the family company and its subsidiaries and, in the case of Lester, his duties as a trustee of the testamentary trust.[1] Indeed, they already have prevailed on a motion for partial summary judgment as to liability with respect to what perhaps is their most important self-dealing claim concerning Lester's actions. They here seek extensive legal and equitable relief against the estate as well as Wendy.

---

[1] The late Mr. Gumaer and the final institutional trustee originally were sued as well. Plaintiffs' claims against the late Mr. Gumaer and the institutional trustee, Canandaigua National Bank & Trust Company ("CNB"), have been resolved by agreement. CNB, however, has found itself subjected to competing demands by the remaining parties and so has intervened and been aligned as a nominal defendant. Dkt 237. It does not seek any relief against the remaining parties, none of which seeks any relief against it.

Unfortunately, the span of years covered by this decision is long[2] and some of the transactions challenged and the contexts in which they occurred are complex. But there is a common thread – Lester, and then Lester's daughter Wendy, repeatedly took, or tried to take, whatever economic value they thought they could get out of the family business to the detriment of the beneficial owners of two-thirds of that business whose interests they were bound to protect.

The parties have been battling in this Court for years now. This is the Court's decision after trial.

### Facts – The Cross-Motions for Summary Judgment

Despite the duration and complexity, and the fact that the parties' cross-motions for partial summary judgment were denied in many respects, there is a great deal that is not at issue. That is so because Magistrate Judge Katharine H. Parker, who decided those motions,[3] rendered careful and detailed rulings which largely set out the context and many of the transactions in

---

[2]

Defendants pleaded the statute of limitations in their amended answer to the third amended complaint. Dkt 241, at 4. They subsequently moved for partial summary judgment seeking dismissal of a number of plaintiffs' claims on that basis. Dkt 262-35, at 26-27. But they withdrew the limitations argument before the motion was decided. Dkt 270. They did not mention any limitations defense in the Joint Pretrial Order. Dkt 356. Nor did they argue at trial or in their post-trial briefing that any of plaintiffs' claims is time barred. Tr. 499-525; Dkt 426; Dkt 427. Accordingly, the limitations defense has been waived. *See Fisher v. Vassar Coll.*, 70 F.3d 1420, 1452 (2d Cir. 1995) ("Whatever the merits of this argument, the statute of limitations is an affirmative defense and can be waived"); *see also Olin Corp. v. Lamorak Ins. Co.*, 332 F. Supp. 3d 818, 874 (S.D.N.Y. 2018) ("To the extent [defendant] believes an affirmative defense forecloses some or all of [plaintiff]'s claims, [defendant] bears the burden of establishing that such a defense applies"); *id.* (granting summary judgment for plaintiff on defendant's affirmative defenses, including a statute of limitations defense, because "[i]n its ample briefing, [defendant] has not directed the Court to any evidence in the record substantiating any of its affirmative defenses").

[3]

The parties consented to the magistrate judge doing so on the merits rather than preparing a report and recommendation. Dkt 271; Dkt 313, at 3.

question.  Accordingly, the Court begins by quoting a substantial portion of the exposition of the facts that is contained in her first decision as a means of setting the stage for what will follow.[4] Next, it summarizes the magistrate judge's rulings on the summary judgment motions to the extent they remain material.

With that background, this Court then proceeds to its own analysis of the issues that were tried.  That section of this opinion contains this Court's additional findings of fact on the material questions presented.  To whatever extent, if any, those findings differ from factual statements in Judge Parker's decisions, as distinguished for example from her description of the parties' claims, this Court's own findings of course control.  It is this Court's findings that are based on its view of the trial evidence, including its view of the credibility of the witnesses and of the appropriate inferences to be drawn on the trial record, which is not identical to the record that was before Judge Parker on the motions.

A.      *The Facts and the Parties' Positions on the Partial Summary Judgment Motions*[5]

### I. Allen Eber's Will and the Testamentary Trust

Allen Eber founded EB&C, including its wine and liquor distribution business. (Dkt. No. 265 ("Pls.' Rule 56 Statement") ¶ 1.) He died in 1970 and his last will and testament (the "Allen Eber Will" or "Will") provided for the creation of a testamentary trust to hold his residuary estate, including

---

[4]

The Court notes that the Second Circuit on occasion has done essentially the same thing, quoting at length from a district court's statement of facts below.  *Chevron Corp. v. Berlinger*, 629 F.3d 297, 300-04 (2d Cir. 2011) (quoting *In re Chevron Corp.*, 709 F. Supp.2d 283, 285-89 (S.D.N.Y. 2010)).  In this opinion, the lengthy quotation from the magistrate judge's first opinion is indented further from the left margin than the rest of this decision and presented in a different font.

[5]

Dkt 314, at 4-25 (footnotes omitted except where presented in brackets).

all of the controlling stock for EB&C (the "Trust"). (*Id.*; Dkt. No. 266-8 ("Brook Decl. in Supp.") Ex. 132 (the "Will").) The Will stated that it was Allen Eber's "wish that [his] voting control of [EB&C] can be retained and, subject to that primary wish, . . . that [his] interests in certain other close corporations can also be retained and that [his] son, Lester [Eber], may have an opportunity to participate in the management thereof." (Will § 11.)

The Allen Eber Will nominated three trustees to manage the Trust: Lester Eber; Allen Eber's attorney, Elliott W. Gumaer, Jr. ("Gumaer"); and Marine Midland Trust Company, a bank. (*Id.* § 12.) M&T Bank subsequently replaced Marine Midland Trust Company as co-trustee, and CNB replaced M&T Bank in July of 2007. (Pls.' Rule 56 Statement ¶ 4.) The Will provided that the Trust assets would transfer to the Trust beneficiaries per stirpes, that is, "[p]roportionately . . . according to their deceased ancestor's share." Black's Law Dictionary (11th ed. 2019); (*see also* Will § 9.) Allen Eber's three children, Mildred Eber Boslov, Sally Eber Kleeberg, and Lester Eber, were the original beneficiaries of the Trust and each held a one-third "equal" interest in the Trust. (Will § 9.) When Mildred Eber Boslov died in 1973, her only child, Plaintiff Audrey Hays, became a one-third beneficiary of the Trust. (Pls.' Rule 56 Statement ¶ 2.) When Sally Kleeberg passed away in 2014, her two children, Plaintiffs Daniel Kleeberg and Lisa Stein, each became a beneficiary of the Trust, each holding a one-sixth interest in the Trust. (*Id.*)

Under the terms of the Will, the Trust could be terminated in one of two ways. The Trust would automatically terminate upon the death of the last of Allen Eber's three children. In the alternative, the Will provided that the Trust could be terminated if "all, or substantially all, [the] stock of [EB&C] . . . [was] sold." Such a decision to terminate the Trust early would be made at the "absolute discretion" of the Trustees. (Will § 9.)

## II. The Corporate Structure of the Eber Entities

### a. EB&C

EB&C is a New York corporation. (Pls.' Rule 56 Statement ¶ 8.) In their Third Amended Complaint ("TAC"), Plaintiffs represented that EB&C functions primarily as a holding company. (Dkt. No. 236 ("TAC") ¶¶ 26, 29.) EB&C's capital structure is comprised of three classes of shares: Class A Common Shares (Voting); Class B Common Shares (Nonvoting); and 6% Non-Cumulative Preferred Shares (Nonvoting). As of February 2017, the

Trust held the following shares of EB&C stock registered in the name of the Trustees: 1,850 Class A Voting Shares; 290 Class B Nonvoting Shares; 2,000 6% Preferred Nonvoting Shares. (Pls.' Rule 56 Statement ¶ 8; Brook Decl. in Supp. Ex. 134 ("EB&C Stock Certificates"); *see also* Dkt. No. 262-21 ("Wendy Eber Aff. in Supp. Ex. A").) It appears that these shares are still registered under the names of the Trust's former co-trustees. (Pls.' Rule 56 Statement ¶ 8; *see also* EB&C Stock Certificates.) The parties contend that the only other registered shareholders of EB&C at any time over the last 20 years have been Lester Eber and Sally Kleeberg, with each holding 100 shares of Class B Nonvoting Common Shares. (Pls.' Rule 56 Statement ¶ 8; Wendy Eber Aff. in Supp. Ex. A; Brook Decl. in Supp. Ex. 11.)

### b. EBWLC

EBWLC is a direct subsidiary of EB&C. (Pls.' Rule 56 Statement ¶ 9; Dkt. No. 277-8 ("Eber Defs.' Rule 56 Counterstatement") ¶ 9; Wendy Eber Aff. in Supp. Ex. A; Brook Decl. in Supp. Ex. 11.) Plaintiffs represented in the TAC that EBWLC is a New York corporation and, like EB&C, operates as a holding company. (TAC ¶¶ 27, 29.) Plaintiffs also allege that EBWLC is the sole owner of nominal defendant Eber Bros. Acquisition Corp. ("Eber Acquisition"), a New York corporation that maintained its principal place of business in Rochester, New York. (*Id.* ¶ 32.)

Plaintiffs contend that, until at least February 2017, EB&C directly held all of EBWLC's voting shares. (Pls.' Rule 56 Statement ¶ 9; Brook Decl. in Supp. Ex. 11.) They also maintain that, prior to February 2017, the Trust held at least some of EBWLC's nonvoting common and preferred shares of stock. (*Id.*) For their part, the Eber Defendants contend that EBWLC was a wholly-owned subsidiary of EB&C. (Eber Defs.' Rule 56 Counterstatement ¶ 9; Wendy Aff. in Supp. Ex. A.)

### c. Eber Metro

Eber Metro was a wholly-owned subsidiary of EBWLC until June 5, 2012, when all 20,000 shares of Eber Metro stock were transferred to Lester Eber's company, Alexbay. (Pls.' Rule 56 Statement ¶¶ 10, 61; Eber Defs.' Rule 56 Counterstatement ¶ 10.) Plaintiffs represent that, like EB&C and EBWLC, Eber Metro also is primarily a holding company without its own business operations. (TAC ¶ 29.) Plaintiffs also aver that Eber Metro is the sole owner of nominal defendants Eber-Rhode Island, LLC ("Eber-RI") and Eber-Metro, LLC ("Eber-NDC"). (*Id.* ¶¶ 31, 33.) Plaintiffs contend that both Eber-RI and Eber-NDC are Delaware limited liability companies, and

Eber-RI was registered to do business in New York. (*Id.*)

### d. Eber-CT

Eber-CT is Delaware limited liability company that operates as a wine and liquor distributorship in Connecticut. (Pls.' Rule 56 Statement ¶ 11; Eber Defs.' Rule 56 Counterstatement ¶ 11.) Out of all the Eber Entities, it is the sole operating business. (Pls.' Rule 56 Statement ¶ 70; Eber Defs.' Rule 56 Counterstatement ¶ 70.)

Eber-CT conducts business under the trade name Slocum & Sons. [Footnote here states that while Eber-CT does business as Slocum & Sons, the decision refers to the company as Eber-CT.] (Pls.' Rule 56 Statement ¶ 11; Eber Defs.' Rule 56 Counterstatement ¶ 11.) The Slocum & Sons distributorship was the result of a 2005 merger between Slocum & Sons, Inc. and Eber-CT. (Pls.' Rule 56 Statement ¶ 11.) At the time of the merger, Eber-CT was a wholly owned subsidiary of Eber Metro. (*Id.*) As part of the 2005 merger, Eber Metro acquired a call option to acquire Slocum & Sons of Maine, Inc. ("Slocum Maine") at an exercise price of $10. (*Id.* ¶ 15.)

Eber-CT remained a wholly owned subsidiary of Eber Metro until 2008, when Eber Metro sold 15 percent of its interest in Eber-CT to a company named Eder-Goodman, LLC for consideration that included a $4.5 million payment to Eber Metro. (*Id.* ¶¶ 11-12; Eber Defs.' Rule 56 Counterstatement ¶¶ 11-12.) Eder-Goodman also acquired a right of first refusal on any further sales by Eber Metro of Eber-CT stock, allowing it to purchase the stock for itself on the same terms that were offered. (Pls.' Rule 56 Statement ¶¶ 11-12.)

Eber Metro retained an 85 percent interest in Eber-CT until 2010, when Eber Metro transferred six percent of its remaining interest in Eber-CT to Polebridge Bowman Partners, LLC ("Polebridge") in exchange for a $350,000 non-recourse promissory note with two percent interest (the "Polebridge Transaction"). (Pls.' Rule 56 Statement ¶¶ 13-14; Brook Decl. in Supp. Ex. 14 ("Polebridge Stock Purchase Agreement").) Eder-Goodman declined to exercise its right of first refusal in connection with this transfer. (Pls.' Rule 56 Statement ¶ 13.) At the time of the transfer, Polebridge was solely owned by Glenn Sturm, an attorney who sometimes advised Lester and Wendy Eber and the Eber Entities. (*Id.* ¶ 63; *see also* Polebridge Stock Purchase Agreement.) Following the Polebridge Transaction, Eber Metro retained a 79 percent interest in Eber-CT. When Eber Metro was transferred to Alexbay on June 5, 2012, that transfer included Eber Metro's

79 percent interest in Eber-CT. (*See* Pls.' Rule 56 Statement ¶¶ 10, 61.)

### III. Lester Eber's, Gumaer's, and Wendy Eber's Roles Within the Eber Entities

Lester Eber wore many hats within the Eber Entities. He was President of EB&C from before 2000 until his death in April 2020; President of EBWLC from prior to 2000 until at least February 1, 2012; President of Eber Metro from prior to 2000 until his death; and Chief Executive Officer of Eber-CT from at least 2008 until his death. (*Id.* ¶ 23.) At all times that Lester was an officer, he was also a director. And, in the case of Eber-CT, he was Chairman of the Board of Managers. (*Id.*) Lester also served as co-trustee of the Trust from the time of Allen Eber's death in 1970 until the Trust was terminated in 2017. (*Id.* ¶¶ 4, 23.)

Like Lester, Gumaer carried out many roles within the Eber Entities. He was a director of EB&C, EBWLC, and Eber Metro from before 2000 through at least the end of 2013. (*Id.* ¶ 17.) He also served as co-trustee of the Trust from the time of Allen Eber's death in 1970 until the Trust was terminated in 2017. Plaintiffs contend that Gumaer was also Lester and Wendy's personal attorney. (*Id.* ¶ 18.)

The parties dispute the role Wendy Eber played within EBWLC. Defendants contend that Wendy Eber was CFO and Secretary of EBWLC from approximately 2007 until 2012, at which time she became President. (Dkt. No. 278 ("Eber Defs.' Rule 56 Statement") ¶ 11.) Plaintiffs contend that Wendy was a director and officer of the company from 2008 through 2013, but that she was never President of the company because her appointment to the position of President by Lester was a "sham." (*Id.*) Wendy is the current President of Eber-CT. (Eber Defs.' Rule 56 Statement ¶ 12.)

### IV. Lester's Non-Competition and Consulting Agreement with Southern Wine and Spirits of America, Inc.

In or about October 2004, Southern Wine and Spirits of America, Inc. ("Southern"), a national wine and liquor distributorship, entered the New York market. (Eber Defs.' Rule 56 Statement ¶ 18.) Southern subsequently solicited and hired approximately 20 of EBWLC's salespeople. In response, EBWLC sued Southern and its former employees in New York State Supreme Court for, among other things, tortious interference, inducement of breach of fiduciary duty, unfair competition, and

interference with prospective business advantage. It also sought a preliminary injunction against Southern. (Dkt. No. 262-1 ("Lester Eber Aff. in Supp.") ¶ 15; *see also* Lester Eber. Aff. in Supp. Ex. E.)

EBWLC's application for a preliminary injunction was denied, and EBWLC and Southern ultimately settled the action (the "Southern Settlement Agreement"). (*Id.*; *see also* Eber Defs.' Rule 56 Statement ¶¶ 19-22.) Pursuant to the Settlement Agreement, entered into in or about July and August of 2007, Southern agreed to pay EBWLC millions of dollars and, in exchange, EBWLC agreed to sell its holdings located in Delaware and Ohio and cease operations in New York. (Pls.' Rule 56 Statement ¶ 25; Brook Decl. in Supp. Ex. 154; *see also* Lester Eber Aff. in Supp. Ex. F.) Eber-CT, however, was permitted to continue operating in Connecticut. According to the documents submitted by the parties, EB&C's board of directors approved the Settlement in or about August 28, 2007. (*See* Brook Decl. in Supp. Ex. 154.)

Southern hired Lester as a consultant and lobbyist effective August 30, 2007 (the "Southern Consulting Agreement"). (Pls.' Rule 56 Statement ¶ 24; Brook Decl. in Supp. Ex. 27 ("Southern Consulting Agreement"); Lester Eber Aff. in Supp. Ex. F.) Under the Agreement, Lester was paid $600,000 in his individual capacity annually for five years. (Pls.' Rule 56 Statement ¶ 28; Southern Consulting Agreement § 4.) As part of the Agreement, Lester entered into a restrictive covenant that prohibited him from competing against Southern in any state where Southern operated, including New York, for five years. (Pls.' Rule 56 Statement ¶ 29; Southern Consulting Agreement § 6.) Thus, from August 2007 through August 2012, Lester served as a consultant for Southern while continuing to serve in his various roles at the Eber Entities – President of EB&C, President of EBWLC (until February 1, 2012), President of Eber Metro, Chief Executive Officer of Eber-CT (beginning in 2008), and director for the various Eber Entities. (Pls.' Rule 56 Statement ¶ 23.)

The parties dispute whether the Eber Entities had fully ceased operations in New York at the time Lester negotiated the Southern Consulting Agreement and began working as a consultant and lobbyist for the Southern. However, it is undisputed that the Southern Settlement Agreement required that the Eber Entities stop doing business in New York. (Pls.' Rule 56 Statement ¶ 27; Eber Defs.' Rule 56 Statement ¶ 25.) Defendants contend that EBWLC and Eber Metro laid off all their employees and ceased operating in New York prior to August of 2007. (Eber Defs.' Rule 56 Statement ¶ 25.) However, Plaintiffs maintain that

EBWLC had employees through at least the end of 2007, and that certain documents, such as W-2's and payroll statements, show that the EBWLC had employees through as late as July 2008. (Dkt. No. 280 ("Brook Decl. in Opp'n") Ex. 168.) The Southern Consulting Agreement was not authorized by the board of directors of any Eber company or consented to by the co-trustees of the Trust. (Pls.' Rule 56 Statement ¶ 35.) Plaintiffs contend that Lester had previously performed consulting and lobbying work on behalf of the Eber Entities. (Eber Defs.' Rule 56 Statement ¶ 26.)

At his deposition, Lee F. Hager, Southern's Executive Vice President and witness pursuant to Federal Rule of Civil Procedure 30(b)(6), testified that Southern sought to hire Lester, in part, due to Lester's personal contacts with the governmental authorities involved in regulating liquor sales and distribution in New York State and his knowledge of the governing regulations. (Brook Decl. in Supp. Ex. 181 ("Hager Dep. Tr.") 36:11-37:12, 41:16-43:02.) He also explained that Southern hired Lester because it did not want Lester to interfere with Southern's "brand building and . . . selling ways," and wanted advice from a "neutral source." (Id. at 38:01-04, 40:40-41:01.) Additionally, Hager stated that Southern entered into the Consulting Agreement with Lester on an individual basis because Southern did not want to be tied to a corporation for a consulting contract for "personal" services. (Id. at 43:23-44:09.) When Plaintiffs' counsel asked Hager if Southern would have agreed to pay one of the Eber Entities instead of Lester pursuant to the Consulting Agreement (id. at 69:14-18), Hager responded that, "[S]ubject to whatever my attorneys might have said, I would have objected vehemently. . . . Call me myopic if you want, after a business is done, it's done. We deal with the individual." (Id. at 69:20-22, 70:23-25.)

At the time EBWLC ceased operations, it was in debt to its primary lender, Wells Fargo, and owed approximately $130 million. (Lester Eber Aff. in Supp. ¶ 26; Eber Defs.' Rule 56 Statement ¶ 23.) In March of 2007, Wells Fargo had put EBWLC's loans into default and classified the loans as a "workout," freezing all of EBWLC's working capital in order to pay down the outstanding loans. (Id.) After the Wells Fargo loans were paid off, Wells Fargo declined to extend any further credit to any Eber Entity. (Eber Defs.' Rule 56 Statement ¶ 23.)

After the Eber Entities ceased operations in New York, Eber-CT continued operating in Connecticut. (Lester Eber Aff. in Supp. ¶ 18; Wendy Eber Aff. in Supp. ¶ 9.) The parties dispute whether Eber-CT suffered from financial problems between 2008 through 2012, and whether there were

any third-party lenders willing to provide debt financing to Eber-CT. (Lester Eber Aff. in Supp. ¶ 27.)

**V. Lester's Loans and Demand for Payment by the New York State Teamsters Conference Pension and Retirement Fund**

While serving as an officer and director of the Eber Entities and co-trustee of the Trust, Lester made personal loans to the Eber Entities. Defendants contend that in October 1, 2002 and August 15, 2005, Lester loaned EBWLC $2,079,645.00, and that the note was amended and restated on March 13, 2006. (Eber Defs.' Rule 56 Statement ¶ 28.) Plaintiffs dispute the amounts of these loans, and contend that Defendants have produced no documents, such as the underlying notes, showing that these loans were actually made. (*Id.*; *see also id.* ¶ 35.)

By letter dated January 10, 2008, shortly after EBWLC ceased operations and laid off its employees, the New York State Teamsters Conference Pension and Retirement Fund (the "Teamsters Fund") advised that EBWLC had incurred an employer withdrawal liability under the Employee Retirement Income Act of 1974 ("ERISA") in connection with its cessation of operations. (Wendy Eber Aff. in Supp. Ex. G, 1.) The Teamsters Fund contended that EBWLC had withdrawal liability totaling $2,212,367.47, and demanded payment of the entire amount within 60 days or, in the alternative, the payment of monthly installments. (*Id.*)

The Eber Defendants represent that, in or about October of 2009, Lester executed a $1.5 million Line of Credit Note with Eber Metro providing Eber Metro with a revolving line of credit that did not require security for potential losses (the "October Line of Credit Note"). (Eber Defs.' Rule 56 Statement ¶ 28; Brook. Decl. in Supp. Ex. 13.) Lester executed a similar line of credit note with EBWLC and Eber Metro in or about February 26, 2010 (the "February 2010 Line of Credit Note"). (Brook. Decl. in Supp. Ex. 16.) On the same day the February 2010 Line of Credit Note was executed, EBWLC and Eber Metro executed a security agreement (the "Security Agreement") with Lester that securitized the February 2010 line of credit note against assets owned by EBWLC and Eber Metro. (Brook Decl. in Supp. Ex. 15.) Wendy signed the Agreement on behalf of EBWLC and Eber Metro. (*Id.*) That same day, EBWLC also executed a guaranty with Lester (the "Guaranty") pledging EBWLC's interest in Eber Metro as collateral for the February 2010 Line of Credit Note. (Brook Decl. in Supp. Ex. 140.) Wendy signed the Guaranty on behalf of EBWLC. (*Id.*)

In or about April 2, 2010, after the Line of Credit Notes were executed and the collateral pledged, Lester sent letters to Audrey Hays and Sally Kleeberg explaining that the Eber Entities were struggling financially and stating that Lester had personally made loans to the Entities to keep them afloat. (Eber Defs.' Rule 56 Statement ¶ 30.) Lester enclosed unsigned and undated copies of the 2010 Line of Credit, Security Agreement, and Guaranty with the Letters. (Lester Eber Aff. in Supp. Ex. J.) In the letters, Lester offered Audrey and Sally the opportunity to participate in the Line of Credit Note on a one-third basis. Both declined to participate. (*Id.* ¶ 32.)

