# **<u>Exhibit 4</u>**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

DANIEL KLEEBERG, et al.,

                              Plaintiffs,

                -against-

WENDY EBER, et al.,

                              Defendants.

-----------------------------------------------------------------X

KATHARINE H. PARKER, United States Magistrate Judge

```
┌─────────────────────────────────────┐
│ USDC SDNY                            │
│ DOCUMENT                             │
│ ELECTRONICALLY FILED                 │
│ DOC #:_____               │
│ DATE FILED:  3/25/2021               │
└─────────────────────────────────────┘
```

**16-CV-9517 (LAK) (KHP)**

**OPINION AND ORDER ON
PARTIES' MOTIONS FOR
RECONSIDERATION**

Before the Court are two motions filed pursuant to Local Civil Rule 6.3 requesting reconsideration of this Court's Opinion and Order, dated August 10, 2020 (ECF No. 314,) ruling on the parties' cross motions for partial summary judgment. In that Opinion and Order, the Court denied Plaintiffs Daniel Kleeberg, Audrey Hays, and Lisa Stein's ("Plaintiffs") motion for partial summary judgment in its entirety. The Court likewise denied most of Defendants Lester Eber, Wendy Eber, and Alexbay, LLC's[1] ("Alexbay," and, collectively with the aforementioned Defendants, the "Eber Defendants") motion for partial summary judgment, granting it only as to Plaintiffs' Declaratory Judgment claim. Plaintiffs and the Estate of Lester Eber (the "Estate") both seek reconsideration of limited portions of the Court's Opinion and Order. The Court presumes familiarity with the parties and the dispute as set forth in its prior Opinion and Order.

---

[1] Lester Eber passed away on April 5, 2020. On October 1, 2020 the relevant parties entered into a stipulation substituting the Estate of Lester Eber as a defendant in the case. (ECF No. 326.) The Court also notes that Lester Eber's Estate has engaged Underberg & Kessler LLP as counsel. (*Id.*)

*See also Kleeberg v. Eber*, 331 F.R.D. 302 (S.D.N.Y. 2019).  However, the Court will restate certain key facts most relevant to resolving the instant motions for reconsideration.

## BACKGROUND

### I.  The Eber Entities and the Allen Eber Will

This case arises out of an intrafamilial dispute for control of a family wine and liquor business.  The relevant entities are Eber Bros. & Co., Inc. ("EB&C"); EB&C's subsidiary, Eber Bros. Wine and Liquor Corp. ("EBWLC"); Eber Bros. Wine & Liquor Metro, Inc. ("Eber Metro"), a former subsidiary of EBWLC; and Eber Metro's subsidiary, Eber-Connecticut ("Eber-CT" and, collectively with the aforementioned companies, the "Eber Entities").

Allen Eber founded EB&C, including its wine and liquor distribution business.  (ECF No. 265 ("Pls.' Rule 56 Statement") ¶ 1.)  His last will and testament (the "Will") provided for the creation of a testamentary trust (the "Trust") to hold his residuary estate, including all controlling stock for EB&C.  (*Id.*; ECF No. 266-8 ("Brook Decl. in Supp.") Ex. 132 (also, the "Will").)  The Will stated that it was Allen Eber's "wish that [his] voting control of [EB&C] can be retained and, subject to that primary wish, . . . that [his] interests in certain other close corporations can also be retained and that [his] son, Lester [Eber], may have an opportunity to participate in the management thereof."  (Will § 11.)

The Will nominated three trustees to manage the Trust: Lester Eber; Allen Eber's attorney, Elliott W. Gumaer, Jr.; and Marine Midland Trust Company, a bank. (*Id*. § 12.)  M&T Bank subsequently replaced Marine Midland Trust Company as co-trustee, and Canandaigua National Bank ("CNB") replaced M&T Bank in July 2007.  (Pls.' Rule 56 Statement ¶ 4.)  The Will provided that the Trust assets would transfer to the Trust beneficiaries per stirpes,

that is, "[p]roportionately . . . according to their deceased ancestor's share."  Black's Law

Dictionary (11th ed. 2019); (*see also* Will § 9.)  Allen Eber's three children, Mildred Eber Boslov,

Sally Eber Kleeberg, and Lester Eber, were the original beneficiaries of the Trust and each held a

one-third "equal" interest in the Trust.  (Will § 9.)  When Mildred Eber Boslov died in 1973, her

only child, Plaintiff Audrey Hays, became a one-third beneficiary of the Trust.  (Pls.' Rule 56

Statement ¶ 2.)  When Sally Kleeberg passed away in 2014, her two children, Plaintiffs Daniel

Kleeberg and Lisa Stein, became beneficiaries of the Trust, each holding a one-sixth interest in

it.  (*Id.* ¶ 3.)

## II.     *Alexbay's Foreclosure Action Against EBWLC and Eber Metro*

On or about February 26, 2010 Lester Eber executed a line of credit note with EBWLC

(the "February 2010 Line of Credit Note") in the amount of $1.5 million.  (Brook Decl. in Supp.

Ex. 16.)  On the same day, EBWLC and Eber Metro executed a security agreement (the "Security

Agreement") with Lester that securitized the February 2010 Line of Credit Note against assets

owned by EBWLC and Eber Metro.  (Brook Decl. in Supp. Ex. 15.)  Wendy Eber signed the

Security Agreement on behalf of EBWLC and Eber Metro.  (*Id.*)  That same day, EBWLC also

executed a guaranty with Lester (the "Guaranty") pledging EBWLC's interest in Eber Metro as

collateral for the February 2010 Line of Credit Note.  (Brook Decl. in Supp. Ex. 140.)  Wendy also

signed the Guaranty on behalf of EBWLC.  (*Id.*)

On or about April 2, 2010, Lester sent letters to Audrey Hays and Sally Kleeberg

explaining that the Eber Entities were struggling financially and stating that Lester had

personally made loans to the entities to keep them afloat – *i.e.*, the February 2010 loan, among

others.  (ECF No. 278 ("Eber Defs.' Rule 56 Statement") ¶¶ 30-32.)[2]  Lester enclosed unsigned and undated copies of the February 2010 Line of Credit Note, Security Agreement, and Guaranty with the letters.  (ECF No. 262-1 ("Lester Eber Aff. in Supp.") Ex. J.)  In the letters, Lester offered Audrey and Sally the opportunity to participate in the Line of Credit Note on a one-third basis.  Both declined to participate.  (*Id*. ¶ 32.)

