```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
DANIEL KLEEBERG, LISA STEIN, and              :
AUDREY HAYS,                                   :
                                               :   Case No.: 16-CV-09517
                              Plaintiffs,      :
                                               :
           v.                                  :
                                               :
WENDY EBER, in her individual capacity and     :
as Executrix u/w/o Lester Eber, et al.,        :
                                               :
                              Defendants,      :
                                               :
           and                                 :
                                               :
EBER BROS. & CO. INC., et al.,                 :
                                               :
                       Nominal Defendants,     :
                                               :
           and                                 :
                                               :
CANANDAIGUA NATIONAL BANK &                    :
TRUST COMPANY, in her individual capacity      :
and as Executrix u/w/o Lester Eber, et al.,    :
                                               :
                 Nominal Intervening Defendant.:
                                               :
------------------------------------------------------------X
```

## DECLARATION OF JOHN S. HERBERT

JOHN S. HERBERT, declares under penalty of perjury, pursuant to 28 U.S.C. §1746, that the following statements are true and correct to the best of his knowledge:

***Background***

1. I am a lawyer in good standing and have been admitted to the New York Bar since 1980. I have never been the subject of professional discipline or sanctions nor has my conduct ever been called into question by any court or tribunal. I submit this declaration in opposition to

the motion by Plaintiffs Audrey Hays, Daniel Kleeberg, and Lisa Stein (collectively, "Plaintiffs") to Impose Sanctions (Docket Entry ("DE") 467, the "Motion").

2. Throughout my career, I have practiced exclusively corporate transactional law. I applied for, and was granted, admission to this Court in connection with this action on June 1, 2021. This is the only case in which I have ever made an appearance. For the past forty-three years, until 2013, I worked as a partner (and before that an associate) at several prominent law firms in New York City. My practice focused on mergers and acquisitions, private equity and corporate finance, and other related areas.

3. Since 2013, I have continued to work as a semi-retired solo practitioner with my own law firm, which I operate from a home office.

*My Involvement with the Ebers*

4. I began representing the Ebers in April 2013, which I agreed to do as an accommodation to Wendy Eber's husband, who had been a longtime client. Before April 2013 I did not have any connection, relationship with, or knowledge of Wendy Eber ("Wendy"), Lester Eber ("Lester"), or any of the other Defendants in this action. In connection with my retention, I agreed to provide assistance with corporate law matters from time-to-time, including dispute resolution, corporate governance and other matters.

5. In this case, filed on December 6, 2016, lead counsel to Lester (later the Estate of Lester Eber) and Wendy was, initially, Underberg & Kessler, LLP ("Underberg"), and after July 6, 2021, Farrell Fritz, P.C. ("Farrell Fritz"). I acted as co-counsel to Lester and Wendy in this action, with the understanding that I was not a litigator and was not responsible for the day-to-day management of the litigation. I did not represent any of the Eber companies in this action. I have never represented EBWLC or EBCO (both defined below) for any purpose in any matter.

6. I also acted as co-counsel to Lester, Wendy, Eber-CT and Eber-Metro in connection with the dispute and subsequent settlement, on or around February 24, 2017, between the Pension Benefit Guaranty Corporation ("PBGC") and the EBWLC ERISA "controlled group" members, which were Eber Bros. & Co. ("EBCO"), Eber Bros. Wine & Liquor Corporation ("EBWLC"), Eber Bros. Wine & Liquor Metro ("Eber-Metro") and Eber Connecticut ("Eber-CT").

7. I never acted as general counsel or corporate secretary to any Defendant in this action.

8. In connection with this action, I did not play a substantive role in discovery, nor was I asked to. As primary litigation counsel, Underberg supervised and administered document discovery in this case for Defendants. It is my understanding that Underberg produced approximately 37,000 pages of documents throughout the course of discovery in this action. I also did not take or defend any depositions in this case.

9. I never signed, filed or submitted to the Court any pleading, written motion or other paper in this case prior to the filing of the Motion. I spoke at the Court's conferences on November 7, 2018 (DE 157), March 12, 2019 (DE 197), and the final one on January 8, 2020 (DE 295) for the purpose of clarifying for the Court certain complex issues relating to UCC Article 8, Lester's 2012 loan foreclosure and other corporate matters owing to my background and experience. However, at all times I was accompanied by lawyers from Underberg. My participation in the trial of this matter was also limited. I had no involvement with the eventual settlement of this case.

10. During my entire representation, Wendy was responsible for handling or maintaining the corporate minute books for the Eber companies. I was not. During my entire representation, I never saw, nor was I in the presence of, the entire corporate minute books of any Defendant entity. To my knowledge, at all relevant dates, the corporate minute books of the

Defendant entities were kept at offices in either Rochester, NY or North Haven, CT. I have never been to either location.

***The PBGC Settlement***

11. In 2010, EBWLC began discussions with PBGC about the failure of EBWLC to make required contributions to EBWLC's retirement plan (the "Retirement Plan"). In connection with these discussions, Lester and Wendy hired the Groom Law Group, a Washington, D.C. law firm specializing in PBGC matters, to advise on Retirement Plan issues. I provided assistance to Groom Law Group and tried to help negotiate a settlement with PBGC.

