UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DANIEL KLEEBERG, LISA STEIN, and AUDREY HAYS,<br><br>　　　　　　Plaintiffs,<br>　v.<br><br>WENDY EBER, in her individual capacity and as Executrix u/w/o LESTER EBER; ALEXBAY, LLC f/k/a LESTER EBER, LLC; LUCIA GORDON GUMAER and PATRICK D. MARTIN solely in their capacities as Executors under the will of ELLIOTT W. GUMAER, JR.; and,<br><br>　　　　　　Defendants,<br>　and<br><br>EBER BROS. & CO., INC.; EBER BROS. WINE AND LIQUOR CORP.; EBER BROS. WINE & LIQUOR METRO, INC.; EBER-CONNECTICUT, LLC; EBER-RHODE ISLAND, LLC; EBER BROS. ACQUISITION CORP.; EBER-METRO, LLC; SLOCUM & SONS OF MAINE, INC.; and CANANDAIGUA NATIONAL BANK & TRUST COMPANY,<br><br>　　　　　　Nominal Defendants. | Civil Action No. 16-CV-9517(LAK)(KHP) |

**REPLY IN SUPPORT OF PLAINTIFFS' MOTION
TO IMPOSE SANCTIONS ON JOHN HERBERT**

Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 257-2334
Brian@brook-law.com
*Attorneys for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

Plaintiffs Audrey Hays, Daniel Kleeberg, and Lisa Stein respectfully submit the following reply in support of their motion to impose sanctions on John Herbert 28 U.S.C. § 1927, and the Court's inherent power.

After considering the Second Circuit authority cited by Underberg & Kessler regarding the timing of Rule 37 sanctions, Plaintiffs have elected to withdraw that portion of their motion.

**ARGUMENT**

**A. The Motion Was Promptly Filed After Judge Kaplan Made the Factual Finding that the Purported Document Was Not Authentic**

John Herbert admits to authoring a document that Judge Kaplan found did not exist. Judge Kaplan only made that finding on March 30, 2023. And yet, Herbert's lead argument is to contend that this June 2023 motion was untimely. Not a good argument, but it is his strongest.

It is absurd to suggest that a clock started ticking to move for sanctions against Herbert while the underlying factual question of whether the document was authentic or not remained unresolved. If Judge Kaplan had reached a contrary conclusion, this motion would not have been filed. Moreover, as Herbert himself points out, he only entered an appearance in this case in 2021, so no motion for sanctions could have been filed before then. The timing issue raised by Herbert is yet another example of defense counsel trying to find a "silver bullet" to avoid a decision on the merits.

And there should be no mistake: Judge Kaplan necessarily and clearly ruled that this purported shareholder authorization was phony, and that the absence of any authentic authorization supplied an additional, independent basis to invalidate the transaction:

> Additionally, New York law requires approval by "vote of a majority ... of shareholders" to create a new class of shares. N.Y. B.C.S. § 803(a). No such vote ever took place, ***and there was no written authorization in lieu of a vote***.

Op. 77 n.28 (emphasis added). Given that Herbert and his client submitted a document that purported to be such a "written consent" of all the shareholders entitled to vote, *see* DX AA at 9, Judge Kaplan necessarily ruled that that document was an incredible fabrication.

1

### B. Herbert Offers No Explanation—Not Even Speculation—For What He Did with the Microsoft Word Document He Admits He Drafted

Herbert nakedly claims that he drafted this document back in 2017 along with the other transaction documents. He offers only partial speculation as to why there is *zero* objective evidence that the document existed until after Plaintiffs moved for partial summary judgment based on the non-existence of that very document.

Herbert offers that he is an extremely experienced attorney, having been a partner in many prominent law firms for decades. Herbert Decl. ¶ 2. Much of Herbert's Declaration is devoted to talking about his supposed "general practices" and how, based on inferences from those, he *could have* given the unsigned shareholder authorization to Wendy Eber in person. He does not say outright that he actually did so. But he speculates that it was possible because he recalls doing so sometimes and he was allegedly in New York at some point around February 2017. He offers no travel records or the like that would corroborate the inference he wants.

Herbert claims to have kept unsigned execution copies of the documents in hardcopy, as if that implies that he handed similar documents to Wendy (it doesn't). Notably, a scan of the alleged hardcopy is not even an exhibit to his Declaration. *Id.* ¶ 27.[1] Nonetheless, Herbert details his general practices in this regard. *Id.* ¶ 28.

Herbert conspicuously omits to mention any "general practice" with respect to keeping the underlying Word files. Herbert does not claim to hammer documents out on a typewriter. On the contrary, he admits that he sometimes sends "Microsoft Word" documents (but only as to other transactions, supposedly). *Id.* ¶ 26. As a transactional lawyer, retaining the Word documents makes much more sense than hardcopies of unsigned paper, because the Word document can be edited if the transaction requires correction, or otherwise used as precedent if a similar transaction arises in the future.

---

[1] The omission of a scan of the alleged hardcopy in his files is more strange than significant, since Herbert references the lack of header and footer on whatever copies he may have and the best evidence rule would appear to require the submission of the documents themselves. It is insignificant, however, because there is no doubt that Herbert is capable of printing out unsigned hardcopy documents, and then scanning those documents, since that avoids conveying the crucial metadata showing when the unsigned document was drafted.