The parties dispute whether the Eber Entities (that is, Eber-CT as the only operating entity remaining) continued to perform poorly through 2012. Plaintiffs believe Eber-CT was doing well and making a profit, whereas the Eber Defendants contend that the Eber Entities were insolvent. (*Id.* ¶ 33; Lester Eber Aff. in Supp. ¶ 36; Brook Decl. in Supp. Ex. 127.)

On February 11, 2011, EBWLC, Eber Metro, and Lester entered into an Amended and Restated Security Agreement (the "Amended and Restated Security Agreement") pertaining to the preexisting debt owed by EBWLC and Eber Metro to Lester. (Brook Decl. in Supp. Ex. 18.) Wendy signed on behalf of EBWLC and Eber Metro. (*Id.*) That same day, EBWLC, Eber Metro, and Lester also entered into a Debt Assumption Agreement. (Brook Decl. in Supp. Ex. 17 ("Debt Assumption Agreement"); *see also id.* Ex. 13.) Wendy signed on behalf of EBWLC and Eber Metro. (*Id.*) On August 18, 2011, Gumaer and Richard Hawks of CNB, in their capacity as cotrustees, ratified Lester's loans and the Security Agreement and Lester abstained from the vote. (Dkt. No. 277-1 ("Lester Eber Aff. in Opp'n") ¶ 12; *see also id.* Ex. A.)

Eber Metro did not repay Lester the sums due under the Line of Credit Note and Debt Assumption Agreement by December 31, 2011, the maturity date for the 2009 $1.5 line of credit note. (Pls.' Rule 56 Statement ¶ 38; Eber Defs.' Rule 56 Counterstatement ¶ 38; Eber Defs.' Rule 56 Statement ¶ 34.) Defendants contend that, by the end of 2011, the outstanding principal and accrued, and unpaid interest on Lester's loans totaled over $3.6 million. Plaintiffs dispute this amount and argue that, while the Eber Defendants have submitted documents showing that Lester appears to have loaned the Eber Entities $1,571,037.48, they have failed to provide documents showing that Lester made loans to EBWLC in October 1, 2002 and August 15, 2005 totaling over $2 million. (Eber Defs.' Rule 56 Statement ¶ 35.) On January 18, 2012, Lester assigned his interest

in $3.6 million in loans to a company he created at about that time, Alexbay. (*Id*. ¶¶ 28, 35.) Lester was the sole owner of Alexbay until his death. (*Id*. ¶ 37.)

## VI. Alexbay's Foreclosure Action Against EBWLC and Eber Metro

On February 21, 2012, Alexbay filed an action in New York State Supreme Court, Monroe County pursuant to U.C.C. § 9-620 and § 9-627, seeking a judicial determination that Alexbay's acceptance of all of EBWLC's ownership interest in Eber Metro – and Eber Metro's 79 percent ownership interest in Eber-CT – in full satisfaction of the loans then held by Alexbay, was "commercially reasonable" (the "Foreclosure Action"). (*Id*. ¶ 40.) Neither the Trust nor any Trust beneficiary was named in or served with notice of the Foreclosure Action. (Pls.' Rule 56 Statement ¶ 53.)

In its pleadings, Alexbay contended that the proposed transfer of Eber Metro and its interest in Eber-CT to Alexbay for elimination of the debt owed by Eber Metro to Alexbay was "commercially reasonable." (*Id*. ¶ 54.) Alexbay valued Eber Metro's 79 percent interest in Eber-CT at $3,660,000, and based this valuation on the price set in the 2010 Polebridge Transaction, which Alexbay described as an "arms' length transaction." (*Id*.; Brook Decl. in Supp. Ex. 44.)

The Eber Defendants allege that Lester Eber resigned from EBWLC on or about February 28, 2012, and that his resignation was retroactive and effective as of February 1, 2012 (that is, prior to Alexbay's filing of the Foreclosure Action on the loans). (*Id*. ¶ 56; Brook Decl. in Supp. Ex. 77.) On March 9, 2012, Marino Fernandez, the attorney representing EBWLC and Eber Metro in the Foreclosure Action, signed a stipulation stating that: "the Eber Bros. Defendants have no objection to the relief requested by Plaintiff in this proceeding and release any claim to the Collateral as defined in the Complaint or any proceeds thereof." (Brook Decl. in Supp. Ex. 159.) Minutes from Board meetings subsequently held by EBWLC and Eber Metro state that EBWLC decided to waive its defenses in the Foreclosure Action to avoid expending additional resources defending the suit. (Pls.' Rule 56 Statement ¶¶ 57-58.) Then, on May 11, 2012, Justice Matthew A. Rosenbaum of the New York Supreme Court, Monroe County, issued an order stating: the "part of Plaintiff's Motion seeking a determination that Alexbay's acceptance of certain collateral in full satisfaction of Eber Bros' obligation is, 'Commercially Reasonable' under the Uniform Commercial Code is GRANTED . . . ." (Lester Eber Aff. in Supp. Ex. M, 3.) The Order specified that the term "commercially reasonable"

was used as defined in the U.C.C. (*Id.*); *see also* U.C.C. § 9-627 (determination of whether conduct was commercially reasonable).

The transfer of Eber Metro to Alexbay was finalized on June 5, 2012, and on that date, all 20,000 shares of Eber Metro stock were registered in Alexbay's name on a certificate signed by Lester as President and Wendy as Vice President of Eber Metro. (Pls.' Rule 56 Statement ¶ 61; Brook Decl. in Supp. Ex. 62.) On June 6 and 9, 2012, Wendy and Gumaer, respectively, formally consented on behalf of EBWLC to "transfer and deliver to Alexbay all of its ownership interest in [Eber] Metro in full satisfaction of [EBWLC's] Obligations to Alexbay . . . ." (Brook Decl. in Supp. Exs. 61 and 63.) EBWLC's only remaining asset following the transfer of Eber Metro to Alexbay was less than $3,000 in cash. (Pls.' Rule 56 Statement ¶ 70.) EBWLC was also left saddled with the debt it still owed to third-party creditors, including pension obligations to the Teamsters Fund. (*Id.* ¶ 69.)

Neither Sally Kleeberg nor Audrey Hays were informed about Alexbay's proposal to accept the stock of Eber Metro in consideration for the elimination of Eber Metro's debt to Alexbay before its approval in 2012. (*Id.* ¶ 71; Dkt. No. 266-12 ("Hays Decl. in Supp.") ¶ 18.) Nor were they advised of the Foreclosure Action. (*Id.*)

## VII. Continuing Liability to the Teamsters Fund, Subsequent Transactions, and Wendy's Promotions Within the Eber Entities

In July of 2012, Eber Metro exercised the Call Option to acquire Slocum Maine for $10. (Pls.' Rule 56 Statement ¶ 75.) However, Eber Metro did not acquire any assets or stock and, instead, Lester and Wendy Eber each individually received a 50 percent interest in Slocum Maine. (*Id.*)

The parties do not dispute that, as of June 1, 2012, the remaining employer withdrawal liability to the Teamsters Fund of the Eber "controlled group" was approximately $1,421,029.95. (Eber Defs.' Rule 56 Statement ¶ 67.) In August of 2012, Wendy signed a confession of judgment on behalf of EBWLC agreeing to a judgment of $1,421,029.95 against EBWLC by the Teamsters Fund for the remaining underfunded Plan liabilities. (*Id.* ¶¶ 67-68; Wendy Aff. in Supp. Ex. I.) That same month, Lester approved a new employment contract with Wendy in which she was awarded shares in Eber Metro, that vested over time. (Pls.' Rule 56 Statement ¶ 76.) Pursuant to her new employment agreement, signed by Lester, Wendy became the new President of Eber-CT. (*Id.*) Wendy subsequently acquired 2,000 shares (or 9.1 percent) of Eber Metro's stock.

(*Id.*) The Eber Defendants also contend that Wendy was promoted to President of EBWLC at some point in 2012, a contention that Plaintiffs dispute. (Eber Defs.' Rule 56 Statement ¶ 11.)

## VIII. The EBWLC Retirement Plan and Pension Benefit Guaranty Corporation Law Suit and the Commencement of the Instant Action

EBWLC was the Plan Administrator and contributing sponsor of the EBWLC Retirement Plan. (Eber Defs.' Rule 56 Statement ¶ 49; Wendy Eber Aff. in Supp. Ex. E ("PBGC Action Decision and Order").) The Plan required the accrual and payment of pension benefits, and annual contributions to the Plan to fund benefits. (Eber Defs.' Rule 56 Statement ¶ 50.) EBWLC and the members of its "controlled group," including Eber Metro and Eber-CT, were required to make certain minimum annual contributions to the EBWLC Plan. (*Id.* ¶ 51; *see also* PBGC Action Decision and Order 4.) The EBWLC Plan was a "single employer defined benefit plan" subject to the termination insurance program established under ERISA. (Eber Defs.' Rule 56 Statement ¶ 53; *see also* PBGC Action Decision and Order 7.) The Eber Defendants contend that the EBWLC Plan was a "debt" of EBWLC. (Eber Defs.' Rule 56 Statement ¶ 54.)

On August 6, 2014, the Pension Benefits Guaranty Corporation ("PBGC") sought to terminate the EBWLC Plan because it determined that the Plan would be unable to pay benefits once they became due. (*Id.* ¶ 55.) The PBGC subsequently sued EWBLC [sic] in the United States District Court for the Western District of New York and sought "to declare the Plan terminated and to have PBGC appointed as statutory trustee." (PBGC Action Decision and Order 2.) On January 19, 2016, the District Court established April 30, 2010 — a date preceding both the Polebridge Transaction and the transfer of EBWLC's interest in Eber Metro to Alexbay — as the termination date of the EBWLC Retirement Plan, and found that Eber Metro and Eber-CT were in the "controlled group" as of that date. (Eber Defs.' Rule 56 Statement ¶¶ 58, 60; *see also* PBGC Action Decision and Order 4, 16.)

Then, by letter dated March 29, 2016, the PBGC demanded immediate payment for unfunded benefit liabilities and other related amounts. (Wendy Eber Aff. in Supp. Ex. D.) The demand letter advised EBWLC that the PBGC had determined that, as of April 30, 2010, EB&C, EBWLC, Eber Metro, and Eber-CT "constituted a parent-subsidiary controlled group based on (a) [EB&C's] direct ownership of 100% of EBWLC, (b) EBWLC's direct ownership of 100% of Eber Metro, and (c) Eber

Metro's direct ownership of 85% of Eber-CT" and as such, "EBWLC, [EB&C], Eber Metro, and Eber-CT are jointly and severally liable for the ERISA liabilities resulting from the termination of the Plan." (*Id.* at 3.)

On December 9, 2016, Plaintiffs commenced the instant action alleging individual and derivative claims against Lester, Gumaer, CNB, and Wendy. The gravamen of their Complaint was, and remains, that Lester, Gumaer, CNB, and Wendy conspired to divest the Trust and the Eber Entities of their only valuable asset — Eber Metro and its subsidiary Eber-CT — for the sole benefit of Lester and his heirs. (*See* Dkt. No. 1 ("Initial Complaint").)

## IX. The 2017 Issuance of EBWLC Voting Preferred Shares of Stock to Lester Eber

On February 14, 2017, Lester Eber, as President of EB&C and the "holder of all outstanding shares of Class A common stock of [EBWLC]," appointed Wendy Eber the sole director of EBWLC. (Brook Decl. in Supp Ex. 43, 26; *see also* Pls.' Rule 56 Statement ¶ 98.) That same day, Wendy Eber executed a Certificate of Amendment of the Certificate of Incorporation of EBWLC, authorizing the creation of Class B junior preferred stock with voting rights. (Pls.' Rule 56 Statement ¶ 100; Brook Decl. in Supp. Ex. 43, 22-25.) Plaintiffs contend that the Amendment to the Certificate of Incorporation was not approved by a vote of EBWLC's shareholders or by a written consent in lieu of a shareholder meeting. (Pls.' Rule 56 Statement ¶ 99.) Defendants counter that because EB&C was the sole owner of EBWLC, Lester, as President of EB&C, was authorized to approve the amendment. (Lester Eber Aff. in Opp'n ¶ 31.)

The next day, Wendy signed a Resolution on behalf of EBWLC issuing 750 shares of Class B junior preferred stock to Lester in exchange for Lester's "agreement to reimburse the Corporation, at its request, for up to $37,500.00 of expenses incurred or to be incurred by the Corporation in connection with its general operations." (Brook Decl. in Supp. Ex. 43, 21; *see also* Pls.' Rule 56 Statement ¶ 100.) Lester also signed the Resolution. (*Id.*)

## X. The Surrogate's Court Order and the Termination of the Trust

In February of 2016, shortly after the District Court's ruling in the PBGC Action against EBWLC, CNB advised Lester and Gumaer of its desire to petition the Surrogate's Court to terminate the Trust. (Pls.' Rule 56

Statement ¶ 79.) On December 15, 2016, Wendy Eber advised CNB that Lester "would like to move forward with closing the [T]rust, finalizing the accounting of the [T]rust, and acquiring the stock of Eber Bros Wine and Liquor [i]mmediately." (Brook Decl. in Supp. Ex. 153.)

Then, in February of 2017, CNB petitioned the Surrogate's Court in Monroe County to terminate the Trust and to be released from its duties as co-trustee by distributing the remaining assets of the Trust, as specified in its final accounting, to the beneficiaries in accordance with their respective interests in the Trust. (Brook Decl. in Supp. Ex. 135 (the "Surrogate's Court Petition").) CNB sought to terminate the Trust because "the Eber Bros. & Co., Inc. stock ha[d] no (or nominal) monetary value." (Surrogate's Court Petition ¶ 12; see also id. ¶ 16.)

CNB's accounting, submitted in connection with the Petition, included the Trust's shares in EB&C on the list of Trust assets to be distributed to the beneficiaries. (Surrogate's Court Petition 33-34, 40, 73-74.) The accounting also stated that the EB&C stock – comprised of 2,000 shares of six percent non-cumulative stock; 1,850 shares of Class A voting stock; and 290 shares of Class B stock – were worth $0. (Id.) CNB's accounting did not list EBWLC shares of stock. (See id.)

Lester was served with notice of the Petition, in his capacity as both co-trustee and beneficiary of the Trust, but did not join in the Petition. (See id. 2.) Gumaer was also served with notice in his capacity as co-trustee, but declined to join the Petition. (See id.) Lester appeared in the proceeding, through counsel James Vazzana, on or about March 13, 2017. (Pls.' Rule 56 Statement ¶ 82; Brook Decl. in Supp. Ex. 137.) Lester did not object to the termination of the Trust or CNB's proposed accounting. (Pls.' Rule 56 Statement ¶ 83.) Plaintiffs were also served notice, but did not enter an appearance or otherwise object to CNB's petition or accounting. (Id. ¶ 84.) On June 1, 2017, the Surrogate's Court adopted CNB's proposed accounting and granted the Petition. The Court ordered CNB to:

> [P]ay the remaining cash and transfer, assign and deliver the other remaining assets shown in the account as follows (less certain specified fees and commissions):
> 1/3 to Lester Eber $[227,817.22]*
> 1/3 to Audrey Hays $[227,817.22]*
> 1/6 to Daniel Kleeberg $[113,908.61]*
> 1/6 to Lisa Stein $[113,908.61]*
> *Less Woods Oviatt Gilman LLP fees and disbursements - amount

to be determined.

(Brook Decl. in Supp. Ex. 33 ("Surrogate's Court Order") 6.)

## XI. CNB's Proposed Distributions and the Transfer Restriction on the EB&C Stock

After the Surrogate's Court issued its Order terminating the Trust, CNB sent the Trust beneficiaries, Plaintiffs and Lester, its proposed final distribution. Plaintiffs contend, and the Eber Defendants do not dispute, that Lester received his share of the Trust's cash and marketable securities, as outlined in CNB's proposed distribution. (Pls.' Rules 56 Statement ¶ 93.) CNB communicated with the same attorney who represented Lester in the Surrogate's Court Proceeding, James Vazzana, when making these distributions[.] (Brook Decl. in Supp. Ex. 37; *id*. at Ex. 40; *id*. at Ex. 41; *see also* Dkt. No. 188-1 ("CNB's Decl. in Supp. of Mot. to Intervene") Ex. 2.) On October 11, 2017, CNB purportedly sent a letter to Lester's counsel, Vazzana, and Plaintiffs' counsel, Brian Brook, enclosing "the Stock Powers transferring their shares of Eber Bros. & Co., Inc. pursuant to [CNB's] distribution schedule." (Brook Decl. in Supp. Ex. 38; *see also* CNB's Decl. in Supp. of Mot. to Intervene Ex. 7 (copies of stock powers)[)]. In its letter, CNB explained that because it "never had possession of the company's stock book or other corporate documents and, despite request, . . . [was] not . . . provided with the same . . . [it was] required to complete these transfers via these Stock Powers as opposed to issuing new stock certificates." (Brook Decl. in Supp. Ex. 38.) The stock powers purported to allocate the 1,850 shares of EB&C voting stock as follows: Audrey Hays (706 shares); Daniel Kleeberg (301 shares); and Lisa Stein (137 shares). (CNB's Decl. in Supp. of Mot. to Intervene Ex. 7.) From the evidence in the record, it does not appear that CNB issued shares to Lester through stock powers. (*See id.*) The Eber Defendants contend that, although Vazzana received CNB's letter, the copies of the stock powers were not enclosed with the Letter. (Eber Defs.' Rule 56 Counterstatement ¶ 93; Lester Eber Aff. in Opp'n ¶ 32.)

At the time the Surrogate's Court issued its Order, EB&C's Bylaws provided that "shares of the corporation shall be represented by certificates . . . ." (Brook Decl. in Supp. Ex. 133 ("EB&C Bylaws") Art. VI.) The Bylaws also included a provision restricting the transfer of shares unless the transferring shareholder first gave notice to EB&C's President (*i.e.*, Lester) or Secretary. (*Id.* at Art. XII.) The Bylaws provide, in relevant part, that:

A shareholder shall not transfer, sell or assign any shares of the corporation's stock without first personally delivering to the president or secretary written notice of a proposed transfer at least five (5) days before the effective date of transfer, stating the terms of the proposed transfer. Any other shareholder may, but is not required to, give notice within said five day period to the transferring shareholder of said other shareholder's intent to purchase the shares for a price equal to the book value thereof as appears by the books of the corporation of the end of the immediately preceding fiscal year.

(*Id.*) The Bylaws further stated that, "No transfer of any stock shall be valid until such notice shall be given and the other shareholders have the opportunity to purchase the same as aforesaid" (the "EB&C Transfer Restriction"). (*Id.*) Lester knew about the Transfer Restriction before the Surrogate's Court issued its Final Accounting Order. (Pls.' Rule 56 Statement ¶ 89; Eber Defs.' Rule 56 Counterstatement ¶ 89.) Neither Lester nor his attorney advised CNB or the Surrogate's Court about the Transfer Restriction before the Court issued its Order terminating the Trust and directing CNB to make distributions. (Pls.' Rule 56 Statement ¶ 90; *see also id.* ¶ 89.) CNB ultimately failed to issue stock certificates for the Trust beneficiaries' shares of EB&C stock. (*See* Pls.' Rule 56 Statement ¶ 93.)

### XII. Plaintiffs Dismiss CNB from the Instant Action with Prejudice, Lester Seeks to Acquire All Remaining Shares of EB&C Voting Stock by Invoking EB&C's Transfer Restriction, and Plaintiffs Supplement Their Second Amended Complaint

On August 7, 2018, the Honorable Judge Lewis A. Kaplan so ordered a stipulation signed by all parties permitting the dismissal of CNB from this action, with prejudice, pursuant to Federal Rule of Civil Procedure 41(a)(1)(A)(ii). (Dkt. No. 117.) In connection with the settlement of their claims against CNB, "Plaintiffs agreed to indemnify CNB for certain legal costs incurred by CNB in connection with further proceedings relating to the Allen Eber Trust." (TAC ¶ 390); *see also Kleeberg*, 331 F.R.D. at 324.

As of October 31, 2018, because it never issued stock certificates for the shares of EB&C stock, CNB had yet to finish distributing the EB&C stock to the Trust beneficiaries pursuant to the Surrogate's Court Order. On that date, Lester, through his attorneys, sent a "Notice of Intent to Purchase" to the Allen Eber Trust, in the care of CNB, and sought to invoke the EB&C Transfer Restriction to acquire all of the EB&C stock for himself. (Brook

Decl. in Supp. Ex. 35.) Then, on or about December 17, 2018, Lester sent an updated notice clarifying that his proposed purchase price for the shares was "$0." (*Id.* Ex. 164.) Plaintiffs balked at Lester's attempt to acquire all of the EB&C stock, and their attorney Brian Brook instructed CNB to refuse Lester's request. As a result, CNB found itself caught between the competing demands of Plaintiffs and the Eber Defendants, with the former demanding the distribution of two-thirds of the EB&C stock, pursuant to the Surrogate's Court Order, and the latter demanding all of the shares of stock under the Transfer Restriction in EB&C's Bylaws. CNB subsequently moved to intervene and was rejoined to this litigation as a nominal defendant. (*See* Dkt. Nos. 200 and 237.)