On February 11, 2011, EBWLC, Eber Metro, and Lester entered into an Amended and Restated Security Agreement pertaining to EBWLC's obligations to maintain the collateral that would be owed to Lester in the event of default under the loans.  (Brook Decl. in Supp. Ex. 18.). Wendy signed on behalf of EBWLC and Eber Metro.  (*Id.*)  That same day, EBWLC, Eber Metro, and Lester also entered into a Debt Assumption Agreement.  (*Id.* Ex. 17.)  Again, Wendy signed on behalf of EBWLC and Eber Metro.  (*Id.*)  On August 18, 2011, Gumaer and Richard Hawks of CNB, in their capacity as co-trustees, ratified Lester's loans and the Security Agreement.  Lester abstained from the vote.  (ECF No. 277-1 ("Lester Eber Aff. in Opp'n") ¶ 12; *see also id*. Ex. A.)

The Eber Entities did not repay Lester the sums due under the various loans extended by Lester over the years.  The Eber Defendants contend that, by the end of 2011, the outstanding principal and unpaid interest on Lester's loans totaled over $3.6 million.  Plaintiffs dispute this amount and argue that, while the Eber Defendants have submitted documents showing that Lester appears to have loaned the Eber Entities $1,571,037.48, they have failed to provide documents showing that Lester made loans to EBWLC in October 1, 2002 and August 15, 2005 totaling over $2 million.  (Eber Defs.' Rule 56 Statement ¶ 35.)  On January 18, 2012, Lester

---

[2] For simplicity and clarity, the Court refers to Plaintiffs' Counterstatement of Material Facts at ECF No. 278 as the Eber Defendants' Rule 56 Statement.

assigned his interest in the $3.6 million in loans to a company he created at about that time called Alexbay. (*Id*. ¶¶ 28, 35.) Lester was the sole owner of Alexbay until his death. (*Id*. ¶ 37.)

Lester resigned as an officer from EBWLC on or about February 28, 2012, with his resignation purportedly retroactive to February 1, 2012 (that is, prior to Alexbay's filing of the Foreclosure Action on the loans). On February 21, 2012, Alexbay filed an action in New York State Supreme Court, Monroe County pursuant to U.C.C. § 9-620 and § 9-627, seeking a judicial determination that Alexbay's acceptance of all of EBWLC's ownership interest in Eber Metro – and Eber Metro's 79 percent ownership interest in Eber-CT – in full satisfaction of the loans then held by Alexbay was "commercially reasonable" (the "Foreclosure Action"). (*Id*. ¶ 40.) Neither the Trust nor any of the Trust beneficiaries were named in, or served with notice of, the Foreclosure Action. (Pls.' Rule 56 Statement ¶ 53.) Then, on May 11, 2012, Justice Matthew A. Rosenbaum of the New York Supreme Court, Monroe County issued an order stating: the "part of Plaintiff's Motion seeking a determination that Alexbay's acceptance of certain collateral in full satisfaction of Eber Bros' obligation is, 'Commercially Reasonable' under the Uniform Commercial Code is GRANTED . . . ." (Lester Eber Aff. in Supp. Ex. M at 3.)

The transfer of Eber Metro to Alexbay was finalized on June 5, 2012, and on that date all 20,000 shares of Eber Metro stock were registered in Alexbay's name on a certificate signed by Lester as President and Wendy as Vice President of Eber Metro. (Pls.' Rule 56 Statement ¶ 61; Brook Decl. in Supp. Ex. 62.) On June 6 and 9, 2012, Wendy and Gumaer, respectively, formally consented on behalf of EBWLC to "transfer and deliver to Alexbay all of its ownership interest in [Eber] Metro in full satisfaction of [EBWLC's] Obligations to Alexbay . . . ." (Brook Decl. in Supp. Exs. 61, 63.) This transferred the Trust's largest asset, its indirect interest in Eber-

CT, entirely to Lester's personal company. EBWLC's only remaining asset following the transfer of Eber Metro to Alexbay was less than $3,000 in cash. (Pls.' Rule 56 Statement ¶ 70.) EBWLC also was left saddled with the debt it still owed to third-party creditors, including pension obligations to the Teamsters Fund. (*Id.* ¶ 69.)

Neither Sally Kleeberg nor Audrey Hays were informed about Alexbay's proposal to accept Eber Metro stock in consideration for the elimination of EBWLC's debt to Alexbay before its approval in 2012. (*Id.* ¶ 71; ECF No. 266-12 ¶ 18.) Nor were they advised of the Foreclosure Action. (*Id.*)

### III.     The EB&C Bylaws Transfer Restriction

In February 2017, nearly five years after the transfer of Eber Metro to Alexbay, CNB advised Lester and Gumaer of its desire to petition the Surrogate's Court to terminate the Trust. (Pls.' Rule 56 Statement ¶ 79.) On December 15, 2016, Wendy Eber had advised CNB that Lester "would like to move forward with closing the [T]rust, finalizing the accounting of the Trust, and acquiring the stock of Eber Bros Wine and Liquor [i]mmediately." (Brook Decl. in Supp. Ex. 153.) CNB sought to terminate the Trust because "the Eber Bros. & Co., Inc. stock ha[d] no (or nominal) monetary value." (Brook Decl. in Supp. Ex. 135 ¶¶ 12, 16.)

Lester was served with notice of the Petition in his capacity as both co-trustee and beneficiary of the Trust but did not join in the Petition. Gumaer was served with notice in his capacity as co-trustee but also declined to join the Petition. Lester appeared in the proceeding through his counsel, James Vazzana, on or about March 13, 2017. (Pls.' Rule 56 Statement ¶ 82; Brook Decl. in Supp. Ex. 137.) Lester did not object to the termination of the Trust or CNB's proposed accounting. (Pls.' Rule 56 Statement ¶ 83.) Plaintiffs also were served notice but did

6

not enter an appearance or otherwise object to CNB's petition or accounting.  (*Id.* ¶ 84.)  On

June 1, 2017, the Surrogate's Court adopted CNB's proposed accounting and granted the

Petition.  The Surrogate's Court then ordered CNB to:

> [P]ay the remaining cash and transfer, assign and deliver
> the other remaining assets shown in the account as
> follows (less certain specific fees and commissions):

| | |
|---|---|
| 1/3 to Lester Eber | $227,817.22* |
| 1/3 to Audrey Hays | $227,817.22* |
| 1/6 to Daniel Kleeberg | $113,908.61* |
| 1/6 to Lisa Stein | $113,908.61* |

> *Less Woods Oviatt Gilman LLP fees and disbursements –
> amount to be determined.