12. On August 6, 2014, PBGC informed EBWLC that it had made an administrative determination that the termination of EBWLC's Retirement Plan was necessary because the plan would be unable to pay benefits when due. Thereafter, PBGC commenced an action against EBWLC in the United States District Court for the Western District of New York on May 11, 2015, seeking to terminate the Retirement Plan, to retroactively establish April 30, 2010[1], as the Retirement Plan's termination date under 29 U.S.C. §1348, and to have PBGC appointed as the statutory trustee of the Retirement Plan (the "PBGC Action"). On January 19, 2016, the Court in the PBGC Action issued an order granting PBGC's requested relief. The Court's order also held that as of April 30, 2010, the EBWLC ERISA "controlled group," within the meaning of 29 U.S.C. §1301(a)(14), included EBCO, EBWLC, Eber-Metro and Eber-CT (the Ebers' last remaining operating entity).

13. Upon retroactive termination of the Retirement Plan as of April 30, 2010, each of the EBWLC ERISA "controlled group" members became jointly and severally liable for all of EBWLC's liabilities under Title IV of ERISA, in connection with the Retirement Plan's

---

[1] Before Lester's 2012 loan foreclosure.

termination, including Retirement Plan unfunded benefit liabilities, due and unpaid contributions, premiums and interest (the "Title IV Liabilities").  The Title IV Liabilities totaled $7,985,670 as of August 31, 2016.

14. On March 29, 2016, PBGC issued demand letters to each member of the EBWLC Controlled Group, including EBCO, EBWLC, Eber-Metro and Eber-CT.

15. On July 31, 2016, PBGC filed federal tax lien notices against all the EBWLC Controlled Group members, in favor of PBGC under 29 U.S.C. § 1368 for the amount of the demand.

16. After years of negotiations with the PBGC, the EBWLC ERISA "controlled group" members and Lester eventually reached a settlement with PBGC on February 24, 2017 (the "PBGC Settlement").  Under the PBGC Settlement, PBGC agreed to release the EBWLC ERISA "controlled group" members from all Title IV Liabilities, in return for Lester waiving his (and Lester's wife waiving her) entire future benefit entitlement under the Retirement Plan, estimated by Wendy and the PBGC to be in the amount of $1.4 million, plus an additional cash payment from Eber-Metro of $2 million.

17. In connection with the PBGC Settlement, Wendy, Lester and the EBWLC ERISA "controlled group" members needed to complete certain corporate documents so that Lester could properly waive his benefits under EBWLC's Retirement Plan.

18. As discussed above, before the PBGC Settlement was reached, the Title IV Liabilities of the EBWLC Controlled Group members were nearly $8 million.  The PBGC Settlement resulted in a release of this entire liability in exchange for a payment of $2 million by Eber-Metro, plus an agreement by Lester and his wife to waive all their remaining pension entitlement, valued at approximately $1.4 million.  As a result, the PBGC Settlement conferred on

the common shareholders of EBCO and EBWLC (whomever they ended up being) a one-time benefit of approximately $6 million. Plaintiffs, who now own of all the common stock of EBCO (and therefore, indirectly, EBWLC) are now the sole beneficiaries of this settlement.

*The Authorization Documents*

19. At the time of the PBGC Settlement, the EBWLC preferred shares were issued to Lester in order to satisfy the technical ERISA requirement that he be the "majority owner" of EBWLC within the meaning of 29 C.F.R. § 4041.2 as of the date of the PBGC Settlement, and to provide needed liquidity into EBWLC.

20. To issue the EBWLC preferred shares to Lester in order to settle the PBGC dispute, EBWLC proposed to (a) create a new class of Class B Junior Preferred Stock by amending the EBWLC charter (by action of the Board of EBWLC (the issuer) and the consent of EBCO (the holder of all the voting stock of the issuer)) and (b) authorize the sale of the shares to Lester (by action by the EBWLC Board), pursuant to N.Y.B.C.L. §§ 615, 803 and 805.

21. The corporate documents required to accomplish this type of transaction were straightforward and well understood by corporate lawyers. I am very familiar with the requirements of N.Y.B.C.L. §§ 615, 803 and 805, and have drafted Board and shareholder consents similar to these for clients many times throughout my career.

22. In this case, I prepared execution copies of the following documents (the "Authorization Documents"):

- Unanimous written consent of the EBCO Board authorizing Lester to execute a shareholder consent appointing Wendy as a director of EBWLC so that she could authorize EBWLC'S Authorization Documents;

- Unanimous written consent of EBCO (as the sole holder of EBWLC voting stock) appointing Wendy as sole director of EBWLC so that she could authorize EBWLC'S Authorization Documents;

- Unanimous written consent of EBCO (as the sole holder of EBWLC voting stock) consenting to the EBWLC charter amendment (the "Charter Amendment") to create the new preferred shares (the "Shareholder Consent");

- Unanimous written consent of EBWLC approving the form of the EBWLC Charter Amendment and authorizing the purchase agreement for the EBWLC preferred shares between EBWLC and Lester; and

- The EBWLC charter amendment.