2

Herbert obviously keeps the Word documents he drafts. His omission to mention that part of his practice here is because he *knows* that the metadata in them—specifically the "Date Modified"—would prove that it was done years later to correct an omission from the February 2017 transaction. And if he claims to have not retained these particular Word files, that would be even more suspicious than his attempt to avoid describing his drafting practices altogether.

There is only one reasonable explanation for why Herbert has no evidence, not even a Word file, to corroborate his claimed timing: Because none ever existed. Of course, this is not a criminal proceeding and Plaintiffs do not have to exclude every "reasonable" alternative in order to prevail. Nonetheless, Herbert's position would require this Court believing that he does not retain Word files for the transaction documents that he drafts. Crucially, *even Herbert does not assert such an absurd claim*, choosing instead to hope that his glaring omission goes unnoticed.

It is simply unbelievable that Herbert kept no copy of what he prepared for the Ebers, much less any record of its transmission to them. Even if this had been a routine corporate transaction, such recordkeeping would be dubious. But this transaction was connected to resolving a litigation dispute with the PBGC. And, moreover, it was effectuated in February 2017, shortly after this litigation had been initiated against the Ebers. There is no *legitimate* reason why Herbert would have deleted the Word documents for this important transaction.

Herbert admits that the underlying transaction was somewhat rushed and that there were reasons why people were not paying close attention; this could explain his mistake in 2017.[2] But he is apparently trying to suggest that Wendy Eber neglected to sign the document and then later signed and backdated it herself without his involvement. But even if one were to buy into his detailed story about how documents *could* have been given to her by hand (again, he offers no travel records to suggest that such an in-person meeting occurred, despite spending the resources to hire top-notch counsel to imply that it did) and insinuation that there was a comity of errors

---

[2] Herbert's initial omission of the shareholder approval document from the set of transaction documents in 2017 was tantamount to malpractice because it rendered the authorization of new shares void (assuming the entire transaction was not voidable for other independent reasons, as Judge Kaplan also held). Thus, he had a strong personal incentive to avoid that outcome.

3

outside his control, that still does not explain the lack of the original Word files, nor his deliberate avoidance of mentioning his general practice in that regard.

As the author, out of all the lawyers in this case, only Herbert would have necessarily known that this document was prepared after-the-fact and backdated.[3] Underberg and Farrell Fritz may well have suspected that the document was thus a forgery, and their defense of it was tepid indeed.[4] But they probably did not *know*.

Herbert entered an appearance on the docket in this case, but he would have this Court conclude that it cannot punish him for having attempted to subvert the integrity of these proceedings by fabricating a document. Unlike Underberg, Herbert was at every moment of the trial. And at that trial, Defendants offered the fabricated document into evidence. Unlike trial counsel Farrell Fritz, Herbert knew the document's true origin. If there is anyone to sanction for introducing forged evidence at trial (besides Wendy Eber, whom Kaplan already addressed through his verdict with punitive damages), it is Herbert.

In sum, excluding Herbert's incomplete speculation based on some of his general practices, there is no evidence corroborating Herbert's claim about the timing. No Word documents with metadata. No contemporaneous emails showing how he sent the document from his home in California to Wendy and Lester Eber. And on the face of the documents themselves, the absence of any header or footer from printing distinguishes this late-produced document from all the rest. *Compare* PX 43 (showing 8 sequentially numbered pages with partial headers and footers) *with* PX 270 at 2. Defense counsel was clearly aware of the header/footer problem, which is why they enlarged the documents in their own submission to the Court. *See* DX AA at 1-8 (showing the same Bates numbered pages as PX 43, but without the partial headers and footers). They tried to make all nine pages look the same, but one was different.

---

[3] Plaintiffs do not contend that Herbert forged Wendy's signature or applied the incorrect date himself. Wendy was undoubtedly a willing participant in the attempt to defraud this Court. By providing the underlying unsigned document to Wendy so that she could sign and backdate it, however, Herbert was just as guilty.

[4] *See, e.g.*, Defs. Proposed Findings of Fact & Conclusions of Law ¶ 319 (discussing the 750 voting preferred shares without arguing that the Court should accept the phony document as true).

While Herbert himself may not have forged Wendy's signature, he enabled her to sign a backdated document. But for his doing so, the defense would have been forced to concede that the necessary shareholder authorization was absent, and this 750-voting-preferred-shares issue could have been eliminated before trial. The sanction sought here is the financial equivalent of a slap on the wrist. But if not even that much is meted out, the growing trend of lawyers doing anything to help their clients win will continue, to the detriment of the courts and honest litigants alike. That is why, despite the fact that no evidence will ever be one-hundred-percent conclusive, in instances like this—with clear, convincing, and compelling evidence of lawyer malfeasance to subvert the Court's truth-seeking function—sanctions should issue.

## CONCLUSION

For the foregoing reasons, the Court should sanction John Herbert in the amount of $14,875.

Respectfully submitted,

/s Brian C. Brook
Brian C. Brook (BB 1980)
BROOK & ASSOCIATES, PLLC
100 Church Street, 8th Floor
New York, New York 10007
Telephone: (212) 256-1957
Facsimile: (646) 257-2887
Brian@brook-law.com

*Counsel for Plaintiffs Daniel Kleeberg, Lisa Stein, and Audrey Hays*

Dated: August 28, 2023