Soon thereafter, Plaintiffs moved to amend and supplement their Second Amended Complaint ("SAC") to allege, among other things, that "[b]y engaging in conduct to prevent the transfer of shares of EB&C to Plaintiffs, including purporting to exercise an option to acquire Plaintiffs' shares for nothing, Lester and Wendy may have caused and may continue to cause Plaintiffs to incur indemnification liability to CNB." (TAC ¶ 391.) Plaintiffs contend that the Eber Defendants' "conduct has caused CNB to incur legal expenses that are likely to be subject to the indemnification agreement executed by Plaintiffs." (*Id.* ¶ 393.) For the reasons stated in the Order granting Plaintiffs leave [to] file the TAC, this Court granted Plaintiffs' request to assert an equitable indemnification claim against the Eber Defendants. *See Kleeberg v. Eber*, 331 F.R.D. at 324.

B.    *The Partial Summary Judgment Decisions*

Plaintiffs moved for partial summary judgment as against Lester and Wendy Eber and Alexbay, LLC (collectively, the "Eber Defendants" or "defendants"[6]) on breach of fiduciary duty claims relating to some of the transactions described above, for an order directing new elections pursuant to Section 619 of the Business Corporation Law, for a declaratory judgment with respect to plaintiffs' rights as shareholders, and for an accounting and attorneys fees. The Eber Defendants cross-moved for summary judgment dismissing plaintiffs' faithless servant, declaratory and

---

6    To be clear, in this opinion, the term "defendants" will refer solely to the Eber Defendants, and not any of the nominal defendants, unless otherwise stated.

indemnification claims. They sought dismissal as well of plaintiffs' claim for aiding and abetting breach of fiduciary duty. Moreover, they sought determinations that (1) EB&C, EBWLC, and Eber Metro were jointly and severally liable for certain pension liabilities as of June 2012, (2) plaintiffs are barred by the *Rooker-Feldman* doctrine and *res judicata* from challenging the 2012 Monroe County Supreme Court order that had held that Alexbay's acceptance of all of EBWLC's interest in the stock of Eber Metro was "commercially reasonable" and, in any case, cannot be rescinded under the Uniform Commercial Code, and (3) CNB's attempt to distribute certain shares of EB&C stock to plaintiffs, which are held by the trust, was ineffective.[7]

The motions for the most part were denied. But a few points concerning the decision warrant mention.

*First,* Judge Parker rejected the Eber Defendants' *Rooker-Feldman* doctrine and *res judicata* arguments on the merits.[8] The Eber Defendants did not seek to resurrect them at trial. In any case, Judge Parker's ruling on those points is the law of this case.

*Second,* the parties' cross-motions with respect to plaintiffs' claim against Lester Eber regarding his so-called consulting agreement with Southern both were denied.[9]

*Third,* plaintiffs sought summary judgment unwinding Alexbay's acquisition of EBWLC's shares of Eber Metro on the ground, among others, that Lester's actions that resulted in the foreclosure by which that was accomplished breached his fiduciary duties to plaintiffs as a co-

---

[7]     Dkt 313, at 2-3.

[8]     Dkt 314, at 31-35.

[9]     *Id.* at 44-48.

trustee of the trust.[10]  Judge Parker initially rejected that argument on the ground that there was a

material issue of fact as to whether the trust beneficiaires had consented to the terms of the

instrument that had granted Lester a security interest in Eber Metro and Eber-CT and allowed him

to foreclose on the collateral himself.[11]  On plaintiffs' subsequent motion, however, Judge Parker

concluded that she had overlooked controlling decisions that made clear the "'exceedingly high

burden established by New York law' for the defense of beneficiary consent."[12]  Accordingly, she

granted reconsideration on that point and, on reconsideration, held that "no reasonable trier of fact

could find that Sally Kleeberg and Audrey Hays impliedly consented to the 2012 [Alexbay]

Foreclosure Actions or the resulting transactions."[13]  In the magistrate judge's words, "because the

2012 Foreclosure Action placed Lester's interests in conflict with those of the Trust beneficiaries

[citation omitted], Lester committed a breach of Trust and the transfer of Eber-CT to Alexbay is

void under the no further inquiry rule."[14]  Nevertheless, Judge Parker concluded that it then would

have been premature to order reconveyance of Eber Metro and Eber-CT without findings of fact on

whether and to what extent Lester was enriched unjustly by the Alexbay foreclosure and thus left

---

[10]  *Id.* at 48.

[11]  *Id.* at 54.

[12]  Dkt 348, at 12-13 (quoting Dkt 323, at 3).

[13]  *Id.* at 12-18.

Wendy Eber, as executrix of Lester's estate, also sought reconsideration to a limited extent. That motion was denied.  *Id.* at 24-28.

[14]  *Id.* at 18.

the question of relief for trial.[15]


C.    *The Trial*

Shortly before trial, the parties waived any rights to a jury so the case was tried to

the Court.[16] Eight witnesses, including Wendy Eber, testified live in whole or in part.[17] Others

testified only by deposition. Notably, Lester Eber and Elliott Gumaer passed away before trial.[18]

Portions of their depositions were received in evidence. Shortly after the trial, the Court – based on

findings that the plaintiffs were likely to prevail in significant respects and were likely to suffer

irreparable damage in the absence of interim relief – entered a preliminary injunction significantly

limiting the defendants' ability to alter the *status quo* to the detriment of the plaintiffs absent notice

to plaintiffs and court approval.[19]


D.    *The Belated Jurisdictional and Res Judicata Defenses*

Following the trial, defendants first raised claims that the Court lacked subject matter

jurisdiction under the *Princess Lida* doctrine and that the action was barred by *res judicata* by virtue

---

[15]

    *Id.* at 18-22.

[16]

    Dkt 359.

[17]

    As is customary in many non-jury trials in this district, some witnesses submitted their direct testimony in writing and were subject to live cross examination. *See Chevron Corp. v. Donziger*, 833 F.3d 74, 85 (2d Cir. 2016), *cert. denied*, 137 S.Ct. 2268 (2017).

[18]

    Wendy, in her capacity as executrix of the estate of Lester Eber (the "Estate of Lester Eber"), was substituted for Lester. Dkt 385.

[19]

    Dkt 405.

of the Monroe County Surrogate's Court judgment settling the account of CNB, which was rendered

years ago.  The Court rejected those claims in a bench opinion rendered on January 26, 2023.[20]

*Analysis and Additional Findings*

A.  *Jurisdiction*

The Court exercises jurisdiction over this matter under 28 U.S.C. § 1332.  At the time

the complaint was filed, complete diversity of citizenship existed between plaintiffs and defendants

and the requisite jurisdictional amount was in controversy.[21]

B.  *General Legal Standards*

1.  *Breach of Trust Claims*

A trustee of a trust such as the one at issue in this case owes to the trust beneficiaries

a duty of undivided loyalty and good faith in its administration.[22]  As the Court of Appeals has

observed, "[t]he duty of a trustee is easily defined because it is absolute."[23]  The trustee's duty of

undivided loyalty "does not permit a trustee to create or to occupy a position in which he has

interests to serve other than the interest of the trust estate . . . ."[24]  The duty of loyalty is "inflexible

---

[20]  Dkt 449, at 12-19.

[21]  Dkt 57, at 2.

[22]  *In re Kalkman*, 908 N.Y.S.2d 307, 309 (App. Div. 4th Dep't 2010).

[23]  *Renz v. Beeman*, 589 F.2d 735, 748 (2d Cir. 1978).

[24]  *Sankel v. Spector*, 819 N.Y.S.2d 520, 523 (App. Div. 1st Dep't 2006) (quoting *City Bank Farmers Trust Co. v. Cannon*, 291 N.Y. 125, 131 (1943) (internal quotation marks omitted));

. . . barring not only blatant self-dealing, but also requiring avoidance of situations in which a fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty."[25] A trustee's duties extend beyond the termination date of a trust – i.e., the date upon which a court orders termination of a trust – until the trust estate properly and finally is distributed to the trust beneficiaries.[26]

These duties are of particular concern where, as here, a trustee is also a beneficiary of the trust.[27] This is so because such a trustee "has an inherent conflict with other trust

---

*see also Renz*, 589 F.2d at 748 (quoting *In re Lewisohn*, 294 N.Y. 596, 608 (1945)) ("'The rule is inflexible that a trustee shall not place himself in a position where his interest is or may be in conflict with his duty.'").

[25]

*Birnbaum v. Birnbaum*, 73 N.Y.2d 461, 466 (1989) (citing *Matter of Ryan*, 291 N.Y. 376, 407 (1943)); *see also In re Heller*, 6 N.Y.3d 649, 655 (2006) (quoting *Birnbaum*, 73 N.Y.2d at 466) ("It is certainly true that the common law in New York contains an absolute prohibition against self-dealing, in that 'a fiduciary owes a duty of undivided and undiluted loyalty to those whose interests the fiduciary is to protect'").

[26]

*See* RESTATEMENT (THIRD) OF TRUSTS § 89 (2007) ("Although the termination date for a trust has arrived, the trustee does not thereby necessarily cease to be trustee but normally continues to serve until the trust is finally wound up. The period for winding up the trust refers to the period after the termination date and before trust administration ends by complete distribution of the trust estate."); *see also In re Estate of Townsend*, 198 N.Y.S. 2d 868, 870 (Sur. Ct. N.Y. Cnty. 1960) (citing *In re Miller's Will*, 257 N.Y. 349, 355 (1931); *In re Thomas' Will*, 254 N.Y. 292, 294 (1930)) (although the trust "terminated" upon the death of a beneficiary, "the duties of the trustee did not then terminate but continued until division and distribution of the income and corpus"); *Neary v. City Bank Farmers Tr. Co.*, 24 N.Y.S.2d 264, 267 (App. Div. 2d Dep't 1940) ("When the time for the termination of an express trust has arrived, it does not follow that the trustee is immediately divested of all duties and responsibilities, for until the trust is closed out it has the duties and powers appropriate for a complete winding up."); *In re Miller's Will*, 257 N.Y. at 355 (same); *In re Pratt*, 235 N.Y.S. 705, 706 (Sur. Ct. Kings Cnty. 1929) (same).

[27]

*See Milea v. Hugunin*, 890 N.Y.S.2d 369 (Sup. Ct. Onondaga Cnty. 2009) (citing *In Re Watson*, 213 N.Y. 177, 183-85; *In Re Coyle*, 104 N.Y.S.2d 260 (Sur. Ct. N.Y. Cnty. 1951); *Markham v. Fay*, 74 F.3d 1347 (1st Cir. 1996); *Alexander v. Alexander*, 262 Ark. 612 (1978)) ("[T]he trustee/beneficiary owes a fiduciary duty and a duty of undivided loyalty to other beneficiaries. . . . The Court of Appeals has expressly held a trustee/beneficiary owes a fiduciary duty to all trust beneficiaries, and must administer the trust fairly for all of them

beneficiaries."[28] New York law therefore requires that courts review a trustee-beneficiary's conduct "with strict scrutiny and with special care."[29]

Transactions with self-dealing trustees are voidable under the so-called "no further inquiry" rule – a "per se rule [under which] the court is generally required, upon challenge by a beneficiary, to set aside a transfer of property, held in trust by a fiduciary, to the fiduciary himself or an entity in which he or she has an interest . . . ."[30] In such a case:

> "the law does not stop to inquire whether the trustee's action or failure to act has been unfairly influenced. It stops the inquiry when the relation is disclosed and sets aside the transaction or refuses to enforce it . . . . It is only by rigid adherence to these principles that all temptation can be removed from one acting as a fiduciary to serve his own interest when in conflict with the obligations of his trust. . . . Th[is] rule is designed to obliterate all divided loyalties which may creep into a fiduciary relationship and utterly to destroy their effect by making voidable any transactions

---

and may not favor himself or herself over the other beneficiaries.").

[28]

*Id.* (citing SCOTT ON TRUSTS, §§ 99.1, 107.1); *see also generally* Karen E. Boxx, *Too Many Tiaras: Conflicting Fiduciary Duties in the Family-Owned Business Context*, 49 HOUS. L. REV. 233 (2012) (discussing fiduciary duties of trustee-beneficiaries in the context of closely-held family corporations).

[29]

*Id.* (citing *In re Heller*, 6 N.Y.3d at 656; *In re Peabody's Will*, 96 N.Y.S.2d 556 (Sup. Ct. Suffolk Cnty. 1950), *aff'd*, 98 N.Y.S.2d 614 (App. Div. 2d Dep't 1950); RESTATEMENT (THIRD) OF TRUSTS, § 50, Cmt. (b)).

[30]

*In re Parisi*, 975 N.Y.S.2d 459, 462 (App. Div. 2d Dep't 2013) (citing *City Bank Farmers Trust Co.*, 291 N.Y. at 132); *see also Estate of Smith*, 2018 NYLJ LEXIS 2151, *9-10 (Sur. Ct. Albany Cnty. 2018) ("Once a conflict of interest has been disclosed, the law imposes a "no further inquiry rule" and the fairness or unfairness of the underlying transaction is immaterial, and the transaction must be set aside.").

in which they appear."[31]

Among the proper remedies for self-dealing by a trustee is the imposition of a constructive trust on the diverted assets.[32] "One who receives property as a result of a breach of trust holds the property in constructive trust" and has a duty "to surrender the property."[33] New York courts have found that constructive trusts are "peculiarly suited to circumstances in which a fiduciary has been guilty of self-dealing."[34] In such circumstances, in the words of Justice Cardozo, "equity converts [the holder of legal title] into a trustee."[35]

A constructive trust is a flexible equitable remedy that is intended to prevent unjust enrichment.[36] A court asked to impose a constructive trust may consider evidence of (1) a fiduciary

---

[31]      *City Bank Farmers Trust Co.,* 291 N.Y. at 132 (internal citations omitted).

[32]      *See Birnbaum v. Birnbaum*, 503 N.Y.S.2d 451, 458 (App. Div. 4th Dep't 1986) (quoting *Meinhard v. Salmon*, 249 N.Y. 458, 467 (1928)).

[33]      *Saltzman v. C.I.R.*, 131 F.3d 87, 91 (2d Cir. 1997) (citing V SCOTT ON TRUSTS § 462.1 at 3415 (3d ed. 1967)); *see also* RESTATEMENT (THIRD) OF RESTITUTION AND UNJUST ENRICHMENT § 55 (2011) ("A transaction in which the defendant (I) has been unjustly enriched (ii) by acquiring legal title to specifically identifiable property (iii) at the expense of the claimant or in violation of the claimant's rights is one in which – by the traditional formula – the defendant's title to the property is subject to the claimant's equitable interest.").

[34]      *Birnbaum*, 503 N.Y.S.2d at 458.

[35]      *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 386 (1919) (Cardozo, J.).

[36]      *See In re First Cent. Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004); *Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 360-61 (2d Cir. 1999); *see also Shih v. Petal Card, Inc.*, No. 18-cv-5495 (JFK), 2020 U.S. Dist. LEXIS 174466, at *58 (S.D.N.Y. Sep. 23, 2020) ("A constructive trust is a remedy, not a cause of action, and is to be imposed only in the absence of an adequate remedy at law.").

relationship, (2) a promise, (3) reliance, and (4) unjust enrichment,[37] however "a constructive trust is a flexible device and must not be bound by an 'unyielding formula.'"[38]  The party seeking a constructive trust must establish the facts which require it by clear and convincing evidence.[39]

### 2.  Derivative Claims

Corporate directors and officers are fiduciaries bound by duties of loyalty and good faith and fair dealing.[40]  The duty of loyalty "derives from the prohibition against self-dealing that inheres in the fiduciary relationship."[41]  Shareholders may sue derivatively on behalf of the corporation for the violation of such a duty.[42]  "To state a cause of action to recover damages for

---

[37]     See, e.g., Palazzo v. Palazzo, 503 N.Y.S.2d 381 (App. Div. 1st Dep't 1986).

[38]     Golden Budha Corp. v. Canadian Land Co., N.V., 931 F.2d 196, 202 (2d Cir. 1991) (quoting Beatty, 225 N.Y. at 389 (Cardozo, J.)).

[39]     Miller v. Hartford Life Ins. Co., 64 F. App'x 795, 797 (2d Cir. 2003).

[40]     See, e.g., Schmidt v. Magnetic Head Corp., 476 N.Y.S.2d 151, 159 (App. Div. 2d Dep't 1984) (citing Pepper v. Litton, 308 U.S. 295, 306 (1939)).  See also In re Ampal-Am. Israel Corp., 543 B.R. 464, 481 (Bankr. S.D.N.Y. 2016) (quoting N.Y. Bus. Corp. L. § 715(h)) ("An officer shall perform his duties as an officer in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances."); id. (quoting N.Y. Bus. Corp. L. § 717(a)) ("A director shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith and with that degree of care which an ordinarily prudent person in a like position would use under similar circumstances.").

[41]     Norlin Corp. v. Rooney, Pace Inc., 744 F.2d 255, 264 (2d Cir. 1984) (citing Pepper, 308 U.S. at 306-07).

[42]     As the third amended complaint reveals, some of the claims in this case are individual capacity claims by the plaintiffs while others are derivative (or double or perhaps triple derivative) claims on behalf of companies in the overall EB&C structure.  Such claims are appropriate on the facts of this case.  See, e.g., Goldstein v. Groesbeck, 142 F.2d 422, 425 (2d Cir. 1944) (double derivative action); United States Lines, Inc. v. United States Lines

breach of fiduciary duty, a plaintiff must allege: (1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct."[43] When "a corporation is a wholly-owned subsidiary, its directors and officers owe their fiduciary duties to the parent corporation."[44]

In many circumstances, the question whether a corporate fiduciary has breached the fiduciary's duty usually is evaluated under the business judgment rule. "New York's business judgment rule 'creates a presumption that directors of a company act in good faith and in the best interests of the corporation.'"[45] The same standard applies to corporate officers.[46] Courts rarely disturb acts or omissions under the business judgment rule so long as they are rational. But the business judgment rule does not protect decisions involving "'fraud, self-dealing, or bad faith.'"[47] "When a corporate director or officer has an interest in a decision, the business judgment rule does

---

*Co.*, 96 F.2d 148, 151-52 (2d Cir. 1938) (A. Hand, J.) (same); *Kaufman v. Wolfson*, 132 F. Supp. 733, 735 (S.D.N.Y. 1955) (double and triple derivative action); *Breswick & Co. v. Harrison-Bye Realty Corp.*, 280 App. Div. 820 (2d Dep't 1952) (double derivative action); 7C CHARLES ALLEN WRIGHT ET AL., FEDERAL PRACTICE & PROCEDURE: CIVIL § 1826 (3d ed. 2022 update) (double and triple derivative actions); 13 WILLIAM MEADE FLETCHER, FLETCHER CYCLOPEDIA OF THE LAW OF CORPORATIONS § 5977 (rev. vol. 2013) (same). The Court finds, moreover, that any demand on the trustees of the Allen Eber trust or on the directors of the relevant Eber entities would have been futile.

[43] *Yukos Capital S.A.R.L. v. Feldman*, 977 F.3d 216, 241 (2d Cir. 2020) (quoting *U.S. Fire Ins. Co. v. Raia*, 942 N.Y.S.2d 543, 545 (App. Div. 2d Dep't 2012) (internal citations omitted)).

[44] *U.S. Small Bus. Admin. v. Feinsod*, 347 F. Supp. 3d 147, 160 (E.D.N.Y. 2018).

[45] *Id.* at 159 (quoting *In re Sabine Oil & Gas Corp.*, 562 B.R. 211, 231 (S.D.N.Y. 2016)).

[46] *See Levy v. Young Adult Inst., Inc.*, 103 F. Supp. 3d 426, 429-30 (S.D.N.Y. 2015) (citing N.Y. BUS. CORP. L. § 717(a)).

[47] *Feinsod*, 347 F. Supp. 3d at 159 (quoting *Patrick v. Allen*, 355 F. Supp. 2d 704, 710 (S.D.N.Y. 2005)).

not apply."[48]

      While the plaintiff bears "the burden of proving that the [transaction] violated the duty of fairness," where "an inherent conflict of interest" exists, "the burden shifts to the interested directors or shareholders to prove good faith and the entire fairness of the [transaction]."[49]  The "'entire fairness' standard has two components: fair process and fair price."[50]  "The concept of fair dealing [or fair process] incorporates 'how the transaction was structured, the timing, disclosures, and approvals,' while the concept of 'fair price relates to the economic and financial considerations of the transaction.'"[51]

      The New York Business Corporation Law ("BCL") provide a statutory alternative basis under which a court may cancel unlawful transactions.  Section 720 empowers courts to "set aside an unlawful conveyance, assignment or transfer of corporate assets, where the transferee knew of the unlawfulness"[52] and to "enjoin a proposed unlawful conveyance, assignment or transfer of corporate assets where there is sufficient evidence that it will be made."[53]

---

[48]     *Levy*, 103 F. Supp. 3d at 429-30 (quoting *In re Croton River Club, Inc.*, 52 F.3d 41, 44 (2d Cir. 1995)).

[49]     *Alpert v. 28 Williams St. Corp.*, 63 N.Y.2d 557, 570 (1984) (explaining the standard in the freeze-out merger context).

[50]     *In re Kenneth Cole Prods., Inc.*, 27 N.Y.3d 268, 275, 52 N.E.3d 214, 219 (2016) (citing *Alpert*, 63 N.Y.2d at 569-70)).

[51]     *Related Companies, L.P. v. Ruthling*, No. 17-cv-4175, 2018 WL 3315728 (S.D.N.Y. July 5, 2018) (quoting *William Penn P'ship v. Saliba*, 13 A.3d 749, 756-57 (Del. 2011)) (applying Delaware law).

[52]     BCL § 720(a)(2).

[53]     *Id.* at § 720(a)(3).

3.     *Aiding and Abetting*

One who "knowingly induce[s] or participate[s]" in a breach of fiduciary duty by another is liable for aiding and abetting under New York law if the plaintiff suffered damages as a result of the breach.[54] "A person knowingly participates in a breach of fiduciary duty only when he or she provides 'substantial assistance' to the primary violator."[55] Such "[s]ubstantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur."[56] Inaction constitutes substantial assistance "only if the defendant owes a fiduciary duty directly to the plaintiff."[57]

4.     *The Corporate Opportunity Doctrine*

"[T]he corporate opportunity doctrine provides that 'corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation.'"[58] In this context, "[a] corporate opportunity is defined as any property, information, or prospective business dealing in which the corporation has

---

[54]     *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 294 (2d Cir. 2006).

[55]     *Kaufman v. Cohen*, 760 N.Y.S.2d 157, 170 (App. Div. 1st Dep't 2003).

[56]     *Id.* (citing *Kolbeck v. LIT Am., Inc.*, 939 F. Supp. 240, 247 (S.D.N.Y. 1996), *aff'd*, 152 F.3d 918 (2d Cir. 1998)).

[57]     *Id.* (citing *In re Sharp Int'l Corp.*, 281 B.R. 506 (Bankr. E.D.N.Y. 2002), *aff'd*, 302 B.R. 760 (E.D.N.Y. 2003), *aff'd*, 403 F.3d 43 (2d Cir. 2005)).