(Brook Decl. in Supp. Ex. 33.)

At the time the Surrogate's Court issued its Order, EB&C's Bylaws provided that "shares

of the corporation shall be represented by certificates . . . ."  (Brook Decl. in Supp. Ex. 133

("EB&C Bylaws") Art. VI.)  The Bylaws also included a provision restricting the transfer of shares

unless the transferring shareholder first gave notice to EB&C's President (*i.e.*, Lester) or

Secretary.  (*Id.* at Art. XII.)  The Bylaws also provide, in relevant part, that "[a]ny other

shareholder may . . . give notice within [a] five day period to the transferring shareholder of

said other shareholder's intent to purchase the shares for a price equal to the book value

thereof as appears by the books of the corporation at the end of the immediately preceding

fiscal year."  (*Id.*)  The Bylaws further state that, "[n]o transfer of any stock shall be valid until

such notice shall be given and the other shareholders have the opportunity to purchase the

same as aforesaid" (the "Transfer Restriction").  (*Id.*)  Lester apparently knew about the

Transfer Restriction before the Surrogate's Court issued its Final Accounting Order. (Pls.' Rule 56 Statement ¶ 89; ECF No. 277-8 ("Eber Defs.' Rule 56 Counterstatement") ¶ 89.) Neither Lester nor his attorney advised CNB or the Surrogate's Court about the Transfer Restriction before the Court issued its Order terminating the Trust and directing CNB to make distributions. (Pls.' Rule 56 Statement ¶¶ 89-90.) CNB ultimately failed to issue stock certificates for the Trust beneficiaries' shares of EB&C stock. (*See id.* ¶ 93.)

As of October 31, 2018, because it never issued stock certificates for the shares of EB&C stock, CNB had yet to finish distributing the EB&C stock to the Trust beneficiaries pursuant to the Surrogate's Court Order. On that date, Lester, through his attorneys, sent a "Notice of Intent to Purchase Shares" from the Allen Eber Trust, in the care of CNB, and sought to invoke the EB&C Transfer Restriction to acquire all of the EB&C stock for himself. (Brook Decl. in Supp. Ex. 35.) Then, on or about December 17, 2018, Lester sent an updated notice clarifying that his proposed purchase price for the shares was "$0." (*Id*. Ex. 164.) Plaintiffs balked at Lester's attempt to acquire all EB&C stock, and their attorney Brian Brook instructed CNB to refuse Lester's request. As a result, CNB found itself caught between the competing demands of Plaintiffs and the Eber Defendants, with the former demanding the distribution of two-thirds of the EB&C stock pursuant to the Surrogate's Court Order, and the latter demanding all of the shares of stock under the Transfer Restriction in EB&C's Bylaws. CNB subsequently moved to intervene and was rejoined to this litigation as a nominal defendant. (*See* ECF Nos. 200, 237.)

## IV.    *The Parties' Cross Motions for Partial Summary Judgment*

Plaintiffs moved for partial summary judgment on only five of their ten claims raised in the operative Complaint: Count I (breach of fiduciary duty – seeking to void certain improper

transactions); Count II (breach of fiduciary duty under the faithless servant doctrine); Count V (B.S.C. § 619 – requesting new corporate elections); Count VI (requesting declaratory judgment as to certain rights); and Count IX (accounting).[3]

The parties consented to my jurisdiction for the limited purpose of issuing a final opinion and order on the cross motions. (ECF No. 271); *see also* 28 U.S.C. § 636(c). As noted above, I denied Plaintiffs' motion in its entirety and granted the Eber Defendants' motion only insofar as Plaintiffs' requests for Declaratory Judgment were found to be duplicative of their other claims. The instant motions for reconsideration ensued. On March 5, 2021 the Court held oral argument on the parties' motions. For the reasons set forth below, Plaintiffs' motion is GRANTED in part and DENIED in part and the Eber Defendants' motion is DENIED in its entirety.

## LEGAL STANDARD

The standard for granting a motion for reconsideration "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp.*, 70 F.3d 255, 257 (2d Cir. 1995). On a motion for reconsideration a party may not simply reargue "those issues already considered when a party does not like the way the original motion was resolved." *In re Houbigant, Inc.*, 914 F. Supp. 997, 1001 (S.D.N.Y. 1996). Therefore, Local Rule 6.3 should be narrowly construed to avoid repetitive arguments already addressed by the Court. *National Congress for Puerto*

---

[3] The Eber Defendants moved for partial summary judgment on Count II (breach of fiduciary duty under the faithless servant doctrine), Count VI (declaratory judgment), Count VIII (aiding and abetting a breach of fiduciary duty and fraudulent concealment), and Count X (equitable indemnification).

*Rican Rights by Perez v. City of New York*, 191 F.R.D. 52, 53 (S.D.N.Y. 1999) (citation omitted). Additionally, parties "may not address facts, issues, or arguments not previously presented to the Court." *U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 182 F.R.D. 97, 100 (S.D.N.Y. 1998) (citation omitted). "Whether to grant or deny a motion for reconsideration . . . is in the 'sound discretion of a district court judge and will not be overturned on appeal absent an abuse of discretion.'" *Id.* (quoting *McCarthy v. Manson*, 714 F.2d 234, 237 (2d Cir. 1983)).

## PLAINTIFFS' MOTION

Plaintiffs' motion for reconsideration is premised on two distinct arguments pertaining to two transactions outlined in the factual background section above. First, Plaintiffs contend that the Court's prior ruling misapprehended the standard for beneficiary consent under New York law in connection with the Foreclosure Action. Second, Plaintiffs assert that the Court failed to address whether it was lawful for Lester Eber to use the Transfer Restriction provision in the EB&C bylaws to attempt to purchase all shares of EB&C from the Plaintiffs for $0 and that the Court should have ruled on that issue. The Court addresses each argument in turn below.