23. At the direction of Wendy, who at the time was the sole decisionmaker at both the EBCO and EBWLC corporate levels, I drafted the five Authorization Documents in January and February 2017 prior to the finalization of the PBGC Settlement.

24. During the six-month period leading up to the PBGC Settlement closing on February 24, 2017, Lester, Wendy and their advisors were extremely busy with an extensive amount of work relating to the Settlement, including completing a variety of very difficult negotiations with PBGC staff, negotiating an entirely new $5 million bank credit facility with a new lending bank, Citizens Bank, New Haven, CT, to finance the majority of the Settlement, and putting the EBWLC preferred share issuance in place. Drafting the Authorization Documents for the shares was a minor part of the overall arrangements for the PBGC Settlement closing and were interspersed among the many other urgent tasks that needed to be done before closing.

25. With respect to the Authorization Documents, Wendy's primary focus was on finalizing the EBWLC Charter Amendment because it needed to be signed and sent to the New

7

York Department of State in Albany for filing before the PBGC Settlement closed.  A signed copy of that document was filed with the New York Department of State on February 16, 2017.  I did not send this document to the New York Department of State for filing, but retrieved a copy on June 29, 2023 from public records.  *See* Ex. A.

26. In February 2017, before the closing of the PBGC Settlement, I provided Wendy with an execution copy of each of the five Authorization Documents.  It was my general practice to provide Wendy and Lester with execution forms of documents either electronically in PDF form (not Microsoft Word) or to have paper copies delivered to them.[2]  This is my standard practice with other clients as well (and the practice of most other corporate lawyers I know) to make sure that I know exactly what form of the document is being signed.

27. Consistent with this practice, I kept unsigned execution copies of all five Authorization Documents in my hard copy files.

28. It has been my practice to retain the paper copies of the final unsigned forms of the documents that I send to clients for execution in a working file and to include therewith the signed version of such documents if I received them back from clients.  Although Wendy would sometimes send me copies of new or old Board or shareholder minutes or consents from time-to-time, it was by no means a consistent practice.  Often, when documents were provided to her to sign, I would not receive back an executed version for my files.

29. I do not have any record (by email or otherwise) of receiving executed versions of the Authorization Documents back from Wendy in 2017.  However, that is not surprising given

---

[2] In January-February 2017, I was still commuting between San Francisco and New York and would regularly meet with Wendy and Lester in-person.  I subsequently relocated permanently to California, where I currently reside. Between January 2017 and December 2019, I moved my entire office and files twice to different home offices.

that, as stated above, I was not responsible for maintaining corporate minute books for any of the Eber companies.

30. In the Motion, Plaintiffs' claim that I forged Wendy's signature and/or fraudulently back-dated the Shareholder Consent. That is false and outrageous. I did not affix Wendy's signature or date on any of the five Authorization Documents. I did not physically witness Lester or Wendy sign or date any of the five Authorization Documents. The Motion also suggests that I may have affixed some type of electronic signature for Wendy onto the Shareholder Consent. I did no such thing. I have never used any type of electronic signature software as part of my practice to facilitate the execution of documents, and I certainly did not do that here.

31. The Motion also makes reference to a footnote in Plaintiffs' Trial Brief (DE 428), which states: "transaction documents produced during discovery had headers and footers, though they concealed the year when they were printed. . . . By contrast, the document that Mr. Herbert supposedly sent to Wendy by means "other than by email" has no header or footer." (*See* DE 428, n.8 (citations omitted)). I have no idea what any of these "headers and footers" referenced in Plaintiffs' submission are or where they came from. They did not exist on the Authorization Documents when I provided them to Wendy in 2017.

32. In connection with this litigation, it was my understanding that Wendy or Lester provided all relevant documents, including the Authorization Documents, to Underberg in connection with discovery.

33. I subsequently learned that four of the five Authorization Documents were produced by Underberg in discovery between September 2017 and June 2019 and that the Shareholder Consent was produced by Underberg on December 6, 2019.

9

34. After Underberg produced the Shareholder Consent on or around December 6, 2019, in response to an inquiry from Plaintiffs, I was asked by Underberg to search my files for records relating to the Shareholder Consent. After a diligent, good faith search I located the above-described unsigned execution versions of the Shareholder Consent and other Authorization Documents in my files. I did not have signed versions of the Authorization Documents or electronic records relating to the Shareholder Consent. I communicated this information to Underberg and understand that Underberg, in turn, promptly provided this information to Plaintiffs.

**The Present Motion**

35. Attached as Exhibit B is a true and correct copy of relevant excerpts of the settlement agreement between Plaintiffs and Defendants, which I received in August 2023, after the Motion was filed.

36. Attached as Exhibit C is an email between Brian Brook, counsel for Plaintiffs, and David Slossberg dated April 20, 2023, which I also received subsequent to the filing of this Motion.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 14th day of August, 2023
At Novato, California

*/s/ John S. Herbert*
John S. Herbert