[58]     *Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*, No. 13-cv-4650 (JFK), 2015 WL 7078641, at *4 (S.D.N.Y. Nov. 12, 2015) (quoting *Alexander & Alexander of N.Y., Inc. v. Fritzen*, 542 N.Y.S.2d 530 (App. Div. 1st Dep't 1989)).

an interest or tangible expectancy or which is essential to its existence or logically and naturally adaptable to its business.'"[59] Such an "interest" or "tangible expectancy" constitutes "something much less tenable than ownership, but, on the other hand, more certain than a desire or a hope."[60] The Second Circuit has held that the existence of a "tangible expectancy" depends on "degree of likelihood" that the corporation would "realiz[e]" that opportunity.[61] The purpose of this doctrine is to prevent employees from acquiring "property which the corporation needs or is seeking, or which they are otherwise under a duty to the corporation to acquire for it."[62]

To remedy a usurped corporate opportunity, a court may impress a constructive trust in favor of the corporation upon the property acquired.[63] "The value of the diverted asset is the amount plaintiff would have received but for the defendant's wrongful interference, including

---

[59]

    *Moser v. Devine Real Estate, Inc. (Fla.)*, 839 N.Y.S.2d 843, 848 (App. Div. 3d Dep't 2007) (quoting *Matter of Greenberg*, 614 N.Y.S.2d 825, 827 (App. Div. 4th Dep't 1994)).

[60]

    *Berman v. Sugo LLC*, 580 F. Supp. 2d 191, 206 (S.D.N.Y. 2008) (quoting *American Fed. Group, Ltd. v. Rothenberg*, 136 F.3d 897, 906 (2d Cir. 1998)).

[61]

    *Abbott Redmont Thinlite Corp. v. Redmont*, 475 F.2d 85, 89 (2d Cir. 1973); *see also Securitas Elec. Sec., Inc. v. DeBon*, No. 20-cv-5323 (CM) (KNF), 2021 WL 965382, at *3 (S.D.N.Y. Mar. 15, 2021) (citing *Alexander & Alexander*, 542 N.Y.S. 2d at 534) ("[W]hen a corporation already has a business relationship with another entity, it is easier to establish that it has a 'tangible expectancy' of continuing that relationship, not simply a desire or hope.").

[62]

    *Burg v. Horn*, 380 F.2d 897, 899 (2d Cir. 1967); *see also generally American Fed. Group, Ltd.*, 136 F.3d at 906 (quoting *Benson v. RMJ Sec. Corp.*, 683 F. Supp. 359, 375 (S.D.N.Y. 1988) (noting that a "shareholder, officer and director of a closely held corporation, is under a duty 'to deal fairly, in good faith, and with loyalty' to the corporation and other shareholders").

[63]

    *See Whitney Holdings, Ltd. v. Givotovsky*, 988 F. Supp. 732, 736 (S.D.N.Y. 1997) (collecting cases); *Poling Transp. Corp. v. A&P Tanker Corp.*, 443 N.Y.S.2d 895 (App. Div. 2d Dep't 1981)

opportunities for profit on the accounts diverted from it through defendant's conduct."[64]


### 5. *The Faithless Servant Doctrine*

An employee must "be loyal to his employer and is 'prohibited from acting in any manner inconsistent with his agency or trust and is at all times bound to exercise the utmost good faith and loyalty in the performance of his duties.'"[65] The faithless servant doctrine, which is grounded in the law of agency, provides relief to an employer whose employee has engaged in repeated acts of disloyal conduct during the course of his or her employment.[66] The New York Court of Appeals has indicated that the faithless servant doctrine applies to disloyal trustees as well.[67]

In *Murray v. Beard*, the Court of Appeals instructed that:

"[a]n agent is held to *uberrima fides* [utmost fidelity] in his dealings with his principal, and if he acts adversely to his employer in any part of the transaction, or

---

[64] *Whitney Holdings*, 988 F. Supp. at 736 (internal quotation marks omitted) (citing *Stoeckel v. Block*, 566 N.Y.S.2d 625, 626 (App. Div. 1st Dep't 1991); *E.W. Bruno Co. v. Friedberg*, 250 N.Y.S.2d 187, 192 (App. Div. 1st Dep't 1964) (quoting *Duane Jones Co. v. Burke*, 306 N.Y. 172, 192 (1954)).

[65] *W. Elec. Co. v. Brenner*, 41 N.Y.2d 291, 295 (1977) (quoting *Lamdin v. Broadway Surface Advert. Corp.*, 272 N.Y. 133, 138 (1936)).

[66] *See, e.g., Tyco Int'l, Ltd. v. Kozlowski*, 756 F. Supp. 2d 553, 564 (S.D.N.Y. 2010) (applying faithless servant doctrine against corporate officer).

[67] *Dutton v. Willner*, 52 N.Y. 312, 319 (1873) (internal citations omitted) (emphasis added) ("The rule which places it beyond the power of the agent to profit by such transactions is founded upon considerations of policy, and is intended not merely to afford a remedy for discovered frauds, but to reach those which may be concealed; and also to prevent them, by removing from *agents and trustees* all inducement to attempt dealing for their own benefit in matters which they have undertaken for others, or to which their *agency or trust* relates.").

omits to disclose any interest which would naturally influence his conduct in dealing with the subject of the employment, it amounts to such a fraud upon the principal as to forfeit any right to compensation for services."[68]

Thus, if an employee or trustee is shown repeatedly to have been disloyal throughout his or her tenure, "complete and permanent forfeiture of compensation, deferred or otherwise, is warranted."[69] Complete forfeiture of compensation is proper even when some or all of "the [agent's] services were beneficial to the principal or [when] the principal suffered no provable damage as a result of the breach of fidelity by the agent."[70] This is because the purpose of a breach of fiduciary duty claim, "unlike an ordinary tort or contract case, is not merely to compensate the plaintiff for wrongs committed by the defendant but . . . to prevent them, by removing from agents and trustees all inducement to attempt dealing for their own benefit in matters which they have undertaken for

---

[68]

102 N.Y. 505, 508 (1886).

[69]

*William Floyd Union Free Sch. Dist. v. Wright*, 877 N.Y.S.2d 395, 397 (App. Div. 2d Dep't 2009); *see also Feiger v. Iral Jewelry, Ltd.*, 41 N.Y.2d 928, 928 (1977) ("One who owes a duty of fidelity to a principal and who is faithless in the performance of his services is generally disentitled to recover his compensation, whether commissions or salary."); *Mahn v. Major, Lindsey, & Afr., LLC*, 74 N.Y.S.3d 7, 8 (App. Div. 1st Dep't 2018) (affirming arbitration award that included disgorgement of more than four years of a disloyal employee's past salary and over $900,000 in attorney's fees under the faithless servant doctrine).

[70]

*City of Binghamton v. Whalen*, 32 N.Y.S.3d 727 (App. Div. 3d Dep't 2016) (quoting *Feiger*, 41 N.Y.2d at 928-29) ("The Court of Appeals has made clear that forfeiture of compensation is required even when some or all of 'the services were beneficial to the principal, or [when] the principal suffered no provable damage as a result of the breach of fidelity by the agent'"); *see also Beach v. Touradji Cap. Mgmt.*, LP, 42 N.Y.S.3d 96 (App. Div. 1st Dep't 2016) (plaintiff could recover compensation paid to disloyal employees even if plaintiff could not show damages arising from their disloyal conduct).

34

others, or to which their agency or trust relates."[71]

For example, in *Phansalkar v. Anderson Weinroth & Co., L.P.*, the Second Circuit held that New York's faithless servant doctrine required that a disloyal employee forfeit all compensation received after his first disloyal act.[72]  In that case, the defendant-employee was compensated generally (i.e., via a salary) and was not compensated specifically for the completion of certain tasks or transactions.[73]  In those circumstances, the Circuit held that "forfeiture [could not] appropriately be limited to only some transactions"[74] which were affected by the employee's disloyalty.  Rather, the faithless servant doctrine required that he "forfeit all compensation awarded to him."[75]

## C. *Self-Dealing Transactions Void Under the No Further Inquiry Rule*

### 1. *Plaintiffs Own Two-Thirds of EB&C*

As Judge Parker's account makes clear, CNB in 2017 – after the institution of this action – petitioned the Monroe County Surrogate's Court to settle *its* account as one of the trustees

---

[71]  *Whalen*, 32 N.Y.S.3d at 727 (quoting *Diamond v. Oreamuno*, 24 N.Y.2d 494, 498 (1969)).

[72]  344 F.3d 184, 211 (2d Cir. 2003).

[73]  *Id.* at 208.

[74]  *Id.*

[75]  *Id.*

The Second Circuit held also that investment opportunities provided to an employee by the employer, and any benefits derived therefrom, are "compensation" for the purposes of the faithless servant doctrine.  *Id.* at 211.

of the Allen Eber testamentary trust. The other trustees – Lester and Gumaer – and the trust beneficiaries were served with the petition, which set forth CNB's accounting of the trust estate and its proposed distribution to the beneficiaries. Only Lester appeared by counsel, and he did not object to the petition. Accordingly, the Surrogate's Court on June 1, 2017 ordered the distribution of the trust estate, including the stock of EB&C, according to CNB's proposed distribution: one third to Lester, one third to Audrey Hays, and one sixth each to Dan Kleeberg and Lisa Stein.[76]

CNB distributed the cash and marketable securities to the beneficiaries, including Lester, but was unable to distribute the EB&C stock because CNB "never had possession of the company's stock book or other corporate documents and, despite request, . . . [was] not . . . provided with the same . . . ."[77]

As of October 31, 2018, CNB had not distributed the EB&C stock to the beneficiaries. On that date, Lester, through his attorneys, sent a "Notice of Intent to Purchase" to the Allen Eber Trust, in the care of CNB, expressing Lester's intent to purchase "all shares of capital stock of [EB&C] of which the Allen Eber Trust is the registered holder that are proposed to be transferred to Daniel Kleeberg, Lisa Stein or Audrey Hays pursuant to Article XII of the [EB&C] By-Laws."[78] Article XII of the EB&C Bylaws (the "Transfer Restriction") provided, in relevant

---

[76]

    *See* Defs.' Ex. TTTT (second and third decretal paragraphs); Defs.' Ex. OOOO, at ¶¶ 3-5 & Sched. A (listing EB&C shares held in trust).

[77]

    Pls.' Ex. 38.

    At the time the Surrogate's Court issued its Order, EB&C's Bylaws provided that "shares of the corporation shall be represented by certificates . . . ." Pls.' Ex. 133 ("EB&C Bylaws"), Art. VI.

[78]

    Pls.' Ex. 35.

part, that:

> "A shareholder shall not transfer, sell or assign any shares of the corporation's stock without first personally delivering to the president or secretary written notice of a proposed transfer at least five (5) days before the effective date of transfer, stating the terms of the proposed transfer. Any other shareholder may, but is not required to, give notice within said five day period to the transferring shareholder of said other shareholder's intent to purchase the shares for a price equal to the book value thereof as appears by the books of the corporation of the end of the immediately preceding fiscal year."[79]

On or about December 17, 2018, Lester sent an updated notice clarifying that his proposed purchase price for the shares was "$0."[80] Plaintiffs objected to Lester's attempt to acquire all of the EB&C stock and instructed CNB to refuse Lester's request. Accordingly, CNB has intervened in this case to seek directions with respect to the stock.

Lester's attempt to take all of the EB&C stock for himself was a violation of his fiduciary duties as a trustee of the Allen Eber Trust and as an officer of EB&C. As the trust estate had not been distributed to the beneficiaries, Lester remained subject to his "duty of undivided loyalty and good faith" to the other beneficiaries.[81] Under New York law, this Court must review

---

[79] Pls.' Ex. 133, Art. XII.

[80] Pls.' Ex. 164.

[81] *See supra* at 24 n.26.

the conduct of a trustee-beneficiary – like Lester – "with strict scrutiny and with special care."[82] The "no further inquiry" rule requires that the Court block Lester's proposed self-dealing transaction by which he sought to transfer all of the EB&C stock from the Allen Eber Trust to himself for nothing. It is only by rigid adherence to this rule that "all temptation can be removed from one acting as a fiduciary to serve his own interest when in conflict with the obligations of his trust."[83]

Section 720 of the New York Business Corporation Law provides an independent basis for the Court to prevent Lester's proposed transaction. It authorizes courts to "enjoin a proposed unlawful conveyance, assignment or transfer of corporate assets where there is sufficient evidence that it will be made."[84] Because "an inherent conflict of interest" exists with respect to this transaction, the burden shifts to defendants "to prove good faith and the entire fairness of the [transaction]."[85]

In this case, defendants have failed utterly to establish that this proposed transaction was undertaken in good faith or was entirely fair to plaintiffs. Rather, there is ample evidence that this transaction was unfair to plaintiffs and was part of a pattern of Lester pilfering the family business for his own selfish gains. Lester's proposed transaction was not the result of a fair process or a fair price. Lester knew of the transfer restriction when CNB petitioned to settle its account, terminate the trust, and distribute the EB&C shares as the Surrogate's Court ultimately ordered but

---

[82]   See *Milea*, 890 N.Y.S.2d 369 (citing *In re Heller*, 6 N.Y.3d at 656; *In re Peabody's Will*, 96 N.Y.S.2d 556; RESTATEMENT (THIRD) OF TRUSTS, § 50, Cmt. (b)).

[83]   *City Bank Farmers Trust Co.*, 291 N.Y. at 132.

[84]   BCL § 720(a)(3).

[85]   See *Alpert*, 63 N.Y.2d at 570.

did not object to the petition. He was aware of the Surrogate's Court decree for over a year before he sprung the transfer restriction, of which the other interested parties were unaware. Then, Lester sought to capture all of the EB&C stock for no consideration. Yet if the stock of EB&C truly were worthless, as Lester claimed, he would not have bothered with this gambit. In reality, and as set forth below, EB&C indirectly owns 85 percent of Eber-CT, which conservatively is worth tens of millions of dollars.[86] Thus, the EB&C stock has significant value and Lester's demand to purchase it for "$0" did not reflect a fair price. At bottom, defendants failed to establish the entire fairness of the proposed transaction and Section 720 authorizes the Court to bar Lester's proposed unlawful transaction.

Accordingly, CNB will be directed to distribute the stock of EB&C one third to Wendy Eber in her capacity as executrix of Lester's estate, one third to Audrey Hays, one sixth to Daniel Kleeberg, and one sixth to Lisa Stein. Defendants forthwith shall execute such documents and take such actions as CNB or the plaintiffs reasonably may request, or that the Court may order, to effectuate that distribution.

2. *Lester's Diversion to His Own Benefit of Over $5 Million from Southern*

a. *The Background – Lester's Expansion of the Business*

In the 1990s, Lester decided to expand into the New York City metropolitan area. He caused EBWLC to form a new subsidiary, Eber Metro, for that purpose, and he was its president and a director until his death. Around 2000, Eber Metro acquired a local distributor in the New

---

[86] *See* Liebman Decl. ¶ 120.

York City area to assist it in gaining a foothold.[87]  But the effort, though initially profitable, ultimately proved unsuccessful, losing suppliers and a good deal of money.[88]  Perhaps in consequence, Lester in the early 2000s began trying to expand outside New York State.  He acquired distributors in Ohio and Delaware as well, in 2005, as Connecticut and Rhode Island distributors called Slocum & Sons, Inc.[89]  EB&C formed two new limited liability companies to complete the Slocum deal, and both entities were wholly owned subsidiaries of Eber Metro at the time of formation.[90]  Slocum's Connecticut business was merged into Eber-CT, a newly formed Delaware entity that then was a wholly owned subsidiary of Eber Metro.[91]

### b.    *The Initial Southern Approach*

Starting around 2004 or 2005,  Southern Wine & Spirits ("Southern"), then the largest wine and liquor distributor in the United States and run by Wayne and Harvey Chaplin, began to move into New York.  It approached Lester and reportedly made two offers to buy EB&C.  But Lester at first backed away,[92] later explaining to Kleeberg that there was no way that either

---

[87]  Kleeberg Decl. ¶ 10.

[88]  Lester Dep. 21:20-22:8; Kleeberg Decl. ¶ 14.

[89]  Kleeberg Decl. ¶ 11; Pls.' Ex. 205, at 9; Lester Dep. 29:22-30:12, 49:18-50:4

[90]  *See* Dkt 238 (Answer to Third Am. Compl.), at ¶ 2 (admitting Third Am. Compl. (Dkt 236) ¶¶ 28-34).

[91]  Defs.' Ex. RRR; Eber Metro Dep. 37:15-38:6.

[92]  Kleeberg Decl. ¶¶ 15-17.

Lester or Kleeberg wanted to work for the Chaplins, whom he described as "ruthless."[93]

Shortly after Lester rejected the Southern overture, Southern began raiding EB&C's personnel. Lester fought back, hiring new employees, increasing salaries, partnering with or agreeing to sell an interest in the New York City business to a Georgia distributor called NDC, and ultimately suing Southern.[94] But these efforts were not entirely successful.[95] EBWLC's consolidated sales and income from operations dropped from approximately $459 million and $9 million, respectively, in the fiscal year ended May 31, 2005 to sales of $351 million and an operating loss of $2.4 million for the comparable period ending May 31, 2006.[96] Nevertheless, the financial statements paint a picture rather less desperate than defendants sought to portray.

As of the end of fiscal year 2005, EBWLC had a $50 million credit line from M&T Bank on which it had borrowed only $36 million. In March 2006, it refinanced with Wells Fargo, obtaining a $60 million line of credit. By May 31, 2006, its outstanding borrowings on that line were only $48 million. And while EBWLC was out of compliance with some of the loan covenants, Wells Fargo then had "no present intention to exercise any of their rights and remedies with respect to such default."[97] Still, it appears that Wells Fargo subsequently took steps to protect its secured position and obtain satisfaction of the credit line, thus putting greater pressure on EBWLC. By late

---

[93]     *Id.* ¶ 21.

[94]     *See* Defs.' Ex. VVV; Kleeberg Decl. ¶¶ 17-23.

[95]     *See* Kleeberg Decl. ¶ 25.

[96]     Pls.' Ex. 205, at 3.

[97]     *Id.* at 12.

2006, the company was in significant financial and commercial distress, and Lester was struggling to save the company.[98]  He ultimately concluded that EB&C had to deal with Southern.  Only when he reached a deal with Southern did he cease those efforts to expand the Eber business in New York and other markets outside of Connecticut.[99]

       *c.*     *The Southern Asset Purchase and Lester's 2007 "Consulting" Agreement and Non-Compete*

In October 2006, EBWLC entered into a confidentiality agreement with Southern to consider transactions that could resolve their dispute.[100]  Negotiations ensued and, on February 7, 2007, resulted in several letters of intent among Southern, EBWLC, certain other Eber entities, and Lester personally (collectively, the "LOI").[101]  It contemplated a series of complex interrelated transactions by which, among other things, (i) Southern would acquire EBWLC's business interests in Ohio and Delaware, its trade name "Liberty Wine Selections," and a right of first refusal in connection with any sale of Eber-CT or Eber-RI, (ii) EBWLC would cease operations in New York and sell its New York assets to Southern, (iii) EBWLC's lawsuit against Southern would be terminated, (iv) Southern would extend loans to various Eber entities with repayment secured by the

---

[98]     There is little or no written substantiation of the specifics claimed by Wendy and Lester, which is notable in view of the fact that events like those described typically leave extensive paper trails.  Accordingly, the Court does not accept the details of their accounts, including their claim that EBWLC and Eber Metro had ceased operations in and begun winding down before 2007.  *See* Wendy Decl. ¶¶ 10-11; Eber Metro Dep. 28:19-29:7.

[99]     Lester Dep. 49:11-50:4.

[100]     Pls.' Ex. 93, at 13.

[101]     *See generally id.*

assets of EBWLC, and (v) Lester, EBWLC, and several EBWLC subsidiaries would enter non-compete restrictive covenants.[102]  Most significantly for present purposes, the LOI provided that Southern would enter into a five-year consulting and lobbying agreement with Lester pursuant to which he would consult as requested and would be paid $500,000 annually regardless of whether he performed any services.[103]

The transactions contemplated by the LOI, as modified by the parties, ultimately closed on August 30, 2007.[104] Following the Southern deal, the value of EB&C and its subsidiaries depended in large part on the value of the only remaining operating entity – Eber-CT.

Significantly, the final agreements included non-compete restrictive covenants only for Lester in his personal capacity and two Eber entities (Eber Bros. Acquisition Corp. and PW &S, LLC) that had interests in Delaware and Ohio, but ultimately were acquired by Southern.  In other words, after the Eber companies completed the sale of their interests in Delaware and Ohio to Southern, only Lester – and not any remaining Eber company – was bound by a restrictive covenant.

By the time the deal closed, Lester's guaranteed annual compensation under the five-year "consulting" agreement had been increased to $600,000.[105]  During the five-year term of the agreement, and for five years thereafter, Lester agreed not to compete, directly or indirectly, with

---

[102]     Id.; Defs.' Ex. YYYY.

[103]     Id. at 9-10.

[104]     See Defs.' Ex. YYYY.

[105]     Pls.' Ex. 27, at §§ 3(c), 4(a),  8.

Southern in any state where Southern conducted business.[106]  In total, Southern paid Lester

$3 million under the "consulting" agreement from August 2007 until August 2012.

Upon conclusion of the five-year agreement, Lester remained on the Southern payroll

as a "consultant" on an at-will basis and without a written agreement.[107]  Under that arrangement,

Southern paid Lester approximately $310,000 per annum from August 2012 until Lester's death in

April 2020.[108] This suggests that Southern found value in Lester's alleged services.  Far more likely,

however, it saw value in keeping Lester happy – and the Eber companies of which he retained

control non-competitive – rather than in his purported consulting and lobbying services.  Southern

paid Lester a total of $2,438,399 pursuant to the at-will "consulting" arrangement.[109]

All told, Lester's tax filings show, and the Court finds, that he received $5,438,399

from Southern for his "consulting" services as follows: $250,000 in 2007, $600,000 in 2008,

$600,000 in 2009, $650,000 in 2010, $600,000 in 2011, $480,000 in 2012, $345,900 in 2013,

$310,000 in 2014, $310,000 in 2015, $310,000 in 2016, $310,000 in 2017, $310,000 in 2018,

$322,500 in 2019, and $39,999 in 2020.[110]

---

[106]

 *Id.* at § 6.

[107]

 Hager Dep. 50:9-51:9.

[108]

 *Id.*

[109]

 *See* Pls.' Ex. 193 (Schedule C tax filings by Lester regarding "consulting" income from Southern from 2007 through 2020).