### I.    *The 2012 Alexbay Foreclosure Action*

<u>Beneficiary Consent</u>

As explained in this Court's prior Opinion and Order, the Trust included all controlling stock for EB&C, the parent/holding company of the Eber Entities. Lester Eber was both a trustee and a beneficiary of the Trust, and Plaintiffs eventually became beneficiaries of the Trust as well. In April 2010, Lester sent letters to Audrey Hays and Sally Kleeberg (the only other living Trust beneficiaries at the time) explaining that the Eber Entities were struggling financially and informing them that he had personally made loans to those entities to help keep

them afloat.  Included in those letters were unsigned and undated copies of the Security

Agreement and Guaranty.  Those documents contained the terms of Lester's loan to the Eber

Entities.  In short, the agreements pledged EBWLC's interest in Eber Metro as collateral for

Lester's loan to the struggling Eber Entities.  In the letters, Lester also offered Audrey and Sally

the opportunity to make their own loans under identical terms, but they declined.

In the prior Opinion and Order the Court also explained that, under New York law, a

trustee may be excused from his or her duty of undivided loyalty to trust beneficiaries with the

consent of the trust beneficiaries.  Based on the conflicting evidence presented, the Court

found that a reasonable jury could find that the Trust beneficiaries in this case – *i.e.*, Audrey

and Sally – consented to the terms of Lester's loan because the terms of the Security

Agreement and Guaranty were fully disclosed and the beneficiaries were given ample time to

determine whether they wanted to make their own loans or otherwise object.  Additionally, the

loan documents clearly stated that the "Guarantor assigns and grants to Lender a security

interest in all moneys, securities, and other property of Guarantor now or hereafter in the

possession of lender and all proceeds thereof" and that "Lender may . . . take possession of any

collateral pledged by" the Guarantor.  Thus, it appears that the agreements expressly

contemplated Lester, as the Lender, collecting on his loan in the event of default, and that

foreclosure was one possible avenue to so collect.  Based on this evidence, the Court

determined that "the issue of whether Lester violated his duty of undivided loyalty to Plaintiffs,

and whether an exception to the rule applies, will depend on findings of fact that must be

decided at trial."  (ECF No. 314 at 56.)  Accordingly, the Court denied summary judgment on the

issue of whether the foreclosure constituted a breach of Lester's duty of undivided loyalty as a trustee.

Plaintiffs now contend that, in so finding, the Court failed to acknowledge the "exceedingly high burden established by New York law" for the defense of beneficiary consent. (ECF No. 323 at 3.)  While Plaintiffs acknowledge that Audrey Hays and Sally Kleeberg may have received the agreements referenced above, they argue that mere receipt of the agreements cannot constitute their "clear and explicit" consent to Lester's self-dealing.  *See Int'l Equity Invs., Inc. v. Opportunity Equity Partners, Ltd.*, 427 F. Supp. 2d 491, 499 (S.D.N.Y. 2006) ("New York law is in accord that the beneficiary's 'authorization to engage in self-dealing must be clear and explicit'").

The Eber Defendants argue that Plaintiffs should not be permitted to pursue reconsideration on the issue of beneficiary consent because Plaintiffs did not raise the issue in their summary judgment papers.  However, it is precisely because the parties did not brief the issue of consent on summary judgment, and because the Court raised the issue sua sponte in its prior Opinion and Order, that the Court will entertain Plaintiffs' argument in the instant motion for reconsideration; Plaintiffs are not attempting to take a second bite of the apple but rather object to this Court concluding that there was a factual dispute on the issue of consent without having had a chance to brief this issue.

As mentioned above, when a party moves for reconsideration and successfully identifies controlling decisions or data that the Court overlooked in rendering its decision, there are grounds for the Court to reconsider its prior ruling.  Consistent with this principle, Plaintiffs' argument in support of reconsideration relies on various cases that the Court purportedly

12

misunderstood or neglected to consider in its prior Opinion and Order. Having reviewed the

various decisions cited by Plaintiffs, as well as additional cases found in the course of the

Court's own research, the Court finds that reconsideration is warranted on the issue of

beneficiary consent in the context of the 2012 Foreclosure Action.

To start, and as noted in the Court's prior Opinion and Order, the "no further inquiry

rule" enforces a trustee's duty of undivided loyalty to trust beneficiaries by prohibiting a trustee

from entering into transactions where his or her private interests are in conflict with those of

the beneficiaries – for example, where a trustee attempts to acquire trust property for him or

herself. Essentially, if such a self-dealing transaction takes place, no further inquiry is necessary

and the transaction can be deemed improper. However, this rule is subject to certain

exceptions. Both New York Courts and the Second Circuit have endorsed beneficiary consent as

one such exception to the duty of undivided loyalty. [4] *Renz v. Beeman*, 589 F.2d 735, 744 (2d

Cir. 1978); *Adair v. Brimmer*, 74 N.Y. 539 (1878).

Further, the case law makes clear that it is the Eber Defendants' burden to prove that

there was beneficiary consent after full disclosure of the material facts. *See, e.g.*, *Benedict v.

Amaducci*, No. 92-cv-5239 (KMW), 1993 WL 87937, at *9 (S.D.N.Y. Mar. 22, 1993)

("[d]efendants may not avoid liability for a self-interested transaction unless they prove that

---

[4] The Court has long understood Defendants' position to be that Lester inviting his siblings to make a loan to the company and providing the loan documents to the other Trust beneficiaries, coupled with their alleged ratification by silence, constituted the beneficiaries' consent both to the loan itself and, in the event of default, to a foreclosure action, regardless of whether "consent" is subsumed within the affirmative defenses listed in the Answer. Plaintiffs also acknowledged that the Court has the authority to grant an amendment of a pleading to add an affirmative defense of consent to the extent it is not subsumed within the existing affirmative defenses. However, even assuming the Court were to find that Defendants raised the affirmative defense of consent or permitted an amendment to include that defense given Defendants' longstanding position in this case, on reconsideration of the facts and the applicable case law, the Court finds that no reasonable jury could find that the Trust beneficiaries consented, either expressly or impliedly, to the foreclosure and transfer of Eber Metro and Eber-CT to Alexbay for the reasons set forth below.

the beneficiaries' consent was obtained after full disclosure").  Indeed, any acquisition of trust property by fiduciaries "must be dealt with as presumptively void unless affirmative proof is made by the fiduciaries that their dealings with each beneficiary was in every instance aboveboard and fully informative.  The fiduciaries in such circumstances have the obligation to show affirmatively not only that they acted in good faith but that they volunteered to the beneficiaries **every bit of information which personal inquiry by the beneficiaries would have disclosed**."  *Flaum v. Birnbaum*, 120 A.D.2d 183, 194 (N.Y. App. Div. 4th Dep't 1986) (emphasis added).  Furthermore, "mere failure to object to a trustee's course of conduct is not sufficient to absolve the trustees breach of duty."  *In re First and Final Account of Proceedings of Susan Lasdon Abrams*, 2010 NYLJ LEXIS 4748, at *11 n.4 (N.Y. Sur. Ct. June 29, 2010).