[110]

 *See id.*

d.      *Lester's "Consulting" Agreement Is Void Under "No Further Inquiry"*

There is no denying that Lester's five-year "consulting" agreement and subsequent at-will agreement resulted in Lester personally taking all or the lion's share of the more than $5 million that otherwise would have been available to the Eber companies for the assets they sold to Southern in 2007, the personal non-compete provision in Lester's "consulting" agreement, and Lester's purported consulting services. Unless justified by some exception to the "no further inquiry" rule, Lester's five-year "consulting" agreement and subsequent at-will agreement were classic self-dealing transactions that are voidable as a breach of his undivided duty of loyalty as a trustee.[111] And there was no persuasive justification for his actions.

The defendants proffered three lines of defense in support of this self-dealing – *first,* that it was fully disclosed to and approved by the boards of the relevant companies; *second,* that the money paid to Lester was appropriate compensation for the non-compete provision and for services rendered, notably for his supposedly exceptional abilities as a lobbyist before New York authorities and as a highly skilled participant in the New York wine and liquor market; and, *third,* that Southern wanted and was willing to purchase Lester's services *only* from Lester personally and not by making Lester's commitment to provide his services part of the consideration to be provided by the Eber companies of which he was a one-third beneficial owner. But none is persuasive.

---

111
      See *Renz,* 589 F.2d at 746 ("The trust possessed an intangible asset which was to be free from competition from its fiduciary."); *see also O'Hayer,* 293 N.Y.S.2d at 154 ("A trustee in control of the corporations . . . was obligated to preserve and advance their economic objectives and to promote new or extended activities which legitimately would belong to them."); RESTATEMENT (THIRD) OF TRUSTS § 78 cmt d(1) ("A trustee engages in self-dealing and therefore normally violates the duty of loyalty by personally accepting from a third person any fee, commission, or other compensation for an act done by the trustee in connection with the administration of the trust. . . . Accordingly, if the trustee sells trust property and accepts (and retains) a bonus from the purchaser for making the sale, the trustee commits a breach of trust.").

As for the first point, the boards of the Eber companies involved in the numerous transactions with Southern and the co-trustees of the Allen Eber testamentary trust – Lester, Gumaer, and the institutional trustee – approved *the agreements into which those companies entered.*[112] None but Lester, however, approved his personal consulting agreement and the personal non-compete provision contained therein.[113] And it is notable that both the Eber companies and Lester personally were represented by the same attorney in these transactions, an attorney paid entirely by the Eber companies and thus himself subject to a conflict of interest between his duties to Lester personally on one hand and his duties to the trust, the trustees in their fiduciary capacities, and the directors and officers of the Eber companies on the other.

As for the second purported justification, the parties devoted a fair amount of attention to Lester's supposed post-closing efforts on Southern's behalf and their value. And while the point is immaterial in light of the "no further inquiry" rule, the Court is unpersuaded that Lester performed any services for Southern that could have been remotely commensurate with the $3 million he was paid pursuant to the original agreement and the $5 million plus he was paid overall. Indeed, Lester testified at his deposition that most of the work he claimed to have done for Southern

---

[112] The Eber companies involved in the many acquisition, settlement, and loan agreements with Southern include EB&C, EBWLC, Eber Metro, Eber-CT, Delaware Importers, LLC (Eber's Delaware entity), PW&S, LLC (Eber's Ohio entity), and Eber Bros. Acquisition Corp. (the Eber entity through which Southern acquired the Eber companies' interest in Delaware Importers, LLC). *See* Defs.' Ex. YYYY.

[113] Given the lack of corroborating evidence, Wendy's patent self interest on this point (she is Lester's heir and stands to benefit from retaining whatever is left of Southern's "consulting" payments, Dkt 391, at 294-97), and the lack of any reason to suppose that Wendy had any relevant personal knowledge on the point, the Court does not credit Wendy's testimony that members of the EBWLC board in 2007 were aware of and acquiesced in his entering into the consulting arrangement. *See* Wendy Decl. ¶¶ 150-155. Nor did she so much as claim that the institutional trustee knew anything about it.

was "governmental work," including lobbying.[114] Yet when he reported his lobbying income to the New York State Joint Commission on Public Ethics ("JCOPE") – a New York regulator with which lobbyists must register and to which they must report their lobbying compensation – Lester claimed that his lobbying income from Southern was $833.33 per month – i.e., $10,000 per year.[115] That, of course, amounted to about 1.7 to 3.2 percent of what Southern was paying him each year.

      As for the non-compete provision in the "consulting" agreement, Southern could have accomplished its objective more directly by insisting on restrictive covenants from the Eber companies and making a personal restrictive covenant by Lester (who was a principal beneficiary of the Southern deal) a condition of the transactions. In any case, I find that the suggestion that Lester's personal services and his personal non-compete, the latter unaccompanied by non-competes from the Eber companies, had a fair value of anything approaching the more than $5 million he was paid is virtually risible.

      As for the third, it is true that Southern's 30(b)(6) witness testified at his deposition that Southern would have "objected vehemently" to paying consideration for Lester's consulting services to an Eber entity rather than to Lester personally and would have refused to structure the

---

[114]     Lester Dep. 67:6-19.

[115]     JCOPE was created by legislation enacted in 2011 and was succeeded by a new entity in 2022. Starting in or about 2012, Lester and Southern created letters for filing with JCOPE that purported to state that Lester's lobby compensation was $833.33 per month. *See* Pls.' Ex. 29. That figure amounted to 1.7 percent of his $600,000 annual compensation from Southern during the five-year term of his consulting agreement. When the consulting agreement ran its course in 2012, Southern continued to pay Lester approximately $310,000 annually, of which the reported $10,000 of lobby compensation was 3.2 percent of his annual compensation. *See* Pls.' Ex. 29; Hager Dep. 50:9-51:9. Lester remained bound by the consulting agreement's restrictive covenant against competition in the New York market, or any other market in which Southern did business, until 2017. Pls.' Ex. 27, at § 6; Hager Dep. 51:7-9.

deal in such a manner.[116]  But he offered no persuasive rationale for that position, and the Court does not credit his assertion.  I infer that Southern would have been entirely happy to have paid the millions of dollars it paid to Lester personally instead to the Eber companies – i.e., the sellers – on the condition that they cause Lester to provide the "services" he purportedly was to provide to Southern under the consulting arrangement and that they provide restrictive covenants binding both the companies and Lester personally.

      To be sure, Lester testified at his deposition that he never considered whether his "consulting" agreement might have taken compensation from EBWLC that it otherwise would have received from Southern.[117]  But even his claim that he acted with an empty head rather than a greedy heart is not only beside the point, but it makes little sense.  Lester was a shrewd and experienced business person.  Even a glance at the exceptionally complex and elaborate transaction documents that effected the corporate deal with Southern demonstrates as much.  It cannot have escaped his attention that taking $3 million from Southern under his personal "consulting" agreement contemporaneously with the Eber companies' asset sales to Southern reduced the compensation that otherwise could have been paid to the sellers for the ultimate benefit of the trust beneficiaries, thus depriving his two sisters and their heirs of $2 million that they otherwise could have received at no additional cost to Southern.  Nor could he have failed to notice that the Eber companies could have contracted with Southern for his "consulting" services in lieu of the five-year agreement and at-will agreement at no additional cost to Southern.

      In sum, I find that Lester's five-year "consulting" agreement and subsequent at-will

---

[116]    Hager Dep. 69:13-22.

[117]    Lester Dep. 446:19-24.

agreement with Southern, in substance, were consideration paid to Lester for assets belonging to the Eber companies, which in turn belonged to the trust. Those agreements constituted self-dealing that breached Lester's undivided duty of loyalty as a trustee and are void under the "no further inquiry" rule. EBWLC shall have judgment against Wendy Eber, in her capacity as executrix of Lester's estate, in the amount of $5,438,399 with prejudgment interest of nine percent accruing from the last day of the year in which each payment was made by Southern to Lester.[118]

e.   *The Southern "Consulting" Arrangement and Non-Compete Was a Corporate Opportunity Usurped by Lester*

The corporate opportunity doctrine provides a basis to impose a constructive trust upon all of Lester's "consulting" proceeds from Southern and to reconvey them to EBWLC with prejudgment interest. Lester's consulting arrangement constituted a usurpation of a corporate opportunity properly belonging to EBWLC. Under New York law, "corporate fiduciaries and employees cannot, without consent, divert and exploit for their own benefit any opportunity that should be deemed an asset of the corporation."[119] The Court already has found that Lester did not receive any valid consent from the Eber entities, the trustees, or the trust beneficiaries. Thus, all that

---

[118]

See, e.g., *Meisel v. Grunberg,* 521 Fed. App'x 3, 8 (2d Cir. 2013) (prejudgment interest on recovery for breach of fiduciary duty); N.Y. CPLR § 5001 (interest computed from earliest ascertainable date claim existed).

As evidenced by Lester's tax filings, the Court finds that he received $5,438,399 from Southern for his "consulting" services as follows: $250,000 in 2007, $600,000 in 2008, $600,000 in 2009, $650,000 in 2010, $600,000 in 2011, $480,000 in 2012, $345,900 in 2013, $310,000 in 2014, $310,000 in 2015, $310,000 in 2016, $310,000 in 2017, $310,000 in 2018, $322,500 in 2019, and $39,999 in 2020. *See* Pls.' Ex. 193.

[119]

*Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC,* No. 13-cv-4650 (JFK), 2015 WL 7078641, at *4 (S.D.N.Y. Nov. 12, 2015) (quoting *Alexander & Alexander of N.Y., Inc. v. Fritzen,* 542 N.Y.S.2d 530 (App. Div. 1st Dep't 1989)).

remains is to determine whether the "consulting" arrangement was an opportunity that should be deemed an asset of the corporation. It was.

       With respect to the original five-year contract, EBWLC had an interest and tangible expectancy in the "consulting" agreement because it was inextricably linked with EBWLC's asset sales to and release of claims against Southern. In view of all of the evidence, it is inescapable that much, if not all, of the money paid to Lester under the consulting agreement actually compensated him for assets that were sold by EBWLC pursuant to the company's agreements with Southern. In other words, Lester skimmed millions of dollars off the top of the Southern deal to the detriment of the Eber entities and, ultimately, the trust beneficiaries. Given the volume of contemporaneous transactions between the Eber companies and Southern, the Eber companies' dire need for additional capital, and the collateral impact of Lester's non-compete agreement on all of the Eber entities, it is highly likely that the Eber companies would have realized this corporate opportunity had it been presented to them. The Court finds that Lester obtained the "consulting" agreement due to his control of the Eber entities and that EBWLC could have and, in all likelihood, would have taken advantage of the opportunity had it been presented. Accordingly, the corporate opportunity doctrine provides an independent basis for the relief granted above.

       As for Southern's at-will payments to Lester from 2012 through 2020, those "consulting" proceeds also constituted a usurped corporate opportunity properly belonging to EBWLC. Those payments served, at least in part, to keep Lester happy and the Eber companies he controlled non-competitive. It could not have escaped either Lester or Southern that removing him as a competitive threat had a collateral effect on all of the Eber companies, which he controlled. As the Court already has found, to the extent that Southern genuinely valued Lester's consulting services, it would have been willing to contract with the Eber companies for Lester's services if he

had presented the opportunity to them.  Instead, Lester misappropriated this opportunity for himself without first disclosing the opportunity to any corporate board or the other co-trustees.  EBWLC had a tangible expectancy in the "consulting" opportunity and  the corporate opportunity doctrine therefore provides an independent basis for the relief granted above.

3.    *Lester's Fraudulent Acquisition of Eber Metro – the June 2012 Alexbay Foreclosure*

Judge Parker granted summary judgment to plaintiffs regarding the legality of Lester's acquisition of Eber Metro in 2012,[120] holding that "Lester committed a breach of [t]rust and the transfer of Eber-CT [via Eber Metro] to Alexbay is void under the no further inquiry rule."[121] According to Judge Parker, the remaining question is "whether, and the extent to which, Lester was unjustly enriched . . . and, therefore, whether ordering a constructive trust and reconveyance of Eber Metro and Eber-CT would be an appropriate remedy."[122]  Judge Parker noted that this determination hinged, in her view, on this Court's ultimate findings of fact with respect to "the amount of money the Eber Entities owed to Lester based on the various loans he allegedly extended to those entities, the value of the business at the time of the foreclosure, and other accounting issues."[123]

I agree that the Alexbay foreclosure is void under the "no further inquiry" rule for

---

[120]    TAC ¶¶ 194-219 (Count I).

[121]    Dkt 348, at 18.

[122]    *Id.* at 22.

[123]    *Id.*

the reasons stated in Judge Parker's decision on reconsideration.[124] I respectfully disagree, however, with Judge Parker's conclusion that a finding of unjust enrichment is necessary to set aside the foreclosure transaction and require the reconveyance of the assets received by Alexbay – including stock in Eber Metro and Eber-CT – to EBWLC.[125] Once the "no further inquiry" rule applies, the Court must "set[] aside the transaction or refuse[] to enforce it," regardless of "whether the trustee's action or failure to act has been unfairly influenced."[126] In other words, "the fairness or unfairness of the underlying transaction is immaterial, and the transaction must be set aside."[127] Accordingly, the Alexbay foreclosure is set aside and defendants shall reconvey to EBWLC all assets that were received by Alexbay pursuant to the foreclosure transaction, including any stock in Eber Metro and Eber-CT.

---

[124]

See Dkt 348, at 10-23.

[125]

I am not bound by the law of the case to the magistrate judge's view. "The law of the case doctrine commands that 'when a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case' unless 'cogent and compelling reasons militate otherwise.'" *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (quoting *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002)). Such grounds for departing from the law of the case include an intervening change in the law, the availability of new evidence, or the need to correct a clear error. *See Johnson*, 564 F.3d at 99-100. Here, it is the need to correct a clear error that requires a departure from the law of the case.

[126]

*City Bank Farmers Trust Co.*, 291 N.Y. at 132 (internal citations omitted).

[127]

*Estate of Smith*, 2018 NYLJ LEXIS 2151, *9-10; *see also In re Parisi*, 975 N.Y.S.2d at 462 (citing *City Bank Farmers Trust Co.*, 291 N.Y. at 132) ("no further inquiry" rule is a "per se rule [under which] the court is generally required, upon challenge by a beneficiary, to set aside a transfer of property, held in trust by a fiduciary, to the fiduciary himself or an entity in which he or she has an interest . . . .").

### a.    Lester Was Enriched Unjustly by the Alexbay Foreclosure

Even if a finding of unjust enrichment were required, the evidence amply demonstrates that Lester was enriched unjustly by the Alexbay foreclosure.  In arguing to the contrary, defendants grossly overstate the Eber companies' liabilities to Lester at the time of the foreclosure and understate the value of the company's primary asset, Eber Metro.  As set forth below, the evidence shows that EBWLC's debts to Lester – or his wholly owned company Alexbay – were substantially less than the value of Eber Metro and Lester therefore was enriched unjustly by the foreclosure transaction.

Defendants seek to paint a grim portrait of EBWLC's financial condition at the time of the Alexbay foreclosure.  On January 18, 2012, Lester assigned his entire interest in the debts that EBWLC purportedly owed to him, which defendants claim were in excess of $3 million, to his wholly owned company, Alexbay.  On the same day, Alexbay sent the company a notice of proposal to accept all of Eber Metro's stock in full satisfaction of those debts.[128]  Approximately five months later, on June 5, 2012, EBWLC, Eber Metro, and Alexbay entered into an agreement that transferred all Eber Metro stock to Alexbay in full satisfaction of the purported debts.[129]  That agreement contained a provision stating that "ownership of [Eber] Metro [was] worth less than the [debts to Alexbay]."[130]

Defendants claim that EBWLC owed Alexbay a total of $4,157,586.31 as of June 5,

---

[128]     Dkt 426, at ¶¶ 237-38.

[129]     *Id.* at ¶ 247.

[130]     *Id.*

2012.[131] That figure purportedly represents the sum of (i) principal and accrued interest payable under two "amended and restated" promissory notes from EBWLC to Lester, dated March 13, 2006 (the "2006 Notes"), (ii) principal and accrued interest payable on two checks deposited by Lester into EBWLC in 2009 (the "2009 Checks"), (iii) principal and accrued interest payable to Lester under a line of credit note issued by Eber Metro in late 2009 or early 2010 (the "LOC Note"), minus (iv) principal and accrued interest of Lester's personal account payable to EBWLC.[132] While the $4.1 million total may have been on EBWLC's balance sheet at the time, the evidence shows that the company's purported balance sheet overstated its debts to Lester in several material respects.

Defendants argue also, based on the testimony of their expert Frank Torchio, that Eber Metro was insolvent and worthless at the time of the Alexbay foreclosure. The evidence clearly demonstrates, however, that Torchio's valuation is deeply flawed and that Eber Metro was worth significantly more than any debts that the Eber companies owed to Lester. Accordingly, as set forth below, Lester was enriched unjustly by the Alexbay foreclosure.

### i. The Purported 2006 Notes

Defendants claim that EBWLC owed Lester $1,422,346.96 in principal based on the aggregate of the 2006 Notes ($2,079,645) and 2009 Checks ($212,000), less Lester's personal account payable to EBWLC ($869,298.04).[133] According to defendants, that amount accrued interest at a rate of nine percent per annum, resulting in a total of $1,991,158.36 in principal and accrued

---

[131]     Id. at ¶ 248.

[132]     Id.

[133]     Id. at ¶¶ 250-51 & n.1; Defs.' Ex. KKKKK.

interest as of June 5, 2012.[134]

The 2006 Notes upon which defendants rely are two purported "amended and restated" promissory notes from EBWLC to Lester, both dated March 13, 2006, in the principal amounts of $575,895[135] and $1,503,750,[136] respectively, for a total of $2,079,645. These notes purport to restate and amend two previous notes, the first said to have been dated October 1, 2002 and the second August 15, 2005, each said to have been in the same principal amount as the amended and restated note that purportedly replaced it.

With respect to the October 2002 note, there is no persuasive evidence that the purported original note ever existed, nor that it was given for value received, nor that Lester gave new consideration for the amended and restated note. There are no bank statements, canceled checks, or audited financial records, either from Lester or the Eber entities, reflecting any significant money transfers from Lester to any Eber company prior to 2009.[137] Neither the original nor any copy of the purported original note was produced by defendants. Indeed, prior to August 2011, there is no record of the October 2002 note apart from the purported 2006 Note.[138]

---

[134]

Dkt 426, at ¶¶ 250-51.

[135]

Defs.' Ex. L (purportedly amending and restating a promissory note, dated October 1, 2002, made by EBWLC to Lester in the amount of $575,895).

[136]

Defs.' Ex. K (purportedly amending and restating a promissory note, dated August 15, 2005, made by EBWLC to Lester in the amount of $1,503,750).

[137]

By contrast, defendants provided HSBC bank statements reflecting the $212,000 that Lester paid to EBWLC via the 2009 Checks. *See* Defs.' Ex. T.

[138]

Ex. 234 at 2.

That month, Wendy referred to the October 2002 note in revised minutes from an August 18,

Defendants claim that EBWLC's audited financial statements for the fiscal years ending May 31, 2005 and May 31, 2006 reflect the October 2002 note. They rely on a note to the financial statement that referred to an "unsecured, non-interest bearing note payable to an officer" as of May 31, 2005 – i.e., before the August 2005 note – in the amount of $263,571.[139] But those financial statements actually undercut the credibility of the purported October 2002 note for several reasons.

First, according to the 2005 audited financial statement, the amount owed to the "officer" as of May 31, 2005 was only $263,571 – less than half of the alleged balance due on the purported October 2002 note that purportedly was restated at $575,895 ten months later.[140] Second, the financial statement describes a "non-interest bearing" note, though defendants claim and the 2006 Note states that the purported October 2002 note was interest bearing.[141] Third, the 2006 audited financial statement does not reflect the purported amended and restated October 2002 note, despite the facts that the financial statement (1) covered the year ending May 31, 2006 and (2) was

---

2011 meeting of the Allen Eber trustees. Notably, the first draft of those minutes, which Wendy sent to Lester and an in-house lawyer but not to Gumaer or CNB, did not refer to the October 2002 note and mentioned only the second 2006 Note for $1,503,750.

[139]

*See* Dkt 426, at para. 216 (citing Defs.' Ex. VVV, at 18.)

[140]

Defs.' Ex. VVV, at 18.

For present purposes, the Court will assume, though it does not find, that Lester is the "officer" referenced in the audited financial statement.

[141]

*See* Defs.' Ex. VVV, at 18.

Wendy testified that she believed that reference to the notes as "non-interest bearing" was in error. Tr. 257:14-16. The Court does not credit her testimony.

issued on August 3, 2006. Altogether, there is no credible or persuasive evidence that the October 2002 note ever existed.[142]  Plaintiffs have satisfied their burden of proof, and the Court finds, that the October 2002 loan was not made. Accordingly, the Court assigns it no value.

With respect to the purported August 2005 note, no original or copy ever was produced. There is no evidence that Lester gave any cash or other tangible consideration to EBWLC in exchange for it. The most that can be said is that the note, if it ever existed, was given to – more accurately, taken by – Lester in a voidable, self-interested transaction.

On May 31, 2005, Lester and his chief financial officer, John T. Ryan, signed a purported "unanimous written consent" of the EBWLC Board, of which they were two of the three members,[143] which authorized (1) payment of a $1.5 million "commission" to Lester "for all of his efforts" in consummating a joint venture with National Distributing Company, Inc. ("NDC") and (2) a "bonus plan" that would pay Lester a $1 million bonus in each of fiscal years 2006, 2007, 2008, 2009, and 2010 "to adequately compensate him for his services and to secure his continued employment with the Corporation."[144]  Lester testified that he was "never paid" the $1.5 million

---

142

    Defendants claim that EBWLC's general ledger is evidence of the promissory notes. Dkt 426, at ¶ 219 (citing Pls.' Ex. 160, at 50.)  But the loan balance in the general ledger was entered manually and there is no audit record or other evidence of when that manual entry was created. Pls.' Ex. 160, at 50. Furthermore, EBWLC's unaudited accounting records do not reflect the accrual of any interest on the purported 2006 Notes. The Court does not credit that evidence.

143

    Pls.' Ex. 25, at 2.

    The third EBWLC director and Lester's co-trustee, Gumaer, did not sign the "unanimous" board resolution.