In addition to these principles, the case of *Birnbaum v. Birnbaum*, 117 A.D.2d 409 (N.Y. App. Div. 4th Dep't 1986)[5] is particularly instructive in assessing whether the Eber Defendants can satisfy their burden to show beneficiary consent and this Court did not fully address the case's import in its prior decision.  In *Birnbaum*, the Appellate Division reviewed a decision of the Surrogate Court that validated a transaction wherein a trustee assigned trust properties to himself, purportedly to satisfy outstanding debts owed by the beneficiaries to the trustee.  The Surrogate Court had found that the beneficiaries expressly consented to the transaction by signing a "Release and Discharge" document and that, therefore, the self-dealing transaction was permissible.  On review, the Fourth Department clarified that it was the trustee fiduciary's burden to show that the beneficiaries consented to self-dealing after "full disclosure by the

---

[5] *Birnbaum* arose in the context of cross appeals from a Surrogate Court's ruling on the petitioner's motion for partial summary judgment.

trustee of the facts of the situation and the legal rights of the beneficiary." *Id.* at 416, 419.

Stated otherwise, the Court explained that, under New York law, the "fiduciary must

affirmatively demonstrate that the beneficiaries were made aware of the nature and legal

effect of the transaction," must present "affirmative proof . . . that [the fiduciary's] dealings

with each beneficiary was in every instance aboveboard and fully informative," and must

volunteer "to the beneficiaries every bit of information which personal inquiry by the

beneficiaries would have disclosed." *Id.* at 416-17. The trustee in *Birnbaum* did not disclose

potential defenses against the alleged debt owed to the him, and, more importantly, sent the

releases to the beneficiaries without explaining the terms, leaving the beneficiaries to interpret

the release language themselves. The trustee also failed to validate the debt owed to him.

Thus, the Appellate Division overturned the Surrogate Court's ruling and found that the trustee

failed to establish beneficiary consent despite the beneficiaries having signed a release

permitting the transaction at issue.

Just as in *Birnbaum*, in the case at bar there is no evidence that Lester offered any

explanations to his siblings as to the ramifications of their decision to not participate in the

February 2010 Line of Credit Note. Nor is there evidence that he explained the probable

consequences of EBWLC's potential default under the Security Agreement and Guaranty.

Failure to disclose this type of information precluded a finding of *express* consent in *Birnbaum*;

*a fortiori*, Lester's disclosure of the relevant loan documents and his general statement that the

Eber Entities were in dire financial straits, absent more, cannot support a finding of *implied*

beneficiary consent to Lester actually foreclosing on the debt and transferring the Trust's most

valuable asset to himself. (*See* ECF No. 328 at 6.) The Eber Defendants have not offered any

15

other evidence suggesting that more information was provided to the other Trust beneficiaries that would create a triable issue of fact on the issue of consent.

Accordingly, this Court has reconsidered its prior finding on the issue of beneficiary consent. Even assuming that both Sally Kleeberg and Audrey Hays reviewed the entirety of the Security Agreement and Guaranty, Lester was still obligated to explain the ramifications of his loan and the potential for foreclosure on Eber Metro in the event of default. The case law outlined above confirms that the standard for beneficiary consent is exceedingly difficult to meet under New York law. Accordingly, after reconsidering the evidence and the applicable law, the Court holds that no reasonable trier of fact could find that Sally Kleeberg and Audrey Hays impliedly consented to the 2012 Foreclosure Action or the resulting transactions.

To the extent that the Eber Defendants argue that beneficiary consent was not necessary because the Will expressly permitted Lester to foreclose on EBWLC's interest in Eber Metro, the Court has already dealt with and discounted that argument. While the Will clearly permitted trustees to make loans secured by collateral held in the Trust, that power does not imply broad authority to collect on the loans through foreclosure on the collateral without notice to the Trust beneficiaries and without discussing other options. *See Renz*, 589 F.2d at 745 ("Courts may not read exculpatory language broadly, lest they unwittingly permit erosion of the fiduciary duty itself"). As explained in the prior Opinion and Order, foreclosure was not Lester's only option to collect on his loan (nor, for that matter, was transfer of its business to pay for the loan necessarily EBWLC's only option). The collateral could have, for example, been sold at a public auction. While the Eber Defendants contend that alternative payment/collection methods, such as a public auction or private third-party sale, were

unfeasible for various reasons, there are disputes of fact concerning the options reasonably available at the time.  Therefore, the options available for payment and collection is a question more properly left for trial.[6]

At oral argument counsel for the Eber Defendants asserted that only the non-conflicted trustees – not the Trust beneficiaries – were required to consent to the February 2010 loan documents and the 2012 Foreclosure Action.  They posit that because the Trust was the majority shareholder of EB&C (and indirectly, EBWLC) at the time of the loan and because the trustees had an obligation to act in the best interests of EB&C's shareholder (i.e., the Trust), the trustees were necessarily acting in the best interest of the Trust beneficiaries and did not need their consent.  However, even assuming the trustees ratified the Security Agreement and Guaranty and expressly contemplated foreclosure in the event of default, those circumstances do not absolve Lester or the ratifying trustees of their duty of undivided loyalty, as trustees, to the Trust beneficiaries at the time of the foreclosure.  *See In re Auditore's Will*, 249 N.Y. 335, 343 (1928) (holding that an estate administrator's breach of a fiduciary duty as an officer and director of a company, which was partially owned by the trust he was administering, "does not expunge or obliterate his breach of duty as administrator"); *see also In re Schulman*, 165 A.D.2d 499, 502 (N.Y. App. Div. 3rd Dep't 1991) (corporate officer who acquired full authority to manage a corporation's affairs through a trusteeship required "application of trustee standards to his conduct of the affairs of the corporation"); *In re Horowitz's Will*, 297 N.Y. 252, 258-59

---

[6] In *Renz*, which was decided after a trial on the merits, the Second Circuit found troubling that the trust was not offered a chance to buy the stock to maintain balance of family control in the family business.  Similarly, here, the trust beneficiaries were not presented with other options besides permitting the foreclosure and transferring the business to the control of one branch of the family.  589 F.2d at 747.