144

    *Id.* at 1.

commission because "[t]here wasn't any money in the company."[145] But EBWLC's accounting records suggest – although do not establish – that the $1,503,750 purportedly owed to Lester pursuant to the August 2005 note, as amended and restated in the 2006 Note, perhaps reflected the commission contemplated by the non-unanimous EBWLC Board resolution, as EBWLC's audited financial statements reflect an increase of approximately $1.5 million in the "[u]nsecured, non-interest note payable to an officer," presumably Lester, between May 31, 2005 and May 31, 2006.[146] Furthermore, an accounting document with handwritten notes from 2011 referred to the $1,503,750 owed to Lester as a "bonus."[147] The Court finds that to the extent the August 2005 promissory note, if it ever existed, and hence the amended and restated note, was in substance a $1.5 million bonus payment to Lester from EBWLC, it is void under the "no further inquiry" rule.

In essence, Lester attempted to award himself $1,503,750 in tax-free compensation that was not approved by the trust beneficiaries, co-trustees, or disinterested directors of EBWLC. The Court finds that Lester breached his duty of undivided loyalty as a trustee and that no exception to the "no further inquiry" rule applies. Accordingly, the "no further inquiry rule" requires that the Court set aside this self-dealing transaction and void the purported 2006 Note.[148]

---

[145]    Lester Dep. 16:19-17:5.

[146]    Pls.' Ex. 205, at 18.

[147]    Pls.' Ex. 6, at 7 ("Description of $1,503,750.00 Bonus").

[148]    Assuming *arguendo* that EBWLC did issue both the October 2002 and August 2005 notes, as amended and restated in 2006, to Lester, they were not valid debts of the company. Because Lester stood on both sides of each purported loan transaction, the burden lay with defendants to prove the entire fairness of the loans. Defendants have not met their burden. *See Alpert*, 63 N.Y.2d at 570 (where "an inherent conflict of interest" exists, "the burden shifts to the interested directors or shareholders to prove good faith and the entire fairness of the [transaction]").

58

Taking the above findings into account, Lester owed EBWLC a net principal amount of $657,298.04 as of June 5, 2012 – the aggregate of the 2006 Notes ($0) and 2009 Checks ($212,000), less Lester's personal account payable ($869,298.04). At trial, defendants conceded, and the Court finds, that Lester's personal account payable to EBWLC was subject to an interest rate of nine percent per annum.[149] Inclusive of interest, Lester owed a total of $1,025,734.14 as of June 5, 2012 for the aggregate of the 2006 Notes and 2009 Checks, less Lester's personal account payable.

### ii. *The LOC Note Was Not a Valid Debt of the Eber Companies*

Defendants claim also that Eber Metro owed Alexbay a principal amount of $1,829,000 pursuant to the LOC Note, which in turn was guaranteed by EBWLC.[150] With interest, defendants claim that Alexbay was owed a total of $2,166,427.95 under the LOC Note as of June 5,

---

The EBWLC Bylaws allowed the company to make loans only with authorization by the Board or "made by properly designated officers as shown on the corporate borrowing resolution." Pls.' Ex. 108, at Art. VII subd. 2. There is no evidence that the Board approved any loan by Lester during this period nor that it authorized Lester to borrow the money on behalf of EBWLC. Tr. at 269:19-270:4 (Wendy testifying that she did not know if she ever found "any corporate borrowing resolution authorizing Lester to loan money to any Eber Brothers company prior to February 2010"). Moreover, Lester unilaterally changed by hand the applicable interest rates on both 2006 Notes from six to nine percent. Defs.' Ex. K at 1; Defs.' Ex. L at 1. Defendants have failed to present evidence that the loans were negotiated or entered into through a process of fair dealing. That the record sheds little light on how the notes' terms were negotiated is strong evidence that the process – if indeed there was any – was not fair to EBWLC. Additionally, there is no evidence that any significant transfers of money or other assets were made by Lester to the Eber companies in connection with these purported loans. Thus, even if Lester did make these loans to EBWLC, he did so in violation of his corporate fiduciary duties and EBWLC's Bylaws.

[149]

*See* Defs.' Ex. KKKKK.

[150]

Dkt 426, at ¶ 249.

2012.[151]  As set forth below, however, the LOC Note constituted a breach of Lester's corporate fiduciary duties and was not a valid debt of the Eber companies.  The Court therefore assigns no value to the purported interest that, defendants claim, accrued on Lester's payments to the Eber companies pursuant to the LOC Note.

Eber Metro issued the LOC Note in late 2009 or early 2010.  It provided that Lester would loan up to $1.5 million to Eber Metro at a 12.5 percent interest rate payable on December 31, 2011.[152]  Lester and Wendy signed the LOC Note on behalf of Eber Metro, and Lester signed it on his own behalf, but their signatures were not dated.  EBWLC's Board purportedly authorized the LOC Note along with a security agreement granting Lester a security interest in Eber Metro's assets, and a guaranty by EBWLC of Eber Metro's debt.[153]  There is substantial evidence, and I find, that Lester transferred the principal amount of $1,829,000 to Eber Metro from 2010 through May 2012 pursuant to the LOC Note.[154]  However, the LOC Note was deficient in several respects and was not a valid debt of the Eber companies.

Neither the LOC Note nor the Board resolution purportedly authorizing it were approved by all of Eber Metro's directors nor by the directors of any other Eber entity.  As stated above, Wendy and Lester signed the LOC Note, but Gumaer – Eber Metro's third director – did

---

[151]     *Id.*

[152]     Defs.' Ex. HH.

[153]     *Id.* at 4; Ex. GG, at 26-28.

[154]     *See* Defs.' Ex. T; Defs.' Ex. U; Pls.' Ex. 22; Pls.' Ex. 160.

not.[155]  Defendants claim that Gumaer approved the LOC Note, as evidenced by EBWLC Board minutes prepared by Wendy and dated February 26, 2010.[156]  But several of the assertions made in the Board minutes are contradicted by other evidence.  The minutes state that Lester refused to loan money to Eber Metro unless the line of credit was secured by "substantially all of the assets of Eber [Metro]."[157]  However, Lester testified that he did not "remember saying that.  I did whatever I had to keep the company alive,"[158] and that the October 2009 LOC Note into which Lester purportedly entered was unsecured.[159]  The minutes state that Wendy and Gumaer voted in favor of the LOC Note, security agreement, and guaranty and that Lester abstained from the vote.  The Court does not find the Board minutes credible and finds that Mr. Gumaer did not approve the LOC Note.

The process by which the LOC Note was drafted, negotiated, and executed was opaque.  The minutes note Glenn Sturm's presence on the Board meeting call.[160]  Sturm – a partner of the Atlanta law firm Nelson Mullins Riley & Scarborough LLP ("Nelson Mullins") – is purported to have represented Lester as his personal attorney.[161]  But Lester testified at his deposition that Sturm was not his personal attorney, before correcting himself to say that Sturm "did some work for

---

[155]    Defs.' Ex. HH, at 5; Defs.' Ex. GG, at 26-27.

[156]    *See* Defs.' Ex. GG, at 28.

[157]    Defs.' Ex. GG, at 28.

[158]    Lester Dep. 102:20-25.

[159]    *See id.*; Defs.' Ex. HH.

[160]    Defs.' Ex. GG, at 28.

[161]    *Id.*

me personally but he did corporate work for [the Eber entities] to[o]."[162]  Lester did not remember

any engagement letter describing any agreement between himself and Sturm, did not recall who paid

Sturm, and could not provide any specific example of "a transaction or document where Glenn

Sturm gave [him] advice as [his] personal lawyer."[163]  Nelson Mullins, Sturm's firm, drafted the

LOC Note and transmitted it – along with a security agreement and guaranty – to Wendy Eber on

February 23, 2010.[164]  Steve Park, another Nelson Mullins attorney, requested that Wendy not sign

the LOC Note and associated documents until he could "touch base . . . again tomorrow to

coordinate the execution."[165]  For his part, Lester testified at his deposition that he did not remember

who drafted the agreements, but it could have been either Sturm or Pat Dalton (a different

attorney).[166]

      Together, this evidence demonstrates that the terms of the LOC Note were not the

result of a fair process.  Rather, it suggests that the LOC Note was another instance of self-dealing,

by which Lester and Wendy sought to bind Eber Metro to terms favorable to them personally and

unfavorable to the Eber companies, including a high interest rate and short maturity date.[167]  The

---

[162]

      Lester Dep. 331:3-24.

[163]

      *Id.*

[164]

      Pls.' Ex. 226, at 1-2.

[165]

      *Id.*

[166]

      Lester Dep. 334:6-21.

[167]

      It bears noting that defendants charged 12.5 percent interest for the LOC Note, but just a few months earlier agreed to a two percent interest rate for the Polebridge non-recourse promissory note.

record indicates also that Lester and Wendy entered into that agreement with no intention of causing Eber Metro to pay off the LOC Note by its maturity date of December 31, 2011. This finding is supported also by Wendy's conduct in the weeks leading up to the LOC Note's maturity date. From October 2011 through January 2012, Wendy helped Lester's lawyer calculate the amount of money he should claim in his anticipated lawsuit against Eber Metro.[168] Despite serving as Eber Metro's chief financial officer and secretary at the time, Wendy testified that she could not remember whether she attempted to renegotiate the LOC Note or extend its maturity date to avoid default.[169]

In all the circumstances, the Court finds that the LOC Note was not the result of a fair process or a fair price and therefore was not a valid debt of the Eber companies, but rather a breach of Lester's corporate fiduciary duties. Accordingly, the Court assigns no value to the "interest" that purportedly accrued on the $1,829,000 that Lester paid to Eber Metro.

The Court finds that EBWLC owed Lester $1,829,000 in relation to his payments pursuant to the purported LOC Note. Together with the Court's finding above – that Lester owed $1,025,734.14 to EBWLC for his personal account payable less the amounts paid under the 2009 Checks – the Court finds that EBWLC owed Lester a net total of $803,265.86 as of June 5, 2012.[170]

     *iii.*    *Valuation of Eber Metro as of June 5, 2012*

Based on the Court's findings above, I find that Lester was enriched unjustly by the

---

[168]

    Pls.' Ex. 109; Pls.' Ex. 112; Pls.' Ex. 114; *see also* Lester Dep. 402:7-16.

[169]

    Eber Metro Dep. 80:3-23.

[170]

    That amount would be less if Lester's personal account payable to the Eber companies accrued interest. The Court does not reach this issue for purposes of the unjust enrichment analysis.

Alexbay foreclosure as long as the value of Eber Metro and its interest in Eber-CT as of June 5, 2012 was greater than the $803,265.86 that EBWLC owed to Lester. And it was.

Lester made a sworn statement on March 14, 2012 that valued Eber Metro at $3.66 million.[171] At trial, the parties offered several valuations of Eber Metro in 2012 through their respective experts, all of which (except for the valuation by defendants' expert Frank Torchio) valued Eber Metro at significantly more than the $803,265.86 that EBWLC owed to Lester.[172]

Torchio submitted the lowest valuation of Eber Metro's interest in Eber-CT at the time of the Alexbay foreclosure – $5,757,768.[173] Combined with Torchio's estimate of Eber Metro's other assets, he estimated the total value of Eber Metro's assets as $6,118,496.[174] Despite this, Torchio asserted that Eber Metro had no value at the time of the Alexbay foreclosure because, he claimed, it was insolvent due to $11,138,680 in liabilities.[175]

---

171

    Pls.' Ex. 45, at ¶¶ 5-7 (Eber Metro's "only asset of any significance is a 79% ownership interest" in Eber-CT, which itself was "valued at $3.660 [m]illion.").

    Lester made this assertion in an affidavit filed in support of his motion for judicial determination of the "commercial reasonableness" of the Alexbay foreclosure under UCC 9-627 then pending before the New York Supreme Court, County of Monroe. *See id.*

172

    Plaintiffs' expert Glenn Liebman estimates that Eber Metro was worth $12.5 million at the time of the Alexbay foreclosure. Liebman noted that his estimate was "a conservative valuation because it did not include any adjustment for the fact that a transaction to acquire 79% of Eber Metro would normally include a control premium." Dkt 401, at ¶ 402.

173

    Torchio Decl., Ex. D.

    Torchio used a "Valuation Date" of May 23, 2012, though there is no evidence in the record to suggest that Eber Metro's value materially changed between May 23 and June 5, 2012.

174

    Torchio Decl. ¶¶ 125-27.

175

    *Id.*

Torchio's estimate of Eber Metro's liabilities is not credible. First, his estimate includes $3,898,366 in liabilities for Lester's "Loan and Line of Credit," including interest thereon.[176] The Court already has found that EBWLC actually owed only $803,265.86 to Lester. Second, for purposes of valuing Eber Metro at the time of the foreclosure transaction, Torchio improperly included liabilities of EBWLC as liabilities of Eber Metro.[177] Moreover, based on defendants' instructions, Torchio erroneously assumed that some liabilities – such as EBWLC's pension funding obligations – were "sum certain" liabilities, rather than contingent liabilities and therefore significantly overstated their amount.[178] At bottom, the Court does not find Torchio's valuation of Eber Metro credible for many of the reasons noted in the declaration of plaintiffs' expert Glenn Liebman.[179]

The Court need not determine a specific value for Eber Metro as of June 5, 2012 to conclude that Lester was enriched unjustly. For present purposes, it is sufficient that the Court finds that, as of June 5, 2012, Eber Metro was worth significantly more than the amount that Lester was

---

[176]  *Id.* at ¶ 46.

[177]  *See* Liebman Decl. ¶¶ 112-13.

[178]  *See id.* at ¶¶ 106-07.

For example, Torchio's estimate included $5,063,388 in liabilities due to EBWLC's underfunded pension liability. Torchio Decl. ¶ 46. That is because defendants instructed Torchio to assume, counterfactually, that EBWLC already had incurred a withdrawal liability from PBGC before June 2012, and that it therefore was a "certainty" that Eber Metro was liable for it as well. *See* Tr. 463:11-21. In other words, rather than valuing the pension funding obligations as a contingent liability, Torchio valued each as a sum certain liability. The Court agrees with Liebman's assessment that the highest value that should have been attributed to the PBGC pension plan liability – if it properly should have been included at all – was the $2,000,000 that actually was paid to settle with PBGC. Liebman Decl. ¶ 109.

[179]  *See generally* Liebman Decl.

owed by EBWLC. Accordingly, the Court finds that Lester was enriched unjustly by the Alexbay foreclosure, which provides an independent basis to conclude that Alexbay has held Eber Metro in constructive trust for EBWLC, subject to EBWLC's reimbursement of the $803,265.86 in debts owed to Alexbay, since June 5, 2012. The Court orders reconveyance of Eber Metro and all of its assets to EBWLC. Ordinarily, recission of this nature would require EBWLC to pay Alexbay the $803,265.86 properly owed to it. In this case, however, the Court instead will offset that amount against the money judgment in favor of EBWLC against the Estate of Lester Eber.

> ### 4. The $400,000 Harris Beach Assignment Is Not a Valid Debt of EBWLC
>
> #### a. The Harris Beach Litigation and Assignment of Claims

In September 2011, nearly a year before the Alexbay foreclosure, Harris Beach PLLC ("Harris Beach") – longtime counsel to EBWLC – sued EBWLC for allegedly unpaid legal fees and litigation expenses.[180] EBWLC asserted a counterclaim and affirmative defenses based on its contention that Harris Beach had committed malpractice.[181] In April 2013, the New York Supreme Court granted partial summary judgment against EBWLC, dismissing EBWLC's malpractice-based counterclaim and affirmative defenses.[182] In January 2014, the Supreme Court granted summary judgment in favor of Harris Beach on its claims for unpaid fees and expenses and entered a

---

[180] Pls.' Ex. 235 (summons and complaint issued to EBWLC by Harris Beach on September 22, 2011).

[181] Pls.' Ex. 241.

[182] *See* Pls.' Ex. 255, at 2 (recounting procedural history).

judgment of $1,031,116.65 against EBWLC.[183]  In October 2014, the Appellate Division reversed the first partial summary judgment ruling and reinstated EBWLC's malpractice counterclaim and affirmative defenses.[184]  Shortly thereafter, in December 2014, Harris Beach filed a second suit against Alexbay, Eber Metro, and Eber-CT to set aside the Alexbay foreclosure based on a theory of fraudulent conveyance.[185]  In January 2015, the Supreme Court vacated the million dollar judgment against EBWLC in view of the Appellate Division's reinstatement of the company's malpractice counterclaim and affirmative defenses.[186]

In October 2015, Harris Beach entered into a settlement agreement with EBWLC, Eber Metro, Eber-CT, and Alexbay.[187]  Defendants released claims on behalf of themselves and the relevant Eber entities including their counterclaims against Harris Beach.[188]  For its part, Harris Beach agreed not to disparage Lester or Wendy publicly and to keep confidential its documents and communications with defendants concerning PBGC and the lawsuits against EBWLC.[189]

In addition, although Harris Beach executed a purported release to defendants and the relevant Eber entities, Harris Beach retained "any claims . . . arising out of the terms of that

---

[183]  See id.

[184]  See id.

[185]  Pls.' Ex. 176, at 3.

[186]  See Pls.' Ex. 255, at 9-10.

[187]  See Pls.' Ex. 176.

[188]  Id. at 5.

[189]  Id. at 5-6.

[October 2015] Agreement . . . ."[190] The settlement agreement assigned from Harris Beach to Lester any and all claims Harris Beach may have had against EBWLC for unpaid legal fees and litigation expenses as well as Harris Beach's "opportunity to recover attorney's fees, costs, and penalties against Lester and Wendy, jointly and severally," pursuant to a conditional contempt order issued by the New York Supreme Court in August 2014.[191]  Per the agreement, Lester paid $400,000 to Harris Beach "[i]n consideration for the assignment . . . ."[192]  The agreement indicated that Lester should "specify '[EBWLC]' on the transfer from the originating bank."[193]

### b.      Litigation with PBGC

In order to understand the context of the Harris Beach litigation and the October 2015 settlement, it is necessary to understand also the contemporaneous litigation between the Eber entities and the Pension Benefit Guaranty Corporation ("PBGC").  After EBWLC made its final contribution to its single employer defined benefit plan (the "Pension Plan") in March 2012, Lester caused the Alexbay foreclosure in June 2012, thereby transferring Eber Metro and its 79 percent interest in Eber-CT to Lester's wholly owned company.

On April 29, 2013, PBGC filed federal statutory liens against EBWLC and its

---

190

Id. at 22.

191

Id. at 3; see Pls.' Ex. 255, at 3 (referring to a "conditional contempt order [] issued against Defendant in August").

192

Pls.' Ex. 176, at 4.

193

Id.

68

"controlled group," including Eber Metro and Eber-CT.[194]  Wendy testified that "[EBWLC] ha[d]

missed a total of $1,106,891 of required minimum funding contributions to the [Pension] Plan" and

that she and Lester had negotiated with PBGC but failed to come to an agreement.[195]  On August 6,

2014, PBGC notified EBWLC of its decision to terminate the Pension Plan because the plan would

be unable to pay benefits when due.[196]  Then on May 11, 2015, after Harris Beach filed its lawsuit

claiming that the Alexbay foreclosure was a fraudulent conveyance, PBGC filed a complaint against

EBWLC in the Western District of New York to establish retroactively a plan termination date of

April 30, 2010, when "[e]ach of Eber Bros., Eber Metro, and Eber-CT was under common control

with EBWLC and a member of EBWLC's 'controlled group.'"[197]

　　　　Folded into defendants' October 2015 settlement agreement with Harris Beach was

an attempt to prevent the Pension Plan's retroactive termination.  In other words, defendants enlisted

Harris Beach in their efforts to shield the fruits of the fraudulent Alexbay foreclosure – Eber Metro

and Eber-CT – from the litigation with PBGC.  Pursuant to the settlement, defendants obtained an

affidavit from Pat Dalton, their Harris Beach attorney, in which he purportedly recanted or clarified

his prior sworn statements from the fraudulent conveyance suit.[198]  Two months after the Harris

---

[194]　Wendy Decl. ¶ 75; Defs.' Ex. WWWW; *see also* 29 U.S.C. § 1301(a)(14) (defining "controlled group" in the context of a single-employer benefit plan).

[195]　Wendy Decl. ¶¶ 75-76.

[196]　*Id.* ¶ 75; Defs.' Ex. RR.

[197]　Pls.' Ex. 186, at 2.

[198]　*See* Pls.' Ex. 176, at 1 (referencing Dalton's affidavit, which is under seal on the docket in N.D.N.Y. Case No. 15-cv-06283 (MAT)); *see also* Pls.' Ex. 166, at 8.

Beach settlement agreement was executed, defendants relied on the Dalton affidavit to support their contention in the PBGC litigation that Eber-CT had no value.[199] In that proceeding, defendants misrepresented the disposition of Harris Beach's claims by stating that "the litigation recently settled for nuisance value, and the claims were dismissed with prejudice on the merits" when in fact Lester had paid $400,000 for the assignment of Harris Beach's claims against the Eber entities.[200]

On January 19, 2016, the federal court in the PBGC action entered a judgment in favor of PBGC deeming the Pension Plan retroactively terminated as early as April 30, 2010.[201] Upon termination, each member of the EBWLC controlled group became jointly and severally liable for all ERISA liabilities in connection with the Pension Plan's termination, including unfunded benefit liabilities, due and unpaid contribution, premiums, and interest.[202] According to a May 10, 2017 audit, these liabilities totaled $7,985,670 as of August 31, 2016.[203] PBGC's final determination demanded immediate payment by the controlled group of $2,187,500 and an agreement to pay

---

[199] According to defendants, PBGC relied on Dalton's prior statements to assert that Eber Metro's equity interest in Eber-CT was worth at least $15.8 million at the time of the Alexbay foreclosure. *See* Pls.' Ex. 166, at 8. In his affidavit, Dalton "admitted" that he had "no view" on the value of Eber-CT and that his prior statements regarding the value of Eber-CT "involved significant assumptions and contained elements of speculation." *Id.*

[200] Pls.' Ex. 166, at 8.

[201] *Id.*

[202] Defs.' Ex. DD, at 17.

[203] Defs.' Ex. HHHH.