(1948) (holding that the roles of director and executor "carry separate obligations, one superimposed on the other," and that "an executor who, to carry out his trust, becomes a director of a corporation in which the estate's moneys are invested, remains an executor and is held to the full duty of an executor"); *Renz*, 589 F.2d at 745 (trust did not grant trustees the right "to prefer their own interests to those of the trust, or to appropriate for their own account trust opportunities;" recognizing the family company was an asset of the trust and that trustee had fiduciary duty to preserve joint control of the family company; fiduciary duty enhanced when trustee was "a member of the family whose welfare he had taken upon himself to preserve"). Accordingly, the Trust beneficiaries' consent was required to permit the transfer of the Trust property to Alexbay. The Eber Defendants have failed to cite any authority – and the Court is aware of none – that holds otherwise. And, as made clear during oral argument, the Eber Defendants acknowledge that no consent was obtained at the time of the foreclosure and transfer, and indeed no notice of the Foreclosure Action was even provided to the other beneficiaries.

*Constructive Trust*

Having now determined that the beneficiary consent exception to the duty of undivided loyalty cannot apply in this case based on the undisputed facts, the Court also notes that none of the other exceptions to that rule apply either. (*See* ECF No. 314 at 52-53) (holding that the first two exceptions do not apply). Accordingly, because the 2012 Foreclosure Action placed Lester's interests in conflict with those of the Trust beneficiaries, *Benedict*, 1993 WL 87937, at *5, Lester committed a breach of Trust and the transfer of Eber-CT to Alexbay is void under the no further inquiry rule. *Renz v. Beeman*, 589 F.2d 735, 744 (2d Cir. 1978) (quoting *Wendt v.*

18

*Fischer*, 243 N.Y. 439, 444 (1926); and *Munson v. Syracuse, Geneva & Corning R.R.*, 103 N.Y. 58, 74 (1886)); *see also generally Phelan v. Middle States Oil Corp.*, 220 F.2d 593, 603 (2d Cir. 1955) (a "'trustee violates his duty to the beneficiary not only where he purchases trust property for himself individually, but also where he has a personal interest in the purchase of such a substantial nature that it might affect his judgment in making the sale'" (quoting Restatement of Trusts § 170, Comment (c)); (ECF No. 267 at 10) (Plaintiffs requesting, in their moving brief, that the Court void the transfer of Eber-CT to Alexbay).

In terms of a remedy, Plaintiffs request that the Court immediately impose a constructive trust on Eber Metro and Eber-CT and all funds and property transferred by EBWLC to the Eber Defendants since June 2012 and order reconveyance of Eber Metro's shares from Alexbay to EBWLC.  (ECF No. 267 at 14-15, 35.)  A constructive trust is a flexible equitable remedy that can be imposed in a wide variety of situations.  *See Counihan v. Allstate Ins. Co.*, 194 F.3d 357, 360-61 (2d Cir. 1999) (collecting cases).  The purpose of a constructive trust is to prevent unjust enrichment.  *Id.* (citing *Simonds v. Simonds*, 45 N.Y. 2d 233, 242 (1978)).  Unjust enrichment results when a person obtains property or some other benefit and, considering the relationship of the parties and the circumstances of the transfer, it would be inequitable for that person to retain the property or benefit.  *See McGrath v. Hilding*, 41 N.Y.2d 625, 629 (1977).  Put simply, a situation may call for imposition of a constructive trust when a party holds property "under such circumstances that in equity and good conscience he ought not to" keep it.  *Miller v.* Schloss, 218 N.Y. 400, 407 (1916).

Whether a party is unjustly enriched is a legal conclusion determined based on principles of equity.  *Sharp v. Kosmalski*, 40 N.Y.2d 119, 123 (1976).  Courts are not bound by

any strict formula in decreeing a constructive trust – "[t]he equity of the transaction must shape the measure of the relief."  *Beatty v. Guggenheim Exploration Co.*, 225 N.Y. 380, 389 (1919).  Although a party seeking a constructive trust most often establish certain elements, such as (1) a fiduciary relationship, (2) a promise, (3) reliance on that promise, and (4) unjust enrichment, a constructive trust need not neatly fit within that framework; these elements are simply considerations for the court to apply.  *Palazzo v. Palazzo*, 121 A.D.2d 261, 264 (N.Y. App. Div. 1st Dep't 1986); *Tordai v. Tordai*, 109 A.D.2d 996 (N.Y. App. Div. 3rd Dep't 1985); *In re Koreag*, 961 F.2d 341, 352 (2d Cir. 1992).

That said, the party who seeks to impose a constructive trust must establish the facts necessitating such a remedy by clear and convincing evidence.  *Miller v. Hartford Life Ins. Co.*, 64 F. App'x 795, 797 (2d Cir. 2003).  While constructive trusts are "peculiarly suited to circumstances in which a fiduciary has been guilty of self-dealing," *Birnbaum*, 117 A.D.2d at 420, the self-dealing party must have been unjustly enriched for a constructive trust to be the appropriate remedy.  *In re First Cent. Fin. Corp.*, 377 F.3d 209, 212 (2d Cir. 2004) (confirming that, under New York law, a finding of unjust enrichment is the most important factor in imposing a constructive trust because "the purpose of the constructive trust is prevention of unjust enrichment") (citation omitted).

Here, it is undisputed that Lester was a trustee and, therefore, a fiduciary with duties owed to the Trust beneficiaries.  Consistent with his role as a fiduciary, the record indicates that Lester loaned money to the Eber Entities in order to keep the businesses afloat and to preserve Trust assets.  Indeed, Lester himself was a Trust beneficiary as well as an officer and director of various Eber Entities; he had a clear personal interest in the Eber Entities' success.