[203] *Id.*

$4,050,420 – the remainder of the liabilities – by April 4, 2016.[204]

Finally, on February 23, 2017, PBGC, the controlled group members, and Lester entered into a settlement agreement pursuant to which PBGC agreed to release the controlled group from all liabilities in exchange for an agreement by Lester and his wife to waive their future benefit entitlements under the Pension Plan, in the amount of approximately $1,400,000, plus an additional cash payment of $2,000,000 by the controlled group.[205]

### c. The Harris Beach Settlement Constituted Self-Dealing by Lester

During this case, Wendy took a position inconsistent with her previous sworn statements regarding Harris Beach's representation during the 2010 transactions. Wendy had stated under oath in the earlier litigation with Harris Beach that Harris Beach's bills were not reasonable or accurate, relied on inaccurate accounting, and included hourly charges for matters that were taken on a contingency fee basis.[206] Nonetheless, after Lester had acquired Harris Beach's claims, Wendy (as executrix of Lester's estate) wrote a letter to the EBWLC board, *of which she then was the sole director*, demanding that EBWLC pay the estate the purported value of Harris Beach's claims: $1.7 million plus, including interest.[207]

Defendants seek to have the $400,000 paid by Lester, plus interest, credited as "a

---

204    Defs.' Ex. QQ, at 4.

205    Pls.' Ex. 186, at 2.

206    Pls.' Ex. 281, at ¶¶ 7-13.

207    *See* Tr. at 356:1-357:23.

set-off . . . against any award of damages in this case."[208]  No such set-off is appropriate here.  The evidence establishes that the $400,000 paid by Lester was not a valid expense of the Eber companies.  Rather, it overwhelmingly suggests that the purpose of the settlement, at least in part, was to protect the defendants' fraudulent transfer of Eber Metro to Alexbay from attack by Harris Beach, PBGC, plaintiffs, or anyone else.[209]

Moreover, the Harris Beach settlement constituted a breach of Lester's duty of undivided loyalty to the trust.  At the time of the settlement, EBWLC was a wholly owned subsidiary of EB&C and an asset of the trust.  By purchasing Harris Beach's claims against EBWLC, Lester put himself in an adversarial position with respect to the trust, which was exacerbated by the simultaneous waiver of EBWLC's counterclaims against Harris Beach.[210]  Wendy's demand – on behalf of Lester's estate – for over $1.7 million exemplifies the self-dealing that the duty of loyalty under both trust and corporate law seeks to avoid.  Defendants completely have failed to establish the entire fairness of this blatantly self-interested transaction.  Under New

---

[208]  Dkt 426, at ¶¶ 595-96.

[209]  This finding is supported by, among other things, the fact that (1) Lester paid the $400,000 settlement from personal funds but specified "Eber Bros. Wine & Liquor Corp." on the transfer from the originating bank; (2) the settlement agreement dismissed the fraudulent conveyance claims against Eber Metro, Eber-CT, and Alexbay, but assigned Harris Beach's breach of contract claims to Lester; (3) the settlement included an affidavit by Dalton purportedly recanting or clarifying his prior sworn statements from the fraudulent conveyance suit; (4) shortly thereafter, defendants used the Dalton affidavit in their litigation against PBGC; and (5) the settlement agreement required that Harris Beach not disparage Lester or Wendy and required Harris Beach to safeguard the attorney-client privilege and keep confidential anything having to do with PBGC.

[210]  As noted by plaintiffs, "[t]hat position is further exacerbated by the fact that the Harris Beach claims only arose because Lester himself caused EBWLC to fail to pay Harris Beach. Thus, Lester now purports to hold claims against EBWLC based on conduct he controlled and caused EBWLC to undertake, all while he was co-trustee." Dkt 402, at 16 n.16.

York law, "[a] wrongdoer who makes improvements to another's property with knowledge of the true owner's rights is barred from recovering the costs of those improvements."[211]

For the foregoing reasons, Lester's estate is not owed anything by plaintiffs or any of the Eber companies with respect to the $400,000 paid to Harris Beach. Accordingly, the Court will not set off that sum against the money judgment awarded to plaintiffs here.

### 5. *Lester's April 2012 Employment Contract Is Set Aside*

In April 2012, two months prior to the Alexbay Foreclosure, Wendy, on behalf of Eber-CT, executed an employment agreement with Lester.[212] The agreement provided, among other things, that upon Lester's death he was entitled to a "severance" payment, which included a lump sum equal to three times his then-current base salary plus an amount equal to three times Lester's bonus for the year prior to his death.[213] This severance was to be paid from the funds of Eber-CT, which, through EB&C, remained a trust asset in April 2012. The preponderance of the evidence shows that the agreement was not approved by Eber-CT's Board as required by the company's LLC

---

[211]

    *Flaum v. Birnbaum*, 582 N.Y.S.2d 853 (App. Div. 4th Dep't 1992).

[212]

    Pls.' Ex. 180, at 1.

[213]

    *Id.* at 4.

agreement,[214] nor was it approved by Lester's co-trustees nor consented to by plaintiffs.[215]

Following Lester's death on April 5, 2020, a severance payment was made to his estate pursuant to the April 2012 employment agreement in the amount of $675,991.[216] While the exact date of the payment is not in the record, it was made no later than May 31, 2020 as evidenced by Eber-CT's financial statement for the period ending on that date.[217]

Plaintiffs assert that the April 2012 employment agreement should be set aside on the basis that it was a self-dealing transaction by Lester to which neither the co-trustees nor the trust beneficiaries consented. The Court agrees. Without notice to or consent from the Board of Managers, the co-trustees, or the trust beneficiaries, Lester conferred upon himself a lucrative "death benefit," which ultimately inured to the benefit of Lester's heir, Wendy, who signed the agreement on behalf of Eber-CT. There is no exception to the "no further inquiry" rule that covers this self-dealing transaction, and the Court thereby sets it aside.[218] Accordingly, defendants must

---

214

See Pls.' Ex. 57, at § 5.2.1 ("The salaries of all Officers and agents of the Company shall be fixed by or in the manner prescribed by the Board.").

The only evidence offered by defendants to the contrary is Wendy's testimony that she "assume[d] [the employment agreement] was approved by the board." Tr. 291:23–292:12.

215

Indeed, plaintiffs were not aware of the April 2012 employment agreement until after the close of discovery because it was not disclosed by defendants. See Tr. 292:13–24.

216

See Pls.' Ex. 220, at 14.

217

Id.

218

Aside from the "no further inquiry" rule, the April 2012 employment agreement is void because defendants violated their corporate fiduciary duties. Both Lester and Wendy had conflicts of interest in the severance benefit payable upon Lester's death and yet they unilaterally executed the agreement without approval from Eber-CT's Board or notice to the co-trustees or trust beneficiaries. Defendants have failed to establish "a fair process and

reconvey to Eber-CT the $675,991 that improperly was paid to Lester's estate.  Additionally, defendants shall pay prejudgment interest at the annual rate of 9 percent on the total judgment amount from May 31, 2020 to the date of entry of the judgment.[219]

6.  *The 2017 Issuance of EBWLC Voting Preferred Shares to Lester Is Void*

As set forth in Judge Parker's account:

"On February 14, 2017, Lester Eber, as President of EB&C[, which was] the 'holder of all outstanding shares of Class A common stock of [EBWLC],' appointed Wendy Eber the sole director of EBWLC. (Brook Decl. in Supp Ex. 43, 26; *see also* Pls.' Rule 56 Statement ¶ 98.)  That same day, Wendy Eber executed a Certificate of Amendment of the Certificate of Incorporation of EBWLC, authorizing the creation of Class B junior preferred stock with voting rights.   (Pls.' Rule 56 Statement ¶ 100; Brook Decl. in Supp. Ex. 43, 22-25.)  Plaintiffs contend that the Amendment to the Certificate of Incorporation was not approved by a vote of EBWLC's shareholders or by a written consent in lieu of a shareholder meeting. (Pls.' Rule 56 Statement ¶ 99.)  Defendants counter that because EB&C was the sole owner of EBWLC, Lester, as President of EB&C, was authorized to approve the amendment.  (Lester Eber Aff. in Opp'n ¶ 31.)

The next day, Wendy signed a Resolution on behalf of EBWLC issuing 750

---

[219]  fair price" for the self-dealing transaction and, therefore, have failed to satisfy their burden of proving "good faith and the entire fairness" of the agreement.  *See In re Kenneth Cole Prods.*, 27 N.Y.3d at 275; *Alpert*, 63 N.Y.2d at 570.

*See, e.g., Meisel,* 521 Fed. App'x at 8 (prejudgment interest on recovery for breach of fiduciary duty), N.Y. CPLR § 5001 (interest from earliest ascertainable date claim existed).

shares of Class B junior preferred stock to Lester in exchange for Lester's 'agreement to reimburse the Corporation, at its request, for up to $37,500.00 of expenses incurred or to be incurred by the Corporation in connection with its general operations.' (Brook Decl. in Supp. Ex. 43, 21; *see also* Pls.' Rule 56 Statement ¶ 100.) Lester also signed the Resolution. (*Id.*)"[220]

Defendants claim that the purpose of this series of transactions was to make Lester a "majority owner" of EBWLC, as that term is used in 29 C.F.R. § 4041.47(d), so that he could agree to relinquish his remaining pension benefits under the Pension Plan as part of EBWLC's settlement with PBGC.[221] Wendy testified that "he had to be the beneficial owner of a majority of the [EBWLC] stock" in order to waive his right to future pension plan benefits.[222]

Prior to the issuance to Lester of the 750 Class B junior preferred shares of EBWLC, EB&C held 100 percent of the voting stock in EBWLC in the form of 2,000 shares of Class A common stock, of which each share was entitled to one vote.[223]

Upon issuance of the 750 junior preferred shares, of which each share also was entitled to one vote, Lester held a direct or indirect beneficial interest in over half of EBWLC's voting stock – 666 and 2/3 shares of Class A common stock and 750 shares of Class B junior

---

[220]    Dkt 314, at 19-20.

[221]    *See* 29 C.F.R. § 4041.47(d) ("A majority owner may elect to forgo receipt of all or part of his or her plan benefits in connection with a distress termination."); *see also* 29 C.F.R. § 4041.2 (defining "majority owner" in relevant part as "an individual who owns, directly or indirectly, 50 percent or more" or "[e]ither the voting stock of a corporation or the value of all of the stock of a corporation").

[222]    Tr. 237:2-11.

[223]    *See* Pls.' Ex. 147, at 7; Defs.' Ex. AA, at 1-3.

preferred stock, combining for a total of 1,416 and 2/3 (or 51.5 percent) of the total 2,750 voting shares in EBWLC.[224]

Regardless of the underlying purpose, these transactions are another instance of self-dealing by Lester that is void under the "no further inquiry" rule. The 750 Class B junior preferred shares gave Lester equity, preferential dividend and liquidation rights, and voting power.[225] In return, Lester's purported consideration for the shares was an agreement to "reimburse [EBWLC], at its request, for up to $37,500.00 of expenses incurred or to be incurred by [EBWLC] in connection with its general options."[226] But Lester never paid a penny pursuant to that agreement.[227]

Most importantly, there was no persuasive evidence that either of Lester's co-trustees or the trust beneficiaries was informed about or consented to Lester's acquisition of these shares in EBWLC. To the contrary, plaintiffs objected to these transactions and moved for summary judgment to void them. The "no further inquiry" rule requires that I set aside these transactions regardless of their underlying fairness or lack thereof.[228] The 750 Class B junior preferred shares

---

[224]

    *See id.*

[225]

    Defs.' Ex. AA, at 1-3.

[226]

    Pls.' Ex. 43, at 3.

[227]

    *See* Lester Dep. 263:7-264:2 (testifying that he had not paid any amount to EBWLC in relation to the agreement to reimburse up to $37,500 of expenses).

[228]

    In all events, Lester and Wendy have failed to establish the entire fairness of these self-dealing transactions, which violated their corporate fiduciary duties. Without any notice to the co-trustees or trust beneficiaries, Lester and Wendy coordinated to create a new class of junior preferred shares in EBWLC and then issued 750 of those shares to Lester. These shares entitled Lester to equity, dividends, voting rights, and liquidation rights in exchange for a dubious "I.O.U." that was never paid. *See* Lester Dep. 263:7-264:2 (testifying that he had not paid any amount to EBWLC in relation to the agreement to reimburse up to $37,500

of EBWLC that were issued to Lester as of February 15, 2017 are void and canceled. Defendants shall account for and disgorge any EBWLC distributions received by them in relation to the 750 shares of EBWLC stock with prejudgment interest of nine percent.

D.    *Other Transactions Set Aside*

1.    *The Polebridge Transaction*

In mid-2010, Eber Metro owned 85 percent of Eber-CT while a company called Eder-Goodman owned the other 15 percent. Eber Metro was wholly owned by EBWLC.[229] The threshold for Eber-CT to be counted as part of EBWLC's "controlled group" for ERISA purposes was 80 percent. At that time, Eber-CT was the only operating entity among the Eber companies and was the most valuable asset of Eber Metro, which in turn was the most valuable asset of EBWLC, which in turn was the most valuable asset of EB&C.[230] Thus, Lester and Wendy schemed to transfer six percent of Eber-CT away from Eber Metro to prevent Eber-CT's assets from being tapped by PBGC to fund EBWLC's Pension Plan.

Wendy testified that Eber-CT hired Sturm for "his assistance in formulating a plan to turn around the company" by providing strategies to secure new financing and helping to manage

---

of expenses). In effect, Lester and Wendy secretly gave Lester a significant windfall – to the detriment of plaintiffs – for no consideration. As such, these transactions are voidable also as violations of their corporate fiduciary duties of loyalty.

Additionally, New York law requires approval by "vote of a majority … of shareholders" to create a new class of shares. N.Y. B.C.S. § 803(a). No such vote ever took place, and there was no written authorization in lieu of a vote.

[229]

JPTO, at 5.

[230]

Only two years earlier, Eder-Goodman purchased its 15 percent stake in Eber-CT for $4.5 million based on a $30 million valuation of the company. *See* Pls.' Ex. 56.

its relationship with CNB.[213] After retaining Sturm, according to Wendy, the company decided to sell a partial equity interest in Eber-CT.[214] Whether it was Sturm's idea or not, the record makes clear that defendants' attorney, Pat Dalton – in discussions referenced in a May 17, 2010 letter – sought consent from Eder-Goodman to transfer six percent of Eber Metro's interest in Eber-CT to Wendy.[215] Andrew Eder, a part owner of Eder-Goodman,[216] testified, and I find, that defendants told Eder-Goodman two different stories in an effort to justify the transfer to Wendy – first, that defendants wished to make the transfer because of Wendy's divorce and, second, that Lester wished to reward Wendy for her service to the company.[217] Defendants repeated their intent to transfer the interest to Wendy in subsequent communications including a draft joinder agreement sent by Dalton to Eder-Goodman's counsel on May 25, 2010.[218]

Shortly thereafter, defendants decided to "identify an alternative purchaser of the 6 [percent] interest in [Eber-CT]."[219] On May 26, 2010, Gumaer emailed Wendy to express his concern that the transfer improperly would grant her a benefit to the detriment of the trust

---

213
    Wendy Decl. ¶ 105.

214
    *Id.* ¶¶ 105-15.

215
    Pls.' Ex. 292, at 2.

216
    Tr. at 98:23-99:7.

217
    Tr. at 105:10-106:4.

218
    *See* Pls.' Ex. 292, at 2; Pls.' Ex. 293, at 1-2 (letter attaching Eber-CT's financial information); Pls.' Ex. 294, at 2 (draft joinder agreement); Pls.' Ex. 295.

219
    Pls.' Ex. 119, at 2.

beneficiaries:

> "I get a little nervous about the possibility that you are receiving something that will, at least in theory, benefit you individually, at the expense of the other persons holding a beneficial interest in the Eber Trust. I don't have Dalton's or Sturm's e-mail addresses, but you might wish to pass these comments on."[220]

That same day, Sturm wrote to Dalton, copying Wendy and Lester, to memorialize a conversation about the same issue. Sturm described a plan to create a new company – which eventually would be called Polebridge Bowman Partners, LLC ("Polebridge") – to "purchase" six percent of Eber-CT for a secured non-recourse note in an unspecified amount.[221] Instead of Wendy, the sole member of this company would be Sturm. Wendy would receive an exclusive right of first refusal ("ROFR") to purchase the new company's shares of Eber-CT as well as a proxy to vote the new company's equity interest in Eber-CT and a limited power of attorney.[222] When all was said and done, Wendy – likely falsely – told Gumaer that Eder-Goodman had requested that she receive the ROFR.[223]

Lester and Wendy testified that the transaction was designed to compensate Sturm for his services because "the company didn't have any money to pay him."[224] But this contention

---

[220]     *Id.*

[221]     *Id.*

[222]     *Id.*

[223]     *See* Tr. at 339:24-342:22.

[224]     Lester Dep. 95:8-14 (testifying that "the six percent to [Sturm] . . . was a way to pay him and the company didn't have any money to pay him"); Wendy Decl. ¶ 108.

is at odds with evidence showing that defendants initially presented the transaction to Eder-Goodman as a benefit to Wendy.  It also does not comport with EBWLC's ledger for the period, which shows that from April 1, 2010 to May 31, 2012 the company paid over $1,100,000 to various law firms and accountants.[225]  Both Lester and Wendy testified also that "Mr. Sturm originally proposed a 10 [percent] ownership interest in Eder-CT, but Lester negotiated him down to 6 [percent] in May 2010."[226]  There is no support in the record for any such negotiation having taken place other than this testimony, which the Court does not find credible.

On July 29, 2010, Wendy sent a proposed resolution, signed by herself and Lester, authorizing the Polebridge transaction to Gumaer via email.[227]  The resolution was backdated to "as of" May 28, 2010 – just a few days before the end of EBWLC's fiscal year.  Lester testified that Wendy worked most closely with Sturm in planning and executing the transaction.[228]  Eber Metro's testimony – through its corporate representative witness, Wendy – did not contradict Lester's view.[229]

Ultimately, Polebridge "purchased" the six percent interest in Eber-CT in exchange

---

225

    Pls.' Ex. 160, at 75-77.

226

    Wendy Decl. ¶ 109; Lester Dep. 184:15-23; *see also* Pls.' Ex. 46, at ¶ 39 (affidavit of Lester Eber in the Harris Beach litigation).

227

    Pls.' Ex. 120.

228

    Lester Dep. 96:5-11.

229

    Eber Metro Dep. 40:8-42:20 (testifying that Lester "knew about [the Polebridge transaction]. I don't remember how much involved he was involved in it [sic]").

for a $350,000 non-recourse promissory note with two percent interest.[230]  But the Polebridge transaction was a sham.  Sturm acted as a straw man who provided temporary "parking space" for the six units of Eber-CT with Sturm's Polebridge entity with the end goal of transferring the shares to Wendy.  Neither Polebridge nor Sturm ever paid any actual cash for the six percent interest in Eber-CT nor the interest accruing under the Polebridge Note.[231]  The "sale" to Polebridge was executed simultaneously with an irrevocable stock power that appointed Eber Metro as Polebridge's "attorney-in-fact, with full power of substitution," and irrevocably assigned the Eber-CT stock to Eber Metro.[231]  Eber Metro had a proxy to vote the equity interest held by Polebridge, and Wendy received an exclusive right of first refusal to attempt to ensure that the shares never would be alienated except to her.[232]

In May 2015, Wendy and Lester extended the maturity of the Polebridge Note to May 29, 2016[233] -- purportedly because of Sturm's hardship arising from cancer treatment.  Then, on May 26, 2016, Wendy extended it again to May 29, 2026.[234]  On February 15, 2017, Wendy formally acquired the six percent interest in Eber-CT from Polebridge in exchange for her

---

[230]
    *See* Dkt 314, at 8.

[231]
    *See* Eber Metro Dep. 40:17-41:9.

[231]
    Pls.' Ex. 14, at 11.

[232]
    *See id.*

[233]
    Pls.' Ex. 58.

[234]
    Pls.' Ex. 260.

assumption of Polebridge's ostensible debt to Eber Metro.[235] Sturm never paid a penny in principal or interest on the Polebridge Note. Wendy had no need to exercise her ROFR because no other offers were sought or made for the shares.[236] She did not allow any of the Eber entities the opportunity to buy the interest in Eber-CT nor did she disclose to any Eber entity that the transaction had taken place.

In the fiscal years ending May 2017 and May 2018, Wendy received $154,102 in distributions from Eber-CT.[237]

Plaintiffs allege, and the Court finds, that Polebridge's purchase of six percent of Eber-CT in 2010 was a sham formulated to get Eber Metro and Eber-CT out of the EBWLC controlled group and protect them – as well as Lester and Wendy – against the PBGC claim while keeping the shares under the control of Lester and his daughter.

Even if defendants initially did not realize they were taking trust assets to the detriment of the trust beneficiaries, which is extremely doubtful, Wendy became aware of this at the latest when Gumaer raised his concern that she was proposing to "receiv[e] something that w[ould] . . . benefit [her] individually, at the expense of the other persons holding a beneficial interest in the Eber Trust."[238] Wendy was not a co-trustee, but Lester and Gumaer were. Moreover, she was a director of Eber Metro, along with Lester and Gumaer, and therefore owed duties to the trust

---

[235] Defs.' Ex. RRRR.

[236] Wendy Decl. ¶ 159.

[237] Pls.' Ex. 218, at 7 (showing 2017 and 2018 distributions).

[238] Pls.' Ex. 119, at 1.

beneficiaries.[239]  Lester's testimony made clear that he was involved in the Polebridge transaction. He signed the Eber Metro Board resolution authorizing the transaction.  And he repeated under oath the false story that the transfer was designed to compensate Sturm for services to the company. CNB never approved the transfer and the trust beneficiaries were not notified.

 A trustee has a duty to avoid situations in which the trustee's personal interests conflict with those of the beneficiaries.  Lester's desire to enrich his daughter constituted such a conflicting interest and a breach of his undivided duty of loyalty as a trustee.[240]  Given this conflict, the transfer constituted a breach of Lester's undivided duty of loyalty, which Wendy aided and abetted.  Polebridge (and later Wendy) have held the six units of Eber-CT in constructive trust for the benefit of Eber Metro ever since the shares were transferred away from Eber Metro in 2010.[241] Wendy shall reconvey the six units of Eber-CT to Eber Metro, as well as all Eber-CT distributions received by her in relation to the six units of Eber-CT with prejudgment interest of nine percent.

 Wendy's breach of her corporate fiduciary duties provides an independent basis to

---

[239]  Pls.' Ex. 120, at 4.

[240]  *See* RESTATEMENT (THIRD) OF TRUSTS § 78 ("[I]t would ordinarily be a breach of trust for the trustee to hire his . . . son or daughter . . . to manage trust property[] or to handle transactions involving the sale or purchase of securities or other property for the trust.  An arrangement of this type would create a temptation for the trustee to consider the interests of others rather than to act solely in the interests of the beneficiaries.  It would also deprive the beneficiaries of the circumstantial assurance that the trustee will exercise an independent and objective judgment . . . not only in the selection of persons to provide trust services but also in establishing the duties, compensation, and other terms of the employment . . . .").

[241]  *See Saltzman*, 131 F.3d at 91 ("One who receives property as a result of a breach of trust holds the property in constructive trust. . . .  In the case of a constructive trust, the duty is merely to surrender the property.").