20

By initiating the 2012 Foreclosure Action and foreclosing on EBWLC's interests in Eber Metro – and Eber Metro's 79 percent ownership interest in Eber-CT – Lester, through Alexbay, acquired sole possession and ownership over the Trust's most significant asset to the detriment of the other beneficiaries of the Trust.[7]  However, the parties dispute a number of important facts including the amount of money EBWLC and Eber Metro owed to Lester,[8] whether Eber-CT made a profit from 2009-2012, the value of Eber-CT at the time of the foreclosure, and whether there were other financing or sale options available at the time of the foreclosure that would have preserved the business and/or collected more funds for the benefit of the Trust.  (Eber Defendants' Rule 56 Statement ¶¶ 33, 35; Eber Defs.' Rule 56 Counterstatement ¶ 54; Lester Eber Aff. in Supp. ¶¶ 33-36.)  These are issues that must be determined through a trial.  *See Birnbaum*, 117 A.D.2d at 420 (although trustee breached fiduciary duty, trustee entitled to receive amount he paid for property with interest and the value of all improvements; referee needed to assess the value of interests and determine adjustments necessary to place beneficiaries in same position they would have been had the misappropriation of property not occurred).  Furthermore, the purported purpose of the transfer of Eber Metro and Eber-CT to Alexbay was to satisfy EBWLC's obligations to Alexbay under the February 2010 Line of Credit Note.  Now that the transfer has been found to be void, as discussed above, the Court must

---

[7] Eber Metro was a wholly owned subsidiary of EBWLC until June 5, 2012, when all 20,000 shares of Eber Metro stock were transferred to Lester Eber's company, Alexbay. (Pls.' Rule 56 Statement ¶¶ 10, 61; Eber Defs.' Rule 56 Counterstatement ¶ 10.)  At the time of the 2012 Foreclosure Action, Eber Metro owned a 79 percent interest in Eber-CT, the Eber Entities sole operating business.  (Pls.' Rule 56 Statement ¶ 70; Eber Defs.' Rule 56 Counterstatement ¶ 70.)  And, when Eber Metro was transferred to Alexbay on June 5, 2012, that transfer included Eber Metro's 79 percent interest in Eber-CT. (*See* Pls.' Rule 56 Statement ¶¶ 10, 61.)

[8] Although the Eber Defendants submitted documents in connection with the Foreclosure Action establishing the amounts loaned by and owed to Lester, Plaintiffs were not given notice of that action and now question the accuracy of those representations.  (*See* Pls.' Rule 56 Statement ¶ 54; Eber Defs.' Rule 56 Statement ¶ 35.)

determine at trial the amount of money the Eber Entities owed to Lester based on the various loans he allegedly extended to those entities, the value of the business at the time of the foreclosure, and other accounting issues.[9]  Without conclusive findings of fact on these issues, the Court is poorly positioned at this stage to determine whether, and the extent to which, Lester was unjustly enriched through the 2012 Foreclosure Action and, therefore, whether ordering a constructive trust and reconveyance of Eber Metro and Eber-CT  would be an appropriate remedy.  By way of example, if the value of Eber Metro's 79 percent interest in Eber-CT were found by a trier of fact to be less than the Eber Entities' outstanding debts owed to Lester, it is unlikely that the Plaintiffs would be able to establish that Lester was unjustly enriched by clear and convincing evidence, as is their burden.

Therefore, under these circumstances, it is premature for the Court to issue a constructive trust that would require Alexbay to reconvey the collateral obtained in the Foreclosure Action to EBWLC.  Once all the disputed facts, outlined above, and all the claims and defenses asserted in this case are resolved, the trier of fact will be able to determine how the Trust assets should be distributed and the extent to which Eber-CT should be a part of that distribution.  In a case such as this one, where there are numerous factual disputes concerning a wide array of challenged transactions in the context of an intricate hierarchy of corporate entities, added flexibility will undoubtedly aid the trier of fact in fashioning an appropriate final equitable remedy.[10]  Therefore, the Court finds that, for now, summary judgment should be

---

[9] Unlike the Foreclosure Action and the attendant transactions thereto, the loans themselves were expressly provided for in the Will and, therefore, are not voidable.  (*See* ECF No. 314 at 48.)

[10] Indeed, the ruling in *Renz* – a case heavily relied on by Plaintiffs in their moving brief (ECF No. 267 at 10-11) and at oral argument on the parties' motions for reconsideration – was a decision rendered on appeal after trial.

granted in favor of the Plaintiffs on the narrow issue, alleged in Count I of the Third Amended

Complaint ("TAC"), that Lester breached his duty of undivided loyalty to the Trust beneficiaries

by foreclosing on Eber-CT without notice to those beneficiaries.  At trial, the parties can present

evidence on the value of the assets at issue, the debts owed to Lester, the proper accounting

for the Trust, and a milieu of other issues that will necessarily impact the final remedy to be

imposed.

### II.    Lester's Attempt to Purchase EB&C Shares for Nothing

To the extent Plaintiffs contend that this Court erred in failing to rule on whether

Lester's attempt to utilize the Transfer Restriction in the EB&C bylaws to purchase all EB&C

shares for $0 was valid, this Court disagrees.  Count IV of the TAC seeks, among other things, an

injunction prohibiting Lester from utilizing the Transfer Restriction for a variety of reasons and

enforcing the distribution of EB&C shares ordered by the Surrogate's Court.  (ECF No. 236

("TAC") ¶¶ 305-30.)  Plaintiffs did not move for summary judgment on Count IV.  Rather, their

motion for *partial* summary judgment was limited to Counts I, II, V, VI, and IX of the TAC.  (ECF

No. 263 at 1.)  The Court granted Defendants' motion to dismiss Count VI, which sought

declaratory relief on the issue of the Transfer Restriction, finding it duplicative of Plaintiffs'

claim in Count IV.  (*See* ECF No. 314 at 41.)  However, the Court was not required to address a

claim that was not the subject of the motion.  The validity of the Transfer Restriction will be

addressed at trial.[11]  Accordingly, this request for reconsideration is denied.

*       *       *

---

[11] To the extent that Plaintiffs' argued at oral argument that Count I encompasses the Transfer Restriction issue, the Court notes that while Count I specifically references various transactions, it fails to mention the Transfer Restriction whatsoever.

For the reasons set forth above, Plaintiffs' motion for reconsideration is GRANTED in part and DENIED in part.

## THE ESTATE'S MOTION

The Estate's motion for reconsideration is premised on its argument, already addressed by this Court in the prior Opinion and Order, that the Will provision permitting trustees to secure loans against collateral held in the Trust automatically authorized Lester to foreclose on that same collateral. For the reasons set forth below, the Estate's motion is DENIED.