The Polebridge transaction was not authorized before July 29, 2010, but it was backdated to May 28, 2010.  *See* Pls.' Ex. 120.

void the Polebridge transaction. During all relevant times, Wendy served as either an officer or director of EBWLC and Eber Metro. Given the Court's finding that the transfer always was intended to benefit Wendy despite Sturm's nominal control of Polebridge, Wendy's coordination and execution of the transaction was tainted by self interest. Defendants have not come close to establishing the entire fairness of the transaction as required "[w]here officers or directors of a corporation considering a transaction are not disinterested and have a personal stake in the outcome."[242] The process deliberately was opaque in order to mislead outsiders to believe that the transfer was for the purpose of compensating Sturm for professional services. But Sturm was nothing more than a straw man for Wendy's acquisition of the interest in Eber-CT. There is no proof in the record that any cash or valuable consideration was given to Eber Metro in exchange for the six percent interest. Without evidence of bona fide negotiations, the Court cannot conclude that Polebridge's non-recourse promissory note was a fair price for the six percent interest, which could have been valuable given Eder-Goodman's purchase of a 15 percent interest in Eber-CT for $4,500,000 just two years earlier.[243]

---

[242]

In re Perry H. Koplik & Sons, Inc., 476 B.R. 746, 803 (Bankr. S.D.N.Y. 2012), aff'd, 567 F. App'x 43 (2d Cir. 2014) ("Where officers or directors of a corporation considering a transaction are not disinterested and have a personal stake in the outcome, their determination is not entitled to the deference usually given under the business judgment rule. Instead they must show the entire fairness of the transaction, or that it is 'intrinsically fair.'"); see also id. at n.307 ("New York law may not be as well as developed as the Delaware law, [but] it is to the same effect.")

[243]

Pls.' Ex. 57, at 34 (Schedule A).

It is notable also that in 2007 – prior to selling the 15 percent interest in Eber-CT for $4.5 million – Eder-Goodman offered to buy the entire company for close to $30 million. Tr. 97:3–17. Defendants never responded to this offer, refusing even to negotiate. This contradicts their sworn testimony that they tried, but failed to find a purchaser for Eber-CT after the collapse of EBWLC's New York operations.

Wendy's purchase of the shares from Polebridge in 2017 was tainted also by self-dealing. As an officer of EBWLC, Eber Metro, and Eber-CT, Wendy had dual obligations to secure the lowest price possible for the outstanding shares and an obligation to present the investment opportunity to the Eber entities. Moreover, defendants have not shown that Wendy's assumption of the non-recourse promissory note payable to Eber Metro in exchange for her receipt of the shares constituted anything approaching a fair price. The Court finds that Wendy was not a *bona fide* purchaser of the six units of Eber-CT.

Accordingly, the transfer of six percent of Eber-CT to Polebridge is void, and Wendy's subsequent acquisition of the shares is cancelled. A constructive trust is imposed on the six percent of Eber-CT and any distributions received by Wendy in relation thereto as set forth above. The Polebridge non-recourse promissory note assumed by Wendy is cancelled as void.

2.     *Post-Foreclosure Transactions*

Shortly after their fraudulent transfer of Eber Metro to Alexbay in June 2012, Lester and Wendy executed several other transactions that violated their duties as corporate fiduciaries and, in the case of Lester, as trustee.

a.     *Slocum Maine Transfer to Wendy and Lester*

In February 2005, Eber Metro acquired Slocum & Sons, a wine and liquor distribution business in Connecticut, and merged it into Eber-CT, which then was a wholly owned subsidiary of Eber Metro. As part of the merger, Eber Metro acquired a call option to purchase all of the outstanding stock of Slocum & Sons of Maine, Inc. ("Slocum Maine"), a wine import

company, "for an aggregate purchase price of $10.00."[244] Originally, the call option was exercisable at any time on or before December 31, 2008, but it subsequently was extended to December 31, 2012.[245]

In July 2012, one month after the Alexbay foreclosure transferred 100 percent of Eber Metro's stock to Lester's wholly owned company, Eber Metro exercised the call option to acquire all of Slocum Maine's stock.[246] But instead of transferring the equity to Eber Metro, Lester and Wendy each personally took 50 percent of the shares.[247] There is no evidence that either of them paid Eber Metro for the 100 percent equity interest in Slocum Maine. The record reflects that Slocum Maine paid Lester an income each year starting in 2012 and paid $10,000 "bonuses" to both Lester and Wendy in 2014.[248]

Lester and Wendy violated their duties both to the trust and to Eber Metro when they took personal ownership of the Slocum Maine shares acquired through Eber Metro's call option. As a result of their self-dealing, defendants took possession of assets properly belonging to Eber Metro, which in turn properly belonged to the trust. They thereby deprived the trust of income-bearing assets from July 2012 to present. Defendants hold the shares of Slocum Maine in constructive trust for the benefit of Eber Metro and shall convey the shares to Eber Metro, as well

---

[244]    Pls.' Ex. 55; Tr. 94:25-96:5.

[245]    *See* Pls.' Ex. 55.

[246]    *See id.*

[247]    *Id.* at 2.

[248]    Pls.' Ex. 142, at 1-2 (showing that Lester received income from Slocum Maine from 2012-2016); Pls.' Ex. 89 (showing $10,000 bonuses paid to Lester and Wendy).

as any distributions made to them in relation thereto. The Court awards prejudgment interest of nine percent on all Slocum Maine distributions received by defendants in relation to the shares of Slocum Maine.

### b. Wendy's Employment Agreement and Receipt of Eber Metro Shares

On August 14, 2012, shortly after Lester and Wendy helped themselves to all of the shares of Slocum Maine at Eber Metro's expense, Lester executed on behalf of Eber-CT an employment agreement for Wendy to become Eber-CT's president, which included substantially similar benefits to those that Lester received pursuant to his April 2012 employment agreement discussed above.[249] This contract was approved only by Lester – in his then-role as Eber-CT's president – and not by Eber-CT's Board.[250] On the same day, Lester granted Wendy 2,000 shares of Eber Metro stock, a 9.1 percent interest in the company, which vested fully in 2015.[251] According to Wendy, the transfer of shares was an inducement for Wendy to enter into the employment agreement.[252]

Wendy testified that she worked tirelessly "in trying to turn Eber-CT into a profitable business."[253] According to her, her cash compensation as president of Eber-CT was approximately

---

[249]  Pls.' Ex. 151, at 8-16.

[250]  *Id.* at 16.

[251]  *Id.* at 1.

[252]  Wendy Decl. ¶ 158.

[253]  *Id.* ¶ 156.

$162,000, which was lower than the compensation of both John Slocum and Lester. Thus, Wendy claimed, she received part of her compensation in the form of an "ownership incentive[]" or equity interest in the business.[254]

Defendants contend without persuasive support that this arrangement was approved by the Board of Eber-CT, yet the only signatory on behalf of Eber-CT was Lester.[255] Defendants have not established that the employment agreement was approved by Eber-CT's Board.

At the time the employment agreement was executed, the trust properly owned – but for defendants' fraudulent and self-interested transactions that are voided – 100 percent of EBWLC and Eber Metro and 85 percent of Eber-CT. The Court finds that Lester and Wendy violated their duties as trustee, in the case of Lester, and as corporate fiduciaries by executing the August 2012 employment agreement. Both Lester and Wendy had conflicts of interest in the execution of the agreement and yet they unilaterally executed the agreement without approval from Eber-CT's Board or notice to Eber Metro or Eber-CT's stakeholders, including Eder-Goodman or the trust beneficiaries. Defendants have failed to establish a "fair process" or a "fair price" for this self-dealing transaction and therefore have failed to satisfy their burden of proving "good faith and the entire fairness" of the agreement.[256] Accordingly, the August 2012 employment agreement is void, and a constructive trust is imposed on the 2,000 shares of Eber Metro issued to Wendy thereunder, as well as any distributions made to Wendy in relation to the 2,000 shares. Defendants shall reconvey the 2,000 shares of Eber Metro to EBWLC and any distributions made to Wendy in

---

[254]

Id.

[255]

Defs.' Ex. UUUU, at 20.

[256]

See In re Kenneth Cole Prods., 27 N.Y.3d at 275; Alpert, 63 N.Y.2d at 570.

relation thereto. The Court awards prejudgment interest at an annual rate of nine percent on all distributions made to Wendy in relation to the 2,000 shares in Eber Metro.

E.    *The Faithless Servant Doctrine Requires Disgorgement of Defendants' Compensation*

Plaintiffs overwhelmingly have established that Lester and Wendy engaged in a series of disloyal acts against the Eber entities during a period exceeding 10 years. These actions breached their duties of loyalty as corporate fiduciaries and, in the case of Lester, as trustee.

With respect to Lester, the first disloyal act established by plaintiffs was his execution of the Southern "consulting agreement" on August 30, 2007. As set forth above, Lester engaged in many breaches of his duty of loyalty to the Eber entities from that date until his death on April 5, 2020. Accordingly, Wendy Eber, in her capacity as executrix of Lester's estate, must disgorge all compensation paid to Lester by the Eber entities during this period.[257]

Although the August 28, 2007 amendment to the Pension Plan benefitted Lester alone, and it increased the financial strain on EBWLC, the Court does not order disgorgement of Lester's pension benefits. These benefits accrued substantially before Lester's disloyalty began. And although the Court does not give Lester's estate credit toward its overall liability for Lester's doing so, the Court has taken into consideration that Lester forewent remaining pension benefits in connection with the PBGC settlement.

The Court finds that Lester must disgorge a total of $268,823.92 in compensation

---

[257]    For the avoidance of doubt, Eber Metro and Eber-CT are to be treated as trust assets during all relevant periods for the purposes of this calculation, despite the purported alienation of those entities from the trust pursuant to the Alexbay foreclosure. It would undermine the faithless servant doctrine severely to hold otherwise and allow Lester to retain compensation due to a fraudulent and self-serving transaction.

from EBWLC as follows: $106,173.76 in 2007 and $162,650.16 in 2010.[258]  Lester must disgorge

a total of $3,367,278.86 in compensation from Eber-CT as follows: $189,788.84 in 2008;

$182,039.12 in 2009; $172,165.89 in 2011; $137,698.37 in 2012; $191,961.08 in 2013; $195,135.56

in 2014; $337,977.73 in 2015; $316,873.14 in 2016; $324,269.76 in 2017; $318,904.90 in 2018;

$219,778.25 in 2019; and $780,686.22.[259]  Lester must disgorge his $10,000 in compensation from

Slocum Maine from 2014.[260]  The Court awards prejudgment interest at the annual rate of nine

percent calculated from the last day of the year in which the compensation payment was made until

the date of judgment.

　　　　　As to Wendy, the first disloyal act established by plaintiffs was her approval of the

LOC Note.  It is unclear whether the LOC Note was executed in October 2009 or on February 26,

2010, however the Court will use the later date of February 26, 2010.  As set forth above, Wendy

repeatedly has breached her duty of loyalty to the Eber entities from that time until the present.  To

mention a few examples, Wendy was a central figure in the planning and execution of (1) the LOC

Note, which she signed on behalf of Eber Metro, (2) Lester's April 2012 employment agreement,

which she signed on behalf of Eber-CT, (3) Wendy's August 2012 employment agreement, (4) the

Alexbay foreclosure, which she affirmatively facilitated rather than working on behalf of the Eber

companies to avoid default on the LOC Note, (5) the board resolution issuing 750 shares of EBWLC

---

[258]

　　　　　*See* Pls.' Ex. 28.

　　　　　In 2007, Lester's total compensation from EBWLC was $318,521.28.  Lester must disgorge the portion of his compensation for the period August 30, 2007 through December 31, 2007, which is equal to $106,173.76.

[259]

　　　　　*See* Pls.' Ex. 28; Pls.' Ex. 220, at 14.

[260]

　　　　　*See* Pls.' Ex. 89.

preferred stock to Lester, which she signed on behalf of EBWLC, (6) the Polebridge transaction, by which she acquired six percent of Eber-CT, and (7) the Slocum Maine call option, by which she acquired a 50 percent interest in Slocum Maine. Moreover, Wendy, as executrix of Lester's estate, demanded over $1.7 million from EBWLC, of which she was the sole director, for the Harris Beach assigned claims, despite the facts that (1) Lester paid only $400,000 for these claims and (2) Wendy made sworn statements in the underlying litigation against Harris Beach that the firm's bills were not reasonable or accurate and relied on inaccurate accounting.

In view of her many disloyal acts over this period, Wendy is ordered to account for and disgorge all compensation provided by the Eber entities from February 26, 2010 until the date of this judgment. For the period from February 26, 2010 through December 31, 2020, Wendy must disgorge her $10,000 in compensation from Slocum Maine. Wendy must disgorge also a total of $2,481,413.97 in compensation from Eber-CT as follows: $121,863.28 in 2010; $152,636.36 in 2011; $129,494.58 in 2012; $147,775.07 in 2013; $185,471.93 in 2014; $230,223.56 in 2015; $313,299.72 in 2016; $280,512.32 in 2017; $290,378.60 in 2018; $200,385.83 in 2019; and $429,372.72 in 2020.[261] Wendy shall account for and disgorge all compensation paid to her by the Eber companies for the period January 1, 2021 through the date of judgment. The Court awards prejudgment interest at the annual rate of nine percent calculated from the last day of the year in which the compensation payment was made until the date of judgment.

---

[261] See Pls.' Ex. 158; Pls.' Ex. 220, at 14.

In 2010, Wendy's total compensation from Eber-CT was $144,415.90. Wendy must disgorge the portion of her compensation for the period February 26, 2010 through December 31, 2010, which is equal to $121,863.28.

F.    *Punitive Damages*

Plaintiffs ask the Court to award punitive damages against Wendy in her individual

capacity because she "bears significant personal responsibility for both aiding and encouraging

Lester to breach his fiduciary duties as a trustee and for her own misconduct as a corporate

fiduciary."[262] Plaintiffs make two alternative proposals with respect to punitive damages. First,

plaintiffs propose that the Court award a total of $600,000 in punitive damages to plaintiffs, split

equally among the three plaintiffs. Second, and in the alternative, plaintiffs suggest that the Court

defer the determination of the amount of punitive damages, assuming the Court determines such

damages are warranted, pending expedited discovery concerning Wendy's financial status and that

of Lester's estate.[263]

Under New York law, the standard for conduct warranting an award of punitive

damages has been variously described. Essentially, punitive damages may be awarded for "conduct

having a high degree of moral culpability which manifests a conscious disregard of the rights of

others or conduct so reckless as to amount to such disregard."[264] The purpose of punitive damages

---

[262]    Dkt 401, at ¶ 531.

New York law does not allow recovery of punitive damages against an estate, *see* NY EPTL § 11-3.2(a)(1); *Doe v. Indyke*, 457 F. Supp. 3d 278, 282 (S.D.N.Y. 2020), so such damages are recoverable only against Wendy. Plaintiffs seem to recognize this, as they did not argue for punitive damages against Lester's estate in their post-trial briefing. *See* Dkt 401, at ¶¶ 531-34; Dkt 402, at 21.

[263]    *Id.* at ¶ 534.

[264]    *Flannigan v. Vulcan Power Grp.*, LLC, 642 F. App'x 46, 53 (2d Cir. 2016) (quoting *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.*, 725 F.3d 65, 127 (2d Cir. 2013)); *see also Action S.A. v. Marc Rich & Co.*, 951 F.2d 504, 509 (2d Cir. 1991) (quoting *Borkowski v. Borkowski*, 39 N.Y.2d 982 (1976) (mem)) ("Under New York law, punitive damages are appropriate in cases involving 'gross, wanton, or willful fraud or other morally culpable

is "to punish [a] defendant and to deter [her] and others from similar conduct in the future."[265]
"[I]nfliction of economic injury, especially when done intentionally through affirmative acts of
misconduct can warrant a substantial penalty."[266]  Such an award "is not a matter of right but is
within the discretion of the trier of the facts[.]"[267]

   In this case, plaintiffs have established by overwhelming evidence that Wendy
repeatedly engaged in morally reprehensible behavior, taking advantage of her position of power
to loot her own kin and the companies that were held in trust for their benefit.  For over a decade,
Wendy affirmatively acted to aid and abet Lester's breach of his fiduciary duties as a trustee,
director, and corporate officer, all the while breaching her own corporate fiduciary duties.  At
various times, Wendy facilitated and orchestrated a complex, premeditated, and long-running
scheme to bilk the Eber entities for her own selfish gains.  Such behavior warrants the imposition
of punitive damages.

   The Court notes, however, that the disgorgement of compensation and profits already
ordered under the faithless servant doctrine and for breach of fiduciary duty accomplishes some of

---

conduct.'").

"In a diversity action, or in any other lawsuit where state law provides the basis of decision,
the propriety of an award of punitive damages for the conduct in question, and the factors
the [fact-finder] may consider in determining their amount, are questions of state law."
*Motorola Credit Corp. v. Uzan*, 509 F.3d 74, 80 (2d Cir. 2007).

[265] *Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (quoting *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir.1992)).

[266] *Uzan*, 509 F.3d at 87 (quoting *BMW of N. Am. v. Gore*, 517 U.S. 559, 576 (1996)).

[267] *Flaks v. Koegel*, 504 F.2d 702, 707 (2d Cir. 1974) (citation omitted); *see also Action S.A.*,
951 F.2d at 509 (trial judge "was in the best position to determine whether or not the award
of punitive damages was an appropriate remedy").

the same deterrent objectives as punitive damages. As plaintiffs acknowledge, those remedies do not give Wendy credit for any positive value that she may have provided to the Eber entities.[268] Accordingly, the Court will award a lesser amount of punitive damages than otherwise would be warranted by Wendy's misconduct.

The Court finds that Wendy first engaged in conduct exhibiting a "high degree of moral culpability" on May 28, 2010.[269] On or about that date, she affirmatively facilitated a fraudulent conveyance of Eber-CT stock from Eber Metro to Polebridge with the dual aims of concealing Eber-CT's assets from PBGC and enriching herself at the expense of plaintiffs. Ever since, Wendy repeatedly and intentionally has acted dishonestly to enrich herself and her father to the detriment of her cousins, whose interests she has had a fiduciary duty to protect.[270] The Court awards approximately $50,000 in punitive damages for each year of Wendy's morally reprehensible conduct from May 2010 through the date of judgment. Plaintiffs shall recover of Wendy Eber punitive damages in the aggregate amount of $650,000, which shall be split equally among the three plaintiffs per their request.

G.    *Equitable Relief Pending Entry of Final Judgment*

Based upon her conduct to date, Wendy Eber is hereby removed as as an officer,

---

[268]    Dkt 402, at 21.

[269]    The exact date of the Polebridge transaction is not clear based on the record in the evidence because the documents executing the transaction were backdated to May 28, 2010. *See* Pls.' Ex. 120. For purposes of calculating punitive damages, the Court will use May 28, 2010 as the relevant date.

[270]    *See supra* at 92-93.

director, or manager of each of EB&C, EBWLC, Eber Metro, and Slocum Maine.  She is barred from serving in those positions again for a period of two years from the date of this opinion.[271] Wendy may remain as president of Eber-CT at the discretion of the company's Board of Managers.

A meeting of the shareholders of EB&C to elect directors shall occur within seven days of the date of this opinion.  This opinion shall not impair Wendy Eber, in her capacity as executrix of Lester's estate, from voting the estate's shares of EB&C at the shareholder meeting, although she is precluded from nominating or voting for herself to serve as a director.  In scheduling this shareholder meeting, plaintiffs shall take into consideration the scheduling concerns of Wendy but shall not delay the vote past the seven-day period described herein.  The directors of EB&C shall promptly appoint an officer with the authority to vote its voting shares in EBWLC.

Until the elections required by this opinion are completed and the Eber companies have full and appropriately constituted boards of directors and at least one officer with the authority of the president and secretary, plaintiff Daniel Kleeberg is appointed as a temporary receiver, with all the duties and responsibilities of a director, president, and secretary, of EB&C, EBWLC, Eber Metro, and Slocum Maine.[272]  "A decision to appoint or not to appoint a receiver is committed to the sound discretion of the trial court."[273]  Although receivership is a "drastic remedy," no lesser

---

[271]  BCL §§ 706(d), 716(c).

[272]  *See Varsames v. Palazzolo*, 96 F. Supp. 2d 361, 365 (S.D.N.Y. 2000) (citing Fed. R. Civ. P. 66) ("A federal court has the power in equity to appoint a receiver in order to protect a party's interest in property.")

[273]  *Id.* (citing *Rosen v. Siegel*, 106 F.3d 28, 34 (2d Cir. 1997)).

relief will be effective at preventing further damage to the Eber companies by defendants.[274]

### Conclusion

When Allen Eber entrusted the family business to his only son for the benefit of all his progeny, he scarcely could have imagined the greed and disloyalty that would follow. The purpose of the testamentary trust was to ensure the equal enjoyment of each of Allen Eber's offspring and their descendants in the fruits of the family business. Somewhere along the way, that guiding principle was cast aside. For over a decade, Lester and Wendy repeatedly violated their fiduciary duties in order to extract as much value from the family business as possible to the detriment of their kin, whose interests they were bound to protect.

This decision begins the process of effectuating Allen Eber's intent – undoing as much of defendants' selfish behavior as equity and law demand. As I wrote at the outset, "[t]he parties have been battling in this Court for years." That battle now is over.

The foregoing constitute the Court's findings of fact and conclusions of law.[275] The

---

[274]

See *Ferguson v. Tabah*, 288 F.2d 665, 674 (2d Cir. 1961).

"The following factors are considered relevant to establishing the need for a receivership: '[F]raudulent conduct on the part of defendant; the imminent danger of the property being lost, concealed, injured, diminished in value, or squandered; the inadequacy of the available legal remedies; the probability that harm to plaintiff by denial of the appointment would be greater than the injury to the parties opposing appointment; and, in more general terms, plaintiff's probable success in the action and the possibility of irreparable injury to his interests in the property.'" *Varsames*, 96 F. Supp. 2d at 365 (quoting 12 WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE § 2983 (1999).). As set forth above, these factors overwhelmingly favor plaintiffs.

[275]

First, after being dismissed as a defendant, CNB intervened seeking interpleader relief in the form of directions as to the distribution of the remaining trust assets. That claim is resolved by this decision.

plaintiffs shall submit a proposed form of final judgment no later than April 5, 2023.

SO ORDERED.

Dated:          March 30, 2023

_____
Lewis A. Kaplan
United States District Judge

---

Second, for the sake of good order, the Court amends the third amended complaint, pursuant to Fed. R. Civ. P. 15(c), to conform to the proof.