The majority of the Estate's motion can be quickly disposed of because it merely seeks to relitigate what was already decided in the Court's prior Opinion and Order. As Plaintiffs correctly point out, all three of the Eber Defendants' summary judgment briefs addressed the scope of authority conferred to Lester through the Will. (*See* ECF Nos. 260 at 12, 16; 277 at 10-12; 288 at 6, 9-10.) Indeed, the Court considered the parties' arguments on this issue and concluded:

> [t]he Eber Defendants contend . . . that this provision of the Will should be interpreted as having 'relax[ed] . . . [the] Trustee[s'] duties . . . expressly or by necessary implication,' and, thus, allowing Lester to foreclose upon trust assets secured as collateral for the loans. (Eber Defs.' Mem. of Law in Opp'n 17.) However, applying the Eber Defendants' logic runs contrary to the prevailing case law, which states that, while trust instruments may expressly permit self-dealing, such instruments must also be strictly construed. *See O'Hayer*, 30 A.D.2d at 423 . . . . In this Court's view, the Trustees' ability to make loans secured by the collateral held in the Trust did not give them carte blanche to foreclose on the collateral without notice to the beneficiaries because the collateral could, for example, have been sold at public auction. In sum, the fact that the Trustees could secure loans against collateral held in Trust did not automatically grant a trustee who made such a securitized loan the right to foreclose on the collateral for him or herself.

24

(ECF No. 314 at 52-53.)  Having already considered and disposed of the crux of the Estate's

argument, the Estate attempts to highlight case law that the Court overlooked or misconstrued

in its initial analysis.  The Estate fails to cite any authority that warrants reconsideration of this

issue.

For instance, in *Dabney v. Chase Nat'l Bank*, cited by the Estate, a bond indenture

provision authorized a bank serving as a trustee to bondholders of a distressed company to

make commercial loans to that same company.  196 F.2d 668 (2d Cir. 1952).  Critically,

however, the Court held that the trustees' express power to lend money merely implied a

broad power to *collect* on that loan.  *Id.* at 670.  In the instant case, the Court never determined

that Lester would be unable to collect on his secured loans to the struggling Eber Entities.

Rather, the appropriate method of collection is a key aspect of the dispute in this case.  Insofar

as the Estate's argument is premised on Lester's more specific implied authority to foreclose on

the collateral, not his ability to collect on the loan in general, *Dabney* is not on point.

*In re Hammer*, cited by the Estate for the same proposition, is also inapposite.  There, a

bank gave a line of credit to a business.  The individual who took out the loan executed a deed

of trust to the bank as trustee and made the trust the residuary beneficiary of his estate.  The

Appellate Division found that the then-deceased individual had properly entered into such an

arrangement and that the bank would be permitted to collect the money it was owed pursuant

to the *explicit* terms of a separate suretyship agreement.  16 A.D.2d 111, 112 (N.Y. App. Div. 1st

Dep't 1962).  This case is factually different, as it involves a collection of a loan on an entity

already held within a trust and a self-dealing transaction where the language of the governing

trust document does not explicitly permit foreclosure by a trustee/creditor as opposed to some

25

other method of collection.  Moreover, *In re Hammer* was governed by Pennsylvania law.  Thus, *In re Hammer* does not support the proposition that Lester's right to foreclose was implied by the terms of the Will, as the facts and controlling law are distinguishable.

Also, as discussed above, to the extent that the Will granted Lester the right to secure loans to the Eber Entities with Trust assets, that authorization did not necessarily lessen Lester's duty of undivided loyalty in foreclosing on the property as a matter of law.  It is disputed whether a public auction would have been possible and, if possible, the amount that would have been paid for the business through that process.  If the amount that could have been obtained through that process exceeded the amount of the debt to Lester, then additional amounts would have remained to potentially be distributed to the beneficiaries, including Plaintiffs.  To the extent the Estate suggests the Court misconstrued applicable case law, such as the *O'Hayer* and *Renz* and *Benedict* cases, this Court disagrees.  *See O'Hayer v. De St. Aubin*, 30 A.D.2d 419, 423-24 (N.Y. App. Div. 2d Dep't 1968) (settlor granting his son the authority, as a trustee, to "purchase at any time any part or the whole of the shares of stock held in the trust, subject only to the proviso that 'the amount of the purchase price and the terms of the sale must be approved'" by the trustees differs from the authority the Will granted to Lester); *Renz*, 589 F.2d 735 (holding that the trustees broad discretion to exercise powers and rights incident to ownership of the trust property did not permit the trustees to prioritize their own interests over those of the trust beneficiaries); *Benedict*, 1993 WL 87937 (holding that broad discretionary powers conferred on the trustees concerning the amount and source of trust distributions did not lessen the duty of undivided loyalty to the beneficiaries). These cases support the Court's prior ruling on this issue.  If anything, they represent the practice under

New York law to narrowly construe language permitting trustee self-dealing.  There is no language in the Will that guarantees Lester's right to foreclose on Trust property without notice to the beneficiaries.  Nor is there language in the Will that lessens Lester's duty of undivided loyalty in that context.

Moreover, the Estate's characterization of *O'Hayer* is incorrect.  While this 1968 case does establish that the duty of undivided loyalty owed by a trustee may be relaxed by "necessary implication" based on the language in a trust instrument, the case also clarifies that "the language limiting the general rule is strictly construed so that the trustee's actions will not be approved if he trespasses outside the boundaries of the powers granted."  *O'Hayer*, 30 A.D.2d at 423.  As alluded to above, in *O'Hayer* the trustee was expressly granted authority to "purchase at any time any part or the whole of the shares of stock held in the trust, subject only to the proviso that 'the amount of the purchase price and the terms of the sale must be approved'" in writing.  *Id.* at 424.  The court found that the trustee merely owed a duty of good faith to the trust in deciding to purchase stock from himself, given his unquestioned authority to do so consistent with the language of the trust instrument.  Quite the contrary, in the instant case it is unclear whether Allen Eber intended a trustee-creditor to be able to foreclose on the Eber Entities without notice to the Trust beneficiaries in lieu of having the trustees consider alternative methods of paying off the loan.  Accordingly, the Estate has failed to identify any controlling authority that warrants reconsideration on this issue.

Based on the above, the Estate's motion for reconsideration is DENIED.

## **CONCLUSION**

27

For the reasons stated above, Plaintiffs' motion for reconsideration (ECF No. 322) is GRANTED in part and DENIED in part and the Estate's motion for reconsideration (ECF No. 332) is DENIED in its entirety.  This case is now ready for trial.  A telephonic conference is hereby scheduled for April 15, 2021 at 12:30 p.m.  Counsel for the parties are directed to call the Court's conference line at the scheduled time.  Please dial (866) 434-5269, access code 4858267.

      **SO ORDERED.**

DATED:       New York, New York
               March 25, 2021

_____
KATHARINE H. PARKER
United States Magistrate Judge